# EXHIBIT 2

# EXHIBIT 3

**FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM** INDEX NO. 160694/2019
NYSCEF DOC. NO. 58 Case 1:20-cv-07311-LAK Document 12-6 Filed 09/14/20 Page 3 of 149
RECEIVED NYSCEF: 02/18/2020



2001 M Street NW, 10th Floor
Washington, DC 20036

WWW.WILKINSONWALSH.COM

A LIMITED LIABILITY PARTNERSHIP

WASHINGTON, D.C. | LOS ANGELES | NEW YORK

January 13, 2020

*By FedEx Overnight Delivery*

John P. Asiello, Esq.
Clerk of Court
New York State Court of Appeals
20 Eagle Street
Albany, New York 12207
Phone: (518) 455-7700

**Re:** *Summer Zervos v. Donald Trump*, **Index No. 150522/2017**

Dear Mr. Asiello:

We represent Summer Zervos in the above-referenced defamation action against Defendant Donald J. Trump. In an order dated January 7, 2020, the First Department, Appellate Division, denied the Defendant's motion to reargue the Division's prior order allowing Ms. Zervos's defamation suit against him to go forward. The First Department did, however, grant leave for this Court to determine whether the First Department's ruling was correct and, without providing any reasoning, issued a stay of *all* trial court proceedings while this Court's decision is pending.

Ms. Zervos filed her lawsuit nearly two years ago, and yet the parties are still litigating threshold issues. During those two years she has successfully defended against numerous pretrial motions and six stay requests while making every effort to complete discovery on schedule. Now, just as the parties were set to begin depositions, her case has been put on hold while the Court determines a question that has already been fully briefed and decided in her favor three times.[1]

---

[1] Ms. Zervos has successfully briefed the very question presented to the Court of Appeals for the trial court, the Appellate Division, and yet again in response to Defendant's latest motion to reargue the Appellate Division's order. The record reflects over 300 pages of substantive briefing.

At every juncture, and despite repeated efforts by the Defendant to delay this action, Ms. Zervos has worked diligently to move this case to trial as quickly as possible. She remains eager to bring her claim to resolution before witness testimony critical to this defamation action fades to memory.

Accordingly, to avoid further undue delay, Ms. Zervos respectfully requests that the Court resolve this interlocutory appeal using its alternative review procedure and on as expedited a schedule as is practicable, pursuant to Section 500.11(b)(5) of the Court's Rules of Practice. That procedure, which allows the Court to decide the question before it without full briefing and without oral argument, is appropriate here. There are no new issues for this Court's consideration. This appeal can and should be decided on the fulsome submissions that have already been presented to two lower courts. *See* Rule 500.11(a). Re-briefing and re-arguing the same question would only cause undue and unjust delay and waste judicial resources. Furthermore, to the extent that this Court believes that further submissions are necessary, the supplemental letter briefing contemplated under Rule 500.11(a) would be more than sufficient.

Moreover, this appeal is a good candidate for alternative procedure review because it presents a narrow issue that is not of *state-wide* importance. *See* Rule 500.11(b)(3). Indeed, the question presented implicates *only* the sitting President of the United States, and no other potential defendant.

In the alternative, if the Court desires additional briefing and argument, Ms. Zervos requests that the schedule be expedited to allow for oral argument no later than during the Court's March session, which currently lists four available argument dates.

Finally, Ms. Zervos requests that this Court lift the stay of trial court proceedings while this is appeal is pending so that discovery can continue as scheduled.[2] Defendant would not be prejudiced by expedited treatment of this threshold issue. To the contrary, despite his multiple attempts to stay this case,

---

[2] This Court is empowered to "vacate, limit or modify any stay" imposed by "[t]he court from or to which an appeal is taken or the court of original instance." *See* N.Y. C.P.L.R. 5519(c). Furthermore, Defendant's argument that the Supremacy Clause requires that this case be stayed while he is President is premised primarily on a concern that the court might have to sanction him based on his conduct *during his deposition*. Every other deposition and all fact discovery can be completed without implicating the Defendant's concern. Accordingly, even if the Court concludes that some form of stay is appropriate, Ms. Zervos requests that the stay be limited to the deposition of the Defendant himself, and that the parties be allowed to continue with all remaining discovery.

Defendant himself has received expedited review of his own lawsuits filed in other courts this year. *See, e.g.*, *Trump v. Vance*, No. 19-3204 (2d Cir. Oct. 7, 2019) (order granting expedited consideration of President Trump's emergency appeal of the district court's decision dismissing the President's complaint); *Trump v. Mazars USA*, No. 19-5142 (D.C. Cir. May 23, 2019) (order setting expedited briefing and argument in President Trump's appeal of the district court's decision entering judgment against President Trump).

For the reasons stated above, Ms. Zervos requests that that the Court invoke its alternative review procedure or, in the alternative, set an expedited briefing schedule with oral argument to be held no later than the Court's March session. Ms. Zervos also requests that the Appellate Division's stay be lifted during the pendency of this appeal.

Sincerely,

Beth A. Wilkinson
Jaclyn Delligatti
2001 M Street, N.W., 10th Floor
Washington, DC 20036
(202) 847-4000
bwilkinson@wilkinsonwalsh.com
jdelligatti@wilkinsonwalsh.com

Moira Kim Penza
Meghan Cleary
130 West 42nd Street, Suite 1402
New York, NY 10036
(929) 264-7765
mpenza@wilkinsonwalsh.com
mcleary@wilkinsonwalsh.com

WILKINSON WALSH + ESKOVITZ LLP
*Attorneys for Plaintiff*

cc: All Counsel, via FedEx and Email.

3

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

------------------------------------x

SUMMER ZERVOS,

Plaintiff-Respondent,

v.

DONALD J. TRUMP,

Defendant-Appellant.

------------------------------------x

Index No. 150522/2017

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE** that, upon the accompanying Affirmation of
Marc. E. Kasowitz, dated November 18, 2019, and memorandum of law,
defendant-appellant President Donald J. Trump will move this Court at the
Appellate Division, First Judicial Department, located at 27 Madison Avenue, New
York, New York, 10010, on _____, 2019, at 10:00 AM, or as soon
thereafter as counsel can be heard. Specifically, President Trump will move this
Court for an Order granting reargument of this Court's March 14, 2019 Decision
and Order pursuant to CPLR 2221 and 22 N.Y.C.R.R. § 1250.16 or, alternatively,
for leave to appeal to the Court of Appeals pursuant to CPLR 5602 and 22
N.Y.C.R.R. § 1250.16, as well as for a stay of the proceedings in the Supreme
Court, New York County pursuant to CPLR § 5519(c).

Dated:  November 18, 2019

KASOWITZ BENSON TORRES LLP

By: _____

Marc E. Kasowitz
Christine A. Montenegro
Paul J. Burgo
Kevin A. Cyrulnik

1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Defendant-Appellant*
*Donald J. Trump*

**TO:** Counsel of Record

# EXHIBIT 5

At a Term of the Appellate Division of the Supreme
Court held in and for the First Judicial Department in
the County of New York on January 7, 2020.

Present - Hon. Dianne T. Renwick,        Justice Presiding,
                Angela M. Mazzarelli
                Troy K. Webber
                Cynthia S. Kern,        Justices.

-------------------------------------X
Summer Zervos,

     Plaintiff-Respondent,
                                          M-8288
          -against-                Index No. 150522/17

Donald J. Trump,

     Defendant-Appellant.
-------------------------------------X

     Defendant-appellant having moved for reargument of or, in
the alternative, for leave to appeal to the Court of Appeals,
from the decision and order of this Court, entered on March 14,
2019 (Appeal No. 7610), and, if leave to appeal to the Court of
Appeals is granted, for a stay of proceedings in the Supreme
Court, New York County, pending hearing and determination of the
appeal by the Court of Appeals,

     Now, upon reading and filing the papers with respect to the
motion, and due deliberation having been had thereon,

     It is ordered that the motion, to the extent it seeks
reargument, is denied.  The motion, to the extent it seeks leave
to appeal to the Court of Appeals, is granted and this Court,
pursuant to CPLR 5713, certifies that the following question of
law, decisive of the correctness of its determination, has
arisen, which in its opinion ought to be reviewed by the Court of
Appeals:

     Was the order of Supreme Court, as affirmed by the
     this Court, properly made?

     This Court further certifies that its determination was made
as a matter of law and not in the exercise of discretion, and it
is further,

FILED: NEW YORK COUNTY CLERK 02/18/2020 02:53 PM
NYSCEF DOC. NO. 60

INDEX NO. 160694/2019
RECEIVED NYSCEF: 02/18/2020

(M-8288)                          -2-                    January 7, 2020


        Ordered that the motion, to the extent is seeks a stay of
proceedings pending hearing and determination of the appeal by
the Court of Appeals, is granted.


                        ENTERED:


                                    _____
                                            CLERK

# EXHIBIT 6



*State of New York*
*Court of Appeals*

*John P. Asiello*
*Chief Clerk and*
*Legal Counsel to the Court*

*Clerk's Office*
*20 Eagle Street*
*Albany, New York 12207-1095*

January 21, 2020

Kasowitz Benson Torres LLP
Attn: Marc E. Kasowitz, Esq.
1633 Broadway
New York, NY 10019-6708

Wilkinson Walsh & Eskovitz, LLP
Attn: Beth A. Wilkinson, Esq.
2001 M Street NW, 10th Floor
Washington, DC 20036-7500

### Re: Zervos v Trump
### APL-2020-00009

Dear Counselors:

This acknowledges receipt of Ms. Wilkinson's January 13, 2020 letter, Mr. Kasowitz's January 16, 2020 letter, and appellant's preliminary appeal statement, with attachments. The appeal will proceed in the normal course of briefing and argument as outlined below. With respect to respondent's request that the Court lift the stay imposed by the Appellate Division, any such request must be made by motion to the full Court pursuant to Section 500.21 of the Court's Rules of Practice.

### Briefing Schedule for Appeal

Appellant's brief and record material shall be served and filed by March 9, 2020. Failure to comply with this due date or such due date as extended pursuant to section 500.15 of the Court of Appeals Rules of Practice (the Rules) shall subject the appellant to dismissal of the appeal (see section 500.16[a] of the Rules). Appellant shall remit the fee required by section 500.3 of the Rules (currently $315.00 in the form of an attorney's check, certified check, cashier's check or money order payable to "State of New York, Court of Appeals").

Respondent's brief and any supplementary record material shall be served and filed by April 24, 2020. Failure to comply with this due date or such due date as extended pursuant to section 500.15 of the Rules shall subject the respondent to preclusion (see section 500.16[b] of the Rules).

Appellant may serve and file a reply brief by May 11, 2020.

Case 1:20-cv-07311-LAK    Document 12-6    Filed 09/14/20    Page 14 of 149

Zervos v Trump
-Page 2-
January 21, 2020

Parties are expected to comply with the service and filing dates stated above. "Filed" means receipt of the paper document by the Clerk's Office. The procedure for requesting an extension, which requires a showing of good cause, is set forth in section 500.15 of the Rules.

## Covers and Contents of Filed Documents

Parties should review and comply with all of the general requirements in section 500.1 of the Rules (e.g., no plastic covers, no sharp metal fasteners, affidavit of service stapled to inside back cover of document labeled "original"), as well as the specific requirements for filings in normal course appeals in sections 500.12, 500.13 and 500.14 of the Rules. Please note the word and page limits for all briefs (see section 500.13[c] of the Rules).

In addition, all filed documents shall display on their covers the letter-number combination listed under the subject line of this letter. Parties also are reminded that citations in briefs to testimony, affidavits, jury charges or exhibits shall be to such material provided to the Court in appellant's record or appendix or in respondent's supplementary appendix, if filed (see section 500.14 of the Rules). The Clerk's Office encourages the filing of any appendix as a separately bound submission.

In preparing briefs and record material, counsel should take careful note of the requirements concerning confidential and sensitive information, and possible sealing or redaction responsibilities (see enclosed notice).

## Digital Filing Requirements

Parties also are required to submit digital versions of each paper filing (see sections 500.2, 500.12[h] and 500.14[g] of the Rules) by uploading them to the Court of Appeals Public Access and Search System (Court-PASS) accessed through the Court's web site (www.courts.state.ny.us/ctapps). A document containing the Technical Specifications and Instructions for Submission of Briefs and Record Material in Digital Format (including Naming Conventions) is enclosed and is available on the Court's web site.

For Court-PASS, parties to this appeal will use **APL-2020-00009** as the Login Number. Attorneys admitted to practice in New York State must also enter their attorney registration number and password from their New York Unified Court System's Attorney Online Service Account. Attorneys who do not have such an account may create one through a link on Court-PASS. Filers who are not registered New York attorneys must call the Clerk's Office at one of the phone numbers below to obtain guest login credentials.

Zervos v Trump
-Page 3-
January 21, 2020

For uploading purposes, appellant's digital brief shall have the following file name: **ZervosvTrump-app-Trump-brf.pdf**. Appellant also shall follow the PDF file naming conventions with respect to the digital submission of record material. All digital record material shall be submitted in separate files. Respondent's digital brief shall have the following file name: **ZervosvTrump-res-Zervos-brf.pdf**. Appellant's reply brief, if any, shall have the following file name: **ZervosvTrump-app-Trump-replybrf.pdf**.

Counsel are reminded of their obligation to ensure that the contents of the digital submissions are identical to those filed in hard copy, with the exception that the digital version need not contain an original signature (see section 12 of the enclosed Technical Specifications and Instructions for Submission of Briefs and Record Material in Digital Format).

When uploading digital versions of filed documents, counsel will be required to fill out an attestation form regarding confidential and/or sensitive information. A copy of such form may be viewed in the Court-PASS area of the Court's web site.

Counsel should review the enclosed "Checklist for Normal Course Appeal Filings" before filing and uploading a brief and/or record material.

## **Argument Scheduling and Parties' Continuing Responsibilities**

A copy of the Court's calendar of upcoming argument sessions is enclosed. Pursuant to section 500.17 of the Rules, counsel have a continuing duty to notify the Clerk's Office of days of known or possible unavailability for oral argument during the Court's scheduled sessions (indicated by the highlighted days on the enclosed calendar). Counsel should review possible argument dates after the date set for filing of appellant's reply brief above, and call the Clerk's Office at least two months in advance of any dates of unavailability. After an argument date is set by the Court, it will not be changed absent good cause.

Requests for argument time must be indicated on the cover of the party's brief. Unless otherwise permitted by the Court upon advance written notice, counsel may request no more than 30 minutes of oral argument time. The Court considers these requests in setting the actual argument times in each appeal.

Generally, counsel of record will be advised of the scheduled argument date at least one month in advance. Approximately two weeks before the scheduled argument date, the Clerk's Office will send to counsel of record a Notice to Counsel, the Court's

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 16 of 149

Zervos v Trump
-Page 4-
January 21, 2020

Day Calendar with assigned argument times, and information on obtaining the Court's decision in the case.

Pursuant to section 500.6 of the Rules, the parties must keep the Clerk's Office apprised of all developments affecting this appeal, including: contemplated and actual settlements; circumstances or facts that could render the matter moot; pertinent developments in applicable law, statutes and regulations; and changes in the status of ongoing related proceedings, if any, at an administrative agency, Supreme Court, the Appellate Division or any other court.

Questions may be directed to Margaret Wood at 518-455-7702 or Edward Ohanian at 518-455-7701.

Very truly yours,

John P. Asiello

JPA/MNW/ni
Encs.

# EXHIBIT 7

# KASOWITZ BENSON TORRES LLP

MARC E. KASOWITZ
DIRECT DIAL: 212-506-1710
DIRECT FAX: 212-835-5010
MKASOWITZ@KASOWITZ.COM

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

January 16, 2020

Via Federal Express

John P. Asiello, Esq.
Clerk of Court
New York State Court of Appeals
20 Eagle Street
Albany, New York 12207

      Re:    *Summer Zervos v. Donald Trump*, Index No. 150522/2017

Dear Mr. Asiello:

We represent appellant President Donald J. Trump in this appeal.[1]  We write in response to respondent Summer Zervos's counsel's letter, dated January 13, 2020, in which she requests that the "Court invoke its alternative review procedure or, in the alternative, set an expedited briefing schedule with oral argument to be held no later than the Court's March session" and that the Appellate Division's stay pending President Trump's appeal be lifted.

Respondent's requests should be denied.[2]  This appeal concerns whether, under the Supremacy Clause of the U.S. Constitution, state courts have jurisdiction to hear actions against a sitting U.S. President -- which the U.S. Supreme Court in 1997 called an "important constitutional issue," *Clinton v. Jones*, 520 U.S. 681, 690-91 (1997), and which remains, as the Appellate Division correctly noted, "a constitutional issue of first impression," *Zervos v. Trump*,

---

[1]     On January 7, 2020, the Appellate Division, First Department, granted leave to appeal to this Court. *Zervos v. Trump*, No. 150522/17, M-8288 (1st Dep't Jan. 7, 2020).  Appellant is filing herewith his preliminary appeal statement pursuant to Rule 500.9.

[2]     Given that a letter "initiating the alternative review procedure" has not been (and should not be) issued under Rule 500.11(a), this does not constitute a letter under Rule 500.11(c)(2).  However, for the avoidance of doubt, none of the enumerated reasons in Rule 500.11(b) to employ the Court's alternative review procedures apply here, and appellant reserves all arguments made in his intermediate appellate court briefs.  This letter does respond to respondent's other requests and addresses the serious misstatements and inaccuracies in respondent's letter. Respondent's requests to expedite the appeal and to vacate or modify the Appellate Division's stay pending this appeal are not only substantively meritless (as shown below), but are also procedurally improper.  Her request, pursuant to CPLR 5519(c), to vacate or modify the stay should be made by formal motion pursuant to Rule 500.21. To the extent that her request to "expedite" the appeal is a request for a calendar preference, she failed to follow the requirements of Rule 500.17(b).

John P. Asiello, Esq.
January 16, 2020
Page 2

171 A.D.3d 110, 113 (1st Dep't 2019). As such, the appeal merits full briefing and argument before this Court, and there is no reason to expedite this appeal or to vacate or modify the Appellate Division's stay.

### A.   There is No Urgency to the Appeal.

There is no urgency to this appeal warranting the relief respondent seeks. Respondent herself has not treated this case, or this appeal, with any urgency.[3] Respondent never served a notice of entry of the Appellate Division's March 2019 order -- which could have and would have commenced the time limit for appellant to move for leave to appeal from that order earlier than October 18, 2019, when appellant filed the notice of entry (NYSCEF Doc. No. 248). *See* CPLR § 5513(b); *see also* New York State Court of Appeals, *Civil Motions Frequently Asked Questions*, *available at* https://www.nycourts.gov/ctapps/civilmotfaq.htm (last visited Jan. 16, 2020); David D. Siegel & Patrick M. Connors, *New York Practice* § 533 (6th ed. 2018) ("As a rule, the winning party should serve the . . . order (with notice of entry) on the loser" and "having won below, the respondent is the one with the incentive to get the appeal time running . . . .").

Nor has respondent litigated this action with any urgency or expedition in the trial court.[4] For example, appellant served document requests seeking financial documents related to respondent's claim of loss earnings on July 13, 2018; however, notwithstanding repeated admonitions and orders from the court (NYSCEF Doc. Nos. 249, 265), to this day, they have not been produced. For months, respondent has also improperly asserted privilege over documents, necessitating numerous court calls and *in camera* review; she ultimately withdrew the privilege designations for the great majority of those documents, many of which were not privileged on their face. Moreover, both parties jointly requested and received from the trial court at least four extensions of discovery deadlines. (*See* NYSCEF Doc. Nos. 230, 234, 242, 246.) Most recently, on November 1, 2019, respondent's former counsel requested and received from the court, with respondent's consent, a thirty-day extension of all court-ordered deadlines, declining to provide the reason for her request. (NYSCEF Doc. No. 265.) Then, on a November 14, 2019 court call, respondent's former counsel explained that respondent was transitioning to new counsel and requested and received an additional two-week hiatus.

In short, respondent's claim that she made "every effort to complete discovery on schedule" is false. Equally false is her assertion that appellant engaged in "numerous pretrial motions." In fact, appellant made only two pretrial motions in the trial court -- his motion to dismiss, at issue here, and a motion to bifurcate briefing on that motion, which appellant withdrew after reaching an agreement with respondent (NYSCEF Doc. No. 40). Respondent has made the *same* number of pretrial motions, including a largely unsuccessful motion to compel (NYSCEF Doc. Nos. 225) and a motion to de-designate documents produced and designated by

---

[3]     In her Complaint, respondent sought $2,914 in monetary damages and an "apology," arising from appellant's allegedly defamatory statements during his campaign for President.

[4]     Respondent's current counsel replaced her former counsel in late November 2019 and apparently is unfamiliar with the facts set forth herein.

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 20 of 149

John P. Asiello, Esq.
January 16, 2020
Page 3

a third-party, the Trump Organization, as confidential, which was quickly settled (NYSCEF Doc. No. 263).

Respondent's claim that appellant made "six stay requests" is misleading: among other things, respondent is counting requests for interim stays separately from the stay motions in the Appellate Division and in this Court (which held that it lacked jurisdiction).

It is irrelevant that, as respondent argues, the President "has received expedited review of his own lawsuits filed in other courts this year." In both *Trump v. Vance*, No. 19-3204 (2d Cir.) and *Trump v. Mazars USA*, No. 19-5142 (D.C. Cir.), cited by respondent, all parties requested expedited review, and there were urgent deadlines of public importance that required expedition. *Trump v. Vance*, No. 19-3204 (2d Cir.) involved the President's challenge to a subpoena to his accountant issued by a state prosecutor facing a statute of limitations deadline, ECF No. 99 at 1, 19, 51. *Trump v. Mazars USA*, No. 19-5142 (D.C. Cir.) involved the President's challenge to a subpoena to his accountant issued by the House of Representatives relating to pending legislation, Doc. No. 1789081. Respondent here has not articulated, because she cannot, any public interest or urgent deadline at stake that would justify deviating from the Court's ordinary briefing schedule.

Finally, allowing the present appeal to follow its ordinary course may well provide this Court with the benefit of the U.S. Supreme Court's decision in *Trump v. Vance*, --- S.Ct. ----, 2019 WL 6797730 (Mem) (U.S. Dec. 13, 2019) (No. 19-635), which is set to be heard during the Court's March Term, *id.*, and in which the President is challenging a state prosecutor's subpoena on, among others, Supremacy Clause grounds.

**B.    There is no Basis to Disturb the First Department's Stay**

There is also no basis to vacate or modify the Appellate Division's stay from its 3-2 decision. *Zervos v. Trump*, No. 150522/17, M-8288 (1st Dep't Jan. 7, 2020).

The stay ensures that the decisions below are reviewable by this Court and, if necessary, the U.S. Supreme Court. *See Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985) (holding a denial of immunity is "effectively unreviewable" after final judgment); *Alvarez v. Snyder*, 264 A.D.2d 27, 34 (1st Dep't 2000) ("[J]udicial immunity is an immunity from suit, not just from ultimate assessment of damages"). Moreover, numerous courts have recognized that a President's request for a stay pending appeal should be granted, given the deference due the President under the Constitution. *See Trump v. Mazars USA, LLP*, --- S.Ct. ----, 2019 WL 6328115 (Mem) (U.S. Nov. 25, 2019) (No. 19A545) (granting President Trump's motion to stay mandate); *Trump v. Deutsche Bank AG*, --- S.Ct. ----, 2019 WL 6797733 (Mem) (U.S. Dec. 13, 2019) (No. 19A640) (same); *United States v. Nixon*, 418 U.S. 683, 714 (1974); *Trump v. Vance*, No. 19-3204, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019) (order granting stay given "the unique [Constitutional] issues raised by the appeal"); *In re Trump*, 781 F. App'x 1, 2 (D.C. Cir. 2019); *In re Trump*, 928 F.3d 360, 368 (4th Cir. 2019); *Jones v. Clinton*, No. 95-1167 (8th Cir. Apr. 16, 1996) (granting President Clinton's "motion to stay the mandate" until "final disposition of the case by [the

John P. Asiello, Esq.
January 16, 2020
Page 4

Supreme C]ourt"); *Nixon v. Sirica*, 487 F.2d 700, 721 (D.C. Cir. 1973) (directing District Court to "provide a reasonable stay to allow the President an opportunity to appeal."); *Galicia v. Trump*, Index No. 24973/15E, M-7413 (1st Dep't Oct. 24, 2019) (granting the President a stay pending appeal from the trial court's order requiring him to appear for deposition).

This principle is so well recognized that, in *Vance*, *supra*, following the Second Circuit's initial, administrative stay, the parties -- including the New York County District Attorney, the Department of Justice, and the President -- all acknowledged that a stay was necessary, pending President Trump's appeal and his petition for *certiorari* to the U.S. Supreme Court. *See Vance*, No. 19-3204, 2019 WL 5703884, at *1 (granting administrative stay); Appellee's Letter, *Trump v. Vance*, No. 19-3204 (2d Cir. Oct. 21, 2019), ECF No. 136 (memorializing parties' agreement to a stay pending appeal and petition for *certiorari*); *Trump v. Vance*, --- S.Ct. ----, 2019 WL 6797730 (Mem) (U.S. Dec. 13, 2019) (No. 19-635). *See also Trump v. Mazars USA, LLP*, 940 F.3d 710, 718 (D.C. Cir. 2019) ("By agreement of the parties, Mazars need not comply with the subpoena during the pendency of this expedited appeal"), *cert. granted*, --- S.Ct. ----, 2019 WL 6797734 (Mem) (U.S. Dec. 13, 2019) (No. 19-715).

And, if anything, the stay here is likely required by the U.S. Constitution. *See Haywood v. Drown*, 556 U.S. 729, 736, 740-41 (2009) ("[A]lthough States retain substantial leeway to establish the contours of their judicial systems, they lack authority to nullify a federal right. . . . A State's authority to organize its courts, while considerable, remains subject to the strictures of the Constitution."); *Lerner v. Karageorgis Lines, Inc.*, 66 N.Y.2d 479, 485 (1985) (noting a state court must not "limit a party's [federal] substantive rights by applying its own procedural rules," but rather must give way to federal constitutional law).

Respondent's alternate request, to stay only the President's deposition, but allow all other discovery to proceed (Letter at 2 n.2), is also inappropriate. The immunity that the President seeks to vindicate on this appeal is not immunity from deposition, but rather temporary immunity from suit while in office. *See, e.g.*, *Clinton v. Jones*, 520 U.S. at 706 (recognizing that a stay originally imposed by the district court that allowed "discovery to proceed" -- prior to that court's issuance of a stay of all proceedings pending President Clinton's appeal of that decision -- "was not the functional equivalent of the constitutional immunity that petitioner claimed").

\*  \*  \*

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 22 of 149

John P. Asiello, Esq.
January 16, 2020
Page 5

Respondent's requests should be denied.

Respectfully,

Marc E. Kasowi[z]

cc: All Counsel, via FedEx and Email.

# EXHIBIT 8

Case 1:20-cv-07311-LAK Document 12-6 Filed 09/14/20 Page 24 of 149

Supreme Court
of the
State of New York



60 CENTRE STREET
NEW YORK, NY 10007

HON. DEBORAH A. KAPLAN
ADMINISTRATIVE JUDGE FOR CIVIL MATTERS

December 9, 2019

Roberta A. Kaplan, Esq.
Kaplan Hecker & Fink, LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118

Re: Carroll v Trump
Index No. 160694/2019

Counsel:

Justice Deborah A. Kaplan is in receipt of plaintiff's counsel's letter request to transfer the above-captioned case from Justice Doris Ling-Cohan to Justice Jennifer Schecter based on the contention that a related case is pending before Justice Schecter. Justice Kaplan is also in receipt of the defendant's opposition to such request.

Judge Kaplan declines to transfer the case to Justice Schecter.

