Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 1 of 75

# EXHIBIT F

**DONALD TRUMP:** —people here that you'll be seeing a lot of. General Milley is here, who is Head of Joint Chiefs of Staff, a fighter, a warrior, had a lot of victories and no losses. And he hates to see the way it's being handled in the various states and I just put him in charge. The Attorney General is here, right here, Bill Barr. And we will activate Bill Barr and activate him very strongly. We're strongly—and Secretary Defense is here. We're strongly looking for arrests. We do have to get much tougher. We're going to get over it. I know Governor Walz is on the phone and we spoke. I fully agree with the way he handled it the last couple of days. I asked him to do that. He had a lot of men. We have all the men and women that you need, but people aren't calling them up. You have to dominate. If you don't dominate, you're wasting your time. They're going to run all over you and you'll look like a bunch of jerks. You have to dominate. And you have to arrest people and you have to indict people and they have to go to jail for long periods of time. I saw what happened in Philadelphia. I saw what happened in Dallas where they kicked a guy to death. I don't know if he died or not, but if he didn't it's a miracle what they did to him. They were kicking him like I've never seen anything like it in my life. People don't talk about that. They don't talk about that. They're talking about a lot of other things, but they don't talk about that. But I saw what happened in Dallas. And those kids, they're all on camera. They're wise guys. And it's coming from the Radical Left. You know it. Everybody knows it. But it's also looters and it's people that think they can get free stuff by running into stores and running out with television sets. I saw it. Kid has a lot of stuff. He's putting it in the back of a brand new car and drives off. You have every one of these guys on tape. Why aren't you prosecuting them? Now the harder you are, the tougher you are, the less likely it is that you're going to be hit. This is a movement. We found out in delivering supplies to various places and various states, your people know about it now. But we found out many things. It's like a movement. And it's a movement that if you don't put it down it'll get worse and worse. This is like Occupy Wall Street. It was a disaster. Until one day somebody said, that's enough, and they just went in and wiped them out. And the last time you heard the name Occupy Wall Street until today when I heard about it. I heard Occupy Wall Street. I haven't heard about it. I heard about it today for the first time in a long time. They were there for forever it seems, on Wall Street. They closed up Wall Street, the financial district of the world, and they had total domination. They were ordering pizzas. Nobody did anything. And then one day somebody said, that's enough. You're getting out of here within two hours. And it was bedlam for an hour and then after that everything was beautiful. And that was the last time we heard about it. These are the same people. These are radicals and they're anarchists. They are anarchists, whether you like it or not. I know a couple of you guys are a different persuasion and that's okay. I fully understand it. I understand both. I'm for everybody. I'm representing everybody. I'm not representing radical right, radical left. I'm representing everybody. But you have to know what you're dealing with, and it's happened before. It's happened numerous times. And the only time it's successful is when you're weak. And most of you are weak. And I will say this, what's going on in Los Angeles, I have a friend who lives in Los Angeles, they say all the storefronts are gone. They're all broken and gone. The merchandise is gone. It's a shame. It didn't look as bad as that to me. Maybe it was the sunshine. I don't know. But in Los Angeles the storefronts are gone. Philadelphia is a mess. Philadelphia, what happened there is horrible. And that was on television. They're breaking into stores and nobody showed up to even stop them. There was nobody showed up to stop them. Washington, they had large groups, very large groups. They attacked the [INDISCERNIBLE 00:04:24] CIL Building. So they attacked [INDISCERNIBLE 00:04:48] which is very interesting. But Washington was under very good

control. We're going to have it under much more control. We're going to pull in thousands of people. We were under guard of the D.C. Police, the mayor of Washington D.C. And Secret Service did a very good job around the White House. Their primary function is around the White House.

**[00:05:00]**

But we're going to clamp down very, very strong. But you've got to arrest people. You have to put them in jail for ten years and you'll never see this stuff again. And you have to let them know that. And they're trying to get people out on bail in Minneapolis. I understand they're in there trying to get all these guys out on bail. So you have them on tape. You have them on television. In history there's never been anybody taped so much committing a crime. You have these guys throwing rocks, and you can see. They showed it last night on one of the stations on one of the networks throwing a big brick. And they had them in slow motion replay. It's like a fielder catching a ball or throwing a ball. They have him in slow motion replay. You see exactly who he is. Everybody knows. You'll find out exactly. You have everybody on tape. You've got to arrest all those people and you've got to try them. And if they get five years or ten years they have to get five years or ten years. There's no retribution. So I say that and the world is dominating. If you don't dominate your city and your state, they're going to walk away with you. And we're doing it in Washington and D.C. We're going to do something that people haven't seen before. But we're going to have total domination. And then you have to put them in jail. And if you have to authorize whatever it is, whoever it is you authorize. And with that, I'll let Bill Barr say a few words. And then I'm going to have General Milley speak. Let's go, Bill.

**WILLIAM BARR:** I know the situations vary around the country, but it seems that some of the common dimensions are we have the normal protesters. You have opportunistic people like looters. But in many places, if not most places, you have this ingredient of extremists, anarchists, agitators who are driving the violence. Law enforcement response is not going to work unless we dominant the streets. Because we have to control the streets. If we treat these as demonstrations, the police are pinned back guarding places and don't have the dynamic ability to go out and arrest the troublemakers. They're just standing in line watching the events. Then when they disperse the crowds, the crowds are running off in different directions to create havoc, looting, and other things. We have to control the crowds and not react [INDISCERNIBLE 00:07:33]. And that requires a strong presence. In many places I think it will require the National Guard and when there's a strong presence, not just an adequate presence to defend buildings, but a strong presence to control the crowd, things are quieting down as in Minneapolis. Some places may not require the National Guard. I think that New Jersey so far has been doing a very good job with the state police and the New York Police. And we'll see what happens there. But the key is, you have to have adequate force. That means that law enforcement, even federal law enforcement working with your state and local law enforcement would be more dynamic and go after the troublemakers. Go after the guys who are peddling the bricks and the [INDISCERNIBLE 00:08:22]. Very few people are running around lighting fires. They have to be taken off the streets and arrested and processed. The structure we're going to use is the Joint Terrorist Task Force, which I know most of you are familiar with. It's a tried and true system. It's worked for domestic homegrown terrorists and we're going to apply that model. It already integrates your state and local people. And it's intelligence driven and they will go

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 4 of 75

operational.  We want to lean forward and charge heavily anyone who violates a federal law in connection with this rioting.  But we need to have people take control of the streets so we can go out and work with law enforcement, state and local law enforcement to identify these people in the crowds, isolate, pull them out, prosecute them.

**DONALD TRUMP:**  So the best example, I alluded to it a couple of seconds ago, is Indianapolis.  It was incredible what happened in the state of Minnesota.  They were a laughing stock all over the world.  They took over the police department.  The police were running down the street, sirens blazing, the rest of them running.  It was on camera.  And then they wiped out— you probably have to build a new one, but I've never seen anything like it.  And the whole world was laughing.  Two days, three days later I spoke to the governor and the governor is I think on the call and he's an excellent guy.  And all of the sudden I said, you've got to use the National Guard in big numbers.

**[00:10:00]**

They didn't at first and they did.  And I'll tell you this.  I don't know what it was, if it was the governor, the third night, fourth night, those guys walked through that stuff like it was butter.  They walked right through and we haven't had any problems since.  I mean they know.  They're not going to go there.  Now they'll go to some other place.  But once you call that and you dominate it, you took the worst place and you made it—they didn't even cover it last night because it was so relaxing because you dominated.  You dominated.  Now what happened to New York, I have to tell you, I live in Manhattan.  What's going on in Manhattan I have no idea.  New York's finest, they've got to be allowed.  They need to do their job.  I don't know what's happening in Manhattan, but it's terrible.  And because it's New York, because it's Manhattan it gets a lot of press.  So they really spend a lot of time on it.  But New York is going to have to toughen up and we'll send you National Guard if you want.  You have the largest police force in the country, 40,000 people I understand.  But what's going on in New York is terrible.  It's terrible of all the places.  What went on last night in Los Angeles with the stores and the storefronts is terrible.  No domination.  You have to dominate.  Go ahead, Bill.

**WILLIAM BARR:**  Something the President said reminded me.  The reason we have to control the streets is not just to bring peace to that town, but to give us the opportunity to get the bad apples because they are going to go elsewhere.  We're picking up information that when they run into a tough nut, a strong police force, the National Guard, they're looking for a secondary target.  And they can go and overwhelm the local police force.  So in several of your states, that's what we're hearing.  So that's why it's so imperative.  We can't play whack-a-mole.  We have to take out the national instigators and leadership group.  And the way to do that is to start with a strong statement.

**DONALD TRUMP:**  If you're weak and don't dominate your streets, they're going to stay away from you until you finally do it and you don't want that.  Philadelphia, you better toughen up because what's going on in Philadelphia, like New York, is terrible.  It's terrible.  You better toughen up.  They'll never leave.  I know you want to say, let's not call up the Guard, let's call up 200 people.  You've got a big National Guard out there that's ready to come in and fight like hell.  I tell you, what they did in Minneapolis was incredible.  They went in and dominated, and it

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 5 of 75

happened immediately, all of the sudden.  My wife says to me, wow, look at all these people.  They go out and were wearing dark black uniforms.  They got out and they were there in the houses.  And they just walked right down the street knocking them out with teargas.  Those guys, they were running.  And the next night it was much less.  And then the next night it was like, you know what happened, they went to other cities.  They're all looking for weak spots.  Now what they're going to do is they're going to search out for perhaps smaller cities, smaller places.  You've got to arrest these people.  You've got to arrest these people and you've got to charge them.  And you can't do the deal where they get one week of jail.  These are terrorists.  These are terrorists.  They're looking to do bad things to our country.  They're ANTIFA and they're Radical Left.  And the reason you have other radicals is because they've been watching this for years, many years, and they don't like it.  Go back and study Occupy Wall Street because you'll see the way that ended was a thing of beauty.  Everybody said, I can't believe how easy it was.  It was an hour of bedlam, but when it was all over, it was a beautiful thing.  And that's the way it has to end for you.  Alright.  Secretary of Defense.

**MARK ESPER:**  Thank you, Mr. President.  If I could build on your comments and Attorney General's comments to give some quick stats.  Of course [INDISCERNIBLE 00:14:00] the states, governors, Department of Justice, law enforcement.  Right now we have 17,000 folks deployed in the National Guard in 29 states.  And I will tell you, [INDISCERNIBLE 00:14:12].  Fewer than 200 people deployed in the [INDISCERNIBLE 00:14:17].  So as the President and the AG rightly pointed out, Minneapolis and Minnesota have done a fantastic job.  By Saturday morning, after the chairman Joint Chiefs of Staff and I spoke to the governor they increased their presence tenfold and I think the evidence was clear from Saturday night and Sunday night.  And so at my urging I agree.  We need to dominate the battle space.  You have key resources in the Guards.  I'm ready.  The chairman stands ready.  The head of the National Guard stands ready to fully support you in terms of helping mobilize the Guard in doing what they need to do.  Again, most of the Guard has not been called up.  There's only a few states, I count two states, where more than 1,000 troops have been called up.

**[00:15:00]**

I think the sooner that you mass and dominate battle space, the quicker this dissipates and we can get back to the right normal.

**DONALD TRUMP:**  I don't know what it is politically when you don't want to call out people.  They're ready, willing, and able.  They want to fight for the country.  I don't know what it is.  Some day you'll have to explain it to me, why it takes so long to call them up.  We're waiting for you.  We're shocked at certain areas, L.A.  We're shocked that they're not using the greatest resource you can use and they're trained for this stuff and they're incredible, why you're not calling them up.  I don't know, but you're making a mistake because you're making yourselves look like fools.  And some have done a great job.  A lot of you, it's not good.  You're very bad for our country.  You know what?  Other countries watch this.  They're watching us and they say, boy, they're really a pushover.  And we can't be a pushover.  And you have all the resources.  It's not like you don't have the resources.  So I don't know what you're doing.  We'll take some questions if you want.  Tim is on the phone now, Tim Walz.  Again, I was very happy with the last couple of days, Tim.  You called up big numbers and the big numbers, knocked them out so

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 6 of 75

fast it was like bowling pins.  Alright.  Anybody, I guess it's #2, right.  The governors on audio, the governors on anything, #2.  Anybody want to speak?  Brian is up there.  Brian, you want to speak?  Georgia, Brian Kemp?

**BRIAN KEMP:**  Good morning, Mr. President.  I can just give you a quick update.  I'll try to do this as fast as I can starting with Friday night.  We have been talking to the City of Atlanta in preparation to support peaceful protests, but also protect the lives and the property of the citizens in Atlanta and around the state of Georgia, but also we have the mindset to take strong actions against the disruptors.  We have 500 Guard called up and ready to support as well as the whole team we have in our state operations center which we activated.  We had the Georgia Space Control and Georgia National Guard, the Department of Natural Resource, a team of Rangers.  And then we used our Department of Corrections, Department of Juvenile Justice, and Department of Community [INDISCERNIBLE 00:17:27].  They all have certified officers.  Two of those have an instant response team that they use to control prison disruptions.  And those people are really good at doing that.  We had all of those teams standing by to help Friday night.  It became evident that APV needed our help and we went in there and I think did a good job in a really tough situation to calm things down.  And then Saturday we worked with their whole team.  We had a major from the Atlanta Police Department embedded in our state operations center.  We had one of our people in their operations center.  So we had constant communications.  And I was in the state ops center all three nights for a very long time.  So I got to see this firsthand.  But that coordination that we were able to have with the locals, with the Guard, the state patrol, and all our other resources as well as having surveillance in the air, especially Saturday night was awesome.  And we had a lot of people that did the right thing.  We supported them in the peaceful protests.  And when the curfew hit, they went home.  And what we saw was the disruptors stay.  And so you knew those were the people that we were going to have to deal with, and that's what we did over the weekend.  Just two other things real quick.  We did see in Savannah last night we were getting details that a lot of the instigators in Charleston, South Carolina on Saturday night were coming to Savannah last night.  So we were watching that.  We got in place early so the Attorney General was correct in saying we could watch those folks that you knew were professionals if you will.  We knew that they were dropping supplies in area parks.  We were surveying that.  They ended up moving those because they figured out we were watching them.  And just because I think we were there early and really prevented [INDISCERNIBLE 00:19:41] that whole thing down there I think they only arrested 10 people.  The first person they arrested was from out of state.  The last thing I will tell you is the Georgia National Guard Medics team most likely saved an Atlanta Police Officer's life last night when he got ran

**[00:20:00]**

by a disruptor on a four-wheeler.  They put a tourniquet on him and helped get him to the hospital and it was great to see that.  So thank you for your support of your Guards.

**DONALD TRUMP:**  Thank you, Brian, very much.  You did a good job.  It looks like Atlanta was a much different place with a little time.  So that first night was pretty rough.  I don't know if you left yet for your conference.  I know you have a conference.  You were the one that did

5

have a conference.  Is Tim there?  I'd like to maybe have him explain the difference between the beginning and the end and how he made a comeback.  Tim, are you there?

**TIM WALZ:**  I am.  Thank you, Mr. President.  I want to give a thank you to General Esper and General Milley for your strategic guidance, very helpful.  Our city is grieving and in pain and I would just say as far as the potential, the peaceful protesters are expressing an outrage that is real.  They witnessed eight minutes of a man dying in front of them.  That part of it then of course sparred the civil unrest.  So there were actors and I would like to believe they were from all out of state here in Minnesota, but they're not.  They're homegrown, which is an issue that just happened with Minneapolis Police Department.  But once that started to spin, the idea that when you saw this happening in the first few days, I don't believe anybody would have taken up force to do this.  We mobilized into Thursday and Friday.  I had mobilized, as the President was saying or the press was saying, about 750 to 1,000 that we could get of National Guard on the scene.  But one of our biggest mobilizations in the state history for civil disobedience and we were still overwhelmed.  At that point, I accepted the unprecedented, I mobilized the entire Minnesota National Guard and that's what the President was alluding to that with the size that the force was capable.  But I think again, Mr. President, if you ask someone to explain this, I would just say it's going to be very difficult.  There are [INDISCERNIBLE 00:22:11] legitimate anger.  And here our problem is going to be if we cannot maintain the [INDISCERNIBLE 00:22:15] do not have the resources to maintain the [INDISCERNIBLE 00:22:17].  And we're going to have to [INDISCERNIBLE 00:22:21] Minneapolis Police Department.  So we can [INDISCERNIBLE 00:22:31] leaders and the peaceful protests.  And I would just close this, I think the guidance is you've got to get a handle on it with that force.  That is absolutely correct.  And then the transition in the next stage is trying to get those states with the peaceful protests and [INDISCERNIBLE 00:22:48] tragedy that I'm still [INDISCERNIBLE 00:22:56] that we avoided is a truck beating down the highway with thousands of protesters.  At that point in time, we do not know that was a fuel truck that was going to be intentional.  As it turned out, it was a confused and scared driver who didn't want to leave the interstate, went into that.  As you saw, he was pulled out of his vehicle.  Some of you recall that horrific event during Rodney King that the truck driver [INDISCERNIBLE 00:23:21].  He's under arrest, but he was interviewed.  He said that that crowd, the vast majority of them [INDISCERNIBLE 00:23:29] and they pulled him in, which deescalated the situation and as the President said, last night was [INDISCERNIBLE 00:23:35].  So thank you for that.

