# EXHIBIT A

(Slip Opinion)       OCTOBER TERM, 2019       1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP *v.* VANCE, DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 19–635.   Argued May 12, 2020—Decided July 9, 2020

In 2019, the New York County District Attorney's Office—acting on behalf of a grand jury—served a subpoena *duces tecum* on Mazars USA, LLP, the personal accounting firm of President Donald J. Trump, for financial records relating to the President and his businesses. The President, acting in his personal capacity, sued the district attorney and Mazars in Federal District Court to enjoin enforcement of the subpoena, arguing that a sitting President enjoys absolute immunity from state criminal process under Article II and the Supremacy Clause. The District Court dismissed the case under the abstention doctrine of *Younger* v. *Harris*, 401 U. S. 37, and, in the alternative, held that the President was not entitled to injunctive relief. The Second Circuit rejected the District Court's dismissal under *Younger* but agreed with the court's denial of injunctive relief, concluding that presidential immunity did not bar enforcement of the subpoena and rejecting the argument of the United States as *amicus curiae* that a state grand jury subpoena seeking the President's documents must satisfy a heightened showing of need.

*Held*: Article II and the Supremacy Clause do not categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President. Pp. 3–22.

   (a) In 1807, John Marshall, presiding as Circuit Justice for Virginia over the treason trial of Aaron Burr, granted Burr's motion for a subpoena *duces tecum* directed at President Jefferson. In rejecting the prosecution's argument that a President was not subject to such a subpoena, Marshall held that a President does not "stand exempt" from the Sixth Amendment's guarantee that the accused have compulsory process for obtaining witnesses for their defense. *United States* v.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 3 of 113

2                           TRUMP *v.* VANCE

Syllabus

*Burr*, 25 F. Cas. 30, 33–34.  The sole argument for an exemption was
that a President's "duties as chief magistrate demand his whole time
for national objects."  *Ibid.*  But, in Marshall's assessment, those duties
were "not unremitting," *ibid.*, and any conflict could be addressed by
the court upon return of the subpoena.  Marshall also concluded that
the Sixth Amendment's guarantee extended to the production of pa-
pers.  "[T]he propriety of introducing any papers," he explained, would
"depend on the character of the paper, not the character of the person
who holds it," and would have "due consideration" upon the return of
the subpoena.  *Id.*, at 34, 37.  Jefferson agreed to furnish whatever
justice required, subject to the prerogative to decide whether particu-
lar executive communications should be withheld.

In the two centuries since *Burr*, successive Presidents from Monroe
to Clinton have accepted Marshall's ruling that the Chief Executive is
subject to subpoena and have uniformly agreed to testify when called
in criminal proceedings.

In 1974, the question whether to compel the disclosure of official
communications over the President's objection came to a head when
the Watergate Special Prosecutor secured a subpoena *duces tecum* di-
recting President Nixon to produce, among other things, tape record-
ings of Oval Office meetings.  This Court rejected Nixon's claim of an
absolute privilege of confidentiality for all presidential communica-
tions.  Recognizing that "compulsory process" was imperative for both
the prosecution and the defense, the Court held that the President's
"generalized assertion of privilege must yield to the demonstrated, spe-
cific need for evidence in a pending criminal trial."  *United States* v.
*Nixon*, 418 U. S. 683, 713.  President Nixon dutifully released the
tapes.  Pp. 3–10.

(b) This history all involved *federal* criminal proceedings.  Here, the
President claims that the Supremacy Clause gives a sitting President
absolute immunity from *state* criminal subpoenas because compliance
with such subpoenas would categorically impair the performance of his
Article II functions.  The Solicitor General, arguing on behalf of the
United States, claims that a state grand jury subpoena for a sitting
President's personal records must, at the very least, meet a heightened
standard of need.  Pp. 10–22.

(1) The President's unique duties as head of the Executive Branch
come with protections that safeguard his ability to perform his vital
functions.  The Constitution also guarantees "the entire independence
of the General Government from any control by the respective States."
*Farmers and Mechanics Sav. Bank of Minneapolis* v. *Minnesota*, 232
U. S. 516, 521.  Marshall's ruling in *Burr*, entrenched by 200 years of
practice and this Court's decision in *Nixon*, confirms that federal crim-
inal subpoenas do not "rise to the level of constitutionally forbidden

Syllabus

impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton* v. *Jones*, 520 U. S. 681, 702–703. But the President claims that state criminal subpoenas necessarily pose a unique threat of impairment and thus require absolute immunity. His categorical argument focuses on three burdens: diversion, stigma, and harassment. Pp. 10–17.

(i) The President contends that complying with state criminal subpoenas would necessarily distract the Chief Executive from his duties. He grounds that concern on *Nixon* v. *Fitzgerald*, which recognized a President's "absolute immunity from damages liability predicated on his official acts." 457 U. S. 731, 749. But, contrary to the President's suggestion, that case did not hold that distraction was sufficient to confer absolute immunity. Indeed, the Court expressly rejected immunity based on distraction alone 15 years later in *Clinton* v. *Jones*, when President Clinton sought absolute immunity from civil liability for private acts. As the Court explained, *Fitzgerald*'s "dominant concern" was not mere distraction but the distortion of the Executive's "decisionmaking process." 520 U. S., at 694, n. 19. The prospect that a President may become "preoccupied by pending litigation" did not ordinarily implicate constitutional concerns. *Id.,* at 705, n. 40. Two centuries of experience likewise confirm that a properly tailored criminal subpoena will not normally hamper the performance of a President's constitutional duties.

The President claims this case is different. He believes that he is under investigation and argues that the toll will necessarily be heavier in that circumstance. But the President is not seeking immunity from the diversion occasioned by the prospect of future criminal *liability*. He concedes that he may be investigated while in office. His objection is instead limited to the *additional* distraction caused by the subpoena itself. That argument, however, runs up against the 200 years of precedent establishing that Presidents, and their official communications, are subject to judicial process, see *Burr*, 25 F. Cas., at 34, even when the President is under investigation, see *Nixon*, 418 U. S., at 706. Pp. 12–14.

(ii) The President next claims that the stigma of being subpoenaed will undermine his leadership at home and abroad. But even if a tarnished reputation were a cognizable impairment, there is nothing inherently stigmatizing about a President performing "the citizen's normal duty of . . . furnishing information relevant" to a criminal investigation. *Branzburg* v. *Hayes*, 408 U. S. 665, 691. Nor can the risk of association with persons or activities under criminal investigation absolve a President of such an important public duty. The consequences for a President's public standing will likely increase if he is

4                          TRUMP *v.* VANCE

                              Syllabus

the one under investigation, but the President concedes that such in-
vestigations are permitted under Article II and the Supremacy Clause.
And the receipt of a subpoena would not seem to categorically magnify
the harm to the President's reputation. Additionally, in the grand jury
context longstanding secrecy rules aim to prevent the very stigma the
President anticipates. Pp. 14–15.

     (iii) Finally, the President argues that subjecting Presidents to state
criminal subpoenas will make them "easily identifiable target[s]" for
harassment. *Fitzgerald*, 457 U. S., at 753. The Court rejected a nearly
identical argument in *Clinton,* concluding that the risk posed by har-
assing civil litigation was not "serious" because federal courts have the
tools to deter and dismiss vexatious lawsuits. 520 U. S., at 708. Har-
assing state criminal subpoenas could, under certain circumstances,
threaten the independence or effectiveness of the Executive. But here
again the law already seeks to protect against such abuse. First, grand
juries are prohibited from engaging in "arbitrary fishing expeditions"
or initiating investigations "out of malice or an intent to harass,"
*United States* v. *R. Enterprises, Inc.*, 498 U. S. 292, 299, and federal
courts may intervene in state proceedings that are motivated by or
conducted in bad faith. Second, because the Supremacy Clause pro-
hibits state judges and prosecutors from interfering with a President's
official duties, any effort to manipulate a President's policy decisions
or to retaliate against a President for official acts through issuance of
a subpoena would be an unconstitutional attempt to "influence" a su-
perior sovereign "exempt" from such obstacles, see *McCulloch* v. *Mary-
land*, 4 Wheat. 316, 417. And federal law allows a President to chal-
lenge any such allegedly unconstitutional influence in a federal forum.
Pp. 15–17.

     (2) A state grand jury subpoena seeking a President's private pa-
pers need not satisfy a heightened need standard, for three reasons.
First, although a President cannot be treated as an "ordinary individ-
ual" when executive communications are sought, *Burr* teaches that,
with regard to private papers, a President stands in "nearly the same
situation with any other individual." 25 F. Cas., at 191–192. Second,
there has been no showing here that heightened protection against
state subpoenas is necessary for the Executive to fulfill his Article II
functions. Finally, absent a need to protect the Executive, the public
interest in fair and effective law enforcement cuts in favor of compre-
hensive access to evidence.

     Rejecting a heightened need standard does not leave Presidents
without recourse. A President may avail himself of the same protec-
tions available to every other citizen, including the right to challenge
the subpoena on any grounds permitted by state law, which usually
include bad faith and undue burden or breadth. When the President

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 6 of 113

Syllabus

invokes such protections, "[t]he high respect that is owed to the office
of the Chief Executive . . . should inform the conduct of the entire pro-
ceeding, including the timing and scope of discovery."  *Clinton*, 520
U. S., at 707.  In addition, a President can raise subpoena-specific con-
stitutional challenges in either a state or a federal forum.  As noted
above, he can challenge the subpoena as an attempt to influence the
performance of his official duties, in violation of the Supremacy Clause.
And he can argue that compliance with a particular subpoena would
impede his constitutional duties.  Pp. 17–21.

941 F. 3d 631, affirmed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which GINSBURG,
BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  KAVANAUGH, J., filed an
opinion concurring in the judgment, in which GORSUCH, J., joined.
THOMAS, J., and ALITO, J., filed dissenting opinions.

Cite as: 591 U. S. ____ (2020)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 19–635

———————

## DONALD J. TRUMP, PETITIONER *v.* CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In our judicial system, "the public has a right to every man's evidence."[1] Since the earliest days of the Republic, "every man" has included the President of the United States. Beginning with Jefferson and carrying on through Clinton, Presidents have uniformly testified or produced documents in criminal proceedings when called upon by federal courts. This case involves—so far as we and the parties can tell—the first *state* criminal subpoena directed to a President. The President contends that the subpoena is unenforceable. We granted certiorari to decide whether Article II and the Supremacy Clause categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President.

———————

[1] This maxim traces at least as far back as Lord Chancellor Hardwicke, in a 1742 parliamentary debate. See 12 Parliamentary History of England 693 (1812).

Case 1:20-cv-07311-LAK Document 12-10 Filed 09/14/20 Page 8 of 113

2                           TRUMP *v.* VANCE

Opinion of the Court

I

In the summer of 2018, the New York County District At-
torney's Office opened an investigation into what it
opaquely describes as "business transactions involving mul-
tiple individuals whose conduct may have violated state
law." Brief for Respondent Vance 2. A year later, the of-
fice—acting on behalf of a grand jury—served a subpoena
*duces tecum* (essentially a request to produce evidence) on
Mazars USA, LLP, the personal accounting firm of Presi-
dent Donald J. Trump. The subpoena directed Mazars to
produce financial records relating to the President and
business organizations affiliated with him, including "[t]ax
returns and related schedules," from "2011 to the present."
App. to Pet. for Cert. 119a.[2]

The President, acting in his personal capacity, sued the
district attorney and Mazars in Federal District Court to
enjoin enforcement of the subpoena. He argued that, under
Article II and the Supremacy Clause, a sitting President
enjoys absolute immunity from state criminal process. He
asked the court to issue a "declaratory judgment that the
subpoena is invalid and unenforceable while the President
is in office" and to permanently enjoin the district attorney
"from taking any action to enforce the subpoena." Amended
Complaint in No. 1:19–cv–8694 (SDNY, Sept. 25, 2019), p.
19. Mazars, concluding that the dispute was between the
President and the district attorney, took no position on the
legal issues raised by the President.

The District Court abstained from exercising jurisdiction
and dismissed the case based on *Younger* v. *Harris*, 401
U. S. 37 (1971), which generally precludes federal courts
from intervening in ongoing state criminal prosecutions.

_____

[2]The grand jury subpoena essentially copied a subpoena issued to
Mazars in April 2019 by the Committee on Oversight and Reform of the
U. S. House of Representatives, which is at issue in *Trump* v. *Mazars
USA, LLP*, *post*, p. ___. The principal difference is that the instant sub-
poena expressly requests tax returns.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 9 of 113

Cite as: 591 U. S. ____ (2020)        3

Opinion of the Court

395 F. Supp. 3d 283, 290 (SDNY 2019). In an alternative holding, the court ruled that the President was not entitled to injunctive relief. *Ibid.*

The Second Circuit met the District Court halfway. As to the dismissal, the Court of Appeals held that *Younger* abstention was inappropriate because that doctrine's core justification—"preventing friction" between States and the Federal Government—is diminished when state and federal actors are already in conflict, as the district attorney and the President were. 941 F. 3d 631, 637, 639 (2019).

On the merits, the Court of Appeals agreed with the District Court's denial of a preliminary injunction. Drawing on the 200-year history of Presidents being subject to federal judicial process, the Court of Appeals concluded that "presidential immunity does not bar the enforcement of a state grand jury subpoena directing a third party to produce nonprivileged material, even when the subject matter under investigation pertains to the President." *Id.*, at 640. It also rejected the argument raised by the United States as *amicus curiae* that a state grand jury subpoena must satisfy a heightened showing of need. The court reasoned that the proposed test, derived from cases addressing privileged Executive Branch communications, "ha[d] little bearing on a subpoena" seeking "information relating solely to the President in his private capacity and disconnected from the discharge of his constitutional obligations." *Id.*, at 645–646.

We granted certiorari. 589 U. S. ___ (2019).

II

In the summer of 1807, all eyes were on Richmond, Virginia. Aaron Burr, the former Vice President, was on trial for treason.[3] Fallen from political grace after his fatal duel

_____
[3]See generally N. Isenberg, Fallen Founder: The Life of Aaron Burr 271–365 (2007); J. Smith, John Marshall: Definer of a Nation 348–374 (1996); M. Lomask, Aaron Burr: The Conspiracy and Years of Exile, 1805–1836, pp. 222–298 (1982).

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 10 of 113

4                          TRUMP *v.* VANCE

Opinion of the Court

with Alexander Hamilton, and with a murder charge pend-
ing in New Jersey, Burr followed the path of many down-
and-out Americans of his day—he headed West in search of
new opportunity.  But Burr was a man with outsized ambi-
tions.  Together with General James Wilkinson, the Gover-
nor of the Louisiana Territory, he hatched a plan to estab-
lish a new territory in Mexico, then controlled by Spain.[4]
Both men anticipated that war between the United States
and Spain was imminent, and when it broke out they in-
tended to invade Spanish territory at the head of a private
army.

   But while Burr was rallying allies to his cause, tensions
with Spain eased and rumors began to swirl that Burr was
conspiring to detach States by the Allegheny Mountains
from the Union.  Wary of being exposed as the principal co-
conspirator, Wilkinson took steps to ensure that any blame
would fall on Burr.  He sent a series of letters to President
Jefferson accusing Burr of plotting to attack New Orleans
and revolutionize the Louisiana Territory.

   Jefferson, who despised his former running mate Burr for
trying to steal the 1800 presidential election from him, was
predisposed to credit Wilkinson's version of events.  The
President sent a special message to Congress identifying
Burr as the "prime mover" in a plot "against the peace and
safety of the Union."  16 Annals of Cong. 39–40 (1807).  Ac-
cording to Jefferson, Burr contemplated either the "sever-
ance of the Union" or an attack on Spanish territory.  *Id.*,
at 41.  Jefferson acknowledged that his sources contained a
"mixture of rumors, conjectures, and suspicions" but, citing
Wilkinson's letters, he assured Congress that Burr's guilt
was "beyond question."  *Id.*, at 39–40.

_____

   [4] Wilkinson was secretly being paid by Spain for information and in-
fluence.  In the wake of Burr's trial, he was investigated by Congress and
later court-martialed.  But he was acquitted for want of evidence, and
his duplicity was not confirmed until decades after his death, when Span-
ish archival material came to light.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 11 of 113

Cite as: 591 U. S. ____ (2020)          5

Opinion of the Court

The trial that followed was "the greatest spectacle in the short history of the republic," complete with a Founder-studded cast. N. Isenberg, Fallen Founder: The Life of Aaron Burr 351 (2007). People flocked to Richmond to watch, massing in tents and covered wagons along the banks of the James River, nearly doubling the town's population of 5,000. Burr's defense team included Edmund Randolph and Luther Martin, both former delegates at the Constitutional Convention and renowned advocates. Chief Justice John Marshall, who had recently squared off with the Jefferson administration in *Marbury* v. *Madison*, 1 Cranch 137 (1803), presided as Circuit Justice for Virginia. Meanwhile Jefferson, intent on conviction, orchestrated the prosecution from afar, dedicating Cabinet meetings to the case, peppering the prosecutors with directions, and spending nearly $100,000 from the Treasury on the five-month proceedings.

In the lead-up to trial, Burr, taking aim at his accusers, moved for a subpoena *duces tecum* directed at Jefferson. The draft subpoena required the President to produce an October 21, 1806 letter from Wilkinson and accompanying documents, which Jefferson had referenced in his message to Congress. The prosecution opposed the request, arguing that a President could not be subjected to such a subpoena and that the letter might contain state secrets. Following four days of argument, Marshall announced his ruling to a packed chamber.

The President, Marshall declared, does not "stand exempt from the general provisions of the constitution" or, in particular, the Sixth Amendment's guarantee that those accused have compulsory process for obtaining witnesses for their defense. *United States* v. *Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (CC Va. 1807). At common law the "single reservation" to the duty to testify in response to a subpoena was "the case of the king," whose "dignity" was seen as "incompatible" with appearing "under the process of the

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 12 of 113

6                          TRUMP *v.* VANCE

                         Opinion of the Court

court." *Id.*, at 34. But, as Marshall explained, a king is born
to power and can "do no wrong." *Ibid.* The President, by
contrast, is "of the people" and subject to the law. *Ibid.* Ac-
cording to Marshall, the sole argument for exempting the
President from testimonial obligations was that his "duties
as chief magistrate demand his whole time for national ob-
jects." *Ibid.* But, in Marshall's assessment, those demands
were "not unremitting." *Ibid.* And should the President's
duties preclude his attendance at a particular time and
place, a court could work that out upon return of the sub-
poena. *Ibid.*

  Marshall also rejected the prosecution's argument that
the President was immune from a subpoena *duces tecum*
because executive papers might contain state secrets. "A
subpoena duces tecum," he said, "may issue to any person
to whom an ordinary subpoena may issue." *Ibid.* As he ex-
plained, no "fair construction" of the Constitution supported
the conclusion that the right "to compel the attendance of
witnesses[] does not extend" to requiring those witnesses to
"bring[] with them such papers as may be material in the
defence." *Id.*, at 35. And, as a matter of basic fairness, per-
mitting such information to be withheld would "tarnish the
reputation of the court." *Id.*, at 37. As for "the propriety of
introducing any papers," that would "depend on the charac-
ter of the paper, not on the character of the person who
holds it." *Id.*, at 34. Marshall acknowledged that the pa-
pers sought by Burr could contain information "the disclo-
sure of which would endanger the public safety," but stated
that, again, such concerns would have "due consideration"
upon the return of the subpoena. *Id.*, at 37.

  While the arguments unfolded, Jefferson, who had re-
ceived word of the motion, wrote to the prosecutor indicat-
ing that he would—subject to the prerogative to decide
which executive communications should be withheld—"fur-
nish on all occasions, whatever the purposes of justice may
require." Letter from T. Jefferson to G. Hay (June 12,

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 13 of 113

1807), in 10 Works of Thomas Jefferson 398, n. (P. Ford ed. 1905). His "personal attendance," however, was out of the question, for it "would leave the nation without" the "sole branch which the constitution requires to be always in function." Letter from T. Jefferson to G. Hay (June 17, 1807), in *id.*, at 400–401, n.

Before Burr received the subpoenaed documents, Marshall rejected the prosecution's core legal theory for treason and Burr was accordingly acquitted. Jefferson, however, was not done. Committed to salvaging a conviction, he directed the prosecutors to proceed with a misdemeanor (yes, misdemeanor) charge for inciting war against Spain. Burr then renewed his request for Wilkinson's October 21 letter, which he later received a copy of, and subpoenaed a second letter, dated November 12, 1806, which the prosecutor claimed was privileged. Acknowledging that the President may withhold information to protect public safety, Marshall instructed that Jefferson should "state the particular reasons" for withholding the letter. *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807). The court, paying "all proper respect" to those reasons, would then decide whether to compel disclosure. *Ibid.* But that decision was averted when the misdemeanor trial was cut short after it became clear that the prosecution lacked the evidence to convict.

