# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE  |  SUITE 7110
NEW YORK, NEW YORK 10118
TEL (212) 763-0883  |  FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL   212.763.0884
DIRECT EMAIL   rkaplan@kaplanhecker.com

July 15, 2020

**VIA NYSCEF**

The Honorable Verna L. Saunders
Supreme Court of the State of New York, New York County
111 Centre Street, Room 934
New York, New York 10013

     *Re:*    *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty.)

Dear Justice Saunders:

     We write on behalf of Plaintiff E. Jean Carroll in response to Defendant Donald J. Trump's letter of yesterday's date. In that letter, President Trump asserts that his recent, historic defeats at the Supreme Court somehow advance his position here. This argument is as desperate as it is unconvincing—particularly when these rulings are set in the broader context, as discussed below.

     Presidents have long argued that they are immune from accountability in state and federal court, but these arguments have failed time and again, except in the special case of civil damages suits seeking to impose liability on Presidents for their official conduct. *See Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982). They failed when President Nixon asserted immunity from federal criminal subpoenas. *See United States v. Nixon*, 418 U. S. 683 (1974). They failed when President Clinton asserted immunity from civil claims filed in federal court arising from private conduct. *See Clinton v. Jones*, 520 U. S. 681 (1997). They failed when President Trump asserted immunity from state criminal subpoenas. *See Trump v. Vance*, No. 19-635 (U.S. July 9, 2020). And they failed when President Trump asserted effective immunity from Congressional subpoenas concerning his private conduct. *See Trump v. Mazars USA LLP*, No. 19-715 (U.S. July 9, 2020).

     There is a clear message here. Presidents lose when they argue that they are above the law. They lose when they argue that state courts are categorically inferior than federal courts and can't be trusted to decide sensitive questions. They lose when they argue that they are too important, or too busy, to answer for private misconduct or to provide information in connection with an investigation into whether crimes were committed. And they lose when they invent novel theories—never embraced by the Supreme Court—to assert that the Constitution forbids ordinary Americans like Ms. Carroll from seeking justice.

KAPLAN HECKER & FINK LLP                                                    2

In their July 14 letter, Messrs. Trump and Kasowitz ignore all of that. Instead, they try to unnecessarily complicate things and kick up a cloud of dust by pointing to irrelevant or incorrect distinctions between *Vance*, *Mazars*, and this case. Their arguments not only lack merit, but are clearly intended to distract the Court from the key principles at issue.

*Vance* rejected President Trump's sweeping assertion that state and federal courts should be treated differently when it comes to issuing criminal subpoenas to the President. In so doing, *Vance* rejected virtually every argument that President Trump has asserted here for treating state courts as incapable of hearing civil claims—like Ms. Carroll's claim—that could unquestionably be heard in federal court under *Clinton v. Jones*. *See* Doc. No. 98 at 10–14. In *Mazars*, the Supreme Court recognized that some suits involving the President's private affairs might also implicate his official duties. But it squarely rejected the President's blunderbuss argument that his private papers should therefore be treated the same as his official papers, explaining that "[s]uch a categorical approach would represent a significant departure from the longstanding way of doing business between the branches." Ex. A at 14 (*Trump v. Mazars* opinion). Like *Nixon*, *Clinton*, and *Vance*, *Mazars* thus confirms that suits involving the President's private conduct are different than those involving his official conduct—and thereby precludes the President's absolutist position.

President Trump wants to make the arguments here appear to be complicated. They aren't. The distinctions he has drawn to escape accountability are irrelevant. That has always been true, and the Supreme Court confirmed the point again in *Vance* and *Mazars* last week. President Trump's extreme position failed there, and it should fail here, too.

As a result, there is no reason to stay this case. Ms. Carroll should be permitted to resume discovery and obtain justice for President Trump's defamation of her good name and character.

Respectfully submitted,

Roberta A. Kaplan

cc:     Joshua Matz, Counsel of Record (via NYSCEF)

# EXHIBIT A

(Slip Opinion)          OCTOBER TERM, 2019          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP ET AL. *v.* MAZARS USA, LLP, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 19–715.   Argued May 12, 2020—Decided July 9, 2020*

In April 2019, three committees of the U. S. House of Representatives issued four subpoenas seeking information about the finances of President Donald J. Trump, his children, and affiliated businesses.  The House Committee on Financial Services issued a subpoena to Deutsche Bank seeking any document related to account activity, due diligence, foreign transactions, business statements, debt schedules, statements of net worth, tax returns, and suspicious activity identified by Deutsche Bank.  It issued a second subpoena to Capital One for similar information.  The Permanent Select Committee on Intelligence issued a subpoena to Deutsche Bank that mirrored the subpoena issued by the Financial Services Committee.  And the House Committee on Oversight and Reform issued a subpoena to the President's personal accounting firm, Mazars USA, LLP, demanding information related to the President and several affiliated businesses.  Although each of the committees sought overlapping sets of financial documents, each supplied different justifications for the requests, explaining that the information would help guide legislative reform in areas ranging from money laundering and terrorism to foreign involvement in U. S. elections.  Petitioners—the President in his personal capacity, along with his children and affiliated businesses—contested the subpoena issued by the Oversight Committee in the District Court for the District of Columbia (*Mazars*, No. 19–715) and the subpoenas issued by the Financial Services and Intelligence Committees in the Southern District of New York (*Deutsche Bank*, No. 19–760).  In both cases, petitioners contended that the subpoenas lacked a legitimate legislative purpose

——————

*Together with 19–760, *Trump et al.* v. *Deutsche Bank AG et al.*, on certiorari to the United States Court of Appeals for the Second Circuit.

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 5 of 85

and violated the separation of powers. The President did not, however, argue that any of the requested records were protected by executive privilege.

In *Mazars*, the District Court granted judgment for the House and the D. C. Circuit affirmed, finding that the subpoena issued by the Oversight Committee served a valid legislative purpose because the requested information was relevant to reforming financial disclosure requirements for Presidents and presidential candidates. In *Deutsche Bank*, the District Court denied a preliminary injunction and the Second Circuit affirmed in substantial part, holding that the Intelligence Committee properly issued its subpoena to Deutsche Bank as part of an investigation into alleged foreign influence in the U. S. political process, which could inform legislation to strengthen national security and combat foreign meddling. The court also concluded that the subpoenas issued by the Financial Services Committee to Deutsche Bank and Capital One were adequately related to potential legislation on money laundering, terrorist financing, and the global movement of illicit funds through the real estate market.

*Held*: The courts below did not take adequate account of the significant separation of powers concerns implicated by congressional subpoenas for the President's information. Pp. 7–20.

(a) Historically, disputes over congressional demands for presidential documents have been resolved by the political branches through negotiation and compromise without involving this Court. The Court recognizes that this dispute is the first of its kind to reach the Court; that such disputes can raise important issues concerning relations between the branches; that similar disputes recur on a regular basis, including in the context of deeply partisan controversy; and that Congress and the Executive have nonetheless managed for over two centuries to resolve these disputes among themselves without Supreme Court guidance. Such longstanding practice "'is a consideration of great weight'" in cases concerning "the allocation of power between [the] two elected branches of Government," and it imposes on the Court a duty of care to ensure that it does not needlessly disturb "the compromises and working arrangements" reached by those branches. *NLRB* v. *Noel Canning*, 573 U. S. 513, 524–526 (quoting *The Pocket Veto Case*, 279 U. S. 655, 689). Pp. 7–11.

(b) Each House of Congress has the power "to secure needed information" in order to legislate. *McGrain* v. *Daugherty*, 273 U. S. 135, 161. This power is "indispensable" because, without information, Congress would be unable to legislate wisely or effectively. *Watkins* v. *United States*, 354 U. S. 178, 215. Because this power is "justified solely as an adjunct to the legislative process," it is subject to several limitations. *Id.*, at 197. Most importantly, a congressional subpoena

is valid only if it is "related to, and in furtherance of, a legitimate task of the Congress." *Id.*, at 187. The subpoena must serve a "valid legislative purpose." *Quinn* v. *United States*, 349 U. S. 155, 161. Furthermore, Congress may not issue a subpoena for the purpose of "law enforcement," because that power is assigned to the Executive and the Judiciary. *Ibid.* Finally, recipients of congressional subpoenas retain their constitutional rights and various privileges throughout the course of an investigation. Pp. 11–12.

(c) The President contends, as does the Solicitor General on behalf of the United States, that congressional subpoenas for the President's information should be evaluated under the standards set forth in *United States* v. *Nixon*, 418 U. S. 683, and *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F. 2d 725, which would require the House to show that the requested information satisfies a "demonstrated, specific need," 418 U. S., at 713, and is "demonstrably critical" to a legislative purpose, 498 F. 2d, at 731. *Nixon* and *Senate Select Committee,* however, involved subpoenas for communications between the President and his close advisers, over which the President asserted executive privilege. Because executive privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch, information subject to the privilege deserves "the greatest protection consistent with the fair administration of justice." 418 U. S., at 715. That protection should not be transplanted root and branch to cases involving nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations. The standards proposed by the President and the Solicitor General— if applied outside the context of privileged information—would risk seriously impeding Congress in carrying out its responsibilities, giving short shrift to its important interests in conducting inquiries to obtain information needed to legislate effectively. Pp. 12–14.

(d) The approach proposed by the House, which relies on precedents that did not involve the President's papers, fails to take adequate account of the significant separation of powers issues raised by congressional subpoenas for the President's information. The House's approach would leave essentially no limits on the congressional power to subpoena the President's personal records. A limitless subpoena power could transform the established practice of the political branches and allow Congress to aggrandize itself at the President's expense. These separation of powers concerns are unmistakably implicated by the subpoenas here, which represent not a run-of-the-mill legislative effort but rather a clash between rival branches of government over records of intense political interest for all involved. The interbranch conflict does not vanish simply because the subpoenas seek personal papers or because the President sued in his personal capacity.

Nor are separation of powers concerns less palpable because the sub-poenas were issued to third parties. Pp. 14–18.

(e) Neither side identifies an approach that adequately accounts for these weighty separation of powers concerns. A balanced approach is necessary, one that takes a "considerable impression" from "the prac-tice of the government," *McCulloch* v. *Maryland*, 4 Wheat. 316, 401, and "resist[s]" the "pressure inherent within each of the separate Branches to exceed the outer limits of its power," *INS* v. *Chadha*, 462 U. S. 919, 951. In assessing whether a subpoena directed at the Pres-ident's personal information is "related to, and in furtherance of, a le-gitimate task of the Congress," *Watkins*, 354 U. S., at 187, courts must take adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the unique position of the President.

Several special considerations inform this analysis. First, courts should carefully assess whether the asserted legislative purpose war-rants the significant step of involving the President and his papers. "'[O]ccasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible." *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 389–390 (quoting *Nixon*, 418 U. S., at 692). Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective. Second, to narrow the scope of possible conflict between the branches, courts should insist on a subpoena no broader than reasonably necessary to support Con-gress's legislative objective. The specificity of the subpoena's request "serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." *Cheney*, 542 U. S., at 387. Third, courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose. The more detailed and substantial, the better. That is par-ticularly true when Congress contemplates legislation that raises sen-sitive constitutional issues, such as legislation concerning the Presi-dency. Fourth, courts should assess the burdens imposed on the President by a subpoena, particularly because they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage. Other considerations may be pertinent as well; one case every two centuries does not afford enough experience for an exhaustive list. Pp. 18–20.

No. 19–715, 940 F. 3d 710; No. 19–760, 943 F. 3d 627, vacated and re-manded.

ROBERTS, C. J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined.

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 8 of 85

Cite as:  591 U. S. ____ (2020)          5

Syllabus

THOMAS, J., and ALITO, J., filed dissenting opinions.

Cite as: 591 U. S. ____ (2020)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–715 and 19–760

_____

### DONALD J. TRUMP, ET AL., PETITIONERS

19–715    *v.*

### MAZARS USA, LLP, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

### DONALD J. TRUMP, ET AL., PETITIONERS

19–760    *v.*

### DEUTSCHE BANK AG, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

Over the course of five days in April 2019, three commit-
tees of the U. S. House of Representatives issued four sub-
poenas seeking information about the finances of President
Donald J. Trump, his children, and affiliated businesses.
We have held that the House has authority under the Con-
stitution to issue subpoenas to assist it in carrying out its
legislative responsibilities. The House asserts that the fi-
nancial information sought here—encompassing a decade's
worth of transactions by the President and his family—will
help guide legislative reform in areas ranging from money
laundering and terrorism to foreign involvement in U. S.

FILED: NEW YORK COUNTY CLERK 07/15/2020 05:07 PM

NYSCEF DOC. NO. 102

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 10 of 85

elections.  The President contends that the House lacked a valid legislative aim and instead sought these records to harass him, expose personal matters, and conduct law enforcement activities beyond its authority.  The question presented is whether the subpoenas exceed the authority of the House under the Constitution.

We have never addressed a congressional subpoena for the President's information.  Two hundred years ago, it was established that Presidents may be subpoenaed during a federal criminal proceeding, *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807) (Marshall, Cir. J.), and earlier today we extended that ruling to state criminal proceedings, *Trump* v. *Vance*, *ante*, p. ___.  Nearly fifty years ago, we held that a federal prosecutor could obtain information from a President despite assertions of executive privilege, *United States* v. *Nixon*, 418 U. S. 683 (1974), and more recently we ruled that a private litigant could subject a President to a damages suit and appropriate discovery obligations in federal court, *Clinton* v. *Jones*, 520 U. S. 681 (1997).

This case is different.  Here the President's information is sought not by prosecutors or private parties in connection with a particular judicial proceeding, but by committees of Congress that have set forth broad legislative objectives.  Congress and the President—the two political branches established by the Constitution—have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity.  See The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring).  That distinctive aspect necessarily informs our analysis of the question before us.

I

A

Each of the three committees sought overlapping sets of

Case 1:20-cv-07311-LAK Document 12-11 Filed 09/14/20 Page 11 of 85

financial documents, but each supplied different justifications for the requests.

The House Committee on Financial Services issued two subpoenas, both on April 11, 2019. App. 128, 154, 226. The first, issued to Deutsche Bank, seeks the financial information of the President, his children, their immediate family members, and several affiliated business entities. Specifically, the subpoena seeks any document related to account activity, due diligence, foreign transactions, business statements, debt schedules, statements of net worth, tax returns, and suspicious activity identified by Deutsche Bank. The second, issued to Capital One, demands similar financial information with respect to more than a dozen business entities associated with the President. The Deutsche Bank subpoena requests materials from "2010 through the present," and the Capital One subpoena covers "2016 through the present," but both subpoenas impose no time limitations for certain documents, such as those connected to account openings and due diligence. *Id.,* at 128, 155.

According to the House, the Financial Services Committee issued these subpoenas pursuant to House Resolution 206, which called for "efforts to close loopholes that allow corruption, terrorism, and money laundering to infiltrate our country's financial system." H. Res. 206, 116th Cong., 1st Sess., 5 (Mar. 13, 2019). Such loopholes, the resolution explained, had allowed "illicit money, including from Russian oligarchs," to flow into the United States through "anonymous shell companies" using investments such as "luxury high-end real estate." *Id.,* at 3. The House also invokes the oversight plan of the Financial Services Committee, which stated that the Committee intends to review banking regulation and "examine the implementation, effectiveness, and enforcement" of laws designed to prevent money laundering and the financing of terrorism.

