Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 1 of 54

# EXHIBIT 10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------x
                                          :
SUMMER ZERVOS,                            :   Index No. 150522/2017
                                          :
                   Plaintiff,             :   Hon. Jennifer G. Schecter
                                          :
           v.                             :   Motion Seq. No. 003
                                          :
DONALD J. TRUMP,                          :
                                          :
                   Defendant.             :
                                          :
------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF PRESIDENT DONALD J. TRUMP'S MOTION TO DISMISS AND STRIKE THE COMPLAINT PURSUANT TO CPLR 3211 AND CAL. CODE CIV. P. § 425.16(B)(1) OR, IN THE ALTERNATIVE, FOR A STAY PURSUANT TO CPLR 2201**


KASOWITZ BENSON TORRES LLP

Marc E. Kasowitz
Christine A. Montenegro
Paul J. Burgo

1633 Broadway
New York, New York 10019
P: (212) 506-1700

*Attorneys for Defendant Donald J. Trump*


July 7, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ..................................................................... 1

BACKGROUND ............................................................................................ 4

    A.    Ms. Zervos's Politically Motivated Lawsuit ........................................... 4

    B.    Ms. Zervos's Allegations Are False ........................................................ 7

    C.    Ms. Zervos Admittedly Seeks Overly Broad  Discovery For Extra-Judicial Purposes ................................................................................ 7

    D.    The Allegedly Defamatory Statements Are Not Actionable ................... 9

ARGUMENT ................................................................................................ 10

I.    This State Court May Not Exercise Jurisdiction Over A  Civil Suit Against The President During His Presidency ............................................... 10

    A.    The Suit Is Barred By The Supremacy Clause ..................................... 11

    B.    Prudential Factors Further Militate Against This  State Court Exercising Jurisdiction Over the President .......................................... 15

II.    In The Alternative, The Court Should Stay This Action Pursuant To CPLR 2201 .......... 17

III.    Ms. Zervos's Complaint Must Be Dismissed In Its Entirety As A Matter Of Law .......... 20

    A.    The Statements Are Non-Actionable Opinion Or Hyperbole With No Defamatory Meaning ................................................................. 22

        1.    The Statements In The Context Of A National Political Campaign Are Non-Actionable Fiery Rhetoric With No Defamatory Meaning ................................................................. 23

        2.    The Statements Are Non-Actionable Opinions ......................... 28

    B.    Most Of The Statements Do Not Even Refer To Ms. Zervos And Therefore Are Not Actionable .............................................................. 30

    C.    President Trump Did Not Publish Barry's Statement Or The Retweets .............. 33

        1.    President Trump Did Not Publish Mr. Barry's Statement Posted On The Campaign Website ......................................... 34

i

2.    President Trump Cannot Be Held Liable As A Publisher
For The Retweets ................................................................. 36

D.    Ms. Zervos Failed To Properly Plead Damages ................................... 37

IV.    The Complaint Must Be Stricken Pursuant to California's Anti-SLAPP Law................. 38

CONCLUSION.................................................................................. 40

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115 St. Corp. v. Von Gutfeld*,
    80 N.Y.2d 130 (N.Y. 1992) ...................................................................23

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013).......................................20, 24, 38

*Ampex Corp. v. Cargle*,
    27 Cal. Rptr. 3d 863 (Cal. Ct. App. 2005) ........................................21, 35

*Annette F. v. Sharon S.*,
    15 Cal. Rptr. 3d 100 (Cal. Ct. App. 2004) ...........................................39

*Armand Schmoll, Inc., v. Fed. Reserve Bank of N.Y.*,
    37 N.E.2d 225 (N.Y. 1941).....................................................................15

*Art of Living Found. v. Does*,
    2011 WL 2441898 (N.D. Cal. June 15, 2011) ................................. 30-31

*Ascentive, LLC v. Opinion Corp.*,
    842 F. Supp. 2d 450 (E.D.N.Y. 2011) ..................................................35

*Asia Econ. Inst. v. Xcentric Ventures LLC*,
    2011 WL 2469822 (C.D. Cal. May, 4, 2011) ......................................33

*Baral v. Schnitt*,
    376 P.3d 604 (Cal. 2016) ................................................................38, 39

*Barrett v. Rosenthal*,
    146 P.3d 510 (Cal. 2006) ...............................................................35, 37

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ..............................................................38

*Behr v. Weber*,
    568 N.Y.S.2d 948 (1st Dep't 1991) .....................................................28

*Beilenson v. Superior Court*,
    52 Cal. Rptr. 2d 357 (Cal. Ct. App. 1996) ...........................................40

*Blatty v. N.Y. Times Co.*,
    728 P.2d 1177 (Cal. 1986) ....................................................................21

*Buckley v. Valeo*,
　424 U.S. 1 (1976) ................................................................38

*Burson v. Freeman*,
　504 U.S. 191 (1992) ...........................................................24

*Carr v. Warden*,
　206 Cal. Rptr. 162 (Cal. Ct. App. 1984) ...........................28

*Carroll v. McKinnell*,
　19 Misc. 3d 1106(A) (Sup. Ct., New York Cty. 2008) ........5

*Carver v. Bonds*,
　37 Cal. Rptr. 3d 480 (Cal. Ct. App. 2005) .........................26

*Chaker v. Mateo*,
　147 Cal. Rptr. 3d 496 (Cal. Ct. App. 2012) .......................27

*Chicherchia v. Cleary*,
　616 N.Y.S.2d 647 (2d Dep't 1994) ....................................31

*Citizens United v. Fed. Election Comm'n*,
　558 U.S. 310 (2010) ...........................................................24

*Clinton v. Jones*,
　520 U.S. 681 (1997) ..................................................... *passim*

*Colantonio v. Mercy Med. Ctr.*,
　901 N.Y.S.2d 370 (2d Dep't 2010) ....................................29

*Collier v. Harris*,
　192 Cal. Rptr. 3d 31 (Cal. Ct. App. 2015) .........................24

*Conroy v. Spitzer*,
　83 Cal. Rptr. 2d 443 (Cal. Ct. App. 1999) .........................39

*Cooper v. Aaron*,
　358 U.S. 1 (1958) ...............................................................15

*Correia v. Santos*,
　13 Cal. Rptr. 132 (Cal. Ct. App. 1961) .............................37

*DiSanto v. Forsyth*,
　684 N.Y.S.2d 628 (2d Dep't 1999) ....................................38

*Doe 2 v. Superior Court*,
　206 Cal. Rptr. 3d 60 (Cal. Ct. App. 2016) .........................21

iv

*Dreamstone Entm't Ltd. v. Maysalward Inc.*,
  2014 WL 4181026 (C.D. Cal. Aug. 18, 2014)......................................................28

*El-Amine v. Avon Prods., Inc.*,
  739 N.Y.S.2d 564 (1st Dep't 2002) ......................................................................29

*Elias v. Rolling Stone LLC*,
  192 F. Supp. 3d 383 (S.D.N.Y. 2016)......................................................21, 31, 33

*Evans v. Unkow*,
  45 Cal. Rptr. 2d 624 (Cal. Ct. App. 1995) ...........................................................40

*Farber v. Jefferys*,
  959 N.Y.S.2d 486 (1st Dep't 2013) ......................................................................29

*Ferlauto v. Hamsher*,
  88 Cal. Rptr. 2d 843 (Cal. Ct. App. 1999) ................................................. 30, 32-33

*Fields v. Twitter, Inc.*,
  217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...............................................................33

*Forsher v. Bugliosi*,
  608 P.2d 716 (Cal. 1980) .............................................................................30, 33

*General Atomic Co. v. Felter*,
  434 U.S. 12 (1977)...............................................................................................15

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974).............................................................................................25

*GetFugu, Inc. v. Patton Boggs LLP*,
  162 Cal. Rptr. 3d 831 (Cal. Ct. App. 2013) ...................................................28, 29

*Global Telemedia Int'l, Inc. v. Doe 1*,
  132 F. Supp. 2d 1261 (C.D. Cal. 2001) ...............................................................27

*Golub v. Enquirer/Star Grp., Inc.*,
  681 N.E.2d 1282 (N.Y. 1997)..............................................................................26

*Gomez-Jimenez v. N.Y. Law Sch.*,
  943 N.Y.S.2d 834 (Sup. Ct., New York Cty. 2012) ...............................................5

*Haefner v. N.Y. Media, LLC*,
  918 N.Y.S.2d 103 (1st Dep't 2011) ......................................................................37

*HSBC Bank, USA v. Despot*,
  12 N.Y.S.3d 556 (2d Dep't 2015).........................................................................17

v

*Huggins v. Povitch*,
    1996 WL 515498 (Sup. Ct., New York Cty. Apr. 19, 1996).................................................28

*Hung Tan Phan v. Lang Van Pham*,
    105 Cal. Rptr. 3d 791 (Cal. Ct. App. 2010) ......................................................................37

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*,
    774 N.E.2d 696 (N.Y. 2002).............................................................................................34

*Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*,
    1988 WL 75262 (S.D.N.Y. July 13, 1988) .......................................................................34

*Jacobus v. Trump*,
    51 N.Y.S.3d 330 (Sup. Ct., New York Cty. 2017) ....................................................... *passim*

*Jaramillo v. Food 4 Less Madera*,
    2010 WL 4746170 (E.D. Cal. Nov. 16, 2010) ..................................................................37

*Jefferson Cty. v. Acker*,
    527 U.S. 423 (1999)..........................................................................................................12

*Kahn v. Bower*,
    284 Cal. Rptr. 244 (Cal. Ct. App. 1991) ..........................................................................22

*Ketchum v. Moses*,
    104 Cal. Rptr. 2d 377 (Cal. 2001) ....................................................................................40

*Konig v. WordPress.com*,
    978 N.Y.S.2d 92 (2d Dep't 2013) .....................................................................................27

*Lakireddy v. Soto-Vigil*,
    2014 WL 1478693 (Cal. Ct. App. Apr. 16, 2014) ............................................................39

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936)..........................................................................................................17

*Lapine v. Seinfeld*,
    918 N.Y.S.2d 313 (Sup. Ct., New York Cty. 2011) .........................................................30

*LeBreton v. Weiss*,
    680 N.Y.S.2d 532 (1st Dep't 1998) ..................................................................................29

*Live Oak Publ'g Co. v. Cohagan*,
    286 Cal. Rptr. 198 (Cal. Ct. App. 1991) .....................................................................33, 35

*Lore v. N.Y. Racing Ass'n Inc.*,
    12 Misc. 3d 1159(A) (Sup. Ct., Nassau Cty. 2006) ...........................................................5

vi

*Main v. Thiboutot*,
    448 U.S. 1 (1980) .................................................................................................15

*Mann v. Abel*,
    10 N.Y.3d 271 (N.Y. 2008) ...............................................................................23

*Martin v. Daily News L.P.*,
    990 N.Y.S.2d 473 (1st Dep't 2014) ............................................................. 36-37

*Masson v. New Yorker Magazine, Inc.*,
    832 F. Supp. 1350 (N.D. Cal. 1993) ...................................................................36

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) ............................................................................................16

*McClung v. Silliman*,
    19 U.S. 598 (1821) ..............................................................................................12

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ........................................................................................12, 14

*McGarry v. Univ. of San Diego*,
    64 Cal. Rptr. 3d 467 (Cal. Ct. App. 2007) .........................................................40

*McRedmond v. Sutton Place Restaurant and Bar, Inc.*,
    851 N.Y.S.2d 478 (1st Dep't 2008) ....................................................................21

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009) ..................................................................34

*Mihalakis v. Comm. of Interns & Residents (CIR)*,
    557 N.Y.S.2d 37 (1st Dep't 1990) ......................................................................37

*Mitchum v. Foster*,
    407 U.S. 225 (1972) ............................................................................................15

*Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*,
    2015 WL 1379702 (S.D.N.Y. Mar. 25, 2015) ....................................................26

*Murray v. Bailey*,
    613 F. Supp. 1276 (N.D. Cal. 1985) ...................................................................36

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................................24

*Nader v. Gen. Motors Corp.*,
    25 N.Y.2d 560 (N.Y. 1970) ................................................................................20

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ................................................................ *passim*

*Noonan v. Rousselot*,
    239 Cal. App. 2d 447 (1966) ................................................ 22

*Nygard, Inc. v. Uusi-Kerttula*,
    72 Cal. Rptr. 3d 210 (Cal. Ct. App. 2008) ......................... 4, 26

*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*,
    418 U.S. 264 (1974) ............................................................ 23

*Paulus v. Bob Lynch Ford, Inc.*,
    43 Cal. Rptr. 3d 148 (Cal. Ct. App. 2006) ......................... 39

*Penaherrera v. New York Times Co.*,
    2013 WL 4013487 (Sup. Ct., New York Cty. Aug. 8, 2013) ........... 22, 35

