Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 1 of 69

# EXHIBIT A

(Slip Opinion)          OCTOBER TERM, 2019                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP *v.* VANCE, DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 19–635.  Argued May 12, 2020—Decided July 9, 2020

In 2019, the New York County District Attorney's Office—acting on be-
half of a grand jury—served a subpoena *duces tecum* on Mazars USA,
LLP, the personal accounting firm of President Donald J. Trump, for
financial records relating to the President and his businesses.  The
President, acting in his personal capacity, sued the district attorney
and Mazars in Federal District Court to enjoin enforcement of the sub-
poena, arguing that a sitting President enjoys absolute immunity from
state criminal process under Article II and the Supremacy Clause.  The
District Court dismissed the case under the abstention doctrine of
*Younger* v. *Harris*, 401 U. S. 37, and, in the alternative, held that the
President was not entitled to injunctive relief.  The Second Circuit re-
jected the District Court's dismissal under *Younger* but agreed with
the court's denial of injunctive relief, concluding that presidential im-
munity did not bar enforcement of the subpoena and rejecting the ar-
gument of the United States as *amicus curiae* that a state grand jury
subpoena seeking the President's documents must satisfy a height-
ened showing of need.

*Held*: Article II and the Supremacy Clause do not categorically preclude,
or require a heightened standard for, the issuance of a state criminal
subpoena to a sitting President.  Pp. 3–22.

(a) In 1807, John Marshall, presiding as Circuit Justice for Virginia
over the treason trial of Aaron Burr, granted Burr's motion for a sub-
poena *duces tecum* directed at President Jefferson.  In rejecting the
prosecution's argument that a President was not subject to such a sub-
poena, Marshall held that a President does not "stand exempt" from
the Sixth Amendment's guarantee that the accused have compulsory
process for obtaining witnesses for their defense.  *United States* v.

2    TRUMP *v.* VANCE

Syllabus

*Burr*, 25 F. Cas. 30, 33–34. The sole argument for an exemption was that a President's "duties as chief magistrate demand his whole time for national objects." *Ibid.* But, in Marshall's assessment, those duties were "not unremitting," *ibid.*, and any conflict could be addressed by the court upon return of the subpoena. Marshall also concluded that the Sixth Amendment's guarantee extended to the production of papers. "[T]he propriety of introducing any papers," he explained, would "depend on the character of the paper, not the character of the person who holds it," and would have "due consideration" upon the return of the subpoena. *Id.*, at 34, 37. Jefferson agreed to furnish whatever justice required, subject to the prerogative to decide whether particular executive communications should be withheld.

In the two centuries since *Burr*, successive Presidents from Monroe to Clinton have accepted Marshall's ruling that the Chief Executive is subject to subpoena and have uniformly agreed to testify when called in criminal proceedings.

In 1974, the question whether to compel the disclosure of official communications over the President's objection came to a head when the Watergate Special Prosecutor secured a subpoena *duces tecum* directing President Nixon to produce, among other things, tape recordings of Oval Office meetings. This Court rejected Nixon's claim of an absolute privilege of confidentiality for all presidential communications. Recognizing that "compulsory process" was imperative for both the prosecution and the defense, the Court held that the President's "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *United States* v. *Nixon*, 418 U. S. 683, 713. President Nixon dutifully released the tapes. Pp. 3–10.

(b) This history all involved *federal* criminal proceedings. Here, the President claims that the Supremacy Clause gives a sitting President absolute immunity from *state* criminal subpoenas because compliance with such subpoenas would categorically impair the performance of his Article II functions. The Solicitor General, arguing on behalf of the United States, claims that a state grand jury subpoena for a sitting President's personal records must, at the very least, meet a heightened standard of need. Pp. 10–22.

(1) The President's unique duties as head of the Executive Branch come with protections that safeguard his ability to perform his vital functions. The Constitution also guarantees "the entire independence of the General Government from any control by the respective States." *Farmers and Mechanics Sav. Bank of Minneapolis* v. *Minnesota*, 232 U. S. 516, 521. Marshall's ruling in *Burr*, entrenched by 200 years of practice and this Court's decision in *Nixon*, confirms that federal criminal subpoenas do not "rise to the level of constitutionally forbidden

impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton* v. *Jones*, 520 U. S. 681, 702–703. But the President claims that state criminal subpoenas necessarily pose a unique threat of impairment and thus require absolute immunity. His categorical argument focuses on three burdens: diversion, stigma, and harassment. Pp. 10–17.

(i) The President contends that complying with state criminal subpoenas would necessarily distract the Chief Executive from his duties. He grounds that concern on *Nixon* v. *Fitzgerald*, which recognized a President's "absolute immunity from damages liability predicated on his official acts." 457 U. S. 731, 749. But, contrary to the President's suggestion, that case did not hold that distraction was sufficient to confer absolute immunity. Indeed, the Court expressly rejected immunity based on distraction alone 15 years later in *Clinton* v. *Jones*, when President Clinton sought absolute immunity from civil liability for private acts. As the Court explained, *Fitzgerald*'s "dominant concern" was not mere distraction but the distortion of the Executive's "decisionmaking process." 520 U. S., at 694, n. 19. The prospect that a President may become "preoccupied by pending litigation" did not ordinarily implicate constitutional concerns. *Id.,* at 705, n. 40. Two centuries of experience likewise confirm that a properly tailored criminal subpoena will not normally hamper the performance of a President's constitutional duties.

The President claims this case is different. He believes that he is under investigation and argues that the toll will necessarily be heavier in that circumstance. But the President is not seeking immunity from the diversion occasioned by the prospect of future criminal *liability*. He concedes that he may be investigated while in office. His objection is instead limited to the *additional* distraction caused by the subpoena itself. That argument, however, runs up against the 200 years of precedent establishing that Presidents, and their official communications, are subject to judicial process, see *Burr*, 25 F. Cas., at 34, even when the President is under investigation, see *Nixon*, 418 U. S., at 706. Pp. 12–14.

(ii) The President next claims that the stigma of being subpoenaed will undermine his leadership at home and abroad. But even if a tarnished reputation were a cognizable impairment, there is nothing inherently stigmatizing about a President performing "the citizen's normal duty of ... furnishing information relevant" to a criminal investigation. *Branzburg* v. *Hayes*, 408 U. S. 665, 691. Nor can the risk of association with persons or activities under criminal investigation absolve a President of such an important public duty. The consequences for a President's public standing will likely increase if he is

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 5 of 69

the one under investigation, but the President concedes that such investigations are permitted under Article II and the Supremacy Clause. And the receipt of a subpoena would not seem to categorically magnify the harm to the President's reputation. Additionally, in the grand jury context longstanding secrecy rules aim to prevent the very stigma the President anticipates. Pp. 14–15.

(iii) Finally, the President argues that subjecting Presidents to state criminal subpoenas will make them "easily identifiable target[s]" for harassment. *Fitzgerald*, 457 U. S., at 753. The Court rejected a nearly identical argument in *Clinton*, concluding that the risk posed by harassing civil litigation was not "serious" because federal courts have the tools to deter and dismiss vexatious lawsuits. 520 U. S., at 708. Harassing state criminal subpoenas could, under certain circumstances, threaten the independence or effectiveness of the Executive. But here again the law already seeks to protect against such abuse. First, grand juries are prohibited from engaging in "arbitrary fishing expeditions" or initiating investigations "out of malice or an intent to harass," *United States* v. *R. Enterprises, Inc.*, 498 U. S. 292, 299, and federal courts may intervene in state proceedings that are motivated by or conducted in bad faith. Second, because the Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties, any effort to manipulate a President's policy decisions or to retaliate against a President for official acts through issuance of a subpoena would be an unconstitutional attempt to "influence" a superior sovereign "exempt" from such obstacles, see *McCulloch* v. *Maryland*, 4 Wheat. 316, 417. And federal law allows a President to challenge any such allegedly unconstitutional influence in a federal forum. Pp. 15–17.

(2) A state grand jury subpoena seeking a President's private papers need not satisfy a heightened need standard, for three reasons. First, although a President cannot be treated as an "ordinary individual" when executive communications are sought, *Burr* teaches that, with regard to private papers, a President stands in "nearly the same situation with any other individual." 25 F. Cas., at 191–192. Second, there has been no showing here that heightened protection against state subpoenas is necessary for the Executive to fulfill his Article II functions. Finally, absent a need to protect the Executive, the public interest in fair and effective law enforcement cuts in favor of comprehensive access to evidence.

Rejecting a heightened need standard does not leave Presidents without recourse. A President may avail himself of the same protections available to every other citizen, including the right to challenge the subpoena on any grounds permitted by state law, which usually include bad faith and undue burden or breadth. When the President

Cite as:  591 U. S. ____ (2020)          5

Syllabus

invokes such protections, "[t]he high respect that is owed to the office of the Chief Executive . . . should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton*, 520 U. S., at 707.  In addition, a President can raise subpoena-specific constitutional challenges in either a state or a federal forum.  As noted above, he can challenge the subpoena as an attempt to influence the performance of his official duties, in violation of the Supremacy Clause. And he can argue that compliance with a particular subpoena would impede his constitutional duties.  Pp. 17–21.

941 F. 3d 631, affirmed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  KAVANAUGH, J., filed an opinion concurring in the judgment, in which GORSUCH, J., joined. THOMAS, J., and ALITO, J., filed dissenting opinions.

Cite as: 591 U. S. ____ (2020)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–635

_____

## DONALD J. TRUMP, PETITIONER *v.* CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In our judicial system, "the public has a right to every man's evidence."[1]  Since the earliest days of the Republic, "every man" has included the President of the United States.  Beginning with Jefferson and carrying on through Clinton, Presidents have uniformly testified or produced documents in criminal proceedings when called upon by federal courts.  This case involves—so far as we and the parties can tell—the first *state* criminal subpoena directed to a President.  The President contends that the subpoena is unenforceable.  We granted certiorari to decide whether Article II and the Supremacy Clause categorically preclude, or require a heightened standard for, the issuance of a state criminal subpoena to a sitting President.

_____

[1] This maxim traces at least as far back as Lord Chancellor Hardwicke, in a 1742 parliamentary debate.  See 12 Parliamentary History of England 693 (1812).

Case 1:20-cv-07311-LAK  Document 14-99  Filed 09/15/20  Page 8 of 69

2                               TRUMP *v.* VANCE

Opinion of the Court

I

In the summer of 2018, the New York County District Attorney's Office opened an investigation into what it opaquely describes as "business transactions involving multiple individuals whose conduct may have violated state law." Brief for Respondent Vance 2. A year later, the office—acting on behalf of a grand jury—served a subpoena *duces tecum* (essentially a request to produce evidence) on Mazars USA, LLP, the personal accounting firm of President Donald J. Trump. The subpoena directed Mazars to produce financial records relating to the President and business organizations affiliated with him, including "[t]ax returns and related schedules," from "2011 to the present." App. to Pet. for Cert. 119a.[2]

The President, acting in his personal capacity, sued the district attorney and Mazars in Federal District Court to enjoin enforcement of the subpoena. He argued that, under Article II and the Supremacy Clause, a sitting President enjoys absolute immunity from state criminal process. He asked the court to issue a "declaratory judgment that the subpoena is invalid and unenforceable while the President is in office" and to permanently enjoin the district attorney "from taking any action to enforce the subpoena." Amended Complaint in No. 1:19–cv–8694 (SDNY, Sept. 25, 2019), p. 19. Mazars, concluding that the dispute was between the President and the district attorney, took no position on the legal issues raised by the President.

The District Court abstained from exercising jurisdiction and dismissed the case based on *Younger* v. *Harris*, 401 U. S. 37 (1971), which generally precludes federal courts from intervening in ongoing state criminal prosecutions.

————————
[2]The grand jury subpoena essentially copied a subpoena issued to Mazars in April 2019 by the Committee on Oversight and Reform of the U. S. House of Representatives, which is at issue in *Trump* v. *Mazars USA, LLP, post,* p. ___. The principal difference is that the instant subpoena expressly requests tax returns.

395 F. Supp. 3d 283, 290 (SDNY 2019). In an alternative holding, the court ruled that the President was not entitled to injunctive relief. *Ibid.*

The Second Circuit met the District Court halfway. As to the dismissal, the Court of Appeals held that *Younger* abstention was inappropriate because that doctrine's core justification—"preventing friction" between States and the Federal Government—is diminished when state and federal actors are already in conflict, as the district attorney and the President were. 941 F. 3d 631, 637, 639 (2019).

On the merits, the Court of Appeals agreed with the District Court's denial of a preliminary injunction. Drawing on the 200-year history of Presidents being subject to federal judicial process, the Court of Appeals concluded that "presidential immunity does not bar the enforcement of a state grand jury subpoena directing a third party to produce nonprivileged material, even when the subject matter under investigation pertains to the President." *Id.,* at 640. It also rejected the argument raised by the United States as *amicus curiae* that a state grand jury subpoena must satisfy a heightened showing of need. The court reasoned that the proposed test, derived from cases addressing privileged Executive Branch communications, "ha[d] little bearing on a subpoena" seeking "information relating solely to the President in his private capacity and disconnected from the discharge of his constitutional obligations." *Id.,* at 645–646.

We granted certiorari. 589 U. S. ___ (2019).

## II

In the summer of 1807, all eyes were on Richmond, Virginia. Aaron Burr, the former Vice President, was on trial for treason.[3] Fallen from political grace after his fatal duel

---

[3]See generally N. Isenberg, Fallen Founder: The Life of Aaron Burr 271–365 (2007); J. Smith, John Marshall: Definer of a Nation 348–374 (1996); M. Lomask, Aaron Burr: The Conspiracy and Years of Exile, 1805–1836, pp. 222–298 (1982).

