# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>                              Plaintiff,<br><br>          v.<br><br>DONALD J. TRUMP,<br>in his individual capacity,<br><br><br>                              Defendant. | **ORAL ARGUMENT REQUESTED**<br><br>Case No. 1:20-cv-7311 (LAK) |

# MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION TO SUBSTITUTE THE UNITED STATES AS DEFENDANT

Roberta A. Kaplan
Joshua Matz
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Plaintiff E. Jean Carroll*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ...................................................................................................................... 2

    I.    Factual Background ................................................................................................ 2

        A.    Trump Sexually Assaults Carroll .............................................................. 2

        B.    Carroll Publicly Reveals that Trump Sexually Assaulted Her ................................. 3

        C.    Trump Slanders Carroll on Three Separate Occasions ............................................ 4

            1.    June 21, 2019 Statement................................................................................ 4

            2.    June 22, 2019 Statement................................................................................ 5

            3.    June 24, 2019 Statement................................................................................ 6

    II.    Procedural History ................................................................................................ 7

        A.    Carroll Files Suit Against Trump in State Court .................................................... 7

        B.    Trump Defends the Proceedings in State Court ...................................................... 7

        C.    The Department of Justice Files a Motion to Substitute ......................................... 8

STANDARD OF REVIEW ...................................................................................................... 9

ARGUMENT ......................................................................................................................... 10

    I.    The FTCA Does Not Cover the President .................................................................... 10

        A.    The President is Not an Officer or Employee of an Executive Department .......... 11

        B.    The President is Not an Officer or Employee of an Independent Establishment of the United States ................................................................................................ 15

        C.    Interpretive and Immunity Principles Confirm This Reading of the FTCA .......... 19

    II.    Trump Was Not Acting Within the Scope of His Job as President When He Defamed Carroll For Revealing That He Sexually Assaulted Her ................................................. 21

ii

A.   New York Law Governs the Scope of Employment Inquiry ................................. 21

B.   Under New York Law, A Person Acts Outside the Scope of Their Employment When They Act for Personal Reasons to Obtain a Personal Benefit .................... 22

C.   Trump Acted Outside the Scope of His Employment in Defaming Carroll .......... 26

1.   Notwithstanding the Breadth of their Official Duties, Presidents May Unquestionably Engage in Personal Conduct Causing Private Wrongs .......... 26

2.   Trump Acted for Personal Reasons in Defaming Carroll ............................... 28

D.   The Justice Department's Position Is Meritless ...................................................... 31

III.  If the Court Concludes That There Is A Factual Dispute Bearing on Whether Trump is Covered by the FTCA, It Should Order Discovery or Hold a Hearing ........................ 34

CONCLUSION ............................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelson v. Harris,*
  973 F. Supp. 2d 467 (S.D.N.Y. 2013) ................................................................... 21

*Allstate Ins. Co. v. Quick,*
  254 F. Supp. 2d 706 (S.D. Ohio 2002) ................................................................. 35

*BedRoc Ltd., LLC v. United States,*
  541 U.S. 176, 124 S. Ct. 1587 (2004) .................................................................. 10

*Bello v. United States,*
  93 F. App'x 288 (2d Cir. 2004) ............................................................................. 10

*Bergeron v. Henderson,*
  47 F. Supp. 2d 61 (D. Me. 1999) .......................................................................... 35

*Bostock v. Clayton Cty.,*
  140 S. Ct. 1731 (2020) .......................................................................................... 12

*Bowles v. United States,*
  685 F. App'x 21 (2d Cir. 2017) ......................................................................... 9, 21

*Cheatum v. Wehle,*
  5 N.Y.2d 585 (1959) ............................................................................................. 31

*Clark v. McGee,*
  49 N.Y.2d 613 (1980) ................................................................................ 2, 3, 4, 31

*Clinton v. Jones,*
  520 U.S. 681, 117 S. Ct. 1636 (1997) .................................................. 26, 27, 30, 34

*Cooke v. United States,*
  918 F.3d 77 (2d Cir. 2019) .................................................................................... 10

*Council on American Islamic Relations v. Ballenger,*
  444 F.3d 659 (D.C. Cir. 2006) ......................................................................... 32, 33

*CREW v. Trump,*
  953 F.3d 178 (2d Cir. 2019) ............................................................................ 27, 28

*Dalehite v. United States,*
  346 U.S. 15, 73 S. Ct. 956 (1953) ........................................................................ 20

*Davila v. Lang*,
  343 F. Supp. 3d 254 (S.D.N.Y. 2018)............................................................ 10, 28

*Demas v. Levitsky*,
  291 A.D.2d 653 (3rd Dept. 2002) ............................................................ 23, 25, 32

*Does 1-10 v. Haaland*,
  No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020) .................... 10, 22, 32, 33

*Dowd v. Calabrese*,
  589 F. Supp. 1206 (D.D.C. 1984) ...................................................................... 22

*Dumas v. President of U.S.*,
  554 F. Supp. 10 (D. Conn. 1982) ...................................................................... 10

*Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian,*
  *Inc.*, 566 F.2d 289 (D.C. Cir. 1977)................................................................... 19

*Foretich v. CBS, Inc.*,
  619 A.2d 48 (D.C. 1993) .................................................................................... 22

*Franklin v. Massachusetts*,
  505 U.S. 788, 112 S. Ct. 2767 (1992)................................................................. 20

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
  561 U.S. 477, 130 S. Ct. 3138 (2010)................................................................. 13

*Freytag v. Commissioner*,
  501 U.S. 868, 111 S. Ct. 2631 (1991)................................................................. 12

*Glacken v. Village of Freeport*,
  No. 09 Civ. 4832, 2014 WL 1836143 (E.D.N.Y. May 8, 2014)...................... 31, 32

*Greaney v. Ferrer*,
  278 A.D.2d 154 (1st Dep't 2000) ....................................................................... 31

*Gutierrez de Martinez v. Lamagno*,
  515 U.S. 417, 115 S. Ct. 2227 (1995)................................................................ 9, 34

*Haddon v. United States*,
  68 F.3d 1420 (D.C. Cir. 1995) ........................................................................... 18

*Haddon v. Walters*,
  43 F.3d 1488 (D.C. Cir. 1995) .............................................................. 12, 17, 18

*Heindel v. Bowery Sav. Bank*,
  138 A.D.2d 787 (3rd Dept. 1988) ................................................................ 23, 24

*Ierardi v. Sisco,*
    119 F.3d 183 (2d Cir. 1997).................................................................... 23, 24

*Indian Towing Co. v. United States,*
    350 U.S. 61, 76 S. Ct. 122 (1955) ............................................................ 20

*Jones v. Clinton,*
    72 F.3d 1354 (8th Cir. 1996) .................................................................... 30

*Kirkman by Kirkman v. Astoria Gen. Hosp.,*
    204 A.D.2d 401 (2nd Dept. 1994) ............................................................. 23

*Klayman v. Obama,*
    125 F. Supp. 3d 67 (D.D.C. 2015) ............................................................ 10

*Knight First Amendment Institute v. Trump,*
    928 F.3d 226 (2d Cir. 2019)...................................................................... 27

*Lee v. Bankers Tr. Co.,*
    166 F.3d 540 (2d Cir. 1999)...................................................................... 21

*N.X. v. Cabrini Med. Ctr.,*
    97 N.Y.2d 247 (2002) .......................................................................... 23, 24

*Nicollette T. v. Hosp. for Joint Diseases/Orthopaedic Inst.,*
    198 A.D.2d 54 (1st Dept. 1993)................................................................ 23

*Nixon v. Fitzgerald,*
    457 U.S. 731, 102 S. Ct. 2690 (1982)....................................... 20, 26, 27, 34

*Operation Rescue Nat. v. United States,*
    147 F.3d 68 (1st Cir. 1998)....................................................................... 10

*Operation Rescue Nat'l v. United States,*
    975 F. Supp. 92 (D. Mass. 1997) ............................................................. 32

*Osborn v. Haley,*
    549 U.S. 225, 127 S. Ct. 881 (2007).......................................................... 9

*Overton v. Ebert,*
    180 A.D.2d 955 (3rd Dept. 1992) ............................................ 24, 26, 29, 34

*Perks v. Town of Huntington,*
    251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ............................................. passim

*Polcari v. John F. Kennedy Center for Performing Arts,*
    712 F. Supp. 230 (D.D.C. 1989)............................................................... 19

*Public Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440, 109 S. Ct. 2558 (1989) ................................................................ 20

*Rausman v. Baugh*,
  248 A.D.2d 8 (2nd Dept. 1998) ............................................................... passim

*Reeves v. Am. Broad. Companies, Inc.*,
  719 F.2d 602 (2d Cir. 1983) ......................................................................... 21

*Reeves v. Am. Broadcasting Cos.*,
  580 F. Supp. 84 (S.D.N.Y. 1983) ................................................................. 22

*Rivera v. State*,
  34 N.Y.3d 383 (2019) ............................................................................. 22, 23

*Riviello v. Waldron*,
  47 N.Y.2d 297 (1979) ....................................................................... 23, 30, 35

*Ross v. Mitsui Fudosan, Inc.*,
  2 F. Supp. 2d 522 (S.D.N.Y. 1998) ............................................................ 24, 26

*Saleh v. Bush*,
  848 F.3d 880 (9th Cir. 2017) ...................................................................... 10

*Seila Law LLC v. C.F.P.B.*,
  140 S. Ct. 2183 (2020) ............................................................................ 13, 26

*Stokes v. Cross*,
  327 F.3d 1210 (D.C. Cir. 2003) ................................................................. 31, 35

*Swarna v. Al-Awadi*,
  622 F.3d 123 (2d Cir. 2010) ....................................................................... 23

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
  No. 06 Civ. 11407, 2007 WL 4820968 (S.D.N.Y. Sept. 18, 2007) ................... 21, 22

