# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JANE DOE, LUKE LOE, RICHARD ROE, and
MARY MOE, individually and on behalf of all
others similarly situated,

<em>Plaintiffs</em>,

<em>v.</em>

THE TRUMP CORPORATION, DONALD J.
TRUMP, in his personal capacity,
DONALD TRUMP JR., ERIC TRUMP, and
IVANKA TRUMP,

<em>Defendants</em>.

No. _____

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PARTIES ...................................................................................................................... 11

    A.    Plaintiffs ........................................................................................... 11

    B.    Defendants ........................................................................................ 11

JURISDICTION AND VENUE ..................................................................................... 12

FACTS ........................................................................................................................... 13

I.      THE TRUMP ENTERPRISE ......................................................................... 13

    A.    The Trump Association-in-Fact ........................................................ 13

    B.    The Trump Corp. Enterprise ............................................................ 15

II.    BETWEEN THE EARLY AND MID-2000S, TRUMP REINVENTED HIS BRAND, AND THE TRUMP ENTERPRISE BEGAN TO CONCOCT ITS FRAUDULENT SCHEME. ............................................................................ 16

III.   THE TRUMP ENTERPRISE AGREES TO ENDORSE AND PROMOTE ACN THROUGH A PERVASIVE AND WIDELY DISSEMINATED MESSAGE. ............. 25

    A.    The ACN "Business Opportunity" Needed High-Profile Endorsement To Recruit and Maintain Investors. .................................................. 25

    B.    Trump Disseminated the Message Through ACN Videos ................... 29

    C.    Trump Disseminated the Message Through Print and Online Media.............. 30

    D.    Trump Disseminated the Message at ACN Events ............................. 32

    E.    Trump Disseminated the Message Through National Primetime Television ....... 35

IV.   THE TRUMP ENTERPRISE KNOWINGLY CONVEYED A CONSISTENT FRAUDULENT MESSAGE ABOUT ACN. ................................................... 37

    A.    The Trump Enterprise Falsely Represented that the ACN Business Opportunity Offered Consumers a Reasonable Probability of Commercial Success. ........................................................................ 37

           1.    Trump Misrepresented ACN's Risk-Profile. ............................ 38

           2.    Trump Falsely Claimed That ACN's Business Model (and Direct-Selling in General) Provided a Viable Source of Income for Prospective Investors. ............................................. 41

           3.    Trump Misrepresented the Commercial Viability of ACN's Products, Especially the ACN Video Phone. ........................ 43

B. Trump Falsely Represented that He Genuinely Supported ACN and Failed To Disclose That He Was Being Paid Lavishly for His Endorsement....................... 49

C. Trump Falsely Represented that His Endorsement Was Predicated on Appropriate Due Diligence and Personal Experience with ACN's Business....... 56

V. THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF ACN WAS THE KEY FACTOR IN PLAINTIFFS' INVESTMENT DECISIONS. ........................................................................ 58

A. Jane Doe.......................................................................................... 61

B. Luke Loe .......................................................................................... 68

C. Richard Roe ..................................................................................... 71

D. Mary Moe......................................................................................... 75

VI. THE TRUMP ENTERPRISE AND ACN'S CO-FOUNDER WAS INVOLVED IN SIDE DEALS THAT FACILITATED MONEY FLOW BETWEEN THEM................ 79

A. ACN's Co-Founder Bought Property Around The Trump Organization's Major Golf Course Development in North Carolina. ........................................... 79

B. ACN Has Paid the Trump Enterprise To Hold Charitable Golf Tournaments at Trump Golf Clubs. ............................................................................... 81

C. Trump Joined the Advisory Board of the SUCCESS Foundation, an Affiliate of *SUCCESS from Home Magazine*, which Purported To Provide "Third-Party Validation" of the ACN Business Opportunity. .................................... 85

VII. THE TRUMP ENTERPRISE'S ONGOING PROMOTION AND ENDORSEMENT OF ACN ................................................................................................ 88

VIII. THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF THE TRUMP NETWORK ........................................... 91

A. Ideal Health Background & DSNC Licensing Deal ............................................. 92

B. Background on The Trump Network .................................................... 93

C. Trump Promoted and Endorsed the Trump Network with a Widely Distributed and Pervasive Message. ....................................................... 94

D. Trump Falsely Represented That Consumers Had a Reasonable Probability of Commercial Success in The Trump Network. ....................................... 98

E. Trump Falsely Represented that He Was Endorsing The Trump Network Because It Was His Company and Because He Genuinely Believed It Would Be a Success...................................................................................... 106

IX.     THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND
        ENDORSEMENT OF THE TRUMP INSTITUTE........................................................ 110

        A.      Trump Falsely Represented That Consumers Had Reasonable Probability of
                Commercial Success in The Trump Institute........................................................ 112

        B.      Trump Falsely Represented that He Supported the Trump Institute Because
                He Believed It Offered a Reasonable Probability of Commercial Success
                (Rather than Because the Trump Enterprise Was Being Paid). .......................... 122

        C.      Trump Falsely Represented that His Endorsement Was Predicated on
                Appropriate Due Diligence and/or Inside Information. ..................................... 130

X.      CLASS ALLEGATIONS ............................................................................................. 131

CAUSES OF ACTION ................................................................................................................ 137

COUNT ONE............................................................................................................................... 137

COUNT TWO:.............................................................................................................................. 144

COUNT THREE:.......................................................................................................................... 144

COUNT FOUR ............................................................................................................................. 147

COUNT FIVE:.............................................................................................................................. 150

COUNT SIX ................................................................................................................................. 151

COUNT SEVEN ........................................................................................................................... 153

COUNT EIGHT ............................................................................................................................ 156

PRAYER FOR RELIEF ............................................................................................................... 159

JURY DEMAND .......................................................................................................................... 159

Plaintiffs Jane Doe, Luke Loe, Richard Roe, and Mary Moe, on behalf of themselves and others similarly situated, allege, upon personal knowledge as to themselves and information and belief as to other matters, as follows:

## INTRODUCTION

1.      This case is about four working-class Americans, and thousands more just like them, who were deliberately defrauded by Donald J. Trump, his family, and the corporation that bears their name.  The Trumps conned each of these victims into giving up hundreds or thousands of dollars—losses that many experienced as devastating and life-altering.  Surely the Trumps dismissed these amounts (and the lives they wrecked) as trivial.  But by defrauding so many for so long, the Trumps made millions.

2.      For more than a decade, Defendants The Trump Corporation, Donald J. Trump, Donald Trump, Jr., Eric Trump, and Ivanka Trump (the latter four, collectively, the "Individual Defendants") have operated a large and complex enterprise with a singular goal:  to enrich themselves by systematically defrauding economically marginalized people looking to invest in their educations, start their own small businesses, and pursue the American Dream.

3.      Central to Defendants' fraudulent scheme was a company called ACN, a multi-level marketing company ("MLM") that offers a business opportunity to individual participants.  From 2005 to at least 2015, Defendants received millions of dollars in secret payments to promote and endorse ACN.  In return, Donald J. Trump ("Trump") told prospective investors that "[y]ou have a great opportunity before you at ACN without any of the risks most entrepreneurs have to take," and that ACN's flagship videophone was doing "half-a-billion dollars' worth of sales a year."  Trump also told investors that he had "experienced the opportunity" and "done a lot of research," and that his endorsement was "not for any money."  Not a word of this was true.

4.      In the minds of many Americans, the Trump brand was once synonymous with entrepreneurial success.  Indeed, Trump spent years cultivating a brand for himself based on the impression that he was a successful entrepreneur.  Defendants conducted the affairs of their enterprise as a fraudulent scheme to leverage that brand, and use a series of false and misleading statements and omissions, to ensnare vulnerable consumers in certain so-called business opportunities and training programs like ACN.

5.      Defendants' association-in-fact enterprise included an array of holding companies, operating companies, licensing companies, a production company, a real estate company, and two of the Trump golf clubs (collectively, the "Trump Association-in-Fact").  The members of the Trump Association-in-Fact did not share common ownership, nor were they all wholly owned, directly or indirectly, by Defendants.  Nevertheless, at all relevant times, the Trump Enterprise was directed and controlled by Defendants.  Indeed, Allen Weisselberg, the Chief Financial Officer of "The Trump Organization," testified at a June 2015 deposition that The Trump Corporation was "the operating entity that we use," and that the Individual Defendants had the authority to sign checks "over all our entities."

6.      Defendant The Trump Corporation, as a legal entity and enterprise (the "Trump Corp. Enterprise," and, together with the with Trump Association-in-Fact, the "Trump Enterprise"), was operated, directed, and controlled by the Individual Defendants.

7.      Between 2005 and 2015, the Trump Enterprise fraudulently promoted and endorsed the business opportunities and training programs (collectively, the "Investments") offered by at least three consumer-facing companies:

      A.      ACN Opportunity, LLC ("ACN"), an MLM;

      B.      TTN, LLC (d/b/a "The Trump Network"), another MLM; and

C.      Business Strategies Group, LLC (d/b/a "The Trump Institute"), a live-

seminar program that purported to sell Trump's "secrets to success" in

extravagantly priced seminars.

8.      In exchange for large, secret payments from these companies (collectively, the

"Endorsed Entities"), the Trump Enterprise deliberately misled consumers by delivering a

common and consistent message:  (1) that prospective investors would have a reasonable

probability of commercial success if they bought into the Investments; (2) that Trump was

endorsing and promoting the Investments because he believed that they offered a reasonable

probability of commercial success (rather than because the Trump Enterprise was being paid);

and (3) that Trump's endorsement was predicated on Defendants' extensive due diligence, inside

information, and personal experience with the Investments (collectively, the "Message").

9.      The Message was materially false.  The Investments did not—and could not—

offer a reasonable probability of success.  Nor was Trump endorsing the Investments because he

believed they would.  Indeed, Defendants were aware that the vast majority of consumers would

lose whatever money they invested in the business opportunities and training programs the

Endorsed Entities offered.  It was, after all, the potential to profit from consumers' unrecouped

investments that drew the Trump Enterprise to the Endorsed Entities in the first place.  And

while Defendants claimed to have conducted extensive diligence and research, and to have

access to inside information or personal experience with the Investments, those claims too were

false and misleading.

10.     The Message was delivered primarily by Trump himself, who made materially

false and misleading statements about the nature of the Investments, as well as about his own

incentives, diligence, and experience, in person at the Endorsed Entities' events and in numerous

written publications and videos.  Defendants also deliberately enhanced, amplified, and augmented the Message by, among other things, selling to the Endorsed Entities the right to use the Trump brand, licensing the Trump name to certain of the Endorsed Entities, and even arranging for one of the Endorsed Entities to appear on the primetime national television show, *The Celebrity Apprentice*.  All of this was intended to create (and did create) a veneer of legitimacy and an impression of success, which further encouraged consumers to take the Message seriously and rely on it.

11.     As they conveyed the Message, Defendants repeatedly failed to correct the impression they had deliberately taken steps to create—namely, the impression that Trump was endorsing the Investments because he genuinely believed that the Investments offered a realistic probability of commercial success, and that this belief was predicated on extensive due diligence, inside information, and personal experience with the Investments.  Defendants willfully failed to disclose their financial ties to—and quid pro quo arrangements with—the Endorsed Entities.

12.     The Message had the effect Defendants intended, and for which the Trump Enterprise was lavishly paid.  Trump's seemingly genuine endorsement brought prospective investors to the table and helped them overcome any lingering reservations about the Investments.  Indeed, for the working people who fell prey to the Investments, the Trump endorsement was typically the first thing they learned about the Investments, the reason they took an interest, and the determining factor in their decision to invest.  "Trust me," Trump often said in endorsing and promoting the Investments.  Unfortunately, far too many victims did.

13.     Many of the Trump Enterprise's victims were then and are now among the most economically marginalized and vulnerable Americans.  Indeed, the victims were specifically targeted *because* they were not experienced in financial and commercial matters.

14.     Those consumers did not achieve the success the Message promised.  To the contrary, Plaintiffs have suffered considerable financial loss because of their reliance on the false and willfully misleading Message.

15.     As alleged above, ACN—short for American Communications Network—was central to the aspect of the Trump Enterprise's fraudulent scheme that is challenged by this action.  From 2005 to at least 2015, the Trump Enterprise received millions of dollars in secret payments to promote and endorse ACN.  These secret payments took the form of speaking fees for Trump's appearances in ACN videos, publications and events, payments for ACN's appearances on *The Celebrity Apprentice*, and fees for ACN golf tournaments held at Trump golf clubs.  All of this was deliberately concealed from unsuspecting ACN recruits.

16.     In exchange for these undisclosed payments, Trump, acting in concert with and through the members of the Trump Enterprise that Defendants controlled, repeatedly, explicitly, and bombastically endorsed ACN, in myriad formats and forums.  Defendants and the Trump Enterprise made and disseminated numerous knowingly false and misleading statements concerning the value of ACN's technology, the soundness of its business model, and the level of risk participants would face in pursuing the ACN business opportunity.

17.     Defendants were fully aware that these statements were false and misleading.  Not only did the Trump Enterprise have a longstanding commercial relationship with ACN, but several of the Individual Defendants, including Trump himself, had close personal and financial ties to ACN's founders and principals.  Indeed, during the time that Defendants were endorsing and promoting ACN, the Trump Enterprise opened a realty office at the golf course that had just been rebranded the Trump National Golf Club in Mooresville, North Carolina, and entities controlled by an ACN co-founder bought multiple properties nearby around the same time.  In

addition, information that was accessible to The Trump Corporation and the Trump Enterprise (but not to the consumers to whom Trump was pitching the ACN business opportunity) made clear that the likelihood of commercial success for an average new participant was miniscule.

18.    In addition to their knowingly false and misleading statements about the nature of the ACN business opportunity, Defendants made and disseminated false and misleading statements indicating that Trump was endorsing the company because he believed that the ACN business opportunity offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid), as well as statements designed to assure consumers that they had done extensive research before endorsing ACN and had experience with the ACN business opportunity.  All available evidence is to the contrary.

19.    The Trump Enterprise's fraudulent promotion and endorsement of ACN had the desired effect on Plaintiffs.  Indeed, Plaintiffs made the fateful decision to invest in ACN because of the Trump Enterprise's promotion and endorsement.  As the truth behind the Message emerged, Plaintiffs eventually realized that they had been scammed, cut their losses, and quit the business.  The Trump Enterprise's fraudulent Message was thus the cause of both the Plaintiffs' investments and the Plaintiffs' losses.

20.    Plaintiff Jane Doe is a resident of California who works as a hospice caregiver.  In 2014, Doe attended a meeting for prospective ACN recruits.  As she listened to the presentations, Doe was skeptical and unpersuaded.  But then she saw a promotional video prominently featuring Trump.  Trump's endorsement was a turning point.  Doe watched clips of ACN appearing on *The Celebrity Apprentice*, where Trump stood alongside the founders and praised the company.  She listened as Trump said that investing in ACN was a great business opportunity—and that the strength of the business opportunity was why he was endorsing it.  She

believed he had researched ACN extensively, and that his statements were supported by his own research. Doe had no idea Trump was being paid lavishly for his endorsement—the video made no mention of that. Doe joined ACN then and there. Despite her limited resources, Doe wrote a check for the $499 registration fee, in reliance on Trump's endorsement. In the two years that followed, Doe paid thousands of dollars in fees and expenses to attend ACN events and host ACN meetings in an effort to succeed with the business. But, ultimately, she had extremely limited success—she earned a single check for $38. Eventually, Doe realized that ACN was not at all what Trump had described, and that she was just going to continue losing money. When her next annual renewal date came up, Doe decided not to renew her position.

21.     Plaintiff Luke Loe is a self-employed resident of California. Loe first heard about ACN in mid-2014 when he was working for the Salvation Army in Los Angeles, California. A colleague approached Loe and invited him to an informational meeting in Los Angeles. At that meeting, Loe saw a promotional video prominently featuring Trump. Loe had watched *The Celebrity Apprentice* a few times and had seen Trump present himself as a savvy, experienced, and knowledgeable entrepreneur who had achieved remarkable wealth and celebrity. Critically for Loe, Trump promoted ACN as a "good moneymaking opportunity" and said that he was glad to be a part of ACN because he genuinely believed the company provided a path to commercial success. Trump's endorsement was the key factor in Loe's decision to invest in the ACN business opportunity. Despite being homeless at the time, Loe paid the $499 registration fee with a loan from a colleague. Though Loe worked hard and attended more than 25 or 30 meetings, Loe never received any income from ACN. Loe came to realize that, contrary to what Trump had said in the promotional videos, ACN was not a good moneymaking opportunity, and he decided not to renew his membership.

22.     Plaintiff Richard Roe is a resident of Maryland who works as a food delivery driver.  Roe first learned about ACN in mid-2016.  Though Roe was initially skeptical about investing in ACN, he decided to look up ACN on YouTube—and the first thing that caught his eye was a video of Trump from *The Celebrity Apprentice*, where Trump stood next to two of the ACN founders, Greg Provenzano and Tony Cupisz and endorsed ACN, saying he knew the company well.  As with other Plaintiffs, the video was the turning point for Roe.  Roe believed that Trump was a successful businessman who knew how to make money and that, by promoting ACN, Trump was telling others that they too could make money and become successful business owners like him.  Though Roe was not able to afford the $499 registration fee at first, he saved up and paid a few months later.  After signing up, Roe incurred multiple additional fees and expenses connected with his participation in ACN.  At no time did Roe recover any of the money that he invested.  Eventually, Roe recognized that he was not making any money from ACN and that Trump's message was false.  Roe then stopped engaging with ACN and did not renew his position.

23.     Plaintiff Mary Moe was a resident of Pennsylvania at all times relevant to this Complaint.  Moe signed up with ACN in April 2013.  Like so many others, she was recruited into ACN at a local meeting, the centerpiece of which was a promotional video prominently featuring Trump's endorsement.  Moe watched intently as Trump described ACN as a great, sophisticated company, and as he touted and praised ACN's products, even suggesting that he used the products himself.  Most of all, Moe was moved by Trump's statement that there was huge potential to make money with ACN.  She did not have the money to sign up right away, but on her next pay day, Moe paid the $499 registration fee.  She spent nearly two years working hard to pursue the business opportunity, buying and studying training and promotional materials,

pitching the products and the business opportunities, and attending numerous meetings.  At every meeting, organizers reminded participants about Trump's involvement.  But despite her hard work, Moe was not able to make money, and ultimately she realized that she had been misled by Trump's endorsement.  At the end of 2014, she cut her losses and left the company.

24.     But for Defendants' fraudulent promotion and endorsement of ACN, acting through the Trump Enterprise, Plaintiffs would not have paid the initial fee to sign up with ACN, would not have paid renewal fees, would not have incurred expenses attending meetings and traveling to conventions, would not have purchased business tools and incurred other expenses in attempting to recruit customers and other participants, and would not have forgone other income.

25.     ACN was not the only consumer-facing company selling a business opportunity or training program for which Defendants agreed to disseminate the Message through the Trump Enterprise in exchange for secret payments.

26.     In 2005, Trump licensed his name to Business Strategies Group, LLC (d/b/a "The Trump Institute"), a company that purported to sell Trump's secrets for success in the real estate business in the form of extravagantly priced multi-day training seminars.  In reality, a substantial amount of the content sold to those hungry to learn Trump's insights for success in real estate investing was plagiarized from other sources, and Trump had nothing to do with the purported teachings of the so-called "Institute."

27.     In addition, during its years of doing business with ACN, the Trump Enterprise was so impressed with its profitability that, in 2009, the Trump Enterprise made a deal with another MLM, which purported to sell vitamins and other similar commodity products through a network of independent distributors.  Unlike the deal with ACN, the Trump Enterprise agreed to license the Trump brand to the MLM, which was then dubbed the Trump Network.  This deal

was an effort on the Trump Enterprise's part to deepen its involvement with the MLM industry—reflecting the Trump Enterprise's knowledge, based on its close relationship with ACN, that the widespread losses of average investors in these sorts of MLMs can generate enormous profits for the owners. Shortly after signing the licensing deal with the Trump Enterprise, the Trump Network hired an ACN advisor to redesign its own compensation plan.

28. The Trump Enterprise was paid in secret to endorse and promote the Trump Network from 2009 until the end of 2011, shortly before the Trump Network collapsed. As with ACN, Defendants, acting through the Trump Enterprise, made or disseminated a series of knowingly false statements about the retail demand for its products, and the likelihood of success for the participants in its business opportunities, as well as statements designed to mislead consumers into believing that the endorsement was genuine and predicated on appropriate diligence, inside information, and personal experience.

29. As a result of the Trump Enterprise's fraudulent promotion and endorsement of the Investments, Defendants are liable for a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c); conspiring to violate RICO, 18 U.S.C. § 1962(d); false advertising under California Business and Professions Code § 17500; unfair competition under California Business and Professions Code § 17200; unfair and deceptive trade practices under the Maryland Consumer Protection Act; unfair and deceptive acts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law; common law false advertising; common law fraud; and common law negligent misrepresentation.

## PARTIES

### A.    Plaintiffs

30.    Plaintiff Jane Doe is a resident of California, who participated in the ACN business opportunity from 2014 to 2016 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

31.    Plaintiff Luke Loe is a resident of California, who participated in the ACN business opportunity from 2014 to 2015 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

32.    Plaintiff Richard Roe is a resident of Maryland, who participated in the ACN business opportunity from 2016 to 2017 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

33.    Plaintiff Mary Moe was a resident of Pennsylvania at all times relevant to this Complaint, who participated in the ACN business opportunity from 2013 to 2014 because of the Trump Enterprise's fraudulent promotion and endorsement of ACN.

### B.    Defendants

34.    Defendant The Trump Corporation is a corporation incorporated under the laws of the State of New York, with a principal place of business at 725 Fifth Avenue, New York, New York, 10022.  The Trump Corporation is itself an enterprise within the meaning of 18 U.S.C. § 1961(4) and is also the principal operating company for the collection of companies known as The Trump Organization.  Along with Defendant Donald J. Trump and the other Individual Defendants, The Trump Corporation operates the Trump Association-in-Fact.

35.     Defendant Donald J. Trump is currently the President of the United States, although he is sued here in his personal capacity only.  At all times relevant to this Complaint, Trump was the Director, President, Chairman and sole shareholder of The Trump Corporation.

36.     Defendant Ivanka Trump is Defendant Donald J. Trump's daughter.  She currently acts as Advisor to the President of the United States, though she is sued here in her personal capacity only.  Ivanka Trump was Vice President of The Trump Corporation from 2009 to 2017, Executive Vice President of TNGC Charlotte, LLC from 2011 to 2017, Trump National Golf Club, LLC from 2008 to 2017, and T International Realty, LLC from 2012 to 2017.

37.     Defendant Donald Trump, Jr. is Defendant Donald J. Trump's son.  On information and belief, in the relevant time period, Donald Trump, Jr. held senior executive positions at, or otherwise exercised control over, entities included in or associated with the Trump Association-in-Fact.  Donald Trump, Jr. resides in New York City, New York.

38.     Defendant Eric Trump is Defendant Donald J. Trump's son.  On information and belief, in the relevant time period, Eric Trump held senior executive positions at, or otherwise exercised control over, entities included in or associated with the Trump Association-in-Fact.  Eric Trump resides in New York City, New York.

### JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States; 28 U.S.C. § 1332, because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000; and 18 U.S.C. § 1964(c), because Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under

Rule 23 of the Federal Rules of Civil Procedure; there are likely thousands of putative Class

Members; the aggregate amount in controversy exceeds the jurisdictional amount or

$5,000,000.00; and Defendants are citizens of a State different from that of Plaintiffs and

members of the Class.  This Court has supplemental jurisdiction over Plaintiffs' state-law claims

under 28 U.S.C § 1367, because those claims are substantially related to Plaintiffs' claims under

federal law.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

40.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2)

because, among other things, Defendants reside in this District, and a substantial part of the

transactions and events giving rise to Plaintiffs' claims occurred in this District.

## FACTS

## I.    THE TRUMP ENTERPRISE

### A.    The Trump Association-in-Fact

41.    At all times relevant to this Complaint, the Trump Association-in-Fact was an

association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of a network of

companies and associates that shared a common purpose of earning revenue from the Endorsed

Entities in exchange for conveying the false and misleading Message.  In other words, the

mission of the Trump Association-in-Fact was to carry out the scheme to defraud consumers.

42.    The Trump Association-in-Fact was made up of a network of companies and

individuals that carried out the scheme under Defendants' direction and control.  The Trump

Association-in-Fact included several companies within the group of companies that operate

under the banner of "The Trump Organization."  Known members of the Trump Association-in-

Fact, which were also members of the Trump Organization, included the following:

a)  Defendant The Trump Corporation;

b)  Defendant Donald J. Trump;

c)  Defendant Ivanka Trump;

d)  Defendant Donald Trump Jr.;

e)  Defendant Eric Trump;

f)  Trump Productions, LLC ("Trump Productions"), which co-produced *The Celebrity Apprentice* in association with Mark Burnett Productions;

g)  DSN Licensing, LLC, which licensed Trump's name and brand to The Trump Network;

h)  Trump University, LLC, which licensed Trump's name and brand to the Trump Institute;

i)  T International Realty, LLC ("Trump International Realty"), a Delaware LLC that is engaged in the business of acquiring and developing property;

j)  Trump National Golf Club, LLC, a New York LLC that operates the Trump National Golf Club in Westchester County, New York; and

k)  TNGC Charlotte, LLC, a Delaware LLC that operates the Trump National Golf Club in Mooresville, North Carolina.

43.    The identities of other members of the Trump Association-in-Fact are currently unknown but are expected to be identified through the discovery process.

44.    The members of the Trump Association-in-Fact did not share common ownership, nor were they all wholly owned, directly or indirectly, by Defendants.  Nevertheless, at all relevant times, the Trump Association-in-Fact was directed and controlled by Defendants.

Defendants approved, authorized, and/or either specifically or tacitly directed, ratified or participated in the acts of the Trump Association-in-Fact detailed in this Complaint.

