# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
E. JEAN CARROLL,

                             Plaintiff,

             -against-                                          20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                             Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

        Roberta A. Kaplan
        Joshua A. Matz
        KAPLAN HECKER & FINK LLP
        *Attorneys for Plaintiff*

        Stephen R. Terrell
        William K. Lane III
        James G. Touhey, Jr.
        Director, Torts Branch, Civil Division
        JEFFREY BOSSERT CLARK
        ACTING ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION
        *Attorneys for Movant*

        John A. Kolar
        *Attorney for Amicus Curiae Government Accountability Project, Inc.*

# Table of Contents

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   Statutory Context – The FTCA and the Westfall Act. . . . . . . . . . . . . . . . . . . . . . . 4

   The Events Giving Rise to This Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   I.    Whether the President Is an "Employee" Under the Westfall Act . . . . . . . . . . . 14

       A.    The Plain Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       B. .   The Legislative History – The *Westfall* Decision and the Westfall Act
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       C.    *Franklin v. Massachusetts* and Lack of Clear Statement to Include the
           President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       D.    Decisions of Other Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   II.   Scope of Employment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       A.    Choice of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       B.    Scope of Employment Under D.C. Law . . . . . . . . . . . . . . . . . . . . . . 39

           1.    Master-Servant Relationship. . . . . . . . . . . . . . . . . . . . . . . . 41

           2.    Scope of Employment Test . . . . . . . . . . . . . . . . . . . . . . . . . . 45

       C.    Scope of Employment Under New York Law . . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

LEWIS A. KAPLAN, *District Judge.*

The plaintiff in this case, E. Jean Carroll, published a book excerpt in 2019 in which she wrote that, in the 1990s, businessman Donald J. Trump, as he then was, raped her in a dressing room of a New York City department store.  Almost immediately after publication of Ms. Carroll's excerpt, Mr. Trump – who by then was president – told the press that Ms. Carroll had made up the rape story.  In substance, he called Ms. Carroll a liar and stated that he never met her.  So Ms. Carroll sued him in New York State court.  She claims that his statements accusing her of lying about the alleged rape were false, that they injured her reputation, and that she is entitled to damages from him.  The legal terms are that Ms. Carroll asserts that President Trump's statements were defamatory – libelous and slanderous.

The question whether Mr. Trump in fact raped Ms. Carroll appears to be at the heart of her lawsuit.  That is so because the truth or falsity of a defendant's alleged defamatory statements can be dispositive of any defamation case.  Although the Court eventually may need to resolve this issue, this opinion concerns a threshold question.  To make the significance of that question clear, we must digress into some technical detail.

Ms.  Carroll sued the president in his individual (or personal) capacity, as distinguished from suing him as the president (*i.e.*, in his official capacity).  In other words, she claims that the president personally harmed her and that he, not the U.S. government, should pay any damages to which she may be entitled.

For nearly a year, this lawsuit proceeded in state court as an ordinary defamation case between Ms. Carroll and President Trump.  The president defended the case as a private individual.  He was represented by his personal lawyers, not by the U.S. Department of Justice ("DOJ") or other government lawyers.  And although he claimed that he could not be sued

because he currently is president, the state court rejected that argument and denied a stay of further proceedings, which would have included pretrial discovery.[1]

It was at that point that the U.S. government inserted itself into the case. It "removed" the case from the state court to this one – that is, it filed a paper certifying that a designee of the Attorney General had determined that the president's statements to the press were part of his job as president and that this case therefore could be moved into federal court. For reasons that will appear, that certificate – whether it is right or wrong – conclusively authorized the removal of the case, and no one claims otherwise. But the DOJ did something else too, and that is what now is before the Court.

The government moves to substitute the United States for President Trump as the defendant. It does so in essence on the theory that this is not truly a lawsuit against President Trump as a private individual. Instead, the government argues, this is really a lawsuit against the United States because Ms. Carroll has sued an "employee" of the United States of America for actions within the scope of his employment. The government thus asserts that this case is virtually identical in principle to a lawsuit against a Postal Service driver for causing a car accident while delivering the mail. But the word "virtually" in the last sentence is necessary because there is an important difference between this case and the case of the hypothetical mail driver. Here is the catch.

---

[1]      Dkt. 14-111.

The United States of America is a sovereign nation.  It therefore shares with other nations what is called sovereign immunity.  This means that it cannot be sued for money damages except to the extent that it explicitly has agreed to being sued.[2]

Within certain limits, the United States has so agreed in a statute called the Federal Tort Claims Act (the "FTCA").  The FTCA authorizes damages claims for negligence and certain other civil wrongs committed by government employees within the scope of their employment.  The postal driver hypothetical is a classic example of a case that generally would be covered by the statute.  But the FTCA specifically excepts libel and slander cases from the United States's consent to be sued.  Thus, if this really is a suit against the United States, it is one to which the United States seemingly has not waived its sovereign immunity.  So if President Trump is an "employee of the Government" within the meaning of the FTCA, and if his statements about Ms. Carroll were within "the scope of his employment," it could well be argued that this case must be dismissed because the United States has sovereign immunity.[3]  In that

---

[2]

Sovereign immunity derives from the principle that "the law ascribes to the king the attribute of sovereignty, or pre-eminence. . . .  Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him.  For all jurisdiction implies superiority of power . . . ."  1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 234-235 (1765) (quoted in *Alden v. Maine*, 527 U.S. 706, 715 (1999)).

[3]

This point has been made in the media.  *E.g.*, Barbara McQuade, *Barr's Defense of Trump in E. Jean Carroll's Suit Could Give Presidents Carte Blanche,* (Oct. 21, 2020), https://www.nbcnews.com/opinion/barr-s-defense-trump-e-jean-carroll-s-suit-could-n12 44088; James D. Zirin, *The Strange Case of 'Carroll v. Trump' – An Adventure in Wonderland* (Sept. 11, 2020), https://billmoyers.com/story/the-strange-case-of-carroll-v-trump-an-adventure-in-wonde rland/.  The Court  expresses no opinion on this question, which is not now before it.

event, Ms. Carroll would be left with no remedy, even if the president's statements were false and defamatory.

This is the nutshell version of this case.  But for the present purpose of deciding the government's motion to substitute, the dispositive questions are two:

- Is the president an "employee of the Government" within the meaning of the FTCA?

- Even if the president is an "employee of the Government" as the FTCA defines that term, were his statements concerning Ms. Carroll within the scope of his "employment" under the law of the relevant jurisdiction?

The answer to both questions is "no." While the president possesses all of the executive power of the United States, he is not an "employee" within the meaning of the FTCA. The FTCA's definition of that term does not include presidents.  And even if the president were an employee under that statute, his statements concerning Ms. Carroll were not within the scope of his employment under the law of the relevant jurisdiction, which for reasons explained below is Washington, D.C.

*Facts*

Before turning to the details of this dispute, the Court places them in context by reviewing the constitutional and statutory framework in which this motion is situated.

*Statutory Context – The FTCA and the Westfall Act*

We already have introduced the principle of sovereign immunity.  It remains to mention a closely related principle, namely that federal employees and the president long

enjoyed absolute official immunity with respect to lawsuits in federal courts charging them with

liability for performance of their official functions.[4]

In 1946, Congress enacted the FTCA. The statute was a major step to provide

compensation to victims of certain torts – *i.e.*, civil wrongs such as negligence – committed by

federal employees. As relevant here, the FTCA provides that the district courts of the United

States

> "have exclusive jurisdiction of civil actions on claims against the United States,
> for money damages, accruing on and after January 1, 1945, for injury or loss of
> property, or personal injury or death caused by the negligent or wrongful act or
> omission of any employee of the Government while acting within the scope of his
> office or employment, under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the place
> where the act or omission occurred."[5]

Although the FTCA's precise workings are complicated, its basic function is

simple. With numerous qualifications and exceptions, the statute allows a person injured by an

"employee of the Government" who is "acting within the scope of his office or employment" to

sue the United States for tort damages, notwithstanding its sovereign immunity, if the United

States would be liable as an employer under the law of the state where the act or omission

occurred. Thus, Congress adopted the view that (1) a suit for damages against a federal

employee acting within the scope of his or her employment in substance is a suit against the

United States, (2) in such a case the United States would be substituted as the defendant for the

individual employee, and (3) the United States is responsible for defending such lawsuits in the

---

[4]

See, e.g., Barr v. Matteo, 360 U.S. 564, 597 (1959).

[5]

28 U.S.C. § 1346(b)(1).

name of the United States and for paying any damages awarded. The individual employee sued in his or her official capacity is not a proper defendant in such a case.

The FTCA does not authorize suits against government employees in their individual or personal capacities. But state law often does. Thus, even after the FTCA was enacted, federal employees were exposed to tort actions against them in their individual capacities in some states.

In 1988, the Supreme Court held in *Westfall v. Erwin*[6] that federal government employees are not absolutely immune from state tort claims based on conduct performed within the scope of their employment except in certain circumstances.[7] This decision opened the door to individual liability for federal employees wider than previously had been understood.

Congress moved promptly to close that door. In 1988, it enacted the Federal Employees Liability Reform and Tort Compensation Act of 1988, more commonly known as the Westfall Act.[8] The statute's "core purpose . . . is to relieve covered employees from the cost and effort of defending [a] lawsuit, and to place those burdens on the Government's shoulders."[9] Pursuant to the Westfall Act:

> "The remedy against the United States provided by sections 1346(b) [the FTCA] and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or

---

[6] 484 U.S. 292 (1988).

[7] *Id.* at 299.

[8] The statute as amended is codified at 28 U.S.C. § 2679.

[9] *Osborn v. Haley*, 549 U.S. 225, 252 (2007).

employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred."[10]

In essence, the quoted provision bars tort claims against government employees acting within the scope of their employment. But it provides plaintiffs with a different remedy: a lawsuit against the United States under the FTCA. Under subsection (c) of the Westfall Act, "[t]he Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any [of the above described] damage or injury."[11]

Because the Westfall Act operates where a lawsuit could have been brought against the United States under the FTCA, the statutes share the same threshold requirements. Thus, in order for the Westfall Act to apply, the defendant must be an "employee of the Government" who was acting within the scope of his or her employment. Under Subsection (d) of the Westfall Act, the Attorney General makes an initial determination as to both issues:

"Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."[12]

---

[10]

    28 U.S.C. § 2679(b)(1).

[11]

    *Id.* § 2679(c).

