20-3977 (L)
*E. Jean Carroll v. Donald J. Trump*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 27 2022

1 UNITED STATES COURT OF APPEALS
2 FOR THE SECOND CIRCUIT

3 _____

4 August Term 2021

5 (Argued: December 3, 2021     Decided: September 27, 2022)

6 Docket Nos. 20-3977-cv (L), 20-3978-cv (Con)

7 _____

8 E. JEAN CARROLL,

9 *Plaintiff-Appellee,*

10 v.

11 DONALD J. TRUMP, IN HIS PERSONAL CAPACITY,

12 *Defendant-Appellant,*

13 UNITED STATES OF AMERICA,

14 *Movant-Appellant.*

15 _____

16 Before: CALABRESI, CHIN, and NARDINI, *Circuit Judges*.

17 _____

18 Defendant-Appellant Donald J. Trump and Movant-Appellant the United
19 States of America appeal from a judgment of the United States District Court for
20 the Southern District of New York (Kaplan, *J.*) denying their motion to substitute
21 the United States in this action pursuant to the Westfall Act of 1988. On appeal,
22 appellants argue that substitution is warranted because the President of the United
23 States is a covered government employee under the Westfall Act, and because
24 Trump had acted within the scope of his employment when he made the allegedly

CERTIFIED COPY ISSUED ON 09/27/2022

defamatory statements denying Plaintiff-Appellee E. Jean Carroll's 2019 sexual assault allegations.

We REVERSE the District Court's holding that the President of the United States is not an employee of the government under the Westfall Act. And we VACATE the District Court's judgment that Trump did not act within the scope of his employment, and CERTIFY that question to the D.C. Court of Appeals.

Judge Calabresi concurs in a separate opinion, and Judge Chin dissents in a separate opinion.

_____

MARK R. FREEMAN, Appellate Staff Civil Division, U.S. Department of Justice (Mark B. Stern and Joshua M. Salzman, Appellate Staff Civil Division, U.S. Department of Justice, *on the brief*), *for* Jennifer B. Dickey, Acting Assistant Attorney General, *for Movant-Appellant United States of America.*

ALINA HABBA, Habba Madaio & Associates LLP, Bedminster, NJ (Marc Kasowitz, Christine A. Montenegro, Paul J. Burgo, Kasowitz Benson Torres LLP, New York, NY, *on the brief*), *for Defendant-Appellant Donald J. Trump.*

JOSHUA A. MATZ, Kaplan Hecker & Fink, LLP, New York, NY (Roberta A. Kaplan, Raymond P. Tolentino, Kaplan Hecker & Fink, LLP, New York, NY, Leah Litman, Ann Arbor, MI, *on the brief*), *for Plaintiff-Appellee E. Jean Carroll.*

Zoe Salzman, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, New York, NY, *for Amici Curiae The Rape, Abuse & Incest National Network (RAINN); Time's Up Foundation; Legal Momentum, The Women's Legal Defense and Education Fund; The National Alliance to End Sexual Violence; The National Center for Victims of Crime (NCVC); The New York City Alliance Against Sexual Assault; and Safe Horizon.*

_____

GUIDO CALABRESI, *Circuit Judge*:

When an employee of the federal government is sued for tortious conduct

that happens on the job, the employee is generally entitled to absolute immunity

1    from personal liability under the Federal Employees Liability Reform and Tort

2    Compensation Act of 1988 (the "Westfall Act").  *See* 28 U.S.C. § 2679(b)(1).  But in

3    order to claim this immunity, the employees must prove two things: (1) that they

4    are qualifying government officials for purposes of the Westfall Act, and (2) that

5    the tortious conduct they purportedly engaged in was within the scope of their

6    employment.  If these requirements are met, the United States is substituted for

7    the employee as the sole defendant in the tort suit.  And from there, the action

8    proceeds against the United States in accordance with the rules set forth in the

9    Federal Tort Claims Act ("FTCA").  *See id.* §§ 2679(d)(1), 1346(b)(1).

10   This case requires us to determine whether the President of the United States

11   is eligible for this form of absolute immunity.  In 2019, Plaintiff-Appellee E. Jean

12   Carroll publicly accused Defendant-Appellant Donald J. Trump of sexual assault

13   and rape, which, on her account, occurred at some point in the mid-1990s.  At the

14   time these allegations were made, Trump was President of the United States.  In

15   response to the accusations, Trump made a series of public statements, which not

16   only denied the allegations but also questioned Carroll's credibility and assertedly

17   demeaned her personal appearance.

1    Carroll then filed a tort suit against Trump in New York State Supreme

2    Court, alleging that his public statements were defamatory under New York law.

3    After some proceedings, the Attorney General of the United States, through his

4    delegate, intervened in the suit and certified that Trump was entitled to

5    substitution under the Westfall Act because he was a government employee acting

6    within the scope of his employment when he made the public statements at issue.

7    On the basis of this certification, the case was removed to the United States District

8    Court for the Southern District of New York.

9    In due course, the District Court (Kaplan, *J.*) denied the motion to substitute

10   the United States for Trump.  It held that the President is not an employee of the

11   government as that term is used in the Westfall Act.  In the alternative, it held that

12   even if the President were a Westfall Act covered employee, Trump had not acted

13   within the scope of his employment when he allegedly defamed Carroll.  For these

14   reasons, the District Court denied the substitution motion.  The Government and

15   Trump appealed.

16   We reverse the District Court's holding that the President of the United

17   States is not an employee of the government under the Westfall Act.  And we

1     vacate the District Court's judgment that Trump did not act within the scope of

2     his employment, and certify that question to the D.C. Court of Appeals.

3

4                                      I

5                                    A

6         According to the complaint, the events precipitating this lawsuit occurred

7     one evening nearly thirty years ago (between the fall of 1995 and spring of 1996)

8     when Carroll unexpectedly encountered Trump at a department store in

9     Manhattan. During this time, Carroll had worked as an advice columnist who

10     regularly appeared on television. As a result, Trump immediately recognized and

11     greeted Carroll. He then requested her assistance in picking out a gift for another

12     woman who was not with him that evening. Carroll agreed to help, and

13     accordingly, the two began to look for an appropriate gift. Their search led them

14     to the lingerie section of the department store.

15         At the lingerie section, Trump picked out a bodysuit and proceeded to

16     engage in banter with Carroll about trying it on. This exchange continued for a

17     short while until, suddenly, Trump "maneuvered" her to a nearby dressing room

18     under the pretext of making her try on the bodysuit. Once inside the dressing

1    room, still according to the complaint, Trump sexually assaulted and raped

2    Carroll.  According to Carroll, the assault lasted for several minutes, before she

3    was able to repel Trump and flee the department store.  Immediately following

4    these events, Carroll purportedly told two close friends of the assault.  But she did

5    not otherwise disclose the incident, nor did she report it to law enforcement

6    authorities.

7                                    **B**

8    Some 24 years later, Carroll decided to go public with her allegations.  For

9    several years, she had been working on a book about 21 men who had left ugly

10    marks on her life.  One of the men featured in the book was Trump.  On June 21,

11    2019, before the book's official release, *New York Magazine* published a pre-

12    publication excerpt which detailed Carroll's sexual assault allegations against

13    Trump.

14    At the time of this disclosure, Trump was President of the United States.   In

15    response to the allegations, Trump issued a series of public statements, which this

16    action claims were defamatory.

17    *First*, hours after Carroll's allegations had been released, Trump issued the

18    following statement denying the incident:

1         **Statement from President Donald J. Trump:**

2         Regarding the 'story' by E. Jean Carroll, claiming she once
3         encountered me at Bergdorf Goodman 23 years ago. I've never met
4         this person in my life. She is trying to sell a new book—that should
5         indicate her motivation. It should be sold in the fiction section.

6

7         Shame on those who make up false stories of assault to try to get
8         publicity for themselves, or sell a book, or carry out a political
9         agenda—like Julie Swetnick who falsely accused Justice Brett
10         Kavanaugh. It's just as bad for people to believe it, particularly when
11         there is zero evidence. Worse still for a dying publication to try to
12         prop itself up by peddling fake news—it's an epidemic.

13

14         Ms. Carroll & New York Magazine: No pictures? No surveillance?
15         No video? No reports? No sales attendants around?? I would like to
16         thank Bergdorf Goodman for confirming they have no video footage
17         of any such incident, because it never happened.

18

19         False accusations diminish the severity of real assault. All should
20         condemn false accusations and any actual assault in the strongest
21         possible terms.

22

23         If anyone has information that the Democratic Party is working with
24         Ms. Carroll or New York Magazine, please notify us as soon as
25         possible. The world should know what's really going on. It is a
26         disgrace and people should pay dearly for such false accusations.

