UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                           :

JANE DOE, et al.,                        :
                          Plaintiffs,    :
                          :

             -against-           :
                          :

THE TRUMP CORPORATION, et al.,   :
                      Defendants.  :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/24/2019

18 Civ. 9936 (LGS)

ORDER

LORNA G. SCHOFIELD, District Judge:

      This case concerns an alleged fraudulent scheme to promote certain third-party companies offering multi-level marketing and training programs. The Amended Complaint (the "Complaint") asserts racketeering and conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). The Complaint also asserts various state law claims. Defendants Donald J. Trump ("Trump"), The Trump Corporation, Donald Trump, Jr., Eric Trump and Ivanka Trump move to dismiss the Complaint for failure to state a claim and lack of subject matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

      As discussed below, Defendants' motion to dismiss is granted in part. The RICO claims are dismissed because the Complaint does not sufficiently plead that Defendants' conduct was the proximate cause of Plaintiffs' losses. Defendants' motion to dismiss the state law claims is denied because the Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

## I.     BACKGROUND

      The following facts are taken from the Complaint and are accepted as true only for purposes of this motion. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

## A. Defendants' Promotion of Third-Party Companies

For over a decade, Defendants operated a complex enterprise through which they promoted third-party companies offering consumer-facing business opportunities and training programs. The companies included two "multi-level marketing" programs, ACN Opportunity, LLC ("ACN") and TTN, LLC (d/b/a "The Trump Network"), and a "live-seminar program," Business Strategies Group, LLC (d/b/a "The Trump Institute") (collectively, the "Third-Party Programs").

In 2005, Defendants agreed to promote and endorse ACN. ACN is a company offering products and services through independent salespeople known as "Independent Business Owners," or "IBOs." In order to sell these products and services, IBOs must pay an initial sign-up fee and an annual renewal fee. From 2013 until 2016, these fees were $499 and $149, respectively. IBOs can earn commissions for selling ACN products and services, and can receive additional bonuses when they meet certain sales targets. IBOs can also earn money by recruiting others to sign up as IBOs. When an existing IBO recruits a new IBO, the recruit becomes part of the existing IBO's "downline," and the existing IBO becomes part of the recruit's "upline." IBOs can receive a commission on the sales generated by members of their downline.

Key to ACN's recruiting operation are small group events hosted by IBOs in their own homes or at local hotels and event spaces. These meetings are the primary mechanism through which consumers are recruited to become IBOs. ACN also stages ticketed multi-day events, often billed as "Training Events" or "International Conventions." These events function as motivational rallies and are a substantial source of revenue for ACN.

In exchange for financial inducements that were never disclosed to the public, Defendants promoted and endorsed ACN in promotional videos, in print and online media, at ACN events and in episodes of *The Celebrity Apprentice*, a television program hosted by Trump that featured Ivanka Trump and Donald Trump, Jr.  Through these channels, Defendants deliberately misled consumers regarding the nature of ACN's business.  First, Defendants misled consumers into believing that ACN offered a reasonable probability of commercial success. Defendants accomplished this by misrepresenting (a) the risk inherent in the ACN business opportunity, (b) the profitability to consumers of the ACN business opportunity and multi-level marketing programs in general and (c) the market for ACN's products and services.  Second, Trump falsely represented that the *reason* he supported ACN was because it offered a reasonable probability of commercial success.  He never disclosed that he was being paid millions of dollars for his endorsement.  Third, Defendants falsely represented that Trump's endorsement was predicated on appropriate due diligence, inside information and personal experience with ACN.

ACN's association with Trump and the Trump brand was "extremely powerful in the minds of investors."  In published testimonials, "IBOs attributed their decision to join ACN to Trump's endorsement."

ACN was not the only third-party company to be promoted and endorsed by Defendants. In the mid-2000s, a company affiliated with Defendants, Trump University, LLC, entered into a licensing agreement with Business Strategies Group, LLC to form "The Trump Institute."  The Trump Institute was a live-seminar program that purported to teach Trump's "secrets to success" in the real estate industry.  In 2009, Defendants entered into a licensing agreement with Ideal Health, a multi-level marketing company.  Pursuant to this agreement, Ideal Health was officially rebranded "The Trump Network."  As they had done with ACN, Defendants disseminated a

series of knowingly false statements regarding The Trump Institute and The Trump Network: (1) that the programs offered consumers a reasonable probability of commercial success, (2) that Trump endorsed the programs *because* they offered a reasonable probability of commercial success and (3) that Trump's endorsements were predicated on extensive due diligence, inside information and personal experience.

### B.     Plaintiffs' Investments in ACN

#### 1.   Plaintiff Doe

Plaintiff Doe, a citizen of California, was invited to attend her first ACN meeting by a friend who told her that the company "was a great opportunity for them both to make money." At the meeting, a promotional video prominently featuring Trump was played. It was Trump's endorsement of ACN that "sold [Doe] on the opportunity."

