**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff,* | |
| v. | |
| DONALD J. TRUMP, | |
| *Defendant.* | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
     -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................2

SUMMARY JUDGMENT STANDARD ...............................................................................2

ARGUMENT .........................................................................................................................3

     I.     ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFEMATION CLAIM .........3

          A.  The Evolution of Absolute Immunity Pre-*Nixon* ........................................5

          B.  *Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity......9

          C.  The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President ............................11

     II.    PLAINTIFF'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ......19

          A.  Plaintiff Has Failed to Establish Cognizable Damages ............................20

             i.      The Statements Do Not Constitute Defamation *Per Se*. ...............20

             ii.     Plaintiff Cannot Establish Her Entitlement to Special Damages...24

          B.  Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of Statements ..................................................28

          C.  The Vast Majority of the Statements are Nonactionable Opinions ...........31

     III.    THE EXTREME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED .................................................................................................34

CONCLUSION.....................................................................................................................35

## TABLE OF AUTHORITIES

*Cases*

*Aronson v. Wiersma,*

    65 N.Y.2d at 594, 493 N.Y.S.2d at 1008.............................................................23

*Aslanidis v. United States Lines, Inc.,*

    7 F.3d 1067, 1072 (2d Cir. 1993). ................................................................3

*Barr v. Matteo,*

    360 U.S. 564, 79 S. Ct. 1335 (1959)........................................................7, 8, 9

*Barret v. Harrington,*

    130 F.3d 246, 254-55 (6th Cir. 1997).........................................................12

*Bradley v. Fisher,*

    80 U.S. 335, 20 L. Ed. 646 (1871)..........................................................5, 6

*Brian v. Richardson,*

    87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 351 (1995).....................................33

*Butz v. Economou,*

    438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)............................................5

*Cain v. Atelier Esthetique Inst. of Esthetics Inc.,*

    733 Fed.Appx. 8, 11 (2d Cir. 2018)..........................................................19

*Camp v. Recreation Bd,*

    104 F. Supp. 10 (D.D.C. 1952)..................................................................7

*Carroll v. Trump,*

    498 F.Supp.3d 422, 456 (S.D.N.Y. 2020) .................................................13

*CBS v. FCC,*

    454 F.2d 1018, 1020 (D.C. Cir. 1971).......................................................17

*Celle v. Filipino Reporter Enters,*

    209 F.3d 163, 179 (2d Cir. 2010) ...................................................................25, 27

*Celotex v. Catrett,*

    477 U.S. 317, 322 (1986)..............................................................................................2

*Chastain v. Sundquist,*

    833 F.2d 311, 315 (D.C. Cir. 1987) .........................................................................11

*Church of Scientology Int'l v. Behar,*

    238 F.3d 168, 173-74 (2d Cir. 2001) ..................................................................19, 20

*Clinton v. Jones,*

    520 U.S. 681, 694 (1997)........................................................5, 9, 10, 11, 13, 17, 32

*Coleman v Grand,*

    18-CV-5663ENVRLM, 2021 WL 768167, at *9 [EDNY Feb. 26, 2021] ...........................20

*Cooper v. O'Connor,*

    99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) .......................................7

*Coppola v. Bear Stearns & Co.,*

    499 F.3d 144, 148 (2d Cir. 2007) ..............................................................................2

*Council on American-Islamic Relations v. Ballenger,*

    444 F.3d 659, 662 (D.C. Cir. 2006)..................................................................13, 15, 17

*Cruz v. Reiner,*

    11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) ........3

*Cummings v. City of N.Y.,*

    No. 19-cv-7723 (CM)(OTW), 2020 U.S. Dist. LEXIS 31572, at *62 (S.D.N.Y. Feb. 24, 2020)

    ....................................................................................................................................34

*Dickson v. Slezak,*

    73 A.D.3d 1249, 902 N.Y.S.2d 206, 208 (3d Dep't 2010) ....................................................28

*District of Columbia v. Jones,*

    919 A.2d 604, 608-09 (D.C. 2007) ..........................................................................14, 15, 16

*Doe v. French,*

    2012 WL 129836 (2d Cir. January 18, 2012) ........................................................................32

*Drug Research Corp. v. Curtis Publ'g Co,*

    7 N.Y.2d 435, 441, 166 N.E.2d 319, 322 (1960)...................................................................26

*Dworin v. Deutsch,*

    2008 WL 508019, at *4 .............................................................................................33, 34, 35

*Elias v. Rolling Stone LLC,*

    872 F.3d 97, 104 (2d Cir. 2017) ...........................................................................................19

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst,*

    184 U.S. App. D.C. 397, 400, 566 F.2d 289, 292 (1977) ....................................................16

*Ferri v. Ackerman,*

    444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979)...........................................10

*Fowler v. New York Herald,*

    172 N.Y.S. 423 (1st Dep't 1918)...........................................................................................30

*Franklin v. Daily Holdings, Inc.,*

    21 N.Y.S.3d 6, 11-12, 135 A.D.3d 87, 93 (1st Dept. 2015) ......................................25, 26, 27

*Gentile v. Grand St. Med. Associates,*

    79 A.D.3d 1351, 1354, 911 N.Y.S.2d 743.............................................................................35

*Goetz v. Kunstler,*

    625 N.Y.S.2d 447, 459 (Sup. Ct., New York Cty. 1995) ......................................................35

*Golub v. Enquirer/Star Grp.,*

    89 N.Y.2d 1074, 1076 (1997) ................................................................................22

*Gregoire v. Biddle,*

    177 F.2d 579 (2d Cir. 1949) ...................................................................................7

*Gurtler v. Union Parts Mfg. Co., Inc.,*

    285 A.D. 643, 646 (1st Dep't 1955) .....................................................................21

*Harlow v. Fitzgerald,*

    457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) ...............................................4, 5

*Hobbs v. Imus,*

    266 A.D.2d, 36, 698 N.Y.S.2d 25 .........................................................................32

*Huggins v. Povitch,*

    1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) ....................34, 35

*Immuno AG. v. Moor-Jankowski,*

    77 N.Y.2d 235, 254, 66 N.Y.S.2d 906, 917 (1991) ..........................................33, 34

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.,*

    981 F. Supp. 124, 125, 128 (E.D.N.Y. 1997) ......................................................36

*In re Grand Jury Proceedings,*

    5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) ...............................................................18

*Jeffreys v. City of New York*,

    426 F.3d 549 (2d Cir. 2005) ...................................................................................3

*Kane v. Orange Cty. Publ'ns,*

    232 A.D.2d 526, 527, (App. Div. 2nd Dept. 1996*)* ...........................................30

*Kforce, Inc. v. Alden Personnel, Inc.,*

 288 F.Supp.2d 513, 517 (S.D.N.Y. 2003) ...........................................................22

*Klayman v. Obama,*

 125 F.Supp.3d 67, 86 (D.D.C. 2015) ....................................................................12

*Knight v. U.S. Fire Ins. Co.,*

 804 F.2d 9, 12 (2d Cir. 1986) ................................................................................3

*Lang Sang v. Ming Hai,*

 951 F. Supp. 2d 504, 525 (S.D.N.Y. 2013) ..........................................................26

*Laughlin v. Garnett,*

 138 F.2d 931 (D.C. Cir. 1943)................................................................................7

*Laughlin v. Rosenman,*

 163 F.2d 838 (D.C. Cir. 1947)................................................................................7

*Lerman v Flynt Distrib. Co., Inc.,*

 745 F2d 123, 136-137 [2d Cir 1984] ...................................................................20

*Liberman v. Gelstein,*

 80 N.Y.2d 429, 435 (1992)............................................................................21, 25

*Mahoney v. Adirondack Pub. Co.,*

 71 N.Y.2d 31, 37 (1987)......................................................................................36

*Masson v. New Yorker Magazine, Inc.,*

 501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991)...................20

