# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

        *Plaintiff*,

    v.

DONALD J. TRUMP, in his personal capacity,

        *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOP SUMMARY JUDGMENT

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 1

    A. Factual Background ............................................................................. 1

    B. Procedural History ............................................................................. 7

STANDARD OF REVIEW ......................................................................................... 10

ARGUMENT ............................................................................................................. 10

    I.    TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS 10

    A. Trump Waived Any Claim to Absolute Immunity ............................................. 10

        1. Legal Standard ............................................................................. 10

        2. Trump Waived His Absolute Immunity Defense .......................................... 12

        3. There is No Excuse for Trump's Waiver ................................................. 13

        4. Alternatively, The Law of the Case Rule Precludes Trump's Position .......... 16

    B. Trump's Absolute Immunity Defense is Meritless ........................................ 16

        1. Absolute Immunity Is Subject to Important Limits ..................................... 17

        2. Trump's Categorical Position Should Be Rejected ..................................... 19

        3. Trump Lacks Absolute Immunity for his Defamatory Statements ................. 24

    II.    TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS ............................... 27

    A. Trump's Statements Constituted Defamation Per Se.................................... 27

    B. Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements ........ 30

    C. Trump's Statements Are Actionable as a Matter of Law ..................................... 32

    D. Carroll is Entitled to Present the Punitive Damages Issue to the Jury................. 35

CONCLUSION............................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allam v. Meyers*,
  906 F. Supp. 2d 274 (S.D.N.Y. 2012) ........................................................................... 35

*Am. Acad. of Religion v. Napolitano*,
  573 F.3d 115 (2d Cir. 2009) ........................................................................................ 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505 (1986) .......................................................................... 10

*Aramony v. United Way of Am.*,
  254 F.3d 403 (2d Cir. 2001) ........................................................................................ 16

*Armstrong v. Simon & Schuster, Inc.*,
  85 N.Y.2d 373 (1995) .................................................................................................. 29

*Aronson v. Wiersma*,
  65 N.Y.2d 592 (1985) .................................................................................................. 30

*Banneker Ventures LLC v. Graham*,
  798 F.3d 1119 (D.C. Cir. 2015) ................................................................................... 19

*Barrett v. Harrington*,
  130 F.3d 246 (6th Cir. 1997) ....................................................................................... 21

*Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*,
  41 F.3d 600 (10th Cir. 1994) ....................................................................................... 11

*Broker Genius Inc. v. Gainor*,
  810 F. App'x 27 (2d Cir. 2020) ................................................................................... 15

*Buckley v. Fitzsimmons*,
  509 U.S. 259, 113 S. Ct. 2606 (1993) .......................................................................... 21

*Butler v. Catinella*,
  868 N.Y.S.2d 101 (2d Dep't 2008) .............................................................................. 13

*Carroll v. Trump*,
  49 F.4th 759 (2d Cir. 2022) ................................................................................. 8, 9, 25

*Carroll v. Trump*,
  120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020) ........................................................................ 7

*Carroll v. Trump,*
   498 F. Supp. 3d 422 (S.D.N.Y. 2020)..........................................................8, 24, 25, 27

*Carroll v. Trump,*
   590 F. Supp. 3d 575 (S.D.N.Y. 2022).............................................................9, 14, 15

*Carroll v. Trump,*
   No. 20 Civ. 7311, 2022 WL 6897075 (S.D.N.Y. Oct. 12, 2022) ......................14, 15

*Carroll v. Trump,*
   No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020) ...................8, 16

*Celle v. Filipino Reporter Enters. Inc.,*
   209 F.3d 163 (2d Cir. 2000)...............................................................................27, 29

*Celotex Corp v. Catrett,*
   477 U.S. 317, 106 S. Ct. 2548 (1986)........................................................................10

*Chestnut v. City of Lowell,*
   305 F.3d 18 (1st Cir. 2002)........................................................................................11

*Clinton v. Jones,*
   520 U.S. 681, 117 S. Ct. 1636 (1997)................................................................*passim*

*Cozzo v. Tangipahoa Par. Council,*
   279 F.3d 273 (5th Cir. 2002) ....................................................................................11

*Davis v. Boeheim,*
   24 N.Y.3d 262 (2014) ....................................................................................32, 33, 34

*Davydov v. Youssefi,*
   169 N.Y.S.3d 322 (1st Dep't 2022) ....................................................................29, 30

*Doe v. McMillan,*
   412 U.S. 306, 93 S. Ct. 2018 (1973).........................................................................22

*Dworin v. Deutsch,*
   No. 06 Civ. 13265, 2008 WL 508019 (S.D.N.Y. Feb. 22, 2008) .............................34

*Edwards v. Nat'l Audubon Soc., Inc.,*
   556 F.2d 113 (2d Cir. 1977).......................................................................................29

*Firestone v. Berrios,*
   42 F. Supp. 3d 403 (E.D.N.Y. 2013) ........................................................................16

*Francis v. Costco Wholesale Corp.,*
   No. 19 Civ. 1979, 2021 WL 1298616 (S.D.N.Y. Apr. 7, 2021)................................10

*Gasperini v. Ctr. for Humans., Inc.*,
   518 U.S. 415, 116 S. Ct. 2211 (1996)...................................................................... 13

*Gentile v. Grand Street Medical Assocs.*,
   79 A.D.3d 1351 (3d Dep't 2010) .............................................................................. 34

*Gong v. Savage*,
   169 N.Y.S.3d 511 (Table) (N.Y. Sup. Ct. N.Y. Cty. 2022)....................................... 29

*Gross v. New York Times Co.*,
   82 N.Y.2d 146 (1993) ............................................................................................... 33

*Gurtler v. Union Parts Mfg. Co., Inc.*,
   285 A.D. 643 (1st Dep't 1955) ................................................................................. 30

*Hamer v. Neighborhood Hous. Servs. of Chicago*,
   138 S. Ct. 13 (2017).................................................................................................. 11

*Huggins v. Povitch*,
   No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996)............................. 34

*Hunter v. Bryant*,
   502 U.S. 224, 112 S. Ct. 534 (1991)......................................................................... 15

*Hutchinson v. Proxmire*,
   443 U.S. 111, 99 S. Ct. 2675 (1979)......................................................................... 21

*In re Stock Exchanges Options Trading Antitrust Litig.*,
   317 F.3d 134 (2d Cir. 2003)...................................................................................... 11

*Jones v. Clinton*,
   72 F.3d 1354 (8th Cir. 1996) .................................................................................... 24

*Joyce v. Thompson Wigdor & Gilly LLP*,
   No. 06 Civ. 15315, 2008 WL 2329227 (S.D.N.Y. June 3, 2008)............................... 33

*Levy v. Nissani*,
   115 N.Y.S.3d 418 (2d Dep't 2020)............................................................................ 29

*Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*,
   397 F.3d 77 (2d Cir. 2005)........................................................................................ 16

*McNamee v. Clemens*,
   762 F. Supp. 2d 584 (E.D.N.Y. 2011) ...................................................................... 31

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1, 110 S. Ct. 2695 (1990)........................................................................... 33

*Morales v. Kavulich & Assocs., P.C.,*
   294 F. Supp. 3d 193 (S.D.N.Y. 2018)................................................................ 35

*Nevada v. Hicks,*
   533 U.S. 353, 121 S. Ct. 2304 (2001) ............................................................... 12

*Nixon v. Fitzgerald,*
   457 U.S. 731, 102 S. Ct. 2690 (1982) ........................................................ *passim*

*Pfizer, Inc. v. Stryker Corp.,*
   348 F. Supp. 2d 131 (S.D.N.Y. 2004).............................................................. 31

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,*
   813 F. Supp. 2d 489 (S.D.N.Y. 2011)......................................................... 29, 30

*Ram v. Moritt,*
   612 N.Y.S.2d 671 (2d Dep't 1994) ................................................................... 30

*Reynaga Hernandez v. Skinner,*
   969 F.3d 930 (9th Cir. 2020) ............................................................................ 11

*Rose v. AmSouth Bank of Fla.,*
   391 F.3d 63 (2d Cir. 2004)................................................................................ 14

*Saks v. Franklin Covey Co.,*
   316 F.3d 337 (2d Cir. 2003)................................................................... 11, 13, 14

*Satchell v. Dilworth,*
   745 F.2d 781 (2d Cir. 1984).............................................................................. 11

*Shmueli v. City of New York,*
   424 F.3d 231 (2d Cir. 2005)....................................................................... 10, 12

*Sleepy's LLC v. Select Comfort Wholesale Corp.,*
   779 F.3d 191 (2d Cir. 2015).............................................................................. 30

*Sleepy's LLC v. Select Comfort Wholesale Corp.,*
   No. 07 Civ. 4018, 2020 WL 1244930 (E.D.N.Y. Mar. 16, 2020) ........................... 30

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.,*
   762 F.3d 165 (2d Cir. 2014).............................................................................. 11

*Stern v. Cosby,*
   645 F. Supp. 2d 258 (S.D.N.Y. 2009)......................................................... 27, 35

*Tacopina v. Kerick,*
   No. 14 Civ. 749, 2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) ............................ 30

*Thompson v. Trump*,
    590 F. Supp. 3d 46 (D.D.C. 2022) ......................................................... 23, 24

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ........................................................................... 19, 22

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ...................................................................... 7, 8, 17

*United States v. Burr*,
    25 F. Cas. 30 (C.C.D. Va. 1807) .................................................................. 17

