# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

*Plaintiff*,

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

## PLAINTIFF E. JEAN CARROLL'S RESPONSE TO DEFENDANT DONALD J. TRUMP'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, Plaintiff E. Jean Carroll submits the following responses to Defendant Donald J. Trump's Local Rule 56.1 Statement of Undisputed Material Facts, ECF 109-1, and a statement of additional material facts in support of her opposition to Trump's motion for summary judgment.

## I.    RESPONSES TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.    According to the Complaint, Plaintiff alleges that she encountered Defendant at the Bergdorf Goodman Store located at 754 5th Ave, New York, NY 10019. Plaintiff is unable to specify a date or time period when the events giving rise to this Complaint allegedly occurred, other than "between the fall of 1995 and the spring of 1996." *Id.* Plaintiff was approximately 52 years old at the time that the purported incident occurred. *See* Declaration of Alina Habba, ("Habba Dec."), Exhibit A at ¶ 22.

**Response:** Undisputed.

2.    Plaintiff, an advice columnist, alleges that Defendant recognized her on sight as the "advice lady" and asked her to help him selected a present for a woman who was not present with him at the store. *Id.* at ¶¶ 24-26.

**Response:** Disputed to the extent that the cited paragraphs of the Complaint allege that Trump said that he was at Bergdorf's to buy a present for "a girl."

3.  Plaintiff alleges that the two eventually proceeded to take the escalator to either the sixth or seventh floor, where the lingerie department was located. *Id*. at ¶¶ 29-30

**Response**: Disputed to the extent that the cited paragraphs of the Complaint do not allege that the lingerie department was located on "the sixth or seventh floor."

4.  Plaintiff alleges that the floor they visited was entirely abandoned, and there were no sales attendants on the floor. Once there, Defendant allegedly insisted that Plaintiff try on the bodysuit. Defendant then purportedly led Plaintiff by the arm to the dressing rooms. *Id*. at ¶¶ 31-35.

**Response**: Disputed to the extent that the cited paragraphs of the Complaint allege that the lingerie department "was uncharacteristically empty, with no sales attendant in sight," not that "the floor they visited was entirely abandoned, and there were no sales attendants on the floor."

5.  At this point, Plaintiff alleges that Defendant purportedly closed the door to of the dressing room, pushed her against a wall, and began kissing her without her consent. She then claims that she pushed Defendant away and laughed at him, and that he then pressed her against the wall once more, pulled down her tights, and forcibly raped her until she managed to push him off and flee the store. *Id*. at ¶¶ 36-42.

**Response**: Disputed to the extent that the cited paragraphs of the Complaint allege that Carroll "burst out in awkward laughter," not that she "laughed at him."

6.  Plaintiff testifies that she only contemporaneously disclosed the details of this alleged attack to two of her friends: Lisa Birnbach and Carol Martin. After sharing her account of the purported attack, Plaintiff did not speak of it, or even so much as dwell on the incident, until Defendant was elected President in 2016. *Id*. at ¶¶ 43-52.

**Response**: Disputed to the extent that the cited paragraphs of the Complaint do not allege that Carroll did not "even so much dwell on the incident, until Defendant was elected President." Further disputed to the extent that the cited paragraphs of the Complaint do not constitute "testi[mony]."

7.  Thereafter, Plaintiff decided to reveal these allegations publicly against Appellant for the first time with the release of the book entitled: 'What Do You Need Men For?" in or around May of 2019. *Id*. at ¶ 74.

**Response:** Disputed in that Trump mischaracterizes the cited paragraph of the Complaint, which does not allege what Trump states as undisputed fact. The evidence establishes that Carroll revealed her allegations against Donald Trump publicly for the first time on June 21, 2019, in *New York Magazine*, prior to the release of her book, and that she did not consider including allegations about Trump in her book until "four or five weeks into writing" it. Ex. 1 to Kaplan Decl. ("Carroll Dep.") at 155:15-18; Ex. 2 to Kaplan Decl. ("Cut Article"). The evidence further establishes that the title of Carroll's book is *What Do **We** Need Men For?* Carroll Dep. at 153:23.

8.　　Plaintiff made a conscious decision to issue an excerpt of her book to *New York Magazine* as opposed to *Elle*, the magazine that formerly published her *Ask E. Jean* advice column. Publicly, she has proffered the following justification for this decision: "Under Nina, Elle has been less into politics or news … Nina's Elle is a fashion magazine. So I went with New York Magazine, which knows how to break news." *See id.*, Exhibit D at 3. 9.

**Response:** Disputed to the extent it does not include a "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." S.D.N.Y. Local Civil Rule 56.1(d). The evidence establishes that Carroll "made the decision along with the publisher and [her] agent" to publish the excerpt of her book detailing the rape allegations in *New York Magazine*. Carroll Dep. at 192:14-16. The excerpt also discussed Carroll's background, career, and other experiences with sexual assault. *See* Cut Article. When asked in her deposition why she chose to publish in *New York Magazine* instead of *Elle*, Carroll testified:

> Because [*Elle*] do[es]n't publish anything of [the excerpt's] length. They don't publish articles about women being raped. It's just they are very careful about not upsetting their readers and I don't believe that they would have run anything close to what New York ran. They would have cut it out very—they wouldn't want to have their readers upset [] concerning their columnist…. I didn't believe they would run a full excerpt.

