**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

E. JEAN CARROLL,

               *Plaintiff*,

     v.

DONALD J. TRUMP, in his personal capacity,

               *Defendant*.

No. 20 Civ. 7311 (LAK) (JLC)

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS MOTION IN LIMINE**

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

STANDARD OF REVIEW ................................................................................................. 2

ARGUMENT ..................................................................................................................... 2

I.   THE COURT SHOULD ADMIT CARROLL'S PRIOR STATEMENTS ABOUT
     THE ATTACK ......................................................................................................... 2

II.  THE COURT SHOULD ADMIT THE TESTIMONY OF STOYNOFF AND LEEDS
     REGARDING THEIR SIMILAR EXPERIENCES WITH TRUMP ............................... 4

     A.  Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible
         Under Rule 415 .................................................................................................. 5

     B.  Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible
         Under Rule 404(b)(2) as Evidence of Trump's *Modus Operandi* ......................... 9

III. THE COURT SHOULD PRECLUDE ROBERT J. FISHER FROM TESTIFYING
     AS A REBUTTAL EXPERT WITNESS ...................................................................... 10

     A.  The Court Should Preclude Fisher's Testimony in its Entirety Because His
         Analysis Is Not Reliable ................................................................................... 12

     B.  Each Portion of Fisher's Testimony Should Be Precluded for Further Reasons ........ 16

IV.  THE COURT SHOULD EXCLUDE TESTIMONY OF WITNESSES NOT
     DISCLOSED IN DISCOVERY, TESTIMONY ADDUCING UNDISCLOSED
     INFORMATION, AND COMMENTARY OR TESTIMONY CONCERNING DNA .. 22

     A.  Trump Has Not Disclosed Witnesses Under Rules 26(a)(1) and (e) and Should
         Be Precluded from Calling Them to Support His Defenses ...................................... 24

     B.  Trump Should Be Precluded from Testifying as to Any Undisclosed Information,
         Including Testimony of Undisclosed Witnesses ...................................................... 25

     C.  The Court Should Preclude Testimony or Commentary Concerning
         DNA Evidence .................................................................................................... 27

V.   THE COURT SHOULD PRECLUDE INQUIRY INTO A SERIES OF IRRELEVANT
     TOPICS IN CONNECTION WITH STEPHANIE GRISHAM'S TESTIMONY ........... 30

     A.  The Court Should Preclude Cross-Examination or the Presentation of Evidence
         Regarding Grisham's Prior Misdemeanor Convictions .......................................... 30

     B.  The Court Should Preclude Cross-Examination of Grisham Regarding an
         Unrelated Lawsuit That Remains Pending ............................................................ 31

C.  The Court Should Preclude the Presentation of Evidence or Cross-Examination of Grisham Regarding Her Past Use of a Pain Reliever ................................................. 33

VI. THE COURT SHOULD PRECLUDE COMMENTS AND CROSS-EXAMINATION REGARDING CARROLL'S CHOICE OF COUNSEL ................................................. 34

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**     **Page(s)**

*523 IP LLC v. CureMD.Com*,
    48 F. Supp. 3d 600 (S.D.N.Y. 2014)......................................................................... 24

*Alaniz v. Zamora-Quezada*,
    591 F.3d 761 (5th Cir. 2009) ................................................................................... 10

*Allen v. Royce*,
    No. 19 Civ. 3672, 2022 WL 125367 (E.D.N.Y. Jan. 13, 2022)................................. 34

*Am. Stock Exch., LLC v. Mopex, Inc.*,
    215 F.R.D. 87 (S.D.N.Y. 2002) ......................................................................... 24, 30

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................................... 21

*Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*,
    No. 11 Civ. 505, 2017 WL 715909 (S.D.N.Y. Feb. 10, 2017)................................. 18

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
    No. 98 Civ. 3287, 2000 WL 1805359 (E.D.N.Y. Dec. 11, 2000) ............................ 35

*Boyce v. Weber*,
    No. 19 Civ. 3825, 2021 WL 2821154 (S.D.N.Y. July 7, 2021) ....................... *passim*

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*,
    No. 06 Civ. 1584, 2009 WL 10674074 (S.D. Cal. Apr. 1, 2009) ............................ 29

*Capri Sun GmbH v. Am. Beverage Corp.*,
    595 F. Supp. 3d 83 (S.D.N.Y. 2022)................................................................ 17, 18

*Carroll v. Trump*,
    590 F. Supp. 3d 575 (S.D.N.Y. 2022)..................................................................... 25

*Carroll v. Trump*,
    No. 22 Civ. 10016, 2023 WL 2006312 (S.D.N.Y. Feb. 15, 2023) .............. 27, 28, 30

*City of Almaty, Kazakhstan v. Ablyazov*,
    No. 15 Civ. 5345, 2021 WL 5154110 (S.D.N.Y. Nov. 5, 2021) ............................ 22

*Cordius Tr. v. Kummerfeld*,
    No. 99 Civ. 3200, 2008 WL 113683 (S.D.N.Y. Jan. 10, 2008)................................ 33

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579, 113 S. Ct. 2786 (1993)........................................................ 11, 12, 15

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013)............................................................................... 19

*Djangmah v. Falcione*,
  No. 08 Civ. 4027, 2013 WL 6388364 (S.D.N.Y. Dec. 5, 2013)............................................... 30

*Doe v. Lima*,
  No. 14 Civ. 2953, 2020 WL 728813 (S.D.N.Y. Feb. 13, 2020) ............................................... 33

*Downey v. Adloox Inc.*,
  No. 16 Civ. 1689, 2018 WL 794592 (S.D.N.Y. Feb. 8, 2018) ................................................. 30

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
  No. 11 Civ. 00201, 2017 WL 2773944 (E.D. Tex. May 26, 2017) ........................................... 35

*Engler v. MTD Prod., Inc.*,
  304 F.R.D. 349 (N.D.N.Y. 2015) ........................................................................... 16, 17

*Estate of Jaquez v. Flores*,
  No. 10 Civ. 2881, 2016 WL 1060841 (S.D.N.Y. Mar. 17, 2016) ............................................ 30

*Faulkner v. Arista Records LLC*,
  46 F. Supp. 3d 365 (S.D.N.Y. 2014)........................................................................ 14, 21

*Fears v. Keystone Petroleum Transp., LLC*,
  No. 10 Civ. 02789, 2014 WL 11517819 (N.D. Ga. Jan. 17, 2014) .......................................... 35

*Gogol v. City of N.Y.*,
  No. 15 Civ. 5703, 2018 WL 4616047 (S.D.N.Y. Sept. 26, 2018) ............................................ 32

*Gray v. Lamanna*,
  No. 17 Civ. 6324, 2021 WL 4844536 (E.D.N.Y. Oct. 18, 2021) ............................................ 28

*Guidi v. Inter-Cont'l Hotels Corp.*,
  No. 95 Civ. 9006, 2003 WL 1907904 (S.D.N.Y. Apr. 16, 2003)............................................. 29

*Haas v. Delaware & Hudson Ry. Co.*,
  282 F. App'x 84 (2d Cir. 2008) ............................................................................. 29

*Hart v. RCI Hosp. Holdings, Inc.*,
  90 F. Supp. 3d 250 (S.D.N.Y. 2015)......................................................................... 34

*Hartwig v. JDP, Inc.*,
  No. 19 Civ. 00008, 2021 WL 9440803 (S.D. Iowa Jan. 25, 2021) .......................................... 35

*Highland Capital Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008)......................................................................... 2

*In re Gen. Motors LLC Ignition Switch Litig.*,
   No. 14 M.D. 2543, 2015 WL 8130449 (S.D.N.Y. Dec. 3, 2015) ............................................ 29

*In re Gen. Motors LLC Ignition Switch Litig.*,
   No. 14 M.D. 2543, 2017 WL 2880882 (S.D.N.Y. July 5, 2017) ............................................. 26

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
   No. 00 Civ. 1898, 2008 WL 1971538 (S.D.N.Y. May 7, 2008) ........................................ 12, 19

*In re Mirena IUD Prod. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...................................................................................... 15

*In re United States*,
   945 F.3d 616 (2d Cir. 2019) ...................................................................................................... 2

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 Civ. 3288, 2005 WL 578109 (S.D.N.Y. Mar. 4, 2005) ................................................ 33

*Jean-Laurent v. Hennessy*,
   840 F. Supp. 2d 529 (E.D.N.Y. 2011) ...................................................................................... 31

*Kellogg v. Nike, Inc.*,
   No. 07 Civ. 70, 2008 WL 4216130 (D. Neb. Sept. 12, 2008) .................................................. 35

*Koppell v. N.Y. State Bd. of Elections*,
   97 F. Supp. 2d 477 (S.D.N.Y. 2000) ........................................................................................ 15

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167 (1999) ................................................................................. 12, 13

*LaMarca v. United States*,
   31 F. Supp. 2d 110 (E.D.N.Y. 1998) .................................................................................... 16, 21

*Linde v. Arab Bank, PLC*,
   269 F.R.D. 186 (E.D.N.Y. 2010) .............................................................................................. 26

*LinkCo, Inc. v. Fujitsu Ltd.*,
   No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ............................................. 19

*Lippe v. Bairnco Corp.*,
   99 F. App'x 274 (2d Cir. 2004) ............................................................................................... 12

*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003) ............................................................................................ 12, 13

*Luce v. United States*,
   469 U.S. 38, 105 S. Ct. 460 (1984) ............................................................................................ 2

v

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016)................................................... 15

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    720 F. App'x 24 (2d Cir. 2017) .......................................................... 15

*Mango v. BuzzFeed, Inc.*,
    316 F. Supp. 3d 811 (S.D.N.Y. 2018)..................................................... 2

*Miller UK Ltd. v. Caterpillar, Inc.*,
    No. 10 Civ. 03770, 2015 WL 7351674 (N.D. Ill. Nov. 20, 2015)........................... 29

*Mitchell v. City of Chicago*,
    862 F.3d 583 (7th Cir. 2017) ............................................................ 28

*Montanez v. City of Syracuse*,
    No. 16 Civ. 00550, 2019 WL 4328872 (N.D.N.Y. Sept. 12, 2019) ........................ 10

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005)......................................................... 17, 18

*Palmieri v. Defaria*,
    88 F.3d 136 (2d Cir. 1996)............................................................ 2, 4

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006)............................................................. 25

*Rapp v. Fowler*,
    No. 20 Civ. 9586, 2022 WL 5243030 (S.D.N.Y. Oct. 6, 2022) ........................... 6, 7

*Sadler v. Moran Towing Corp.*,
    No. 01 Civ. 1666, 2002 WL 1977604 (S.D.N.Y. Aug. 28, 2002) ......................... 28

