# EXHIBIT 3

```
 1
 2            UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
            CASE No. 20 CIV. 7311 (LAK)(JLC)
 4
 5   E. JEAN CARROLL,
 6            Plaintiff,
 7   -vs-
 8   DONALD J. TRUMP,
     in his personal capacity,
 9
              Defendant.
10   _____/
11
12
13                  =  =  =
14               CONFIDENTIAL
15                  =  =  =
16
17      VIDEOTAPED DEPOSITION OF DONALD J. TRUMP
18
                Wednesday, October 19, 2022
19                10:22 a.m. - 3:50 p.m.
20             The Mar-a-Lago Club
              1100 South Ocean Boulevard
21            Palm Beach, Florida, Florida
22
23   Stenographically Reported By
     Pamela J. Pelino, RPR, FPR, CLR
24   Notary Public, State of Florida
     TSG REPORTING
25   JOB NO. 218342
                   -  -  -
```

Confidential

```
 1                        D. J. TRUMP
 2        A.    Other people in the press, yes.
 3        Q.    If you could read -- if you're able to --
 4   and I apologize for the size of the text.
 5              If you could read that statement into the
 6   record.
 7        A.    You want me to read the whole thing?
 8        Q.    Please.
 9        A.    It's a very unclear copy.  Do you have a
10   better copy of it?
11        Q.    I think this is the best we have.  I
12   could read it in.  I'll read it in.
13        A.    Yeah, why don't you read it in.
14        Q.    It says:  "Statement from President
15   Donald J. Trump.  Regarding the 'story' by
16   E. Jean Carroll claiming she once encountered me at
17   Bergdorf Goodman 23 years ago, I've never met this
18   person in my life.  She's trying to sell a new book.
19   That should indicate her motivation.  It should be
20   sold in the fiction section.  Shame on those who
21   make up false stories of assault, who try to get
22   publicity for themselves or sell a book or carry out
23   a political agenda like Julie Swetnick, who falsely
24   accused Justice Brett Kavanaugh.  It's just as bad
25   for people to believe it, particularly when there is
```

Confidential

|   | D. J. TRUMP |
|---|---|

1
2  zero evidence.  Worse still for a dying publication
3  to try to prop itself up by pedaling fake news.
4  It's an epidemic.  Ms. Carroll in New York Magazine:
5  No pictures, no surveillance, no videos, no reports,
6  no sales attendants around???  I would like to thank
7  Bergdorf Goodman for confirming they have no video
8  footage of any such incident because it never
9  happened.  False accusations diminish the severity
10  of real assault.  All should condemn false
11  accusations and any actual assault in the strongest
12  possible terms.  If anyone has information that the
13  Democratic party is working with Ms. Carroll or
14  New York Magazine, please notify us as soon as
15  possible.  The world should know what's really going
16  on.  It's a disgrace, and people should pay dearly
17  for such false accusations."  Do you see that?
18  That's what you have in front of you?
19      A.   Yeah.
20      Q.   And I think you've already confirmed that
21  this is a statement that you gave to someone on your
22  staff to give to the press?
23      A.   Yeah.
24      Q.   And that's how it ended up in
25  Laura Littman's tweets?

Confidential

```
 1                     D. J. TRUMP

 2        A.     Perhaps, yes.

 3        Q.     Sitting here today, do you stand by this

 4   statement?

 5        A.     Yes.

 6        Q.     Sitting here today, are there any

 7   inaccuracies in this statement that you now know of?

 8        A.     Not that I can see, no.  The only thing

 9   that I would say is -- and I've just heard this --

10   that she has no idea when this event took place, and

11   somehow 23 years is mentioned, 23 years ago.  It's a

12   long time.  But she has no idea supposedly when this

13   took place, what season, what year, what month, what

14   day.  She knows nothing.  And for some reason, it's

15   put down here 23 years ago.  So, you know, at one

16   point I was told 23 years.  But I've heard since she

17   really has no clue when this took place supposedly,

18   which -- it didn't take place.

19        Q.     So is it your testimony that when

20   Ms. Carroll made her allegations, she had -- putting

21   aside what day it happened that she had no idea

22   whatsoever of what year it took place?

23        A.     My lawyers told me that.

24        Q.     Okay.  I don't want to know what your

25   lawyers told you.
```

Confidential

1                          D. J. TRUMP

2        took place because it didn't take place.

