# EXHIBIT 10

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ------------------------------x

5  E. JEAN CARROLL,

6                  Plaintiff,

7      -vs-                        20 CIV. 7311

8  DONALD J. TRUMP,                (LAK)(JLC)

9  in his personal capacity,

10                 Defendant.

11 ------------------------------x

12

13            DEPOSITION OF ROBERT FISHER

14                 December 14, 2022

15

16

17

18

19 Reported by:

20 MARY F. BOWMAN, RPR, CRR

21 JOB NO. 220615

22

23

24

25

1                     R. Fisher

2        Q.    You were there from 1968 to 1969?

3        A.    Yeah.  Yeah.  I started in mid --

4    probably mid '68, went into '69.

5        Q.    Did you reach a full year at The

6    Times?

7        A.    No, I wasn't there a full year.

8        Q.    What was your position?

9        A.    I was a reporter.  What they

10   call -- I worked in the Los Angeles bureau,

11   not in New York, and there are like ten

12   people there.

13              And when you're in a bureau, if

14   you're in New York, usually you have a

15   specialty type of thing.  But out there, we

16   were all generalists.  So I would do

17   various type assignments.  I could cover a

18   Litton stockholder meeting.  The next day I

19   could cover a press conference for the Los

20   Angeles Rams.  I just did all sorts of

21   articles.

22       Q.    Roughly how many articles did you

23   write while you worked there?

24       A.    Oh, I could not give you a guess.

25   I could not give you an estimate.  I did a

1                         R. Fisher

2    lot of what you call -- I did multiple

3    articles a day.  I was -- I covered the

4    international beat for a while.  I could

5    explain that to you.

6            But I might write or three or

7    four international stories a day and it was

8    based on -- well, if you want me to get

9    into it, it was based on pirating something

10   from the LA Times.  If you want me to get

11   into it, I will.  If not -- let's vague and

12   ambiguous just say I wrote a lot of

13   articles.

14       Q.    Did you name appear on the byline

15   for those articles?

16       A.    No, I can't remember -- no, they

17   couldn't.  Those kind of articles, you

18   couldn't put the byline because they were

19   basically plagiarism.  I mean -- not

20   plagiarism, but I mean taking information

21   from other sources.

22            So you couldn't put your name on

23   it because if you put your name -- if

24   anybody put their name on it, it would be

25   more -- it was more -- it looked like a

1                    R. Fisher

2   there is anything else out there, that kind

3   of thing, and that's pretty much the

4   only -- oh, if the case has media exposure.

5   You know, 90 percent of the cases I have,

6   no one knows who the plaintiff and

7   defendants are.  And you know, there is --

8   the media doesn't cover it.

9              But if there are, I like to get a

10  sense of what, you know, what the -- I have

11  a case in New York, the Central Park Five

12  case where there is literally 5, 600

13  articles on the internet about it, you

14  know, that kind of thing.  But most cases

15  have none.

16             So I looked and I saw a few

17  articles.  You know, I don't read them all

18  because they all basically say the same

19  thing.  I just try to get a sense of what's

20  being said out there.

21       Q.    And can you approximate how many

22  articles you read about the case or the

23  parties involved in the case?

24       A.    This was about a month ago when I

25  got the assignment and -- probably about

1                          R. Fisher

2     four or five, I'd say.  There were a lot

3     of -- but you know, I mean, most of them

4     are covering pretty much the same thing and

5     so -- I just try to get a flavor of what's

6     being said out there.

7          Q.    And in addition to those four or

8     five articles that you read, do you recall

9     reviewing anything else as part of this

10    internet research?

11         A.    No.  No.  That's -- there

12    wasn't -- I didn't have a lot of time.  I

13    had a deadline of five days from the day

14    they -- Mr. Swift called me, to the day

15    that the report was due, it was like five

16    days.  I didn't have time to do too much

17    researching.

18              And frankly I didn't need to.

19    Because the scope of my -- I think -- in

20    the 60 -- 80 cases is I've had, this was

21    the first time I was ever hired as a

22    rebuttal.  You know, normally, I'm hired by

23    the plaintiff or defendant, you know,

24    handle the whole case.  This was the first

25    time I was ever hired exclusively to do a

1                    R. Fisher

2    and I'm trying to remember whether there

3    was exhibits or not.

4            I don't believe I read the

5    exhibits.  I just looked at the report.

6    Like I said, time was very short.  I

7    concentrated on the report.

8        Q.    If we can turn to what is the

9    table of contents, it's I guess -- the

10   (iii) just a couple of pages in, still in

11   the table of contents, you see there is

12   various appendices listed?  Sort of

13   following the conclusion on that page?

14       A.    Oh, yeah, appendix, you mean.

15       Q.    Yeah, by -- when you testified

16   previously that you didn't review the

17   exhibits, were you referring to the

18   appendices?

19       A.    Yeah.

20       Q.    So you had not reviewed any of

21   the appendices that are listed out in the

22   table of contents?

23       A.    I might have skimmed through just

24   to see what they look like, but I don't

25   remember -- I more or less stopped with the

1                         R. Fisher

2    signature page on the thing.  I might have

3    skimmed through some of them.

4        Q.    Okay, let's turn to first turn to

5    page 74 of this, of Exhibit 4.

6        A.    Yes.

7        Q.    You will see at the top, it says,

8    "Appendix A, Professor Humphreys' CV and

9    prior testimony," and underneath that in

10   brackets, it says "Produced in native

11   form"?

12       A.    Yeah, that bothered me a great

13   deal because I was not able to see her CV.

14       Q.    So you didn't receive or review

15   Professor Humphreys CV?

16       A.    No, and that bothered me.  That

17   bothered me.  I would have liked to have

18   seen her CV, but since they listed her

19   background within her report, you know, she

20   summarized her background in her report.

21            But it would have been nice to

22   see her -- the thing.  But I didn't feel it

23   was that germane.  I didn't really -- more

24   or less, you know, retained to look at her

25   opinions, not her background.

Page 105

1                         R. Fisher

2        Q.    If we turn to page 116 in this

3    same exhibit.  You will see it says at the

4    top, "Appendix A, Examples of negative

5    comments and posts about Ms. Carroll," and

6    then we see in brackets "Produced in native

7    form"?  Do you see that?

8        A.    Yeah, what does that mean,

9    produced in native format?

10       Q.    We don't have to sort through

11   that now, but sort of my previous question,

12   did you review this appendix A that was

13   produced in native form?

14       A.    No, I never saw it.

15       Q.    And if you turn just one more

16   page, to page 117 of Professor Humphreys'

17   report, and you see another appendix

18   listed, it's appendix I, "Examples of

19   direct messages and emails to Ms. Carroll,"

20   and under that it says, "Produced in native

21   form," is it fair to say that you didn't

22   review appendix I either?

23       A.    No.

24       Q.    Let's turn back to page 75.

25       A.    Yes.

1                          R. Fisher

2        Q.    At the top, do you see where it

3    says "Appendix B, materials considered"?

4        A.    Yes.

5        Q.    And then the first section says

6    "Bates stamped documents."

7             Did you review any of the

8    documents listed in this section?

9        A.    No.

10       Q.    And then under that on the same

11   page, we see a section entitled, "Legal

12   filings and depositions."

13            You testified previously that you

14   did review the complaint, is that correct?

15       A.    Yes.

16       Q.    Did you review the deposition of

17   Robbie Myers?

18       A.    No.

19       Q.    Turn to the next page, page 76,

20   header "Academic articles" and then there

21   is a list of academic articles that

22   continues on to page through page 78.

23            Do you see that?

24       A.    Yes.

25       Q.    And did you review any of the

1                         R. Fisher

2    academic articles listed here?

3         A.    No, I wasn't provided.

4         Q.    By -- I believe you said no, you

5    weren't provided.  Are you aware that these

6    academic articles were made available to

7    the defendant's counsel in conjunction with

8    Professor Humphreys' expert report?

9         A.    I don't know what the relevance

10   of these academic -- I don't know what

11   these academic articles are or what they're

12   about or whether they are -- I mean, you're

13   asking me about the things I'm not even

14   aware of and whether they are germane to

15   anything.

16        Q.    Okay, if we turn to page 79,

17   there is a section titled "Books."  Did you

18   review any of the books listed in this

19   section?

20        A.    No.

21        Q.    And then lower on that same page,

22   there is a section titled "Websites" and

23   then there is a list of URLs that continues

24   on to page 83.

25             Did you review any of the

1                      R. Fisher

2    websites at those URLs?

3         A.    No.

4         Q.    Then if we turn to page 83, there

5    is a section entitled "Social media posts"

6    that continues on to page 84.

7               Did you review any of those

8    social media posts listed there?

9         A.    No.

10        Q.    And then on page 84, there is a

11   section called, "TV rating references,"

12   that continues on to page 85.

13              Did you review any of those TV

14   rating references that Professor Humphreys

15   lists?

16        A.    No.

17        Q.    And then on page 85, we have a

18   section entitled, "Damages model

19   references," that lists as 5 bullets under

20   there.

