# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL )
)
)
v )                    Case No. 20 civ. 7311 (LAK) (JLC)
)
DONALD J. TRUMP )
)
)

EXPERT REBUTTAL REPORT OF ROBERT J. FISHER

PREPARED FOR DEFENDANT DONALD J. TRUMP

TABLE OF CONTENTS

Assignment……………………………………………………………………… 1

Background and Qualifications……………………………………………….. 1

Case Background……………………………………………………………... 1-2

Plaintiff's Expert ……………………………………………………………… 2

Information/Input Reviewed to Form Opinions……………………………… 2-3

General Overview …………………………………………………………... 3-4

Analysis of Statements ……………………………………………………… 4-7

Reputation and Reputation Damage………………………………………... 7-8

Reputation Harm to Plaintiff ……………………………………………… 8-9

Reputation Damage Repair Program………………………………………… 9-12

Summary of Conclusions and Opinions …………………………………...... 12

Report Disclaimer …………………………………………………………… 12

<u>**Assignment**</u>

I am a veteran communications professional, executive and counselor – acquired from my background as both a journalist (reporter for the New York Times) and a half-century career in the communications fields of public relations, advertising and marketing. I have also been acknowledged nationally by the legal profession and news media as an expert in the field of crisis communications and image/reputation management and damage repair. Additionally, I am an experienced expert witness who has been involved in over approximately 80 cases, 70 of which were defamation or reputational harm-related cases during the past 16 years. Due to that experience and expertise, I have been retained as an expert on behalf of the Defendant, Donald J. Trump. Specifically, I have asked to review, analyze and offer my comments and assessment of the conclusions and opinions offered by Professor Ashlee Humphreys, PHD in her expert witness report prepared on behalf of the Plaintiff, E. Jean Carroll.

<u>**Background and Qualifications**</u>

While my credentials (e.g., professional experience and expertise) are detailed in the attached CV, I will briefly encapsulate this background here to give credence to my qualifications to offer the opinions and conclusions contained in this Rebuttal Report.

As a preface to this, it is important to note that only one profession is solely oriented to the creation, development, enhancement, advancement and repair of a reputation, and that is public relations. Advertising and marketing have some involvement but that isn't their main purpose. A public relations professional is the most qualified to address issues relating to reputation.

My qualifications (in brief) as an expert and authority on reputation development, management and damage repair are as follows:

- 50 years as a public relations professional, 42 as owner of my own Los Angeles-based firm.

- Of the 400-plus clients my firm represented, 80 to100 had issues relating to a damaged reputation and/or were in a crisis situation that negatively impacted their reputation.

- Beginning in 1978, I acquired a significant national reputation with both the legal profession and the news media as a preeminent expert in crisis communications and reputation damage and repair which resulted in law firms throughout the nation retaining my firm's services as well as the news media utilizing me as an expert media information source and analyst.

- As an expert witness since 2006, I have represented both Plaintiffs and Defendants in 30 states (and the District of Columbia) in litigation that related to defamation or reputation harm. I have testified over 25 times in depositions, arbitration hearings and trials (bench and jury), in both state and federal courts.

<u>**Case Background**</u>

Following is a brief synopsis of the background that led to this litigation.

The Plaintiff in this case is E. Jean Carroll ("Carroll"), a resident of the State of New York who is a journalist, author, former writer for Saturday Night Live, and advice columnist for *Elle* magazine. She hosted her own TV show "Ask E Jean" on America's Talking network, was reputedly the longest running advice columnist in the U.S. and has authored numerous books.

1

The Defendant is Donald J. Trump ("Trump"), a resident of the State of Florida and a former President of the United States. (Note: this lawsuit was filed while he was in office, but it was directed at him personally). Prior to that he was a businessman (real estate developer) and was the host of a television program.

