# EXHIBIT A

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                 Plaintiff,              New York, N.Y.

         v.                              22 Civ.10016 (LAK)

DONALD J. TRUMP,

                 Defendant.
------------------------------x          Jury Trial

                                         April 25, 2023
                                         9:55 a.m.

Before:

                 HON. LEWIS A. KAPLAN,

                                         District Judge
                                             and a Jury


                      APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant
```

1   whatever he wanted to.

2          Donald Trump has said:  I've never met E. Jean

3   Carroll.  I never went to Bergdorf's.  She's not my type.  As

4   the evidence will show, these are lies, and they are just some

5   of the lies that you will hear from Donald Trump throughout

6   this trial.

7          I am going to sit down in a minute, but before I do, I

8   want to say a word about what you are going to be asked to

9   decide at the end of this trial, once you have heard from all

10  of the witnesses and the evidence is in.  As Judge Kaplan told

11  you and as he will explain in more detail before you

12  deliberate, Ms. Carroll brought two claims against Donald

13  Trump, so there will be two claims that you need to decide.

14         The first claim, as Judge Kaplan described, is for

15  what's called battery, and that has to do with what happened in

16  the Bergdorf Goodman dressing room back in 1996.  I expect that

17  Judge Kaplan will instruct you that battery covers a range of

18  conduct, from forcibly grabbing or groping someone without

19  their consent to rape.  If you find that Donald Trump did any

20  one of those things, he is liable for battery.

21         Ms. Carroll's second claim, as Judge Kaplan said, is

22  for defamation.  That has to do with the harm that Donald Trump

23  did to Ms. Carroll's reputation and good name.  The key

24  question for that claim is whether Trump was lying in that

25  October 2022 Truth Social post that you saw, whether he was

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     E. JEAN CARROLL,
 3
                     Plaintiff,              New York, N.Y.
 4
               v.                            22 Civ.10016 (LAK)
 5
     DONALD J. TRUMP,
 6
                     Defendant.
 7   ------------------------------x         Jury Trial

 8                                           April 26, 2023
                                            10:10 a.m.
 9
     Before:
10
                         HON. LEWIS A. KAPLAN,
11
                                            District Judge
12                                              and a Jury

13
                            APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  MICHAEL T. MADAIO

24
     W. PERRY BRANDT
25        Attorney for Defendant
```

```
1    to Bergdorf's?

2    A.  I am guessing that it was a sale.

3    Q.  Do you recall sitting here today?

4    A.  No.

5    Q.  Did you buy anything that day?

6    A.  I don't think I did because I didn't have carrier bags with

7    me.  I didn't have shopping bags.

8    Q.  Do you recall how long you were in the store?

9    A.  No.

10   Q.  When did you first see Mr. Trump that day?

11   A.  I was leaving the store, and I was exiting the 58th Street

12   entrance, and I was just about to go out the door.  He was

13   standing on the other side of it and put up his hand.

14   Q.  You're putting up your hand to indicate what, Ms. Carroll,

15   so it's clear?

16   A.  It's universal signal for stop.

17   Q.  What did you do?

18   A.  I stopped.

19   Q.  What happened next?

20   A.  And he came through the door and he said, hey, you are that

21   advice lady.

22   Q.  How did you respond?

23   A.  I said, hey, you're that real estate tycoon.

24   Q.  What was your impression of Donald Trump at that time when

25   you saw him at Bergdorf's?
```

1   A.  Very personable, engaging.

2   Q.  What happened after you said, hey, you're that real estate

3   tycoon?

4   A.  He said, I need to buy a gift, come help me.  Come help me.

5   Come advise me.

6   Q.  Did you agree?

7   A.  I was delighted.

8   Q.  Why?

9   A.  Well, it was such a funny New York scene.  I'm a born

10  advice columnist.  I love to give advice, and here was Donald

11  Trump asking me for advice about buying a present.  It was a

12  wonderful prospect for me.

13  Q.  Who was he shopping for, if you know?

14  A.  I asked him.  I said:  Who is it for?  He said:  A girl.

15  And then I asked him, trying to figure out who it would be:

16  How old is she?  And he replied with:  How old are you?

17  Q.  What did you say?

18  A.  I said 52.

19  Q.  How did he respond?

20  A.  He said:  You are so old.

21  Q.  Was that in a fresh way or in a sort of teasing way?

22  A.  No.  It was humorous the way he said it.

23  Q.  What did the two of you do next?

24  A.  At the time, in '96, the little circular alcove we were

25  standing in had displayed three or four handbags, which were so

1  beautiful and such works of art I thought, wow, any girl would

2  love one of these handbags.  But he didn't like the idea of a

3  handbag.  So we went -- we turned to the left, went walk

4  through the first floor to the hats.  I thought a hat would be

5  great, and she is going to love a hat.

6  Q.  As far as you were able to tell -- what floor of Bergdorf

7  were you on at this point?

8  A.  First floor.

9  Q.  As far as you were able to tell, did anyone recognize you

10 or Mr. Trump?

11 A.  There was a shopper.  She was tiny, because I remember her

12 staring up at him in awe.  She recognized him.  He was very

13 pleasant.

14 Q.  Anyone else?

15 A.  There was a sales attendant, and she was also very pleased

16 to see him.  He was pleased to see her.

17 Q.  What, if any, words did they exchange?

18 A.  I think he said hello, how are you doing, how are you.

19 Q.  What happened after hats?

20 A.  He was holding -- he picked up a hat that was a fur hat and

21 he was petting it like a little cat or a dog.  And as he was

22 petting it he said, I know, lingerie.

23 Q.  Lingerie meaning underwear?

24 A.  Yes.

25 Q.  Where was the lingerie -- the lingerie section, I guess, in

1   the store?  Where was that located?

2   A.  I didn't know where it was.  I do now know where it is.

3   But he led the way to the escalator, and we started to go up

4   the escalator.

5   Q.  What floor do you recall lingerie being on at that time?

6   A.  Six.

7   Q.  Was there anything sort of discomforting to you about the

8   fact that Mr. Trump had proposed the lingerie?

9   A.  No.  By this time -- first of all, he was very talkative.

10  In the escalator he talked about how great Bergdorf's was.  At

11  one time he was thinking of buying Bergdorf's.  I was

12  absolutely enchanted -- I could only think of it as a scene,

13  such a great story, so I was delighted to go to lingerie with

14  him.

15  Q.  Were you chatting --

16  A.  Yes.  He was very funny, yeah.

17  Q.  Do you recall what the two of you were discussing as you

18  made your way to the lingerie area?

19  A.  He was talking about Bergdorf's.  I don't remember

20  precisely.

21  Q.  What was the tone of the conversation?

22  A.  Very joshing and light.

23  Q.  Who, if anyone else, in the store did you see as you rode

24  up to the lingerie area?

25  A.  I wasn't looking.  I was watching him and watching that I

1    Q.  In your mind, at the time, Ms. Carroll, had things --

2    withdrawn.

3         Had you been flirting sort of much this time with

4    Mr. Trump?

5    A.  Yeah.  I was flirting the whole time, probably.

6    Q.  At this point now, when Mr. Trump has proposed going to the

7    dressing room, have things escalated in your mind?

