

**U.S. Department of Justice**
Civil Division

---

*Office of the Assistant Attorney General*                *Washington, DC 20044*

July 11, 2023

Alina Habba, Esq.
Michael T. Madaio, Esq.
Habba Madaio & Associates LLP
1430 US Highway 206, Suite 240
Bedminster, NJ 07921
ahabba@habbalaw.com
mmadaio@habbalaw.com

Roberta Kaplan, Esq.
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
rkaplan@kaplanhecker.com

      Re:    *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y.)

Dear Counsel:

      I write to inform you that, in light of the D.C. Court of Appeals' clarification of the standard for *respondeat superior* liability under D.C. law, *see Trump v. Carroll*, 292 A.3d 220 (D.C. 2023), as well as new factual developments, the Department of Justice is declining to certify under the Westfall Act, 28 U.S.C. § 2679(d), that defendant Donald J. Trump was acting within the scope of his office and employment as President of the United States when he made the statements that form the basis of the defamation claims in plaintiff's Amended Complaint in this action.

**The D.C. Court of Appeals Decision**

      Under the Westfall Act, federal employees are entitled to absolute immunity from personal tort liability for conduct occurring within the scope of their employment. *See* 28 U.S.C. § 2679. State tort law governs the scope-of-employment inquiry under the Act. Here, the parties agree that D.C. *respondeat superior* law governs. *Carroll v. Trump*, 49 F.4th 759, 766 & n.6 (2d Cir. 2022). The District of Columbia "generally adheres" to the Restatement (Second) of Agency's formulation of the *respondeat superior* standard, as set forth in § 228. *See Carroll*, 292 A.3d at 225; *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. 1987).

The D.C. Court of Appeals clarified the meaning of this standard in response to the Second Circuit's certification in this case.  The Court explained that the question under § 228(1)(c)—whether the conduct "is actuated, at least in part, by a purpose to serve" the employer—contains distinct components, two of which are relevant here: the "purpose" element and the "quantum" element.  *Carroll*, 292 A.3d at 233-34.

The purpose element "is an inquiry into the employee's state of mind to determine whether the employee was, in fact, motivated by a purpose to serve their employer."  *Id.* at 234. This element focusses on the *subjective* state of mind of the employee, notwithstanding prior D.C. Court of Appeals decisions suggesting that the inquiry was an objective one.  *E.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986).  The Court explained that any history between the employee and the victim may also be relevant to this determination of subjective intent: "Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance."  *Carroll*, 292 A.3d at 235.

The quantum element requires that the employee be motivated "at least in part" by a purpose to serve the employer.  The requirement "does not foreclose that an employee could be concurrently motivated by a personal purpose," nor that such personal purpose could be the employee's predominant motivation.  *Id.* at 235-36.  But "if the employee's conduct is 'too little actuated' by [a public] purpose, then the employee's conduct would be outside the scope of employment."  *Id.* at 236.  The Court declined to "parse out an exact threshold" at which an employee is "actuated at least in part" by a purpose to serve their employer but "too little actuated" by that purpose for their conduct to fall within the scope of employment, instead "entrust[ing] this question to the factfinder."  *Id.* at 237.  The Court explained:  "In other words, the factfinder must determine that an employee's partial purpose to serve their employer was more than an insignificant interest.  It is a balancing and weighing of the evidence, both direct and circumstantial, to determine whether the quantum of purpose is more than insignificant."  *Id.*

Finally, with respect to the D.C. Circuit's decision in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), the Court of Appeals made two observations:  First, it noted that *Ballenger* did not adopt a categorical rule holding that "the conduct of elected officials speaking to the press is always within the scope of that official's employment," and the Court declined to itself adopt such a categorical rule.  *Carroll*, 292 A.3d at 239-240 ("We have never adopted a rule that has determined that a certain type of conduct is per se within (or outside of) the scope of employment, and we decline to do so now.").  Second, it noted that the *Ballenger* court's holding "rested on undisputed, affirmative evidence in the record that [Ballenger's] purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities," *id.* at 239, and suggested that in this respect, the record before the *Ballenger* court was distinct from the record in this case, "which is disputed by the parties."  *Id.* at 239 n.23.

