# EXHIBIT 2

1

2              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
3
             CASE No. 20 CIV. 7311 (LAK)(JLC)
4

5   E. JEAN CARROLL,

6              Plaintiff,

7   -vs-

8   DONALD J. TRUMP,
    in his personal capacity,
9
              Defendant.
10  _____/

11

12

13                    =  =  =

14                 CONFIDENTIAL

15                    =  =  =

16

17      VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

18
              Wednesday, October 19, 2022
19            10:22 a.m. - 3:50 p.m.

20            The Mar-a-Lago Club
            1100 South Ocean Boulevard
21          Palm Beach, Florida, Florida

22

23  Stenographically Reported By
    Pamela J. Pelino, RPR, FPR, CLR
24  Notary Public, State of Florida
    TSG REPORTING
25  JOB NO. 218342
                    -  -  -

```
 1                      D. J. TRUMP
 2   is it your understanding that it happened before the
 3   excerpt from Ms. Carroll's book was published in
 4   New York Magazine?
 5        A.    I don't know.
 6              (DJT Exhibit 18 was marked for
 7   identification.)
 8   BY MS. KAPLAN:
 9        Q.    I'm handing you a document that's been
10   marked as DJT 18.  It bears the Bates range Carroll
11   24378 through 24385.  Do you have that in front of
12   you?
13        A.    Yeah.
14        Q.    Sitting here today, do you recognize this
15   document?
16        A.    No.
17        Q.    I will represent to you that this is the
18   excerpt from Ms. Carroll's book that was published
19   in New York Magazine online -- originally online on
20   June 21, 2019.
21        A.    Okay.
22        Q.    At any point in time, did you read this
23   article?
24        A.    Excuse me?
25        Q.    Did you ever read this article?  This
```

1                          D. J. TRUMP

2    document in front of --

3         A.    No, I don't believe I did.

4              (DJT Exhibit 19 was marked for

5    identification.)

6    BY MS. KAPLAN:

7         Q.    I've handed you a book marked as DJT 19,

8    a book by E. Jean Carroll.  It says What Do We Need

9    Men For, and if you look at the publication date, it

10   says first edition July 2019.  Do you have that?

11        A.    Yes.

12        Q.    Do you have that book in front of you?

13        A.    Yeah.

14        Q.    Sitting here today, sir, have you ever

15   read this book either in its entirety or any portion

16   of this book?

17        A.    No, never have.  I've never seen the book

18   actually.

19        Q.    Okay.  Now, the allegations that first

20   appeared in DJT 18, which is the article -- it was

21   big news that Ms. Carroll had made this allegation

22   against you; correct?

23        A.    I'd say it was, yeah.  Because that's

24   what she wanted, to sell a book.

25        Q.    And it was covered widely in the press;

1              D. J. TRUMP

2  BY MS. KAPLAN:

3       Q.    What we're doing, sir, is -- it's hard to

4  read the tweet as it was on Twitter.  So we blew it

5  up.  It's hard to read.

6             So what we've handed you as DJT 20 is a

7  blown-up, for legibility purposes, version of a

8  tweet posted by a woman by the name of Laura Littman

9  at 5:17 p.m. on June 21, 2019.  Do you have that in

10  front of you?

11      A.    Yes.

12      Q.    Do you know -- sitting here today, do you

13  know who Laura Littman is?

14      A.    No.

15      Q.    The statement that is in this tweet, is

16  this a statement that you gave?

17      A.    I mean, essentially that's what I said,

18  yeah.

19      Q.    Sitting here today, do you know how

20  Ms. Littman got this statement?

21      A.    No.  But it sounds like I would have

22  given it maybe to one of my people or something to

23  give to her and other people.

24      Q.    When you say "other people," you mean

25  other people in the press?

1                       D. J. TRUMP

2       A.      Other people in the press, yes.

3       Q.      If you could read -- if you're able to --

4  and I apologize for the size of the text.

5               If you could read that statement into the

6  record.

7       A.      You want me to read the whole thing?

8       Q.      Please.

9       A.      It's a very unclear copy.  Do you have a

10  better copy of it?

11      Q.      I think this is the best we have.  I

12  could read it in.  I'll read it in.

13      A.      Yeah, why don't you read it in.

14      Q.      It says:  "Statement from President

15  Donald J. Trump.  Regarding the 'story' by

16  E. Jean Carroll claiming she once encountered me at

17  Bergdorf Goodman 23 years ago, I've never met this

18  person in my life.  She's trying to sell a new book.

19  That should indicate her motivation.  It should be

20  sold in the fiction section.  Shame on those who

21  make up false stories of assault, who try to get

22  publicity for themselves or sell a book or carry out

23  a political agenda like Julie Swetnick, who falsely

24  accused Justice Brett Kavanaugh.  It's just as bad

25  for people to believe it, particularly when there is

1                       D. J. TRUMP

2    zero evidence.  Worse still for a dying publication

3    to try to prop itself up by pedaling fake news.

4    It's an epidemic.  Ms. Carroll in New York Magazine:

5    No pictures, no surveillance, no videos, no reports,

6    no sales attendants around???  I would like to thank

7    Bergdorf Goodman for confirming they have no video

8    footage of any such incident because it never

9    happened.  False accusations diminish the severity

10   of real assault.  All should condemn false

11   accusations and any actual assault in the strongest

12   possible terms.  If anyone has information that the

13   Democratic party is working with Ms. Carroll or

14   New York Magazine, please notify us as soon as

15   possible.  The world should know what's really going

16   on.  It's a disgrace, and people should pay dearly

17   for such false accusations."  Do you see that?

18   That's what you have in front of you?

19        A.    Yeah.

20        Q.    And I think you've already confirmed that

21   this is a statement that you gave to someone on your

22   staff to give to the press?

23        A.    Yeah.

24        Q.    And that's how it ended up in

25   Laura Littman's tweets?

1                          D. J. TRUMP

2        A.      Perhaps, yes.

3        Q.      Sitting here today, do you stand by this

4    statement?

5        A.      Yes.

6        Q.      Sitting here today, are there any

7    inaccuracies in this statement that you now know of?

8        A.      Not that I can see, no.  The only thing

9    that I would say is -- and I've just heard this --

10   that she has no idea when this event took place, and

11   somehow 23 years is mentioned, 23 years ago.  It's a

12   long time.  But she has no idea supposedly when this

13   took place, what season, what year, what month, what

14   day.  She knows nothing.  And for some reason, it's

15   put down here 23 years ago.  So, you know, at one

16   point I was told 23 years.  But I've heard since she

17   really has no clue when this took place supposedly,

18   which -- it didn't take place.

19       Q.      So is it your testimony that when

20   Ms. Carroll made her allegations, she had -- putting

21   aside what day it happened that she had no idea

22   whatsoever of what year it took place?

