UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL,<br><br>　　　　　　　　Plaintiff,<br><br>-against-<br><br>DONALD J. TRUMP,<br><br>　　　　　　　　Defendants. | Civil Action No.: 1:20-cv-7311-LAK-JLC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR ENTRY OF AN ORDER LIMITING THE ISSUES TO BE LITIGATED ON GROUNDS OF COLLATERAL ESTOPPEL**

Alina Habba, Esq.
Michael T. Madaio, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
　　　　-and-
112 West 34th St, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Defendant, Donald J. Trump*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii
ARGUMENT ..........................................................................................................................1
    I.    PLAINTIFF MUST BE PRECLUDED FROM CONTESTING THE FALSITY OF HER DEFAMATORY STATEMENT ...................................................................4
    II.    PLAINTIFF'S ENTITLEMENT TO DAMAGES MUST BE LIMITED DUE TO THE CARROLL II JUDGMENT .........................................................................6
        A.  Compensatory Damages In This Case Cannot Exceed The One Million Dollar Award In *Carroll II* ...........................................................................7
        B.  Any Award for Reputational Repair Must Be Reduced By $1.7 Million To Avoid Double Recovery By Plaintiff...........................................................11
CONCLUSION.....................................................................................................................16

# **TABLE OF AUTHORITIES**

*Cases*

*Ali v. Mukasey*,
   529 F.3d 478, 489 (2d Cir. 2008) ...................................................................................2

*Berg-Bakis Ltd. v. City of Yonkers,*
   90 A.D.2d 784, 784 (1982)............................................................................................11

*Boguslavsky v. Kaplan*,
   159 F.3d 715, 720 (2d Cir. 1998) ..................................................................................1

*Burgos v. Hopkins,*
   14 F.3d 787, 792-93 (2d Cir.1994) ................................................................................1

*Colliton v. Donnelly*,
   399 Fed. App'x 619, 620 (2d Cir. 2010) .......................................................................1

*Constantine v. Teachers Coll.*,
   448 F. App'x 92, 93-94 (2d Cir. 2011) ..........................................................................9

*Emich Motors Corp. v. Gen. Motors Corp.*,
   340 U.S. 558, 571-72 (1951) .........................................................................................3

*Gelb v. Royal Globe Ins. Co.*,
   798 F.2d 38, 44 (2d Cir. 1986) ......................................................................................7

*Hauser v. Fort Hudson Nursing*,
   202 A.D.3d 45, 53 (3d Dep't 2021)...............................................................................11

*Howard v. City of Coos Bay*,
   871 F.3d 1032, 1042 (9th Cir 2017) .............................................................................11

*Montana v. United States*,
   440 U.S. 147, 153, 99 S. Ct. 970, 973 (1979)................................................................4

*Medcalf v. Thompson Hine LLP*,
   84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) .....................................................................2

*Nat'l Lb'r Rel. Bd. v. Unt'd Tch.*,
   706 F.2d 1254, 1260 (2d Cir. 1983) ..............................................................................2

*Ott v. Barash*,
   109 A.D2d 254, 263 (2d Dep't 1985)............................................................................11

*Phelan v. Local 305 of United Ass'n of Journeymen, and Apprentices of Plumbing and Pipefitting Indus. of U.S. and Can.*,
    973 F.2d 1050, 1063 (2d Cir. 1992) ....................................................................................10

*Pike v. Freeman*,
    266 F.3d 78, 91 n. 14 (2d Cir. 2001) ...................................................................................3

*Rafter v. Liddle*,
    704 F. Supp. 2d 370, 375 (S.D.N.Y. 2010) ..........................................................................3

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
    68 F.3d 1478, 1486-87 (2d Cir. 1995) .................................................................................9

*Stone v. Williams*,
    970 F.2d 1043, 1056 (2d Cir. 1992) ....................................................................................4

*Sullivan v. Gagnier*,
    225 F.3d 161, 166 (2d Cir. 2000) ........................................................................................1

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236, 247 (2d Cir. 2017) ........................................................................................5

*Taylor v. Sturgell*,
    553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008)..............................................6

