# EXHIBIT 1

N4RMCAR2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                Plaintiff,              New York, N.Y.

           v.                           22 Civ.10016 (LAK)

DONALD J. TRUMP,

                Defendant.
------------------------------x         Jury Trial

                                        April 27, 2023
                                        10:50 a.m.

Before:

                HON. LEWIS A. KAPLAN,

                                        District Judge
                                           and a Jury


                    APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant
```

1  keep moving.
2  Q.  Are you on Truth Social, Ms. Carroll?
3  A.  Yes.
4  Q.  How did you find out about this statement?
5  A.  I heard from several people that he had posted it.
6  Q.  How, if at all, do you believe this statement affected your
7  reputation?
8  A.  I really thought I was gaining back a bit of ground.  I
9  thought, it's starting to go and I felt, you know, happy that,
10 you know, I was back on my feet, had garnered some readers, and
11 feeling pretty good, and then, boom, he knocks me back down
12 again.
13 Q.  Were you surprised by the statement?
14 A.  Stunned.
15 Q.  Why?
16 A.  Because I'm suing him for saying these very things.
17 Q.  In light of Mr. Trump's October 22 statement, did you file
18 a second lawsuit?
19 A.  Yes.
20 Q.  Is that second lawsuit why we are here today?
21 A.  Yes.  This is why we are here.
22 Q.  What did you sue him for in the second lawsuit?
23 A.  I sued him for defamation of character.
24 Q.  Anything else?
25 A.  Yes.  I also sued him for assault.

1  Q.  Why didn't you sue him for assault in the first lawsuit?
2  A.  Because the time period allowed was -- it had passed, and I
3  could not do it.
4  Q.  What happened that allowed you to do it -- to sue him for
5  assault in the second lawsuit?
6  A.  The state assembly and the state senate passed what they
7  called the Adult Survivors Act, and it gave survivors of sexual
8  assault, sexual abuse, sexual harassment a one-year window to
9  come forward and bring suit against the people.
10 Q.  Had you advocated for passage of that law?
11 A.  Yes.
12 Q.  Why.
13 A.  Because I understand why women, particularly, and some men
14 do not come forward and tell what happened.  It takes sometimes
15 years to get the courage to face the person who hurt you, if at
16 all.  It takes years.  And some maturity and some age.  It
17 takes -- there are many people, reasons why people don't report
18 it, and this act gives us a chance to be heard.
19 Q.  What, if any, I'll call it sort of public response did you
20 experience after Mr. Trump made his October 2022 statement?
21 A.  It was not very nice.
22 Q.  What do you recall?
23 A.  Just a wave of slime.  It was very seedy comments, very
24 denigrating.  Almost an endless stream of people repeating what
25 Donald Trump says, I was a liar and I was in it for the money,

1  A.  Yes.
2  Q.  How, if at all, do they compare to tweets or messages you
3  received after Mr. Trump made his first remarks in June of
4  2019?
5  A.  They were equally, equally disparaging and hurtful, but
6  these particularly hurt because I thought I had made it through
7  and here they are again.
8  Q.  Sitting here today, have you stopped -- to this day have
9  you stopped -- to this day are you still receiving messages
10 like this?
11 A.  I looked at my Twitter this morning.  They haven't stopped.
12          MR. FERRARA:  May I just have one moment, your Honor?
13          THE COURT:  Yes.
14          MR. FERRARA:  Nothing further.
15          THE COURT:  Thank you.
16          Is this the point where you and Mr. Tacopina need some
17 time?
18          MR. TACOPINA:  Yes, your Honor.
19          MR. FERRARA:  That would be ideal.
20          THE COURT:  What do you say, 15 minutes, 20 minutes?
21          MR. FERRARA:  That would work.
22          THE COURT:  Fifteen minutes.
23          11:30, folks.
24          (Jury not present)
25          (Recess)

N512car1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                Plaintiff,              New York, N.Y.

           v.                           22 Civ.10016 (LAK)

DONALD J. TRUMP,

                Defendant.
------------------------------x         Jury Trial

                                        May 1, 2023
                                        9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge
                                          and a Jury


                        APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant
```

THE COURT: You know what I am talking about, number one and number two.

MR. FERRARA: In terms of an instruction, your Honor?

THE COURT: In some way.

MR. TACOPINA: Okay. We will figure it out. You want us to get together to --

THE COURT: No. Maybe we can do it now.

MR. TACOPINA: Okay, sure.

THE COURT: Members of the jury -- and if counsel has any objection to my doing it?

MR. TACOPINA: It's okay.

THE COURT: Okay.

Members of the jury, there are two lawsuits between Ms. Carroll and Mr. Trump. This is one of them. The first lawsuit was brought in 2019. That's not the one we are dealing with. It's still alive, but you don't have to worry about why or where or whatever. That was brought solely for alleged defamation that Mr. Trump allegedly committed in 2019. At that time, Ms. Carroll could not have sued him for allegedly raping her for legal reasons.

