

Michael T. Madaio, Esq.
Partner
mmadaio@habbalaw.com
Admitted to practice in NJ, NY & PA

December 13, 2023

**_VIA PACER_**
The Honorable Lewis A. Kaplan, U.S.D.J.
United States District Court, Southern District of New York
500 Pearl Street, New York, New York 10007

> Re:  *E. Jean Carroll v. Donald J. Trump*
> *1:20-cv-7311 (LAK)*

Dear Judge Kaplan:

We write on behalf of the defendant, Donald J. Trump ("Defendant"), to preclude the testimony of Dr. Ashlee Humphreys ("Dr. Humphreys"), or, in the alternative, to admit the supplemental rebuttal report of Defendant's proposed expert, Charles Malkus ("Mr. Malkus").

For the sake of brevity, Defendant incorporates the factual background set forth in Defendant's prior application dated November 3, 2023. *See* ECF 221. In addition, several recent developments have since become pertinent to the instant application:

On October 17, 2023, the plaintiff, E. Jean Carroll ("Plaintiff"), submitted a letter indicating that she "does not intend to pursue defamation liability in connection with Defendant's June 24 Statement." ECF 220. Thereafter, on November 3, 2023, Defendant filed an application to substitute a new expert. *See* ECF 221. Although Defendant's application was denied, this Court's Memorandum Opinion, dated November 16, 2023 (the "November 16 Order"), specifically permitted Defendant to "renew his request to submit a rebuttal report limited to rebutting any such new methodology or analysis." *See* ECF 232 at 16. The Order also stated that "[a]ny such request must demonstrate precisely how Dr. Humphreys' analysis or methodology in the supplemental report is different from her original report." *See id.*

Just prior to the November 16 Order and following her October 17, 2023 letter to this Court, Plaintiff served the supplemental report of proposed expert Dr. Humphreys, dated November 13, 2023 ("Supplemental Report"), which sought to calculate the harm attributable to the June 21 and 22 statements, and to specifically exclude the June 24 Statement. *See* **Exhibit A**. The Supplemental Report is intended to modify Dr. Humphreys' initial report dated October 14, 2022 (the "Initial Report"), which opines on the collective harm caused by all three statements. *See* ECF 135-8. An additional deposition of Dr. Humphreys was conducted on December 11, 2023. *See* **Exhibit B**.

Following the November 16 Order, Defendant identified a new rebuttal expert, Charles Malkus, who has rendered a proposed rebuttal report in compliance with the November 16 Order. *See* ECF 232 at 16. A copy of Mr. Malkus' proposed expert report is attached hereto as **Exhibit C**. Additionally, Defendant is ready to produce Mr. Malkus for a deposition at the earliest possible date that is mutually convenient for the parties.

\*     \*     \*

## I.      Dr. Ashlee Humphreys Must Be Precluded From Testifying Based On The Deficiencies In Her Expert Reports

Trial courts serve as gatekeepers for expert witnesses and are tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). This determination begins with the requirement that an expert witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Even if qualified, an expert's testimony is admissible only if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. *Id.*

"When evaluating the reliability of an expert's testimony, the court must 'undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Carroll v. Trump*, No. 22-cv-10016, 2023 WL 2652636, at *3 (S.D.N.Y. Mar. 27, 2023) ("*Carroll II*") (citing *Scott v. Chipotle Mexican Grill,* 315 F.R.D. 33, 43 (S.D.N.Y. 2016); *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002)). "A district court 'must focus on the principles and methodology employed by the expert, not on the conclusions reached.'" *Id.* (citing *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004); *Daubert,* 509 U.S. at 595)). "Where the expert's testimony does not rely on scientific methods, 'the court may permit testimony where a proposed expert witness bases her testimony on practical experience rather than scientific analysis.'" *Id.* (citing *Scott*, 315 F.R.D. at 43; *Davis v. Carroll,* 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013))*.* "Courts have excluded rebuttal testimony where the rebuttal expert 'failed to employ a reliable methodology or illustrate how [the expert's] experience informed [his or her] analysis' or where the rebuttal expert 'was unable to articulate a specific process or methodology by which [the expert] reached [his or her] conclusions.'" *Id.* (citations omitted).

