

Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

January 19, 2024

**VIA ECF**
The Honorable Lewis A. Kaplan, U.S.D.J.
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

    Re:    *Carroll v. Trump*
            Civil Case No.: 1:20-cv-7311-LAK-JLC

Dear Judge Kaplan:

    This office represents President Donald J. Trump in the above-referenced action. The instant letter application is submitted to renew a demand for a mistrial; or, in the alternative, that Plaintiff be precluded from seeking damages relating to death threats purportedly made to her and all testimony related to same be stricken from the record; or, in the alternative, that the Court include an adverse inference charge against Plaintiff relating to her willful violation of her discovery obligations and the spoliation of relevant evidence.

    As Your Honor is aware, during cross-examination on January 17, 2024, Plaintiff, E. Jean ]\Carroll ("Plaintiff") was specifically asked about the deletion of e-mail messages which bear direct relevance to the instant action. In response, Plaintiff admitted that she deleted multiple e-mail messages pertaining to purported death threats made to her. The pertinent trial testimony provided by Ms. Carroll on this issue is set forth below:

> Q. Now, you said you received threatening messages in your testimony today, correct.
>
> A. Yes.
>
> Q. And you deleted those messages.
>
> A. Yes.
>
> Q. And do you know what happens when you delete a message from your inbox?
>
> A. It goes into the trash in my computer, and then the trash is emptied automatically every 30 days, I think.
>
> Q. Did you ever delete the e-mails from the trash section of your e-mail?
>
> A. I probably did.

Q. So your testimony is that you deleted the messages and then they went to the trash and then you went into the trash and deleted the trash as well, correct?

A. I didn't go into the trash, I just periodically empty my trash in my computer because it's an old computer and tends to slow down if I have a lot in the trash.

Q. Did you stop deleting these threatening messages at any point, Ms. Carroll?

A. Yes.

Q. What was that point?

A. Actually, I went on deleting most of the replies. I stopped right around the second lawsuit. The one in May, I stopped.

Q. The first trial we had was when you stopped deleting them?

A. Well, no.

Q. That is correct?

A. I don't remember deleting any around that time or since then.

Q. I'm confused, Ms. Carroll. You stated in your testimony today that you received death threats daily, correct?

A. Not daily, but often.

Q. Often, OK. And you deleted those messages all until you were in the middle of trial, is that your testimony today?

A. No.

Q. So please explain to me what you meant by that.

A. I –

THE COURT: Explain what she meant by what?

BY MS. HABBA:

Q. When did you stop deleting the death threats?

A. I generally got rid of many of the replies on Twitter and on Facebook. I would just delete, delete, delete. I did not delete my post, but I deleted the replies. I hadn't realized how many death threats there were in my private messages.

Q. Ms. Carroll, my question is, when did you stop deleting them, the messages that you just spoke about?

A. Probably 2023.

Trial tr. 231:10–233:8.

Based upon the above-referenced trial testimony, Plaintiff's admission to the deletion of e-mail correspondences clearly related to this litigation is in direct contravention of Fed. R. Civ. P. 37(e). Rule 37(e) requires that all electronically stored information should be "preserved in the anticipation or conduct of litigation." *See* Fed. R. Civ. P. 37(e).

Plaintiff acknowledged, under oath, that she violated Rule 37(e). Despite being served with a subpoena in connection with this action, Plaintiff failed to take reasonable steps to preserve relevant evidence. In fact, she did much worse – she *actively deleted* evidence which she now attempts to rely on in establishing her damages claim. Accordingly, it is beyond dispute that Plaintiff's failure to comply with Rule 37(e) has caused significant prejudice to President Trump.

### A. Request for Mistrial

President Trump renews his request previously placed on the record for a mistrial for this matter, which is set forth below:

> Your Honor, at this moment, I feel I have to ask for a mistrial. The witness has just admitted to deleting evidence herself, which are part of her claim of damages, and I haven't seen them. She has no evidence of them. She hasn't turned them over.

Trial tr. 236:21-25.

Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction. *See Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir.1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). This is a defamation action, and the ongoing trial is centered solely around Plaintiff's claims for damages.  A significant component of her claim stems from the death threats Plaintiff purportedly received after President Trump issued his first denial on June 21, 2019. Specifically, Plaintiff testified as follows:

> My brain just froze. So to make myself feel good, I went to my Ask E. Jean website thinking that I would feel better if I could read some support. And I opened it up, and, yes, there was a really lovely email, you know, saying, "You go girl." And then I opened up the next Ask E. Jean letter, and I looked at it, I read it, and I ducked. Because the image of what the person said caused me to believe that it was going to happen right now. I thought I was going to get shot. And what the hard part was, I couldn't get the curtain across the window closed. I was sitting in a room with an open window at 11:30 at night. And it's -- when you see the words, the image comes into my mind, and

>  I believed it was happening right now. So I deleted the message to protect myself.

Trial tr. 127:7-19.

As stated above, Plaintiff recounted to the jury that she received vicious death threats on June 21, 2019, which she directly attributed to President Trump's June 21, 2019 statement. And she sought to substantiate her claim for emotional harm by describing how she felt like an attack would happen "right now" and that her heart would race, however, it cannot be established that these messages existed at all, since Plaintiff deleted them. *See* Trial tr. at 129:21-25. *See also id.* at 128:25-129:1 ("I just delete, delete, delete.")

Even assuming the messages did exist, the question of when they were sent is material and pertinent to President Trump's defense. One of the consistent themes throughout trial has been the lack of a causal link between President Trump's June 21 and June 22 statements and the damages that Plaintiff claims to have incurred. Particularly, there is a five-hour window between the time *The Cut* article was released and when President Trump issued his first denial, both of which occurred on June 21, 2019. Plaintiff claims to have received at least two death threats on that same date, which she subsequently deleted. *See* Trial tr. at 128:7-9. Plaintiff testified that she did not recall what time the messages were sent to her, *See* Trial tr. at 351:10-12; and, since the messages have been deleted, this information is unknowable.

Critically, if the June 21, 2019 death threats had been issued during that five-hour window—*before President Trump ever spoke about Plaintiff*—it would conclusively establish that those death threats are not attributable to President Trump's statements. This fact would also severely undercut any argument that subsequent death threats are attributable to President Trump's statements, since Plaintiff was receiving similar messages in the immediate aftermath of *The Cut* article being published.

In sum, it is clear from the trial testimony set forth above that Ms. Carroll sought to circumvent the Federal Rules of Civil Procedure by not only failing to preserve evidence, but by knowingly deleting e-mail messages that purportedly contained death threats against her. This is a procedural irregularity that is not only appropriate for the Court to grant a mistrial, but it is essential under the circumstances. Plaintiff's failure to preserve this purported evidence—in contravention of the Federal Rules of Civil Procedure—severely prejudices the President Trump's defense since he has been deprived of critical information relating to critical evidence which Plaintiff has described to the jury.

As such, President Trump respectfully renews its request for Your Honor to declare a mistrial.

### B. Preclusion of Damages Claimed for Purported Death Threats to Plaintiff

As part of her claim for damages in the case at bar, Plaintiff testified at trial on January 17, 2024 that she received numerous death threats in e-mail messages sent to her. The following are relevant portions of Plaintiff's trial testimony on this specific issue.

> Q. Ms. Carroll, when was the first time that you publicly revealed that you had been receiving -- that you have received death threats?
>
> A. At the last trial in May.

Trial tr. 144:13-16.

> Q. Were you also receiving death threats, Ms. Carroll.
>
> A. Yes.

Trial tr. 149:12-13.

> Q. I'm confused, Ms. Carroll. You stated in your testimony today that you received death threats daily, correct?
>
> A. Not daily, but often.

Trial tr. 232:15-17.

> Q. So all your death threats that you received that frightened you were in writing, is that correct?
>
> A. Yes.

Trial tr. 255:18-20.

    As set forth in the multiple trial transcript excerpts set forth above, Plaintiff has testified that she received death threats on multiple occasions. Her receipt of these messages comprises a significant portion of her claim for damages. Yet, while she claims that she received numerous death threats, she did not provide any specific testimony concerning any of the purported threats with the exception of those she claims to have received on June 21, 2019 and subsequently deleted.

