**KAPLAN HECKER & FINK LLP**

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL       212.763.0883
DIRECT EMAIL      jmatz@kaplanhecker.com

January 21, 2024

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *Carroll v. Trump*, 20 Civ. 7311 (LAK)

Dear Judge Kaplan:

      On January 18, 2024, Your Honor requested briefing on the following question: "If someone's reputation in part of a community is injured, is the plaintiff or the injured party entitled to recover damages for that injury even if the reputation of the party in another part of the community is benefited." As explained below, the answer to that question is "yes."

      In this letter, we also address a second and related issue concerning Mr. Trump's repeated arguments (as advanced in opening statements and evident in cross-examination) that by revealing his sexual assault, Ms. Carroll somehow assumed the risk of being defamed, consented to such defamation, or afforded him a right of "self-defense" in his responses to her truthful revelation.

*       *       *       *       *

      We first address the question posed by Your Honor. In short, where a defamatory statement harms the plaintiff's reputation within a substantial part of a community, the plaintiff is entitled to damages based on her actual injuries (including reputational injuries), and New York law does not impose any offset based on alleged reputational benefits to the plaintiff within other parts of the community. We respectfully request that the jury be instructed on that point of law.

      This legal rule is supported by two considerations. *First*, a defamation victim can sustain a claim even if the defamatory statement at issue did not subject her to universal (or even majority) public disrepute. To qualify as defamatory, a communication "need not tend to prejudice the other in the eyes of everyone in the community or of all of his associates, nor even in the eyes of a majority of them." *Restatement (Second) of Torts* § 559 (1977). "It is enough that the communication would tend to prejudice him in the eyes of a substantial and respectable minority

of them, and that it is made to one or more of them or in a manner that makes it proper to assume that it will reach them." *Id.* Thus, a statement can be defamatory even if it confers both benefits and harms on a plaintiff's reputation. *See, e.g.*, *Armstrong v. Shirvell*, 596 F. App'x 433, 448 (6th Cir. 2015) (applying Michigan law and rejecting the argument that a defamation claim failed on the merits because the statements at issue "did not damage [the plaintiff's] reputation but enhanced it" and caused the plaintiff to receive "support … from the University and elsewhere"). Consistent with that understanding, courts in several recent cases have upheld defamation liability where the defendants made highly offensive statements about the plaintiffs, and where those statements were well known to have sparked substantial sympathy for the plaintiffs among parts of the public. *See, e.g.*, *Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 18, 2021), ECF 142; *Lafferty v. Jones*, 2022 WL 18110184, at *2, *9-10 (Conn. Super. Ct. Nov. 10, 2022). Notably, in none of these cases did courts suggest that any potential reputational benefits to the plaintiffs within parts of the public were relevant to the issue of damages. *E.g.*, *Freeman*, ECF 137 (final jury instructions that do not include any reference to such a concept in describing the law of defamation damages). Indeed, this makes sense: many statements that could rank as defamatory would tend to make a plaintiff better known in a community, or to induce sympathy or support from at least some members of the community, yet there is no body of law offsetting damages on that basis.[1]

*Second*, and relatedly, New York State has not adopted the so-called "benefits rule" in the context of intentional torts—and, even if it had, that rule by its terms would not apply. The classic statement of the benefits rule is as follows: "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." *Restatement (Second) of Torts* § 920 (1979); *see also Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 629 (S.D.N.Y. 2005) (Kaplan, J.) (applying this rule under New Jersey law in an accounting malpractice action). So far as we can tell from a diligent search, this rule has been applied by New York courts mainly (if not solely) in the context of medical malpractice cases concerning so-called "wrongful birth" claims. *See Becker v. Schwartz*, 46 N.Y.2d 401, 415 (1978). Courts have declined to apply the rule in other settings, particularly where intentional torts are involved. *See, e.g.*, *Bingham v. Zolt*, 823 F. Supp. 1126, 1134 (S.D.N.Y. 1993) (rejecting offset for enhancement in value of diverted assets "because defendants were found liable as intentional tortfeasors" and "should not be able to reap the benefit of any enhancement"); *see also Scott v. Brooklyn Hosp.*, 480 N.Y.S.2d 270, 274 (N.Y. Sup. Ct. 1984) (declining to apply rule in medical malpractice action). We have not discovered any New York case in which a court applied the benefits rule to actual malice defamation.

---

[1] In *Grant v. Readers Digest Association, Inc.*, 151 F.2d 733 (2d. Cir. 1945), Judge Hand held under New York law that a statement accusing a lawyer of being an agent of the Communist Party qualifies as defamatory. *Id.* at 734. In so holding, he recognized that juries might consider "in mitigation of damages" the "moral obliquity of the opinions of those in whose minds the words might lessen [a] reputation." *Id.* Put differently, he recognized that in deciding damages, the jury can consider whether the community in which reputational harm occurs is one that does not "embrace prevailing moral standards." *Id.* But there is a categorical difference between (on the one hand) assessing where reputational harm occurs and (on the other hand) negating reputational harm on a theory of offsetting benefits in different parts of the community. Thus, Judge Hand did *not* suggest that a jury could consider potential benefits to a plaintiff's reputation from being called an agent of the Communist Party (*e.g.*, admiration of domestic Communists). The absence of any such suggestion is consistent with the view that such benefits are irrelevant as a matter of law.

