**KAPLAN HECKER & FINK LLP**

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL    212.763.0883
DIRECT EMAIL   rkaplan@kaplanhecker.com

January 21, 2024

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

                Re:     *Carroll v. Trump*, 20 Civ. 7311 (LAK)

Dear Judge Kaplan:

       We write in response to Defendant Donald J. Trump's letter motion dated January 19, 2024, seeking reconsideration of this Court's denial of a mistrial; or, in the alternative, seeking an order precluding and striking testimony relating to death threats; or, in the alternative, seeking an adverse inference charge. *See* ECF 271. For the reasons explained below, each of Mr. Trump's various alternative requests should be denied.

*   *   *

       Mr. Trump's counsel made a spectacle in Court last week when Ms. Carroll testified that she had deleted certain death threats, even though they have known about that for nearly a year and did not previously raise a concern. On January 31, 2023, Ms. Carroll sat for a deposition in the related *Carroll II* matter. There, she stated that "my initial reaction was to delete [death threats] when I saw them." Ex. A ("*Carroll II* Dep.") at 73-74. When asked how many death threats she had received after Mr. Trump's June 2019 statements, she stated, while also responding to follow-up questions: "[L]ess than ten … [from] [p]ossibly three nights. The whole time I was staying in New York … I deleted them … it was a natural reaction to get them away from me …" *Id.* at 74.[1]

       At trial last week, on direct examination, Ms. Carroll testified that, in the immediate aftermath of Mr. Trump's first defamatory statement, she began to receive messages that threatened her with physical violence. Tr. 126-27. Ms. Carroll explained that she read the

---

[1] In her October 14, 2022 deposition, Ms. Carroll was asked whether she keeps track of the letters she receives from her readers, and stated that she "doesn't delete anything" since she filed suit in 2019. Ex. B. at 230-31.

messages, which included graphic images, for the first time at approximately 11:30pm on June 21, 2019. *Id.* at 126. Ms. Carroll further testified that she deleted these messages almost immediately to "protect" herself and take back "control of the situation." *Id.* at 127, 129. At that time, in the hours after Mr. Trump released his first statement, Ms. Carroll had not given any thought to potentially filing a lawsuit against him. She "was just trying to acclimate to the new world [she] was in." *Id.* at 129.

During her direct, Ms. Carroll separately testified that she has been receiving death threats over the past several years. *See, e.g., id.* at 126 ("Q: How often did you receive message threatening to kill you? A: Often enough. I mean often."); *id.* at 149 ("Q: Were you also receiving death threats, Ms. Carroll. A: Yes."). Ms. Carroll also testified about some specific threats she has received, including two from May 2023. *E.g.*, Ex. C (PX-126); Ex. D (PX-128).

On cross examination, defense counsel asked Ms. Carroll a series of questions about the threatening messages she received. Ms. Carroll acknowledged her earlier testimony, where she explained that she had deleted certain threatening messages (namely, those that she received on the night of June 21, 2019). *Id.* at 231-32. Ms. Carroll then explained that she eventually stopped deleting threatening messages, but elaborated that she "went on deleting most of the replies" and "stopped right around the second lawsuit." *Id.* at 232. At this point, defense counsel asked whether Ms. Carroll was testifying that she "received death threats daily," prompting Ms. Carroll to respond, "Not daily, but often." *Id.* Defense counsel followed up to ask, "And you deleted those messages all until you were in the middle of trial," at which point Ms. Carroll clarified, "No." *Id.*

Following Ms. Carroll's statement that she had not deleted all the threatening messages that she received until the middle of trial, defense counsel asked, "When did you stop deleting the death threats." *Id.* at 233. With sole reference to "the replies on Twitter and Facebook," Ms. Carroll said that she "did not delete my post, but I deleted the replies." *Id.* Defense counsel then asked Ms. Carroll when she stopped deleting "the messages that you just spoke about"—in other words, the replies on social media—to which Ms. Carroll said, "Probably 2023." *Id.* At this point, defense counsel started asking about a subpoena and the discovery process. Ms. Carroll clarified that she did not delete her own posts, just the replies, and that she had not deleted emails in her inbox. *Id.* Defense counsel then asked again whether Ms. Carroll had in her inbox all messages related to death threats; this question was not specific about which "inbox" (namely, email or social media), and Ms. Carroll responded (with confusion apparent to anyone sitting in the courtroom), "No. I deleted them early on because I didn't know how to handle death threats." *Id.* at 234. Finally, defense counsel asked if Ms. Carroll deleted anything after filing this lawsuit, to which Ms. Carroll answered, "I never deleted any of my posts or anything that I thought was the agreement. May, may have deleted some emails. Hated, that were filled with threats. I can't say for sure." *Id.*

