O1GsCAR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   E. JEAN CARROLL,

 4                    Plaintiff,

 5             v.                          20 CV 7311 (LAK)
                                           TRIAL
 6   DONALD J. TRUMP, in his personal capacity,

 7                    Defendant.

 8   ------------------------------x
                                           New York, N.Y.
 9                                         January 16, 2024
                                           9:30 a.m.
10
     Before:
11
                         HON. LEWIS A. KAPLAN,
12
                                           District Judge
13                                         -and a Jury-

14                           APPEARANCES

15   KAPLAN HECKER & FINK LLP
          Attorneys for Plaintiff
16   BY:  ROBERTA ANN KAPLAN
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18   HABBA MADAIO & ASSOCIATES LLP
          Attorneys for Defendant
19   BY:  ALINA HABBA
          MICHAEL T. MADAIO
20        PETER SWIFT
          PETER GABRA
21

22

23

24

25
```

O1GsCAR1

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE COURT:  Good morning, everyone.  The clerk will |
| 3 | call the case. |
| 4 | THE DEPUTY CLERK:  Counsel for plaintiffs, are you |
| 5 | ready? |
| 6 | Please put your appearances on the record. |
| 7 | MS. CROWLEY:  We are. |
| 8 | Good morning, your Honor.  Shwan Crowley, Robbie |
| 9 | Kaplan counsel for E. Jean Carroll, sitting with us at counsel |
| 10 | table. |
| 11 | THE COURT:  Good morning. |
| 12 | THE DEPUTY CLERK:  Counsel for defendant, are you |
| 13 | ready? |
| 14 | MS. HABBA:  Ready, your Honor. |
| 15 | Alina Habba, Michael Madaio, Peter Swift. |
| 16 | And who else do I have I need to put on?  That's about |
| 17 | it for the record. |
| 18 | From Habba Madaio, representing president Donald |
| 19 | Trump. |
| 20 | THE COURT:  Good morning. |
| 21 | Before we get to the jurors, there are a few things |
| 22 | that I want to say.  First of all, I think and trust that we |
| 23 | can agree in this case, as I have with counsel in many others, |
| 24 | that I will initially ask the whole panel of jurors who comes |
| 25 | in whether any of them, without knowing anything more about the |

O1GsCAR1

case, are in a position where they feel they can be fair and

impartial to both sides and excusing all those who answer that

question yes.

        Anybody have a problem with that?

        MS. CROWLEY:  No, your Honor.

        MS. HABBA:  No, your Honor.

        THE COURT:  OK.  Secondly, we'll pick a jury of nine.

I will pick by the struck-panel method.  That means that the

nine jurors occupying seats one through nine when we finish the

questioning and the challenges for cause and peremptories will

be the jury.  There are no alternates in civil juries in

federal court.

        Next, each party, that is Ms. Carroll and Mr. Trump,

is now directed not to say anything within the earshot of any

juror or prospective juror and not to communicate or attempt to

communicate with any juror or prospective juror by any means,

directly or indirectly, unless the party in question has been

called as a witness, is on the witness stand, under oath, and

responding to a question.

        If either party thinks it would be appropriate to

engage in such communication or attempted communication, he or

she shall not do so unless the court and the other side has

been advised of the wish to do so and the court has granted

permission.

        Just for sake of clarity, neither individual party is

O1GsCAR1

1    entitled to make any objections to anything that happens in

2    court except through their lawyers.

3         Next, the attorneys in this case on both sides and

4    those assisting them are forbidden to say anything within the

5    earshot of any juror or prospective juror or to communicate or

6    attempt to communicate with any juror or prospective juror,

7    directly or indirectly, except in open court during the regular

8    trial proceedings and in the presence of the court.

9         Next, as both sides are well aware, the court has made

10   a number of rulings precluding evidence and argument on a

11   number of subjects, and in some instances, particular kinds or

12   pieces of evidence or argument.

13        Ms. Kaplan, have you fully and completely advised

14   Ms. Carroll of each of those restrictions?

15        MS. KAPLAN:  We have, your Honor.

16        THE COURT:  Ms. Habba, have you fully and completely

17   advised Mr. Trump of those restrictions?

18        MS. HABBA:  Your Honor, I have and I believe, as we

19   indicated prior to your clerk, we do have issues with them that

20   we would like to address with the court before the jury comes

21   in.

22        THE COURT:  Well, I'll hear you very briefly because

23   that's the way it's going to be.

24        MR. MADAIO:  Your Honor, several issues.

25        THE COURT:  I can't make out what you're saying.

O1GsCAR1

1          MR. MADAIO:  There are several issues we would like to

2     address before we begin.  The first is that there was an appeal

3     that we filed back in July.  The mandate still has not issued

4     from that appeal.  Under Supreme Court precedent, the court is

5     supposed be divested of jurisdiction.  The Second Circuit

6     specifically declined to confirm that this court has

7     jurisdiction at this time.  Due to us being at this court right

8     now, we have essentially forfeited our right to meaningfully

9     appeal to the supreme.  That's our first objection to place on

10     the record, this court does not have jurisdiction to proceed

11     forward with this trial.

12          THE COURT:  Overruled.

13          Next.

14          MR. MADAIO:  The second thing we would like to raise

15     is that the Carroll II verdict is still on appeal at this time.

16     Much of the same evidence in that case and the general issue,

17     preclusion, findings that are applying here, are on appeal.

18     And, again, that is a nonfinal decision at this time.  If that

19     decision is overturned, this decision will be overturned as

20     well.

21          We are also preserving the right pending Carroll II

22     any decision in this case should be overturned as well.

23          THE COURT:  Overruled.

24          MR. MADAIO:  We would also like to point out many of

25     the evidentiary rulings made by the court recently are

O1GsCAR1

1    inconsistent and unfair to president Trump.  For example, the

2    court has found that admitting the Anderson Cooper tape was

3    overly prejudicial --

4                THE COURT:  Excuse me.  I couldn't understand what you

5    said.

6                MR. MADAIO:  Your Honor, the court stated that the

7    Anderson Cooper tape is overly prejudicial to Ms. Carroll, but

8    it still up for consideration now, that two women --

9                THE COURT:  I said a lot more than that, but go ahead.

10                MR. MADAIO:  OK.  Jessica Leeds and Natasha Stoynoff,

11    who have unsubstantiated stories and essentially fabricated

12    allegations against president Trump, may be able to testify.

13    And, again, we don't know at this time whether or not they are

14    able to testify.  It's prejudicial.  Just the very fact that we

15    don't know standing here on day one of the trial, we don't even

16    know if these women are going to be allowed to testify.  There

17    is issues with timing here as well.  The court has stated that

18    we have made multiple attempts to include an expert, and the

19    court said that a month and a half ago, that was not enough

20    time for the other side to prepare for trial.

21                Meanwhile, there has been rulings within the past 72

22    hours that has drastically changed our ability to defend this

23    case, has stripped most of our defenses, essentially, you know,

24    gotten rid of any ability to meaningfully defend ourselves and

25    president Trump in this case, and that's not to mention the

O1GsCAR1

1    issue of preclusion which largely presents us from defending

2    any case to begin with at all.

3            THE COURT:  Overruled.

4            MS. HABBA:  Your Honor, I just have to say -- thank

5    you, Michael for looking over -- there is one other.

6            First and foremost, I do think that these are issues

7    that will become an issue on appeal.  I cannot understand how

8    on the day of trial we still don't know what witnesses are

9    coming in or what witnesses aren't, how any attorney is

10   supposed to prepare this way.

11           Secondly, I'm not sure why, like my client --

12           THE COURT:  Ms. Habba, you have a witness list.

13           MS. HABBA:  Your Honor, we don't have a witness list

14   actually, all due suspect.  We don't know whether Natasha and

15   Jessica --

16           THE COURT:  You have a witness list.

17           MS. HABBA:  OK.  So your order didn't address this.

18   I'm sorry over the weekend I didn't have the ability to discuss

19   with you --

20           THE COURT:  You both had a witness list for months.  I

21   have not ruled in limine yet.

22           MS. HABBA:  Correct.  Exactly --

23           THE COURT:  I'll rule in limine on Leeds and Stoynoff.

24   I understand you feel that is very upsetting.

25           In the event there is a verdict you're unhappy with in

O1GsCAR1

1    this case, you will have an appeal.  I have ruled, to the

2    extent I'm going to rule, at this time.  Should this arise as

3    an issue during the trial, I'll rule then.

4         MS. HABBA:  So, just so that I'm clear, your Honor.

5         We have a witness list, but they can make motions 72

6    hours before about our exhibits and they have had those for

7    years, but I am not permitted to get any information on who

8    they are calling the day of trial.

9         That's the thinking between Rule 403, I believe, I'm

10   saying is completely prejudicial as his attorney --

11        THE COURT:  Ms. Habba.

12        MS. HABBA:  I don't know how to try this case, your

13   Honor.

14        THE COURT:  I have heard you, I have considered what

15   you have to say, and I have ruled.  That's it.

16        In my courtroom, when the ruling is made, that is the

17   end, not the beginning, of argument.

18        MS. HABBA:  Sure.

19        There is one thing that hasn't been addressed which is

20   the funeral on Thursday, which is not something that anybody

21   can plan for.  And when the funeral was planned and plans were

22   made, I informed the court of that.  I think it is completely

23   unfair, completely.  I have never seen it, frankly, that

24   somebody then has to make a choice to be at their trial where

25   they are getting sued for millions of dollars or go to their

O1GsCAR1

1    mother-in-law's funeral.

2          We are asking, again, your Honor, for a brief one-day

3    adjournment so my client can be here, just like he flew at the

4    wee hours of the night to be here today.

