O1HsCAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

E. JEAN CARROLL,

                    Plaintiff,

          v.                           20 CV 7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                    Defendant.              TRIAL

------------------------------x
                                    New York, N.Y.
                                    January 17, 2024
                                    10:00 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                    District Judge

                         APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG

HABBA MADAIO & ASSOCIATES LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO
     PETER SWIFT
     PETER GABRA

O1HsCAR1

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.

3          The delay this morning was caused by a transportation

4  problem, but the jury is now all present.

5          Before I bring them in, in light of the opening

6  statement for defendant yesterday afternoon, I have the

7  following questions of law that have not been properly

8  addressed, at least with the jury instructions, if not other

9  things.

10         Number one, is mitigation or avoidance of damages an

11  affirmative defense?

12         Number two, did the defendant plead it, and if not,

13  has the defense waived it?

14         Number three, assuming either that it is not an

15  affirmative defense or that the defendants have not waived it,

16  is such a defense applicable to a defamation case?

17         Last, if it is applicable in a defamation case, which

18  side has the burden of proof and what must be proved in order

19  to satisfy that burden?

20         To give you a head start, there appears to be a

21  controlling New York Court of Appeals case on some of these

22  questions, the name of which is *Norske* -- and I won't try to

23  pronounce the rest of it -- *v. Sun Printing*, 226 New York 1,

24  followed in recent years by the appellate division in a case

25  called *Cain*, which I don't actually have before me at the

O1HsCAR1

1  moment, but you won't have any trouble finding it.

2          OK.  Let's bring the jury in.

3          MS. HABBA:  Your Honor, sorry.  Excuse me, if I may.

4  May I have a minute before the jury comes in?

5          I would like an opportunity to address what your Honor

6  is recommending in writing, if possible.  We're happy to do so

7  overnight.

8          THE COURT:  I don't understand what you're talking

9  about.

10          MS. HABBA:  Well, you just added instructions, is my

11  understanding.  Am I wrong to understand that you're saying

12  that you're going to add an instruction?

13          THE COURT:  I haven't said that.  I said what I had to

14  say is likely to affect the instructions, and the next thing

15  I'm going to say is that I want briefs from both sides.

16          MS. HABBA:  Right.

17          THE COURT:  On Friday.

18          MS. HABBA:  Thank you.  That is exactly what --

19          THE COURT:  Before four o'clock.

20          MS. HABBA:  Right.  Thank you, your Honor.

21          And if I may.

22          THE COURT:  OK.

23          MS. HABBA:  My client and I, frankly, would like to

24  reiterate that Ms. Carroll is able to sit here in front of the

25  jury every single day.  She did not have an unexpected death in

O1HsCAR1

1    her family, which only the Lord can control, and I think it is

2    insanely prejudicial that, your Honor, clearly we are not going

3    to finish this trial tomorrow.  This trial will go into next

4    week.

5            I am asking your Honor to have the kindness that my

6    client deserves to be with his family tomorrow and not have to

7    choose to miss trial that he has a right to be here for.  There

8    is a jury watching.  It is prejudicial.

9            THE COURT:  Indeed, Ms. Habba.

10           The right that he has, according to the Supreme Court

11   of the United States, is the right to be present either in

12   person or by counsel, and nothing is stopping him from doing

13   either.

14           The application is denied.  I will hear no further

15   argument on it.

16           MS. HABBA:  Your Honor.

17           THE COURT:  None.

18           Do you understand that word?

19           None.  Please sit down.

20           MS. HABBA:  Your Honor, if I may.

21           THE COURT:  I said sit down.

22           MS. HABBA:  I'm not arguing on that, your Honor.

23           THE COURT:  What else do you want to discuss?

24           MS. HABBA:  I don't like to be spoken to that way,

25   your Honor, and we are going to be here for several days.  I'm

O1HsCAR1

1    not going to speak to Ms. Kaplan like that.  I will not speak

2    to you like that.  I am asking your Honor to please refrain

3    from speaking to me in that manner.

4              I am asking for adjournment for a funeral, your Honor.

5              THE COURT:  All right.  It's denied.

6              Sit down.

7              MS. HABBA:  Yeah.

8              THE COURT:  Bring in the jury.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1HsCAR1                    Carroll - Direct

1                (Jury present)

2                THE COURT:  Good morning, everybody.

3                All right.  The jurors all are present.

4                Plaintiff call her first witness.

5                MS. KAPLAN:  Your Honor, plaintiff calls E. Jean

6     Carroll.

7                THE DEPUTY CLERK:  If you would please step around and

8     remain standing.

9                Please raise your right hand.

10    E. JEAN CARROLL,

11         called as a witness by the Plaintiff,

12         having been duly sworn, testified as follows:

13               Thank you.  Please be seated.

14               THE COURT:  You may proceed, Ms. Kaplan.

15               MS. KAPLAN:  Thank you, your Honor.

16    DIRECT EXAMINATION

17    BY MS. KAPLAN:

18    Q.  Ms. Carroll, can you please say your name and spell it for

19    the court reporter.

20    A.  Yes.  It's E. Jean Carroll.  Hello.  E, period, J-e-a-n,

21    Carroll, C-a-r-r-o-l-l.

22    Q.  And can you please tell us what you do for a living,

23    Ms. Carroll?

24    A.  Yes.  I'm a journalist and advice columnist.

25    Q.  And without being too specific, could you tell the jury

O1HsCAR1                          Carroll - Direct

1   where you live?

2   A.   Yes.   In Upstate New York in the mountains in a small

3   cabin.

4   Q.   And, Ms. Carroll, why are you here today?

5   A.   I'm here because Donald Trump assaulted me.   And when I

6   wrote about it, he said it never happened, he lied, and he

7   shattered my reputation.

8   Q.   Has he continued to lie about you, Ms. Carroll?

9   A.   In this very courtroom in May, a jury found that I had

10  indeed been sexually assaulted by Donald Trump.

11          THE COURT:   Ms. Carroll, please listen to the question

12  and answer the question.

13          MS. KAPLAN:   I'll repeat the question, your Honor.

14  Q.   Ms. Carroll, has he continued to lie about you?

15  A.   Yes, he has continued to lie.   He lied last month.   He lied

16  on Sunday.   He lied yesterday.   And I am here to get my

17  reputation back and to stop him from telling lies about me.

18          MS. HABBA:   Objection, your Honor, nonresponsive.

19  Also, those statements are not at issue here.

20          THE COURT:   Overruled.   Certainly relevant to punitive

21  damages, at least.

22  Q.   Ms. Carroll, when did Donald Trump first start lying about

23  you?

24  A.   June 21, 2019.

25  Q.   And before that time, before June 2019, Ms. Carroll, what

O1HsCAR1                     Carroll - Direct

1    was your reputation in the world?

2    A.  Well, I'm 80 years old.  So I spent 50 years building a

3    reputation as a magazine journalist both in articles and as an

4    advice columnist.  My column was very popular.  People

5    appreciated my articles because I stuck to the truth and used

6    the facts.

7    Q.  And I think you just testified a minute ago, Ms. Carroll,

8    that as a result of Mr. Trump's defamation, your reputation was

9    shattered.

10             How was it shattered after June 2019?

11   A.  Well, yesterday -- I haven't looked today -- but yesterday,

12   I opened up Twitter and it said, Hey lady, you're a fraud.

13             So, previously, I was known as simply as a journalist

14   and had a column, and now I'm known as the liar, the fraud, and

15   the whack job.

16   Q.  Now, you testified that in addition to being a writer,

17   Ms. Carroll, you're also an advice columnist, is that correct?

18   A.  Yes.

19   Q.  And is reputation important to an advice columnist?

20   A.  Well, yes.  People are not dying to write to an advice

21   columnist who the president says is a disgrace.  People write

22   to advice columnists because they want to get tips and get

23   their problems solved so they can live delightfully and not,

24   like, disgracefully.

25   Q.  Now, Ms. Carroll, is this the first time you have sat in

O1HsCAR1                          Carroll – Direct

1   this courtroom in that very seat and testified in a case

2   against Donald Trump?

3   A.   No.

4   Q.   When was the first time?

5   A.   April and May last year.

6   Q.   And in that case, were you the plaintiff?

7   A.   Yes.

8   Q.   And how many legal claims did you have in that case?

9   A.   Two.

10  Q.   What were they?

11  A.   One was for first was for assault and the second was for

12  defamation.

13  Q.   And the defamation claim in that case, Ms. Carroll, when

14  did that  defamation occur?

15  A.   It occurred in October 2022.

16  Q.   And the assault, the sexual assault that was at issue in

17  this case, Ms. Carroll, when did that occur?

18  A.   In 1996.

19  Q.   How long did the trial in that case last, Ms. Carroll?

20  A.   A little over two weeks.

21  Q.   Were you cross-examined?

22  A.   Yes, I was.

23  Q.   Who cross-examined you?

24  A.   Joe Tacopina.

25  Q.   Who is Mr. Tacopina?

O1HsCAR1                          Carroll - Direct

1   A.  He was the lead attorney --

2             MS. HABBA:  Objection.  Excuse me.  Relevance, your

3   Honor.

4             THE COURT:  Sustained.

5             MS. HABBA:  Thank you.

6   Q.  Was there a jury in that case, Ms. Carroll?

7   A.  Yes.

8   Q.  And what did the jury find?

9             THE COURT:  Sustained.

10  Q.  I'm going to go back now to your background and then come

11  back to what we were just talking about, Ms. Carroll.

12  A.  OK.

13  Q.  Where did you grow up?

14  A.  Rural Indiana.

15  Q.  Could you tell us a little bit about your parents?

16  A.  Well, they were great parents.  My father was an inventor

17  and he had a furniture store in Fort Wayne, Indiana, and my

18  mother was a volunteer with the republican party and turned

19  into a republican politician and was voted into office and she

20  ran the budget of Allen Country, Indiana.

21            MS. HABBA:  Objection, relevance.

22            THE COURT:  Background.

23            MS. HABBA:  About her mother, your Honor?

24            I thought there was a ruling regarding us talking

25  about politics.  She's discussing her mother, who has passed,

```
 1   and politics.
 2             THE COURT:  Fair enough.
 3             Strike everything after "was a volunteer with the
 4   republican party."
 5             MS. HABBA:  Thank you.
 6   BY MS. KAPLAN:
 7   Q.  Do you have any brothers and sisters, Ms. Carroll?
 8   A.  Yes.  There are four of us.
 9   Q.  Where were you in the order?
10   A.  First born.
11   Q.  And how did your parents raise you, Ms. Carroll?
12   A.  Oh, they raised us in a small red brick schoolhouse, very
13   upbeat, extremely positive, and they had two rules.
14   Q.  What were those rules?
15   A.  Oh, well, smile and look on the bright side.
16   Q.  Now, when you were growing up as a kid in Indiana,
17   Ms. Carroll, what did you want to be when you grew up?
18   A.  I wanted to be a writer.
19   Q.  Did you succeed in that?
20   A.  Yes.
21   Q.  Did you go to college?
22   A.  Yes.
23   Q.  Where did you go to college?
24   A.  Indiana University.
25   Q.  And did you have a major in college?
```

O1HsCAR1                    Carroll – Direct

 1  A.  Communications.

 2  Q.  What about extracurriculars?

 3  A.  Yes, I was a cheerleader and I was in a sorority.

 4  Q.  And in connection with those extracurriculars, did you

 5  participate in any competitions?

 6  A.  Yes.

 7  Q.  Can you explain?

 8  A.  Well, my sorority nominated me for Ms. Indiana University.

 9  I happened to win.

10          MR. MADAIO:  Objection, your Honor, relevance.

11          THE COURT:  Overruled.

12          I'm sorry, who made that objection?

13          MR. MADAIO:  Mr. Madaio.

14          THE COURT:  Let's just get this clear for both sides

15  right now.  The first lawyer who says anything when a witness

16  is on the stand says everything there is to be said for that

17  side.  This is not a tag team lawyering.

18  BY MS. KAPLAN:

19  Q.  I'm sorry, Ms. Carroll.

20          I think you were talking about the competitions you

21  were in, in college.

22  A.  Oh, yes.  Indianapolis 500 princess, where I had a

23  convertible.  But the athletic -- here is the main one.  The

24  athletic department at Indiana nominated me for Ms. Cheerleader

25  USA and I won the national championship.

O1HsCAR1                    Carroll - Direct

1    Q.   Now, how long did it take for you to become a writer,

2    Ms. Carroll?

3    A.   I started at the age of 12, but I understood what the big

4    magazines were like, and I sent off my first letter to the

5    editor at the age of 12.  I spent the next two decades in a

6    blizzard of negativity, rejections.  And at the end of two

7    decades, finally got my first piece accepted.

8    Q.   How old were you when you got your first piece accepted?

9    A.   36.

10   Q.   Now, during the time you graduated from college and the

11   time you got your first piece accepted, what you did do for a

12   living?

13   A.   Well, I had cheerleading camp, I worked in market research

14   for Proctor & Gamble, I taught gym at a reform school in Idaho.

15   I kept busy.  My main objective was to fill the mails with

16   ideas for articles.

17   Q.   So, Ms. Carroll, how did it come about you got your first

18   shot at being a writer at the age of 36?

19   A.   Mere fluke.  I sent an article into Esquire magazine.

20   There was a slush pile.  That is where uninvited ideas for

21   articles end up in a magazine called slush piles.  One at

22   Esquire was over five feet tall, and the editor by chance

23   picked up my envelope, opened it, read it, and bought it.

24   Q.   And what happened after that?

25   A.   Then once the door at Esquire opened, other doors opened

O1HsCAR1                        Carroll - Direct

1    across the world of journalism.

2    Q.  Did you then write for other magazines?

3    A.  Yes.

4    Q.  Which ones?

5    A.  Rolling Stone, New York, Glamour, Atlantic, Vanity Fair.

6    Q.  Did there come a time, Ms. Carroll, when you moved to New

7    York City?

8    A.  Yes.

9    Q.  How does that come about?

10   A.  I moved here in '80 or '81.  An outside magazine assigned

11   me to take Fran Lebowitz camping.  Fran Lebowitz is, as all

12   New Yorkers know, she's the great wit who described the

13   outdoors as being that place you pass through from your

14   apartment to the taxi cab.  And I took her campaign.  We put

15   her on the cover.

16   Q.  And as a result of that, you moved to New York?

17   A.  I took one look at Manhattan and said, this is it, I love

18   it here, and I stayed.

19   Q.  Now, you've testified already that you're an advice

20   columnist.

21          Can you tell the jury how you became an advice

22   columnist?

23   A.  Um, the editor-in-chief of Elle magazine -- Elle is the

24   world's largest fashion magazine, also called the thinking

25   woman's magazine.  She had been reading my pieces in Esquire

O1HsCAR1                    Carroll - Direct

```
 1    and offered me an advice column.

 2    Q.  When was that?

 3    A.  1993.

 4    Q.  Now I know it seems obvious, kind of, from what the words

 5    are.

 6            Can you tell us what an advice columnist does?

 7    A.  An advice -- people write in to advice columnists with

 8    problems that they are having difficulties solving.  The advice

 9    columnist solves the problem and it's printed in a magazine or

10    a newspaper.

11    Q.  Did your advice column have a name?

12    A.  Yes.

13    Q.  What was the name?

14    A.  Ask E. Jean.

15    Q.  I'm going to ask Mr. Termonfilis to show you on your

16    screen, Ms. Carroll, a document marked as identification as

17    Plaintiff's Exhibit 29.

18            Do you have that in front of you, Ms. Carroll?

19    A.  Yes.

20    Q.  Do you recognize it?

21    A.  Yes.

22    Q.  What is it?

23    A.  That is me.  That is a photograph --

24    Q.  Just say what it is.

25    A.  It's a photograph.
```

1   Q.  A photo of who?

2   A.  That is me.

3           MS. KAPLAN:  Plaintiff moves for the admission of 29,

4   your Honor.

5           THE COURT:  Received.

6           (Plaintiff's Exhibit 29 received in evidence)

7   Q.  Ms. Carroll, when was this photograph taken?

8   A.  '97 or '98.

9   Q.  And what was this photo used for?

10  A.  This is appeared on some of the columns.

11  Q.  And I'm going to show you another document, Ms. Carroll,

12  Plaintiff's Exhibit 30.

13          Again, this same rigmarole, tell me what kind of a

14  document this is.

15  A.  This is a photograph.

16  Q.  Do you recognize the photograph?

17  A.  Yes, that is me.

18          MS. KAPLAN:  Plaintiff moves for the admission of

19  Plaintiff's 30, your Honor.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 30 received in evidence)

22  Q.  What's going on in this photograph, Ms. Carroll?

23  A.  This is a picture of me.  This is being taken for a

24  publicity for the Ask E. Jean column and the Ask E. Jean

25  television show.

O1HsCAR1                        Carroll - Direct

1    Q.  Do you know when this photo was taken?

2    A.  Yes.  This was December 1995.

3    Q.  How do you know that?

4    A.  The woman who did my hair and makeup worked for me during

5    that month of December.

6    Q.  Now, as an advice columnist, Ms. Carroll, what kinds of

7    questions do you get?

8    A.  Well, it's comedy and drama of life, you know.  I get how

9    do I get a raise questions; I get how do I get a boyfriend

10   questions; I get how do I get rid of a boyfriend questions; I

11   get what is my purpose in life questions.

12          There are two questions that I get quite frequently.

13   One is asking how do I get my husband to take more showers and

14   the other one is how do I let -- get my wife to let me start

15   sleeping in bed and get off the sofa.  Those are typical of

16   what I receive.

17   Q.  I'm going to take it from those questions, Ms. Carroll --

18          Let me ask you this.  Was there a gender breakdown

19   based on the people who asked you for advice?

20   A.  Yes.  About 80 percent women, 20 percent men.

21   Q.  And did your advice column have any particular kind of

22   style or attitude?

23   A.  Well, it sort of broke with the pass, the way advice

24   columnists are written, because I spent very little time going

25   deeply into the psychological problems, reasons for a problem.

1  I was all about taking action and I was, like, come on, get up,

2  stop blubbering.  Take action, because I believed that if a

3  woman or a man leads an adventurous life, takes action, they

4  can solve their own problems.

5  Q.  Was your advice column supposed to be funny?

6  A.  Much of it was light-hearted, humorous.  It was deeply

7  serious at times, but I found that when I approached the

8  solution using humor, people were more likely to take the

9  advice than when I lectured or was serious.

10  Q.  In addition to the advice column in Elle magazine,

11  Ms. Carroll, did you provide advice as part of your career in

12  any other way?

13  A.  Yes.  I had a television show.

14  Q.  What was the name of your television show?

15  A.  Ask E. Jean.

16  Q.  Same as your column?

17  A.  Yes.

18  Q.  And when did you have this television show?

19  A.  1994 and '95 and '96, and then the channel I was on became

20  MSNBC.

21  Q.  What was the channel you were on?

22  A.  It was an NBC cable channel started by Roger Ailes and it

23  was called America's Talking.

24  Q.  How often was your show on the air?

25  A.  Every day live for an hour, and then it ran again 11 at

O1HsCAR1                      Carroll - Direct

1    night.

2    Q.   What was the format of the show?

3    A.   It was an advice column brought live.  People would come

4    on, there was a big white sofa, they would sit down, they would

5    tell me their problem, I would solve it, and it was a very, um,

6    engaging way for people, viewers, to help me solve problems.

7    Because they would call in, they would add to my advice, so the

8    person who was on the sofa got all sorts of advice.  It was a

9    great show.

10   Q.   Apart from your E. Jean TV show, Ms. Carroll, did you do

11   any other writing for TV?

12   A.   Yes, I was a writer at Saturday Night Live.

13   Q.   For how long?

14   A.   1987.

15   Q.   And in connection with the work at Saturday Night Live, did

16   you receive any award nomination?

17   A.   Emmy nomination for writing.

18   Q.   Now, in addition to the Ask E. Jean show, did you have

19   occasion to appear on other TV shows?

20   A.   Yes.  Good Morning America, The Early Show, The Today Show,

21   Bill Marsh.  You know, the typical shows.  Oprah, Anderson

22   Cooper.  You know, the shows that were on every day.  Yeah.

23   Q.   Before June 2019, Ms. Carroll, what would be the nature of

24   your appearance on shows like that?

25   A.   Oh, I would appear as an advice columnist because I was

O1HsCAR1                          Carroll - Direct

1   very easy to slot in for four minutes.  If producers needed a

2   segment on how to tip, I could come on, talk to a person about

3   the difficulties of learning how to tip, solve the problem in

4   three minutes, and on and off in four minutes.

5   Q.  And how often, again, before June 2019, did you appear,

6   make those kinds of appearances, on TV shows like that?

7   A.  Often.

8           MS. HABBA:  Objection, your Honor.  Sorry.  That's

9   very broad.

10          Can we get a specific date?

11          THE COURT:  You can ask later.

12  Q.  Ms. Carroll, did you ever have regular arrangements to

13  appear as advice columnist on TV shows like that?

14  A.  Yes.

15  Q.  What was the most recent regular arrangement?

16  A.  On The Today Show, I had a weekly advice segment.  That was

17  2015 or 2016.

18  Q.  Now, in addition to articles for magazines, your advice

19  column, have you also written any books?

20  A.  Yes.

21  Q.  How many?

22  A.  Five.

23  Q.  What kinds of books?

24  A.  A book of essays, a biography of Hunter Thompson the

25  journalist, two books of advice, and a memoir.

1    Q.  Let's start with your book of essays, Ms. Carroll.

2           MS. KAPLAN:  Mr. Termonfilis, can you show, just for

3    Ms. Carroll, Plaintiff's Exhibit 154.

4    Q.  Ms. Carroll, do you recognize this?

5    A.  Yes.

6    Q.  Again, without going into detail, could you say what it is?

7    A.  Yes.  It's a book of essays.

8    Q.  You wrote the book?

9    A.  Yes.  It was my first book.

10          MS. KAPLAN:  Plaintiff moves for the admission of 154,

11   your Honor.

12          THE COURT:  Received.

13          (Plaintiff's Exhibit 154 received in evidence)

14   Q.  So I'm going to apologize in advance before I say this,

15   Ms. Carroll.  This looks a little dated to me.

16          What year did you write this book?

17   A.  That's a lovely way of putting it.  19 -- it was published

18   in 1983, I think.  I'm not sure.

19   Q.  And did this book create any controversy after it was

20   published?

21   A.  No.  It was exit I will review and I loved writing it.  No,

22   there was no controversy.

23   Q.  Did it lead to any career opportunities for you?

24   A.  Yes, it got me hired at Saturday Night Live.

25   Q.  How did it sell?

O1HsCAR1                        Carroll – Direct

1   A.  It sold well.  It was a first book totally unknown writer

2   who wrote about interesting things going on with women in the

3   culture and (by a) and it sold.  It sold surprisingly well for

4   an unknown.  It wasn't a best seller, though.

5   Q.  I think you said you were wrote a buying fee?

6   A.  Yes.

7        MS. KAPLAN:  If we could again, Mr. Termonfilis, put

8   up Plaintiff's Exhibit 157 just for Ms. Carroll.

9   Q.  Ms. Carroll, sorry, do you recognize?

10  A.  Yes.

11  Q.  The document you're looking at?

12  A.  Yes.  That is the cover of a book.

13  Q.  A book that you wrote?

14  A.  Yes.

15       MS. KAPLAN:  Plaintiff moves for the admission, your

16  Honor, of Plaintiff's 157.

17       THE COURT:  Received.

18       (Plaintiff's Exhibit 157 received in evidence)

19  Q.  Ms. Carroll, what book is this?

20  A.  This is the biography of Hunter Thompson, the astonishingly

21  emphatic journalist.

22  Q.  Is that a picture of Mr. Thompson on the cover?

23  A.  Yes.

24  Q.  And when did you write this book?

25  A.  I wrote it between '91 and '92.  It was published in 1993.

O1HsCAR1                     Carroll - Direct

```
1    Q.  And how did this book sell?

2    A.  It sold well.  It was extremely well-reviewed because

3    people writing about him were journalists, writing the reviews

4    were journalists, and they all loved Hunter.

5    Q.  I think you said, Ms. Carroll, if I'm not mistaken, that

6    you wrote a couple books of advice?

7    A.  Yes.

8           MS. KAPLAN:  Let's do these together.  If we could put

9    up on the screen, Mr. Termonfilis, Plaintiff's 155 and 156.

10   Q.  Do you recognize what's on the screen in front of you,

11   Ms. Carroll?

12   A.  Yes, I do.

13   Q.  Are those books written by you?

14   A.  Yes.

15          MS. KAPLAN:  Plaintiff moves for the admission, your

16   Honor, of 155 and 156.

17          THE COURT:  They are received.

18          (Plaintiff's Exhibits 155 and 156 received in

19   evidence)

20   BY MS. KAPLAN:

21   Q.  Ms. Carroll, you have in front of you the covers of two

22   books, correct?

23   A.  Yes.

24   Q.  Are those the advice books you've been talking about?

25   A.  Yes.
```

O1HsCAR1                    Carroll – Direct

1    Q.  Do you remember when you wrote those?

2    A.  Yes.  In 1996 on A Dog in Heat, and Mr. Right, Right Now,

3    is 2003.

4    Q.  How did those books do?

5    A.  Both of these books are still earning royalties, and they

6    also look dated to me.

7    Q.  What is the name of the last book you wrote, Ms. Carroll?

8    A.  What Do We Need Men For.

9    Q.  And why did you give the book that title?

10   A.  Because for 25 years, I was writing the Ask E. Jean column,

11   and women had been writing in to me complaining about men when

12   I knew they really loved men.  So that was a confusing thing.

13          MS. HABBA:  Objection, your Honor.  Hearsay,

14   speculation.  She's talking about what women believed that

15   wrote in to her.

16          THE COURT:  First of all, when you speak in this

17   courtroom or any other courtroom in this building, you'll stand

18   up.

19          MS. HABBA:  Sure.

20          THE COURT:  It certainly isn't hearsay.

21          What else did you say?

22          MS. HABBA:  She's stating what they really felt.

23   Speculation.

24          THE COURT:  Well, that's not offered for the truth of

25   the matter, is it, Ms. Kaplan?

1           MS. KAPLAN:  It is not, Judge.

2           THE COURT:  All right.  The question was why did she

3      give the book the title.  She's entitled to explain that.

4           MS. HABBA:  Sure.

5      A.  So it was a confusion to me.  They were complaining about

6      men, but they were complaining because they -- because they

7      wanted to be with men.

8           So I took a road trip, drew a line down the middle of

9      America, and visited little towns named after women.

10          Marianne --

11          THE COURT:  Ms. Carroll, please stick to the question.

12     This is why you gave it that title.

13     A.  Oh, yes.  To discover why do we need men.

14     Q.  And how did you go about the process of writing the book,

15     Ms. Carroll?

16     A.  That's when I drew the line down the center of the country,

17     and I went to little towns named after women and talked to

18     women and men and had exhilarating interviews.  Women were

19     very, very blunt and forthcoming.  In New York, when we

20     interview people, New Yorkers are very blasé about talking to

21     journalists.  In Alabama and Arkansas and Ohio, they were

22     thrilled to talk to a journalist and tell them, tell me what

23     their opinions were.

24     Q.  When did you start writing your latest book, Ms. Carroll?

25     A.  2017.

1    Q.  And when was it published?

2    A.  2019.

3    Q.  Now, is any part of the book, this book What Do We Need Men

4    For, is it any part of it about yourself or your own life?

5    A.  I did not intend to write a memoir.

6    Q.  Did you end up writing a memoir?

7    A.  Yes.

8    Q.  When did that change?

9    A.  Well, it started to change when I started talking to women,

10   because they were very trusting of me and telling me their

11   stories about how they lived with men or didn't live with men.

12   And I thought, if they trusted me, why can't I trust myself a

13   little bit and talk about some of the men in my life.

14          So they gave me courage to think, OK, E. Jean, you can

15   maybe include a few of your stories.

16   Q.  Is there a way, Ms. Carroll, that you organized the stories

17   in the book from your own life?

