O1IQcar1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   E. JEAN CARROLL,

 4                    Plaintiff,

 5             v.                        20 CV 7311 (LAK)
                                              Trial
 6   DONALD J. TRUMP, in his
     personal capacity,
 7
                    Defendant.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         January 18, 2024
10                                       9:40 a.m.

11   Before:

12                     HON. LEWIS A. KAPLAN,

13                                       District Judge
                                          -and a Jury-
14                          APPEARANCES

15   KAPLAN HECKER & FINK LLP
          Attorneys for Plaintiff
16   BY:  ROBERTA ANN KAPLAN
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18   HABBA MADAIO & ASSOCIATES LLP
          Attorneys for Defendant
19   BY:  ALINA HABBA
          MICHAEL T. MADAIO
20        PETER SWIFT
          PETER GABRA
21

22

23

24

25
```

O1IQcar1                          Carroll – Cross

 1              (Trial continued; jury not present)

 2              THE COURT:  Good morning everyone.  Where is our

 3    witness?

 4     E. JEAN CARROLL, resumed.

 5              THE COURT:  Ms. Carroll, you are still under oath.

 6              Ms. Habba, you may continue.

 7              MS. HABBA:  The jury?

 8              THE COURT:  Pardon?

 9              MS. HABBA:  The jury.

10              THE COURT:  Oh.  Been a long evening.  The jury.

11    Thank you for that.

12              Hard to lose nine people.

13              (Jury present)

14              THE COURT:  Good morning, everyone.  Ms. Habba, you

15    may continue.

16              MS. HABBA:  Thank you.

17    CROSS-EXAMINATION CONTINUED

18    BY MS. HABBA:

19              MS. HABBA:  Good morning, your Honor.

20              THE COURT:  Good morning.

21              MS. HABBA:  Good morning, ladies and gentlemen of the

22    jury.

23    Q.  Good morning, Ms. Carroll.

24    A.  Good morning, Ms. Habba.

25    Q.  Ms. Carroll, since you left yesterday from the stand, have

O1IQcar1                    Carroll - Cross

1   you spoken with your counsel regarding the subject matter of

2   your testimony?

3   A.  No.

4   Q.  And since you left the stand yesterday, have you reviewed

5   any documents in anticipation of today's testimony?

6   A.  No.

7   Q.  Ms. Carroll, yesterday we discussed the five-hour gap

8   between the release of your excerpt in *The Cut* containing your

9   allegations against president Trump?

10          THE COURT:  Counsel, you're assuming a five-hour gap.

11  Now, I understand why you think there's evidence that may

12  support that, and maybe it turns out that it will be that way,

13  but in fact, I would think you would be better advised to talk

14  about the gap, if there was a gap.  There is no evidence that

15  the email transmitting a copy of Mr. Trump's statement on

16  June 21 which does bear a stamp indicating that the email sent

17  at 5:17 was sent at the moment that the statement was issued.

18  I believe that's the case, and if I'm mistaken, the jury will

19  recall and have the evidence available.

20          MS. HABBA:  I'm happy to provide that, your Honor, and

21  show --

22          THE COURT:  That's fine when it's your turn to provide

23  evidence, that's fine.  But in the meantime, let's stick to

24  what we have evidence of.

25          MS. HABBA:  Okay.  So perhaps --

O1IQcar1                          Carroll – Cross

1            MR. MADAIO:  Your Honor, can we have a sidebar about

2    this issue?  I believe it's a fairly important issue.

3            THE COURT:  It may be an important issue, but there's

4    nothing to be decided at this moment.

5            MR. MADAIO:  I think there is something we'd like to

6    address with the Court regarding this issue.

7            THE COURT:  Well, all right.  I'll give you the

8    benefit of the doubt, but ...

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IQcar1                        Carroll - Cross

1              (At the sidebar)

2              MR. MADAIO:  Your Honor, I think there may be some

3    confusion.  The 5:17 -- it was a tweet, not an email, so it was

4    publicly posted.  So it wasn't private; it was public for the

5    5:17.

6              THE COURT:  It was a tweet?

7              MR. MADAIO:  It was a tweet, a Laura Litvan tweet.

8              MS. HABBA:  She put it out.

9              THE COURT:  Who's she?

10             MS. HABBA:  She's a news reporter who received the

11   statement to put out.

12             THE COURT:  So that means that she posted it?

13             MS. HABBA:  Yes.  He did not, actually.

14             THE COURT:  At 5:17.  But when did it come into her

15   hands?

16             MR. MADAIO:  Well, it was put in the public's view at

17   5:17.  She posted on her Twitter releasing the statement at

18   5:17.

19             THE COURT:  How do we know the statement wasn't made

20   public earlier than that?

21             MR. MADAIO:  That's never been alleged, and there's no

22   evidence --

23             MS. HABBA:  We're happy to call her if that's an

24   issue.

25             THE COURT:  Maybe you can work this out, but I'm only

O1IQcar1                        Carroll - Cross

1    dealing with the record I have in front of me right now.  And

2    you may know facts that I certainly don't that lead you in the

3    best of good faith to say it was 5:15 but there's no evidence

4    of that right now.

5              MR. MADAIO:  Your Honor, even the complaint alleges

6    and essentially states the June 121 statement is the tweet, the

7    5:17 tweet, that that's the time it was publicly released.

8              THE COURT:  It certainly contains it.  Does it say it

9    was publicly released at 5:17?

10             MR. MADAIO:  Yes, unless there's any other --

11             MS. HABBA:  We can look --

12             THE COURT:  Does it say that?

13             MS. CROWLEY:  It doesn't have the time, the complaint.

14             MS. HABBA:  Yes, it does.  You put it in.

15             MS. CROWLEY:  In the complaint?  The time?

16             MS. HABBA:  Yes.

17             THE COURT:  This is a simple matter to resolve.  Get

18   the complaint.

19             MS. HABBA:  Sure.

20             MR. MADAIO:  Okay.

21             MS. HABBA:  And if there's an issue, I would just

22   reserve the right to Ms. Litvan, and we can resolve it.

23             MS. CROWLEY:  I think there's testimony --

24             THE COURT:  Stop this.  You're wasting a lost time.

25   You're telling me it's in the complaint.  I want to see the

O1IQcar1                          Carroll - Cross

1   complaint.

2            And who are you?

3            MR. KATZ:  I'm an attorney working with them.

4            THE COURT:  And does this attorney have a name?

5            MR. KATZ:  Adam Katz.

6            MS. HABBA:  Katz.

7            THE COURT:  Have you appeared in this case?

8            MR. KATZ:  I haven't, your Honor.

9            THE COURT:  Sit behind the bar and stay there.

10           MR. KATZ:  Okay.

11           THE COURT:  Get the complaint.

12           MS. HABBA:  Okay.

13           THE COURT:  Well, paragraph 84 of the complaint said

14   it was posted by Ms. Litvan of *Bloomberg News* at 2:17.

15   Indeed--

16           MS. HABBA:  Is that the time --

17           MR. MADAIO:  But that's a link to the tweet which

18   shows a time of 5:17.  I think that's a typo in there.

19           THE COURT:  So it's a matter for evidence.

20           MS. HABBA:  Okay.

21           THE COURT:  And however it turns out is fine, but

22   we're not just going to keep saying that it was 5:17 before

23   it's established.

24           MR. MADAIO:  Understood, your Honor.  Could we have a

25   clarification to the jury that this was a tweet, not a private

O1IQcar1                          Carroll - Cross

1    email that was sent?  I think there may be some confusion it

2    was sent to Ms. Carroll as a private email.

3              THE COURT:  There are ways to clarify things in court

4    before juries.

5              MR. MADAIO:  Understood, your Honor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IQcar1                        Carroll - Cross

1              (In open court)

2              THE COURT:  Members of the jury, I referred in what I

3     said before to an email sent at 5:17.  It may not be an email.

4     It may be a tweet.  You will have it before you.  Let's

5     proceed.

6     BY MS. HABBA:

7     Q.  Ms. Carroll, do you recall where you saw the president's

8     statement that you are -- that is an issue -- the first

9     statement at issue on June 21, 2019?

10    A.  Yes.

11    Q.  Where did you see it?

12    A.  I saw it in the excerpt that was published online.  That

13    was the White House statement.

14    Q.  So let's go back to that.  The White House statement did

15    not say president Trump's statement, correct?

16    A.  No, they said from the White House.

17    Q.  And my question to you was:  The statement that you sued

18    him for, for defamation, is not that statement, correct?

19    A.  That is correct.

20    Q.  So let me be clear.  When I refer to president Trump's

21    statement which you are suing him for, so the jury

22    understands--

23    A.  Mmm-hmm.

24    Q.  -- we're not talking about *The Cut* article that you

25    released, right?

O1IQcar1                    Carroll - Cross

1              MS. KAPLAN:  Objection.

2              THE COURT:  It's complete confusion.

3              MS. HABBA:  It is confusion.  I'd like to clarify it.

4              THE COURT:  Let's try to do a little clearer job.

5              MS. HABBA:  Well --

6    Q.  Ms. Carroll, president Trump's statement is different than

7    the White House statement, correct?

8    A.  Yes.

9    Q.  You never sued the White House, did you?

10   A.  No.

11   Q.  You never sued the United States Government, did you?

12             MS. KAPLAN:  Objection, your Honor.

13             MS. HABBA:  On what basis?

14             THE COURT:  Look, we have been all over this.  And it

15   is clear as a bell.

16             There was quoted, I understand, and correct me if I'm

17   wrong, Ms. Carroll, in the article posted on *The Cut*, a

18   statement to the effect that president Trump denied the

19   allegation, or words to that effect, yes?

20             THE WITNESS:  Yes.

21             THE COURT:  And you're not suing over that statement?

22             THE WITNESS:  No.

23             THE COURT:  That statement was on what date?

24             THE WITNESS:  It was published on June 21, 2019.

25             THE COURT:  And it was published in *New York* magazine,

O1IQcar1                        Carroll - Cross

1    yes?

2              THE WITNESS:  Yes.

3              THE COURT:  All right.  Then a statement issued out of

4    the White House after *The Cut* article appeared, yes?

5              THE WITNESS:  Yes.

6              THE COURT:  That's the June 21 statement you're suing

7    about, right?

8              THE WITNESS:  Yes.

9              THE COURT:  And then there was another statement

10   you're suing about that was published on June 22, yes?

11             THE WITNESS:  Correct.

12             THE COURT:  All right.  It's clear as a bell.  Now

13   let's go on.

14   BY MS. HABBA:

15   Q.  Ms. Carroll, did you review *The Cut* article before it was

16   published?

17   A.  Yes.

18   Q.  The final version of *The Cut* article?

19   A.  Yes.

20   Q.  And in that article, did it contain the statement that you

21   are discussing from the White House?

22   A.  The White House -- the statement that was issued from the

23   White House appeared in *The Cut*.  This is a statement -- the

24   lawsuit is over the statement from president Donald Trump.

25   Q.  Yes, I know.  The Judge just made that very clear.

O1IQcar1                    Carroll - Cross

1        My question is, before *The Cut* article that you were

2   paid $7,000 to do --

3            MS. KAPLAN:  Objection, your Honor.

4            THE COURT:  Argumentative.

5            MS. KAPLAN:  Also not consistent with the testimony.

6            MS. HABBA:  Okay.

7            THE COURT:  Yes, also true.  Sustained.

8   BY MS. HABBA:

9   Q.  Ms. Carroll, did you get paid $7,000 for *The Cut* article?

10  A.  No, it went to my publisher.

11  Q.  Okay.

12           THE COURT:  And you covered all of that yesterday.

13           MS. HABBA:  Right.

14  Q.  Did you review that article with the White House denial in

15  it before it went public?

16  A.  Yes.

17  Q.  Thank you.

18       Yesterday we discussed a gap between the release of

19  your excerpt from *The Cut* which you approved and the

20  president's response.  There is a gap of time, correct?

21  A.  Yes.

22  Q.  Okay.  And before president Trump's response, do you recall

23  receiving any negative tweets prior to that statement, PX-1?

24  I'm happy to put it up for you if you need?

25  A.  I wasn't on Twitter during that afternoon.

O1IQcar1                          Carroll - Cross

1   Q.  When you went on Twitter later that evening, I believe that

2   was your testimony, correct?

3   A.  Around 11:30 at night.

4   Q.  Did you notice what time the statements were issued to you

5   that you found to be negative tweets?

6           MS. KAPLAN:  Objection, your Honor.

7           THE COURT:  Sustained as to form.

8   Q.  When you went home and looked at the tweets in the evening,

9   correct?

10  A.  At the hotel, yes.

11  Q.  Did you look at time that the tweets were sent to you?

12  A.  No.  There were so many, I -- I did not focus on the time.

13  There were so many.

14  Q.  Nate, can you please pull up what has been premarked DX-65

15  for the witness.

16          Ms. Carroll, do you recognize this document in front

17  of you?

18  A.  It's a tweet, yes.

19  Q.  In that document, do you recognize the Twitter handle that

20  is tagged E. Jean Carroll?

21  A.  Yes.

22  Q.  Does that appear to be your Twitter handle?

23  A.  Yes.

24  Q.  Does that tweet tag your Twitter account?

25  A.  Yes.

O1IQcar1                          Carroll - Cross

1            MS. HABBA:  Your Honor, I would like to offer DX-65

2       into evidence.

3            MS. KAPLAN:  No objection, your Honor.

4            THE COURT:  Received.

5            (Defendant's Exhibit 65 received in evidence)

6  Q.  Ms. Carroll, this tweet states, "Nothing like making up

7  fake news to try to ruin the president's win in 2020."  Is that

8  correct?

9  A.  Yes.

10  Q.  Ms. Carroll, this tweet was issued at 2:21 p.m.  Is that

11  correct?

12  A.  Yes.

13  Q.  And that was before the 5:17 tweet by Ms. Litvan.  Is that

14  correct?

15  A.  Yes.

16  Q.  Nate, can you please pull up what has been premarked DX-66

17  for the witness.

18            Ms. Carroll, what is this?

19  A.  This is a tweet.

20  Q.  In that document, do you recognize the Twitter handle

21  E. Jean Carroll?

22  A.  Yes.

23  Q.  And does that appear to be your Twitter handle?

24  A.  Yes.  It is my Twitter handle.

25  Q.  Does this tweet tag your Twitter account?

O1IQcar1                         Carroll - Cross

1   A.  Yes.

2            MS. HABBA:  Your Honor, I would like to move in DX-66

3   into evidence.

4            THE COURT:  Is there any objection?

5            MS. KAPLAN:  No objection, your Honor.

6            THE COURT:  It's received.

7            (Defendant's Exhibit 66 received in evidence)

8   Q.  Ms. Carroll, does this tweet say, "I've got some advice for

9   you.  Drop this lie because it's a bad look on you. @POTUS,"

10  and you can see a link to Huffpost.

11  A.  Yes.

12  Q.  Is that at 2:34 p.m. on June 21?

13  A.  Yes.

14  Q.  Nate, can you please pull up DX-67 for the witness?

15           THE COURT:  This is already in evidence, isn't it, as

16  a different exhibit?

17           MS. HABBA:  No, your Honor.  The response is different

18  here.

19           THE COURT:  Go ahead.

20           MS. HABBA:  It's a reply, so it appears that way.

21           THE COURT:  I don't need the explanation.  You tell me

22  it's different, it's different.

23  Q.  Ms. Carroll, what is this?

24  A.  This is a tweet.  This is one of my posts, a tweet, and

25  that I posted on June 20.

O1IQcar1                          Carroll - Cross

1    Q.  And in that document, that is your Twitter handle again,

2    E. Jean Carroll?

3    A.  Yes.

4    Q.  And this is a response to your tweet.  Is that correct?

5    A.  Yes.

6    Q.  Does this tweet respond directly to something you posted?

7    A.  Yes.

8            MS. HABBA:  Your Honor, I'd like to put in DX-67 into

9    evidence, please.

10           MS. KAPLAN:  No objection.

11           THE COURT:  Received.

12           (Defendant's Exhibit 67 received in evidence)

13   Q.  This person Power to the Polish! calls you a dirty liar.

14   Is that correct?

15   A.  Yes.

16           THE COURT:  I think he was trying to say Power to the

17   Polish.

18           MS. HABBA:  Power to the Pole -- did I misstate that?

19   What did I say?  Power to the Polish.

20   Q.  Was this sent at 2:51, Ms. Carroll?

21   A.  Yes.

22   Q.  On June 21?

23   A.  Yes.

24   Q.  That was before president Trump's tweet was issued by Laura

25   Litvan at 5:17?

O1IQcar1                         Carroll - Cross

1    A.   Yes.

2    Q.   Thank you.

3              Nate, can you pull up what was marked DX-68 for the

4    witness.

5              Do you recognize this document in front of you?

6    A.   It's a tweet.

7    Q.   Do you recognize that that is also your Twitter handle

8    E. Jean Carroll?

9    A.   Yes.

10   Q.   Does the comment -- excuse me --

11             THE COURT:   What is it, Ms. Kaplan?

12             MS. KAPLAN:   Has it been offered?

13             MS. HABBA:   That's what I was about to do.

14             MS. KAPLAN:   We object to this one.

15   Q.   Does this tweet tag your Twitter account?

16   A.   Yes.

17             MS. HABBA:   Your Honor, I would like to admit DX-68

18   into evidence, please.

19             THE COURT:   Defendant's 68 is received.

20             MS. HABBA:   Thank you.

21             MS. KAPLAN:   We object, your Honor.

22             THE COURT:   You object.   What's the objection?

23             MS. KAPLAN:   The objection is it's inconsistent with

24   your Honor's prior rulings.

25             THE COURT:   Why not -- I'm sorry.   Ms. Habba?

O1IQcar1                         Carroll - Cross

1            MS. HABBA:  Yes.  Your Honor, this goes to show that

2      prior to the president's comments being put on Twitter, people

3      were saying these things to her.  They are not directly related

4      to his statements.  It strictly goes to his statements, and

5      she's testified that it's because of his statements that people

6      were saying things about rape.

7            THE COURT:  It is stricken, and it's inconsistent with

8      the ruling that the Court made before trial.  And, in addition,

9      it's cumulative and, therefore, of no additional value.

10     Q.  Nate, can you please pull up DX-69 for the witness.

11            Ms. Carroll, what is this?

12     A.  This is a tweet.

13     Q.  In that document, do you recognize your Twitter handle

14     @E. Jean Carroll?

15     A.  Yes.

16     Q.  Does that appear to be your actual Twitter handle?

17     A.  Yes.

18     Q.  Does this tweet tag your Twitter account?

19     A.  Yes.

20            MS. HABBA:  Your Honor, I would like to move DX-69

21     into evidence.

22            MS. KAPLAN:  No objection, your Honor.

23            THE COURT:  Received.

24            (Defendant's Exhibit 69 received in evidence)

25     Q.  Ms. Carroll, the tweet states, "Attacked 1990 by the POTUS.

O1IQcar1                    Carroll - Cross

1    What a fool you are Missy Carol.  Your book must need pumping.

2    You are a disgrace."  Do you see that?

3    A.  Yes.

4    Q.  Was this sent at 3:22 on June 21, 2019?

5    A.  Yes.

6    Q.  Was this sent before Laura Litvan are posted the

7    president's statement at 5:17?

8    A.  Yes.

9    Q.  Nate, can you please pull up what has been plea marked

10   DX-70.

11            Ms. Carroll, what is this?

12   A.  This is a reply to one of my tweets.

13   Q.  In that document, do you recognize your Twitter handle that

14   is tagged -- excuse me -- that is replied to?

15   A.  I recognize my Twitter handle.  I don't know the Skip.

16   Q.  The Twitter handle E. Jean Carroll, that's your Twitter

17   handle, correct?

18   A.  Yes, that's my post.

19   Q.  That's your post, and there's a reply directly to your

20   post, correct?

21   A.  Yes.

22            MS. HABBA:  Your Honor, I would like to offer into

23   evidence DX-69, please -- 70, excuse me.

24            MS. KAPLAN:  Your Honor, we have no objection to this

25   specific document other than to note that this is starting to

O1IQcar1                    Carroll – Cross

1    get cumulative.  We'll stipulate there were nasty tweets sent

2    to Ms. Carroll before 5:17 p.m. on June 21, 2019.

3            THE COURT:  This one is received, since there is no

4    objection.

5            MS. HABBA:  Thank you, your Honor.

6            (Defendant's Exhibit 70 received in evidence)

7    Q.  Ms. Carroll, you posted, "The most dangerous woman is a

8    woman who has nothing to lose.  The most dangerous man is the

9    man who has everything to lose" on February 16, 2016, correct?

10   A.  Yes.

11   Q.  And someone responded to you after -- on June 21, 2019 at

12   3:47, correct?

13   A.  Yes.

14   Q.  And they stated, "No.  The most dangerous woman is a lying

15   sack of shit making false accusations right after a

16   presidential run announcement.  You should just go ahead and

17   admit you are lying now to save yourself the embarrassment when

18   it"s proven you are just another pathetic liar."  That's what

19   that says, correct?

20   A.  Yes.

21   Q.  And that was before the president's statement was posted by

22   Laura Litvan at 5:17, correct?

23   A.  Yes.

24   Q.  And this individual looked at your comments from 2016 to

25   reply, correct?

O1IQcar1                          Carroll - Cross

```
 1    A.  Yes.
 2    Q.  And they would not have known about you if you were not --
 3    they would not have been able to speak to you if you were not
 4    on Twitter at that time, correct?
 5               THE COURT:  I'm sorry, I don't understand the
 6    question.
 7               MS. HABBA:  Let me rephrase the question.  I'll
 8    withdraw that.
 9    Q.  They dug into your Twitter and looked back at messages you
10    posted from 2016, correct?
11    A.  Apparently.
12               MS. KAPLAN:  Objection, your Honor.
13               THE COURT:  What's the objection?
14               MS. KAPLAN:  I'm not sure anyone knows exactly what
15    this person did.
16               THE COURT:  Sustained.  The answer is stricken.
17    Q.  In 2019, @rodeoclown911 replied to a statement from your --
18    from February 16, 2016 on your Twitter account, correct?
19    A.  Yes.
20    Q.  Nate, can you please pull up what has been marked DX-71 for
21    the witness.
22               Ms. Carroll, what is this?
23    A.  This is a tweet.
24    Q.  In this document, do you recognize your Twitter handle?
25    A.  Yes, I do.
```

O1IQcar1                         Carroll - Cross

1   Q.  And does it appear that this person is replying to a

2   comment you made?

3   A.  Yes.

4           MS. HABBA:  Your Honor, I'd like to offer DX-71 into

5   evidence.

6           MS. KAPLAN:  Objection, your Honor.

7           THE COURT:  Objection or no objection?

8           MS. KAPLAN:  Objection.  Cumulative.

9           THE COURT:  Do you have many more of these?

10          MS. HABBA:  I have a few more, your Honor, but I would

11  also state -- first, yes, I do.

12          THE COURT:  Define few.

13          MS. HABBA:  Six.

14          THE COURT:  You can offer them in evidence.  If

15  there's no objection, they will all be received, and we've

16  taken enough time on this because it is cumulative.

17          MS. HABBA:  Your Honor, if I may be heard?

18          THE COURT:  No.  That was the ruling, and that's where

19  we're going.

20  Q.  Ms. Carroll --

21          MS. HABBA:  Did I admit this into evidence yet?  No.

22  Okay.

23  Q.  -- do you recognize -- I believe I asked you these

24  questions, but do you recognize this document?

25  A.  Yes.

O1IQcar1                         Carroll - Cross

1              THE COURT:  Ms. Kaplan, is there any objection to this
2     document?
3              MS. KAPLAN:  Same objections, your Honor.
4              THE COURT:  This is received, but let's go on.
5              MS. HABBA:  Thank you.
6              (Defendant's Exhibit 71 received in evidence)
7              THE COURT:  What are the other exhibits you want to
8     offer of the same nature?
9              MS. HABBA:  I'd like to ask her questions about this
10    exhibit.
11             THE COURT:  Go ahead.
12    Q.  Does this exhibit show that someone responded to that same
13    2016 tweet that you posted, "You're a joke.  No one would
14    willingly touch your ugly ass"?
15    A.  Yes.
16    Q.  And that was at June 21, 2019 at 3:48 p.m., correct?
17    A.  Yes.
18    Q.  Before the 5:17 tweet by Laura Litvan with the president's
19    statement, correct?
20    A.  Yes.
21             THE COURT:  Everybody knows the times now, counsel.
22    Are there any other exhibits like this?  Tell us what they are,
23    and we'll see if there are objections.
24             MS. HABBA:  You'd like me to show you each and every
25    one?

O1IQcar1                          Carroll - Cross

1          THE COURT:  I don't want you to show me any.  Give us

2    the numbers, and we'll find out if there's any objection.

3          MS. HABBA:  Sure.  The next is DX-72.

4          THE COURT:  And the next?

5          MS. HABBA:  DX-73.

6          THE COURT:  The next?

7          MS. HABBA:  DX-74.

8          THE COURT:  The next?

9          MS. HABBA:  75.

10         THE COURT:  Yes.

11         MS. HABBA:  Through 78, your Honor, 76, 77, 78.  And

12   that is it on this.

13         MS. KAPLAN:  Your Honor, could we perhaps have copies

14   so we could see if we have any objections, and we'll deal with

15   it on a break.  I can't read fast enough as they're going

16   through the screen.

17         THE COURT:  We'll withhold the ruling on that until

18   later.  Remember to come back to it, Ms. Habba, if no one else

19   does.

20         MS. HABBA:  So I can't continue my line of

21   questioning?

22         THE COURT:  Right.  Because it's simply repetitious.

23         MS. HABBA:  Your Honor, all due respect, she put a ton

24   of tweets --

25         THE COURT:  All due respect means that when I issue a

O1IQcar1                          Carroll - Cross

1    ruling, you say next question.

2              MS. HABBA:  Sure.  I'll just reserve my right to go

3    back to them when she's reviewed them.

4    Q.  As you can see here, Ms. Carroll, there are email tweets of

5    users calling you a liar well before the president had an

6    opportunity to respond.  Isn't that right?

7              MS. KAPLAN:  Objection, your Honor.

8    A.  Yes.

9              THE COURT:  Sustained.  The answer is stricken.

10             MS. HABBA:  On what basis is she objecting?

11             THE COURT:  This is not my law school examination.

12             MS. HABBA:  That's not that.  I don't read minds.

13   Q.  Ms. Carroll --

14   A.  Yes.

15   Q.  -- you have statements going back many years on your

16   current Twitter account, correct?

17   A.  Yes.

18   Q.  And in fact these Twitter posts that we just went through,

19   some of them look remarkably similar to the tweets posted after

20   the president issued his statement.  Isn't that correct?

21             MS. KAPLAN:  Objection, your Honor.

22             THE COURT:  Sustained.

23   Q.  Wouldn't you agree that negative tweets are not necessarily

24   tied to president Trump's statements, Ms. Carroll?

25             MS. KAPLAN:  Objection, your Honor.

O1IQcar1                     Carroll - Cross

1      THE COURT:  Overruled.

2  A.  Some negative tweets are definitely tied to the president's

3  statement.

4  Q.  Why do you think that?

5  A.  Because they follow Donald Trump.  They want to emulate

6  him.

7  Q.  Ms. Carroll, I just showed you tweets that are responding

8  to things you said in 2016 before the president issued his

9  statement.

10      MS. KAPLAN:  Objection, your Honor.

11      THE COURT:  This is in the nature of a jury summation.

12  Get to a question.

13  Q.  How do you know that, Ms. Carroll?

14      MS. KAPLAN:  Objection, your Honor.

15      THE COURT:  How do you know what?

16  Q.  What she just said --

17      Ms. Carroll --

18  A.  Yes.

19  Q.  -- you believe that they emulated president Trump's

20  statement, correct?

21  A.  Yes.

22  Q.  But these were before president Trump's statement, correct?

23  A.  Yes.

24  Q.  So how can they emulate president Trump's statement?

25  A.  Not that particular statement.  I'm saying they're standing

O1IQcar1                    Carroll - Cross

1    up for the man that they admire.

2    Q.  Is that what you think or is that what you know?

3            MS. KAPLAN:  Your Honor, I don't know what that means.

4            MS. HABBA:  Well, she's stating it as a fact.  It's

5    speculation.

6            THE COURT:  Ms. Habba, move on.

7            MS. HABBA:  Sure.

8    Q.  So you saw the denial in *The Cut* article before it was

9    published from the White House?

10   A.  Yes.

11   Q.  And did you have to authorize the publishing of that

12   article before it was public?

13   A.  I agreed that it should go live, yes.

14   Q.  You agreed with *The Cut*?

15   A.  I agreed with the edit that was running, yes, the final

16   edit.

17   Q.  Who did you communicate with for that?

18   A.  The editor of the piece, Genevieve Smith.

19   Q.  So they sent you the final via email.  Is that correct?

20   A.  Yes.

21   Q.  And did you review that?

22   A.  Yes.

23   Q.  Did you read it fully?

24   A.  Yes.

25   Q.  And it included that White House statement, correct?

O1IQcar1                    Carroll - Cross

1    A.  Yes.

2    Q.  And then you gave the okay to have them print it, correct?

3              MS. KAPLAN:  That's about four questions your Honor.

4              MS. HABBA:  I'm walking her through the process.  It's

5    a different question.

6    A.  Yes.

7    Q.  You run a blog on Substack, correct?

8    A.  Yes.

9    Q.  What is it called?

10   A.  Ask E. Jean.

11   Q.  You make approximately $70,000 from that blog on Substack,

12   correct?

13   A.  No, I make more than that now.

14   Q.  How much more?

15   A.  Now I'm making a hundred thousand.

16   Q.  And that doesn't include the royalties that we discussed

17   yesterday from your books that you are still receiving,

18   correct?

19   A.  That's correct.

20   Q.  So you're making over a hundred thousand dollars currently,

21   correct?

22   A.  Yes.

23   Q.  And I hate to ask you this, Ms. Carroll, but how old are

24   you?

25   A.  I'm 80.

O1IQcar1                    Carroll - Cross

1    Q.  And that's more than you were making in 2018 before *The Cut*

2    article came out, correct?

3    A.  That -- yes, that is correct.

4    Q.  And you started your Substack in 2021.  Is that correct?

5    A.  April 2021.

6    Q.  And it became popular immediately, correct?

7    A.  It was -- immediately.  No, it's a slog.  It's a slog to

8    gather readers and to get some energy and get some followers.

9    It's hard work.

10   Q.  But you generate a good amount of income from that,

11   correct?

12         THE COURT:  Look, questions like this, what's a good

13   amount of income?  Look, it's evidence number one.

14         MS. HABBA:  Yeah.

15         THE COURT:  Evidence 101.

16   Q.  Ms. Carroll, how much do you make?

17         MS. KAPLAN:  Objection, your Honor.  This has been

18   asked and answered.

19         MS. HABBA:  She hasn't answered how much she makes

20   entirely.  Yesterday I learned about royalties.  Now she's

21   saying more than 70.  When I deposed her, it was a different

22   number.  I'm trying to get an answer, your Honor.

23   A.  Yeah.

24         THE COURT:  Ms. Carroll, when there's an objection,

25   you should sit quietly and wait to answer if an answer is

O1IQcar1                          Carroll - Cross

1    required.

2            THE WITNESS:  Thank you, your Honor.

3            THE COURT:  Now let me go look at yesterday because we

4    spent a lot of time on this yesterday.

5            Ms. Carroll, what was your gross income in 2023?

6            THE WITNESS:  2022 --

7            THE COURT:  '23.

8            THE WITNESS:  '23, a little over 70,000, and I've been

9    publishing more often, I've gone --

10           THE COURT:  Ms. Carroll, you completed your answer at

11   70,000.

12           THE WITNESS:  Thank you.

13           THE COURT:  Next question.

14   BY MS. HABBA:

15   Q.  Ms. Carroll, are you making more in 2023 -- or 2024?

16   Excuse me.

17   A.  Yes.

18   Q.  How many subscribers do you have on your Substack?

19           THE COURT:  That was definitely answered yesterday.

20           MS. HABBA:  Subscriber amount?

21           THE COURT:  Yes.  1,800.  Let's move on.

22   Q.  Do you still have 1,800?

23   A.  It's -- yes.

24   Q.  And president Trump is often a subject of discussion on

25   your Substack.  Isn't that correct?

O1IQcar1                    Carroll - Cross

1   A.  I counted the number of times I wrote posts about president

2   Trump.  Seven times in 2021.  Five times in 2022.  And seven

3   times in 2023.

4   Q.  Thank you, Ms. Carroll.

5   A.  It's approximately once every month and a half.

6           THE COURT:  Ms. Carroll, just answer the question.

7   Q.  Do you think your Substack would have been successful had

8   you not become more well-known as a result of the fame you

9   received due to your public affiliation about president Trump?

10  A.  Difficult to say.

11  Q.  You testified that your Substack was your only source of

12  income.  Isn't that correct?

13  A.  Yes.

14  Q.  So that was not accurate, right?

15          MS. KAPLAN:  Objection, your Honor.

16  Q.  Your Substack -- do you have social security?

17  A.  Yes.  Oh, I forgot.  Yes.

18  Q.  Do you have a pension?

19  A.  No.

20  Q.  Do you have an IRA?

21  A.  No.

22  Q.  401K?

23  A.  No.  But I do have stocks.

24  Q.  Approximately how much do you have in stocks?

25          MS. KAPLAN:  Objection, your Honor.

O1IQcar1                          Carroll - Cross

1           THE COURT:  Sustained.

2   Q.  Do you consider yourself a financially successful person,

3   Ms. Carroll?

4           MS. KAPLAN:  Objection, your Honor.

5           THE COURT:  Sustained.

6   Q.  Have you always paid your mortgage, Ms. Carroll?

7   A.  Yes.

8   Q.  You said you're successful and career is going well.  Isn't

9   that correct?

10  A.  Yes.

11  Q.  And prior to *The Cut*, did you ever publish a tweet asking

12  the public would you have sex with Donald Trump for $17,000,

13  even --

14          MS. KAPLAN:  Objection, your Honor.

15          THE COURT:  Let's hear the rest of the question.

16  Q.  -- even if you could (A) give the money to charity, (B)

17  close your eyes and he's not allowed to speak?

18          MS. KAPLAN:  Objection, your Honor.  Relevance.

19  Inconsistent with your Honor's rulings in 412.

20          THE COURT:  Sustained.

21          MS. HABBA:  Can I be heard on that?

22          THE COURT:  No.

23          MS. HABBA:  Okay.

24  BY MS. HABBA:

25  Q.  During your direct examination, you testified that you were

O1IQcar1                        Carroll - Cross

1   offended that certain tweets were posted concerning your

2   allegations that made you appear to be promiscuous.  Do you

3   recall that?

4           MS. KAPLAN:  Objection, your Honor.

5           THE COURT:  What's the objection?

6           MS. KAPLAN:  It's okay, your Honor.  I'll waive that.

7   I mean, I'll withdraw it.

8   Q.  Do you recall that, Ms. Carroll?

9   A.  Could you repeat the question, please?

10  Q.  Sure.

11          Yesterday you testified that you were upset because

12  certain tweets that you were receiving made you appear

13  promiscuous.  Is that correct?

14  A.  Yes.

15  Q.  And prior to June 21, 2019, did you ever post any tweets

16  that could be considered sexually explicit?

17          MS. KAPLAN:  Same objection, your Honor.

18          THE COURT:  Sustained.

19  Q.  Nate, can you please pull up what has been marked DX-79.

20          Ms. Carroll, do you recognize what this is?

21  A.  Yes.

22  Q.  Please describe for me what this is without reading it.

23  A.  I do recognize it.

24  Q.  Is it a tweet that you posted?

25  A.  Yes.

O1IQcar1                         Carroll - Cross

1    Q.  And in that document, do you recognize that your Twitter

2    handle is tagged @E. Jean Carroll?

3    A.  Yes.

4    Q.  And that's your Twitter handle?

5    A.  Yes.

6            MS. HABBA:  Your Honor, I would like to move into

7    evidence DX-79.

8            MS. KAPLAN:  Objection, your Honor.  Same objections.

9            THE COURT:  Objection sustained.

10   Q.  Nate, can you please pull up DX-80.

11           Ms. Carroll, do you recognize this document?

12   A.  Yes.

13   Q.  What is this document?

14   A.  This is a tweet or a Facebook post, I don't know which.

15   Q.  Let me help.  Is @E. Jean Carroll a Twitter handle?

16   A.  It is.

17   Q.  So is this your Twitter account?

18   A.  Yes.

19   Q.  And that's a statement you made, correct?

20   A.  Yes.

21           MS. HABBA:  Your Honor, I'd like to offer DX-80 into

22   evidence.

23           MS. KAPLAN:  Same objections, your Honor.

24           THE COURT:  Sidebar.

25           (At the sidebar)

O1IQcar1                            Carroll - Cross