Sincerely,

Joan Levenson, Esq.
Principal Law Clerk to Administrative Judge
Deborah A. Kaplan

cc: Lawrence S. Rosen, Esq.
LaRocca Hornik Rosen & Greenberg, LLP
The Trump Building
40 Wall Street, 32nd Floor
New York, New York 10005

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 25 of 149

# EXHIBIT 9

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 26 of 149

**Hobday, Erin** <Erin.Hobday@hearst.com>    Dec 11, 2019, 3:57 PM    ☆    ↩    ⋮
to me ▾

Dear E. Jean,

Thank you for taking the time to speak with me today. It is with deep regret that I am writing to confirm that we are terminating your contract with Elle magazine and neither party will have any further obligation to one another (except for payments mentioned noted below). We and your readers so appreciate your many years of work for the magazine, and the wonderful columns you contributed to our publication. We will miss you tremendously.

Please confirm that you have received this email and send us an invoice for the remaining 5 columns on your contract, so we can be sure to process it before the end of the year.

Warmest,
Erin Hobday

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 27 of 149

# EXHIBIT 10

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 28 of 149

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------x
                                           :
SUMMER ZERVOS,                             :   Index No. 150522/2017
                                           :
                        Plaintiff,         :   Hon. Jennifer G. Schecter
                                           :
             v.                            :   Motion Seq. No. 003
                                           :
DONALD J. TRUMP,                           :
                                           :
                        Defendant.         :
                                           :
-------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF PRESIDENT DONALD J. TRUMP'S
MOTION TO DISMISS AND STRIKE THE COMPLAINT PURSUANT TO CPLR 3211
AND CAL. CODE CIV. P. § 425.16(B)(1) OR, IN THE ALTERNATIVE, FOR A STAY
PURSUANT TO CPLR 2201**



KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Christine A. Montenegro
Paul J. Burgo

1633 Broadway
New York, New York 10019
P: (212) 506-1700

*Attorneys for Defendant Donald J. Trump*



July 7, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    Ms. Zervos's Politically Motivated Lawsuit ........................................................... 4

    B.    Ms. Zervos's Allegations Are False ....................................................................... 7

    C.    Ms. Zervos Admittedly Seeks Overly Broad  Discovery For Extra-Judicial Purposes ................................................................................... 7

    D.    The Allegedly Defamatory Statements Are Not Actionable ................................. 9

ARGUMENT ..................................................................................................................... 10

I.    This State Court May Not Exercise Jurisdiction Over A  Civil Suit Against The President During His Presidency ............................................................. 10

    A.    The Suit Is Barred By The Supremacy Clause ..................................................... 11

    B.    Prudential Factors Further Militate Against This  State Court Exercising Jurisdiction Over the President ........................................................ 15

II.    In The Alternative, The Court Should Stay This Action Pursuant To CPLR 2201 .......... 17

III.    Ms. Zervos's Complaint Must Be Dismissed In Its Entirety As A Matter Of Law .......... 20

    A.    The Statements Are Non-Actionable Opinion Or Hyperbole With No Defamatory Meaning ................................................................... 22

           1.    The Statements In The Context Of A National Political Campaign Are Non-Actionable Fiery Rhetoric With No Defamatory Meaning ................................................................... 23

           2.    The Statements Are Non-Actionable Opinions ......................................... 28

    B.    Most Of The Statements Do Not Even Refer To Ms. Zervos And Therefore Are Not Actionable ............................................................... 30

    C.    President Trump Did Not Publish Barry's Statement Or The Retweets ............... 33

           1.    President Trump Did Not Publish Mr. Barry's Statement Posted On The Campaign Website ......................................................... 34

i

2.  President Trump Cannot Be Held Liable As A Publisher For The Retweets ................................................................. 36

D.  Ms. Zervos Failed To Properly Plead Damages .................................................. 37

IV.  The Complaint Must Be Stricken Pursuant to California's Anti-SLAPP Law................. 38

CONCLUSION.................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115 St. Corp. v. Von Gutfeld,*
    80 N.Y.2d 130 (N.Y. 1992) ......................................................................23

*Adelson v. Harris,*
    973 F. Supp. 2d 467 (S.D.N.Y. 2013) ..........................................20, 24, 38

*Ampex Corp. v. Cargle,*
    27 Cal. Rptr. 3d 863 (Cal. Ct. App. 2005) ..........................................21, 35

*Annette F. v. Sharon S.,*
    15 Cal. Rptr. 3d 100 (Cal. Ct. App. 2004) ..............................................39

*Armand Schmoll, Inc., v. Fed. Reserve Bank of N.Y.,*
    37 N.E.2d 225 (N.Y. 1941) ......................................................................15

*Art of Living Found. v. Does,*
    2011 WL 2441898 (N.D. Cal. June 15, 2011) ..................................... 30-31

*Ascentive, LLC v. Opinion Corp.,*
    842 F. Supp. 2d 450 (E.D.N.Y. 2011) ....................................................35

*Asia Econ. Inst. v. Xcentric Ventures LLC,*
    2011 WL 2469822 (C.D. Cal. May, 4, 2011) .........................................33

*Baral v. Schnitt,*
    376 P.3d 604 (Cal. 2016) ....................................................................38, 39

*Barrett v. Rosenthal,*
    146 P.3d 510 (Cal. 2006) ....................................................................35, 37

*Batzel v. Smith,*
    333 F.3d 1018 (9th Cir. 2003) .................................................................38

*Behr v. Weber,*
    568 N.Y.S.2d 948 (1st Dep't 1991) ........................................................28

*Beilenson v. Superior Court,*
    52 Cal. Rptr. 2d 357 (Cal. Ct. App. 1996) ..............................................40

*Blatty v. N.Y. Times Co.,*
    728 P.2d 1177 (Cal. 1986) .......................................................................21

iii

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................................................38

*Burson v. Freeman*,
504 U.S. 191 (1992) ........................................................................................24

*Carr v. Warden*,
206 Cal. Rptr. 162 (Cal. Ct. App. 1984) .......................................................28

*Carroll v. McKinnell*,
19 Misc. 3d 1106(A) (Sup. Ct., New York Cty. 2008) ...................................5

*Carver v. Bonds*,
37 Cal. Rptr. 3d 480 (Cal. Ct. App. 2005) ....................................................26

*Chaker v. Mateo*,
147 Cal. Rptr. 3d 496 (Cal. Ct. App. 2012) ..................................................27

*Chicherchia v. Cleary*,
616 N.Y.S.2d 647 (2d Dep't 1994) ................................................................31

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ........................................................................................24

*Clinton v. Jones*,
520 U.S. 681 (1997) .................................................................................*passim*

*Colantonio v. Mercy Med. Ctr.*,
901 N.Y.S.2d 370 (2d Dep't 2010) ................................................................29

*Collier v. Harris*,
192 Cal. Rptr. 3d 31 (Cal. Ct. App. 2015) ....................................................24

*Conroy v. Spitzer*,
83 Cal. Rptr. 2d 443 (Cal. Ct. App. 1999) ....................................................39

*Cooper v. Aaron*,
358 U.S. 1 (1958) ............................................................................................15

*Correia v. Santos*,
13 Cal. Rptr. 132 (Cal. Ct. App. 1961) .........................................................37

*DiSanto v. Forsyth*,
684 N.Y.S.2d 628 (2d Dep't 1999) ................................................................38

*Doe 2 v. Superior Court*,
206 Cal. Rptr. 3d 60 (Cal. Ct. App. 2016) ....................................................21

iv

*Dreamstone Entm't Ltd. v. Maysalward Inc.*,
　2014 WL 4181026 (C.D. Cal. Aug. 18, 2014) .......................................................28

*El-Amine v. Avon Prods., Inc.*,
　739 N.Y.S.2d 564 (1st Dep't 2002) .....................................................................29

*Elias v. Rolling Stone LLC*,
　192 F. Supp. 3d 383 (S.D.N.Y. 2016) .................................................21, 31, 33

*Evans v. Unkow*,
　45 Cal. Rptr. 2d 624 (Cal. Ct. App. 1995) .........................................................40

*Farber v. Jefferys*,
　959 N.Y.S.2d 486 (1st Dep't 2013) .....................................................................29

*Ferlauto v. Hamsher*,
　88 Cal. Rptr. 2d 843 (Cal. Ct. App. 1999) ............................................. 30, 32-33

*Fields v. Twitter, Inc.*,
　217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...............................................................33

*Forsher v. Bugliosi*,
　608 P.2d 716 (Cal. 1980) .............................................................................30, 33

*General Atomic Co. v. Felter*,
　434 U.S. 12 (1977) ...............................................................................................15

*Gertz v. Robert Welch, Inc.*,
　418 U.S. 323 (1974) .............................................................................................25

*GetFugu, Inc. v. Patton Boggs LLP*,
　162 Cal. Rptr. 3d 831 (Cal. Ct. App. 2013) ...................................................28, 29

*Global Telemedia Int'l, Inc. v. Doe 1*,
　132 F. Supp. 2d 1261 (C.D. Cal. 2001) ...............................................................27

*Golub v. Enquirer/Star Grp., Inc.*,
　681 N.E.2d 1282 (N.Y. 1997) ..............................................................................26

*Gomez-Jimenez v. N.Y. Law Sch.*,
　943 N.Y.S.2d 834 (Sup. Ct., New York Cty. 2012) .............................................5

*Haefner v. N.Y. Media, LLC*,
　918 N.Y.S.2d 103 (1st Dep't 2011) .....................................................................37

*HSBC Bank, USA v. Despot*,
　12 N.Y.S.3d 556 (2d Dep't 2015) ........................................................................17

v

*Huggins v. Povitch*,
    1996 WL 515498 (Sup. Ct., New York Cty. Apr. 19, 1996)................................................28

*Hung Tan Phan v. Lang Van Pham*,
    105 Cal. Rptr. 3d 791 (Cal. Ct. App. 2010) ...........................................................37

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*,
    774 N.E.2d 696 (N.Y. 2002)..............................................................................34

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*,
    1988 WL 75262 (S.D.N.Y. July 13, 1988) ...........................................................34

*Jacobus v. Trump*,
    51 N.Y.S.3d 330 (Sup. Ct., New York Cty. 2017) ....................................... *passim*

*Jaramillo v. Food 4 Less Madera*,
    2010 WL 4746170 (E.D. Cal. Nov. 16, 2010) .......................................................37

*Jefferson Cty. v. Acker*,
    527 U.S. 423 (1999)........................................................................................12

*Kahn v. Bower*,
    284 Cal. Rptr. 244 (Cal. Ct. App. 1991).............................................................22

*Ketchum v. Moses*,
    104 Cal. Rptr. 2d 377 (Cal. 2001)......................................................................40

*Konig v. WordPress.com*,
    978 N.Y.S.2d 92 (2d Dep't 2013)......................................................................27

*Lakireddy v. Soto-Vigil*,
    2014 WL 1478693 (Cal. Ct. App. Apr. 16, 2014) .................................................39

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936)........................................................................................17

*Lapine v. Seinfeld*,
    918 N.Y.S.2d 313 (Sup. Ct., New York Cty. 2011) .............................................30

*LeBreton v. Weiss*,
    680 N.Y.S.2d 532 (1st Dep't 1998) ...................................................................29

*Live Oak Publ'g Co. v. Cohagan*,
    286 Cal. Rptr. 198 (Cal. Ct. App. 1991).......................................................33, 35

*Lore v. N.Y. Racing Ass'n Inc.*,
    12 Misc. 3d 1159(A) (Sup. Ct., Nassau Cty. 2006) ...............................................5

vi

*Main v. Thiboutot*,
    448 U.S. 1 (1980) ........................................................................................15

*Mann v. Abel*,
    10 N.Y.3d 271 (N.Y. 2008) ......................................................................23

*Martin v. Daily News L.P.*,
    990 N.Y.S.2d 473 (1st Dep't 2014) ...................................................... 36-37

*Masson v. New Yorker Magazine, Inc.*,
    832 F. Supp. 1350 (N.D. Cal. 1993) ........................................................36

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) ..................................................................................16

*McClung v. Silliman*,
    19 U.S. 598 (1821) ....................................................................................12

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ..............................................................................12, 14

*McGarry v. Univ. of San Diego*,
    64 Cal. Rptr. 3d 467 (Cal. Ct. App. 2007) ..............................................40

*McRedmond v. Sutton Place Restaurant and Bar, Inc.*,
    851 N.Y.S.2d 478 (1st Dep't 2008) .........................................................21

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009) ........................................................34

*Mihalakis v. Comm. of Interns & Residents (CIR)*,
    557 N.Y.S.2d 37 (1st Dep't 1990) ............................................................37

*Mitchum v. Foster*,
    407 U.S. 225 (1972) ..................................................................................15

*Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*,
    2015 WL 1379702 (S.D.N.Y. Mar. 25, 2015) .........................................26

*Murray v. Bailey*,
    613 F. Supp. 1276 (N.D. Cal. 1985) ........................................................36

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................24

*Nader v. Gen. Motors Corp.*,
    25 N.Y.2d 560 (N.Y. 1970) ......................................................................20

vii

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)............................................................................................... *passim*

*Noonan v. Rousselot*,
239 Cal. App. 2d 447 (1966) ..............................................................................22

*Nygard, Inc. v. Uusi-Kerttula*,
72 Cal. Rptr. 3d 210 (Cal. Ct. App. 2008) .....................................................4, 26

*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*,
418 U.S. 264 (1974)............................................................................................23

*Paulus v. Bob Lynch Ford, Inc.*,
43 Cal. Rptr. 3d 148 (Cal. Ct. App. 2006) ......................................................39

*Penaherrera v. New York Times Co.*,
2013 WL 4013487 (Sup. Ct., New York Cty. Aug. 8, 2013) ........................22, 35

*Peper v. Gannett Co.*,
2003 WL 22457121 (Cal. Super. Ct. Apr. 4, 2003)..........................................32

*Precedo Capital Grp. Inc. v. Twitter Inc.*,
33 F. Supp. 3d 245 (S.D.N.Y. 2014)..................................................................35

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ....................................................34

*Preiser v. Rodriguez*,
411 U.S. 475 (1973)............................................................................................16

*Rappaport v. VV Publ'g. Corp.*,
618 N.Y.S.2d 746 (Sup. Ct., New York Cty. 1994) ........................................28

*Reed v. Gallagher*,
204 Cal. Rptr. 3d 178 (Cal. Ct. App. 2016)..........................................23, 38, 39

*Regalia v. Nethercutt Collection*,
90 Cal. Rptr. 3d 882 (Cal. Ct. App. 2009) ......................................................37

*Rosenaur v. Scherer*,
105 Cal. Rptr. 2d 674 (Cal. Ct. App. 2001)........................................24, 26, 30, 39

*Rosner v. Amazon.com*,
18 N.Y.S.3d 155 (2d Dep't 2015)......................................................................33

*Rudnick v. McMillan*,
31 Cal. Rptr. 2d 193 (Cal. Ct. App. 1994) ......................................................24

*Sandals Resorts Int'l. Ltd. v. Google, Inc.*,
  925 N.Y.S.2d 407 (1st Dep't 2011) ...................................................27

*Seldon v. Magedson*,
  2012 WL 4475274 (S.D.N.Y. July 10, 2012) .......................................35

*Shiamili v. Real Estate Grp. of New York, Inc.*,
  952 N.E.2d 1011 (N.Y. 2011)........................................................33, 35

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
  779 F.3d. 191 (2d Cir. 2015)............................................................29

*Smalley v. Dreyfus Corp.*,
  832 N.Y.S.2d 157 (1st Dep't 2007) ..................................................33

*Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California
  v. Yagman*,
  55 F.3d 1430 (9th Cir. 1995) ...........................................................30

*Stepanov v. Dow Jones & Co., Inc.*,
  987 N.Y.S.2d 37 (1st Dep't 2014)................................................. 22-23

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
  2007 WL 935703 (S.D. Cal. Mar. 7, 2007) ........................................36

*Suozzi v. Parente*,
  616 N.Y.S.2d 355 (1st Dep't 1994) ..................................................24

*Sutherland v. Remax 2000*,
  20 Misc. 3d 1131(A), (Sup. Ct., Nassau Cty. 2008) ............................34

*In re Tarble*,
  80 U.S. 397 (1871)......................................................................3, 12

*Tennessee v. Davis*,
  100 U.S. 257 (1879).........................................................................12

*Terry v. Davis Cmty. Church*,
  33 Cal. Rptr. 3d 145 (Cal. Ct. App. 2005) .........................................29

*Three Amigos SJL Rest., Inc. v. CBS News Inc.*,
  15 N.Y.S.3d 36 (1st Dep't 2015) ..................................................23, 31

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936).........................................................................13

*Watson v. Philip Morris Companies, Inc.*,
  551 U.S. 142 (2007).........................................................................15

*Wong v. Tai Jing*,
    117 Cal. Rptr. 3d 747 (Cal. Ct. App. 2010) ...........................................................40

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) .................................................................................36

*Youngstown Sheet and Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)................................................................................................13

**Statutes**

47 U.S.C. § 230...............................................................................................33, 34, 35, 37

Cal. Code Civ. P. § 425.16.....................................................................................1, 4, 38, 40

**Other Authorities**

CPLR 2201...............................................................................................................1, 17, 40

CPLR 3211...............................................................................................................1, 20, 40

Ashley Cullins, *Gloria Allred: I'll Hunt Trump Into the White House*,
    The Hollywood Reporter (Dec. 13, 2016) .................................................................8

Brian Ross et al., *Women Accusing Trump Won't Be Intimidated After Election,*
    *Lawyer Says*, ABC News (Nov. 10, 2016) ...............................................................9

Harold J. Laski, *The American Presidency, An Interpretation*
    (Harper & Brothers 1940).......................................................................................18

Jeremy Stahl, *The New Trump Defamation Lawsuit Is Daring Trump to*
    *Incriminate Himself in Court*, Slate (Jan. 17, 2017)..........................................8, 19

Karen O'Connor & John R. Hermann, *The Courts: The Perils of Paula, in The*
    *Clinton Scandal and the Future of American Government* 40 (Mark J. Rozell
    & Clyde Wilcox eds., Georgetown Univ. Press 2000) ...........................................19

Laurence Tribe, *American Constitutional Law* (3d ed. 2000) ...........................13, 15, 18

Ken Gormley, *The Death of American Virtue: Clinton v. Starr*
    (Broadway Paperbacks 2010) .................................................................................19

Lou Cannon, *President Reagan -- The Role Of A Lifetime*
    (Public Affairs, 1st ed. 2000)..................................................................................14

Martin H. Redish, *Judicial Parity, Litigant Choice, and Democratic Theory: A*
    *Comment on Federal Jurisdiction and Constitutional Rights*,
    36 UCLA L. Rev. 329 (1988)..................................................................................16

x

Meagan Twohey, *Former 'Apprentice' Contestant Files Defamation Suit Against Trump*, The New York Times (Jan. 17, 2017) ........................................................8

Michael Kantor, *William J. Clinton Presidential History Project* (June 28, 2002) ....................18

Michael Kramer, *Monument to stupidity*, New York Daily News (Sept. 26, 1999) ......................5

Neil Kinkopf, *Executive Privilege: The Clinton Administration in the Courts*, 8 Wm. & Mary Bill Rts. J. 631 (2000) ...................................................................18

Peter Baker, *Clinton Settles Paula Jones Lawsuit for $850,000*, The Washington Post (Nov. 14, 1998) ........................................................................................18

Richard A. Posner, *Law, Pragmatism, and Democracy* (2003) ...........................................9, 18, 19

Richard A. Posner, *An Affair of State: The Investigation, Impeachment, And Trial Of President Clinton* (Harvard Univ. Press ed., 1999) .........................................18

Terry Eastland, *The Power to Control Prosecution*, 2 Nexus J. Op. 43 (Spring 1997) ...............................................................................................14

Transcript of Oral Argument, *Packingham v. North Carolina*, 137 S. Ct. 1730, 2017 WL 749021 (Feb. 27, 2017) (No. 15-1194) ...............................................27

U.S. Const. amend. XXV § 1 ...............................................................................14

U.S. Const. art. I ...........................................................................................14

U.S. Const. art. II .................................................................................3, 13, 17

U.S. Const. art. VI ......................................................................................11, 15

xi

Defendant President Donald J. Trump, in his individual capacity, respectfully submits this memorandum of law in support of his motion to dismiss the complaint ("Complaint" or "Compl.")[1] pursuant to CPLR 3211 and special motion to strike and for attorneys' fees pursuant to Cal. Code Civ. P. § 425.16, or in the alternative, to stay this action pursuant to CPLR 2201.

## PRELIMINARY STATEMENT

At the height of one of the most contentious presidential campaigns in history, plaintiff Summer Zervos -- a reality-TV performer on President Trump's former television show, *The Apprentice* -- and her attorney, the self-proclaimed political activist Gloria Allred, made false and scandalous allegations that Mr. Trump had, years earlier, purportedly engaged in inappropriate conduct directed toward Ms. Zervos.  As intended by Ms. Zervos and her counsel, these false accusations immediately became part of a public debate as to Mr. Trump's qualifications for office, and substantially influenced press coverage of the campaign. Mr. Trump vigorously defended his character and qualifications in the political arena -- at political rallies, a Presidential debate, on a campaign website, and on Twitter -- and denied these scurrilous allegations.

After President Trump was elected and immediately before he took office, Ms. Zervos and her counsel continued to press their political agenda by filing this meritless litigation asserting a frivolous $3,000 claim of defamation against Mr. Trump -- a claim based primarily on Mr. Trump's denials during the campaign of her false accusations.  Indeed, Ms. Zervos's own cousin has voluntarily come forward to refute her false allegations and publicly defend the President against Ms. Zervos's fame-seeking accusations, as Ms. Zervos admits in the

---

[1] Submitted herewith in support of the motion is the affirmation of Marc E. Kasowitz, dated July 7, 2017 ("Kasowitz Aff.").  A copy of the Complaint is attached as Kasowitz Aff. Ex. 19 [Complaint filed by Summer Zervos on 1/17/2017].

1

Complaint. Further, Ms. Zervos and her counsel have openly conceded -- indeed, bragged -- that

their true motivation is to use this action for political purposes as a pretext to obtain broad

discovery that they hoped could be used in impeachment hearings to distract from the President's

agenda.

This action should be dismissed in its entirety. First, and fundamentally, the Supremacy

Clause of the United States Constitution prevents this State Court from hearing this action,

whatever its merit or lack thereof, against a sitting President. The action therefore should be

dismissed without prejudice to Ms. Zervos refiling after the President leaves office, or stayed

until such time. Twenty years ago, the United States Supreme Court permitted a private federal

court action to proceed against President Clinton, but explicitly distinguished the situation there

from that presented here, where a plaintiff asks a state court to hear claims against the sitting

President. The Supreme Court's distinction is critical, and the Court pointed to the Supremacy

Clause as the key distinguishing impediment to a state court entertaining a case such as this one.

*See Clinton v. Jones*, 520 U.S. 681, 691 n.13 (1997). The Court raised as an "important

constitutional issue[]" whether a state court may hear an action against the President -- *i.e.*,

whether a state court's resulting exercise of "any direct control . . . over the President, who has

principal responsibility to ensure that [federal] laws are 'faithfully executed,' may implicate"

issues of federalism, comity, and concerns over local prejudice, so as to be improper. *Id.* at 690,

691 n.13 (citations omitted).

In fact, the Supremacy Clause and our federal system of government require that state

governments, including their courts, refrain from interfering in the operations of the federal

government. The Supreme Court has long made clear that high-ranking federal officials cannot

be "interfered with and controlled for any period by . . . tribunals of another [state] sovereignty."

2

*In re Tarble*, 80 U.S. 397, 409 (1871).  The application of that principle reaches its apex with respect to the President, who is the ultimate repository of power within the Executive Branch. U.S. Const. art. II, §1.  For that reason, this action should be dismissed without prejudice to its reinstatement following the Trump Presidency.

Should this Court decline to dismiss this action on Supremacy Clause grounds, it also has discretion to stay this case during the Trump Presidency.  The balance of the equities, as addressed in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), strongly weighs in favor of such a stay -- to prevent a politically-motivated plaintiff claiming approximately $3,000 in monetary damages from embarking on a private witch-hunt that would threaten to interfere with the operations of the Executive Branch of the federal government.

Second, and in any event, Ms. Zervos's single claim -- for defamation -- has no legal merit and should be dismissed on that ground as well.  Ms. Zervos does not and cannot state a cause of action for defamation under California law, which applies here because Ms. Zervos is domiciled and was purportedly injured there.  The allegedly defamatory statements were made during a national political campaign that involved heated public debate in political forums. Statements made in that context are properly viewed by courts as part of the expected fiery rhetoric, hyperbole, and opinion that is squarely protected by the First Amendment.  Indeed, this very issue has already been recently addressed by this Court, which, before he took office, dismissed a defamation action against then President-elect Trump because the statements made during a political campaign were "expressions of opinion entitled to full First Amendment protection," even though some of those statements contained factual information.  *See Jacobus v. Trump*, 51 N.Y.S.3d 330, 344 (Sup. Ct., New York Cty. 2017).[2]  Further, that President Trump

---

[2] Kasowitz Aff. Ex. 20 [*Jacobus v. Trump* Opinion].

3

denied Ms. Zervos's accusations cannot constitute defamation as a matter of law, because they do not subject her to "hatred, contempt, ridicule, or obloquy," *Nygard, Inc. v. Uusi-Kerttula*, 72 Cal. Rptr. 3d 210, 225 (Cal. Ct. App. 2008), particularly given the context in which they were made. Ms. Zervos also does not and cannot show that each of the purportedly defamatory statements cited in the Complaint were "of and concerning" her because they in fact make no mention of Ms. Zervos. Ms. Zervos also cannot establish that President Trump was responsible for making several of the statements. Finally, Ms. Zervos's claim should be dismissed because she has failed to adequately plead damages.

Third, California's anti-SLAPP statute, Cal. Code Civ. P. § 425.16, protecting defendants from strategic lawsuits against public participation ("SLAPP") also bars this action. There can be no question, under the statute, that the statements Ms. Zervos challenges were "in furtherance of [President Trump's] right of . . . free speech under the United States Constitution or the California Constitution in connection with a public issue" and that Ms. Zervos cannot satisfy the resulting heightened burden she must meet to establish that there is a "probability that [she] will prevail on [her] claim." Cal. Code Civ. P. § 425.16(b)(1). Further, under the SLAPP statute, Mr. Trump is entitled to receive his attorneys' fees incurred in responding to the Complaint. Cal. Code Civ. P. § 425.16(c).

Accordingly, the Complaint should be dismissed and stricken or, alternatively, stayed during the Trump Presidency, and Mr. Trump should be awarded his attorneys' fees

## BACKGROUND

### A.    Ms. Zervos's Politically Motivated Lawsuit

Donald J. Trump, now the forty-fifth President of the United States, formally announced his candidacy on June 16, 2015, embarking on a historic year-and-a-half campaign that crisscrossed the country, and appearing at numerous rallies, press conferences, debates, and

4

interviews.  The 2016 presidential election was one of the most contentious in history, drawing extensive media coverage and commentary concerning every aspect of the candidates' qualifications and character.

In the critical final stretch before the election, on October 14, 2016,[3] Ms. Zervos and her counsel, Gloria Allred,[4] held a carefully choreographed televised news conference ("October 14 Press Conference") at Ms. Allred's office.  (Compl. ¶ 53.)  The goal of the October 14 Press Conference was clear:  to attempt to influence the election process and to bait President Trump into responding to the grave and false accusations of inappropriate conduct asserted by Summer Zervos, a California resident and former reality-TV star of President Trump's television show, *The Apprentice*.[5]  Ms. Allred and Ms. Zervos looked straight into the camera to address President Trump directly, accusing him of "declaring war on women" and "treat[ing] women as sexual objects."[6]  They tied their salacious accusations to unfounded allegations by others and to women everywhere who "hav[e] [had] to perform sexual favors in order to get a job."[7]  Around the same time, Ms. Allred publicly sat with three other potential plaintiffs who leveled similarly

---

[3] On a motion to dismiss, the Court may take judicial notice of documents like newspaper articles, transcripts, and filings in courts.  *See, e.g.*, *Gomez-Jimenez v. N.Y. Law Sch.*, 943 N.Y.S.2d 834, 854-55 (Sup. Ct., New York Cty. 2012), *aff'd*, 956 N.Y.S.2d 54 (1st Dep't 2012); *Carroll v. McKinnell*, 19 Misc. 3d 1106(A), at *10 n.1 (Sup. Ct., New York Cty. 2008).  Additionally, because the Complaint specifically refers to the October 14 Press Conference (Compl. ¶¶ 6, 13, 50, 53), and also mirrors Ms. Zervos's statements made in the October 14 Press Conference (*Compare* Kasowitz Aff. Ex. 23 [Statement by Gloria Allred, 10/14/2016] *with* Compl. ¶¶ 20-44), it is incorporated by reference and the transcript of the press conference can be considered by the Court on a motion to dismiss.  *See, e.g.*, *Lore v. N.Y. Racing Ass'n. Inc.*, 12 Misc. 3d 1159(A), at *2 (Sup. Ct., Nassau Cty. 2006).