**DONALD TRUMP:**  But Tim, it shows the incredible difference between your great states.  Yesterday and the day before compared to the first few days.

**TIM WALZ:**  Absolutely.

**DONALD TRUMP:**  I don't blame you.  I blame the mayor.  I mean I've never seen anything like it where the police, were told to abandon the police house and it was ransacked and really destroyed.  You know, millions and millions of dollars are going to have to go back to fix it.  I don't know.  You'll have—

**TIM WALZ:**  Mr. President, if I'm still on, the one thing is [INDISCERNIBLE 00:24:13] years in the dark.  The one thing I will say that you can do is a lot of people don't understand who the

National Guard is and you need to get out there from a PR perspective and make sure that it's not viewed as an occupying force, but it's our neighbors. [INDISCERNIBLE 00:24:27] business owners, those types of things. That's a really effective [INDISCERNIBLE 00:24:31].

**DONALD TRUMP:** Okay. Good. I think that's a good idea. I must tell you, it got so bad a few nights ago that the people wouldn't have minded an occupying force. I wish we had an occupying force in that. But for some reason, I don't know what it is, [INDISCERNIBLE 00:24:47] don't like calling up a lot of the Guards. We have thousands and thousands of people waiting to be called up. Is that a correct statement, General?

**MARK MILLEY:** 350,000.

**DONALD TRUMP:** 350,000.

**[00:25:00]**

We have 350,000 people and they call up 200. Tim did that the first night and what happened is after that he said, let's go. And [INDISCERNIBLE 00:25:11] was like magic. You saw thousands of people all of the sudden just walking through the street. I saw it. It was like a beautiful thing to see. But we have 350,000 plus in the National Guard and nobody wants to use them. And their cities are ransacked and they're a disgrace all over the world. All over the world they're showing this. What happened in Los Angeles with the storefronts, Philadelphia. And New York was a disaster. I don't understand what happened to New York's finest. I don't understand it. But there's nothing wrong with New York calling up the National Guard. There's nothing wrong with it. Alright. Thank you very much, Tim. Go ahead, next please. Governor you want to say something?

**MALE 1:** Mr. President, while we're waiting on the governor, what you mentioned about the Guard, we've done various studies over the years, the 1960s riots, Rodney King. The introduction of the National Guard in force on the streets during civil disobedience, civil riots, civil unrest proves to be a very calming effect. Mass numbers as you saw in Minnesota. So when I talked to the governor, when Secretary of Defense talked to the governor, when the president talked to the governor, and to his credit, he mobilized the entire Minnesota Guard, mass [INDISCERNIBLE 00:26:36]. And dominated the battle space. Within six sites of security at key points and around and you have the in places mobile forces, the [INDISCERNIBLE 00:26:46] law enforcement. It's a very effective technique used for years. We have activated the National Guard, the civil authorities on average the civil disturbance [INDISCERNIBLE 00:26:58]. So it's a very effective technique. We highly encourage to mobilize [INDISCERNIBLE 00:27:05] today, as many of the Guard as you think you need in order to establish law and order in the various cities. 55 cities have protests, 54-55 cities have protests the last 24 hours and 22 of them were violent at moderate to severe levels. But the rest were peaceful. The rest were peaceful because it was a good law and order on the street. So strongly encourage to use the National Guard to get as many boots on the ground as you can muster.

Case 1:20-cv-07311-LAK Document 12-9 Filed 09/14/20 Page 9 of 75

**DONALD TRUMP:** So we automatically have our experiment. I hate to say, Minnesota. You had the first part, which was weak and pathetic. And you had the second part which was domination. And those guys probably largely left, they've gone to one of your cities or one of your states because they're not getting anywhere in Minnesota anymore. So you have that perfect contrast of Minnesota Phase 1, Minnesota Phase 2. It's a beautiful thing to watch. It just can't be any better. There's no experiment needed. You don't have to do tests. Alright. Go ahead, hash tag [INDISCERNIBLE 00:28:11] anybody?

**OPERATOR:** Governor Mills, your line is now open.

**JANET MILLS:** Mr. President, this is Janet Mills, governor of the great state of Maine. Thank you for the call and information and thank you, Attorney General Barr and Mr. Secretary and General. I have two questions and one comment perhaps. One is, you mentioned, somebody mentioned, some intelligence regarding the source of the protests and the bad actors and professional instigators have been prosecuted for more than 20 years in the state of Maine and former Attorney General, former District Attorney to three counties. I would be very interested in knowing the intel so that we can prepare in advance for any resurgence or any professional instigators. We haven't seen that yet in my state that I know of, but I would love to get the intel that you're clear to have access to regarding who these individuals are, the bad actors and professional instigators. Secondly, General Barr, you mentioned arresting for violations of federal law and charging people federally. I'd be interested to know what federal statutes we would rely on for prosecution, direct to prosecution for violations of federal law. Those are my questions. My comment is, Mr. President, I am very concerned quite frankly that we understand you may be coming to the state of Maine later this week. I'm very concerned that your presence may cause security problems for our state. We don't have them yet. I'm concerned about that. Thank you.

**DONALD TRUMP:** We'll look into that. We have a tremendous crowd of people showing up, as you know. I think most of them are very favorable.

**[00:30:00]**

They like their president. But we'll talk to you about that certainly. As far as the intelligence, we do have intelligence, information. And we will present it to the appropriate people. I'd like to turn that around though. If you hear anything, let us know. Report it to the Attorney General.

**JANET MILLS:** Of course. But [INDISCERNIBLE 00:30:22]. I would really like to have it. Thank you.

**DONALD TRUMP:** By the way, [INDISCERNIBLE 00:30:33]. If you prosecute the level will go down very rapidly. Bill, go ahead.

**WILLIAM BARR:** We will be sharing intelligence with all our state and local partners through joint terrorist task forces. So anything pertinent we would direct your way. And I know your [INDISCERNIBLE 00:30:56] to that. As to federal offenses, there are many different federal offenses that emerge in rioting situations. Two of the most common are anyone who crosses the

INDEX NO. 160694/2019
RECEIVED NYSCEF: 06/15/2020

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 10 of 75

state line [INDISCERNIBLE 00:31:14] federal offense to incite, to participate in [INDISCERNIBLE 00:31:17]. Or anyone who uses any interstate facility, telecommunications, whatever in connection with participating and encouraging riots. Those are two federal offenses. There are many others. Destructive devices and conspiracies and others.

**DONALD TRUMP:** Phil Murphy did a very good job in New Jersey, which is interesting because you had very little problem. You did call up a lot of good law enforcement. You had a lot of good law enforcement. Phil, I think you're there, Phil Murphy.

**PHIL MURPHY:** Mr. President, can you hear me?

**DONALD TRUMP:** Yes.

**PHIL MURPHY:** Good morning to each of you. Honored to be with you. We had about 30 protests over the weekend, which the Attorney General is [INDISCERNIBLE 00:32:14]. The latest one was in Newark, but there were about 30 and we managed 28 out of 30. There was some disturbances in both Atlantic City and Creston, but by the scales maybe what we've seen on television, these were while unfortunate were not big scale events. We've got no philosophical issue whatsoever using or not using the National Guard. It just so happened that so far a good percent of the state [INDISCERNIBLE 00:32:41] is within our range so far. We've got about looks like nine more scheduled for today. [INDISCERNIBLE 00:32:58] these are peaceful in nature and we're going to make sure we've got the police there to ensure that that's the case to protect the community, allow them to express their protest, which we have no issue with. We just want to make sure it's peaceful. But so far so good. [INDISCERNIBLE 00:33:18] but so far so good.

**DONALD TRUMP:** I appreciate it very much. Really good. Congratulations so far. Keep it going. Doug Ducey, Arizona please.

**DOUG DUCEY:** Yes. Thank you very much, Mr. President. Yesterday we met with community leaders from around the state, heard all of their concerns. I know that we can do better both statewide and federally as well. Phoenix is the fifth largest metropolitan area in the entire country and we've learned some lessons over the last three days. First, the more aggressive approach does work. We wanted peaceful protesters to be able to exercise their first amendment rights. We had a tough time after the sun went down figuring out who was the peaceful protester and who was the person that was going to cause trouble, destroy property, or begin violent action. I put out the state wide emergency yesterday and we put out a state wide curfew for 8:00 p.m. And we did that because of what we saw the night before. Phoenix Police Department, Department of Public Safety did a great job stopping the unlawful part of the protest, become riotous. But it morphed into Scottsdale, was rumored to go to Chandler or to the west side. So we put out a state wide curfew. We called up the National Guard in force.

**[00:35:00]**

We got all of our mayors, all of our police chiefs on board, and last night was a very quiet and peaceful night in the state of Arizona.

9

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 11 of 75

**DONALD TRUMP:** That's what I saw. I saw that big difference. Good job, guys. Thank you very much.

**DOUG DUCEY:** Thank you.

**DONALD TRUMP:** Great job. Big difference. John Bel Edwards? John Bel, are you there?

**JOHN BEL EDWARDS:** Mr. President, first of all, thank you very much for the meeting and for the call. We've had about a dozen protests. I think a grand total of about two arrests of individuals. [INDISCERNIBLE 00:35:33] peaceful here. We have engaged the African American and [INDISCERNIBLE 00:35:39] communities primarily but also leaders across the state of Louisiana have been able to respond thus far with the two police departments, the sheriff's office, and the state police. Obviously we have the National Guard here and can use them if necessary. We have in particular of benefit for us, we went through in 2016 several weeks of very heavy protests, almost all of which were peaceful. And so we've kept up those communications with the various communities. And thus far we've [INDISCERNIBLE 00:36:19] respect to this. Like Phil Murphy, I don't want to jinx things. If we know that things can turn on a dime. And we know that in 2016, most of the problems came from people who were bussed in from out of state. It was not local, homegrown folks who were the most violent and extremists on our streets. And so that's where we can get some help from the federal government, if you all know that there are individuals or groups out there that are intending to target Louisiana in terms of coming in, that would be very, very helpful. We are monitoring the internet. We have our patient center and so forth. But Mr. Attorney General, if you end up with more information like that, I would be very [INDISCERNIBLE 00:37:01] if you would share it with us.

**DONALD TRUMP:** Good. I appreciate that very much. And likewise. If you have information of the groups just as we had information last night, we got it, where they're going to be loading. They're going to be loading. It's like a military operation. There's certain states. We've already notified them. They're going to be loading like we're talking about a war, which it is a war in a certain sense. And we're going to end it fast. So thanks very much. Larry Hogan, please, Maryland?

**LARRY HOGAN:** Mr. President, thank you very much. First of all, I want to thank you for agreeing to our request on extending title 32. It's been more timely with talking about everybody calling up the National Guard. I couldn't agree more with all of the things that you said. We had this experience in Maryland in 2015 when we had the riots in Baltimore and we did exactly what you're recommending. The city police in Baltimore were somewhat overwhelmed, but within a matter of hours, went sent in 4,000 members of the National Guard and 1,000 or so police office and we outnumbered the protesters and immediately calmed down the violence after a few hours and then just allowed peaceful protests for the rest of the week. And I think what's not happening in some of the cities, and I agree with peace through strength. I think bringing up enough manpower and not letting anybody be overpowered the way they have been in the past few days is exactly the right thing. We've got 1,300 members of the Guard called up now. We haven't had any issues or problems yet. And most are peaceful. I think this one may be afraid to

take action in Baltimore, but we're watching to see if it breaks out again. But I had a call with many of the governors and talking with them all across the country. Everyone is saying the same thing about the out-of-town agitators. It seems to be very organized. And so the discussion is very general talking about crossing state lines is a federal line, sharing of information and intelligence is critically important to all of us governors and something we all are focused on. It's difficult in some of these cities with the prosecutors we have and the judges we have to get convictions even on violent crimes let alone these kinds of things. So federal charges with U.S. attorneys going to federal force, steering of intelligence, all of that I think very, very helpful and we appreciate all the effort. Thank you very much.

**DONALD TRUMP:** Thank you very much, Larry. National anarchists in many cases and they're leading a group of [INDISCERNIBLE 00:39:47] and these are easily led people.

**LARRY HOGAN:** And I'll just point out, Mr. President, we had those in Baltimore in 2015. This is not new. Like you pointed out, Occupy Wall Street.

**[00:40:00]**

We had a lot of peaceful demonstrators back in 2015. I had only been governor for 90 days. But the troublemakers were all from out-of-town, all organized, professional agitators. I don't know if it's the same group or different groups, but they were former Occupy Wall Street folks back then. So they just continue to hone their craft and get better and better.

**DONALD TRUMP:** That's right. And, you know, when they have bricks, you know they come armed with bricks. And they have bricks and rocks and they have other things and they throw them. You know, you're allowed to fight back. You don't have to have a brick hit you in the face and you don't do anything about it. You are allowed to fight back. Now I'm not asking my Attorney General, perhaps he'll stop me from saying that, but I would think that if a brick is thrown at somebody and it hits them or maybe if it doesn't hit them, your strong powerful people are allowed to fight back against that guy and very strongly and powerfully. That's what I think. I saw what they did to the kid in Dallas and that was a disgrace. That was a disgrace. That should have been stopped. I've never seen anybody take that punishment, then I don't know, I guess maybe he's not going to live. But I saw what happened to that kid. I've never seen it. Nobody talks about it. Nobody even mentions it. All of that stuff, it can't happen. But I know when you're doing well because I haven't seen Maryland on television and that's good, when you're not on television.

**LARRY HOGAN:** We don't want to be on television again. Yeah. What you're talking about with the injuries, we had 137 police and fire fighters injured in the first few hours from that [INDISCERNIBLE 00:41:39] 2015. And we sent in the Guard and all the police officers and not a single person was hurt for the rest of the week. No more violence. Powerful forces, with showing restraint, but I think showing those groups, people start to scatter.

**DONALD TRUMP:** Well thank you very much, Larry. That's good. #2 if anyone wants to call in, #2.

11

Case 1:20-cv-07311-LAK    Document 12-9    Filed 09/14/20    Page 13 of 75

**JIM JUSTICE:**  Mr. President, can you hear me?  It's Jim Justice, West Virginia.

**DONALD TRUMP:**  Yes, I can.

**JIM JUSTICE:**  Great to see you.  If it comes to pass that some states would rather you didn't come there, you come to West Virginia because you're a blooming hero here.  And we'll protect you in every way and there won't be any disturbance whatsoever.  What it really boils right down to is we've had some real peaceful protests.  We welcome them.  But absolutely we're not going to have a problem here because first and foremost, I'm not going to put up with it.  There is no way.  There is no way.  Instantaneously, we'll call in the Guard or do whatever we've got to do.  But I am just as disgusted as you and I'm not going to put up with this.

**DONALD TRUMP:**  That sounds a lot different than the governor of Maine.  That's very good.  She tried to talk me out of it.  Now I think she probably talked me into it.  But that's okay.  Thank you very much.  I appreciate it very much, Jim.  You know, we have a situation I was thinking about calling a number of you with flag burning.  I'm not a believer in flag burning and I would think that if a state wanted to try and pass a law it's not allowed to burn flags with a certain punishment, strong punishment I would think that the United States Government would be backing you up all the way.  So you're all on the phone right now.  And I would think that the United States Government would love to see somebody go and do that because I think flag burning is a disgrace.  And it passed last time, as you know, against what a lot of people want.  It passed five to four.  We have a different court and I think that it's time to review that again.  Because when I see flags being burned, they wanted to crawl up flagpoles in Washington and try and burn flags, but we stopped them.  They weren't able to do it.  But they would have done it, if we didn't stop them.  I think it's time to re-look at that issue.  Hopefully the Supreme Court will accept that.  But if you have a state where you feel strongly, and many of you do, most of you do I'll bet, if you wanted to try and pass a very powerful flag burning statute, again, anti-flag burning I hope you do it because we'll back you 100% all the way.  Okay.  I hope some of you do it.  Alright.  Go ahead, #2 please.