In the two centuries since the Burr trial, successive Presidents have accepted Marshall's ruling that the Chief Executive is subject to subpoena. In 1818, President Monroe received a subpoena to testify in a court-martial against one of his appointees. See Rotunda, Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote, 1975 U. Ill. L. Forum 1, 5. His Attorney General, William Wirt—who had served as a prosecutor during Burr's trial—advised Monroe that, per Marshall's ruling, a subpoena to testify may "be properly awarded to the President." *Id.*, at 5–6.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 14 of 113

Monroe offered to sit for a deposition and ultimately submitted answers to written interrogatories.

Following Monroe's lead, his successors have uniformly agreed to testify when called in criminal proceedings, provided they could do so at a time and place of their choosing. In 1875, President Grant submitted to a three-hour deposition in the criminal prosecution of a political appointee embroiled in a network of tax-evading whiskey distillers. See 1 R. Rotunda & J. Nowak, Constitutional Law §7.1(b)(ii), p. 996 (5th ed. 2012) (Rotunda & Nowak). A century later, President Ford's attempted assassin subpoenaed him to testify in her defense. See *United States* v. *Fromme*, 405 F. Supp. 578 (ED Cal. 1975). Ford obliged—from a safe distance—in the first videotaped deposition of a President. President Carter testified via the same means in the trial of two local officials who, while Carter was Governor of Georgia, had offered to contribute to his campaign in exchange for advance warning of any state gambling raids. See Carter's Testimony, on Videotape, Is Given to Georgia Gambling Trial, N. Y. Times, Apr. 20, 1978, p. A20 (Carter recounted that he "rejected the proposition instantly."). Two years later, Carter gave videotaped testimony to a federal grand jury investigating whether a fugitive financier had entreated the White House to quash his extradition proceedings. See Rotunda & Nowak §7.1(b)(vi), at 997. President Clinton testified three times, twice via deposition pursuant to subpoenas in federal criminal trials of associates implicated during the Whitewater investigation, and once by video for a grand jury investigating possible perjury. See *id.*, §7.1(c)(viii), at 1007–1008.

The bookend to Marshall's ruling came in 1974 when the question he never had to decide—whether to compel the disclosure of official communications over the objection of the President—came to a head. That spring, the Special Prosecutor appointed to investigate the break-in of the Democratic National Committee Headquarters at the Watergate

complex filed an indictment charging seven defendants associated with President Nixon and naming Nixon as an unindicted co-conspirator. As the case moved toward trial, the Special Prosecutor secured a subpoena *duces tecum* directing Nixon to produce, among other things, tape recordings of Oval Office meetings. Nixon moved to quash the subpoena, claiming that the Constitution provides an absolute privilege of confidentiality to all presidential communications. This Court rejected that argument in *United States* v. *Nixon*, 418 U. S. 683 (1974), a decision we later described as "unequivocally and emphatically endors[ing] Marshall's" holding that Presidents are subject to subpoena. *Clinton* v. *Jones*, 520 U. S. 681, 704 (1997).

The *Nixon* Court readily acknowledged the importance of preserving the confidentiality of communications "between high Government officials and those who advise and assist them." 418 U. S., at 705. "Human experience," the Court explained, "teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Ibid.* Confidentiality thus promoted the "public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Id.*, at 708.

But, like Marshall two centuries prior, the Court recognized the countervailing interests at stake. Invoking the common law maxim that "the public has a right to every man's evidence," the Court observed that the public interest in fair and accurate judicial proceedings is at its height in the criminal setting, where our common commitment to justice demands that "guilt shall not escape" nor "innocence suffer." *Id.*, at 709 (internal quotation marks and alteration omitted). Because these dual aims would be "defeated if judgments" were "founded on a partial or speculative presentation of the facts," the *Nixon* Court recognized that it was "imperative" that "compulsory process be available

10                         TRUMP *v.* VANCE

for the production of evidence needed either by the prosecution or the defense." *Ibid.*

The Court thus concluded that the President's "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id.*, at 713. Two weeks later, President Nixon dutifully released the tapes.

### III

The history surveyed above all involved *federal* criminal proceedings. Here we are confronted for the first time with a subpoena issued to the President by a local grand jury operating under the supervision of a *state* court.[5]

In the President's view, that distinction makes all the difference. He argues that the Supremacy Clause gives a sitting President absolute immunity from state criminal subpoenas because compliance with those subpoenas would categorically impair a President's performance of his Article II functions. The Solicitor General, arguing on behalf of the United States, agrees with much of the President's reasoning but does not commit to his bottom line. Instead, the Solicitor General urges us to resolve this case by holding that a state grand jury subpoena for a sitting President's personal records must, at the very least, "satisfy a heightened standard of need," which the Solicitor General contends was not met here. Brief for United States as *Amicus Curiae* 26, 29.

### A

We begin with the question of absolute immunity. No one doubts that Article II guarantees the independence of the

---

[5] While the subpoena was directed to the President's accounting firm, the parties agree that the papers at issue belong to the President and that Mazars is merely the custodian. Thus, for purposes of immunity, it is functionally a subpoena issued to the President.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 17 of 113

Executive Branch.  As the head of that branch, the President "occupies a unique position in the constitutional scheme." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749 (1982). His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth.  Quite appropriately, those duties come with protections that safeguard the President's ability to perform his vital functions.  See, *e.g.*, *ibid.* (concluding that the President enjoys "absolute immunity from damages liability predicated on his official acts"); *Nixon*, 418 U. S., at 708 (recognizing that presidential communications are presumptively privileged).

In addition, the Constitution guarantees "the entire independence of the General Government from any control by the respective States." *Farmers and Mechanics Sav. Bank of Minneapolis* v. *Minnesota*, 232 U. S. 516, 521 (1914).  As we have often repeated, "States have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress." *McCulloch* v. *Maryland*, 4 Wheat. 316, 436 (1819).  It follows that States also lack the power to impede the President's execution of those laws.

Marshall's ruling in *Burr*, entrenched by 200 years of practice and our decision in *Nixon*, confirms that *federal* criminal subpoenas do not "rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton*, 520 U. S., at 702–703.  But the President, joined in part by the Solicitor General, argues that *state* criminal subpoenas pose a unique threat of impairment and thus demand greater protection.  To be clear, the President does not contend here that *this* subpoena, in particular, is impermissibly burdensome.  Instead he makes a *categorical* argument about the burdens generally associated with state criminal subpoenas, focusing on three: diversion, stigma, and harassment.  We address each in turn.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 18 of 113

12                          TRUMP *v.* VANCE

Opinion of the Court

1

The President's primary contention, which the Solicitor
General supports, is that complying with state criminal
subpoenas would necessarily divert the Chief Executive
from his duties. He grounds that concern in *Nixon* v. *Fitz-
gerald*, which recognized a President's "absolute immunity
from damages liability predicated on his official acts." 457
U. S., at 749. In explaining the basis for that immunity,
this Court observed that the prospect of such liability could
"distract a President from his public duties, to the detri-
ment of not only the President and his office but also the
Nation that the Presidency was designed to serve." *Id.*, at
753. The President contends that the diversion occasioned
by a state criminal subpoena imposes an equally intolerable
burden on a President's ability to perform his Article II
functions.

But *Fitzgerald* did not hold that distraction was sufficient
to confer absolute immunity. We instead drew a careful
analogy to the common law absolute immunity of judges
and prosecutors, concluding that a President, like those of-
ficials, must "deal fearlessly and impartially with the duties
of his office"—not be made "unduly cautious in the dis-
charge of [those] duties" by the prospect of civil liability for
official acts. *Id.*, at 751–752, and n. 32 (internal quotation
marks omitted). Indeed, we expressly rejected immunity
based on distraction alone 15 years later in *Clinton* v.
*Jones*. There, President Clinton argued that the risk of be-
ing "distracted by the need to participate in litigation" enti-
tled a sitting President to absolute immunity from civil lia-
bility, not just for official acts, as in *Fitzgerald*, but for
private conduct as well. 520 U. S., at 694, n. 19. We disa-
greed with that rationale, explaining that the "dominant
concern" in *Fitzgerald* was not mere distraction but the dis-
tortion of the Executive's "decisionmaking process" with re-
spect to official acts that would stem from "worry as to the
possibility of damages." 520 U. S., at 694, n. 19. The Court

Opinion of the Court

recognized that Presidents constantly face myriad demands on their attention, "some private, some political, and some as a result of official duty." *Id.*, at 705, n. 40. But, the Court concluded, "[w]hile such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional . . . concerns." *Ibid.*

The same is true of criminal subpoenas. Just as a "properly managed" civil suit is generally "unlikely to occupy any substantial amount of" a President's time or attention, *id.,* at 702, two centuries of experience confirm that a properly tailored criminal subpoena will not normally hamper the performance of the President's constitutional duties. If anything, we expect that in the mine run of cases, where a President is subpoenaed during a proceeding targeting someone else, as Jefferson was, the burden on a President will ordinarily be lighter than the burden of defending against a civil suit.

The President, however, believes the district attorney is investigating him and his businesses. In such a situation, he contends, the "toll that criminal process . . . exacts from the President is even heavier" than the distraction at issue in *Fitzgerald* and *Clinton*, because "criminal litigation" poses unique burdens on the President's time and will generate a "considerable if not overwhelming degree of mental preoccupation." Brief for Petitioner 16–18, 30 (internal quotation marks omitted).

But the President is not seeking immunity from the diversion occasioned by the prospect of future criminal *liability*. Instead he concedes—consistent with the position of the Department of Justice—that state grand juries are free to investigate a sitting President with an eye toward charging him after the completion of his term. See Reply Brief 19 (citing Memorandum from Randolph D. Moss, Assistant Atty. Gen., Office of Legal Counsel, to the Atty. Gen.: A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. OLC 222, 257, n. 36 (Oct. 16, 2000)).

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 20 of 113

14                    TRUMP *v.* VANCE

Opinion of the Court

The President's objection therefore must be limited to the *additional* distraction caused by the subpoena itself. But that argument runs up against the 200 years of precedent establishing that Presidents, and their official communications, are subject to judicial process, see *Burr*, 25 F. Cas., at 34, even when the President is under investigation, see *Nixon*, 418 U. S., at 706.

2

The President next claims that the stigma of being subpoenaed will undermine his leadership at home and abroad. Notably, the Solicitor General does not endorse this argument, perhaps because we have twice denied absolute immunity claims by Presidents in cases involving allegations of serious misconduct. See *Clinton*, 520 U. S., at 685; *Nixon*, 418 U. S., at 687. But even if a tarnished reputation were a cognizable impairment, there is nothing inherently stigmatizing about a President performing "the citizen's normal duty of . . . furnishing information relevant" to a criminal investigation. *Branzburg* v. *Hayes*, 408 U. S. 665, 691 (1972). Nor can we accept that the risk of association with persons or activities under criminal investigation can absolve a President of such an important public duty. Prior Presidents have weathered these associations in federal cases, *supra*, at 6–10, and there is no reason to think any attendant notoriety is necessarily greater in state court proceedings.

To be sure, the consequences for a President's public standing will likely increase if he is the one under investigation. But, again, the President concedes that such investigations are permitted under Article II and the Supremacy Clause, and receipt of a subpoena would not seem to categorically magnify the harm to the President's reputation.

Additionally, while the current suit has cast the Mazars subpoena into the spotlight, longstanding rules of grand jury secrecy aim to prevent the very stigma the President

anticipates. See S. Beale et al., Grand Jury Law and Practice §5:1, p. 5–3 (2d ed. 2018) ("[T]he federal system and most states have adopted statutes or court rules" that "impose sharp restrictions on the extent to which matters occurring before a grand jury may be divulged" to outside persons.). Of course, disclosure restrictions are not perfect. See *Nixon*, 418 U. S., at 687, n. 4 (observing that news media reporting made the protective order shielding the fact that the President had been named as an unindicted co-conspirator "no longer meaningful"). But those who make unauthorized disclosures regarding a grand jury subpoena do so at their peril. See, *e.g.*, N. Y. Penal Law Ann. §215.70 (West 2010) (designating unlawful grand jury disclosure as a felony).

3

Finally, the President and the Solicitor General warn that subjecting Presidents to state criminal subpoenas will make them "easily identifiable target[s]" for harassment. *Fitzgerald*, 457 U. S., at 753. But we rejected a nearly identical argument in *Clinton*, where then-President Clinton argued that permitting civil liability for unofficial acts would "generate a large volume of politically motivated harassing and frivolous litigation." *Clinton*, 520 U. S., at 708. The President and the Solicitor General nevertheless argue that state criminal subpoenas pose a heightened risk and could undermine the President's ability to "deal fearlessly and impartially" with the States. *Fitzgerald*, 457 U. S., at 752 (internal quotation marks omitted). They caution that, while federal prosecutors are accountable to and removable by the President, the 2,300 district attorneys in this country are responsive to local constituencies, local interests, and local prejudices, and might "use criminal process to register their dissatisfaction with" the President. Brief for Petitioner 16. What is more, we are told, the state courts su-

pervising local grand juries may not exhibit the same re-
spect that federal courts show to the President as a coordi-
nate branch of Government.

We recognize, as does the district attorney, that harass-
ing subpoenas could, under certain circumstances, threaten
the independence or effectiveness of the Executive. See Tr.
of Oral Arg. 73. Even so, in *Clinton* we found that the risk
of harassment was not "serious" because federal courts
have the tools to deter and, where necessary, dismiss vexa-
tious civil suits. 520 U. S., at 708. And, while we cannot
ignore the possibility that state prosecutors may have polit-
ical motivations, see *post,* at 15 (ALITO, J., dissenting), here
again the law already seeks to protect against the predicted
abuse.

First, grand juries are prohibited from engaging in "arbi-
trary fishing expeditions" and initiating investigations "out
of malice or an intent to harass." *United States* v. *R. Enter-
prises, Inc.*, 498 U. S. 292, 299 (1991). See also, *e.g.*, *Virag*
v. *Hynes*, 54 N. Y. 2d 437, 442–443, 430 N. E. 2d 1249, 1252
(1981) (recognizing that grand jury subpoenas can be "chal-
lenged by an affirmative showing of impropriety," including
"bad faith" (internal quotation marks omitted)). These pro-
tections, as the district attorney himself puts it, "apply with
special force to a President, in light of the office's unique
position as the head of the Executive Branch." Brief for Re-
spondent Vance 43. And, in the event of such harassment,
a President would be entitled to the protection of federal
courts. The policy against federal interference in state
criminal proceedings, while strong, allows "intervention in
those cases where the District Court properly finds that the
state proceeding is motivated by a desire to harass or is con-
ducted in bad faith." *Huffman* v. *Pursue, Ltd.*, 420 U. S.
592, 611 (1975).

Second, contrary to JUSTICE ALITO's characterization, our
holding does not allow States to "run roughshod over the
functioning of [the Executive B]ranch." *Post,* at 22. The

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 23 of 113

Cite as: 591 U. S. ____ (2020)          17

Opinion of the Court

Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties. See, *e.g.,* *Tennessee* v. *Davis*, 100 U. S. 257, 263 (1880) ("No State government can . . . obstruct [the] authorized officers" of the Federal Government.). Any effort to manipulate a President's policy decisions or to "retaliat[e]" against a President for official acts through issuance of a subpoena, Brief for Respondent Vance 15, 43, would thus be an unconstitutional attempt to "influence" a superior sovereign "exempt" from such obstacles, see *McCulloch*, 4 Wheat., at 427. We generally "assume[] that state courts and prosecutors will observe constitutional limitations." *Dombrowski* v. *Pfister*, 380 U. S. 479, 484 (1965). Failing that, federal law allows a President to challenge any allegedly unconstitutional influence in a federal forum, as the President has done here. See 42 U. S. C. §1983; *Ex parte Young*, 209 U. S. 123, 155–156 (1908) (holding that federal courts may enjoin state officials to conform their conduct to federal law).

Given these safeguards and the Court's precedents, we cannot conclude that absolute immunity is necessary or appropriate under Article II or the Supremacy Clause. Our dissenting colleagues agree. JUSTICE THOMAS reaches the same conclusion based on the original understanding of the Constitution reflected in Marshall's decision in *Burr*. *Post,* at 2, 5–6. And JUSTICE ALITO, also persuaded by *Burr*, "agree[s]" that "not all" state criminal subpoenas for a President's records "should be barred." *Post,* at 16. On that point the Court is unanimous.

B

We next consider whether a state grand jury subpoena seeking a President's private papers must satisfy a heightened need standard. The Solicitor General would require a threshold showing that the evidence sought is "critical" for "specific charging decisions" and that the subpoena is a "last resort," meaning the evidence is "not available from

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 24 of 113

18    TRUMP *v.* VANCE

Opinion of the Court

any other source" and is needed "now, rather than at the end of the President's term." Brief for United States as *Amicus Curiae* 29, 32 (internal quotation marks and alteration omitted). JUSTICE ALITO, largely embracing those criteria, agrees that a state criminal subpoena to a President "should not be allowed unless a heightened standard is met." *Post,* at 16–18 (asking whether the information is "critical" and "necessary . . . now").

We disagree, for three reasons. First, such a heightened standard would extend protection designed for official documents to the President's private papers. As the Solicitor General and JUSTICE ALITO acknowledge, their proposed test is derived from executive privilege cases that trace back to *Burr.* Brief for United States as *Amicus Curiae* 26–28; *post,* at 17. There, Marshall explained that if Jefferson invoked presidential privilege over executive communications, the court would not "proceed against the president as against an ordinary individual" but would instead require an affidavit from the defense that "would clearly show the paper to be essential to the justice of the case." *Burr,* 25 F. Cas., at 192. The Solicitor General and JUSTICE ALITO would have us apply a similar standard to a President's personal papers. But this argument does not account for the relevant passage from *Burr*: "If there be a paper in the possession of the executive, which is *not of an official nature*, he must stand, as respects that paper, in nearly the same situation with any other individual." *Id.,* at 191 (emphasis added). And it is only "nearly"—and not "entirely"—because the President retains the right to assert privilege over documents that, while ostensibly private, "partake of the character of an official paper." *Id.,* at 191–192.

Second, neither the Solicitor General nor JUSTICE ALITO has established that heightened protection against state subpoenas is necessary for the Executive to fulfill his Article II functions. Beyond the risk of harassment, which we addressed above, the only justification they offer for the

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 25 of 113

heightened standard is protecting Presidents from "unwarranted burdens." Brief for United States as *Amicus Curiae* 28; see *post,* at 16 (asking whether "there is an urgent and critical need for the subpoenaed information"). In effect, they argue that even if federal subpoenas to a President are warranted whenever evidence is material, state subpoenas are warranted "only when [the] evidence is essential." Brief for United States as *Amicus Curiae* 28; see *post,* at 16. But that double standard has no basis in law. For if the state subpoena is not issued to manipulate, *supra,* at 16–17, the documents themselves are not protected, *supra,* at 18, and the Executive is not impaired, *supra,* at 12–15, then nothing in Article II or the Supremacy Clause supports holding state subpoenas to a higher standard than their federal counterparts.

Finally, in the absence of a need to protect the Executive, the public interest in fair and effective law enforcement cuts in favor of comprehensive access to evidence. Requiring a state grand jury to meet a heightened standard of need would hobble the grand jury's ability to acquire "all information that might possibly bear on its investigation." *R. Enterprises, Inc.*, 498 U. S., at 297. And, even assuming the evidence withheld under that standard were preserved until the conclusion of a President's term, in the interim the State would be deprived of investigative leads that the evidence might yield, allowing memories to fade and documents to disappear. This could frustrate the identification, investigation, and indictment of third parties (for whom applicable statutes of limitations might lapse). More troubling, it could prejudice the innocent by depriving the grand jury of *exculpatory* evidence.