4  TRUMP *v.* MAZARS USA, LLP

Opinion of the Court

H. R. Rep. No. 116–40, p. 84 (2019). The plan further provided that the Committee would "consider proposals to prevent the abuse of the financial system" and "address any vulnerabilities identified" in the real estate market. *Id.*, at 85.

On the same day as the Financial Services Committee, the Permanent Select Committee on Intelligence issued an identical subpoena to Deutsche Bank—albeit for different reasons. According to the House, the Intelligence Committee subpoenaed Deutsche Bank as part of an investigation into foreign efforts to undermine the U. S. political process. Committee Chairman Adam Schiff had described that investigation in a previous statement, explaining that the Committee was examining alleged attempts by Russia to influence the 2016 election; potential links between Russia and the President's campaign; and whether the President and his associates had been compromised by foreign actors or interests. Press Release, House Permanent Select Committee on Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6, 2019). Chairman Schiff added that the Committee planned "to develop legislation and policy reforms to ensure the U. S. government is better positioned to counter future efforts to undermine our political process and national security." *Ibid.*

Four days after the Financial Services and Intelligence Committees, the House Committee on Oversight and Reform issued another subpoena, this time to the President's personal accounting firm, Mazars USA, LLP. The subpoena demanded information related to the President and several affiliated business entities from 2011 through 2018, including statements of financial condition, independent auditors' reports, financial reports, underlying source documents, and communications between Mazars and the President or his businesses. The subpoena also requested all engagement agreements and contracts "[w]ithout regard to time." App. to Pet. for Cert. in 19–715, p. 230.

Opinion of the Court

Chairman Elijah Cummings explained the basis for the subpoena in a memorandum to the Oversight Committee. According to the chairman, recent testimony by the President's former personal attorney Michael Cohen, along with several documents prepared by Mazars and supplied by Cohen, raised questions about whether the President had accurately represented his financial affairs. Chairman Cummings asserted that the Committee had "full authority to investigate" whether the President: (1) "may have engaged in illegal conduct before and during his tenure in office," (2) "has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions," (3) "is complying with the Emoluments Clauses of the Constitution," and (4) "has accurately reported his finances to the Office of Government Ethics and other federal entities." App. in No. 19–5142 (CADC), p. 107. "The Committee's interest in these matters," Chairman Cummings concluded, "informs its review of multiple laws and legislative proposals under our jurisdiction." *Ibid.*

B

Petitioners—the President in his personal capacity, along with his children and affiliated businesses—filed two suits challenging the subpoenas. They contested the subpoena issued by the Oversight Committee in the District Court for the District of Columbia (*Mazars*, No. 19–715), and the subpoenas issued by the Financial Services and Intelligence Committees in the Southern District of New York (*Deutsche Bank*, No. 19–760). In both cases, petitioners contended that the subpoenas lacked a legitimate legislative purpose and violated the separation of powers. The President did not, however, resist the subpoenas by arguing that any of the requested records were protected by executive privilege. For relief, petitioners asked for declaratory judgments and injunctions preventing Mazars and the banks from complying with the subpoenas. Although named as defendants,

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 14 of 85

6                     TRUMP *v.* MAZARS USA, LLP

Opinion of the Court

Mazars and the banks took no positions on the legal issues
in these cases, and the House committees intervened to de-
fend the subpoenas.

Petitioners' challenges failed.   In *Mazars*, the District
Court granted judgment for the House, 380 F. Supp. 3d 76
(DC 2019), and the D. C. Circuit affirmed, 940 F. 3d 710
(2019).   In upholding the subpoena issued by the Oversight
Committee to Mazars, the Court of Appeals found that the
subpoena served a "valid legislative purpose" because the
requested information was relevant to reforming financial
disclosure requirements for Presidents and presidential
candidates.  *Id.*, at 726–742 (internal quotation marks omit-
ted).  Judge Rao dissented.  As she saw it, the "gravamen"
of the subpoena was investigating alleged illegal conduct by
the President, and the House must pursue such wrongdoing
through its impeachment powers, not its legislative powers.
*Id.*, at 773–774.  Otherwise, the House could become a "rov-
ing inquisition over a co-equal branch of government."  *Id.*,
at 748.  The D. C. Circuit denied rehearing en banc over
several more dissents.  941 F. 3d 1180, 1180–1182 (2019).

In *Deutsche Bank*, the District Court denied a prelimi-
nary injunction, 2019 WL 2204898 (SDNY, May 22, 2019),
and the Second Circuit affirmed "in substantial part," 943
F. 3d 627, 676 (2019).  While acknowledging that the sub-
poenas are "surely broad in scope," the Court of Appeals
held that the Intelligence Committee properly issued its
subpoena to Deutsche Bank as part of an investigation into
alleged foreign influence over petitioners and Russian in-
terference with the U. S. political process.  *Id.*, at 650, 658–
659.  That investigation, the court concluded, could inform
legislation to combat foreign meddling and strengthen na-
tional security.  *Id.*, at 658–659, and n. 59.

As to the subpoenas issued by the Financial Services
Committee to Deutsche Bank and Capital One, the Court of
Appeals concluded that they were adequately related to po-
tential legislation on money laundering, terrorist financing,

Case 1:20-cv-07311-LAK Document 12-11 Filed 09/14/20 Page 15 of 85

and the global movement of illicit funds through the real estate market. *Id.*, at 656–659. Rejecting the contention that the subpoenas improperly targeted the President, the court explained in part that the President's financial dealings with Deutsche Bank made it "appropriate" for the House to use him as a "case study" to determine "whether new legislation is needed." *Id.*, at 662–663, n. 67.[1]

Judge Livingston dissented, seeing no "clear reason why a congressional investigation aimed generally at closing regulatory loopholes in the banking system need focus on over a decade of financial information regarding this President, his family, and his business affairs." *Id.*, at 687.

We granted certiorari in both cases and stayed the judgments below pending our decision. 589 U. S. ___ (2019).

## II
### A

The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).

That practice began with George Washington and the

---

[1] The Court of Appeals directed a "limited" remand for the District Court to consider whether it was necessary to disclose certain "sensitive personal details" (such as documents reflecting medical services received by employees of the Trump business entities) and a "few" documents that might not relate to the committees' legislative purposes. 943 F. 3d 627, 667–668, 675 (2019). The Court of Appeals ordered that all other documents be "promptly transmitted" to the committees. *Id.*, at 669.

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 16 of 85

early Congress. In 1792, a House committee requested Executive Branch documents pertaining to General St. Clair's campaign against the Indians in the Northwest Territory, which had concluded in an utter rout of federal forces when they were caught by surprise near the present-day border between Ohio and Indiana. See T. Taylor, Grand Inquest: The Story of Congressional Investigations 19–23 (1955). Since this was the first such request from Congress, President Washington called a Cabinet meeting, wishing to take care that his response "be rightly conducted" because it could "become a precedent." 1 Writings of Thomas Jefferson 189 (P. Ford ed. 1892).

The meeting, attended by the likes of Alexander Hamilton, Thomas Jefferson, Edmund Randolph, and Henry Knox, ended with the Cabinet of "one mind": The House had authority to "institute inquiries" and "call for papers" but the President could "exercise a discretion" over disclosures, "communicat[ing] such papers as the public good would permit" and "refus[ing]" the rest. *Id.*, at 189–190. President Washington then dispatched Jefferson to speak to individual congressmen and "bring them by persuasion into the right channel." *Id.*, at 190. The discussions were apparently fruitful, as the House later narrowed its request and the documents were supplied without recourse to the courts. See 3 Annals of Cong. 536 (1792); Taylor, *supra*, at 24.

Jefferson, once he became President, followed Washington's precedent. In early 1807, after Jefferson had disclosed that "sundry persons" were conspiring to invade Spanish territory in North America with a private army, 16 Annals of Cong. 686–687, the House requested that the President produce any information in his possession touching on the conspiracy (except for information that would harm the public interest), *id.*, at 336, 345, 359. Jefferson chose not to divulge the entire "voluminous" correspondence on the sub-

ject, explaining that much of it was "private" or mere "rumors" and "neither safety nor justice" permitted him to "expos[e] names" apart from identifying the conspiracy's "principal actor": Aaron Burr. *Id.*, at 39–40. Instead of the entire correspondence, Jefferson sent Congress particular documents and a special message summarizing the conspiracy. *Id.*, at 39–43; see generally *Vance*, *ante*, at 3–4. Neither Congress nor the President asked the Judiciary to intervene.[2]

Ever since, congressional demands for the President's information have been resolved by the political branches without involving this Court. The Reagan and Clinton presidencies provide two modern examples:

During the Reagan administration, a House subcommittee subpoenaed all documents related to the Department of the Interior's decision whether to designate Canada a reciprocal country for purposes of the Mineral Lands Leasing Act. President Reagan directed that certain documents be withheld because they implicated his confidential relationship with subordinates. While withholding those documents, the administration made "repeated efforts" at accommodation through limited disclosures and testimony over a period of several months. 6 Op. of Office of Legal Counsel 751, 780 (1982). Unsatisfied, the subcommittee and its parent committee eventually voted to hold the Secretary of the Interior in contempt, and an innovative compromise soon followed: All documents were made available, but only for one day with no photocopying, minimal notetaking, and no participation by non-Members of Congress. *Id.*, at 780–781; see H. R. Rep. No. 97–898, pp. 3–8 (1982).

---

[2] By contrast, later that summer, the Judiciary *was* called on to resolve whether President Jefferson could be issued a subpoena *duces tecum* arising from Burr's criminal trial. See *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807); see also *Trump* v. *Vance*, *ante*, at 5–7.

10          TRUMP *v.* MAZARS USA, LLP

   In 1995, a Senate committee subpoenaed notes taken by
a White House attorney at a meeting with President Clin-
ton's personal lawyers concerning the Whitewater contro-
versy.  The President resisted the subpoena on the ground
that the notes were protected by attorney-client privilege,
leading to "long and protracted" negotiations and a Senate
threat to seek judicial enforcement of the subpoena.  S. Rep.
No. 104–204, pp. 16–17 (1996).  Eventually the parties
reached an agreement, whereby President Clinton avoided
the threatened suit, agreed to turn over the notes, and ob-
tained the Senate's concession that he had not waived any
privileges.  *Ibid.*; see L. Fisher, Congressional Research
Service, Congressional Investigations: Subpoenas and Con-
tempt Power 16–18 (2003).
   Congress and the President maintained this tradition of
negotiation and compromise—without the involvement of
this Court—until the present dispute.  Indeed, from Presi-
dent Washington until now, we have never considered a dis-
pute over a congressional subpoena for the President's rec-
ords.  And, according to the parties, the appellate courts
have addressed such a subpoena only once, when a Senate
committee subpoenaed President Nixon during the Wa-
tergate scandal.  See *infra*, at 13 (discussing *Senate Select
Committee on Presidential Campaign Activities* v. *Nixon*,
498 F. 2d 725 (CADC 1974) (en banc)).  In that case, the
court refused to enforce the subpoena, and the Senate did
not seek review by this Court.
   This dispute therefore represents a significant departure
from historical practice.  Although the parties agree that
this particular controversy is justiciable, we recognize that
it is the first of its kind to reach this Court; that disputes of
this sort can raise important issues concerning relations be-
tween the branches; that related disputes involving con-
gressional efforts to seek official Executive Branch infor-
mation recur on a regular basis, including in the context of

Opinion of the Court

deeply partisan controversy; and that Congress and the Ex-
ecutive have nonetheless managed for over two centuries to
resolve such disputes among themselves without the bene-
fit of guidance from us. Such longstanding practice "'is a
consideration of great weight'" in cases concerning "the al-
location of power between [the] two elected branches of Gov-
ernment," and it imposes on us a duty of care to ensure that
we not needlessly disturb "the compromises and working
arrangements that [those] branches . . . themselves have
reached." *NLRB* v. *Noel Canning*, 573 U. S. 513, 524–526
(2014) (quoting *The Pocket Veto Case*, 279 U. S. 655, 689
(1929)). With that in mind, we turn to the question
presented.

### B

Congress has no enumerated constitutional power to con-
duct investigations or issue subpoenas, but we have held
that each House has power "to secure needed information"
in order to legislate. *McGrain* v. *Daugherty*, 273 U. S. 135,
161 (1927). This "power of inquiry—with process to enforce
it—is an essential and appropriate auxiliary to the legisla-
tive function." *Id.*, at 174. Without information, Congress
would be shooting in the dark, unable to legislate "wisely or
effectively." *Id.*, at 175. The congressional power to obtain
information is "broad" and "indispensable." *Watkins* v.
*United States*, 354 U. S. 178, 187, 215 (1957). It encom-
passes inquiries into the administration of existing laws,
studies of proposed laws, and "surveys of defects in our so-
cial, economic or political system for the purpose of enabling
the Congress to remedy them." *Id.*, at 187.

Because this power is "justified solely as an adjunct to the
legislative process," it is subject to several limitations. *Id.*,
at 197. Most importantly, a congressional subpoena is valid
only if it is "related to, and in furtherance of, a legitimate
task of the Congress." *Id.*, at 187. The subpoena must serve
a "valid legislative purpose," *Quinn* v. *United States*, 349

12          TRUMP *v.* MAZARS USA, LLP

Opinion of the Court

U. S. 155, 161 (1955); it must "concern[] a subject on which legislation 'could be had,'" *Eastland* v. *United States Servicemen's Fund*, 421 U. S. 491, 506 (1975) (quoting *McGrain*, 273 U. S., at 177).

Furthermore, Congress may not issue a subpoena for the purpose of "law enforcement," because "those powers are assigned under our Constitution to the Executive and the Judiciary." *Quinn*, 349 U. S., at 161. Thus Congress may not use subpoenas to "try" someone "before [a] committee for any crime or wrongdoing." *McGrain*, 273 U. S., at 179. Congress has no "'general' power to inquire into private affairs and compel disclosures," *id.*, at 173–174, and "there is no congressional power to expose for the sake of exposure," *Watkins*, 354 U. S., at 200. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.*, at 187.

Finally, recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation. See *id.*, at 188, 198. And recipients have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege. See, *e.g.*, Congressional Research Service, *supra,* at 16–18 (attorney-client privilege); *Senate Select Committee*, 498 F. 2d, at 727, 730–731 (executive privilege).

C

The President contends, as does the Solicitor General appearing on behalf of the United States, that the usual rules for congressional subpoenas do not govern here because the President's papers are at issue. They argue for a more demanding standard based in large part on cases involving the Nixon tapes—recordings of conversations between President Nixon and close advisers discussing the break-in at the Democratic National Committee's headquarters at

Opinion of the Court

the Watergate complex. The tapes were subpoenaed by a Senate committee and the Special Prosecutor investigating the break-in, prompting President Nixon to invoke executive privilege and leading to two cases addressing the showing necessary to require the President to comply with the subpoenas. See *Nixon*, 418 U. S. 683; *Senate Select Committee*, 498 F. 2d 725.

Those cases, the President and the Solicitor General now contend, establish the standard that should govern the House subpoenas here. Quoting *Nixon*, the President asserts that the House must establish a "demonstrated, specific need" for the financial information, just as the Watergate special prosecutor was required to do in order to obtain the tapes. 418 U. S., at 713. And drawing on *Senate Select Committee*—the D. C. Circuit case refusing to enforce the Senate subpoena for the tapes—the President and the Solicitor General argue that the House must show that the financial information is "demonstrably critical" to its legislative purpose. 498 F. 2d, at 731.