*Peper v. Gannett Co.*,
    2003 WL 22457121 (Cal. Super. Ct. Apr. 4, 2003) ............... 32

*Precedo Capital Grp. Inc. v. Twitter Inc.*,
    33 F. Supp. 3d 245 (S.D.N.Y. 2014) .................................. 35

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ......................... 34

*Preiser v. Rodriguez*,
    411 U.S. 475 (1973) ............................................................ 16

*Rappaport v. VV Publ'g. Corp.*,
    618 N.Y.S.2d 746 (Sup. Ct., New York Cty. 1994) ............... 28

*Reed v. Gallagher*,
    204 Cal. Rptr. 3d 178 (Cal. Ct. App. 2016) ......................... 23, 38, 39

*Regalia v. Nethercutt Collection*,
    90 Cal. Rptr. 3d 882 (Cal. Ct. App. 2009) ......................... 37

*Rosenaur v. Scherer*,
    105 Cal. Rptr. 2d 674 (Cal. Ct. App. 2001) ......................... 24, 26, 30, 39

*Rosner v. Amazon.com*,
    18 N.Y.S.3d 155 (2d Dep't 2015) ....................................... 33

*Rudnick v. McMillan*,
    31 Cal. Rptr. 2d 193 (Cal. Ct. App. 1994) ......................... 24

viii

*Sandals Resorts Int'l. Ltd. v. Google, Inc.*,
   925 N.Y.S.2d 407 (1st Dep't 2011) ............................................................... 27

*Seldon v. Magedson*,
   2012 WL 4475274 (S.D.N.Y. July 10, 2012) ................................................ 35

*Shiamili v. Real Estate Grp. of New York, Inc.*,
   952 N.E.2d 1011 (N.Y. 2011) ................................................................. 33, 35

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
   779 F.3d 191 (2d Cir. 2015) ........................................................................ 29

*Smalley v. Dreyfus Corp.*,
   832 N.Y.S.2d 157 (1st Dep't 2007) .............................................................. 33

*Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California
   v. Yagman*,
   55 F.3d 1430 (9th Cir. 1995) ....................................................................... 30

*Stepanov v. Dow Jones & Co., Inc.*,
   987 N.Y.S.2d 37 (1st Dep't 2014) ........................................................... 22-23

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
   2007 WL 935703 (S.D. Cal. Mar. 7, 2007) .................................................. 36

*Suozzi v. Parente*,
   616 N.Y.S.2d 355 (1st Dep't 1994) .............................................................. 24

*Sutherland v. Remax 2000*,
   20 Misc. 3d 1131(A), (Sup. Ct., Nassau Cty. 2008) ................................... 34

*In re Tarble*,
   80 U.S. 397 (1871) ................................................................................... 3, 12

*Tennessee v. Davis*,
   100 U.S. 257 (1879) ..................................................................................... 12

*Terry v. Davis Cmty. Church*,
   33 Cal. Rptr. 3d 145 (Cal. Ct. App. 2005) .................................................. 29

*Three Amigos SJL Rest., Inc. v. CBS News Inc.*,
   15 N.Y.S.3d 36 (1st Dep't 2015) ............................................................ 23, 31

*United States v. Curtiss-Wright Export Corp.*,
   299 U.S. 304 (1936) ..................................................................................... 13

*Watson v. Philip Morris Companies, Inc.*,
   551 U.S. 142 (2007) ..................................................................................... 15

ix

*Wong v. Tai Jing*,
    117 Cal. Rptr. 3d 747 (Cal. Ct. App. 2010) ..........................................................40

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) ..........................................................................36

*Youngstown Sheet and Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................................13

**Statutes**

47 U.S.C. § 230........................................................................................33, 34, 35, 37

Cal. Code Civ. P. § 425.16............................................................................1, 4, 38, 40

**Other Authorities**

CPLR 2201....................................................................................................1, 17, 40

CPLR 3211....................................................................................................1, 20, 40

Ashley Cullins, *Gloria Allred: I'll Hunt Trump Into the White House*,
    The Hollywood Reporter (Dec. 13, 2016) .................................................................8

Brian Ross et al., *Women Accusing Trump Won't Be Intimidated After Election,*
    *Lawyer Says*, ABC News (Nov. 10, 2016) ...............................................................9

Harold J. Laski, *The American Presidency, An Interpretation*
    (Harper & Brothers 1940)....................................................................................18

Jeremy Stahl, *The New Trump Defamation Lawsuit Is Daring Trump to*
    *Incriminate Himself in Court*, Slate (Jan. 17, 2017)............................................8, 19

Karen O'Connor & John R. Hermann, *The Courts: Perils of Paula, in The*
    *Clinton Scandal and the Future of American Government* 40 (Mark J. Rozell
    & Clyde Wilcox eds., Georgetown Univ. Press 2000) .............................................19

Laurence Tribe, *American Constitutional Law* (3d ed. 2000) ...........................13, 15, 18

Ken Gormley, *The Death of American Virtue: Clinton v. Starr*
    (Broadway Paperbacks 2010) .............................................................................19

Lou Cannon, *President Reagan -- The Role Of A Lifetime*
    (Public Affairs, 1st ed. 2000)..............................................................................14

Martin H. Redish, *Judicial Parity, Litigant Choice, and Democratic Theory: A*
    *Comment on Federal Jurisdiction and Constitutional Rights*,
    36 UCLA L. Rev. 329 (1988)..............................................................................16

x

Meagan Twohey, *Former 'Apprentice' Contestant Files Defamation Suit Against Trump*, The New York Times (Jan. 17, 2017) ........................................................... 8

Michael Kantor, *William J. Clinton Presidential History Project* (June 28, 2002) ..................... 18

Michael Kramer, *Monument to stupidity*, New York Daily News (Sept. 26, 1999) ....................... 5

Neil Kinkopf, *Executive Privilege: The Clinton Administration in the Courts*, 8 Wm. & Mary Bill Rts. J. 631 (2000) ..................................................................... 18

Peter Baker, *Clinton Settles Paula Jones Lawsuit for $850,000*, The Washington Post (Nov. 14, 1998) ................................................................................... 18

Richard A. Posner, *Law, Pragmatism, and Democracy* (2003) ........................................... 9, 18, 19

Richard A. Posner, *An Affair of State: The Investigation, Impeachment, And Trial Of President Clinton* (Harvard Univ. Press ed., 1999) ........................................... 18

Terry Eastland, *The Power to Control Prosecution*, 2 Nexus J. Op. 43 (Spring 1997) ................................................................................... 14

Transcript of Oral Argument, *Packingham v. North Carolina*, 137 S. Ct. 1730, 2017 WL 749021 (Feb. 27, 2017) (No. 15-1194) ................................................. 27

U.S. Const. amend. XXV § 1 ........................................................................... 14

U.S. Const. art. I .................................................................................... 14

U.S. Const. art. II .............................................................................. 3, 13, 17

U.S. Const. art. VI ............................................................................... 11, 15

xi

Defendant President Donald J. Trump, in his individual capacity, respectfully submits this memorandum of law in support of his motion to dismiss the complaint ("Complaint" or "Compl.")[1] pursuant to CPLR 3211 and special motion to strike and for attorneys' fees pursuant to Cal. Code Civ. P. § 425.16, or in the alternative, to stay this action pursuant to CPLR 2201.

## PRELIMINARY STATEMENT

At the height of one of the most contentious presidential campaigns in history, plaintiff Summer Zervos -- a reality-TV performer on President Trump's former television show, *The Apprentice* -- and her attorney, the self-proclaimed political activist Gloria Allred, made false and scandalous allegations that Mr. Trump had, years earlier, purportedly engaged in inappropriate conduct directed toward Ms. Zervos. As intended by Ms. Zervos and her counsel, these false accusations immediately became part of a public debate as to Mr. Trump's qualifications for office, and substantially influenced press coverage of the campaign. Mr. Trump vigorously defended his character and qualifications in the political arena -- at political rallies, a Presidential debate, on a campaign website, and on Twitter -- and denied these scurrilous allegations.

After President Trump was elected and immediately before he took office, Ms. Zervos and her counsel continued to press their political agenda by filing this meritless litigation asserting a frivolous $3,000 claim of defamation against Mr. Trump -- a claim based primarily on Mr. Trump's denials during the campaign of her false accusations. Indeed, Ms. Zervos's own cousin has voluntarily come forward to refute her false allegations and publicly defend the President against Ms. Zervos's fame-seeking accusations, as Ms. Zervos admits in the

---

[1] Submitted herewith in support of the motion is the affirmation of Marc E. Kasowitz, dated July 7, 2017 ("Kasowitz Aff."). A copy of the Complaint is attached as Kasowitz Aff. Ex. 19 [Complaint filed by Summer Zervos on 1/17/2017].

1

Complaint. Further, Ms. Zervos and her counsel have openly conceded -- indeed, bragged -- that their true motivation is to use this action for political purposes as a pretext to obtain broad discovery that they hoped could be used in impeachment hearings to distract from the President's agenda.

This action should be dismissed in its entirety. First, and fundamentally, the Supremacy Clause of the United States Constitution prevents this State Court from hearing this action, whatever its merit or lack thereof, against a sitting President. The action therefore should be dismissed without prejudice to Ms. Zervos refiling after the President leaves office, or stayed until such time. Twenty years ago, the United States Supreme Court permitted a private federal court action to proceed against President Clinton, but explicitly distinguished the situation there from that presented here, where a plaintiff asks a state court to hear claims against the sitting President. The Supreme Court's distinction is critical, and the Court pointed to the Supremacy Clause as the key distinguishing impediment to a state court entertaining a case such as this one. *See Clinton v. Jones*, 520 U.S. 681, 691 n.13 (1997). The Court raised as an "important constitutional issue[]" whether a state court may hear an action against the President -- *i.e.*, whether a state court's resulting exercise of "any direct control . . . over the President, who has principal responsibility to ensure that [federal] laws are 'faithfully executed,' may implicate" issues of federalism, comity, and concerns over local prejudice, so as to be improper. *Id.* at 690, 691 n.13 (citations omitted).

In fact, the Supremacy Clause and our federal system of government require that state governments, including their courts, refrain from interfering in the operations of the federal government. The Supreme Court has long made clear that high-ranking federal officials cannot be "interfered with and controlled for any period by . . . tribunals of another [state] sovereignty."

2

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 16 of 54

*In re Tarble*, 80 U.S. 397, 409 (1871).  The application of that principle reaches its apex with respect to the President, who is the ultimate repository of power within the Executive Branch.  U.S. Const. art. II, §1.  For that reason, this action should be dismissed without prejudice to its reinstatement following the Trump Presidency.

Should this Court decline to dismiss this action on Supremacy Clause grounds, it also has discretion to stay this case during the Trump Presidency.  The balance of the equities, as addressed in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), strongly weighs in favor of such a stay -- to prevent a politically-motivated plaintiff claiming approximately $3,000 in monetary damages from embarking on a private witch-hunt that would threaten to interfere with the operations of the Executive Branch of the federal government.

Second, and in any event, Ms. Zervos's single claim -- for defamation -- has no legal merit and should be dismissed on that ground as well.  Ms. Zervos does not and cannot state a cause of action for defamation under California law, which applies here because Ms. Zervos is domiciled and was purportedly injured there.  The allegedly defamatory statements were made during a national political campaign that involved heated public debate in political forums.  Statements made in that context are properly viewed by courts as part of the expected fiery rhetoric, hyperbole, and opinion that is squarely protected by the First Amendment.  Indeed, this very issue has already been recently addressed by this Court, which, before he took office, dismissed a defamation action against then President-elect Trump because the statements made during a political campaign were "expressions of opinion entitled to full First Amendment protection," even though some of those statements contained factual information.  *See Jacobus v. Trump*, 51 N.Y.S.3d 330, 344 (Sup. Ct., New York Cty. 2017).[2]  Further, that President Trump

_____

[2] Kasowitz Aff. Ex. 20 [*Jacobus v. Trump* Opinion].

3

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 17 of 54

denied Ms. Zervos's accusations cannot constitute defamation as a matter of law, because they

do not subject her to "hatred, contempt, ridicule, or obloquy," *Nygard, Inc. v. Uusi-Kerttula*, 72

Cal. Rptr. 3d 210, 225 (Cal. Ct. App. 2008), particularly given the context in which they were

made. Ms. Zervos also does not and cannot show that each of the purportedly defamatory

statements cited in the Complaint were "of and concerning" her because they in fact make no

mention of Ms. Zervos. Ms. Zervos also cannot establish that President Trump was responsible

for making several of the statements. Finally, Ms. Zervos's claim should be dismissed because

she has failed to adequately plead damages.