4                         TRUMP *v.* VANCE

Opinion of the Court

with Alexander Hamilton, and with a murder charge pend-
ing in New Jersey, Burr followed the path of many down-
and-out Americans of his day—he headed West in search of
new opportunity.  But Burr was a man with outsized ambi-
tions.  Together with General James Wilkinson, the Gover-
nor of the Louisiana Territory, he hatched a plan to estab-
lish a new territory in Mexico, then controlled by Spain.[4]
Both men anticipated that war between the United States
and Spain was imminent, and when it broke out they in-
tended to invade Spanish territory at the head of a private
army.

But while Burr was rallying allies to his cause, tensions
with Spain eased and rumors began to swirl that Burr was
conspiring to detach States by the Allegheny Mountains
from the Union.  Wary of being exposed as the principal co-
conspirator, Wilkinson took steps to ensure that any blame
would fall on Burr.  He sent a series of letters to President
Jefferson accusing Burr of plotting to attack New Orleans
and revolutionize the Louisiana Territory.

Jefferson, who despised his former running mate Burr for
trying to steal the 1800 presidential election from him, was
predisposed to credit Wilkinson's version of events.  The
President sent a special message to Congress identifying
Burr as the "prime mover" in a plot "against the peace and
safety of the Union."  16 Annals of Cong. 39–40 (1807).  Ac-
cording to Jefferson, Burr contemplated either the "sever-
ance of the Union" or an attack on Spanish territory.  *Id.*,
at 41.  Jefferson acknowledged that his sources contained a
"mixture of rumors, conjectures, and suspicions" but, citing
Wilkinson's letters, he assured Congress that Burr's guilt
was "beyond question."  *Id.*, at 39–40.

──────────
[4] Wilkinson was secretly being paid by Spain for information and in-
fluence.  In the wake of Burr's trial, he was investigated by Congress and
later court-martialed.  But he was acquitted for want of evidence, and
his duplicity was not confirmed until decades after his death, when Span-
ish archival material came to light.

Cite as: 591 U. S. ____ (2020)          5

Opinion of the Court

The trial that followed was "the greatest spectacle in the short history of the republic," complete with a Founder-studded cast. N. Isenberg, Fallen Founder: The Life of Aaron Burr 351 (2007). People flocked to Richmond to watch, massing in tents and covered wagons along the banks of the James River, nearly doubling the town's population of 5,000. Burr's defense team included Edmund Randolph and Luther Martin, both former delegates at the Constitutional Convention and renowned advocates. Chief Justice John Marshall, who had recently squared off with the Jefferson administration in *Marbury* v. *Madison*, 1 Cranch 137 (1803), presided as Circuit Justice for Virginia. Meanwhile Jefferson, intent on conviction, orchestrated the prosecution from afar, dedicating Cabinet meetings to the case, peppering the prosecutors with directions, and spending nearly $100,000 from the Treasury on the five-month proceedings.

In the lead-up to trial, Burr, taking aim at his accusers, moved for a subpoena *duces tecum* directed at Jefferson. The draft subpoena required the President to produce an October 21, 1806 letter from Wilkinson and accompanying documents, which Jefferson had referenced in his message to Congress. The prosecution opposed the request, arguing that a President could not be subjected to such a subpoena and that the letter might contain state secrets. Following four days of argument, Marshall announced his ruling to a packed chamber.

The President, Marshall declared, does not "stand exempt from the general provisions of the constitution" or, in particular, the Sixth Amendment's guarantee that those accused have compulsory process for obtaining witnesses for their defense. *United States* v. *Burr*, 25 F. Cas. 30, 33–34 (No. 14,692d) (CC Va. 1807). At common law the "single reservation" to the duty to testify in response to a subpoena was "the case of the king," whose "dignity" was seen as "incompatible" with appearing "under the process of the

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 12 of 69

court." *Id.*, at 34.  But, as Marshall explained, a king is born
to power and can "do no wrong."  *Ibid.*  The President, by
contrast, is "of the people" and subject to the law.  *Ibid.*  Ac-
cording to Marshall, the sole argument for exempting the
President from testimonial obligations was that his "duties
as chief magistrate demand his whole time for national ob-
jects."  *Ibid.*  But, in Marshall's assessment, those demands
were "not unremitting."  *Ibid.*  And should the President's
duties preclude his attendance at a particular time and
place, a court could work that out upon return of the sub-
poena.  *Ibid.*

Marshall also rejected the prosecution's argument that
the President was immune from a subpoena *duces tecum*
because executive papers might contain state secrets.  "A
subpoena duces tecum," he said, "may issue to any person
to whom an ordinary subpoena may issue."  *Ibid.*  As he ex-
plained, no "fair construction" of the Constitution supported
the conclusion that the right "to compel the attendance of
witnesses[] does not extend" to requiring those witnesses to
"bring[] with them such papers as may be material in the
defence."  *Id.*, at 35.  And, as a matter of basic fairness, per-
mitting such information to be withheld would "tarnish the
reputation of the court."  *Id.*, at 37.  As for "the propriety of
introducing any papers," that would "depend on the charac-
ter of the paper, not on the character of the person who
holds it."  *Id.*, at 34.  Marshall acknowledged that the pa-
pers sought by Burr could contain information "the disclo-
sure of which would endanger the public safety," but stated
that, again, such concerns would have "due consideration"
upon the return of the subpoena.  *Id.*, at 37.

While the arguments unfolded, Jefferson, who had re-
ceived word of the motion, wrote to the prosecutor indicat-
ing that he would—subject to the prerogative to decide
which executive communications should be withheld—"fur-
nish on all occasions, whatever the purposes of justice may
require."  Letter from T. Jefferson to G. Hay (June 12,

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM

NYSCEF DOC. NO. 98

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 13 of 69

1807), in 10 Works of Thomas Jefferson 398, n. (P. Ford ed. 1905). His "personal attendance," however, was out of the question, for it "would leave the nation without" the "sole branch which the constitution requires to be always in function." Letter from T. Jefferson to G. Hay (June 17, 1807), in *id.*, at 400–401, n.

Before Burr received the subpoenaed documents, Marshall rejected the prosecution's core legal theory for treason and Burr was accordingly acquitted. Jefferson, however, was not done. Committed to salvaging a conviction, he directed the prosecutors to proceed with a misdemeanor (yes, misdemeanor) charge for inciting war against Spain. Burr then renewed his request for Wilkinson's October 21 letter, which he later received a copy of, and subpoenaed a second letter, dated November 12, 1806, which the prosecutor claimed was privileged. Acknowledging that the President may withhold information to protect public safety, Marshall instructed that Jefferson should "state the particular reasons" for withholding the letter. *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807). The court, paying "all proper respect" to those reasons, would then decide whether to compel disclosure. *Ibid.* But that decision was averted when the misdemeanor trial was cut short after it became clear that the prosecution lacked the evidence to convict.

In the two centuries since the Burr trial, successive Presidents have accepted Marshall's ruling that the Chief Executive is subject to subpoena. In 1818, President Monroe received a subpoena to testify in a court-martial against one of his appointees. See Rotunda, Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote, 1975 U. Ill. L. Forum 1, 5. His Attorney General, William Wirt—who had served as a prosecutor during Burr's trial—advised Monroe that, per Marshall's ruling, a subpoena to testify may "be properly awarded to the President." *Id.*, at 5–6.

Monroe offered to sit for a deposition and ultimately submitted answers to written interrogatories.

Following Monroe's lead, his successors have uniformly agreed to testify when called in criminal proceedings, provided they could do so at a time and place of their choosing. In 1875, President Grant submitted to a three-hour deposition in the criminal prosecution of a political appointee embroiled in a network of tax-evading whiskey distillers. See 1 R. Rotunda & J. Nowak, Constitutional Law §7.1(b)(ii), p. 996 (5th ed. 2012) (Rotunda & Nowak). A century later, President Ford's attempted assassin subpoenaed him to testify in her defense. See *United States* v. *Fromme*, 405 F. Supp. 578 (ED Cal. 1975). Ford obliged—from a safe distance—in the first videotaped deposition of a President. President Carter testified via the same means in the trial of two local officials who, while Carter was Governor of Georgia, had offered to contribute to his campaign in exchange for advance warning of any state gambling raids. See Carter's Testimony, on Videotape, Is Given to Georgia Gambling Trial, N. Y. Times, Apr. 20, 1978, p. A20 (Carter recounted that he "rejected the proposition instantly."). Two years later, Carter gave videotaped testimony to a federal grand jury investigating whether a fugitive financier had entreated the White House to quash his extradition proceedings. See Rotunda & Nowak §7.1(b)(vi), at 997. President Clinton testified three times, twice via deposition pursuant to subpoenas in federal criminal trials of associates implicated during the Whitewater investigation, and once by video for a grand jury investigating possible perjury. See *id.*, §7.1(c)(viii), at 1007–1008.

The bookend to Marshall's ruling came in 1974 when the question he never had to decide—whether to compel the disclosure of official communications over the objection of the President—came to a head. That spring, the Special Prosecutor appointed to investigate the break-in of the Democratic National Committee Headquarters at the Watergate

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 15 of 69

complex filed an indictment charging seven defendants associated with President Nixon and naming Nixon as an unindicted co-conspirator. As the case moved toward trial, the Special Prosecutor secured a subpoena *duces tecum* directing Nixon to produce, among other things, tape recordings of Oval Office meetings. Nixon moved to quash the subpoena, claiming that the Constitution provides an absolute privilege of confidentiality to all presidential communications. This Court rejected that argument in *United States* v. *Nixon*, 418 U. S. 683 (1974), a decision we later described as "unequivocally and emphatically endors[ing] Marshall's" holding that Presidents are subject to subpoena. *Clinton* v. *Jones*, 520 U. S. 681, 704 (1997).

The *Nixon* Court readily acknowledged the importance of preserving the confidentiality of communications "between high Government officials and those who advise and assist them." 418 U. S., at 705. "Human experience," the Court explained, "teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Ibid.* Confidentiality thus promoted the "public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Id.*, at 708.

But, like Marshall two centuries prior, the Court recognized the countervailing interests at stake. Invoking the common law maxim that "the public has a right to every man's evidence," the Court observed that the public interest in fair and accurate judicial proceedings is at its height in the criminal setting, where our common commitment to justice demands that "guilt shall not escape" nor "innocence suffer." *Id.*, at 709 (internal quotation marks and alteration omitted). Because these dual aims would be "defeated if judgments" were "founded on a partial or speculative presentation of the facts," the *Nixon* Court recognized that it was "imperative" that "compulsory process be available

10                            TRUMP *v.* VANCE

Opinion of the Court

for the production of evidence needed either by the prosecution or the defense." *Ibid.*

The Court thus concluded that the President's "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id.*, at 713. Two weeks later, President Nixon dutifully released the tapes.

III

The history surveyed above all involved *federal* criminal proceedings. Here we are confronted for the first time with a subpoena issued to the President by a local grand jury operating under the supervision of a *state* court.[5]

In the President's view, that distinction makes all the difference. He argues that the Supremacy Clause gives a sitting President absolute immunity from state criminal subpoenas because compliance with those subpoenas would categorically impair a President's performance of his Article II functions. The Solicitor General, arguing on behalf of the United States, agrees with much of the President's reasoning but does not commit to his bottom line. Instead, the Solicitor General urges us to resolve this case by holding that a state grand jury subpoena for a sitting President's personal records must, at the very least, "satisfy a heightened standard of need," which the Solicitor General contends was not met here. Brief for United States as *Amicus Curiae* 26, 29.

A

We begin with the question of absolute immunity. No one doubts that Article II guarantees the independence of the

_____

[5] While the subpoena was directed to the President's accounting firm, the parties agree that the papers at issue belong to the President and that Mazars is merely the custodian. Thus, for purposes of immunity, it is functionally a subpoena issued to the President.

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM
NYSCEF DOC. NO. 98

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 17 of 69

Executive Branch. As the head of that branch, the President "occupies a unique position in the constitutional scheme." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749 (1982). His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth. Quite appropriately, those duties come with protections that safeguard the President's ability to perform his vital functions. See, *e.g.*, *ibid.* (concluding that the President enjoys "absolute immunity from damages liability predicated on his official acts"); *Nixon*, 418 U. S., at 708 (recognizing that presidential communications are presumptively privileged).

In addition, the Constitution guarantees "the entire independence of the General Government from any control by the respective States." *Farmers and Mechanics Sav. Bank of Minneapolis* v. *Minnesota*, 232 U. S. 516, 521 (1914). As we have often repeated, "States have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress." *McCulloch* v. *Maryland*, 4 Wheat. 316, 436 (1819). It follows that States also lack the power to impede the President's execution of those laws.

Marshall's ruling in *Burr*, entrenched by 200 years of practice and our decision in *Nixon*, confirms that *federal* criminal subpoenas do not "rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton*, 520 U. S., at 702–703. But the President, joined in part by the Solicitor General, argues that *state* criminal subpoenas pose a unique threat of impairment and thus demand greater protection. To be clear, the President does not contend here that *this* subpoena, in particular, is impermissibly burdensome. Instead he makes a *categorical* argument about the burdens generally associated with state criminal subpoenas, focusing on three: diversion, stigma, and harassment. We address each in turn.

12                    TRUMP *v.* VANCE

Opinion of the Court

1

The President's primary contention, which the Solicitor
General supports, is that complying with state criminal
subpoenas would necessarily divert the Chief Executive
from his duties. He grounds that concern in *Nixon* v. *Fitz-
gerald*, which recognized a President's "absolute immunity
from damages liability predicated on his official acts." 457
U. S., at 749. In explaining the basis for that immunity,
this Court observed that the prospect of such liability could
"distract a President from his public duties, to the detri-
ment of not only the President and his office but also the
Nation that the Presidency was designed to serve." *Id.*, at
753. The President contends that the diversion occasioned
by a state criminal subpoena imposes an equally intolerable
burden on a President's ability to perform his Article II
functions.