*Thompson v. United States*,
  795 F. App'x 15 (2d Cir. 2019) .................................................................... 19

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ............................................................................... 26

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) ............................................................................... 11

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ............................................................................. 8, 27

*United States v. Burr*,
　　25 F. Cas. 30 (C.C.D. Va. 1807) ............................................................. 27

*United States v. Germaine*,
　　99 U.S. 508 (1878) ................................................................................... 12

*Weeks v. Oswald*,
　　No. 1:12 Civ. 82, 2012 WL 3012640 (D. Idaho July 23, 2012) ............... 35

*Weyrich v. New Republic, Ins. Co.*,
　　235 F.3d 617 (D.C. Cir. 2001) ................................................................ 22

*Williams v. United States*,
　　71 F.3d 502 (5th Cir. 1995) .................................................................... 32

*Wilson v. Libby*,
　　535 F.3d 697 (D.C. Cir. 2008) ................................................................ 10

*Wuterich v. Murtha*,
　　562 F.3d 375 (D.C. Cir. 2009) ............................................................ 32, 35

**Statutes**

3 U.S.C. § 112 ....................................................................................................... 17

5 U.S.C. § 101 ................................................................................................. 12, 13

5 U.S.C. § 104 ................................................................................................. 17, 18

5 U.S.C. § 1101 ..................................................................................................... 18

5 U.S.C. § 3110 ..................................................................................................... 18

5 U.S.C. § 3347 ..................................................................................................... 14

15 U.S.C. § 9054(a)(3) .......................................................................................... 15

15 U.S.C. §§ 1501, 1503a, 1503b, 1505, 1506, 1507, 1507b, 1507c, 1508 ................ 14

20 U.S.C. §§ 3411, 3412 ....................................................................................... 14

24 U.S.C. § 411 ..................................................................................................... 18

28 U.S.C. § 2671 .............................................................................................. passim

28 U.S.C. § 2679(b) ................................................................................................ 1

28 U.S.C. § 2679(d) ............................................................................................. 1, 9

28 U.S.C. §§ 1346(b)(1) ......................................................................................... 10

28 U.S.C. §§ 1346, 2671 ........................................................................................... 1

39 U.S.C. § 201 ...................................................................................................... 18

42 U.S.C. §§ 3532(a), 3533 ................................................................................... 14

42 U.S.C. §§ 7131, 7132 ........................................................................................ 14

43 U.S.C. §§ 1451-1456 ........................................................................................ 14

44 U.S.C. § 1501 .................................................................................................... 15

46 U.S.C. § 301 ...................................................................................................... 18

49 U.S.C. § 1111 .................................................................................................... 18

49 U.S.C. § 1301 .................................................................................................... 18

Pub. L. No. 89-554, 80 Stat. 378 (1966) ................................................................ 17

Pub. L. No. 100-694, 102 Stat. 4563 (1988) .......................................................... 20

## Other Authorities

4 Fed. Reg. 3864 (Sept. 12, 1939) ......................................................................... 16

Debates on the Federal Constitution 480 (2d ed. 1863) (James Wilson) .................... 26

*Gillian Metzger, The Constitutional Duty to Supervise,*
   124 Yale L.J. 1836 (2015) ................................................................................ 13

Exec. Order No. 8248 ............................................................................................. 16

H.R. Rep. No. 203 .................................................................................................. 12

*Operation of the Twenty-Fifth Amendment Respecting Presidential Succession,*
   9 Op. O.L.C. 65, 1985 WL 185391 (1985) ....................................................... 13

*Testimonial Immunity Before Congress of the Former Counsel to the President,*
   Op. O.L.C., 2019 WL 2315338 (May 20, 2019) .......................................... 15, 16

## Constitutional Provisions

U.S. CONST. art. II, § 2 ........................................................................................... 13

U.S. CONST. art. II, § 1 ........................................................................................... 26

## PRELIMINARY STATEMENT

There is not a single person in the United States—not the President and not anyone else—whose job description includes slandering women they sexually assaulted. That should not be a controversial proposition. Remarkably, however, the Justice Department seeks to prove it wrong. At the behest of the White House, and following a certification from the Attorney General pursuant to the Westfall Act, 28 U.S.C. § 2679(d), federal lawyers have moved to substitute the United States of America as the defendant in this action. They assert that Defendant Donald J. Trump was acting within the scope of his employment as President when he defamed Plaintiff E. Jean Carroll, a woman he sexually assaulted over twenty years ago, as retaliation for revealing his misconduct. Trump's defamatory lies included assertions that Carroll had falsely accused other men of rape; that she was lying about him as part of a secret political conspiracy; that she had fabricated her accusation to sell books; and that he had never met her (despite a photograph of them together). Trump also remarked, "she's not my type." Compl. ¶ 97. These are the statements that the Justice Department asks the Court to find that Trump uttered within the scope of his duties as President.

The Justice Department's motion should be rejected for two reasons. First, the statute cited in support of the Attorney General's certification—namely, the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.*, as amended by the Westfall Act, 28 U.S.C. § 2679(b)—does not apply to the President. This is clear from the plain text of the statute, which encompasses a wide range of federal employees yet conspicuously offers no basis for covering the President. That textual conclusion is confirmed by a host of constitutional, statutory, legislative, judicial, and executive branch authorities. The bottom line is that the President enjoys absolute immunity from damages claims based on conduct within the outer perimeter of his official responsibilities, but is not shielded by the FTCA for tortious acts committed within the scope of his employment.

In any event, there is no merit to the Justice Department's certification that Trump acted within the scope of his employment as President in defaming Carroll. Under New York law (which controls), and as confirmed by the Complaint (which must be taken as true), Trump acted for decidedly personal reasons unrelated to furthering any interests of the United States. Moreover, it is inconceivable that Trump's employers—*a.k.a.*, the American people—expect his job to include viciously defaming a woman he sexually assaulted. In asserting otherwise, the Justice Department opines that elected officials *always* act within the scope of their office when speaking with the press, even about personal matters. *See* ECF No. 3-1 at 4. But the cases that the Justice Department cites do not support that categorical claim. No legal authority holds that elected officials may— within the scope of their federal employment—defame anyone, at any time, for any reason, no matter how personal their motives or statements, so long as a journalist overhears them.

"Public office does not carry with it a license to defame at will, for even the highest officers exist to serve the public, not to denigrate its members." *Clark v. McGee*, 49 N.Y.2d 613, 618-19 (1980). If accepted, the Justice Department's extreme position would distort the law and dishonor the Office of the Presidency. This Court should therefore deny the motion to substitute.

## BACKGROUND

### I.      Factual Background

#### A.      Trump Sexually Assaults Carroll

One evening between the fall of 1995 and spring of 1996, Carroll went to shop at the Bergdorf Goodman department store in Manhattan after work. Compl. ¶ 22. As she exited through the revolving glass doors on the north side of the building, Trump entered through the same doors from 58th Street (across from the Plaza Hotel). *Id.* at ¶ 23. Recognizing Carroll—they had met at least once before, they traveled in similar circles, and Carroll was then a frequent guest on the *Today* show as well as the host of the *Ask E. Jean* show—Trump put his hand up to stop Carroll,

saying: "Hey, you're that advice lady!" *Id.* at ¶¶ 24-25. Trump told Carroll that he was at Bergdorf's to buy a present "for a girl" and asked Carroll to advise him. *Id.* at ¶ 26. Surprised, but anticipating the funny stories she might later tell, Carroll agreed to help Trump shop for a gift. *Id.*

After first considering other items, Trump decided to buy lingerie. *Id.* at ¶¶ 27-29. When he and Carroll arrived at the lingerie department, it was uncharacteristically empty, with no sales attendant in sight. *Id.* at ¶ 30. Trump snatched a see-through bodysuit and insisted that Carroll try it on. *Id.* at ¶ 31. Bemused, Carroll responded that he should try it on himself. *Id.* Trump and Carroll then went back and forth, teasing each other about who should try on the bodysuit. *Id.*

Suddenly, Trump grabbed Carroll's arm and said, "Let's put this on." *Id.* at ¶ 32. Trump maneuvered Carroll into a dressing room, shut the door, and lunged at her—knocking her head against the wall. *Id.* at ¶¶ 33-36. He then forcibly put his mouth on her lips. *Id.* at ¶ 36. Shocked by Trump's behavior, Carroll shoved him back and burst out in awkward laughter, hoping that he would retreat. *Id.* at ¶ 37. But Trump did no such thing: he seized both of Carroll's arms and pushed her up against the wall again. *Id.* at ¶ 38. Trump then jammed his hand under her coatdress and pulled down her tights. *Id.* He opened his overcoat, unzipped his pants, pushed his fingers around Carroll's genitals, and forced his penis inside of her. *Id.* at ¶ 39. Carroll resisted, struggling to break free. She tried to stomp Trump's foot with her high heels. She tried to push him away. Finally, she raised a knee up high enough to push him off of her. *Id.* at ¶ 40. Carroll ran out of the dressing room, out of Bergdorf's, and onto Fifth Avenue. *Id.* at ¶ 41.

## B.   Carroll Publicly Reveals that Trump Sexually Assaulted Her

Immediately after Trump attacked her, Carroll told two close friends. *See id.* at ¶¶ 43, 47. One urged her to report the crime, but the other warned her that Trump would ruin her life if she did. *See id.* at ¶¶ 44-48. Carroll chose silence. She knew how brutal Trump could be and was convinced that nobody would believe her. Like so many other survivors of sexual assault, Carroll

also blamed herself. *Id.* at ¶ 50. Carroll did not mention the assault to another soul for over twenty years—not wanting to be perceived or to see herself as a victim of rape. *Id.* at ¶ 53.