45.     Allen Weisselberg, the Chief Financial Officer of "The Trump Organization," testified at a June 2015 deposition that The Trump Corporation was "the operating entity that we use," and that Trump and his children were among the small group of people who had the authority to sign checks "over all our entities."  In a 2011 deposition, Defendant Donald Trump, Jr. testified:  "We kind of run a little bit like a mom-and-pop in that sense . . . .  I guess there is an organizational chart, but in theory, there is not too many levels. . . .  Could I make one?  Yes.  Is there one officially?  Not that I'm aware of."

46.     Ivanka Trump served as a Vice President of The Trump Corporation from 2009 to 2017, Executive Vice President of TNGC Charlotte, LLC from 2011 to 2017, Trump National Golf Club, LLC from 2008 to 2017, and T International Realty, LLC from 2012 to 2017.

47.     Upon information and belief, Eric Trump and Donald Trump, Jr. also held senior executive positions at, or otherwise exercised control over, entities included in or associated with the Trump Association-in-Fact.

**B.     The Trump Corp. Enterprise**

48.     At all times relevant to this Complaint, The Trump Corporation was an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Trump Corp. Enterprise"), comprised of high level executives, including without limitation Defendant Donald J. Trump, Defendant Ivanka Trump, Defendant Donald Trump, Jr., Eric Trump and various corporate entities owned or controlled by The Trump Corporation, that worked together to earn revenue from the Endorsed Entities in exchange for conveying the false and misleading Message.  The mission of the Trump Corp. Enterprise was to carry out the scheme to defraud consumers.

-15-

49.     The identities of other members of the Trump Corp. Enterprise are currently unknown but are expected to be identified through the discovery process.

50.     The Trump Enterprise and the Trump Corp. Enterprise are referred to collectively as "The Trump Enterprise."

## II.   BETWEEN THE EARLY AND MID-2000S, TRUMP REINVENTED HIS BRAND, AND THE TRUMP ENTERPRISE BEGAN TO CONCOCT ITS FRAUDULENT SCHEME.

51.     In the early 2000s, The Trump Organization was in dire straits.  It was saddled in debt left over from Trump's extravagances in the early 1990s.  In 1995, Trump had rolled up The Trump Organization's hotel and casino businesses into a public company, Trump Hotels & Casino Resorts, Inc.  In the years that Trump was the company's chairman, the company lost more than $1 billion and was in the red every year from 1995 to 2005.  It filed for bankruptcy in 2004 (the fifth corporate bankruptcy filing in Trump's career).  Shareholders and creditors suffered devastating losses.  Indeed, Trump's Taj Mahal casino in Atlantic City went bankrupt even though Trump's father, Fred Trump, reportedly made at least one quiet loan to the casino by buying $3 million in chips and not using them.[1]

52.     By the early 2000s, Trump himself was living on a personal allowance from a syndicate of banks as part of their deal to restructure the organization's debt.  The New York tabloid press often ridiculed Trump for continuing to live a lavish lifestyle while his empire crumbled around him.  He needed a way to restore his brand—and to start making money again.

---

[1] *See* Netflix, *Dirty Money*, Season 1, Episode 6:  *The Confidence Man* (2018).

53.     Trump began rebuilding his brand and public persona in the early 2000s.  His real breakthrough in this comeback came when he agreed to host the reality television show, *The Apprentice* and its successor, *The Celebrity Apprentice*.[2]

54.     In 2002, Mark Burnett, the creator of the highly successful reality television show, *Survivor*, approached Trump with the idea for *The Apprentice*.  The pitch was that the show would feature "Trump's whole empire—Trump Tower, the casinos, the hotels, the helicopter and the jet, the opulent apartment, and the splendor of Mar-a-Lago."[3]  Each episode would feature contestants competing in business-oriented tasks, with Trump evaluating their performance and "firing" each episode's least impressive competitor.  The ultimate prize at the end of the season was a job at The Trump Organization.

55.     Trump loved the idea, and soon the deal was done.  On the air beginning in January 2004, *The Apprentice* was produced by Mark Burnett Productions in association with Trump Productions, LLC, a company within the Trump Enterprise that was effectively controlled by Defendants Trump and The Trump Corporation.  Mark Burnett and Trump were executive producers, and Trump Productions, LLC owned 50% of the show.

---

[2] *See generally* Michael Kranish and Marc Fisher, *Trump Revealed, Chapter Twelve:  Ratings Machine* (2016).

[3] *See* Michael Kranish and Marc Fisher, *The Inside Story of How "The Apprentice" Rescued Donald Trump*, FORTUNE, Sept. 8, 2016, available at http://fortune.com/2016/09/08/donald-trump-the-apprentice-burnett/.



56.    In 2007, *The Apprentice* became *The Celebrity Apprentice*.  Instead of ordinary people competing for a job at The Trump Organization, contestants were celebrities who competed to win cash donations for their nominated charities.

57.    These shows portrayed Trump to an audience of millions around the country as a credible and authoritative voice in the world of business—a man portrayed, in the words of biographers Michael Kranish and Marc Fisher, as "supremely competent and confident, dispensing his authority and getting immediate results."  Far from the hard-scrabble Queens-to-Brooklyn-to-Manhattan property developer whose empire was collapsing under debt, Trump was presented to the world as a highly successful and fabulously wealthy entrepreneur and businessman.  As Trump boasted in a voice-over at the start of an episode:

> I'm the largest real-estate developer in New York.  I own buildings all over the place.  Model agencies, the Miss Universe pageant, jetliners, golf courses, casinos, and private resorts like Mar-a-Lago. . . .  I've mastered the art of the deal and have turned the name Trump into the highest-quality brand.  And as the master, I want to pass along some of my knowledge to somebody else.

-18-





58.     In contrast to the image of Trump projected to the television audience, *The Apprentice*'s producers candidly acknowledged that their portrayal of Trump was pure fiction. One of the producers commented that the producers intended Trump's persona on *The Apprentice* to be a satirical figure:

How funny is it to have this washed-up, 5-time bankruptcy guy, who lives in a golden palace that other people are paying for – that he is now the "executive in charge of this big corporation"?[4]



59.     Of the show's impact on its audience, the producer commented that "a lot of people who watched the show believed in Donald Trump that we were presenting, in this character. . . . [but] it was a scam, that was entertainment."  Trump's character was "a construct, almost from the very beginning."

60.     *The Apprentice* was a hit, both financially and for Trump's larger project to restore his brand.  As one commentator put it: "*The Apprentice* really overnight repositioned [Trump] in the American imagination as the embodiment of dealmaking savvy, capable entrepreneur, and business success."[5]

---

[4] *See* Netflix, *Dirty Money*, Season 1, Episode 6:  *The Confidence Man* (2018).
[5] *Id.*



61.     A defining aspect of Trump's rebuilt brand was the notion that Trump was very

rich.  *The Apprentice* portrayed him as enjoying the trappings of extraordinary wealth.  Trump

was shown in private jets, at luxury golf courses, surrounded by beauty pageant contestants, and

strolling through the marble-and-brass excess of his Trump Tower apartment.  A court document

reportedly filed on Trump's behalf in December 2009—at the peak of the success of *The*

*Celebrity Apprentice*—explained the centrality of this perception of wealth to Trump's brand:

> Critical to Trump's success in business is the fact that he is widely recognized by both the financial community and the public as a skilled, successful businessman, who has financial resources totaling ***billions of dollars***. . . . Trump's ability to close deals and secure financing for his projects depends on investors trusting his ***reputation and net worth***.

(emphases added).



     62.     Trump has a long and storied history of wildly exaggerating his net worth.  In one

notorious account, Trump told an author in early 2005 that he was worth "five to six" billion

dollars—a significant increase from the "four to five billion dollars" Trump had told the same

author before.  A brochure for one of Trump's clubs around the same time claimed he was worth

"$9.5 billion."[6]  The author conducted further research, and was told by people who claimed "direct knowledge" of Trump's finances that his net worth was "somewhere between $150 million and $250 million."[7]

63.     When the author published this account, Trump sued the author in the Superior Court of New Jersey on the basis that the author had defamed him by understating his wealth. The Superior Court granted summary judgment in the author's favor, holding that Trump had failed to prove that the author published the statements regarding Trump's wealth with actual malice.  In affirming the Superior Court's decision, the Appellate Division held that there was no "reliable information" contradicting the author's reports and that the author had no "obvious reasons to doubt the veracity" of his sources' statements.[8]  The Court noted that "Trump's estimates of his own worth changed substantially over time," and quoted from Trump's deposition in the case:

> Q:  Now, Mr. Trump, have you always been completely truthful in your public statements about your net worth of properties?
>
> A:  I try.
>
> Q:  Have you ever not been truthful?
>
> A:  My net worth fluctuates, and it goes up and down with markets and with attitudes and with feelings, even my own feelings, but I try.
>
> Q:  . . . You said that the net worth goes up and down based upon your own feelings?
>
> A:  Yes, even my own feelings, as to where the world is, where the world is going, and that can change rapidly from day to day.  . . .  So yeah, even my own feelings affect my value to myself.

---

[6] *See Trump Revealed*, Chapter Seventeen:  *The Worth of a Man*.
[7] *Id.*
[8] *Trump* v. *O'Brien*, 422 N.J. Super. 540, 557, 29 A.3d 1090, 1101 (App. Div. 2011).

. . .

Q:  When you publicly state what you're worth, what do you base that number on?

. . .

A:  I would say it's my general attitude at the time that the question may be asked. And as I say, it varies.[9]

64.     The Court also noted that the document that Trump principally relied on to establish that he was a billionaire had "limited value as an accurate representation of Trump's net worth" as it was "not audited" and disclosed on its face "significant departures from generally accepted accounting principles."[10]

65.     Put simply, through *The Apprentice* and other means, Trump painted himself as a billionaire who had achieved the pinnacle of financial success.  But, in reality, Trump consistently exaggerated his wealth and success, and hid from his audiences any evidence by which they could assess his true financial position (and that of The Trump Organization).

66.     In the mid-2000s, to capitalize on Trump's rebuilt brand and massive exposure, Defendants concocted a scheme to use Trump's brand and reputation, as well as his casual willingness to make false and misleading statements, to defraud consumers who were inspired by Trump's apparent wealth and success.

67.     Beginning in 2005, the year after *The Apprentice* first aired, Defendants used the Trump Enterprise to operate a fraudulent scheme in which companies that offered training programs and/or business opportunities to ambitious and entrepreneurial consumers paid the Trump Enterprise in secret in exchange for Trump conveying the Message, with the full weight

---

[9] *Trump*, 422 N.J. Super. at 555–56, 29 A.3d at 1100.
[10] *Trump*, 422 N.J. Super. at 554, 29 A.3d at 1099.

of his personal brand behind it.  This scheme was knowingly designed to defraud consumers and enrich the Trump Enterprise.

68.    The operation of the Scheme with respect to each of the Endorsed Entities is detailed below.

## III.    THE TRUMP ENTERPRISE AGREES TO ENDORSE AND PROMOTE ACN THROUGH A PERVASIVE AND WIDELY DISSEMINATED MESSAGE.

### A.    The ACN "Business Opportunity" Needed High-Profile Endorsement To Recruit and Maintain Investors.

69.    ACN is a multi-level marketing company that offers a business opportunity to "Independent Business Owners" ("IBOs").  IBOs are required to pay an initial sign-up fee and an annual renewal fee for the privilege of selling ACN's products.  As of the 2013-2016 time period, the sign-up fee was $499 and the renewal fee was $149.

70.    According to the ACN compensation plan, IBOs can earn small commissions on sales and billing to customers who purchase ACN products and services through that IBO, with additional bonuses for meeting sales targets.  IBOs can also earn money by recruiting others to sign up as IBOs.  When an existing IBO recruits a new IBO, the recruit becomes part of the existing IBO's "downline."  IBOs can receive a commission on the sales and bills generated by members of their downline.

71.    ACN forbids IBOs from engaging in mass-marketing or advertising.  Instead, the lifeblood of ACN's recruiting operation is small group events hosted by IBOs in their own homes or at local hotels and event spaces.  IBOs are encouraged to identify "warm" leads among friends, family and other contacts and to invite them to small group meetings at their homes.  To help them in their sales and recruitment efforts, ACN sells IBOs a series of "Business Tools,"

including promotional DVDs and magazines, as well as "Your Business Assistant," a web application IBOs can use to manage both their downlines and customers.

72.     At these small-group recruiting events, hosts will typically play the DVDs and distribute the materials they have bought from ACN.  The aim is both to sell ACN's products and services and to "share the opportunity" to become an IBO.  These small meetings are the primary mechanism through which consumers are persuaded to make the initial investment to become an IBO.



73.     In order to keep IBOs motivated to invest in promotional materials and business tools after they have signed up, ACN stages ticketed multi-day events.  These events, often billed as large "Training Events" or "International Conventions," include both large rallies held in auditoriums, with guest speakers who encourage IBOs to make continued investments in ACN, as well as smaller seminar-style break-out sessions.  These conventions are not merely business conferences at which participants meet to network and hear from industry experts:  they are motivational rallies, designed to stoke enthusiasm and convince IBOs that they can make a profit

if they just keep investing and trying to build their downline.  These events themselves are another source of substantial revenue for ACN.





74.     In order to make both the small-group recruiting meetings and the larger motivational rallies successful, it was critical for ACN to obtain high-profile celebrity endorsement.  Enter the Trump Enterprise.



75.     ACN first announced that the Trump Enterprise had agreed to promote and endorse ACN in the Q4 2005 edition of *ACN Newsmagazine*, ACN's quarterly magazine sent to IBOs.  The announcement stated that Trump would be "featured in a variety of print and video media over the coming months, *all designed to help you build your ACN business*." [11]  The announcement also said that Trump would "speak to important points, edifying ACN—the company and vision."[12]  The magazine quoted Trump touting ACN.[13]

76.     Not long after Trump's endorsement was first announced, the Q2 2006 issue of ACN Newsmagazine explained to investors the unprecedented significance of Trump's endorsement.  The magazine emphasized Trump's global entrepreneurial stature and the impact it had on bolstering ACN's integrity in the eyes of investors:

> This endorsement serves as a ***huge testament to the integrity*** of the ACN Opportunity – ***never before*** has a company in the direct selling industry received an endorsement from ***someone of such stature***.  Donald J. Trump is an ***entrepreneurial icon***.  He's a multi-billionaire, Founder and CEO of The Trump

---

[11] *Donald Trump & ACN*, ACN NEWSMAGAZINE, Q4 2005, at 2 (emphasis added).
[12] *Id.*
[13] *Id.*

Organization, a ***globally-renowned*** property mogul, Executive Producer and host of *The Apprentice*, Founder of Trump University, and a best-selling author.

(emphases added).[14]

77.     Following the announcement, the Trump Enterprise endorsed and promoted ACN through four principal channels:  (1) in ACN videos distributed for IBOs to screen at home meetings; (2) in features in print and online media, including in ACN-branded magazines; (3) at ACN events; and (4) during episodes of *The Celebrity Apprentice*.  In each of these channels, as alleged more fully and with greater detail in Section IV below, the Trump Enterprise conveyed a common, consistent, and pervasive Message.  The overall reach of the Message across these channels was enormous, allowing the Trump Enterprise to convey the Message to millions of potential investors.

**B.     Trump Disseminated the Message Through ACN Videos**

78.     Trump was featured prominently on multiple versions of the "ACN Opportunity Disc," a series of promotional CDs and DVDs that IBOs used consistently to pitch the ACN business opportunity to prospective recruits.  IBOs were encouraged to purchase copies of the Opportunity Disc in bulk from ACN, so that they could play the videos on the disc at meetings with potential recruits and sell or give copies of the disc to other ACN participants to do the same.  The Opportunity Disc was updated frequently, sometimes more than once per year.  Each edition of the Opportunity Disc during the period of Trump's endorsement included prominent footage of Trump giving his personal endorsement to ACN and the business opportunity it offered.  Indeed, the same footage of Trump was reused frequently in successive editions with only minor editing between editions.  The effect was consistent:  during the relevant time period,

---

[14] *Baltimore International Training Event Sept. 8-10, 2006,* ACN NEWSMAGAZINE, Q2 2006, at 2.

the Message was conveyed in every edition of the Opportunity Disc in substantially the same form.



### C. Trump Disseminated the Message Through Print and Online Media

79.    ACN was featured frequently and prominently in *Success from Home*, a monthly magazine that purportedly included reporting on the network marketing and direct-selling industry but, in reality, exclusively published content sponsored by companies in that industry. Trump was featured in or contributed to issues of *Success from Home* published in April 2007, April 2008, August 2010, August 2011, July 2012, September 2013, September 2014, and August 2015.  ACN encouraged IBOs to purchase subscriptions to the magazine, touting it as "A Valuable Third-Party Validation Tool" for the ACN business opportunity and the MLM industry

more generally, exhorting IBOs to "put one in the hands of each of your top prospects!"[15]

Trump also encouraged ACN IBOs to use copies of the magazine to "*legitimize [their] business*"

in the eyes of potential recruits.[16]



---

[15] *Success from Home Magazine Featuring ACN,* ACN NEWSMAGAZINE, Q4 2005, at 6; *see also Home Sweet Home,* ACN NEWSMAGAZINE, Q2 2007, at 8.
[16] Donald J. Trump, *From the Mind of Donald J. Trump*, ACN, Aug. 7, 2013, available at https://web.archive.org/web/20150126184008/http:/acninc.com:80/news/donald-j-trump-messages/2013/08/07/acn-donald-j-trump.



80.    From August 2013 to around February 2015, Trump regularly contributed "inspirational note[s]" to ACN's blog.[17]  Trump's posts were designed to motivate and encourage IBOs to persevere with ACN.  The posts also encouraged readers to attend ACN events at which Trump was scheduled to speak.

### D.    Trump Disseminated the Message at ACN Events

81.    Between 2006 and 2015, Trump disseminated the Message during at least fourteen appearances at major ACN events held in auditoriums across the United States and overseas.  Trump was by far ACN's most important speaker—indeed, in 2014, the ACN website stated that Trump "[set] the record for the most appearances from the ACN stage by any ACN

---

[17] *Id.*

special guest speaker."[18]   His appearances included the following events:  ACN's International Training Event in Baltimore, Maryland, around September 8–10, 2006; ACN's International Convention in Fort Worth, Texas, around February 23–25, 2007; ACN's International Training Event in East Rutherford, New Jersey, around June 27–29, 2008; ACN's International Training Event in Charlotte, North Carolina, around June 26–28, 2009; ACN's International Convention in San Jose, California, around February 19–21, 2010; ACN's 2010 International Training Event in Charlotte, North Carolina, around September 10–12, 2010; ACN's International Convention in Barcelona, Spain, around March 18–20, 2011; ACN's International Training Event in San Jose, California, around June 24–26, 2011; ACN's International Convention in Charlotte, North Carolina, around February 17–19, 2012; ACN's 20th Anniversary International Training Event in Charlotte, North Carolina, around February 15–18, 2013; ACN's International Training Event in San Jose, California, around December 6–8, 2013; ACN's Canada International Training Event in Toronto, Ontario, around May 31, 2014; ACN's International Convention in Barcelona, Spain, around June 27–29, 2014; and ACN's International Convention in Charlotte, North Carolina, around February 13–15, 2015.



---

[18] *Catching the Eye of a Billionaire: Donald J. Trump and ACN,* ACN, available at https://web.archive.org/web/20140717125753/http:/acninc.com:80/trump.





82.    Attendees paid substantial sums to attend these events.  For example, tickets to watch Trump's speech from an overflow room next to the main hall at the September 2006 event in Baltimore cost $99.  Tickets to the June 2008 event in East Rutherford were $150.  And tickets to the February 2012 event in Charlotte ranged from $149 to $189 each.

83.    Although ACN made substantial efforts to prevent recording of these appearances—including by banning the use of cameras or smartphones and sending security guards through the crowd with flashlights to enforce the prohibition—recordings of some of

-34-

these appearances are available online, and more are expected to be obtainable through the discovery process.

### E.   Trump Disseminated the Message Through National Primetime Television

84.   On two separate occasions, the Trump Enterprise facilitated an appearance by ACN and promoted it on *The Celebrity Apprentice*, a national primetime television show. According to the *Hollywood Reporter*, the first such episode, which aired March 22, 2009, reached 12.4 million viewers.  The second episode, which aired March 27, 2011, reached 8.58 million viewers, according to the *Los Angeles Times*.



85.   Defendants Trump, Donald Trump, Jr., and Ivanka Trump appeared alongside ACN representatives in both episodes.  And not only did Trump disseminate the Message on primetime television on both occasions, but, in anticipation of each episode's release, ACN also issued press releases further touting the Message, on February 24, 2009, and March 16, 2011, respectively.

86.   These appearances achieved the Trump Enterprise's goals.  For example, shortly after the second episode was screened, on April 1, 2011, Debbie Davis, an ACN "Senior Vice President and Circle of Champions Member," wrote on ACN's Company Blog that:

This primetime opportunity has simply changed the game.  Because of the show, many representatives were able to talk to people they've never talked with before, and . . . many of those people may have never heard of the ACN home-based business opportunity.  When Mr. Trump acknowledged our Co-Founders as "friends" of his, at that moment, ACN was *oozing with credibility in everyone's eyes.*

(emphasis added).[19]



87.     Davis continued:  "Ask everyone on your list if they watched *The Celebrity Apprentice* last Sunday. . . .  [T]hat question has become the easiest, most successful way for me to share this opportunity with someone new."[20]



---

[19] Debbie Davis, *ACN & The Celebrity Apprentice: Next Steps*, ACN, Apr. 1, 2011, available at http://acninc.com/news/company/2011/04/01/acn-celebrity-apprentice-follow-up-next-steps-debbie-davis/.

[20] *Id.*

IV.   **THE TRUMP ENTERPRISE KNOWINGLY CONVEYED A CONSISTENT FRAUDULENT MESSAGE ABOUT ACN.**

88.   Through all four channels described above, the Trump Enterprise deliberately misled consumers into believing a common and consistent false Message—(1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN business opportunity; (2) that Trump was promoting and endorsing the ACN business opportunity *because* he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, inside information, and personal experience with ACN. Each part of that Message was knowingly false.

A.   **The Trump Enterprise Falsely Represented that the ACN Business Opportunity Offered Consumers a Reasonable Probability of Commercial Success.**

89.   Throughout the relevant period, the Trump Enterprise falsely represented to consumers they would have a reasonable probability of commercial success if they bought into the ACN business opportunity (the "Success Claim"). The Trump Enterprise conveyed the Success Claim to consumers through appearances by Trump himself in each of the channels of distribution described above—video, print and online media, in-person events, and national television broadcasts.

90.   The Trump Enterprise built the Success Claim on three false pillars: in his appearances on behalf of ACN, Trump falsely misrepresented (1) the level of risk inherent in the ACN business opportunity; (2) the potential profitability to consumers of the ACN business opportunity and MLMs in general; and (3) the market for ACN's products and services.

1. *Trump Misrepresented ACN's Risk-Profile.*

91.    Trump repeatedly misrepresented ACN's risk profile to consumers, falsely

claiming that investing in ACN was a low-risk entrepreneurial venture.  Chief among the

vehicles for disseminating this false message was the ACN Opportunity Disc, a video that was

distributed to prospective investors.  In that video, Trump stated:

> You have a great opportunity before you at ACN ***without any of the
> risks most entrepreneurs have to take***.  You have the ability to market
> breakthrough technology before it hits the critical mass.  I've
> experienced the opportunity that exists when you're able to jump ahead
> of the curve, and ACN gives you that opportunity.

(emphasis added).

Trump repeated this claim over and over again—this statement appeared in ***every*** edition of ACN

Opportunity Disc released from 2010 to 2013.

92.    Trump doubled down on his claim during his in-person endorsements, going so

far as to suggest that ACN was risk-free.  Onstage at ACN's International Convention in

Barcelona, Spain in March 2011, Trump explained to the auditorium that:

> A lot of the [ACN] people that I've met had their job for two or three
> years, and all of a sudden they started leaving out of their job and going
> full-time at ACN because they're making more money with ACN.  So I
> like it because ***it really takes the risk out***.  It ***takes a lot of the risk out of
> the decision***.

(emphases added).



93.     Investigations by regulatory agencies, however, show that the ACN business opportunity was high risk and that investors had a miniscule probability of commercial success. In multiple jurisdictions in the United States and throughout the world, a common and consistent finding has emerged:  consumers have not (and could not) achieve a reasonable probability of financial success by investing in the ACN business opportunity.

94.     For example, a Montana Commissioner of Securities and Insurance ("CSI") investigation reviewed ACN internal documents as part of an investigation into its business practices.  The CSI found that the IBOs recruited in Montana in the previous year paid approximately $234,812 in membership and convention fees and supplies to ACN, but received only $16,615 in compensation.  In one year, the average Montana IBO paid $752.60 to ACN, but received only $53.25 in compensation.  In other words, these IBOs had costs associated with their investment in the ACN business opportunity that were over ten times greater than their returns.

95.     A French investigation into ACN reached similar findings.  During its
investigation, the French Directorate General for Competition Policy, Consumer Affairs and
Fraud Control ("DGCCRF") modeled the earnings potential of ACN IBOs, using records
furnished by ACN.  The DGCCRF concluded that "*only 1 percent of people recruited could
claim a satisfactory income*, while 99 percent either lose money or at best earn a monthly
income of €28.20" (approximately US$35) (emphasis added).  Moreover, the DGCCRF
projected that even comparably successful IBOs within ACN could earn only a paltry income.
For example, an IBO who had as many as 50 direct clients and 72 clients in their network earned
only €2.35 monthly (approximately US$3), while an IBO who had as many as 40 direct clients
and 350 clients in their network earned only €79.70 monthly (approximately US$98).  The
projections suggested that the vast majority of IBOs lost money regardless of their client
configurations.  Even if an IBO acquired six clients, 15 direct clients and six network clients, or
20 direct clients and 18 network clients, the IBO was projected to lose between €376
(approximately US$458) and €613 (approximately US$747) annually.