[12]

    *Id.* § 2679(d)(1).

If the Attorney General issues a certification and the action is pending in state court, the Westfall Act requires that the action be removed to federal court.[13]  If the Attorney General declines to issue a certification, "the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment."[14]  Either way, if the court is satisfied that the threshold requirements are met, the action "shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA]."[15]

The Attorney General's certification is conclusive only "*for purposes of removal*"[16] – that is to say, only for purposes of whether the action shall continue in federal rather than state court.  As the Supreme Court has held, such a certification "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee."[17]  "The statute is fairly construed to allow petitioners to present to the District Court their objections to the Attorney General's scope-of-employment certification . . . ."[18]  Hence, the federal court to which the action has been removed must determine for itself whether the

---

13

     *Id.* § 2679(d)(2).

14

     *Id.* § 2679(d)(3).

15

     *Id.* § 2679(d)(4).

16

     *Osborn*, 549 U.S. at 242 (emphasis in original) (quoting 28 U.S.C. § 2697(d)(2)).

17

     *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995).

18

     *Id.* at 436-37.

individual defendant is covered by the statute and, if so, whether the actions of which that defendant is accused or committed were within the scope of the defendant's federal employment. If those conditions both are met, the United States is made the defendant and the individual defendant is dismissed from the case. If either condition is not met, the case proceeds against the individual defendant in his or her personal capacity.

*The Events Giving Rise to This Lawsuit*

According to the complaint, Mr. Trump, then a private citizen, encountered Ms. Carroll at the Bergdorf Goodman department store in Manhattan some time between the fall of 1995 and the spring of 1996.[19] Ms. Carroll, who was an advice columnist appearing on television, alleges that Mr. Trump recognized her and asked her to help him select a present for a woman who was not with him at the store.[20] The two eventually went to the lingerie department, where, according to the complaint, Mr. Trump insisted that the plaintiff try on a bodysuit.[21] Ms. Carroll alleges next that what she first perceived as playful banter took a dark turn when Mr. Trump closed the door of a dressing room, pushed her against a wall, and began kissing her without her consent.[22] She claims that she pushed Mr. Trump away and laughed at him, and that

---

[19]  Dkt. 3-3 at 5.

[20]  *Id.*

[21]  *Id.* at 6.

[22]  *Id.*

he then pressed her against the wall once more, pulled down her tights, and forcibly raped her for several minutes until she managed to push him off and flee the store.[23]

Ms. Carroll asserts that she immediately told one friend about the alleged rape and told another friend in the coming days.[24]  She did not, however, make the allegations public at that time.[25]  They remained private for many years.

In 2017, the plaintiff began drafting a book about twenty-one men who had left ugly marks on her life.[26]  One of those men was Donald Trump.[27]  On June 21, 2019, *New York* magazine published an excerpt from the plaintiff's then forthcoming book.  The excerpt tells a more detailed version of the allegations outlined above.[28]  The book was published on July 2, 2019.[29]

Roughly two hours after the excerpt was published in *New York* magazine, the president issued a public statement to media outlets.  It said:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago.  I've never met this person in my life.  She is trying to sell a new book – that should indicate her motivation.  It should be sold

---

[23]  *Id.* at 6-7.

[24]  *Id.* at 7.

[25]  *Id.* at 8.

[26]  *Id.* at 13.

[27]  *Id.*

[28]  *Id.* at 14.

[29]  *Id.*

in the fiction section.  Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh.  It's just as bad for people to believe it, particularly when there is zero evidence.  Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine: No pictures?  No surveillance?  No video?  No reports?  No sales attendants around??  I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault.  All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible.  The world should know what's really going on.  It is a disgrace and people should pay dearly for such false accusations."[30]

The next day, June 22, 2019, a reporter at the White House confronted President Trump about the story.[31]  They had the following exchange:

[Reporter:] Mr. President, you had said earlier that you never met E. Jean Carroll.  There was a photograph of you and her in the late 1980's —

[President Trump:] I have no idea who this woman is.  This is a woman who has also accused other men of things, as you know.  It is a totally false accusation.  I think she was married — as I read; I have no idea who she is — but she was married to a, actually, nice guy, Johnson — a newscaster.

[Reporter:] You were in a photograph with her.

[President Trump:] Standing with [my] coat on in a line – give me a break – with my back to the camera.  I have no idea who she is.  What she did is – it's terrible, what's going on.  So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

---

[30] *Id.* at 15.

[31] *Id.* at 17.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that – and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is – none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York – which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things – that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that."[32]

President Trump commented on the story a third time on June 24, 2019, when he gave an interview to *The Hill*. As relevant here, he stated: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?"[33]

*Procedural Background*

On November 4, 2019, the plaintiff filed this lawsuit in the New York Supreme

---

[32]      *Id.* at 17-18.

[33]      *Id.* at 19.

Court, New York County, against President Trump in his personal capacity.[34]  On the basis of the June 21, June 22, and June 24 statements, she alleged that the president defamed her under New York law.[35]

The lawsuit proceeded in state court for ten months during which time the court resolved, among other things, a motion to dismiss and several motions to stay.[36]  On September 8, 2020, James G. Touhey, Jr., Director of the Torts Branch of the Civil Division of the U.S. Department of Justice, certified on behalf of the Attorney General "on the basis of the information now available with respect to the incidents alleged in the [plaintiff's] complaint, that Defendant Donald J. Trump was acting within the scope of his office as the President of the United States at the time of the alleged conduct."[37]  Shortly after, the government filed in this Court a notice of removal.[38]  It filed also a motion, pursuant to the Westfall Act, to substitute itself in place of President Trump as the defendant.[39]  It is that motion that now is ripe for decision.

---

[34]     *Id.* at 1.

[35]     *Id.* at 26-27.

[36]     *See, e.g.*, Dkts. 14-36, 14-111.

[37]     Dkt. 3-4.

[38]     Dkt. 6.

[39]     Dkt. 3.

14

*Discussion*

The government's motion to substitute turns on whether the Attorney General's certification that President Trump was an employee of the government acting within the scope of his employment was correct. As noted at the outset of this opinion, that question raises two subsidiary issues: (1) whether the President of the United States is an "employee of the Government" and, if the answer to this question is "yes," (2) whether President Trump was acting within the scope of his employment when he made the allegedly defamatory statements.[40]

I.      *Whether the President Is an "Employee" Under the Westfall Act*

As noted above, the Westfall Act applies to any "employee of the Government."[41] That phrase is defined in 28 U.S.C. § 2671, a provision enacted by the Act of June 25, 1948 as part of a "Tort Claims Procedure" package. The statute reads:

"As used in this chapter and sections 1346(b) [the FTCA] and 2401(b) of this title, the term [[42]] * * *

---

[40]

For reasons explained below, D.C. law applies to this issue.

[41]

28 U.S.C. § 2679(b)(1).

[42]

The Act of June 25, 1948 contains an em dash in this location, signifying that the "As used in this chapter" clause applies to all three of the definitions that follow. *See* Act of June 25, 1948, ch. 646, 62 Stat. 982, *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf. In 1962, Congress amended the definition of "federal agency," the first defined term. In doing so, it omitted the em dash and combined the "As used in this chapter" clause with the paragraph defining "federal agency." *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307, *available at* https://www.govinfo.gov/content/pkg/STATUTE-80/pdf/STATUTE-80-Pg306.pdf. The failure to retain the em dash appears to have been a scrivener's error. For one thing, the term "federal agency" is not used in Section 1346(b). And taking Congress literally would require a belief that, in updating the definition of "federal agency," it silently chose to un-define "employee of the Government" as that term is used in the chapter where it is found

> "'Employee of the government' includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18."[43]

The term "federal agency" also is defined by Section 2671:

> "'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."[44]

These definitions apply to both the Westfall Act provisions codified in 28 U.S.C. § 2679 and the FTCA provisions codified in 28 U.S.C. § 1346(b).[45]

Neither Ms. Carroll nor the government has cited any case addressing the question whether the President of the United States is an "employee of the Government" under

---

and in Section 1346(b) while inexplicably keeping it in the definition section.  Whatever the case may be, the Supreme Court has stated that both definitions apply to Section 1346(b).  *See Logue v. United States*, 412 U.S. 521, 525-26 (1973).

[43]    28 U.S.C. § 2671.

[44]    *Id.*

[45]    Section 2679, where the Westfall Act provisions are codified, is part of the chapter in which the definition is contained.  *See also* note 42, *supra*.

Section 2671 specifically or the Westfall Act or FTCA more generally. And the Court is aware of none. We therefore begin the search for an answer to this question with the statutory text.[46]

### A.    The Plain Language

Section 2671's definition of "employee of the Government" says that the term "includes" five categories of government personnel:

1.    "officers or employees of any federal agency,"

2.    "members of the military . . . ,"

3.    "members of the National Guard [in certain circumstances],"

4.    "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States," and

5.    "any officer or employee of a Federal public defender organization."

Categories 2, 3 and 5 obviously do not apply to the president. Nor does category 4, which "is designed to cover special situations such as government officials who serve without pay, or an employee of one government agency who is loaned to and works under the direct supervision of another government agency."[47]    Thus, the remaining question is whether

---

[46]    *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

[47]    *Leone v. United States*, 910 F.2d 46, 51 (2d Cir. 1990); *see also Logue*, 412 U.S. at 531 (noting that the legislative history of the provision suggests that "the language is designed to cover special situations such as the 'dollar-a-year' man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to contract or other arrangement").

presidents are "officers or employees of any federal agency."[48]   Unfortunately, the terms
"officers" and "employees" are not defined.[49]

The president is a *constitutional* officer.  He occupies the highest office in our
nation, which is created by Article II of the Constitution.  But that is not what Section 2671
requires.  It speaks only of "officers . . . *of any federal agency*," not officers of the United States
within the meaning of the Constitution.  So we turn to the question whether the president is an

---

[48]   The government argues for the first time in its reply brief that the use of the word "includes"
indicates that the five categories that follow it are exemplary, not exclusive.  In other words,
the use of the word "includes" invites courts to rewrite Section 2671 by expanding
"employees of the Government" to include categories of individuals that Congress did not
see fit to identify.  This contention fails.