27

28  Special App'x at 12-13.

29

30      *Second*, on June 22, 2019, as he was departing for Camp David, Trump again

31 publicly denied the allegations during a press gaggle on the White House lawn:

1    **Trump:**  I have no idea who this woman is.  This is a woman who has
2    also accused other men of things, as you know.  It is a totally false
3    accusation.  I think she was married—as I read; I have no idea who
4    she is—but she was married to a, actually, nice guy, Johnson—a
5    newscaster.

6

7    **Reporter:**  You were in a photograph with her.

8

9    **Trump:**  Standing with [my] coat on in a line—give me a break—with
10   my back to the camera.  I have no idea who she is.  What she did is—
11   it's terrible, what's going on.  So it's a total false accusation and I don't
12   know anything about her.  And she's made this charge against others.

13

14   And, you know, people have to be careful because they're playing
15   with very dangerous territory.  And when they do that—and it's
16   happening more and more.  When you look at what happened to
17   Justice Kavanaugh and you look at what's happening to others, you
18   can't do that for the sake of publicity.

19

20   New York Magazine is a failing magazine.  It's ready to go out of
21   business, from what I hear.  They'll do anything they can.  But this
22   was about many men, and I was one of the many men that she wrote
23   about.  It's a totally false accusation.  I have absolutely no idea who
24   she is.  There's some picture where we're shaking hands.  It looks like
25   at some kind of event.  I have my coat on.  I have my wife standing
26   next to me.  And I didn't know her husband, but he was a newscaster.
27   But I have no idea who she is—none whatsoever.

28

29   It's a false accusation and it's a disgrace that a magazine like New
30   York—which is one of the reasons it's failing.  People don't read it
31   anymore, so they're trying to get readership by using me.  It's not
32   good.

33

1    You know, there were cases that the mainstream media didn't pick
2    up.  And I don't know if you've seen them.  And they were put on
3    Fox.  But there were numerous cases where women were paid money
4    to say bad things about me.  You can't do that.  You can't do that.  And
5    those women did wrong things—that women were actually paid
6    money to say bad things about me.

7

8    But here's a case, it's an absolute disgrace that she's allowed to do
9    that.

10

11   *Id.* at 13-14.

12

13   *Finally*, on June 24, 2019, the online newspaper publication, *The Hill*, released

14   an interview with Trump, in which he stated:  "I'll say it with great respect:

15   Number one, she's not my type.  Number two, it never happened.  It never

16   happened, OK?" *Id.* at 14.

17                                          C

18   In November 2019, Carroll filed the present lawsuit in New York State

19   Supreme Court against Trump in his individual capacity, alleging that his public

20   statements denying her sexual assault allegations were defamatory under New

21   York law.  In September 2020, Director James G. Touhey, Jr. of the Torts Branch of

22   the U.S. Department of Justice's Civil Division intervened in the suit and certified

23   on behalf of the Attorney General that Trump had acted "within the scope of his

1    office as President of the United States" when he made the public statements

2    denying Carroll's allegations.    Based on this certification, the Government

3    removed the case to Federal District Court.  *See Osborn v. Haley*, 549 U.S. 225, 242

4    (2007) (holding that the Attorney General's certification is "dispositive" for

5    purposes of removal).  And shortly thereafter, the Government moved, pursuant

6    to the Westfall Act, to substitute the United States as the sole defendant in this

7    case.

8        The District Court denied the Government's motion to substitute and did so

9    on two independent grounds. *Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020).

10       *First*, it held that substitution was not warranted because, at the time the

11   allegedly defamatory statements had been made, Trump was President of the

12   United States, and the President is not an "employee of the Government" for

13   purposes of the Westfall Act.  *Id.* at 443.

14       The Westfall Act, the District Court explained, incorporates the FTCA's

15   definitional provision at 28 U.S.C. § 2671, which, as relevant here, defines an

16   "[e]mployee of the Government" to "include[] . . . officers or employees" of "the

17   executive departments[.]"   Under this statutory definition, the District Court

18   reasoned that while the President is "the 'head' of many federal departments,

10

agencies, and organizations," the President is not an employee of any particular

federal agency or department.  *Carroll*, 498 F. Supp. 3d at 437.  As a result, he does

not fit within the statutory definition of employee.  *Id.*  In addition to this textual

analysis of the statute, the District Court relied on relevant legislative history and

on the Constitutional avoidance canon articulated in *Franklin v. Massachusetts*, 505

U.S. 788 (1992), in support of its interpretation of the statute.  *Id.* at 438-42.  For

these reasons, it concluded that the Westfall Act's provisions did not apply to the

President.

*Second*, and in the alternative, the District Court held that even if the

President were an employee of the government for purposes of the Westfall Act,

substitution of the United States as defendant was still inappropriate because

Trump had not acted within the scope of his employment when he publicly denied

Carroll's sexual assault allegations.  *Carroll*, 498 F. Supp. 3d at 457.  After

identifying either New York or District of Columbia *respondeat superior* law as

governing this inquiry, the District Court, discerning no conflict between the laws

of the two jurisdictions, declined to resolve the choice of law issue.  *Id.* at 446-47.

The District Court then held that, under either New York or District law, Trump

had exceeded the scope of his employment.  *Id.* at 447-57.  Therefore, even if the

1    President were a covered employee under the statute, Trump could not be

2    substituted under the Westfall Act.

3        This meant that Carroll's suit could proceed against Trump in his personal

4    capacity.  The Government and Trump timely appealed the denial of substitution.[1]

5    *See Osborn*, 549 U.S. at 238 (holding that denial of substitution under the Westfall

6    Act is, pursuant to the collateral order doctrine, "a reviewable final decision within

7    the compass of 28 U.S.C. § 1291").

8                                            II

9                                            A

10       A short history of the Westfall Act is useful to understanding the issues in

11   this case.

12       In *Westfall v. Erwin*, 484 U.S. 292 (1988),[2] the Supreme Court held that federal

13   employees were entitled to absolute immunity against individual tort liability only

14   if their conduct occurred "within the scope of their official duties *and* the conduct

---

[1] For convenience sake, we refer to the Government and Trump collectively under the latter's name.

[2] Unless otherwise noted, case text quotations omit internal citations, footnotes, quotation marks, and previous alterations.

1    [was] discretionary in nature," *id.* at 297-98 (emphasis in original).  In adopting a

2    "discretionary in nature" requirement, for immunity, the Court attempted to strike

3    a balance between the following policy considerations: a) placing an unfortunate

4    risk of individual liability on government employees and b) compensating those

5    who "had the misfortune to be injured by a federal official."  *Id.* at 295-97.  Under

6    *Westfall*'s test, the Court explained that "official immunity would have to be

7    determined on a case-by-case basis, according to whether the contribution to

8    effective government in particular contexts from granting immunity outweighs

9    the potential harm to individual citizens."  *United States v. Smith*, 499 U.S. 160, 163

10    (1991) (discussing *Westfall*, 484 U.S. at 299).

11        Apparently troubled by the personal tort liability the *Westfall* decision was

12    likely to impose on federal employees, but not wishing to leave injured victims

13    uncompensated, Congress responded swiftly and enacted the Westfall Act.  *See*

14    Pub. L. No. 100-694, § 2, 102 Stat. 4563, 4563-64 (1988) (stating the purpose of the

15    law was to reverse the effects of the *Westfall* decision); *see also Smith*, 499 U.S. at 163

16    ("Congress took this action in response to our ruling in *Westfall v. Erwin*[.]").

17        The Westfall Act was a monumental act of legislation.  Among other things,

18    it eliminated *Westfall*'s "discretionary in nature" requirement, 484 U.S. at 297-98,

1   and replaced it with a single factor test for absolute federal employee immunity,

2   *see Smith*, 499 U.S. at 163.   Under the Westfall Act, qualifying government

3   employees were entitled to absolute immunity from personal tort liability for any

4   conduct occurring within the scope of their employment—even if the tortious

5   conduct was not a discretionary function of their employment.  *See* 28 U.S.C. §

6   2679(b)(1).[3]

7       But in enacting this law, Congress did not intend to preclude tort victims

8   from redress as a result of torts committed by government employees.  Quite the

9   contrary, Congress sought to shift such liability costs away from the individual

10  employees and place them on their employer: the United States.  And it did so by

11  waiving sovereign immunity for certain categories of torts, and by using the

12  common law doctrine of *respondeat superior*—which generally made private

13  employers liable for the torts of their employees.