Doe paid the $499 sign-up fee to become an IBO. Shortly thereafter, senior IBOs told Doe that attending an ACN convention in Palm Springs "would be a great way to begin her career with ACN," and they implied that Trump would make an appearance. Doe decided to attend the convention for several reasons, but the most important reason was that she wanted to meet Trump. At the Palm Springs convention, Trump was prominently featured, but he did not appear in person. Doe's cumulative expenses from the convention totaled almost $1,500.

After the convention, Doe remained fully committed to ACN. Senior IBOs told her that she had to attend ACN meetings in order to be successful. Each meeting cost $20, and Doe often attended two meetings per month. Doe felt "substantial pressure" to attend these meetings, which often caused her to miss shifts at work.

Approximately six months after she signed up as an IBO, Doe attended a national ACN convention in Cleveland, Ohio. Senior IBOs told Doe that the convention "could not be missed,"

emphasizing "the community, the training and, importantly, that Trump might be there as a special guest."  Doe's total investment in attending the Cleveland convention was approximately $2,000.  Doe also attended a multi-day event in Detroit, Michigan, again investing substantial amounts of money to attend in the hopes of seeing or meeting Trump.

Trump's support for ACN -- including specific statements touting ACN -- had encouraged Doe to join and persevere with ACN.  But eventually, during her second year as an IBO, Doe came to the realization that ACN did not provide average IBOs a realistic chance of making a profit.  Doe cut her losses and ceased to participate in ACN.  She had earned only $38.

### 2.  Plaintiff Loe

Plaintiff Loe, a citizen of California, was invited to attend an informational meeting about ACN by a co-worker at the Salvation Army.  The meeting was held at a hotel in Los Angeles, and began with short speeches by ACN representatives, followed by a promotional video prominently featuring Trump.  Trump's endorsement "was the key factor" that induced Loe to join ACN.  When he joined and while he was associated with ACN, Loe heard and relied on specific statements from Trump, which are detailed in the Complaint.

Loe had very limited success with ACN.  During his time with ACN, he was able to recruit only one other IBO.  Loe sold ACN services to friends, in one instance registering services in his own name for a friend who promised to pay him back, but who never did.

Loe attended twenty-five to thirty ACN meetings, each one costing $10 to $20.  Loe felt "substantial pressure" to attend these meetings, and when he missed one "he was criticized and shunned by more senior IBOs."  Loe also attended three larger ACN events -- the national convention in Cleveland and two multi-day events in Palm Springs and Detroit.  Loe borrowed

money from his team members to attend these events, "hopeful that if he continued investing in pursuing the ACN business opportunity he would ultimately recoup his initial investment."

But Loe ultimately concluded that ACN "was not a good moneymaking opportunity." When the time came for his annual renewal, he chose not to pay the renewal fee. Despite his efforts, Loe never received any income from ACN.

### 3. Plaintiff Roe

Plaintiff Roe, a citizen of Maryland, learned about ACN from an IBO who told him that "he had a business opportunity for him." The IBO showed Roe an ACN magazine and gave Roe his ACN business card. Two weeks later, Roe called the number on the business card, and the IBO sent Roe "an informational video that boasted of the lifestyle ACN would provide." The IBO convinced Roe to join an online conference with IBOs and potential recruits. After the online conference, the IBO pressed Roe to sign up, but Roe said that he would have to think about it. The IBO then invited Roe to attend an ACN convention.

Roe decided to do additional research on ACN. In his research, he came across an online video of Trump and Ivanka Trump promoting ACN. Trump's statements were the "turning point . . . . Roe believed that by promoting the company, the Trumps were telling others that they too could make money and become successful business owners like him by investing in ACN."

Roe attended the convention and was excited about the opportunity offered by ACN. The IBO continued to call Roe to recruit him, but the $499 sign-up fee was financially out of reach. Roe was finally able to afford the fee after winning $300 at a casino and $200 from a lottery ticket. The IBO who recruited Roe became his mentor, and during his first month with ACN the IBO "repeatedly called him and would always give him an ACN motivational speech." When he

was recruited and during his time with ACN, Roe heard and relied on specific statements by Trump, which are detailed in the Complaint.

In March 2017, Roe began to suspect that ACN was a scam. Roe realized that he was not making any money, and that Trump's statements about ACN were false. Roe did not renew his ACN registration and his account was terminated. He did not recover any of the money that he invested in ACN.

### 4. Plaintiff Moe

Plaintiff Moe, a citizen of Pennsylvania, signed up as an IBO in April 2013. Moe's niece introduced Moe to ACN and invited her to an ACN award ceremony. Soon after arriving at the ceremony, it became clear to Moe that the main purpose of the event was to recruit IBOs. The organizers of the event played a five-minute promotional video that prominently featured Trump. After watching this video, "Moe knew that she was going to sign up for ACN."