*Mandelblatt v. Perelman,*

 683 F. Supp. 379, 383 (S.D.N.Y. 1988) ..............................................................28

*Matherson v. Marchello,*

 100 A.D.2d 233, 473 N.Y.S.2d 998 (2d Dept. 1984).............................................26

*McDougal v Fox News Network, LLC,*

    No. 1:19-CV-11161 (MKV), 2020 WL 5731954 [S.D.N.Y. Sept. 24, 2020]). ......................20

*Mencher v. Chesley,*

    85 N.Y.S.2d 431 (N.Y. Sup. Ct. 1948) ...................................................................30

*Mitchell v. Forsyth,*

    472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985)...................................................4

*Morsette v. "The Final Call,*

    309 A.D.2d 249, 254 (1st Dep't 2003) .................................................................36

*Moss v. Stockard,*

    580 A.2d 1011 (D.C. 1990*)* ................................................................................15

*Murphy v. Cadillac Rubber & Plastics, Inc.,*

    946 F. Supp. 1108, 1124 (W.D.N.Y. 1996)..........................................................25

*New York Times Co. v. Sullivan,*

    376 U.S. 254, 280, 84 S. Ct. 710 (1964 ..............................................................19

*Nixon v. Fitzgerald,*

    457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982)................1, 3, 4, 5, 9, 10, 11, 12, 17, 18, 19

*Papagianakis v. The Samos,*

    186 F.2d 257 (4th Cir. 1950) ................................................................................7

*Perez v Violence Intervention Program,*

    116 AD3d 601, 601, 984 N.Y.S.2d 348 [1st Dept 2014] ......................................20

*Pierson v. Ray,*

    386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967)...............................................4, 10

*Present v. Avon Products, Inc.,*

    253 A.D.2d 183, 189 (1st Dep't 1999) .................................................................36

*Preston v. Hobbs,*

    146 N.Y.S. 419 (1st Dep't 1914) ............................................................................30

*Project Veritas v. NY Times citing Prozeralik v Capital Cities Communications, Inc,*

    82 NY2d 466, 474 [1993] ......................................................................................19

*Prozeralik v. Capital Cities Commc'ns, Inc,*

    82 N.Y.2d 466, 479-80 (1993) ..............................................................................36

*Puranmalka v. Puranmalka,*

    39 N.Y.S.2d 802, 803 (N.Y. App. Div. 1989) ......................................................28

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*

    813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) ....................................................22, 25

*Rankin v. McPherson,*

    483 U.S. 378, 387 (1987) ......................................................................................17

*Rappaport v. VV Pub. Corp.,*

    618 N.Y.S.2d 746, 751 (Sup. Ct., New York Cty. 1994) ......................................34

*Reynolds v. Pegler,*

    223 F.2d 429, 432 (2d Cir. 1955) .........................................................................30

*Rickerson v. Porsch,*

    2019 NY Slip Op 50369(U), 63 Misc. 3d 1204(A), 114 N.Y.S.3d 184 (Sup. Ct.). ..............22

*Robertson v. Doe,*

    2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ...........................................36

*Robertson v. Dowbenko,*

    443 F. App'x 659 (2d Cir. 2011) .....................................................................36, 37

*Rufeh v. Schwartz,*

    50 A.D.3d 1002, 1004-05 (2d Dep't 2008) ..........................................................21

*Scott v. Harris,*

    550 U.S. 372, 380 (2007)......................................................................................3

*Sharratt v. Hickey,*

    20 A.D.3d 734, 736 (3d Dep't 2005)....................................................................27

*Shenkman v. O'Malley,*

    157 N.Y.S.2d 290, 297-98 (1st Dep't 1956)........................................................30

*Siegel v. Metropolitan Life Ins. Co.,*

    32 N.Y.S.2d 658 (1st Dep't 1942)........................................................................30

*Sleepy's LLC v Select Comfort Wholesale Corp.,*

    779 F3d 191, 199 (2d Cir 2015) ..............................................................28, 29, 30

*Snyder v. Phelps,*

    562 U.S. 443, 453 (2011).....................................................................................17

*Spalding v. Vilas,*

    161 U.S. 483, 16 S.Ct. 631 (1896).....................................................................6, 7

*Standard Nut Margarine Co. v. Mellon,*

    72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) .................................7

*Steinhilber v. Alphonse,*

    68 N.Y.2d at 286, 508 N.Y.S.2d at 901........................................................32, 33

*Stepanov v. Dow Jones & Co.,*

    987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014) ...........................................................19

*Stern v. Cosby,*

    645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) .........................................................21

*Tacopina v. Kerick,*

    14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) ...................21, 22

*Taylor v. Glotfelty,*

    201 F.2d 51 (6th Cir. 1952) ....................................................................7

*Teichner v. Bellan,*

    181 N.Y.S.2d 842, 846 (App. Div. 1959)...............................................28

*Torain v. Liu,*

    279 Fed. App'x 46, 47 (2d Cir. 2008) ...............................................33, 34

*Trump v. Hawaii,*

    138 S. Ct. 2392, 2417–18 (2018)...........................................................17

*Trump v. Mazars USA, LLP,*

    140 S.Ct. 2019, 2034 (2020)..................................................................18

*Trump v. Vance,*

    140 S. Ct. 2412, 2425  ....................................................................10, 13

*Van-Go Transp. Co. Inc. v. New York City Board of Education,*

    971 F. Supp. 90, 98 (E.D.N.Y. 1997) .....................................................22

*Weiner v. Doubleday & Co.,*

    142 A.D.2d 100, 105 (1st Dep't 1988) ...................................................35

*Weinstock v. Columbia Univ.,*

    224 F.3d 33, 41 (2d Cir. 2000). ................................................................2

*Wilson v. Libby,*

    535 F.3d 697 (D.C. Cir. 2008)................................................................14

*Wuterich v. Murtha,*

    562 F.3d 375 (D.C. Cir. 2009) .........................................................14, 32

*Yaselli v. Goff,*

    12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927)...........................7

*Zellner v. Summerlin,*

    494 F.3d 344, 371 (2d Cir. 2007) ............................................................................3

*Zerman v. Sullivan & Cromwell,*

    677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) ...........................................................34

## **Statutes and Rules**

Fed. R. Civ. P. 56 (c)(2) ............................................................................................2

Restatement (Second) of Torts, § 583 ......................................................................28

Restatement (Second) of Torts § 892 .......................................................................28

Restatement (Second) of Torts § 594 .......................................................................30

Defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion for summary judgment against the plaintiff, E. Jean Carroll ("Plaintiff"), pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

At the heart of this case lies a singular question of paramount importance: should a sitting President have the right to address the public on matters of grave national importance without fear of being dragged into harassing and burdensome lawsuits? The answer to this question will reverberate well beyond the instant dispute.

This action, which sounds in a single claim for defamation, seeks to impute civil liability upon Donald J. Trump, then-sitting President of the United States, for statements he made in response to Plaintiff's serious accusations which had ignited a media frenzy and threatened to cast a shadow upon his moral standing. President Trump issued the challenged statements as a necessary measure to maintain the public's trust and assure the American people that the heinous allegations were not true. This scenario perfectly illustrates how the President is an "easily identifiable target for suits to civil damages" and why there "exists the greatest public interest" in providing [the President] 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Nixon v. Fitzgerald,* 457 U.S. 731, 752, 102 S. Ct. 2690, 2702 (1982). Indeed, "because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and would be "to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 751-52. Thus, given the vital considerations at stake, there is no question that Plaintiff's run-of-the-mill defamation suit does not merit upending

decades of Supreme Court precedent which has consistently emphasized the monumental importance of endowing the President with absolute immunity for his official conduct.

Even setting aside the question of absolute immunity, Plaintiff's defamation claim is deficient as a matter of law and this Court should grant summary judgment in Defendant's favor for three additional reasons. *First*, the alleged defamatory statements were not targeted towards Plaintiff's professional competence and, therefore, are not defamatory *per se*. Since Plaintiff has also failed to substantiate any entitlement to special damages, her defamation claim fails as a matter of law because she has failed to establish any form of cognizable damages. *Second,* Plaintiff intentionally solicited the allegedly defamatory statements by levying heinous (and false) allegations against a sitting President, in a profoundly public manner, thereby necessitating him to issue a public denial. *Third*, the majority of Defendant's statements do not even qualify as defamation in a substantive respect, but instead are largely comprised of non-actionable opinion.