*United States v. Stein*,
    473 F. Supp. 2d 597 (S.D.N.Y. 2007) ........................................................ 34

*Zerman v. Sullivan & Cromwell*,
    677 F. Supp. 1316 (S.D.N.Y. 1988) .......................................................... 34

*Zervos v. Trump*,
    74 N.Y.S.3d 442 (N.Y. Sup. Ct. 2018) .................................................. 33, 34

*Zervos v. Trump*,
    171 A.D.3d 110 (1st Dep't 2019) ............................................................... 7

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1 ........................................................................... 21

U.S. Const. art. II, § 1 ................................................................................... 20

U.S. Const. art. II, § 1, cl. 8 ......................................................................... 20

U.S. Const. art. II, § 2, cl. 1 ......................................................................... 20

U.S. Const. art. II, § 2, cl. 2 ......................................................................... 20

U.S. Const. art. II, § 3 ................................................................................... 20

**Rules**

Fed. R. Civ. P. 8(c) ................................................................................. 10, 11

Fed. R. Civ. P. 15(a) ..................................................................................... 11

Fed. R. Civ. P. 16(b)(4) ................................................................................. 11

Fed. R. Civ. P. 56(a) ..................................................................................... 10

NY CPLR § 3211 ............................................................................................ 7

**Other Authorities**

Doris Kearns Goodwin, *The Bully Pulpit* (2013) .......................................................................... 22

James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836) ........................ 18

Jeffrey K. Tulis, *The Rhetorical Presidency* (1987) .................................................................... 22

Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon, Teac*hing American History ........................................................................................................... 20

Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020) ........................................................ 8

Laurence H. Tribe, *American Constitutional Law* (3d ed. 2000) ................................................ 18

Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. May 24, 2021) ................................................................................. 15

Mem. in Support of Mot. to Dismiss, *District of Columbia v. Trump*, No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) ................................................................................ 18

Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at* https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/ ............ 23, 26

Pet. for Writ of Cert., *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) .................................................................................................. 18

Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, Wash. Post (Jan 29, 2020) .......................................................................... 20

Sand, et al., *Modern Federal Jury Instructions* (2022) ................................................................ 34

Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.) ................................................ 16

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.) ...................................................... 11

# INTRODUCTION

Now that this defamation case is ready for trial after three years of litigation, Defendant Donald J. Trump seeks summary judgment based mainly on his argument that absolute immunity bars Plaintiff E. Jean Carroll's claim. But Trump has waived that affirmative defense: he did not assert it in his answer, he did not mention it at any point prior to the filing of this summary judgment motion, and he took positions in state court that were clearly at odds with it. As a result, Trump can raise absolute immunity at this late stage only in the absence of prejudice to Carroll, undue delay, bad faith or dilatory motive, or futility—and each of those considerations independently prohibits excusing his waiver. Trump's absolute immunity theory is also meritless: his personal attacks on Carroll did not constitute the performance of any presidential function.

This leaves only a handful of other arguments asserted by Trump, each of which lacks merit. First, as explained in Carroll's recent opposition to Trump's motion to dismiss in *Carroll v. Trump*, No. 22 Civ. 10016, ECF 26, Carroll was not required to plead special damages because Trump's statements were defamatory *per se*. Second, it goes without saying that Carroll did not "consent" to Trump's defamation—and it is frivolous to assert that when a woman reveals sexual abuse by a powerful man, she somehow automatically consents to whatever defamatory abuse he may unleash as retribution. Third, precedent confirms that Trump's highly specific factual claims about Carroll's motives for speaking up are actionable as a matter of law and do not qualify as speculative opinion. Finally, Carroll is surely entitled to ask a jury to impose punitive damages.

# BACKGROUND

## A.      Factual Background

More than 25 years ago, Carroll left work at a studio in New Jersey where she had taped her daily television show ("Ask E. Jean") and headed to Bergdorf Goodman, the luxury department store on Fifth Avenue in New York City. *See* Plaintiff E. Jean Carroll's Response to Defendant

Donald J. Trump's Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 24. Carroll did not find what she was looking for and was about to leave the store empty-handed. *Id.* She approached the revolving door on 58th Street, where she saw Trump. *Id.* ¶¶ 24-25. They knew people in the same circles and had previously met at a party. *Id.* ¶ 22. When Trump saw Carroll at Bergdorf's, he "held up [his] hand," so she "stopped and he came in." *Id.* ¶ 25. He said: "Hey, you're that advice lady." Carroll replied: "Hey, you're that real estate tycoon." *Id.*

Trump told Carroll that he was at Bergdorf's to buy a present for a girl and asked her to "come help [him]." *Id.* ¶ 26. Trump and Carroll began searching for a gift. Eventually, on Trump's suggestion, they went upstairs to the lingerie department. *Id.* ¶ 27. When they arrived, it was empty. *Id.* ¶ 28. Sitting on the glass counter near them were "three or four boxes" and "a see-through [lilac-greyish] bodysuit with a little bit of lace on it." *Id.* ¶ 29. Trump picked up the bodysuit, tossed it at Carroll, and said "go put this on." *Id.* ¶ 30. Bemused, Carroll "tossed it back to him" and said to him "it goes with your eyes." *Id.* Trump caught the bodysuit, held it up to Carroll's chest, and said "you're in good shape, this looks like it might fit you." *Id.* ¶ 31. Carroll had assumed they were engaging in "an enjoyable repartee," but then Trump abruptly grabbed her arm and said, "let's go put this on." *Id.* ¶¶ 32-33. As he maneuvered her into a fitting room, Carroll thought to herself, "this is hilarious, I'm going to make him put it on over his pants." *Id.* ¶ 33.

Trump, as it turns out, had a very different plan in mind. As soon as Carroll walked into the dressing room, Trump closed the door and lunged at her. *Id.* ¶¶ 34-35. He pushed her against the wall; she hit her head for the first time before "he had his hands on [her] arms" and "pushed [her] back a second time." *Id.* ¶¶ 34, 37. She "hit [her] head [again] and then he put his shoulder into [her]." *Id.* ¶ 37. As Carroll struggled, she began to realize that "this [was] a battle." *Id.* He grabbed both of her arms, held his weight on her up against the wall, jammed his hand under her

dress, and forcibly pulled down her tights. *Id.* Carroll "tried to get [her] arms up to push him back" but she "couldn't get [her] knee up because the pantyhose had been taken down." *Id.* ¶ 38. Carroll "felt [Trump's] fingers rummaging around" her genitals, and then his penis inside her. *Id.* ¶ 39. Finally, Carroll managed to escape by "push[ing] him with [her] hands and knee." *Id.* ¶ 40.

Carroll ran out of the Bergdorf's and onto Fifth Avenue, scared that Trump would "come after" her and "grab [her] again." *Id.* ¶¶ 40-41. Once outside, Carroll immediately called her friend, Lisa Birnbach. *Id.* ¶¶ 42, 44. When Birnbach picked up the phone, Carroll was "very agitated, very hyperventilating. Emotional. And she told [Birnbach] about what happened to her just really moments before she made the phone call." *Id.* ¶ 43. In that moment, Carroll "was in shock and disordered." *Id.* ¶ 42. She "felt unbalanced." *Id.* Birnbach explained to Carroll that what happened to her was rape—and urged her to go the police. *Id.* ¶ 44. Carroll resisted and swore Birnbach to secrecy. *Id.* ¶ 45. A day or two after the rape, Carroll confided in another close friend, Carol Martin. *Id.* ¶ 46. When Carroll told Martin what had occurred, Martin warned Carroll against revealing the assault because Trump was a powerful man, "he's got 200 lawyers, he'll bury you." *Id.*

Apart from her conversations with Birnbach and Martin, Carroll remained silent about the sexual assault for two decades. *Id.* ¶ 47. She was "embarrassed" and "ashamed," so she "said let's never talk about this again." *Id.* She recalls, "I always feel I can handle things myself." *Id.* She knew that sexual assault was pervasive but feared that "women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked." *Id.* ¶ 49. Carroll's silence, though, concealed trauma. After Trump raped her, "the music had stopped" and her "light was gone." *Id.* ¶ 50. Carroll never had sex or dated again; she "had no desire for desire"—she did not "have the desire to want sex." *Id.*

3

Years later, when Trump announced he was running for President, Carroll watched with "disbelief" and "heartache." *Id.* ¶ 51. But she did not come forward at the time because her mother, a respected Republican politician in Indiana, was dying. *Id.* ¶ 52. She knew that if she spoke up, "it would ruin" her mother's last days. *Id.* It would also come to nothing: "I didn't want to get fired from *Elle* and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about." *Id.* ¶ 53. Moreover, Carroll was horrified that some of Trump's supporters seemed to admire him *more* as woman after woman revealed that he had sexually assaulted them. *Id.*

Everything changed for Carroll in 2017 when she was on a road trip interviewing women for a book she planned to write about their experiences with the men in their lives. *Id.* ¶ 54. On the first day of her trip, "the Harvey Weinstein story broke" and Carroll watched "the flood of stories … as women started standing up." *Id.* ¶¶ 55, 57. Her book began to take a different shape, and Carroll started to create a list of terrible men she had encountered in her own life. *Id.* ¶ 55 Inspired by the women of the #MeToo movement—and understanding the importance of being honest with loyal readers of her column—Carroll decided she had to include Trump. *Id.* ¶ 57. Carroll's book was ultimately published in 2019. In advance of its release, *New York Magazine* published an eight-page excerpt containing, among other things, her account of being raped by Trump. *Id.* ¶ 59.