*Id.* at 190:15-191:2, 191:22-23.

9.　　Additionally, Plaintiff testified that she chose *New York Magazine* over *Elle* because she didn't "believe that [*Elle*] would have run anything close to what New York ran." *See Id*. Exhibit B at 190:15-25.

**Response:** Undisputed.

10. Following these public allegations set forth in Appellee's book, Plaintiff's defamation claim arises out of three statements in June 2019 made directly in response to Plaintiff's allegations (the "Statements"). *See id*., Ex. A at ¶ 81.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not allege

that Trump responded "directly" to Carroll's allegations.

11. On June 21, 2019, a statement circulated by the Deputy White House Press Secretary to the press denied the accusation and Appellant stated:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.
>
> Shame on those people who make up false stories of assault to try to get publicly for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.
>
> Ms. Carroll & New York Magazine. No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.
>
> False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.
>
> If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations. *Id*. at ¶ 82.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not allege

that the statement was "circulated by the Deputy White House Press Secretary." Further disputed

to the extent that the above misquotes portions of Trump's statement, which should read:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met

this person in my life. She is trying to sell a new book – that should indicate her motivation. It should be sold in the fiction section.

Shame on **those who** make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda – like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news – it's an epidemic.

Ms. Carroll & New York Magazine**:** No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

Compl. ¶ 82; *see also* Ex. 3 to Kaplan Decl. ("Trump Dep. Ex. 20").

12.     On June 22, 2019, Defendant made the following statement to the White House press:

[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is— it's terrible, what's going on. So it's a total false accusation and I don't know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that—and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York—which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that women were actually paid money to say bad things about me. But here's a case, it's an absolute disgrace that she's allowed to do that. *Id*. at ¶ 91.

**Response:** Undisputed. *See also* Ex. 4 to Kaplan Decl. ("Trump Dep. Ex. 21").

13. On June 24, 2019, Defendant issued a third statement in response to Plaintiff's allegations against him: "I'll say with great respect: Number one, she's not my type. Number two, It never happened. It never happened, OK?" *Id.* at ¶ 97.

**Response:** Disputed to the extent that the cited paragraph of the Complaint alleges that Trump "made [a third] statement," not that he "issued a third statement." Further disputed to the extent that Trump misquotes his statement, which said, "I'll say **it** with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" Compl. ¶ 97; *see also* Ex. 5 to Kaplan Decl. ("Trump Dep. Ex. 22").

14. Following Defendant's repudiation of Plaintiff's claims, Plaintiff filed the instant complaint. See generally, *id.*

**Response:** Disputed to the extent that "[f]ollowing" suggests the instant action was filed immediately after Trump made his June 2019 statements. Carroll initially filed this action in New York State Court on November 4, 2019. *See* Compl.

15. The Complaint alleges, among other things, that the above referenced statements issued by the President were defamatory per se and caused her to "suffer reputational, emotional, and professional harm. *Id.*

**Response:** Undisputed.

16. Plaintiff alleges that the Statements caused her professional harm by causing "injury to her reputation, honor, and dignity." *Id.* at ¶ 132.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not include the words "professional harm."

17. In a meager attempt to quantify this damage, Plaintiff alleges that she "received roughly 50% fewer letters than she received during the same period in 2018." *Id.* at ¶ 134.

**Response:** Disputed to the extent that the cited paragraph of the Complaint does not support the characterization "In a meager attempt to quantify this damage."

18. Plaintiff when deposed, however, candidly admitted that she never kept track of the letters she received from Elle Readers until 2019, after the lawsuit was filed. See *id.*, Exhibit B at 230:20-24; 231:2-7.

**Response:** Undisputed.

19. Plaintiff also produced the expert report of Professor Ashlee Humphries, PhD to assess the damages Plaintiff purportedly suffered as a result of the Statements. See generally, *id.*, Exhibit C (["Humphreys Rep."]).

**Response:** Disputed in that Trump mischaracterizes the purpose and scope of the report, which was:

> to create an analytic model to (1) estimate the number of impressions for the allegedly defamatory statements ("Statements") that were made by Donald Trump on June 21, 22, and 24, 2019, and circulated on social and traditional media ("Impressions Model"), (2) analyze the impact, if any, of these Statements by estimating the percentage of people who may have been receptive to these Statements and assess the damage to Ms. Carroll's reputation and person brand ("Impact Model"), and (3) provide a model to estimate costs for reputational repair based on the impact of those impressions ("Damages Model") on behalf of Ms. Carroll.

Humphreys Rep. at 2. Further disputed to the extent that Trump misspells the name of Professor Ashlee Humphreys.