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................... 11, 13

*Simon v. City of N.Y.*,
    No. 14 Civ. 8391, 2017 WL 57860 (S.D.N.Y. Jan. 5, 2017).............................. 25

*Smith v. Toyota Motor Corp.*,
    No. 16 Civ. 24, 2018 WL 1806698 (E.D. Mo. Apr. 17, 2018)............................. 35

*United States v. Araujo*,
    79 F.3d 7 (2d Cir. 1996)................................................................ 10

*United States v. Barnason*,
    852 F. Supp. 2d 367 (S.D.N.Y. 2012)................................................... 6, 8

*United States v. Bowen,*
    511 F. Supp. 3d 441 (S.D.N.Y. 2021)................................................................. 31

*United States v. Cadet,*
    664 F.3d 27 (2d Cir. 2011).......................................................................... 9, 10

*United States v. Caracappa,*
    614 F.3d 30 (2d Cir. 2010)............................................................................... 3

*United States v. Donovan,*
    577 F. Supp. 3d 107 (E.D.N.Y. 2021) ............................................................. 32

*United States v. Flores,*
    945 F.3d 687 (2d Cir. 2019)......................................................................... 3, 4

*United States v. Gabinskaya,*
    829 F.3d 127 (2d Cir. 2016).................................................................... 27, 28

*United States v. Graham,*
    No. 14 Cr. 500, 2015 WL 6161292 (S.D.N.Y. Oct. 20, 2015) ................................. 8

*United States v. Kaufman,*
    No. 19 Cr. 504, 2021 WL 4084523 (S.D.N.Y. Sept. 8, 2021)................................. 12

*United States v. LaFlam,*
    369 F.3d 153 (2d Cir. 2004)......................................................................... 9, 10

*United States v. Larson,*
    112 F.3d 600 (2d Cir. 1997)............................................................................ 8

*United States v. Mohamed,*
    148 F. Supp. 3d 232 (E.D.N.Y. 2015) ............................................................... 9

*United States v. Moye,*
    793 F. App'x 19 (2d Cir. 2019) ....................................................................... 9

*United States v. Nelson,*
    365 F. Supp. 2d 381 (S.D.N.Y. 2005)............................................................. 32

*United States v. O'Connor,*
    650 F.3d 839 (2d Cir. 2011).......................................................................... 3, 4

*United States v. Potapova,*
    800 F. App'x 14 (2d Cir. 2020) ..................................................................... 31

*United States v. Ray,*
    583 F. Supp. 3d 518 (S.D.N.Y. 2022)............................................................. 15

*United States v. Ray*,
  No. 20 Cr. 110, 2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) ......................... 4

*United States v. Roldan-Zapata*,
  916 F.2d 795 (2d Cir. 1990) ...................................................................... 8

*United States v. Rutkoske*,
  506 F.3d 170 (2d Cir. 2007) ...................................................................... 9

*United States v. Schaffer*,
  851 F.3d 166 (2d Cir. 2017) ...................................................................... 6

*United States v. Sliker*,
  751 F.2d 477 (2d Cir. 1984) ...................................................................... 9

*United States v. Spoor*,
  904 F.3d 141 (2d Cir. 2018) ...................................................................... 6

*United States v. Whitley*,
  No. 04 Cr. 1381, 2005 WL 2105535 (S.D.N.Y. Aug. 31, 2005) ................. 31

*United States v. Whitmore*,
  359 F.3d 609 (D.C. Cir. 2004) .................................................................. 32

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) ................................................... 11, 13, 14, 15

*United States v. Xiong*,
  262 F.3d 672 (7th Cir. 2001) .................................................................... 34

**Statutes**

18 U.S.C. § 2241 ............................................................................................. 6

18 U.S.C. § 2242 ......................................................................................... 6, 7

18 U.S.C. § 2243 ............................................................................................. 6

18 U.S.C. § 2244 ......................................................................................... 6, 7

18 U.S.C. § 2246 ......................................................................................... 6, 7

A.R.S. § 28-693 ............................................................................................ 31

A.R.S. § 28-1381 .......................................................................................... 31

## Rules

Fed. R. Civ. P. 26 ....................................................................................................... *passim*

Fed. R. Civ. P. 37 ...................................................................................... 23, 24, 26, 29

Fed. R. Evid. 401 ................................................................................................... 33, 34

Fed. R. Evid. 403 ....................................................................................................... *passim*

Fed. R. Evid. 404 ......................................................................................................... 9, 10

Fed. R. Evid. 413 ........................................................................................................... 6, 7

Fed. R. Evid. 415 ....................................................................................................... 5, 6, 7, 8

Fed. R. Evid. 608 .............................................................................................. 30, 31, 32, 33

Fed. R. Evid. 609 ............................................................................................................ 30, 31

Fed. R. Evid. 702 ....................................................................................................... *passim*

Fed. R. Evid. 801 ............................................................................................................... 2, 3

## Other Authorities

Jose Pagliery, *Trump Says He'll Hand Over His DNA for E. Jean Carroll Case*, Daily Beast (Feb. 9, 2023) ........................................................................................................ 29

Robert J. Fisher, Expert Report, *Am. Society of Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, No. 18 Civ. 001559 (D. Colo. May 14, 2020) ............................................ 20

Robert J. Fisher, Expert Report, *100+ Animal Rescue, Inc. v. Butkus*, No. 17 Civ. 61893 (S.D. Fla. Feb. 14, 2020) ............................................................................................... 20

Robert J. Fisher, Expert Report, *Zinn v. City of Scottsdale*, No. 2:17 Civ. 01813 (Super. Ct. Ariz., Maricopa Cty. Jan. 16, 2020) ........................................................................... 20

## PRELIMINARY STATEMENT

The central question for the jury is whether Defendant Donald J. Trump lied when he denied sexually assaulting Plaintiff E. Jean Carroll in a Bergdorf Goodman dressing room. This case is not a complicated one, and the Court should make certain straightforward rulings to ensure an efficient and orderly trial.

The Court should first rule on the admissibility of two key parts of Carroll's evidence. It should admit Carroll's prior consistent statements about Trump's attack, which rebut Trump's repeated claim that Carroll fabricated her allegations. The Court should also admit the testimony of two other women whom Trump sexually assaulted in a similar way. Their testimony is admissible because a sexual assault is a "factual premise" of Carroll's claim, and because their testimony evidences Trump's *modus operandi* of forcing himself on nonconsenting women.

The Court should next rule on the inadmissibility of certain of Trump's evidence. It should exclude testimony by Trump's rebuttal expert because he offers only *ipse dixit* opinions regarding Carroll's damages—and also because he fails to respond to the bulk of Carroll's expert's report; dedicates much of his own report to impermissibly drawing legal and factual conclusions; and engages in data-less, conclusion-driven speculation. The Court should also bar Trump from calling previously undisclosed witnesses, as well as from testifying to information that he claims those undisclosed witnesses would provide on his behalf or addressing the issue of DNA evidence.

Finally, the Court should place limits on the prejudicial tactics that Trump has already previewed in this litigation. The Court should preclude Trump from inquiring into a witness's irrelevant and dated misdemeanor convictions, an unrelated pending lawsuit, and her treatment of a serious foot injury. The Court should also preclude Trump and his counsel from distracting the jury from the issues actually in dispute by attacking Carroll's choice of counsel.

1

## STANDARD OF REVIEW

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Mango v. BuzzFeed, Inc.*, 316 F. Supp. 3d 811, 812 (S.D.N.Y. 2018) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 463 n.4 (1984)). In ruling on evidentiary issues, trial courts enjoy significant discretion "within the bounds of the Federal Rules of Evidence." *In re United States*, 945 F.3d 616, 630 (2d Cir. 2019).

## ARGUMENT

### I.   THE COURT SHOULD ADMIT CARROLL'S PRIOR STATEMENTS ABOUT THE ATTACK

The core of Trump's defense in this case is that, in connection with her 2019 book, Carroll completely fabricated an account of him sexually assaulting her. But decades before she published her book, and within days of the attack at Bergdorf's, Carroll confided in two close friends—Lisa Birnbach and Carol Martin—that Trump had sexually assaulted her.[1] Those prior statements by Carroll are admissible under Rule 801(d)(1)(B), as the Court should confirm prior to trial.

A prior statement is excluded from the definition of hearsay, and thus permitted as substantive evidence, when that statement is "consistent with the declarant's testimony" and offered "to rebut an express or implied charge that the declarant recently fabricated [her testimony] or acted from a recent improper influence or motive in so testifying." Fed. R. Evid. 801(d)(1)(B);

---

[1] This motion incorporates by reference the factual presentation included in Carroll's opposition to Trump's summary judgment motion and in her Rule 56.1 response. ECF 113, 115.

*see also United States v. Flores*, 945 F.3d 687, 704–05 (2d Cir. 2019). A "prior consistent statement … may be proffered through any witness who has firsthand knowledge of the statement." *United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir. 2010).

Carroll's prior statements to Birnbach and Martin regarding Trump's sexual assault clearly satisfy this Rule. *First*, the statements are consistent: Carroll's testimony at trial about how Trump raped her will match what she told Birnbach and Martin in the days after the attack occurred. Birnbach will testify that Carroll called immediately after leaving Bergdorf's and explained in detail what had happened to her minutes before, from Trump and Carroll's initial banter to his attack in the lingerie dressing room. Ex. 1 ("Birnbach Dep.") at 31:12–32:7, 34:6–39:20. Similarly, Martin will testify that Carroll told Martin that Trump had raped her at Bergdorf's just a day or two after the assault. Ex. 2 ("Martin Dep.") at 27:23–28:18, 32:6–12, 33:25–34:6. Both women will also testify that the account of the rape as described in Carroll's book aligns what she told the two of them at the time. *Id.* at 40:13–19; Birnbach Dep. at 51:25–52:12. *Second*, the statements rebut a charge of recent fabrication: Trump has claimed that Carroll fabricated her sexual assault allegation for a variety of nefarious reasons, including because she was "trying to sell a new book" (which, he has insisted, "should indicate her motivation"). Ex. 3 ("Trump Dep.") at 58:4–60:5; *see also id.* at 88:14–17 (claiming that Carroll "was trying to carry out a political agenda"). Carroll's prior statements are thus admissible under Rule 801(d)(1)(B)(i). *See United States v. O'Connor*, 650 F.3d 839, 862–63 (2d Cir. 2011) (upholding admission of prior statements about sexual abuse where defense claimed that victim had recently fabricated the abuse allegation).