3   BY MS. KAPLAN:

4        Q.    So your answer to my question is, no, you

5   don't have any witnesses?

6        A.    If you could give me a date, I could

7   check on security because I traveled with security

8   quite a bit, and I would have somebody from security

9   confirm a statement that it never happened.

10       Q.    Is it your testimony, sir, that you

11  always walked around New York City during the period

12  late 1995 and early 1996 with security?  Is that

13  your statement?

14       A.    Pretty much, yes.

15       Q.    Pretty much isn't always.  Is that your

16  testimony?

17            MS. HABBA:  Objection.

18            THE WITNESS:  I would say pretty much to

19       always, yeah.  I always have a security person

20       with me.

21  BY MS. KAPLAN:

22       Q.    Okay.  Who would have been your security

23  person in late 1995, early 1996?

24       A.    Well, I had many.  I had many people.  So

25  I would go with many, but if you could give me a

Confidential

```
 1                     D. J. TRUMP
 2      clarify for the record.  If we can read from
 3      the complaint the actual record.  I believe it
 4      says fall of 1995 --
 5           MS. HABBA:  It says fall of 1995 and the
 6      spring of 1996.
 7  BY MS. KAPLAN:
 8      Q.    Yeah.  Do you know who your security
 9  people were from the fall of 1995 through the spring
10  of 1996?
11           MS. HABBA:  Objection.  Asked and
12      answered.
13  BY MS. KAPLAN:
14      Q.    You can answer again.
15      A.    I'll find out.  I'll check.  If I can,
16  I'll find out.  I'll have people ask.
17      Q.    That information should have been
18  provided long ago, but if you have it, we would like
19  to see it.
20           When you made your statements that
21  Ms. Carroll's accusation was false and that it never
22  happened, do you recall you or anyone working for
23  you looking at any documents before those statements
24  were made?
25      A.    No.  They wouldn't be in documents.  It
```

1                       D. J. TRUMP

2    wouldn't be because it never happened, number one.

3    But there wouldn't be documents.

4         Q.    Just so the record is clear, other than

5    the possibility of security guards, can you think of

6    any other persons who would be witnesses to -- who

7    could confirm your account that Ms. Carroll's

8    allegation was false?

9         A.    That could confirm my account that

10   nothing happened?

11        Q.    Correct.  Anyone other than security?

12        A.    I would have to look for people, but, you

13   know, you're asking them to confirm that something

14   didn't happen.  In other words, you're asking them

15   to confirm that they never saw anything happen, and

16   they didn't because it didn't happen.  It's a lie.

17        Q.    Again, I'm just trying --

18        A.    It's a made-up story.  It's a fairy tale.

19        Q.    I'm trying to get the answer.  If you

20   could answer my question, the question I asked, we'd

21   get through this quicker.

22             MS. HABBA:  I think I'm just going to

23        object and state for the record that the

24        client's made clear that he can't find people

25        to say something that didn't happen didn't

1              D. J. TRUMP

2    Smith or by somebody within minutes; okay?  So there

3    were no complaints.  There were no stories.  There

4    was no anything because it never happened.  It's all

5    fiction.  It's a con job.

6          Q.    So before you made your statements that

7    it never happened in 2019, did you or anyone on your

8    staff reach out to anyone at Bergdorf Goodman?

9          A.    I didn't have to reach out to anybody

10   because it didn't happen.  And by the way, if it did

11   happen, it would have been reported within minutes.

12   You're talking about going to a major floor

13   probably.  I assume the most important floor, a

14   major floor in a major department stores that's a

15   very busy store, by the way, and checkout counters

16   and everything else.  And I would be in there?  I

17   mean, it's the most ridiculous -- it's the most

18   ridiculous, disgusting story.  It was just made up.