21              Did you review any of those

22   damages model references that Professor

23   Humphreys lists?

24        A.    No.

25        Q.    And also on page 85, we have a

```
 1                     R. Fisher
 2   section entitled, "Print publication data
 3   references."
 4            Did you review any of those print
 5   publication data references?
 6       A.    No.
 7       Q.    And at the end of 85, we have a
 8   section entitled, "ProQuest articles," and
 9   that continues on to page 86.
10            Did you review any of those
11   ProQuest articles?
12       A.    No.
13       Q.    And then finally, on page 86, we
14   have a section entitled "Databases."
15            Did you review or consult any of
16   those databases?
17       A.    No.
18       Q.    So if we look -- just I apologize
19   for maybe doing some flipping back and
20   forth between your rebuttal report and
21   Professor Humphreys' report.  If we open to
22   page 9 of your rebuttal report in the
23   paragraph with the header "preface."
24            Do you see that?
25       A.    Yes.
```

```
 1                    R. Fisher
 2      A.     No.
 3      Q.     And you haven't read any of the
 4  other articles listed on pages 76 through
 5  78 of appendix B, is that correct?
 6      A.     The ones we went through
 7  meticulously, no.
 8      Q.     So what was the basis for your
 9  claim that her expertise is not
10  "primarily" -- or is "primarily geared to
11  promotion and advancing positive content"?
12      A.     I was taking her own words for
13  it.  She entered a description at the
14  beginning of her report which is what --
15  where people outline basically their
16  expertise.
17             She talked about -- she gave her
18  academic background which she is doing now
19  and she said she previously worked as a --
20  well, this was in her deposition, prior to
21  working at Northwestern, she worked in
22  events and promotion, promotions and --
23  events and promotions.
24             She said that her background was
25  very heavy in marketing and advertising and
```

```
1                          R. Fisher
2    that she had experience in social media,
3    digital communications.  That sort of
4    thing.  That's -- I mean, that was her
5    background.
6             And given that this is a
7    defamation case and given that defamation
8    relates to reputation harm, when she was
9    representing what her expertise is and
10   doesn't mention any background whatsoever
11   in reputation harm or reputation management
12   or damage, she is basically somewhat of a
13   fish out of water.
14            For the most part, it would be
15   the equivalent to an attorney being a
16   family law attorney and then getting
17   involved in something in intellectual
18   property.
19            It's both areas of law just like
20   advertising and marketing is areas of
21   communications but they're not the specific
22   specialization area that is required for
23   the task at hand.
24        Q.   And you made reference in your
25   answer to Professor Humphreys' depositions,
```

1                          R. Fisher

2    promotions disqualify you as an expert in

3    this case?

4         A.    No.  Because I -- that's not the

5    sole base of my expertise.

6         Q.    And are you aware that academic

7    who study marketing regularly research and

8    study reputation and brand crises?

9         A.    Not that I was aware of.

10        Q.    Have you spent any time reviewing

11   the academic literature on reputation

12   repair?

13        A.    No, not specifically.

14        Q.    And would your opinions regarding

15   Professor Humphreys' report change if you

16   became aware that her primary area of study

17   is not related to the promotion and

18   advancing of positive content?

19        A.    I'm sorry, would you repeat that

20   question.

21        Q.    I said would your opinions

22   regarding Professor Humphreys' report

23   change if you became aware her primary area

24   of study is not primarily focused on the

25   promotion and advancing of positive

1                    R. Fisher

2    content?

3         A.    I would have to know what her

4    primary focus was on.

5         Q.    And --

6         A.    I mean, it doesn't do any good to

7    say that isn't her primary area.  That

8    tells me nothing.  What is her -- you would

9    have to tell me what her primary focus

10   seems to be on and I could make a better

11   judgment.

12        Q.    What sort of information would

13   you need to assess her primary focus?

14        A.    I need to know what her

15   background -- what her background and

16   experience and expertise are in the area of

17   reputation -- reputation in -- anything to

18   do with reputation.  Creating reputations,

19   building them, nurturing them, protecting

20   them and overcoming negative -- negative

21   content that harms reputations.

22             Nothing she said in her report

23   gave any indication she has any background

24   whatsoever in reputations.  And frankly,

25   her report reflected that.  But go ahead.

1                         R. Fisher

2    It's not a reputation damage or anything to

3    do with reputation per se.

4              And I wouldn't be emphasizing

5    that.  I would be saying, look, this is my

6    background and expertise as it relates

7    directly to reputations and either building

8    them or protecting them or overcoming

9    damage of them.

10             She has not one word in her

11   report -- and I didn't see her CV, so if

12   there is something in there, I apologize

13   for not seeing it.  But she didn't say one

14   word in her report in her describing her

15   background, experience and expertise that

16   related whatsoever to reputation or

17   reputation damage.

18       Q.    In your report, you make

19   reference to your work as a reporter at the

20   New York Times, correct?

21       A.    I was a reporter for the New York

22   Times, yes.

23       Q.    And you found that relevant to

24   mention in your report?

25       A.    Well, it was relevant in the

1                          R. Fisher

2     that that was for roughly a year in 19 --

3          A.     Not quite, it was under a year.

4          Q.     Are you aware that one of

5     Professor Humphreys' professorships is at

6     Northwestern School of Journalism?

7          A.     That's an excellent school of

8     journalism.  It's one of the best around.

9          Q.     Were you aware that Professor

10    Humphreys was a professor at that school of

11    journalism?

12         A.     No.  No.

13         Q.     Can you turn to page 1 of

14    Professor Humphreys' report.  If you read

15    the very first sentence of her report, it

16    says, "I am a professor of integrated

17    marketing communications at the Medill

18    School of Journalism."

19              Do you see that?

20         A.     Yes.  But again, as I said,

21    journalism -- there is a difference between

22    teaching journalism and being in the field

23    covering events.  You're comparing apples

24    to oranges there.

25              I mean, it's one thing to get up

1                          R. Fisher

2    in, you know, of how to be a journalist,

3    what to write, how to write, how to conduct

4    an interview right.  They don't go out and

5    write articles themselves and they don't --

6    journalist professors -- I have two years

7    of journalism.  I know what they teach.

8    It's not the same thing.  You're comparing

9    apples to oranges.

10       Q.    Do you know what sort of classes

11   Professor Humphreys teaches?

12       A.    No, but I've about been -- I

13   don't know that journalism -- there is

14   different forms of communications back and

15   when I was going to journalism school, the

16   internet didn't exist.

17            So there is different

18   communications outlet that journalism

19   people, you know -- a lot of journalists

20   are contacted by Twitter now or this or

21   that.  There is the things -- but the

22   basics of journalism hasn't changed.  Maybe

23   the outlets of how you communicate change

24   but the basics of journalism hasn't

25   changed.

1                        R. Fisher

2    shocked how different it is when you're out

3    there as to how they're applied, which are

4    used, how they're applied, that kind of

5    thing.

6            So I'm a little skeptical

7    about -- you know, academia people and

8    their theories on how you should do things

9    as opposed to how they're done in the real

10   world.

11       Q.    And so I guess you understand

12   that lawyers cannot serve as experts in --

13       A.    Of course.

14       Q.    -- a lawsuit?

15            So besides, to use your term sort

16   of, real world PR professionals, are there

17   any other qualified experts in a defamation

18   case?

19       A.    I don't really think so.  I mean,

20   the bottom line is that to take somebody --

21   and I'm not talking specific about

22   Professor Humphreys, but I've been in other

23   cases, many other cases where the opposing

24   experts had -- especially in the internet,

25   they seem to hire, these law firms seem to

1                    R. Fisher

2    I don't know.  I wasn't in the dressing

3    room at the time.  Very well could have

4    happened.

5            But the point is you have to look

6    at -- nothing I saw in any of the

7    documentation I read or any of the evidence

8    or anything that I saw validated that a

9    rape occurred.  And you know, I mean, he

10   says -- she said it did.  He said it

11   didn't.  I mean, I don't think anybody

12   could make a judgment.  It's -- you know,

13   you have two conflicting views and there is

14   no independent evidence one way or the

15   other.

16       Q.    And what do you mean when you

17   write, "It cannot be a false statement to

18   deny some action that hasn't been proven to

19   have taken place"?

20       A.    That's true.  A false

21   statement -- a statement as opposed to an

22   opinion, as you know, but I'll just put it

23   for the record, a statement is something

24   that could be proven or not proven, whereas

25   a -- whereas an opinion is something that

1                          R. Fisher

2    obviously can't be proven.  And no one has

3    proved one way or the other -- so by the

4    classic definition of a false statement, it

5    can't be a false statement if it's not

6    proved to be untrue.

7        Q.    So is it your testimony that

8    whether or not Mr. Trump raped Ms. Carroll

9    is a question of opinion?

10       A.    No, I'm not saying it's a

11   question of opinion.  I'm saying it's --

12   there is no documented evidence that I'm

13   aware of -- now, there may be something.

14            Maybe she, like Monica Lewinsky,

15   maybe she kept her dress and has taken it

16   in for a sampling and they found his semen

17   on it.  I don't know.  I'm saying -- I can

18   only give my conclusions and opinions based

19   on knowledge that I have and I have no

20   knowledge whatsoever that that rape

21   occurred.

22            Now, if there is some, I don't

23   have it.  And if it didn't occur, it can't

24   be -- it can't -- when he denied it, it

25   can't be a false statement because it's an

1                          R. Fisher

2    act that has never been proven to be.

3        Q.    But if Trump committed the rape

4    and therefore, knew he committed the rape,

5    would it have been a false statement when

6    he denied it?