The Plaintiff alleges that sometime between the Fall of 1995 and Spring of 1996, she encountered the Defendant when she was exiting the Bergdorf Goodman Department Store in New York City. She maintains that he requested that she assist him in helping to select a gift for a female friend. In doing so, she alleges that he raped her in a dressing room in the store. She stated that she did not report the alleged rape to law enforcement nor report the incident publicly because she was afraid of retaliation from him and feared the disclosure would ruin her life. In the aftermath of the Weinstein controversy and the "Me Too" movement, she decided to come forward and included an account of the incident in a book she wrote ("What Do We Need Men For? A Modest Proposal") which was published on July 2, 2019. Prior to publication, an excerpt from it on the alleged rape appeared in New Yorker Magazine on June 21, 2019, which was the first public exposure for her claim. In response, between June 21 and 24, 2019, the Defendant issued statements and made comments to the news media denying the Plaintiff's allegations of sexual assault and rape.

The Plaintiff maintains that the negative comments made the Defendant exhibited reckless disregard for the truth and ill will and resulted in significant reputational harm to her. As a result, on November 4, 2019, she filed a lawsuit against him for Defamation in the New York Supreme Court. (Note: The lawsuit was later moved to Federal Court in New York.) She is seeking an order to require the Defendant to retract all defamatory statements and to pay compensatory and punitive damages. The Defendant denies the allegations advanced by the Plaintiff in this lawsuit.

## Plaintiff's Expert

To assist with the case, the Plaintiff retained Professor Ashlee Humphreys, PHD ("Humphreys") to serve as an expert witness on her behalf. A graduate of Northwestern University with a Bachelor of Arts degree in Economics and Philosophy, Humphreys currently is employed by the University as a Professor of Integrated Marketing Communications at its Medill School of Journalism and as Professor of Marketing with its Kellogg School of Management. She reports that her focus of instruction is on assessing the impact of social media campaigns and strategically directing a portfolio of social media tools to pursue managerial goals involving persuasion, advertising, market growth, and branding. She purports to have a decade of experience in the field of digital communications and marketing and states that her expertise is the fields of marketing, advertising, market growth and social media.

From my review of Humphreys credentials she has a very impressive background of accomplishments, (including awards), however, she does not indicate that she has any professional background, experience or expertise in reputation management, damage or repair - which are at the center of this case. As stated above, her expertise is in fields that are promotion-oriented, including marketing, advertising, digital and social media campaigns. This case requires expertise in overcoming negative communications which damages a reputation.

## Information/Input Reviewed to Form Opinions

In connection with my preparation of this Rebuttal Report, I have received and reviewed from the Plaintiff's legal counsel, the following documents and information relating to this case:

- Expert Report of Professor Ashlee Humphreys, PHD  (October 14, 2022)

- Complaint: E. Jean Carroll v Donald J Trump  (November 4, 2019)

- Legal Documents:  Answer (January 23, 2020)

- Depositions:

  - E. Jean Carroll  (October 14, 2022)
  - Donald J. Trump  (October 19, 2022)

- Miscellaneous Documents

  - Plaintiff E. Jean Carroll's Responses and Objections to Defendant Donald J. Trump's Request for Production of Documents  (June 27, 2022)
  - Plaintiff E. Jean Carroll's Second Set of Interrogatories to Defendant Donald J. Trump  (August 2, 2022)
  - Defendant's Amended Responses and Objections to Plaintiff's First Request for Production of Documents  (August 26, 2022)
  - Defendant Donald J. Trump's Responses and Objections to Plaintiff's Second Set of Interrogatories  (September 7, 2022)

## General Overview

I have reviewed the documents listed in the preceding section of this report, have received additional input from the Defendant's legal counsel and have done some basic internet research to obtain some background on the litigants, see what type of information existed on the lawsuit itself as well as to get a sense of the type and extent of media exposure that was generated by this lawsuit.

This core of this case which emanated from an alleged rape is a classic "he said, she said" situation.  The Plaintiff says he did, and the Defendant says he didn't.  There is no empirical evidence to support either side as there weren't any witnesses or no forensic evidence.  The Plaintiff reports she told two friends about the assault within a day or two and the Defendant said it couldn't have happened because he was accompanied at all times by a security person.  The Plaintiff has an explanation why she waited 23 years to go public with the assault and the Defendant reacted to the news with vehement statements of denial.  This lawsuit has a single Cause of Action – Defamation – and it is relating directly to the Defendant's responses and denials of being accused of sexual assault and rape.