8    A.  The comedy was escalating, and I thought it was getting

9    funnier and funnier.

10   Q.  Did you ever think about saying, no, I'm not going in?

11   A.  No.  It didn't occur to me.  I didn't really think about

12   going into the dressing room.  I thought of it as sort of an

13   open area.  I thought the door was open, we walked in.  I

14   didn't picture anything about what was about to happen.  Didn't

15   picture it.

16   Q.  What happened once you -- first off, was the dressing room

17   open or closed?

18   A.  The door was opened.  That open door has plagued me for

19   years because I just walked into it, just walked in.

20   Q.  Let's take it one step at a time.  What happened once you

21   entered the dressing room?

22   A.  He immediately shut the door and shoved me up against the

23   wall and shoved me so hard my head banged.

24   Q.  What were you thinking at that moment?

25   A.  I was extremely confused and suddenly realizing that what I

 1   A.  I remember him being -- he was very large, and his whole

 2   weight came against my chest and held me up there, and he

 3   leaned down and pulled down my tights.

 4   Q.  What, if anything, were you doing while that was happening?

 5   A.  I was pushing him back.  It was quite clear that I was not

 6   going -- I didn't want anything else to happen.  It was quite

 7   clear.  I pushed him back.  This arm was pinned down.  This arm

 8   had my purse.  Trying to get him back.

 9   Q.  At any point during this encounter, do you recall saying

10   no?

11   A.  No, I don't recall saying it.  I may have said it.

12           MR. FERRARA:  Just one moment, your Honor.

13   Q.  At any point during this encounter did you scream?

14   A.  I don't remember screaming.  I'm not a screamer.  I'm a

15   fighter.  I'm much more physical than I am vocal.

16   Q.  What about his head?  What is happening?

17   A.  His head was beside mine breathing.  First, he put his

18   mouth against me.

19   Q.  Do you mean he kissed you?

20   A.  Yes.

21   Q.  Did you kiss him back?

22   A.  No.  I didn't consider it a kiss.  It was such -- it was a

23   shocking thing for him to suddenly put his mouth against mine.

24   I thought what.  What.  What.  No.

25   Q.  Do you think -- based on what you were experiencing, do you

1  believe that if someone had been nearby, they would have been

2  able to hear what was happening in the dressing room?

3  A.   They would have heard the head hitting and definitely would

4  have heard me laughing.

5  Q.   You described Mr. Trump as a -- you described Mr. Trump as

6  sort of, I think, larger than you?

7  A.   Yeah.

8  Q.   Do you recall approximately what the difference or how tall

9  are you?

10  A.   At the time I was five-nine.  Because I'm 79, I have sort

11  of all compacted down due to gravity, but at the time I was

12  five-nine.  I was wearing four-inch heels.  So it put me about

13  level with Donald Trump, who I think is six-two.  I was

14  six-one.  And I weighed at the time about 120, and I believe he

15  weighed about 100 more pounds.

16  Q.   Were you afraid while this was happening?

17  A.   I was in -- this is going to sound strange.  I was almost

18  too frightened to think if I was afraid or not.  I was

19  stamping.  My whole reason for being alive in that moment was

20  to get out of that room.

21  Q.   How were you trying to accomplish that?

22  A.   Stamping and trying to wiggle out from under him.  But he

23  had pulled down my tights and his hand went -- his fingers went

24  into my vagina, which was extremely painful, extremely painful.

25  It was a horrible feeling because he curved, he put his hand

1   inside of me and curved his finger.  As I'm sitting here today,

2   I can still feel it.  It was --

3   Q.  Then what happened?

4   A.  Then he inserted his penis.

5   Q.  What did you do in that moment?

6   A.  I tried --

7   Q.  Do you need a moment, Ms. Carroll?

8   A.  You asked me what I did in that moment.  I always think

9   back to why I walked in there to get myself in that situation,

10  but I'm proud to say I did get out.  I got my knee up.  I got

11  my knee up and pushed him back.

12  Q.  Was anything in your hands?

13  A.  My handbag.

14  Q.  Why were you holding your handbag?

15  A.  I have no idea.

16  Q.  I want to be -- I want to make sure I understand it.

17         How were you able to -- were you able to see what

18  Mr. Trump was doing with his hand, or are you telling us what

19  you experienced sort of physically by feeling it?

20  A.  He was against me, his whole shoulder -- I couldn't see

21  anything.  I couldn't see anything that was happening.  But I

22  could certainly feel it.  I could certainly feel that pain in

23  the finger jamming up.

24  Q.  How long was your dress?

25  A.  Mid knee.  Mid knee.

 1    Q.  Where were Mr. Ailes' studios in relation to your studio --

 2    or set?  Let me --

 3    A.  Sets.  They kept Roger's set on the sets -- we -- many of

 4    the shows use the same studio, so they break the sets between

 5    shows and then put them up.  Roger had -- he did live shows in

 6    New Jersey and he did live shows also in New York.  So we ran

 7    into each other almost every day in Fort Lee.

 8    Q.  When you say "we," who do you --

 9    A.  Roger and I.

10    Q.  Do you recall ever seeing Mr. Trump on Mr. Ailes' set?

11    A.  No.

12    Q.  And do you recall -- sitting here today, Ms. Carroll, do

13    you know when exactly that interview was filmed or aired?

14    A.  I have a pretty good idea.

15    Q.  When do you think that was filmed or aired?

16    A.  Well, whenever that big parade was.

17    Q.  Okay.  So let's -- so thank you for just going back to

18    that.

19         Let's come back, though, now to where we were, sort of

20    where we had left off before lunch.

21         I think we had finished discussing the assault and

22    sort of your immediate steps that you took.  Looking sort of

23    further out, have you had a romantic relationship since the

24    assault?

25    A.  No.

1    Q.   Why not?

2    A.   I -- the short answer is because Donald Trump raped me.

3    Q.   How did that affect you in a way -- can you describe for

4    the jurors why that assault left you unable to form a romantic

5    connection?

6    A.   What I did was I flirted with Donald Trump.  I laughed with

7    him.  I tried to be -- tried to engage him.  I laughed at his

8    jokes.  I found him charming.  And what happened to me when I

9    was flirting?  I got into serious trouble.  And so I, after

10   that event, I found it's impossible for me -- if I meet a man

11   who is a possibility, it's impossible for me to even -- well,

12   to even look at him and smile.  And in order to fall in love or

13   have dinner with someone, you've got to at least look at them

14   in the eye and smile, and I couldn't -- I couldn't force myself

15   to show a man that I liked that I liked them.  I couldn't do

16   it.  It just led to terrible consequences, hence, I didn't meet

17   anybody.

18   Q.   I'm sorry to ask this so directly, but have you had sex

19   since Donald Trump assaulted you?

20   A.   No.

21   Q.   This person you just described to us as sort of having shut

22   down, is that how you portrayed yourself on television

23   following the assault or in public appearances?

24   A.   No, I have a, I have a, I have a public self, which is

25   vibrant and wanting to help everyone, and always, always upbeat

1     MR. TACOPINA:  I'm sorry.  I really just don't --

2     THE COURT:  Sustained.

3     MR. FERRARA:  I will withdraw that question.

4  BY MR. FERRARA:

5  Q.  How do you feel about not having been in a relationship

6  since the mid '90s?