**Analysis**

Applying the clarified D.C. *respondeat superior* standard, the Department has determined that it lacks adequate evidence to conclude that the former President was sufficiently actuated by a purpose to serve the United States Government to support a determination that he was acting within the scope of his employment when he denied sexually assaulting Ms. Carroll and made the other statements regarding Ms. Carroll that she has challenged in this action.[1]  The evidence of Mr. Trump's state of mind, some of which has come to light only after the Department last made a certification decision, does not establish that he made the statements at issue with a "more than insignificant" purpose to serve the United States Government.  *Id.* at 237.

No direct evidence of the former President's state of mind in making these statements is available.  As the D.C. Court of Appeals noted, this case stands in contrast to *Ballenger*, in which the Congressman offered "undisputed, affirmative evidence," *id.* at 239, by way of his affidavit, on which the district court relied in finding that he was acting, at least in part, "for the purpose of preserving his effectiveness as a congressman."  *Ballenger*, 444 F.3d at 663 (quotation marks and citation omitted).

Moreover, the circumstantial evidence of Mr. Trump's *subjective* intent in making the allegedly defamatory statements does not support a determination in this case that he was sufficiently motivated by a desire to serve the United States Government.  There is some evidence that could, in some circumstances, support a certification.  The former President was responding to allegations that could have called into question his fitness to hold the office of the Presidency.  In addition, the statements at issue were drafted or made at the White House, in response to inquiries made to or at the White House, through official channels that Presidents often use to communicate with the media: a statement issued by the press office to a daily press pool, a press "gaggle" on the White House lawn, and an interview in the Oval Office.  *See, e.g.*, *Does 1-10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) ("Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.").

The D.C. Court of Appeals, however, has now made clear that D.C. law does not hold that *any* statement, whatever its actual purpose, is by definition made for official purposes simply because it is made using official channels of communication.  *See Carroll*, 292 A.3d at 232 ("The employment must have created more than the mere opportunity to commit the tort; there must still be some relationship or nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy.").  Additionally, the Court of Appeals' clarification that *Ballenger* did not establish a "categorical" rule "that would hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment," *id.* at 239, confirms that the context in which the former President made these statements does not end our inquiry even if it would, on its own, give rise to an inference that he was acting for an official purpose.

---

[1] In her Amended Complaint, Ms. Carroll no longer challenges Mr. Trump's denial of having raped her.

3

Instead, the Department must also consider whether the allegedly tortious action arose out of a work-related incident. *See id.* at 232 (explaining that "the District of Columbia case precedents have focused on whether the conduct was an 'outgrowth of a job-related controversy,'" which has been "framed as an inquiry into whether the conduct was the 'outgrowth of the employees' instructions or job assignments'" (citation omitted)).[2]  The D.C. Court of Appeals explained that this inquiry may be informed by whether the alleged tortfeasor and the victim had a prior history that would suggest that the alleged tortfeasor was personally motivated. *See id.* at 234 ("Likewise, we have viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim.").  Here, although the statements themselves were made in a work context, the allegations that prompted the statements related to a purely personal incident: an alleged sexual assault that occurred decades prior to Mr. Trump's Presidency.  That sexual assault was obviously not job-related.  As a general matter, an elected official's ability to retain the trust of his constituents—including by addressing their concerns and informing them of his views on issues that they care about, or by discussing personal matters that may pertain to the public's confidence in him—is an important part of his ability to effectively perform his job.  But that background principle cannot overcome countervailing evidence that an official who made defamatory statements was insufficiently actuated by a public purpose, to justify a finding that he was acting within the scope of his employment. *See, e.g.*, *Lyons v. Brown*, 158 F.3d 605, 610 (1st Cir. 1998) (noting that "whatever justification [the defendant] might have for his actions could be overcome if his actual purpose was to retaliate").  The evidence of personal motivation that has been developed in this case outweighs any public-purpose inference one might draw in other circumstances.

*First*, Mr. Trump's statements regarding Ms. Carroll continued after the former President left office, as indicated by new allegations in the Amended Complaint. *See Carroll v. Trump*, No. 20-cv-07311, Dkt. No. 157, Ex. A (Amended Complaint), ¶ 152 (October 12, 2022 Truth Social post that the *Carroll II* jury found defamatory); ¶ 165 ("Mere minutes after the verdict [in *Carroll II*] became public, Trump repeated the defamatory lie that he had no idea who Carroll was" on his Truth Social account); *id.* ¶¶ 166-67 (two additional Truth Social posts the night after the jury verdict, calling Ms. Carroll's allegations a "Hoax" and suggesting that the accusations and subsequent trial were part of a political conspiracy); *id.* ¶ 168 (stating, during a CNN town hall on May 10, 2023, "I never saw this woman"; labelling Ms. Carroll's accusations a "fake story"; and calling her "a whack job").  The later statements are substantially similar to the three June 2019 statements at issue in this action, and because he was no longer the President when he made the later statements, Mr. Trump could not have been motivated by any interest in serving the United States Government.  These post-Presidency statements, which were not before the Department during the original scope certification in this case, tend to undermine the claim that the former President made very similar statements at issue in *Carroll I* out of a desire to