23       A.      My lawyers told me that.

24       Q.      Okay.  I don't want to know what your

25   lawyers told you.

```
 1                    D. J. TRUMP
 2       A.    It's all right.  I don't mind saying it.
 3  But I was told that.  No, I don't think anything
 4  else that I see would be objectionable.
 5       Q.    Okay.
 6            MS. KAPLAN:  Let's mark as DJT 21 a
 7       document bearing the Bates range -- hold on --
 8       DJT 21, a document bearing the Bates range
 9       MP1795 through MP1807.
10            (DJT Exhibit 21 was marked for
11  identification.)
12  BY MS. KAPLAN:
13       Q.    Do you have that in front of you?
14       A.    Yeah.
15       Q.    Do you recognize this form of document?
16       A.    Yeah.  It's statements that are put out,
17  et cetera.
18       Q.    I didn't hear the last part of the
19  question.  Statements that are put out -- oh,
20  et cetera.
21       A.    From the press secretary.
22       Q.    And these are statements that were put
23  out when you were the president of the United
24  States?
25       A.    Yeah.
```

1                          D. J. TRUMP

2        Q.     And if you look at the top email, the

3   address of the email, it says under that "Remarks by

4   President Trump before Marine One departure"?

5        A.     Yes.

6        Q.     Marine One is a helicopter?

7        A.     Yes.

8        Q.     And if you look where it shows you

9   speaking about halfway or two-thirds of the way down

10  the document, the very first thing you say:  "So

11  we're going to Camp David"?

12       A.     Yes.

13       Q.     So am I correct in interpreting this --

14  that this is a statement you made while boarding or

15  getting onto Marine One --

16       A.     Looks like it.

17       Q.     -- to go to Camp David?

18       A.     It looks like it.

19       Q.     Okay.  Now, if you turn to page MP1800,

20  which is halfway -- well, about a third of the way

21  through the document.  That's a -- it says towards

22  the bottom of the page:

23            "Q.  Mr. President, you had said earlier

24  that you never met E. Jean Carroll.  There was a

25  photograph of you and her in the late 1980s," dash.

1                        D. J. TRUMP

2    Do you see that?

3         A.    That's correct.

4         Q.    And then after that, it says "The

5    President," and there's a statement that goes on to

6    the top of MP1802; is that correct?

7         A.    Okay.

8         Q.    And is it fair to say that that statement

9    that begins at the bottom of 1800 and goes to the

10   top of 1802 was your response to the question asked

11   by the reporter that we just talked about?

12             MS. HABBA:  I'm just going to state for

13        the record an objection that I don't know who

14        drafted this obviously.  So it's to the best of

15        his knowledge.  We can't really authenticate

16        it.

17             You can answer.

18             THE WITNESS:  Yeah.  I mean, it looks

19        like something that's something I might have

20        said getting onto a helicopter when asked.

21             MS. KAPLAN:  And just for the record,

22        this document was produced to us by the Trump

23        campaign.  That's what the Bates stamp means.

24             MS. HABBA:  But I still just wanted to

25        place on the record I'm not sure who drafted

1                          D. J. TRUMP

2          this.

3     BY MS. KAPLAN:

4          Q.     And I take it -- is it fair to say that

5     when you made comments while you were president on

6     your way to somewhere, on your way to an event, on

7     your way to boarding Air Force One or Marine One

8     that a transcript would be created like this and

9     released by your press office?

10         A.     Oftentimes, yeah.

11         Q.     Are you better able -- this is a long

12    one.  Let's try to do this, sir.  Are you better

13    able to read the writing in this document than the

14    previous document?

15         A.     I can.  You could read it.  But why don't

16    you read it?

17         Q.     You want me to read it?

18         A.     Yeah.

19         Q.     When my son was little, I couldn't stand

20    reading books to him because you had to read it so

21    slow, and it would drive me nuts.  But I'm going to

22    try to read it slow.

23                At the bottom of page 1800, it says "The

24    President," colon, and then it says as follows:

25                "I have no idea who this woman is.  This

```
                           D. J. TRUMP
 1
 2   is a woman who has also accused other men of things
 3   as you know.  It is a totally false accusation.  I
 4   think she was married, as I read.  I have no idea
 5   who she is, but she was married to an actually nice
 6   guy, Johnson, a newscaster.
 7              "Question:  You were in a photograph with
 8   her?
 9              "The President:  Standing with coat on in
10   a line -- give me a break -- with my back to the
11   camera.  I have no idea who she is.  What she did
12   is -- it's terrible, what's going on.  So it's a
13   total false accusation, and I don't know anything
14   about her, and she's made this charge against
15   others.  And, you know, people have to be careful
16   because they're playing with very, very dangerous
17   territory."
18              Am I going slow enough?
19        A.    Yeah, you're going fine.
20        Q.    "And when they do that -- and it's
21   happening more and more.  And when you look at what
22   happened to Justice Kavanaugh and when you look at
23   what's happening to others, you can't do that for
24   the sake of publicity.  New York Magazine is a
25   failing magazine.  It's ready to go out of business
```

1                       D. J. TRUMP

2    from what I hear.  They'll do anything they can, but

3    this was about many men.  And I was one of the many

4    men that she wrote about.  It's a totally false

5    accusation.  I have absolutely no idea who she is.

6    There's some picture where we're shaking hands.  It

7    looks like it's some kind of event.  I have my coat

8    on.  I have my wife standing next to me.  And I

9    didn't know her husband, but he was a newscaster.

10   But I have no idea who she is.  None whatsoever.

11   It's a false accusation, and it's a disgrace that a

12   magazine like New York -- which is one of the

13   reasons it's failing.  People don't read it anymore.

14   So you're trying to get readership by using me.

15   It's not good.  You know, there were cases that the

16   mainstream media didn't pick up, and I don't know if

17   you've seen them, and they were put on Fox.  But

18   there were numerous cases where women were paid

19   money to say bad things about me.  You can't do

20   that.  You can't do that.  And those women did wrong

21   things, that women were actually paid money to say

22   bad things about me.  But here's a case.  It's an

23   absolute disgrace that she's allowed to do that."

24             You made that statement, correct?

25        A.    Read the last part, please.

1                         D. J. TRUMP

2       Q.     "But here's a case.  It's an absolute

3   disgrace that she's allowed to do that."

4       A.     Yes.

5       Q.     Okay.  And I'm going to ask the same

6   questions I asked last time.

7              I take it you stand by that statement

8   today?

9       A.     Yes.

10      Q.     Sitting here today, are you aware of any

11  inaccuracies in your statement?  I'm not asking

12  about her allegation.  About your statement.

13      A.     No.  I think it's pretty much fine.  I

14  can't -- I haven't reviewed it in great detail, but,

15  you know, it was standing outside of a helicopter

16  that was getting ready to take off.  But, no, that

17  was -- that -- the statement is, in my opinion,

18  correct.

19      Q.     Okay.  And just so the record is clear,

20  if at any point you come across any inaccuracies,

21  please don't hesitate to let us know.

22             Let's go now to the third statement,

23  which we're going to mark as DJT 22.

24             (DJT Exhibit 22 was marked for

25  identification.)

1                          D. J. TRUMP

2   BY MS. KAPLAN:

3         Q.    You have in front of you, sir, a

4   five-page document.  The first page says in bold

5   type "Exclusive:  Trump vehemently denies

6   E. Jean Carroll allegation.  Says she's not my

7   type."

8               It's from a publication known as The

9   Hill.  It's dated June 24, 2019, and it's attributed

10  to the gentleman Jordan Fabian and -- or maybe not

11  the gentleman.  It's attributed to two people,

12  Jordan Fabian and Saagar Enjeti.  Do you see that?

13        A.    Yes.

14        Q.    So this is two days after the last

15  statement we're looking at, which is on June 22nd.

16              Do you recall having an interview with

17  reporters from The Hill on June 24, 2019?