*United States v. McGann*,
    951 F.Supp. 372, 380 (E.D.N.Y.1997) ............................................................................4, 5

*Wickham Contracting Co., Inc. v. Bd. of Educ. of City of N.Y.*,
    715 F.2d 21, 28 (2d Cir. 1983) ............................................................................................3

*Zarcone v. Perry*,
    78 A.D.2d 70, 76 (2d Dep't 1980).........................................................................10, 14, 15

**Rules, Statutes, and Treatises**

18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417 n.2 (2d ed.) .........................2

18 Moore's Fed. Practice § 132.03(4)(i)..........................................................................................3

The defendant, Donald J. Trump ("Defendant"), by and through his undersigned attorneys, Habba Madaio & Associates LLP, respectfully submits this memorandum of law in support of his motion for entry of an order limiting the issues to be litigated on the grounds of collateral estoppel with respect to certain findings of fact and law in the corresponding matter of *Carroll v. Trump*, Case No. 1:22-cv-1001 (S.D.N.Y 2022) ("*Carroll II*").[1] For the reasons set forth herein, Defendant's motion should be granted in its entirety.

## ARGUMENT

The "fundamental notion of the doctrine of collateral estoppel, or issue preclusion, "is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies." *Colliton v. Donnelly*, 399 Fed. App'x 619, 620 (2d Cir. 2010).

Under New York law, collateral estoppel applies when "the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) (citing *Parker v. Blauvelt Volunteer Fire Co.,* 93 N.Y.2d 343, 690 N.Y.S.2d 478, 482 (1999)); *Burgos v. Hopkins,* 14 F.3d 787, 792-93 (2d Cir.1994)); *see also Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) ("Collateral estoppel applies when: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to

---

[1] In light of the Court's directive that each party shall "file a motion setting forth precisely each fact or proposition of law, if any, as to which the *moving party* claims *Carroll II* has preclusive effect," and its further clarification that "[n]o fact or proposition of law not identified in such a motion shall be regarded as having been established by *Carroll II*, Order dated July 19, 2023 Order, *see* ECF No. 178 (emphasis added), Defendant, for the purposes of this motion, is only setting forth facts and propositions of law for which he affirmatively seeks to invoke the doctrine of collateral estoppel. With respect to facts or propositions of law that Defendant contends should *not* be given preclusive effect, Defendant shall address those points in his opposition to Plaintiff's motion, to the extent necessary.

1

litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.") (citations omitted).

In other words, collateral estoppel "is succinctly defined as 'the preclusive effect of a judgment that prevents a party from litigating a second time an issue of fact or law that has once been decided.'" *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) (quoting *Murphy v. Gall.*, 761 F.2d 878, 879 (2d Cir.1985)). The doctrine bars "relitigation of an issue of law or fact that was raised, litigated, and actually decided by a judgment in a prior proceeding between the parties, if the determination of that issue was essential to the judgment, regardless of whether the two proceedings are based on the same claim." *Nat'l Lb'r Rel. Bd. v. Unt'd Tch.*, 706 F.2d 1254, 1260 (2d Cir. 1983).

Collateral estoppel "comes into play when the subsequent action is 'upon a different claim or demand.'" *Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir. 1992) (quoting *United States v. Moser*, 266 U.S. 236, 241 (1924)). "In such case, 'the inquiry is whether the point or question presented for determination in the subsequent action is the same as that litigated and determined in the original action.'" *Id.* (quoting *Moser*, 266 U.S. at 241).

Both factual issues and legal issues can be subject to issue preclusion. *See, e.g.*, *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) ("The 'fundamental notion' of the doctrine of collateral estoppel, or issue preclusion, 'is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies.'") (emphasis in original); *see generally* 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4417 n.2 (2d ed.) ("An issue is a single, certain and material point arising out of the allegations and contentions of the parties. . . . It may concern only the existence or non-existence of certain facts, or it may concern the legal significance of those

facts. . ... If the issues are 'merely evidentiary', they need only deal with the same past events to be considered identical.") (alteration in original). For collateral estoppel to apply to a given issue, that issue must be "necessary and essential" and "material" to the prior ruling. *Wickham Contracting Co., Inc. v. Bd. of Educ. of City of N.Y.*, 715 F.2d 21, 28 (2d Cir. 1983). "In discovering what issues were determined by the judgment in a prior action, the court in the second action is free to go beyond the judgment roll, and may examine the pleadings and the evidence in the prior action." 18 Moore's Fed. Practice § 132.03(4)(i); *see also, e.g., Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 571-72 (1951).