The legal context changed. It changed in November of 2022. She at that time gained the right to sue him for the rape, the alleged rape.

In addition, Mr. Trump had issued a statement that you have already seen in October of 2022 in which Ms. Carroll

```
N545car1
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                Plaintiff,              New York, N.Y.

          v.                            22 Civ. 10016 (LAK)

DONALD J. TRUMP,

                Defendant.
------------------------------x         Jury Trial

                                        May 4, 2023
                                        10:00 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge
                                           and a Jury


                        APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant

                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1    that measures exactly how many people are watching the program
2    at that time.
3    Q.   And how many people watched Donald Trump's or viewed Donald
4    Trump's October 12th statement on television?
5    A.   So, if you add that up, that is 7 million impressions.
6    Q.   Finally, you testified that you also calculated print
7    impressions from Donald Trump's statement.  Can you explain how
8    you did that?
9    A.   Yes.  So, there is a database where you can search all
10   print news articles and so I, again, searched for the statement
11   and I found one print article.
12   Q.   Where was that article published?
13   A.   That was in the Washington Post.
14   Q.   And what was -- how did you determine the total number of
15   impressions from the Washington Post article?
16   A.   So, here there is a service that measures how many readers
17   every article has, and the circulation rate for the Washington
18   Post was 159,000 people.
19   Q.   After looking at all of these forms of media, were you able
20   to estimate the total number of impressions of Donald Trump's
21   October 12th statement?
22   A.   Yes, I was.
23   Q.   And what was your final estimate?
24   A.   So the final estimate, when you add up across all the
25   media, was between 13.7 million and 18 million impressions.

1  of 21 percent.
2  Q.  So, to be clear, the 21 percent is the percentage of
3  republicans who viewed the statement who likely believed it?
4  A.  Yes.  I would call those receptive impressions.
5  Q.  What was the next step in your analysis?
6  A.  So, the next step was to take the number of impressions
7  that I had from that first step, which was a lot of
8  impressions, and then discount it by only the impressions where
9  people were receptive to the statement.  And so, that gives you
10 an estimate, a high and low estimate for each type of media,
11 and then you can add those up.
12 Q.  And what did you, when you alleged it up, what did you get?
13 A.  So, on the low end we have 3.7 million receptive
14 impressions and on the high end you have 5.6 million receptive
15 impressions.
16 Q.  And just to summarize, does that mean that between
17 3.7 million and 5.6 million people saw Mr. Trump's statement
18 and likely believed it?
19 A.  That's correct.
20 Q.  To your knowledge -- we saw some examples of negative
21 commentary that Ms. Carroll received after the October 12
22 statement.  To your knowledge, did Ms. Carroll receive any
23 positive response following Donald Trump's statement?
24 A.  Yes, she did.
25 Q.  How, if at all, did your analysis account for the positive

1  Q.  After calculating the amount it would cost to place
2  corrective messages on each type of media, were you able to
3  determine how much it would cost to place corrective messages
4  on all these types of media?
5  A.  That's right.  So I calculated for each type of media how
6  much it would cost and I added that up.
7  Q.  And what was the number?
8  A.  So the final number at the high end was $2.7 million.
9  Q.  What was the next step in your analysis?
10 A.  So the final step was to apply this logic to kind of my
11 previous -- my low impressions estimate and my high impressions
12 estimate for each level of frequency—for one, three, and five
13 times.
14 Q.  And what was the range, the cost range to run a
15 reputational repair campaign for Ms. Carroll following the
16 October 12 statement?
17 A.  So at the low, low end it would be three hundred and
18 sixty-eight thousand dollars, hundred thousand dollars and on
19 the high end it would be $2.7 million but, again, I don't think
20 the low campaign would be effective if no campaign had been run
21 previously.
22 Q.  So to summarize, Professor Humphreys, what was your
23 conclusion about how far or how wide Mr. Trump's statements
24 spread?
25 A.  So my conclusion about how wide it spread in the

1  BY MR. BRANDT:
2  Q.  Now, we have had some discussion about this previously, but
3  there are actually two cases, correct?
4  A.  That's right.
5  Q.  And you were retained as an expert by Ms. Carroll in two
6  cases, correct?
7  A.  Correct.
8  Q.  And the first case chronologically related to statements
9  made by Mr. Trump in June of 2019, correct?
10 A.  That's correct.
11 Q.  And as I recollect your first report, you said that those
12 statements were widely published at the time, correct?
13 A.  Yes.
14 Q.  And following that time, there were appearances by
15 Ms. Carroll and others on news shows and interviews and
16 podcasts and articles, is that correct?
17 A.  I did not study those as part of my report.
18 Q.  So you didn't look at any of that?
19 A.  I did not look at her activities, no.
20 Q.  Okay.  We will come to that in a little bit.
21         But did you at least come to the conclusion that there
22 had been widespread publication of the June 2019 statements?
23 A.  Yes.
24 Q.  And the statement that you looked at in the second case was
25 only the October 2022 statement, correct?