Further, Rule 702 permits expert testimony only if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This 'helpfulness' requirement of Rule 702 goes beyond "mere relevance…because it also requires expert testimony to have a valid connection to the pertinent inquiry." *In re Rezulin Prods. Liab.*, 309 F. Supp. 2d at 540 (citations omitted). As with all testimony, expert testimony not only must be relevant under Fed. R. Evid. 401, *see, e.g., Amorgianos*, 303 F.3d at 265, but is also subject to exclusion under Fed. R. Evid. 403 where its probative value is substantially outweighed by the danger of unfair prejudice or other factors, *see, e.g., Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). For the reasons set forth below, both the Initial Report and the Supplemental Report must be stricken and Dr. Humphreys must be precluded from testifying at trial.

### A.  *The Supplemental Report Is Improper And Must Be Stricken*

The purpose of the Supplemental Report is to revise Dr. Humphreys' analysis to account only for the harm caused by the June 21 and 22 statements, "given that the [Initial Report] would have been improper for its inclusion of the June 24 Statement." ECF 232 at 14, n. 38. Because the Supplemental Report fails to do so, it is inadmissible and should be stricken.

In the Initial Report, Dr. Humphreys performs two types of damage assessments – a 'qualitative impact assessment' and a 'quantitative impact assessment.' *See* Initial Report at 40. Both assessments address the harm caused by the June 21, 22 and 24 statements collectively, not individually. Despite the inclusion of the June 24 Statement in both analyses, Dr. Humphreys fails to employ any reliable method for removing the harm attributable to that particular statement in her Supplemental Report. Therefore, for the reasons outlined below, the Supplemental Report is improper and must be stricken.

> ### i. *The Qualitative Impact Assessment Remains Unchanged In The Supplemental Report*

In the Initial Report, Dr. Humphreys performs a quantitative impact assessment of Plaintiff's estimated damages wherein she purports to "link the impressions estimate with the damages estimate." *See* Initial Report at 40. This quantitative aspect of her analysis is centered around the number of 'impressions' garnered by media sources, which cited to one of the Statements. *Id*. at 58. As evidenced by her impressions model, and as further confirmed by Dr. Humphreys during her December 12, 2023 deposition, her quantitative analysis does not distinguish between articles or impressions which are attributable to any one of the June 21, June 22, or June 24 statements, but rather, groups all three statements together and deals with them collectively. *See* Humphreys Dep. tr. 11:10-21.

Despite the purported removal of the June 24 Statement from the Supplemental Report, Dr. Humphreys states that her "opinions are unchanged from those listed in the Summary of Opinions in the Humphreys Report except for the opinions D, F, and H." *See* Supplemental Report at 2. Sections D, F, and H in the Summary of Opinions relate to her qualitative impact analysis, which remains entirely unchanged despite the withdrawal of the June 24 Statement. Dr. Humphreys admitted as much at her deposition:

> Q: [Y]our qualitative analysis in the initial report, did that include the June 24th statement?
>
> A: Yes, it did.
>
> Q: Okay. And that wasn't changed in any way in the supplemental report?
>
> A: That's correct.
>
> Q: Okay. So viewing the report as a whole right now the -- your qualitative impact analysis includes reference to the June 24th statement?
>
> A: My qualitative analysis in the initial report?
>
> Q: Yes.
>
> A: Yes, that's right.
>
> Q: And the supplemental report did nothing to change that, right?
>
> A: Correct. I did not redo the impact analysis.

Humphreys Dep. tr. 38:19-39:9.

Dr. Humphreys' failure to modify her qualitative analysis to account for the removal of the June 24 Statement demonstrates the unreliability of her testimony. Unquestionably, the removal

of the June 24 Statement should have resulted in a substantial change to Dr. Humphreys' qualitative impact assessment given how the June 24 statement is deeply embedded in the analysis.

For instance, in the Initial Report, Dr. Humphreys states that "to conduct the quantitative impact assessment, [she] relied on materials publicly available from before and after Mr. Trump's Statements on June 21, 22, *and 24*, 2019." *Id*. at 41 (emphasis added). And all the data presented in the qualitative impact analysis section cover time periods which are inclusive of the June 24 Statement. *See id.* at 44 (Figures 8 and 9 comparing the 'word cloud' for E. Jean Carroll for time frames "before June 2019" and "after June 2019."); *id.* at 47 (Figure 10 indicated daily relative search interest for time period of June 1, 2019 through June 29, 2019); *id.* at 48-49 (Figure 11 evidencing the difference in the "top related queries associated with searches of E. Jean Carroll" for the time periods of "January 1, 2019 through June 20, 2019" as compared to "*June 21, 2019 through November 3, 2019*.") (emphasis added).