    During cross-examination of Plaintiff, she admitted that there was a five-hour gap in between when the article on *The Cut* was released and the time when President Trump made his statement, as evidenced by the trial testimony below.

> Q. That was not my question, Ms. Carroll. There was time between when you put out The Cut article and when President Trump made this statement, is that correct?
>
> A. That is correct.
>
> Q. And if I told you that was about five hours, would that sound about right.

A. Yes.

Trial tr. 221:3-9.

It is undisputed that there were malicious tweets directed at Plaintiff during this five-hour period in between the release of the article on *The Cut* and when President Trump made his statement. *See* Trial tr. at 283:14-293:20. As explained above, there also exists a substantial likelihood that the death threats Plaintiff received on June 21, 2019—which she referenced in her testimony and is part of her claim for emotional harm—were also sent during that five-hour window. If that is the case, then Plaintiff's entire claim for emotional harm is undermined because it would show that Plaintiff was receiving death threats before President Trump ever spoke about her. Therefore, Plaintiff cannot establish any causal link between the death threats and President Trump's statements, nor differentiate between whether they were attributable to the release of the *The Cut* article.

Plaintiff admitted to knowingly and repeatedly deleting e-mail messages containing death threats. Plaintiff further admitted that all of the death threats that frightened her were transmitted to her in writing. *See* Trial tr. at 255:15-17. Since Plaintiff clearly failed to preserve the e-mail messages containing these purported death threats, in violation of Rule 37(e), it is impossible to ascertain whether the messages existed at all, the time they were sent, and whether the contents mirrored language in President Trump's June 21 statement. As such, due to Plaintiff's deletion of pertinent evidence, a causal link cannot be established between the death threats and President Trump's denial.

Accordingly, for the foregoing reasons, it is respectfully requested that any damages claimed by Plaintiff due to death threats should be precluded by this Court. In addition, President Trump asks that this Court strike any testimony from the record relating to death threats that Plaintiff claims to have received and that the jury be instructed to disregard such testimony.

**C. Spoliation of Evidence Jury Charge**

In the alternative, President Trump requests, pursuant to Fed. R. Civ. P. 37(e)(2)(B), that the Court include an adverse inference instruction against Plaintiff for her willing violation of her discovery obligations.

"[D]istrict courts have broad discretion in fashioning an appropriate sanction for a party's failure to produce documents in breach [of] its discovery obligations . . ." *Bogosian v. All Am. Concessions*, No. 06-CV-1633 (RRM) (RML), 2011 U.S. Dist. LEXIS 109082, 2011 WL 4460362, at *7 n.4 (E.D.N.Y. Sept. 26, 2011); accord *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) ("Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs."); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."). An adverse inference may be drawn if (1) the party having control over the evidence had an obligation to timely produce it; (2) the party that failed to timely produce the evidence had a culpable state of mind; and (3) the missing evidence is relevant

to a claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Residential Funding Corp.*, 306 F.3d at 107.

As set forth at length above, Plaintiff has sole possession of the purported death threats she received, and she knowingly and intentionally deleted them. This evidence is relevant to both Plaintiff's claim since it relates to the quantification of damages, as well as President Trump's defense since it pertains to the question of causation. Therefore, permitting an adverse inference against Plaintiff is an appropriate sanction for Plaintiff's deliberate attempts to circumvent the discovery process, and her blatant violation of Rule 37(e).

Specifically, a jury charge should be added instructing the jury that if they find that a party intentionally failed to preserve electronic mail messages, then a negative inference may be drawn against that party and the jury may presume that the electronic mail messages were unfavorable to that party.

\*   \*   \*

For the reasons set forth above, President Trump respectfully requests that: (i) a mistrial be declared; (ii) Plaintiff be precluded from seeking damages relating to death threats purportedly made to her and all testimony related to same be stricken from the record; or (iii) the Court include an adverse inference charge against Plaintiff relating to her willful violation of her discovery obligations and the spoliation of relevant evidence.

Respectfully submitted,

Alina Habba, Esq.
For HABBA MADAIO & ASSOCIATES LLP

cc: All Counsel of Record (via ECF)