KAPLAN HECKER & FINK LLP

3

Once again, that makes sense. By its terms, the benefits rule applies only "to the extent that this is equitable." *Restatement (Second) of Torts* § 920. Specifically, "this principle is intended primarily to restrict the injured person's recovery to the harm that he actually incurred and not to permit the tortfeasor to force a benefit on him against his will." *Id.* at cmt. f. And in applying that principle, "the good faith" and "reasonableness of the attitudes" of the parties are crucial. *Id.*; *see also id.* ("[U]nless the plaintiff is capricious or spiteful and the defendant has acted by mistake, so that his conduct was not knowingly tortious … the damages *may not be diminished* by the fact that the defendant's interference has increased the monetary value of the property." (emphasis added)).

Here, Mr. Trump has been held liable for defamation under the actual malice standard. It would thus be profoundly inequitable to allow him (through his defamatory attacks) to "force a benefit on [Ms. Carroll] against [her] will." *See id.* Given the utter absence of good faith and reasonableness in Mr. Trump's conduct—and given that his conduct was malicious and intentional rather than negligent or mistaken—Mr. Trump cannot equitably avail himself of the benefits rule, event to the extent that rule applies under New York law in this setting (which it does not).

It would be perverse to hold otherwise. The question here is not whether Ms. Carroll may have incurred a reputational benefit from coming forward to reveal the truth that Mr. Trump sexually assaulted her. It is whether Mr. Trump's own defamatory statements resulted in some sort of reputational benefit to Ms. Carroll—and, if so, whether he can offset damages on that basis. The answer to that question is clear. As a matter of precedent and equity, the law does not authorize Mr. Trump to defame Ms. Carroll but then minimize the ensuing damages because he involuntarily inflicted a "benefit" on her in the form of support from parts of the community who find his statements abhorrent (or who are otherwise predisposed to disbelieve his attacks). Ms. Carroll never asked for any "benefit" that Mr. Trump may think that he has forced upon her through his defamatory attacks. If anything, it is offensive for him to persist in his assertions that she should be grateful to him for defaming her. And it is equally absurd to claim that her damages are less substantial just because his unlawful, unwanted, and unwelcome attacks on her reputation provoked sympathy in some parts of the public or drew more attention to Ms. Carroll. If Ms. Carroll suffered harm to her reputation—which she plainly did—then she deserves to be fully compensated for that injury. If she somehow benefited in any respect from the President of the United States falsely calling her a liar and a fraud (and threatening and insulting her), the law of New York does not reward Mr. Trump for that collateral result of his own tortious malfeasance.

Because Mr. Trump's opening argument and cross-examinations plainly indicated to the jury that Ms. Carroll's damages should be reduced by the amount of any reputational benefit she received from his defamatory statements, and because that contention rests on a mistaken legal premise, Ms. Carroll respectfully requests that the Court's jury instructions address this issue. For example, the Court might include the following language in its instructions on defamation damages: "Under the law, the injury (if any) that Mr. Trump caused to Ms. Carroll's reputation by his defamatory statements is not mitigated by any benefit to her reputation that Mr. Trump may claim that his defamatory statements caused in some parts of the community. You are not to consider any such reputational benefits (if any) in deciding on a damages award in this case." In addition, Ms. Carroll would also request that the Court issue an order precluding the defense from making any argument to the jury in summation that is inconsistent with this legal rule.

\*     \*     \*     \*     \*

KAPLAN HECKER & FINK LLP

4

Ms. Carroll also wishes to raise a second, related issue. Throughout the trial, Mr. Trump's lawyers have repeatedly impugned Ms. Carroll's motives for revealing that he sexually assaulted her—and they have then suggested that Mr. Trump was "merely defending himself" when he defamed her. Tr. 52:21; *see also id.* at 56:16-17 (arguing that "before she came out with her allegation against Donald Trump," Ms. Carroll's "career was dwindling and it needed a spark"); *id.* at 54:21-22 (arguing that Ms. Carroll waited "for the opportune time" to expose Mr. Trump's misconduct because that "was the business she was in"); *id.* at 55:2-15 (arguing that Ms. Carroll revealed Mr. Trump's sexual assault in order to gain attention and make money).

The unmistakable upshot of these arguments is that Ms. Carroll's motives for revealing that Mr. Trump assaulted her are suspect; that Ms. Carroll somehow assumed the risk or consented to Mr. Trump's June 2019 defamatory attacks by revealing that he had sexually assaulted her; and that Mr. Trump's defamation was somehow justified as a form of public self-defense.