At the risk of stating the obvious, this line of questioning and testimony was not a model of clarity. Ms. Carroll testified that she has been receiving threats since June 2019. She testified about several specific threats and said she had received many more. She testified that she has preserved her own posts on social media. She testified that she has deleted some but not all "replies" to her posts (by which she likely meant hiding replies, since it is not always possible to delete replies to posts on social media), and even then, Ms. Carroll recalled on direct that death threats themselves came through private messages, not public replies to social media posts. *Id.* at 135. She testified that she has preserved all (or nearly all) of the items in her email inbox. And

she testified that early on, and potentially at some subsequent points, she has deleted a subset of the death threats she received.[2]

\* \* \*

**Mistrial.** In a flagrant departure from appropriate courtroom decorum, defense counsel has already requested a mistrial declaration in the presence of the jury. The Court responded by stating: "Denied. The jury will disregard everything Ms. Habba just said." Tr. 237. Thus, Mr. Trump's letter request for a mistrial declaration is nothing more than a motion for reconsideration. He cannot meet that high standard. *See Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013) (holding that the moving party must identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice"). Indeed, Mr. Trump makes no effort to satisfy the standard for reconsideration. He cites only a single, decades-old decision that does not even contain the word mistrial. *See* ECF 271 at 3 (citing *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)). The purported "evidence" that Mr. Trump invokes is not "new," but rather the same trial testimony on which defense counsel based their original mistrial motion. *See* ECF 271 at 3-4. And he does not even try to show a "clear error" or "manifest injustice" in a decision whose only effect is to leave a question about the weight of certain damages evidence for the jury. *See McDowell v. Eli Lilly & Co.*, No. 13 Civ. 3786, 2015 WL 845720, at \*7 (S.D.N.Y. Feb. 26, 2015). At bottom, Mr. Trump simply repeats an "old argument[] previously rejected," which cannot justify reconsideration. *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). And even if his position were considered anew, Mr. Trump could not possibly demonstrate a denial of "the right to a fair trial" supporting a mistrial declaration. *See* 1 Fed. Jury Prac. & Instr. § 5:21 (6th ed.).

**Preclusion of damages relating to death threats.** Mr. Trump next argues that Mr. Carroll should be precluded from seeking any damages based on the death threats that she received on and after June 21, 2019. He also seeks to strike any evidence relating to death threats. He contends that some of these threats may have arrived during the "gap" in time between the publication of Ms. Carroll's account in *The Cut* and the posting of Mr. Trump's first defamatory statement on Twitter. Because of that possibility, he contends that Ms. Carroll cannot conceivably demonstrate any causal connection between his defamatory statements and the death threats that she received.

This argument is meritless. Ms. Carroll testified that she did not receive death threats before June 2019; that she first saw them in her inbox the night of June 21, 2019, around 11:30pm; and that she has been receiving them "often" over the past several years. In addition, and contrary to the claims made on page five of Mr. Trump's letter, Ms. Carroll testified about specific threats that she has received subsequent to June 21, 2019. Finally, Ms. Carroll testified to her understanding that Mr. Trump's June 21 and June 22 statements contained clear threats that she should "pay dearly" and had entered "dangerous territory."

---

[2] Defense counsel mischaracterizes Ms. Carroll's testimony on this point. Specifically, they pick a single sentence out of context ("I just delete, delete, delete") and assert that Ms. Carroll was referring to the death threats she received (and deleted) on June 21, 2019. ECF 271 at 4. When read in context, however, it is clear that Ms. Carroll was referring to "replies on Twitter and Facebook," not the death threats she received by email in June 2019. Tr. 233.

KAPLAN HECKER & FINK LLP

4

Given all this, it is plainly a question for the jury—subject to appropriate argument from the parties—whether some or all of the death threats that Ms. Carroll started receiving on June 21, 2019, and that she has been receiving often since then, are causally attributable to Mr. Trump's defamatory statements such that they properly support damages. Mr. Trump is free to argue that some of the initial statements that Ms. Carroll described may have arrived in the five-hour gap before the publication of Mr. Trump's first defamatory statement at 5:17pm, rather than between 5:17pm and 11:30pm (which is when Ms. Carroll says she first saw those threats). But there is no basis to preclude Ms. Carroll from arguing to the jury (or from offering evidence) that she should receive damages based partly on the death threats she received starting June 21, 2019, and continuing for years thereafter. Indeed, even if it were true that some of the death threats Ms. Carroll recalls may have arrived in her inbox prior to 5:17pm on June 21, 2019, those threats may still provide relevant context for Ms. Carroll's mental state when she encountered Mr. Trump's first defamatory statement, and they may illustrate the social climate in which Mr. Trump chose to repeatedly and maliciously defame Ms. Carroll. Moreover, Ms. Carroll is obviously free to argue that the possibility of a few threats preceding Mr. Trump's first defamatory statement hardly means that he bears no causal responsibility (and cannot be held liable for) subsequent death threats that continued for years and in some cases bore the hallmarks of language in his own statements.