5          THE COURT:  Ms. Habba.

6          MS. HABBA:  Yes.

7          THE COURT:  You said you're asking again for a brief

8    one-day adjournment.  That is the first time you've done that,

9    notwithstanding statements made elsewhere --

10         MS. HABBA:  That's not true, your Honor.

11         THE COURT:  -- to the contrary.  You asked me for a

12   week's adjournment.  I denied it.

13         MS. HABBA:  Your Honor.

14         THE COURT:  Ms. Habba, I have considered very

15   carefully what's been said on this subject, and what I have

16   done is to say that if your case rests fully, save for the

17   testimony of Mr. Trump, by sometime on Thursday, he need not be

18   here.

19         On Thursday, because we will not sit -- we will

20   continue the case from the point where you rest, subject only

21   to his testimony, until next Monday.  That is the allowance

22   I've made.  That is the only allowance I'm going to make.

23         MS. HABBA:  So --

24         THE COURT:  And the repetition is not accomplishing

25   anything.

O1GsCAR1

1          MS. HABBA:  -- I just want to understand.  Because now

2     I want to be sure that I'm clear.

3          I am asking you, sir, now, for a one-day adjournment

4     of this trial so that my client --

5          THE COURT:  So you want to begin tomorrow.

6          MS. HABBA:  No.  I would like to proceed today, have

7     trial tomorrow, and on the day of her funeral, allow my client

8     to be there so that he can be present for every day of this

9     trial, as he has a right to be.

10         THE COURT:  I am not stopping him from being there.

11         MS. HABBA:  No, you're stopping him from being here,

12    your Honor.

13         THE COURT:  Ms. Habba, the argument is over.  The

14    ruling stands.

15         MR. MADAIO:  Your Honor, there is one additional point

16    we would like to raise.  We believe it's completely unnecessary

17    to gag the parties.

18         THE COURT:  I'm sorry.  I can't hear you.

19         MR. MADAIO:  We believe it is completely unnecessary

20    to gag both sides during the course of the trial.

21         THE COURT:  I'm still not making out what you're

22    saying.

23         MR. MADAIO:  We believe it is completely unnecessary

24    for the court to gag both parties during the course of the

25    trial.  The court is well within its right to order the jury to

O1GsCAR1

1    not look at any media, not look at any publicity regarding the

2    case.  And it's completely unnecessary to have both sides, you

3    know, essentially not be able to speak.

4              THE COURT:  I don't know what you're talking about,

5    counselor.  There is no gag order.  There is nothing of the

6    sort.

7              What I have said is that there can be no communication

8    with jurors or prospective jurors.  That's what I have said.

9              MR. MADAIO:  Understood, your Honor.

10             So the parties are free to speak about the trial

11   during the course of the trial?

12             THE COURT:  Certainly not in this courtroom, not in

13   the presence of a juror or prospective juror.  That's the

14   ruling.

15             MR. MADAIO:  Understood.

16             THE COURT:  OK.  Are we ready to bring in the panel?

17             MS. HABBA:  Your Honor, I just need a little bit of

18   clarity on one point.  I'm not questioning your ruling.  I

19   would like to understand something, since you clearly made your

20   mind up.

21             On the Anderson Cooper tape, your order stated -- I

22   don't have the language in front of me, I can pull it up --

23   that the tape cannot be played where she says rape is sexy or

24   some, people think rape is sexy, and pauses and has is cut off

25   by Mr. Cooper.  I am not allowed to bring that in visually.

O1GsCAR1

1          I was unclear if I can refer to it and her comments

2   and any articles that came from it.  I believe your ruling was

3   no video.

4          THE COURT:  I will rule on issues as they arise.

5          MS. HABBA:  OK.  Thank you.

6          THE COURT:  OK.  Checking on jury.

7          (Pause)

8          While we're waiting, Ms. Kaplan, how long do you think

9   the plaintiff's case will take to go in?

10         MS. KAPLAN:  Depending on whether Ms. Martin

11  testifies, we think two, two and a half.  Excuse me.

12         THE COURT:  Ms. Habba, how long do you expect the

13  defense case, putting aside any testimony from Mr. Trump, if he

14  elects to testify?

15         MS. HABBA:  Putting aside that, a day, day and a half.

16         THE COURT:  OK.  What witnesses are you calling?

17         MS. HABBA:  For me?

18         THE COURT:  Yes.

19         MS. HABBA:  A lot of it is up in the air still, your

20  Honor.

21         THE COURT:  None of is up in the air.

22         MS. HABBA:  Carol Martin.  As she said, Carol Martin

23  we would like to call, as we put in our witness list for

24  months.  Carol Martin and president Trump.

25         THE COURT:  So you expect to be a day or a day after a

O1GsCAR1

1    half with Carol Martin.

2        MS. HABBA:  Carol Martin will definitely be at least

3    an hour, maybe two.  President Trump, obviously, I need to see

4    the scope of what they bring out.  That depends on who is

5    coming.  If Jessica Leeds and Natasha do, it will be lengthier.

6        MS. CROWLEY:  Your Honor, as we said in our letters

7    over the weekend, if the court permits Ms. Martin's testimony,

8    we will be calling her in our case in chief.

9        MS. HABBA:  That is so prejudicial, your Honor.  They

10    have known that that is our -- it is --

11        I know this is funny to you.  This is not funny to my

12    client.

13        THE COURT:  What's funny is this.  Your position is

14    you want to have testimony from Leeds and Stoynoff.

15        MS. HABBA:  No, they are calling them.  I'm not.

16        THE COURT:  I'm sorry, Martin.  You want to call

17    Martin, but it would very prejudicial if they ask questions of

18    her.

19        MS. HABBA:  No.  They want to call her in their case

20    in chief, which means they get to ask first.  They didn't plan

21    it that way.

22        I would like her in my case in chief, meaning she is

23    my witness.  Very different, as you know, in front of a jury

24    whose witness is called.

25        THE COURT:  Ms. Crowley, Ms. Martin is not in your

O1GsCAR1

```
 1    witness list in the pretrial order.
 2              MS. HABBA:  No.
 3              MS. CROWLEY:  She was not on our witness list.  As we
 4    said in our letters, we don't think she has relevant testimony.
 5    However, if your Honor disagrees with that and permits her
 6    testimony, we will be calling her.
 7              THE COURT:  But the whole premise of my ruling
 8    allowing the defense to call her was that, while you think she
 9    has nothing relevant to say, I can't reach that conclusion and,
10    therefore, you're limited on your case to the witnesses you
11    listed in the pretrial order.
12              She's not going to testify on direct on the
13    plaintiff's case.
14              MS. HABBA:  Thank you, your Honor.
15              MS. CROWLEY:  Understood.
16              THE COURT:  You'll have the ability to cross-examine
17    her.
18              Andy, does this mean the jury department is not ready
19    for 10 or 15 minutes?
20              MS. CROWLEY:  Judge, I don't know if you want to talk
21    about Carol Martin's testimony now or wait.  We do think that
22    there should be limits to what she is cross-examined on, given
23    the narrow scope of what is actually at issue in this trial.
24              For example, in the last trial, Ms. Martin was
25    extensively cross-examined about her feelings about president
```

O1GsCAR1

1    Trump.  The suggestion was made that she was in cahoots or some

2    sort of a scheme with Ms. Carroll to make up the story of the

3    assault.  That is obviously not relevant or permissible

4    testimony here, as your Honor has ruled.

5         We would like to address the limits that should be

6    imposed on the questions that they should be able to ask.

7         THE COURT:  I'll deal with this as the questions are

8    asked.

9         MS. CROWLEY:  Understood, your Honor.

10        THE COURT:  OK.  We'll take a recess until the jury is

11   ready to be brought into the courtroom.

12        (Recess)

13        (Jury selection followed)

14

15

16

17

18

19

20

21

22

23

24

25

O1GsCAR1

                    AFTERNOON SESSION

1

2                        3:00 p.m.

3          (Jury not present)

4          THE DEPUTY CLERK:  Shall I get the jury, Judge?

5          THE COURT:  Yes, please.

6          MR. EPSHTEYN:  Your Honor, Boris Epshteyn, the

7    president's in-house counsel, and a member of the bar in good

8    standing.

9          THE COURT:  Are you a member of this court?

10         MR. EPSHTEYN:  I'm a member of the New York Bar.

11         THE COURT:  Please have a seat.

12         (Jury present)

13         THE DEPUTY CLERK:  Shall I swear the jury?

14         THE COURT:  Please swear the jury.

15         (A jury of nine was impaneled and sworn)

16         All right.  Now that you've been sworn, I'm going to

17   take a few minutes to give you some preliminary instructions

18   about principally the conduct of the trial.

19         It's going to be your duty to find from the evidence

20   what the facts at issue in this case are.  You and you alone

21   will be the judge of those facts, and you will then have to

22   apply to those facts the law as I give it to you.  You must

23   follow that law whether you agree with it or not.