18   A.  Yes.  I made a list.

19   Q.  And was Donald Trump initially on that list?

20   A.  No, no.

21   Q.  Did Donald Trump end up on that list?

22   A.  Yes.

23   Q.  How did that happen?

24   A.  Well, when I came home, I was watching the video of

25   interviews.  I was writing down, I was transcribing and, again,

O1HsCAR1                    Carroll - Direct

```
 1   I was overwhelmed with the honesty of these women.  And I
 2   thought, my God, I'm such a hypocrite.  They are telling me
 3   their opinions, I'm holding back.  And then I said, I'm 95
 4   years old.  If I don't do it now, I'll never do it.  So I
 5   included him.
 6   Q.  Now, at a very general level, I'm sure you've been sitting
 7   here and hearing the court's instructions.
 8           At a very high level, what did you say about Mr. Trump
 9   in that book?
10   A.  I said we met outside of Bergdorf's.  He said, hey, are you
11   the advice columnist?  I'm buying a gift.  I need your advice.
12   Come help me buy a gift.  I was delighted, and we went to the
13   lingerie department --
14           THE COURT:  I think --
15           Ms. Habba.
16           MS. HABBA:  Yes.  Thank you.
17           Objection, your Honor.  This is incredibly
18   prejudicial.  You have ruled on this prior to --
19           THE COURT:  Sustained.
20           MS. HABBA:  Thank you.
21           MS. KAPLAN:  Your Honor, can we also move to strike?
22           THE COURT:  Granted.
23           MS. HABBA:  Thank you.
24           THE COURT:  Members of the jury, you have been told
25   what has been determined already, and that is what you need to
```

O1HsCAR1                    Carroll - Direct

1   know.

2   BY MS. KAPLAN:

3   Q.  How many pages is your book, Ms. Carroll?

4   A.  274.

5   Q.  And how many pages is the chapter about Mr. Trump?

6   A.  Nine.

7   Q.  I'm going to ask Mr. Termonfilis to put up on the screen in

8   front of you a document marked for identification as

9   Plaintiff's Exhibit 6.

10          Do you have that in front of you?

11  A.  Yes, I do.

12  Q.  Do you recognize this document?

13  A.  Yes.

14  Q.  What is it?

15  A.  This is a photocopy of the excerpt that ran in New York

16  Magazine.

17          MS. KAPLAN:  Plaintiff moves for the introduction,

18  your Honor, of Plaintiff's Exhibit 6.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 6 received in evidence)

21  A.  Ms. Kaplan, may I have my glasses?

22          They are in my purse.

23  Q.  Oh, of course.  I apologize.

24  A.  Good luck finding it in that bag.  There we go.

25          Ah, thank you.

O1HsCAR1                    Carroll - Direct

1              MS. HABBA:  Your Honor, I'm going to object.  This,

2      again, goes to the underlying facts that we were not to discuss

3      per your order.

4              THE COURT:  Why isn't that true, Ms. Kaplan?

5              MS. KAPLAN:  We can redact it further, your Honor,

6      when it's presented.  I'm not going to cover anything here.

7      They had this with these redactions now for a while.

8              THE COURT:  I'm sorry.  What?

9              MS. KAPLAN:  So the document she has is mostly

10     redacted.  If the defendant would like further redactions,

11     we're happy to provide them, but I don't think they've had this

12     version.  I'm happy to talk about further redactions before it

13     goes to the jury room.

14             THE COURT:  Well, first of all, I'm advised that the

15     version of the document that's on the screen, although only one

16     page is showing, is not redacted.

17             Second of all, I still haven't had an answer to the

18     question, Ms. Kaplan.

19             MS. KAPLAN:  The question is why is it relevant, your

20     Honor?

21             THE COURT:  Yes.

22             MS. KAPLAN:  This is what Mr. Trump then reacts to.

23     The two defamatory statements are a result of this article.

24             THE COURT:  Ms. Habba, what about that?

25             MS. HABBA:  Your Honor, the president denied an

O1HsCAR1                        Carroll - Direct

1    allegation on the White House lawn from a reporter.  That's

2    what happened.  As he was president.

3            If we're going to get into this, your Honor, quite

4    honestly, this violates every order that you just issued.  They

5    discuss awful men.  We're not allowed to ask about the other

6    men --

7            THE COURT:  Do you think that that's a little bit

8    exaggerated, Ms. Habba?

9            MS. HABBA:  What part, your Honor?

10           Your order says we can't discuss --

11           THE COURT:  Every order I've issued.  That's what you

12   said.

13           MS. HABBA:  The order you issued this weekend, as I

14   said, addressed these evidentiary issues.  We're not allowed to

15   discuss any of the men -- I'm not going to violate it -- but

16   the men that she, prior, made assault claims to, and now we

17   have Donald Trump assaulting me.

18           If she's going to do that, she's opening the door, and

19   I want to ask her about the other men.

20           THE COURT:  Look, I don't really get what you said,

21   but I'm going to sustain it anyway.

22           MS. HABBA:  Thank you.

23           I'm sorry, your Honor.  May we move to strike?

24           THE COURT:  To strike what?

25           MS. HABBA:  She -- sorry.  Can we move this up?

O1HsCAR1                    Carroll - Direct

```
1            I can't see this.  It's not up.  It's not in.
2            Thank you.
3            MR. MADAIO:  To the extent she read the title earlier
4   on the transcript --
5            MS. HABBA:  I believe Ms. Kaplan read the title.
6            THE COURT:  Mr. Madaio.
7            MS. HABBA:  He read the title.  He's talking to me.
8   It's fine.
9            THE COURT:  It isn't fine.
10           MS. HABBA:  Your Honor, I don't know.  Was it shown to
11  the jury?
12           THE COURT:  No.  It's not in evidence.
13           MS. HABBA:  I can't see what they see.
14           THE COURT:  But it can't be shown to the jury unless
15  it's in evidence.
16           MS. HABBA:  OK.  Thank you.
17  BY MS. KAPLAN:
18  Q.  In connection with your most recent book What Do We Need
19  Men For, excuse me, Ms. Carroll, did there come a time when an
20  excerpt from that book was published before the book was
21  available in the stores?
22  A.  Yes.
23  Q.  And where was it published?
24  A.  It was published in New York Magazine.
25  Q.  And when was it published, that excerpt?
```

O1HsCAR1                          Carroll - Direct

1    A.  June 21, 2019.

2    Q.  Now, do you remember what time of day it was published?

3    A.  Yes.  Um, the New York Times was going to publish an

4    article about the book that caused New York Magazine to print

5    it on a Friday.  We wanted to go on Monday, but they jumped the

6    gun because of The Times, and it was published in the

7    afternoon, in the afternoon on Friday, June 21st.

8            (Counsel confer)

9    Q.  Did the excerpt of your book that was published in the New

10   York Magazine, did that include portions of your book about the

11   assault by Mr. Trump?

12   A.  Yes.

13   Q.  And did the excerpt -- withdrawn.

14           Do you remember you were in court here yesterday,

15   Ms. Carroll?

16   A.  Yes.

17   Q.  And you heard Ms. Habba's opening argument?

18   A.  Yes.

19   Q.  She talked about a five-hour interval --

20   A.  Yes.

21   Q.  -- between the publication of this excerpt and some

22   statements that she talked about?

23   A.  I remember it well.

24   Q.  Did the excerpt published in New York Magazine contain a

25   denial from Mr. Trump?

O1HsCAR1                    Carroll – Direct

1    A.  It contained a denial from the White House.

2            MS. KAPLAN:  Your Honor, subject to proper redactions,

3    which I'm assuming counsel can work out, I move again for the

4    introduction of Plaintiff's Exhibit 6.

5            MS. HABBA:  Your Honor, she can move for Plaintiff's

6    Exhibit 6, which means then I would argue she is waiving the

7    ability for me to cross-examine her on everything in there, and

8    I'm happy to do so.

9            But that's what your ruling was, so ...

10           THE COURT:  Objection sustained.

11   Q.  Now, when this excerpt was published in New York Magazine,

12   what was Donald Trump's job?

13   A.  He was the president of the United States.

14   Q.  And when the excerpt -- at the time the excerpt was

15   published in the New York Magazine, had you ever told anyone

16   publicly the story about Mr. Trump; yes or no?

17   A.  No.

18   Q.  And did the fact that Mr. Trump was president, did that

19   factor into your account of whether to reveal this publicly or

20   not?

21   A.  Yes, it did.  I took the responsibility and went ahead and

22   did it.

23   Q.  And given the fact that Donald Trump was then president,

24   did you expect him to respond?

25   A.  Yes.

1    Q.  And how did you expect him to respond?

2    A.  Well, I expected him to deny it, but to say it was

3    consensual, which it was not.  But that's what I expected him

4    to say.

5    Q.  Is that what he did?

6    A.  No.

7    Q.  I'm going to show you a document that's been marked as

8    Plaintiff's Exhibit 1.  You have it on the screen in front of

9    you.

10            Do you recognize this document?

11   A.  Yes.

12   Q.  Without going into the contents, can you just say what it

13   is?

14   A.  It's a tweet by Laura Litvan.  She is a journalist for

15   Bloomberg.

16            MS. KAPLAN:  Plaintiff moves for the admission, your

17   Honor, of Plaintiff's Exhibit 1.

18            THE COURT:  Received.

19            (Plaintiff's Exhibit 1 received in evidence)

20   Q.  Ms. Carroll, what is the date that this tweet was posted?

21   A.  June 21, 2019.

22   Q.  And what time of day on June 21, 2019 was it posted?

23   A.  5:17 p.m.

24   Q.  And can you, please, again at a high level, go through this

25   document briefly and identify for the jury where the defamatory

O1HsCAR1                      Carroll - Direct

1   statements about you are in here?

2   A.  Donald Trump says, I've never met this woman in my life.

3   That is a lie.  He said that I was trying to sell --

4             MS. HABBA:  Objection.

5             THE COURT:  Overruled.

6             MS. HABBA:  Can I put my basis, your Honor?

7             THE COURT:  It's not necessary.

8             MS. HABBA:  OK.

9   A.  He said I made up an accusation to sell a book.  That is a

10  lie.  He said I made up an accusation for publicity sake.  That

11  is a lie.  He said that my false accusation damaged the real

12  victims of sexual assault.  That is a lie.

13            MS. HABBA:  Objection, your Honor.

14            THE COURT:  On what ground in a word?

15            MS. HABBA:  She is not a lawyer.

16            THE COURT:  Overruled.

17  A.  But the thing that really got me about this is, from the

18  White House, he asked if anyone had any information about me,

19  and that if they did, to please come forward as soon as

20  possible because he wanted the world to know what's really

21  going on and that people like me should pay dearly.

22  Q.  Have you paid dearly, Ms. Carroll?

23  A.  I've paid just about as dearly as is possible to pay.

24  Q.  I'm going to put another document in front of you,

25  Ms. Carroll.  It's been marked for identification as

1   Plaintiff's Exhibit 2.  Again, same rigmarole.

2           Can you just say, without divulging the contents, what

3   this document is?

4   A.  This is a copy of an announcement by the Office of the

5   Press Secretary.

6   Q.  What's the date?

7   A.  June 27, 2019.

8           MS. KAPLAN:  Plaintiff moves for the admission of

9   Plaintiff's Exhibit 2, your Honor.

10           THE COURT:  Is this a multi-page document?

11           MS. KAPLAN:  It's redacted.

12           THE COURT:  It's received.

13           (Plaintiff's Exhibit 2 received in evidence)

14           Members of the jury, the part that are blacked out are

15   just not relevant to the case.

16   BY MS. KAPLAN:

17   Q.  How does the timing of this statement relate to the

18   statement we just looked at, Ms. Carroll?

19   A.  The first statement by Donald Trump was on a Friday,

20   June 21.  This is a Saturday, June 22.

21   Q.  And you see on page 1800, there is a reference to a

22   photograph of you.

23           Do you see that?

24   A.  Yes, yes.

25           MS. KAPLAN:  Just give me a second, your Honor.

O1HsCAR1                        Carroll - Direct

1   Q.  Are you sitting here today, Ms. Carroll, are you aware of

2   the photograph that's being discussed by this reporter?

3   A.  Yes, very.

4   Q.  I'm going to ask Mr. Termonfilis to put up, just for you,

5   Plaintiff's Exhibit 9.

6   A.  Yes.

7   Q.  Again, same thing, just what kind of a document is this?

8   A.  This is a photograph.

9   Q.  Is this the photograph that that reporter is asking

10  Mr. Trump about?

11  A.  Yes, it is.

12          MS. KAPLAN:  Plaintiff moves for the admission of

13  plaintiff's Exhibit 9, your Honor.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 9 received in evidence)

16  Q.  Just briefly, Ms. Carroll, what is going on in this

17  photograph?

18  A.  This is -- we were at a party, and that is Ivana Trump on

19  the right, that's my ex-husband, John Johnson, the New York

20  anchorman, that is myself, and that is Donald Trump.

21  Q.  And do you recall -- do you know when this party was

22  happening?

23  A.  I think it was NBC Saturday Night Live party.

24  Q.  So how would that relate to time?

25  A.  That would probably be 1987.

O1HsCAR1                          Carroll - Direct

1    Q.  And how do you know that this was the photograph that the

2    reporter in Plaintiff's Exhibit 2 was asking Mr. Trump about?

3    A.  Because this photograph appeared in the excerpt.

4    Q.  From the New York Magazine?

5    A.  Yes.  Yes.

6            MS. KAPLAN:  I'm going to ask Mr. Termonfilis to turn

7    to page 1800 and 1801 of the document.

8            THE COURT:  Referring to Plaintiff's 2, correct?

9            MS. KAPLAN:  Plaintiff's 2, yes, your Honor.

10   Q.  And we looked at an earlier statement of Mr. Trump that is

11   very similar.

12           What, if anything, is new in this statement that's

13   defamatory about you, Ms. Carroll?

14   A.  This, first of all, he's -- the journalist said,

15   Mr. President, we have photographs showing you together.  He

16   said he agreed that that was true.  Then, of course, he says it

17   was a false accusation, and that is a lie.  The thing about

18   this, about this piece, this statement, is that he said that

19   numerous numbers of women had been paid to make false

20   accusations about him, and that these women did very well --

21           MS. HABBA:  Objection, your Honor.

22           THE COURT:  Overruled.

23   A.  And women were actually paid money to say bad things about

24   me.  He includes me in that group.  That is not true.  I was

25   not paid.

O1HsCAR1                      Carroll - Direct

1   Q.  And if you look at the second paragraph on page 1801,

2   Ms. Carroll, is there something there similar to the language

3   we saw last time about paying dearly?

4   A.  Yes.

5   Q.  What is that?

6   A.  Well, he says people like me who make false accusations are

7   very dangerous, in very dangerous territory.

8          MS. HABBA:  Objection.

9          THE COURT:  Overruled.

10  A.  And I shouldn't have done it for the sake of publicity.

11  That is also a lie.

12  Q.  Now, I think I should have done this earlier, just to clean

13  it up, Ms. Carroll.  I apologize.

14          What's the context of, Ms. Carroll, of these

15  statements Mr. Trump is giving?

16          Go back to page one.  I'm trying to place it for the

17  jury.

18          How is this interview happening?

19  A.  Oh, he's on his way to the helicopter and he's being

20  questioned by journalists.

21          MS. KAPLAN:  Mr. Termonfilis, if you could put up for

22  Ms. Carroll for identification Plaintiff's Exhibit 3.

23  Q.  Do you recognize this document, Ms. Carroll?

24  A.  Yes, I do.  It's a copy of The Hill's, which is a news

25  blog, interview with Donald Trump.

O1HsCAR1                          Carroll - Direct

1    Q.  And is it about you?

2    A.  Some of it is about me.

3              MS. HABBA:  Objection, your Honor.

4              THE COURT:  What's the objection?

5              MS. HABBA:  This statement is not part of the case.

6              THE COURT:  Overruled.

7              Members of the jury, there is not a claim for damages

8    based on this statement, but this statement is properly part of

9    the case and I'll give you instructions on it later.

10             MS. KAPLAN:  I'll move for the admission of Exhibit 3,

11   your Honor.

12             THE COURT:  Received.

13             (Plaintiff's Exhibit 3 received in evidence)

14   BY MS. KAPLAN:

15   Q.  Ms. Carroll, if you could turn, -- or if Mr. Termonfilis

16   could turn to the page that's two of five.  You'll see there is

17   a direct quote from Mr. Trump.

18             Do you see that quote?

19   A.  Yes, I do.

20   Q.  Is Mr. Trump saying something new here?

21   A.  Yes.

22   Q.  What's he saying that is new?

23   A.  He says I am not his type.

24   Q.  What does that mean?

25   A.  It means I'm too ugly to assault.

O1HsCAR1                        Carroll - Direct

1              MS. HABBA:  Objection.

2              THE COURT:  On what ground?

3              MS. HABBA:  Speculation.  It's not the definition.

4      She's assuming.

5              THE COURT:  Overruled.  You can cross-examine.

6      Q.  Now, Ms. Carroll, we've just looked at three statements

7      from Donald Trump, then the president of the United States,

8      over a very brief period in June of 2019?

9      A.  Yes.

10     Q.  Can you tell the jury, what did it feel like to have the

11     president of the United States say those kind of things about

12     you at that time in June?

13     A.  Well, to have the president of the United States, one of

14     the most powerful persons on earth, calling me a liar for

15     three days and saying I'm a liar 26 times -- I counted them --

16     it ended the world that I had been living in, and I -- and a

17     new world.

18     Q.  In terms of that new world, Ms. Carroll, what happened to

19     you after Donald Trump made those statements?

20     A.  I was attacked.

21              (Continued on next page)

22

23

24

25

O1GQcar2                          Carroll - Direct

1   BY MS. KAPLAN:   (Continued)

2   Q.   How were you attacked?

3   A.   I was attacked on Twitter.  I was attacked on Facebook I

4   was attacked in news blogs.  I was brutally attacked in

5   messages.  As I said, it was a new world.  I had left the world

6   of facts, a lovely world, and I was living in a new universe.

7   Q.   How quickly did those attacks happen, Ms. Carroll?

8   A.   Instantaneously.

9   Q.   And how did you know that those attacks were the result of

10  what Mr. Trump had said?

11  A.   Because many of the -- much of the wording that people used

12  repeated Donald Trump's words.

13  Q.   I'm going to show you for identification, Ms. Carroll, a

14  document that's been marked as Plaintiff's Exhibit 59.  And,

15  again, without divulging the contents, can you just identify

16  what this document is?

17  A.   Yes, this is a Facebook chat.

18  Q.   To whom was it addressed?

19  A.   To me.

20          MS. KAPLAN:  Plaintiff moves for the admission of 59,

21  your Honor.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 59 received in evidence)

24  Q.   Do you know the person who sent this to you, Ms. Carroll?

25  A.   No.

O1GQcar2                          Carroll - Direct

1   Q.  What is the date of this Facebook message?

2   A.  June 21, 2019.

3   Q.  What time was it sent?

4   A.  Six -- nine minutes after 6:00.

5   Q.  It says down there UTC minus four.  Do you know what that

6   means?

7   A.  It's a Universal Time.  This is New York.

8            THE COURT:  I'm sorry.  What is New York?

9            THE WITNESS:  Oh, because they put it at 6:09 p.m. and

10  they said that's using Universal, the Universal Time code or --

11  yeah.

12  Q.  Is it the same as Eastern Standard Time for practical

13  purposes?

14  A.  Yes, it's Eastern Time.

15  Q.  If we could do -- I won't do -- I will do very few of

16  these, but if they could put that, Mr. Termonfils, side by side

17  with Plaintiff's Exhibit 1.

18           So Plaintiff's Exhibit 1, the initial statement, was

19  made at what time on June 21, 2019?

20  A.  5:17.

21  Q.  And Plaintiff's Exhibit 59 that we just looked at is less

22  than an hour later, right?

23  A.  Yes.

24  Q.  And how do you know that Plaintiff's 59 was prompted by

25  Plaintiff's 1?

O1GQcar2                          Carroll - Direct

```
 1  A.  He's repeating that I'm a liar; that it didn't happen; that
 2  I'm -- that I only brought this accusation to promote a book.
 3          MS. HABBA:  Your Honor, I'm just going to object.  She
 4  is speculating.  The question was improper as to the mindset of
 5  the person.
 6          THE COURT:  It's a little late.  The objection is
 7  supposed to come before the answer, counsel.  And besides, it's
 8  harmless.  You can cross-examine.  Maybe the person just came
 9  up with it spontaneously.  You going to argue that?
10          MS. HABBA:  Thank you.
11          THE COURT:  Maybe it was a bolt of lightning.
12  Q.  Did you receive other messages like Plaintiff's 59 right
13  after Donald Trump started making the statements that we've
14  seen about you?
15  A.  Yes.  Hundreds.
16  Q.  I'm going to show you for identification purposes
17  Plaintiff's 40.  And, again, without divulging the contents,
18  tell me what type of document is this?
19  A.  This is an email.
20  Q.  To whom is it addressed?
21  A.  This is to my Ask E. Jean account.
22          MS. KAPLAN:  Move for admission of Plaintiff's 40,
23  your Honor.
24          THE COURT:  Received.
25          (Plaintiff's Exhibit 40 received in evidence)
```

O1GQcar2                        Carroll - Direct

1   Q.  You just mentioned this was an email sent to your

2   Ask E. Jean address?

3   A.  This is where people sent their problems to me or they sent

4   cheerful notices saying:  "E. Jean, I got the job.  Thanks a

5   lot."  Or "E. Jean, we're getting married finally thanks to

6   you."  Or they send me problems.  So it's one of my go-to

7   places that makes me feel great.

8   Q.  Just so I understand, Ms. Carroll, so some of the advice

9   that you would respond to in your column, you would get through

10  this email?

11  A.  Yes, this is where they all -- all the problems came into

12  this address.

13  Q.  And the person who sent it, Sports Justice --

14  A.  Yes.

15  Q.  -- do you have any idea who that person is?

16  A.  No.

17  Q.  And the date of this email, how does that relate, if at

18  all, to the statements made by Donald Trump?

19  A.  Well, it looks like this is June 22 -- it's early in the

20  morning.  So this -- yes.  Again, we see the lying.

21  Q.  I'm going to show you one more like this, Ms. Carroll,

22  Plaintiff's Exhibit 71.  Again, what type of document is this?

23  A.  This is a message on Facebook.

24  Q.  To whom was it sent?

25  A.  To me.

O1GQcar2                        Carroll - Direct

1          MS. KAPLAN:  Plaintiff moves for the admission of 71,

2     your Honor.

3          THE COURT:  It's received.

4          (Plaintiff's Exhibit 71 received in evidence)

5     Q.  And what is the date this message was sent, Ms. Carroll?

6     A.  This is the Monday, June 24, 2019.

7     Q.  Does the person who sent this message say anything that we

8     haven't seen in the prior messages?

9     A.  Yes.  He talks about how ashamed I should be for making up

10    a fake story because I make it so much harder on the true

11    victims of abuse.

12    Q.  Did Donald Trump say anything like that?

13    A.  Yes.

14    Q.  Before June 2019, Ms. Carroll, on your Ask E. Jean email

15    account that we just looked at, did you receive emails that

16    were critical of your column?

17    A.  Oh, yeah.

18    Q.  What kind of criticisms were they?

19    A.  Well, if I advised -- let's say I advised a husband how to

20    fight with his wife, not to let it get out of bounds, maybe the

21    husband's sister wrote in and said, "Listen, I gave him better

22    advice than you did and this is what I said."  So I tended to

23    like those because I became a better advice -- I learned a lot

24    from my correspondence because it kept me in line and would

25    always tell me that they're -- you know, they would give me

O1GQcar2                          Carroll - Direct

1    ideas about how to answer the next question better.

2    Q.  Before June 2019, Ms. Carroll, did you ever receive

3    messages like the three we just looked at on your Ask E. Jean

4    email account or anywhere else?

5    A.  Never.

6    Q.  How did receiving messages like this, Ms. Carroll, make you

7    feel?

8    A.  Well, I thought I -- I thought I had lost something very

9    important.  Here's the thing.  I understand that people have

10   lost a lot more than I have.  I understand that people have

11   been through a lot more than I have ever been through in my

12   life, but this laid me low.  It -- it was so unexpected from a

13   place where I felt that I was doing well in the world and

14   helping people.

15   Q.  Did the messages like this continue, Ms. Carroll?

16   A.  They've never stopped.

17   Q.  How often do you receive them?

18   A.  All the time.

19   Q.  When you say "all the time," every day?

20   A.  Yes.  Scores and scores, sometimes hundreds a day.

21   Q.  Do the messages that you have been receiving since

22   June 2019 share any common themes?

23   A.  Yes.

24   Q.  What are those themes?

25   A.  You're a liar.  You hurt victims.  You are ugly.  Those are

O1GQcar2                          Carroll - Direct

1   the -- they're like five areas, but those would be the first

2   three.

3   Q.  What about, do they say anything about your motivations for

4   coming forward?

5   A.  Oh yeah, to promote a --

6               MS. HABBA:  Objection.

7               THE COURT:  What's the objection?

8               MS. HABBA:  We were ordered not to discuss the

9   motivations.

10              THE COURT:  Sidebar.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  She said she's going to deal with it

3    differently, so it's mute.

4              MS. HABBA:  Can we strike that please, your Honor?

5              THE COURT:  Strike what?

6              MS. HABBA:  The question.

7              THE COURT:  We don't strike questions necessarily.

8              MS. HABBA:  She started answering, your Honor.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1GQcar2                          Carroll - Direct

1              (In open court)

2              THE COURT:  I will strike the witness's partial

3     answer.  The jury will disregard it.

4     BY MS. KAPLAN:

5     Q.  Ms. Carroll, let's start with messages calling you a liar.

6     I am going to show you a document again on the screen that's

7     been marked for identification as Plaintiff's Exhibit 66.

8     Again, if you could just say whether you recognize it?

9     A.  Yes, this is a Facebook chat.

10    Q.  To whom was it addressed?

11    A.  To me.

12             MS. KAPLAN:  Plaintiff moves for the admission of 66,

13    your Honor.

14             THE COURT:  Received.

15             (Plaintiff's Exhibit 66 received in evidence)

16    Q.  Who sent this, Ms. Carroll?

17    A.  A woman named Kathleen Woolard.

18    Q.  Do you know anyone by the name of Kathleen Woolard?

19    A.  No.

20    Q.  What are the dates on this document?

21    A.  June 22, 2019.

22    Q.  Are there any other dates?

23    A.  There's a second one and a third one in July 2019.

24    Q.  What does it mean that there are two or three separate

25    dates on there?

O1GQcar2                         Carroll - Direct

1  A.  It means that she wants me to receive this message and know

2  how ugly I am and what a liar I am.

3  Q.  Did you respond to this message, Ms. Carroll?

4  A.  No.

5  Q.  Now, you'll see, especially on the bottom one from July, it

6  talks about answering to God?

7  A.  Yes.

8  Q.  Did you get messages that talked about you answering to

9  God?

10  A.  Yes.

11  Q.  Can you explain?

12  A.  Well, they want God to punish me.  Not want God.  Know God.

13  They know God will punish me. Other people want the devil to

14  punish me.  It goes both ways.

15  Q.  I'm going to ask Mr. Termonfils to put up another document,

16  Ms. Carroll.  It's Plaintiff's 45 for identification.

17          Again, if you could just tell us what type of document

18  this is?

19  A.  This is an email.

20  Q.  To whom was it addressed?

21  A.  Ask E. Jean.

22          MS. KAPLAN:  Plaintiff moves for the admission of 45,

23  your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 45 received in evidence)

O1GQcar2                          Carroll - Direct

1  Q.  This is the same Ask E. Jean column we were talking about

2  before?

3  A.  Yes.

4  Q.  What's the date on here?

5  A.  June 23.

6  Q.  Is this person asking you for advice?

7  A.  No.  Quite the contrary, I remember this email because it

8  hurt my feelings because she said she wasn't going to ask me

9  for any advice.

10 Q.  Why did that hurt your feelings?

11 A.  My whole career, my whole reason for being a happy person

12 is I feel like I'm giving good advice and helping people.

13 Q.  Ms. Carroll, this email asked you how much George Soros

14 paid you to lie about president Trump.  Do you see that?