```
 1              THE COURT:  Okay.
 2              MS. KAPLAN:  This is all irrelevant.  These are
 3   statements that were made any before the defamatory statements.
 4   The fact that she -- I guess the point that she's trying to
 5   make is the fact she talked about sex before 2019 somehow is
 6   relevant to the fact that people gave -- said the twit --
 7   excuse me -- the tweet that we showed yesterday that was having
 8   her sleep with tons of Roman legionnaires -- I can't even
 9   remember the thing.  Those posts are things completely
10   irrelevant.  It's 412 and it's 403.
11              MR. MADAIO:  Your Honor, there was testimony --
12              THE COURT:  Not you.  Ms. Habba.
13              MS. HABBA:  Sure.  Your Honor, there was testimony
14   yesterday that it bothered her that people were saying the
15   words and that she associates them with Donald Trump's words,
16   but she --
17              THE COURT:  It bothers her.
18              MS. HABBA:  Your Honor, may I --
19              THE COURT:  Look.
20              MS. HABBA:  I haven't even gotten to say my --
21              THE COURT:  What you've said so far, I don't
22   understand.  Wouldn't you like to know that?
23              MR. MADAIO:  Your Honor, may I please speak?
24              THE COURT:  No.
25              MS. HABBA:  I'm going to just need to make a record of
```

O1IQcar1                         Carroll - Cross

1   this.  Ms. Crowley and Ms. Kaplan have both been allowed to

2   speak sidebar, but for some reason you're not allowing me to

3   have my partner speak with me.

4           THE COURT:  I don't think that is accurate.

5           MS. HABBA:  It is absolutely accurate.  Ms. Crowley

6   spoke --

7           THE COURT:  I'm not going to argue with you.

8           MS. HABBA:  Okay, but I need to make a record of that.

9           Your Honor, this entire case she has been saying that

10  people are emulating president Trump's statement.  He didn't

11  say rape.  He didn't say those things.  She has said them.  And

12  these are responses directly to things prior to him ever saying

13  anything that she said.  They're responding to her comments.

14  She has an obligation, and so does Ms. Kaplan, to show that

15  it's directly related to president Trump's statements.  That's

16  how defamation works.  It has nothing to do with her sex.  She

17  in fact testified that she never had sex for last 20 years.  It

18  has to do with the fact that she has been putting these

19  statements into the world, and they are there for people to

20  read.  When she puts out *The Cut* article, it's clear that some

21  of these Twitter users were responding to things she put into

22  the world, not president Trump's statement.  You can't equate

23  everything to president Trump when she herself is using the

24  word rape, saying would you have sex with Donald Trump.  Things

25  like that prior to this.  I have to be allowed to show that she

O1IQcar1                         Carroll - Cross

1    can't show causation.

2            MS. KAPLAN:  Your Honor, the tweet that -- it's

3    Plaintiff's Exhibit 47.  "Rapes by Trump?  Present your

4    evidence E. J Carroll, you lying sleep-around known by more

5    penises than Julius Caesar and Pompey had legionnaires."

6            That is directly connected to what Ms. Carroll said in

7    The Cut and what Mr. Trump said in response.  The stuff that

8    she is trying to get in right now is totally unrelated, has

9    only to do with 412-type materials and doesn't draw any

10   connection whatsoever between the allegation that Ms. Carroll

11   made of rape and what people said.

12           MS. HABBA:  But yesterday Ms. Kaplan asked her --

13           THE COURT:  What is the date of the exhibit now in

14   question?

15           MS. KAPLAN:  It's 2011, I believe.

16           MS. HABBA:  2011.

17           THE COURT:  So it's eight years earlier?

18           MS. HABBA:  But also, your Honor, she opened the door

19   with promiscuous, and said she was emotionally damaged because

20   people were thinking she was promiscuous.

21           THE COURT:  What page of the transcript?

22           MS. HABBA:  I have it, your Honor.  From yesterday's

23   transcript, page 124, line 20.  Would you like me to read it

24   in?

25           THE COURT:  No.  I have it in front of me.  And the

O1IQcar1                          Carroll - Cross

1    question was:  "Now did any of the messages you received,

2    Ms. Carroll, accuse you of being promiscuous?

3    "A.  Yes.

4            MS. HABBA:  Yes, and then she goes on to say she has

5    emotional harm.

6            THE COURT:  Where does she say that?

7            MS. HABBA:  The question was:  "How did you feel, how

8    did receiving messages like this make you feel?"

9            THE COURT:  What page?

10           MS. HABBA:  125, line 24.

11           THE COURT:  And that refers to Plaintiff's Exhibit 47.

12           MS. HABBA:  Yes, about the promiscuous.

13           THE COURT:  Right.  And Ms. Kaplan just read Exhibit

14   47 into the record.  That's what you're hanging this on?

15           MS. HABBA:  That, and to prove damages, and her entire

16   testimony was trying to show causation from president Trump's

17   statement, I have to be able to prove that this is not the

18   case.  She was putting out statements like -- and your Honor

19   won't allow it in, but "rape is sexy" and she received a

20   backlash from that.

21           THE COURT:  You know, your client says that all the

22   time.

23           MS. HABBA:  "Some people think rape is sexy."

24           THE COURT:  Well, there is rather a material

25   difference even though you can't seem to recognize it.

O1IQcar1                          Carroll - Cross

1          MS. HABBA:  But I do recognize, and there are facts

2     that we will show, that she received more backlash after she

3     said that statement, your Honor.  That was a big part of it.

4     Her own statements.  You can't equate everything to Donald

5     Trump.

6          THE COURT:  That is quite possibly true.  It doesn't

7     get him off the hook.

8          MS. HABBA:  That's extremely prejudicial, your Honor.

9          THE COURT:  Prejudicial.

10         MS. HABBA:  And biased towards my client.

11         THE COURT:  I said it to his lawyer, not to the jury

12    as well you know.

13         MS. HABBA:  I understand, but --

14         THE COURT:  And if he is contributing to it and

15    damaging her in part, I believe the law is that he's liable.

16         MS. HABBA:  Your Honor, this is prior to him saying a

17    statement.

18         THE COURT:  Okay.  We've had enough of this.  I will

19    take one more look at this exhibit.

20              (Continued on next page)

21

22

23

24

25

O1IQcar1                         Carroll - Cross

1              (In open court)

2              THE COURT:  The objection to this is sustained.  It's

3     remote in time, of dubious relevance, and obvious prejudicial

4     value.

5     BY MS. HABBA:

6     Q.  Nate, can you please pull up DX-44.

7              Ms. Carroll, what is this?

8     A.  This is a tweet.

9     Q.  In that document, do you recognize your Twitter handle is

10    tagged -- or is on there, E. Jean Carroll?

11    A.  Yes.

12    Q.  Is this a tweet you put out?

13    A.  Yes.

14    Q.  Does it appear to be your Twitter handle?

15    A.  Yes.

16             MS. HABBA:  Your Honor, I would like to move DX-44

17    into evidence.

18             MS. KAPLAN:  Same objections, your Honor.

19             THE COURT:  Same ruling.  Sustained.

20    Q.  Nate, please pull up DX-82.

21             Ms. Carroll, what is this?

22    A.  This is a tweet.

23    Q.  Is this a tweet you put out?

24    A.  Yes.

25    Q.  And that's your handle, E. Jean Carroll?

O1IQcar1                          Carroll – Cross

1   A.  Yes.

2              MS. HABBA:  Your Honor, I would like to admit DX-82

3   into evidence.

4              MS. KAPLAN:  Same objections, your Honor.

5              THE COURT:  Same ruling.  Sustained.

6   Q.  Nate, please pull up DX-83.  Excuse, me let's go to DX-84,

7   actually.

8              Ms. Carroll, do you see this tweet?

9   A.  Yes.

10  Q.  What is it?

11  A.  It's a post by me.

12  Q.  And that's your handle, correct?

13  A.  Yes.

14             MS. HABBA:  Your Honor, I would like to admit DX-84

15  into evidence.

16             MS. KAPLAN:  Same objections, your Honor.

17             THE COURT:  I'm going to allow it.

18             MS. HABBA:  Thank you.

19             (Defendant's Exhibit 84 received in evidence)

20  Q.  Ms. Carroll --

21  A.  Yes.

22  Q.  -- did you tweet, "How do you know your 'unwanted sexual

23  advance' is unwanted until you advance it"?

24  A.  Yes.

25  Q.  And did you put that out at 12:04 p.m. on November 25,

O1IQcar1                        Carroll - Cross

1   2015?

2   A.  Yes.

3   Q.  And is that still on your Twitter account?

4   A.  Yes.

5   Q.  Nate, please put up DX-83.

6           Ms. Carroll, what is that?

7   A.  It's a tweet.

8   Q.  Is that your Twitter handle?

9   A.  Yes.

10  Q.  Is that a tweet you put out?

11  A.  Yes.

12          MS. HABBA:  Your Honor, I would like to move DX-83

13  into evidence.

14          MS. KAPLAN:  Same objections, your Honor.

15          THE COURT:  Objection sustained.

16  Q.  DX-85, please, Nate.

17          Ms. Carroll, do you recognize this?

18  A.  Yes, it's a tweet.

19  Q.  And in this document, do you recognize your Twitter handle?

20  A.  Yes.

21  Q.  Is this something you posted?

22  A.  Yes.

23          MS. HABBA:  Your Honor, I would like to move DX-85

24  into evidence.

25          MS. KAPLAN:  Same objections, your Honor.

O1IQcar1                        Carroll - Cross

1           THE COURT:  I'll receive this one.

2           MS. HABBA:  Thank you, your Honor.

3           (Defendant's Exhibit 85 received in evidence)

4    Q.  Ms. Carroll, in this post what is that picture from?

5    A.  It is from *Wall Street*, the movie *Wall Street*.

6    Q.  And you state, "Any ideas on how to dominate a man,"

7    correct?

8    A.  Yes.

9    Q.  What is that link to the picture underneath that comment?

10   A.  It links to a -- I think to an Ask E. Jean column and *Elle*.

11   Q.  Were your Ask E. Jean columns often discussing sex or

12   things of that nature?

13   A.  Yes.

14           MS. KAPLAN:  Objection, your Honor.

15   Q.  And you posted this at 4:53 p.m. on August 15, 2015,

16   correct?

17   A.  Yes.

18   Q.  And it is still on your Twitter website, isn't it?

19   A.  Yes.

20   Q.  What does that mean dominating a man, Ms. Carroll?

21   A.  It means getting your way and living the way you would like

22   you to live.

23   Q.  Can we pull the last exhibit that was entered 84 up?

24           THE COURT:  That was not, I believe -- excuse me.  It

25   was received.

O1IQcar1                          Carroll – Cross

1   Q.  Ms. Carroll, in this one, you say, "How do you know your

2   unwanted sexual advance is unwanted, until you advance it"?

3   What do you mean by that?

4   A.  I obviously mean that if you take someone's hand, you don't

5   know if they'll receive your hand unless you take that hand.

6   Q.  You being the one that's grabbing the hand?

7   A.  This was in answer to an Ask E. Jean question.

8   Q.  Was the question here in your Tweeter -- Twitter account?

9   A.  No.

10  Q.  So this is just your statement?

11  A.  Yes.

12  Q.  And both tweets are still up on Twitter, correct?

13  A.  Yes.

14  Q.  Can we please pull up for the witness DX-86.

15          Ms. Carroll, what is this?

16  A.  This is a tweet.

17  Q.  Is this a tweet you wrote?

18  A.  Yes.

19  Q.  Is that your Twitter handle?

20  A.  That's my Twitter handle.

21          MS. HABBA:  Your Honor, I'd like to move DX-86 into

22  evidence.

23          MS. KAPLAN:  Objection, your Honor.

24          THE COURT:  Ground?

25          MS. KAPLAN:  412, 403, your Honor's collateral

O1IQcar1                    Carroll - Cross

1   estoppel rulings.

2           THE COURT:  Overruled.  It's received.

3           MS. HABBA:  Thank you.

4           (Defendant's Exhibit 86 received in evidence)

5   BY MS. HABBA:

6   Q.  Ms. Carroll, does this tweet that you wrote say, "A chap is

7   not a mind-reader.  Show him what you like or he will soon

8   regret he even has a penis"?

9   A.  Mmm-hmm.

10  Q.  Is that a yes?

11  A.  Did you ask a question?

12  Q.  I asked if this is what it says?

13  A.  Yes, that is what it says.

14  Q.  And you posted that on August 7, 2013 at 1:51 p.m.,

15  correct?

16  A.  Yes.

17  Q.  It is still on your Twitter account today?

18  A.  Yes.

19  Q.  What did you mean by this?

20  A.  Tell a man what you'd like.

21  Q.  And what do you mean by "he will soon regret he even has a

22  penis"?

23  A.  I'm talking about when two people are in love, and they're

24  making love, the lovers can't guess what each other wants

25  unless they tell one another.

O1IQcar1                        Carroll - Cross

1   Q.  He will regret it.  That sounds to me like what you

2   interpreted president Trump to say was a threat, correct?

3              MS. KAPLAN:  Objection, your Honor.

4              THE COURT:  Sustained.

5   Q.  Can you please pull up DX-87.

6              Ms. Carroll, what is this?

7   A.  It's a tweet.

8   Q.  Is this your Twitter account?

9   A.  Yes.

10  Q.  You recognize this?

11  A.  Yes.

12             MS. HABBA:  Your Honor, I'd like to move DX-87 into

13  evidence.

14             MS. KAPLAN:  Objection, your Honor.  Plus it's 2013.

15  There is just no conceivable relevance or connection.

16             THE COURT:  It's received.

17             MS. HABBA:  Thank you, your Honor.

18             (Defendant's Exhibit 87 received in evidence)

19  Q.  Ms. Carroll, does this say, "What can be done about the

20  penis?  It gets large when you want it small and stays small

21  when you want it large"?

22  A.  Yes.

23  Q.  Those were your words, correct?

24  A.  Yes.

25  Q.  And you posted them on a public social media account--

O1IQcar1                         Carroll - Cross

1   A.  Yes --

2   Q.  -- on March -- please let me finish, Ms. Carroll.

3           -- on March 6, 2013, correct?

4   A.  Yes.

5   Q.  2:34 p.m.?

6   A.  Yes.

7   Q.  And you left that on your Twitter account as we stand here

8   today, correct?

9   A.  Yes.

10  Q.  What does that mean, "What can be done about the penis"?

11  A.  It's a philosophical question.  Sometimes women do not feel

12  like making love and the man wants to.  Sometimes a man wants

13  to make love and the woman doesn't want to.  It has to be

14  worked out.  My column was about relationships.  Many times I

15  address them in short quippy phrases like this.

16  Q.  And discuss penises?

17  A.  Yes, we discussed penises.

18  Q.  Nate, can you please pull up DX-88.

19          Ms. Carroll, what is this?

20  A.  This is a tweet.

21  Q.  Is this a tweet you put out?

22  A.  Yes.

23  Q.  Is that your Twitter account?

24  A.  Yes.

25          MS. HABBA:  Your Honor, I'd like to move DX-88 into

O1IQcar1                          Carroll - Cross

1    evidence.

2              MS. KAPLAN:  Same objections, your Honor.  And now

3    we're looking at 2010.

4              THE COURT:  Sustained.

5    Q.  Ms. Carroll, I have asked you about several tweets?

6    A.  Yes.

7    Q.  You didn't delete them?

8    A.  No.

9    Q.  Did you delete any of your tweets?

10   A.  No.  I told you before I did not delete a post.

11   Q.  So all your posts are still up on your Twitter account as

12   we sit here today?

13   A.  I believe they are.

14   Q.  Does anybody else have access to your Twitter account?

15             THE COURT:  It's been answered.

16   A.  No.

17   Q.  Nate, can you please pull up DX-47.

18             Ms. Carroll, do you recognize this?

19   A.  Yes.

20   Q.  What is this?

21   A.  This is a tweet.

22   Q.  Ms. Carroll, if I represented it might be a Facebook post,

23   would that be more accurate?

24             THE COURT:  We're not having any representations.

25   You're not a witness.

O1IQcar1                                   Carroll - Cross

1    Q.  Is your Twitter account handle on here?

2    A.  No.

3    Q.  So how is it a tweet?

4    A.  Oh, I guess it's not.  I guess it's a --

5           THE COURT:  The question is, do you know?

6    A.  I don't know.  I don't know.

7    Q.  Is that your profile picture?

8    A.  It's my -- it's been my profile picture on all my social

9    media accounts.

10   Q.  What social media accounts do you have?

11   A.  Instagram, Facebook, Twitter, Threads.

12   Q.  On Instagram, can you post comments like this?

13   A.  On Instagram?  Do I post comments like -- no.  This is --

14   this is from my -- yes, I do post comments like this,

15   obviously.

16   Q.  So you do not recognize where this could have come from?

17   A.  No, but possibly Facebook.

18   Q.  Do you recognize it as your own comment?

19   A.  Oh, it's something I would say, absolutely.

20   Q.  Do you have any reason to believe this is not your post?

21   A.  No, I believe it's my post.

22           MS. HABBA:  Your Honor, I'd like to admit DX-47 into

23   evidence.

24           MS. KAPLAN:  Your Honor, way, way far afield, into

25   topics that the parties have agreed not to discuss, 403.  412.

O1IQcar1                          Carroll - Cross

1   Relevance.

2           THE COURT:  Sustained.

3   Q.  Ms. Carroll, do you consider yourself an advocate for

4   women?

5   A.  Yes.

6   Q.  And is it fair to say that many commentators have praised

7   you for your advocacy?

8   A.  Some people have, yes.

9   Q.  More than one?

10  A.  Yes.

11  Q.  More than two?

12  A.  I think so.

13  Q.  More than ten?

14  A.  Possibly.

15  Q.  And you've received a lot of positive coverage after the

16  verdict in the *Carroll II* trial, correct?

17  A.  Yes.

18  Q.  Did the *Carroll II* verdict in your opinion provide you with

19  bigger status in New York?

20  A.  It provided me with enormous elation and a feeling of

21  well-being and a feeling of triumph.

22  Q.  And after your other trial finished against the president,

23  you did another round of media, didn't you?

24  A.  We had four -- five television appearances.

25  Q.  And you posted about your victory as well as the television

O1IQcar1                          Carroll - Cross

1    appearances, correct?

2    A.  I posted twice on my Substack about it.

3    Q.  Did you post anything on Twitter about it?

4    A.  I think I did make a post on Twitter.

5    Q.  Did you post anything on Instagram?

6    A.  I believe I did post on Instagram.

7    Q.  Did you post anything on Facebook?

8    A.  I believe I -- I'm not sure about Facebook, but I suppose I

9    did.

10   Q.  Have you talked about your victory on any podcasts other

11   than the shows you did on TV?

12   A.  One podcast.

13   Q.  Have you talked to any news reporters since your victory?

14   A.  A group of reporters at my attorney's office.

15   Q.  When was that?

16   A.  The following day.

17   Q.  You had a press conference --

18   A.  No.  No.  No.  It was one newspaper.  They had a group of

19   reporters from one newspaper.

20   Q.  What newspaper was that?

21   A.  The *New York Times*.

22   Q.  Ms. Kaplan arranged for the *New York Times* to be at her

23   office the following day?  Is that your testimony?

24            MS. KAPLAN:  Objection, your Honor.

25            THE COURT:  I'm sorry, what was that?  It's sustained.

O1IQcar1                        Carroll - Cross

1   Q.  So other than that, have you had any communication with the

2   press since that day?

3   A.  Very little.  I have led a very quiet life since then.

4   Q.  When you say "very little," what has your communication

5   been with the press?

6   A.  I really can't think of anything.

7   Q.  So you can't think of anything other than the meeting you

8   just discussed?

9   A.  We had five television appearances, the meeting with the

10  *New York Times*, one podcast.  I'm drawing a blank for anything

11  else.

12  Q.  Leading up to this case -- withdrawn.

13          You previously testified the media appearances were on

14  *CNN* and *MSNBC*, correct, on TV?

15  A.  Yes.

16          MS. KAPLAN:  Asked and answered, your Honor.

17  Q.  And these are left-leaning platforms.  Isn't that right?

18          THE COURT:  Sustained.

19  Q.  These are left-leaning platforms?

20          THE COURT:  Did you perhaps not hear?

21          MS. HABBA:  I thought that was for the first question,

22  your Honor.

23  Q.  So when you go on these programs, they were generally

24  sympathetic, weren't they?

25          MS. KAPLAN:  Objection, your Honor.

01IQcar1                          Carroll - Cross

1       THE COURT:  Sustained.

2  Q.  Ms. Carroll, has anyone on TV ever questioned your

3  credibility?

4       MS. KAPLAN:  Objection, your Honor.  Inconsistent with

5  your Honor's rulings.

6       THE COURT:  Sustained.

7  Q.  Did you go on TV because you thought it would help your

8  reputation, Ms. Carroll?

9  A.  Yes, I wanted people to know the good news, that we had won

10  this milestone case.

11  Q.  And you went on TV prior to the good news about winning the

12  milestone case, correct?

13  A.  No.  I did for the book four years before that.  I went on

14  four television shows in 2019, yes.

15  Q.  Were you portrayed in a negative light?

16       MS. KAPLAN:  Objection, your Honor.

17       THE COURT:  Sustained.

18  Q.  Would you call yourself a success on social media,

19  Ms. Carroll?

20  A.  No, I'd call myself mediocre on social media.

21  Q.  But you will agree that in the past few years, you have

22  increased your following on social media, correct?

23  A.  Yes, because I started a Substack and because I was more

24  agile at learning how to do Twitter.

25  Q.  How do you know it's not because of this lawsuit,

1    Ms. Carroll?

2    A.  I don't -- I think it's because I used to post on my

3    Substack once a week, and I upped it to three times a week.

4    Q.  After you appeared on prime time TV, did your followers

5    increase back in 2019?

6    A.  I think -- yes, I think it did.

7    Q.  And then in 20 -- last year when you won the last trial

8    against the president and you went on prime time TV, did you

9    receive more followers after that?

10   A.  I believe I received a few more followers, yes.

11   Q.  What is prime time TV, Ms. Carroll?

12   A.  I guess it's anything after 8:00 -- 7:00 or 8:00, I'm not

13   sure.  7:00 or 8:00 in the evening.

14   Q.  Do you know why it's called prime time TV?

15            MS. KAPLAN:  Objection, your Honor.

16            THE COURT:  Sustained.

17   Q.  Ms. Carroll, you worked in the TV industry, didn't you?

18   A.  Yes.

19   Q.  You understand that there are certain parts of time during

20   the day when more people watch.  Is that correct?

21   A.  Yes.

22   Q.  And what is that time?

23   A.  8:00 to 11:00.

24   Q.  Is that also known as prime time?

25   A.  Yes.

O1IQcar1                          Carroll - Cross

1   Q.   And the shows you appeared on, some of those were prime

2   time, correct?

3            MS. KAPLAN:  Asked and answered, your Honor.

4            THE COURT:  Sustained.

5   A.   Yes.  Two.

6            THE COURT:  Ms. Carroll --

7            THE WITNESS:  Sorry, your Honor.

8            THE COURT:  -- there was an objection.

9            The answer is stricken.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OiIsCAR2                         Carroll - Cross

1              MS. HABBA:  Can you please pull up DX 30 for the

2      witness.  Excuse me, 31.  They are correcting me.

3      BY MS. HABBA:

4      Q.  Ms. Carroll, what is this?

5      A.  This is my Twitter profile.

6      Q.  Does this appear to be a screenshot of your Twitter

7      profile?

8      A.  Yes.

9              MS. HABBA:  Your Honor, I would like to offer DX 31

10     into evidence.

11             MS. KAPLAN:  Your Honor, there is no date on this

12     document.

13             THE COURT:  Well, the witness testified in the present

14     tense.

15             MS. KAPLAN:  Withdrawn, your Honor.

16             THE COURT:  Received.

17             (Defendant's Exhibit 31 received in evidence)

18             MS. HABBA:  Thank you, your Honor.

19     BY MS. HABBA:

20     Q.  When you joined Twitter, how many followers did you have?

21     A.  One.

22     Q.  Considerably less than 232,000 followers, correct?

23     A.  Yes.

24     Q.  In fact, didn't you only have ten and a half thousand

25     followers back in 2017?

OiIsCAR2                      Carroll - Cross

1   A.  Probably around 10 or 12.  I don't know.  Around there.

2          MS. HABBA:  Nate, can you please pull up the document

3   marked DX 30, for the witness.  30.

4   Q.  Ms. Carroll, what is this?

5   A.  This is a screenshot of how many followers I have.

6   Q.  What is the social media?

7   A.  This is Twitter.  I believe -- no, no.  I think it's

8   Facebook.  Actually, I don't know.  It says E. Jean Carroll

9   twitter.

10         OK.  Twitter.

11  Q.  Do you know approximately when you would have had these,

12  without getting into the details; do you know when this was?

13  A.  Pardon?

14  Q.  Do you know when this screenshot was taken from?

15         Obviously 2024, but do you know what year this would

16  be from?

17         THE COURT:  Is this in evidence?

18         MS. HABBA:  No, I just am trying to authenticate it,

19  your Honor.

20         THE COURT:  What you are trying to do is get the

21  witness to read it to you.

22         MS. HABBA:  I've instructed her not to.  We can move

23  on.

24  BY MS. HABBA:

25  Q.  So you stated you had between ten to 12,000 followers back

OiIsCAR2                    Carroll – Cross

1    in 2017, correct?

2    A.  Yes.

3    Q.  What do you believe this exponential increase came from?

4    A.  Hard work.

5    Q.  You don't think any of that increase came as a direct

6    result of the fame you received from coming forward with your

7    story?

8    A.  I believe that played a part, yes.

9    Q.  And do you think that now you have greater ability to reach

10   a wider audience with your writing, given your increased

11   following base?

12   A.  I am reaching more readers.  It's not particularly a wide

13   base.  It's still a very -- 28,000 readers is not a wide base.

14   It's a small base.

15   Q.  You have 232,000 followers?

16   A.  Oh, on Twitter, yes.

17   Q.  You stated yesterday that you have to use Twitter to have

18   your stories go out, right?

19   A.  Yes.

20   Q.  So not 28,000, correct?

21   A.  No.  I thought you were talking about Substack.

22   Q.  Do you have a link to your Substack on your Twitter

23   account?

24   A.  Yes.

25           MS. HABBA:  Nate, can you please pull up the document

OiIsCAR2                        Carroll - Cross

1   premarked DX 32.

2   Q.  Ms. Carroll, what is this?

3   A.  This is a tweet.

4   Q.  Is that your Twitter handle?

5   A.  Yes.

6   Q.  Do you recognize that as something you put up?

7   A.  Yes.

8           MS. HABBA:  Your Honor, I would like to move DX 32

9   into evidence.

10          MS. KAPLAN:  No objection, your Honor.

11          THE COURT:  Received.

12          (Defendant's Exhibit 32 received in evidence)

13          MS. HABBA:  Thank you.

14  Q.  Ms. Carroll, I believe I'm not sure if the plaintiff has

15  put this in.  I remember seeing it.  We'll call it DX 32.  I'll

16  check with opposing counsel.

17          Does this say, Ladies, may I have a word with you ...

18  question, we won?

19  A.  Yes.

20  Q.  That was on 12:50 on May 10, 2023, correct?

21  A.  Yes.

22  Q.  How many views did you get?

23  A.  I don't know how many views.

24          Oh, 3.9 million views.

25  Q.  So your post was viewed 3.9 million times, correct?

OiIsCAR2                          Carroll - Cross

1    A.  Yes.

2            THE COURT:  That's what she just said.

3    Q.  Is it correct that none of your tweets prior to the lawsuit

4    received anywhere near 3.9 million views, is that correct?

5    A.  I'm not sure.

6    Q.  After the verdict was received on the last trial against

7    the president, several celebrities reached out to you, isn't

8    that correct?

9    A.  Yes.

10   Q.  The actor John Cusack described you as heroic, didn't he?

11   A.  I'm not sure.

12   Q.  Do you remember Jamie Lee Curtis thanking you?

13   A.  She's a friend, so yes.

14   Q.  Is she a celebrity?

15   A.  Yes.

16   Q.  And actress and advocate Mira Sorvino said she was proud of

17   you and happy for you, remember that?

18   A.  It's lovely, yes.  Thank you for reminding me.

19   Q.  So you do remember receiving that?

20   A.  I remember Mira, yes.

21   Q.  Actress Alyssa Milano thanked you, do you remember that?

22   A.  Yes.

23   Q.  Bette Midler even tweeted about the verdict, correct?

24   A.  Yes.  It was all wonderful.

25   Q.  And Rob Reiner?

OiIsCAR2                    Carroll - Cross

1   A.  They were very happy with the verdict.

2   Q.  And you've been invited to several social events because of

3   your role in this case, haven't you?

4   A.  I've been invited to two parties.

5   Q.  What were those two parties?

6   A.  At Molly Jong-Fast's house, both of them.

7   Q.  Who is that?

8   A.  Molly Jong-Fast is a journalist, an imminent journalist,

9   and she's a very good hostess.

10  Q.  Who does she write for?

11  A.  Right now, Vanity Fair.

12  Q.  When you went to those two parties, was Mary Trump or Kathy

13  Griffin there?

14  A.  Yes.

15  Q.  Was your lawyer there?

16  A.  She was at a recent party.

17  Q.  Anybody else from her team at the party with you with them?

18  A.  No.

19  Q.  Furthermore, you've become -- I'm going to withdraw that.

20          Is it safe to say that your friends that we discussed

21  yesterday -- Kathy Griffin, Mary Trump, George Conway -- all of

22  these people do not like president Trump at all, do they?

23          MS. KAPLAN:  Objection, your Honor.

24          THE COURT:  Sustained.

25  Q.  Ms. Carroll, you said you were on Instagram, correct?

OiIsCAR2                    Carroll - Cross

1   A.  Yes.

2   Q.  What is your handle on Instagram?

3   A.  *EJeanCarroll.*  I think *EJeanCarroll1.*  I'm not on it much,

4   maybe twice a month.

5   Q.  When did you join Instagram?

6   A.  Oh, years ago.

7   Q.  Do you know what year?

8   A.  When did it start?  2007, 2008?

9        Around there, I guess.

10       MS. HABBA:  Nate, can you please pull up what has been

11  premarked DX 34 for the witness.

12  Q.  Ms. Carroll, do you recognize this document?

13  A.  Oh, it's an Instagram.

14  Q.  Is it your Instagram?

15  A.  I guess, yes.  *EJeanCarroll1,* there it is.

16  Q.  And does it appear to be a screenshot of your Instagram

17  account?

18  A.  Yes.

19  Q.  Do you have any reason to doubt its authenticity?

20  A.  No.

21       MS. HABBA:  Your Honor, I would like to offer DX 34

22  into evidence.

23       MS. KAPLAN:  No objection, your Honor.

24       THE COURT:  Received.

25       (Defendant's Exhibit 34 received in evidence)

OiIsCAR2                              Carroll - Cross