[4] Ms. Allred advertises herself on her website as an "activist."  *See* Gloria Allred Home Page, www.gloriaallred.com (last visited July 7, 2017).  She is a high-profile Democratic fundraiser who has politically opposed Donald Trump for decades, considered Hillary Clinton her "she-ro," and found President Trump's historic victory "very painful."  *See* Kasowitz Aff. Ex. 21 at 7, 8 [Tr. of Gloria Allred Interview by Thom Hartmann, 1/20/2017]; *see also* Kasowitz Aff. Ex. 22 at 1-2 [*New York Daily* News Article, 9/26/1999].

[5] *See* Kasowitz Aff. Ex. 23 [Statement by Gloria Allred, 10/14/2016].

[6] *Id.* at 3 [Statement by Gloria Allred, 10/14/2016].

[7] *Id.* at 2 [Statement by Gloria Allred, 10/14/2016].

5

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 45 of 149

false allegations against President Trump, and claimed that there were "many" others who had

not decided whether to come forward.[8]

Ms. Zervos and Ms. Allred explicitly politicized their allegations, openly seeking to

foment a public debate over President Trump's qualifications for office.  Ms. Zervos claimed to

have made her accusations "so that the public could evaluate Mr. Trump fully as a candidate for

president, and could take both [Ms. Zervos's] experience and Mr. Trump's denials into

consideration."  (Compl. ¶ 50.)  However, the true purpose of their false allegations is clear:  a

political smear campaign attempting to elicit public statements by the candidate that could later

be used as a pretext to initiate legal action.

On October 14, 2016, President Trump issued a statement on his official campaign

website defending his character and qualifications as a presidential candidate, plainly stating that

"I never met her at a hotel or greeted her inappropriately a decade ago.  That is not who I am as a

person, and it is not how I've conducted my life."  (Compl. ¶ 55; App. A No. 1.)  President

Trump then quickly turned to comment on the media's role in "creating a theater of absurdity"

and his opponent, Hillary Clinton, in making personal attacks, and then to his own political

agenda.  (Compl. ¶ 55; App. A No. 1.)  However, in the coming weeks of heated public debate

leading up to the election, the issue of false accusations levied against President Trump, and of

other false media reports, continued to be front-and-center in the political campaign.  (Compl. ¶¶

60-61, 71-72; App. A Nos. 4-5, 15-16.)

---

[8] *See id.* at 3 [Statement by Gloria Allred, 10/14/2016]; *see also* Kasowitz Aff. Ex. 24 at 7 [*CNN* Tr. Trump Claims
Election Being Rigged, 10/16/2016] (Ms. Allred stating "I can assure [Trump] that more women will be coming
forward"); Kasowitz Aff. Ex. 25 at 1 [Statement by Gloria Allred, 10/16/2016] ("Summer Zervos, Kristin Anderson,
Jessica Leeds, Rachel Crooks, Mindy McGillivray, Natasha Stoynoff, and Temple Taggart . . . are all claiming
inappropriate" behavior by Mr. Trump at different times.); Kasowitz Aff. Ex. 26 at 1 [Statement by Gloria Allred,
10/20/2016] ("nine women have come forward with allegations that Mr. Trump" engaged in inappropriate sexual
behavior); Compl. ¶¶ 5, 11.

6

### B. Ms. Zervos's Allegations Are False

On October 14, 2016, the same day as Ms. Zervos's press conference, her own cousin, John Barry, voluntarily came forward to refute the unfounded, pretextual accusations she made against President Trump. Mr. Barry was "completely shocked and bewildered by [his] cousin," because Ms. Zervos had previously only spoke "glowing[ly]" about President Trump, going so far as to convert her friends and family to supporting his campaign. (Compl. ¶ 56; App. A No. 2.)

Indeed, Ms. Zervos's own account of events appears to contradict her accusations. (*See, e.g.*, Compl. ¶¶ 21, 35, 40.) For instance, she continued to seek employment from President Trump for several years, even after their purported encounter because "her dream of working for Mr. Trump might come true." (Compl. ¶ 24; *see also* ¶ 40.) In April 2016 -- a mere six months before she made her unfounded public accusations -- she contacted President Trump to invite him to her restaurant. (Compl. ¶ 64; App. A. Nos. 2, 8.) It was only after President Trump rejected her invitation that she turned against him, levying her false accusations. As Ms. Zervos's own cousin opined as to why she was making these untrue statements, "I think Summer wishes she could still be on reality TV[.]" (Compl. ¶ 56; App. A No. 2.)

### C. Ms. Zervos Admittedly Seeks Overly Broad Discovery For Extra-Judicial Purposes

Despite the questions about the veracity of Ms. Zervos's claims, on January 17, 2017 -- three days before President Trump's inauguration -- Ms. Zervos filed this frivolous defamation claim. During a press conference by Ms. Zervos and Ms. Allred, they made clear that this lawsuit was engineered for political purposes and as a precursor to serial litigation to be

7

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 47 of 149

filed by Ms. Allred.[9]  Ms. Allred also openly acknowledged that her true motive for filing this

lawsuit went well beyond the actual allegations of the Complaint.  She stated that this action was

filed:  (1) as part of an effort to generate fodder for a time-consuming impeachment hearing and

(2) to distract the President in order to obstruct his presidency.[10]

Ms. Allred has also publicly and repeatedly gloated about the broad level of discovery

she will seek, including tapes of *The Apprentice*.[11]  To that end, Ms. Allred has served a far-

reaching subpoena on the Trump campaign ("Campaign Subpoena") that seeks wholly irrelevant

information intended solely to harass the President.  Indeed, Ms. Allred herself has questioned

how the President could run the country if faced with broad discovery.[12]  Ms. Allred has stated

that she is looking forward to taking "far-reaching" depositions so that she can "ask [the

President] many questions he may not wish to answer but will be required to answer."[13]

Ms. Allred has publicly acknowledged that she intends to follow Ms. Jones's playbook in

her suit against Bill Clinton, which, in the words of Judge Posner, led to, "a distracting political

drama that impaired . . . Clinton's ability to govern effectively . . . as well as subjecting a number

---

[9] *See generally* Kasowitz Aff. Ex. 27 [Zervos and Allred Interview, 1/17/2017].

[10] *See* Kasowitz Aff. Exs. 27 at 19-21 [Zervos and Allred Interview, 1/17/2017]; and 28 at 4 [Statement by Gloria Allred, 1/17/2017] (discussing desire to depose President Trump); Kasowitz Aff. Ex. 29 at 1 [*Slate* Article, 1/17/2017] (noting references made by Ms. Allred during press conference regarding the potential for deposing Trump); Kasowitz Aff. Ex. 30 at 3 [Tr. of Gloria Allred Interview, 1/20/2017] (stating "I'm sure Congress would be interested" in President Trump's deposition testimony); Kasowitz Aff. Ex. 31 at 2 [*New York Times* Article, 1/17/2017].

[11] *See* Kasowitz Aff. Ex. 32 at 2-3 [Tr. of Gloria Allred Interview, 10/15/2016] (Ms. Allred discussing her interest in seeking raw footage from *The Apprentice*); Kasowitz Aff. Ex. 29 at 2 [*Slate* Article, 1/17/2017] ("We would certainly seek any and all information and documents, recordings, etc., which may be relevant to the litigation of our lawsuit.").

[12] *See* Kasowitz Aff. Ex. 33 at 16 [Tr. of *The Last Word: With Lawrence O'Donnell*, 10/27/2016] ("Sitting in depositions as [host Lawrence O'Donnell] just said, with all of the people that he's sued.  I mean, how is he going to deal with any major crisis of our nation if there is one?  If he's sitting in a deposition and trying to defend the lawsuits which by the way might be filed against him.").

[13] Kasowitz Aff. Ex. 34 at 1 [*Hollywood Reporter* Article, 12/13/2016] ("I'll Hunt Trump into the White House.").

8

of persons to enormous embarrassment and staggering legal expenses."[14]  Ms. Allred and Ms.

Zervos have launched a fundraiser seeking to raise at least $500,000 to finance this meritless

lawsuit.[15]

### D.    The Allegedly Defamatory Statements Are Not Actionable

The Complaint asserts a single cause of action for defamation based on 18 statements

allegedly made during the presidential campaign, which Ms. Zervos seeks to attribute to

President Trump.  All of the statements reflect opinions and rhetoric made in political forums:

campaign rallies, the presidential debate, the official campaign website, and Twitter.  The 18

statements (together, "Statements") -- attached hereto as Appendix A with their full context --

can be broken up into several, sometimes overlapping, categories.  First is the single statement

made by President Trump himself that refers to Ms. Zervos directly, quoted above, in which he

merely denies acting "inappropriately" (an opinion) or having met her at a hotel (not defamatory)

("Statement No. 1").  (Compl. ¶ 55; App. A, No. 1.)  Second are Statement Nos. 2 and 6 made by

Mr. Barry -- not President Trump -- concerning Mr. Barry's opinion that Ms. Zervos's

allegations are false.  (Compl. ¶¶ 56, 62; App. A, Nos. 2, 6.)  Third are Statement Nos. 4-7 and

10-14 made on President Trump's campaign website or Twitter.  (Compl. ¶¶ 60-63, 66-70; App.

A, Nos. 4-7, 10-14.)  Of those, several merely "retweet" the statements of others:  (a) Statement

No. 6 simply retweets the statement by Barry; and (b) Statement No. 13 is actually of a Twitter

news personality, Paul Joseph Watson (@PrisonPlanet), characterizing Ms. Zervos's statement

as a "hoax" based on the fact that she had recently emailed President Trump praising him, to

---

[14] Kasowitz Aff. Ex. 35 at 319 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner]; *see also* Kasowitz Aff. Ex. 36 at 2 [*ABC News* Article, 11/10/2016] ("Whether the president of the United States decides that he wants to spend his time in lawsuits or serving the American people as president of the United States, is a question that only Mr. Trump can answer.").

[15] *See* Kasowitz Aff. Ex. 37 [Zervos Crowdrise Fundraising Page].

9

which President Trump added only the rhetorical opinion "Terrible." (Compl. ¶ 69; App. A, No. 13.) And finally, there are President Trump's broad Statement Nos. 3, 8-9 and 15-18, which concern the media or his accusers generally and were made at his campaign rallies, on Twitter, or during the presidential debate. (Compl. ¶¶ 59, 64-65, 71-74; App. A, Nos. 3, 8-9, 15-18.) Notably, most of the statements are ambiguous and do not refer to Ms. Zervos at all, such as: "the media and the Clinton Campaign have brought forward false allegations" and "[t]hese allegations are one hundred percent false" (Compl. ¶ 59; App. A No. 3); "100% fabricated and made up charges, pushed strongly by the media and the Clinton Campaign, may poison the minds of the American voter" (Compl. ¶ 60; App. A No. 4); and the "media [is] pushing false and unsubstantiated charges, and outright lies, in order to elect Crooked Hillary!" (Compl. ¶ 61; App. A No. 5.)

## ARGUMENT

### I.    This State Court May Not Exercise Jurisdiction Over A Civil Suit Against The President During His Presidency

This action should be dismissed without prejudice to Ms. Zervos refiling after the President completes his presidency because this State Court does not have jurisdiction to hear a civil action against a sitting President. First, as raised by the U.S. Supreme Court in *Clinton v. Jones*, and as supported by hundreds of years of precedent, this Court lacks the authority pursuant to the Supremacy Clause of the Constitution to exercise jurisdiction in this case because a state court cannot control President Trump -- who uniquely embodies the Executive Branch -- or interfere with his ability to perform his duties. Second, *Clinton v. Jones* recognized that if any civil suit against a sitting president were permitted to proceed, a federal court would be better positioned to handle such a matter given the threat of local prejudices, the lack of uniformity in states' laws, and the federal courts' expertise in handling federal immunity matters.

10

## A.    The Suit Is Barred By The Supremacy Clause

The Supreme Court in *Clinton v. Jones* held that under the circumstances before it, a private lawsuit against a sitting president could proceed in federal court.  In doing so, the Court expressly distinguished the federal lawsuit before it from a private civil action that might be brought in a state court:  "[b]ecause the Supremacy Clause makes federal law 'the supreme Law of the Land,' . . . any direct control by a state court over the President, who has principal responsibility to ensure that those laws are 'faithfully executed,' . . . may implicate" issues of federalism, comity, and "the interest in protecting federal officials from possible local prejudice that underlies the authority to remove certain cases brought against federal officers from a state to a federal court."[16]  *Clinton*, 520 U.S. at 691, 691 n.13.

Thus, as recognized by *Clinton v. Jones*, our system of government requires that state governments, including their courts, refrain from interfering with the operations of the federal government.  The Supremacy Clause provides that the U.S. Constitution and all laws and treaties made "under the Authority of the United States shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby."  U.S. Const. art. VI, § 2.  Courts have long interpreted this language as limiting state courts' ability to influence or burden the federal government.  For example, in *McCulloch v. Maryland*, the U.S. Supreme Court was faced with whether a state could impose a tax on a federal institution.  17 U.S. 316, 436 (1819).  The Court

---

[16] Indeed, the Court's concern with whether a state court would have authority over the President occupied much of the oral argument.  *See generally* Kasowitz Aff. Ex. 41 at *7 [Oral Argument Tr. from *Clinton v. Jones*] ("[I]t seems to me what you're saying is that the inherent nature of the President's office requires that the States be constrained in this way."); *id.* at *8 ("A State court might . . . recognize such a similar immunity as a matter of their common law."); *id.* at *19 ("It's simply the supremacy clause that says State courts don't muck around with -- with Federal activities."); *id.* at *31 ("[W]hat do you do when a State court tells the President, you're going to lose this lawsuit unless you appear for a hearing on June 2, and the President says, you know, Your Honor, I have a NATO meeting I'm supposed to go to, heads of State, and you know, you have a testy district judge or local State court judge -- you've encountered some of them -- and they say, this is my courtroom and you know, I expect you here on June 2."); *id.* at *38 ("So the trial court judge at the State court level is to determine whether the offer -- the complaint made by the President's lawyer is made in good faith or not?")

11

held that it could not, because "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws."[17]  *Id.*

Indeed, longstanding precedent establishes that a state court may not exercise jurisdiction over a federal official without violating the Supremacy Clause of the Constitution.  While these cases have historically been applied to state courts exercising jurisdiction over federal officers acting in their official capacities, it is not limited to that context given that, as *Clinton v. Jones* recognized, the federal executive authority is uniquely embodied in the President and is inseparable from the person holding the office.  *In re Tarble* expressly forbid "the claim of jurisdiction by a State court . . . to interfere with the authority of the United States" when "that authority [is] exercised by a federal officer."  80 U.S. at 403-04.  That Court recognized that "no state can authorize one of its judges or courts to exercise judicial power . . . within the jurisdiction of [the federal] government . . . .  It is manifest that the powers of the National government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by . . . tribunals of another [state] sovereignty."  *Id.* at 405, 409.  To the contrary, the "conduct [of an officer of the federal government] can only be controlled by the power that created him," *i.e.*, the federal government.  *See McClung v. Silliman*, 19 U.S. 598, 605 (1821).  *See also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (allowing a federal revenue officer to remove a murder indictment to federal court in recognition of the fact that requiring federal executive branch officials to submit to state court procedures could "paralyze the operations of the government.")

---

[17] Further, states may not enforce rules that limit a federal official's ability to carry out his or her federal duties.  *See Jefferson Cty. v. Acker*, 527 U.S. 423, 440-41 (1999) ("Alabama, of course, cannot make it unlawful to carry out duties of a federal office without local permission.").

*McClung*, *Tarble*, and *Davis* each involved attempts by state courts to assert jurisdiction over the official conduct of petty federal officials. However, these same principles prohibit a state court from exercising any authority over a sitting president, who embodies the office, such that any assertion of jurisdiction by a state court over the President will inevitably interfere with, or burden, his ability to exercise his Article II powers.

Unlike the other branches, the President "is a person as well as an institution; and unlike other institutions, the Presidency is led by an individual elected by the entire Nation to secure its survival, to represent it to the world, and to voice its aspirations to all people."[18]  The President as an individual is invested with all of the inherent and express powers of the Executive Branch. He is also "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). He is Commander in Chief of the Army and Navy.  *See* U.S. Const. art. II, § 2, cl. 1.  And he alone is charged with the power to sign bills into law, the appointment power, the treaty power and the duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, §§ 2, 3.

The importance of the President to our nation and the uniqueness of the Executive Branch cannot be overstated.  The Constitution invests the entire executive authority in the President as a "single head in whose choice the whole nation has a part, making him the focus of public hopes and expectations.  In drama, magnitude and finality his decisions so far overshadow any others that almost alone, he fills the public eye and ear." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring).  Indeed, "the President, for all practical purposes . . . affords the only means through which we can act as a nation."[19]  Thus, to interfere

---

[18] *See* Kasowitz Aff. Ex. 38 at 631 [Excerpts from *American Constitutional Law*, by Laurence Tribe].

[19] *See* Kasowitz Aff. Ex. 39 at 118 [Excerpts from *President Reagan: The Role of A Lifetime*, by Lou Cannon] (quoting George E. Reedy, *Discovering the Presidency*, N.Y. Times, Jan. 20, 1985, at G1).

with the President's duties is to interfere with the nation.  Indeed, in the words of Thomas

Jefferson, the Executive Branch "is the sole branch which the constitution requires to be always

in function."[20]  Justice Breyer's concurrence in *Clinton v. Jones* contrasts the Congress, which

adjourns and can function "even when up to half of its members are absent," or the judiciary,

which can designate other judges, with the Executive Branch, in which "[i]nterference with a

President's ability to carry out his public responsibilities is constitutionally equivalent to

interference with the ability of the entirety of Congress, or the Judicial Branch, to carry out its

public obligations." *Clinton*, 520 U.S. at 713 (Breyer, J., concurring).[21]

Regardless of whether a suit relates to official or unofficial conduct, a state court cannot

exercise direct control or "retard, impede, burden, or in any manner control" the Executive

Branch, *McCulloch*, 17 U.S. at 436, by compelling the President to submit to its jurisdiction,

including by ordering him to respond to motions or sit for discovery, or issuing a judgment

against him.[22]  Accordingly, this Court lacks the power to hear this action because it cannot take

any actions to control the Executive Branch embodied by the President or otherwise interfere in

any way with his ability to exercise his Article II constitutional duties, and it should be dismissed

without prejudice to Ms. Zervos seeking to reinitiate an action after the conclusion of the Trump

Presidency.  *See Armand Schmoll, Inc., v. Fed. Reserve Bank of N.Y.*, 37 N.E.2d 225, 225 (N.Y.

---

[20] *See* Kasowitz Aff. Ex. 42 at 7 [Letter from Thomas Jefferson to George Hay, 5/20/1807].

[21] *See also* Kasowitz Aff. Ex. 40 at 43, 46 [*The Power to Control Prosecution*, by Terry Eastland].  Moreover, under the Constitution, the President, unlike Congress, is always in session unless he is replaced for exigent reasons, such as incapacitation or death.  *See* U.S. Const. amend. XXV § 1 ("In case of the removal of the President from office or of his death or resignation, the Vice President shall become President."); *Id.* § 3 ("Whenever the President transmits . . . his written declaration that he is unable to discharge the powers and duties of his office . . . , such powers and duties shall be discharged by the Vice President as Acting President."); U.S. Const. art. I, § 4, cl. 2 ("Congress shall assemble at least once in every Year, and such Meeting shall be on . . .").

[22] *See* Kasowitz Aff. Ex. 38 at 780 n.66 [Excerpts from *American Constitutional Law*, by Laurence Tribe] ("An order of a state judge directing the President to release information on pain of contempt would in all probability violate principles of federalism."); *cf. General Atomic Co. v. Felter*, 434 U.S. 12, 12 (1977) (state courts lack the power to bar litigants from bringing actions in federal courts).

1941) (affirming dismissal of a state proceeding because "State courts have no jurisdiction to issue orders or directions to the Federal Reserve Bank in the performance of its statutory duty").

Moreover, this Court cannot hear this matter without violating the state court judge's solemn oath required by Article VI, Section 3 of the Constitution "to support this Constitution." *Cooper v. Aaron*, 358 U.S. 1, 18, 19 (1958) (citing U.S. Const. art. VI, § 3) (no state official or court has "power to nullify a federal court order" or other federal law).  The oath requirement reflects the Framers' "anxiety to preserve [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State" such that "[n]o state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." *Id.* at 18 (citing *Ableman v. Booth*, 62 U.S. 506, 524 (1858)).

### B. Prudential Factors Further Militate Against This State Court Exercising Jurisdiction Over the President

As the Court in *Clinton v. Jones* recognized, beyond the mandate of the Supremacy Clause, important prudential factors that are critical to the functioning of our federal system also require that a state court refrain from exercising jurisdiction over a sitting president.  First, "state-court proceedings may reflect 'local prejudice' against unpopular . . . federal officials." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007); *see also Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (federal courts are the "guardians of the people's federal rights"); *Main v. Thiboutot*, 448 U.S. 1, 20 (1980) (noting generally the Congressional concern that state courts might not provide an impartial forum).  As *Clinton v. Jones* explained, there is an interest to protect federal officers from "possible local prejudice that underlies the authority to remove certain cases brought against federal officers from a state to a federal court."  520 U.S. at 691

15

(citing 28 U.S.C. § 1442(a); *Mesa v. California*, 489 U.S. 121, 125-126 (1989)).[23]

Second, requiring that any private suit against the President be brought in federal court ensures those actions will be managed consistently to avoid interference with the President's duties. *See Clinton*, 520 U.S. at 708; *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996). The *Clinton* Court allowed a federal case to proceed because of its view of the federal courts' ability to "manage those actions in such fashion (including deferral of trial) that interference with the President's duties would not occur." *Clinton*, 520 U.S. at 708. Indeed, at oral argument, the Court expressed concern that a "trial court judge at the State court level is to determine whether . . . the complaint [of demands of national importance] made by the President's lawyer is made in good faith or not?"[24]

Third, the Supreme Court has explained that because federal courts have vast experience in managing suits involving the federal government, they are better suited to address the legal issues that inevitably arise in such situations. *See Preiser v. Rodriguez*, 411 U.S. 475, 514 (1973) (federal question jurisdiction "was designed to preserve and enhance the expertise of the federal courts in applying federal law . . . and . . . to minimize misapplications of federal law.") (Brennan, J., dissenting); *see also* Martin H. Redish, *Judicial Parity, Litigant Choice, and Democratic Theory: A Comment on Federal Jurisdiction and Constitutional Rights*, 36 UCLA L. Rev. 329, 333 (1988).

---

[23] To be clear, President Trump does not suggests that such issues are present here, but rather cautions against creating a precedent that could open the door for such prejudice.

[24] *See, e.g.*, Kasowitz Aff. Ex. 41 at *38 [Oral Argument Tr. from *Clinton v. Jones*].

16

## II.    In The Alternative, The Court Should Stay This Action Pursuant To CPLR 2201

Alternatively, this Court has the broad discretion to temporarily stay this action pursuant to CPLR 2201 during the Trump Presidency.  *See HSBC Bank, USA v. Despot*, 12 N.Y.S.3d 556, 556 (2d Dep't 2015).  CPLR 2201 provides that "the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just."  As the Supreme Court recognized in *Landis v. N. Am. Co.*, "the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  299 U.S. 248, 256 (1936).[25]

The Supreme Court in *Nixon v. Fitzgerald* established a standard by which federal courts could determine whether a civil suit against the President could proceed:  "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch."  *Nixon*, 457 U.S. at 754.  Here, a stay is warranted given the significant risk that this action will interfere with the President's executive responsibilities to the detriment of the public.[26]

As discussed above, the President alone is vested with the entire executive power and his constitutional obligations as President never cease.  *See* U.S. Const. art. II.  At a moment's notice the President could be required to tend to exigent crises that require his undivided attention.  There is not a day in which he is not required to make decisions on profound matters that have a significant impact on the public, including, among other things, on national and international

---

[25] *See also* Kasowitz Aff. Ex. 41 at *8-9 [Oral Argument Tr. from *Clinton v. Jones*] ("A State court might . . . recognize such a similar immunity as a matter of their common law.").

[26] While the *Clinton* court decided it was unnecessary to stay a harassment and defamation case brought against the former sitting President, *see* 520 U.S. at 708, the particular circumstances of that case were vastly different from here, as discussed below at pp. 18-20.

17

policies, the dispatch of military forces, legislation and congressional matters.[27]  Thus,

"[b]ecause of the singular importance of the President's duties, diversion of his energies by

concern with private lawsuits would raise unique risks to the effective functioning of

government."  *Nixon*, 457 U.S. at 751.  Indeed, as the U.S. Supreme Court recognized in *Nixon v.*

*Fitzgerald*, the President has "incidental powers":

> Among these must necessarily be included the power to perform [his functions]
> without any obstruction or impediment whatsoever.  The President cannot,
> therefore, be liable to arrest, imprisonment, or detention, while he is in the
> discharge of the duties of his office; and for this purpose his person must be
> deemed, in civil cases at least, to possess an official inviolability.

*Id*. at 776-77 (citing 2 Justice Story, *Commentaries on the Constitution of the United States*

§ 1569 p. 372 (4th ed. 1873)).

Accordingly, if this action is not temporarily stayed, it will disrupt and impair the

President's ability to discharge his Article II responsibilities.  Indeed, numerous commentators

have concluded that allowing *Clinton v. Jones* to proceed was in error.[28]  Then-Commerce

Secretary Mickey Kantor noted how "[the] whole thing created chaos and took away from the

ability of the U.S. government to function.  The ability of the presidency and the White House to

function -- it is not even arguable. . . .  It had a huge effect . . . on his ability to get things

done."[29]  Judge Posner similarly called it a "national emergency" with a "disastrous effect."[30]

---

[27] *See* Kasowitz Aff. Ex. 43 at 26 [*The American Presidency: An Interpretation*, by Harold J. Laski].

[28] *See, e.g.*, Kasowitz Aff. Ex. 45 at 3 [*Washington Post* Article, 11/14/1998] (President Clinton spoke with his attorney three times on the day he was consulting about whether to attack Iraq); Neil Kinkopf, *Executive Privilege: The Clinton Administration in the Courts*, 8 Wm. & Mary Bill Rts. J. 631, 652 (2000) ("[T]he matter necessarily displaced other policy items from the agendas."); Kasowitz Aff. Ex. 38 at 765-66 [Excerpts from *American Constitutional Law*, by Laurence Tribe] ("The Court -- unwisely, hindsight would suggest -- deemed the threat that civil litigation . . . . 'impair the effective performance of [the President's] office,' to be implausible."); Kasowitz Aff. Ex. 35 at 317 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner]; Kasowitz Aff. Ex. 44 at 265 [Excerpts from *An Affair of State*, by Richard A. Posner] ("We have learned that . . . [w]e do not need to be able to sue our Presidents during their term of office.").

[29] Kasowitz Aff. Ex. 46 at 72 [Interview with Michael Kantor, 6/28/2002].

[30] Kasowitz Aff. Ex. 35 at 316 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner].

18

Furthermore, the public and governmental concerns in occupying the President's time are far greater here than they were in *Clinton v. Jones*. First, Ms. Allred has openly admitted that this lawsuit is being used as a political weapon in a campaign seeking to impeach the President.[31] Second, Ms. Allred has repeatedly boasted that she intends to seek exceptionally broad discovery, and has already served an expansive subpoena that has demonstrated that overreaching. Third, while the Court in *Clinton v. Jones* discounted the likelihood of additional litigation following its decision in that case, Ms. Allred has already indicated that she intends to continue to file additional tactical suits against the President.[32] *See Nixon*, 457 U.S. at 753 (noting danger that President would be "easily identifiable target for suits for civil damages"). Indeed, while there may have only been three civil suits against sitting presidents prior to *Clinton v. Jones*, since that decision there have been numerous suits involving allegations related to presidents' non-official actions -- many of them frivolous and many politically motivated.[33] Indeed, "the normal incentive structures that we have to keep civil litigation in check don't apply when the litigation is against the president" because of those who "who would have enormous amounts to gain by destabilizing his presidency."[34]

---

[31] *See, e.g.*, Kasowitz Aff. Ex. 29 at 1-2 [*Slate* Article, 1/17/2017].