**OPERATOR:**  Governor Polis, your line is now open.

**JARED POLIS:**  Hi.  This is Jared Polis, Colorado.  We here in Colorado, we also were one of the most affective.  We were able to use the National Guard and they're very amazing folks.  I want to thank you for renewing their service.

**[00:45:00]**

As you know, [INDISCERNIBLE 00:45:02] their benefit, so we owe that to them.  The testing for coronavirus, the defending our cities.  It's all incredibly important.  I just want to add the public health side to this.  One of the things we did is we distributed masks to some of the peaceful protesters.  I don't know if others had that experience.  We're obviously concerned with the size of the gatherings.  Some were doing social distance, some weren't.  But encouraging that method.  We are all testing, [INDISCERNIBLE 00:45:30] testing clinic, freely available.  We send it to anybody who went to a peaceful protest can get tested next weekend.  So after an incubation period.  But we're all worried, Mr. President, that this could be some kind of a setback

to the reopening and to everything going on. To just be [INDISCERNIBLE 00:45:45] about people, some of which were doing social distancing, some of which weren't. But I just want to encourage others to provide masks, offer testing, all of those things for the peaceful protesters. Obviously we're using the National Guard, protecting ourselves. We just had a handful of arrests. We didn't see a large infiltration, but we did see some people that want to be [INDISCERNIBLE 00:46:07] to further their own agenda of anarchy or whatever it is and we did have some bad folks in their groups. So I just wanted to pass along that kind of help and encourage everybody to be responsible in that sense.

**DONALD TRUMP:** Thank you very much, Governor. Thank you. [INDISCERNIBLE 00:46:22] hit the White House last week too. I hear Henry McMaster on the line. He's [INDISCERNIBLE 00:46:28] his people, which I think is much more important than [INDISCERNIBLE 00:46:31], Henry. I know what you're doing. You get them ready. Go ahead.

**HENRY MCMASTER:** Thank you, Mr. President. I loved all of what you were saying and also what the Attorney General was saying. It seems listening to the governors and telephone calls over the days and also what we've been saying today is I don't think we're prosecuting enough people. These people are just getting 30 days or $500. That's just the cost of doing business. I know that we have organized people. We're trying to figure out if we've got some here, which we think maybe we do. We have a state grand jury that's just like every grand jury in that it's activating that and bring them before that grand jury where we can investigate using the tools of the grand jury. We talked about U.S. Attorney fees and the cost and everybody was on board and we really had a model thing happening in the city of Charleston that the first night they had one approach that they delayed 11:00 curfew and we had a whole lot of [INDISCERNIBLE 00:47:40] I guess you could say a less confrontational approach and they had a lot of damage on Kings Street, beautiful place. People were busting out windows in restaurants and throwing in firecrackers landing on the tables of diners and there was no curfew. The diners were still there and it was scaring everybody and they were running out. We had one fellow who pulled out a pistol on a civilian in a hotel and he fired shots in the air to scare off some of the agitators. A lot of them are from outside. There's no doubt about it. Part of this ANTIFA or whatever you call it. We arrested one man in Columbia who had a Glock pistol in a knapsack and 90 rounds of ammunition. So we've got him locked up and I hope to be able to get some information from him. But I think what you're saying is right. We have to make it more difficult. We've got to take these people out, get some justice. Make it more than just doing business to come in one round, get arrested, pay bond, and go to another town and do the same thing. The other point we had law enforcement everywhere up in the corrections [INDISCERNIBLE 00:48:58] the state law enforcement division, the city police. We had the county sheriffs coming in from adjoining counties. And in Charleston we had the National Guard there on Sunday night, last night, and they had virtually no problems. The National Guard and sheriff said you've never seen such a police presence in his life. And it worked like a charm. I think just a handful of arrests. There's no damage. They had five [INDISCERNIBLE 00:49:27] rolling around the city of Charleston. Very peaceful strength works. You have to dominate, as you said. I think now is the time to get serious about prosecuting these people, finding out where the organizations are, who is paying them money. We even had some of them

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 15 of 75

get a bonus if they get an arrest.  [INDISCERNIBLE 00:49:49] told him to get out there and get more arrests.  So that's the state of it.  I think we have to be careful, but we've got to be tough.

**[00:50:00]**

**DONALD TRUMP:**  You don't have to be too careful.  I'll tell you, you have to do the prosecutions.  If you don't do the prosecutions, they're just going to be back.  That's just a fact.  Whether it's been two years or in two months, they're going to be back and you've got to do the prosecutions.  And you know, when somebody is throwing a rock, that's like shooting a gun.  What's the difference between having a brick that weighs ten pounds hit somebody in the face and wipe them out practically?  We had a couple of people badly hurt and there's no retribution.  You have to do retribution, in my opinion.  You have to use your own legal system.  They do have great legal systems, everybody I was speaking to.  But if you want this to stop, you have to do it.  But you have to prosecute people, Henry, you're right.  Thank you very much.  #2.

**OPERATOR:**  Please go ahead.  Your line is now open.

**MALE 2:**  Mr. President, can you hear me?  This is Governor [INDISCERNIBLE 00:51:06].

**DONALD TRUMP:**  I can hear you, not great, but I can hear you.  Are you on your cell phone maybe?  I'm not hearing you great.  Go ahead.

**MALE 2:**  Thank you.  I wanted to take this moment, and I can't let it pass, to speak up and say that I've been extraordinarily concerned about the rhetoric that's been used by you.  It's not okay for that officer to choke Mr. Floyd to death, but we have to call for calm.  We have to have police reform called before we call out our National Guard and our state police.  But the rhetoric that's coming out of the White House is making it worse.  And I hate to say it, but people are feeling real pain out there.  That we've got to have national leadership calling for calm and making sure that we're [INDISCERNIBLE 00:52:23] legitimate peaceful protesters.  That will help us to bring order.

**DONALD TRUMP:**  Okay.  Well thank you very much.  I don't like your rhetoric much either because I watched [INDISCERNIBLE 00:52:37] coronavirus and I don't like your rhetoric much either.  I think you could have done a much better job, but that's okay we don't agree with each other.  As far as the event that took place with respect to Mr. Floyd, I've spoken about it often and I've spoken about it with great compassion that I think it's a horrible thing that happened and I've spelled it out on numerous occasions on numerous speeches.  I even spoke about it at our great rocket launch.  I covered it before I covered the rocket.  We sent out a billion dollar rocket, and before I spoke about the rocket at a major speech after the rocket launched I spoke as to what happened with respect to Mr. Floyd.  I thought I was a disgrace.  I thought what happened was a disgrace, but I spoke about it probably as long as I did about the rocket itself.  And those police officers, what they did, including the three of them that stood there and watched and maybe even participated, the whole world was disgraced by it, not just our country.  The whole world was watching.  So nobody can tell me I haven't spoken about it.  I've spoken about it at great length and great length and I will continue to speak about it.  But I also have to speak about law and

14

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 16 of 75

order.  We need law and order in our country.  And we don't have law and order, we don't have a country, so we need law and order.  Okay.  Who is next?  #2.

**OPERATOR:**  There's no one in queue at this time.

**DONALD TRUMP:**  Okay.  I want to thank you all.  Be strong.  Be tough.  Be smart.  Be safe.  Be safe, very important.  And we honor many people and we have to do it right, many, many people.  We honor, as you know, Mr. Floyd, but we honor many other people that have been badly hurt and killed.  And the way we're going to do it and the way we're going to solve the problem is to be fair and be strong.  You have to be strong.  Use our National Guard.  You're much better off with too many than too few.  That's one thing we have found out.

**[00:55:00]**

Too many is a good thing.  Too few is unacceptable.  So go out there and get them.  Good luck tonight.  And if you have any information, let us know please.  Thank you very much.

**[00:55:14]**



TRANSPERFECT
LEGAL SOLUTIONS

I, Anders Nelson, hereby certify that the document "2020.06.08 Audio for Transcription" is, to the best of my knowledge and belief, a true and accurate transcription from English to English. The audio was retrieved from https://www.thedailybeast.com/listen-to-trumps-unhinged-rant-to-guvs" on June 8, 2020.

# Anders Nelson

Digitally signed by
Anders Nelson
Date: 2020.06.09
11:34:56 -04'00'

Anders Nelson
Project Manager

June 9, 2020

# EXHIBIT G

**127363273 Trump, Donald John (Doc Images)**

PAL   127363273   Trump, Donald J                    1600 S Ocean Blvd Palm Beach 33480

## Florida Voter Registration Application
Part 2 – Form (DS-DE 039, R18-2.040, F.A.C.)(eff. 7/2019)

Form available online at: Formulario disponible en línea en: registertovoteflorida.gov

This is: ☑ New Registration ☐ Record Update/Change (e.g., Address, Party Affiliation, Name, Signature) ☐ Request to Replace Voter Information Card

| | | | |
|---|---|---|---|
| 1 | Are you a citizen of the United States of America? | ☑ YES ☐ NO | **OFFICIAL USE ONLY** |

ACCOUNT02 OF ELECTIONS

2019 OCT 24 PM 12:30

FVRS No:

PALM BEACH COUNTY FL

2. ☑ I affirm I have never been convicted of a felony.
☐ If I have been convicted of a felony, I affirm my voting rights have been restored by the Board of Executive Clemency.
☐ If I have been convicted of a felony, I affirm my voting rights have been restored pursuant to s. 4, Art. VI of the State Constitution upon the completion of all terms of my sentence, including parole or probation.

3. ☑ I affirm that I have not been adjudicated mentally incapacitated with respect to voting or, if I have, my right to vote has been restored.

| 4 | Date of Birth (MM-DD-YYYY) | 0 6 - 1 4 - 1 9 4 6 |

| 5 | Florida Driver License (FL DL) or Florida Identification (FL ID) Card Number | redacted | If no FL DL or FL ID, then provide | ☑ I have NONE of these numbers. |

| 6 | Last Name: Trump | First Name: Donald | Middle Name: John | Name Suffix (Jr., Sr., I, II, etc.): |

| 7 | Address Where You Live (legal residence-no P.O. Box): 1600 Pennsylvania Ave NW | Apt/Lot/Unit | City: Washington | County | Zip Code: 20500 |

| 8 | Mailing Address (if different from above address): Mar-A-Lago, c/o Sean McCabe, 1100 S. Ocean Blvd | Apt/Lot/Unit | City: Palm Beach | State or Country: Florida | Zip Code: 33480 |

| 9 | Address Where You Were Last Registered to Vote: 721 5th Avenue | Apt/Lot/Unit | City: New York | State: New York | Zip Code: 10022 |

| 10 | Former Name (if name is changed) | | Gender ☑ M ☐ F | State or Country of Birth: New York | Telephone No. (optional) ( ) |

| 11 | ☐ Email me SAMPLE BALLOTS if option is available in my county. (See Public Record Notice above) My email address is: |

**Party Affiliation**
(Check only one. If left blank, you will be registered without party affiliation.)
☐ Florida Democratic Party
☑ Republican Party of Florida
☐ No party affiliation
☐ Minor party (print party name):

**Race/Ethnicity** (Check only one)
☐ American Indian/Alaskan Native
☐ Asian/Pacific Islander
☐ Black, not of Hispanic Origin
☐ Hispanic
☑ White, not of Hispanic Origin
☐ Multi-racial
☐ Other:

(Check only one if applicable)
☐ I am an active duty Uniformed Services or Merchant Marine member
☐ I am a spouse or a dependent of an active duty uniformed services or merchant marine member
☐ I am a U.S. citizen residing outside the U.S.

☐ I will need assistance with voting.
☐ I am interested in becoming a poll worker.

12. **Oath:** I do solemnly swear (or affirm) that I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, that I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that all information provided in this application is true.

**redacted per F.S. 97.0585**

Date: [redacted handwritten]

Scan Date = 11/04/2019

Date image Scanned 11/04/2019

**127363273  Trump, Donald John  (Doc Images)**

PAL    127363273    Trump Donald J

### Florida Voter Registration Application
Part 2 – Form (DS-DE 498, R18-2.040, F.A.C.)(eff. 7/2019)

Form available online at: registertovoteflorida.gov

This is: ☑ New Registration  ☐ Record Update/Change (e.g. Address, Party Affiliation, Name, Signature)  ☐ Request to Replace Voter Information Card

| | | | |
|---|---|---|---|
| 1 | Are you a citizen of the United States of America? | ☑ YES  ☐ NO | **OFFICIAL USE ONLY** |

**2**
- ☑ I affirm I have never been convicted of a felony.
- ☐ If I have been convicted of a felony, I affirm my voting rights have been restored by the Board of Executive Clemency.
- ☐ If I have been convicted of a felony, I affirm my voting rights have been restored pursuant to s. 4, Art. VI of the State Constitution upon the completion of all terms of my sentence, including parole or probation.

SUPERVISOR OF ELECTIONS

... OCT 18 PM 2: 2

FVRS No:  ... BEACH COUNTY, F...

**3** ☑ I affirm that I have not been adjudicated mentally incapacitated with respect to voting or, if I have, my right to vote has been restored.

**4** Date of Birth (MM-DD-YYYY)  0 6 - 1 4 - 1 9 4 6

**5** Florida Driver License (FL DL) or Florida Identification (FL ID) Card Number

If no FL DL or FL ID, then provide  Last 4 digits of Social  **redacted**  ☐ I have NONE of these numbers.

| | | | | | |
|---|---|---|---|---|---|
| **6** | Last Name  Trump | First Name  Donald | Middle Name  John | Name Suffix (Jr, Sr, II, III, etc.) | |
| **7** | Address Where You Live (legal residence–no P.O. Box)  Mar-A-Lago, 1100 S. Ocean Blvd | Apt/Lot/Unit | City  Palm Beach | County  Palm Beach County | Zip Code  33480 |
| **8** | Mailing Address (if different from above address) | Apt/Lot/Unit | City | State or Country | Zip Code |
| **9** | Address Where You Were Last Registered to Vote  721 Fifth Avenue | Apt/Lot/Unit | City  New York | State  New York | Zip Code  10022 |
| **10** | Former Name (if name is changed) | Gender  ☑ M  ☐ F | State or Country of Birth  New York | Telephone No. (optional)  (    )    - | |

**11** ☐ Email me SAMPLE BALLOTS if option is available in my county.
(See Public Record Notice above)  My email address is:

**Party Affiliation**
(Check only one. If left blank, you will be registered without party affiliation)
- ☐ Florida Democratic Party
- ☑ Republican Party of Florida
- ☐ No party affiliation
- ☐ Minor party (print party name):

**Race/Ethnicity** (Check only one)
- ☐ American Indian/Alaskan Native
- ☐ Asian/Pacific Islander
- ☐ Black, not of Hispanic Origin
- ☐ Hispanic
- ☑ White, not of Hispanic Origin
- ☐ Multi-racial
- ☐ Other:

(Check only one if applicable)
- ☐ I am an active duty Uniformed Services or Merchant Marine member
- ☐ I am a spouse or a dependent of an active duty uniformed services or merchant marine member
- ☐ I am a U.S. citizen residing outside ... OCT 18 0 2010

- ☐ I will need assistance with voting.
- ☐ I am interested in becoming a poll worker.

**12** Oath: I do solemnly swear (or affirm) that I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, that I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that all information provided in this application is true.

**redacted
per F.S. 97.0585**

Date  10/28/1...

Scan Date = 11/04/2019

# EXHIBIT H

# JONES, FOSTER, JOHNSTON & STUBBS, P.A.

ATTORNEYS AND COUNSELORS
FLAGLER CENTER TOWER
505 SOUTH FLAGLER DRIVE
ELEVENTH FLOOR
P. O. BOX 3475
WEST PALM BEACH, FLORIDA 33402-3475
(407) 659-3000
FAX: (407)832-1454

WRITER'S DIRECT LINE: _____

LARRY B. ALEXANDER
STEPHEN J. AUCAMP
TRACEY BIAGIOTTI
JOYCE A. CONWAY
MARGARET L. COOPER
EDWARD DIAZ
REBECCA G. DOANE
CHRISTOPHER S. DUKE
SCOTT G. HAWKINS
THORNTON M. HENRY
PETER S. HOLTON
MARK B. KLEINFELD
MICHAEL T. KRANZ

JOHN BLAIR McCRACKEN
SCOTT L. McMULLEN
JOHN C. RANDOLPH
JOHN C. RAU
ANDREW ROSS
STEVEN J. ROTHMAN
PETER A. SACHS
D. CULVER SMITH III
SIDNEY A. STUBBS, JR.
ALLEN R. TOMLINSON
JOHN S. TRIMPER
MICHAEL P. WALSH
H. ADAMS WEAVER

HENRY F. LILIENTHAL
1902-1982
HARRY ALLISON JOHNSTON
1895-1983
R. BRUCE JONES
1904-1966
PAUL C. WOLFE
1933-1991
RETIRED
WILLIAM A. FOSTER
OF COUNSEL
L. MARTIN FLANAGAN

· November 15, 1993

Ms. Grace T. Peters
Town Clerk
Town of Palm Beach
Post Office Box 2029
Palm Beach, Florida   33480

RE:   Town of Palm Beach/Mar-A-Lago Club
      Declaration of Use Agreement
      Our File No. 13156.6

Dear Grace:

Enclosed for the files of the Town is the original recorded
Declaration of Use Agreement between the Town of Palm Beach, The
Mar-A-Lago Club, Inc. and Donald J. Trump, as recorded in Official
Record Book 7933, Page 22, public records of Palm Beach County,
Florida.