Rejecting a heightened need standard does not leave Presidents with "no real protection." *Post,* at 19 (opinion of ALITO, J.). To start, a President may avail himself of the same protections available to every other citizen. These include the right to challenge the subpoena on any grounds

20                    TRUMP *v.* VANCE

Opinion of the Court

permitted by state law, which usually include bad faith and
undue burden or breadth. See, *e.g.*, *Virag*, 54 N. Y. 2d, at
442–445, 430 N. E. 2d, at 1252–1253; *In re Grand Jury Sub-
poenas*, 72 N. Y. 2d 307, 315–316, 528 N. E. 2d 1195, 1200
(1988) (recognizing that grand jury subpoenas can be chal-
lenged as "overly broad" or "unreasonably burdensome"
(internal quotation marks omitted)). And, as in federal
court, "[t]he high respect that is owed to the office of the
Chief Executive . . . should inform the conduct of the entire
proceeding, including the timing and scope of discovery."
*Clinton*, 520 U. S., at 707. See *id.*, at 724 (BREYER, J., con-
curring in judgment) (stressing the need for courts presid-
ing over suits against the President to "schedule proceed-
ings so as to avoid significant interference with the
President's ongoing discharge of his official responsibili-
ties"); *Nixon*, 418 U. S., at 702 ("[W]here a subpoena is di-
rected to a President . . . appellate review . . . should be par-
ticularly meticulous.").

Furthermore, although the Constitution does not entitle
the Executive to absolute immunity or a heightened stand-
ard, he is not "relegate[d]" only to the challenges available
to private citizens. *Post,* at 17 (opinion of ALITO, J.). A
President can raise subpoena-specific constitutional chal-
lenges, in either a state or federal forum. As previously
noted, he can challenge the subpoena as an attempt to in-
fluence the performance of his official duties, in violation of
the Supremacy Clause. See *supra*, at 17. This avenue pro-
tects against local political machinations "interposed as an
obstacle to the effective operation of a federal constitutional
power." *United States* v. *Belmont*, 301 U. S. 324, 332 (1937).

In addition, the Executive can—as the district attorney
concedes—argue that compliance with a particular sub-
poena would impede his constitutional duties. Brief for Re-
spondent Vance 42. Incidental to the functions confided in
Article II is "the power to perform them, without obstruc-

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 27 of 113

tion or impediment." 3 J. Story, Commentaries on the Constitution of the United States §1563, pp. 418–419 (1833). As a result, "once the President sets forth and explains a conflict between judicial proceeding and public duties," or shows that an order or subpoena would "significantly interfere with his efforts to carry out" those duties, "the matter changes." *Clinton*, 520 U. S., at 710, 714 (opinion of BREYER, J.). At that point, a court should use its inherent authority to quash or modify the subpoena, if necessary to ensure that such "interference with the President's duties would not occur." *Id.*, at 708 (opinion of the Court).

\*      \*      \*

Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard[] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. *Burr*, 25 F. Cas., at 34.

The arguments presented here and in the Court of Appeals were limited to absolute immunity and heightened need. The Court of Appeals, however, has directed that the case be returned to the District Court, where the President may raise further arguments as appropriate. 941 F. 3d, at 646, n. 19.[6]

———————————
[6]The daylight between our opinion and JUSTICE THOMAS's "dissent" is not as great as that label might suggest. *Post*, at 12. We agree that Presidents are neither absolutely immune from state criminal subpoenas nor insulated by a heightened need standard. *Post*, at 6, 11, n. 3. We

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 28 of 113

22          TRUMP *v.* VANCE

Opinion of the Court

We affirm the judgment of the Court of Appeals and re-
mand the case for further proceedings consistent with this
opinion.

*It is so ordered.*

————————

agree that Presidents may challenge specific subpoenas as impeding
their Article II functions.  *Post,* at 6–7.  And, although we affirm while
JUSTICE THOMAS would vacate, we agree that this case will be remanded
to the District Court.  *Post,* at 12.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 29 of 113

Cite as: 591 U. S. ____ (2020)          1

KAVANAUGH, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–635

_____

## DONALD J. TRUMP, PETITIONER *v.* CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE KAVANAUGH, with whom JUSTICE GORSUCH joins, concurring in the judgment.

The Court today unanimously concludes that a President does not possess absolute immunity from a state criminal subpoena, but also unanimously agrees that this case should be remanded to the District Court, where the President may raise constitutional and legal objections to the subpoena as appropriate. See *ante*, at 21–22, and n. 6; *post*, at 11–12 (THOMAS, J., dissenting); *post*, at 16–19 (ALITO, J., dissenting). I agree with those two conclusions.

\*    \*    \*

The dispute over this grand jury subpoena reflects a conflict between a State's interest in criminal investigation and a President's Article II interest in performing his or her duties without undue interference. Although this case involves personal information of the President and is therefore not an executive privilege case, the majority opinion correctly concludes based on precedent that Article II and the Supremacy Clause of the Constitution supply some protection for the Presidency against state criminal subpoenas of this sort.

In our system of government, as this Court has often stated, no one is above the law. That principle applies, of

2                          TRUMP *v.* VANCE

course, to a President. At the same time, in light of Article
II of the Constitution, this Court has repeatedly declared—
and the Court indicates again today—that a court may not
proceed against a President as it would against an ordinary
litigant. See *Cheney* v. *United States Dist. Court for D. C.*,
542 U. S. 367, 381–382 (2004) ("In no case would a court be
required to proceed against the president as against an or-
dinary individual" (internal quotation marks and altera-
tions omitted)); *Clinton* v. *Jones*, 520 U. S. 681, 704, n. 39
(1997) (a court may not "proceed against the president as
against an ordinary individual" (internal quotation marks
omitted)); *United States* v. *Nixon*, 418 U. S. 683, 715 (1974)
("In no case of this kind would a court be required to proceed
against the president as against an ordinary individual"
(internal quotation marks and alterations omitted)); *United
States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va.
1807) (Marshall, C. J.) ("In no case of this kind would a
court be required to proceed against the president as
against an ordinary individual").

The question here, then, is how to balance the State's in-
terests and the Article II interests. The longstanding prec-
edent that has applied to federal criminal subpoenas for of-
ficial, privileged Executive Branch information is *United
States* v. *Nixon*, 418 U. S. 683 (1974). That landmark case
requires that a prosecutor establish a "demonstrated, spe-
cific need" for the President's information. *Id.*, at 713; see
also *In re Sealed Case*, 121 F. 3d 729, 753–757 (CADC
1997); cf. *Senate Select Committee on Presidential Cam-
paign Activities* v. *Nixon*, 498 F. 2d 725, 730–731 (CADC
1974) (en banc) (similar standard for congressional subpoe-
nas to the Executive Branch).

The *Nixon* "demonstrated, specific need" standard is a
tried-and-true test that accommodates both the interests of
the criminal process and the Article II interests of the Pres-
idency. The *Nixon* standard ensures that a prosecutor's in-
terest in subpoenaed information is sufficiently important

to justify an intrusion on the Article II interests of the Presidency. The *Nixon* standard also reduces the risk of subjecting a President to unwarranted burdens, because it provides that a prosecutor may obtain a President's information only in certain defined circumstances.

Although the Court adopted the *Nixon* standard in a different Article II context—there, involving the confidentiality of official, privileged information—the majority opinion today recognizes that there are also important Article II (and Supremacy Clause) interests at stake here. A state criminal subpoena to a President raises Article II and Supremacy Clause issues because of the potential for a state prosecutor to use the criminal process and issue subpoenas in a way that interferes with the President's duties, through harassment or diversion. Cf. *Nixon* v. *Fitzgerald*, 457 U. S. 731, 751–753 (1982).

Because this case again entails a clash between the interests of the criminal process and the Article II interests of the Presidency, I would apply the longstanding *Nixon* "demonstrated, specific need" standard to this case. The majority opinion does not apply the *Nixon* standard in this distinct Article II context, as I would have done. That said, the majority opinion appropriately takes account of some important concerns that also animate *Nixon* and the Constitution's balance of powers. The majority opinion explains that a state prosecutor may not issue a subpoena for a President's personal information out of bad faith, malice, or an intent to harass a President, *ante*, at 16; as a result of prosecutorial impropriety, *ibid.*; to seek information that is not relevant to an investigation, *ante*, at 16, 19–20; that is overly broad or unduly burdensome, *ante*, at 19–20; to manipulate, influence, or retaliate against a President's official acts or policy decisions, *ante*, at 17, 20; or in a way that would impede, conflict with, or interfere with a President's official duties, *ante*, at 20–21. All nine Members of the

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 32 of 113

4                              TRUMP *v.* VANCE

KAVANAUGH, J., concurring in judgment

Court agree, moreover, that a President may raise objections to a state criminal subpoena not just in state court but also in federal court.[1]  And the majority opinion indicates that, in light of the "high respect that is owed to the office of the Chief Executive," courts "should be particularly meticulous" in assessing a subpoena for a President's personal records. *Ante*, at 20 (quoting *Clinton*, 520 U. S., at 707, and *Nixon*, 418 U. S., at 702).

In the end, much may depend on how the majority opinion's various standards are applied in future years and decades.[2]  It will take future cases to determine precisely how much difference exists between (i) the various standards articulated by the majority opinion, (ii) the overarching *Nixon* "demonstrated, specific need" standard that I would adopt, and (iii) JUSTICE THOMAS's and JUSTICE ALITO's other proposed standards.  In any event, in my view, lower courts in cases of this sort involving a President will almost invariably have to begin by delving into why the State wants the information; why and how much the State needs the information, including whether the State could obtain the information elsewhere; and whether compliance with the subpoena would unduly burden or interfere with a President's official duties.

*          *          *

I agree that the case should be remanded to the District Court for further proceedings, where the President may raise constitutional and legal objections to the state grand

---

[1] As I see it, the standards identified by the majority opinion should be considered, in this context, Article II requirements, not just statutory or state-law requirements. Cf. *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 385–392 (2004); *Clinton* v. *Jones*, 520 U. S. 681, 707 (1997); *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749–757 (1982); *United States* v. *Nixon*, 418 U. S. 683, 714–716 (1974).

[2] The same point—namely, that much may depend on future application—is also true of the four considerations articulated by the Court today in *Trump* v. *Mazars USA, LLP*, *post*, at 19–20.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 33 of 113

Cite as: 591 U. S. ____ (2020)                    5

Kavanaugh, J., concurring in judgment

jury subpoena as appropriate.

Cite as: 591 U. S. ____ (2020)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 19–635

————————

## DONALD J. TRUMP, PETITIONER v. CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE THOMAS, dissenting.

Respondent Cyrus Vance, Jr., the district attorney for the County of New York, served a grand jury subpoena on the President's personal accounting firm. The subpoena, which is nearly identical to a subpoena issued by a congressional Committee, requests nearly 10 years of the President's personal financial records. *Ante*, at 2, and n. 2. In response to this troublingly broad request, the President, in his personal capacity, sought a declaration in federal court "'that the subpoena is invalid and unenforceable'" and an injunction preventing respondent "'from taking any action to enforce the subpoena.'" *Ante*, at 2. The District Court denied the President's motion for a preliminary injunction, and the Second Circuit affirmed in relevant part. *Ante*, at 2–3.

The President argues that he is absolutely immune from the issuance of any subpoena, but that if the Court disagrees, we should remand so that the District Court can develop a record about this particular subpoena. I agree with the majority that the President is not entitled to absolute immunity from *issuance* of the subpoena. But he may be entitled to relief against its *enforcement*. I therefore agree with the President that the proper course is to vacate and remand. If the President can show that "his duties as chief magistrate demand his whole time for national objects,"

2    TRUMP *v.* VANCE

THOMAS, J., dissenting

*United States* v. *Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (CC
Va. 1807) (Marshall, C. J.), he is entitled to relief from en-
forcement of the subpoena.

## I

The President first argues that he has absolute immunity
from the issuance of grand jury subpoenas during his term
in office. This Court has recognized absolute immunity for
the President from "damages liability predicated on his of-
ficial acts." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749 (1982).
But we have rejected absolute immunity from damages ac-
tions for a President's nonofficial conduct, *Clinton* v. *Jones*,
520 U. S. 681, 684 (1997), and we have never addressed the
question of immunity from a grand jury subpoena.

I agree with the majority that the President does not have
absolute immunity from the issuance of a grand jury sub-
poena. Unlike the majority, however, I do not reach this
conclusion based on a primarily functionalist analysis. In-
stead, I reach it based on the text of the Constitution,
which, as understood by the ratifying public and incorpo-
rated into an early circuit opinion by Chief Justice Mar-
shall, does not support the President's claim of absolute im-
munity.[1]

## A
### 1

The text of the Constitution explicitly addresses the priv-
ileges of some federal officials, but it does not afford the
President absolute immunity. Members of Congress are
"privileged from Arrest during their Attendance at the Ses-
sion of their respective Houses, and in going to and return-
ing from the same," except for "Treason, Felony and Breach
of the Peace." Art. I, §6, cl. 1. The Constitution further
specifies that, "for any Speech or Debate in either House,

---

[1] I do not address the continuing validity of *Nixon* v. *Fitzgerald*, 457
U. S. 731 (1982), which no party asks us to revisit.

THOMAS, J., dissenting

they shall not be questioned in any other Place." *Ibid.* By contrast, the text of the Constitution contains no explicit grant of absolute immunity from legal process for the President. As a Federalist essayist noted during ratification, the President's "person is not so much protected as that of a member of the House of Representatives" because he is subject to the issuance of judicial process "like any other man in the ordinary course of law." An American Citizen I (Sept. 26, 1787), in 2 Documentary History of the Ratification of the Constitution 141 (M. Jansen ed. 1976) (emphasis deleted).

Prominent defenders of the Constitution confirmed the lack of absolute Presidential immunity. James Wilson, a signer of the Constitution and future Justice of this Court, explained to his fellow Pennsylvanians that "far from being above the laws, [the President] is amenable to them in his private character as a citizen, and in his public character by *impeachment*." 2 Debates on the Constitution 480 (J. Elliot ed. 1891) (emphasis in original). James Iredell, another future Justice, observed in the North Carolina ratifying convention that "[i]f [the President] commits any crime, he is punishable by the laws of his country." 4 *id.*, at 109. A fellow North Carolinian similarly argued that, "[w]ere it possible to suppose that the President should give wrong instructions to his deputies, . . . citizens . . . would have redress in the ordinary courts of common law." *Id.*, at 47; see also Americanus No. 2, in 19 Documentary History of the Ratification of the Constitution 288–289 (J. Kaminski & G. Saladino eds. 2003); Americanus No. 4, in *id.*, at 359.

2

The sole authority that the President cites from the drafting or ratification process is The Federalist No. 69, but it provides him no real support. Alexander Hamilton stated that "[t]he President of the United States would be liable to

4                           TRUMP *v.* VANCE

THOMAS, J., dissenting

be impeached, tried, and upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law." The Federalist No. 69, p. 416 (C. Rossiter ed. 1961). Hamilton did not say that the President was temporarily immune from judicial process. Moreover, he made this comment to reassure readers that the President was "amenable to personal punishment and disgrace." *Id.*, at 422. For the President, this is at best ambiguous evidence that cannot overcome the clear evidence discussed above.

The President further relies on a private letter written by President Jefferson. In the letter, Jefferson worried that the Executive would lose his independence "if he were subject to the *commands* of the [judiciary], & to imprisonment for disobedience; if the several courts could bandy him from pillar to post, keep him constantly trudging from north to south & east to west, and withdraw him entirely from his constitutional duties." 10 Works of Thomas Jefferson 404 n. (P. Ford ed. 1905) (emphasis in original). But President Jefferson never squarely argued for absolute immunity. Yoo, The First Claim: The Burr Trial, *United States v. Nixon*, and Presidential Power, 83 Minn. L. Rev. 1435, 1450 (1999). And, the concern Jefferson had about demands on the President's time is addressed by the standard that Chief Justice Marshall articulated in *Burr*. See *infra*, at 6–7.

The President also quotes the views of Vice President John Adams and then-Senator Oliver Ellsworth in 1789. The record of the conversation we have from a fellow Senator's diary is brief. Adams or Ellsworth (or perhaps both) stated that "you could only impeach [the President], and no other process whatever lay against him." Journal of William Maclay 167 (E. Maclay ed. 1890). The only reason given was that it would "stop the whole machine of Government." *Ibid.* Senator Philip Schuyler joined the conversation and gave his own reason: "'I think the President [is] a

kind of sacred person.'" *Ibid.* Schuyler's theory clearly has
no basis in the Constitution, and the view held by Adams
and Ellsworth seems to be grounds for relief from enforce-
ment rather than a basis for absolute immunity from issu-
ance of a subpoena.

### B

This original understanding is reflected in an early cir-
cuit decision by Chief Justice Marshall, on which the major-
ity partially relies. In 1805, disgraced former Vice Presi-
dent Aaron Burr began a murky series of negotiations to
raise a volunteer army in the Western Territories. *Ante*, at
3–4. One of his contacts, General James Wilkinson, was not
only commander of the Army and Governor of Louisiana,
but also a Spanish spy. *Ante*, at 4, n. 4; Yoo, *supra*, at 1440.
After Burr set out with his army—perhaps to attack Span-
ish forces or perhaps to separate Western Territories from
the United States—Wilkinson wrote to President Jefferson
and accused Burr of the latter. *Ante*, at 4; Yoo, *supra*, at
1440. Burr was arrested for treason and brought before a
grand jury in Richmond, where Chief Justice Marshall pre-
sided.

During the grand jury proceedings, Burr moved for a *sub-
poena duces tecum* ordering President Jefferson to produce
the correspondence concerning Burr. *Burr*, 25 F. Cas., at
30. Chief Justice Marshall pre-emptively rejected any no-
tion of absolute immunity, despite the fact that the Govern-
ment did not so much as suggest it in court. He distin-
guished the President from the British monarch, who did
have immunity, calling it an "essentia[l] . . . difference" in
our system that the President "is elected from the mass of
the people, and, on the expiration of the time for which he
is elected, returns to the mass of the people again." *Id.*, at
34. Thus, the President was more like a state governor or
a member of the British cabinet than a king. Chief Justice
Marshall found no authority suggesting that these officials

6    TRUMP *v.* VANCE

THOMAS, J., dissenting

were immune from judicial process. *Ibid.*; see also *ante*, at 5–6.

Based on the evidence of original meaning and Chief Justice Marshall's early interpretation in *Burr*, the better reading of the text of the Constitution is that the President has no absolute immunity from the issuance of a grand jury subpoena.

## II

In addition to contesting the issuance of the subpoena, the President also seeks injunctive and declaratory relief against its enforcement. The majority recognizes that the President can seek relief from enforcement, but it does not vacate and remand for the lower courts to address this question. I would do so and instruct them to apply the standard articulated by Chief Justice Marshall in *Burr*: If the President is unable to comply because of his official duties, then he is entitled to injunctive and declaratory relief.

### A

In *Burr*, after explaining that the President was not absolutely immune from issuance of a subpoena, Chief Justice Marshall proceeded to explain that the President might be excused from the enforcement of one. As he put it, "[t]he guard, furnished to this high officer, to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court *after those subpoenas have issued*; not in any circumstance which is to precede their being issued." 25 F. Cas., at 34 (emphasis added). Chief Justice Marshall set out the pertinent standard: To avoid enforcement of the subpoena, the President must "sho[w]" that "his duties as chief magistrate demand his whole time for national objects." *Ibid.*[2]

---

[2]This standard appears to be something that Chief Justice Marshall

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 98                                                    RECEIVED NYSCEF: 07/10/2020

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 40 of 113

Although *Burr* involved a federal subpoena, the same principle applies to a state subpoena. The ability of the President to discharge his duties until his term expires or he is removed from office by the Senate is "integral to the structure of the Constitution." *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 15). The Constitution is the "supreme Law of the Land," Art. VI, cl. 2, so a state court can no more enforce a subpoena when national concerns demand the President's entire time than a federal court can. Accordingly, a federal court may provide injunctive and declaratory relief to stay enforcement of a state subpoena when the President meets the *Burr* standard.

B

The *Burr* standard places the burden on the President but also requires courts to take pains to respect the demands on the President's time. The Constitution vests the President with extensive powers and responsibilities, and courts are poorly situated to conduct a searching review of the President's assertion that he is unable to comply.

1

The President has vast responsibilities both abroad and at home. The Founders gave the President "primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 580 (2004) (THOMAS, J., dissenting). The Constitution "expressly identifies certain foreign affairs powers and vests them" in his office. *Zivotofsky* v. *Kerry*, 576 U. S. 1, 32 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part).

_____

and President Jefferson, who were often at odds, could agree on. President Jefferson's concern was that the Executive would lose his independence if courts could "withdraw him entirely from his constitutional duties." 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905). Relief from enforcement when those duties preclude the President's compliance addresses these concerns.