We disagree that these demanding standards apply here. Unlike the cases before us, *Nixon* and *Senate Select Committee* involved Oval Office communications over which the President asserted executive privilege. That privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is "fundamental to the operation of Government." *Nixon*, 418 U. S., at 708. As a result, information subject to executive privilege deserves "the greatest protection consistent with the fair administration of justice." *Id.*, at 715. We decline to transplant that protection root and branch to cases involving nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations.

The standards proposed by the President and the Solicitor General—if applied outside the context of privileged information—would risk seriously impeding Congress in carrying out its responsibilities. The President and the

14                TRUMP *v.* MAZARS USA, LLP

Opinion of the Court

Solicitor General would apply the same exacting standards to *all* subpoenas for the President's information, without recognizing distinctions between privileged and nonprivileged information, between official and personal information, or between various legislative objectives. Such a categorical approach would represent a significant departure from the longstanding way of doing business between the branches, giving short shrift to Congress's important interests in conducting inquiries to obtain the information it needs to legislate effectively. Confounding the legislature in that effort would be contrary to the principle that:

> "It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." *United States* v. *Rumely*, 345 U. S. 41, 43 (1953) (internal quotation marks omitted).

Legislative inquiries might involve the President in appropriate cases; as noted, Congress's responsibilities extend to "every affair of government." *Ibid.* (internal quotation marks omitted). Because the President's approach does not take adequate account of these significant congressional interests, we do not adopt it.

D

The House meanwhile would have us ignore that these suits involve the President. Invoking our precedents concerning investigations that did not target the President's papers, the House urges us to uphold its subpoenas because they "relate[] to a valid legislative purpose" or "concern[] a

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 23 of 85

subject on which legislation could be had." Brief for Respondent 46 (quoting *Barenblatt* v. *United States*, 360 U. S. 109, 127 (1959), and *Eastland*, 421 U. S., at 506). That approach is appropriate, the House argues, because the cases before us are not "momentous separation-of-powers disputes." Brief for Respondent 1.

Largely following the House's lead, the courts below treated these cases much like any other, applying precedents that do not involve the President's papers. See 943 F. 3d, at 656–670; 940 F. 3d, at 724–742. The Second Circuit concluded that "this case does not concern separation of powers" because the House seeks personal documents and the President sued in his personal capacity. 943 F. 3d, at 669. The D. C. Circuit, for its part, recognized that "separation-of-powers concerns still linger in the air," and therefore it did not afford deference to the House. 940 F. 3d, at 725–726. But, because the House sought only personal documents, the court concluded that the case "present[ed] no direct interbranch dispute." *Ibid.*

The House's approach fails to take adequate account of the significant separation of powers issues raised by congressional subpoenas for the President's information. Congress and the President have an ongoing institutional relationship as the "opposite and rival" political branches established by the Constitution. The Federalist No. 51, at 349. As a result, congressional subpoenas directed at the President differ markedly from congressional subpoenas we have previously reviewed, *e.g.*, *Barenblatt*, 360 U. S., at 127; *Eastland*, 421 U. S., at 506, and they bear little resemblance to criminal subpoenas issued to the President in the course of a specific investigation, see *Vance*, *ante*, p. ___; *Nixon*, 418 U. S. 683. Unlike those subpoenas, congressional subpoenas for the President's information unavoidably pit the political branches against one another. Cf. *In re Sealed Case*, 121 F. 3d 729, 753 (CADC 1997) ("The Presi-

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 24 of 85

16           TRUMP *v.* MAZARS USA, LLP

Opinion of the Court

dent's ability to withhold information from Congress impli-
cates different constitutional considerations than the Pres-
ident's ability to withhold evidence in judicial proceed-
ings.").

Far from accounting for separation of powers concerns,
the House's approach aggravates them by leaving essen-
tially no limits on the congressional power to subpoena the
President's personal records. Any personal paper possessed
by a President could potentially "relate to" a conceivable
subject of legislation, for Congress has broad legislative
powers that touch a vast number of subjects. Brief for Re-
spondent 46. The President's financial records could relate
to economic reform, medical records to health reform, school
transcripts to education reform, and so on. Indeed, at ar-
gument, the House was unable to identify *any* type of infor-
mation that lacks some relation to potential legislation. See
Tr. of Oral Arg. 52–53, 62–65.

Without limits on its subpoena powers, Congress could
"exert an imperious controul" over the Executive Branch
and aggrandize itself at the President's expense, just as the
Framers feared. The Federalist No. 71, at 484 (A. Hamil-
ton); see *id.*, No. 48, at 332–333 (J. Madison); *Bowsher* v.
*Synar*, 478 U. S. 714, 721–722, 727 (1986). And a limitless
subpoena power would transform the "established practice"
of the political branches. *Noel Canning*, 573 U. S., at 524
(internal quotation marks omitted). Instead of negotiating
over information requests, Congress could simply walk
away from the bargaining table and compel compliance in
court.

The House and the courts below suggest that these sepa-
ration of powers concerns are not fully implicated by the
particular subpoenas here, but we disagree. We would have
to be "blind" not to see what "[a]ll others can see and under-
stand": that the subpoenas do not represent a run-of-the-
mill legislative effort but rather a clash between rival

branches of government over records of intense political interest for all involved. *Rumely*, 345 U. S., at 44 (quoting *Child Labor Tax Case*, 259 U. S. 20, 37 (1922) (Taft, C. J.)).

The interbranch conflict here does not vanish simply because the subpoenas seek personal papers or because the President sued in his personal capacity. The President is the only person who alone composes a branch of government. As a result, there is not always a clear line between his personal and official affairs. "The interest of the man" is often "connected with the constitutional rights of the place." The Federalist No. 51, at 349. Given the close connection between the Office of the President and its occupant, congressional demands for the President's papers can implicate the relationship between the branches regardless whether those papers are personal or official. Either way, a demand may aim to harass the President or render him "complaisan[t] to the humors of the Legislature." *Id.*, No. 71, at 483. In fact, a subpoena for personal papers may pose a heightened risk of such impermissible purposes, precisely because of the documents' personal nature and their less evident connection to a legislative task. No one can say that the controversy here is less significant to the relationship between the branches simply because it involves personal papers. Quite the opposite. That appears to be what makes the matter of such great consequence to the President and Congress.

In addition, separation of powers concerns are no less palpable here simply because the subpoenas were issued to third parties. Congressional demands for the President's information present an interbranch conflict no matter where the information is held—it is, after all, the President's information. Were it otherwise, Congress could sidestep constitutional requirements any time a President's information is entrusted to a third party—as occurs with rapidly increasing frequency. Cf. *Carpenter* v. *United States*, 585 U. S. ___, ___, ___ (2018) (slip op., at 15, 17).

FILED: NEW YORK COUNTY CLERK 07/15/2020 05:07 PM
NYSCEF DOC. NO. 102

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 26 of 85

Indeed, Congress could declare open season on the President's information held by schools, archives, internet service providers, e-mail clients, and financial institutions. The Constitution does not tolerate such ready evasion; it "deals with substance, not shadows." *Cummings* v. *Missouri*, 4 Wall. 277, 325 (1867).

E

Congressional subpoenas for the President's personal information implicate weighty concerns regarding the separation of powers. Neither side, however, identifies an approach that accounts for these concerns. For more than two centuries, the political branches have resolved information disputes using the wide variety of means that the Constitution puts at their disposal. The nature of such interactions would be transformed by judicial enforcement of either of the approaches suggested by the parties, eroding a "[d]eeply embedded traditional way[] of conducting government." *Youngstown Sheet & Tube Co.*, 343 U. S., at 610 (Frankfurter, J., concurring).

A balanced approach is necessary, one that takes a "considerable impression" from "the practice of the government," *McCulloch* v. *Maryland*, 4 Wheat. 316, 401 (1819); see *Noel Canning*, 573 U. S., at 524–526, and "resist[s]" the "pressure inherent within each of the separate Branches to exceed the outer limits of its power," *INS* v. *Chadha*, 462 U. S. 919, 951 (1983). We therefore conclude that, in assessing whether a subpoena directed at the President's personal information is "related to, and in furtherance of, a legitimate task of the Congress," *Watkins*, 354 U. S., at 187, courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake, including both the significant legislative interests of Congress and the "unique position" of the President, *Clinton*, 520 U. S., at 698 (internal quotation marks omitted). Several special considerations inform this analysis.

First, courts should carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers. "'[O]ccasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible." *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 389–390 (2004) (quoting *Nixon*, 418 U. S., at 692). Congress may not rely on the President's information if other sources could reasonably provide Congress the information it needs in light of its particular legislative objective. The President's unique constitutional position means that Congress may not look to him as a "case study" for general legislation. Cf. 943 F. 3d, at 662–663, n. 67.

Unlike in criminal proceedings, where "[t]he very integrity of the judicial system" would be undermined without "full disclosure of all the facts," *Nixon*, 418 U. S., at 709, efforts to craft legislation involve predictive policy judgments that are "not hamper[ed] . . . in quite the same way" when every scrap of potentially relevant evidence is not available, *Cheney*, 542 U. S., at 384; see *Senate Select Committee*, 498 F. 2d, at 732. While we certainly recognize Congress's important interests in obtaining information through appropriate inquiries, those interests are not sufficiently powerful to justify access to the President's personal papers when other sources could provide Congress the information it needs.

Second, to narrow the scope of possible conflict between the branches, courts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective. The specificity of the subpoena's request "serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President." *Cheney*, 542 U. S., at 387.

Third, courts should be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose. The more detailed and

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 28 of 85

20          TRUMP *v.* MAZARS USA, LLP

Opinion of the Court

substantial the evidence of Congress's legislative purpose, the better. See *Watkins*, 354 U. S., at 201, 205 (preferring such evidence over "vague" and "loosely worded" evidence of Congress's purpose). That is particularly true when Congress contemplates legislation that raises sensitive constitutional issues, such as legislation concerning the Presidency. In such cases, it is "impossible" to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation. *Id.*, at 205–206, 214–215.

Fourth, courts should be careful to assess the burdens imposed on the President by a subpoena. We have held that burdens on the President's time and attention stemming from judicial process and litigation, without more, generally do not cross constitutional lines. See *Vance*, *ante,* at 12–14; *Clinton*, 520 U. S., at 704–705. But burdens imposed by a congressional subpoena should be carefully scrutinized, for they stem from a rival political branch that has an ongoing relationship with the President and incentives to use subpoenas for institutional advantage.

Other considerations may be pertinent as well; one case every two centuries does not afford enough experience for an exhaustive list.

When Congress seeks information "needed for intelligent legislative action," it "unquestionably" remains "the duty of *all* citizens to cooperate." *Watkins*, 354 U. S., at 187 (emphasis added). Congressional subpoenas for information from the President, however, implicate special concerns regarding the separation of powers. The courts below did not take adequate account of those concerns. The judgments of the Courts of Appeals for the D. C. Circuit and the Second Circuit are vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 591 U. S. ____ (2020) 1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–715 and 19–760

_____

DONALD J. TRUMP, ET AL., PETITIONERS
19–715          *v.*
MAZARS USA, LLP, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


DONALD J. TRUMP, ET AL., PETITIONERS
19–760          *v.*
DEUTSCHE BANK AG, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE THOMAS, dissenting.

Three Committees of the U. S. House of Representatives issued subpoenas to several accounting and financial firms to obtain the personal financial records of the President, his family, and several of his business entities. The Committees do not argue that these subpoenas were issued pursuant to the House's impeachment power. Instead, they argue that the subpoenas are a valid exercise of their legislative powers.

Petitioners challenge the validity of these subpoenas. In doing so, they call into question our precedents to the extent that they allow Congress to issue legislative subpoenas for the President's private, nonofficial documents. I would hold that Congress has no power to issue a legislative subpoena for private, nonofficial documents—whether they belong to the President or not. Congress may be able to obtain these documents as part of an investigation of the President, but

2          TRUMP *v.* MAZARS USA, LLP

Thomas, J., dissenting

to do so, it must proceed under the impeachment power. Accordingly, I would reverse the judgments of the Courts of Appeals.

I

I begin with the Committees' claim that the House's legislative powers include the implied power to issue legislative subpoenas. Although the Founders understood that the enumerated powers in the Constitution included implied powers, the Committees' test for the scope of those powers is too broad.

"The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury* v. *Madison*, 1 Cranch 137, 176 (1803). The structure of limited and enumerated powers in our Constitution denotes that "[o]ur system of government rests on one overriding principle: All power stems from the consent of the people." *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 846 (1995) (Thomas, J., dissenting). As a result, Congress may exercise only those powers given by the people of the States through the Constitution.

The Founders nevertheless understood that an enumerated power could necessarily bring with it implied powers. The idea of implied powers usually arises in the context of the Necessary and Proper Clause, which gives Congress the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, §8, cl. 18. As I have previously explained, the Necessary and Proper Clause simply "made explicit what was already implicit in the grant of each enumerated power." *United States* v. *Comstock*, 560 U. S. 126, 161 (2010) (dissenting opinion). That is, "the grant of a gen-

Cite as: 591 U. S. ____ (2020)          3

THOMAS, J., dissenting

eral power includes the grant of incidental powers for carrying it out." Bray, "Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution, 102 Va. L. Rev. 687, 741 (2016).

The scope of these implied powers is very limited. The Constitution does not sweep in powers "of inferior importance, merely because they are inferior." *McCulloch* v. *Maryland*, 4 Wheat. 316, 408 (1819). Instead, Congress "can claim no powers which are not granted to it by the constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 326 (1816). In sum, while the Committees' theory of an implied power is not categorically wrong, that power must be necessarily implied from an enumerated power.

## II

At the time of the founding, the power to subpoena private, nonofficial documents was not included by necessary implication in any of Congress' legislative powers. This understanding persisted for decades and is consistent with the Court's first decision addressing legislative subpoenas, *Kilbourn* v. *Thompson*, 103 U. S. 168 (1881). The test that this Court created in *McGrain* v. *Daugherty*, 273 U. S. 135 (1927), and the majority's variation on that standard today, are without support as applied to private, nonofficial documents.[1]

## A

The Committees argue that Congress wields the same investigatory powers that the British Parliament did at the time of the founding. But this claim overlooks one of the fundamental differences between our Government and the British Government: Parliament was supreme. Congress is

---

[1] I express no opinion about the constitutionality of legislative subpoenas for other kinds of evidence.

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 32 of 85

4                    TRUMP *v.* MAZARS USA, LLP

THOMAS, J., dissenting

not.

I have previously explained that "the founding generation did not subscribe to Blackstone's view of parliamentary supremacy." *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 74 (2015) (opinion concurring in judgment). "Parliament's violations of the law of the land had been a significant complaint of the American Revolution." *Id.,* at 74–75. "And experiments in legislative supremacy in the States had confirmed the idea that even the legislature must be made subject to the law." *Id.*, at 75.

James Wilson, signer of the Constitution and future Justice, explained this difference to the Pennsylvania ratifying convention: "Blackstone will tell you, that in Britain [the supreme power] is lodged in the British Parliament; and I believe there is no writer on the other side of the Atlantic" who thought otherwise. 2 Documentary History of the Ratification of the Constitution 471 (M. Jensen ed. 1976) (Documentary History). In the United States, however, "the supreme, absolute, and uncontrollable authority, *remains* with the people." *Id.*, at 472. And "[t]he Constitution plainly sets forth the 'few and defined' powers that Congress may exercise." *Comstock*, 560 U. S., at 159 (THOMAS, J., dissenting); see also *McCulloch*, 4 Wheat., at 405; *Marbury*, 1 Cranch, at 176. This significant difference means that Parliament's powers and Congress' powers are not necessarily the same.