Third, California's anti-SLAPP statute, Cal. Code Civ. P. § 425.16, protecting defendants

from strategic lawsuits against public participation ("SLAPP") also bars this action. There can

be no question, under the statute, that the statements Ms. Zervos challenges were "in furtherance

of [President Trump's] right of . . . free speech under the United States Constitution or the

California Constitution in connection with a public issue" and that Ms. Zervos cannot satisfy the

resulting heightened burden she must meet to establish that there is a "probability that [she] will

prevail on [her] claim." Cal. Code Civ. P. § 425.16(b)(1). Further, under the SLAPP statute, Mr.

Trump is entitled to receive his attorneys' fees incurred in responding to the Complaint. Cal.

Code Civ. P. § 425.16(c).

Accordingly, the Complaint should be dismissed and stricken or, alternatively, stayed

during the Trump Presidency, and Mr. Trump should be awarded his attorneys' fees

## BACKGROUND

### A.    Ms. Zervos's Politically Motivated Lawsuit

Donald J. Trump, now the forty-fifth President of the United States, formally announced

his candidacy on June 16, 2015, embarking on a historic year-and-a-half campaign that

crisscrossed the country, and appearing at numerous rallies, press conferences, debates, and

4

interviews.  The 2016 presidential election was one of the most contentious in history, drawing

extensive media coverage and commentary concerning every aspect of the candidates'

qualifications and character.

In the critical final stretch before the election, on October 14, 2016,[3] Ms. Zervos and her

counsel, Gloria Allred,[4] held a carefully choreographed televised news conference ("October 14

Press Conference") at Ms. Allred's office.  (Compl. ¶ 53.)  The goal of the October 14 Press

Conference was clear:  to attempt to influence the election process and to bait President Trump

into responding to the grave and false accusations of inappropriate conduct asserted by Summer

Zervos, a California resident and former reality-TV star of President Trump's television show,

*The Apprentice*.[5]  Ms. Allred and Ms. Zervos looked straight into the camera to address President

Trump directly, accusing him of "declaring war on women" and "treat[ing] women as sexual

objects."[6]  They tied their salacious accusations to unfounded allegations by others and to

women everywhere who "hav[e] [had] to perform sexual favors in order to get a job."[7]  Around

the same time, Ms. Allred publicly sat with three other potential plaintiffs who leveled similarly

---

[3] On a motion to dismiss, the Court may take judicial notice of documents like newspaper articles, transcripts, and filings in courts.  *See, e.g.*, *Gomez-Jimenez v. N.Y. Law Sch.*, 943 N.Y.S.2d 834, 854-55 (Sup. Ct., New York Cty. 2012), *aff'd*, 956 N.Y.S.2d 54 (1st Dep't 2012); *Carroll v. McKinnell*, 19 Misc. 3d 1106(A), at *10 n.1 (Sup. Ct., New York Cty. 2008).  Additionally, because the Complaint specifically refers to the October 14 Press Conference (Compl. ¶¶ 6, 13, 50, 53), and also mirrors Ms. Zervos's statements made in the October 14 Press Conference (*Compare* Kasowitz Aff. Ex. 23 [Statement by Gloria Allred, 10/14/2016] *with* Compl. ¶¶ 20-44), it is incorporated by reference and the transcript of the press conference can be considered by the Court on a motion to dismiss.  *See, e.g.*, *Lore v. N.Y. Racing Ass'n. Inc.*, 12 Misc. 3d 1159(A), at *2 (Sup. Ct., Nassau Cty. 2006).

[4] Ms. Allred advertises herself on her website as an "activist."  *See* Gloria Allred Home Page, www.gloriaallred.com (last visited July 7, 2017).  She is a high-profile Democratic fundraiser who has politically opposed Donald Trump for decades, considered Hillary Clinton her "she-ro," and found President Trump's historic victory "very painful."  *See* Kasowitz Aff. Ex. 21 at 7, 8 [Tr. of Gloria Allred Interview by Thom Hartmann, 1/20/2017]; *see also* Kasowitz Aff. Ex. 22 at 1-2 [*New York Daily* News Article, 9/26/1999].

[5] *See* Kasowitz Aff. Ex. 23 [Statement by Gloria Allred, 10/14/2016].

[6] *Id.* at 3 [Statement by Gloria Allred, 10/14/2016].

[7] *Id.* at 2 [Statement by Gloria Allred, 10/14/2016].

5

false allegations against President Trump, and claimed that there were "many" others who had not decided whether to come forward.[8]

Ms. Zervos and Ms. Allred explicitly politicized their allegations, openly seeking to foment a public debate over President Trump's qualifications for office.  Ms. Zervos claimed to have made her accusations "so that the public could evaluate Mr. Trump fully as a candidate for president, and could take both [Ms. Zervos's] experience and Mr. Trump's denials into consideration."  (Compl. ¶ 50.)  However, the true purpose of their false allegations is clear:  a political smear campaign attempting to elicit public statements by the candidate that could later be used as a pretext to initiate legal action.

On October 14, 2016, President Trump issued a statement on his official campaign website defending his character and qualifications as a presidential candidate, plainly stating that "I never met her at a hotel or greeted her inappropriately a decade ago.  That is not who I am as a person, and it is not how I've conducted my life."  (Compl. ¶ 55; App. A No. 1.)  President Trump then quickly turned to comment on the media's role in "creating a theater of absurdity" and his opponent, Hillary Clinton, in making personal attacks, and then to his own political agenda.  (Compl. ¶ 55; App. A No. 1.)  However, in the coming weeks of heated public debate leading up to the election, the issue of false accusations levied against President Trump, and of other false media reports, continued to be front-and-center in the political campaign.  (Compl. ¶¶ 60-61, 71-72; App. A Nos. 4-5, 15-16.)

---

[8] *See id.* at 3 [Statement by Gloria Allred, 10/14/2016]; *see also* Kasowitz Aff. Ex. 24 at 7 [*CNN* Tr. Trump Claims Election Being Rigged, 10/16/2016] (Ms. Allred stating "I can assure [Trump] that more women will be coming forward"); Kasowitz Aff. Ex. 25 at 1 [Statement by Gloria Allred, 10/16/2016] ("Summer Zervos, Kristin Anderson, Jessica Leeds, Rachel Crooks, Mindy McGillivray, Natasha Stoynoff, and Temple Taggart . . . are all claiming inappropriate" behavior by Mr. Trump at different times.); Kasowitz Aff. Ex. 26 at 1 [Statement by Gloria Allred, 10/20/2016] ("nine women have come forward with allegations that Mr. Trump" engaged in inappropriate sexual behavior); Compl. ¶¶ 5, 11.

6

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 20 of 54

### B.    Ms. Zervos's Allegations Are False

On October 14, 2016, the same day as Ms. Zervos's press conference, her own cousin, John Barry, voluntarily came forward to refute the unfounded, pretextual accusations she made against President Trump.  Mr. Barry was "completely shocked and bewildered by [his] cousin," because Ms. Zervos had previously only spoke "glowing[ly]" about President Trump, going so far as to convert her friends and family to supporting his campaign.  (Compl. ¶ 56; App. A No. 2.)

Indeed, Ms. Zervos's own account of events appears to contradict her accusations.  (*See, e.g.*, Compl. ¶¶ 21, 35, 40.)  For instance, she continued to seek employment from President Trump for several years, even after their purported encounter because "her dream of working for Mr. Trump might come true."  (Compl. ¶ 24; *see also* ¶ 40.)  In April 2016 -- a mere six months before she made her unfounded public accusations -- she contacted President Trump to invite him to her restaurant.  (Compl. ¶ 64; App. A. Nos. 2, 8.)  It was only after President Trump rejected her invitation that she turned against him, levying her false accusations.  As Ms. Zervos's own cousin opined as to why she was making these untrue statements, "I think Summer wishes she could still be on reality TV[.]"  (Compl. ¶ 56; App. A No. 2.)

### C.    Ms. Zervos Admittedly Seeks Overly Broad
###        Discovery For Extra-Judicial Purposes

Despite the questions about the veracity of Ms. Zervos's claims, on January 17, 2017 -- three days before President Trump's inauguration -- Ms. Zervos filed this frivolous defamation claim.  During a press conference by Ms. Zervos and Ms. Allred, they made clear that this lawsuit was engineered for political purposes and as a precursor to serial litigation to be

7

filed by Ms. Allred.[9]  Ms. Allred also openly acknowledged that her true motive for filing this lawsuit went well beyond the actual allegations of the Complaint.  She stated that this action was filed:  (1) as part of an effort to generate fodder for a time-consuming impeachment hearing and (2) to distract the President in order to obstruct his presidency.[10]

Ms. Allred has also publicly and repeatedly gloated about the broad level of discovery she will seek, including tapes of *The Apprentice*.[11]  To that end, Ms. Allred has served a far-reaching subpoena on the Trump campaign ("Campaign Subpoena") that seeks wholly irrelevant information intended solely to harass the President.  Indeed, Ms. Allred herself has questioned how the President could run the country if faced with broad discovery.[12]  Ms. Allred has stated that she is looking forward to taking "far-reaching" depositions so that she can "ask [the President] many questions he may not wish to answer but will be required to answer."[13]

Ms. Allred has publicly acknowledged that she intends to follow Ms. Jones's playbook in her suit against Bill Clinton, which, in the words of Judge Posner, led to, "a distracting political drama that impaired . . . Clinton's ability to govern effectively . . . as well as subjecting a number

---

[9] *See generally* Kasowitz Aff. Ex. 27 [Zervos and Allred Interview, 1/17/2017].

[10] *See* Kasowitz Aff. Exs. 27 at 19-21 [Zervos and Allred Interview, 1/17/2017]; and 28 at 4 [Statement by Gloria Allred, 1/17/2017] (discussing desire to depose President Trump); Kasowitz Aff. Ex. 29 at 1 [*Slate* Article, 1/17/2017] (noting references made by Ms. Allred during press conference regarding the potential for deposing Trump); Kasowitz Aff. Ex. 30 at 3 [Tr. of Gloria Allred Interview, 1/20/2017] (stating "I'm sure Congress would be interested" in President Trump's deposition testimony); Kasowitz Aff. Ex. 31 at 2 [*New York Times* Article, 1/17/2017].

[11] *See* Kasowitz Aff. Ex. 32 at 2-3 [Tr. of Gloria Allred Interview, 10/15/2016] (Ms. Allred discussing her interest in seeking raw footage from *The Apprentice*); Kasowitz Aff. Ex. 29 at 2 ("We would certainly seek any and all information and documents, recordings, etc., which may be relevant to the litigation of our lawsuit.").

[12] *See* Kasowitz Aff. Ex. 33 at 16 [Tr. of *The Last Word: With Lawrence O'Donnell*, 10/27/2016] ("Sitting in depositions as [host Lawrence O'Donnell] just said, with all of the people that he's sued.  I mean, how is he going to deal with any major crisis of our nation if there is one?  If he's sitting in a deposition and trying to defend the lawsuits which by the way might be filed against him.").

[13] Kasowitz Aff. Ex. 34 at 1 [*Hollywood Reporter* Article, 12/13/2016] ("I'll Hunt Trump into the White House.").

8

of persons to enormous embarrassment and staggering legal expenses."[14]  Ms. Allred and Ms.

Zervos have launched a fundraiser seeking to raise at least $500,000 to finance this meritless

lawsuit.[15]

### D.    The Allegedly Defamatory Statements Are Not Actionable

The Complaint asserts a single cause of action for defamation based on 18 statements

allegedly made during the presidential campaign, which Ms. Zervos seeks to attribute to

President Trump.  All of the statements reflect opinions and rhetoric made in political forums:

campaign rallies, the presidential debate, the official campaign website, and Twitter.  The 18

statements (together, "Statements") -- attached hereto as Appendix A with their full context --

can be broken up into several, sometimes overlapping, categories.  First is the single statement

made by President Trump himself that refers to Ms. Zervos directly, quoted above, in which he

merely denies acting "inappropriately" (an opinion) or having met her at a hotel (not defamatory)

("Statement No. 1").  (Compl. ¶ 55; App. A, No. 1.)  Second are Statement Nos. 2 and 6 made by

Mr. Barry -- not President Trump -- concerning Mr. Barry's opinion that Ms. Zervos's

allegations are false.  (Compl. ¶¶ 56, 62; App. A, Nos. 2, 6.)  Third are Statement Nos. 4-7 and

10-14 made on President Trump's campaign website or Twitter.  (Compl. ¶¶ 60-63, 66-70; App.

A, Nos. 4-7, 10-14.)  Of those, several merely "retweet" the statements of others:  (a) Statement

No. 6 simply retweets the statement by Barry; and (b) Statement No. 13 is actually of a Twitter

news personality, Paul Joseph Watson (@PrisonPlanet), characterizing Ms. Zervos's statement

as a "hoax" based on the fact that she had recently emailed President Trump praising him, to

---

[14] Kasowitz Aff. Ex. 35 at 319 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner]; *see also* Kasowitz Aff. Ex. 36 at 2 [*ABC News* Article, 11/10/2016] ("Whether the president of the United States decides that he wants to spend his time in lawsuits or serving the American people as president of the United States, is a question that only Mr. Trump can answer.").