But *Fitzgerald* did not hold that distraction was sufficient
to confer absolute immunity. We instead drew a careful
analogy to the common law absolute immunity of judges
and prosecutors, concluding that a President, like those of-
ficials, must "deal fearlessly and impartially with the duties
of his office"—not be made "unduly cautious in the dis-
charge of [those] duties" by the prospect of civil liability for
official acts. *Id.*, at 751–752, and n. 32 (internal quotation
marks omitted). Indeed, we expressly rejected immunity
based on distraction alone 15 years later in *Clinton* v.
*Jones*. There, President Clinton argued that the risk of be-
ing "distracted by the need to participate in litigation" enti-
tled a sitting President to absolute immunity from civil lia-
bility, not just for official acts, as in *Fitzgerald*, but for
private conduct as well. 520 U. S., at 694, n. 19. We disa-
greed with that rationale, explaining that the "dominant
concern" in *Fitzgerald* was not mere distraction but the dis-
tortion of the Executive's "decisionmaking process" with re-
spect to official acts that would stem from "worry as to the
possibility of damages." 520 U. S., at 694, n. 19. The Court

Opinion of the Court

recognized that Presidents constantly face myriad demands on their attention, "some private, some political, and some as a result of official duty." *Id.*, at 705, n. 40. But, the Court concluded, "[w]hile such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional . . . concerns." *Ibid.*

The same is true of criminal subpoenas. Just as a "properly managed" civil suit is generally "unlikely to occupy any substantial amount of" a President's time or attention, *id.,* at 702, two centuries of experience confirm that a properly tailored criminal subpoena will not normally hamper the performance of the President's constitutional duties. If anything, we expect that in the mine run of cases, where a President is subpoenaed during a proceeding targeting someone else, as Jefferson was, the burden on a President will ordinarily be lighter than the burden of defending against a civil suit.

The President, however, believes the district attorney is investigating him and his businesses. In such a situation, he contends, the "toll that criminal process . . . exacts from the President is even heavier" than the distraction at issue in *Fitzgerald* and *Clinton*, because "criminal litigation" poses unique burdens on the President's time and will generate a "considerable if not overwhelming degree of mental preoccupation." Brief for Petitioner 16–18, 30 (internal quotation marks omitted).

But the President is not seeking immunity from the diversion occasioned by the prospect of future criminal *liability*. Instead he concedes—consistent with the position of the Department of Justice—that state grand juries are free to investigate a sitting President with an eye toward charging him after the completion of his term. See Reply Brief 19 (citing Memorandum from Randolph D. Moss, Assistant Atty. Gen., Office of Legal Counsel, to the Atty. Gen.: A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. OLC 222, 257, n. 36 (Oct. 16, 2000)).

14    TRUMP *v.* VANCE

Opinion of the Court

The President's objection therefore must be limited to the *additional* distraction caused by the subpoena itself. But that argument runs up against the 200 years of precedent establishing that Presidents, and their official communications, are subject to judicial process, see *Burr*, 25 F. Cas., at 34, even when the President is under investigation, see *Nixon*, 418 U. S., at 706.

2

The President next claims that the stigma of being subpoenaed will undermine his leadership at home and abroad. Notably, the Solicitor General does not endorse this argument, perhaps because we have twice denied absolute immunity claims by Presidents in cases involving allegations of serious misconduct. See *Clinton*, 520 U. S., at 685; *Nixon*, 418 U. S., at 687. But even if a tarnished reputation were a cognizable impairment, there is nothing inherently stigmatizing about a President performing "the citizen's normal duty of . . . furnishing information relevant" to a criminal investigation. *Branzburg* v. *Hayes*, 408 U. S. 665, 691 (1972). Nor can we accept that the risk of association with persons or activities under criminal investigation can absolve a President of such an important public duty. Prior Presidents have weathered these associations in federal cases, *supra*, at 6–10, and there is no reason to think any attendant notoriety is necessarily greater in state court proceedings.

To be sure, the consequences for a President's public standing will likely increase if he is the one under investigation. But, again, the President concedes that such investigations are permitted under Article II and the Supremacy Clause, and receipt of a subpoena would not seem to categorically magnify the harm to the President's reputation.

Additionally, while the current suit has cast the Mazars subpoena into the spotlight, longstanding rules of grand jury secrecy aim to prevent the very stigma the President

anticipates. See S. Beale et al., Grand Jury Law and Practice §5:1, p. 5–3 (2d ed. 2018) ("[T]he federal system and most states have adopted statutes or court rules" that "impose sharp restrictions on the extent to which matters occurring before a grand jury may be divulged" to outside persons.). Of course, disclosure restrictions are not perfect. See *Nixon*, 418 U. S., at 687, n. 4 (observing that news media reporting made the protective order shielding the fact that the President had been named as an unindicted co-conspirator "no longer meaningful"). But those who make unauthorized disclosures regarding a grand jury subpoena do so at their peril. See, *e.g.*, N. Y. Penal Law Ann. §215.70 (West 2010) (designating unlawful grand jury disclosure as a felony).

### 3

Finally, the President and the Solicitor General warn that subjecting Presidents to state criminal subpoenas will make them "easily identifiable target[s]" for harassment. *Fitzgerald*, 457 U. S., at 753. But we rejected a nearly identical argument in *Clinton*, where then-President Clinton argued that permitting civil liability for unofficial acts would "generate a large volume of politically motivated harassing and frivolous litigation." *Clinton*, 520 U. S., at 708. The President and the Solicitor General nevertheless argue that state criminal subpoenas pose a heightened risk and could undermine the President's ability to "deal fearlessly and impartially" with the States. *Fitzgerald*, 457 U. S., at 752 (internal quotation marks omitted). They caution that, while federal prosecutors are accountable to and removable by the President, the 2,300 district attorneys in this country are responsive to local constituencies, local interests, and local prejudices, and might "use criminal process to register their dissatisfaction with" the President. Brief for Petitioner 16. What is more, we are told, the state courts su-

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 22 of 69

pervising local grand juries may not exhibit the same re-
spect that federal courts show to the President as a coordi-
nate branch of Government.

We recognize, as does the district attorney, that harass-
ing subpoenas could, under certain circumstances, threaten
the independence or effectiveness of the Executive. See Tr.
of Oral Arg. 73. Even so, in *Clinton* we found that the risk
of harassment was not "serious" because federal courts
have the tools to deter and, where necessary, dismiss vexa-
tious civil suits. 520 U. S., at 708. And, while we cannot
ignore the possibility that state prosecutors may have polit-
ical motivations, see *post,* at 15 (ALITO, J., dissenting), here
again the law already seeks to protect against the predicted
abuse.

First, grand juries are prohibited from engaging in "arbi-
trary fishing expeditions" and initiating investigations "out
of malice or an intent to harass." *United States* v. *R. Enter-
prises, Inc.*, 498 U. S. 292, 299 (1991). See also, *e.g., Virag*
v. *Hynes*, 54 N. Y. 2d 437, 442–443, 430 N. E. 2d 1249, 1252
(1981) (recognizing that grand jury subpoenas can be "chal-
lenged by an affirmative showing of impropriety," including
"bad faith" (internal quotation marks omitted)). These pro-
tections, as the district attorney himself puts it, "apply with
special force to a President, in light of the office's unique
position as the head of the Executive Branch." Brief for Re-
spondent Vance 43. And, in the event of such harassment,
a President would be entitled to the protection of federal
courts. The policy against federal interference in state
criminal proceedings, while strong, allows "intervention in
those cases where the District Court properly finds that the
state proceeding is motivated by a desire to harass or is con-
ducted in bad faith." *Huffman* v. *Pursue, Ltd.*, 420 U. S.
592, 611 (1975).

Second, contrary to JUSTICE ALITO's characterization, our
holding does not allow States to "run roughshod over the
functioning of [the Executive B]ranch." *Post,* at 22. The

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 23 of 69

Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties. See, *e.g.,* *Tennessee* v. *Davis*, 100 U. S. 257, 263 (1880) ("No State government can . . . obstruct [the] authorized officers" of the Federal Government.). Any effort to manipulate a President's policy decisions or to "retaliat[e]" against a President for official acts through issuance of a subpoena, Brief for Respondent Vance 15, 43, would thus be an unconstitutional attempt to "influence" a superior sovereign "exempt" from such obstacles, see *McCulloch*, 4 Wheat., at 427. We generally "assume[] that state courts and prosecutors will observe constitutional limitations." *Dombrowski* v. *Pfister*, 380 U. S. 479, 484 (1965). Failing that, federal law allows a President to challenge any allegedly unconstitutional influence in a federal forum, as the President has done here. See 42 U. S. C. §1983; *Ex parte Young*, 209 U. S. 123, 155–156 (1908) (holding that federal courts may enjoin state officials to conform their conduct to federal law).

Given these safeguards and the Court's precedents, we cannot conclude that absolute immunity is necessary or appropriate under Article II or the Supremacy Clause. Our dissenting colleagues agree. JUSTICE THOMAS reaches the same conclusion based on the original understanding of the Constitution reflected in Marshall's decision in *Burr*. *Post,* at 2, 5–6. And JUSTICE ALITO, also persuaded by *Burr*, "agree[s]" that "not all" state criminal subpoenas for a President's records "should be barred." *Post,* at 16. On that point the Court is unanimous.

## B

We next consider whether a state grand jury subpoena seeking a President's private papers must satisfy a heightened need standard. The Solicitor General would require a threshold showing that the evidence sought is "critical" for "specific charging decisions" and that the subpoena is a "last resort," meaning the evidence is "not available from

any other source" and is needed "now, rather than at the
end of the President's term." Brief for United States as
*Amicus Curiae* 29, 32 (internal quotation marks and alter-
ation omitted). JUSTICE ALITO, largely embracing those cri-
teria, agrees that a state criminal subpoena to a President
"should not be allowed unless a heightened standard is
met." *Post,* at 16–18 (asking whether the information is
"critical" and "necessary . . . now").

We disagree, for three reasons. First, such a heightened
standard would extend protection designed for official doc-
uments to the President's private papers. As the Solicitor
General and JUSTICE ALITO acknowledge, their proposed
test is derived from executive privilege cases that trace
back to *Burr.* Brief for United States as *Amicus Curiae* 26–
28; *post,* at 17. There, Marshall explained that if Jefferson
invoked presidential privilege over executive communica-
tions, the court would not "proceed against the president as
against an ordinary individual" but would instead require
an affidavit from the defense that "would clearly show the
paper to be essential to the justice of the case." *Burr,* 25
F. Cas., at 192. The Solicitor General and JUSTICE ALITO
would have us apply a similar standard to a President's per-
sonal papers. But this argument does not account for the
relevant passage from *Burr*: "If there be a paper in the pos-
session of the executive, which is *not of an official nature*,
he must stand, as respects that paper, in nearly the same
situation with any other individual." *Id.,* at 191 (emphasis
added). And it is only "nearly"—and not "entirely"—be-
cause the President retains the right to assert privilege over
documents that, while ostensibly private, "partake of the
character of an official paper." *Id.,* at 191–192.

Second, neither the Solicitor General nor JUSTICE ALITO
has established that heightened protection against state
subpoenas is necessary for the Executive to fulfill his Arti-
cle II functions. Beyond the risk of harassment, which we
addressed above, the only justification they offer for the

heightened standard is protecting Presidents from "unwarranted burdens." Brief for United States as *Amicus Curiae* 28; see *post,* at 16 (asking whether "there is an urgent and critical need for the subpoenaed information"). In effect, they argue that even if federal subpoenas to a President are warranted whenever evidence is material, state subpoenas are warranted "only when [the] evidence is essential." Brief for United States as *Amicus Curiae* 28; see *post,* at 16. But that double standard has no basis in law. For if the state subpoena is not issued to manipulate, *supra,* at 16–17, the documents themselves are not protected, *supra,* at 18, and the Executive is not impaired, *supra,* at 12–15, then nothing in Article II or the Supremacy Clause supports holding state subpoenas to a higher standard than their federal counterparts.

Finally, in the absence of a need to protect the Executive, the public interest in fair and effective law enforcement cuts in favor of comprehensive access to evidence. Requiring a state grand jury to meet a heightened standard of need would hobble the grand jury's ability to acquire "all information that might possibly bear on its investigation." *R. Enterprises, Inc.*, 498 U. S., at 297. And, even assuming the evidence withheld under that standard were preserved until the conclusion of a President's term, in the interim the State would be deprived of investigative leads that the evidence might yield, allowing memories to fade and documents to disappear. This could frustrate the identification, investigation, and indictment of third parties (for whom applicable statutes of limitations might lapse). More troubling, it could prejudice the innocent by depriving the grand jury of *exculpatory* evidence.

Rejecting a heightened need standard does not leave Presidents with "no real protection." *Post,* at 19 (opinion of ALITO, J.). To start, a President may avail himself of the same protections available to every other citizen. These include the right to challenge the subpoena on any grounds

20                              TRUMP *v.* VANCE

permitted by state law, which usually include bad faith and
undue burden or breadth. See, *e.g.*, *Virag*, 54 N. Y. 2d, at
442–445, 430 N. E. 2d, at 1252–1253; *In re Grand Jury Sub-
poenas*, 72 N. Y. 2d 307, 315–316, 528 N. E. 2d 1195, 1200
(1988) (recognizing that grand jury subpoenas can be chal-
lenged as "overly broad" or "unreasonably burdensome"
(internal quotation marks omitted)). And, as in federal
court, "[t]he high respect that is owed to the office of the
Chief Executive . . . should inform the conduct of the entire
proceeding, including the timing and scope of discovery."
*Clinton*, 520 U. S., at 707. See *id.*, at 724 (BREYER, J., con-
curring in judgment) (stressing the need for courts presid-
ing over suits against the President to "schedule proceed-
ings so as to avoid significant interference with the
President's ongoing discharge of his official responsibili-
ties"); *Nixon*, 418 U. S., at 702 ("[W]here a subpoena is di-
rected to a President . . . appellate review . . . should be par-
ticularly meticulous.").