For the next two decades, Carroll pursued her career as a writer and advice columnist while concealing her own trauma. *Id.* at ¶ 59-60. During the last month of the 2016 election, several women publicly revealed that Trump had engaged in sexual misconduct. *Id.* at ¶ 61. Carroll saw Trump savage their reputations on the national stage. *Id.* During this period, though, Carroll was focused on attending to her mother, who was then in hospice care. *Id.* at ¶ 62. Carroll feared that speaking up would cause a media storm and destroy her mother's remaining time. *Id.* It was only after her mother died and the #MeToo movement empowered survivors of sexual assault to come forward that Carroll finally decided to reveal the truth. *Id.* at ¶¶ 65-73. A writer to her core, and determined to tell her story on her own terms, Carroll described Trump's attack in a book released on July 2, 2019. *Id.* at ¶¶ 77, 80. On June 21, 2019, *New York* magazine published a pre-publication excerpt from Carroll's book detailing Trump's attack. *Id.* at ¶ 79.

### C.   Trump Slanders Carroll on Three Separate Occasions

Trump responded to Carroll's account with a slew of lies. He denied the rape. He even went so far as to insult her physical appearance, saying "she's not my type." *Id.* at ¶ 97. But he did not stop there: he also denied ever having met Carroll or knowing who she was. Through express statements and deliberate implications, he accused Carroll of lying about the rape in order to increase book sales, carry out a political agenda, advance a conspiracy with the Democratic Party, and make money. *Id.* at ¶ 11. He also implied that she had falsely accused other men of rape. Trump made these false and defamatory statements, detailed below, from June 21 to 24, 2019.

### 1.   June 21, 2019 Statement

On June 21, 2019, a Bloomberg reporter, Laura Litvan, tweeted a statement from Trump concerning Carroll (*see below*). According to Trump's initial disclosures here, Deputy White

4

House Press Secretary Judd Deere sent this statement to Litvan. It does not appear this statement was provided on White House letterhead or with any other signs of official process:



**2.**     **June 22, 2019 Statement**

The next day, while departing the White House, Trump made the following statement in response to a question from a reporter:

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.

Compl. ¶ 91; *see id.* at ¶ 110 (photo of Carroll, Trump, and their then-spouses at a social event).

### 3.    June 24, 2019 Statement

Two days later, during an interview with reporters from *The Hill* and in response to an inquiry about Carroll's accusation, Trump stated, "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened." *Id.* at ¶ 97. During the June 24

interview, Trump discussed a range of topics, including the upcoming 2020 election as well as the possibility that President Barack Obama might endorse Vice President Biden in that race.[1]

## II.     Procedural History

### A.     Carroll Files Suit Against Trump in State Court

On November 4, 2019, Carroll filed this action in New York State Supreme Court to redress the injuries Trump's defamation caused and to vindicate her reputation through a public airing of the truth. In her Complaint, Carroll alleged one claim of defamation—and unquestionably alleged the elements of that claim. *First*, she identified eleven specific false and defamatory statements contained within the President's June 21, 22, and 24 remarks. *See* Compl. at ¶¶ 85-90, 93-96, 100. *Second*, she set forth comprehensive, detailed allegations demonstrating that Trump made each of these statements with actual malice. *See id.* at ¶¶ 106-128. *Third*, the Complaint alleged concrete reputational and financial harm resulting from Trump's defamatory statements. *See id.* at ¶¶ 129-136. In short, Carroll alleged a strong defamation claim against Trump for his demeaning, false, and barbaric response to her accusation that he attacked her two decades earlier.

### B.     Trump Defends the Proceedings in State Court

From the very start of this action, Trump has done everything in his power to stop the truth from coming out. He first refused to accept service of the Complaint, forcing Carroll to seek leave of court to serve him through alternative means. NYSECF Doc. No. 15. Trump next filed a motion to dismiss the Complaint based on his spurious assertion that he was no longer subject to personal jurisdiction in New York. NYSECF Doc. No. 33. That too was rejected. NYSECF Doc. No. 36.

When those efforts failed, Trump filed a motion to stay this action pending a decision by the New York Court of Appeals in *Zervos v. Trump*—a case involving another woman who had

---

[1] Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, THE HILL (June 24, 2019).

accused Trump of sexual assault. (Trump had previously claimed Zervos's case was so different from Carroll's case that the two should not be assigned to the same judge. NYSECF Docs. No. 25, 43.) In his stay motion, Trump argued that he was entitled to absolute immunity and that resolution of Carroll's case should await a decision in *Zervos*. Notably, this motion was filed just six days after Carroll served discovery requests on Trump, including one seeking a cheek swab for DNA to be compared against unidentified male DNA that experts had taken from the Donna Karan dress that Carroll was wearing that day at Bergdorf's. On August 6, 2020, shortly after the United States Supreme Court decided *Trump v. Vance*, 140 S. Ct. 2412 (2020), the New York trial judge (Saunders, J.), relying on *Vance*, denied Trump's motion to stay, thereby restarting the clock for the pending discovery deadlines.[2] NYSECF Doc. No. 110.

Following the denial of his stay motion, Trump and his lawyers spent the next four weeks stonewalling Carroll's efforts to resume discovery. During this period, his private counsel consistently communicated his intent to litigate Carroll's claims in state court, including by taking an interlocutory appeal as of right to the Appellate Division from the denial of Trump's stay motion. *See* Kaplan Affidavit Ex. A-H. But even as Trump's private counsel in New York made those statements, his client was hard at work in Washington, D.C. devising another stratagem to avoid accountability for slandering a woman he had sexually assaulted.

### C.    The Department of Justice Files a Motion to Substitute

On September 8, 2020—the deadline for Trump to appeal the denial of his stay motion to the Appellate Division—the Justice Department removed this case to federal district court and filed a motion to substitute the United States as defendant. As the Attorney General later

---

[2] After the stay was lifted, the date for Trump to respond to Carroll's Second Set of Document Requests became August 14, 2020. *See* Kaplan Affidavit Ex. A. Following a meet and confer, Carroll agreed to extend that deadline to August 21. *See* Kaplan Affidavit Ex. B. Nevertheless, Trump refused to produce a single document.

acknowledged, the Justice Department took that step in response to a request from the White House. *See* Katie Brenner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. TIMES (Sept. 9, 2020). It does not appear that the White House directed the Justice Department to intercede in response to any new facts in this case, which had been pending for over ten months in state court without any suggestion that it was somehow a case against the United States. Rather, the Justice Department intervened to shield Trump from legal accountability only after his state court stall tactics, procedural gambits, and assertions of immunity were all rejected. This highly irregular maneuver prompted widespread condemnation from public officials and legal experts—in part because it forced the American people to pay for Trump's legal defense in a suit about his private sexual misconduct.[3]

## STANDARD OF REVIEW

This case was removed to federal court upon the Attorney General's certification under the Westfall Act that a federal employee was acting within the scope of his office or employment at the time of the tortious conduct alleged in the complaint. *See* 28 U.S.C. § 2679(d). The Attorney General's certification is conclusive of this Court's removal jurisdiction. *See Osborn v. Haley*, 549 U.S. 225, 233-34, 127 S. Ct. 881, 889-90 (2007). But his scope of employment determination under the Westfall Act is judicially reviewable in the posture of a motion to substitute the United States as defendant. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420, 115 S. Ct. 2227, 2229 (1995). In assessing the Justice Department's motion to substitute, "[t]he certification is subject to *de novo* judicial review." *Bowles v. United States*, 685 F. App'x 21, 23 (2d Cir. 2017).

---

[3] *See, e.g.*, Leah Litman, *The Justice Department Says Defaming Women is Part of Trump's Job. Literally.*, WASH. POST (September 10, 2020) (expressing doubt "that the Federal Tort Claims Act . . . applies to the President"); Noah Bookbinder, *Now Trump Wants Americans to Pay for his Defense in a Rape-Related Defamation Case*, USA TODAY (September 14, 2020) ("The DOJ move was shocking because it went well beyond the legal standard to argue that the president's statements about Carroll were official actions.").

In undertaking that *de novo* review, this Court must view "the tortious conduct in the light most favorable to plaintiff" and may consider evidence outside the pleadings to make "findings of fact with respect to the scope of the tortfeasor's employment." *Davila v. Lang*, 343 F. Supp. 3d 254, 270-71 (S.D.N.Y. 2018); *Bello v. United States*, 93 F. App'x 288, 289-90 (2d Cir. 2004).

## ARGUMENT

The Justice Department's motion should be denied for two reasons: (1) the FTCA does not cover the President; and (2) even if it does, the President was not acting within the scope of his employment when he made the eleven defamatory statements alleged in the Complaint.

## I.      The FTCA Does Not Cover the President

Statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S. Ct. 1587, 1593 (2004). It is particularly vital to respect that principle in construing waivers of sovereign immunity such as the FTCA. *See Cooke v. United States*, 918 F.3d 77, 82 (2d Cir. 2019). While several courts have assumed (without analysis) or suggested (in dicta) that the FTCA covers the President, none offered any reasons—textual or otherwise—to support that proposition (which does not appear to have been briefed in those litigations).[4] The Second Circuit has not addressed the question.

The FTCA is a limited waiver of sovereign immunity that covers "any employee of the Government." 28 U.S.C. § 1346(b)(1). That broad phrase, however, is given a narrower definition in 28 U.S.C. § 2671:  it covers "officers or employees of any federal agency," as well as several

---

[4] *See, e.g.*, *Does 1-10 v. Haaland*, No. 19-6347, 2020 WL 5242402, at *4 (6th Cir. Sept. 3, 2020); *Saleh v. Bush*, 848 F.3d 880, 889-92 (9th Cir. 2017); *Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008); *Klayman v. Obama*, 125 F. Supp. 3d 67, 85 (D.D.C. 2015); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998); *Dumas v. President of U.S.*, 554 F. Supp. 10, 15 (D. Conn. 1982). Mindful of this Court's page limitations, we are not providing discussion of these cases, but would be happy to do so if the Court determines it would be helpful.

other categories not applicable here.[5] The phrase "federal agency," in turn, is defined by the FTCA as including "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States . . . ." 28 U.S.C. § 2671.