96.     In addition, ACN's own reports in Canada confirm that consumers did not have a
reasonable probability of commercial success.[21]  According to ACN, the average "active" ACN
Canada IBO earned only approximately CA$500 in one year.  Previous versions of the same
reports reveal even lower earnings.  For example, according to Sergio Pareja of the University of
New Mexico, the average ACN Canada active IBO "earned approximately [CAN] $400" in a
single year.[22]  Even these figures, however, do not reveal the full extent of IBOs' losses.  As

---

[21] Unfortunately for Plaintiffs, Trump did not mitigate the Success Claim by reference to any
such disclosures, nor did ACN make disclosures of such granularity in the United States.
[22] Sergio Pareja, *Sales Gone Wild: Will the FTC's Business Opportunity Rule Put an End to
Pyramid Marketing Schemes?*, 39 McGeorge L. Rev. 129 (2008), available at
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1092188.

Pareja explained, ACN's figures showed gross earnings that did not take account of expenses incurred by IBOs; nor did those figures identify the percentage of *non-active* IBOs, who were categorically excluded from the calculation.

       2.   *Trump Falsely Claimed That ACN's Business Model (and Direct-Selling in General) Provided a Viable Source of Income for Prospective Investors.*

97.     Not only did Trump misrepresent ACN's risk profile, but also Trump falsely claimed that the ACN business opportunity (and the MLM business model in general) was highly profitable for investors.  Trump stated that "direct selling"—a component of the MLM business model—"is actually one of the oldest, most respected business models in the world, and has stood the test of time, most importantly."  In an extract from his book, *Why We Want You to Be Rich*, which was published in *Success from Home*, Trump (and his co-author) stated that

> Network marketing has proven itself to be a ***viable and rewarding source of income***. . . .  My advice about network marketing is to do your research, and put everything you've got into your product.  Genuine enthusiasm is hard to beat, and ***the odds will be with you***.

(emphases added).[23]

98.     In addition, far from encouraging prospective IBOs to exercise caution in a tough economic climate during the peak of the global financial crisis, Trump claimed that the MLM industry was "growing when many others are suffering massive losses."[24]

99.     Elsewhere, Trump continued the same theme.  In the *Success from Home* magazine, Trump repeatedly praised ACN's business model as presenting a "good business and a solid opportunity" for "thousands and thousands of people."[25]  Speaking from a position of

---

[23] Donald J. Trump, *Why Network Marketing?*, SUCCESS FROM HOME, Aug. 2011, at 96.
[24] Anne Archer, *Direct Selling in the Age of Donald J. Trump*, SUCCESS FROM HOME, Aug. 2010, at 22.
[25] *Id.*

apparent authority as a self-proclaimed business expert, Trump portrayed ACN as a business

with strong fundamentals and sound management:

> When evaluating a business opportunity, people need to look for strong
> leadership, a solid track record, success stories, a strong product people
> really need and want, and a clear plan for the future.  ACN has all of
> these things.

100.    In sum, Trump told his audiences:  "I know what it takes to be a success, and

ACN has a winning business model.  And I mean – winning."



101.    Trump's claim about the profitability of the ACN business opportunity was false.

As alleged above, only 1% of IBOs were able to earn a satisfactory income—every regulatory

agency to have studied the matter has concluded that the costs to IBOs greatly exceeds their

returns.  Moreover, the losses were not just limited to ACN's IBOs.  Contrary to Trump's

statements, such losses were endemic to MLM and direct-selling opportunities.  As Jon M.

Taylor, President and co-founder of the nonprofit Consumer Awareness Institute, has written,

loss rates in the multi-level marketing industry are "extraordinary."  Taylor concluded that,

"[b]ased on available company data, approximately 99.7% of all MLM participants lose money –

spending more on company purchases and promotion and operating expenses than they receive in commissions from the company."  Taylor lists ACN as one such company.

102.    Finally, consumer complaints bureaus have received a litany of complaints about the "business opportunity" offered by ACN.  Countless IBOs made no money at all.  For example, one said:  "I trusted a very good friend and paid out $500.00 and never saw any income from this business."[26]  Another said:  "I did everything I was supposed to and have not made a dollar."[27]

### 3. *Trump Misrepresented the Commercial Viability of ACN's Products, Especially the ACN Video Phone.*

103.    In addition to misrepresenting the risk profile and profitability of the ACN business model, Trump misrepresented the commercial viability of ACN's products.  When Trump first began endorsing the company, ACN dedicated an important part of its business to reselling third-party telephone and internet utility plans through IBOs.  In late 2008, however, ACN moved into selling a "videophone," a desktop telephone with a screen and camera that allowed users to have conversations using voice and video.  The videophone was a central component of ACN's sales strategy for many years.  During this period, Trump repeatedly praised ACN's "great product"—its "new ACN Video Phone."  But ACN's videophone was anything but great—the product was doomed almost from the outset.  The videophone was essentially a desktop, wired telephone with a video screen and webcam in addition to the usual handset and keypad.  It required an internet connection to work.  And, because an ACN videophone could only be used to make video calls to other ACN videophones, both parties to a

---

[26] *Pissed Consumer* report no. 832927, available at https://acn.pissedconsumer.com/very-very-bad-idea-20160419832927.html.

[27] *Pissed Consumer* report no. 601509, available at https://acn.pissedconsumer.com/rip-off-acn-is-a-scam-all-the-way-beware-20150227601509.html.

call had to subscribe to ACN services to use the phone's video capabilities.  The ACN

videophone was in direct competition with easily accessible video calling software (including

Skype) and was soon eclipsed by smartphones with video calling capability.  In short, there was

no proven market for the phone, no reason to expect consumers would demand the phone, and

nothing to suggest a standalone videophone was a desirable product in light of its competition.



104.    Information available to the Trump Enterprise (but unfortunately not readily

available to Plaintiffs) reflected the ACN videophone's dim commercial prospects.  Worldgate

Communications, Inc. was a small company that sold "digital video phones directly or through

agents to telecommunications service providers who have a digital voice and video management

and network infrastructure."[28] In late 2008, Worldgate was on the brink of collapse.[29]  It had

---

[28] *Company Overview of WorldGate Communications, Inc.,* BLOOMBERG, available at
https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=36713.
[29] *See generally* WorldGate 10-K Annual Report at 6 (2009), available at
https://www.sec.gov/Archives/edgar/data/1030058/000114420410017605/v179472_10k.htm.

been delisted from the NASDAQ in 2007 and suspended operations for some time during 2008.[30] Its managers doubted it could continue as a going concern.[31]

105.     In December 2008, a mere three months before ACN appeared on *The Celebrity Apprentice* for the first time, ACN agreed to buy 300,000 videophones from Worldgate and to provide $1.2 million in funding for Worldgate.  The same month, WGI Investor LLC, an entity owned indirectly by ACN co-founder Robert Stevanovski and his wife, agreed to purchase a 63% stake in Worldgate in exchange for $1.45 million and the assumption of $5.1 million in debt.[32]

106.     In the 2009 episode of *The Celebrity Apprentice* featuring ACN, Trump said that "ACN is the largest distributor of videophones anywhere in the world.  They do half-a-billion dollars worth of sales a year."  This revenue representation was abjectly false.



---

[30] *Id.* at 45.
[31] *Id.* at 6.
[32] *Id.* at 21

107.   Even if ACN sold each and every one of the 300,000 videophones it ordered in one year, at the retail price of 300, for example, that would only amount to $90 million in sales.

108.   In addition, it seems highly unlikely that ACN's order for 300,000 units from Worldgate came anywhere close to making ACN the "largest distributor of videophones" in the world at the time.

109.   At an ACN convention in June 2009, Trump continued to claim ACN had a "great product." Trump stated that ACN was a "leader in the field," and assured participants that they were in the "right business." He had previously told ACN participants that "I think [ACN's] new videophone is going to be tremendous." But there was neither a basis for Trump to assert that ACN was a "leader" in the field of telecommunications hardware generally nor videophones specifically.

110.   Trump repeatedly represented that ACN's videophone products were technologically superior to their competition. In one video, he said:

> I would say, knowledge is so important, especially when you're dealing in high-tech kind of things like you. . . . With ACN it's really knowledge, and one of the beauties with ACN, that I've been able to determine after some research, is that **you guys have stayed ahead of the pack. You've stayed ahead of it from a technological standpoint**, from a knowledge standpoint. And in your world, I think the word knowledge is so important.

(emphasis added).

111.   Onstage at an ACN event, Trump said that:

> Breakthrough products like the ACN Video Phone reveal ACN's commitment to pioneering technologies of the future. With the ACN Video Phone, they are leading the way in a communication revolution.

-46-

Staying at the forefront of innovation is key to long-term business success, and ACN is doing just that.[33]



112.    Trump repeatedly claimed that this technological superiority would lead to robust consumer demand for the video phones.  In an ACN Opportunity Disc released around 2010, Trump said:

> Imagine seeing the person you're talking to, not just hearing their voices. No matter who you are, no matter what you do, ***everyone can find value in this technology***.  With my busy schedule, the ACN video phone keeps me personally connected to my contacts around the world, without ever leaving my office.

(emphasis added).  This could not possibly be true.

---

[33] Anne Archer, *Direct Selling in the Age of Donald J. Trump*, SUCCESS FROM HOME, Aug. 2010, at 22.

113.    To put it beyond doubt, in a 2010 edition from *Success from Home*, Trump was quoted as saying that the video phone was "changing communications as we know it. . . .  It's a product that practically sells itself."[34]

114.    In ACN's press release announcing its appearance in the 2011 season of *The Celebrity Apprentice*, ACN again touted its "latest video phone" as "revolutionary."  Trump was quoted as saying:

> I think the ACN Video Phone is amazing.  It's connecting people face-to-face regardless of where they are.  I simply can't imagine anybody using this phone and not loving it.[35]

115.    Trump's statements regarding the technological superiority of the video phone and expected consumer demand were false and misleading.  ACN's videophone was less technologically advanced than any of its competitors, which also offered their competitive products at lower prices.  For example, as alleged above, desktop applications such as Skype offered voice and video calling at far lower costs than ACN's videophone plan.  Indeed, the market's reception showed ACN videophone was anything but amazing.  In March 2011, mere days before the 2011 episode of *The Celebrity Apprentice* aired, Worldgate announced that it was in a "cash crunch" and would fire 65% of its workforce (leaving it with 15 employees).  That same month, ACN revised downward its agreement to buy 300,000 videophones.

---

[34] Anne Archer, *Direct Selling in the Age of Donald J. Trump*, SUCCESS FROM HOME, Aug. 2010, at 21.

[35] *ACN Goes Primetime with Encore Appearance on Donald J. Trump's* The Celebrity Apprentice, ACN, Mar. 16, 2011, available at https://web.archive.org/web/20130627214919/http://www.acnpresskit.com/documents/ACN-Celebrity-Apprentice-NBC-Trump-Press-Release.pdf.

**B.      Trump Falsely Represented that He Genuinely Supported ACN and Failed To Disclose That He Was Being Paid Lavishly for His Endorsement.**

116.      Trump repeatedly told his audiences that he endorsed ACN because he believed it offered a reasonable probability of commercial success.  He touted ACN's commercial prospects and/or his regard for its founders.  And he failed to disclose that he was, in fact, being paid millions of dollars for his ACN endorsement.



117.      For example, in his speech at ACN's 2008 International Convention in East Rutherford, New Jersey, Trump stated that he had just "extended" his "partnership with ACN," because "when you have knowledge of something, and you really believe in something, it's very easy to give an endorsement.  ***And I give my endorsement*** 100 percent" (emphasis added). [36] Neither Trump nor ACN disclosed to the audience that Trump was paid for this appearance, though he was paid lavishly for each appearance—at times millions of dollars for delivering a single speech. [37]

---

[36] *Learn 3 Networking Secrets from Donald Trump on Effective MLM Marketing*, YOUTUBE, Apr. 5, 2010, available at www.youtube.com/watch?v=NsIQSku1ioI.
[37] James V. Grimaldi and Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, THE WALL STREET JOURNAL, Aug. 13, 2015, available at https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

118.    Onstage at ACN's 2009 International Training Event in Charlotte, North Carolina, Trump noted it was the "fourth time I've felt like I'm part of you."  He praised ACN's founders, saying, "I really understand these guys," having "been with them for over three years as their friend."  He concluded: "I mean that, and if I didn't, I wouldn't be here."[38]

119.    Trump was the "keynote speaker" at ACN's 2010 International Training Event in Charlotte, North Carolina, where he was misleadingly billed as a "multi-billionaire entrepreneur."[39]  At the convention, he was interviewed by Darren Hardy, publisher of *Success from Home*.  In the interview, Trump emphasized his liking for ACN's founders, saying that he had "developed a real liking for Greg [Provenzano] and Robert [Stevanovski]," and that "I really enjoy and use your product . . . . I really like it a lot.  I use it when I can."[40]  Trump also said that "ACN is going to become a major sponsor of *The Apprentice*," and suggested that he would "put in a little special flavor because I really feel strongly about the company."[41]

120.    Trump was the guest speaker at ACN's 2011 International Convention in Barcelona, Spain, where he was again interviewed onstage by Hardy.  Asked why he had "such affinity for ACN," Trump explained that he "really like[s] the guys," who "have really become friends of mine."[42]  He continued to explain that he "give[s] lots of money to charity, and [the ACN founders] contribute to my charities.  They really have been very generous. . . . These are

---

[38] *ACN Donald Trump TRUMP CLT*, YOUTUBE, Mar 4. 2010, available at https://www.youtube.com/watch?v=EziHMkg5GfI.

[39] *ACN Welcomes Representatives to Hometown for International Training Event,* ACN, Aug. 30, 2010, available at http://acninc.com/news/press-releases/2010/08/30/acn-welcomes-representatives-to-hometown-for-international-training-event/.

[40] *Donald Trump Interviewed by Darren Hardy Part 1,* YOUTUBE, Mar. 26, 2011, available at https://www.youtube.com/watch?v=rj0tlNg5WGM.

[41] *Donald Trump Interviewed by Darren Hardy Part 3,* YOUTUBE, Mar. 27, 2011, available at https://www.youtube.com/watch?v=x7Uq0dl9DsA.

[42] *Convention Internationale Barcelone 2011 Iterview de M. Donald J. Trump,* YOUTUBE, Apr. 10, 2011, available at https://www.youtube.com/watch?v=l081iz5QAEk.

good guys.  And I just felt I had a little bit of an obligation. . . . [It] was a pain in the ass to get

here."[43]  (There is little evidence to support Trump's claims about giving lots of money to

charity.)

121.    At an ACN convention shortly thereafter, Trump explained to great applause:  "I

do speeches because I like doing it."[44]

122.    In a 2012 edition of the ACN Opportunity Disc, Trump elaborated on his reasons

for supporting the company:

> I've been working with ACN for a few years now.  Since that time I have
> developed a great relationship with ACN, and the more I learn about
> them, the more I like and respect them.  I see incredible potential in the
> things they're doing now, and are planning in the future.

123.    At ACN's 20th Anniversary International Training Event in Charlotte, North

Carolina, in February 2013, ACN announced that Trump was now an "exclusive" endorser.

Onstage at the event, Hardy asked Trump, "why do you keep coming back?  What is it about

ACN? ***Certainly not for any money***" (emphasis added). [45]  Trump answered:  "No." [46]



---

[43] *Id.*

[44] *Trump Loves ACN,* YOUTUBE, Feb. 22, 2012, available at
https://www.youtube.com/watch?v=53I_vIjFsMs.

[45] *Donald Trump 1 of 5 at ACN's 20th,* YOUTUBE, Feb. 18, 2013, available at
https://www.youtube.com/watch?v=bY_g7Ws3C3Q.

[46] *Id.*

124.    Hardy continued, "It's for the love of the organization.  Tell us why you love ACN?"[47]  Trump replied:

> [T]he reason I'm doing it is because I really have a just a special relationship with the founders, they are good people, they are hard workers, they love what they are doing, they love the people in the room . . . [T]hey are really good people with great ideas and they want to help other people.[48]

125.    Trump continued to say that he had "agreed to extend the relationship for a substantial period of time . . . .  Again, because of my relationship with the founders."[49]  After Hardy noted that Trump had "[chosen] to become exclusive with ACN,"[50] Trump said, "It's true.  It's an honor.  Believe me."[51]

126.    At the June 2014 ACN International Convention in Barcelona, Trump again affirmed that he was not endorsing ACN because he was paid to do so.  He claimed he was "a fan of the founders and the vision" of ACN, and continued to say that he was "not an owner of ACN" so he did not "really need this," but that he "respect[s] what the owners are doing."

127.    Trump's representations that he genuinely supported ACN out of admiration for its business and affection for its founders were, at best, knowingly misleading.  During the period of his endorsement, Trump never disclosed to his audiences that he was paid vast sums of money for each appearance as an ACN guest speaker.

---

[47] *Id.*

[48] *Id.*

[49] *Donald Trump 2 of 5 ACN 20th,* YOUTUBE, Feb. 18, 2013, available at https://www.youtube.com/watch?v=8l3ilD5j4WA.

[50] This "exclusive" agreement appears to have been reached shortly after the Trump Network collapsed in late 2011.

[51] *Donald Trump 2 of 5 ACN 20th,* YOUTUBE, Feb. 18, 2013, available at https://www.youtube.com/watch?v=8l3ilD5j4WA.

128.    To the contrary, Trump affirmatively claimed that he did not endorse ACN for the

money.  For example, in the August 2011 issue of *Success from Home*, Trump was quoted as

saying:

> When Trump was negotiating with ACN, Inc. to represent the company
> and speak at their events, he made it clear that he would not be doing it
> "for the money."  He has plenty of money, so something else had to be
> the deciding factor.  For him, it came down to the four ACN co-
> founders.[52]

129.    Trump reiterated this message repeatedly at ACN's events.

130.    In direct contradiction to his many years of statements and omissions indicating

that he was not doing it "for the money," Trump admitted years later that his speaking fees

amounted to "a substantial amount of money, even if you're rich."[53]  Plaintiffs are not presently

aware of just how much Trump and the Trump Enterprise were paid for Trump's endorsement.

But the evidence now available suggests that the amounts were staggering—especially compared

to the income of the average ACN IBO.  According to Trump's 2015 financial disclosures, ACN

Inc. paid him $450,000 each for three in-person appearances between May 2014 and

February 2015.[54]

131.    Similarly, in neither the 2009 nor the 2011 episodes did Trump or the Trump

Enterprise disclose that ACN had paid the producers of *The Celebrity Apprentice* handsomely to

be featured on the show.  But, years later, Trump admitted that ACN "paid a lot of money to go

on the show," saying that "it was like a two-hour advertisement, as opposed to a 30-second

---

[52] Anne Archer, *Catching the Eye of a Billionaire*, SUCCESS FROM HOME, Aug. 2011, at 23.
[53] James V. Grimaldi and Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, THE WALL STREET JOURNAL, Aug. 13, 2015, available at
https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.
[54] Donald J. Trump, Office of Government Ethics Disclosure Form, July 22, 2015.

commercial."[55]  Although Plaintiffs are not aware how much ACN paid for its appearances on

*The Celebrity Apprentice*, public reports have estimated that the company paid between $5–9

million to appear in a single episode. [56]  Plaintiffs are unaware of which entity within the Trump

Enterprise received these payments, or whether other parties shared in the payments.

132.    The Federal Trade Commission (the "FTC"), the agency charged with protecting

the nation's consumers, has long emphasized the importance of disclosing clearly and

conspicuously compensation for endorsement activities—and that failing to do so misleads

consumers.  Indeed, as part of its consumer protection mandate, the FTC issues specific guidance

concerning the use of endorsements.[57] In the FTC's view, endorsers must disclose "connections"

with, including monetary compensation they receive from, sellers of advertised products "that

might materially affect the weight or credibility of the endorsement."[58]

133.    The FTC succinctly explains why endorsers must clearly and conspicuously

disclose "material connections" with sellers of products:

> Suppose you meet someone who tells you about a great new product.
> She tells you it performs wonderfully and offers fantastic new features
> that nobody else has. Would that recommendation factor into your
> decision to buy the product? Probably.
>
> Now suppose the person works for the company that sells the product –
> **or has been paid by the company to tout the product. Would you want
> to know that when you're evaluating the endorser's glowing**

---

[55] James V. Grimaldi and Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, THE WALL STREET JOURNAL, Aug. 13, 2015, available at https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

[56] *Id.*

[57] § 16 CFR Part 255.

[58] *Id.*; *see also* FTC Staff Reminds Influencers and Brands to Clearly Disclose Relationship, https://www.ftc.gov/news-events/press-releases/2017/04/ftc-staff-reminds-influencers-brands-clearly-disclose ("FTC Reminder").

> *recommendation? You bet.* That common-sense premise is at the heart
> of the Federal Trade Commission's (FTC) Endorsement Guides.

(emphases added).[59]

134.    In recent years, the FTC has taken a more vigorous approach towards those who fail to comply with its advice.  Indeed, just last year, the FTC announced that its staff had issued in excess of 90 letters reminding celebrities to disclose material connections with relevant parties when promoting or endorsing products.[60]

135.    In addition to requiring disclosure of an endorser's material connections, the FTC states that endorsements "must reflect the honest opinions, findings, beliefs, or experience of the endorser."[61] The FTC again explains the responsibility that a celebrity endorser assumes when she or he elects to make a paid endorsement:

> The celebrity has *decided to earn money by providing an endorsement*.
> With that opportunity comes the *responsibility* for the celebrity or his or
> her legal representative to *ensure in advance* that the celebrity does *not
> say something that does not "reflect [his or her] honest opinions,
> findings, beliefs, or experience*."

(emphases added).[62]  Indeed, in the FTC's view, even if a celebrity is only reading from a script that was written by the advertiser, the endorser may have "an obligation to make *reasonable inquiries* of the advertiser that there is an *adequate basis* for assertions that the script has them making" (emphasis added).[63]

136.    Trump's persistent failure to disclose that he was being paid for his endorsement of ACN was wholly inconsistent with these basic consumer-protection principles.

---

[59] The FTC's Endorsement Guides:  What People Are Asking, https://www.ftc.gov/tips-advice/business-center/guidance/ftcs-endorsement-guides-what-people-are-asking.
[60] FTC Reminder.
[61] 16 CFR Part 255.1(a).
[62] 74 Fed. Reg. 53128 (citing 16 CFR 255.1(a)).
[63] 74 Fed. Reg. 53128-29.

### C. Trump Falsely Represented that His Endorsement Was Predicated on Appropriate Due Diligence and Personal Experience with ACN's Business.

137.    Trump reassured his audiences that they could trust what he was saying about ACN by making further false statements about the basis for his statements.  In particular, Trump claimed that he conducted appropriate due diligence into ACN before agreeing to endorse it.  In so doing, he implied that his diligence confirmed that ACN presented a reasonable probability of commercial success for prospective IBOs.  Trump also claimed that he had personally experienced the ACN opportunity and that his endorsement was based on that experience.

138.    For example, in announcing his endorsement in 2005, Trump said:  "ACN is a great company.  How do I know?  Because we have *done a lot of research*."[64]  Later, in another ACN Opportunity Disc, Trump explained his process for deciding to endorse ACN, saying "*we do a lot of research on companies* before we agree to do something like I'm doing for you.  And ACN's a great company."[65]

139.    Trump echoed these false statements during his in-person appearances.  When explaining to a live audience in 2008 why he had decided to extend his endorsement, Trump said that "when you have knowledge of something . . . it's very easy to give an endorsement 100 percent."[66]  And Trump repeated this message in interviews for *Success from Home*.  As the August 2011 issue put it:

---

[64] *Donald Trump & ACN,* ACN NEWSMAGAZINE, Q4 2005, at 2.
[65] *ACN Interview with Donald Trump #3,* YOUTUBE, Apr. 3, 2008, available at https://www.youtube.com/watch?v=sMpnCXmMrxM.
[66] *Learning 3 Network Secrets from Donald Trump on Effective MLM Marketing,* YOUTUBE, Apr. 5, 2010, available at www.youtube.com/watch?v=NsIQSku1ioI.

> When Trump was initially deciding to work with ACN, his organization
> did a great deal of research on the company and took a hard look before
> deciding to endorse ACN and its products.[67]

A later issue stated reiterated Trump "only chooses" to invest "after performing due diligence."[68]

140.    In the video on the ACN Opportunity Disc, Trump similarly claimed that, "I've experienced the opportunity that exists when you're able to jump ahead of the curve, and ACN gives you that opportunity."

141.    In addition to claiming he had conducted research into and had personal experience with ACN's business model, Trump claimed to have conducted specific research into its videophone product.  Affirming the importance of "knowledge" when dealing with "high-tech" products, Trump claimed, "I've been able to determine after some research" that ACN's technology had "stayed ahead of the pack."[69]

142.    But all available information is to the contrary.  As Trump told the *Wall Street Journal* in 2015, "I'm not familiar with what [ACN] do[es] or how they go about doing that."[70] He went on to say, "and I make that clear in my speeches"[71]—yet another blatant falsehood.

---

[67] Anne Archer, *Catching the Eye of a Billionaire*, SUCCESS FROM HOME, Aug. 2011, at 24; *see also* Anne Archer, *Direct Selling in the Age of Donald J. Trump*, SUCCESS FROM HOME, Aug. 2010, at 20.

[68] Beth Douglass Silcox, *Recognizing a Winner*, SUCCESS FROM HOME, Sept. 2013, at 74.

[69] *ACN Interview with Donald Trump #3,* YOUTUBE, Apr. 3, 2008, available at https://www.youtube.com/watch?v=sMpnCXmMrxM.

[70] James V. Grimaldi and Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, THE WALL STREET JOURNAL, Aug. 13, 2015, available at https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.

[71] *Id.*

**V.     THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF ACN WAS THE KEY FACTOR IN PLAINTIFFS' INVESTMENT DECISIONS.**

143.    Trump's fraudulent message was highly material in the minds of investors, as ACN itself acknowledged—all the more so because the Trump Enterprise used the Trump brand to bolster the message, and permitted ACN to do the same.  This use of the Trump brand and association with Trump was also extremely powerful in the minds of investors.  Indeed, in numerous published testimonials, IBOs attributed their decision to join ACN to Trump's endorsement.