As an initial matter, counsel for the government at oral argument waived on the record all
arguments raised for the first time in the government's reply brief.  *See* Tr. at 4:13-24 (Oct.
21, 2020) (agreeing, in exchange for precluding the plaintiff from filing a surreply, "to
invoke the time-honored principle that new arguments raised for the first time in a reply
brief will not be considered").  This argument therefore is waived.  *See also Conn. Bar
Ass'n v. United States*, 620 F.3d 81, 91 (2d Cir. 2010) ("Issues raised for the first time in
a reply brief are generally deemed waived.").

In any case, the Court would reject this argument.  "[C]ourts aren't free to rewrite clear
statutes under the banner of our own policy concerns."  *Azar v. Allina Health Servs.*, 139
S. Ct. 1804 (2019).  As discussed below, if Congress had intended to include an individual
as significant and obvious as the president in this statute, it would have done so clearly.  *See
Franklin v. Massachusetts*, 505 U.S. 788 (1992).  Moreover, and also discussed below, there
are compelling reasons to conclude that Congress did not intend the major expansion of
federal tort exposure that would arise if the FTCA applied to the president's conduct.

[49]   The original definition of "employee of the Government" does not shed any additional light
on this question.  It reads:

"'Employee of the government' includes officers or employees of any federal agency,
members of the military or naval forces of the United States, and persons acting on behalf
of a federal agency in an official capacity, temporarily or permanently in the service of the
United States, whether with or without compensation."  Act of June 25, 1948, c. 646, 62
Stat. 982.

18

officer "of any federal agency" within the meaning of Section 2671. As noted above, Section 2671 states that the term "federal agency" "includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States."[50]

At the outset, it is apparent that this definition does not include the entire executive branch. Although Congress referred to "the executive departments," the fact that the phrase is plural makes clear that Congress did not mean "the executive branch." Congress knew how to refer to an entire branch of government, as evidenced by the fact that the very next words of the statute are "the judicial and legislative branches."[51] The plain meaning of this language is

---

[50]

The 1948 version of the statute, which since has been amended, stated:

> "[T]he term- 'Federal agency' includes the executive departments and independent establishment of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States." *Id.*

The singular "independent establishment" appears to have been a typographical error. It was changed to "independent establishments" in the 1966 amendment. *See* Act of July 18, 1966, Pub. L. 89-506, 80 Stat. 307.

[51]

The Supreme Court drew the same inference with regard to a related section of the same statute, the Act of June 25, 1948. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) ("It is difficult to reconcile the Government's . . . reading with the fact that two of the Act's other exceptions specifically reference an 'act or omission.' *See* 28 U.S.C. § 2680(a). The Government's request that we read that phrase into the [FTCA's] foreign country exception, when it is clear that Congress knew how to specify 'act or omission' when it wanted to, runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06, p. 194 (6th rev. ed. 2000))).

Although the original statute did not refer to the judicial and legislative branches, this fact does not offer any reason to conclude that Congress's use of "executive departments" in 1948 was intended as a reference to the executive branch as a whole. The phrase "executive

that members of Congress, federal judges, and the staffs of both all are included in the term "federal agency." But the entire executive branch is not. Only those parts of the executive branch that fall within the other terms of the definition are included.

Here, the arguably relevant parts of the "federal agency" definition are "the executive departments" and "independent establishments." The governing statutes do not define either term. Although the government asserts that the president is covered by the Westfall Act, its five page memorandum in support of its motion neither cites to Section 2671 nor argues that either of the plausibly relevant terms applies to the president.[52]

Of course, one of the best ways to understand what Congress meant by "federal agency" is to examine how it used that term. The definition applies to Sections 1346(b) and 2401(b), to which it refers specifically, as well as the remaining sections of the Act of June 25, 1948, which are codified as amended at 28 U.S.C. §§ 2672-2680. Six of these eleven statutory sections use the term "federal agency." And four of them[53] suggest strongly that the term applies to what one ordinarily thinks of as a federal agency or executive department: a unit of government housed within the executive branch, such as the Department of Defense, the Department of State, or the Central Intelligence Agency,[54] and not a single constitutional officer,

departments" did not mean "executive branch" in 1948. And the fact that Congress added the phrase "judicial and legislative branches" immediately following "executive departments" demonstrates that it was aware of the difference and employed it intentionally. *See id.*

[52]

*See* Dkt. 3-1.

[53]

The other provisions, 28 U.S.C. §§ 2679 and 2680, shed no additional light on this issue.

[54]

*Cf. Executive Agency*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An executive-branch department whose activities are subject to statute and whose contracts are

the president.  The statutes likewise make clear in several ways that "federal agency" does not refer to the executive branch as a whole or to any particular unit of the executive branch of which the president is an "officer," if any such unit existed.

First, under 28 U.S.C. § 2672, "[t]he head of each Federal agency or his designee" is permitted, pursuant to any regulations promulgated by the Attorney General, to settle claims for money damages against the United States caused by "any employee of the agency while acting within the scope of his office or employment" provided that any award "in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his designee."  In the original 1948 statute, the dollar amount was just $1,000.[55]  It is difficult to imagine that Congress intended, without any explicit affirmative statement, to require the president to seek the approval of the Attorney General, one of his subordinates, before settling, on behalf of the federal government, claims against the United States.  And to suggest that the president could be an "officer" of a federal agency without being its head would contravene our constitutional design, which vests in the president "the 'executive power' – all of it."[56]  The far more natural reading is that when Congress referred to "executive departments" and "federal

---

subject to judicial review.  One example is the National Aeronautics and Space Agency."); *see also, e.g.*, *Department of Defense*, *id.* ("An executive department of the federal government . . . ."); *Department of State*, *id.* ("The cabinet-level department of the federal government responsible for advising the President in formulating and executing foreign policy."); *Central Intelligence Agency*, *id.* ("An independent federal agency that compiles intelligence information, conducts counterintelligence activities outside the United States, and advises the President and the National Security Council on matters of foreign intelligence and national security.").

[55]

Act of June 25, 1948, c. 646, 62 Stat. 982.

[56]

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).

agencies," it was referring to entities such as the Department of Defense and the Central Intelligence Agency.

Second, under 28 U.S.C. § 2673, Congress required that "[t]he head of each federal agency shall report annually to Congress all claims paid by it under section 2672 of this title, stating the name of each claimant, the amount claimed, the amount awarded, and a brief description of the claim." The government has presented no evidence that any president ever has authorized a payment on an FTCA claim or supplied such a report to Congress on behalf of an agency of which he is the head, if any such agency existed.

Third, 28 U.S.C. § 2675(a) provides that a plaintiff who wishes to sue under the FTCA "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." This would make little sense if it were applied to the president. Certainly, the government has not suggested that an individual with a tort claim based on actions of the president first must present that claim to the president and obtain the president's final written denial before bringing suit under the FTCA. Similar inferences may be drawn from 28 U.S.C. § 2401(b), which sets a statute of limitations for presenting tort claims to an agency and filing them in court following the agency's determination.

Because the president is at the apex of the executive branch, many think of him, in a colloquial sense, as the "head" of many federal departments, agencies, and organizations. At the very least, one might imagine that he leads some agency at the core of the executive branch. The government has not attempted to identify any such agency in its papers, but the two most obvious candidates are the Executive Office of the President ("EOP") and the president's cabinet. But neither entity fits the bill. The head of the EOP, which is a network of agencies, is

the president's chief of staff.[57]   And even if one were to call the cabinet an "executive department" or "independent establishment" – a dubious contention – the president himself is not a member of the cabinet, although the vice president is.[58]

Indeed, the basic civics lessons on the White House's website draw a clear distinction between "the executive branch," "the executive departments," and "federal agencies." Its page on "The Executive Branch" states that the Constitution vests in the president "[t]he power of the Executive Branch" and that "[f]ifteen executive departments – each led by an appointed member of the President's Cabinet – carry out the day-to-day administration of the federal government."[59]  It states also that the "executive departments" "are joined in this [effort] by other executive agencies such as the [Central Intelligence Agency] and Environmental

---

[57]

THE EXECUTIVE BRANCH, WHITE HOUSE,
https://www.whitehouse.gov/about-the-white-house/the-executive-branch/  ("The EOP, overseen by the White House Chief of Staff, has traditionally been home to many of the President's closest advisers.").

[58]

THE CABINET, WHITE HOUSE,
https://www.whitehouse.gov/about-the-white-house/the-cabinet/  ("President Donald J. Trump's Cabinet includes Vice President Mike Pence and the heads of the 15 executive departments – the Secretaries of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Labor, State, Transportation, Treasury, and Veterans Affairs, and the Attorney General.  Additionally, the Cabinet includes the White House Chief of Staff and heads of the Environmental Protection Agency, Office of Management and Budget, United States Trade Representative, Central Intelligence Agency, Office of the Director of National Intelligence, and Small Business Administration.").

[59]

THE EXECUTIVE BRANCH, WHITE HOUSE,
https://www.whitehouse.gov/about-the-white-house/the-executive-branch/.

Protection Agency, the heads of which are not part of the Cabinet, but who are under full authority of the President."[60]

The phrase "independent establishments" does not rescue the government's argument. As Judge Sullivan once observed, "[a]lthough the Second Circuit has never definitively interpreted what 'independent establishment' means, it has suggested that independent establishments are defined by a 'substantial governmental role in funding and oversight.'"[61] The opinion to which he referred is *Johnson v. Smithsonian Institution*,[62] in which the Second Circuit cited favorably a D.C. Circuit opinion stating with respect to the Smithsonian Institution that "the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition."[63]

Although the FTCA does not define "independent establishments," Congress defined the term in 1966 when it enacted 5 U.S.C. § 104. That definition does not apply to the FTCA, but it is instructive as to how Congress understood the relevant language. It states:

"For the purpose of [Title 5], 'independent establishment' means—

"(1) an establishment in the executive branch (other than the United States Postal Service or the Postal Regulatory Commission) which is not an

---

[60]

    *Id.*

[61]

    *U.S. S.E.C. v. Syron*, 934 F. Supp. 2d 609, 623 (S.D.N.Y. 2013) (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999)).

[62]

    189 F.3d 180, 189 (2d Cir. 1999).

[63]

    *Id.* (quoting *Expeditions Unlimited Aquatic Enters., Inc. v. The Smithsonian Inst.*, 566 F.2d 289, 296 (D.C. Cir. 1977) (panel opinion reprinted as appendix to opinion en banc)).