---

[3] Until the Westfall Act, the President was "entitled to absolute immunity from damages liability predicated on his official acts."  *Nixon v. Fitzgerald,* 457 U.S. 731, 749 (1982). "Official acts," however, did not include *all* conduct within the scope of employment. Our holding today is that the Westfall Act extended absolute immunity to the President also for non-official acts as long as they are within the scope of employment.

1    Thus, when a federal employee is now sued for tortious conduct committed

2    in the course of employment, the Westfall Act confers immunity by substituting

3    the defendant with the United States, and, in turn, making the action against the

4    United States under the FTCA the exclusive means of recovery for the injured

5    individual in tort, *see* 28 U.S.C. § 2679(b)(1) ("The remedy against the United States

6    provided by sections 1346(b) and 2672 . . . is exclusive of any other civil action . . .

7    for money damages[.]").  Substitution of the United States as defendant is, in other

8    words, the procedural vehicle by which the Westfall Act confers absolute

9    immunity on federal government officials.

10    In order for substitution to take place, the Westfall Act first "empowers the

11    Attorney General to certify that the employee was acting within the scope of his

12    office or employment at the time of the incident out of which the claim arose."  *See*

13    *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) (quoting 28 U.S.C.

14    § 2679(d)(1)).[4]  "Upon certification, the employee is dismissed from the action and

---

[4] Specifically, the Westfall Act provides:

1    the United States is substituted as defendant." *Id.* Although the "certification

2    constitutes *prima facie* evidence that the employee was acting within the scope of

3    his employment," *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009), the merits

4    of the certification are judicially reviewable, *see Lamagno*, 515 U.S. at 420 (holding

5    that the "scope-of-employment certification is reviewable in court"). If the district

6    court concludes that certification is appropriate, the individual employee has been

7    appropriately dismissed from the tort action and the case proceeds against the

8    United States in accordance with the FTCA. Conversely, if "the District Court

9    determines that the employee in fact, and not simply as alleged by the plaintiff,

10    engaged in conduct *beyond* the scope of his employment," *Osborn*, 549 U.S. at 231

11    (emphasis added), the substitution motion must be denied, and the suit will

12    proceed against the government employee in a personal capacity.

---

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

1    Substitution in Westfall Act cases generally raises no serious issues because,

2    once it occurs, "such cases unfold much as cases do against other employers who

3    concede *respondeat superior* liability."   *Lamagno*, 515 U.S. at 420.    As Justice

4    Ginsburg aptly noted, however, the issue of substitution presents a totally

5    different and frequently troubling issue in those cases where "an exception to the

6    FTCA shields the United States from suit, [since] the plaintiff may be left without

7    a tort action against any party."   *Id.*; *see Smith*, 499 U.S. at 165 (holding that the

8    Westfall Act "immunizes Government employees from suit even when an FTCA

9    exception precludes recovery against the Government").   In such situations, the

10   Westfall Act results in the victims of wrongful action by a government employee

11   being left to bear the loss.[5]

12   And that is what lies at the core of this case.  The FTCA, expressly, does not

13   waive the sovereign immunity of the United States for the tort of defamation, *see*

---

[5] Under the common law doctrine of *respondeat superior*, the employee generally is liable, along with her employer, for torts committed within the scope of her employment. Hence, situations like the instant case, where a court's reading of scope of employment may totally preclude the tort victim from suing either the employee or the employer, rarely arose.

1    28 U.S.C. § 2680(h). So substituting the United States in place of Trump means the

2    failure of Carroll's defamation lawsuit.

3                                            B

4           In disputing whether substitution is appropriate here, the parties raise two

5    issues on appeal: (1) whether the President of the United States is an employee of

6    the federal government for purposes of the Westfall Act and (2) whether Trump

7    had acted within the scope of his employment when he made the public

8    statements denying Carroll's sexual assault allegations.

9           The parties all agree that the second issue presented (scope of employment)

10   is governed by the District of Columbia's *respondeat superior* law.[6]    As we

11   understand it, the District's law regarding vicarious liability is sufficiently unclear

12   that we are unable to predict with any confidence how the District's highest

---

[6] The District Court identified a potential choice of law issue on whether to apply New York's or the District's *respondeat superior* law, *see Richards v. United States*, 369 U.S. 1, 11 (1962) (holding that the FTCA "requires application of the whole law of the State where the act or omission occurred"). But it declined to resolve the issue after concluding that there was "no true conflict" between the jurisdictions' laws. *Carroll*, 498 F. Supp. 3d at 446-47. Although we have our doubts regarding that conclusion, we need not reach the choice of law issue in light of the parties' agreement that the District's *respondeat superior* law governs the scope of employment inquiry. Oral Arg. Tr. at 31 ("The first premise is that under D.C. law, which we are happy to accept for purposes of this appeal . . . .").

court—the D.C. Court of Appeals—would resolve this issue. We, therefore, conclude that it would be advisable to certify that question to the D.C. Court of Appeals. *See* D.C. Code Ann. § 11-723(a) (West 2001) ("The District of Columbia Court of Appeals may answer questions of law certified to it by . . . a Court of Appeals of the United States[.]").

We are, however, sensitive to the fact that the District's certification statute appears to favor certification of legal issues "which may be *determinative* of the cause pending" before the "certifying court." *Id.* (emphasis added); *see Penn Mut. Life Ins. Co. v. Abramson*, 530 A.2d 1202, 1206 (D.C. 1987) ("[I]f in our view the question of local law which perplexed the certifying court would in no way be determinative of the cause within the meaning of § 11-723(a), we might refuse to answer the question.").

In light of that local policy, we find it prudent to answer the antecedent question: Is the President of the United States an employee of the federal government under the Westfall Act? *See* 28 U.S.C. §§ 2671, 2679. This ground presents a possible independent basis for affirmance of the District Court's judgment below. Accordingly, if the President is not a qualifying government employee as a matter of federal law, any answer from the D.C. Court of Appeals

1   regarding scope of employment would not be determinative.  In other words, we

2   must first hold that the Westfall Act in fact applies to the President in order for the

3   scope of employment inquiry to be determinative in this case.

4       We therefore turn to that federal question.

5                                    III

6                                     A

7       The Westfall Act provides immunity against individual tort liability to "any

8   employee of the Government while acting within the scope of his office or

9   employment."  28 U.S.C. § 2679(b)(1).  Does the President of the United States fall

10  within the meaning of "employee of the Government" as that term is used in the

11  Westfall Act?  We review this question of statutory interpretation *de novo*.  *See*

12  *Williams v. United States*, 71 F.3d 502, 504 (5th Cir. 1995).

13      Like any other statutory interpretation case, our inquiry begins with the text

14  of the statute.  *See Hui v. Castaneda*, 559 U.S. 799, 805 (2010).  The parties agree that

15  the Westfall Act's reference to "employee of the Government" incorporates the

16  FTCA's definitional provision at 28 U.S.C. § 2671.  And "[w]hen a statute includes

17  an explicit definition, we must follow that definition, even if it varies from a term's

18  ordinary meaning."  *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020).

1    We thus turn to § 2671, which sets forth the following definition:

2         Employee of the government includes (1) officers or employees of any

3         federal agency, members of the military or naval forces of the United

4         States, members of the National Guard while engaged in training or

5         duty . . . and persons acting on behalf of a federal agency in an official

6         capacity, temporarily or permanently in the service of the United

7         States, whether with or without compensation, and (2) any officer or

8         employee of a Federal public defender organization, except when

9         such officer or employee performs professional services in the course

10        of providing representation under section 3006A of title 18.

11   28 U.S.C. § 2671.

12        The parties do not dispute that, under § 2671, only the first employee

13   category—that is, "officers or employees of any federal agency"—may be of

14   potential relevance to the President.  The provision, in turn, elaborates on the term

15   "federal agency" by stating that it: "includes the executive departments, the

16   judicial and legislative branches, the military departments, independent

17   establishments of the United States, and corporations primarily acting as

18   instrumentalities or agencies of the United States, but does not include any

contractor with the United States."  28 U.S.C. § 2671.  The one category of covered

employees under § 2671 that may apply to the President is, therefore, "officers or

employees" of "the executive departments,"  *id.*

Given this statutory definition, Carroll principally argues that the President

does not come within the scope of the FTCA and the Westfall Act because he is not

an officer or employee of any "executive departments."  Appellee Br. at 20.  The

term "executive departments," Carroll contends, has been understood since the

Nation's founding to refer to "Cabinet-level agencies, and perhaps a small number

of additional freestanding components within the executive branch, but not to the

executive branch in its entirety."  *Id*.  In view of this longstanding meaning of the

term "executive departments," she asserts that when Congress enacted the FTCA,

it necessarily incorporated that term's historical connotation.  *Id.* at 21 (citing

*Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows

terms of art in which are accumulated the legal tradition and meaning of centuries

of practice, it presumably knows and adopts the cluster of ideas that were attached

to each borrowed word[.]")).  And since the President is not an officer or employee

of any "subsidiary components of the executive branch," Carroll contends that he

1    is not an employee of the federal government under § 2671.  *Id.* at 27.  The learned

2    District Court reached the same conclusion.  *Carroll*, 498 F. Supp. 3d at 437.

3         We, however, disagree.  Even if we were to accept these arguments on their

4    own terms, Carroll's interpretive theory fails for it rests on the flawed assumption

5    that § 2671 provides an *exhaustive* definition of covered government employees

6    under the FTCA.  *Cf. Witt v. United States*, 462 F.2d 1261, 1263 (2d Cir. 1972) ("This

7    definition [28 U.S.C. § 2671] is not without boundaries, but quite clearly the

8    statutory language was drafted to have an expansive reach.").  Put differently, the

9    term "executive departments" would only control the interpretive analysis here,

10   as Carroll argues, if it limits the definition of government employee rather than

11   provide examples of who are covered by that term.