As an IBO, Moe attended ACN meetings in order "to widen her network and continue to develop her skills." Meetings occurred almost every weekend and cost between $5 and $10 to attend. At the meetings, organizers would remind IBOs of Trump's involvement with and endorsement of ACN. Moe also attended four extended weekend seminars that cost $49 to $69. Moe believed the senior IBOs who told her that these meetings were "important and necessary for her success."

During her second year as an IBO, Moe paid the registration fee for the national ACN convention in Los Angeles, believing that "attending the convention was necessary for her to succeed." After paying the fee, however, it became clear that the costs of attending the convention would be too high, and she decided not to attend. In December 2014, "Moe realized that she was not going to make any money in ACN," and she declined to renew her membership.

## II.    STANDARD

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *John Brady v. Int'l Bhd. of Teamsters, Local 817*, 741 F.3d 387, 389 (2d Cir. 2014) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "[T]he court may resolve . . . disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *accord Weinberger v. Town of Fallsburg*, No. 18 Civ. 988, 2019 WL 481733, at *3 (S.D.N.Y. Feb. 6, 2019).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a

right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Montero v. City of Yonkers*, 890 F.3d 386, 391 (2d Cir. 2018), but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).

## III. DISCUSSION

### A. RICO Claims

To state a civil RICO claim under 18 U.S.C. § 1964(c), a complaint must plead (1) "that the individual defendants committed a substantive RICO violation" and (2) "that the violation proximately caused an injury to [the plaintiffs'] business or property."  *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 196 (2d Cir. 2019); *see also* 18 U.S.C. § 1964(c) (providing a private right of action for persons injured "by reason of" a substantive RICO violation).

To plead a substantive RICO violation, a complaint must allege that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001)); *accord Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018); 18 U.S.C. § 1962(c). "Racketeering activity," for purposes of RICO, includes "any 'act' indictable under various specified federal statutes, including the mail and wire fraud statutes."  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting 18 U.S.C. § 1961(1)).

To plead proximate cause, a complaint must allege a "direct relation between the injury asserted and the injurious conduct alleged." *See Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *accord Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 140 (2d Cir. 2018). It is not enough to allege that "*but for* the defendant's wrongful acts, the plaintiffs would not have entered into the transaction that resulted in their losses." *See Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999); *accord 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 18-1102, 2019 WL 1914278, at *3 (2d Cir. Apr. 30, 2019) (summary order). Rather, a complaint must allege a causal connection between the substantive RICO violation and the plaintiff's injury that is not "too remote, purely contingent, or indirect." *See Empire Merchants*, 902 F.3d at 141 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)) (internal quotation marks omitted).

As discussed below, the Complaint does not sufficiently plead that Defendants' conduct was the proximate cause of Plaintiffs' losses. Accordingly, the substantive RICO and RICO conspiracy claims, Counts I and II, are dismissed.[1]

### 1. Proximate Cause Requirement

The requirement of proximate cause for civil RICO cases has its genesis in *Holmes v. Securities Investor Protection Corp.* The plaintiff, a nonprofit corporation that insured the funds of brokerage customers, paid nearly $13 million to cover losses attendant to the failure of two broker-dealers. *See Holmes*, 503 U.S. at 261–63. The plaintiff brought civil RICO claims against several dozen defendants whom the plaintiff alleged had caused the brokerages to fail through a conspiracy to manipulate stock prices. *See id.* at 262–63.

---

[1] Because the Complaint does not plead proximate cause, resulting in the dismissal of both RICO claims, this Opinion does not address whether the Complaint pleads a substantive RICO violation.

The Supreme Court held that the plaintiff had not established its right to sue under civil RICO because it had not demonstrated that the stock manipulators' conduct was the proximate cause of the losses.[2]  *See id.* at 268.  Although the plain text of § 1964(c) could be construed to require only "but for" causation, *see* 18 U.S.C. § 1964(c) (providing a private cause of action for persons injured "by reason of" a substantive RICO violation), the court declined to give the RICO statute "such an expansive reading."  *See id.* at 259, 266.  Looking to indicia of legislative intent, the court determined that RICO's civil action provision -- like the analogous Clayton Act section upon which it was based -- incorporated the common law requirement of proximate causation.  *See id.* at 267–68.

Although the court in *Holmes* looked to the common law for the requirement of proximate cause for civil RICO claims, the court's causation inquiry was not rooted in the *foreseeability* of the injury.  *Holmes*, 503 U.S. at 269; *see also Hemi Group*, 559 U.S. at 12 (stating that the court in "*Holmes* never even mention[ed] the concept of foreseeability"); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (in common law tort case, premising proximate cause on foreseeability).  "[I]n the RICO context, the focus is on the directness of the relationship between the conduct and the harm," and whether the connection is attenuated by substantial intervening factors or third party conduct.  *See Hemi Group*, 559 U.S. at 12;  *see also Moore*, 189 F.3d at 179 (Calabresi, J., concurring) ("[O]ur cases have held RICO plaintiffs to a more stringent showing of proximate cause than would be required at common law.").  Insofar as civil RICO cases are concerned, a court's proximate cause inquiry does "go

---

[2] Although *Holmes* addressed actions under § 1964(c), its proximate cause holding applies to actions under § 1964(d) as well.  *See European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 149, 151 (2d Cir. 2014) (per curiam); *accord Empire Merchants, LLC v. Reliable Churchill LLLP*, No. 16 Civ. 5226, 2017 WL 5559030, at *5 (E.D.N.Y. Mar. 16, 2017).

beyond the first step." *Holmes*, 503 U.S. at 271 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).