Therefore, this Court should grant summary judgment in Defendant's favor.

## STATEMENT OF FACTS

Pursuant to Local Civil Rule 56.1, the uncontested material facts relevant to this motion are set forth in Defendant's Statement of Uncontested Facts ("DSOF").

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to isolate and terminate claims that are factually unsupported so as to avoid costly and unnecessary trials. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). As such, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2). In that regard, a particular fact will be deemed "material" only if

its existence or non-existence would "affect the outcome of the suit under governing law." *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation and internal quotations omitted). Likewise, an issue will only be considered "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 148 (citation and internal quotations omitted). Thus, for factual issues to be considered genuine, they must have a real basis in the record. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). "The requirement of detecting a genuine issue of fact finds substance in the principle that despite some evidence in opposition to a summary judgment motion, if 'no reasonable jury could have believed' the opponent's version of the events, summary judgment is appropriate." *Cruz v. Reiner*, 11 Civ. 2131 (BMC), 2013 U.S. Dist. LEXIS 149199, at *7 (E.D.N.Y. Oct. 16, 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1775 (2007)).

In order to withstand a motion for summary judgment, the plaintiff must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with specific and admissible evidence showing a genuine issue for trial on each element of her claim. *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

## ARGUMENT

### I.      ABSOLUTE IMMUNITY BARS PLAINTIFF'S DEFAMATION CLAIM

It is blackletter law that a President is "entitled to absolute immunity from damages liability predicated on his official acts." *Nixon*, 457 U.S. at 749. This wide-spanning, unqualified immunity is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.; see also Mitchell v.*

*Forsyth,* 472 U.S. 511, 521, 105 S. Ct. 2806, 2812 (1985); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability."). It is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision making from second guessing by the courts. *See Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S. Ct. 2727, 2732 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or adjudicative functions, and the President); *Mitchell,* 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Presidential immunity serves a vital function for the office of the presidency. Since the President is an "easily identifiable target for suits for civil damages" due to the "visibility of his office and the effect of his actions on countless people," there "exists the greatest public interest in providing [him] 'the maximum ability to deal fearlessly and impartially with' the duties of his office," *Nixon,* 457 U.S. at 751. Indeed, this protection benefits not only the President, but the nation as a whole, since "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government" and "could distract a President from his public duties." *Id.* at 752. By granting immunity for a President's official acts, he is able to function with "bold and unhesitating action." *Id.* at 744–45; *see also Pierson v. Ray,* 386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials).

Presidential immunity is rooted in the historical doctrine of absolute immunity, which recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727 (1982) (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910 (1978)). As the doctrine has evolved over time, the Supreme Court has emphasized that the policy considerations underlying absolute immunity apply with special force to the President, who is the quintessential official "whose special functions or constitutional status requires complete protection from suit." *Harlow*, 457 U.S. 800 at 807. Thus, the Supreme Court has broadly applied absolute immunity to foreclose civil suits against the President in his individual capacity and has clarified that the protection extends to any and all "acts within the 'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 755; *see also Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997) ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

## A. The Evolution of Absolute Immunity Pre-*Nixon*

As early as 1871, in *Bradley v. Fisher*, 80 U.S. 335, 20 L. Ed. 646 (1871), the Supreme Court recognized that public policy considerations weighed in favor of providing absolute immunity to public officials for actions taken within the scope of their official duties. In *Bradley*, a trial judge had disbarred an attorney who represented an alleged co-conspirator in the plot to assassinate President Lincoln. *Id.* at 342. The attorney sued the judge in question, arguing that the disbarment was malicious. *Id*. The Supreme Court, however, held that the judge was absolutely immune from civil suit for his judicial acts "even when such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly." *Id*. at 357. The *Bradley* court drew

on English common law and reasoned that that absolute immunity was needed to safeguard judicial independence and stated that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequence to himself. *Id*. at 347. The *Bradley* court found it imperative to protect sincere judges from "vexatious actions." *Id*. at 349.

The Supreme Court extended the newly-minted doctrine of absolute immunity to federal executive officers in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631 (1896), where the Supreme Court addressed the question of whether a court could adjudicate a civil claim based on the allegedly malicious acts of an executive official. Relying upon *Bradley,* the Court found that "the allegation of malicious or corrupt motives could always be made, and, if the motives could be inquired into, judges would be subjected to the same vexatious litigation upon such allegation, whether the motives had or had not any real existence." *Spalding*, 161 U.S. at 494, 16 S.Ct. at 635. The Court also noted that this limitation on liability, and the justifications for it, "has a deep root in the common law [and] is to be found in the earliest judicial records, and it has been steadily maintained by an undisputed current of decisions in the English courts, amidst every change of policy, and through every revolution of their government." *Id*. at 494. Applying these same standards to the facts before it, the Supreme Court held that:

> the same general consideration of public policy and convenience which demand for judges . . . immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions apply, to a large extent, to [the heads of executive departments] when engaged in the discharge of duties imposed upon them by law . . . In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of government, if he were subjected to any such restraint.

*Id*. at 498.

A litany of cases would follow *Spalding*, wherein federal courts continued to expand the doctrine of absolute immunity to encompass a wide range of federal officials. *See, e.g.*, *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927) (special assistant to the Attorney General); *Standard Nut Margarine Co. v. Mellon*, 72 F.2d 557 (D.C. Cir.), cert. denied, 293 U.S. 605 (1934) (Treasury Secretary); *Cooper v. O'Connor*, 99 F.2d 135 (D.C. Cir.), cert. denied, 305 U.S. 643 (1938) (F.B.I. agent, Comptroller of the Currency); *Laughlin v. Garnett*, 138 F.2d 931 (D.C. Cir. 1943), cert. denied, 322 U.S. 738 (1944) (United States Attorney); *Laughlin v. Rosenman*, 163 F.2d 838 (D.C. Cir. 1947) (Special Counsel to the President); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950) (Attorney General); *Papagianakis v. The Samos*, 186 F.2d 257 (4th Cir. 1950), cer. denied, 341 U.S. 921 (1951) (immigration officer); *Taylor v. Glotfelty*, 201 F.2d 51 (6th Cir. 1952) (prison psychiatrist); *Camp v. Recreation Bd*., 104 F. Supp. 10 (D.D.C. 1952) (Interior Secretary).

Subsequently, in *Barr v. Matteo*, the Supreme Court recognized that the doctrine of absolute immunity encompasses an absolute privilege for federal executive officials who publish defamatory statements in the performance of their official duties. There, two employees of the Federal Office of Rent Stabilization sued the agency's Acting Director in relation to the publication of a press release in which he promised to suspend the employees for promoting an unpopular budget plan. *Barr v. Matteo*, 360 U.S. 564, 79 S. Ct. 1335 (1959). The former employees contended that the director's press release contained defamatory statements. *Id.* at 568. However, the Supreme Court ruled that the director was protected by absolute privilege when he issued the press release and dismissed the employees' claims, reasoning that communicating with the media by disseminating the press release "was an appropriate exercise of the discretion which an officer of

that rank must possess if the public service is to function effectively." *Id*. at 575. The Court went on to emphasize that "***[i]t would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty***." *Id.* (emphasis supplied).

In coming to this holding, the Supreme Court established the seminal rule that federal officials are absolutely immune from damages taken for actions taken within the "outer perimeter" of their duties. *Id*. The Supreme Court was well aware of the wide applicability of this standard, but explained that "the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted the relation of the act complained of to "matters committed by law to his control or supervision." *Id*. at 573 (internal citations omitted).