Trump responded by seeking to punish and humiliate Carroll. He denied her accusation and insisted they had never met. *Id.* ¶¶ 11-13, 61. But he went much further than that. He insulted her physical appearance, implying that he could not have attacked her because "she's not my type"—in other words, that Carroll was too ugly for him to have raped her. *Id.* ¶ 13. He said that Carroll's non-fiction book, with its accounts of what women on her road trip had told her (as well as her own autobiographical account of the rape), "should be sold in the fiction section." *Id.* ¶ 11.

He accused Carroll of "mak[ing] up false stories of assault to try to get publicity for [herself], or to sell [her] book." *Id.* He charged that Carroll had invented an allegation of rape to make money. *Id.* ¶¶ 11-12 And he implied that she had falsely accused other men of sexual assault. *Id.* ¶ 12.

At his deposition in this case, Trump doubled down on each of these statements. *Id.* ¶¶ 64-68. When pressed on his claim that Carroll was too unattractive for him to have sexually assaulted her, for instance, he reiterated it: "And that's 100 percent true. She's not my type. … There's no way I would ever be attracted to her." *Id.* ¶ 69. However, when shown a photograph including himself and Carroll from a party several years before the rape, Trump *twice* misidentified Carroll as his ex-wife Marla Maples—insisting that it was Marla smiling at him in the photo even as he pointed straight at Carroll. *Id.* ¶¶ 70-71. Ultimately, Trump's lawyer had to correct his mistake (which obviously undercut any assertion that Carroll was not "his type"). *Id.* ¶ 70.

Trump's total lack of knowledge about Carroll was unsurprising. When Trump made his statements in June 2019, nobody in the White House had undertaken any research into Carroll or her allegations. *Id.* ¶ 72. Trump admitted during the deposition that he had never read Carroll's book or magazine excerpt. *Id.* ¶ 78. Moreover, neither Trump nor (to his knowledge) any of his White House aides conducted any research or investigation into Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors, her reasons for speaking up, or the veracity of her allegations concerning experiences of sexual misconduct at the hands of other men. *Id.* ¶¶ 72-77. Nor did Trump identify any White House personnel as involved in investigating, preparing, strategizing, or creating the defamatory statements he made about Carroll in June 2019. *Id.* ¶ 72.

Trump's attacks directly targeted Carroll's professional life. Carroll is a journalist, author, and advice columnist who built her career providing honest advice to women in response to their

questions *Id.* ¶ 81. Indeed, her "entire career as an advice columnist rested on the fact that [she] could be trusted." *Id.* ¶ 88. And her advice column had run in *Elle* for 26 years, where it "was one of the most popular columns ever in the magazine." *Id.* ¶ 81. As explained by Roberta Myers (*Elle*'s editor-in-chief for 17 years), Carroll was "a destination, meaning readers would want to hear from her. She was an important part of what kept [*Elle*] popular." *Id.* ¶ 84. Myers elaborated that Carroll "is a journalist first and everything that she writes is informed by that, meaning the facts." *Id.* ¶ 87. As Carroll explained at her own deposition, while she was not surprised that Trump denied raping her, she actually thought he would insist that because she had been flirtatious with him she had somehow consented to having sex with him in the dressing room that day. *Id.* ¶ 62. She was shocked that Trump instead stated that he had never met her and the incident had never happened at all—statements that he subsequently reaffirmed at his deposition. *Id.* ¶¶ 62, 64-65.

But President Trump's charge that she had lied about everything—about meeting him, about the rape itself, about her motives for coming forward—had devastating consequences. As she had feared, Carroll became viewed "as a woman who's untrustworthy," and "a woman who can't be believed." *Id.* ¶ 89. She also received fewer letters from readers—and then was unexpectedly fired from *Elle* before her contract was up for renewal. *Id.* ¶ 90. An expert analysis confirms that Trump's statements reached an immense audience and harmed Carroll's reputation and professional endeavors. *See id.* ¶ 91 (analyzing dissemination of the statements and concluding they generated between 142,334,424 and 188,155,507 impressions); *id.* ¶ 92 (completing quantitative impact analysis to determine number of readers and listeners likely to believe Trump's statements by publication, averaging 25.25%)]. In short, Trump's defamation "shook th[e] whole foundation" of the career that Carroll had painstakingly built for herself as an author and journalist over many years, and "that was it." *Id.* ¶ 89.

B.      **Procedural History**

Carroll filed this action in New York state court in November 2019. From the start, Trump engaged in a pattern of bad faith and dilatory measures. He began by evading service of the complaint, forcing Carroll to seek leave to serve him through alternatives means. NYSCEF No. 15.[1] Once served, Trump filed a motion to dismiss under NY CPLR 3211 that presented only a single, frivolous ground for dismissal: lack of personal jurisdiction in New York. *See* NYSCEF Nos. 33. This motion was denied. *See Carroll v. Trump*, 120 N.Y.S.3d 587 (N.Y. Sup. Ct. 2020).

After Trump's initial evasions failed, he filed an answer raising nine affirmative defenses. NYSCEF No. 68. Eight of them concerned the merits of Carroll's defamation claim or personal jurisdiction over him in New York. *Id.* ¶¶ 148-55. The sole remaining affirmative defense asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." *Id.* ¶ 147 (emphasis added). Trump's affirmative defenses did not include any assertion that the Supremacy Clause or Article II rendered him absolutely immune from liability in this proceeding.

Trump subsequently relied on his Supremacy Clause defense in seeking a stay of the case pending a decision by the New York Court of Appeals in *Zervos v. Trump*. The *Zervos* case concerned whether a civil suit could proceed against Trump in state court during his time in office. *See* 171 A.D.3d 110, 113 (1st Dep't 2019). In his stay motion, Trump argued only that the Supremacy Clause "bars state-court subject matter jurisdiction over actions against a U.S. President *while he or she is in office*." NYSCEF No. 49 at 6 (emphasis added); *accord id.* at 1-4.

While Trump's stay motion was pending, the U.S. Supreme Court decided *Trump v. Vance*, which held that the Constitution does not categorically preclude the issuance of a state criminal

---

[1] Citations to "NYSCEF No. __" are to the New York state court docket, No. 160694/2019 (N.Y. Sup. Ct.).

subpoena to a sitting President. *See* 140 S. Ct. 2412, 2421-29 (2020). In light of *Vance*, Carroll renewed her opposition to Trump's stay motion. Trump responded by asserting that *Vance* was limited to the criminal context: "[T]here is no pressing need for a state court to exercise control over a sitting President in a civil action, particularly because the action can be stayed *until the President is no longer in office*." NYSCEF No. 99 at 3 (emphasis added). Two days later, Trump expressly disclaimed any effort to evade litigation or liability once he was no longer President: "No one is seeking to 'escape accountability' here. Plaintiff is free to pursue this action *when the President is no longer in office*." NYSCEF No. 103 at 3 (cleaned up) (emphasis added).[2]

In August 2020, Justice Saunders denied Trump's stay motion. *See Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130 (N.Y. Sup. Ct. Aug. 3, 2020). Trump then faced a choice: seek appellate relief or comply with his discovery obligations. Trump opted instead to pressure the United States Department of Justice (DOJ) to intervene under the Westfall Act. *See* Katie Benner & Charlie Savage, *White House Asked Justice Dept. to Take Over Defamation Suit Against Trump, Barr Says*, N.Y. Times (Sept. 9, 2020). At Trump's behest, the DOJ removed the case to this Court and filed a motion to substitute itself as the defendant. *See* Dist. Ct. Doc. No. 3.

This Court denied the DOJ's motion to substitute on two grounds: first, the Westfall Act does not cover the President; second, Trump's defamatory attacks on Carroll were not undertaken within the scope of his office or employment as President. *See Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020). Both Trump and the DOJ appealed. *See* Dist. Ct. Doc. Nos. 45, 46. On September 27, 2022—over a dissent by Judge Chin—a Second Circuit panel held that the Westfall Act does cover the President. *See Carroll v. Trump*, 49 F.4th 759, 767-72 (2d Cir. 2022). The

---

[2] At this point, Trump was represented by attorneys at the law firm of Kasowitz Benson Torres LLP.

majority then certified the scope-of-employment issue to the District of Columbia Court of Appeals, *see id.* at 772-81, which held oral argument sitting *en banc* on January 10, 2023.[3]

During the pendency of his appeal, Trump remained exceptionally active in this Court. He moved to stay proceedings twice, first on December 10, 2020, and then again on September 28, 2022. *See* Dist. Ct. Doc. Nos. 47, 92. This Court denied both motions. *See id.* at 56, 96. Trump also moved to amend his answer to add an anti-SLAPP affirmative defense and counterclaim against Carroll. *See id.* at 64. The Court denied that motion, too, observing that "Trump has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails." *Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). Indeed, the Court not only found Trump's amendment to be futile, but also determined that Trump had "delayed unduly in seeking leave to amend," that Trump had made the request to amend his answer "at least in part in bad faith," and that "granting the motion would prejudice the plaintiff unduly." *Id*. at 589.

Trump thereafter proposed, and Carroll agreed to, a discovery schedule. *See* Dist. Ct. Doc. Nos. 76, 77. Throughout discovery, Trump affirmatively invoked this Court's power to press and litigate his case: he obtained 30,469 pages of records from Carroll and hundreds more pursuant to nonparty subpoenas; he received 19 substantive interrogatory responses; and he deposed Carroll herself, numerous nonparty witnesses, and Carroll's expert witness. In contrast, Trump produced a mere handful of documents and discovery responses before sitting for a deposition.