20.     Upon examination, the Report almost exclusively focuses on the purported harm Plaintiff has allegedly sustained to her "reputation and person brand." *Id.* at 2.

**Response:** Disputed for the reasons stated in the response to paragraph 19.

21.     Dr. Humphreys concludes that the "utterance and circulation of Mr. Trump's Statements caused short - and long-term harm to Ms. Carroll's person brand, shifting perceptions associated with her person brand with the general public and specific perceptions amongst a group of people receptive to the claims" and that Plaintiff's "reputational value has been diminished due to the Statements." *Id.* at 5.

**Response:** Disputed as an incomplete statement of the conclusions of Prof. Humphreys' report. *See, e.g.*, Humphreys Rep. at 3-5 (summary of opinions).

## II.     PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

### A.     Trump Rapes Carroll

22.     Carroll and Trump once met at a party in the late 1980s, and long moved in similar New York City circles. Carroll Dep. at 18:8-11, 45:20-23, 46:10-18, 48:13-18, 50:19-51:23, 96:2-5; Ex. 6 to Kaplan Decl. ("Trump Dep.") at 18:12-21:12, 22:15-25:14, 34:12-36:13; Ex. 7 to Kaplan Decl. ("Trump-Carroll Photo").

23.     They met again sometime in the fall of 1995 or the spring of 1996 at Bergdorf Goodman on Fifth Avenue in New York City. Carroll Dep. 59:22-61:2.

24.     Carroll had gone to Bergdorf's after leaving work at a studio in New Jersey, where she taped her "Ask E. Jean" television show, and as she was about to leave without having made a purchase, she saw Trump through the revolving door as she was exiting onto 58th Street. *Id.* at 35:6-7, 81:13-21, 85:23-86:2, 96:2-4, 96:19-97:4.

25.     Carroll testified, "I was leaving the store. He was coming in. He held up his hand as I was coming out so I stopped and he came in and he said hey, you're that advice lady…. I said

something like hey, you're that real estate tycoon." *Id.* at 96:2-9; *see also id.* at 96:21-22 ("[He] put up his hand to stop me from going out when he was coming in."), 98:18-20 ("Q. Why did you stop? A. It's the international symbol. It was aimed at me so I stopped.").

26.     After greeting Carroll, Trump said, "come help me buy a present." *Id.* at 99:7-8. Carroll asked, "who is the present for?" and Trump responded, "a girl," but did not give a name. *Id.* at 102:19-20.

27.     After rejecting Carroll's suggestion of handbags, and a brief perusal of hats, *id.* at 100:7-13, 103:5-6, Trump said, "I know, lingerie," *id.* at 103:22-104:2.

28.     Trump and Carroll rode the escalator to the floor with the lingerie, which Carroll noticed was empty. *Id.* at 104:14-24, 106:10-18.

29.     Upon entering the lingerie section, they saw that "on the counter were three or four boxes" and a "see-through body suit with a little bit of lace on it." *Id.* at 106:21-107:3; *see also id.* at 109:23-110:3 (describing the bodysuit as a "one-piece body suit" that was "[s]ee-through, lilac grayish-blue edged with a little bit of lace, very pretty").

30.     Trump "snatched it up" and "threw it" at Carroll, telling her to "go put this on." *Id.* at 109:11-12, 110:8. She "tossed it back to him," saying, "you put it on, it's your color," and telling him, "it goes with your eyes." *Id.* at 109:14-15, 110:8-10.

31.     Trump then "held it against [her] chest" and said, "you're in good shape, this looks like it might fit you." *Id.* at 110:24-111:3. She replied, "but it's your size." *Id.* at 111:5-6.

32.     Carroll testified, "This was banter. We're going back and forth. He's saying put this on, I'm saying you put it on. He's saying—I thought it was an enjoyable repartee." *Id.* at 111:6-9.

33.     After Carroll told him, "it's your size," "he took [her] arm and he said let's go put this on." *Id.* at 111:17-19. In response, Carroll explained, "I started laughing because I'm thinking to myself this is hilarious, I'm going to make him put it on over his pants. That's my plan. And then after I make him put it on over his pants I'm going to have a story that I can tell my friends at dinner." *Id.* at 111:19-25.

34.     Then, in "all one action":

> I stepped into the room, the door was banged closed and he pushed me up against the wall…. [H]e immediately pushed me up against the wall so hard that I banged my head …. It hurt. It jolted me and then he pushed me back again and I hit it again for a second time.

*Id.* at 115:15-17, 116:13-15, 119: 6-8.

35.     She testified further:

> [W]hen he first shoved me against the wall, [he] lunged and shoved me back and I hit my head, [and] he put his mouth against mine.

*Id.* at 127:19-21.