The Court need not wait until trial to make this determination. The Second Circuit has rejected the argument that Rule 801(d)(1)(B) "is applicable only if the declarant's credibility or memory is challenged *during cross examination*." *Flores*, 945 F.3d at 706. Prior consistent

statements may be admitted where "it was clear that [the declarant] would be subject to cross-examination," and where the declarant's credibility or memory has been put at issue. *Id.*; *see also* *O'Connor*, 650 F.3d at 862–63; *United States v. Ray*, No. 20 Cr. 110, 2022 WL 558146, at *5 (S.D.N.Y. Feb. 24, 2022). Here, there is no question that Carroll will be subject to cross-examination, and Trump's statements themselves (not to mention his entire litigation strategy) explicitly call Carroll's credibility into question. The Court should determine now that testimony regarding Carroll's prior consistent statements to Birnbach and Martin are admissible.

## II. THE COURT SHOULD ADMIT THE TESTIMONY OF STOYNOFF AND LEEDS REGARDING THEIR SIMILAR EXPERIENCES WITH TRUMP

At his deposition, Trump acknowledged past statements in which he boasted about sexually forcing himself on women without consent: "I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything, grab them by the pussy. You can do anything." Trump Dep. at 174:5–10; *see also id.* at 169:8–9. And when pressed on his claim that "you can do anything, grab them by the pussy. You can do anything," Trump doubled down: "Well, historically, that's true with stars." *Id.* at 174:9–13; *see also id.* at 174:20–21 ("Q. And you consider yourself to be a star? A. I think you can say that, yeah.").

It is unsurprising, then, that what happened to Carroll at Bergdorf's was not an isolated act. For this reason, Carroll seeks to admit the testimony of Natasha Stoynoff and Jessica Leeds, who, like Carroll, were sexually assaulted by Trump—and who (also like Carroll) later experienced additional shame and humiliation when Trump publicly denied their accusations and insulted their physical appearance as part of his explanation for why the alleged assault did not occur.

Stoynoff testified at her deposition in this case that Trump sexually assaulted her at Mar-a-Lago in 2005 when she was writing a story for People Magazine about Trump's upcoming one-year wedding anniversary. Ex. 4 ("Stoynoff Dep.") at 14:23–25. During their interview, Trump

led Stoynoff to an empty room, claiming that he wanted to show her a painting. *Id.* at 20:10–15.

Once there, Trump closed the door behind them, grabbed Stoynoff's shoulders, pushed her against

the wall, and started "kissing and groping [her] without consent." *Id.* at 21:2–8, 38:9–10. Stoynoff

pushed him back twice, but Trump stopped attacking her only after a staff member walked in. *Id.*

at 21:20–21, 22:3–6. After Stoynoff came forward with her allegations, Trump disparaged her at

a rally, denying the attack and saying, "look at her, go take a look at her." *Id.* at 39:14–25.

Leeds testified that sometime around 1979, Trump sexually assaulted her on an airplane.

Ex. 5 ("Leeds Dep.") at 17:20–22, 18:10–11. A stewardess unexpectedly invited Leeds to sit in

first class in the seat next to Trump. *Id.* at 17:5–15. After they made small talk and finished their

meals, Trump suddenly lunged at Leeds. *Id.* at 18:10–11. He tried to kiss her, grabbed her breasts,

pulled himself onto her, and started to put his hand up her skirt. *Id.* at 19:3–15. When Leeds

realized no one was going to help her, she escaped the seat and went to the back of the plane. *Id.*

at 19:16–18. A few years later, when Trump saw her at a charity event, he stated, "you're the cunt

from the airplane." *Id.* at 22:4–16. And after Leeds came forward with her allegations, Trump

denied them and implied that she too "was not his type." *Id.* at 27:7–12.

## A.    Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible Under Rule 415

Stoynoff's and Leeds' accusations against Trump, and his responses denying those

accusations, are relevant evidence that he committed additional sexual assaults.

Rule 415 provides that, "[i]n a civil case involving a claim for relief based on a party's

alleged sexual assault … , the court may admit evidence that the party committed any other sexual

assault." Such evidence "may be considered on any matter to which it is relevant," including a

defendant's "propensity to commit the alleged acts," creating an exception to the common law's

general prohibition on the use of propensity evidence. *Boyce v. Weber*, No. 19 Civ. 3825, 2021

WL 2821154, at *8 (S.D.N.Y. July 7, 2021) (discussing *United States v. Spoor*, 904 F.3d 141, 154 (2d Cir. 2018)). In creating that exception, Congress "considered knowledge that the defendant has committed [sexual assault] on other occasions to be critical in assessing the relative plausibility of sexual assault claims and accurately deciding cases." *Boyce*, 2021 WL 2821154, at *8 (quoting *United States v. Schaffer*, 851 F.3d 166, 178 (2d Cir. 2017)). For evidence to come in under Rule 415, two requirements must be satisfied: (1) the case at hand must be "based on" a "sexual assault," and (2) the conduct alleged by the nonparty accuser must meet the definition of "sexual assault." *United States v. Barnason*, 852 F. Supp. 2d 367, 372 (S.D.N.Y. 2012).

These requirements are both satisfied here. Starting with the first requirement, Carroll's claim against Trump is "based on" a sexual assault. As courts have recognized, the relevant question is "whether an alleged sexual assault constitutes a factual premise of the plaintiff's claim." *Boyce*, 2021 WL 2821154, at *9; *see Barnason*, 852 F. Supp. 2d at 373 (admitting Rule 415 evidence in connection with Fair Housing Act claim). This Court has already recognized that "whether Mr. Trump raped Ms. Carroll is the paramount issue" in this proceeding. ECF 96 at 15.

Turning to the second requirement, there is no doubt that Trump's misconduct toward Carroll, Stoynoff, and Leeds falls within the relevant definition of "sexual assault." That definition comes from Rule 413(d) and covers "'a crime under federal law or under state law … involving' any of five categories of conduct." *Rapp v. Fowler*, No. 20 Civ. 9586, 2022 WL 5243030, *1 (S.D.N.Y. Oct. 6, 2022) (omission in original) (quoting Fed. R. Evid. 413(d)). Of the five proscribed categories, the most directly applicable ones to this case are Rule 413(d)(1) and (d)(2). Rule 413(d)(1) captures "sexual conduct" and "sexual acts" that are criminalized under Chapter 109A, and as defined through 18 U.S.C. §§ 2241–2244, 2246. Separately, Rule 413(d)(2) captures crimes that involve the nonconsensual contact of another person's genitals.

This Court recently analyzed Rule 415 in *Rapp v. Fowler*. There, the plaintiff sought to introduce evidence from two nonparty accusers that the defendant had sexually assaulted them too. One accuser testified that the defendant had touched his leg two inches above his knee for 30 to 45 seconds. Since the incident was "not said to have involved any 'touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks,'" the Court found that the conduct did not qualify as "sexual contact"—as defined in 18 U.S.C. § 2246(3) and for the purposes of Chapter 109A—and therefore did not fall within the meaning of "sexual assault" under Rule 415. The second accuser testified that the defendant grabbed "him by his crotch and lifted him on to a desk" and "began 'grinding' and 'gyrating' his erection into [him] for several seconds." The Court found that this conduct "certainly involved 'sexual contact,'" and thus was admissible evidence of a prior sexual assault under Rule 415. *Rapp*, 2022 WL 5243030, at \*2–\*3.

The accounts of Carroll, Stoynoff, and Leeds all fit within the definition of "sexual assault," as interpreted by this Court and described above. Carroll will testify that Trump moved his fingers around her genitals and then forced his penis inside her. Ex. 6 at 123:6–13. Rape undoubtedly satisfies Rule 413(d). *See Boyce*, 2021 WL 2821154, at \*9. Stoynoff alleges that Trump grabbed her shoulders, pushed her against the wall, and started "kissing and groping [her] without consent." Stoynoff Dep. at 21:2–8, 38:9–10. And Leeds alleges that Trump attacked her by "grabbing [her] breasts," "pulling himself onto [her]," and "putting his hand up [her] skirt." Leeds Dep. at 19:3–15. Both accounts involve "touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks," and Trump's nonconsensual contact thus satisfies Rule 413(d) as well. *Rapp*, 2022 WL 5243030 at \*2–\*3; *see also, e.g.*, 18 U.S.C. §§ 2242(3), 2244(a)(2), 2246(3). If there were any doubt on this score, Stoynoff's and Leeds' allegations independently satisfy Rule 413(d)(5)—and can be properly admitted on that basis alone—because both women

indicate in their testimony that Trump would have continued his assault had he not been stopped, making it clear that Trump was "attempt[ing] … to engage" in further sexual contact.

There are no Rule 403 concerns in admitting Stoynoff's and Leeds' testimony. Not only is their testimony highly relevant, but there is little danger of unfair prejudice where, as here, the conduct they allege is not "any more sensational or disturbing" than the conduct already at issue in the case. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Graham*, No. 14 Cr. 500, 2015 WL 6161292, at *4 (S.D.N.Y Oct. 20, 2015) (holding that probative value of testimony about defendant's participation in other prostitution activities was no more sensational or disturbing than the sex trafficking crime he was charged with). There is little risk that the jury will be confused or misled by hearing the accounts of two nonparty accusers, as "[j]urors are frequently called upon to keep track of multiple events and people." *Boyce*, 2021 WL 2821154, at *6. And admitting the accounts of just two other accusers (of the 24 who have made similar allegations against Trump according to his own campaign) is not needlessly cumulative. Ex. 7; *see Boyce*, 2021 WL 2821154, at *5 (admitting the testimony of six nonparty accusers of sexual assault under Rule 404(b)); *Graham*, 2015 WL 6161292, at *2 (allowing testimony regarding defendant's prior dealings with multiple prostitutes).

In addition, the "Second Circuit has held that Rule 403 should be applied less rigorously in evaluating Rule 415 evidence to avoid Rule 403 from precluding evidence Congress intended to make admissible." *Barnason*, 852 F. Supp. 2d at 376. Thus, "[w]ith respect to the Rule 403 balancing, … '[t]he presumption is that the evidence admissible pursuant to [Rules 413–15] is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'" *United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (citation omitted).

**B.** **Stoynoff's and Leeds' Testimony About Trump's Sexual Assault Are Admissible Under Rule 404(b)(2) as Evidence of Trump's *Modus Operandi***

Stoynoff's and Leeds' testimony is separately admissible under Rule 404(b)(2), which provides that other wrongs or acts "may be admissible … [to] prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit takes an "inclusionary" approach to other acts evidence under Rule 404(b). *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). It allows such evidence to be admitted for *any* purpose other than to demonstrate propensity, so long as the evidence is relevant to some disputed issue at trial and satisfies Rule 403. *Id.* Thus, a district court may admit evidence of uncharged acts if: "(1) [such evidence] is introduced for a proper purpose, (2) it is relevant to the [plaintiff's claim], (3) its prejudicial effect does not substantially outweigh its probative value, and (4) it is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007). Both Stoynoff's and Leeds' proposed testimony meet these requirements.