19            MS. HABBA:  Just to clarify, the question

20        is if he reached out to Bergdorf?

21            MS. KAPLAN:  If he or anyone before he

22        made the statement in June 2019.

23            MS. HABBA:  If he directed anyone?

24            MS. KAPLAN:  Did he or anyone working for

25        him reach out to Bergdorf Goodman.

1                        D. J. TRUMP

2   book sales?

3        A.     No idea.

4        Q.     Before you made this statement, do you

5   know if you or anyone working for you went on to --

6   withdrawn.

7               Before you made this statement that

8   appears in DJT 20, do you know whether you or anyone

9   working for you did any research on Ms. Carroll?

10       A.     I just don't know.  It's possible

11  somebody -- when they heard this horrible

12  accusation, it's possible that somebody did a little

13  quick research but not that I know of.

14       Q.     Another thing that you say in your June

15  21 statement is that Ms. Carroll was trying to carry

16  out a political agenda?

17       A.     Yeah.

18       Q.     How did you know she had a political

19  agenda if you didn't know who she was?

20       A.     Somebody told me early on that she was

21  somehow aligned with Hillary Clinton.  She was

22  either aligned with her or -- I thought aligned with

23  her.

24       Q.     Who told you that?

25       A.     I think you're aligned with her too

Confidential

```
 1                    D. J. TRUMP
 2  actually.
 3       Q.   Who told you that?
 4       A.   Somebody had mentioned it.
 5       Q.   Do you recall who?
 6       A.   I don't know.  I don't know who said it,
 7  but somebody had mentioned it since, that she was
 8  somehow into that whole world.
 9       Q.   And you just said "I don't know who -- I
10  don't know who said it, but somebody has mentioned
11  it since"?
12       A.   No.  I meant since the accusation.
13       Q.   Oh, since the accusation.
14            Do you remember what that person told you
15  if you don't --
16       A.   Just mentioned that they thought she was
17  somewhat political and aligned with Hillary Clinton.
18       Q.   Before issuing your statement on June 21,
19  did you learn what political party Ms. Carroll
20  belonged to?
21       A.   No, I didn't know that.
22       Q.   Before you issued your June 21 statement,
23  did you have any documents indicating that she was
24  pursuing a political agenda?
25       A.   No.
```

```
 1                         D. J. TRUMP
 2    with something that's called an interrogatory?
 3         A.    Go ahead.  Give me a definition.
 4         Q.    An interrogatory are written questions
 5    that attorneys ask the other side, and then written
 6    answers are provided.
 7               Are you familiar with that general
 8    concept?
 9         A.    Yes.
10         Q.    Okay.  I'm going to show you your
11    interrogatory responses in this case.
12               MS. KAPLAN:  We're going to mark it as
13         25.
14               (DJT Exhibit 25 was marked for
15    identification.)
16               THE WITNESS:  Okay.  Go ahead.
17    BY MS. KAPLAN:
18         Q.    So if you turn to page 2, you'll see
19    about a quarter of the way down it says Number 2
20    under the header "Supplemental Responses and
21    Objections to Interrogatories," and 2 reads:
22    "Identify all individuals with whom you have
23    communicated by any means concerning the plaintiff
24    or this action."  And I'll represent to that you
25    that's E. Jean Carroll or this case, and then
```

```
 1                      D. J. TRUMP

 2  there's a lot of objections.  And then subject to

 3  those objections, there's names listed, and it

 4  starts with Dan Scavino.

 5             You had told me a few minutes ago that

 6  you couldn't remember, but it's possible that you

 7  spoke to Mr. Scavino.  Does this refresh your

 8  recollection?

 9      A.    No.  I mean, it is possible.

10      Q.    Okay.  Nicholas Luna.  You had said I

11  doubt it, but he appears in these interrogatories?

12      A.    It's possible.

13      Q.    Molly Michael I think you told me you

14  spoke to.  So that checks.

15      A.    Yeah.

16      Q.    Hope Hicks.  You had said no, and she

17  appears in this interrogatory.

18      A.    I'd say less likely.

19      Q.    Less likely --

20      A.    I mean, I would say no, but her name is

21  here.  So they put the name, but I would say

22  anything is possible with any of these people.

23  These are the people that I deal with.

24      Q.    Derek Lyons.  You said pretty sure no and

25  then --
```

Confidential

1               D. J. TRUMP

2       A.    Derek Lyons I think -- I'm fairly sure,

3  but, again, it's possible that I did.  But I

4  think -- I think no.