7        A.    Well, of course it would have

8    been.  Of course it would have been.  There

9    is no question about it.

10            But the point is we don't know it

11   was a false statement.  There is no

12   documented evidence that it was a false

13   statement.

14            The only way it would have been a

15   false statement -- I mean, he knows in his

16   own heart whether he did it or not.  But

17   the only way it would have been a false

18   statement is if somebody could prove it

19   really didn't happen and he lied about it.

20       Q.    Is it your opinion the only way

21   to prove defamation in this context is to

22   have documentary evidence proving that a

23   rape occurred?

24       A.    Well, it's common sense I think.

25   I don't know if it's my opinion, but I

```
 1                    R. Fisher
 2   mean -- my -- am I supposed to say -- is
 3   anyone supposed to say that Trump lied when
 4   there is no evidence that he did lie?
 5            I mean -- maybe you are seeing
 6   something I'm not.  I mean, I know -- it
 7   doesn't matter whether we think he did it
 8   or not or didn't do it, something like
 9   that.
10            The point is all you can -- you
11   don't try cases -- you don't decide cases
12   on supposition.  Well, you know, he must
13   have done it or we think he did it or
14   something.
15            You know you -- you put people in
16   the death chamber, you know -- you convict
17   people of murder based on hardcore
18   evidence, not supposition or, well, he
19   didn't like his girlfriend so he probably
20   murdered her.
21      Q.    In your opinion, is Ms. Carroll's
22   testimony that the rape occurred sufficient
23   to prove that the rape took place?
24      A.    No.  No.  Because she said it?  I
25   mean --
```

```
 1                    R. Fisher
 2       Q.    So is it your opinion that in a
 3   he said/she said situation, we are not
 4   allowed to believe --
 5       A.    Either party --
 6       Q.    We are not allowed to believe the
 7   person who alleges that the sexual assault
 8   occurred?
 9       A.    No.  You're -- you know, you're
10   not guilty until you're proven guilty.
11   That means that everybody that was accused
12   of something would go to court and to jail,
13   you know -- you don't convict people of
14   burglary or crime or anything like that
15   unless there is evidence that they did it.
16              You're presumed -- in the
17   American judicial system -- and I'm not a
18   lawyer -- but in the American judicial
19   system, you are innocent until proven
20   guilty.  Isn't that true?
21              Well, it's the same thing in
22   anything, until you are proven guilty, you
23   are innocent.  The burden is on the thing
24   -- I could accuse you of stealing my
25   wallet.  does that mean you should go to
```

```
 1                    R. Fisher
 2   trial and be convicted because I accused
 3   you of it?  I mean, I don't know where
 4   you're coming from.  I'm lost here.
 5           I mean, the bottom line just
 6   because she makes an accusation, we are
 7   supposed to assume it's true?  I mean --
 8       Q.    Is Ms. -- is Ms. Carroll's
 9   testimony relevant to whether or not
10   Trump's statement is false and therefore
11   defamatory?
12       A.    I don't believe so.  I believe
13   it's one person accusing the other of
14   wrongful act.  And the bottom line is there
15   has got to be -- if everybody went to court
16   and jail when somebody accused them of
17   something, the court system would be --
18   fall apart.
19           I mean, normally police don't
20   arrest somebody -- I mean, they're on --
21   unless there is evidence.  I mean, there
22   has to be evidence to it.
23       Q.    And does that evidence include
24   the testimony of the victim of a sexual
25   assault?
```

```
 1                    R. Fisher
 2  conclusions based on it.
 3            I'm not going to opine on whether
 4  she has a strong case or not.
 5      Q.    If we look on the bottom of page
 6  5 of your report, and it goes on to page 6,
 7  you're addressing Ms. Carroll's claim that
 8  Trump falsely implied that she had accused
 9  other men of sexual assault and then you
10  set forth testimony from plaintiff and
11  defendant's depositions.
12            Do you see that?
13      A.    Yes.
14      Q.    And then at the bottom, on page 6
15  at the bottom of this subsection, after
16  pointing to Ms. Carroll's deposition
17  testimony in which she explains that she
18  had been sexually assaulted before, you
19  conclude, "Trump's implication was true."
20            What do you mean by that?
21      A.    Well, that's the one.  Most of
22  these seven statements were a he said/she
23  said situation.
24            But that was one where there was
25  actually, you know, one way or the other,
```

```
 1                    R. Fisher
 2   there was actually some evidence.  I mean,
 3   she -- she claimed that -- he claimed, I
 4   suppose, that she had falsely accused other
 5   men of sexual assault.  She denied it.
 6           But then again, the evidence I
 7   saw is that she did.  I mean, she accused
 8   her girl scout leader of abusing her, and
 9   then throughout this paragraph she talked
10   about they weren't all adults, but she
11   talked about other people assaulting her or
12   this or that.
13           So that was one of the couple
14   maybe where there was almost everything in
15   all those statements were totally he
16   said/she said, but that one it appears to
17   me that that wasn't a false statement
18   because she had accused other people.
19       Q.    Is there anything in the evidence
20   reviewed that showed that she had falsely
21   accused other people of sexual assault?
22       A.    Oh, I see what you mean.
23           Okay, I erred there.  I didn't
24   factor in the word "falsely."
25       Q.    So is your --
```

1                          R. Fisher

2      A.      As I said, I -- this thing

3    overnight.

4               Yes, that changes the context of

5    this definitely.

6               I just saw had accused other

7    people of sexual assault.  Not falsely.

8               Right, we don't know -- we don't

9    know if these other things were false or

10   not with the girl scout leader, just that

11   she accused them.  But we don't know if

12   that was falsely.

13              Yes, I would agree that the word

14   "falsely" in there which I obviously missed

15   would change the -- would change in this.

16      Q.      And so recognizing now that the

17   word "falsely" is in there, what would your

18   comment be as revised?

19      A.      Well, I wouldn't make a comment

20   on that at all.  I would not have addressed

21   that particular statement at all because I

22   don't know whether they were falsely

23   accused or not.

24              So I wouldn't have even addressed

25   that particular comment because I would

```
 1                    R. Fisher
 2    it in a manner that I felt was -- made
 3    sense for my report or at least that my
 4    style of doing things, let's put it that
 5    way.
 6        Q.    And if you look at -- I guess, so
 7    the part of your report that is the
 8    analysis of the statements that we have
 9    been talking about, is it your testimony
10    that you were simply responding to the
11    reservation of rights that Professor
12    Humphreys includes at the bottom of page 72
13    in her report?
14        A.    I have to look at the bottom of
15    page 72.
16              Well, yes, that's the -- yes,
17    that's -- that was her -- I thought it was
18    the last paragraph.  It's the next-to-last
19    paragraph, I guess, as it turns out.
20              But yes, that was what it was
21    referencing to a little bit earlier there.
22        Q.    Okay.  And in this -- in your
23    report in this section called "Analysis of
24    statements," on page 4, toward the bottom
25    in the paragraph that begins in her report,
```

```
 1                    R. Fisher
 2   you say, "Humphreys detailed all these
 3   allegations -- i.e. she said -- but did not
 4   provide the defendant's responses."
 5            Do you see that?
 6      A.    Yeah.
 7      Q.    If you turn to page 3, in the
 8   second paragraph from the bottom, about in
 9   the middle, you write, she, "She only
10   presents the 'she said' side and not that
11   of the 'he said.'"
12            Do you see that?
13      A.    Yeah.
14      Q.    So by the "she said," are you
15   referring to the allegations that
16   Ms. Carroll made against Mr. Trump in her
17   book, in the book excerpt that ran in New
18   York Magazine?
19      A.    I don't think I was -- I wasn't
20   referring to Ms. Carroll at all.
21      Q.    In presenting this case as a he
22   said/she said situation, the "she" is not
23   Ms. Carroll?
24      A.    Oh, oh, okay.  Yeah, no,
25   that's -- I'm sorry, yes, that is
```

```
 1                    R. Fisher
 2    Ms. Carroll.
 3             No, I was talking about -- I
 4    didn't specify it to be what she said in
 5    the book or anything.  It could be what she
 6    said in the complaint.
 7             I'm talking about in general
 8    terms, the allegations that she was making
 9    against Mr. Trump, whether it was in her
10    article or in her complaint, I didn't
11    specify the source.
12             I just said that she has made
13    certain claims and allegations against him,
14    rightly or wrongly.  But, you know, she has
15    made allegations, and frankly, I don't know
16    if any of us know whether she is right or
17    wrong.  As I said, this is totally a he
18    said/she said.
19             But yes, that's -- I wasn't
20    sourcing it to any particular -- whether it
21    was the article, the book or the complaint.
22    I was just saying in general, the
23    allegations she was making.
24       Q.    So the "she said" are
25    Ms. Carroll's allegations, correct?
```

1                        R. Fisher

2        A.     Yes.

3        Q.     And the "he said" would be

4    Mr. Trump's response to those allegations?

5        A.     Um-hm, correct.

6        Q.     So if we can go to page 6 of --

7    sorry, page 8 --

8        A.     Of my report?

9        Q.     Professor Humphreys' report,

10   sorry.

11       A.     Oh, getting confused on reports.

12              Okay.

13       Q.     If you look, there is a block

14   quote that represents Mr. Trump's statement

15   on June 21, 2019.