In Humphrey's report, she properly disclaims that the Plaintiff's false statements are "alleged" and that the findings, conclusions and opinions she offers in the report are based on that assumption (Page 8, Footnote 20). However, throughout the report, in her background information provided both on the incident and the subsequent actions and words by both parties once the Plaintiff went public, she only presents the "she said" side and not that of the "he said."  As a reporter with the New York Times, I was schooled in the "fair and balanced" code or principle of the journalism profession.  As an expert witness, I believe the "Case Background" section of any report which precedes the expert's conclusions and opinions section should present both sides equally because that provides the reader of the report with of fair, accurate and unbiased information on the matter which the expert has been asked to address. It also provides background, insight, perspective, and context to what occurred and to the litigation.  I have found this to be proper procedure and have followed that in the approximately 50 expert witness reports I have authored in the past 16 years.

Additionally, as noted, while she did disclaim that the false statements were alleged, she possibly tipped her bias towards Carroll at the end of her report when she stated:

3

*"I reserve the right to revisit and supplement this analysis and amend these conclusions should additional information and/or documents become available, such as Mr. Trump's October 12 statement, **reiterating many of the defamatory claims** against Ms. Carroll, in response to a judge's denial of Mr. Trump's request to delay his deposition."*   (Pages 72.73)

## Analysis of Statements

Immediately after Plaintiff Carroll went public with her allegation of sexual assault and rape, between June 21 and 24, 2019, Defendant Trump made a series of statements/comments/opinions denying her accusations. The Plaintiff takes issue with the comments and statements which were disseminated.

In a statement issued by (or on behalf of) Trump on June 21:

- Trump falsely stated that he did not rape Carroll.
- Trump falsely stated that he had never met Carroll.
- Trump falsely implied and affirmatively intended to imply that he had no idea who Carroll was.
- Trump falsely implied and affirmatively intended to imply that Carroll had invented the rape accusation as a ploy for increased book sales.
- Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation to carry out a political agenda.
- Trump falsely implied and affirmatively intended to imply that Carroll invented the rape accusation as part of a conspiracy with the Democratic Party.

On June 22, Trump spoke with reporters and the Plaintiff said he made the following remarks:

- Trump falsely stated that he did not rape Carroll.
- Trump falsely stated that he had no idea who Carroll was.
- Trump stated that she made up the allegation to increase the sales of her book
- Trump stated that she made up the allegation to carry out a political agenda
- That she made up the allegation as part of a conspiracy against him by the Democratic party
- Trump falsely implied and affirmatively intended to imply that Carroll had falsely accused other men of sexual assault.
- Trump falsely implied and affirmatively intended to imply that Carroll had been paid money to invent the rape accusation against him.

On June 24, in an interview with The Hill publication, Trump stated:

- The Plaintiff wasn't his type.
- The assault/rape never happened.

In her report, Humphreys detailed all these allegations (i.e., "she said") but did not provide the Defendant's responses. Following is a list of the allegations individually and the Defendant's words which led to them as well as some comments I would offer. (Note: As an expert, I cannot offer a legal opinion as to whether a statement is defamatory but as a professional communicator, I can provide an opinion or offer context and perspective as to whether it meets the criteria for defamation.)

Following is the list of alleged false statements and/or false implications as cited by the Plaintiff and reported by Humphreys in her report along information related to each and my own observations, comments, or assessment:

4

- <u>Trump falsely stated that he did he did not rape Carroll.</u>

  Comment: There is no evidence that the rape occurred. It cannot be a false statement to deny some action that hasn't been proven to have taken place. In fact, it is more of a defamatory statement for the Plaintiff to have made a statement that it did occur, especially without any evidence of it.