7  A.  I feel I have lost out.  I'm sorry.  I am a happy person

8  basically, but I'm aware that I have lost out on one of the

9  glorious experiences of any human being.  Being in love with

10  somebody else, making dinner with them, walking the dog

11  together.  I don't have that.  I am -- and just cuddling on the

12  sofa, watching TV, and eating popcorn.  I am aware of how much

13  I have lost and I feel, here's the thing, I feel like I should

14  be able to overcome it.

15  Q.  I want to come back to your second marriage to Mr. Johnson,

16  John Johnson.  Was there violence in that relationship?

17  A.  Yes.

18  Q.  What kind of violence?

19  A.  Well, we were -- it was a very passionate marriage, very

20  passionate, very hot, very tempestuous, lots of fun, I mean, we

21  would laugh so hard I would literally fall out of my chair.

22     But on the flip side of that is we argued.  We were

23  dog and cat.

24  Q.  Was there violence?

25  A.  Yes.

1   A.  Because he -- Cam didn't -- it was not violent.

2   Q.  Has -- sorry?

3   A.  The incident in Bergdorf's was very violent.

4   Q.  I want to -- for clarification, was the -- you mentioned

5   William Goldman.  Was your relationship with William Goldman

6   before or after Mr. Trump assaulted you?

7   A.  Before.

8   Q.  Have you ever been diagnosed with any mental health

9   conditions such as PTSD or depression?

10  A.  No.

11  Q.  Have you taken any medication for depression or anxiety?

12  A.  No.

13  Q.  Are you a happy person, Ms. Carroll?

14  A.  I am a happy person.  I know it seems strange to hear me

15  after today, but I'm basically a happy person.  But I think I

16  could work on a few things.

17  Q.  How often, if at all, do you think about the assault that

18  night at Bergdorf's?

19  A.  Well, that very night the visions would wash over me.  I

20  couldn't -- it was horrible.  Not only did it happen in

21  Bergdorf, but it happened over and over and over in my mind

22  because I did not have the ability to strike to get the visions

23  out of my head.

24          As I learned to deal with the sudden intrusions, I got

25  better and better at moving them aside.  And so they -- I've

1  had them ever since the attack.  They were more frequent right

2  after the attack and they stayed about -- I had -- I would be

3  going about my normal day, I would be walking the dog, I would

4  be hiking on -- hiking, and suddenly up would come the vision.

5  Those types of intrusions happened regularly.  I didn't know

6  when they would come, I didn't know when to expect them, but

7  they would absolutely take over my brain.  I would move them

8  aside.  So that was fairly frequent.

9  Q.  Can you give the jurors a sense or examples of what -- what

10  would you see?  What does a vision sort of look like?

11  A.  Just recently, I pulled over to the side of the high -- of

12  the road on my way home because it was late and I thought I

13  would rest my eyes and just take a quick nap.  I closed my

14  eyes.  I must have fallen asleep.  Because when I woke, I felt

15  Donald Trump again on top of me, his huge -- I thought for a

16  minute I was going to die because I couldn't breathe.  That's

17  the sudden, horrible kind.

18          But normally I would be cooking pasta or just going

19  about my normal day, and in would slide just a picture of him

20  going like this into the dressing room or hitting my head or

21  feeling his fingers jammed up inside of me and then with effort

22  I could move those out of my mind.  I think everybody has

23  visions coming up.

24  Q.  Were there specific -- are there specific things, were

25  there specific things that triggered these visions?

N4RMCAR2

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                  Plaintiff,              New York, N.Y.
4
           v.                             22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                  Defendant.
7  ------------------------------x        Jury Trial

8                                         April 27, 2023
                                          10:50 a.m.
9
   Before:
10
                       HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                          and a Jury

13
                          APPEARANCES
14
   KAPLAN HECKER & FINK LLP
15      Attorneys for Plaintiff
   BY:  ROBERTA A. KAPLAN
16      MICHAEL J. FERRARA
        SHAWN G. CROWLEY
17      MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19      Attorneys for Defendant
   BY:  JOSEPH TACOPINA
20      CHAD D. SEIGEL
        MATTHEW G. DeOREO
21
22  HABBA MADAIO & ASSOCIATES, LLP
        Attorneys for Defendant
23  BY:  MICHAEL T. MADAIO

24
   W. PERRY BRANDT
25      Attorney for Defendant

1    Q.  Why did you agree in the first place?

2    A.  I was a big admirer of Ivy's work.

3    Q.  Why did you stop filming?

4    A.  Because this lawsuit became very important, and Ivy and I

5    decided together, we should cease.

6    Q.  Have you received any payments for that documentary?

7    A.  No.

8    Q.  I want to call your attention -- I think this is sort of

9    the last topic.  I want to call your attention to October of

10   2022.

11   A.  Yes.

12   Q.  Do you recall, what, if any, additional relevant statements

13   did Donald Trump make at that time?

14   A.  Just when I had managed to get my Substack up and running,

15   get my career a little bit back and feeling that things were

16   going to be OK, Donald Trump posted on social media every

17   single thing that I was suing him for.  He repeated it on

18   October 12 and then added the fact that he thought the justice

19   system in America was broken, and one of the prime examples of

20   the justice system being broken was my suing him.

21   Q.  Let me show you what has been marked for identification as

22   Plaintiff's Exhibit 4.

23         Do you recognize this?

24   A.  Yes.

25   Q.  What is it?

1   keep moving.

2   Q.  Are you on Truth Social, Ms. Carroll?

3   A.  Yes.

4   Q.  How did you find out about this statement?

5   A.  I heard from several people that he had posted it.

6   Q.  How, if at all, do you believe this statement affected your

7   reputation?

8   A.  I really thought I was gaining back a bit of ground.  I

9   thought, it's starting to go and I felt, you know, happy that,

10  you know, I was back on my feet, had garnered some readers, and

11  feeling pretty good, and then, boom, he knocks me back down

12  again.

13  Q.  Were you surprised by the statement?

14  A.  Stunned.

15  Q.  Why?

16  A.  Because I'm suing him for saying these very things.

17  Q.  In light of Mr. Trump's October 22 statement, did you file

18  a second lawsuit?

19  A.  Yes.

20  Q.  Is that second lawsuit why we are here today?

21  A.  Yes.  This is why we are here.

22  Q.  What did you sue him for in the second lawsuit?

23  A.  I sued him for defamation of character.

24  Q.  Anything else?

25  A.  Yes.  I also sued him for assault.

1    Q.   Why didn't you sue him for assault in the first lawsuit?

2    A.   Because the time period allowed was -- it had passed, and I

3    could not do it.

4    Q.   What happened that allowed you to do it -- to sue him for

5    assault in the second lawsuit?

6    A.   The state assembly and the state senate passed what they

7    called the Adult Survivors Act, and it gave survivors of sexual

8    assault, sexual abuse, sexual harassment a one-year window to

9    come forward and bring suit against the people.

10   Q.   Had you advocated for passage of that law?

11   A.   Yes.

12   Q.   Why.

13   A.   Because I understand why women, particularly, and some men

14   do not come forward and tell what happened.  It takes sometimes

15   years to get the courage to face the person who hurt you, if at

16   all.  It takes years.  And some maturity and some age.  It

17   takes -- there are many people, reasons why people don't report

18   it, and this act gives us a chance to be heard.