---

[2] Although this language comes from the Court of Appeals' discussion of the first prong of its *respondeat superior* test—whether the allegedly tortious conduct was "of the kind" the person is employed to perform, *see Carroll*, 292 A.3d at 232—the Court also considered it relevant for purposes of determining the defendant's subjective state of mind under the third prong. *See id.* at 235 ("[I]nquiries into whether the tort was the outgrowth of a job-related controversy allow the factfinder to make inferences about whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated.").

serve the Government.

*Second*, the prior history between Ms. Carroll and Mr. Trump supports a determination that the former President's statements were not sufficiently motivated by a purpose to serve the Government.  As noted above, the D.C. Court of Appeals "ha[s] viewed it as relevant, at least in part, whether there was a prior history between the tortfeasor and the victim."  *Carroll*, 292 A.3d at 234; *id.* at 235 ("Inquiries into whether there was a prior employee-victim relationship allow the factfinder to make inferences about whether the tortfeasor-employee, for example, used their employment as a mere opportunity to act on a personal grievance.").  And a jury has now found that Mr. Trump sexually assaulted Ms. Carroll long before he became President.  That history supports an inference that Mr. Trump was motivated by a "personal grievance" stemming from events that occurred many years prior to Mr. Trump's presidency.  *Id.* at 235.[3]

*Third*, certain aspects of the content of the statements at issue and subsequent statements by Mr. Trump go far beyond merely denying Ms. Carroll's accusation.  *See, e.g.*, Amended Compl. ¶ 83 ("Shame on those who make up false stories of assault to try to get publicity for themselves or sell a book or carry out a political agenda."); *id.* ("It is a disgrace, and people should pay dearly for such false accusations."); *id.* ¶ 92 ("This is a woman who has also accused other men of things . . . she's made this charge against others. . . I was one of the many men that she wrote about."); *id.* ("I have no idea who she is, none whatsoever."); *id.* ("[T]here were numerous cases where women were paid money to say bad things about me . . . those women did wrong things . . . here's a case, it's an absolute disgrace that she's allowed to do that."); *id.* ¶ 98 & n. 10; Jordan Fabian & Saagar Enjeti, *Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type,"* The Hill (June 24, 2019), at 11 ("[S]he made this charge up.  And by the way, she's made it up about, or she's said it about other people too."); *id.* ("I'll say it with great respect, number one, she's not my type.").  In his deposition, Mr. Trump indicated that he "wanted people to know" that "she's . . . a very deranged, sick person[.]"  Deposition of Donald J. Trump, *Carroll v. Trump*, No. 20-cv-07311 (S.D.N.Y. Oct. 19, 2022), at 216:3-8.  The "tone of [the relevant statements] strongly suggests that [defendant's] motivation . . . did not spring from a desire to serve . . . the United States."  *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 95 (D.D.C. 2011).

\*     \*     \*

The Department must "take a holistic approach to discerning an employee's purpose in engaging in the tortious conduct, considering any inferences from the circumstances of the relationship between the parties and the conduct," as is "appropriate under the facts presented," *Carroll*, 292 A.3d at 235.  After "balancing and weighing [] the evidence," *id.* at 237, from Mr. Trump's deposition, the jury verdict in *Carroll II*, and the new allegations in the Amended

---

[3] The Westfall Act affords the Attorney General or his designee broad latitude to make factual determinations relevant to applying the scope-of-employment standard.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 429 (1995); *cf. Osborn v. Haley*, 549 U.S. 225, 247 (2007).  For this reason, the Department is not bound by the jury's findings.  At the same time, in this case, there does not appear to be a basis to disregard the jury's conclusions, which were made after weighing the relevant evidence presented by both parties in that case.

Complaint, the Department has determined that there is no longer a sufficient basis to conclude that the former President was motivated by "more than an insignificant" desire to serve the United States Government, *id*.  Accordingly, the Department hereby declines to issue a new Westfall Act certification.


                                                                      Sincerely,


                                                                      Brian M. Boynton
Principal Deputy Assistant Attorney General