18        A.    Vaguely, yes.

19        Q.    And do you recall where that interview

20  took place?

21        A.    I think it was in the Oval Office.

22        Q.    And if you turn to page -- the first

23  page -- it's really page 2 of the document I gave

24  you.  At the very top it says:  "President said

25  Monday that writer E. Jean Carroll was totally lying

```
 1                        D. J. TRUMP
 2   when she recently accused him of raping her during
 3   an encounter in a New York department store in the
 4   mid-1990s."  And then it talks about an exclusive
 5   interview with The Hill.  Do you see that?
 6        A.    Yeah.
 7        Q.    And you're quoted just below that
 8   paragraph as saying as follows -- and this one I'll
 9   read:  "I'll say it with great respect.  Number one,
10   she's not my type.  Number two, it never happened.
11   It never happened.  Okay?"
12              And then the reporters say:  "The
13   president said, 'Well, see you behind the Resolute
14   Desk in the Oval Office.'"  Do you see that?
15        A.    Yes, I do.
16        Q.    And the statement that I just read that
17   begins "I'll state with great respect," that was a
18   statement that you made to the reporter for The Hill
19   on June 24, 2019; correct?
20        A.    Yes.
21        Q.    And the same set of questions.  I take
22   it, sir, that you stand by that statement today?
23        A.    Yes, I do.
24        Q.    And I take it that from what we've been
25   discussing so far that you don't see any
```

```
 1                    D. J. TRUMP
 2  inaccuracies in that statement?
 3            MS. HABBA:  Objection to form.
 4            You can answer.
 5            THE WITNESS:  No.  No.  She made up the
 6       story.  It's a total lie.  She knows it.  She
 7       did it to sell a book, I guess, or something.
 8  BY MS. KAPLAN:
 9       Q.   In your June 21 statement, which is DJT
10  20, which is the Littman tweet, you referred to
11  Ms. Carroll's claim as a false accusation?
12       A.   Where is this?
13       Q.   DJT 20.
14       A.   Yeah.
15       Q.   You say it's a false accusation; correct?
16       A.   It's true.
17       Q.   And in your June 22 statement made on
18  your way to Camp David, you said that she made a
19  false accusation and a totally false accusation;
20  correct?
21       A.   Yes.
22       Q.   And in your interview with The Hill on
23  June 24, you say that Ms. Carroll was totally lying
24  and it never happened?
25       A.   Correct.
```

1              D. J. TRUMP

2   wouldn't be because it never happened, number one.

3   But there wouldn't be documents.

4       Q.    Just so the record is clear, other than

5   the possibility of security guards, can you think of

6   any other persons who would be witnesses to -- who

7   could confirm your account that Ms. Carroll's

8   allegation was false?

9       A.    That could confirm my account that

10  nothing happened?

11      Q.    Correct.  Anyone other than security?

12      A.    I would have to look for people, but, you

13  know, you're asking them to confirm that something

14  didn't happen.  In other words, you're asking them

15  to confirm that they never saw anything happen, and

16  they didn't because it didn't happen.  It's a lie.

17      Q.    Again, I'm just trying --

18      A.    It's a made-up story.  It's a fairy tale.

19      Q.    I'm trying to get the answer.  If you

20  could answer my question, the question I asked, we'd

21  get through this quicker.

22          MS. HABBA:  I think I'm just going to

23      object and state for the record that the

24      client's made clear that he can't find people

25      to say something that didn't happen didn't

```
1                    D. J. TRUMP
2   Smith or by somebody within minutes; okay?  So there
3   were no complaints.  There were no stories.  There
4   was no anything because it never happened.  It's all
5   fiction.  It's a con job.
6        Q.    So before you made your statements that
7   it never happened in 2019, did you or anyone on your
8   staff reach out to anyone at Bergdorf Goodman?
9        A.    I didn't have to reach out to anybody
10  because it didn't happen.  And by the way, if it did
11  happen, it would have been reported within minutes.
12  You're talking about going to a major floor
13  probably.  I assume the most important floor, a
14  major floor in a major department stores that's a
15  very busy store, by the way, and checkout counters
16  and everything else.  And I would be in there?  I
17  mean, it's the most ridiculous -- it's the most
18  ridiculous, disgusting story.  It was just made up.
19            MS. HABBA:  Just to clarify, the question
20        is if he reached out to Bergdorf?
21            MS. KAPLAN:  If he or anyone before he
22        made the statement in June 2019.
23            MS. HABBA:  If he directed anyone?
24            MS. KAPLAN:  Did he or anyone working for
25        him reach out to Bergdorf Goodman.
```

```
 1                        D. J. TRUMP

 2              THE WITNESS:  No.

 3  BY MS. KAPLAN:

 4       Q.    After you made the statements that you

 5  made in June of 2019, did you or anyone working for

 6  you reach out to Bergdorf Goodman?

 7       A.    After the statement was made?  No.

 8       Q.    No?

 9       A.    No.  This would have been public years

10  ago if it happened.  Years ago, many people, very

11  crowded store.

12              MS. HABBA:  Obviously, just to make the

13       record clear, we're not discussing any

14       conversations he had with attorneys.  That

15       would be privileged.

16              MS. KAPLAN:  But if you had the

17       statement, you could say had the conversation,

18       but I don't know what it was.  That's fair.

19       But other than that, I don't want to know.  And

20       I'm talking about Bergdorf Goodman.  So I'm not

21       asking about attorneys.

22  BY MS. KAPLAN:

23       Q.    In your June 21 statement, which is --

24  oh, Exhibit 20.

25              MS. KAPLAN:  I thought you were
```

1               D. J. TRUMP

2       correcting the date.  He kept saying 20.

3   BY MS. KAPLAN:

4       Q.    In your June 21 statement that's marked

5   as Exhibit 20, you say -- and this is the Littman

6   tweet -- "I never met this person in my life."

7       A.    Yes.

8       Q.    Was that a true statement when you made

9   it on June 21, 2019?

10      A.    It was a true statement when I made it.

11  I think subsequently or at some point they showed a

12  picture on a receiving -- I was on a celebrity line

13  for a charity, and I think I was either shaking her

14  hand or her husband's hand on a receiving line.

15  Like I say, I shake a lot of hands with people, but

16  I had no idea who she was.

17      Q.    So if I can understand your testimony,

18  sir, you're saying that at the time you made the

19  statement that's in DJT 20, you were not aware of

20  ever having met Ms. Carroll?  You have since seen a

21  photograph that shows you with Ms. Carroll on a

22  receiving line; correct?

23      A.    Along with a lot of other people.

24            MS. HABBA:  Objection to form.

25            THE WITNESS:  This was a very public -- I

1                         D. J. TRUMP

2         think it was a charity or a celebrity event or

3         something.  And I think that's her big claim to

4         fame, you know, that she shook my hand at some

5         celebrity event.

6    BY MS. KAPLAN:

7         Q.   So the answer to my question is yes, that

8    after you made the statement, you became aware that

9    there's a photo of you with Ms. Carroll in a

10   receiving line; correct?

11        A.   At some point.

12        Q.   Okay.

13        A.   I saw there was a photo on a receiving

14   line, yes.

15        Q.   Okay.

16             MS. KAPLAN:  Let's mark the photo.  What

17        number are we on?

18             (DJT Exhibit 23 was marked for

19   identification.)