Further, "there is no discernible difference between federal and New York law concerning res judicata and collateral estoppel." *Id.* at 154 (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)); *accord Pike v. Freeman*, 266 F.3d 78, 91 n. 14 (2d Cir. 2001) ("[T]here appears to be no significant difference between New York preclusion law and federal preclusion law[.]"); *Rafter v. Liddle*, 704 F. Supp. 2d 370, 375 (S.D.N.Y. 2010) (same).

As outlined herein, *Carroll II* should have preclusive effect in this action in several respects. First, with respect to Defendant's counterclaim, Plaintiff must be precluded from arguing that her defamatory statement was not false, since she directly refuted the jury's findings in *Carroll II*. Second, collateral estoppel must be applied to limit the sphere of Plaintiff's available damages in the instant action based on the factual record of *Carroll II* and to prevent Plaintiff from obtaining an impermissible 'double recovery.' Therefore, for the reasons set forth below, Defendant's motion should be granted in its entirety.

I.  **PLAINTIFF MUST BE PRECLUDED FROM CONTESTING THE FALISTY OF HER DEFAMATORY STATEMENT**

Consistent with the principles of collateral estoppel, the issue of falsity has been conclusively established in Defendant's favor with respect to the claim for defamation asserted in his counterclaim.

Here, there can be no doubt that the elements of collateral estoppel are met. First, there is little question that the issue of whether Defendant raped Plaintiff has always been a central question in both *Carroll I* and *Carroll II*. *See Carroll v. Trump*, 635 F. Supp. 3d 229 (S.D.N.Y. 2022) ("the question whether Mr. Trump in fact raped Ms. Carroll is central to this case."). Second, the issue was actually determined in *Carroll II* when the jury expressly found that Plaintiff failed to demonstrate by a preponderance of the evidence that she was raped by Defendant. ECF 174 at 1. Third, the parties had a full and fair opportunity to litigate the issue throughout *Carroll II*'s proceedings and trial, and despite Plaintiff's extensive testimony advancing her claim that she was raped, the jury rejected her account and returned a verdict in Defendant's favor. Finally, it is readily apparent that the issue of whether Plaintiff was raped was a material aspect to the jury's finding. As such, the doctrine of collateral estoppel is properly applied here.

Further, collateral estoppel is particularly appropriate in the context of Defendant's counterclaim against Plaintiff, wherein it is alleged that Plaintiff defamed him by publicly refuting the jury's finding in *Carroll II* that no rape occurred.

A jury verdict, by its very nature, has preclusive effect. *See, e.g., Stone v. Williams*, 970 F.2d 1043, 1056 (2d Cir. 1992) (giving preclusive effect to a decision on the merits that did not finally determine the issue of relief because "a judgment is considered final for purposes of issue preclusion if the 'conclusion in question is procedurally definite.'") (citation committed); *see also United States v. McGann*, 951 F.Supp. 372, 380 (E.D.N.Y.1997) (noting that issue preclusion may

4

apply to a decision that is "sufficiently firm to be accorded conclusive effect.") (quoting Restatement (Second) of Judgments, § 13 (1982)). Indeed, the concept that a jury verdict has preclusive effect is vital to the "central . . . purpose for why the civil courts have been established, the conclusive resolution of disputes," and "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153, 99 S. Ct. 970, 973 (1979).