1        MR. BRANDT:  Well, I think even higher or lower is
2   getting a number out.
3        THE COURT:  Look, members of the jury, the question of
4   whether there was any adverse effect by virtue of the 2019
5   statements and, if there was, how much adverse effect is not at
6   issue in this case.  It is not for you to determine.
7        With that instruction, I will allow an answer to the
8   question as it was asked.
9        MS. CROWLEY:  May I ask it again?
10        THE COURT:  You may ask it again.
11   BY MS. CROWLEY:
12   Q.  Was the cost that you estimated to repair Ms. Carroll's
13   reputation following Trump's June 2019 statements higher or
14   lower than the cost that you estimated it would take to repair
15   her reputation following the October 12 statement?
16   A.  It was higher.
17   Q.  Why was it higher?
18   A.  So that statement generated considerably more impressions
19   and considerably more receptive impressions.
20   Q.  And how did that factor into the analysis that you did on
21   the cost following the October 12 statement?
22   A.  So here I only looked at the reputational harm from the
23   October 12 statement.
24        MS. CROWLEY:  Thank you, your Honor.  Nothing further.
25        THE COURT:  Thank you.

N592CAR1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
E. JEAN CARROLL,

                Plaintiff,              New York, N.Y.

           v.                           22 Civ.10016 (LAK)

DONALD J. TRUMP,

                Defendant.
------------------------------x         Jury Trial

                                        May 9, 2023
                                        10:05 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge
                                        and a Jury


                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA A. KAPLAN
     MICHAEL J. FERRARA
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG


TACOPINA SEIGEL & DeOREO
     Attorneys for Defendant
BY:  JOSEPH TACOPINA
     CHAD D. SEIGEL
     MATTHEW G. DeOREO


HABBA MADAIO & ASSOCIATES, LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO


W. PERRY BRANDT
     Attorney for Defendant
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

ever you wish.  I'm going to sit down in just a minute.  And we are about 40 percent of the way through what I have to say to you this morning.

So now we are going to go on to the questions in the verdict form, which are Questions 6 through 10, which deal with Ms. Carroll's defamation claim in relation to Mr. Trump's October 12, 2022 statement, and more specifically to the parts of that statement about Ms. Carroll.  Under New York law, there are two categories of defamation.  One of them is called libel.  Written statements, like Mr. Trump's October 12, 2022 statement, the law regards as libel.  I'm telling you this only because I may use the terms "defamation" and "libel" interchangeably in my instructions, and it means the same thing as far as you are concerned for purposes of this case.

Now, you have seen and heard Mr. Trump's October 12 statement at various points in the course of this trial.  And if memory serves, you will have it in the jury room.  To remind you, that statement, which Ms. Carroll alleges was defamatory, read as follows:  "This 'Ms. Bergdorf Goodman case' is a complete con job . . . She completely made up a story that I met her at the doors of this crowded New York City department store and, within minutes, 'swooned' her.  It is a Hoax and a lie. . . .  She has no idea what day, what week, what month, what year, or what decade this so-called 'event' supposedly took place.  The reason she doesn't know is because it never

happened, and she doesn't want to get caught up with details or facts that can be proven wrong.  If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam.  She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . .  In the meantime, and for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."

Now, there are several elements that Ms. Carroll has the burden of proving for her to recover damages for libel, and I'm going to instruct you on each one as we go through the verdict form.

Question 6 asks whether Ms. Carroll has proved by a preponderance of the evidence that Mr. Trump's statement was defamatory.  A statement is defamatory if it tends to disparage a person in the way of that person's business or office or profession or trade.  It is also defamatory if it tends to expose someone to hatred or contempt or aversion or to induce an evil or an unsavory opinion of that person in the minds of a substantial number of people in the community, even though it may impute no moral turpitude to the person.

Now, not every unpleasant or uncomplimentary statement is defamatory.  A statement that is merely unpleasant, or

will award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement. In fixing that amount, if you fix one, you should consider the plaintiff's standing in the community, the nature of Mr. Trump's statement made about Ms. Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Ms. Carroll, and all of the other facts and circumstances in the case.  These damages can't be proved with mathematical certainty.  Fair compensation may vary, ranging from one dollar, if you decide that there was no injury, to a substantial sum if you decide that there was substantial injury.

Now, in this case, Question 9, I have divided the damages determination into two parts, and you will see those on page 3 of the verdict form in the parts below the yes/no question.  The first of those two parts asks you whether or not Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I have just described. I misspoke about where on the form.  The first part of Question 9, right at the top, the yes/no question asks you to decide whether Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I just