Further, much of the analysis in the qualitative impact assessment is focused on the Google search volume pertaining to Plaintiff during the month of June 2019. *Id.* at 46-49. Dr. Humphreys utilizes a relative scale from 0 to 100 to indicate the "peak search volume achieved during the time period of interest." *Id*. Specifically, Figure 10 depicts a chart demonstrating the purported daily search interest associated with Plaintiff in June of 2019. *Id*. at 47. By Dr. Humphreys' own admission, this "data show[s] two clear spikes in search volume," the second of which occurred "on June 24, the day that Mr. Trump made the third Statement." *Id.* at 47. Dr. Humphreys notes that the June 25 spike scores as a '100' on the scale of relative search interest, the highest possible rating. And Dr. Humphreys specifically pointed to this spike in determining that Defendant's "response to Ms. Carroll's accusation may have been at least as impactful as Ms. Carroll's allegations." *Id*. Yet, in her deposition, Dr. Humphreys failed to offer any viable explanation for her failure to account for the removal of the statement that prompted the largest "spike" in relative search volume:

Q: And despite the fact that the June 24th statement had a 100 relative search volume resulting the next day, you didn't think it was necessary to update your qualitative impact analysis to account for that in your supplemental report?

A: No, I didn't.

Humphreys Dep. tr. 41:11-16.

Dr. Humphreys attempts to justify her failure to adjust the qualitative analysis by claiming: "In the initial report I had established that there was reputational harm attributable to the first two statements, and so I didn't feel it was necessary or relevant to reconduct a qualitative analysis." *Id.* tr. 60:10-15. But this position contradicts the contents of the Initial Report, which deals with the statements collectively, as well as Dr. Humphreys' testimony that the Initial Report does not "differentiate between either the June 21st, the June 22nd or June 24th statement." *Id.* tr. 11:17-21.

Therefore, because the qualitative impact assessment remains wholly unchanged from the Initial Report, it is beyond dispute that the Supplemental Report fails to adequately account for the withdrawal of the June 24 Statement and should be stricken.

**ii.** *The Quantitative Impact Analysis Fails To Adequately Account For The Removal Of The June 24 Statement*

**a.** *The Methodology For Determining Which Sources To Remove From The Quantitative Analysis Was Formulated By Plaintiff's Counsel*

The Supplemental Report must also be stricken because the methodology utilized for removing harm attributable to the June 24 statement was formulated by Plaintiff's counsel, not Dr. Humphreys. Since it fails to incorporate Dr. Humphreys' experience or expertise, and merely adopts the methodology developed by an interested party in this case—Plaintiff—the Supplemental Report cannot satisfy Rule 702.

In the Supplemental Report, Dr. Humphreys was tasked with isolating the harm caused by the June 24 Statement. Specifically, Dr. Humphreys explains:

> I have been ***asked by counsel*** to provide a supplemental analysis to reevaluate the Impressions Model, the Impact Model, and the Damages Model in order to provide an updated estimate of the cost of a reputational repair campaign. Specifically, ***I was asked***…to exclude the coverage referring ***exclusively*** to the June 24, 2019, statement[.]

*See* Supplemental Report at 1 (emphasis added).

During her deposition, Dr. Humphreys confirmed that she utilized this precise methodology to determine whether to include or exclude media sources from her damages model. Specifically, she stated that she "omitted any instance that contained *only* the June 24 statement or referred to the June 24 Statement," *see* Humphreys Dep. tr. 9:17-23, and kept in any sources in which the "June 21st or 22nd statements are mentioned in any way." Humphreys Dep. tr. 14:7-9. She also confirmed that this method was formulated entirely by Plaintiff's counsel:

> Q: Was it counsel that directed you to remove statements that exclusively relate to the June 24th statement, or did you come up with that method on your own?
>
> A: Counsel asked that I redo the analysis for statements one and two.
>
> […]
>
> Q: [I]t says in your report that's what you were asked to do by counsel.
>
> A: Yes, that's what I was asked to do by counsel.
>
> Q: So they asked you to exclude coverage that only referred to the June 24th statement?
>
> A: Yes.