On the first point, Mr. Trump's position is directly at odds with one of Your Honor's pre-trial orders. In pre-trial briefing, the defense sought leave to introduce evidence of Ms. Carroll's "financial motivation" and "efforts to promote her claims," arguing that this evidence was relevant to the harm that Ms. Carroll suffered; the defense also sought to introduce evidence that "Plaintiff's conduct was politically-charged" as relevant to reputational harm. ECF 235 at 6. The Court largely rejected these contentions: "Such evidence, however, falls squarely within the Court's prior decisions, as it tends to suggest that Ms. Carroll had impure and non-truthful motives in raising her allegations against Mr. Trump. Moreover, Ms. Carroll's personal *motivations* for speaking up are not probative of the harms that she *actually* suffered from Mr. Trump's defamation, shedding no light on her mental and emotional state and reputational damage after Mr. Trump issued his 2019 statements. Indeed, regardless of the reasons why Ms. Carroll chose to come forward, she did not implicitly consent to whatever defamation Mr. Trump might subsequently commit." ECF 252 at 14 (emphasis in original). Although the Court's pre-trial ruling did not entirely forbid evidence or argument about Ms. Carroll's statements, the Court imposed important limits: "Mr. Trump is not precluded from introducing evidence of Ms. Carroll's public statements for the purpose of arguing that she contributed to the reputational and emotional harm that she claims, *but he may not use such statements or related argument to suggest that she fabricated her account or to inquire about her motives in making such statements*." *Id.* at 14 n.41 (emphasis added).

Mr. Trump's lawyers have run roughshod over these limits. In addition to her comments during opening statements, Ms. Habba has repeatedly sought to elicit testimony and advance arguments meant to suggest that Ms. Carroll had financial, political, or fame-seeking motives for revealing that Mr. Trump sexually assaulted her. *See also, e.g.*, Tr. at 208:20 (seeking to elicit testimony that Ms. Carroll's salary had been cut the year before she decided to come forward); 216:5-6 (seeking to elicit testimony about financial compensation in connection with her book).

Evidence and argument about Ms. Carroll's financial circumstances and political views when she revealed that Mr. Trump sexually assaulted her are not relevant to the reputational harm or the emotional suffering she experienced from his defamatory statements. *See* Fed. R. Evid. 401. And even if it had some slight probative value in this respect, that value is substantially outweighed by the risk of prejudice and confusion concerning the truthfulness of her revelation that Mr. Trump had assaulted her (a fact that has already been found through collateral estoppel). *See* Fed. R. Evid.

KAPLAN HECKER & FINK LLP

5

403. Simply put, while the Court authorized Mr. Trump to offer evidence and argument concerning Ms. Carroll's public statements, it drew a sensible line around attacks on her motives for revealing the underlying sexual assault, and Mr. Trump's lawyers have utterly failed to honor that limitation.

This is particularly concerning because Mr. Trump is unabashedly arguing to the jury—by virtue of his attacks on Ms. Carroll's motives for speaking up, and through direct argumentation that his counsel advanced in opening statements—that Ms. Carroll assumed the risk of being defamed, consented to (or even hoped for) such defamation, and/or has justified Mr. Trump's conduct as self-defense. Every single such claim is forbidden as a matter of law. The assumption of risk doctrine does not apply to defamation (or more generally in the context of intentional torts). *See, e.g., Custodi v. Town of Amherst*, 20 N.Y.3d 83, 87 (2012); *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 359 (D.C. Cir. 2018); *Janelsins v. Button*, 102 Md. App. 30, 41 (1994). With respect to consent—in other words, the theory that Ms. Carroll essentially invited or agreed to defamation—this Court has already rejected Mr. Trump's position, holding that when "a survivor of sexual assault makes the choice to speak up, that choice does not constitute consent to whatever defamatory lies their abuser may unleash in response." *Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 4393067, at *18 (S.D.N.Y. July 5, 2023), *aff'd*, 88 F.4th 418 (2d Cir. 2023). And as to Mr. Trump's claim that his defamatory statements were somehow a form of self-defense, whether he intends that in a political or personal sense, it is meaningless as a legal matter: when a person commits sexual assault and their victim reveals what they did, the law confers no right of self-defense to make defamatory statements aimed at crushing or humiliating the accuser. *Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 576 (S.D.N.Y. 2019) (explaining under New York law that a finding of constitutional actual malice defeats any self-defense privilege in defamation cases).[2]

In consequence of Mr. Trump's improper argumentation and violation of the Court's pre-trial orders, Ms. Carroll respectfully requests that the Court issue the attached curative instruction to the jury prior to deliberations, and that the Court issue an order precluding the defense from making any argument to the jury in summation that is inconsistent with this instruction.

Respectfully submitted,

Joshua Matz

cc:   Counsel of Record

---

[2] Moreover, under federal pleading standards, assumption of risk, consent, and self-defense would all be affirmative defenses to liability, and have either been waived, rejected, or otherwise precluded by virtue of the Court's prior rulings and its summary judgment determination on liability. It is inappropriate for Mr. Trump to seek to repackage these meritless affirmative defenses to liability as considerations that somehow vitiate his damages at trial.