At bottom, "the jury are judges of the damages." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353, 118 S. Ct. 1279, 1287 (1998). Weighing all the relevant evidence to arrive at a damages number is what the jury will do here; there is no reason to preclude this issue.

**Spoliation of evidence jury charge.** As a final alternative, Mr. Trump requests an adverse inference instruction for Ms. Carroll's alleged "willing violation of her discovery obligations." ECF 271 at 6. But "[a] court will only order an adverse inference instruction" under Federal Rule of Civil Procedure 37 "if the requesting party can establish: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Tian v. Star Nail Salon, Inc.*, No. 20 Civ. 5263, 2022 WL 20598558, at *2 (E.D.N.Y. May 31, 2022). And even when that high standard is satisfied, whether to issue an adverse instruction to the jury remains a matter of discretion. *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). None of those requirements is satisfied here.

*First*, Mr. Trump has not demonstrated that Ms. Carroll had an obligation to maintain the evidence in question. Mr. Trump focuses on Ms. Carroll's deletion of certain messages that she recalls receiving the night of June 21, 2019. But Ms. Carroll had no legal obligation to preserve her documents or communications at that time. As she testified, Ms. Carroll had no initial plan to file a lawsuit. Tr. 151, 266. She had not consulted with counsel or given any thought at that point to filing an action. Where a person does not reasonably anticipate litigation, there is no duty to preserve—and so Mr. Trump cannot show that the deletion of threatening messages in the days following his defamatory statements occurred in contravention of any legal obligation.

Moreover, Ms. Carroll acknowledged in her January 2023 deposition that she had deleted the initial wave of threatening messages. *Carroll II* Dep. at 73-74. Mr. Trump was free to file motions or otherwise seek to pursue this issue sooner. But he chose not to do so. Therefore, equity

does not support affording him a remedy now that he has raised the issue in the middle of trial and professed surprise in the presence of the jury. If anything, Mr. Trump has forfeited this issue.

Insofar as Mr. Trump premises his argument on supposed deletion of emails after litigation began, that misses the mark for multiple reasons. Ms. Carroll has testified in her deposition, on direct at trial, and on cross at trial that she deleted threatening emails only in the early days. *See supra*. Only after a confusing back-and-forth—in which defense counsel mistakenly referenced a subpoena, asked Plaintiff about different threats she received across multiple forms of media, and inquired confusingly about the timing of those threats in relation to two separate lawsuits—did Ms. Carroll appear to equivocate. *Id.* This muddled testimony, which resulted from muddled and shouted questions, is hardly sufficient to carry Mr. Trump's burden of demonstrating that Ms. Carroll deleted evidence when she was under an obligation to preserve it. Further still, as part of the discovery process and in light of Mr. Trump's initial stonewalling, Ms. Carroll clarified that as to documents post-dating the filing of her complaint in his action, she would produce only those documents "that may be used by Plaintiff as evidence at trial or contain communications with potential witnesses." *See* Ex. E. Mr. Trump could have raised a discovery dispute about this years ago, but he did not.

*Second*, Mr. Trump has not demonstrated that Ms. Carroll acted with "the intent to deprive [him] of the information for use in the litigation." *Am. Lecithin Co. v. Rebmann*, No. 12 Civ. 929, 2023 WL 7160729, at *3 (S.D.N.Y. Oct. 31, 2023). Under these circumstances, this "intent requirement" must "go beyond the intent to destroy electronically stored information." *Id.* at *5. Instead, Mr. Trump must show by clear and convincing evidence "the intent to deprive another party of evidence"—a motive that is usually shown only when the challenged deletion "cannot be credibly explained other than by bad faith." *Id.* Here, Mr. Trump cannot carry that burden. Ms. Carroll has repeatedly testified that she deleted certain death threats she received in the wake of coming forward only because the threats she received were terrifying. Tr. 127-29, 234-36. This innocent (and understandable) reaction falls well short of the necessary culpable intent to impose an adverse instruction under Rule 37.

*Finally*, the deleted emails are in no way helpful to the defense. Apart from questions concerning the so-called "gap" on June 21, 2019 (during which period Ms. Carroll had no legal duty to preserve the messages she received), evidence of death threats is helpful to Ms. Carroll, not Mr. Trump. If threats existed after that point in time and were deleted, those threats would have simply added to Ms. Carroll's extensive evidence of harm, and the substance of an adverse instruction would make no sense. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219-20 (S.D.N.Y. 2003) (adverse instruction tells jury that they may "infer that the party who destroyed potentially relevant evidence did so 'out of a realization that the [evidence was] unfavorable'"). In other words, Ms. Carroll did not stand to gain by deleting threats that she received, and there is no reason to believe that an adverse instruction would be warranted to address her conduct.

For all these reasons, Mr. Trump's motion should be denied in its entirety, and the parties should be afforded an appropriate opportunity to make argument on these matters to the jury.

KAPLAN HECKER & FINK LLP

                                        Respectfully submitted,

                                        Roberta A. Kaplan

cc:      Counsel of Record