24         Nothing I say or do during the course of the trial is

25   intended to indicate or should be taken by you as indicating

O1GsCAR1

| | |
|---|---|
| 1 | what your verdict should be.  The evidence from which you'll |
| 2 | find the facts will consist of the testimony of witnesses, |
| 3 | documents, and other things received into the record as |
| 4 | exhibits, and any facts that the lawyers agree to or stipulate |
| 5 | to -- which is just another word for agreeing to -- or I may |
| 6 | instruct you to find.  Certain things are not evidence and are |
| 7 | not to be considered by you, and I'm going to list them for you |
| 8 | now. |
| 9 |      Statements, arguments, questions by the lawyers are |
| 10 | not evidence.  Objections to questions are not evidence. |
| 11 | Lawyers have an obligation to their clients to make objections |
| 12 | when they believe that evidence is being offered that is |
| 13 | improper under the rules of evidence that govern proceedings |
| 14 | here.  You shouldn't be influenced by lawyers' objections or, |
| 15 | for that matter, by my rulings on them unless I tell you |
| 16 | otherwise.  If an objection is sustained, you will ignore the |
| 17 | question.  If it's overruled, you'll treat the answer like any |
| 18 | other.  If you're instructed that some piece of evidence is |
| 19 | received for a limited purpose only, you must follow that |
| 20 | instruction and consider the evidence only for that purpose. |
| 21 |      There may be occasions during this trial when I |
| 22 | exclude testimony or evidence or tell you to disregard |
| 23 | something that you've already seen or heard.  If that occurs, |
| 24 | you are to ignore entirely and not take into consideration |
| 25 | whatever I've stricken or told you to disregard.  This happens |

O1GsCAR1

1    not infrequently.  When a lawyer begins to ask a question, the

2    witness sometimes anticipates what it may be and starts

3    talking.  Then I may strike the answer or may not, depending on

4    what is appropriate.

5        Likewise, if a witness is asked one question and

6    starts talking about another subject or something like that, I

7    may tell you to disregard all or part of the answer, and you're

8    obliged to do that.  Anything you may have seen or heard

9    outside the courtroom is not evidence and has to be

10   disregarded.  You're to decide the case solely on the basis of

11   the evidence received in evidence here in the courtroom.

12       There are two kinds of evidence, direct and

13   circumstantial.  Direct evidence is direct proof of a fact.

14   One example is testimony of a witness about something that the

15   witness actually saw or perceived.  Circumstantial evidence is

16   proof of facts from which you may infer something else.  I'll

17   give you further instructions about that at the end of the

18   trial, but keep in mind that you're to consider both kinds of

19   evidence.

20       It will be up to you to decide which witnesses you

21   believe and to what extent you believe them and which witnesses

22   not to believe or which parts of testimony to reject.  I'll

23   talk to you about how you go about that in terms of what you

24   may consider at the end of the case, and I won't take more time

25   now.

O1GsCAR1

1          This is a civil case.  Typically the plaintiff in a

2     civil case has the burden of proving her case by what we refer

3     to as the preponderance of the evidence.  On some issues, the

4     burden of proof is higher.  Should it become necessary, I'll

5     explain that to you in this case, too.  What a preponderance of

6     the evidence means is that the plaintiff has to produce

7     evidence which, considered in light of all of the facts, leads

8     you to believe that what the plaintiff claims is more likely

9     correct or true than not.  To put it differently, if you were

10    to put the plaintiff's and the defendant's evidence on opposite

11    sides of metaphorical scales, the plaintiff has the burden to

12    make the scales tip, even if only slightly, in the plaintiff's

13    favor.  If they tip slightly for the plaintiff or heavily for

14    the plaintiff, then the plaintiff has prevailed by a

15    preponderance of the evidence.  If they tip even slightly for

16    the defendant or heavily for the defendant, then the defendant

17    prevails on that issue.

18         Those of you who have sat on criminal cases will have

19    heard of proof beyond a reasonable doubt.  That requirement

20    never applies in a civil case.  That has nothing to do with

21    this case, and you should put it out of your mind.  Now, I'm

22    not going to give you my final instructions on the law until

23    the end of the trial, but I think it will be helpful to give

24    you some context to help you understand the evidence as it

25    comes in.  And I do it with the further instruction that to

O1GsCAR1

1    whatever extent my final instructions at the end of the trial

2    are different than what I tell you now, it is those final

3    instructions that you must follow.  If there is a conflict, you

4    follow the final instructions, not anything I say now.

5         You know who is involved in this case, Ms. Carroll and

6    Mr. Trump.  You know, generally speaking, who they are.  On

7    June 21, 2019, a magazine published an excerpt of a forthcoming

8    book by Ms. Carroll, a portion of which contained her account

9    of being sexually assaulted by Mr. Trump.  According to

10   Ms. Carroll, that occurred in the Bergdorf Goodman store, and I

11   needn't go into any more detail about that because it's not

12   before you.

13        On June 21 and June 22, 2019, after that excerpt was

14   published, Mr. Trump publicly denied knowing Ms. Carroll,

15   denied sexually assaulting her, and accused her of making up

16   the assault for ulterior and improper purposes.  You will see

17   those statements by Mr. Trump in evidence during the trial, and

18   they are what this case is about.

19        The very first thing you need to know about this case

20   is that, as I mentioned very briefly earlier, there have been

21   previous proceedings relating to these events, including a

22   previous jury trial.  The jury in that case and other

23   proceedings in this court already have determined some of the

24   key facts about this dispute.  And under long-established

25   principles of American law, some of those factual

O1GsCAR1

1  determinations are binding here for the perfectly logical

2  reason that the parties previously had their chance to dispute

3  those facts, and there usually is no sufficient reason to give

4  them a second bite at the apple.

5      Those facts that were definitively decided in the

6  previous trial include the following:

7      First, Mr. Trump, in fact, sexually abused Ms. Carroll

8  by forcibly and without her consent inserting his fingers into

9  her vagina.

10     Second, Mr. Trump's June 21 and June 22 statements

11 were false.  Ms. Carroll did not make up her claim of forceable

12 sexual abuse.

13     Third, Mr. Trump's June 21 and June 22, 2019,

14 statements were defamatory.  In other words, his statements,

15 his false statements, tended to disparage Ms. Carroll in the

16 way of her business or office or profession or trade, or they

17 tended to expose her to hatred or contempt or aversion, or to

18 induce an evil or unsavory opinion of her in the minds of a

19 substantial number of people in the community.

20     Fourth, Mr. Trump, when he made his June 21 and

21 June 22, 2019, statements, knew that they were false, had

22 serious doubts as to the truth of what he said, or made those

23 statements with a high degree of awareness that they probably

24 were false.

25     For your purposes, you must accept these points as

O1GsCAR1

true no matter what else you may hear at this trial.  And
because you must accept them as true, this trial is not a
do-over of the previous trial which determined those facts.
What remains for you to decide are only two very limited issues
relating to damages for Mr. Trump's publication of those two
statements.

The first issue for you to decide will be whether
Ms. Carroll sustained more than nominal damages by reason of
Mr. Trump's June 21 and June 22, 2019, statements, and if she
did, the amount of money damages that Mr. Trump must pay
Ms. Carroll to compensate her for the injuries she suffered as
a result of each of those statements.

I want to be entirely clear.  Your first task in this
case relates only to damages caused by Mr. Trump's issuance of
those two statements.  You are not to be determining any
damages that Ms. Carroll suffered by reason of the forceable
sexual assault itself.  That already has been done.  Your focus
will be entirely on damages caused by Mr. Trump's publication
of the June 21 and June 22 defamatory statements.

The second issue for you to decide will be whether
Mr. Trump should be required to pay Ms. Carroll any punitive
damages.  That is to say, damages intended to punish him for
defaming Ms. Carroll in those two June 2019 statements and to
deter him from defaming her in the future, and if so, how much
he should be required to pay.

O1GsCAR1

1        Now, a few words about your conduct of the jury and
2  how the trial will work.  As I've repeatedly stressed, you must
3  decide this case based solely on the evidence presented here
4  within the four walls of this courtroom.  That means that,
5  during the trial, you must not conduct any independent research
6  about the case, the matters in the case, and the individuals
7  involved in the case.  In other words, you're not to consult
8  research materials, search the internet, websites, blogs, or
9  use any other electronic tools to obtain information about the
10  case or to help you decide the case.  Please do not try to find
11  out any information from any source outside the confines of the
12  courtroom.  And while I think it goes without saying, you're
13  not to follow the case in the press or on the internet or
14  anything else like that.

15        Until you retire to deliberate, you may not discuss
16  the case with anyone, even among yourselves.  After you retire
17  to deliberate, you may begin discussing the case with your
18  fellow jurors, but you may not discuss the case with anyone
19  else until you've returned a verdict and the case is at an end.
20  No matter what they say on television where judges instruct the
21  jury every time they leave the courtroom not to talk about the
22  case, you're all grownups.  I've said it once.  I've said it
23  clearly.  I'll probably not do it again.  But the instruction
24  carries through the whole case.

25        Now, of course, I know that many of you use cell

O1GsCAR1

phones, the internet, and all sorts of other bits of

technology, most of which I probably don't understand.  You

also are not to talk to anyone at any time about this case or

use any of those tools to communicate with anyone else around

the case, and that includes your family and your friends.  You

can't communicate with anyone about the case on cell phones,

e-mail, iPhones, text messaging, X formerly Twitter, and so on.

          You can't use any of that technology at all, even if

I've not specifically mentioned it here, and I expect you'll

inform me if you become aware that another juror has violated

these instructions.  A jury who violates these instructions

jeopardizes the fairness of the proceedings, a mistrial could

result, and it could require the whole trial process to start

all over again.

          Finally, do try very hard not to form an opinion until

you've heard all of the evidence.  Keep an open mind until you

start your deliberations at the end of the case.  I hope that

you will find the case interesting and worth your attention.

          You're welcome to take notes.  You are also welcome

not to take notes.  If you decide to take notes, please be sure

that you pay attention to what the witnesses are saying at the

same time, and don't let the note-taking distract you or

interfere with your paying close attention.  If you don't take

notes, don't discuss them with anyone before you begin your

deliberations.  Don't take them at the end of the day.  Be sure

O1GsCAR1

1    to leave them in the jury room where they will be safe.   If

2    you don't take notes, remember it's your own responsibility to

3    listen to the evidence carefully and you cannot, in effect,

4    delegate that to somebody else who did take notes.  We depend

5    on all of you to decide this case, not just some few or some

6    larger number that are paying close attention.