15 A.  Yes.

16 Q.  Do you know who George Soros is?

17 A.  Yes.

18 Q.  Who is he?

19 A.  He's a very rich old man.

20 Q.  Have you ever met George Soros?

21 A.  No.

22 Q.  Have you ever been to a party where George Soros was there?

23 A.  No.

24 Q.  Did George Soros pay you to lie about Donald Trump?

25 A.  No.

O1GQcar2                        Carroll - Direct

```
1    Q.  You see here also it says DNC, the three letters.  Do you
2    see that?
3    A.  Yes.
4    Q.  Do you know what that stands for?
5    A.  Democratic National Committee.
6    Q.  Do you know anyone who works at the Democratic National
7    Committee?
8    A.  No.
9    Q.  Do you know anyone who used to work at the Democratic
10   National Committee?
11   A.  No.
12   Q.  Did anyone from the DNC pay you to tell lies about Donald
13   Trump?
14   A.  No.
15           MS. KAPLAN:  Is there an objection, Ms. Habba?
16           MS. HABBA:  Yes, your Honor.  I just want to note that
17   now that they have opened the door, and she has denied getting
18   funding, I will be addressing this on cross.
19           THE COURT:  We'll see.
20           The last I heard, Ms. Habba, I do not need
21   announcements from counsel about what they intend to do.
22           MS. HABBA:  Okay.
23           THE COURT:  And I make the rulings here, not the
24   lawyers.  Just get that very clear in your mind, please.
25           MS. HABBA:  Okay, your Honor.  And they just asked her
```

O1GQcar2                         Carroll - Direct

1    a question.  She said she didn't get funding --

2              THE COURT:  Sit down.

3              MS. HABBA:  Okay.

4    BY MS. KAPLAN:

5    Q.  Now, when I first showed you this -- you can put it back

6    up, Mr. Termonfils, if you will, please.

7              When I first showed you this email, Ms. Carroll, you

8    said it particularly hurt your filings because they said they

9    wouldn't be asking you for advice, correct?

10   A.  Right.

11   Q.  Prior to June 2019, how many emails or letters would you

12   get from readers each month asking you for your advice?

13   A.  Around 200 a month.

14   Q.  Today, how many emails or letters do you get from readers

15   asking you for your advice?

16   A.  Around two letters a week.

17   Q.  So that's how many a month?

18   A.  Eight.

19   Q.  We're both very bad at math.

20             MS. KAPLAN:  This might be a good time, your Honor.  I

21   don't know when you wanted to have the morning break.  Is it

22   okay?

23             THE COURT:  Yes, it is.  15 minutes.

24             (Jury not present)

25             THE COURT:  Be seated folks.  Somebody had an

O1GQcar2                          Carroll - Direct

1   application?

2          MS. CROWLEY:  Yes.

3          Judge, Ms. Habba has now twice in front of the jury

4   made comments about things that your Honor has ruled are

5   clearly out of bounds.  The first is Ms. Carroll —- the fact

6   that Ms. Carroll has accused other men of sexual misconduct.

7   Ms. Habba said that twice when we were talking about the *New*

8   *York* magazine excerpt.

9          We sent all of our exhibits to the defense weeks ago.

10  If they had looked at them, they would have seen that that

11  exhibit was redacted.  There was no mention of any of the other

12  men who Ms. Carroll wrote about.

13         The second time was just now when Ms. Habba brought up

14  the fact that Ms. Carroll received funding in connection with

15  this case in front of the jury.  Obviously, that's totally

16  improper as your Honor has ruled.

17         I also just want to put on the record that in light of

18  your Honor's order and instructions to the parties yesterday,

19  Mr. Trump has been sitting at the back table and has been

20  loudly saying things throughout Ms. Carroll's testimony,

21  including things that she is saying are false and noting that

22  she seems to have now gotten her memory back.  It's loud enough

23  for us sitting up here to hear it.  I assume it's loud enough

24  for the jury to hear it.

25         THE COURT:  Ms. Habba?

1          MS. HABBA:  On the first issue, the *New York* magazine

2     excerpt, Ms. Kaplan brought that excerpt in.  It was not

3     redacted in the title which brought up prior men, which brought

4     up the underlying assault, and your ruling was from this

5     weekend which said that we were not -- or perhaps it was

6     Friday; we had several in the last 72 hours.  But that is why,

7     despite us having it, I objected, and you sustained it, your

8     Honor.

9          As to the second issue, they asked her if she had

10    funding.  She said no.  We know that she has funding.  How am I

11    supposed to sit here when they open the door, your Honor?

12    That's the issue.

13          THE COURT:  That wasn't the second issue.

14          MS. HABBA:  No, that was the issue, I believe.

15          THE COURT:  No, it was about Mr. Trump being vocal

16    within the hearing of the jury.  That's what I just heard.

17          MS. CROWLEY:  The second -- I believe, your Honor, the

18    second comment that Ms. Habba improperly made to the jury was

19    about funding.

20          I just want to make clear, we didn't ask Ms. Carroll

21    anything about whether she received funding in connection with

22    this lawsuit.  Ms. Kaplan asked her if when the comment was

23    made back in June of 2019 she had been paid by the DNC or

24    George Soros to tell lies about Mr. Trump.

25          MS. HABBA:  Your Honor, if --

O1GQcar2                         Carroll - Direct

1           THE COURT:  Go ahead.

2           MS. HABBA:  If they are going to ask questions that

3     open the door — this is how the rules work — my understanding

4     is that I can bring it up.  And I'm not going to ask about the

5     underlying men, but when you bring it up and ask her does she

6     have funding from Soros and DNC, but it's Reid Hoffman, how am

7     I supposed to bring that up?  It's their opening of the door,

8     your Honor.  Twice now they've violated your order.  They've

9     gotten into things they're not supposed to do.  I am going to

10    respond if they keep ignoring your order.

11          THE COURT:  When they have gone against my order, I

12    have stopped them, as you know.  I will consider what you've

13    said and we'll see what happens.

14          MS. HABBA:  Thank you, your Honor.

15          DEPUTY CLERK:  All rise.

16          (Recess)

17          THE COURT:  Before we bring in the jury, I'm just

18    going to ask Mr. Trump takes special care to keep his voice

19    down when he's conferring with counsel so that the jury does

20    not overhear it.

21          Let's get the jury.

22          (Continued on next page)

23

24

25

O1GQcar2                          Carroll - Direct

 1              (Jury present)

 2              THE COURT:  A little earlier Plaintiff's Exhibit 6 was

 3    received.  There was then an objection.  One page of it may

 4    have been exhibited to the jury.  I'm going to strike Exhibit 6

 5    now without prejudice to its being offered at a subsequent

 6    time, and the jury, unless it is received in evidence, will

 7    disregard it.

 8              MS. KAPLAN:  Thank you, your Honor.

 9              THE COURT:  Let's continue.  You may continue,

10    Ms. Kaplan.

11    BY MS. KAPLAN:

12    Q.  Mr. Termonfils, can you please put up for Ms. Carroll

13    Plaintiff's Exhibit 85.

14              Ms. Carroll, do you recognize the document in front of

15    you?

16    A.  Yes, it's a tweet.

17    Q.  And who posted the original tweet?

18    A.  I did.

19              MS. KAPLAN:  Your Honor, plaintiff moves for the

20    admission of Plaintiff's Exhibit 85.

21              THE COURT:  Received.

22              (Plaintiff's Exhibit 85 received in evidence)

23    Q.  Ms. Carroll, what is the date of the tweet here that you

24    posted?

25    A.  June 20, 2019.

O1GQcar2                        Carroll - Direct

1    Q.  How does that relate in time to Mr. Trump's statements?

2    A.  This is two days beforehand.

3    Q.  Just so the record is clear, let me make sure we have that

4    right.

5    A.  It's one day.  He made the statement June 21.  This is

6    June 20.

7    Q.  What is this tweet, what's it about?

8    A.  I'm offering advice.  That's a picture of Zelda Fitzgerald.

9    I'm saying the best way to deal with heartache is a 6,000-mile

10   road trip.

11   Q.  Is there a reply to your tweet, Ms. Carroll?

12   A.  Yes.

13   Q.  And when was the reply posted?

14   A.  June 21, 2019.

15   Q.  And is there anything in this reply, Ms. Carroll, in terms

16   of the statements about you that we haven't seen before?

17   A.  Pretty much hit all the high spots.

18   Q.  Does this reply tweet talk about your mental health?

19   A.  Yes.  Psychological messed up to lie about something to

20   draw sales to the book.

21   Q.  Is the theme you were psychologically messed up, is that a

22   theme that you saw in tweets in other messages that you

23   received?

24   A.  Continually.

25   Q.  How, if at all, Ms. Carroll, did the messages you received

O1GQcar2                          Carroll - Direct

1    following June 2019 comment on your appearance?

2    A.  Many.  Many.  Many commented on the way I look.

3    Q.  What kinds of things did they say?

4    A.  Oh, well, just I'm too ugly to go on living.

5    Q.  How did receiving messages like that make you feel?

6    A.  It makes it hard for a girl to get up in the morning,

7    really.  To put on some lipstick, I will avoid a mirror.  You

8    know, it makes me feel bad.  I know I'm old.  I know I'm 80.  I

9    know I'm not a pretty, young woman, but it makes it tough to

10   get on with the day when you open up to see what the breaking

11   news is, and people see you ugly, scrawny, hag, and so that's

12   not a good way to start the day.

13   Q.  Let's take a look -- if you could put up, Mr. Termonfils,

14   Plaintiff's Exhibit 43 for Ms. Carroll.

15        Ms. Carroll, what kind of a document is this?

16   A.  This is an email.

17   Q.  Was it sent to you?

18   A.  It's sent to my personal email.

19        MS. KAPLAN:  Plaintiff moves for the admission of 43,

20   your Honor.

21        THE COURT:  Received.

22        (Plaintiff's Exhibit 43 received in evidence)

23   Q.  Ms. Carroll, do you have any idea -- do you know the person

24   who sent this to you?

25   A.  No.

O1GQcar2                        Carroll - Direct

1    Q.  Do you have any idea how they got your personal email

2    account?

3    A.  No.

4    Q.  How does this compare to the other messages you receive

5    commenting on your appearance?

6    A.  This is different in that it's written in red in caps, but

7    it's pretty much like most of them.

8    Q.  One more of these, Mr. Termonfils.  If you could put up

9    Plaintiff's 118.

10             Again, Ms. Carroll, what type of document is this?

11   A.  This is a tweet.

12   Q.  Is there an image of you on this posted as part of this

13   tweet?

14   A.  Yes.

15             MS. KAPLAN:  Plaintiff moves for the admission of 118,

16   your Honor.

17   A.  I want to stipulate that I am on the left.

18             THE COURT:  It's received.

19             (Plaintiff's Exhibit 118 received in evidence

20   Q.  Now, did any of the messages you received, Ms. Carroll,

21   accuse you of being promiscuous?

22   A.  Yes.

23   Q.  I'm going to ask Mr. Termonfils to put up Plaintiff's

24   Exhibit 47.

25             What type of document is this, Ms. Carroll?

O1GQcar2                        Carroll - Direct

1    A.  This is an email.

2    Q.  To whom was it sent?

3    A.  To me at my Ask E. Jean address.

4           MS. KAPLAN:  Plaintiff moves for the admission of 47,

5    your Honor.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 47 received in evidence

8    Q.  What's the date of this email, Ms. Carroll?

9    A.  June 25, 2019.

10   Q.  In addition to yourself, was it sent to other people as

11   well?

12   A.  Yes.  It was sent to my publishing company and my agent.

13   Q.  Now, the person who sent this or the name of the person who

14   sent this is Sports Justice.  Do you see that?

15   A.  Yes.

16   Q.  Is that familiar?

17   A.  Yes.

18   Q.  Was there another message that we looked at already that

19   was sent by this person?

20   A.  Yes.

21   Q.  Mr. Termonfils, can you put up side by side Plaintiff's 40

22   and Plaintiff's 47.  Is 40 the other one sent by this person?

23   A.  Yes.

24   Q.  How did you feel -- focusing on 47, Ms. Carroll, how did

25   receiving messages like this make you feel?

O1GQcar2                          Carroll - Direct

1    A.  Horrible.  Horrible.

2    Q.  Now, we just looked at a number of messages, Ms. Carroll,

3    that I think is fair to say aren't pretty.  Apart from the

4    messages that we've seen, did you receive messages that were

5    even more upsetting than the kinds we've already looked at?

6    A.  Yes.

7    Q.  In what ways were they more upsetting?

8    A.  Well, they threaten to kill me.

9    Q.  How often did you receive messages threatening to kill you?

10   A.  Often enough.  I mean, often.

11   Q.  Let's go with the two groups.  Messages like the ones we

12   have been looking at up to now that did not contain any threats

13   of violence, how many messages like that do you think you've

14   received to this day?

15   A.  Oh, thousands.  Thousands.

16   Q.  And the new category that we're now talking about, messages

17   that threaten violence, how many messages like that do you

18   think you've received to this day?

19   A.  Hundreds.

20   Q.  When was the very first time, Ms. Carroll, that you recall

21   seeing a message threatening you with that?

22   A.  I remember almost the exact time.  It was around 11:30 on

23   the night of June 21.  I was in a very small, very cheap hotel

24   on Tenth Avenue.  I walked into the room.  I couldn't wait to

25   see the news and check out what was happening.  I had been

1  unconnected.  And the room was so small, there was no desk.

2  There was a board that you flapped down from the wall, so I

3  flapped the board down.  I put my computer on the board.  I

4  opened it up.  I immediately went to Twitter where I get

5  breaking news, and I saw:  "You lying whore.  You lying scag.

6  You lying slut.  You lying psycho.  You lying scumbag."

7          My brain just froze.  So to make myself feel good, I

8  went to my Ask E. Jean website thinking that I would feel

9  better if I could read some support.  And I opened it up, and,

10  yes, there was a really lovely email, you know, saying, "You go

11  girl."  And then I opened up the next Ask E. Jean letter, and I

12  looked at it, I read it, and I ducked.  Because the image of

13  what the person said caused me to believe that it was going to

14  happen right now.  I thought I was going to get shot.  And what

15  the hard part was, I couldn't get the curtain across the window

16  closed.  I was sitting in a room with an open window at 11:30

17  at night.  And it's -- when you see the words, the image comes

18  into my mind, and I believed it was happening right now.  So I

19  deleted the message to protect myself.  Then I stood up and

20  tried to get the curtain closed.  Couldn't do it.  I had

21  brought some jumpsuits in my bag.  I tried to hang them up over

22  the window.  And it was -- I had never dealt with anything like

23  that.

24  Q.  And I think as you were telling the story, Ms. Carroll, you

25  said it was June 21.  Is that June 21, 2019?

O1GQcar2                          Carroll - Direct

1    A.  Yes.

2    Q.  Did you get more than one -- was there more than one

3    message that night --

4    A.  Yes.

5    Q.  -- threatening you with violence?

6    A.  Yes.

7    Q.  And did you -- what did you do with the other messages?

8    A.  Two of them I remember, I immediately deleted because they

9    sent images.  One was a car accident with a very dead woman on

10   the pavement with some of her brains coming out her head.  She

11   had totally died in an accident.  And the other one was a woman

12   who had obviously been murdered, blood on her neck and her

13   chest.

14           MS. HABBA:  Objection, your Honor.  It's inflammatory.

15           THE COURT:  We'll strike the last sentence.

16           The question was:  "What did you do with the other

17   messages?"

18           THE WITNESS:  Yes, I deleted them.

19           MS. HABBA:  Thank you.

20   Q.  Why did you delete them, Ms. Carroll?

21   A.  When I see messages like that, it's -- my brain reacts, and

22   my body reacts.  Like it's going to happen right now.  And so

23   the heart races.  My pulse was up.  My senses heighten.  And in

24   order to get rid of that horrible feeling of the heart racing

25   and, you know, my -- I became hyperaware.  I just delete,

O1GQcar2                       Carroll - Direct

1    delete, delete.  It really helped me, you know, get control of

2    the situation.

3    Q.  What did you do for the rest of that night, Ms. Carroll?

4    A.  Well, probably -- I couldn't help myself, I went back to

5    Twitter.  I wanted to see, you know, if it was as bad as I

6    thought.  I also wanted to find some support.  I found

7    wonderful messages and support, and I spent pretty much the

8    rest of the night looking at the news, reading the horrible

9    things on Twitter, reading some bad messages on Facebook,

10   getting off Facebook.  I was just trying to acclimate to the

11   new world I was in, and I had to do it that night.  In about

12   six, seven hours I got acclimated.

13   Q.  Did you sleep a lot that night?

14   A.  I didn't sleep until the sun came up because of the window,

15   and I probably fell asleep around 6:00 or 7:00 in the morning.

16   Q.  I'm going to ask Mr. Termonfils to put in front of you,

17   Ms. Carroll, a document that's been marked for identification

18   as Plaintiff's 122.  And same thing, Ms. Carroll, can you just

19   say what kind of document this is?

20   A.  This is a Facebook message.

21   Q.  To whom was it addressed?

22   A.  To me.

23        MS. KAPLAN:  Plaintiff moves for the admission of 122,

24   your Honor.

25        THE COURT:  Received.

1              (Plaintiff's Exhibit 122 received in evidence)

2    Q.  Do you know the person who sent you this, Ms. Carroll?

3    A.  No.

4    Q.  And is this message typical of the kind of messages you

5    received threatening you with violence?

6    A.  No.

7    Q.  Why not?

8    A.  This is more, it's longer, more descriptive, in an odd way

9    more eloquent in the way they want me to die.

10   Q.  How do they want you to die?

11   A.  Stretched -- my neck stretched immediately after a quick

12   public trial.

13   Q.  Let me show you another one, Ms. Carroll.

14              Mr. Termonfils, can we put up in front of Ms. Carroll

15   plaintiff's 132.

16   A.  Oh.

17   Q.  Ms. Carroll, what kind of document do you have up in front

18   of you?

19   A.  This is a message.

20   Q.  Social media message?

21   A.  Yes.

22   Q.  To whom was it sent?

23   A.  To me.

24   Q.  Plaintiff moves for the admission of 132, your Honor?

25              THE COURT:  Received.

O1GQcar2                          Carroll - Direct

1              (Plaintiff's Exhibit 132 received in evidence)

2     Q.  Ms. Carroll, what's the date of this message?

3     A.  This is the day after the trial in -- last year.

4     Q.  And how does this person want you to die?

5     A.  I apologize to the people in the audience because when a

6     woman, particularly a woman sees the words, we can't help but

7     think of the image.  And so he wants me to stick a gun in my

8     mouth and pull the trigger.  And I imagine that many of us now

9     can picture that.

10    Q.  We talked about messages from readers that you received

11    prior to June 2019, Ms. Carroll.  Do you remember that?

12    A.  Yes.

13    Q.  Prior to June 2019, had any reader -- you can keep that up,

14    Mr. Termonfils -- had any reader accused you of being a

15    pedophile?

16    A.  No.

17    Q.  Had any reader accused you of being a child grooming

18    rapist?

19    A.  No.

20    Q.  Had any reader told you are were a satan-worshipping Nazi?

21    A.  No.

22    Q.  Mr. Termonfils, can you put up in front of Ms. Carroll the

23    document marked for identification as Plaintiff's 128.

24              Ms. Carroll, do you recognize -- can you say what kind

25    of document this is?

1    A.  Yes, this is a Facebook message.

2    Q.  To whom was it addressed?

3    A.  This is to me.

4            MS. KAPLAN:  Plaintiff moves for admission of 126.

5            THE COURT:  Received.

6            MS. KAPLAN:  I'm wrong.  128.  I'm wrong.

7            THE COURT:  128 is received, not 126.

8            (Plaintiff's Exhibit 128 received in evidence)

9    Q.  Ms. Carroll, was this message you're looking at now

10   different than some of the messages you received?

11   A.  Yes.

12   Q.  How and why?  Compound.  I object to my own question.

13   How was it different?

14   A.  This person wants me to know it's not himself who is

15   threatening me, but his friend wants to kill me and this man

16   cannot stop him.

17   Q.  If you could put up in front of Ms. Carroll — now I'm on

18   the right number, Mr. Termonfils — plaintiff's 126.

19           Before we get there, in addition to threats of killing

20   you, did you receive any other threats of violence?

21   A.  Yes.

22   Q.  What kind of violence?

23   A.  Raping.  Raping me.

24   Q.  Mr. Termonfils, if you could put up in front of Ms. Carroll

25   Plaintiff's 126, please.

1          Ms. Carroll, do you recognize this document?

2    A.   Yes, I do.

3    Q.   What type of document is it?

4    A.   This is a Facebook message.

5    Q.   To whom was it sent?

6    A.   Me.

7          MS. KAPLAN:  Plaintiff moves for the admission of 126,

8    your Honor.

9          THE COURT:  Received.

10         (Plaintiff's Exhibit 126 received in evidence.

11   Q.   What's the date on this one?

12   A.   This is one day after last year's trial.

13   Q.   What does this person want to have happen to you?

14   A.   Rape and murder.

15   Q.   Now, if you look below the main message, it says something.

16   What does it mean, the second paragraph?

17   A.   It means Jack Daniels Melissa tried to call me.

18   Q.   Did you ever speak to that person?

19   A.   No.

20   Q.   Mr. Termonfils, can you show Ms. Carroll Plaintiff's 114.

21         Ms. Carroll what type of document is this?

22   A.   This is an email to my Ask E. Jean.

23   Q.   What's the date?

24   A.   September 9, 2023.

25         MS. KAPLAN:  Plaintiff moves for the admission of 114,

O1GQcar2                          Carroll - Direct

```
 1    your Honor.

 2              THE COURT:  114 received.

 3              (Plaintiff's Exhibit 114 received in evidence)

 4    Q.  How many months after the trial was over -- we've just been

 5    looking at ones for May.  How many months later is this one?

 6    A.  Three and a half months -- four months.

 7    Q.  I'm going to show you two more, but I'm going to do them at

 8    once, Ms. Carroll, if you don't mind.

 9              Mr. Termonfils, can you put up in front of

10    Ms. Carroll — they're both short — Plaintiff's 124 and

11    Plaintiff's 130.  And maybe if you could go to the second page.

12              Ms. Carroll, do you recognize what these documents

13    are?

14    A.  Yes.

15    Q.  What are they?

16    A.  They're Facebook messages.

17              MS. KAPLAN:  Plaintiff moves for the admission of 124

18    and 130, your Honor.

19              THE COURT:  They're received.

20              (Plaintiff's Exhibits 124 and 130 received in

21    evidence)

22    A.  I'm sorry that people in the courtroom have to see this

23    picture.

24    Q.  Ma'am, I'm sorry to have to ask you about it, Ms. Carroll,

25    but when you got a message like these, how would you react?
```

O1GQcar2                        Carroll - Direct

```
 1   A.  I'm -- the image would flash into my mind.  I couldn't help
 2   but picture it.  I couldn't help but feel it was imminent.  The
 3   heart would, you know, constrict and start to pound, and it's
 4   funny, the body believes it's going to happen.  My brain knows
 5   it's just a picture, don't worry, but my body thinks something
 6   entirely different.  It feels like it's going to happen.
 7   Q.  So, Ms. Carroll, when we looked at some of the earlier
 8   messages talking about you being ugly or a liar, some of those
 9   were posted on public media sites?
10   A.  Yes.
11   Q.  The messages threatening violence are all sent to you
12   privately.  Is that correct?
13   A.  Yes.
14   Q.  Do you understand what the reason for that is?
15   A.  Well, they would be not allowed to put on public social
16   media these kinds of threats.
17   Q.  So we've seen some pretty horrible messages, Ms. Carroll,
18   and the question I have to ask is, why didn't you just delete
19   your social media account?
20   A.  Well, social media is my lifeblood.  It's where I'm
21   connected with my family and friends.  It's where I see -- you
22   know, I could watch my nephew win his swimming race.  I could
23   see my friend's sweater she knit.  And as a journalist, it's
24   where I publish my latest pieces.  It's where I read page.  My
25   favorite journalists are on social media.  It's where I see
```

O1GQcar2                              Carroll - Direct

1   breaking news.  To be a writer and not be on social media in

2   2024 would be to live in oblivion.

3   Q.  Is the same true for your Ask E. Jean email account?

4   A.  Yes.

5   Q.  Now, you ever come to regret, Ms. Carroll, coming forward

6   with what you said about Mr. Trump in light of these messages?

7   A.  Only momentarily.  I am very glad I took action.

8   Q.  Now, to reorient people, again without providing any

9   specifics, can you describe for the jury where you live?

10  A.  Yes.  I live in Upstate New York in the mountains in the

11  woods in a small cabin.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O1HsCAR3                          Carroll – Direct

1    BY MS. KAPLAN:

2    Q.  Is it remote where you live?

3    A.  Yes.

4    Q.  Do you live alone?

5    A.  Yes.  Well, with my dogs.

6    Q.  And since you started getting messages like these, what, if

7    any, steps have you taken to protect yourself?

8    A.  Well, I have a pit bull, rescue.  He's a great dog, but I

9    never, never had him off the leash.  When the first threats

10   came in, I let him off the leash, and he now patrols the place,

11   I must say, very eagerly and enthusiastically.

12   Q.  And how do you make sure that he stays on your property?

13   A.  Put in an electronic fence.

14   Q.  And what other steps have you taken?

15   A.  I alerted the neighbors to be on the watch and I bought

16   bullets for the gun I had inherited from my father.

17   Q.  Where do you keep that gun?

18   A.  By my bed.

19   Q.  Are there any steps you take, Ms. Carroll, when you're

20   driving?

21   A.  There is hardly a moment in the day when I don't take steps

22   to be aware of what is going on.  Driving, I watch before I

23   pull out of my driveway.  I pay attention to everything going

24   on around me, who is behind me, who is in front of me.  I am

25   hyperalert.

O1HsCAR3                          Carroll - Direct

1    Q.  What about when you run errands?

2    A.  Yes.  Choosing a parking place, looking to see who's

3    around, looking to see if I should open the car door, should I

4    drive on, doing the errand.  And then, on the way home, making

5    sure nobody is following me.  If a car turns into my road

6    behind me, I never stop at my house.  I drive to the end of it,

7    to the road.

8    Q.  Have there been any instances where you changed your

9    behavior because of these security concerns you have?

10   A.  I change direction a lot.  There was also a time at the

11   grocery, I had parked in a really safe space.  I had gone to

12   the grocery.  I had done two weeks' worth of shopping.  I had

13   the cart filled to the brim.

14          I'm on the way out to my car with the cart, and I see

15   a man leaning against my car like this, he was wearing a brown

16   shirt and brown pants, waiting for me.  So I backed up with my

17   cart and went back in the grocery and stood behind the wall and

18   watched for him to leave.  And as soon as he walked away and I

19   hadn't seen him anyplace else, then I quickly exited the store,

20   got in my car, and drove home.

21          When I arrived in the driveway and opened my car door,

22   I discovered I had left my entire cart of groceries in the

23   grocery store.  That's how hyperalert I am.  I was way more

24   attentive to my surroundings than I was to the food I had just

25   bought.

O1HsCAR3                          Carroll - Direct

1   Q.  Have the security measures that you have been talking

2   about, Ms. Carroll, have they been effective?

3   A.  Yes.

4   Q.  Do you have personal security with you at this trial?

5   A.  Yes.

6   Q.  Did you have personal security with you at the last trial?

7   A.  Yes.

8   Q.  Have you thought about having personal security with you

9   more often?

10  A.  Many times.

11  Q.  Why don't you?

12  A.  I can't afford it.

13  Q.  Did you report any of the threatening messages you received

14  or others that you may have received, did you report any of

15  them to the police?

16  A.  No.

17  Q.  Why not?

18  A.  I would be reporting stuff to the police -- I wouldn't do

19  it.  It wouldn't do any good.

20  Q.  Why wouldn't it do any good?

21  A.  There is nothing they can do about it.

22  Q.  Ms. Carroll, any of the messages that we looked at today or

23  any other messages like them, threatening you with violence,

24  did you share any of those messages with your friends?

25  A.  No.

O1HsCAR3                        Carroll - Direct

1    Q.  Why not?

2    A.  I would not want my friends to see them.  I would not want

3    them to be scared for me.  They already look at me with pity in

4    their eyes that I had accused the president of the United

5    States.  They felt sorry for me, and it would cause them pain,

6    pain to worry about me.  There is nothing they can do about it.