```
 1    Q.  Ms. Carroll, you have approximately 12 and a half thousand
 2    followers on Instagram, correct?
 3    A.  Yes.
 4    Q.  How many of these followers did you have in 2014?
 5    A.  Oh, I have no -- I have no idea.  Maybe half.  I have no
 6    idea.
 7    Q.  Significantly less?
 8    A.  Honestly, I'm so rarely on Instagram, I'm not sure.
 9    Q.  Ms. Carroll, do you have any current projects --
10    A.  No.
11    Q.  -- lined up?
12    A.  None.
13    Q.  You have an agent, correct?
14    A.  No.
15    Q.  Did you have an agent?
16    A.  I had an agent until 2019.
17    Q.  Did you have an agent when you came out with your Cut
18    article?
19    A.  No.
20    Q.  But you had the publicist through your publisher, correct?
21    A.  I had --
22              MS. KAPLAN:  I think this has been asked and answered.
23              THE COURT:  This has been asked and answered, yes.
24    Q.  When did you get an agent?
25    A.  Oh, 1983, 1982.
```

1   Q.  And when did you fire your agent?

2   A.  I didn't --

3          MS. KAPLAN:  Objection, your Honor.

4          THE COURT:  Sustained.

5   Q.  Why don't you have an agent right now?

6   A.  I'm not working on anything.  I don't need an agent.

7   Q.  Have you been promoting publicly the book Mary Trump, we

8   discussed with Mary Trump yesterday?

9          MS. KAPLAN:  Asked and answered, your Honor.

10         MS. HABBA:  No, it was not.

11         THE COURT:  Just wait a minute.

12         (Pause)

13         MS. KAPLAN:  Also, your Honor, I believe it's a

14  Substack, not a book.

15         THE COURT:  Sustained as to form, at least.

16  BY MS. HABBA:

17  Q.  In the media, in Substack social media, has your name come

18  up with Mary Trump and the romance story that is coming out?

19         MS. KAPLAN:  Asked and answered, your Honor.

20         THE COURT:  Sustained.

21  Q.  Are you helping Mary Trump in any way?

22         MS. KAPLAN:  Asked and answered.

23         THE COURT:  Sustained.

24         MS. KAPLAN:  Your Honor.

25         MS. HABBA:  OK.

OiIsCAR2                          Carroll – Cross

1    Q.  Are you still working on your Substack?

2    A.  Yes.  Well, I haven't been.  I stopped writing when

3    litigation proceeded lately.

4    Q.  Litigation --

5            Lately?

6    A.  Right here, yes.  This trial.

7    Q.  Two days ago?

8    A.  No, no.  I stopped posting on Substack three weeks -- two

9    weeks ago, three weeks ago.  I don't remember which.

10   Q.  OK.  And you had another trial, we've discussed?

11   A.  Yes.

12   Q.  Did you work on your Substack in between this trial and the

13   last trial?

14   A.  Yes.

15   Q.  So you stopped for a couple weeks to prepare for this

16   trial --

17   A.  Yes.

18   Q.  -- or whatever, whatsoever?

19   A.  Yes.

20   Q.  OK.  Do you plan to go back on Substack after this?

21   A.  Yes.

22   Q.  Do you plan to go back on TV after this case?

23   A.  I'm not sure what will happen.

24   Q.  So you've come a long way since that ranch in Montana,

25   haven't you, Ms. Carroll?

OiIsCAR2                          Carroll - Cross

1          MS. KAPLAN:  Objection, your Honor.

2          THE COURT:  Sustained.

3  Q.  As you sit here today, do you believe you are more

4  well-known because of the allegations you made against my

5  client, president Trump?

6  A.  Yes, I'm more well-known and hated by a lot more people.

7          MS. HABBA:  Your Honor, I move to strike that.  That's

8  not responsive.

9          THE COURT:  Overruled.

10 Q.  Did you expect that everybody would like you, Ms. Carroll?

11 A.  I --

12         MS. KAPLAN:  Objection, your Honor.

13         THE COURT:  Sustained.  Asked and answered.

14 Q.  Do you feel that you are more recognized today than you

15 were in June of 2019?

16         MS. KAPLAN:  Objection, your Honor.  Asked and

17 answered.

18         THE COURT:  Sustained, at least as to form.

19 Q.  Do more people know you today since your accusation came

20 out?

21         MS. KAPLAN:  Objection, your Honor.  Asked and

22 answered multiple times.

23         THE COURT:  Sustained, at least as to form.

24 Q.  Aren't you making more money today than you were before The

25 Cut article came out in 2019?

OiIsCAR2                          Carroll - Cross

1            MS. KAPLAN:  Objection, your Honor.  Asked and

2   answered.

3            THE COURT:  Sustained.

4   Q.  And it's fair to say, at least to a broad spectrum of

5   American people, you are more well-regarded today than you were

6   in June of 2019, correct?

7            MS. KAPLAN:  Objection, your Honor.

8            THE COURT:  Sustained.

9   Q.  You have been provided opportunities today, such as hosting

10  your own Substack and appearing on Primetime media, that you

11  weren't being provided in 2019, correct?

12           MS. KAPLAN:  Objection, your Honor.  And I --

13           THE COURT:  Sustained.

14           MS. KAPLAN:  I object further to the tone.

15  Argumentative.

16  Q.  Your reputation, in many ways, is better today, isn't it,

17  Ms. Carroll?

18  A.  No.  My status was lowered.  I'm partaking in this trial to

19  bring my own reputation and status back.

20  Q.  So you sued Donald Trump to bring your old reputation back?

21  A.  Yeah.

22           MS. HABBA:  No more questions, your Honor.

23           THE COURT:  All right.  Thank you.

24           We'll take our morning break.  15 minutes, folks.

25           (Recess)

OiIsCAR2                        Carroll - Redirect

1              Is there going to be redirect?

2              MS. KAPLAN:  Very brief, your Honor.

3              THE COURT:  OK.  Get the jury.

4              (Jury present)

5              Welcome back, folks.

6              Ms. Carroll, you're still under oath.

7              Ms. Kaplan, redirect examination, please.

8              MS. KAPLAN:  Thank you, your Honor.

9   REDIRECT EXAMINATION

10  BY MS. KAPLAN:

11  Q.  Ms. Carroll, do you recall that Ms. Habba asked you a

12  series of questions about the gap, was the word she used?

13  A.  Yes.

14  Q.  And about the denial from the White House that was in The

15  Cut magazine excerpt of your book on June 21, 2019; do you

16  recall that?

17  A.  Yes.

18  Q.  And I think your testimony -- withdrawn.  I don't want to

19  characterize it.

20              If you can repeat again, what was the denial in that

21  piece?

22  A.  It was a denial issued from the White House.

23  Q.  OK.  Ms. Carroll, whose office -- withdrawn.

24              Who was president at the time?

25  A.  Donald Trump.

OiIsCAR2                        Carroll - Redirect

1   Q.   Who had his office in the White House at that time?

2   A.   Donald Trump.

3               MS. HABBA:  Objection.  Sorry.

4               THE COURT:  What's the objection?

5               MS. HABBA:  Your Honor, this is completely

6   speculation.  I understand what she's doing.  I'm trying not to

7   say it in front of the jury, but it's prejudicial.

8               THE COURT:  Prejudicial.

9               The question is:  Who had his office in the White

10  House at that time?

11              MS. HABBA:  Yes.

12              But can we have a side bar?

13              THE COURT:  That's prejudicial.

14              MS. HABBA:  I can discuss it in front of the jury, if

15  we can have a sidebar.

16              THE COURT:  We're not going to have it in front of the

17  jury.

18              MS. HABBA:  Your Honor, she's trying to imply --

19              THE COURT:  We are not going to have it in front of

20  the jury.

21              Come to the sidebar.  I don't understand what happens

22  if you say I can do it in front of the jury and I say no and --

23              MS. HABBA:  I misunderstood you.

24              (Continued on next page)

25

OiIsCAR2                        Carroll - Redirect

 1                (At the sidebar)

 2                THE COURT:  Ms. Habba, what is it?

 3                MR. MADAIO:  I'll speak for defense.

 4                THE COURT:  All right.

 5                MR. MADAIO:  The issue we would like to raise is it's

 6       prejudicial where this is headed.  They are going to be

 7       statements issued by the White House and they are trying imply

 8       they were president Trump that made the statements.

 9                Those statements are not at issue.  There has been no

10       showing that he was the one that made them and, again, those

11       statements are not attributable to him.  They are not the issue

12       at suit.  They are not at issue in this suit.

13                And even if they were, they were obviously immunity

14       issues there that have not been litigated in this case.

15                THE COURT:  What obvious immunity issues?

16                MS. HABBA:  The White House --

17                MR. MADAIO:  If they are trying to impugn liable to

18       him.

19                THE COURT:  No, they are not.  I'll give an

20       instruction.

21                MR. MADAIO:  Because, to the extent, even if these

22       tweets were attributable to that White House statement, that's

23       not the same as being attributable to president Trump.

24                THE COURT:  I understand that.  That's why I'm willing

25       to give such an instruction.

OiIsCAR2                          Carroll – Redirect

1              MR. MADAIO:  OK.  All right.  That's all we wanted to

2       make clear.

3                   (Continued on next page)

1          (In open court)

2          THE COURT:  Members of the jury, just to reiterate to

3    you again, the two statements by Mr. Trump that are the basis

4    of the compensatory damage claim in this case are the written

5    statement on June 21, Plaintiff's Exhibit 1, and the written

6    statement on June 24, Plaintiff's Exhibit 2.

7          There is no compensatory damage claim being made with

8    respect to whatever was said that appeared in the New York

9    Magazine piece called The Cut, or on The Cut, or whatever the

10   right formulation of that is at sometime before Plaintiff's

11   Exhibit 1.

12          All right.  Let's go ahead.

13          MS. KAPLAN:  Judge, I'm sorry.  Just to clarify the

14   record, I think you said June 21 and June 24, and it's June 21

15   and June 22.

16          THE COURT:  Thank you.  I stand corrected.

17          June 21 and June 22.

18   BY MS. KAPLAN:

19   Q.  Ms. Carroll, do you recall that Ms. Habba, in her cross-

20   examination of you, showed you a handful of tweets that you

21   were tagged in on Twitter between the time that The Cut

22   magazine excerpt was published online and the Laura Litvan

23   tweet later that afternoon; do you recall that?

24   A.  Yes.

25   Q.  The tweets that Ms. Habba showed you from that period of

OiIsCAR2                          Carroll - Redirect

1    time, did any of those tweets accuse you of being a paid

2    democratic operative?

3    A.  No.

4    Q.  Did any of those tweets threat your life?

5    A.  No.

6    Q.  Did any of those tweets say that you should be in jail?

7    A.  No.

8    Q.  Did any of those tweets say that you should be raped?

9    A.  No.

10   Q.  Now, do you recall that Ms. Habba asked you a bunch of

11   questions about social status?

12   A.  Yes.

13   Q.  Do you recall those questions?

14            Did you reveal your account of what Donald Trump did

15   to you at Bergdorf Goodman in 1996 to enhance your social

16   status?

17   A.  No.  It took great courage to come forward and tell people

18   what happened.

19   Q.  Do you remember that Ms. Habba asked you a bunch of

20   questions about being on magazine covers; do you recall those

21   questions?

22   A.  Yes.

23   Q.  Did you reveal your account of the sexual assault by

24   Mr. Trump because you wanted to be on a magazine cover?

25            MS. HABBA:  Objection, your Honor.

OiIsCAR2                           Carroll - Redirect

```
 1              THE COURT:  Overruled.

 2              MS. KAPLAN:  You can answer.

 3   A.   No.   The exact opposite.

 4   Q.   Did you reveal your account of what Mr. Trump did that day

 5   in 1996 because you wanted to make money from it?

 6   A.   No.

 7   Q.   Did you decide to reveal your account of what had happened

 8   that day at Bergdorf Goodman -- withdrawn.

 9              Did you wait to tell your story intentionally about

10   what Mr. Trump had done to you, wait until he became president?

11   A.   No, no.

12   Q.   Now, I think you testified to this with me on direct.

13              Did you expect to receive backlash when you told your

14   account of what Donald Trump had done to you?

15              MS. HABBA:  Objection, your Honor, asked and answered.

16              THE COURT:  Overruled.

17   A.   Yes, I did expect backlash.

18   Q.   In terms of what actually happened, did Mr. Trump's

19   statements on June 21 and June 22 make the backlash worse?

20              THE COURT:  Worse than what?

21              MS. KAPLAN:  Worse than what she expected.

22   A.   It was worse.

23   Q.   Now, I think Ms. Habba asked you this question, but you

24   didn't have any conversations with counsel, with me or anyone

25   from my law firm, since you've finished your testimony
```

OiIsCAR2                      Carroll - Redirect

1    yesterday, correct?

2    A.  No.

3          THE COURT:  Not correct, or no, you didn't have any

4    conversations?

5          MS. KAPLAN:  My fault.

6          THE WITNESS:  I had no conversations.

7    Q.  Would you be surprised to learn, Ms. Carroll, that during

8    that time, Donald Trump made yet another statement about you?

9    A.  Yes.

10         MS. KAPLAN:  Your Honor --

11   A.  No, I would not be surprised, actually.

12   Q.  Did you know he made another statement about you?

13   A.  No, but I'm not surprised.

14         MS. KAPLAN:  Can we put up just a still of Plaintiff's

15   164.

16         THE COURT:  Well, are you offering it?

17         MS. KAPLAN:  I will, your Honor.  Obviously, I'm going

18   to argue self-authentication here.  I couldn't authenticate it

19   with the witness beforehand.

20         MS. HABBA:  Your Honor, I would just ask counsel if

21   they plan to play what he said.

22         MS. KAPLAN:  We do.

23         THE COURT:  I don't know.

24         MS. HABBA:  Yes.  OK.

25   BY MS. KAPLAN:

1  Q.  Ms. Carroll, looking at this still which is before you,

2  have you ever seen this before?

3  A.  No.

4  Q.  Do you recognize the person here?

5  A.  Yes.

6          MS. KAPLAN:  Your Honor, we would like to offer one --

7  I have a transcript, too, I can hand to her.

8          THE COURT:  Well, that would be 164-T, would it?

9          MS. KAPLAN:  Exactly.  It would be 164-T, your Honor.

10         THE COURT:  All right.  Is there any objection?

11         MS. HABBA:  No objection, your Honor.

12         MS. KAPLAN:  May I approach, your Honor?

13         THE COURT:  Yes.  164 and 164-T are both received.

14         Same instruction about the transcript, ladies and

15  gentlemen.

16         MS. HABBA:  It might have been a marking inadvertently

17  by tech.

18         MS. KAPLAN:  Excuse me.

19         AV TECHNICIAN:  Let me clear this for you.

20         MS. KAPLAN:  Oh.  Is the screen clear --

21         THE WITNESS:  Yes.

22         MS. KAPLAN:  -- Mr. Termonfilis?

23         THE COURT:  When you say is the screen clear, is it

24  blank?

25         MS. KAPLAN:  Your Honor, what we were talking about,

OiIsCAR2                          Carroll - Redirect

1    there was a weird purple line going across the screen.

2              THE COURT:  Thank you.

3              MS. KAPLAN:  Mr. Termonfilis, can you play for the

4    jury 164, please.

5              (Video played)

6              Ms. Carroll --

7              MS. HABBA:  I'm sorry, your Honor.  That is not the

8    full clip.  I was not made aware of this portion only being

9    shown.

10             OK.  Well, I would like the whole clip played.

11             THE COURT:  Let me have 164-T, Ms. Kaplan.

12             MS. KAPLAN:  Here you go, Mr. Mohan.

13             THE COURT:  Do you have a transcript of the whole

14   thing?

15             MS. KAPLAN:  I do not, your Honor.  I can represent

16   that the things that were cut were either not about

17   Ms. Carroll --

18             THE COURT:  I don't want that either.  You're not a

19   witness.

20             MS. KAPLAN:  OK.  This is what we did with all the

21   other videos, your Honor, that we played.

22             THE COURT:  I don't know that.

23             MS. HABBA:  I have no objection to the video being

24   played, the whole video, your Honor, and it is relevant because

25   they cut what he said about her.

OiIsCAR2                    Carroll - Redirect

1            THE COURT:  They cut what he said about her?

2            MS. HABBA:  Yes, that is not it.  It's cut.

3            THE COURT:  I see.  The whole thing is made up.  That

4    has nothing to do with Ms. Carroll.

5            MS. HABBA:  My point is it's not the full clip, your

6    Honor.

7            THE COURT:  I don't know that because I'm not glued to

8    CNN.

9            Look, we're not going to do this now.  They are

10   entitled to see the whole thing.

11           MS. KAPLAN:  Yeah.

12           THE COURT:  If there is an issue under completeness,

13   I'll deal with it.

14           MS. HABBA:  The whole thing was not sent to me.

15           MS. KAPLAN:  That's not a problem, your Honor.

16           THE COURT:  We'll pass over that for now.  The

17   exhibits are not now received.

18           MS. KAPLAN:  Didn't we --

19           (Counsel confer)

20           Your Honor, so the record is clear, we sent this to

21   them.

22           MS. HABBA:  A portion.

23           THE COURT:  I don't care.  You know the rules.

24           (Counsel confer)

25   BY MS. KAPLAN:

OiIsCAR2                    Carroll - Recross

1    Q.  Ms. Carroll, I think you've been testifying about the

2    changes throughout your testimony yesterday and today, the

3    changes to your reputation as a result of the statements

4    Mr. Trump made in June 2019, correct?

5    A.  Yes.

6    Q.  Sitting here today, would you prefer to have the reputation

7    you have now with all those Twitter followers or the reputation

8    you had before June 2019?

9    A.  Reputation before.

10           MS. KAPLAN:  No further questions, your Honor.

11           THE COURT:  Recross.

12           MS. HABBA:  I'll be brief.

13   RECROSS EXAMINATION

14   BY MS. HABBA:

15   Q.  Ms. Carroll, you said you would rather have the reputation

16   before, correct?

17   A.  Yes.

18   Q.  Was it your choice to do the article with The Cut?

19   A.  Yes.

20           MS. KAPLAN:  Objection, your Honor.

21           THE COURT:  Yes.

22           No, overruled.

23   Q.  Yesterday you stated that you were ducking as you heard a

24   threat from Twitter on June 21, correct?

25           MS. KAPLAN:  Objection.

OiIsCAR2                         Carroll - Recross

```
 1   A.  No --
 2              THE COURT:  Excuse me.  When the lawyer stands up, it
 3   means there is an objection.
 4              THE WITNESS:  Yes.
 5              THE COURT:  And you wait.
 6              THE WITNESS:  OK.
 7              THE COURT:  What is it?
 8              MS. KAPLAN:  Outside the scope.
 9              THE COURT:  Sustained.
10              MS. HABBA:  I didn't hear what she said.
11              THE COURT:  Outside the scope.
12              MS. HABBA:  Outside?
13              She directly, your Honor, talked about the threat
14   again on redirect that she received.
15              MS. KAPLAN:  I don't think I did, your Honor.
16              THE COURT:  I don't believe so.
17              MS. HABBA:  Can I have a moment to look at the
18   transcript?
19              THE COURT:  Let me go back and look at the transcript.
20              (Counsel confer)
21              If I'm mistaken, I'll correct it.
22              MS. HABBA:  The question was whether, during the gap
23   of time we'll call it, if she received death threats.  That is
24   what she asked her about.
25              THE COURT:  What's your question?
```

OiIsCAR2                       Carroll - Recross

```
 1                 MS. HABBA:  Do you know what time that was?

 2                 THE COURT:  Do you know what time what was?

 3                 MS. HABBA:  That you received that threat?

 4    A.  Yes.

 5                 THE COURT:  She didn't say threat, she said threats.

 6    BY MS. HABBA:

 7    Q.  Threats.  Do you know what time they were?

 8    A.  I know what time I opened my computer and saw my e-mails in

 9    my Twitter, around 11:30 at night.

10    Q.  My question was, do you know what time those threats were

11    sent to you at your Twitter account?

12    A.  No.  I didn't focus on the dates or the times.

13    Q.  Do you have any of them?

14    A.  I have many of the tweets and posts, but I don't have the

15    letters because I deleted them.

16    Q.  Did you delete any -- those were tweets that you deleted,

17    Ms. Carroll?

18    A.  I'm not sure.  My state of mind that night, my body was

19    clinched.  My heart was raising.

20                 MS. HABBA:  Excuse me, your Honor.  Sorry to interrupt

21    you, Ms. Carroll.

22                 Move to strike that.  I'm asking her if she deleted

23    them.

24                 THE WITNESS:  I'm trying to tell you.

25                 THE COURT:  Ms. Carroll.
```

OiIsCAR2                    Carroll - Recross

1           THE WITNESS:  Yes.

2           THE COURT:  Either you remember deleting tweets --

3    we're talking about tweets, that's what we're talking about.

4           THE WITNESS:  I don't remember.

5           THE COURT:  Just a minute.

6           And when, if ever, that happened.

7    A.  I don't precisely remember deleting them.

8    Q.  Have you ever deleted threats?

9    A.  Yes.

10   Q.  On what social media websites; what platforms, Twitter?

11   A.  Yes.

12   Q.  Instagram?

13   A.  No.

14   Q.  Facebook?

15   A.  Yes.

16   Q.  Text messages?

17          MS. KAPLAN:  We're getting way outside the scope, your

18   Honor.

19          MS. HABBA:  It's directly on point with her redirect.

20   She wants to have damages for claims --

21          THE COURT:  Sustained.  Repetitious.

22   Q.  Do you use WhatsApp, Ms. Carroll?

23   A.  No.

24          MS. KAPLAN:  That's definitely outside the scope.

25          THE COURT:  The answer is in.  You have to make timely

OiIsCAR2                    Carroll - Recross

```
1    objections.
2              MS. HABBA:  Your Honor, I would like to pull up DX 72
3    for the witness.
4              MS. KAPLAN:  Your Honor, we haven't --
5              These documents are ones that haven't come in and we
6    have objections to them.
7              THE COURT:  I haven't seen it.  I don't know what it
8    is.
9              Put it on the screen.
10             MS. HABBA:  Your Honor, this is what they asked for
11   time for.
12             THE COURT:  It's there.
13             Is there a question?
14             MS. HABBA:  Yes.
15   BY MS. HABBA:
16   Q.  Ms. Carroll, do you recognize what this is?
17   A.  I -- I think it's a tweet.
18   Q.  Does that appear to be your Twitter handle?
19   A.  Yes.
20   Q.  And is that Twitter handle tagged in that tweet?
21   A.  Yes.
22             MS. HABBA:  Your Honor, I would like to move DX 72
23   into evidence.
24             MS. KAPLAN:  Your Honor, this is entirely outside the
25   scope.
```

OiIsCAR2                          Carroll - Recross