[32] *See* Kasowitz Aff. Ex. 24 at 7 [*CNN* Tr. Trump Claims Election Being Rigged, 10/16/2016) (Ms. Allred stating "I can assure [Trump] that more women will be coming forward"); Kasowitz Aff. Ex. 25 at 1 [Statement by Gloria Allred, 10/16/2016) ("Summer Zervos, Kristin Anderson, Jessica Leeds, Rachel Crooks, Mindy McGillivray, Natasha Stoynoff, and Temple Taggart . . . are all claiming inappropriate sexual behavior by Mr. Trump at different times.").

[33] *See* Kasowitz Aff. ¶ 51; *see also* Kasowitz Aff. Ex. 47 at 40, 56 [Excerpts from *The Clinton Scandal: and the Future of American Government*, by Rozell and Wilcox] ("[G]rowth of the internet, increased media attention to presidential actions, and interestingly, the lucrative nature of book deals about presidential scandals are potential catalysts for more lawsuits."); Kasowitz Aff. Ex. 35 at 318 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner] (recognizing that "American society is increasingly litigious and increasingly disrespectful of officials and the effect of *Clinton v. Jones* itself in encouraging future litigation, since it removed a legal uncertainty that might have discouraged such suits.").

[34] Kasowitz Aff. Ex. 48 at 223 [Excerpts from *The Death of American Virtue: Clinton vs. Starr*, by Ken Gormley] (quoting then-Acting Solicitor General, Walter Dellinger, regarding Robert Bork and Ted Olson "prepping" Paula Jones's lawyer).

19

INDEX NO. 150522/2019
RECEIVED NYSCEF: 02/08/2020

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 59 of 149

By contrast to the President and the public, Ms. Zervos will suffer no prejudice if this action is temporarily stayed, as she will eventually have her day in court. None of the relief that Ms. Zervos has sought -- an apology and $2,914 in damages -- is urgent or time-sensitive, and even if Ms. Zervos could adequately state a cause of action for defamation -- which she cannot -- this Court can grant relief at a later date. There is also no risk of spoliation of evidence as the parties can take efforts to preserve any relevant material.

Thus, the effective administration of our nation provides a compelling justification to stay this action. *See, e.g.*, *Nixon*, 457 U.S. at 753 ("Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."); *Clinton*, 520 U.S. at 707 ("The high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery.").

## III. Ms. Zervos's Complaint Must Be Dismissed In Its Entirety As A Matter Of Law

As explained above, the Constitution bars this Court from hearing this action during the Trump Presidency and, even if it did not, compelling prudential factors mandate that the action be dismissed or stayed. However, if the Court were to consider the Complaint substantively, it should be dismissed with prejudice either under California's SLAPP statute, as explained *infra* in Part IV, or even applying the lower standard of CPLR 3211(a)(7) for failure to state a cause of action.[35]  While "a court must accept the facts alleged in the complaint as true, [and] accord the

---

[35] Under New York choice of law rules, California's substantive law applies to Ms. Zervos's defamation claim because California has "the most significant relationship with [Plaintiff's claim]" given that, among other things, Ms. Zervos is domiciled there (Compl. ¶ 14) and her alleged injuries to her reputation and business occurred in California (*id.* ¶¶ 81-82). *See Nader v. Gen. Motors Corp.*, 25 N.Y.2d 560, 565 (N.Y. 1970) (place where plaintiff lives and is injured is the place "which has the most significant relationship with the subject matter of the tort charged"); *Adelson v. Harris*, 973 F. Supp. 2d 467, 477-78 (S.D.N.Y. 2013) (explaining that other jurisdictions' interests were not "sufficient to overcome the presumption that the law of Plaintiff's domicile should apply" in multi-state defamation case). While California law applies to Ms. Zervos's claims, parallel citations to New York cases have been provided, where doctrines are similar, out of an abundance of caution.

20

plaintiff the benefit of every possible favorable inference," where, as here, the factual allegations

do not "fit within any cognizable legal theory," a motion to dismiss is appropriately granted.

*McRedmond v. Sutton Place Restaurant and Bar, Inc.*, 851 N.Y.S.2d 478, 479 (1st Dep't 2008).

To adequately plead a defamation claim, Ms. Zervos must allege "(1) a publication that is

(2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes

special damage." *Doe 2 v. Superior Court*, 206 Cal. Rptr. 3d 60, 68 (Cal. Ct. App. 2016), *review

denied* (Nov. 16, 2016) (citation omitted); *Elias v. Rolling Stone LLC*, 192 F. Supp. 3d 383, 391

(S.D.N.Y. 2016) (listing elements). Additionally, the statements must be "of and concerning"

the plaintiff. *Ferlauto v. Hamsher*, 88 Cal. Rptr. 2d 843, 852 (Cal. Ct. App. 1999).[36]

Further, where, as here, the plaintiff is a limited public figure, she must establish that the

Statements were made with actual malice. *Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 869

(Cal. Ct. App. 2005) ("[P]ublic figures must prove by clear and convincing evidence that an

allegedly defamatory statement was made with knowledge of falsity or reckless disregard for

truth.") (citation omitted). Ms. Zervos is a limited public figure under *Ampex's* three-part test:

"First, there must be a public controversy . . . Second, the plaintiff must have undertaken some

voluntary act through which he or she sought to influence resolution of the public issue. In this

regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And

finally, the alleged defamation must be germane to the plaintiff's participation in the

controversy." *Ampex Corp.*, 27 Cal. Rptr. 3d at 870. Here, (i) the presidential campaign of 2016

and the attacks on the character of the candidates are undeniably an ongoing "public

controversy" (Compl. ¶¶ 4, 8); (ii) Ms. Zervos voluntarily sought to influence that public debate

by making unfounded accusations regarding Mr. Trump less than one month before the election,

---

[36] *See also Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1185 (Cal. 1986).

so that, as she readily admits, the public could evaluate Mr. Trump's qualifications for presidency (Compl. ¶¶ 6, 13, 50, 53); and (iii) the Statements -- to the extent one or more of them were made in response to Ms. Zervos's scurrilous accusations -- are undeniably germane to Ms. Zervos's effort to influence the election.  (Compl. ¶¶ 55-56, 59-74; App. A Nos. 1-18.)

As demonstrated below, Ms. Zervos has not and cannot establish a defamation claim, warranting dismissal of her Complaint.  First, the Statements are protected by the First Amendment because they are statements of "fiery rhetoric" or hyperbole advanced during a heated political debate and have no defamatory meaning.  Second, the Statements are not actionable as they reflect a subjective belief and/or are too ambiguous and vague to be capable of being proven true or false.  Third, nearly all of the Statements are not actionable because they do not even refer to Ms. Zervos.  Fourth, Ms. Zervos cannot even establish that certain Statements were published by President Trump.  Fifth, Ms. Zervos has not sufficiently alleged damages. Finally, Ms. Zervos's sole allegation concerning malice is conclusory and insufficient as a matter of law, constituting an independent ground for dismissal.  *Noonan v. Rousselot*, 239 Cal. App. 2d 447, 454 (1966) (affirming dismissal of action where allegation that defendants acted "wickedly and maliciously" was found to be conclusory and insufficient as a matter of law); *Penaherrera v. New York Times Co.*, 2013 WL 4013487, at *17 (Sup. Ct., New York Cty. Aug. 8, 2013).

A.     **The Statements Are Non-Actionable Opinion Or Hyperbole With No Defamatory Meaning**

It is well-established that a court, in the first instance, must determine as a matter of law whether an alleged statement is "reasonably susceptible of a defamatory interpretation" or is protected free speech, such as the expression of an opinion. *Kahn v. Bower*, 284 Cal. Rptr. 244, 249–50 (Cal. Ct. App. 1991), *reh'g denied and opinion modified* (Sept. 6, 1991); *Stepanov v.*

22

*Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 42 (1st Dep't 2014); *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 15 N.Y.S.3d 36, 41 (1st Dep't 2015), *aff'd*, 65 N.E.3d 35 (N.Y. 2016).

Indeed, "[t]he *sine qua non* of recovery for defamation . . . is the existence of falsehood," *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 283 (1974), and thus, statements consisting of "rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt, and language used in a loose, figurative sense have all been accorded constitutional protection." *Reed v. Gallagher*, 204 Cal. Rptr. 3d 178, 188 (Cal. Ct. App. 2016) (citations and quotations omitted).[37]  To determine whether the statements in question are provably false factual assertions or non-actionable statements, courts consider the "totality of the circumstances." *Reed*, 204 Cal. Rptr. 3d at 189; *Jacobus*, 51 N.Y.S.3d at 336 (recognizing "context is key" in the defamation analysis).  The totality of the circumstances here show the statements are not actionable as they were all "advanced during the course of a heated public debate, during which an audience would reasonably anticipate the use of 'epithets, fiery rhetoric or hyperbole.'" 51 N.Y.S.3d at 336-37 (citation omitted).

1.      **The Statements In The Context Of A National Political Campaign Are Non-Actionable Fiery Rhetoric With No Defamatory Meaning**

The Statements -- all of which were advanced during a heated political campaign to convince the public to vote for Mr. Trump, and many of which were published via Twitter -- constitute non-actionable rhetoric and hyperbole that is protected by the First Amendment. (Compl. ¶¶ 55-56, 59-74; App. A Nos. 1-18.)  In this context, courts recognize that "language which generally might be considered as statements of fact may well assume the character of statements of opinion[,]" "where potentially defamatory statements are published in a public

---

[37] *Mann v. Abel*, 10 N.Y.3d 271, 276 (N.Y. 2008); *600 W. 115 St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139-140 (N.Y. 1992).

23

debate . . . or in another setting in which the audience may anticipate efforts by the parties to

persuade others to their positions by use of epithets, fiery rhetoric or hyperbole[.]" *See Rudnick*

*v. McMillan*, 31 Cal. Rptr. 2d 193, 197-98 (Cal. Ct. App. 1994); *Rosenaur*, 105 Cal. Rptr. 2d

674, 688 (Cal. Ct. App. 2001) (same); *see also Jacobus*, 51 N.Y.S.3d at 338 ("Even apparent

statements of fact may assume the character of statements of opinion, and thus be privileged,

when made in public debate … or other circumstances in which an 'audience may anticipate [the

use] of epithets, fiery rhetoric or hyperbole.'").[38]  Thus, courts will "'shelter strong, even

outrageous political speech,' on the ground that 'the ordinary reader or listener will, in the

context of political debate, assume that vituperation is some form of political opinion neither

demonstrably true nor demonstrably false.'"  *Adelson*, 973 F. Supp. 2d at 489-90 (collecting

cases); *see also Rosenaur*, 105 Cal. Rptr. 2d at 688 ("Courts must be cautious lest we inhibit

vigorous public debate about . . . public issues.").

The rationale is, as explained by the Supreme Court, that "the First Amendment 'has its

fullest and most urgent application' to speech uttered during a campaign for political office."

*Burson v. Freeman*, 504 U.S. 191, 196 (1992) (citations omitted).  Indeed, the ability to discuss

freely "the character and qualifications of candidates for their suffrages" lies at the heart of the

First Amendment.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 281-82 (1964) (citation omitted);

*see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339-40 (2010) (noting that

speech "on the qualifications of candidates are integral" and should be protected) (citation

omitted); *Collier v. Harris*, 192 Cal. Rptr. 3d 31, 39-40 (Cal. Ct. App. 2015) (public discussion

about "the character and qualification of a candidate for public office" is a public concern that

---

[38] *Suozzi v. Parente*, 616 N.Y.S.2d 355, 358-59 (1st Dep't 1994) (political campaign article was entitled to qualified privilege because article was "obvious political tract emanating from the opposing camp," and timing during political campaign "suggests that it was intended for maximum political effect").

should be afforded "First Amendment" protection) (citations omitted), *as modified* (Sept. 1, 2015), *review denied* (Dec. 9, 2015); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974) (society's interest includes "anything which might touch on an official's fitness for office").

This Court's decision in a defamation case brought against the President prior to his election for statements he made during his campaign is instructive. *See Jacobus*, 51 N.Y.S.3d at 339-40, 344. This Court found that President Trump's statements -- that Ms. Jacobus had "begged" him for a job, that he turned her down twice, that she approached the Trump Campaign for a job, and that she therefore had "zero credibility!" -- while all technically statements of fact, were, in the context of the heated presidential election, to be treated merely as non-defamatory fiery rhetoric. *Id.* at 341; *see also id.* at 342 ("the immediate context of defendant's statements is the familiar back and forth between a political commentator and the subject of her criticism, and the larger context is the Republican presidential primary and Trump's regular use of Twitter.").

Similarly, here, as demonstrated by Ms. Zervos's own Complaint (Compl. ¶¶ 45-48), Mr. Trump had been engaged in a longstanding public debate with the media and his opponents on a host of matters, including his qualifications to run for office. In that context, the Statements are nothing more than heated campaign rhetoric designed to persuade the public audience that Mr. Trump should be elected president irrespective of what the media and his opponents had claimed over his 18-month campaign. (*See e.g.* Compl. ¶ 61; App. A No. 5 ("the media pushing"); ¶ 63; App. A No. 7 ("Totally made up nonsense to steal the election."); ¶ 64; App. A. No. 8 ("The election is being rigged by corrupt media, pushing completely false allegations and outright lies, in an effort to elect her President."); ¶ 65; App. A No. 9 ("in an effort to elect Hillary Clinton President"); ¶ 70; App. A No. 14 ("media has deceived the public"); ¶ 71, App. A. No. 15 ("[The media] want[s] to poison the minds of the voters.").) Indeed, "[i]t would

25

undermine our fundamental democratic process if [candidates] risked lawsuits for responding to the arguments, connections or positions" of the public, or for urging the public to vote for or against "a particular candidate." *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, 2015 WL 1379702, at *10 (S.D.N.Y. Mar. 25, 2015), *aff'd,* 637 F. App'x 16 (2d Cir. 2016). For instance, Statement No. 1 regarding whether President Trump had met Ms. Zervos at a hotel and greeted her appropriately is protected political speech because the audience understood he was merely contributing to a public debate about his fitness for office. (Compl. ¶ 55; App. A No. 1.) As Ms. Zervos readily admits, her unfounded accusations were made to foster a public debate regarding President Trump's candidacy for public office. (Compl. ¶¶ 50, 53.)

Further, Statement No. 1 -- as well as the others -- in no way expose Ms. Zervos to "hatred, contempt or aversion," particularly given the context, where a political candidate was merely responding to public allegations in the midst of a campaign. *Nygard*, 72 Cal. Rptr. 3d at 225 (Defamation is "a false and unprivileged publication that exposes the plaintiff 'to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation'"); *Golub v. Enquirer/Star Grp., Inc.*, 681 N.E.2d 1282, 1283 (N.Y. 1997). Indeed, no defamatory meaning can be drawn from denying a meeting at a hotel. As this Court has held, the context of President Trump's statements advanced during a campaign makes clear that had they been "intended to belittle and demean plaintiff, any reasonable reading of them makes it 'impossible to conclude that [what defendants said or implied] . . . could subject . . . [plaintiff] to contempt . . . or reflect adversely upon [her] work,' or otherwise damage her reputation." *Jacobus*, 51 N.Y.S.3d at 343.[39]

---

[39] *See also Carver v. Bonds*, 37 Cal. Rptr. 3d 480, 494-95 (Cal. Ct. App. 2005) (collecting cases where calling someone a liar was not defamatory given the context); *Rosenaur v. Scherer*, 105 Cal. Rptr. 2d at 688 (calling political opponent a "liar" and "thief" is constitutionally protected "hyperbolic language").

Moreover, the Statements were disseminated through the official campaign website, campaign rallies, a presidential debate, and President Trump's Twitter account -- all forums the audience understands robust political debate will be conducted in, albeit in an informal manner. (Compl. ¶¶ 55-56, 59-74; App. A Nos 1-18.)  Indeed, as recently recognized by the Supreme Court, "[a]ll 50 governors, all 100 senators, every member of the House has a Twitter account. So this has become a . . . crucially important channel of political communication."[40]  The informal nature of the Internet communications cited in the Complaint further militates against any potential finding that any of them is susceptible to a defamatory meaning.[41]  *See Chaker v. Mateo*, 147 Cal. Rptr. 3d 496, 503 (Cal. Ct. App. 2012) (collecting cases and noting that "[i]n determining statements are nonactionable opinions, a number of recent cases have heavily relied on the fact that statements were made in Internet forums"); *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1267 (C.D. Cal. 2001) ("[T]he [Internet] postings are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents, such as corporate press releases or SEC filings."); *Sandals Resorts Int'l. Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415-16 (1st Dep't 2011).

Indeed, similar statements by President Trump, "advanced on social media[,] have been held to warrant an understanding that the statements contained therein are 'vigorous expressions of personal opinion,' 'rather than the rigorous and comprehensive presentation of factual matter.'" *Jacobus*, 51 N.Y.S.3d at 339.[42]  The *Jacobus* court explicitly addressed President Trump's use of Twitter, taking note of how his "regular use of Twitter to circulate his positions

---

[40] Transcript of Oral Argument, *Packingham v. North Carolina*, 137 S. Ct. 1730, 2017 WL 749021, at *28 (Feb. 27, 2017) (No. 15-1194).

[41] Compl. ¶¶ 60-63, 66-70; App. A Nos. 4-7, 10-14.

[42] *See also Konig v. WordPress.com*, 978 N.Y.S.2d 92, 94 (2d Dep't 2013).

27

and skewer his opponents and others who criticize him," which are "necessarily restricted to 140 characters or less," would not be understood as statements of fact. *Id.* at 342.

## 2.      The Statements Are Non-Actionable Opinions

Many of the Statements cited in Ms. Zervos's Complaint are also non-actionable because, on their face, they cannot be proven to be true or false.  (*See, e.g.*, Compl. ¶¶ 55, 56, 62, 69; App A Nos. 1-2, 6, 13.)  *GetFugu, Inc. v. Patton Boggs LLP*, 162 Cal. Rptr. 3d 831, 843 (Cal. Ct. App. 2013) (tweet regarding how organization was run for benefit of officers and directors stated "subjective [non-actionable] opinion with respect to corporate governance at GetFugu").  For example, the statements that President Trump retweeted -- to which he merely adds the words "the truth is a beautiful weapon" and "Terrible" -- are opinions rather than statements of facts. (Compl. ¶¶ 62, 69; App. A Nos. 6, 13.)  Likewise, Statement Nos. 2 and 6 by Mr. Barry -- which of course are not the words of President Trump -- reflect Mr. Barry's subjective beliefs about Ms. Zervos's motivation for making false accusations:  "*I think* Summer wishes she could still be on reality TV ….  *I can only imagine* that Summer's actions today are nothing more than an attempt to regain the spotlight ….  (Compl. ¶¶ 56, 62; App. A Nos. 2, 6) (emphasis added).)  That Mr. Barry prefaced each statement with "*I think*" and "*I can only imagine*" illustrates the subjective nature of Mr. Barry's opinions, which cannot be proven true or false.  *See Carr v. Warden*, 206 Cal. Rptr. 162, 163 (Cal. Ct. App. 1984) (statement beginning with "I think" is an non-actionable opinion); *Behr v. Weber*, 568 N.Y.S.2d 948, 949-50 (1st Dep't 1991).  Moreover, these types of statements about Ms. Zervos's state of mind or motivations constitute opinions as a matter of law.  *See Dreamstone Entm't Ltd. v. Maysalward Inc.*, 2014 WL 4181026, at *8 (C.D. Cal. Aug. 18, 2014) (statements about plaintiff's state of mind or motivations are not actionable); *Huggins v. Povitch*, 1996 WL 515498, at *8 (Sup. Ct., New York Cty. Apr. 19, 1996); *Rappaport v. VV Publ'g. Corp.*, 618 N.Y.S.2d 746, 750 (Sup. Ct., New York Cty. 1994).

28

Further, Ms. Zervos's defamation claim is premised upon numerous vague and ambiguous statements related to the merits of Mr. Trump's Presidential campaign, such as President Trump's statement, "100% fabricated and made-up charges, pushed strongly by the media and the Clinton Campaign."  (*See, e.g.*, Compl. ¶¶ 59-61, 63, 65-68, 70, 72- 74; App. A Nos. 3-5, 7, 9-12, 16-18.)  These publications are not actionable because they "'mean different things to different people' and cannot be proven true or false because of their 'subjective, relative meanings.'"  *Jacobus*, 51 N.Y.S.3d at 338; *see also GetFugu, Inc.*, 162 Cal. Rptr. 3d at 842.

Finally, Statement No. 1 that President Trump never "greeted her inappropriately a decade ago," even accepting her allegations as true for this motion, is a subjective opinion that has no precise meaning capable of being proven true or false.  (Compl. ¶ 55; App. A No 1.); *Terry v. Davis Cmty. Church*, 33 Cal. Rptr. 3d 145, 158-59 (Cal. Ct. App. 2005) (whether a relationship is "inappropriate" is opinion); *Colantonio v. Mercy Med. Ctr.*, 901 N.Y.S.2d 370, 373-74 (2d Dep't 2010) (referring to someone as "inappropriate" is opinion).  Moreover, when considering the totality of Statement No. 1, including the non-defamatory portion of the statement, "I never met her at a hotel," it is a mere denial that reflects Mr. Trump's subjective belief about the lack of merit of Ms. Zervos's assertions.[43]  (Compl. ¶ 55; App. A No 1.)

That Ms. Zervos intentionally solicited President Trump's response to her political rhetoric also serves as a basis for dismissal of her claim.  (Compl. ¶¶ 55-56, 59-74; App. A Nos. 1-18.)  *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d. 191, 201 (2d Cir. 2015) (statements solicited by plaintiff not actionable); *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (1st

---

[43] *See Farber v. Jefferys*, 959 N.Y.S.2d 486, 488 (1st Dep't 2013) (defendants use of the word "liar" was not actionable as defamation because the "full content of the statement, including its tone and apparent purpose, and the broader context of the statement and surrounding circumstances leads to the conclusion that what was being read was 'likely to be opinion, not fact'") (quotations omitted); *El-Amine v. Avon Prods., Inc.*, 739 N.Y.S.2d 564, 564 (1st Dep't 2002) ("[T]he statement by defendant to the media that plaintiff's claim against it was without merit constituted mere opinion, and was therefore nonactionable.").

Dep't 1998) (same).  "If the law were to the contrary, the protection of the First Amendment would be unacceptably denied to persons who publicly defend themselves against what they believe to be baseless public charges . . . ."  *Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 329 (Sup. Ct., New York Cty. 2011).

In an attempt to sidestep this fundamental flaw with her claim, Ms. Zervos attempts to anchor her claim to the false notion that President Trump called her a "liar" -- words that were never uttered by the President about Ms. Zervos.  But even if she was called a liar (and she was not), it still is not a basis for defamation.  *See, e.g.*, *Rosenaur*, 105 Cal. Rptr. 2d at 688 (referring to political opponent as a "liar" was non-actionable in context of heated political contest); *cf. Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1440-41 (9th Cir. 1995) (referring to judge as "dishonest" was non-actionable where it would be interpreted merely as statement of contempt); *Lapine*, 918 N.Y.S.2d at 328-29.

### B.     Most Of The Statements Do Not Even Refer To Ms. Zervos And Therefore Are Not Actionable

Most of the eighteen Statements at issue cannot serve as a basis for Ms. Zervos's defamation claim because they do not even refer to her.  (Compl. ¶¶ 59-61, 63, 65-68, 70-74; App. A Nos 3-5, 7, 9-12, 14-18.)  For a statement to be actionable under California defamation law, a plaintiff must allege "that the contested statements are 'of and concerning,' [her] either by name or by 'clear implication.'"  *Ferlauto*, 88 Cal. Rptr. 2d at 852 (finding statements were not "of and concerning" plaintiff where plaintiff was never referred to by name); *Forsher v. Bugliosi*, 608 P.2d 716, 717, 723 (Cal. 1980) (upholding dismissal of defamation claim where it was unclear that allegedly defamatory language referred to the plaintiff); *Art of Living Found. v.*

*Does*, 2011 WL 2441898, at *6 (N.D. Cal. June 15, 2011).[44]  Whether the Statements could be

reasonably interpreted to be "of and concerning" a plaintiff is appropriate for resolution at this

stage.  *See, e.g.*, *Art of Living*, 2011 WL 2441898, at *6.[45]

       Here, most of the Statements make no reference whatsoever to Ms. Zervos.  Rather, these

either explicitly refer to other parties (such as Hillary Clinton or her campaign, or the media (*see,*

*e.g.*, Compl. ¶¶ 59-61, 65, 71; App. A Nos. 3-5, 9, 15)), or they generally refer to unidentifiable

parties who had opposed President Trump both before and after his Republican nomination:

- Statement 3 refers to "the media and the Clinton Campaign," as well as "false allegations" and "allegations that are one hundred percent false." (Compl. ¶ 59; App. A No. 3.)  In context, the statement is also clearly referring to events that happened "many years, even decades" ago.

- Statement 4 refers to "100% fabricated and made-up charges, pushed strongly by the media and the Clinton Campaign." (Compl. ¶ 60; App. A No 4.)

- Statement 5 refers to "the media pushing false and unsubstantiated charges, and outright lies, in order to elect Crooked Hillary." (Compl. ¶ 61; App. A No. 5.)

- Statement 7 says "[n]othing ever happened with any of these women.  Totally made up nonsense to steal the election." (Compl. ¶ 63; App. A No. 7.)

- Statement 8 is deceptively quoted in the Complaint to omit the portions that clearly refer to accusers other than Ms. Zervos:  "But those allegations have been -- many of them -- already proven so false.  And in fact, the other one with *People* magazine, the butler said it was a total lie.  Remember the butler?  The butler said it was a total lie.  We can't let them get away with this folks.  We can't.  Total lies.  And you've been seeing total lies." (Compl. ¶ 64; App. A No. 8.)

- Statement 9 refers to the "election being rigged by corrupt media, pushing completely false allegations and outright lies, in an effort to elect Hillary Clinton President . . . False stories, all made up.  Lies, lies.  No witnesses, no nothing.  All big lies." (Compl. ¶ 65; App. A No. 9.)

---

[44] *See also Elias*, 192 F. Supp. 3d at 392-93; *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (2d Dep't 1994).

[45] *See also Three Amigos*, 65 N.E.3d at 37; *Elias*, 192 F. Supp. at 392.

31

- Statement 10 refers to losing "large numbers of women voters based on made up events THAT NEVER HAPPENED.  Media rigging election!"  (Compl. ¶ 66; App. A No. 10.)

- Statement 11 refers to the "[e]lection [] being rigged by the media, in a coordinated effort with the Clinton campaign, by putting stories that never happened into news!"  (Compl. ¶ 67; App. A No. 11.)

- Statement 12 refers to the "totally phoney stories, 100% made up by women (many already proven false) and pushed big time by the press."  (Compl. ¶ 68; App. A No. 12.)

- Statement 14 reads "the media has deceived the public by putting women front and center with made-up stories and lies."  (Compl. ¶ 70; App. A No. 14.)

- Statement 15 refers to "sexy headlines" and the Clinton Campaign.  (Compl. ¶ 71; App. A No. 15.)

- Statement 16 refers to the press "telling totally false stories, most recently about phony allegations."  (Compl. ¶ 72; App. A No. 16.)

- Statement 17 refers to protesters in Chicago and "the woman on the plane."  (Compl. ¶ 73; App. A No. 17.)

- Statement 18 states "[e]very woman lied when they came forward to hurt my campaign.  Total fabrication.  The events never happened.  Never."  (Compl. ¶ 74; App. A No. 18.)