Sincerely,

John C. Randolph

JCR/ssm
cc:   Robert J. Doney

This instrument was prepared by:
Alan J. Ciklin, Esq.
John C. Randolph, Esq.
Paul Rampell, Esq.

Please record and return to:
Paul Rampell, Esq.
125 Worth Avenue
Suite 202
Palm Beach, FL 33480

OCT-15-1993  4:18pm 93-330542
ORB    7933 Pg    22

# DECLARATION OF USE AGREEMENT
by
## THE TOWN OF PALM BEACH,
## THE MAR-A-LAGO CLUB, INC.,
and
## DONALD J. TRUMP

Dated: _August_ _10_, 1993

ORB    7933 Pg    23

# TABLE OF CONTENTS

|  | Page No. |
|---|---|
| ARTICLE I<br>Representation of Ownership | 2 |
| ARTICLE II<br>Club Use | 2 |
| ARTICLE III<br>Unity of Title | 3 |
| ARTICLE IV<br>Building Codes, Fire Protection and Utilities | 3 |
| ARTICLE V<br>Principles of Preservation and Critical Features | 4 |
| ARTICLE VI<br>Mitigation/North Boundary | 4 |
| ARTICLE VII<br>Club Membership Limitations | 4 |
| ARTICLE VIII<br>Traffic/Special Events | 5 |
| ARTICLE IX<br>Liability and Abandonment of Club Use | 6 |
| ARTICLE X<br>Reimbursement for Special Studies/Monitoring | 7 |
| ARTICLE XI<br>Remedies for Violation | 7 |
| ARTICLE XII<br>Provisions to Run with Land/Recording | 8 |
| ARTICLE XIII<br>Entire Agreement | 8 |
| ARTICLE XIV<br>Miscellaneous | 8 |

ORB 7933 Pg 24

Acknowledgements                                    10

Consent and Joinder of Mortgagee                    13

Exhibit "A"                                          14

Exhibit "B"                                          15

Exhibit "C"                                          17

ORB 7933 Pg 25

# DECLARATION OF USE AGREEMENT

THIS DECLARATION OF USE AGREEMENT is made and entered into this _10th_ day of _August_____, 1993 by and between the TOWN OF PALM BEACH, a Florida municipal corporation, 360 South County Road, Palm Beach, Florida 33480 (hereinafter called the "Town"); and THE MAR-A-LAGO CLUB, INC., a Florida corporation, c/o Paul Rampell, Esquire, 125 Worth Avenue, Palm Beach, Florida 33480 (hereinafter called the "Club"); and DONALD J. TRUMP, 725 Fifth Avenue, New York, New York 10022 (hereinafter called "Owner"), which terms Town, Club, and Owner will include and bind the successors and assigns of the parties, wherever the contact so requires or admits.

## W I T N E S S E T H :

WHEREAS, the land described in Exhibit "A" attached hereto and made a part hereof, together with improvements thereon (hereinafter referred to as the "Land") and known as Mar-a-Lago, is located within the municipal limits of the Town;

WHEREAS, Mar-a-Lago is unique and no other property in Palm Beach is like it in any way;

WHEREAS, the Land is owned by the Owner, and the Owner shall convey title to the Land to the Club;

WHEREAS, the Land is zoned RAA-Large Estate Residential and RA-Estate Residential and private social clubs are allowable Special Exception Uses within such zoning categories, subject to the approval of the Town Council;

WHEREAS, the Town has approved a Special Exception use for the Land as a private social club subject to the conditions set forth herein and on the basis that the approval of the Special Exception, in compliance with said conditions, will not be adverse to the public interest;

WHEREAS, the Town has approved the site plan for the Special Exception on the basis of the specific finding of the Town Council that said site plan meets the requirements of the Town's Code of Ordinances relating to same;

WHEREAS, in approving the Special Exception and site plan, the conditions of approval reflected herein are imposed in order to regulate the use and mitigate any impacts of the Club, as well as to insure that said use shall not be adverse to the public interest; and

WHEREAS, all of the representations made herein are true and accurate and the granting of the Special Exception and site plan review are conditioned upon the representations made herein and all of the conditions herein imposed.

NOW THEREFORE, in consideration of the mutual promises set forth herein, it is agreed as follows:

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 27 of 75

ORB 7933 Pg 26

# ARTICLE I

## REPRESENTATION OF OWNERSHIP

Owner is the fee simple title holder of the property described in Exhibit "A" attached hereto, is in sole possession of the property, and has full right to enter into this Agreement and to bind the property and himself to the terms hereof. Owner's interest is subject only to mortgages of record and all holders of said mortgages, by execution hereof, hereby consent to the terms and conditions of this Agreement as evidenced by their signatures hereto. There are no covenants, restrictions or reservations of record that will prevent the use of the property as a club in accordance with the terms and conditions of this Agreement. No consent to execution, delivery and performance hereunder is required from any person, partner, limited partner, creditor, investor, judicial or administrative body, governmental authority or other party other than any such consent which already has been unconditionally given or referenced herein. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will violate any restriction, court order or agreement to which Owner or the real property is subject.

# ARTICLE II

## CLUB USE

The use of the Land shall be for a private social club in compliance with all of the information and exhibits included in the application not inconsistent with the terms set forth herein, and subject to such uses not inconsistent with the terms set forth herein, set forth in the Application for Special Exception No. 11-93 and The Mar-a-Lago Club:  A Special Exception Use and Preservation Plan, as amended (hereinafter referred to as the "Plan") as submitted to the Town.  Any usages not specifically set forth in the Plan (including, without limitation, docks, cabanas, gambling, helicopter operations or landings, animal circuses, and commercial or quasi-commercial uses) are excluded from the Town's approval of the Plan pursuant to that provision of the Town Code which provides that no subsequent deviation may be made from the application as approved by the Town Council except upon new application to and approval by the Town Council.  Chapters 2, 3, 5, 6, 10 and 11 of the Plan are adopted herein by reference and made a part of this Agreement.  Any additional uses of the Land shall be subject to approval by the applicable governmental authority including but not limited to the Town Council of the Town, the Landmarks Preservation Commission of the Town, the Architectural Review Commission of the Town, Palm Beach County, the State of Florida, the United States Government, and/or any agencies under any of the foregoing governmental authorities.

The guest suites as set forth in the Plan shall be limited to the use of Club members, shall be limited to ten (10) in number, shall not be open to the public, and shall not be advertised.  No kitchen or other food preparation facilities shall be allowed in any of the guest suites.  The use of guest suites shall be limited to a maximum of three (3) non-consecutive seven (7) day periods by any one member during the year.  The operations of the Club shall not result in a nuisance to any of the neighboring properties.

2

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM

NYSCEF DOC. NO. 91

INDEX NO. 160694/2019

RECEIVED NYSCEF: 06/15/2020

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 28 of 75

ORB 7933 Pg 27

Club facilities may be used only by members and guests of the Club.

Photography at the Club shall be conducted in a manner consistent with the rules and regulations governing other clubs in the Town. This shall include but not be limited to the prohibition of film making, movie producing, magazine feature photography, newspaper photography, photography for public relations purposes for individual members and/or guests and other commercial photography and the like.

## ARTICLE III

## UNITY OF TITLE

The Land, as described herein, shall be considered as one (1) parcel and no portion thereof may be sold, transferred, devised or assigned except in its entirety, either voluntarily or involuntarily, by operation of law or otherwise. This provision shall not preclude the dedication of right-of-way for road improvements required by governmental authority. No portion of the Land or structures thereon shall be condominiumized or changed to a cooperative form of ownership. This provision shall survive the use of the property as a club and shall apply to any subsequent use of the property.

## ARTICLE IV

## BUILDING CODES, FIRE PROTECTION AND UTILITIES

The Owner and the Club hereby grant and convey to the Town an easement over the Land in order to have access to the real property described in Exhibit "B" for the purpose of operating and maintaining a sewage pump station and force main located thereon, and for any other governmental purpose related thereto.

The existing sewage overflow (manually valved) shall be eliminated by the Owner at the Owner's expense. The Town and the Owner shall calculate the sewage generation utilizing generally accepted engineering methodology. If it is reasonably determined by the Town engineer that the existing pump station needs to be upgraded or replaced, it shall be upgraded or replaced by the Owner.

The air-conditioning condensate presently discharging into the sanitary sewer system shall be rerouted by the Owner into the storm sewer system.

Exfiltration trenches subject to approval by the Town engineer shall be constructed along a portion of the perimeter of the Phase B parking area as depicted in the Plan, and intermittently along the soil stabilized cart path to dispose of any increase in stormwater runoff from those improvements.

The existing tunnel to the beach area shall be evaluated for structural soundness by a Florida registered engineer and shall be improved as required. Owner and Club shall save,

3

defend and hold the Town, its officers, agents, representatives and employees, harmless from any and all claims which may arise as a result of the presence or use of the tunnel.

All applicable building, fire, and life safety codes shall be complied with prior to the commencement of Club operations. The Owner shall install an onsite fire hydrant as required by the Standard Fire Prevention Code. The Owner shall install an approved fire detection and extinguishing system.

All conditions herein are required to be met prior to commencement of Club operations and prior to the issuance of a Certificate of Occupancy for operation of a Club use.

## ARTICLE V

## PRINCIPLES OF PRESERVATION AND CRITICAL FEATURES

The principles of preservation and critical features specifically described in Chapters 2 and 3 of the Plan as amended shall be binding on the Owner and the Club and shall be enforceable in accordance with the terms of this Agreement. Prior to any changes to the grounds or exterior of the buildings, the Owner and/or the Club shall obtain a Certificate of Appropriateness from the Landmarks Preservation Commission prior to issuance of any permits. The outdoor loggia shall not be structurally enclosed.

## ARTICLE VI

## MITIGATION/NORTH BOUNDARY

The Owner shall install a solid masonry wall and landscaping along the Northern perimeter of the Land to serve as a noise and light buffer for the residents of Woodbridge Road, according to the specifications attached hereto and made a part hereof as Exhibit "C". Owner shall post surety in the amount of One Hundred Thirty-Five Percent (135%) of the cost of the improvements to be installed. The amount of the surety shall be provided through cost estimates from the Owner and shall be subject to approval by the Town. The mitigation set forth herein shall be completed prior to commencement of Club operations and prior to issuance of the Certificate of Occupancy for Club use. No additional lighting shall be installed in the parking area bordering the Northern boundary, and no accumulation of kitchen refuse shall be allowed to be held in this area.

## ARTICLE VII

## CLUB MEMBERSHIP LIMITATIONS

At least fifty percent (50%) of the members of the Club shall consist of individuals who maintain residences in the Town of Palm Beach or have places of employment in the Town of Palm Beach. An affidavit verifying this fact, and the guest suite occupancy interval and frequency limitations, and compliance with Article IX relating to establishment of the fiduciary

account, shall be filed with the Town on an annual basis on or before a date each year which coincides with the date the Certificate of Occupancy is issued to the Club. The membership in the Club shall be limited to five hundred members; provided, however, such number may be adjusted in the reasonable discretion of the Town. In the event the trip generation limitation set forth in Article VIII is reached, membership at that time shall be frozen until measures are taken to reduce daily trips.

The Club shall not discriminate against any prospective member on the basis of race, color, religion, gender, national origin, handicap, age, or marital status.

All Club facilities such as dining, tennis and golf shall require advance reservations.

The Owners of Woodbridge Road residences shall have guest privileges at the Club without having to pay membership initiation fees; provided, however, they shall not be permitted to park on the Land while exercising their guest privileges. The foregoing shall run in perpetuity with the land of the Woodbridge Road residences.

## ARTICLE VIII

### TRAFFIC/SPECIAL EVENTS

The total trip generation of the Club shall be limited to three hundred thirteen (313) daily trips based on an annual average of daily trips of the Club. Traffic monitoring by a method approved by the Town for the Club shall be performed by the Club on a daily basis and shall be available to the Town upon request. Monitoring devices approved by the Town shall be in place prior to issuance of a Certificate of Occupancy. The results of the monitoring during the first and third quarters of each year shall be averaged to determine the average annual daily trips of the Club. The Club shall reimburse the Town for the reasonable expense incurred by the Town's traffic consultant in reviewing the monitoring results.

The monitoring results shall be supplied to the Town and the Palm Beach County Traffic Division to assure compliance.

The Club shall install, prior to commencement of Club operations and prior to issuance of a Certificate of Occupancy for Club use, a northbound left-turn storage lane to serve the Club's entrance drive on Ocean Boulevard, subject to obtaining a permit from the Florida Department of Transportation. The Town, Owner, and Club jointly shall obtain such permit at the sole expense of the Owner and the Club, and the Owner and Club shall hold the Town harmless from any liability caused by the initial design and construction of the turn lane. If, after the Club is opened it is reasonably determined by the Chief of Police in consultation with the Town's traffic consultant that a southbound right turn lane is necessary, the Owner and/or Club and the Town shall use their best efforts to obtain a permit and to install such right turn lane.

The Club shall utilize a shuttle van to transport approximately forty percent (40%)

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM     INDEX NO. 160694/2019
NYSCEF DOC. NO. 91     Case 1.20-cv-07311-LAK     Document 12-9     Filed 09/14/20     Page 31 of 75     RECEIVED NYSCEF: 06/15/2020

ORB  7933 Pg  30

of the Club's staff to assist in complying with the three hundred thirteen (313) daily trip limitation on an average annual basis.

Dining area seating shall be limited to seventy-five (75) seats.

Special events shall be limited to three hundred ninety (390) individuals and shall occur strictly on weekends or after 6:00 p.m. on week days. At no time shall more than one (1) special event occur at the same time at the Club. Special events at the Club shall be coordinated with special events at the Bath and Tennis Club so that special events at the two (2) clubs scheduled on the same day shall commence at least one (1) hour apart, so that the overlap of peak traffic during special events is reasonably avoided. Tents may only be used for special events upon approval of the Town Building and Zoning Director after presentation of satisfactory assurance that the attendance limitations will not be exceeded.

Site ingress and egress shall be as proposed in the Plan. The existing main entrance on Ocean Boulevard shall be used as an entrance only for both regular activities and special events at the Club; two (2) lanes of ingress shall exist on this entrance drive inside the gate. The existing service access on Ocean Boulevard shall be used as an exit only for both such regular activities and special events; two (2) lanes of egress shall exist on this exit drive inside the gate. A gate West of the existing Southern Boulevard gate shall be provided prior to commencement of Club operations and receipt of an occupational license for Club use, and shall be aesthetically identical to the existing gate, and the Owner and Club shall hold the Town harmless from any liability caused by the initial design and construction of the gate and driveway connection to Southern Boulevard. The new Southern Boulevard gate shall serve as the primary entry and exit for staff and service vehicles. During special events the new Southern Boulevard gate may be used by members and guests for exiting if deemed necessary.

Valet parking services shall be used at all times for all club events. Town of Palm Beach off-duty police shall be engaged to supervise traffic at all special events. Parking shall occur only in those areas so identified in the Plan and shall provide two hundred fifty-two (252) spaces. Any grass areas to be used for parking as well as the existing cart path shall be stabilized with "grass-crete" or an equivalent treatment. Said cart path shall be eighteen (18) feet in width.

## ARTICLE IX

## LIABILITY AND ABANDONMENT OF CLUB USE

Until the Club operates at a break-even point, or profitability for three (3) consecutive years, the Owner shall pay any and all real estate taxes, maintenance costs, insurance premiums, and similar expenses to the extent the Club is unable to meet such obligations.

A separate fiduciary account shall be established by the Club into which ten percent (10%) of all gross revenues from the guest suites shall be deposited and used exclusively for maintenance and restoration purposes.