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM  INDEX NO. 160694/2019
NYSCEF DOC. NO. 98                                                    RECEIVED NYSCEF: 07/10/2020

He is "Commander in Chief of the Army and Navy of the
United States, and of the Militia of the several States, when
called into the actual Service of the United States." Art. II,
§2, cl. 1. He has "Power, by and with the Advice and Con-
sent of the Senate, to make Treaties." Cl. 2. He has the
power to "nominate, and by and with the Advice and Con-
sent of the Senate [to] appoint Ambassadors [and] other
public Ministers and Consuls." *Ibid.* He has the power to
fill vacancies that arise during a Senate recess until "the
End of [the Senate's] next Session." Cl. 3. And he is respon-
sible for "receiv[ing] Ambassadors and other public Minis-
ters" from foreign countries. §3.

The President also has residual powers granted by Arti-
cle II's Vesting Clause. "By omitting the words 'herein
granted' in [the Vesting Clause of] Article II, the Constitu-
tion indicates that the 'executive Power' vested in the Pres-
ident is not confined to those powers expressly identified in
the document." *Zivotofsky*, 576 U. S., at 34–35 (opinion of
THOMAS, J.). Rather, the Constitution "vests the residual
foreign affairs powers of the Federal Government—*i.e.*,
those not specifically enumerated in the Constitution—in
the President." *Id.*, at 33. Evidence from both the founding
and the early years of the Constitution confirms that the
residual foreign affairs powers of the Government were part
of the "executive Power." *Id.,* at 35–40.

The President has extensive domestic responsibilities as
well. He is given "[t]he executive Power," Art. II, §1, cl. 1,
and is directed to "take Care that the Laws be faithfully ex-
ecuted," §3. "The vesting of the executive power in the Pres-
ident was essentially a grant of the power to execute the
laws." *Myers* v. *United States*, 272 U. S. 52, 117 (1926).
Even under a proper understanding of the scope of federal
power, the President could not possibly execute all of the
laws himself. The President must accordingly appoint sub-
ordinates "to act for him under his direction in the execu-

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 42 of 113

tion of the laws." *Ibid.* Once officers are selected, the President must "supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Id.*, at 135. And, of course, the President has the power to remove officers as he sees fit. *Id.*, at 176; see also *Seila Law LLC* v. *Consumer Financial Protection Bureau, ante,* at 1–13 (THOMAS, J., concurring in part and dissenting in part).

In addition, the President has several specifically enumerated domestic powers. He has the "Power to Grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." Art. II, §2, cl. 1. He also has the power to "nominate, and by and with the Advice and Consent of the Senate [to] appoint . . . Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." Cl. 2. And he must "give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." §3.

The founding generation debated whether it was prudent to vest so many powers in a single person. Supporters of ratification responded that the design of the Presidency was necessary to the success of the Constitution. As Alexander Hamilton wrote:

"Energy in the executive is a leading character in the definition of good government. It is essential to the protection of the community against foreign attacks; it is not less essential to the steady administration of the laws; to the protection of property against those irregular and high-handed combinations which sometimes interrupt the ordinary course of justice; to the security

10                    TRUMP *v.* VANCE

THOMAS, J., dissenting

of liberty against the enterprises and assaults of ambi-
tion, of faction, and of anarchy. . . . A feeble Executive
implies a feeble execution of the government. A feeble
execution is but another phrase for a bad execution;
and a government ill executed, whatever it may be in
theory, must be, in practice, a bad government." The
Federalist No. 70, at 423.

In sum, the demands on the President's time and the im-
portance of his tasks are extraordinary, and the office of the
President cannot be delegated to subordinates. A subpoena
imposes both demands on the President's limited time and
a mental burden, even when the President is not directly
engaged in complying. This understanding of the Presi-
dency should guide courts in deciding whether to enforce a
subpoena for the President's documents.

2

Courts must also recognize their own limitations. When
the President asserts that matters of foreign affairs or na-
tional defense preclude his compliance with a subpoena, the
Judiciary will rarely have a basis for rejecting that asser-
tion. Judges "simply lack the relevant information and ex-
pertise to second-guess determinations made by the Presi-
dent based on information properly withheld." *Hamdi*, 542
U. S., at 583 (THOMAS, J., dissenting).

"[E]ven if the courts could compel the Executive to pro-
duce the necessary information" to understand the de-
mands on his time, decisions about that information "are
simply not amenable to judicial determination because
'[t]hey are delicate, complex, and involve large elements of
prophecy.'" *Ibid.* (quoting *Chicago & Southern Air Lines,
Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948)).
The President has at his disposal enormous amounts of
classified intelligence regarding the Government's concerns
around the globe. His decisionmaking is further informed
by experience in matters of foreign affairs, national defense,

THOMAS, J., dissenting

and intelligence that judges almost always will not have.
And his decisionmaking takes into account the full spec-
trum of the Government's operations, not just the matters
directly related to a particular case. Even with perfect in-
formation, courts lack the institutional competence to en-
gage in a searching review of the President's reasons for not
complying with a subpoena.

Here, too, Chief Justice Marshall was correct. A court
should "fee[l] many, perhaps, peculiar motives for manifest-
ing as guarded a respect for the chief magistrate of the Un-
ion as is compatible with its official duties." *Burr*, 25
F. Cas., at 37. Courts should have the same "circumspec-
tion" as Chief Justice Marshall before "tak[ing] any step
which would in any manner relate to that high personage."
*Id.*, at 35.[3]

*     *     *

I agree with the majority that the President has no abso-
lute immunity from the issuance of this subpoena. The
President also sought relief from enforcement of the sub-
poena, however, and he asked this Court to allow further
proceedings on that question if we rejected his claim of ab-
solute immunity. The Court inexplicably fails to address
this request, although its decision leaves the President free
to renew his request for an injunction against enforcement

---

[3]The President and the Solicitor General argue that the grand jury must
make a showing of heightened need. I agree with the majority's
decision not to adopt this standard, *ante*, at 17–19, but for different rea-
sons. The constitutional question in this case is whether the President
is able to perform the duties of his office, whereas a heightened need
standard addresses a logically independent issue. Under a heightened-
need standard, a grand jury with only the usual need for particular in-
formation would be refused it when the President is perfectly able to
comply, while a grand jury with a heightened need would be entitled to
it even if compliance would place undue obligations on the President.
This result makes little sense and lacks any basis in the original under-
standing of the Constitution. I would leave questions of the grand jury's
need to state law.

12                          TRUMP *v.* VANCE

THOMAS, J., dissenting

immediately on remand.

I would vacate and remand to allow the District Court to
determine whether enforcement of this subpoena should be
enjoined because the President's "duties as chief magistrate
demand his whole time for national objects." *Id.*, at 34. Ac-
cordingly, I respectfully dissent.

Cite as: 591 U. S. ____ (2020)        1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 19–635

DONALD J. TRUMP, PETITIONER *v.* CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE ALITO, dissenting.

This case is almost certain to be portrayed as a case about the current President and the current political situation, but the case has a much deeper significance. While the decision will of course have a direct effect on President Trump, what the Court holds today will also affect all future Presidents—which is to say, it will affect the Presidency, and that is a matter of great and lasting importance to the Nation.

The event that precipitated this case is unprecedented. Respondent Vance, an elected state prosecutor, launched a criminal investigation of a sitting President and obtained a grand jury subpoena for his records. The specific question before us—whether the subpoena may be enforced—cannot be answered adequately without considering the broader question that frames it: whether the Constitution imposes restrictions on a State's deployment of its criminal law enforcement powers against a sitting President. If the Constitution sets no such limits, then a local prosecutor may prosecute a sitting President. And if that is allowed, it follows *a fortiori* that the subpoena at issue can be enforced. On the other hand, if the Constitution does not permit a State to prosecute a sitting President, the next logical ques-

Case 1:20-cv-07311-LAK Document 12-10 Filed 09/14/20 Page 47 of 113

2                    TRUMP *v.* VANCE

ALITO, J., dissenting

tion is whether the Constitution restrains any other prose-
cutorial or investigative weapons.

These are important questions that go to the very struc-
ture of the Government created by the Constitution. In
evaluating these questions, two important structural fea-
tures must be taken into account.

I

A

The first is the nature and role of the Presidency. The
Presidency, like Congress and the Supreme Court, is a per-
manent institution created by the Constitution. All three
of these institutions are distinct from the human beings
who serve in them at any point in time. In the case of Con-
gress or the Supreme Court, the distinction is easy to per-
ceive, since they have multiple Members. But because
"[t]he President is the only person who alone composes a
branch of government . . . , there is not always a clear line
between his personal and official affairs." *Trump* v. *Mazars
USA, LLP*, *post*, at 17. As a result, the law's treatment of
the person who serves as President can have an important
effect on the institution, and the institution of the Presi-
dency plays an indispensable role in our constitutional sys-
tem.

The Constitution entrusts the President with responsibil-
ities that are essential to the country's safety and well-
being. The President is Commander in Chief of the Armed
Forces. Art. II, §2, cl. 1. He is responsible for the defense
of the country from the moment he enters office until the
moment he leaves.

The President also has the lead role in foreign relations.
He "make[s]" treaties with the advice and consent of the
Senate, Art. II, §2, cl. 2, decides whether to recognize for-
eign governments, *Zivotofsky* v. *Kerry*, 576 U. S. 1 (2015),
enters into and rescinds executive agreements with other

Cite as: 591 U. S. ____ (2020)            3

ALITO, J., dissenting

countries,[1] meets with foreign leaders, appoints ambassadors, Art. II, §2, cl. 2, oversees the work of the State Department and intelligence agencies, and exercises important foreign-relations powers under statutes and treaties that give him broad discretion in matters relating to subjects such as terrorism, trade, and immigration.[2]

---

[1] See, *e.g.*, *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 415 (2003); *Dames & Moore* v. *Regan*, 453 U. S. 654, 679–683 (1981); *United States* v. *Pink*, 315 U. S. 203, 229–230 (1942); *United States* v. *Belmont*, 301 U. S. 324, 330–331 (1937).

[2] Foreign Assistance Act of 1961, 22 U. S. C. §2318(a)(1) (permitting the President to order "the drawdown of defense articles from the stocks of the Department of Defense" in the event of "an unforeseen emergency . . . which requires immediate military assistance to a foreign country or international organization"); National Emergencies Act, 50 U. S. C. §1621 (authorizing the President to declare a national emergency and activate over 100 statutory emergency powers); International Emergency Economic Powers Act, 50 U. S. C. §1701(a) (granting Presidential emergency power "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States"); Trading with the Enemy Act, 50 U. S. C. §4305(b)(1)(B) (authorizing the President, "[d]uring the time of war," to prohibit "transactions involvin[g] any property in which any foreign country or a national thereof has any interest," among other things); Trade Expansion Act of 1962, 19 U. S. C. §1862(c)(3)(A) (authorizing "actions as the President deems necessary to adjust the imports of" certain articles of trade "so that such imports will not threaten to impair the national security"); Trade Act of 1974, 19 U. S. C. §2132(a) (authorizing the President, among other things, to impose temporary duty surcharges or quotas in order to address "large and serious United States balance-of-payments deficits," "an imminent and significant depreciation of the dollar in foreign exchange markets," or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium"), §2133(a) (authorizing the President, whenever a specified event "increases or imposes any duty or other import restriction," to "enter into trade agreements with foreign countries or instrumentalities for the purpose of granting new concessions as compensation in order to maintain the general level of reciprocal and mutually advantageous concessions" and to take actions "to carry out any such agreement"), §2411(a) (mandating the U. S. Trade

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 49 of 113

4                          TRUMP *v.* VANCE

ALITO, J., dissenting

The Constitution vests the President with "the executive Power" of the United States, Art. II, §1, cl. 1, and entrusts him with the responsibility "to take Care that the Laws be faithfully executed," §3. As the head of the Executive Branch, the President is ultimately responsible for everything done by all the departments and agencies of the Federal Government and a federal civilian work force that includes millions of employees. These weighty responsibilities impose enormous burdens on the time and energy of any occupant of the Presidency.

"Constitutionally speaking, the President never sleeps. The President must be ready, at a moment's notice, to do whatever it takes to preserve, protect, and defend the Constitution and the American people." Amar & Katyal, Executive Privileges and Immunities: The Nixon and Clinton Cases, 108 Harv. L. Rev. 701, 713 (1995). Without a President who is able at all times to carry out the responsibilities of the office, our constitutional system could not operate, and the country would be at risk. That is why the Twenty-fifth Amendment created a mechanism for temporarily transferring the responsibilities of the office to the Vice President if the President is incapacitated for even a brief

───────────

Representative, subject to the President's direction, to modify tariff rates if "the rights of the United States under any trade agreement are being denied" or if a foreign country's actions are "unjustifiable and burde[n] or restric[t] United States commerce"), §2461 (authorizing the President to "provide duty-free treatment for any eligible article from any beneficiary developing country"); Bipartisan Congressional Trade Priorities and Accountability Act of 2015, 19 U. S. C. §§4201–4210 (most recent delegation of trade-promotion authority, authorizing the President to negotiate and enter trade agreements); Immigration and Nationality Act of 1952, 8 U. S. C. §1182(f) (authorizing the President, "for such period as he shall deem necessary," to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate," "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States").

ALITO, J., dissenting

time.  The Amendment has been explicitly invoked on only two occasions, each time for a period of about two hours.[3] This mechanism reflects an appreciation that the Nation cannot be safely left without a functioning President for even a brief time.

## B

The second structural feature is the relationship between the Federal Government and the States.  Just as our Constitution balances power against power among the branches of the Federal Government, it also divides power between the Federal Government and the States.  The Constitution permitted the States to retain many of the sovereign powers that they previously possessed, see, *e.g.*, *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___ (2018), but it gave the Federal Government powers that were deemed essential for the Nation's well-being and, indeed, its survival.  And it provided for the Federal Government to be independent of and, within its allotted sphere, supreme over the States.  Art. VI, cl. 2.  Accordingly, a State may not block or interfere with the lawful work of the National Government.

This was an enduring lesson of Chief Justice Marshall's landmark opinion for the Court in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819).  As is well known, the case concerned the attempt by the State of Maryland to regulate and tax the federally chartered Second Bank of the United States.  After holding that Congress had the authority to establish the bank, *id.*, at 425, Marshall's opinion went on to conclude

---

[3]See Letter from G. Bush to Congressional Leaders on Temporary Transfer of the Powers and Duties of President of the United States (June 29, 2002), www.presidency.ucsb.edu/node/213575; Letter from G. Bush to Congressional Leaders on the Temporary Transfer of the Powers and Duties of the President of the United States (July 21, 2007), www.presidency.ucsb.edu/node/276172; see also Stolberg, For a Short While Today, It Will Be President Cheney, N. Y. Times, July 21, 2007, p. A11, col. 1.

6                    TRUMP *v.* VANCE

ALITO, J., dissenting

that the State could not tax it. Marshall recognized that
the States retained the "sovereign" power to tax persons
and entities within their jurisdiction, *id.*, at 429, but this
power, he explained, "is subordinate to, and may be con-
trolled by the constitution of the United States." *Id.*, at 427.
Noting the potency of the taxing power ("[a] right to tax
without limit or control, is essentially a power to destroy,"
*id.*, at 391), he concluded that a State's power to tax had to
give way to Congress's authority to charter the bank. In his
words, the state power to tax could not be used to "defeat
the legitimate operations," *id.*, at 427, of the Federal Gov-
ernment or "to retard, impede, burden, or in any manner
control" it, *id.*, at 436. Marshall thus held, not simply that
Maryland was barred from assessing a crushing tax that
threatened the bank's ability to operate, but that the State
could not tax the bank at all. He wrote:

> "We are not driven to the perplexing inquiry, so unfit
> for the judicial department, what degree of taxation is
> the legitimate use, and what degree may amount to the
> abuse of the power. The attempt to use it on the means
> employed by the government of the Union, in pursu-
> ance of the constitution, is itself an abuse." *Id.*, at 430.

Even a rule allowing a state tax that did not discriminate
between the federally chartered bank and state banks was
ruled out. Instead, he concluded that preservation of the
Constitution's federal structure demanded that any state
effort to tax a federal instrumentality be nipped in the bud.
Building on this principle of federalism, two centuries of
case law prohibit the States from taxing,[4] regulating, or

---

[4] *Kern-Limerick, Inc.* v. *Scurlock*, 347 U. S. 110, 117 (1954) (noting that
"recognition of the constitutional immunity of the Federal Government
from state exactions rests, of course, upon unquestioned authority");
*Mayo* v. *United States*, 319 U. S. 441, 447 (1943) ("These inspection fees
are laid directly upon the United States. They are money exactions the

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM INDEX NO. 160694/2019

NYSCEF DOC. NO. 98 RECEIVED NYSCEF: 07/10/2020

Case 1:20-cv-07311-LAK Document 12-10 Filed 09/14/20 Page 52 of 113

ALITO, J., dissenting

otherwise interfering with the lawful work of federal agen-
cies, instrumentalities, and officers.[5]   The Court premised

_____

payment of which, if they are enforceable, would be required before exe-
cuting a function of government.  Such a requirement is prohibited by
the supremacy clause"); *Clallam County* v. *United States*, 263 U. S. 341,
344 (1923) (holding that property owned by the United States is immune
from state taxation); see also *Weston* v. *City Council of Charleston*, 2 Pet.
449, 469 (1829) ("The tax on government stock is thought by this Court
to be a tax on the contract, a tax on the power to borrow money on the
credit of the United States, and consequently to be repugnant to the con-
stitution"); *Osborn* v. *Bank of United States*, 9 Wheat. 738, 867 (1824) ("If
the trade of the Bank be essential to its character, as a machine for the
fiscal operations of the government, that trade must be as exempt from
State control as the actual conveyance of the public money.  Indeed, a tax
bears upon the whole machine; as well upon the faculty of collecting and
transmitting the money of the nation, as on that of discounting the notes
of individuals.   No distinction is taken between them"); *Dawson* v.
*Steager*, 586 U. S. ___, ___ (2019) (slip op., at 2) (surveying Court prece-
dent on intergovernmental tax immunity).

   [5] *Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 180 (1988) ("It is well
settled that the activities of federal installations are shielded by the Su-
premacy Clause from direct state regulation unless Congress provides
'clear and unambiguous' authorization for such regulation"); *id.*, at 181
(concluding that "a federally owned facility performing a federal function
is shielded from direct state regulation, even though the federal function
is carried out by a private contractor, unless Congress clearly authorizes
such regulation"); *Hancock* v. *Train*, 426 U. S. 167, 178–179 (1976) (re-
jecting state agency's bid to regulate a federal installation and surveying
doctrines that establish that "'the federal function must be left free' of
[state] regulation"); see also *Leslie Miller, Inc.* v. *Arkansas*, 352 U. S. 187,
189–190 (1956) (*per curiam*) (concluding that federal contractors cannot
be forced to submit to state licensing procedures that would add to the
qualifications required to receive the federal contract); *Johnson* v. *Mar-
yland*, 254 U. S. 51, 57 (1920) (concluding that federal postal officials
may not be required to get a state driver's license to perform their duties
and explaining that "the immunity of the instruments of the United
States from state control in the performance of their duties extends to
. . . requirement[s] that they desist from performance until they satisfy
a state officer upon examination that they are competent for a necessary
part of them"); *In re Neagle*, 135 U. S. 1, 75 (1890) (concluding that a
federal official may not be "held in the state court to answer for an act
which he [or she] was authorized to do by the law of the United States");

8                              TRUMP *v.* VANCE

                              ALITO, J., dissenting

these cases on the principle that "the activities of the Federal Government are free from regulation by any State.  No other adjustment of competing enactments or legal principles is possible."  *Mayo* v. *United States*, 319 U. S. 441, 445 (1943) (footnote omitted).

                                    II
                                    A

   In *McCulloch*, Maryland's sovereign taxing power had to yield, and in a similar way, a State's sovereign power to enforce its criminal laws must accommodate the indispensable role that the Constitution assigns to the Presidency. This must be the rule with respect to a state prosecution of a sitting President.  Both the structure of the Government established by the Constitution and the Constitution's provisions on the impeachment and removal of a President make it clear that the prosecution of a sitting President is out of the question.  It has been aptly said that the President is the "sole indispensable man in government,"[6] and

──────────
*id.*, at 62 ("To cite all the cases in which this principle of the supremacy of the government of the United States, in the exercise of all the powers conferred upon it by the Constitution, is maintained, would be an endless task"); *Tarble's Case*, 13 Wall. 397, 404 (1872) (explaining that States have no authority to "interfere with the authority of the United States, whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 376–382 (2000) (explaining harm caused by state statutes that would "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments"); *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 211 (1976) ("Federal installations are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous"); *Arizona* v. *California*, 283 U. S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a State"); *Hunt* v. *United States*, 278 U. S. 96, 100–101 (1928) (recognizing that the United States was entitled to an injunction against state officers interfering with private citizens killing deer in national forest under authority of the United States).