In fact, the plain text of the Constitution makes clear that they are not. The Constitution expressly denies to Congress some of the powers that Parliament exercised. Article I, for example, prohibits bills of attainder, §9, cl. 3, which Parliament used to "sentenc[e] to death one or more specific persons." *United States* v. *Brown*, 381 U. S. 437, 441 (1965). A legislature can hardly be considered supreme if it lacks the power to pass bills of attainder, which Justice Story called the "highest power of sovereignty." 3 Commentaries on the

Constitution of the United States §1338, p. 210 (1833). Relatedly, the Constitution prohibits *ex post facto* laws, §9, cl. 3, reinforcing the fact that Congress' power to punish is limited.[2]  And in a system in which Congress is not supreme, the individual protections in the Bill of Rights, such as the prohibition on unreasonable searches and seizures, meaningfully constrain Congress' power to compel documents from private citizens. Cf. 1 St. George Tucker, Blackstone's Commentaries 203–205, n. § (1803); see also D. Currie, The Constitution in Congress: The Federalist Period, 1789–1801, p. 268 (1997).

Furthermore, *Kilbourn*—this Court's first decision on the constitutionality of legislative subpoenas—emphasized that Parliament had more powers than Congress.  There, the congressional respondents relied on Parliament's investigatory power to support a legislative subpoena for testimony and documents.  The Court rejected the analogy because the judicial powers of the House of Commons—the lower house of Parliament—exceeded the judicial functions of the House of Representatives. *Kilbourn*, *supra,* at 189. At bottom, *Kilbourn* recognized that legislative supremacy was decisively rejected in the framing and ratification of our Constitution, which casts doubt on the Committees' claim that they have power to issue legislative subpoenas to private parties.

### B

The subpoenas in these cases also cannot be justified based on the practices of 18th-century American legisla-

---

[2]The Constitution also enumerates a limited set of congressional privileges.  Although I express no opinion on the question, at least one early commentator thought the canon of *expressio unius* meant that Congress had no unenumerated privileges, such as the power to hold nonmembers in contempt.  1 St. George Tucker, Blackstone's Commentaries 200, n. § (1803).

6                  TRUMP *v.* MAZARS USA, LLP

                      THOMAS, J., dissenting

tures. *Amici* supporting the Committees resist this conclu-
sion, but the examples they cite materially differ from the
legislative subpoenas at issue here.

First, *amici* cite investigations in which legislatures
sought to compel testimony from government officials on
government matters. The subjects included military af-
fairs, taxes, government finances, and the judiciary. Potts,
Power of Legislative Bodies To Punish for Contempt, 74
U. Pa. L. Rev. 691, 708, 709, 710, 716–717 (1926) (Potts);
see also E. Eberling, Congressional Investigations: A Study
of the Origin and Development of the Power of Congress To
Investigate and Punish for Contempt 18 (1928) (Eberling).
But the information sought in these examples was official,
not private. Underscoring this distinction, at least one rev-
olutionary-era State Constitution permitted the legislature
to "call for all *public or official* papers and records, and send
for persons, whom they may judge necessary in the course
of their inquiries, concerning affairs relating to the public
interest." Md. Const., Art. X (1776) (emphasis added).

Second, 18th-century legislatures conducted nonlegisla-
tive investigations. For example, the New York colonial
legislature tasked one committee with investigating a nui-
sance complaint and gave it the "power to send for persons,
papers and records." Eberling 18; see also *id.*, at 19 (inves-
tigation of a government contract obtained by alleged
wrongdoing); Potts 716 (investigation of armed resistance).
But to describe this category is to distinguish it. Here, the
Committees assert only a legislative purpose.

Third, colonial and state legislatures investigated and
punished insults, libels, and bribery of members. For ex-
ample, the Pennsylvania colonial assembly investigated
"injurious charges, and slanderous Aspersions against the
Conduct of the late Assembly" made by two individuals. *Id.*,
at 710 (internal quotation marks omitted); see also *id.*, at
717; Eberling 20–21. But once again, to describe this cate-

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 35 of 85

gory is to distinguish it because the subpoenas here are justified only as incidental to the power to legislate, not the power to punish libels or bribery. In short, none of the examples from 18th-century colonial and state history support a power to issue a legislative subpoena for private, nonofficial documents.

### C

Given that Congress has no exact precursor in England or colonial America, founding-era congressional practice is especially informative about the scope of implied legislative powers. Thus, it is highly probative that no founding-era Congress issued a subpoena for private, nonofficial documents. Although respondents could not identify their first such legislative subpoena at oral argument, Tr. of Oral Arg. 56, Congress began issuing them by the end of the 1830s. However, the practice remained controversial in Congress and this Court throughout the first century of the Republic.

### 1

In an attempt to establish the power of Congress to issue legislative subpoenas, the Committees point to an investigation of Government affairs and an investigation under one of Congress' enumerated privileges. Both precedents are materially different from the subpoenas here.

In 1792, the House authorized a Committee to investigate a failed military expedition led by General Arthur St. Clair. 3 Hinds' Precedents of the House of Representatives of the United States §1725, pp. 79–80 (1907) (Hinds). The Committee was "empowered to call for such persons, papers and records as may be necessary to assist their inquiries." *Ibid.* But the Committee never subpoenaed private, nonofficial documents, which is telling. Whereas a subpoena for Government documents does not implicate concerns about property rights or the Fourth Amendment "right of the people to be secure in their persons, houses, papers, and effects,

8        TRUMP *v.* MAZARS USA, LLP

THOMAS, J., dissenting

against unreasonable searches and seizures," a subpoena
for private, nonofficial documents raises those questions.
Thus, the power to subpoena private documents, which the
Committee did not exercise, is a far greater power and
much less likely to be implied in Congress' legislative pow-
ers.

In 1832, the House investigated Representative Samuel
Houston for assaulting Representative William Stanberry.
Stanberry had accused Houston of collusion with Secretary
of War John Eaton in connection with a bid for a Govern-
ment contract, and the House initiated an investigation
into the truthfulness of Stanberry's accusation.  8 Cong.
Deb. 2550, 3022–3023 (1832).  The House subpoenaed wit-
nesses to testify, and one of them brought official corre-
spondence between the Secretary of War and the President.
H. R. Rep. No. 502, 22d Cong., 1st Sess. 64, 66–67 (1832).
But official documents are obviously different from nonoffi-
cial documents.  Moreover, the subpoenas were issued pur-
suant to the House's enumerated privilege of punishing its
own Members, Art. I, §5, not as part of its legislative pow-
ers.  Because these subpoenas were not issued pursuant to
a legislative power, they do not aid the Committees' case.

2

As late as 1827, a majority of the House declined to au-
thorize the Committee on Manufactures to subpoena docu-
ments, amid concerns that it was unprecedented.  During
the debate over the resolution, one opponent remarked that
"[t]here is no instance under this Government, within my
recollection, where this power has been given for the mere
purpose of enabling a committee of this House to adjust the
details of an ordinary bill."  4 Cong. Deb. 865–866 (Rep.
Strong); see also *id.*, at 862 (referring to "authority to bring
any citizens of the United States . . . whom they might
choose to send for, and compel them to give answers to
every inquiry which should be addressed to them" as "very

extraordinary"). Another opponent stated that the Committee had requested a power that had "not heretofore been thought necessary to enable that Committee to acquire correct information." *Id.*, at 866 (Rep. Storrs). A third called it "not only novel and extraordinary, but wholly unnecessary." *Id.*, at 874 (Rep. Stewart); see also *id.*, at 884–885 (Rep. Wright). No supporter of the resolution offered a specific precedent for doing so, and the House ultimately authorized the Committee to send for persons only. *Id.*, at 889–890.

This debate is particularly significant because of the arguments made by both sides. Proponents made essentially the same arguments the Committees raise here—that the power to send for persons and papers was necessary to inform Congress as it legislated. *Id.*, at 871 (Rep. Livingston). Opponents argued that this power was not part of any legislative function. *Id.*, at 865–866 (Rep. Strong). They also argued that the House of Commons provided no precedent because Congress was a body of limited and enumerated powers. *Id.*, at 882 (Rep. Wood). And in the end, the opponents prevailed. Thus, through 1827, the idea that Congress had the implied power to issue subpoenas for private documents was considered "novel," "extraordinary," and "unnecessary." *Id.*, at 874.

3

By the end of the 1830s, Congress began issuing legislative subpoenas for private, nonofficial documents. See Eberling 123–126. Still, the power to demand information from private parties during legislative investigations remained controversial.

In 1832, the House authorized a Committee to "inspect the books, and to examine into the proceedings of the Bank of the United States, to report thereon, and to report whether the provisions of its charter have been violated or

10          TRUMP *v.* MAZARS USA, LLP

THOMAS, J., dissenting

not." 8 Cong. Deb. 2160, 2164. The House gave the Committee "power to send for persons and papers." *Id.,* at 2160. The power to inspect the books of the Bank of the United States is not itself a clear example of a legislative subpoena for private, nonofficial documents, because the Bank was a federally chartered corporation and was required to allow Congress to inspect its books. App. to 8 Cong. Deb. 54 (1833). The investigation itself appears to have ranged more widely, however, leading Congressman John Quincy Adams to criticize

> "investigations which must necessarily implicate not only the president and directors of the bank, and their proceedings, but the rights, the interests, the fortunes, and the reputation of individuals not responsible for those proceedings, and whom neither the committee nor the House had the power to try, or even accuse before any other tribunal." *Ibid.*

Adams continued that such an investigation "bears all the exceptionable and odious properties of general warrants and domiciliary visits." *Ibid.* He also objected that the Committee's investigation of the Bank was tantamount to punishment and thus was in tension with the constitutional prohibitions on "passing any bill of attainder [or] *ex post facto* law." *Id.,* at 60. Thus, even when Congress authorized a Committee to send for private papers, the constitutionality of doing so was questioned.

An 1859 Senate investigation, which the Court of Appeals cited as precedent, underscores that legislative subpoenas to private parties were a 19th-century innovation. Following abolitionist John Brown's raid at Harper's Ferry, Senate Democrats opened an investigation apparently designed to embarrass opponents of slavery. As part of the investigation, they called private individuals to testify. Senator Charles Sumner, a leading opponent of slavery, railed against the proceedings:

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 39 of 85

Cite as: 591 U. S. ____ (2020)          11

Thomas, J., dissenting

"I know it is said that this power is necessary *in aid of legislation*. I deny the necessity. *Convenient*, at times, it may be; but *necessary*, *never*. We do not drag the members of the Cabinet or the President to testify before a committee *in aid of legislation*; but I say, without hesitation, they can claim no immunity which does not belong equally to the humblest citizen." Cong. Globe, 36th Cong., 1st Sess., 3007 (1860).

Sumner also addressed the matter of Parliament's powers, calling them "more or less inapplicable" because "[w]e live under a written Constitution, with certain specified powers; and all these are restrained by the tenth amendment." *Ibid.* For Sumner, as for Adams, the power to issue legislative subpoenas to private parties was a "dangerous absurdity" with no basis in the text or history of the Constitution. *Ibid.*[3]

4

When this Court first addressed a legislative subpoena, it refused to uphold it. After casting doubt on legislative subpoenas generally, the Court in *Kilbourn* v. *Thompson*, 103 U. S. 168, held that the subpoena at issue was unlawful because it sought to investigate private conduct.

In 1876, the House created a special Committee to investigate the failure of a major bank, which caused the loss of federal funds and related to financial speculation in the District of Columbia. *Id.*, at 171. The Committee issued a subpoena to Kilbourn, an employee of the bank. *Id.,* at 172. When he refused to answer questions or produce documents, the House held him in contempt and arrested him. *Id.*, at 173. After his release, he sued the Speaker, several

---

[3] I note as well that Sumner expressly distinguished legislative subpoenas from subpoenas issued during "those inquiries which are in their nature preliminary to an impeachment." Cong. Globe, 36th Cong., 1st Sess., 3007 (1860).

12   TRUMP *v.* MAZARS USA, LLP

THOMAS, J., dissenting

Committee members, and the Sergeant at Arms for damages.

The Court discussed the arguments for an "impli[ed]" power to issue legislative subpoenas. *Id.*, at 183. As the Court saw it, there were two arguments: "1, its exercise by the House of Commons of England . . . and, 2d, the necessity of such a power to enable the two Houses of Congress to perform the duties and exercise the powers which the Constitution has conferred on them." *Ibid.*

The Court rejected the first argument. It found "no difference of opinion as to [the] origin" of the House of Commons' subpoena power:

> "[T]he two Houses of Parliament were each courts of judicature originally, which, though divested by usage, and by statute, probably, of many of their judicial functions, have yet retained so much of that power as enables them, like any other court, to punish for a contempt of these privileges and authority that the power rests." *Id.,* at 184.

Even after the division of Parliament into two houses, "[t]o the Commons was left the power of impeachment, and, perhaps, others of a judicial character, and jointly they exercised, until a very recent period, the power of passing bills of attainder for treason and other high crimes which are in their nature punishment for crime declared judicially by the High Court of Parliament." *Ibid.* By contrast, the House of Representatives "is in no sense a court, . . . exercises no functions derived from its once having been a part of the highest court of the realm," and has no judicial functions beyond "punishing its own members and determining their election." *Id.*, at 189. The Court thus rejected the notion that Congress inherited from Parliament an implied power to issue legislative subpoenas.

The Court did not reach a conclusion on the second theory

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 41 of 85

that a legislative subpoena power was necessary for Congress to carry out its legislative duties.  But it observed that, based on British judicial opinions, not "much aid [is] given to the doctrine, that this power exists as one necessary to enable either House of Congress to exercise successfully their function of legislation." *Ibid.*  The Court referred to a collection of 18th- and 19th-century English decisions grounding the Parliamentary subpoena power in that body's judicial origins. *Id.,* at 184–189 (citing *Burdett* v. *Abbott*, 104 Eng. Rep. 501 (K. B. 1811); *Brass Crosby's Case*, 95 Eng. Rep. 1005 (C. P. 1771); *Stockdale* v. *Hansard*, 112 Eng. Rep. 1112 (K. B. 1839); and *Kielley* v. *Carson*, 13 Eng. Rep. 225 (P. C. 1841)).  The Court placed particular emphasis on *Kielley*, in which the Privy Council held that the Legislative Assembly of Newfoundland lacked a power to punish for contempt.  The Privy Council expressly stated that the House of Commons could punish for contempt

> "'not because it is a representative body with legislative functions, but by virtue of ancient usage and prescription . . . which forms a part of the common law of the land, and according to which the High Court of Parliament before its division, and the Houses of Lords and Commons since, are invested with many privileges, that of punishment for contempt being one.'" *Kilbourn*, 103 U. S., at 188–189.