[15] *See* Kasowitz Aff. Ex. 37 [Zervos Crowdrise Fundraising Page].

9

which President Trump added only the rhetorical opinion "Terrible." (Compl. ¶ 69; App. A, No. 13.) And finally, there are President Trump's broad Statement Nos. 3, 8-9 and 15-18, which concern the media or his accusers generally and were made at his campaign rallies, on Twitter, or during the presidential debate. (Compl. ¶¶ 59, 64-65, 71-74; App. A, Nos. 3, 8-9, 15-18.) Notably, most of the statements are ambiguous and do not refer to Ms. Zervos at all, such as: "the media and the Clinton Campaign have brought forward false allegations" and "[t]hese allegations are one hundred percent false" (Compl. ¶ 59; App. A No. 3); "100% fabricated and made up charges, pushed strongly by the media and the Clinton Campaign, may poison the minds of the American voter" (Compl. ¶ 60; App. A No. 4); and the "media [is] pushing false and unsubstantiated charges, and outright lies, in order to elect Crooked Hillary!" (Compl. ¶ 61; App. A No. 5.)

**ARGUMENT**

## I. This State Court May Not Exercise Jurisdiction Over A Civil Suit Against The President During His Presidency

This action should be dismissed without prejudice to Ms. Zervos refiling after the President completes his presidency because this State Court does not have jurisdiction to hear a civil action against a sitting President. First, as raised by the U.S. Supreme Court in *Clinton v. Jones*, and as supported by hundreds of years of precedent, this Court lacks the authority pursuant to the Supremacy Clause of the Constitution to exercise jurisdiction in this case because a state court cannot control President Trump -- who uniquely embodies the Executive Branch -- or interfere with his ability to perform his duties. Second, *Clinton v. Jones* recognized that if any civil suit against a sitting president were permitted to proceed, a federal court would be better positioned to handle such a matter given the threat of local prejudices, the lack of uniformity in states' laws, and the federal courts' expertise in handling federal immunity matters.

10

### A.      The Suit Is Barred By The Supremacy Clause

The Supreme Court in *Clinton v. Jones* held that under the circumstances before it, a private lawsuit against a sitting president could proceed in federal court.  In doing so, the Court expressly distinguished the federal lawsuit before it from a private civil action that might be brought in a state court:  "[b]ecause the Supremacy Clause makes federal law 'the supreme Law of the Land,' . . . any direct control by a state court over the President, who has principal responsibility to ensure that those laws are 'faithfully executed,' . . . may implicate" issues of federalism, comity, and "the interest in protecting federal officials from possible local prejudice that underlies the authority to remove certain cases brought against federal officers from a state to a federal court."[16]  *Clinton*, 520 U.S. at 691, 691 n.13.

Thus, as recognized by *Clinton v. Jones*, our system of government requires that state governments, including their courts, refrain from interfering with the operations of the federal government.  The Supremacy Clause provides that the U.S. Constitution and all laws and treaties made "under the Authority of the United States shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby."  U.S. Const. art. VI, § 2.  Courts have long interpreted this language as limiting state courts' ability to influence or burden the federal government.  For example, in *McCulloch v. Maryland*, the U.S. Supreme Court was faced with whether a state could impose a tax on a federal institution.  17 U.S. 316, 436 (1819).  The Court

---

[16] Indeed, the Court's concern with whether a state court would have authority over the President occupied much of the oral argument.  *See generally* Kasowitz Aff. Ex. 41 at *7 [Oral Argument Tr. from *Clinton v. Jones*] ("[I]t seems to me what you're saying is that the inherent nature of the President's office requires that the States be constrained in this way."); *id.* at *8 ("A State court might . . . recognize such a similar immunity as a matter of their common law."); *id.* at *19 ("It's simply the supremacy clause that says State courts don't muck around with -- with Federal activities."); *id.* at *31 ("[W]hat do you do when a State court tells the President, you're going to lose this lawsuit unless you appear for a hearing on June 2, and the President says, you know, Your Honor, I have a NATO meeting I'm supposed to go to, heads of State, and you know, you have a testy district judge or local State court judge -- you've encountered some of them -- and they say, this is my courtroom and you know, I expect you here on June 2."); *id.* at *38 ("So the trial court judge at the State court level is to determine whether the offer -- the complaint made by the President's lawyer is made in good faith or not?")

11

held that it could not, because "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws."[17]  *Id.*

Indeed, longstanding precedent establishes that a state court may not exercise jurisdiction over a federal official without violating the Supremacy Clause of the Constitution.  While these cases have historically been applied to state courts exercising jurisdiction over federal officers acting in their official capacities, it is not limited to that context given that, as *Clinton v. Jones* recognized, the federal executive authority is uniquely embodied in the President and is inseparable from the person holding the office.  *In re Tarble* expressly forbid "the claim of jurisdiction by a State court . . . to interfere with the authority of the United States" when "that authority [is] exercised by a federal officer."  80 U.S. at 403-04.  That Court recognized that "no state can authorize one of its judges or courts to exercise judicial power . . . within the jurisdiction of [the federal] government . . . .  It is manifest that the powers of the National government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by . . . tribunals of another [state] sovereignty."  *Id.* at 405, 409.  To the contrary, the "conduct [of an officer of the federal government] can only be controlled by the power that created him," *i.e.*, the federal government.  *See McClung v. Silliman*, 19 U.S. 598, 605 (1821).  *See also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (allowing a federal revenue officer to remove a murder indictment to federal court in recognition of the fact that requiring federal executive branch officials to submit to state court procedures could "paralyze the operations of the government.")

---

[17] Further, states may not enforce rules that limit a federal official's ability to carry out his or her federal duties.  *See Jefferson Cty. v. Acker*, 527 U.S. 423, 440-41 (1999) ("Alabama, of course, cannot make it unlawful to carry out duties of a federal office without local permission.").

12

*McClung*, *Tarble*, and *Davis* each involved attempts by state courts to assert jurisdiction over the official conduct of petty federal officials. However, these same principles prohibit a state court from exercising any authority over a sitting president, who embodies the office, such that any assertion of jurisdiction by a state court over the President will inevitably interfere with, or burden, his ability to exercise his Article II powers.

Unlike the other branches, the President "is a person as well as an institution; and unlike other institutions, the Presidency is led by an individual elected by the entire Nation to secure its survival, to represent it to the world, and to voice its aspirations to all people."[18] The President as an individual is invested with all of the inherent and express powers of the Executive Branch. He is also "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). He is Commander in Chief of the Army and Navy. *See* U.S. Const. art. II, § 2, cl. 1. And he alone is charged with the power to sign bills into law, the appointment power, the treaty power and the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 2, 3.

The importance of the President to our nation and the uniqueness of the Executive Branch cannot be overstated. The Constitution invests the entire executive authority in the President as a "single head in whose choice the whole nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone, he fills the public eye and ear." *Youngstown Sheet and Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). Indeed, "the President, for all practical purposes . . . affords the only means through which we can act as a nation."[19] Thus, to interfere

---

[18] *See* Kasowitz Aff. Ex. 38 at 631 [Excerpts from *American Constitutional Law*, by Laurence Tribe].

[19] *See* Kasowitz Aff. Ex. 39 at 118 [Excerpts from *President Reagan: The Role of A Lifetime*, by Lou Cannon] (quoting George E. Reedy, *Discovering the Presidency*, N.Y. Times, Jan. 20, 1985, at G1).

13

with the President's duties is to interfere with the nation.  Indeed, in the words of Thomas Jefferson, the Executive Branch "is the sole branch which the constitution requires to be always in function."[20]  Justice Breyer's concurrence in *Clinton v. Jones* contrasts the Congress, which adjourns and can function "even when up to half of its members are absent," or the judiciary, which can designate other judges, with the Executive Branch, in which "[i]nterference with a President's ability to carry out his public responsibilities is constitutionally equivalent to interference with the ability of the entirety of Congress, or the Judicial Branch, to carry out its public obligations." *Clinton*, 520 U.S. at 713 (Breyer, J., concurring).[21]

Regardless of whether a suit relates to official or unofficial conduct, a state court cannot exercise direct control or "retard, impede, burden, or in any manner control" the Executive Branch, *McCulloch*, 17 U.S. at 436, by compelling the President to submit to its jurisdiction, including by ordering him to respond to motions or sit for discovery, or issuing a judgment against him.[22]  Accordingly, this Court lacks the power to hear this action because it cannot take any actions to control the Executive Branch embodied by the President or otherwise interfere in any way with his ability to exercise his Article II constitutional duties, and it should be dismissed without prejudice to Ms. Zervos seeking to reinitiate an action after the conclusion of the Trump Presidency.  *See Armand Schmoll, Inc., v. Fed. Reserve Bank of N.Y.*, 37 N.E.2d 225, 225 (N.Y.

---

[20] *See* Kasowitz Aff. Ex. 42 at 7 [Letter from Thomas Jefferson to George Hay, 5/20/1807].

[21] *See also* Kasowitz Aff. Ex. 40 at 43, 46 [*The Power to Control Prosecution*, by Terry Eastland].  Moreover, under the Constitution, the President, unlike Congress, is always in session unless he is replaced for exigent reasons, such as incapacitation or death.  *See* U.S. Const. amend. XXV § 1 ("In case of the removal of the President from office or of his death or resignation, the Vice President shall become President."); *Id.* § 3 ("Whenever the President transmits . . . his written declaration that he is unable to discharge the powers and duties of his office . . . , such powers and duties shall be discharged by the Vice President as Acting President."); U.S. Const. art. I, § 4, cl. 2 ("Congress shall assemble at least once in every Year, and such Meeting shall be on . . .").

[22] *See* Kasowitz Aff. Ex. 38 at 780 n.66 [Excerpts from *American Constitutional Law*, by Laurence Tribe] ("An order of a state judge directing the President to release information on pain of contempt would in all probability violate principles of federalism."); *cf. General Atomic Co. v. Felter*, 434 U.S. 12, 12 (1977) (state courts lack the power to bar litigants from bringing actions in federal courts).

14

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 28 of 54

1941) (affirming dismissal of a state proceeding because "State courts have no jurisdiction to issue orders or directions to the Federal Reserve Bank in the performance of its statutory duty").

Moreover, this Court cannot hear this matter without violating the state court judge's solemn oath required by Article VI, Section 3 of the Constitution "to support this Constitution." *Cooper v. Aaron*, 358 U.S. 1, 18, 19 (1958) (citing U.S. Const. art. VI, § 3) (no state official or court has "power to nullify a federal court order" or other federal law).  The oath requirement reflects the Framers' "anxiety to preserve [the Constitution] in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State" such that "[n]o state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it."  *Id.* at 18 (citing *Ableman v. Booth*, 62 U.S. 506, 524 (1858)).

**B.      Prudential Factors Further Militate Against This State Court Exercising Jurisdiction Over the President**

As the Court in *Clinton v. Jones* recognized, beyond the mandate of the Supremacy Clause, important prudential factors that are critical to the functioning of our federal system also require that a state court refrain from exercising jurisdiction over a sitting president.  First, "state-court proceedings may reflect 'local prejudice' against unpopular . . . federal officials." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007); *see also Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (federal courts are the "guardians of the people's federal rights"); *Main v. Thiboutot*, 448 U.S. 1, 20 (1980) (noting generally the Congressional concern that state courts might not provide an impartial forum).  As *Clinton v. Jones* explained, there is an interest to protect federal officers from "possible local prejudice that underlies the authority to remove certain cases brought against federal officers from a state to a federal court."  520 U.S. at 691

15

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 29 of 54

(citing 28 U.S.C. § 1442(a); *Mesa v. California*, 489 U.S. 121, 125-126 (1989)).[23]

Second, requiring that any private suit against the President be brought in federal court ensures those actions will be managed consistently to avoid interference with the President's duties. *See Clinton*, 520 U.S. at 708; *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996). The *Clinton* Court allowed a federal case to proceed because of its view of the federal courts' ability to "manage those actions in such fashion (including deferral of trial) that interference with the President's duties would not occur." *Clinton*, 520 U.S. at 708. Indeed, at oral argument, the Court expressed concern that a "trial court judge at the State court level is to determine whether . . . the complaint [of demands of national importance] made by the President's lawyer is made in good faith or not?"[24]

Third, the Supreme Court has explained that because federal courts have vast experience in managing suits involving the federal government, they are better suited to address the legal issues that inevitably arise in such situations. *See Preiser v. Rodriguez*, 411 U.S. 475, 514 (1973) (federal question jurisdiction "was designed to preserve and enhance the expertise of the federal courts in applying federal law . . . and . . . to minimize misapplications of federal law.") (Brennan, J., dissenting); *see also* Martin H. Redish, *Judicial Parity, Litigant Choice, and Democratic Theory: A Comment on Federal Jurisdiction and Constitutional Rights*, 36 UCLA L. Rev. 329, 333 (1988).