Furthermore, although the Constitution does not entitle
the Executive to absolute immunity or a heightened stand-
ard, he is not "relegate[d]" only to the challenges available
to private citizens. *Post,* at 17 (opinion of ALITO, J.). A
President can raise subpoena-specific constitutional chal-
lenges, in either a state or federal forum. As previously
noted, he can challenge the subpoena as an attempt to in-
fluence the performance of his official duties, in violation of
the Supremacy Clause. See *supra*, at 17. This avenue pro-
tects against local political machinations "interposed as an
obstacle to the effective operation of a federal constitutional
power." *United States* v. *Belmont*, 301 U. S. 324, 332 (1937).

In addition, the Executive can—as the district attorney
concedes—argue that compliance with a particular sub-
poena would impede his constitutional duties. Brief for Re-
spondent Vance 42. Incidental to the functions confided in
Article II is "the power to perform them, without obstruc-

Case 1:20-cv-07311-LAK Document 14-99 Filed 09/15/20 Page 27 of 69

tion or impediment." 3 J. Story, Commentaries on the Constitution of the United States §1563, pp. 418–419 (1833). As a result, "once the President sets forth and explains a conflict between judicial proceeding and public duties," or shows that an order or subpoena would "significantly interfere with his efforts to carry out" those duties, "the matter changes." *Clinton*, 520 U. S., at 710, 714 (opinion of BREYER, J.). At that point, a court should use its inherent authority to quash or modify the subpoena, if necessary to ensure that such "interference with the President's duties would not occur." *Id.*, at 708 (opinion of the Court).

\*    \*    \*

Two hundred years ago, a great jurist of our Court established that no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding. We reaffirm that principle today and hold that the President is neither absolutely immune from state criminal subpoenas seeking his private papers nor entitled to a heightened standard of need. The "guard[] furnished to this high officer" lies where it always has—in "the conduct of a court" applying established legal and constitutional principles to individual subpoenas in a manner that preserves both the independence of the Executive and the integrity of the criminal justice system. *Burr*, 25 F. Cas., at 34.

The arguments presented here and in the Court of Appeals were limited to absolute immunity and heightened need. The Court of Appeals, however, has directed that the case be returned to the District Court, where the President may raise further arguments as appropriate. 941 F. 3d, at 646, n. 19.[6]

---

[6]The daylight between our opinion and JUSTICE THOMAS's "dissent" is not as great as that label might suggest. *Post*, at 12. We agree that Presidents are neither absolutely immune from state criminal subpoenas nor insulated by a heightened need standard. *Post*, at 6, 11, n. 3. We

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 28 of 69

22                          TRUMP *v.* VANCE

                          Opinion of the Court

   We affirm the judgment of the Court of Appeals and re-
mand the case for further proceedings consistent with this
opinion.

                                        *It is so ordered.*

———————

agree that Presidents may challenge specific subpoenas as impeding
their Article II functions. *Post,* at 6–7. And, although we affirm while
JUSTICE THOMAS would vacate, we agree that this case will be remanded
to the District Court. *Post,* at 12.

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 29 of 69

Cite as: 591 U. S. ____ (2020)          1

Kavanaugh, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 19–635

––––––––––

## DONALD J. TRUMP, PETITIONER v. CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE KAVANAUGH, with whom JUSTICE GORSUCH joins, concurring in the judgment.

The Court today unanimously concludes that a President does not possess absolute immunity from a state criminal subpoena, but also unanimously agrees that this case should be remanded to the District Court, where the President may raise constitutional and legal objections to the subpoena as appropriate. See *ante*, at 21–22, and n. 6; *post*, at 11–12 (THOMAS, J., dissenting); *post*, at 16–19 (ALITO, J., dissenting). I agree with those two conclusions.

\*     \*     \*

The dispute over this grand jury subpoena reflects a conflict between a State's interest in criminal investigation and a President's Article II interest in performing his or her duties without undue interference. Although this case involves personal information of the President and is therefore not an executive privilege case, the majority opinion correctly concludes based on precedent that Article II and the Supremacy Clause of the Constitution supply some protection for the Presidency against state criminal subpoenas of this sort.

In our system of government, as this Court has often stated, no one is above the law. That principle applies, of

Case 1:20-cv-07311-LAK    Document 14-99    Filed 09/15/20    Page 30 of 69

2                           TRUMP *v.* VANCE

KAVANAUGH, J., concurring in judgment

course, to a President.  At the same time, in light of Article
II of the Constitution, this Court has repeatedly declared—
and the Court indicates again today—that a court may not
proceed against a President as it would against an ordinary
litigant.  See *Cheney* v. *United States Dist. Court for D. C.*,
542 U. S. 367, 381–382 (2004) ("In no case would a court be
required to proceed against the president as against an or-
dinary individual" (internal quotation marks and altera-
tions omitted)); *Clinton* v. *Jones*, 520 U. S. 681, 704, n. 39
(1997) (a court may not "proceed against the president as
against an ordinary individual" (internal quotation marks
omitted)); *United States* v. *Nixon*, 418 U. S. 683, 715 (1974)
("In no case of this kind would a court be required to proceed
against the president as against an ordinary individual"
(internal quotation marks and alterations omitted)); *United
States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va.
1807) (Marshall, C. J.) ("In no case of this kind would a
court be required to proceed against the president as
against an ordinary individual").

The question here, then, is how to balance the State's in-
terests and the Article II interests.  The longstanding prec-
edent that has applied to federal criminal subpoenas for of-
ficial, privileged Executive Branch information is *United
States* v. *Nixon*, 418 U. S. 683 (1974).  That landmark case
requires that a prosecutor establish a "demonstrated, spe-
cific need" for the President's information.  *Id.*, at 713; see
also *In re Sealed Case*, 121 F. 3d 729, 753–757 (CADC
1997); cf. *Senate Select Committee on Presidential Cam-
paign Activities* v. *Nixon*, 498 F. 2d 725, 730–731 (CADC
1974) (en banc) (similar standard for congressional subpoe-
nas to the Executive Branch).

The *Nixon* "demonstrated, specific need" standard is a
tried-and-true test that accommodates both the interests of
the criminal process and the Article II interests of the Pres-
idency.  The *Nixon* standard ensures that a prosecutor's in-
terest in subpoenaed information is sufficiently important

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 98 RECEIVED NYSCEF: 07/10/2020

Case 1:20-cv-07311-LAK Document 14-99 Filed 09/15/20 Page 31 of 69

to justify an intrusion on the Article II interests of the Presidency. The *Nixon* standard also reduces the risk of subjecting a President to unwarranted burdens, because it provides that a prosecutor may obtain a President's information only in certain defined circumstances.

Although the Court adopted the *Nixon* standard in a different Article II context—there, involving the confidentiality of official, privileged information—the majority opinion today recognizes that there are also important Article II (and Supremacy Clause) interests at stake here. A state criminal subpoena to a President raises Article II and Supremacy Clause issues because of the potential for a state prosecutor to use the criminal process and issue subpoenas in a way that interferes with the President's duties, through harassment or diversion. Cf. *Nixon* v. *Fitzgerald*, 457 U. S. 731, 751–753 (1982).

Because this case again entails a clash between the interests of the criminal process and the Article II interests of the Presidency, I would apply the longstanding *Nixon* "demonstrated, specific need" standard to this case. The majority opinion does not apply the *Nixon* standard in this distinct Article II context, as I would have done. That said, the majority opinion appropriately takes account of some important concerns that also animate *Nixon* and the Constitution's balance of powers. The majority opinion explains that a state prosecutor may not issue a subpoena for a President's personal information out of bad faith, malice, or an intent to harass a President, *ante*, at 16; as a result of prosecutorial impropriety, *ibid.*; to seek information that is not relevant to an investigation, *ante*, at 16, 19–20; that is overly broad or unduly burdensome, *ante*, at 19–20; to manipulate, influence, or retaliate against a President's official acts or policy decisions, *ante*, at 17, 20; or in a way that would impede, conflict with, or interfere with a President's official duties, *ante*, at 20–21. All nine Members of the

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 32 of 69

4                          TRUMP *v.* VANCE

Court agree, moreover, that a President may raise objections to a state criminal subpoena not just in state court but also in federal court.[1]  And the majority opinion indicates that, in light of the "high respect that is owed to the office of the Chief Executive," courts "should be particularly meticulous" in assessing a subpoena for a President's personal records. *Ante*, at 20 (quoting *Clinton*, 520 U. S., at 707, and *Nixon*, 418 U. S., at 702).

In the end, much may depend on how the majority opinion's various standards are applied in future years and decades.[2]  It will take future cases to determine precisely how much difference exists between (i) the various standards articulated by the majority opinion, (ii) the overarching *Nixon* "demonstrated, specific need" standard that I would adopt, and (iii) JUSTICE THOMAS's and JUSTICE ALITO's other proposed standards.  In any event, in my view, lower courts in cases of this sort involving a President will almost invariably have to begin by delving into why the State wants the information; why and how much the State needs the information, including whether the State could obtain the information elsewhere; and whether compliance with the subpoena would unduly burden or interfere with a President's official duties.

                        *     *     *

I agree that the case should be remanded to the District Court for further proceedings, where the President may raise constitutional and legal objections to the state grand

_____

[1] As I see it, the standards identified by the majority opinion should be considered, in this context, Article II requirements, not just statutory or state-law requirements. Cf. *Cheney* v. *United States Dist. Court for D. C.*, 542 U. S. 367, 385–392 (2004); *Clinton* v. *Jones*, 520 U. S. 681, 707 (1997); *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749–757 (1982); *United States* v. *Nixon*, 418 U. S. 683, 714–716 (1974).

[2] The same point—namely, that much may depend on future application—is also true of the four considerations articulated by the Court today in *Trump* v. *Mazars USA, LLP, post*, at 19–20.

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 33 of 69

Cite as:  591 U. S. ____ (2020)          5

Kavanaugh, J., concurring in judgment

jury subpoena as appropriate.

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 34 of 69

Cite as: 591 U. S. ____ (2020)          1

Thomas, J., dissenting

# SUPREME COURT OF THE UNITED STATES

——————

No. 19–635

——————

## DONALD J. TRUMP, PETITIONER *v.* CYRUS R. VANCE, JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF THE COUNTY OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE THOMAS, dissenting.

Respondent Cyrus Vance, Jr., the district attorney for the County of New York, served a grand jury subpoena on the President's personal accounting firm. The subpoena, which is nearly identical to a subpoena issued by a congressional Committee, requests nearly 10 years of the President's personal financial records. *Ante*, at 2, and n. 2. In response to this troublingly broad request, the President, in his personal capacity, sought a declaration in federal court "'that the subpoena is invalid and unenforceable'" and an injunction preventing respondent "'from taking any action to enforce the subpoena.'" *Ante*, at 2. The District Court denied the President's motion for a preliminary injunction, and the Second Circuit affirmed in relevant part. *Ante*, at 2–3.

The President argues that he is absolutely immune from the issuance of any subpoena, but that if the Court disagrees, we should remand so that the District Court can develop a record about this particular subpoena. I agree with the majority that the President is not entitled to absolute immunity from *issuance* of the subpoena. But he may be entitled to relief against its *enforcement*. I therefore agree with the President that the proper course is to vacate and remand. If the President can show that "his duties as chief magistrate demand his whole time for national objects,"

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 35 of 69

2                          TRUMP *v.* VANCE

Thomas, J., dissenting

*United States* v. *Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (CC
Va. 1807) (Marshall, C. J.), he is entitled to relief from en-
forcement of the subpoena.

## I

The President first argues that he has absolute immunity
from the issuance of grand jury subpoenas during his term
in office.  This Court has recognized absolute immunity for
the President from "damages liability predicated on his of-
ficial acts."  *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749 (1982).
But we have rejected absolute immunity from damages ac-
tions for a President's nonofficial conduct, *Clinton* v. *Jones*,
520 U. S. 681, 684 (1997), and we have never addressed the
question of immunity from a grand jury subpoena.

I agree with the majority that the President does not have
absolute immunity from the issuance of a grand jury sub-
poena.  Unlike the majority, however, I do not reach this
conclusion based on a primarily functionalist analysis.  In-
stead, I reach it based on the text of the Constitution,
which, as understood by the ratifying public and incorpo-
rated into an early circuit opinion by Chief Justice Mar-
shall, does not support the President's claim of absolute im-
munity.[1]

## A
### 1

The text of the Constitution explicitly addresses the priv-
ileges of some federal officials, but it does not afford the
President absolute immunity.  Members of Congress are
"privileged from Arrest during their Attendance at the Ses-
sion of their respective Houses, and in going to and return-
ing from the same," except for "Treason, Felony and Breach
of the Peace."  Art. I, §6, cl. 1.  The Constitution further
specifies that, "for any Speech or Debate in either House,

---

[1] I do not address the continuing validity of *Nixon* v. *Fitzgerald*, 457
U. S. 731 (1982), which no party asks us to revisit.

Case 1:20-cv-07311-LAK    Document 14-99    Filed 09/15/20    Page 36 of 69

they shall not be questioned in any other Place." *Ibid.* By contrast, the text of the Constitution contains no explicit grant of absolute immunity from legal process for the President. As a Federalist essayist noted during ratification, the President's "person is not so much protected as that of a member of the House of Representatives" because he is subject to the issuance of judicial process "like any other man in the ordinary course of law." An American Citizen I (Sept. 26, 1787), in 2 Documentary History of the Ratification of the Constitution 141 (M. Jansen ed. 1976) (emphasis deleted).