Reading these provisions together, the relevant question in this case is whether the President is an "officer[] or employee[]" of any enumerated "federal agency." Since he obviously is not an officer or employee of "the judicial and legislative branches," "the military departments," or "corporations primarily acting as instrumentalities or agencies of the United States," that leaves as possibilities only "the executive departments" and "independent establishments of the United States."[6] But, as we demonstrate below, those terms have well-understood meanings that are not consistent with treating the President as covered by the FTCA. This conclusion is supported by a negative implication from the statutory text:  whereas the FTCA *does* cover "the judicial and legislative branches," it explicitly *does not* cover "the executive branch." *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) ("The President is the only person who alone composes a branch of government."). Instead, it applies only to entities—executive departments and independent establishments—that have long been understood as distinct from the Presidency itself.

## A.   The President is Not an Officer or Employee of an Executive Department

The phrase "executive departments" has a settled meaning under federal law: it refers to Cabinet-level agencies. This is confirmed by a host of sources. Most notably, Title 5 of the U.S.

---

[5] Those other categories also include: "members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty . . . , and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," and "any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18." 28 U.S.C. § 2671.

[6] To the extent the Justice Department argues that the FTCA might elsewhere cover the President as an officer of "the military departments," it is implausible that he was acting within the scope of his employment *as an officer of the military* when he defamed Carroll. Even if that provision might apply in some cases, this is clearly not one of them.

Code—entitled "Government Organization and Employees"—defines "executive departments" as the fifteen Cabinet-level agencies: the Departments of State, Treasury, Defense, Justice, Interior, Agriculture, Commerce, Labor, Health and Human Services, Housing and Urban Development, Transportation, Energy, Education, Veterans Affairs, and Homeland Security. 5 U.S.C. § 101; *see also Haddon v. Walters*, 43 F.3d 1488, 1490 (D.C. Cir. 1995) (describing 5 U.S.C. § 101 as setting forth an "exclusive list of Executive departments"). While there were fewer Cabinet departments when the FTCA was enacted in 1946, the U.S. Code set forth an analogous definition of "executive departments" at that time. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) (looking to time of enactment). And that straightforward definition of the phrase traces all the way back to the work of the First Congress, which created the "Executive department[s]" of Foreign Affairs and War—and directed that they be led by a "principal officer." Act of July 27, 1789, ch. 4, 1st Cong. 28-29 (Foreign Affairs); Act of Aug. 7, 1789, ch. 8, 1st Cong. 49-50 (War).

All three branches of government have recognized this understanding of "executive departments." For example, in *United States v. Germaine*, the Supreme Court held that the phrase "executive Departments" in the Opinions Clause of the Constitution—which authorizes the President to "require the opinion, in writing, of the principal Officer in each of the executive Departments"—referred only to Cabinet members. *See* 99 U.S. 508, 511 (1878). Over a century later, in *Freytag v. Commissioner*, the Supreme Court observed that the phrase "executive departments" in Section 4 of the Twenty-Fifth Amendment was intended and understood by Congress to refer only to Cabinet-level entities. *See* 501 U.S. 868, 887, 111 S. Ct. 2631, 2643 (1991) (discussing H.R. Rep. No. 203, 89th Cong., 1st Sess., 3 (1965)). The Office of Legal Counsel (OLC) later embraced this interpretation of "executive departments" in the Twenty-Fifth

Amendment—and cited 5 U.S.C. § 101 to support its view. *See Operation of the Twenty-Fifth Amendment Respecting Presidential Succession*, 9 Op. O.L.C. 65, 69, 1985 WL 185391 (1985).[7]

Giving "executive departments" its settled meaning, the FTCA covers the President on this basis only if he is an officer or employee of the Cabinet-level agencies. But he is neither of those things. While American law books are littered with countless theories of the relation between Presidents and executive departments, nowhere is the President considered to be an officer or employee of the Department of Commerce. Instead, he maintains a general supervisory power—anchored in the Vesting, Take Care, and Appointments Clauses—over the executive departments, each of which has its own employees and is headed by a distinct principal officer subject to Senate confirmation and statutory limitations. *See Seila Law LLC v. C.F.P.B.*, 140 S. Ct. 2183, 2197-2205 (2020); Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 Yale L.J. 1836 (2015).

This understanding is supported by a wide range of sources. Returning to the Opinions Clause in Article II, it would make no sense to say that the President "may require the opinion . . . of the principal officer in each of the executive Departments" if he is also, in fact, an officer of those departments. Nor would it make sense to describe someone else as the "principal officer" of a department if the President is also an officer there. Indeed, Article II, Section 2 elsewhere authorizes the appointment of "inferior Officers" by *either* "the President alone, in the Courts of Law, *or* in the Heads of Departments," U.S. Const. art. II, § 2 (emphasis added)—a rule which presumes a distinction in identity between "the President" and "the Heads of Departments."

---

[7] In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court ever so slightly broadened its interpretation of "Departmen[t]" for purposes of the Appointments Clause of the Constitution, extending it to cover principal agencies such as the Securities and Exchange Commission. 561 U.S. 477, 510–11, 130 S. Ct. 3138, 3162-63 (2010). In so doing, it did not alter the settled meaning of "executive departments" and, in all events, it adhered to an understanding of the phrase "Departmen[t]" that confines it to principal agencies such as the SEC.

That distinction runs consistently through federal law. Most notably, it is reflected in the statutes that create the executive departments and define their personnel—including the specification of "officer" positions at each agency, none of which defines the President as himself an "officer." *See, e.g.*, 43 U.S.C. §§ 1451-1456 (Interior); 15 U.S.C. §§ 1501, 1503a, 1503b, 1505, 1506, 1507, 1507b, 1507c, 1508 (Commerce); 42 U.S.C. §§ 3532(a), 3533 (HUD); 42 U.S.C. §§ 7131, 7132 (Energy); 20 U.S.C. §§ 3411, 3412 (Education). The organizational plan defined by those statutes is reflected on the websites of the executive departments, all of which list their officers and none of which list the President among that group.[8] This reading is also consistent with the definitive *Federal Government Manual* from 1946, which shows the President as the sole officer under "executive" and no appearance by the President in any of the charts for the individual executive departments or other agencies. *See U.S. Government Manual* 570, 576-602 (1946).

In addition, countless statutes use disjunctive language—"or"—to refer to the President and the executive departments as distinct. The Federal Vacancies Reform Act, for example, allows "the President, a court, or the head of an Executive department" to designate a temporary acting officer. 5 U.S.C. § 3347. The Coronavirus Economic Stabilization Act similarly limits certain transactions by "the President, the Vice President, the head of an Executive department, or a

---

[8] Department of State, Organizational Chart (Feb. 2020), https://www.state.gov/wp-content/uploads/2020/02/Dept-Org-Chart-Feb-2020-508.pdf; Department of the Treasury, Organizational Chart, https://home.treasury.gov/about/general-information/organizational-chart; Department of Defense, Our Leaders, https://www.defense.gov/Our-Story/Meet-the-Team/; Department of Justice, Organizational Chart (Feb. 2018), https://www.justice.gov/agencies/chart; Department of the Interior, Interior Leadership, https://www.doi.gov/interior-leadership; Department of Agriculture, Organization Chart (Aug. 2020), https://www.usda.gov/sites/default/files/documents/usda-organization-chart.pdf; Department of Commerce, Leadership, https://www.commerce.gov/about/leadership; Department of Labor, Leadership Team, https://www.dol.gov/general/contact/contact-phonekeypersonnel; Department of Health and Human Services, Organizational Chart, https://www.hhs.gov/about/agencies/orgchart/index.html; Department of Housing and Urban Development, Leadership, https://www.hud.gov/about/leadership; Department of Transportation, Government Officials at the U.S. Department of Transportation, https://www.transportation.gov/mission/meet-key-officials; Department of Energy, Leadership, https://www.energy.gov/leadership; Department of Education, Operating Structure, https://www2.ed.gov/about/offices/or/index.html; Department of Veterans Affairs, Functional Organization Manual Version 5.0 at 3-5, https://www.va.gov/FOM-5-Final-July-2019.pdf; Department of Homeland Security, Organizational Chart, https://www.dhs.gov/sites/default/files/publications/19_1205_dhs-organizational-chart.pdf.

Member of Congress." 15 U.S.C. § 9054(a)(3). And "Federal agency" is defined for purposes of the chapter about the Federal Register to mean "the President of the United States, *or* an executive department." 44 U.S.C. § 1501 (emphasis added). And so on.

OLC put the point clearly in a recent decision on testimonial immunity: "[A]s a function of the independence and autonomy of the President himself," the President's immediate advisors "are *constitutionally distinct* from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes." *Testimonial Immunity Before Congress of the Former Counsel to the President*, Op. O.L.C., 2019 WL 2315338, at *2 (May 20, 2019) (emphasis added). That constitutional distinction explains why the President cannot be both the President *and* an officer or employee of the "executive departments" under the FTCA.

## B. The President is Not an Officer or Employee of an Independent Establishment of the United States

If the President is not an officer or employee of the "executive departments," that leaves only one possible textual basis for concluding that he is covered by the FTCA: namely, that he is an officer or employee of an "independent establishment[] of the United States." 28 U.S.C. § 2671. On the face of the statute, however, there is little to commend this interpretation. The text refers separately to "the executive departments" and "the judicial and legislative branches," suggesting that it does not cover the entirety of "the executive branch." And it would be strange for Congress to tuck the President within the FTCA's coverage by referring obliquely, in the fourth clause of the definitional term—between "the military departments" and "corporations primarily acting as instrumentalities or agencies of the United States"—to "independent establishments." Congress is not presumed to hide elephants in mouseholes, nor should we expect it to hide Presidents within subsidiary (and in this case quaternary) definitional terms.