144.    For example, one IBO described leaving her job as a dental hygienist to join ACN after a patient left her a copy of the Opportunity Disc:

> One special day, however, it was a patient who was looking out for Kim when she told her all about ACN and left behind an Opportunity Disc. 'She really drove home two major points that made an impression: first, ***that Donald Trump endorsed the company***, and second, that the disc she had given me would take less than 10 minutes to take a look at.' . . . As soon as she watched the videos, she signed up right away.

 (emphasis added).

145.    ACN itself proudly boasted of its relationship with Trump and the legitimacy the Trump brand afforded the company.  As one edition of the ACN Opportunity Disc put it:

> We're attracting attention in very high places, and among ***the world's most successful business leaders.***  One such leader is billionaire entrepreneur Donald Trump, who has ***built his career on recognizing an exceptional opportunity when he sees it.***

(emphases added).

146.    ACN's prime-time features on *The Celebrity Apprentice* massively boosted ACN's business.  In June 2010, *Direct Selling News* reported that ACN "had tremendous growth after its video phone was featured on Donald Trump's *The Celebrity Apprentice*."  Provezano was quoted as saying that ACN's performance was "spectacular" in the first quarter of 2010.  In

2012, Provenzano explained that, from ACN's perspective, "having Donald Trump endorse our organization would be the epitome of an endorsement."[72]   As an article in *Success from Home* noted, "[t]he endorsement is truly a direct seller's dream.  After all, Trump personifies the will to win.  He is an entrepreneurial icon, nobody can outwork him and he is a fan of network marketing."[73]

147.    ACN made crystal clear that Trump's brand was an impactful recruiting tool for investors in two principal ways:  first, it attracted the interest of prospective investors and second, it would help close the deal with prospective recruits.  As ACN News magazine explained, the ACN Opportunity Disc was designed to "pique interest in ACN and ***get existing prospects off the fence***," including by using "the ***powerful*** endorsement of Donald J. Trump" (emphases added). [74]

148.    ACN executives repeatedly emphasized that the Trump brand would heighten the impact of his endorsement in the minds of prospective investors.  ACN co-founder Tony Cupisz was quoted as saying "You've got that incredible disc with Donald Trump on it . . . whoever hands out the most of those discs will get the most results. . . . ***Donald Trump is promoting your business for you***" (emphasis added).[75]  Co-founder Mike Cupisz noted that Trump's support for ACN was unparalleled: "We have got Donald ***Trump*** – a ***multi-billionaire*** –giving us ***the highest level endorsement than any other network marketing company has ever had in history***" (emphases added).[76] Greg Provenzano, ACN's co-founder and president, boasted in his

---

[72] Barbara Seale, *The Wizard of Winning,* SUCCESS FROM HOME, July 2012, at 76.
[73] *Id.*
[74] *Baltimore International Training Event Sept. 8-10, 2006,* ACN NEWSMAGAZINE, Q2 2006, at 2.
[75] *Id.*
[76] *Id.*

"President's Message" about the significance and singularity of Trump's endorsement—and the

enormous value it would have because of its impact on investors:

> One of the ***most important tools*** available to ACN representatives today is
> obviously the Donald J. Trump endorsement. ***It's all about Trump*** this
> quarter at ACN – and all about what Trump can do for you! . . .
>
> How much would it be worth to have Mr. Trump sit in your living room
> and ***personally endorse*** ACN as you present the ACN Opportunity to your
> prospects?  It would be ***priceless*** – and ACN is making that happen. . . .
>
> Mr. Trump is ***extremely selective*** in his speaking engagements and in the
> companies he chooses to work with – and he ***chose ACN***!

(emphases added).

149.    Finally, ACN's appearance on *The Celebrity Apprentice* "added credibility for

[ACN] like none other."[77]  As Provenzano put it in an interview in *Success from Home*:

> It was the ***biggest meeting night in ACN history***!  Independent business
> owners held opportunity meetings in hotels, theaters, restaurants and other
> venues to introduce ACN in a whole new way through the episode,
> providing a new platform for them to share the ACN home-based business
> with their prospects.  And the interest didn't die down during commercial
> breaks, as independent business owners used commercials as prime
> opportunities to answer questions, host contests about ACN and the
> episode, and to share our opportunity through presentations and talks. . . .
> ***The wave of momentum the episode created is truly incredible***!"

(emphases added).[78]

150.    The repeated references to Trump's wealth were a key part of the use of his brand

to boost ACN's business.  Potential investors were led to credit Trump's assessments of ACN as

a business opportunity because of his portrayal as exceedingly wealthy—after all, a purportedly

self-made billionaire must know a thing or two about making money.  But, as alleged above,

Trump's apparent wealth was largely an illusion.

---

[77] Anne Archer, *Catching the Eye of a Billionaire*, SUCCESS FROM HOME, Aug. 2011, at 24.
[78] *Id.*

151.     Thus, it was not only the message conveyed by Trump that so misled investors.  It was ACN's ability to associate itself with the Trump brand—a right that ACN secretly bought from the Trump Enterprise—that drove the fraudulent message home and pushed investors to overcome lingering doubts and invest in the ACN business opportunity.

152.     Throughout the period of his endorsement, Trump was in full control of how his brand was used to bolster ACN in the eyes of potential investors.  Indeed, ACN directed IBOs that they could only use materials featuring Trump that were created by ACN itself, because ACN had "exclusive and *limited* permission to reference Donald J. Trump and use his image on ACN created material that has been *approved by* the Trump organization" (emphases added).

### A.     Jane Doe

153.     Plaintiff Doe signed up as an ACN IBO in mid- to late 2014 and pursued the business opportunity for approximately two years.  Throughout that time, she also worked as a hospice caregiver, often working twelve-hour shifts, seven days a week.  Doe continues to work as a hospice caregiver to this day.

154.     Doe was invited to her initial ACN meeting by her friend, Plaintiff Luke Loe.  Doe had first met Loe about five years earlier through a social club, and they connected because of their mutual interest in business and current events.  Doe and Loe were ambitious, entrepreneurial, and eager to invest in themselves.

155.     One day in mid- to late 2014, Loe called Doe and told her that he had joined ACN.  He said that he thought that the company was a great opportunity for them both to make money, and invited her to join him at an ACN meeting.  Doe was intrigued.  She knew that, like herself, Loe really needed and wanted to make money.  They were both struggling financially.  Doe agreed to attend.

156.     The meeting was held in a large meeting room at a hotel in Los Angeles.  There were about 75 people there:  a mix of current ACN IBOs at various levels, as well as potential recruits.  The recruits were encouraged to sit right up front.

157.     The meeting began with speeches by three more senior ACN IBOs.  The first speaker talked at some length about ACN's charitable giving, and told recruits that, if they signed up for ACN, they would not need to make charitable donations, since a substantial portion of their investment would support charitable causes.  Doe, a charitable person who regularly made donations to St. Jude despite her extremely limited means, liked what she was hearing.

158.     The next IBO talked more about how to pursue the business opportunity.  She emphasized the importance of getting one's own family involved in the company.  Doe thought this sounded okay, but she was unconvinced.

159.     The third speaker was a senior ACN IBO.  Doe did not care for him at all.  She was extremely put off by her sense that he was talking down to people, fancying himself as better than lower-level IBOs.  She thought he seemed arrogant.  She considered leaving the meeting.

160.     Next, the organizers of the meeting played a seven- to eight-minute promotional video prominently featuring Donald Trump.  This video was the turning point for Doe.  Doe thought very highly of Trump.  She was entrepreneurial and ambitious, and she thought of Trump as a highly successful businessman with many accomplishments.  In addition, Doe's mother had been a viewer of *The Celebrity Apprentice* and frequently told Doe all about it.  She emphasized how impressive Trump was—how good he seemed at business.

161.     As she watched the video, Doe was very impressed by Trump's endorsement of ACN.  She watched as he said that ACN IBOs could make real money from their involvement in the company, which he said was already worth millions.  Then she watched clips of ACN's

appearance on *The Celebrity Apprentice*.  Doe saw Trump stand alongside the founders and praise the company.

162.     Based on what she knew about Trump and *The Celebrity Apprentice*, Doe was convinced by his statements that ACN was a great opportunity.  Doe trusted Trump.  She was convinced that Trump believed that investing in ACN was a great business opportunity—and that that was why he was endorsing it.  And she believed that, like any businessman promoting a business opportunity, he had researched ACN extensively and that his statements were supported by his own research and experience.

163.     In addition, Doe believed that Trump had her best interests at heart.  She believed that Trump was already very rich, and she thought to herself, "what would he want with my $500?"  She thought, "he already has a lot of money, he's not trying to scam me."  Doe had no idea Trump was being paid lavishly for his endorsement—the video made no mention of that.  Doe thought Trump's only motivation in endorsing ACN was to help people like her make good business decisions.  As a result, Doe trusted Trump when he said that ACN was "one of the best businesses" and that participants could make a lot of money from investing in ACN.  Doe concluded that Trump would not have associated himself with ACN, brought the company onto his show, and given it such huge publicity if it were not a genuine opportunity that offered a strong likelihood of a good return.

164.     Moreover, based on the way Trump talked about ACN in the video, Doe believed that Trump himself had invested in the ACN business opportunity and had made money from it.  She believed that if Trump had made money with ACN, she could too.

165.     After seeing Trump in the video, Doe was convinced.  Based on the speeches she had seen up to that point, she would not have joined.  However, Trump's endorsement sold her

on the opportunity.  She told others at the meeting that she had not liked the third speaker, but that she had been convinced by Trump.

166.    Doe joined ACN then and there.  She wrote a check for the $499 registration fee and became an IBO.  She also signed up for an upcoming trip for a larger ACN meeting in Palm Springs, California.

167.    More senior IBOs told Doe that Palm Springs would be a great way to begin her career with ACN.  They also told her that there would be a "special guest" and an opportunity to "meet someone very special," and implied that it would be Donald Trump.  Doe wanted to go to Palm Springs for many reasons:  she was excited about the convention; she wanted to be successful in ACN; she believed the convention was necessary for her success; but, above all, she wanted to meet Donald Trump.

168.    Having paid the $499 registration fee, Doe had very limited funds.  Despite her limited resources, Doe used her most recent paycheck to pay for her event expenses, including her registration fee and her share of a car rental, hotel room, and food.  She shared a hotel room with four other women.  She also purchased training materials and other business tools to help her succeed with ACN.  Doe's cumulative expenses from the convention totaled almost $1,500.  Throughout the event in Palm Springs, Trump's endorsement was featured prominently, although Trump himself did not appear.

169.    After the event in Palm Springs, Doe returned to Los Angeles and remained fully committed to ACN.  More senior IBOs told her that, to be successful, she had to attend ACN meetings like the one where she had first signed up.  Each meeting cost $20, and Doe often attended two per month.

170.    These meetings were held in one of two hotels in Los Angeles.  The program at every meeting was essentially the same:  speeches by more senior IBOs, recognition of IBOs who claimed they were "making money" (rarely was a specific number given), and, the centerpiece of it all, the promotional video featuring Trump's endorsement.

171.    Doe felt substantial pressure to attend these meetings.  Attending these meetings often caused Doe to miss shifts providing hospice care, which reduced Doe's income.

172.    Doe worked tirelessly to recruit her friends and family and sell them services. She hosted events at her home for her family to inform them about ACN.  Doe invested money and considerable time providing food and supplies for these events, preparing her house and cooking food.  Ultimately, she had extremely limited success.  In her first few months, Doe was able to recruit one of her sisters as an IBO, but just two days later, her sister demanded her money back.  Doe, wanting to do right by her sister, refunded her sister's $499 investment herself.

173.    Doe also was able to recruit three of her cousins as customers.  Two of her cousins purchased a TV plan and one changed his cell phone plan.

174.    Based on those customers, Doe received a check from ACN for $38.  It was the only income she would ever receive from the company.

175.    As the months wore on, Doe began to get discouraged.  But each time she began to lose confidence, she would blame it on herself and try to change her approach because she believed that she was doing something wrong.

176.    Throughout Doe's time in ACN, including at the regular meetings, more senior IBOs constantly touted Trump's endorsement of ACN.  They said things like, "If you are successful enough with ACN, then you can meet Donald Trump," and told her that Trump would

help individual IBOs with their businesses if they put in enough work.  Doe understood that that Trump was invested in the company financially and that he had a personal stake it its success.

177.    About six months after she first signed up, Doe attended a national ACN convention in Cleveland, Ohio.  She was wary of spending the money, but her upline told her that it could not be missed. They emphasized the community, the training and, importantly, that Trump might be there as a special guest.  At the local meetings leading up to the convention, Doe's upline played even more Trump videos than usual, whipping up excitement among the IBOs.  Doe knew that she could not miss out on opportunity to learn about business from Trump—and she decided to go.

178.    Doe purchased a convention ticket and gave her upline money for flights and her share of a hotel room, van service, and miscellaneous expenses.  Again, Doe hoped and expected that Trump would appear personally.  And again, Doe was disappointed.  Although Trump did not appear, photos and videos featuring Trump were prominently displayed throughout the convention.

179.    Doe had to return from the convention a day earlier than the rest of her group, and when she got to the airport, she realized that the ticket her upline had given her was one-way only.  She had to purchase a return ticket herself.  Her total investment in attending the Cleveland convention was approximately $2,000.

180.    Some months later, Doe attended another multi-day event, this time in Detroit, Michigan.  Again, she invested substantial amounts of money to attend the event, in the hopes of seeing or meeting Donald Trump.  Again, he did not appear, but his endorsement was central to the event.

181.    Not long after the Detroit event, Doe's friend, Plaintiff Luke Loe, who had first

recruited her to the business, decided not to renew his IBO position for a second year.  Loe, who

was homeless at the time, simply had no funds to continue pursuing the business opportunity.

Though she was disappointed that Loe would not continue with ACN, Doe herself decided to

soldier on, and she paid the annual renewal fee of $150.

182.    For a time, Doe continued attempting to recruit both customers and IBOs,

bringing family members to the local ACN events.  She was mindful of how much money she

had invested in the ACN business opportunity and was eager to find a way to recoup her

investment.  But eventually she too simply ran out of money to invest.

183.    At one point in her second year with ACN, Doe came to one of the regular

meetings without a recruit.  Her upline criticized her and told her she would never make money

if she did not bring people to the regular meetings.  Doe thought to herself that she had been

bringing people to the meetings for more than a year and had only made $38.  Despite her

strenuous efforts, she simply was not making money.  She began to have real doubts about the

company.  And she was becoming uncomfortable with the idea of trying to recruit people into

the company—she did not see how she could tell people ACN was a good thing when she was

more and more convinced that neither they nor she could make a profit.

184.    Not long thereafter, the location of the regular meeting was moved to the house of

an IBO.  As she paid the fee to enter the meeting, Doe thought to herself, I really am spending a

lot.

185.    At the meeting, it became clear to Doe that the statements Trump was making

about ACN were not true and that ACN did not provide average IBOs with a realistic chance of

making a profit.  She realized that she had been scammed.  Trump was selling a dream to people

like her—people who were struggling financially, were really desperate, and would leap at a promise of the kind of success Trump embodied.  It was her last meeting.

186.    Doe realized that it was a lost cause and that she was just going to continue losing money.  It was at this point that Doe cut her losses and ceased to participate in ACN.  When her next annual renewal date came up, Doe decided not to renew her position.

### B.    Luke Loe

187.    Plaintiff Loe first heard about ACN in mid-2014 when he was working for the Salvation Army.  He was homeless at the time.  A colleague approached Loe and told him about an opportunity to make money by joining ACN.  The colleague invited Loe to join him at an information meeting.

188.    The meeting was held at a hotel in Los Angeles.  The meeting began with some short speeches by ACN representatives, followed by a seven- to eight-minute promotional video, which prominently featured Trump.  Loe believed at the time that Trump was a highly successful businessman.  Loe had watched *The Celebrity Apprentice* a few times and had seen Trump present himself as a savvy, experienced, and knowledgeable entrepreneur who had achieved remarkable wealth and celebrity.

189.    In the ACN video, Trump spoke about his entrepreneurialism, describing how he had started businesses and become very successful.  Critically for Loe, Trump promoted ACN as a good moneymaking opportunity.  Trump also said that he was glad to be a part of ACN because he genuinely believed the company provided a path to commercial success.

190.    The Trump endorsement in the video was the key factor that made Loe decide to invest in the ACN business opportunity.  Loe thought that, if a successful businessperson like Trump believed in the company, it was worth Loe's own time and effort.

191.    After the video, an ACN regional vice president gave a formal presentation.  After that presentation, and some speeches by other ACN members, Loe was asked to join ACN—for a $499 registration fee.

192.    Loe was homeless at the time and did not have the money to pay the registration fee.  But Loe's colleague—the one who had first introduced him to the company and invited him to the meeting—offered to loan Loe the money.  Although $499 was a very significant amount of money for Loe, he believed it was worth going into debt because he thought, based largely on Trump's endorsement, that he would recoup his investment if he worked hard to build a business within ACN.

193.    After he signed up, Loe began trying to recruit other IBOs and sell ACN services. He had very limited success.  Loe was only able to recruit one other IBO, fellow Plaintiff Jane Doe.  He also sold a handful of services to friends.  Loe registered some of the services in his own name, even though they were intended for a friend who had promised to foot the bill. Ultimately, Loe's friend was unable to pay because the prices of the services got too high, and Loe was stuck with a bill that he too was unable to pay.  The unpaid charges remain on his credit report to this day.

194.    Loe never received any income whatsoever from ACN.

195.    Loe's inability to succeed with ACN was not due to lack of effort.  Loe attended 25 to 30 meetings, each costing between $10 to $20.  These meetings were held approximately twice per month in one of two hotels in Los Angeles.  The program at every meeting was essentially the same:  speeches by more senior IBOs, recognition of IBOs who claimed they were "making money" (rarely was a specific number given), and, the centerpiece of it all, the promotional video featuring Trump's endorsement.

196.    Loe felt substantial pressure to attend these meetings; when he missed a meeting, he was criticized and shunned by more senior IBOs.  Attending these meetings often caused Loe to forgo opportunities to earn income performing one-off projects as a mechanic or handyman.

197.    Loe also attended three larger ACN events during the year he spent in the company:  a multi-day event in Palm Springs, California, a national convention in Cleveland, Ohio, and another multi-day event in Detroit, Michigan.

198.    Loe was unable to pay for his own event tickets, flights, lodging, and miscellaneous expenses.  In dire straits, Loe borrowed money from his fellow team members so that he could attend these events, hopeful that if he continued investing in pursuing the ACN business opportunity he would ultimately recoup his initial investment.

199.    Like Doe, Loe thought Trump might surprise the audience at the national convention in Cleveland by appearing on stage personally.  While Trump did not appear in person, his endorsement of the company was center stage.  Photos of Trump and word of his endorsement were widespread, and a promotional video prominently featuring Trump was played on large screens in the convention arena.  When Trump came on the screen, the entire arena was transfixed.  For his part, Loe was again impressed by Trump's seemingly genuine support for the company and left the convention re-inspired and reinvigorated, believing that ACN could still be a good business opportunity.

200.    After a few more months of meetings, expenses, debt, and zero income to show for it all, Loe stopped believing in the company.  He knew that he had only lost money so far and could not see a path to making any money in the future.  Contrary to what Trump had said in the promotional videos, Loe concluded ACN was not a good moneymaking opportunity.  When the time came for his next annual renewal, he chose not to pay the fee.

### C.      Richard Roe

201.     Plaintiff Roe is a resident of Maryland.  He was an active IBO for less than one year, from November 2016 until November 2017, when he let his registration lapse.  He currently works as a food delivery driver.

202.     Roe first learned about ACN in mid-2016.  At the time, he was living with his mother and brother and working for a fast-food restaurant in Columbia.

203.     One day in mid-2016, Roe was working an afternoon shift when a customer beckoned Roe over and told Roe he had a business opportunity for him.  The customer said he was involved with ACN gave Roe his business card bearing the ACN logo, showed Roe an ACN magazine, and told Roe to give him a call if he was interested.

204.     Initially, Roe was skeptical.  He was not sure the business would be worth his time and effort.  But Roe was spending most of his time as a food-delivery driver and was not making very much on tips.  He wanted to change his life for the better.

205.     About two weeks later, Roe called the number on the business card the ACN participant had given him to learn more about the potential opportunity.  The ACN participant texted Roe a link to an informational video that boasted of the lifestyle ACN would provide and encouraged Roe to join an online conference with other ACN IBOs and potential recruits.  Roe joined the online conference later that evening, where he viewed a presentation providing more detail about ACN.  At the end of the presentation, Roe was told that each recruit would have to pay $499 if they wanted to "start a business."

206.     After the online conference, the ACN participant who had given him the business card immediately called Roe and pressed Roe to sign up, but Roe said that he would have to think about it.  Five hundred dollars was more than Roe could afford.  The ACN participant then invited Roe to attend a convention in his hometown, Columbia, Maryland.

207.    Intrigued, Roe decided to do some additional research on ACN.  Roe first looked at the Better Business Bureau's website.  He saw that ACN had an A rating, but that there were some complaints, including from customers who had tried the phone service, who were not satisfied, and had tried to end the service, but kept getting bills.  Because the comments did not match ACN's rating, Roe remained unsure.  He decided to look up ACN on YouTube.  The first thing that caught his eye was a video of Trump from *The Celebrity Apprentice*.

208.    Roe was excited to see Trump.  He clicked on the link and watched the video.  For about eight minutes, he watched as the celebrity contestants performed different pitches to sell ACN video phones.  As part of the clip, Donald Trump stood next to two of the ACN founders, Greg Provenzano and Tony Cupisz, and endorsed ACN, saying that he knew the company well.  Trump then let the founders speak as he remained alongside them.

209.    This video was a turning point for Roe.  Roe was fascinated by Donald Trump.  He believed that Trump was a successful businessman who had many kinds of businesses, including Trump Towers in New York City and a casino in Atlantic City and, thus, a wide range of business expertise.  Roe believed that Trump really knew how to make money.  Consequently, Trump's endorsement of the company meant a lot.  Roe believed that by promoting the company, Trump was telling others that they too could make money and become successful business owners like him by investing in ACN.  Ultimately, for Roe, Donald Trump *was* business.  He believed that if Donald Trump said that ACN was great, then it must be true.  After watching this video, Roe was inclined to sign up with ACN and decided to attend the convention.

210.    Roe attended the convention.  He was excited about the ACN opportunity and how much he could make compared to his fast-food job.  But he still could not afford the $500 initiation fee.  The customer followed up with Roe over the phone a few days later.  When the

customer asked Roe what he was thinking about ACN, Roe said he was not sure because he did not have the money.  The customer kept calling Roe.  During these conversations, Roe would tell the customer that he was not planning to commit to ACN now because it was too much money. But because of Trump's endorsement, he wanted to sign up—if only he could find a way to afford it.

211.    One weekend, in the beginning of November 2016, Roe and his mother went to a nearby casino.  Roe got on a slot machine and he quickly won $300.  He immediately put this in his bank account.  Later that night, he won $200 from a lottery ticket.  At that moment, something clicked:  Roe realized he had enough money for the ACN registration fee.  He put the money directly into his account and decided he would sign up.

212.    Roe then called the ACN participant who gave him the business card and told the participant that he was ready to sign up.  The participant remained on the phone with Roe as he filled out his registration form and paid the $499 registration fee.

213.    The participant, who would now become Roe's ACN "mentor," invited him to his house that evening to help train Roe on how to best use the ACN tools.

214.    After this training, Roe quickly attempted to establish his own success in the company.  He did this both by trying to convince potential customers to purchase ACN services and trying to convince others to join ACN as IBOs.  He first tried to recruit his mother as a customer.  She said no.  Then, about a month later, he visited a friend who had a high electric bill.  Roe thought maybe he could help by providing alternative services through ACN.  Roe attempted to use the ACN pitch to sell the services, but his friend was skeptical and did not purchase any services.  Finally, Roe tried to use social media as a recruiting tool.  He sent the

link to the ACN recruitment video to his friends using Snapchat, but received nothing in response.

215.    During his first month of ACN, Roe's mentor repeatedly called him and would always give him an ACN motivational speech.  Roe was motivated at first but began to get discouraged when he was unable to recruit any additional customers or recruits.  Toward the end of his second month, around the start of 2017, Roe, who followed ACN on multiple social media accounts, including Facebook, Instagram, and YouTube, started seeing that ACN was posting videos saying that it was not a scam.  These videos caught Roe's eye, but he did not think much of it at the time.

216.    Then, in early 2017, Roe's mentor invited him to a local seminar on a Saturday morning.  He paid $10 to attend a similar presentation that he had seen months earlier—he watched the same video featuring Trump, a slideshow, and then participated in a session about how to pitch ACN.

217.    After the class, Roe was again feeling more motivated to sell and promote ACN.  Roe had already reached out to his family and friends, who had not signed up.  He tried to talk to people at work, including a new hire who was not making much money.  Roe made the pitch and gave the new hire his mentor's number, but does not believe the new hire ever signed up.

218.    Then, around March 2017, Roe again saw the videos about ACN *not* being a scam on his social media feed.  At this point, Roe began to become skeptical of the company.  He found it questionable that the company was having to produce videos that it was *not* a scam and answer questions such as, "Is ACN a pyramid scheme?"  Instead of convincing Roe that ACN was not a scam, these videos had the opposite impact:  Roe began to become concerned that ACN *was* a scam.  Roe recognized that he was not making any money and did not see how he

-74-

*could* make any money.  It was at this point that Roe began to realize that the message he took away from Trump's endorsement was false – he realized he had wasted his time and money on ACN.

219.     Roe then stopped engaging with ACN.  By this time, his mentor had stopped reaching out to him.  He really had no reason or motivation to continue.  In October 2017, Roe received an email asking him to renew his ACN registration.  He ignored the email, and as a result, his account was terminated.