Executive department, military department, Government corporation, or part thereof, or part of an independent establishment; and

"(2) the Government Accountability Office."[64]

The D.C. Circuit has held that this definition does not apply to "the Executive Residence."[65] And DOJ's Office of Legal Counsel – in two different presidential administrations – took the position that the definition does not apply to the Executive Office of the President.[66]

The government has identified no component of the United States of which the president is an officer or employee that satisfies these understandings of the phrase "independent establishments." Moreover, and as will be discussed, the idea that the chief executive of the United States could be an officer or employee of an entity for which there is a "substantial governmental role in funding and oversight" makes little sense.

B. . *The Legislative History – The* Westfall *Decision and the Westfall Act*

There is still another strong reason supporting the view that president is not an "employee of the Government" within the meaning of the Westfall Act. That reason is apparent from the context in which the statute was enacted.

---

[64]

5 U.S.C. § 104.

[65]

*See Haddon v. Walters*, 43 F.3d 1488, 1489 (D.C. Cir. 1995).

[66]

*See* Mem. for Gregory B. Craig, Counsel to the President, from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Application of 5 U.S.C. § 3110 to Two Proposed Appointments by the President to Advisory Committees* 15 & n.15 (Sept. 17, 2009). On two earlier occasions, however, the Office of Legal Counsel took the opposite view. *See id.* at 15 n.14.

In 1982, the Supreme Court decided in *Nixon v. Fitzgerald*[67] that the president "*is entitled to absolute immunity* from damages liability predicated on his official acts."[68]  So when the Supreme Court decided *Westfall* just six years later and held that "federal officials *are not absolutely immune* from state-law tort liability for all actions committed within the outer perimeter of their duties," it clearly was not referring to the president.[69]  When *Westfall* referred generally to "federal officials," it merely expanded the potential amenability to suit and liability of that more limited group of individuals.

Congress was well aware of this background when it passed the Westfall Act.  As the Supreme Court later wrote, "[w]hen Congress wrote the Westfall Act, which covers federal employees generally . . . , the legislators had one purpose firmly in mind."[70]  That purpose was "to 'return Federal employees to the status they held prior to the *Westfall* decision.'"[71]  There was no need to extend the protections of the Westfall Act to the president, whom the Supreme Court evidently recognized was not a "federal employee," for the very good reason that the president already had "absolute immunity from damages liability predicated on his official acts"

---

[67]

 457 U.S. 731 (1982).

[68]

 *Id.* at 749 (emphasis added).

[69]

 *Westfall*, 484 U.S. at 299 (emphasis added).

[70]

 *Gutierrez*, 515 U.S. at 425.  Senator Grassley, the principal sponsor of the bill, explained that the purpose of the Westfall Act was to solve  the "immediate crisis of personal liability exposure for the entire Federal Work force," "particularly rank-and-file civil servants," occasioned by the *Westfall* decision.  134 Cong. Rec. 14265 (June 13, 1988) (Sen. Grassley).

[71]

 *Id.* (quoting H.R. REP. NO. 100-700, p. 4 (1988)).

by virtue of *Nixon v. Fitzgerald*.[72]

Unless one ignores *Nixon*, it is impossible to read *Westfall* as applying to the president. Given that the "one purpose" of the Westfall Act was to "return Federal employees to the status they held prior to the *Westfall* decision," Congress presumptively was aware that neither Section 2671 nor the FTCA applied to the president. It therefore had no reason to extend the Westfall Act to that office.

C.     Franklin v. Massachusetts *and Lack of Clear Statement to Include the President*

The foregoing discussion provides numerous grounds for concluding that the president is not an "employee of the Government." At best, the government might argue the statute is silent on the issue and, on that basis, it should be read expansively to include the president.

The Court rejects the view that the statute is silent on the matter, an argument that the government in any event has waived. But even granting the point for the sake of argument, any statutory silence would not help the government. Instead, it would provide an additional reason to conclude that the failure to mention the president should be understood as *excluding* him from the scope of the Westfall Act and Section 2671.

---

[72]     Congress was well aware of this fact. *See* H.R. Rep. 100-700, 100th Cong., 2d Sess. 5 (June 14, 1988) ("The United States is liable under the Federal Tort Claims Act. * * * 'under circumstances where the United States, if a private person, would be liable * * *' 28 U.S.C. 1346(b). Thus ordinary tort defenses, such as contributory negligence, assumption of risk, estoppel, waiver, and res judicata, as applicable, continue to be available to the United States. *The United States would also be able to continue to assert other functional immunities, such as Presidential and prosecutorial immunity, recognized in the constitution and judicial decisions*. (emphasis added)).

Under the Administrative Procedure Act ("APA"), plaintiffs have a cause of action to petition courts for review of "agency action."  In *Franklin v. Massachusetts*,[73] the Supreme Court considered whether "agency action" included the conduct of the president.  It held that "the President is not an agency within the meaning of the Act."[74]

*Franklin* does not resolve the question of whether the president is an employee of a federal agency under Section 2671.  But the following line of reasoning, portions of which are not limited to the APA, is directly on point:

> "The APA defines 'agency' as 'each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include – (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia.'  The President is not explicitly excluded from the APA's purview, but he is not explicitly included, either.  Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA.  *We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.  Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 748, n.27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President).  As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."[75]

*Franklin* not only prohibits courts from presuming, absent "an express statement by Congress," that Congress "intended the President's performance of his statutory duties to be reviewed for abuse of discretion." By relying on *Nixon*, it makes clear that the same reasoning applies when a plaintiff sues the president for tort damages predicated on acts allegedly done in

---

[73]      505 U.S. 788 (1992).

[74]      *Id.* at 796.

[75]      *Id.* at 800-01 (emphasis added).

the scope of his employment – lawsuits that, by definition, challenge the president's performance of his job. The government is asking this Court to do precisely what *Franklin* forbids: to take a statute that, at best from the government's standpoint, is silent on the question of whether it applies to the president – and in fact strongly appears to exclude him – and hold that Congress intended to authorize lawsuits by private plaintiffs requiring federal courts to review his official acts. This would run afoul of *Franklin*.

One could attempt to distinguish *Franklin* on the ground that an FTCA claim is pled against the United States, while the president himself was among the defendants in *Franklin*. But *Franklin* itself defeats that argument. *Franklin*'s holding – like the APA itself – is agnostic to the identity of the defendant. The relevant question is who committed the "agency action."[76] In fact, the Supreme Court spent several pages emphasizing this point, because its ultimate holding that the president's actions were not reviewable shielded all the defendants from suit, including the Secretary of Commerce and other lower-level officials.[77]

---

[76]     *See, e.g.*, *id.* at 801 ("Although the President's *actions* may still be reviewed for constitutionality, we hold that *they* are not reviewable for abuse of discretion under the APA." (emphasis added)).

[77]     *See id.* at 796 ("The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.' 5 U.S.C. § 704. At issue in this case is whether the 'final' action that appellees have challenged is that of an 'agency' such that the federal courts may exercise their powers of review under the APA. We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards."); *id.* at 799 ("Because it is the President's personal transmittal of the report to Congress that settles the apportionment, until he acts there is no determinate agency action to challenge. The President, not the Secretary, takes the final action that affects the States."); *id.* at 800 ("As enacted, 2 U.S.C. § 2a provides that the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress. That the final act is that of the President is important to the integrity of the process and bolsters our conclusion that his duties are not

The same focus is present here.  The function of an FTCA lawsuit is to decide whether a government employee's official conduct was tortious and, if so, to compensate one injured by that conduct.  When the employee is the president, his actions are the ones under review.  It does not matter whether his name appears in the caption of the case.  Thus, as *Franklin*'s reliance on *Nixon* makes plain, the lack of "an express statement by Congress" indicating that the president's actions are reviewable through FTCA lawsuits is decisive.

One other point about *Franklin* deserves attention.  The outcome of that case was that the president's conduct was not subject to review in an APA suit.  Here the poles in some sense are reversed.  If the Court holds that the president's conduct cannot be challenged in tort suits under the FTCA, this case most likely will move forward, albeit against President Trump in his individual or personal capacity.  But that difference does not affect the result here.

To begin, nothing in *Franklin* forbids courts from reviewing the president's official actions.  The case provides instead a rule of statutory interpretation: that a court should not assume, absent a clear statement, that *Congress* authorized such review in a *federal statute*.  Here, the plaintiff's cause of action arises under *state common law*.  *Franklin* says nothing about such claims.  And in fact, it is the government, rather than Ms. Carroll, that is arguing that a federal statute (the FTCA) authorizes review of the president's official actions, albeit in a case in which it argues the United States should be substituted for the president.

Why, then, would holding that the FTCA authorizes review of the president's official actions most likely secure the dismissal of this lawsuit?  The reason is that the FTCA's

---

merely ceremonial or ministerial.  Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an "agency" within the meaning of the Act.").

waiver of sovereign immunity contains an exception for libel and slander claims.[78]  For that reason, and that reason alone, permitting FTCA lawsuits challenging the president's job performance would close the door on this particular lawsuit.

But what would happen in cases involving the many types of torts for which the United States *has* waived its sovereign immunity – cases in which no FTCA exception applies?  The answer, if the Court agrees with the government, is that those lawsuits could move forward – the precise problem that *Franklin* sought to avoid.  In essence, the government is arguing that, so long as none of the exceptions applies, the FTCA authorizes plaintiffs to sue the United States for money damages when the president, acting within the scope of his employment, engages in an "act or omission" that allegedly is negligent or wrongful under state law and causes them injury.

The President of the United States wields the entire executive power of the federal government.  Each day, he or she makes decisions that affect the lives of hundreds of millions of Americans in countless ways.  It is difficult to fathom that Congress – without any textual indication, and with considerable evidence to the contrary – intended for the FTCA to authorize tort lawsuits that bring the president's official conduct into question.[79]  "Congress . . .

---

[78]

28 U.S.C. § 2680(h) (exempting from the FTCA claims arising out of, among other things, libel and slander).

[79]

One might surmise that *Nixon* would prevent such an expansion of federal tort exposure. It would not.  *Nixon* holds that *the president* is absolutely immune from suit with respect to official conduct.  The defendant in an FTCA suit is the United States.  Moreover, Congress could not have relied on this backstop when it passed the FTCA.  The FTCA and its procedural provisions were enacted in the 1940s.  *Nixon* was decided in 1982.

Nor is it sufficient to say that other legal doctrines such as the need for proximate causation might protect the government against liability in such cases.  Even if the government

does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes."[80]

### D. Decisions of Other Courts

The government relies on several cases in other circuits for the proposition that "elected officials" in general are government employees under the Westfall Act. None of those cases so held. And none supports the argument that the statute applies to the president.