12        And, given the plain language and structure of § 2671, we conclude that the

13   better reading of the statute is that it simply sets forth an *illustrative* set of examples

14   of those who qualify as covered government officials.  *See* 28 U.S.C. § 2671.

15        To begin with, § 2671 uses the term "includes" to describe the categories of

16   employees who fall under the  statutory definition."  *Id.* ("Employee of the

17   government includes . . . .").  When used in such a context, this "word choice is

18   significant because it makes clear that the examples enumerated in the text are

1    intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham*

2    *Corp.*, 567 U.S. 142, 162 (2012) (citing *Burgess v. United States*, 553 U.S. 124, 131 n.3

3    (2008)). As the Supreme Court explained nearly a century ago in *Groman v.*

4    *Commissioner of Internal Revenue*, 302 U.S. 82 (1937), "[t]he terms 'includes' and

5    'including' when used in a definition . . . shall not be deemed to exclude other

6    things otherwise within the meaning of the term defined," *id.* at 86. *See also Federal*

7    *Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (stating that the

8    term "'including' is not one of all-embracing definition, but connotes simply an

9    illustrative application of the general principle").[7]

10    Significantly, Federal Courts of Appeals have applied this interpretive rule

11    to the precise statutory language at issue, including recently the Seventh Circuit,

12    which cogently noted: "§ 2671 begins with the word 'includes,' which ordinarily

13    introduces exemplary, not exhaustive language . . . So, § 2671 does not necessarily

14    contain every instance in which a person is an 'employee of the Government.'"

---

[7] The fact that this canon of construction had been identified and applied in *Bismarck* and *Groman* (decided in 1941 and 1937, respectively) makes it particularly probative of the original meaning of § 2671, as those cases were decided close in time to the FTCA's enactment in 1946, *see Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020) (explaining that a statute should be interpreted "in accord with the ordinary public meaning of its terms at the time of its enactment").

1    *Talignani v. United States*, 26 F.4th 379, 382 (7th Cir. 2022) (citing A. SCALIA & B.

2    GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132-33 (2012)).  And,

3    long since, the Eighth Circuit in *United States v. LePatourel*, 571 F.2d 405 (8th Cir.

4    1978), similarly observed that, "Congress chose to define 'employees of the

5    government' and 'federal agency' inclusively rather than exclusively," *id.* at 408.

6    *See also McNamara v. United States*, 199 F. Supp. 879, 880-81 (D.D.C. 1961) (noting

7    that § 2671 does not set forth an "exclusive definition").

8         The significance of the word "includes," moreover, is underscored by the

9    statutory context in which it appears.  Specifically, while § 2671 uses the word

10   "includes" to describe the terms "Federal agency" and "Employee of the

11   government," a different word—"means"—is used in describing a closely related

12   part of the statutory provision:

13         "Acting within the scope of his office or employment," in the case of

14   a          member of the military or naval forces of the United States or a

15             member of the National Guard as defined in section 101(3) of title 32,

16             *means* acting in line of duty.

17   *Id.* (emphasis added).

1    This is, of course, telling because—in contrast to the expansive meaning

2    generally ascribed to "includes"—the term "means," as it has come to be

3    understood, generally signifies the presence of "an exclusive definition." *Burgess*,

4    553 U.S. at 131 n.3 (quoting *Groman*, 302 U.S. at 86). Further, this canon of

5    construction applies with special force here, for Congress chose to use both of these

6    verbs in the same definitional provision, thereby underscoring the significance of

7    this linguistic distinction.

8                                        B

9                                        1

10   Because we conclude that the examples listed in § 2671 of the FTCA do not,

11   per se, limit the definition of "Employee of the government," 28 U.S.C. § 2671, the

12   focus of our inquiry must accordingly turn to the ordinary meaning of "employee"

13   in 1946, which is when the FTCA was originally enacted, Legislative

14   Reorganization Act of 1946, Pub. L. No. 79-601, 60 Stat. 812, 842-43. *See Bostock*,

15   140 S. Ct. at 1738 (instructing courts to interpret statutes "in accord with the

16   ordinary public meaning of [their] terms at the time of [their] enactment").

17   The term "employee" had roughly the same meaning in the mid-20th

18   century as it does today. According to a leading dictionary of the time, an

"employee" was defined as "one who works for wages or salary in the service of an employer."  *Employee*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1943); *see Employee*, BLACK'S LAW DICTIONARY (3d ed. 1944) (defining term as "a person in some official employment"); *cf. Employee*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Someone who works in the service of another person (the employer) under an express or implied contract of hire[.]").  It would, therefore, seem that payment of consideration and formal service to an employer were the hallmarks of an employee relationship at the time of the FTCA's enactment.

In the original 1946 law it had enacted, Congress did not, however, make the payment of wages or a salary the dispositive criterion for whether an individual was a covered government employee under the FTCA.  *See* Pub. L. No. 79-601, 60 Stat. 812, 843 (1946).  Rather, Congress went further, and included under the employee definition "persons acting on behalf of a Federal agency in an official capacity, temporarily or permanently . . . whether *with or without compensation*." *Id.* (emphasis added).  In this respect, we think that Congress intended to broaden the meaning of employee in § 2671, and extend its reach beyond the traditional limitations attached to the word in ordinary parlance.  *Id.*; *see* Irvin M. Gottlieb,

1    *The Federal Tort Claims Act–A Statutory Interpretation*, 35 Geo. L.J. 1, 11-12 (1946)

2    ("Section 402(b) defines Employee of the Government, giving broad scope to this

3    phrase and including within its terms temporary and even uncompensated

4    employees[.]").

5        We are, therefore, convinced that § 2671 lends itself to only one

6    interpretation: The statute covers "all federal employees from personal liability

7    without regard to agency affiliation or line of work." *Levin v. United States*, 568

8    U.S. 503, 509 (2013).

9        It follows that the President of the United States fits comfortably within the

10    statutory description's plain language.  For, as Trump points out in his brief, the

11    President is a government employee in the most basic sense of the term: He

12    renders service to his employer, the United States government, in exchange for a

13    salary and other job-related benefits.  *Cf. United States v. Hatter*, 532 U.S. 557, 563

1  (2001) (recognizing the President as a federal employee for purposes of a social

2  security program).[8]

3                                        2

4        Precedent and historical practice, together with the mischief the statute

5  sought to remedy, reinforce this conclusion.

6        To begin with, those of our sister circuits that have addressed § 2671 have

7  likewise interpreted "employee" broadly, and held that the term applies to high

8  ranking officials of the other branches of the federal government.  *See, e.g.*, *Does 1-*

9  *10 v. Haaland*, 973 F.3d 591, 597-98 (6th Cir. 2020) (members of Congress are

10  covered government employees); *Operation Rescue Nat'l v. United States*, 147 F.3d

11  68, 70-71 (1st Cir. 1998) (same); *Williams v. United States*, 71 F.3d 502, 504-05 (5th

---

[8] Unlike "employees" in the most conventional sense, the President cannot be fired from his job.  But Presidents are still subject to other forms of control.  The President "is subjected to constant scrutiny by the press" and "[v]igilant oversight by Congress."  *Nixon,* 457 U.S. at 757.  Other checks "may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature."  *Id.*  In this respect, the President is quite like these government officials who cannot be fired, but are subject to other forms of control and are plainly covered by the FTCA, as amended by the Westfall Act.  These include members of Congress and judges.  The dissent's appropriate differentiation of the President from ordinary employees, while on point, is therefore unconvincing because it would exclude many government officials who are, instead, expressly covered by the Westfall Act.