The requirement of a direct causal relation, the *Holmes* court explained, served vital considerations of judicial administrability and convenience. *See id.* at 268–69. First, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id.* at 269. Second, recognizing the claims of the indirectly injured would lead to problems of apportionment, as courts would have to adopt complicated rules to prevent multiple recoveries. *See id.* Third, "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269–70.

Subsequent cases have confirmed that, even at the pleading stage, civil RICO's direct relation requirement is rigorous and requires dismissal where substantial intervening factors attenuate the causal connection between the defendant's conduct and the plaintiff's injury. In *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), the plaintiff, a steel supply company, alleged that its principal competitor had evaded taxes, thus undercutting the plaintiff's prices and causing it to lose sales. *See Anza*, 547 U.S. at 454. In finding that proximate cause had not been pleaded adequately, the court identified a "discontinuity between the RICO violation and the asserted injury," given that the plaintiff's "lost sales could have resulted from factors other than [the defendants'] alleged acts of fraud." *Id.* at 459. The court observed that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of" the defendant's conduct. *Id.*

"The element of proximate causation," the Court explained, "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Id.* at 460.

Likewise, in *Hemi Group*, a plurality of the Supreme Court held that New York City had not stated a RICO claim against a merchant that had failed to furnish statutorily-required disclosures about its customers to the New York state government, making it difficult for the city to pursue tax evaders. *See Hemi Group*, 559 U.S. at 5–7. Citing the various intervening factors attenuating the link between the merchant's failure to disclose and the city's lost tax revenue, the court concluded that proximate cause had not been sufficiently pleaded because "the conduct directly causing the [city's] harm was distinct from the conduct giving rise to the fraud." *See id.* at 2, 11.

The Second Circuit's decision in *Empire Merchants* is instructive regarding a civil RICO plaintiff's pleading burden. In *Empire Merchants*, a distributor with exclusive rights to distribute certain brands of liquor in New York sued competing distributors for illegally smuggling liquor into the state from Maryland. *See Empire Merchants*, 902 F.3d at 136. The plaintiff contended that because the smuggled liquor was not subject to New York excise taxes, it could be sold at a lower price to retailers, thus costing the plaintiff sales. *See id.* at 137. The Second Circuit held that the complaint did not sufficiently plead proximate cause because the retailers' choice not to purchase liquor from the plaintiff did not necessarily follow from the defendants' smuggling activities. *Id.* at 146–47. The plaintiff "might have lost sales due to bootlegging from states with even lower alcohol excise taxes . . . [o]r various retailers might have purchased wine, beer, or a brand of liquor not subject to Empire's exclusive distribution contracts to offer something new to consumers or to respond to changes in consumer tastes." *Id.* at 143. The court in *Empire Merchants* acknowledged that the plaintiff had "allege[d] a straightforward causal connection,"

and that "in the pleadings phase, we ordinarily accept well-pled allegations as true, notwithstanding possible alternative causal explanations." *Id.* at 143. "But in the RICO context, the element of proximate causation is meant to prevent . . . intricate, uncertain inquiries from overrunning RICO litigation. That is why the Supreme Court engaged in this exact same kind of counterfactual reasoning at the pleadings stage in *Anza* . . . ." *Id.* (alterations and citation omitted).

These cases do not mean that, at the pleading stage, a defendant may break the chain of causation merely by citing a trivial factor ancillary to the defendant's conduct or the plaintiff's injury. Whether conduct falls within the causal "'first step' depends in part 'on an assessment of what is administratively possible and convenient.'" *Empire Merchants*, 902 F.3d at 141 (quoting *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (alterations omitted)); *see also Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys.*, 271 F.3d 374, 381 (2d Cir. 2001) (cautioning against "applying a mechanical test detached from the policy considerations" identified in *Holmes*). For example, one factor is "whether it would [be] difficult to determine how much the [defendant's] tortious conduct injured the [plaintiff], as compared to other factors." *Empire Merchants*, 902 F.3d at 141. If a purported intervening factor does not make any less certain the quantum of loss attributable to the defendant or create problems of apportionment, it cannot be said to attenuate the causal link. Thus, an appellate court's affirmance of a fraudulently procured foreign judgment does not break the chain of causation where the appellate court did not substantively alter the lower court's judgment. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 136 (2d Cir. 2016). Likewise, a legatee's expenses incurred to halt a defendant's fraudulent activity with respect to the estate are sufficiently connected to the fraudulent activity to satisfy the direct relation requirement of proximate cause -- even if such

expenses are, strictly speaking, a step removed from the defendant's conduct. *See D'Addario v. D'Addario*, 901 F.3d 80, 97 (2d Cir. 2018) ("These expenses were incurred in an attempt to protect both the Estate and [plaintiff's] share of that Estate, and, for purposes of our causation inquiry here, the two are reasonably treated as indivisible.").

The Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), exemplifies the policy-driven approach to proximate cause in civil RICO cases. In *Bridge*, participants in county tax lien auctions alleged that the defendants had won a disproportionate share of auctions by fraudulently manipulating the county's process through which a winner was determined in the event of a tie. *See Bridge*, 553 U.S. at 642–44. The defendants argued that proximate cause had not been established because it was the *county* that had relied on their alleged misrepresentations, not the *plaintiffs*. *See id.* at 653–55. The court rejected this argument: "[H]ere, unlike in *Holmes* and *Anza,* there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." *Id.* at 658. Thus, the fact that the defendants' misrepresentations were directed at the county did not negate proximate cause. Crucially, the extent to which the defendants were responsible for the plaintiffs' injury was no less certain by virtue of the misrepresentations being directed at the county. As the court in *Hemi Group* would explain, "the plaintiff's theory of causation in *Bridge* was 'straightforward': Because of the zero-sum nature of the auction, and because [of the county's procedure for awarding bids], each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over." *Hemi Group*, 559 U.S. at 14.

In sum, to state a civil RICO claim, the connection between the defendant's conduct and the plaintiff's injury must be "direct" and "straightforward," *Holmes*, 503 U.S. at 268; *Hemi Group*, 559 U.S. at 14, and must not entail "intricate, uncertain inquiries" into the extent of the defendant's responsibility for the loss, *Anza*, 547 U.S. at 460; *accord Empire Merchants*, 902 F.3d at 142.  Put another way, "the conduct giving rise to the fraud" must be "the conduct directly causing the harm," *Hemi Group*, 559 U.S. at 2, 11, unattenuated by substantial intervening factors or third parties, *see id.* at 15; *accord Empire Merchants*, 902 F.3d at 142.  A link that is "too remote, purely contingent, or indirect" is insufficient, *Hemi Group*, 559 U.S. at 9–10; *accord Empire Merchants*, 902 F.3d at 141, and even at the pleading stage, a court should rarely "go beyond the first step" in assessing causation, *Holmes*, 503 U.S. at 272; *accord Empire Merchants*, 902 F.3d at 141.  Whether conduct falls within the "first step" depends on considerations of judicial administrability, which may include (1) the difficulty in ascertaining the quantum of damages attributable to the alleged RICO violation, as opposed to independent factors, (2) problems of apportionment and multiple recoveries and (3) whether more directly injured victims would be better suited as plaintiffs.  *Holmes*, 503 U.S. at 269; *accord Empire Merchants*, 902 F.3d at 141.

## 2. Application

The Complaint fails to plead proximate causation because it does not allege a direct relation between Defendants' conduct and Plaintiffs' losses.  At most, the Complaint pleads a "but for" theory of causation: "But for Defendants' fraudulent promotion and endorsement of ACN," Plaintiffs would not have incurred the costs and expenses associated with becoming IBOs -- "sign up" and "renewal fees," expenses incurred in "attending meetings and . . . conventions," the costs of "business tools" and recruiting expenses and foregone income from other sources.

As discussed above, but for causation alone does not satisfy RICO's causation requirement.  *See*

*Moore*, 189 F.3d at 172 (requiring both "but for causation" and so-called "loss causation").

In determining whether a defendant's conduct proximately caused a plaintiff's loss, the

threshold question is what constitutes the "loss."  The above quoted language from the

Complaint makes clear that Plaintiffs' claimed losses are the monies they were induced to pay as

IBOs.  The loss amount is necessarily each Plaintiff's *net* loss, rather than gross expenditures.

*See generally* RESTATEMENT (SECOND) OF TORTS § 903 cmt. a (1979) ("When there has been

harm only to the pecuniary interests of a person, compensatory damages are designed to place

him in a position substantially equivalent in a pecuniary way to that which he would have

occupied had no tort been committed.")  Accordingly, the Complaint seeks to certify a

"Nationwide Damages Class" of individuals who suffered net monetary losses from their

association with ACN -- "all persons and entities who invested in, subscribed to or made

payments to ACN . . . or its affiliates, but did not recoup an amount equal to or [greater] than

those payments from ACN."[3]  The loss for purposes of analyzing causation is therefore

determined by reference to both amounts Plaintiffs paid to ACN, and the revenues, if any, that

Plaintiffs received through it.