Importantly, the *Barr* Court refused to consider the plaintiffs' argument that the defendant had acted with malice, noting that "the claim of an unworthy purpose does not defeat the privilege." *Id*. at 575. The *Barr* Court acknowledged that conferring an absolute privilege may lead to "occasional instances of actual injustice," but reasoned that such a price is "a necessary one to pay for the greater good." *Id*. at 576. In coming to this conclusion, the Court weighed the competing public policy considerations at play:

> [O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or illfounded damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr*, 360 U.S. at 565, 79 S.Ct. 1335. The Supreme Court ultimately determined that shielding public officers from civil liability was the more compelling need, reasoning that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Id.* at 572

**B.  *Nixon v. Fitzgerald* Establishes the Doctrine of Presidential Immunity**

Relying on the above holdings, the Supreme Court, in *Nixon v. Fitzgerald*, affirmed that the doctrine of absolute immunity applies special force to the office of the presidency.

In *Nixon*, a government whistleblower attempted to sue President Nixon for wrongful termination, claiming that Nixon had unlawfully fired him in retaliation for damaging testimony that he had given before an oversight committee.  The Supreme Court flatly rejected the contention that President Nixon could be subject to civil liability for his decision to terminate the whistleblower, and affirmed, in a sweeping decision, that "a former President of the United States is entitled to absolute immunity from damages liability predicated on his official acts." *Id.* at 749. The Supreme Court recognized that this immunity—"presidential immunity"—is a "functionally mandated incident of the President's unique office," *id.*, which extends beyond the mere 'functional' immunity afforded to other federal officials such as judges, prosecutors, etc., *id.* at 755. Given the "special nature of the President's constitutional office and functions," the Supreme Court found it appropriate to define the scope of presidential immunity as encompassing any and all "acts within the '***outer perimeter'*** of [the President's] official responsibility," *id.* at 756 (emphasis added); *see also Clinton*, 520 U.S. at 694, 117 S.Ct. 1636 ("Because of the President's broad responsibilities, we recognized in [*Nixon*] an immunity from damages claims arising out of the official acts extending to the 'outer perimeter' of his authority.") (citing *Nixon*, 457 U.S. at 757).

9

Throughout the *Nixon* decision, the Supreme Court continually emphasized the indispensable nature of presidential immunity, noting that, without it, a President's ability to effectively serve his country would be severely hindered. The Supreme Court observed:

> Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government. As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson v. Ray*, 386 U.S., at 554, 87 S.Ct., at 1218. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri v. Ackerman*, 444 U.S. 193, 203, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system. Nor can the sheer prominence of the President's office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages. Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

*Id.* at 752-753; *see also Trump v. Vance*, 140 S. Ct. 2412, 2425 (noting that the President's duties "are of unrivaled gravity and breadth."). In short, the Supreme Court acknowledged that, since the President's duties "must necessarily include[] the power to perform them without any obstruction or impediment whatsoever," it follows that "the President . . . must be deemed, in civil cases at least, to possess an official inviolability." *Nixon*, 457 U.S. at 776-77, 102 S.Ct. at 2701.

The Supreme Court was again asked to explore the contours of presidential immunity in *Clinton v. Jones*, 520 U.S. 681, 117 S.Ct. 1636. In *Clinton*, an individual filed suit against President Clinton after she publicly accused him of sexual misconduct before he took office. *Id.* at 685. Unlike the case at bar, however, all of three claims under review by the Supreme Court arose from President Clinton's conduct *before* he was in office. *Id.* Due to this distinguishable factor, the *Clinton* court found that those causes of action were unrelated to any of his official duties as

President. *Id.* at 710. The *Clinton* court, however, took occasion to recognize the "high respect that is owed to the office of the Chief Executive," *id.* at 707, and to acknowledge that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Id.* at 697.

Notably, the underlying case in *Clinton* had involved a fourth defamation claim which did arise during President Clinton's time in office when he publicly responded to the plaintiff's allegations of misconduct. Although this claim was not at issue before the Supreme Court, the Court expressly noted that the claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities," thereby qualifying it for presidential immunity.

## C. The Alleged Defamatory Statements Were Made Within the Outer Perimeter of Defendant's Official Duties as President.

A thorough analysis of decades of case law leaves little room for doubt – a President is entitled to wide-ranging immunity for conduct that occurs within the "outer perimeter" of his official responsibilities. *Nixon*, 457 U.S. at 749.

Thus, as established in *Nixon*, in determining whether a President should be afforded absolute immunity, the relevant inquiry is whether the liability in a civil lawsuit is "predicated on [the President's] official acts." *Nixon,* 457 U.S. at 749. A President's "sphere of protected action" is interpreted broadly and extends to conduct within the "outer perimeter of his official responsibilities." *Id.* at 756; *see also Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties"); *Clinton*, 520 U.S. at 696 ("With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages.").

The test is an objective one – it focused on the nature of the act in question, not the motive underlying it. *Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). Indeed, presidential immunity is "not overcome by 'allegations of bad faith or malice.'" *Klayman v. Obama*, 125 F.Supp.3d 67, 86 (D.D.C. 2015) (quoting *Barret v. Harrington*, 130 F.3d 246, 254-55 (6th Cir. 1997)); even "***alleged wrongful acts . . . lay well within the outer perimeter" of the President's authority***." *Nixon*, 457 U.S. at 757 (emphasis added). Thus, inquiry into the subjective motive or intent underlying the President's alleged conduct is simply improper. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.").[1]

The broad interpretation of this test is justified by historical tradition and functional considerations that are grounded in the President's "unique position in the constitutional scheme." *Nixon,* 457 U.S. at 749. The President must be immune from constant judicial scrutiny so that he may concentrate on the task of governing. *Id*. at 750 n.31. The passage of time has only intensified these concerns; the President holds "supervisory and policy responsibilities of utmost discretion and sensitivity," *id*. at 750, concerning "matters likely to arouse the most intense feelings[.]" *Id*. at 752. The President's prominence makes him "an easily identifiable target," yet the public interest demands that he be able "to deal fearlessly and impartially with the duties of his office." *Id*. at 752-53. Presidential immunity guards against "this personal vulnerability," *Id*. at 753, not just for his "particular functions," but for his official responsibilities more generally[.] *Id*. at 755-56.

---

[1] Plaintiff recently conceded this point in an appellate brief filed with the D.C. Court of Appeals, acknowledging that "absolute immunity . . . ***precludes any consideration of motive***." *See* Habba Dec., Ex. E, *Carroll v. Trump*, D.C. Court of Appeals, 22-SP-0745 (2022), App. Br. at 46.

Further, the "outer perimeter" analysis must be viewed in the context of the President's wide-ranging duties. The Supreme Court has consistently acknowledged that the President's responsibilities are "of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that "[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear," *Clinton*, 520 U.S. at 698. In other words, considering the vastness and importance of his duties, and the multitude of functions he performs, it can be said that the President "never adjourns." *Id.* at 713 (Breyer. J., concurring in judgment).

One of those functions must include the President's ability to address matters of national concern and defend himself from grave accusations that impugn his character. Indeed, a well-established body of case law demonstrates that lower officials, who are not tasked with the same constitutional protections enjoyed by the President, have been found to have acted within the outer perimeter of their official responsibilities when speaking to the press.

Even under the narrower *respondeat superior* test applied in Westfall Act cases,[2] courts have consistently found that statements to the press, even when they involve personal matters, fall within the scope of an elected official's responsibilities. In *Council on American-Islamic Relations v. Ballenger*—a case the Second Circuit has described as "directly on point" with respect to the facts *sub judice*, *Carroll v. Trump*, 49 F.4th 759, 780 (2d Cir. 2022)—the Council on American-Islamic Relations sued congressman Ballenger for calling it the "fundraising arm for Hezbollah." *CAIR v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006). In applying the narrower scope-of-

---

[2] Although this Court previously found that Defendant's statements were not within the scope of employment for the purposes of the Westfall Act, it also acknowledged that absolute immunity is applied more broadly than the traditional scope of employment test. *Carroll v. Trump*, 498 F.Supp.3d 422, 456 (S.D.N.Y. 2020), *revd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022) ("[E]ven if commenting on this matter fell within the outer perimeter of those duties, that faint nexus is not enough under the District of Columbia's scope of employment doctrine.").

employment test, the D.C. Circuit found that the congressman's acted within the scope of his duties in making the allegedly defamatory statement when speaking to the press reasoning that "'[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties'" because a "[m]ember's ability to do his job as a legislator effectively is tied . . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 664- 65. The D.C. Circuit identified "a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id.* at 665-66.