Following the close of discovery, Trump submitted a proposed schedule for the remainder of the case. Although Trump urged the Court to schedule trial in May 2023, he did not reveal that he planned to inject a previously undisclosed affirmative defense into the action—even as he sought to push the summary judgment schedule closer to the trial date. Dist. Ct. Doc. Nos. 99, 102.

---

[3] A recording of that oral argument is available here: https://www.youtube.com/watch?v=EFX5Y8kp4Co.

## STANDARD OF REVIEW

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant bears the burden of proof. *See id.* at 323, 106 S. Ct. at 2552. The court resolves all ambiguities and draws all factual inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Francis v. Costco Wholesale Corp.*, No. 19 Civ. 1979, 2021 WL 1298616, at *2 (S.D.N.Y. Apr. 7, 2021) (Kaplan, J.).

## ARGUMENT

## I.    TRUMP'S ABSOLUTE IMMUNITY DEFENSE IS WAIVED AND MERITLESS

### A.    Trump Waived Any Claim to Absolute Immunity

Trump did not attempt to raise an absolute immunity argument until over three years into this litigation. He did not assert this affirmative defense in his answer, nor did he include it any of his voluminous filings in state or federal court. Instead, he took positions in state court plainly at odds with an assertion of absolute immunity—and more recently asked this Court to set a trial date without even mentioning that he planned to raise an unpleaded affirmative defense. Trump therefore waived any contention that absolute immunity defeats Carroll's case. And although the Court has discretion to excuse that waiver in the absence of bad faith or dilatory motive, prejudice to the plaintiff, undue delay of the proceedings, or futility, in this case each of those considerations *independently* forecloses any claim that Trump's waiver of absolute immunity should be excused.

#### 1.    Legal Standard

Absolute immunity is an affirmative defense. *See Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). Under Federal Rule of Civil Procedure 8(c), "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." A "core purpose[]" of this

rule is "to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003). Accordingly, "[i]t is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule of Civil Procedure 8(c) results in the waiver of that defense and its exclusion from the case." Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1278 (4th ed.); *see Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 176 (2d Cir. 2014); *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984). This longstanding rule applies with full force to absolute immunity. *See Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002) ("Absolute immunity is an affirmative defense that is waived if it is not pleaded."); *accord Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 n.1 (9th Cir. 2020); *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003); *Chestnut v. City of Lowell*, 305 F.3d 18, 22 (1st Cir. 2002) (Torruella, J., concurring); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604-05 (10th Cir. 1994).

As the Second Circuit has explained, the waiver of an affirmative defense may be excused only in limited circumstances: namely, "in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks*, 316 F.3d at 350. In those exceptional situations—and consistent with Federal Rules of Civil Procedure 15(a) and 16(b)(4)—"the district court may construe the motion for summary judgment as a motion to amend the defendant's answer." *Id.* at 350-51 (citations omitted).[4]

---

[4] Adhering to Second Circuit precedent, we describe Trump's conduct in this litigation as resulting in a waiver, even though it may also properly be characterized as a forfeiture under recent Supreme Court precedent. *See, e.g.*, *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) ("The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous. Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." (cleaned up)).

### 2.        Trump Waived His Absolute Immunity Defense

Trump waived his affirmative defense of absolute immunity by failing to raise it in his answer. That waiver is confirmed by his subsequent conduct in this litigation.

Trump's answer raised nine affirmative defenses, only one of which concerned official immunity in any respect. In his first affirmative defense, Trump asserted that "Plaintiff's claim is barred because defendant is immune, under the Supremacy Clause of the United States Constitution, from suit in state court *while serving as President of the United States*." NYSCEF No. 68 at ¶ 147 (emphasis added). On its face, this defense did not invoke Article II, did not invoke absolute immunity, and did not claim total or permanent immunity from either litigation or liability. Neither in form nor in substance did it encompass absolute immunity, which "protects an official not only from liability but also from suit." *Shmueli*, 424 F.3d at 236.

Instead, this part of Trump's answer raised a very different argument: that the Supremacy Clause divested the state court of power to hear this case during Trump's presidential tenure. In other words, Trump claimed only that the state court temporarily lacked subject matter jurisdiction over him by virtue of his federal office. *See* NYSCEF No. 49 at 1 (contending that the "Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office"). That time-limited Supremacy Clause argument is fundamentally different from an assertion of absolute immunity in two respects. First, within its scope, absolute presidential immunity provides *permanent* rather than *temporary* immunity. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748-49, 102 S. Ct. 2690, 2700-01 (1982). And second, in contrast to Trump's portrayal of his Supremacy Clause argument as jurisdictional, "there is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Nevada v. Hicks*, 533 U.S. 353, 373, 121 S. Ct. 2304, 2317 (2001).

Accordingly, the affirmative defense in Trump's answer simply had nothing to do with absolute immunity—and so Trump waived absolute immunity by failing to raise it in his answer.[5]

Trump's subsequent litigation conduct only confirmed that waiver. In state court, Trump repeatedly described his immunity position as limited to his tenure in office. *See* NYSCEF No. 99 at 3. More fundamentally, Trump affirmatively stated that "no one is seeking to 'escape accountability' here," and he conceded that "Plaintiff is free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Meanwhile, Trump neither sought to amend his answer nor sought appellate relief after his Supremacy Clause defense was rejected in state court. The subsequent removal of this case to federal court only gave Trump more opportunities to persist in his waiver: he failed to raise absolute immunity in his first stay motion, *see* Dist. Ct. Doc. No. 47; in his second stay motion, *see id.* at 92; in his motion to amend his answer to add an anti-SLAPP affirmative defense and counterclaim, *see id.* at 64, in agreeing to a joint proposed discovery schedule, *see id.* at 75; or in his letters to the Court concerning a proposed schedule for summary judgment briefing and trial proceedings, *see id.* at 99, 102. Stated simply, Trump waived absolute immunity when he filed his answer on January 23, 2020, and he deepened that waiver by litigating this case for almost three years before seeking to raise that defense.

### 3.    There is No Excuse for Trump's Waiver

In light of the Court's power to grant leave to amend an answer, the Court may "entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of

---

[5] To the extent Trump may argue that he raised absolute immunity by averring that the complaint fails to state a claim, that position is foreclosed by Second Circuit precedent. *See Saks*, 316 F.3d at 350 (collecting cases). To the extent Trump claims that state court procedural rules are different, he is mistaken, *see Butler v. Catinella*, 868 N.Y.S.2d 101, 106 (2d Dep't 2008) ("Affirmative defenses … as a general rule, would be deemed waived if not raised in the pleadings." (citation omitted)), and in all events federal procedural rules apply now that the case has been removed to federal court, *see Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219 (1996).

the proceedings." *Saks*, 316 F.3d at 350. Because Trump fails that standard several times over, the Court should not excuse Trump's waiver of the affirmative defense of absolute immunity.

First, Trump has clearly acted with bad faith and dilatory motive. In fact, this Court already reached that conclusion with specific respect to the propriety of granting Trump leave to amend his answer to add an unpleaded affirmative defense. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022) (denying Trump's motion for leave to amend his answer to include an anti-SLAPP defense and finding that Trump "has slow-rolled his defenses, asserting or inventing a new one each time his prior effort to delay the case fails"); *see also id.* at 587-89 (describing the course of Trump's dilatory conduct). The Court then reaffirmed that finding of bad faith just three months ago. *See Carroll v. Trump*, No. 20 Civ. 7311, 2022 WL 6897075, at *6 (S.D.N.Y. Oct. 12, 2022) (adhering to the Court's earlier finding that "defendant's litigation tactics have had a dilatory effect and, indeed, strongly suggest that he is acting out of a strong desire to delay any opportunity plaintiff may have to present her case against him"). Whether seen as law of the case concerning Trump's entitlement to amend his answer or instead as highly relevant findings concerning Trump's bad faith and dilatory purpose, these decisions make clear that Trump's waiver should not be excused. Indeed, as noted above, Trump previously sought to shore up his state court stay motion by insisting that Carroll was "free to pursue this action when the President is no longer in office." NYSCEF No. 103 at 3. Now that he has left office—and his other stall tactics have failed—Trump should not be permitted to renege on that position by introducing yet another brand-new argument (which, if rejected, he will presumably seek to leverage into another interlocutory appeal). No party should be allowed to deliberately engage in such a "seriatim appeals" strategy.

Second, Trump did not seek to raise this defense "at the first pragmatically possible time," and allowing him to do so at this late juncture would "unfairly prejudice the opposing party." *Rose*

*v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004); *see Broker Genius Inc. v. Gainor*, 810 F. App'x 27, 32 (2d Cir. 2020) (upholding finding of waiver). The law of absolute immunity is not new—and Trump has known all the facts relevant to that potential defense from the outset of this case. *See* Mot. at 3-18. Moreover, immunity doctrines are meant to be raised and resolved "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991), and Trump has had no difficulty asserting absolute immunity at the outset of other civil damages cases, *see, e.g.*, Mem. in Support of Donald J. Trump and Donald Trump Jr.'s Mot. to Dismiss at 8-11, *Swalwell v. Trump*, No. 21 Civ. 586 (D.D.C. May 24, 2021). These facts not only confirm Trump's bad faith and dilatory purpose, but also highlight the substantial prejudice to Carroll that would result from allowing him to invoke an unpleaded affirmative defense that he could have raised much earlier. *See Carroll*, 590 F. Supp. 3d at 586 ("The defendant has not offered a satisfactory reason for the length of his delay in this case."). That prejudice includes a lack of notice concerning the need to respond to this affirmative defense throughout the now-concluded discovery process. It encompasses Trump's efforts to raise this issue only after having inflicted substantial burdens on Carroll and third parties in discovery (when a major purpose of absolute immunity is to gatekeep access to discovery in the first place). And it captures the potential for significant additional delays in this litigation arising from a defense that Trump chose not to assert for the first three years of the proceedings. *See Carroll*, 2022 WL 6897075, at *6 ("Delay is a more serious concern in this case than usual …. [T]he defendant should not be permitted to run the clock out on plaintiff's attempt to gain a remedy for what allegedly was a serious wrong.").