36.     Carroll explained, "I was so shocked that I didn't speak. What I did was I laughed."

*Id.* at 118:22-23. When asked why she was laughing, Carroll answered:

> A. Shock. Trying to recapture the camaraderie we had and sort of a feeling of a lark, we're on a lark, we're having an adventure, it's a lark, trying to recapture that and take it out of the realm where he had entered, trying to reduce any eroticism about it.
>
> Q. Was it erotic?
>
> A. Not to me.
>
> Q. Was he angry?
>
> A. No.
>
> Q. What was his demeanor?
>
> A. Intent.

*Id.* at 119:25-120:13.

37.     After Carroll had "hit [her] head twice," she testified:

> [T]hen he had his hands on my arms, pushed me back a second time, hit my head and then he put his shoulder into me, and he's a big man. He's—and he—guessing 220, maybe 225 at the time. I weighed 120. He was 100 more pounds. And that was one of the things that went through my mind was how big and heavy he was because his whole weight came, his shoulder came into me and so at this point I realized it was serious. I was shocked before because he put me against the wall but now I understood that this is—this is a battle, and he pulled down my tights…. [I]t went from good humor joshing into being up against the wall and then having that heavy weight against me.

*Id.* at 120:20-121:10, 121:16-18.

38.     After he pulled down her tights, she "tried to get [her] arms up to push him back," but "[t]he problem was [she] couldn't get [her] knee up because the pantyhose had been taken down." *Id.* at 122:13-17.

39.     Then he raped her:

> I felt his fingers rummaging around my vagina and this huge weight against me. My head hurt, this huge weight, I'm in a situation where I can't—I can't—at one point I remember saying this is Donald Trump, what the heck is going on? And then I felt his penis inside of me.

*Id.* at 123:6-13.

40.     Finally, Carroll "managed to get [her] knee up and push off." *Id.* at 125:8-9. When asked, "[s]o when you pushed him off with your knee, did he back off of you?," she answered, "Well, I pushed him with hands and knee and I didn't look to see what he was doing. I turned and got out." *Id.* at 127:4-9.

41.     As she fled down the escalator, Carroll testified, "I do remember going and having the fear that he may—may be coming after me" and would "maybe grab me again." *Id.* at 128:10-24.

42.     She exited on Fifth Avenue and immediately called her friend Lisa Birnbach. *Id.* at 130:13-14. Carroll "was in shock and disordered," and "felt unbalanced." *Id.* at 135:5-6.

43.     When Birnbach answered, she noticed that "E. Jean was very agitated, very hyperventilating. Emotional. And she told me about what happened to her just really moments before she made the phone call." Ex. 8 to Kaplan Decl. ("Birnbach Dep.") at 34:14-18. Birnbach explained that "[t]here was a moment that [Carroll] was laughing. But she was not laughing funny. She was laughing excited. Highly reactive." *Id.* at 35:20-23.

44.     Carroll then told Birnbach what "just happened," *id.* at 36:17-37:17, 38:10-24, 39:2-5, and Birnbach replied, "E. Jean, you've been raped," *id.* at 39:12-13. Birnbach told Carroll that she should go to the police, but Carroll refused. *See id.* at 39:14-20; Carroll Dep. at 134:15-21 ("I remember Lisa suggesting I go to the police and also Lisa suggesting that she go to the police with me and that idea was so, such a terrible—I couldn't picture myself going to the police so I shut that down.").

45.     Instead Carroll "swore [Birnbach] to secrecy," saying, "you and I will never discuss this again." Birnbach Dep. at 40:4-9.

46.     The "next day or the day after," Carroll told her friend Carol Martin what had happened. Carroll Dep. at 141:10-14; Ex. 9 to Kaplan Decl. ("Martin Dep.") at 27:24-28:18, 32:6-12. Martin "advised [Carroll] not to do anything," telling her "that Mr. Trump had many lawyers and he would bury her" if she brought this allegation. *Id.* at 33:8-24; *see also* Carroll Dep. at 143:19-21 ("[Martin] said tell no one, he's got 200 lawyers, he'll bury you.").

47.     Carroll did not tell another person for over two decades. She explained:

> I didn't want to talk about it ever again, ever. That was it, and I didn't want to hear about it ever again. I was embarrassed, I was ashamed at this point. I was raped, this is like—this was shocking and so I just said let's never talk about this again. … I didn't want

to talk to anybody or tell the police. I just didn't—it was just something that I would keep to myself.

Carroll Dep. at 138:7-15, 144:9-12; *see also id.* at 144:18-19 ("I always feel I can handle things myself.").

48.     In her deposition, she was asked about the use of the word "rape" to describe what happened to her:

> Q. … [Y]ou had stated prior that you didn't like using the word "rape." Do you recall that?
>
> A. I recall feeling that.
>
> Q. Why did you feel that way?
>
> A. The word to me means something that generally speaking a man does to a woman, that she's powerless, that he has the power over her, rape. It means he's taken something from her and I didn't view it that way. I viewed ... what went on in that dressing room as a fight.
>
> Q. Did you feel like you won that fight?
>
> A. I don't think there are any winners there.

*Id.* at 138:19-139:10.