To start, Stoynoff's and Leeds' testimony is offered for a proper purpose and is relevant to a material issue in dispute. Here, the testimony establishes a *modus operandi*: Trump's pattern of suddenly and without warning lunging at a woman, pushing his body against her, grabbing at her, and kissing her, in what constitutes a knowing and intentional sexual assault, and later categorically denying the allegations and declaring that the accuser was too ugly for him to have sexually assaulted her. *See supra* at 4–5. Establishing *modus operandi* is a well-recognized proper purpose under Rule 404(b). *See United States v. Moye*, 793 F. App'x 19, 21 (2d Cir. 2019); *United States v. Mohamed*, 148 F. Supp. 3d 232, 240 (E.D.N.Y. 2015). Taken together, Stoynoff's and Leeds' testimony contain "characteristics [that] are sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *Mohamed*, 148 F. Supp. 3d at 241 (quoting *United States v. Sliker*, 751 F.2d 477, 487 (2d Cir. 1984)); *see also United States v. Cadet*, 664 F.3d 27, 33 (2d Cir.

2011) ("There is no necessity for synonymity but there must be *substantial* relevancy."). Moreover, that *modus operandi* is directly relevant to a material issue in dispute here: it makes it *more likely* that Trump sexually assaulted Carroll and then lied when he denied having done so (since doing so would square with his *modus operandi*). Recognizing the highly probative nature of an established *modus operandi*, courts regularly admit such evidence in this context. *E.g.*, *Boyce*, 2021 WL 2821154, at *5; *Montanez v. City of Syracuse*, No. 16 Civ. 00550, 2019 WL 4328872, at *4 (N.D.N.Y. Sept. 12, 2019); *accord Alaniz v. Zamora-Quezada*, 591 F.3d 761, 774–75 (5th Cir. 2009).

In addition, the prejudicial effect of Stoynoff's and Leeds' testimony does not substantially outweigh the probative value, as explained above. *See supra* 8. And, to mitigate any possible concern, the jury can be instructed on the permissible uses of the other acts evidence admitted under Rule 404(b)(2), if necessary. *Montanez*, 2019 WL 4328872, at *4; *see LaFlam*, 369 F.3d at 157; *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996).

## III.   THE COURT SHOULD PRECLUDE ROBERT J. FISHER FROM TESTIFYING AS A REBUTTAL EXPERT WITNESS

As part of this action, Carroll engaged Professor Ashlee Humphreys to assess the effect of Trump's statements on Carroll's reputation. Professor Humphreys constructed quantitative models to analyze the dissemination of Trump's defamatory statements, their impact, and the cost to counteract the damage to Carroll's reputation through a reputation repair campaign. *See* Ex. 8 ("Humphreys Rep.") at 26–72 & Appxs. D, E, F, G, J, K. Those models confirmed that Trump's statements reached an immense audience, generating between 142,334,424 and 188,155,507 impressions, *id.* at 35, and harming Carroll's reputation and professional endeavors, with 25.25% of readers and listeners likely to believe Trump, *id.* at 61. Ultimately, Professor Humphreys

demonstrates that Trump's statements caused a "significant shift" in Carroll's reputation and that her reputation "has been, and continues to be harmed." *Id.* at 4, 72.

Trump engaged Robert J. Fisher as his rebuttal expert. Under Rule 26(a)(2)(D)(ii), a party may submit expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." But Fisher does not engage in any meaningful way with Professor Humphreys' report. Far from it: Fisher submitted a 12-page report, nine pages of which are dedicated to reciting his qualifications, casting suspicion on Humphreys' qualifications, and opining on the legal merits, facts, and credibility of the witnesses. See Ex. 9 ("Fisher Rep.") at 4–9; *see also id.* at 1–3, 10–12. At his deposition, Fisher conceded that he had failed to read large sections of Professor Humphreys' report, completed his research and analysis "overnight," and responded only—and partially—to Professor Humphreys' damages model (and nothing more). Ex. 10 ("Fisher Dep.") at 105:2–109:17, 183:2–3, 316:4–11.

Fisher's report is a textbook example of unreliable and patently impermissible rebuttal opinion, and he should be precluded from testifying. Although rebuttal experts have "no burden to produce models or methods of their own," they still "must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (citation omitted); *see also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (burden on proponent of expert to establish that he meets these standards by a preponderance of the evidence). Here, Fisher cannot meet the necessary reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), and Federal Rule of Evidence 702. Breaking his report down, there are additional grounds to exclude each of his purported areas of testimony, with the ultimate effect of leaving him nothing about which to testify.

A.      **The Court Should Preclude Fisher's Testimony in its Entirety Because His Analysis Is Not Reliable**

The district court is the gatekeeper of expert testimony and is charged with "ensur[ing] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Kaufman*, No. 19 Cr. 504, 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (quoting *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2788). Here, Fisher explicitly disclaims the use of data, methods, science, or any literature to inform his opinions. *E.g.*, Fisher Dep. at 304:16–310:14, 387:14–15, 397:6–7; *see also id.* at 127:6–8 ("I'm a little skeptical about—you know, academia people and their theories on how you should do things …."); *id.* at 310:25 ("Well, I don't particularly get into data …."); *see also id.* at 116:10–13. Instead, he says he relied solely on his personal knowledge informed by his experience in public relations. *See, e.g.*, *id.* at 313:4–9.[2]

It is possible for an expert to "draw a conclusion from a set of observations based on extensive and specialized experience," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S. Ct. 1167, 1178 (1999), in which case "the method is the application of experience to facts," *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 00 Civ. 1898, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008). But that method still requires an expert "do more than aver conclusorily that his experience led to his opinion." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004). The expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702, advisory committee note). If the testimony is "speculative or conjectural," "based on assumptions

---

[2] Some of Fisher's "experience" is itself doubtful. For example, he repeatedly cites his experience as a "reporter" for the New York Times. *See* Fisher Rep. at 3; Fisher Dep. at 313:9. But he testified at his deposition that he worked at the Times for less than a year in the 1960s not long after college, and that he wrote articles that were "based on pirating something" from another newspaper, explaining the process as "basically plagiarism." Fisher Dep. at 16:5–7, 17:16–19.

that are 'so unrealistic and contradictory as to suggest bad faith,'" or "connected to existing data only by the *ipse dixit* of the expert," it must be excluded. *Id.* (citations omitted). At bottom, a court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S. Ct. at 1176.

Fisher's analysis fails this reliability test for at least three reasons: first, the report is the result of a hasty, last-minute effort; second, Fisher did not review Professor Humphreys' report or the underlying information as obviously would be necessary to rebut her opinions; and finally, he failed to tie his experience and personal knowledge to his conclusions in a non-speculative manner.

*First*, to say the report was the result of a rushed process is an understatement. Despite having several years' notice that Carroll intended to seek defamation damages (and thirty days from the issuance of Professor Humphreys' report), Trump hired Fisher five days before the rebuttal report was due. Fisher Dep. at 99:11–17. Fisher then wrote his report "overnight," *id.* at 183:2–3, with the entirety of his research consisting of "four or five" news articles about the case. *Id.* at 98:21–99:17. This lack of effort could not be more evident from the report itself, which is riddled with inaccuracies about Professor Humphreys' report. Fisher is keenly aware of his report's defects—and he repeatedly described problems and inaccuracies as byproducts of his own hasty drafting. *Id.* at 183:2–3, *see also id.* at 99:16–17, 103:4–7, 319:9–14. It is clear from the face of the report and confirmed by his deposition that Fisher did not employ the same level of "intellectual rigor that characterizes the practice" of his field. Fed. R. Evid. 702, advisory committee note.

*Second*, these reliability problems are compounded by the fact that Fisher failed to read Professor Humphreys' report closely or consider certain aspects of it at all. Professor Humphreys' report contained twelve appendices, and she supplied access to a separate drive containing the

materials she relied on. *See* Humphreys Rep. at 5 & Appxs. A–L. Those appendices and supplemental materials contained the information she considered, the models she created, and a large collection of the negative public and private messages that Carroll received. *See id.* Fisher did not read the appendices. Fisher Dep. at 105:2–109:17. Nor did he review a single article, book, or other source that Professor Humphreys relied on in her analyses. *Id*. at 385:23–386:4.

As a predictable consequence of that choice, Fisher offered assumptions about Carroll and Professor Humphreys' report that were plainly inaccurate.[3] This sheer sloppiness caused Fisher to recant many aspects of his report when confronted with the information that he had overlooked. *See, e.g.*, *id.* at 181:14–19, 182:19–183:7 (taking back his opinion that "Trump's implication" that Carroll had falsely accused other men of sexual assault "was true," stating "Okay, I erred there. I didn't factor in the word 'falsely,'" which "changes the context of this definitely"); *id.* at 200:22–207:11 (conceding that, contrary to the claim in his report, Professor Humphreys did account for the "he said" side of what he describes as a "he said, she said" case); *see also id.* at 322:12–6, 379:15–380:2, 389:7–14.[4] Fisher's failure to read any documents supporting the opinion he purports to rebut may alone be grounds for exclusion: "The reliability of [an expert's] analysis … is called into question by the fact that [he] disclosed at his deposition that he had failed to review all of the documents produced by the [opposing party] in the course of preparing his expert report." *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014).

---

[3] Take, for example, Fisher's comments that "I don't think anyone has a negative impression of Ms. Carroll," Fisher Dep. at 383:20–22, and that there was a "questionable negative impact on Carroll," Fisher Rep. at 11. Professor Humphreys had attached to her report hundreds of negative messages that Carroll has received since Trump's statements that repeated his insults and denials. Humphreys Rep. at 51–58.

[4] In addition to inaccuracies, Fisher's report also contained plagiarized material. After criticizing Professor Humphreys' definition of "reputation," Fisher supplied a supposedly distinct definition that he claimed he wrote specifically for purposes of his 2022 report. Fisher Dep. at 220:4–224:6. But he had no explanation when confronted with the fact that the definition appears verbatim in an article from 2018 that Fisher did not author. *Id.* at 225:12–229:7 ("Q. Can you read the first three sentences of the article. A. … Boy that sounds familiar. … I'm looking like I'm a plagiarist or something. … [M]y compliments to whoever found this though.").

*Finally* and most importantly, Fisher fails to supply the requisite foundation for his opinions. In fact, conclusory opinions are all that Fisher's report actually offers. He does not provide any analysis, does not show how his experience informs his opinions, and does not cite a single source. Instead, he claims to have relied on his so-called "common sense." *See* Fisher Dep. at 335:20–21 ("I'm a big believer in rhyme, reason, logic, and common sense."); *id.* at 310:13 (describing his methodology as an "educated feel"); *see also id.* at 170:24, 336:16–17.