5       Q.    And then Jared Kushner.  I think your

6  answer to me was I don't think so, and then his name

7  appears?

8       A.    I don't think so, but it's possible that

9  I spoke to him.

10      Q.    Did you review this document prepared by

11 your attorneys before it was submitted?  This was on

12 August 23rd.

13      A.    Yes, very quickly.  I don't know if I

14 signed it.  Did I sign it?

15      Q.    No.  It's signed by --

16      A.    No.  I didn't sign it, but I reviewed it,

17 I guess, in concept.  I didn't sign it.  When I sign

18 something, I guess maybe I look at it more closely.

19 But I didn't sign this.  I'm not sure.  I was told

20 about the document.

21      Q.    And so --

22      A.    It was just a refutation.  That's --

23 because this was something that never happened, as

24 you know very well.

25      Q.    Well, this question isn't about whether

Confidential

                          D. J. TRUMP

1
2   or not it happened or not, sir.  It's a question
3   about --
4        A.    Let's go.  Let's go.
5        Q.    Well, again, this interrogatory is about
6   who you spoke to, and your answers have been
7   somewhat inconsistent --
8        A.    Yeah.
9        Q.    -- between this interrogatory and what I
10  heard today, so what I'm trying to understand is
11  what's your position as of today.
12              And I take it -- and you can correct me
13  if I'm wrong -- that your position as of today is
14  what you've said here at this deposition; correct?
15       A.    The deposition rules.  That's correct.
16  Because this is not signed by me.  This is signed by
17  somebody else.
18       Q.    Okay.  Okay.  Now, a woman by the name of
19  Stephanie Grisham served as your press secretary and
20  communications director from July 1, 2019, to April
21  7, 2020; correct?
22       A.    Yeah.
23       Q.    And before that she had served as the
24  press secretary for the First Lady?
25       A.    Yes.

Confidential

1                          D. J. TRUMP

2         Q.    Does that refresh your recollection that

3    Stephanie Grisham's promotion was announced on or

4    about June 25th --

5         A.    Yeah.  Sure.

6         Q.    Now, the reason I ask is because June

7    25th was one day after the statements that you made

8    to The Hill reporters, which is DJT 22.  So it's

9    fair to say that at the time of the promotion, the

10   issue of E. Jean Carroll and her allegations was

11   front of mind; fair?

12        A.    Well, I had many other things happening,

13   too, in case you're not aware.  So the

14   E. Jean Carroll thing was so false and so ridiculous

15   that I put out a statement, and that was it.  I want

16   people to know that it never happened.

17              But we had a lot of other things

18   happening like China, like Russia, like Ukraine,

19   like inflation, like a lot of other things that we

20   did a great job on.  This was not the only thing on

21   my mind.