16       A.     Yeah.

17       Q.     Do you see that?

18       A.     Um-hm.

19       Q.     And that block quote continues on

20   through page 9 -- through the top of page

21   9?

22       A.     Um-hm.

23       Q.     And then starting on page 9,

24   there is a text that reads, "The second

25   statement was made to reporters at the

1                              R. Fisher

2    White House on June 22," and then there is

3    another block quote?

4         A.    Yes.

5         Q.    And then that continues on to

6    page 10, of Professor Humphreys' report.

7               And then we have a paragraph on

8    page 10 that begins, "The final statement

9    was published in an interview with The Hill

10   on June 24, 2019.

11        A.    Um-hm.

12        Q.    And it -- and it then goes on to

13   quote what Mr. Trump said to The Hill

14   reporters.

15        A.    Um-hm.

16        Q.    You see all three of these

17   statements quoted --

18        A.    Yes.

19        Q.    -- in Ms. Humphreys' report?

20        A.    Frankly, that was one of the

21   reasons that I broke out -- since she made,

22   it's refreshing my memory a little bit.

23   Since she spent three or four pages

24   spelling out word for word what he said, I

25   mean, you know, in these different

1                    R. Fisher

2     interviews or comments that he made in

3     various cases, the 21st, 22nd, 24th or

4     whatever, that's one of the reasons she

5     went into it that I analyzed each one of

6     them individually because where she

7     presented the whole, the whole scope of

8     what he said, I thought that, you know,

9     since she brought that up, that I would --

10    that I would break down the ones -- not the

11    whole ones, but the ones -- the portions of

12    it that they considered defamatory.

13         Q.    But you would agree that

14    Professor Humphreys' report quotes what

15    Mr. Trump said in response to Ms. Carroll's

16    allegations?

17         A.    As far as I know.  I mean, I

18    assume -- I never saw the articles.  I

19    assume this is an accurate representation

20    of what he said.  I don't know that for a

21    fact.  But I'm going to assume it is.

22         Q.    So wouldn't these fully quoted

23    responses count as the "he said" side of

24    the equation?

25         A.    I think -- I think you could

```
 1                      R. Fisher
 2   construe it that way, yes.
 3        Q.    Is there any part of the "he
 4   said" that you referred to in your report
 5   that you believe is missing from Professor
 6   Humphreys' report?
 7        A.    No.  That could -- that seems to
 8   be the -- I mean, as I said, I don't know.
 9   I didn't see -- I don't know frankly
10   whether this represents everything he said
11   or didn't say.  I mean, because I never saw
12   the original articles or the -- that these
13   came from.
14             So I don't know whether she
15   cherrypicked or whether this was everything
16   he said or not.
17             But to your point, yes, you could
18   say that this would, in fact, represent a
19   portion of the "he said" or good portion if
20   not all.
21        Q.    And so do you stand by what you
22   wrote in your report that Professor
23   Humphreys quote only presents the "she
24   said" side and not that of the "he said"?
25        A.    Well, in this context, yes, I
```

```
1                         R. Fisher

2     guess this could -- could represent what he

3     was saying in this, yes.

4                This would be an accurate -- if

5     it's complete, this would be a fair

6     representation of his side.

7          Q.    So if it's complete, you would

8     agree that you mischaracterized Humphreys'

9     report in saying it only presents the "she

10    said" side and not that of the "he said"?

11         A.    I think that's a fair assessment.

12         Q.    So if we look to page 7 of your

13    report, you recall that you disagreed with

14    Professor Humphreys' definition of

15    reputation?

16         A.    Yeah, I -- I think that she is --

17    I think she is coming from a different

18    perspective on that.  Of what reputation is

19    and the terms of -- I think she was --

20    well, go ahead and ask your question.

21         Q.    Can I just have you read her

22    definition that's at the -- that you quote

23    at the bottom of page 7 in your report.

24         A.    "Reputation is fundamentally a

25    social concept.  One's reputation is
```

1                        R. Fisher

2    the specific question and provide

3    follow-ups if I ask them.

4              If we look at page 8 of your

5    report, you provide your own definition of

6    reputation.

7              Do you see that?

8       A.    Yes.

9       Q.    It says, "More appropriate

10   definition of reputation would be that a

11   reputation is the sum of all of our actions

12   that is reflected by the people around us

13   in the same way they treat us or interact

14   with us"?

15      A.    Yes.

16      Q.    "It is an indirect result of

17   anything and everything that we do.

18   Successful people have always stressed on

19   the building and maintaining of reputation

20   as a fundamental ingredient to success."

21      A.    Yes.

22      Q.    Do you see that?

23      A.    Yes.

24      Q.    What's the difference between

25   your reference to, "The sum of all of our

1                          R. Fisher

2    actions that is reflected in the people

3    around us and the way they treat us or

4    interact with us," and Professor Humphreys'

5    reference to "one's reputation determined

6    by the social esteem held among a bonded

7    group of people"?

8         A.    Because mine is very clearly

9    oriented more to business and how people

10   are looking.

11              For instance, the direct

12   inference of that is the sentence,

13   "Successful people have always stressed on

14   the building and maintaining of reputation

15   as a fundamental agreement to success."

16   "Success" is talking about business world.

17              That is more -- that is more --

18   it's more generic in nature than Ms. --

19   Ms. -- it's more generic in nature than

20   Ms. -- Professor Humphreys was.  But it's

21   also clearly more targeted to someone in

22   the public light and business world.

23   Someone successful.  Someone -- you're not

24   talking about someone being a success in

25   their -- that they are popular in their

```
 1                    R. Fisher
 2   neighborhood or at the country club.  You
 3   are talking about success in terms of the
 4   business world.
 5        Q.    And does your report cite any
 6   source or authority for your definition?
 7        A.    No.  No.  No.  And I didn't feel
 8   the need to.  I'm my own authority.
 9              But I don't need -- that's just
10   general -- it's a general definition of
11   reputation.
12              I mean, there is many definitions
13   of reputation.  But that's -- that's
14   something I've had 50 years in the field
15   working on reputation and that's -- it's an
16   amalgamation of other definitions and maybe
17   with my own interpretation of it.  I don't
18   have to cite an authority.
19        Q.    But -- did you write this
20   definition yourself?
21        A.    I wouldn't claim total
22   authorship, but I think I -- it's probably
23   a hybrid of, you know, as I said, I've been
24   an expert witness a lot of cases and I
25   write about reputation damage.  I've
```

1                         R. Fisher

2    written articles as you have seen on my

3    things.  So I'm very aware of reputation

4    and whatever.

5             So I probably wrote this myself,

6    but it is probably something that relates

7    to other definitions I've seen in the past.

8         Q.    But this is the first time you've

9    used this particular definition in one of

10   your reports, correct?

11        A.    Yeah.  I think it's -- I mean,

12   I've written -- not treatises, but I've

13   written articles on reputation and a lot of

14   in detail.

15            This is kind of just -- it's not

16   necessarily a direct excerpt from one of

17   those, but it's just kind of a shortened

18   version of things I've said about

19   reputation in the past.

20        Q.    But in those articles, you

21   haven't sort of used this specific

22   three-sentence definition before, correct?

23        A.    No, I -- I created that.  I don't

24   think I lifted that from anything previous.

25   I think I just sat and wrote that from my

1               R. Fisher

2  own, you know, my own knowledge that I've

3  had.

4       Q.    Wrote that for the purposes of

5  this rebuttal report?

6       A.    Yes, yes.

7       Q.    Okay.

8       A.    Again, let me just express real

9  quickly, I'm not knocking Ms. Carroll's

10 definition.  I think her definition is a

11 good one.  I'm just saying it's -- two

12 things.  I'm just -- well --

13      Q.    I'm going to hand you?

14            MR. SWIFT:  Just to clear it up.

15      There was -- were you finishing

16      answering his question or --

17      A.    When he is talking to her, it's

18 kind of hard.

19            The only point I was making is

20 twofold.  One it's too narrow of a

21 definition, and second of all, it's not

22 apropos to this particular situation.