- <u>Trump stated that he had never met Carroll.</u>
- <u>Trump falsely stated that he had no idea of who Carroll was.</u>

Carroll declares that she first met Trump when she was a writer on Saturday Night Live in 1987, then met him at a party in the 1990's and later they waved at each other across Fifth Avenue in 1994 or 1995.

In his June 21, 2019 statement, Trump stated:

> *"I've never met this person in my life."*

In his deposition, Trump responded to this assertion by testifying:

> Q. *When the allegation came out in 2019, you said you – I think it's your testimony that you had no idea who she was.*
>
> A. *I still don't.*

Carroll produced a photograph showing herself talking with Trump at a party as a form of proof that they knew each other. Trump maintains that he was in a receiving line at the party and greeted a number of people which is not an indication he knew her. In his deposition (Page 18, 17-23), he testified:

> Q. *So, if I can understand your testimony, sir, you're saying that at the time you made the statement, you were not aware of ever meeting Ms. Carroll? You have since seen a photograph that shows you with Ms. Carroll on a receiving line; correct?*
>
> A. *Along with a lot of other people. (81 – 17-23)*

Comment: Whether Trump knew her or not is unknowable barring a third person documenting this was true and I have not seen any evidence of that. These could not be false statements unless there is verification that they indeed knew each other. Further, even if it was proven that these were false statements, it is highly questionable that a dispute over whether he knew her or not would cause Carroll reputational harm.

- <u>Trump falsely implied that Carroll had accused other men of sexual assault:</u>

  In his deposition (Page 91, 3-7), Trump did not deny that he made this allegation:

> Q. *Now , in your June 22 statement, you claim that Ms. Carroll had falsely accused other men of sexual assault; correct?*
>
> A. *That's what I heard, yes. (91 – 3-7)*

5

In her deposition, Carroll addressed the subject in her testimony:

> Q. *You also claimed that a girl scout leader sexually abused you every day for a two-week period when you were; is that correct?*
>
> A. *Yes.*                          (Page 161, 6-10)
>
> Q. *How many times in your life have you been sexually assaulted or raped?*
>
> A. *When I was a child, when I was 5, another child, not knowing what he was11doing shoved a stick up my vagina or rock, I can't remember which, so that was an assault when I was 5. At Indiana University on a drive in the country in Brown County, a boy pulled over and I -- he called me a prick tease and so I scooted out and jumped out the car and he caught me and threw me on the ground, got on top of me and pulled out a knife. At a military academy, my friend and I were visiting her parents' friends who I think he was the dean of admissions and a boy threw me on the ground and then chased me through it was called the military -- chased me across the campus with his friends cheering him on. I was thrown on the ground when was by a neighbor's nephew. Luckily the mother and the daughter came out and caught him. Moonves in the elevator*          (Pages 73, 7-25 and 174, 2-9)

Comment: From her own testimony, Trump's implication was true.

- Trump falsely implied that she fabricated the rape allegation to increase book sales.

Specifically, Trump was reported to have said the following:

> *"Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh."* (Trump Statement, June 21, 2019)

In her deposition, Carroll testified (Page 157, 8-11):

> Q. *Did you think it would help sell the book?*
>
> A. *I thought people would be interested.*

Comment: In the above excerpts of their testimony, Trump did not refer to Carroll directly when alluding to selling a book and in her testimony, Carroll implied that people would have interest in the rape charge, which indirectly would could be construed that it would result in an increase in sales. Further, Trump's comment was clearly an opinion and constitutes speculation and supposition.

- Trump falsely implied that Carroll had a political agenda.

Trump addressed this accusation in his deposition. (Page 88, 14-23)

> Q. *Another thing that you say in your June 21 statement is that Ms. Carroll was trying to carry out a political agenda? How did you know she had a political agenda if you didn't know who she was?*
>
> A. *Somebody told me early on that she was somehow aligned with Hillary Clinton.*

6

Comment:  Trump was parroting something that someone told him.  His statement can also be classified as conjecture, speculation and opinion.