19   Q.   What, if any, I'll call it sort of public response did you

20   experience after Mr. Trump made his October 2022 statement?

21   A.   It was not very nice.

22   Q.   What do you recall?

23   A.   Just a wave of slime.  It was very seedy comments, very

24   denigrating.  Almost an endless stream of people repeating what

25   Donald Trump says, I was a liar and I was in it for the money,

1    can't wait for the payoff, working for the democrats, over and

2    over.  But the main thing was way too ugly.  It is very hard to

3    get up in the morning and face the fact that you're receiving

4    these messages you are just too ugly to go on living,

5    practically.

6    Q.  Let me show you what has been marked for identification as

7    Plaintiff's Exhibit 45.

8            Do you recognize this, Ms. Carroll?

9    A.  Yeah.  I think it was -- it appeared -- yeah.

10   Q.  What is it?

11   A.  It's a tweet.

12   Q.  What is the date?

13   A.  October 13.

14   Q.  Of what year?

15   A.  2022.

16   Q.  Is your name mentioned?

17   A.  I guess that is me.

18           MR. FERRARA:  Your Honor, plaintiff offers 45.

19           THE COURT:  Received.

20           (Plaintiff's Exhibit 45 received in evidence)

21           MR. FERRARA:  Mr. Lam, we can publish this for the

22   jurors.  Thank you.

23           If we just focus on the tweet in the upper left, the

24   sort of main tweet.

25   Q.  Ms. Carroll, this was the day after Mr. Trump's statement?

1    give you a specific date of the alleged incident, either,

2    right?

3    A.  No.

4    Q.  They couldn't.

5    A.  No.

6    Q.  You couldn't.

7    A.  No.

8    Q.  No one.

9    A.  I wish to heaven we could give you a date.  I wish we could

10   give you a date.

11   Q.  In fact, they couldn't even tell you the year, whether it

12   was 1995 or 1996?

13   A.  Oh, no, no.  Lisa believes that because she published a

14   sort of a bombshell *New York* magazine piece about Mar-a-Lago

15   being opened as a club and Donald Trump had personally invited

16   Lisa to come down to do the story of the opening of the club,

17   *New York* magazine published it February -- in February.  I'm

18   not quite sure of the date.  Lisa believes she never would have

19   accepted that assignment if it had happened before she went

20   down to Florida.  So that places it definitely in 1996.

21   Q.  Okay.  And certainly you or them couldn't tell you whether

22   it was the fall or the spring.  You have testified to that?

23   A.  No, Lisa believes that it was in the spring of '96 because

24   of the *New York* magazine articles.  She swears up and down that

25   she would never go if she had heard about what Trump did to me

1  Q.  It's your testimony that when Donald Trump, this big and

2  heavy man, lunged at you and banged your head against the wall

3  so hard it hurt, you still didn't think it was serious at that

4  point?

5  A.  I was trying to figure out what the hell was going on.

6  This is a man.  This is Donald Trump.  I thought I knew him.

7  We had just been laughing 12, 15 seconds before.  And here I am

8  being pushed up against the wall.  I had no idea.  It took me

9  several seconds to process what the heck was going on.  It

10  didn't make any sense.  It didn't make any sense at all.

11         Then he put his mouth against mine.  Then I

12  understood.  OK.

13  Q.  In fact, you viewed what went on in that dressing room as a

14  fight.

15  A.  Yes.

16  Q.  In fact, in response to this supposedly serious situation

17  that you viewed as a fight, where you got physically hurt, it's

18  your story that you not only didn't scream out, but you started

19  laughing?

20  A.  I did not scream.  I started laughing.  That is right.  I

21  don't think I started laughing.  I think I was laughing going

22  into the dressing room, and I think I laughed pretty

23  consistently after the kiss to absolutely throw cold water on

24  anything he thought was about to happen.  Laughing is a very

25  good -- I use the word weapon -- to calm a man down if he has

1   any erotic intention.

2   Q.  According to you, after Donald Trump had you against the

3   wall, he pulled your tights down?

4   A.  Yes.

5   Q.  It's your story that at some point you felt his penis

6   inside of you?

7   A.  Yes.

8   Q.  But before that, it's your sworn testimony that you felt

9   his fingers, what you said was rummaging around your vagina?

10  A.  It's an unforgettable feeling.

11  Q.  Now, when you say rummaging around your vagina, that's

12  different than inserting a finger inside your vagina.

13  A.  At first he rummaged around and then he put his finger

14  inside me.

15  Q.  In your book you wrote that he was forcing his fingers

16  around my private area and then thrust his penis halfway

17  completely, I'm not certain, inside me.  Is that accurate?

18  A.  Yes.

19  Q.  And this attack or this fight, based on your word, this

20  fight that you were in, could have taken as long as three

21  minutes?

22  A.  From entering the dressing room to my leaving it, I don't

23  think it could be any more than three minutes.  I may be wrong.

24  I didn't have a stopwatch, but it was about three minutes.

25  Q.  Even though you understood you were in the middle of this

1    supposed battle, you never screamed at Donald Trump or screamed

2    for help?

3    A.  I'm not a screamer.

4    Q.  You said that yesterday, I'm not a screamer, right?

5    A.  I'm not a screamer.  Here is the thing.  I was too much in

6    a panic to screech.  I was fighting.

7    Q.  When you're fighting and being sexually assaulted and

8    raped, because you are not a screamer, as you describe it, you

9    wouldn't scream?

10   A.  I'm not a screamer.  You can't beat up on me for not

11   screaming.

12   Q.  I'm not beating up on you.  I'm asking you questions,

13   Ms. Carroll.

14   A.  No.  Women who come forward, one of the reasons they don't

15   come forward is because they are always asked why didn't you

16   scream.  Some women scream.  Some women don't.  It keeps women

17   silent.

18   Q.  And, according to you, this attack wasn't taking place in

19   some secluded place in the middle of nowhere in a forest.  That

20   was in a crowded department store in New York City.

21   A.  Yes.  Not crowded, though.

22   Q.  Right.  The inconceivable part, right?

23              MR. FERRARA:  Objection, your Honor.

24              THE COURT:  Sustained.

25   Q.  When you spoke with Dr. Lebowitz after filing your lawsuit,

N4RMCAR4                        Carroll - Cross

1     you were still trying to come up with an explanation for your

2     story as why you did not scream.

3     A.   I wasn't coming up with a story.  It's usually -- I would

4     say more than usually under discussion when a woman is raped

5     and she doesn't scream.  It's usually discussed, why didn't she

6     scream.  Why didn't you scream, E. Jean?  Why didn't you

7     scream?  It's what a woman -- you better have a good excuse why

8     you didn't scream.  Because if you didn't scream, you weren't

9     raped.  I'm telling you, he raped me, whether I screamed or

10    not.

11    Q.   You need a minute, Ms. Carroll?

12    A.   No.  You go right on.

13    Q.   Aside from you not being a screamer, another reason you

14    gave for possibly not screaming was because you were wondering

15    if the pressure Donald Trump's shoulder placed against your

16    chest interfered with your ability to scream, correct?