20   BY MS. KAPLAN:

21        Q.   You have in front of you a black and

22   white photograph that we've marked as DJT 23.  And

23   I'm going to ask you:  Is this the photo that you

24   were just referring to?

25        A.   I think so, yes.

```
 1                      D. J. TRUMP
 2        Q.    And do you recall when you first saw this
 3   photo?
 4        A.    At some point during the process, I saw
 5   it.  I guess that's her husband, John Johnson, who
 6   was an anchor for NBC.  Nice guy, I thought.  I
 7   mean, I don't know him, but I thought he was pretty
 8   good at what he did.  I don't even know the woman.
 9   I don't know who -- it's Marla.
10        Q.    You're saying Marla is in this photo?
11        A.    That's Marla, yeah.  That's my wife.
12        Q.    Which woman are you pointing to?
13              MS. HABBA:  No, that's Carroll.
14              THE WITNESS:  Oh, I see.
15   BY MS. KAPLAN:
16        Q.    The person you just pointed to was
17   E. Jean Carroll.
18              MS. HABBA:  That's your wife.
19   BY MS. KAPLAN:
20        Q.    And the person -- the woman on your right
21   was --
22        A.    I don't know.  This was the picture.  I
23   assume that's John Johnson.
24              MS. HABBA:  That's Carroll.
25              THE WITNESS:  That's Carroll?  Because
```

1                          D. J. TRUMP

2        A.    No.   I don't know how I even knew she was

3    married to him.  At some point I heard that she was

4    married to John Johnson, who I knew as an announcer

5    or anchor, I thought, for ABC.

6        Q.    Now, in your June 21 statement, which

7    is -- in your June 21 statement, which is DJT 20,

8    you said that Ms. Carroll was trying to sell a new

9    book and that you said shame on those who make up

10   false stories of assault to try to get publicity for

11   themselves or sell a book?

12       A.    Yeah, that's right.

13       Q.    Before you made that statement, did you

14   have any knowledge one way or the other of the

15   financial arrangements between Ms. Carroll and the

16   publisher of her book?

17       A.    No.

18       Q.    Did you even know who her publisher was?

19       A.    No.

20       Q.    Did you ever see her book contract?

21       A.    No.

22       Q.    Did you know anything about Ms. Carroll's

23   financial situation?

24       A.    No.

25       Q.    Did you know anything about her expected

```
1                    D. J. TRUMP
2   book sales?
3        A.    No idea.
4        Q.    Before you made this statement, do you
5   know if you or anyone working for you went on to --
6   withdrawn.
7              Before you made this statement that
8   appears in DJT 20, do you know whether you or anyone
9   working for you did any research on Ms. Carroll?
10       A.    I just don't know.  It's possible
11  somebody -- when they heard this horrible
12  accusation, it's possible that somebody did a little
13  quick research but not that I know of.
14       Q.    Another thing that you say in your June
15  21 statement is that Ms. Carroll was trying to carry
16  out a political agenda?
17       A.    Yeah.
18       Q.    How did you know she had a political
19  agenda if you didn't know who she was?
20       A.    Somebody told me early on that she was
21  somehow aligned with Hillary Clinton.  She was
22  either aligned with her or -- I thought aligned with
23  her.
24       Q.    Who told you that?
25       A.    I think you're aligned with her too
```

```
 1                    D. J. TRUMP
 2  actually.
 3       Q.    Who told you that?
 4       A.    Somebody had mentioned it.
 5       Q.    Do you recall who?
 6       A.    I don't know.  I don't know who said it,
 7  but somebody had mentioned it since, that she was
 8  somehow into that whole world.
 9       Q.    And you just said "I don't know who -- I
10  don't know who said it, but somebody has mentioned
11  it since"?
12       A.    No.  I meant since the accusation.
13       Q.    Oh, since the accusation.
14             Do you remember what that person told you
15  if you don't --
16       A.    Just mentioned that they thought she was
17  somewhat political and aligned with Hillary Clinton.
18       Q.    Before issuing your statement on June 21,
19  did you learn what political party Ms. Carroll
20  belonged to?
21       A.    No, I didn't know that.
22       Q.    Before you issued your June 21 statement,
23  did you have any documents indicating that she was
24  pursuing a political agenda?
25       A.    No.
```

D. J. TRUMP

1

2      Q.    At the end of your statement, your June

3  21 statement, you say:  "If anyone has information

4  that the Democratic party is working with

5  Ms. Carroll or New York Magazine, please notify us

6  as soon as possible."

7           Did anyone ever notify you --

8      A.    I don't know.

9      Q.    Sitting here today, you can't recall

10  anyone who notified you?

11      A.    I don't know, yeah.

12      Q.    Now --

13           MS. KAPLAN:  Oh, it's noon.  Leah, I know

14      you wanted to stay on schedule.  Did you want

15      to break now?

16           MS. HABBA:  Okay --

17           THE WITNESS:  No.  No.  I'd rather finish

18      this up.

19           MS. HABBA:  How much more time do you

20      have?

21           MS. KAPLAN:  Oh, I'm not going to be

22      done, but I can get through this section in

23      probably five or ten minutes.

24           MS. HABBA:  Yeah, go ahead.

25

Page 94

1                           D. J. TRUMP

2    physically; right?

3         A.    I saw her in a picture.  I didn't know

4    what she looked like, and I said it -- and I say it

5    with as much respect as I can, but she is not my

6    type.

7         Q.    And, again, when you say "type," you just

8    referred to looking at photos.  So you mean

9    physically she's not your type?

10        A.    Physically she's not my type, and now

11   that I've gotten indirectly to hear things about

12   her, she wouldn't be my type in any way, shape, or

13   form.

14        Q.    But when you were talking back on June

15   24th, you were referring to her not being your type

16   physically; correct?

17        A.    I saw a photo of her.

18        Q.    Okay.

19        A.    And the only difference between me and

20   other people is I'm honest.  She's not my type.

21        Q.    Do you recall what photo you saw of her

22   before you made that statement?

23        A.    No.  No.  I saw a photo after the --

24   after her ridiculous accusation was made, I got to

25   see a photo -- somebody --

1                         D. J. TRUMP

2    allegedly made?

3         A.    Just a general statement.

4         Q.    Okay.  Now, I'm going to go through a

5    list of people who I think you may have spoken to

6    about Ms. Carroll's allegations or this lawsuit.  I

7    want to do this carefully.  So what I first want to

8    just ask you is -- I want to give you the person's

9    name, and you can tell me, yes or no, you spoke to

10   them.  And if it's yes, I may have some follow-up

11   questions but --

12        A.    Okay.

13             MS. HABBA:  Just so that I don't have to

14        object on every ground, obviously executive

15        privilege.  I don't want to go into the

16        substance of any conversations with any of his

17        advisers or anyone while he was in the

18        White House.

19             MS. KAPLAN:  I understand that.  Let's

20        take it question by question.