Here, the factual circumstances set forth in Defendant's counterclaim are straightforward. The *Carroll II* jury unequivocally found that Plaintiff had failed to carry her burden with respect to the question of whether a 'rape'—as defined in New York Penal Law—had occurred. Confronted with this finding, and asked to comment on it, Plaintiff chose to refute the verdict and insist that the rape did occur. Specifically, Plaintiff stated as follows:

> Reporter: . . . [W]hat went through your head when you heard that [the jury found that Trump did not rape you]?
>
> Plaintiff: Well, I just immediately say in my own head, oh, yes, he did—oh, yes, he did. So that's my response.

*See* ECF 175 at 6.

Given the inherently preclusive effect of the *Carroll II* verdict, Plaintiff's public repudiation of the jury's findings cannot, as a matter of course, be deemed to be substantially true. *See*, *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) (holding that "[b]ecause falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint . . . must plead facts that, if proven, would establish that the defendant's statements were not substantially true."). In other words, by challenging a factual finding made by a competent jury, Plaintiff's statement is inherently 'false' for the purposes of collateral estoppel.

5

While Plaintiff has argued that her comments were referring to the 'colloquial' definition of rape, this argument misses the point. Defendant does not dispute that the term 'rape' has different meanings in different contexts. But Plaintiff's statement was made in one particular context – the *Carroll II* jury verdict. Indeed, her comments were in direct response to a reporter's question about the jury's "*first finding* . . . [that] Trump did not rape you," ECF 175 at 6 (emphasis added), and her response was directed at that precise finding – that there was no 'rape' within the definition of the New York Penal Law. Plaintiff has even acknowledged that her CNN remarks "concerned the jury verdict specifically," *see* ECF 175 at 20. Accordingly, it would be wholly disingenuous for Plaintiff to argue that her unequivocal rejection of the jury's finding was intended only to refer to a broader definition of rape, when the jury's determination was plainly not made in that context.

Simply put, the jury's finding in *Carroll II* that Defendant did not rape Plaintiff is "sufficiently firm to be accorded conclusive effect," *McGann*, 951 F Supp. at 380. Plaintiff's denial of this finding must therefore be construed as false as a matter of law. As such, under the doctrine of collateral estoppel, Plaintiff must be precluded from contesting the falsity of her statement.

## II.   PLAINTIFF'S ENTITLEMENT TO DAMAGES MUST BE LIMITED DUE TO THE *CARROLL II* JUDGMENT

Based on the principles of collateral estoppel, the judgment in *Carroll II* operates to limit Plaintiff's entitlement to damages in the instant action.

For context, in *Carroll II*, the jury's calculation of compensatory damages was split into two parts. First, the jury was instructed to consider the amount Plaintiff would be entitled to for compensatory damages "other than the reputation repair program." *See Carroll II*, ECF 212 at 34. Second, the jury was instructed to determine what amount of compensatory "for the reputation

6

repair program only." *Id.* These two separate forms of compensatory damages were likewise reflected on the jury verdict form. *Carroll II*, ECF 174 at 3.

For the reasons set forth below, any Plaintiff may receive with respect to both categories of compensatory damages must be limited in accordance with the judgment of *Carroll II*.

### A. Compensatory Damages In This Case Cannot Exceed The One Million Dollar Award In *Carroll II*

Collateral estoppel "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

As noted above, for the doctrine of collateral estoppel to apply, a four-part test must be satisfied: "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceedings must have been actually litigated and actually decided, (3) there must have been full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986).

In *Carroll II*, with respect to the category of damages "other" than those to her reputation— which were compensated through the reputational repair program—the jury was instructed that Plaintiff was entitled to recover for "the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement." ECF 201 at 1432:27-29. To establish the extent of harm she suffered in this respect, Plaintiff relied almost exclusively on tweets and messages she received through Twitter and other means in response to Defendant's October 12, 2022 statement. When discussing the impact of these messages, Plaintiff explained

7

that the damage she suffered as a result of the October 12, 2022 statement was identical to—potentially even greater than—the harm she incurred as a result of the June 2019 statements. Specifically, she testified as follows:

> Q. How, if at all, were these similar to Tweets or messages you received after Mr. Trump made his initial statements in 2019?
>
> A. Can you repeat that?
>
> Q. Sure. Sorry. These statements all came after the October 2022 denial by Mr. Trump?
>
> A. Yes.
>
> Q. How, if at all, do they compare to tweets or messages you received after Mr. Trump made his first remarks in June of 2019?
>
> A. They were **equally, equally disparaging and hurtful**, but these particularly hurt because I thought I had made it through and here they are again.