*Id.* at 47:16-48:14.

Beyond her mere reliance on the method which Plaintiff's counsel instructed her to utilize, Dr. Humphreys was unable to articulate any independent basis for choosing to keep in articles that "largely focused on the June 24 statement" and have "hardly any mention of the June 21 or June 22 statements." *Id.* at 13:16-22. And Dr. Humphreys' testimony confirms that she did not rely on any academic source in determining whether this method was a sufficient or proper means of

removing the harm attributable to the June 24 statement.[1] Nor does she "explain how [her] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

It is readily apparent that Dr. Humphreys took no steps to independently assess whether it would be appropriate to incorporate articles that prominently feature the June 24 Statement in her impressions model, particularly when those articles contain only fleeting references to the June 21 and June 22 statements. Instead, she merely accepted and applied the methodology proposed by Plaintiff. Because her analysis lacks an "adequate factual basis" and will provide no assistance to the trier of fact through the application of specialized knowledge, it must be excluded. *Davis*, 937 F. Supp. 2d at 418; *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("[T]he expert witness must in the end be giving his own opinion. He cannot simply be a conduit for an unproduced expert."); *Gary Price Studios v. Randolph Rose Collection*, No. 03-cv-969, 2006 WL 1319543, at *8 (S.D.N.Y. May 11, 2006) (granting motion to exclude expert testimony where court found expert was, in large measure, parroting the testimony of the plaintiff); *In re Med Diversified, Inc.*, 334 B.R. 89, 100–02 (E.D.N.Y. 2005) (excluding expert testimony where expert testified that "he did not do any independent analysis of these companies, and did not independently analyze the data from the databases from which he derived his figures"); *Rowe Entm't v. The William Morris Agency*, No. 98 Civ. 8272(RPP), 2003 WL 22124991, at *6 (S.D.N.Y. Sept. 15, 2003) (excluding expert's damages calculation under *Daubert*, in part, for failing to do any independent analysis to validate information provided by the plaintiff).

Additionally, Dr. Humphreys' analysis should independently be stricken because the methodology she employs—which was formulated by *Plaintiff's counsel*—constitutes an impermissible legal opinion. It is blackletter law that experts "are not permitted to present testimony in the form of legal conclusions." *U.S. v. Articles of Banned Hazardous Substances*, 34 F.3d 91, 96 (2d Cir. 1994); *see also Hygh v. Jacobs*, 961 F.2d 359, 363–64 (2d Cir.1992) (an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court). "Accordingly, although an expert may give his [or her] opinion on an issue of fact that the jury will eventually decide, 'he [or she] may not give testimony stating ultimate legal conclusions based on those facts.'" *Id*. (citation omitted); *see also DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) ("[Expert witness] statements embodying legal conclusions exceed[] the permissible scope of opinion testimony under the Federal Rules of Evidence.").

At its core, the question of whether, and to what degree, a measure of harm is attributable to the June 21, June 22 and/or June 24 statement goes to the legal issue of causation. By arbitrarily deciding that any media source that even slightly references the June 21 or 22 statement—even when almost exclusively focused on the June 24 statement—should be considered a proximate source of harm is a legal determination, and a baseless one at that. Dr. Humphreys has not provided any foundation for her utilization of this method, and the fact that it was formulated by Plaintiff's counsel is highly suggestive that it is nothing more than "reverse-engineering a theory to fit the

---

[1] In her deposition, Dr. Humphreys states that the only academic sources she relied upon in preparing the Supplemental Report are those "cited" in the Supplemental Report. Humphreys Dep. tr. 55:6-8. However, Dr. Humphreys fails to cite to a single academic source in her Supplemental Report. *See generally*, Supplemental Report.

desired outcome." *City of Almaty, Kazakhstan v. Ablyazov*, No. 1-cv- 5345, 2021 WL 5154110, at *13 (S.D.N.Y. Nov. 5, 2021).