7         The trial is now going to begin.  Each side gets to

8    make an opening statement.  An opening statement is not

9    evidence and is not argument.  It's an outline of what the

10    lawyer hopes the evidence will show.  I think of opening

11    statements as trailers in the movies.  They are trying to

12    engage your attention to give you an idea of what the movie

13    will be.  If you go see it and attract you to seeing it, and my

14    experience in the movies is sometimes the trailers are right on

15    the money and sometimes I go to the movie and it's not even

16    close.  That happens in courtrooms, too.

17         So just remember what you're hearing is the lawyer's

18    version of what they hope the record will show.  The defense

19    has the right to make an opening statement as well as the

20    plaintiff.  When the plaintiff is all done and the defendant is

21    all done with openings, the plaintiff will call her witnesses,

22    the defendant is entitled to cross-examine or cross-question

23    them.  When the plaintiff is all done presenting evidence, the

24    defense has his chance, and it works the same way.  And when

25    the defendant is all through there, occasionally there is a

1    brief rebuttal presentation by a plaintiff.  And once that

2    happens, I meet with the lawyers, the final jury instructions

3    that I will give you are resolved, and then you'll hear closing

4    arguments, and I will instruct you and you will get the case.

5            That's how it all works.  That concludes my remarks

6    for now, and so now we're going to hear opening statements on

7    behalf of the plaintiff.

8            MS. CROWLEY:  Thank you.

9            THE COURT:  Ms. Crowley.

10           You may proceed.

11           MS. CROWLEY:  Thank you, your Honor.

12           In the spring of 1996, Donald Trump sexually assaulted

13   E. Jean Carol.  He managed to get her alone in an empty

14   department store one evening and he sexually assaulted her.

15   That's a fact.  As Judge Kaplan just instructed you, that fact

16   has been proven, and a jury sitting in the exact seats where

17   you're sitting now found that it happened.

18           So why are we here?  We're here because 25 years after

19   Donald Trump sexually assaulted Ms. Carroll in June of 2019,

20   she came forward and spoke publicly about the assault for the

21   first time.  We're here because when she did that, Donald Trump

22   didn't just deny the assault.  He went much, much further.  He

23   denied ever meeting Ms. Carroll.  He said he had no idea who

24   she was.  He accused her of lying and making up a story to make

25   money and to advance some political conspiracy against him.

O1GsCAR1                      Opening – Ms. Crowley

1    And he threatened her.  He said she should pay dearly for

2    speaking out against him.

3           Donald Trump was president when he made those

4    statements, and he used the world's biggest microphone to

5    attack Ms. Carroll, to humiliate her, and to destroy her

6    reputation.  Every single one of the statements that Donald

7    Trump made in response to Ms. Carroll's allegations was an

8    outright lie.  Everything he said was a lie.  As Judge Kaplan

9    just instructed you, that has already been decided.  It's

10   already been proven.

11          Last May, a jury of nine New Yorkers sat in these same

12   seats in this courtroom, in front of this same judge, at a

13   separate trial involving Ms. Carroll and Donald Trump.  Those

14   jurors listened to witnesses, saw exhibits, and heard

15   arguments, just like you will.  And after two weeks of

16   testimony, those jurors reached a unanimous decision.  They all

17   agreed Donald Trump sexually assaulted E. Jean Carroll in that

18   department store in 1996, and he defamed her when he falsely

19   claimed that it never happened.

20          Now, defamation is a legal term, and Judge Kaplan is

21   going to describe for you.  He's going to explain to you what

22   it means.  But basically, when someone defames you, they make a

23   statement that they know is false and that statement causes you

24   harm.  Harm to your reputation, emotional harm, or professional

25   harm.  The earlier jury found that Donald Trump did those

O1GsCAR1                      Opening - Ms. Crowley

1    things, that he defamed Ms. Carroll when he lied and said that

2    she made up the story of the assault.

3          And because of that unanimous jury verdict and various

4    rulings by Judge Kaplan, it has been proven that Donald Trump

5    sexually assaulted Ms. Carroll, it has been proven that Donald

6    Trump defamed her when he lied and said it never happened and

7    accused her of making up a story for all sorts of terrible

8    reasons.  That has already been decided, and as Judge Kaplan

9    just told you, you just accept it as true because it is true,

10   and because you've sworn an oath to uphold the law.

11         So what is your job?  What are you here to decide?

12   Your job at the end of this trial will be to decide whether

13   Donald Trump's defamatory statements about Ms. Carroll, that is

14   the lies that he told about her back in June of 2019, caused

15   her harm.  And if it did, if they did, you'll be asked to

16   decide how much money Donald Trump should have to pay for what

17   he's done.

18         You'll also need to decide how much money he should

19   pay to get him to stop doing it again.  The legal term for

20   that, for the amount of money that someone has to pay when

21   they've broken the law, is called damages.  And this trial is

22   about damages and only damages.

23         You'll hear over the next couple days how the

24   statements that Donald Trump made about Ms. Carroll in June

25   2019 harmed her reputation as a respected writer and advice

1    columnist, a reputation she had spent her whole life building,

2    and that Donald Trump wrecked in just a couple days.  You'll

3    hear how Donald Trump's defamatory lies about Ms. Carroll

4    unleashed his followers to go after her online, to attack her

5    character, to threaten her life.  You'll see some of those

6    messages.  You'll see them, people echoing Donald Trump's

7    words, calling Ms. Carroll a liar, accusing her of making up a

8    story to make money, and making good on Donald Trump's threat

9    that she would suffer for speaking up.

10          You'll see messages, you'll see them, where people

11   tell Ms. Carroll that she should go to jail, promising that

12   they would rape her, threatening that she should die, all

13   because she had the courage to speak out about what Donald

14   Trump had done to her.

15          And after you've seen all of this evidence, you'll be

16   asked to decide how much money Donald Trump should have to pay

17   Ms. Carroll for the damage that he has done to her life, for

18   ruining her hard-run reputation, for causing her to live every

19   day of her life in fear of the hate and the threats that she

20   gets from his followers online.

21          And as I said, and as Judge Kaplan said, you'll also

22   be asked to decide how much money Donald Trump should have to

23   pay as punishment for what he's done and to deter him and

24   others from doing it again.  In other words, how much money

25   will it take to make him stop, because he has not stopped.  He

O1GsCAR1                    Opening – Ms. Crowley

did not stop defaming Ms. Carroll back in 2019.  You'll hear

that he did it again three years later in October of 2022.  He

said the same thing.  He told the same lies about Ms. Carroll

as he had before.  And Donald Trump kept on defaming

Ms. Carroll.  He kept up those very same lies even after a

federal jury sat in this courtroom and unanimously found that

he had sexually assaulted her and defamed her.

In fact, you'll soon see his attacks on Ms. Carroll

still continue to this day.  Literally to today, as he is

campaigning for president of the United States, Donald Trump

continues to lie about Ms. Carroll, to attack her character,

and to threaten her livelihood.  For more than four years, he

has not stopped.

So at the end of this trial, it will be your job to

decide how much money Donald Trump should pay for what he's

done to Ms. Carroll, and how much money he should pay, it will

take, to get him to stop defaming her, so that Ms. Carroll can

maybe, finally, live her life in peace.

In light of all of the evidence that you're going to

see that we'll present to you during this trial, we submit that

that number should be significant.  Very significant.  Donald

Trump, after all, is a self-proclaimed billionaire.

Members of this jury, my name is Shawn Crowley, and

together with my colleagues, Robbie Kaplan and Matt Craig, I am

proud to represent E. Jean in this case.  This opening

O1GsCAR1                    Opening – Ms. Crowley

statement, as Judge Kaplan said, is our chance to give you a
preview of the evidence that you're going to see throughout
this trial.  Evidence of the terrible harm that Donald Trump
has caused to Ms. Carroll.  Evidence that he has not stopped
harming her.

So what is that evidence going to be?

You're going to hear from several witnesses over the
next few days.  Ms. Carroll herself will testify.  So will
Dr. Ashlee Humphreys, an expert in sociology and reputational
harm, obviously important concepts in a case like this.  And
you'll hear from Robbie Myers, the former editor in chief of
the magazine where Ms. Carroll worked as an advice columnist
for more than 25 years.

Let me start with Ms. Carroll.  She is going to tell
you, when she testifies tomorrow, that she grew up in rural
Indiana and that she always dreamed of becoming a writer.
She'll tell you that she worked very hard at achieving that
dream.  She submitted her first article at age 12, and kept on
writing through her time in college at Indiana University,
where she was also crowned a beauty pageant queen.  She
continued writing and submitting stories until, finally, at age
36, she told her first piece.

Ms. Carroll will tell you how she moved to New York
shortly after she sold that article, and then she spent the
next few decades building up her career.  She wrote countless

1    articles in different magazines:  Esquire, Vanity Fair, The

2    Atlantic, Glamour, Rolling Stone.  She published several books,

3    wrote for Saturday Night Live, was nominated for an Emmy,

4    hosted her own daily talk show on TV, and wrote the longest

5    running advice column for Elle magazine called *Ask E. Jean.*

6          Ms. Carroll will tell you how she received, as an

7    advice columnist, tens of thousands of letters from men and

8    women seeking her advice and guidance.  She built her career by

9    telling them the truth, giving them hard, honest advice about

10   the problems in their lives, and doing it with a fresh and

11   funny voice that mixed comedy with toughness and truth.

12         And Ms. Carroll will tell you that at the height of it

13   all, in the spring of 1996, Donald Trump sexually assaulted

14   her.  It happened in the Bergdorf Goodman department store in

15   Manhattan.  Ms. Carroll had done some shopping and was leaving

16   the store.  And as she was exiting, she ran into Donald Trump.