7           So the kind thing is, no.  Um, I maintain my cheerful

8    attitude.  Also, they are aware of them.  Sometimes my family

9    calls me that they've seen something.  My friends see the

10   threats.  Um, we don't talk about it.

11   Q.  Ms. Carroll, who is Lisa Birnbach?

12   A.  Lisa Birnbach is a well-known journalist, humor writer,

13   television correspondent.  She's the author of eight or ten

14   books, and she is my very good friend.

15   Q.  How long have you known her?

16   A.  33 years.

17   Q.  I'm going to ask Mr. Termonfilis to put up in front of you

18   a document that's been marked as Plaintiff's 135.

19          Do you recognize this, Ms. Carroll?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a text between Lisa and myself.

23   Q.  What's the date?

24   A.  On the top, it's 6/22.

25          MS. KAPLAN:  Plaintiff moves for the admission of 135,

 1    your Honor.

 2              THE COURT:  Received.

 3              (Plaintiff's Exhibit 135 received in evidence)

 4    Q.  Ms. Carroll, where were you, where were you when you were

 5    having this text exchange with Ms. Birnbach?

 6    A.  I was in that little hotel room with the open window.

 7    Q.  And you see that in these texts, looking at the second one

 8    down, you say to Ms. Birnbach you slept until noon.

 9              Do you see that?

10    A.  Yes.

11    Q.  Is that correct?

12    A.  I did sleep until noon.

13    Q.  Why?

14    A.  Well, I had been up all night with the handling the Twitter

15    thing and the death threats.  I had not -- I hadn't fallen

16    asleep until early that morning.

17    Q.  And you also say in that line to Ms. Birnbach, I'm fine as

18    wine.

19              Do you see that?

20    A.  Yes.

21    Q.  Was that true?

22    A.  No.

23    Q.  Why did you say that?

24    A.  I always say I'm fine.  That is what I say when people ask

25    me how I am.  I say I'm fine.

1  Q.  Do you remember at the first trial, Ms. Carroll, talking

2  about the difference between the public E. Jean and the private

3  E. Jean?

4  A.  Yes.

5  Q.  Can you please explain that to the jury?

6  A.  Well, public E. Jean is the cheerleader, the buoyant

7  indestructible old lady who advises people on how to be happy

8  and who just knows everything and is always your best friend

9  and she will cheer you on.  When I'm out in public or with my

10 friends, that's who I am.

11         There is the private E. Jean who is, um, quiet.  She

12 feels sometimes pain.  I like the private E. Jean.  She and I

13 are becoming better and better acquainted.

14 Q.  Ms. Carroll, do you recall that you gave a second

15 deposition in your other case following Mr. Trump?

16 A.  Yes.

17 Q.  And that you were deposed by Ms. Habba?

18 A.  Yes.

19 Q.  Do you recall that she asked you questions about this text

20 with Ms. Birnbach?

21 A.  Not specifically, but yes.

22 Q.  Does it refresh your recollection, Ms. Carroll, that in

23 that deposition you said that, in that text when you said fine

24 and wine, you were being accurate with Ms. Birnbach?

25 A.  I guess I did, yes.

O1HsCAR3                          Carroll - Direct

1    Q.  How do you explain that?

2    A.  I don't think I was aware of the date.  I think I was

3    confused.  I didn't -- I didn't put it together that this was

4    on the 20 -- this was -- yeah.  This was the night I hadn't

5    slept, got up early in the morning.

6    Q.  And, again, just so the record is clear, Ms. Carroll, on

7    the morning of June 22, were you fine as wine?

8    A.  As I say, I always answer that.  But I was in a -- I didn't

9    look at the time.  I couldn't put it together.

10   Q.  I'll show you another document marked for identification as

11   Plaintiff's 136.

12            Do you recognize this document, Ms. Carroll?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is a text with Carol Martin, Carol Martin's daughter

16   Courtney, and myself.

17   Q.  And who is Carol Martin?

18   A.  Carol Martin was the pioneer of breakthrough, black

19   newswoman, anchorwoman who set -- who broke a lot of ceilings

20   in New York.

21            MS. KAPLAN:  And plaintiff moves for the admission of

22   136, your Honor.

23            THE COURT:  Received.

24            (Plaintiff's Exhibit 136 received in evidence)

25   Q.  Ms. Carroll, what's the date of this text?

1  A.  June 27th.

2  Q.  So it's just a few days after the night of the hotel,

3  correct?

4  A.  Yes.

5  Q.  And do you see how in this text you say there are not major

6  security concerns for me?

7  A.  Yes.

8  Q.  Was that true?

9  A.  I wanted them to believe it because I didn't want them to

10  worry.  Because Courtney is worried about her little

11  two-year-old child, and I didn't think Courtney had any worries

12  about a two-year-old child.

13  Q.  Ms. Carroll, when was the first time that you publicly

14  revealed that you had been receiving -- that you have received

15  death threats?

16  A.  At the last trial in May.

17  Q.  Now, after the excerpt from your book was published -- I'm

18  switching gears.  Sorry.

19        After the excerpt from your book was published in

20  New York Magazine, did you do anything to promote your book?

21  A.  Yes.  That was my duty.  When you write a book, you want to

22  promote the book, because you want people to hear about it and

23  you want them to buy it.

24  Q.  So what did you do to promote it?

25  A.  I did four television interviews.

O1HsCAR3                        Carroll - Direct

1    Q.  Did you also give print interviews?

2    A.  Yes, I did print interviews.

3    Q.  Did you appear on podcasts?

4    A.  I believe I appeared on four or five podcasts.

5    Q.  On those TV interviews, print interviews, podcasts, what

6    did you talk about?

7    A.  The journalist interviewing me wanted to hear about

8    president Trump, so I answered their questions.  I quickly saw

9    that the book was not selling.  I wanted to talk about the rest

10   of the book, because I thought that was pretty interesting what

11   women really thought about men.  So I tried to talk about that,

12   but mainly it was centered on the president.

13   Q.  I'm showing you a document that's been marked as

14   Plaintiff's Exhibit 145.

15            Without revealing the substance, do you recognize

16   this?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's a Vanity Fair interview.

20   Q.  With who?

21   A.  Keziah Weir.

22   Q.  Who is Keziah Weir interviewing?

23   A.  Myself.

24            MS. KAPLAN:  Plaintiff moves for the admission of 145,

25   your Honor.

O1HsCAR3                          Carroll - Direct

1              THE COURT:  Received.

2              (Plaintiff's Exhibit 145 received in evidence)

3    Q.  What's the date of this interview, Ms. Carroll?

4    A.  The interview was -- this is the publishing date.  The

5    interview was slightly before this.

6    Q.  What's the publishing date?

7    A.  June 28.

8    Q.  So how does this relate in time to that night in the hotel

9    room in New York City?

10   A.  It's between those two.

11   Q.  After the night in the hotel?

12   A.  Yes.

13   Q.  And who -- I think you mentioned it already.

14              Who conducted this interview?

15   A.  Keziah Weir.

16   Q.  Is that someone you knew?

17   A.  Yes.  He worked together at Elle, and now she was at Vanity

18   Fair.

19   Q.  You see in the headline, Ms. Carroll, I think it's also at

20   page six of 17 -- put up page six of 17 as well -- you're asked

21   that you've been living a private life and then now you're in

22   the public eye.  What's that like?  You say fabulous.  Buoyant.

23              Do you see that?

24   A.  Yeah.

25   Q.  Why did you say that?

O1HsCAR3                     Carroll - Direct

1   A.  That's E. Jean, fabulous and buoyant.

2   Q.  You also say in here that you don't read Twitter now and

3   you've been off it.

4              Do you see that?

5   A.  Oh, yes.

6   Q.  What was the reason for that?

7   A.  Well, I -- that horrible night.  I stopped looking at it.

8              MS. KAPLAN:  If we could put up for Ms. Carroll,

9   Mr. Termonfilis, Plaintiff's Exhibit 158.

10  Q.  Again, Ms. Carroll, can you just say what this is?

11  A.  This is an interview with USA Today.

12  Q.  Who gave the interview?

13  A.  I gave the interview.

14             MS. KAPLAN:  Plaintiff moves for the admission of 158,

15  your Honor.

16             THE COURT:  Received.

17             (Plaintiff's Exhibit 158 received in evidence)

18  Q.  Ms. Carroll, where is this in the timeline we've been

19  talking about, this interview?

20  A.  It's July 3rd, 2019.

21  Q.  And the last one was end of June, as I recall?

22  A.  Pardon?

23  Q.  The last one we looked at was end of June?

24  A.  Yes.  This was the day the book was actually published, I

25  believe.

O1HsCAR3                         Carroll – Direct

1   Q.  You see here it says that this moment is probably one of

2   the most carefree and happy times of my life, and that you've

3   been in a cocoon of love and support?

4   A.  Yes.

5   Q.  I have to ask you to explain that one too, Ms. Carroll.

6   A.  That is the image I am presenting to the world.  If I

7   actually did an interview, if private E. Jean would talk to one

8   of these interviewers and said, My God, you should see the, you

9   know, actually said what was going on, it would not have been

10  good for me or for anybody else.

11  Q.  I'm showing you what's been marked for identification as

12  Plaintiff's 138.

13          Do you recognize this, Ms. Carroll?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's a recording, a transcript of a recording of a podcast.

17  Q.  Who was on the podcast?

18  A.  Maris Kreizman and myself.

19          MS. KAPLAN:  Plaintiff moves for the admission of 138,

20  your Honor.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 138 received in evidence)

23  Q.  Who is Maris Kreizman?

24  A.  She is well-known book reviewer.  She has a podcast about

25  books.

O1HsCAR3                           Carroll - Direct

1    Q.  This is going to start to seem familiar, Ms. Carroll.

2               If you look at the second page.  You say that you're

3    fabulous?

4    A.  Yes.

5    Q.  You're receiving lots of support and lots of love?

6    A.  Remember, Ask E. Jean always, always says take action,

7    stays upbeat.  As my parents said, look on the sunny side, and

8    that's how I am in official interviews.

9    Q.  Were you -- you were receiving -- withdrawn.

10              Were you receiving support, Ms. Carroll?

11   A.  Oh, yes.  Wonderful, really wonderful support.

12   Q.  Were you also receiving death threats, Ms. Carroll?

13   A.  Yes.

14   Q.  I'm going to show you what's been marked for identification

15   as Plaintiff's 139.

16              If you could just tell me what this is?

17   A.  Yes.  This is a photograph.  I personally put it on

18   Instagram.

19              MS. KAPLAN:  Plaintiffs move for the admission --

20   Q.  Is the photograph of you, Ms. Carroll?

21   A.  Yes.

22              MS. KAPLAN:  Plaintiff moves for the admission of 139.

23              THE COURT:  Received.

24              (Plaintiff's Exhibit 139 received in evidence)

25   Q.  Ms. Carroll, what's going on here?

O1HsCAR3                     Carroll - Direct

1   A.   I'm leading a walking tour of New York.

2   Q.   What was the working tour?

3   A.   Walking tours are great in New York City.  You can take a

4   Harlem Renaissance walking tour and walk in the footsteps of

5   Duke Ellington and Marcus Garvey or you can go on a tour and

6   see where world-famous writers lived.  You see where Edgar

7   Allen Poe wrote --

8             THE COURT:  Ms. Carroll, I'm sorry.  I'm going to

9   strike the answer.  Can you come back and answer the question

10  you were asked.

11            What was the walking tour?

12  A.   The walking tour was, I led a group through six blocks of

13  Midtown, and the topic was we visited the buildings where

14  powerful men mistreated women.

15  Q.   About how many of those walking tours did you do?

16  A.   Six or seven.

17  Q.   Did you charge for them?

18  A.   No.  My -- I said women had been underpaid for

19  10,000 years, you get this one for free.

20  Q.   And where is this photo particular photo being taken?

21  A.   This is in front of Trump Tower.

22  Q.   You've heard testimony, Ms. Carroll, from you about your

23  security concerns and the threats you received.

24            How do you square that with this photo of you, it

25  looks like you're smiling on the streets of Midtown Manhattan?

O1HsCAR3                          Carroll - Direct

1   A.  I feel very secure walking around Midtown.  First of all,

2   in this photo, there are pictures of two police cars and three

3   police people.  New York, to me, Midtown is one of the safest

4   places on earth.

5   Q.  Ms. Carroll, how did you get the idea to bring these cases

6   against Donald Trump?

7   A.  Um, it was not something that I ever dreamed of ever doing.

8   But starting, um, on June 22, June 21st, people would say, Are

9   you going to sue him?

10          That is such an unusual question for me.  I've never

11  been in a courtroom.  I have never thought of -- I don't know

12  anything about the law.  And so, um, the idea was in my head.

13          And then I ran into George Conway at a party.

14  Q.  Who is George Conway?

15  A.  He was once a republican attorney.  Now he's an independent

16  attorney.

17  Q.  And what did he say to you at the party?

18  A.  He said -- he took me aside.  He had an iPad and he

19  explained to me the difference between a criminal case and a

20  civil case.  I was that innocent.  I didn't know the

21  difference.  And he took me through the steps.

22          And at the end of the explanation he said, If you

23  would like an attorney, I can suggest someone.  And I said,

24  Well, thank you, George.  At a party, when somebody says

25  listen, I'll e-mail you, I'll send you -- they rarely follow

O1HsCAR3                          Carroll - Direct

1    up.  I didn't expect to hear from George Conway.

2            And yet, a day later, he sent me an e-mail with a

3    recommendation.

4    Q.  Who was that recommendation for?

5    A.  It was yourself, Robbie Kaplan.

6    Q.  Now, how long have these cases been going on, Ms. Carroll,

7    at this point?

8    A.  Over four years.

9    Q.  And I take it, over four years of time, there have been

10   developments in the cases?

11   A.  We were in four different courtrooms.  Four different

12   courtrooms.

13   Q.  So there have been arguments in court?

14   A.  Yes, many.  Yes.

15   Q.  Did you get to see some of the arguments in court?

16   A.  Yes.  Yes, I got to see arguments.  When the pandemic hit,

17   I was able to listen to oral arguments.  I've been very

18   involved in all the cases.  They are very confusing.

19   Q.  Did you ever invite friends to watch arguments with you?

20   A.  Yes.

21           MS. KAPLAN:  If you can put up, Mr. Termonfilis,

22   Plaintiff's 159.

23   Q.  Ms. Carroll, what is 159?

24           Again, just identify what it is.

25   A.  This is a photograph.

O1HsCAR3                          Carroll - Direct

1   Q.  Are you in the photograph?

2   A.  Yes.

3           MS. KAPLAN:  Plaintiff moves for the admission of 159.

4           THE COURT:  It's received.

5           (Plaintiff's Exhibit 159 received in evidence)

6   Q.  Ms. Carroll, can you please explain to the jury what is

7   going on in this photograph?

8   A.  We were on the Empire State Building about to go to your

9   office and listen to Joshua Matz argue in front of the Second

10  Circuit Court of Appeals.

11  Q.  Now, Ms. Carroll, during the four years that your cases

12  have been pending, have you had occasion to talk about them

13  publicly?

14  A.  Yes.  My philosophy of life is take action, so yes.

15          MS. KAPLAN:  Could you show, Mr. Termonfilis,

16  Plaintiff's Exhibit 140 to Ms. Carroll.

17  Q.  Ms. Carroll, what is this?

18  A.  This is my personal website, *EJeanCarroll.com*.

19          MS. KAPLAN:  Move for the admission of 140, your

20  Honor.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 140 received in evidence)

23  Q.  Ms. Carroll, you see in this document you're posting an

24  article and you reference your case?

25  A.  Yes.

O1HsCAR3                    Carroll - Direct

```
 1   Q.  Why would you put something like this on your website?
 2   A.  Well, because Donald Trump called me a liar.  I felt that I
 3   really had to keep people updated on what was really going on
 4   and to inform them.
 5   Q.  Ms. Carroll, after the jury verdict in the last trial, did
 6   you do interviews?
 7   A.  Yes.
 8   Q.  Why?
 9   A.  We won and we wanted to tell the world.
10   Q.  What shows did you go on?
11   A.  We went on five shows.  Five -- four morning shows and an
12   evening show.
13   Q.  Were you on those shows alone?
14   A.  No.  I went with you.
15           MS. KAPLAN:  Mr. Termonfilis, if you can show
16   Ms. Carroll Plaintiff's 162.  I think it's a two-page document.
17   Q.  Ms. Carroll, what are you looking at?
18   A.  I'm looking at you and me on -- we were very happy.  Very
19   happy.
20           MS. KAPLAN:  Plaintiff moves for the admission of 162,
21   your Honor.
22           THE COURT:  Received.
23           (Plaintiff's Exhibit 162 received in evidence)
24   Q.  If you can tell the jury now, what are these photographs
25   of, Ms. Carroll?
```

O1HsCAR3                          Carroll - Direct

```
1    A.   This is you and me on CNN and you and me on Rachel Maddow.

2    Q.   When were these interviews given in time?

3    A.   The day after we won.

4    Q.   What do you talk about during these interviews?

5    A.   We talked about holding Donald Trump liable for his lies.

6    Q.   During the trial, Ms. Carroll, the first trial, was there a

7    hullabaloo of getting you in and out of the courthouse?

8    A.   Yes.

9    Q.   And -- withdrawn.

10            MS. KAPLAN:  I'm going to put up, have Mr. Termonfilis

11   show you Plaintiff's 161.

12   Q.   Do you recognize 161, Ms. Carroll?

13   A.   These are photographs taken outside the courtroom.

14   Q.   Is this during the first trial?

15   A.   Yes.

16            MS. KAPLAN:  Plaintiff moves for the admission of 161,

17   your Honor.

18            THE COURT:  Received.

19            (Plaintiff's Exhibit 161 received in evidence)

20   Q.   Now, Ms. Carroll, at this same time you were going in and

21   out of court for the first trial, were you also receiving the

22   kind of messages we looked at earlier?

23   A.   Yes.

24   Q.   At the same time, people were holding these posters of

25   support?
```

O1HsCAR3                          Carroll - Direct

1    A.  Yes, yes.

2    Q.  Were people holding negative messages?

3    A.  Yes.

4    Q.  Ms. Carroll, do you recall Ms. Habba in her opening

5    yesterday talked about a documentary?

6    A.  Yes.

7    Q.  Did you agree to do a documentary with anyone?

8    A.  Yes.

9    Q.  With whom?

10   A.  Ivy Meeropol.

11   Q.  I think, Ms. Carroll -- I apologize if I'm wrong -- I think

12   there was some indication in the opening you paid for the

13   documentary.

14           Did you pay for the documentary?

15           MS. HABBA:  Objection.

16           THE COURT:  What's the objection?

17           MS. HABBA:  I did not indicate that.  That's a

18   misrepresentation.

19           MS. KAPLAN:  Let me withdraw the question, your Honor.

20           THE COURT:  Yes, that will solve it.

21   BY MS. KAPLAN:

22   Q.  Ms. Carroll, did you pay anyone to do a documentary of you?

23   A.  No.

24   Q.  Have you received any money for a documentary about you?

25   A.  No.

O1HsCAR3                          Carroll – Direct

1   Q.  What is the status, if any, of the documentary about you?

2   A.  As soon as we began entering the phase of preparing for the

3   first trial, all filming and all producing stopped.

4   Q.  I want to shift gears again and focus on some statements

5   made by Mr. Trump after you sued him.

6          OK.  My very smart colleague just reminded me to ask

7   you this, Ms. Carroll.  The documentary that you had discussed

8   with Ms. Meeropol, what was the subject of it?

9   A.  It was a documentary about a woman finding her voice at 70

10  or 80 years old and finally speaking up.

11  Q.  Was it limited only to your issues with Mr. Trump's

12  statements?

13  A.  No, no.  It started at childhood on.

14  Q.  I'm going to ask Mr. Termonfilis to show you a document

15  that's been marked for identification as Plaintiff's 4.

16          Do you recognize this document, Ms. Carroll?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is a statement that Donald Trump put on Truth Social.

20          MS. KAPLAN:  Move for the admission of 4, your Honor.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 4 received in evidence)

23  Q.  Ms. Carroll, what is Truth Social?

24  A.  It is a social network.

25  Q.  Does it have any connection to Mr. Trump?

1    A.  Yes.  I believe he has something to do with the company

2    that owns it.  I'm not sure.

3    Q.  There is a photo here.

4            Who is the photo of?

5    A.  That's -- that is myself.

6    Q.  And what is the date of this post?

7    A.  It was October 12, 2022.

8    Q.  And what did you do after Mr. Trump made this statement?

9    A.  Well, I had thought that I was starting to regain a bit of

10   my believability.  I had started a new Substack.  I had

11   relaunched Ask E. Jean.  I was clawing my way up --

12           THE COURT:  Ms. Carroll, I'm going to strike the

13   answer and ask you to go back to the question, which is, what

14   did you do after he made this statement?

15   A.  Ah, I don't remember what I did right after.

16   Q.  Was this statement, does this statement have anything to do

17   with your last trial?

18   A.  Yes, this did.

19   Q.  And what was the relationship between this statement and

20   your last trial?

21   A.  This statement was why I sued him in the last trial.

22   Q.  And you were talking about a moment ago how -- what your

23   reaction was to the statement.

24           If you could, just briefly, Ms. Carroll, tell us how

25   you reacted when you saw this statement?

O1HsCAR3                        Carroll - Direct

```
 1              MS. HABBA:  Objection.

 2              THE COURT:  On what ground?

 3              MS. HABBA:  This was the last trial, your Honor.

 4              THE COURT:  I heard that part.

 5              MS. HABBA:  Right.

 6              So we're not going into damages relating to this

 7    statement in this trial.

 8              THE COURT:  There are no damages, no compensatory

 9    damages, sought with respect to this statement, and the jury

10    should follow that direction from me.

11              The witness may answer the question.

12              MS. KAPLAN:  Thank you, your Honor.

13    A.  Well, I had found my footing.  I had relaunched Ask E.

14    Jean.  I was feeling that, wow, I can do this, I can get back

15    my credibility, was publishing on Substack.  And boom.  This

16    statement by the president, calling me a con job and a hoax,

17    knocked me down again.

18    Q.  Now, did the jury verdict at the first trial, Ms. Carroll,

19    fix your reputation?

20    A.  Pardon me?

21    Q.  Did the jury verdict in your favor at the first trial, did

22    that solve the problems with your reputation?

23    A.  For a few minutes that day, I felt relief.  I thought,

24    good.  Now, at last, I can start to get my reputation back.

25    And that did not happen.
```

1   Q.  Why not?

2   A.  24 hours after the verdict upholding Donald Trump liable

3   for the lies, he went on CNN Town Hall --

4           MS. HABBA:  Objection.

5           THE COURT:  What's the objection?

6           MS. HABBA:  Your Honor, again --

7           THE COURT:  Not a speech.

8           What's the objection?

9           MS. HABBA:  Irrelevant to this case.

10          THE COURT:  Overruled.

11          Folks, there is no claim for compensatory damages with

12  respect to what happened the next day.  It is nonetheless

13  relevant because you have before you the issue of punitive

14  damages to decide, which involve deterrence, among other

15  factors, and also the question of whether Mr. Trump acted at

16  relevant times with malice, which I'll define for you later.

17          MS. KAPLAN:  I don't know.  I think we got interrupted

18  mid answer.  Would the court reporter mind reading back where

19  Ms. Carroll was?

20          THE COURT:  The question was, why not?

21  BY MS. KAPLAN:

22  Q.  Why not?

23          Why wasn't your reputation fixed as a result of the

24  jury verdict?

25  A.  For those few glorious hours, I thought it was.  I thought

1   this is it.  And 24 hours later, Donald Trump went on CNN Town

2   Hall and repeated the same lies.

3   Q.  Before we get there, Ms. Carroll, I'm going to ask

4   Mr. Termonfilis to show you a document that's been marked as

5   Plaintiff's 96.

6           Do you recognize this document, Ms. Carroll?

7   A.  Yes.

8   Q.  What is it?

9   A.  This is a post by Donald Trump on Truth Social.

10  Q.  Does it relate to you?

11  A.  Yes.

12          MS. KAPLAN:  Plaintiffs move for the admission of 96,

13  your Honor.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 96 received in evidence)

16  Q.  Now, what is the date of this post, Ms. Carroll?

17  A.  May 9th.  This is the day of the trial.

18  Q.  And just answer specifically my question.

19          Do you remember when the jury reached this verdict

20  that day?

21  A.  Early afternoon.  I think a little after three p.m.

22  Q.  And so this is just a few hours later?

23  A.  Yes.

24  Q.  And is there anything -- we've looked at a lot of

25  statements by Mr. Trump already, Ms. Carroll.

O1HsCAR3                         Carroll - Direct

1        But is there anything new in this one?

2   A.  Yes.

3   Q.  What's new?

4   A.  This is his first post about a witch hunt.

5   Q.  Now, in addition to the post we just saw -- withdrawn.

6        MS. KAPLAN:  Let me try it this way.  Mr. Termonfilis,

7   can you please show Ms. Carroll Plaintiff's 146.

8   Q.  Ms. Carroll, again, without divulging any substance, can

9   you please tell me what 146 is?

10  A.  It's a video on Truth Social posted by Donald Trump.

11  Q.  Hold on.

12       Was a video posted by Donald Trump at the time of this

13  document?

14  A.  Yes.

15       MS. KAPLAN:  May I approach the witness, your Honor?

16       THE COURT:  Yes.

17  Q.  Ms. Carroll, I'm handing you a document.

18  A.  Yes.

19  Q.  It's not a document, it's a disk.

20  A.  Yes.

21  Q.  Now, this is Plaintiff's Exhibit 97?

22  A.  Yes.

23  Q.  And I'm also going to have Mr. Termonfilis put up 97-T.

24       Do you have that in front of you?

25  A.  Yes.

O1HsCAR3                        Carroll - Direct

1    Q.  Did you watch the video that's in your hands that I'll

2    represent is the video in Plaintiff's 146?

3    A.  Yes.  I watched the video and read along with the

4    transcript.

5    Q.  Is that transcript an accurate reflection of what was on

6    that video?

7    A.  Yes.

8              MS. KAPLAN:  Move for the admission of 146, 97, and

9    97-T, your Honor.

10             MS. HABBA:  Sorry.  It's not necessarily an objection,

11   your Honor, but we will be -- I just want to be clear.

12             THE COURT:  If it's an announcement --

13             MS. HABBA:  No.

14             THE COURT:  Excuse me.  If it's not an objection, it's

15   out of order.

16             MS. HABBA:  Objection.  The entire video should be

17   submitted.

18             MR. TRUMP:  And played.

19             MS. HABBA:  And played.

20             THE COURT:  Nobody has proposed anything else yet, so

21   please sit down and see what happens.

22             Plaintiff's 96 is received, Plaintiff's 97 is

23   received, Plaintiff's 97-T, the transcript, is received.

24             (Plaintiff's Exhibits 96, 97, and 97-T received in

25   evidence)

1          Members of the jury, the transcript is just a

2     transcript.  The evidence is the video.  That's what controls,

3     your view of what happened on that occasion.  If there is any

4     discrepancy between the transcript and the video, it's the

5     video that controls.

6     BY MS. KAPLAN:

7     Q.  Now, Ms. Carroll, looking at 146, when was this video

8     posted on Truth Social?

9     A.  The day after the trial.

10    Q.  At what time?

11    A.  Very early in the morning.

12         MS. KAPLAN:  Let's watch the video.  Mr. Termonfilis,

13    could you please play it.

14         (Video played)

15         Stop it right there, Mr. Termonfilis.

16    Q.  Who is the woman that Mr. Trump is referring to in this

17    video?

18    A.  Me.

19    Q.  What's the verdict that Mr. Trump is referring to in that

20    video?

21    A.  The verdict that we won at our trial in May 2023.

22    Q.  What's the screen that you're looking at right now,

23    Ms. Carroll?

24    A.  This is Donald Trump raising money on our trial.

25         MS. HABBA:  Objection to that, your Honor.  That

1   should be stricken.  That is complete speculation.

2            THE COURT:  The answer is stricken.

3            MS. HABBA:  Thank you.

4            THE COURT:  The jury will disregard it.

5            MS. KAPLAN:  I'm going to ask Mr. Termonfilis to show

6   you another document.