```
 1              THE COURT:  Sustained.
 2              MS. HABBA:  Can we please pull up DX 73 for the
 3      witness.
 4      Q.  Ms. Carroll, what is that?
 5              THE COURT:  Look, if you're going to do this with 73
 6      through 78, is there objection to any of them, Ms. Kaplan?
 7              MS. KAPLAN:  There are.  All of them, your Honor.  We
 8      thought we were going to meet-and-confer.
 9              THE COURT:  Yes.
10              Did you do that?
11              MS. KAPLAN:  No, they --
12              (Counsel confer)
13              We asked and they said --
14              MS. HABBA:  That's a misrepresentation.  You didn't
15      ask to meet-and-confer with me.
16              THE COURT:  What you're really doing is you're asking
17      to reopen the direct.  That's what you're asking to do.
18              MS. HABBA:  Your Honor, I preserved it.  They asked
19      me, and I gave them what they asked, as you directed, that they
20      have time to review it so that I could then come back to it.
21              MS. KAPLAN:  Your Honor --
22              THE COURT:  That certainly isn't exactly what
23      happened.
24              MS. HABBA:  Take a look at the transcript.
25              THE COURT:  Yes, you do that.
```

1          You said 'no further questions' and sat down.  That's
2     the long and the short of it.
3          MS. HABBA:  OK, your Honor.
4          THE COURT:  Just a minute.
5          Is there an application from the defense about these
6     exhibits?
7          MS. HABBA:  Yes, your Honor.  I gave Ms. Kaplan and
8     her team the exhibits to review during the break, as per your
9     instruction.  I've gotten no objection in the interim.
10          I would like to go one by one.  There are only six.
11     If she would like to state --
12          THE COURT:  You're not going one by one.  I made that
13     clear before.  But the question is whether you're applying to
14     offer them this evidence now.
15          MS. HABBA:  I am offer -- I am applying to offer them
16     in evidence now, as I preserved originally.  Yes, your Honor.
17          THE COURT:  You think you preserved.
18          MS. HABBA:  OK, your Honor.  I would like to offer
19     these into evidence now, please.
20          THE COURT:  Ms. Kaplan.
21          MS. KAPLAN:  Your Honor, we object to their admission.
22     Many of them are barred by your Honor's prior rulings,
23     collateral estoppel, 403, and are cumulative.  We certainly, as
24     your Honor I think understands, never agreed that that allowed
25     her to reopen questioning about them.

OiIsCAR2                              Carroll - Recross

1              THE COURT:  I have that point.

2              All right.  I'm looking at 73, exhibit to me.  74.

3    I'm sorry.  I was looking at 72.

4              I would like to see 73.

5              74.

6              75.

7              76.

8              77.

9              78.

10             All right.  Here's what we're going to do.  I am not

11   relying on the defendant's failure to offer these later in the

12   direct after we put them aside, which, in fact, is a sufficient

13   ground to exclude them.  But I am not doing it on that ground.

14             I sustain the other objection made.  They are not

15   coming in, except that --

16             Let me just check my notes.  Electronic is wonderful,

17   except when they don't work.

18             The objections are sustained.

19   BY MS. HABBA:

20   Q.  Ms. Carroll, I had asked when we started whether you spoke

21   to your attorney during the time that you were put under oath

22   yesterday before this morning.

23             Do you remember that?

24   A.  Yes.

25   Q.  Did you speak to any attorneys at all, not ones

1  representing you?

2  A.  No.  No.

3  Q.  George Conway, for instance?

4  A.  No.

5  Q.  Ms. Kaplan just asked you -- this is my last question.

6         Ms. Kaplan just asked you about what your motivations

7  were when you came out with the cover of that magazine on New

8  York; remember that?

9  A.  Yes.

10 Q.  Before you did that and came out with your story, you had a

11 New York Times fact-checkers, didn't you?

12        MS. KAPLAN:  Objection.

13        THE COURT:  Sustained as to form.

14 Q.  Ms. Carroll, you were worried people would question your

15 story, so you had the New York Times fact-check it at one

16 point, didn't you?

17 A.  When The Times was writing the story, yes, they fact-

18 checked it.

19 Q.  And when they fact-checked it, they found errors in your

20 story such as years of the dress, for instance, correct?

21        MS. KAPLAN:  Outside the scope, your Honor.

22        THE COURT:  Sustained.

23        MS. HABBA:  No more questions.

24        THE COURT:  Any redirect?

25        MS. KAPLAN:  Nothing, your Honor.

OiIsCAR2                          Humphreys - Direct

1              THE COURT:  Ms. Carroll, you're excused.  Thank you.

2              (Witness excused)

3              Next witness.

4              MS. CROWLEY:  Plaintiff calls Dr. Ashlee Humphreys.

5     ASHLEE HUMPHREYS,

6         called as a witness by the Plaintiff,

7         having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  Thank you.

9              If you can please state your name and spell your first

10    and last name for the record.

11             THE WITNESS:  Sure.  My name is Ashlee Humphreys.

12    A-s-h-l-e-e.  H-u-m-p-h-r-e-y-s.

13             THE COURT:  You may proceed, Ms. Crowley.

14             MS. CROWLEY:  Thank you, your Honor.

15    DIRECT EXAMINATION

16    BY MS. CROWLEY:

17    Q.  Good afternoon, Professor Humphreys.

18             What is your current profession?

19    A.  I'm a professor of integrated marketing communications at

20    Northwestern University.

21    Q.  How long have you been on the faculty at Northwestern?

22    A.  I've been on the faculty since 2008.

23    Q.  Have been asked to perform work on behalf of the plaintiff

24    in this case, E. Jean Carroll?

25    A.  Yes, I have.

OiIsCAR2                           Humphreys - Direct

1  Q.  On what topic?

2  A.  I was asked to calculate the reach for a set of statements

3  made by the defendant, Mr. Trump, about Ms. Carroll, the

4  defendant, to assess the reputational impact of those

5  statements, if any, and to calculate the cost to repair that

6  reputational damage.

7  Q.  We'll get back to that in a couple minutes, but I would

8  just like to talk about your background.

9          Where did you go to undergrad?

10  A.  I went to Northwestern University.

11  Q.  What did you study?

12  A.  I studied economics and philosophy.

13  Q.  Did you go to grad school?

14  A.  Yes, I did.  I got my Ph.D. at Northwestern as well.

15  Q.  And now that you're on the faculty at Northwestern.

16          You might have touched on this already, what do you

17  teach?

18  A.  I teach social media strategy, I teach marketing research,

19  I teach consumer behavior.

20  Q.  Are you familiar with the term reputation repair?

21  A.  Yes, I am.

22  Q.  Is that one of the topics that you teach about?

23  A.  Yes.  In social media, for instance, we discuss

24  reputational repair through social media and other channels,

25  and design campaigns to do that.

OiIsCAR2                        Humphreys - Direct

1    Q.  What is reputational repair?

2    A.  Reputational repair, companies, celebrities commonly do

3    this, and they hire companies to do it.  It's when you place

4    positive messages about someone or some company with trusted

5    stakeholders, with trusted, um, sources.

6    Q.  And that's to repair damage done to that person, celebrity

7    or company's reputation?

8    A.  That's right.

9    Q.  Professor, in addition to teaching, do you engage in

10   research?

11   A.  Yes, I do.

12   Q.  Are you currently engaged in research?

13   A.  Yes.

14   Q.  On what topics?

15   A.  I am doing research on search marketing, um, on wine, on

16   casino gambling.  I research a lot of different types of

17   topics.

18   Q.  And have you authored any books?

19   A.  Yes, I have.  I have a book on social media called Social

20   Media:  Enduring Principles.

21   Q.  When was that first published?

22   A.  That was first published in 2016, and I'm currently

23   revising the book.

24   Q.  As an academic, have you published articles in your field?

25   A.  Yes.  I published over 20 peer-reviewed articles.

1    Q.  You said peer-reviewed?

2    A.  Yes, that's right.

3    Q.  What does that mean?

4    A.  When an article undergoes peer review, it is sent to your

5    colleagues anonymous, they don't know that you wrote it.  They

6    read it and assess its validity, and you revise the paper

7    before it's published.

8    Q.  What are those articles about, just generally?

9    A.  In general, I study how industries and other ideas become

10   accepted in the public sphere.  I also study how that happens

11   through digital and social media.

12   Q.  Have you received any awards related to your academic work?

13   A.  Yes.  In 2020, I was named a marketing science institute

14   scholar, which kind of picks out the most prominent 35

15   marketing scholars in the world.

16   Q.  Any other awards?

17   A.  Several of my papers have won awards for best paper.

18   Q.  Have you made any academic presentations?

19   A.  Yes.  I have made over 40 academic presentations around the

20   world.

21   Q.  Now, aside from this case, have you ever been consulted as

22   a legal expert in any other case?

23   A.  Yes, I have.

24   Q.  How many times?

25   A.  I have worked about ten cases.

OiIsCAR2                          Humphreys - Direct

1    Q.  And, in those cases, were those civil cases?

2    A.  Yes, they are all civil.

3    Q.  And in those cases, were you retained by the defendant or

4    the plaintiff?

5    A.  Most cases have been for the plaintiff.  I have one case

6    right now that is for a defendant.

7    Q.  Have you authored any expert opinions in connection with

8    those other cases?

9    A.  Yes, I have.

10   Q.  What kinds of opinions have you offered?

11   A.  I offer opinions generally on two types of cases.  One type

12   of case concerns defamation, usually on social media, and I

13   also offer opinions on cases that are marketing related, such

14   as trademark cases, marketing practices, things like that.

15   Q.  Have you ever testified in court before?

16   A.  Yes, I have.

17   Q.  In which cases?

18   A.  I testified in a case with the same defendant and plaintiff

19   here, where Ms. Carroll was suing Mr. Trump, and I've also

20   testified in a case where two election workers were suing

21   Rudolph Giuliani, again, for defamation.

22   Q.  So those two cases also involved claims for defamation?

23   A.  Yes.

24   Q.  Just briefly, what was the subject of your testimony in the

25   other case involving Ms. Carroll and Donald Trump?

OiIsCAR2                    Humphreys - Direct

1   A.  In that case, I was estimating the reach of one particular

2   statement made in October of 2022 about Ms. Carroll.

3   Q.  And that was a statement made by Donald Trump?

4   A.  That's right, yeah.

5   Q.  And what was, just generally, the subject of your testimony

6   in the Rudy Giuliani case?

7   A.  In general, I was looking at a similar thing where

8   Mr. Giuliani had made, I believe, 12 statements about the

9   plaintiffs, these election workers.  And I was calculating how

10  many people saw those and the cost to repair those individual

11  reputations.

12  Q.  So in the Giuliani case, you testified on behalf of the

13  plaintiffs?

14  A.  That's right, yeah.

15  Q.  What is your political affiliation?

16  A.  I'm registered as a democrat.

17  Q.  Have you ever voted for a republican?

18  A.  No, I haven't.

19  Q.  Does your political affiliation affect your professional

20  work as an expert?

21  A.  No.  The calculations here are pretty mechanical, so no.

22  Q.  Did you agree to take this case or to work on this case

23  because of your political views?

24  A.  No.

25  Q.  Are you being paid for your work on this case?

1    A.  Yes, I am.

2    Q.  How much?

3    A.  For the research and reporting, I'm paid $510 an hour, and

4    for my time for the testimony, I'm paid $850 an hour.

5    Q.  Based on your experience, is that rate or are those rates

6    fairly standard for experts in your field?

7    A.  Yes, those are fairly standard.

8    Q.  Are they toward the higher end or lower end?

9    A.  I would say a little bit more toward the lower end.  Some

10   of my colleagues I know get paid $1,000 an hour.

11   Q.  Were you paid in connection with your work, on the work

12   that you did in Ms. Carroll's other lawsuit?

13   A.  Yes, I was.

14   Q.  And were you paid the same rates?

15   A.  Yes, I believe the rates were the same.

16   Q.  All right.  So, Professor Humphreys, you testified that you

17   were asked to do work in this case.  Can you just describe

18   generally, what was the nature of that work?

19   A.  Yes.  I was asked to calculate the reach for some

20   statements by Mr. Trump about the plaintiff, Ms. Carroll, to

21   assess the reputational harm, if any, of those statements, and

22   then to estimate the cost to repair that reputational damage.

23   Q.  We already talked about this a little bit more later.

24         When you say the reach of those statements by

25   Mr. Trump, what do you mean?

OiIsCAR2                      Humphreys - Direct

1   A.  I mean how many impressions did they get.  So when a

2   prominent person makes a statement, it's circulated in lots of

3   different types of media, and so I needed to understand first

4   how many people saw this statement.

5   Q.  And what were the dates of the statements that you

6   analyzed?

7   A.  There were three statements initially that I analyzed.  One

8   was on June 21st, 2019, one was on June 22nd, 2019, and there

9   was a third statement in my initial analysis that occurred on

10  June 24th, 2019.

11  Q.  Did there come a time when you removed one of those

12  statements from your analysis?

13  A.  Yes.  I provided a supplemental analysis that removed the

14  June 24th statement.

15  Q.  You're here to testify just about your analysis relating to

16  the June 21 and June 22 statements, correct?

17  A.  That's right.

18  Q.  Did anyone assist you in the work that you did in

19  connection with this case?

20  A.  Yeah.  I was assisted by a team of four research

21  assistants.

22  Q.  Why did you use research assistants?

23  A.  In a case like this, there is quite a bit of data, and they

24  were really helpful in collecting the data, cleaning the data,

25  and then performing calculations at my direction.

1  Q.  Did you prepare a report in connection with your work on

2  this case?

3  A.  Yes, I did.

4  Q.  Did you help prepare a slide deck that summarized the

5  methodology that you used and the conclusions that you reached?

6  A.  Yes, I did.

7  Q.  And would that assist the jury in understanding your

8  testimony today?

9  A.  Yes.

10 Q.  If we can just put up on the screen the demonstrative which

11 is marked Plaintiff's Exhibit 14.

12         Is this the slide deck that you helped prepare?

13 A.  Yes, it is.

14         MS. CROWLEY:  May I publish to the jury, your Honor?

15         THE COURT:  Yes.

16 Q.  You testified just a minute ago that your work involved

17 analyzing the reputational harm caused by two statements.

18         If we go to the first slide, this slide shows what's

19 in evidence as Plaintiff's Exhibit 1.

20         Is this one of the statements that you focused on as

21 part of your analysis?

22 A.  Yes, it is.

23 Q.  And on what date was this statement made?

24 A.  June 21st, 2019.

25 Q.  Where was this statement first published?

OiIsCAR2                    Humphreys - Direct

1    A.  It was first published on to Twitter by a journalist, by a

2    journalist named Laura Litvan.

3    Q.  We can go to the next slide.  You can see what is in

4    evidence on this slide as Plaintiff's Exhibit 2.

5            Is this the other statement that you focused on as

6    part of your analysis?

7    A.  Yes, it is.

8    Q.  What date, what was the date of this statement?

9    A.  This was on June 22, 2019.

10   Q.  And who did Donald Trump make this statement to?

11   A.  This statement was made to some reporters, I believe, on

12   the south lawn of the White House.

13   Q.  In broad strokes, how did you go about analyzing how those

14   two statements affected Ms. Carroll's reputation?

15   A.  The first step was to calculate how many impressions did

16   the statement receive, how many times was it seen or heard on

17   different media channels.  The next step was to understand the

18   impact of those statements, so how did they damage

19   Ms. Carroll's reputation, if they did.

20           And then a second part of that analysis was to

21   understand how many people likely believed the statements when

22   they saw them or were receptive to believing them.  And I call

23   that the impact assessment.

24           And then the third part of my work was to understand

25   or estimate how much would it cost to repair that damage to

1    Ms. Carroll's reputation, and I call that the damages model.

2    Q.  In your experience, is this a fairly standard way to

3    measure reputational harm used by experts in your field?

4    A.  Yes, it is.

5    Q.  OK.  Now, you just testified that the final step in your

6    analysis was to determine how much it would cost to repair

7    Ms. Carroll's reputation.

8            Is that another way of saying that you estimated the

9    amount of damages in this case?

10   A.  Yes, that's right.

11   Q.  And are you here to offer an opinion on the amount of

12   reputational damages that Ms. Carroll suffered as a result of

13   Donald Trump's statements?

14   A.  Reputational damages, yes.

15   Q.  Are you offering any opinion on what punitive damages would

16   be in this case?

17   A.  No, I'm not.

18   Q.  Are you offering any opinion as to memory harm or emotional

19   damage that Ms. Carroll may have suffered as a result of

20   Trump's statements?

21   A.  No, I'm not.

22   Q.  At a high level, we're going to go into this, what is your

23   opinion with respect to the reputational damages that Trump's

24   statements caused to Ms. Carroll?

25   A.  I found that Mr. Trump's statement reached a very large

OiIsCAR2                       Humphreys - Direct

number of people, that before the statements, Ms. Carroll had

one set of associations attached to her name.  After the

statements, the associations and the public sphere were

completely different and aligned with his particular statement.

I found that damage was severe to her reputation as a

journalist and that the costs to repair it were considerable.

Q.  You testified that you were initially asked to include a

statement that Donald Trump made on June 24, 2019.

A.  Yes.

Q.  Looking at the slide and what's in evidence as Plaintiff's

Exhibit 3, is that the statement that you initially included in

your analysis?

A.  Yes, it is.

Q.  And you testified, I believe, that you removed this

statement and redid your analysis, correct?

A.  Yes.

Q.  Why did you remove this statement?

A.  I was asked by Ms. Carroll's counsel to remove the

statement from my calculations.

Q.  Again, the analysis that you're testifying about today is

limited to the harm caused by Donald Trump's statement on

June 21 and his statement on June 22, correct?

A.  That's correct.

Q.  OK.  I would like to just take a step back and talk about

some basic concepts for a minute.

OiIsCAR2                          Humphreys - Direct

1          What is a reputation?

2    A.  A reputation, we all have reputations.  We build them

3    throughout our lifetime with friends we have, our family, the

4    work that we do.  A reputation can be damaged either by

5    something that someone does or something that is said about

6    someone.  We typically think of them as having both a moral and

7    an economic value.

8    Q.  What does that mean?

9    A.  So by moral value, we mean that it gives someone dignity in

10   society.  It enables people to trust them, to kind of -- it's

11   how they operate in society based on your reputation.  It's a

12   moral value.

13         They also have economic value.  So they enable you to

14   get gainful employment, to keep employment, and then to also

15   get future employment.

16   Q.  Now, I believe you just testified that a reputation,

17   someone's reputation can be harmed when someone makes a

18   negative statement about them.

19         Does everyone who hears that negative statement need

20   to believe it in order for the reputation to be harmed?

21   A.  No.  We think a reputation as kind of a general perception.

22   Imagine, for example, you go to work one morning and someone

23   said that you stole money.  Even if a minority of people

24   believe that, let's say like 20 percent of your colleagues

25   believe that, it still impacts your reputation.

1    So they might be talking about it with others, they

2    might be talking to others who don't believe it.  It would be

3    kind of the talk of the office, and you would feel that it

4    affected your reputation.  It would have affected your

5    reputation even if 20 percent of the people believe it.

6    Q.  How, if at all, does the fame or prominence of the person

7    making that negative statement about you affect the harm to

8    your reputation?

9    A.  Kind of famous sources have two aspects.  One is that their

10   statements are covered very widely in the media, so it

11   increases the number of people who see and hear that

12   information.  Typically famous people will be trusted by some

13   portion of the public.

14   Q.  What happens when that same famous person makes the same or

15   similar negative statements more than once?

16   A.  So what we know from research is that the repetition of

17   statements from a trusted source will strengthen your attitude

18   toward what that person is saying.

19   Q.  How, if at all, can a reputation that's been damaged be

20   repaired?

21   A.  Um, so it can be difficult to repair a reputation, but

22   companies and celebrities routinely kind of do these exercises

23   and they are widely regarded to be successful.  It involves

24   placing positive messages about that person or that company

25   with trusted sources.

1                So this could be certain media channels that the

2     person listens to or watches, it could be something on social

3     media, like hiring influencers.

4     Q.  And we're going to talk about this more in a minute, but

5     can those positive messages be placed anywhere for reputation

6     repair to be effective?

7     A.  No.  For an effective reputational repair campaign, you

8     want to place the message with trusted sources, people that

9     that target audience believes and trusts.

10    Q.  And when you say target audience, what do you mean?

11    A.  The people whose attitudes you're trying to change.

12    Q.  Is it always possible to repair damage to a reputation?

13    A.  No, not for every single person in the audience, no.

14    Q.  What happens if a reputation is not repaired?

15    A.  If a reputation isn't repaired, those associations can

16    linger.  They do linger over time, and anytime that person's

17    name kind of comes up in the public sphere, those same

18    associations emerge.

19    Q.  How, if at all, do social media and the internet affect a

20    reputation that has not been repaired?

21    A.  Um, well, on social media, as we all know, anybody can post

22    anything at any time.  And so if there is a considerable group

23    of people who believe something, they will and can post about

24    it, if they still hold those negative associations.

25    Q.  I would like to talk now about the work that you did on

1    this case.

2              You testified that the first analysis that you

3    performed was estimating the reach or the number of times that

4    Donald Trump's June 21 and June 22 statements were seen.  I

5    believe you called that the impressions model.

6              What is an impression?

7    A.   An impression is one person seeing a statement one time.

8    Q.   What does it mean for a statement to have a high number of

9    impressions?

10   A.   If the statement has a high number of impressions, it would

11   be seen by many people.  We measure kind of new media, like

12   social media and impressions, and we tend to measure old or

13   traditional media and viewers.

14   Q.   You testified that the two statements that Trump made in

15   June 2019 first appeared on Twitter and then in a White House

16   press release.

17             What did you observe about whether those statements

18   spread to other forms of media?

19   A.   Anytime a prominent person makes a statement, it's

20   circulated in what I would call the media system, so in

21   different channels of communication.  So in order to calculate

22   how many people saw this statement, you need to calculate how

23   many people saw it in each different channel.

24   Q.   And what forms of media did Donald Trump's statements

25   spread to?

OiIsCAR2                              Humphreys - Direct

1   A.  So here I included its spread on social media, on the

2   internet in the form of online news articles, in print

3   publications, and on television.

4   Q.  OK.  So let's start with the web.

5            Can you explain to us how you calculated the number of

6   times Donald Trump's statements were viewed on the web?

7   A.  Sure.  So in this case, I started with the complaint.  The

8   complaint was prepared, I believe, by Ms. Carroll's lawyers,

9   and it listed a set of news articles that contained the

10  statement.

11  Q.  Did you review those articles?

12  A.  Yes, I did.

13  Q.  Did you, in fact, ensure that those articles contained

14  Donald Trump's statements?

15  A.  Yes.  So I checked all of the articles to make sure the

16  statement was in the article.

17  Q.  And how many articles were cited in the complaint?

18  A.  In the complaint, 53 articles were cited.

19  Q.  Did you remove any of those articles in conducting this

20  analysis?

21  A.  Yes.  So when removing articles that referred only to that

22  June 24 statement, I removed six articles that referred only to

23  that statement.

24  Q.  So you had 53 articles that referenced one of the three

25  statements, June 21, 22 or 24, and then you removed any

OiIsCAR2                          Humphreys - Direct

1    articles that only referenced the June 24 statement?

2    A.  That's right.

3    Q.  What were some --

4            We'll go to the next slide.

5            How many articles remained after you removed those

6    six?

7    A.  47 articles remained.

8    Q.  What were some of the cites where those 47 articles were

9    posted?

10   A.  So, as you can see here, it appeared on news sites like Fox

11   News, the New York Times and Washington Post.  It appeared in

12   magazines such as GQ and People.  And it appeared on blogs and

13   other political news sites like Slate and Politico.

14   Q.  After identifying the articles that included Trump's

15   June 21 and 22 statements, what was the next step in your

16   analysis?

17   A.  The next step was to figure out how many people went to

18   those websites on that particular day.

19   Q.  And did you consider the number of people on a particular

20   day, the number of people who visited these sites on a

21   particular day?

22   A.  Yes.  I only included the day that the article was

23   published.

24   Q.  So you didn't look at people who may have visited the

25   website and view the article the next day or the next week or

OiIsCAR2                          Humphreys - Direct

1    next month?

2    A.   That's right.

3    Q.   And in your opinion, would there have been more people who

4    would have visited these sites and viewed these articles the

5    following day or week or month?

6    A.   Yes.  I think undoubtedly there were people who visited

7    that website after that particular day.

8    Q.   Now, does the fact that someone visited a website

9    necessarily mean that they've read the article that was posted

10   there?

11   A.   Not necessarily, and so I accounted for that in my analysis

12   with something called a bounce rate.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O1IQcar3                          Humphreys - Direct

1    BY MS. CROWLEY:  (Continued)

2    Q.  What's a bounce rate?

3    A.  A bounce rate is basically the percent of people who go to

4    a website but who don't click anything.  For some websites, it

5    can be about 60 percent of the visitors.

6    Q.  What was the bounce rate that you used in this case?

7    A.  It was -- it's reported by a publicly available source for

8    each individual site, and so it's different for each news

9    website.

10   Q.  So if a person just reads the title of an article but

11   doesn't click on any links, that would be considered a bounce?

12   A.  That's right, they would not be included.

13   Q.  After you subtracted the bounce rate, what did you

14   determine was the total number of times that Trump's June 21st

15   and 22nd statements were viewed on the internet?

16   A.  I basically added up the unique visitors for that

17   particular day for every site, and the total was 13.2 million

18   impressions.

19   Q.  Again, that's just the number of people who visited the

20   sites where these articles were posted on the day that they

21   were posted?

22   A.  That's right.

23   Q.  You testified that you also calculated the number of times

24   that Trump's statements were viewed on social media.  Which

25   platforms did you consider?

O1IQcar3                          Humphreys - Direct

1    A.  Here I considered only Twitter.

2    Q.  Does Twitter still go by that name?

3    A.  No, I believe it's now called X.

4    Q.  When did that name change happen?

5    A.  That was last year sometime.

6    Q.  Why did you only consider Twitter?

7    A.  Twitter is very transparent.  It's studied a lot in prior

8    research and so its numbers were easy to collect and calculate.

9    Q.  Are you aware of whether Trump's statements were posted or

10   appeared on other forms of social media besides Twitter?

11   A.  Yes, I know that it appeared on Facebook, for example.

12   Q.  But you only considered Twitter?

13   A.  Correct.

14   Q.  What was your first step in calculating the number of times

15   that Trump's statements were viewed on Twitter?

16   A.  So on social media, the way information travels is by

17   people.  It may be posted by a particular news source like the

18   *New York Times*, but then people re-tweet it, and it goes out to

19   their followers as well.  And so you need to account for not

20   only kind of those initial followers but also the followers of

21   the people who share the post.  So you start from that big

22   group of followers and work on.

23   Q.  Stepping back, how did you decide which Twitter posts to

24   consider in your analysis?

25   A.  Right.  So a first step was to consider which tweets to

O1IQcar3                          Humphreys - Direct

1    consider.  And so I considered any tweet that was linked to one

2    of those 47 articles that were in my initial analysis and was

3    posted by that publisher's primary count, so the *New York*

4    *Times*, for instance, and contained one of the two statements in

5    the tweet itself.

6    Q.  So if a Twitter post referenced one of the statements but

7    didn't link to an article, one of the 47 articles, that would

8    not have been counted in your analysis?

9    A.  That's right.

10   Q.  If a statement or if a post linked to an article but didn't

11   actually contain the statement in the post, that would not be

12   included in your analysis either?

13   A.  That's right.

14   Q.  How many tweets fit that criteria?

15   A.  So 28 tweets fit that criteria, and they came from 13

16   accounts.  As you can see here, they're from prominent sites.

17   Most of them have over a million followers.

18   Q.  Did you consider any posts or accounts belonging to

19   individual people?

20   A.  The only individual here was Laura Litvan, who was the

21   journalist that published one of the statements.

22   Q.  Why didn't you consider individual accounts?

23   A.  In this particular case, it was a lot.  It would have been

24   computationally very difficult to just calculate and add up all

25   of those individuals.  Certainly there were some, but I did not

O1IQcar3                    Humphreys – Direct

1    count them.

2    Q.  How did you calculate the number of times that those 28

3    Twitter posts or tweets were seen?

4    A.  So, you know, as I said, you include the followers of that

5    publication and the followers of people who re-tweeted the

6    article or shared it.  But not all of those followers see what

7    you post.  In fact, a small fraction of your followers see what

8    you share on social media.  So you can imagine if you start

9    with a hundred followers, some of them might be bots.

10   Q.  What's a bot?

11   A.  A bot is an account that follows you but just kind of

12   automatically re-posts what you post.  And computer science

13   research shows us that about 12 percent of the accounts of your

14   followers are bots.

15   Q.  What did you do with that number?

16   A.  So you start with a hundred, that takes you down to 87

17   human followers, and then even only a small fraction of those

18   will see the information.  And we call that the impression

19   rate.  So it's the percent of people who see what you share,

20   and there are two ways to calculate that.  The first way is to

21   use an impression rate of about 20 percent.  This is sort of

22   industry standard.  And so I'm going to call that the

23   high estimate.  So at the high -- there's another formula that

24   one can use that takes into account other information about the

25   tweet, like how many times it was re-tweeted and things like

O1IQcar3                          Humphreys - Direct

1   that.  And that could give you an impression rate of about

2   5 percent.

3   Q.  The high impression rate assumes about 20 percent of people

4   who follow an account actually saw the post that contained

5   Donald Trump's statement?

6   A.  That's right.

7   Q.  And the median rate or low rate assumes that only 5 percent

8   of the people who followed those accounts would have seen the

9   statements?

10  A.  That's right.

11  Q.  Considering the types of accounts that posted Donald

12  Trump's statements that you considered, do you think the

13  20 percent rate or the 5 percent rate is more reasonable?

14  A.  So these were pretty -- very prominent accounts with lots

15  of followers.  They also are sites that tend to have a lot of

16  engagement.  So a lot of people are liking and re-tweeting

17  them.  I would say the high estimate is more likely.

18  Q.  We can go to the next slide, please.  What are we looking

19  at here?

20  A.  So this shows you how I calculated the impressions, for

21  example.  If you take a look at the *time* one, for instance,

22  *time* has 16 million followers, and it tweeted an article that

23  fit the criteria.  You add some of the followers because of

24  re-tweeting, and then you take basically either 5 percent or

25  20 percent of those, and that gives you an estimate of between

1  600,000 and 2.8 million followers.

2  Q.  And that's an estimate of how many people would have seen

3  *time's* post that contained one of Donald Trump's statements?

4  A.  It's how many impressions, yes.

5  Q.  And you did the same thing for each of the 28 posts?

6  A.  Yes.

7  Q.  After you calculated the impression rate for each of the 28

8  posts, what did you do next?

9  A.  So I basically added those all together for all of the

10  posts, and that gives you between 25.3 million impressions and

11  7 million impressions.

12  Q.  And, again, considering the types of accounts that were

13  posting Trump's statements that you considered, do you think

14  the high estimate or the low estimate is more accurate?

15  A.  I think the high estimate is more accurate in this case.

16  Q.  You testified that you also calculated the number of times

17  Trump's June 21st and 22nd statements were viewed on

18  television.  Can you walk us through how you did that?

19  A.  Sure.  So the first challenge was to see where did it

20  appear on television.  For that, I used a television news

21  database and I searched for the particular statement.

22  Q.  How do you search a television database for statements?

23  A.  So this -- that uses the closed captioning, the words that

24  people say on television, and you can search through them

25  digitally to identify the broadcasts.

O1IQcar3                          Humphreys - Direct

Q.  You searched for Donald Trump's June 21st and 22nd

statements in that database?

A.  Yeah.

Q.  And how many television broadcasts did you identify that

aired or shared the June 21st or 22nd statement?

A.  So I found 37 broadcasts on six different stations.

Q.  What news stations aired those broadcasts?

A.  You can see here their mainstream stations *CNN*, *Fox News*,

*NBC*.

Q.  Once you identified the 37 broadcasts that aired the

statements, what did you do next?

A.  Next I needed to see how many people were watching the

broadcast at that particular time, and for that I used a

publicly available source that basically monitors the viewers

on television, and they do that because of advertising rates,

the number of people watching is important to advertisers.  And

so I consulted their numbers of viewers.

Q.  And what did you determine about how many times the

June 21st and 22nd statements were viewed on TV broadcasts?

A.  So I added up broadcasts and got 63.1 million viewers.

Q.  Last you testified that you calculated the number of times

that the June 21st and 22nd statements were viewed in print or

newspapers?

A.  That's right.

Q.  Can you explain how you did that?

O1IQcar3                        Humphreys - Direct

1   A.  Sure.  So for this, I used a service that -- where you can

2   search newspapers, and I searched for Ms. Carroll's name and

3   the statement.

4   Q.  And how many print articles did you find that shared the

5   June 21st or 22nd statement?

6   A.  That was ten articles, again, in mainstream news like the

7   *Washington Post*, the *Chicago Tribune*, *USA Today*.

8   Q.  How did you determine the total number of times that those

9   statements were read in those newspapers?

10  A.  So, again, I added up the readers from each article to get

11  2.3 million impressions.

12  Q.  Maybe you said this already, but how do you know how many

13  readers each of these newspapers has?

14  A.  So, again, I consulted a third-party source that provides

15  those numbers for advertisers.

16  Q.  And what was the total number of times that the June 21st

17  and 22nd statements were viewed in newspapers?

18  A.  It was 2.3 million times.

19  Q.  We just walked through several different forms of media.

20  Were you able to estimate the total number of times that

21  Trump's June 21st and 22nd statements were viewed in all of

22  those forms of media?

23  A.  Yes.  So here you add up each channel.  For the social

24  media channel, you have an estimate between 25.3 and 7 million.

25  And then you add the others that were from publicly available

O1IQcar3                        Humphreys - Direct

1    sources to get a range between 104 million impressions and

2    85.8 million impressions.

3    Q.  Were there any instances in which the statements may have

4    been seen or heard that your analysis didn't take into account?

5    A.  Yes.  So I started with just the articles in the complaint

6    in this case.  I didn't include articles that were not in the

7    complaint that mentioned the statement.  I also didn't include

8    entire platforms, such as Facebook or Reddit.  I didn't include

9    television that wasn't in this database, so that would have

10   been local television.  I also didn't include -- sometimes on

11   television that will be on YouTube, rebroadcast on YouTube, and

12   I didn't include those.  I didn't include the mention of

13   statements on podcast, on radio, or word of mouth.

14   Q.  For television, did you include broadcasts that referenced

15   or paraphrased the statements?

16   A.  No, I included only direct locations.

17   Q.  So in your opinion, was your total impression number likely

18   an undercount.

19   A.  Yes, I considered it an undercount.

20   Q.  Now, after estimating the number of times that Trump's

21   June 21st and 22nd statements were seen or heard, what did you

22   do next?

23   A.  Next I needed to understand what impact, if any, did those

24   statements have on Ms. Carroll's reputation.

25   Q.  I believe you said earlier that's called an impact

O1IQcar3                          Humphreys - Direct

1   assessment?

2   A.  That's right.

3   Q.  What's an impact assessment?

4   A.  So it's where I understand both kind of qualitatively how

5   did the statements affect Ms. Carroll's reputation in the

6   public sphere by reading the responses to them and

7   understanding it more broadly.  And then I also conducted a

8   quantitative analysis to figure out, well, what percentage of

9   those impressions that I calculated were receptive to the

10  claims of Mr. Trump.

11  Q.  So let's start with the qualitative analysis.  Can you tell

12  us what you did in that analysis?

13  A.  Sure.  So I started with publicly available data related to

14  Ms. Carroll's name.  I read through book reviews, newspaper

15  articles, any connection to her name in the public sphere.  I

16  also consulted the comments underneath the articles that I

17  counted in that first analysis as well as some social media

18  more generally.

19  Q.  What time period were you focused on in this analysis?

20  A.  I was focused on the time after -- well, both before and

21  after the statements.

22  Q.  In June 2019?

23  A.  That's right.

24  Q.  Could you describe just generally what you observed about

25  Ms. Carroll's reputation prior to June 2019 as compared to her

reputation after June 2019?

A.   So before June 2019, she was known as a journalist, as a

women's advice columnist to a pretty general audience from

*Elle*.  About 30 percent of *Elle*'s readers are conservative or

Republican.  So she was known as a truth-teller, a sassy advice

columnist.

          After June 2019, the associations with her name were

largely about her being a liar, being -- having a political

agenda and working with the Democratic party.

Q.   When you say associations, what do you mean?

A.   Yeah.  I mean, anytime that her name appeared, those

associations appeared as well.

Q.   And in conducting this analysis, what, if anything, did you

conclude about whether Trump's June 2019 statements affected

Ms. Carroll's reputation?

A.   Yeah.  So I determined that they did affect her reputation,

particularly as a journalist as someone's whose work is based

in the facts.

Q.   Why did you conclude that?

A.   Some of the content in Mr. Trump's statements from the

first and second statement called her a liar, said she wasn't

telling the truth, and that she had a particular agenda for not

telling the truth.

Q.   And you observed those sorts of statements in some of the

comments that you looked at?

O1IQcar3                          Humphreys - Direct

1   A.   That's right.

2   Q.   On what platforms did you or what social media or media

3   platforms did you observe those comments?

4   A.   I looked at both Twitter and Facebook.

5   Q.   If we could go to the next slide.  Are these examples of

6   some of the Twitter commentary that you reviewed?

7   A.   Yes.

8   Q.   Do you see the post that says, "She's only looking for

9   three things:  Publicly for her book, money, and some political

10  agenda"?

11  A.   Yes.

12  Q.   What's the date of that post?

13  A.   This post was made on June 22, 2019.

14  Q.   What's that post replying to?

15  A.   This, as you can see, under it say "replying to" and then

16  it has @dailycaller, which means it was replying to a

17  particular article that was in my first analysis that contained

18  the statements.

19  Q.   So it was replying to an article that published one of

20  Donald Trump's statements?

21  A.   That's right.

22  Q.   And how, if at all, does this post relate to the substance

23  of Trump's statements?

24  A.   So as you can see here, it repeats some of the claims in

25  those statements such as her seeking publicity for her book,

O1IQcar3                          Humphreys – Direct

1    having a political agenda.

2    Q.  And do you see the post that says, "Sick, ugly, rejected

3    old hags trying to up their book sales should go to prison

4    themselves"?

5    A.  Yes.

6    Q.  What's the date on that post?

7    A.  That's from September 21, 2022.

8    Q.  Do you see the post that says, "Look, anything you

9    Democratic party touches is corrupt and full of lie"?

10   A.  Yes.

11   Q.  What's the date of that post?

12   A.  That's from September 9, 2020.

13   Q.  How, if at all, do those two posts relate to the substance

14   of Trump's statements?

15   A.  So, again, it uses the content of his statement that she's

16   connected with the Democratic party, and that she's lying in

17   the statement itself.

18   Q.  Were these posts similar to other comments that you

19   reviewed?

20   A.  Yes.  So in my report I provide over a hundred examples

21   that were connected with his particular statement and more than

22   a thousand in the public sphere more generally.

23   Q.  Apart from reviewing commentary on social media, did you

24   look at any other data in connection with the qualitative

25   analysis?

O1IQcar3                         Humphreys - Direct

1    A.  Yes.  So I also looked at Google trends.

2    Q.  What's that?

3    A.  Google provides a way to look at how many people are

4    searching for a given word or phrase at a particular time, and

5    so you can use this tool to understand basically how many

6    people are searching, what's the public attention for this

7    term.

8    Q.  And what term were you searching?

9    A.  I was searching for E. Jean Carroll.

10   Q.  What did you observe about -- from the Google trend data?

11   A.  So as you can see here, the date is -- it's over time, and

12   Google provides you a score from zero to a hundred.  They have

13   a lot of information about how many people are searching or

14   other information.  They don't give you the total volume.  They

15   just give you a rating from zero to a hundred.  So what you can

16   see is the colored lines are the dates of the statements.  The

17   first statement is in yellow.  The second statement on June 22

18   is where that first peak is, and the third statement is in red.

19   Q.  The third statement, again, was the statement Trump made on

20   June 24?

21   A.  That's right.

22   Q.  That statement you testified you removed from your damages

23   calculation, correct?

24   A.  Correct.

25   Q.  In your opinion, is there a difference in content between

O1IQcar3                          Humphreys - Direct

1    the statement that Trump made on June 24 and the two statements

2    that he made on June 21st and 22nd?

3    A.  Yes, there's a bit of a difference in content only in that

4    in the first two statements he attacks Ms. Carroll's reputation

5    as being truthful, which is particularly harmful to her job as

6    a journalist.  And the third statement I believe says she is

7    not his type, and her appearance is not particularly relevant

8    to her work.

9    Q.  What, if anything, did you conclude about how the

10   statements that Trump made on June 21st and 22nd affected

11   Ms. Carroll's reputation?

12   A.  So I found that they did affect her reputation, and, in

13   particular, they affected her reputation regarding being a

14   journalist, telling the truth, not having any particular

15   agenda.

16   Q.  What was your next step in the impact assessment?

17   A.  The next step in the impact assessment was to understand

18   what percent of those impressions, what portion of those people

19   were likely to believe the statement.

20   Q.  What does it -- sorry.  Withdrawn.

21        Why is it important to determine what percent of the

22   people who saw the statements likely believed them?

23   A.  Yeah.  I mean, here for the damages analysis to understand

24   what kind of campaign do you need to run, who is the target

25   audience, whose minds do you need to change, it's important to

1    understand what portion of those impressions were effective. We

2    ended with the receptive audience.

3    Q.   How do you go about figuring out the number of people who

4    saw Trump's June 21st and 22nd statements and likely believed

5    them?

6    A.   So here I used a survey from a nonpartisan research group

7    called Pew Research Center.  They provide you -- for any given

8    publication, they can tell you what percent of the readers are

9    Republican.

10   Q.   Did your analysis assume that every Republican who saw

11   Trump's statements believed them?

12   A.   No.  Of course not all Republicans might believe

13   Mr. Trump's statements.  For that I used an additional survey

14   from a company or a non-profit called YouGov who can give you

15   -- they did a survey to show 76 percent of Republicans believed

16   Mr. Trump on issues of sexual assault.

17   Q.   And is that what we're seeing in this chart here?

18   A.   Right.  For example, for the *New York Times*, so 16 percent

19   of the readers at that time were Republican.  But then if you

20   take only three-fourths of those readers, it's down to

21   12 percent of the readers who were likely receptive to

22   Mr. Trump's claims.

23   Q.   So your analysis assumed that 12 percent of people who read

24   the *New York Times* believed Trump's statements, correct?

25   A.   Yes.

1   Q.  And about 53 percent of people who read *Fox News* believed

2   Trump's statements?

3   A.  Were receptive to them, yes.

4   Q.  What is your next step after determining those percentages?

5   A.  So the next step is essentially to take the impressions

6   from that first analysis, say for the *New York Times*, and only

7   take 12 percent of those impressions to calculate the receptive

8   impressions.  So you do that, and you come up with a number

9   between 24.7 million and 21.2 million receptive impressions.

10  Q.  That's the estimate of how many people who saw Trump's

11  statements and likely believed them?

12  A.  That's right.

13  Q.  Can you remind us what the low estimate is?

14  A.  It's 21.2 million impressions.

15  Q.  Why is there a low estimate?

16  A.  There's a low estimate because of the range provided from

17  social media.

18  Q.  That's the 5 percent and 20 percent of Twitter?

19  A.  That's right.  So this number was important because I based

20  the damages model only on these particular impressions.

21  Q.  Professor Humphreys, to your knowledge, did Ms. Carroll

22  receive any positive messages, positive responses after Donald

23  Trump made his statements in June 2019?

24  A.  Yes, she did.

25  Q.  How, if at all, did you account for positive responses that

O1IQcar3                         Humphreys - Direct

1    Ms. Carroll received?

2    A.   So I observed those in my impact analysis.  Undoubtedly, of

3    the total impressions that I counted in that first part, those

4    were positive.  Those believed Ms. Carroll, some of them, and

5    offered those positive responses.

6              However, in the damages analysis, I only included the

7    impressions that were receptive to those claims because I was

8    trying to estimate the reputational harm of the statements.

9    Q.   You only included impressions that needed to be corrected?

10   A.   That's right, yeah.

11   Q.   You didn't include people who saw Donald Trump's statements

12   and did not believe them?

13   A.   That's right, the damages are based only on the receptive

14   impressions.

15   Q.   Now, in addition to analyzing how many people saw the

16   statements and how many people likely believed them, what was

17   your next step in your analysis?

18   A.   The next step was to figure out, well, how much would it

19   cost to repair this reputational damage.

20   Q.   How do you do that?

21   A.   So for that you can design a reputation repair campaign as

22   a proxy for how much it would cost to repair that damage.

23   Q.   Have you ever executed a reputation repair campaign

24   yourself?

25   A.   No, I didn't.

O1IQcar3                              Humphreys - Direct

1    Q.  How do you know about them?

2    A.  I teach those to my students every quarter.

3    Q.  What is a reputation repair campaign?

4    A.  So a reputation repair campaign is where you would place a

5    positive message with a trusted source in a particular media

6    channel, and you typically would hire a number of public

7    sources -- a number of trusted sources, and they would share

8    different messages about kind of the attitude that you want to

9    change.

10   Q.  Did you design a reputation repair campaign in connection

11   with your work on this case?

12   A.  Yes, I did.

13   Q.  How did you do that?

14   A.  So the first step is to identify the target audience whose

15   attitudes do you want to change.  And in this case, the target

16   audience was that 25 million, that receptive audience that I

17   calculated in the former analysis.

18   Q.  So the people who saw Trump's statements and likely

19   believed them?

20   A.  That's right.

21   Q.  Those are the people you're targeting to try to change

22   their minds and repair Ms. Carroll's reputation?

23   A.  Correct.

24   Q.  You've used the term trusted source a couple times.  What's

25   that?

A.  It can be a channel that someone watches that they trust.

It can be something like a podcast where they trust and like

the host.  It can also very commonly now be an influencer.

Q.  What's an influencer?

A.  An influencer is someone, usually on social media, who has

a large following and the trust of their audience.  And so

typically celebrities and companies will place messages and pay

these influencers to share information.

Q.  What's a corrective message?

A.  A corrective message is something positive that you want to

share with the audience and their influencers about almost any

topic you can think of.  Influencers also exist in the

political space, both on the left and right.

Q.  Can you give us examples of corrective messages that you

would use in a reputation repair campaign for Ms. Carroll?

A.  Sure.  So typically I think it would be someone who has

something good to say, who maybe read her book and wants to

talk about it.  Or if she has done some recent work to talk

about it, share positive things about her.  Again, that would

come from a trusted source for this particular audience, so you

want to hire influencers who this audience trusts.  I think the

most the biggest following would be something somebody like Joe

Rogan, or Candace Owens is another one in this space.

Q.  How did you determine where -- on what media platforms you

would post or send those corrective messages?

A.  So to figure out where to place the messages, you want to
place them where people in this particular audience get their
news.  For that, I use the same survey from Pew Research that
will tell you for this audience of Republicans where do they
get their news.  So, for example, 21 percent comes from cable
television.

Q.  And, again, that's the people who likely believed Trump's
statements?

A.  Yes.

Q.  Okay.  What was the next step in your analysis?

A.  The next step is to figure out how many times do you need
to show the audience the message from a trusted source.  So if
somebody has an attitude already, their attitude is not changed
by seeing a message one time, particularly on social media.  So
you would -- research shows us that you need to show them a
message three, five, or even seven times.

Q.  How do you determine how many times someone needs to see a
message in order to have their minds changed?

A.  It depends on the strength of their attitude.

Q.  How did that factor into your analysis here?

A.  So in this case, these are political attitudes, and
political attitudes tend to be pretty close to the self or
self-image, what we think of ourselves, our identity.  They are
also potentially strongly held if they've been exposed to a
message more than one time from this trusted source.  And so I

O1IQcar3                          Humphreys - Direct

1    think three, five, in some cases even seven times would be

2    appropriate.

3    Q.  So someone from this target audience would likely need to

4    see a corrective message three, five, or seven times to have

5    their minds changed?

6    A.  That's right.

7    Q.  If we could go to the next slide.

8            Can you walk us through how you calculated how much it

9    would cost to place those corrective messages?

10   A.  Sure.  So I created a few tables like this depending on the

11   different elements that I've outlined.  But you start with the

12   total impressions that you want to serve.  So that's

13   123.9 million impressions.  That's showing that target audience

14   a message five times.

15   Q.  I'll just stop you.

16   A.  Sure.

17   Q.  That number, 123 million, that's the number of people who

18   saw Donald Trump's statements and likely believed them?

19   A.  Yeah.  That's basically the 25 million people in the

20   receptive audience showing them a message five times.  So it's

21   five times 25 million.

22   Q.  Okay.  And I'm sorry for interrupting.

23   A.  Sure.  So that's the total number of impressions you need

24   in your campaign, and then you would break it down by channel,

25   where they get their news.  So, for example, on broadcast TV,

O1IQcar3                        Humphreys - Direct

1   about a third of your impressions would be on broadcast TV.  So

2   that's 36 million impressions.

3           And then the last step is simply to look up the cost

4   of how much does it cost to buy an impression on that

5   particular source.  So on broadcast television, the industry

6   standard is $16 per thousand impressions.  And so essentially

7   you do math across that row to come up with the cost, which is

8   about half a million dollars.

9   Q.  What does it mean to buy an impression?

10  A.  So it can vary by channel.  To buy an impression on

11  broadcast TV would be a message that looks maybe a little bit

12  more like a traditional advertisement, again, on a trusted

13  source.  *Fox News* might be an example.

14          If it's hiring an influencer, then you would create a

15  brief that tells them what you want them to say.  They

16  sometimes give it their own spin, and then they post it to

17  their followers.

18  Q.  What was the next step in your analysis?

19  A.  The next step was simply to add up the cost for all the

20  channels for each different parameter, so for high and low

21  impressions and for showing a message one, three, or five

22  times.

23  Q.  Why are there -- can you just explain why there are three

24  different ranges here?

25  A.  Yes, of course.  You might remember from the social media

O1IQcar3                      Humphreys - Direct

1    calculation, there's a high and a low impression.  I would -- I

2    think the high impressions is more likely in this case.  Then

3    you can choose to show the message either one, three, or five

4    times.  I included one as a baseline here, but I think the more

5    appropriate cost would be either three or five times, so that's

6    between 7.2 and 12.1 million.

7    Q.  I believe you just said this, but just so I'm clear, the

8    first row that says high impressions $2.4 million and low

9    impressions $2.07 million, do you think that that is a

10   reasonable estimate for how much it would cost to run a

11   reputation repair campaign in this case?

12   A.  No, I think given the context, you know, I don't think

13   that's appropriate.

14   Q.  What do you mean by that?

15   A.  I mean that the attitudes at issue here are, from what I

16   saw on my impact analysis, strongly held, and they have been

17   repeated by a trusted source, so I don't think one time is

18   enough to change attitudes.

19   Q.  They need to see a corrective message more than once?

20   A.  I think so.

21   Q.  Professor Humphreys, what was your ultimate conclusion as

22   to how Trump's statements that he made on June 21 and 22, 2019

23   affected Ms. Carroll's reputation?

24   A.  So I first found that Mr. Trump's statements were seen

25   between the 85.8 million and 104 million times across different

O1IQcar3                        Humphreys - Direct

1    channels.  I found that they did have an impact on

2    Ms. Carroll's reputation, particularly as a journalist, and

3    that between 21 million and 24.7 million of them were to a

4    receptive audience who likely believed them; that the cost to

5    repair that damage is between $7.2 and $12.1 million.

6    Q.  We could take that slide down.  Thank you.

7         You testified earlier that you have testified in

8    Ms. Carroll's related case against Donald Trump.  When was

9    that?

10   A.  That was last year.

11   Q.  And that case involved a claim for defamation as well?

12   A.  Yeah, it included one claim.

13   Q.  What was the nature of your testimony in that case?

14   A.  The nature of my testimony was similar.  I looked at how

15   many impressions that one statement received.  That was a

16   statement made after the statements I've covered here, and so I

17   calculated how many impressions it had, what reputational

18   damage did that particular statement do, and then I estimated a

19   cost to repair that damage.

20   Q.  When was that statement made?

21   A.  That statement was made in October of 2022.

22   Q.  You can see on your screen Plaintiff's Exhibit 4.  Is that

23   the statement that you're referring to?

24   A.  Yes.

25   Q.  In estimating the damages in that case, did you estimate

O1IQcar3                        Humphreys - Direct