Thus, none of the above Statements even reference Ms. Zervos.  Inasmuch as she claims that the Statements referring to "false allegations," "fabricated charges" or similar language "clearly identified" her (Compl. ¶ 86), that argument fails.  In particular, because numerous accusations of various kinds were leveled against President Trump during his campaign on or before October 2016 -- as Ms. Zervos admits (Compl. ¶¶ 5-6, 8) -- she cannot satisfy her burden of showing these general broad sweeping Statements directly refer to her -- let alone any identifiable group.  *See Peper v. Gannett Co.*, 2003 WL 22457121, at *4 (Cal. Super. Ct. Apr. 4, 2003) ("The gravamen of a defamation claim is that the plaintiff has been the direct object of criticism, not that he has suffered some consequential damage as a result of an allegedly defamatory statement about someone else.") (citation and quotations omitted); *Ferlauto*, 88 Cal.

32

Rptr. 2d at 852 ("[Plaintiff] cannot constitutionally establish liability unless he proves that the

contested statements are 'of and concerning,' him either by name or by 'clear implication.'");

*Forsher*, 608 P.2d at 723 (obscure statements are non-actionable); *Elias*, 192 F. Supp. 3d at 391.

### C. President Trump Did Not Publish Barry's Statement Or The Retweets

Ms. Zervos's defamation claim also fails because she cannot establish that President

Trump published the Statements by Mr. Barry or the retweets of others' postings.  (Compl. ¶¶

56, 62, 69; App. A Nos. 2, 6, 13.)  *See Live Oak Publ'g Co. v. Cohagan*, 286 Cal. Rptr. 198, 201

(Cal. Ct. App. 1991) ("[A] libelous statement is not actionable until it has been published to a

third person. . . . [T]he publication must be done by the defendant"); *Smalley v. Dreyfus Corp.*,

832 N.Y.S.2d 157, 163 (1st Dep't 2007), *partially reversed on other grounds*, 882 N.E.2d 882

(2008); *Rosner v. Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015).

Further, to the extent the Court were to find that President Trump posted these Statements

online, he is insulated from liability under Section 230 of the Communications Decency Act

("CDA"), which carves out broad immunities to providers and users of interactive computer

services that do not provide the content of the posted information but exercise traditional

publishing roles.  *See Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *5-7

(C.D. Cal. May, 4, 2011) (noting that CDA should be given "expansive" reading and concluding

that defendants are shielded from liability); *Shiamili v. Real Estate Grp. of New York, Inc.*, 952

N.E.2d 1011, 1016-1017 (N.Y. 2011).  Section 230 specifically provides:  "No provider or user

of an interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider."[46]  47 U.S.C. § 230(c)(1).  Thus, because

---

[46] Section 230 defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  Courts have found that Twitter users may qualify as "information content providers."  *See Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1121 (N.D. Cal. 2016).

President Trump, as an interactive computer service user, did not provide the content of the information contained in Mr. Barry's statements posted to the Internet or the retweets, he is insulated from liability under Section 230.  (Compl. ¶¶ 56, 62, 69; App. A No 2, 6, 13.)

### 1. President Trump Did Not Publish Mr. Barry's Statement Posted On The Campaign Website

Ms. Zervos cannot establish that Mr. Barry's statement posted to the campaign website was published by President Trump.  Instead, Ms. Zervos makes the conclusory allegation that "[o]n information and belief, Mr. Trump's campaign team drafted and issued Barry's statement at Mr. Trump's direction and with his approval."  (Compl. ¶ 56; App. A No. 2.)  Such conclusory allegations, however, fail as a matter of agency law to establish that the campaign was acting within the scope of its authority when it purportedly drafted Mr. Barry's statement.  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *18-19 (E.D.N.Y. Jan. 4, 2011) (agency allegations were insufficient as they were "based on conclusory and generic statements that do not even provide the barest allegations as to the elements of the agency relationship"), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012); *Sutherland v. Remax 2000*, 20 Misc. 3d 1131(A), at *4 (Sup. Ct., Nassau Cty. 2008) (rejecting plaintiff's agency allegations as conclusory).[47]

Even if the campaign did draft Mr. Barry's statement -- and Ms. Zervos has not pleaded any facts to support that it did -- Ms. Zervos did not allege any facts to show that the campaign was acting within the scope of authority granted to it by President Trump so as to allow its acts to be imputed to Mr. Trump personally.  *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 112-13 (S.D.N.Y. 2009) (allegations that fall outside of agent's management and operation role "cannot,

---

[47] New York law applies to agency-related allegations because the Trump campaign is based in New York.  *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 1988 WL 75262, at *3 (S.D.N.Y. July 13, 1988); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 700 (N.Y. 2002).

34

as a matter of law, be imputed to [the principal]").  Drafting third-party statements is not the type

of activity ordinarily vested within the scope of a political campaign's authority.  Nor does Ms.

Zervos allege that President Trump had specific knowledge that his campaign had drafted Mr.

Barry's statement, which is fatal to her agency allegations given that the campaign website

expressly states Mr. Barry wrote his own statement:  "Statement From John Barry."  (*See* App. A

No. 2).[48]  *See Precedo Capital Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 257-58 (S.D.N.Y.

2014) (agency theory falls short absent allegations that defendant had "knowledge of all the

material facts of the transaction[s]" between alleged agent and plaintiff for ratification purposes).

Because Ms. Zervos cannot establish under agency law that President Trump is

responsible for drafting Mr. Barry's statements, President Trump is insulated from liability under

Section 230.  *See Shiamili*, 952 N.E.2d at 1020; *Seldon v. Magedson*, 2012 WL 4475274, at *16

(S.D.N.Y. July 10, 2012), *report and recommendation adopted,* 2012 WL 4475020 (S.D.N.Y.

Sept. 28, 2012); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 472-73 (E.D.N.Y. 2011);

*Live Oak*, 286 Cal. Rptr. at 203; *Barrett v. Rosenthal*, 146 P.3d 510, 529 (Cal. 2006).

Even assuming that Ms. Zervos could establish that Mr. Trump's campaign was acting as

his agent when it purportedly drafted Mr. Barry's statements, Ms. Zervos cannot demonstrate as

a matter of law that President Trump acted with the requisite malice that she is required to

establish as a limited public figure.  *See Ampex*, 27 Cal. Rptr. 3d at 870-71; *Penaherrera*, 2013

WL 4013487, at *15.  At most, Ms. Zervos made conclusory allegations that the campaign -- not

Mr. Trump -- published Mr. Barry's statements with malice.  (Compl. ¶¶ 56, 89; App. A No. 2.)

However, Ms. Zervos cannot recover for defamation "without proving ***each defendant*** acted

---

[48] Instead, the Complaint only alleges that the statement was issued with "Mr. Trump's direction and with his approval."  (Compl. ¶ 56.)

with actual malice as to each purported defamation." *Murray v. Bailey*, 613 F. Supp. 1276, 1281

(N.D. Cal. 1985) (emphasis added). Courts have consistently refused to apply agency principles

in the First Amendment context to impute malice. *See id.* ("The stringent standards required by

the First Amendment make application of the agency theory inappropriate [in the defamation

context.]"); *Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1370 (N.D. Cal. 1993)

("general agency rules do not apply in the constitutional context. Indeed, the requirement that

the defendant's state of mind be proven is the cornerstone of the constitutional requisite that a

plaintiff prove by clear and convincing evidence"), *aff'd*, 85 F.3d 1394 (9th Cir. 1996).

### 2. President Trump Cannot Be Held Liable As A Publisher For The Retweets

Ms. Zervos also cannot demonstrate that President Trump published defamatory

statements (a) when he retweeted and linked to Mr. Barry's statements from the campaign

website with the added words "[t]he truth is a beautiful weapon" (Compl. ¶ 62; App. A No. 6), or

(b) when he retweeted and provided a link to the post of another Twitter user called

@PrisonPlanet and added the single word "Terrible" to the introduction of that retweet. (Compl.

¶ 69; App. A No. 13.) First, California follows the single-publication rule that "limits tort claims

premised on mass communications to a single cause of action that accrues upon the first

publication of the communication." *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012).

This rule applies to the Internet, and Internet publications that "are generally considered

'published' when they are first made available to the public." *Id.* at 1081-82. Second, it is well

established that providing links to statements already published on the Internet, as President

Trump did, is not actionable as a republication. *See Sundance Image Tech., Inc. v. Cone Editions

Press, Ltd.*, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) (providing links to a previously

published internet article does not constitute republication); *Martin v. Daily News L.P.*, 990

36

N.Y.S.2d 473, 483 (1st Dep't 2014); *Haefner v. N.Y. Media, LLC*, 918 N.Y.S.2d 103, 104 (1st Dep't 2011). Third, under Section 230, "Congress has comprehensively immunized republication by individual Internet users," *Barrett*, 146 P.3d at 529, even if the Internet user like President Trump, adds language to the republication. *See Hung Tan Phan v. Lang Van Pham*, 105 Cal. Rptr. 3d 791, 794–95 (Cal. Ct. App. 2010) (holding defendant is not liable for defamation under Section 230 for forwarding a defamatory email and adding introductory language). Thus, President Trump is not liable for retweeting others' statements.

### D.  Ms. Zervos Failed To Properly Plead Damages

The Complaint should be dismissed also because Ms. Zervos failed to properly plead damages. First, Ms. Zervos's allegations do not establish defamation *per se* because her allegations about President Trump purportedly questioning her honesty and integrity do not relate to her restaurant, its food, or to her ability to run it. (Comp. ¶¶ 79, 81.) *See Regalia v. Nethercutt Collection*, 90 Cal. Rptr. 3d 882, 888 (Cal. Ct. App. 2009) ("[D]isparagement must be more than general defamation of the victim's character, it must go to a characteristic particularly relevant to the victim's occupation.").[49] Indeed, calling a person a liar is not defamation *per se* unless that person's profession specifically requires honesty. *See, e.g.*, *Correia v. Santos*, 13 Cal. Rptr. 132, 136-37 (Cal. Ct. App. 1961); *Mihalakis*, 557 N.Y.S.2d at 37-38.

Second, while Ms. Zervos attempts to plead special damages with specificity by choosing a seemingly precise number -- $2,914 -- she does not allege a single fact to support the specificity of her damages as California law requires. (Compl. ¶ 81.) *See Jaramillo v. Food 4 Less Madera*, 2010 WL 4746170, at *10 (E.D. Cal. Nov. 16, 2010) (dismissing slander *per se* claim because while plaintiff alleged he lost his job and job opportunities, he failed to "allege the

---

[49] *See, e.g.*, *Mihalakis v. Comm. of Interns & Residents (CIR)*, 557 N.Y.S.2d 37, 37-38 (1st Dep't 1990).

nature and extent [of his] claimed loss with specifics"). Nor does she, as New York requires, plead any facts showing how she knows that she lost customers due to the Statements, or name a single allegedly lost customer. *DiSanto v. Forsyth*, 684 N.Y.S.2d 628, 629 (2d Dep't 1999).

## IV. The Complaint Must Be Stricken Pursuant to California's Anti-SLAPP Law

The Complaint should be stricken pursuant to California's anti-SLAPP statute, Cal. Code Civ. P. § 425.16(b)(1),[50] which protects the right to freedom of speech from a frivolous complaint, like here, that targets protected First Amendment activity.[51] *See Reed*, 204 Cal. Rptr. 3d at 186. There is no doubt that the statements are protected under the Constitution and Ms. Zervos has not established a probability that she will prevail on her claim.

The courts apply a two-step analysis in analyzing a motion to strike. Under the first step, the defendant makes "a threshold showing that the challenged cause of action is one 'arising from' protected activity," *Reed*, 204 Cal. Rptr. 3d at 186, and when the relief sought is "based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage," *Baral v. Schnitt*, 376 P.3d 604, 617 (Cal. 2016). President Trump has made a threshold showing that the Statements arise from protected activity, because, as Ms. Zervos readily admits, the Complaint targets statements made by President Trump as a political candidate and his supporters during an on-going political debate regarding issues of significant public interest -- Mr. Trump's qualifications for office. (Compl. ¶¶ 4, 6, 8, 50.) *See Buckley v. Valeo*, 424 U.S. 1, 15 (1976) ("[C]onduct of campaigns for political office" is where "the

---

[50] "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. P. § 425.16(b)(1).

[51] Despite Ms. Zervos's attempt to forum shop away from it, California's substantive anti-SLAPP statute applies here. *See Adelson*, 973 F. Supp. 2d at 476, 493 n.21 (recognizing, under New York choice of law principles, that the Nevada anti-SLAPP statute, which is similar to California's, was substantive in nature); *see also Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) (finding California's anti-SLAPP statute to be a substantive law).

38

constitutional guarantee [of free speech] has its fullest and most urgent application."); *Rosenaur*, 105 Cal. Rptr. 2d at 688 ("heated oral exchange . . . in the midst of a hard-fought [political] contest" constituted protected activity in a defamation action); *Conroy v. Spitzer*, 83 Cal. Rptr. 2d 443, 446 (Cal. Ct. App. 1999) (allegedly defamatory statements "obviously" constituted protected activity where they "addressed a matter of public concern -- a candidate's qualifications and conduct in office"); *Reed*, 204 Cal. Rptr. 3d at 181-82, 196; *Lakireddy v. Soto-Vigil*, 2014 WL 1478693, at *1 (Cal. Ct. App. Apr. 16, 2014).

Under the second step, "the burden shifts to plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated," which requires a heightened showing that that Ms. Zervos has a probability of prevailing on the merits. *Baral*, 376 P.3d at 617. "The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." *Id.* Under this standard, Ms. Zervos is not entitled to "rely solely on [her] complaint . . . instead, [ ] proof must be made upon competent admissible evidence." *Paulus v. Bob Lynch Ford, Inc.*, 43 Cal. Rptr. 3d 148, 158 (Cal. Ct. App. 2006).

As shown above (Section III), Ms. Zervos cannot prevail on her claim, let alone under this heightened standard that requires her to establish a probability of prevailing on the merits through admissible evidence. Ms. Zervos has not introduced admissible evidence to support *any* of her allegations and cannot possibly introduce evidence to establish a number of aspects of her claim. For example, first, as a limited purpose public figure, Ms. Zervos cannot substantiate her claim because she cannot prove by clear and convincing direct evidence that the Statements were made with actual malice. *See, e.g.*, *Annette F. v. Sharon S.*, 15 Cal. Rptr. 3d 100, 111 (Cal. Ct. App. 2004) (reversing trial court's order denying anti-SLAPP motion based on plaintiff's failure

39

to show a probability of proving actual malice by clear and convincing evidence); *Beilenson v. Superior Court*, 52 Cal. Rptr. 2d 357, 362 (Cal. Ct. App. 1996) ("[A]ctual malice cannot be implied and must be proven by direct evidence.").  Second, Ms. Zervos cannot introduce a scintilla of evidence to substantiate her unfounded allegation -- made "[o]n information and belief" -- that Mr. Barry's statements were drafted by Mr. Trump's campaign at Mr. Trump's purported direction and approval.  (Compl. ¶ 56.)  *See Evans v. Unkow*, 45 Cal. Rptr. 2d 624, 629 (Cal. Ct. App. 1995) ("An averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim."); *McGarry v. Univ. of San Diego*, 64 Cal. Rptr. 3d 467, 488 (Cal. Ct. App. 2007) ("Absent clear and convincing evidence identifying the precise individual who spoke the defamatory statements, and therefore whose 'state of mind' is at issue, McGarry cannot show a likelihood of success on the malice element.") (citation omitted); *Wong v. Tai Jing*, 117 Cal. Rptr. 3d 747, 761 (Cal. Ct. App. 2010).  Third, Ms. Zervos cannot introduce credible evidence to establish her alleged financial losses, including that customers stopped patronizing her restaurant due to Mr. Trump defending his character for office.  (Compl. ¶ 81.)  Therefore, because Ms. Zervos cannot carry her burden of establishing a probability of prevailing on her claim, her Complaint must be stricken in its entirety and she should be ordered to pay Mr. Trump's costs and attorneys' fees, as a "prevailing defendant," under Cal. Code Civ. P. § 425.16(c).  *See Ketchum v. Moses*, 104 Cal. Rptr. 2d 377 (Cal. 2001).

## CONCLUSION

For the foregoing reasons, the Court should dismiss and strike the Complaint pursuant to CPLR 3211 and Cal. Code Civ. P. § 425.16(b)(1), or, in the alternative, stay the action pursuant to CPLR 2201, and award President Trump his costs and attorneys' fees pursuant to Cal. Code Civ. P. § 425.16(c).

40

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 80 of 149

Dated: July 7, 2017
      New York, New York

                            **KASOWITZ BENSON TORRES LLP**

                            By:    _/s/ Marc E. Kasowitz_
                                Marc E. Kasowitz
                                Christine A. Montenegro
                                Paul J. Burgo

                            1633 Broadway
                            New York, New York 10019
                            (212) 506-1700

                            *Attorneys for Defendant Donald J. Trump*

41

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 81 of 149

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------- x
                                   :

E. JEAN CARROLL,                    :   Index No. 160694/2019
                                     :
                Plaintiff,       :   Hon. Verna L. Saunders
                                     :
            - against-         :   Mot. Seq. No. 2
                                     :

DONALD J. TRUMP,           :   **REPLY AFFIRMATION OF**
                                     :   **MARC E. KASOWITZ**
               Defendant.      :
                                     :
--------------------------------------- x

      Marc E. Kasowitz, an attorney duly admitted to practice before the courts of the State of

New York, hereby affirms the following under penalty of perjury:

      1.       I am a member of the firm Kasowitz Benson Torres LLP (the "Firm"), attorneys

for defendant President Donald J. Trump in the above-referenced action.  I respectfully submit

this reply affirmation in further support of defendant's motion to stay pending the appeal in

*Zervos v. Trump* ("Pl. Mem.").

      2.       Attached as **Exhibit A** is a true and correct copy of Katherine Rosman and Jessica

Bennett, *What Happened Between E. Jean Carroll and Elle Magazine?*, NEW YORK TIMES (Feb.

21, 2020), https://www.nytimes.com/2020/02/21/style/ejean-carroll-fired-elle.html.

      3.       Attached as **Exhibit B** is a true and correct copy of defendant's Answer, which

was served on plaintiff's counsel by email on January 23, 2020.

      4.       When plaintiff's counsel emailed on November 4, 2019, the firm did not represent

President Trump in connection with this action, nor was the Firm or any of its lawyers authorized

to accept service of the summons and complaint on the President's behalf.  The firm entered an

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 82 of 149

appearance, as co-counsel, on February 4, 2020, nearly three months after service had been

completed.  (*See* NYSCEF Doc. Nos. 40-42.)

5.      As of the time of the First Department's decision granting leave to appeal and a

stay in *Zervos v. Trump*, 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U) (1st Dep't Jan. 7, 2020),

there were numerous outstanding issues from the parties concerning document production as

well as outstanding third-party document subpoenas.

6.      Attached as **Exhibit C** is a true and correct copy of the First Department's Order

in *In re People ex rel. Schneiderman v. Trump Entrepreneur Initiative LLC*, No. 451463/13, M-

1498 (1st Dep't May 17, 2016).

Dated: February 27, 2020
       New York, New York

        */s/ Marc E. Kasowitz*
        MARC E. KASOWITZ

2

# Exhibit A

FILED: NEW YORK COUNTY CLERK 02/28/2020 12:03 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 5  Case 1:20-cv-07311-LAK  Document 12-6  Filed 09/14/20  Page 84 of 149  RECEIVED NYSCEF: 02/28/2020

**The New York Times**  https://nyti.ms/38PIbMb

# What Happened Between E. Jean Carroll and Elle Magazine?

Her contract was terminated early, but the fashion magazine maintains it wasn't because of her allegations against President Trump.

  **By Katherine Rosman and Jessica Bennett**

Feb. 21, 2020

In the fall of 2017, when Nina Garcia, the fashion editor and "Project Runway" judge, became the editor in chief of Elle magazine, E. Jean Carroll felt she needed to fight for her job.

Ms. Garcia was remaking the staff and was scaling back on lucrative contracts the magazine offered freelance contributors like Ms. Carroll, who had written the Ask E. Jean advice column since 1993.

But rather than dash off a pleading email, as many writers might, Ms. Carroll did something more in line with her outsize personality: She showed up at the offices of Hearst Magazines, the publisher of Elle, with a stack of hula hoops. "I said, 'Here's some hula hoops, let's get it going girl!'" she recalled in a phone interview.

Ms. Garcia appeared to love it.

"Oh, my God, I adore E. Jean!" she said in a 2018 interview, about a year after taking over. "She's just so perfect for this generation. Her voice is so modern, quirky, and cheeky. While everybody on Twitter thinks they could be the E. Jean, she is the E. Jean!"

The same month that the interview ran, Ms. Garcia agreed to provide a blurb for Ms. Carroll's forthcoming memoir, "What Do We Need Men For?," praising her work at Elle. At that point, Ms. Carroll had shared the book's contents with very few people, and Ms. Garcia had not read it.

"E. Jean Carroll is a force of nature, whose natural vibrancy has held readers in rapture for decades," read Ms. Garcia's blurb, which was printed on the back cover.

In the book, which recounts stories from her life, Ms. Carroll accuses Donald Trump of raping her in a department store dressing room in the mid-1990s. The details were revealed in an excerpt in New York magazine in June of 2019, just before the book was published, and quickly picked up by news outlets around the world.

Mr. Trump denied ever meeting Ms. Carroll, calling her a liar. ("She's not my type," he told The Hill.) Several months later, she filed a defamation suit against him. She argued he had damaged her reputation and her career by denying that her story was true, and by saying that she took money from his political opponents to fabricate the allegation.

Elle covered the story, reporting on her book's revelations and the reaction to them on its website. It also ran a column in print (but not online) last fall in which Ms. Carroll explained why she had decided to come forward at last.

But by December 2019, Elle's regard for its columnist had changed. Ms. Carroll, 76, was contacted by a Hearst editor, Erin Hobday, who asked if she was free for a call; Ms. Carroll thought she was being invited to the company holiday party.

Instead, she was informed that her contract, which was supposed to go through July of this year, was being terminated. She was asked to invoice for the remaining four columns, which would not be published and for which Ms. Carroll said she still has not been paid.

"We and your readers so appreciate your many years of work for the magazine, and the wonderful columns you contributed to our publication," Ms. Hobday wrote in an email, adding: "We will miss you tremendously."

## 'A Beloved Voice'

On Feb. 18, Ms. Carroll wrote on Twitter: "Because Trump ridiculed my reputation, laughed at my looks, & dragged me through the mud, after 26 years, ELLE ! red me. I don't blame Elle. It was the great honor of my life writing 'Ask E. Jean.' I blame @realdonaldtrump."

Earlier that day, her lawyers had disclosed in a court ! ling in connection to her defamation suit against Mr. Trump that Elle had killed the Ask E. Jean column, which had been published virtually every month for 26 years.

In response to a list of questions sent by The New York Times, a Hearst spokeswoman emailed a statement. "E. Jean Carroll was long a beloved voice in the pages of Elle, the decision not to renew her contract was a business decision and had nothing to do with politics," it said.

Even if Ms. Carroll did not blame Elle, others did, and were quick to say so. Soon, the hashtag #BoycottElleMagazine began appearing on Twitter.

"Extremely disappointing from the woman's mag that historically has done more hard hitting reporting and taken stands than most," Clara Jeffery, the editor of Mother Jones magazine, wrote on Twitter.

"If you ever wondered whether women's magazines are really on the side of women, I think this says all we need to know," said Nancy Jo Sales, a magazine writer.

Many editors who have worked with Ms. Carroll say Elle has lost an important voice. "E. Jean is an American original and to many, an icon," said Robbie Myers, the longtime editor of Elle, before Ms. Garcia.

"E. Jean was just so beloved," said Maggie Bullock, a former deputy editor at Elle. "It seems really sad that a women's publication that had the chance to align itself with a woman who was speaking her truth — and speaking truth to power — in a time like this, chose not to. What a shortsighted thing to do."

But inside the Hearst building in Midtown Manhattan this week, some journalists quietly fumed at what they saw as an inaccurate portrayal.

More than a dozen current and former Hearst employees, who spoke to The Times anonymously for fear they would face repercussions in their jobs, attributed Ms. Carroll's contract termination, at least in part, to a steep paycheck and a break in convention: Ms. Carroll had given away the news-breaking excerpt from her book to New York magazine — not Elle. (The New York cover story, "Hideous Men," was edited by Laurie Abraham, one of Ms. Carroll's former editors at Elle. Ms. Abraham now works at The Atlantic.)

Some said that Ms. Carroll's contention that Mr. Trump's insults cost her the columnist job was self-serving, since her defamation lawsuit against him will require her to prove she has been damaged by his remarks.

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 86 of 149
What Happened Between Jean Carroll and Elle Magazine | The New York Times   2/20/20, 2:38 PM

Ms. Carroll dismissed those comments. "The lawsuit is for all women who have been harassed, who cannot speak up and don't have the money to sue," Ms. Carroll said. "I am speaking out now for the women who have spoken out and have met their doom. Sometimes you speak out against a man in power and you lose your job."

Ms. Carroll has been credited with helping to shape the advice column genre and voice, inspiring modern-day iterations like Ask Polly, published by New York magazine, and "Dear Sugars," an advice column turned podcast.

"She didn't just toss off a bunch of ! uff — she used research, referenced current events and politics, interviewed experts and actually gave real advice that often was as much about helping get a woman's career on track as a relationship," said Ms. Bullock, the former Elle editor, now a freelance writer. "Early on, Jean was inclusive and, you could argue, 'woke.'"

But the days of lucrative magazine contracts are largely a thing of the past. When Ms. Garcia took over Elle, Ms. Carroll was being paid $120,000 a year for 12 columns of about 1,800 words each. (At about $5.50 per word, that was more than twice the $2 per word usually paid to Elle's freelance writers for the print magazine.)

When Ms. Carroll's contract came up for renewal during Ms. Garcia's ! rst year, editors went to bat for Ms. Carroll, arguing that her column had become synonymous with the Elle brand.

Ms. Garcia gave Ms. Carroll a new contract: $60,000 per year for 12 columns of 900 words.

## Changing of the Guard

The changes at Elle, many of them in response to the economic challenges of the magazine industry, re! ect big shifts at its parent company, Hearst, which is also facing tension with employees who recently unionized.

In 2018, David Carey, the president of Hearst Magazines for eight years, stepped down. Troy Young, who had previously overseen the company's digital efforts, succeeded him. Since then, most of the high-pro! le editors who served under Mr. Carey have left. (In 2019, Mr. Carey was named by Hearst Corporation as senior vice president of public affairs and communications.)

Ms. Garcia has worked to put her own stamp on Elle. She has made the magazine more visual, and amped up its social media presence. She has dedicated less space to political features, which had been a hallmark of Elle under its previous editors. Its annual women-in-Washington "Power List" magazine feature and awards dinner was canceled under Ms. Garcia.

She has also worked hard to avoid ruf! ing feathers, according to some current and former employees. In a 2017 article about Whitney Wolfe, the founder of the dating app Bumble, several paragraphs detailing her perspective on feminism were removed from the digital version of the article after Ms. Wolfe complained that the quotes were taken out of context, according to four former staffers who were aware of the discussions. (Later, Hearst worked with Bumble to start Bumble Mag.)

Last winter, a pro! le of Dr. Jen Gunter, the ob-gyn (and New York Times columnist) who has been a critic of Gwyneth Paltrow and Goop, was killed after top editors expressed concern that it might upset Ms. Paltrow and her publicist Stephen Huvane, who represents a variety of celebrity clients, according to three former staffers. (Ms. Paltrow appeared on a November 2019 cover of Elle.)

Sources also said a pro! le of Lara Trump, the president's daughter-in-law, was published in the print magazine but not on the Elle website because of fear it would stoke rage online.

After sending the statement about Ms. Carroll, Hearst did not respond to questions about these editorial decisions.

## Shifting Loyalties

Case 1:20-cv-07311-LAK    Document 12-6    Filed 09/14/20    Page 87 of 149
What Happened Between E. Jean Carroll and Elle Magazine - The New York Times    2/20/20, 8:18 AM

By the time Ms. Carroll was deciding where to excerpt her book — and publish her accusation that the sitting president had raped her years before — Ms. Carroll didn't consider Elle.