If the Club use is unintentionally abandoned for a period of one (1) year after the Club has been in operation, or is intentionally abandoned at any time, the use of the Land shall revert to a single family residence and the ownership of the Owner. Bylaws and or documents relating to the Club membership shall include an agreement to be executed by Club members acknowledging their understanding of and consent to the terms of this agreement, and specifically agreeing to the reversion of the Land to Owner, and its return of the Land to use as a single family residence, in the event of intentional or unintentional abandonment of the Club use. Owner, Club, and Club members shall agree to hold the Town harmless from any liability or claim against the Town resulting from the enforcement of the terms of this Agreement, the reversion to single family use, the reversion to Owner or any other claims resulting therefrom.

Additionally, the three (3) paragraphs set forth above shall be set forth in the Articles of Incorporation of the Club and said provisions of the Articles shall not be amended without consent of the Town.

## ARTICLE X

## REIMBURSEMENT FOR SPECIAL STUDIES/MONITORING

The Owner or Club shall reimburse the Town for any reasonable costs incurred by the Town's consultants in their review of monitoring in compliance with the conditions set forth herein and the reasonable costs associated with the review of the Application.

## ARTICLE XI

## REMEDIES FOR VIOLATION

The Town shall have all remedies available at law and equity in order to enforce the terms of this Agreement including but not limited to (a) the Town's code enforcement procedures of the Code of Ordinances through the Code Inspector, Code Enforcement Officer, and Code Enforcement Board; and (b) the Town may initiate action to revoke the Club's occupational license pursuant to applicable provisions of the Town Code, and (c) all remedies otherwise offered in the Town's Code of Ordinances; and (d) injunction, specific performance, and any and all other equitable relief through the civil courts in and for Palm Beach County for the State of Florida. In the event the Town is required to seek injunctive relief, it shall not be required to post bond and it shall not be required to demonstrate irreparable harm or injury to secure an injunction to enforce the terms of this Agreement. Additionally, in the event of any breach, default or non performance of this Agreement, or any of its covenants, agreements, terms or conditions, the Town shall be entitled to recover its costs, expenses and reasonable attorneys' fees insofar as the Town prevails, either before or as a result of litigation, including appeals.

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM
INDEX NO. 160694/2019
NYSCEF DOC. NO. 91
RECEIVED NYSCEF: 06/15/2020

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 33 of 75

ORB 7933 Pg 32

# ARTICLE XII

## PROVISIONS TO RUN WITH LAND/RECORDING

This Agreement shall run with the Land and shall be binding upon the Owner, the Club, and their respective heirs, legal representatives, successors and assigns. This Agreement shall be recorded in the Public Records of Palm Beach County, Florida upon full execution by the parties hereto.

# ARTICLE XIII

## ENTIRE AGREEMENT

This Agreement represents the entire agreement between the parties as to its subject matter and it may not be amended except by written agreement executed by both parties.

# ARTICLE XIV

## MISCELLANEOUS

Wherever the word "laws" appears in this Agreement it shall be deemed to include all ordinances, rules and regulations as well as laws of the appropriate governmental authorities.

This Agreement may not be amended except by written instrument signed by all parties hereto.

Paragraph headings are inserted for convenience only and shall not be read to enlarge, construe, restrict or modify the provisions hereof. All references to numbered or lettered paragraphs, subparagraphs and exhibits refer (unless the context indicates otherwise) to paragraphs and subparagraphs of this Agreement and to exhibits attached hereto, which exhibits are by this reference made a part hereof.

This Agreement shall be binding upon the parties hereto and upon their successors, assigns, heirs and personal representatives.

In the event of the invalidity of any provision of this Agreement, same shall be deemed stricken herefrom and this Agreement shall continue in full force and effect as if such invalid provision were never a part hereof.

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 91 Case 1:20-cv-07311-LAK Document 12-9 Filed 09/14/20 Page 34 of 75 RECEIVED NYSCEF: 06/15/2020

ORB 7933 Pg 33

IN WITNESS WHEREOF the parties have hereunto set their hands and seals the day and year first written above.

Signed, sealed and delivered
in the presence of:

TOWN OF PALM BEACH

By: _____

Paul R. Ilyinsky, Mayor

By: _____

M. William Weinberg,
President, Town Council

By: _____

Robert Doney,
Town Manager

THE MAR-A-LAGO CLUB, INC.

By: _____

Donald J. Trump,
President

By: _____

Donald J. Trump

9

ORB   7933 P9   34

STATE OF FLORIDA

COUNTY OF PALM BEACH

        The foregoing instrument was acknowledged before me this _1d_ day of _Deeg_ , 1993, by **Paul R. Ilyinsky,** the Mayor of The Town of Palm Beach, a Florida municipal corporation, on behalf of the corporation.  He is personally known to me or has produced Florida Driver's License Number _____ as identification and who did not take an oath.

Signature of Notary Public

GRACE I. PETERS

Printed Name of Notary Public

Commission No.: _CC26123/_

Commission Expires:

OFFICIAL NOTARY SEAL
GRACE T PETERS
COMMISSION NO. CC26123I
MY COMMISSION EXP. MAR. 27, 1997

STATE OF FLORIDA

COUNTY OF PALM BEACH

        The foregoing instrument was acknowledged before me this _1d_ day of _august_ , 1993, by **M. William Weinberg,** the President of The Town of Palm Beach, a Florida municipal corporation, on behalf of the corporation.  He is personally known to me or has produced Florida Driver's License Number _____ as identification and who did not take an oath.

Signature of Notary Public

GRACE T. PETERS

Printed Name of Notary Public

Commission No.: _CC26123/_

Commission Expires:

OFFICIAL NOTARY SEAL
GRACE T PETERS
COMMISSION NO. CC26123I
MY COMMISSION EXP. MAR. 27, 1997

10

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 36 of 75

ORB   7933 Pg   35

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this _10_ day of ___Aug___, 1993, by **Robert J. Doney,** the Town Manager of The Town of Palm Beach, a Florida municipal corporation, on behalf of the corporation. He is personally known to me or has produced Florida Driver's License Number _____ as identification and who did not take an oath.

_____
Signature of Notary Public

_GRACE I · PETERS_
Printed Name of Notary Public

Commission No.: _CC261231_

Commission Expires:

STATE OF _New York_

COUNTY OF _New York_

The foregoing instrument was acknowledged before me this _21st_ day of ___July___, 1993, by **Donald J. Trump,** President of **The Mar-a-Lago Club, Inc.,** a Florida corporation, on behalf of the corporation. He is personally known to me or has produced _his_ Driver's License Number _T-18792-35181-79406446_ as identification and who did not take an oath.

_____
Signature of Notary Public

_Norma I. Foerderer_
Printed Name of Notary Public

Commission No.: _31-4743494_

Commission Expires: _9/30/93_

NORMA I FOERDERER
Notary Public, State of New York
No. 31-4743494
Qualified in New York Co
Commission Expires Sept. 30, 1993

11

ORB   7933 Pg   36

STATE OF _____ New York _____

COUNTY OF _____ New York _____

     The foregoing instrument was acknowledged before me this 21st day of _____ July _____, 1993, by **Donald J. Trump**, who is personally known to me or has produced _____ his _____ Driver's License Number I 18792- 35181- 79106446 as identification and who did not take an oath.

_____
Signature of Notary Public

Norma I. Foerderex
Printed Name of Notary Public

Commission No.: 31-4743494

Commission Expires: 9/30/93

NORMA I FOERDERER
Notary Public, State of New York
No. 31-4743494
Qualified in New York Co.
Commission Expires Sept. 30, 1993

APPROVED AS TO  FORM AND
LEGAL SUFFICIENCY FOR THE
TOWN  OF PALM BEACH

By: _____
  John C. Randolph, Esq.

12

ORB   1933 Ps   37

## CONSENT AND JOINDER OF MORTGAGEE

The below referenced Mortgagee hereby consent to the Declaration of Use Agreement and its recordation.

MORTGAGEE

Herbert A. Kolben

Eric J. Ekeroth

By: _____

⫰  Vice President

~~STATE~~ District OF Columbia

~~COUNTY~~ City OF Washington

The foregoing instrument was acknowledged before me this 3 day of April, 1995 by Thomas C. Perkins, of The Union Labor Life Ins. Co. on behalf of the _____ . Perkins is personally known to me or has produced _____ Driver's License Number _____ as identification and who did not take an oath.

Larolya R. Williams
Signature of Notary Public

Larolya R. Williams
Printed Name of Notary Public

Commission No.:   Lavolya R. Williams
Notary Public, District of Columbia
My Commission Expires Nov. 14, 1998
Commission Expires:

13

FILED: NEW YORK COUNTY CLERK 06/15/2020 08:36 AM          INDEX NO. 160694/2019
NYSCEF DOC. NO. 91   Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 39 of 75   RECEIVED NYSCEF: 06/15/2020

ORB  7933 Pg    38

## EXHIBIT "A"

Being all that part of the North 610.00 feet of the South 1170.00 feet of Government Lot 2 of Section 35, Township 43, South, Range 43 East, in the Town of Palm Beach, Palm Beach County, Florida, lying West of Ocean Boulevard (State Road A1A) Right of Way and more particularly described as follows, to-wit:

Beginning at a point on the West face of an existing seawall on the East shore of Lake Worth, which point is 560.00 feet North of, measured at right angles, to the South line of Government Lot 2 of said Section 35; thence North 6°09'22" West along the West face of said seawall for a distance of 77.32 feet; thence North 10°23'23" East along the West face of said seawall for a distance of 539.50 feet to a point in the South line of BINGHAM-COPP TRACT, a subdivision recorded in Plat Book 18, Page 6, Palm Beach County Public Records; thence run South 88°12'07" East along the South line of said BINGHAM-COPP TRACT for a distance of 1134.10 feet to a point in the Westerly right-of-way line of Ocean Boulevard (State Road A1A); thence run South 0°09'07" East for a distance of 82.59 feet to a point of curvature; thence run Southerly along the arc of a curve concaved to the Southwest having a radius of 1412.69 feet and a central angle of 3°03'00" for a distance of 75.20 feet to a point of tangency; thence run South 2°53'53" West for a distance of 176.28 feet to a point of curvature; thence run Southwesterly along the arc of a curve concaved to the Northwest having a radius of 2968.36 feet and a central angle of 2°27'30" West for a distance of 127.36 feet to a point of compound curvature; thence continue Southwesterly along the arc of a curve, concaved to the Northwest having a radius of 158.68 feet and a central angle of 86°26'30" for a distance of 239.40 feet to a point of tangency; thence run North 88°12'07" West along the North line of Southern Boulevard (State Road 80) for a distance of 1040.43 feet to the POINT OF BEGINNING, containing 16.3760 Acres, more or less;

and

The West one-half (W 1/2) of Lot 20 and the South 15 feet of the East one-half (E 1/2) of Lot 20 and the South 15 feet of the West one-half (W 1/2) of Lot 21, all in BINGHAM-COPP TRACT, a subdivision in the Town of Palm Beach, Palm Beach County, Florida, as recorded in Plat Book 18, Page 6, Palm Beach County Public Records, containing 0.1894 acres, more or less;

Together with an easement for the use of the tunnel under South Ocean Boulevard (State Road A1A) as described in that certain Quit Claim Easement Deed recorded in Official Record Book 2327, Page 1970 of the Palm Beach County Public Records;

and

Being the South 358.00 feet of the North 403.00 feet of the South 1170.00 feet of Government Lot 2, Section 35, Township 43 South, Range 43 East, Palm Beach County, Florida, lying East of Ocean Boulevard (State Road A1A) as now laid out and in use; together with all riparian and littoral rights, if any, thereunto appertaining.

14

EXHIBIT "B"    ORB  7933 Pg    39

### LEGAL DESCRIPTION

A parcel of land lying within the North 610.00 feet of the South 1170.00 feet of Government Lot 2 of Section 35, Township 43 South, Range 43 East in the Town of Palm Beach, Palm Beach County, Florida, lying West of Ocean Boulevard (S.R. AlA) Right-of-Way and more particularly described as follows, to wit:

Commencing at a point in the West face of an existing seawall on the East shore of Lake Worth, which point is 560.00 feet North of, measured at Right Angles to, the South line of Government Lot 2 of said Section 35; Thence S 88° 12' 07" E, parallel to said South line of Government Lot 2 (all other bearings refer thereto) a distance of 443.27 feet, to the Point of Beginning of the centerline of a strip of land being 12 feet in width; thence N 15° 22' 28" E along said centerline, a distance of 58.28 feet to a point hereinafter called Point 'A' and the Point of Termination of said centerline.

### TOGETHER WITH

Beginning at the above described Point 'A'; Thence S 88° 58' 21" E a distance of 8.37 feet; Thence N 01° 01' 39" E a distance of 20.0 feet; Thence N 88° 58' 21" W a distance of 20.0 feet; Thence S 01° 01' 39" W a distance of 20.00 feet; Thence S 88° 58' 21" E a distance of 11.63 feet; To the Point of Beginning.

### CERTIFICATION

(NOT VALID UNLESS SEALED WITH EMBOSSED SURVEYOR'S SEAL)

I HEREBY CERTIFY that the Description and Sketch of the property shown hereon was completed under my direction on  _MAY 27, 1993_ , and that said description is true and correct to the best of my knowledge and belief.

I FURTHER CERTIFY that this Description and Sketch meets the MINIMUM TECHNICAL STANDARDS FOR SURVEYS set forth by the FLORIDA BOARD OF LAND SURVEYORS pursuant to Section 472.027 Florida State Statutes, NO SEARCH OF THE PUBLIC RECORDS has been made by this Office.  The description is based on information furnished by client or client's representative.

Date of Signature  _5-27-93_

*Franklin A. Shutts*
Franklin A. Shutts
Registered Land Surveyor
Florida Certificate No. 2780

This legal description is to be attached to and made a part of the sketch.

| | | **Hutcheon Engineers** | DATE 5-27-93 | SHEET |
|---|---|---|---|---|
| DRN. F.S. | NOTEBOOK NO. PG. | A DIVISION OF KIMLEY-HORN AND ASSOCIATES, INC. (C) 1993 KIMLEY-HORN AND ASSOCIATES, INC. 4431 EMBARCADERO DRIVE, WEST PALM BEACH, FL 33407 WEST PALM BEACH          STUART | FILE & DWG. NO. 93-1-7485.00 | 1 of 2 |



ORB 7933 Pg 40

MAR·A·LAGO

LAKE WORTH

POINT OF COMMENCEMENT

SOUTHERN BLVD.

NOTE: THIS DRAWING DOES NOT REPRESENT A FIELD SURVEY AND IS BASED ON OFFICE INFORMATION ONLY.

This sketch is to be attached to and made a part of the legal description.

**Hutcheon Engineers**
A DIVISION OF KIMLEY-HORN AND ASSOCIATES, INC.
© 1983 KIMLEY-HORN AND ASSOCIATES, INC.
4431 EMBARCADERO DRIVE, WEST PALM BEACH, FL. 33407
WEST PALM BEACH

SCALE 1" = 10'
NOTEBOOK
DATE 5-27-93
95-1-7485.00
SHEET 2 OF 2

## EXHIBIT "C"

## WOODBRIDGE ROAD MITIGATION SPECIFICATION

1.    Construct a 6'0" high solid, concrete block and stucco wall adjacent to the Loomis southern property line continuing along the Mar-a-Lago property line until it intersects the seawall at its western limits. This wall will be wholly constructed on Mar-a-Lago property.

2.    To remove the Australian pine hedge and fence currently in place behind the Loomis property on an East/West axis.

3.    To install a solid hedge row of Mimusops Roxberghiana (kanapali) or Conocarpus Erectus (silver buttonwood) var, sercius, the genus and species to be decided upon based on the availability at the time of installation. The hedge row will be 12' (twelve feet) at the time of planting. Spacing of plant materials will follow sound horticultural practices usual for the species selected in order to maximize the potential growth characteristics of each plant consistent with the buffering objective (i.e., Mimusops, 2 plants per hold at 30" o.c., buttonwood double staggered row at 4' o.c., calophyllum, 5' o.c.)

4.    A setback from the wall to the hedge row material, consistent with the location of the footing and its width. A 24-36" setback is anticipated.

5.    A maintained height of 20' (twenty feet) maximum, with periodic pruning during the warmer months on a twice yearly basis or more frequently if necessary to encourage growth and density. The minimum maintained height of 12' (twelve feet) used at installation, will be used as a minimum maintained height during pruning operations.

6.    That maintenance of the hedge will follow a prescribed schedule of fertilization; 4 times per year with an approved 50% organic 12-16-8 or equivalent formula which may vary with seasonal needs.