[6] P. Kurland, Watergate and the Constitution 135 (1978).

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 54 of 113

ALITO, J., dissenting

subjecting a sitting President to criminal prosecution would
severely hamper his ability to carry out the vital responsi-
bilities that the Constitution puts in his hands.

Justice Joseph Story endorsed this reasoning in his fa-
mous treatise. He wrote that a President's responsibilities
necessarily entail "the power to perform [those duties],
without any obstruction or impediment whatsoever," and
that, as a result, a President is not "liable to arrest, impris-
onment, or detention" while in office. 3 Commentaries on
the Constitution of the United States §1563, pp. 418–419
(1833).

The constitutional provisions on impeachment provide
further support for the rule that a President may not be
prosecuted while in office. The Framers foresaw the need
to provide for the possibility that a President might be im-
plicated in the commission of a serious offense, and they did
not want the country to be forced to endure such a President
for the remainder of his term in office. But when a Presi-
dent has been elected by the people pursuant to the proce-
dures set out in the Constitution, it is no small thing to
overturn that choice. The Framers therefore crafted a spe-
cial set of procedures to deal with that contingency. They
put the charging decision in the hands of a body that repre-
sents all the people (the House of Representatives), not a
single prosecutor or the members of a local grand jury. And
they entrusted the weighty decision whether to remove a
President to a supermajority of Senators, who were ex-
pected to exercise reasoned judgment and not the political
passions of the day or the sentiments of a particular region.

The Constitution not only sets out the procedures for
dealing with a President who is suspected of committing a
serious offense; it also specifies the consequences of a judg-
ment adverse to the President. After providing that the
judgment cannot impose any punishment beyond removal
from the Presidency and disqualification from holding any
other federal office, the Constitution states that "the Party

10                         TRUMP *v.* VANCE

                         Alito, J., dissenting

convicted shall nevertheless be liable and subject to Indict-
ment, Trial, Judgment, and Punishment, according to
Law." Art. I, §3, cl. 7. The plain implication is that criminal
prosecution, like removal from the Presidency and disqual-
ification from other offices, is a consequence that can come
about only after the Senate's judgment, not during or prior
to the Senate trial.

   This was how Hamilton explained the impeachment pro-
visions in the Federalist Papers. He wrote that a President
may "be impeached, tried, and, upon conviction . . . *would
afterwards be liable to prosecution and punishment in the
ordinary course of law.*" The Federalist No. 69, p. 416 (C.
Rossiter ed. 1961) (emphasis added); see also *id.*, No. 77, at
464 (A. Hamilton) (a President is "at all times liable to im-
peachment, trial, [and] dismissal from office," but any
other punishment must come only "by *subsequent prosecu-
tion* in the common course of law" (emphasis added)).

   In the proceedings below, neither respondent, nor the
District Court, nor the Second Circuit was willing to con-
cede the fundamental point that a sitting President may not
be prosecuted by a local district attorney. Respondent has
said that he is investigating the President and, until oral
argument in this Court, he never foreswore an intention to
charge the President while he is still in office.[7] The District

––––––––––
   [7] During oral argument in the Second Circuit, respondent's attorney
said the following:

   "It's hard for me to say that there could be no circumstance under
which a President could ever imaginably be criminally charged or per-
haps tried . . . . You can invent scenarios where you can imagine that it
would be necessary or at least perhaps a good idea for a sitting President
to be subject to a criminal charge even by a state while in office."  Re-
cording of Oral Arg. in No. 19–3204 (CA2, Oct. 23, 2019), at 28:20–
28:40;  36:35–36:45,  https://www.ca2.uscourts.gov/decisions/oral_argu-
ments.html.

   Respondent's brief in this case says only that "[f]or the purpose of this
case, the Court may assume . . . that a sitting President is not amenable
to criminal prosecution." Brief for Respondent Vance 24–25. During oral

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 56 of 113

ALITO, J., dissenting

Court conceded only that "perhaps" a sitting President could not be prosecuted for an offense punishable by "lengthy imprisonment" but that an offense requiring only a short trial would be another matter. 395 F. Supp. 3d 283, 289, 311 (SDNY 2019). And the Second Circuit was silent on the question.

The scenario apparently contemplated by the District Court is striking. If a sitting President were charged in New York County, would he be arrested and fingerprinted? He would presumably be required to appear for arraignment in criminal court, where the judge would set the conditions for his release. Could he be sent to Rikers Island or be required to post bail? Could the judge impose restrictions on his travel? If the President were scheduled to travel abroad—perhaps to attend a G–7 meeting—would he have to get judicial approval? If the President were charged with a complicated offense requiring a long trial, would he have to put his Presidential responsibilities aside for weeks on end while sitting in a Manhattan courtroom? While the trial was in progress, would aides be able to approach him and whisper in his ear about pressing matters? Would he be able to obtain a recess whenever he needed to speak with an aide at greater length or attend to an urgent matter, such as speaking with a foreign leader? Could he effectively carry out all his essential Presidential responsibilities after the trial day ended and at the same time adequately confer with his trial attorneys regarding his defense? Or should he be expected to give up the right to attend his own trial and be tried in absentia? And if he were convicted, could he be imprisoned? Would aides be installed in a nearby cell?

This entire imagined scene is farcical. The "right of all

_____
argument in this Court, however, counsel for respondent stated: "We're mindful that as a state actor our office cannot investigate a president for any official acts and that we cannot prosecute a president while in office." Tr. of Oral Arg. 54.

12                          TRUMP *v.* VANCE

ALITO, J., dissenting

the People to a functioning government" would be sacri-
ficed.  Amar & Kalt, The Presidential Privilege Against
Prosecution, 2 Nexus 11, 14 (1997).  "Does anyone really
think, in a country where common crimes are usually
brought before state grand juries by state prosecutors, that
it is feasible to subject the president—and thus the coun-
try—to every district attorney with a reckless mania for
self-promotion?"  C. Black & P. Bobbitt, Impeachment: A
Handbook 112 (2018).  See also R. Moss, Asst. Atty. Gen., A
Sitting President's Amenability to Indictment and Criminal
Prosecution, 24 Op. Office of Legal Counsel (OLC) 222, 260
(2000) (Moss Memo); Memorandum from R. Dixon, Asst.
Atty. Gen., OLC, Re: Amenability of the President, Vice
President, and Other Civil Officers to Federal Criminal
Prosecution While in Office (Sept. 24, 1973).

                                   B

    While the prosecution of a sitting President provides the
most dramatic example of a clash between the indispensa-
ble work of the Presidency and a State's exercise of its crim-
inal law enforcement powers, other examples are easy to
imagine.  Suppose state officers obtained and sought to ex-
ecute a search warrant for a sitting President's private
quarters in the White House.  Suppose a state court author-
ized surveillance of a telephone that a sitting President was
known to use.  Or suppose that a sitting President was sub-
poenaed to testify before a state grand jury and, as is gen-
erally the rule, no Presidential aides, even those carrying
the so-called "nuclear football,"[8] were permitted to enter the
grand jury room.  What these examples illustrate is a prin-
ciple that this Court has recognized: legal proceedings in-
volving a sitting President must take the responsibilities
and demands of the office into account.  See *Clinton* v.
*Jones*, 520 U. S. 681, 707 (1997).

──────────
    [8]Atomic Heritage Foundation, Nuclear Briefcases (June 12, 2018),
www.atomicheritage.org/history/nuclear-briefcases.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 58 of 113

It is not enough to recite sayings like "no man is above the law" and "the public has a right to every man's evidence." *Ante*, at 1. These sayings are true—and important—but they beg the question. The law applies equally to all persons, including a person who happens for a period of time to occupy the Presidency. But there is no question that the nature of the office demands in some instances that the application of laws be adjusted at least until the person's term in office ends.

### C

I now come to the specific investigative weapon at issue in the case before us—a subpoena for a sitting President's records. This weapon is less intrusive in an immediate sense than those mentioned above. Since the records are held by, and the subpoena was issued to, a third party, compliance would not require much work on the President's part. And after all, this is just one subpoena.

But we should heed the "great jurist," *ante*, at 21, who rejected a similar argument in *McCulloch*. If we say that a subpoena to a third party is insufficient to undermine a President's performance of his duties, what about a subpoena served on the President himself? Surely in that case, the President could turn over the work of gathering the requested documents to attorneys or others recruited to perform the task. And if one subpoena is permitted, what about two? Or three? Or ten? Drawing a line based on such factors would involve the same sort of "perplexing inquiry, so unfit for the judicial department" that Marshall rejected in *McCulloch*, 4 Wheat., at 430.

The Court faced a similar issue when it considered whether a President can be sued for an allegedly unlawful act committed in the performance of official duties. See *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982). We did not ask whether the particular suit before us would have interfered with the carrying out of Presidential duties. (It could not

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 59 of 113

14              TRUMP *v.* VANCE

ALITO, J., dissenting

have had that effect because President Nixon had already
left office.)

Instead, we adopted a rule for all such suits, and we
should take a similar approach here. The rule should take
into account both the effect of subpoenas on the functioning
of the Presidency and the risk that they will be used for
harassment.

I turn first to the question of the effect of a state grand
jury subpoena for a President's records. When the issuance
of such a subpoena is part of an investigation that regards
the President as a "target" or "subject,"[9] the subpoena can
easily impair a President's "energetic performance of [his]
constitutional duties." *Cheney* v. *United States Dist. Court
for D. C.*, 542 U. S. 367, 382 (2004). Few individuals will
simply brush off an indication that they may be within a
prosecutor's crosshairs. Few will put the matter out of their
minds and go about their work unaffected. For many, the
prospect of prosecution will be the first and last thing on
their minds every day.

We have come to expect our Presidents to shoulder bur-
dens that very few people could bear, but it is unrealistic to
think that the prospect of possible criminal prosecution will

——————

[9]Respondent asserts that his office has never characterized President
Trump as a "target" of the investigation, Brief for Respondent Vance 29,
n. 10, but by the same token, respondent has never said that the Presi-
dent is not a "target." Moreover, the terms "target" and "subject" have
no consistent legal meaning. The United States Attorney's Manual de-
fines a "target" as "a person as to whom the prosecutor or the grand jury
has substantial evidence linking him or her to the commission of a crime
and who, in the judgment of the prosecutor, is a putative defendant."
Dept. of Justice, Justice Manual, Section 9–11.151 (Jan. 2020),
https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151/. "A 'sub-
ject' of an investigation" is defined as "a person whose conduct is within
the scope of the grand jury's investigation." *Ibid.* Of course, these defi-
nitions are not binding on the State of New York, but under them, it is
apparent that the President is at least a "subject."

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM
NYSCEF DOC. NO. 98

not interfere with the performance of the duties of the office. "[C]riminal litigation uniquely requires [a] President's personal time and energy, and will inevitably entail a considerable if not overwhelming degree of mental preoccupation." Moss Memo 254 (emphasis deleted). See also Kavanaugh, Separation of Powers During the Forty-Fourth Presidency and Beyond, 93 Minn. L. Rev. 1454, 1461 (2009) ("[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President").

As for the potential use of subpoenas to harass, we need not "'exhibit a naiveté from which ordinary citizens are free.'" *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 28). As we have recognized, a President is "an easily identifiable target." *Fitzgerald*, 457 U. S., at 752–753. There are more than 2,300 local prosecutors and district attorneys in the country.[10] Many local prosecutors are elected, and many prosecutors have ambitions for higher elected office. (Respondent's famous predecessor Thomas E. Dewey used the office of District Attorney for New York County as a springboard to the governorship of New York and to the Republican nomination for President in 1944 and 1948.) If a sitting President is intensely unpopular in a particular district—and that is a common condition—targeting the President may be an alluring and effective electoral strategy. But it is a strategy that would undermine our constitutional structure.

The Framers understood the importance of protecting the Presidency from interference by the States. At the Constitutional Convention, James Wilson argued that the President should be "as independent as possible . . . of the States." 1 Records of the Federal Convention of 1787, p. 69 (M. Farrand ed. 1911). He and James Madison successfully

---

[10] Dept. of Justice, Bureau of Justice Statistics, Prosecutors in State Courts, 2007—Statistical Tables 1 (Dec. 2011).

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 98    Case 1:20-cv-07311-LAK    Document 12-10    Filed 09/14/20    Page 61 of 113    RECEIVED NYSCEF: 07/10/2020

opposed a proposal to vest the impeachment power in state legislatures, contending that this "would open a door for intrigues agst. [the President] in States where his administration tho' just might be unpopular, and might tempt him to pay court to particular States whose leading partizans he might fear." *Id.*, at 86. And to prevent a State from compromising a President's independence, the Convention adopted a provision barring a President from receiving an "Emolument" from any State, U. S. Const., Art. II, §1, cl. 7. See The Federalist No. 73, at 494 (J. Cooke ed. 1961) (A. Hamilton).

Two centuries later, the Court's decision in *Clinton* reflected a similar concern. The Court held that a sitting President could be sued in federal court, but the Court took pains to reserve judgment on the question whether "a comparable claim might succeed in a state tribunal." 520 U. S., at 691. "[A]ny direct control by a state court over the President," the Court observed, might raise concerns about "protecting federal officials from possible local prejudice." *Ibid.*, and n. 13.

D

In light of the above, a subpoena like the one now before us should not be enforced unless it meets a test that takes into account the need to prevent interference with a President's discharge of the responsibilities of the office. I agree with the Court that not all such subpoenas should be barred. There may be situations in which there is an urgent and critical need for the subpoenaed information. The situation in the Burr trial, where the documents at issue were sought by a criminal defendant to defend against a charge of treason, is a good example. But in a case like the one at hand, a subpoena should not be allowed unless a heightened standard is met.

Prior cases involving Presidential subpoenas have always applied special, heightened standards. In the Burr trial,

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 62 of 113

ALITO, J., dissenting

Chief Justice Marshall was careful to note that "in no case of this kind would a court be required to proceed against the president as against an ordinary individual," and he held that the subpoena to President Jefferson was permissible only because the prosecutor had shown that the materials sought were "essential to the justice of the [pending criminal] case." *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (brackets omitted).

In *United States* v. *Nixon*, 418 U. S. 683 (1974), where the Watergate Special Prosecutor subpoenaed tape recordings and documents under the control of President Nixon, this Court refused to quash the subpoena because there was a "demonstrated, specific need for [the] evidence in a pending criminal trial." *Id.*, at 713. In an earlier Watergate-related case where a Senate Committee subpoenaed President Nixon's White House tapes, the D. C. Circuit refused to order their production because the Committee had failed to show that "the subpoenaed evidence [wa]s demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F. 2d 725, 731 (1974). Later, when an independent counsel investigating a Cabinet officer wanted to enforce a federal grand jury subpoena for privileged materials held by the White House counsel, the D. C. Circuit explained that enforcement demanded a "'demonstrated, specific need'" for the materials sought. *In re Sealed Case*, 121 F. 3d 729, 736 (1997) (*per curiam*).

The important point is not that the subpoena in this case should necessarily be governed by the particular tests used in these cases, most of which involved official records that were claimed to be privileged. Rather, the point is that we should not treat this subpoena like an ordinary grand jury subpoena and should not relegate a President to the meager defenses that are available when an ordinary grand jury subpoena is challenged. But that, at bottom, is the effect of the Court's decision.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 63 of 113

18                     TRUMP *v.* VANCE

ALITO, J., dissenting

The Presidency deserves greater protection.  Thus, in a case like this one, a prosecutor should be required (1) to provide at least a general description of the possible offenses that are under investigation, (2) to outline how the subpoenaed records relate to those offenses, and (3) to explain why it is important that the records be produced and why it is necessary for production to occur while the President is still in office.

In the present case, the district attorney made a brief proffer, but important questions were left hanging.  It would not be unduly burdensome to insist on answers before enforcing the subpoena.

One obvious question concerns the scope of the subpoena. The subpoena issued by the grand jury is largely a copy of the subpoenas issued by Committees of the House of Representatives, and it would be quite a coincidence if the records relevant to an investigation of possible violations of New York criminal law just so happened to be almost identical to the records thought by congressional Committees to be useful in considering federal legislation.  It is therefore appropriate to ask the district attorney to explain the need for the various items that the subpoena covers.

The district attorney should also explain why it is important that the information in question be obtained from the President's records rather than another source.  See, *e.g.*, *Nixon*, 418 U. S., at 702; *Sealed Case*, 121 F. 3d, at 755. And the district attorney should set out why he finds it necessary that the records be produced now as opposed to when the President leaves office.  At argument, respondent's counsel told us that his office's concern is the expiration of the statute of limitations,[11] but there are potential solutions to that problem.  Even if New York law does not automatically suspend the statute of limitations for prosecuting a

───────────

[11] Tr. of Oral Arg. 77, 102.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 64 of 113

President until he leaves office,[12] it may be possible to eliminate the problem by waiver.[13] And if the prosecutor's statute-of-limitations concerns relate to parties other than the President, he should be required to spell that out.

There may be other good reasons why immediate enforcement is important, such as the risk that evidence or important leads will be lost, but if a prosecutor believes that immediate enforcement is needed for such a reason, the prosecutor should be required to provide a reasonably specific explanation why that is so and why alternative means, such as measures to preserve evidence and prevent spoliation, would not suffice.

E

Unlike this rule, which would not undermine any legitimate state interests, the opinion of the Court provides no real protection for the Presidency. The Court discounts the risk of harassment and assumes that state prosecutors will observe constitutional limitations, *ante*, at 18, and I also assume that the great majority of state prosecutors will carry out their responsibilities responsibly. But for the reasons noted, there is a very real risk that some will not.

The Court emphasizes the protection afforded by "longstanding rules of grand jury secrecy," *ante*, at 15, but that is no answer to the burdens that subpoenas may inflict, and in any event, grand jury secrecy rules are of limited value as safeguards against harassment. State laws on

―――――――――――

[12] See N. Y. Crim. Proc. Law Ann. §30.10(4)(a) (West 2010) (statute tolled when defendant outside the jurisdiction); see also *People* v. *Knobel*, 94 N. Y. 2d 226, 230, 723 N. E. 2d 550, 552 (1999) (explaining New York rule for tolling the limitations period when a defendant is "continuously outside" the State and concluding that "all periods of a day or more that a nonresident defendant is out-of-State should be totaled and toll the Statute of Limitations").

[13] See *People* v. *Parilla*, 8 N. Y. 3d 654, 659, 870 N. E. 2d 142, 145 (2007); R. Davis & T. Muskus, New York Practice with Forms, 33A Carmody-Wait 2d §186:34 (June 2020).

Case 1:20-cv-07311-LAK    Document 12-10    Filed 09/14/20    Page 65 of 113

grand jury secrecy vary and often do not set out disclosure restrictions with the same specificity as federal law.[14]

Under New York law, the decision whether to disclose grand jury evidence is committed to the discretion of the supervising judge under a test that simply balances the need for secrecy against "the public interest." *In re District Attorney of Suffolk Cty.*, 58 N. Y. 2d 436, 444, 448 N. E. 2d 440, 443–444 (1983); see also *People* v. *Fetcho*, 91 N. Y. 2d 765, 769, 698 N. E. 2d 935, 938 (1998). That test provides no solid protection for the Presidency. Reported New York decisions do not deal with whether this test restricts disclosure to, among others, a congressional committee, the state legislature, or the state attorney general and her staff for the purpose of civil litigation. Indeed, since New York legislators have attempted to enact laws to force the disclosure of some of the subpoenaed information, it is not impossible to imagine a trial judge's finding that public disclosure is in the "public interest." And even where grand jury information is not lawfully disclosed, confidential law enforcement information is avidly sought by the media in high-profile cases, leaks of such information are not uncommon, and those responsible are seldom called to account.

The Court notes that "grand juries are prohibited from engaging" in "'fishing expeditions,'" *ante*, at 17, but an objection on that ground is a very long shot under New York law. In New York, a grand jury subpoena need not be supported by probable cause, *In re Nassau Cty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 4 N. Y. 3d 665, 677–678, 830 N. E. 2d 1118, 1126 (2005), and a party seeking to quash a subpoena must show that the documents sought "can have no conceivable relevance to any legitimate object of investigation." *In re Grand Jury Subpoenas for Locals 17, 135, and 608*, 72 N. Y. 2d 307, 317, 528 N. E. 2d 1195, 1201 (1988) (quoting *Virag* v. *Hynes*, 54 N. Y. 2d 437,

---

[14] S. Beale et al., Grand Jury Law and Practice §§5:3–5:4 (2018).