This Court also noted that the Privy Council "discusse[d] at length the necessity of this power in a legislative body for its protection, and to enable it to discharge its law-making functions, and decide[d] against the proposition." *Id.*, at 189.  Although the Court did not have occasion to decide whether the legislative subpoena in that case was necessary to the exercise of Congress' legislative powers, its dis-

FILED: NEW YORK COUNTY CLERK 07/15/2020 05:07 PM
NYSCEF DOC. NO. 102
INDEX NO. 160694/2019
RECEIVED NYSCEF: 07/15/2020

cussion strongly suggests the subpoena was unconstitutional.[4]

The Court instead based its decision on the fact that the subpoena at issue "ma[de] inquiry into the private affairs of the citizen." *Id.*, at 190. Such a power, the Court reasoned, "is judicial and not legislative," *id.*, at 193, and "no judicial power is vested in the Congress or either branch of it, save in the cases" of punishing Members, compelling Members' attendance, judging elections and qualifications, and impeachment and trial, *id.*, at 192–193. Notably, the Court found no indication that the House "avowed to impeach the secretary," or else "the whole aspect of the case would have been changed." *Id.*, at 193. Even though the Court decided *Kilbourn* narrowly, it clearly entertained substantial doubts about the constitutionality of legislative subpoenas for private documents.

### D

Nearly half a century later, in *McGrain* v. *Daugherty*, the Court reached the question reserved in *Kilbourn*—whether Congress has the power to issue legislative subpoenas. It rejected *Kilbourn*'s reasoning and upheld the power to issue legislative subpoenas as long as they were relevant to a legislative power. Although *McGrain* involved oral testimony, the Court has since extended this test to subpoenas for private documents. The Committees rely on *McGrain*, but this line of cases misunderstands both the original meaning of Article I and the historical practice underlying it.

--------

[4] According to Justice Miller's private letters, "a majority of the Court, including Miller himself, were of the opinion that neither House nor Senate had power to punish for contempt witnesses who refused to testify before investigating committees." T. Taylor, Grand Inquest: The Story of Congressional Investigations 49 (1955). Only Justice Miller's desire to "'decid[e] no more than is necessary'" caused the Court to avoid the broader question. *Ibid.*

FILED: NEW YORK COUNTY CLERK 07/15/2020 05:07 PM
NYSCEF DOC. NO. 102

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 43 of 85

THOMAS, J., dissenting

1

Shortly before Attorney General Harry Daugherty resigned in 1924, the Senate opened an investigation into his "'alleged failure'" to prosecute monopolists, the protagonists of the Teapot Dome scandal, and "'many others.'" *McGrain*, 273 U. S., at 151. The investigating Committee issued subpoenas to Daugherty's brother, Mally, who refused to comply and was arrested in Ohio for failure to testify. *Id.*, at 152–154. Mally petitioned for a writ of habeas corpus, and the District Court discharged him, based largely on *Kilbourn*. *Ex parte Daugherty*, 299 F. 620 (SD Ohio 1924). The Deputy Sergeant at Arms who arrested Mally directly appealed to this Court, which reversed.

The Court concluded that, "[i]n actual legislative practice[,] power to secure needed information by [investigating and compelling testimony] has long been treated as an attribute of the power to legislate." *McGrain*, 273 U. S., at 161. The Court specifically found that "[i]t was so regarded in the British Parliament and in the Colonial legislatures before the American Revolution" and that "a like view has prevailed and been carried into effect in both houses of Congress and in most of the state legislatures." *Ibid.* But the authority cited by the Court did not support that proposition. The Court cited the 1792 investigation of St. Clair's defeat, in which it appears no subpoena was issued, *supra,* at 7–8, and the 1859 Senate investigation of John Brown's raid on Harper's Ferry, which led to an impassioned debate. 273 U. S., at 162–164. Thus, for the reasons explained above, the examples relied on in *McGrain* are materially different from issuing a legislative subpoena for private, nonofficial documents. See *supra,* at 7, 10–11.[5]

_____

[5]The Court also cited decisions between 1858 and 1913 from state courts and a Canadian court, none of which are persuasive evidence about the original meaning of the U. S. Constitution. *McGrain*, 273 U. S., at 165–167.

The Court acknowledged *Kilbourn,* but erroneously distinguished its discussion regarding the constitutionality of legislative subpoenas as immaterial dicta. *McGrain*, *supra*, at 170–171 (quoting *Kilbourn*, *supra,* at 189). The Court concluded that "the two houses of Congress, in their separate relations, possess not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective." *McGrain*, *supra*, at 173.

Instead of relying on *Kilbourn*'s analysis, *McGrain* developed a test that rested heavily on functional considerations. The Court wrote that "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." 273 U. S., at 175. Because "mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete," "some means of compulsion are essential to obtain what is needed." *Ibid.*

The Court thus concluded that Congress could issue legislative subpoenas, provided that "the purpose for which the witness's testimony was sought was to obtain information in aid of the legislative function." *Id.,* at 176. The Court has since applied this test to subpoenas for papers without any further analysis of the text or history of the Constitution. See *Eastland* v. *United States Servicemen's Fund*, 421 U. S. 491, 504–505 (1975). The majority today modifies that test for cases involving the President, but it leaves the core of the power untouched. *Ante*, at 18–20.

2

The opinion in *McGrain* lacks any foundation in text or history with respect to subpoenas for private, nonofficial documents. It fails to recognize that Congress, unlike Parliament, is not supreme. It does not cite any specific prece-

dent for issuing legislative subpoenas for private documents from 18th-century colonial or state practice. And it identifies no founding-era legislative subpoenas for private documents.[6]

Since *McGrain*, the Court has pared back Congress' authority to compel testimony and documents. It has held that certain convictions of witnesses for contempt of Congress violated the Fifth Amendment. See *Watkins* v. *United States*, 354 U. S. 178 (1957) (Due Process Clause); *Quinn* v. *United States*, 349 U. S. 155 (1955) (Self-Incrimination Clause); see also *Barenblatt* v. *United States*, 360 U. S. 109, 153–154 (1959) (Black, J., dissenting). It has also affirmed the reversal of a conviction on the ground that the Committee lacked authority to issue the subpoena. See *United States* v. *Rumely*, 345 U. S. 41 (1953). And today, it creates a new four-part, nonexhaustive test for cases involving the President. *Ante*, at 18–20. Rather than continue our trend of trying to compensate for *McGrain*, I would simply decline to apply it in these cases because it is readily apparent that the Committees have no constitutional authority to subpoena private, nonofficial documents.

### III

If the Committees wish to investigate alleged wrongdoing by the President and obtain documents from him, the Constitution provides Congress with a special mechanism for

—————————

[6]The Court further observed that Congress has long exercised the power to hold nonmembers in contempt for reasons other than failure to comply with a legislative subpoena. *McGrain, supra,* at 168–169. The earliest case it cited, *Anderson* v. *Dunn,* 6 Wheat. 204 (1821), relied on arguments about Congress' power of self-protection, *id.,* at 226–227. Members of Congress defending the use of contempt for these other purposes made similar arguments about self-protection. 5 Annals of Cong. 181–182 (1795) (Rep. W. Smith); *id.,* at 189 (Rep. I. Smith). But the failure to respond to a subpoena does not pose a fundamental threat to Congress' ability to exercise its powers.

18              TRUMP *v.* MAZARS USA, LLP

Thomas, J., dissenting

doing so: impeachment.[7]

### A

It is often acknowledged, "if only half-heartedly honored," that one of the motivating principles of our Constitution is the separation of powers. *Association of American Railroads*, 575 U. S., at 74 (Thomas, J., concurring in judgment). The Framers recognized that there are three forms of governmental power: legislative, executive and judicial. The Framers also created three branches: Congress, the President, and the Judiciary. The three powers largely align with the three branches. To a limited extent, however, the Constitution contains "a partial intermixture of those departments for special purposes." The Federalist No. 66, p. 401 (C. Rossiter ed. 1961) (A. Hamilton). One of those special purposes is the system of checks and balances, and impeachment is one of those checks.

The Constitution grants the House "the sole Power of Impeachment," Art. I, §2, cl. 5, and it specifies that the President may be impeached for "Treason, Bribery, or other high Crimes and Misdemeanors," Art. II, §4. The founding generation understood impeachment as a check on Presidential abuses. In response to charges that impeachment "confounds legislative and judiciary authorities in the same body," Alexander Hamilton called it "an essential check in the hands of [Congress] upon the encroachments of the executive." The Federalist No. 66, at 401–402. And, in the Virginia ratifying convention, James Madison identified impeachment as a check on Presidential abuse of the treaty power. 10 Documentary History 1397.

### B

The power to impeach includes a power to investigate and

---

[7]I express no view on whether there are any limitations on the impeachment power that would prevent the House from subpoenaing the documents at issue.

FILED: NEW YORK COUNTY CLERK 07/15/2020 05:07 PM
NYSCEF DOC. NO. 102

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 47 of 85

demand documents.  Impeachments in the States often involved an investigation.  In 1781, the Virginia Legislature began what Edmund Randolph called an "impeachment" of then-Governor Thomas Jefferson.  P. Hoffer & N. Hull, Impeachment in America, 1635–1805, p. 85 (1984).  This "most publicized and far-reaching impeachment inquiry for incompetence" included an "'inquir[y] into the conduct of the executive of this state for the last two months.'"  *Ibid.*  The legislatures of New Jersey, *id.*, at 92, and Pennsylvania, *id.*, at 93–95, similarly investigated officials through impeachment proceedings.

Reinforcing this understanding, the founding generation repeatedly referred to impeachment as an "inquest."  See 4 Debates on the Constitution 44 (J. Elliot ed. 1854) (speech of A. Maclaine) (referring to the House as "the grand inquest of the Union at large"); The Federalist No. 65, at 397 (Hamilton) (referring to the House as "a method of NATIONAL INQUEST"); 2 Records of the Federal Convention 154 (M. Farrand ed. 1911) (record from the Committee of Detail stating that "[t]he House of Representatives shall be the grand Inquest of this Nation; and all Impeachments shall be made by them"); see also Mass. Const., ch. 1, §3, Art. VI (1780) (referring to the Massachusetts House of Representatives as "the Grand Inquest of this Commonwealth").  At the time, an "inquest" referred to an "[i]nquiry, especially that made by a Jury" or "the Jury itself."  N. Bailey, Universal Etymological Dictionary (22d ed. 1770).

The Founders were also aware of the contemporaneous impeachment of Warren Hastings in England, in which the House of Commons heard witnesses before voting to impeach.  P. Marshall, The Impeachment of Warren Hastings 40–41, 58 (1965).  In the first impeachment under the new Constitution, Congressmen cited the Hastings impeachment as precedent for several points, including the power to take testimony before impeaching.  7 Annals of Cong. 456 (1797) (Rep. Rutledge); *id.*, at 459 (Rep. Sitgreaves); *id.,* at

460 (Rep. Gallatin).

Other evidence from the 1790s confirms that the power to investigate includes the power to demand documents. When the House of Representatives sought documents related to the Jay Treaty from President George Washington, he refused to provide them on the ground that the House had no legislative powers relating to the ratification of treaties. 5 Annals of Cong. 760–762 (1796). But he carefully noted that "[i]t does not occur that the inspection of the papers asked for can be relative to any purpose under the cognizance of the House of Representatives, except that of an impeachment; which the resolution has not expressed." *Id.,* at 760. In other words, he understood that the House can demand documents as part of its power to impeach.

This Court has also long recognized the power of the House to demand documents. Even as it questioned the power to issue legislative subpoenas, the Court in *Kilbourn* acknowledged the ability to "compel the attendance of witnesses, and their answer to proper questions" when "the question of . . . impeachment is before either body acting in its appropriate sphere on that subject." 103 U. S., at 190.

I express no view today on the boundaries of the power to demand documents in connection with impeachment proceedings. But the power of impeachment provides the House with authority to investigate and hold accountable Presidents who commit high crimes or misdemeanors. That is the proper path by which the Committees should pursue their demands.

## IV

For nearly two centuries, until the 1970s, Congress never attempted to subpoena documents to investigate wrongdoing by the President outside the context of impeachment. Congress investigated Presidents without opening impeachment proceedings. See, *e.g.,* 2 Hinds §1596, at 1043–1045 (President James Buchanan). But it never issued a

FILED: NEW YORK COUNTY CLERK 07/15/2020 05:07 PM
NYSCEF DOC. NO. 102
INDEX NO. 160694/2019
RECEIVED NYSCEF: 07/15/2020

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 49 of 85

subpoena for private, nonofficial documents as part of those non-impeachment inquiries. Perhaps most strikingly, one proposed request for official documents from the President was amended after objection so that it "'requested'" them rather than "'direct[ing]'" the President to provide them. 3 *id.*, §1895, at 193.

Insisting that the House proceed through its impeachment power is not a mere formality. Unlike contempt, which is governed by the rules of each chamber, impeachment and removal constitutionally requires a majority vote by the House and a two-thirds vote by the Senate. Art. I, §2, cl. 5; §3, cl. 6. In addition, Congress has long thought it necessary to provide certain procedural safeguards to officials facing impeachment and removal. See, *e.g.*, 3 Annals of Cong. 903 (1793) (Rep. W. Smith). Finally, initiating impeachment proceedings signals to the public the gravity of seeking the removal of a constitutional officer at the head of a coordinate branch. 940 F. 3d 710, 776 (CADC 2019) (Rao, J., dissenting).

\*   \*   \*

Congress' legislative powers do not authorize it to engage in a nationwide inquisition with whatever resources it chooses to appropriate for itself. The majority's solution—a nonexhaustive four-factor test of uncertain origin—is better than nothing. But the power that Congress seeks to exercise here has even less basis in the Constitution than the majority supposes. I would reverse in full because the power to subpoena private, nonofficial documents is not a necessary implication of Congress' legislative powers. If Congress wishes to obtain these documents, it should proceed through the impeachment power. Accordingly, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–715 and 19–760

_____

DONALD J. TRUMP, ET AL., PETITIONERS
19–715                    *v.*
MAZARS USA, LLP, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


DONALD J. TRUMP, ET AL., PETITIONERS
19–760                    *v.*
DEUTSCHE BANK AG, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE ALITO, dissenting.

JUSTICE THOMAS makes a valuable argument about the constitutionality of congressional subpoenas for a President's personal documents. In these cases, however, I would assume for the sake of argument that such subpoenas are not categorically barred. Nevertheless, legislative subpoenas for a President's personal documents are inherently suspicious. Such documents are seldom of any special value in considering potential legislation, and subpoenas for such documents can easily be used for improper non-legislative purposes. Accordingly, courts must be very sensitive to separation of powers issues when they are asked to approve the enforcement of such subpoenas.

In many cases, disputes about subpoenas for Presidential documents are fought without judicial involvement. If Congress attempts to obtain such documents by subpoenaing a President directly, those two heavyweight institutions can

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 51 of 85

2                    TRUMP *v.* MAZARS USA, LLP

ALITO, J., dissenting

use their considerable weapons to settle the matter.  See *ante*, at 10 (opinion of the Court) ("Congress and the President maintained this tradition of negotiation and compromise—without the involvement of this Court—until the present dispute").  But when Congress issues such a subpoena to a third party, Congress must surely appreciate that the Judiciary may be pulled into the dispute, and Congress should not expect that the courts will allow the subpoena to be enforced without seriously examining its legitimacy.

Whenever such a subpoena comes before a court, Congress should be required to make more than a perfunctory showing that it is seeking the documents for a legitimate legislative purpose and not for the purpose of exposing supposed Presidential wrongdoing.  See *ante*, at 12.  The House can inquire about possible Presidential wrongdoing pursuant to its impeachment power, see *ante*, at 17–21 (THOMAS, J., dissenting), but the Committees do not defend these subpoenas as ancillary to that power.