---

[23] To be clear, President Trump does not suggests that such issues are present here, but rather cautions against creating a precedent that could open the door for such prejudice.

[24] *See, e.g.*, Kasowitz Aff. Ex. 41 at *38 [Oral Argument Tr. from *Clinton v. Jones*].

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 30 of 54

## II.     In The Alternative, The Court Should Stay This Action Pursuant To CPLR 2201

Alternatively, this Court has the broad discretion to temporarily stay this action pursuant to CPLR 2201 during the Trump Presidency.  *See HSBC Bank, USA v. Despot*, 12 N.Y.S.3d 556, 556 (2d Dep't 2015).  CPLR 2201 provides that "the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just."  As the Supreme Court recognized in *Landis v. N. Am. Co.*, "the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  299 U.S. 248, 256 (1936).[25]

The Supreme Court in *Nixon v. Fitzgerald* established a standard by which federal courts could determine whether a civil suit against the President could proceed:  "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch."  *Nixon*, 457 U.S. at 754.  Here, a stay is warranted given the significant risk that this action will interfere with the President's executive responsibilities to the detriment of the public.[26]

As discussed above, the President alone is vested with the entire executive power and his constitutional obligations as President never cease.  *See* U.S. Const. art. II.  At a moment's notice the President could be required to tend to exigent crises that require his undivided attention.  There is not a day in which he is not required to make decisions on profound matters that have a significant impact on the public, including, among other things, on national and international

---

[25] *See also* Kasowitz Aff. Ex. 41 at *8-9 [Oral Argument Tr. from *Clinton v. Jones*] ("A State court might . . . recognize such a similar immunity as a matter of their common law.").

[26] While the *Clinton* court decided it was unnecessary to stay a harassment and defamation case brought against the former sitting President, *see* 520 U.S. at 708, the particular circumstances of that case were vastly different from here, as discussed below at pp. 18-20.

17

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 31 of 54

policies, the dispatch of military forces, legislation and congressional matters.[27]  Thus,

"[b]ecause of the singular importance of the President's duties, diversion of his energies by

concern with private lawsuits would raise unique risks to the effective functioning of

government."  *Nixon*, 457 U.S. at 751.  Indeed, as the U.S. Supreme Court recognized in *Nixon v.*

*Fitzgerald*, the President has "incidental powers":

> Among these must necessarily be included the power to perform [his functions]
> without any obstruction or impediment whatsoever.  The President cannot,
> therefore, be liable to arrest, imprisonment, or detention, while he is in the
> discharge of the duties of his office; and for this purpose his person must be
> deemed, in civil cases at least, to possess an official inviolability.

*Id*. at 776-77 (citing 2 Justice Story, *Commentaries on the Constitution of the United States*

§ 1569 p. 372 (4th ed. 1873)).

Accordingly, if this action is not temporarily stayed, it will disrupt and impair the

President's ability to discharge his Article II responsibilities.  Indeed, numerous commentators

have concluded that allowing *Clinton v. Jones* to proceed was in error.[28]  Then-Commerce

Secretary Mickey Kantor noted how "[the] whole thing created chaos and took away from the

ability of the U.S. government to function.  The ability of the presidency and the White House to

function -- it is not even arguable. . . .  It had a huge effect . . . on his ability to get things

done."[29]  Judge Posner similarly called it a "national emergency" with a "disastrous effect."[30]

---

[27] *See* Kasowitz Aff. Ex. 43 at 26 [*The American Presidency: An Interpretation*, by Harold J. Laski].

[28] *See, e.g.*, Kasowitz Aff. Ex. 45 at 3 [*Washington Post* Article, 11/14/1998] (President Clinton spoke with his
attorney three times on the day he was consulting about whether to attack Iraq); Neil Kinkopf, *Executive Privilege:
The Clinton Administration in the Courts*, 8 Wm. & Mary Bill Rts. J. 631, 652 (2000) ("[T]he matter necessarily
displaced other policy items from the agendas."); Kasowitz Aff. Ex. 38 at 765-66 [Excerpts from *American
Constitutional Law*, by Laurence Tribe] ("The Court -- unwisely, hindsight would suggest -- deemed the threat that
civil litigation . . . . 'impair the effective performance of [the President's] office,' to be implausible."); Kasowitz Aff.
Ex. 35 at 317 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner]; Kasowitz Aff. Ex. 44 at
265 [Excerpts from *An Affair of State*, by Richard A. Posner] ("We have learned that . . . [w]e do not need to be able
to sue our Presidents during their term of office.").

[29] Kasowitz Aff. Ex. 46 at 72 [Interview with Michael Kantor, 6/28/2002].

[30] Kasowitz Aff. Ex. 35 at 316 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner].

18

Furthermore, the public and governmental concerns in occupying the President's time are far greater here than they were in *Clinton v. Jones*. First, Ms. Allred has openly admitted that this lawsuit is being used as a political weapon in a campaign seeking to impeach the President.[31] Second, Ms. Allred has repeatedly boasted that she intends to seek exceptionally broad discovery, and has already served an expansive subpoena that has demonstrated that overreaching. Third, while the Court in *Clinton v. Jones* discounted the likelihood of additional litigation following its decision in that case, Ms. Allred has already indicated that she intends to continue to file additional tactical suits against the President.[32] *See Nixon*, 457 U.S. at 753 (noting danger that President would be "easily identifiable target for suits for civil damages"). Indeed, while there may have only been three civil suits against sitting presidents prior to *Clinton v. Jones*, since that decision there have been numerous suits involving allegations related to presidents' non-official actions -- many of them frivolous and many politically motivated.[33] Indeed, "the normal incentive structures that we have to keep civil litigation in check don't apply when the litigation is against the president" because of those who "who would have enormous amounts to gain by destabilizing his presidency."[34]

---

[31] *See, e.g.*, Kasowitz Aff. Ex. 29 at 1-2 [*Slate* Article, 1/17/2017].

[32] *See* Kasowitz Aff. Ex. 24 at 7 [*CNN* Tr. Trump Claims Election Being Rigged, 10/16/2016) (Ms. Allred stating "I can assure [Trump] that more women will be coming forward"); Kasowitz Aff. Ex. 25 at 1 [Statement by Gloria Allred, 10/16/2016) ("Summer Zervos, Kristin Anderson, Jessica Leeds, Rachel Crooks, Mindy McGillivray, Natasha Stoynoff, and Temple Taggart . . . are all claiming inappropriate sexual behavior by Mr. Trump at different times.").

[33] *See* Kasowitz Aff. ¶ 51; *see also* Kasowitz Aff. Ex. 47 at 40, 56 [Excerpts from *The Clinton Scandal: and the Future of American Government*, by Rozell and Wilcox] ("[G]rowth of the internet, increased media attention to presidential actions, and interestingly, the lucrative nature of book deals about presidential scandals are potential catalysts for more lawsuits."); Kasowitz Aff. Ex. 35 at 318 [Excerpts from *Law, Pragmatism, and Democracy*, by Richard A. Posner] (recognizing that "American society is increasingly litigious and increasingly disrespectful of officials and the effect of *Clinton v. Jones* itself in encouraging future litigation, since it removed a legal uncertainty that might have discouraged such suits.").

[34] Kasowitz Aff. Ex. 48 at 223 [Excerpts from *The Death of American Virtue: Clinton vs. Starr*, by Ken Gormley] (quoting then-Acting Solicitor General, Walter Dellinger, regarding Robert Bork and Ted Olson "prepping" Paula Jones's lawyer).

19

By contrast to the President and the public, Ms. Zervos will suffer no prejudice if this action is temporarily stayed, as she will eventually have her day in court. None of the relief that Ms. Zervos has sought -- an apology and $2,914 in damages -- is urgent or time-sensitive, and even if Ms. Zervos could adequately state a cause of action for defamation -- which she cannot -- this Court can grant relief at a later date. There is also no risk of spoliation of evidence as the parties can take efforts to preserve any relevant material.

Thus, the effective administration of our nation provides a compelling justification to stay this action. *See, e.g.*, *Nixon*, 457 U.S. at 753 ("Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."); *Clinton*, 520 U.S. at 707 ("The high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery.").

## III. Ms. Zervos's Complaint Must Be Dismissed In Its Entirety As A Matter Of Law

As explained above, the Constitution bars this Court from hearing this action during the Trump Presidency and, even if it did not, compelling prudential factors mandate that the action be dismissed or stayed. However, if the Court were to consider the Complaint substantively, it should be dismissed with prejudice either under California's SLAPP statute, as explained *infra* in Part IV, or even applying the lower standard of CPLR 3211(a)(7) for failure to state a cause of action.[35] While "a court must accept the facts alleged in the complaint as true, [and] accord the

---

[35] Under New York choice of law rules, California's substantive law applies to Ms. Zervos's defamation claim because California has "the most significant relationship with [Plaintiff's claim]" given that, among other things, Ms. Zervos is domiciled there (Compl. ¶ 14) and her alleged injuries to her reputation and business occurred in California (*id.* ¶¶ 81-82). *See Nader v. Gen. Motors Corp.*, 25 N.Y.2d 560, 565 (N.Y. 1970) (place where plaintiff lives and is injured is the place "which has the most significant relationship with the subject matter of the tort charged"); *Adelson v. Harris*, 973 F. Supp. 2d 467, 477-78 (S.D.N.Y. 2013) (explaining that other jurisdictions' interests were not "sufficient to overcome the presumption that the law of Plaintiff's domicile should apply" in multi-state defamation case). While California law applies to Ms. Zervos's claims, parallel citations to New York cases have been provided, where doctrines are similar, out of an abundance of caution.

20

plaintiff the benefit of every possible favorable inference," where, as here, the factual allegations

do not "fit within any cognizable legal theory," a motion to dismiss is appropriately granted.

*McRedmond v. Sutton Place Restaurant and Bar, Inc.*, 851 N.Y.S.2d 478, 479 (1st Dep't 2008).

To adequately plead a defamation claim, Ms. Zervos must allege "(1) a publication that is

(2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes

special damage."  *Doe 2 v. Superior Court*, 206 Cal. Rptr. 3d 60, 68 (Cal. Ct. App. 2016), *review

denied* (Nov. 16, 2016) (citation omitted); *Elias v. Rolling Stone LLC*, 192 F. Supp. 3d 383, 391

(S.D.N.Y. 2016) (listing elements).  Additionally, the statements must be "of and concerning"

the plaintiff.  *Ferlauto v. Hamsher*, 88 Cal. Rptr. 2d 843, 852 (Cal. Ct. App. 1999).[36]

Further, where, as here, the plaintiff is a limited public figure, she must establish that the

Statements were made with actual malice.  *Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 869

(Cal. Ct. App. 2005) ("[P]ublic figures must prove by clear and convincing evidence that an

allegedly defamatory statement was made with knowledge of falsity or reckless disregard for

truth.") (citation omitted).  Ms. Zervos is a limited public figure under *Ampex's* three-part test:

"First, there must be a public controversy . . . Second, the plaintiff must have undertaken some

voluntary act through which he or she sought to influence resolution of the public issue.  In this

regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye.  And

finally, the alleged defamation must be germane to the plaintiff's participation in the

controversy."  *Ampex Corp.*, 27 Cal. Rptr. 3d at 870.  Here, (i) the presidential campaign of 2016

and the attacks on the character of the candidates are undeniably an ongoing "public

controversy" (Compl. ¶¶ 4, 8); (ii) Ms. Zervos voluntarily sought to influence that public debate

by making unfounded accusations regarding Mr. Trump less than one month before the election,

---

[36] *See also Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1185 (Cal. 1986).

so that, as she readily admits, the public could evaluate Mr. Trump's qualifications for presidency (Compl. ¶¶ 6, 13, 50, 53); and (iii) the Statements -- to the extent one or more of them were made in response to Ms. Zervos's scurrilous accusations -- are undeniably germane to Ms. Zervos's effort to influence the election.  (Compl. ¶¶ 55-56, 59-74; App. A Nos. 1-18.)

As demonstrated below, Ms. Zervos has not and cannot establish a defamation claim, warranting dismissal of her Complaint.  First, the Statements are protected by the First Amendment because they are statements of "fiery rhetoric" or hyperbole advanced during a heated political debate and have no defamatory meaning.  Second, the Statements are not actionable as they reflect a subjective belief and/or are too ambiguous and vague to be capable of being proven true or false.  Third, nearly all of the Statements are not actionable because they do not even refer to Ms. Zervos.  Fourth, Ms. Zervos cannot even establish that certain Statements were published by President Trump.  Fifth, Ms. Zervos has not sufficiently alleged damages. Finally, Ms. Zervos's sole allegation concerning malice is conclusory and insufficient as a matter of law, constituting an independent ground for dismissal.  *Noonan v. Rousselot*, 239 Cal. App. 2d 447, 454 (1966) (affirming dismissal of action where allegation that defendants acted "wickedly and maliciously" was found to be conclusory and insufficient as a matter of law); *Penaherrera v. New York Times Co.*, 2013 WL 4013487, at *17 (Sup. Ct., New York Cty. Aug. 8, 2013).