Prominent defenders of the Constitution confirmed the lack of absolute Presidential immunity. James Wilson, a signer of the Constitution and future Justice of this Court, explained to his fellow Pennsylvanians that "far from being above the laws, [the President] is amenable to them in his private character as a citizen, and in his public character by *impeachment*." 2 Debates on the Constitution 480 (J. Elliot ed. 1891) (emphasis in original). James Iredell, another future Justice, observed in the North Carolina ratifying convention that "[i]f [the President] commits any crime, he is punishable by the laws of his country." 4 *id.*, at 109. A fellow North Carolinian similarly argued that, "[w]ere it possible to suppose that the President should give wrong instructions to his deputies, . . . citizens . . . would have redress in the ordinary courts of common law." *Id.*, at 47; see also Americanus No. 2, in 19 Documentary History of the Ratification of the Constitution 288–289 (J. Kaminski & G. Saladino eds. 2003); Americanus No. 4, in *id.*, at 359.

2

The sole authority that the President cites from the drafting or ratification process is The Federalist No. 69, but it provides him no real support. Alexander Hamilton stated that "[t]he President of the United States would be liable to

be impeached, tried, and upon conviction of treason, brib-
ery, or other high crimes or misdemeanors, removed from
office; and would afterwards be liable to prosecution and
punishment in the ordinary course of law." The Federalist
No. 69, p. 416 (C. Rossiter ed. 1961). Hamilton did not say
that the President was temporarily immune from judicial
process. Moreover, he made this comment to reassure read-
ers that the President was "amenable to personal punish-
ment and disgrace." *Id.*, at 422. For the President, this is
at best ambiguous evidence that cannot overcome the clear
evidence discussed above.

The President further relies on a private letter written by
President Jefferson. In the letter, Jefferson worried that
the Executive would lose his independence "if he were sub-
ject to the *commands* of the [judiciary], & to imprisonment
for disobedience; if the several courts could bandy him from
pillar to post, keep him constantly trudging from north to
south & east to west, and withdraw him entirely from his
constitutional duties." 10 Works of Thomas Jefferson 404
n. (P. Ford ed. 1905) (emphasis in original). But President
Jefferson never squarely argued for absolute immunity.
Yoo, The First Claim: The Burr Trial, *United States v.
Nixon*, and Presidential Power, 83 Minn. L. Rev. 1435, 1450
(1999). And, the concern Jefferson had about demands on
the President's time is addressed by the standard that Chief
Justice Marshall articulated in *Burr*. See *infra*, at 6–7.

The President also quotes the views of Vice President
John Adams and then-Senator Oliver Ellsworth in 1789.
The record of the conversation we have from a fellow Sena-
tor's diary is brief. Adams or Ellsworth (or perhaps both)
stated that "you could only impeach [the President], and no
other process whatever lay against him." Journal of Wil-
liam Maclay 167 (E. Maclay ed. 1890). The only reason
given was that it would "stop the whole machine of Govern-
ment." *Ibid.* Senator Philip Schuyler joined the conversa-
tion and gave his own reason: "'I think the President [is] a

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 38 of 69

Cite as: 591 U. S. ____ (2020)           5

THOMAS, J., dissenting

kind of sacred person.'" *Ibid.* Schuyler's theory clearly has
no basis in the Constitution, and the view held by Adams
and Ellsworth seems to be grounds for relief from enforce-
ment rather than a basis for absolute immunity from issu-
ance of a subpoena.

B

This original understanding is reflected in an early cir-
cuit decision by Chief Justice Marshall, on which the major-
ity partially relies. In 1805, disgraced former Vice Presi-
dent Aaron Burr began a murky series of negotiations to
raise a volunteer army in the Western Territories. *Ante*, at
3–4. One of his contacts, General James Wilkinson, was not
only commander of the Army and Governor of Louisiana,
but also a Spanish spy. *Ante*, at 4, n. 4; Yoo, *supra*, at 1440.
After Burr set out with his army—perhaps to attack Span-
ish forces or perhaps to separate Western Territories from
the United States—Wilkinson wrote to President Jefferson
and accused Burr of the latter. *Ante*, at 4; Yoo, *supra*, at
1440. Burr was arrested for treason and brought before a
grand jury in Richmond, where Chief Justice Marshall pre-
sided.

During the grand jury proceedings, Burr moved for a *sub-
poena duces tecum* ordering President Jefferson to produce
the correspondence concerning Burr. *Burr*, 25 F. Cas., at
30. Chief Justice Marshall pre-emptively rejected any no-
tion of absolute immunity, despite the fact that the Govern-
ment did not so much as suggest it in court. He distin-
guished the President from the British monarch, who did
have immunity, calling it an "essentia[l] . . . difference" in
our system that the President "is elected from the mass of
the people, and, on the expiration of the time for which he
is elected, returns to the mass of the people again." *Id.*, at
34. Thus, the President was more like a state governor or
a member of the British cabinet than a king. Chief Justice
Marshall found no authority suggesting that these officials

6    TRUMP *v.* VANCE

THOMAS, J., dissenting

were immune from judicial process. *Ibid.*; see also *ante*, at 5–6.

Based on the evidence of original meaning and Chief Justice Marshall's early interpretation in *Burr*, the better reading of the text of the Constitution is that the President has no absolute immunity from the issuance of a grand jury subpoena.

## II

In addition to contesting the issuance of the subpoena, the President also seeks injunctive and declaratory relief against its enforcement. The majority recognizes that the President can seek relief from enforcement, but it does not vacate and remand for the lower courts to address this question. I would do so and instruct them to apply the standard articulated by Chief Justice Marshall in *Burr*: If the President is unable to comply because of his official duties, then he is entitled to injunctive and declaratory relief.

## A

In *Burr*, after explaining that the President was not absolutely immune from issuance of a subpoena, Chief Justice Marshall proceeded to explain that the President might be excused from the enforcement of one. As he put it, "[t]he guard, furnished to this high officer, to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court *after those subpoenas have issued*; not in any circumstance which is to precede their being issued." 25 F. Cas., at 34 (emphasis added). Chief Justice Marshall set out the pertinent standard: To avoid enforcement of the subpoena, the President must "sho[w]" that "his duties as chief magistrate demand his whole time for national objects." *Ibid.*[2]

---

[2] This standard appears to be something that Chief Justice Marshall

Case 1:20-cv-07311-LAK  Document 14-99  Filed 09/15/20  Page 40 of 69

Although *Burr* involved a federal subpoena, the same principle applies to a state subpoena. The ability of the President to discharge his duties until his term expires or he is removed from office by the Senate is "integral to the structure of the Constitution." *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 15). The Constitution is the "supreme Law of the Land," Art. VI, cl. 2, so a state court can no more enforce a subpoena when national concerns demand the President's entire time than a federal court can. Accordingly, a federal court may provide injunctive and declaratory relief to stay enforcement of a state subpoena when the President meets the *Burr* standard.

B

The *Burr* standard places the burden on the President but also requires courts to take pains to respect the demands on the President's time. The Constitution vests the President with extensive powers and responsibilities, and courts are poorly situated to conduct a searching review of the President's assertion that he is unable to comply.

1

The President has vast responsibilities both abroad and at home. The Founders gave the President "primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 580 (2004) (THOMAS, J., dissenting). The Constitution "expressly identifies certain foreign affairs powers and vests them" in his office. *Zivotofsky* v. *Kerry*, 576 U. S. 1, 32 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part).

———————

and President Jefferson, who were often at odds, could agree on. President Jefferson's concern was that the Executive would lose his independence if courts could "withdraw him entirely from his constitutional duties." 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905). Relief from enforcement when those duties preclude the President's compliance addresses these concerns.

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 41 of 69

8                                  TRUMP *v.* VANCE

THOMAS, J., dissenting

He is "Commander in Chief of the Army and Navy of the
United States, and of the Militia of the several States, when
called into the actual Service of the United States." Art. II,
§2, cl. 1. He has "Power, by and with the Advice and Con-
sent of the Senate, to make Treaties." Cl. 2. He has the
power to "nominate, and by and with the Advice and Con-
sent of the Senate [to] appoint Ambassadors [and] other
public Ministers and Consuls." *Ibid.* He has the power to
fill vacancies that arise during a Senate recess until "the
End of [the Senate's] next Session." Cl. 3. And he is respon-
sible for "receiv[ing] Ambassadors and other public Minis-
ters" from foreign countries. §3.

The President also has residual powers granted by Arti-
cle II's Vesting Clause. "By omitting the words 'herein
granted' in [the Vesting Clause of] Article II, the Constitu-
tion indicates that the 'executive Power' vested in the Pres-
ident is not confined to those powers expressly identified in
the document." *Zivotofsky*, 576 U. S., at 34–35 (opinion of
THOMAS, J.). Rather, the Constitution "vests the residual
foreign affairs powers of the Federal Government—*i.e.*,
those not specifically enumerated in the Constitution—in
the President." *Id.*, at 33. Evidence from both the founding
and the early years of the Constitution confirms that the
residual foreign affairs powers of the Government were part
of the "executive Power." *Id.,* at 35–40.

The President has extensive domestic responsibilities as
well. He is given "[t]he executive Power," Art. II, §1, cl. 1,
and is directed to "take Care that the Laws be faithfully ex-
ecuted," §3. "The vesting of the executive power in the Pres-
ident was essentially a grant of the power to execute the
laws." *Myers* v. *United States*, 272 U. S. 52, 117 (1926).
Even under a proper understanding of the scope of federal
power, the President could not possibly execute all of the
laws himself. The President must accordingly appoint sub-
ordinates "to act for him under his direction in the execu-

tion of the laws." *Ibid.* Once officers are selected, the President must "supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Id.*, at 135. And, of course, the President has the power to remove officers as he sees fit. *Id.*, at 176; see also *Seila Law LLC* v. *Consumer Financial Protection Bureau, ante,* at 1–13 (THOMAS, J., concurring in part and dissenting in part).

In addition, the President has several specifically enumerated domestic powers. He has the "Power to Grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." Art. II, §2, cl. 1. He also has the power to "nominate, and by and with the Advice and Consent of the Senate [to] appoint . . . Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." Cl. 2. And he must "give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." §3.

The founding generation debated whether it was prudent to vest so many powers in a single person. Supporters of ratification responded that the design of the Presidency was necessary to the success of the Constitution. As Alexander Hamilton wrote:

> "Energy in the executive is a leading character in the definition of good government. It is essential to the protection of the community against foreign attacks; it is not less essential to the steady administration of the laws; to the protection of property against those irregular and high-handed combinations which sometimes interrupt the ordinary course of justice; to the security

10              TRUMP *v.* VANCE

Thomas, J., dissenting

of liberty against the enterprises and assaults of ambi-
tion, of faction, and of anarchy. . . . A feeble Executive
implies a feeble execution of the government. A feeble
execution is but another phrase for a bad execution;
and a government ill executed, whatever it may be in
theory, must be, in practice, a bad government." The
Federalist No. 70, at 423.

In sum, the demands on the President's time and the im-
portance of his tasks are extraordinary, and the office of the
President cannot be delegated to subordinates. A subpoena
imposes both demands on the President's limited time and
a mental burden, even when the President is not directly
engaged in complying. This understanding of the Presi-
dency should guide courts in deciding whether to enforce a
subpoena for the President's documents.

2

Courts must also recognize their own limitations. When
the President asserts that matters of foreign affairs or na-
tional defense preclude his compliance with a subpoena, the
Judiciary will rarely have a basis for rejecting that asser-
tion. Judges "simply lack the relevant information and ex-
pertise to second-guess determinations made by the Presi-
dent based on information properly withheld." *Hamdi*, 542
U. S., at 583 (Thomas, J., dissenting).

"[E]ven if the courts could compel the Executive to pro-
duce the necessary information" to understand the de-
mands on his time, decisions about that information "are
simply not amenable to judicial determination because
'[t]hey are delicate, complex, and involve large elements of
prophecy.'" *Ibid.* (quoting *Chicago & Southern Air Lines,
Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 111 (1948)).
The President has at his disposal enormous amounts of
classified intelligence regarding the Government's concerns
around the globe. His decisionmaking is further informed
by experience in matters of foreign affairs, national defense,

Case 1:20-cv-07311-LAK Document 14-99 Filed 09/15/20 Page 44 of 69

and intelligence that judges almost always will not have. And his decisionmaking takes into account the full spectrum of the Government's operations, not just the matters directly related to a particular case. Even with perfect information, courts lack the institutional competence to engage in a searching review of the President's reasons for not complying with a subpoena.

Here, too, Chief Justice Marshall was correct. A court should "fee[l] many, perhaps, peculiar motives for manifesting as guarded a respect for the chief magistrate of the Union as is compatible with its official duties." *Burr*, 25 F. Cas., at 37. Courts should have the same "circumspection" as Chief Justice Marshall before "tak[ing] any step which would in any manner relate to that high personage." *Id.*, at 35.[3]

\*     \*     \*

I agree with the majority that the President has no absolute immunity from the issuance of this subpoena. The President also sought relief from enforcement of the subpoena, however, and he asked this Court to allow further proceedings on that question if we rejected his claim of absolute immunity. The Court inexplicably fails to address this request, although its decision leaves the President free to renew his request for an injunction against enforcement

_____

[3]The President and the Solicitor General argue that the grand jury must make a showing of heightened need. I agree with the majority's decision not to adopt this standard, *ante*, at 17–19, but for different reasons. The constitutional question in this case is whether the President is able to perform the duties of his office, whereas a heightened need standard addresses a logically independent issue. Under a heightened-need standard, a grand jury with only the usual need for particular information would be refused it when the President is perfectly able to comply, while a grand jury with a heightened need would be entitled to it even if compliance would place undue obligations on the President. This result makes little sense and lacks any basis in the original understanding of the Constitution. I would leave questions of the grand jury's need to state law.

Case 1:20-cv-07311-LAK Document 14-99 Filed 09/15/20 Page 45 of 69

12                    TRUMP *v.* VANCE

THOMAS, J., dissenting

immediately on remand.

I would vacate and remand to allow the District Court to determine whether enforcement of this subpoena should be enjoined because the President's "duties as chief magistrate demand his whole time for national objects." *Id.*, at 34. Accordingly, I respectfully dissent.