Once again, both text and history confirm this interpretation. The Attorney General has described the White House as the referring agency for purposes of the Westfall Act certification here. Although it is conceivable that the Justice Department will also refer to the Executive Office of the President (EOP), neither office ranks as an "independent establishment[]"—and, in any event, the President is not actually designated as an officer or employee of either entity.

Starting with the plain meaning of the text, the FTCA does not define "independent establishments" (and when the Act was passed in 1946, neither did Title 5). But that year, the *U.S. Government Manual* identified 26 "independent offices and establishments" in its authoritative organizational chart of the executive branch—and EOP and the White House Office were not among them. *See U.S. Government Manual* 570 (1946). Instead, they were placed beside the President and labeled "permanent staff agencies." *Id.* This was consistent with how they had been understood since their creation in 1939—at which point they were neither ranked nor situated among other entities expressly described as "independent establishments."[9]

In 1966, Congress added a definition for "independent establishment" to Title 5, deeming it for purposes of that title to mean an "establishment in the executive department (other than the United States Postal Service or the Postal Regulatory Commission) which is not an Executive department, military department, Government corporation, or part thereof, or part of an

---

[9] President Franklin D. Roosevelt created the EOP and White House Office as part of a large-scale reorganization of the executive branch. *See* Exec. Order No. 8248, 4 Fed. Reg. 3864 (Sept. 12, 1939). The EOP was created to ensure that "the President will have adequate machinery for the administrative management of the Executive branch of the Government." *Id.* The White House Office was to be a "division[] of the Executive Office of the President" designed "to serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office." *Id.* § II(1). His Executive Order did not describe either entity as "independent." This was a telling omission, since the very same Executive Order addressed itself directly to several "independent establishments" and announced the President's intent to rearrange them. Specifically, President Roosevelt intended to "set up a Federal Security Agency, a Federal Works Agency, and a Federal Loan Agency, and then to distribute among the 10 executive departments and these 3 new agencies, the major independent establishments in the Government." 84 Cong. Rec. 4,708, 4,710 (1939) (Reorganization Plan No. I—Message from the President). Those "major independent establishments," in turn, included the Social Security Board and the Civilian Conservation Corps. *Id.*; *see also U.S. Government Manual* 473, 475 (1939) (illustrating which independent establishments were moved into which component). Again, there was no mention of EOP or the White House Office as "independent establishments."

independent establishment." Pub. L. No. 89-554, 80 Stat. 378, 379 (1966) (codified at 5 U.S.C. § 104). At the same time, the *U.S. Government Manual* continued to reflect the distinction between what were then called "independent agencies" and other entities in the executive branch, including the White House and the EOP. *See Contents*, *U.S. Gov't Manual* at v-vii (1966/67).[10]

This is no coincidence. In *Haddon v. Walters*, the D.C. Circuit held that the Executive Residence at the White House does not fall within the definition of "independent establishment" in 5 U.S.C. § 104. 43 F.3d 1488, 1490 (D.C. Cir. 1995). In reasoning directly applicable to this case, *Haddon* based its conclusion mainly on 3 U.S.C. § 112, where Congress allowed "[t]he head of any department, agency, or independent establishment of the executive branch of the Government [to] detail, from time to time, employees of such department, agency, or establishment to the White House Office, the Executive Residence at the White House, the Office of the Vice President, the Domestic Policy Staff, and the Office of Administration." *Id.* As *Haddon* noted, "[t]hat Congress distinguished the Executive Residence from the independent establishments, whatever they may be, suggests that Congress does not regard the Executive Residence to be an independent establishment, as it uses that term." *Id*. Whereas *Haddon* highlighted § 112's reference to the "Executive Residence," here the notable phrase is "White House Office." But the conclusion is the same: "Congress has used the term 'independent establishment' in distinction to

---

[10] That remained true after passage of the Westfall Act in 1988: the 1988 version of the *U.S. Government Manual* dutifully separated "The President of the United States," the "Executive Office of the President," and "The White House Office," from "Executive Agencies" consisting of "Departments," "Independent Establishments and Government Corporations," "Guide to Boards, Committees, and Commissions," and "Quasi-Official Agencies" on the other. *U.S. Government Manual* at v-vii (1988/89). In fact, most recent version of the *U.S. Government Manual* draws the same distinction between the President, EOP, the White House Office, and what it now calls "Independent Agencies and Government Corporations" (but historically described as "independent establishments").

the [White House Office] . . . [which] suggests that Congress does not regard the [White House Office] to be an independent establishment, as it uses that term." *See id.*[11]

It is not only courts and Congress that have noted the distinction between "independent establishments" and the White House and EOP. In 2009, OLC noted that it has "espoused more recently" the view that "EOP is not an independent establishment" within the meaning of 5 U.S.C. § 104. *See* Memorandum for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 (Sept. 17, 2009). Eight years later—while addressing a definition of "Executive agency" that includes "independent establishments"—OLC concluded that "the White House Office is not an 'Executive agency' insofar as the laws on employment and compensation are concerned." *Application of the Anti-Nepotism Statute to a Presidential Appointment in the White House Office*, Op. O.L.C., 2018 WL 5653623, at *5 (Jan. 20, 2017); *see also id.* (discussing *Haddon* and observing that "the general treatment of the White House Office under title 3 instead of title 5 undergird this conclusion").

Two final points support this conclusion. First, in many other contexts, Congress has denominated entities as "independent establishments"—yet it has not does so for the White House Office or EOP.[12] And second, in construing the term "independent establishments" in the FTCA context, courts have considered only entities like the Postal Service, the Smithsonian Institution, and the Kennedy Center; the logic of these decisions does not suggest that Congress covered the

---

[11] The D.C. Circuit dismissed FTCA claims as outside the scope of employment in a related case by the same plaintiff against a White House electrician. *Haddon v. United States*, 68 F.3d 1420 (D.C. Cir. 1995). The court did not address in that case whether the employee fit within § 2671's definition in the first place—neither party raised it in their brief.

[12] For instance, the Office of Personnel Management "is an independent establishment in the executive branch." 5 U.S.C. § 1101. So are the Federal Maritime Commission, 46 U.S.C. § 301, the U.S. Postal Service, 39 U.S.C. § 201, and the Surface Transportation Board, 49 U.S.C. § 1301. The National Transportation Safety Board is also an independent establishment, 49 U.S.C. § 1111, along with the Armed Forces Retirement Home, 24 U.S.C. § 411.

President and the Kennedy Center in a single statutory breath. *See Thompson v. United States*, 795 F. App'x 15, 18 n.3 (2d Cir. 2019) (USPS); *Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian, Inc.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (Smithsonian); *Polcari v. John F. Kennedy Center for Performing Arts*, 712 F. Supp. 230, 231-32 (D.D.C. 1989) (Kennedy Center).

In any event, the President is not covered under the FTCA's "independent establishments" language because he is not an officer or employee of the White House Office or the EOP. To start, he is plainly not an "employee" of either entity, both of which exist to support him. Nor is he an officer of the EOP or the White House Office. In fact, he is not even *part* of these offices. As the *U.S. Government Manual* confirms, the President occupies a constitutional office at the head of the executive branch: he is not an "officer" of his own support staff. The White House Office itself has acted consistent with that view: the President is not listed as an officer or employee in EOP's annual report to Congress on White House Office Personnel. *See* EOP, *Annual Report to Congress on White House Office Personnel* (June 26, 2020). The White House website says the EOP is "overseen by the White House Chief of Staff." *See* White House, *The Executive Branch*. And under the Obama Administration, too, the Plum Book—created by congressional committees based on information from the Office of Personnel Management—did not list President Obama as part of the EOP or the White House Office. *See* U.S. Senate, Committee on Homeland Security and Governmental Affairs, *Policy and Supporting Positions* 2-6 (Dec. 1, 2016).

In sum, while the President *is* the Executive Branch, he is not an officer or employee of any discrete executive department or any independent establishment within it.

### C.    Interpretive and Immunity Principles Confirm This Reading of the FTCA

Two final considerations confirm that the President is not covered by the FTCA. *First*, the FTCA does not include an express statement that it applies to the President, even though Congress ordinarily must include such clear language in a statute that covers the President (and that may in

some cases constrain his ability to take charge of his own legal defense). *See Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465-67, 109 S. Ct. 2558, 2564-65 (1989). Indeed, it was the absence of such an express statement in the APA—passed just two months before the FTCA—which later led the Supreme Court to hold that its definition of "agency" could not be applied to the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01, 112 S. Ct. 2767, 2775-76 (1992).[13]

*Second*, reading the FTCA in this manner coheres with long-settled principles of absolute immunity. The President has historically been treated as absolutely immune for damages liability based on actions within the outer perimeter of his official responsibilities. *See Nixon v. Fitzgerald*, 457 U.S. 731, 756, 102 S. Ct. 2690, 2704 (1982); *id.* at 758, 102 S. Ct. 2690 & n.1 (Burger, C.J., concurring). Given the unique nature of his office, there is likely little daylight between the scope of the President's employment for FTCA purposes and the scope of his official responsibilities for absolute immunity purposes. (Indeed, as discussed above, in this very case Carroll spent months litigating Trump's assertion of absolute immunity.) And so Congress would have had no reason— either in 1946, or in 1988 when the Westfall Act made the FTCA an exclusive remedy, Pub. L. No. 100-694, 102 Stat. 4563 (1988)—to include the President in the FTCA's coverage.[14]

---

[13] The Justice Department's Supreme Court brief in *Franklin* is consistent with the reasons given above for concluding that the President is not an officer or employee of a "federal agency" as that term is defined in 28 U.S.C. § 2671: "The term 'agency' would be a peculiar way to refer to the President in any event, since an 'agency' is generally understood as being responsible to a principal. The President, of course, is not the agent of any principal, but rather is the principal—the constitutional officer in the Executive Branch to whom the agencies in that Branch are responsible." Br. for Appellants at 30 n.16, *Franklin v. Massachusetts*, 505 U.S. 788, 112 S. Ct. 2767 (No. 91-1502).