220.     Roe incurred multiple expenses as an ACN IBO.  First, he paid the $499 registration fee.  Second, he paid $10 to attend the seminar.  Third, he paid his expenses for travel to and from ACN events.  Finally, Roe spent his free time recruiting ACN customers and recruits.  At no time did Roe recover any of the money that he invested in ACN.

### D.     Mary Moe

221.     Moe was a resident of Pennsylvania at all times relevant to this Complaint.  Moe is temporarily residing in North Carolina.  Moe also works at a national retail store.

222.     Plaintiff Moe signed up as an ACN IBO in April 2013.  At the time, she was living in a small town in Pennsylvania with her husband and three children.  Moe, who was working in customer services at a manufacturing company, was the primary breadwinner for the household, while her husband was in and out of jobs.

223.     Moe's niece initially connected her to ACN.  Moe originally attended an ACN award ceremony to support her niece at a hotel in Pennsylvania.  Besides Moe, there were about twelve other participants in the room.  Soon after she arrived, it became clear to Moe that the main purpose of the event was for the existing IBOs to recruit her and other guests to ACN.

224.     The event began with short introductions from the ACN IBOs in the room.

225.    Next, the organizers played a promotional video, which lasted about five minutes and prominently featured Trump.  The video is what led Moe to decide to commit to ACN.  Moe was already extremely impressed by Trump.  She was a regular viewer of *The Celebrity Apprentice* and she knew him to be an extremely wealthy, savvy businessman.  She believed in his ability to make money.

226.    As the film played, Moe was struck by Trump's powerful endorsement of ACN.  She watched him describe ACN as a lucrative business opportunity.  He praised the ACN products, and even alluded to the fact that he used ACN products and services himself.  Most importantly, Moe was impressed by Trump's statement that investors in ACN had enormous potential to make money, because of the way it was designed.

227.    After the video, Moe knew that she was going to sign up for ACN.  She believed that joining the company was a lucrative opportunity; she imagined that, by following Trump and investing in the company, she would receive something in return.  Moe very much needed the extra money to support her children, one of whom was about to enter college.  Largely because of the video, Moe believed ACN was the way she could generate additional income.

228.    Moe was ready to sign up immediately, but she had to wait until her payday, the next Friday, when she would be able to cover the registration fee.  Given that Moe's annual salary was only $36,000, paying the registration fee was going to be a big risk; the $499 was not the small change the ACN recruiters made it out to be.  Nevertheless, Moe believed it would be worth it.  As soon as her paycheck cleared, she paid the $499 registration fee.

229.    To ensure that she was fully prepared to pitch ACN's products effectively, Moe immersed herself in information about the company.  She explored the website, watched videos,

and read pamphlets.  Only then did Moe begin to make her recruitment lists and to think about approaching her friends and other potential customers.

230.    Moe also began to attend ACN meetings to widen her network and continue to develop her skills.  Meetings occurred almost every weekend and cost between $5 and $10 to attend.  Each Saturday morning, Moe would leave her family at home and drive to a meeting in Delaware or Pennsylvania.  In total, Moe attended about 25 meetings during her time with ACN.

231.    In addition to the meetings, Moe attended four Revolution Weekends.  These were extended seminars that lasted from Friday night through mid-day Sunday.  Moe paid $49 to $69 to attend these weekends, in addition to expenses.

232.    Moe was not particularly excited about spending her weekend with ACN IBOs rather than her husband and children, but she believed her upline who told her that these meetings were important and necessary for her success.  The meetings consisted of trainings on how best to recruit IBOs and customers.  They also included presentations and videos intended to motivate and impress IBOs.

233.    Trump was often referenced at these meetings.  Meeting organizers would remind IBOs of Trump's involvement with and endorsement of ACN; they would consistently reiterate that such a successful, wealthy, businessman saw value in and supported the company.  Moe was even given the opportunity to take a picture with a cutout of Trump.

234.    At the meetings Moe attended, organizers also continually promoted the story of Casey Snyder.  Snyder is an ACN IBO from nearby Pennsylvania who worked his way up in ACN to the role of Regional Vice President.  IBOs would describe Snyder's trajectory through the company and explain that ACN had not only helped Snyder become wealthy, but also that it had allowed him to achieve a celebrity-like status.  They would highlight that he had been a

judge on *The Celebrity Apprentice*.  Stories of Snyder's success, including his connection to Trump, were especially motivational for Moe; it was powerful to see that an ordinary person from her area could become such a successful businessman and enter the elite world of someone like Trump.

235.    Moe would leave meetings and the Revolution Weekends excited about ACN and the opportunity.  She believed that she could become the next Snyder if she tried hard enough. Yet, repeatedly, she would have the wind blown out of her sails.  While Moe applied what she learned at these meetings to her efforts to recruit IBOs and sell additional services, she was nevertheless unable to find success.  When she did find potential clients, she received no support from the IBOs who had recruited her and promised to mentor her.

236.    Despite her lack of success with ACN, Moe still had faith in the company.  In fact, she renewed her registration for an additional year and she even purchased a registration for her son.  While Moe spent the last money she had, she was committed to making her investment in ACN work.

237.    During the second year of her participation in ACN, Moe paid for, but ultimately did not attend, a national convention in Los Angeles.  Despite the fact that it was extremely difficult for Moe to find money to pay for the registration fee and to travel across the country, Moe believed attending the convention was necessary for her to succeed.  After paying the non-refundable registration fee, however, it became clear that the costs associated with attending the convention would be too high for Moe.

238.    Finally, in December 2014, Moe realized that she was not going to make any money in ACN.  Moe stopped working with ACN and chose not to renew for another year.

*        *        *

239.    The Trump Enterprise's fraudulent promotion and endorsement of ACN alone constitutes a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.*, and further constitutes mail and wire fraud under federal law, false advertising under California Business and Professions Code § 17500, unfair competition under California Business and Professions Code § 17200, unfair and deceptive trade practices under the Maryland Consumer Protection Act, unfair and deceptive acts under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, common law false advertising, common law fraud, and common law negligent misrepresentation.

## VI.    THE TRUMP ENTERPRISE AND ACN'S CO-FOUNDER WERE INVOLVED IN SIDE DEALS THAT FACILITATED MONEY FLOW BETWEEN THEM.

240.    Over the years, the Trump Enterprise built a close relationship with ACN and its co-founders.  Upon information and belief, the various interconnections and deals between Defendants and ACN were yet another way that money flowed between the two, in quid pro quo arrangements that were not disclosed to the vulnerable consumers hearing Trump's pitch.

### A.    ACN's Co-Founder Bought Property Around The Trump Organization's Major Golf Course Development in North Carolina.

241.    In March 2012, TNGC Charlotte, LLC (a member of the Trump Enterprise) agreed to acquire The Point Lake and Golf Club in Mooresville, North Carolina, and rebranded it the Trump National Golf Club ("TNGC Charlotte").  That same month, ACN co-founder Robert Stevanovski and his wife, Sonya Stevanovski, registered Pasicor LLC ("Pasicor") in North Carolina.  The Stevanovskis used corporate entities managed by Pasicor to acquire several parcels of land near TNGC Charlotte.[79]

---

[79] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: Pasicor, LLP (2017).

242.    On March 28, 2012, the day before Pasicor was registered, Augusta Lee Capital Partners LLC ("Augusta Lee") was registered in North Carolina.  Pasicor was appointed its managing member.  Two days after it was registered, Augusta Lee paid $7.3 million to purchase a 110-acre property known as "Augustalee" in Cornelius, North Carolina, nearby TNGC Charlotte.[80]

243.    On April 30, 2012, Langtree Development Group LLC and Langtree Capital Partners LLC (the "Langtree Companies") were registered in North Carolina with Pasicor as their managing member.  The Langtree Companies purchased multiple properties around the Lake Norman waterfront nearby TNGC Charlotte.[81]

244.    Meanwhile, the following year, Trump announced the opening of Trump International Realty Charlotte, a real estate brokerage based at TNGC Charlotte.  Trump International Realty Charlotte is a brokerage specializing in "luxury homes for sale in Lake Norman, Charlotte, Mooresville, Cornelius, Davison, Huntersville and Statesville, all in the Lake Norman region of North Carolina."

245.    On June 30, 2014, West Catawba Avenue LLC was registered in North Carolina with Pascior as its managing member.  In July 2014, West Catawba Avenue LLC purchased a property at 19620 W. Catawba Avenue, in Cornelius, North Carolina (near Lake Norman) for $2.275 million.  Xoom Energy, an ACN subsidiary, leased a suite in an office building at that site.  In August 2017, West Catawba Avenue LLC sold the property for $3.1 million.[82]

---

[80] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: Augusta Lee Capital Partners, LLC (2017).
[81] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: Langtree Capital Partners, LLC (2017).
[82] North Carolina Dep't of State, Business Registration Division, Limited Liability Company Information: West Catawba Avenue LLC (2017).

246.     Plaintiffs have limited information about these real estate deals, but expect that discovery would shed more light on any connections between these transactions and the Trump Enterprise, including Trump International Realty.

247.     In addition, in August 2015, the wedding of Provenzano's daughter, Autumn Moheyer, was held at the Trump International Golf Club in Charlotte.

**B.      ACN Has Paid the Trump Enterprise To Hold Charitable Golf Tournaments at Trump Golf Clubs.**

248.     The financial ties between ACN and the Trump Enterprise were not limited to payments for Trump's endorsement and the real estate deals in North Carolina.

249.     From 2013 to 2016, ACN Global Reach Charities, Inc. ("ACN Global Reach"), a non-profit affiliated with ACN, staged annual celebrity golf tournaments that were hosted at TNGC Charlotte.  Although these events were billed as fundraisers for Ronald McDonald House, the Trump Enterprise appears to have been paid substantial sums to host the events.  By associating Trump and ACN and their respective brands and businesses with charitable causes, the Trump Enterprise created another veneer of legitimacy in the eyes of ACN's members and potential recruits—while pocketing large sums of money.





250.    In 2013, ACN Global Reach reportedly raised $213,000 from the golf tournament. It reported $86,000 in expenses in raising this amount.  It is unclear how much of that expense amount was paid to the Trump Enterprise for hosting the tournament (and, in so doing, further promoting and endorsing ACN).

251.    In 2014, ACN Global Reach reported a "record-breaking" $228,750 raised from the tournament.  Tax filings later revealed that it incurred $107,674 in expenses for the event, including $15,788 in "rent/facility" costs and $22,128 in food and beverage costs.

252.    In 2015, ACN Global Reach reported another "record-breaking gift" of $287,560 from the tournament.  Tax filings revealed that it incurred $112,718 in expenses for the event, including $25,046 in "rent/facility" costs and $21,625 in food and beverage costs.

253.    In 2016, ACN Global Reach raised a "record-breaking" $261,500 from the tournament.  Tax filings revealed that it incurred $118,000 in expenses for the event, including $18,871 in "rent/facility" costs and $28,312 in food and beverage costs.

254.    ACN's payments to the Trump golf clubs were not limited to direct payments for hosting ACN Global Reach events.   In each of 2013, 2014 and 2015, ACN purchased a "Titanium" level sponsorship, priced at $100,000, to the Annual Golf Invitational & Auction Dinner hosted by Defendant Eric Trump and the Eric Trump Foundation.  The events were fundraisers for the St. Jude Children's Research Hospital.  The events were hosted at the Trump International Golf Club in Westchester, New York, which is owned by an entity within The Trump Organization.  It is unclear how much of ACN's sponsorship donation was paid over to the Trump club.







**C.**     **Trump Joined the Advisory Board of the SUCCESS Foundation, an Affiliate of *SUCCESS from Home Magazine*, which Purported To Provide "Third-Party Validation" of the ACN Business Opportunity.**

255.     One of the tools ACN promoted to its IBOs was *Success from Home Magazine*, a monthly magazine for the direct-selling industry.  ACN was featured several times in the magazine during the period relevant to this Complaint—and Trump was featured prominently in many of those features.  ACN encouraged IBOs to buy copies of the magazine, touting it as "A Valuable Third-Party Validation Tool" for its business model and the direct-selling industry generally, and exhorting IBOs to "put one in the hands of each of your top prospects!"[83]  But, far from being an independent and objective source, *Success from Home Magazine* was and is

---

[83] *Success from Home Magazine Featuring ACN,* ACN NEWSMAGAZINE, Q4 2005, at 6; *see also Home Sweet Home,* ACN NEWSMAGAZINE, Q2 2007, at 6.

owned by Success Partners, whose mission is to provide paid marketing services for MLM businesses.  Indeed, ACN is listed prominently as a "client" on Success Partners' website.[84]

256.    Examples of ACN's features in *Success from Home Magazine* abound.  The April 2007 edition featured ACN's founders on the cover.  According to an ACN newsletter, the edition contained "128 pages of company information, success stories and an article by Donald J. Trump on the power of network marketing."[85]  ACN was also featured in *Success from Home Magazine* April 2008 issue, which ACN touted as including "page after page of all the reasons why ACN is THE vehicle for individuals to achieve their dreams," and being "[p]acked with 132 pages of success stories from ACN's top leaders; complete company history, product and training information, and validation of the direct-selling industry from best-selling authors and advisors."[86]



---

[84] Success Partners: Our Clients (2016), available at http://www.successpartners.com/#section-1 (last visited May 25, 2018).
[85] *Home Sweet Home,* ACN NEWSMAGAZINE, Q2 2007, at 8.
[86] *A New Day at ACN,* ACN in Action: North America (Feb. 17, 2008), available at https://web.archive.org/web/20080228151209/http:/www2.acnin.com:80/acninaction/2008/action217.htm.

257.    Trump first became involved with the SUCCESS Foundation in March 2009, during production of the first *The Celebrity Apprentice* episode featuring ACN.  ACN co-founder Provenzano made the introduction.  Along with Provenzano, Trump joined the SUCCESS Foundation's Advisory Board, which was launched that same month.[87]

258.    The SUCCESS Foundation purports to be "a nonprofit that provides personal-development tools for youth."[88]  The Foundation distributed a personal development book called *Success for Teens* to high-school students.  In explaining the significance of Trump joining the Advisory Board, SUCCESS Foundation executive director John Fleming said:

> The ***Trump name is a brand in itself***. To have that brand affiliated with the SUCCESS Foundation obviously gives us ***credibility***. For the ***public at large***, he is ***someone who most people have heard of***, and whose ***name is synonymous with achievement***. That ***results in attracting possible donors*** who are looking for a good cause to donate to and an ease in finding vehicles of distribution for the book. In addition, it will help us gain the attention of teenagers who may be readers of this book. We, at the foundation, are ecstatic about his participation.

(emphasis added).[89]



---

[87] Sarah Paulk, *The Trumps of Tomorrow,* SUCCESS FROM HOME, Vol. 5 No. 4, at 86.
[88] *Id.*
[89] *Id.*

259.    Trump's involvement with the SUCCESS Foundation is yet another example of him selling his image and brand to lend purported credibility to ACN, and also is emblematic of his many close ties to ACN and its co-founders.

## VII.    THE TRUMP ENTERPRISE'S ONGOING PROMOTION AND ENDORSEMENT OF ACN

260.    In August 2015, just days after a *Wall Street Journal* reporter interviewed Trump about his relationship with ACN, ACN deleted all references to Trump from its website, stating that it did so "in conjunction and with the full support of the Trump organization" because of Trump's presidential campaign.[90]

261.    In an article published on August 13, 2015, the *Wall Street Journal* reported that Trump had "not only endorsed ACN, he twice featured the company on his former reality TV Show, 'The Celebrity Apprentice.'"[91]  The article quoted some of Trump's statements promoting and endorsing the ACN videophone and then reported that, in fact (and contrary to Trump's statements), "the ACN video phone was in trouble.  It sold poorly in part because it only worked with other ACN video phones, unlike Skype's video-calling technology."  The article further reported that ACN "had slashed orders for the phone from its supplier, which laid off 70% of its staff just before the show aired and later filed to liquidate in federal bankruptcy court."  Critically, the article reported that "[t]he bad news about the phones was never mentioned by Mr. Trump on the show, nor did he disclose to viewers he had been paid by ACN for appearances over the years."

---

[90] James V. Grimaldi and Mark Maremont, *Donald Trump Made Millions from Multilevel Marketing Firm*, THE WALL STREET JOURNAL, Aug. 13, 2015, available at https://www.wsj.com/articles/trump-made-millions-from-multilevel-marketing-firm-1439481128.
[91] *Id.*

262.    The article recognized that Trump's promotion and endorsement of ACN posed a threat to his presidential campaign:  "Mr. Trump, who currently leads the field of Republican candidates for president, bills himself on the campaign trail as a straight talker and says he will use his business savvy to solve America's problems."

263.    Recognizing this threat, Trump attempted to distance himself from ACN.  He stated (falsely):  "I do not know the company. I know nothing about the company other than the people who run the company . . . I'm not familiar with what they do or how they go about doing that, and I make that clear in my speeches."[92]

264.    Notwithstanding Trump's purported dissociation from ACN in August 2015, numerous videos remain on YouTube and other streaming services with footage of Trump's endorsement of ACN, including in ACN's appearances on *The Celebrity Apprentice*.  These videos have continued to induce people to sign up to ACN after Trump purportedly ended his endorsement.

265.    Moreover, despite the claimed separation between Defendants and ACN, the financial ties between ACN and the individuals with ties to the Trump Enterprise have remained. For example, in September 2017, ACN sponsored a hole at the annual golf tournament for the Eric Trump Foundation (now known as Curetivity).[93]

266.    In addition, on August 14, 2017, ACN held its Seventh Annual Ronald McDonald House Celebrity Golf Tournament at Trump National Golf Club in Mooresville, NC.  Photographs of the event confirm the timing and location:

---

[92] *Id.*

[93] Dan Alexander, *Eric Trump's Old Foundation Apparently Held Secret Event at Trump-Owned Golf Club*, FORBES, Sep. 18, 2017, available at https://www.forbes.com/sites/danalexander/2017/09/18/eric-trumps-old-foundation-apparently-held-secret-event-at-trump-owned-golf-club/#67e53e665759.





## VIII.   THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF THE TRUMP NETWORK

267.    A few years after the beginning of its relationship with ACN, the Trump

Enterprise sought to deepen its involvement in the MLM industry.  In 2009, Defendants entered

into a licensing agreement with Ideal Health, another MLM.  As part of the agreement, Ideal

Health was officially re-branded "The Trump Network."  The Trump Network deal reflected the

Defendant's attempt to capitalize on what they had learned from their relationship with ACN:

that owners of MLMs could reap enormous profits fueled by widespread losses at the expense of

average investors' initial investments.  With the promise of such riches, Trump agreed to

promote and endorse The Trump Network, in exchange for royalty payments, as well as

additional fees contingent upon ongoing promotional activities.  Thus, in the Trump Network

deal, Defendants gave even more access to use the Trump brand than had been agreed upon with

ACN, in exchange for a greater share of the upside.

268.    From 2009 until December 2011, the Trump Enterprise received secret payments

to endorse and promote the Trump Network.[94] As they had done repeatedly with ACN,

Defendants, acting through the Trump Enterprise, made or disseminated a series of knowingly

false statements (1) that prospective investors would have a reasonable probability of

commercial success if they bought into the Trump Network; (2) that Trump was promoting and

endorsing the Trump Network because he believed that they offered a reasonable probability of

commercial success (rather than because the Trump Enterprise was being paid); and (3) that

Trump's endorsement was predicated on Defendants' extensive due diligence, inside

information, and personal experience with the Trump Network.  And as with ACN, the use of the

---

[94] *See* Adam Feuerstein and Damian Garde, *Donald Trump and the Vitamin Company that Went Bust*, STAT NEWS, Nov. 4, 2015, available at https://www.statnews.com/2016/03/02/donald-trump-vitamin-company/.

Trump brand amplified Trump's fraudulent message and encouraged potential investors to take it seriously.

### A.   Ideal Health Background & DSNC Licensing Deal

269.   Ideal Health, Inc. was founded in 1997 by Lou DeCaprio and brothers Scott and Todd Stanwood.  From its inception, the company sold dietary supplements, health-related products, and customized vitamins as part of an MLM business model.

270.   Between 1999 and 2004, at least twenty different complaints were submitted to the Federal Trade Commission ("FTC") by both salespeople and customers of Ideal Health, according to FTC records.[95]  Complaints from Ideal Health salespeople stated that they had invested thousands of dollars in the company and had received no returns on the work or investment.  In addition, customers of the company submitted complaints stating that the vitamin supplements sold by the company had caused illnesses and that Ideal Health had refused their requests to cancel their subscriptions and continued charging for the vitamins.

271.   In 2007, Ideal Health was under-capitalized and looking for a strategic partnership that could help grow brand recognition and expand its existing network of sales representatives. In early 2008, the Stanwood brothers and DeCaprio were introduced to Trump to discuss a possible partnership.

272.   In January 2009, "TTN, LLC"—TTN may stand for The Trump Network—was registered in the state of Delaware.  Corporate records show that the company planned to "engage in the marketing, selling and distributing of health and wellness products."[96]  Scott and

---

[95] Federal Trade Commission, Aug. 16, 2004 Freedom of Information Act Request Response: Consumer Complaints to Federal Trade Commission (FTC).

[96] TTN, LLC Foreign Limited Liability Company Application for Registration, The Commonwealth of Massachusetts, Secretary of the Commonwealth, Corporations Division (Jan 10, 2011).

Todd Stanwood, as well as DeCaprio, were listed as the company's managers. Shortly after TTN, LLC's formation, Ideal Health agreed to "conduct its business exclusively" through TTN, LLC, essentially merging the corporate activities with the new business entity.

273.   On March 4, 2009, TTN, LLC entered into a licensing agreement with DSN Licensing, LLC, a member of the Trump Enterprise.[97]  According to court records, Ideal Health, Inc. created TTN, LLC as a wholly owned subsidiary for the specific purposes of its licensing agreement with DSN Licensing, LLC.[98]

274.   The initial agreement between DSN Licensing, LLC and Ideal Health stated that "Ideal [Health] would license various trademarks principally owned by, and the likeness of, Mr. Trump, to utilize in [Ideal Health's] direct marketing efforts."[99]  In addition, Trump agreed "personally to promote and support The Trump Network, including, without limitation, to appear personally at a number of Company events each year and to appear on the Company's marketing and promotional videos and other materials."[100]

275.   Shortly after the deal, a senior advisor and "Top-Rank" representative at ACN, Marty Hale, was brought on board at the Trump Network as Chief Strategist to help redesign the compensation plan and ensure some of the same success that Trump had experienced with ACN.

### B.   Background on The Trump Network

276.   The Trump Network, as the new venture was named, was an MLM that purported to sell an array of diet supplements and multivitamins.  As is typical with MLMs, The Trump Network relied on participants to sell the products, person-to-person, and to recruit others to do

---

[97] *Ideal Health, Inc. et al.* v. *Dean Blechman*, No. 1:09-cv-10791-DJC, Compl. ¶ 37.
[98] *Id.*
[99] *Id.* at ¶ 36.
[100] *Id.*

the same.  Each additional salesperson that someone recruited to The Trump Network would become a member of the recruiter's "downline" sales team.  The incentive to continue to build out one's own "downline" sales team was inherent in the structure of the scheme; for each commission of The Trump Network products sold, a percentage of that commission would pass to each "upline" recruiter, with the individuals at the top of the pyramid earning the greatest income.  Those salespeople then, in turn, would recruit additional people to become part of their own downline sales team, and so on, with each additional salesperson undertaking to resell The Trump Network products, and a percentage of each sale funneling all the way up the pyramid.

277.     Becoming a Trump Network salesperson, however, was costly.  Beginner sales representatives were told to buy a starter kit of products costing nearly $497,[101] and encouraged to attend expensive seminars.  In order to join at the "FastStart Gold" level, a marketer could spend about $600 just to purchase a kit of sample products, even before paying to attend a seminar or purchasing additional supplies.[102]

### C.     Trump Promoted and Endorsed the Trump Network with a Widely Distributed and Pervasive Message.

278.     Shortly after DSN Licensing, LLC entered an agreement with the Trump Network, Trump widely disseminated false statements promoting and endorsing the Trump Network.  Trump's false statements were distributed through various channels, including television infomercials, news outlets, printed promotional and editorial material, and in-person promotional events.

---

[101] Julianna Goldman and Laura Strickler, *Behind the collapse of the "recession-proof" Trump Network*, CBS NEWS (Apr. 12, 2016), available at https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/.

[102] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New Scheme. Seller Beware*, NEW YORK MAGAZINE (Jan. 23, 2011), http://nymag.com/nymag/features/70831/index2.html#print.




279.   *First*, Trump featured prominently in infomercials promoting The Trump

Network, beginning with a 2009 infomercial announcing The Trump Network's official

launch.[103]  The infomercial simulated a television talk-show in which a host interviewed Trump

about his thoughts on The Trump Network to frequent applause from actors portraying an

excited studio audience.

280.   *Second,* Trump took advantage of opportunities to disseminate false statements

about The Trump Network through news outlets.  For example, in December of 2010, he issued a

press release announcing that former contestants from *The Apprentice* would be joining The

---

[103] The Trump Network, "Donald Trump and Ideal Health Team Up," available on The Trump
Network Youtube channel, https://www.youtube.com/watch?v=fK9AhOo3Fj0.

Trump Network.[104]  The same month Trump also discussed the strength of The Trump Network business model with reporters from the Boston Globe,[105] among others.

281.    *Third,* Trump's false statements touting the Message, described more fully below, appeared in numerous printed promotional materials of The Trump Network, as well as dozens of interviews with reporters about the Trump Network business opportunity.  Moreover, between the years of 2009 and 2011, for example, at least two different letters addressed to potential Trump Network investors or marketers and signed by Trump personally were posted to The Trump Network website.[106]

---

[104] *NBC's The Apprentice Leads Candidates to The Trump Network*, PR Newswire, Trump Network (Dec. 10, 2010), http://bioceutica.com/pdf/Press%20Release.pdf.

[105] Erin Ailworth, *Firm's New Moniker May be its Trump Card: After Partnering with the Donald, the Former Ideal Health Takes Off*, BOSTON GLOBE, Dec. 7, 2010, available at http://archive.boston.com/business/articles/2010/12/07/firms_new_moniker_may_be_its_trump_card/.