*Council on American Islamic Relations v. Ballenger*,[81] a D.C. Circuit case discussed in more detail below on another issue, held that certain statements of a Member of Congress – not the president – had been made within the scope of his employment. But the parties did not brief the question whether a Member of Congress (or any elected official) is an "employee of the Government," and the D.C. Circuit did not even mention the issue.[82] *Wuterich v. Murtha*,[83] another D.C. Circuit decision concerning a Member of Congress that relied on *Ballenger*, similarly did not acknowledge the existence of the issue.

---

sometimes would prevail on these arguments, the cases would need to be defended at least to a certain point, and the president's conduct would be reviewed in the same manner as any other federal employee's.

[80] *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

[81] 444 F.3d 659 (D.C. Cir. 2006).

[82] *See* Brief of Appellant, *Council on Am. Islamic Relations v. Ballenger*, No. 05-5161 (D.C. Cir. Dec. 22, 2005); Brief for Appellee, *id.* (D.C. Cir. Feb. 3, 2006); Reply Brief of Appellant, *id.* (D.C. Cir. Feb. 16, 2006).

[83] 562 F.3d 375 (D.C. Cir. 2009).

The Sixth Circuit held recently in *Does 1-10 v. Haaland*[84] that Members of Congress are "employees of the Government" under the Westfall Act. But its conclusion turned on the fact that Section 2671 defines "federal agency" to include "the judicial and legislative branches" and thereby "expands sovereign immunity to the entire legislative branch."[85] As discussed above, Section 2671's definition of "federal agency" does not use the phrase "executive branch." It refers to "the executive *departments*, [and] the judicial and legislative *branches*."[86]

Like *Does 1-10*, two older decisions from the First and Fifth Circuits held that Members of Congress are employees under the Westfall Act. Neither contains significant reasoning, and the few points they raise are particular to Congress.[87] The government's remaining cases neither raise nor resolve the issue.[88]

---

[84]       No. 19-6347, 2020 WL 5242402 (6th Cir. Sept. 3, 2020).

[85]       *Id.* at *4.

[86]       The Sixth Circuit relied also on the fact that the Supreme Court once held "that a Representative is 'an officer acting under the authority of the United States' for purposes of a criminal statute that punishes individuals who 'falsely assume or pretend to be an officer or employee acting under the authority of the United States.'" *Id.* at *4 (quoting *Lamar v. United States*, 241 U.S. 103, 111-12 (1916)). This holding has no relevancy when the alleged federal employee is the president.

[87]       *See Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (noting that "in 1988, Congress extended coverage under the FTCA to officers and employees of the legislative and judicial branches"); *Operation Rescue Nat. v. United States*, 147 F.3d 68, 71 (1st Cir. 1998) (concluding that because no Members of Congress spoke up about their possible exclusion from the Westfall Act when they debated the statute, the Members presumably understood the statute to include them, and that holding otherwise would be irrational).

[88]       *See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017).

* * *

The president is not an "employee of the Government" under the Westfall Act. The text of the Act of June 25, 1948 offers numerous strong indications that Congress did not intend for this term to apply to him. Congress clearly held that view when it passed the Westfall Act in 1988. And the *Franklin* decision forbids the Court from reading the president into the FTCA without a clear statement from Congress. Moreover, holding that the president is an "employee of the Government" within the meaning of the Act could ignite a significant expansion of federal tort exposure – without any evidence of a congressional intent to do so – by authorizing lawsuits that could involve review of the president's job performance.

As the president is not an "employee of the Government" within the meaning of the Westfall Act, the Attorney General's certification was erroneous.

## II.   *Scope of Employment*

The holding that the president of the United States is not an "employee of the Government," as Congress defined that term, is sufficient to resolve the government's motion. But the parties have briefed also the question of whether, if the president is a government employee, President Trump's allegedly defamatory statements were made within the scope of his employment. And it is appropriate to address that issue as well in order to avoid the possibility of an unnecessary remand should a higher court disagree on the "employee" question.

### A.   *Choice of Law*

Under Second Circuit law, the question of whether government employees are acting within the scope of their employment for the purposes of the FTCA is resolved "in

accordance with the respondeat superior law of the jurisdiction where the tort occurred."[89]  The origin of this rule and its precise meaning are complicated issues that will be discussed momentarily.  For present purposes, it suffices to note that the rule is derived from a provision of the FTCA stating that the government's ultimate liability turns on "the law of the place where the act or omission occurred."[90]

The parties disagree over which jurisdiction's law applies to the scope of employment issue.  The government argues that because President Trump's allegedly defamatory statements were made in the District of Columbia, the Court should apply D.C. law.  Ms. Carroll, though not disputing that the statements were made in Washington, D.C., argues that the tort occurred where she was injured, which was New York.  Both parties, however, assert that the outcome would be the same under the *respondeat superior* doctrine of either jurisdiction.[91]

As to the question of where the tort occurred for FTCA purposes, the Court agrees with the government.  The governing case law refers to the place of the tort, not the place

---

[89]

See, e.g., *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016); *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007).

*Respondeat superior* is a Latin phrase meaning "let the superior make answer."  The substance of the doctrine is that an employer is liable for any injuries wrongly inflicted by its employee within the scope of the employment.  *See Respondeat Superior*, BRYAN A. GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019).  The doctrine applies also to principal and agent and to master and servant.

[90]

See *Fountain*, 838 F.3d at 135 (quoting 28 U.S.C. § 1346(b)(1)).

[91]

See Dkt. 16 at 31 n.18 (plaintiff arguing that "[a]lthough New York laws governs and supplies a more restrictive rule of respondeat superior liability than does D.C., the ultimate outcome would be the same under D.C. law"); Dkt. 21 at 13 (government arguing that "[t]he outcome under New York law would be no different")

of injury.  And the FTCA's reference to the "act or omission" makes the conclusion absolutely clear.

But the apparently simple question of which law applies is more nuanced than the parties acknowledge.  The complication turns on whether the Court must apply the D.C. *respondeat superior* doctrine or whether it instead must apply D.C.'s choice of law rules to determine which jurisdiction's *respondeat superior* doctrine applies.

At first blush, the FTCA appears to require the choice of law path.  The statute predicates the government's liability on "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[92]  This language seems to suggest that a federal court hearing an FTCA claim should apply the same law as would a local court in the relevant jurisdiction.  In *Richards v. United States*,[93] the Supreme Court took that view by holding that the FTCA "requires application of the whole law of the [jurisdiction] where the act or omission occurred," which includes that jurisdiction's choice of law rules.[94]

The issue in *Richards* was which jurisdiction's law applied to the question of liability – not whose *respondeat superior* doctrine applied.  But nothing in the opinion distinguished between those questions or suggests that they might require a different type of

---

[92]

   28 U.S.C. § 1346(b)(1).

[93]

   369 U.S. 1 (1962).

[94]

   *Id.* at 11; *see also Winston v. United States*, 305 F.2d 253, 272 n.20 (2d Cir. 1962) (reading *Richards* as interpreting the FTCA "language to mean the 'whole law' of that place, including its conflict of law rules").

analysis.  And the FTCA provides no textual basis for distinguishing between them.  It would be odd to read the statute to require that courts apply the *respondeat superior* doctrine of the place where the act or omission occurred, but they must begin with that jurisdiction's choice of law rules when determining the law applicable to liability.  Moreover, treating the *respondeat superior* issue differently may violate *Richards*.  A scope of employment finding is a necessary component of liability in a suit against an employer.

However, a separate line of cases suggests that federal courts may have developed different rules for liability and scope of employment, seemingly without considering the possible inconsistency.  In *Williams v. United States*,[95] decided seven years before *Richards*, the Supreme Court reviewed a Ninth Circuit decision that applied federal law to the scope of employment question.  In a two sentence *per curiam* opinion, the Supreme Court vacated and remanded on the ground that "[t]his case is controlled by the California doctrine of respondent superior."[96] The Court did not set forth its reasoning.

There are two plausible explanations for that result.  One is that the Court, consistent with the reading it later gave in *Richards*, looked to the whole law of California, the place where the act or omission occurred, and found that California's choice of law rules required application California *respondeat superior* doctrine.  The other is that California's *respondeat superior* doctrine applied by virtue of the FTCA itself – *i.e.*, California was where the act or omission occurred.

---

[95]   350 U.S. 857 (1955) (per curiam).

[96]   *Id.*

All twelve of the geographic courts of appeals have said specifically that the FTCA requires courts to apply "the *respondeat superior* law" of the jurisdiction where the act or omission occurred.[97] But all twelve of those courts have stated also that courts must apply "the law" of the relevant jurisdiction without indicating whether they are referring to (a) that jurisdiction's "whole law," which includes its choice of law rules, or (b) the jurisdiction's

---

[97]

*See, e.g.*, *Nasuti v. Scannell*, 906 F.2d 802, 806 n.1 (1st Cir. 1990) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of respondeat superior of the state in which the negligent or wrongful conduct occurred."); *Fountain*, 838 F.3d at 135 ("We interpret the FTCA's 'scope of employment' requirement in accordance with the respondeat superior law of the jurisdiction where the tort occurred."); *McSwain v. United States*, 422 F.2d 1086, 1088 (3d Cir. 1970) ("Such liability for the acts or omissions of a civilian or military federal employee is determined by the law of respondeat superior of the state in which the act or omission occurred."); *Ross v. Bryan*, 309 F.3d 830, 834 (4th Cir. 2002) ("To determine whether Bryan's acts were within the scope of his employment, we must apply Virginia respondeat superior law."); *Garza v. United States*, 809 F.2d 1170, 1171 (5th Cir. 1987) ("Whether military personnel are acting within the line of duty is determined by applicable state rules of respondeat superior."); *United States v. Taylor*, 236 F.2d 649, 653 (6th Cir. 1956) ("[T]he standard of governmental liability under the Federal Tort Claims Act is with respect to both military and civilian employees that imposed by the respondeat superior doctrine of the state."); *Duffy v. United States*, 966 F.2d 307, 314 (7th Cir. 1992) ("[W]e have followed the Court's ruling in *Williams* and looked to state law of respondeat superior to determine whether a person was acting "in the line of duty)."; *United States v. Farmer*, 400 F.2d 107, 109 (8th Cir. 1968) ("[T]he question of whether a Government employee is acting within the scope of his office or employment must be determined by the respondeat superior rule of the state where the negligent act occurred."); *United States v. McRoberts*, 409 F.2d 195, 197 (9th Cir. 1969) ("In resolving the sole issue before us, we must apply the respondeat superior principles of California, the state wherein the alleged tort was committed."); *Nichols v. United States*, 796 F.2d 361, 365 n.4 (10th Cir. 1986) ("Whether he was 'acting within the scope of his office or employment' at the time his act caused injury to Nichols is determined by reference to the respondeat superior law of the state in which the accident occurred."); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996) ("'Line of duty,' in turn, draws its meaning from the applicable state law of respondeat superior."); *Nelson v. United States*, 838 F.2d 1280, 1282 (D.C. Cir. 1988) ("'Line of duty,' in turn, takes its meaning from the applicable state law of respondeat superior.").