1   Cir. 1995) (same); *United States v. LePatourel*, 571 F.2d 405, 408-10 (8th Cir. 1978)

2   (federal judges are covered).

3       Given these interpretations of the "employee" definition in the legislative

4   and judicial branch contexts, it coheres to apply the same language to the

5   President, *see, e.g.*, *Operation Rescue*, 147 F.3d at 70-71 (stating in dictum that § 2671

6   covers "all officers, up to the president").  And indeed, as Trump correctly notes

7   in his brief, in previous cases where substitution of the President occurred, the

8   applicability of the Westfall Act was not questioned.  *See, e.g.*, *Saleh v. Bush*, 848

9   F.3d 880, 891 (9th Cir. 2017); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 73 n.1

10   (D.D.C.), *aff'd*, 861 F.3d 241 (D.C. Cir. 2016); *Klayman v. Obama*, 125 F. Supp. 3d 67,

11   82 (D.D.C. 2015); *West v. Trump*, No. 3:19-CV-2522-K-BH, 2020 WL 4721291, at *3

12   n.6 (N.D. Tex. July 23, 2020).

13       The legislative context behind the FTCA's passage, moreover, lends further

14   support for this interpretation.  Specifically, the mischief that the FTCA purported

15   to fix was the private claims bills procedure.  Because of sovereign immunity, until

16   the FTCA's enactment in 1946, private citizens who were injured by tortious

17   conduct at the hands of government employees were left without a judicial

18   remedy against the federal government.  *See Feres v. United States*, 340 U.S. 135,

1 139-40 (1950) (detailing history of private claims bills). As a result, persons seeking

2 compensation from the federal government regularly resorted to submitting

3 private claims to their elected representatives—who then were responsible for

4 drafting and pushing bills that would provide compensation to their injured

5 constituents. *See United States v. Muniz*, 374 U.S. 150, 154 (1963) ("Private claim

6 bills introduced in the Sixty-eighth through the Seventy-eighth Congresses

7 averaged 2,000 or more per Congress, roughly 20% of which were enacted.").

8    For decades, this practice was widely criticized as being a costly

9 administrative burden on the work of Congress. *See* Alexander Holtzoff, *The*

10 *Handling of Tort Claims Against the Federal Government*, 9 Law & Contemp. Probs.

11 311, 311–12 (1942). And during the joint committee hearings that led to the FTCA's

12 enactment, various members of Congress expressed their collective displeasure at

13 the private claims bills system, criticizing it as a poor use of time and resources, as

14 well as an unjust remedy for injured victims. *See, e.g.*, *Legislative Reorganization*

15 *Act: Hearings Before the Joint Comm. on the Org. of Congress*, 79th Cong. 68-69 (1945)

16 (remarks of Sen. Kefauver); *id.* at 95 (remarks of Rep. Wadsworth).

17    The FTCA was the solution to this long-running problem. By waiving

18 sovereign immunity for certain torts, it sought to delegate to the federal courts the

31

1   resolution of such claims brought by private citizens against government officials.

2   *See Muniz*, 374 U.S. at 154.  And significantly, the FTCA delegated this burden *en*

3   *masse*, without particular concern for the specific role or position of the

4   government employee responsible for committing the tort.  *See* S. Rep. No. 1400,

5   at 31-32 (1946) (stating that the FTCA's provisions "cover all Federal agencies,

6   including Government corporations, and all Federal officers and employees").

7        In light of this contextual evidence, there is no reason to assume that

8   Congress in enacting the FTCA meant to exclude the President from the process

9   that would avoid serious administrative burdens while providing comprehensive

10  redress to private individuals "having meritorious claims hitherto barred by

11  sovereign immunity," *Muniz*, 374 U.S. at 154.[9]  Or as the Eighth Circuit

12  convincingly explained in the course of interpreting § 2671 to cover federal judges:

13  "[T]o hold that employees of the judicial branch are not covered by the Federal

---

[9] Consider, for example, if the President of the United States—while discussing foreign policy with the head of a neighboring country in the course of playing golf with that person—potentially negligently hit the golf ball in a way that injured a member of the golfing group.  We do not believe that Congress in the Westfall Act and in the FTCA could conceivably have meant to place the burden of defending a tort suit under such circumstances on the President.  Oral Arg. Tr. at 22-23.

1 Tort Claims Act would ultimately impede Congress' statutory design: efficient

2 redress for victims of governmental torts." *LePatourel*, 571 F.2d at 409.

3      For all these reasons, we hold that the President is an employee of the

4 government under the Westfall Act.

5                         IV

6      The remaining question on appeal is whether Trump's public statements

7 denying Carroll's sexual assault allegations occurred within the scope of his

8 employment, *see* 28 U.S.C. §§ 1346(b)(1), 2679. If they did, then Trump is entitled

9 to immunity through substitution pursuant to the Westfall Act. But if they did

10 not, substitution must be denied and Carroll's lawsuit will proceed in the ordinary

11 course against Trump in his personal capacity. Where, as here, the parties do not

12 dispute the facts underlying the allegedly tortious conduct, we review the scope

13 of employment issue *de novo*. *See, e.g.*, *Council on Am. Islamic Relations v. Ballenger*,

14 444 F.3d 659, 664 (D.C. Cir. 2006); *Bello v. United States*, 93 F. App'x 288, 289-90 (2d

15 Cir. 2004).

16      The scope of employment inquiry is governed by the *respondeat superior* law

17 of the state in which the alleged tort occurred. *See Williams v. United States*, 350

1  U.S. 857 (1955) (per curiam); *Fountain v. Karim*, 838 F.3d 129, 135 (2d Cir. 2016).

2  Here, as noted earlier, the parties agree that District of Columbia law applies.

3  But applying that law is easier said than done since the District's application

4  of *respondeat superior* in contexts like the instant one is anything but clear.  In light

5  of this uncertainty, and the apparent significance of this case, we conclude that it

6  is advisable to certify this question to the D.C. Court of Appeals.  To explain our

7  uncertainty, however, we must review both the historical origins of *respondeat*

8  *superior* in tort law and how that doctrine has been applied in the District.

9                                                A

10  The liability of an employer for the *negligent* torts of the employee has deep

11  roots in the common law.  Indeed, Holmes wrote that virtually every legal system

12  has an analogical doctrine.  *See generally* O. W. Holmes, Jr., *Agency*, 4 Harv. L. Rev.

13  345 (1891).  In Anglo-American law, it was an essential part of the form of action—

14  Trespass on the Case ("Case")—from which much of modern tort law derives.

15  Case held the master (employer) liable for the *negligent* torts of the servant

16  (employee) whenever the servant was acting in the scope of employment, as that

17  concept was broadly defined.  If the negligent acts were a characteristic risk of the

18  employer's business, there would be liability even if they did not benefit the

34

1     employer. The distinction between "frolics" on the part of the employee (which

2     gave rise to no liability on the employer) and "detours" (which did give rise to

3     liability) reflected this dichotomy. *See generally* Guido Calabresi, *Some Thoughts on*

4     *Risk Distribution and the Law of Torts*, 70 Yale L.J. 499 (1961).[10]

5         When the employee's tortious acts were intentionally wrongful, however,

6     the history was quite different. Case did *not* cover intentional torts, and an action

7     in Trespass ("Trespass"), the other form of action from which much of modern tort

8     law derives, covered only *direct* wrongs. *See* Guido Calabresi, *Toward A Unified*

9     *Theory of Torts*, 1 J. Tort L. 1, 3-4 (2007). Trespass gave rise to liability on the *doer*—

10     regardless of whether the injury was intentional, faultless, or negligent—but not

11     on the doer's employer. *Id.* This left a gap that troubled courts increasingly from

12     the late eighteenth century on, as the reasons for the peculiar rules governing

---

[10] Case did not in all cases require "fault" on the part of the employee in order to sustain an action. Guido Calabresi, *Toward A Unified Theory of Torts*, 1 J. Tort L. 1, 3 (2007). It applied to a few other situations in which financial deterrence was sought. *Id.* But Case did not apply to intentional wrongdoings for, at the time, deterrence as to these was dealt with by the criminal law. *Id.* at 6 ("When someone injured somebody else intentionally, even if indirectly, the injurer was hanged or whipped.").

Trespass and Case faded and were forgotten. *See, e.g.*, *Scott v. Shepherd*, 96 Eng. Rep. 525 (K.B. 1773).

What to do about employer liability where the employee's acts were intentionally wrongful? Liability in some cases seemed clearly warranted, and yet there were no precedents and, so, courts made up new rules to deal with such cases. *Cf.* William O. Douglas, *Vicarious Liability and Administration of Risk I*, 38 Yale L.J. 584, 584 (1929) ("From whence came the rule and a complete exposition of its pedigree are problems as yet unanswered.").