The Complaint fails to plead proximate causation because it does not allege a direct

relation between Defendants' conduct and Plaintiffs' losses.  Numerous intervening factors may

account for Plaintiffs' inability to recover their investments in ACN.  Plaintiffs' lack of success

---

[3] The Complaint seeks certification of the Nationwide Damages Class and state-specific damages
sub-classes under Federal Rule of Civil Procedure 23(b)(3).  The Complaint also seeks to certify
a Nationwide Equitable Class and state-specific equitable sub-classes under Rule 23(b)(1)(A)
and/or 23(b)(2), seeking injunctive and declaratory relief, and other equitable relief on behalf of
"all persons and entities who invested in, subscribed to, or made payments to [ACN] or its
affiliates."  The RICO claims are brought on behalf of both putative nationwide classes.

could be attributable to the inherent challenges of multi-level marketing, Plaintiffs' capabilities as salespeople and the extent of Plaintiffs' existing networks to whom Plaintiffs could sell ACN products and recruit new IBOs. The losses may also be attributable to the market for ACN products in the Plaintiffs' localities and ACN's business practices -- legitimate or otherwise -- separate from Defendants' role. These factors, contributing in whole or part to Plaintiffs' losses, make the question of Defendants' responsibility the sort of "intricate, uncertain inquir[y]" that the proximate cause requirement is intended to avert. *See Anza*, 547 U.S. at 460.

The absence of a direct relation in this case can be illustrated by the following hypothetical. Suppose that two class members each paid $1,000 to ACN in registration fees and expenses, induced to invest by Defendants' endorsements. The class members are identical in all respects except for one -- Class Member A earned $700 in revenue from participating in ACN, but Class Member B earned only $200. As to each class member, what is the loss attributable to the Defendants' conduct? As the loss is the extent to which Plaintiffs did not recover their investments in ACN, conceivably Defendants could be charged with having caused a $300 loss to Class Member A and an $800 loss to Class Member B. Yet, if Plaintiffs' inability to recover their investments is attributable to their own sales capabilities or the extent of their existing networks, this would unmoor the loss from the Defendants' conduct. The $500 difference in Defendants' liability to Class Member A and Class Member B could not be imputed to anything that *Defendants* did, contravening the principle "that the compensable injury flowing from a RICO violation necessarily is the harm caused by the predicate acts." *Hemi Group*, 559 U.S. at 13 (alterations and internal quotation marks omitted); *see also id.* at 11 (proximate cause lacking when "the conduct giving rise to the fraud" is distinct from "the conduct directly causing the harm").

It is also unclear whether Defendants were the direct cause of Plaintiffs' payments to ACN. Plaintiff Doe was introduced to ACN by a friend who told her that "the company was a great opportunity . . . to make money." After she joined ACN, Doe was pressured by other IBOs into attending ACN meetings, for which Doe was charged a fee. Plaintiff Loe attended his first ACN meeting at the behest of a co-worker. As an IBO, he too paid to attend meetings, and when he missed meetings he was "criticized and shunned." An IBO sent Plaintiff Roe a recruitment video "that boasted of the lifestyle ACN would provide." The IBO pressured Roe to invest on multiple occasions, and once Roe did, the IBO would repeatedly call him to give "ACN motivational speech[es]." Plaintiff Moe was introduced to ACN by a family member. Like the others, Moe paid money to attend meetings and seminars that other IBOs told her "were important and necessary for her success."

The conduct of these third parties bears on the question of proximate cause. In *Kerrigan v. Visalus, Inc.*, No. 14 Civ. 12693, 2016 WL 892804, at *8 (E.D. Mich. Mar. 9, 2016), civil RICO claims were brought against individuals who, in exchange for undisclosed payments and other inducements, promoted a multi-level marketing company. *See id.* at *11. The district court stated in dicta that proximate cause was lacking because the individuals' promotional activities merely "helped put the [p]laintiffs in a position to be defrauded by other, unrelated representations." *See id.* at *8.

The multitude of intervening factors and third-party conduct attenuating the link between Defendants' conduct and Plaintiffs' losses compels the conclusion that the Complaint does not sufficiently plead proximate cause. This conclusion is buttressed by the profound difficulties that would ensue in "ascertain[ing] the amount of [Plaintiffs'] damages attributable to [Defendants' RICO] violation, as distinct from other, independent factors." *See Holmes*, 503

U.S. at 269.  *See generally Empire Merchants*, 902 F.3d at 141 (proximate cause inquiry depends in part on the difficulty in determining how much the plaintiff's injury was caused by the defendants' conduct, as opposed to other factors).  To assess with accuracy the losses attributable to Defendants, the factfinder would first need to determine the extent to which Plaintiffs' payments to ACN and other expenses were induced by Defendants, rather than ACN and its IBOs.  Then, after subtracting monies recouped, the factfinder would need to reduce the loss further by the extent to which Plaintiffs' inability to recover their costs was attributable to Plaintiffs' sales abilities and networks, ACN's business practices, the demand for ACN products in Plaintiffs' localities, and the inherent difficulties of succeeding in multi-level marketing ventures, among other factors.  The quixotic nature of this undertaking underscores the purpose of the proximate cause requirement -- "to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation."  *Anza*, 547 U.S. at 460.