In a series of cases that followed, the D.C. Circuit applied the holding in *Ballenger* to similarly conclude that other high-ranking government officials were acting within the scope of their duties in similar dealings with the press. *See, e.g. Wuterich v. Murtha,* 562 F.3d 375 (D.C. Cir. 2009) (holding that congressman acted within the scope of his employment in disseminating a purportedly defamatory stated when responding to a question from a reporter; *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (finding that executive branch employees acted within the scope of their employment in "discredit[ing] public critics of the Executive Branch," even though the officials had acted in ways that were alleged to be unlawful and contrary to the national security of the United States.).

In a case that bears a striking resemblance to the matter *sub judice*, the D.C. Court of Appeals concluded that the Mayor of the District of Columbia acted within the scope of his duties when he allegedly issued defamatory statements to the media. *See District of Columbia v. Jones*, 919 A.2d 604, 608-09 (D.C. 2007). In *Jones,* after various news stations began to scrutinize the Mayor's fundraising activities, the Mayor placed his deputy chief of staff, Marc Jones on

administrative leave and then proceeded to terminate him. *Id*. at 606. During that time, the Mayor allegedly "made numerous remarks" to the media "placing primary responsibility" on the deputy chief of staff for any purported wrongdoing. *Id*. Shortly thereafter, Mr. Jones sued the Mayor for defamation, alleging that the Mayor's statements were "false and malicious" and that the allegations were made "to protect himself politically at the known expense of [Jones's] reputation, character, and integrity." *Id*.

The court in *Jones* proceeded to analyze whether it was appropriate to apply the doctrine of absolute immunity in that matter. Applying the absolute immunity test circumscribed in *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990), the court held that absolute immunity applies when the challenged conduct is (1) within the "outer perimeter" of official duties, and (2) the governmental function was "discretionary" rather than ministerial." *Id*. at 608 (citing *Moss,* 580 A.2d at 1020.) The court indicated that the test is rather expansive, finding that the court need only determine "whether the official acted 'in relation to matters committed by law to his control or supervision.'" *Id*. (*citing Moss*, 580 A.2d at 1020.).

Readily disposing of the first prong of that analysis, the court found that "*it cannot be questioned*" that responding to inquiries from the press fell within the "outer perimeter of the Mayor's official duties." *Jones*, 919 A.2d at 608 (quotation omitted). In coming to that conclusion, the *Jones* court relied on the principle set forth in *Ballenger* that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" The court explained that the allegedly defamatory statements concerned a mayoral staff member's activities "and the Mayor's own knowledge of and responsibility for those activities," and it is "certainly" the case that the Mayor's "official responsibilities" include "[i]nforming the public about the conduct of persons serving in the Office of the Mayor." *Id*.

The *Jones* court expressly rejected the plaintiff's contention that the statements fell outside the outer perimeter of the Mayor's duties because the underlying conduct he was discussing—allegations of improper fundraising—fell outside the scope of any official duties. As the Court explained, it is part of the Mayor's responsibilities to "account[] to the press and the public for the manner in which his staff conducted itself," regardless of whether the underlying conduct itself constituted part of the staff member's, or the Mayor's, official duties. *Jones*, 919 A.2d at 608 n.8.

Lastly, the court refused to inquire into the Mayor's motives in making the challenged statements, relying on a substantive body of law which specifically precludes this type of analysis. *Jones*, 919 A.2d at 610. The court cautioned that "[p]ermitting inquiry into the official's motives would defeat the very purpose of absolute immunity. A determined litigant could always assert an improper motive, and the official would be required to shoulder the burden of responding to discovery, and perhaps enduring a trial, to expose these motives." *Id*. at 611. The Court acknowledged that, in applying absolute immunity to such cases, it may result in personal injury that cannot be redressed, but ultimately concluded that such a "trade off" is necessary to "promote our mutual interest in in effective government." *Id*. (citing *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 292 (1977), "it is better to leave unredressed some defamations by officers acting out of malice or excess zeal, than to subject the conscientious to the constant dread of retaliation.").

Like in *Jones*, it cannot reasonably be questioned that the conduct at issue herein—namely, the communications made by Defendant to the press in response to the allegations raised by Plaintiff—fell squarely within the "outer perimeter" of Defendant's official duties as President. More than any other public official, the President "possesses an extraordinary power to speak to his fellow citizens," *Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018), and is ubiquitous in the

public eye due to the "sheer prominence" of his position, *Nixon*, 457 at 753; *see also Clinton*, 520 U.S. at 698 ("[T]he Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations."); *CBS v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971) ("The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role.").

Here, Defendant made the three alleged defamatory statements in direct response to Plaintiff's allegations which impugned his character and, in turn, threatened his ability to effectively govern the nation. As both the leader of the nation and head of the Executive Branch, Defendant could not sit idly while a "media frenzy" erupted around allegations that attempted to paint him as a rapist. Indeed, faced with this widely-reported, unprovoked attack on his character, the President had a duty to respond; at a minimum, this action was necessary to "maintain the continued trust and respect of [his] constituents" and to "preserve his ability to carry out his [] responsibilities." *Ballenger*, 444 F.3d at 320 (internal quotations omitted); *see also*, *Barr*, 360 U.S. at 575. ("It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty."). Thus, it cannot be reasonably disputed that Defendant's conduct was 'presidential' in nature because he was addressing an issue of grave public concern that weighed on the character and competency of the leader of the nation. *Snyder v. Phelps,* 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"); *Rankin v. McPherson*, 483

U.S. 378, 387, 107 S. Ct. 2891, 2898 (1987)("The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

Further, it bears repeating that the absolute immunity test is an *objective* one and inquiry into Defendant's subjective motive or intent in making the alleged defamatory statements is expressly prohibited. *See Nixon*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). The only question is whether the objective nature of his conduct was within the scope of his official duties as President. This is undoubtedly the case. Defendant's statements were made in a White House press release in response to reporter's inquiries to the White House, and otherwise in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries. Simply stated, he was addressing an issue of national importance.

That Defendant himself was the subject of the accusations does not in any way diminish the level of public concern, nor does it remove it from the scope of his official responsibilities. In fact, due to their sheer prominence, it is commonly the case that the personal affairs of a President are a matter of public concern. *See Trump v. Mazars USA, LLP*, 140 S.Ct. 2019, 2034 (2020) (noting that because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs."); *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) (President Clinton's communications concerning how to respond to Monica Lewinsky affair were "in the President's performance of his official duties," because "the President does need to address personal matters in the context of his official decisions.").

Based on the foregoing, in accordance with long-established Supreme Court precedent, Defendant is entitled to "absolute immunity from damages liability" predicated on the statements he made to the media in response to the heinous allegations Plaintiff levied against him. *Nixon*, 457 U.S. at 749. Since such conduct was within the "'outer perimeter' of his official responsibility," the instant action must be dismissed in its entirety. *Id.* at 755.

## II.   PLAINTIFF's DEFAMATION CLAIM FAILS AS A MATTER OF LAW

Even setting aside the issue of absolute immunity, Plaintiff's defamation claim fails on a fundamental level since she has failed to establish a cognizable cause of action.

To state a claim for defamation under New York law, the plaintiff must allege "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 Fed.Appx. 8, 11 (2d Cir. 2018) (citing *Elias v. Rolling Stone LLC,* 872 F.3d 97, 104 (2d Cir. 2017); *Stepanov v. Dow Jones & Co.,* 987 N.Y.S. 2d 37, 41-42 (1st Dep't 2014)).   In addition, as is the case here, "a public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001) (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710 (1964)). "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Project Veritas v. N.Y. Times Co.,* 2021 NY Slip Op 31908(U) (Sup. Ct.).