Finally, for the reasons set forth below in Part I.B, Trump's absolute immunity argument is meritless, and so his attempt to overcome or excuse his waiver would fail based on futility.

For each of these independent reasons—bad faith and dilatory motive, undue prejudice to the plaintiff, undue delay of the proceedings, and futility—the Court should find that Trump has waived any affirmative defense of absolute immunity and should not excuse that waiver.

### 4.     Alternatively, The Law of the Case Rule Precludes Trump's Position

In the event this Court concludes that Trump's first affirmative defense did include absolute immunity, the Court should nonetheless reject it as precluded by the law-of-the-case doctrine.

If one court decides a legal issue, "that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (citation omitted). That is especially true where "one judge or court is asked to consider the ruling of a different judge or court." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (quoting Wright & Miller, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.)). This doctrine applies, as here, "when a state court case is removed to federal court." *Firestone v. Berrios*, 42 F. Supp. 3d 403, 412 (E.D.N.Y. 2013) (citation omitted).

Trump's first affirmative defense in this case maintained that the state court temporarily lacked jurisdiction under the Supremacy Clause. To the extent this qualified as an assertion of absolute immunity, it was rejected by the state trial court when considered directly in connection with Trump's motion to stay, *see Carroll v. Trump*, No. 160694/2019, 2020 WL 4547130, at *2 (N.Y. Sup. Ct. Aug. 03, 2020), and Trump then chose *not* to appeal that determination. Therefore, Trump has either waived absolute immunity or, alternatively, law of the case precludes it.

### B.     Trump's Absolute Immunity Defense is Meritless

Even if it were not waived or precluded, Trump's absolute immunity defense should be rejected: it is foreclosed by precedent and would invite abuse by future officeholders. Because Trump's attacks on Carroll were private conduct beyond the scope of any Article II function, there is no basis for concluding that absolute immunity bars Carroll's defamation action.

16

### 1.    Absolute Immunity Is Subject to Important Limits

As the "chief constitutional officer of the Executive Branch," the President "occupies a unique position in the constitutional scheme." *Nixon*, 457 U.S. at 749-50, 102 S. Ct. at 2701. "His duties, which range from faithfully executing the laws to commanding the Armed Forces, are of unrivaled gravity and breadth." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020). Therefore, to avoid the "distortion of the Executive's decisionmaking process with respect to official acts that would stem from worry as to the possibility of damages," *id.* (citation omitted), courts have long held that the President enjoys absolute immunity from "damages liability for acts within the 'outer perimeter' of his official responsibility," *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704. This rule upholds the separation of powers by policing judicial intrusion on Article II functions.

If extended beyond official conduct, however, this doctrine poses a risk of abuse, since it would immunize the President for even egregious personal wrongs. The Supreme Court has thus held that the purposes of absolute immunity also define its limits. *See id.* at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes."). Because those purposes concern only the President's official acts, there is "no support for an immunity for *unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694, 117 S. Ct. 1636, 1644 (1997). Simply put, the President does not receive immunity for acts beyond the "'outer perimeter' of his official responsibility." *Nixon*, 457 U.S. at 756, 102 S. Ct. at 2704; *see also Clinton*, 520 U.S. at 696, 117 S. Ct. at 1645 (the President lacks immunity "for his purely private acts").

In practice, this limitation underscores the importance of discerning the scope of official presidential conduct. The Presidency is a demanding job. But as Chief Justice Marshall anticipated, the demands of a president's "duties as chief magistrate" are not so "unremitting" as to consume "his whole time." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14692D); *see*

17

*also* Clinton, 520 U.S. at 705 n.40, 117 S. Ct. at 1650 (Presidents "face a variety of demands on their time, … some private, some political, and some as a result of official duty"); Laurence H. Tribe, *American Constitutional Law* 631 (3d ed. 2000) (recalling that the President "is a person as well as an institution"). Indeed, the Framers foresaw that Presidents would engage in private conduct.[6] And while serving as President, Trump insisted that aspects of his conduct were wholly private, including profitable business deals with foreign nations and censoring critics on Twitter.[7]

Because Presidents engage in a shifting mix of personal and official acts, only some of which reflect presidential functions, the Supreme Court has provided additional guidance. *First*, plaintiffs cannot defeat immunity merely by alleging that the President's conduct was unlawful or motivated by an improper purpose. *See Nixon*, 457 U.S. at 756, 102 S. Ct. at 2705. *Second*, the President cannot invoke immunity merely by claiming that his conduct was "clearly taken *within* an official capacity," since the "scope of an immunity" even for otherwise official acts depends on "'performance of particular functions of his office.'" *Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (citation omitted). *Third*, a conception of absolute immunity that would encompass all presidential conduct is inconsistent with the teaching that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 695, 117 S. Ct. at 1644 (citation omitted). *Finally*, as the D.C. Circuit has recognized, the official seeking immunity (here,

---

[6] *See* James Wilson, *Debates in the Convention of the State of Pennsylvania* (Dec. 4, 1787), *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 480 (Jonathan Elliot ed., Washington, 2d ed. 1836) ("Far from being above the laws, [the President] is amenable to them in his private character as a citizen.").

[7] Although Trump was mistaken in those contexts that his actions were not subject to constitutional constraint, Trump concededly understood himself to be acting in a purely private capacity during important interactions with the public during his tenure in office. *See, e.g.*, Petition for Writ of Certiorari at 14, *Trump v. Knight First Amendment Institute*, No. 20-197 (U.S. Aug. 20, 2020) ("Blocking third-party accounts from interacting with the @realDonaldTrump account is a purely personal action."); Mem. in Supp. of Mot. to Dismiss at 31, *District of Columbia v. Trump*, No. 17 Civ. 1596 (D. Md. Sept. 29, 2017) (arguing in Emoluments Clause litigation that President Trump was free to profit from private commercial transactions with foreign powers, so long as he did not receive "compensation for services rendered … in an official capacity or in an employment (or equivalent) relationship with a foreign government").

the President) bears the burden of proof in establishing his entitlement to it for any particular act. *See, e.g.*, *Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015). Under this framework, the President enjoys robust protection for conduct undertaken as part of an Article II function, but lacks immunity for personal conduct outside the scope of his presidential role.

### 2.    Trump's Categorical Position Should Be Rejected

Trump asks this Court to hold that whenever the President addresses the public on a matter of "national concern," or "defend[s] himself from grave accusations that impugn his character," he has engaged in a presidential function shielded by absolute immunity. Mot. at 13. That proposed categorical rule—which treats the nature and context of his public statements as all but irrelevant—sweeps much too far. It defies precedent and tradition, and it should be rejected.

Starting with first principles, the Supreme Court has made clear that absolute immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Clinton*, 520 U.S. at 695, 117 S. Ct. at 1644. Thus, absolute immunity shields only particular presidential functions, rather than all conduct by the holder of the office. For that distinction to bear weight, presidential functions cannot be defined so expansively as to encompass everything a President might say. Yet that is what Trump urges here. Every statement by the President may— by simple virtue of who uttered it—be seen as involving a matter of "national concern." Similarly, the President could describe most (or all) of his statements as responses to those who "impugn his character." Trump's position therefore conflicts with *Clinton*: it would treat virtually every statement by a President as the performance of an official function, and would (in effect) assign unlimited immunity to the President himself rather than to his perceptibly presidential conduct.

To be sure, nobody doubts that the President "possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018). Certain exercises of

Article II authority inherently involve speech, including the Oath of Office, U.S. Const. art. II, § 1, cl. 8, the State of the Union, *id.* art. II, § 3, the Commander in Chief power, *id.* art. II, § 2, cl. 1, the pardon power, *id.*, and the nominating power, *id.* art. II, § 2, cl. 2. In many other settings, such as signing statements, veto threats, supervision of the executive branch, and certain personnel announcements, the President performs an official function by speaking about how he has exercised (or intends to exercise) aspects of "the executive Power." *Id.* art. II, § 1. Speech by the President about the operation and administration of the government, and about the execution of the laws that he has sworn to faithfully execute, is ordinarily part of his official functions as well.