49.     When asked why she did not come forward sooner, she further testified:

> I'm going to say something that even surprises me because women who have been raped are looked at in this society as less, are looked at as spoiled goods, are looked at as rather dumb to let themselves get attacked. I mean even you have to say did you scream? I mean every woman who admits to being attacked has to answer that question, why didn't you scream, why did you come forward when you did, why didn't you come forward before ….

*Id.* at 147:16-148:7.

50.     Carroll never had sex or dated again, *id.* at 44:17-25, explaining that, after the rape, "the music had stopped" and her "light was gone," *id.* at 41:3-4, 42:13-18. In her own words, she explained, "I had no desire for desire. I don't have the desire to want sex. You have to want sex." *Id.* at 43:5-7.

### B.    Carroll Comes Forward

51.    In 2016, Trump announced his candidacy for President, and Carroll felt "[j]ust almost disbelief and a little bit of heartache." *Id.* at 148:9-15.

52.    When asked why she did not come forward with her account at that time, she testified:

> A. I was with my mother in Bloomington, Indiana. She was on her deathbed. She was a feisty redheaded Scottish woman, republican politician, so we gathered around for her last weeks.
>
> Q. Did you think she would be upset if she heard the allegations against Donald Trump?
>
> A. That's all she needed to hear on her death bed. Well, I was worried that it would ruin her last days and I just couldn't have done it. I just wouldn't have done it.

*Id.* at 148:20-149:10.

53.    Carroll further testified:

> Q. What do you mean by helping him?
>
> A. As more and more women came forward with accusations against the former president, his popularity seemed to go up.
>
> …
>
> Q. And that was part of the reason you didn't come out with it; is that correct?
>
> A. ... I was – didn't think it was -- I knew it would help him. I didn't want to get fired from Elle and I didn't want to lose my reputation and I didn't want to be looked at as soiled goods or stupid to go get yourself attacked in Bergdorf's. It was not something I would want to talk about.

*Id.* at 150:19-151:23.

54.    In 2017, Carroll took a road trip interviewing women for a book she was writing.

*Id.* at 153:22-23. She testified:

> I started the book because over the 26 years that I was writing the column, almost every single letter, whether it was about career or finances or children or romance, there was always a complaint about

a man. So I spent 26 years saying get rid of him, get rid of him. So I thought why don't I just go on the road and ask women what do we need men for and let them tell me so I don't go through with my idea which is to put them, all the men, in Montana. That was the idea. That was what I was going to do. It had nothing to do with Donald Trump, nothing, and then the first day of the trip started. My intention was to go to towns named after women, only wear clothes designed by women, only eat in restaurants like Betty's Cafe run by women or owned by women, only listen to books by women in the car, listen to music by women. That was the whole thing. I get out of the car when I got to the small town and talk to the people, what do we need men for. I was getting fabulous answers.

*Id.* at 153:23-154:24.

55. The same day her road trip started, "the Harvey Weinstein story broke." *Id.* at 154:24-25. After this, she began "making a list" of the "hideous men" in her life." *Id.* at 155:13-14, 156:6. She explained that "[m]any other men were on it but [Trump] wasn't," and she "didn't make th[e] decision to include him [in the book] until four or five weeks into writing the book." *Id.* at 155:14-18.

56. In her deposition, she testified about the prior sexual assaults she experienced. *See id.* at 161:6-16, 173:7-175:8.

57. Carroll decided to include Trump on her list because of "the flood of stories that started as women started standing up" during the #MeToo movement. *Id.* at 155:2-3.

58. When asked "[i]f it wasn't for the #MeToo movement, do you think you would have spoken out against the defendant?," Carroll answered, "No, I don't think I would have." *Id.* at 153:9-12.

59. Prior to the release of the book, *New York Magazine* published an excerpt of the book that included stories about Carroll's background, career, and experiences with sexual assault, including being raped by Trump. *Id.* at 190:7-8; Cut Article; Ex. 10 to Kaplan Decl. (eight-page print version of book excerpt).

60.     She made the decision "along with the publisher and [her] agent" to publish the excerpt in *New York Magazine*. Carroll Dep. at 192:15-16. Carroll testified:

> Because [*Elle*] do[es]n't publish anything of [the excerpt's] length. They don't publish articles about women being raped. It's just they are very careful about not upsetting their readers and I don't believe that they would have run anything close to what New York ran. They would have cut it out very—they wouldn't want to have their readers upset [] concerning their columnist…. I didn't believe they would run a full excerpt.

*Id*. at 190:17-191:2, 191:22-23.

61.     Trump responded to the allegations with three statements made on June 21, 22, and 24, 2019, respectively. *See* Trump Dep. at 64:23-70:7; Trump Dep. Ex. 20; Trump Dep. Ex. 21; Trump Dep. Ex. 22; *see also* Ex. 11 to Kaplan Decl., at 5-6, 16-17, 21 (Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission).