Courts routinely exclude experts who offer nothing more than "a compendium of [their personal] opinions." *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2000); *see also, e.g.*, *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 648 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017). Courts rule this way because "subjective belief or unsupported speculation" are not themselves reliable methods, even when relying on personal knowledge and experience to testify. *Daubert*, 509 U.S. at 590, 113 S. Ct. at 2795. Nor are vague references to "common sense" enough: "If [an] opinion is based on simple common sense, it is not helpful; the jury does not need expert opinion because its common sense will suffice. And if the jury needs expert opinion because common sense will not suffice, it must come from an expert who is applying her expertise." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 484 (S.D.N.Y. 2016). Here, Fisher is not applying his expertise in any apparent respect; instead, he is merely "attribut[ing] [his] opinion to simple logic rather than any application of principles of [reputation repair]." *Id.* In the end, he offers nothing more than a "'because I said so' explanation," which "cannot satisfy the reliability prong of Rule 702 and *Daubert*." *United States v. Ray*, 583 F. Supp. 3d 518, 542 (S.D.N.Y. 2022).

For all these reasons, Fisher's testimony should be excluded in its entirety.

15

**B.**      **Each Portion of Fisher's Testimony Should Be Precluded for Further Reasons**

    **1.**      **Fisher Should Not Be Permitted to Address Professor Humphreys' Impressions Model or Impact Assessment**

An expert report "must contain a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Of the three tasks that Professor Humphreys' report addresses, Fisher's report includes the "opinions [he] will express" in response to only one. Professor Humphreys' report sets forth: (1) an Impressions Model; (2) an Impact Assessment; and (3) a Damages Model. Humphreys Rep. at 26–72 & Appxs. D, E, F, G, J, K. But Fisher's report does not address the Impressions Model or the Impact Assessment at all. Indeed, Fisher conceded at his deposition that he did not even review her data quantifying the number of impressions of the defamatory statements or the ideological makeup of those who read or heard them. Fisher Dep. at 316:4–11.

Instead of responding to Professor Humphreys' analysis or methodology, as would be his role as a rebuttal witness, Fisher simply stated there was no point in doing those calculations at all. *See id.* at 296:3–8 ("I don't think there is a need to figure out how many people [saw or heard the statements]."); *id.* at 308:5–7 ("I don't feel the need to respond on [how many people believed the statements."); *id.* at 316:20–21 ("I don't need to see surveys to have a good feel on how many people would believe what he said."); *see also id.* at 315:13–320:1. Thus, Fisher should be precluded from commenting on the Impressions Model or Impact Assessment for the first time in front of the jury. *See Engler v. MTD Prod., Inc.*, 304 F.R.D. 349, 354 (N.D.N.Y. 2015).[5] That is,

---

[5] Indeed, "preclusion is automatic absent a determination of either substantial justification or harmlessness." *Engler*, 304 F.R.D. at 355 (cleaned up); *see also LaMarca v. United States*, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1998) ("[The] duty to disclose information concerning expert testimony is intended to allow 'opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'"). Fisher's failure to set forth these opinions was hardly justified. His only excuse for an incomplete report was the lack of time he had to draft it, but Trump's delinquency in hiring an expert is no excuse for flouting Rule 26. *See, e.g.*, Fisher Dep. at 309:16–310:1 (Q. "[D]o you agree it is important [] in order to understand the impact of

Fisher should be precluded from opining on Professor Humphreys' findings of how widely the statements were disseminated, where they were disseminated, the makeup of people to whom they were disseminated, or the percentage of people likely to have believed the statements.

### 2. Fisher Should Not Be Permitted to Draw Legal or Factual Conclusions

Fisher devotes nearly half of his report to impermissible legal conclusions and factual determinations that fall far outside the bounds of permissible expert opinion. *See* Fisher Rep. at 4–9; *see also id.* at 2–4, 9–12. That impermissibility should be uncontroversial, as an expert may not usurp (1) "the role of the trial judge in instructing the jury as to the applicable law," *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005); (2) "the role of the jury in applying that law to the facts before it," *id.*; or (3) "the role of the trial court to act as gatekeepers to ensure the relevance and reliability of all expert testimony," *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 138–39 (S.D.N.Y. 2022). Fisher's report attempts to do all three.

*First*, in a section titled "Analysis of Statements," Fisher goes through each allegedly defamatory statement and offers his opinion on whether the statement meets the legal criteria for defamation. Fisher Rep. at 4–7. He then concludes: "It is my opinion that none of the statements she identified can be determined as being false and the negative implications are expressions of his opinions which constitute free speech and are protected under the First Amendment." *Id.* at 7; *see id.* at 8–9 (similar for defamation per se).[6]  It is hard to imagine anything that would more demonstrably constitute legal assertions.

---

alleged defamation to understand the percentage of people exposed to those statements that are likely to believe it or disbelieve it? A. Well, it's—it's a moot point, … because the bottom line is regardless of whether it's something that's worthwhile or not in this particular case, I did not have the ability to do so or … more specific, the time to do so."). Nor is this failure harmless, given that discovery long ago closed and trial is approaching. *Engler*, 304 F.R.D. at 355.

[6] The legal conclusions include statements like, "it is more of a defamatory statement for the Plaintiff to have made a statement that it did occur"; "Trump's comment was clearly an opinion and constitutes speculation and supposition"; "His statement can also be classified as conjecture, speculation and opinion"; "This can also be categorized as an opinion"; "This was clearly an opinion." Fisher Rep. at 5–7.

*Second*, Fisher's report provides his opinions on the facts of the case and the credibility of the witnesses—often relying on Trump's deposition to support his views on truth and falsity. *See* Fisher Rep. at 5–8. Indeed, he makes various factual assertions by crediting Trump's testimony, including that "[t]here is no evidence that the rape occurred," "Trump was parroting something that someone told him," and Trump's denial "cannot be a false statement" because it's an act that "hasn't been proven to have taken place."[7] *Id.* at 5–7, 11; *see also id* at 168:16–173:12.[8] Courts regularly preclude expert testimony that "usurps the province of the jury to make factual determinations," *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, No. 11 Civ. 505, 2017 WL 715909, at *2 (S.D.N.Y. Feb. 10, 2017), or "instruct[s] the jury as to an ultimate determination that was exclusively within its province, namely, the credibility of [witnesses]," *Nimely*, 414 F.3d at 398.

*Third*, throughout his report and deposition, Fisher demeans Professor Humphreys' qualifications because, according to him, she does not have the necessary experience. *See* Fisher Rep. at 2–4, 9–12; Fisher Dep. at 111:24–112:23, 117:12–25, 119:10–17, 241:11–22.[9] But it is solely the prerogative of the court to assess the reliability of expert testimony, including whether an expert is qualified to testify in the first place. *See Capri Sun GmbH*, 595 F. Supp. 3d at 13–39 (precluding an expert from testifying as to another expert's qualifications).

---

[7] Fisher also characterizes Trump's defamatory statements as "relative[ly] mild." Fisher Rep. at 11; *see also* Fisher Dep. at 391:10–16 ("Q. And is it your opinion that the President of the United States implying someone is too ugly to sexually assault is mild? A. Yes, yes, … given who it's coming from, yes. I mean, Trump doesn't think much of women.").

[8] At his deposition, Fisher went further, hypothesizing that a person can never prove a rape happened based on her testimony alone—not-so-subtly implying that Carroll cannot do so here. Fisher Dep. at 171:21–172:9.

[9] Fisher made his comments without even having read Professor Humphreys' CV, Fisher Dep. at 104:12–17, without realizing that she is a professor at Northwestern's School of Journalism (a fact listed in the first sentence of her report), *id.* at 121:4–20, and while admitting he does not know what people learn or teach in journalism school today, *id.* at 123:10–16; *see also id.* at 123:14–16 ("[W]hen I was going to journalism school, the internet didn't exist.").

### 3.    Fisher Should Not Be Permitted to Testify Regarding Professor Humphreys' Reputation Repair Damages Model

In the section of his report titled "Reputation Repair Program," Fisher offers a series of inaccurate, unsupported conclusions that are not tied to his experience or any other methodology. Fisher Rep. 9–12. Even where an expert's "method" is the purported "application of experience to facts," the testimony must still be "grounded, well-reasoned, and not speculative," and must "show how his or her experience … led to his conclusion," *In re MTBE*, 2008 WL 1971538 at *6 (citations omitted). Moreover, the expert's assumptions must have "adequate factual bas[es]," *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013). Applying those familiar criteria here, Fisher's response to Humphreys' damages model calculating what it would cost to counteract the negative impact of Trump's defamatory statements should be excluded in its entirety. His response is speculative and conjectural; it is untied to the record; and it completely "neglects to explain how his experience supports his conclusion[s]." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002); *see supra* at 12–13.

The unreliability of Fisher's analysis is most evident when taken paragraph by paragraph. To begin, Fisher launches into a critique of Humphreys' "Type of Program" by asserting she is proposing only a "social media campaign" and "not a diverse [m]ulti-faceted communications campaign," criticizing her for "[having] almost the entire program geared to online exposure," and insisting that "[t]he most successful type of communications program features dissemination of information through multiple communications channels." Fisher Rep. at 9–10. But Professor Humphreys' campaign does, in fact, feature "multiple communications channels"— the *majority* of her target impressions are for media types other than social media or internet sources, which is evident on the face of her report and thoroughly detailed in Appendix K. Humphreys' Rep. at 66–67, 126–32. Fisher's statement that "[t]he vast majority of her program is linked to [the internet

and social media], at the near exclusion of other channels of communication" is blatantly erroneous—though perhaps unsurprisingly so, considering that Fisher admitted that he only skimmed Professor Humphreys' report and failed to read Appendix K altogether.[10]

Fisher next attacks Professor Humphreys' "Target Audiences," again incorrectly asserting that "she doesn't clearly define her audience" and "it would appear she is targeting the public in general." Fisher Rep. at 10. This assertion is blatantly wrong: Professor Humphreys' entire Impact Assessment is dedicated to discerning the readership demographics of the different media sources that disseminated the statements and determining the precise percentages of people who were likely to believe Trump's statements, and her damages analysis and reputation repair campaign are premised on targeting that specific audience. *See* Humphreys Rep. at 40–59, 66. Indeed, Fisher admitted as much at his deposition when confronted with Professor Humphreys' clear target audience, stating, "I will concede to you that that is a—a more targeted definition. … [Y]ou're right, that's a … more defined definition." Fisher Dep. at 379:15–380:2.