22        Q.    I certainly understand that, sir, but --

23        A.    I'm sure you do.

24        Q.    -- you'll agree with me, will you not,

25   that the third statement you made, which was on June

Confidential

```
 1                     D. J. TRUMP
 2   reporters by email, there's a designated group, and
 3   it always goes to the same --
 4        A.    I don't know how they do that, but it
 5   goes to the press.
 6        Q.    Why did you decide to issue the statement
 7   on Truth Social on October 12th?
 8        A.    Because I was offended at this woman's
 9   lie.  Because I was offended that she could just
10   make up a story out of cold air, refuted by her
11   testimony on CNN, but that she could make up a story
12   just out of nowhere and that I get a phone call
13   asking me about this ridiculous situation.  The
14   woman -- there's something wrong with her in my
15   opinion.  Okay.  But it's a false accusation.  Never
16   happened, never would happen.  And I posted and I
17   will continue to post until such time as -- and then
18   I will sue her after this is over, and that's the
19   thing I really look forward to doing.  And I'll sue
20   you too because this is -- how many cases do you
21   have?  Many, many cases, and I know the statements
22   that were made -- that you made.  Keep Trump busy
23   because this is the way you defeat him, to keep him
24   busy with litigation.  So I will be suing you also,
25   but I'll be suing her very strongly as soon as this
```

```
 1                    D. J. TRUMP
 2  case ends.  But I'll be suing you also.
 3       Q.    Are you done?
 4       A.    Yeah.
 5       Q.    Is there anything in particular that
 6  prompted you to make this statement last week?
 7       A.    Yeah.  Her false story and that I have to
 8  waste a whole day doing these ridiculous questions
 9  with you.
10       Q.    Okay.
11            MS. KAPLAN:  Let's look at the statement.
12       Let's mark it as -- what's my next number?
13            MR. MADAIO:  DJT 28.
14            (DJT Exhibit 28 was marked for
15  identification.)
16            THE WITNESS:  I can't read this.
17            MS. KAPLAN:  Well, we have a blown-up
18       version.
19  BY MS. KAPLAN:
20       Q.    Let's mark it as 28 and 28A.
21            Oh, so you have a document that's got --
22  let me back up.  I'm not following my own rules that
23  it's not a conversation.
24            So what we have in front of you as DJT
25  28, sir, is the post as it appeared on Truth Social
```

```
 1                    D. J. TRUMP
 2   type?  Yeah.  Because it's not politically correct
 3   to say it, and I know that, but I'll say it anyway.
 4   She's accusing me of rape, a woman that I have no
 5   idea who she is.  It came out of the blue.  She's
 6   accusing me of rape -- of raping her, the worst
 7   thing you can do, the worst charge.
 8             And you know it's not true too.  You're a
 9   political operative also.  You're a disgrace.  But
10   she's accusing me and so are you of rape, and it
11   never took place.  And I will tell you I made that
12   statement, and I said, while it's politically
13   incorrect, she's not my type.  And that's
14   100 percent true.  She's not my type.
15        Q.    And when you say "not my type," you want
16   people -- your intention of saying -- withdrawn.
17             The point of saying she's not my type is
18   to persuade people that you didn't rape her because
19   she wasn't attractive enough; correct?
20             MR. MADAIO:  Object to the form.
21             MS. HABBA:  Objection to the form.
22             THE WITNESS:  When I say she's not my
23        type, I say she is not a woman I would ever be
24        attracted to.  There is no reason for me to be
25        attracted to her.  I just -- it's not even
```

```
1                      D. J. TRUMP

2    you talk about the justice system being broken;

3    correct?

4         A.    Yeah.  The system in our country is

5    broken, and the system in New York City is broken,

6    in New York and New York State.  It's a broken

7    system.

8         Q.    And isn't the reason, sir, that you

9    issued this statement in the evening of October 12th

10   because the judge in this case denied your motion to

11   stay discovery that day?

12        A.    I have no idea.  It could be.  I mean, it

13   could be a factor, but, no, I just issued this

14   because I knew it was coming up.  I knew that we'd

15   be wasting a day doing this, a whole day doing this.

16   I don't know how you do it.  You've got to be

17   connected to get this kind of a time.  But a whole

18   day doing this stuff on something that never

19   happened.

20        Q.    So is it your testimony that it's just a

21   coincidence that you issued this on the same day

22   that Judge Kaplan denied the stay?

23        A.    I don't know what day he issued it, but

24   he issued something that was, I guess, somewhat

25   negative.  No.  He's not a fan of mine obviously,
```