23      Q.    So the court reporter is handing

24 you a document we will mark as Exhibit 7 or

25 Fisher 7.

```
 1                       R. Fisher
 2        A.    Incidentally, there is --
 3              MR. SWIFT:   There is no question
 4        pending.
 5        A.    I was just going to say I don't
 6   think this has to end at 3.  There is no
 7   way this deposition is going to end by 3
 8   o'clock.  I mean, you could do it by Zoom
 9   or continue somewhere it's not going to
10   happen by 3.
11              (Exhibit 7, article entitled,
12        "The Importance and Psychology of
13        Reputation in Human Lives," marked for
14        identification, as of this date.)
15        Q.    Do you see what the court
16   reporter handed you is an article from the
17   source Medium entitled, "The Importance and
18   Psychology of Reputational Harm in Human
19   Lives"?
20        A.    Um-hm.
21        Q.    It's authored by Borderless
22   Technology Corp.?
23        A.    Um-hm.
24        Q.    It's published on February 9,
25   2018.  Do you see that?
```

```
 1                    R. Fisher
 2      A.    I see it.  And that's the date of
 3   my wife's birthday, February 9.
 4            But anyway...
 5      Q.    Are you familiar with Borderless
 6   Technology Group?
 7      A.    No, I'm not.
 8      Q.    Have you seen this article
 9   before?
10      A.    No, I've not.
11      Q.    Can you read the first three
12   sentences of the article.
13      A.    "Reputation is the sum of all of
14   our actions as reflected by the people
15   around us in the way they treat or interact
16   with us."
17            Boy that sounds familiar.
18            "It is an indirect result of
19   anything and everything we do.  Successful
20   people have always stressed on the building
21   and maintaining of reputation as a
22   fundamental ingredient to success."
23            Boy, is that so?
24      Q.    You testified previously that you
25   developed your definition of reputation for
```

```
1                        R. Fisher

2    the purposes of this rebuttal report.  Is

3    that correct?

4        A.    Yes, I did.

5        Q.    Can you explain how the

6    definition you wrote for your November 2020

7    rebuttal report in this case appears

8    verbatim in an article from February of

9    2018?

10       A.    I never saw this article.  I --

11   no, I can't explain it.  I mean, obviously,

12   there is -- I'm looking like I'm a

13   plagiarist or something.

14            But I swear -- the only thing I

15   can think of -- I never saw this article.

16   I can say that unequivocally.  I've never

17   read an article about importance of

18   psychology in reputation ever.

19            The only thing I can say, and

20   it's too much of a coincidence to say the

21   words were exactly the same as I came up,

22   the only thing I can say is that I might

23   have seen this definition stand by itself

24   somewhere in the past and picked it up -- I

25   know I never saw the article.  The words
```

1                    R. Fisher

2    speak for themselves.

3            The only thing I can say is that

4    over the course of time obviously, I pick

5    and -- I pick up information from different

6    places and the only thing I can say is I

7    must have -- I must have -- I never saw

8    this article as a whole.  I can guarantee

9    you that.

10           The only thing I can say is

11   somewhere along the line somewhere, someone

12   else picked this up, that particular phrase

13   or paragraph or whatever, and I came across

14   it somewhere by itself and picked it up.

15           I must have had it in another --

16   sometimes I pick from my own reports.  I

17   might have put it another report and then

18   picked from it.  I don't know.

19           But my compliments to whoever

20   found this though.  It's -- so obviously,

21   that particular phrase I must have lifted

22   from another one of my reports or another

23   place that I had.

24           I mean, I do have a place where I

25   have different definitions of reputation

1                          R. Fisher

2    kind of like a case -- a notes kind of

3    section I keep on the internet and

4    sometimes I go to it and extract out

5    definitions to feed -- to meet a particular

6    purpose.  And that is all I have -- that's

7    the only way I can explain it.

8         Q.    Okay.  So turning to page --

9         A.    Interesting.

10        Q.    Turning to page 9 of your report,

11   you state, about three-fourths of the way

12   down in the paragraph that begins, "Note,"

13   you write that Professor Humphreys is

14   proposing "a social media campaign, not a

15   diverse multi-faceted communications

16   campaign as part of her reputation repair

17   program."

18             Do you see that?

19        A.    Yes.

20        Q.    What do you mean by a "social

21   media campaign"?

22        A.    I mean, basically her -- the

23   whole campaign is, at least as she

24   described it, is an internet campaign.

25             Her campaign basically is -- the

1                           R. Fisher

2    program.

3        Q.    If I can just -- let's open

4    Professor Humphreys' report which is

5    Exhibit 4, the big one over there.  And if

6    you could turn to page --

7              MR. SWIFT:  It's Humphreys'

8        report.

9        Q.    Turn to page 126.

10       A.    126?

11             Okay.

12       Q.    And you will see at the top, it

13   says, "Appendix K damages model."

14       A.    Yes, I see it.

15       Q.    And you testified before that you

16   didn't focus on the appendices as part of

17   your review, but have you seen appendix K

18   before?

19       A.    I can't even be sure I had the

20   appendices, to be honest with you.  But I

21   didn't see them one way or the other.

22       Q.    If you could just look at this

23   and then I think it continues for a few

24   more pages giving different cost amounts.

25             But if we look at the information

```
 1                      R. Fisher
 2   even the most effective way to do it.
 3            So I've got two problems with
 4   this.  I have a problem that she is putting
 5   all her eggs in one basket, which would be
 6   fine if they were unknown people maybe.
 7            But when you have somebody
 8   willing to do stuff for you for free and
 9   you're spending all your money paying for
10   something that you can get otherwise,
11   it's -- I think her program -- and I have
12   the utmost respect for Professor Humphreys.
13   She is obviously extremely accomplished in
14   what she has done.
15            She has written books.  She has
16   got awards.  She has written articles.  But
17   she is totally a fish out of water.  She
18   doesn't understand how to repair -- she
19   knows how to promote things, but she has no
20   concept of how you overcome negative
21   reputations and her program is the best
22   example of it; not only in its direction
23   and focus, but the budget is ridiculous.
24            She said 3 to 20 million with
25   maybe the right figure being 10 to 12
```

Page 266

1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF NEW YORK

3    _____)
                                     )
4    E. JEAN CARROLL,                )CASE NO.:
                                     )
5                   Plaintiff,       )20-Civ-7311
                                     )(LAK)(JLC)
6            v.                      )
                                     )
7    DONALD J. TRUMP, in his personal)
     capacity,                       )
8                                    )
                    Defendant.       )
9    _____)

10

11

12

13

14             DEPOSITION OF ROBERT FISHER

15                     VOLUME II

16        REMOTELY IN LOS ANGELES, CALIFORNIA

17            TUESDAY, DECEMBER 20, 2022

18

19

20

21

22

23

24   REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR
                     CSR NO. 14125
25   JOB NO.:       220862

1   disseminated?

2        A.   Oh, certainly.

3        Q.   And that means looking at different types

4   of news sources, among other things, and figuring

5   out how many people might have seen or heard

6   negative information?

7        A.   Well, I don't think there is a need to

8   figure out how many people.  It's a -- I mean, you

9   know -- I mean, there's no way to determine how many

10   people, but the bottom line is you have to get a

11   feel on various factors, such as what type of

12   audiences saw it, what the geographical spend was.

13   I mean, was it heard in just a small town or was it

14   nationwide?  I mean, there is a lot of factors that

15   dictate how would you approach planning and

16   implementing such a program.

17        Q.   And do you follow any particular

18   methodology to quantify the degree of dissemination

19   of allegedly defamatory statements in print and news

20   sources?

21        A.   No.  Unlike Professor Humphreys, I don't

22   do statistical analysis.  I mean, in most cases,

23   it's pretty clear -- both by the geographical spread

24   and by the means of the communications, it's pretty

25   clear on where -- you know, what the extent of the

1        Q.    And do you ever look at the readership

2    data associated with the specific online news

3    sources?

4        A.    No.

5        Q.    And do you know what a bounce rate is?

6        A.    Yes.

7        Q.    What's a bounce rate?

8        A.    Well, bounce rate is how many times

9    somebody goes on your website and actually sees

10   content as opposed to moving on.

11       Q.    And do you account for a bounce rate in

12   part of your analysis of the dissemination of online

13   news?

14       A.    That's something that I may or may not

15   factor in.

16       Q.    What -- what data do you use as your

17   source for specifying the bounce rate?

18       A.    Well, I haven't -- I don't get into it

19   that specifically.

20       Q.    Do you know any of the specific data

21   sources that experts use for bounce rates?

22       A.    Not particularly.

23       Q.    And has your methodology for tracking

24   dissemination in online news been subject to any

25   form of peer review?

1       A.    Not that I know of but they may exist.

2       Q.    Have you ever seen it in any peer-reviewed

3   literature?

4       A.    No.   I haven't looked for it.

5       Q.    And do you -- turning to television, do

6   you follow any particular methodology to quantify

7   the dissemination of allegedly defamatory statements

8   through television?

9       A.    No.

10      Q.    And is there particular data sets that you

11  consult to measure the viewership of individual

12  television programs?

13      A.    No.

14      Q.    And has your methodology for tracking

15  dissemination of allegedly defamatory information on

16  television been subject to any peer review?

17      A.    No.   As I say, I'm not the one that would

18  be doing this.   So you can keep asking and I'll keep

19  saying no.

20      Q.    Understood.   And do you follow any

21  particular methodology to quantify the dissemination

22  of allegedly defamatory statements on Twitter?

23      A.    No.

24      Q.    And is there any data that you've

25  consulted to measure the level of engagement with

1   individual tweets?

2      A.   No.

3      Q.   And is there a particular source you use

4   for an impression rate in connection with tweets and

5   retweets of information on Twitter?

6      A.   No.

7      Q.   Do you know what an impression rate is?

8      A.   Yes, I -- I looked at

9   Ms. Humphreys' -- yes, I -- I have an idea of what

10   impression rate is.

11      Q.   And -- and what is an impression rate as

12   it pertains to Twitter?

13      A.   Well, impression rate is -- is basically

14   how many -- how many hits there are on a -- on a

15   particular -- on Twitter on a particular subject or

16   post.

17      Q.   And what -- what -- what is used to

18   measure those so-called hits on Twitter?

19      A.   I don't know specifically.

20      Q.   And have you ever done work with Twitter's

21   API?

22      A.   No.

23      Q.   Do you know what Twitter's API is?

24      A.   No.

25      Q.   Is there a peer-reviewed methodology that

1    you've used for tracking dissemination on Twitter --

2         A.    No.

3         Q.    -- for tracking allegedly defamatory

4    information?