- <u>Trump falsely implied that Carroll was conspiring against him with the Democratic Party.</u>

  Trump's actual quote was as follows:

  > *"If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible."* (Trump Statement, June 21, 2019)

  Comment:  Trump was soliciting information and input from others on any connection of Carroll With the Democratic Party and did not make a declarative statement that she was part of a conspiracy.

- <u>Trump falsely implied that Carroll had been paid money to make the rape allegation.</u>
  Trump's actual quote was as follows:

  > *"But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things—that woman were actually paid money to say bad things about me."* (Remarks to media, June 22, 2019)

  Comment:  Trump was generalizing and did not specifically refer to Carroll.  This can also be categorized as an opinion.

- <u>Trump negatively implying she is not appealing to him.</u>

  > *"I'll say it with great respect: Number one, she's not my type."*

  Comment:  This was clearly an opinion.

In summary, after a careful review of all the alleged false statements and negative implications that the Plaintiff claims that Trump made, it is my opinion that none of the statements she identified can be determined as being false and the negative implications are expressions of his opinions which constitute free speech and are protected under the First Amendment of the Constitution.  (This is not meant to be a legal conclusion, just my analysis of them.)

## Reputation and Reputation Damage

As a preface to discussing Humphreys' input relating to the reputation damage to the Plaintiff in this case, it is important to analyze her views on reputations.  Having nearly 50 years of experience "in the field" in terms of addressing the issues of reputation harm and damage, I differ with Humphreys on her concept of what a reputation is and the impact of damage to it.  In her report, she expresses a lot of explanations and opinions relating to reputations and attributes them (through footnotes) to other sources.  (Side note:  I learned many years ago that there is often a significant difference to what you learn in textbooks as opposed to what actually transpires in the "real world.")  Following are some examples of what she wrote in her report relating to reputations and my views on them:

- *"Reputation is fundamentally a social concept; one's reputation is determined by the social esteem held among a bounded group of people, up to and including the public sphere at large.  It has value in the sense that it gives someone social standing and respect in society."*   (Page 11, IIIA)

7

Comment:  She attributed this statement to an excerpt in a book on sociology.  This definition is fine if this case was about someone's reputation being harmed in the community or social circles, but it is not germane in this case where the main thrust of the Plaintiff's grievances relates to the damage to her career or livelihood.  A more appropriate definition of reputation would be that a reputation is the sum of all our actions that is reflected by the people around us in the way they treat us or interact with us. It is an indirect result of anything and everything that we do.  Successful people have always stressed on the building and maintaining of reputation as a fundamental ingredient to success.  This distinction is important in relation to the claims made by Carroll against Trump.

- *"A person brand that has a general popular following can be especially harmed by negative claims, even if only a subset of the public believes the claims.* (Page 4, A)

  Comment:  To the contrary, a person who has an established positive brand and developed a reservoir of good will (e.g., Carroll) which can withstand attacks especially when coming from someone as controversial as Trump.  It's the one no one knows that is most hurt because they have a "clean slate" where the negative input has no counterbalance.

## Reputation Harm to Plaintiff

Throughout her report, Humphreys offers extensive observations, comments and opinions regarding the reputation harm that Carroll suffered from Trump's statements, comments and assertions.  She discusses in great length how her "person brand" had been damaged resulting in people perceiving Carroll as being untrustworthy and someone that can't be believed.  This is reflective of Carroll's assertions in her lawsuit what Trump's remarks caused a significant decrease in letters for advice she was receiving at Elle Magazine and led to her eventual dismissal from the magazine.  Both were debunked by Carroll in her deposition through her own testimony.  On the issue of receiving less letters from public awareness of the alleged rape:

Q.  *Did you -- were you told in any of these letters or did you get any information from the outside that they were going down because of your article or was this just your perception?*

A.  *No, it was my perception…*  (Page 216, 3-8)

On being terminated by Elle because of the Trump alleged rape exposure:

Q.  *Did someone from Elle tell you that?*

A.  *No, they would never admit it.*  (Page 178 9-11)

Q.  *And at the bottom of this article do you see that it says in the last paragraph on the first page in response to a list of questions sent by The New York Times, a Hearst spokeswoman e-mailed the statement, quote, E. Jean Carroll was long a beloved voice in the pages of Elle. The decision not to renew her contract was a business decision that had nothing to do with politics, it said. Do you see that?*

A.  *Yes*                         (Page 183, 10-21)

Similarly, the Plaintiff, in her Complaint, states that that Trump's statements and comments constituted Defamation Per Se (which was not listed as a Cause of Action).  Under New York law, Defamation Per Se is defined by the following criteria:

8

- Statements charging a Plaintiff with a serious crime.
- Statements that tend to injure another in their trade, business, or profession.
- Statements imputing a loathsome disease on a Plaintiff.
- Statements imputing unchastity on a woman.

Trump's comments and opinions did not accuse her of a serious crime, having a loathsome disease or being unchaste. He also did not say anything negative about her professional capability or career.

## Reputation Repair Program

Following is my analysis and comments on the Reputation Repair Program advocated and advanced by Humphreys.

### Preface

Humphreys expert report is extremely impressive in terms of the quality and quantity of the information, the research and statistics she advances, her thought processes and her attention to detail. Unfortunately, nowhere in her report is it more evident that she doesn't have the background, experience, knowledge, or insight into matters relating to reputation damage or repair than in the presentation of her reputation damage repair program. Humphreys' self-stated expertise is in advertising, marketing, social media and digital communications. The orientation of these is all primary geared to promotion and advancing positive content. Promoting someone or something as opposed to overcoming and reversing negative impressions, images and reputations are two different worlds. This is evident in aspects of her proposed program, from conception to the budget. Following is my analysis and my thoughts on her program.

### Type of Program

In describing the type of program that would be needed to repair the reputation of Carroll, Humphreys stated:

> "A holistic, _**integrated**_ campaign is needed to effectively create attitudinal change and in turn repair reputational damage" (Page 5, H)

However, this is not what she is proposing. Later she clarifies it to state the following:

> "A holistic _**social media**_ campaign that includes these integrated elements is therefore the most effective way to repair reputational damage in this case." (Page 186, 65i)

Note the "integrated" reference in the first quote is actually related to a social media campaign - not a diverse. Multi-faceted communications campaign – as defined in the second quote. Humphreys' background and expertise is largely concentrated with the internet and social media. The vast majority of her program is linked to both, at the near exclusion of other channels of communication. In her report, she states:

> "Reputational repair is a matter of public good and must occur in relation to the public sphere and the sphere in which it was originally damaged." (Page 12, i)

The initial damage was from widespread news coverage as traditional media had a field day with the news of the alleged rape. That was the genesis of the negative exposure, not social media. She also states in her report:

> "The public in which the reputational harm originally occurred persists on social media and may have limited exposure to traditional media." (Page 47, 15)

9

This may be true, but conversely, there are a great amount of people (e.g., senior citizens, technologically-challenged people) that are not on the internet (except maybe for e-mails). Having almost the entire program geared to online exposure is equivalent to "putting all your eggs in one basket." The most successful type of communications program features dissemination of information through multiple communications channels.

(Side note:  A good analogy is Custer at the last stand. There were 2,000 Indians to his 196 soldiers. He was not defeated because they outnumbered him. The massacre occurred because they surrounded him. If they came from one direction, they could have escaped by going the opposite direction. The theory is the same in communications, don't use one channel of communications, use a variety to ensure the message is received.)

In her report Humphreys herself gave two other reasons why it would be important to put a major focus on traditional news media instead of strictly social media:

> *"Since the news broke in June 2019, these same news publications have continued to cover the story, which has extended the effect of Mr. Trump's Statements further into the present day."* (Page 50, iv)

In short, she has made her own case for making a public relations program targeted to free media exposure an integral part of the program as opposed to dwelling almost solely on internet exposure and social media.