17    A.   It could be.  I don't need an excuse for not screaming.

18    Q.   OK.

19          Despite that, you certainly wish your story included

20    you having screamed?

21    A.   Of course I do.  More people would have believed me if I

22    had screamed.

23    Q.   Aside from not being a screamer, and perhaps his chest was

24    interfering with your ability to scream, along the same lines

25    at some point you prepared a list of questions -- list of

N4r2Car5                    Carroll - Cross

1    BY MR. TACOPINA:

2    Q.  So that's a question that you anticipate being asked and

3    that question was why didn't you scream?

4    A.  Right.

5    Q.  And you wrote down "too much adrenaline powering through me

6    to think to scream."  Do you see that?

7    A.  Yeah.

8    Q.  So that's the third potential reason why you didn't scream

9    you have testified to.

10   A.  It's another reason why I didn't scream.

11   Q.  Now, according to this, screaming would have been a purely

12   voluntary action you need to think about before doing?

13   A.  Mr. Tacopina, if I was going to make up a lie, I would have

14   lied when I was writing this and say I screamed my head off.  I

15   didn't.  When I came forward, I told the truth.  I said I

16   didn't scream.  We could probably come up with more reasons I

17   didn't scream, but I did not scream.  I did not scream.

18   Q.  Well, Ms. Carroll, the reason why you wrote that you wish

19   you had screamed was why?  Why did you write you wish you had

20   screamed?

21   A.  Because more people would have believed me.

22   Q.  How about more people may have heard you and helped you?

23   Is that a possibility?

24   A.  No, I didn't want to make a scene.

25   Q.  Oh.  So you didn't scream while you were getting violently

1    raped because didn't you want to make a scene?

2              MR. FERRARA:  Objection, your Honor.

3              THE COURT:  Overruled.

4    Q.  You could answer.

5    A.  Repeat your question.

6    Q.  Sure.  So you didn't scream while you were getting

7    violently raped because you didn't want to make a scene.

8    A.  That's right.  That's probably why I didn't scream.

9    Q.  Okay.

10             Now, with the specifics to the rape allegation, Donald

11   Trump, you said, had his penis inside of you while your tights

12   were obviously still down?

13   A.  Yes.

14   Q.  And to be clear, it's your story that Donald Trump did not

15   take off your tights?

16   A.  No, no, just pulled down.  They were still above the knees.

17   Q.  They were above the knees.

18   A.  Um-hmm.

19   Q.  And because your tights were above the knees, you couldn't

20   get your knee up?

21   A.  I couldn't get it all the way up.  I finally got it up,

22   though.

23   Q.  Okay.

24             And it's your story that you tried to stomp on his

25   foot.

N4r2Car5                    Carroll - Cross

1   night.

2   Q.  Okay.  Do you remember the time?

3   A.  It was right after work, 5 or 6.

4   Q.  Okay.  And according to you, after hearing your story,

5   Ms. Martin told you to tell no one about it.

6   A.  Emphatically.

7   Q.  Emphatically.

8          And it's your testimony you took Ms. Martin's advice

9   not to go to the police?

10  A.  That's the advice I wanted, and so that's the advice I

11  followed.

12  Q.  So after speaking to Ms. Martin, you never told anyone else

13  about this alleged attack apart from that related to this

14  litigation and subsequently the book that came out in 2019,

15  correct?

16  A.  That's correct.

17  Q.  Now, the reason, I think you testified yesterday, was Carol

18  Martin told you not to go to the police because Donald Trump

19  was powerful?

20  A.  Yes.

21  Q.  And you were frightened of Donald Trump at the time.

22  A.  He was not only powerful, he was rich, he was famous, and,

23  as Carol put it, he has 200 lawyers.

24  Q.  And because of him being powerful, you didn't go to the

25  police.  You didn't want to tell your story.

N4r2Car5                    Carroll - Cross

1   A.  I don't -- no, I did not want to tell my story.  I did not

2   want to -- I was ashamed of myself.

3   Q.  But one of the reasons Carol Martin told you not to tell

4   the story to anyone and one of the reasons you have testified

5   that you never told the story to anyone was because of Donald

6   Trump's power.

7   A.  I was afraid Donald Trump would retaliate, which exactly is

8   what he did.  That's exactly.  One of my biggest fears came

9   absolutely true.

10  Q.  Okay.

11  A.  He has two tables full of lawyers here today.  It came

12  absolutely true.

13  Q.  We have about the same amount of lawyers.  Not everyone is

14  a lawyer, Ms. Carroll, but regardless of that --

15          THE COURT:  Come on, Mr. Tacopina, let's move along.

16          MR. TACOPINA:  Yes, sir.

17  BY MR. TACOPINA:

18  Q.  So instead you waited for Donald Trump to become arguably

19  the most powerful man in the world, president of the

20  United States of America, to tell your story to everybody.

21  A.  I waited until other women -- I was not a pioneer.  I'm a

22  follower.  I saw other women coming forward after Harvey

23  Weinstein and I thought who am I?  Who am I not to stay silent?

24  Also, I was 78 or 79.  I just thought I've been silent too

25  long.

N4r2Car5                      Carroll – Cross

1   on you?

2   A.   They couldn't be seen.  You can't see inside my vagina as I

3   am driving home.  No, you can't see it.

4   Q.   How about the head?  You said your head --

5   A.   No.  My hair would cover it.  It was probably a bump on the

6   back.  I could feel the bump, but that's covered.

7   Q.   Did you show Carol Martin the bump?

8   A.   No.

9   Q.   No, you didn't.

10  A.   Well --

11          THE COURT:  There is no question.

12  A.   I don't know.

13          THE COURT:  Ms. Carroll, there is no question.

14          THE WITNESS:  Okay.

15  BY MR. TACOPINA:

16  Q.   And you never went to the police to report this alleged

17  incident?

18          MR. FERRARA:  Objection.  Asked and answer.

19          THE COURT:  Mr. Tacopina --

20          MR. TACOPINA:  Did I ask that already?

21          THE COURT:  I'm out -- well, I'm not going to be

22  guilty of hyperbole, but plenty.

23          MR. TACOPINA:  Okay, your Honor.

24  BY MR. TACOPINA:

25  Q.   Well, let me ask you this question anew.  You would agree

N4r2Car5                        Carroll – Cross

1    that not reporting this alleged attack to the police is a very

2    odd fact, to use your words?

3    A.  No, that's not an odd fact.  As a matter of fact, it --

4    many women do not go to the police.  I understand why.

5    Q.  Okay.  So it's not an odd fact that you didn't report it to

6    the police.

7    A.  No, it's not.  It's the usual fact.

8           MR. TACOPINA:  Put up AA in evidence, please.

9    Q.  It's from your book, Ms. Carroll, page 242, lines 9-12.

10   Actually, let's get counsel get situated.  AA in evidence, page

11   242, lines 9-12.