21             MS. HABBA:  Sure.

22   BY MS. KAPLAN:

23        Q.    Did you ever communicate about

24   Ms. Carroll or this lawsuit with Dan Scavino?

25        A.    I don't remember having done so.  It's

```
 1                      D. J. TRUMP
 2    possible, but I don't remember having done so.
 3         Q.    Same question for Nicholas Luna.
 4         A.    I sort of doubt it.  I don't think so.
 5         Q.    Molly Michael?
 6         A.    I don't think I talked about it
 7    specifically.  It's possible, but I don't think so.
 8         Q.    Hope Hicks?
 9         A.    No.  Pretty sure no.
10         Q.    Adam Kennedy?
11         A.    Say it again.  Who?
12         Q.    Adam Kennedy?
13         A.    I don't think so.
14         Q.    Derek Lyons?
15         A.    Pretty sure no.
16         Q.    Sara Sanders?
17         A.    No.
18         Q.    Stephanie Grisham?
19         A.    I don't remember exactly.  I think -- I
20    don't -- it's possible I said something.  I don't
21    know.  I really don't -- not much.
22         Q.    Judd Deere?
23         A.    Who?
24         Q.    Judd Deere.
25         A.    Not that I remember.
```

```
 1                          D. J. TRUMP

 2        Q.    Nick Mulvaney?

 3        A.    Not that I remember.

 4        Q.    Emma Doyle?

 5        A.    Not that I remember.

 6        Q.    Heidi Stirrup?

 7        A.    Not that I remember.

 8        Q.    Kayleigh McEnany?

 9        A.    Not that I remember.

10        Q.    Erin Perrine?

11        A.    Not that I remember.

12        Q.    Sarah Matthews?

13        A.    Not that I remember.

14        Q.    Daniel -- I hope I'm pronouncing this

15   right -- Bucheli, B-U-C-H-E-L-I?

16        A.    Not that I remember.

17        Q.    Tim Murtaugh?

18        A.    Some of these people I don't even know.

19        Q.    Okay.

20        A.    You're asking me names I don't even know.

21        Q.    Well, if you don't know, tell me just so

22   the record is clear.

23        A.    Go ahead.

24        Q.    Tim Murtaugh?

25        A.    No.
```

```
 1                        D. J. TRUMP

 2       Q.    Matt Wolking?

 3       A.    No.

 4       Q.    Zach Parkinson?

 5       A.    No.  I say -- when I say no, I mean I

 6  really have to say not that I remember but --

 7       Q.    Okay.

 8       A.    -- pretty much not that I remember.

 9       Q.    Okay.  And in addition to -- let me make

10  sure I got through the list.  Oh, no.  I'm not done.

11  Sorry.

12              Jared Kushner?

13       A.    Did I ever speak to him about it?

14       Q.    Yeah.

15       A.    I don't think so.

16       Q.    Your daughter.

17       A.    I told my daughter that this was a --

18              MR. MADAIO:  She's just asking whether or

19       not you had a conversation about it.

20              MS. HABBA:  I don't want you to answer.

21       It's privileged.

22              THE WITNESS:  I mentioned it briefly.

23  BY MS. KAPLAN:

24       Q.    Either of your sons?

25       A.    I don't think so.
```

```
 1                        D. J. TRUMP

 2       Q.    And by the sons, I mean your adult sons.

 3       A.    Yeah.  I don't think so.

 4       Q.    Your current wife?

 5       A.    Yeah.

 6       Q.    Okay.  And I'm just going to use

 7  categories.  In addition to the people that I

 8  mentioned, do you recall any conversations with

 9  anyone in the legislative branch -- and by that I

10  mean the House or the Senate or people who work

11  there.

12       A.    Well, it's probable that I told people

13  that there was a false, disgusting lie made about me

14  because I would say that to a lot of people.  Even

15  if they didn't ask, I was very offended by this.

16  This woman is sick.  There's something wrong with

17  her, and it's a false story.  So I would go around

18  saying that to people, yes.  So it's possible that I

19  would say that to legislators.

20       Q.    What about people in the executive branch

21  who I didn't mention?

22       A.    No.  I mean, I think you mentioned a lot

23  of people.

24       Q.    I did, and I take it -- what about anyone

25  else who worked on your presidential campaign?
```

1                        D. J. TRUMP

2   with something that's called an interrogatory?

3        A.    Go ahead.  Give me a definition.

4        Q.    An interrogatory are written questions

5   that attorneys ask the other side, and then written

6   answers are provided.

7               Are you familiar with that general

8   concept?

9        A.    Yes.

10        Q.    Okay.  I'm going to show you your

11   interrogatory responses in this case.

12               MS. KAPLAN:  We're going to mark it as

13        25.

14               (DJT Exhibit 25 was marked for

15   identification.)

16               THE WITNESS:  Okay.  Go ahead.

17   BY MS. KAPLAN:

18        Q.    So if you turn to page 2, you'll see

19   about a quarter of the way down it says Number 2

20   under the header "Supplemental Responses and

21   Objections to Interrogatories," and 2 reads:

22   "Identify all individuals with whom you have

23   communicated by any means concerning the plaintiff

24   or this action."  And I'll represent to that you

25   that's E. Jean Carroll or this case, and then

1                         D. J. TRUMP

2    there's a lot of objections.  And then subject to

3    those objections, there's names listed, and it

4    starts with Dan Scavino.

5               You had told me a few minutes ago that

6    you couldn't remember, but it's possible that you

7    spoke to Mr. Scavino.  Does this refresh your

8    recollection?

9         A.    No.  I mean, it is possible.

10        Q.    Okay.  Nicholas Luna.  You had said I

11   doubt it, but he appears in these interrogatories?

12        A.    It's possible.

13        Q.    Molly Michael I think you told me you

14   spoke to.  So that checks.

15        A.    Yeah.

16        Q.    Hope Hicks.  You had said no, and she

17   appears in this interrogatory.

18        A.    I'd say less likely.

19        Q.    Less likely --

20        A.    I mean, I would say no, but her name is

21   here.  So they put the name, but I would say

22   anything is possible with any of these people.

23   These are the people that I deal with.

24        Q.    Derek Lyons.  You said pretty sure no and

25   then --

1                    D. J. TRUMP

2       A.    Derek Lyons I think -- I'm fairly sure,

3  but, again, it's possible that I did.  But I

4  think -- I think no.

5       Q.    And then Jared Kushner.  I think your

6  answer to me was I don't think so, and then his name

7  appears?

8       A.    I don't think so, but it's possible that

9  I spoke to him.

10       Q.    Did you review this document prepared by

11  your attorneys before it was submitted?  This was on

12  August 23rd.

13       A.    Yes, very quickly.  I don't know if I

14  signed it.  Did I sign it?

15       Q.    No.  It's signed by --

16       A.    No.  I didn't sign it, but I reviewed it,

17  I guess, in concept.  I didn't sign it.  When I sign

18  something, I guess maybe I look at it more closely.

19  But I didn't sign this.  I'm not sure.  I was told

20  about the document.

21       Q.    And so --

22       A.    It was just a refutation.  That's --

23  because this was something that never happened, as

24  you know very well.

25       Q.    Well, this question isn't about whether

```
 1                    D. J. TRUMP
 2  or not it happened or not, sir.  It's a question
 3  about --
 4       A.    Let's go.  Let's go.
 5       Q.    Well, again, this interrogatory is about
 6  who you spoke to, and your answers have been
 7  somewhat inconsistent --
 8       A.    Yeah.
 9       Q.    -- between this interrogatory and what I
10  heard today, so what I'm trying to understand is
11  what's your position as of today.
12              And I take it -- and you can correct me
13  if I'm wrong -- that your position as of today is
14  what you've said here at this deposition; correct?
15       A.    The deposition rules.  That's correct.
16  Because this is not signed by me.  This is signed by
17  somebody else.
18       Q.    Okay.  Okay.  Now, a woman by the name of
19  Stephanie Grisham served as your press secretary and
20  communications director from July 1, 2019, to April
21  7, 2020; correct?
22       A.    Yeah.
23       Q.    And before that she had served as the
24  press secretary for the First Lady?
25       A.    Yes.
```

1                        D. J. TRUMP

2        Q.    Do you recall telling any other woman

3   that if they had been assaulted as Ms. E. Jean

4   describes it in a dressing room, that woman would

5   have fought back?