ECF 189 at 328:19 – 329:7 (emphasis added).

After hearing this testimony, the jury went on to award Plaintiff $1,000,000 for her compensatory damages "other than the reputation repair program." ECF 174 at 3.

The New York test for collateral estoppel has been met with respect to Plaintiff's claims for additional compensatory damages arising from the challenged statements in the case *sub judice*. Based on the above-referenced testimony, Plaintiff must be precluded from seeking relief in excess of $1,000,000 for compensatory damages "other than the reputation repair program." The four-factor collateral estoppel test is in accord.

*First*, there is complete overlap in the types of defamation damages sought by Plaintiff in *Carroll I* and *Carroll II*, particularly with respect to the defamation claims in each. The complaints filed in each action confirm as much. In the complaint filed in *Carroll I*, Plaintiff alleged that the June 2019 Statements caused her "emotional pain and suffering at the hands of the man who sexually assaulted her, as well as injury to her reputation, honor, and dignity." ECF 157-1 at ¶ 144. In an identical allegation, Plaintiff asserted in *Carroll II* that, as a result of the October 2022

8

statement, she allegedly suffered "emotional pain and suffering at the hands of the man who raped her, as well as injury to her reputation, honor, and dignity." *Carroll II*, ECF 1, at ¶ 119. The mirrored allegations serve as a clear indication that the two actions raise an identical issue as to the category of damages sought, thus satisfying the first element of the collateral estoppel test.

*Second*, the issue of whether Plaintiff was awarded adequate compensatory damages was actually litigated in *Carroll II*. Both Plaintiff and Defendant participated in the *Carroll II* litigation, engaged in extensive motion practice, and participated in trial. *See generally*, *Carroll II*. After consideration of all evidence, including Plaintiff's above-referenced testimony, the jury awarded Plaintiff $1,000,000 for compensatory damages "other than the reputation repair program." ECF 174 at 3. Thus, the issue of compensatory damages as it related to the October 2022 statement—for which Plaintiff testified that the damage from that statement was "equally disparaging and hurtful" as the June 2019 statements—was fully litigated in *Carroll II*.

*Third*, Plaintiff was provided with a full and fair opportunity to litigate this issue in *Carroll II*. "'[T]he party attempting to defeat [issue preclusion's] application has the burden of establishing the absence of a full and fair opportunity to litigate the issues.'" *Constantine v. Teachers Coll.*, 448 F. App'x 92, 93-94 (2d Cir. 2011) (quoting *Evans v. Ottimo*, 469 F.3d 278, 281-82 (2d Cir. 2006)). Plaintiff cannot, by any stretch of the imagination, carry this burden. *Carroll II* provided ample and repeated opportunities for Plaintiff to litigate the appropriateness of a compensatory damage award in that case. Plaintiff had every incentive and opportunity to litigate her claims and she did so. *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank*, N.V., 68 F.3d 1478, 1486-87 (2d Cir. 1995) (a party did not have a "full and fair" opportunity to litigate where they had "little incentive" to litigate the issue and the issue was "largely uncontested"). Therefore, the third prong is satisfied.

9

*Lastly*, the finding of fact was necessary to the jury's determination. While the jury may or may not have erroneously included harm from the June 2019 statements in calculating the $1,000,000 figure,[2] one thing is clear: the jury did not consider any mitigating effect that Plaintiff's experience with the June 2019 statements may have had on the extent of harm she suffered in connection with the subsequent October 2022 statement. The jury effectively treated the October 2022 statement as if it were the first and only instance in which Defendant made purportedly defamatory claims about her. In *Carroll II*, this Court's instruction to the jury as to compensatory damages excluding the reputation repair program was as follows:

> Now, in this case, Question 9, I have divided the damages determination into two parts . . . . The first part of Question 9, right at the top, the yes/no question asks you to decide whether Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I just described. . . . If the answer is 'yes,' you first will fill in the amount you award for all defamation damages, excluding the reputation repair program. You will leave that out if you put in a figure in the first blank. That was of course the testimony of Professor Humphreys. Second, you will fill in the amount, if any, that you award for the reputation repair program only."