> **b. *Dr. Humphreys' Improper Qualitative Analysis Renders Her Testimony Unhelpful and Unreliable***

Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In other words, the testimony must be both reliable and relevant in that it "fits" the facts of the case. *Daubert*, 509 U.S. at 591–92. Testimony is neither helpful nor reliable where "there is simply too great an analytical gap between the data [on which the expert relies] and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, Dr. Humphreys analysis fails under *Daubert* because of her continued incorporation of articles focused on the June 24 Statement, which undermines the reliability of her process. Although the June 24 Statement should have been entirely removed from her quantitative model, review of the Supplemental Report reveals that it was not.[2] The below table reflects a sampling of the web articles that remain a part of impressions analysis in the Supplemental Report:[3]

| No. | Title | Author | Publication Date |
|-----|-------|--------|------------------|
| W-35 | Trump on E. Jean Carroll's Assault Allegations: 'She's Not My Type' | J. Arciga | 6/25/2019 |
| W-36 | EXCLUSIVE: Trump vehemently denies E. Jean Carroll allegation, says 'she's not my type' | J. Fabian, S. Enjeti | 6/24/2019 |
| W-42 | Trump On E. Jean Carroll Accusing Him Of Rape: 'She's Not My Type' | A. Blumberg | 6/24/2019 |
| W-44 | Trump denies woman's sexual assault accusation: 'She's not my type' | Reuters | 6/25/2019 |
| W-46 | Trump says he didn't rape author E. Jean Carroll: "She's not my type" | R. Falconer | 6/24/2019 |
| W-48 | She's not my type': Trump again denies E. Jean Carroll's sexual misconduct allegation | R. Morin | 6/24/2019 |
| W-50 | Trump Responds to E. Jean Carroll Rape Allegation: 'She's Not My Type' | M. Stieb | 6/25/2019 |
| W-52 | Donald Trump Responds to E. Jean Carroll's Rape Allegation: "She's Not My Type" | J. Willis | 6/25/2019 |
| W-53 | Trump says sexual assault accuser E Jean Carroll 'not my type' | - | 6/25/2019 |

The phrase "she's not my type"—which is featured in the headlines of all nine of the above-cited articles—is from the June 24 Statement. *See* ECF 157-1 at ¶ 98. And while these articles are focused almost exclusively on the June 24 Statement, they contain, at most, a mere passing reference to the June 21 and 22 statements.[4]

By failing to consider the prominence of how the June 21 or 22 statements are featured in the articles, Dr. Humphreys is not only employing a new methodology – she is contradicting the methodology she previously employed in *Carroll II*.[5] In that case, she testified that, in determining

---

[2] Dr. Humphreys identifies the sources removed from her Supplemental Report in Appendix B. *See* Supplemental Report at 22-24.

[3] Dr. Humphreys' entire table is contained in Appendix D of the Initial Report at 90-99.

[4] For reference, links to the above-referenced articles are located in Appendix D of the Initial Report at 90-99.

[5] Notably, Dr. Humphreys' *Carroll II* report states that she utilized the same methodology as in the Initial Report. *See Carroll II*, ECF 74-3 at 3 ("I also submitted a report in the case *Carroll v. Trump*, No. 20 Civ. 7311 (S.D.N.Y.) (LAK)

whether to include a particular article in her impressions model for the October 12, 2022 statement, her criteria was limited to: articles that "***featured the statement prominently***"; articles where the October 12 statement "***related to the headline***"; articles which the October 12 statement "***appeared in the first half of the article***"; and articles where the October 12 statement was "a ***prominent part***." *See* ECF 197, tr. 1119:12-1120:7 (emphasis added). At her December 11 deposition, however, Dr. Humphreys suddenly claimed that these same factors were not part of her "criteria" for determining whether to include or exclude articles from her impressions model in the Supplemental Report. *See* Humphreys Dep. tr. 21:10-14; 22:5-8.

Even more perplexing, this methodology is at odds with Plaintiff's own view of which articles are attributable to the June 24 Statement. In the Complaint, Plaintiff specifically lists 52 news articles and correlates each of them to one of the three statements. In particular, 19 articles are assigned to the June 24 Statement. *See* ECF 6-1 at ¶¶ 97-98. Yet, despite Dr. Humphreys acknowledging that impressions model is "limited to the set of 52 online news articles cited in the Complaint," Initial Report at 26, she only removes 6 of the 19 articles that are tied to the June 24 Statement, *id.* at 22-24. Thus, even according to Plaintiff's own theory of the case, the remaining 13 articles are improperly incorporated in the Supplemental Report's damages assessment.