17   You'll hear that Ms. Carroll had met Donald Trump a few years

18   before at a party with their then spouses.  This is a photo

19   from that party.

20         And when they ran into each other outside the

21   department store in 1996, they recognized each other onsite and

22   started chatting.  Eventually, Donald Trump got Ms. Carroll

23   into the dressing room of the store's lingerie section, and he

24   sexually assaulted her.

25         Now, you're not going to hear details at this trial of

1    how Donald Trump sexually assaulted Ms. Carroll, what she did

2    right after the assault, or how it affected her life over the

3    following decades.  That's because, as Judge Kaplan just said,

4    those facts are not at issue in this trial because a jury has

5    already sat in these very seats, listened to Ms. Carroll's

6    testimony and a lot of other evidence, and unanimously decided

7    that the assault happened and that Donald Trump was lying when

8    he denied it.

9         Donald Trump sexually assaulted Ms. Carroll in 1996

10   and that is a proven fact.  Ms. Carroll will tell you that for

11   years after the assault, she tried to forget it.  She was

12   scared, she was ashamed, she thought nobody would believe her,

13   and she wanted to move on with her life.  But the memory of

14   what Donald Trump had done to her stayed with her.  And as time

15   passed, that memory became harder and harder for her to

16   suppress.

17        You'll hear that in 2017, Ms. Carroll took a road trip

18   interviewing women for a book that she was writing at the time.

19   She wanted to talk to women across the country and ask them

20   about the perspectives, their perspectives on the men in their

21   life.  She wanted to hear about the ways that men made their

22   lives better or worse, and then she would write about them.

23        But as she wrote, the book started to turn into more

24   of a memoir, and Ms. Carroll started to write about the events

25   in her own life, including the time that Donald Trump sexually

assaulted her many years before.  Ms. Carroll's book was

published in June 2019.  Right before it was released, New York

Magazine published an excerpt that contained the chapter about

Donald Trump's assault.  It was the first time that Ms. Carroll

had spoken publicly about what had happened.

On June 21, 2019, the day that the story was published

in New York Magazine, then president Trump issued a public

statement lying, saying he had never met Ms. Carroll in his

life.  He accused her of making up the assault to get publicity

or to sell a book or to carry out some political agenda.  He

called it a disgrace, and he threatened her.  People should pay

dearly, he said, for making up accusations about him.

The next day he doubled down.  On June 22, he told

reporters on the White House lawn that he had no idea who this

woman was.  He called her story a total false accusation.  And

by the way, when a reporter pointed out that there was a

photograph of him and Ms. Carroll from a few years before the

1    assault, that photo that we just saw, Donald Trump repeated his

2    lies saying he had no idea who she was.

3            And, again, he threatened her.  He said Ms. Carroll

4    was playing with very dangerous territory.  His attacks

5    continued two days later on June 24, and this time he added --

6            MR. MADAIO:  Objection.

7            MS. CROWLEY:  -- insult.

8            THE COURT:  What's the objection?

9            MR. MADAIO:  Your Honor, this is, given the statements

10   that are at issue here, I think this is potentially misleading

11   for the jury.

12           THE COURT:  Members of the jury, no damages are being

13   sought for this statement by way of compensation, but it is

14   relevant to another issue.

15           Mr. Madaio, as I think you know.  Overruled.

16           MS. CROWLEY:  Once again, on June 24, Donald Trump

17   called Ms. Carroll a liar.  Once again, he claimed he had never

18   met her.  And he said, I'm quoting here, "I'll say it with

19   great respect:  She's not my type."  In other words, she was

20   too ugly to assault.  She must have been lying because she was

21   too unattractive for Donald Trump to sexually assault.

22           Suddenly, Ms. Carroll was front page news branded a

23   liar and a fraud by the president in statements heard around

24   the world.  And as Judge Kaplan has already instructed you,

25   those statements that Donald Trump made on June 21 and June 22,

O1GsCAR1                          Opening - Ms. Crowley

1    the ones where he calls her a liar and accuses her of making up

2    the assault for all sorts of reasons, they were false and they

3    were defamatory.  That has already been decided.

4            The law protects all people.  All of us, including

5    each of you and Ms. Carroll from defamation, from having our

6    good names ruined and our reputations shattered.  It protects

7    all of us, no matter how powerful the person is who targets us.

8    And there is no denying that Donald Trump was powerful.

9            Speaking from the White House, Donald Trump used the

10   most famous platform on earth to lie about what he had done, to

11   attack Ms. Carroll's hard-earned integrity, and to falsely

12   accuse her of inventing a terrible lie.  On top of all that, he

13   went after her appearance, just to punish her and humiliate her

14   and ensure or try to ensure that nobody believed her again.

15           He said these things from the White House.  The White

16   House, a place where presidents have signed laws, declared

17   wars, decided the fate of the nation.  So is it any wonder that

18   when Donald Trump spoke from the White House, people all across

19   the country listened and many, many believed what he said.  Of

20   course not.

21           The evidence will show that when Donald Trump called

22   Ms. Carroll a liar and a fraud, people listened and they

23   believed, and they decided to go after her.  You'll hear that

24   Donald Trump supporters latched on to his hateful messages

25   about Ms. Carroll and bombarded her with threatening e-mails

O1GsCAR1                    Opening - Ms. Crowley

1    and Tweets.

2              Here are a few of them, and you're going to see more

3    throughout this trial.  Immediately after Donald Trump made his

4    statements in June 2019, literally within minutes people

5    started posting horrible things about Ms. Carroll online, often

6    repeating and amplifying Trump's own attacks and threats.  They

7    appeared on Twitter, Facebook, Instagram, and direct messages

8    sent to her private and professional accounts.

9              These messages copied Trump's own specific words.

10   They called Ms. Carroll a liar.  They accused her of making up

11   a statement to sell a book or to carry out a political agenda.

12   They called her ugly, too ugly for Donald Trump to sexually

13   assault.  And they went even further.  They threatened her,

14   extending Trump's threats that she should pay dearly for

15   accusations.  They told Ms. Carroll she should be in jail,

16   should be raped, should die.

17             Let me pause here for just a second.  When you think

18   about the harm that Donald Trump's defamatory lies caused

19   Ms. Carroll and when you decide how much he should have to pay

20   as a consequence, you should think about these messages.

21   You're going to see them and you're going to see a lot more of

22   them during this trial, and you should remember that Donald

23   Trump set them in motion.  His words are shot through them.

24   They echo and expand the lies that he injected into the world.

25   They make good on his threats that Ms. Carroll should pay.

O1GsCAR1                    Opening - Ms. Crowley

1   They were the obvious and intended result of his own repeated

2   defamatory attack.

3          Donald Trump knew exactly what he was unleashing when

4   he told his lies about Ms. Carroll, when he issued those

5   threats, when he targeted her appearance.  And Ms. Carroll will

6   describe how those messages affect her.  You should try to

7   imagine it yourselves.  Imagine what it would be like to open

8   up your inbox and be blasted with that kind of savage hate from

9   total strangers.  People, by the way, who could live anywhere,

10  100 miles away or just steps from your house.  Ms. Carroll was

11  terrified and horrified, and she immediately regretted,

12  immediately, that she dared take on the most powerful man on

13  the planet.

14         Ms. Carroll will tell you that there has not been a

15  day that's gone by since Donald Trump first defamed her that

16  she has not been afraid.  She'll tell you how, in some ways,

17  it's actually changed the way she has lived her life.  Right

18  after Donald Trump's attacks in June of 2019 and the

19  threatening messages that immediately followed them,

20  Ms. Carroll bought bullets for the gun that she inherited from

21  her father, and she now sleeps with it right beside her bed.

22  She checks her surroundings every time she leaves her house or

23  get outs of her car.  She lets her pit bull she used to keep

24  inside roam free from the yard outside her house.  She's

25  afraid.  Afraid that some day somebody is going to make good on

their threats and come after her in person.  Imagine that.
Imagine how that would feel to live your life that way.

            But, look, Ms. Carroll is also going to tell you that
the hate mail and death threats aren't the only types of
messages that she's gotten.  She has also gotten supportive
messages.  People encouraging her, applauding her for her
bravery for taking on Donald Trump, telling her that they were
happy when she won the trial last spring.  And I suspect that
the defense is going to tell you about those supportive
messages as well.  And when they do that, just remember, the
good does not undo the bad here.  The fact that there are
people who support Ms. Carol doesn't change the fact that there
are thousands, problems hundreds of thousands, who have
answered Donald Trump's call to make her pay.

            The positive support she's gotten doesn't make it any
less scary when she opens up her inbox or clicks on Twitter and
sees people threatening to kill her.  The truth is, Donald
Trump's attacks on Ms. Carroll and his followers' commitment to
echo and expand those attacks, they have meant that, in many
ways, she now lives her life in fear.

            But the horrible lies that Donald Trump told about
Ms. Carroll after she came forward in June 2019 did more than
just destroy her sense of safety.  They also ruined her
professional reputation, a reputation for honesty and integrity
that she had spent years, decades, her whole career building up

O1GsCAR1                    Opening - Ms. Crowley

as a journalist and advice columnist.  A reputation that rested

at the very core of her professional success.  It was wrecked

by Trump in just a couple days.

        Another witness that you're going to hear from in this

trial is Robbie Myers, the former editor in chief or head boss

at Elle magazine.  Ms. Carroll worked at Elle for more than

25 years.  Ms. Myers is going to tell you that Ms. Carroll was

an exceptionally popular writer who was celebrated for her

ability to write powerfully while sticking to the facts.

Ms. Myers will explain how Ms. Carroll single-handedly

revolutionized advice columns and how her readers trusted her

and adored her.