7   Q.  We've now seen, Ms. Carroll, if I'm counting correctly, two

8   statements made by Mr. Trump after the verdict?

9   A.  Yes.

10  Q.  OK.  Let's look at the next one.  Mr. Termonfilis will show

11  you Plaintiff's 98.

12           Do you recognize this document?

13  A.  Yes.

14  Q.  What is it?

15  A.  It's a post by Donald Trump on Truth Social.

16  Q.  What's it about?

17  A.  He --

18  Q.  Withdrawn.

19           Who is it about?

20  A.  It's about me.

21           MS. KAPLAN:  Plaintiff moves for the admission of 98,

22  your Honor.

23           THE COURT:  Received.

24           (Plaintiff's Exhibit 98 received in evidence)

25  Q.  Ms. Carroll, what's the date of this post?

O1HsCAR3                         Carroll - Direct

1    A.  Oh, May 10th, 2023.

2    Q.  Now, I want to get to the Town Hall that you referenced

3    earlier, Ms. Carroll.

4              THE COURT:  Are we near the close, Ms. Kaplan, of your

5    direct?

6              MS. KAPLAN:  How far am I?

7              THE COURT:  Yes.

8              MS. KAPLAN:  20 minutes maybe, your Honor.

9              THE COURT:  We'll break here.  1:45.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  I understand there is an application.

3          MS. CROWLEY:  Judge, I just want to place on the

4     record, again, that notwithstanding your instruction right

5     before we started, the defendant has been making statements

6     that, again, we can hear at counsel table.  Some of the jurors

7     are sitting closer to him than we are.

8          He said, It is a witch hunt.  It really is a con job.

9     And when you played the last video, he said, It's true.  So we

10    would just ask your Honor to remind the parties that they are

11    not supposed to make statements to or indirectly to the jury.

12         THE COURT:  Mr. Trump has the right to be present

13    here.  That right can be forfeited, and it can be forfeited if

14    he is disruptive, which what has been reported to me consists

15    of, and if he disregards court orders.

16         Mr. Trump, I hope I don't have to consider excluding

17    you from the trial or at least from the presence.  I understand

18    you're probably very eager for me to do that.

19         MR. TRUMP:  I would love it.

20         THE COURT:  I know you would.  You just can't control

21    yourself in these circumstances, apparently.

22         Thank you.

23         (Recess)

24

25

O1HQcar4

```
 1                        AFTERNOON SESSION

 2                           1:50 p.m.

 3             (In open court; jury not present)

 4             THE COURT:  Good afternoon.  I understand somebody has

 5   an application?

 6             MR. MADAIO:  Yes, your Honor.  I'd like to make an

 7   application based on what just transpired before the break

 8   here.  We'd like to make a motion for recusal.  There was

 9   representation made by Shawn Crowley, who was your former law

10   clerk, regarding some of the conduct by president Trump.  You

11   immediately accepted her representations.  There was no

12   opportunity for the defense to respond.  There was no

13   consultation with the defense.  She made representations that

14   president Trump was not that he cannot control himself; that he

15   was disruptive.

16             THE COURT:  She did, did she?

17             MR. MADAIO:  There has also been a general hostility

18   towards the defense throughout this case.  Based on all of that

19   and under ethical Canon 3, we'll make an application for

20   recusal to the Court.

21             THE COURT:  Denied.

22             DEPUTY CLERK:  Shall I get the jury now?

23             THE COURT:  Sure.

24             (Continued on next page)

25
```

O1HQcar4                         Carroll - Direct

1              (Jury present)

2     E. JEAN CARROLL, resumed.

3              THE COURT:  Ms. Carroll, you're still under oath.

4              Ms. Kaplan, you may continue.

5              MS. KAPLAN:  Thank you, your Honor.

6     DIRECT EXAMINATION CONTINUED

7     BY MS. KAPLAN:

8     Q.  Before we move on, Ms. Carroll, I wanted to just clarify

9     something.

10             Mr. Termonfils, can you put up Plaintiff's 145.

11             Do you remember I asked you some questions about this

12    *Vanity Fair* interview with you Ms. Carroll?

13    A.  Yes.

14    Q.  If you turn to the other page, Mr. Termonfils.

15             And I asked you some questions about you saying there

16    that you were off Twitter?

17    A.  Yes.

18    Q.  And the date of this -- I'm sorry, Mr. Termonfils.  Can you

19    go back?  I'm sorry.  No.  No.

20             The date of this is June 28?

21    A.  Yes.

22    Q.  I take it, you didn't stay off Twitter from June onward?

23    A.  No.  No.  No.  I went back on Twitter.

24    Q.  And the reason you were off Twitter at that time on

25    June 28?

1    A.  Well, this interview is done -- this is published on

2    June 28.  So the interview was done a few days before June 28,

3    and I think I had had it up to here with Twitter.  But it

4    wasn't long before I went back on it.

5    Q.  And, Ms. Carroll, we talked about the statements that you

6    gave to this journalist about being feeling fabulous and

7    bouyant.  I take it there were times in the four plus years

8    this case has been pending that you felt good about things?

9    A.  Oh, many times when I did absolutely feel bouyant and

10   optimistic and wonderful.

11   Q.  And there were other times as well, correct?

12   A.  Yes.

13   Q.  Now, we're going to get to the *CNN* town hall.  Let's put up

14   Plaintiff's 100.

15          Ms. Carroll, do you recognize this document?

16   A.  Yes.  Yes.

17   Q.  What is it?

18   A.  This is a transcript -- this is a typed copy of a

19   transcript.

20   Q.  Of what?

21   A.  Of Donald Trump's interview on *CNN* town hall.

22          MS. KAPLAN:  Your Honor, may I approach?

23          THE COURT:  Yes, you may.

24   Q.  Ms. Carroll, I've handed you a disk that's got on it PX-99

25   and has a date and signature.

O1HQcar4                        Carroll – Direct

1   A.  Yes.

2   Q.  Whose signature that?

3   A.  That is my signature.

4   Q.  What is the date?

5   A.  January 14.

6   Q.  Just so the record is clear I don't think I did this for

7   the other disk.  The same is true for the other disk?

8   A.  Yes.

9   Q.  Did you watch the video that's on that disk?

10  A.  I watched the video and I read along at the same time with

11  the transcript.

12  Q.  Were the two --

13  A.  Yes, they match.  Yes.

14          MS. KAPLAN:  Your Honor, I'm going to move for the

15  admission of Plaintiff's Exhibit 100 and Plaintiff's Exhibit

16  99.

17          THE COURT:  Received in each case.

18          (Plaintiff's Exhibits 99 and 100 received in evidence)

19  Q.  Let's watch the video, please, Mr. Termonfils.

20          (Video played)

21  Q.  Ms. Carroll, when did you first learn about what Mr. Trump

22  had said on CNN town hall?

23  A.  The next morning.

24  Q.  Why did you not hear until the next morning?

25  A.  I was sound asleep.  The night before I went to bed very

O1HQcar4                     Carroll - Direct

 1   early.

 2   Q.  What you just heard on this video, is this different in any

 3   way from the statements we've been looking at or listening to

 4   during your testimony?

 5   A.  Well, yes, because he's doing it to a large crowd and

 6   drawing laughs about sexual assault.

 7   Q.  How did -- what was your reaction to seeing the people

 8   laughing about this?

 9   A.  I felt worthless.

10   Q.  After the *CNN* town hall, Ms. Carroll, did Mr. Trump

11   continue to make defamatory statements about you?

12   A.  Yes.

13   Q.  Let's look at the next time.

14         Mr. Termonfils, can you please put up for Ms. Carroll,

15   Plaintiff's Exhibit 101.

16         MS. HABBA:  Objection, your Honor.

17         THE COURT:  Nothing has been asked yet.

18         MS. HABBA:  I know, but you instructed me to object

19   prior to an issue.  She did just call it defamatory.  I would

20   just state that this has not been found to be a defamatory

21   statement.

22         THE COURT:  Thank you for that illumination.

23         Do you want to restate your question.

24         MS. KAPLAN:  Yes.

25   Q.  Ms. Carroll, in the *CNN* town hall, did Mr. Trump continue

O1HQcar4                          Carroll - Direct

1   to make statements about you afterwards?

2   A.  Yes.

3   Q.  And were those statements false?

4   A.  Yes.

5   Q.  Take a look at Plaintiff's 101.  If you could just say what

6   is this, again, the same way we've been doing it.

7   A.  Yes.

8   Q.  What --

9   A.  This is a post by Donald Trump on Truth Social.

10  Q.  Is the post about you?

11  A.  Yes.

12          MS. KAPLAN:  Plaintiff offers 101, your Honor.

13          THE COURT:  Received.

14          (Plaintiff's Exhibit 101 received in evidence)

15  Q.  The *CNN* town hall, Ms. Carroll, when did that take place?

16  A.  One day after the trial, so May 10, 2023.

17  Q.  And what is the date that this is posted?

18  A.  July 12, 2023.

19  Q.  Was that the last statement that Mr. Trump made about you?

20  A.  No.

21  Q.  I'm going to go to the next, which, if I'm counting

22  correctly, is the sixth.  If you could put up on the stand for

23  Ms. Carroll, Mr. Termonfils, Plaintiff's Exhibit 149T.

24          MS. KAPLAN:  And may I approach, your Honor?

25          THE COURT:  You may.

O1HQcar4                    Carroll - Direct

1    Q.  Ms. Carroll, I've shown you a document that's stamped 144T.

2    Do you have that in front of you?

3              THE COURT:  I'm sorry, I thought you said 149T.

4              MS. KAPLAN:  Hold on.  I apologize, your Honor.  It's

5    144 and 144T.  My mistake.

6    Q.  Do you have --

7    A.  Yes.

8    Q.  Do you have a disk in front of you that says 144?

9    A.  Yes.

10   Q.  And do you have a document in front of you that says 144T

11   on the screen?

12   A.  It's not marked.

13   Q.  I'll represent it's 144T.

14             THE COURT:  Let's get it marked.

15             MS. KAPLAN:  Can we mark it?

16   Q.  Ms. Carroll, what is the document that you have in front of

17   you?

18   A.  I have -- this is a transcript of Donald Trump's remarks in

19   a campaign speech.

20   Q.  Did you -- on the disk, is that a video on the disk?

21   A.  Yes.  I watched it.

22   Q.  Did you sign it and date it?

23   A.  Yes, I signed it EJC January 14, 2024.

24   Q.  What does it mean that you signed it?

25   A.  That means I watched the video and followed along with the

O1HQcar4                        Carroll - Direct

1   transcript and they were identical.

2   Q.  Let's watch the video.

3          MS. KAPLAN:  Excuse me.  Your Honor, let me move into

4   evidence 144 and 144T?

5          THE COURT:  Both received.  144T --

6          MR. MADAIO:  Objection, your Honor.

7          THE COURT:  What's the objection?  I'm sorry.  One

8   lawyer per witness.  You're not it.

9          Ms. Habba?

10         MS. HABBA:  Your Honor, I'm sorry, what rule is that?

11         THE COURT:  That is an order I issued this morning

12   when you were present.

13         MS. HABBA:  Can we have a moment to confer with

14   Ms. Kaplan?

15         THE COURT:  Yes.

16         MS. HABBA:  Thank you.

17         (Counsel consult)

18         THE COURT:  You've had the moment and the conference

19   seems to be over.

20  Q.  Let me skip this and put it on hold.  We'll come back to it

21  when we have a chance.  I don't want to waste the time of the

22  jury.

23         Now you testified -- we're okay?  That's good.  Let me

24  go back to where I was before.

25         MS. KAPLAN:  I move for the admission of 149 and 149T?

O1HQcar4                      Carroll – Direct

1              THE COURT:  149 or 144?

2              THE WITNESS:  144.

3              THE COURT:  I was asking Ms. Kaplan.

4              MS. KAPLAN:  144 and 144T.

5              THE COURT:  Repeat it, Ms. Kaplan?

6              MS. KAPLAN:  I apologize, your Honor.  144 and 144T.

7              THE COURT:  They are received.  The transcript is

8      received on the same basis as previously.

9              (Plaintiff's Exhibits 144 and 144T received in

10     evidence)

11             MS. KAPLAN:  Let's play the video.

12             (Video played)

13     Q.  The woman that Mr. Trump was referring to on that video,

14     who was the woman?

15     A.  Me.

16     Q.  Do you know how recently Mr. Trump said that?

17     A.  Within a few days.

18     Q.  Thank you.

19             Let's look at the next time.  Can you put in front of

20     Ms. Carroll plaintiff's 152.  Wait.  Wait.  I want to get it in

21     order.  I'm sorry.  Can you put in front of Ms. Carroll 149T.

22             Ms. Carroll, do you see 149T in front of you?

23     A.  Yes, I do.

24             MS. KAPLAN:  Your Honor, may I approach?

25             THE COURT:  You may.

O1HQcar4                        Carroll – Direct

1              MS. KAPLAN:  This is the last one, I promise.

2    Q.  Ms. Carroll, do you have in front of you 149T?

3    A.  Yes.

4    Q.  What is 149T?

5    A.  It is the transcript and a video of Donald Trump giving a

6    press conference.

7    Q.  What is the date of the press conference?

8    A.  January 11.

9    Q.  A few days ago?

10   A.  Yes.

11   Q.  Did you watch the video?

12   A.  Yes.

13   Q.  Did you sign the disk?

14   A.  Yes, I did.

15   Q.  In signing the disk, what were you saying?

16   A.  I'm saying that I watched the video and followed along with

17   the transcript, and they are the same.

18              MS. KAPLAN:  Move for the admission, your Honor, of

19   149 and 149T?

20              THE COURT:  Both received.  Same instruction on the

21   transcript.

22

23              (Plaintiff's Exhibits 149 and 149T received in

24   evidence)

25              (Video played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HQcar4                    Carroll - Direct

1   Q.  The woman there -- I know it's repetitive, Ms. Carroll.

2   But who is the woman he's referring to?

3   A.  That is me.

4   Q.  Mr. Termonfils, if you could put up in front of the

5   witness, Plaintiff's Exhibit 152.

6           Ms. Carroll, if you could identify what Plaintiff's

7   152 is.

8   A.  It is a post by Donald Trump on Truth Social.

9           MS. KAPLAN:  Move for the admission of Plaintiff's

10  152?

11          THE COURT:  Received.

12          (Plaintiff's Exhibit 152 received in evidence)

13  Q.  Ms. Carroll, what date did Mr. Trump post this on Truth

14  Social?

15  A.  January 14, 2024.

16  Q.  When he says it's a totally fabricated story, what story is

17  he talking about?

18  A.  He's talking about the assault.

19  Q.  We have now looked at, if I counted right, and I think I

20  did because I doublechecked, eight statements that Mr. Trump

21  made after the verdict in your case?

22  A.  Yes.

23  Q.  What happened after he made those statements?

24  A.  There was a flurry of sort of a stream of attacks.

25  Q.  Attacks like the ones we looked at earlier this morning?

O1HQcar4                    Carroll - Direct

1    A.  Yes.

2    Q.  Have you gotten used to -- by now, have you gotten used to

3    receiving attacks like that?

4    A.  Never.  I will never -- never get used to attacks like

5    that.

6    Q.  But as we've touched on, you also received positive

7    messages after the verdict?

8    A.  Yes.  Yes.

9    Q.  And from time to time, people would recognize you and

10   congratulate you on the verdict?

11   A.  Yes.

12   Q.  And positive articles were written in the media?

13   A.  Yes.

14   Q.  Didn't that fix your reputation for you, Ms. Carroll?

15   A.  No.

16   Q.  Why not?

17   A.  Because so many more people hated me.

18   Q.  Would you say, Ms. Carroll, that you're more famous since

19   you sued Donald Trump?

20   A.  Yes.  I'm better known.

21   Q.  And are you better known by people who admire you or people

22   feel differently?

23   A.  I'm better known by the people who think I'm a liar --

24   people who didn't know who I was --

25          MS. HABBA:  Objection.  Your Honor, she is speaking to

O1HQcar4                         Carroll – Direct

1   what other people think.

2            THE COURT:  Overruled.

3   Q.  You can finish answering.

4   A.  People who didn't know me from Adam.  People who didn't

5   care about me, really don't care about this person, they now

6   have opinions about me, and that is that I'm a liar.

7   Q.  Now, you testified earlier about your advice column for

8   *Elle* magazine.  For how many years did you write that column?

9   A.  27 years.

10  Q.  How does that compare to the length of other advice

11  columns?

12  A.  It was the longest currently running advice column in

13  American publishing.

14  Q.  When did you stop writing that column?

15  A.  Two thousand -- at the end of 2019.

16  Q.  Do you still write an advice column today?

17  A.  Yes.

18  Q.  How do you do that?

19  A.  I publish it on Substack.

20  Q.  Excuse my ignorance, what is Substack?

21  A.  Substack is a platform where writers can publish directly

22  to their readers.

23  Q.  When did you start publishing your advice column on

24  Substack?

25  A.  2021.

1    Q.  Do you make money from publishing on Substack?

2    A.  Yes.

3    Q.  How does that work?

4    A.  Well, I'm a writer.  I have to feed the dogs and feed

5    myself.  I earn my money by my writing, and so readers pay to

6    read my Substack, and also I have readers who can read it for

7    free.

8    Q.  So how many readers do you have total?  How many

9    subscribers do you have on Substack in total approximately?

10   A.  Subscribers, so 28,000.  I just checked this morning.

11   Q.  About how many of those are paid subscribers?

12   A.  1,800.

13   Q.  Has the number of your Substack -- has the number of your

14   subscribers on Substack increased since you started it?

15   A.  Yes.  Yes, it has.

16   Q.  Have the number of your Twitter followers increased since

17   2019?

18   A.  Yes.

19   Q.  Do you earn any money from your followers on Twitter?

20   A.  No.

21   Q.  What does it mean, Ms. Carroll, to write freelance?

22   A.  Freelance is where you send articles and pitch articles to

23   editors at magazines.  So you're not under contract.

24   Q.  And before June 2019, did you write articles freelance for

25   various magazines?

O1HQcar4                          Carroll - Direct

```
 1   A.  Yes.
 2   Q.  Has there been any change in your ability to get freelance
 3   work since June 2019?
 4   A.  It stayed about the same.  It's just that the assignments
 5   became different.
 6   Q.  How did the assignments become different?
 7   A.  People want me to write, but they want me to write about
 8   Donald Trump.
 9   Q.  Do people want you to write about anything else today?
10   A.  No, I never -- I don't get pitched articles about the
11   culture or anything.  They want to hear about Donald Trump and
12   I can't -- I don't write about it.
13   Q.  Before June 2019, did you write -- withdrawn.
14          Prior to June 2019, did the freelance articles you
15   wrote touch on --
16   A.  Yes.
17   Q.  -- Donald Trump?
18   A.  Oh, no.
19   Q.  Were they limited only to writing about politics?
20   A.  No.  I never wrote about politics.
21   Q.  Prior to June 2019, Ms. Carroll, how much money did you
22   make a year writing freelance articles?
23   A.  It ranged any place from 20,000 a year to a hundred
24   thousand --
25          MS. HABBA:  Objection.  Your Honor, sorry.  Could you
```

O1HQcar4                      Carroll - Direct

1    specify which year, please?

2              THE COURT:  That is a proper question for

3    cross-examination unless counsel wants to go into it.

4    Q.  Let me try to ask it this way.  In the years 2017, 2018,

5    how much money, if you can recall, were you making from writing

6    freelance articles?

7    A.  '17 and '18, probably 50,000 a year.

8    Q.  How much did you make from writing freelance articles in

9    2023?

10   A.  So far?  500,000 -- 500,000 -- $500.

11   Q.  Ultimately, Ms. Carroll, how did your book sell?

12   A.  It was a dud.

13   Q.  Now, you testified earlier about being asked to appear on

14   TV shows as an advice columnist.  Do you recall that?

15   A.  Yes.

16   Q.  Do you still get asked to appear on TV shows as an advice

17   columnist?

18   A.  No.

19   Q.  When did that stop?

20   A.  2019.

21   Q.  Last month, Ms. Carroll, did you happen to post any

22   messages on Twitter?

23   A.  Yes.

24   Q.  What kind of a message did you post on Twitter last month?

25   A.  I posted dog videos, and I posted a Christmas message.

1    Q.  Did your Christmas message have anything to do whatsoever

2    with Donald Trump?

3    A.  No.

4    Q.  Mr. Termonfils, can you put up on the screen Plaintiff's

5    134.

6         Ms. Carroll, if you can again just say what this is?

7    A.  This is a post on Twitter.

8    Q.  Who posted it?

9    A.  I did.

10   Q.  What's the date of the post?

11   A.  December 25, 2023.

12        MS. KAPLAN:  Plaintiff moves for the admission, your

13   Honor, of 134.

14        THE COURT:  Received.

15        (Plaintiff's Exhibit 134 received in evidence)

16   Q.  Did you receive replies to this Christmas message wishing

17   people care and love?

18   A.  Yes.

19   Q.  Mr. Termonfils if you could scroll –- let's look at the

20   first one and scroll through the others.

21        Is the first page one of those responses, one of those

22   replies?

23   A.  Yes.

24   Q.  And if you could just scroll relatively slowly through

25   those, there's a bunch.  I'm not going to read them all, but

O1HQcar4                       Carroll - Direct

1   people will get a sense.

2          Ms. Carroll, what was your reaction to seeing -- how

3   did you react to seeing these responses to your Christmas

4   tweet?

5   A.  I just re-experienced it.  Debilitated.  Just -- I've lost

6   people's respect.

7   Q.  Mr. Termonfils, can you please put up in front of

8   Ms. Carroll Plaintiff's Exhibit 143.

9          Ms. Carroll, if you could just tell us what you're

10  looking at.

11  A.  This is a --

12         MS. HABBA:  Objection.  Relevance.

13         THE COURT:  It hasn't been offered yet.

14  A.  This is a tweet by *Fox* news reporting --

15         THE COURT:  Don't go into what it says.

16  Q.  Is the tweet about you?

17  A.  Yes.

18  Q.  Was there a reply made to this tweet, Ms. Carroll?

19  A.  Yes.  I remember it.

20  Q.  Can you put up, 143, Mr. Termonfils.

21         Is that the reply?

22  A.  Yes.

23         MS. KAPLAN:  Plaintiff moves for the admission of 140

24  and 143?

25         MS. HABBA:  Objection.

O1HQcar4                        Carroll – Direct

1            THE COURT:  Ground?

2            MS. HABBA:  Sorry, your Honor?

3            THE COURT:  Ground?  In a word.

4            MS. HABBA:  Prejudicial.

5            THE COURT:  All evidence is prejudicial to the side

6    against whom it's offered.  If that's it --

7            MS. HABBA:  Relevance.

8            THE COURT:  Excluded under 403.

9    Q.  A couple more documents.

10           Mr. Termonfils, can you put up Plaintiff's 108.

11           Ms. Carroll, what's the document that you have in

12   front of you?

13   A.  This is an email to Ask E. Jean.

14   Q.  So written to your email account?

15   A.  Yes.

16           MS. KAPLAN:  Plaintiff moves for if the admission,

17   your Honor, of 108.

18           THE COURT:  Received.

19           (Plaintiff's Exhibit 108 received in evidence)

20   Q.  Ms. Carroll, who sent this email to you?

21   A.  Somebody called Nebraska Cornhusker.

22   Q.  What's the date of the email?

23   A.  Wednesday, June 28, 2023.

24   Q.  Was that before or after the verdict in your first trial?

25   A.  Shortly afterwards.

O1HQcar4                          Carroll - Direct

1    Q.  What does this person predict is going to happen?

2    A.  This person predicts that suing Trump was a big mistake,

3    and now Trump is going to get back.

4              MS. HABBA:  Objection.  It's mischaracterizing.

5              THE COURT:  In what way is it mischaracterizing?

6              MS. HABBA:  And it's complete -- she's going into the

7    thinking of this person.  I mean, she can read it in.  It can

8    be admitted.

9              THE COURT:  It's offered in evidence.  It was received

10   in evidence.  Now she can read it.

11             MS. HABBA:  Sure.

12             THE COURT:  You didn't object to it.

13   Q.  This person says, Ms. Carroll, that Trump is going to get

14   back at you?

15   A.  Yes, that's what this person says.

16   Q.  Did Mr. Trump get back to you?

17   A.  Yes.  Yes, he did.

18   Q.  Was he tweeting about you as recently as yesterday?

19   A.  That's what I hear.

20   Q.  Excuse me.  Posting about you as recently as yesterday?

21   A.  Yes, I've been told.

22   Q.  Can we take a look at Plaintiff's Exhibit 160.

23             You have a document in front of you that's been marked

24   for identification as Plaintiff's Exhibit 160.  Can you just

25   say what it is, Ms. Carroll?

O1HQcar4                        Carroll - Cross

1  A.  Yes, this is a post by Donald Trump on Truth Social.

2           MS. KAPLAN:  Plaintiff moves for the admission of 160,

3  your Honor.

4           THE COURT:  Received.

5           (Plaintiff's Exhibit 160 received in evidence)

6  Q.  Ms. Carroll, what is this?

7  A.  I had heard about these.  This is the first one I've looked

8  at.  And this is -- this was posted as we were in the

9  courtroom.

10  Q.  When?

11  A.  Yesterday.  This is one of many posted during the trial.

12  Q.  Is there anything that he says -- Mr. Trump says about you

13  in this Truth Social post that is true?

14  A.  About me?  No.

15           MS. KAPLAN:  No further questions, your Honor.

16           THE COURT:  Thank you.

17           Cross-examination, Ms. Habba.

18           MS. HABBA:  Can I just have one moment, your Honor?

19           THE COURT:  Sure.

20                          (Counsel consult)

21           THE COURT:  You may proceed.

22           MS. HABBA:  Thank you, your Honor.

23  CROSS-EXAMINATION

24  BY MS. HABBA:

25  Q.  Good afternoon, Ms. Carroll.

O1HQcar4                          Carroll - Cross

1    A.  Good afternoon, Ms. Habba.

2    Q.  I'm going to take us back to the beginning.  Back in the

3    Eighties, Ms. Carroll, you used to live in Montana in your

4    first marriage to Steve Byers, correct?

5    A.  Yes.

6    Q.  Montana was no New York, was it?

7    A.  No, it's a very different place.

8    Q.  It's fair to say that Montana was boring for you,

9    Ms. Carroll?

10   A.  No.  No.  Montana is a lot -- it's never boring.

11   Q.  Ms. Carroll, do you recall being deposed in this matter

12   twice by me?

13   A.  Yes, I do.

14   Q.  Can we please pull up -- you were on trial on this case,

15   correct?

16   A.  Pardon?

17   Q.  The first case -- excuse me, *Carroll II* let's call it.  I'm

18   going to call it *Carroll II* for clarity throughout this.

19   A.  Yes.

20   Q.  Do you recall saying that you and your first husband were

21   "hail-fellows-well-met, enjoyed writing"?

22   A.  Yes.

23   Q.  "We enjoyed the ranch life.  We loved the same things.  We

24   had great friends.  The spark was gone, and he didn't want it

25   to end.  But I came to New York to interview Fran Lebowitz."

O1HQcar4                    Carroll - Cross

```
 1   Do you remember that conversation we had?

 2   A.  Yes.

 3            MS. KAPLAN:  Can we get a page number?

 4   Q.  Sure.  It's trial transcript 13:18 --

 5            THE COURT:  You have to say that again more slowly.

 6            MS. HABBA:  Deposition transcript.  Excuse me.

 7            MS. KAPLAN:  This is a deposition?  Which deposition?

 8            MS. HABBA:  He's pulling it up for you.  October 14,

 9   2022.

10            MS. KAPLAN:  Which page?

11            MS. HABBA:  I just said it.  He'll pull it up for you

12   again.

13            THE COURT:  You're going to have to say it again.

14            MS. HABBA:  13:18 to 15:2, line 2.

15            May I proceed?

16            THE COURT:  I need a transcript to be able to work

17   with this.

18            MS. HABBA:  Okay.  Can you give him a transcript?

19            MS. KAPLAN:  Your Honor, I don't see anything

20   inconsistent here.

21            MS. HABBA:  I'll read it to you.  May I ask the

22   witness?

23            THE COURT:  You are just going to have to wait a

24   minute.

25            MS. HABBA:  I understand.  She just made a question,
```

O1HQcar4                          Carroll - Cross

1    so...