```
 1   how many receptive impressions there were of Donald Trump's
 2   October 12, 2022 statements or, put another way, how many times
 3   people who saw that statement likely believed it?
 4              MR. MADAIO:  Objection.
 5   A.  Yes.
 6              MR. MADAIO:  Your Honor --
 7              THE COURT:  Sustained as to form.
 8              MR. MADAIO:  Your Honor, this is a statement that --
 9              THE COURT:  I just sustained your objection.
10              MR. MADAIO:  Thank you, your Honor.
11   Q.  Did you estimate how many receptive impressions there were
12   of Donald Trump's October 2022 statement?
13   A.  Yes.
14              MR. MADAIO:  Objection.
15              THE COURT:  Overruled.  She just said yes.
16   Q.  What was that number?
17              MR. MADAIO:  Objection.
18              THE COURT:  What's the relevance of this?
19              MS. CROWLEY:  Your Honor, I can come back to this
20   depending what the cross is.
21   Q.  What did the jury find with respect to whether Trump
22   defamed Ms. Carroll when he made this October 2022 statement?
23              MR. MADAIO:  Objection.
24              THE COURT:  Sustained.
25              MS. CROWLEY:  Your Honor, may I be heard briefly.
```

O1IQcar3                        Humphreys – Direct

1              THE COURT:  I'll see you at the sidebar.

2              (Continued on next page)

O1IQcar3                        Humphreys - Direct

1              (At the sidebar)

2              THE COURT:  Why is this appropriate?

3              MS. CROWLEY:  Because, your Honor, they have argued

4    repeatedly in briefing and through their cross-examination of

5    Ms. Carroll that her reputation was repaired after the jury

6    verdict in this case.  I believe that I'm entitled to ask this

7    expert why that is not true.

8              MR. MADAIO:  Your Honor, she is asking about the --

9    what the jury considered in coming up with the award in *Carroll*

10   *II*.  It has nothing do with what happened to Ms. Carroll's

11   reputation after.  These are the numbers that Dr. Hums

12   testified to to the jury in *Carroll II*.  It's completely

13   irrelevant to her public reputation after.

14             MS. CROWLEY:  I skipped those questions.  All I'm

15   asking her now is whether the jury found, which has already

16   been established and instructed, whether the jury found that

17   Trump defamed her, and then I'm going to ask her whether she

18   believes that that repaired the damage that had been done to

19   Ms. Carroll's reputation.

20             MR. MADAIO:  It's nowhere in her report.

21             THE COURT:  Sustained.

22             (Continued on next page)

23

24

25

1              (In open court)

2    BY MS. CROWLEY:

3    Q.  Professor Humphreys, are you familiar with the media

4    attention that Ms. Carroll received after the jury verdict last

5    May?

6              MR. MADAIO:  Objection.

7              THE COURT:  I'll allow an answer to that question.

8    A.  In general, yes.

9    Q.  Are you familiar with the fact that Ms. Carroll herself

10   appeared on television a few times after the jury verdict?

11             MR. MADAIO:  Objection.

12             THE COURT:  Ground.

13             MR. MADAIO:  The same discussion we just had at

14   sidebar.

15             THE COURT:  Sustained.

16   Q.  Professor Humphreys, you testified earlier to this briefly,

17   but, generally speaking, how is someone's reputation affected

18   when the same person keeps making the same negative claim about

19   them?

20   A.  In general, repeated claims only strengthen people's

21   attitudes when they're made from a trusted source.  When that

22   source is prominent, their statements are covered, circulated

23   very widely, and so a lot of people's attitudes would be

24   strengthened.

25   Q.  Do you consider Donald Trump to be a prominent source?

O1IQcar3                          Humphreys – Direct

1    A.  Yes.

2              MS. CROWLEY:  May I have a moment, your Honor?

3              THE COURT:  Yes.

4              MS. CROWLEY:  Nothing further.

5              THE COURT:  Thank you, Ms. Crowley.  We'll adjourn for

6    lunch.  Five minutes to 2:00, folks.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IQcar3

1            (Jury not present)

2            THE COURT:  I'm informed counsel has an issue.

3            MS. KAPLAN:  Your Honor, at the very end of

4    Ms. Habba's examination of Ms. Carroll, the question that she

5    asked -- your Honor sustained the objection, but the question

6    she asked was about the dress.  Was about the dress.

7            THE COURT:  Uh-huh.

8            MS. KAPLAN:  Ms. Habba knows very well that your

9    Honor's orders, including your most recent order on January 9,

10   preclude any questioning, any evidence about that at this

11   trial, and we would just ask that the Court consider

12   admonishing her to exclude, even if her questioning because

13   it's potentially prejudicial, any of the items and topics your

14   Honor has said are off limits.

15           THE COURT:  The question that I remember being asked

16   was how much she paid for the dress.  Am I mistaken about that

17   recollection?

18           MS. KAPLAN:  I have to -- can we pull it up?  The

19   point is about whether she kept the dress.

20           MS. HABBA:  No, I did not ask whether she kept the

21   dress.

22           THE COURT:  I don't believe she did.

23           MS. HABBA:  I did not ask about DNA, which was part of

24   your order, your Honor.

25           THE COURT:  Of course, I understand that.  When you're

O1IQcar3

1    right, you're right, Ms. Habba.  I mean, that's the fact.

2            MS. HABBA:  Thank you.

3            THE COURT:  Am I mistaken in my recollection?

4            MS. KAPLAN:  I'm sorry, your Honor, I'm pulling it up.

5            No, it was about fact-checking, your Honor.  And they,

6    in fact, checked and they found errors in your story, such as

7    years of the dress.  She was talking about the *New York Times*

8    fact-checkers.

9            THE COURT:  I'm sorry, years of the dress?

10           MS. KAPLAN:  That's the way it was transcribed.  She

11   was talking about New York Times fact-checkers.  The question

12   was whether the *New York Times* fact-checkers found errors --

13           THE COURT:  I see she did say that.

14           MS. KAPLAN:  And I don't understand how that's not

15   precluded, your Honor.

16           THE COURT:  And I sustained the objection.

17           MS. KAPLAN:  I understand, but the jury hears the

18   question.  She shouldn't even be asking the question.

19           MS. HABBA:  Your Honor, your order was to DNA.

20           THE COURT:  Of course it was.

21           Now I sustained the objection in part because of that,

22   in part only.  But I sustained it, and we're not going to make

23   a mountain out of every molehill in this case.

24           MS. KAPLAN:  Understood, your Honor.

25           (Luncheon recess)

1                          AFTERNOON SESSION

2                              2:00 p.m.

3          (Jury not present)

4          THE DEPUTY CLERK:  Would you like me to get the jury,

5     Judge?

6          THE COURT:  Yes.

7          (Jury present)

8          The witness is still under oath.

9          Mr. Madaio.

10    CROSS-EXAMINATION

11    BY MR. MADAIO:

12    Q.  Good afternoon, Professor Humphreys.

13    A.  Hi.

14    Q.  You testified earlier that you were retained by

15    Ms. Carroll's counsel for this case, right, as an expert?

16    A.  That's correct.

17    Q.  And how much have you been paid to date?

18          You testified earlier as to your rates as well.  How

19    much have you been paid to date on this case?

20    A.  For this particular case?

21    Q.  For this particular case.

22    A.  I would say I'm paid $510 an hour, I've put in about

23    100 hours, a little over, so that would be about $50,000 over a

24    period of a year and half.

25    Q.  OK.  You were also retained in connection with the other

O1IsCAR4                         Humphreys – Cross

1    trial, Carroll II, correct?

2    A.   That's correct.

3    Q.   And how much were you paid in total for that matter?

4    A.   I don't know the number of hours in particular.  It was the

5    same rate.  I would say it was about $20,000.

6    Q.   OK.  You testified earlier about your opinions in this case

7    and you have the two expert reports as well.

8              There is the original report and supplemental report,

9    right?

10   A.   That's correct.

11   Q.   And you stand by the opinions set forth in both of those

12   reports?

13   A.   I do.

14   Q.   OK.  You testified earlier that your damages model, it

15   estimates the harm for president Trump's June 21 and June 22

16   statements, correct?

17   A.   In my testimony today, yes, I did.

18   Q.   And it's only for those two statements, right?

19   A.   That's correct.

20   Q.   And you use two models when you're assessing the harm,

21   right; there is the impressions model and impact model,

22   correct?

23   A.   Um, I'm not quite sure what you mean.  I use -- I assess

24   the impact and I call that the impact assessment.

25              For impressions I do use a model, yes.

O1IsCAR4                    Humphreys – Cross

1  Q.  Well, in your report you refer to them as impressions model

2  and impact model?

3  A.  I might.  I tend to think of it as the impact assessment.

4  I might sometimes refer to it as the impact model.

5  Q.  OK.  And the impressions model, as testified earlier, is

6  basically a way of identifying the sources which contain the

7  June 21 and June 22 statements and a total amount of views that

8  those statements received?

9            THE COURT:  The question is compound.

10           Break it down, please.

11 Q.  Sure.

12           So the impressions model is essentially a way of

13 showing the amount of views for everybody after those

14 statements, right?

15 A.  The impressions model estimates or calculates the number of

16  impressions, yes.

17 Q.  OK.  An impressions model has several different sources,

18 there is television, social media, print articles, web

19 articles, right?

20 A.  Yes.

21 Q.  And all those media sources that you cite in your

22 impressions model, they discuss Ms. Carroll's accusations as

23 well as president Trump's denials, right?

24           MS. CROWLEY:  Objection to form.

25           THE COURT:  Sustained.

O1IsCAR4                        Humphreys - Cross

1    Q.  The sources cited in your impressions model, do they also

2    discuss Ms. Carroll's allegation?

3                MS. CROWLEY:  Objection to form.

4                THE COURT:  Sustained.

5    Q.  When you included sources in your impressions model, did

6    you consider whether those sources also cited Ms. Carroll's

7    accusation?

8                MS. CROWLEY:  Same objection.

9                THE COURT:  Sustained.

10                I think the testimony was that the impressions model

11    included a number of, if memory serves, articles that were

12    cited in the complaint and that mentioned or quoted -- if I

13    remember correctly, but the witness will correct me if I'm

14    wrong -- quoted Mr. Trump's statement of the 21st or statement

15    of the 22nd

16                Is that accurate?

17                THE WITNESS:  That's correct.

18                In some cases it was a direct quote.  In other cases,

19    there may have been a direct paraphrase.

20    BY MR. MADAIO:

21    Q.  In your analysis of the harm to Ms. Carroll's reputation,

22    did you consider at all whether the sources cited in your

23    impressions model also discussed Ms. Carroll's accusation

24    against Mr. Trump, president Trump?

25    A.  So the question is did I consider?

O1IsCAR4                       Humphreys - Cross

1    Q.  Did you consider at all whether those sources also

2    discussed her accusation, or did you only look at his response?

3              MS. CROWLEY:  Objection to form.

4              THE COURT:  Sustained as to form.  It's compound.

5              You can rephrase it.

6    Q.  All right.  Professor Humphreys, did you consider at all

7    whether those sources discussed Ms. Carroll's accusation?

8    A.  No.  My assignment in this case was to calculate the

9    impressions for the statement of Mr. Trump, so I did not, no.

10   Q.  OK.  So you didn't consider at all the fact that, you know,

11   a large portion of the article could have been dedicated to

12   discussing Ms. Carroll's accusation as opposed to president

13   Trump's denial?

14             MS. CROWLEY:  Objection to form.

15             THE COURT:  Sustained as to form.

16   Q.  You didn't consider the prominence of president Trump's

17   denial in the articles and the sources cited in your

18   impressions report, did you?

19   A.  No.

20   Q.  So when you have written down a TV broadcast, for example,

21   did you look at the amount of time dedicated to discussing

22   president Trump's denial?

23   A.  No.

24   Q.  And would you agree that some, if not most, of the TV

25   broadcasts in your impressions model portray Ms. Carroll in a

O1IsCAR4                        Humphreys - Cross

1    positive light?

2              MS. CROWLEY:  Objection.

3              THE COURT:  Sustained.

4    Q.  Did you consider whether the TV broadcasts in your

5    impressions model portrayed Ms. Carroll in a positive light?

6    A.  I did not consider that, no.

7    Q.  Let me pose an example, a hypothetical for you.

8              If Don Lemon is on CNN talking about this story and he

9    spends ten minutes -- it's a ten-minute segment, he spends the

10   entire ten minutes talking about Ms. Carroll, portraying her in

11   a very positive light, you know, detailing all of the

12   accusations in her story, and at the very end says, by the way,

13   president Trump denies her accusation; that broadcast would be

14   considered as being harmful to Ms. Carroll's reputation in your

15   report, right?

16             MS. CROWLEY:  Objection.

17             THE COURT:  Sustained.

18   Q.  I want to talk about your impact models.

19             So the impact model is meant to assess the people who

20   would have been receptive to president Trump's statements,

21   right?

22   A.  Yes.  That's one aspect of the impact assessment, yes.

23   Q.  What other aspects are there?

24   A.  I also conducted a qualitative analysis of her reputational

25   change.

O1IsCAR4                          Humphreys - Cross

1  Q.  OK.  With respect to the people that you believe would have
2  been receptive to president Trump's statements, you're
3  essentially saying people would have believed him, right?
4  A.  Those are the people that were receptive, that are likely
5  to have believed him or needed more information to make up
6  their mind.
7  Q.  OK.  And in your opinion, the people that would have been
8  likely to believe president Trump's denial are the people on
9  the political right or supporters of president Trump, right?
10          MS. CROWLEY:  Objection to form.
11          THE COURT:  Sustained as to form.
12          It's compound, among other things.
13  Q.  So, in your opinion, the people who would have been likely
14  to support president Trump, would have been receptive to his
15  statements, those are the people who are essentially Trump
16  supporters, right?
17          MS. CROWLEY:  Objection to form.
18          THE COURT:  Sustained as to form.
19          (Counsel confer)
20  Q.  So you're saying that Trump supporters are the people that
21  would have been likely to believe president Trump?
22  A.  I used a calculation where I included the Republicans,
23  percent of Republicans for that periodical, and I discounted
24  that by the percent of Republicans who were likely to believe
25  Mr. Trump on accusations of sexual assault.

1    Q.  Do you think those same people would have been unlikely to

2    believe Ms. Carroll's initial accusation?

3              MS. CROWLEY:  Objection.

4              THE COURT:  What's the objection exactly?

5              MS. CROWLEY:  Speculation and outside of her report.

6              THE COURT:  Sustained.

7              MR. MADAIO:  Your Honor, can I respond on that?

8              THE COURT:  Your model was constructed on the premise

9    that self-identifying -- that readers or viewers of an article

10   that paraphrased or quoted Mr. Trump's statements were more

11   likely to have believed Mr. Trump's statements about

12   Ms. Carroll than otherwise, without regard to what your

13   personal beliefs are, is that right?

14             THE WITNESS:  My own personal beliefs you mean?

15             THE COURT:  Yes.

16             THE WITNESS:  Yes, of course.

17             THE COURT:  OK.  Let's go from there.

18   BY MR. MADAIO:

19   Q.  OK.  And you agree that people have confirmation bias,

20   right?

21   A.  Yes.

22             Sorry.

23             MS. CROWLEY:  I just didn't hear the question.

24   Q.  You believe that people have confirmation bias?

25   A.  I believe confirmation bias can occur in many contexts,

O1IsCAR4                    Humphreys - Cross

1    yes.

2    Q.  OK.  So you agree that people are less likely to believe

3    information that is inconsistent with their views, right?

4    A.  People are likely to believe, more readily believe

5    information that conforms to their views.

6    Q.  Right.

7          And do you also believe they are less likely to

8    believe information that does not conform to their views?

9    A.  Confirmation bias doesn't speak necessarily to that aspect.

10   Q.  I would like to pull up --

11         MR. MADAIO:  Nate, can you pull up Dr. Humphreys,

12   Professor Humphreys' October 14 report.

13         THE COURT:  What exhibit, please?

14         MR. MADAIO:  I'm using it.  I don't want to place it

15   as an exhibit, I just want to pull it up for the witness.

16         THE COURT:  It's got to be an exhibit.  That doesn't

17   mean it has to come into evidence.  It has to be marked.

18         There is a reason for this.  Sometimes people who lose

19   lawsuits appeal and the Court of Appeals has to know what was

20   being discussed.  And the way they do that is that the piece of

21   paper gets marked as an exhibit so it can be identified without

22   doubt in the event of later proceedings.  That is why these

23   rules exist, some of them.

24         MR. MADAIO:  I understand, your Honor.  I misspoke.  I

25   meant that I didn't want to enter it into evidence.

O1IsCAR4                    Humphreys - Cross

1          MS. CROWLEY:  Your Honor, perhaps we can help.  We

2     have premarked the October 14 report as Plaintiff's Exhibit

3     202.

4          THE COURT:  OK.  Let's use that.

5          MR. MADAIO:  I would like to pull up Plaintiff's

6     Exhibit 202.

7          Nate, if you can put that to page --

8          MS. HABBA:  We haven't received that yet.

9          MR. MADAIO:  We haven't received Exhibit 202 yet.

10          MS. HABBA:  Just give her the report.  Give her a

11     copy.

12     BY MR. MADAIO:

13     Q.  Professor Humphreys, can we --

14          MR. MADAIO:  Nate, can you put this to page 24.

15     Q.  And, Professor Humphreys, do you recognize this document?

16     A.  I do.

17     Q.  Is this your expert report dated October 14, 2022?

18     A.  It appears to be.  If you have a paper copy, I prefer it.

19     I don't know.

20     Q.  It's right here.

21     A.  Thank you.

22          OK.  I see it here.

23     Q.  OK.  So I want to go back to the question I asked you

24     earlier.

25          If you look at the second paragraph of the page about

O1IsCAR4                        Humphreys – Cross

1    two sentences up, did you state:  Due to confirmatory bias,

2    people are less likely to attend to information that confirms

3    or is congruent with their existing beliefs and ignore or

4    discount information that is counter to them?

5            MS. CROWLEY:  Objection.  That's not what it says.

6            MR. MADAIO:  Is there a misstatement in there?

7            THE COURT:  That's the point she's making.  I'm not

8    sure it's correct.

9            Let me just read it.

10           It is correct.  You didn't read it correctly.

11           MR. MADAIO:  OK.  The statement is, due to

12   confirmatory bias, people are less likely to attend to

13   information --

14           THE COURT:  No.  You just misread it again.

15   BY MR. MADAIO:

16   Q.  Due to confirmatory bias, people are likely to attend to

17   information that confirms or is congruent with their existing

18   beliefs and ignore or discount information that is counter to

19   them.

20           Is that what it says?

21   A.  Yes, that's correct.

22   Q.  OK.  So do you still think that confirmation bias will not

23   make somebody less likely to believe something?

24           MS. CROWLEY:  Objection to form.

25           THE COURT:  What's wrong with the form?

O1IsCAR4                         Humphreys - Cross

1              MS. CROWLEY:  Also, your Honor, this statement is not

2    inconsistent with her testimony, so I'm not sure what this is

3    being offered for.

4              THE COURT:  We'll let the jury decide that.

5              Answer the question, please.

6    A.  I'm sorry.  Could you repeat the question?

7              MR. MADAIO:  Your Honor, could we please have it read

8    back?

9              THE COURT:  Yes.  Would the court reporter please read

10   back Mr. Madaio's question.

11             (Record read)

12   A.  It depends on what the something is.  I mean, I could just

13   say what I believe.

14             Confirmatory bias means that when exposed to a piece

15   of information, they are more likely to pay attention to it if

16   it's consistent with their existing beliefs.  They may ignore

17   it or not attend to it if it is inconsistent.

18   Q.  So do you think that Trump supporters would have already

19   believed that Ms. Carroll was a liar when she first made her

20   allegation against president Trump?

21             MS. CROWLEY:  Objection.

22             THE COURT:  And the ground is?

23             MS. CROWLEY:  Outside the report and speculation.

24             THE COURT:  Sustained.

25   BY MR. MADAIO:

O1IsCAR4                      Humphreys – Cross

1    Q.  Did you consider in your analysis whether Trump supporters

2    would have believed Ms. Carroll's initial accusation when

3    drafting your report?

4    A.  No.  My assignment here was to assess whether the readers

5    would have believed Mr. Trump.

6    Q.  Did you think it was relevant whether Trump supporters

7    would have believed Ms. Carroll's accusation as to whether her

8    reputation was actually harmed with those same individuals?

9    A.  Here, I was focused on is the reader likely to believe

10   Mr. Trump.  Those were the statements that I was studying in

11   this case.

12   Q.  But if they already had an opinion formed on the subject

13   and they already didn't believe Ms. Carroll, would president

14   Trump's statement had any effect on their opinion?

15            MS. CROWLEY:  Objection to form.

16            THE COURT:  Sustained as to the form.

17   Q.  Would president Trump's denial of Ms. Carroll's allegation

18   have any effect on these individual's belief if they already

19   did not believe Ms. Carroll?

20            MS. CROWLEY:  Objection to form, and it calls for

21   speculation.

22            THE COURT:  Sustained, form.

23   Q.  So essentially the conclusion in your report is that Trump

24   supporters believed president Trump and that non–Trump

25   supporters believed Ms. Carroll, is that right?

O1IsCAR4                      Humphreys - Cross

1          MS. CROWLEY:  Objection, misstates testimony.

2          THE COURT:  Sustained.

3   Q.  Professor Humphreys, you also testified earlier one of the

4   ways to assess the harm to a person's reputation is to look at

5   changes in the associations with their brand, is that right?

6   A.  Yes.

7   Q.  In this case, it's your opinion that there was a

8   significant shift in the association with Ms. Carroll's brand

9   in June 2019, correct?

10  A.  That's correct.

11  Q.  And specifically you believe that associations looking at

12  her brand shifted from her role as an advice columnist to her

13  association with president Trump, right?

14  A.  That's what I --

15          Oh, sorry.  That's what I found in my impact analysis,

16  yes.

17  Q.  OK.  And you're aware that Ms. Carroll publicly accused

18  president Trump of sexually assaulting her in June 2019, right?

19  A.  Correct.

20  Q.  You're aware she first made these allegations through a

21  New York Magazine which featured her on the cover, right?

22  A.  Yes, I am.

23  Q.  And you're aware that president Trump never spoke about

24  Ms. Carroll until after this article came out, right?

25  A.  I actually am not aware if president Trump spoke about

O1IsCAR4                         Humphreys - Cross

1    Ms. Carroll prior to that.

2    Q.  Well, did you look at all at the timing between when the

3    article came out and when president Trump responded?

4    A.  I did not.

5    Q.  That wasn't considered at all in your analysis?

6    A.  I believe those were on the same day.

7    Q.  Well, do you believe at least some of the shift in

8    Ms. Carroll's brand was attributable to Ms. Carroll's initial

9    accusation, as opposed to president Trump's subsequent denial?

10            MS. CROWLEY:  Objection to form.

11            THE COURT:  What's the objection as to form?

12            MS. CROWLEY:  I think it's compound.

13            THE COURT:  Overruled.

14   A.  I'm sorry.  Would you mind asking it again?

15            MR. MADAIO:  Your Honor, could we please have a

16   readback?

17            THE COURT:  Please have a readback.

18            (Record read)

19   A.  To her brand, no, I don't.

20   Q.  OK.  I would like to turn to page 43 of your report, your

21   October 14 report.

22            THE COURT:  Plaintiff's Exhibit 202.

23            MR. MADAIO:  That's right, Plaintiff's Exhibit 202.

24   Q.  On page 43 you state:  While some shift was attributable to

25   the publication of her memoir and New York Magazine piece, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    which she detailed the alleged encounter with Mr. Trump, that

2    refers to the shift in Ms. Carroll's accusation -- I'm sorry --

3    Ms. Carroll's brand after her accusation was published in The

4    Cut.

5            So would you like to change your answer?

6            MS. CROWLEY:  Objection.

7    Q.  Do you still believe that none of this shift was

8    attributable to The Cut article?

9    A.  So maybe it would help if I just clarify.

10            So what I'm referring to here are the semantic

11    associations that you can see in figures eight and nine, and

12    not Ms. Carroll's brand in particular.  It's the semantic

13    associations, and as you can see in figures eight and nine, the

14    word Trump appears.

15   Q.  So what's the difference between the semantic associations

16   in Ms. Carroll's broader brand?

17   A.  So her brand here is based on her reputation as a

18   journalist, as being truthful.  I would consider that her

19   brand.  There might be other associations with her name, but

20   what I mean by her brand is the fact that she's a journalist

21   whose reporting is based on facts.

22   Q.  And so what are the semantic associations?

23   A.  Those are what you would find in figures eight and nine.

24   Q.  Can you define what those are in terms of your analysis?

25   A.  Yes.  So let me just find them here.  One moment.

O1IsCAR4                        Humphreys - Cross

1              So if someone has a page number for figure -- page 44.

2    Q.   Page 44, I believe.

3    A.   Right.  Um, so I believe -- so I believe these are from

4    news articles about Ms. Carroll.  And what you see in figure

5    eight is the word cloud from news articles about Ms. Carroll

6    from Mr. June 2019, and what you see in figure nine is the word

7    cloud of words that you see in news articles about Ms. Carroll

8    after June 2019.

9              THE COURT:  Please tell the jury what you mean by word

10   cloud.

11             THE WITNESS:  Of course.

12             So what you see on the screen here, it's the words

13   that occurred in the news articles and the size.  The bigger

14   the word, the more common it was.  So the big words occur more

15   frequently.

16   Q.   So this word cloud is intended to show the shift in

17   Ms. Carroll's reputation, right?

18   A.   That's one purpose of this, yes.

19   Q.   And that shift was that it associated her brand with

20   becoming a liar in connection with president Trump's

21   statements?

22   A.   That's one thing that this word cloud can represent, yes.

23   Q.   What else does it represent?

24   A.   You know, it's all the words that were about her.

25             So, for example, if she's associated with a prominent

O1IsCAR4                          Humphreys - Cross

1    person, then the articles also mention that prominent person.

2    So as you see in figure nine, Trump appears to be large, but,

3    um, it's associated now with Ms. Carroll's name.

4    Q.  I would like to pull up the word cloud.

5             Well, let me ask you this.  Would it be helpful for

6    the jury to better understand your opinion and your analysis if

7    I pulled up the word cloud for them to see as a demonstrative?

8    A.  I didn't realize they couldn't see it.

9             Um, sure.

10            MR. MADAIO:  All right.  Nate, can we pull it up.

11   Your Honor, would it be OK to publicize?

12            THE COURT:  No.  It's not in evidence.

13            Do you want to offer it in evidence?

14            MR. MADAIO:  I don't want to offer the entire report.

15   I can offer just this page as a demonstrative.

16            THE COURT:  Is that what you would like to do?

17            MR. MADAIO:  That's what I would like to do, your

18   Honor.

19            THE COURT:  So is there any objection to that?

20            MS. CROWLEY:  No objection, as long as she's allowed

21   to explain the dates and what the word cloud, how the word

22   cloud fits into her larger report.

23            THE COURT:  Whether he asks or not, you're certainly

24   going to be entitled to ask.

25            MS. CROWLEY:  That's fair, your Honor.

O1IsCAR4                    Humphreys - Cross

1          No objection.

2          THE COURT:  All right.  Figures eight and nine on

3    page 44 of plaintiff's Exhibit 202 are received and may be

4    published.

5          (Plaintiff's Exhibit 202 - figures eight and nine on

6    page 44 received in evidence)

7    BY MR. MADAIO:

8    Q.  OK.  Again, just to reiterate, these two charts, figure

9    eight is before, the associations with Ms. Carroll's brand

10   before 2019, is that correct?

11   A.  Yes.  So just to be clear, what you see here from this word

12   cloud, it's a component of my impact analysis.  They are

13   associations only from the news articles.  So it's not

14   associations in any of the other material I looked at, social

15   media, other material, TV, any of those materials.

16   Q.  How many of these articles did you look at in connection

17   with figure eight?

18   A.  Um, you know, I don't recall.  I could consult my report,

19   if you want.

20   Q.  Sure.  If you would like to consult your report.

21   A.  Sure.

22          So I believe I read a sampling of these articles.

23   Q.  OK.  And how many articles?

24   A.  That's what I was trying to find.

25          You know, I don't see it in the impact assessment

1    section.  I could go and look further, if you would like.

2    Q.  Do you recall?

3    A.  How many articles there were in this particular?

4    Q.  How many you reviewed.

5          Did you review any articles?

6    A.  Of course.

7    Q.  Do you know how many?

8    A.  You know, right now in the report I can't find the

9    particular number.  I can tell you they came from a ProQuest

10   search of E. Jean Carroll for the before-and-after analysis.

11         MR. MADAIO:  And can we move to figure eight, Nate.

12   I'm sorry, figure nine.

13   Q.  So these are the associations with Ms. Carroll's brand

14   after June 2019, correct?

15   A.  No.

16   Q.  So what is this word chart show?

17   A.  These are the most common words in news articles that

18   contain E. Jean Carroll.

19   Q.  OK.  And you believe that this shows a connection, this

20   word chart shows a connection between president Trump's

21   statements and the shift in Ms. Carroll's brand, right?

22         MS. CROWLEY:  Objection, misstates testimony.

23         THE COURT:  Sustained.

24   Q.  Do you state in your report that this chart illustrates

25   that Mr. Trump's response in not Ms. Carroll's initial

O1IsCAR4                        Humphreys – Cross

1   resulted in the escalating attention she received and played a

2   considerable role in shifting the nature and balance of

3   associations with her name on page 43 of the last sentence?

4   A.  I'm sorry.  Can you point me to that?

5   Q.  Sure.

6            The last sentence of the entire sentence I'll read.

7   While some shift was attributable to the publication of her

8   memoir and New York Magazine piece, in which she detailed the

9   alleged encounter with Mr. Trump, an analysis of Google search

10  data in subsection three below illustrates that Mr. Trump's

11  response and not her initial claim resulted in the escalating

12  attention that she received and played a considerable role in

13  shifting the nature and balance of associations with her name.

14  A.  I'm really sorry.

15           Could you tell me the page?  Was it not page 40?

16  Q.  Page 43.

17  A.  Oh, 43.

18           MS. CROWLEY:  Objection, your Honor.  The statement

19  that he just read is not inconsistent with her testimony.  It

20  doesn't relate to the word cloud.  It's referencing another

21  section of the report.

22           THE COURT:  Overruled.

23  A.  I'm sorry.  Could you repeat the question?

24           About this sentence?

25  Q.  You just stated previously that you don't necessarily

O1IsCAR4                        Humphreys - Cross

1   believe that the word cloud connects president Trump's

2   statement and the shift in Ms. Carroll's brand, is that

3   correct?

4   A.  So maybe it's just easier if I say.

5           So the word cloud shows you the semantic associations,

6   the other words that occur in the news alongside Ms. Carroll's

7   name, but it doesn't necessarily reflect her brand.

8   Q.  Right.  But my question is, are you relying on this word

9   cloud to support your opinion that the harm to Ms. Carroll's

10  reputation was connected to president Trump's June 21 and

11  June 22 statements?

12  A.  It's one piece of a much larger impact analysis.

13  Q.  OK.  Well, you state in your report that it is one of the

14  reasons that you rely on, right?

15  A.  It is something that I rely on, yes.

16  Q.  OK.  And, again, that shift in her brand was that it

17  made -- it introduced the association of Ms. Carroll being

18  considered a liar to the public, right?

19          MS. CROWLEY:  Objection to form.

20          THE COURT:  I'll let the witness answer.

21          Overruled.

22  A.  I'm sorry.  Could you ask again for read back?

23          MR. MADAIO:  Your Honor, could we please have a read

24  back?

25          THE COURT:  Please.