"Under Nina, Elle has been less into politics or news," Ms. Carroll said. "Nina's Elle is a fashion magazine. So I went with New York magazine, which knows how to break news."

That decision was revealed to Elle editors over drinks at the Russian Tea Room last spring, where Ms. Carroll and a few of the editors had gone to celebrate the upcoming publication of her book. It was there that she told the editors what the book was about — including what she had written about Mr. Trump — and that an excerpt containing this revelation would be running in New York magazine.

"They were extremely disappointed," Ms. Carroll said of the Elle editors.

They told Ms. Carroll that they were shocked, both by what she said had happened to her and by the fact that she had not given Elle !rst dibs on the excerpt.

By the terms of her contract, Ms. Carroll was not required to offer her story to Elle. But she agreed to help facilitate a phone call between Elle editors, her agent and a representative of her book publisher.

The excerpt still was published by New York.

When it came time to make budget cuts this past December, Hearst employees said, few felt lingering loyalty to Ms. Carroll. That's when Ms. Hobday told her she had been cut loose.

In a statement, Ms. Garcia, said: "E. Jean and I have known each other for more than two decades and she will always be part of the Elle DNA. We applaud and support her for coming forward with telling her story. The response to her allegations were not a factor in not renewing her contract."

Ms. Carroll is under no illusion that she was carrying the magazine into the next era. "I AM old, unhip and uncool, yes," she wrote on Twitter. But she doesn't believe Elle gave her the boot simply because it couldn't afford her. "I would have taken a new contract for less money," she said.

By Thursday, Ms. Carroll said she had received inquiries from four other publications asking if she would consider writing for them.

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

E. JEAN CARROLL,                                    Index No.: 160694/19

                Plaintiff,

        -against-                              **<u>ANSWER</u>**

DONALD J. TRUMP, in his personal capacity,

                Defendant.

------------------------------------------------------------------X

       Defendant Donald J. Trump ("President Trump"), subject to and reserving all rights to his

immunity, under the Supremacy Clause of the United States Constitution, Article IV, Section II, of a

sitting United States President from being sued in state court while serving as President, for his

answer to the complaint:

      1.      Denies the allegations contained in paragraph 1 of the Complaint.

      2.      Denies the allegations contained in paragraph 2 of the Complaint.

      3.      Denies the allegations contained in paragraph 3 of the Complaint.

      4.      Denies the allegations contained in paragraph 4 of the Complaint.

      5.      Denies the allegations contained in paragraph 5 of the Complaint.

      6.      Denies the allegations contained in paragraph 6 of the Complaint.

      7.      Denies the allegations contained in paragraph 7 of the Complaint.

      8.      Denies the allegations contained in paragraph 8 of the Complaint.

      9.      Denies the allegations contained in paragraph 9 of the Complaint.

     10.     Denies the allegations contained in paragraph 10 of the Complaint.

     11.     Denies the allegations contained in paragraph 11 of the Complaint.

     12.     Denies the allegations contained in paragraph 12 of the Complaint.

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 90 of 149

13.     Denies the allegations contained in paragraph 13 of the Complaint.

14.     Denies the allegations contained in paragraph 14 of the Complaint.

15.     Denies the allegations contained in paragraph 15 of the Complaint.

16.     Denies the allegations contained in paragraph 16 of the Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint.

18.     Denies the allegations contained in paragraph 18 of the Complaint.

19.     The allegation contained in paragraph 19 of the Complaint asserts a demand for a jury trial for which no response is required.

20.     Denies the allegations contained in paragraph 20 of the Complaint.

21.     Denies the allegations contained in paragraph 21 of the Complaint.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the Complaint.

23.     Denies the allegations contained in paragraph 23 of the Complaint.

24.     Denies the allegations contained in paragraph 24 of the Complaint.

25.     Denies the allegations contained in paragraph 25 of the Complaint.

26.     Denies the allegations contained in paragraph 26 of the Complaint.

27.     Denies the allegations contained in paragraph 27 of the Complaint.

28.     Denies the allegations contained in paragraph 28 of the Complaint.

29.     Denies the allegations contained in paragraph 29 of the Complaint.

30.     Denies the allegations contained in paragraph 30 of the Complaint.

31.     Denies the allegations contained in paragraph 31 of the Complaint.

32.     Denies the allegations contained in paragraph 32 of the Complaint.

33. Denies the allegations contained in paragraph 33 of the Complaint.

34. Denies the allegations contained in paragraph 34 of the Complaint.

35. Denies the allegations contained in paragraph 35 of the Complaint.

36. Denies the allegations contained in paragraph 36 of the Complaint.

37. Denies the allegations contained in paragraph 37 of the Complaint.

38. Denies the allegations contained in paragraph 38 of the Complaint.

39. Denies the allegations contained in paragraph 39 of the Complaint.

40. Denies the allegations contained in paragraph 40 of the Complaint.

41. Denies the allegations contained in paragraph 41 of the Complaint.

42. Denies the allegations contained in paragraph 42 of the Complaint.

43. The allegations contained in paragraph 43 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 43 of the Complaint.

44. Denies the allegations contained in paragraph 44 of the Complaint.

45. Denies the allegations contained in paragraph 45 of the Complaint.

46. Denies the allegations contained in paragraph 46 of the Complaint.

47. Denies the allegations contained in paragraph 47 of the Complaint.

48. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 of the Complaint.

49. Denies the allegations contained in paragraph 49 of the Complaint.

50. Denies the allegations contained in paragraph 50 of the Complaint.

51. Denies the allegations contained in paragraph 51 of the Complaint.

52. Denies the allegations contained in paragraph 52 of the Complaint.

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 92 of 149

53.     Denies the allegations contained in paragraph 53 of the Complaint.

54.     Denies the allegations contained in paragraph 54 of the Complaint.

55.     Denies the allegations contained in paragraph 55 of the Complaint.

56.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 of the Complaint.

57.     The allegations contained in paragraph 57 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 of the Complaint.

58.     The allegations contained in paragraph 58 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the Complaint.

59.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 of the Complaint.

60.     Denies the allegations contained in paragraph 60 of the Complaint.

61.     Denies the allegations contained in paragraph 61 of the Complaint.

62.     Denies the allegations contained in paragraph 62 of the Complaint.

63.     Denies the allegations contained in paragraph 63 of the Complaint.

64.     Denies the allegations contained in paragraph 64 of the Complaint.

65.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 of the Complaint.

66.     The allegations contained in paragraph 66 of the Complaint can neither be admitted

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 66 of the Complaint.

67.     The allegations contained in paragraph 67 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 67 of the Complaint.

68.     Denies the allegations contained in paragraph 68 of the Complaint.

69.     Denies the allegations contained in paragraph 69 of the Complaint.

70.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint.

71.     Denies the allegations contained in paragraph 71 of the Complaint.

72.     Denies the allegations contained in paragraph 72 of the Complaint.

73.     Denies the allegations contained in paragraph 73 of the Complaint.

74.     Denies the allegations contained in paragraph 74 of the Complaint.

75.     Denies the allegations contained in paragraph 75 of the Complaint.

76.     Denies the allegations contained in paragraph 76 of the Complaint.

77.     The allegations contained in paragraph 77 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 77 of the Complaint.

78.     The allegations contained in paragraph 78 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 78 of the Complaint.

79.     Denies the allegations contained in paragraph 79 of the Complaint.

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 94 of 149

80.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80 of the Complaint.

81.     Denies the allegations contained in paragraph 81 of the Complaint.

82.     Denies the allegations contained in paragraph 82 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

83.     The allegations contained in paragraph 83 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 83 of the Complaint.

84.     The allegations contained in paragraph 84 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 84 of the Complaint.

85.     Denies the allegations contained in paragraph 85 of the Complaint.

86.     Denies the allegations contained in paragraph 86 of the Complaint.

87.     Denies the allegations contained in paragraph 87 of the Complaint.

88.     Denies the allegations contained in paragraph 88 of the Complaint.

89.     Denies the allegations contained in paragraph 89 of the Complaint.

90.     Denies the allegations contained in paragraph 90 of the Complaint.

91.     The allegations contained in paragraph 91 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 91 of the Complaint and respectfully refers the Court to any alleged statements for their full and complete content and context.

92.     The allegations contained in paragraph 92 of the Complaint can neither be admitted

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 95 of 149

nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 92 of the Complaint.

93.    Denies the allegations contained in paragraph 93 of the Complaint.

94.    Denies the allegations contained in paragraph 94 of the Complaint.

95.    Denies the allegations contained in paragraph 95 of the Complaint.

96.    Denies the allegations contained in paragraph 96 of the Complaint.

97.    The allegations contained in paragraph 97 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 97 of the Complaint and respectfully refers the Court to any alleged statement for its full and complete content and context.

98.    The allegations contained in paragraph 98 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 98 of the Complaint.

99.    The allegations contained in paragraph 99 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 99 of the Complaint.

100.    Denies the allegations contained in paragraph 100 of the Complaint.

101.    The allegations contained in paragraph 101 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies the allegations contained in paragraph 101 of the Complaint.

102.    The allegations contained in paragraph 102 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014. Otherwise, denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 102 of the Complaint.

103.    The allegations contained in paragraph 103 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103 of the Complaint.

104.    The allegations contained in paragraph 104 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 104 of the Complaint.

105.    The allegations contained in paragraph 105 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 of the Complaint.

106.    Denies the allegations contained in paragraph 106 of the Complaint.

107.    Denies the allegations contained in paragraph 107 of the Complaint.

108.    Denies the allegations contained in paragraph 108 of the Complaint.

109.    Denies the allegations contained in paragraph 109 of the Complaint.

110.    Denies allegations contained in paragraph 110 of the Complaint and respectfully refers the Court to any alleged photographs for their full and accurate depictions.

111.    The allegations contained in paragraph 111 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 111 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

112.     The allegations contained in paragraph 112 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 112 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

113.     Denies the allegations contained in paragraph 113 of the Complaint.

114.     Denies the allegations contained in paragraph 114 of the Complaint.

115.     Denies the allegations contained in paragraph 115 of the Complaint.

116.     Denies the allegations contained in paragraph 116 of the Complaint.

117.     Denies the allegations contained in paragraph 117 of the Complaint.

118.     Denies the allegations contained in paragraph 118 of the Complaint.

119.     Denies the allegations contained in paragraph 119 of the Complaint.

120.     Denies the allegations contained in paragraph 120 of the Complaint.

121.     Denies the allegations contained in paragraph 121 of the Complaint.

122.     Denies the allegations contained in paragraph 122 of the Complaint.

123.     The allegations contained in paragraph 123 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 123 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

124.     Denies the allegations contained in paragraph 124 of the Complaint

125.     The allegations contained in paragraph 125 of the Complaint can neither be admitted nor denied because of the improper inclusion of a footnote citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 125 of the Complaint and respectfully refers the Court to any alleged statements for their full and accurate content and context.

126.    Denies the allegations contained in paragraph 126 of the Complaint.

127.    The allegations contained in paragraph 127 of the Complaint can neither be admitted nor denied because of the improper inclusion of footnotes citing to external sources in violation of CPLR 3014.  Otherwise, denies the allegations contained in paragraph 127 of the Complaint.

128.    Denies the allegations contained in paragraph 128 of the Complaint.

129.    Denies the allegations contained in paragraph 129 of the Complaint.

130.    Denies the allegations contained in paragraph 130 of the Complaint.

131.    Denies the allegations contained in paragraph 131 of the Complaint.

132.    Denies the allegations contained in paragraph 132 of the Complaint.

133.    Denies the allegations contained in paragraph 133 of the Complaint.

134.    Denies the allegations contained in paragraph 134 of the Complaint.

135.    Denies the allegations contained in paragraph 135 of the Complaint.

136.    Denies the allegations contained in paragraph 136 of the Complaint.

## FIRST CAUSE OF ACTION

137.    Paragraphs 1 through 136 are realleged.

138.    Denies the allegations contained in paragraph 138 of the Complaint.

139.    Denies the allegations contained in paragraph 139 of the Complaint.

140.    Denies the allegations contained in paragraph 140 of the Complaint.

141.    Denies the allegations contained in paragraph 141 of the Complaint.

142.    Denies the allegations contained in paragraph 142 of the Complaint.

143.    Denies the allegations contained in paragraph 143 of the Complaint.

144.    Denies the allegations contained in paragraph 144 of the Complaint.

145.    Denies the allegations contained in paragraph 145 of the Complaint.

## DEMAND FOR RELIEF

146.    President Trump denies that plaintiff is entitled to any relief requested in the *ad damnum* clause of the Complaint or any other relief.

## FIRST AFFIRMATIVE DEFENSE

147.    Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States.

## SECOND AFFIRMATIVE DEFENSE

148.    The Complaint fails to state a cause of action.

## THIRD AFFIRMATIVE DEFENSE

149.    The alleged defamatory statements are privileged or protected by one or more immunities, including, but not limited to, under the Constitution of the United States.

## FOURTH AFFIRMATIVE DEFENSE

150.    The alleged defamatory statements are true.

## FIFTH AFFIRMATIVE DEFENSE

151.    Plaintiff's claim is barred because her damages, if any, were caused by acts of third persons, for which defendant is not responsible.

## SIXTH AFFIRMATIVE DEFENSE

152.    Plaintiff is not entitled to punitive damages as a matter of law.

## SEVENTH AFFIRMATIVE DEFENSE

153.    Plaintiff has not sufficiently alleged defamation *per se*.

## EIGHTH AFFIRMATIVE DEFENSE

154.    Plaintiff has failed to plead damages with the required specificity.

## NINTH AFFIRMATIVE DEFENSE

155.     The Court lacks personal jurisdiction over President Trump.


WHEREFORE, defendant Donald J. Trump respectfully demands judgment dismissing the

Complaint in its entirety, together with costs, disbursements, and all such other relief as this Court

deems just and proper.

Dated: New York, New York
       January 23, 2020

                                              **LAROCCA HORNIK ROSEN
                                              & GREENBERG LLP**

                          By: _____
                                              Lawrence S. Rosen, Esq.
                                              Amy D. Carlin, Esq.
                                              Patrick McPartland, Esq.
                                              40 Wall Street, 32nd Floor
                                              New York, New York 10005
                                              T: (212) 530-4822, 4836, 4837
                                              E: LROSEN@LHRGB.COM
                                                 ACARLIN@LHRGB.COM
                                                 PMCPARTLAND@LHRGB.COM

                                              *Attorneys for Donald J. Trump*


To:     Roberta Kaplan, Esq.
        Kaplan Hecker & Fink LLP
        350 Fifth Avenue, Suite 7110
        New York, NY  10118

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 101 of 149

# Exhibit C

At a Term of the Appellate Division of the Supreme
Court held in and for the First Judicial Department in
the County of New York on May 17, 2016.

PRESENT: Hon. Angela M. Mazzarelli,        Justice Presiding,
              Dianne T. Renwick
              David B. Saxe
              Karla Moskowitz,               Justices.

---------------------------------------X

In re The People of the State of
New York by Eric T. Schneiderman, etc.,
     Petitioner-Appellant-Respondent,

          -against-                          M-1498
                                        Index No. 451463/13

The Trump Entrepreneur Initiative
LLC, formerly known as Trump University
LLC, et al.,
     Respondents-Respondents-Appellants.
---------------------------------------X


          Respondents-respondents-appellants having moved for
leave to appeal to the Court of Appeals from the decision and
order of this Court entered on March 1, 2016 (Appeal No. 16093-
16094),

          Now, upon reading and filing the papers with respect to
the motion, and due deliberation having been had thereon,

          It is ordered that the motion is granted, and this
Court, pursuant to CPLR 5713, certifies that the following
question of law, decisive of the correctness of its
determination, has arisen, which in its opinion ought to be
reviewed by the Court of Appeals:

          Was the order of Supreme Court, as affirmed by
          this Court, properly made?

          This Court further certifies that its determination was
made as a matter of law and not in the exercise of discretion.

                    ENTER:



                                        CLERK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------ x

E. JEAN CARROLL,

              Plaintiff,

       - against-

DONALD J. TRUMP,

           Defendant.

------------------------------------------ x

:
:
: Index No. 160694/2019
:
: Hon. Verna L. Saunders
:
: Mot. Seq. No. 002
:
:
:
:
:
:
:

**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION FOR A STAY**

KASOWITZ BENSON TORRES LLP

  Marc E. Kasowitz
  Christine A. Montenegro
  Paul J. Burgo
  1633 Broadway
  New York, New York 10019
  (212) 506-1700

LAROCCA HORNIK ROSEN &
GREENBERG LLP

  40 Wall Street, 32nd Floor
  New York, New York 10005
  (212) 530-4822

*Attorneys for Defendant,
President Donald J. Trump*

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 104 of 149

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ...................................................................................................... 6

I.   THE FIRST DEPARTMENT'S DECISION IN *ZERVOS*, SUPPORTS, RATHER THAN BARS, A STAY HERE. ............................................................... 7

   A.   This is a "Proper Case" for a Stay of Proceedings Under CPLR § 2201 ............... 7

   B.   The First Department's Decisions in *Zervos* Supports a Stay Here ........................ 7

II.   THERE ARE NO "UNIQUE CIRCUMSTANCES" HERE TO JUSTIFY DENYING A STAY. ............................................................................ 10

   A.   There Has Been No Undue Delay. ........................................................ 10

   B.   A Stay Will Irreparably Harm the President and the Public Interest. ................... 12

   C.   A Stay Will Not Prejudice Plaintiff. ...................................................... 15

III.   PLAINTIFF DOES NOT REBUT THE "UNIQUE CIRCUMSTANCES" HERE. ........ 16

   A.   The Appeal in *Zervos* Without Question Has Merit. ........................................ 16

   B.   Plaintiff Concedes that the President is Entitled to Judicial Deference. ............... 17

CONCLUSION ................................................................................................ 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Artibee v. Home Place Corp.*,
  28 N.Y.3d 739 (2017) ...........................................................................................11

*Assenzio v. A.O. Smith Water Prods.*,
  No. 190008/12, 2015 WL 5283301 (Sup. Ct., N.Y. Cnty. Aug. 28, 2015) .........................8, 9

*Behrens v. Pelletier*,
  516 U.S. 299 (1996).............................................................................................17

*Belabarodaya v. Carepro of NY, Inc.*,
  No. 152534/2018, 2018 WL 3733304 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) .......................1, 8

*Broadway 500 W. Monroe Mezz II LLC v. Transwestern Mezzanine Realty
  Partners II, LLC*,
  80 A.D.3d 483 (1st Dep't 2011) ...............................................................................4, 15

*Cheney v. U.S. Dist. Court for D.C.*,
  542 U.S. 367 (2004)........................................................................................ *passim*

*Clifford v. Trump*,
  339 F. Supp.3d 915 (C.D. Cal. 2018) ........................................................................14

*Clinton v. Jones*,
  520 U.S. 681 (1997)........................................................................................ *passim*

*Crawford-El v. Britton*,
  523 U.S. 574 (1998).............................................................................................17

*Feinstein v. Bergner*,
  48 N.Y.2d 234 (1979) ...........................................................................................10

*Fin. Indus. Regulatory Auth., Inc. v. Fiero*,
  10 N.Y.3d 12 (2008) .............................................................................................11

*Goldstone v. Gracie Terrace Apartment Corp.*,
  110 A.D.3d 101 (1st Dep't 2013) .............................................................................15

*Grisi v. Shainswrit*,
  119 A.D.2d 418 (1st Dep't 1986) .............................................................................7, 9

*Jacobus v. Trump*,
  55 Misc.3d 470 (Sup. Ct., N.Y. Cnty. 2017..............................................................6, 14

ii

*Jones v. Clinton,*
　No. 95-1167, BL-62 (8th Cir. Apr. 16, 1996).............................................................................19

*In re Level 3 Commc'ns, LLC v. Essex Cnty.,*
　54 Misc.3d 291 (Sup. Ct., Essex Cnty. 2016)...........................................................................9

*Miller v. Miller,*
　109 Misc.2d 982 (Sup. Ct., Suffolk Cnty. 1981) ................................................................2, 8, 9

*Nixon v. Fitzgerald,*
　457 U.S. 731 (1982).................................................................................................................13

*People v. Shakur,*
　215 A.D.2d 184 (1st Dep't 1995) ............................................................................................8

*Pludeman v. Northern Leasing Systems,*
　No. 101059/04, 2015 WL 7008051 (Sup. Ct., N.Y. Cnty. Mar. 13, 2015) .............................9

*Pub. Relations Soc. of Am., Inc. v. Rd. Runner High Speed Online,*
　8 Misc.3d 820 (Sup. Ct., N.Y. Cnty. 2005) ...........................................................................16

*In re Reynders v. Conway,*
　79 A.D.2d 863 (4th Dep't 1980)...............................................................................................8

*Rinaldi v. Viking Penguin, Inc.,*
　52 N.Y.2d 422 (1981) .............................................................................................................15

*Trump v. Deutsche Bank AG,*
　140 S.Ct. 660 (U.S. Dec. 13, 2019) ..................................................................................18, 19

*Trump v. Mazars USA, LLP,*
　--- S.Ct. ----, 2019 WL 6328115 (U.S. Nov. 25, 2019) ...................................................18, 19

*Trump v. Vance,*
　941 F.3d 631 (2d Cir. 2019).....................................................................................................17

*Trump v. Vance,*
　No. 19-3204, 2019 WL 5703884 (2d Cir. Oct. 7, 2019)...............................................17, 18, 19

*United States v. Nixon,*
　418 U.S. .................................................................................................................................18

*In re Weinbaum's Estate,*
　51 Misc.2d 538 (Surr. Ct., Nassau Cnty. 1966) ......................................................................8

*Williams v. Brooks,*
　996 F.2d 728 (5th Cir. 1993) ...................................................................................................18

iii

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 107 of 149

**Other Authorities**

CPLR § 2201 ...............................................................................................................6, 7

CPLR § 3211(e) ...............................................................................................................11

iv

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 108 of 149

Defendant Donald J. Trump respectfully submits this memorandum of law in reply to plaintiff's memorandum of law in opposition to his motion to stay pending the appeal in *Zervos v. Trump* ("Pl. Mem." or "Opposition") and in further support of the motion.[1]

## PRELIMINARY STATEMENT

The threshold dispositive issue in this case is identical to the issue on appeal to the Court of Appeals in *Zervos* -- whether a state court's exercise of jurisdiction over the President while he or she is in office is permissible under the U.S. Constitution. *See Clinton v. Jones*, 520 U.S. 681, 690-91, 691 n.13 (1997) (state court jurisdiction over the President poses an "important constitutional issue[]"). As President Trump showed in his opening memorandum, just as a stay pending that appeal was granted by the First Department in *Zervos*, so, too, a stay should be granted here.

Plaintiff does not and cannot refute President Trump's showing. Instead, plaintiff resorts to mischaracterizations of the law and of the record. Plaintiff asserts that the motion should be denied because, she claims, this Court is bound by the First Department's 3-2 decision on the merits in *Zervos*. (Pl. Mem. 8.) That is not so. Courts, including this Court, have repeatedly recognized -- including where there is binding Appellate Division authority -- that "[i]f the point of law involved in the case, and potentially dispositive of it, is about to be definitively decided in another case presently on appeal before a court whose decisions bind the trial court, the action may be stayed to await the decision." *Belabarodaya v. Carepro of NY, Inc.*, No. 152534/2018,

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in President Trump's opening memorandum of law ("Def. Mem."). Submitted herewith in support of the motion is the reply affirmation of Marc E. Kasowitz, dated February 27, 2020 ("Kasowitz Reply Aff."). References to "Reply Ex. __" are to exhibits to that affirmation. The affirmation of Roberta Kaplan, dated February 18, 2020, submitted in opposition to the motion is referred to as "Kaplan Aff."

2018 WL 3733304, at *1 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) (citation omitted).

The cases that plaintiff cites (Pl. Mem. 8) are wholly inapposite.  Among other things, in those cases, unlike here: the Appellate Division had not stayed proceedings pending appeal in the separate action; the party seeking the stay would not be irreparably harmed if the action continued; there was no claim of official immunity; and the President, who is entitled to deference under the U.S. Constitution, was not seeking the stay.  Indeed, plaintiff's "reliance on cases that do not involve [the President] is altogether misplaced."  *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385 (2004).

Plaintiff's contention that this Court may not stay the action pending the *Zervos* appeal because it is bound by the First Department's decision in *Zervos* thus makes no sense.  Not only is the First Department decision set to be reviewed by the Court of Appeals, but the First Department itself decided to grant a stay in *Zervos* pending that same appeal.  There is no principled reason, and plaintiff offers none, why this Court should not be bound by *that* First Department decision or why a stay is appropriate in *Zervos*, but not here, where precisely the same threshold issue is at stake.

Plaintiff also contends (Pl. Mem. 8) that a stay may be granted pending an appeal in another case only when the decision on the appeal is "imminent."  But, in the single case to which plaintiff cites that denied a stay on this ground, *Miller v. Miller*, 109 Misc.2d 982, 983 (Sup. Ct., Suffolk Cnty. 1981), there was no appeal even pending; only a motion for leave to appeal had been filed, but not granted.  Here, by contrast, leave to appeal and a stay pending appeal have been granted in *Zervos*, and the appeal will be fully briefed by May 11, 2020.  Neither *Miller* nor any other case holds or even suggests that, under such circumstances, a stay pending an appeal on a threshold dispositive issue is not justified.

Plaintiff claims that "unique circumstances of this litigation" -- defendant's supposed "dilatory" behavior and plaintiff's purported prejudice from a stay -- make a stay here inappropriate.  Again, that is not so.  Plaintiff's complaints about delay (Pl. Mem. 11-13) are, apart from irrelevant, unfounded.  Cutting through the verbiage, plaintiff appears to complain about the time it took to serve the complaint, but she filed her complaint on November 4, 2019, and served it only seven business days later.  She also complains about the President's order to show cause to dismiss on jurisdictional grounds, but admits that he filed it two weeks before the agreed upon date for moving to dismiss, that she responded the next business day, and that the Court declined to sign the order the same day.  (Pl. Mem. 3-4.)  Plaintiff also falsely asserts that this motion to stay was in response to and an attempt to avoid a discovery request she served on January 30, 2020 (Pl. Mem. 1, 6), but she omits that she already knew, a week before, on January 23, when defendant's counsel asked her counsel to consent to this motion, which was filed promptly after the First Department granted leave to appeal and a stay in *Zervos* (*id.* at 5, 6; Kaplan Aff. ¶ 6, Ex. 1).  In fact, it would be more accurate to say that plaintiff timed her discovery request so that she could make that false assertion.  In short, there has been no undue delay here.[2]

Second, as in *Zervos*, the necessity for a resolution of this threshold jurisdictional issue under the U.S. Constitution -- which, the First Department recognized, is an issue of "first

---

[2]     Plaintiff also makes misstatements concerning *Zervos*.  She asserts, for example, that there, the First Department granted the stay pending appeal, when only depositions remained to be completed.  (Pl. Mem. 6.)   This is not so; there are numerous outstanding issues from the parties concerning document production as well as outstanding third-party document subpoenas. *See, e.g.*, Kasowitz Reply Aff. ¶ 5; *Zervos v. Trump*, Index. No. 150522/2017 NYSCEF Doc. No. 249 (discussing forthcoming privilege motion); Kaplan Aff. Ex. 3 at 2 n.2 (referring to remaining "fact discovery" other than depositions).  Plaintiff also refers (Pl. Mem. 12-13) to the *Zervos* plaintiff's request to the Court of Appeals to expedite the appeal -- but omits to mention that the Court of Appeals *denied* that request (Kaplan Aff. Ex. 6).

impression," *Zervos*, 171 A.D.3d at 113 -- is a "unique consideration" far outweighs any burden on plaintiff resulting from allowing the Court of Appeals to decide the issue (Def. Mem. 11-13).

As for prejudice, plaintiff cannot show -- indeed, her own admissions belie her claim -- that a stay would result in any significant burden.  She asserts conclusorily that the allegedly defamatory statements are causing her continuing harm, including that *Elle* magazine to decline to renew her contract to write a column.  (Pl. Mem. 14-15.)  Even if that were true, and *Elle* magazine's publisher and other sources cited by the *New York Times* deny it,[3] by February 20, 2020, she had already, as she admitted to the *Times*, "received inquiries from four other publications asking if she would consider writing for them."  (Kasowitz Reply Ex. A.)  Plaintiff's claim that her alleged harm was continuing and compounding was always far-fetched, to say the least, but is refuted by her own words.