7.    Existing plant materials beyond the Loomis property in the buffer (moving in a westerly direction) will be retained unless they are in the way of construction. Some specimen trees in the rear yards of the neighboring properties are greater than 30' (thirty feet) in height. It would be almost impossible to replace this existing buffer. Replace current 4-1/2 to 5' Ficus Nitida hedge with a 6' concrete block wall as previously described.

8.    Further West from the existing 30' hedge, to continue the 6' masonry wall to the seawall while installing a 6' Ficus Nitide hedge on the South side of the hedge beyond the staff quarters building.

17

Case 1:20-cv-07311-LAK Document 12-9 Filed 09/14/20 Page 43 of 75

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

E. JEAN CARROLL,

$\qquad$ *Plaintiff*,

-against-

DONALD J. TRUMP, in his personal capacity,

$\qquad$ *Defendant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Index No. 160694/2019

Hon. Verna L. Saunders

Mot. Seq. No. 003

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION TO STRIKE AN AFFIRMATIVE DEFENSE

Roberta A. Kaplan
Joshua Matz
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mcraig@kaplanhecker.com
*Counsel for Plaintiff E. Jean Carroll*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

RELEVANT FACTUAL & PROCEDURAL BACKGROUND.................................. 2

ARGUMENT ...................................................................................................... 6

    I.   TRUMP'S PERSONAL JURISDICTION DEFENSE CONSISTS OF NOTHING
        MORE THAN AN BARE LEGAL CONCLUSION......................................... 7

    II.  TRUMP'S PERSONAL JURISDICTION DEFENSE FAILS AS A FACTUAL
        MATTER AS WELL ................................................................................ 8

CONCLUSION.................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC,*
  78 A.D.3d 746 (2d Dep't 2010) ............................................................... 7

*Chen v. Guo Liang Lu,*
  144 A.D.3d 735 (2d Dep't 2016) .............................................................. 9

*Commissioners of the State Ins. Fund v. Ramos,*
  63 A.D.3d 453 (1st Dep't 2009) .............................................................. 7

*Deer Consumer Prods., Inc. v. Little,*
  35 Misc. 3d 374 (Sup. Ct., N.Y. Cty. 2012) ............................................ 7

*Hosley v. Curry,*
  85 N.Y.2d 447 (1995) ..................................................................... *passim*

*In re Gelarie's Estate,*
  75 N.Y.S.2d 594 (Sur. Ct., Westchester Cty. 1947) ............................... 12

*In re Hall's Estate,*
  120 N.Y.S.2d 886 (Sur. Ct., N.Y. Cty. 1953) .......................................... 8

*In re Lynch's Estate,*
  170 Misc. 966 (Sur. Ct., N.Y. Cty. 1939) ............................................... 10

*In re Newcomb's Estate,*
  192 N.Y. 238 (1908) ............................................................................ 2, 11

*Laufer v. Hauge,*
  140 A.D.2d 671 (2d Dep't 1988) .............................................................. 9

*Mississippi Band of Choctaw Indians v. Holyfield,*
  490 U.S. 30 (1989) ................................................................................. 11

*People v. Settles,*
  46 N.Y.2d 154 (1978) .............................................................................. 9

*Reed v. McCord,*
  160 N.Y. 330 (1899) ................................................................................ 9

*Robbins v. Growney,*
  229 A.D.2d 356 (1st Dep't 1996) ......................................................... 7, 8

*Wilke v. Wilke,*
  73 A.D.2d 915 (1980) ............................................................................. 11

ii

## Constitution and Statutes

U.S. Const. amend. XXII, § 1 ................................................................. 10

18 U.S.C. § 3056 .................................................................................... 3

## Rules

CPLR § 301 ............................................................................................ 5

CPLR § 308 ............................................................................................ 4

CPLR § 3211 ...................................................................................... *passim*

## Other Authorities

Aamer Madhani & Darlene Superville, *As Trump Resumes Travel, Staff Takes Risks to Prepare Trip,* AP (May 5, 2020) ............................................. 11

*Celebrity Apprentice Intro / Credits*, YouTube. ........................................ 3

Donald J. Trump (@realDonaldTrump), Twitter (Oct. 31, 2019, 9:32 PM) ................................ 10

Donald J. Trump, The Trump Organization ............................................ 2, 3

Peter Baker & Maggie Haberman, *As Protests and Violence Spill Over, Trump Shrinks Back*, N.Y. Times (May 31, 2020) ....................................... 11

Scott Neuman, *Governors Push Back On Trump's Threat To Deploy Federal Troops To Quell Unrest,* NPR (June 2, 2020) ............................................. 5, 6

*See the Paperwork: Trump Changes Residence to Florida*, N.Y. Times (Oct. 31, 2019) ........... 10

*The Apprentice 1 Official Intro*, YouTube .............................................. 3

Transcript, *Trump: The Reality TV Years*, NPR (Mar. 3, 2016) .................... 2

Maggie Haberman, *Trump, Lifelong New Yorker, Declares Himself a Resident of Florida,* N.Y. Times (Oct. 31, 2019) ................................................. 10

iii

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 47 of 75

## PRELIMINARY STATEMENT

For better or for worse, depending upon how you look at it, New York has always been part of Defendant Donald Trump's story. Trump built his brand on the claim that he had conquered the New York real estate market; he prominently featured the Manhattan skyline, the Brooklyn Bridge, and Flushing Meadows–Corona Park in the introductions of his television shows, *The Apprentice* and *The Celebrity Apprentice*; he celebrated his election as President at the New York Hilton; and he put the headquarters of his reelection campaign at Trump Tower in Manhattan, just below his spacious penthouse apartment. Even as he temporarily resides at the White House, a permanent Secret Service presence, funded by U.S. taxpayers, protects Trump Tower for whenever Trump is in New York City. In other words, Trump's lifelong connection to New York is as strong as ever.

But as darker chapters of his story have begun catching up with him, Trump has worked hard to distance himself from New York. This case is one example of that retreat. Plaintiff E. Jean Carroll alleges that Trump sexually assaulted her at Bergdorf Goodman, a department store a couple of blocks away from Trump Tower, and then defamed her when she spoke out about her experience last year. In response to Carroll's particularized and credible allegations, Trump has done everything possible to try to stop discovery from moving forward. His tactics have ranged from attempting to avoid service to making meritless arguments for a stay. Although his argument that this case should be stayed because he cannot be sued while serving as President was heard by this Court on March 4, 2020, he has also asserted that this Court lacks jurisdiction altogether because he cannot be sued in New York. This motion is directed at that second (meritless) argument, which Trump now asserts as an affirmative defense.

1

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 48 of 75

In light of recent events, it's now time for the door to Trump's jurisdictional defense to be shut permanently. Two weeks ago, on a nearly hour-long phone call, Trump told a large group of U.S. Governors that they would "look like a bunch of jerks" if they didn't "dominate" the people protesting against racism and police misconduct, and he promised to do "something that people haven't seen before" in order to achieve "total domination." Of particular relevance here, during that same call, Trump openly admitted that he continues to "live in Manhattan." In addition, other new revelations have further confirmed that New York continues to be Trump's domicile and that no other jurisdiction (including Washington, D.C. or Florida) could possibly satisfy the strict standard that applies when a New Yorker wants to establish a new domicile outside of New York under New York law.

As the Court of Appeals recognized long ago, in order to effect such a change of domicile, "[r]esidence without intention, or intention without residence, is of no avail." *In re Newcomb's Estate*, 192 N.Y. 238, 250 (1908). Trump may reside now in Washington, D.C., but he has disavowed any intention of staying there after his Presidency. And while he may intend to move to Florida at some point in the future, there can be no question that he does not reside there now. Accordingly, Trump remains subject to jurisdiction in New York, and the Court should grant this motion to strike Trump's personal jurisdiction defense pursuant to CPLR § 3211(b).

**RELEVANT FACTUAL & PROCEDURAL BACKGROUND**

"New York, my city," Donald Trump proudly declared on the very first episode of his famed television program, *The Apprentice*. Transcript, *Trump: The Reality TV Years*, NPR (Mar. 3, 2016).[1] And in that respect, he was telling the truth. Trump was born in Queens 74 years ago and has been associated with New York City his entire life. *See Donald J. Trump*, The Trump

---

[1] https://www.npr.org/transcripts/468560204?storyId=468560204?storyId=46856020.

2

Organization (last visited June 8, 2020).[2] The opening credits of both *The Apprentice* and *The Celebrity Apprentice* highlighted the City, featuring skyline views, the Brooklyn Bridge, and the Unisphere in Flushing Meadows–Corona Park. *See The Apprentice 1 Official Intro*, YouTube[3]; *Celebrity Apprentice Intro / Credits*, YouTube.[4] Moreover, the logo for *The Apprentice* depicted Trump with the City behind him:



Ex. A.[5]

For decades, Trump has maintained his home in the penthouse of Trump Tower in Manhattan. Both the Trump Organization and Trump's presidential reelection campaign are headquartered there, and Trump designated Trump Tower as the single residence to be "fully secured by the Secret Service on a permanent basis" under Section 3 of the Presidential Protection Assistance Act of 1976, 18 U.S.C. § 3056 note. *See* Exs. B–E; Doc. No. 6 ¶¶ 7–12.

In fact, it was due to the permanent Secret Service presence at Trump Tower that Carroll had such difficulty effecting service of process at the start of this action. A process server went to

---

[2] https://www.trump.com/leadership/donald-j-trump-biography.
[3] https://www.youtube.com/watch?v=9paNJJqMn3c.
[4] https://www.youtube.com/playlist?list=PL1iX0GymYlpbAEdGi2MK68etZxZl75UUy.
[5] All "Ex." references are to those exhibits attached to the Affirmation of Roberta A. Kaplan in Support of Plaintiff's Motion to Strike an Affirmative Defense.

3

Trump Tower on four different occasions, at different times, and each time, Secret Service agents and building staff blocked the process server. Doc. No. 6 ¶¶ 7–12. On one occasion, a Secret Service agent informed the process server that they "had been instructed not to allow process servers" to effect service. *Id.* ¶ 9. Another process server was warned that if he tried to leave papers with the Trump Tower concierge, he would not be permitted to leave the building. *Id.* ¶¶ 11.

Because the Secret Service had rendered service at Trump Tower "impracticable," Carroll filed a motion for an order permitting an alternative method of service pursuant to CPLR § 308(5). In support of her motion, Carroll submitted a copy of Trump's then-active New York voter registration dated November 4, 2019, which listed the Trump Tower penthouse as his home. Doc. No. 8. She sought leave to serve Trump by mail at Trump Tower, with copies of the Summons and Complaint to be sent to the White House and to six attorneys representing Trump in other ongoing personal capacity actions in New York. Doc. No. 6 ¶ 27. The Court granted that motion, and Trump eventually appeared in this action. Doc. Nos. 15, 19.

Once Trump had been properly served, however, his efforts to delay this case only intensified. Trump requested, and Carroll acquiesced in, a significant extension of time to file a motion to dismiss. Doc. No. 20; Doc. No. 24 ¶ 10; Doc No. 34 ¶ 6. Yet, well before that deadline, on the same day that discovery was set to commence, Trump filed a motion to dismiss focused exclusively on the argument that he was no longer subject to personal jurisdiction in New York because he had resided in the White House for the past three years. Doc. No. 33. Trump accompanied that motion to dismiss with an affirmation from his attorney that did not even purport to address the basis for Trump's personal jurisdiction defense, and requested that the Court stay all discovery deadlines pending a decision on the motion. Doc. Nos. 28, 29.

4

Carroll opposed Trump's initial stay request, arguing that Trump was subject to general jurisdiction in New York under CPLR § 301 because, despite his temporary residence in Washington, D.C., he remained domiciled in New York City. Doc. No. 34. The Court (Ling-Cohan, J.) agreed, denying Trump's motion to dismiss and holding that Trump had provided no evidence demonstrating that he was no longer subject to jurisdiction in New York. In her opinion, Justice Ling-Cohan emphasized that "there is not even a tweet, much less an affidavit by defendant Trump in support of his motion." Doc. No. 36 at 1.

From there, Trump seemed to pivot to another delay tactic, arguing next that he is immune from suit in state court while he serves as President and asking that the Court stay this action pending the Court of Appeals' consideration of that issue in *Zervos v. Trump*. Doc. No. 43. The parties briefed that second stay motion, and the Court entered a temporary stay of discovery deadlines pending its decision. Doc. Nos. 39, 50.[6] In the course of briefing that motion, however, Trump filed his Answer to Carroll's Complaint. Doc. No. 68. As his ninth and final affirmative defense, Trump claimed, once again, that he is not subject to personal jurisdiction in this Court. Doc. No. 68 ¶ 155.

While Trump's second stay motion remains *sub judice*, recent events have shed additional light on the deficiencies of Trump's personal jurisdiction defense. More specifically, on June 1, 2020, Trump spoke with a large group of U.S. Governors (including Jared Polis of Colorado, Phil Murphy of New Jersey, Andrew Cuomo of New York, J.B. Pritzker of Illinois, Janet Mills of Maine, Charlie Baker of Massachusetts, Gretchen Whitmer of Michigan, Tim Walz of Minnesota, and Jay Inslee of Washington) about the protests against racial injustice and police misconduct sweeping the Nation. Ex. F; *see also* Scott Neuman, *Governors Push Back On Trump's Threat To*

---

[6] As noted above, oral argument on that motion took place on March 4, 2020.

*Deploy Federal Troops To Quell Unrest*, NPR (June 2, 2020).[7] Trump spoke at length on that call, chastising the states whose response to the protestors (whom he characterized as "terrorists") had not been forceful enough: "You have to dominate. If you don't dominate, you're wasting your time. They're going to run all over you and you'll look like a bunch of jerks. You have to dominate." Ex. F at 1. Trump promised that the impending federal action would be forceful: "We're going to do something that people haven't seen before. But we're going to have total domination." *Id.* at 2.

Of relevance to this case, in commenting on the response of the New York City police during that call, Trump stated as follows:

> Now what happened in New York, I have to tell you, *I live in Manhattan*. What's going on in Manhattan, I have no idea. New York's finest, they've got be allowed. They need to do their jobs. I don't know what's happening in Manhattan, but it's terrible. And because it's New York, because it's Manhattan it gets a lot of press. So they really spend a lot of time on it. But New York is going to have to toughen up and we'll send you National Guard if you want.

*Id.* at 3 (emphasis added).

Based on that statement concerning his current residency, as well as the other undisputed facts and points of law set forth below, Carroll now files this motion to strike Trump's affirmative defense that he is not subject to jurisdiction in New York.

### ARGUMENT

Under CPLR § 3211(b), a plaintiff may "move for judgment dismissing one or more defenses, on the ground that a defense is not stated or has no merit." CPLR § 3211(b) was made for a case like this since *both* reasons for striking a defense are fully applicable here. Trump has "not stated" the affirmative defense of personal jurisdiction because his Answer asserts nothing

---

[7] https://www.npr.org/2020/06/02/867565338/governors-push-back-on-trumps-threat-to-deploy-federal-troops-to-quell-unrest.

Case 1:20-cv-07311-LAK Document 12-9 Filed 09/14/20 Page 53 of 75

but a bare, and thus insufficient, conclusion of law. Trump's personal jurisdiction defense also has "no merit" because it is foreclosed by his own recent admission that he continues to "live in Manhattan" and by the patent insufficiency of any alternative domicile he might assert. For each of these independent reasons, the Court should grant Carroll's motion to strike.

## I. TRUMP'S PERSONAL JURISDICTION DEFENSE CONSISTS OF NOTHING MORE THAN AN BARE LEGAL CONCLUSION

Trump's affirmative defense of lack of personal jurisdiction should be stricken for the simple reason that Trump has not pleaded a single fact to support it.

Although a court must construe the pleadings in favor of the nonmoving party, "[b]are legal conclusions are insufficient to raise an affirmative defense." *Robbins v. Growney*, 229 A.D.2d 356, 358 (1st Dep't 1996). Where "affirmative defenses merely plead conclusions of law without any supporting facts, the affirmative defenses should be dismissed pursuant to CPLR 3211(b)." *Bank of Am., N.A. v. 414 Midland Ave. Assocs., LLC*, 78 A.D.3d 746, 750 (2d Dep't 2010) (internal quotation marks omitted) (dismissing affirmatives defenses of equitable estoppel, laches, waiver, unclean hands, and culpable conduct on this basis); *see Comm'rs of the State Ins. Fund v. Ramos*, 63 A.D.3d 453, 453 (1st Dep't 2009) (dismissing affirmative defense on same ground).