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 66 of 113

444, 430 N. E. 2d 1249, 1253 (1981)).

The Court says that a President can "*argue* that compliance with a particular subpoena would impede his constitutional duties," *ante*, at 20 (emphasis added), but under the Court's opinions in this case and *Mazars*, it is not easy to see how such an argument could prevail. The Court makes clear that any stigma or damage to a President's reputation does not count, *ante*, at 14, and in *Mazars*, the Court states that "burdens on the President's time and attention" are generally not of constitutional concern, *post*, at 20. Elsewhere in its opinion in this case, the Court takes the position that when a President's non-official records are subpoenaed, his treatment should be little different from that of any other subpoena recipient. *Ante*, at 18. The most that the Court holds out is the possibility that there might be some unspecified extraordinary circumstances under which a President might obtain relief.

Finally, the Court touts the ability of a President to challenge a subpoena by "'an affirmative showing of impropriety,' including 'bad faith'" or retaliation for official acts. *Ante*, at 16–17. But "such objections are almost universally overruled." S. Beale et al., Grand Jury Law and Practice §6:23, p. 6–243 (2014). Direct evidence of impropriety is rarely obtainable, and it will be a challenge to make a circumstantial case unless the prosecutor is required to provide the sort of showing outlined above.

For all practical purposes, the Court's decision places a sitting President in the same unenviable position as any other person whose records are subpoenaed by a grand jury. See *ante*, at 18.

Attempting to justify this approach, the Court relies on Marshall's ruling in the Burr trial, but the Court ignores important differences between the situation in that case and the situation here. First, the subpoena in *Burr* was not issued by a grand jury at the behest of a prosecutor who was investigating the President. Instead, a defendant who was

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 67 of 113

22                    TRUMP *v.* VANCE

ALITO, J., dissenting

initially on trial for his life sought to obtain exculpatory ev-
idence from the very man who was orchestrating the prose-
cution. *Ante*, at 5. Marshall's ruling took note of the context
in which the evidence was sought. He stated: "If there be a
paper in the possession of the executive, which is not of an
official nature, he must stand, as respects that paper, in
nearly the same situation with any other individual who
possesses a paper *which might be required for the defense*."
*Burr*, 25 F. Cas., at 191 (emphasis added).

Second, it is significant that Burr, unlike the prosecutor
in the present case, did not have the option of postponing
his request for information until the President's term
ended. Burr had not chosen to be charged or tried while
Jefferson was in office, and by the time Jefferson's tenure
ended, his trial was history. Third, because the case was
prosecuted in federal court under federal law, it entirely
lacked the federalism concerns that lie at the heart of the
present case.

The lesson we should take from Marshall's jurisprudence
is the lesson of *McCulloch*—the importance of preventing a
State from undermining the lawful exercise of authority
conferred by the Constitution on the Federal Government.
There is considerable irony in the Court's invocation of Mar-
shall to defend a decision allowing a State's prosecutorial
power to run roughshod over the functioning of a branch of
the Federal Government.

The Court's other examples of presidential subpoenas, far
from supporting the Court's holding, actually show that
usual procedures have been substantially altered in cases
involving Presidents. In every one of the examples, a Pres-
ident did not testify in person, as is almost always required
when a witness is subpoenaed to testify at a criminal trial
or before a grand jury, but instead was deposed. *Ante*, at 8.
The examples involving Presidents Ford and Carter oc-
curred under modern federal rules of procedure, and allow-

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 68 of 113

ing them to testify by deposition represented a sharp departure from conventional practice.[15]

The Court turns to *United States* v. *Nixon*, 418 U. S. 683, but that case arose under markedly different circumstances. Because the trial was in federal court, there was no issue of federalism, and the Court refused to order that the subpoena be quashed because of "the demonstrated, specific need for evidence in a pending criminal trial." *Id.*, at 713. In the case now before us, a "demonstrated, specific need" is precisely what is lacking.

This Court's decision in *Clinton* v. *Jones*, 520 U. S. 681, provides no greater support for today's decision. In that case, as noted, the lawsuit was brought in federal, not state, court, and while the subject of that particular civil suit was embarrassing, the Court addressed the broad question whether a President is immune from civil suits "'in all but

---

[15] When President Ford was subpoenaed as a defense witness in the trial of a woman who had attempted to assassinate him, the District Court ruled that Federal Rule of Criminal Procedure 15 allowed him to be deposed at a place of his choosing, instead of testifying in person, and provided for defense counsel but not the defendant herself to be present. Then, as now, Rule 15 permits a witness to be deposed under "exceptional circumstances" in order "to preserve testimony for trial." This Rule is generally used when a witness may not be available to testify at trial, not simply when it would be burdensome or inconvenient for the witness to appear. The judge's application of the Rule in this case was innovative. In addition, the defendant was not present when President Ford was deposed. Repeating such a practice today might run into other obstacles. See *Coy* v. *Iowa*, 487 U. S. 1012, 1020–1021 (1988); see also Rule 15(c) (providing for the defendant's presence during the deposition).

A similar procedure appears to have been followed when President Carter testified as a prosecution witness in a criminal trial. No reported case explains the legal authority cited as justification for excusing live testimony, but Rule 15 may have been invoked. As for President Carter's testimony by deposition before a grand jury, although neither the Federal Rules of Evidence nor the Confrontation Clause apply to federal grand jury proceedings, testimony by deposition is nevertheless not the norm.

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM INDEX NO. 160694/2019

NYSCEF DOC. NO. 98                                                          RECEIVED NYSCEF: 07/10/2020

the most exceptional cases.'" *Id.*, at 692.  There is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit.

\*       \*       \*

The subpoena at issue here is unprecedented.  Never before has a local prosecutor subpoenaed the records of a sitting President.  The Court's decision threatens to impair the functioning of the Presidency and provides no real protection against the use of the subpoena power by the Nation's 2,300+ local prosecutors.  Respect for the structure of Government created by the Constitution demands greater protection for an institution that is vital to the Nation's safety and well-being.

I therefore respectfully dissent.

# K A S O W I T Z   B E N S O N   T O R R E S  LLP

<table>
<tr><td>Marc E. Kasowitz<br>Direct Dial: (212) 506-1710<br>Direct Fax: (212) 835-5010<br>MKasowitz@Kasowitz.com</td><td>1633 BROADWAY<br>NEW YORK, NEW YORK 10019<br>(212) 506-1700<br>FAX: (212) 506-1800</td><td>Atlanta<br>Houston<br>Los Angeles<br>Miami<br>Newark<br>San Francisco<br>Silicon Valley<br>Washington DC</td></tr>
</table>

July 14, 2020

<u>VIA NYSCEF</u>

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

  Re: *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

  We write on behalf of defendant President Donald J. Trump to respond to plaintiff's July 10, 2020 letter to the Court ("Pl. Letter"), in which she asserts that the U.S. Supreme Court's decision last week in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), means that the President's motion to stay this case pending the now fully briefed appeal to the Court of Appeals from *Zervos v. Trump*, 171 A.D.3d 110 (1st Dep't 2019), should be denied.

  Plaintiff's assertion is incorrect. *Vance* does *not* hold that a civil action in state court against a sitting President like *Zervos* and this action may proceed. The Supreme Court itself made this clear on the same day it handed down *Vance*. In *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which concerned the ability of Congress to issue a subpoena to the President, the Supreme Court explicitly noted that the holding in *Vance* was limited to criminal proceedings:

> Two hundred years ago, it was established that Presidents may be subpoenaed during a federal criminal proceeding, and earlier today we extended that ruling to **state criminal proceedings**, *Trump v. Vance*, ante, p. ___.

*Id.* at *4 (emphasis added) (citation omitted). The Supreme Court also confirmed in *Mazars* that its *Clinton v. Jones*, 520 U.S. 681 (1997), ruling was limited to civil actions against a sitting President in federal, not state, court:

> [M]ore recently we ruled that a private litigant could subject a President to a damages suit and appropriate discovery obligations *in federal court*, *Clinton v. Jones*, 520 U.S. 681 (1997).

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 14, 2020
Page 2

*Mazars*, 2020 WL 3848061, at *4 (emphasis added).

In fact, as outlined below, and contrary to plaintiff's arguments, *Vance* confirms the reasons *Clinton v. Jones*, which upheld federal court jurisdiction over civil actions against a sitting President, should not be extended to state court. In any event, the Court of Appeals itself will soon decide this issue on the pending *Zervos* appeal. Staying this action would not only allow the Court of Appeals to decide this threshold constitutional issue, but would extend the "judicial deference and restraint" the courts owe the President under the United States Constitution. *Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982). (*See also* NYSCEF Doc. No. 49 at 9 (collecting cases).)

### A. The Reasoning in *Vance* and *Mazars* Supports the Conclusion That State Courts Lack Jurisdiction Over the President in Civil Actions.

While *Vance* neither addressed nor decided whether state courts may exercise jurisdiction over the President in civil actions, its reasoning supports the conclusion that the First Department's decision in *Zervos* that they may do so was erroneous.

First, in *Clinton v. Jones*, the Supreme Court decided that the federal district court there could exercise jurisdiction over President Clinton in a sexual harassment case arising from his alleged unofficial conduct precisely because, under the Separation of Powers doctrine, federal courts may exercise jurisdiction -- i.e., control -- over the President's official conduct.[1] However, state courts, under the Supremacy Clause, may not exercise any jurisdiction or control over the President's official conduct. *Vance* reaffirms this principle. *See Vance*, 2020 WL 3848062, at *8 (because "'States have no power … to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress[,]' [i]t follows that States also lack the power to impede the President's execution of those laws." (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 436 (1819))). Accordingly, the Supreme Court's justification in *Clinton v. Jones* has no application to state court jurisdiction.

Second, *Mazars* also reaffirms that the principal basis for the First Department's decision in *Zervos* -- that *Clinton v. Jones* "unequivocally demonstrates that the presidency and the President are indeed separable," 171 A.D.3d at 124 -- was erroneous:

> The interbranch conflict here does not vanish simply . . . because the President sued in his personal capacity. ***The President is the only person who alone composes a branch of government.*** As a result, there is not always a clear line between his personal and official affairs. "The interest of the man" is often "connected with the

---

[1]     *See* Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1 ("*Zervos* App. Br."), at 13-18

K ASOWITZ  B ENSON  T ORRES llp

Hon. Verna L. Saunders
July 14, 2020
Page 3

> constitutional rights of the place." Given the close connection
> between the Office of the President and its occupant, congressional
> demands for the President's papers can implicate the relationship
> between the branches regardless [*sic*] whether those papers are
> personal or official.

*Mazars*, 2020 WL 3848061, at *11 (emphasis added) (citation omitted). In other words, *Mazars* confirms that, because "[t]he President is the only person who alone composes a branch of government," state courts may not exercise direct control over the President, "simply . . . because the President [is] sued in his personal capacity." *Id*.

Finally, plaintiff again attempts to reduce the President's Supremacy Clause argument in *Zervos* to a claim that this action constitutes an impermissible "distraction" of the President, an argument *Vance* rejected in the criminal context. (Pl. Letter at 2.) However, distraction is not the basis for the President's argument in *Zervos*. Rather, as noted (NYSCEF Doc. No. 78), the dispositive constitutional issue in *Zervos* turns not on the distraction to the President, but on state courts' inability, under the Supremacy Clause, to control the President in a civil action in the first place -- an issue that was neither addressed nor decided by *Vance*. The President argued distraction only as an additional reason why the balance of the equities favors staying this action pending the appeal in *Zervos*. (*See* NYSCEF No. 49 at 12.)

**B.  The Supreme Court's Holding in *Vance* Was Limited to the Criminal Context.**

The Supreme Court's holding in *Vance*, as noted, was limited to the criminal context, and its reasoning does not extend to civil actions.

First, the Supreme Court has repeatedly recognized that the heightened public interest in criminal actions justifies intrusions on the Executive Branch that would be impermissible in other contexts. *See Nixon v. Fitzgerald*, 457 U.S. at 754 n.37 ("The Court has recognized before there is a lesser public interest in actions for civil damages . . . in criminal prosecutions."). In fact, the Supreme Court applied that principle in *Mazars*, in which it held that while *criminal* subpoenas may issue against the President because "'the very integrity of the judicial system' would be undermined without 'full disclosure of all the facts,'" Congress's "interests are not sufficiently powerful to justify access to the President's personal papers when other sources could provide Congress the information it needs." 2020 WL 3848061, at *12 (quoting *United States v. Nixon*, 418 U.S. 683, 709 (1974)). Here, as in *Zervos*, the interest in pursuing a civil action now, as opposed to when the President is no longer in office, is plainly much less powerful than the Congressional interest the Court held was insufficient. Unlike criminal proceedings, there is no pressing need for a state court to exercise control over a sitting President in a civil action, particularly because the action can be stayed until the President is no longer in office.

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 14, 2020
Page 4

Second, in *Vance*, the cornerstone of the Supreme Court's decision was that, if state criminal proceedings threatened the independence or effectiveness of the Executive, the President would "be entitled to the protection of federal courts," by availing himself of 42 U.S.C. § 1983.  *Id.*  However, that avenue is not available to the President in civil actions.[2]  *Compare Peters v. Noonan*, No. 12-CV-234-FPG, 2020 WL 1322573, at *1 (W.D.N.Y. Mar. 20, 2020) ("The Second Circuit has read [section 1983] to preclude both injunctive and declaratory relief against a judicial officer." (citation omitted)) *with Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) (prosecutors do not enjoy absolute immunity from declaratory and injunctive relief claims under § 1983.  Therefore, because the President does not have recourse in federal courts from undue influence in civil actions, state courts may not exercise jurisdiction over a sitting President in civil actions.

Plaintiff cites to Justice Kavanaugh's concurrence in *Vance*, which stated that the President is not "above the law."  (Pl. Letter at 3.)  She omits that Justice Kavanaugh went on to say: "[a]t the same time, in light of Article II of the Constitution, this Court has repeatedly declared -- and the Court indicates again today -- that a court may not proceed against a President as it would against an ordinary litigant."  *Vance*, 2020 WL 3848062, at *13 (Kavanaugh, J., concurring).  In any event, as the Supreme Court noted in *Clinton v. Jones*, "a postponement of the judicial proceedings" during the Presidency does not place "the occupant of the Office of the President . . . 'above the law.'"  *Clinton v. Jones*, 520 U.S. at 697.  (*See generally Zervos* App. Br. at 28-29.)

Respectfully submitted,

Marc E. Kasowitz

cc:      Counsel of Record

---

[2]      *See* 42 U.S.C. § 1983 ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.")

INDEX NO. 160694/2019

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 74 of 113

RECEIVED NYSCEF: 07/14/2020

# Exhibit 1

*To be Argued by:*
MARC E. KASOWITZ
*(Time Requested: 30 Minutes)*

APL-2020-00009
New York County Clerk's Index No. 150522/17

# Court of Appeals

*of the*

# State of New York

SUMMER ZERVOS,

*Plaintiff-Respondent,*

– against –

DONALD J. TRUMP,

*Defendant-Appellant.*

## BRIEF FOR DEFENDANT-APPELLANT

KASOWITZ BENSON TORRES LLP
*Attorneys for Defendant-Appellant*
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Date Completed: March 9, 2020

## RULE 500.13(a) RELATED LITIGATION STATEMENT

This appeal affects other actions against the President, including *Galicia v. Trump*, No. 24973/2015E (Sup. Ct., N.Y. Cnty.), and *Carroll v. Trump*, No. 160694/2019 (Sup. Ct., N.Y. Cnty.), in which the President has moved for a stay pending this appeal; that motion is *sub judice*.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 8

QUESTION PRESENTED ..................................................................... 8

STATEMENT OF THE CASE ................................................................ 9

ARGUMENT ....................................................................................... 10

I.  UNDER THE U.S. CONSTITUTION, THE PRESIDENT
    EMBODIES THE EXECUTIVE BRANCH ................................................. 10

II.  THE FEDERAL JUDICIARY, BUT NOT STATE COURTS, MAY
     EXERT CONTROL OVER THE EXECUTIVE BRANCH ...................... 13

III.  ALLOWING STATE COURT JURISDICTION CONFLICTS WITH
      ARTICLE II ............................................................................................ 15

      A.  State Courts Are Bound By Article II. ................................................15

      B.  State Courts May Not Control the Official Conduct of Federal
          Officials. .........................................................................................16

      C.  State Courts May Not Control the President in Any Capacity. ..........17

IV.  THE FIRST DEPARTMENT MISREAD THE SUPREMACY
     CLAUSE AND *CLINTON V. JONES* ........................................................ 19

      A.  The Constitution Itself Displaces State Court Jurisdiction Over
          the President. ...................................................................................19

      B.  *Clinton v. Jones* Recognized That the Presidency and the
          President Are Not Separable. .............................................................21

      C.  *Clinton v. Jones* Explicitly Stated That Its Reasoning Did Not
          Apply to State Court Actions. ............................................................22

i

D.     The Concerns Raised by *Clinton v. Jones* in Footnote 13 Were Not Limited to Cases Involving the President's Official Conduct. ..............................................................................23

E.     The Mere Exercise of Jurisdiction Constitutes Impermissible Control Over the President. ................................................24

F.     Temporary State Court Immunity Does Not Place the President "Above the Law." ..............................................................28

CONCLUSION ..................................................................................... 29

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ableman v. Booth*,
  62 U.S. 506 (1858)................................................................3, 16

*Alvarez v. Snyder*,
  264 A.D.2d 27 (1st Dep't 2000) ...................................................8, 28

*In re Armand Schmoll, Inc. v. Fed. Reserve Bank of NY*,
  286 N.Y. 503 (1941) .................................................................3, 17

*Buchanan v. Alexander*,
  45 U.S. 20 (1846) ........................................................................16

*Cheney v. U.S. Dist. Court for D.C.*,
  542 U.S. 367 (2004)................................................................26, 28

*Clinton v. Jones*,
  520 U.S. 681 (1997)..............................................................*passim*

*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1983)..................................................................3, 15

*Felder v. Casey*,
  487 U.S. 131 (1988).................................................................2, 15

*Fieger v. Glen Oaks Vill.*,
  309 N.Y. 527 (1956) ....................................................................17

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010).................................................................4, 11

*Hancock v. Train*,
  426 U.S. 167 (1976).....................................................................20

*Haywood v. Drown*,
  556 U.S. 729 (2009).....................................................................19

*Licci v. Lebanese Canadian Bank, SAL*,
  20 N.Y.3d 327 (2012) ...............................................................5, 18

iii

*In re Lindsey,*
    158 F.3d 1263 (D.C. Cir. 1998) ..........................................................12

*McClung v. Silliman,*
    19 U.S. 598 (1821) ...........................................................................16

*McCulloch v. Maryland,*
    17 U.S. 316 (1819) .................................................................2, 15, 25

*Mesa v. California,*
    489 U.S. 121 (1989) ..........................................................................27

*Mitchum v. Foster,*
    407 U.S. 225 (1972) ..........................................................................27

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ....................................................................*passim*

*Rogers v. Calumet Nat'l Bank of Hammond,*
    358 U.S. 331 (1959) ..........................................................................16

*Scripps-Howard Radio v. F.C.C.,*
    316 U.S. 4 (1942) .............................................................................23

*In re Tarble,*
    80 U.S. 397 (1871) ...........................................................................16

*Tennessee v. Davis,*
    100 U.S. 257 (1879) ..........................................................................27

*Trump v. Hawaii,*
    138 S.Ct 2392 (2018). .......................................................................28

*Trump v. Mazars USA, LLP,*
    940 F.3d 710 (D.C. Cir. 2019) .......................................................5, 12

*Trump v. Vance,*
    941 F.3d 631 (2d Cir. 2019) ...........................................................4, 18

*United States v. Curtiss-Wright Export Corp.,*
    299 U.S. 304 (1936) ..........................................................................11

*United States v. Nixon*,
   418 U.S. 683 (1974)........................................................................26, 27

*Wasservogel v. Meyerowitz*,
   300 N.Y. 125 (1949) ....................................................................17

*Watson v. Philip Morris Companies, Inc.*,
   551 U.S. 142 (2007)........................................................................27

*Youngstown Sheet and Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)......................................................................5, 11

*Zervos v. Trump*,
   171 A.D.3d 110 (1st Dep't 2019) ............................................*passim*

*Zervos v. Trump*,
   2020 WL 63397, 2020 N.Y. Slip Op. 60193(U) (1st Dep't Jan. 7,
   2020) ........................................................................................10

*Zervos v. Trump*,
   59 Misc.3d 790 (Sup. Ct., N.Y. Cnty. 2018) ......................................9

**Constitutional Provisions**

N.Y. Const. art. VI, § 3 ........................................................................8

U.S. Const. art. II ..........................................................................*passim*

U.S. Const. art. VI, cl. 2 ..................................................................*passim*

**Statutes**

28 U.S.C. § 1442(a) ..........................................................................27

CPLR § 5602(b)..................................................................................8

**Other Authorities**

Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and
   Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701,
   713 (1995)................................................................................12

Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth
   Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1462 (2009) ..........28

Ken Gromley, *The Death of American Virtue: Clinton v. Starr* (2010) .................27

Jay S. Bybee, *Who Executes the Executioner?,* 2-SPG NEXUS: J.
Opinion 53 (1997) ...............................................................................12

Laurence Tribe, *American Constitutional Law* (3d ed. 2000) ..................................12

O'Connor & Hermann, *The Courts: The Perils of Paula, in* THE
CLINTON SCANDAL AND THE FUTURE OF AMERICAN GOVERNMENT
(Rozell & Wilcox ed. 2000) .................................................................27

Richard A. Posner, *Law, Pragmatism, and Democracy* (2003) .............................27

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 83 of 113

Defendant-appellant President Donald J. Trump respectfully submits this

brief in support of his appeal from the March 14, 2019 decision and order of the

Appellate Division, First Department, *Zervos v. Trump*, 171 A.D.3d 110 (1st Dep't

2019) ("*Zervos*"), denying his motion to dismiss or stay the action while he is in

office.