Instead, they claim that the subpoenas were issued to gather information that is relevant to legislative issues, but there is disturbing evidence of an improper law enforcement purpose.  See 940 F. 3d 710, 767–771 (CADC 2019) (Rao, J., dissenting).  In addition, the sheer volume of documents sought calls out for explanation.  See 943 F. 3d 627, 676–681 (CA2 2019) (Livingston, J., concurring in part and dissenting in part).

The Court recognizes that the decisions below did not give adequate consideration to separation of powers concerns.  Therefore, after setting out a non-exhaustive list of considerations for the lower courts to take into account, *ante*, at 18–20, the Court vacates the judgments of the Courts of Appeals and sends the cases back for reconsideration.  I agree that the lower courts erred and that these cases must be remanded, but I do not think that the consid-

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 52 of 85

erations outlined by the Court can be properly satisfied unless the House is required to show more than it has put forward to date.

Specifically, the House should provide a description of the type of legislation being considered, and while great specificity is not necessary, the description should be sufficient to permit a court to assess whether the particular records sought are of any special importance.  The House should also spell out its constitutional authority to enact the type of legislation that it is contemplating, and it should justify the scope of the subpoenas in relation to the articulated legislative needs.  In addition, it should explain why the subpoenaed information, as opposed to information available from other sources, is needed.  Unless the House is required to make a showing along these lines, I would hold that enforcement of the subpoenas cannot be ordered.  Because I find the terms of the Court's remand inadequate, I must respectfully dissent.

# KASOWITZ BENSON TORRES LLP

MARC E. KASOWITZ
DIRECT DIAL: (212) 506-1710
DIRECT FAX: (212) 835-5010
MKasowitz@Kasowitz.com

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

July 16, 2020

<u>VIA NYSCEF</u>

The Honorable Verna L. Saunders
Supreme Court of the State of New York
New York County
111 Centre Street, Room 934
New York, New York 10013

     Re:   *Carroll v. Trump*, Index No. 160694/2019 (Sup. Ct., N.Y. Cty).

Dear Justice Saunders:

I write on behalf of defendant President Donald J. Trump to correct certain assertions in plaintiff's July 15, 2020 letter ("PL") to the Court.

First, plaintiff asserts that the President's argument is based on a contention that state courts are "inferior" or "incapable" (PL at 1, 2). That is not so. The President's argument -- that under Article II and the Supremacy Clause, a President is temporarily immune while in office from being sued in state court -- is based on the federal structure of the Constitution, which every state ratified and by which every state is bound.[1] Ironically, it is plaintiff, not the President, who seems to believe that the Court could be "distract[ed]" by legal arguments. (PL at 2.)

Second, plaintiff asserts that the President's argument is "desperate," "novel," and "extreme." (PL at 1, 2.) Even allowing for rhetorical flourish, that characterization is completely off base: the President's argument was raised in 1997 by the Supreme Court itself in *Clinton v. Jones* -- where the Supreme Court characterized that supposedly "desperate," "novel" and "extreme" argument as an "important constitutional issue[]," which it recognized could "present a more compelling case for immunity" than a "comparable claim" in federal court. 520 U.S. 681, 690-91, 691 n.13 (1997). And not only did nothing in the Supreme Court's decision in *Trump v. Vance*, No. 19-635, 2020 WL 3848062 (U.S. July 9, 2020), address that issue, but the

---

[1] Under plaintiff's "logic," the U.S. Supreme Court's holding in *Trump v. Mazars USA, LLP*, No. 19-715, 2020 WL 3848061 (U.S. July 9, 2020), which vacated orders upholding Congressional subpoenas, must have been based on the Supreme Court's view that Congress is inferior or less capable than the state prosecutor in its *Vance* decision, which affirmed an order upholding the prosecutor's criminal subpoena to the President. Such a conclusion would, of course, be as baseless as plaintiff's assertion concerning the President's argument here. *See also* Reply Brief for Defendant-Appellant in *Zervos v. Trump*, APL-2020-00009, attached hereto as Exhibit 1, at 1 ("No one questions the capability of state courts.").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 2

Supreme Court the same day, in *Mazars*, made sure not to include the issue of state court civil cases in its description of its Presidential immunity jurisprudence -- it plainly did so because the important constitutional issue has not yet been decided. (*See* Defendant's July 14, 2020 Letter to the Court ("DL") at 1-2 (quoting *Mazars*, 2020 WL 3848061, at *4).)

Third, plaintiff grossly mischaracterizes the Supreme Court Presidential immunity cases she cites. (PL at 1.) Rather than dismiss or downplay, as plaintiff does, the unique status of the President under the Constitution, every case cited by plaintiff reaffirms that status. In *United States v. Nixon*, while the Supreme Court rejected an "absolute privilege of confidentiality for all Presidential communications," it adopted a "presumptive privilege for Presidential communications." 418 U.S. 683, 703, 708 (1974). In *Clinton v. Jones*, while the Supreme Court allowed civil damages suits against a President in federal courts, it specifically left unresolved not only the issue at stake here, but also whether any court -- state or federal -- "may compel the attendance of the President at a specific time or place," 520 U.S. at 690-91, and reaffirmed that courts may not "proceed against the President as against an ordinary individual." *Id.* at 704 n.39 (citation omitted).[2]

And, in *Mazars*, the Supreme Court in fact granted the President's appeal and -- after having earlier stayed the proceedings, *see Mazars*, 2020 WL 3848061, at *6 -- vacated the decisions below upholding the Congressional subpoenas, *id.* at *12. The Court agreed with the President that, because of the "President's unique constitutional position," Congressional subpoenas to the President "implicate special concerns" not applicable to other citizens -- regardless of whether the information sought is "personal or official." *Id.* at *11-12. Thus, contrary to plaintiff's assertion, *Mazars* did not reject the President's "argument that his private papers should . . . be treated the same as his official papers." (PL at 2.) In fact, the Supreme Court specifically pointed out that "a subpoena for personal papers may pose a heightened risk of . . . impermissible purposes," such as harassment. *Mazars*, 2020 WL 3848061, at *11.

Although the Supreme Court in *Mazars* did find, with respect to the Congressional subpoenas at issue, that "a categorical approach" to assessing the "distinctions between [among other things] official and personal information," was inappropriate, it did so because such an approach "would represent a significant departure from the longstanding way of doing business between the branches.'" *Mazars*, 2020 WL 3848061, at *9. However, there is no "longstanding way of doing business" between state courts and the President. Rather, as shown (DL at 2),

---

[2]      *See also Mazars*, 2020 WL 3848061, at *11 ("The President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation."); *Vance*, 2020 WL 3848062, at *7 (the "President 'occupies a unique position in the constitutional scheme'" and "Article II guarantees the independence of the Executive Branch" (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982))); *Clinton v. Jones*, 520 U.S. at 697-98 (the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties"); *Nixon v. Fitzgerald*, 457 U.S. at 749 ("immunity [is] a functionally mandated incident of the President's unique office"); *United States v. Nixon*, 418 U.S. at 710, 715 ("courts have traditionally shown the utmost deference to Presidential responsibilities" and the President has a "singularly unique role under Art. II").

# KASOWITZ BENSON TORRES LLP

Hon. Verna L. Saunders
July 16, 2020
Page 3

while Congress, like the federal judiciary, is a coequal branch of government and may therefore exercise "*partial agency* in, or [] *controul* over," the Executive Branch, *Clinton v. Jones*, 520 U.S. at 702-03 (emphasis in original) (citation omitted), state courts, as *Vance* confirmed, are not coequal branches and may not do so. *See Vance*, 2020 WL 3848062, at *8.

Finally, no one is seeking to "escape accountability" here (PL at 2). Plaintiff is free to pursue this action when the President is no longer in office. Plaintiff's repetition of the assertion that a postponement of proceedings would place the President "above the law" (*id.* at 1) does not make it so, and has been squarely rejected by the Supreme Court (DL at 4).[3]

\*   \*   \*

The bottom line is that the issue of temporary Presidential immunity has not yet been decided by the Court of Appeals in *Zervos* -- which itself is stayed pending that decision -- or by the U.S. Supreme Court. Under these circumstances, there is every reason to stay this case, which raises the identical issue, as well.

Respectfully submitted,

Marc E. Kasowitz

cc:   Counsel of Record

---

[3]     That the Supremacy Clause mandates that civil cases in state court be postponed, does not make the President "above the law" any more than, say, the automatic stay granted bankruptcy debtors places them "above the law."

# Exhibit 1

*To be Argued by:*
MARC E. KASOWITZ
*(Time Requested: 30 Minutes)*

APL-2020-00009
New York County Clerk's Index No. 150522/17

# Court of Appeals

*of the*

# State of New York

SUMMER ZERVOS,

*Plaintiff-Respondent,*

– against –

DONALD J. TRUMP,

*Defendant-Appellant.*

## REPLY BRIEF FOR DEFENDANT-APPELLANT

KASOWITZ BENSON TORRES LLP
*Attorneys for Defendant-Appellant*
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Date Completed: May 8, 2020

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ...................................................................................... 6

I.     THE SUPREME COURT'S REASONING IN *CLINTON V. JONES* IN NO WAY SUPPORTS RESPONDENT'S POSITION. ................................................................... 6

II.    DUAL SOVEREIGNTY IS CONSISTENT WITH AND INDEED SUPPORTS PRESIDENTIAL IMMUNITY HERE. ........ 11

III.   CONGRESSIONAL SILENCE IS IRRELEVANT WHERE THE CONSTITUTION ITSELF PRECLUDES STATE-COURT JURISDICTION. ................................................... 16

IV.   THE CONSTITUTION BARS STATE-COURT JURISDICTION OVER THE PRESIDENT RELATED TO UNOFFICIAL CONDUCT. ............................................. 17

V.    THE CONTEMPT POWER IS INDICATIVE OF THE COURT'S DIRECT CONTROL OVER THE PRESIDENT. .......... 21

VI.   THE LAWSUITS CITED BY RESPONDENT ARE IRRELEVANT. ........................................................... 22

CONCLUSION .................................................................................. 24

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Cheney v. U.S. Dist. Court for D.C,*
    542 U.S. 367 (2004)................................................................17, 19

*Clinton v. Jones,*
    520 U.S. 681 (1997).................................................................*passim*

*Erie R. Co. v. Tompkins,*
    304 U.S. 64 (1938)............................................................................11

*Felder v. Casey,*
    487 U.S. 131 (1981)..........................................................................12

*Fieger v. Glen Oaks Vill.,*
    309 N.Y. 527 (1956).........................................................................15

*Galicia v. Trump,*
    65 Misc.3d 653 (Sup. Ct., Bronx Cnty. 2019)...................................20

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991).....................................................................3, 12

*Guice v. Charles Schwab & Co.,*
    89 N.Y.2d 31 (1996).........................................................................15

*McClung v. Sillman,*
    19 U.S. 598 (1821)............................................................................13

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)........................................................4, 5, 17, 19

*Norfolk S. Ry. Co. v. Shanklin,*
    529 U.S. 344 (2000).........................................................................15

*Scripps-Howard Radio v. F.C.C.,*
    316 U.S. 4 (1942).............................................................................16

*Shiamili v. Real Estate Grp. of N.Y., Inc.,*
    17 N.Y.3d 281 (2011).......................................................................15

ii

*Stewart v. Hertz Vehicles, LLC,*
 18 Misc. 3d 1139(A), 2008 N.Y. Slip Op. 50373(U) (Sup. Ct.,
 Kings Cnty. 2008) ...............................................................................15

*Stone v. Powell,*
 428 U.S. 465 (1976) ......................................................................19, 20

*In re Tarble,*
 80 U.S. 397 (1871) ........................................................................12, 13

*Teal v. Felton,*
 3 U.S. 284 (1851) ................................................................................18

*Tennessee v. Davis,*
 100 U.S. 257 (1879) ............................................................................13

*U.S. v. Burr,*
 25 F. Cas. 187 (C.C. Va. 1807) ..........................................................18

*United States v. Darby,*
 312 U.S. 100 (1941) ........................................................................2, 14

*United States v. Lopez,*
 514 U.S. 549 (1995) ............................................................................12

*United States v. Nixon,*
 418 U.S. 683 (1974) ............................................................................19

*Zervos v. Trump,*
 31 N.Y.3d 1113 (2018) ...........................................................14, 21, 22

**Statutes and Other Authorities**

28 U.S.C. § 1442(a) ...................................................................................16

U.S. Const. amend X....................................................................2, 13, 14, 15

David D. Siegel & Patrick M. Connors, *New York Practice* § 526 (6th
 ed. 2018) ...............................................................................................20

17A Wright & Miller, Fed. Prac. & Proc. Juris. § 4213 (3d ed.) ............18

Richard S. Arnold, *The Power of State Courts to Enjoin Federal
 Officers*, 73 Yale L.J. 1385 (1964) .....................................................18

Appellant President Donald J. Trump respectfully submits this reply brief in further support of, and in response to respondent's brief ("Resp. Br.") in opposition to, his appeal.[1]

## PRELIMINARY STATEMENT

Respondent asserts that "all of [the President's] arguments boil down to one -- that in this instance, state courts are inferior to and less capable than federal courts." (Resp. Br. 3.)  That is not so.  No one questions the capability of state courts.  And while there is "every reason to trust" (*id.*) that respondent's assertion is not meant as an appeal to "local prejudice," *Clinton v. Jones*, 520 U.S. at 681, 691 (1997), it plainly is an effort to distract from the real question at stake here -- the "important constitutional issue[]," *id.* at 690 -- whether state courts are authorized under the Constitution to hear cases against a sitting President in the first place.

Perhaps because respondent thus misreads or misstates the President's argument, she does not refute his showing that state courts are not so authorized. She claims that the "reasons" for the U.S. Supreme Court's holding in *Clinton v. Jones* as to federal courts "apply equally well here." (Resp. Br. 2.)  But that also is not so.  As the Supreme Court itself made clear, its Separation of Powers analysis

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meaning given to them in President Trump's opening brief ("App. Br.").

in *Clinton* in fact does *not* apply here.  Under that analysis, federal courts differ

from state courts in two dispositive ways.  First, Article III of the Constitution

expressly grants federal courts "judicial power," so there is a constitutional basis

for their authority, as a coequal branch of the federal government, to exercise

"agency in" or "controul over" the President as the embodiment of the Executive

Branch under Article II.  *See* App. Br. at 21-22; *Clinton*, 520 U.S. at 701

("Respondent is merely asking the courts to exercise their core Article III

jurisdiction to hear cases and controversies.").  For state courts, there is no such

authority in the Constitution, and the Tenth Amendment does not, and has never

been held by any court to, grant such authority.

Indeed, contrary to respondent's contention, the Tenth Amendment -- which

is nothing "more than declaratory of the relationship between the national and state

governments as it had been established by the Constitution before the amendment,"

*United States v. Darby*, 312 U.S. 100, 124 (1941) -- does *not* bar the federal

government from preempting the "heartland of state court jurisdiction" (Resp. Br.

12) -- tort lawsuits.  Belying respondent's fallacious argument (Resp. Br. 19-20)

that the Constitution bars "[s]ubordinating a state court by denying it jurisdiction

over a claim which it is presumed competent to adjudicate," and as decades of

preemption jurisprudence confirms, Congress can and does pass laws permanently

preempting state tort lawsuits.  And if Congress can do so, whether or not the states

consent, then *a fortiori* the Constitution itself -- which the states themselves

ratified -- can, and does, temporarily preempt state lawsuits against a President

while he or she is in office.