### A.    The Statements Are Non-Actionable Opinion Or Hyperbole With No Defamatory Meaning

It is well-established that a court, in the first instance, must determine as a matter of law whether an alleged statement is "reasonably susceptible of a defamatory interpretation" or is protected free speech, such as the expression of an opinion.  *Kahn v. Bower*, 284 Cal. Rptr. 244, 249–50 (Cal. Ct. App. 1991), *reh'g denied and opinion modified* (Sept. 6, 1991); *Stepanov v.*

22

*Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 42 (1st Dep't 2014); *Three Amigos SJL Rest., Inc. v.*
*CBS News Inc.*, 15 N.Y.S.3d 36, 41 (1st Dep't 2015), *aff'd*, 65 N.E.3d 35 (N.Y. 2016).

Indeed, "[t]he *sine qua non* of recovery for defamation . . . is the existence of falsehood,"
*Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264,
283 (1974), and thus, statements consisting of "rhetorical hyperbole, vigorous epithets, lusty and
imaginative expressions of contempt, and language used in a loose, figurative sense have all been
accorded constitutional protection." *Reed v. Gallagher*, 204 Cal. Rptr. 3d 178, 188 (Cal. Ct.
App. 2016) (citations and quotations omitted).[37] To determine whether the statements in
question are provably false factual assertions or non-actionable statements, courts consider the
"totality of the circumstances." *Reed*, 204 Cal. Rptr. 3d at 189; *Jacobus*, 51 N.Y.S.3d at 336
(recognizing "context is key" in the defamation analysis). The totality of the circumstances here
show the statements are not actionable as they were all "advanced during the course of a heated
public debate, during which an audience would reasonably anticipate the use of 'epithets, fiery
rhetoric or hyperbole.'" 51 N.Y.S.3d at 336-37 (citation omitted).

### 1.    The Statements In The Context Of A National Political Campaign Are Non-Actionable Fiery Rhetoric With No Defamatory Meaning

The Statements -- all of which were advanced during a heated political campaign to
convince the public to vote for Mr. Trump, and many of which were published via Twitter --
constitute non-actionable rhetoric and hyperbole that is protected by the First Amendment.
(Compl. ¶¶ 55-56, 59-74; App. A Nos. 1-18.) In this context, courts recognize that "language
which generally might be considered as statements of fact may well assume the character of
statements of opinion[,]" "where potentially defamatory statements are published in a public

---

[37] *Mann v. Abel*, 10 N.Y.3d 271, 276 (N.Y. 2008); *600 W. 115 St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 139-140
(N.Y. 1992).

23

debate . . . or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole[.]" *See Rudnick v. McMillan*, 31 Cal. Rptr. 2d 193, 197-98 (Cal. Ct. App. 1994); *Rosenaur*, 105 Cal. Rptr. 2d 674, 688 (Cal. Ct. App. 2001) (same); *see also Jacobus*, 51 N.Y.S.3d at 338 ("Even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate … or other circumstances in which an 'audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole.'").[38]  Thus, courts will "'shelter strong, even outrageous political speech,' on the ground that 'the ordinary reader or listener will, in the context of political debate, assume that vituperation is some form of political opinion neither demonstrably true nor demonstrably false.'"  *Adelson*, 973 F. Supp. 2d at 489-90 (collecting cases); *see also Rosenaur*, 105 Cal. Rptr. 2d at 688 ("Courts must be cautious lest we inhibit vigorous public debate about . . . public issues.").

The rationale is, as explained by the Supreme Court, that "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (citations omitted).  Indeed, the ability to discuss freely "the character and qualifications of candidates for their suffrages" lies at the heart of the First Amendment.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 281-82 (1964) (citation omitted); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339-40 (2010) (noting that speech "on the qualifications of candidates are integral" and should be protected) (citation omitted); *Collier v. Harris*, 192 Cal. Rptr. 3d 31, 39-40 (Cal. Ct. App. 2015) (public discussion about "the character and qualification of a candidate for public office" is a public concern that

---

[38] *Suozzi v. Parente*, 616 N.Y.S.2d 355, 358-59 (1st Dep't 1994) (political campaign article was entitled to qualified privilege because article was "obvious political tract emanating from the opposing camp," and timing during political campaign "suggests that it was intended for maximum political effect").

24

should be afforded "First Amendment" protection) (citations omitted), *as modified* (Sept. 1, 2015), *review denied* (Dec. 9, 2015); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974) (society's interest includes "anything which might touch on an official's fitness for office").

This Court's decision in a defamation case brought against the President prior to his election for statements he made during his campaign is instructive. *See Jacobus*, 51 N.Y.S.3d at 339-40, 344. This Court found that President Trump's statements -- that Ms. Jacobus had "begged" him for a job, that he turned her down twice, that she approached the Trump Campaign for a job, and that she therefore had "zero credibility!" -- while all technically statements of fact, were, in the context of the heated presidential election, to be treated merely as non-defamatory fiery rhetoric. *Id.* at 341; *see also id.* at 342 ("the immediate context of defendant's statements is the familiar back and forth between a political commentator and the subject of her criticism, and the larger context is the Republican presidential primary and Trump's regular use of Twitter.").

Similarly, here, as demonstrated by Ms. Zervos's own Complaint (Compl. ¶¶ 45-48), Mr. Trump had been engaged in a longstanding public debate with the media and his opponents on a host of matters, including his qualifications to run for office. In that context, the Statements are nothing more than heated campaign rhetoric designed to persuade the public audience that Mr. Trump should be elected president irrespective of what the media and his opponents had claimed over his 18-month campaign. (*See e.g.* Compl. ¶ 61; App. A No. 5 ("the media pushing"); ¶ 63; App. A No. 7 ("Totally made up nonsense to steal the election."); ¶ 64; App. A. No. 8 ("The election is being rigged by corrupt media, pushing completely false allegations and outright lies, in an effort to elect her President."); ¶ 65; App. A No. 9 ("in an effort to elect Hillary Clinton President"); ¶ 70; App. A No. 14 ("media has deceived the public"); ¶ 71, App. A. No. 15 ("[The media] want[s] to poison the minds of the voters.").) Indeed, "[i]t would

25

undermine our fundamental democratic process if [candidates] risked lawsuits for responding to the arguments, connections or positions" of the public, or for urging the public to vote for or against "a particular candidate." *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, 2015 WL 1379702, at *10 (S.D.N.Y. Mar. 25, 2015), *aff'd*, 637 F. App'x 16 (2d Cir. 2016). For instance, Statement No. 1 regarding whether President Trump had met Ms. Zervos at a hotel and greeted her appropriately is protected political speech because the audience understood he was merely contributing to a public debate about his fitness for office. (Compl. ¶ 55; App. A No. 1.) As Ms. Zervos readily admits, her unfounded accusations were made to foster a public debate regarding President Trump's candidacy for public office. (Compl. ¶¶ 50, 53.)

Further, Statement No. 1 -- as well as the others -- in no way expose Ms. Zervos to "hatred, contempt or aversion," particularly given the context, where a political candidate was merely responding to public allegations in the midst of a campaign. *Nygard*, 72 Cal. Rptr. 3d at 225 (Defamation is "a false and unprivileged publication that exposes the plaintiff 'to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation'"); *Golub v. Enquirer/Star Grp., Inc.*, 681 N.E.2d 1282, 1283 (N.Y. 1997). Indeed, no defamatory meaning can be drawn from denying a meeting at a hotel. As this Court has held, the context of President Trump's statements advanced during a campaign makes clear that had they been "intended to belittle and demean plaintiff, any reasonable reading of them makes it 'impossible to conclude that [what defendants said or implied] . . . could subject . . . [plaintiff] to contempt . . . or reflect adversely upon [her] work,' or otherwise damage her reputation." *Jacobus*, 51 N.Y.S.3d at 343.[39]

---

[39] *See also Carver v. Bonds*, 37 Cal. Rptr. 3d 480, 494-95 (Cal. Ct. App. 2005) (collecting cases where calling someone a liar was not defamatory given the context); *Rosenaur v. Scherer*, 105 Cal. Rptr. 2d at 688 (calling political opponent a "liar" and "thief" is constitutionally protected "hyperbolic language").

Moreover, the Statements were disseminated through the official campaign website, campaign rallies, a presidential debate, and President Trump's Twitter account -- all forums the audience understands robust political debate will be conducted in, albeit in an informal manner. (Compl. ¶¶ 55-56, 59-74; App. A Nos 1-18.)  Indeed, as recently recognized by the Supreme Court, "[a]ll 50 governors, all 100 senators, every member of the House has a Twitter account. So this has become a . . . crucially important channel of political communication."[40]  The informal nature of the Internet communications cited in the Complaint further militates against any potential finding that any of them is susceptible to a defamatory meaning.[41]  *See Chaker v. Mateo*, 147 Cal. Rptr. 3d 496, 503 (Cal. Ct. App. 2012) (collecting cases and noting that "[i]n determining statements are nonactionable opinions, a number of recent cases have heavily relied on the fact that statements were made in Internet forums"); *Global Telemedia Int'l, Inc. v. Doe 1*, 132 F. Supp. 2d 1261, 1267 (C.D. Cal. 2001) ("[T]he [Internet] postings are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents, such as corporate press releases or SEC filings."); *Sandals Resorts Int'l. Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415-16 (1st Dep't 2011).

Indeed, similar statements by President Trump, "advanced on social media[,] have been held to warrant an understanding that the statements contained therein are 'vigorous expressions of personal opinion,' 'rather than the rigorous and comprehensive presentation of factual matter.'" *Jacobus*, 51 N.Y.S.3d at 339.[42]  The *Jacobus* court explicitly addressed President Trump's use of Twitter, taking note of how his "regular use of Twitter to circulate his positions

---

[40] Transcript of Oral Argument, *Packingham v. North Carolina*, 137 S. Ct. 1730, 2017 WL 749021, at *28 (Feb. 27, 2017) (No. 15-1194).

[41] Compl. ¶¶ 60-63, 66-70; App. A Nos. 4-7, 10-14.

[42] *See also Konig v. WordPress.com*, 978 N.Y.S.2d 92, 94 (2d Dep't 2013).

27

and skewer his opponents and others who criticize him," which are "necessarily restricted to

140 characters or less," would not be understood as statements of fact.  *Id.* at 342.

## 2.    The Statements Are Non-Actionable Opinions

Many of the Statements cited in Ms. Zervos's Complaint are also non-actionable because,

on their face, they cannot be proven to be true or false.  (*See, e.g.*, Compl. ¶¶ 55, 56, 62, 69; App

A Nos. 1-2, 6, 13.)  *GetFugu, Inc. v. Patton Boggs LLP*, 162 Cal. Rptr. 3d 831, 843 (Cal. Ct.

App. 2013) (tweet regarding how organization was run for benefit of officers and directors stated

"subjective [non-actionable] opinion with respect to corporate governance at GetFugu").  For

example, the statements that President Trump retweeted -- to which he merely adds the words

"the truth is a beautiful weapon" and "Terrible" -- are opinions rather than statements of facts.

(Compl. ¶¶ 62, 69; App. A Nos. 6, 13.)  Likewise, Statement Nos. 2 and 6 by Mr. Barry -- which

of course are not the words of President Trump -- reflect Mr. Barry's subjective beliefs about

Ms. Zervos's motivation for making false accusations:  "*I think* Summer wishes she could still be

on reality TV ….  *I can only imagine* that Summer's actions today are nothing more than an

attempt to regain the spotlight ….  (Compl. ¶¶ 56, 62; App. A Nos. 2, 6) (emphasis added).)

That Mr. Barry prefaced each statement with "*I think*" and "*I can only imagine*" illustrates the

subjective nature of Mr. Barry's opinions, which cannot be proven true or false.  *See Carr v.

Warden*, 206 Cal. Rptr. 162, 163 (Cal. Ct. App. 1984) (statement beginning with "I think" is an

non-actionable opinion); *Behr v. Weber*, 568 N.Y.S.2d 948, 949-50 (1st Dep't 1991).  Moreover,

these types of statements about Ms. Zervos's state of mind or motivations constitute opinions as

a matter of law.  *See Dreamstone Entm't Ltd. v. Maysalward Inc.*, 2014 WL 4181026, at *8

(C.D. Cal. Aug. 18, 2014) (statements about plaintiff's state of mind or motivations are not

actionable); *Huggins v. Povitch*, 1996 WL 515498, at *8 (Sup. Ct., New York Cty. Apr. 19,

1996); *Rappaport v. VV Publ'g. Corp.*, 618 N.Y.S.2d 746, 750 (Sup. Ct., New York Cty. 1994).