Cite as: 591 U. S. ____ (2020)    1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–635

_____

DONALD J. TRUMP, PETITIONER *v.* CYRUS R. VANCE,
JR., IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY
OF THE COUNTY OF NEW YORK, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[July 9, 2020]

JUSTICE ALITO, dissenting.

This case is almost certain to be portrayed as a case about the current President and the current political situation, but the case has a much deeper significance. While the decision will of course have a direct effect on President Trump, what the Court holds today will also affect all future Presidents—which is to say, it will affect the Presidency, and that is a matter of great and lasting importance to the Nation.

The event that precipitated this case is unprecedented. Respondent Vance, an elected state prosecutor, launched a criminal investigation of a sitting President and obtained a grand jury subpoena for his records. The specific question before us—whether the subpoena may be enforced—cannot be answered adequately without considering the broader question that frames it: whether the Constitution imposes restrictions on a State's deployment of its criminal law enforcement powers against a sitting President. If the Constitution sets no such limits, then a local prosecutor may prosecute a sitting President. And if that is allowed, it follows *a fortiori* that the subpoena at issue can be enforced. On the other hand, if the Constitution does not permit a State to prosecute a sitting President, the next logical ques-

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 47 of 69

2                          TRUMP *v.* VANCE

ALITO, J., dissenting

tion is whether the Constitution restrains any other prose-
cutorial or investigative weapons.

These are important questions that go to the very struc-
ture of the Government created by the Constitution.  In
evaluating these questions, two important structural fea-
tures must be taken into account.

## I
## A

The first is the nature and role of the Presidency.  The
Presidency, like Congress and the Supreme Court, is a per-
manent institution created by the Constitution.  All three
of these institutions are distinct from the human beings
who serve in them at any point in time.  In the case of Con-
gress or the Supreme Court, the distinction is easy to per-
ceive, since they have multiple Members.  But because
"[t]he President is the only person who alone composes a
branch of government . . . , there is not always a clear line
between his personal and official affairs." *Trump* v. *Mazars
USA, LLP*, *post*, at 17.  As a result, the law's treatment of
the person who serves as President can have an important
effect on the institution, and the institution of the Presi-
dency plays an indispensable role in our constitutional sys-
tem.

The Constitution entrusts the President with responsibil-
ities that are essential to the country's safety and well-
being.  The President is Commander in Chief of the Armed
Forces.  Art. II, §2, cl. 1.  He is responsible for the defense
of the country from the moment he enters office until the
moment he leaves.

The President also has the lead role in foreign relations.
He "make[s]" treaties with the advice and consent of the
Senate, Art. II, §2, cl. 2, decides whether to recognize for-
eign governments, *Zivotofsky* v. *Kerry*, 576 U. S. 1 (2015),
enters into and rescinds executive agreements with other

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM
NYSCEF DOC. NO. 98

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 48 of 69

ALITO, J., dissenting

countries,[1] meets with foreign leaders, appoints ambassa-
dors, Art. II, §2, cl. 2, oversees the work of the State Depart-
ment and intelligence agencies, and exercises important
foreign-relations powers under statutes and treaties that
give him broad discretion in matters relating to subjects
such as terrorism, trade, and immigration.[2]

---

[1] See, *e.g.*, *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 415
(2003); *Dames & Moore* v. *Regan*, 453 U. S. 654, 679–683 (1981); *United
States* v. *Pink*, 315 U. S. 203, 229–230 (1942); *United States* v. *Belmont*,
301 U. S. 324, 330–331 (1937).

[2] Foreign Assistance Act of 1961, 22 U. S. C. §2318(a)(1) (permitting
the President to order "the drawdown of defense articles from the stocks
of the Department of Defense" in the event of "an unforeseen emergency
. . . which requires immediate military assistance to a foreign country or
international organization"); National Emergencies Act, 50 U. S. C.
§1621 (authorizing the President to declare a national emergency and
activate over 100 statutory emergency powers); International Emer-
gency Economic Powers Act, 50 U. S. C. §1701(a) (granting Presidential
emergency power "to deal with any unusual and extraordinary threat,
which has its source in whole or substantial part outside the United
States, to the national security, foreign policy, or economy of the United
States"); Trading with the Enemy Act, 50 U. S. C. §4305(b)(1)(B) (author-
izing the President, "[d]uring the time of war," to prohibit "transactions
involvin[g] any property in which any foreign country or a national
thereof has any interest," among other things); Trade Expansion Act of
1962, 19 U. S. C. §1862(c)(3)(A) (authorizing "actions as the President
deems necessary to adjust the imports of" certain articles of trade "so
that such imports will not threaten to impair the national security");
Trade Act of 1974, 19 U. S. C. §2132(a) (authorizing the President,
among other things, to impose temporary duty surcharges or quotas in
order to address "large and serious United States balance-of-payments
deficits," "an imminent and significant depreciation of the dollar in for-
eign exchange markets," or "to cooperate with other countries in correct-
ing an international balance-of-payments disequilibrium"), §2133(a) (au-
thorizing the President, whenever a specified event "increases or imposes
any duty or other import restriction," to "enter into trade agreements
with foreign countries or instrumentalities for the purpose of granting
new concessions as compensation in order to maintain the general level
of reciprocal and mutually advantageous concessions" and to take actions
"to carry out any such agreement"), §2411(a) (mandating the U. S. Trade

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM    INDEX NO. 160694/2019
NYSCEF DOC. NO. 98    Case 1:20-cv-07311-LAK    Document 14-99    Filed 09/15/20    Page 49 of 69    RECEIVED NYSCEF: 07/10/2020

4    TRUMP *v.* VANCE

Alito, J., dissenting

The Constitution vests the President with "the executive Power" of the United States, Art. II, §1, cl. 1, and entrusts him with the responsibility "to take Care that the Laws be faithfully executed," §3.    As the head of the Executive Branch, the President is ultimately responsible for everything done by all the departments and agencies of the Federal Government and a federal civilian work force that includes millions of employees.    These weighty responsibilities impose enormous burdens on the time and energy of any occupant of the Presidency.

"Constitutionally speaking, the President never sleeps. The President must be ready, at a moment's notice, to do whatever it takes to preserve, protect, and defend the Constitution and the American people."    Amar & Katyal, Executive Privileges and Immunities: The Nixon and Clinton Cases, 108 Harv. L. Rev. 701, 713 (1995).    Without a President who is able at all times to carry out the responsibilities of the office, our constitutional system could not operate, and the country would be at risk.    That is why the Twenty-fifth Amendment created a mechanism for temporarily transferring the responsibilities of the office to the Vice President if the President is incapacitated for even a brief

---

Representative, subject to the President's direction, to modify tariff rates if "the rights of the United States under any trade agreement are being denied" or if a foreign country's actions are "unjustifiable and burde[n] or restric[t] United States commerce"), §2461 (authorizing the President to "provide duty-free treatment for any eligible article from any beneficiary developing country"); Bipartisan Congressional Trade Priorities and Accountability Act of 2015, 19 U. S. C. §§4201–4210 (most recent delegation of trade-promotion authority, authorizing the President to negotiate and enter trade agreements); Immigration and Nationality Act of 1952, 8 U. S. C. §1182(f) (authorizing the President, "for such period as he shall deem necessary," to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate," "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States").

ALITO, J., dissenting

time. The Amendment has been explicitly invoked on only two occasions, each time for a period of about two hours.[3] This mechanism reflects an appreciation that the Nation cannot be safely left without a functioning President for even a brief time.

## B

The second structural feature is the relationship between the Federal Government and the States. Just as our Constitution balances power against power among the branches of the Federal Government, it also divides power between the Federal Government and the States. The Constitution permitted the States to retain many of the sovereign powers that they previously possessed, see, *e.g.*, *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___ (2018), but it gave the Federal Government powers that were deemed essential for the Nation's well-being and, indeed, its survival. And it provided for the Federal Government to be independent of and, within its allotted sphere, supreme over the States. Art. VI, cl. 2. Accordingly, a State may not block or interfere with the lawful work of the National Government.

This was an enduring lesson of Chief Justice Marshall's landmark opinion for the Court in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). As is well known, the case concerned the attempt by the State of Maryland to regulate and tax the federally chartered Second Bank of the United States. After holding that Congress had the authority to establish the bank, *id.*, at 425, Marshall's opinion went on to conclude

_____

[3]See Letter from G. Bush to Congressional Leaders on Temporary Transfer of the Powers and Duties of President of the United States (June 29, 2002), www.presidency.ucsb.edu/node/213575; Letter from G. Bush to Congressional Leaders on the Temporary Transfer of the Powers and Duties of the President of the United States (July 21, 2007), www.presidency.ucsb.edu/node/276172; see also Stolberg, For a Short While Today, It Will Be President Cheney, N. Y. Times, July 21, 2007, p. A11, col. 1.

6          TRUMP *v.* VANCE

ALITO, J., dissenting

that the State could not tax it. Marshall recognized that
the States retained the "sovereign" power to tax persons
and entities within their jurisdiction, *id.*, at 429, but this
power, he explained, "is subordinate to, and may be con-
trolled by the constitution of the United States." *Id.*, at 427.
Noting the potency of the taxing power ("[a] right to tax
without limit or control, is essentially a power to destroy,"
*id.*, at 391), he concluded that a State's power to tax had to
give way to Congress's authority to charter the bank. In his
words, the state power to tax could not be used to "defeat
the legitimate operations," *id.*, at 427, of the Federal Gov-
ernment or "to retard, impede, burden, or in any manner
control" it, *id.*, at 436. Marshall thus held, not simply that
Maryland was barred from assessing a crushing tax that
threatened the bank's ability to operate, but that the State
could not tax the bank at all. He wrote:

> "We are not driven to the perplexing inquiry, so unfit
> for the judicial department, what degree of taxation is
> the legitimate use, and what degree may amount to the
> abuse of the power. The attempt to use it on the means
> employed by the government of the Union, in pursu-
> ance of the constitution, is itself an abuse." *Id.*, at 430.

Even a rule allowing a state tax that did not discriminate
between the federally chartered bank and state banks was
ruled out. Instead, he concluded that preservation of the
Constitution's federal structure demanded that any state
effort to tax a federal instrumentality be nipped in the bud.

Building on this principle of federalism, two centuries of
case law prohibit the States from taxing,[4] regulating, or

––––––––––

[4] *Kern-Limerick, Inc.* v. *Scurlock*, 347 U. S. 110, 117 (1954) (noting that
"recognition of the constitutional immunity of the Federal Government
from state exactions rests, of course, upon unquestioned authority");
*Mayo* v. *United States*, 319 U. S. 441, 447 (1943) ("These inspection fees
are laid directly upon the United States. They are money exactions the

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM INDEX NO. 160694/2019

NYSCEF DOC. NO. 98 RECEIVED NYSCEF: 07/10/2020

ALITO, J., dissenting

otherwise interfering with the lawful work of federal agen-
cies, instrumentalities, and officers.[5]  The Court premised

―――――――

payment of which, if they are enforceable, would be required before exe-
cuting a function of government.  Such a requirement is prohibited by
the supremacy clause"); *Clallam County* v. *United States*, 263 U. S. 341,
344 (1923) (holding that property owned by the United States is immune
from state taxation); see also *Weston* v. *City Council of Charleston*, 2 Pet.
449, 469 (1829) ("The tax on government stock is thought by this Court
to be a tax on the contract, a tax on the power to borrow money on the
credit of the United States, and consequently to be repugnant to the con-
stitution"); *Osborn* v. *Bank of United States*, 9 Wheat. 738, 867 (1824) ("If
the trade of the Bank be essential to its character, as a machine for the
fiscal operations of the government, that trade must be as exempt from
State control as the actual conveyance of the public money.  Indeed, a tax
bears upon the whole machine; as well upon the faculty of collecting and
transmitting the money of the nation, as on that of discounting the notes
of individuals.  No distinction is taken between them"); *Dawson* v.
*Steager*, 586 U. S. ___, ___ (2019) (slip op., at 2) (surveying Court prece-
dent on intergovernmental tax immunity).

  [5]*Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 180 (1988) ("It is well
settled that the activities of federal installations are shielded by the Su-
premacy Clause from direct state regulation unless Congress provides
'clear and unambiguous' authorization for such regulation"); *id.*, at 181
(concluding that "a federally owned facility performing a federal function
is shielded from direct state regulation, even though the federal function
is carried out by a private contractor, unless Congress clearly authorizes
such regulation"); *Hancock* v. *Train*, 426 U. S. 167, 178–179 (1976) (re-
jecting state agency's bid to regulate a federal installation and surveying
doctrines that establish that "'the federal function must be left free' of
[state] regulation"); see also *Leslie Miller, Inc.* v. *Arkansas*, 352 U. S. 187,
189–190 (1956) (*per curiam*) (concluding that federal contractors cannot
be forced to submit to state licensing procedures that would add to the
qualifications required to receive the federal contract); *Johnson* v. *Mar-
yland*, 254 U. S. 51, 57 (1920) (concluding that federal postal officials
may not be required to get a state driver's license to perform their duties
and explaining that "the immunity of the instruments of the United
States from state control in the performance of their duties extends to
. . . requirement[s] that they desist from performance until they satisfy
a state officer upon examination that they are competent for a necessary
part of them"); *In re Neagle*, 135 U. S. 1, 75 (1890) (concluding that a
federal official may not be "held in the state court to answer for an act
which he [or she] was authorized to do by the law of the United States");

8                         TRUMP *v.* VANCE

ALITO, J., dissenting

these cases on the principle that "the activities of the Federal Government are free from regulation by any State. No other adjustment of competing enactments or legal principles is possible." *Mayo* v. *United States*, 319 U. S. 441, 445 (1943) (footnote omitted).