[14] Consulting legislative history only deepens this gulf between the FTCA's purposes and the President's duties. When the FTCA was enacted, "[u]ppermost in the collective mind of Congress were the ordinary common-law torts," and "the example which is reiterated in the course of the repeated proposals for submitting the United States to tort liability is negligence in the operation of vehicles." *Dalehite v. United States*, 346 U.S. 15, 28, 73 S. Ct. 956, 964 (1953), *abrogated on other grounds*, *Indian Towing Co. v. United States*, 350 U.S. 61, 76, 76 S. Ct. 122, 130 (1955). There is no reason to believe that legislators concerned mainly with automobile accidents committed by the likes of postal workers saw any need to cover the President. Until *Bivens*, there were "fewer than a handful of damages actions" *ever* filed against the President, *Nixon*, 457 U.S. at 750 n.31, 102 S. Ct. at 2701, confirming that Congress had no particular need to apply the FTCA to the single federal official with the broadest immunity attached to his office.

## II.     Trump Was Not Acting Within the Scope of His Job as President When He Defamed Carroll For Revealing That He Sexually Assaulted Her

In the alternative, the Justice Department's motion should be denied because Trump was not acting within the scope of his office or employment when he defamed Carroll.

### A.     New York Law Governs the Scope of Employment Inquiry

Whether an officer or employee acted "within the scope of his or her employment for purposes of the Westfall Act is determined by reference to 'principles of *respondeat superior* of the state in which the alleged tort occurred.'" *Bowles*, 685 F. App'x at 24 (citation omitted). Here, Trump's acts of defamation "occurred" in New York. As the Second Circuit has noted, New York treats defamation as a "conduct regulating rule" and therefore the "situs of the tort" controls the choice of law analysis. *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). "Because 'the locus of the tort is where the plaintiff suffered injury, often the Court can resolve the choice of law analysis [in a defamation action] simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.'" *Adelson v. Harris*, 973 F. Supp. 2d 467, 476 (S.D.N.Y. 2013) (citation omitted); *accord Reeves v. Am. Broad. Companies, Inc.*, 719 F.2d 602, 605 (2d Cir. 1983) ("[T]he state of the plaintiff's domicile will usually have the most significant relationship to the case."); *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, No. 06 Civ. 11407, 2007 WL 4820968, at *4 (S.D.N.Y. Sept. 18, 2007) ("Where the plaintiff suffered injury usually determines the locus of the tort in an action for defamation."). Carroll is domiciled in New York. That is where she suffered the greatest injury to her reputation. Therefore, the tort at issue in this case "occurred" in New York and New York law governs the inquiry into whether Trump acted within the scope of his employment. *See Bowles*, 685 F. App'x at 24.

To be sure, where a "defamatory statement is published nationally, there is only a 'presumptive' rule that the law of plaintiff's domicile applies." *Adelson*, 973 F. Supp. 2d at 477

(citation omitted). Yet even then, "[i]t is most often assumed that the state of plaintiff's domicile is where the greatest injury occurred, and that this is the state with the most significant interest in the litigation." *Test Masters*, 2007 WL 4820968, at \*4. Here, both of those factors cut decisively in favor of concluding that Trump's acts of defamation "occurred" in New York. And so do a host of additional factors: Trump made the statements in direct response to an essay published in a New York magazine; the subject matter of his statements concerned conduct that occurred exclusively in New York; Trump himself was a New York resident when the underlying events occurred and remains a New York resident (as evidenced by his failed objections to personal jurisdiction in the state court); and this case was filed in a New York forum. *See Reeves v. Am. Broadcasting Cos.*, 580 F. Supp. 84, 90 (S.D.N.Y. 1983) (applying California law to a multistate defamation action because plaintiff was a California resident, suffered the most injury in California, and the defamatory statement focused on activities that took place in California, "notwithstanding" that the defamatory statement "was broadcast nationwide from Washington, D.C.").[15]

### B.  Under New York Law, A Person Acts Outside the Scope of Their Employment When They Act for Personal Reasons to Obtain a Personal Benefit

"Under the common-law doctrine of *respondeat superior*, an employer . . . may be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment." *Rivera v. State*, 34 N.Y.3d 383, 389-90 (2019). "The employer may

---

[15] The Sixth Circuit's choice of law analysis in *Does 1-10 v. Haaland* is instructive. *See* No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020). In that FTCA case, the plaintiffs filed suit in Kentucky, alleging that Senator Elizabeth Warren (Massachusetts) and Representative Debra Haaland (New Mexico) had defamed them through statements published on their official Congressional Twitter accounts. On those facts, the Sixth Circuit easily concluded that "the conduct—i.e., the allegedly defamatory tweets—occurred in Kentucky because Plaintiffs live in Kentucky and the tweets were accessible in that state." *Id.* at \*5 (citations omitted). The same fundamental logic controls the analysis here: Trump's statements were aimed at a New York resident, injured that resident in New York, concerned conduct that had occurred in New York, and were accessible in New York.

To the extent relevant, the same result obtains under D.C.'s choice of law rules, where the "the law to be applied [in defamation cases] is that of the place where the plaintiff suffered injury by reason of [her] loss of reputation." *Weyrich v. New Republic Ins. Co.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (quoting *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984)); *see also Foretich v. CBS, Inc.*, 619 A.2d 48, 54 n.9 (D.C. 1993).

be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *Id.* (citation omitted). However, "[l]iability attaches 'for the tortious acts of . . . employees only if those acts were committed in furtherance of the employer's business and within the scope of employment.'" *Id.* (citation omitted); *see also Nicollette T. v. Hosp. for Joint Diseases/Orthopaedic Inst.*, 198 A.D.2d 54, 54–55 (1st Dept. 1993) ("[T]he mere fact that an employee's actions . . . occurred during the time of his employment, does not conclusively demonstrate that said actions were within the scope of his employment or that he was performing said acts in the furtherance of his employer's business." (citations omitted)).  In assessing whether a person acted within the scope of their employment, New York courts often consider "[t]he connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated." *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

As a matter of first principles, however, "there is no *respondeat superior* liability for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business." *Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 788 (3rd Dept. 1988); *accord Swarna v. Al-Awadi*, 622 F.3d 123, 144–45 (2d Cir. 2010); *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002); *Demas v. Levitsky*, 291 A.D.2d 653, 661 (3rd Dept. 2002); *Kirkman by Kirkman v. Astoria Gen. Hosp.*, 204 A.D.2d 401, 402 (2nd Dept. 1994). "Under such circumstances, the conduct—although occurring during the course of his employment—is outside the scope of [his] employment." *Ierardi v. Sisco*, 119 F.3d 183, 188 (2d Cir. 1997). That rule controls even if "an activity which benefits an employee personally could also have a possible benefit to the employer."

*Overton v. Ebert*, 180 A.D.2d 955, 957 (3rd Dept. 1992); *see also id.* (finding that an employee acted outside the scope of his employment when he "was acting for his own personal convenience and benefit and not in the furtherance of any duty owed to [his employer]").

Unsurprisingly, most applications of the "personal motives" doctrine have occurred in cases involving sexual assault, sexual harassment, or defamation claims arising from or relating to sexual misconduct. *See Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."); *see also Ierardi*, 119 F.3d at 188–89 (employee acted outside scope of employment in harassing another employee); *N.X.*, 97 N.Y.2d at 251 (surgeon acted outside scope of employment in sexually assaulting patient); *Heindel*, 138 A.D.2d at 788 (mall security guard acted outside scope of employment in sexually assaulting juvenile). In *Rausman v. Baugh*, for example, the Second Department overturned a finding that questions of fact precluded a determination of whether a hospital employee had acted "within the scope of her employment"—or instead "solely for personal motives"—in making an allegedly defamatory accusation of sexual harassment against another employee. 248 A.D.2d 8, 9-10 (2nd Dept. 1998). *Rausman* held that there was no basis for imposing liability on the employer for on "an employee's allegedly false accusation of sexual harassment," since such accusations were not made pursuant to "a duty to the employer." *Id.* at 12. *Rausman* added that making "defamatory" allegations of "alleged sexual harassment" was "certainly not a part of [the employee's] job description." *Id.* at 13.

*Perks v. Town of Huntington*, 251 F. Supp. 2d 1143 (E.D.N.Y. 2003), further illustrates this principle. There, William Perks (Huntington's Harbor Master) alleged that Councilwoman Susan Scarpati-Reilly "maneuvered herself into a position as one of his supervisors, whereupon

she initiated a sexual relationship with him and—once he terminated the relationship—sexually harassed, defamed, and conspired against him." *Id.* at 1148. Among other causes of action, Perks alleged two defamation claims against Scarpati-Reilly. *See id.* at 1164-1171. On both of these claims, Perks also sought recovery from Huntington on a *respondeat superior* theory—and on both claims, Judge Young (sitting by designation) granted summary judgment for Huntington, finding that Scarpati-Reilly had acted in furtherance of personal motives. *See id.*

His reasoning as to the first defamation claim is especially instructive. That claim arose from a false police report Scarpati-Reilly filed against Perks shortly after he terminated their sexual relationship and she began retaliating against him for doing so. In holding that she acted outside her employment in filing the report—and that she had instead acted with "personal motives"— Judge Young relied on four considerations: (1) her official duties did not require her to file police reports against Town employees; (2) her official position conferred no special authority to file such reports; (3) Huntington had not instructed her to engage in such behavior; and (4) her filing of the report "did not yield any benefit for Huntington or further its interests." *Id.* at 1167. In response, Scarpati-Reilly objected that she was "always [a] Councilwoman"—an "elected official twenty-four hours a day"—and so "Everything that I do I'm acting as Councilwoman for the Town of Huntington." *Id.* But Judge Young rejected her position as "the standard for determining when to place vicarious liability upon Huntington for Scarpati-Reilly's actions." *Id.* Instead, he looked "objectively at whether a given action taken by Scarpati-Reilly" fell within her employment, concluding that this defamatory statement did not because it resulted from personal motives. *Id.*

As these cases confirm, when a person acts for private reasons, or to obtain private gain, they do not act within the scope of their employment. That rule applies in the defamation context. *E.g.*, *Demas v. Levitsky*, 291 A.D.2d 653, 661 (3rd Dept. 2002). It applies to public officials. *See*

*Perks*, 251 F. Supp. 2d at 1167. It applies even if the employee can identify some incidental benefit to the employer. *See Overton*, 180 A.D.2d at 957. And it applies with particular force in cases where an employee's personal motives arise from or relate to sexual misconduct. *See, e.g.*, *Perks*, 251 F. Supp. 2d. at 1164-1171; *Ross*, 2 F. Supp. 2d at 531; *Rausman*, 248 A.D.2d at 9-10.