[106] Julianna Goldman and Laura Strickler, *Trump's Failed Venture: Vitamin Business Fails After Get Rich Quick Pledge*, CBS News Investigation, CBS THIS MORNING, Apr. 12, 2016, at 0:55, available at https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/; CBS This Morning Investigation (Apr. 12, 2016), available at https://www.youtube.com/watch?v=opA9gBmcQkw; *see also* Tim Murphy, *The Trump Files: The Saga of Donald Trump's Short-Lived Weight-Loss Program*, MOTHER JONES, Oct. 3, 2016, available at https://www.motherjones.com/politics/2016/10/trump-files-weight-loss-snazzle-snaxxs/.



282.    *Fourth*, Trump appeared as the keynote speaker at several in-person promotional events for The Trump Network.  For example, Trump spoke at the 2009 Trump Network launch in Miami, Florida, heralding the launch of The Trump Network to a room of several thousand people:  "[The Trump Network] is not a long shot," he proclaimed. "This is going to be something that's really amazing."[107]

---

[107] Donald Trump speech, Trump Network Conference, Miami, Florida (2009), Youtube, https://www.youtube.com/watch?time_continue=1&v=XyRE5MN8jrA; *see also* Ian Tuttle, *Add*





**D.     Trump Falsely Represented That Consumers Had a Reasonable Probability of Commercial Success in The Trump Network.**

283.     Throughout the relevant period, Trump frequently misrepresented the nature of

The Trump Network's business model and offered false and misleading promises of success.

Trump's statements promoting The Trump Network, and his depiction in countless promotional

materials, were intentionally calculated to give the false impression that The Trump Network

---

*Another Yuuge Failure to Trump's Pile: The Trump Network*, National Review, Mar. 8, 2016,
available at https://www.nationalreview.com/2016/03/donald-trump-networks-failure-harmed-
small-investors/.

Investment opportunity offered a reasonable probability of commercial success for those who invested in it.



284.     Trump made repeated statements calculated to cause the listener to believe that investing in The Trump Network was a sound financial decision, that it was without risk, and that it would provide sufficient return to save them from the threat of financial ruin in the wake of the recession.  From 2009 until 2011, Trump traveled around the country promoting The Trump Network and promising people that it was a safe investment.[108]  During his in-person appearances, Trump spoke to large crowds and enthusiastically gave The Trump Network scheme his personal stamp of approval, referencing his own track record of success.[109]

---

[108] CBS This Morning Investigation (Apr. 12, 2016), available at https://www.youtube.com/watch?v=opA9gBmcQkw, at 1:48.

[109] Donald Trump speech, Trump Network Conference, Miami, Florida (2009), Youtube, https://www.youtube.com/watch?time_continue=1&v=XyRE5MN8jrA; *see also* Ian Tuttle, *Add Another Yuuge Failure to Trump's Pile: The Trump Network*, NATIONAL REVIEW, Mar. 8, 2016,

285.     In a 2009 infomercial heralding the launch of The Trump Network, Trump specifically targeted vulnerable individuals suffering from the effects of the economic recession: "The Trump Network wants to give millions of people renewed hope and with ***an exciting plan to opt-out of the recession***," he said. "I hope you're going to join us" (emphasis added).[110]



286.     Similarly, in an open letter to potential investors, signed by Trump personally and posted on the Trump Network website in or around 2009, Donald Trump wrote:  "The Trump Network can provide you with a solution to help you and your family create a more secure future.  Diversifying is a way to protect your income so that you can continue to do what you know and love, and still make money."

287.     And at a 2009 appearance in Miami, Florida, for the official launch of the Trump Network, Trump made similar statements extolling the commercial prospects for those who invested in The Trump Network: "When I did 'The Apprentice,' it was a long shot.  ***This is not a***

available at https://www.nationalreview.com/2016/03/donald-trump-networks-failure-harmed-small-investors/.

[110] The Trump Network, "Donald Trump and Ideal Health Team Up," available on The Trump Network Youtube channel, https://www.youtube.com/watch?v=fK9AhOo3Fj0.

*long shot*. **This is going to be something that's really amazing . . . . We are going to be the biggest in the industry**" (emphasis added).[111]

288.    Trump also made misrepresentations about the products that The Trump Network sales representatives sold.

289.    For example, in an open letter posted on the Trump Network website titled "A Personal Letter from Donald J. Trump" and containing Donald Trump's personal signature at the bottom, Trump wrote that the "Trump Network works with some of the ***best nutritionists, scientists,*** and ***technologists*** . . . [and] as a result, ***our*** products are ***leaders in their categories***—designed to help improve your health and wellness, putting you on a path to the lifestyle you've always wanted" (emphases added).[112]



**A Personal Letter from Donald J. Trump**

**Welcome To The Trump Network™**

I am pleased to be part of this great company and glad you are taking time to learn more about it. The vision for The Trump Network goes far beyond the individual products. The Trump Network is designed to help you become the very best you can be—physically and mentally.

Todd, Scott, and Lou understand that to be successful you have to surround yourself with the best and the brightest. The Trump Network works with some of the best nutritionists, scientists, and technologists. As a result, our products are leaders in their categories—designed to help improve your health and wellness, putting you on a path to the lifestyle you've always wanted.

**The First Step Toward Your Ideal Lifestyle**
The mission at The Trump Network is to empower you to become all that you were meant to be.

**A Financial Solution You Can Believe In**
The Trump Network offers you something you can believe in—products that help make people healthier, an opportunity for you to make as much money as you want, based on your own efforts, and the training and support to help you succeed.

Donald J. Trump
Chairman and President
The Trump Organization

---

[111] *Id.*
[112] "A Personal Letter from Donald J. Trump," Trump Network website.

290.     A few years later, however, when questioned about reports that The Trump Network products were ineffective and based on flawed or non-existent science, Trump representatives told reporters that Trump was never personally involved in the creation of The Trump Network's products and that he did not guarantee their effectiveness.[113]  Trump did not own the company or make the products, an attorney speaking on Trump's behalf claimed.[114]

291.     Trump encouraged investors to rely on his statements by emphasizing his record of success in business and assuring prospective recruits that his past achievements assured their success.

292.     In a 2010 interview with the *Boston Globe*, for example, Trump said that "The Trump Network has a big advantage over other network marketing concerns because of the fact that I am so well known."[115]  He continued:  "It is very important for me to be associated with success, [so] it's very important for me that the Trump Network be a big success."[116]

293.     As with ACN, the fact that the Trump Enterprise had sold the Trump Network a license to use the Trump brand dramatically increased the impact of Trump's false and misleading statements.  For example, in a 2011 interview with *New York Magazine*, when asked about his decision to partner with Trump, DeCaprio explained the critical importance of having the Trump endorsement in getting people to invest:  "When you think of Donald Trump as a

---

[113] CBS This Morning Investigation (Apr. 12, 2016), available at https://www.youtube.com/watch?v=opA9gBmcQkw,

[114] *Id.*

[115] Erin Ailworth, *Firm's New Moniker May be its Trump Card: After Partnering with the Donald, the Former Ideal Health Takes Off*, BOSTON GLOBE, Dec. 7, 2010, available at http://archive.boston.com/business/articles/2010/12/07/firms_new_moniker_may_be_its_trump_card/.

[116] *Id.*

brand, what do you think of? . . . Prestige products, best in class, really being successful."[117]

DeCaprio went on to note that "[n]o matter what happens, [Trump] can come back out of the

ground like a phoenix and get right back on top again. He represents entrepreneurialism for this

country. He represents *success*."[118]

294.    In one Trump Network infomercial, a man explains that he left a "six-figure job"

to join Trump's new business when he "realized . . . how huge this is gonna be."[119]  Another man

said that when he learned that Trump was starting his own company, "[i]t [was] a no brainer."[120]

He continued, explaining that Trump's involvement "brings so much to the industry. It brings

credibility, it brings us to a new level, because everyone recognizes and trusts that Trump brand

name, and so, when we talk business, Trump means business."[121]

295.    Trump's statements—and the use of the Trump brand—had the desired effect.

Vulnerable consumers relied on his assurances; they believed him when he promised that the

Trump Network was a low-risk way to escape the financial impacts of the Recession, and that if

people worked hard enough, they would make a good return.

296.    For example, Eileen and George Kelley, two Florida residents and retired college

professors, spoke about their experience with the Trump Network in a 2016 CBS investigative

report. "They were sowing hope there, to a lot of people, in the middle of the Recession,"

---

[117] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New Scheme. Seller Beware*, NEW YORK MAGAZINE (Jan. 23, 2011), http://nymag.com/nymag/features/70831/index2.html#print.

[118] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New Scheme. Seller Beware*, NEW YORK MAGAZINE (Jan. 23, 2011), http://nymag.com/nymag/features/70831/index2.html#print.

[119] The Trump Network, "Donald Trump and Ideal Health Team Up," available on the Trump Network Youtube channel, https://www.youtube.com/watch?v=fK9AhOo3Fj0.

[120] *Id.*

[121] *Id.*

George Kelley stated.  Eileen Kelley elaborated: "I was sold on the product, and the message, and the testimonials, and then, of course, Donald Trump coming on." [122]



297.    The experiences of Eileen and George Kelley were typical of other investors in The Trump Network.  In the months following the launch of the newly rebranded Trump Network, recruitment increased significantly.  In just one year, the company recruited 15,000 new participants, growing from 5,000 to 20,000 after securing the Trump endorsement. [123]  In a 2010 press release, the company stated that it had grown "373 percent" since partnering with Trump. [124]  According to a complaint filed by Dean Blechman with the Supreme Court of New York in Suffolk County in 2009, at the time that Ideal Health announced the deal with Trump

---

[122] Julianna Goldman and Laura Strickler, *Trump's Failed Venture: Vitamin Business Fails After Get Rich Quick Pledge*, CBS News Investigation, CBS THIS MORNING (Apr. 12, 2016), at 0:55, available at https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/.

[123] Erin Ailworth, *Firm's New Moniker May be its Trump Card: After Partnering with the Donald, the Former Ideal Health Takes Off*, BOSTON GLOBE, Dec. 7, 2010, available at http://archive.boston.com/business/articles/2010/12/07/firms_new_moniker_may_be_its_trump_card/.

[124] *NBC's The Apprentice Leads Candidates to The Trump Network*, PR NEWSWIRE, Trump Network (Dec. 10, 2010), http://bioceutica.com/pdf/Press%20Release.pdf.

Corporation to rebrand the company as The Trump Network, company leadership told its existing network of marketers that they expected the company's revenue to grow to $1 billion.[125]

298.    Trump's statements that The Trump Network offered a reasonable probability of commercial success were false.  In reality, the chances of commercial success were miniscule. Approximately a year after its official launch, the company stopped regularly paying its salespeople.[126]  In 2009, for example, a former salesperson told reporters that she was making "six figures, enough to support her children as a single mom."[127] After barely a year, however, the paychecks stopped, and the salesperson "lost her house and car."[128]

299.    In December 2011, Trump's licensing agreement with Ideal Health expired and was not renewed.[129]  By 2012, the company was sold and renamed Bioceutica LLC,[130] and people who had bought into Trump's promises of success lost everything.  George and Eileen Kelley, for example, who invested their retirement savings into The Trump Network precisely because of Trump's assurances, lost nearly $10,000 in only a couple of years.[131]

---

[125] *See Blechman* v. *Ideal Health, Inc., et al.*, No. 09-19409, Compl. ¶ 26.

[126] Ana Swanson, *The Trump Network Sought To Make People Rich but Left Behind Disappointment,* WASHINGTON POST, Mar. 23, 2016, available at https://www.washingtonpost.com/news/wonk/wp/2016/03/23/the-trump-network-sought-to-make-people-rich-but-left-behind-disappointment/?utm_term=.9b13221c0f9c.

[127] *3 Trump-backed companies that raise troubling questions*, CBS News, Jan. 27, 2016, available at https://www.cbsnews.com/news/3-companies-that-raise-questions-about-the-trump-brand/.

[128] *Id.*

[129] Ike Swetlitz, *Donald Trump, Bad Science, and the Vitamin Company That Went Bust,* STAT NEWS, Mar. 2, 2016, available at https://www.statnews.com/2016/03/02/donald-trump-vitamin-company/.

[130] *See Bioceutica Review: Neutraceuticals, Cosmeceuticals & Retail,* BEHIND MLM, Jan. 26, 2016, available at http://behindmlm.com/mlm-reviews/bioceutica-review-neutraceuticals-cosmeceuticals-retail/; *see also* Ted Nuyten, *The Trump Network Sold to Antoine Nohra,* BUSINESS FOR HOME, Feb. 18, 2012, available at https://www.businessforhome.org/2012/02/the-trump-network-sold-to-antoine-nohra/.

[131] Julianna Goldman and Laura Strickler, *Trump's Failed Venture: Vitamin Business Fails After Get Rich Quick Pledge*, CBS News Investigation, CBS THIS MORNING (Apr. 12, 2016), at 0:55,

300.     By 2012, numerous judgements totaling in excess of $1.75 million were awarded

against The Trump Network, Inc., TTN, LLC, Scott Stanwood, Todd Stanwood, and DeCaprio in

various state courts.

**E.     Trump Falsely Represented that He Was Endorsing The Trump Network Because It Was His Company and Because He Genuinely Believed It Would Be a Success.**

301.     When Ideal Health partnered with Defendants in 2009, the name and face of the

company was changed and rebranded, but the fundamental products and business model

remained the same.  Nonetheless, Trump promoted The Trump Network products and business

opportunities as if it were a new venture that he himself had created, in which he had personally

invested, and upon which he had conducted appropriate due diligence.  Trump sent a message

that investors should trust him because he had access to superior information than they did upon

which he had based his investment decisions.

302.     He suggested that his belief was predicated on, among other things, his personal

stake in the company.  He failed to disclose to consumers that he did not, in fact, own a majority

of the company or that he was being paid for each of his promotional statements and

endorsements.

303.     In a 2016 investigation into The Trump Network, for example, CBS reported that

Donald Trump had personally signed a letter addressed to Trump Network marketers, that

plainly stated: "I believe in the Trump Network products."

---

available at https://www.cbsnews.com/news/donald-trump-network-cbs-news-investigation-supplements-multi-level-marketing/.



304.     Moreover, at his appearance at the Trump Network launch in 2009, Trump told

attendees: "It's going to be our company as a group."[132]  He assured them: "We're all going to

be successful together."[133]  Trump was conveying to eager listeners that he wanted them to join a

business of which he was a part and whose success he would ensure.

305.     Trump urged people to believe in his endorsement of The Trump Network and to

trust his judgment, all the while obfuscating his lack of actual involvement in the company.  As

alleged above, a Trump Enterprise entity DSN Licensing LLC and Ideal Health had entered into

a simple licensing agreement in which DSN Licensing LLC received payments for Trump's

promotions and endorsements of the company in exchange for the use of the Trump name and

brand.  Trump was neither the owner nor the operator of the Trump Network, but created that

impression in the minds of potential recruits.

---

[132] Donald Trump speech, Trump Network Conference, Miami, Florida (2009), Youtube,
https://www.youtube.com/watch?time_continue=1&v=XyRE5MN8jrA
[133] *Id.*

306.    A June 2008 proposal from then-President of Ideal Health, DeCaprio, to Cathy

Glosser, former executive Vice President of Global Licensing for The Trump Organization,

provides additional insight into the details of the agreement between DSN Licensing LLC and

Ideal Health.[134]  According to the proposal, The Trump Organization would receive an initial

licensing fee of $1 million, as well as a 17 percent equity stake in Ideal Health, Inc., additional

income, and "cash distributions."[135]  In return, Trump would, among other things, attend the

company's Annual National Meeting as a keynote speaker, participate in two of the company's

leadership conferences "with compensation," participate in two conference call interviews with

the founders and two audio and video productions.[136]  Finally, Trump would agree to have his

image and quotes used in company marketing and recruiting materials.[137]

307.    Notably, the proposal stated that under the terms of the agreement, Trump would

agree to allow The Trump Network to use "his image and quotations for press releases and

marketing materials ***with [Trump's] approval***, which will not [] be unreasonably withheld"

(emphasis added).[138]  As was the case with ACN, because Trump's image could only be used

with his approval, the Trump Enterprise very likely approved the company's statements about

Trump's endorsement and role in The Trump Network.

308.    In addition to Trump's own endorsement, the Trump Enterprise also facilitated

the endorsement of, and participation in, The Trump Network by several former contestants from

---

[134] Exhibit 3, Email from Lou DeCaprio to Cathy Glosser titled "Final Trump Documents for
Wednesday Meeting," *Ideal Health* v. *Blechman,* Case 1:09-cv-10791-DJC (Apr. 12, 2010).
[135] *Id.*
[136] *Id.*
[137] Exhibit 3, Email from Lou DeCaprio to Cathy Glosser titled "Final Trump Documents for
Wednesday Meeting," *Ideal Health* v. *Blechman*, Case 1:09-cv-10791-DJC (Apr. 12, 2010).
[138] *Id.*

*The Apprentice.*  In a 2010 press release discussing those endorsements, Trump echoed the idea

that he was endorsing The Trump Network because he genuinely believed in the company:

> When I started The Apprentice television show, everyone told me it was
> a long shot.  We are now in our 10th season.  ***The Trump Network is not
> a long shot.***  I want people to be successful, and to enjoy what they are
> doing.  ***I see unbelievable enthusiasm for the company's products and
> business model.***

(emphasis added).[139]

309.    Trump's misrepresentation about the meaning of, and motivations for, his

endorsement succeeded in bringing many new recruits to The Trump Network.  In the span of a

little over two years, thousands of people were induced to invest in the business opportunities

offered by The Trump Network because of Trump's seemingly genuine endorsement and false

statements about the company.

310.    For example, Richard Chester, a marketer for The Trump Network, based out of

Long Island, New York, told *New York Magazine*: "Who in their right mind would not go with

something Donald Trump is promoting?"[140]  Chester explained that although he was initially

hesitant to join, promotional videos of Donald Trump on The Trump Network's website

convinced him.  He said: "I felt like he was speaking to me.  This is a man who was down in the

dumps and came back! Now everything he touches turns to gold!"[141]

---

[139] *NBC's The Apprentice Leads Candidates to The Trump Network*, PR NEWSWIRE, Trump
Network,  Dec. 10, 2010, available at http://bioceutica.com/pdf/Press%20Release.pdf.
[140] Jessica Pressler, *If I Can't Trust Donald Trump, Who Can I Trust? The Donald Has a New
Scheme. Seller Beware*, NEW YORK MAGAZINE (Jan. 23, 2011),
http://nymag.com/nymag/features/70831/index2.html#print.
[141] *Id.*

311.    Chester went on: "I feel like in [Donald Trump's] heart, he wants to help people who are down and out," Chester said.  "If I thought he was just in it for the money, I wouldn't do it."[142]

312.    Alex Izzo, another former sales representative or "marketer" of The Trump Network, was quoted in the same article explaining her motivation for deciding to quit her job to become a marketer full-time: "People have said, 'This is Donald Trump's network-marketing company? I want in,'" Izzo said.[143]  "I was talking to a woman the other day and she said, 'If I can't trust Donald Trump, who can I trust?'  And I said, 'You're *totally* right.'"[144]

## IX.    THE TRUMP ENTERPRISE'S FRAUDULENT PROMOTION AND ENDORSEMENT OF THE TRUMP INSTITUTE

313.    At some point between 2005 and early 2006, Trump University, LLC entered into a licensing agreement with Business Strategies Group, LLC to form the "Trump Institute." The Trump Institute was a live-seminar program that purported to sell Trump's "secrets to success" in the real estate business in several extravagantly priced seminars.  Trump agreed to endorse and promote the Trump Institute lectures and products in exchange for franchise fees and secret lump-sum payments.

314.    As with ACN and The Trump Network, the Trump Enterprise disseminated the Message as it related to the Trump Institute pervasively.  It used various channels to disseminate the Message, including television infomercials, advertorials, and printed promotional materials. For example, in informercials, Trump promoted the purported successes of the Trump Institute and the quality of the Seminar contents, including the "Donald Trump Way to Wealth"

---

[142] *Id.*
[143] *Id.*
[144] *Id.*

seminar.[145]   In addition, Trump disseminated false statements about the Trump Institute in

printed promotional materials mailed to consumers across the country.   In a promotional mailing,

for example, Trump's signature is prominently featured on a letter to potential Trump Institute

recruits, extolling the quality of the information contained in "The Trump Institute's Way to

Wealth" seminar series.[146]   And Trump was prominently emblazoned on promotional materials

displayed on the Trump Institute website.



---

[145] Donald Trump Way to Wealth Seminars infomercial (2007),
https://youtube.com/watch?v=0Ogz-wuN40I.; The Donald Trump Way to Wealth, Jun. 2008,
https://www.youtube.com/watch?v=775yy9Rusc4.
[146] Mailing, "The Trump Institute's Way To Wealth," (Feb. 2009), Florida Attorney General
Consumer Complaints; *see also* Sam Stein, *Trump Tried to Get Bush's Labor Secretary to Attend
His Get-Rich-Quick Seminar*, HUFFINGTON POST, Dec. 28, 2016, available at
https://www.huffingtonpost.com/entry/donald-trump-elaine-
chao_us_57abaeb9e4b0ba7ed23f0993.



315.     The Message as applied to the Trump Institute was substantively the same as the

Message applied to The Trump Network and ACN.  As with ACN and The Trump Network,

Trump falsely represented that (1) prospective students would have a reasonable probability of

commercial success if they invested in the training program offered by the Trump Institute;

(2) Trump was endorsing the Institute because he believed it offered a reasonable probability of

commercial success (rather than because the Trump Enterprise was being paid); and (3) his

endorsement was predicated on Defendants' extensive due diligence, inside information, and

personal experience with the Trump Institute.

### A.     Trump Falsely Represented That Consumers Had Reasonable Probability of Commercial Success in The Trump Institute.

316.     From the period of 2005 until 2009, Donald Trump appeared in numerous

television infomercials, and online and printed promotional materials for the Trump Institute.  In

all these promotions, Trump emphatically stated that by participating in the Trump Institute

seminars, students would learn industry secrets and advice from him about how to succeed in the

real estate business, which would afford them a reasonable probability of commercial success.

Ultimately, he promised that the skills taught would help people make money and become successful in the real estate business, just as he did.

317.    The website and other materials directly predicated the reasonable probability of success promised with the fact that Trump was intimately involved in the Institute.  On the Trump Institute's website, for example, Trump falsely claimed that prospective students would learn Trump's "secret recipe for success" and other tactics to "improve their lives through financial success."[147]  The website proclaimed that "there are two great ways to create wealth – owning a business and investing in real estate.  Donald Trump is a master of both, and his strategies for both have been packed into this seminar."[148]  Promotional materials promised that by attending Trump Institute seminars, customers could learn the "right knowledge and the right mindset to create unlimited riches."[149]



---

[147] The Trump Institute website, "The Seminar," archives,
https://web.archive.org/web/20080703213536/http://www.trumpinstitute.com/seminar.php.
[148] *Id.*
[149] *Id.*



318.    Repeatedly, Trump's assurances of success were premised on the fact that the

seminars purportedly contained his personal knowledge and advice about how to succeed in the

real estate market.  Another infomercial from 2007, for example, proclaimed that at the "Donald

Trump Way to Wealth" seminars, customers would "learn the secrets and strategies that have

made Donald Trump a billionaire!"[150] Trump personally promised that customers would, among

---

[150] Donald Trump Way to Wealth Seminar (2007), https://www.youtube.com/watch?v=0Ogz-wuN40I.

other things, learn "the Trump way to get cash back when you buy a property."[151] "There are many, many great deals out there, and I'm going to teach you how to find them" he continued.[152] The infomercial also featured clips of what appear to be interviews with actual customers who had recently attended one of the "Way to Wealth" seminars: "Everything he touched turned to gold, and now it's rubbing off on us the same way," a man says, while standing in the middle of what appears to be the lobby of a busy hotel convention center.[153] "I think it's the greatest thing I've ever gone to. Better than a college education," asserts another. "Learn from the best. That's how I see it, that's why I'm here, that's why I came."[154]

319.   Extensive promotional materials also heralded the Trump Institute seminars as containing "Donald Trump's 'secret recipe' for success — a combination of the right knowledge and the right mind set to create unlimited riches" the Trump Institute website promised.[155] "As you'll discover, there are two great ways to create wealth — owning a business and investing in real estate. Donald Trump is a master of both, and his strategies for both have been packed into this seminar."[156]

---

[151] Donald Trump Way to Wealth Seminar (2007), https://www.youtube.com/watch?v=0Ogz-wuN40I.
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] The Trump Institute, archived website, "The Seminar," https://web.archive.org/web/2008070321356/http://www.trumpinstitute.com/seminar.php (last accessed Mar. 28, 2018); *see also* Alex Leary, *In Trump Institute, Donald Trump Had Florida Partners With a Record of Fraud*, TAMPA BAY TIMES, Jun. 20, 2016, available at http://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-trump-had-florida-partners-with-a-record-of-fraud/2283767.
[156] The Trump Institute, archived website, "The Seminar," https://web.archive.org/web/2008070321356/http://www.trumpinstitute.com/seminar.php (last accessed Mar. 28, 2018); *see also* Alex Leary, *In Trump Institute, Donald Trump Had Florida Partners With a Record of Fraud*, TAMPA BAY TIMES, Jun. 20, 2016, available at http://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-trump-had-florida-partners-with-a-record-of-fraud/2283767.