*respondeat superior* doctrine without regard to its choice of law rules.[98]  It is not crystal clear

which of these approaches is the law, although that fact that most of the decisions in both groups

cite *Williams* and none conducts a choice of law analysis strongly suggests that the former view

controls.  Nevertheless, this Court need not and does not resolve this issue.

　　Although the *respondeat superior* doctrines of New York and the District of

Columbia are not identical, they dictate the same outcome on these facts, largely for the same

reasons.  As will appear, *respondeat superior* liability does not apply under the law of either

---

[98]　　*See, e.g.*, *Borrego v. United States*, 790 F.2d 5, 6 (1st Cir. 1986) ("Whether or not a particular act is within the scope of employment is a matter to be determined in accordance with the law of the place in which the alleged negligent act or omission occurred."); *Mandelbaum v. United States*, 251 F.2d 748, 750 (2d Cir. 1958) ("Under [the FTCA] the law applicable to this case is that of New York [where the act or omission occurred].  And subsequent to the decision below the Supreme Court [in *Williams*] has made it absolutely clear that . . . the state law controls."); *Matsko v. United States*, 372 F.3d 556, 559 (3d Cir. 2004) ("We assess whether Kotor was acting within the scope of his employment under the law of Pennsylvania, because that is where the incident occurred."); *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1156 (4th Cir. 1997) ("In answering [the scope of employment] question, we apply the law of the state where the conduct occurred."); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) ("The issue of whether an employee is acting within the scope of his employment for purposes of the FTCA is governed by the law of the state in which the wrongful act occurred."); *Arbour v. Jenkins*, 903 F.2d 416, 421-22 (6th Cir. 1990) ("Whether an employee's actions are within the scope of his employment for purposes of the Westfall Act is an issue that must be determined in accordance with the law of the state where the incident occurred."); *Guthrie v. United States*, 392 F.2d 858, 859 (7th Cir. 1968) (holding, because the act or omission occurred in Wisconsin, that "[t]he state law of Wisconsin is decisive on this issue"); *Brown v. Armstrong*, 949 F.2d 1007, 1012 n.7 (8th Cir. 1991) ("Under the FTCA, the law of the place of the alleged tort governs the scope-of-employment question."); *Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) ("This phrase must be applied according to the law of the state where the alleged tort occurred."); *United States v. Hainline*, 315 F.2d 153, 155 (10th Cir. 1963) ("In actions brought under the Act, the scope of employment is determined by the state law."); *Green v. Hill*, 954 F.2d 694, 698 (11th Cir. 1992) ("The issue of whether an employee acted within the scope of his employment is determined by the law of the state where the alleged tort occurred."); *United States v. Baker*, 265 F.2d 123, 123 (D.C. Cir. 1959) (noting that "the law of Virginia, where the accident occurred, would control the question of 'scope of employment'").

jurisdiction unless the employer exercises, or has the ability to exercise, control over the employee's relevant actions.[99]  Because the control factor is dispositive and would reach an identical result under either D.C. or New York law, there is no true conflict between D.C. and New York law for the purpose of D.C.'s governmental interest analysis.  In fact, and as noted at the outset, both parties assert that the outcome would be the same under New York and D.C. law.  "Since there is 'no real conflict' . . . it is unnecessary for [the Court] to engage in the choice-of-law exercise . . . ."[100]

### B.    Scope of Employment Under D.C. Law

"'*Respondeat superior* is a doctrine of vicarious liability' that imposes liability on employers for tortious and negligent 'acts of [their] employees committed within the scope of their employment.'"[101]  "Generally, 'whether an employee is acting within the scope of his

---

[99]
      *Compare Fountain*, 838 F.3d at 135 ("Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'" (brackets omitted) (quoting *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Lundberg v. State*, 25 N.Y.2d 467, 471 (1969))), *with Tolu v. Ayodeji*, 945 A.2d 596, 602 (D.C. 2008) ("The decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." (ellipsis omitted) (quoting *Safeway Stores v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)).

[100]
      *Barimany v. Urban Pace LLC*, 73 A.3d 964, 968 (D.C. 2013) (quoting *Taylor v. Canady*, 536 A.2d 93, 96 (D.C. 1988)).

[101]
      *Blair v. D.C.*, 190 A.3d 212, 225 (D.C. 2018) (quoting *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006)).

employment is a question of fact for the jury.'"[102]  However, the issue becomes a question of law "if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment."[103]

As to the legal question, the D.C. Court of Appeals has adopted Section 228 of the Restatement (Second) of Agency.[104]  In that court's words, D.C. law holds that "[i]n order to succeed under a *respondeat superior* theory of liability, [a party] must show [1] that a master-servant relationship existed between [the employer] and [its] workers or contractors, and

---

[102]

*Id.* (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001)).

[103]

*Id.* at 226 (quoting *Brown*, 782 A.2d at 757).

Whether the provision about sending this issue to a jury applies here is unclear.  The reason for the lack of clarity is that the scope of employment issue arises as a threshold question about the Westfall Act's applicability, rather than as an element of the plaintiff's cause of action that might be resolved at trial.  For reasons explained below, however, the Court holds that the matter is decided appropriately as a question of law in this case.

[104]

*See, e.g.*, *District of Columbia v. Bamidele*, 103 A.3d 516, 525 n.6 (D.C. 2014); *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987); *Wuterich*, 562 F.3d at 383.  The full provision reads:

"(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

"(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."

[2] that the incident at issue occurred while the workers or contractors were acting within the scope of their employment."[105]   The Court begins with the master-servant issue.

### 1.   Master-Servant Relationship

"The terms 'master' and 'servant' are defined as follows:

> "(1) A master is a principal who employs an agent to perform service in his affairs *and who controls or has the right to control the physical conduct of the other* in the performance of the service.

> "(2) A servant is an agent employed by a master to perform service in his affairs *whose physical conduct in the performance of the service is controlled or is subject to the right to control* by the master."[106]

"The decisive test [for the existence of a master-servant relationship] is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done."[107]   "[T]here is no liability for the conduct of one who, although a servant in performing other service, is doing work as to which there is no

---

[105]   *Tolu*, 945 A.2d at 601-02 (brackets omitted) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 611 (D.C. 1985)); *see Moorehead v. D.C.*, 747 A.2d 138, 142 (D.C. 2000) (same).

[106]   *Safeway*, 448 A.2d at 856 n.6 (quoting RESTATEMENT (SECOND) OF AGENCY § 2) (emphasis added).

[107]   *Tolu*, 945 A.2d at 602 (ellipsis omitted) (quoting *Safeway*, 448 A.2d at 860); *cf.* RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c) (noting that "one is a servant only if, as to his physical conduct in the performance of the service, he is subject to the control or to the right to control of the master"); *id.* § 220(1) (similar).   The Supreme Court has made the same observation about the "control" element's centrality to one's status as a servant. *See Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003) ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant.   The general definition of the term 'servant' in the Restatement (Second) of Agency § 2(2) (1957), for example, refers to a person whose work is "controlled or is subject to the right to control by the master.").

control or right to control by the master."[108]   D.C. courts consider five factors in determining whether a master-servant relationship exists:  "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer."[109]

"The President of the United States possesses an extraordinary power to speak to his fellow citizens . . . ."[110]  While he is a "public servant," holding that he is a "servant" whom a "master" "has the right to control and direct" when he speaks to reporters, or otherwise, would be absurd.

First, except for the payment of a salary, not one of the five factors relied upon by D.C. courts to determine whether a master-servant relationship exists is satisfied here.  The president is selected by the electoral college, not the executive branch or any part of it.  The government does not have the power to discharge him in any circumstances, unless one construes impeachment, or removal under the Twenty-Fifth Amendment, as forms of discharge.  And while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not.[111]

---

[108]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

[109]

See, e.g., Anthony v. Okie Dokie, Inc., 976 A.2d 901, 906 (D.C. 2009) (quoting Safeway, 448 A.2d at 860); Bostic v. D.C., 906 A.2d 327, 331 (D.C. 2006) (same) (quoting Giles, 487 A.2d at 611).

[110]

Trump v. Hawaii, 138 S. Ct. 2392, 2417-18 (2018).

[111]

Although the government waived this argument, one could contend that the president cannot meaningfully perform his job without responding to public sexual assault allegations.

The "decisive" factor, however, is the fourth and most important: control.  The president is the chief executive of the United States government.  No one, inside or outside of the executive branch, has "the power to control the [president's] conduct."

That conclusion is found in the first sentence of the president's job description.  Under Article II of the Constitution, "[t]he executive Power shall be vested in a President of the United States of America."[112]  As Justice Scalia explained in his famous dissent in *Morrison v. Olson*,[113] "this does not mean *some of* the executive power, but *all of* the executive power."[114] "The entire 'executive Power' belongs to the President alone."[115]

Not only does the president's sole possession of the executive power place him atop the chain of command of the executive branch.  "Article II confers on the President 'the general administrative *control* of those executing the laws.'"[116]  "The buck stops with the President, in Harry Truman's famous phrase."[117]

---

Because this argument is better characterized as a question of whether the president acted within the scope of his employment, rather than a question of whether he is a "servant" under the "control" of a "master," the Court addresses this theory below.

[112]  U.S. Const. Art. II, § 1, cl. 1.

[113]  487 U.S. 654 (1988).

[114]  *Id.* at 705.

[115]  *Seila*, 140 S. Ct. at 2197.

[116]  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (emphasis added).