As a result, until the mid-twentieth century, the prevailing approach to *respondeat superior* for intentional torts of the employee focused on whether the employer had enjoyed a benefit as a result of the employee's tortious conduct. Although no cogent explanation for the theory was provided, this view of the doctrine "required a close link between the acts of the agent and profit accruing to the master before vicarious liability" could attach to the latter. *Taber v. Maine*, 67 F.3d 1029, 1036 (2d Cir. 1995); *see also Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167, 170 (2d Cir. 1968) (discussing traditional approach). As the Restatement (Second) of Agency put it, an employee's tortious conduct would be deemed

1    within the scope of employment if "it is actuated, at least in part, by a purpose to

2    serve the master."  Restatement (Second) of Agency § 228 (1958).

3           In the second half of the twentieth century, however, the traditional view of

4    *respondeat superior* for intentional torts began to recede.  *See Taber*, 67 F.3d at 1036

5    ("But today, this position is in hasty retreat, if not rout.").  The legal academy and

6    the courts in turn started to treat vicarious liability in intentional tort cases

7    consistently with the longstanding approach to *respondeat superior* in negligent

8    torts.  In both instances, liability of the employer was viewed by courts as a means

9    of *internalizing* the liability costs of running a business enterprise on that business.

10   *See, e.g.*, *Taber*, 67 F.3d at 1037 (Calabresi, J.) (holding that drunken Navy sailor's

11   car accident off base was within the scope of his employment because "it is a

12   reasonably obvious risk" of the Navy's "general enterprise"); *Ira S. Bushey*, 398

13   F.2d at 170 (Friendly, J.) (concluding that the Navy was vicariously liable for

14   drunken sailor's damage to a drydrock after returning to ship from a night's

15   liberty); *Carr v. Wm. C. Crowell Co.*, 171 P.2d 5, 8 (Cal. 1946) (Traynor, J.)

16   (concluding that workplace assault fell within scope of employment because it was

17   a risk "inherent in the working environment"); *see also* Guido Calabresi, *Some*

18   *Thoughts on Risk Distribution and the Law of Torts*, 70 Yale L.J. 499, 545 (1961) ("For

37

1 a cost of an activity is not any the less real because the employee was not

2 authorized to undertake it, or because he acted willfully.").

3      At bottom, the "integrating principle" of this view was that "the employer

4 should be liable for those faults that may fairly be regarded as risks of his business,

5 whether they are committed in furthering it or not."  5 FOWLER V. HARPER,

6 FLEMING JAMES, JR. & OSCAR S. GRAY, THE LAW OF TORTS § 26.7, 40-41 (2d ed. 1986)

7 (hereinafter "HARPER & JAMES").  Or as Judge Friendly most elegantly put it, the

8 doctrine of *respondeat superior* is based on "a deeply rooted sentiment that a

9 business enterprise cannot justly disclaim responsibility for accidents which may

10 fairly be said to be characteristic of its activities."  *Ira S. Bushey*, 398 F.2d at 171.

11                                B

12      Some states, though, remained wedded to the narrower approach to

13 intentional torts which emphasized employer benefit or profit.  *See, e.g., A-G Foods,*

14 *Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69, 208 (Conn. 1990) ("We have long adhered

15 to the principle that in order to hold an employer liable for the intentional torts of

16 his employee, the employee must be acting . . . in furtherance of the employer's

17 business."); Catherine M. Sharkey, *Institutional Liability for Employees' Intentional*

18 *Torts: Vicarious Liability as a Quasi-Substitute for Punitive Damages*, 53 Val. U. L. Rev.

1, 12-14 (2018) (analyzing split among jurisdictions). And, the District of

Columbia, at least as a formal matter, has endorsed this more traditional view.

Specifically, when analyzing intentional tort *respondeat superior* cases, the D.C.

Court of Appeals has stated that it applies the analytical framework set forth in

the Restatement (Second) of Agency. *See Dist. of Columbia v. Bamidele*, 103 A.3d

516, 525 n.6 (D.C. 2014).[11]

      Importantly, however, while the District has adopted the Restatement as

part of its law, this does not conclusively establish that internalization of costs—

that is, the placement of costs that are a part of doing a business on that business—

has little or no role to play in the District's vicarious liability jurisprudence.

Indeed, despite the District's formal emphasis on discerning benefit to the

employer, several of its major precedents regarding *respondeat superior* appear, in

---

[11] The Restatement states that "[c]onduct of a servant is within the scope of employment" if:

    (a) it is of the kind he is employed to perform;

    (b) it occurs substantially within the authorized time and space limits;

    (c) it is actuated, at least in part, by a purpose to serve the master, and

    (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228.

1   fact, to be all about internalizing costs within the business enterprise.  *See* Oral Arg.

2   Tr. at 36-40 (discussing the District's case law).

3        In such cases, the D.C. Court of Appeals may seem to be conducting a mixed

4   type of analysis, in which it internalizes certain costs that cannot comfortably be

5   said to be "for the benefit" of the business enterprise, but are, nevertheless,

6   described as such.  *See Taber*, 67 F.3d at 1036 (stating that "employer-benefit can be

7   adduced in all these cases"); *Ira S. Bushey*, 398 F.2d at 170 (noting that, under the

8   traditional view, "[c]ourts have gone to considerable lengths to find such a

9   purpose").  At the same time, though, we must acknowledge that there are

10  decisions in the District's case law that apply *respondeat superior* truly in a

11  traditional light and look totally to whether the employee's actions were taken

12  with the purpose of serving the master.

13       It is in considerable part because of the oscillation between these two

14  conceptions of *respondeat superior* that we are left with insufficient guidance as to

15  which doctrinal framework might apply to this case.  And it is with this

16  background in mind that we review the law of the District.

17                                          1

1    Although the District's *respondeat superior* law is determined by the

2    jurisdiction's highest court, the D.C. Court of Appeals, some—but not all—

3    decisions of the Federal U.S. Court of Appeals for the D.C. Circuit have, over the

4    years, been accepted by the D.C. Court of Appeals as a part of its law.  To avoid

5    confusion between these courts, we will hereafter refer to the District's highest

6    court as the "Court of Appeals" and the Federal Appeals court as the "D.C.

7    Circuit."

8    The foundational decisions underlying the District's *respondeat superior*

9    doctrine involving intentional torts originated in the late 1970s to early 1980s.  In

10   the earliest of these decisions, *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976), the D.C.

11   Circuit, purporting to apply District law, addressed a case in which a young man

12   who had been employed as a deliveryman by a trucking company assaulted and

13   raped a woman while delivering a mattress.  *Id.* at 652.  The incident had been

14   spurred by an argument between the employee and the woman over whether the

15   mattress should be brought upstairs to the apartment, and whether payment was

16   to be made by check or cash.  *Id.* at 651–52.  In upholding the jury's finding of

17   vicarious liability on the part of the trucking company, the *Lyon* court held that the

18   employee's conduct fell within the scope of employment under District law since

1    "[t]he dispute arose out of the very transaction which had brought [the employee]

2    to the premises, and . . . out of the employer's instructions to get cash only before

3    delivery." *Id.* at 652.

4          Notably, the D.C. Circuit applied internalization theory in reaching this

5    conclusion, stating in no uncertain terms:

6              It is within the enterprise liability of vendors like furniture stores

7              and those who deliver for them that deliverymen, endeavoring to

8              serve their masters, are likely to be in situations of friction with

9              customers, and that when they secure entry into a customer's

10             premises by means of a badge of employment, these foreseeable

11             altercations may precipitate violence for which recovery may be had,

12             even though the particular type of violence was not in itself

13             anticipated or foreseeable.

14   *Id.* at 651.

15         And notably, also, the Court of Appeals has treated *Lyon* as accurately

16   applying District law.  *See, e.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 990-92 (D.C.

17   1986); *Boykin v. Dist. of Columbia*, 484 A.2d 560, 563-64 (D.C. 1984); *Howard Univ. v.*

18   *Best*, 484 A.2d 958, 987 (D.C. 1984).

1    Three years later, the Court of Appeals handed down arguably its most

2 significant *respondeat superior* decision in *Penn Central Transportation Company v.*

3 *Reddick*, 398 A.2d 27 (D.C. 1979). In *Penn Central*, the court held that a railroad

4 company employee's assault on a taxi driver exceeded the scope of his

5 employment because the "conduct was in no sense, either wholly or partially in

6 furtherance of [the railroad's] business." *Id.* at 32. The employee in that case had

7 returned to the District after working an overnight shift on a train ride that had

8 crossed state lines. *Id.* at 28. On arriving at the District's Union Station, the

9 employee hailed a taxi cab in the vicinity to obtain a ride home, but, in the course

10 of doing so, became embroiled in a heated argument with the taxi driver. *Id.* at 28-

11 29. In a fit of outrage, the employee kicked the driver with his steel-toed railman

12 boots, causing the driver to fall on the floor; the employee then continued kicking

13 the driver "as he lay on the floor, shattering [the driver's] right leg." *Id.* at 29.