Citing several cases, Plaintiffs argue that proximate cause is demonstrated where a defendant "misrepresents investment risk, or the value of a particular investment," or "fraudulently induce[s] plaintiffs to put their money into something that was other (and less valuable) than what the defendants had represented."  The cases cited by Plaintiffs are not on point.

Plaintiffs cite three cases involving only state statutory and common law claims, *Blue Cross & Blue Shield of Minn. v. Wells Fargo Bank, N.A.*, No. 11 Civ. 2529, 2012 WL 1343147 (D. Minn. Apr. 18, 2012), *Dolan v. PHL Variable Ins. Co.*, No. 15 Civ. 1987, 2018 WL 1696650 (M.D. Pa. Apr. 6, 2018) and *Peterson v. Goldberg*, No. 02 Civ. 7375, 2005 WL 589753, at *6 (N.D. Ill. Feb. 25, 2005).  They are irrelevant because they do not involve RICO claims and do not apply the "direct relation" standard set forth under *Holmes* and its progeny.  *See generally*

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 278 (2d Cir. 2006) ("A plaintiff must make a different showing of proximate cause -- one that is often more difficult to make -- when bringing suit under the RICO statute than when bringing a common-law cause of action."); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 348–49 (2d Cir. 2003) (distinguishing RICO's proximate cause standard from state law standard applicable to claims brought under New Jersey Consumer Fraud Act and other state causes of action); *accord Hemmerdinger Corp. v. Ruocco*, No. 12 Civ. 2650, 2016 WL 1588500, at *6 (E.D.N.Y. Apr. 19, 2016) (civil RICO standard for proximate cause is "more stringent" than common law causation); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 330–31 (E.D.N.Y. 2012) ("The 'direct relationship' standard under RICO is stricter than the 'foreseeability' analysis for common-law causation.").[4]

The RICO cases cited by Plaintiffs also do not support their contention that the causal link in this case is sufficiently direct. In *Bank of China v. NBM L.L.C.*, No. 01 Civ. 0815, 2001 WL 1360299 (S.D.N.Y. Nov. 5, 2001), the defendants submitted false documents in order to induce a bank to issue loans that the defendants never repaid. *See id.* at *1. The court held that the defendants' submission of the false documents was the proximate cause of the bank's loss. *See id.* Because the defendants both submitted the fraudulent documents and failed to repay the loans, there were no intervening causes, nor anything "intricate" or "uncertain" about assessing Defendants' responsibility for the loss. *Anza*, 547 U.S. at 460.

In *Lukaszuk v. Sudeen*, No. 02 Civ. 5143, 2007 WL 4699018 (E.D.N.Y. Nov. 27, 2007), the defendants operated a Ponzi scheme, inducing the plaintiffs to invest with promises of high returns, only to fail to make a single payment. *See id.* at *1. It was the Ponzi scheme itself that

---

[4] A fourth case cited by Plaintiffs, *In re Evans*, 81 F.3d 167, 1996 WL 138553 (9th Cir. 1996), is an unpublished table decision that seems to apply California law and in any event does not involve a RICO claim. *See id.* at *1.

harmed the plaintiffs; there was no distinction between "the conduct directly causing the harm" and "the conduct giving rise to the fraud."  *See Hemi Group*, 559 U.S. at 11.

Similarly, proximate cause was adequately pleaded in *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575 (D. Md. 2014), a case involving a dealership's concealment of the fact that the vehicle it sold to the plaintiff had previously been a short-term rental car.  *See id.* at 583–84.  The causal connection was direct -- "[t]he fraudulent conduct alleged . . . is the misrepresentation and concealment of the rental history of the vehicle[] sold to Plaintiff. . . . Plaintiff's alleged injury was that she was overcharged for the vehicle because the vehicle was sold falsely as a former consumer car."  *Id.* at 603.

Likewise, in *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274 (S.D.N.Y. 2013), the causal connection between the defendants' conduct and the plaintiffs' loss was direct.  The plaintiffs purchased forged paintings based on the defendants' false representation that the paintings were authentic, and there were no intervening factors making uncertain the extent of the loss attributable to the defendants.  *See id.* at 285–86.  Given the exceedingly straightforward theories of causation in *Bank of China*, *Lukaszuk*, *Chambers* and *De Sole*, the defendants' conduct was found to fall within the causal "first step."  *See Empire Merchants*, 902 F.3d at 141 (scope of first step depends in part "on an assessment of what is administratively possible and convenient").   In contrast, the causal theory in this case is riddled with intervening factors that make Defendants' responsibility for the loss uncertain and insufficiently direct.  *See Empire Merchants*, 902 F.3d at 136 (proximate cause lacking where asserted losses may have been caused by independent actions of third parties).