### A.  Plaintiff Has Failed to Establish Cognizable Damages

In a defamation case, a plaintiff is required to prove that the defamation "either cause[d] special harm or constitute[s] defamation per se." *Peters v. Baldwin Union Free Sch. Dist*, 320 F.3d

19

164, 169 (2d Cir. 2003) (quoting *Dillon v. City of N.Y.*, 261 A.D.2d 34 (1st Dep't 1999)). Here, after the completion of fact discovery, Plaintiff has failed to establish any entitlement to damages whatsoever. Therefore, there is no genuine issue of material fact and Plaintiff's defamation claim fails as a matter of law.

### i.   The Statements Do Not Constitute Defamation *Per Se*.

The New York Court of Appeals has recognized four narrowly defined categories of statements which are considered to be defamatory *per se*, including statements: "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). In her Complaint, Plaintiff alleges that the statements fit within the second category because they "tended to (and did) damage Carroll in her trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information." *See* Habba Dec., Exhibit A at ¶ 129. As discussed herein, Plaintiff's contention is misplaced.

"Determining whether a statement is defamatory per se is a question of law for the Court." *Stern v. Cosby*, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009). "To find that a statement qualifies as one that tends to injure another in his or her 'trade, business, or profession,' the statement must be made with reference to a matter of significance and importance for [the operation of the business], rather than a more general reflection upon the plaintiffs' character or qualities." *Rufeh v. Schwartz*, 50 A.D.3d 1002, 1004-05 (2d Dep't 2008) (citations omitted). "[W]ords [such] as 'cheat,' 'dishonest,' 'immoral' and many others, if *generally* applied are not slanderous per se, but become such if applied to the plaintiff's trade, business or profession" because "[i]t is not sufficient that [such words] tend to injure plaintiff in his business, they must have been spoken of him *in his*

*business.*'" *Gurtler v. Union Parts Mfg. Co., Inc.*, 285 A.D. 643, 646 (1st Dep't 1955) (emphasis added). In other words, to qualify as defamation *per se*, the allegedly defamatory statement "must be targeted at specific standards of performance that are *directly relevant* to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'" *Tacopina v. Kerick*, 14-CV-749-LTS-FM, 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) (citing *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011); *Van-Go Transp. Co. Inc. v. New York City Board of Education*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997)).

Here, the alleged defamatory statements, which lack any correlation to Plaintiff's professional capabilities, are not defamatory *per se*. The statements do not impugn, or even relate to, any particular talent or ability needed to perform in Plaintiff's profession as a "writer and advice columnist" *See* Habba Dec., Ex. A, at ¶ 55. Thus, the statements "do[] not, on [their] face, defame [P]laintiff in her trade, business or profession." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985).

As outlined in the Complaint, the first alleged defamatory statements, the first statement, made on June 21, 2019 (the "June 21 Statement"), states as follows:

> "Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book—that ***should*** indicate her motivation. It ***should*** be sold in the fiction section.
>
> Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.
>
> Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations."

*See* Habba Dec. Ex. A at ¶ 82. (emphasis added).

The second statement at issue, made on June 22, 2019 (the "June 22 Statement"), is comprised of the following language:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

> You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me.
>
> But here's a case, it's an absolute disgrace that she's allowed to do that.

*See* Habba Dec. Ex. A at ¶ 91.

The third and final statement, issued on June 24, 2019 (the "June 24 Statement"), provides as follows:

> I'll say with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?

*See* Habba Dec., Ex. A at ¶ 97.

Based on the contents of these statements, Defendant is entitled to summary judgment because the statements are incapable, as a matter of law, of the defamatory construction Plaintiff seeks to ascribe to them. Notably absent from the above statements is any language aimed at a particular skill or trait that reflects upon Plaintiff's competency as a "writer and advice columnist," *Id*. at ¶ 55, much less one of "significance and importance," *Rufeh,* 50 A.D.3d at 1005. Even read in a light most favorable to Plaintiff, the statements are, at most, a general reflection upon her character or qualities, as they portray her as a dishonest individual who fabricated an account that "never happened." *Id*. at ¶ 82. Yet, it is well established that a "statement imputing . . . dishonesty to the plaintiff" may be construed as defamatory *per se* only if there is "some reference, direct or indirect, in the words or in the circumstances attending their utterance, which connects the charge of incompetence or dishonesty to the particular profession or trade engaged in by plaintiff." *Van Lengen v. Parr,* 136 A.D.2d 964 (4th Dep't 1988). Since the alleged defamatory statements do not peculiarly relate to Plaintiff's occupation as a "writer and advice columnist." Habba Dec., Ex. A

at ¶ 55, it cannot be said that they impute "conduct that is 'of a kind incompatible with the proper conduct" of her profession, *Tacopina*, 2016 WL 1268268 at *4.

Indeed, New York courts consistently find that these types of statements—which broadly refer to a person's dishonest nature—are insufficient to support a claim of defamation *per se. See, e.g., Davydov v. Youseffi*, 205 A.D.3d 881, 882 (1st Dep't 2022) ("While the plaintiff asserted in his affidavit that the defendant had called him a 'fraud' and that he 'operate[d] as a fake,' there are no allegations that these statements were specifically directed at the plaintiff in his professional capacity as a dentist."); *Pure Power Boot Camp*, LLC, 813 F. Supp. 2d at 551 (statements characterizing plaintiff as a "loose cannon" and a "liar" were not defamatory *per se* because the statements reflected personal characteristics rather than reflections of professional competence); *Ram v. Moritt*, 205 A.D. 516 (2d Dep't 1994) (finding that statements referring to the plaintiff, a doctor, as a "a 'liar,' a 'cheat,' and a 'debtor'" did not constitute defamation *per se* because they "did not address the plaintiff's professional status as a doctor[.]").

Plaintiff has failed to present any evidence to contrary, or otherwise substantiate how the statements could possibly be construed as defamation *per se*. Accordingly, Plaintiff has failed to establish defamation *per se* because her allegation that Defendant made a statement calling into question her general character and morality does not in any way reflect on her ability to perform in a professional capacity, or otherwise "injure [her] in [] her trade, business or profession." *Liberman*, 80 N.Y.2d at 435.

### ii.    **Plaintiff's Cannot Establish Her Entitlement to Special Damages.**

Where, as here, the defamation alleged does not fall into one of the *per se* categories, the plaintiff must establish entitlement to special damages. *Mable Assets, LLC v. Rachmanov*, 192 A.D.3d 998, 1001 (2d Dep't 2021) (citing *Liberman v. Gelstein,* 80 N.Y.2d 429, 434-435 (1992)).

24

To adequately plead special damages, a plaintiff must claim "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179 (2d Cir. 2010) (citation and internal quotation marks omitted). The special harm must be "alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts." *Cambridge Assoc. v. Inland Vale Farm Co.*, 116 A.D.2d 684, 686 (2d Dep't 1986); *see also Franklin v. Daily Holdings*, 135 A.D.3d 87, 93 (1st Dep't 2015) ("Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation."). "The particularity requirement is strictly applied, as courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai v. Cayre Group, Ltd.*, 726 F.Supp.2d 323, 330 (S.D.N.Y. 2010). Further, the requirement that special damages be pleaded with particularity flows not only from state law, but from the Federal Rules as well, which require that special damages be "specifically stated." Fed. R. Civ. P. 9(g). Accordingly, a plaintiff's failure to plead special damages with sufficient precision, in and of itself, warrants dismissal of a cause of action. *See Franklin*, 135 A.D.3d at 92.