But when the President speaks about personal and private matters bearing no relation to any historical, ongoing, or intended use of Article II authority—and bearing no relation to the operation and administration of the government—it is more tenuous to claim that he is engaged in a presidential function. In such cases, a context-sensitive assessment is necessary to honor the purposes and limits of absolute immunity. *See Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704 ("[T]he sphere of protected action must be related closely to the immunity's justifying purposes …."). Holding otherwise (as Trump urges) would conflate the President's private interests with the functions of his office in circumstances far removed from any official undertaking.[8]

This fundamental point has been understood in every analogous setting: time and again, courts have denied absolute immunity to statements beyond the scope of official functions. *See Nixon*, 457 U.S. at 759, 102 S. Ct. at 2706 (Burger, C.J., concurring) ("President[s], like Members of Congress, judges, prosecutors, or congressional aides—all having absolute immunity—are not

---

[8] At Trump's first impeachment trial, his lawyer insisted that "if a president does something, which he believes will help him get elected in the public interest, that cannot be [an impeachable offense]." Philip Bump, *Trump's Impeachment Team Argues That Anything He Does to Win Reelection Isn't Impeachable*, Wash. Post (Jan 29, 2020). Similar logic underwrites Trump's position here that anything the President says is necessarily a presidential function. Of course, our nation has historically rejected analogous claims that "when the president does it, that means that it is not illegal." Jeremy M. Bailey, *Transcript of David Frost's Interview with Richard Nixon*, Teaching American History.

immune for acts outside official duties."). Starting with other Executive Branch officials, the Supreme Court has held that prosecutors are not protected by absolute immunity for statements at press conferences, even though they "may be an integral part of a prosecutor's job" and "may serve a vital public function." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278, 113 S. Ct. 2606, 2618 (1993). So too for the Judiciary. As the Sixth Circuit has emphasized, judges lack absolute immunity for statements made to the press about matters and litigants pending before them: "Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense." *Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997). The same rule covers Congress, whose members (like the President) are accountable to the public through elections and may feel hindered if they cannot speak about matters of "national concern" or respond to accusations that "impugn their character." Members of Congress enjoy a constitutional immunity of their own under the Speech or Debate Clause—which, unlike Article II, *specifically* guarantees immunity for their "Speech." U.S. Const. art. I, § 6, cl. 1. But public statements uttered outside the context of official congressional proceedings constitute non-legislative activity and are *not* shielded by any absolute constitutional immunity—even when a legislator's statements may have "a significant impact on the other [legislators]," and even when statements are issued in furtherance of Congress's own "informing function." *See Hutchinson v. Proxmire*, 443 U.S. 111, 131-32, 99 S. Ct. 2675, 2686-87 (1979). Together, these cases concerning all three branches of government confirm that absolute immunity has *never* been held to encompass all public statements by federal officials, even if those statements may help facilitate the performance of their official functions or are issued in response to public criticism.[9]

---

[9] Strangely, Trump suggests that cases involving legislators and other executive branch officials support his position— and does so relying almost exclusively on cases involving Westfall Act immunity. *See* Mot. at 13-16. Those cases are not a reliable guide to ascertaining the scope of absolute immunity. In some circumstances absolute immunity is

Although the Presidency is unique in certain respects, that uniqueness does not transform every public statement into the performance of an official function. This conclusion is bolstered by original understanding, as well as by common sense. First consider history. *See Nixon*, 457 U.S. at 747, 102 S. Ct. at 2700. Tested against an originalist perspective, Trump's position is baseless: from the founding of the Republic through the early twentieth century, the President's rhetorical function was not understood to encompass public pronouncements on every matter of perceived private or national importance. *See generally* Jeffrey K. Tulis, *The Rhetorical Presidency* (1987). It was not until Presidents Woodrow Wilson, William Howard Taft, and Theodore Roosevelt that the "bully pulpit" came to be seen as a substantial part of the Presidency. *See id.*; *see also* Doris Kearns Goodwin, *The Bully Pulpit* (2013). In our own era, of course, the bully pulpit is established as a presidential function. *See Hawaii*, 138 S. Ct. at 2417-18. But its modern vintage—coupled with its lack of an originalist grounding, sustained contest over its proper scope, and the principle that absolute immunity must be limited—precludes Trump's maximalist position.

So does common sense; hypotheticals illustrate the point. Imagine if a President responded to criticism of his business acumen by appearing at one of his privately-owned hotels to make unlawful statements about a competitor while urging listeners to stay at his property. Or consider a President who appeared at a campaign event and declared that he would endorse anybody who burned down his political opponent's private residence. Or a President who responded to debates over electoral integrity by hosting events in which he urged supporters to engage in unlawful voter

---

broader than Westfall Act protections, and in some circumstances it may be narrower. When it comes to speech by legislators, for instance, the Westfall Act may provide comparatively broad protection by virtue of its application to *all* job-related duties that are actuated by a job-related purpose. In contrast, courts have more tightly limited absolute immunity, denying it to conduct undertaken within the scope of employment wherever that conduct is not in actual, objective furtherance of an official function. *See, e.g.*, *Doe v. McMillan*, 412 U.S. 306, 313, 93 S. Ct. 2018, 2025 (1973) ("[E]verything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause."); *see also Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 (holding that conduct "clearly taken *within* an official capacity" lacks absolute immunity if not undertaken in performance of an official function).

intimidation. Or a President who retained a private residence, got into a property dispute with his neighbor, and willfully sought to incite local protesters to violence and trespass. Or a President who, first thing every morning, randomly picked the name of a critic on social media and then made sure to accuse them of some horrible crime in answering questions from the press that day. For each of these scenarios, Trump's position would shield the President with absolute immunity. Not only would those results be absurd; they would also entail a stark departure from the constitutional principles that animate presidential immunity, which exists to ensure that the President is not improperly diverted in the exercise of his traditional Article II functions.

It is therefore unsurprising that the courts have rejected Trump's proposed rule. This occurred directly in *Thompson v. Trump*, a civil suit arising from Trump's conduct on January 6, 2021. *See* 590 F. Supp. 3d 46 (D.D.C. 2022). There, Judge Mehta described Trump's position as "too simplistic." *Id.* at 77. As he reasoned, "to say that speaking on matters of public concern is a function of the presidency does not answer the question at hand: Were President Trump's words in this case uttered in performance of official acts, or were his words expressed in some other, unofficial capacity?" *Id.* at 79. Ultimately, Judge Mehta found that "the better course is to evaluate the defense on the specific facts alleged and, based on those facts, determine whether President Trump's words were spoken in furtherance of a presidential function." *Id.* at 81. Applying that rule to the facts in the case before him, he concluded that Trump lacked absolute immunity.[10]

Trump's proposed categorical rule is also at odds with *Clinton v. Jones*. There, as here, a plaintiff sued the President for defaming her after she revealed that he had engaged in sexual misconduct before taking office. More precisely, she alleged that "various persons authorized to

---

[10] On December 7, 2022, the D.C. Circuit—Chief Judge Srinavasan, Judge Rogers, and Judge Katsas—heard oral argument in Trump's appeal from Judge Mehta's ruling. *See* Oral Argument, *Blassingame v. Trump*, No. 22-5069, *available at* https://www.courtlistener.com/audio/84126/james-blassingame-v-donald-trump/.

speak for the President"—including his own White House aides and the official White House Spokesman—"publicly branded her a liar by denying that the incident had occurred." *Clinton*, 520 U.S. at 685, 117 S. Ct. at 1640. Under Trump's position, *Clinton* should have been an easy case: it involved a comparatively mild denial of alleged sexual misconduct, and that denial was issued by the President in coordination with his official White House agents and spokespersons.[11] But the Eighth Circuit described Clinton's entitlement to absolute immunity as "not free from doubt." *Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). And the Supreme Court declined to address whether Clinton's defamatory statements were "taken within the 'outer perimeter' of his official responsibilities," observing only that the allegations "arguably may involve conduct" within that outer perimeter. *Clinton*, 520 U.S. 686 & n.3, 117 S. Ct. at 1640 & n.3.

Like *Nixon* before it and Judge Mehta's decision more recently, *Clinton* made clear that absolute immunity requires a careful examination of the facts to see whether a particular act was undertaken in performance of a recognized presidential function. *See Clinton*, 520 U.S. at 694, 117 S. Ct. at 1644 ("[W]hen defining the scope of an immunity for acts clearly taken *within* an official capacity, we have applied a functional approach."); *accord Nixon*, 457 U.S. at 755, 102 S. Ct. at 2704; *Thompson*, 590 F. Supp. 3d at 76-81. That context-sensitive approach requires a rejection of Trump's proposed categorical rule—and also requires the denial of absolute immunity here.

### 3.   Trump Lacks Absolute Immunity for his Defamatory Statements

As this Court has already recognized, "while commenting on the operation of government is part of the regular business of the United States, commenting on sexual assault allegations unrelated to the operation of government is not." *Carroll v. Trump*, 498 F. Supp. 3d 422, 448

---

[11] The complaint in *Jones v. Clinton*, No. 94 Civ. 290 (E.D. Ark.), is available at https://www.washingtonpost.com/wp-srv/politics/special/pjones/docs/complaint.htm.

(S.D.N.Y. 2020), *rev'd in part, vacated in part*, 49 F.4th 759 (2d Cir. 2022). Under the undeniably unusual and extreme facts presented here, Trump has no legitimate claim to absolute immunity.

Although Trump never previously raised absolute immunity in this case, and Carroll lacked notice of that issue, the discovery process partly illuminated the context of Trump's statements. Trump never read (or even saw) Carroll's article or book before he set out to destroy her. He did not undertake any investigation whatsoever into Carroll, her background, or her claims, nor did he ask anyone in the White House to do so. He had no idea what Carroll even looked like—and, when first presented with a photo of himself with Carroll during the deposition, twice mistook Carroll for his second wife, at least until his lawyer corrected him. At the time he made the defamatory statements at issue, Trump had no knowledge of Carroll's financial arrangements, her publication contract, her book sales, her political leanings, her connections to political actors, or her reasons for speaking up—in other words, he knew nothing (and made no effort to learn anything) about the defamatory attacks he aimed at Carroll, and had no recollection of involving White House staff or aides in those attacks (or seeking their advice). He does not recall any specific basis to have believed when he defamed her that Carroll had falsely accused any other particular man of sexual assault. He did not engage in any notable way with White House aides in making his defamatory statements, and there was no effort within the White House to investigate Carroll's claim.