62.     When asked in her deposition how she expected him to react to the allegations, she explained:

> I didn't think he would deny it. I thought he would just say it didn't happen that way. She agreed to it or it was consensual sex.
>
> …
>
> I just was shocked that he absolutely denied it because he was there and he denied it. That's what gets me every time. He was there, he denied it.

Carroll Dep. at 166:2-6, 167:3-7.

63.     Carroll was also asked if, "[p]rior to releasing this article with The Cut, did [she] anticipate that you might need to sue the defendant to hold him accountable?" She replied, "No, it was the last thing I would ever think of." *Id.* at 167:17-22.

**C.      Trump Doubles Down on His Statements and Continues to Insult Carroll**

64.     In his deposition, Trump reaffirmed and stood by his three June 2019 statements:

> Q. Sitting here today, do you stand by this [June 21] statement?

A. Yes.

Q. Sitting here today, are there any inaccuracies in this statement that you now know of?

A. Not that I can see, no.

…

Q. I take it you stand by that [June 22] statement today?

A. Yes.

Q. Sitting here today, are you aware of any inaccuracies in your statement? …

A. No. … [T]he statement is, in my opinion, correct.

…

Q. … I take it, sir, that you stand by that [June 24] statement today?

A. Yes, I do.

Q. And I take it that from what we've been discussing so far that you don't see any inaccuracies in that statement?

…

A. No. No.

Trump Dep. at 60:3-8, 67:7-18, 69:21-70:5.

65. Trump repeated that he never met Carroll:

Q. In your June 21 statement that's marked as Exhibit 20, you say— and this is the Littman tweet—"I never met this person in my life."

A. Yes.

Q. Was that a true statement when you made it on June 21, 2019?

A. It was a true statement when I made it.

…

Q. So if I can understand your testimony, sir, you're saying that at the time you made the statement …, you were not aware of ever having met Ms. Carroll? You have since seen a photograph that shows you with Ms. Carroll on a receiving line; correct?

A. Along with a lot of other people.

…

Q. So the answer to my question is yes, that after you made the statement, you became aware that there's a photo of you with Ms. Carroll in a receiving line; correct?

A. At some point … I saw there was a photo on a receiving line, yes.

*Id.* at 80:4-10, 80:17-23, 81:7-14.

66. Trump repeated that Carroll made up the rape to sell a book:

Q. [I]n your June 21 statement ... you said that Ms. Carroll was trying to sell a new book and that you said shame on those who make up false stories of assault to try to get publicity for themselves or sell a book?

A. Yeah, that's right.

*Id*. at 87:6-12.

67. Trump repeated that Carroll made up the rape to carry out a political agenda:

Q. Another thing that you say in your June 21 statement is that Ms. Carroll was trying to carry out a political agenda?

A. Yeah.

Q. How did you know she had a political agenda if you didn't know who she was?

A. Somebody told me early on that she was somehow aligned with Hillary Clinton. She was either aligned with her or—I thought aligned with her.

Q. Who told you that?

…

A. I don't know. I don't know who said it, but somebody had mentioned it since, that she was somehow into that whole world.

*Id.* at 88:14-24, 89:6-8.

68. Trump repeated that Carroll falsely accused other men of sexual assault:

Q. Now, in your June 22nd statement, … you claim that Ms. Carroll had falsely accused other men of sexual assault; correct?

A. That's what I heard, yes.

Q. And you believed that was a true claim?

A. It's what I heard.

…

Q. … Did whoever told you that she accused other men of things also tell you that all those accusations were false?

A. No.

…

Q. … Did anyone tell that you that the accusations she has made about other men were false?

A. I don't know.

*Id.* at 91:3-9, 92:8-11, 92:16-20.

69.     When pressed on his statement suggesting that Carroll was too ugly to rape, Trump testified that "[P]hysically she's not my type, and now that I've gotten indirectly to hear things about her, she wouldn't be my type in any way, shape, or form." *Id.* at 94:10-13. He further testified that "that's 100 percent true. She's not my type. … There's no way I would ever be attracted to her." *Id.* at 142:13-143:3.

70.     When confronted with the photo of Carroll and himself from a party before the rape, Trump twice misidentified Carroll as his ex-wife Marla Maples, insisting it was Maples smiling at him in the photo, when in fact the woman he was pointing to was Carroll herself:

A: [I]t's Marla. [*pointing at Carroll*]

Q. You're saying Marla is in this photo?

A. That's Marla, yeah. That's my wife.

Q. Which woman are you pointing to?

MS. HABBA: No, that's Carroll.

THE WITNESS: Oh, I see.

Q. The person you just pointed to was E. Jean Carroll.

*Id.* at 82:9-17; *see* Trump-Carroll Photo.

71.     The photo did not depict Maples, but rather Carroll, Carroll's then-husband John Johnson, Trump, and Trump's then-wife Ivana Trump. Carroll Dep. at 49:11-15; Trump-Carroll Photo.