Fisher then launches into a series of unsupported factual assertions and opinions that he ties neither to his experience nor any other sources or methodology, as confirmed during his deposition. His report stated that, because Trump was a "highly visible, famous and well-known person who is also highly controversial," "you aren't going to change the negative comments or opinions [Trump] had about Carroll because recipients of them will have believed them or not when hey [sic] were first heard." Fisher Rep. at 10. But he admitted that his opinions of Trump

---

[10] *See* Fisher Dep. at 238:9–21 ("I can't even be sure I had the appendices, to be honest with you. But I didn't see [Appendix K] one way or the other."); *see also id.* 103:23–104:2. As if that were not enough, reports that Fisher has submitted in other cases reveal that he himself has proposed numerous campaigns that focus entirely on the internet, and include no reference to broadcast TV, cable TV, radio, podcasts, or print newspapers (unlike Professor Humphreys, who includes all these channels and more). *See, e.g.*, Robert J. Fisher, Expert Report, *Am. Society of Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, No. 18 Civ. 001559 (D. Colo. May 14, 2020), ECF 72-1; Robert J. Fisher, Expert Report, *100+ Animal Rescue, Inc. v. Butkus*, No. 17 Civ. 61893 (S.D. Fla. Feb. 14, 2020), ECF 76; Robert J. Fisher, Expert Report, *Zinn v. City of Scottsdale*, No. 2:17 Civ. 01813 (Super. Ct. Ariz., Maricopa Cty. Jan. 16, 2020), ECF 66-1.

and the effect of Trump's statements were based on his personal views and conversations with "friends, business[,] family, and business associates"—not on his own expertise or any data. Fisher Dep. at 394:12–395:2; *see also id.* at 316:20–22, 318:23–25. Fisher's other comments—that "Trump is controversial and often bombastic," which "make[s] it less likely some people would believe him" and that "Trump's previous admissions of sexual inappropriateness would also lessen people's belief in the negative statements, comments or opinions he had of Carroll"—are equally unsubstantiated opinions tied neither to his own expertise nor to any data. Fisher Rep. at 11; *see* Fisher Dep. at 319:23–320:1.

In addition, Fisher makes the unfounded assertion that "Carroll's long standing positive image would possibly offset most of his derogatory remarks," the implication of which is that Carroll did not incur much damage to her reputation from Trump's statements. Fisher Rep. at 11. Fisher admitted that this statement was not based on any data or his experience; rather, he thought it was "reasonable to assume." Fisher Dep. at 393:18. But this assumption is the opposite of what he thought it was "reasonable to assume" in other cases that he has testified in. As Fisher acknowledged, he has authored reports where he said, "It takes years to build a reputation and seconds to destroy it." *Id.* at 394:5–6. As for Fisher's failure to apply that principle here: "I usually do that in conjunction with the reputation damage repair programs I write … but in this case I'm representing the defendant, so I didn't …." *Id.* at 399:6–11. Under Rule 702, testimony may be excluded where the expert "failed to apply his own methodology reliably." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002); *see also Faulkner*, 46 F. Supp. 3d at 381 (where "methodology [is] aimed at achieving one result," an expert's "analysis is unreliable" and "must be excluded").

Finally, Fisher makes a series of statements based on percentages, stating that, "[i]f only

basically 25% would believe Trump, that leaves 75% of the public who could be impacted. If you reasonably assume that at least 50% wouldn't believe anything he said, you are left with a very small percentage that you would have to reach to counteract his negative comments about Carroll." Fisher Rep. at 11. But Fisher's report "provides no justification whatsoever for the numerical values" that he selected. *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345, 2021 WL 5154110, at *13 (S.D.N.Y. Nov. 5, 2021) (cleaned up). When asked how he determined these percentages, Fisher answered, "those are reasonable projections based on what polls and surveys have shown about what his support is"—but admitted that no polls or surveys were cited in his report. Fisher Dep. at 383:2–7. Here, too, his testimony violates core rules that govern expert testimony.

## IV.   THE COURT SHOULD EXCLUDE TESTIMONY OF WITNESSES NOT DISCLOSED IN DISCOVERY, TESTIMONY ADDUCING UNDISCLOSED INFORMATION, AND COMMENTARY OR TESTIMONY CONCERNING DNA

The Federal Rules impose on litigants a duty to disclose and timely supplement certain information as part of the discovery process. Yet, Trump admitted at his deposition that he and his counsel have taken a loose approach to these discovery obligations because none of them took Carroll's case "seriously." Trump Dep. at 205:9–18. Two elements of Trump's discovery conduct are of particular relevance here. First, in Trump's initial disclosures, he referred to groups of people with potentially relevant information in nonspecific, collective terms. Ex. 11 at 2–3. With one irrelevant exception, Trump did not identify a single individual who was likely to have information that he would use to support his defenses. When Trump supplemented his disclosures months later to add a reference a potentially relevant insurance agreement, he otherwise referred back to his prior disclosures. Ex. 12 at 2. Trump also made the same nonspecific references to witnesses in his January 9, 2023 initial disclosures in *Carroll II*. Ex. 13 at 2–3.

Second, in the one instance Trump offered names of potential witnesses, he made clear that his answer was neither serious nor accurate. Carroll's Interrogatory No. 2 sought the identity of "all individuals with whom [Defendant has] communicated, by any means, concerning Plaintiff or this Action." Ex. 14 at 2. After months of stalling, Trump eventually supplied a supplemental response to that interrogatory. He listed the names of only six individuals. *Id.* at 2–3. It was clear from the start that those six names had no real significance. Trump's counsel confirmed by email that Defendant "d[id] not intend to call any of the individuals identified in Interrogatory No. 2 as witnesses at trial." Ex. 15. And, then, at his deposition, Trump denied having spoken with five of the six individuals he had previously identified. *See* Trump Dep. at 108:18–110:9. He even went so far as to declare that "[t]he deposition rules" because his interrogatory responses were "not signed by" him. *Id.* at 111:15–17.

Trump's latest word on the matter represents yet another switch. In the Joint Pretrial Order, Trump included five new nonparty witnesses in his witness list: David Haskell, Elizabeth Dyssegaard, Erin Hobday, Laurie Abraham, and Sarah Lazin. ECF 128.[11] But under Rule 37(c), Trump cannot offer testimony from any undisclosed witnesses at trial absent circumstances that are not present here. The Court should thus preclude testimony from the five new witnesses identified in the Joint Pretrial Order and any other witness whom Trump has not disclosed. In addition, the Court should hold that Trump cannot testify—directly or by implication—to information that any undisclosed witnesses theoretically could have testified to if they had been properly disclosed (which has already been an issue with Trump in these proceedings). And in the

---

[11] The list also includes Birnbach, Fisher, and Anderson Cooper. Carroll obviously does not object to Birnbach, as her testimony is part of Carroll's case-in-chief. Carroll objects to Fisher's testimony on other grounds, as explained above. *See supra* 10–22. Cooper was the only individual identified in Trump's initial disclosures as potentially having "discoverable knowledge or information to support one or more of his defenses." Ex. 11 at 2. Trump did not depose or otherwise obtain discovery from Cooper, and it is not clear what relevant information Cooper could have.

same vein, given Trump's repeated failure to comply with the applicable discovery rules, the Court

should preclude any testimony or commentary at trial concerning DNA evidence.

### A.    Trump Has Not Disclosed Witnesses Under Rules 26(a)(1) and (e) and Should Be Precluded from Calling Them to Support His Defenses

The Federal Rules of Civil Procedure are designed to prevent "surprise" and "trial by

ambush." *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002). To achieve

that goal, Rule 26(a)(1) requires that a party, "without awaiting a discovery request," proceed to

name "each individual likely to have discoverable information—along with the subjects of that

information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P.

26(a)(1)(A)(i). Rule 26(e) further instructs a party to "supplement or correct" a disclosure or

response when necessary. *See* Fed. R. Civ. P. 26(e)(1)(A). Here, Trump's initial disclosures

identified only one person. During discovery, when the identification of witnesses is a key aspect

of the fact-finding process, Trump doubled—and tripled and quadrupled—down on his position

that he has no witnesses to call as part of his defense. Now, however, long after discovery has

closed, Trump apparently intends to call six nonparty witnesses. But his failure to identify all but

one of those witnesses earlier in the process precludes him from using any of the five previously

undisclosed witnesses, none of whom were deposed, at trial. *523 IP LLC v. CureMD.Com*, 48 F.

Supp. 3d 600, 638 (S.D.N.Y. 2014).

The consequences for violating Rule 26 are clear: "the party is not allowed to use that

information or witness to supply evidence … at a trial, unless the failure was substantially justified

or is harmless." Fed. R. Civ. P. 37(c)(1). That analysis is aided by four factors: "(1) the party's

explanation for the failure to comply with the disclosure requirement; (2) the importance of the

testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result

of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (cleaned up). Each factor favors preclusion here.

First, Trump's discovery conduct to date belies any argument that his failure to identify evidence or witnesses was justified. *See, e.g.*, *Simon v. City of N.Y.*, No. 14 Civ. 8391, 2017 WL 57860, at *6 (S.D.N.Y. Jan. 5, 2017). Indeed, Carroll identified Trump's new witnesses in her responses to Trump's sweeping interrogatories or even earlier in the litigation, but he did not list any of them in any of his disclosures in this action or in *Carroll II*.[12] Second, Trump has maintained the position throughout this case "that the underlying incident alleged in the Complaint did not occur," Ex. 11 at 2, and he testified at his deposition that he could not point to any documents or witnesses to corroborate his account, Trump Dep. 75:25–76:16. Third, disclosure of a new witness after the close of fact discovery and on the eve of trial is inherently prejudicial. *See, e.g.*, *Patterson*, 440 F.3d at 118. Finally, and for good reason, the Court has previously declined to allow Trump to continue delaying these proceedings based on a failure to follow the rules. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 587 (S.D.N.Y. 2022). This situation is no different. Thus, preclusion is the appropriate sanction, and Trump cannot call any witness whom he did not properly disclose.

**B.      Trump Should Be Precluded from Testifying as to Any Undisclosed Information, Including Testimony of Undisclosed Witnesses**

As part of its decision precluding Trump from calling undisclosed witness, the Court should also make clear that Trump cannot suggest what any undisclosed witness would have said on his behalf. That issue has already arisen in these proceedings. For instance, Trump did not disclose any witness who provided him security services in the mid-1990s. Yet, at his deposition,

---

[12] As further evidence that Trump had knowledge of these individuals long ago, Trump sent Carroll notice of subpoenas to all five of them on August 9, 2022, but still elected not to list them in his disclosures. While it is not clear which of the subpoenas were served, no depositions of these individuals took place. As a result, we reasonably assumed that Trump had decided that they were no longer potential witnesses with relevant testimony for trial.