Confidential

```
1                    D. J. TRUMP

2             And I apologize.  I'm hoping the

3        technology works better.

4             (DJT Exhibit 35 was marked for

5    identification.)

6             (Video played.)

7    BY MS. KAPLAN:

8        Q.   That's you in that video, speaking?

9        A.   Yes, correct.

10       Q.   And am I correct that video was recorded

11   in January -- withdrawn.

12            Am I correct that that video was recorded

13   September of 2005?

14       A.   I guess that would -- don't know the

15   date.  But whatever date it was is fine with me.

16       Q.   And am I correct that you were engaged to

17   your current wife sometime in 2004?

18       A.   I don't know.

19       Q.   Am I correct that you married your

20   current wife in January 2005?

21       A.   I don't know relative to that tape, no.

22       Q.   Well, relative to that tape, isn't it

23   true you were married to your current wife?

24       A.   I don't know.  I don't know when the tape

25   was done.
```

1                        D. J. TRUMP

2          Isn't it true that -- withdrawn.

3          When you say in this tape you moved on

4    her heavily, what you're trying to say is that you

5    tried to have sex with her; correct?

6              MS. HABBA:  Objection.  Form.

7              THE WITNESS:  Well, no, actually, I said

8         I didn't.  And I said I didn't succeed with it.

9              And this was very heavily litigated

10        during the campaign, and as you probably heard,

11        I won.  I beat your friend pretty badly and got

12        more votes, got -- we did a good job.

13             But this was very heavily litigated.  In

14        fact, it was the first question of one of the

15        debates, and it went on for a while.  And at

16        the end, the public said that's the one we want

17        for the president.

18             And they made the right decision,

19        obviously, based on what you're looking at

20        today and what you were looking at two years

21        ago.

22   BY MS. KAPLAN:

23        Q.   Okay.  But this isn't a debate or a

24   presidential debate --

25        A.   No, but this was litigated already by the

1                         D. J. TRUMP

2       Q.    Did you pay for the furniture?

3       A.    No, I didn't.  I didn't buy her anything,

4   actually.

5       Q.    And you say -- and again, this has become

6   very famous -- in this video, "I just start kissing

7   them.  It's like a magnet.  Just kiss.  I don't even

8   wait.  And when you're a star, they let you do it.

9   You can do anything, grab them by the pussy.  You

10  can do anything."

11            That's what you said; correct?

12      A.    Well, historically, that's true with

13  stars.

14      Q.    True with stars that they can grab women

15  by the pussy?

16      A.    Well, that's what -- if you look over the

17  last million years, I guess that's been largely

18  true.  Not always, but largely true.  Unfortunately

19  or fortunately.

20      Q.    And you consider yourself to be a star?

21      A.    I think you can say that, yeah.

22      Q.    And -- now, you said before, a couple of

23  minutes ago, that this was just locker room talk?

24      A.    It's locker room talk.

25      Q.    And so does that mean that you didn't

Confidential

```
 1                    D. J. TRUMP
 2   Ms. Leeds' allegations at campaign events in 2016?
 3        A.    I might have.  I thought it was so like
 4   your client, I thought it was so ridiculous.
 5        Q.    Let's take a look at the next video,
 6   which is DJT 38.
 7              (DJT Exhibit 38 was marked for
 8   identification.)
 9              (Video played.)
10   BY MS. KAPLAN:
11        Q.    When you said --
12        A.    Is that finished now?
13        Q.    When you said in that video that
14   Ms. Leeds would not be your first choice, you were
15   referring to her physical looks; correct?
16        A.    Just the overall, not -- I looked at her.
17   I see her.  I hear what she says.  Whatever.  You
18   wouldn't be a choice of mine, either, to be honest
19   with you.  I hope you're not insulted.  I wouldn't
20   under any circumstances have any interest in you.
21   I'm honest when I say it.
22              She, I would not have any interest in.
23        Q.    Well, other than her looks, did you know
24   anything about -- withdrawn.
25              I'm an attorney in cases suing you.
```

```
 1                         D. J. TRUMP

 2        A.     Yeah.

 3        Q.     But with respect to Ms. Leeds, did you

 4   know anything about what she did or what her past

 5   life was?

 6        A.     Even if you weren't suing me, I would

 7   have no interest.  Okay?

 8               And with Ms. Leeds, I watched her.  I

 9   guess I saw her interview.

10               I mean, the whole concept of it.  I'm

11   sitting on a plane.  I'm very well known.  Very,

12   very well known even then.  It was a long time ago.

13               And all of a sudden -- and I think she

14   said this making out with her went on for quite a

15   while.  So why didn't she leave?  Why didn't she

16   scream?  Why didn't she do something?

17               And she wasn't able -- as I remember

18   it -- I'm going -- I haven't read this again,

19   because I haven't seen this in years, but I believe

20   she said she didn't know where the plane was, where

21   the flight was, because I don't remember ever

22   sitting next to her.  I don't think I did ever sit

23   next to her.  I think she made that up, too.

24               But she couldn't find tickets.  She

25   couldn't find anything.  She didn't know where the
```