5         A.    No.

6         Q.    And just thinking about social media more

7    generally, is there a particular methodology that

8    you use to quantify dissemination of allegedly

9    defamatory information on other forms of social

10   media?

11        A.    No.

12        Q.    Is there any particular data sources that

13   you use to measure dissemination or engagement with

14   defamatory information on social media?

15        A.    No.

16        Q.    And is there any peer-reviewed methodology

17   that you've used for tracking or quantifying

18   dissemination of information on social media?

19        A.    No.  As I said, this is not my -- this is

20   not my task or responsibility to do, it is -- all of

21   this would be handled by whatever firm or

22   subcontractors or consultants that are brought in

23   for -- to implement such a program, so you can keep

24   asking.

25        Q.    And do you agree that in order to assess

1  the impact of an allegedly defamatory statement, you

2  have to determine approximately how many people

3  actually believed the statement when they read or

4  heard it?

5       A.   Well, that's not germane to my role in

6  this case so I don't feel the need to respond on

7  that.

8       Q.   So your testimony that it's not germane,

9  what percentage of people believe a statement is

10 true or false as part of your expert --

11      A.   No.  I'm -- I'm saying that I represent

12 the defendant in this case and that is something

13 that the -- the plaintiff is more -- is more germane

14 to her than to me, but if I was representing the

15 plaintiff, yes, then that would be -- that would be

16 more -- a more -- more my task or my responsibility.

17      Q.   But in order to -- as a general matter, in

18 order to assess the impact of alleged defamation, is

19 it important or relevant to understand the

20 percentage of people who read or viewed that

21 defamation or alleged defamation, sort of, to

22 understand the percentage of people that actually

23 believed it?

24      A.   It may or may not.

25      Q.   In what cases may it -- may it be

1    relevant?

2         A.   Well, I mean, certainly -- certainly

3    the -- the plaintiff in this case is claiming

4    reputation harm as a result of statements that

5    Mr. Trump made whether they -- regardless of whether

6    they were true or false.  She's claiming reputation

7    harm, so therefore if I was her expert I would have

8    to delve into that, but in my role in this

9    particular case that's not part of my assignment.

10        Q.   So in this particular case, you have not

11   undertaken any efforts to determine what percentage

12   of people who read or heard Mr. Trump's allegedly

13   defamatory statements believed them?

14        A.   No.

15        Q.   Okay.  And as a general matter, as an

16   expert, do you a agree it is important to -- in

17   order to understand the impact of alleged defamation

18   to understand the percentage of people exposed to

19   those statements that are likely to believe it or

20   disbelieve it?

21        A.   Well, it's -- it's a moot point, the

22   question you're asking because the bottom line is

23   regardless of whether it's something that's

24   worthwhile or not in this particular case, I did not

25   have the ability to do so or may -- be more

Page 310

1   specific, the time to do so.  I was given five days

2   to -- from the time I was contacted, to the time I

3   prepared a report.  And I did not have the luxury

4   of -- of delving particularly beyond what was

5   reasonable for me to know to be able to offer my

6   conclusions and opinions.

7            And plus, I may add that having been

8   involved in these kind of things for 50 years,

9   representing people that have been damaged by

10  programs and the extent of the damage, how they were

11  damaged, how it manifested itself, so on and so

12  forth, I don't need to consult pie charts or to --

13  to have a -- have an educated feel of -- of what the

14  potential damage was.

15       Q.   And you would agree that in designing a

16  reputational repair campaign someone should, sort

17  of, focus on the forms of media that the target

18  audience actually consumes?

19       A.   That would be a reasonable -- a reasonable

20  thing to do.

21       Q.   And is part of your designing reputation

22  with repair campaigns, what sort of data do you rely

23  on to identify the types of media that your target

24  audience consumes?

25       A.   Well, I don't particularly get into data

1   best news media that have the most credibility, the

2   reach, and whatever to go after, regardless of

3   whether they ever carried the original information.

4        Q.   And -- and what data do you rely upon to

5   determine what the best media is for your target

6   audience in terms of credibility and the other

7   things you mentioned?

8        A.   Knowledge.  I've been in this business

9   50 years.  A reporter for "The "New York Times", I

10  was in journalism -- I know the media, I know which

11  media -- who the media are, I know what they do, I

12  know who they reach out to, I know who reads them or

13  listens to them, I know what -- for instance, if I

14  had something from Mr. Trump back in the day, I

15  wouldn't go to MSNBC for it, I would go to FOX, you

16  know, or now Newsmax or America One [sic] or

17  whatever.

18            But the bottom line is I -- I have

19  knowledge; that's why I'm an expert.  I have

20  50 years of knowledge of working with the media.

21  Most of them were around 50 years ago.  "New York

22  Times" was around 50 years ago, so was the

23  Washington Post, so was ABC, so was AP, so was Wall

24  Street Journal.  I don't need to consult textbooks

25  or media guides -- again, we're just talking about

1        Q.    Mr. Fisher, I'm just -- I feel like we're

2    well off the topic of my question --

3        A.    Well, I'm trying to -- we are but I'm

4    trying to educate you because the pattern of your

5    questions obviously shows a lack of knowledge

6    about --

7        Q.    Mr. Fisher, I get to ask the questions,

8    you have to answer them.

9        A.    Okay.  Pardon me.  Go ahead.

10       Q.    And we'll get through it more quickly if

11   you just stick to answering them.

12       A.    Go ahead.

13       Q.    So in this case you did do not any

14   analysis to calculate the number of times that

15   Mr. Trump's allegedly defamatory statements were

16   viewed; correct?

17       A.    No.

18       Q.    And so, you have no idea how many people

19   actually saw or read what Mr. Trump said about

20   Ms. Carroll?

21       A.    No.  I see you got Professor Humphreys

22   (inaudible) did charts somewhat to that effect but

23   no, I didn't.  I didn't -- as I said, I did not have

24   time at the time to do it.  I was on a strict

25   deadline so there were things -- there were some

1    things I might have been done if I had a couple

2    months to do it, the luxury of time, but in this

3    case I had to meet the need.

4         Q.   Understood.  So just again, you did not --

5    you did not have any idea how many people actually

6    saw or read what Mr. Trump said about Ms. Carroll?

7         A.   Not at the time I did this report, no.

8         Q.   And sitting here today?

9         A.   Well, I -- I glanced at Professor

10   Humphreys' charts.  I didn't add them up but I

11   glanced at them.

12        Q.   Okay.  And you didn't perform any analysis

13   to calculate the percentage of people who were

14   likely to believe what Ms. Trump said about

15   Ms. Carroll; correct?

16        A.   No, I don't think I had to do a study

17   to -- to -- to get that information.  I mean,

18   Mr. Trump is a very well-known person and

19   has a -- is very polarizing.  And to answer your

20   question, I don't need to see surveys to have a good

21   feel on how many people would believe what he said

22   or not believe what he said.

23        Q.   And so, any opinion you have about

24   the -- the degree to which people were receptive to

25   what he said is based on your good feel and your

1    instincts?

2        A.    Well, yeah, I think it's based on -- I

3    don't think good feel or instincts, I think

4    Mr. Trump has been a national figure since 2016.  I

5    mean, he was before that, but in a different context

6    and I -- I think that it's -- after eight years or

7    whatever it's been of -- six years of him being in

8    the public limelight, it's pretty -- pretty clear

9    who or -- what people are prone to accept what he

10   says and aren't accepting, including degrees.

11       Q.    And is -- is your -- your understanding

12   based on any particular data points?

13       A.    Not data points, no.  Just -- just

14   information, general information.

15       Q.    What do you mean by general information?

16       A.    Well, information about percentages, like

17   of people who are -- are strong advocates of Trump

18   as opposed to people that aren't.  I mean,

19   it's -- you know, it's very clear he has a very

20   adamant -- I mean, a very strong following to -- to

21   some extent.  And then, conversely there is a lot of

22   people that think he's the reincarnation of the

23   devil, you know, I mean, I don't think that's it.

24            So I mean, if -- if we were talking about

25   you or me, who are basically unknown and didn't have

1    a profile or whatever, then I think you'd have to

2    delve into -- to the us as individuals to see, well,

3    you know, what kind of favorability ratings we have,

4    who we impact or who we don't impact.  But with

5    Mr. Trump that's not the case.

6         Q.    And so, you didn't analyze any -- or you

7    didn't analyze the idealogical makeup of people who

8    were exposed to Mr. Trump's allegedly defamatory

9    statements though reading print news in this case?

10        A.    Well, I did (inaudible) --

11        Q.    Did you consult any data?

12        A.    No, no data.  But I -- it's not -- define

13   the word analyze.  I mean, did I do a systematic

14   analysis, no, but do I -- did I analyze from the

15   sake of what is readily apparent about Mr. Trump and

16   -- and where he stands in the American public?  And

17   among the media, for that matter?

18        Q.    So can you -- can you walk me through what

19   specifically you did, sort of, what methodology you

20   followed for analyzing the idealogical makeup of

21   people who specifically saw Trump's allegedly

22   defamatory statement in print news sources?