However, Humphreys appears to have a negative view of traditional news media as evidenced by this comment:

> *"Secondly, trust in traditional media has declined across the ideological spectrum.  Whereas legitimate sources of news once went unquestioned, assessing trust of the source is now a primary concern of users when assessing claims…"*  (Pages 22-23, Ci)

(Side note:  Somewhat ironically, it is Trump and conservatives that have the most distrust of traditional media, often labeling reports as "false news.")

It also important to note that internet exposure (and even media exposure) is a form of "indirect" communications meaning that the receiver is not getting the message directly from the sender.  The most effective form of communications is "direct" contact.  There are many ways to do this (e.g., direct verbal conversations, letters, emails, speaking engagements, appearance at events) and it does not appear that any form of direct communications is in Humphreys' program.

Target Audiences

While she doesn't clearly define her audience, it would appear she is targeting the public in general, including those who were exposed to Trump's alleged negative comments about Carroll.  Thus, her detailing of the importance of "impressions" being received by people multiple times to be effective.  This is standard promotional advertising and marketing "language."  There are aspects related to who would be receiving the program's messages and how they would interpret them that I'm not sure she is factoring in.

- Trump is a highly visible, famous and well-known person who is also highly controversial and generates extreme passions in people one way or the other.  There is no "gray area" in people's views of him, it's all black or white.  Therefore, you aren't going to change the negative comments or opinions he had about Carroll because recipients of them will have believed them or not when hey were first heard.

- Carroll also is a public figure, known by many people.  She has also, for the most part, has long had a positive image that she has cultivated.  Humphreys addressed that herself in her report:

> *"Once a popular advice columnist at Elle Magazine, Ms. Carroll had invested many years in forming and maintaining a person brand as a wise, personable, and insightful truthseeker. As a celebrated writer, she had a broad readership, reaching about 4.5 million Elle readers."*
> (Page 4, B)

Therefore, Carroll's long standing positive image would possibly offset most of his derogatory remarks.

- In her report, Humphreys states the following in reference to what segment of the public who were exposed to Trump's comments about Carroll would be prone to believe them:

  > *"In an attempt to quantify at least a portion of the impact these Statements had on Ms. Carroll's brand....an average of 25.45% of the impression recipients were likely receptive to Mr. Trump's message."*   (Page 5 F)

  In effect she is stating that only 25.45% of the people exposed to his comments would believe them.

- If only basically 25% would believe Trump, that leaves 75% of the public who could be impacted.

- If you reasonably assume that at least 50% wouldn't believe anything he said, you are left with a very small percentage that you would have to reach to counteract his negative comments about Carroll.

- Also factor in that they may not have heard his comments and/or did but didn't know (or care) who Carroll was and therefore there was no harm to her.

- Trump is controversial and often bombastic.  This would make it less likely some people would believe him.

- Trump's previous admissions of sexual inappropriateness would also lessen people's belief in the negative statements, comments or opinions he had of Carroll.

11

**Summary of Conclusions and Opinions**

A general summary of my conclusions and opinions are as follows:

- Humphreys is an accomplished and aware-winning university professor who is an expert and appears to have significant and extensive expertise in advertising, marketing, market growth, social media and digital communications.

- While she most likely has background and experience in creating and building a reputation, there is no evidence that she has any background, experience or expertise in reputation management, damage and repair – which is reflected in her report - and that is essential to this case.

- Her report is very impressive and very professional but her strategy, approach and recommendations for the program she proposed are inappropriate and not suitable for a reputation damage repair program.

- She doesn't seem to understand the dynamics of who Trump is and how his comments and opinions would be received by diverse and polarized audiences and how that would factor in both how his messages would be received and how best to combat them.

**Report Disclaimer**

The views, conclusions and opinions stated in this report are based on information and input related to this case that I have received to date.  Based on receiving additional documents or information (e.g., legal filings, expert reports, depositions or hearing transcripts, records, communications, data) that may be made available to me in the future, I would reserve the right to either add to, change and/or expand on the scope of what I have offered in this report.

Robert J. Fisher                                                NOVEMBER 14, 2022
                                                                Date

12