12          MR. FERRARA:  Just one moment, your Honor.

13          (Counsel confer)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

N512car1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| | E. JEAN CARROLL, |
| 3 | |
| |        Plaintiff, |
| 4 | |
| |     v. |
| 5 | |
| | DONALD J. TRUMP, |
| 6 | |
| |        Defendant. |
| 7 | ------------------------------x |

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                 Plaintiff,              New York, N.Y.

            v.                           22 Civ.10016 (LAK)

DONALD J. TRUMP,

                 Defendant.
------------------------------x          Jury Trial

                                         May 1, 2023
                                         9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                         District Judge
                                           and a Jury

                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant
```

N512Car3                          Carroll - Cross

1   BY MR. TACOPINA:

2   Q.  Okay.  So what you were saying was that obviously you were

3   making more money with your Substack podcast than you had done

4   previously?

5   A.  Yes.

6   Q.  Okay.  And the reason you were able to make more money with

7   your podcast following your accusations against Donald Trump is

8   because of the number of people who subscribed to your podcast.

9             MR. FERRARA:  Objection.

10            THE COURT:  Overruled.

11  A.  In part, yes.

12  Q.  Now, it would be fair to say, Ms. Carroll, that your life

13  has been fabulous since your book came out.

14  A.  That is what I like my life to appear to be.

15  Q.  Okay.  As a matter of fact, that's what you said, correct,

16  in the past?

17  A.  I say it quite a bit.  That is how I want people to

18  perceive me.  Underneath my private self is another thing

19  altogether.

20  Q.  Well, you were going on all these TV shows and podcasts

21  after the allegations came out and, for example, in December of

22  2019, you -- that was one month after you filed your initial

23  lawsuit against Donald Trump, right?  December 2019?

24  A.  Yes.

25  Q.  Yeah.  So you appeared on a podcast called the Maris

1   Review, BV.

2            Please show it to the witness.

3            Do you remember the Maris Review podcast?

4   A.  Yes.

5   Q.  We don't have to play that now.  It's okay.  Take it down.

6            During that podcast, you confirmed that your life had

7   been fabulous since the book came out, right?

8            THE COURT:  Sustained as to form.

9            MR. TACOPINA:  Yeah.

10  BY MR. TACOPINA:

11  Q.  During that podcast, you confirmed or you stated that your

12  life had been fabulous since the book came out.

13  A.  I always say my life is fabulous.  No matter who asks me,

14  what time of day, I will always reply it's fabulous.

15  Q.  Except in this courtroom in front of this jury?

16  A.  In this courtroom I am being forced to tell the truth.

17  Q.  So all these TV shows and all these podcasts and in your

18  book where you say how great your life is, that's all lies?

19  A.  No.  I want -- if I walked in the courtroom today and you

20  said:  Hi, E. Jean.  How are you?  I would have said:  Fine.

21  I'm fabulous.  It is my -- it is the way I present myself to

22  the world.  It's E. Jean the writer, E. Jean the advice

23  columnist.  I am the one, rightly or wrongly, I see myself as

24  solving other people's problems.  That is what my Substack is.

25  That is what I have done for almost 29 years.  So I always say

N512Car3                    Carroll – Cross

1    I'm fine.  The column is not called E. Jean Asks Other People

2    For Their Advice.  It's called Ask E. Jean.  I put up a front.

3    Q.  Right.  I'm not talking --

4    A.  That's what I said.

5    Q.  -- about your column, your advice column, Ms. Carroll, I'm

6    talking when you go on TV or radio or interviews or podcasts

7    and are asked about the incident with Donald Trump, you always

8    say that you are fabulous now.

9    A.  Of course I do.

10   Q.  Okay.

11   A.  I don't want anyone to know I suffered.  I did not and

12   still don't, unfortunately, during this trial I have to reveal

13   what is actually going on, but up until now, I would be ashamed

14   to know -- let people know what is actually going on.

15   Q.  You also explain on that podcast that you were receiving

16   lots of support --

17   A.  Um-hmm.

18   Q.  -- since your book came out?

19   A.  Um-hmm.

20   Q.  Yes?

21           THE COURT:  Please answer with words.

22   A.  Yes.

23   Q.  And you confirm you were receiving lots of love?

24   A.  Yes.

25   Q.  In fact, you were receiving several invitations to parties

1  somehow still alive.  That was -- really.  It took me minutes,

2  well seconds, and then minutes.  And even when Lisa said it, it

3  took a real effort for me to take it in.

4  Q.  Was -- sorry.

5  A.  Yes.  Lisa is the one who focused my brain for that moment.

6  It was Lisa saying that.

7  Q.  Was there ever any doubt in your mind that Mr. Trump had

8  penetrated you with his fingers and penis?

9  A.  Oh, never a doubt about that.

10  Q.  Was there a doubt in your mind that you tried to shove him

11  away?

12  A.  Oh, no.  There was never a doubt about that.

13  Q.  Was there ever a doubt in your mind regarding whether you

14  had consented to this, to what he had done to you?

15  A.  Never.  The minute that door shut I -- there was no

16  consent.

17  Q.  Was there ever a doubt in your mind that you hit him in the

18  head with your purse?

19  A.  I believe I hit him in the head with my purse that year.

20  Q.  Was there ever a doubt in your mind that you tried to fight

21  him off?

22  A.  No.  Never.  That's how I got out.

23  Q.  Before you spoke to Ms. Birnbach how, if at all, have you

24  processed all of that information?

25  A.  Before I had?

1  persona.  So, are you happy or are you not happy now?

2  A.  I'm happy.

3  Q.  OK.

4  A.  With undertones.

5  Q.  Happy with undertones?

6  A.  Of -- of --

7  Q.  OK.  Shall I go on?

8  A.  Of unhappiness.

9  Q.  The answer is you are happy with undertones of unhappiness?

10 A.  Yes.  It goes up and down, it is not always totally buoyant

11 and gleeful and happy.  There are times when I feel unhappy, of

12 course.

13 Q.  You testified on redirect that you were astonished that in

14 2023 someone would ask you about not screaming.  Do you

15 remember saying that?

16 A.  Yes.

17 Q.  Do you understand, Ms. Carroll, that I'm not judging what

18 is the appropriate reaction for any true rape victim, I was

19 questioning the fact that you gave four different answers for

20 not screaming?

21         THE COURT:  Sustained.  The jury will disregard that

22 remark.

23 Q.  Well, the reason you gave for not screaming was, one, you

24 are not a screamer.

25 A.  Right.

N515car6                        Carroll - Recross

1   Q.  You also said that Donald Trump's chest interfered with

2   your screaming?

3   A.  I guess I did.

4   Q.  Do you recall saying that you had too much adrenaline to

5   think to scream?

6   A.  That makes sense.

7   Q.  OK.  And then lastly you said you didn't scream because you

8   didn't want to make a fuss?

9   A.  I'm sure all -- you can have many reasons for not

10  screaming.

11  Q.  You understand that's what I was asking you about?

12  A.  Yes.

13          THE COURT:  Now, look.  You understand that that's not

14  an appropriate question so move on.

15          MR. TACOPINA:  OK, your Honor.  I thought based on the

16  answer it was but I'm sorry, I will move on.

17          THE COURT:  Mr. Tacopina, you get to have a closing

18  argument in this case and it is after I instruct the jury.

19          MR. TACOPINA:  OK.  Fine.

20          THE COURT:  Or before, actually, but...

21  BY MR. TACOPINA:

22  Q.  In evidence is Defendant's Exhibit AR that was already

23  introduced into evidence, subject to redaction, but the portion

24  we have shown before we will show again.  Ms. Carroll, you

25  prepared questions, you recall, when you were getting ready for

N582CAR1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     E. JEAN CARROLL,
3
                  Plaintiff,              New York, N.Y.
4
             v.                           22 Civ.10016 (LAK)
5
     DONALD J. TRUMP,
6
                  Defendant.
7    ------------------------------x      Jury Trial

8                                         May 8, 2023
                                          9:10 a.m.
9
     Before:
10
                      HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                           and a Jury

13
                          APPEARANCES
14
     KAPLAN HECKER & FINK LLP
15        Attorneys for Plaintiff
     BY:  ROBERTA A. KAPLAN
16        MICHAEL J. FERRARA
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18
     TACOPINA SEIGEL & DeOREO
19        Attorneys for Defendant
     BY:  JOSEPH TACOPINA
20        CHAD D. SEIGEL
          MATTHEW G. DeOREO
21

22   HABBA MADAIO & ASSOCIATES, LLP
          Attorneys for Defendant
23   BY:  ALINA HABBA
          MICHAEL T. MADAIO
24

25   W. PERRY BRANDT
          Attorney for Defendant
```