6              MS. HABBA:  Objection.

7              THE WITNESS:  No, I don't remember saying

8         that.  I don't remember that.  But I didn't --

9         I don't think I said that.  But if you read --

10        if you see her interview with Anderson Cooper,

11        she's talking about this not only not being an

12        assault, but she said other things that were

13        frankly crazy in terms of what -- that

14        interview, to me, made her look like, number

15        one, a liar, and, number two, like she was off.

16        There's something a little off with her

17        mentally.

18   BY MS. KAPLAN:

19        Q.    So you said a couple of answers ago that

20   you would have told -- excuse me -- that you did

21   tell people that if this had happened in a dressing

22   room of a crowded department store, people would

23   have heard it, and people would have asked what the

24   hell is going on.

25        A.    Yeah.  I would say that that would be

1                          D. J. TRUMP

2    work out those problems for herself.  Now, like

3    everyone else, she gets paid by a radical,

4    left-leaning publisher to say bad and untrue

5    things."  Do you see that?

6         A.    Yeah.

7         Q.    I want to focus on the very last

8    sentence, which says:  "Now, like everyone else, she

9    gets paid by a radical, left-leaning publisher to

10   say bad and untrue things."

11        A.    Yeah.

12        Q.    Do you know who her publisher was?

13        A.    No.  I just heard it was a publisher that

14   did some very bad books on us.

15        Q.    I'll represent to you her publisher was

16   Harper Collins.

17        A.    Yeah.  And they haven't been great.

18        Q.    Do you know who published your

19   son-in-law, Jared Kushner's book?

20        A.    Could be, but they published some very

21   bad ones too.

22        Q.    What is Truth Social?

23        A.    It's a platform that's been opened by me

24   as an alternative to Twitter.

25        Q.    And your handle on Truth Social is

1                        D. J. TRUMP

2      @realdonaldtrump?

3           A.    I believe so, yes.

4           Q.    And as of today, you have approximately

5      four million followers on Truth Social?

6           A.    I don't know the number.  I know

7      Truth Social is doing very well.  I think it was

8      number one ahead of TikTok, number one ahead of

9      Twitter, number one ahead of Instagram and everyone

10     else for the last number of days.  I just noticed

11     that.  Somebody put it on my desk.  They have the

12     ratings, and they said Truth Social is hot.

13          Q.    And I'll represent to you, sir, that we

14     looked it up, and it showed, at least as of the last

15     time we looked, you had around four million -- a

16     little bit over four million followers.

17          A.    On me personally.

18          Q.    On you personally.

19          A.    Not Truth Social, on me.  I don't know.

20     That's possible.

21          Q.    Okay.  And like Twitter, people have the

22     ability to repost, or I think as you used the

23     expression in Truth Social, "retruth" posts that you

24     make from your @realdonaldtrump account; correct?

25          A.    I think so, yes.  Yes, they do.

1                         D. J. TRUMP

2        Q.     And people have the opportunity to like

3   or heart one of your posts as well; correct?

4        A.     Could be.

5        Q.     Okay.  Now, on October 12, just a few

6   days ago, you issued a statement on Truth Social

7   about Ms. Carroll and this case; correct?

8        A.     I believe so, yes.

9        Q.     And the statement that you posted, who

10  wrote that statement?

11       A.     I did.

12       Q.     You yourself?

13       A.     Yeah.

14       Q.     Did you post the statement yourself?

15       A.     Yes.

16       Q.     And in addition to posting the statement

17  on Truth Social, you also sent it to the press?

18       A.     Yes.  It's called truth and post.  We

19  post much like -- how would you say it?  We put out

20  a statement, and we also put it on Truth.

21       Q.     And when you say you put it out --

22       A.     Like a public relations statement.

23       Q.     It goes, like, to an email list of

24  reporters?

25       A.     Yeah, whatever.  Yeah.  The bigger grab

1                          D. J. TRUMP

2    is The Truth, but we also -- we call it posts.  We

3    have -- actually it's truth and post.  So we call it

4    post.  But the bigger -- the more important of the

5    two is The Truth because people are watching it.

6          Q.    And in that sentence, you just used the

7    word "we."  Does someone help you --

8          A.    Well, I'm talking about me.

9          Q.    Okay.  But --

10         A.    But when I say "we," I'm talking about

11   perhaps Truth because Truth has, you know, people

12   working for it, quite a few people.

13         Q.    Okay.  But you didn't personally send the

14   email to the reporters yourself, did you?

15         A.    No.  What they do is they take it from

16   Truth, and then they'll put it out as a press

17   release.

18         Q.    And that's what I'm trying to ask, sir.

19   Who's "they"?

20         A.    Different people that work in the

21   organization in Truth or -- some cases my office.

22         Q.    And with this statement, do you recall

23   whether it was people who worked for Truth Social or

24   your office?

25         A.    I believe we put it out through my

1                     D. J. TRUMP

2    office.

3         Q.    And who in your office would have been

4    responsible for doing that?

5         A.    Possibly -- maybe Margo or maybe

6    Chamberlain, Chamberlain Harris.

7         Q.    So Chamberlain Harris and -- I don't know

8    Margo's last name.

9         A.    One or two of the people in the office

10   would have done it.

11        Q.    What's Margo's last name?

12        A.    Excuse me?

13        Q.    Do you know Margo's last name?

14        A.    Margo Martin.

15        Q.    Trying to interpret the last several

16   questions and answers.

17              When you post something on Truth Social,

18   does it always go to the press ultimately, or does

19   someone make that decision?

20        A.    Pretty automatic.

21        Q.    Okay.

22        A.    It goes to the press really directly on

23   Truth too.  So most people have it before they get

24   the Post.

25        Q.    And I take it when it goes to the

1                         D. J. TRUMP

2    reporters by email, there's a designated group, and

3    it always goes to the same --

4         A.    I don't know how they do that, but it

5    goes to the press.

6         Q.    Why did you decide to issue the statement

7    on Truth Social on October 12th?