*Carroll II*, ECF 201 at 1433:16 – 1434:7.

In accordance with this instruction, the jury ultimately considered and factored in Plaintiff's testimony that the October statement and the June 2019 statements were "equally disparaging and hurtful." ECF 189 at 329:5. Absent Plaintiff's statement that the response to the October 2022 statement was "equally disparaging and hurtful," the jury could well have reduced the award of compensatory damages by a significant margin if it determined that the initial backlash in June 2019 was more harmful to Plaintiff than the subsequent backlash in October 2022. Indeed, this Court has acknowledged the weight of Plaintiff's statement by citing to it in support of the proposition that Plaintiff adequately distinguished the harm between the June 2019

---

[2] This point was argued on several grounds in Defendant's motion for a new trial or remittitur, *see Carroll II*, ECF 205 at 16 - 22, which is incorporated by reference herein.

10

statements and the October 2022 statement.³ As such, the testimony that the harm suffered by Plaintiff in relation to the October 2022 statement was equal to or greater than the June 2019 statements was a necessary and material component of the jury's decision to award Plaintiff $1,000,000 for "any damages other than the reputation repair program." ECF 174 at 3.

Based on the foregoing, Plaintiff must be precluded from receiving compensatory damages in excess of $1,000,000—which the jury determined to be fair compensation for the harm she suffered from the October 2022 statement—since she previously testified that the response to the October 2022 statement was "equally disparaging and hurtful," potentially even *more* disparaging and hurtful, as the response to the June 2019 statements.

### B. Any Award for Reputational Repair Must Be Reduced By $1.7 Million To Avoid Double Recovery by Plaintiff

It is well settled that a "plaintiff may not recover twice for the same injury." *Phelan v. Local 305 of United Ass'n of Journeymen, and Apprentices of Plumbing and Pipefitting Indus. of U.S. and Can.*, 973 F.2d 1050, 1063 (2d Cir. 1992) (citing *Ostano Commerzanstalt v. Telewide Systems,* 880 F.2d 642, 649 (2d Cir.1989)); *see also Zarcone v. Perry*, 78 A.D.2d 70, 76 (2d Dep't 1980), *affd,* 55 N.Y.2d 782 (1981) ("It has been broadly stated that judicial policy forestalls a double recovery for an injury.") (citing *Derby v. Prewitt*, 12 N.Y.2d 100, 107, 236 N.Y.S.2d 953); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297, 122 S. Ct. 754 (2002) ("[I]t goes without saying that the courts can and should preclude double recovery by an individual."). "[L]ike res judicata and collateral estoppel, application of the double recovery rule is predicated upon the existence of a prior final judgment granting recovery[.]" *Ott v. Barash*, 109 A.D2d 254, 263 (2d Dep't 1985).

---

³ *See Carroll II*, ECF 212 at 56, n.100 ("It also is inaccurate because, as noted above, Ms. Carroll in fact did compare the post-2022 messages she received to the post-2019 messages and stated that the post-2022 messages were "equally disparaging and hurtful, but these particularly hurt because [she] thought [she] had made it through and there they are again." Dkt 189 (Trial Tr.) at 329:5-7.")

11

Critically, "[d]ouble recovery is not permitted for a single injury, even if a patient can prove separate causes of action that result in the same injury." *Hauser v. Fort Hudson Nursing*, 202 A.D.3d 45, 53 (3d Dep't 2021) (citing *Milks v. McIver,* 264 N.Y. 267, 270 (1934); *Leighty v. Brunn,* 125 A.D.2d 648, 648-649 (1986); *Berg-Bakis Ltd. v. City of Yonkers,* 90 A.D.2d 784, 784 (1982), *appeal dismissed* 60 N.Y.2d 664 (1983), *lv denied* 64 N.Y.2d 603 (1985)).