Accordingly, Dr. Humphreys' methodology is neither discernible nor reliable and should be excluded. It is well settled that "[t]he more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." *O'Conner v. Comm. Ed. Co.*, 13 F.3d 1090 (7th Cir. 1994) (holding that expert testimony based on a subjective methodology was properly excluded). Here, Dr. Humphrey's methodology and conclusions are the result of her "subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, and it would plainly be a "dereliction of this Court's role as a 'gatekeeper' to find such [] opinion[s] admissible." *LVL XIII Brands* v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 648 (S.D.N.Y. 2016), *aff'd sub nom*. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017). Therefore, the Supplemental Report must be precluded under Rule 702.

For the above-stated reasons, and because the danger of confusion substantially outweighs even the minimal probative value of Dr. Humphreys' proffered opinions, preclusion is required under both Rules 403 and 702.

## B. *The Initial Report Must Be Stricken Because It Is No Longer Appropriate*

### i. *The Initial Report Improperly Includes The June 24 Statement In Its Damages Assessment*

The requirement that an expert's opinion must assist the trier of fact "goes primarily to relevance." *Daubert*, 509 U.S. at 591. Essentially, this is a question of "fit." *Id*. The expert testimony should be "sufficiently tied to the fact of the case" in order to "aid the jury in resolving a factual dispute." *Id*.; *see also In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony.").

---

(JLC). In the present report I estimate the impressions, impact, and damages for only the October 12, 2022 Statement using the same methodology adopted in my prior analysis.")

When a cause of action has been dismissed or removed from consideration, courts routinely exclude expert testimony which is intertwined with that claim. *See Price v. Fox Entm't Grp*, 499 F. Supp. 2d 382, 388 (S.D.N.Y. 2007) (expert testimony on "theory of striking similarity" was precluded after dismissal of corresponding cause of action); *Lichtenstein v. Triarc Cos.*, No. 02-cv-2626, 2004 WL 1087263, at *13 (S.D.N.Y. May 14, 2004) (expert analysis on pay disparity was no longer relevant because pay disparity claim was dismissed); *see also, Campbell, Jr. v. Consol. Rail Corp.*, No. 05-cv-1501, 2009 WL 36890, at *6 (N.D.N.Y. January 6, 2009) (expert testimony precluded in part to the extent that it concerned claims already withdrawn by plaintiff).

Due to Plaintiff's withdrawal of the June 24 Statement from her cause of action, the Initial Report no longer aligns with the subject matter of this case. As previously stated, in the Initial Report, Dr. Humphreys assesses the collective harm of all *three* statements – the June 21, June 22 *and* June 24 statements – without any differentiation between the individual damage caused by any particular one. *See* Humphreys Dep. tr. 11:17-21 (admitting that the Initial Report does not "differentiate between either the June 21st, the June 22nd or [the] June 24th statement[s]." *Id.* at tr. 11:17-21. As a result, the Initial Report includes the June 24 statement in both its qualitative and quantitative damages models, resulting in an improper and inflated estimation of damages.

In fact, Plaintiff has expressly acknowledged that the Initial Report is no longer appropriate due to the withdrawal of the June 24 Statement. *See* ECF 223, Ex. A at 5 ("In light of Plaintiff's decision not to pursue defamation liability for the June 24, 2019, statement, we agree to submit a brief supplemental expert report recalculating damages based on the June 21 and 22, 2019, statements alone."). Likewise, this Court noted that the Initial Report is deficient based on this change. *See* ECF 232 at 14, n. 38 ("Given that Ms. Carroll decided not to pursue a defamation claim for Mr. Trump's June 24, 2019 statement, she arguably was required to supplement [Dr.] Humphreys' report to reflect that change *given that the original report would have been incorrect for its inclusion of the June 24 statement*.") (emphasis added). Since the Supplemental Report fails to adequately account for the withdrawal of the June 24 statement—and must be stricken in its own right—the deficiency remains uncured. As such, the Initial Report is no longer "sufficiently tied to the fact of the case" and must be precluded. *Daubert*, 509 U.S. at 591.