        But as you'll see throughout this trial, much of that

was ruined when Donald Trump went after her.  The letters and

e-mails that Ms. Carroll had previously received every day for

25 years from people seeking advice were replaced with messages

of hate, calling her a liar, a whore and much, much worse.  She

stopped getting requests to write freelance pieces for

magazines.  TV programs that used to have her on regularly to

talk about being an advice columnist -- The Today Show, Good

Morning America -- they stopped inviting her back after Donald

Trump defamed her.

        Now, of course I'm not saying that Ms. Carroll's

professional life came to a complete stop after Donald Trump

defamed her.  I am not saying that she was never happy again.

O1GsCAR1                        Opening - Ms. Crowley

The evidence is not going to show that, because that is not how

life works.  People who suffer terrible experiences and

terrible threats, they can still find moments of joy.  They can

still have measures of success, even if their life is

ultimately harder and sadder than it was before.

       And as Ms. Carroll will is tell you, she was invited

to do some media appearances after Donald Trump defamed her and

then again after she won the trial last spring.  Her story was

important to people wanted to talk to her about it.

Ms. Carroll is going to tell you about those appearances, and I

expect that the defense will as well.

       Donald Trump's lawyers may even try to use those

interviews, those media appearances, to distract you from what

he did to Ms. Carroll.  They may show you pictures of

Ms. Carroll on the news or focus on times that she has been

happy, and argue that she was drawing this attention to

herself, so it wasn't actually Donald Trump's fault.  They may

claim that because she's happy sometimes, she must not actually

have been harmed by Donald Trump.

       You should reject those arguments outright.  Of course

when Donald Trump called her a liar, Ms. Carroll wanted to

stand up for herself and tell the world that she was not a

fraud.  Of course, when a unanimous jury decided that she was

telling the truth and Donald Trump was not, she was happy and

she wanted to let the world know that she had been vindicated.

O1GsCAR1                      Opening – Ms. Crowley

1   And, of course, she has found some other moments and sources of

2   joy over the past four and a half years.

3          But the fact that Ms. Carroll has gone on TV, the fact

4   that she has been able to find some happiness, none of that

5   undoes the harm that Trump has caused her, the fear she faced

6   and continues to face, the devastating effect that Donald

7   Trump's lies have had on her reputation and career.

8          You're going to hear more about that damage, the

9   damage that Trump's lies caused to Ms. Carroll's reputation,

10  from Dr. Ashlee Humphreys, who is a tenured professor at

11  Northwestern University.  She's an expert in sociology and

12  communications, and she is going to explain how the statements

13  that Donald Trump made about Ms. Carroll in 2019 spread like

14  wildfire across the news, social media, television, newspapers.

15  And she'll talk about how much harm they caused to

16  Ms. Carroll's career.

17         Dr. Humphreys is going to explain that before Donald

18  Trump defamed Ms. Carroll in June of 2019, she was known to the

19  world to people who knew her as a respected and widely read

20  journalist, as a modern and sometimes sassy advice columnist

21  and truth-teller whose readers relied on her for honest

22  feedback and advice.

23         But after Donald Trump branded her a fraud,

24  Ms. Carroll's reputation changed overnight.  Because of Trump's

25  lies, many people came to think of Ms. Carroll as a political

operative.  A liar.  Someone who had made up a sexual assault

to sell a book.  In other words, Donald Trump's lies achieved

exactly what he wanted them to accomplish.  All of her life,

Ms. Carroll, her dream was to become a respected writer.  It

was that dream that took her from rural Indiana to New York

City and a life she had always wanted.  And over the course of

just a couple days in June of 2019, when the then president of

the United States took to the world stage and called her a

liar, it was shattered.

So Ms. Carroll filed this lawsuit to get her name

back, to get her life back, to stop Donald Trump's attacks on

her character, on her livelihood.  In November of 2019,

Ms. Carroll sued Donald Trump for defamation, and that is this

case.  But the filing of this lawsuit did not stop Donald

Trump.  Far from it.  In October of 2022, while this case was

pending, he came at Ms. Carroll again, posting on his social

media platform Truth Social.  Trump repeated his defamatory

attack.  The same lies.  The same insults.  He told his

millions and millions of followers that Ms. Carroll was a liar.

He said her story was a con job and a hoax.  And, of course, he

couldn't help himself.  He said it again, She is not my type.

So Ms. Carroll sued him again for defamation.  And in

that same lawsuit, she also sued Donald Trump for sexually

assaulting her back in 1996.  You see, she could do that at

that time in 2022, because New York had just passed a law that

O1GsCAR1                         Opening - Ms. Crowley

gave people an opportunity to bring lawsuits for older sexual

assaults.  Under this law, this new law, people like

Ms. Carroll could finally have their day in court.  So she took

that opportunity and she filed her second lawsuit in November

of 2022.

That lawsuit moved faster than this one.  As you

heard, it went to trial last spring.  It lasted two weeks, and

Ms. Carroll called 11 witnesses.  She testified herself, just

like she will tomorrow.  In the end, a jury of nine New Yorkers

sitting in these very seats found that Donald Trump was liable

on both claims for the sexual assault that he committed back in

1996 and for the defamation that he submitted in October of

2022, when he repeated his defamatory attack on Ms. Carroll.

In other words, the jury unanimously decided that

Donald Trump had assaulted Ms. Carroll, and they also found

that his statement denying the assault, denying that he knew

Ms. Carroll and impugning her motives, was false and

defamatory.  Ms. Carroll had taken on the most powerful man on

earth and she had won.

But even that didn't stop him.

The day after the jury reached its verdict, literally

the day after, Donald Trump went on national television, on

CNN, and once again called Ms. Carroll a liar.  This is a fake

story, a made-up story, he said.  I have no idea who the hell

she is.  She's a whack job.  Even though a jury just like you

1    had unanimously decided the day before that Ms. Carroll's

2    account was true, Donald Trump went on national television and

3    called it fake and made-up.

4            And he didn't stop with CNN.  For months after the

5    jury's verdict, Donald Trump continued to repeat his hateful

6    lies about Ms. Carroll.  In May of last year, again in July, he

7    said she had totally fabricated her accusation, a proven lie.

8    He posted that he had absolutely no idea who Ms. Carroll was or

9    even what she looked like.  Proven lies.  A federal jury had

10   just decided that these were all blatant lies and that he'd

11   broken the law by saying them, but Donald Trump just kept

12   repeating them.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O1GQcar2                    Opening - Ms. Crowley

1          MS. CROWLEY:  (Continued) And he didn't stop last

2     summer.  He is continuing to tell these lies to this very

3     day -- earlier this month, last week, even today.  You will

4     hear that as Donald Trump faces trial over how much money it

5     will take to get him to stop defaming Ms. Carroll, he keeps

6     doing it.  He sat in this courthouse.  You saw him.  He sat in

7     this courthouse this morning.  And while he was sitting there,

8     he posted more defamatory statements, more lies about

9     Ms. Carroll and this case.  By our count, by our last count, 22

10    posts, just today.  Think about that.  Think about that when

11    you consider how much money will it will take to get him to

12    stop.

13          As Donald Trump campaigns for president, he continues

14    to lie about Ms. Carroll and defame her.  And I bet you can

15    guess what happens every time Donald Trump takes to the world

16    stage and lies about Ms. Carroll:  More cruel and hateful

17    messages come pouring in, many of them echoing Trump's own

18    words calling Ms. Carroll a liar, a paid democratic operative,

19    too ugly for Donald Trump to sexually assault, threatening her

20    livelihood, threatening her life.  Every time Donald Trump

21    repeats his lies about Ms. Carroll, his followers come at her

22    with demeaning, vicious, brutal attacks, reminding her every

23    day of what Donald Trump said back in June 2019 when she first

24    told the world that he'd assaulted her.  People should pay

25    dearly for these accusations, pay dearly, in other words, for

O1GQcar2                        Opening – Ms. Crowley

1   daring to go up against him.  And Ms. Carroll has paid dearly.

2   Donald Trump has seen to that himself.

3        I am going to sit down in a minute, but before I do, I

4   just want to say one final word about what you as jurors are

5   going to be asked to decide at the end of this trial.  Judge

6   Kaplan, as he said, is going to give you final instructions at

7   the end, and he will explain to you what you as jurors must

8   decide, and you should obviously listen to those instructions.

9   I expect that he will tell you that your job in this case will

10  be to answer just a few questions about damages.

11       First, you'll need to decide whether Ms. Carroll was

12  harmed by the defamatory statements that Donald Trump made

13  about her in June of 2019; and if she was harmed, you will be

14  asked to decide how much money Donald Trump should have to pay

15  her to compensate her for that harm.  You will also be asked to

16  decide how much money he should have to pay to ensure that he

17  never defames her again.

18       Now, we've already talked about the overwhelming

19  evidence of harm that Donald Trump's false defamatory

20  statements caused to Ms. Carroll, how they ruined her

21  reputation and made her fear every day for her safety and

22  well-being.  The question of harm is an easy one.  Of course,

23  his defamatory attacks harmed her.  And once you've decided

24  that Ms. Carroll has been harmed, the question of damages of

25  how much he should have to pay for what he did will also be

1    straightforward.  Ms. Carroll deserves to have her reputation

2    repaired.  And Dr. Humphreys, that professor, will explain that

3    one way to measure how much a reputation has been harmed is to

4    estimate how much it would cost to repair it.  Think about if

5    your business is destroyed by a fire or a flood, you will want

6    to know how much it will cost you to re-build it.  It's the

7    same idea for reputation, except instead of using hammers and

8    nails, rebuilding a reputation means identifying the people who

9    may have believed Donald Trump's false claims about Ms. Carroll

10   and convincing them to see the truth about her.  It means using

11   social media and blogs and television ads to persuade these

12   people that what Donald Trump was saying was a lie.  Those

13   things cost money, and Dr. Humphreys is going to tell you how

14   she calculated how much money they would cost.