2               THE COURT:  She just said something.  I asked for the

3    transcript which you haven't provided yet.

4               MS. HABBA:  Your clerk has it.  Your Honor, it's also

5    on the screen.  They got it up.

6               THE COURT:  Yes, but I can't turn pages on the screen,

7    counselor.

8               MS. HABBA:  Can you scroll down please, Nate.

9               THE COURT:  This is the way we're going to do this.

10   And I issued an order a week or two ago.  What specific part

11   are you referring to, counsel?

12              MS. HABBA:  Where she says --

13              THE COURT:  Don't read it.  Give me page and line.

14              MS. HABBA:  I did, your Honor.  13 --

15              THE COURT:  Now look, Ms. Habba -- Ms. Habba.

16              MS. HABBA:  Yes.

17              THE COURT:  We're going to do it my way in this

18   courtroom, and that's all there is to it.  Now you give me the

19   page and line number you want me to focus on without reading

20   it, and then I'll look at it.  And then I'll see if there's an

21   objection or not, and then we'll see where we go from there.

22              MS. HABBA:  Sure.

23              Your Honor has my copy of the transcript.

24              The statement is:  "we had a great ranch life, and I

25   wanted more."  It's between this section here shown 13:18 --

O1HQcar4                    Carroll - Cross

1          THE COURT:  We are going to take a recess during which
2     you will provide me with a complete copy of every transcript
3     you are going to use.
4          MS. HABBA:  They're right there.  Hand him the binder,
5     please.
6          DEPUTY CLERK:  Please be seated.
7          THE COURT:  Now, Ms. Habba, please tell me
8     specifically what page and line the passage you are referring
9     to begins on and where it ends, without reading it aloud.
10          MS. HABBA:  It is on -- you don't want me to read it.
11     If you could look at page 14, 6 through 8.
12          THE COURT:  What are you doing?  You're offering that
13     in evidence?
14          MS. HABBA:  I am offering that as impeachment to
15     refresh her recollection that she did --
16          THE COURT:  Those are two different things.
17          MS. HABBA:  It's impeachment.  It's inconsistent with
18     what she just said.
19          THE COURT:  With what she just said?
20          MS. HABBA:  Yes, your Honor.  She said she didn't
21     leave -- she thought Montana was great.  That's not what she
22     said.
23          THE COURT:  What she said was "Montana is a lot --
24     it's never boring."
25          That's the impeachment that she said on a previous

O1HQcar4                           Carroll - Cross

```
 1   time that it was great, and this time she said it's not boring?
 2           MS. HABBA:  I believe my question was about her moving
 3   to New York, but I can't see that at this moment because it's
 4   not up.  I can just ask another question.
 5           THE COURT:  Good idea.
 6   BY MS. HABBA:
 7   Q.  Ms. Carroll, during the Eighties, you were trying to become
 8   a journalist.  Is that correct?
 9   A.  Yes, I was -- yes.
10   Q.  And I believe you testified earlier that when you moved to
11   New York, you had an active social life, correct?
12   A.  Yes.
13   Q.  You were a regular at Elaine's.  Isn't that right?
14   A.  Yes.
15   Q.  Elaine's is a very popular restaurant, isn't it,
16   Ms. Carroll?
17   A.  Yes.
18   Q.  It's not only popular, it's incredibly hard to get into,
19   correct?
20   A.  Not -- you can get into Elaine's.
21           THE COURT:  Ms. Habba, it hasn't existed for years, if
22   I'm not mistaken.
23           MS. HABBA:  Correct.  We're talking about the 1990s
24   and 80s.  I was asking Ms. Carroll about that time?
25           THE COURT:  Your question was:  "Elaine's is a very
```

O1HQcar4                    Carroll - Cross

1  popular restaurant, isn't it, Ms. Carroll?"  Followed up by:

2  "It's not only popular, it's incredibly hard to get into."  That

3  may be on account of its being closed.

4  Q.  Was it incredibly hard to get into Elaine's at the time

5  period I was asking you, Ms. Carroll?

6  A.  It was hard to get seated in the front room.  Elaine always

7  had room for anyone in the back, in the side room.

8  Q.  Why was it hard to get seated in the front?

9  A.  Because it was a writer's hangout, and Elaine seated her

10  friends who were writers around her in the front room.

11  Q.  Were you a regular at Elaine's on Thursday nights?

12  A.  Yes.

13  Q.  And you could regularly see Jackie Kennedy, Gay Talese,

14  Mario Puzo, the author of *The Godfather*, George Plimpton, Woody

15  Allen, Clint Eastwood and the creator of *Sex and the City*

16  there, couldn't you?

17        MS. KAPLAN:  Objection, your Honor.

18        THE COURT:  I'll allow it.

19  A.  The creator of *Sex and the City* is my friend Candace

20  Bushnell.  I certainly saw Woody Allen there quite a bit.  I

21  didn't see any of the other people you mentioned.

22  Q.  You met your second husband at Elaine's?

23  A.  Yes.

24  Q.  And you were at a writer's table there, correct?

25  A.  Yes.

O1HQcar4                          Carroll - Cross

1    Q.   Was that in the first two rows as you described?

2    A.   The fourth table down from the front.

3    Q.   And during this time period, you were a contributing editor

4    for *Esquire*, correct?

5    A.   Yes.

6    Q.   But you were not a full-time employee?

7    A.   No.

8    Q.   When did your work stop for *Esquire*?

9    A.   They stopped accepting my ideas.

10   Q.   My question was when did your work stop?

11   A.   When?

12   Q.   Yes, with *Esquire*.

13   A.   The early 2000s.

14   Q.   In 1979, you were earning about 4,000 a piece.  Is that

15   correct?

16            THE COURT:  4,000 a piece for what?

17   Q.   For each article?

18   A.   That's high.  In 1979, which is the year I published my

19   first piece in *Esquire*, I think I got $750, which was a lot of

20   money then.

21   Q.   So if I stated to you that you had previously said in 1979

22   you maybe made $26,000 a year when you began as a freelancer,

23   would that be correct?

24   A.   Yes, because I started to sell mag -- yes, that's about

25   right, yes.

O1HQcar4                         Carroll - Cross

1  Q.  And freelancers, as Ms. Kaplan said, means you were

2  pitching and working with many magazines at the time, correct?

3  A.  Yes.

4  Q.  And you also previously testified that getting your

5  magazine articles published with a major publication was your

6  lifeblood.  Is that fair to say?

7  A.  That's it.  That was my goal in life, and it made me happy.

8  Q.  In fact, you moved a lot of jobs because you told me you

9  were always working towards the goal of getting a magazine

10  article published in *New York* or *Atlantic* or *Esquire*.  Isn't

11  that correct?

12  A.  That was my goal.

13         MS. KAPLAN:  Sorry, your Honor.  I'm not sure I

14  understand what "moved a lot of jobs" means.

15         THE COURT:  You can follow up on redirect.

16  Q.  As a writer, it is a massive achievement to be featured in

17  a magazine, correct?

18  A.  I thought so.

19  Q.  Presumably, it would be an even greater achievement to be

20  on the cover of a magazine, correct?

21  A.  Actually, for me it was a greater achievement to be in the

22  magazine as a writer.

23  Q.  What about to have a cover story as a writer?

24  A.  No, that -- that was a great feeling.

25  Q.  And you ultimately achieved that goal of getting on the

O1HQcar4                         Carroll – Cross

1    cover of the magazine with your story inside.  Isn't that

2    correct?

3    A.   Several times.

4    Q.   You stated several times.  So you've been on the cover of

5    *New York* magazine before, right?

6    A.   No.  No.  I thought you said having a cover story.  I had

7    many cover stories in my life, but I was not on the cover.

8    Q.   Do you consider being featured on the cover as one of your

9    crowning achievements?

10   A.   No.  I consider writing --

11            MS. KAPLAN:  Could we have a sidebar?

12            THE COURT:  Okay.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HQcar4                          Carroll - Cross

1                    (At the sidebar)

2                    MS. KAPLAN:  I don't know where Ms. Habba is going

3        with this other than to suggest a motivation for making up a

4        story about Mr. Trump, which is what's prohibited.

5                    MS. HABBA:  No, your Honor, that's not it.  I know

6        that's prohibited, I'm not doing that.

7                    THE COURT:  What are you doing?

8                    MS. HABBA:  I'm showing that she enjoyed the fame.

9        Fame is what she has always wanted, and this has all been part

10       of her -- after she sued him what she has been doing.  Going on

11       TV, all of that has nothing to do with the sexual assault

12       claim.

13                   MS. KAPLAN:  I think she's talking, your Honor, about

14       the cover of *New York* magazine, which EJ was on.  I'm not sure

15       there's a huge difference to wanting the fame --

16                   THE COURT:  I'm going to let it go.  We'll see.  If

17       there are objections question by question, I'll deal with it.

18                   MS. KAPLAN:  Okay, your Honor.

19                   (Continued on next page)

20

21

22

23

24

25

```
 1              (In open court)
 2    BY MS. HABBA:
 3    Q.  Ms. Carroll, when you were on the cover of New York
 4    magazine, how much was the dress you were wearing?
 5    A.  How much did it cost?
 6              MS. KAPLAN:  Objection, your Honor.
 7              THE COURT:  Sustained.
 8    Q.  You cared how you present to other people.  Isn't that
 9    correct, Ms. Carroll?
10    A.  Yes.
11    Q.  And how much did you make per piece that you authored at
12    the highest point in your career?
13    A.  Around $25,000 a piece.
14    Q.  What is the most you've made annually?
15    A.  Around $400,000.
16    Q.  And $400,000, was that in the mid Nineties you would say
17    that you made that?
18    A.  Yes.
19    Q.  And in today's day, that's a lot more money.  Isn't it,
20    Ms. Carroll?
21              MS. KAPLAN:  Objection.
22              THE COURT:  You're going to have to be clear about
23    what that question means.
24              MS. HABBA:  Sure.
25    Q.  Would you agree that $400,000 in about 1995 is worth about
```

O1HQcar4                          Carroll - Cross

1    double today?

2    A.   I have no idea, but it's worth more.

3    Q.   And you were working for *Elle* too, correct?

4    A.   Yes.

5    Q.   When did that start?

6    A.   1993.

7    Q.   You had a regular column there, correct?

8    A.   Yes, I did.

9    Q.   How much were you paid for that column?

10   A.   I started at *Elle* at 5,000 a column.

11   Q.   Are you sure it was 5,000, Ms. Carroll?

12   A.   I believe I started at 5,000.

13   Q.   At one point you had told me it was about 6,000 a column.

14   Could that be correct?

15   A.   Then I moved up to 6,000, and then 7500, then 10,000 a

16   month.

17   Q.   And you were also on television during this time, correct?

18   A.   Yes.

19   Q.   Or the forerunner for *MSNBC*?

20   A.   Yes.

21   Q.   You had your own talk show, didn't you?

22   A.   Yes.

23   Q.   In this period during the 1990s, you were working for

24   *Esquire*, *Elle* and *NBC*?

25   A.   Yes.

O1HQcar4                        Carroll - Cross

1   Q.  That was through 1997, correct?

2   A.  Yes.

3   Q.  You were also a writer on *SNL*, correct?

4   A.  Yes.

5   Q.  You've also authored several books, as your attorney

6   mentioned before, correct?

7   A.  Yes.

8   Q.  Can you walk us through those books --

9   A.  Yes.

10  Q.  -- chronologically, please?

11  A.  Yes.  First book was a collection of essays.

12  Q.  I'm just going to stop you for each one so we can discuss

13  them if it's okay.

14  A.  Fine.

15  Q.  So your first book was a collection of essays, you said,

16  Ms. Carroll?

17  A.  Yes.

18  Q.  What was the name of that book?

19  A.  *Female Difficulties*.

20  Q.  Was that the full name of the book?

21  A.  The subtitle was:  *Sorority Girls, Rodeo Queens* — not quite

22  sure — *Smut Stars, Frigid Women, and Other* -- can't quite

23  remember the last phrase.

24  Q.  Would it help if I showed you the cover, Ms. Carroll?

25  A.  Yes.  Thank you.

O1HQcar4                        Carroll - Cross

1    Q.  Could you read that in for me, the full title of that book,

2    please?

3    A.  Yes.  *Female Difficulties:  Sorority Sisters, Rodeo Queens,*

4    *Frigid Women, Smut Stars and Other Modern Girls.*

5    Q.  You were on the cover of that book, correct?

6    A.  I'd forgotten that I was, but yes, there I am.

7    Q.  Can you just explain to me what a rodeo queen is?

8    A.  Yes.  In the West they have athletic contests.  You have to

9    ride and rope.  You have to run the barrels.  You have to get

10   on a green horse, do a circle eight, come to a sliding stop, do

11   a circle eight in the other direction, come to a sliding stop,

12   and then leave the auditorium popping salutes to the crowd.  It

13   is extremely difficult.  All the while you have to maintain

14   high beauty standards and the ability to give a public speech.

15   Women in the West -- actually, each state is represented in

16   Miss Rodeo America, and I followed the queen and attended the

17   contest.

18   Q.  What about frigid women?

19   A.  Frigid women was --

20              MS. KAPLAN:  Objection, your Honor.  Relevance.  412.

21              THE COURT:  Sustained.

22   Q.  What does the phrase smut stars mean?

23              MS. KAPLAN:  Same objection, your Honor.

24              MS. HABBA:  Sorry, I can respond.

25              THE COURT:  Overruled.

1          MS. HABBA:  Thank you.

2     Q.  What does smut stars mean?

3     A.  Smut is the old term that was used in many court cases.

4     They'd say, "I know smut when I see it."  Smut is another

5     word -- the more modern word is pornographic.  So these were

6     about stars who performed in pornographic movies.

7     Q.  When I originally asked you what this book was about, how

8     did you describe it?

9          MS. KAPLAN:  Objection.

10          THE COURT:  What's the objection?

11          MS. KAPLAN:  I don't know what she's talking about.

12          THE COURT:  Either do I.

13    Q.  I can walk you through it --

14          THE COURT:  December 21, my order explained how you

15    are to use depositions and other testimony in this courtroom,

16    which I what I think you are trying to do.

17          MS. HABBA:  No, your Honor, it has nothing to do --

18          THE COURT:  You are trying to make this a witness to a

19    previous conversation, is that what you're trying to do?

20          MS. HABBA:  No, your Honor.  The witness testified

21    that she was offended by the tweets because they made her look

22    like she was in some way -- I don't want to use the word --

23    promiscuous was I believe the word she used today.  I'm showing

24    the witness was clearly not afraid of putting herself out there

25    as talking about pornographic items.  Smut stars is a porn

O1HQcar4                         Carroll - Cross

1    term.

2              MS. KAPLAN:  412, 403, your Honor, couldn't be more

3    different.  Apples and oranges completely.

4              THE COURT:  Sustained.

5    BY MS. HABBA:

6    Q.  What was the next -- how did that book sell?

7    A.  It was -- sold.  It sold well.  I was an unknown writer

8    and -- but it sold well.  It was beautifully reviewed.

9    Q.  When you say it sold well, what do you mean by that?

10   A.  I think it sold through.  In other words, they printed

11   however many, 10,000 copies, and all of them sold, so it sold

12   well.

13   Q.  Did you get any advances for that book?

14   A.  Yes, I did.

15   Q.  Do you recall how much that advance was?

16   A.  No, I don't.

17   Q.  What was the next book that you wrote?

18   A.  Biography of Hunter S. Thompson.

19   Q.  How many copies did you sell of that book?

20   A.  That again sold through, I believe.

21   Q.  And what was the book after that?

22   A.  Then came two advice books.

23   Q.  What was the name of the book after that?

24   A.  *A Dog in Heat is a Hot Dog*.  And the next one was

25   *Mr. Right, Right Now.*

O1HQcar4                          Carroll – Cross

1  Q.  If I clarified for the jury that your book was fully called

2  *A Dog in Heat is a Hot Dog, and Other Rules to Live By,* would

3  you agree with me?

4  A.  Yes.

5  Q.  How many copies did you sell of that book?

6  A.  It's still selling.

7  Q.  Still selling today?

8  A.  Yes.

9  Q.  Didn't you testify earlier that you make your income mostly

10  from Substack?

11  A.  Yes.

12  Q.  Do you get any income from that book being sold today?

13  A.  Yes, royalties.  Not a lot of royalties, but royalties.

14  Q.  How much is that, this year, let's say, meaning 2023?

15  A.  I don't know.

16  Q.  You don't know.  *Mr. Right, Right Now*, you said -- would

17  you correct me if I'm wrong, the full title is *Mr. Right, Right*

18  *Now.  How a Smart Woman Can Land Her Dream Man in Six Weeks,*

19  would that be correct?

20  A.  Yes.

21              (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HsCAR5                         Carroll - Cross

```
 1  BY MS. HABBA:
 2  Q.  How many copies did you sell of that book?
 3  A.  Again, it sold through.
 4  Q.  So it did well?
 5  A.  It did well enough, yeah.  I'm still receiving royalties.
 6  None of these were big sellers, but they did well enough.
 7  Q.  I'm just trying to understand what you mean by the word
 8  well.
 9          Less than $5,000 that you made from those books?
10  A.  I'm not sure of the amounts, but all the booked printed
11  were sold.  That's what I caught doing well.
12  Q.  You don't know how much you made from these books we're
13  talking about, is that correct?
14  A.  That's correct.
15  Q.  So when I asked you about income, did you include the
16  royalties from this book?
17  A.  No.
18  Q.  Are you still getting royalties from these books as we
19  stand here today?
20  A.  Two.  Two books, yes, I'm still getting royalties.
21  Q.  Would you recall if it was $10,000?
22  A.  Oh, no.
23          MS. KAPLAN:  Asked and answered, your Honor.
24          THE COURT:  Sustained.
25  Q.  You had a long career at Elle, correct?
```

O1HsCAR5                    Carroll – Cross

1    A.  Yes.

2    Q.  At one point you were making $120,000 a year, isn't that

3    right?

4    A.  Yes.

5    Q.  I'm sorry, Ms. Carroll.  I couldn't hear you.

6    A.  Yes.

7    Q.  Yes.

8            But then Nina Garcia took over as editor-in-chief of

9    Elle, is that right?

10            MS. KAPLAN:  Objection.  Objection, your Honor.

11            THE COURT:  What's the objection?

12            MS. KAPLAN:  Relevance and beyond the scope.

13            THE COURT:  Sustained, at least as to the latter and

14    as to the former.

15    Q.  Ms. Carroll, was your salary changed at Elle?

16    A.  Across the board, the magazine business had to tighten the

17    belts because advertising rates, all magazines went down and

18    magazines were forced to make cuts.

19            THE COURT:  Ms. Carroll, I'm going to have to strike

20    your answer.  It's not responsive to the question.  The jury

21    will disregard the answer.

22            Put the question to the witness again.

23    Q.  Ms. Carroll.

24    A.  Yes.

25    Q.  Was your salary changed at Elle?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  When?

3   A.  2018, I think.

4   Q.  Did your salary go up or down, Ms. Carroll?

5   A.  Down.  It was cut in half.

6   Q.  It was cut in half.

7          This was before you left Elle, right?

8   A.  Yes.

9   Q.  So you were making $60,000 per year, correct?

10  A.  Yes.

11  Q.  This was around September 2017, correct?

12  A.  2017?

13         No, I was still making 120,000 a year.

14  Q.  So what year would you say your salary was cut in half to

15  60,000?

16  A.  I think it's 2018.

17  Q.  2018.

18         Was that your primary source of income?

19  A.  Oh, yes.

20  Q.  You were making $60,000 a year in 2018, that's correct.

21         So was that a low point for your career financially?

22  A.  I had -- being cut in half, it was -- it was a loss, that's

23  for sure.

24  Q.  Up until 2018, was this the lowest you made in your

25  journalistic career since --

O1HsCAR5                        Carroll - Cross

1    A.  No.  When I --

2    Q.  I'm sorry, Ms. Carroll.  I'm just going to need to finish

3    the question so you can hear it.  I'm giving you a relevant

4    timeframe.

5            Since you were working with Esquire making $400,000,

6    was this the lowest point since that time?

7    A.  Um, yes.  I started to look for -- I started to look to

8    move the column to another magazine.

9    Q.  And the following year was when you wrote the book What Do

10   We Need Men For, correct?

11           MS. KAPLAN:  Objection, your Honor.

12           THE COURT:  Basis?

13           MS. KAPLAN:  The collateral estoppel ruling.

14           THE COURT:  I'm going to overrule it not because the

15   point is not well taken, because these facts are all in the

16   record already.

17           Answer the question, please, Ms. Carroll.

18   Q.  Do you need the question read back to you?

19   A.  Yes, please.

20           MS. HABBA:  Your Honor, may I ask that the question be

21   read back?

22           THE COURT:  Yes.  Please read the question.

23           (Record read)

24   A.  Yes.

25   Q.  That was the year after your salary was cut to 60,000,

1     correct?

2              MS. KAPLAN:  Asked and answered.

3              THE COURT:  Sustained.

4     Q.  Did you receive an advance for that book?

5     A.  Yes.

6     Q.  And that's the book where you put allegations against

7     president Trump, correct?

8     A.  Yes.

9     Q.  How much was the advance you received for that book?

10    A.  $70,000.

11    Q.  And you stated today that you have no issue using your

12    appearance to promote your book, isn't that correct?

13             MS. KAPLAN:  Objection.

14             THE COURT:  Did you say that today, Ms. Carroll?

15    A.  I don't remember saying it.

16    Q.  I can rephrase it.

17             Ms. Carroll, did you go on TV to promote the book,

18    What Do We Need Men For?

19    A.  Yes.  It was my duty as a writer to go on television to

20    promote the book.

21    Q.  It was your duty as a writer.

22             So in the prior books, did you go on Primetime TV four

23    times in 24 hours to promote the book?

24    A.  No.  I went on television, though, to promote the book for

25    the previous books, that's true.  Actually, for Mr. Right,

O1HsCAR5                          Carroll - Cross

1    Right Now, I went on eight consecutive weeks on The Early Show

2    on CBS.  So I went on television more for that book.

3    Q.  Didn't you work for CBS?

4    A.  No.

5    Q.  You never worked for CBS?

6    A.  I was con --

7                No.

8    Q.  Were you a contributor?

9    A.  When that book came out, they made me a contributor, and I

10   did it for seven weeks.  So I went on more television for that

11   book.

12   Q.  Was that Primetime?

13   A.  CBS Early Show.

14   Q.  And every time you went on that week, you discussed only

15   that book, is that correct?

16   A.  No.  It was wide-ranging because when you get on the

17   subject of courtship and finding the love of your life, the

18   subjects tend to expand.

19   Q.  Did you hold your books up when you went on the show those

20   eight weeks to promote --

21   A.  No, I didn't hold them up.  The producer made sure when I

22   was introduced to put a picture of the book.

23   Q.  When you went on Primetime TV for What Do We Need Men For

24   and discussed my client, did they put a picture of your book

25   up?

O1HsCAR5                    Carroll — Cross

1    A.  I believe so.

2    Q.  Are you sure, Ms. Carroll?

3    A.  I'm not sure.  You're right, I'm not sure.

4    Q.  Can you tell us generally, Ms. Carroll, what was What Do We

5    Need Men For about?

6    A.  Exactly what the title said, What Do We Need Men For.

7    That's what it was about.

8    Q.  Is president Trump the only man you talk about in this

9    book?

10              MS. KAPLAN:  Objection, your Honor.

11              THE COURT:  Overruled.

12   A.  No.

13   Q.  How many other men do you talk about?

14   A.  I talked about, in the book, about 70 or 80, maybe 90

15   different men.

16   Q.  How many pages are contained in the book, do you know,

17   Ms. Carroll?

18   A.  Yes.  274.

19   Q.  And how many pages of that book are centered around my

20   client?

21   A.  Nine.

22   Q.  Do you know how many times the name Donald Trump is in that

23   back, Ms. Carroll?

24   A.  I think once.

25   Q.  Correct.  One time.

1              And after release of the book, how many times did you

2    mention his name in your interviews?

3    A.   Probably an answer, I believe it was more the interviewers

4    who were mentioning Donald Trump.  I'm not sure.  I wasn't

5    clocking it.

6    Q.   Approximately how many shows did you do?

7    A.   Four.

8    Q.   Four Primetime shows?

9    A.   Not -- not even Primetime.  One was Alisyn Camerota on at

10   six o'clock in the morning on CNN.  So not Primetime.

11   Q.   Do you think you mentioned his name five times?

12   A.   I have -- I didn't like mentioning his name, but usually it

13   was the interviewer.

14   Q.   You didn't like mentioning his name, is that what your

15   testimony is today?

16              That was a question, Ms. Carroll.

17   A.   I was a little surprised at the overwhelming, overwhelming

18   coverage and the questions.

19   Q.   Ms. Carroll, my question was, is your testimony that you

20   don't like mentioning Donald Trump's name?

21              MS. KAPLAN:  Objection, your Honor.

22              THE COURT:  Overruled.

23   A.   No, I don't like mentioning it.

24   Q.   But you do it often, don't you, Ms. Carroll?

25   A.   I did it here because that's the topic.  But in everyday

1   life, very rare.

2   Q.  But the topic of your book What Do We Need Men For was not

3   Donald Trump, was it, Ms. Carroll?

4   A.  No, it was not.

5   Q.  But when you promoted it on those four shows, you spoke

6   about Donald Trump, the man that was named one time, is that

7   correct?

8   A.  When I went on television, it was up to the producers and

9   the person interviewing me what the topic was.

10  Q.  Ms. Carroll, did you mention any of the other men?

11  A.  I may have because several of the men that I mentioned in

12  my life were done in a humorous way.

13  Q.  Several men were done in a humorous way.  I don't

14  understand.

15          What does that mean, Ms. Carroll?

16  A.  It means that when I was talking about the book, I also

17  wanted to talk about the women and what they thought about men,

18  but it didn't do any good.  The interviewers were very

19  interested in Donald Trump.

20  Q.  So when you went on Primetime, did you speak about the

21  women and what they thought?

22  A.  I tried to.  I wanted to.

23  Q.  We'll get back to that.

24          You first came public with your allegations against

25  the president on June 21, 2019, is that correct?

1   A.  Yes.

2   Q.  That was before the book came out, correct?

3   A.  Yes.

4   Q.  I'm sorry.  You're going to have to give verbal answers for

5   the court reporter.

6   A.  Yes, yes, yes.

7   Q.  OK.  Thank you.

8           And you chose to give the exclusive to The Cut,

9   correct?

10  A.  To New York Magazine, yes.

11  Q.  The Cut is a part of New York Magazine, correct?

12  A.  Yes, yes.

13  Q.  But you chose to give it to The Cut, isn't that right?

14  A.  Yes.

15  Q.  And I'm sure you would agree that New York Magazine is a

16  popular publication, wouldn't you agree?

17  A.  Yes.

18  Q.  Wasn't it your testimony prior that it was one of your

19  goals to be featured in New York Magazine?

20  A.  I had been featured in New York Magazine several times

21  before this.

22  Q.  But, as you said, as a journalist, it was one of your goals

23  to be featured in New York Magazine at one point, correct?

24          MS. KAPLAN:  Objection.

25  A.  Yes, but I achieved that goal way before 2019.

O1HsCAR5                          Carroll – Cross

1    Q.  But, Ms. Carroll, you chose The Cut to feature this because

2    you thought they knew how to break the news, isn't that

3    correct?

4    A.  Yes, because they were a sterling news magazine.

5    Q.  And you were paid $7,000 for that exclusive interview,

6    weren't you?

7    A.  That went to the publisher, not to me.

8    Q.  Who is the publisher?

9    A.  St. Martin's.

10   Q.  The publisher of the book that you wrote, is that correct?

11   A.  Yes, yes.  They received the $7,000, I did not.

12   Q.  The reason they received the $7,000 is because you got the

13   $70,000 advance, isn't that correct?

14   A.  I got the $70,000 advance and the 7,000 went to pay off

15   that advance because the book was not selling.

16   Q.  Right.  Well, you hadn't sold it yet at this point when you

17   put out The Cut, isn't that correct?

18   A.  No, you're right.

19   Q.  Right.

20          So it's misleading to say that the book is not selling

21   because, in fact, the book had not yet come out, correct?