```
 1              (Record read)
 2   A.   I'm sorry.  I don't understand it.
 3              Would you mind asking the question again?
 4   Q.   Sure.  So it's essentially your opinion that president
 5   Trump's statements, the main harm that Ms. Carroll's brand
 6   suffered was that it caused people to think of her as a liar?
 7   A.   Yes.  After Mr. Trump's statement, people spoke about
 8   Ms. Carroll as a liar, yes.
 9   Q.   OK.  Could you identify to me in figure nine where the word
10   lied is?
11   A.   Lying occurs.  I can point you to that.
12   Q.   Sure.  Can you point me to where that is?
13   A.   It's right under the R in Trump.
14   Q.   That's very small spared compared to the rest of the words
15   on here, would you agree?
16   A.   What do you mean by small?
17   Q.   Let me ask you.  The size of the words on here is meant to
18   show the prominence and how often they are searched, correct?
19              THE COURT:  And how often they are searched?
20              MR. MADAIO:  And how often -- sorry.
21   Q.   And how often they are stated in news articles?
22   A.   Yes, that's correct.
23   Q.   OK.  So the smaller the word, the less prominent it is
24   featured, the less frequently it's featured in news articles?
25   A.   Yes, in these news articles.  That's right.
```

O1IsCAR4                        Humphreys - Cross

1    Q.  OK.  Do you see any other word on here that you think

2    connects to the association with Ms. Carroll being considered a

3    liar?

4    A.  There are other words on here that are associated with

5    Mr. Trump's statements, yes.

6    Q.  But specifically about her being a liar?

7    A.  There are other words that are defamatory statements, that

8    are associated with defamatory statements in here.

9    Q.  What words are those?

10   A.  A word like money, for instance.

11          MS. HABBA:  Defamatory.

12   Q.  And where do you see money?

13   A.  It is right above the T in Trump.

14          MR. MADAIO:  OK.  Can we highlight that, please.

15   Q.  OK.  But you would agree that the vast majority of words on

16   here have nothing to do with Ms. Carroll being a liar, right?

17   A.  Um, what do you mean by the vast majority?

18   Q.  Unless you can point me to any other words on here having a

19   connection to her being a liar, it appears to me the vast

20   majority have nothing to do with her being a liar whatsoever?

21          MS. CROWLEY:  Objection.

22          THE COURT:  Sustained.

23          It doesn't matter how it appears to you, sir.

24   Q.  Would you agree many of the words on here are connected to

25   Ms. Carroll's lawsuits?

O1IsCAR4                         Humphreys - Cross

1    A.   That's correct.  These are news articles that report mostly

2    on those facts, yes.

3    Q.   And Ms. Carroll's a plaintiff in this action, right?

4    A.   Yes.

5    Q.   And that means that she chose to commence the action?

6              MS. CROWLEY:  Objection.

7              THE COURT:  Sustained.

8    Q.   You also testified earlier and plaintiff's counsel pulled

9    up earlier a Google trends chart which you claim also supports

10   the shift in reputation which you claim is attributable to

11   president Trump, to Ms. Carroll's reputation.

12             MS. CROWLEY:  Objection, misstates testimony.

13             THE COURT:  It's not even a question.

14             MR. MADAIO:  I'm sorry.  I'm getting there.

15   Apologies, your Honor.

16             Nate, can we pull up the figure ten.

17             Your Honor, this is figure ten from Professor

18   Humphreys' chart, Professor Humphreys' report.  It's page 47.

19   I would also like to publish this for the jury as a

20   demonstrative.

21             THE COURT:  Are you offering it?

22             MR. MADAIO:  Not as evidence, only as a demonstrative.

23   I could also refer to plaintiff had this up earlier in their

24   demonstrative.  I just don't think we've been provided with the

25   demonstrative that we're able to pull it up.

O1IsCAR4                          Humphreys – Cross

1              So for the ease of being able to show it to the

2    jury --

3              THE COURT:  You've had this report for almost a year

4    and a half, right?

5              MR. MADAIO:  We can pull it up right now, your Honor.

6    I just don't want to admit it into evidence.  I would like to

7    use it as a demonstrative.

8              THE COURT:  Is there an objection or not?

9              MS. CROWLEY:  Your Honor, it was in our demonstrative.

10   We're happy to show it from there.

11             THE COURT:  OK.  We're going to mark it --

12             MR. MADAIO:  I just don't think it's been provided to

13   us.

14             THE COURT:  Excuse me.

15             This is figure ten on page 47 of exhibit, Plaintiff's

16   Exhibit 202 for identification.

17             All right.  You may display it.

18             MR. MADAIO:  OK.

19   BY MR. MADAIO:

20   Q.  OK.  In this Google trends chart, this shows the relative

21   search interest for Ms. Carroll in and around the date of her

22   accusation.

23             Well, it's in and around, you know, June 2019, right?

24   A.  That's correct.

25   Q.  OK.  June 21, that was when Ms. Carroll first publicly made

O1IsCAR4                        Humphreys - Cross

1    her accusation against president Trump, right?

2    A.  Yes.

3    Q.  And we can see the search interest on June 21 is about 55

4    on your chart, is that right?

5    A.  I think that's fair, yeah.

6    Q.  And then on June 22 it jumped to approximately 94, correct?

7    A.  That's right.  It was 94 in my analysis.

8    Q.  OK.  And is it your position that this jump to 94 is

9    attributable solely to president Trump's June 22 statement?

10   A.  No.

11   Q.  So you agree that some of that increase in attention is due

12   to Ms. Carroll's -- the attention that Ms. Carroll's accusation

13   was receiving at the time?

14   A.  I could tell you about the temporal order of this.

15        Mr. Trump and Ms. Carroll made their statements on the

16   same day, and here we have this only by day, and so it's not

17   possible with this particular data to disentangle those two

18   things in this chart.

19   Q.  So you can't differentiate what attention was due to

20   president Trump's statements as opposed to Ms. Carroll's

21   accusation, right?

22   A.  This chart cannot do that.

23   Q.  We see another spike on June 25 with a 100 relative search

24   volume, right?

25   A.  That's correct.

O1IsCAR4                        Humphreys - Cross

1    Q.   And what do you attribute that spike to?

2    A.   I can tell you that Mr. Trump made a statement on June 21st

3    and June 22nd and then again on June 24th, and there is a third

4    spike on June 25th.

5    Q.   OK.  Are you aware that Ms. Carroll also had two CNN

6    interviews on June 24?

7    A.   I am aware that she did interviews around that time.  I did

8    not actually analyze when she did her interviews in reference

9    to this chart.

10   Q.   OK.  Two of those are referenced in your original report.

11           There is an interview she did with Alisyn Camerota,

12   which according to your report garnered --

13           THE COURT:  We're now reading from the report that you

14   don't want to put into evidence.  Is that what we're doing?

15           MR. MADAIO:  I'm simply asking her the contents of her

16   report.

17           THE COURT:  Well, you're reading the report, right?

18           MR. MADAIO:  No, I'm just --

19           No.  Sorry, your Honor.

20   Q.   I'm saying, the first interview was with Alisyn Camerota.

21   It was a CNN interview on June 24 and it garnered 460,000

22   views, is that right?

23           MS. CROWLEY:  Objection.

24           THE COURT:  What's the objection?

25           MS. CROWLEY:  I think he's reading from the report.

1          MR. MADAIO:  I'm asking the witness a question, your

2     Honor.

3          THE COURT:  Do you know the answer to the question?

4          THE WITNESS:  Not without consulting my report.

5          THE COURT:  I'm sorry?

6          THE WITNESS:  I'm sorry.  Not without consulting my

7     report.  I need to check it.

8     BY MR. MADAIO:

9     Q.  Professor Humphreys, could I refresh your recollection with

10    the impressions model on your report.  Can we turn to --

11         MR. MADAIO:  Nate, page 109 of the report, only for

12    Professor Humphreys.

13    Q.  If you look at T30, it's identified in your report.

14    A.  Yes, I see that.

15    Q.  That's New Day with Alisyn Camerota and John Berman.

16         You have the ratings estimate as 460,000 in your

17    report, is that correct?

18    A.  Yes, I see that.

19    Q.  OK.  And then if you look at T32, that's Anderson Cooper

20    360, June 24, and the ratings estimate is 877,000, is that

21    correct?

22         MS. CROWLEY:  Objection, your Honor.  This is not in

23    the supplement report.  There was briefing on this over the

24    weekend.

25         MR. MADAIO:  Your Honor, this is in the supplemental

O1IsCAR4                           Humphreys – Cross

1    report.

2              THE COURT:  Really?

3              I think we'll send the jury out for a few minutes.

4              THE DEPUTY CLERK:  Would the jury please come this way

5    and bring your notebooks with you.

6              THE COURT:  Professor, you should wait for us outside

7    the courtroom.

8              THE WITNESS:  Sure.

9              (Witness temporarily excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IsCAR4                        Humphreys - Cross

1              (Jury not present)

2              THE COURT:  OK.  I very much --

3              MS. HABBA:  Your Honor, the witness is still here.

4              THE COURT:  The witness is not still here.

5              MS. HABBA:  She just walked over here.

6              THE COURT:  The witness was in the anteroom out the

7    door when you stood up.

8              I'm very aware of the briefing over the weekend and

9    I've ruled on it.  So what's your point, counsel?

10             MR. MADAIO:  Your Honor, actually, I wasn't, at least

11   at this time, I wasn't going to go into the substance of that

12   appearance.  I was only discussing it with respect to the

13   amount of views that it garnered, strictly as it ties to the

14   figure ten in the spike in interest.

15             THE COURT:  Is figure ten in the supplemental report?

16             MR. MADAIO:  No, but it's still part of Dr. Humphreys'

17   analysis that carries over from the initial report.

18             THE COURT:  I don't know that.

19             MS. CROWLEY:  Your Honor, figure ten is not in the

20   supplemental report.

21             MR. MADAIO:  They introduced it as -- they showed it

22   to the jury already.  Of course it's part of the report.

23             MS. CROWLEY:  Your Honor.

24             THE COURT:  The fact that they showed it to the jury

25   doesn't mean it's part of her report.  I don't know what

1    happened.

2            But what I do know is that, in the course of the

3    weekend, you folks submitted papers that said the following, as

4    I remember, and I may make an error in this because I'm only

5    human.

6            But you asked for a supplemental report some time ago

7    that removed from the analysis that was in the original report

8    impact attributable to the Anderson Cooper June 24 -- I believe

9    it was a June 24 -- program because the plaintiff had dropped

10   any claim for damages based on Mr. Trump's June 24 statement.

11           Do we agree so far?

12           MR. MADAIO:  Yes.

13           I think you may have said Anderson Cooper, June 24.

14   It was the June 24 statement that was removed.  We agree with

15   that.

16           THE COURT:  Yes, but what you wanted --

17           Yes.  You're right.  The June 24th.

18           Then you've got a supplemental report in which the

19   witness -- certainly the counsel said that the views

20   attributable to the Anderson Cooper program on June 24th had

21   been eliminated -- and that in any event, the witness was not

22   going to offer any opinion based on any data attributable to

23   the viewing of the Anderson Cooper program on June 24.

24           Right?

25           MR. MADAIO:  Your Honor, I just want to clarify, the

O1IsCAR4                        Humphreys – Cross

1    purpose of the supplemental report was to remove president

2    Trump's June 24 statement, not the Anderson Cooper June 24 --

3            THE COURT:  You corrected me once before and I

4    restated, and I restated I believe correctly.

5            In any case, are we right so far?

6            MR. MADAIO:  As long as we're clear that president

7    Trump's June 24 statement was removed, the purpose of the

8    supplemental report was to remove the June 24 statement.

9            THE COURT:  That is correct.

10           And then you were provided with the supplemental

11   report.  Yes?

12           MR. MADAIO:  Yes.

13           THE COURT:  And then you claimed, I think in

14   substance, that the data relating to the Anderson Cooper

15   program, which the plaintiff said had been removed from the

16   report, in fact had not been removed from the report.

17           Right?

18           MR. MADAIO:  Yes, your Honor.

19           THE COURT:  And then the plaintiff came back and said,

20   yes, it had.  And you're confused because there had been a

21   re-numbering of certain data points that had been in the

22   original report that meant that when you claimed that the

23   Anderson Cooper data had not been removed, you were talking

24   about something else entirely, and in the mistaken belief that

25   it was data that related to Anderson Cooper.

O1IsCAR4                        Humphreys - Cross

1              Just stay with me.  Right so far?

2              MR. MADAIO:  That's correct.  There is additional

3    information.  We've had conversations --

4              THE COURT:  Just work with me.  That's what you said.

5              And then I issued an order in which I said there

6    appeared to be confusion between the plaintiff and the

7    defendant about what data had been removed or not, and that if

8    it hadn't been resolved by the time of trial, it appeared to me

9    that it was irrelevant anyway because the plaintiff represented

10   that nothing would be offered that included views attributable

11   to the June 24 statement.

12             Right?  Is that about right?

13             MR. MADAIO:  That's right.

14             THE COURT:  OK.  So what are we talking about?

15             MR. MADAIO:  So, your Honor, we're not intending to

16   discuss the June 24 appearance for that purpose.

17             Again, the line of questioning now is only relating to

18   showing the amount of views that it garnered.  Again, tying it

19   back to the chart where there is a spike showing on June 24

20   that there was increased search interest for E. Jean Carroll of

21   which, in Professor Humphreys' report, she claims is due to the

22   June 24 statement by president Trump, but it disregards the

23   fact that there was a June 24 appearance by Ms. Carroll that,

24   according to her own report, garnered a significant amount of

25   attention.

1             Increased search interest.

2             THE COURT:  I hear you.

3             Ms. Crowley, what do you say to that?

4             MS. CROWLEY:  Your Honor, I believe that the witness

5    testified on direct, and then was about to on cross, that she

6    wasn't attributing any of the increased Google search or Google

7    traffic information to any of the statements.  She was merely

8    laying out sequentially what has happened.  And the reason that

9    we -- she certainly wasn't --

10            As your Honor said, she very clearly removed the

11   Anderson Cooper interview when she was doing the supplemental

12   report.  The reason that we questioned her in direct about that

13   chart that shows the Google spike was because, after conferring

14   with defense counsel, we understood that they were going to go

15   into whether she had properly removed the June 24 statement in

16   her analysis, and we wanted to con front the fact that there

17   was this chart, and she at one point had considered the June 24

18   statement when looking at Google search data.

19            THE COURT:  So your position at this point is simply

20   that figure ten lays out the chronology that the data, there is

21   no data in the impact calculation, and the damage argument that

22   flows from any articles or impressions that reflected only the

23   June 24 statement.  Yes?

24            MS. CROWLEY:  That's absolutely correct, your Honor.

25            THE COURT:  And Mr. Madaio's point is that in the

1  Google chart, figure ten, there was the Anderson Cooper

2  broadcast, which was excluded from the data in the damages

3  assessment, and he's offering that as an alternative

4  explanation –– I'm stating it too broadly.

5          His point is that the fact that that second spike

6  happened, could be attributable to something in relevant part

7  that is not included in this calculation at all, is that right?

8          MS. CROWLEY:  I think so, your Honor.

9          Just to be clear, though, there is nothing in the

10  Google chart that relates to the Anderson Cooper video.  It's

11  just a sequential, Ms. Carroll's allegation, the June 21

12  statement, spike in increase, the June 22 ––

13          THE COURT:  But I think his point is, if I understand

14  him correctly, that Anderson Cooper went on TV on June 24, he

15  was seen by however many people watch Anderson Cooper, and that

16  fact may well have contributed to the spike in Google searches

17  on E. Jean Carroll on June 24, 25.

18          Right, Mr. Madaio?

19          MR. MADAIO:  Yes, your Honor.

20          And if it helps, because this is some something that I

21  was planning on going into, you can also look at figure 11

22  which shows the related queries around that same time.  And if

23  you look at –– it's, you know, essentially variations on

24  E. Jean Carroll's name and Donald Trump's name.  And then you

25  can also see Anderson Cooper, you know, those four or five

O1IsCAR4                              Humphreys - Cross

1    results is essentially the only search result in there.

2              So the two charts show that was a major search

3    interest among the public.  It does connect, because she is

4    trying to shows these charts as the reason why she can connect,

5    you know, the shift in reputation, in her reputation to

6    president Trump's statements.  But there were other causes

7    here.

8              MS. CROWLEY:  I don't think that was her testimony.

9              THE COURT:  Just let me look.

10             MS. CROWLEY:  I apologize.

11             (Pause)

12             THE COURT:  Well, I don't see how figure 11 gives you

13   any support at all because the relative value on queries on

14   Jean Carroll being 100, queries that were related to Anderson

15   Cooper was two.

16             MR. MADAIO:  Well, there is three -- it's referenced

17   three different times.

18             THE COURT:  OK.  You're right about that.  They add up

19   to five.

20             MR. MADAIO:  Right.  But it's the only other topic in

21   there, not some variation.  I mean, the largest topic in there

22   that is not some variation of Carroll or Trump.  Most of the

23   search is either Carroll or Trump or some variation of the

24   names.

25             THE COURT:  Well, that's for sure.

O1IsCAR4                        Humphreys - Cross

1          MR. MADAIO:  I mean, it makes sense that would be the

2     largest search results, but when you filter it down --

3          THE COURT:  By comparison, Anderson Cooper is on the

4     verge of negligible.

5          MS. CROWLEY:  Your Honor, perhaps I can speed this

6     along.

7          I don't have a problem with Mr. Madaio asking

8     Dr. Humphreys whether she's aware that Ms. Carroll appeared on

9     CNN after her allegation and whether she thinks that that

10    contributed to the reputational damage that she suffered.

11         I very strongly do not want there to be a suggestion

12    that the Anderson Cooper program or the Alisyn Camerota

13    broadcast were included in her damages assessment, because that

14    is not the case.  That is what we briefed over the weekend.

15         I also would object -- I don't know if he's going

16    here -- but to showing this chart to the jury because --

17         THE COURT:  Which chart?

18         MS. CROWLEY:  Figure 11, I'm sorry.

19         -- because it contains references to DNA and the dress

20    and other topics that are clearly out of bounds.

21         THE COURT:  What do you say to that, Mr. Madaio?

22         MR. MADAIO:  I would like to show the chart.  I mean,

23    we can --

24         THE COURT:  Which chart, please?

25         MR. MADAIO:  Figure 11.

1          THE COURT:  OK.  I know you would like to.

2          What about that as a resolution?

3          MR. MADAIO:  We can redact.  I believe we can redact

4   any references that -- we only want to show the Anderson Cooper

5   on there.  We can redact any references that plaintiff's

6   counsel has an issue with.

7          MS. CROWLEY:  But that would be misleading.  You're

8   redacting that there were other searches that related to what

9   Trump was saying about Ms. Carroll at the time.

10         THE COURT:  That's true.

11         Look, I will let you make the point you want to make

12  if you can do it about figure ten.

13         And if you want to use figure ten, I think we have it

14  up already, right?

15         MR. MADAIO:  Yes.

16         THE COURT:  That's fine.

17         But I think Ms. Crowley is right on figure 11 --

18         MR. MADAIO:  OK.

19         THE COURT:  -- for two reasons.  The one she gives and

20  the one that immediately lept off the page at me, which is that

21  there is almost no reference to Anderson Cooper.  Not

22  literally, but relatively.

23         MR. MADAIO:  Your Honor, there is one other point,

24  because this may become relevant later.

25         THE COURT:  OK.

1    MR. MADAIO:  In terms of the Anderson Cooper

2    appearance, we had discussions with counsel in terms of whether

3    or not it's included.  They seem to think there was some error,

4    I guess, in the supplemental report that the T32 that is

5    referenced in the supplemental report is the Anderson Cooper

6    video, and it does match up with the numbers on the initial

7    report as the T32 there.

8            I think there may be some sort of confusion in how it

9    was carried over from the reports or misidentified or

10    something.  It's not clear that it's not included in the

11    report.

12           THE COURT:  Well, look, here is what I said days ago

13    now, that there is obviously confusion.  One or both of you is

14    wrong or confused, or maybe both of you, I don't know.  But

15    we're sure not going to have a trial about that.

16           And you ought to be able to work it out.  There are

17    footnotes referencing everything in both reports.  One of the

18    problems is that in the supplemental report there is no

19    counterpart of what was Exhibit F or appendix F to the original

20    report, which makes this a little difficult to get at.

21           And despite the fact that my law clerks and I spent

22    hours trying to audit this, in effect, and figure out who is

23    confused, if anybody, we're not there because we don't have all

24    the data.

25           So what I said is, if you have doubts about whether

O1IsCAR4                        Humphreys - Cross

1    she eliminated the data, you can ask her, and you'll get your

2    answer.

3              MR. MADAIO:  Understood.

4              THE COURT:  OK.  Now we'll extend the break by another

5    ten minutes so that we get a break.

6              (Recess)

7              MS. CROWLEY:  Judge, Mr. Madaio informed me that he

8    has quite a bit more of his cross to do and that it might take

9    us until after 4:30.

10             Dr. Humphreys lives in Chicago and she has a newborn

11   child, in addition to two other kids under five.  So if the

12   court would be amenable to it, we would be fine with staying

13   later than 4:30 to get her done so she can go home to her kids

14   and not have to stay here over the weekend or come back on

15   Monday.

16             THE COURT:  What about you, Mr. Madaio?

17             MR. MADAIO:  We are OK with going extra, as long as we

18   have to get through what we have to get through.  If it ends up

19   going too long, we have to wait until Monday.  Staying later

20   today, we have no issue with that.

21             THE COURT:  We have to see about the jury.

22             What about the jury?

23             THE DEPUTY CLERK:  I'll have to ask them, Judge.

24             THE COURT:  Go ahead and talk to them.  Maybe we can

25   do this a lot more efficiently.

O1IsCAR4                      Humphreys – Cross

1            MR. MADAIO:  Yes, your Honor.

2            (Pause)

3            THE DEPUTY CLERK:  Jury is fine with it.

4            THE COURT:  The jury is good with it.

5            THE DEPUTY CLERK:  I'll bring in the jury.

6            MS. CROWLEY:  Thank you, Judge.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

01IQcar5                          Humphreys - Cross

1            (Jury present)

2            THE COURT:  The witness is still under oath.  Let's

3    continue.

4    BY MR. MADAIO:  (Continued)

5    Q.  Professor Humphreys, you stated earlier that your report

6    also contains a qualitative analysis in it as well, correct?

7    A.  That's correct.

8    Q.  And in the qualitative analysis, you discuss a number of

9    social media comments that were directed at Ms. Carroll,

10   correct?

11   A.  I analyzed social media comments that occurred underneath

12   the news articles, for example.

13   Q.  Okay.  And they are either aimed at or discussing

14   Ms. Carroll generally, right?

15   A.  Many of them do discuss Ms. Carroll.  They occurred because

16   they were underneath the news articles, for example.

17   Q.  Okay.  Nate, if we could pull up Professor Humphreys'

18   October 14 report, page 52.  It's figure 12.  Just for

19   Professor Humphreys right now.

20            And, Professor Humphreys, do you recognize this figure

21   12?

22   A.  Yes, I do.

23   Q.  And that's contained in your October 14, 22 report, right?

24   A.  Yes.

25            MR. MADAIO:  I'd like to enter this page only into

O1IQcar5                           Humphreys - Cross

1    evidence.

2              MS. CROWLEY:  No objection.  The figures on the page.

3              THE COURT:  All right.  Figure 12 of Plaintiff's 202

4    is received.

5              (Plaintiff's Exhibit 202 figure 12 received in

6    evidence)

7    Q.  Professor Humphreys, you rely on these comments as proof

8    that Ms. Carroll's reputation has been damaged from president

9    Trump's statements, right?

10   A.  Yes, it's one part of my impact analysis.

11   Q.  And you believe that the tweets -- that these tweets are a

12   direct result of president Trump's statements, right?

13             MS. CROWLEY:  Objection.  Misstates testimony.

14             THE COURT:  The witness can answer.

15   A.  What do you mean by direct result?

16   Q.  Is there a direct causal link between president Trump's

17   statements and the reason these tweets were sent -- the reason

18   these tweets were sent out?

19   A.  So these links occurred underneath the news articles that

20   contain Mr. Trump's statements.  They contain language that

21   references his statements.  I don't believe they would have

22   been made but for language in his statements.

23   Q.  So you think they are directly attributable to president

24   Trump's statements?

25   A.  What do you mean by directly attributable?

01IQcar5                          Humphreys - Cross

Q.   That if he hadn't made the statements -- if he hadn't made
is June 21st and 22nd statements, these tweets never would have
been sent, right?
A.   I do believe some of the language in these tweets would not
be there if not for his statements.
Q.   So let's go through one of them.  It's from @dizzienewz.
It states, "After all the women who have lied in court under
oath about being raped by someone in or affiliated with the
Trump administration, yeah Ima call this bitch a liar.  Look,
anything you Democratic party touches is corrupt and full of
lie to hold power over you, their brainless sheep."

          So what about this statement makes you believe that
this is due to president Trump's June 21st and June 22nd
statements as opposed to this user's personal opinion?
A.   You can see there where it says there "replying to
@newyorktimes, so it occurred underneath an article that
contained one of the statements in this case.  It also includes
language that references the statement such as liar, Democratic
party, et cetera.
Q.   Right, but in this statement, this user is specifically
referencing his belief that other women have lied in court
under oath.  Doesn't that lead you to believe that their --
that his opinion is based off of his own personal opinion?
          MS. CROWLEY:  Objection.
          THE COURT:  The objection is what, Ms. Crowley?

O1IQcar5                        Humphreys – Cross

1              MS. CROWLEY:  He is asking her what she thinks this

2       person believes.

3              MR. MADAIO:  Pointing to the substance of the

4       statement.

5              THE COURT:  I'm sorry?

6              MR. MADAIO:  I'm pointing to the substance of the

7       statement.

8              THE COURT:  I know.  This is now in evidence.  You can

9       argue it to the jury, but we are not going to engage in this.

10      This is not appropriate cross.

11             MR. MADAIO:  Well, your Honor, I'd like to move on to

12      another one of the statements here.

13             THE COURT:  Well, you are -- I don't think that's