In any event, the supposedly continuing harm that plaintiff claims is irrelevant to this motion.  Plaintiff seeks damages for the alleged harm to her reputation.  Where the claimed injury "can be compensated by damages [it] therefore cannot demonstrate irreparable harm" so as to warrant equitable relief.  *Broadway 500 W. Monroe Mezz II LLC v. Transwestern Mezzanine Realty Partners II, LLC*, 80 A.D.3d 483, 484 (1st Dep't 2011).  If, as plaintiff claims, allegations of ongoing harm to reputation are so prejudicial that a court cannot grant a stay, then defamation actions could never be stayed, but plaintiff does not and cannot point to a single case in support of that erroneous proposition, and *Zervos* itself would not have been stayed.

---

[3]       *See* Kasowitz Reply Ex. A (Katherine Rosman and Jessica Bennett, *What Happened Between E. Jean Carroll and Elle Magazine?*, NEW YORK TIMES (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/style/ejean-carroll-fired-elle.html (citing sources attributing *Elle* magazine's termination to plaintiff's decision to publish excerpts from her book in another magazine, a decision at which, plaintiff admits, *Elle* was "extremely disappointed.").)

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 112 of 149

If there is a "unique circumstance" here, it is that the President is involved.  Plaintiff fails to refute defendant's showing (Def. Mem. 7-11) that -- given the novel threshold official immunity issue claim on appeal in *Zervos* and the deference afforded the President's overriding responsibilities under Article II -- the U.S. Constitution mandates a stay here.  Plaintiff asserts that "the Constitution does not require a stay based simply on Trump's say-so" (Pl. Mem. 15), but the requested stay here is required, not based on his "say-so," but on the "say-so" of numerous cases, including the First Department's decision granting a stay pending appeal in *Zervos*, and the U.S. Constitution (Def. Mem. 8-11).

Plaintiff seeks to distinguish the numerous cases that have granted Presidents stays pending appeal (Def. Mem. 9-10) on the ground that, in those cases, the appeals were pending in the same case.  (Pl. Mem. 16.)  That is a distinction without a difference.  The stays in those cases were granted to prevent proceedings in the trial courts from abrogating the very relief the President sought to vindicate on appeal and to prevent an unnecessary "occasion for constitutional confrontation" with the Executive Branch, *Cheney*, 542 U.S. at 389-90 (citation omitted).  A stay here would serve precisely the same purposes.

And, while plaintiff concedes, as she must, that the courts are constitutionally required to afford the President deference, plaintiff contends that this action should nonetheless proceed because state courts can accommodate the President in overseeing litigation.  (Pl. Mem. 20-21.) That misses the point.  The threshold issue in this case, which the Court of Appeals will resolve in *Zervos*, is not whether state courts can accommodate the President once they have asserted jurisdiction over him or her, but whether the very exercise of jurisdiction over the President by state courts is constitutionally permissible in the first place.  (Def. Mem. 7-8.)  The issue on this motion, on the other hand, is whether deference to the President mandates a stay while the Court

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 113 of 149

of Appeals resolves that threshold issue.  As shown, and as numerous courts have held, it does. (Def. Mem. 9-10.)

Having no valid argument to oppose the President's motion, plaintiff argues that the motion should be denied because, she asserts, he "did not litigate presidential immunity" in six other cases against him.  (Pl. Mem. 18-19.)  Plaintiff's argument, even if it otherwise had any merit (and it does not), is completely misleading.  Four of the six cases plaintiff cites are in federal court, where there can be no claim of presidential immunity, as the U.S. Supreme Court held in *Clinton v. Jones*, while recognizing that state court actions might very well present a "more compelling case." 520 U.S. 681, 691 (1997).  And, as to the two state court cases plaintiff refers to: *Galicia v. Trump*, No. 24973/2015E (Sup. Ct., Bronx Cnty.) was filed over a year before President Trump took office, the President *did* assert presidential immunity, and the First Department stayed the action pending the President's appeal, on constitutional grounds, among others, from an order compelling the President's trial deposition.  *Jacobus v. Trump*, 55 Misc.3d 470, 486 (Sup. Ct., N.Y. Cnty. 2017), *aff'd*, 156 A.D.3d 452 (1st Dep't 2017), *lv. denied*, 31 N.Y.3d 903 (2018) was dismissed before the President took office.  Moreover, even in the federal actions -- in *every single federal court action* plaintiff cites -- the court granted the President stays of discovery, including on the ground that the President is owed judicial deference.

Accordingly, the President's motion for a stay should be granted.

## **ARGUMENT**

Plaintiff does not and cannot refute the President's showing that, under the U.S. Constitution, the caselaw, and CPLR § 2201, a stay is mandated here pending resolution by the Court of Appeals in the *Zervos* action of precisely the same threshold jurisdictional issue that is

6

dispositive here. Each of the arguments plaintiff does make is based on a fundamental misunderstanding of the law or the facts or both.

## I. THE FIRST DEPARTMENT'S DECISION IN *ZERVOS*, SUPPORTS, RATHER THAN BARS, A STAY HERE.

### A. This is a "Proper Case" for a Stay of Proceedings Under CPLR § 2201.

As the First Department has recognized, a stay pending the appeal in *Zervos* "provides for the opportunity for appellate review of certain orders" -- a "fundamental right[] to which a litigant is entitled . . . [which] cannot be ignored, no matter how pressing the need for the expedition of cases." *Grisi v. Shainswrit*, 119 A.D.2d 418, 421 (1st Dep't 1986). That applies to any litigant and, *a fortiori* to the President in deference to the President's overriding responsibilities under Article II of the Constitution.

### B. The First Department's Decisions in *Zervos* Supports a Stay Here.

Plaintiff asserts that, under New York law, a stay would be "improper" here because this Court is bound by decisions of the Appellate Division -- here, the First Department's 3-2 decision on the merits in *Zervos*. (Pl. Mem. 7-8.) But it was the First Department which, after that decision, decided to grant leave to appeal the decision and granted a stay pending that appeal. Under plaintiff's own logic, this Court should, if anything, be bound by the First Department's stay order here.[4]

But, in any event, by granting the stay, this Court would not contravene the First Department's decision on the merits. Rather, it would merely wait for the decision of the Court of Appeals on the merits -- a decision which is binding on all New York courts.[5]

---

[4] Plaintiff cannot cite to a single case in which a party was denied a stay pending appeal in a separate action where -- as here -- the proceedings in the separate action were themselves stayed by an appellate court.

[5] This was the procedural posture in cases cited by the President in his initial memorandum, which granted stays pending appeals in separate actions despite Appellate

Indeed, plaintiff's argument proves too much.  All Appellate Division decisions are binding on all trial courts (absent a contrary decision in the Court of Appeals or in the Department in which the trial court sits).  *See People v. Shakur*, 215 A.D.2d 184 (1st Dep't 1995) ("Trial courts within this department must follow the determination of the Appellate Division in another department until such time as this court or the Court of Appeals passes on the question.").  Thus, under plaintiff's argument, a trial court would never be empowered to grant a stay pending any appeal to the Court of Appeals because the Appellate Division decision appealed from would be binding.  As shown (Def. Mem. 11), that is not the law.

The cases plaintiff cites are readily distinguishable, and none supports her argument.  (Pl. Mem. 8.)  First, in none of those cases did the appellate court in the separate action stay proceedings pending appeal, as the First Department did in *Zervos*.[6]  Second, in none of those cases would the movants have been irreparably harmed absent a stay.[7]  Third, none of those

---

Division authority.  (Def. Mem. 11.)  *See In re Reynders v. Conway*, 79 A.D.2d 863, 864 (4th Dep't 1980) ("court had the power to stay petitioners['] . . . action until the [separate] appeal was argued in the Court of Appeals"); *Belabarodaya v. Carepro of NY, Inc.*, No. 152534/2018, 2018 WL 3733304, at *1 (Sup. Ct., N.Y. Cnty. Aug. 1, 2018) (staying discovery until the Court of Appeals resolved a joint appeal from two binding Second Department decisions) (internal quotations omitted); *Assenzio v. A.O. Smith Water Prods.*, No. 190008/12, 2015 WL 5283301 (Sup. Ct., N.Y. Cnty. Aug. 28, 2015) (granting stay pending appeal in Appellate Division that itself would turn on the outcome of an appeal in the Court of Appeals in a third separate action).

[6]    In *Schneiderman*, 53 Misc.3d 1210(A), 2016 WL 6330584, the case plaintiff relies most heavily on (Pl. Mem. 9), it is clear that the appellant in the separate action, did *not* seek or obtain a stay pending appeal.  (Reply Ex. C (Order of First Department granting leave to appeal in *Trump Entrepreneur Initiative* without granting a stay); NYSCEF Doc. No. 285, Stipulated Briefing Schedule for Motion to Compel, *In re People ex rel. Schneiderman v. Trump Entrepreneur Initiative LLC*, index No. 451463/2013 (indicating that the case continued during the pendency of the appeal to the Court of Appeals).

[7]    Here because the issue on appeal will resolve the threshold issue of whether the court's very assertion of jurisdiction violates the President's constitutional right of immunity, and prevent a constitutional confrontation, the President, and the public, would be irreparably harmed absent a stay.  (Def. Mem. 11-12.)  Plaintiff's cases involve no such threshold constitutional issue.  *See Schneiderman*, 53 Misc.3d 1210(A), 2016 WL 6330584 at *7 (defendant in summary proceeding denied stay pending appeal in separate action that would determine whether some of

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 116 of 149

cases involved the President and therefore plaintiff's reliance on them is "altogether misplaced," *see Cheney*, 542 U.S. at 385.

Plaintiff also contends (Pl. Mem. 8) that a stay may be granted pending an appeal in another case only when the decision on the appeal is "imminent." But, in the single case to which plaintiff cites that denied a stay on this ground, *Miller*, 109 Misc.2d at 983, there was no appeal even pending; only a motion for leave to appeal had been filed, but not granted. Here, by contrast, leave to appeal and a stay pending appeal have been granted in *Zervos* and the appeal will be fully briefed by May 11, 2020. Neither *Miller* nor any other case holds or even suggests that, under such circumstances, a stay pending appeal on a threshold dispositive issue is not justified. To the contrary, where, as here, the equities are strong or the appeal will have a "significant impact" on a case, it is irrelevant whether the appeal is imminent. *See Assenzio*, 2015 WL 5283301, at *2 (staying proceedings even though appeal in separate action was not "imminent" because it would have a "significant impact" on the case); *Pludeman v. Northern Leasing Systems*, No. 101059/04, 2015 WL 7008051, *2 (Sup. Ct., N.Y. Cnty. Mar. 13, 2015) (granting stay pending an unperfected appeal because "'the equities involved [were] apparent and strong'" in avoiding a waste of judicial and party resources).

---

plaintiff's claims were valid); *Miller v. Miller*, 109 Misc.2d 982, 983 (Sup. Ct., Suffolk Cnty. 1981) (defendant denied stay pending potential appeal, which had not yet been granted leave, in separate action that would determine whether defendant was required to provide financial disclosure affidavit); *In re Weinbaum's Estate*, 51 Misc.2d 538, 539 (Surr. Ct., Nassau Cnty. 1966) (court denied stay pending appeal involving whether claim against administratrix requiring an accounting was time-barred). In *In re Level 3 Commc'ns, LLC v. Essex Cnty.*, 54 Misc.3d 291, 293 (Sup. Ct., Essex Cnty. 2016), the plaintiff was *granted* a stay pending appeal to the Appellate Division in a separate action, based on the chance that Appellate Division would overturn its own prior "binding authority," on whether plaintiff had properly asserted a claim for a tax refund.

And, contrary to plaintiff (Pl. Mem. 10), whether the parties are substantively identical

and share a common dispute has no bearing on whether a stay pending an appeal in another

action should be granted, and no case holds that it does.  As shown, the applicable standard here

focuses on whether there is a common, dispositive issue.  (Def. Mem. 11-12.)

## II.     THERE ARE NO "UNIQUE CIRCUMSTANCES" HERE TO JUSTIFY DENYING A STAY.

Having failed to establish why a stay is not appropriate under relevant case law, plaintiff

asserts that there are "unique considerations" justifying denial under these circumstances.  (Pl.

Mem. 11.)  However, none of these so-called "unique circumstances" withstands scrutiny.

### A.     There Has Been No Undue Delay.

Plaintiff's complaints about delay (Pl. Mem. 11-13) are, apart from irrelevant, unfounded.

Cutting through the verbiage, plaintiff appears to complain about the time it took to serve

the complaint, but she filed her complaint on November 4, 2019, and served it only seven

business days later on November 13, 2019.  (NYSCEF Doc. Nos. 2, 17.)  And even if defendant

was aware of the action, as plaintiff contends (Pl. Mem. 2-3), that is irrelevant to her obligation

to effectuate service.  *See Feinstein v. Bergner*, 48 N.Y.2d 234, 241-42 (1979) (notice of the

complaint does not cure a defect in service of process because "notice received by means other

than those authorized by statute cannot serve to bring a defendant within the jurisdiction of the

court").[8]

Plaintiff also complains about the President's order to show cause to dismiss on

---

[8]     Plaintiff insinuates (Pl. Mem. 3) that defendant's new co-counsel in this action, Kasowitz Benson Torres, is to blame because plaintiff was told on or around November 4, 2019, that the firm could not accept service of her summons and complaint on the President's behalf. However, that was accurate; the firm -- which only entered an appearance, as co-counsel, on February 4, 2020 -- did not then represent the President in this action and was therefore not authorized to accept service.  (Kasowitz Reply Aff. ¶ 5; NYSCEF Doc. Nos. 40-42.)

10

jurisdictional grounds, but admits that he filed it two weeks before the agreed upon date for

moving to dismiss, that she responded the next business day, and that the Court ruled the same

day. (Pl. Mem. 3-4; (NYSCEF Doc. No. 36.)  The Court did not "agree[]" with the arguments

plaintiff made in opposition, as she claims (Pl. Mem. 4-5), but only "decline[d] to sign" the order

to show cause on the ground that the Court would not "take judicial notice that the President of

the United States has resided in the White House for the past three years."  (NYSCEF Doc. No.

36.)

Further, plaintiff falsely asserts that the President "has not formally asserted [immunity

under the Supremacy Clause] in this litigation" (Pl. Mem. 12) when, in fact, President Trump's

Answer, dated January 23, 2020, asserts as affirmative defenses, among others, immunity under

the Supremacy Clause and preserves his defense of lack of personal jurisdiction.  (Reply Ex. B at

¶¶ 147, 155.)  The timing for the President's assertion of this Court's lack of subject matter

jurisdiction is also irrelevant given that "a court's lack of subject matter jurisdiction is not

waivable, but may be raised at any stage of the action, and the court may, *ex mero motu* [on its

own motion], at any time."  *Fin. Indus. Regulatory Auth., Inc. v. Fiero*, 10 N.Y.3d 12, 17 (2008)

(citation omitted); *see also* CPLR 3211(e) ("motion based upon [lack of subject matter

jurisdiction] may be made at any subsequent time or in a later pleading"); *Artibee v. Home Place

Corp.*, 28 N.Y.3d 739, 746 (2017) ("immunity from suit" stemming from the Constitution is a

"constitutional limitation on 'the jurisdiction of Supreme Court'").[9]

---

[9]      Defendant does not, as plaintiff claims (Pl. Mem. 13), engage in "gamesmanship" or
"opportunism" here, because he opposed plaintiff's request to designate this action as related to
*Zervos*, which has no bearing here.  That opposition -- prior to the First Department's decision
granting a leave to appeal and a stay -- concerned the differences between the defamation claims,
not the threshold issue of whether a state court may exercise jurisdiction over the President
relevant to this motion.  If anything, it is plaintiff who is engaged in opportunism by denying the
similarities between this case and *Zervos* after previously arguing this action and *Zervos* "present

11

Plaintiff also falsely asserts that this motion to stay was in response to and an attempt to avoid a discovery request she served on January 30, 2020 (Pl. Mem. 1, 6), but she omits that she already knew, a week before, on January 23, when defendant's counsel asked her counsel to consent to this motion, which was filed promptly after the First Department, on January 7, granted leave to appeal and a stay in *Zervos* (*id.* at 5, 6; Kaplan Aff. ¶ 6, Ex. 1).  In fact, it would be more accurate to say that plaintiff timed her discovery request so that she could make that false assertion.  In short, there has been no undue delay here.

Plaintiff also makes misstatements concerning *Zervos*.  She asserts, for example, that there, the First Department granted the stay pending appeal, when only depositions remained to be completed.  (Pl. Mem. 6.)   This is not so; there are numerous outstanding issues from the parties concerning document production as well as outstanding third-party document subpoenas. *See, e.g.*, Kasowitz Reply Aff. ¶ 5; *Zervos v. Trump*, Index. No. 150522/2017 NYSCEF Doc. No. 249 (discussing forthcoming privilege motion); Kaplan Aff. Ex. 3 at 2 n.2 (referring to remaining "fact discovery" other than depositions).  Plaintiff also refers (Pl. Mem. 12-13) to the *Zervos* plaintiff's request to the Court of Appeals to expedite the appeal -- but omits to mention that the Court of Appeals *denied* that request (Kaplan Aff. Ex. 6).

**B.      A Stay Will Irreparably Harm the President and the Public Interest.**

Plaintiff fails to refute President Trump's showing of irreparable harm and prejudice absent a stay (Def. Mem. 11-13), which extends to the public interest. *See also Clinton v. Jones*, 520 U.S. at 697-98 (agreeing that the President "occupies a unique office with powers and

---

similar, and often novel, legal issues," including "the same argument[s] that Trump made, and Justice Schecter considered, in *Zervos*," and that "[a]ssigning two different Justices to these cases would both amplify the Court's workload unnecessarily and risk conflicting rulings."  (Kasowitz Aff., Ex. A (NYSCEF Nos. 3 at ¶¶ 6, 8, 24 at ¶¶ 9, 10, 12).)

12

responsibilities so vast and important that the public interest demands that he devote *his undivided time and attention* to his public duties.") (emphasis added); *Nixon v. Fitzgerald*, 457 U.S. 731, 751-53, 754 (1982) (recognizing that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government," such that "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch.").

Plaintiff's claim that the President has not provided "support for the claim that discovery would 'distract' him from his public duties" (Pl. Mem. 17) is both irrelevant and false.  Absent a stay, the President would be deprived of his constitutional right to immunity from this action while in office, including his immunity to the extensive and burdensome discovery requests plaintiff has served under the Court's scheduling order.  Failing to grant a stay further improperly imposes an unnecessary constitutional confrontation concerning whether this Court's exercise of jurisdiction violates the Constitution.  *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389-90 (2004) (where the "Executive's Article II prerogatives" are at issue -- here whether the President's Article II prerogatives immunize him from suit in state court -- courts should "avoid[] whenever possible" "'occasion[s] for constitutional confrontation.'").

Having no valid argument to oppose the President's motion, plaintiff argues that the motion should be denied because, she asserts, he "did not litigate presidential immunity" in six other cases against him.  (Pl. Mem. 18-19.)  Plaintiff's argument, even if it otherwise had any merit (and it does not), is completely misleading.  Four of the six cases plaintiff cites are in federal court, where there can be no claim of presidential immunity, as the U.S. Supreme Court held in *Clinton v. Jones*, while recognizing that state court actions might very well present a

"more compelling case." 520 U.S. 681, 691 (1997).  Nonetheless, the federal "personal conduct" cases cited by plaintiff only further support a stay here, because in every single case cited by plaintiff, the President received stays of discovery, including stays that the President requested on the ground that he is owed judicial deference.[10]  Accordingly, plaintiff's citations only add to the authority, cited at Mem. 9-10, that the President should be afforded a stay here.

In *Galicia v. Trump*, No. 24973/2015E (Sup. Ct., Bronx Cnty.) -- which was filed on September 9, 2015, over a year before President Trump took office, the President asserted Presidential immunity in response to a trial subpoena.  Moreover, the First Department has stayed that action pending the President's appeal, on constitutional grounds, among others, from an order compelling the President's trial deposition.  *Galicia v. Trump*, No. 24973/15E, M-7413 (1st Dep't Oct. 24, 2019).

And in *Jacobus v. Trump*, No. 24973/2015E (Sup. Ct., N.Y. Cnty.), a defamation action against the President, the court granted the President's motion to dismiss on January 10, 2017, before the President took office.  *Jacobus v. Trump*, 55 Misc.3d 470, 486, (Sup. Ct., N.Y. Cnty. Jan. 10, 2017), *aff'd* 156 A.D.3d 452 (1st Dep't 2017), *lv. denied* 31 N.Y.3d 903 (2018).

---

[10]    *See Nwanguma v. Trump*, No. 16 Civ. 247 (W.D. Ky.), Doc. No. 58 (Aug. 9, 2017) (Doc. No. 36-1 (Apr. 20, 2017) at 4, 6 (granting the President's request for interlocutory appeal and stay of discovery pending appeal, brought on grounds that included the burden imposed on the President); *Johnson v. Trump*, No. 8:19 Civ. 0475 (M.D. Fla. July 10, 2019) Doc. No. 73 at 8-10, Doc. No 83 at 4:3-14 (abating discovery following President Trump's motion for a protective order, including on the ground of the deference owed his office.); *Doe v. Trump Corp.*, No. 18-cv-9936, Doc. No. 54 (S.D.N.Y. Dec. 20, 2018) (staying discovery pending resolution of President's motion to dismiss); *Clifford v. Trump*, 339 F. Supp.3d 915, 922, 928 (C.D. Cal. 2018) (denying plaintiff's request to conduct discovery after President Trump brought a motion to strike the complaint).

14

## C.    A Stay Will Not Prejudice Plaintiff.

Plaintiff cannot show -- indeed, her own admissions belie her claim -- that a stay would result in any significant burden.  She asserts conclusorily that the allegedly defamatory statements are causing her continuing harm, including that *Elle* magazine to decline to renew her contract to write a column.  (Pl. Mem. 14-15.)  Even if that were true, and *Elle* magazine's publisher and other sources cited by the *New York Times* deny it,[11] by February 20, 2020, she had already, as she admitted to the *Times*, "received inquiries from four other publications asking if she would consider writing for them."  (Kasowitz Reply Ex. A.)  Plaintiff's claim that her alleged harm was continuing and compounding was always far-fetched, to say the least, but is refuted by her own words.

In any event, the supposedly continuing harm that plaintiff claims is irrelevant to this motion.  Plaintiff seeks damages for the alleged harm to her reputation.  Where the claimed injury "can be compensated by damages [it] therefore cannot demonstrate irreparable harm" so as to warrant equitable relief.  *Broadway 500 W. Monroe Mezz II*, 80 A.D.3d at 484; *see also Goldstone v. Gracie Terrace Apartment Corp.*, 110 A.D.3d 101, 104, 106 (1st Dep't 2013) ("The balance of the equities does not weigh in plaintiff's favor" where the "claimed injury would be compensable by money damages").  If, as plaintiff claims, allegations of ongoing harm to reputation are so prejudicial that a court cannot grant a stay, then defamation actions could never be stayed, but plaintiff does not and cannot point to a single case in support of that erroneous proposition.  *Compare, e.g.*, *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 431 (1981)

---

[11]    *See* Kasowitz Reply Ex. A (Katherine Rosman and Jessica Bennett, *What Happened Between E. Jean Carroll and Elle Magazine?*, NEW YORK TIMES (Feb. 21, 2020), https://www.nytimes.com/2020/02/21/style/ejean-carroll-fired-elle.html (citing sources attributing *Elle* magazine's termination to plaintiff's decision to publish excerpts from her book in another magazine, a decision at which, plaintiff admits, *Elle* was "extremely disappointed.").)

15

(discussing stay pending appeal granted by the Appellate Division in connection with leave to

appeal in defamation action); *Pub. Relations Soc. of Am., Inc. v. Rd. Runner High Speed Online*,

8 Misc.3d 820, 822 (Sup. Ct., N.Y. Cnty. 2005) (noting stay of judgment granted to defamation

defendant).  Indeed, under plaintiff's argument, *Zervos* itself would not have been stayed.

## III.     PLAINTIFF DOES NOT REBUT THE "UNIQUE CIRCUMSTANCES" HERE.

If there are any "unique circumstances," it is that the case involves the President and

appeal of a threshold claim of immunity.

### A.     The Appeal in *Zervos* Without Question Has Merit.

Plaintiff argues that the appeal in *Zervos* has no merit because, she contends, First

Department's decision in *Zervos* "confirm[s] the weakness of Trump's immunity argument on

the merits" because this case and *Zervos* "differ[s] from *Clinton* in only one respect: they were

brought in state, not federal court.  But that does not change the clear force of the Supreme

Court's logic."  (Pl. Mem. 19.)  In fact, the Supreme Court's logic in *Clinton v. Jones* was

explicitly based on that critical difference.  The Court took pains to differentiate the claim of

immunity made in federal court -- which "relie[d] heavily on the doctrine of separation of

powers that restrains each of the three branches of Federal Government from encroaching on the

domain of the other two" -- from a claim of immunity in state court, which would rely on the

Supremacy Clause.  The Supreme Court recognized that the state court immunity claim "may

implicate concerns that are *quite different* from the interbranch separation-of-powers questions

addressed here," and therefore potentially "present a more compelling case for immunity."  *Id.* at

691, 691 n.13 (emphasis added).

There is therefore no question that the President's appeal has merit.  The First

Department in *Zervos* confirmed precisely that by granting leave to appeal to the Court of

Appeals and staying proceedings pending that appeal.  *Zervos*, 2020 WL 63397, 2020 N.Y. Slip

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 124 of 149

Op. 60193(U).  Likewise, the Court of Appeals for the Second Circuit in *Trump v. Vance* readily

acknowledged that "the President may be correct that state courts lack the authority to issue him

orders."  941 F.3d 631, 642-43 (2d Cir. 2019), *cert. granted*, 140 S.Ct. 659 (Mem) (U.S. Dec. 13,

2019) (No. 19-635).  And, two Justices found in dissent that President Trump's appeal should

have been granted.  *Zervos*, 171 A.D.3d at 131 (Mazzarelli, J., dissenting in part).

### B.    Plaintiff Concedes that the President is Entitled to Judicial Deference.

Plaintiff concedes that, as shown (Def. Mem. 8-9), the courts are constitutionally required

to afford the President with at least "some special consideration" (Pl. Mem. 21) but nonetheless

contends that this action should proceed because state courts can be trusted as well as federal

courts to accommodate the President's needs (Pl. Mem. 20-21).  This misses the point.  The

issue, which the Court of Appeals will resolve, is not whether state courts can accommodate the

President in overseeing the litigation, but whether the very exercise of jurisdiction over the

President by state courts is constitutionally permissible in the first place.  (Def. Mem. 7-8.)

Thus, under these circumstances, as President Trump has shown, federal courts (and indeed state

courts), accommodate the President by granting his requests for stays or interlocutory appeals on

constitutional issues the one presented here.  (Def. Mem. 9-10.)[12]

Plaintiff seeks to distinguish the numerous cases that granted the President stays pending

appeal or interlocutory appeals (Def. Mem. 9-10) on the ground that, in those cases, the appeals

---

[12]    Plaintiff also does not and cannot contest that official immunity claims -- like the one at
issue here -- exist to protect government officials from "*pretrial* matters as discovery …, as
'[i]nquiries of this kind can be peculiarly disruptive of effective government."  *Behrens v.
Pelletier*, 516 U.S. 299, 308 (1996) (emphasis in original) (citing *Mitchell v. Forsyth*, 472 U.S.
511, 526 (1985)); *Crawford-El v. Britton*, 523 U.S. 574, 598, 598 n.19 (1998) ("[I]f the
defendant does plead the immunity defense, the district court should resolve that threshold
question before permitting discovery" and, if denied, "the official is entitled to bring an
immediate interlocutory appeal of that legal ruling on the immunity question."); *see also* Def.
Mem. 8 (citing cases).