With respect to the Court's purported lack of personal jurisdiction, a bare legal conclusion is all that Trump has asserted here. His ninth affirmative defense states, in full, that "[t]he Court lacks personal jurisdiction over President Trump." Doc. No. 68 ¶ 155. Trump does not even plead that Trump is no longer domiciled in New York and has established domicile somewhere else, let alone plead any facts that would allow the Court to reach such a conclusion. *See, e.g., Deer Consumer Prods., Inc. v. Little*, 35 Misc. 3d 374, 381 (Sup. Ct., N.Y. Cty. 2012).

Trump's wholly insufficient pleading is even more egregious given that, as outlined above, it came weeks *after* Justice Ling-Cohan had already put Trump on notice that his personal jurisdiction defense was devoid of any reliable factual foundation. In denying Trump's motion to dismiss for lack of jurisdiction, she emphasized that there was "not even a tweet, much less an affidavit by defendant Trump in support of his motion," and that "even the defendant's attorney affirmation does not assert a basis (evidentiary or otherwise) for dismissal." Doc. No. 36 at 1–2.

Yet Trump has done nothing to bolster his defense since that ruling. Trump could not prove any facts then, and he does not plead any facts now. On this basis alone, the Court should grant Carroll's motion and strike the affirmative defense of personal jurisdiction. *See Robbins*, 229 A.D.2d at 358.

## II. TRUMP'S PERSONAL JURISDICTION DEFENSE FAILS AS A FACTUAL MATTER AS WELL

Trump's personal jurisdiction defense should be also stricken for the additional reason that Trump could not support his bare legal conclusion with the requisite facts even if he tried. In other words, not only has Trump "not stated" the affirmative defense of personal jurisdiction, but that defense also has "has no merit." CPLR § 3211(b).

Because the issue comes up most often in the context of individuals seeking to avoid paying their taxes, the burden for a party to establish a new domicile outside of New York is understandably a heavy one. *See, e.g.*, *In re Hall's Estate*, 120 N.Y.S.2d 886, 889 (Sur. Ct., N.Y. Cty. 1953) (rejecting charge of domicile argument where the statements of the deceased that "were declarative of an intent to establish a Florida domicile were prompted by a purpose to avoid tax liabilities"). "For a change to a new domicile to be effected, there must be a union of residence in fact and an 'absolute and fixed intention' to abandon the former and make the new locality a fixed and permanent home." *Hosley v. Curry*, 85 N.Y.2d 447, 451 (1995). The party claiming a change

in domicile "has the burden to prove the change by clear and convincing evidence," *id.*, and "until a clear intention to change is established," the "residence established earlier in time remains the individual's domicile," *Laufer v. Hauge*, 140 A.D.2d 671, 673 (2d Dep't 1988). Moreover, for purposes of personal jurisdiction, the relevant inquiry is where the defendant was domiciled at the time the complaint was filed. *Chen v. Guo Liang Lu*, 144 A.D.3d 735, 737 (2d Dep't 2016).

The simplest reason why Trump cannot meet this demanding standard is that he recently admitted to a large group of the nation's Governors that he "live[s] in Manhattan." Ex. F at 3. That statement, which is indisputably admissible as a party statement against interest, *see, e.g.*, *People v. Settles*, 46 N.Y.2d 154, 167 (1978); *Reed v. McCord*, 160 N.Y. 330, 341 (1899), cannot be reconciled with the notion that Trump has established a residence elsewhere and intends to remain there permanently. And Trump certainly cannot prove by "clear and convincing evidence" that he has abandoned New York while he continues to hold himself out as a Manhattanite, especially when so much of his life—his business, his campaign, his permanent Secret Service protection—centers on a single address in Midtown. *Hosley*, 85 N.Y.2d at 451.

Even without Trump's recent admission, any claim to a changed domicile under New York law would fail because there is no alternative location that would allow Trump to satisfy the dual requirements of "residence in fact" and an "absolute and fixed intention to . . . make the new locality a fixed and permanent home." *Id.* at 451. As noted above, without the "union" of these two elements, Trump's domicile remains unchanged. *Id.*.

Although Trump's answer does not identify another state where he can properly be sued, his original motion to dismiss papers implied Washington, D.C., arguing that there was no general personal jurisdiction in New York because Trump "has resided in the White House for the past three years." Doc. No. 33 at 2. We obviously do not dispute that Trump currently resides at the

White House in Washington, D.C. But Trump's time at the White House is, as a matter of

constitutional law, temporary. *See* U.S. Const. amend. XXII, § 1 ("No person shall be elected to

the office of the President more than twice, and no person who has held the office of President, or

acted as President, for more than two years of a term to which some other person was elected

President shall be elected to the office of President more than once."). Without "an absolute and

fixed intention" to make a temporary home "permanent," the "[m]ere change of residence *although

continued for a long time* does not effect a change of domicile." *Hosley*, 85 N.Y.2d at 451.

It is possible that Trump might argue that his new domicile is Florida, especially since

Trump has tweeted that although he "will stay for, hopefully, five more years" at the White House,

he and his family "*will be making* Palm Beach, Florida, [their] Permanent Residence." Donald J.

Trump (@realDonaldTrump), Twitter (Oct. 31, 2019, 9:32 PM),

https://twitter.com/realdonaldtrump/ status/1190079191355670529 (emphasis added). Trump also

purported to formalize that decision by filing a "Declaration of Domicile" that proclaimed Florida

his "predominant and principal home." *See the Paperwork: Trump Changes Residence to Florida*,

N.Y. Times (Oct. 31, 2019).[8]

Those acts in themselves, however, are irrelevant under New York law. Declaring that he

"will" someday become a Florida permanent resident doesn't establish a new domicile; to the

contrary, it confirms a *failure* to do so, since expressing a "prospective" intention of changing

domicile is not enough to effect an actual change. *In re Lynch's Estate*, 170 Misc. 966, 967 (Sur.

Ct., N.Y. Cty. 1939). Nor does a formal declaration suffice: given the eagerness of New Yorkers

to avoid paying their taxes,[9] "[s]o-called 'formal declarations' of domicile . . . have lost their

---

[8] https://www.nytimes.com/interactive/2019/10/31/us/trump-residence-documents html
[9] Indeed, at the time that Trump issued the above tweet, "a person close to the president said the reasons were primarily for tax purposes." Maggie Haberman, *Trump, Lifelong New Yorker, Declares Himself a Resident of Florida*, N.Y.

importance . . . as courts have recognized their self-serving nature." *Wilke v. Wilke*, 73 A.D.2d 915, 917 (1980); *see also In re Newcomb's Estate*, 192 N.Y. at 252 ("If she had made the most formal declaration of intention for the purpose of creating evidence of an apparent change, with no intention of making an actual change, it would have been a fraud and of no effect.").

Most fundamentally, however, a person cannot change his domicile to a state where he doesn't currently reside—and Trump doesn't *currently* reside in Florida. *See Hosley*, 85 N.Y.2d at 451 (domicile requires "residence in fact"); *In re Newcomb's Estate*, 192 N.Y. at 250 ("Residence is necessary, for there can be no domicile without it . . . ."); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (domicile requires "physical presence"). As noted above, Trump previously told this Court in this case that he "has resided *in the White House* for the past three years," Doc. No. 33 at 2 (emphasis added), and any attempt to backtrack from this prior position would not only be inconsistent with the facts, but also reflect the type of gamesmanship that courts as a general rule do not tolerate.[10] Thus, Trump fails to satisfy one of the single most important criteria for a change of domicile: actually moving to a new state.

But that is not all. Trump's efforts to register to vote in Florida further prove his lack of a permanent residence in that state. As noted above, at the time this lawsuit began, Trump maintained an active New York voter registration. Doc. No. 8. When he registered to vote in Florida (where he voted by mail in the March primary election), his first Florida voter registration application listed the White House as his place of residence. Ex. G. Although Trump later completed another

---

Times (Oct. 31, 2019), https://www.nytimes.com/2019/10/31/us/politics/trump-new-york-florida-primary-residence.html.

[10] Indeed, since the outbreak of Covid-19 in early spring, followed by the recent protests against racism and police brutality, Trump has understandably remained in the White House for longer periods of time than ever before during his Presidency. *See* Aamer Madhani & Darlene Superville, *As Trump Resumes Travel, Staff Takes Risks to Prepare Trip*, AP (May 5, 2020), https://apnews.com/fd846eb2c00ef1bb288699d1ee583aef; Peter Baker & Maggie Haberman, *As Protests and Violence Spill Over, Trump Shrinks Back*, N.Y. Times (May 31, 2020), https://www.nytimes.com/2020/05/31/us/politics/trump-protests-george-floyd.html.

11

Florida voter registration application that changed the address to the Trump Organization's Mar-a-Lago Club in Palm Beach, Florida, *id.*, that address doesn't work either, since residing permanently at Mar-a-Lago is forbidden under Florida law. The land use agreement with Palm Beach County that permitted Trump to establish Mar-a-Lago in the first place makes this clear. That agreement explicitly limits the use of the rooms at Mar-a-Lago to "a maximum of three (3) non-consecutive seven (7) day periods by any one member during the year," and "any [other] usages not specifically" approved are prohibited. Ex. H at 2.[11] With this 21-day limitation, Mar-a-Lago cannot possibly qualify as Trump's "fixed and permanent home"—and until another such home is actually established, Trump cannot be domiciled in Florida. *Hosley*, 85 N.Y.2d at 451; *see also In re Gelarie's Estate*, 75 N.Y.S.2d 594, 595 (Sur. Ct., Westchester Cty. 1947) ("Therefore his residence at the hotel was only temporary and he never abandoned the residence he had established in Westchester County. It is well established that a domicile continues until it is superseded by a new one and the abandonment of an established domicile is a necessary prerequisite to the acquisition of a new one.").

Because Trump does not intend to reside permanently in Washington, D.C., and does not reside in Florida at all, he "lives in Manhattan" for purposes of personal jurisdiction under New York law. Any argument that he should be deemed domiciled elsewhere "has no merit," and his personal jurisdiction defense should be dismissed pursuant to CPLR § 3211(b).[12]

---

[11] Counsel express no opinion as to whether Trump's purported voter registration in Florida was valid—and whether he lawfully may vote in Florida in the upcoming Presidential election.

[12] Given the complete lack of merit to Trump's jurisdictional defense as well as the lack of any supporting evidence in the wake of Justice Ling-Cohan's prior ruling, Carroll reserves the right to seek an appropriate award of costs and fees in connection with this motion since Trump's personal jurisdictional defense is "completely without merit in law" and was made "primarily to delay or prolong the resolution of the litigation." Rules of the Chief Administrative Judge, Subpart 130-1.1(c)(1), (2).

12

## CONCLUSION

For the reasons set forth above, the Court should grant Carroll's motion and strike

Trump's ninth affirmative defense.


Dated: New York, New York
       June 15, 2020

                                        _____
                                        Roberta A. Kaplan
                                        Joshua Matz
                                        Matthew J. Craig
                                        KAPLAN HECKER & FINK LLP
                                        350 Fifth Avenue, Suite 7110
                                        New York, New York 10118
                                        Tel: (212) 763-0883
                                        Fax: (212) 564-0883
                                        rkaplan@kaplanhecker.com
                                        jmatz@kaplanhecker.com
                                        mcraig@kaplanhecker.com


                                        *Counsel for Plaintiff E. Jean Carroll*

13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
E. JEAN CARROLL,

                                   Index No.:  160694/19

               Plaintiff,

              -against-                    **Motion Seq. No. 003**

DONALD J. TRUMP, in his personal capacity,

               Defendant.
------------------------------------------------------------------X

**NOTICE OF VOLUNTARY**
**<u>WITHDRAWAL OF AFFIRMATIVE DEFENSE</u>**

      PLEASE  TAKE  NOTICE  that  defendant  hereby  voluntarily  withdraws  the  ninth

affirmative defense asserted in his Answer.

      PLEASE  TAKE  FURTHER  NOTICE  that  the  undersigned  attorneys  submitted  a

stipulation to plaintiff's attorneys proposing to withdraw the ninth affirmative defense asserted in

defendant's Answer, but plaintiff's attorneys have refused to sign this stipulation.

Dated:  New York, New York
       June 29, 2020

                                     **LAROCCA HORNIK ROSEN**
                                     **& GREENBERG LLP**

                                   */s/ Patrick McPartland*
                                   _____
                                   Patrick McPartland
                                   Jared E. Blumetti
                                   40 Wall Street, 32nd Floor
                                   New York, New York  10005
                                   T:  (212) 530-4837; 4831
                                   E:  pmcpartland@lhrgb.com
                                       jblumetti@lhrgb.com

                                   *Attorneys for defendant*
                                   *Donald J. Trump*

To:     All counsel of record (*via ECF*)

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL  rkaplan@kaplanhecker.com

June 29, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

      *Re:*    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

     We write on behalf of Plaintiff E. Jean Carroll in response to the Notice of Voluntary Withdrawal of Affirmative Defense that Defendant Donald J. Trump filed earlier today. *See* Doc. No. 93. In his Notice, Trump withdraws his affirmative defense of lack of personal jurisdiction and states that his withdrawal moots Carroll's pending motion to strike. *Id.* Carroll does not oppose Trump's decision to withdraw that meritless defense, and she acknowledges that such a withdrawal, assuming it is with prejudice, moots Carroll's motion to strike. But Trump's Notice also states that "plaintiff's attorneys have refused to sign" a stipulation to facilitate Trump's withdrawal. Because that statement is misleading and inaccurate, we write to correct the record. *Id.*

     As Your Honor is aware, Trump first moved to dismiss this action on personal jurisdiction grounds on January 3, 2020. Doc. No. 33. In response, Carroll argued that Trump remained domiciled in New York and reserved her right to seek sanctions for frivolous conduct intended to delay proceedings. Doc. No. 34 at 6 n.2. The Court (Ling-Cohan, J.) agreed that Trump's motion to dismiss was baseless, holding that there was "not even a tweet, much less an affidavit by defendant Trump in support of his motion." Doc. No. 36 at 1.

     Weeks later, Trump reasserted personal jurisdiction as an affirmative defense in his Answer. Doc. No. 68 ¶ 155. Tellingly, although Trump necessarily has, and has always had, full knowledge of the facts relevant to his domicile, Trump made no effort to address any of the deficiencies of that defense that the Court had identified. And after Trump admitted to a group of U.S. governors that he "lives in Manhattan," enough was enough. Carroll moved to strike Trump's personal jurisdiction defense pursuant to CPLR § 3211(b). Doc. No. 82. Carroll again reserved the right to seek recovery of costs and fees in connection with the motion. Doc. No. 92 at 12 n.12.

KAPLAN HECKER & FINK LLP                                                    2

On the eve of Trump's opposition deadline, his attorney revealed that Trump did not intend to oppose the motion to strike. The next day, his attorney proposed a stipulation that would recognize Trump's withdrawal of his personal jurisdiction defense. As reflected in the communications between counsel attached as Exhibit A, Carroll was amenable to such a stipulation. Our only request was that the stipulation acknowledge that Carroll was reserving her right to seek costs and fees in connection with the motion to strike. After Trump resisted that acknowledgment, we offered on multiple occasions to make the reservation of rights mutual, such that Trump would reserve his right to oppose any motion for costs and fees that Carroll might make.

Accordingly, any suggestion that Carroll "refused" to sign a stipulation is false. Although Carroll was not willing to sign the stipulation in the exact form that Trump had drafted, stipulations in judicial proceedings are not take-it-or-leave-contracts that the more powerful party may hold over the other. Trump may have balked at a stipulation that would acknowledge the potential consequences of pushing a frivolous defense, but it was hardly inappropriate for Carroll's counsel to ensure that Carroll's rights were protected in any stipulation bearing her name.

Respectfully submitted,

Roberta A. Kaplan

cc:    Counsel of Record (via NYSCEF)

# EXHIBIT A

| **From:** | Patrick Mcpartland |
|---|---|
| **To:** | Matthew Craig |
| **Cc:** | Roberta Kaplan |
| **Subject:** | RE: Trump/Carroll |
| **Date:** | Monday, June 29, 2020 2:59:00 PM |

Matt,

We have already informed you that we are withdrawing the affirmative defense.

For the ease of the Court, we recommended a short stipulation memorializing the withdrawal of the defense and withdrawing your motion to strike (which is moot). For reasons best known to you, you have insisted on including sanctions language in the stipulation, despite the fact that your filed motion does not include any request for sanctions.

We are not required to withdraw our defense by stipulation, so we intend to simply alert the Court that the affirmative defense is withdrawn.  Your motion is moot and you are very much on notice of that fact.

Pat


Patrick McPartland, Esq.



The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4837
C: (917) 647-4094
F: (212) 530-4815
E: PMCPARTLAND@LHRGB.COM


 Please, don't print if you don't have to.