## PRELIMINARY STATEMENT

The question on this appeal -- an unresolved "important constitutional

issue[]," *Clinton v. Jones*, 520 U.S. 681, 690-91 (1997) -- is whether state courts

are barred by the U.S. Constitution from exercising jurisdiction over a U.S.

President while he or she is in office.  As shown below, the text and structure of

the Constitution, including the Supremacy Clause, and the decisions of the U.S.

Supreme Court, compel the conclusion that state court cases against a President --

who, under Article II of the Constitution, uniquely embodies an entire branch of

the federal government (*see infra* Part I) -- must be dismissed or stayed while the

President is in office.

In *Clinton v. Jones*, a lawsuit against President Clinton in federal court

allegedly arising, like this one, from the President's unofficial conduct, President

Clinton claimed that he was immune from suit while in office.  The Supreme Court

rejected the claim, holding that, under the Separation of Powers doctrine, while the

President does have "vast and important" overriding duties and responsibilities

under Article II of the Constitution, 520 U.S. at 697-98, those duties and responsibilities do not override the "core Article III jurisdiction" of the federal judiciary, as a coequal branch of the federal government, to decide cases and controversies, including against the President. *Id.* at 701-06.[1]

By contrast, there is no basis, under the Separation of Powers doctrine or otherwise, for state courts to assert jurisdiction over the President. Unlike federal courts, state courts are not a coequal branch of the federal government and have no jurisdiction under the Constitution to hear cases and controversies against the President. To the contrary, state courts are expressly bound by the Constitution and, unlike federal courts, have no authority coequal to the authority granted the President or any other part of the federal government:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. *See McCulloch v. Maryland*, 17 U.S. 316, 436 (1819) (Under the Supremacy Clause, "the states have no power . . . to retard, impede, burden, or in any manner control" the federal government.). *See also Felder v.*

---

[1] The Supreme Court noted that it did not need to decide and was not deciding the issue on this appeal, whether state court jurisdiction over the President would constitute impermissible direct control over the federal government. *Clinton v. Jones*, 520 U.S. at 690-91, 691 n.13. As shown herein, it does.

Case 1:20-cv-07311-LAK    Document 12-10    Filed 09/14/20    Page 85 of 113

*Casey*, 487 U.S. 131, 151 (1988) ("Just as federal courts are constitutionally obligated to apply state law to state claims, *see* [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1983)], so too the Supremacy Clause imposes on state courts a constitutional duty 'to proceed in such manner that all the substantial rights of the parties under controlling federal law [are] protected.'") (citation omitted).

As this Court, like the U.S. Supreme Court, has long held, state courts thus may not, consistent with the Supremacy Clause, exercise jurisdiction over *any* federal official, let alone the President, in a manner which would interfere with his or her official duties.  *See, e.g.*, *Ableman v. Booth*, 62 U.S. 506, 524 (1858) (It would be unconstitutional for "the authority of a State, in the form of judicial process or otherwise, [to] attempt to control [any] authorized officer or agent of the United States, in any respect," in the performance of his or her official duties.); *In re Armand Schmoll, Inc. v. Fed. Reserve Bank of N.Y.*, 286 N.Y. 503, 509 (1941) (A state court may not "control the manner in which a federal agency performs or attempts to perform its functions and duties . . . .  Assumption of such power would hamper orderly government and ignore the division of fields of government of state and nation created by the Constitution."), *cert denied*, 315 U.S. 818 (1942).

The President, however, is unlike any other federal official: the President, under the Constitution, embodies the Executive Branch and any restriction on the President necessarily restrains the Executive Branch.

For this reason, as the Supreme Court made clear in *Clinton v. Jones*, a claim of Presidential immunity in state court may very well "present a more compelling case" than such a claim in federal court:

> Because the Supremacy Clause makes federal law "the supreme Law of the Land," any direct control by a state court over the President, who has principal responsibility to ensure that those laws are "faithfully executed," may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here.

520 U.S. at 691, 691 n.13 (citations omitted). *See also Trump v. Vance*, 941 F.3d 631, 642-43 (2d Cir. 2019) (acknowledging, without deciding, that "the President may be correct that state courts lack the authority to issue him orders"), *cert. granted*, 140 S.Ct. 659 (Mem) (U.S. Dec. 13, 2019) (No. 19-635).

The President's immunity while in office from being sued in state court -- including in cases arising from alleged unofficial conduct -- thus derives from the President's "unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Article II of the Constitution, which vests "[t]he executive Power" in a single, elected "President of the United States of America," U.S. Const. art. II, § 1, cl. 1, "'makes a single President responsible for the actions of the Executive Branch,'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-97 (2010) (quoting *Clinton v. Jones*, 520 U.S. at 712-13 (Breyer, J., concurring)) -- the "'sole branch which the constitution requires to be

4

always in function,'" *Clinton v. Jones*, 520 U.S. at 717 (Breyer, J., concurring)
(quoting 10 *Works of Thomas Jefferson* 401 (P. Ford ed. 1905) (Letter from
Thomas Jefferson to George Hay (June 17, 1807))). *See also Clinton v. Jones*, 520
U.S. at 697 (The President "occupies a unique office with powers and
responsibilities so vast and important that the public interest demands that he
devote his undivided time and attention to his public duties."); *id.* at 698 ("[T]he
Presidency concentrates executive authority 'in a single head in whose choice the
whole Nation has a part . . . .'") (quoting *Youngstown Sheet and Tube Co. v.
Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring)); *Trump v. Mazars
USA, LLP*, 940 F.3d 710, 725-26 (D.C. Cir. 2019) (because "the constitutional
authority assigned to the Office of the President can be exercised only by the flesh-
and-blood human occupying that office, . . . as a practical matter, a restriction on
the person might constrain the branch of government."), *cert. granted*, 140 S.Ct.
660 (Mem) (U.S. Dec. 13, 2019) (No. 19-715).

And, as this Court has held, a court's exercise of jurisdiction over a person is
"fundamentally about a court's control over the person of the defendant," *Licci v.
Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 340 (2012). Accordingly, the very
exercise of jurisdiction by a state court over the President would constitute
impermissible "direct control," *Clinton v. Jones*, 520 U.S. at 691 n.13, over the
federal government.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 88 of 113

State courts therefore may not, consistent with the Supremacy Clause and
Article II, exercise jurisdiction over the President while he or she is in office, and,
in holding otherwise, the court below fundamentally erred.  In doing so, the First
Department misread *Clinton v. Jones* as "clearly and unequivocally
demonstrat[ing] that the presidency and the President are indeed separable."
*Zervos*, 171 A.D.3d at 124.  *Clinton v. Jones* did no such thing.  In fact, whether
the Presidency and the President are "separable" was irrelevant to the Supreme
Court's Separation of Powers analysis, under which the federal courts can have
"*partial agency* in, or . . . *controul* over the acts" of the Presidency.  *Clinton v.
Jones*, 520 U.S. at 703 (emphasis in original) (citation omitted) ("The fact that a
federal court's exercise of its traditional Article III jurisdiction may significantly
burden the time and attention of the Chief Executive is not sufficient to establish a
violation of the Constitution.").  By contrast, there is no basis in the Constitution
for state courts to have any "agency in" or "controul over," or to place any burden
on, the Chief Executive, or any other branch of the federal government.

The First Department below also erroneously stated that "*Clinton v. Jones*
did not suggest that its reasoning would not apply to state court actions." *Zervos*,
171 A.D.3d at 126.  But that is *precisely* what *Clinton v. Jones* suggested:

> [B]ecause the claim of immunity is asserted in a federal
> court and relies heavily on the doctrine of separation of
> powers that restrains each of the three branches of the
> Federal Government from encroaching on the domain of

> the other two, it is not necessary to consider or decide
> whether a comparable claim might succeed in a state
> tribunal.

520 U.S. at 691 (citation omitted). In fact, the Supreme Court took pains to note

that a state court's exercise of jurisdiction over the President raised concerns under

the Supremacy Clause "*quite different* from the interbranch separation-of-powers

questions addressed here," *id.* at 691 n.13 (emphasis added) (citations omitted),

which may "present a more compelling case for immunity," *id.* at 691.

The First Department also erroneously reasoned that "[s]ince there is no

federal law conflicting with or displacing this defamation action, the Supremacy

Clause does not provide a basis for immunizing the President from state court civil

damages actions." *Zervos*, 171 A.D.3d at 114. That misses the point. This action

is barred, not because there is conflicting federal defamation law, but because

Article II of the Constitution, under which the President embodies the Executive

Branch, "conflict[s] with" any state law allowing for state court jurisdiction over a

President while he or she is in office.

And, contrary to the First Department's statement below, affording the

President temporary immunity while in office in no way places the President

"above the law." *Zervos*, 171 A.D.3d at 121. In *Clinton v. Jones*, the Supreme

Court specifically rejected that argument: it noted that the President "does not

contend the occupant of the Office of the President is 'above the law'. . . [but]

argues merely for a postponement of the judicial proceedings that will determine whether he violated any law."  520 U.S. at 697.  *See also Nixon v. Fitzgerald*, 457 U.S. at 758 n.41 (rejecting, as "rhetorically chilling but wholly unjustified," the contention that affording the President absolute immunity from suits relating to the "outer perimeter" of his or her official duties would place the President above the law, given the analogous absolute immunity from certain claims afforded to judges and members of Congress).  In short, affording the President temporary immunity in no way places the President "above the law" any more than the absolute immunity afforded Judges, *see generally Alvarez v. Snyder*, 264 A.D.2d 27, 34 (1st Dep't 2000), places them "above the law."

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal because the underlying action originated in the Supreme Court, New York County, the First Department granted leave to appeal the decision below, and the issue on appeal involves a question of law.  (R.1251 [Order Granting Leave To Appeal].)[2]  *See* N.Y. Const. art. VI, §§ 3(a), 3(b)(4); CPLR § 5602(b).

## QUESTION PRESENTED

Does the United States Constitution bar a state court from exercising jurisdiction over the President of the United States during his or her term in office?

---

[2]     Citations to the record on appeal are to "R.___."

The Appellate Division incorrectly answered this question in the negative.

## **STATEMENT OF THE CASE**

In her complaint, respondent asserts that she suffered $2,914 in lost earnings as a result of allegedly defamatory statements made by President Trump during his presidential campaign.  (R.175 [Compl.] ¶ 81.)  President Trump moved to dismiss or stay the action on the ground, among others, that the Supremacy Clause of the Constitution bars state-court jurisdiction against a President while he or she is in office.  The trial court denied the motion, *Zervos v. Trump*, 59 Misc.3d 790 (Sup. Ct., N.Y. Cnty. 2018) (R.7 [Order Denying Motion to Dismiss]), and the President appealed.

On March 14, 2019, the First Department, in a 3-2 decision, affirmed, holding "that the Supremacy Clause was never intended to deprive a state court of its authority to decide cases and controversies under the state's constitution." *Zervos*, 171 A.D.3d at 114.  Justice Mazzarelli dissented from this holding in an opinion joined by Justice Tom:

> [S]ubjecting the President to a state trial court's jurisdiction imposes upon him a degree of control by the State of New York that interferes with his ability to carry out his constitutional duty of executing the laws of the United States.  Since the Supremacy Clause guarantees that any effort by the individual states to annul, minimize, or otherwise interfere with those laws will be struck down, it follows that any effort by a state court to control the President must likewise fail.

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 92 of 113

*Id.* at 131.

On October 18, 2019, the President filed and served notice of entry of the First Department's Order.  Notice of Entry, *Zervos v. Trump*, No. 150522/17 (Sup. Ct., N.Y. Cnty. Oct. 18, 2019), NYSCEF No. 248.

On January 7, 2020, the First Department granted President Trump's motion for leave to appeal to this Court and for a stay pending appeal.  *Zervos v. Trump*, 2020 WL 63397, 2020 N.Y. Slip Op. 60193(U) (1st Dep't Jan. 7, 2020) (R.1251 [Order Granting Leave To Appeal]).

## **ARGUMENT**

The text and structure of the Constitution, including the Supremacy Clause, and the decisions of the U.S. Supreme Court, compel the conclusion that state court cases against a President -- who, under Article II of the Constitution, uniquely embodies an entire branch of the federal government -- must be dismissed or stayed while the President is in office.

## I.   UNDER THE U.S. CONSTITUTION, THE PRESIDENT EMBODIES THE EXECUTIVE BRANCH

It is axiomatic that "[t]he President occupies a unique position in the constitutional scheme," given the President's duties and responsibilities under Article II of the Constitution.  *Nixon v. Fitzgerald*, 457 U.S. at 749-50.  Article II vests the nation's "executive Power" in a single, elected "President of the United States of America."  U.S. Const. art. II, § 1, cl. 1.  The President is "the sole organ

of the federal government in the field of international relations," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); is "Commander in Chief of the Army and Navy," U.S. Const. art. II, § 2, cl. 1; and alone is given the power to sign bills into law, the veto power, the appointment power, the treaty power and the duty to "take Care that the Laws be faithfully executed," *id.* art. I, § 7, art. II, §§ 2, 3.

Article II "makes a single President responsible for the actions of the Executive Branch." *Free Enter. Fund*, 561 U.S. at 496-97 ("[T]he President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it[.]'") (quoting *Clinton v. Jones*, 520 U.S. at 712-13 (Breyer, J., concurring)); *Clinton v. Jones*, 520 U.S. at 698 ("[T]he Presidency concentrates executive authority 'in a single head in whose choice the whole Nation has a part . . . .'") (quoting *Youngstown Sheet and Tube Co.*, 343 U.S. at 653 (Jackson, J., concurring)).

Moreover, the Executive Branch, which is embodied by the President, "is the sole branch which the constitution requires to be always in function." *Id.* at 717 (Breyer, J., concurring) (quoting 10 *Works of Thomas Jefferson* 401 (P. Ford ed. 1905) (Letter from Thomas Jefferson to George Hay (June 17, 1807))); *see also Clinton v. Jones*, 520 U.S. at 697-98 (recognizing that the President must "devote his undivided time and attention to his public duties" as "grounded in the character

of the office that was created by Article II of the Constitution").  Unlike the

President, Congress and the Judiciary, for example, can and do adjourn, and even

when in session, they can and do function without all members having to be

present.  By contrast, "interference with a President's ability to carry out his public

responsibilities is constitutionally equivalent to interference with the ability of the

entirety of Congress, or the Judicial Branch, to carry out its public obligations."

*Id.* at 713 (Breyer, J., concurring).  *See also Trump v. Mazars USA, LLP*, 940 F.3d

at 725-26  (because "the constitutional authority assigned to the Office of the

President can be exercised only by the flesh-and-blood human occupying that

office, . . . as a practical matter, a restriction on the person might constrain the

branch of government.") (citing *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir.

1998) (Tatel, J. concurring in part and dissenting in part)), *cert. granted*, 140 S.Ct.

660 (Mem) (U.S. Dec. 13, 2019) (No. 19-715); R.327 [Laurence Tribe, *American

Constitutional Law* § 4-1 (3d ed. 2000)] ("[U]nlike [the other branches of federal

government], the President . . . is a person as well as an institution; and unlike

other institutions, the Presidency is led by an individual . . . ."); Jay S. Bybee, *Who

Executes the Executioner?*, 2-SPG NEXUS: J. Opinion 53, 60 (1997) ("The

President is the only person who is also a branch of government."); Akhil Reed

Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and*

*Clinton Cases*, 108 Harv. L. Rev. 701, 713 (1995) ("Constitutionally speaking, the President never sleeps.").

## II.    THE FEDERAL JUDICIARY, BUT NOT STATE COURTS, MAY EXERT CONTROL OVER THE EXECUTIVE BRANCH

In *Clinton v. Jones*, a lawsuit against President Clinton in federal court allegedly arising, like this one, from the President's unofficial conduct, President Clinton claimed that he was immune from suit while in office.  The Supreme Court rejected the claim, holding that while the President does have "vast and important" overriding duties and responsibilities under Article II of the Constitution, 520 U.S. at 697-98, those duties and responsibilities do not override the "core Article III jurisdiction" of the federal judiciary, as a coequal branch of the federal government under the Separation of Powers doctrine, to decide cases and controversies.  *Id.* at 701-06.

The Supreme Court reasoned that under the Separation of Powers doctrine, "interactions between the Judicial Branch and the Executive, even quite burdensome interactions" are permitted because the Constitution "'imposes upon the Branches a degree of overlapping responsibility.'"  *Id.* at 702 (citations omitted).  Inasmuch as the co-equal branches of the federal government thus have "*partial agency* in, or . . . *controul* over the acts of each other," *id.* at 703 (emphasis in original) (citation omitted), the Supreme Court noted, "a federal court's exercise of its traditional Article III jurisdiction *may* significantly burden

13

the time and attention of the Chief Executive," *id.* (emphasis added). In fact, it was precisely because federal courts *do* have jurisdiction over cases involving the President's official conduct that the Supreme Court found that federal courts may also exercise jurisdiction over cases involving unofficial conduct:

> In sum, "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." If the judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct.

*Clinton v. Jones*, 520 U.S. at 705 (citation omitted).

The Supreme Court in *Clinton v. Jones* thus plainly and explicitly held that the Constitution authorized federal court jurisdiction only under the Separation of Powers doctrine. The Supreme Court's Separation of Powers analysis, and its acknowledgement of the scope of Article II, demonstrate that the Supreme Court did *not*, as the First Department erroneously put it, "effectively recognize[] that the President is presumptively subject to civil liability" for private conduct. *Zervos* 171 A.D.3d at 124. If anything, the Supreme Court effectively presumed that the President is *not* subject to such civil liability -- but overcame that presumption only because the federal judiciary (unlike state courts) is a coequal branch permitted to burden the President.

## III.   ALLOWING STATE COURT JURISDICTION CONFLICTS WITH ARTICLE II

### A.   State Courts Are Bound By Article II.

The Supreme Court's reasoning in *Clinton v. Jones* has no application to state courts; there is no basis in the Constitution for state courts, unlike federal courts, to have any "agency in" or "control over," or to place any burden on, the Chief Executive. Unlike federal courts, state courts are not a coequal branch of the federal government and, accordingly, are not authorized by the Constitution to assert control or jurisdiction over the President. To the contrary, under the Supremacy Clause, state courts are expressly bound by the Constitution, including Article II:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. *See McCulloch v. Maryland*, 17 U.S. at 436 (Under the Supremacy Clause, "the states have no power . . . to retard, impede, burden, or in any manner control" the federal government.). *See also Felder*, 487 U.S. at 151 ("Just as federal courts are constitutionally obligated to apply state law to state claims, *see* [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1983)], so too the Supremacy Clause imposes on state courts a constitutional duty 'to proceed in such manner

that all the substantial rights of the parties under controlling federal law [are]

protected.'") (citation omitted).