Citing *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991), respondent also

asserts that the "balance of power between the states and the federal government is

as critical to the integrity of the Constitution as the separation of powers." (Resp.

Br. 19.) Whether or not that is true, and the Supreme Court in *Ashcroft* did not say

that, respondent neglects to mention what the Supreme Court did say: "The

Federal Government holds a decided advantage in this delicate balance: the

Supremacy Clause." 501 U.S. at 460. Respondent nonetheless claims that the

Supremacy Clause "generally operates as a conflict-of-laws rule, not a source of

immunity for federal officials." (Resp. Br. 10.) Even assuming that claim is true,

respondent misses the point: as shown (App. Br. 19-21), inasmuch as the President,

under Article II, embodies the Executive Branch and "must be always in function,"

Article II conflicts with state laws or constitutions which would otherwise provide

for jurisdiction over a sitting President. Accordingly, state courts may not,

consistent with the Supremacy Clause, which makes the Constitution itself the

"supreme Law of the Land," exercise any control (*i.e.*, jurisdiction) over the

President while he or she is in office.

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 64 of 85

The second dispositive way that federal courts differ from state courts under *Clinton* is that federal courts are empowered to hear cases against the President arising from his or her official conduct -- and that, as the Supreme Court held, is precisely why federal courts are empowered to hear cases against the President arising from his or her unofficial conduct:

> In sum, "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct.*

520 U.S. at 705 (emphasis added) (citation omitted).  By contrast, as respondent must concede (Resp. Br. 16), state courts are not empowered to review the President's official conduct, so, again contrary to respondent's argument, the reasoning underlying *Clinton* does not and cannot apply here.

Contrary to respondent's argument "that Article II [does not] confer[] on [the President] broader immunity from suit than other federal officials" (Resp. Br. 17), the fact that state courts may hear lawsuits against such federal officials arising from their nonofficial conduct has no bearing on whether they can constitutionally hear such suits against the President.  In deciding the extent of Presidential immunity in cases involving official conduct, the Supreme Court, in

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982), rejected precisely the kind of argument

respondent advances:

> In arguing that the President is entitled only to qualified immunity, the respondent relies on cases in which we have recognized immunity of this scope for governors and cabinet officers. We find these cases to be inapposite. *The President's unique status under the Constitution distinguishes him from other executive officials.*

*Id.* at 750 (emphasis added) (citations omitted).

Nor does the President's immunity mean, as respondent would have it

(Resp. Br. 10), that the President would "escape liability," or "render citizens like

[respondent] unable to turn to state courts" (Resp. Br. 20). The immunity

mandated by the Constitution for the President's unofficial conduct (unlike, say,

the immunity afforded for the President's official conduct or for judges and others)

is temporary, applicable only while the President is in office. *See Clinton*, 520

U.S. at 697 (Presidential immunity entails "merely . . . a postponement of the

judicial proceedings"); *see also* App. Br. 28.

In short, the fundamental flaw in respondent's opposition is that it ignores

the dispositive difference between the Separation of Powers doctrine, which

controls in a case in federal court, and the Supremacy Clause, which controls here.

As the Supreme Court noted in *Clinton*, "[i]f this case were being heard in a state

forum, instead of advancing a separation-of-powers argument, [the President]

would presumably rely on federalism and comity concerns, as well as the interest

in protecting federal officials from possible local prejudice." *Id.* at 691 ("Whether those concerns would present a more compelling case for immunity is a question that is not before us.") (citations omitted). And, as the Supreme Court explained:

> Because the Supremacy Clause makes federal law 'the supreme Law of the Land,' any direct control by a state court over the President, who has principal responsibility to ensure that those laws are "faithfully executed," Art. II, § 3, may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here.

*Id.* at 691 n.13. So much for respondent's claim (Resp. Br. 2) that the President's position here -- the same position the Supreme Court suggested might "present a more compelling case" -- is "radical."

Accordingly, this action should be dismissed or stayed during President Trump's presidency.

## ARGUMENT

## I.  THE SUPREME COURT'S REASONING IN *CLINTON V. JONES* IN NO WAY SUPPORTS RESPONDENT'S POSITION.

The Supreme Court in *Clinton v. Jones* held that, under the Separation of Powers doctrine, federal courts may exercise jurisdiction over a sitting President in actions arising from his or her unofficial conduct. 520 U.S. at 705-06. Respondent contends that that holding applies equally to state courts, arguing that "[t]he fact that Ms. Zervos brought a similar lawsuit in state rather than federal court is a distinction that makes no difference" (Resp. Br. 8-9), and that the Supreme Court

"considered several of the arguments [the President] has made throughout this litigation and rejected them for reasons that apply equally well here." (*id.* 8.) In fact, however, the Supreme Court itself expressly disagrees and, far from rejecting the arguments the President has made, itself raised them.

Thus, as shown (App. Br. 13-14, 22-23), the Supreme Court in *Clinton* expressly differentiated between, on the one hand, President Clinton's "claim of immunity . . . asserted in federal court [which] relie[d] heavily on the doctrine of separation of powers that restrains each of the three branches of the Federal Government" -- the immunity claim the Court rejected -- and, on the other hand, a "comparable claim" of immunity asserted, as here, in state courts.  520 U.S. at 691. The Court pointed out that, while that "important constitutional issue[]," *id.* at 690, as to state courts was not before it, state court actions "may implicate concerns that are *quite different*," *id.* at 691 n.13 (emphasis added), and might "present a *more compelling* case for immunity," *id.* at 691 (emphasis added).  In fact, the Supreme Court outlined those very concerns, including whether "any direct control by a state court over the President" violates the Supremacy Clause, *id.* at 691 n.13, as well as "possible local prejudice," *id.* at 691.[2]

---

[2]     The President does not argue that *Clinton* "does not control *simply* because this case was not filed in federal court." (Resp. Br. 9) (emphasis added).  Rather, the President, like the Supreme Court itself, raises the concerns -- the different constitutional concerns -- that are implicated because the case was filed in state court and that mandate immunity while the President is in office.

Respondent correctly points out that with respect to the "constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions," *Clinton*, 520 U.S. at 702, the President "makes virtually identical arguments here, even citing the same cases as President Clinton." (Resp. Br. 9.)  But, of course, it is those same cases, based on the same constitutional provisions -- in Article II -- which establish the President's "constitutionally mandated functions."  Yet again, respondent misses the point -- the crucial distinction between federal and state courts recognized by the Supreme Court itself in *Clinton*.  In the case of federal courts, the Separation of Powers doctrine means that, as a coequal branch, they can assert jurisdiction over the President, whereas the Supremacy Clause means that state courts, which are not a coequal branch, may not.

Respondent incorrectly asserts that the Supreme Court in *Clinton* held that "'neither the 'President, [n]or any official, has an immunity that extends beyond the scope of any action taken in an official capacity.'" (Resp. Br. 8 (quoting *Clinton*, 520 U.S. at 694).)  That statement, which respondent quotes out of context, does not stand for what respondent seems to claim it does, does not address the part of the Supreme Court's decision relevant here, and addressed only the first of three grounds President Clinton advanced -- namely, that the President's temporary immunity from suit in federal court can "be sustained on the basis of

precedent," *see Clinton*, 520 U.S. at 692. The full sentence from which respondent extracted the quote, and the context in which it appears, make clear that it is addressing whether there is such precedent, not reciting the rule respondent advances: "*But we have never suggested* that the President, or any other official has an immunity that extends beyond the scope of any action taken in an official capacity." *Id.* at 694 (emphasis added for words respondent elided).

The second ground President Clinton advanced was that "evidence from the historical record" supports according the President immunity. The Court found that ground equally unpersuasive, particularly given the conflicting historical evidence. *Id.* at 695-97.

President Clinton's third ground -- the "strongest argument supporting his immunity claim," *id*. at 697 -- gave rise to the Supreme Court's principal holding in *Clinton*. That holding is the one relevant here, because it is the holding that the Court, as shown, *supra* at 5-7, expressly indicated is inapplicable to actions in state court. That argument was "grounded in the character of the office that was created by Article II of the Constitution, and relie[d] on separation-of-powers principles." *Id.* at 697. The Supreme Court had "no dispute with the initial premise of the argument," *id*. at 698 -- that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he

devote his undivided time and attention to his public duties," *id.* at 697.  (*See also* App. Br. 11-12, 21.)

While agreeing with President Clinton's premise, the Supreme Court held that "[i]t does not follow, however, that separation-of-powers principles would be violated by allowing this action to proceed."  *Clinton*, 520 U.S. at 699.  The Supreme Court reasoned that, inasmuch as "separation of powers does not mean that the branches [of the federal government] 'ought to have no *partial agency* in, or no *controul* over the acts of each other,'" *id.* at 703 (emphasis in original) (citation omitted), "a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive . . . ." *Id.* at 705-06.  (*See* App. Br. 13-14, 21-22.)  And, after noting that "when the President takes official action, the Court has the authority to determine whether he has acted within the law," the Court explained:

> In sum, "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."  *If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct.*

*Clinton*, 520 U.S. at 705 (emphasis added) (citation omitted).

As shown (App. Br. 15-18), and as the Supreme Court itself indicated (*see supra* at 5-7), that reasoning has no application to state courts: there is no basis in

10

the Constitution for state courts to have any "agency in" or "controul over," or to place any burden on, the President who embodies the Executive Branch of the federal government.  And because the Executive Branch, which is embodied by the President, must "be always in function," *Clinton*, 520 U.S. at 717 (Breyer, J., concurring) (citation omitted), *any* exercise of jurisdiction by a state court over the President amounts to impermissible "direct control," *see Clinton*, 520 U.S. at 691 n.13, over the office of the President.[3]

## II.  DUAL SOVEREIGNTY IS CONSISTENT WITH AND INDEED SUPPORTS PRESIDENTIAL IMMUNITY HERE.

Respondent makes much of the principle of federal and state "dual sovereignty" (Resp. Br. 12) inherent in our federal system.  But that principle is entirely consistent with, and in fact supports, affording the President of the United States immunity from state-court jurisdiction while he or she is in office.

First, as noted (App. Br.  15-16), dual sovereignty cuts both ways:

> Just as federal courts are constitutionally obligated to apply state law to state claims, *see* [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)], so too the Supremacy Clause imposes on state courts a constitutional duty 'to proceed in such manner that all the substantial rights of the parties under controlling federal law [are] protected.

---

[3]  *See Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 340 (2012) (A court's exercise of jurisdiction over a person is "fundamentally about a court's control over the person."). Thus, as shown (App. Br. 24-25), because the mere exercise of jurisdiction over the President constitutes impermissible direct control, whether a state court is willing to make reasonable accommodations (Resp. Br. 20) is irrelevant.  Further, a state court may not, under the Supremacy Clause, determine whether an accommodation is "reasonable." (*See* App. Br. 25-26.)

*Felder v. Casey*, 487 U.S. 131, 151 (1988) (citation omitted).

A century and a half ago, the Supreme Court explained how the dual sovereignty principle, as limited by the Supremacy Clause, in fact prevents states from enjoining federal officials:

> [N]o State can authorize one of its judges or courts to exercise judicial power . . . within the jurisdiction of another and independent government. And although the State . . . is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United States. . . . And the sphere of action appropriated to the United States, is as far beyond the reach of the judicial process issued by a State judge or a State court, as if the line of division was traced by landmarks and monuments visible to the eye.

*In re Tarble*, 80 U.S. 397, 405-08 (1871). The Supreme Court thus held that "[i]t is manifest that the powers of the National government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by officers or tribunals of another sovereignty." *Id.* at 409.[4]

---

[4]     Citing *Ashcroft*, 501 U.S. at 458, respondent also asserts that the "balance of power between the states and the federal government is as critical to the integrity of the Constitution as the separation of powers." (Resp. Br. 19.) Whether or not that is true, and the Supreme Court in *Ashcroft* did not say that, respondent neglects to mention what the Supreme Court did say: "The Federal Government holds a decided advantage in this delicate balance: the Supremacy Clause." 501 U.S. at 460. *United States v. Lopez*, 514 U.S. 549, 552 (1995) (Resp. Br. 19) is also inapposite. There, the Supreme Court held that Congress, in enacting a statute which made it illegal to possess a firearm in a school zone, exceeded its authority under the Commerce Clause, because the statute had nothing to do with interstate commerce. This action, by contrast, has nothing to do with Congress's limited powers, but with the President's overriding responsibilities under Article II. (App. Br. 10.)

Accordingly, a state court's exercise of jurisdiction "for any period," *Tarble*, 80 U.S. at 409, over the President -- who must "be always in function," *Clinton*, 520 U.S. at 717 (Breyer, J., concurring) (citation omitted) -- impermissibly interferes with "the powers of the National government," *Tarble*, 80 U.S. at 409. *See also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (the federal government "can act only through its officers and agents" and "[n]o State government can . . . obstruct its authorized officers against its will . . . ."); *McClung v. Sillman*, 19 U.S. 598, 605 (1821) (state courts cannot control the federal land office register because "he is to be regarded either as an officer of that government, or as its private agent. In the one capacity or the other, his conduct can only be controlled by the power that created him . . . ."); App. Br. 18.[5]

Nor is the Tenth Amendment -- which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States . . . ." -- relevant here, as respondent suggests. (Resp. Br. 12.) The Tenth Amendment is "declaratory of the relationship between the national and state governments as it had been established by the Constitution

---

[5]  Respondent erroneously asserts that "[s]ubordinating a state court by denying it jurisdiction over a claim which it is presumed competent to adjudicate would destroy [the] balance" between the federal and state governments and leave "citizens like Ms. Zervos unable to turn to state courts to resolve their disputes" (Resp. Br. 19-20).  To the contrary, confirming Presidential immunity here would, under Supreme Court precedent, including *Tarble*, preserve that balance, and it would merely postpone, not deny, state-court jurisdiction and respondent's access to state court.

before the amendment." *Darby*, 312 U.S. at 124. The Constitution before the amendment established the Article II duties of the President and the supremacy of the Constitution itself, including Article II. Therefore the ability to assert jurisdiction or otherwise control the President is not a power "reserved to the States," and the Tenth Amendment has no application here.