28

Further, Ms. Zervos's defamation claim is premised upon numerous vague and ambiguous statements related to the merits of Mr. Trump's Presidential campaign, such as President Trump's statement, "100% fabricated and made-up charges, pushed strongly by the media and the Clinton Campaign." (*See, e.g.*, Compl. ¶¶ 59-61, 63, 65-68, 70, 72- 74; App. A Nos. 3-5, 7, 9-12, 16-18.) These publications are not actionable because they "'mean different things to different people' and cannot be proven true or false because of their 'subjective, relative meanings.'" *Jacobus*, 51 N.Y.S.3d at 338; *see also GetFugu, Inc.*, 162 Cal. Rptr. 3d at 842.

Finally, Statement No. 1 that President Trump never "greeted her inappropriately a decade ago," even accepting her allegations as true for this motion, is a subjective opinion that has no precise meaning capable of being proven true or false. (Compl. ¶ 55; App. A No 1.); *Terry v. Davis Cmty. Church*, 33 Cal. Rptr. 3d 145, 158-59 (Cal. Ct. App. 2005) (whether a relationship is "inappropriate" is opinion); *Colantonio v. Mercy Med. Ctr.*, 901 N.Y.S.2d 370, 373-74 (2d Dep't 2010) (referring to someone as "inappropriate" is opinion). Moreover, when considering the totality of Statement No. 1, including the non-defamatory portion of the statement, "I never met her at a hotel," it is a mere denial that reflects Mr. Trump's subjective belief about the lack of merit of Ms. Zervos's assertions.[43] (Compl. ¶ 55; App. A No 1.)

That Ms. Zervos intentionally solicited President Trump's response to her political rhetoric also serves as a basis for dismissal of her claim. (Compl. ¶¶ 55-56, 59-74; App. A Nos. 1-18.) *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d. 191, 201 (2d Cir. 2015) (statements solicited by plaintiff not actionable); *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (1st

---

[43] *See Farber v. Jefferys*, 959 N.Y.S.2d 486, 488 (1st Dep't 2013) (defendants use of the word "liar" was not actionable as defamation because the "full content of the statement, including its tone and apparent purpose, and the broader context of the statement and surrounding circumstances leads to the conclusion that what was being read was 'likely to be opinion, not fact'") (quotations omitted); *El-Amine v. Avon Prods., Inc.*, 739 N.Y.S.2d 564, 564 (1st Dep't 2002) ("[T]he statement by defendant to the media that plaintiff's claim against it was without merit constituted mere opinion, and was therefore nonactionable.").

29

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 43 of 54

Dep't 1998) (same).  "If the law were to the contrary, the protection of the First Amendment would be unacceptably denied to persons who publicly defend themselves against what they believe to be baseless public charges . . . ."  *Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 329 (Sup. Ct., New York Cty. 2011).

In an attempt to sidestep this fundamental flaw with her claim, Ms. Zervos attempts to anchor her claim to the false notion that President Trump called her a "liar" -- words that were never uttered by the President about Ms. Zervos.  But even if she was called a liar (and she was not), it still is not a basis for defamation.  *See, e.g.*, *Rosenaur*, 105 Cal. Rptr. 2d at 688 (referring to political opponent as a "liar" was non-actionable in context of heated political contest); *cf. Standing Committee on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1440-41 (9th Cir. 1995) (referring to judge as "dishonest" was non-actionable where it would be interpreted merely as statement of contempt); *Lapine*, 918 N.Y.S.2d at 328-29.

### B. Most Of The Statements Do Not Even Refer To Ms. Zervos And Therefore Are Not Actionable

Most of the eighteen Statements at issue cannot serve as a basis for Ms. Zervos's defamation claim because they do not even refer to her.  (Compl. ¶¶ 59-61, 63, 65-68, 70-74; App. A Nos 3-5, 7, 9-12, 14-18.)  For a statement to be actionable under California defamation law, a plaintiff must allege "that the contested statements are 'of and concerning,' [her] either by name or by 'clear implication.'"  *Ferlauto*, 88 Cal. Rptr. 2d at 852 (finding statements were not "of and concerning" plaintiff where plaintiff was never referred to by name); *Forsher v. Bugliosi*, 608 P.2d 716, 717, 723 (Cal. 1980) (upholding dismissal of defamation claim where it was unclear that allegedly defamatory language referred to the plaintiff); *Art of Living Found. v.*

30

Case 1:20-cv-07311-LAK   Document 14-66   Filed 09/15/20   Page 44 of 54

*Does*, 2011 WL 2441898, at *6 (N.D. Cal. June 15, 2011).[44]  Whether the Statements could be reasonably interpreted to be "of and concerning" a plaintiff is appropriate for resolution at this stage.  *See, e.g.*, *Art of Living*, 2011 WL 2441898, at *6.[45]

Here, most of the Statements make no reference whatsoever to Ms. Zervos.  Rather, these either explicitly refer to other parties (such as Hillary Clinton or her campaign, or the media (*see, e.g.*, Compl. ¶¶ 59-61, 65, 71; App. A Nos. 3-5, 9, 15)), or they generally refer to unidentifiable parties who had opposed President Trump both before and after his Republican nomination:

- Statement 3 refers to "the media and the Clinton Campaign," as well as "false allegations" and "allegations that are one hundred percent false."  (Compl. ¶ 59; App. A No. 3.)  In context, the statement is also clearly referring to events that happened "many years, even decades" ago.

- Statement 4 refers to "100% fabricated and made-up charges, pushed strongly by the media and the Clinton Campaign."  (Compl. ¶ 60; App. A No 4.)

- Statement 5 refers to "the media pushing false and unsubstantiated charges, and outright lies, in order to elect Crooked Hillary."  (Compl. ¶ 61; App. A No. 5.)

- Statement 7 says "[n]othing ever happened with any of these women.  Totally made up nonsense to steal the election."  (Compl. ¶ 63; App. A No. 7.)

- Statement 8 is deceptively quoted in the Complaint to omit the portions that clearly refer to accusers other than Ms. Zervos:  "But those allegations have been -- many of them -- already proven so false.  And in fact, the other one with *People* magazine, the butler said it was a total lie.  Remember the butler?  The butler said it was a total lie.  We can't let them get away with this folks.  We can't.  Total lies.  And you've been seeing total lies." (Compl. ¶ 64; App. A No. 8.)

- Statement 9 refers to the "election being rigged by corrupt media, pushing completely false allegations and outright lies, in an effort to elect Hillary Clinton President . . . False stories, all made up.  Lies, lies.  No witnesses, no nothing.  All big lies."  (Compl. ¶ 65; App. A No. 9.)

---

[44] *See also Elias*, 192 F. Supp. 3d at 392-93; *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (2d Dep't 1994).

[45] *See also Three Amigos*, 65 N.E.3d at 37; *Elias*, 192 F. Supp. at 392.

31

- Statement 10 refers to losing "large numbers of women voters based on made up events THAT NEVER HAPPENED.  Media rigging election!"  (Compl. ¶ 66; App. A No. 10.)

- Statement 11 refers to the "[e]lection [] being rigged by the media, in a coordinated effort with the Clinton campaign, by putting stories that never happened into news!" (Compl. ¶ 67; App. A No. 11.)

- Statement 12 refers to the "totally phoney stories, 100% made up by women (many already proven false) and pushed big time by the press."  (Compl. ¶ 68; App. A No. 12.)

- Statement 14 reads "the media has deceived the public by putting women front and center with made-up stories and lies."  (Compl. ¶ 70; App. A No. 14.)

- Statement 15 refers to "sexy headlines" and the Clinton Campaign.  (Compl. ¶ 71; App. A No. 15.)

- Statement 16 refers to the press "telling totally false stories, most recently about phony allegations."  (Compl. ¶ 72; App. A No. 16.)

- Statement 17 refers to protesters in Chicago and "the woman on the plane."  (Compl. ¶ 73; App. A No. 17.)

- Statement 18 states "[e]very woman lied when they came forward to hurt my campaign.  Total fabrication.  The events never happened.  Never."  (Compl. ¶ 74; App. A No. 18.)

Thus, none of the above Statements even reference Ms. Zervos.  Inasmuch as she claims that the Statements referring to "false allegations," "fabricated charges" or similar language "clearly identified" her (Compl. ¶ 86), that argument fails.  In particular, because numerous accusations of various kinds were leveled against President Trump during his campaign on or before October 2016 -- as Ms. Zervos admits (Compl. ¶¶ 5-6, 8) -- she cannot satisfy her burden of showing these general broad sweeping Statements directly refer to her -- let alone any identifiable group.  *See Peper v. Gannett Co.*, 2003 WL 22457121, at *4 (Cal. Super. Ct. Apr. 4, 2003) ("The gravamen of a defamation claim is that the plaintiff has been the direct object of criticism, not that he has suffered some consequential damage as a result of an allegedly defamatory statement about someone else.") (citation and quotations omitted); *Ferlauto*, 88 Cal.

32

Rptr. 2d at 852 ("[Plaintiff] cannot constitutionally establish liability unless he proves that the

contested statements are 'of and concerning,' him either by name or by 'clear implication.'");

*Forsher*, 608 P.2d at 723 (obscure statements are non-actionable); *Elias*, 192 F. Supp. 3d at 391.

### C. President Trump Did Not Publish Barry's Statement Or The Retweets

Ms. Zervos's defamation claim also fails because she cannot establish that President

Trump published the Statements by Mr. Barry or the retweets of others' postings. (Compl. ¶¶

56, 62, 69; App. A Nos. 2, 6, 13.) *See Live Oak Publ'g Co. v. Cohagan*, 286 Cal. Rptr. 198, 201

(Cal. Ct. App. 1991) ("[A] libelous statement is not actionable until it has been published to a

third person. . . . [T]he publication must be done by the defendant"); *Smalley v. Dreyfus Corp.*,

832 N.Y.S.2d 157, 163 (1st Dep't 2007), *partially reversed on other grounds*, 882 N.E.2d 882

(2008); *Rosner v. Amazon.com*, 18 N.Y.S.3d 155, 157 (2d Dep't 2015).

Further, to the extent the Court were to find that President Trump posted these Statements

online, he is insulated from liability under Section 230 of the Communications Decency Act

("CDA"), which carves out broad immunities to providers and users of interactive computer

services that do not provide the content of the posted information but exercise traditional

publishing roles. *See Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *5-7

(C.D. Cal. May, 4, 2011) (noting that CDA should be given "expansive" reading and concluding

that defendants are shielded from liability); *Shiamili v. Real Estate Grp. of New York, Inc.*, 952

N.E.2d 1011, 1016-1017 (N.Y. 2011). Section 230 specifically provides: "No provider or user

of an interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider."[46] 47 U.S.C. § 230(c)(1). Thus, because

---

[46] Section 230 defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Courts have found that Twitter users may qualify as "information content providers." *See Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1121 (N.D. Cal. 2016).

President Trump, as an interactive computer service user, did not provide the content of the information contained in Mr. Barry's statements posted to the Internet or the retweets, he is insulated from liability under Section 230.  (Compl. ¶¶ 56, 62, 69; App. A No 2, 6, 13.)

1.     **President Trump Did Not Publish Mr. Barry's Statement Posted On The Campaign Website**

Ms. Zervos cannot establish that Mr. Barry's statement posted to the campaign website was published by President Trump.  Instead, Ms. Zervos makes the conclusory allegation that "[o]n information and belief, Mr. Trump's campaign team drafted and issued Barry's statement at Mr. Trump's direction and with his approval."  (Compl. ¶ 56; App. A No. 2.)  Such conclusory allegations, however, fail as a matter of agency law to establish that the campaign was acting within the scope of its authority when it purportedly drafted Mr. Barry's statement.  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *18-19 (E.D.N.Y. Jan. 4, 2011) (agency allegations were insufficient as they were "based on conclusory and generic statements that do not even provide the barest allegations as to the elements of the agency relationship"), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012); *Sutherland v. Remax 2000*, 20 Misc. 3d 1131(A), at *4 (Sup. Ct., Nassau Cty. 2008) (rejecting plaintiff's agency allegations as conclusory).[47]

Even if the campaign did draft Mr. Barry's statement -- and Ms. Zervos has not pleaded any facts to support that it did -- Ms. Zervos did not allege any facts to show that the campaign was acting within the scope of authority granted to it by President Trump so as to allow its acts to be imputed to Mr. Trump personally.  *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 112-13 (S.D.N.Y. 2009) (allegations that fall outside of agent's management and operation role "cannot,

---

[47] New York law applies to agency-related allegations because the Trump campaign is based in New York.  *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 1988 WL 75262, at *3 (S.D.N.Y. July 13, 1988); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 700 (N.Y. 2002).