## II
### A

In *McCulloch*, Maryland's sovereign taxing power had to yield, and in a similar way, a State's sovereign power to enforce its criminal laws must accommodate the indispensable role that the Constitution assigns to the Presidency. This must be the rule with respect to a state prosecution of a sitting President. Both the structure of the Government established by the Constitution and the Constitution's provisions on the impeachment and removal of a President make it clear that the prosecution of a sitting President is out of the question. It has been aptly said that the President is the "sole indispensable man in government,"[6] and

_____

*id.*, at 62 ("To cite all the cases in which this principle of the supremacy of the government of the United States, in the exercise of all the powers conferred upon it by the Constitution, is maintained, would be an endless task"); *Tarble's Case*, 13 Wall. 397, 404 (1872) (explaining that States have no authority to "interfere with the authority of the United States, whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 376–382 (2000) (explaining harm caused by state statutes that would "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments"); *EPA* v. *California ex rel. State Water Resources Control Bd.*, 426 U. S. 200, 211 (1976) ("Federal installations are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous"); *Arizona* v. *California*, 283 U. S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a State"); *Hunt* v. *United States*, 278 U. S. 96, 100–101 (1928) (recognizing that the United States was entitled to an injunction against state officers interfering with private citizens killing deer in national forest under authority of the United States).

[6] P. Kurland, Watergate and the Constitution 135 (1978).

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM
NYSCEF DOC. NO. 98

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 54 of 69
RECEIVED NYSCEF: 07/10/2020

subjecting a sitting President to criminal prosecution would severely hamper his ability to carry out the vital responsibilities that the Constitution puts in his hands.

Justice Joseph Story endorsed this reasoning in his famous treatise. He wrote that a President's responsibilities necessarily entail "the power to perform [those duties], without any obstruction or impediment whatsoever," and that, as a result, a President is not "liable to arrest, imprisonment, or detention" while in office. 3 Commentaries on the Constitution of the United States §1563, pp. 418–419 (1833).

The constitutional provisions on impeachment provide further support for the rule that a President may not be prosecuted while in office. The Framers foresaw the need to provide for the possibility that a President might be implicated in the commission of a serious offense, and they did not want the country to be forced to endure such a President for the remainder of his term in office. But when a President has been elected by the people pursuant to the procedures set out in the Constitution, it is no small thing to overturn that choice. The Framers therefore crafted a special set of procedures to deal with that contingency. They put the charging decision in the hands of a body that represents all the people (the House of Representatives), not a single prosecutor or the members of a local grand jury. And they entrusted the weighty decision whether to remove a President to a supermajority of Senators, who were expected to exercise reasoned judgment and not the political passions of the day or the sentiments of a particular region.

The Constitution not only sets out the procedures for dealing with a President who is suspected of committing a serious offense; it also specifies the consequences of a judgment adverse to the President. After providing that the judgment cannot impose any punishment beyond removal from the Presidency and disqualification from holding any other federal office, the Constitution states that "the Party

convicted shall nevertheless be liable and subject to Indict-
ment, Trial, Judgment, and Punishment, according to
Law." Art. I, §3, cl. 7. The plain implication is that criminal
prosecution, like removal from the Presidency and disqual-
ification from other offices, is a consequence that can come
about only after the Senate's judgment, not during or prior
to the Senate trial.

This was how Hamilton explained the impeachment pro-
visions in the Federalist Papers. He wrote that a President
may "be impeached, tried, and, upon conviction . . . *would
afterwards be liable to prosecution and punishment in the
ordinary course of law.*" The Federalist No. 69, p. 416 (C.
Rossiter ed. 1961) (emphasis added); see also *id.*, No. 77, at
464 (A. Hamilton) (a President is "at all times liable to im-
peachment, trial, [and] dismission from office," but any
other punishment must come only "by *subsequent prosecu-
tion* in the common course of law" (emphasis added)).

In the proceedings below, neither respondent, nor the
District Court, nor the Second Circuit was willing to con-
cede the fundamental point that a sitting President may not
be prosecuted by a local district attorney. Respondent has
said that he is investigating the President and, until oral
argument in this Court, he never foreswore an intention to
charge the President while he is still in office.[7] The District

---

[7] During oral argument in the Second Circuit, respondent's attorney
said the following:

"It's hard for me to say that there could be no circumstance under
which a President could ever imaginably be criminally charged or per-
haps tried . . . . You can invent scenarios where you can imagine that it
would be necessary or at least perhaps a good idea for a sitting President
to be subject to a criminal charge even by a state while in office." Re-
cording of Oral Arg. in No. 19–3204 (CA2, Oct. 23, 2019), at 28:20–
28:40; 36:35–36:45, https://www.ca2.uscourts.gov/decisions/oral_argu-
ments.html.

Respondent's brief in this case says only that "[f]or the purpose of this
case, the Court may assume . . . that a sitting President is not amenable
to criminal prosecution." Brief for Respondent Vance 24–25. During oral

Court conceded only that "perhaps" a sitting President could not be prosecuted for an offense punishable by "lengthy imprisonment" but that an offense requiring only a short trial would be another matter. 395 F. Supp. 3d 283, 289, 311 (SDNY 2019). And the Second Circuit was silent on the question.

The scenario apparently contemplated by the District Court is striking. If a sitting President were charged in New York County, would he be arrested and fingerprinted? He would presumably be required to appear for arraignment in criminal court, where the judge would set the conditions for his release. Could he be sent to Rikers Island or be required to post bail? Could the judge impose restrictions on his travel? If the President were scheduled to travel abroad—perhaps to attend a G–7 meeting—would he have to get judicial approval? If the President were charged with a complicated offense requiring a long trial, would he have to put his Presidential responsibilities aside for weeks on end while sitting in a Manhattan courtroom? While the trial was in progress, would aides be able to approach him and whisper in his ear about pressing matters? Would he be able to obtain a recess whenever he needed to speak with an aide at greater length or attend to an urgent matter, such as speaking with a foreign leader? Could he effectively carry out all his essential Presidential responsibilities after the trial day ended and at the same time adequately confer with his trial attorneys regarding his defense? Or should he be expected to give up the right to attend his own trial and be tried in absentia? And if he were convicted, could he be imprisoned? Would aides be installed in a nearby cell?

This entire imagined scene is farcical. The "right of all

_____

argument in this Court, however, counsel for respondent stated: "We're mindful that as a state actor our office cannot investigate a president for any official acts and that we cannot prosecute a president while in office." Tr. of Oral Arg. 54.

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 57 of 69

12            TRUMP *v.* VANCE

ALITO, J., dissenting

the People to a functioning government" would be sacri-
ficed.  Amar & Kalt, The Presidential Privilege Against
Prosecution, 2 Nexus 11, 14 (1997).  "Does anyone really
think, in a country where common crimes are usually
brought before state grand juries by state prosecutors, that
it is feasible to subject the president—and thus the coun-
try—to every district attorney with a reckless mania for
self-promotion?"  C. Black & P. Bobbitt, Impeachment: A
Handbook 112 (2018).  See also R. Moss, Asst. Atty. Gen., A
Sitting President's Amenability to Indictment and Criminal
Prosecution, 24 Op. Office of Legal Counsel (OLC) 222, 260
(2000) (Moss Memo); Memorandum from R. Dixon, Asst.
Atty. Gen., OLC, Re: Amenability of the President, Vice
President, and Other Civil Officers to Federal Criminal
Prosecution While in Office (Sept. 24, 1973).

B

While the prosecution of a sitting President provides the
most dramatic example of a clash between the indispensa-
ble work of the Presidency and a State's exercise of its crim-
inal law enforcement powers, other examples are easy to
imagine.  Suppose state officers obtained and sought to ex-
ecute a search warrant for a sitting President's private
quarters in the White House.  Suppose a state court author-
ized surveillance of a telephone that a sitting President was
known to use.  Or suppose that a sitting President was sub-
poenaed to testify before a state grand jury and, as is gen-
erally the rule, no Presidential aides, even those carrying
the so-called "nuclear football,"[8] were permitted to enter the
grand jury room.  What these examples illustrate is a prin-
ciple that this Court has recognized: legal proceedings in-
volving a sitting President must take the responsibilities
and demands of the office into account.  See *Clinton* v.
*Jones*, 520 U. S. 681, 707 (1997).

---

[8]Atomic Heritage Foundation, Nuclear Briefcases (June 12, 2018),
www.atomicheritage.org/history/nuclear-briefcases.

Case 1:20-cv-07311-LAK Document 14-99 Filed 09/15/20 Page 58 of 69

Cite as: 591 U. S. ____ (2020)     13

ALITO, J., dissenting

It is not enough to recite sayings like "no man is above the law" and "the public has a right to every man's evidence." *Ante*, at 1. These sayings are true—and important—but they beg the question. The law applies equally to all persons, including a person who happens for a period of time to occupy the Presidency. But there is no question that the nature of the office demands in some instances that the application of laws be adjusted at least until the person's term in office ends.

C

I now come to the specific investigative weapon at issue in the case before us—a subpoena for a sitting President's records. This weapon is less intrusive in an immediate sense than those mentioned above. Since the records are held by, and the subpoena was issued to, a third party, compliance would not require much work on the President's part. And after all, this is just one subpoena.

But we should heed the "great jurist," *ante*, at 21, who rejected a similar argument in *McCulloch*. If we say that a subpoena to a third party is insufficient to undermine a President's performance of his duties, what about a subpoena served on the President himself? Surely in that case, the President could turn over the work of gathering the requested documents to attorneys or others recruited to perform the task. And if one subpoena is permitted, what about two? Or three? Or ten? Drawing a line based on such factors would involve the same sort of "perplexing inquiry, so unfit for the judicial department" that Marshall rejected in *McCulloch*, 4 Wheat., at 430.

The Court faced a similar issue when it considered whether a President can be sued for an allegedly unlawful act committed in the performance of official duties. See *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982). We did not ask whether the particular suit before us would have interfered with the carrying out of Presidential duties. (It could not

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 59 of 69

14                          TRUMP *v.* VANCE

                          ALITO, J., dissenting

have had that effect because President Nixon had already
left office.)

    Instead, we adopted a rule for all such suits, and we
should take a similar approach here. The rule should take
into account both the effect of subpoenas on the functioning
of the Presidency and the risk that they will be used for
harassment.

    I turn first to the question of the effect of a state grand
jury subpoena for a President's records. When the issuance
of such a subpoena is part of an investigation that regards
the President as a "target" or "subject,"[9] the subpoena can
easily impair a President's "energetic performance of [his]
constitutional duties." *Cheney* v. *United States Dist. Court
for D. C.*, 542 U. S. 367, 382 (2004). Few individuals will
simply brush off an indication that they may be within a
prosecutor's crosshairs. Few will put the matter out of their
minds and go about their work unaffected. For many, the
prospect of prosecution will be the first and last thing on
their minds every day.

    We have come to expect our Presidents to shoulder bur-
dens that very few people could bear, but it is unrealistic to
think that the prospect of possible criminal prosecution will

———————

    [9] Respondent asserts that his office has never characterized President
Trump as a "target" of the investigation, Brief for Respondent Vance 29,
n. 10, but by the same token, respondent has never said that the Presi-
dent is not a "target." Moreover, the terms "target" and "subject" have
no consistent legal meaning. The United States Attorney's Manual de-
fines a "target" as "a person as to whom the prosecutor or the grand jury
has substantial evidence linking him or her to the commission of a crime
and who, in the judgment of the prosecutor, is a putative defendant."
Dept. of Justice, Justice Manual, Section 9–11.151 (Jan. 2020),
https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151/. "A 'sub-
ject' of an investigation" is defined as "a person whose conduct is within
the scope of the grand jury's investigation." *Ibid.* Of course, these defi-
nitions are not binding on the State of New York, but under them, it is
apparent that the President is at least a "subject."

FILED: NEW YORK COUNTY CLERK 07/10/2020 08:07 AM INDEX NO. 160694/2019
NYSCEF DOC. NO. 98          RECEIVED NYSCEF: 07/10/2020

ALITO, J., dissenting

not interfere with the performance of the duties of the office. "[C]riminal litigation uniquely requires [a] President's personal time and energy, and will inevitably entail a considerable if not overwhelming degree of mental preoccupation." Moss Memo 254 (emphasis deleted). See also Kavanaugh, Separation of Powers During the Forty-Fourth Presidency and Beyond, 93 Minn. L. Rev. 1454, 1461 (2009) ("[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President").

As for the potential use of subpoenas to harass, we need not "'exhibit a naiveté from which ordinary citizens are free.'" *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 28). As we have recognized, a President is "an easily identifiable target." *Fitzgerald*, 457 U. S., at 752–753. There are more than 2,300 local prosecutors and district attorneys in the country.[10] Many local prosecutors are elected, and many prosecutors have ambitions for higher elected office. (Respondent's famous predecessor Thomas E. Dewey used the office of District Attorney for New York County as a springboard to the governorship of New York and to the Republican nomination for President in 1944 and 1948.) If a sitting President is intensely unpopular in a particular district—and that is a common condition—targeting the President may be an alluring and effective electoral strategy. But it is a strategy that would undermine our constitutional structure.

The Framers understood the importance of protecting the Presidency from interference by the States. At the Constitutional Convention, James Wilson argued that the President should be "as independent as possible . . . of the States." 1 Records of the Federal Convention of 1787, p. 69 (M. Farrand ed. 1911). He and James Madison successfully

---

[10]Dept. of Justice, Bureau of Justice Statistics, Prosecutors in State Courts, 2007—Statistical Tables 1 (Dec. 2011).

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 61 of 69

16            TRUMP *v.* VANCE

ALITO, J., dissenting

opposed a proposal to vest the impeachment power in state legislatures, contending that this "would open a door for intrigues agst. [the President] in States where his administration tho' just might be unpopular, and might tempt him to pay court to particular States whose leading partizans he might fear." *Id.*, at 86. And to prevent a State from compromising a President's independence, the Convention adopted a provision barring a President from receiving an "Emolument" from any State, U. S. Const., Art. II, §1, cl. 7. See The Federalist No. 73, at 494 (J. Cooke ed. 1961) (A. Hamilton).