### C.  Trump Acted Outside the Scope of His Employment in Defaming Carroll

#### 1.  Notwithstanding the Breadth of their Official Duties, Presidents May Unquestionably Engage in Personal Conduct Causing Private Wrongs

The Constitution provides that "[t]he executive power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1. "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon*, 457 U.S. at 750, 102 S. Ct. at 2701. These responsibilities include "enforcement of federal law," "conduct of foreign affairs," and "management of the Executive Branch." *Id.* As a matter of history and tradition—and by virtue of being held "directly accountable to the people through regular elections," *Seila Law*, 140 S. Ct. at 2203—the President also "possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). The President thus enjoys a "unique status under the Constitution." *Nixon*, 457 U.S. at 750, 102 S. Ct. at 2701. He must be available, at all times, to lead the Nation. In a sense, he "never adjourns." *Clinton v. Jones*, 520 U.S. 681, 713, 117 S. Ct. 1636, 1653 (1997) (Breyer, J., concurring in the judgment).

But the President "is a person as well as an institution." Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW 631 (3d ed. 2000). While in office, "far from being above the laws, he is amenable to them in his private character as a citizen . . . ." 2 J. Elliot, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863) (James Wilson). And as Chief Justice Marshall anticipated, the demands of a President's "duties as chief magistrate" are not so "unremitting" as to consume "his

whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807). The Supreme Court has thus recognized that the President may engage in private acts beyond the "'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704; that he remains "subject to the laws for his purely private acts," *Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645; and that he can be investigated for private criminal deeds, *see Vance*, 140 S. Ct. at 2426-27. These cases confirm that Presidents retain a personal capacity—and the ability to commit private wrongs—while in office.

Indeed, more than any other recent president, Trump has repeatedly insisted that aspects of his conduct in office are private and personal. In a pending petition for certiorari, for example, he asserts that "blocking third-party accounts from interacting with the @realDonaldTrump account *is a purely personal* action." *See Trump v. Knight First Amendment Institute*, No. 20-197, at 14 (U.S. Aug. 20, 2020) (emphasis added); *see also id.* at 10 (describing Trump's "always personal decision to block respondents from his own account"). Trump argues that his conduct in blocking Twitter users from his account is "well within the ambit of . . . personal pursuits," *see id.* at 15 (citation omitted)—and not subject to First Amendment limitations—even though he frequently uses that very same Twitter account to make momentous official announcements. *See Knight First Amendment Institute v. Trump*, 928 F.3d 226, 231-32 (2d Cir. 2019). Trump thus insists upon a broad view of his purely private, non-Presidential conduct while in office. This outlook extends to and purports to justify his choice to maintain a substantial ownership stake in the Trump Organization. *See CREW v. Trump*, 953 F.3d 178, 185 (2d Cir. 2019). In response to claims that he is thereby violating the Foreign and Domestic Emoluments Clauses, Trump has argued that he is free to engage in purely private commercial transactions with foreign governments, so long as he does not receive "compensation for services rendered . . . in an official capacity or in an

employment (or equivalent) relationship with a foreign government." Motion to Dismiss at 32, *District of Columbia v. Trump*, No. 17 Civ. 1596, ECF. 21 (Sept. 29, 2017).

Whatever the ultimate merits of Trump's position in these cases, his filings confirm that this is not a President who views his every word and deed as Presidential. By his own confession, Trump sometimes perceives himself as acting in a purely personal capacity—and as pursuing his own private purposes—while in office. Consistent with *Burr*, *Nixon*, *Clinton*, and *Vance*, there can thus be no doubt that Trump's scope of employment is not all-encompassing, and that it leaves room for purely private pursuits that may (as occurred here) result in private wrongs.

## 2.     Trump Acted for Personal Reasons in Defaming Carroll

On June 21, 2019, Carroll revealed to the public that Trump had sexually assaulted her in New York City over twenty years earlier. Trump responded by denying the assault, insisting that he had never met Carroll, and saying "she's not my type." Compl. ¶¶ 97-98. He then went further, making numerous false and defamatory statements—including that Carroll had lied to (a) increase book sales; (b) carry out a political agenda; (c) advance a secret conspiracy with the Democratic Party; and (d) make money. *See id.* ¶ 11. He also defamed Carroll by pointedly implying that she had falsely accused other men of rape. *See id.* The question before the Court is whether, in making these specific statements, Trump was acting within the scope of his employment or was instead acting based on personal motives unrelated to the furtherance of the interests of the United States.

In answering that question, the Court views "the tortious conduct in the light most favorable to plaintiff" based upon the factual record before it. *See Davila*, 343 F. Supp. 3d at 270-71. Here, that record consists almost entirely of the Complaint. And significantly, the Complaint sets forth comprehensive allegations concerning Trump's motives for making these statements—all of which must be accepted as true. *See* Compl. ¶¶ 106-128. To summarize: Trump knew who Carroll was when he raped her, *id.* at ¶¶ 106-112; he knew in June 2019 that he had assaulted her and that

his denials were false, *id.* at ¶¶ 113-115; he deliberately lied, and spoke with no concern for the truth, in accusing Carroll of fabricating the accusation as part of a political conspiracy, a plot to increase book sales, or in exchange for payment, *id.* at ¶¶ 116-18; he deliberately lied, or spoke with no concern for the truth, in charging that Carroll had falsely accused other men of sexual assault, *id.* at ¶¶ 118-119; and he engaged in these barbaric attacks because they were familiar to him based on his prior public response to credible reports that he had assaulted women, *id.* at ¶¶ 122-127. Simply put, Trump "knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth." *Id.* at ¶ 128. Further, Trump did not lie to advance any interest of the United States or the Executive Branch; he did not consider such interests at all. He lied to protect himself from the truth and, after he knowingly lied about the sexual assault itself, "he surrounded that central lie with a swarm of related lies in an effort to explain why [Carroll] would invent an accusation of rape." *Id.* at ¶ 13.

Under New York law, these particularized allegations—which stand unrefuted and must be read in Carroll's favor—support only a single conclusion: Trump "was acting for his own personal convenience and benefit and not in furtherance of any duty owed" by virtue of his office. *See Overton*, 180 A.D.2d at 957. He was not acting within the scope of his employment.

This conclusion is bolstered by at least seven additional considerations. *First*, the substance of Trump's statements reeks of personal animus; it is inconceivable that Trump aimed to do his job as President by implying that Carroll is too unattractive for him to sexually assault her. The same is true of his eleven defamatory statements. *See Perks*, 251 F. Supp. 2d at 1171 (considering contents of statement); *Rausman*, 248 A.D.2d at 9-10 (asking whether defamer was acting pursuant to job description). *Second*, Trump's statements concern allegations of sexual assault, which New York law recognizes as especially likely to engender personal motives at odds with (or indifferent

to) employment interests. *See supra* at 24. *Third*, Trump was under no Presidential obligation to make these defamatory statements. *See Perks*, 251 F. Supp. 2d at 1167. And in tone and substance these statements were not of the kind "commonly done" by Presidents; there is no history of Presidents defaming citizens who report sexual assault. *See Riviello*, 47 N.Y.2d at 303.[16] *Fourth*, Trump's attacks on Carroll do not reflect anything unique to his current position, or involve any Presidential prerogative, but rather track a *modus operandi* of purely private conduct stretching back decades. *See* Compl. at ¶¶ 122-127; *see also* Cert. Petn., *Trump v. Knight*, No. 20-197, at 9-14 (arguing that continuity with Trump's pre-office use of Twitter confirms personal nature of use while in office). *Fifth*, since Trump took office, his administration has referred nearly all questions about his sexual misconduct to private lawyers or campaign counsel, thus treating these matters as personal in nature.[17] *Sixth*, the context in which Trump made some of his defamatory statements shows irregular procedures. *See Riviello*, 47 N.Y.2d at 303. The June 21 statement appears to have been hurriedly dictated by Trump and conveyed to a reporter, who tweeted the image of his statement on a page lacking any official markings. *Finally*, the conduct here is far more obviously based on personal motives—and unrelated to his job as President—than conduct he has elsewhere described as private. *See id.* at 302. Trump views his commercial dealings with Russia and China as personal, not presidential. He views blocking people from a platform on which he has fired Cabinet secretaries as personal, not presidential. Only in a world gone mad could it somehow be presidential, not personal, for Trump to slander a woman who he sexually assaulted.

---

[16] In *Clinton v. Jones*, the plaintiff alleged a defamation claim against Clinton, but this claim was based on statements by his alleged agents (including his presidential press secretary) rather than any statements by Clinton himself. *See Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). The fact that this claim involved an alleged plot between Clinton and his White House Secretary likely explains why the Supreme Court described it as potentially falling within the "outer perimeter of the President's official responsibilities." *Clinton*, 520 U.S. at 686, 117 S. Ct. at 1640.