320.     In a promotional mailing from the Trump Institute, prospective customers received what appeared to be a personal letter, written and signed by Trump, in his capacity as "Chairman, Trump Institute."[157]  "What you have in your hands right now is my personal invitation for you and your guest to attend a special event featuring a hand-picked member of my organization who will teach you many of the strategies and techniques that are the reasons for my success," it read.[158]  "This is what I have learned the hard way, in the streets, fighting to grow my empire."[159]

321.     A description of the "Donald Trump Way to Wealth" seminar on the Trump Institute website explained to prospective customers that at the seminar they would learn about the secrets to Donald Trump's success.  The website proclaimed: "The Donald Trump Way to Wealth Seminar . . . provides a powerful introduction to the wealth-building strategies in real estate and business that have made Donald Trump a multi-billionaire."[160]



**The Trump Institute**

*The Donald Trump Way to Wealth Seminar*

This seminar will introduce you to Donald Trump's "secret recipe" for success - a combination of the right **knowledge** in the right **mindset** to create unlimited riches.

As you'll discover, there are two great ways to create wealth - owning a business and investing in real estate. Donald Trump is a master of both, and his strategies for both have been packed into the seminar.

You can have all of this priceless knowledge and much, much more. But you must be willing to **take action**.

Register Now for the Donald Trump "Way to Wealth" Seminar Click Here

---

[157] Mailing, "The Trump Institute's Way to Wealth," (Feb. 2009), Florida Attorney General Consumer Complaints; *see also* Sam Stein, *Trump Tried to Get Bush's Labor Secretary to Attend His Get Rich Quick Seminar,* HUFFINGTON POST, Dec. 28, 2016, available at https://www.huffingtonpost.com/entry/donald-trump-elaine-chao_us_57abaeb9e4b0ba7ed23f0993.

[158] *Id.*

[159] *Id.*

[160] Trump Institute website, "About Us," https://web.archive.org/web/20080703213608/http://www.trumpinstitute.com/aboutus.php.

## *The Trump Institute's Way To Wealth*

What you have in your hands right now is my personal invitation for you and your guest to attend a special event featuring a hand-picked member of my organization who will teach you many of the strategies and techniques that are the reasons for my success.

At this special event, you will discover many of my unique wealth creating secrets and strategies that I use to buy and sell real estate and that I also use in many of my highly profitable businesses.

This is the type of inside information that you'll not find in any books, tapes or manuals anywhere. **This is what** I have learned the hard way, in the streets, fighting to grow my empire and fighting to stay on top.

Here's just a sample of what you'll learn:

• **How to get cash back when you buy a property** • How to get other people to jump-start your business • **How to finance your business without putting up your home for personal liability** • How to get the government to buy your product and rent your properties • **How to negotiate with bankers and win BIG!** • How to be your own boss Forever! • **How to build your retirement account quickly and live the lifestyle of your dreams** • How to stop paying high taxes • **How to structure your business organization for maximum profit and protection** • And much, much more.

Seating is definitely limited and I expect to have a full house filled with people like you who want a piece of the good life. The exact dates, times and locations are listed on the back of your invitation. Please feel free to invite one guest. Call today!

Sincerely,
Donald J. Trump

Chairman, Trump Institute

P.S.   This invitation and the enclosed tickets have been sent only to those that have demonstrated a desire and a willingness to be successful. I promise it will be well worth your time and to prove it, I am giving everyone who attends one of my best selling books, *Think Like a Billionaire*, as a bonus.  Call the toll-free number on the back of this invitation or visit www.trumpwd.com today to confirm your reservation, as seating is limited!





**ABOUT US**

Founded in 2005, the Trump Institute is a nationwide learning organization based on the extraordinary knowledge and wisdom Mr. Trump has gathered during his successful career.

The Trump Institute hosts *The Donald Trump Way to Wealth Seminar* in multiple cities on a weekly basis throughout the year. This seminar provides a powerful introduction to the wealth-building strategies in real estate and business that have made Donald Trump a multi-billionaire. Attendees learn how they can practically use these strategies to build their own wealth and success.

| Contact Us | Privacy Policy | Terms of Service |

©2006 THE TRUMP INSTITUTE

322.    But these statements were plainly false.  Trump had no actual involvement in the creation of course materials.  No matter how much people paid to attend the seminars, they would never actually be able to learn what Trump had to teach, because he never spent any time reviewing the course materials or drafting the contents.  In fact, large portions of the materials sold as part of the Trump Institute seminars were plagiarized from another source.

## An Example of the Copied Text

At least 20 pages of the Trump Institute instructional book were copied
entirely or in large part from a book in a set titled "Real Estate Mastery
System." Highlighted here is an example of some of what was duplicated.

**From the book published first in 1995 by Success magazine**

Consider the following example to illustrate the use of a purchase money mortgage in residential properties. Seller A is asking $80,000 for a single-family residence. Buyer B likes the house but only has $10,000 for a down payment. The lending institution will only loan $64,000 on the house. To be able to sell the house, Seller A agrees to take a purchase money mortgage for $6,000 from Buyer B. In addition to taking this purchase money mortgage, Seller A is willing to accept a lower priority of claim if Buyer B should default. In this case, the lending institution has the first claim because it has a first mortgage. The purchase money mortgage is a second mortgage.

Real Estate Mastery System: Mortgage and Finance, Success magazine

**From the book published in 2006 by the Trump Institute**

Consider the following example: Seller A is asking $80,000 for a single-family residence. Buyer B likes the house, but only has $10,000 for a down payment. The lending institution will only loan $64,000 on the house. To be able to sell the house, Seller A agrees to take a purchase money mortgage for $6,000 from Buyer B. In addition to taking this purchase money mortgage, Seller A is willing to accept a lower priority of claim if Buyer B should default. In this case, the lending institution has the first claim because it has a first mortgage. The purchase money mortgage is a second mortgage.

Billionaire's Road Map to Success, the Trump Institute

323.   One of the products marketed by the Trump Institute was a workbook containing tips and strategies for ways to acquire wealth in real estate and other related businesses.[161]   In 2016, the *New York Times* reported that substantial portions of the content of the course materials

---

[161] *See* Jonathan Martin, *Trump Institute Offered Get Rich Schemes with Plagiarized Lessons*, THE NEW YORK TIMES, Jun. 29, 2016,
https://www.nytimes.com/2016/06/30/us/politics/donald-trump-institute-plagiarism.html.

contained in the workbook, called "Billionaire's Roadmap to Success," had been plagiarized

from a book that was part of a collection of training materials titled "Real Estate Mastery System,"

published in 1995 by SUCCESS Magazine.[162]  As alleged above, Trump was an advisory board

member of the SUCCESS Foundation in 2009, an affiliate of SUCCESS Magazine.  In addition,

Trump and his family have been featured in articles in SUCCESS Magazine, which detailed Trump's

relationship with ACN.



---

[162] *See* Jonathan Martin, *Trump Institute Offered Get Rich Schemes with Plagiarized Lessons*, THE NEW YORK TIMES, Jun. 29, 2016, https://www.nytimes.com/2016/06/30/us/politics/donald-trump-institute-plagiarism.html.



324.    In 2016, the *New York Times* reported that Susan G. Parker, the editor of the Trump Institute manual, said that she was hired to write the manual after responding to a Craigslist ad and that she certainly never met Donald Trump or received any guidance from him about what to write in the manual.  Instead, Parker said that she wrote it based on her own personal knowledge about real estate and a cursory review of prior books that Trump had written.[163]

---

[163] *Id.*

**B.    Trump Falsely Represented that He Supported the Trump Institute Because He Believed It Offered a Reasonable Probability of Commercial Success (Rather than Because the Trump Enterprise Was Being Paid).**

325.    Trump falsely represented that he was endorsing the Institute because he believed it would result in a reasonable probability of commercial success (and not because he was being paid).  For example, the "FAQ" section of the Trump Institute website explicitly misstated the basis for Trump's endorsement.  "Why did Donald Trump create the Trump Institute?" read one question.[164]  "America has been very good to Mr. Trump," the answer explained, "and this is his way of giving back knowledge to those who want to learn more about becoming successful."[165]

> **General FAQs**
>
> **Why did Donald Trump create The Trump Institute?**
> America has been very good to Mr. Trump and this is his way of giving back knowledge to those who want to learn more about becoming successful.
> Top
>
> **How do I take advantage of the classes offered by The Trump Institute?**
> When you attend *The Donald Trump Way to Wealth Seminar,* you will learn about the powerful courses offered by the Institute.
> Top

326.    In yet another Trump Institute infomercial, Trump asserted that if customers attended the seminar titled "The Donald Trump Way to Wealth," they would learn about his personal advice and real estate knowledge.  "I put all of my concepts that have worked so well for me, new and old, into our seminar," he proclaimed.[166]  "I'm teaching what I've learned. And *I'm real*" (emphasis added).[167]  The infomercial was staged to look like an interview between Donald Trump and a reporter-narrator.  "In continuing that effort to share his knowledge," the interviewer explained directly to the camera, "he has created the Trump Institute . . . so his

---

[164] Trump Institute website, "FAQ,"
https://web.archive.org/web/20080703213552/http://www.trumpinstitute.com/faq.php#g1.
[165] *Id.*
[166] The Donald Trump Way to Wealth, Jun. 2008,
https://www.youtube.com/watch?v=775yy9Rusc4.
[167] *Id.*

methods of success can be taught to anyone who wants to have that power, knowledge, and know-how." [168]



327.    Trump and the Trump Enterprise intentionally concealed the nature of the licensing agreement with the Trump Institute, the fact that Trump received large fees to license out the Trump brand, and the fact that the Trump Enterprise had no ownership or day-to-day control over the operation of the company.  To the contrary, the Trump Institute was initially created as part of a business plan involving Trump University, Donald Trump's online university that has been widely investigated and accused of operating fraudulent business practices.  Some of the key allegations against Trump University involved misleading advertisements that Trump himself would be integrally involved in the selection of professors and course materials when, in fact, he was not.  While Trump had a majority interest in Trump University, he had no personal equity stake in the Trump Institute.  As Alan Garten, then executive vice president and general counsel of The Trump Organization, told the *Huffington Post* in 2016: "The Trump Institute was a licensee of Trump University and was not owned or controlled by Mr. Trump or any of his companies." [169]

---

[168] *Id.*
[169] Christina Wilkie, *Trump Institute Fired Veteran for 'Absences' after He Was Deployed to Afghanistan,* HUFFINGTON POST, Apr. 22, 2016, available at

328.    In fact, the Trump Institute deal was the culmination of an effort by the Trump

Enterprise to find and partner with individuals who had run legally problematic live seminars in

the past.  In a July 2012 deposition taken as part of the New York Attorney General's

investigation into Trump University, President of Trump University Michael Sexton explained

that when he and Trump were searching for people to license the live seminar business out to,

they did, in fact, consider several different companies with relevant experience.

329.    Sexton further explained that they later planned to bring the Trump Institute live

seminar business "back in-house" at Trump University once they understood the business of

producing live seminars better.  That is, Trump and Sexton were looking to *learn* the live

seminar business from their licensing partner.

330.    Ultimately, he explained, they decided to license to Michael and Irene Milin, a

Florida couple who owned and operated another live seminar company called National Grants

Conferences ("National Grants").  Over a period of decades, the Milins operated a variety of get-

rich-quick schemes in which they sold educational seminars and materials that purported to teach

people how to easily obtain wealth.  In each case, the companies were accused of making false

promises; luring customers in with deceptive marketing; using aggressive sales tactics to

persuade people to buy increasingly expensive products; and providing little accountability in the

way of customer service or refunds, according to news articles.[170]

---

https://www.huffingtonpost.com/entry/trump-institute-fired-
veteran_us_5718fda7e4b024dae4f1517e.

[170] Gideon Resnick, *Trump's Get Rich Seminar Partnered With Couple Prosecuted for Fraud*,
Daily Best (Apr. 7, 2016 1:00 AM) https://www.thedailybeast.com/trumps-get-rich-seminar-
partnered-with-couple-prosecuted-for-fraud; Drew Garber, *Meet the Shadowy Jewish Couple at
the Center of the Trump Institute Scandal*, Forward (July 9. 2016); Alex Leary, *In Trump
Institute, Donald Trump had Florida Partners With Record of Fraud,* Tampa Bay Times (July 3,
2016 2:28 AM); Jonathan Martin, Trump Institute Offered Get-Rich Schemes With Plagiarized
Lessons, NY Times (June 29, 2016), https://www.nytimes.com/2016/06/30/us/politics/donald-



331.    In June 2007, 33 state attorneys general (and the attorney general of Guam) signed a letter to the Federal Trade Commission, noting the Milins' deceptive trade practices through National Grants.[171]   And in January 2010, then-Texas Attorney General Greg Abbott sued National Grants and its executives Mike and Irene Milin, Matt Orlando and Gail Amen in Harris County District Court in Texas, alleging that National Grants had misled consumers.[172] National Grants did not admit any wrongdoing, but the action resulted in their being barred from conducting the kind of deceptive advertising they had previously used.

---

trump-institute-plagiarism.html; Spencer Woodman, *Documents Show Just How Trump Suckered Students of the Trump Institute Felt*, The Nation (March 28, 2016), https://www.thenation.com/article/documents-show-just-how-suckered-students-of-the-trump-institute-felt/.

[171] Letter from Attorneys Generals to the Federal Trade Commission (June 18, 2007).

[172] Assurance of Voluntary Compliance, In the Matter of: *Proven Methods Seminars*, *LLC*, No. 2010-04032, (Harris Cty. Dist. Ct. Jan. 21, 2010)



332.    The Milins effectively ran the Trump Institute.  The Trump Institute even shared

office space in Boca Raton, Florida, with the Milins' other companies, according to Florida

corporate records.

333.    The Trump Institute even shared staffers with the Milins' other companies.

According to an April 2016 article in the *Daily Beast*, for example, National Grants used its

staffers and office space to help operate the Trump Institute.[173]  Two such staffers were speakers

Rick Wiseman and Saen Higgins, who had worked as salespeople for National Grants before

---

[173] Gideon Resnick, *Trump's Get Rich Seminar Partnered With Couple Prosecuted for Fraud*,
Daily Best (Apr. 7, 2016 1:00 AM) https://www.thedailybeast.com/trumps-get-rich-seminar-partnered-with-couple-prosecuted-for-fraud.

doing the same work for the Trump Institute.[174]  There was also "recycled NGC material" in Trump Institute pitches, including a story about how Wiseman obtained over $100,000 in government money to renovate his Utah home.

334.    The Milins ran the Trump Institute in a similarly problematic way.  In 2009, the Better Business Bureau gave Trump Institute an F rating.[175]  This was reflective of the overall experience that consumers had with the company during the years it was operational.

335.    Records compiled by Attorneys General across the country during the years that Trump Institute was in operation also demonstrate wide-spread dissatisfaction with the Trump Institute seminars by customers who could not receive refunds and felt as though they had been scammed out of thousands of dollars.

336.    As part of a 2010 investigation into Trump-entity for-profit education schemes, for example, then-Texas Attorney General, Greg Abbott, had compiled about 400 pages of documents and complaints that had been filed against Trump Institute (and Trump University), according to reporting by *The Nation* in 2016.[176]  Included in Abbott's documents were complaints that were not only submitted to the Texas Attorney General's office, but also filings

---

[174] Joe Mullin and Jonathan Kaminsky, *Firm's Claims for Grants Get Legal Scrutiny,* SACRAMENTO BEE, July 5, 2006, available at https://drive.google.com/file/d/0B4yHJZsoGnJBeHVJVzNtQ3NZbW8/view; *see also* Joe Mullin and Jonathan Kaminsky, *Trump University and the Art of the Get Rich Seminar,* ARS TECHNICA, Apr. 29, 2016, available at https://arstechnica.com/tech-policy/2016/04/we-witnessed-the-birth-of-trump-university/.
[175] Douglas Feiden, *Trump U. Hit by Complaints from Those Who Paid Up to 30G, And Say They Got Very Little in Return,* NY DAILY NEWS, May 30, 2010, available at http://www.nydailynews.com/news/trump-u-hit-complaints-paid-30g-return-article-1.44632.
[176] Spencer Woodman, *Documents Show Just How Suckered Students of the Trump Institute Felt,* THE NATION, Mar. 28, 2016, available at https://www.thenation.com/article/documents-show-just-how-suckered-students-of-the-trump-institute-felt/.

from Better Business Bureaus in the states of Florida and New York, where there were additional Trump Institute and Trump University offices. [177]

337.    The Trump Enterprise profited enormously from this fraud.  The Trump Institute seminars and course material could cost participants tens of thousands of dollars in total fees.  At the initial "free" seminars, for example, participants were prodded to purchase an additional three-day conference, a "Wealth Building Weekend," for $1,500. [178]

338.    In its first full year of operation, the Trump Institute held about 120 different seminars in 30 different cities across the country. [179]

339.    As one man wrote in a complaint to the Florida Attorney General's office about a 2009 seminar:  "They are using our money to make money." [180]  Another complaint from a woman who wrote to the Attorney General's office requesting aid in receiving a refund of $19,000, after she was allegedly misled about the Trump Institute by its advertising, stated: "We spent numerous hours placing calls & most times were only able to leave a message in a general mailbox or were disconnected without allowing a voicemail."  "Trump Institute took our money, did not provide any mentoring service, is virtually unavailable by phone, email or fax and has failed to live up to their agreement."

---

[177] *Id.  See also* Scott Maxwell, *Trump Funds Bondi as the AG Considered a Probe*, ORLANDO SENTINEL, Oct. 15, 2013, available at http://articles.orlandosentinel.com/2013-10-15/news/os-scott-maxwell-bondi-trump-20131015_1_attorney-general-pam-bondi-donald-trump-campaign-event.

[178] Gideon Resnick, *Trump's Get Rich Seminar Partnered with Couple Prosecuted for Fraud*, THE DAILY BEAST, Apr. 7, 2016, available at https://www.thedailybeast.com/trumps-get-rich-seminar-partnered-with-couple-prosecuted-for-fraud.

[179] Alex Leary, *In Trump Institute, Donald Trump Had Florida Partners with a Record of Fraud,* TAMPA BAY TIMES, Jun. 20, 2016, http://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-trump-had-florida-partners-with-a-record-of-fraud/2283767.

[180] *Id.*

340.    Another student wrote to the Florida Attorney General's office seeking help in obtaining a refund from Trump Institute: "Please help me. . . . I was laid off work for the first time in my life and really need this money to support my family.  $1,400 is so much money for my family."[181]  Another woman wrote a complaint directly addressed to Donald Trump, which was then forwarded to the Attorney General's office:  "Mr. Trump, I am an 85-year-old woman living on a fixed, modest income. The monthly payment your organization has been deducting from my bank account is creating an ongoing hardship for me."[182]

341.    Another complaint submitted in 2010 by a Connecticut couple explained that they attended a Trump Institute seminar and were led to believe by the person conducting the seminar, "that he was absolutely broke and his wife was about to leave him and he found the Trump Institute which saved his life."  A few days later, the couple received a phone call from someone at the Trump Institute who convinced them to sign up for a more extended program.  "This man knew that we were already in a lot of debt and we were going to pay for this part [on] credit card and the other part my husband was to borrow from his 401k retirement Plan," the complaint stated.  A few days later, when the course materials and the contract did not arrive in the mail, the couple tried to cancel their membership and receive a refund.  Several phone calls and over ten days later, they were told that their membership was past the cancellation date and they would not be able to receive a refund.  "The Trump Institute failed us by not [...] staying true to their word," they wrote.

---

[181] Spencer Woodman, *Documents Show Just How Suckered Students of the Trump Institute Felt,* THE NATION, Mar. 28, 2016, https://www.thenation.com/article/documents-show-just-how-suckered-students-of-the-trump-institute-felt.

[182] Alex Leary, *In Trump Institute, Donald Trump had Florida partners with a record of fraud,* TAMPA BAY TIMES, June 30, 2016, https://www.tampabay.com/news/politics/stateroundup/in-trump-institute-donald-trump-had-florida-partners-with-a-record-of-fraud/2283767.

342.     Another Florida resident submitted a complaint to the Attorney General's office in 2010, seeking help obtaining a refund from the Trump Institute.  The customer had been waiting several months for a response from the Trump Institute regarding a refund.  "[T]he company…[is] trying to get rid of me!" the complaint states.  "This company is a Donald Trump company, so I felt it was legitimate."

343.     A California resident wrote to the Florida Attorney General's office in January of 2010, explaining that he had paid $12,000 for a real estate course over a year earlier and has since been unable to get a refund.  "I received nothing" from the course, he wrote.  "I have called repeatedly to get a refund . . . I think this is a big scam.  Can you help me?"

### C.     Trump Falsely Represented that His Endorsement Was Predicated on Appropriate Due Diligence and/or Inside Information.

344.     In addition to misrepresenting the probability of prospective students' commercial success based on the material and the nature of his own involvement and compensation, Trump repeatedly misstated that he had access to inside information regarding the Institute and that he was intimately aware of the educational content in which he was asking students to invest.

345.     As part of Trump's claim that he was intimately familiar with the content of the Trump Institute's educational services, he suggested that he himself had chosen the course material.  Trump claimed that he has "put all of [his own] concepts" into the seminars for people to learn from.[183]  "Additional educational materials will be for sale at the seminar" is written across the bottom of the screen during one portion of one of the infomercials.

346.     Not only was it patently false that Trump had authored the course materials (as alleged above), but Trump's own attorneys made clear just how little diligence Trump had done

---

[183] The Donald Trump Way to Wealth, Jun. 2008, https://www.youtube.com/watch?v=775yy9Rusc4.

on the Institute he was endorsing.  For example, when Alan Garten, then-executive vice president and general counsel of The Trump Organization, spoke to the *New York Times* in 2016, he claimed that Donald Trump was "obviously" unaware of the plagiarism issue, since he had little actual involvement with the Trump Institute in the first place.[184]  Garten underscored that the Trump Institute was simply a "short-term licensing deal," though Trump's own statements at the time were directly to the contrary.[185]

347.   Moreover, Garten directly contradicted Trump's many assertions that he was involved in designing the Trump Institute program and in selecting mentors.  Garten stated that "[t]he Trump Institute was a licensee of Trump University and was not owned and controlled by Mr. Trump or any of his companies."  Garten continued, "As such, Mr. Trump had nothing whatsoever to do with the employment of any of the Trump Institute's employees or mentors."[186]

348.   In his 2012 deposition, Sexton said that he did not "believe" that anyone at The Trump Organization would have reviewed the Trump Institute's curriculum.[187]  He further emphasized that Trump, personally, "would never do that."[188]

## X.   CLASS ALLEGATIONS

349.   Plaintiffs bring this action on their own behalf and pursuant to Federal Rule of Civil Procedure 23(a), each of the three subdivisions of Rule 23(b), and Rule 23(c)(4).

---

[184] *See* Jonathan Martin, *Trump Institute Offered Get Rich Schemes with Plagiarized Lessons*, THE NEW YORK TIMES, Jun. 29, 2016, https://www.nytimes.com/2016/06/30/us/politics/donald-trump-institute-plagiarism.html.
[185] *Id.*
[186] Christina Wilkie, *Trump Institute Fired Veteran for 'Absences' After he was Deployed to Afghanistan*, HUFFINGTON POST, Apr. 22, 2016, available at https://www.huffingtonpost.com/entry/trump-institute-fired-veteran_us_5718fda7e4b024dae4f1517e.
[187] *Makaeff et al.* v. *Trump University, LLC, et al.,* No. 10-cv-00940, EIG-WVG, Sexton Dep., July 25, 2012, at 126.
[188] *Id.* at 127.

350.    First, Plaintiffs seek certification of a nationwide class under Rule 23(b)(1)(A) and/or 23(b)(2) class consisting of all persons and entities who invested in, subscribed to, or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "Nationwide Equitable Class") for purposes of asserting common law fraud and common law negligent misrepresentation claims, and claims under RICO.

351.    Plaintiffs Jane Doe and Luke Loe also seek certification of a class or subclass under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who, from California, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "California Equitable Class") for purposes of asserting statutory claims under California law.

352.    Plaintiff Richard Roe also seeks certification of a class or subclass under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who, from Maryland, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "Maryland Equitable Class") for purposes of asserting statutory claims under Maryland law.

353.    Plaintiff Mary Moe also seeks certification of a class or subclass under Rule 23(b)(1)(A) and/or 23(b)(2) consisting of all persons and entities who, from Pennsylvania, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates (the "Pennsylvania Equitable Class") for purposes of asserting statutory claims under Pennsylvania law.

354.    The proposed Nationwide Equitable Class, the proposed California Equitable Class, the proposed Maryland Equitable Class and the proposed Pennsylvania Equitable Class are referred to collectively as the "Equitable Classes."

355.     The prosecution of separate actions by individual members of the Rule 23(b)(1)(A) and (b)(2) Equitable Classes would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

356.     Defendants have acted, or failed to act, on grounds generally applicable to the Rule 23(b)(1)(A) and (b)(2) Equitable Classes, thereby making appropriate final injunctive and declaratory relief with respect to the Equitable Classes as a whole.

357.     The individual members of the Rule 23(b)(1)(A) and (b)(2) Equitable Classes are so numerous that joinder is impracticable.  The precise size of the each of the Equitable Classes is known only to Defendants but handily meets the threshold for certification.

358.     Second, Plaintiffs seek certification of a nationwide class under Rule 23(b)(3) consisting of all persons and entities who invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "Nationwide Damages Class") for purposes of asserting common law fraud and common law negligent misrepresentation claims, and claims under RICO.

359.     Plaintiffs Jane Doe and Luke Loe also seek certification of a class or subclass under Rule 23(b)(3) consisting of all persons and entities who, from California, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "California Damages Class") for purposes of asserting statutory claims under California law.

360.     Plaintiff Richard Roe also seeks certification of a class or subclass under Rule 23(b)(3) consisting of all persons and entities who, from Maryland, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an

amount equal to or more than those payments from ACN (the "Maryland Damages Class") for purposes of asserting statutory claims under Maryland law.

361.    Plaintiff Mary Moe also seeks certification of a class or subclass under Rule 23(b)(3) consisting of all persons and entities who, from Pennsylvania, invested in, subscribed or made payments to ACN Opportunity, LLC ("ACN") or its affiliates, but did not recoup an amount equal to or more than those payments from ACN (the "Pennsylvania Damages Class") for purposes of asserting statutory claims under Pennsylvania law.

362.    The proposed Nationwide Damages Class, the proposed California Damages Class, the proposed Maryland Damages Class and the proposed Pennsylvania Damages Class are referred to collectively as the "Damages Classes."