[117]  *Id.*

To hold that someone else exercises control over the president would turn the Constitution on its head.  And it would subvert the requirement that the president "shall take Care that the Laws be faithfully executed."[118]  As explained recently by the Supreme Court:

> "The . . . constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections.  In that scheme, individual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision *and control* of the elected President.  Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'"[119]

Interpreting this authority, Justices Thomas and Kavanaugh have opined that components of the executive branch "that wield substantial power with no accountability to either the President or the people . . . 'pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.'"[120]

As noted above, "there is no liability for the conduct of one who . . . is doing work as to which there is no control or right to control by the master."[121]  Such control is absent

---

[118]

U.S. Const. Art. II, § 3.

[119]

*Seila*, 140 S. Ct. at 2203 (quoting 1 Annals of Cong. 499 (J. Madison)); *see also, e.g.*, *Free Enter. Fund*, 561 U.S. at 514 ("Without [the] power [to remove and control subordinates], the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." (quoting The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)); *id.* at 492 ("As Madison stated on the floor of the First Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing, *overseeing*, and *controlling* those who execute the laws.'" (emphasis added) (quoting 1 Annals of Cong. 463 (J. Madison))).

[120]

*Seila*, 140 S. Ct. at 2212 (Thomas, *J.*, concurring in part) (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, *J.*, dissenting)).

[121]

RESTATEMENT (SECOND) OF AGENCY § 228 cmt. (c).

whenever the president discharges his duties. And it is non-existent when the president exercises his "extraordinary power to speak to his fellow citizens"[122] by addressing the press. No one gives him permission to speak. No one can require him to say, or not to say, anything at all. No one has the authority to cut him off. And the statements he makes, as well as the topics he discusses, are entirely of his own choosing.

These points are clearer still on the facts of this case. No one even arguably directed or controlled President Trump when he commented on the plaintiff's accusation, which had nothing to do with the official business of government, that he raped her decades before he took office. And no one had the ability to control him.

President Trump is not a "servant" controlled by a "master" within the meaning of the District of Columbia's scope of employment doctrine. Thus, his allegedly defamatory statements were not "actuated, at least in part, by a purpose to further the master's business."[123] He was not acting within the scope of his employment when he made them, and the Attorney General's certification under the Westfall Act was erroneous.[124]

### 2. Scope of Employment Test

The president is no one's servant. But assume, for the sake of argument, that he were an employee of the United States whose master were something vaguely described as "the

---

[122]    *Trump*, 138 S. Ct. at 2417.

[123]    *Blair*, 190 A.3d at 225.

[124]    Because the Court concludes as a matter of law that President Trump is not a servant, it concludes also that no reasonable jury could find that his actions were done within the scope of his employment.

public," which "controlled" him indirectly through its role in choosing the electoral college members[125] or in electing the Members of Congress who can impeach and remove him. Even then, the Court would hold that President Trump was not acting within the scope of his employment when he made the allegedly defamatory statements.

Under D.C. law, "[t]o be within the scope of employment, the tortious activity 'must be actuated, at least in part, by a purpose to further the master's business,' and this 'intent or purpose excludes from the scope of employment all actions committed solely for the servant's own purposes.'"[126] The "at least in part" language demonstrates that the action need not "be wholly in furtherance of the employer's business."[127] That said, a slight purpose to serve the master is not enough. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[128] Finally, "the employee's 'tortious conduct must be foreseeable to the employer, meaning that it is a direct outgrowth of the employee's instructions or job assignments.'"[129]

---

[125]

This view is impossible to reconcile with the "control" element of D.C. law. "The public" is not an employer, and it does not have the authority to control the president's performance of his job when he makes statements to reporters or otherwise. Nor, because of the electoral college system, is the president directly elected by the public. And while our system of checks and balances gives Congress (and the judiciary) certain powers that the president lacks, no branch of government "controls" another in anything resembling the same manner that an employer controls an employee.

[126]

*Blair*, 190 A.3d at 226 (quoting *Bamidele*, 103 A.3d at 525).

[127]

*Id.*

[128]

*See, e.g.*, *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)); *Brown*, 782 A.2d at 758 (same).

[129]

*Blair*, 190 A.3d at 226 (alteration omitted) (quoting *Bamidele*, 103 A.3d at 525).

At its core, the government's argument is that speaking to reporters is part of the president's job. Thus, it argues, whenever the president speaks to reporters – no matter the topic – he is acting within the scope of his employment. For this proposed rule, the government relies on the D.C. Circuit's *Ballenger* decision. A discussion of *Ballenger* will be helpful to explaining why the Court is not persuaded.

The defendant in *Ballenger* was Rep. Cass Ballenger, a Member of Congress. Ballenger's chief of staff gave an interview to a reporter who asked a question about Ballenger's recent separation from his wife.[130]  Ballenger later called the reporter "from his congressional office during regular business hours" and stated, among other things, that the separation was amicable and that his wife was uncomfortable living across the street from the plaintiff, an Islamic institution.[131]  The journalist reported this comment, and the plaintiff sued Ballenger for defamation.[132]

Shortly after the lawsuit was filed, the Department of Justice certified that Ballenger "acted within the scope of his employment as an employee of the United States when he made the allegedly defamatory statement."[133]  The district court agreed and dismissed the case under the FTCA's exemption for libel and slander claims.[134]

---

[130]

*Ballenger*, 444 F.3d at 661.

[131]

*Id.* at 662.

[132]

*Id.* at 663.

[133]

*Id.*

[134]

*Islamic Council on Am. Islamic Relations, Inc. v. Ballenger*, 366 F. Supp. 2d 28, 30 (D.D.C. 2005).

The D.C. Circuit affirmed. Like the district court, it did not acknowledge the question of whether a Member of Congress is an "employee of the Government" pursuant to the Westfall Act or a "servant" under a master's control. But it nonetheless found that Ballenger acted within the scope of his employment when he made the comment at issue.

The D.C. Circuit began by rejecting the plaintiff's argument "that Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform."[135] Instead, it reasoned that D.C. law and the Westfall Act "direct[] courts to look beyond alleged intentional torts themselves."[136] Finding that the "'underlying dispute or controversy' was the phone call between Ballenger and [the reporter] discussing the marital separation," it held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'"[137] The court did not explain its use of the word "authorized" nor offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters, much less to discuss his marital status with them. Nor, when it reached the question of whether speaking to reporters is conduct "actuated, even in part, to serve *the master*," did the court offer any theory as to who is the "master" of a Member of Congress or who controls a Member's discussions with the press.[138] The D.C. Circuit appears to have

---

[135]

  *Ballenger*, 444 F.3d at 664.

[136]

  *Id.*

[137]

  *Id.*

[138]

  *Id.* at 665. Although the court quoted this standard several times, its analysis failed to engage with it.

overlooked these requirements by focusing only on whether the "conduct was motivated – at least in part – by a legitimate desire to discharge his duty as a congressman."[139]

Even on the issues it addressed, *Ballenger*'s reasoning is wanting. Its explanation for why a Member of Congress acts within the scope of his employment is presented in the following paragraph:

> "[The plaintiff] resists this conclusion on two grounds. First, it insists that Ballenger's statement was purely private, unrelated to any matter of public concern. The circumstances of the conversation belie this suggestion. The *Charlotte Observer* and at least some subset of Ballenger's constituents were interested in the separation. Given this level of public interest, we find CAIR's absolutist view at odds with reality. Moreover, it is telling that [the reporter] felt at liberty to ask [Ballenger's chief of staff] – rather than Ballenger himself – about the marital separation."[140]

There are two problems with this passage. The first is that it is unpersuasive. Gossip about a congressperson's marriage may very well be interesting to the public. But that fact does not transform it into the official business of the United States Congress. The job description of a congressperson does not include transparency about one's personal life.

In addition, *Ballenger* misstates D.C. law – and not only in the manner described above. A plaintiff is not required, as the court asserted, to show that the defendant's "statement was *purely* private, unrelated to any matter of public concern."[141] A real but insubstantial

---

[139]

     *Id.* This language tracks Section 228(1)(a) of the Restatement. But that is only one element of the definition of scope of employment. *See* RESTATEMENT (SECOND) OF AGENCY § 228(1) (listing four elements); *see also, e.g.*, *id.* § 228(1)(c) (requiring that the conduct be "actuated, at least in part, by a purpose to serve the master").

[140]

     *Ballenger*, 444 F.3d at 665.

[141]

     *Id.* (emphasis added).

purpose to serve the master is insufficient. "'Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[142]

The implications of *Ballenger*'s holding also are troubling. The case stands for the proposition that, under D.C. law, virtually any remarks that Members of Congress make to the press are conduct within the scope of their employment. Setting aside the master-servant question that the court did not address, this means that Members of Congress, and perhaps all federal officials who speak to the press with any regularity, effectively are immune from defamation claims for comments made within the District of Columbia, no matter how personal or private in nature.

*Ballenger* acknowledged this concern. But it made no attempt to assuage it. It noted merely that the case was limited to its facts.[143]

A subsequent panel of the D.C. Circuit did not accept the invitation to read *Ballenger* so narrowly. In *Wuterich*, the court held that *Ballenger* controlled where a Member of Congress was sued for defamation based on his comments about the Iraq War.[144] Unlike

---

[142]

    *Bamidele*, 103 A.3d at 525 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(2)). Although *Ballenger* includes this language when it quotes the entirety of Section 228, its analysis does not engage with it.

[143]

    *See Ballenger*, 444 F.3d at 666 ("This case, like every judicial decision, cannot be divorced from its facts. To be sure, it involves a statement by a congressman to the press. But our *ratio decidendi* necessarily depends on the context in which the statement was made. *See* KARL LLEWELLYN, THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those 'who think that precedent produces or ever did produce a certainty that did not involve matters of judgment and of persuasion . . . simply do not know our system of precedent in which they live.'). We lack the power to render an opinion on any case or controversy not properly before us.").

[144]

    *Wuterich*, 562 F.3d at 384.

*Ballenger*, however, *Wuterich* considered the relationship between the congressperson's remarks and his official duties.  It relied on the fact that "the underlying conduct – interviews with the media about the pressures on American troops in the ongoing Iraq war – is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress," particularly because he "was the Ranking Member of the Appropriations Committee's Subcommittee on Defense and had introduced legislation to withdraw American troops from Iraq."[145]

The Court declines to apply a *Ballenger*-like principle to the president on the facts of this case.  Perhaps the president, were he in service of a "master," would act within the scope of his employment when he comments on matters having a non-negligible nexus to his official duties.  But there is no basis for concluding that a D.C. court would ignore the nature and content of his statements and hold that anything he says is within the scope of his employment.  A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office.  And the public's reasons for being interested in these comments are different as well.  The president's views on the former topics are interesting because they alert the public about what the government is up to.  President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government.