14    In holding that these actions exceeded the scope of employment, the Court

15 of Appeals began its analysis by acknowledging the two competing views of

16 *respondeat superior* with respect to intentional torts, *see id.* at 30 (traditional view);

17 *id.* at 31 (internalization view). The court then rejected the view that it was

18 desirable to internalize every liability risk that might arise in the ordinary course

1  of running a business.[12]  *Id*.  Specifically, it noted that employee conduct that is

2  "wholly unprovoked, highly unusual, and outrageous" might justify treating it

3  outside the scope of employment, *see id.* at 31 ("The outrageous quality of an

4  employe[e]'s act may well be persuasive in considering whether his motivation

5  was purely personal.").  According to the court, the employee's motive in this

6  sense provided one way of discerning whether it would be fair to internalize the

7  liability cost at issue.  *Id.*

8        In then applying these principles, the *Penn Central* court concluded that the

9  railroad employee's assault was too attenuated from his employment duties given

10  the "violent and unprovoked" nature of the assault.  *Id.* at 32.  The court explained

11  that, given these circumstances, the assault did not "further" the employer's

12  business, nor could the assault be reasonably considered "more or less [an]

13  inevitable toll of a lawful enterprise."  *Id.* ("There is nothing in the business of

14  running a railroad that makes it likely that an assault will occur between a railroad

---

[12] Oddly, but significantly, however, in *Penn Central*, the court relied heavily, among other sources, on the leading torts treatise: HARPER & JAMES.  As that torts treatise put it, "the integrating principle of *respondeat superior* is that the employer should be liable for those faults that may be fairly regarded as risks of his business, whether they are committed in furthering it or not."  HARPER & JAMES § 26.7, 40-41.

1    brakeman and a taxicab driver over the celerity with which the latter will provide

2    a taxicab ride to the former.").

3        Two years later, the Court of Appeals decided *Johnson v. Weinberg*, 434 A.2d

4    404 (D.C. 1981).  In *Johnson*, the plaintiff "visited a laundromat near his home at

5    midday to launder some shirts."  *Id.* at 406.  While his clothes were being washed,

6    the plaintiff left the laundromat for a short while and returned later in the day to

7    retrieve them.  *Id.*  When he returned, however, the plaintiff discovered his clothes

8    were missing, and, as a result, questioned a laundromat employee intermittently

9    throughout the course of that day about his missing clothes.  *Id.*  After the last of

10   these exchanges, as the plaintiff looked to be giving up and exiting the store, the

11   laundromat employee called out and shot the plaintiff in the face.  *Id.*

12       On appeal from summary judgment entered against the plaintiff, the Court

13   of Appeals held that a reasonable jury could find the laundromat vicariously liable

14   in these circumstances.[13]  *Id.* at 409.  Although the court purported to analyze scope

15   of employment using the Restatement Second framework, its analysis of the case,

---

[13] At trial, the jury found that the employee had acted within the scope of his employment under D.C. law.  *See Weinberg v. Johnson*, 518 A.2d 985 (D.C. 1986) ("*Johnson II*").  The Court of Appeals upheld that jury determination on appeal.  *Id.* at 989.

1    in fact, centered on internalization. *Id.* at 408-09. After citing the reasoning of *Lyon*

2    and *Penn Central*, the court concluded that it was fair to internalize the cost on the

3    laundromat owner in this instance because "[t]he assault arose out of the

4    transaction which initially brought [the employee] to the premises (to launder

5    shirts) and was triggered by a dispute over the conduct of the employer's business

6    (missing shirts)." *Id.* at 409.

7        To round out the circle, in *Boykin v. District of Columbia*, 484 A.2d 560 (D.C.

8    1984), the Court of Appeals stated that *Johnson* had defined the outer limits of its

9    *respondeat superior* jurisprudence with respect to intentional torts. In *Boykin*, the

10   court held that a sexual assault committed by a public school employee upon a

11   disabled student did not occur within the scope of his employment. *Id.* at 561. The

12   employee there had been a Field Coordinator with the District's public schools,

13   and was responsible for coordinating services and planning educational programs

14   for deaf and blind children. *Id.* While still on school grounds, the employee

15   sexually assaulted a blind, deaf, and mute 12-year old student under his

16   supervision. *Id.* The student died shortly thereafter, and her mother pursued a

17   lawsuit against the District, seeking to hold it vicariously liable. *Id.*

1    Based on this factual record, the Court of Appeals held that the employee

2    had not acted within the scope of his employment because the sexual assault was

3    not "committed to serve the school's interest, but rather appear[ed] to have been

4    done solely for the accomplishment of [his] independent, malicious, mischievous

5    and selfish purposes." *Id.* at 562.

6    Needing, however, to distinguish its prior decisions, the court characterized

7    those cases as "approach[ing] the outer limits" of its *respondeat superior* case law,

8    *id.* at 563, and accordingly cabined them to their underlying facts. Moreover, as

9    the court saw it, *Lyon* and *Johnson* involved situations where the employment

10   environment created the very risk of the tortious conduct occurring, whereas in

11   *Boykin*, the employee's job merely "afforded him the *opportunity* to pursue his

12   adventure," *id.* (emphasis in original). In drawing this supposed distinction, the

13   *Boykin* court concluded that *respondeat superior* could not be invoked since the

14   employee's conduct "was utterly without relation to the service which he was

15   employed to render." *Id.* at 564.

16   Having examined the seminal *respondeat superior* decisions of the District,

17   we find it unclear whether, today, the doctrine's origins rest on

18   internationalization or the more traditional view premised on employer benefit.

All of these decisions use language and reasoning drawn from both approaches; but in *Lyon*, *Johnson*, and *Penn Central*, the driving force behind their rulings seems to be whether internalizing costs was a desirable outcome based on the particular context of the case. In *Boykin*, instead, the focus seems to be on whether the employee's behavior in some way serves the employer. 484 A.2d at 562.

2

Subsequent *respondeat superior* decisions in the District's case law have done little to clarify this doctrinal uncertainty. For example, in *Howard University v. Best*, 484 A.2d 958 (D.C. 1984), the Court of Appeals reversed a grant of summary judgment for the university after concluding that a reasonable jury could find acts of sexual harassment by university professors to be within the scope of their employment, *id.* at 987. In *Best*, the plaintiff had been the sole female faculty member in the College of Pharmacy at Howard University. *Id.* at 981 The plaintiff alleged that, throughout her tenure, male colleagues propositioned her on numerous occasions and made inappropriate sexual remarks. *See, e.g., id.* (alleging that a male colleague whispered "if you keep dressing this way you are going to be raped" during a faculty meeting).

48

1    Based on this record, the court held that a reasonable jury could find the

2    university vicariously liable since the alleged harassment "occurred during

3    faculty, administrative or other professional meetings[.]"  *Id.* at 987.  Citing the

4    internalization rationale set forth in *Penn Central*, the court explained that:

5    "Liability may be extended to situations where the employment provides a

6    peculiar opportunity and incentive for the tortious activity."  *Id.* (quoting *Penn*

7    *Central*, 398 A.2d at 31).

8    But two years later, in *District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986),

9    the Court of Appeals issued an opinion in which the pendulum swung the other

10   way.  In *Coron*, an off-duty police officer, who had been drinking on the evening

11   in question, assaulted a pedestrian on the sidewalk following a confrontation at a

12   traffic light.  *Id.* at 437.  As a result of the incident, the injured victim sued the

13   District on a vicarious liability theory, and alleged that the officer was acting

14   within the scope of his employment because the police department's regulations

15   required its officers "always to be on duty."  *Id.* at 438.  At trial, the jury agreed

16   and found the District vicariously liable.  *Id.* at 437.

17   The Court of Appeals, however, reversed this determination on appeal, and

18   concluded that the violent and vengeful nature of the assault demonstrated that

49

1   the officer's actions could not have possibly served the District's interests.  *Id.* at

2   438 ("[I]t is of particular importance that at no time was Guidotti's conduct in

3   furtherance of the District's interests.").   And rather than engage in an

4   internalization analysis, the court applied the employer benefit view of *respondeat*

5   *superior*, and concluded that the officer's conduct was outside the scope because it

6   was "solely for the accomplishment of his independent malicious or mischievous

7   purposes." *Id.* at 438-39.