The other case Plaintiffs cite is no more compelling.  In *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, No. 09 Civ. 511, 2012 WL 713289 (N.D. Cal. Mar. 5, 2012), the

defendants allegedly induced investors to purchase real estate at inflated prices based on appraisals inflated by the defendants' wrongful conduct. *See id.* at *1, 15. The court found that proximate cause had been adequately pleaded, notwithstanding prior risk disclosures to the plaintiffs and questions about whether the prices were actually inflated. *See id.* at *15. The case is distinguishable because there were no substantial intervening factors between the defendants' conduct and the plaintiffs' loss, except the alleged risk disclosure to the plaintiffs.[5] Although this issue was discussed in the context of proximate cause, it bore more directly on whether the plaintiffs had been defrauded at all, not whether or to what extent the defendants had caused any loss. In contrast, and as explained above, the loss in this case was potentially caused by many circumstances besides Defendants' conduct.

Finally, Plaintiffs argue that "[t]he requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations," citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015). This argument is unpersuasive. *Loreley* was a case involving fraud claims under New York state law, and the plaintiffs' burden was merely to give the defendants "some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *See id.* at 187 (quotation marks omitted). But "counterfactual reasoning at the pleadings stage" is appropriate in the RICO context -- "the

---

[5] Although the defendants asserted that the increase in price may have been caused by "a hot real estate market and the additional value from a long-term lease," *see Eclectic Properties*, 2012 WL 713289, at *15, these two factors would be unlikely to cause difficulties in assessing the defendants' responsibility for the loss. Expert testimony might establish the extent to which a change in a particular housing market or the availability of a long-term lease would affect the value of a property. In contrast, the quantity and quality of the factors that may have contributed to Plaintiffs' losses in this case makes any inquiry into the extent of Defendants' responsibility intricate and uncertain. *See Anza*, 547 U.S. at 460.

element of proximate causation is meant to prevent . . . intricate, uncertain inquiries from overrunning RICO litigation." *Empire Merchants*, 902 F.3d at 143–44. Because assessing Defendants' responsibility for Plaintiffs' losses would necessitate just such an inquiry, proximate cause has not been sufficiently pleaded. Counts I and II of the Complaint are dismissed.

### B.  State Claims

The Court has subject matter jurisdiction over the state law claims pursuant to CAFA. CAFA "confer[s] federal jurisdiction over certain class actions where: (1) the proposed class contains at least 100 members (the numerosity requirement); (2) minimal diversity exists between the parties, (i.e., where [at least one plaintiff] is a citizen of a State different from any defendant); and (3) the aggregate amount in controversy exceeds $5,000,000." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (quotation marks omitted) (quoting 28 U.S.C. § 1332(d)(2)–(6)); *accord Shulman v. Becker & Poliakoff, LLP*, No. 17 Civ. 9330, 2019 WL 1567661, at *1 (S.D.N.Y. Apr. 11, 2019). The party asserting federal jurisdiction must present facts sufficient to establish a "reasonable probability" that each of these elements is satisfied. *See Cutrone v. Mortg. Elec. Registration Sys.*, 749 F.3d 137, 148 (2d Cir. 2014); *Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 579 (S.D.N.Y. 2016). However, there is "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006); *accord Ameer v. Fleet Mech. Sys.*, No. 18 Civ. 7655, 2019 WL 1949858, at *2 (S.D.N.Y. Apr. 17, 2019). A party opposing jurisdiction based on the amount in controversy can rebut this presumption by demonstrating "to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017) (citing *Colavito*, 438 F.3d

at 221). "[T]he legal impossibility of recovery must be so certain as virtually to negat[e] plaintiff's good faith in bringing the claim." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003); *accord Bracken v. MH Pillars Inc.*, 290 F. Supp. 3d 258, 263 (S.D.N.Y. 2017).

Plaintiffs have demonstrated a reasonable probability that "the proposed class contains at least 100 members." *Purdue Pharma*, 704 F.3d at 213. Although the precise size of the class is not yet known, the Complaint alleges that "[i]n each of the years from 2011 to 2016, ACN reported that it had 200,000 IBOs." It is reasonably probable that at least 100 IBOs did not recoup their investments in ACN and can assert state law claims against Defendants. Regarding the second element, "minimal diversity exists between the parties," because Plaintiff Doe is a citizen of California and Defendant Trump is a citizen of New York. *Id.*

The amount in controversy element is satisfied because the Complaint asserts that the amount in controversy exceeds $5,000,000, and Defendants have not demonstrated "to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums." *Pyskaty*, 856 F.3d at 223. The Complaint alleges that "there are at least tens of thousands of putative class members, each of whom, like Plaintiffs, suffered at least $500 in damages." Moreover, Plaintiff Doe asserts actual damages of approximately $5,500. If only 910 class members asserted similar damages (out of approximately 200,000 IBOs), the jurisdictional amount would be met.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED with respect to the RICO claims (Counts I and II), and they are dismissed. Defendants' motion is denied with

respect to the state law claims (Counts III through VIII), and they survive.  Plaintiffs' motion to strike (Dkt. No. 87) and Defendants' motion for oral argument (Dkt. No. 89) are denied as moot.

The Clerk of Court is respectfully directed to close the motion at Docket Nos. 83 and 87.

Dated: July 24, 2019
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**