In the instant matter, Plaintiff has failed to plead, substantiate, or otherwise prove her entitlement to special damages. From the outset, the bare allegations of harm plead in the Complaint fell remarkably short of the stringent standard applied by New York courts to establish special damages. Plaintiff's sole allegation of special damages consists of the unquantified, non-itemized claim that Plaintiff has received "roughly 50% fewer letters than she received during the same period in 2018." *See* Habba Dec., Ex. A at ¶ 134. This unspecified allegation fails to meet the requisite degree of specificity required to survive on a summary judgment motion. This is

especially true where Plaintiff has failed to establish that any loss in readership was causally related to the alleged defamatory statements, nor identified a single reader she purportedly lost. *See*, *Lang Sang v. Ming Hai*, 951 F. Supp.2d 504, 525 (S.D.N.Y. 2013) ("The individuals who ceased to be customers, or who refused to purchase, must be named and the exact damages itemized."); *Drug Research. v. Curtis Pub.*, 7 N.Y.2d 435, 441 (1960) ("[I]f the special damage was a loss of customers, the persons who ceased to be customers, or who refused to purchase, must be named.")*.* Even more damning, Plaintiff freely admitted during her deposition that she never kept track of the amount of letters that she received *until she filed the instant lawsuit*. *See* Habba Dec., Ex. B at 230:20-24; 231:2-7 (When asked whether she kept track of the amount of letters she received, Ms. Carroll testified that "I never did until – until this happened ... before that, I would delete. You know, after that I deleted nothing . . .). Thus, her claim—advanced in her Complaint—that she had received "roughly 50%" less letters over the course of the prior year is positively groundless.

Likewise, Plaintiff's allegation that "Trump has injured the reputation on which she makes her livelihood and attracts readers" similarly fails. *See* Habba Dec. Ex. A at ¶ 133. In an attempt to quantify her damages, Plaintiff submitted an expert report authored by Professor Ashlee Humphreys, PhD. *See generally, id.*, Exhibit C (the "Report"). The Report, however, exclusively assesses "the damage to Ms. Carroll's *reputation* and person brand." *Id.* at 2 (emphasis added). In summarizing her findings, for instance, Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short- and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "*reputational value* has been diminished due to the Statements." *Id*. at 5 (emphasis added). The Report entirely misses the mark and fails to identify any actionable harm since special damages require "the loss

of something having economic or pecuniary value," *Franklin*, 135 A.D.3d at 93, and do not include

damages for "impairment of reputation and standing in the community, personal humiliation, and

mental anguish and suffering," *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 179 (2d Cir. 2000)

(citation omitted); *see also Salomone v. MacMillan Pub. Co., Inc.*, 77 A.D.2d 501, 502 (1st Dep't

1980) (noting that plaintiff "pleads no special damage" where he "claims damages for loss of

reputation and for mental anguish."); *Sharratt v. Hickey*, 20 A.D.3d 734, 736 (3d Dep't 2005)

("General testimony regarding humiliation and loss of reputation in the community is insufficient

to prove special damages."); *Franklin*, 135 A.D.3d at 93 ("[A]lthough plaintiff states the ways in

which he believes his career was damaged as a result of the article, he fails to state more than a

round figure of $3,000,000 when alleging his damages, which is insufficient to state special

damages."); *Garland v. Vermilyea*, 88 A.D.2d 1044 (3d Dep't 1982) ("The allegation that plaintiff

'was required to expend large sums of money' does not allege special damages for it is of

insufficient particularity . . . as is the claim that plaintiff has been damaged in the round figure of

$1,000,000.") (citations omitted); *Jordan v. Tucker, Albin and Assoc., Inc.*, 3-CV-6863-JMA-SIL,

2017 WL 2223918, at *10 (E.D.N.Y. May 19, 2017) ("'Emotional distress, 'hurt feelings,'

'embarrassment,' or 'chagrin' do not constitute 'special damages.'") (citations omitted).

Thus, due to Plaintiff's failure to identify the "loss of something having economic or

pecuniary value" with the requisite degree of particularity, she is unable to establish a claim for

special damages. Since Plaintiff is also unable to maintain a claim for defamation *per se*, her

defamation claim fails as a matter of law based on the absence of cognizable damages.

**B. Plaintiff's Defamation Claim is Barred as a Direct Result of her Consent to the Publication of the Statements.**

New York courts have long recognized that consent is a complete defense to actions for

defamation which is unaffected by the motives of the speaker. *See* Restatement (Second) of Torts,

27

§ 583 (1977) ("[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation."); *id.* (comment f) ("The protection given by it is complete, and it is not affected by the ill will or personal hostility of the publisher or by any improper purpose for which he may make the publication."); *see also Teichner v. Bellan,* 7 A.D.2d 247, 251 (4th Dep't 1959) (describing consent as "an absolute immunity or an absolute privilege upon the defendant.").

A plaintiff expresses apparent consent to the alleged defamation where her "words or conduct are reasonably understood by another to be intended as consent." Restatement (Second) of Torts § 892. Even where the plaintiff "does not in fact agree" to publication of the defamatory statement, her "words or acts or even [her] inaction may manifest a consent that will justify the other in acting in reliance upon them." Restatement (Second) of Torts § 892 cmt. c (emphasis added). When apparent consent is given, it is "as effective as consent in fact." Restatement (Second) of Torts § 892.

Second Circuit precedent provides that, in certain circumstances, a plaintiff's intentional eliciting of a statement which she expects will be defamatory constitutes her consent to the making of the statement. In *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191 (2d Cir. 2015), the plaintiff, Sleepy's, sent hired personnel into Select Comfort stores posing as customers to determine whether salespeople were disparaging Plaintiff and its merchandise. *Id.* at 194. Plaintiff's secret shoppers then intentionally elicited the alleged defamation from Select Comfort salespeople, finding that they regularly disparaged plaintiff's products. *Id.* Upon further investigation, Select Comfort was able to present evidence showing that plaintiff instructed its secret shoppers to ask about differences between Sleepy's products and Select Comfort's products to determine whether Select Comfort was denigrating its products. *Id.* at 201. The Second Circuit

ultimately remanded this issue to the District Court to determine whether plaintiff's defamation claims were barred by plaintiff's consent. *Id*. at 202.

The Second Circuit went on to explain that, in assessing whether a plaintiff consents to the publication of an alleged defamatory statement, the "more evidence that supports the proposition that the plaintiff elicited the statement with a high degree of certainty that it would be defamatory, for the purpose of enabling a lawsuit, the stronger the defendant's case for deeming the statement consented to, thus barring the claim." *Sleepy's LLC*, 779 F.3d at 199. Referencing the Restatement the Second Circuit found that this type of elicitation by the plaintiff is tantamount to "*decoying the defendant into a lawsuit*" and thus cannot sustain a valid cause of action for defamation." *Id.* at 199 (citing Restatement (Second) of Torts, § 584 (comment d)) (emphasis added).

Based on this principle, the Second Circuit remanded the case for the district court to make findings as to whether the plaintiff was "motivated by a good faith attempt to learn whether" the defendant was "carrying on a consistent pattern of slander, or [was] merely a ruse to decoy [the defendant] into a lawsuit, along with the closely related question [of] what was the degree of [the plaintiff's] confidence or certainty at the time of each inquiry that such a pattern of slander existed." *Id.* at 201. On remand from the Second Circuit, the District Court found that:

> "In short, because the evidence shows that [plaintiff] Sleepy's was both virtually certain that its inquiry would elicit allegedly slanderous statements and substantially motivated by the desire to bolster a contemplated lawsuit, Sleepy's consented to the publication of these allegedly defamatory statements.

*Sleepy's LLC*, 133 F. Supp. 3d at 500.

Here, similarly, Plaintiff's pattern of conduct demonstrates that she sought to intentionally elicit a denial from Defendant of her inflammatory allegations, in the hopes that any such retort could serve as a basis for defamation lawsuit. By her own admission, Plaintiff purposefully chose to publish her account in *New York Magazine* to garner as much attention as possible. Plaintiff

chose not to consider *Elle* because ""under Nina, *Elle* has been less into politics or news," Ms. Carroll said. "Nina's *Elle* is a fashion magazine. So I went with New York magazine, *which knows how to break news.*" *See* Habba Dec., Ex. D. at 3. Plaintiff also testified that she decided to move forward with *New York Magazine* because she believed that *Elle* would not run a full excerpt of the story and that "they would not have run anything close to what New York ran." *See* Habba Aff., Ex. B at tr. 190:15-25.