On its face, this conduct did not constitute the performance of any presidential function: "A comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office. … President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government." *Carroll*, 498 F. Supp. 3d at 453. Simply put, Trump's attacks on Carroll had no connection to the exercise of

any Article II power, had nothing to do with the operation or administration of the government, did not concern any government policy or program or position, and did not reflect the execution of any presidential duty under the Take Care Clause. Moreover, the subject matter of Trump's attacks arose from his own private sexual misconduct years before he took his office, and his defamatory statements went far beyond a mere denial to encompass specific and highly personal remarks about a private citizen. This spree of defamatory statements not only was unusually vitriolic (including Trump's conceded implication that Carroll was too unattractive for him to have raped her), but was also undertaken with no official executive process and hardly any White House involvement (beyond someone handing a reporter a copy of Trump's statement on June 21, 2019). Nothing about Trump's many statements concerning Carroll had *any* connection to a presidential function. Even as compared to the *Clinton* case, which the Supreme Court appeared to view as a closer call, Trump's statements were more decisively private along every relevant dimension.[12]

All but conceding as much, Trump resorts to a sweeping claim that the President is entitled to open season whenever he addresses a matter of "public concern" or responds to "allegations which impugned his character." Mot. at 17. Analogous arguments have been repeatedly rejected as to other officials, *see supra* at 21, and that position should be rejected here as well: "[I]t would mean that a president is free [to] defame anyone who criticizes his conduct or impugns his character—without adverse consequences to that president and no matter what injury he inflicts on the person defamed. Indeed, the same would be true for many government officials, who plausibly could argue that criticism of their behavior or character, even if completely unrelated to

---

[12] At oral argument in the *Blassingame* appeal, Trump conceded that he would not have enjoyed absolute immunity for an act of sexual assault while in office. *See supra* n.10, at 8:38-8:48. It would appear that Trump believes Presidents lack immunity if they rape someone *while* in office, but enjoy immunity if they rape someone *before* taking office and then (after being sworn in) use their bully pulpit to viciously destroy that person when they reveal the sexual assault.

their government employment, would undermine their ability to perform effectively while in office." *Carroll*, 498 F. Supp. 3d at 453.

While he served as President, Trump may have seen a benefit to punishing and humiliating women who revealed that he had sexual assaulted them. He may even have been right that he would benefit personally or politically by taking such actions. But that self-interested calculation does not render his defamatory statements a performance of *presidential* functions. Holding otherwise would obliterate the crucial line between office and occupant, collapsing presidential functions into anything that might advance the personal or electoral interests of the incumbent. That has never been the law in this country. It would dishonor the Constitution to declare that the President is free to willfully injure private citizens who reveal his own private misconduct.

## II.    TRUMP'S OTHER ARGUMENTS ARE ALSO MERITLESS

### A.    Trump's Statements Constituted Defamation *Per Se*

While Trump asserts that no reasonable juror could find Carroll has established cognizable damages, damages are presumed because his statements were defamatory *per se*.

As explained in Carroll's opposition to Trump's motion to dismiss in *Carroll II*, No. 22 Civ. 10016, ECF 26, a statement qualifies as defamatory *per se* if it "affect[s] a person in [her] profession, trade, or business by imputing to [her] any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (citation omitted). With respect to such statements, the law "dispenses with the special damages requirement … because [they] are considered so inflammatory and offensive that the law presumes the statements to have caused damage." *Stern v. Cosby*, 645 F. Supp. 2d 258, 289 (S.D.N.Y. 2009). When a statement "impugns the basic integrity or creditworthiness of a [person's] business," it is settled that "an action for defamation lies and injury is conclusively presumed." *Celle*, 209 F.3d at 180 (citation omitted).

27

A reasonable juror could find that standard to be met here. Carroll is a journalist, author, and advice columnist who built her career providing honest, trustworthy advice to women in response to intimate questions—many of which concerned sex, men, and relationships. Her career "rested on the fact that [she] could be trusted." Pl. 56.1 ¶ 88; *see also id.* ¶ 86 ("[W]omen really trusted E. Jean and [*Elle*] got lots of feedback from readers that she helped them."). For Carroll's community of loyal readers, integrity and credibility were essential.

In his defamatory statements, Trump took *direct aim* at that credibility. Each of his three statements targeted an autobiographical account in her non-fiction book and denounced it as false. His June 21 statement, moreover, directly and repeatedly attacked her as an author: it accused her of lying "to sell a new book," it said her book "*should* be sold in the fiction section," and it claimed that she wrote about being raped to "try to get publicity for [herself], or sell a book, or carry out a political agenda." *Id.* ¶ 11; *see id.* ¶ 66. It also implied a conspiracy between Carroll, *New York Magazine*, and "the Democratic Party." *Id.* ¶ 11; *see id.* ¶¶ 67, 75. Trump's June 22 statement continued in the same vein, implying that she had falsely accused other men, stating that he had "no idea who she is," and attacking Carroll and her publisher. *Id.* ¶ 12; *see id.* ¶¶ 13, 68.

A reasonable juror could easily find that these statements attacked Carroll not only in general terms, but also specifically in her trade and profession. Trump directly attacked an author and columnist—who specializes in honest advice to women about sex and men—with false claims that she lied about an experience of being raped (which she had revealed in her non-fiction book) and that she did so for despicable reasons that would eviscerate her professional credibility, integrity, and trust. Trump thereby "impugn[ed] the basic integrity or creditworthiness of [Carroll's] business," and attributed to her an "unfitness" in her profession as a writer and advice

columnist. *Celle*, 209 F.3d at 180. He took direct aim not only at the veracity of her non-fiction book, but also at her reliability as an honest broker who could be trusted by her readers.

This conclusion is supported by *Celle v. Filipino Reporter Enterprises Inc*. There, a news commentator alleged that two statements were defamatory: one that suggested a judge had found him to be negligent, and one that suggested he had made false accusations about another person's financial obligations. *See* 209 F.3d at 185-86. The Second Circuit found the challenged statements to be defamatory *per se* under settled New York law because they "impugn[ed]" the plaintiff's "trustworthiness." *Id.* at 185.[13] So too here. Carroll has spent decades building an audience and community of loyal readers who trust her to provide accurate facts and trustworthy, honest advice. A statement by Trump accusing her of lying about being sexually assaulted—and of making fraudulent claims against others, and of lying in her article and book, and of doing all this for nefarious financial and political reasons—would surely "leave readers with the conclusion that [she] abused her position as a [writer]." *See id.*; *see also Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 n.5 (2d Cir. 1977) (statements accusing scholars of being "paid liars" were defamatory *per se*); *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 n.5 (1995) (statement that attorney suborned perjury was defamatory *per se*); *Levy v. Nissani*, 115 N.Y.S.3d 418, 421 (2d Dep't 2020); *Gong v. Savage*, 169 N.Y.S.3d 511 (Table), at *2 (N.Y. Sup. Ct. N.Y. Cty. 2022) (statement accusing researcher of stealing research was defamatory *per se*).

The cases that Trump cites do not support his position. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011); *Davydov v. Youssefi*, 169

---

[13] As to the first statement, the court noted that as a reporter in a tightly knit community, his "professional reputation would turn in large measure on the community's faith in the accuracy and fairness of his reporting," and "[t]he statement that a United States judge has found plaintiff negligent for spreading false information would leave readers with the conclusion that he abused his position as a news commentator." *Id.* As to the second claim, the court found it defamatory because it impugned his "trustworthiness," could lead "an average reader to believe [the plaintiff had] made 'false' accusations" about someone else, and could "cause listeners and advertisers … who read the article to question [his] professional integrity." *Id.* at 185-86.

N.Y.S.3d 322 (1st Dep't 2022); *Ram v. Moritt*, 612 N.Y.S.2d 671 (2d Dep't 1994). In *Davydov*

and *Ram*, the plaintiffs (a doctor and dentist) had not been targeted in their professional capacity

by statements calling them cheats and frauds. And the statements at issue in *Pure Power Boot*

*Camp* were about the plaintiff's personal characteristics—alleging she treated her employees

poorly or fired an employee for being gay—which the court found were not defamatory *per se*

because they did "not impute fraud or misconduct to [her], nor do they suggest a general unfitness,

incapacity, or inability to perform her duties." 813 F. Supp. 2d at 551. Trump's remaining cases

are equally inapposite. *Gurtler v. Union Parts Mfg. Co., Inc.* concerned claims about the plaintiff's

political affiliation that bore no relationship—not even "by way of innuendo"—to his professional

endeavors. 285 A.D. 643, 647 (1st Dep't 1955). In *Tacopina v. Kerick*, claims that the plaintiff

"disclos[ed] privileged information to federal prosecutors" did not "specifically discredit" him as

an author. No. 14 Civ. 749, 2016 WL 1268268, at \*4 (S.D.N.Y. Mar. 31, 2016). And in *Aronson*

*v. Wiersma*, the "mere expression of unhappiness with plaintiff's fulfilling her duties" was not "of

significance" to her work as a linguist and researcher. 65 N.Y.2d 592, 594 (1985).