72.     Trump made his June 2019 statements on his own, without any guidance or direction from anyone else, and without any research or investigation into Carroll or her

accusations. Trump Dep. at 60:3-8, 67:7-18, 69:21-70:5, 88:7-13. He was unable to identify any other White House personnel as involved in investigating, preparing, strategizing, or creating the defamatory statements he made about Carroll in June 2019. *Id.* at 99:4-103:23.

73. Trump admitted that no one ever reached out to Bergdorf's.

> Q. So before you made your statements that it never happened in 2019, did you or anyone on your staff reach out to anyone at Bergdorf Goodman?
>
> A. I didn't have to reach out to anybody because it didn't happen.
>
> …
>
> Q. After you made the statements that you made in June of 2019, did you or anyone working for you reach out to Bergdorf Goodman?
>
> A. After the statement was made? No.

*Id.* at 78:6-10, 79:4-9.

74. Neither Trump nor anyone working for him did any research on Carroll:

> Q. Before you made this statement that appears in DJT 20, do you know whether you or anyone working for you did any research on Ms. Carroll?
>
> A. … [N]ot that I know of.

*Id.* at 88:7-13.

75. He similarly had no evidence to support his accusation that she was carrying out a political agenda or working with the Democratic party:

> Q. Before issuing your statement on June 21, did you learn what political party Ms. Carroll belonged to?
>
> A. No, I didn't know that.
>
> Q. Before you issued your June 21 statement, did you have any documents indicating that she was pursuing a political agenda?
>
> A. No.
>
> …
>
> Q. At the end of your statement, your June 21 statement, you say: "If anyone has information that the Democratic party is working

with Ms. Carroll or New York Magazine, please notify us as soon as possible." Did anyone ever notify you?

A. I don't know.

Q. Sitting here today, you can't recall anyone who notified you?

A. I don't know, yeah.

*Id.* at 89:18-25, 90:2-11.

76. Although he implied in his June 22 statement that Carroll falsely accused men of similar things, Trump repeated that he could not explain where he got that information:

Q. Now, in your June 22nd statement, … you claim that Ms. Carroll had falsely accused other men of sexual assault; correct?

A. That's what I heard, yes.

Q. And you believed that was a true claim?

A. It's what I heard.

Q. From whom had you heard it?

A. I don't know. I don't know.

*Id.* at 91:3-11.

77. At the time of his statements, Trump had no knowledge regarding Carroll's financial situation, the arrangement between Carroll and her publisher, or her book sales:

Q. Before you made that statement, did you have any knowledge one way or the other of the financial arrangements between Ms. Carroll and the publisher of her book?

A. No.

Q. Did you even know who her publisher was?

A. No.

Q. Did you ever see her book contract?

A. No.

Q. Did you know anything about Ms. Carroll's financial situation?

A. No.

Q. Did you know anything about her expected book sales?

A. No idea.

*Id.* at 87:13-88:3.

78.    Trump issued all three statements without reading the excerpt in *New York Magazine* or the book itself—indeed, until his deposition, Trump had never even seen Carroll's book:

> Q. At any point in time, did you read this article?
>
> …
>
> A. No, I don't believe I did.
>
> Q. [This is] a book by E. Jean Carroll. It says What Do We Need Men For, and if you look at the publication date, it says first edition July 2019…. Sitting here today, sir, have you ever read this book either in its entirety or any portion of this book?
>
> A. No, never have. I've never seen the book actually.

*Id.* at 54:22-55:18.

79.    Trump continuously insulted Carroll in his deposition, stating: "It's a big, fat hoax. She's a liar and she's a sick person in my opinion. Really sick," *id.* at 148:11-13; "[S]he made it up probably to sell her book or for her own ego, because she's … a very deranged, sick person, to make it up," *id.* at 216:4-8; "And I think that's her big claim to fame, you know, that she shook my hand at some celebrity event," *id.* at 81:3-5; "There's something a little off with her mentally, *id.* at 121:16-17; "I will sue her after this is over, and that's the thing I really look forward to doing," *id.* at 130:18-19; "I think she's a wack job," *id.* at 137:14-15; "I know nothing about this nut job," *id.* at 141:19-20; "[W]hen people accuse me of something, I think I have a right to be insulting," *id.* at 192:10-11; "That's a sick woman that would say that. Only a sick—there's something wrong with her," *id.* at 217:2-4.

80.    Trump also testified that he would repeat his insults to anyone who would listen:

> I told people that there was a false, disgusting lie made about me because I would say that to a lot of people. Even if they didn't ask, I was very offended by this. This woman is sick. There's something wrong with her, and it's a false story. So I would go around saying

that to people, yes. So it's possible that I would say that to legislators.

*Id.* at 103:12-19.

### D. Carroll Suffered Professional and Reputational Harm

81.     Carroll had been writing a regular advice column in *Elle* Magazine, titled *Ask E. Jean*, since 1993. Carroll Dep. at 33:14-16, 175:15-17. She testified:

> [The column] had run in the magazine for 26 years. It was one of the most popular columns ever in the magazine. I loved my readers, loved them. They would pour their hearts out to me and I loved helping them, they helped me …. [There is a] foundation of trust that a columnist has with their readers. And those readers, I loved those readers. They are the best in the world.