Trump testified that he "would [be able] to have somebody from security confirm a statement that [the assault] never happened," vaguely adding that he "pretty much to always" had security with him in that time period. Trump Dep. at 73:8–9, 73:18–19. But Trump failed to supplement or correct the silent record regarding the existence of any such witness—despite assuring that he would "check," "ask people," and "find out" who served in his security detail from the fall of 1995 through the spring of 1996. *Id.* at 75:8–16. Concocting but not disclosing "evidence" to support his side is a well-known pattern for Trump. Indeed, in his very first statement about Carroll, Trump "thank[ed] Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened." Ex. 16; Trump Dep. at 59:6–9. But Trump later admitted under oath that neither he nor anyone on his team ever spoke with Bergdorf's. *Id.* at 59:6–9, 78:6–10.

Testimony of this nature is not permissible and will confuse the trial. Trump cannot circumvent Rules 26 and 37 by, on the one hand, claiming that there is no information or witnesses to support his defense and then, on the other, testifying to the ways in which undisclosed information or witnesses would support him. In trying to have it both ways, Trump is effectively attempting to spare the undisclosed information and witnesses from the adversarial process by providing such information through his testimony alone. That is not how the Rules work. To the contrary, under Rule 37(b)(2)(A)(ii), Courts regularly preclude all evidence and testimony related to undisclosed information. *E.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14 M.D. 2543, 2017 WL 2880882, at *2 (S.D.N.Y. July 5, 2017). That safeguard is important here, since Trump's reliance on undisclosed information and the supposed knowledge of undisclosed witnesses to support his defense would "provide [the other side] with no means of effectively cross-examining whether that representation is credible." *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 204 (E.D.N.Y. 2010).

The Court should thus prohibit Trump from testifying—directly or by implication—about the ways in which undisclosed witnesses might have supported his defense if they had been called.

**C.    The Court Should Preclude Testimony or Commentary Concerning DNA Evidence**

As this Court knows from a related decision made in *Carroll II*, Carroll sought for years to test Trump's DNA against a mixture of DNA found on the dress that she wore during the attack at Bergdorf's, but ultimately changed strategies after Trump adamantly refused to provide DNA. *See Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 2006312, at *1–*6 (S.D.N.Y. Feb. 15, 2023). As a result, discovery in *Carroll I* closed without any fact-finding or expert analysis relating to DNA, and discovery in *Carroll II* began and closed without even a mention of DNA. Last week, however, "three days after [Trump's] latest request for a multi-week trial postponement was substantially denied" and "one day after the parties filed a joint pretrial order in [*Carroll I*] that makes clear that neither [Carroll] nor [Trump] intends to call any DNA experts as witnesses in [that] trial," Trump proposed to provide his DNA sample if the Court would require Carroll to produce an undisclosed appendix to a years-old DNA report. *Id.* at *1. The Court rejected Trump's motion to reopen discovery, finding that there was "no justification for imposing [Trump's] proposal on [Carroll] now that she has prepared for trial on the entirely justified basis that there will be no DNA evidence." *Id.* at *2.

In light of this ruling, and by virtue of its reasoning, the Court should preclude testimony or commentary regarding any aspect of this DNA issue at the trial—including Trump's eleventh-hour "offer" to reopen discovery so he might provide a DNA sample and any inferences his counsel might ask the jury to draw about the lack of DNA evidence at trial. Under Rule 403, a court may exclude evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." *United States*

27

*v. Gabinskaya*, 829 F.3d 127, 134 (2d Cir. 2016). That analysis weighs decisively in Carroll's favor.

To start, any testimony related to DNA evidence has no probative value in this case: "No one knows whether [Trump's] DNA is on the dress." *Carroll*, 2023 WL 2006312, at *8. Faced with a similar situation, where DNA evidence was not secured during discovery, the Seventh Circuit upheld not only the district court's decision to squash a tardy subpoena to secure such evidence, but also the preclusion of any "argument or questioning [of] witnesses regarding the lack of testing of DNA." *Mitchell v. City of Chicago*, 862 F.3d 583, 587 (7th Cir. 2017). As the Seventh Circuit explained, any "[a]rgument or evidence demonstrating unavailability of DNA evidence would not tend to make the existence of any fact that is of consequence 'more probable or less probable than it would be without the evidence,'" and thus had "no tendency to prove liability." *Id.* The same is true here.

The risks inherent in allowing nonprobative references to DNA are heightened given the outsized weight that juries tend to give to DNA evidence or the lack thereof. Courts have recognized a so-called "CSI effect" by which jurors who "have been exposed to legal proceedings in the media … have developed an expectation" related to DNA testing. *Gray v. Lamanna*, No. 17 Civ. 6324, 2021 WL 4844536, at *7 n.3 (E.D.N.Y. Oct. 18, 2021). Here, the jury could attach undue weight to DNA evidence that does not exist, including to the absence of any DNA "match," and could be prejudicially confused or deceived by a misleading suggestion that Trump was willing to provide DNA. *Cf. Sadler v. Moran Towing Corp.*, No. 01 Civ. 1666, 2002 WL 1977604, at *1 (S.D.N.Y. Aug. 28, 2002) (Kaplan, J.) (evidence that would "suggest, improperly, a willingness on defendants' part to settle," when no effort to settle had been made, is "misleading," "confusing" and its "probative value would be far outweighed by unfair prejudice").

Moreover, any mention of DNA at trial will force the parties to detail the ins and outs of the related discovery disputes, leading to significant jury confusion, wasted time, and prejudice. Indeed, there is no way to raise DNA before the jury without also requiring testimony and other evidence regarding the history of *Carroll I* and *Carroll II*; the differences and overlap between the two actions; Trump's broader pattern of discovery obstinance and dilatory tactics that Carroll responded to by abandoning her longstanding efforts to obtain Trump's DNA; the responses of Trump's counsel to Carroll's requests for DNA; and more. All this would undoubtedly create a "sideshow" at trial on collateral issues and push the jury into the improper function of relitigating the discovery dispute. *Cf. Guidi v. Inter-Cont'l Hotels Corp.*, No. 95 Civ. 9006, 2003 WL 1907904, at *1–*2 (S.D.N.Y. Apr. 16, 2003) (collecting similar cases of juror confusion). Courts have generally observed that evidence regarding discovery conduct has "limited or no probative value," and "the dangers of unfair prejudice, jury confusion, and waste of time are quite real." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14 M.D. 2543, 2015 WL 8130449, at *4–*5 (S.D.N.Y. Dec. 3, 2015); *accord Miller UK Ltd. v. Caterpillar, Inc.*, No. 10 Civ. 03770, 2015 WL 7351674, at *10 (N.D. Ill. Nov. 20, 2015); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, No. 06 Civ. 1584, 2009 WL 10674074, at *3 (S.D. Cal. Apr. 1, 2009). That is certainly the case here.

Finally, the type of testimony that Trump or his lawyers apparently previewed for the press is *exactly* the sort of sandbagging that the Federal Rules are designed to prevent.[13] *See* Fed. R. Civ. P. 26 & 37(c)(1); *Haas v. Delaware & Hudson Ry. Co.*, 282 F. App'x 84, 86 (2d Cir. 2008) ("The purpose of [Rule 37] is to prevent the practice of 'sandbagging' an opposing party with new

---

[13] *See* Jose Pagliery, *Trump Says He'll Hand Over His DNA for E. Jean Carroll Case*, Daily Beast (Feb. 9, 2023) ("According to a source familiar with his defense team's new strategy, Trump's proposition has not yet been made to the opposing side. But if they follow through, it would position them to tell jurors his DNA was offered—just never tested."). Tipping his hand even further, Trump included the DNA analysts whom Carroll consulted years ago as part of his witness list in *Carroll II*, even though he had never disclosed them as witnesses before. *See* Proposed Joint Pretrial Order, *Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y. Feb. 16, 2023), ECF 60.

evidence."). To ward off "surprise" and "trial by ambush," courts routinely preclude parties from introducing evidence that was disclosed for the first time only after the close of discovery, especially where, as here, the parties were aware of the issues well before. *Am. Stock Exch.*, 215 F.R.D. at 93; *Downey v. Adloox Inc.*, No. 16 Civ. 1689, 2018 WL 794592, at *1–*2 (S.D.N.Y. Feb. 8, 2018); *Estate of Jaquez v. Flores*, No. 10 Civ. 2881, 2016 WL 1060841, at *8 (S.D.N.Y. Mar. 17, 2016). Trump has had "years in which to make DNA an issue in this case." *Carroll*, 2023 WL 2006312, at *2. He did not. Now, on the eve of trial, he cannot change course by offering testimony on what the DNA evidence might show. *Cf. Djangmah v. Falcione*, No. 08 Civ. 4027, 2013 WL 6388364, at *2–*4 (S.D.N.Y. Dec. 5, 2013). The Court should not abide his gamesmanship and should preclude any testimony purportedly related to DNA.

## V. THE COURT SHOULD PRECLUDE INQUIRY INTO A SERIES OF IRRELEVANT TOPICS IN CONNECTION WITH STEPHANIE GRISHAM'S TESTIMONY

Stephanie Grisham served in Trump's White House for nearly four years and was publicly announced as Trump's Press Secretary and Communications Director just one day after Trump's June 24, 2019 statement about Carroll. Trump Dep. at 114:2–5. At Grisham's deposition, Trump's counsel cross-examined her regarding two prior misdemeanor convictions and an unrelated pending lawsuit, and repeatedly objected to the deposition based on Grisham's use of a pain reliever following a serious foot injury. The Court should preclude cross-examination or the introduction of evidence regarding these topics as improper character evidence under Rules 608 and 609, and as unduly prejudicial under Rule 403.

### A. The Court Should Preclude Cross-Examination or the Presentation of Evidence Regarding Grisham's Prior Misdemeanor Convictions

Grisham was arrested on two prior occasions, between 2013 and 2015 in Arizona, resulting in convictions for reckless driving and driving under the influence. Ex. 17 ("Grisham Dep.") at

88:13–89:3, 89:18–90:7. Rule 608 permits cross-examination regarding "specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness" *only* where the prior conduct is "probative of the character for truthfulness or untruthfulness." Rule 609 allows a party to attack a witness's character for truthfulness "by evidence of a criminal conviction" *only* where the conviction required proof of "a dishonest act or false statement."

Grisham's driving-related convictions do not fit within either Rule. The criminal statutes at issue do not have as an element falsity or dishonesty. *See* A.R.S. § 28-693 (reckless driving); A.R.S. § 28-1381 (driving or actual physical control while under the influence). And courts in this District have consistently held that convictions for driving while intoxicated do "not involve dishonest acts or false statements." *United States v. Bowen*, 511 F. Supp. 3d 441, 453 (S.D.N.Y. 2021); *United States v. Whitley*, No. 04 Cr. 1381, 2005 WL 2105535, at *3 (S.D.N.Y. Aug. 31, 2005) (similar). Because Grisham's prior misdemeanor convictions fall outside these rules, neither cross-examination nor the introduction of evidence regarding those convictions is permissible.