Confidential

1              D. J. TRUMP

2          (DJT Exhibit 39 was marked for

3   identification.)

4          (Video played.)

5   BY MS. KAPLAN:

6      Q.    So in that video, you're talking about

7   the women who had accused you of sexual impropriety;

8   correct?

9      A.    Yeah.

10     Q.    And you say, "These are lies being pushed

11  by the media and the Clinton campaign"; correct?

12     A.    Yeah.  Not in all cases, but in some,

13  yeah.  I think that's what's happening with you and

14  your client.  I don't know if it's Clinton or if

15  it's the Democrat party.  It's probably not Clinton

16  anymore.

17     Q.    Let's watch --

18     A.    But the Democrat party.  That's you.

19     Q.    I apologize.

20          Let's watch another video, tab 86.

21          (DJT Exhibit 40 was marked for

22  identification.)

23          MS. KAPLAN:  This is from the West Palm

24      Beach event on October 13, 2016.

25          (Video played.)

```
 1                       D. J. TRUMP
 2   there was nothing -- I think the Anderson Cooper is
 3   very big.  But I think in addition to that, there
 4   were no complaints.  There was nothing lodged.  Your
 5   client doesn't have any idea what time, when, what
 6   year, what decade, I guess.  I don't know if they
 7   even know the decade.  I think you have it boiled
 8   down to two or three years now.
 9               No, it's -- I think it's a whole big
10   scam.  And I think you're doing this for the
11   Democrat party, okay, your friends over in the
12   Democrat party.
13       Q.    I think we looked at this earlier.  At
14   the end of your statement, the first statement you
15   made about E. Jean Carroll on June 21, which has
16   been marked as DJT 20, you say, "If anyone has
17   information that the Democratic party is working
18   with Ms. Carroll or New York Magazine, please notify
19   me as soon as possible."
20               Did anyone ever notify you --
21       A.    Well, I'll let you know.
22               MS. HABBA:  Objection.
23               MR. MADAIO:  Objection.  That was already
24       asked.
25               THE WITNESS:  You'll hear.  We'll let you
```

Confidential

1                    D. J. TRUMP

2        A.    I heard this case and I said this is one

3   of the most ridiculous cases I've ever heard.

4              And I guess -- was that just before or

5   just after the Anderson Cooper interview?  But both

6   ways, it was ridiculous when I heard it.  After

7   listening to the interview, it became even more

8   ridiculous.

9        Q.    Did you ask anyone at the

10  Trump Organization to preserve any documents?

11       A.    No.

12       Q.    Did you ask anyone at your presidential

13  campaign to preserve any documents?

14       A.    No.

15       Q.    Do you know if anyone did that on your

16  behalf?

17       A.    Nobody.  I don't think anybody took this

18  seriously.

19              When they heard this case, most people,

20  without even seeing Anderson Cooper, thought it was

21  a scam.

22       Q.    In the other case, in which I deposed you

23  last week, you testified when talking about

24  documents that Norma Foerderer filed that you said,

25  "We keep documents, yeah.  We keep everything."