23        A.    I didn't -- I didn't -- I didn't do any

24   analytical study of people who saw -- saw the

25   defamatory statements --

1        Q.    Okay.  And did you --

2        A.    -- or allegedly defamatory statements.

3    Let me correct myself.

4        Q.    And did you do any analysis of the

5    ideological makeup of people who saw the allegedly

6    defamatory statements, specifically through online

7    news sources?

8        A.    No.

9        Q.    And did you do any analysis of the

10   idealogical makeup of the people who saw Mr. Trump's

11   allegedly defamatory statements through television?

12       A.    Tell me, how many hours are there in a

13   day, tell me that and then I'll answer your

14   question.

15       Q.    Mr. --

16       A.    I know, I can't ask you a question.  No,

17   no, no.

18       Q.    And did you do any analysis of the

19   idealogical makeup of people who were exposed

20   through -- to Mr. Trump's allegedly defamatory

21   statements through Twitter?

22       A.    No.

23       Q.    And did you do any analysis of the

24   receptivity of Mr. Trump's supporters to claims that

25   he committed sexual misconduct?

```
1        A.    No.
2        Q.    And in this case, you haven't developed
3   your own budget for a reputational repair program
4   for Ms. Carroll; correct?
5        A.    Well, no, I wasn't -- I wasn't -- although
6   I did opine in the first part of the -- this
7   deposition that -- two things; one, of course, that
8   her -- that the budget she came forward with is -- I
9   don't know what's a kind way of saying it -- is --
10        Q.    Just --
11        A.    Over --
12        Q.    -- answer my question, Mr. Fisher?
13        A.    Yes, I did -- I did opine to you in the
14   initial deposition that when we were talking about
15   that I had done programs for 100,000 to 900,000, my
16   own programs for budgets, I did opine something in
17   the higher -- maybe, higher end of that range would
18   be more than suitable for Ms. Carroll's program,
19   should she prepare.
20        Q.    But did you develop your own budget for --
21        A.    No, there was no purpose to it.  I'm not
22   representing the plaintiff.  Why would I -- why
23   would I put together a budget for a program that --
24   that is for -- for her?
25        Q.    And your report doesn't identify specific
```

1    New Yorker" in your answer.  What do you mean "The

2    New Yorker" broke this story in the first place?

3         A.    Well, "The New Yorker" broke

4    Ms. Carroll -- Ms. Carroll wrote a book and one of

5    the chapters in the book addressed Mr. Trump's

6    alleged assault and a week before, I think it was on

7    the 21st -- the 21st of June, I think a week before,

8    the New York -- "The New Yorker" published an

9    excerpt from the book or ran an article on it and

10   that -- when I said broke the story, that was the

11   first it had reached the public.

12        Q.    And it's - and it's your understanding

13   that the print version of "The New Yorker" is where

14   this story begins?

15        A.    As far as public exposure, yes, that's my

16   total understanding.

17        Q.    And what about the allegedly defamatory

18   statements of Mr. Trump, do you know where those

19   originated?

20        A.    Well, those originated in response to "The

21   New Yorker" article.  In other words, the New

22   York -- let me finish.  "The New Yorker" article

23   came out, I believe, it was on the 21st of the month

24   and between the 21st and the 24th, on three

25   different occasions within the first three days,

```
 1   bullets that have, sort of, of negative opinions --
 2        A.   I'm sorry, where is that in here?
 3        Q.   At the top of -- the paragraph at the top
 4   of page 29 --
 5        A.   Oh, yeah, top of the paragraph, yeah.
 6        Q.   -- down at the last sentence.
 7        A.   Oh, I see.  Yeah.  "Anyone reading."  Yes,
 8   I see.
 9        Q.   Okay.  And so it says, "Anyone reading
10   these headlines relating to the Plaintiffs could
11   reasonably be expected to conclude," and then you
12   have a list of six negative conclusions that -- that
13   one might draw?
14        A.   Yes.
15        Q.   Did you consult any data to assess the
16   percentage of people who are likely to believe the
17   specific things that you listed here?
18        A.   No, there was no specific data.  It's --
19   again, this was, first of all, as I've said before I
20   think in the last depo, I'm a big believer in rhyme,
21   reason, logic, and common sense.  And I think that
22   anyone that read those articles -- I mean, I don't
23   think it's rocket science that these would be the
24   impressions that people would take away from some of
25   these headlines related to a series of health care
```

1  facilities, particularly for people, elderly people.

2  I think it's -- I think that's -- I mean, sometimes,

3  you know, again, if it looks like a duck, walks like

4  a duck, and quacks like a duck, it's a duck, and I

5  think that's true in this case.

6      Q.   And so, is it your testimony that anyone

7  reading the -- the headlines that we looked at

8  before would come to these conclusions?

9      A.   Yes, it's more than that.  I mean, let me

10  not digress but go forward a little bit.  This is --

11  part of this is feedback I received from the client,

12  you know.  I mean, in other words, in talking to --

13  the client to hospital personnel, talking to the

14  lawyers, talking to the people, I mean, this is --

15  these are the kind of things that were circulating

16  in the community so -- I mean, I could have come to

17  these just from common sense and logic about how

18  people would interpret something like this, but I

19  also received feedback that this was the kind of

20  feedback that they were getting at the hospitals,

21  you know, from the nurses, doctors.  I mean, this

22  was kind of feedback people were giving to people

23  that were working from the hospital.

24          So it was more than just common sense of

25  how people would interpret something.  It was direct

1    the subset of the general public that Professor

2    Humphreys identified is an appropriate target

3    audience for her reputational repair program?

4         A.   Yeah, I -- although I think it -- it's

5    narrowed.  The bottom line is I -- I think that's a

6    misguided target audience.  I mean --

7         Q.   Just so I can get an answer to my

8    question.  But your report said she was targeting

9    the public in general, when, in fact, her report

10   specifies a subset of the population that she's

11   targeted --

12        A.   Would you read me the part of my -- that

13   talked about the -- the public in general or -- read

14   that part.

15        Q.   "While she doesn't clearly define her

16   audience, it would appear she is targeting the

17   public in general."

18        A.   Okay.  Well, that's a little bit of

19   splitting hairs, but, yes, the Trump is a subset of

20   -- of the public in -- I mean, Trump supporters are

21   the public in general.  But the bottom line is that

22   I will concede to you that that is a -- a more

23   targeted definition by saying the Trump supporters.

24            I was just differentiating it from going

25   into it after industries or anything other than

```
 1    people on the street.  But you're right, that's a
 2    more defined -- more defined definition.
 3         Q.   Okay.  So we're going look at your report
 4    briefly.  I'm going to mark -- mark it -- the one
 5    that doesn't have the page numbers as Fisher 20 just
 6    so we can, sort of, keep track of them both.
 7              (Exhibit 20 marked.)
 8              THE WITNESS:  Okay.  Do you want to put 20
 9    on that?  Got to be official here.
10    BY MR. CRAIG:
11         Q.   So if we turn to the second to the last
12    page.
13         A.   Yes.
14         Q.   And you see the second bullet down that
15    begins "If only"?
16         A.   Yes.
17         Q.   So your report states, "If only basically
18    25 percent would believe Trump, that leaves
19    75 percent of the public who could be impacted."
20              The next bullet reads, "If you reasonably
21    assume that at least 50 percent wouldn't believe
22    anything he said, you are left with a very small
23    percentage that you would have to reach to
24    counteract his negative comments about Carroll."
25         A.   Right.
```

1    certain group of people or the population and I

2    think that that's -- those are reasonable

3    projections based on what polls and surveys have

4    shown about what his support is.

5         Q.   But none of those polls and surveys are

6    cited in your report --

7         A.   No, no, no.

8         Q.   And can you identify any peer-reviewed

9    literature supporting the proposition that a

10   reputational repair program should ignore the

11   segment of the population that holds a negative

12   belief about the person whose reputation is damaged?

13        A.   You're going to have to -- in other words,

14   it ignores the percentage of the population that has

15   a negative opinion about who?

16        Q.   Ms. Carroll.

17        A.   You mean not address them?

18        Q.   Yes.

19        A.   I didn't know Ms. Carroll had any

20   negative -- I mean, you'd have to represent -- I

21   don't think anyone has a negative impression of

22   Ms. Carroll so --

23        Q.   You testified earlier that 25 -- you

24   believe 25 percent of the population would believe

25   Ms. Trump and that --

1   win over, you know, and you're -- while you don't --

2   while people are -- you don't think you're going to

3   impact very much one group, you don't ignore them

4   and you don't -- you put the emphasis on those

5   people that are open to persuasion one way or the

6   other.

7       Q.   And is it your testimony that you should

8   not target the people, the population -- the segment

9   of the population among who your reputation was

10  damaged?

11      A.   Oh, no, no, no, definitely.  I -- well --

12      Q.   Let me rephrase my question, so I can get

13  a clear answer --

14      A.   Yeah, I guess the word target -- I mean,

15  you can target a lot of different groups.  That's

16  the problem, that word target.  I definitely think

17  you should reach out to those people, if that's what

18  you're asking.  I'm just saying that if you had to

19  weigh how much resources and time and budget and

20  money, that they would be better put to somebody

21  that isn't so -- would be so hard to change their

22  opinion on.

23      Q.   And -- and you testified last week that

24  you didn't review any of the peer-reviewed

25  literature cited by Professor Humphreys in her

Page 386

1    report; correct?