1   using the word rape.  But as we heard Dr. Lebowitz explain,

2   E. Jean's refusal to call what happened to her rape or to

3   identify herself as a victim does not mean that she was not

4   sexually assaulted.

5        Now, another way that Donald Trump responds to all of

6   this is by trying to get you to believe in the big lie.  What

7   do I mean when I say the big lie?  I mean that Mr. Trump's

8   lawyers need you to find that not only E. Jean Carroll, but

9   also Lisa Birnbach and Carol Martin are all lying, that they

10  are all part of some part of coordinated conspiracy, that they

11  somehow joined forces and agreed to come up with a story about

12  an assault that happened nearly 30 years ago simply because

13  they hate Donald Trump.  I'm sorry.  Seriously?  That's just

14  ridiculous.

15       First of all, there is no evidence -- not a shred --

16  that any such conspiracy exists.  No testimony.  No documents.

17  Nowhere in all of those pages of e-mails and texts between

18  E. Jean Carroll, Lisa Birnbach, and Carol Martin did you see

19  anything suggesting that they all agreed to come up with a lie

20  that Donald Trump raped E. Jean Carroll.  In fact, you saw the

21  opposite of that.  You heard Ms. Martin read from a text she

22  sent to a friend in 2021 -- a friend, so it is not Lisa

23  Birnbach and she is not texting E. Jean Carroll -- another

24  friend, in which she expressed frustration that she was dealing

25  with the publicity from this case and she suggested that that

 1   didn't care about the person you lost?  Of course not.  And

 2   Dr. Lebowitz explained this to you too.  She told you that

 3   Ms. Carroll doesn't blame Bergdorf's.  It wasn't the store that

 4   assaulted her, it was Donald Trump.  That's at page 883 of the

 5   transcript.  Or, the point about having, you know, kept the

 6   dress she was wearing when Trump assaulted her.  This is

 7   something Ms. Carroll told you herself.  If she is going to

 8   lie, why not say she destroyed the dress?  Why not say I

 9   destroyed it, I don't have it anymore.  Who could ever prove

10   her wrong?  Because she told you the truth, good or bad.  She

11   kept the dress because it was beautiful and it was her nicest

12   dress, and Dr. Lebowitz explained that.

13           Or how about watching *The Apprentice*?  Dr. Lebowitz

14   explained the reaction Ms. Carroll had when Ms. Carroll first

15   saw the trailer for *The Apprentice*.  You guys remember this?

16   Ms. Carroll was sitting in a meeting and someone showed the

17   trailer for *The Apprentice* and Ms. Carroll completely froze and

18   couldn't speak.  This is at page 884 of the transcript.  But at

19   the same time, as Dr. Lebowitz told you, *The Apprentice* was a

20   show that everyone in Ms. Carroll's social circle was watching

21   at that time and if she hadn't, she would have sort of stood

22   out.

23           I think the point is that Ms. Carroll is entitled to

24   find happiness again in her life, to focus on the positive

25   things in life and work to be the happiest, best version of

1   herself, and it feels like the defense has this idea of the

2   perfect rape victim and in their version it goes something like

3   this:  The perfect rape victim doesn't flirt.  The perfect rape

4   victim screams.  The perfect rape victim never goes back to

5   where they were raped.  The perfect rape victim tells the

6   police but otherwise never discusses the rape publicly.  The

7   perfect rape victim burns whatever clothes they were wearing.

8   The perfect rape victim never laughs again, never jokes around.

9   The perfect rape victim never again has success in their

10  career.  The perfect rape victim never looks at their rapist

11  again.  The perfect rape victim never tries to hold their

12  rapist accountable, never gets their day in court.  And, the

13  perfect rape victim is never happy again.

14        That's the defense's out-of-date, out-of-touch view.

15  It is as wrong as it is offensive.  Dr. Lebowitz explained to

16  you why it is wrong.  For example, she talked about victims who

17  don't scream, even if they're being raped in the stacks of the

18  public library.  That's at page 857 of the transcript.  But you

19  also know it is wrong because you heard from three victims of

20  sexual assault in this case, three of Donald Trump's victims

21  and they told you the same thing.  Ms. Carroll couldn't process

22  what was happening and was extremely confused when Trump

23  attacked her.  That's what she told you, that's at page 177.

24  Jessica Leeds told you that when Trump started groping her on

25  the airplane she didn't scream or shout and to this day she

1  still doesn't know why.  That's at 742.  And Natasha Stoynoff,

2  the *People* magazine writer, described how after Trump assaulted

3  her at Mar-a-Lago, she went into auto-pilot, as she put it, and

4  finished the interview with Trump and his wife Melania.  That's

5  at 993.

6           Three women, all assaulted by Trump, none of them

7  screamed, none of them discussed it with their employers, none

8  of them wanted to fired or sued.  All of them went on with

9  their lives and careers and found happiness despite what

10  happened to them.  And because they did, the defense wants you

11  to believe they were never assaulted.  But, you know Donald

12  Trump assaulted every one of them.  They told you that and he

13  told you that when he described how he treats women on the

14  *Access Hollywood* tape.

15           THE COURT:  Let's try to wrap it up in the next five

16  minutes.

17           MR. FERRARA:  Yes, sir.  I have one minute and a half,

18  your Honor.