8         A.    Because I was offended at this woman's

9    lie.  Because I was offended that she could just

10   make up a story out of cold air, refuted by her

11   testimony on CNN, but that she could make up a story

12   just out of nowhere and that I get a phone call

13   asking me about this ridiculous situation.  The

14   woman -- there's something wrong with her in my

15   opinion.  Okay.  But it's a false accusation.  Never

16   happened, never would happen.  And I posted and I

17   will continue to post until such time as -- and then

18   I will sue her after this is over, and that's the

19   thing I really look forward to doing.  And I'll sue

20   you too because this is -- how many cases do you

21   have?  Many, many cases, and I know the statements

22   that were made -- that you made.  Keep Trump busy

23   because this is the way you defeat him, to keep him

24   busy with litigation.  So I will be suing you also,

25   but I'll be suing her very strongly as soon as this

```
1                      D. J. TRUMP
2   case ends.  But I'll be suing you also.
3        Q.    Are you done?
4        A.    Yeah.
5        Q.    Is there anything in particular that
6   prompted you to make this statement last week?
7        A.    Yeah.  Her false story and that I have to
8   waste a whole day doing these ridiculous questions
9   with you.
10       Q.    Okay.
11             MS. KAPLAN:  Let's look at the statement.
12       Let's mark it as -- what's my next number?
13             MR. MADAIO:  DJT 28.
14             (DJT Exhibit 28 was marked for
15   identification.)
16             THE WITNESS:  I can't read this.
17             MS. KAPLAN:  Well, we have a blown-up
18       version.
19   BY MS. KAPLAN:
20       Q.    Let's mark it as 28 and 28A.
21             Oh, so you have a document that's got --
22   let me back up.  I'm not following my own rules that
23   it's not a conversation.
24             So what we have in front of you as DJT
25   28, sir, is the post as it appeared on Truth Social
```

1                    D. J. TRUMP

2    on October 12, 2022, and a blown-up version because

3    we appreciate that the type is very small.  A

4    blown-up version that should be more legible.

5         A.    I can see it, yeah.

6         Q.    Would you like me to read it into the

7    record?

8         A.    Yeah, go ahead.  Sure.

9         Q.    So it says:  "October 12, 2022, statement

10   by Donald J. Trump, forty-fifth President of the

11   United States of America.  This 'Ms. Bergdorf

12   Goodman case' is a complete con job, and our legal

13   system in this country but especially in New York

14   State (just look at Peekaboo James) is a broken

15   disgrace.  You have to fight for years and spend a

16   fortune in order to get your reputation back from

17   liars, cheaters, and hacks.  This decision is from

18   the judge who was just overturned on my same case.

19   I don't know this woman, have no idea who she is

20   other than it seems she had a picture of me many

21   years ago with her husband shaking my hand on a

22   reception line at a celebrity charity event.  She

23   completely made up a story that I met her at the

24   doors of this crowded New York City department store

25   and within minutes 'swooned' her."  "Swooned" is in

```
 1                    D. J. TRUMP

 2   quotes.

 3              "It is a hoax and a lie just like all the

 4   other hoaxes that have been played on me for the

 5   past seven years, and while I'm not supposed to say

 6   it, I will.  This woman is not my type!  She has no

 7   idea what day, what week, what month, what year, or

 8   what decade this so-called 'event' supposedly took

 9   place.  The reason she doesn't know is because it

10   never happened, and she doesn't want to get caught

11   up with details or facts that could be proven wrong.

12   If you watch Anderson Cooper's interview with her

13   where she was promoting a really crummy book, you

14   will see that it is a complete scam.  She changed

15   her story from beginning to end after the commercial

16   break to suit the purposes of CNN and Andy Cooper.

17   Our justice system is broken along with almost

18   everything else in our country.  Her lawyer is a

19   political operative and Cuomo crony who goes around

20   telling people that the way to beat Trump is to sue

21   him all over the place.  She is suing me on numerous

22   frivolous cases just like this one, and the court

23   system does nothing to stop it.

24              "In the meantime and for the record,

25   E. Jean Carroll is not telling the truth, is a woman
```

1                      D. J. TRUMP

2    I had nothing to do with, didn't know, and would

3    have no interest in knowing her if I ever had the

4    chance.  Now all I have to do is go through years

5    more of legal nonsense in order to clear my name of

6    her and her lawyer's phony attacks on me.  This can

7    only happen to 'Trump'!"

8                Did I read that correctly?

9         A.    Great statement, yeah.  True.  True.

10        Q.    And now that you've heard it again and

11   you have it in front of you, you again confirm that

12   you wrote the whole thing yourself?

13        A.    I wrote it all myself.  All myself.

14        Q.    Did you talk to anyone before you wrote

15   it?  Did you talk to anyone about what to say in the

16   statement?

17        A.    No.  I didn't need to.  I'm not Joe

18   Biden.

19        Q.    In this statement you say, I think, for

20   the first time that it was a charity event, that

21   photo.  It was a charity event that --

22        A.    That was what I was told, yeah.  I was

23   told it was a charity event.  Nobody knows which

24   event it was, but it was like a charity event.

25        Q.    Do you know -- remember who told you

1                          D. J. TRUMP

2        Q.     So you wrote the statement and someone in

3   your office gave you the picture?

4        A.     They pasted it.  They -- it's called

5   pasting.  You put it onto a statement.  This was a

6   Save America statement, which is very interesting

7   actually because it is saving America, stopping

8   people from doing things like this, trying to

9   save -- it's one big part of saving America.  No.

10  But this was the photo that was given of her.

11       Q.     Okay.  Who gave you the photo?

12       A.     I don't know.  I don't know.

13       Q.     Was it someone in your office?

14       A.     I think it's stock.  I think it's a stock

15  photo.  It was taken from either a periodical or a

16  newspaper.

17       Q.     Why did you include -- decide to include

18  this photo in your post?

19       A.     I don't know.  They just gave me a photo.

20  I don't know.  They just added it in.

21       Q.     So you weren't given a selection of

22  photos to --

23       A.     No.  No.  They just added it in.

24       Q.     Now, at the beginning of your post, the

25  reference "Ms. Bergdorf Goodman" is a reference to

1                    D. J. TRUMP

2   Ms. Carroll; right?

3        A.    That's right.

4        Q.    And at the deposition in another case

5   where I was here, you referred to, as I recall,

6   Ms. Carroll as Madam Bergdorf Goodman.  Same idea;

7   right?

8        A.    Same concept, yeah.

9        Q.    Now, when you say in here I don't know

10  this woman and have no idea who she is, even though

11  you're using the present tense, you're referring

12  back to your knowledge as of when she first made the

13  allegation --

14       A.    I still don't know this woman.  I think

15  she's a wack job.  I have no idea.  I don't know

16  anything about this woman other than what I read in

17  stories and what I hear.  I know nothing about her.

18       Q.    Okay.  Well, I guess the distinction I'm

19  trying to make, sir, is that when the allegation

20  came out in 2019, you said you -- I think it's your

21  testimony that you had no idea who she was.

22       A.    I still don't.

23       Q.    Well, today you at least know that she's

24  a plaintiff in a case suing you; correct?

25       A.    Oh, yes.  That, I know, but I know

1                    D. J. TRUMP

2    nothing about her.  I think she's sick, mentally

3    sick.

4         Q.    Okay.  You say in this post -- you use a

5    strange word, which I want to ask you about.  You

6    say she completely made up a story that I met her at

7    the doors of this crowded New York City department

8    store and within minutes swooned her.  Do you see

9    that?

10        A.    Yeah.

11        Q.    What does "swooned her" mean?

12        A.    That would be a word, maybe accurate or

13   not, having do with talking to her and talking

14   her -- to do an act that she said happened, which

15   didn't happen.  And it's a nicer word than the word

16   that starts with an F, and this would be a word that

17   I used because I thought it would be inappropriate

18   to use the other word.  And it didn't happen.

19        Q.    Okay.  I was curious when I read this.

20   So I looked up the word "swoon" in the dictionary,

21   and under the dictionary, it means "to faint with

22   extreme emotion."  That's not what you meant here?