For a plaintiff to be precluded from recovering damages under a theory of double recovery, the operative question is whether the plaintiff has "request[ed] damages covering the same factual losses in both suits[.]" *Howard v. City of Coos Bay*, 871 F.3d 1032, 1042 (9th Cir 2017).

In *Carroll II*, Plaintiff sought to recover a subset of compensatory damages that she would use to employ a "reputation repair program" to mitigate the damage to her reputation caused by Defendant's alleged defamation. To establish the cost of carrying out such a program, Plaintiff relied upon the reports submitted by, and testimony of, her expert witness, Dr. Ashlee Humphreys. According to Dr. Humphreys' testimony, a reputation repair program is a "campaign to put out positive messages about that person." ECF 189 at 1136:10 – 11. In explaining the scope and purpose of this type of program, Dr. Humphreys testified as follows:

> Q. Explain how reputation can be damaged.
>
> A. So, a reputation can be damaged when there emerge negative associations that kind of undermine that reputation that might cause people to mistrust you or think you are a bad person or things like that.
>
> Q. And how, if at all, can a reputation that's been damaged be repaired?
>
> A. So, reputation can be repaired through sort of strategic concerted efforts to build positive associations back to that person.
>
> […]
>
> Q. Can you explain how a reputational repair campaign works?
>
> A. Yes. So first you need to identify where to place the messages. What media does your target audience, the people's whose mind you want to change, what media do they use? Where do they get their information?

ECF 189 at 1117:18 – 1136:24.

In her *Carroll II* expert report, Dr. Humphreys explained her process for identifying the target audience and selecting the appropriate media outlets to place the corrective messages about Plaintiff. In particular, she states:

> To allocate media budget and media spend across each platform, I relied on the Pew data previously cited in the impact analysis. Using the Pew data, I conducted an analysis of the ways individuals who identify as Trump supporters reported getting their news (see Figure 17 below). Respondents who identified as Trump supporters[166] were asked "what is the most common way you get political and election news?" News websites or apps were the most commonly cited media used, with 23.1%. I added this together with social media (13%) to allocate the online and influencer budget. The next most common responses were cable (21.3%), local (15.6%), and national network television (14%), which I allocated to the mass media budget. I allocated radio (9.1%) and print (3.4%) accordingly as well, using publicly available data on rates for these media channels.

*See* Declaration of Alina Habba ("Habba Dec."), Ex. A at 51 – 52.

She goes on to refer to a table which sets forth her findings of her analysis:

Figure 17. The Media Mix of Respondents who Identify as Trump Supporters

NEWS_MOST_W57. What is the most common way you get political and election news?

|  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| Print newspaper or magazines | 162 | 3.4 | 3.4 | 3.4 |
| Radio | 438 | 9.1 | 9.1 | 12.5 |
| Local television | 748 | 15.6 | 15.6 | 28.1 |
| National network television | 669 | 14 | 14 | 42.1 |
| Cable television | 1020 | 21.3 | 21.3 | 63.3 |
| Social media | 623 | 13 | 13 | 76.3 |
| News website or app | 1109 | 23.1 | 23.1 | 99.5 |
| Refused | 26 | 0.5 | 0.5 | 100 |
| Total | 4795 | 100 | 100 |  |
|  |  | 99.5 |  |  |

*Id*. at 52.

Critically, this portion of Dr. Humphrey's *Carroll II* report is *identical* to the corresponding portion of her expert report in *Carroll I*. The language is indistinguishable and all of her "findings" are exactly the same. For reference, in explaining how she selected the appropriate media outlets

to convey corrective messages about Plaintiff, Dr. Humphreys reiterates precisely the same language:

> To allocate media budget and media spend across each platform, I relied on the Pew data previously cited in the impact analysis. Using the Pew data, I conducted an analysis of the ways individuals who identify as Trump supporters reported getting their news (see Figure 17 below). Respondents who identified as Trump supporters were asked "what is the most common way you get political and election news?" News websites or apps were the most commonly cited media used, with 23.1%. I added this together with social media (13%) to allocate the online and influencer budget. The next most common responses were cable (21.3%), local (15.6%), and national network television (14%), which I allocated to the mass media budget. I allocated radio (9.1%) and print (3.4%) accordingly as well, using publicly available data on rates for these media channels.