Further, allowing the Initial Report to remain in this case although it includes the June 24 Statement will confuse and/or mislead the jury. *See* Fed. R. Evid. 403; *Daubert*, 509 U.S. at 595-97. Given the contents of the Initial Report—and how it deals with the Statement collectively, not individually—a jury cannot be expected to differentiate the harm caused by the June 24 Statement, as opposed to the June 21 and 22 statements, and this would create a significant and unnecessary risk that any damages award will be improperly inflated.

ii. ***Dr. Humphreys' Recent Testimony Has Exposed A Glaring And Fatal Flaw In Her Methodology For Assessing Damages***

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. Expert testimony should be excluded where the expert "failed to apply [her] own methodology reliably," *id.* at 268–69, or where the "methodology [is] aimed at

achieving one result," *Faulkner v. Arista Records* 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014). It is "critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.

Incredibly, Dr. Humphreys testified that she did not believe that the June 24 Statement caused *any* harm to Plaintiff's brand or reputation. Yet, despite this belief, she deemed it appropriate to include the June 24 Statement in her quantitative damages model, afford it equal weight to the June 21 and 22 statements, and attribute millions of dollars of damages to it. Specifically, she testified:

Q: So do you believe…the June 24th statement was harmful to her reputation at all?

A: As a journalist, no, and as a person -- her personal brand, no.

Q:. But despite that you did include it in your initial quantitative analysis report, correct?

A: Correct.

[…]

Q: When you removed the June 24th statement, it reduced the damages calculation by millions of dollars, right?

A: That's correct.

[…]

Q: Why is it that in your opinion the June 24th statement was relevant to the quantitative analysis in the initial report but not the qualitative analysis?

A So at the time I prepared my expert report, the assignment was to include three statements and to measure the impressions of those statements, and so that's what I did.

Q: And you did that…***even knowing that in your opinion that the June 24th statement didn't cause any harm, you still included it in your…quantitative analysis***?

A: ***Correct***.

Humphreys Dep. tr. 61:14-17; 62:5-8; 62:21-63:9 (emphasis added).

Dr. Humphreys' admission that her quantitative impact model attributed significant damages to a statement which she did not believe caused any harm calls into question the reliability of her entire analysis. Indeed, Dr. Humphreys' testimony confirms that her damages model is not a legitimate attempt to quantify the harm caused by Defendant's statements. Rather, Dr. Humphreys was simply completing her "assignment" – to "measure the impressions" of the "three statements." *Id.* Remarkably, Dr. Humphrey failed to consider as part of her analysis whether the statements caused any actual harm to Plaintiff's brand or reputation. To the contrary, the model included "millions of dollars" of purported damages which Dr. Humphreys *knew* did not correlate to actual harm to Plaintiff. *Id.*

In short, according to Dr. Humphreys' own testimony, the damages estimations in her Initial Report are egregiously inflated (to the tune of millions of dollars), utilize methods which ascribe harm in an unreliable and incorrect manner; and do not accurately reflect the actual harm to Plaintiff's reputation. It is therefore inarguable that her testimony will not assist the trier of fact in determining the appropriate amount of damages attributable to the June 21 and June 22

statement; is not based on sufficient facts or data; is not the product of reliable principles and methods; and is not the result of reliable application of her principles and methods to the facts of this case. Fed. R. Evid. 702. Dr. Humphreys' testimony must therefore be precluded under Rule 702. *See, e.g.*, *In re Pfizer, Inc.*, 819 F.3d 642, 662 (2d Cir. 2016) ("If the opinion 'is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'") (citations omitted); *Heller v. Shaw Indus.,* 167 F.3d 146, 153 (3d Cir.1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used."); *Gen. Elec.*, 522 U.S. at 146 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *City of Almaty*, 2021 WL 5154110, at *13 (excluding expert report which "provides no justification whatsoever for the numerical values" that the expert selected.").

## II.    <u>In The Alternative, Defendant Should Be Permitted To Submit Charles Malkus' Rebuttal Report In Response To The Supplemental Report</u>

For all the aforementioned reasons, this Court should simply exclude Dr. Humphreys testimony altogether. If, however, it declines to do so, Defendant respectfully requests that this Court permit Defendant to submit the supplemental rebuttal report of Charles Malkus.