15        The amount of money it would take Ms. Carroll to

16   repair her reputation to restore the very thing that Donald

17   Trump's lies damaged, that's just one piece of the damage that

18   you're going to be asked to find at the end of this trial.

19   Ms. Carroll also deserves compensation for the years of pain

20   and distress that Donald Trump's statements have caused her,

21   for the death threats, for the hate mail, for the fact that she

22   no longer feels safe.  That's another part of the damages that

23   you'll be asked to decide.

24        Finally, you will be asked how much Donald Trump

25   should have to pay to be punished for his behavior and to

prevent him and others like him from doing the same kind of

thing again, to get him to stop going after Ms. Carroll.  And

when you sit in that jury room and deliberate on that question,

I would ask you to think carefully about exactly what Donald

Trump has done here.  Really think about it.  25 years after

sexually assaulting Ms. Carroll, Donald Trump set out to ruin

her life for revealing what he'd done.  He attacked her

integrity, her honesty, her trustworthiness.  He insulted her

life.  He called her a liar, a political operative, a person

motivated by greed and fame and other awful traits.  He

unleashed his millions of followers to spew those hateful

horrible things at her, and he hasn't stopped.

        Even after a unanimous jury of nine people, a jury

just like you, decided, every single one of them, that what

he'd done was against the law, decided that he was lying about

all of this, Donald Trump doubled down in attacking

Ms. Carroll.  More lies.  More threats.  More hatred.  Those

nine jurors last May, they took an oath just like every single

one of you just did.  They sat here in this courtroom, and they

swore to listen to the evidence and decide this case without

fear or favor.  And that's what they did.  They respected the

system of justice in this country, and they did exactly what

the law required them to do, no matter how they felt about

Donald Trump or Ms. Carroll or national politics or anything

else.  But Donald Trump did not respect the law or the system

O1GQcar2                         Opening – Ms. Habba

1    of justice.  He believed that he could do whatever he wanted to

2    someone who dared speak up against him.  He believed that he

3    could get away with it.

4           Members of the jury, it's time to tell Donald Trump

5    that that is wrong.  It's time to hold him accountable.  It's

6    time to show him that in our system of justice, no one is above

7    the law, not even former presidents or real estate tycoons or

8    billionaires.  25 years after sexually assaulting Ms. Carroll,

9    Donald Trump defamed her for speaking up, and then he did it

10   again and again.  He keeps doing it even now.  It's time to

11   make him stop.  It's time to make him pay dearly for what he's

12   done, to pay enough to convince him once and for all not to do

13   it again.

14          THE COURT:  Thank you, counsel.

15          Who is going to open for the defense?

16          Ms. Habba, you may proceed.

17          MS. HABBA:  Thank you, your Honor.

18          Ladies and gentlemen of the jury, good morning -- good

19   afternoon, excuse me.  My name is Alina Habba, and I represent

20   former president Donald J. Trump in this matter.

21          The Judge explained opening statements are going to be

22   sometimes very different.  They're right to put on their

23   opening statement of their rendition of what the story will

24   tell, and now I will tell you ours.

25          The plaintiff E. Jean Carroll is pursuing a claim for

O1GQcar2                          Opening – Ms. Habba

money damages that stem from two statements made by president

Trump -- two statements.  One they brought up was from June 21,

2019, and the second is from June 22, 2019.  Those are the two

statements.

          As you heard from the Judge, you must accept for the

purposes of this trial that the statements made by president

Trump were found by a jury to be defamatory in a prior trial.

The other side will attempt to paint Ms. Carroll, as you just

heard, as someone who lost everything because president Trump

stood up and defended himself when he was publicly accused of

assault.

          MS. CROWLEY:  Objection, your Honor.

          THE COURT:  I'll allow it, but don't go much further,

please.

          MS. HABBA:  You just heard their story of the case

from Ms. Crowley, and it is their right to tell that story.

But that doesn't mean you have to believe it.  Ms. Carroll will

try to convince you and her legal team that her reputation has

been harmed, and that she suffered throughout this ordeal.  But

the evidence will show you something different.  Her career has

prospered, and she has been thrust back into the limelight like

she always has wanted.

          During this trial, Ms. Carroll will have to prove that

she is entitled to more damages.  That is why we are here.  She

has to prove that she actually suffered harm, and that the harm

O1GQcar2                          Opening – Ms. Habba

1    she suffered was specifically tied to the publication of two

2    statements -- two.  That's their burden.  To do so, she will

3    allege two specific types of harm in this case.  The first is

4    compensatory damages, and the second is punitive.

5           With respect to compensatory damages, Ms. Carroll will

6    allege that the challenged statements, the two statements

7    harmed her reputation as a journalist and writer, and that the

8    statements caused her some degree of emotional harm.

9           The second on your screen, (B) punitive damages,

10   Ms. Carroll has to prove that those two statements made by the

11   sitting president were made with common law malice, which means

12   that his response was so outrageous that she should get more

13   money that exceeds her claim for her reputation.

14           MS. CROWLEY:  Objection.  I believe that misstates the

15   law.

16           THE COURT:  That does misstate the law, Ms. Habba.

17           And the jury will disregard the assertion of the law.

18   I will give you instructions at the end of the case about what

19   she must prove.

20           MS. HABBA:  The evidence will show that president

21   Trump was merely defending himself.

22           MS. CROWLEY:  Objection.

23           MS. HABBA:  On what basis?

24           THE COURT:  Ms. Crowley?

25           MS. CROWLEY:  Your Honor, I believe that suggests that

1   Mr. Trump is denying what actually happened.

2           MS. HABBA:  No.

3           THE COURT:  I'll call on you when I'm ready.

4           What do you mean, Ms. Crowley?

5           MS. CROWLEY:  He was defending himself from

6   allegations that have been proven to be true.

7           THE COURT:  Well, that's how it turns out, but he was

8   arguably defending himself from what has now been determined to

9   have been a true allegation.

10          MS. HABBA:  I can restate it, your Honor, if you'd

11  like, or I can just move on.

12          THE COURT:  It's not -- you do what you think is

13  appropriate.  You are not here to please me.

14          MS. HABBA:  I wanted the jury to remember one thing.

15  This case is not about assault.  We had that case.  This case

16  is about the defamation.  For defamation, Ms. Carroll, when we

17  look at what happened, did not minimize the effects of the

18  purported defamation.  She went on talk shows.  She gave

19  interviews.  But she expects you as the jury to give her an

20  award that compensates her for every negative comment that was

21  thrown her way.  That is what she wants you to do.

22          But I need you as a jury to remember this — and this

23  is very important — Ms. Carroll had a duty to minimize the

24  effect of the statements, not exacerbate them, as I will show

25  she did when she ignored that duty and did the exact opposite

1    and still does today.

2         The evidence will show that Ms. Carroll's reputation

3    was not harmed by president Trump's statements.  In fact, it's

4    the exact opposite.  She has gained more fame, more notoriety

5    than she could ever have dreamed of.  Remember, this case does

6    not turn on the truth of plaintiff's original assault

7    allegations.  That was decided.  This is a defamation case.

8    She already had that trial.  She had that day in court.  You

9    are not here to make her whole for that.  That happened.

10         Here she is looking for you to give her a windfall

11   because some people on social media said mean things about her.

12   But in today's day and age, the internet always has something

13   to say, and it's not always going to be nice.  Imagine if every

14   time a public person got a mean tweet, they could get money.

15   They could sue someone and get money for the backlash from that

16   because people didn't agree.

17         Let me be perfectly clear, I am incredibly sympathetic

18   to victims of sexual assault.  But this case is not about that.

19   This case is about a plaintiff who used her story to obtain as

20   much fame and notoriety as possible.  That was the business she

21   was in.  She waited 30 years for the opportune time when she

22   actually was making less to maximize coverage.

23         THE COURT:  What is the objection?

24         MS. CROWLEY:  Waiting 30 years.

25         THE COURT:  Overruled.

O1GQcar2                          Opening — Ms. Habba

1            MS. HABBA:  She wanted status.  We will show you that

2       she wanted the attention, and it was planned.  And she got her

3       attention.  She hired a publicist.  She hired an agent.  In

4       fact, the evidence will show that she even recently hired

5       someone to do a documentary about her.  She is now suing my

6       client because all the attention that she got is not positive.

7       Her legal team will make you think that the negative attention

8       was because of two statements by Donald Trump.  You heard them

9       just say he unleashed his followers.

10           But I will show you through this trial that this

11      attention actually existed before Donald Trump ever mentioned

12      her name, before he ever addressed her allegations at the time.

13      Before he even spoke her name, she was already being publicly

14      denounced as a liar.  Before Donald Trump.  But she wants more.

15      And now that she has it, exactly what she wanted, she wants

16      president Trump to pay for the risks that she took with the way

17      she did this.  She wants president Trump to pay for the mean

18      tweets.  Not for his two statements, for other people's mean

19      statements.

20           We will show you through this trial that Ms. Carroll

21      enjoyed controversial discussions in the public.  Things that

22      would elicit strong feelings from men, from women.  The

23      evidence will show that she authored books prior to any of this

24      that elicited opinions that many would find polarizing.  She

25      liked that.

1          Let me show you some of those books before:  *Female*

2     *Difficulties:  Sorority Sisters, Rodeo Queens, Frigid Women,*

3     *Smut Stars* --  I had to look up what that means -- *And Other*

4     *Modern Girls*.

5               *A Dog in Heat Is a Hot Dog and Other Rules*.