22          MS. KAPLAN:  Objection, your Honor.

23          THE COURT:  Sustained.

24   Q.  The article for The Cut was released around noon on

25   June 21, 2019, is that right?

O1HsCAR5                    Carroll - Cross

1    A.  Sometime after noon.

2    Q.  So if I represented to you that it was released at 12:14,

3    would that sound about right to you?

4    A.  I'm glad to give the date, yes.  It could be.

5    Q.  And the president's initial response to that article, it

6    wasn't issued until about five hours later at 5:17, correct?

7    A.  No.  The White House ran a denial when the piece was

8    published.  It's right in the piece.  It's in the excerpt.

9    Q.  Right.  So, Ms. Carroll, this lawsuit, that you're saying

10   was prior to the president's statement at 5:17, is that your

11   testimony?

12   A.  I don't understand the question.

13          MS. KAPLAN:  Objection.

14          THE COURT:  Sustained.

15   Q.  Let me walk you through this.  I'll walk through

16   chronologically.

17          You put an article out with The Cut, correct?

18   A.  I put --

19   Q.  In The Cut?

20   A.  Yes, in New York Magazine.  It went online on June 21st,

21   2019.

22   Q.  And did they reach out to the White House for comment?

23   A.  Yes, they reached out.  We had reached -- we had reached

24   the end of fact-checking, that was on a Wednesday or a

25   Thursday.  They said one more thing to do, we have to contact

O1HsCAR5                         Carroll - Cross

1   the White House, tell them what we are running, and get their

2   reaction.  And they got the reaction.  New York never intended

3   to publish this on Friday.  That's a bad time to come out with

4   a news piece.  Monday was the goal.  We were slated to go on

5   Monday at six a.m.

6          However, the New York Times got the story, and because

7   New York Magazine did not want to be scooped by The Times, they

8   went with it on Friday.

9   Q.  For maximum exposure, correct?

10  A.  No.  They wanted to go on Monday, but they didn't want The

11  Times to have the story first.

12  Q.  Because they make money the more they sell the story,

13  correct?

14          MS. KAPLAN:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.  Did The Cut --

17          THE COURT:  Excuse me.

18  Q.  -- contact Donald Trump?

19  A.  Yes.  The fact-checkers spoke with -- I don't know if she

20  spoke with president Trump in person.  I have no idea.

21  Q.  Do you believe that when somebody from the news writes a

22  story about a president, they contact the president directly?

23  A.  I think our finest reporters do contact the president in

24  person.

25  Q.  Do you know if there is a communications team for the White

O1HsCAR5                         Carroll - Cross

1    House?

2    A.  I don't know how that White House works.

3    Q.  I'll represent to you that there is a communications --

4         THE COURT:  Counsel, we're not going to have any

5    representations.

6         MS. KAPLAN:  Objection.

7         MS. HABBA:  It goes to my next question.

8         THE COURT:  I don't care what it goes to.  We're not

9    going to have any representations.  If you want to make

10   representations, you can be called as a witness.

11   BY MS. HABBA:

12   Q.  Did you sue the president for that statement the White

13   House issued in The Cut?

14   A.  No.

15   Q.  Is that part of the suit today?

16   A.  No.

17   Q.  OK.  So the statement at 5:17 was also issued from the

18   White House; we had it up prior, is that correct?

19   A.  No.  The one we had up and looked at was issued by

20   president Trump.

21   Q.  Can we please pull up PX 1.

22   A.  Yes.

23   Q.  Do you see that, Ms. Carroll?

24   A.  That was -- it says statement from president Donald J.

25   Trump.

O1HsCAR5                    Carroll - Cross

1   Q.   And do you see who tweeted that?

2   A.   Yes.  Laura Litvan.

3   Q.   And that was at 5:17 p.m., correct?

4   A.   Yes.

5   Q.   Was that the first time you read a denial from president

6   Trump?

7   A.   No.  I read it in the excerpt before it went live.

8   Q.   But you didn't sue him for the excerpt when it went live,

9   did you?

10  A.   No.

11          THE COURT:  Ms. Carroll, just for clarification, the

12  5:17, this is the time the e-mail from Ms. Litvan was sent?

13          THE WITNESS:  Yes.  The tweet, yes.

14          THE COURT:  All right.

15  BY MS. HABBA:

16  Q.   Ms. Carroll, your case today is that you were harmed by the

17  statements made on June 21st, 2019, correct?

18  A.   Yes.

19  Q.   That's this statement?

20  A.   Yes.

21  Q.   So there was time before this, in fact, on social media, a

22  wave of tweets came out when you came out with your story on

23  The Cut that repudiated your account before president Trump put

24  this statement out, is that correct?

25  A.   There was -- they -- the White House ran a denial in the

O1HsCAR5                    Carroll - Cross

1   story, in the excerpt.

2   Q.  That was not my question, Ms. Carroll.

3        There was time between when you put out The Cut

4   article and when president Trump made this statement, is that

5   correct?

6   A.  That is correct.

7   Q.  And if I told you that was about five hours, would that

8   sound about right?

9   A.  Yes.

10  Q.  And didn't many people call you a liar on social media

11  during that five-hour gap?

12  A.  Yes, because the White House had denied it.

13  Q.  Ms. Carroll, I'm going to ask you questions and you're

14  happy to answer them directly, but I'll ask another question if

15  I need one.

16       Did you sue the White House for the denial?

17  A.  No.

18  Q.  As I was saying, many people called you a liar on social

19  media before the president issued his statement.  I'm going --

20           MS. KAPLAN:  Asked and answered, your Honor.

21           MS. HABBA:  I was not finished.

22  Q.  I'm going to show you some of those statements.

23       Do you recall this tweet dated June 21, 2019.  Can we

24  please pull it up.

25       It states, You're a pathetic ugly old hag.  No one in

O1HsCAR5                    Carroll - Cross

1    their right mind will believe these lies --

2             MS. KAPLAN:  Your Honor, it's not in evidence.

3             THE COURT:  I'm sorry.

4             MS. KAPLAN:  It's not in evidence.

5             THE COURT:  Let's take a break right here.

6             What exhibit is this, Ms. Habba?

7             MS. HABBA:  I'm trying to get it in, your Honor.  I

8    have to ask about it.

9             THE COURT:  Guess what?

10            You may not read from a document that's not in

11   evidence.

12            MS. HABBA:  Sure.

13            Let me get it in.

14            THE COURT:  No.  We're going to take a break now.

15            MS. HABBA:  OK.

16            THE COURT:  Until 3:30.

17            MS. HABBA:  Great.

18            THE COURT:  During which you should refresh your

19   memory about how it is you get a document into evidence.

20            (Recess)

21            THE DEPUTY CLERK:  Ms. Kaplan, is Ms. Carroll taking

22   the stand now?

23            MS. KAPLAN:  Yes.  I wanted to raise an issue, your

24   Honor.

25            THE COURT:  Pardon me?

O1HsCAR5                     Carroll - Cross

1          MS. KAPLAN:  I wanted to raise an issue.

2          THE COURT:  Yes.  What's that?

3          MS. KAPLAN:  So, your Honor, obviously Ms. Habba has a

4    right to show exhibits to the witness during cross-examination

5    and she doesn't have to show us those exhibits in advance.

6          Some of the things that were on her slide looked like

7    they needed to be redacted.  I'm very concerned, given what

8    just happened before the break, that documents with material

9    that is off limits in some manner is shown.

10          THE COURT:  So when the document is authenticated and

11    offered, that's when you say objection.

12          MS. KAPLAN:  OK, your Honor.

13          THE COURT:  That's when we deal with it.

14          MS. KAPLAN:  OK.  I'll go get E. Jean.

15          THE COURT:  Ms. Habba, you can't read from documents

16    that are not in evidence.

17          MS. HABBA:  I understand that.

18          (Counsel confer)

19          (Continued on next page)

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Ms. Carroll, you're still under oath.

 3              You may proceed, Ms. Habba.

 4    BY MS. HABBA:

 5    Q.  Ms. Carroll, before we broke I asked you if you had

 6    received a series of tweets to your Twitter account that had

 7    called you a liar, among other things, in that five-hour gap

 8    before the president issued his statement.

 9              Do you remember that?

10    A.  Yes.

11    Q.  OK.  What was your response to that question?

12    A.  I had received them, yes.  I hadn't seen them, but I

13    received them, I guess.

14    Q.  You hadn't seen them?

15    A.  Was it directed to me?

16    Q.  I'm happy to walk you through that, Ms. Carroll.

17              Is your Twitter handle @*EJeanCarroll*?

18    A.  Yes.

19    Q.  What we're going to do, I spoke with opposing counsel.  I'm

20    going to show you a series of tweets.  It will not be published

21    to the jury until counsel sees it.  It will hopefully refresh

22    your recollection.

23              Can you see that on your screen, Ms. Carroll?

24              I'm not going to read it in.

25    A.  Yes.

O1HsCAR5                          Carroll - Cross

1   Q.  Do you recall, is that you @EJeanCarroll there?

2   A.  Yes.

3   Q.  Are you tagged in that post?

4   A.  Yes.

5   Q.  Can you explain --

6           THE COURT:  I'm sorry.  We're just not going to go

7   into the contents of the documents.

8           MS. HABBA:  I'm not.

9           THE COURT:  Well, you just did.

10          MS. HABBA:  I have to authenticate it.

11          THE COURT:  Your last two questions were precisely

12  that.  Yes, indeed.

13          MS. HABBA:  Your Honor, how would you recommend I make

14  sure that this is her Twitter that was tagged?

15          She said she didn't have knowledge of it.

16          THE COURT:  I recommend that you show it to her and

17  ask her if she recognizes it.

18          MS. HABBA:  I did.

19          THE COURT:  And if she does, then you ask her what it

20  is, and she will tell you what kind of a document it is and

21  we'll go from there.  And if you offer it --

22          MS. HABBA:  Fine, your Honor.

23          Understood, your Honor.

24          THE COURT:  Yes.

25  BY MS. HABBA:

O1HsCAR5                     Carroll – Cross

1    Q.  Ms. Carroll.

2    A.  Yes.

3    Q.  Do you recognize this document?

4    A.  Yes.

5    Q.  What is it?

6    A.  It's a tweet.

7            THE COURT:  And what's the exhibit number?

8            MS. HABBA:  DX22.

9            THE COURT:  It's not marked.

10           MS. HABBA:  I'm asking, I'm trying to mark it as an

11   exhibit to enter into evidence.

12           THE COURT:  It should be premarked.

13           MS. HABBA:  Your Honor, counsel and I just discussed

14   this and had an agreement I would show them this before.  If

15   you would like, we can move on.

16           I'll move on.

17           THE COURT:  Why don't you do it in the normal way, get

18   it ready overnight and do it appropriately.

19           MS. HABBA:  They had the exhibits, your Honor.  These

20   are impeachment evidence.  I asked if she represented --

21           THE COURT:  They need to be premarked to avoid just

22   what is happening.

23   BY MS. HABBA:

24   Q.  Ms. Carroll.

25   A.  Yes.

O1HsCAR5                         Carroll – Cross

1    Q.  When your allegation was first released, did you anticipate

2    that the general public would immediately believe your

3    allegations?

4    A.  I -- I didn't think who would believe or who would not

5    believe, I just made the accusation.

6    Q.  Didn't you say in your book that the facts were so odd that

7    you felt that you needed to clear them up from the start?

8              MS. KAPLAN:  Objection, your Honor.

9              THE COURT:  Ground.

10             MS. KAPLAN:  Your collateral estoppel motion, your

11   motion in limine decision.

12             THE COURT:  Sidebar.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O1HsCAR5                        Carroll - Cross

1              (At the sidebar)

2              MS. KAPLAN:  The question was, didn't you say in your

3      book -- wait -- general public would not believe your opinion.

4      That has to go with the truth of what she said.

5              MR. MADAIO:  Your Honor, it goes to --

6              MS. HABBA:  He is going to say --

7              I'm sorry, your Honor.  I didn't want him to

8      interrupt.

9              MR. MADAIO:  Your Honor, it goes to what her

10     expectation was.  She admits it was a difficult-to-believe

11     story.  She put it out there.  She made it public.  It goes

12     towards whatever sort of backlash she was expecting.  It's out

13     in the public, relevant to any emotional harm she suffered,

14     and, again, her reputation.

15             Whether or not the story was believable to begin with

16     relates to whether or not it was president Trump's statement or

17     initial accusation.  She herself put out a statement saying

18     it's a difficult-to-believe story, so it's relevant.

19             MS. KAPLAN:  Your Honor, this is like the huge tail

20     wagging a very small dog.  To introduce evidence that her

21     statement was unbelievable, the overwhelming weight of that is

22     they are trying to suggest that the statement was unbelievable.

23     We have a jury determination that it was true.

24             MR. MADAIO:  Your Honor, one of the main issues in

25     this case is causation.  These statements, these tweets aimed

O1HsCAR5                          Carroll - Cross

1     at Ms. Carroll, were they because of her initial accusation or

2     Mr. Trump, president Trump's response.  The believability of

3     her story goes towards whether or not people would initially

4     think of her as a liar.  It's absolutely relevant.

5              THE COURT:  I understand the relevance argument.  It's

6     not wholly without merit.  The unfair, prejudicial effect of

7     this is impugning the accuracy of the prior determination,

8     which is binding on your client, outweighs whatever probative

9     value this has on the subject of whether or not it was

10    farfetched.

11             MS. HABBA:  While we're on the sidebar, your Honor,

12    just so I want to be clear, so before it goes to emotional

13    damages and her being shocked by the tweets, can I discuss

14    this, so we don't have to stop?

15             THE COURT:  I never know how it is going to come out

16    from you.

17             MS. HABBA:  OK.

18             THE COURT:  Or anybody else for that matter.

19             MS. HABBA:  OK.

20             (Continued on next page)

21

22

23

24

25

O1HsCAR5                          Carroll - Cross

1              (In open court)

2              THE COURT:  Next question.

3    BY MS. HABBA:

4    Q.  Ms. Carroll.

5    A.  Yes.

6    Q.  Were you surprised that there was backlash because of your

7    article in The Cut?

8    A.  I didn't look forward to backlash.  I was surprised at the

9    backlash.

10   Q.  My question was, were you surprised that there was backlash

11   when you accused a sitting president what you accused him of?

12   A.  I expected there to be a reaction.

13   Q.  A rash?

14   A.  A reaction.

15   Q.  Would that include backlash?

16              MS. KAPLAN:  Objection.

17              THE COURT:  Depends what backlash means, doesn't it.

18   Q.  That's what I'm trying to -- I can ask another question.

19              THE COURT:  Sustained as to form.

20              Next question.

21   Q.  Ms. Carroll, couldn't you --

22              You're a journalist, correct?

23   A.  Yes.

24   Q.  Couldn't you have expected that some people would not

25   believe you, your allegations?

O1HsCAR5                          Carroll - Cross

1    A.  Absolutely.

2            MS. KAPLAN:  Objection, your Honor.

3    A.  Yes.

4    Q.  And didn't you say that you suspected that would happen in

5    your book?

6    A.  Yes.

7            THE COURT:  The answer is stricken.  The jury will

8    disregard it.  I ruled at that at the sidebar, and you just

9    ignored the ruling.

10   Q.  Now, you said you received threatening messages in your

11   testimony today, correct?

12   A.  Yes.

13   Q.  And you deleted those messages?

14   A.  Yes.

15   Q.  And do you know what happens when you delete a message from

16   your inbox?

17   A.  It goes into the trash in my computer, and then the trash

18   is emptied automatically every 30 days, I think.

19   Q.  Did you ever delete the e-mails from the trash section of

20   your e-mail?

21   A.  I probably did.

22   Q.  So your testimony is that you deleted the messages and then

23   they went to the trash and then you went into the trash and

24   deleted the trash as well, correct?

25   A.  I didn't go into the trash, I just periodically empty my

O1HsCAR5                          Carroll - Cross

1  trash in my computer because it's an old computer and tends to

2  slow down if I have a lot in the trash.

3  Q.  Did you stop deleting these threatening messages at any

4  point, Ms. Carroll?

5  A.  Yes.

6  Q.  What was that point?

7  A.  Actually, I went on deleting most of the replies.  I

8  stopped right around the second lawsuit.  The one in May, I

9  stopped.

10  Q.  The first trial we had was when you stopped deleting them?

11  A.  Well, no.

12  Q.  That is correct?

13  A.  I don't remember deleting any around that time or since

14  then.

15  Q.  I'm confused, Ms. Carroll.  You stated in your testimony

16  today that you received death threats daily, correct?

17  A.  Not daily, but often.

18  Q.  Often, OK.

19        And you deleted those messages all until you were in

20  the middle of trial, is that your testimony today?

21  A.  No.

22  Q.  So please explain to me what you meant by that.

23  A.  I --

24        THE COURT:  Explain what she meant by what?

25  BY MS. HABBA:

O1HsCAR5                          Carroll - Cross

1    Q.   When did you stop deleting the death threats?

2    A.   I generally got rid of many of the replies on Twitter and

3    on Facebook.  I would just delete, delete, delete.  I did not

4    delete my post, but I deleted the replies.  I hadn't realized

5    how many death threats there were in my private messages.

6    Q.   Ms. Carroll, my question is, when did you stop deleting

7    them, the messages that you just spoke about?

8    A.   Probably 2023.

9    Q.   2023.

10   A.   Um-hmm.  I don't --

11   Q.   Ms. Carroll.

12   A.   Yes.

13   Q.   Did you receive a subpoena in this matter or in the

14   original matter?

15   A.   Yes.

16   Q.   Do you know what discovery is?

17   A.   Yes.

18   Q.   Do you understand that you had a duty to preserve

19   documents?

20   A.   I preserve every single one of my posts.  I didn't know

21   that the replies, which were just a wave of slime, was part of

22   that.  They were just replies.  My posts, I never deleted.

23   Q.   What about e-mails in your inbox?

24   A.   No.

25   Q.   No, you did not delete those?

O1HsCAR5                          Carroll - Cross

1   A.  No.  No, I did not.

2   Q.  So do you have, in your inbox, all the messages relating to

3   death threats that you spoke about today?

4   A.  No.  I deleted them early on because I didn't know how to

5   handle death threats.  I had no idea.  I thought deleting them

6   was the smartest, best, quickest way to get it out of my life.

7   Q.  Did you delete anything after you filed this lawsuit?

8            MS. KAPLAN:  Asked and answered, your Honor.

9            MS. HABBA:  I'm sorry, your Honor.  This is a very

10  important question I'm finding the answer out to.

11           MS. KAPLAN:  I'll also object to the commentary, your

12  Honor.

13           THE COURT:  We'll strike the commentary.  The jury

14  will disregard that.

15           Let me just look back a moment.

16           (Pause)

17           Answer the question, please, Ms. Carroll.

18  A.  Yes.

19           Again, can you repeat the question, please?

20           MS. HABBA:  Can I have it read back, please?

21           THE COURT:  Yes.  Please read it back, Ms. Reporter.

22           (Record read)

23  A.  I never deleted any of my posts or anything that I thought

24  that was the agreement.  May, may have deleted some e-mails.

25  Hated, that were filled with threats.  I can't say for sure.

1    Q.  So as you sit here today, these e-mails that I have not

2    seen that are deleted, according to you, you also didn't give

3    them to the police, correct?

4    A.  No, I never would.

5    Q.  Did you give them to anybody?

6    A.  No.

7    Q.  Did you give them to your lawyers?

8    A.  No, they -- no.

9    Q.  Why not?

10   A.  I don't like to upset people.

11              MS. KAPLAN:  Objection, your Honor.

12              THE COURT:  Overruled.

13              You have your answer.  Next question.

14   Q.  What about the e-mails supporting you, Ms. Carroll, do you

15   keep those?

16   A.  Some, yes.  Most.

17   Q.  Did you delete any of those after this, your first lawsuit

18   against the president?

19              THE COURT:  Which is the first lawsuit?

20              MS. HABBA:  This is the first lawsuit.

21   A.  I'm not sure.  The Ask E. Jean place where they come in, I

22   tend to delete questions to me about -- that I know I won't use

23   in the column, but I don't believe I deleted anything

24   supportive.  I think I had an entire label and I file, people

25   who send supportive messages, I file it all in that one place.

O1HsCAR5                         Carroll - Cross

1    Q.  Ms. Carroll, do you control your e-mail?

2    A.  Yes.

3    Q.  Can you provide me those e-mail --

4         Well, actually, I won't let you do that.

5         Do you control your e-mail?  Does anybody else control

6    your e-mail?

7    A.  Nobody.

8    Q.  Would anybody else have deleted the messages after we were

9    in active litigation?

10   A.  I don't think they would.

11   Q.  So only you could have done that, is that correct?

12   A.  Yes.

13   Q.  Ms. Carroll, are you aware that it is illegal to delete

14   evidence after a subpoena has been issued?

15        MS. KAPLAN:  Objection, your Honor.

16        THE COURT:  Sustained.

17        Jury will disregard the question.

18        MS. HABBA:  Your Honor.

19        THE COURT:  You're not instructing the jury, counsel.

20        MS. HABBA:  I was not going to.

21        Your Honor, at this moment, I feel I have to ask for a

22   mistrial.  The witness has just admitted to deleting evidence

23   herself, which are part of her claim of damages, and I haven't

24   seen them.  She has no evidence of them.  She hasn't turned

25   them over.

O1HsCAR5                          Carroll - Cross

 1              THE COURT:  Denied.

 2              The jury will disregard everything Ms. Habba just

 3   said.

 4   BY MS. HABBA:

 5   Q.  Ms. Carroll, your reaction to this story was that you were

 6   in a whirl of love and support, isn't that right?

 7   A.  Yes.

 8   Q.  And when you were interviewed, you said you couldn't feel

 9   more buoyant and happy, is that correct?

10   A.  Yes.

11   Q.  To that point, you said that people were coming up to you

12   in the street to praise you, is that correct?

13   A.  Yes.

14   Q.  And not just women, but men too, right?

15   A.  Yes.

16   Q.  You even went so far as to state that you were in a cocoon

17   of love and support, didn't you?

18   A.  Yes.

19   Q.  And you made these statements on June 28, almost a full

20   week after the president's statement that you have sued him

21   for, is that correct?

22   A.  Yes.

23   Q.  You concluded that it was quite marvelous, isn't that

24   right?

25   A.  Yes.

O1HsCAR5                        Carroll - Cross

1   Q.  So it appears you weren't suffering too much emotional harm

2   after his response, isn't that fair to say?

3   A.  No, that's not fair to say.  I experienced both great

4   support, which I found very encouraging, and on the other hand,

5   horrible, menacing, terrible flood of slime.  Both.  Both.

6   Both things occurred at the same time.

7   Q.  But some of that slime, let's call it -- let's use your

8   word -- happened before the president issued a statement, isn't

9   that correct?

10  A.  It was --

11  Q.  Yes or no, Ms. Carroll?

12  A.  No, because they were reacting to the White House

13  statement, I believe.

14  Q.  How do you know that?

15  A.  Because of their wording.

16  Q.  What was the White House statement in The Cut?

17  A.  I would have to have it if front of me.  I don't have it

18  memorized.

19  Q.  Do we have the article?  I'll get back to it.

20          So a denial from the White House would mean that any

21  statement after that, echoing it, should be president Trump's

22  fault, is that correct?

23  A.  No.

24          MS. KAPLAN:  Objection, your Honor.

25          THE COURT:  You have the answer.

O1HsCAR5                          Carroll - Cross

1          Continue.

2     Q.  Didn't you previously say that you stayed off social media

3     and refused to read the negative comments made about you

4     because you felt they were not real?

5     A.  Yes, I've said that.  I go off and on social media, like

6     everybody.  Once in a while I take a break from social media,

7     then I'm back on social media to read the breaking news.

8     Q.  So when you take a break from social media, as you describe

9     it, that's so that you're not affected by the negative reaction

10    to the article you put out, is that correct?

11    A.  It's to temper the flood and to take a break.  We can't

12    live by Twitter alone.

13    Q.  But you stated that this blowback was fake and that you

14    were in cocoon of love, correct?

15    A.  On the one hand, I did feel very supported.

16    Q.  But now you believe that these tweets are real?

17          MS. KAPLAN:  Objection, your Honor.

18    Q.  Not fake, is that correct?

19          THE COURT:  Sustained.

20    Q.  Do you believe these tweets are real now, today?

21          MS. KAPLAN:  Objection, your Honor.

22          THE COURT:  Sustained.

23    Q.  On June 21, 2019, the excerpt, the day after the excerpt

24    was published -- excuse me, the very day the excerpt was

25    published -- president Trump came up with that first statement,

O1HsCAR5                        Carroll - Cross

```
1    is that correct?
2    A.  Yes.
3    Q.  And on June 22, Lisa Birnbach, your close friend, texted
4    you, isn't that correct?
5    A.  Yes.
6              MS. HABBA:  Your Honor, I would like to introduce the
7    next exhibit which has been identified as DX 11.
8              MS. KAPLAN:  Do you have a copy?
9              THE COURT:  Is this already in?
10             MS. HABBA:  Yes, your Honor.
11             THE COURT:  Then you don't have to introduce it.  You
12   have to show the exhibit that's in.
13   BY MS. HABBA:
14   Q.  Ms. Carroll.
15   A.  Yes.
16   Q.  Would you have any reason to doubt that this is a true and
17   accurate copy of a text?
18             THE COURT:  Sustained.
19             MS. KAPLAN:  PX 135, your Honor.
20             MS. HABBA:  PX 135.
21   Q.  Was this the day after president Trump's first statement?
22   A.  Yes.
23   Q.  And what did you text her, do you remember?
24   A.  Yes, I texted I was fine as wine and I slept until noon.
25   Q.  And you stated today, well, do you have -- you stated today
```

O1HsCAR5                        Carroll - Cross

1    that you think you were confused when I asked you about this in

2    a deposition, correct?

3    A.   I didn't realize that it was, um, the -- that it was -- I

4    typed this after that horrible night.  This was -- and I did

5    sleep until noon the next -- I had just not put the timeframe

6    together.

7    Q.   So today it's not accurate, is that your testimony?

8                 MS. KAPLAN:  Objection.

9                 THE COURT:  Sustained.

10   Q.   But here, Ms. Birnbach was one of your close friends,

11   correct?

12   A.   Yes.

13   Q.   Would you lie to Ms. Birnbach?

14                MS. KAPLAN:  Objection, your Honor.

15                THE COURT:  Sustained.

16   A.   I --

17                THE COURT:  Sustained.

18   Q.   You gave an interview to Vanity Fair on June 28, 2019,

19   correct?

20   A.   Yes.

21   Q.   And during this interview, you stated that you love being

22   in the public eye, correct?

23   A.   Yes.

24   Q.   You're happy that you're no longer living a private life in

25   Montana, you said that, didn't you?

O1HsCAR5                          Carroll - Cross

 1   A.  I don't remember saying it.  If you say I did, yes.

 2   Q.  You don't have to take my word for it, Ms. Carroll.

 3             Can we please show the witness Vanity Fair article?

 4             MS. KAPLAN:  Plaintiff's Exhibit 145, your Honor.

 5   Q.  Do you recall your attorney asking you questions about this

 6   article?

 7   A.  Yes.

 8   Q.  Do you recall saying in that Vanity Fair article it is

 9   incredibly heart-warming receiving all the messages from the

10   public, after you came out with your story?

11   A.  Yes.

12   Q.  So you enjoyed that fame, didn't you, Ms. Carroll?

13   A.  It wasn't fame.  It was warmth, and I enjoyed it immensely.

14   Q.  Warmth.  OK.

15             Just for context, this was within the week that

16   president Trump's statement came out, correct?

17   A.  Yes.

18   Q.  Now, you would agree that you attracted a lot of media

19   exposure after you came forward with your story about president

20   Trump, isn't that right?

21   A.  Yes.

22   Q.  During these media appearances, you were both promoting

23   your book and discussing your allegations against president

24   Trump, correct?

25   A.  I was promoting my book, yes.  And in the promoting of the

O1HsCAR5                    Carroll - Cross

1    book, I would discuss the allegations.

2    Q.  You would discuss the allegations against president Trump

3    only, correct?