14      going to happen.

15             MR. MADAIO:  Well, I'd like to ask a followup question

16      on the next tweet.

17             THE COURT:  You want a followup on the next tweet?  I

18      don't know what the next tweet is.

19             MR. MADAIO:  Well, I can show you on the figure 12.

20             THE COURT:  All right.

21      BY MR. MADAIO:

22      Q.  Professor Humphreys, there's also a tweet here from

23      @brucewe77516428.  That tweet simply states, "Attention whore."

24             Can you explain why you believe that this statement is

25      attributable to president Trump's June 21st and June 22nd

O1IQcar5                              Humphreys - Cross

1    statement?

2    A.   As you see here, this is another tweet that occurred

3    directly underneath one of the articles that I analyzed that

4    contains a statement in this case.

5    Q.   And the article that you're referencing was that an article

6    entirely about president Trump's June 21st and June 22nd

7    statement?

8    A.   I would need to see the article to tell you.

9    Q.   Did it discuss Ms. Carroll's accusation as well?

10   A.   I would need to see the article to tell you.

11   Q.   In your opinion, is it uncommon for Twitter users to

12   express negative and malicious opinions when discussing

13   polarizing topics such as politics?

14          THE COURT:   Could you say the question again?

15          MR. MADAIO:   Your Honor, could we please have a read

16   back?

17          THE COURT:   Yes.

18          (Read back)

19   A.   I'd say it depends on what you mean by uncommon.  You said

20   is it uncommon?

21   Q.   Is it uncommon?

22   A.   I think it depends on what you mean by uncommon.  People do

23   make negative statements on Twitter.  That happens, yes.

24   Q.   And you would agree it happens frequently when discussing

25   the realm of politics on social media, right?

O1IQcar5                           Humphreys – Cross

1              THE COURT:  It depends what you mean by frequently.

2    If you just got all of those adjectives and efforts out of your

3    questions, there would be a lot less difficulty.

4    Q.  Professor Humphreys, you agree that on social media

5    Twitter, Facebook, there's a lot of polarizing discussion

6    around politics?

7    A.   There is polarizing discussion on Twitter about politics,

8    yes.

9    Q.   And in those polarizing discussions, there can

10   frequently -- there can be a lot of attacks on Twitter users if

11   they don't agree with someone's belief or opinion?

12             MS. CROWLEY:  Objection to form.

13             THE COURT:  Sustained as to form.

14   Q.  Professor Humphreys, you agree that there is a lot of

15   malicious comments on Twitter and Facebook when people are

16   discussing politics?

17             MS. CROWLEY:  Objection.  Asked and answered.

18             THE COURT:  Sustained.

19   Q.  And you're aware Ms. Carroll made her allegations against

20   the sitting president of the United States, right?

21             THE COURT:  We are now wasting time big time.  Stop

22   it.

23             MR. MADAIO:  All right, your Honor.

24             THE COURT:  We all agree Lincoln was the 16th.  Let's

25   move on.

O1IQcar5                          Humphreys – Cross

1    BY MR. MADAIO:

2    Q.  Professor Humphreys, when you performed your analysis in

3    your report did you see any positive or supportive messages

4    about Ms. Carroll?

5    A.  Yes.

6    Q.  And how did these supportive messages weigh in your

7    analysis of how Ms. Carroll's reputation was affected following

8    her allegation and president Trump's response?

9    A.  So I first read through some of these.  I saw some in my

10   impact analysis.  I considered them in my impressions analysis

11   in the sense that some of those impressions were people who

12   felt positively about Ms. Carroll.  However, I did not include

13   them in my damages analysis.

14   Q.  So you only looked at how Ms. Carroll's reputation was

15   negatively impacted, correct?

16          MS. CROWLEY:  Objection.  Misstates testimony.

17          THE COURT:  It's a characterization, but I'll let the

18   witness answer.

19   A.  My assignment was to study reputational harm, so in that

20   sense I estimated the reputational harm.

21   Q.  So you only looked at the negative impact, right?

22   A.  That's not correct.

23   Q.  So what's the difference between, in your opinion -- can

24   you explain the difference between reputational harm and

25   negative impact?

O1IQcar5                         Humphreys - Cross

1    A.  Sure.  So what I mean is that in the impressions analysis,

2    I counted everybody who saw this information.  I did see in the

3    impact analysis that there were positive comments about

4    Ms. Carroll.

5            In my damages analysis, I did not count the roughly

6    75 percent of people who may have felt positively.  I

7    counted -- I included only the 25 percent of those impressions

8    that were receptive to Mr. Trump's claims.

9    Q.  So did you consider whether any of the positive impact on

10   Ms. Carroll's reputation could have offset any negative impact?

11           THE COURT:  I'll see counsel at sidebar.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IQcar5                          Humphreys – Cross

1                    (At the sidebar)

2                    THE COURT:  You are both to file briefs by noon Sunday

3       on this question:  If someone's reputation in part of a

4       community is injured, is the plaintiff or the injured party

5       entitled to recover damages for that injury even if the

6       reputation of the party in another part of the community is

7       benefited?

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1IQcar5                        Humphreys - Cross

1          (In open court)

2     Q.  So, Professor Humphreys, you didn't find it appropriate in

3     your expert opinion to factor in any positive impact in

4     Ms. Carroll's reputation.  Is that correct?

5          MS. CROWLEY:  Objection.  Asked and answered several

6     times.

7          THE COURT:  Sustained.

8     Q.  You didn't consider whether high-profile celebrities such

9     as Bette Midler John Cusack, Jamie Lee Curtis Alyssa Milano and

10    others who praised Ms. Carroll increased her public profile.

11    Isn't that right?

12    A.  No, I didn't study the remarks.

13    Q.  Don't you think these comments of support would generate a

14    greater impression than the comments from anonymous users?

15         MS. CROWLEY:  Objection, your Honor.  Those comments

16    were all made after the verdict, as Ms. Carroll testified

17    today.  They were not part of Professor Humphreys report.

18         THE COURT:  Sustained.

19    Q.  Did you consider at all whether -- or you didn't consider

20    whether Ms. Carroll has more career opportunities now than she

21    did before June 2019, did you?

22    A.  I did not study her career opportunities, no.

23    Q.  Did you look at how many Twitter followers she had prior to

24    June 2019 as compared to now?

25    A.  I did not.

01IQcar5                    Humphreys - Cross

1   Q.  Did you do any analysis of how president Trump's name may
2   have made Ms. Carroll more famous?
3   A.  What do you mean by more famous?
4   Q.  Increased her public profile.
5   A.  I do agree that it's likely more people know her name than
6   previously.
7   Q.  Did you do any analysis of how Ms. Carroll's numerous TV
8   and podcast appearances may have helped her reputation?
9          MS. CROWLEY:  Objection, your Honor.  You sustained an
10  objection during the direct examination on these exact
11  questions.
12         THE COURT:  Yes.
13         Look, she has told you exactly what she considered.
14  By definition, that means she didn't do anything else.  And the
15  question is not how long you can take asking questions about
16  things that you know now were not part of her study.  The
17  question is get on to something relevant.  And we are all eager
18  to hear it if there is something.
19  Q.  Professor Humphreys, did you consider whether Ms. Carroll
20  made more money prior to June 2019 than she does now?
21         MS. CROWLEY:  Objection.
22         THE COURT:  Sustained.
23         MR. MADAIO:  Your Honor, I don't think we've touched
24  on to that subject at all.
25         THE COURT:  It doesn't matter.

1          MR. MADAIO:  All right.  I'll move on.

2          THE COURT:  You are perfectly entitled to make that

3   argument unless there's a reason not to let you make it that I

4   don't know now when you get to sum up, but this is a

5   cross-examination limited to the scope of what she said on

6   direct and to what's relevant here.

7          MR. MADAIO:  I understand.

8   Q.  Professor Humphreys, you stated it would require a

9   reputation repair program costing upwards of $12 million to

10  repair Ms. Carroll's reputation, correct?

11  A.  Yes.

12  Q.  And on the low end in your report, you state that the

13  number could be 2.1 million on the low estimate.  Is that

14  correct?

15  A.  Yes, although I don't think that would lead to an effective

16  campaign in this case.

17  Q.  That's quite a large gap, 10 million.  You're not able to

18  narrow it any more than that?

19         THE COURT:  She already just did.  She said she

20  doesn't think 2 million would be adequate, and you said -- your

21  question was:  "You stated it would require a reputation repair

22  program costing upwards of 12 million to repair Ms. Carroll's

23  reputation?"  She answered.

24         MR. MADAIO:  Your Honor, I'm asking about her report.

25         THE COURT:  I know about the report.  I know what you

1    asked.  She said that she doesn't think 2.1 million would do

2    it.

3             MR. MADAIO:  I'd like to ask her if she's able to

4    narrow it down any more than $10 million.

5             THE COURT:  Well, the difference between 7 million and

6    12 million isn't 10 million.  Please go on.

7             MR. MADAIO:  Your Honor, I'm talking about the figures

8    in her report.

9             THE COURT:  That's what I'm talking about.

10            MR. MADAIO:  I'd like to ask her if she -- in terms of

11   narrowing down the $10 million figure in her report.

12            THE COURT:  Maybe we're talking about two different

13   10 million figures.  What are you talking about?

14            MR. MADAIO:  I'll move on, your Honor.

15            THE COURT:  You don't have to move on.  Maybe I made a

16   mistake.  If I've overlooked something, please tell me.

17   BY MR. MADAIO:

18   Q.  Professor Humphreys, in your report, you have your

19   reputational repair program on the low estimate is 2.1 million

20   and on the high estimate is 12.1 million.  Is that correct?

21   A.  That's correct, that's what's in my report.

22   Q.  That's essentially a $10 million gap from the low end to

23   the high end, right?

24   A.  Yes.

25   Q.  You're not able to narrow it down in your report anywhere

O1IQcar5                           Humphreys – Cross

1  from 2.1 million to 12.1 million any more narrow than that?

2  A.  As I said in my direct testimony, I don't believe one time

3  would be sufficient.  In my direct testimony, I was able to

4  narrow it down to between 7 and 12 million.

5  Q.  But when you wrote your report, you thought 2.1 million

6  might be acceptable?

7  A.  That's not correct.

8  Q.  Is that -- your report states 2.1 million as the low end of

9  your estimate, correct?

10 A.  Yes, I did provide that number as for reference.

11 Q.  Professor Humphreys, have you ever executed a reputational

12 repair program?

13 A.  I have not.

14 Q.  Do you have any real-world experience about aside from

15 being a professor?

16         MS. CROWLEY:  Objection.

17         THE COURT:  Sustained.

18 Q.  Your experience has been limited to being a professor or a

19 teacher.  Isn't that correct?

20         MS. CROWLEY:  Objection.

21         THE COURT:  Sustained.

22         MR. MADAIO:  Your Honor, it goes towards her

23 qualifications.

24         THE COURT:  Well, there was birth, adolescence,

25 education, jobs, that's all real-world experience.

1              MR. MADAIO:  Your Honor, I asked if she's had any

2    experience other than being a teacher or professor.

3              THE COURT:  No, you said real-world experience quite a

4    few times.

5              MR. MADAIO:  I believe that was the prior question,

6    your Honor.

7              THE COURT:  Ask a new question.

8    BY MR. MADAIO:

9    Q.  Dr. Humphreys, have you ever applied the methodologies

10   utilized in your report in the real world?

11   A.  No.  I teach students how to apply these methodologies.

12   Q.  And you're familiar with a reputational repair firm,

13   correct?

14   A.  With a firm?  Yes, I am.

15   Q.  And did you perform any sort of estimate or obtain any sort

16   of quote from a reputation repair firm to see what sort of cost

17   it would take to repair Ms. Carroll's reputation in this case?

18   A.  No, a campaign had not been initiated yet, so no, I

19   haven't.

20   Q.  And that's what reputation repair firms do, right, they

21   repair reputations for individuals?

22   A.  That's correct.

23   Q.  And in your experience, is $12 million a reasonable amount

24   that you would have to pay a reputation repair firm to repair

25   someone's reputation?

O1IQcar5                         Humphreys - Cross

1    A.  I would say for most -- of many campaigns, that's on the

2    low end.

3    Q.  In your experience, it cost 12 million -- you would have to

4    pay a firm $12 million to perform a campaign such as this?

5    A.  I know of other campaigns that have costed $50 million.

6    I've testified in a previous case about a campaign that would

7    cost $48 million.

8    Q.  Did that campaign involve Joe Rogan and Candace Owens?

9    A.  It might have.

10   Q.  Can you point to any specifics?

11        MS. CROWLEY:  Objection.

12        THE COURT:  I'll allow it.

13   A.  Specifics about what?

14   Q.  Any prior campaigns you're familiar with that cost upwards

15   of more than $10 million?

16   A.  Yes, of course.  There's a hedge fund manager recently who

17   said that he had spent $50 million on a campaign against a

18   company called Nutra-Life, for example.

19   Q.  And what was the issue there?

20   A.  I believe -- I'm only generally familiar with it, but I did

21   read an article that said it cost $50 million.  He, I believe

22   in that case, was trying to send negative messages against

23   Nutra-Life.

24   Q.  This wasn't part of your research; this was an article you

25   read in leisure?

O1IQcar5                          Humphreys - Cross

1    A.  This was an article that came across my newsfeed.

2    Q.  Did you perform any analysis of what Ms. Carroll's

3    reputation was before June 2019?

4    A.  Yes.

5    Q.  And you stated she was a celebrated journalist **at** *Elle*

6    magazine, right?

7    A.  Yes.

8    Q.  Among other things?

9    A.  Among other things.

10   Q.  And you represented that Ms. Carroll reached about

11   4.5 million readers during her time at *Elle*, right?

12   A.  Yes, that's the number that *Elle* gives for its circulation.

13   Q.  Okay.  And that number, the 4.5 million, that's from your

14   report, right, or you cite that in your report, correct?

15   A.  I do, yeah.

16   Q.  And in your report, you also state that you weren't able --

17   you were unable to find readership data prior to 2020.  Isn't

18   that correct?  I can refresh your recollection.

19   A.  If you tell me what page.  I don't argue with you.  What

20   page is it?

21   Q.  It's footnote 136.

22            THE COURT:  What document, please?

23            MR. MADAIO:  It's the October 14, 2022 report.

24            THE COURT:  Plaintiff's 202.  What's the footnote?

25            MR. MADAIO:  Footnote 136, which is page 41.

O1IQcar5                    Humphreys - Cross

1           THE COURT:  Is there a question?

2           MR. MADAIO:  Yes.

3   BY MR. MADAIO:

4   Q.  Professor Humphreys, you're aware that Ms. Carroll was no

5   longer working for *Elle* as of December or as of 2018, correct?

6   A.  I'm not sure of the exact date, but I am aware that she

7   stopped working for *Elle* at some point.

8   Q.  Okay.  So ultimately you weren't able to find any

9   readership data for the time that she actually worked at *Elle*,

10  right?

11  A.  So I'm a professor in journalism school.  I am aware that

12  readership has declined over time, so I would estimate that in

13  2018, if anything, *Elle* had more readers than 4.5 million.

14  Q.  But you didn't find any data specific to Ms. Carroll in the

15  readership that she had?

16  A.  I pulled the number that I had available to me.  That was

17  the closest to the time period at hand.

18  Q.  I don't think that was responsive to my question.

19  A.  I'm sorry, what was the question?

20  Q.  You never reviewed any data that is specific to Ms. Carroll

21  and her readership, right?

22          MS. CROWLEY:  Objection to form.

23          THE COURT:  Overruled.

24  A.  So given that Ms. Carroll wrote for the magazine *Elle*, the

25  way that you would estimate her readership in my field is to

1    use the readership of the magazine.

2    Q.  But you have no way of knowing what Ms. Carroll's actual

3    readership was?

4    A.  To my knowledge, there's no finer grain data available to

5    me.

6    Q.  And in your reputation repair program, you talk about

7    social media influencers sending positive messages as a way of

8    repairing Ms. Carroll's reputation.  Do you really think that

9    positive message from social media influencers will have a

10   positive impact on her reputation?

11   A.  As part of a larger reputational repair campaign, I do.

12   Q.  And you stated earlier that you would have influencers say

13   positive things about Ms. Carroll's books and messages like

14   that to help her reputation, right?

15   A.  That's one example.  I'm sure there could be many different

16   messages you could send.

17   Q.  You think that will help repair her reputation to the

18   extent that people believe she's a liar?

19   A.  Yes, I do.

20   Q.  Positive messages about her book?

21   A.  Yes.  These types of positive messages have been shown to

22   affect the attitudes of an audience over time, yes.

23   Q.  So you believe that -- that positive message relating to

24   her book would make them believe she's not a liar -- withdrawn.

25           Do you think Ms. Carroll's numerous media appearances

O1IQcar5                          Humphreys – Cross

1    have helped her reputation?

2               MS. CROWLEY:  Objection.

3               THE COURT:  What's the ground?

4               MS. CROWLEY:  Outside the scope of her report.

5               (Reporter inquires)

6               MS. HABBA:  Hi.  Ms. Habba.  I don't have realtime.

7    The realtime stopped.  Anyway, I couldn't here what Ms. Crowley

8    said.

9               THE COURT:  Ms. Crowley, would you speak a little more

10   loudly so Ms. Habba can hear you.

11              MS. CROWLEY:  I apologize.  I said objection.  Outside

12   the scope of her report.

13              MS. HABBA:  It just downloaded.  Thank you.

14              THE COURT:  Overruled.

15   A.  Would you mind reading back or repeating?

16              MR. MADAIO:  Your Honor, could we have a readback?

17              THE COURT:  Please read it back.

18              (Read back)

19   A.  It depends amongst who the target audience is for those

20   messages.

21   Q.  And earlier when you were testifying about the reputation

22   repair program, you testified it would need to be someone like

23   Joe Rogan or Candace Owens to repair Ms. Carroll's reputation,

24   correct?

25   A.  Those are two examples of sources that you might use, yes.

O1IQcar5                          Humphreys - Cross

1    Q.  And, in fact, you said that you would need to effectively

2    promote her reputation up to -- they would have to relay these

3    messages up to five times, right?

4    A.  Yes, that's one potential campaign.

5    Q.  And your plan is to target Trump supporters to project

6    these messages to, correct?

7    A.  Not exactly.  The plan would be to target these receptive

8    Republicans, people who were receptive to Mr. Trump's claims,

9    so, yes.

10   Q.  Are you suggesting that Ms. Carroll would actually hire or

11   would be able to actually hire Joe Rogan or Candace Owens to

12   perform this reputation repair program?

13   A.  You might have to ask them.  I did not ask them in my work.

14   Q.  Would you consider whether it's a possibility?

15   A.  Yes, I know it's a possibility to hire these two

16   individuals to share messages for payment.

17   Q.  Do you know any other celebrities who would do these type

18   of repair reputation programs that they're paid to do?

19   A.  I'm sorry, could you say it again?

20   Q.  Do you know any other celebrities who are paid to do these

21   type of reputation repair programs?

22   A.  So you mean influencers?  Are there other influencers?

23   Q.  Influencers, celebrities, anybody with a large public

24   profile.

25   A.  Yes.  So influencers exist in many different categories.

1   There are influencers in the political space in both the left

2   and the right.

3   Q.  Did you ever contact Joe Rogan and Candace Owens to see if

4   it would be possible for them to perform this reputational

5   repair program?

6            THE COURT:  She already testified that she didn't.

7   Q.  Professor Humphreys, can you honestly say that your damages

8   model is an accurate designation of the real-world harm that

9   was caused by president Trump's response to Ms. Carroll's

10  accusation?

11           MS. CROWLEY:  Objection to form.

12           THE COURT:  Sustained as to form.

13  Q.  Does your damages model account for real-world harm to

14  Ms. Carroll's reputation?

15           MS. CROWLEY:  Objection to form.

16           THE COURT:  Sustained.

17  Q.  Didn't your damages model contain millions of dollars'

18  worth of supposed damages which you now admit were not actually

19  attributable to harm to Ms. Carroll's reputation?

20  A.  So in this case I did do an initial analysis, and I did a

21  supplementary analysis in which I removed consideration of one

22  statement in this case.

23  Q.  When you removed those statements -- withdrawn.

24           Of the media sources that you removed which were

25  connected to the June 24 statement in your supplemental report,

O1IQcar5                         Humphreys – Cross

1    some of those statements that you removed didn't actually cause

2    harm to Ms. Carroll's reputation, correct?

3              MS. CROWLEY:  Objection.

4              THE COURT:  Sustained.

5    Q.  Professor Humphreys, you had a team that helped you compile

6    and organize the data contained in your expert report, right?

7    A.  That's correct.

8    Q.  And that's Voluble Insights?

9    A.  Yes.

10   Q.  And Voluble Insights helped you prepare your initial

11   report, right?

12   A.  Yes.

13   Q.  And what was their role for the initial report?

14   A.  So the team was helpful in helping me collect the data and

15   putting it in a spreadsheet, in some cases cleaning it, and do

16   other things at my direction.

17   Q.  And they also helped you prepare your supplemental report,

18   right?

19   A.  That's correct.

20   Q.  And was it essentially the same role?

21   A.  Yes.

22   Q.  And you reviewed their work?

23   A.  Yes.

24   Q.  And you are confident that the numbers in both of your

25   reports are accurate?

O1IQcar5                          Humphreys – Cross

1    A.  Yes.  I mean I, of course, reserve the right to reconsider,

2    but yes.

3    Q.  And you're confident that the millions of dollars you claim

4    Ms. Carroll is entitled to is supported by those numbers,

5    right?

6    A.  Yes.

7    Q.  And, Dr. Humphreys, your impressions model includes

8    television programs, right, as one of the categories?

9    A.  Yes.

10   Q.  And for each television program, you include a ratings

11   estimate, right?

12   A.  That's correct.

13   Q.  And the ratings estimate is an estimate for the number of

14   people who viewed a particular broadcast, right?

15   A.  That's correct, the number is provided by Nielsen in most

16   cases.

17   Q.  And the ratings estimate is the same as the total number of

18   impressions that you assign to each television program, right?

19   A.  Yes.

20   Q.  So, in other words, in your damages model, the ratings

21   estimate for television program should always match up with the

22   total number of impressions for that program, right?  It's a

23   one-to-one ratio?

24   A.  Yes.

25   Q.  Okay.  So I'd like to look at an example.  Nate, can you

O1IQcar5                         Humphreys - Cross

1    pull up page 108 of the October 14, 2022 report.

2               MR. MADAIO:  And I'd like to enter this as a

3    demonstrative.

4               MS. CROWLEY:  Objection your, Honor.  This is the

5    original report.  She is here to testify about the damages

6    numbers from the supplemental report.

7               MR. MADAIO:  Every single -- every single item that I

8    am going to go through is included in the supplemental report.

9               THE COURT:  Then why don't we deal with the

10   supplemental report?

11              MR. MADAIO:  I need to reference both for the purposes

12   of this line of questioning.

13              THE COURT:  How is this a demonstrative?

14              MR. MADAIO:  I can just go through the questions, your

15   Honor.  I don't have to show the exhibit.

16              THE COURT:  You don't what?

17              MR. MADAIO:  I don't need to show it to the jury.  I

18   can just go through the questions.

19              THE COURT:  Go ahead.

20   BY MR. MADAIO:

21   Q.  Professor Humphreys, let's look at T27 in your impressions

22   model.  So this broadcast has a ratings estimate of 833,000

23   according to your report, right?  And that's *CNN Tonight* with

24   Don Lemon?

25   A.  Yes.

O1IQcar5                         Humphreys - Cross

1    Q.   If we look at your supplemental report -- which, Nate, can

2    you pull up the supplemental report, page 30?

3              THE COURT:   What is the exhibit number?

4              MR. MADAIO:   That is DX-96.

5    Q.   We are looking at page 30 of your supplemental report, you

6    have identified T27.  And that has the same amount of

7    impressions 833,000, right?

8    A.   Yes.  If it would be possible if there are more questions,

9    could I have a copy, a paper copy of the supplement?

10             MR. MADAIO:   Yes.

11             MS. CROWLEY:   Your Honor, I understand Mr. Madaio

12   intends to ask Professor Humphreys about a TV appearance that

13   was removed from the supplemental report.  I think he agrees

14   with me it's removed, so I'm not sure what the relevance is

15   here.

16             MR. MADAIO:   Your Honor, I think this is the only one

17   that actually was removed.  I can move on to the next ones.

18   I'm going to hand Professor Humphreys her report so she can

19   reference it.

20             THE COURT:   You are giving her now Defendant's 96 for

21   identification?

22             MR. MADAIO:   Yes, DX-96, it's the supplemental report.

23             THE COURT:   Okay.

24   Q.   Professor Humphreys, I want to do a different example.

25   Let's go back to your initial report, page 105.

O1IQcar5                         Humphreys – Cross

1            THE COURT:  We are now back on Plaintiff's 202.

2            MR. MADAIO:  That's right, Plaintiff's 202.

3   Q.  Do you see what's been identified as T1 in your report?

4   A.  Yes.

5   Q.  That's *Anderson Cooper 360*, which was aired June 21, 2019,

6   right?

7   A.  Yes.

8   Q.  You had the ratings estimate as 877,000 views, right?

9   A.  That's correct.

10  Q.  In your supplemental report, the impressions for T1 should

11  be 877,000, right?

12  A.  For total impressions, I would assume it would be.  We can

13  look.

14  Q.  Let's look at your supplemental report at page 29, DX-96.

15  Can you tell me what the total impressions estimate is for T1?

16  A.  So in this chart, it is -- total impressions would be 9.3

17  and receptive is 2.4.

18  Q.  So the total impressions is almost 9.4 million?

19  A.  That's correct.

20  Q.  But in your impressions model, it's 877,000?

21            MS. CROWLEY:  Objection.  There's a difference between

22  ratings and impressions.

23            MR. MADAIO:  She testified that there is not.

24            THE COURT:  I don't think that's what she said, but

25  you can ask her.

Q.   Professor Humphreys, is there a difference between ratings

estimate and total impressions for television?

A.   In this case we did use the ratings to measure viewers, to

measure impressions.

Q.   So ratings estimate should always equal total impressions,

right?

A.   That's correct.  However, as I understand, there were some

labeling issues.  This might be attributable to that.

Q.   Okay.  But to be clear, in your initial -- in your

impressions model, your ratings estimate for this program is

877,000, and in your damages model, the total impressions is

almost 9.4 million?

            THE COURT:  If they're the same thing.

            MR. MADAIO:  I'm asking her if they are.

A.   So I believe — and this is regarding the labeling issue —

Those are the ratings for another program.  It's probably T46,

*ABC World News Tonight* with David Muir.  It's the same number.

Q.   It's labeled the T1?

A.   In the supplemental report, it's labeled as T46.

Q.   I'm talking about T1 on the supplemental report.

A.   Yes, I see that.

Q.   So the 9.4 million number that I'm talking about is for T1

on the supplemental report, not T46, right?

A.   I see.  Yes, that's correct, but I believe the labels do

not correspond exactly.

O1IQcar5                              Humphreys - Cross