17

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 125 of 149

were pending in the same case.  (Pl. Mem. 16.)[13]  That is a distinction without a difference.  The

stays in those cases were granted to prevent proceedings in the trial courts from abrogating the

very relief the President sought to vindicate on appeal.  *See Cheney*, 542 U.S. at 389-90 (courts

should "avoid[] whenever possible" "'occasion[s] for constitutional confrontation.'"); *see also*

*United States v. Nixon*, 418 U.S. at 691-92.  A stay here would serve precisely the same purpose.

Plaintiff claims that the standard for staying a case based on an appeal in a separate action

is "unsurprisingly, far more stringent." (Pl. Mem. 16.)  Not only is plaintiff wrong that courts

apply a more stringent standard under ordinary circumstances, but because this case involves the

President, it is subject to a far *less* stringent standard.  *See, e.g.*, *Cheney*, 542 U.S. at 381-2 (Vice

President was entitled to interlocutory review, by writ of mandamus, of a discovery order, given,

among other things, the deference owed to the Executive Branch, even though "[w]ere the Vice

President not a party in the case, the argument that the Court of Appeals should have entertained

an action in mandamus . . . might present different considerations"); Def. Mem. 8-10 (citing

cases).  Thus, plaintiff's "reliance on cases that do not involve [the President] is altogether

misplaced."  *Cheney*, 542 U.S. at 385.

Plaintiff argues that *Trump v. Mazars USA, LLP*, --- S.Ct. ----, 2019 WL 6328115 (Mem)

(U.S. Nov. 25, 2019) (No. 19A545), *cert. granted*, 140 S.Ct. 660 (Mem) (U.S. Dec. 13, 2019)

(No. 19-715); *Trump v. Deutsche Bank AG*, 140 S.Ct. 660 (Mem) (U.S. Dec. 13, 2019) (No.

19A640); and *Trump v. Vance*, No. 19-3204, 2019 WL 5703884, at *1 (2d Cir. Oct. 7, 2019), are

inapplicable because they all involved a preliminary injunctions in a "singular dispute."  (Pl.

---

[13]    In federal court, "the filing of a non-frivolous notice of interlocutory appeal following a
district court's denial of a defendant's immunity defense divests the district court
of jurisdiction to proceed against that defendant," *Williams v. Brooks*, 996 F.2d 728, 730 (5th
Cir. 1993) (collecting cases), and therefore in effect constitutes a stay pending appeal.

18

Mem. 17.)  That is incorrect.  While *Mazars* and *Deutsche Bank* both involved Congressional

subpoenas, *Vance* is a separate dispute, against a separate party, concerning the enforcement of

subpoenas in a state grand jury proceeding.  (*See* Def. Mem. 9-10.)  Plaintiff does not even

attempt to distinguish the remaining cases in which courts have granted stays to the President,

plainly applicable here, including, in particular, the First Department's stays in *Zervos* and

*Galicia v. Trump*, No. 24973/15E, M-7413 (1st Dep't Oct. 24, 2019), and the Eighth Circuit's

stay in *Jones v. Clinton*, No. 95-1167, BL-62 (8th Cir. Apr. 16, 1996).  *See generally* Def. Mem.

8-11.

## <u>CONCLUSION</u>

A stay of all proceedings pending the decision of the Court of Appeals in *Zervos v.*

*Trump* should be granted.

19

Dated: New York, New York.
February 27, 2020

Respectfully submitted,

KASOWITZ BENSON TORRES LLP


By:    _/s/ Marc E. Kasowitz_
  Marc E. Kasowitz
  Christine A. Montenegro
  Paul J. Burgo

  1633 Broadway
  New York, New York 10019
  T:  (212) 506-1700
  E:  mkasowitz@kasowitz.com
   cmontenegro@kasowitz.com
   pburgo@kasowitz.com

LAROCCA HORNIK ROSEN &
  GREENBERG LLP
  Lawrence S. Rosen
  Patrick McPartland
  Jared E. Blumetti

  40 Wall Street 32nd Floor
  New York, New York 10005
  T: (212) 530-4822, 4837, 4831
  E: lrosen@lhrgb.com
   pmcpartland@lhrgb.com
   jblumetti@lhrgb.com

  *Attorneys for Defendant Donald J. Trump*

20

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0884
DIRECT EMAIL   rkaplan@kaplanhecker.com

March 2, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
80 Centre Street, Room 326
New York, NY 10013

     *Re:*    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

On behalf of Plaintiff E. Jean Carroll, we write to bring to the Court's attention the complaint in *Donald J. Trump for President, Inc. v. The New York Times Company*, Index No. 152099/2020 (Sup. Ct., N.Y. Cty.), attached hereto as Exhibit A.

The attached defamation complaint was filed by the Trump campaign on February 26, 2020, the day before Defendant Donald J. Trump filed his reply brief in support of his motion to stay this defamation action. We expect that this newly-filed case will come up at the oral argument in connection with the stay motion in the above-referenced action that is scheduled for 11:30 am on March 4, 2020.

Respectfully submitted,

Roberta A. Kaplan

cc:    Counsel of Record (via NYSCEF)

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 129 of 149

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |  |
|---|---|---|
| **DONALD J. TRUMP FOR PRESIDENT, INC.,** a Virginia corporation, | : | **Index No.** |
|  | : |  |
| **Plaintiff,** | : |  |
|  | : | **COMPLAINT** |
| **v.** | : |  |
|  | : | **JURY TRIAL DEMANDED** |
| **THE NEW YORK TIMES COMPANY d/b/a** *The New York Times*, a New York corporation, | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## INTRODUCTION AND SUMMARY OF CASE

1. Defendant The New York Times Company d/b/a *The New York Times* ("*The Times*") knowingly published false and defamatory statements of and concerning plaintiff Donald J. Trump for President, Inc. (the "Campaign"), claiming it had an "overarching deal" with "Vladimir Putin's oligarchy" to "help in the campaign against Hillary Clinton" in exchange for "a new pro-Russian foreign policy, starting with relief from the Obama administration's burdensome economic sanctions."

2. *The Times* was well aware when it published these statements that they were not true. *The Times*' own previous reporting had confirmed the falsity of these statements. But *The Times* published these statements anyway, knowing them to be false, and knowing it would misinform and mislead its own readers, because of *The Times*' extreme bias against and animosity toward the Campaign, and *The Times*' exuberance to improperly influence the presidential election in November 2020.

1

3.      The Campaign therefore files this lawsuit to: publicly establish the truth, properly

inform *The Times*' readers (and the rest of the world) of the true facts, and seek appropriate

remedies for the harm caused by *The Times*' intentional false reporting.

4.      *The Times* has engaged in a systematic pattern of bias against the Campaign,

designed to maliciously interfere with and damage its reputation and seek to cause the

organization to fail.

## THE PARTIES

5.      Plaintiff Donald J. Trump for President, Inc. is a Virginia corporation with its

principal place of business in New York City, New York County, State of New York.  The

Campaign operated the presidential election campaign of Donald J. Trump commencing in 2015,

and has operated his reelection campaign since the President's election.

6.      On information and belief, defendant The New York Times Company d/b/a *The

New York Times* is a New York corporation with its principal place of business in New York

City, New York County, State of New York.  On information and belief, The New York Times

Company d/b/a *The New York Times* publishes *The New York Times*, including both its print and

online editions.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over *The Times* under CPLR § 301 because *The Times*

has offices in, has its principal place of business in and/or is domiciled in New York City, New

York County, State of New York, and the cause of action alleged arises out of *The Times*'

activities in New York City, New York County, State of New York.

8.       Venue is proper in this county under CPLR § 503 because *The Times* has its

principal place of business here and/or is domiciled here.

2

## STATEMENT OF FACTS

9.       On or about March 27, 2019, *The Times* published an article by Max Frankel entitled "The Real Trump-Russia Quid Pro Quo" (the "Defamatory Article"), which claims, among other things, that "There was no need for detailed electoral collusion between the Trump campaign and Vladimir Putin's oligarchy because they had an overarching deal: the quid of help in the campaign against Hillary Clinton for the quo of a new pro-Russian foreign policy, starting with relief from the Obama administration's burdensome economic sanctions.  The Trumpites knew about the quid and held out the prospect of the quo."  On information and belief, *The Times* published the Defamatory Article in *The Times*' print and online editions.

10.       The Defamatory Article does not allege or refer to any proof of its claims of a "quid pro quo" or "deal" between the Campaign and Russia.  Rather, the Defamatory Article selectively refers to previously-reported contacts between a Russian lawyer and persons connected with the Campaign.  The Defamatory Article, however, insinuates that these contacts must have resulted in a quid pro quo or a deal, and the Defamatory Article does not acknowledge that, in fact, there had been extensive reporting, including in *The Times*, that the meetings and contacts that the Defamatory Article refers to **did not** result in any quid pro quo or deal between the Campaign and Russia, or anyone connected with either of them.

11.       *The Times*' story is false.  The falsity of the story has been confirmed by Special Counsel Robert Mueller's *Report on the Investigation into Russian Interference in the 2016 Presidential Election* released on or about April 18, 2019 (the "Mueller Report"), and many other published sources, that there was **no conspiracy** between the Campaign and Russia in connection with the 2016 United States Presidential Election, or otherwise.  Among other things,

3

there was no "deal," and no "quid pro quo," between the Campaign or anyone affiliated with it, and Vladimir Putin or the Russian government.

12.     It is not entirely surprising that *The Times* would publish such a blatant false attack against the Campaign.  There is extensive evidence that *The Times* is extremely biased against the Campaign, and against Republicans in general.  This evidence includes, among other things, the fact that *The Times* has endorsed the Democrat in every United States presidential election of the past sixty (60) years.  Also, Max Frankel, the author of the Defamatory Article, described himself in an interview as "a Democrat **with a vengeance**."

13.     *The Times* obviously had a malicious motive, and also acted with reckless disregard for the truth.  Extensive information, including stories in *The Times* published before the Defamatory Article, had put *The Times* and the world on notice that **there was no conspiracy between the Campaign and the Russian government**, and there was no "quid pro quo" or "deal" between them.  Moreover, extensive information, including stories in *The Times* published before the Defamatory Article, established that, at most, there had been isolated contacts between individual Russians and some persons associated with the Campaign, which **did not result** in any "deal" or "quid pro quo."  These prior statements in *The Times* included, among others:

a.  On July 9, 2017, *The Times* published an article which confirmed that, in fact, Russian lawyer Natalya Veselnitskaya, who has been alleged to have met with individuals connected with the Campaign in 2016, had no meaningful information about Hillary Clinton to provide to attendees of the meeting.  *The Times* further reported Ms. Veselnitskaya's statement that she never worked on behalf of the Russian government.

4

    b.  On July 11, 2017, *The Times* reported in an article that Ms. Veselnitskaya's statements at the meeting were described by attendees as "vague, ambiguous, and mak[ing] no sense," "generic" and "inane nonsense."

    c.  On September 7, 2017, *The Times* reported Donald Trump, Jr.'s statement that the meeting "provided no meaningful information" and that he was "adamant" that he did not collude with the Russian government.

    d.  On May 16, 2018, *The Times* reported that Ms. Veselnitskaya was disappointed that her meeting with associates of the Campaign **did not result** in a commitment to relax sanctions against Russia.  *The Times* also reported that a second meeting with Ms. Veselnitskaya did not take place.

14.    In other words, at the time the Defamatory Article was published, the public record, and *The Times*' own reporting, had **already confirmed** what Robert Mueller would eventually conclude: that there was no "deal" or "quid pro quo" between the Campaign and Russia.  *The Times* and its writer, Mr. Frankel, consciously disregarded all such information, including information that had appeared in several of *The Times*' own past articles, in falsely accusing the Campaign of an "overarching deal" and a "quid pro quo" with the Russian government to "help in the campaign against Hillary Clinton" in exchange for "a new pro-Russian foreign policy, starting with relief from the Obama administration's burdensome economic sanctions."  *The Times* thus published the statements at issue knowing that they were false at the time of publication, or at the very least, published them with reckless disregard for the truth.

15.    *The Times* never informed the Campaign that it intended to publish the claims in the Defamatory Article, did not afford the Campaign an opportunity to verify the accuracy of the

5

claims before publication, and did not reach out to the Campaign for comment.  This is further

evidence of *The Times*' actual malice.

16.     On information and belief, *The Times* decided to publish the Defamatory Article

when it did, in advance of the Mueller Report, knowing that the Mueller Report was likely to

exonerate the Campaign from allegations of collusion with Russia regarding the 2016 election.

Once the Mueller Report was released, *The Times* knew that any claims of conspiracy would not

be credible.  Thus, by publishing the Defamatory Article in March 2019, *The Times* sought to

damage the Campaign before the Mueller Report would be released debunking the conspiracy

claims.

17.     The Defamatory Article defamed the Campaign in its trade or profession, because

it falsely accuses the Campaign of conducting an unethical and unpatriotic election campaign

and colluding with a foreign adversary to improperly influence an election result.

18.     The Defamatory Article has forced, and will continue to force, the Campaign to

expend funds on corrective advertisements and to otherwise publicize the fact that the Campaign

did not collude with, have a deal with, or have a "quid pro quo" with Russia regarding the 2016

election.  The Campaign has been damaged in an amount to be proven at trial.

## **FIRST CAUSE OF ACTION**

### **(Defamation)**

19.     The Campaign realleges and incorporates by this reference Paragraphs 1 through

18 as though fully set forth herein.

20.     *The Times* published the Defamatory Article on or about March 27, 2019.

21.     The Defamatory Article contains false statements of fact, including the following:

a.   "The Real Trump-Russia Quid Pro Quo";

6

b.  "[T]hey had an overarching deal: the quid of help in the campaign against
Hillary Clinton for the quo of a new pro-Russian foreign policy, starting with
relief from the Obama administration's burdensome economic sanctions.  The
Trumpites knew about the quid and held out the prospect of the quo.";

c.  "Run down the known facts about the communications between Russians and
the Trump campaign and their deal reveals itself.";

d.  "But no such speculation is needed to perceive the obvious bargain reached
during the campaign of 2016."; and

e.  "And true to the campaign minuet, despite great resistance in Congress,
President Trump has watered down the sanctions and otherwise appeased
Russian interests, even at the expense of America's allies.  Call it the art of the
deal."

22.    The false statements in the Defamatory Article are of and concerning the
Campaign, in that they allege the Campaign specifically colluded with and reached a quid pro
quo deal with the Russian government.

23.    The Campaign is concededly a public figure, and the false statements were made
with actual malice, as alleged herein.

24.    The false statements defamed the Campaign in its trade or profession.

25.    The false statements caused actual damage to the Campaign.

26.    *The Times* acted with malice or reckless disregard for the Campaign's rights,
thereby justifying an award of punitive damages.

7

## PRAYER FOR RELIEF

WHEREFORE, the Campaign prays for relief as follows:

i.        Compensatory damages in the millions of dollars, according to proof;

ii.       Presumed damages according to proof;

iii.      Punitive damages according to proof;

iv.      Costs of suit; and

v.       Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

The Campaign hereby demands a trial by jury.

**Dated: New York, New York**
      **February 26, 2020**

           **HARDER LLP**

           **By:** _____

           **Charles J. Harder, Esq.**
           **HARDER LLP**
           **260 Madison Avenue, Sixteenth Floor**
           **New York, New York 10016**
           **Telephone: (212) 799-1400**
           CHarder@HarderLLP.com

           *Attorneys for Plaintiff Donald J.*
           *Trump for President, Inc.*

8

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

March 6, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
80 Centre Street, Room 326
New York, NY 10013

     *Re:*    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

     On behalf of Plaintiff E. Jean Carroll, we write to bring to the Court's attention two additional defamation complaints filed by the Trump campaign in recent days. The first, *Donald J. Trump for President, Inc. v. WP Company LLC*, No. 20 Civ. 626 (D.D.C.), attached hereto as Exhibit A, was filed against *The Washington Post* on March 3, 2020; the second, *Donald J. Trump for President, Inc. v. CNN Broadcasting, Inc.*, No. 20 Civ. 1045 (D. Ga.), attached hereto as Exhibit B, was filed against CNN on March 6, 2020.

     The attached complaints closely resemble the defamation complaint against *The New York Times* that we provided to the Court on March 2, 2020, *see* Docs. No. 71-72, and discussed during oral argument on March 4, 2020.

                                    Respectfully submitted,

                                    Roberta A. Kaplan

cc:     Counsel of Record (via NYSCEF)

Case 1:20-cv-07311-LAK   Document 12-6   Filed 09/14/20   Page 139 of 149

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DONALD J. TRUMP FOR PRESIDENT, INC.,** ) <br> 725 Fifth Avenue ) <br> New York, NY 10022, ) <br> ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **WP COMPANY LLC** ) <br> **d/b/a** *The Washington Post* ) <br> Serve : ) <br> CT Corporation System ) <br> 1015 15th St., NW, Suite 100 ) <br> Washington, D.C. 20005, ) <br> ) <br> Defendant. ) | Civil Action No. <br><br> **COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Donald J. Trump for President, Inc. (the "Campaign"), by and through its

undersigned attorneys, alleges as follows:

**INTRODUCTION AND SUMMARY OF CLAIM**

1.      Defendant WP Company LLC d/b/a *The Washington Post* ("*The Post*") published

false and defamatory statements of and concerning the Campaign in two articles published in

June 2019 (the "Defamatory Articles").

2.      On or about June 13, 2019, *The Post* published the article entitled "Trump just

invited another Russian attack.  Mitch McConnell is making one more likely" (the "June 13

Article"), by Greg Sargent, which contained the defamatory claim that Special Counsel Robert

Mueller concluded that the Campaign "tried to conspire with" a "sweeping and systematic"

attack by Russia against the 2016 United States presidential election.

3.      The statement in the June 13 Article is false and defamatory.  In fact, Special

Counsel Mueller's *Report on the Investigation into Russian Interference in the 2016 Presidential

Election* released on or about April 18, 2019 (the "Mueller Report"), nearly two months before

the June 13 Article, came to the opposite conclusion of the June 13 Article, namely, the Mueller

Report concluded there was **no conspiracy** between the Campaign and the Russian government,

and **no United States person** intentionally coordinated with Russia's efforts to interfere with the

2016 election.

4.      On or about June 20, 2019, *The Post* published the article entitled "Trump: I can

win reelection with just my base" (the "June 20 Article"), by Paul Waldman, which contains the

defamatory statement "who knows what sort of aid Russia and North Korea will give to the

Trump campaign, now that he has invited them to offer their assistance?"

5.      The statement in the June 20 Article is false and defamatory.  There has never

been any statement by anyone associated with the Campaign or the administration "inviting"

Russia or North Korea to assist the Campaign in 2019 or beyond.  There also has never been any

reporting that the Campaign has ever had any contact with North Korea relating to any United

States election.

6.       *The Post* was well aware at the time of publishing the foregoing statements that

they were not true.  Obviously, the Mueller Report is a public record that has been extensively

reported in *The Post*.  Further, there is an extensive record of statements from the Campaign and

the White House expressly disavowing any intention to seek Russian assistance.  Finally, despite

extensive reporting on the Campaign's activities, there is not a shred of evidence that there have

been any contacts between the Campaign and North Korea, let alone any invitation transmitted to

North Korea to interfere in the election.

{00106297;4}                                    2

7.     The Campaign files this lawsuit to: publicly establish the truth, properly inform *The Post*'s readers (and the rest of the world) of the true facts, and seek appropriate remedies for the harm caused by *The Post*'s false reporting.

8.     The articles at issue herein also are part of the *The Post*'s systematic pattern of bias against the Campaign, designed to maliciously interfere with and damage its reputation and ultimately cause the organization to fail.

## THE PARTIES

9.     Plaintiff Donald J. Trump for President, Inc. is a Virginia corporation with its principal place of business in New York, New York.  The Campaign operated the presidential election campaign of Donald J. Trump commencing in 2015, and has operated his reelection campaign since the President's election.

10.     On information and belief, defendant WP Company LLC d/b/a *The Washington Post* is a District of Columbia limited liability company with its principal place of business in Washington, D.C.  On information and belief, defendant WP Company LLC d/b/a *The Washington Post* owns and operates *The Washington Post* newspaper and the www.WashingtonPost.com website.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because the Campaign resides in the State of New York, and *The Post* resides in the District of Columbia.  The amount in controversy is in the millions of dollars, which exceeds the statutory minimum of $75,000.

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) & (b)(2), in that

*The Post* is located in this District and published the defamatory statements alleged herein within

this District.

## STATEMENT OF FACTS

13.     On or about June 13, 2019, *The Post* published the June 13 Article, which

contained the defamatory statement that Special Counsel Robert Mueller concluded that the

Campaign "tried to conspire with" a "sweeping and systematic" attack by Russia against the

2016 United States presidential election.

14.     The June 13 Article is false and defamatory.  The Mueller Report is a public

record, and repeatedly finds that there was **no conspiracy** between the Campaign and the

Russian government.  For instance, the Executive Summary of the Mueller Report concludes that

"the evidence was not sufficient to charge that any member of the Trump Campaign conspired

with representatives of the Russian government to interfere in the 2016 election".  The Executive

Summary also concludes that "Some [Russian Internet Research Agency] employees, posing as

U.S. persons and without revealing their Russian association, communicated electronically with

individuals associated with the Trump Campaign and with other political activists to seek to

coordinate political activities, including the staging of political rallies.  The investigation did not

identify evidence that any U.S. persons knowingly or intentionally coordinated with the IRA's

interference operation."  The Mueller Report discusses contacts between individuals associated

with the Campaign and concludes: "Based on the available information, the investigation did not

establish such coordination."

15.     On or about June 20, 2019, *The Post* published the June 20 Article.  The June 20

Article contains the defamatory statement "who knows what sort of aid Russia and North Korea

will give to the Trump campaign, now that he has invited them to offer their assistance?"

16.     The June 20 Article is false and defamatory.  The Campaign has repeatedly and

openly disclaimed any intention to seek Russia's help in the 2020 election.  The examples of this

are too numerous to fully enumerate, but examples include:  (a) then-Press Secretary Sarah

Sanders stated on August 2, 2018 that, "Since the beginning of his administration, President

Trump has implemented a whole-of-government approach to safeguard our nation's elections.

The President has made it clear that his administration will not tolerate foreign interference in

our elections from any nation-state or other dangerous actor"; (b) on September 12, 2018, while

signing an executive order imposing sanctions on foreign countries who interfere in United

States elections, the White House issued a statement that "the United States will not tolerate any

form of foreign meddling in our elections"; and (c) on May 13, 2019, the White House stated it

would "certainly" agree not to use any information hacked or stolen by foreign adversaries in the

2020 election.

17.     As for *The Post*'s statement that the Campaign is seeking North Korea's help in

the 2020 election, this has been made up out of whole cloth.  Not only has nobody affiliated with

the Campaign made such a statement, but there has been no reporting by any reputable news

outlet that the Campaign has sought or will seek North Korea's assistance, or has had any contact

with North Korea regarding the 2020 election.

18.     It is not surprising that *The Post* would publish such blatant false attacks against

the Campaign.  There is extensive evidence that *The Post* is extremely biased against the

Campaign, and against Republicans in general.  This evidence includes, among other things, the

{00106297;4}                                            5

fact that *The Post* has endorsed the Democrat in every United States presidential election since it started endorsing a presidential candidate in 1976, with the exception of 1988 when *The Post* did not endorse any candidate.

19.    There also is extensive evidence that *The Post*'s writers, Messrs. Sargent and Waldman, are extremely biased against the Campaign.  Mr. Sargent has been labeled a "liberal writer", has written a book which charges that the current presidency "raises the specter of authoritarian rule", and has published many anti-administration tweets.  Mr. Waldman has authored numerous anti-Trump articles and formerly worked for Media Matters for America, an activist organization which is sharply critical of the administration.

20.    *The Post* clearly had a malicious motive, but more importantly acted with reckless disregard for the truth.  The Mueller Report and its conclusions are a matter of widely disseminated public record.  Extensive public information, known to and available to *The Post*, confirms that the Campaign has not sought Russian help in the 2020 election and has disavowed such assistance, and that there have been no reported contacts between the Campaign and North Korea relating to any United States election.  *The Post* knowingly disregarded all of this information when it decided to publish the Defamatory Articles.

21.    *The Post* never informed the Campaign that it was going to publish the claims in the Defamatory Article, did not afford the Campaign an opportunity to verify the accuracy of the claims before publication, and did not reach out to the Campaign for comment.

22.    The Defamatory Article defamed the Campaign in its trade or profession, because it falsely accuses the Campaign of pursuing a strategy of disloyal, unethical, and potentially unlawful conduct: seeking the assistance of a foreign adversary of the United States to improperly influence an election result.

23.     The Defamatory Article has forced, and will force the Campaign, to expend funds on corrective advertisements and to otherwise publicize the facts that it did not conspire with Russia in 2016 and is not seeking Russia's or North Korea's help in the 2020 election.  The Campaign was damaged in the millions of dollars, the specific amount to be proven at trial.

### **FIRST CAUSE OF ACTION**

**(Libel)**

24.     The Campaign realleges and incorporates by this reference Paragraphs 1 through 23 as though fully set forth herein.

25.     *The Post* published the Defamatory Articles on or about June 13 and June 20, 2019.

26.     The Defamatory Articles contain false statements of fact.

27.     The false statements in the Defamatory Articles are of and concerning the Campaign, in that they allege that the Campaign tried to conspire with Russia in 2016, and is actively considering seeking Russia's and North Korea's assistance in the 2020 election campaign.

28.     The Campaign is concededly a public figure, and the false statements were made with actual malice, as alleged herein.

29.     The false statements defamed the Campaign in its trade or profession.

30.     The false statements caused actual damage to the Campaign, the full amount of which will be proven at trial, but is in the millions of dollars.

31.     *The Post* acted with malice or reckless disregard for the Campaign's rights, thereby justifying an award of punitive damages.

## DEMAND FOR JURY TRIAL

The Campaign hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Campaign prays for relief as follows:

i.      Compensatory damages in the millions of dollars, according to proof;

ii.     Presumed damages according to proof;

iii.    Punitive damages according to proof;

iv.     Costs of suit; and

v.      Such other and further relief as the Court may deem proper.

Dated: March 3, 2020                    Respectfully submitted,

                                        TOBIN O'CONNOR & EWING

                                        By: /s/ David C. Tobin_____
                                            David C. Tobin, Esq. D.C. Bar #395959
                                            TOBIN O'CONNOR & EWING
                                            5335 Wisconsin Avenue NW, Suite 700
                                            Washington, D.C. 20015
                                            Telephone: (202) 362-5900
                                            DCTobin@TobinOConnor.com

                                            Charles J. Harder, Esq.
                                            *Pro Hac Vice Application forthcoming*
                                            HARDER LLP
                                            132 South Rodeo Drive, Fourth Floor
                                            Beverly Hills, California 90212
                                            Telephone: (424) 203-1600
                                            CHarder@HarderLLP.com



SO ORDERED

HON. JENNIFER G. SCHECTER
J.S.C.
J.S.C.
3/27/19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
SUMMER ZERVOS,                                    :     Index No. 150522/2017
                                     Plaintiff,   :
                   -against-                      :     Hon. Jennifer G. Schecter
                                                  :
DONALD J. TRUMP,                                  :     **STIPULATION**
                                                  :
                                     Defendant.   :
-------------------------------------------------------------------x

     IT IS HEREBY STIPULATED AND AGREED by and between undersigned counsel for

the parties hereto that:

     1.    The current deadline for third-party subpoenas, requests for commissions, and

letters rogatory is March 23, 2019.

     2.    In light of the extended deadlines for depositions and discovery, the parties

hereby agree that the deadline for third-party subpoenas, requests for commissions, and letters

rogatory be extended until July 10, 2019.

     3.    No other dates or deadlines are otherwise amended.

     4.    This stipulation may be executed in counterparts and facsimile or PDF copies

shall be deemed originals.

Dated: New York, New York
      March 20, 2019

CUTI HECKER WANG LLP               KASOWITZ BENSON TORRES LLP

By: Mariann Meier Wang               By: Paul J. Burgo
305 Broadway, Suite 607               1633 Broadway
New York, New York 10007             New York, New York 10019
(212) 620-2600                        (212) 506-1700

*Counsel for Plaintiff*                   *Counsel for Defendant*

SO ORDERED

_____
Hon. Jennifer G. Schecter, J.S.C.

2