-------------------------------------------------------------------------------------
This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confiden ial informa ion.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemina ion, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited.  If you have received this e-mail in error, please immediately notify me by reply e-mail and permanently delete the original and any copy of this e-mail and any printout  hereof. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses.  The company accepts no liability for any damage caused by any virus transmitted by this email.

---

**From:** Matthew Craig <mcraig@kaplanhecker.com>
**Sent:** Monday, June 29, 2020 2:37 PM
**To:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>
**Subject:** RE: Trump/Carroll


Pat,

I write to follow up on my email from Friday. As noted, if you'd like to effect the withdrawal via

stipulation, we are amenable to a stipulation in which our client reserves her right to seek sanctions and your client reserves his right to oppose. Absent such a stipulation, we will put in our reply papers on the motion to strike tomorrow, per the deadline. We will note in our reply that you informed us before the opposition deadline that your client did not intend to oppose the motion, but that he has not yet taken steps to withdraw his defense and would not agree to a stipulation with a mutual reservation of rights.

Thanks,
Matt

**Matthew Craig** | **Kaplan Hecker** & **Fink LLP**
350 Fifth Avenue | Suite 7110
New York, New York 10118
(W) 929.294.2542 | (M) 646.719.7443
mcraig@kaplanhecker.com

---

**From:** Matthew Craig
**Sent:** Friday, June 26, 2020 9:43 AM
**To:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>
**Subject:** RE: Trump/Carroll

Pat,

We are happy to acknowledge by email your right to oppose any motion we might make. In terms of the stipulation, however, it is important to us that we maintain consistency in our filings with respect to our reservation of rights. It seems that a mutual reservation of rights in the stipulation is the most straightforward way to accomplish that while simultaneously having your client's defense withdrawn. If you prefer to make a unilateral submission, we understand, and we can simply review your filing and put in whatever response may be appropriate.

Thanks,
Matt

**Matthew Craig** | **Kaplan Hecker** & **Fink LLP**
350 Fifth Avenue | Suite 7110
New York, New York 10118
(W) 929.294.2542 | (M) 646.719.7443
mcraig@kaplanhecker.com

---

**From:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Sent:** Thursday, June 25, 2020 7:26 PM
**To:** Matthew Craig <mcraig@kaplanhecker.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>
**Subject:** RE: Trump/Carroll

Matt,

Yes, we preserved the affirmative defense in our answer, as was our right. I am glad you do not dispute our right to withdraw it.

Not to belabor the point, but you served discovery on that affirmative defense (and insisted upon the necessity of same). Discovery was stayed, so, needless to say, we were not anticipating motion practice on an issue for which you clearly wanted discovery. In our opinion, you should have reached out to us before you made this unexpected motion (even just for the courtesy of discussing a briefing schedule), at which time we would have informed you that we decided to withdraw the defense.

Regardless, the matter at hand is your current motion to strike (which does not seek sanctions) and our withdrawal of the defense (which moots your motion). That is all that needs to be addressed with the Court in the stipulation.

We will acknowledge by this email that you have not waived any right to make a motion for sanctions, provided that you similarly acknowledge our right to oppose that motion and also cross-move for sanctions. That should take care of any issues on sanction motions.

Assuming this is acceptable, kindly confirm your agreement on the sanctions motion by reply email and return a signed copy of the original stipulation that I forwarded to you.

Thanks,

Pat

Patrick McPartland, Esq.



The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4837
C: (917) 647-4094
F: (212) 530-4815
E: PMCPARTLAND@LHRGB.COM



---------------------------------------------------------------------------------------
This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confiden ial informa ion. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemina ion, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by reply e-mail and permanently delete the original and any copy of this e-mail and any printout hereof. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

**From:** Matthew Craig <mcraig@kaplanhecker.com>
**Sent:** Thursday, June 25, 2020 2:16 PM
**To:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>
**Subject:** RE: Trump/Carroll

Pat,

For the avoidance of doubt, we obviously do not oppose withdrawal of your client's personal jurisdiction defense. The reservation of rights language we added to the stipulation is consistent with the position we have always taken with respect to that defense, including in response to your original motion to dismiss on personal jurisdiction grounds back in January. *See* Doc. No. 34 at 6 n.2; Doc. No. 92 at 12 n.12. Although the language we added does not impose any obligations on you, we would be happy to consider language in which you reserve your rights to oppose such a sanctions motion.

We have to admit, however, that we are more than a little surprised by your suggestion that we acted in bad faith in not connecting with you before making our motion. Our position on your client's defense has been clear since January, and your client chose to include the defense in his answer even *after* the Court denied the motion to dismiss on the same grounds. It is difficult to imagine that, despite all of that, your client was simply waiting for us to ask if he had changed his mind, or that your client would have voluntarily dismissed the defense had we called months ago, before Trump made a statement to a group of governors that was inconsistent with the position has long maintained in this litigation.

We are happy to consider a resolution that would obviate the need for our client to reserve her right to seek sanctions and, as noted above, are also open to a stipulation that contains a mutual reservation of rights. We look forward to your thoughts.

Matt

**Matthew Craig | Kaplan Hecker & Fink LLP**
350 Fifth Avenue | Suite 7110
New York, New York 10118
(W) 929.294.2542 | (M) 646.719.7443
mcraig@kaplanhecker.com

---

**From:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Sent:** Thursday, June 25, 2020 10:44 AM
**To:** Matthew Craig <mcraig@kaplanhecker.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>
**Subject:** RE: Trump/Carroll

Good morning Matt,

We do not agree to your proposed redline changes in paragraph 3 of the stipulation.

As I told you during our call on Tuesday, had you simply requested that we withdraw the defense prior to making your motion (which you did not), we would have agreed to withdraw it.  In any event, the defense was—and remains—a legitimate (albeit disputed) defense, just one we have elected not to pursue.  This is self-evident from the very arguments you present in your own motion, which, of course, does not seek sanctions.

Should your client insist on including her "sanctions" language in the stipulation, we will simply notify Judge Saunders that we withdraw the defense. We will further advise her that you rejected our request to withdraw by stipulation (this, after failing to reach out in good faith prior to making your motion).

Finally, as you are surely aware, a meritless sanctions motion by itself is sanctionable.

Kindly advise how your client intends to proceed.

Pat

Patrick McPartland, Esq.



The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4837
C: (917) 647-4094
F: (212) 530-4815
E: PMCPARTLAND@LHRGB.COM

 Please, don't print if you don't have to.

----------------------------------------------------------------------------------
This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidenial informaion. If you are not the intended recipient of this e-mail, you are hereby notified that any disseminaion, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me by reply e-mail and permanently delete the original and any copy of this e-mail and any printout hereof. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this email.

**From:** Matthew Craig <mcraig@kaplanhecker.com>
**Sent:** Wednesday, June 24, 2020 7:29 PM
**To:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Cc:** Roberta Kaplan <rkaplan@kaplanhecker.com>
**Subject:** RE: Trump/Carroll

Pat,

Thank you for your email. We do not disagree that your client has a right to withdraw his affirmative defense at any time, and once it is dismissed with prejudice, Plaintiff's motion to strike becomes moot. As for the stipulation itself, we are speaking to our client, but think it is unlikely that she will enter into a stipulation without the language added in redline to the attached.

Thanks,
Matt

**Matthew Craig** | **Kaplan Hecker** & **Fink LLP**

350 Fifth Avenue | Suite 7110
New York, New York 10118

Case 1:20-cv-07311-LAK   Document 12-9   Filed 09/14/20   Page 69 of 75

(W) 929.294.2542 | (M) 646.719.7443
mcraig@kaplanhecker.com

---

**From:** Patrick Mcpartland <pmcpartland@lhrgb.com>
**Sent:** Wednesday, June 24, 2020 5:00 PM
**To:** Matthew Craig <mcraig@kaplanhecker.com>
**Subject:** Trump/Carroll

Hi Matt,

Further to our conversation yesterday, see the attached stipulation.

Kindly return an executed copy and we will get it filed.

Thanks and stay well,

Pat

Patrick McPartland, Esq.



The Trump Building
40 Wall Street, 32nd Floor
New York, NY 10005
T: (212) 530-4837
C: (917) 647-4094
F: (212) 530-4815
E: PMCPARTLAND@LHRGB.COM

 Please, don't print if you don't have to.

----------------------------------------------------------------------------------------
This e-mail, and any attachments hereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confiden ial informa ion.  If you are not the intended recipient of this e-mail, you are hereby notified that any dissemina ion, distribution or copying of this e-mail, and any attachments hereto, is strictly prohibited.  If you have received this e-mail in error, please immediately notify me by reply e-mail and permanently delete the original and any copy of this e-mail and any printout  hereof. Finally, while the company uses virus protection, the recipient should check this email and any attachments for the presence of viruses.  The company accepts no liability for any damage caused by any virus transmitted by this email.

---

*This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of the message from your computer system. Thank you.*

---

*This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of the message from your computer system. Thank you.*

---

*This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and*

*destroy all copies of the message from your computer system. Thank you.*

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | |
|---|---|---|
| **PRESENT:** __HON. VERNA L. SAUNDERS__ | **PART** | **IAS MOTION 36** |
| _Justice_ | | |

-------------------------------------------------------------------------X

| | |
|---|---|
| E. JEAN CARROLL, | **INDEX NO.** ___160694/2019___ |
| Plaintiff, | **MOTION SEQ. NO.** ___003___ |
| - v - | |
| DONALD J. TRUMP, in his personal capacity, | **DECISION + ORDER ON MOTION** |
| Defendant. | |

-------------------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 003) 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95

were read on this motion to/for    ___**DISMISS DEFENSE**___.

Pursuant to defendant's Notice of Voluntary Withdrawal of Affirmative Defense dated June 29, 2020 and annexed hereto, plaintiff's motion seeking to dismiss defendant's ninth affirmative defense is denied as moot.

___June 30, 2020___

___HON. VERNA L. SAUNDERS, JSC___

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
|---|---|---|---|
| | ☐ GRANTED ☒ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

160694/2019   CARROLL, E. JEAN vs. TRUMP, DONALD J.                    Page 1 of 1
Motion No.  003

1 of 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

E. JEAN CARROLL,

                        Plaintiff,

                  -against-

DONALD J. TRUMP, in his personal capacity,

                        Defendant.

-------------------------------------------------------------------X

Index No.: 160694/19

**Motion Seq. No. 003**

### NOTICE OF VOLUNTARY
### WITHDRAWAL OF AFFIRMATIVE DEFENSE

      PLEASE TAKE NOTICE that defendant hereby voluntarily withdraws the ninth affirmative defense asserted in his Answer.

      PLEASE TAKE FURTHER NOTICE that the undersigned attorneys submitted a stipulation to plaintiff's attorneys proposing to withdraw the ninth affirmative defense asserted in defendant's Answer, but plaintiff's attorneys have refused to sign this stipulation.

Dated: New York, New York
       June 29, 2020

                               **LAROCCA HORNIK ROSEN
                               & GREENBERG LLP**

                               */s/ Patrick McPartland*
                               _____

                               Patrick McPartland
                               Jared E. Blumetti
                               40 Wall Street, 32nd Floor
                               New York, New York  10005
                               T:  (212) 530-4837; 4831
                               E: pmcpartland@lhrgb.com
                                    jblumetti@lhrgb.com

                               *Attorneys for defendant
                               Donald J. Trump*

To:    All counsel of record (*via ECF*)

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0804
DIRECT EMAIL  rkaplan@kaplanhecker.com

July 10, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

     *Re:*    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

     We write on behalf of Plaintiff E. Jean Carroll to provide notice of supplemental authority confirming that Defendant Donald J. Trump's presidential immunity claim in this action, the sole basis for his motion for a stay, *see* Doc. No. 49, lacks any merit whatsoever. As Your Honor may recall, Trump has moved to stay this action pending the New York Court of Appeals' decision in *Zervos v. Trump*. In that motion, Trump asserted that the Supremacy Clause provides presidential immunity for personal conduct actions pending in state court, even though the Supreme Court has already held that there is no such immunity for identical actions in federal court. *See* Doc. No. 49 at 6–7; Doc. No. 70 at 16–17. In other words, Trump argued that state and federal courts are completely different for purposes of assessing presidential immunity. However, the United States Supreme Court resoundingly rejected the central premises of that argument yesterday by a vote of 7-2 in *Trump v. Vance* (2020) (attached as Exhibit A and cited as "Slip op."). It follows directly from *Vance* that Trump's assertions of immunity in this case, as well as his purported arguments for a stay, are completely baseless.

     *Vance* involved a New York grand jury subpoena issued by the Manhattan District Attorney seeking "financial records relating to the President and business organizations affiliated with [Trump]." Slip op. 2. Although there was a nearly 200-year history of the President being subject to *federal* judicial process, the Supreme Court noted that the subpoena at issue was "the first *state* criminal subpoena directed to a President." *Id.* at 1.

     Trump's arguments here and in *Vance* are exactly the same—and fail for the same reasons.

KAPLAN HECKER & FINK LLP                                                    2

Here, Trump has argued that there is a "critical difference" in terms of presidential immunity between proceedings in state and federal court. Doc. No. 70 at 16. In *Vance*, Trump argued that the "distinction [between state and federal proceedings] makes all the difference" for purposes of such immunity. Slip op. at 10.

Here, Trump has asserted that the Supremacy Clause affords him absolute immunity because "subjecting the President to a state trial court's jurisdiction imposes upon him a degree of control by the State of New York that interferes with his ability to carry out his constitutional duty of executing the laws of the United States." Doc. No. 49 at 7 (internal quotation marks omitted). In *Vance*, Trump asserted that "the Supremacy Clause gives a sitting President absolute immunity from state criminal subpoenas because compliance with those subpoenas would categorically impair a President's performance of his Article II functions." Slip op. at 10.

And here, Trump has contended that the mere pendency of this case serves as an "unnecessary distraction of the President from his public duties." Doc. No. 49 at 12. In *Vance*, Trump contended that a state court subpoena unrelated to his official functions as President remained an intolerable "diversion" from his official duties. Slip op. at 12.

Indeed, the parallels between *Vance* and the presidential immunity issue here are so great that Trump himself sought to use the Supreme Court's grant of a writ of certiorari in *Vance* to his advantage in the New York state courts. Specifically, in opposing Zervos's request for expedited proceedings at the New York Court of Appeals, Trump argued that the case should proceed on a lengthier schedule because doing so "may well provide [the] Court with the benefit of the U.S. Supreme Court's decision in *Trump v. Vance* . . . in which the President is challenging a state prosecutor's subpoena on, among others, Supremacy Clause grounds." Doc. No. 62 at 3.

The Supreme Court has now spoken, and it has rejected the supposed state-federal distinction that Trump has pressed in *Vance*, *Zervos*, and this case. Slip op. at 12–14. In the same breath, the Supreme Court has also rejected the policy arguments Trump has advanced here for treating him as immune from suit in state court. While denying Trump's claim of presidential immunity from state legal process, the Supreme Court in *Vance* applied the very separation of powers precedents that we cite in our opposition, Doc. No. 54 at 17–20 (and that Trump has deemed irrelevant), to explain that the Supremacy Clause does not confer immunity on the President simply because civil litigation might prove a "distraction." *Id.* at 12. Instead, as the Supreme Court explained yesterday, absolute immunity for a President is limited to litigation relating to official conduct because *only* official conduct actions stand to distort the Executive's "decisionmaking process." *Id.* Here, of course, there was nothing "official" about Trump's false statements defaming E. Jean Carroll after she spoke out about a sexual assault Trump committed in the mid-1990s.

Accordingly, the meritless arguments that Trump has used to delay this action should now be put to rest, and Trump's motion for a stay should be denied. Although *Zervos* nominally remains pending before the Court of Appeals, the Supreme Court's decision in *Vance* leaves no question that the Court of Appeal must affirm the decision of the Appellate Division, First Department, refusing to stay that case during Trump's Presidency since Trump is not immune from personal conduct actions in New York state court. As a result, there is certainly no "just" basis for a stay of this action pursuant to CPLR § 2201.

KAPLAN HECKER & FINK LLP                                                    3

     The Supreme Court reminded us yesterday that "[i]n our system of government, as this Court has often stated, no one is above the law. That principle applies, of course, to a President." Slip op. (Kavanaugh, J., concurring) at 1. Trump has no special right to defame those who have accused him of sexual misconduct and then avoid the consequences of his actions. Carroll should be permitted to resume discovery so that she can obtain justice for the defamation of her good name and character.

Respectfully submitted,

Roberta A. Kaplan

cc:     Counsel of Record (via NYSCEF)