### B. State Courts May Not Control the Official Conduct of Federal Officials.

Moreover, under the Supremacy Clause, as the U.S. Supreme Court has long

held, state courts may not exercise jurisdiction over *any* federal official, let alone

the President, in a manner which would interfere with his or her duties. *See Rogers*

*v. Calumet Nat'l Bank of Hammond*, 358 U.S. 331, 331 (1959) ("[A] state court is

without power to review the discretion exercised by the Attorney General of the

United States under federal law."); *In re Tarble*, 80 U.S. 397, 409 (1871) ("It is

manifest that the powers of the National government could not be exercised with

energy and efficiency at all times, if its acts could be interfered with and controlled

for any period by . . . tribunals of another [state] sovereignty."); *Ableman v. Booth*,

62 U.S. 506, 524 (1858) (It would be unconstitutional for "the authority of a State,

in the form of judicial process or otherwise, [to] attempt to control [any] authorized

officer or agent of the United States, in any respect," in the performance of his or

her duties.); *Buchanan v. Alexander*, 45 U.S. 20, 20 (1846) (federal funds in the

hands of agent of the government may not "be diverted and defeated by state

process"); *McClung v. Silliman*, 19 U.S. 598, 605 (1821) (the "conduct [of an

officer of the federal government] can only be controlled by the power that created

him," *i.e.*, the federal government).

This Court has a long history of enforcing that principle.  As this Court has held, a state court may not "control the manner in which a federal agency performs or attempts to perform its functions and duties . . . .  Assumption of such power would hamper orderly government and ignore the division of fields of government of state and nation created by the Constitution."  *In re Armand Schmoll, Inc. v. Fed. Reserve Bank of N.Y.*, 286 N.Y. 503, 509 (1941), *cert denied*, 315 U.S. 818 (1942).  *See also Fieger v. Glen Oaks Vill.*, 309 N.Y. 527, 533 (1956) ("[S]tate courts have no power whatever to revise such official acts performed by Federal officials . . . ."); *Wasservogel v. Meyerowitz*, 300 N.Y. 125, 134 (1949) ("The courts of this State have never afforded, and do not now afford, any such remedies [in] . . . reviewing the acts of Federal officers . . . .").

### C.      State Courts May Not Control the President in Any Capacity.

The President is unlike any other federal official: the President, under the Constitution, embodies the Executive Branch and any restriction on the President necessarily restrains the Executive Branch.  (*See supra* Part I.)

For this reason, as the Supreme Court made clear in *Clinton v. Jones*, a claim of Presidential immunity in state court may very well "present a more compelling case" than such a claim in federal court:

> Because the Supremacy Clause makes federal law "the supreme Law of the Land," any direct control by a state court over the President, who has principal responsibility to ensure that those laws are "faithfully executed," may

implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here.

520 U.S. at 691, 691 n.13 (citations omitted).  *See also Trump v. Vance*, 941 F.3d at 642-43 (acknowledging, without deciding, that "the President may be correct that state courts lack the authority to issue him orders").

The President's immunity while in office from being sued in state court -- including in cases arising from alleged unofficial conduct -- thus derives from the President's "unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982); *see supra* Part I.

And, because, as this Court has held, a court's exercise of jurisdiction over a person is "fundamentally about a court's control over the person of the defendant," *Licci*, 20 N.Y.3d at 340, the exercise of jurisdiction by a state court over the President would in itself constitute impermissible control over the federal government, because, as shown (*supra* Part I), the President embodies the Executive Branch.  Accordingly, the very exercise of jurisdiction by a state court over the President would constitute impermissible "direct control," *Clinton v. Jones*, 520 U.S. at 691 n.13, over the federal government.

## IV.   THE FIRST DEPARTMENT MISREAD THE SUPREMACY CLAUSE AND *CLINTON V. JONES*

In reaching its erroneous conclusion that state courts may exercise jurisdiction over the President, the First Department misread the Supremacy Clause and *Clinton v. Jones.*

### A.   The Constitution Itself Displaces State Court Jurisdiction Over the President.

The First Department erroneously reasoned that "[s]ince there is no federal law conflicting with or displacing this defamation action, the Supremacy Clause does not provide a basis for immunizing the President from state court civil damages actions." *Zervos*, 171 A.D.3d at 114.  That misses the point.  This action is barred, not because there is conflicting federal defamation law, but because Article II of the Constitution, under which the President embodies the Executive Branch, "conflict[s] with" and "displace[s]" any state law allowing for state court jurisdiction over a President while he or she is in office.[3]

Under the plain text of the Supremacy Clause, the U.S. Constitution itself supersedes state law: "[t]his Constitution . . . shall be the supreme Law of the

---

[3]   The First Department also erroneously concluded that "the Supremacy Clause confers 'supreme' status on federal laws, not on the status of a federal official," *Zervos*, 171 A.D.3d at 120, based on a dissenting opinion of Justice Thomas in *Haywood v. Drown*, 556 U.S. 729, 752 (2009), which the Supreme Court had previously rejected and rejected again in that case. *Id.* at 740 n.7 (noting that "we again reject" the theory raised by the dissent).

19

Land; and the Judges in every State shall be bound thereby." U.S. Const. art. VI, cl. 2. And, as shown (*supra* Part I), it is paramount to the U.S. Constitution itself that the President embodies the entire Executive Branch, is granted express and implicit powers, privileges, and immunities, and must be "always in function." No federal law is needed. Thus, in footnote 13 of *Clinton v. Jones*, the Supreme Court explicitly stated that the Supremacy Clause -- which "makes federal law 'the supreme Law of the Land,' Art. VI, cl. 2" -- may itself prohibit "any direct control by a state court over the President" because of Article II, which, the Court noted, gives the President "principal responsibility to ensure that those laws are 'faithfully executed.'" 520 U.S. at 691 n.13; *see also id.* at 697-98 (recognizing that the President must "devote his undivided time and attention to his public duties" as "grounded in the character of the office that was created by Article II of the Constitution").[4]

Indeed, where, as here, "the rights and privileges of the Federal Government at stake . . . find their origin in the Constitution," "*[p]articular* deference should be accorded that 'old and well-known rule'" that "the instruments of the United

---

[4]     Thus, no other federal law is required. *See also Nixon v. Fitzgerald*, 457 U.S. at 748 n.27, 756 (President's absolute immunity for conduct within the "outer perimeter" of his or her official duties stems from the incidental powers conveyed to the President by Article II as a "constitutional issue" and without any "explicit affirmative action by Congress.").

States" have "immunity . . . from state control in the performance of their duties."

*Hancock v. Train*, 426 U.S. 167, 178-79 (1976) (quoting *Johnson v. Maryland*, 254

U.S. 51, 57 (1920) (Holmes, J.) (emphasis added)) (a state regulation requiring

environmental permits could not, under the Supremacy Clause, apply to federal

installations in the absence of clear and unambiguous Congressional action

explicitly allowing states to require permits for federal installations).

### B.   *Clinton v. Jones* Recognized That the Presidency and the President Are Not Separable.

The First Department stated that *Clinton v. Jones* "clearly and unequivocally

demonstrat[ed] that the Presidency and the President are indeed separable."

*Zervos*, 171 A.D.3d at 124.   *Clinton v. Jones* did no such thing.   To the contrary,

the Supreme Court expressly agreed that the President "occupies a unique office

with powers and responsibilities so vast and important that the public interest

demands that he devote his undivided time and attention to his public duties."   520

U.S. at 697-98.

In fact, whether the Presidency and the President are "separable" was

irrelevant to the Supreme Court's Separation of Powers analysis.   Under that

analysis, as the Supreme Court held, federal courts can exercise jurisdiction over

the President because the Federal Judicial Branch can have "*partial agency* in, or

. . . *controul* over the acts" of the Executive Branch.   *Clinton v. Jones*, 520 U.S. at

703 (emphasis in original) (citation omitted) ("The fact that a federal court's

exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution.").  By contrast, there is no basis in the Constitution for state courts to have any "agency in" or "controul over," or to place any burden on, the President as the embodiment of the Executive Branch of the federal government.

The First Department's erroneous conclusion that the "presidency and the President are indeed separable," was based, in large part, on its contention that the Supreme Court had "credited" the plaintiff's "historical evidence" concerning Presidential immunity.  *Zervos*, 171 A.D.3d at 123-24 (quoting *Clinton v. Jones*, 520 U.S. at 696).  Again, that is not so.  In fact, the Supreme Court explicitly rejected the conflicting historical evidence submitted both by the plaintiff and President Clinton, concluding that it "yields no net result" and "largely cancel[s] each other."  *Clinton v. Jones*, 520 U.S. at 696-97 (citation omitted).

### C. *Clinton v. Jones* Explicitly Stated That Its Reasoning Did Not Apply to State Court Actions.

The First Department below also erroneously stated that "*Clinton v. Jones* did not suggest that its reasoning would not apply to state court actions." *Zervos*, 171 A.D.3d at 126.  But that is *precisely* what *Clinton v. Jones* suggested:

> [B]ecause the claim of immunity is asserted in a federal court and relies heavily on the doctrine of separation of powers that restrains each of the three branches of the Federal Government from encroaching on the domain of the other two, it is not necessary to consider or decide

INDEX NO. 160694/2019

RECEIVED NYSCEF: 07/14/2020
Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 105 of 113

whether a comparable claim might succeed in a state tribunal.

520 U.S. at 691 (citation omitted).  In fact, the Supreme Court took pains to note that a state court's exercise of jurisdiction over the President raised concerns under the Supremacy Clause "*quite different* from the interbranch separation-of-powers questions addressed here," *id.* at 691 n.13 (emphasis added) (citations omitted), which may "present a more compelling case for immunity," *id.* at 691.[5]

### D. The Concerns Raised by *Clinton v. Jones* in Footnote 13 Were Not Limited to Cases Involving the President's Official Conduct.

The First Department deemed the concerns raised by the Supreme Court in footnote 13 of *Clinton v. Jones* -- "any direct control by a state court over the President . . .  may implicate [Supremacy Clause] concerns," 520 U.S. at 691 n.13 -- inapplicable to this state court action, because, the court below stated, the cases cited in that footnote "suggest only that the Supreme Court was concerned with a

---

[5]    The First Department also erroneously relied on the fact that Congress did not "'respond [to *Clinton v. Jones*] with appropriate legislation.'" *Zervos*, 171 A.D.3d at 126 (quoting *Clinton v. Jones*, 520 U.S. at 709).  First, following *Clinton v. Jones*, there was no need, let alone a pressing need, for Congress to pass a law immunizing the President from actions in state court, inasmuch as the Supreme Court had noted in *Clinton v. Jones* that the Supremacy Clause likely already accomplished the same result.  Moreover, as the U.S. Supreme Court has recognized, "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage.  [Courts] must be wary against interpolating [their] notions of policy in the interstices of legislative provisions."  *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 11 (1942).

state's exercise of control over the President in a way that would interfere with his execution of federal law." *Zervos*, 171 A.D.3d at 125.

But that cannot be so. As shown (*supra* at 16-17), it has long been firmly established by the Supreme Court and this Court that state courts may not interfere with the "execution of federal law" by *any* federal official. If, as the First Department held, the Supreme Court had been concerned only with state court cases involving the President's official conduct, footnote 13, and the discussion in the accompanying text, would have been entirely superfluous. Rather, the Supreme Court made clear that it was referring to state court jurisdiction over cases involving *unofficial* conduct by the President. The Supreme Court in *Clinton v. Jones* explicitly stated that the issue it did not need to decide was "whether a *comparable claim* might succeed in a state tribunal," 520 U.S. at 691 (emphasis added) -- *i.e.*, a claim comparable to the claim at issue in *Clinton v. Jones*, which involved President Clinton's private, unofficial conduct.[6]

### E.     The Mere Exercise of Jurisdiction Constitutes Impermissible Control Over the President.

The First Department erroneously concluded that state courts could exercise jurisdiction without engaging in impermissible "direct control" over the President,

---

[6]     As the First Department itself acknowledged: "aside from the forum, plaintiff's case is materially indistinguishable from *Clinton v. Jones*" and, as in *Clinton v. Jones*, "Plaintiff's state law claims . . . are based purely on [the President's] pre-presidential unofficial conduct." 171 A.D.3d at 125.

so long as they avoided finding the President in contempt, because state courts

could make "reasonable accommodations . . . with respect to the President's

schedule" and manage discovery so as to "minimize the impact on his ability to

carry out his official duties." *Zervos*, 171 A.D.3d at 127-28.  That misses the

point.  As shown (*supra* at 18), the exercise of jurisdiction is fundamentally about

control, and because the President embodies the Executive Branch and must "be

always in function," a state court's exercise of jurisdiction in itself would

constitute impermissible state control over the Executive Branch.

In any event, a state court may not, under the Supremacy Clause, determine

what constitutes "reasonable accommodations" for the President or what is a

constitutionally permissible "impact" on the President's "ability to carry out his

official duties."  By contrast, federal courts, as a coequal branch, may do so; as

shown, they are permitted to intrude into the authority and functions of -- or have

"*partial agency* in, or [] *controul* over" -- the Executive Branch in the first place.

*Clinton v. Jones*, 520 U.S. at 703.  State courts, on the other hand, "have no power

. . . to retard, impede, burden, or in any manner control" the federal government,

*McCulloch v. Maryland*, 17 U.S. at 322.

Likewise, while the First Department correctly recognized that "[i]t is likely

that holding the President in contempt would be the kind of impermissible 'direct

control' contemplated by *Clinton v. Jones* and violative of the Supremacy Clause,"

*Zervos*, 171 A.D.3d at 127 (quoting *Clinton v. Jones*, 520 U.S. at 691 n.13), it

failed to recognize that the power of the courts to issue contempt or other orders

itself also constitutes impermissible direct control.  "To require a President of the

United States to place himself in the posture of disobeying an order of a court

merely to trigger the procedural mechanism for review of the ruling would be

unseemly, and would present an unnecessary occasion for constitutional

confrontation between two branches of the Government."  *United States v. Nixon*,

418 U.S. at 691-92; *see also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367,

389-90 (2004) (courts should "avoid[] whenever possible" "'occasion[s] for

constitutional confrontation'" with the Executive Branch) (citations omitted).

As the dissent in *Zervos* correctly concluded, "once personal jurisdiction is

conferred over the President," the Supremacy Clause is violated by the "immediate

and ever-present power to issue an order requiring him to take some action, as

mundane as directing him to produce discovery or as consequential as mandating

his appearance in court on a date certain," as well as by "the very power to [hold

the President in contempt]" -- which acts as a "sword of Damocles hanging over

the President's head." *Zervos*, 171 A.D.3d at 137 (Mazzarelli, J., dissenting in

part).[7]

---

[7]    Another instance of impermissible "direct control" that clearly violates the
Supremacy Clause would be a state court ordering a President to produce
"Presidential communications," which are "presumptively privileged." *United*

26

The appropriate answer is to postpone lawsuits against the President until he or she is no longer in office.  It is not an appropriate answer, as the dissent pointed out, to allow "the litigation to proceed until such time as a constitutional crisis is at hand."  *Zervos*, 171 A.D.3d at 137 (Mazzarelli, J., dissenting in part).[8]

---

*States v. Nixon*, 418 U.S. at 711-12.  Once the President asserts executive privilege over his or her communications -- a privilege which "derive[s] from the supremacy of [Executive Branch] within its own assigned area of constitutional duties," *id.* at 705-06 -- courts evaluating that privilege are placed on a constitutional "collision course" with the Executive Branch, *Cheney*, 542 U.S. at 389.  While this places a federal court -- as a "coequal branch[] of the Government" -- in an "awkward position of evaluating the Executive's claims of confidentiality and autonomy, [that] pushes to the fore difficult questions of separation of powers and checks and balances," *id.*, a state court -- which is not a coequal branch of government -- under the Supremacy Clause, may not control the President in an area where the President is constitutionally "suprem[e]," *United States v. Nixon*, 418 U.S. at 705-06.

[8]     As the Supreme Court in *Clinton v. Jones* explained, a state court's exercise of jurisdiction over the President raises concerns over protecting federal officers from "possible local prejudice."  520 U.S. at 691 (citing 28 U.S.C. § 1442(a); *Mesa v. California*, 489 U.S. 121, 125-26 (1989)); *see also Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007) (State-court proceedings may reflect "'local prejudice' against unpopular . . . federal officials."); *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (federal courts are the "guardians of the people's federal rights"); *Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (requiring federal executive branch officials to submit to state court jurisdiction could "paralyze the operations of the government").  As numerous commentators have pointed out, "the normal incentive structures that we have to keep civil litigation in check don't apply" to lawsuits against the President because of those "who would have enormous amounts to gain by destabilizing [a] presidency."  R.565 [Ken Gormley, *The Death of American Virtue: Clinton v. Starr* 223 (2010)]; *see also* R.560 [O'Connor & Hermann, *The Courts: The Perils of Paula*, in THE CLINTON SCANDAL AND THE FUTURE OF AMERICAN GOVERNMENT 40, 56 (Rozell & Wilcox ed. 2000)]; R.317 [Richard A. Posner, *Law, Pragmatism, and Democracy* 319 (2003)].  These

### F.     Temporary State Court Immunity Does Not Place the President "Above the Law."

Contrary to the First Department's statement below, affording the President temporary immunity while in office in no way places the President "above the law." *Zervos*, 171 A.D.3d at 121.  In *Clinton v. Jones*, the Supreme Court specifically rejected that argument: it noted that the President "does not contend the occupant of the Office of the President is 'above the law'. . . [but] argues merely for a postponement of the judicial proceedings that will determine whether he violated any law."  520 U.S at 697.  *See also Cheney*, 542 U.S. at 382 (principles that provide the President unique deference "do not mean that the 'President is above the law.'  Rather they simply acknowledge that a coequal branch of Government . . . [must] give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties") (citation omitted); *Nixon v. Fitzgerald*, 457 U.S. at 758 n.41 (rejecting, as "rhetorically chilling but wholly unjustified," the contention that affording the President absolute immunity from suits relating to the "outer perimeter" of his or her official duties would place the President above the law, given the analogous absolute immunity from certain claims afforded to judges and members of Congress); Brett M. Kavanaugh,

---

concerns go beyond any "particular President" to "the Presidency itself."  *Trump v. Hawaii*, 138 S.Ct 2392, 2402 (2018).

*Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1462 (2009) ("The point is not to put the President above the law . . . but simply to defer litigation . . . until the President is out of office.").

Thus, the President, who may be sued in state court after leaving office, is no more "above the law" than is a debtor granted an automatic stay during bankruptcy proceedings. Indeed, Judges enjoy absolute, not just temporary immunity, *Alvarez*, 264 A.D.2d at 34, but that does not mean that they are above the law either. In all these cases, the immunity is there for compelling reasons and itself is part of the "law."

## CONCLUSION

For the foregoing reasons, the First Department's decision in *Zervos* should be reversed, and this action should be dismissed or stayed while the President is in office.

Respectfully submitted,

Dated:  March 9, 2020

KASOWITZ BENSON TORRES LLP

By: _____
Marc E. Kasowitz
Daniel R. Benson
Christine A. Montenegro
Paul J. Burgo

1633 Broadway

29

Case 1:20-cv-07311-LAK   Document 12-10   Filed 09/14/20   Page 112 of 113

New York, New York 10019
(212) 506-1700
mkasowitz@kasowitz.com
dbenson@kasowitz.com
cmontenegro@kasowitz.com
pburgo@kasowitz.com

*Attorneys for Defendant-Appellant Donald
J. Trump*

Case 1:20-cv-07311-LAK Document 12-10 Filed 09/14/20 Page 113 of 113

# NEW YORK STATE COURT OF APPEALS
## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to 22 NYCRR PART 500.l(j) that the foregoing brief was prepared on a computer using Microsoft Word.

*Type.* A proportionally spaced typeface was used, as follows:

    Name of Typeface:  Times New Roman
    Point size:  14
    Line spacing:  Double

*Word Count.*  The total number of words in this brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of services, certificate of compliance, corporate disclosure statement, question presented, statement of related cases, or any authorized addendum containing statutes, rules, regulations, etc., is 7,177 words.

Dated:  March 9, 2020

                                        Marc E. Kasowitz
                                        Daniel R. Benson
                                        Christine A. Montenegro
                                        Paul J. Burgo
                                        KASOWITZ BENSON TORRES LLP
                                        1633 Broadway
                                        New York, New York 10019
                                        (212) 506-1700

                                        *Attorneys for Defendant-Appellant*
                                        *Donald J. Trump*