It is likewise irrelevant that, as respondent argues (Resp. Br. 12-13), state courts are presumed to have concurrent jurisdiction with federal courts. As the *Zervos* dissent pointed out in addressing this argument, that a particular federal statute does not preempt state courts from exercising jurisdiction in the absence of explicit contrary congressional intent, has no bearing on "whether the state court's exercise of jurisdiction would interfere with the very ability of the President to execute federal law." *Zervos*, 171 A.D.3d at 136 (Mazzarelli, J., dissenting). Moreover, it is well-established that this presumption gives way, under the Supremacy Clause, to the right of federal officers to perform their duties without interference from state courts. (App. Br. 16-17.)[6]

It is also irrelevant that, as respondent asserts, "[t]ort lawsuits fall within the heartland of state court jurisdiction." (Resp. Br. 12.) Belying respondent's

---

[6]    Respondent argues that "concurrent jurisdiction extends even to cases brought against federal officials for violations of federal law under color of their *official* authority" (Resp. Br. 13 (emphasis in original)). However, those cases are inapposite because they do not involve the President. *See supra* 8-9 and *infra* 17-19.

fallacious argument (Resp. Br. 19-20) that the Constitution bars "[s]ubordinating a

state court by denying it jurisdiction over a claim which it is presumed competent

to adjudicate," and as decades of preemption jurisprudence confirms, Congress can

and does pass laws permanently preempting state tort lawsuits. *See, e.g., Norfolk*

*S. Ry. Co. v. Shanklin*, 529 U.S. 344, 359 (2000) (state law negligence claims

preempted by the Federal Railroad Safety Act); *Shiamili v. Real Estate Grp. of*

*N.Y., Inc.*, 17 N.Y.3d 281, 286 (2011) (state law defamation and unfair competition

claims preempted by federal Communications Decency Act); *Guice v. Charles*

*Schwab & Co.*, 89 N.Y.2d 31, 39, 44-48 (1996) (state breach of fiduciary duty

claims preempted by SEC regulations); *Fieger v. Glen Oaks Vill.*, 309 N.Y. 527,

531, 534 (1956) (state court lacked jurisdiction to hear tort claims amounting to a

"collateral attack on a determination" of the Federal Housing Authority).[7]

And if Congress can preempt state tort laws, then *a fortiori* the Constitution

itself -- which the states themselves ratified -- can, and does, preempt state lawsuits

against a President while he or she is in office.  Moreover, unlike Congressional

---

[7]     Given the preemption cases, *Stewart v. Hertz Vehicles, LLC*, 18 Misc. 3d 1139(A), 2008
N.Y. Slip Op. 50373(U), *5 (Sup. Ct., Kings Cnty. 2008), cited by respondent for the proposition
that "'[t]he Tenth Amendment generally reserves to the States traditional police powers, such as
the powers to proscribe or punish conduct through state tort laws'" (Resp. Br. 12), does not
support her position.  Moreover, that case recognized that "[i]f a power is delegated . . . in the
Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the
States."  As shown, here, the President's immunity stems from his Article II powers.  (App. Br.
20 n.4.)

preemption, the preemption here does not bar the application of state tort laws permanently, but merely while the President is in office.

## III. CONGRESSIONAL SILENCE IS IRRELEVANT WHERE THE CONSTITUTION ITSELF PRECLUDES STATE-COURT JURISDICTION.

Respondent argues that state courts may exercise jurisdiction over the President because "Congress has enacted no such law allowing federal officials, including the President, to escape state court jurisdiction for suits involving their unofficial conduct." (Resp. Br. 13-14.)  Congress's silence has no bearing on the immunity afforded the President by the Constitution because the President's immunity stems from the Constitution itself.  *See* App. Br. 19-21; *see also Clinton v. Jones*, 520 U.S. at 691 n.13 ("'[A]bsent explicit congressional *consent* no state may command federal officials ... to take action in derogation of their ... federal responsibilities'") (emphasis added) (quoting L. Tribe, American Constitutional Law 513 (2d ed. 1988)).[8]

---

[8]     That the federal removal statute, 28 U.S.C. § 1442(a), allows lower federal officers to remove a lawsuit brought in state court "relating to any act under color of such office," does not imply any Congressional affirmation of state-court jurisdiction over the President (Resp. Br. 13). In fact, as the Supreme Court recognized in *Clinton*, 520 U.S. at 691, the "authority to remove certain cases brought against federal officers from a state to a federal court," is based on a concern militating in favor of Presidential immunity.  It is also irrelevant that, as respondent argues (Resp. Br. 13-14), Congress has not enacted legislation barring state-court jurisdiction over the President.  Following *Clinton*, there was no need for Congress to do so, inasmuch as the Supreme Court had suggested that the Supremacy Clause already accomplished the same result. *See also Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 11 (1942) ("The search for significance in the silence of Congress is too often the pursuit of a mirage.  [Courts] must be wary against interpolating [their] notions of policy in the interstices of legislative provisions.").

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 77 of 85

## IV.   THE CONSTITUTION BARS STATE-COURT JURISDICTION OVER THE PRESIDENT RELATED TO UNOFFICIAL CONDUCT.

Respondent, in attempting to distinguish cases that bar state-court jurisdiction over federal officials on the ground that they involve unofficial conduct (Resp. Br. 16-17), again ignores the President's unique status under the Constitution.

First, that state courts may hear lawsuits against lower federal officials arising from their nonofficial conduct has no bearing on whether they can constitutionally hear such suits against the President.  In deciding the extent of Presidential immunity in cases involving official conduct, the Supreme Court, in *Nixon v. Fitzgerald*, 457 U.S. 731, rejected precisely the kind of argument respondent advances:

> In arguing that the President is entitled only to qualified immunity, the respondent relies on cases in which we have recognized immunity of this scope for governors and cabinet officers.  We find these cases to be inapposite. *The President's unique status under the Constitution distinguishes him from other executive officials.*

*Id.* at 750 (emphasis added) (citations omitted).  *See also Cheney v. U.S. Dist. Court for D.C*, 542 U.S. 367, 385 (2004) ("Respondent['s] reliance on cases that do not involve senior members of the Executive Branch is altogether misplaced.");

*U.S. v. Burr*, 25 F. Cas. 187, 192 (C.C. Va. 1807) (Marshall, C.J., by designation)

("In no case of this kind would a court be required to proceed against the president as against an ordinary individual.").[9]

Respondent's claim that *Clinton's* "rejection of any claim to Article II exceptionalism is not limited to lawsuits filed in federal court" (Resp. Br. 18) is thus doubly wrong. Not only did *Clinton* explicitly embrace "Article II exceptionalism," 520 U.S. at 697-98, but its holding that federal courts could exercise jurisdiction notwithstanding such exceptionalism has no application to state courts. *Id.* at 691 n.13.

Respondent argues next that the President is not immune from state-court jurisdiction related to unofficial conduct, because, she claims, the purpose of affording lower federal officials immunity is so that they may "perform their designated functions effectively without fear that a particular decision may give rise to personal liability." (Resp. Br. 16-17.) However, the broader immunity afforded the President reflects broader concerns. The Supreme Court has

---

[9]     For the same reason, respondent's cases holding that state courts have jurisdiction to hear damages claims against lower federal officials -- to the extent those claims are not otherwise barred by the officials' qualified immunity -- have no application to the President. (*See* Resp. Br. 14 (citing *Teal v. Felton*, 53 U.S. 284 (1851) (allowing conversion action for damages against postmaster who acted outside of the scope of his authority in refusing to deliver mail without additional postage); 17A Wright & Miller, Fed. Prac. & Proc. Juris. § 4213 (3d ed.) ("It is settled that state courts may entertain actions against federal officers for damages . . . . On the other hand, it has been clear since 1821 that a state court cannot issue a writ of mandamus against a federal officer."); Richard S. Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 Yale L.J. 1385 (1964) (noting the "line of New York cases that deny the power of state courts to enjoin federal officers").)

repeatedly stressed that even federal-court jurisdiction over the President raises unique concerns.[10]

Respondent's argument that "Defendant has provided no explanation as to how this suit would interfere with his Constitutional duties (Resp. Br. 17), thus misses the point. As shown (App. Br. 18), the exercise of jurisdiction itself amounts to impermissible direct control. Further, because the President's official duties stem directly from Article II, state courts may not even assess a President's explanation of how a particular suit interferes with the President's constitutional duties. (*See* App. Br. 25-26.)[11]

Respondent cites *Stone v. Powell*, 428 U.S. 465, 493 n.35 (1976), for the proposition that state court judges are as competent as federal court judges to manage their cases. But the Supreme Court's concern in *Clinton* with "possible

---

[10]     *See, e.g.*, *Cheney*, 542 U.S. at 382 ("[T]he public interest requires that a coequal branch of Government . . . give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties."); *Clinton*, 520 U.S. at 707 ("[T]he potential burdens on the President . . . are appropriate matters for the District Court to evaluate in its management of the case. The high respect owed the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding . . . ."); *Fitzgerald*, 457 U.S. at 753 ("Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."); *United States v. Nixon*, 418 U.S. 683, 692 (1974) (federal courts should avoid where possible an "occasion for constitutional confrontation" with the Executive Branch); App. Br. 26-27.

[11]     Respondent cites Justice Breyer's concurrence in *Clinton*, but his reasoning has no application in state court, as was the Second Circuit's similar reasoning in *Trump v. Vance* (Resp. Br. 18). *See* 941 F.3d 631, 642-43 (2d Cir. 2019) ("the President may be correct that state courts lack the authority to issue him orders . . . ."), *cert. granted*, 140 S. Ct. 659 (2019).

local prejudice" is not that state court judges are less competent, but rather with the potential for conflict between the local interests of the states with those of the federal government. *Clinton*, 520 U.S. at 691. *Stone v. Powell* -- which held that state courts are equally competent to hear a defendant's Fourth Amendment defense -- is irrelevant to this concern.

In fact, pending actions have already indicated the difficulties with subjecting the President to the varying procedural rules of state courts. In *Galicia v. Trump*, the trial court ordered the President to appear for a videotaped deposition within three business days, during the week in which the President was set to address the United Nations General Assembly. *Galicia v. Trump*, 65 Misc.3d 653, 658 (Sup. Ct., Bronx Cnty. 2019). While the President was able to obtain an emergency stay pending the determination of his interlocutory appeal -- now *sub judice* before the First Department, No. 24973/15E, M-7413 (1st Dep't Oct. 24, 2019) -- it exemplifies the control a state court asserting jurisdiction can wield over the President. Further, many state courts do not even afford such interlocutory relief. *See* David D. Siegel & Patrick M. Connors, *New York Practice* § 526 (6th ed. 2018) ("New York is unique in its generosity, making a broad range of nonfinal -- also called 'intermediate' or 'interlocutory' -- orders immediately appealable without waiting for final judgment").

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 81 of 85

And in this action, when the President was initially unable to obtain a stay pending appeal of the trial court's denial of his motion to dismiss from the First Department, he then was unable to obtain review of that decision from this Court, due to the constitutional limitations on its jurisdiction. *See Zervos v. Trump*, 31 N.Y.3d 1113, 1114 (2018). Had the case been in federal court, he would have been able to obtain an interlocutory appeal and stay from the District Court's denial. *See* Appellant's Mem. in Opposition to Mot. to Vacate Stay, in *Zervos v. Trump*, APL-2020-00009, Mo. No. 2020-115, at 8, 24 n.11, 26-29 (collecting cases).

## V.  THE CONTEMPT POWER IS INDICATIVE OF THE COURT'S DIRECT CONTROL OVER THE PRESIDENT.

Respondent claims that there is no basis for "indefinitely delaying Ms. Zervos's day in court based on the mere possibility that Defendant may engage in conduct over the course of the litigation that would trigger contempt, as the dissent below feared." (Resp. Br. 21.) But the dissent was not concerned with some hypothetical future contempt-triggering conduct. Rather, the dissent explained that the mere power to hold the President in contempt acts as "sword of Damocles hanging over the President's head," such that a state court's exercise of jurisdiction in and of itself amounts to impermissible direct control. (*See* App. Br. 26 (citing *Zervos*, 171 A.D.3d at 137)). Moreover, as shown (App. Br. 25-26), it would be

improper to wait for a constitutional confrontation in the form of a contempt finding to rule on the permissibility of jurisdiction.

## VI.   THE LAWSUITS CITED BY RESPONDENT ARE IRRELEVANT.

Respondent incorrectly claims that "Defendant's concern about state court jurisdiction appears to wax and wane depending on the subject matter of the lawsuit," because, she claims, he "has actively participated in numerous lawsuits across the country, including in state court."  (Resp. Br. 24.)[12]

Respondent's counsel, who was not involved in those actions, is incorrect about the extent of the President's involvement and the objections to subject-matter jurisdiction that he raised.[13]  The President did not "actively participate" in *Galicia v. Trump*, No. 24973/2015E (Sup. Ct., Bronx Cnty.) -- filed over a year *before* President Trump took office, against numerous defendants.  To the contrary, the trial court refused the plaintiffs' request to allow his deposition in discovery.

---

[12]     Respondent does not, as she cannot, explicitly argue that the President has waived his right to assert the Supremacy Clause.  Even if there were a factual basis for such an argument, and, as shown, there is not, there is no basis for concluding that the jurisdiction issue here arising under the Supremacy Clause is waivable at all.  Such a conclusion was soundly rejected by the dissent below, *Zervos*, 171 A.D.3d at 131, and was not addressed in the majority decision.

[13]     Respondent's counsel, who until recently, was not involved in this action, is also incorrect about the procedural posture in this action.  She states that "[a]t the time the stay was ordered[ by the First Department,] document discovery was nearly complete . . . ." (Resp. Br. 7.)  Not so.  In fact, there is significant document discovery outstanding.  As respondent herself acknowledged, if appellant were unsuccessful on his appeal, there is a "long road ahead" and "the parties will spend significantly more time completing discovery, litigating motions, and, then, trying this case to final judgment."  (Respondent's Mem. in Support of Mot. to Vacate Stay Under N.Y. C.P.L.R § 5519(c), in *Zervos v. Trump*, APL-2020-00009, Mo. No. 2020-115, at 7.)

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 83 of 85

(NYSCEF 125.)  When plaintiffs subsequently served a trial subpoena, President Trump did, in fact, assert immunity from state-court jurisdiction (NYSCEF 390) and, as noted (*supra* 20), his appeal of the order allowing that deposition on constitutional grounds, among others, is *sub judice*.

Nor did President Trump "actively participate" in *Garcia v. Bayrock/Sapir Org., LLC*, No. 601495/2015 (Sup. Ct. Suffolk Cnty.) -- an action by an employee of a staffing agency against 12 defendants alleging that she was owed gratuities from a Trump hotel.  (NYSCEF 2.)  Discovery was completed *before* President Trump's inauguration (NYSCEF 55), and there was little to no motion practice following it (NYSCEF 88, 96), before the plaintiff voluntarily discontinued the action (NYSCEF 122).[14]

\* \* \*

---

[14]     The President is not a party to the lawsuits filed by his campaign.

Case 1:20-cv-07311-LAK   Document 12-11   Filed 09/14/20   Page 84 of 85

## **CONCLUSION**

For the foregoing reasons, and those in the President's opening brief, this

action should be dismissed or stayed while the President is in office.

Respectfully submitted,

Dated: May 8, 2020

KASOWITZ BENSON TORRES LLP

By: _____

Marc E. Kasowitz
Daniel R. Benson
Christine A. Montenegro
Paul J. Burgo

1633 Broadway
New York, New York 10019
(212) 506-1700
mkasowitz@kasowitz.com
dbenson@kasowitz.com
cmontenegro@kasowitz.com
pburgo@kasowitz.com

*Attorneys for Defendant-Appellant*
*Donald J. Trump*

# NEW YORK STATE COURT OF APPEALS
## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to 22 NYCRR PART 500.l(j) that the foregoing brief was prepared on a computer using Microsoft Word.

*Type.* A proportionally spaced typeface was used, as follows:
    Name of Typeface:  Times New Roman
    Point size:  14 (footnotes in 12 point)
    Line spacing:  Double

*Word Count.*  The total number of words in this brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of services, certificate of compliance, corporate disclosure statement, question presented, statement of related cases, or any authorized addendum containing statutes, rules, regulations, etc., is 6,094 words.

Dated:  May 8, 2020

        Marc E. Kasowitz
        Daniel R. Benson
        Christine A. Montenegro
        Paul J. Burgo
        KASOWITZ BENSON TORRES LLP
        1633 Broadway
        New York, New York 10019
        (212) 506-1700

        *Attorneys for Defendant-Appellant*
        *Donald J. Trump*