34

as a matter of law, be imputed to [the principal]").  Drafting third-party statements is not the type

of activity ordinarily vested within the scope of a political campaign's authority.  Nor does Ms.

Zervos allege that President Trump had specific knowledge that his campaign had drafted Mr.

Barry's statement, which is fatal to her agency allegations given that the campaign website

expressly states Mr. Barry wrote his own statement:  "Statement From John Barry."  (*See* App. A

No. 2).[48]  *See Precedo Capital Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 257-58 (S.D.N.Y.

2014) (agency theory falls short absent allegations that defendant had "knowledge of all the

material facts of the transaction[s]" between alleged agent and plaintiff for ratification purposes).

Because Ms. Zervos cannot establish under agency law that President Trump is

responsible for drafting Mr. Barry's statements, President Trump is insulated from liability under

Section 230.  *See Shiamili*, 952 N.E.2d at 1020; *Seldon v. Magedson*, 2012 WL 4475274, at *16

(S.D.N.Y. July 10, 2012), *report and recommendation adopted,* 2012 WL 4475020 (S.D.N.Y.

Sept. 28, 2012); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 472-73 (E.D.N.Y. 2011);

*Live Oak*, 286 Cal. Rptr. at 203; *Barrett v. Rosenthal*, 146 P.3d 510, 529 (Cal. 2006).

Even assuming that Ms. Zervos could establish that Mr. Trump's campaign was acting as

his agent when it purportedly drafted Mr. Barry's statements, Ms. Zervos cannot demonstrate as

a matter of law that President Trump acted with the requisite malice that she is required to

establish as a limited public figure.  *See Ampex*, 27 Cal. Rptr. 3d at 870-71; *Penaherrera*, 2013

WL 4013487, at *15.  At most, Ms. Zervos made conclusory allegations that the campaign -- not

Mr. Trump -- published Mr. Barry's statements with malice.  (Compl. ¶¶ 56, 89; App. A No. 2.)

However, Ms. Zervos cannot recover for defamation "without proving ***each defendant*** acted

---

[48] Instead, the Complaint only alleges that the statement was issued with "Mr. Trump's direction and with his approval."  (Compl. ¶ 56.)

35

with actual malice as to each purported defamation." *Murray v. Bailey*, 613 F. Supp. 1276, 1281

(N.D. Cal. 1985) (emphasis added). Courts have consistently refused to apply agency principles

in the First Amendment context to impute malice. *See id.* ("The stringent standards required by

the First Amendment make application of the agency theory inappropriate [in the defamation

context.]"); *Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1370 (N.D. Cal. 1993)

("general agency rules do not apply in the constitutional context. Indeed, the requirement that

the defendant's state of mind be proven is the cornerstone of the constitutional requisite that a

plaintiff prove by clear and convincing evidence"), *aff'd*, 85 F.3d 1394 (9th Cir. 1996).

### 2.   President Trump Cannot Be Held Liable As A Publisher For The Retweets

Ms. Zervos also cannot demonstrate that President Trump published defamatory

statements (a) when he retweeted and linked to Mr. Barry's statements from the campaign

website with the added words "[t]he truth is a beautiful weapon" (Compl. ¶ 62; App. A No. 6), or

(b) when he retweeted and provided a link to the post of another Twitter user called

@PrisonPlanet and added the single word "Terrible" to the introduction of that retweet. (Compl.

¶ 69; App. A No. 13.) First, California follows the single-publication rule that "limits tort claims

premised on mass communications to a single cause of action that accrues upon the first

publication of the communication." *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012).

This rule applies to the Internet, and Internet publications that "are generally considered

'published' when they are first made available to the public." *Id.* at 1081-82. Second, it is well

established that providing links to statements already published on the Internet, as President

Trump did, is not actionable as a republication. *See Sundance Image Tech., Inc. v. Cone Editions

Press, Ltd.*, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) (providing links to a previously

published internet article does not constitute republication); *Martin v. Daily News L.P.*, 990

36

N.Y.S.2d 473, 483 (1st Dep't 2014); *Haefner v. N.Y. Media, LLC*, 918 N.Y.S.2d 103, 104 (1st Dep't 2011). Third, under Section 230, "Congress has comprehensively immunized republication by individual Internet users," *Barrett*, 146 P.3d at 529, even if the Internet user like President Trump, adds language to the republication. *See Hung Tan Phan v. Lang Van Pham*, 105 Cal. Rptr. 3d 791, 794–95 (Cal. Ct. App. 2010) (holding defendant is not liable for defamation under Section 230 for forwarding a defamatory email and adding introductory language). Thus, President Trump is not liable for retweeting others' statements.

### D.    Ms. Zervos Failed To Properly Plead Damages

The Complaint should be dismissed also because Ms. Zervos failed to properly plead damages. First, Ms. Zervos's allegations do not establish defamation *per se* because her allegations about President Trump purportedly questioning her honesty and integrity do not relate to her restaurant, its food, or to her ability to run it. (Comp. ¶¶ 79, 81.) *See Regalia v. Nethercutt Collection*, 90 Cal. Rptr. 3d 882, 888 (Cal. Ct. App. 2009) ("[D]isparagement must be more than general defamation of the victim's character, it must go to a characteristic particularly relevant to the victim's occupation.").[49]  Indeed, calling a person a liar is not defamation *per se* unless that person's profession specifically requires honesty. *See, e.g.*, *Correia v. Santos*, 13 Cal. Rptr. 132, 136-37 (Cal. Ct. App. 1961); *Mihalakis*, 557 N.Y.S.2d at 37-38.

Second, while Ms. Zervos attempts to plead special damages with specificity by choosing a seemingly precise number -- $2,914 -- she does not allege a single fact to support the specificity of her damages as California law requires. (Compl. ¶ 81.) *See Jaramillo v. Food 4 Less Madera*, 2010 WL 4746170, at *10 (E.D. Cal. Nov. 16, 2010) (dismissing slander *per se* claim because while plaintiff alleged he lost his job and job opportunities, he failed to "allege the

---

[49] *See, e.g.*, *Mihalakis v. Comm. of Interns & Residents (CIR)*, 557 N.Y.S.2d 37, 37-38 (1st Dep't 1990).

nature and extent [of his] claimed loss with specifics"). Nor does she, as New York requires,

plead any facts showing how she knows that she lost customers due to the Statements, or name a

single allegedly lost customer. *DiSanto v. Forsyth*, 684 N.Y.S.2d 628, 629 (2d Dep't 1999).

## IV.   The Complaint Must Be Stricken Pursuant to California's Anti-SLAPP Law

The Complaint should be stricken pursuant to California's anti-SLAPP statute, Cal. Code

Civ. P. § 425.16(b)(1),[50] which protects the right to freedom of speech from a frivolous

complaint, like here, that targets protected First Amendment activity.[51] *See Reed*, 204 Cal. Rptr.

3d at 186. There is no doubt that the statements are protected under the Constitution and Ms.

Zervos has not established a probability that she will prevail on her claim.

The courts apply a two-step analysis in analyzing a motion to strike. Under the first step,

the defendant makes "a threshold showing that the challenged cause of action is one 'arising

from' protected activity," *Reed*, 204 Cal. Rptr. 3d at 186, and when the relief sought is "based on

allegations of both protected and unprotected activity, the unprotected activity is disregarded at

this stage," *Baral v. Schnitt*, 376 P.3d 604, 617 (Cal. 2016). President Trump has made a

threshold showing that the Statements arise from protected activity, because, as Ms. Zervos

readily admits, the Complaint targets statements made by President Trump as a political

candidate and his supporters during an on-going political debate regarding issues of significant

public interest -- Mr. Trump's qualifications for office. (Compl. ¶¶ 4, 6, 8, 50.) *See Buckley v.*

*Valeo*, 424 U.S. 1, 15 (1976) ("[C]onduct of campaigns for political office" is where "the

---

[50] "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. P. § 425.16(b)(1).

[51] Despite Ms. Zervos's attempt to forum shop away from it, California's substantive anti-SLAPP statute applies here. *See Adelson*, 973 F. Supp. 2d at 476, 493 n.21 (recognizing, under New York choice of law principles, that the Nevada anti-SLAPP statute, which is similar to California's, was substantive in nature); *see also Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) (finding California's anti-SLAPP statute to be a substantive law).

38

constitutional guarantee [of free speech] has its fullest and most urgent application."); *Rosenaur*, 105 Cal. Rptr. 2d at 688 ("heated oral exchange . . . in the midst of a hard-fought [political] contest" constituted protected activity in a defamation action); *Conroy v. Spitzer*, 83 Cal. Rptr. 2d 443, 446 (Cal. Ct. App. 1999) (allegedly defamatory statements "obviously" constituted protected activity where they "addressed a matter of public concern -- a candidate's qualifications and conduct in office"); *Reed*, 204 Cal. Rptr. 3d at 181-82, 196; *Lakireddy v. Soto-Vigil*, 2014 WL 1478693, at *1 (Cal. Ct. App. Apr. 16, 2014).

Under the second step, "the burden shifts to plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated," which requires a heightened showing that that Ms. Zervos has a probability of prevailing on the merits. *Baral*, 376 P.3d at 617. "The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken." *Id.* Under this standard, Ms. Zervos is not entitled to "rely solely on [her] complaint . . . instead, [ ] proof must be made upon competent admissible evidence." *Paulus v. Bob Lynch Ford, Inc.*, 43 Cal. Rptr. 3d 148, 158 (Cal. Ct. App. 2006).

As shown above (Section III), Ms. Zervos cannot prevail on her claim, let alone under this heightened standard that requires her to establish a probability of prevailing on the merits through admissible evidence. Ms. Zervos has not introduced admissible evidence to support *any* of her allegations and cannot possibly introduce evidence to establish a number of aspects of her claim. For example, first, as a limited purpose public figure, Ms. Zervos cannot substantiate her claim because she cannot prove by clear and convincing direct evidence that the Statements were made with actual malice. *See, e.g.*, *Annette F. v. Sharon S.*, 15 Cal. Rptr. 3d 100, 111 (Cal. Ct. App. 2004) (reversing trial court's order denying anti-SLAPP motion based on plaintiff's failure

39

to show a probability of proving actual malice by clear and convincing evidence); *Beilenson v. Superior Court*, 52 Cal. Rptr. 2d 357, 362 (Cal. Ct. App. 1996) ("[A]ctual malice cannot be implied and must be proven by direct evidence."). Second, Ms. Zervos cannot introduce a scintilla of evidence to substantiate her unfounded allegation -- made "[o]n information and belief" -- that Mr. Barry's statements were drafted by Mr. Trump's campaign at Mr. Trump's purported direction and approval. (Compl. ¶ 56.) *See Evans v. Unkow*, 45 Cal. Rptr. 2d 624, 629 (Cal. Ct. App. 1995) ("An averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim."); *McGarry v. Univ. of San Diego*, 64 Cal. Rptr. 3d 467, 488 (Cal. Ct. App. 2007) ("Absent clear and convincing evidence identifying the precise individual who spoke the defamatory statements, and therefore whose 'state of mind' is at issue, McGarry cannot show a likelihood of success on the malice element.") (citation omitted); *Wong v. Tai Jing*, 117 Cal. Rptr. 3d 747, 761 (Cal. Ct. App. 2010). Third, Ms. Zervos cannot introduce credible evidence to establish her alleged financial losses, including that customers stopped patronizing her restaurant due to Mr. Trump defending his character for office. (Compl. ¶ 81.) Therefore, because Ms. Zervos cannot carry her burden of establishing a probability of prevailing on her claim, her Complaint must be stricken in its entirety and she should be ordered to pay Mr. Trump's costs and attorneys' fees, as a "prevailing defendant," under Cal. Code Civ. P. § 425.16(c). *See Ketchum v. Moses*, 104 Cal. Rptr. 2d 377 (Cal. 2001).

## CONCLUSION

For the foregoing reasons, the Court should dismiss and strike the Complaint pursuant to CPLR 3211 and Cal. Code Civ. P. § 425.16(b)(1), or, in the alternative, stay the action pursuant to CPLR 2201, and award President Trump his costs and attorneys' fees pursuant to Cal. Code Civ. P. § 425.16(c).

40

Dated: July 7, 2017
      New York, New York

                                  **KASOWITZ BENSON TORRES LLP**

                                By: _/s/ Marc E. Kasowitz_____
                                    Marc E. Kasowitz
                                    Christine A. Montenegro
                                    Paul J. Burgo

                                1633 Broadway
                                New York, New York 10019
                                (212) 506-1700

                                *Attorneys for Defendant Donald J. Trump*

41