Two centuries later, the Court's decision in *Clinton* reflected a similar concern. The Court held that a sitting President could be sued in federal court, but the Court took pains to reserve judgment on the question whether "a comparable claim might succeed in a state tribunal." 520 U. S., at 691. "[A]ny direct control by a state court over the President," the Court observed, might raise concerns about "protecting federal officials from possible local prejudice." *Ibid.*, and n. 13.

D

In light of the above, a subpoena like the one now before us should not be enforced unless it meets a test that takes into account the need to prevent interference with a President's discharge of the responsibilities of the office. I agree with the Court that not all such subpoenas should be barred. There may be situations in which there is an urgent and critical need for the subpoenaed information. The situation in the Burr trial, where the documents at issue were sought by a criminal defendant to defend against a charge of treason, is a good example. But in a case like the one at hand, a subpoena should not be allowed unless a heightened standard is met.

Prior cases involving Presidential subpoenas have always applied special, heightened standards. In the Burr trial,

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 62 of 69

Chief Justice Marshall was careful to note that "in no case of this kind would a court be required to proceed against the president as against an ordinary individual," and he held that the subpoena to President Jefferson was permissible only because the prosecutor had shown that the materials sought were "essential to the justice of the [pending criminal] case." *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (brackets omitted).

In *United States* v. *Nixon*, 418 U. S. 683 (1974), where the Watergate Special Prosecutor subpoenaed tape recordings and documents under the control of President Nixon, this Court refused to quash the subpoena because there was a "demonstrated, specific need for [the] evidence in a pending criminal trial." *Id.*, at 713. In an earlier Watergate-related case where a Senate Committee subpoenaed President Nixon's White House tapes, the D. C. Circuit refused to order their production because the Committee had failed to show that "the subpoenaed evidence [wa]s demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F. 2d 725, 731 (1974). Later, when an independent counsel investigating a Cabinet officer wanted to enforce a federal grand jury subpoena for privileged materials held by the White House counsel, the D. C. Circuit explained that enforcement demanded a "'demonstrated, specific need'" for the materials sought. *In re Sealed Case*, 121 F. 3d 729, 736 (1997) (*per curiam*).

The important point is not that the subpoena in this case should necessarily be governed by the particular tests used in these cases, most of which involved official records that were claimed to be privileged. Rather, the point is that we should not treat this subpoena like an ordinary grand jury subpoena and should not relegate a President to the meager defenses that are available when an ordinary grand jury subpoena is challenged. But that, at bottom, is the effect of the Court's decision.

Case 1:20-cv-07311-LAK   Document 14-99   Filed 09/15/20   Page 63 of 69

18            TRUMP *v.* VANCE

Alito, J., dissenting

The Presidency deserves greater protection. Thus, in a case like this one, a prosecutor should be required (1) to provide at least a general description of the possible offenses that are under investigation, (2) to outline how the subpoenaed records relate to those offenses, and (3) to explain why it is important that the records be produced and why it is necessary for production to occur while the President is still in office.

In the present case, the district attorney made a brief proffer, but important questions were left hanging. It would not be unduly burdensome to insist on answers before enforcing the subpoena.

One obvious question concerns the scope of the subpoena. The subpoena issued by the grand jury is largely a copy of the subpoenas issued by Committees of the House of Representatives, and it would be quite a coincidence if the records relevant to an investigation of possible violations of New York criminal law just so happened to be almost identical to the records thought by congressional Committees to be useful in considering federal legislation. It is therefore appropriate to ask the district attorney to explain the need for the various items that the subpoena covers.

The district attorney should also explain why it is important that the information in question be obtained from the President's records rather than another source. See, *e.g.*, *Nixon*, 418 U. S., at 702; *Sealed Case*, 121 F. 3d, at 755. And the district attorney should set out why he finds it necessary that the records be produced now as opposed to when the President leaves office. At argument, respondent's counsel told us that his office's concern is the expiration of the statute of limitations,[11] but there are potential solutions to that problem. Even if New York law does not automatically suspend the statute of limitations for prosecuting a

---

[11] Tr. of Oral Arg. 77, 102.

Case 1:20-cv-07311-LAK Document 14-99 Filed 09/15/20 Page 64 of 69

ALITO, J., dissenting

President until he leaves office,[12] it may be possible to eliminate the problem by waiver.[13]  And if the prosecutor's statute-of-limitations concerns relate to parties other than the President, he should be required to spell that out.

There may be other good reasons why immediate enforcement is important, such as the risk that evidence or important leads will be lost, but if a prosecutor believes that immediate enforcement is needed for such a reason, the prosecutor should be required to provide a reasonably specific explanation why that is so and why alternative means, such as measures to preserve evidence and prevent spoliation, would not suffice.

### E

Unlike this rule, which would not undermine any legitimate state interests, the opinion of the Court provides no real protection for the Presidency.  The Court discounts the risk of harassment and assumes that state prosecutors will observe constitutional limitations, *ante*, at 18, and I also assume that the great majority of state prosecutors will carry out their responsibilities responsibly.  But for the reasons noted, there is a very real risk that some will not.

The Court emphasizes the protection afforded by "longstanding rules of grand jury secrecy," *ante*, at 15, but that is no answer to the burdens that subpoenas may inflict, and in any event, grand jury secrecy rules are of limited value as safeguards against  harassment.  State laws on

_____

[12] See N. Y. Crim. Proc. Law Ann. §30.10(4)(a) (West 2010) (statute tolled when defendant outside the jurisdiction); see also *People* v. *Knobel*, 94 N. Y. 2d 226, 230, 723 N. E. 2d 550, 552 (1999) (explaining New York rule for tolling the limitations period when a defendant is "continuously outside" the State and concluding that "all periods of a day or more that a nonresident defendant is out-of-State should be totaled and toll the Statute of Limitations").

[13] See *People* v. *Parilla*, 8 N. Y. 3d 654, 659, 870 N. E. 2d 142, 145 (2007); R. Davis & T. Muskus, New York Practice with Forms, 33A Carmody-Wait 2d §186:34 (June 2020).

grand jury secrecy vary and often do not set out disclosure restrictions with the same specificity as federal law.[14]

Under New York law, the decision whether to disclose grand jury evidence is committed to the discretion of the supervising judge under a test that simply balances the need for secrecy against "the public interest." *In re District Attorney of Suffolk Cty.*, 58 N. Y. 2d 436, 444, 448 N. E. 2d 440, 443–444 (1983); see also *People* v. *Fetcho*, 91 N. Y. 2d 765, 769, 698 N. E. 2d 935, 938 (1998). That test provides no solid protection for the Presidency. Reported New York decisions do not deal with whether this test restricts disclosure to, among others, a congressional committee, the state legislature, or the state attorney general and her staff for the purpose of civil litigation. Indeed, since New York legislators have attempted to enact laws to force the disclosure of some of the subpoenaed information, it is not impossible to imagine a trial judge's finding that public disclosure is in the "public interest." And even where grand jury information is not lawfully disclosed, confidential law enforcement information is avidly sought by the media in high-profile cases, leaks of such information are not uncommon, and those responsible are seldom called to account.

The Court notes that "grand juries are prohibited from engaging" in "'fishing expeditions,'" *ante*, at 17, but an objection on that ground is a very long shot under New York law. In New York, a grand jury subpoena need not be supported by probable cause, *In re Nassau Cty. Grand Jury Subpoena Duces Tecum Dated June 24, 2003*, 4 N. Y. 3d 665, 677–678, 830 N. E. 2d 1118, 1126 (2005), and a party seeking to quash a subpoena must show that the documents sought "can have no conceivable relevance to any legitimate object of investigation." *In re Grand Jury Subpoenas for Locals 17, 135, and 608*, 72 N. Y. 2d 307, 317, 528 N. E. 2d 1195, 1201 (1988) (quoting *Virag* v. *Hynes*, 54 N. Y. 2d 437,

─────────

[14]S. Beale et al., Grand Jury Law and Practice §§5:3–5:4 (2018).

444, 430 N. E. 2d 1249, 1253 (1981)).

The Court says that a President can "*argue* that compliance with a particular subpoena would impede his constitutional duties," *ante*, at 20 (emphasis added), but under the Court's opinions in this case and *Mazars*, it is not easy to see how such an argument could prevail. The Court makes clear that any stigma or damage to a President's reputation does not count, *ante*, at 14, and in *Mazars*, the Court states that "burdens on the President's time and attention" are generally not of constitutional concern, *post*, at 20. Elsewhere in its opinion in this case, the Court takes the position that when a President's non-official records are subpoenaed, his treatment should be little different from that of any other subpoena recipient. *Ante*, at 18. The most that the Court holds out is the possibility that there might be some unspecified extraordinary circumstances under which a President might obtain relief.

Finally, the Court touts the ability of a President to challenge a subpoena by "'an affirmative showing of impropriety,' including 'bad faith'" or retaliation for official acts. *Ante*, at 16–17. But "such objections are almost universally overruled." S. Beale et al., Grand Jury Law and Practice §6:23, p. 6–243 (2014). Direct evidence of impropriety is rarely obtainable, and it will be a challenge to make a circumstantial case unless the prosecutor is required to provide the sort of showing outlined above.

For all practical purposes, the Court's decision places a sitting President in the same unenviable position as any other person whose records are subpoenaed by a grand jury. See *ante*, at 18.

Attempting to justify this approach, the Court relies on Marshall's ruling in the Burr trial, but the Court ignores important differences between the situation in that case and the situation here. First, the subpoena in *Burr* was not issued by a grand jury at the behest of a prosecutor who was investigating the President. Instead, a defendant who was

22          TRUMP *v.* VANCE

initially on trial for his life sought to obtain exculpatory evidence from the very man who was orchestrating the prosecution. *Ante*, at 5. Marshall's ruling took note of the context in which the evidence was sought. He stated: "If there be a paper in the possession of the executive, which is not of an official nature, he must stand, as respects that paper, in nearly the same situation with any other individual who possesses a paper *which might be required for the defense*." *Burr*, 25 F. Cas., at 191 (emphasis added).

Second, it is significant that Burr, unlike the prosecutor in the present case, did not have the option of postponing his request for information until the President's term ended. Burr had not chosen to be charged or tried while Jefferson was in office, and by the time Jefferson's tenure ended, his trial was history. Third, because the case was prosecuted in federal court under federal law, it entirely lacked the federalism concerns that lie at the heart of the present case.

The lesson we should take from Marshall's jurisprudence is the lesson of *McCulloch*—the importance of preventing a State from undermining the lawful exercise of authority conferred by the Constitution on the Federal Government. There is considerable irony in the Court's invocation of Marshall to defend a decision allowing a State's prosecutorial power to run roughshod over the functioning of a branch of the Federal Government.

The Court's other examples of presidential subpoenas, far from supporting the Court's holding, actually show that usual procedures have been substantially altered in cases involving Presidents. In every one of the examples, a President did not testify in person, as is almost always required when a witness is subpoenaed to testify at a criminal trial or before a grand jury, but instead was deposed. *Ante*, at 8. The examples involving Presidents Ford and Carter occurred under modern federal rules of procedure, and allow-

ALITO, J., dissenting

ing them to testify by deposition represented a sharp departure from conventional practice.[15]

The Court turns to *United States* v. *Nixon*, 418 U. S. 683, but that case arose under markedly different circumstances. Because the trial was in federal court, there was no issue of federalism, and the Court refused to order that the subpoena be quashed because of "the demonstrated, specific need for evidence in a pending criminal trial." *Id.*, at 713. In the case now before us, a "demonstrated, specific need" is precisely what is lacking.

This Court's decision in *Clinton* v. *Jones*, 520 U. S. 681, provides no greater support for today's decision. In that case, as noted, the lawsuit was brought in federal, not state, court, and while the subject of that particular civil suit was embarrassing, the Court addressed the broad question whether a President is immune from civil suits "'in all but

---

[15] When President Ford was subpoenaed as a defense witness in the trial of a woman who had attempted to assassinate him, the District Court ruled that Federal Rule of Criminal Procedure 15 allowed him to be deposed at a place of his choosing, instead of testifying in person, and provided for defense counsel but not the defendant herself to be present. Then, as now, Rule 15 permits a witness to be deposed under "exceptional circumstances" in order "to preserve testimony for trial." This Rule is generally used when a witness may not be available to testify at trial, not simply when it would be burdensome or inconvenient for the witness to appear. The judge's application of the Rule in this case was innovative. In addition, the defendant was not present when President Ford was deposed. Repeating such a practice today might run into other obstacles. See *Coy* v. *Iowa*, 487 U. S. 1012, 1020–1021 (1988); see also Rule 15(c) (providing for the defendant's presence during the deposition).

A similar procedure appears to have been followed when President Carter testified as a prosecution witness in a criminal trial. No reported case explains the legal authority cited as justification for excusing live testimony, but Rule 15 may have been invoked. As for President Carter's testimony by deposition before a grand jury, although neither the Federal Rules of Evidence nor the Confrontation Clause apply to federal grand jury proceedings, testimony by deposition is nevertheless not the norm.

24                TRUMP *v.* VANCE

ALITO, J., dissenting

the most exceptional cases.'" *Id.*, at 692.  There is no ques-
tion that a criminal prosecution holds far greater potential
for distracting a President and diminishing his ability to
carry out his responsibilities than does the average civil
suit.

\*        \*        \*

The subpoena at issue here is unprecedented.  Never be-
fore has a local prosecutor subpoenaed the records of a sit-
ting President.  The Court's decision threatens to impair
the functioning of the Presidency and provides no real pro-
tection against the use of the subpoena power by the Na-
tion's 2,300+ local prosecutors.  Respect for the structure of
Government created by the Constitution demands greater
protection for an institution that is vital to the Nation's
safety and well-being.

I therefore respectfully dissent.