[17] For example, when a reporter inquired about whether Trump provided "hush money" to conceal an alleged affair, Trump stated, "Michael is my attorney, and you'll have to ask Michael Cohen." *Stormy Daniels and Trump: The conflicting statements*, BBC News (August 23, 2018).

For all these reasons, a straightforward application of New York law confirms that Trump was acting outside the scope of his employment in making each of the statements identified in the Complaint as false and defamatory. The motion to substitute must therefore be denied.[18]

### D.     The Justice Department's Position Is Meritless

In its five-page brief, the Justice Department addresses none of the above. It does not consider New York law. It does not cite or discuss the Complaint. It does not attach any additional evidence. Instead, it rests its argument on a categorical assertion that "elected officials act within the scope of their office or employment when speaking with the press, including with respect to personal matters." *See* ECF No. 3-1 at 4. But as should now be clear, that argument is inconsistent with New York law, which holds that employees fall outside the scope of their employment if they act in pursuit of private purposes while disregarding or disrupting duties owed to their employer. There is no authority in New York for an unqualified "elected official" exception to this rule. *See, e.g.*, *Perks*, 251 F. Supp. 2d at 1167 (finding an elected official acted outside the scope of her employment while defaming the plaintiff in police reports and a newspaper advertisement); *Glacken v. Village of Freeport*, No. 09 Civ. 4832, 2014 WL 1836143, at *6 (E.D.N.Y. May 8, 2014) (finding the Mayor of Freeport acted outside the scope of his employment while defaming the plaintiff and noting "a mayor's activities *may*, depending on the circumstances, fall within the scope of his employment at any time of the day and in diverse locations" (emphasis added)).[19]

---

[18] Although New York laws governs and supplies a more restrictive rule of *respondeat superior* liability than does D.C., the ultimate outcome would be the same under D.C. law. *See Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) ("The District of Columbia's formulation of th[e scope of employment] test excludes from the scope of employment all actions committed solely for the servant's own purposes."). Since D.C. law does not apply to this case, and to comply with the Court's page limits, we have not briefed that issue, but we can submit a supplemental brief on the application of D.C. scope of employment law if the Court so desires.

[19] Consistent with this understanding, and based on deeply rooted public policy principles, New York courts have carefully restricted the scope of the absolute privilege against defamation liability afforded to elected officials for statements made in the context of performing their public duties. *See Clark v. McGee*, 49 N.Y.2d 613, 618-19 (1980); *Cheatum v. Wehle*, 5 N.Y.2d 585, 593 (1959); *Greaney v. Ferrer,* 278 A.D.2d 154, 155 (1st Dep't 2000).

The cases cited by the Justice Department do not demonstrate otherwise. To start, none of them applies New York law; they all apply law from states with a broader view of *respondeat superior*. For instance, *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006), applies D.C.'s expansive *respondeat superior* test, which is governed by cases taking a significantly narrower view of the "personal motives" exception than do New York cases. *Compare id.* at 664-65, *with cases cited supra* at 23-26. And unlike in the New York cases cited above, the D.C. cases cited in *C.A.I.R.* focus on the general activity in which the defendant was engaged (speaking to the press), rather than on the specific act alleged to remove his conduct from the scope of employment (the defamatory statement). *Compare id.* at 664-65, *with cases cited supra* at 25-26, 32.[20] The Justice Department's authorities are inapposite on these grounds alone.

Moreover, all five of its cases involve statements by Members of Congress on pending legislative matters or public events of widespread political interest. *See Does 1-10 v. v. Haaland*, 2020 WL 5242402, at *6, *8 (6th Cir. 2020) (Senator Warren and Representative Haaland "were reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall."); *Wuterich v. Murtha*, 562 F.3d 375, 385 (D.C. Cir. 2009) (statement by the Ranking Member of the House Appropriations Committee's Subcommittee on Defense regarding military killing of Iraqi civilians); *C.A.I.R.*, 444 F.3d at 662 (statement by Member of Congress that C.A.I.R. was the "fund-raising arm for Hezbollah"); *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995) (statement by Chairman of the House Appropriations Committee on a plaintiff's lobbying in relation to a pending appropriations bill); *Operation Rescue Nat'l v. United*

---

[20] *C.A.I.R.* also notes the defendant's interest in maintaining a positive reputation in his profession and potentially campaigning for re-election. New York courts, in contrast, have held that defendants who advanced similar interests were acting outside the scope of their employment. *See Glacken*, 2014 WL 1836143, at *6 (campaigning); *Demas*, 291 A.D.2d at 661 (scientist who sought to advance "his own reputation in the academic community").

*States*, 975 F. Supp. 92, 94–95 (D. Mass. 1997) (statement by Senator Kennedy on legislation scheduled to be considered by the Senate the next day). None of these cases involved statements remotely analogous to Trump's personal attacks on Carroll. There is a world of difference between Members of Congress making controversial comments on affairs of state and the President repeatedly slandering a private citizen to punish her for revealing that he sexually assaulted her. That is particularly true in light of the comprehensive allegations in the Complaint concerning Trump's motives for defaming Carroll. *Compare Haaland*, 2020 WL 5242402, at *6 ("[T]he Senator's employer was his constituents and he served them by fully informing them of his views and working to pass legislation he believed would benefit them."), *with* Compl. ¶ 128 ("Trump thus knew he was lying when he said that Carroll had fabricated her rape accusation for a hodgepodge of unsavory reasons that he himself had invented out of whole cloth. He knew she was telling the truth because he knew who she was and he knew that he had raped her.").

The Justice Department assigns overwhelming weight to the fact that "when providing the challenged statements, the President was speaking to or responding to inquiries from the press." ECF No. 3-1 at 5. To be sure, elected officials may sometimes need to comment on their private lives to do their jobs effectively and maintain their constituents' trust. *See Haaland*, 2020 WL 5242402, at *7; *C.A.I.R.*, 444 F.3d at 665-66. But no case holds that press statements *automatically* fall within elected officials' scope of employment—and no case finds that a federal official acted within their employment by defaming a private citizen for private conduct while discussing their own private affairs. *See C.A.I.R.*, 444 F.3d at 666 (disagreeing that its holding "would immunize many federal employees for any gratuitous slander in the context of statements of a purely personal nature"). It would be startling and unprecedented to hold that federal officials act within their jobs in defaming any citizen—at any time, for any reason, no matter how personal or private their

33

slanderous statements—because doing so might incidentally improve their political or electoral position. *See Overton*, 180 A.D.2d at 957 (personal motives defeat a scope of employment finding even if the activity "could also have a possible benefit to the employer"); *see also Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645 (Presidents can engage in "purely private acts"); *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704 (there is an "outer perimeter" on the President's official duties).

In fact, the Justice Department's position here bears an unnerving resemblance to the most disreputable claim advanced by President Trump's lawyers in the recent impeachment trial. There, Professor Alan Dershowitz argued that Trump can engage in official acts for personal gain—without risking loss of his job as President—so long as he believes that advancing his own personal interests in abusing power will incidentally benefit the nation by helping to keep him in office. *See* Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, WASHINGTON POST (Jan 29, 2020) ("[I]f a president does something, which he believes will help him get elected in the public interest, that cannot be [an impeachment offense]."). Here, the Justice Department implies that Trump can engage in private tortious acts for personal gain—without exceeding the scope of his employment as President—so long as he believes that advancing his own personal interests in harming other citizens will incidentally benefit the nation by improving his political standing. This reasoning has no place in any discussion of the American presidency. Rather, it calls to mind King Louis XIV's famous declaration, "*L'état, c'est moi*."

## III.   If the Court Concludes That There Is A Factual Dispute Bearing on Whether Trump is Covered by the FTCA, It Should Order Discovery or Hold a Hearing

For the reasons set forth above, the Court can and should overturn the Attorney General's certification that Trump's tortious conduct is covered by the FTCA. *See Gutierrez*, 515 U.S. at 420, 423-437, 115 S. Ct. at 2229, 2231-37. At the very least, however, it should conclude that Carroll has "alleged sufficient facts that, taken as true, would establish that [Trump's] actions

exceeded the scope of [his] employment." *Stokes*, 327 F.3d at 1215. In that event, the proper course is to order "limited discovery and hold an evidentiary hearing to resolve [the] material factual dispute regarding the scope of [Trump's] employment." *See id.* at 1214 (citations omitted); *see also Wuterich*, 562 F.3d at 381; *Riviello*, 47 N.Y.2d at 303 ("[B]ecause the determination of whether a particular act was within the scope of the [worker's] employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury.").

Indeed, courts have ordered discovery in FTCA cases where plaintiffs raised material factual disputes as to whether defendants acted with personal motives—and thus outside the scope of their employment—in making defamatory statements. *See Weeks v. Oswald*, No. 1:12 Civ. 82, 2012 WL 3012640, at *8 (D. Idaho July 23, 2012); *Bergeron v. Henderson*, 47 F. Supp. 2d 61, 79 (D. Me. 1999); *see also Allstate Ins. Co. v. Quick*, 254 F. Supp. 2d 706, 708 (S.D. Ohio 2002).[21]

---

[21] Carroll approached the Justice Department about discovery shortly after this case was removed to federal court and sought to reach a consensual resolution of the issue. The Justice Department, however, took the position that it would oppose any discovery unless the Court concluded that Carroll was entitled to it under the standard set forth above.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully submits that the Government's motion to substitute the United States as defendant should be denied or, in the alternative, that the Court should hold an evidentiary hearing into whether Trump acted within the scope of his employment as President in defaming Carroll on June 21, June 22, and June 24, 2019.

Respectfully submitted,

/s/  Roberta A. Kaplan

October 5, 2020

Roberta A. Kaplan
Joshua Matz
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Plaintiff E. Jean Carroll*