363.    The individual members of the Damages Classes are so numerous that joinder is impracticable.  The precise size of the each of the Damages Classes is known only to Defendants but handily meets the threshold for certification.

364.    All of the members of the Damages Classes have been injured as a result of Defendants' conduct.

365.    Third, as an alternative to seeking class certification under Rule 23(b), Plaintiffs may also seek certification of the classes defined above, but limited to specific identified common issues under Rule 23(c)(4).

366.    Plaintiffs reserve the right to amend the definitions of the Classes if discovery and/or further investigation reveal that the Classes should be expanded or otherwise modified.

367.    There are numerous questions of law and fact common to the Equitable Classes and the Damages Classes (collectively, the "Classes").  Chief among them are whether Defendants actions, as described in this Complaint violated RICO or the consumer protection

statutes of California, Maryland or Pennsylvania or constituted common law fraud or common law negligent misrepresentation.  These common issues predominate over any individual issues pertaining to the members of the Damages Classes and include, without limitation, whether:

a) The Trump Association-in-Fact is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

b) The Trump Corporation is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

c) Defendants operated and controlled the Trump Association-in-Fact;

d) The Individual Defendants operated and controlled the Trump Corp. Enterprise;

e) Defendants engaged or conspired to engage in a pattern of mail fraud, indictable under 18 U.S.C. § 1341;

f) Defendants engaged or conspired to engage in a pattern of wire fraud, indictable under 18 U.S.C. § 1343;

g) Defendants promoted the ACN business opportunity with false and misleading statements;

h) Defendants engaged in a scheme to defraud members of the Classes;

i) Members of the Classes are entitled to an award of treble, statutory, punitive damages, attorneys' fees, and expenses;

j) Members of the Classes are entitled to equitable relief, and if so, the nature of such relief;

    k)  Defendants' conduct injured members of the Classes and whether those injuries, including monetary and out of pocket pecuniary losses, are compensable.

368.    Defendants' practices and the claims alleged in this complaint are common to all members of the Classes.

369.    The violations and injuries suffered by Plaintiffs are typical of those suffered by members of the Classes. Plaintiffs, like all members of the Classes, are individuals who were lured into investing in the ACN business opportunity and incurred costs and suffered losses as a result of Defendants' misrepresentations and scheme to defraud. The Classes will benefit from the remedial and monetary relief sought in this action.

370.    Plaintiffs and their counsel will adequately and fairly protect the interests of all members of the Class because they have the requisite personal interest in the outcome of this litigation and they have no interest antagonistic to others in the Classes.

371.    Plaintiffs are represented by counsel competent and experienced in federal class action, consumer protection, and RICO litigation. Kaplan, Hecker and Fink LLP ("KHF") is a prominent New York City law firm whose lawyers have extensive experience litigating complex civil cases and in civil rights litigation. Emery Celli Brinckerhoff & Abady LLP ("ECBA") is also a prominent New York City law firm with extensive experience in class action lawsuits, and in consumer and civil rights litigation. ECBA served as class counsel in *Sykes* v. *Mel Harris & Associates, LLC*, 285 F.R.D. 279 (S.D.N.Y. 2012) (certifying Rule 23(b)(2) and (3) classes of hundreds of thousands of persons injured by fraudulent scheme to obtain default judgments in violation of, *inter alia*, RICO and the New York Consumer Protection Act), *aff'd*, 780 F.3d 70 (2d Cir. 2015).

372.     A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in a manner generally applicable to the Classes, joinder of all members of the Classes is impracticable, and a class action may avoid numerous separate actions by Class members that would unduly burden the courts.

373.     Additionally, the damages suffered by class members, although substantial, are small in relation to the extraordinary expense and burden of complex litigation, and it is therefore highly unlikely that any significant number of individual actions will be pursued, particularly because members of the Classes are primarily low-income individuals with limited access to counsel.  Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

374.     This case can be efficiently and easily managed as a class action.

## CAUSES OF ACTION

**COUNT ONE**:     **Racketeering in Violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**

375.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

376.     Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

377.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Trump Association-in-Fact through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

378.     The Individual Defendants are "persons" within the meaning of 18 U.S.C. 1961(3) who conducted the affairs of the Trump Corp. Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

379.    At all times relevant to this Complaint, the Trump Association-in-Fact was an association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of a network of companies and associates that shared a common purpose, including but not limited to (i) Defendant, The Trump Corporation; (ii) Defendant Donald J. Trump; (iii) Defendant Ivanka Trump; (iv) Defendant Donald Trump, Jr.; (v) Defendant Eric Trump; (vi) Trump Productions; (vii) DSN Licensing, LLC; (viii) Trump University LLC; (ix) Trump International Realty; (x) Trump National Golf Club, LLC; and (xi) TNGC Charlotte, LLC.

380.    At all times relevant to this Complaint, the Trump Corp. Enterprise was legal entity and an enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of high level executives within The Trump Corporation who operated and controlled The Trump Corporation and the Trump Corp. Enterprise, including without limitation the Individual Defendants.

381.    The Trump Association-in-Fact and the Trump Corp. Enterprise (referred to collectively as the "Trump Enterprise") had the common purpose of earning revenue from the Endorsed Entities in exchange for conveying a false and misleading Message on behalf of the Endorsed Entities, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the Investments; (2) that Trump was promoting and endorsing the Investments because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the Investments.  The Enterprise's pursuit of this common purpose by the actions alleged in this Complaint amounted to the conduct of a scheme to defraud Plaintiffs (the "Fraudulent Scheme").

382.    Defendant Trump exercised substantial control over the Trump Enterprise through the following means:

      A.    directing the business activities of The Trump Corporation and its subsidiaries and affiliates to carry out the Trump Enterprise;

      B.    approving marketing and advertising materials which featured his name, likeness and/or voice, including materials produced by ACN, the Trump Institute, and Trump Network;

      C.    authorizing companies within the Trump Enterprise to license the right to use his name to other companies, including the Trump Institute and Trump Network.

383.    At all relevant times, the Trump Enterprise had an ascertainable structure that was separate and distinct from Trump and The Trump Corporation, and its operations were separate from the pattern of racketeering activity in which Trump and The Trump Corporation engaged.

384.    In carrying out the Fraudulent Scheme, the Trump Enterprise engaged in interstate commerce and/or its activities affected interstate commerce, including because the businesses that Trump endorsed offered their products nationally and because Trump made appearances in several states in conducting the Enterprise.

385.    Under the direction of Defendants, the Trump Enterprise had an ongoing organizational framework for carrying out its objectives and functioned as a continuing unit with a common purpose. Each participant in the Trump Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing coordination of their activities.

386.    By engaging in the Fraudulent Scheme, Defendants conducted the affairs of the Trump Enterprise through a pattern of racketeering activity.  The racketeering activity was made possible by the regular and repeated use of the facilities, services, legal entities, and employees of the Trump Enterprise.

387.    Defendants carried out the Fraudulent Scheme through numerous acts of mail and wire fraud, which acts are indictable under 18 U.S.C. §§ 1341 and 1343, respectively, and thus constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1).  Defendants used thousands of interstate mail and wire communications to create and perpetuate the Fraudulent Scheme, through communications between and among Defendants and members of the Enterprise, money transfers, false statements, misrepresentations, and misleading omissions alleged in this Complaint.  These acts of mail and wire fraud together constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

388.    The pattern of racketeering activity commenced in late 2005, when Trump began to endorse ACN.  The pattern extended to Trump's endorsement of The Trump Network and Trump Institute.  The pattern continued until at least August 2017, when the ACN Charity golf tournament was hosted at the TNGC Charlotte. Though the pattern of racketeering extended to the Trump Network and the Trump Institute, the Trump Enterprise's fraudulent promotion and endorsement of ACN alone constitutes a pattern of racketeering activity.

389.    Defendants' fraudulent use of the mails included communications between and among Defendants and members of the Enterprise, in addition to the following communications sent by interstate mail to Plaintiffs and other third parties via U.S. mail or commercial carrier at Trump's behest or with his express authorization, and which involved knowingly false statements, misrepresentations, and misleading omissions by Trump:

A.    The ACN Opportunity Discs featuring Trump;

B.    Issues of ACN Newsmagazine featuring Trump and/or detailing his endorsement of ACN;

C.    Issues of *Success from Home Magazine* featuring Trump and/or detailing his endorsement of ACN;

D.    Episodes of *The Celebrity Apprentice* featuring ACN that were distributed in physical media (such as DVDs);

E.    Promotional materials for Trump Institute containing Trump's name and image;

F.    Advertising materials for the Trump Institute containing a signed letter from Trump promoting the *Donald Trump Way to Wealth* seminar;

G.    Advertising materials for Trump Network containing Trump's name, image, and promotional statements.

390.    Defendants' fraudulent use of interstate wire services included email communications and money transfers between and among Defendants and members of the Enterprise, in addition to the following communications that were broadcast or distributed using interstate wire services or other interstate electronic media:

A.    Videos of Trump's speeches at ACN events that were posted on YouTube;

B.    Posts authored by Trump on ACN's blog;

C.    Videos of Trump's speeches at Trump Network events that were posted on YouTube;

D.      Posts authored by Trump on the Trump Network's website;

E.      Promotional videos featuring Trump for Trump Network that were

         posted on YouTube;

F.      Promotional videos featuring Trump for the Trump Institute that

         were posted on YouTube.

391.    Throughout the relevant time period, on or about the dates set forth below,

Plaintiffs also received the following fraudulent mail and/or wire communications by Trump:

A.      In mid-to-late 2014, Plaintiff Doe viewed an ACN DVD in which Trump

         delivered the Message directly to viewers at an ACN recruitment meeting

         in Los Angeles.  The Message was repeated and augmented by clips of

         ACN's appearance on *The Celebrity Apprentice*, which Plaintiff Doe also

         viewed.

B.      Plaintiff Doe also received the Message at ACN meetings she attended

         every two weeks throughout late 2014 to late 2015 at two hotels in Los

         Angeles, during which ACN DVDs prominently featuring Trump's

         endorsement were played.

C.      Plaintiff Doe also received the Message at ACN conferences in 2015 in

         Cleveland, Ohio and Detroit, Michigan, during which videos featuring

         Trump conveying the Message were prominently displayed.

D.      In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Loe

         viewed an ACN DVD in which Trump delivered the Message directly to

         viewers.

E.      Plaintiff Loe also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

F.      Plaintiff Loe also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

G.      Around mid-2016, Plaintiff Roe received the Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.

H.      Around mid-2013, Plaintiff Moe received the Message by watching a promotional video prominently featuring Trump at an event held at a hotel in Pennsylvania.

392.    In reliance on the Message conveyed by Trump and the Trump Enterprise in furtherance of the Fraudulent Scheme, Plaintiffs invested in ACN, incurred expenses in connection therewith, and suffered loss and damage thereby.

393.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by the pattern of racketeering activity described above.

394.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT TWO:**      **Conspiracy to Conduct the Affairs of a Racketeering Enterprise, 18 U.S.C. § 1962(d)**

395.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

396.    Defendants have agreed and conspired to violate 18 U.S.C. § 1962(c), as set forth above, in violation of 18 U.S.C. § 1962(d). Defendants have intentionally conspired and agreed to directly, and indirectly, conduct and participate in the conduct of the affairs of the Trump Enterprise through a pattern of racketeering activity.

397.    Defendants knew that their predicate acts of wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to defraud hopeful investors.

398.    As a direct result and proximate result of Defendants' conspiracy, and the multiple overt acts taken by all Defendants in furtherance of that conspiracy, Plaintiffs have been injured in their business and property.

**COUNT THREE:**    **Dissemination of Untrue and Misleading Public Statements in Violation of California Business and Professions Code § 17500 *et seq*.**

399.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiffs Jane Doe and Luke Loe ("California Plaintiffs") assert Count Three on behalf of themselves.

400.    Defendants are "persons" within the meaning of California Business & Professional Code § 17506.

401.    California Business & Professions Code § 17500 prohibits the dissemination, in any manner or means, of any untrue or misleading statements or representations concerning property or services.

402.    Defendants violated California Business & Professions Code § 17500 by disseminating to the public a false and misleading Message on behalf of the ACN, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into ACN; (2) that Trump was endorsing and promoting ACN because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the ACN business opportunities.

403.    On or about the dates set forth below, Plaintiffs Doe and Loe received the following fraudulent communications by Trump:

    A.    In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Doe viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff Doe also viewed.

    B.    Plaintiff Doe also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles during which ACN DVDs prominently featuring Trump's endorsement were played.

    C.    Plaintiff Doe also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.    In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Loe viewed an ACN DVD in which Trump delivered the Message directly to viewers.

E.    Plaintiff Loe also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles—during which ACN DVDs prominently featuring Trump's endorsement were played.

F.    Plaintiff Loe also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

404.    As set forth in this Complaint, Defendants knew, or by exercise of reasonable care should have known, that the statements regarding ACN were false and misleading. The statements referenced above, which Defendants disseminated to the public, were material and likely to deceive a reasonable consumer.

405.    As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding ACN.

406.    Plaintiffs Doe and Loe invested in ACN, and incurred expenses in connection therewith, as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

407.    Had members of the Trump Enterprise not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs Doe and Loe would not have been injured.  Thus, their injuries were directly and proximately caused by Defendants' dissemination

of untrue or misleading statements and representations of property or services to individuals

within the state of California, in violation of California Business & Professions Code § 17500.

408.    In accordance with California Business & Professions Code § 17500, Plaintiffs

Doe and Loe request that this Court enter such orders or judgments as may be necessary,

including disgorgement of any money Defendants obtained by false advertising, and for such

other relief as may be appropriate.

**COUNT FOUR**:        **Unfair Competition in Violation of California Business and
                       Professions Code § 17200 *et seq*.**

409.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as

if set forth fully herein.  Plaintiffs Doe and Loe assert Count Four on behalf of themselves.

410.    Defendants are "persons" within the meaning of California Business &

Professions Code § 17021.

411.    Defendants have violated California Business & Professions Code § 17200's

prohibition against "unlawful, unfair, or fraudulent" business practices by disseminating

materially false and misleading representations about ACN to Plaintiffs Doe and Loe.

412.    Defendant's actions constitute "unfair" business acts and practices within the

meaning of California Business & Professions Code § 17200.  Defendants' practices offend

public policy and are unethical, oppressive, unscrupulous and violate the laws stated herein.

Moreover, Defendants' conduct has caused substantial injury to Plaintiffs Doe and Loe.  The

gravity of Defendants' wrongful conduct significantly outweighs any purported benefits that can

be attributed to such conduct.

413.    Defendants' actions also constitute fraudulent business acts and practices within

the meaning of California Business & Professions Code § 17200.  Defendants' omissions

regarding the nature of Trump's relationship with the ACN, as well as Defendants' assertions

regarding the quality and value of the investing in ACN and the likelihood of financial success, were all intended to deceive consumers like Plaintiffs Doe and Loe.

414.   On or about the dates set forth below, Plaintiffs Doe and Loe received the following fraudulent communications by Trump:

    A.    In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Doe viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff Doe also viewed.

    B.    Plaintiff Doe also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

    C.    Plaintiff Doe also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

    D.    In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Loe viewed an ACN DVD in which Trump delivered the Message directly to viewers.

    E.    Plaintiff Loe also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

F.   Plaintiff Loe also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

415.   As set forth in this Complaint, Defendants knew or, by exercise of reasonable care should have known, that the statements regarding the property and services of ACN were false and misleading.  The statements referenced above, which Defendants disseminated to the public, were material and likely to deceive a reasonable consumer.

416.   As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

417.   Plaintiffs Doe and Loe invested in ACN, and incurred expenses in connection therewith, as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

418.   Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs Doe and Loe would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' conduct of the Trump Enterprise's affairs through a pattern of unlawful, fraudulent and unfair business practices in violation of California Business & Professions Code § 17200 *et seq*.

419.   Defendants' conduct was also unlawful in violation of California Business & Professions Code § 17200's prohibition against business practices which constitute violations of other statutes, including California Business & Professions Code § 17500.

420.     In accordance with California Business & Professions Code § 17200, California Plaintiffs and members of the California Class request that this Court enter such orders or judgment as may be necessary, including disgorgement of any money Defendants gained by unfair competition, and for such other relief as may be appropriate.

**COUNT FIVE:**      **Unfair and Deceptive Trade Practices in Violation of Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-301**

421.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiff Roe asserts Count Five on behalf of himself.

422.     Maryland's Consumer Protection Act ("MCPA") prohibits any unfair or deceptive trade practices, including "false or misleading representations of any kind" which have the "capacity, tendency, or effect of deceiving or misleading customers."  Md. Code Ann., Com. Law § 13-301(1).  The statute further prohibits all "deception, fraud, false pretense, false premise, misrepresentation, or knowing concealing, suppression, or omission of any material fact" with the intent to induce reliance "in connection with the promotion or sale of any consumer goods . . . or service."  Md. Code Ann., Com. Law § 13-301(9).

423.     Defendants engaged in deceptive trade practices in violation of Md. Code Ann. Com. Law § 13-301(1) by knowingly disseminating to the public a false and misleading Message regarding ACN, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN; (2) that Trump was endorsing and promoting ACN because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the ACN business opportunities.

424.    Defendants used mail and wire communications to create and disseminate false statements, misrepresentations, and misleading omissions, to Plaintiff Roe.

425.    On or around mid-2016, Plaintiff Roe received the fraudulent Message by watching video of Trump from an episode of the *The Celebrity Apprentice* featuring ACN.

426.    As set forth in this Complaint, Defendants intended that Plaintiff Roe rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

427.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiff Roe, would not have been injured.  Thus, his injuries were directly and proximately caused by Defendants' dissemination of untrue or misleading statements and representations regarding property or services to individuals within the state of Maryland in violation of Md. Code Ann., Com. Law § 13-301(9).

428.    Plaintiff Roe is entitled to equitable relief, actual damages and attorneys' fees under Md. Code Ann., Com. Law § 13-408(a), in an amount to be proven at trial, and any other just and proper relief available under the Maryland CPA.

**COUNT SIX**:       **Unfair and Deceptive Acts or Practices in Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") 73 Pa. Stat. Ann. § 201-2(4) *et seq*.**

429.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.  Plaintiff Mary Moe asserts Count Six on behalf of herself.

430.    Defendants are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2(2).

431.    Section 201-2(4)(ii) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law prohibits business acts or practices that "caus[e] likelihood of confusion or of misunderstanding as to the sources, sponsorship, approval or certification of goods or services."

73 Pa. Stat. Ann. § 201-2(4)(ii).  Section 201-2(4)(iii) prohibits business acts or practices that "caus[e] likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another."  73 Pa. Stat. Ann. § 201-2(4)(iii).

432.   Section 201-2(4)(v) further prohibits business acts or practices which include "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have."  73 Pa. Stat. Ann. § 201-2(4)(v).

433.   Section 201-2(4)(vii) prohibits business acts or practices which include "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another."  73 Pa. Stat. Ann. § 201-2(4)(vii). Finally, section 201-2(4)(xxi) prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 Pa. Stat. Ann. § 201-2(4)(xxi).

434.   Defendants violated 73 Pa. Stat. Ann. § 201-2(4)(ii, iii, v, vii, xxi) by disseminating to the public a false and misleading Message on behalf of ACN, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into ACN; (2) that Trump was endorsing and promoting investment in ACN because he believed that it offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, insider information, and personal experience with the ACN business opportunities.

435.   Around mid-2013, Plaintiff Moe received the fraudulent Message by watching a promotional video prominently featuring Trump at an event held in a Pennsylvania hotel.

436.   All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

437.    As set forth in this Complaint, Defendants knew or, by exercise of reasonable care should have known, that the statements regarding the property and services of ACN were false and misleading.  The statements described above, which Defendants disseminated to the public, were material and likely to deceive a reasonable consumer.

438.    As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

439.    Plaintiff Moe invested her money in ACN as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

440.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiff Moe would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' dissemination of untrue or misleading statements and representations of property or services to individuals within the state of Pennsylvania, in violation of 73 Pa. Stat. Ann. § 201-2(4)(ii, iii, v, vii, xxi).

441.    In accordance with 73 Pa. Stat. Ann. § 201-9.2, Plaintiff Moe is entitled to treble their actual damages or $100, whichever is greater, equitable relief and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a).  Plaintiff Moe is also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT SEVEN**:    **Common Law Fraud**

442.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

443.    As alleged herein, Defendants intentionally made false representations of material fact regarding the nature of the ACN business opportunities, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN business opportunities; (2) that Trump was endorsing and promoting the ACN business opportunities because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's endorsement was predicated on extensive due diligence, experience, and/or access to inside information about the ACN business opportunities.

444.    On or about the dates set forth below, Plaintiffs received the following fraudulent communications by Trump:

A.    In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Doe viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff Doe also viewed.

B.    Plaintiff Doe also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

C.    Plaintiff Doe also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.   In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Loe viewed an ACN DVD in which Trump delivered the Message directly to viewers.

E.   Plaintiff Loe also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

F.   Plaintiff Loe also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

G.   Around mid-2016, Plaintiff Roe received the Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.

H.   Around mid-2013, Plaintiff Moe received the Message by watching a promotional video prominently featuring Trump at an event held in a Pennsylvania hotel.

445.   As set forth in this Complaint, Defendants knew or, by exercise of reasonable care should have known that the statements regarding the property and services of Investments ACN were false and misleading. The statements referenced above, which Defendants disseminated to the public, were likely to deceive a reasonable consumer and therefore were material.

446.   As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

447.    Plaintiffs invested their money in ACN as a direct result of, and in reliance on, the false and misleading representations disseminated by Defendants.

448.    Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs would not have been injured. Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' conduct of the Trump Enterprise's affairs through a pattern of disseminating untrue or misleading statements and representations of property or services to members of the public in violation of the law.

449.    Plaintiffs are entitled to equitable relief and damages in an amount to be proven at trial.

**COUNT EIGHT**:      **Common Law Negligent Misrepresentation**

450.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

451.    As alleged herein, Defendants negligently made material misrepresentations of fact regarding the nature of ACN.  Defendants' misrepresentations were furnished for the purpose of influencing Plaintiffs' financial choices (and ultimately inducing them to invest in the Endorsed Entities' business opportunities and training programs).

452.    As alleged herein, Defendants intentionally made false representations of material fact regarding the nature of the ACN business opportunities, namely:  (1) that prospective investors would have a reasonable probability of commercial success if they bought into the ACN business opportunities; (2) that Trump was endorsing and promoting the ACN business opportunities because he believed that they offered a reasonable probability of commercial success (rather than because the Trump Enterprise was being paid); and (3) that Trump's

endorsement was predicated on extensive due diligence, experience, and/or access to inside information about the ACN business opportunities.

453.   On or about the dates set forth below, Plaintiffs received the following fraudulent communications by Trump:

A.   In mid-to-late 2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Doe viewed an ACN DVD in which Trump delivered the Message directly to viewers.  The Message was repeated and augmented by clips of ACN's appearance on *The Celebrity Apprentice*, which Plaintiff Doe also viewed.

B.   Plaintiff Doe also received the Message at ACN meetings she attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

C.   Plaintiff Doe also received the Message at ACN conferences in 2015 in Cleveland, Ohio and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

D.   In mid-2014 at an ACN recruitment meeting in Los Angeles, Plaintiff Loe viewed an ACN DVD in which Trump delivered the Message directly to viewers.

E.   Plaintiff Loe also received the Message at approximately 25 to 30 ACN meetings he attended every two weeks throughout late 2014 to late 2015 at two hotels in Los Angeles, during which ACN DVDs prominently featuring Trump's endorsement were played.

F.   Plaintiff Loe also received the Message at ACN conferences in 2015 in Palm Springs, California; Cleveland, Ohio; and Detroit, Michigan, during which videos featuring Trump conveying the Message were prominently displayed.

G.   Around mid-2016, Plaintiff Roe received the Message by watching video of Trump from an episode of *The Celebrity Apprentice* featuring ACN.

H.   Around mid-2013, Plaintiff Moe received the Message by watching a promotional video prominently featuring Trump at an event held in a Pennsylvania hotel.

454.   As set forth in this Complaint, Defendants intended that consumers rely on the false and misleading representations that they disseminated regarding the property and services of ACN.

455.   Defendants had no reasonable grounds for believing that the misrepresentations were true and failed to exercise reasonable care and/or diligence in communicating the misrepresentations. Defendants' misrepresentations were material to the reasonable consumer, and therefore reliance upon such representations may be presumed as a matter of law.

456.   Had Defendants not been complicit and had they not bolstered and furthered the deception of consumers, Plaintiffs would not have been injured.  Thus, Plaintiffs' injuries were directly and proximately caused by Defendants' dissemination of untrue or misleading statements and representations of property or services to members of the public in violation of the law.

457.   Plaintiffs are entitled to equitable relief and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.      An order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.      A judgment declaring that Defendants have committed the violations of law alleged in this case;

C.      Award actual, compensatory, statutory, consequential damages;

D.      Award punitive and treble damages;

E.      Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure an effective remedy;

F.      Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

G.      Enjoin Defendants from continuing to falsely market and advertise, conceal material information from the public, and commit unlawful and unfair business acts and practices; and order Defendants to engage in a corrective notice campaign;

H.      Award declaratory relief;

I.      Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

J.      Grant such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

Dated: October 29, 2018

Respectfully submitted,

Roberta A. Kaplan, Esq.
John C. Quinn, Esq.
Joshua Matz, Esq.
Alexander J. Rodney, Esq.

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
jquinn@kaplanhecker.com
jmatz@kaplanhecker.com
arodney@kaplanhecker.com


Andrew G. Celli, Jr., Esq.
Matthew D. Brinckerhoff, Esq.
O. Andrew F. Wilson, Esq.
Katherine Rosenfeld, Esq.

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
New York, NY 10020
Telephone: (212) 763-5000
acelli@ecbalaw.com
mbrinckerhoff@ecbalaw.com
awilson@ecbalaw.com
krosenfeld@ecbalaw.com


*Attorneys for Plaintiffs*