---

[145] *Id.* at 384-85.  These facts are irrelevant under *Ballenger*'s broader holding that essentially any comment a Member of Congress makes to the press is done within the scope of his or her employment.  That said, *Wuterich* did not purport to narrow *Ballenger* or limit the case to its facts.

The government's best argument on this point is that President Trump's statements about Ms. Carroll were within the scope of his employment in that refuting her accusation furthered his ability to govern effectively because the accusation was reported widely and charged him with the commission of a serious crime. But there are at least three answers to that objection.

As an initial matter, the government first made the argument in its reply brief, thereby foreclosing the plaintiff from responding to it. As previously discussed, it thereby waived the argument as its counsel agreed in open court, as previously discussed.

Second, the Court would reject the argument even if it were not waived. While the government's position is not entirely without merit, it goes much too far. Accepting it would mean that a president is free defame anyone who criticizes his conduct or impugns his character – without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to their government employment, would undermine their ability to perform effectively while in office.

Finally, even if the president's comments here had some nexus to his official duties, that nexus would be too weak. As stated several times now, "'[c]onduct of a servant [that] is . . . too little actuated by a purpose to serve the master' is not within the scope of employment."[146] That is the case here.

---

[146] *Bamidele*, 103 A.3d at 525 (quoting Restatement (Second) of Agency § 228(2)).

Beyond the District of Columbia precedent already discussed, support for this conclusion comes from the Supreme Court's decision in *Clinton v. Jones*.[147]  Much like in this case, a plaintiff sued the sitting president for defamation after she accused him of engaging in sexual misconduct before he took office.[148]  Her theory was that "various persons authorized to speak for the President publicly branded her a liar by denying that the incident had occurred."[149]

As relevant here, the Supreme Court held that President Clinton was not absolutely immune from suit by virtue of his office where the claims against him were based on his "*unofficial* conduct."[150]  As to most of the plaintiff's claims, the Court explained, "it is perfectly clear that the alleged misconduct of [President Clinton] was unrelated to any of his official duties as President of the United States and, indeed, occurred before he was elected to that office."[151]  The one possible exception was the alleged defamatory comments that were made while he was in office.  The Court noted that the defamation claim "arguably may involve

---

[147]

520 U.S. 681 (1997).

[148]

*Id.* at 685-86; *see also Jones v. Clinton*, 72 F.3d 1354, 1357 (8th Cir. 1996) (1997) ("Her complaint also includes two supplemental state law claims, one against Mr. Clinton for intentional infliction of emotional distress and the other against both Mr. Clinton and Trooper Ferguson for defamation.").

[149]

*Clinton*, 520 U.S. at 685.

[150]

*Id.* at 694 (emphasis in original); *see also id.* at 695 ("As our opinions have made clear, immunities are grounded in the nature of the function performed, not the identity of the actor who performed it." (citation and quotation marks omitted)).

[151]

*Id.* at 686.

conduct within the outer perimeter of the President's official responsibilities."[152]  But because that issue was "not before [the Court]," it declined to consider whether the president's absolute immunity extended to these comments.[153]

Although both doctrines call for some assessment of whether the defendant was engaged in the performance of his job, the absolute immunity doctrine is different than D.C.'s scope of employment doctrine.  But as to the president's job description, *Clinton* suggests that a sitting president's comments about a sexual assault allegation fall somewhere between being outside the scope of his duties and "arguably . . . within [their] outer perimeter."  At least where D.C. law is concerned, conduct that is "too little actuated by a purpose to serve the master" does not suffice.[154]  It is difficult to see how conduct that at most is in the "outer perimeter" of the president's job duties could be actuated in any meaningful degree to serve his master, whomever that may be.

In this regard, the Court notes also that all of the remaining Westfall Act defamation decisions relied upon by the government are distinguished easily from this case – and not merely because each of them concerned a Member of Congress.  Although the Sixth Circuit's *Does 1-10* case involved a defamation claim against a Senator who commented "on an event of widespread public interest," the decision applied Kentucky's scope of employment

---

[152]

 *Id.*

[153]

 *Id.* at 686 n.3.

[154]

 *Bamidele*, 103 A.3d at 525 (quoting Restatement (Second) of Agency § 228(2)).

law.[155]  According to the Supreme Court of Kentucky decision relied upon by the Sixth Circuit,

Kentucky's doctrine is similar to the Restatement (Third) of Agency approach.[156]  While that

approach resembles in some ways Section 228 of the Restatement (Second) of Agency,[157] the

drafters intentionally omitted the "too little actuated" standard discussed above:

> "Under § 228(2), conduct is not within the scope of employment if it is 'too little
> actuated by a purpose to serve' the employer.  Under § 235, conduct is not within
> the scope of employment 'if it is done with no intention' to perform an authorized
> service or an incidental act.  These formulations are not entirely consistent; an act
> motivated by *some* purpose to serve the employer could still be '*too little
> actuated*' to be within the scope of employment.
>
> *In contrast*, under subsection (2) of [Section 7.07 of the Restatement (Third)], an
> employee's conduct is outside the scope of employment when it occurs within an
> independent course of conduct intended to serve *no purpose* of the employer."[158]

As explained, the "too little actuated" caveat is decisive on these facts to the extent that one

considers President Trump's comments to have been actuated in some small part to serve

whomever one believes to be his "master."  Thus, the Sixth Circuit's interpretation of Kentucky

law is of no moment here.

The government's remaining cases involve the laws of different jurisdictions or

Members of Congress who commented on matters related clearly to their job duties.  *Wuterich*

---

[155]

No. 19-6347, 2020 WL 5242402, at *2, 6.

[156]

*Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) ("Kentucky's approach . . . [focuses
on whether the servant's] purpose, however misguided, is wholly or in part to further the
master's business.").

[157]

A key difference is that the Restatement (Third) abandons the foreseeability element of the
Restatement (Second).  *See* RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006), cmt.

[158]

*Id.* (citation omitted, emphasis added).

involved D.C. law but concerned remarks that the D.C. Circuit found were "unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress."[159]  *Williams v. United States*[160] involved a Texas congressperson's comments "concerning the status of an appropriations bill to restore the Battleship Texas."[161]  And the case applied Texas's scope of employment doctrine, which differs from the Restatement (Second) approach.[162]  And *Operation Rescue National v. United States*[163] did not consider whether the defendant's comments were made within the scope of his employment because the issue was not raised on appeal.  The district court did consider that issue, but it did so under Massachusetts law where the defendant, a Senator, commented on a "bill, of which he was the prime sponsor, [that] was to be debated in the Senate the following day."[164]

President Trump's comments concerned media reports about an alleged sexual assault that took place more than twenty years before he took office.  Neither the media reports nor the underlying allegations have any relationship to his official duties.  And even if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not

---

[159]

*Wuterich*, 562 F.3d at 384-85.

[160]

71 F.3d 502 (5th Cir. 1995).

[161]

*Id.* at 504, 506.

[162]

*See id.* at 506 (citing *Mata v. Andrews Transp., Inc.*, 900 S.W.2d 363, 366 (Tex. App. 1995)).

[163]

147 F.3d 68, 69 (1st Cir. 1998).

[164]

*Id.* at 68-69.

enough under the District of Columbia's scope of employment doctrine.

> ### C.  *Scope of Employment Under New York Law*

If the Court were to apply New York law, it would reach the same conclusion largely for the same reasons.

"Under New York law, an employee acts within the scope of his employment when (1) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities,' and (2) 'the employee is doing something in furtherance of the duties he owes to his employer.'"[165]  "Whether an employee acted within the scope of employment is a fact-based inquiry."[166]

For all the reasons already outlined, any person or group that might be characterized as President Trump's employer neither controls, nor could control, his activities. And even if that were not so, the government's argument would fail also because the president's actions were not taken "in furtherance of the duties he owes to his employer," whoever or whatever that may be.

When applying the "in furtherance" requirement, New York courts "consider, among other factors,

---

[165]

> *Fountain*, 838 F.3d at 135 (brackets omitted) (quoting *Hamm*, 483 F.3d at 138 (quoting *Lundberg*, 25 N.Y.2d at 471)).

[166]

> *Rivera v. State*, 34 N.Y.3d 383, 90 (2019).  Although it is fact heavy, "the question may be resolved on summary judgment, particularly when the material facts are undisputed."  *Id.*  This language arguably does not apply here because the scope of employment question arises as a threshold issue, rather than as a merits issue on summary judgment or even a Rule 12 motion.  But in either event, the issue is resolved appropriately by the Court because the material facts are not in dispute.

'the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated' (i.e., whether it was foreseeable)."[167]

Conduct "committed for wholly personal motives" is not done in furtherance of any duties owed to the employer.[168] And at least as a general matter, "New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."[169] That said, "[i]nvoking respondeat superior both in defamation cases and in sexual harassment cases is not unprecedented."[170] As in all cases, "the determination of whether a particular act was within the scope of the servant's employment is . . . heavily dependent on factual considerations."[171]

As explained above, the undisputed facts demonstrate that President Trump was not acting in furtherance of any duties owed to any arguable employer when he made the statements at issue. His comments concerned an alleged sexual assault that took place several decades before he took office, and the allegations have no relationship to the official business of

---

[167] *Rivera*, 34 N.Y.3d at 389-90 (2019) (quoting *Riviello v Waldron*, 47 N.Y.2d 297, 304 (1979)); *see also Fountain*, 838 F.3d at 138 (applying these factors to the "in furtherance" inquiry).

[168] *See, e.g.*, *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002).

[169] *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

[170] *Rausman v. Baugh*, 682 N.Y.S.2d 42 (App. Div. 2d 1998).

[171] *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979).

the United States.  To conclude otherwise would require the Court to adopt a view that virtually everything the president does is within the public interest by virtue of his office.  The government has provided no support for that theory, and the Court rejects it as too expansive.

## Conclusion

The President of the United States is not an "employee of the Government" within the meaning of the relevant statutes.  Even if he were such an "employee," President Trump's allegedly defamatory statements concerning Ms. Carroll would not have been within the scope of his employment.  Accordingly, the motion to substitute the United States in place of President Trump [Dkt. 3] is denied.

SO ORDERED.

Dated:        October 26, 2020

_____
Lewis A. Kaplan
United States District Judge