8        The schisms in the doctrine were further made apparent in *Haddon v. United*

9   *States*, 68 F.3d 1420 (D.C. Cir. 1995), *abrogated on other grounds by Osborn*, 549 U.S.

10  at 225.  In *Haddon*, the D.C. Circuit, purporting to apply District law, held that a

11  White House electrician had not acted within the scope of his employment "when

12  he allegedly threatened to beat up the [White House] chef." *Id.* at 1423.  After

13  undertaking a comprehensive review of the District's *respondeat superior* law,

14  Judge Tatel, in writing for the majority, explained the integrating principle of the

15  doctrine as:

16          According to the D.C. Court of Appeals, conduct is incidental to an

17          employee's legitimate duties if it is foreseeable.  Foreseeable in this

18          context does not carry the same meaning as it does in negligence

50

1  cases; rather, it requires the court to determine whether it is fair to

2  charge employers with responsibility for the intentional torts of their

3  employees.

4  *Id.* at 1424.

5  Judge Tatel then concluded that the employee's threats of violence fell

6  outside the scope of his employment because they "did not arise directly out of his

7  instructions or job assignment as a White House electrician." *Id.* at 1425.

8  In dissent, Judge Sentelle argued that he did "not find the state of D.C. law

9  as clear as [his] colleagues [did]." *Id.* at 1427.  According to Judge Sentelle, while

10  the "D.C. courts . . . have paid lip service to the principles of the Restatement

11  (Second)," the case law appeared to go much further in internalizing faults that

12  would not normally fit under the Restatement's framework.  *Id.* at 1427-28 (citing

13  *Lyon* and *Johnson*).

14  Subsequent vicarious liability decisions from the Court of Appeals have

15  turned less on internalization, and more on employer benefit.  But some of these

16  have stretched employer benefit very far.  Thus, in *Hechinger Company v. Johnson*,

17  761 A.2d 15 (D.C. 2000), the court held that a home improvement store was

18  properly found vicariously liable when a store employee, on suspicion of theft,

1   assaulted a customer at the checkout counter.  *Id.* at 25.  Applying the traditional

2   view of *respondeat superior*, the court explained that a reasonable jury could find

3   based on these facts "that the man's actions were motivated by a desire" to serve

4   his employer.  *Id.*

5          Similarly, in *Brown v. Argenbright Security, Inc.*, 782 A.2d 752 (D.C. 2001), the

6   Court of Appeals concluded that a grocery store security guard could be found by

7   a reasonable jury to have acted within the scope of his employment when he

8   allegedly conducted an inappropriate search of a young girl's chest and genital

9   area.  *Id.* at 758-59.  As the court put it, "[w]hile it is probable that the vast majority

10  of sexual assaults arise from purely personal motives, it is nevertheless possible

11  that an employee's conduct may amount to a sexual assault and still be actuated,

12  at least in part, by a desire to serve the employer's interests."  *Id.* at 758 (citing

13  Restatement (Second) of Agency § 228).

14         Most recently, the Court of Appeals addressed the doctrine of *respondeat*

15  *superior* in a pair of cases involving alleged police misconduct.  First, in *District of*

16  *Columbia v. Bamidele*, 103 A.3d 516 (D.C. 2014), the court held that off-duty police

17  officers who had assaulted a couple at a restaurant did not act within the scope of

18  their employment because they were drawn into the skirmish for "purely personal

1    reasons." *Id.* at 525-26. Since the officers had acted out of personal spite, the court

2    explained that their conduct was not intended to further the interests of the police

3    department and, so, declined to impose vicarious liability. *Id.*

4         In *Blair v. District of Columbia*, 190 A.3d 212 (D.C. 2018), however, the court

5    came out the other way in a situation where off-duty police officers had become

6    embroiled in a fight outside a nightclub with a group of unruly civilians, *id.* at 216-

7    17. In holding that a reasonable jury could find vicarious liability on this factual

8    record, the court emphasized that, unlike *Bamidele*, the "professional and personal

9    motives" of at least one of the officers "were significantly intertwined," such that

10   the interests of the police department were being served. *Id.* at 227.

11                                            C

12        Despite the manifest uncertainty the above cases demonstrate, Trump

13   contends that the D.C. Circuit's decision in *Council on American Islamic Relations v.*

14   *Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), as well as its progeny, *see, e.g.*, *Haaland*, 973

15   F.3d 591; *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009); *Wilson v. Libby*, 535 F.3d

16   697 (D.C. Cir. 2008), dictate the outcome of this case. We disagree. *Ballenger*'s core

17   holding—that a public official's statements to the press fall within the scope of

18   employment—is indeed directly on point. But the D.C. Circuit, as a Federal Court

53

1  of Appeals, is not the arbiter of the District's law.  Its views of the District's law

2  are no more binding than would be ours, or those of any other federal or state

3  court.

4                                                    D

5          Under the District's certification statute, the Court of Appeals may accept

6  certification on an issue of District law from a Federal Court of Appeals if the

7  certified issue "may be determinative of the cause pending in such certifying court

8  and as to which it appears to the certifying court there is no controlling precedent

9  in the decisions" of the Court of Appeals.   *See* D.C. Code Ann. § 11-723(a) (West

10  2001).  While we know of no instances in which our court has certified to the Court

11  of Appeals, the D.C. Circuit has done so routinely, "when District of Columbia law

12  is genuinely uncertain and the question is of extreme public importance."

13  *Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d

14  369, 373 (D.C. Cir. 2011).  Both factors are clearly present in the case before us.

15                                                    1

16          As we have just discussed, the District's law with respect to *respondeat*

17  *superior* is "genuinely uncertain."  *Id.*  The Court of Appeals has oscillated between

18  the traditional, narrower view of *respondeat superior* and the more modern,

54

1   broader, internalization view.  As a result, it has left us with insufficient guidance

2   as to which controls.  Moreover, we think that certain decisions that appeared (on

3   the surface) to apply a traditional analysis, in fact, applied the approach of

4   internalizing costs on the employer.  *See, e.g.*, *Best*, 484 A.2d 958; *Johnson*, 434 A.2d

5   404; *Lyon*, 533 F.2d 649.  Thus, it is hard to explain the court's treatment of sexual

6   harassment by university professors in *Best*, that of the laundromat employee's

7   discharge of a gun in *Johnson*, and that of the deliveryman's rape of a customer in

8   *Lyon* under the traditional paradigm of benefit to the employer.  We think it is at

9   least as likely that, in those decisions, the Court of Appeals sought to internalize

10  costs.

11      The District's case law has, thus, seemed to vacillate between a narrow view

12  of scope of employment that requires evidence that an intentional tort benefit—or

13  be for the purpose of benefiting—the employer, and a more modern, broader view

14  of scope of employment that would hold that any intentional tort that is a part of

15  the risks of an employer's activity falls within the scope of employment.

16      Under the circumstances, we cannot say what the District would do in this

17  case.

18                                          2

1    Finally, the scope of employment issue presents "a question of extreme

2    public importance." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1303 (D.C. Cir.

3    2002). As relevant here, the question touches upon the duties of the President of

4    the United States, and the personal tort liability he and his successors may (or may

5    not) face under the Westfall Act. Getting the law of the local jurisdiction right is,

6    therefore, of crucial importance, and only the highest local court is capable of

7    making such a determination.

8    In certifying, we wish to emphasize that the issue before us is totally

9    separate from the substantive merits of the claim underlying this defamation

10   action. That is, in evaluating the scope of employment issue, we do not pass

11   judgment or express any view as to whether Trump's public statements were

12   indeed defamatory or whether the sexual assault allegations had, in fact, occurred.

13   Those questions, which might loom large over this case at some point, are simply

14   not before us in the present appeal.

15   The issue that is before us, and which we now certify to the D.C. Court of

16   Appeals, is only: Under the laws of the District, were the allegedly libelous public

17   statements made, during his term in office, by the President of the United States,

1    denying allegations of misconduct, with regards to events prior to that term of

2    office, within the scope of his employment as President of the United States?

3            The D.C. Court of Appeals is, of course, free, should it accept certification,

4    to modify the above question as it chooses.

5                             *        *        *

6            We, therefore, respectfully request the D.C. Court of Appeals to exercise its

7    discretionary authority to accept and decide this, aforementioned, question of law.

8    The Clerk of this Court is hereby ordered to transmit forthwith to the D.C. Court

9    of Appeals, under official seal of the United States Court of Appeals for the Second

10    Circuit, a copy of this order and request for certification and all relevant briefs and

11    excerpts of record pursuant to D.C. Code § 11-723.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

57