In addition, the timing of Plaintiff making her claims is highly indicative of an intentional effort to solicit the allegedly defamatory remarks from Defendant. Despite the fact that the incident purportedly happened in 1995, Plaintiff waited 27 years to publicly raise her allegations, a time when Defendant was the sitting President of the United States. The suspect timing can only lead to one logical conclusion – she publicized her account to maximize the national attention her story would receive. As discussed at length *supra*, Defendant's prominent position as the head of the executive branch left him with no choice but to defend himself against these heinous accusations. *See Wuterich*, 562 F.3d at 384 ("[A] congressman's ability to do his job as a legislator effectively is tied . . . to [his] relationship with the public and . . . his constituents."); *see also Clinton*, 520 U.S. at 698 (noting that the President is "the focus of public hopes and expectations.").

In short, Plaintiff sought to drum up a national outcry in response to her narrative, she succeeded, and she cannot now claim that the statements were defamatory when she actively solicited them. Therefore, Plaintiff's defamation claim must fail because she consented to the publication of the allegedly defamatory statements.

### C. The Vast Majority of the Statements are Nonactionable Opinions.

To the extent Plaintiff's defamation claim survives at all, nearly all of the content contained in the statements are immaterial since they constitute protected opinion speech.

It is well settled that "expressions of an opinion, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 286 (1986) (citations omitted) (emphasis added); *Hobbs v. Imus*, 266 A.D.2d 36, 37 (1999); *Doe v. French*, 458 F. App'x 21, 22 (2d Cir. 2012*)*. Opinions can only be actionable if they imply that the speaker knows certain facts which are detrimental to the plaintiff and false *Steinhilber,* 68 N.Y.2d at 289. The question of whether a statement is one of fact or opinion is a question of law to be determined by the Court. *Id*. Courts examine the following four factors when determining whether a statement is protected opinion: (1) whether the specific language in the statements has a precise meaning which is readily understood (i.e. the language is not indefinite, ambiguous, hyperbolic, or figurative); (2) whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication, including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact. *Dworin v. Deutsch*, 2008 WL 508019, at *4 (S.D.N.Y. Feb. 22, 2008); *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995); *Steinhilber*, 68 N.Y.2d at 292. Applying these four factors, the Court of Appeals has mandated against a "hypertechnical parsing" of written or spoken words "for the purpose of identifying possible facts that might form the basis of a sustainable [defamation] action." *Dworin*, 2008 WL 508019, at *4 (internal quotations omitted). Instead, courts are required to examine the overall context in which the statements were made and "determine whether the reasonable reader [or listener] would have believed that the challenged statements were conveying facts about the… plaintiff." *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991).

Further, under New York law, it has been repeatedly held that statements made that address another person's state of mind or motivations are constitutionally protected opinion speech that cannot form the basis for a defamation claim. *See e.g., Huggins v. Povitch*, 1996 WL 515498, *8 (Sup. Ct., New York Cty. April 19, 1996) (statements that address someone's state of mind or motivations "are speculation and are generally not readily verifiable" and cannot form the foundation for a defamation claim); *Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (statement that plaintiff aimed to "set up" brokerage houses "is nothing more than speculation about . . . motivations" and, as such, is a "clear statement of opinion" which "does not support a claim for libel.").

In accordance with this principle, the courts have repeatedly dismissed defamation claims where the alleged defamatory statements constituted opinions about a plaintiff's state of mind or personal motivations. *See e.g. Dworin*, 2008 WL 508019, at *5 (statements made to New York Post that plaintiff was a "disgruntled ex-employee" threatening to sue was opinion not susceptible to objective verification); *Gentile v. Grand St. Med.*, 79 A.D.3d 1351, 1354 (statements that plaintiff's motives for bringing sexual harassment lawsuit were that she "[did] not want work" and "want[ed] to make easy money" could not form basis of defamation claim as they were "not capable of being proven true or false"); *Weiner v. Doubleday*, 142 A.D.2d 100, 105 (1st Dep't 1988) (dismissing defamation claim for calling plaintiff "ugly" because "there can be no action for libel based upon opinion, expressed in the form of epithets"), *aff'd*, 74 N.Y.2d 586 (1989).

In her Complaint, Plaintiff contends that various aspects of the alleged defamatory statements, aside from the general repudiation of Plaintiff's allegations, are defamatory for the following reasons: (1) Defendant lacked any factual basis for stating that Plaintiff had falsely accused other men of sexual assault; (2) Defendant knew it was false to state he both never met

her and had no idea who Plaintiff was; (3) she fabricated her claims to increase her books sales; and (4) she fabricated her claims as part of a conspiracy with the Democratic Party or in exchange for payment. *See* Habba Aff., Ex. A ¶¶ 116-117. Each of these purported statements, however, are no more than non-actionable opinions about Plaintiff's state of mind and are not capable of being proven true or false. No reasonable reader would find the challenged comments defamatory. At most, Defendant was merely opining on Plaintiff's state of mind and motivations for coming forward with her allegation, thus invalidating Plaintiff's claims. This is particularly true here, given that Defendant was merely defending himself, and the integrity of his office, by publicly denying Plaintiff's allegations of unlawful conduct. *See, e.g., Indep. Living Aids v. Maxi-Aids*, 981 F. Supp. 124 (E.D.N.Y. 1997) (defendant's statement that plaintiff was "a liar," in the context of responding to plaintiff's accusations, "can only be understood as a denial of [plaintiff's] accusations," and constituted "personal opinion and rhetorical hyperbole, rather than objective fact").

Thus, aside from Defendant's repudiation of Plaintiff's contention that he sexually assaulted her, the remainder of the language contained in the alleged defamatory statements is protected opinion speech. Therefore, these statements are not actionable as defamation.

## III.   <u>THE EXTEME REMEDY OF PUNITIVE DAMAGES IS NOT WARRANTED</u>

Plaintiff has not established that she has a right to punitive damages which requires that the statements be made with "common law malice—that is, with a desire to harm plaintiff or reckless disregard for the injurious effect the [statement] would have upon [her]." *Mahoney v. Adirondack Pub. Co*., 71 N.Y.2d 31, 37 (1987). Common law malice "focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity." *Morsette v. "The Final Call"*, 309 A.D.2d 249, 254 (1st Dep't 2003) (quoting *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993)). To prove common law malice,

the speaker must be "*solely* motivated by a desire to injure plaintiff, and there must be some evidence that the animus was the one and only cause for the publication." *Morsette*, 309 A.D.2d at 255 (emphasis in original) (internal citations omitted.); s*ee also Robertson v. Doe*, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ("Under New York law, only a finding that [defendant] 'was **solely motivated** by a desire to injure plaintiff' can establish common-law malice."), *aff'd sub nom.*

As discussed at length herein, Defendant made the statements in direct response to heinous allegations levied against him by Plaintiff. Thus, these statements could not have been "motivated by a desire to injure plaintiff," since they were strictly made in Defendant's own defense. *Morsette*, 309 A.D.2d at 255. Indeed, in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity. *See Kane v. Orange Cty.,* 232 A.D.2d 526, 527 (2d Dept. 1996) ("response to unfavorable publicity against [the defendant is] covered by a qualified privilege"); *see also* Restatement (Second) of Torts § 594 cmt. k (1977) ("A conditional privilege exists . . . when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself . . . Thus the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar.").

Therefore, Plaintiff is not entitled to punitive damages as she has failed to show that Defendant's statements were at all motivated by a desire to injure Plaintiff, much less solely motivated by such a desire.

## **CONCLUSION**

For the reasons set forth above, Defendant, Donald J. Trump, respectfully submits that

summary judgment should be granted in his favor.

Dated: December 22, 2022                        Respectfully submitted,

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, New Jersey 07921
                -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Defendant, Donald J. Trump*

35