### B.  Carroll (Obviously) Did Not Consent to Trump's Defamatory Statements

Trump next asserts that Carroll's claim is barred because she consented to his defamatory

statements. *See* Mot. at 27-30. This argument is not only highly offensive, but it is also frivolous.

Consent is a rare, narrow defense to defamation. It applies where a person has the specific

intent of eliciting a defamatory statement from the defendant and in that sense affirmatively agrees

to its publication. *See Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir.

2015); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, No. 07 Civ. 4018, 2020 WL 1244930, at

\*7 (E.D.N.Y. Mar. 16, 2020). For instance, this defense may apply where a plaintiff sends a letter

requesting a statement that they consider defamatory, or has a private investigator willfully elicit

such a statement, or provides written consent to the publication of a defamatory claim, or obtains

a statement by impersonating a third party, or otherwise acts with the goal of eliciting a statement on which to base a defamation lawsuit. *See McNamee v. Clemens*, 762 F. Supp. 2d 584, 604-05 (E.D.N.Y. 2011) (collecting New York cases). Trump contends that Carroll provided such specific content in two respects: (1) choosing to publish with *New York Magazine*, which would run a full excerpt and had a broad circulation; and (2) revealing her account while Trump was President, since at that point he had "no choice but to defend himself." Mot. at 29-30.

Recalling that credibility judgments about the underlying sexual assault must be resolved in Carroll's favor at this stage, any reasonable juror would reject Trump's consent defense. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131, 136 n.11 (S.D.N.Y. 2004). At bottom, Trump insists that Carroll cannot sue him for defamation because she was asking for it. This insulting argument is foreclosed by Carroll's own deposition testimony, where Carroll explained that she was "shocked" by Trump's statements after her book excerpt was published. Pl. 56.1 ¶¶ 62-63. It is also wrong in a deeper sense. When a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response. The law does not vest perpetrators of sexual assault with a right to slander survivors who decide to come forward in a public manner. It is perverse to claim that the revelation of sexual abuse by a powerful man automatically invites (and somehow legally protects) further defamatory abuse. If anything, Trump gets it backwards: his position of political power made it *more* important, not *less* important, that he follow the law in responding to Carroll's revelation that he had assaulted her. Her decision to speak up—prompted by her mother's death and the phenomenon of the #MeToo movement—did not give Trump any warrant to break the law in seeking to punish her. Indeed, Trump's *modus operandi* of seeking to destroy women who accused

him of sexual assault, which was on display before and after his term in office, undercuts any claim that his conduct here reflected anything unique to the political office he occupied in 2019.

Trump's defense that he had "no choice" in defaming Carroll is really no defense at all. Mot. at 30. Of course he had a choice. And because he chose to issue a series of brutal, defamatory statements rife with injurious lies about Carroll, he is not entitled to summary judgment.

### C.    Trump's Statements Are Actionable as a Matter of Law

Trump's third argument is that many (though concededly not all) of his statements were merely speculative expressions of opinion. Mot. at 30-31. In support of this theory, he asserts that statements "about a plaintiff's state of mind or personal motivations" qualify as "non-actionable opinions" and "are not capable of being proven true or false." *Id.* at 32-33. Trump is mistaken.

"Since falsity is a necessary element of a defamation cause of action and only facts are capable of being proven false … only statements alleging facts can properly be the subject of a defamation action." *Davis v. Boeheim*, 24 N.Y.3d 262, 268 (2014) (cleaned up). "An opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it is a mixed opinion and is actionable." *Id.* at 269 (cleaned up). "The dispositive inquiry … is 'whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff.'" *Id.* at 269-70 (citation omitted). In "distinguishing between fact and opinion," the Court asks "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 269-70 (citation omitted) (cleaned up).

Applying this familiar framework, courts have repeatedly held that statements concerning a person's motivation for conduct can be actionable if they imply a knowledge of facts about that

person. In *Davis v. Boeheim*, the New York Court of Appeals concluded that the defendants made actionable statements where they claimed that the plaintiffs (who had made allegations of sexual molestation) had lied and had done so to make money. *See id.* at 271-73. In *Zervos v. Trump*, the court concluded that Trump made actionable statements when he claimed that the plaintiff (who had accused him of sexual abuse) told "phony stories" that were "totally false" since the events supposedly "never happened" and she was "was motivated by fame and/or directed by Clinton or the Democrats." *See* 74 N.Y.S.3d 442, 445-46, 449 (N.Y. Sup. Ct. 2018) ("A reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe what defendant's statements convey: that plaintiff is contemptible because she 'fabricated' events for personal gain."). Many other decisions reflect similar logic. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S. Ct. 2695, 2705-06 (1990) ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth."); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 150 (1993) (defendants made actionable statements where the "overall-thrust" of their publications was that "plaintiff had issued false or misleading reports about deaths occurring within his jurisdiction in order to protect the police"); *Joyce v. Thompson Wigdor & Gilly LLP*, No. 06 Civ. 15315, 2008 WL 2329227, at *9 (S.D.N.Y. June 3, 2008) (R&R finding that defendants made actionable statements where they claimed that the plaintiff had faked having breast cancer because she hoped to thereby avoid being fired).

Here, each of Trump's statements about Carroll's motives had a readily understood and precise meaning: that she had falsely accused other men of sexual assault; that Trump had never met her; and that she had lied about being assaulted by Trump to make money, to get publicity, to sell her book, or as part of a conspiracy with the Democratic party. Each of these statements can be proven objectively true or false. Moreover, in context, a reasonable observer would understand

Trump to be implying or stating concrete facts (not opinions) about Carroll based on knowledge not known to the public. *See Davis*, 24 N.Y.3d at 269-73; *Zervos*, 74 N.Y.S.3d at 448-49.

At bottom, Trump is wrong that claims about a person's motivations for revealing a sexual assault are inherently opinions rather than facts. It is commonplace for courts and juries to make fact findings about a person's motives. *See Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 133 n.17 (2d Cir. 2009) ("[A] person's state of mind is a fact question to be proved the same as any other fact."); *accord United States v. Stein*, 473 F. Supp. 2d 597, 602-03 (S.D.N.Y. 2007) (Kaplan, J.); Sand, et al., *Modern Federal Jury Instructions*, at § 91-7 (2022). By imputing specific nefarious motives to Carroll—each of which she either *did* or *did not* possess—Trump committed actionable defamation. His effort to disavow the obvious import of his own statements, or to claim that a person can respond to allegations of sexual assault by imputing vile motives with factual particularity, is at odds with common sense, precedent, and his own deposition (where he agreed that he made these precise claims about Carroll, *see supra* at 5). His argument thus fails.[14]

---

[14] The cases that Trump cites involved very different kinds of statements. *See* Mot. at 32. In *Huggins v. Povitch*, for instance, a talk show guest said: "Uh, because there would be times when, uh, my husband would have hundreds of dollars in his pocket and I had to take the subway, my daughter and myself. And we have a Rolls-Royce in the garage, and he would say, the car is not available. I understand now that was psychological, uh, easing me into the point where, either get used to it or get mad, I think he wanted me to divorce him." No. 131164/94, 1996 WL 515498, at *4 (N.Y. Sup. Ct. Apr. 19, 1996). The court reasonably understood that specific statement as "speculat[ion] on plaintiff's motivation for certain conduct" and held it to be non-actionable. *Id.* at *8. In *Zerman v. Sullivan & Cromwell*, the relevant news article explicitly made clear that it contained only speculation: "But lawyers for the five securities firms *speculate* that the Zermans have a different motive …." 677 F. Supp. 1316, 1320 (S.D.N.Y. 1988) (emphasis added). In *Gentile v. Grand Street Medical Assocs.*, the statement at issue was "loose and generalized," referring vaguely to "several people in the community who do not want to work, hold jobs and want to make easy money, [who] find a few lawyers who make a living exploiting hard working people and corporations." 79 A.D.3d 1351, 1352-53 (3d Dep't 2010). Finally, in *Dworin v. Deutsch*, a news article "merely" referred to the plaintiff as a "disgruntled former employee," a phrase the court deemed "a matter of opinion based on the fact that he was 'threatening to sue'" his former employer. No. 06 Civ. 13265, 2008 WL 508019, at *8 (S.D.N.Y. Feb. 22, 2008).

### D.      Carroll is Entitled to Present the Punitive Damages Issue to the Jury

Finally, Trump argues that Carroll should not be allowed to seek punitive damages. Mot. at 33-34. Here, too, he is wrong. Punitive damages are available where the defendant acted "with 'hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice.'" *Stern v. Cosby*, 645 F. Supp. 2d 258, 286 (S.D.N.Y. 2009) (citation omitted). The decision to award punitive damages involves evaluating the defendant's "moral culpability" and thus "rests within the sound discretion of the jury." *Allam v. Meyers*, 906 F. Supp. 2d 274, 291 (S.D.N.Y. 2012) (citation omitted). Where there is a need to "interpret[] the character of [the defendant's] actions," summary judgment is necessarily "inappropriate." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018). That rule controls here: Trump's repeated and highly inflammatory statements—which he issued from a position of power and influence—were maliciously calculated to punish, humiliate, and destroy a woman who he had raped and who he knew he had raped. *See also* Pl. 56.1 ¶¶ 79-80. Under these circumstances, Carroll is entitled to put the propriety of punitive damages to a jury when this case is tried.

## CONCLUSION

For the foregoing reasons, Trump's motion for summary judgment should be denied.

Dated: New York, New York
       January 12, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
   application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*