*Id.* at 175:15-176:4, 176:7-10.

82.     When Carroll "was writing the [advice] column in [*Elle*], *Ask E. Jean* received hundreds of letters every month." *Id.* at 38:3-5.

83.     Roberta Myers, Carroll's former boss and the editor-in-chief of *Elle* for 17 years, testified that Carroll "was beloved" and "really important to the magazine," and she was "good at [building an audience]." Ex. 12 to Kaplan Decl. ("Myers Dep.") at 28:9-13.

84.     Myers testified to Carroll's importance to the magazine:

> [I]f the magazine world is somewhat in decline, you actually want to keep those people who readers—you know, she's a destination, meaning readers would want to hear from her. She was an important part of what kept us [] popular. Also with the Internet we had another place to put her and put her—what she produced, right. So the audience actually got bigger for her.

*Id.* at 32:4-12.

85.     When asked about Carroll's reputation, Myers testified:

> E. Jean was—I mean, she's kind of a rock star, meaning, you know, she had a public profile before she came to Elle, people knew who she was. She was on television. She had a show on MSNBC. She

was hired by Roger Ailes. So she was public in that way, but she also worked for a lot of different places.

…

[In the office], people that didn't work with her and maybe hadn't met her, would come up these dramatic stairs and it would be like E. Jean, you're great, you rock. Of course, when she was on the floor, you know, Elle's floor, people just loved to see her because also she would walk up to them and say "What are you working on, girl," you know.

*Id.* at 22:12-18, 25:11-18.

86.     She also testified to Carroll's impact on the magazine industry as a whole:

Q. Would you say she had an impact on advice column—the advice column genre more broadly?

A. Absolutely. I mean, it sort of exploded, you know, the other—some of our competitors … never had advice columnists. So I think that the term "advice columnist" has sort of like maybe kind of a dated feeling to it starting with Anne Landers and people who wrote in newspapers which were completely legitimate, but Elle was a national magazine which meant she was talking to the whole country.

Q. So other publications including competitors added advice columnists because of E. Jean?

A. Yes, but I will say that E. Jean was in a particular sort of category by herself. As I said, she had a high public profile before she came to Elle. I mean, what other people are doing is great, right, and it's fun and interesting, but women really trusted E. Jean and we got lots of feedback from readers that she helped them. Also, you know, they loved her voice because she puts a lot of funny in there or sort of—but it's always undergirded by reporting.

*Id.* at 23:5-24:4.

87.     When asked about Carroll's relationship with her readers, Myers continued:

Q. How would you describe E. Jean as a writer?

A. [T]he term that came to mind is sort of she's a baller … as a writer. She's a gifted writer. She is a journalist first and everything that she writes is informed by that, meaning the facts, but she—she also, you know, has a lot of wit and I think that's why her readers loved her so much.

*Id.* at 21:15-22.

88. Carroll's "entire career as an advice columnist rested on the fact that [she] could be trusted." Carroll Dep. at 175:22-24. And during Myers's tenure at Elle, there were no concerns about Carroll's accuracy as a writer. Myers Dep. at 26:14-27:10.

89. Carroll's reputation was severely damaged by Trump's June 2019 statements. After Trump's statements were published, Carroll "was looked at as a woman who's untrustworthy, looked at ... as a woman who can't be believed." Carroll Dep. at 172:12-14; *see also id.* at 176:2-4 ("So when the president said I'm a liar, it shook that whole foundation, that was it."). She received significant negative attention (both publicly and privately) following Trump's statements. Humphreys Rep. at 49-58; Ex. 13 to Kaplan Decl. (Appendix H to the Expert Report of Professor Ashlee Humphreys); Ex. 14 to Kaplan Decl. (Appendix I to the Expert Report of Professor Ashlee Humphreys).

90. She received fewer letters after Trump made his statements and was terminated from *Elle* months before her contract was up for renewal. Carroll Dep. at 176:12-13, 176:25-177:12.

91. The quantitative data shows that Trump's statements were widely disseminated. Based on a comprehensive analysis conducted by Professor Ashlee Humphreys, Ph. D., and using conservative estimates, Trump's defamatory statements generated between 142,334,424 and 188,155,507 impressions across various forms of media. *See* Humphreys Rep. at 26-30 & Appxs. D, E, F, G.

92. Prof. Humphreys completed a quantitative impact analysis that showed 25.25% of readers and listeners were likely to believe Trump's statements. *Id.* at 58-63 & Appx. L. As a result, between 34,075,512 and 42,936,354 of the impressions generated by Trump's statements were likely received by people who were receptive to them. *Id.*

Dated: New York, New York
      January 12, 2023

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (*pro hac vice*
  application pending)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, D.C. 20001
Telephone: (212) 742-2661
Facsimile: (212) 564-0883
jmatz@kaplanhecker.com

*Attorneys for Plaintiff E. Jean Carroll*