Even if it were, the probative value of Grisham's misdemeanor convictions is substantially outweighed by the prejudice of admitting them. *See* Fed. R. Evid. 403. The impeachment value of old misdemeanors that do not involve dishonesty or untruthfulness is low, and inquiry into Grisham's driving-related conduct would serve only to confuse the jury and prolong her testimony. *See United States v. Potapova*, 800 F. App'x 14, 16 (2d Cir. 2020); *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 544 (E.D.N.Y. 2011).

### B.    The Court Should Preclude Cross-Examination of Grisham Regarding an Unrelated Lawsuit That Remains Pending

Grisham is currently a defendant in a defamation suit brought in October 2021 by her ex-boyfriend (and current U.S. Representative) Max Miller, who claims that Grisham defamed him when she publicly stated that her relationship with another White House staff member had "turned

abusive." Compl., *Miller v. Grisham* ¶ 11, No. CV-21-953971 (Ohio Ct. Com. Pl., Cuyahoga Cty. Oct. 5, 2021). That case will be in discovery until at least April 6, 2023, with dispositive motions not due until May 8, 2023. Journal Entry, *Miller v. Grisham*, No. CV-21-953971 (Ohio Ct. Com. Pl., Cuyahoga Cty. Dec. 6, 2022).

Courts regularly prohibit cross-examination of a witness about pending litigation like this. Rule 608(b) does "not authorize inquiry on cross-examination into instances of conduct that do not actually indicate a lack of truthfulness." *United States v. Nelson*, 365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005). Where litigation remains pending, there will have been no "adverse credibility finding" that could come in under Rule 608(b). *Id.* at 389, 392; *accord United States v. Donovan*, 577 F. Supp. 3d 107, 122 (E.D.N.Y. 2021) (precluding cross-examination on pending litigation because there had been "no finding of any wrongdoing, and mere allegations are irrelevant to truthfulness"). There have been no findings against Grisham in the Ohio action, and therefore cross-examination about that action should not be permitted.

Such cross-examination should also be prohibited under Rule 403. Courts have had little difficulty finding that the probative value of "mere" allegations "is outweighed by the danger of unfair prejudice, confusion of the issues and considerations of undue delay." *Gogol v. City of N.Y.*, No. 15 Civ. 5703, 2018 WL 4616047, at *4 (S.D.N.Y. Sept. 26, 2018). For one, there is a significant risk that jurors will give undue weight to the unsubstantiated allegations from another lawsuit. *Cf. United States v. Whitmore*, 359 F.3d 609, 619 (D.C. Cir. 2004) (upholding exclusion of evidence regarding prior judicial finding which fell short of a perjury *conviction* because jury "might rely too heavily on the finding in making its own credibility determination"). Moreover, allowing Trump's counsel to cross-examine Grisham on the other lawsuit would force Carroll's counsel to pursue a confusing and time-consuming inquiry into the merits of Representative

Miller's defamation claim—the exact sort of "'trial within a trial' that Rule 403 disfavors." *E.g.*, *Doe v. Lima*, No. 14 Civ. 2953, 2020 WL 728813, at *8 (S.D.N.Y. Feb. 13, 2020); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 578109, at *2 (S.D.N.Y. Mar. 4, 2005).

> **C.    The Court Should Preclude the Presentation of Evidence or Cross-Examination of Grisham Regarding Her Past Use of a Pain Reliever**

A few weeks prior to her deposition, Grisham broke her foot, for which she was prescribed a pain reliever. Grisham Dep. at 9:15–25. At the beginning of her deposition, Grisham noted that she had taken a "very low dose" of her medication and explained that it had no effect on her ability to testify. *Id.* at 10:1–16. Trump's counsel interrupted Grisham's testimony and demanded that the deposition be ended. *Id.* at 12:1–13:20. Counsel then requested a conference before the Court and made repeated objections based on Grisham's "mental capacity." *E.g.*, *id.* at 29:9–22.

The Court has already made clear that Grisham's prescription medication is irrelevant. At the mid-deposition conference that Trump's counsel requested, the Court quickly put an end to these disruptive tactics:

> THE COURT: Do you understand the questions? And are you capable of testifying?
>
> MS. GRISHAM: Yes, your Honor.
>
> THE COURT: That's it, Mr. Madaio. Stop wasting time. [The deposition] goes forward.

Tr. of Oct. 6, 2022 Conf. at 5. If there was no reason to stop the deposition, there is no reason why Grisham's past use of her medication would have any relevance at trial. *See Cordius Tr. v. Kummerfeld*, No. 99 Civ. 3200, 2008 WL 113683, at *3 (S.D.N.Y. Jan. 10, 2008) ("The test [for mental capacity] is whether the prospective witness 'has sufficient intelligence to understand the nature of any oath and to give a reasonably accurate account of what he has seen and heard[.]'"). Cross-examination regarding Grisham's medication should be precluded as irrelevant under Rule 401, unduly prejudicial under Rule 403, and improper character evidence under Rule 608.

VI.     **THE COURT SHOULD PRECLUDE COMMENTS AND CROSS-EXAMINATION REGARDING CARROLL'S CHOICE OF COUNSEL**

At his deposition, Trump previewed a strategy of maligning Carroll's counsel to distract

from the actual issues. Among other things:

- Trump claimed that Carroll's counsel was "doing this [lawsuit] for the Democrat party, … your friends over in the Democrat party," Trump Dep. at 202:10–12, even declaring at one point, "You're a political operative. … You're a disgrace," *id.* at 142:8–9; *see also, e.g.*, *id.* at 197:18 ("But the Democrat party. That's you."); *id.* at 88:25–89:2 ("I think you're aligned with [Hillary Clinton] too actually."); *id.* at 171:11 ("I beat your friend [Hillary Clinton] pretty badly.").

- Trump speculated that Carroll's counsel used unscrupulous means to obtain the time taken to depose him, stating, "I knew that we'd be wasting a day doing this, a whole day doing this. I don't know how you do it. You've got to be connected to get this kind of a time." *Id.* at 144:16–17. Those comments fit within Trump's broader comments about the supposed "broken" nature of the judicial system. *Id.* at 144:4–7, 24–25 ("The system in our country is broken, and the system in New York City is broken, in New York and New York State. It's a broken system. … [Judge Kaplan] is not a fan of mine, obviously.").

- Trump threatened to sue Carroll's counsel multiple times: "And I'll sue you too because this is—how many cases do you have? Many, many cases, and I know the statements that were made—that you made. Keep Trump busy because this is the way you defeat him, to keep him busy with litigation. So I will be suing you also, but I'll be suing her very strongly as soon as this case ends. But I'll be suing you also." *Id.* at 130:19–131:2.

- While discussing the appearance of a woman who had accused him of sexual impropriety, Trump disparaged Carroll's counsel in the same vein, stating, "You wouldn't be a choice of mine, either, to be honest with you. I hope you're not insulted. I wouldn't under any circumstances have any interest in you. I'm honest when I say it. … Even if you weren't suing me, I would have no interest. Okay?" *Id.* at 184:17–20, 185:6–7.

Trump should not be permitted to continue with this strategy at trial. Personal attacks on a

party's counsel are "reprehensible" and "detract from the dignity of judicial proceedings." *United*

*States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001); *see also Allen v. Royce*, No. 19 Civ. 3672, 2022

WL 125367, at *9 (E.D.N.Y. Jan. 13, 2022) ("[A]ttacks on the credibility or motives of defense

counsel are not permissible."). Courts regularly preclude testimony regarding opposing counsel

under both Rules 401 and 403. *E.g.*, *Hart v. RCI Hosp. Holdings, Inc.*, 90 F. Supp. 3d 250, 273

(S.D.N.Y. 2015) (granting motion to exclude commentary or arguments related to "lawyer-driven

lawsuits" because "the jury's attitudes about … the business model, role, or ethics of [] counsel, have no bearing" on the merits of the case and "can serve only to confuse, inflame, and introduce unfair prejudice"); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, No. 98 Civ. 3287, 2000 WL 1805359, at *2 (E.D.N.Y. Dec. 11, 2000) (granting motion to exclude references to attorneys and firms representing defendants).[14] Carroll's choice of counsel—and Trump's opinion and speculation regarding her counsel—have no bearing on whether Trump raped and defamed Carroll. Any testimony or commentary regarding her counsel should be excluded in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should:

- Admit Carroll's prior consistent statements about Trump's attack to Birnbach and Martin;

- Admit the testimony of Stoynoff and Leeds regarding their own experiences with Trump;

- Preclude Fisher from testifying as a rebuttal expert witness;

- Exclude testimony from witnesses whom Trump has not disclosed; preclude Trump from testifying to undisclosed information, including the testimony that undisclosed witnesses could theoretically offer in support of his defense; and preclude any testimony or commentary at trial concerning DNA evidence;

- Preclude cross-examination or evidence regarding Grisham's prior misdemeanor convictions, her unrelated pending lawsuit, and her use of a prescription medication; and

- Preclude comments and cross-examination regarding Carroll's choice of counsel.

---

[14] *See also, e.g.*, *Hartwig v. JDP, Inc.*, No. 19 Civ. 00008, 2021 WL 9440803, at *2 (S.D. Iowa Jan. 25, 2021) (excluding "[a]ny statement disparaging ... Defendants' counsel [or] any Defendants' case or theory"); *Smith v. Toyota Motor Corp.*, No. 16 Civ. 24, 2018 WL 1806698, at *9 (E.D. Mo. Apr. 17, 2018) (excluding references to representation by defense counsel); *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 11 Civ. 00201, 2017 WL 2773944, at *1 (E.D. Tex. May 26, 2017) (excluding references to the litigation's funding); *Fears v. Keystone Petroleum Transp., LLC*, No. 10 Civ. 02789, 2014 WL 11517819, at *4 (N.D. Ga. Jan. 17, 2014) (excluding comments that "disparage Defendants or defense counsel, imply or infer that Defendants or defense counsel have bad characters, violated the law, [or] engaged in discovery abuse or fraud"); *Kellogg v. Nike, Inc.*, No. 07 Civ. 70, 2008 WL 4216130, at *3 (D. Neb. Sept. 12, 2008) (excluding comments about the "[defendant's] attorneys' law firm and size, type, names, and identities of other clients represented by the firm").

Dated:  New York, New York
          February 16, 2023

Respectfully submitted,

_____

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*