2        A.    No, I -- I stated earlier in this -- this

3    segment of the deposition that I don't read

4    peer-reviewed literature.

5        Q.    And so that would include the literature

6    cited in the section of her report entitled "Media

7    Exposure and Counter Attitude and No Attitude

8    Change"?

9        A.    Right.

10        Q.    And is it your opinion that people could

11    never change strongly-held beliefs?

12        A.    Well, that -- you can't make a blanket

13    statement with that.  I mean, there's -- there's --

14    I would say you might say percentages that can't

15    change your belief, but I don't think you can state

16    that not -- if you had 100 people, and you were

17    trying to change their opinion, all 100 would not

18    change it.  I mean, there's going be some people you

19    could reach -- reach to with some logic or common

20    sense.  No, I don't think you can make a blanket

21    statement like that.

22        Q.    And do you think it is more costly or less

23    costly to change a person's views when those views

24    are strongly held?

25        A.    Well, more costly.  I mean, it's going to

1    take a more intense effort because if you're talking

2    about somebody with a clean slate, and if you go to

3    them and make a reasonable approach to them, you

4    have more chance to influence.  If you're talking to

5    someone, and they've got their back up -- I'm not

6    saying it's a lost cause, but it's going to take a

7    more intense effort to get them to change their

8    opinion.

9         Q.    And have you read any of the literature on

10   psychology and persuasion?

11        A.    No.

12        Q.    And what about on how people form and

13   change their beliefs?

14        A.    No.  But, again, I don't have to read

15   literature.  I've got 50 years of being a

16   communicator in which --

17        Q.    Again, just answers to the questions to

18   get through it --

19        A.    Okay.  No, I haven't read it.

20        Q.    And have you read any literature on the

21   number of exposures to a message that are required

22   in order to change someone's beliefs?

23        A.    No.

24        Q.    So if we look at -- I was trying to get my

25   page numbers correct here.

1   I'm just saying that a couple of them, in my

2   opinion, are -- whether they're true or not true,

3   and I'm not opining on that, are -- would not have

4   the extent of reputational harm that maybe some of

5   the other ones would.  So, yes, I think it's

6   appropriate.

7        Q.   And so, is it your opinion that the

8   President of the United States calling someone a

9   liar with respect to an alleged sexual assault is

10  mild?

11       A.   That one -- of the four, that one I

12  will -- I will concede.  That one is -- probably

13  shouldn't have been on that list.  The other

14  three --

15       Q.   We'll go through them.

16            Is it your opinion that the President of

17  United States accusing someone of fabricating sexual

18  assault allegations to sell a book is mild?

19       A.   Yeah, I do.  And same with the political

20  agenda.  Yeah, I think that's --

21       Q.   Again, I'll go through them.

22       A.   Yeah.

23       Q.   Is it your opinion that the President of

24  the United States accusing someone of fabricating a

25  sexual assault allegation for political ends is

```
 1        Q.    So that wouldn't be a mild allegation,
 2   defamatory statement?
 3        A.    No, not mild.  I'll stick with the three
 4   that are in there in that bracket, other than the
 5   lying about selling books, political agenda, and I
 6   don't know her.  I mean, somebody's saying, "I don't
 7   know her," and the other person said, "I did.  I
 8   don't."  That's -- that's not reputation harm in
 9   that.
10        Q.    And is it your opinion that the President
11   of the United States implying someone is too ugly to
12   sexually assault is mild?
13        A.    Yeah.  I mean, first of all, again --
14        Q.    Just yes or no is fine.
15        A.    Yes, yes, I -- given who it's coming from,
16   yes.  I mean, Trump doesn't think much of women.  I
17   don't think (indiscernible) that much and, yeah, I
18   would agree that.
19        Q.    And do egregious and extreme statements
20   cause more reputational harm than mild statements?
21        A.    I would say that's a fair assessment.
22        Q.    And so, if this case involves statements
23   that you consider all to be egregious or extreme
24   rather than mild, your estimate of Ms. Carroll's
25   reputational damages would increase?
```

1        A.    Well -- well, I can't make it as a

2    definitive fact, but generally, if someone -- my

3    understanding of Ms. Carroll, she has -- had a very

4    positive -- before all this happened, she had an

5    extremely positive -- a positive image, reputation,

6    and therefore, because of who she is, because of her

7    positive imagine, and her longstanding visibility in

8    the community, yes, I think she would -- she would

9    be able to offset that kind of derogatory comments,

10   again, not only because who she is but because who

11   Mr. Trump is and -- and in terms of allegations.

12        Q.    So, did you consult any data in connection

13   with your opinion about the possible effect of -- of

14   Ms. Carroll's preexisting reputation here?

15        A.    No.   And that's where I used the word

16   "possibly."   I mean, I could take that word out,

17   but, I mean, the bottom line is I hedged a little

18   bit.   But I think it's reasonable to assume that a

19   woman that had a public profile for 30 years and had

20   been all positive, that it's a -- if a certain

21   individual is known to be controversial makes some

22   comments about her, that it's not going to harm her

23   to any -- to the extent it might somebody who

24   didn't -- people didn't know.

25        Q.    And you would agree that longstanding

1   positive reputations can be destroyed almost

2   instantly by a negative statement; correct?

3        A.   Yeah, you must have seen in one of my

4   reports where I said reputations -- there's an old

5   saying.  It takes years to build a reputation and

6   seconds to destroy it.

7             But, again, a lot of these questions that

8   you're asking, I would answer differently if it was

9   anyone but Mr. Trump.  But given the nature of his

10  controversial nature, I think everybody would look

11  at those with a -- you know, seed of doubt.

12       Q.   And have you consulted any -- any data

13  about how people filter Mr. Trump's comments when it

14  comes to statements he makes about other

15  individuals?

16       A.   Yes, yes, I've talked to -- all the time,

17  last six years.  I talked to people all the time.  I

18  mean, people I know, people -- friends, business --

19  family, business associates.  We talk all the time.

20  He's a public figure.  He makes thousands of

21  comments.  His tweets were famous.

22            Yes, I've talked -- over the years, I've

23  talked to hundreds, probably, of people about what

24  did you think of this or did you see Mr. Trump said

25  that and this, and did you hear his latest -- yeah,

```
 1    I would say yes.  Over six years, I've probably
 2    talked to at least a hundred people, more.
 3         Q.   And that is in your capacity as a family
 4    member or friend or someone you might run --
 5         A.   Well, some --
 6         Q.   -- into in a business setting?
 7         A.   Yeah.  Sorry.  Some in a business context,
 8    but, I mean, you know, I talk to -- yeah, it's a
 9    combination of personal conversations and, in some
10    cases, business conversations.
11         Q.   And is there any data that underlies that
12    opinion that you've addressed in your report?
13         A.   There may be.  I'm not aware of it.
14         Q.   Do you recall having any source for your
15    opinion that Mr. Trump causes less reputational harm
16    than another person saying the exact same thing?
17         A.   Only the knowledge, experience, and
18    expertise I've gained over 50 years of dealing with
19    people in public life and people in private life and
20    how they impact -- if someone that's well known
21    saying something as opposed to somebody that isn't
22    and how that impacts the recipient of the negative
23    assertions.
24         Q.   So I believe you gave this example when
25    you testified last week.  Is it your opinion that a
```

1    you know, I could answer the question.

2         Q.    And so do you have -- do you have any data

3    or other sources for differentiating between

4    statements that Mr. Trump makes and Mr. Pence and

5    Mr. Schumer makes?

6         A.    Any data, no.  Just, you know, a

7    combination of common sense and logic and -- and

8    then my experience in the background on people

9    calling each other names, and those who had positive

10   images making the assertions, and those who had

11   negative images making the assertions.

12        Q.    And you refer to something you've written

13   before that it can take a lifetime to build a

14   reputation but only seconds to destroy it, and it's

15   fair to say that that's something that you write in

16   most of your expert reports?

17        A.    Yeah, yeah.  I mean, I think -- I have

18   certain principles I cite.  I mean, I have a list of

19   like 32 principles that relate to reputation harm

20   that I've amassed over the years and I consult those

21   principles.  But, yeah, I think in almost every

22   report I put that in because -- particularly if I'm

23   representing the plaintiff, in a sense.

24              But, again, that is related to normal

25   people.  I mean, businesses against businesses or

1    100 percent but she had a highly positive -- yes.

2        Q.   And you did not include the point that it

3    could take a lifetime to build a reputation but only

4    seconds to destroy in your report here; correct?

5        A.   No.  Because as I -- I represent -- first

6    of all, I usually do that in -- in conjunction with

7    the reputation damage repair programs I write.  And

8    since I didn't do it, I didn't put it in.  I use

9    that as a preface for the program, but in this case

10   I'm representing the defendant, so I didn't put it

11   in.

12       Q.   And you agree that the more broadly

13   negative information is disseminated, the greater

14   the reputational harm; correct?

15       A.   I'm sorry.  Please repeat that question.

16       Q.   You would agree that the more broadly

17   negative information is disseminated, the greater

18   the reputational harm?

19       A.   Well, that's logical, yes.

20       Q.   And you would also agree that the

21   President of the Untied States has one of the most

22   prominent platforms in the world?

23       A.   I think that's a fair assumption.

24       Q.   And are you a member of any political

25   party?