19           THE COURT:  OK.

20           MR. FERRARA:  The long and short of it is this, ladies

21  and gentlemen:  Donald Trump's entire defense rests on calling

22  everyone a liar.  He needs you to believe Ms. Carroll is a

23  liar; Lisa Birnbach, Carol Martin, liars.  Natasha Stoynoff and

24  Jessica Leeds, he has to call them liars.  Even Robert Salerno

25  and Cheryl Beall, I guess they're lying, too, when they talk

N592CAR1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   E. JEAN CARROLL,
3
                   Plaintiff,              New York, N.Y.
4
              v.                           22 Civ.10016 (LAK)
5
   DONALD J. TRUMP,
6
                   Defendant.
7  ------------------------------x        Jury Trial

8                                         May 9, 2023
                                          10:05 a.m.
9
   Before:
10
                        HON. LEWIS A. KAPLAN,
11
                                          District Judge
12                                          and a Jury

13
                           APPEARANCES
14
   KAPLAN HECKER & FINK LLP
15       Attorneys for Plaintiff
   BY:   ROBERTA A. KAPLAN
16       MICHAEL J. FERRARA
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18
   TACOPINA SEIGEL & DeOREO
19       Attorneys for Defendant
   BY:   JOSEPH TACOPINA
20       CHAD D. SEIGEL
         MATTHEW G. DeOREO
21

22  HABBA MADAIO & ASSOCIATES, LLP
         Attorneys for Defendant
23  BY:   ALINA HABBA
         MICHAEL T. MADAIO
24

25  W. PERRY BRANDT
         Attorney for Defendant

crimes.  Ms. Carroll claims that Mr. Trump is liable to her for

battery on three different and alternative bases, each of which

corresponds to a criminal law definition of a different sex

crime.  Mr. Trump denies that he is liable to her for battery

on any of these three different and alternative bases.

Accordingly, the first set of questions in the verdict form has

to do with whether or not Ms. Carroll has established that

Mr. Trump's conduct, if any, came within any of those criminal

law definitions.  But I emphasize to you that this is a civil

case for damages.  It is not a criminal case.

        Now, if you look on the verdict form, you will see the

first question is whether Ms. Carroll proved by a preponderance

of the evidence that Mr. Trump raped her.  It's a yes/no

question.  I am going to explain the preponderance of the

evidence standard, which is incorporated in that question,

later on.  But right now I am going to tell you the required

elements of rape under the New York law.

        In order to establish that Mr. Trump raped her,

Ms. Carroll must prove each of two elements by a preponderance

of the evidence.

        The first element is that Mr. Trump engaged in sexual

intercourse with her.

        The second element is that Mr. Trump did so without

Ms. Carroll's consent by the use of forcible compulsion.  So

let me define each one of those terms.

N592Car1                          Charge

1          "Sexual intercourse" means any penetration, however

2     slight, of the penis into the vaginal opening.  In other words,

3     any penetration of the penis into the vaginal opening,

4     regardless of the distance of penetration, constitutes an act

5     of sexual intercourse.  Sexual intercourse does not necessarily

6     require erection of the penis, emission, or an orgasm.

7          Now, of course, I hope you will forgive me for this

8     very explicit language, but I have no alternative——nobody has

9     in this case——in discussing the elements of the alleged

10    battery.

11         I also used the phrase "forcible compulsion," and what

12    that means is intentionally to compel by the use of physical

13    force.

14         If you find that Ms. Carroll has proved by a

15    preponderance of the evidence both of those two elements, you

16    will answer Question 1 "yes."  If you answer Question 1 "yes,"

17    I instruct you that Mr. Trump thus committed battery against

18    Ms. Carroll.  There would be no need to consider whether he

19    committed battery on either of the other two alternative bases.

20    Remember, I said there were three alternatives.  So if you

21    answer Question 1 "yes," you will skip question 2 and question

22    3 on the verdict form and go right on to question 4.  If you

23    find that Ms. Carroll has not proven either of the two elements

24    of rape by a preponderance of the evidence, you must answer

25    "no" to Question 1 and go on to Question 2, which deals with

1     the second of the three alternative bases for the battery

2     claim.

3             The second theory of battery corresponds to something

4     called sexual abuse.  Sexual abuse has two elements.  In order

5     to establish that Mr. Trump sexually abused her, Ms. Carroll

6     must prove each of two elements by a preponderance of the

7     evidence.

8             The first element is that Mr. Trump subjected

9     Ms. Carroll to sexual contact.

10            The second element is that he did so without

11    Ms. Carroll's consent by the use of forcible compulsion.

12            So let me define "sexual contact" for you.  Sexual

13    contact for this purpose means any touching of the sexual or

14    other intimate parts of a person for the purpose of gratifying

15    the sexual desire of either person.  It includes the touching

16    of the actor by the victim, as well as the touching of the

17    victim by the actor, and the touching may be either directly or

18    through clothing.

19            Now, I just used the term or the phrase "sexual or

20    intimate part" in defining sexual contact.  For this purpose, a

21    "sexual part" is an organ of human reproduction.

22            So far as intimate part is concerned, the law does not

23    specifically define which parts of the body are intimate.

24    Intimacy, moreover, is a function of behavior and not just

25    anatomy.  Therefore, if any touching occurred, the manner and

1   play.  I previously instructed you about "actual malice" with

2   regard to Question 8.  With regard to Question 10, I'm using

3   the words "malice" or "maliciously," not the phrase "actual

4   malice," and the word "malice" and the word "maliciously" for

5   purposes of Question 10 means something different from "actual

6   malice."  A statement is made with malice or it's made

7   maliciously for the purpose of Question 10 if it's made with

8   deliberate intent to injure or made out of hatred or ill will

9   or spite or made with willful or wanton or reckless disregard

10  of another's rights.

11          If you answer "yes" to the first part of Question

12  10—in other words, if you find that Mr. Trump acted with

13  malice, as I have just defined that term for you, in making the

14  October 12 statement about Ms. Carroll—you will write down an

15  amount, if any, that you find Mr. Trump should pay to

16  Ms. Carroll in punitive damages for the defamation.  If you

17  answer "no" to that first part of Question 10—that is, you

18  find that Mr. Trump's statement was not made maliciously—you

19  may not award punitive damages.  Ms. Carroll bears the burden

20  of proving by a preponderance of the evidence that Mr. Trump

21  acted in accordance with this standard.

22          In arriving at your decision as to the amount of

23  punitive damages, you should consider here with respect to the

24  defamation punitive damage claim:

25          The nature and reprehensibility of what Mr. Trump did

N592Car1                    Charge

1   the issues in Question 7, which is the falsity of the statement
2   of October 12 and Question 8, actual malice, by clear and
3   convincing evidence, you must decide against her on those
4   issues.  What does "clear and convincing evidence" mean?  Clear
5   and convincing evidence is a more exacting standard than proof
6   by a preponderance of the evidence, where you need believe only
7   that a party's claim is more likely true than not.  On the
8   other hand, clear and convincing evidence, clear and convincing
9   proof, is not as high a standard as the burden of proof applied
10  in criminal cases, beyond a reasonable doubt.  Clear and
11  convincing proof leaves no real substantial doubt in your mind.
12  It is proof that establishes in your mind not only the
13  proposition -- not only that the proposition at issue is
14  probable, but also that it is highly probable.  It is enough if
15  Ms. Carroll establishes that Mr. Trump's statement was
16  false—which is Question 7—and that he made the statement with
17  actual malice—that's Question 8—beyond any "substantial
18  doubt"; she does not have to dispel every "reasonable doubt."
19          Now, you folks, the nine of you, are the sole and
20  exclusive judges of the facts.  I certainly do not mean to
21  indicate any opinion as to the facts or as to what your verdict
22  ought to be.  The rulings I have made during this trial are not
23  any indication of any views on my part about what your decision
24  ought to be or as to who should prevail here.  I express no
25  such opinion with respect to what you ought to do here.