23              MS. HABBA:  Objection to the form.

24              THE WITNESS:  Well, sort of that's what

25        she said I did to her.  She fainted with great

1                    D. J. TRUMP

2    you better watch the interview.

3         Q.    In the interview when Ms. Carroll talked

4    about rape being sexy, isn't it true that she said

5    that's a view that many other people hold?

6         A.    Oh, I don't know.  I mean, I don't know.

7    All I know is I believe she said rape is sexy or

8    something to that effect, but you'll have to watch

9    the interview.  It's been awhile.

10        Q.    And just to clarify, I think you said a

11   few minutes earlier that you used the word "swooned"

12   as a synonym for -- you said the F word -- for

13   sexual intercourse?

14        A.    Yeah.  That's because that's what she

15   said.

16        Q.    What do you mean?  She never used the

17   word "swooned."

18        A.    No.  She said that I did something to her

19   that never took place.  There was no anything.  I

20   know nothing about this nut job.

21        Q.    Okay.  Then you go on to say in the

22   statement:  "And while I am not supposed to say it,

23   I will."  Why were you not supposed to say it?

24        A.    Because it's not politically correct to

25   say -- read the next.  Go ahead.  That she's not my

1                          D. J. TRUMP

2    type?  Yeah.  Because it's not politically correct

3    to say it, and I know that, but I'll say it anyway.

4    She's accusing me of rape, a woman that I have no

5    idea who she is.  It came out of the blue.  She's

6    accusing me of rape -- of raping her, the worst

7    thing you can do, the worst charge.

8              And you know it's not true too.  You're a

9    political operative also.  You're a disgrace.  But

10   she's accusing me and so are you of rape, and it

11   never took place.  And I will tell you I made that

12   statement, and I said, while it's politically

13   incorrect, she's not my type.  And that's

14   100 percent true.  She's not my type.

15       Q.   And when you say "not my type," you want

16   people -- your intention of saying -- withdrawn.

17             The point of saying she's not my type is

18   to persuade people that you didn't rape her because

19   she wasn't attractive enough; correct?

20             MR. MADAIO:  Object to the form.

21             MS. HABBA:  Objection to the form.

22             THE WITNESS:  When I say she's not my

23        type, I say she is not a woman I would ever be

24        attracted to.  There is no reason for me to be

25        attracted to her.  I just -- it's not even

1                          D. J. TRUMP

2          meant to be an insult.  There's no way I would

3          ever be attracted to her.  Now, some people

4          would be attracted to her perhaps.  I would

5          never be attracted to her.

6              So in addition to the fact that it never

7          happened, never could happen -- so I say it's

8          politically incorrect to say essentially she's

9          not my type on top of everything else.

10   BY MS. KAPLAN:

11         Q.    So you also have a reference -- you

12   have -- withdrawn.

13              At the top of the thing, you say Peekaboo

14   James?

15         A.    Yes.

16         Q.    I assume that's the New York attorney

17   general, Letitia James?

18         A.    Or New York State attorney general.

19         Q.    Yes.

20         A.    You know, your friend Cuomo knows her.

21         Q.    And then you talk --

22         A.    You should ask Andrew.  If you want a

23   definition, ask Andrew about her.  I think

24   you've been through a lot.

25         Q.    And then you talk about the judge, and

1              D. J. TRUMP

2        many times hoax by all these people, the scum

3        that we have in our country, lying to Congress

4        hoax, the spying on my campaign hoax.  They

5        spied on my campaign, and now they admit it.

6        That was another hoax, and I could get a whole

7        list of them.  And this is a hoax too.

8   BY MS. KAPLAN:

9        Q.    This -- when you say "this" and "that" --

10       A.    This ridiculous situation that we're

11  doing right now.  It's a big, fat hoax.  She's a

12  liar and she's a sick person in my opinion.  Really

13  sick.  Something wrong with her.

14       Q.    Okay.  In addition to the Russia Russia

15  Russia hoax, the Ukraine Ukraine Ukraine hoax, the

16  Mueller or Mueller hoax, the lying to FISA hoax, the

17  lying to Congress hoax, and the spying on your

18  campaign hoax, isn't it true that you also referred

19  to the use of mail-in ballots as a hoax?

20       A.    Yeah, I do.  Sure.

21            MS. HABBA:  Objection.

22            THE WITNESS:  I do.  I think they're very

23       dishonest.  Mail-in ballots, very dishonest.

24  BY MS. KAPLAN:

25       Q.    And isn't it true that you yourself have

1                    D. J. TRUMP

2   talked about Ms. Leeds.

3            What else did you know about Ms. Leeds

4   that would indicate to you that she was -- would not

5   have been your first choice other than how she

6   looked?

7        A.    I don't know.  I think I probably saw her

8   on television or something.

9            But -- I don't want to be insulting, but

10  when people accuse me of something, I think I have a

11  right to be insulting, because they're insulting me.

12  They're doing the ultimate insult.  They make up

13  stories and then I'm not allowed to speak my mind?

14  No, I disagree with that.

15           She would not have been anywhere on a

16  list.  I just -- just wouldn't have been for me.

17           It's disgusting.  What she said was

18  disgusting.

19           Can you imagine doing that on an

20  airplane, what she said?  I'm doing that on an

21  airplane?  That's almost as ridiculous as doing it

22  in Bergdorf Goodman in a dressing room.

23       Q.    Now, you just testified at some length,

24  sir, that Ms. Leeds would have remembered the date

25  or the flight that she was on when she says this

D. J. TRUMP

1

2       You wanted people to think that; no?

3       A.    All I wanted people to know is that this

4    false story, which is a false, made-up story -- she

5    made it up probably to sell her book or for her own

6    ego, because she's, I think -- again, I've said it

7    before.  I think she's a very deranged, sick person,

8    to make it up.

9            And I look forward to suing her at the

10   appropriate time.

11      Q.    And are you aware, if you look at page 5

12   of the document in front of you, sir, that

13   Ms. Humphreys has calculated that what it would cost

14   to run a corrective campaign to remedy Ms. Carroll's

15   reputation from the things you have said and the

16   follow-up millions and millions of times would be in

17   the range of 9.9 and $12.5 million?

18      A.    This is nonsense.  Okay?  She made a

19   statement about me and I responded to her statement.

20   That's it.

21           Because we could go the other way.

22   What's it costing me?  What will it cost me to get

23   my reputation back before a wacky person that made

24   up a story that I took her up to a department store

25   into a little room with people all over the place

```
 1                     D. J. TRUMP
 2  and raped her?  That's a sick woman that would say
 3  that.  Only a sick -- there's something wrong with
 4  her.
 5              And I believe she did it because of her
 6  book.  She never mentioned it for years and years
 7  and she doesn't know when it took place, how it
 8  took -- she doesn't know anything.  She has no idea
 9  what season it took place, what day it took place,
10  what year it took place.
11              And I have every right to clear my
12  reputation.
13      Q.    And all of the other women who have made
14  such accusations against you, including the 24 that
15  your campaign cited, they're all sick, too; right?
16      A.    I don't know about any of these people or
17  very many of them.  I mean, every once in a while,
18  you get -- I think a lot of famous people have
19  charges thrown at them, and many of them are false
20  and some of them are true.
21              But in my case --
22      Q.    None of it is true?
23      A.    I would say.  I mean, I don't see any.  I
24  mean, you haven't shown me anything.  I don't even
25  know what you're even talking about when you say
```