*See* Habba Dec., Ex. B at 66.

Likewise, the table in Dr. Humphrey's *Carroll I* report sets forth identical findings:

**Figure 19. The Media Mix of Respondents who Identify as Trump Supporters**

NEWS_MOST_W57. What is the most common way you get political and election news?

|  | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|
| Print newspaper or magazines | 162 | 3.4 | 3.4 | 3.4 |
| Radio | 438 | 9.1 | 9.1 | 12.5 |
| Local television | 748 | 15.6 | 15.6 | 28.1 |
| National network television | 669 | 14 | 14 | 42.1 |
| Cable television | 1020 | 21.3 | 21.3 | 63.3 |
| Social media | 623 | 13 | 13 | 76.3 |
| News website or app | 1109 | 23.1 | 23.1 | 99.5 |
| Refused | 26 | 0.5 | 0.5 | 100 |
| Total | 4795 | 100 | 100 |  |
|  |  | 99.5 |  |  |

*Id.* at 67.

Thus, it is readily apparent that Dr. Humphreys utilized the same methodologies and criteria to determine how the reputation repair programs in both *Carroll I* and *Carroll II* would broadcast Plaintiff's corrective messaging, what media outlets they would use, and what target audience they would be directed towards. In fact, practically *every* aspect of the reputation repair program that Dr. Humphreys constructed for *Carroll II* is lifted from the reputation repair program

14

that she designed for *Carroll* I. The language discussing both programs is directly mirrored in both reports; the *Carroll II* reputation repair program is essentially 'copy-and-pasted' from Dr. Humphrey's *Carroll I* report.

Given that the two programs are identical in their design and function, there will be a complete overlap in their remedial effect on Plaintiff's reputation. The *Carroll II* jury already awarded $1.7 million to Plaintiff to repair any reputational harm she sustained from October 12, 2022 and forward. Permitting Plaintiff to recover twice for this same relief would therefore constitute an impermissible double recovery. *See Zarcone*, 78 A.D.2d at 81 ("Except in cases in which punitive damages may be allowed, an injured party may recover damages only for the actual loss he suffered and no more; he is to be made whole, but not entitled to be put in a better condition than he would be in had the wrong not been committed.") (citing *Stringer v. Dilger*, 313 F.2d 536, 541-42 (10th Cir. 1963)).

Indeed, the proposition that awarding damages for reputational harm Plaintiff suffered *after* the October 12 statement would constitute a double recovery is further supported by the testimony adduced at trial. First, Plaintiff testified that she had "gain[ed] back" her reputation and was "back on [her] feet" on October 12, 2022, evidencing that any harm emanating from the June 2019 statements had largely subsided by that point. Second, Dr. Humphreys testified that she "noticed . . . that those meetings [public statements of negative associations with Carroll] existed after June 2019" but that the "frequency of the posting with those associations had started to decline. However, after the statement on October 12th, the frequency of the negative associations, the volume of them escalated again." *Carroll II*, ECF 197 at 1130:18-22.

Based on the foregoing, any award in the instant action for a reputational repair program in the instant action must be reduced by $1.7 million to account for the corresponding relief

15

awarded in *Carroll II*. This reduction is necessary to prevent Plaintiff from obtaining double recovery for the same harm. *See Zarcone*, 78 A.D. at 81 ("Where, as in this case, the plaintiff has already recovered adequate damages on the same facts constituting the injury, and according to a charge which submitted the same elements of damages, we hold that in justice and fairness, no further recovery should be allowed.").

## CONCLUSION

For all the reasons above, Defendant respectfully requests that the instant motion be granted in its entirety.

Dated: New York, New York
      August 2, 2023

Respectfully submitted,

*/s/ Alina Habba*
Alina Habba, Esq.
Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
      -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Phone: (908) 869-1188
Fax: (908) 450-1881
Email: ahabba@habbalaw.com
      mmadaio@habbalaw.com
*Attorneys for Defendant Donald J. Trump*