In the November 16 Order, this Court permitted Defendant to renew his application to submit a rebuttal report in the event that Dr. Humphreys supplemental report contained any "new methodology or analysis." ECF 232 at 16. As detailed above, the Supplemental Report does just that – it fundamentally alters the manner and method in which she assesses the purported reputational injury to Plaintiff and changes her analysis concerning where and how the harm arose. Thus, in accordance with the Court's directive, Defendant secured a highly qualified expert, Charles Malkus, with over 39 years of experience in reputational management, to rebut the Supplemental Report. Mr. Malkus promptly prepared a rebuttal report, which addresses the improprieties of the new methodologies employed by Dr. Humphreys in the Supplemental Report, counters her newly-added analysis, and explains the flaws in her revised damages calculations.

Fed. R. Civ. P. 26 allows rebuttal expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). While a rebuttal's scope "is limited to the same subject matter encompassed in the opposing party's expert report…district courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language." *Scott*, 315 F.R.D. at 44. "Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." *Id.* at 44. Further, courts typically admit rebuttal testimony where an opposing expert adds new analysis or methodology. *See id. at 41–42, 45* (finding that a rebuttal expert's own calculations, allegedly correcting for errors by the first expert, "falls within the permissible bounds of rebuttal testimony."); *Hart v. BHH, LLC,* No. 15-cv-4804, 2018 WL 3471813, at *9 (S.D.N.Y. July 19, 2018) (new damages calculation "is proper rebuttal because it offers a new methodology").

As detailed above, Dr. Humphreys' Supplemental Report, and her accompanying testimony, fundamentally changes the methodologies, theories, and analyses supporting both her quantitative and qualitative assessments.

To summarize, Dr. Humphreys' Initial Report dealt with the statements in a collective manner and did not attempt to identify the harm caused by any one of the three statements. *See*, *e.g.*, Initial Report at 2 (noting that the assignment was to "create an analytical model to…estimate the number of impressions for the allegedly defamatory statements that were made by Donald Trump on June 21, 22 and 24, 2019" and to "analyze the impact…of these Statements."); *id.* at 5 ("Ms. Carroll's reputational value has been diminished due to the Statements."); *see generally* Appendices D, E, F, G, J, K (including media sources which solely reference the June 24 statement. In her Supplemental Report, she purports to be able to isolate the harm caused by one statement—the June 24 Statement—and distinguish it from that of the other two statements. Her methodology of differentiating the harm between the three statements is inherently new since it was not utilized in the Initial Report.

Furthermore, Dr. Humphreys includes a substantial amount of new analysis in her Supplemental Report as a means of justifying this change and retrofitting it to her prior findings. For instance, she testified *for the first time* on December 11, 2023 that the reputational harm sustained by Plaintiff was solely "due to specific connections between the content of Mr. Trump's statement and the nature of the associations in the public [sphere], *specifically that Ms. Carroll was lying*." Humphreys Dep. at tr. 60:19-22; *id.* tr. 61:10-15 ("The harm that I documented in my qualitative analysis was primarily attributable to her reputation and specifically to the claim that she was lying."). As such, she now theorizes the predominant cause of harm to Plaintiff's reputation was the assertion that she is a liar—which she argues is directly attributable to the June 21 and 22 statements—and not any of the other associations that are connected to the June 24 Statement. This analysis presents a new and marked departure from her Initial Report, which did not distinguish between the content of any of the three separate statements, or the resulting impact on Plaintiff's reputation. Therefore, it is necessary to permit Defendant to introduce an Expert to rebut these new assertions.

In addition, Dr. Humphrey's Supplemental Report unveils a fundamental shift in her quantitative analysis. Specifically, Dr. Humphreys' testimony revealed that her impressions model is solely formulated to gauge the number of views that the articles garnered; it is not intended to measure reputational harm. Of particular note, Dr. Humphreys testified that she included the impressions from the June 24 Statement in her Initial Report *even though she believed that it did not cause Plaintiff any reputational harm*. *See* Humphreys Dep. tr. 62:20-63:9. She implicitly revealed that her Impressions Model is not intended to depict the real-world impact of the statements on Plaintiff's reputation; it is merely an objective measure of views. As such, Defendant's expert must be permitted to rebut this point.

Defendant therefore respectfully requests that this Court permit Mr. Malkus to testify should it choose not to strike Dr. Humphreys' testimony in its entirety.

Respectfully submitted,

Dated: December 13, 2023
      New York, New York

Michael T. Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
112 West 34th Street, 17th & 18th Floors
New York, New York 10120