6               *Men Catching Made Easy*.

7               *Mr. Right, Right Now*.

8          And *What Do We Need Men For?*

9          You will hear further evidence that almost every book

10    featured her face on the cover because that's what she wanted.

11    You will hear her testify that she moved from Montana to New

12    York because the quiet life did not suit her.  In fact, counsel

13    just said in her opening she just wanted to go from Indiana and

14    make it in New York.

15         We will also demonstrate that by 2019, before she came

16    out with her allegation against Donald Trump, her career was

17    dwindling and it needed a spark.  The evidence will show that

18    Ms. Carroll's book shown here, *What Do We Need Men For?* was not

19    met with the critical acclaim that she had hoped for.  We will

20    also show that every interview that she did was centered around

21    Donald Trump, not the book.  We will show through this trial

22    that even Ms. Carroll's own close friends thought that her head

23    was getting too big and that she was loving the adulation after

24    she came out with the allegations.  It is no secret that if you

25    speak about president Trump, you are going to elicit strong

1    reactions from both sides -- good and bad.  But the plaintiff

2    will try and make you feel sorry for her and convince you that

3    all of the negative backlash she received was due to president

4    Trump's two statements, and that he now should foot the bill

5    for all the mean tweets, for all the backlash.

6          But the evidence I will show you will show you that

7    Ms. Carroll's conduct has sparked this media frenzy.  The

8    evidence will show that she shocked her story about president

9    Trump and specifically chose the outlet that she thought would

10   maximize her public exposure.  And we will also show you that

11   this strategy was effective, and her story gained an enormous

12   amount of attention just as she had hoped.  And it is no secret

13   that if you make explosive allegations against a sitting

14   president, no matter who the president is, people are going to

15   react, both good and bad.

16         In fact, you will see during this trial that many

17   social media posts that Ms. Carroll say harmed her have

18   absolutely no connection to president Trump's two statements at

19   all.  There were scores of tweets criticizing Ms. Carroll

20   during the five hours after she posted the story in *The Cut*

21   that she got paid for before president Trump even acknowledged

22   it, before he even ever mentioned her name.

23         You will see that president Trump by defending himself

24   that day did nothing to add to the wave of criticism that came

25   Ms. Carroll's way.  It existed before.  You will also hear

O1GQcar2                    Opening – Ms. Habba

Ms. Carroll was completely unaffected by negative feedback and

was fully enjoying the attention she has been receiving and was

basking in the limelight.

        We will ask Ms. Carroll in this trial to confirm that

she thought she was in a cacoon of love after the allegations

because the people who do not support president Trump heaped

praises on her, stopped her in the streets to thank her and

made that support clear online.  In fact, she has now become an

advocate.  This has become part of her identity because that

was her plan.  And we will show that it is Ms. Carroll's

intention to continue to capitalize on this newfound fame long

after we leave this courtroom.  The evidence will show that

this was after she had done countless interviews following

publication of the article she wanted.

        In fact, she has gone out of her way to be on

magazines, periodicals, media appearances, podcasts and book

signings that she couldn't possibly have gotten on, all in

order to enhance and improve her public profile.  Let's not

forget:  Duty to minimize the effects.  It's not my client's

duty; that's hers.  You will see that each and every time

Ms. Carroll promoted herself, she spread the message far and

wide.  We will show you that by her own acts, more people

learned of her allegations and president Trump's response --

her acts.  You will see that she has served as the catalyst

herself for the purported harm she now wants to claim she

1   suffered and my client has to pay for.  And let me just remind

2   the ladies and gentlemen of the jury, the harm she suffered in

3   this case, the case you have to decide, consists of mean tweets

4   from Twitter trolls.  These came as a result that she has to

5   prove from his two comments, not the media frenzy that she

6   created.

7          That's what you're here to assess.  And she wants my

8   client to pay for their actions.  She didn't stop going on TV

9   after he denied it.  Her alleged emotional harm didn't stop her

10  from going back on TV again and again and again.  Duty to

11  mitigate.  The evidence will show that Ms. Carroll has made

12  Trump the focal point of her new identity now.  We will show

13  that she frequently promoted and publicized every development

14  with her first lawsuit against him herself.  She doesn't want

15  to fix her reputation, ladies and gentlemen.  She likes her new

16  brand.  And we will show you that she has been monetizing it

17  four years, and once this case is concluded, she has plans

18  already to continue doing so.

19         You will also hear from us about how her social circle

20  has changed.  She is now widely regarded as an anti-Trump

21  figure and regularly hangs out with high profile anti-Trump

22  celebrities.  The evidence will show that since June 2019, she

23  has been very close with Mary Trump, a vocal critic of her

24  uncle.  In fact, we will show you that not only are they

25  friends, but she is teaming up with the defendant's niece to

O1GQcar2                          Opening — Ms. Habba

make money on a new book after this trial, a romance book
nonetheless.  The evidence will also show that she is friendly
with Kathy Griffin pictured here, who I would not allow my team
to put a picture up of her holding a likeness of president
Trump's severed head.  Those are her friends.

          The evidence will show that following the release of
her book and the president's statements, there have been tens
of thousands of tweets in support of her, and an outpouring of
love for her.  They will try and say they will show it to you,
but they will minimize it.  That is by design.  As you will
see, she got what she wanted.  But it's up to you now, the
jury, to see through this charade and tell her just like they
said, it is enough.

          We will show you that this is someone who craves fame
and seeks fame wherever she can get it.  She was that way long
before Trump.  Their team will try and show you that what
plaintiff went through is uniquely connected to president
Trump's two statements.  They have to be able to prove to you
that the harm she suffered is because of those two statements
he said —— nothing else.  As you will see through this trial,
they will not be able to do that.

          In fact, as they just mentioned, the plaintiff will
call professor Ashlee Humphreys in her attempt to quantify the
damages that she should get in this trial.  Although Professor
Humphreys is purportedly a reputational expert, she will tell

O1GQcar2                              Opening – Ms. Habba

you that she has actually never executed a reputational repair

campaign.  But despite that, their team is going to ask you to

award millions and millions of dollars, additional dollars to

Ms. Carroll, so that she can pay social media influencers to

post a few positive messages about her.  The evidence will

further show that this type of campaign is, frankly, neither

effective, it's not effective or warranted.

        The methodologies that Professor Humphreys is going to

explain to you through this trial and the conclusions utilized

by her in formulating this type of campaign are severely

flawed.  And I will walk you through that.  For example, you

will hear how Professor Humphreys only looked at the negative

impact on plaintiff's reputation, completely disregarding any

positive that she has experienced, their expert.  You will hear

that she viewed countless messages of love and support for

Ms. Carroll, but she did not consider them at all in her

analysis.

        Essentially, they are going to put an expert up who

chose social media posts that helped plaintiff's case and

conveniently left out any of the ones that do not.  You will

also hear about how Professor Humphreys attributes all of the

attention that Ms. Carroll received to president Trump's

June 21 and June 22 statements, while completely overlooking

the media frenzy that she herself created.  Remember, the

five-hour window.  She will also show you social media posts

O1GQcar2                      Opening - Ms. Habba

1    which she claims show that Ms. Carroll's reputation was

2    injured, but you will see, and I will show you, that these

3    posts have no actual connection to president Trump's

4    statements.  In other words, the evidence will show that

5    Professor Humphreys' opinion is based on flawed reasoning and

6    even more flawed methodology, if you can even call it that.

7            So why are we here?  Your task is to determine, and

8    the Judge will articulate exactly what he wants you to

9    determine, but in sum, whether Ms. Carroll's reputation was --

10           THE COURT:  Excuse me.  The Judge will not articulate

11   what the Judge wants them to determine.  The Judge will

12   articulate the law.

13           MS. HABBA:  The law, correct, your Honor.  I was

14   trying to preempt an objection and make sure I was clear that I

15   was not stating your position.

16           Your task --

17           THE COURT:  Well, so you've done it again.  I have no

18   position.

19           MS. HABBA:  Your task is to determine whether

20   Ms. Carroll's reputation was harmed by president Trump's two

21   statements.  The simple answer is:  It is not.  The negative

22   backlash that she purportedly suffered is simply a byproduct of

23   a digital age and social media.  When you put yourself out into

24   the world, when you get paid for articles, when you put a story

25   out, you will receive backlash.  It's a normal thing that

O1GQcar2

1    happens, but she wants you to pay, and is claiming it's all

2    because of his two statements.

3            So they're right.  The last trial happened.  That jury

4    made a decision.  Gave an award.  And we're here again.  She

5    wants another award for the defamation from those two

6    statements.  Your job is to get them from the fact that that

7    jury found that it was defamation to now getting her over the

8    bridge and giving her more money.  And regardless of a few mean

9    tweets, Ms. Carroll is now more famous than she has ever been

10   in her life, and loved and respected by many, which was her

11   goal.

12           Ladies and gentlemen, we will prove our case that they

13   cannot fulfill the burden that they have by a preponderance of

14   evidence.

15           Thank you, ladies and gentlemen, for your time.

16           THE COURT:  Thank you, Ms. Habba.

17           Okay.  We will resume at 9:30 a.m. tomorrow morning.

18           Counsel remain

19           DEPUTY CLERK:  Will the jury please come this way.

20           (Jury not present)

21           THE COURT:  Anything else we need to do this

22   afternoon, folks?  Okay.  Then I'll see you tomorrow morning.

23           (Trial continued January 17, 2024 at 9:30 a.m.)

24

25

O1GQcar2

          I hereby certify that the foregoing is a true and

accurate transcript, to the best of my skill and ability, from

my stenographic notes.


_____
          Official Court Reporter
          U.S. District Court