4    A.  Yes.

5    Q.  Nobody else?

6           MS. KAPLAN:  Objection, your Honor.

7           THE COURT:  Overruled.

8    Q.  Was Donald Trump the only one you discussed in those

9    appearances?

10   A.  Yes.  Donald Trump is the only one the interviewers were

11   interested in.

12   Q.  But you were trying to promote your book that was 274 pages

13   long, correct?

14   A.  Yes.  Yes.

15   Q.  And when you were on Primetime TV, you can answer those

16   questions how you want, correct?

17   A.  I could try to steer the conversation.  I couldn't do it.

18   Q.  Could you have mentioned any of the other people named in

19   the book?

20   A.  I could have.  I didn't.

21   Q.  So if you were so damaged by president Trump's statements

22   and all this backlash, wouldn't you have stopped going on

23   Primetime TV, Ms. Carroll?

24   A.  I did.  After four interviews, I was done.

25   Q.  When did you start the interviews?

O1HsCAR5                         Carroll - Cross

```
 1   A.  In June 21, and I think they ended by June 23 or June 24
 2   was the last interview.  That was Anderson Cooper.
 3   Q.  June 21 was the day that The Cut was released, is that
 4   correct?
 5   A.  Yes, and I was done doing television on Monday, the 24th.
 6   Q.  So you did TV for days?
 7   A.  No, I did four.  I didn't do days.  I just did four
 8   television appearances.
 9   Q.  Ms. Carroll, correct me if I'm wrong.  I thought you just
10   said the 21st was your first appearance and the 24th was your
11   last, is that not correct?
12   A.  That's correct.
13   Q.  Did you have to accept the appearances you were asked to do
14   after the 21st, your first appearance?
15   A.  No, I didn't have to accept it.
16   Q.  Did you accept it?
17   A.  Of course.  I was promoting my book.
18   Q.  Did they ask you about anything in the book other than
19   president Trump?
20   A.  No.  They were very interested in president Trump.
21   Q.  But didn't you testify today that you don't like talking
22   about Donald Trump?
23          MS. KAPLAN:  Objection, your Honor.  This has been
24   asked and answered multiple times.
25          THE COURT:  Sustained.
```

O1HsCAR5                        Carroll - Cross

1   Q.  You were also in a number of podcasts after you came out

2   with your account, isn't that correct?

3   A.  Four or five podcasts, yes.

4   Q.  Were you on Unstyled by Refinery29's Christene Barberich?

5   A.  Yes.

6   Q.  Were you on The Maris Review by Maris Kreizman?

7   A.  Yes.

8   Q.  Were you on CheerLEADING for Democracy with E. Jean Carroll

9   on The MeidasTouch?

10  A.  Yes.

11  Q.  Were you on the New York Times Daily podcast?

12  A.  Yes.

13  Q.  Were you on Trumpcast, a Slate Plus podcast?

14  A.  Yes.

15  Q.  Were you on Women Who Travel podcast, which is a Condé Nast

16  Traveler podcast?

17  A.  Yes, that one I like.  We didn't mention Donald Trump.

18  Q.  Were you on By the Book, bonus episodes, Speaking Out and

19  Giving Advice?

20  A.  I'm not sure.

21  Q.  All Ears with Abigail Disney?

22  A.  That was -- that was recently.

23  Q.  That was recently?

24  A.  That was last year, yeah.

25  Q.  Last year.

1          So that was after the 24th, correct?

2    A.  Yes.

3    Q.  So, after the 24th, when you said you stopped, did you

4    continue again to do appearances?

5          MS. KAPLAN:  Objection, your Honor.

6          THE COURT:  Sustained.  Misrepresents the testimony.

7    Q.  Ms. Carroll, have you done TV appearances about president

8    Trump since 2019, after June 24th?

9    A.  Yes, only one last year.  When we won the trial, I did TV

10   appearances.

11   Q.  How many did you do?

12   A.  Five.

13   Q.  Did you say Donald Trump then?

14         MS. KAPLAN:  Objection, your Honor.  I don't know what

15   that means.

16         MS. HABBA:  She testified that she doesn't like to use

17   his name.  I'm asking her if she used his name again last year

18   when she did those five appearances?

19   A.  Yes, I said his name.

20   Q.  You were also featured on a host of television interviews

21   following the publication of your book, right?

22   A.  Yes, four.

23   Q.  Was that MSNBC with Lawrence O'Donnell?

24   A.  Yes.

25   Q.  CNN with Ms. Camerota?

O1HsCAR5                          Carroll - Cross

1    A.  Yes.

2    Q.  Anderson Cooper on CNN?

3    A.  Yes.

4    Q.  And MSNBC with Chris Matthews?

5    A.  Yes.

6    Q.  That's a lot of appearances for somebody who doesn't want

7    to attract attention, isn't it, Ms. Carroll?

8              MS. KAPLAN:  Objection.

9              THE COURT:  Sustained.  That's argumentative and

10   inappropriate.

11   Q.  Who handled your appearances, Ms. Carroll?

12   A.  The publisher.

13   Q.  The publisher of What Do We Need Men For?

14   A.  Yes.

15   Q.  Are they a publicist?

16   A.  No.  They had an entire publicity department, and the vice

17   president of publicity handled my book.

18   Q.  So did they book you?

19   A.  Yes.

20   Q.  Did you have to accept those interviews before they could

21   book you?

22             MS. KAPLAN:  Asked and answered, your Honor.

23             THE COURT:  Sustained.

24             MS. HABBA:  I haven't --

25             THE COURT:  Yes, you have.

1  Q.  Did you have an agent, Ms. Carroll?

2  A.  Yes.

3  Q.  Do you still have an agent, Ms. Carroll?

4  A.  No.

5  Q.  Do you have a publicist currently?

6  A.  No.

7  Q.  How do you get booked on TV now?

8  A.  I don't get booked on TV.  I don't go on TV.

9  Q.  Were you on TV in the last year?

10  A.  Yes, when we won this case.

11  Q.  I didn't ask why.

12  A.  That was the last trial, yes.

13  Q.  Who booked that?

14  A.  The publicist that is employed by Kaplan Hecker & Fink.

15  Q.  So if you have a publicist for the book, or your lawyer's

16  publicist, they book you on the shows, not yourself; is that

17  what you're saying to me?

18          MS. KAPLAN:  Objection to form.

19          THE COURT:  Sustained as to form.

20          Rephrase it.

21          MS. HABBA:  Sure.

22  Q.  You don't book yourself on TV, is that your testimony?

23  A.  No, I don't.

24  Q.  But do you go willingly on TV?

25          MS. KAPLAN:  Objection, your Honor.

1           MS. HABBA:  What's the objection?

2           MS. KAPLAN:  Asked and answered multiple times.

3           THE COURT:  Multiple times.

4  Q.  Ms. Carroll, who pays for those publicists?

5           MS. KAPLAN:  Objection to form, your Honor.

6           THE COURT:  Sustained.

7  Q.  Ms. Carroll.

8  A.  Yes.

9  Q.  Status is important to you, isn't it?

10  A.  Yes.

11  Q.  And you stated that in New York, status is everything,

12  haven't you?

13  A.  I have stated status is very important.

14  Q.  Yet even after all of these appearances, you still want to

15  gain more publicity, don't you?

16  A.  Not necessarily.  I'm pretty much having my fill of it,

17  frankly.

18  Q.  So are you done promoting books?

19  A.  I'm done writing books, probably.

20  Q.  You don't have a book that you're currently writing with

21  Mary Trump?

22  A.  No.  That's on Substack.

23  Q.  That wasn't my question, Ms. Carroll.

24           Do you currently have a book that you're writing with

25  Mary Trump?

O1HsCAR5                      Carroll – Cross

1    A.  No.

2    Q.  No?

3          Are you writing any piece with Mary Trump?

4    A.  No.  Mary Trump is writing the novel, not me.

5    Q.  Are you involved in it?

6    A.  I -- I am in charge of the comments, the reader's comments.

7    Q.  And if that book makes money, will you make any money off

8    of it?

9    A.  No.  It's Mary's money.

10   Q.  Whose idea was that book?

11   A.  We were sitting around during the pandemic thinking of

12   Hallmark movies, which led us to talk about wouldn't it be fun

13   to do politic-free zone.  Let's just not talk about politics.

14   Let's do something romantic and selling and wonderful, and

15   let's just do that.  Mary sat down and started writing it, and

16   we decided let's put it on Substack.

17   Q.  Ms. Carroll, you have ever --

18          Let's stick to this.  Who is Mary Trump?

19   A.  She is Donald Trump's niece.

20   Q.  Has Mary Trump sued Donald Trump?

21          MS. KAPLAN:  Objection, your Honor.

22          THE COURT:  Sustained.

23   Q.  Have you ever said anything that you regret on national

24   television?

25   A.  Yes.

O1HsCAR5                    Carroll – Cross

1           MS. KAPLAN:  Objection, your Honor.

2           THE COURT:  What's the objection?

3           MS. KAPLAN:  Can we have a sidebar?

4           THE COURT:  Yes.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           MS. KAPLAN:  My concern, your Honor --

3           THE COURT:  I can't hear you.

4           MS. KAPLAN:  My concern, your Honor, is the answer to

5    that question is going to be the Anderson Cooper tape that we

6    just dealt with in motion practice.

7           MS. HABBA:  Your Honor, I asked about this.  I'm going

8    to ask about -- I'm not playing the tape.  I'm going to ask

9    about what happened after she made a statement that has nothing

10   to do with the underlying comment and that she actually fought

11   with people on Twitter about it.  She did not shy away from

12   them.

13          MS. KAPLAN:  I don't know what she's talking about.

14   If you ask her that question --

15          MS. HABBA:  If I ask the question --

16          THE COURT:  What is it?

17          MS. HABBA:  I have a series of tweets, your Honor,

18   where Ms. Carroll did not -- she actually got in arguments with

19   people on Twitter about her "rape is sexy" comment.

20          THE COURT:  These are the tweets where she said she

21   never said rape was sexy, right?

22          MS. HABBA:  No.  There is actually articles as well

23   that discuss that she got negative feedback from her cutting to

24   commercial by, Anderson Cooper cutting to commercial break and

25   that whole series.

O1HsCAR5                           Carroll - Cross

1              MR. MADAIO:  Your Honor, if I can clarify.  I'm sorry

2     for speaking.

3              But if I can clarify, I know you said in your order

4     that we had only shown her response.  To clarify here, we do

5     have tweets from other people mentioning the statement itself,

6     as well as her response.  So it sort of shows the public's

7     reaction.

8              THE COURT:  We're not going there.

9              MS. HABBA:  Your Honor, I have to make a record.

10             I don't understand how we can't go there when she

11    caused some of the backlash herself and we're in a damages

12    trial.

13             THE COURT:  I understand.

14             We're not going there.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              (Counsel confer)

3    BY MS. HABBA:

4    Q.  My colleague remained me of one thing.  I apologize I'm

5    going to go out of order, Ms. Carroll.

6              When you said you deleted e-mails, have you deleted

7    text messages as well, since this trial began?

8    A.  No.

9    Q.  So just e-mails that you've deleted?

10   A.  I'm not sure if I've deleted them, but my natural reaction

11   when I see a threat is to delete it.  So I can't be 100 percent

12   positive.

13             THE COURT:  Have you done that in the last 48 hours?

14             THE WITNESS:  No.

15   Q.  Have you done that in the last year?

16   A.  I don't believe so.  I may have.  The instinct is so

17   strong.  It's very hard to resist not getting rid of something

18   that causes my whole body to react.

19             MS. HABBA:  Your Honor, may we have a sidebar, please?

20             THE COURT:  No.

21             MS. HABBA:  OK.

22   Q.  Ms. Carroll, have you ever gotten in arguments with Twitter

23   users?

24   A.  Possibly.

25   Q.  Have you done that since the statement president Trump came

1    out with?

2    A.   Possibly.

3    Q.   But you said you were afraid, isn't that right,

4    Ms. Carroll?

5    A.   Yes, I've been afraid.

6    Q.   Did any of the death threats you received, were they also

7    oral, meaning a phone call, spoken?

8    A.   People did leave phone calls.  I never picked up the

9    messages.

10   Q.   Did you save those messages, Ms. Carroll?

11   A.   No.

12   Q.   Did you get any --

13   A.   I didn't know you could save them.  I didn't delete any

14   phone messages, so I guess ...

15   Q.   So you have never deleted messages from your phone in the

16   past year that include death threats?

17   A.   No.  I never received a death threat over the phone.

18   Q.   So all your death threats that you received that frightened

19   you were in writing, is that correct?

20   A.   Yes.

21   Q.   But you don't have any today, right?

22           MS. KAPLAN:  Objection, your Honor.

23           THE COURT:  Sustained.

24   Q.   You said you were afraid, but you never called the police,

25   isn't that correct?

O1HsCAR5                          Carroll – Cross

1    A.  It wouldn't do any good.

2    Q.  What is the basis of your thought that it wouldn't do any

3    good?

4    A.  Well, I would be calling them constantly to come to my

5    house, and it would be -- I don't want to -- the police force

6    is not large where I live, and they have better things to do

7    than to, you know, sit watch on my house.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1HQcar6                    Carroll - Cross

1    BY MS. HABBA:  (Continued)

2    Q.  My question was, did you ever report them?

3    A.  No, I never reported them.

4    Q.  So you don't know what the police would have done, do you?

5          MS. KAPLAN:  Objection, your Honor.

6          THE COURT:  Overruled.

7    Q.  Do you, Ms. Carroll?

8    A.  No, but I know pretty much the people who are the types to

9    deliver death threats use emails that they get off of Tor or

10   they use companies where they -- the IP addresses are hidden,

11   and so I don't see the use of reporting them.

12   Q.  But you have your dog outside --

13   A.  Yes.

14   Q.  So you -- please let me finish the question, Ms. Carroll.

15          Are you afraid that they're going to come to your

16   home?

17   A.  Yes.

18   Q.  But you've never called the police?

19   A.  No.

20   Q.  So as I sit here today, I have no way of knowing how many

21   death threats you've received and neither do the police,

22   correct?

23          MS. KAPLAN:  Objection, your Honor.

24          THE COURT:  What's the objection?

25          MS. KAPLAN:  Argumentative.

01HQcar6                        Carroll - Cross

1           THE COURT:  Sustained.

2    Q.  Ms. Carroll, have you had the same phone for the last four

3    years?

4    A.  Yes.

5    Q.  And you still have that phone?

6    A.  Yes.

7    Q.  You're a public person, aren't you, Ms. Carroll?

8           MS. KAPLAN:  Objection to form.

9           THE COURT:  Sustained as to form.

10   Q.  Ms. Carroll, who is Carol Martin?

11   A.  Carol Martin was a television anchor woman in New York, and

12   she is one of my very good friends.

13   Q.  Would you call her a confidante?

14   A.  Yes.

15   Q.  Did you speak to her about your allegations against my

16   client?

17   A.  Yes.

18   Q.  And did you write to her that you had no security threats

19   and felt safe walking in the streets New York alone?

20   A.  Yes.

21   Q.  And Ms. Kaplan showed you a series of messages between you

22   and Ms. Martin.  Isn't that correct?

23   A.  Yes.

24   Q.  And you told her that you felt safe, right?

25   A.  I do feel safe in New York City.

O1HQcar6                      Carroll - Cross

1   Q.  But she asked you prior about her own safety concerns,

2   Ms. Carroll?

3   A.  About her daughter's safety concerns.

4   Q.  So when you said there was nothing to worry about, don't

5   you think lying to her was inappropriate?

6   A.  No.  I think it preserved her sanity.  Her daughter would

7   have been -- her daughter was so worried as it was to see her

8   mother's name in the *New York Times*, and she just was beside

9   herself with fear.  And so to calm Carol's daughter down, I

10  said I thought the daughter and Carol's granddaughter were

11  safe.

12  Q.  You lied to Carol Martin when you said you hadn't received

13  death threats, isn't that correct, Ms. Carroll?

14  A.  I didn't directly --

15          MS. KAPLAN:  Objection.

16          THE COURT:  What's the objection?

17          MS. KAPLAN:  That's not what the testimony was.

18          THE COURT:  Overruled.

19  Q.  You told Ms. Martin:  "Do not worry.  I have been walking

20  these great New York streets the last six days alone, and at

21  night and all day long and receive nothing but thanks and

22  thumbs up.  It is the opposite of concern."  Did you say that?

23  A.  Yes.

24  Q.  And Ms. Martin was afraid for her daughter's safety.  Isn't

25  that correct?

O1HQcar6                          Carroll – Cross

1   A.  No, Ms. Martin wasn't.  Her daughter was frightened for the

2   safety of Carol's granddaughter.  They were not in jeopardy.

3   Q.  They were afraid, and you didn't tell them that you were

4   receiving death threats like you're saying today, correct?

5           MS. KAPLAN:  Objection, your Honor.  Asked and

6   answered.

7           THE COURT:  I'm sorry?

8           MS. HABBA:  No, it wasn't asked.

9           THE COURT:  Sustained.

10  Q.  Ms. Carroll, do you have a daughter?

11  A.  No.

12  Q.  Do you have a niece?

13  A.  Yes.

14  Q.  Would you want someone to tell you if they were in

15  jeopardy?

16          MS. KAPLAN:  Objection, your Honor.

17          THE COURT:  Sustained.

18  Q.  And you previously testified that you have a gun, correct?

19  A.  Yes.

20  Q.  It's a gun you inherited, correct?

21  A.  Yes.

22  Q.  I asked you about that gun some time ago.  Do you remember

23  that?

24  A.  Yes.

25  Q.  Do you have a license for that gun?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  No.

2    Q.  Do you still not have a license for that gun?

3    A.  I still do not have a license.

4    Q.  Are you aware that you have to have a license --

5           THE COURT:  Don't even start.

6           MS. HABBA:  -- with -- okay.

7    Q.  What kind of a gun is it?

8    A.  It's a high, standard high -- high standard revolver, nine

9    chambers.

10   Q.  And where is it kept?

11   A.  By my bed.

12   Q.  In your home?

13   A.  Yes.

14   Q.  And you have bullets for that gun?

15   A.  Yes, 22 long-range rifle bullets.

16   Q.  You live in this state.  I don't want you to give me your

17   address, but you live in this state, don't you, Ms. Carroll?

18   A.  I live in this state, yes.

19   Q.  Ms. Carroll, you stated that you had expected president

20   Trump to deny the allegations, correct?

21   A.  Yes.

22   Q.  But instead, he said he didn't know who you were and that

23   the encounter never happened.  Isn't that correct?

24   A.  Yes.

25   Q.  In fact, you knew he would deny them in some form before

O1HQcar6                         Carroll - Cross

1   you made them.  Isn't that right?

2   A.  Yes, I suspected very strongly that he would deny it and

3   say it was consensual.

4   Q.  And you were aware that you waited until he was the

5   president of the United States when you made these allegations,

6   correct?

7            MS. KAPLAN:  Objection, your Honor.

8            THE COURT:  Sustained as to form.

9   Q.  Ms. Carroll, did you know president Trump was the sitting

10  president of the United States when you chose to write the

11  article with *The Cut*?

12  A.  Yes.

13  Q.  So you knew there would be blowback, correct?

14  A.  I expected there would be, yes, great interest.

15  Q.  And despite the fact that you're telling us that you don't

16  like the blowback, you've continued to publicize every lawsuit

17  you've had against Donald Trump.  Isn't that correct?

18           MS. KAPLAN:  Objection, your Honor.

19           THE COURT:  Overruled.

20  Q.  You can answer.

21  A.  Yes.  As -- as I told you before, as an advice columnist, I

22  always advise take action, and that is what I do when I sued

23  Donald Trump.  I want people to know about it.  I am very

24  active about keeping people informed.  When I spoke up, it's

25  very hard to make me be quiet.

01HQcar6                        Carroll - Cross

1              MS. HABBA:  Your Honor, that was not responsive.  I'm

2      going to move to strike that.

3              MS. KAPLAN:  Completely responsive, your Honor.

4              THE COURT:  No, it's not.  Strike everything after

5      "Yes."  The jury will disregard it.

6      Q.  Ms. Carroll, you just said that you believe people should

7      speak up, correct?

8      A.  Yes.

9      Q.  Didn't you say at one point prior that you would advise

10     people not to go to HR with their accusations?

11             MS. KAPLAN:  Objection, your Honor.

12             THE COURT:  Overruled.

13     A.  I have advised in my column if you have a problem -- not

14     necessarily sexual assault though, but if you have a problem,

15     to avoid HR because they will generally decide the case that

16     will do the most good for the company.

17     Q.  So you haven't always said to speak up.  Is that right?

18             MS. KAPLAN:  Objection, your Honor.

19             THE COURT:  Sustained.  It's argumentative.

20     Q.  So despite the blowback that made you so afraid, you

21     publicized this lawsuit and the last lawsuit, correct?

22             MS. KAPLAN:  Asked and answered, your Honor.

23             THE COURT:  Sustained.

24     Q.  Did you even host watch parties with friends to see the

25     arguments on these lawsuits --

O1HQcar6                     Carroll - Cross

```
 1    A.   Yes.

 2    Q.   -- against the president?

 3    A.   Yes.

 4    Q.   Among those friends, was his niece Mary Trump, correct?

 5    A.   Yes.

 6    Q.   And was also Kathy Griffin, correct?

 7    A.   Yes.

 8    Q.   Isn't she famously known for holding up a severed head of

 9    president Trump?

10    A.   Yes.

11    Q.   And she's your friend?

12    A.   Yes.

13    Q.   In fact, she's so close, you thought it was important to

14    have them watch me argue in Washington.  Isn't that correct?

15              MS. KAPLAN:  Asked and answered, your Honor.

16              THE COURT:  Sustained.

17    Q.   Where did you watch?

18    A.   In Kaplan Hecker Fink's office.

19    Q.   Was there alcohol there?

20    A.   No.

21    Q.   Do you remember stating when I deposed you that you this --

22              THE COURT:  Ms. Habba.

23              MS. HABBA:  No, that's not the question, your Honor.

24    I'm not impeaching her.

25              THE COURT:  Pardon me?  Doesn't matter.
```

O1HQcar6                     Carroll - Cross

1    Q.  Ms. Carroll --

2    A.  Yes.

3    Q.  -- have you ever said that you like speaking with me?

4    A.  Yes.

5    Q.  Is that because at some level you enjoy this attention?

6    A.  No.

7              MS. KAPLAN:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A.  This is not the kind of attention that I enjoy.

10   Q.  Then why, Ms. Carroll, were you publicizing the lawsuits

11   yourself?

12   A.  Because once I spoke up --

13             MS. KAPLAN:  Objection.

14   A.  -- I wanted people to know that a woman can speak up and

15   win a trial.  I wanted people to know.  It was a major victory,

16   and I wanted people to know.  I don't want to be quiet now.

17   I'm 80.  It's not right to try to make women be quiet.  It's

18   been going on for too long.

19   Q.  Ms. Carroll, you were not quiet --

20   A.  No, I was not.

21   Q.  I'm sorry, Ms. Carroll.  You have to let me finish my

22   question.  You were not quiet in the Eighties, were you?

23   A.  No.

24   Q.  Were you quiet in the Nineties?

25   A.  No.

O1HQcar6                        Carroll – Cross

1    Q.  What about in 2000s?

2    A.  No.

3    Q.  So 25 years of you not being quiet, you brought this suit

4    against the sitting president.  Is that right?

5              MS. KAPLAN:  Objection, your Honor.

6              THE COURT:  Sustained.

7    Q.  Didn't you expect that people who hate president Trump

8    would be supportive of your accusation?

9              MS. KAPLAN:  Objection your Honor.

10             THE COURT:  Sustained.  You're running the repeat key

11   too often, Ms. Habba.  Move on.

12             MS. HABBA:  Sure.

13   Q.  Ms. Carroll, you were asked whether you would sue the

14   president at one point, and you said no.  Isn't that correct?

15   A.  Yes.

16   Q.  What changed your mind?

17   A.  I began thinking about it.

18   Q.  Isn't it true that you previously said George Conway

19   planted the seed to sue president Trump?

20   A.  No, he didn't plant it.  He explained what a lawsuit would

21   consist of, because I really didn't know.

22   Q.  Who is George Conway, Ms. Carroll?

23   A.  He is a formerly Republican lawyer.  He is now an

24   independent lawyer who does not like Donald Trump.

25   Q.  Has he been on TV speaking about your case the past couple

O1HQcar6                          Carroll - Cross

1    days?

2    A.   I haven't seen him, but I wouldn't be surprised.

3    Q.   Was he married to president Trump's campaign person,

4    Ms. Carroll, Ms. Kellyanne Conway?

5              MS. KAPLAN:  Objection.  We're way outside.

6    A.   Yes.

7              MS. HABBA:  It's not outside.

8              THE COURT:  Yes, of course it is.

9              MS. HABBA:  Your Honor, may I put my reasoning --

10             THE COURT:  I don't need to hear your reasoning.

11             MS. HABBA:  Okay.

12             THE COURT:  How much longer do you anticipate?

13             MS. HABBA:  If you would like to break, we can.  I

14   have probably half an hour.

15             THE COURT:  I think we'll break now and resume at 9:30

16   tomorrow morning.

17             (Trial continued January 18, 2024 at 9:30 a.m.)

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3    E. JEAN CARROLL

 4   Direct By Ms. Kaplan . . . . . . . . . . . .72

 5   Cross By Ms. Habba . . . . . . . . . . . . 191

 6                      PLAINTIFF EXHIBITS

 7   Exhibit No.                           Received

 8    29   . . . . . . . . . . . . . . . . . . .82

 9    30   . . . . . . . . . . . . . . . . . . .82

10   154   . . . . . . . . . . . . . . . . . . .87

11   157   . . . . . . . . . . . . . . . . . . .88

12   155 and 156   . . . . . . . . . . . . . . .89

13    6    . . . . . . . . . . . . . . . . . . .94

14    1    . . . . . . . . . . . . . . . . . . 100

15    2    . . . . . . . . . . . . . . . . . . 102

16    9    . . . . . . . . . . . . . . . . . . 103

17    3    . . . . . . . . . . . . . . . . . . 106

18    59   . . . . . . . . . . . . . . . . . . 108

19    40   . . . . . . . . . . . . . . . . . . 110

20    71   . . . . . . . . . . . . . . . . . . 112

21    66   . . . . . . . . . . . . . . . . . . 116

22    45   . . . . . . . . . . . . . . . . . . 117

23    85   . . . . . . . . . . . . . . . . . . 124

24    43   . . . . . . . . . . . . . . . . . . 126

25   118   . . . . . . . . . . . . . . . . . . 127
</pre>

 1   47    . . . . . . . . . . . . . . . . 128

 2   122   . . . . . . . . . . . . . . . . 133

 3   132   . . . . . . . . . . . . . . . . 134

 4   128   . . . . . . . . . . . . . . . . 135

 5   126   . . . . . . . . . . . . . . . . 136

 6   114   . . . . . . . . . . . . . . . . 137

 7   124 and 130   . . . . . . . . . . . . 137

 8   135   . . . . . . . . . . . . . . . . 144

 9   136   . . . . . . . . . . . . . . . . 146

10   145   . . . . . . . . . . . . . . . . 149

11   158   . . . . . . . . . . . . . . . . 150

12   138   . . . . . . . . . . . . . . . . 151

13   139   . . . . . . . . . . . . . . . . 152

14   159   . . . . . . . . . . . . . . . . 156

15   140   . . . . . . . . . . . . . . . . 156

16   162   . . . . . . . . . . . . . . . . 157

17   161   . . . . . . . . . . . . . . . . 158

18   4     . . . . . . . . . . . . . . . . 160

19   96    . . . . . . . . . . . . . . . . 164

20   96, 97, and 97-T   . . . . . . . . . . 166

21   98    . . . . . . . . . . . . . . . . 168

22   99 and 100   . . . . . . . . . . . . . 174

23   101   . . . . . . . . . . . . . . . . 176

24   144 and 144T   . . . . . . . . . . . . 179

25   149 and 149T   . . . . . . . . . . . . 180

152 . . . . . . . . . . . . . . . . . . . 181
134 . . . . . . . . . . . . . . . . . . . 187
108 . . . . . . . . . . . . . . . . . . . 189
160 . . . . . . . . . . . . . . . . . . . 191

I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes.

_____
Official Court Reporter
U.S. District Court