```
1    Q.   Why is that?

2    A.   I think we've discussed this previously.  There were two

3    cases where just the labels are different.  The overall numbers

4    are not affected at all.

5    Q.   So when you identified these programs in your initial

6    report and then you carried them over to the supplemental

7    report, is there any reason you would have changed the

8    identifier?

9    A.   I'm not sure why the identifier would be changed, but the

10   overall numbers are the same.  It didn't affect our total

11   numbers.

12   Q.   Are you able to identify -- well, you stated that the T1

13   here you believe is T46.  What makes you believe that this is

14   T46?

15   A.   It's T46 in the original report.  It's the same ratings

16   estimate, 4,390,000.

17   Q.   So is that a mistake when you carried it over from the

18   original report to the supplemental report?

19   A.   That's correct, I believe this to be a labeling mistake.

20   Q.   I'd like to -- can we go back to the initial report, page

21   105.  What's been identified as T3, that's *Cuomo Prime Time*,

22   which aired June 21, 2019.  The ratings estimate for this one

23   is 936,000, correct?

24   A.   Yes.

25   Q.   In your supplemental report in the damages model, the
```

O1IQcar5                          Humphreys – Cross

1    impression should be 936,000 right?

2    A.   Correct.

3    Q.   Okay.  Let's pull up the supplemental report, page 29.

4    That's DX-96.  And T3.  Can you tell me what the impressions

5    are for T3?

6    A.   That would be 1.5 million and 241 receptive impressions.

7    Q.   So that 1.5 million is more than the 936,000 in your

8    initial report, correct?

9             MS. CROWLEY:  Your Honor, Professor Humphreys has

10   testified that the actual number --

11            MS. HABBA:  Is that an objection?  Sorry, your Honor.

12   She is just speaking for the witness.

13            THE COURT:  Counsel?

14            MS. CROWLEY:  Your Honor, objection.

15            Professor Humphreys has testified that there was a

16   difference in the labels that were given to each of the sources

17   from the original report to the supplemental report.  However,

18   the numbers, the rating numbers are the same.

19            MS. HABBA:  That's not an objection.  Your Honor that

20   was not an objection.  That was her trying to correct her

21   witness.

22            THE COURT:  Ms. Habba, sit down, please.  Mr. Madaio

23   will defend himself.

24            MR. MADAIO:  Your Honor, she hasn't given a valid

25   objection.  She is trying to testify for her witness.

O1IQcar5                    Humphreys - Cross

1          THE COURT:  Mr. Madaio, listen to the testimony and

2    let's move on.

3          MR. MADAIO:  Your Honor, I'd like to walk through

4    several of these examples.  I believe it's very relevant.

5          THE COURT:  Well, I understand, so keep on walking.

6    BY MR. MADAIO:

7    Q.  I'd like to point you back to the initial report, page 106.

8    I believe that's PX-202.  And if you could look at T9, which is

9    *CNN Newsroom Live*, which aired June 22, 2019, and the ratings

10   estimate is 628,000, correct?

11   A.  That's correct.

12   Q.  So in your supplemental report in the damages model, the

13   impression should be 628,000, right?

14   A.  Yes.  So I would just point you, again, this is a labeling

15   error.  If you look at T18, that's the same program.

16   Q.  How do you know that it's T18?

17   A.  It just is the same.  It's the same number.  There's just a

18   labeling error.

19   Q.  So there -- let me ask you, what is the -- what are the

20   impressions for T9 in the supplemental report?

21   A.  For T9, the impressions is 839,000.

22   Q.  And, again, that's more than the 628,000 for the ratings

23   estimate in your initial report, right?

24   A.  Yes.  And, again, the label that I pointed you to is the

25   correct number.

1              MR. MADAIO:  I move to strike as non-responsive.

2              THE COURT:  Overruled.

3              Is the bottom line here, Professor, that the TV shows

4      listed in the impressions model in your original report,

5      Plaintiff's Exhibit 202, numbered from T1 to whatever the

6      highest number was, when you eliminated certain items in

7      preparing the supplemental report, the T numbers used in the

8      appendix to the supplemental report are not the same T numbers

9      that were used in the original report in some or all cases.  Is

10     that right?

11             THE WITNESS:  That's correct, the labeling is

12     different.

13             THE COURT:  And why is that so, if you can tell the

14     jury?

15             THE WITNESS:  So I don't know why the labels are

16     different.  I can tell you what I'm doing, which is I'm looking

17     at the same ratings number, and I'm finding it in the

18     supplemental analysis in every case.  So it doesn't affect the

19     overall numbers.  The labels may be different, but it's not a

20     material difference.

21     BY MR. MADAIO:

22     Q.  Professor Humphreys, did you review the supplemental report

23     before you submitted it?

24     A.  Yes.

25     Q.  Did you notice any discrepancies with the initial report?

O1IQcar5                        Humphreys - Cross

1   A.  I obviously didn't check the labels because they're not

2   accurate.

3   Q.  Okay.  Well, I'd like to keep going through these examples.

4   Let's pull up the page 107 of the October 12 report T16.

5   That's *CNN Newsroom* with Fredricka Whitfield, which aired

6   June 22, 2019.  And your ratings estimate for that is NA,

7   correct?  Which I believe you count as zero?

8   A.  That's correct.

9   Q.  Okay.  So the impressions in your supplemental report

10  should be zero, right?

11          MS. CROWLEY:  Objection.  Cumulative.

12          THE COURT:  Overruled.

13  A.  Given the labeling error, I don't expect a correspondence

14  here.

15  Q.  So you don't expect that your supplemental report and your

16  initial report are consistent, the numbers are consistent?

17  A.  The labels are not consistent.

18  Q.  So you don't expect that the ratings estimate matches up

19  with the impressions?

20          MS. CROWLEY:  Objection.  Asked and answered.

21          THE COURT:  Sustained.

22  Q.  Can you tell me -- I'd like to turn to the supplemental

23  report, page 30.  Can you tell me what the impressions estimate

24  is for T16?

25  A.  T16 in this report is 2.7 million.

O1IQcar5                           Humphreys - Cross

1    Q.   Okay.  And that's not the same as the zero in the initial
2    report, right?
3    A.   That's correct, it's a different label.
4    Q.   Okay.  And then I'd like to go to page 110 of the
5    supplemental report, and if you look at T35?
6    A.   T35.  Sorry, in the original or the supplemental?
7    Q.   T35 in the original report is 110.
8              MS. CROWLEY:  Objection.  T35 was removed from the
9    supplemental report.
10             THE COURT:  I haven't heard a question yet.
11   Q.   The ratings estimate for T35 is NA, which is equivalent to
12   zero, right?
13   A.   That's correct.
14   Q.   So, again, you would expect the ratings -- the impressions
15   in the supplemental report to be zero, right?
16             MS. CROWLEY:  Objection.  T35 is not in the
17   supplemental report.
18             MR. MADAIO:  That's incorrect, your Honor.
19             THE COURT:  Show me how it is.
20   BY MR. MADAIO:
21   Q.   Can we go to the supplemental report, page 30, T35.  If you
22   notice next to removed, Professor Humphreys, there's no X next
23   to removed, right, which means it was not removed from the
24   report.
25             THE COURT:  Assuming it's the same thing.

O1IQcar5                        Humphreys - Cross

1    Q.  Well, is it the same thing, Professor Humphreys?

2    A.  It's not.  The labels don't correspond, so you wouldn't

3    expect a correspondence here between the two reports, but you

4    will find -- what I'm doing is just looking up the rating 3.92,

5    and you will find it in this list of programs.  It corresponds.

6    Q.  Just to be clear, this is an error, the fact that it

7    doesn't correspond?

8    A.  Yes, it is.

9            MS. CROWLEY:  Objection.  Asked and answered.

10           THE COURT:  Yes, it has been.  It's a labeling error.

11   She said it over and over and over again.

12   Q.  Professor Humphreys, what else didn't you check in your

13   reports?

14   A.  I checked through everything.

15   Q.  And you didn't notice that the vast majority of your

16   numbers are mislabeled and don't carry over, what you described

17   as an error?

18   A.  I wouldn't characterize that as the vast majority.

19   Q.  I can keep going if you'd like.

20           MS. CROWLEY:  Objection.

21           THE COURT:  You want to take everybody's time with

22   this, go right ahead.

23   Q.  I'd like to show you page 110 of the initial report, T37,

24   and that's *First Look* which aired June 24, correct?

25   A.  Give me one moment.  This is in the original report?

O1IQcar5                          Humphreys - Cross

1    Q.  This is the original report, page 110?

2    A.  And the program is the *Last Word*?

3    Q.  The program is *First Look*.

4    A.  Oh, *First Look*.

5    Q.  T37?

6    A.  Gotcha, yep.

7    Q.  The ratings estimate is 385,000, right?

8    A.  That's correct.

9    Q.  And then can we turn to page 30 of the supplemental report.

10   And T37, can you tell me what the impressions estimate is?

11   A.  It is 1.4.  I believe you'll find that one is T33.

12   Q.  And that's 1.4 million, right, for the impressions

13   estimate?

14   A.  That's right, you'll see the correct one as T33.

15           MR. MADAIO:  Let me strike that as non-responsive,

16   please.

17           THE COURT:  Overruled.

18   Q.  And, again, so the 1.4 million impressions is not the same

19   as the 385,000 ratings estimate, right?

20   A.  That's correct.  The correct number occurs at T33.

21   Q.  I'd like to go to page 110.

22           THE COURT:  Let me see if we can't short-circuit this

23   a little.  Do you have a Plaintiff's 202 up there?

24           THE WITNESS:  The original report?

25           THE COURT:  Yes.

O1IQcar5                         Humphreys - Cross

1              THE WITNESS:  Yes.

2              THE COURT:  Turn to page 106 -- sorry -- 105, which is

3     headed Appendix F, TV Impressions Model.  That lists every

4     single television show that was included in your original

5     report analysis from T1 to T47, yes?

6              THE WITNESS:  Yes.

7              THE COURT:  And in the ratings estimate column next to

8     each listing is a footnote, correct?

9              THE WITNESS:  That's correct.

10             THE COURT:  And the footnote gives the source with a

11    viewers resource locator, in other words, a URL on the

12    internet, yes?

13             THE WITNESS:  Yes, that's correct.

14             THE COURT:  And if you click on those URLs, you can

15    actually watch the TV show that is included on each line here,

16    yes?

17             MR. MADAIO:  Your Honor -- I would like to continue my

18    line of questioning.

19             THE COURT:  I'm sure you would.  You will have the

20    opportunity.

21             Is that correct?

22             THE WITNESS:  I believe so, yes.

23             THE COURT:  Right.  And so there is available to

24    anybody who cares to check Appendix F in your original report

25    the ability to see definitively which TV show is on which line.

O1IQcar5                        Humphreys – Cross

1    Isn't that true?

2                THE WITNESS:  That's correct.  All the television

3    shows I provided URLs for all of them in my report.

4                THE COURT:  Now, in your supplemental report, there is

5    no comparable Appendix F.  There are no footnotes as to what's

6    on each line, right.

7                THE WITNESS:  That's correct.

8                THE COURT:  Any particular reason for that?

9                THE WITNESS:  No, there's not.

10                THE COURT:  Go ahead.

11   BY MR. MADAIO:

12   Q.  Professor Humphreys, did you click through every single

13   link when you were preparing your supplemental report?

14   A.  I personally did not.  I had someone check that.

15   Q.  And did you review their work?

16   A.  Yes, I did my best to review their work.

17   Q.  And you're confident that they did their work competently?

18   A.  Yes, I trust them to do their work.

19   Q.  Despite the numerous errors that we've discussed here?

20   A.  There is a labeling error.

21   Q.  Professor Humphreys, you have a Twitter account, don't you?

22   A.  I do.

23   Q.  Do you mind sharing your Twitter handle?

24   A.  Sure.  It's Profhumphreys.

25   Q.  And that Twitter account was public until recently, right?

01IQcar5                          Humphreys - Cross

1   A.  Yes.

2   Q.  As a matter of fact, just a few weeks ago, right?

3   A.  That's correct.

4   Q.  And that account is now private, isn't it?

5   A.  That's correct.

6   Q.  Why did you make it private?

7   A.  I had a few high-profile trials upcoming.  I thought it

8   best, given what I've seen on social media, to make it private.

9   Q.  So you were worried about increased attention you might

10  receive from testifying in a high-profile case.  Is that

11  correct?

12  A.  Yes, I thought it best to make it private.

13  Q.  Because you knew the natural consequence of that would be

14  some negative backlash from the internet, right?

15  A.  I mean, in general I just thought it was best to not

16  receive input from others on my Twitter.

17  Q.  And by making it private, those people who want to say

18  nasty things to you can't do that, right?

19          MS. CROWLEY:  Objection, your Honor.

20          THE COURT:  Sustained.

21  Q.  And all Twitter users have the ability to make their

22  accounts private, right?

23          MS. CROWLEY:  Objection, your Honor.

24          THE COURT:  Sustained.

25  Q.  Including E. Jean Carroll?

1           THE COURT:  And far beyond the scope of direct.

2           MR. MADAIO:  That's all I have, your Honor.

3           THE COURT:  Any redirect?

4           MS. CROWLEY:  I'll be brief, your Honor.

5    REDIRECT EXAMINATION

6    BY MS. CROWLEY:

7    Q.  Professor Humphreys, you were just asked for quite some

8    time about two charts:  One from your original report and one

9    from your supplemental report.  Do you recall those questions?

10   A.  Yes.

11   Q.  And you were asked to compare several times TV programs

12   that were listed in your original report and then again listed

13   in your supplemental report, correct?

14   A.  Correct.

15          MS. HABBA:  Objection, your Honor.  Didn't you go

16   through this?

17          THE COURT:  Ms. Habba, it's Mr. Madaio's witness.

18          MS. HABBA:  Okay.  You have the mic, go ahead.

19          MR. MADAIO:  Your Honor, I do think this issue was

20   already discussed at length with the witness.

21          THE COURT:  What makes you think, or do you have any

22   legal authority to suggest, that on redirect the attorney can't

23   go into a subject that was the subject of the

24   cross-examination?  Do you have any authority for that?

25          MR. MADAIO:  The objection is overruled, I'll sit

1   down.

2           THE COURT:  Well, I guess since there's no authority

3   for it, it's overruled.

4   Q.  I believe you testified that when you were asked to prepare

5   the supplemental report, you removed certain TV broadcasts and

6   news articles and other pieces that referenced Donald Trump's

7   June 24th statement, correct?

8   A.  That's correct, I removed one set exclusively referred to

9   his statement.

10  Q.  As a result of removing those articles and TV broadcasts,

11  did the numbers in the charts we just discussed change the

12  numbers -- the labels of those sources change?

13  A.  Yes, the labels are different from the original report and

14  the supplemental report.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MS. CROWLEY:

2   Q.  You were asked about ratings and impressions numbers tied

3   to each of the TV broadcasts that you considered in the

4   original and supplemental report, correct?

5   A.  That's correct.

6   Q.  For the TV broadcasts that you considered in both the

7   original and supplemental report, did those ratings and

8   impressions numbers change, or did they stay the same?

9   A.  They stayed the same.

10  Q.  Was there any error in your supplemental report with

11  respect to the ratings numbers and the impressions numbers for

12  those broadcasts?

13  A.  No.

14  Q.  The only error was to how they were labeled, correct?

15  A.  That's correct.

16  Q.  Now, you were also asked certain questions about figures

17  that I believe you called word clouds?

18  A.  Yes, that's right.

19  Q.  And if we could just put those up on the screen, I believe

20  it's Plaintiff's Exhibit 202, figure eight.

21          You testified that these word clouds were from before

22  June 2019 and after June 2019, correct?

23  A.  That's right.

24  Q.  And if we can look at the bottom figure.

25          When did you run this word cloud?

1  A.  I believe it was after Ms. Carroll had filed her lawsuit.

2  Q.  After the lawsuit had been going on for a while?

3  A.  That's correct.

4  Q.  After there had been many events in the lawsuit?

5  A.  That's correct.

6  Q.  Including then president Trump's attempt to get the Justice

7  Department to intervene in this lawsuit?

8  A.  Yes.

9  Q.  Is that why you see many words both big bolded words that

10  say things like department and justice and court?

11  A.  Very likely.

12        So these are from news articles, and because of the

13  routines of news reporters, they tend to cover in the news

14  official proceedings, and so that is what you will see here.

15  Q.  Now, I believe that you said in response to Mr. Madaio's

16  questions that these word associations were just one source

17  that you reviewed when you were conducting your impact

18  analysis, correct?

19  A.  That's right.

20  Q.  What were the other sources that you considered?

21  A.  I considered comments that appeared directly underneath the

22  news articles that I studied, I considered the tweets that were

23  connected to the news articles, I considered other social media

24  content from Twitter and from Facebook.

25  Q.  Now, Dr. Humphreys, you were asked a couple questions on

1    cross about whether you have ever yourself executed a

2    reputation repair campaign.

3            Do you recall that?

4    A.  Yes.

5    Q.  And I believe you said that you haven't yourself, but

6    you've taught some?

7    A.  Correct.

8    Q.  In teaching and studying reputation repair campaigns, are

9    you familiar with campaigns that have actually been run?

10   A.  Yes.

11   Q.  Are those campaigns that you teach your students about?

12   A.  Yes.

13   Q.  And are those students, do those students then go on to

14   actually execute reputation repair campaigns?

15   A.  Yes.  I have quite of a few students that now work in

16   public relations and do these kind of campaigns routinely.

17   Q.  Can you tell us some of the reputation repair campaigns

18   you're familiar with that have actually been executed?

19   A.  Sure.  I mean, there are some well-known ones.  Martha

20   Stewart, for example, hired a firm to repair her reputation

21   after the insider trading scandal, and that is regarded as

22   successful.  There is a number of others.  Hugh Grant, I

23   remember.

24           There are more recent examples of using influencers in

25   these types of strategies.  Justin Beiber, for instance,

O1IsCAR6                          Humphreys – Redirect

1  constructed one of these in 2015.  I believe Taylor Swift has

2  done this as well.

3  Q.  Professor Humphreys, you were asked a number of questions

4  by Mr. Madaio about whether you looked at the harm that may

5  have been caused to Ms. Carroll's reputation by her own

6  allegation.

7          Do you recall that question?

8  A.  Yeah.

9  Q.  In your opinion, did the harm to Ms. Carroll's reputation,

10  was that a result of Ms. Carroll making an allegation against

11  Donald Trump?

12  A.  No.

13  Q.  What do you think caused the harm to Ms. Carroll's

14  reputation?

15  A.  From what I've seen, it was the claim that she was a liar,

16  that she had a political agenda, that she was working with the

17  democratic parties.  These were the associations that harmed

18  her reputation.

19  Q.  And who made that claim?

20  A.  Mr. Trump, the defendant.

21          MS. CROWLEY:  One moment, your Honor.

22          (Counsel confer)

23          Nothing further.

24          THE COURT:  Thank you.

25          Mr. Madaio, anything else?

```
1           MR. MADAIO:  Just a few more questions, your Honor.
2    RECROSS EXAMINATION
3    BY MR. MADAIO:
4    Q.  Professor Humphreys, you didn't know about this, as you
5    call it, labeling error before today, right?
6    A.  Um, I believe we were -- I was contacted about a similar
7    error a couple days ago.
8    Q.  Who were you contacted by?
9    A.  Um, I believe I was asked via e-mail about the issue.
10   Q.  Was that by Ms. Carroll's counsel?
11   A.  Yes.
12   Q.  And if you didn't know about this error until, you know, a
13   couple days ago, at most, how can you be confident there is no
14   errors in the report?
15   A.  I checked the reports thoroughly.  What I've seen here is
16   that there was simply a difference in the label and not the
17   actual numbers.
18   Q.  Again, you never saw this error, despite all the time and
19   money you were paid to prepare this report, and you submitted
20   the report and you never noticed it before then?
21           MS. CROWLEY:  Objection to form and asked and
22   answered.
23           THE COURT:  Sustained.
24   Q.  You just testified about a reputational repair campaign
25   involving Martha Stewart.
```

01IsCAR6                          Humphreys – Recross

1          How much did Martha Stewart spend on her campaign?

2     A.   You know, I don't know that.  I don't know right now.

3     Q.   How much did Justin Beiber spend on his campaign?

4     A.   I don't know that number.

5     Q.   What about Taylor Swift?

6     A.   Typically celebrities don't share those kinds of --

7     Q.   That's not the question, Professor Humphreys.

8     A.   That information is not available to me.

9     Q.   And do you know whether those campaigns were successful?

10    A.   Those were all widely regarded as successful campaigns,

11    yes.

12    Q.   But, again, you don't know how much they cost?

13              THE COURT:  Sustained.

14              MR. MADAIO:  That's all I have, your Honor.

15              THE COURT:  Anything else, Ms. Crowley?

16              MS. CROWLEY:  No, your Honor.

17              THE COURT:  All right.

18              Ladies and gentlemen, enjoy the weekend.  See you 9:30

19    Monday morning, and have a good one.  Stay warm.

20              (Adjourned to January 22, 2024, at 9:30 a.m.)

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                           Page

 3    E. JEAN CARROLL

 4   Cross By Ms. Habba . . . . . . .272

 5   Redirect By Ms. Kaplan . . . . .338

 6   Recross By Ms. Habba . . . . . .349

 7    ASHLEE HUMPHREYS

 8   Direct By Ms. Crowley  . . . . .358

 9   Cross By Mr. Madaio  . . . . . .409

10   Redirect By Ms. Crowley  . . . .490

11   Recross By Mr. Madaio  . . . . .496

12                    PLAINTIFF EXHIBITS

13   Exhibit No.                           Received

14    202 - figures eight and nine on page 44  . . 427

15    202 figure 12   . . . . . . . . . . . . . . 452

16                    DEFENDANT EXHIBITS

17   Exhibit No.                           Received

18    65   . . . . . . . . . . . . . . . . . . 284

19    66   . . . . . . . . . . . . . . . . . . 285

20    67   . . . . . . . . . . . . . . . . . . 286

21    69   . . . . . . . . . . . . . . . . . . 288

22    70   . . . . . . . . . . . . . . . . . . 290

23    71   . . . . . . . . . . . . . . . . . . 293

24    84   . . . . . . . . . . . . . . . . . . 311

25    85   . . . . . . . . . . . . . . . . . . 313
</pre>

1   86   . . . . . . . . . . . . . . . . . . . 315

2   87   . . . . . . . . . . . . . . . . . . . 316

3   31   . . . . . . . . . . . . . . . . . . . 326

4   32   . . . . . . . . . . . . . . . . . . . 329

5   34   . . . . . . . . . . . . . . . . . . . 332

6

7

8

9

10

11

12          I hereby certify that the foregoing is a true and

13   accurate transcript, to the best of my skill and ability, from

14   my stenographic notes.

15

16

17

18   _____

19          Official Court Reporter
            U.S. District Court

20

21

22

23

24

25