O1PQcar1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

E. JEAN CARROLL,

                    Plaintiff,

          v.                          20 CV 7311 (LAK)
                                            Trial
DONALD J. TRUMP, in his
personal capacity,

                    Defendant.

------------------------------x
                                      New York, N.Y.
                                      January 25, 2024
                                      9:50 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                      District Judge
                                       -and a Jury-
                    APPEARANCES

KAPLAN HECKER & FINK LLP
     Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
     SHAWN G. CROWLEY
     MATTHEW J. CRAIG
     JOSHUA MATZ

HABBA MADAIO & ASSOCIATES LLP
     Attorneys for Defendant
BY:  ALINA HABBA
     MICHAEL T. MADAIO
     PETER SWIFT
     PETER GABRA

O1PQcar1

1                    (Trial continued; jury not present)

2                    THE COURT:  Good morning.  Let's bring in the jury.  I

3       will just mention that in a superabundance of caution, the

4       jurors in seats 2 and 3 are going to be socially distanced from

5       the others and sit in a different row for today.  Okay.

6                    MS. KAPLAN:  Your Honor, okay to put the witness on

7       the stand?

8                    THE COURT:  You're calling a new witness, right?

9                    MS. KAPLAN:  Yes, one more witness.

10                   THE COURT:  Yes.

11                   (Jury present)

12                   THE COURT:  Good morning, folks.  Hope everybody is

13      feeling fit today.

14                   Ms. Carroll formally call your witness who is now

15      sitting on the witness stand.  Or Mr. Craig.

16                   MR. CRAIG:  Plaintiff calls Roberta Myers.

17       ROBERTA MYERS,

18           called as a witness by the Plaintiff,

19           having been duly sworn, testified as follows:

20                   DEPUTY CLERK:  State your name and spell your first

21      and last names for the record.

22                   THE WITNESS:  Roberta Myers, R-O-B-E-R-T-A.

23      M-Y-E-R-S.

24                   THE COURT:  You may proceed.

25

O1PQcar1                          Myers - Direct

1    DIRECT EXAMINATION

2    BY MR. CRAIG:

3    Q.  Good morning, Ms. Myers.

4    A.  Good morning.

5    Q.  What do you currently do for work?

6    A.  I'm a consultant, and I'm on several boards and projects in

7    the media space.

8    Q.  Before doing that work, what did you do?

9    A.  I was a magazine editor for most of my career.

10   Q.  What was your most recent position as a magazine editor?

11   A.  As a mag -- well, my last full-time job I worked for Shonda

12   Rhimes' Company, Shondaland, where I was also an editor.  But

13   my longest running job was as editor of *Elle*.

14   Q.  What is *Elle*?

15   A.  *Elle* is a fashion media brand.  It's global.  When E. Jean

16   and I were there, there were 55-plus different issues around

17   the world, and -- but of course it's not just a print magazine.

18   It's also a website, social media, and all the ways that we

19   talk to people now.

20   Q.  What was your most recent position at *Elle*?

21   A.  I was the editor-in-chief.

22   Q.  If you could just speak up a little closer to the mic, I'm

23   having trouble hearing you.

24   A.  Okay.

25   Q.  During what years were you editor-in-chief?

O1PQcar1                          Myers - Direct

1    A.   2000 to 2017.

2              THE COURT:   The record will reflect that Mr. Trump is

3    in the courtroom.

4              Go ahead.

5    Q.   Generally speaking, what does an editor-in-chief do?

6    A.   My job was really to manage all of the editorial while also

7    trying to help raise revenue and work with advertisers as well.

8    Q.   Did you hold any other positions at *Elle* magazine?

9    A.   Well, I worked at *Elle* in the mid-Nineties as an assigning

10   editor before I was the editor-in-chief of a magazine called

11   *Mirabella*, and then I went back to *Elle* as editor-in-chief.

12   Q.   What is an assigning editor?

13   A.   Well, it's an editor who goes out and tries to find stories

14   and find writers to do good stories, you assign the story, and

15   work with the writer to get it to a point where the

16   editor-in-chief feels like it's a good time to publish it.

17   Q.   Where did you start your career?

18   A.   At *Rolling Stone*.

19   Q.   Have you worked at any other magazines in addition to *Elle*

20   and *Rolling Stone*?

21   A.   Yes.

22   Q.   Which ones?

23   A.   I worked at *Interview* magazine; it was Andy Warhol's

24   magazine.  I worked at *Seventeen*, *In Style*.  I did a magazine

25   for *NBC*, and I worked at *Mirabella* and *Elle* for a long time.

O1PQcar1                          Myers - Direct

1    Q.  In total how many years did you spend working in the

2    magazine industry?

3    A.  30 plus, maybe 35.

4    Q.  Do you know the plaintiff in this case, E. Jean Carroll?

5    A.  I do.  I do.

6    Q.  How do you know her?

7    A.  Well, she -- we worked together at *Elle*.

8    Q.  In approximately what year did you first meet her?

9    A.  I want to say that I met her when I was working at *Elle* as

10   an assigning editor in the mid-Nineties.

11   Q.  Have you testified in court before, Ms. Myers?

12   A.  I have.

13   Q.  In which case?

14   A.  In E. Jean's last case.

15   Q.  Did it involve the same defendant, Donald Trump?

16   A.  Yes.

17   Q.  Have you spoken about that appearance experience publicly?

18   A.  Yes.  I went on *The Beat*, Ari Melber's show on MSNBC.

19   Q.  How did you end up appearing on *The Beat*?

20   A.  I was invited.

21   Q.  Had you appeared on TV prior to that occasion?

22   A.  Yes.

23   Q.  Approximately how many times?

24   A.  More than I can -- a hundred?  Probably.

25   Q.  Why did you agree to appear on *The Beat?*

1   A.  Well, because I was invited after the judgment came out to

2   talk about my experience being a witness.

3   Q.  Were you paid for your appearance on *The Beat?*

4   A.  No.

5   Q.  Have you ever met the defendant in this case, Donald Trump?

6   A.  I have.

7   Q.  When did you meet him?

8   A.  When I was on an episode of *Celebrity Apprentice*.  I'm not

9   a celebrity, and I wasn't an apprentice.  I was there as the

10  editor of *Elle* to present what was known as the challenge to

11  the -- to the apprentices.

12  Q.  What year was that?

13  A.  I think it was 2012 or 2013.

14  Q.  Did you interact with Mr. Trump while appearing on that

15  episode of *The Apprentice*?

16  A.  I did.

17  Q.  To what degree?

18  A.  Well, I met him on the first day of filming.  I was on the

19  set for three days, and he was kind and friendly and showed me

20  around the office during some down time of shooting.

21  Q.  Have you spoken with Donald Trump since then?

22  A.  I have not.

23  Q.  Did you support Mr. Trump's candidacy for the 2016

24  presidential election?

25  A.  I voted for the Democrat.

O1PQcar1                              Myers - Direct

1    Q.  What about for the 2020 election?

2    A.  I voted for the Democrat.

3    Q.  Are you registered with any political party?

4    A.  I'm a registered Democrat.

5    Q.  Have you donated to political candidates?

6    A.  I have.

7    Q.  Which party?

8    A.  Both.

9    Q.  You testified previously that you were editor-in-chief at

10   *Elle* for about 17 years.  Can you tell us a bit more about your

11   responsibilities in that role?

12   A.  Well, so I ran a big staff and, you know, there are several

13   *Elle* -- *Elle* covered a lot of things.  Obviously, we were a

14   fashion magazine.  We covered fashion, we covered beauty, but

15   really we covered cultural events.  Our mission was to open

16   women's appetites, which was really -- there are a lot of

17   women's media in the world and not all women are the same, so

18   our particular mission was really about helping women figure

19   out who they were in the culture right now and how to get what

20   they want.

21   Q.  Was *Elle* a political magazine?

22   A.  No.

23   Q.  During your tenure at *Elle*, did the magazine ever endorse

24   political candidates?

25   A.  No.

1    Q.   Why not?

2    A.   Well, that wasn't really our role.  I think that, you know,

3    we would cover people in the political space.  We would write

4    profiles of people who were running or who sort of worked

5    behind the scenes just because they had interesting lives, and

6    we thought that was a good way to talk about who they were and

7    what they stood for.

8    Q.   What role, if any, did you have in deciding what sorts of

9    stories to run?

10   A.   All of it.

11   Q.   Did you have a role in deciding who would write those

12   stories?

13   A.   Yes.

14   Q.   What kind of writers would you look for when you were

15   editor-in-chief?

16   A.   Good ones, seasoned ones, people that knew what they were

17   doing.  We shared a lot of writers with other publications.

18   The people in New York might be familiar with like the *New York*

19   *Times* and the *Atlantic* and the *New York Post*.

20   Q.   Was *Elle* a weekly or monthly or daily publication?

21   A.   Well, it was a magazine.  You know, the physical thing was

22   a monthly publication, but, as I said, we had a website and,

23   you know, communicated with our readers every day.

24   Q.   What kind of writer was Ms. Carroll?

25   A.   She was accomplished.  She had a whole career before I even

1   met her as a journalist, and, you know, like I would have loved

2   to have her career working at *Saturday Night Live* and working

3   for *Esquire*, which was really hard to do, you know, if you're a

4   woman when she started her career and is still kind of hard,

5   frankly.

6          But, you know, she's a -- I mean, she's a

7   truth-teller.  She -- and she has tremendous amount of empathy

8   and a great sense of humor, which is why she was so important

9   to the brand *Elle*.

10  Q.  What was Ms. Carroll's specific contribution to *Elle*

11  magazine?

12  A.  She had a monthly column.

13  Q.  What was that column?

14  A.  It was called "Ask E. Jean."

15  Q.  What was the column about?

16  A.  Women, and it was -- I mean, people -- it was about

17  everything.  I mean, people would write to her to the point

18  where, you know, there were stacks -- we would get them also at

19  the office, and there were so many to go through, but she would

20  sort of hone in on the kinds of questions that were -- people

21  had real problems, and she wanted to help them answer them, and

22  she did a good job at that, that's why they kept writing.

23  Q.  How often did you interact with Ms. Carroll while you were

24  editor-in-chief?

25  A.  Well, at least once a month when the column would come in

O1PQcar1                              Myers - Direct

1    because I would -- her assigning editor would edit it and then

2    I would get it and maybe have some questions or ideas.

3    Q.  Were you friends with Ms. Carroll outside of work during

4    the time you were editor-in-chief?

5    A.  I would say we were friendly, but, you know, we had very

6    different lives.  I mean, I ran a big business, and I had two

7    young children, and E. Jean was doing other work too, you know,

8    as well as her column, so ...

9    Q.  Did Ms. Carroll ever speak with you about her personal

10   life?

11   A.  No.

12   Q.  Did she ever tell you she had been sexually assaulted by

13   Donald Trump?

14   A.  No.

15             MS. HABBA:  Objection.

16             THE COURT:  Sustained.  The answer is stricken.

17   Q.  Returning to your tenure at *Elle*, did you review

18   Ms. Carroll's column before it was published each month?

19   A.  Yes.

20   Q.  You referred to her as a truth-teller.  What did you mean

21   by that?

22   A.  Well, you know, I mean, the best gift a writer can give you

23   is the ability to write well and also know how to report and

24   make sure that the facts are straight.  I mean, we had very

25   good fact-checkers at *Elle*, and as far as I know, we never got

1  sued, meaning, you know, she did the work.  But I will say that

2  all of the journalists that worked for us did the work.

3  Q.  Would you have hired an advice columnist or other

4  journalist who was not considered a truth-teller?

5  A.  No.

6  Q.  What role, if any, did you have in determining how much

7  Ms. Carroll was paid for writing her column?

8  A.  All of it.

9  Q.  Did the amount that Ms. Carroll was paid change during the

10  time you were editor-in-chief?

11  A.  It did.

12  Q.  In which direction?

13  A.  I gave her a raise.

14  Q.  Why did you decide to do that?

15  A.  Well, because she was -- well, she was beloved by the

16  readers.  I would say she was probably the most prominent

17  columnist -- she was the most prominent columnist that we had,

18  and I thought of her column as a sort of destination, meaning

19  people picked up the magazine and would often go to her column

20  first.  That's what they told us in, you know, any number of

21  like ways that we would talk to our readers, it was something

22  that we discovered.  But also because she's great.  She's great

23  at her job.

24  Q.  In your 30-plus years in the magazine industry, did you

25  have occasion to read advice columns written by other writers?

O1PQcar1                          Myers - Direct

1    A.  I did.

2    Q.  How would Ms. Carroll's column compare to those?

3    A.  Well, I think that her column was sort of the leader of the

4    pack, and I think it actually inspired a lot of other

5    publications like ours and others not like ours, like, you

6    know, *New York* magazine to bring on, you know, sort of similar

7    talent, and, you know, try to follow E. Jean.  And, look, I'm

8    not saying they weren't good at what they do, but, you know,

9    E. Jean I think probably did it the longest in terms of the

10   modern magazine world.

11   Q.  Did Ms. Carroll's column run the entire 17 years you were

12   editor-in-chief?

13   A.  Yes.

14   Q.  Why did you leave *Elle* at year 17?

15   A.  Because my contract was not renewed.

16   Q.  When you left them, was Ms. Carroll still writing her

17   column?

18   A.  She was.

19   Q.  How would you describe its popularity at that moment in

20   time?

21   A.  High.  I mean, again, you know, she was still as popular as

22   she was, you know, when I started in 2000.  Actually, her

23   popularity grew, so it was high.

24         MR. CRAIG:  No further questions.

25         THE COURT:  All right.  Thank you.  Cross.  Ms. Habba.

O1PQcar1                          Myers – Cross

1    CROSS-EXAMINATION

2    BY MS. HABBA:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  Good morning, Ms. Myers.  We haven't met.  My name is

6    Alina Habba.  I'll try and be brief.

7         You stated that you are registered Democrat, correct?

8    A.  Correct.

9    Q.  Are you currently involved with the Democratic Party in any

10   way in terms of contributing?

11   A.  No.

12   Q.  But you didn't vote for Donald Trump in 2016, right?

13   A.  No.

14   Q.  Or in 2020?

15   A.  No.

16   Q.  And you don't plan on voting for him in 2024, do you?

17   A.  Well, I don't think I have to say what I plan to do.

18   Q.  Fair enough.

19        You said that Ms. Carroll -- you worked at *Elle* until

20   2017, right?

21   A.  Right.

22   Q.  And you left involuntarily.  Isn't that correct?

23   A.  Pretty much.

24   Q.  Were you terminated?

25   A.  They didn't renew my contract, but I had a year left on my

O1PQcar1                          Myers – Cross

1   contract, which meant that I could have stayed around for a

2   bit, but I didn't.

3   Q.  Do you know that?

4   A.  Do I know what?

5   Q.  That they would have renewed your contract?

6   A.  No.  I said --

7        THE COURT:  She didn't say that.  Excuse me,

8   Mr. Craig, you rose.

9        She didn't say it.  The answer is stricken.  You can

10  rephrase the question.

11       MS. HABBA:  Sure.

12  Q.  Were you offered a renewal of your contract at *Elle* after

13  2017?

14       MR. CRAIG:  Objection.  Asked and answered.

15       THE COURT:  Sustained.  Just a minute.  There is no

16  evidence that the contract expired in 2017, so let's focus on

17  the facts.

18       MS. HABBA:  Yes.

19  Q.  So when Ms. Carroll departed, that was 2019, correct?

20  A.  I believe so.  I wasn't there.

21  Q.  You weren't there when she departed at all, right?

22  A.  No.

23  Q.  And you didn't write for *Elle* in 2019?

24  A.  Not that I remember, no.

25  Q.  Okay.  So for two years, from 2017 to 2019, you don't

O1PQcar1                              Myers – Cross

1   specifically have knowledge of what happened at *Elle* with

2   Ms. Carroll, do you?

3   A.  Not anything more than gossip, no.

4   Q.  What was that gossip?

5          MR. CRAIG:  Objection.

6          THE COURT:  Sustained.

7   Q.  So you said that at her time at *Elle*, she was known as a

8   truth-teller.  Is that correct?

9   A.  Yes.

10  Q.  What is a truth-teller?

11  A.  Somebody who gets their facts straight.

12  Q.  What type of writer was Ms. Carroll?

13  A.  Ebullient, careful, journalistic.

14  Q.  What does journalistic mean?

15  A.  It means that she gets her facts straight.

16  Q.  Was she writing on current news?

17  A.  That's an interesting question.  I mean, she wasn't a news

18  reporter for us, but she did write about things that were going

19  on in the culture.

20  Q.  And was it her opinion that she was writing about?

21         MR. CRAIG:  Objection to form.

22         THE COURT:  Sustained as a form.

23  Q.  You stated that she was writing about things happening in

24  culture, correct?

25  A.  Yes.

O1PQcar1                          Myers – Cross

1           THE COURT:  Sustained.  That wasn't exactly the

2    question you put.

3    Q.  Feel free to correct me if I'm misstating your testimony.

4    I'm trying to understand it, Ms. Myers.

5           Ms. Carroll gave advice on relationships, correct?

6    A.  And other things as well.

7    Q.  And it was advice in her opinion, correct?

8           MR. CRAIG:  Objection to form.

9           THE COURT:  Sustained as to form.

10          Just -- are you having trouble seeing witness, sir?

11          JUROR:  Yes.

12          THE COURT:  So move to your left.  Better?

13          JUROR:  Yes.

14          THE COURT:  Go ahead, Ms. Habba.  Next question,

15   please.

16          MS. HABBA:  Sure.

17   BY MS. HABBA:

18   Q.  Let me try and rephrase the scenario.

19          Ms. Carroll would receive inquiries for her advice.

20   Isn't that right?

21   A.  Yes.

22   Q.  And she would respond with how she would handle it,

23   correct?

24   A.  Not necessarily.

25   Q.  How would she respond?

O1PQcar1                          Myers - Cross

```
 1   A.  Well, often she would -- if it were something that were
 2   particularly problematic or she didn't know about that
 3   particular thing, she would call perhaps a psychiatrist or an
 4   MD or an expert on whatever the issue was that the person had
 5   asked for advice about.
 6   Q.  So you think that's a basis to refer to her as a
 7   fact-checking journalist.  Is that correct?
 8            MR. CRAIG:  Objection.
 9            THE COURT:  Sustained.  Form.
10   Q.  Ms. Myers, you have no personal knowledge of what happened
11   with Ms. Carroll at Elle in her last two years, do you?
12            MR. CRAIG:  Objection.  Beyond the scope.
13            MS. HABBA:  What's the objection?
14            THE COURT:  It's beyond the scope.  It's been asked
15   and answered, and you're done with that.  Let's go on.
16            She said all she had was gossip, and you asked her
17   what the gossip was, and I sustained the objection, and that's
18   the ruling.
19   Q.  Ms. Myers, do you know what her salary was in 2019?
20   A.  No.
21   Q.  Do you know what her salary was in 2018?
22   A.  No.
23            MS. HABBA:  Thank you.  No more questions.
24            THE COURT:  Thank you.
25            Redirect, Mr. Craig?
```

1          MR. CRAIG:  No redirect, your Honor.

2          THE COURT:  The witness is excused.  Thank you.

3          (Witness excused)

4          THE COURT:  Do you have another witness?

5          MR. CRAIG:  Your Honor, we have no more witnesses, but

6     we do have a few additional pieces of evidence to offer at this

7     time.

8          THE COURT:  Okay.

9          MR. CRAIG:  We first re-offer PX-164 and 164T.  There

10    was briefing on this over the weekend.  You will recall we

11    offered it first last week.

12         THE COURT:  Hearing no objection, they're received.

13         MR. CRAIG:  If we can play the video 164 at this time.

14         (Video played)

15         THE COURT:  Is there any agreement as to the timing of

16    that?

17         MR. CRAIG:  We have the transcript here, your Honor.

18    this was offered and unobjected to.  It has the date.

19         THE COURT:  Okay.

20         MS. HABBA:  Your Honor, if I may, we actually did

21    state an objection when we met and conferred with counsel on

22    it.  I have no problem with them putting in this portion.  I

23    would just ask that if I would choose to play the entire

24    portion, that I be given the same courtesy.  We did meet and

25    confer on this though, your Honor.

O1PQcar1                    Myers - Cross

1           THE COURT:  Well, that's fine, but this just came in

2   without objection.

3           MS. HABBA:  Yes, it's no problem.

4           THE COURT:  Okay.  Have a seat.  Thanks.

5           (Plaintiff's Exhibits 164 and 164T received in

6   evidence)

7           MR. CRAIG:  Next we would offer PX-165.

8           Display that for the jury, if it's okay with your

9   Honor.

10          THE COURT:  Hearing no objection, 165 is received.

11          (Plaintiff's Exhibit 165 received in evidence)

12          MR. CRAIG:  Your Honor, if we could return to 165

13  momentarily, we're having a tech issue.

14          We would offer 166.

15          THE COURT:  There being no objection, it's received.

16          (Plaintiff's Exhibit 166 received in evidence)

17          MS. HABBA:  Sorry, can we preview the -- no objection.

18          MR. CRAIG:  And now we can go back to 165.  Thank you,

19  your Honor.

20          MS. HABBA:  No objection.

21          THE COURT:  It was received awhile ago.

22          MR. CRAIG:  Your Honor, next we would offer -- excuse

23  me.  I'll let the jury view this for one moment.

24          Plaintiff next offers PX-147 and 147V.

25          THE COURT:  V as in victor?  V as in video?

O1PQcar1                          Myers – Cross

1              MR. CRAIG:  V as in victim.

2              MR. MADAIO:  Objection.

3              THE COURT:  All right. Mr. Madaio, what's the

4      objection?

5              MR. MADAIO:  Your Honor, we've objected to this

6      evidence on several grounds:  401, 402, 403.  In addition, it

7      was not disclosed timely within their pretrial order.

8              MR. CRAIG:  Your Honor, if we may take this up at the

9      sidebar, we've addressed some of these before, but it may be --

10             THE COURT:  Put it on the screen where I can see it.

11             All right, I'll see you at sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O1PQcar1                          Myers - Cross

1                (At the sidebar)

2                THE COURT:  Who wants to address it?

3                MR. CRAIG:  I'm happy to address it, your Honor.  If

4     you recall, we submitted this to your Honor in mid-December.

5     It's a portion of Mr. Trump's testimony from the New York

6     Attorney General's action.  All of the portions we've selected

7     have to do with his wealth, which of course is relevant to

8     punitive damages.

9                Your Honor ordered in -- following our submission in

10    mid-December that they counter-designate any additional

11    deposition testimony or other testimony that they would like to

12    supplemental this with.  They didn't provide any

13    supplementation.  We think it's clearly relevant and not unduly

14    prejudicial to his own testimony.

15               THE COURT:  What about the pretrial argument?

16               MR. CRAIG:  147V, which is the video which accompanies

17    this, was just publicly released last Friday.  We certainly

18    couldn't put that on the pretrial order.  Of course, we've

19    given this to them with ample time.  There is no prejudice to

20    his testimony.  He knows what he said.  We also just note --

21               THE COURT:  Did you have the transcript earlier?

22               MR. CRAIG:  I don't recall the initial date we got the

23    transcript, but if your Honor would like us to put in just the

24    video that was released on Friday, we are happy to do so.

25               THE COURT:  Mr. Madaio.

O1PQcar1                         Myers - Cross

1                MR. MADAIO:  Your Honor, in terms of timeliness, the

2       video -- the transcript was dated after the -- earlier than the

3       pretrial order was available, it was not disclosed timely, so

4       we would object on those grounds.

5                THE COURT:  When you say "the transcript was dated,"

6       what does that mean?

7                MR. MADAIO:  That the testimony was given before the

8       pretrial order deadline.

9                THE COURT:  Was the transcript available?

10               MR. MADAIO:  I believe it was.

11               THE COURT:  Do you have any evidence?

12               MS. HABBA:  The day after.

13               MR. MADAIO:  I'm not sure what date counsel came in.

14      I believe it was available prior to the pretrial order.  I know

15      the testimony was absolutely given prior to the pretrial order.

16               MR. CRAIG:  Your Honor, we're happy to just put in the

17      video and not put in the transcript.

18               THE COURT:  I note that the transcript that I've been

19      given 147 indicates it was filed with the New York County Clerk

20      August 30, 2023.

21               MR. CRAIG:  That may well be, your Honor.  As I said,

22      we're happy to agree to just put in the deposition video and

23      not offer the transcript.

24               THE COURT:  All right.

25               MR. MADAIO:  Your Honor, the other thing I would add

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O1PQcar1                          Myers - Cross

1    is that this is for a pending case.  There's been no decision

2    on it.  It's prejudicial to view testimony for that case in

3    this case.  Again, there's no order from Justice Engoron on

4    that case yet.

5            THE COURT:  That doesn't matter at all.  It's sworn

6    testimony by your client.

7            MS. HABBA:  He's also here.

8            MR. CRAIG:  Your Honor, it may make sense at this time

9    to discuss the next exhibit, which is also Mr. Trump's

10   testimony from the trial in this action -- in the Attorney

11   General action.  We think it comes in on the same grounds.  He

12   gave that trial testimony just three days before the joint

13   pretrial order was filed in this case.  We did not have access

14   to it before we had put the joint pretrial order together, and

15   we think it comes in for all the same reasons.

16           THE COURT:  What's the number?

17           MR. CRAIG:  148, your Honor.

18           THE COURT:  Do you have any objection to that that I

19   haven't heard?

20           MR. MADAIO:  Yes, we have.  Again, it's largely

21   irrelevant.  To the extent they had any questions they would

22   like to ask of president Trump, they could have called him and

23   asked the questions at that time.  He's here.  He is willing

24   and planning to testify.

25           THE COURT:  I'm going to exclude 147, the transcript.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1PQcar1                          Myers – Cross

1            147V will be received, and 148 will be received.

2            The objection is otherwise overruled.

3            MR. CRAIG:   Thank you, your Honor.

4            MR. MADAIO:   Thank you.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1PQcar1                          Myers - Cross

1                  (In open court)

2                  THE COURT:  Is it agreed among counsel that 147V is a

3        videotape of sworn deposition testimony that Mr. Trump gave in

4        another case?

5                  MS. HABBA:  Yes, it is.

6                  THE COURT:  Mr. Craig, agreed?

7                  MR. CRAIG:  Yes, your Honor.

8                  (Plaintiff's Exhibits 147V and 148 received in

9        evidence)

10                  (Videotape played)

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1P5car2

1          MR. CRAIG:  As discussed at side bar, plaintiff now

2     offers PX- 148.

3          THE COURT:  Received.

4          (Plaintiff's Exhibit 148 received in evidence)

5          MR. CRAIG:  We will submit that with other exhibits to

6     the jury.

7          Finally, we offer PX- 167 and PX- 167-T, which are the

8     designations from this case.

9          THE COURT:  Without objection, they are received.

10          (Plaintiff's Exhibits PX- 167 and PX- 167-T received

11     in evidence)

12          MR. CRAIG:  If we can play PX- 167 for the jury?

13          (Videotape played)

14          MR. CRAIG:  Your Honor, at this time I believe we are

15     close to resting but perhaps we can do our break and rest

16     afterwards?

17          THE COURT:  All right.  10 minutes.  15 minutes,

18     folks; I have some business with the lawyers.

19          (Continued on next page)

20

21

22

23

24

25

O1P5car2

```
 1              (Jury not present)
 2              THE COURT:  Who has the application?
 3              MS. CROWLEY:  Your Honor, as Mr. Craig just said, I
 4    think we are about to rest, and obviously the defense I think
 5    is calling two witnesses; their client, the defendant, and then
 6    Ms. Martin.  There are a couple issues, we have attempted to
 7    work them out and I think we have been productive on that but
 8    there are a couple issues we would like to raise with the Court
 9    before Mr. Trump's testimony and Ms. Martin's.  I don't know if
10    you want do that now or we should wait until after.
11              THE COURT:  I assume there are going to be motions
12    after the plaintiff rests; is that correct?
13              MS. HABBA:  Yes, your Honor.
14              THE COURT:  Why don't we do it then.
15              MS. CROWLEY:  Understood.  Thank you, your Honor.
16              MR. CRAIG:  One additional thing, your Honor.
17              We got a note from Andy.  We had offered, last week,
18    Plaintiff's Exhibit 96, Plaintiff's Exhibit 97 and accompanying
19    exhibit Plaintiff's 146.  They were all received but it appears
20    the transcript only indicates that 96, 97 and 97-T were
21    received.
22              THE COURT:  What is it you say that is missing?
23              MR. CRAIG:  PX- 146.
24              THE COURT:  Any disagreement about that, Ms. Habba?
25              MS. HABBA:  No, your Honor.
```

O1P5car2

1          THE COURT:  146 shall be reflected as having been

2    received.

3          MR. CRAIG:  Thank you, your Honor.

4          (Plaintiff's Exhibit 146 received in evidence)

5          (Recess)

6          THE COURT:  Now, before we bring the jury in, is the

7    plaintiff going to rest now?  Or not.

8          MS. CROWLEY:  We are, your Honor.

9          THE COURT:  Then I think what we need to do is tell

10   the jury we will be a little longer and to bear with us, and I

11   will ask you to rest in the jury's presence when they come

12   back.  But you are resting now; correct?

13         MS. CROWLEY:  That's correct, your Honor.

14         THE COURT:  Is there a motion?

15         MS. HABBA:  Yes, there is, your Honor.

16         The defense would like to --

17         THE COURT:  Please go to the lectern.

18         MS. HABBA:  Sure.

19         Your Honor, at this time, since plaintiff has rested

20   their case, we would like to move for a motion for judgment as

21   a matter of law pursuant to Rule 50(a).  President Trump is

22   entitled to judgment as a matter of law --

23         THE COURT:  I'm sorry, Ms. Habba.  Rule 58?

24         MS. HABBA:  50(a), your Honor.

25         THE COURT:  50(a).

O1P5car2

1              MS. HABBA:  Yes.

2              THE COURT:  Sorry.

3              MS. HABBA:  That's OK.

4              President Trump is entitled to judgment as a matter of

5    law because Ms. Carroll has failed to establish any causal link

6    between her claimed damages and President Trump's June 21 and

7    June 22 statements.

8              The record has established that there was a five-hour

9    gap between the release of the article and President Trump's

10   first response to Ms. Carroll's allegation.  Within that time

11   frame, many social media users made posts that echoed the same

12   sentiments that this Court has determined to be defamatory by

13   collateral estoppel.  They said Ms. Carroll is a liar.  They

14   said she made her allegations to sell a book.  And they said

15   she had a nefarious political motivation.  This backlash

16   existed before President Trump even had an opportunity to

17   speak, which proves that he could not be the cause of it.  It

18   is simply impossible for a jury to determine that the

19   president's statements of June 21 and June 22, as opposed to

20   Ms. Carroll's story in The Cut, caused the harm that she claims

21   to have suffered.  Any such finding would be the result of

22   sheer surmise and conjecture.  Therefore, as the Second Circuit

23   recognized in *Samuels v. Air Transport Local 504*, judgment as a

24   matter of law is warranted in this scenario.  I am happy to

25   provide a cite if you would like, your Honor.

O1P5car2

1    We showed multiple tweets to this effect.  For

2    example, Ms. Carroll admitted herself that the backlash she

3    received was not attributable to President Trump, but rather to

4    independent actors.  She testified this is about people

5    standing up for a man they admire.  They also went through

6    numerous tweets that were sent in the five-hour gap and

7    confirmed, herself, they have no causal connection to President

8    Trump's statement.

9          At trial transcript 285:8 through 13 she stated -- the

10   question:

11   "Q   Ms. Carroll, does this tweet say:  'I've got some advice

12   for you.  Drop this lie because it's a bad look on you.

13   @POTUS,' and you can see a link to Huff Post."

14         Her response?

15   "A   Yes."

16         At trial transcript 288:25 to 289:8, I asked

17   Ms. Carroll:  The tweet states, "Attacked 1990 by the POTUS" --

18         THE COURT:  I take it your point is there is

19   insufficient evidence of causation; is that right?

20         MS. HABBA:  Yes, your Honor.  I am almost finished.  I

21   would just like to make the record.

22         THE COURT:  Well, you have made the record but if you

23   are going to be brief I will certainly let you finish.

24         MS. HABBA:  Thank you.

25         Where I was was at the trial transcript:

O1P5car2

1    "Q  Ms. Carroll, the tweet states, "Attacked 1990 by the POTUS.

2    What a fool you are Missy Carol.  Your book must need pumping.

3    You are a disgrace."  Do you see that?"

4    "A   Yes.

5    "Q   Was this sent at 3:22 p.m. on June 21, 2019?

6    "A   Yes.

7    "Q   Was this sent before Laura Litvan posted the president's

8    statement at 5:17?

9    "A   Yes."

10            In addition, her prior tweets reveal that she has made

11   a number of lewd posts about penises, sexual advances, and

12   other topics, and we have seen evidence of the same that people

13   found those tweets before responding to her story.  We

14   presented direct evidence of people responding to those prior

15   tweets.  Certainly, there is no way to ascertain one way or the

16   other and causation cannot be proven.  She cannot point to a

17   single opportunity that she has lost.  And, she testified her

18   advice column on Substack generates more income than the

19   $60,000 she was making at *Elle* before she released it.

20            She also has testified in court that she deleted the

21   exact evidence which she now relies on in attempting to support

22   her claim for emotional harm, but due to her intentional

23   deletion of this evidence in blatant violation of her discovery

24   obligations, your Honor, it is impossible --

25            THE COURT:  I'm curious about one thing.

O1P5car2

1          MS. HABBA:  Yes.

2          THE COURT:  When did that deletion allegedly occur?

3          MS. HABBA:  She stated that she deleted it the day

4    that The Cut article came out in the evening so she could not

5    prove what time those tweets were sent.

6          THE COURT:  And The Cut article was June 21; is that

7    correct?

8          MS. HABBA:  At 12:15.

9          THE COURT:  Isn't the testimony quite clear that there

10   was no anticipation of litigation any earlier than the middle

11   of July when George Conway, at a party, suggested to her that

12   she sue?

13         MS. HABBA:  The testimony also stated, your Honor --

14   that is true -- but she the also stated for us that after we

15   were in the middle of litigation, after she received subpoenas

16   to preserve, she deleted evidence.

17         THE COURT:  Relevant to subpoenas; is that right?

18         MS. HABBA:  We discussed that with witness Carroll

19   when she was on the stand, sir.

20         THE COURT:  You discussed a subpoena.

21         Is there in evidence any subpoena; one or more?

22         MS. HABBA:  It is discovery rules, your Honor, and

23   yes, she was sent --

24         THE COURT:  Show it to me.  Which exhibit is the

25   subpoena?

O1P5car2

1          MS. HABBA:  I am happy to have my team pull it.

2          THE COURT:  No, no.  Which exhibit.  I am interested

3     in what exhibit.

4          MS. HABBA:  We can point to her testimony, your Honor.

5     She acknowledged it.

6          THE COURT:  You have already pointed to her testimony.

7          MS. HABBA:  OK.

8          THE COURT:  I want to see the subpoena that is

9     admitted in evidence in this case.

10          MS. HABBA:  During the trial?

11          THE COURT:  During the trial.

12          MS. HABBA:  We are happy to submit that.

13          THE COURT:  You are not going to be submitting that

14     now.  It is not in the record now.

15          MS. HABBA:  May I proceed, your Honor?

16          THE COURT:  Well, sure, but let's pay attention to the

17     facts.

18          MS. HABBA:  OK.

19          On causation alone, your Honor, she has not proven her

20     facts, it is her burden and she has not proven causation.  She

21     has not given us proof that she received those only after.  She

22     can't.  She admitted she deleted it.  That is a blatant

23     violation of discovery obligations that I have -- frankly,

24     common knowledge.  They cannot prove whether the evidence

25     existed before President Trump's statements were issued.

O1P5car2

1          THE COURT:  These are tweets and e-mails you claim

2    that include death threats; yes?

3          MS. HABBA:  We don't know, your Honor, but that's what

4    she said; yes.

5          THE COURT:  You certainly don't have any evidence

6    otherwise; right?

7          MS. HABBA:  It is not my obligation to prove their

8    case, your Honor.

9          THE COURT:  I didn't ask you that.

10          MS. HABBA:  I don't have evidence because it was

11    deleted.

12          THE COURT:  And so your theory here is that she should

13    be punished because, for whatever reason, before there was

14    litigation, she deleted tweets that would be helpful to her?

15          MS. HABBA:  No, your Honor.  That is not my argument.

16          THE COURT:  Sounds like it.

17          MS. HABBA:  Would you like me to clarify?

18          THE COURT:  No.  Just continue.

19          MS. HABBA:  Well, I would like to clarify since I am

20    making the motion and it is clear that you are not

21    understanding what I am saying, so please let me clarify.

22          Your Honor, Ms. Carroll didn't prove her case.

23    Period.  We have seen tweets.  We have seen tweets before the

24    president's statements and she acknowledged that those existed

25    and they are exactly what this is.

O1P5car2

1          THE COURT:  You are repeating yourself.

2          MS. HABBA:  Well, clearly I'm not being heard.  But

3   Ms. Carroll's expert -- let me move on to my next point --

4   Professor Humphreys, the so-called expert, testified that she

5   was not even aware that President Trump's denial was issued

6   five hours after The Cut article was published.  Trial

7   transcript 422:17 to 423:2.  We asked:

8   "Q  And you're aware President Trump never spoke about

9   Ms. Carroll until after this article came out, right?

10  "A   I am not aware if President Trump spoke about Ms. Carroll

11  prior to that.

12  "Q   Well, do you look at all the timing between when the

13  article came out and when President Trump responded?"

14          The expert's response:  "I did not."

15          She also confirmed that she did not consider the

16  timing between The Cut and the Laura Litvan tweet in making her

17  damages assessment.  Trial transcript 413:6-9:

18  "Q   Professor Humphreys, did you consider at all whether those

19  sources discussed Ms. Carroll's accusation?"

20          Her response:  "No.  My assignment in this case was to

21  calculate the impressions for the statement of Mr. Trump, so I

22  did not, no."

23          Therefore, your Honor, since Ms. Carroll cannot

24  possibly establish causation -- her burden, not mine, your

25  Honor -- her claim should not go to the jury and President

O1P5car2

1    Trump should be granted judgment as a matter of law pursuant to

2    Rule 50(a).

3            Thank you.

4            THE COURT:  Thank you, Ms. Habba.

5            Does the plaintiff care to respond?

6            MS. KAPLAN:  Sure, your Honor.  I am going to be

7    brief.

8            THE COURT:  Please go to the lectern.

9            MS. KAPLAN:  I am going to be brief, your Honor, but

10   happy to answer any questions the Court has.

11           We believe that there is more than ample evidence of

12   causation here to allow the case to go to the trier of fact;

13   the jury.  First of all, as I am sure your Honor will recall,

14   Mr. Trump actually did speak before the Laura Litvan tweet came

15   out; he spoke through the White House.  There was a denial of

16   Ms. Carroll's account in the New York Cut article at the very

17   same time by the White House.  No one in the world

18   distinguished, at that point, the White House from Donald

19   Trump.

20           Two, the messages and tweets we have shown, your

21   Honor, often contain overlapping language, overlapping

22   theories, overlapping sentiments to what Mr. Trump said in the

23   June 21 and June 22 statements, and we also put into this case

24   timing.  There is a message that we showed where he made the

25   statement, Laura Litvan's tweet is I think 5-something, 5:20,

O1P5car2

1    5:19; and then there was an immediate response less than an

2    hour later and then it only followed.

3           THE COURT:  Immediate response from whom to what?

4           MS. KAPLAN:  From one of the people attacking E. Jean

5    on the internet, taking Mr. Trump's language and repeating it.

6           The idea, your Honor, that somehow after Mr. Trump

7    made his statements on June 21 and June 22, that no one paid

8    any attention to them, that everything after that was only the

9    response to their own thoughts about The Cut article, your

10   Honor, obviously is implausible, at best, and certainly

11   something that should go to the jury as a trier of fact.

12          In terms of Professor Humphreys, your Honor, I don't

13   think there could possibly be any issue because --

14          THE COURT:  There could be multiple causation,

15   multiple causal factors.

16          MS. KAPLAN:  There could be, your Honor.

17          Professor Humphreys testified very clearly that the

18   articles that she used to do her analysis were the 47 articles

19   in our complaint that actually quoted or paraphrased

20   Mr. Trump's statements directly, so there could be no timing

21   issue with what she did.  That is what she focused on and

22   that's how she assessed the damages.

23          Finally -- I could go on but I'm not going to do too

24   much more, your Honor -- the response here was absolutely and

25   positively foreseeable based on what Mr. Trump himself said,

O1P5car2

1    your Honor, and let me refresh you very quickly.

2              In the first statement he said:  "People should pay

3    dearly."  Repeat:  "People should pay dearly for making

4    statements like that."  That was a call to get people to

5    amplify and repeat what he said and much more which we know the

6    Court and jury has seen.  Then the next day he says:  "She is

7    entering onto dangerous territory."  Dangerous territory, your

8    Honor, again the very same sentiment, his followers knew what

9    he meant, and they followed up on it.

10             Finally, with respect to professional damages, your

11   Honor, Ms. Carroll testified she gets no freelance work.  The

12   only time she gets writing work now is to write about Donald

13   Trump, which she doesn't want to do.  She is never asked to

14   appear on TV unless it is about Donald Trump.  She used to be

15   on TV all the time, giving advice, it was a portion of her

16   career, none of that is available to her today.

17             There is more than enough here to go to the jury.

18             THE COURT:  The motion is denied.

19             Who will be your first witness, Ms. Habba?

20             MS. HABBA:  Your Honor, I have one additional issue

21   before we bring in the jury.  My first witness will be Carol

22   Martin, to answer your question.

23             THE COURT:  OK.

24             MS. HABBA:  Your Honor, after seeing the testimony

25   that they chose to play from his deposition, the president's

O1P5car2

```
1     deposition, it was PX- 167, your Honor, it is clear that they

2     have opened the door for me to now ask my client what he meant

3     by what he said in that deposition and to further ask questions

4     in regard to that.

5             THE COURT:  I will hear briefly from the plaintiff.

6             MS. CROWLEY:  So, your Honor, we have two issues.  The

7     first is on --

8             THE COURT:  On that issue?

9             MS. CROWLEY:  Yes.

10            I believe that your Honor ruled on the motion *in*

11    *limine* -- our motion *in limine* with respect to what Mr. Trump

12    could permissibly testify after we had provided defense counsel

13    and the Court with our deposition designations.  Your Honor's

14    ruling, quite clearly stated, that Mr. Trump may not testify at

15    all in contrast or in contradiction to the Court's collateral

16    estoppel ruling that he sexually assaulted Ms. Carroll and that

17    his statements in June of 2019 were false.

18            Your Honor, that sort of leads us into one of the

19    issues that I had mentioned that we were going to raise right

20    after we sent out the jury which is that, as we said in our

21    letter over the weekend, we do think that it is appropriate for

22    Ms. Habba to provide some sort of a proffer about what she

23    thinks her client can permissibly testify about.  We talked a

24    little bit before Court this morning.  Our understanding is

25    that her questioning will be limited to his state of mind back
```

O1P5car2

1    in June 2019.

2              THE COURT:  I am planning on dealing with this.

3              MS. CROWLEY:  OK.  Your Honor, should I raise the

4    Carol Martin issues now?

5              THE COURT:  This would be the time to raise the Carol

6    Martin issues.

7              MS. CROWLEY:  OK.  We got, at 10:30 last night, an

8    e-mail from defense counsel with four or five exhibits that

9    they intend to introduce with Ms. Martin.  Those exhibits were

10   not on the joint pretrial order, they were never disclosed to

11   us until last night.  Obviously, Ms. Carroll was listed on

12   their order as a witness that they intended to call, and they

13   have had the documents that they intended to use with her for

14   years so we would object to any of those exhibits being offered

15   on the ground that, as they just brought up with respect to the

16   NYAG deposition transcript, they were not disclosed to us.

17             THE COURT:  What are the exhibits?

18             MS. CROWLEY:  The exhibits are Defendant's Exhibit

19   100, which is a text message.

20             THE COURT:  Just give me the numbers to start.

21             MS. CROWLEY:  Defendant's Exhibit 100, Defendant's

22   Exhibit 101, Defendant's Exhibit 23, and Defendant's Exhibit

23   97.

24             THE COURT:  Is that it?  Or no.

25             MS. HABBA:  Just three.

O1P5car2

| | |
|---|---|
| 1 | THE COURT:  Who is going to address this for |
| 2 | Mr. Trump? |
| 3 | MR. MADAIO:  I will, your Honor. |
| 4 | Your Honor, the plaintiff has known about these text |
| 5 | messages for some time, they were even referenced in our |
| 6 | briefings regarding Ms. Martin, and one of the exhibits, |
| 7 | DX 101, is actually already in evidence, it's the text message |
| 8 | that they had introduced previously. |
| 9 | THE COURT:  Well, if it is already in evidence what is |
| 10 | it?  Why do you insist on giving everything two numbers? |
| 11 | MR. MADAIO:  Apologies, your Honor.  I will have the |
| 12 | number for you momentarily, it is a text message from |
| 13 | Ms. Carroll to Carol Martin. |
| 14 | THE COURT:  I just asked the question. |
| 15 | MS. CROWLEY:  I can help, your Honor. |
| 16 | THE COURT:  What is that? |
| 17 | MS. CROWLEY:  It is Plaintiff's Exhibit 136 and it is |
| 18 | one text message.  Defendant's Exhibit 101 is four text |
| 19 | messages. |
| 20 | MR. MADAIO:  We've agreed to redact so it is now |
| 21 | three, and it is essentially the same exact subject material |
| 22 | that is discussed in the other text messages. |
| 23 | THE COURT:  The bottom line, as I understand it, first |
| 24 | of all, is that you have had all these documents for a long |
| 25 | time.  Is that true or not true? |

O1P5car2

1          MR. MADAIO:  That's true, your Honor, and we were

2     initially planning on introducing them as impeachment evidence

3     for the sake of convenience and the Court's -- in the interest

4     of moving things along quickly --

5          THE COURT:  And then you didn't.

6          MR. MADAIO:  That's correct, your Honor.  We can still

7     use it as impeachment evidence I think in the interest of --

8          THE COURT:  Who are you going to impeach?  Your own

9     witnesses?

10         MR. MADAIO:  That's correct, your Honor.

11         THE COURT:  I don't think so.

12         MR. MADAIO:  That's another issue that we can discuss

13    when Ms. Martin is on the stand.

14         THE COURT:  I don't see the point.  You are saying you

15    have a use for one or more of these as impeachment evidence

16    when she testifies?

17         MR. MADAIO:  That's correct, your Honor; as a witness

18    who is identified as an adverse party, Rule 611.

19         THE COURT:  Which ones do you say are impeachment,

20    think you will use on impeachment?

21         MR. MADAIO:  All of them, your Honor.

22         THE COURT:  All of them?

23         MR. MADAIO:  Potentially.

24         THE COURT:  Potentially.

25         MR. MADAIO:  Obviously it depends on the witness'

O1P5car2

1    testimony.

2              MS. CROWLEY:  Your Honor, one of the exhibits is the

3    cover of the *New York* magazine piece.  I don't see any way that

4    that could possibly be impeachment as to Carol Martin.  I

5    believe also when we attempted to offer that article, defense

6    objected and your Honor sustained the objection.

7              THE COURT:  Which one is the magazine cover?

8              MR. MADAIO:  Your Honor, it is a cover of a magazine.

9    Everything has been --

10             THE COURT:  That's what I was just told.  I asked for

11   a number, please.

12             MS. CROWLEY:  Defendant's Exhibit 23.

13             THE COURT:  So you are anticipating that Ms. Martin

14   will testify that it's not the *New York* magazine cover and you

15   are going to use the exhibit to prove that when she said it

16   wasn't the cover she wasn't telling the truth?  Is that what

17   you are saying to me?

18             MR. MADAIO:  No, your Honor.

19             The magazine cover is one that we would not be

20   offering as impeachment.

21             THE COURT:  OK, so 23 is out.

22             MR. MADAIO:  Understood.

23             THE COURT:  You have certainly known about that for

24   about five years.

25             MR. MADAIO:  Understood.

O1P5car2

1          THE COURT:  What about 100, Ms. Crowley?

2          MS. CROWLEY:  Your Honor, I think the only way that

3     your Honor appears to be pointing out that they can impeach

4     Ms. Martin if is if she says something on the stand that is

5     inconsistent.

6          THE COURT:  Yes.  I understand.

7          MS. CROWLEY:  And so, I don't think that that's

8     happened yet and so I don't think that there is any basis for

9     this to come in.

10         THE COURT:  So there is no basis for the objection yet

11    either; right?

12         MS. CROWLEY:  Well, your Honor, I was objecting to

13    them offering them for the truth and so -- and I don't know

14    whether that was going to happen.  I felt like I needed to

15    point out the fact that they have been late disclosed.

16         There are a couple other issues.

17         THE COURT:  So other than 23, which is not going to be

18    used, we will wait and see what happens on the other three.

19         MS. CROWLEY:  Understood, your Honor.

20         THE COURT:  OK.  Next.

21         MS. CROWLEY:  On the topic of the *New York* magazine

22    cover page, when we met and conferred with defense counsel this

23    morning about that, our understanding is that they intend to

24    ask Ms. Martin about the fact that she was mentioned in

25    Ms. Carroll's article, as well as the fact that she appeared on

O1P5car2

The Daily podcast to talk about what was said in the article.

Now, our position is that if they do that, they have then opened the door to Ms. Martin testifying about how she was one of the outcry witnesses who Ms. Carroll told about the assault back when it happened in 1996.  There is no other reason that she was mentioned in the article or that she appeared on The Daily podcast.

MR. MADAIO:  Your Honor, I think we can clarify.  We don't intend on asking anything in the article, anything from the substance of the article.  The only reason we will ask her that she was mentioned in the article is to establish that she was anonymously referenced in the article because that's relevant to one of the --

THE COURT:  So she wasn't mentioned in the article. Somebody was mentioned in the article.  Is that what I am to understand?  Without a name?  Without any identifying information?

MR. MADAIO:  That's right, your Honor, but the point is that she later had conversations with Ms. Carroll about her being revealed publicly, her name, and that is relevant for the purpose so that -- the discussion regarding the text messages and the security concerns.  So it is only relevant to establish why she was discussing releasing her name publicly.

MS. CROWLEY:  Again, your Honor, I think that if she's asked about why she was even mentioned or why she was being

O1P5car2

| | |
|---|---|
| 1 | named publicly, then we are entitled to probe why she was being |
| 2 | mentioned in the first place and that's because she was told |
| 3 | about the assault back in 1996. |
| 4 | THE COURT:  Where are you going with this, Mr. Madaio? |
| 5 | I don't understand it. |
| 6 | MR. MADAIO:  Your Honor, it is relevant to testimony |
| 7 | that Ms. Carroll testified to earlier when she had |
| 8 | communications with Ms. Martin that she stated that she had no |
| 9 | security concerns at all, she was walking down the street, |
| 10 | high-fiving people and being thanked by people in the street. |
| 11 | Those were communications with Ms. Martin so that is something |
| 12 | we would like to probe with Ms. Martin herself. |
| 13 | THE COURT:  Is Ms. Martin going to say anything |
| 14 | different about that than Ms. Carroll said? |
| 15 | MR. MADAIO:  We believe so. |
| 16 | MS. CROWLEY:  Your Honor, Ms. Martin testified at the |
| 17 | last trial to exactly that and in her deposition.  If they want |
| 18 | to ask her -- |
| 19 | THE COURT:  I can't do this. |
| 20 | MS. CROWLEY:  I apologize. |
| 21 | THE COURT:  No, no.  I can't do this in a totally |
| 22 | abstract universe.  I don't get it because, I don't have the |
| 23 | context, so we are just going to have to do it the old |
| 24 | fashioned way and you will ask questions and if there are |
| 25 | objections, I will rule on them. |

O1P5car2

1          What else?

2          MS. CROWLEY:  Just one more issue, your Honor.

3          In our conversation with defense counsel this morning,

4    they suggested that they are also going to ask Ms. Martin about

5    her knowledge of whether Ms. Carroll's lawsuit was funded.

6    That's an issue that's been clearly ruled out of bounds.  I

7    understand that their position is that we somehow opened the

8    door to it by asking Ms. Carroll about an e-mail that she

9    received on June 23rd, 2019, when she was accused of being paid

10   by the DNC and George Soros to tell lies about Donald Trump.

11   That is Plaintiff's Exhibit 45.  That obviously has nothing to

12   do with any funding for this lawsuit.  Your Honor has already

13   ruled on that issue.  Ms. Martin has no personal knowledge of

14   whether Ms. Carroll's lawsuit was funded and we think that it

15   is very prejudicial to even ask the question.

16          MS. HABBA:  Your Honor, if I may, this is what I was

17   trying to get at before.  They have now opened the door not

18   once, but twice, on the Reid Hoffman issue.  The first is when

19   they asked Ms. Carroll to break down that tweet or the e-mail

20   rather, your Honor, and asked her:  Are you funded by anybody

21   related to the DNC?

22          She said:  No.

23          The transcript is 116:1-14.  They also asked her about

24   George Soros if you recall, your Honor.  I'm not asking about

25   George Soros, but when you ask somebody whether they're funded

O1P5car2

by the DNC, and they are, and they make a misrepresentation and
then Ms. Martin has text messages proving that she knew about
it, those are fair game, your Honor.

They also played his deposition transcript where they
asked about the DNC stuff and president and I will get to that
with the president, but the door has been wide open not by me,
your Honor, I have respected your rules, but by them, and it is
fair game at this point.

THE COURT:  The door is closed.

MS. CROWLEY:  Thank you, your Honor.

THE COURT:  Anything else before we have Ms. Martin?
OK.  Let's bring in the jury.

(Continued on next page)

O1P5car2                         Martin - Direct

1              (Jury present)

2              THE COURT:  Thanks for bearing with us, folks.  As you

3    know, especially when you get close to the end of the trial,

4    all sorts of things have to be resolved.

5              The plaintiff, as I understand it, rests?

6              MS. CROWLEY:  That is correct, your Honor.

7              THE COURT:  That is the conclusion of plaintiff's

8    evidentiary presentation on her case-in-chief.  The defense now

9    has an opportunity to put on its case.

10             Ms. Habba?

11             MS. HABBA:  Thanks, your Honor.  The defense calls

12   Ms. Carol Martin to the stand, please.

13   FRANCES CAROL MARTIN,

14        called as a witness by the Defendant,

15        having been duly sworn, testified as follows:

16             THE DEPUTY CLERK:  Please state your name and spell

17   your first and last names for the record.

18             THE WITNESS:  My name is Frances Carol Martin.

19             Did you say spell it as well?

20             THE DEPUTY CLERK:  Yes, ma'am.

21             THE WITNESS:  F-R-A-N-C-E-S, C-A-R-O-L, M-A-R-T-I-N.

22             THE COURT:  You may proceed, Ms. Habba.

23             MS. HABBA:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MS. HABBA:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Hi.  How are you, Ms. Martin?

2    A.  Fine, thanks.

3    Q.  Ms. Martin, your legal name is different than Carol Martin;

4    is that correct?

5    A.  I worked professionally for many years as Carol Martin.  My

6    first name is Frances.

7    Q.  Understood.

8            Do you know the plaintiff in this case, E. Jean

9    Carroll?

10   A.  Yes, I do.

11   Q.  How long have you known her?

12   A.  I think I have known her about 33 years.

13   Q.  Would you consider yourself close friends with Ms. Martin?

14   A.  I do.

15   Q.  Did plaintiff previously call you as a witness in her

16   case-in-chief in Ms. Carroll's second lawsuit against President

17   Trump?

18   A.  Yes.

19   Q.  You have counsel; correct, Ms. Martin?

20   A.  Yes, I do.

21   Q.  Are you aware that our team tried to interview you

22   directly, Ms. Martin?

23   A.  Am I aware?  Well, you did interview me directly.

24   Q.  I believe you are thinking about a deposition in the prior

25   case.

O1P5car2                          Martin - Direct

1   A.  Oh, the deposition.

2              THE COURT:  Ms. Habba, your role is to ask questions.

3              MS. HABBA:  Sure.

4              Your Honor, I would like permission to treat

5   Ms. Martin as a witness identified with an adverse party

6   pursuant to Rule 611(c).

7              THE COURT:  Objection?

8              MS. CROWLEY:  No, your Honor.

9              THE COURT:  Go ahead.

10             MS. HABBA:  Thank you.

11  BY MS. HABBA:

12  Q.  Ms. Martin, did you meet by telephone or in person with

13  Carroll's counsel prior to your testimony today?

14  A.  No.

15  Q.  Do you recognize counsel from plaintiff's table?

16  A.  Yes.

17  Q.  When did you meet?

18  A.  Oh, it's been a while.  It has been a week or so or more.

19  Q.  So a week prior to this week you met with counsel?

20  A.  Not that recently, but over time.  I'm sorry, my time is a

21  little fuzzy now.  It has been four years.

22  Q.  That's OK.  I don't want you to guess.

23             In the last month, have you met with plaintiff's

24  counsel?

25  A.  Yes.

1    Q.  How many times?

2    A.  Twice.

3    Q.  Have you met with my team at all, Ms. Martin?

4    A.  With your team?  No, not at all.

5    Q.  Are you aware that we have subpoenaed you to be here today

6    as a witness, Ms. Martin?

7    A.  Yes.  Yes, that's why I am here.

8    Q.  What did you discuss with Ms. Carroll's counsel?

9    A.  I didn't speak with her, I have co-counsel, I guess you

10   call it, who were provided to me.

11   Q.  So did you go to Ms. Kaplan's office at Kaplan Hecker in

12   the past month, Ms. Martin?

13   A.  Yes, I have been there.

14   Q.  And when you went there you had your attorneys; correct?

15   A.  Yes.

16   Q.  And your attorneys are separate from Ms. Carroll's

17   attorneys; correct?

18   A.  Correct.

19   Q.  What did you discuss when you were at Kaplan Hecker meeting

20   with Ms. Carroll's attorneys?

21   A.  That recent time that I mentioned would have been because I

22   hadn't expected to be subpoenaed, so they were trying to

23   prepare me for whatever was coming.

24   Q.  And you are aware -- did they tell you they wanted you to

25   testify that E. Jean Carroll was damaged because of Donald

1    Trump's two statements in June?

2              MS. CROWLEY:  Objection.

3              THE COURT:  Overruled.

4    Q.  You can answer.

5    A.  Would you repeat the question, please?

6              MS. HABBA:  Your Honor, may I get a read-back, please?

7              THE COURT:  Please read it back.

8              (Record read)

9    A.  Yes.

10   Q.  Did they ask you to review any materials?

11   A.  No.

12   Q.  Did they show you any documents in advance of today's

13   testimony?

14   A.  No, because I had testified twice before.

15   Q.  And both of those times were for Ms. Carroll; right?

16   Excuse me.  I'm going to do that -- yes, Ms. Carroll.

17   A.  Yes.  Yes.

18   Q.  Who is your attorney here today?

19   A.  Noam Biale and Vikram Shah.

20   Q.  How were you introduced to those attorneys?

21   A.  I was introduced through the Kaplan firm.

22   Q.  Does your lawyer speak to Ms. Carroll's attorneys?

23   A.  I suppose so.  I don't really know.

24   Q.  Do you know if your attorneys spoke with them this weekend?

25   A.  I don't know.

O1P5car2                          Martin - Direct

1   Q.  Are you paying for your attorneys in this matter?

2   A.  No, I'm not.  No, I'm not.

3   Q.  Are you aware who is?

4   A.  No, I'm not.

5   Q.  Do you receive bills from your attorneys?

6   A.  No.

7   Q.  Are you currently working?

8   A.  No.  I'm retired.

9   Q.  And what did you do for a living previously?

10  A.  For 20 years, from 1975 to '95, I was a reporter and news

11  anchor for WCBS TV here in New York, Channel 2.

12  Q.  So most of your career was in journalism and television;

13  isn't that right?

14  A.  Correct.

15  Q.  And you were on television regularly during your career,

16  correct?

17  A.  Yes, yes.

18  Q.  Do you currently use Twitter or any form of social media?

19  A.  I do not.

20  Q.  Why not?

21  A.  Just not attracted to it.

22  Q.  Is it because you prefer to lead a private life?

23  A.  Very much so.

24  Q.  And if you had social media you know that your life would,

25  to some extent, be public; correct?

O1P5car2                    Martin - Direct

1    A.  It seems that way.

2    Q.  You the spent majority of your career, as we discussed, in

3    TV, the same as Ms. Carroll; isn't that right?

4    A.  Well, she was more of an independent journalist and I was

5    working for CBS.

6    Q.  But at one point you and Ms. Carroll worked together at the

7    same network; isn't that right?

8    A.  We did, yes.

9    Q.  And that was at America's Talking?

10   A.  America's Talking Cable.

11   Q.  America's Talking Cable.  Understood.

12          What network owns America's Talking Cable?

13   A.  Well, it doesn't exist anymore, it was a short-term.  For

14   two years it was in existence, from 1994 to '96, and it was

15   owned by NBC -- why, General Electric at that point.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

O1PQcar3                          Martin – Direct

1   BY MS. HABBA:  (Continued)

2   Q.  That was in the mid-1990s, correct?

3   A.  Correct.

4   Q.  Roger Ailes was the president of *America's Talking* cable,

5   correct?

6   A.  Yes, he was the person who hired me.

7   Q.  Is it fair to say that you and Ms. Carroll both reported to

8   Mr. Ailes?

9   A.  Yes.  Yes.

10  Q.  What is your understanding of Ms. Carroll's reputation in

11  the workplace?

12  A.  I think she has an admirable profession -- profession in

13  the workplace.

14  Q.  And how about Ms. Carroll and Mr. Ailes' relationship?

15          MS. CROWLEY:  Objection.  Relevance.

16          THE COURT:  Sustained.

17  Q.  Do you know whether Ms. Carroll was reprimanded at work for

18  inappropriate behavior directed at Roger Ailes?

19          MS. CROWLEY:  Objection.  Relevance.

20          THE COURT:  Sustained.

21          MS. HABBA:  Can I be heard on that, your Honor?

22          THE COURT:  It's not necessary.

23  Q.  It was common knowledge at *America's Talking* cable that

24  Ms. Carroll would speak publicly about Mr. Ailes on TV,

25  correct?

 1                 MS. CROWLEY:  Objection.

 2                 THE COURT:  Sustained.

 3   Q.  Ms. Martin, at some point you became aware that Ms. Carroll

 4   was working on a book entitled, *What Do We Need Men For?*  Is

 5   that correct?

 6   A.  Yes.

 7   Q.  And you saw a copy of the book before it was published?

 8   A.  Yes.  Before -- not exactly before -- I saw a portion of

 9   the book before it was published.

10   Q.  What portion was that, do you recall?

11   A.  It was a portion that involved the other outcry witness, if

12   I can call it that, and myself.

13   Q.  And you had an opportunity to review the book, correct?

14   A.  Not the whole book, but those portions.

15   Q.  And the portion of that book was published in *The Cut* prior

16   to the book's release, correct?

17   A.  *The Cut*, meaning ...

18   Q.  There was a magazine article that Ms. Carroll released a

19   portion of her book in advance of the book publishing, correct?

20   A.  In *New York* magazine.

21   Q.  Yes.

22   A.  Yes, I was aware of that.

23   Q.  How would you describe the immediate reaction to the

24   excerpt that was in *New York* magazine?

25                 MS. CROWLEY:  Objection.

1           THE COURT:  Sustained.

2     Q.  Did the article get a lot of attention?

3           MS. CROWLEY:  Objection.

4           THE COURT:  Sustained.

5     Q.  At any point, did you ask to read the whole book *What Do We*

6     *Need Men For?*

7     A.  I was given a copy.

8     Q.  Did you read it?

9     A.  Sometimes.

10    Q.  Did you read the whole book?

11    A.  Over time.

12    Q.  Did you read the whole book before it was released?

13    A.  No.  No, I had not.

14    Q.  When did you finish reading the book?

15    A.  Hard to say.  It's been awhile now.

16    Q.  And at some point -- withdrawn.

17          Following the release of *The Cut* article by

18    Ms. Carroll, were you ever concerned for your safety?

19    A.  On some levels.

20    Q.  Were you concerned for your daughter's safety because of

21    the article's publication?

22    A.  On some levels, yes.

23    Q.  And did you ever express those concerns to Ms. Carroll?

24    A.  Oh, yes.

25    Q.  How would you express those?

O1PQcar3                          Martin - Direct

```
 1    A.  Well --
 2              THE COURT:  Is this a hypothetical question or are you
 3    asking something else?
 4              MS. HABBA:  I'm not sure I understand what your
 5    Honor's saying.  She said she expressed them I'm asking how
 6    would she express them, meaning text, email, conversation.
 7              THE COURT:  Why don't you ask how she expressed it.
 8    Q.  Sure.  I believe that was my question but --
 9              THE COURT:  No, actually, it wasn't, Ms. Habba.
10              MS. HABBA:  Okay.
11    Q.  Ms. Martin, how would you express your concern for your
12    safety to Ms. Carroll?
13              THE COURT:  How did you express your concern to
14    Ms. Carroll?
15    Q.  Do you understand what I'm asking?
16    A.  Yes.
17              THE COURT:  No, the question is:  Do you understand
18    what I'm asking because I'm trying to help counsel ask what I
19    think she is trying to ask.
20    Q.  Go ahead.
21    A.  And, once again, the question is?
22    Q.  Did you text Ms. Carroll concerns about your safety?
23    A.  I did not text them.  We sat and spoke about them.
24    Q.  Did you ever put anything in an email to Ms. Carroll about
25    your safety concern?
```

O1PQcar3                          Martin - Direct

```
 1    A.  Yes.

 2    Q.  And after you spoke to Ms. Carroll, did you feel less

 3    concerned for your safety?

 4    A.  I can only say sometimes.  It ebbed and flowed.

 5    Q.  And why is that?

 6    A.  Because the climate in the country actually was changing

 7    very rapidly.

 8    Q.  Didn't Ms. Carroll assure you that she does not have any

 9    major security concerns for herself?

10    A.  Is this early now we're speaking?  I don't know exactly --

11    this has been about a four-year --

12    Q.  Sure.  I can narrow down the time for you.  After The Cut

13    article was released --

14    A.  Around 2019.

15    Q.  -- in June 2019, were you concerned for your safety?

16    A.  As I saw the popularity of that article, my daughter became

17    more concerned for her daughter.

18    Q.  And that's your granddaughter, correct?

19    A.  Yes.

20    Q.  And you spoke to Ms. Carroll about those concerns when

21    that -- during that timeframe, correct?

22    A.  Correct.

23    Q.  And Ms. Carroll assured you that she didn't have any major

24    security concerns.  Isn't that correct?

25    A.  That was her opinion, yes.
```

O1PQcar3                      Martin - Direct

1    Q.  And didn't she also tell you that your daughter would

2    receive zero attention, Ms. Martin?

3    A.  I -- something like that.  I may not be exactly right.

4    Q.  Nate, can you please -- you're not sure or I just --

5    A.  No, I just -- that particular conversation, I know what it

6    was about, but I didn't know if she said zero.

7    Q.  Okay.  Nate, can you please pull up the document which has

8    been premarked DX-101 just for the witness.

9          Ms. Martin, do you recognize the document in front of

10   you?

11   A.  Yes, I do.

12   Q.  Without describing its contents, what is it?

13   A.  This would be from E. Jean Carroll to -- and then it's

14   redacted.

15   Q.  Does it appear to be a series of text messages you received

16   from Ms. Carroll on June 27, 2019?

17   A.  The date isn't -- I'm sorry, June 27.  Yes, okay.

18         MS. HABBA:  Your Honor, I would like to introduce

19   DX-101 for the purpose of impeaching the witness's testimony

20   only.

21         MS. CROWLEY:  Objection, your Honor.  I don't think

22   there's anything to impeach.

23         THE COURT:  Give me a moment.

24         I'll allow it on this occasion.  I'll leave to the

25   jury the question of whether they think there is any

O1PQcar3                          Martin - Direct

```
 1   inconsistency between the text and what the witness said a
 2   moment ago.
 3   Q.  Ms. Martin, do you recall prior that I asked you whether
 4   she said you will receive zero attention?
 5   A.  I can call that hyperbolic a little bit because Jeannie
 6   didn't want us to worry.  It was -- I don't know that there was
 7   anything to worry about per se at that moment.  That was June
 8   of 2019.
 9   Q.  And, in fact, if you look at these text messages, she says
10   herself there were no major security concerns for herself.
11   Isn't that right?
12   A.  That was her opinion.
13   Q.  There might not even have been minor concerns.  Isn't that
14   correct?
15   A.  It's hard for me to say.  I'm not in her head.  I know she
16   may have been responding a different way.
17   Q.  My question is, does it say that?
18   A.  On this text --
19           THE COURT:  Go ahead.
20   A.  -- there have not been --
21           THE COURT:  I've received the text.  It's in evidence.
22           MS. HABBA:  Your Honor, I have a right to ask her what
23   it says.
24           THE COURT:  It's in evidence.
25   Q.  At that time did you believe that Ms. Carroll was being
```

1  truthful to you?

2  A.  Yes, I did.

3  Q.  Sometime after that, Ms. Carroll filed her first lawsuit

4  against president Trump, correct?

5  A.  Yes, I'm pretty sure.

6  Q.  And Ms. Carroll invited you to social events in connection

7  with the proceedings in that case, didn't she?

8  A.  Yes.

9  Q.  You can take down this, Nate.

10         And you attended some of these events, didn't you?

11  A.  Occasionally, yes.

12  Q.  Do you have recollection as to which events you attended?

13  A.  No, sorry.

14  Q.  Was I arguing at some of the events you were watching?

15  A.  Were you arguing?  I -- I really couldn't say, I'm sorry.

16  Q.  Were they court appearances?

17  A.  No.  No.  No.  They were social events.

18  Q.  What did you think about the fact that Ms. Carroll was

19  hosting so many parties in connection with this lawsuit?

20  A.  Depends on the time.  In the early year or two after the --

21  if I can be a little more specific, after the -- *The Cut*, as

22  you -- and after the *New York Times* podcast, there was a great

23  deal of interest, and there was a Harvey Weinstein sidebar.

24  There were a lot of issues around the actual assault.  And so

25  there were a lot of things going on that had to do with

O1PQcar3                          Martin - Direct

1   learning more about the issues.  Not just E. Jean.  I think for

2   others as well.

3   Q.  Did you think that Ms. Carroll was enjoying the attention

4   she was receiving as a result of this case?

5   A.  In early -- at points in early years.

6   Q.  Is that a yes?

7   A.  At points in early years.  At different times in early

8   years.

9   Q.  Ms. Martin, was does narcissism mean to you?

10  A.  Narcissism means an exceptional involvement with oneself.

11  Q.  What do you mean by "exceptional involvement"?  I don't

12  understand that.

13  A.  An awareness of oneself, how things are impacted on

14  oneself.  That's the way I think of narcissism.

15  Q.  Ms. Martin, you understand you're under oath, correct?

16  A.  Yes.

17          MS. CROWLEY:  Objection.

18  Q.  At one point during this trial, you believed that

19  Ms. Carroll's narcissism had run amok, didn't you?

20          MS. CROWLEY:  Objection.  During this trial?

21          THE COURT:  Sustained.

22  Q.  At one point during the prior trial, were any of the

23  lawsuits -- withdrawn.  Let me restate.

24          Ms. Martin, at one point you said Ms. Carroll's

25  narcissism had run amok, didn't you?

 1   A.  I wrote it on a text.  Is that what you're saying?

 2   Q.  Yes.

 3   A.  Yes.  Yes.

 4   Q.  You texted that?

 5   A.  I did.

 6   Q.  Who did you text that to?

 7   A.  I'm -- I'm not sure who I said it to.  To a different

 8   friend after E. Jean and I had had a conversation.

 9   Q.  And you were reflecting on your beliefs of Ms. Carroll at

10   that time, correct?

11   A.  There were a lot of events happening all at once.

12   Q.  Were these events related to this lawsuit?

13   A.  The book as much as the lawsuit.  I'm sorry.  Was this

14   before or after the lawsuit was filed?  I'm --

15   Q.  We'll get there.  I'm just walking you through that.

16   That's okay.

17           In fact, you stated that you were suspicious about her

18   motives, didn't you?

19   A.  I don't remember saying that.  Perhaps I did.

20   Q.  Nate.

21           Let me refresh your recollection.  Ms. Martin, do you

22   see what has been premarked as DX-97 in front of you?

23   A.  Mmm-hmm.  That was the 30th of November.

24           THE COURT:  No.  No.  You are not to read anything out

25   loud.  She only wants to know if you see it.

O1PQcar3                        Martin - Direct

1    A.   Yes.

2    Q.   Do you recognize what it is without reading the contents?

3    A.   Yes.  I know who it was written to, and I do know what the

4    contents are.

5    Q.   Would you like a moment to read it?

6    A.   I have the gist of it.  I know what it's about.

7    Q.   Ms. Martin, does this refresh your recollection when I

8    asked you if you felt suspicious about her motives?

9    A.   Bad choice of words on my part.  I wasn't suspicious.

10   Q.   Ms. Martin, does it say you were?

11   A.   I have to find that --

12            THE COURT:  I'm sorry.  It's not in evidence.

13   Q.   When you said "bad choice of words," Ms. Martin, what do

14   you mean by that?

15   A.   On my part.  I'm a little hyperbolic.  I become a little

16   passionate with my texts, and I am very sorry about that, in

17   this context in particular.

18   Q.   I understand it's uncomfortable for a friend to see these

19   text messages, Ms. Martin.  I'm just asking --

20            THE COURT:  No speeches, Ms. Habba.

21            MS. HABBA:  Well, my question --

22            THE COURT:  No speeches.

23   Q.   Ms. Martin, did you text that?

24   A.   Yes, I texted it.

25   Q.   Thank you.  You've also previously described Ms. Carroll as

O1PQcar3                        Martin - Direct

1   a drug addict and the drug is herself, didn't you?

2   A.  I don't know where that is.

3   Q.  Do you have any recollection of saying that?

4   A.  Not exactly, no.

5   Q.  Nate.

6        Ms. Martin, I'm going to pull up what has been

7   premarked as Exhibit DX-100.

8        Ms. Martin, do you recognize this document?

9   A.  Now I do, yes.  This was written to my daughter.

10       THE COURT:  Ms. Martin.

11       THE WITNESS:  I'm sorry.

12       THE COURT:  Just stop when you answer the question.

13       THE WITNESS:  I'm sorry.

14  Q.  Ms. Martin, what is this document without reading its

15  contents.

16  A.  I need to take a look at it if --

17  Q.  Take your time.

18  A.  Yes, I know what this is.

19  Q.  Is this a text message between you and your daughter,

20  Ms. Martin?

21  A.  Yes, it is.

22       MS. HABBA:  Your Honor, I'd like to move DX-97 into

23  evidence.

24       MS. CROWLEY:  Objection, your Honor.

25       THE COURT:  Didn't you just say this was 100?

 1              MS. HABBA:  No, your Honor.  That was a prior one.
 2    Was it a hundred?  This is DX-97.  The prior was 100.
 3              THE COURT:  I quote: "Ms. Martin, I'm going to pull up
 4    what has been premarked as Exhibit 100.
 5              "Ms. Martin, do you recognize this document?
 6    "A.  Now I do, yes.  This was written to my daughter.
 7              "THE COURT:  Ms. Martin.
 8              "THE WITNESS:  I'm sorry.
 9              "THE COURT:  Just stop when you answer the question.
10              "THE WITNESS:  I'm sorry.
11    "Q.  Ms. Martin, what is this document" -- referring to
12    Defendant's Exhibit 100 -- "without reading its content?"
13              And then you go down --
14              MS. HABBA:  Your Honor, I see what you're saying.
15              THE COURT:  "Your Honor, I'd like to move Defendant's
16    Exhibit 97 into evidence."
17              MS. HABBA:  Your Honor, I was not moving 97.  I was
18    asking about 100.  I'll clarify that.
19              THE COURT:  At this moment, neither one is in
20    evidence.  Ask another question.
21    BY MS. HABBA:
22    Q.  Do you recognize this text message, Ms. Martin?
23    A.  Yes, I do.
24    Q.  It has been premarked as DX-97.  Do you see that?  It's on
25    the bottom of the page.  Nate, can you scroll up?

O1PQcar3                          Martin - Direct

1        THE COURT:  No, actually, it's marked at the bottom of

2   the page DX-100.

3        MS. HABBA:  They're pulling it up.  I'm talking to my

4   tech team, your Honor.  Thank you.

5   Q.  At the top, you see that this is a text message from you,

6   correct?

7   A.  Yes.

8   Q.  And it's dated November 30, 2021, correct?

9   A.  Correct.

10        THE COURT:  No.  Just a minute.  What exhibit is on

11   the screen?

12        MS. HABBA:  DX-97.  The tech team had the wrong

13   exhibit up, your Honor.

14        THE COURT:  Yes, I certainly am aware of that.  We're

15   talking about Defendant's Exhibit 97 now.

16        MS. HABBA:  Yes, your Honor.

17   Q.  Ms. Martin, you recognize it?

18   A.  Yes.

19        MS. HABBA:  I would like to move DX-97 into evidence,

20   your Honor?

21        MS. CROWLEY:  Objection.  Hearsay.

22        THE COURT:  Come to the sidebar and bring a copy of

23   this in writing please.

24             (Continued on next page)

25

1          (At the sidebar)

2          THE COURT:  Now, is the offer of all three texts or --

3          MS. HABBA:  No, your Honor.  Solely the top.

4          THE COURT:  So we are only -- the top half.

5          MS. HABBA:  Yes, and I'm happy to redact.

6          THE COURT:  So we're talking about --

7          MS. HABBA:  This green portion.

8          THE COURT:  In other words, the first message?

9          MS. HABBA:  Yes.

10         THE COURT:  And it's offered for what purpose?

11         MS. HABBA:  Offered to show the present sense

12   impression of Ms. Carroll's enjoyment of this lawsuit and her

13   reputation in the community.

14         THE COURT:  And the objection?

15         MS. CROWLEY:  Your Honor, they're offering it for its

16   truth.  It's hearsay.  She testified in response to questions

17   from Ms. Habba that she indeed called Ms. Carroll --

18         THE COURT:  I'm sorry, the author of the one text

19   that's being offered is the witness?

20         MS. CROWLEY:  Yes.

21         MS. HABBA:  Mmm-hmm.

22         THE COURT:  How is it hearsay?

23         MS. CROWLEY:  It's an out-of-court statement that she

24   made.  It could only be offered as impeachment if she testifies

25   inconsistently with it and she clearly didn't.  As she said,

1  she at one point called Ms. Carroll a narcissist.  That's what

2  this text messages is about.

3          MS. HABBA:  No.  I'm sorry, your Honor, if I may.  The

4  narcissist issue was prior.  She just said that she did not

5  recall calling her the drug addict, and that she is over the

6  moon.  This is her statement.  It is not hearsay.  She is here

7  as a witness on the stand.

8          THE COURT:  Yes, but you didn't make any effort to

9  refresh her recollection.

10          MS. HABBA:  I'm happy to do so first, your Honor.

11          THE COURT:  Let's start with that.

12          MS. CROWLEY:  If she testifies after having read this

13  that she recalls writing this, then the message doesn't come

14  in.

15          MS. HABBA:  I'm happy to refresh her recollection. No

16  problem.

17          THE COURT:  Let's see where we get.

18          MS. HABBA:  Sure.

19          (Continued on next page)

20

21

22

23

24

25

O1PQcar3                    Martin - Direct

1              (In open court)

2              THE COURT:  Let's put a question.

3              MS. HABBA:  Sure.

4    BY MS. HABBA:

5    Q.  Ms. Martin, do you recall stating that Ms. Carroll is like

6    a --

7              THE COURT:  Just a minute.  That's not the way to do

8    it.

9              MS. HABBA:  We could get a readback of my prior

10   question if you'd like, your Honor.

11             THE COURT:  Which of them would you like read back.

12             MS. HABBA:  The last question about this content.  I

13   can repeat it.

14             THE COURT:  Okay.

15   Q.  Ms. Martin, you've previously described Ms. Carroll as a

16   drug addict and that the drug is herself, didn't you?

17   A.  That's very harsh.  That feels like a misinterpretation of

18   what I wrote.

19             THE COURT:  The question is:  Did you say it.

20             THE WITNESS:  It is written there, yes.

21             MS. HABBA:  Thank you, your Honor.

22             I'd like to strike the prior answer as unresponsive.

23             THE COURT:  I'll strike the prior part.

24             MS. HABBA:  Thank you, your Honor.

25   Q.  Did you understand that Ms. Carroll was hoping to lose this

O1PQcar3                          Martin - Direct

1    case so she could go to the Supreme Court?

2              MS. CROWLEY:  Objection.

3              THE COURT:  Sustained.

4    Q.  Has Ms. Carroll ever told you she wants to go to the

5    Supreme Court?

6    A.  Not specifically.

7    Q.  Ms. Martin, in front of you is an exhibit that we have gone

8    through ad nauseam DX-97.  Would you like to take a look at

9    that exhibit, please?

10             THE COURT:  Sustained.  Ask a proper question, please.

11   Q.  Did you ever text that she wanted to go to the Supreme

12   Court?

13   A.  I was just reading it to myself.  That was hyperbole, but I

14   did write it.

15   Q.  Ms. Martin, you keep saying it was hyperbole.

16   A.  Yes.

17   Q.  My question is, did you write that in a text to your

18   daughter?

19             THE COURT:  She just answered that.

20   Q.  Do you believe Ms. Carroll intentionally publicized this

21   case against Donald Trump?

22   A.  Intentionally?

23   Q.  Yes.

24   A.  I don't know that it couldn't have been -- I'm not trying

25   not to answer you.  I'm just saying it was a part of the book

O1PQcar3                          Martin - Direct

1    and a part of the case.

2    Q.  So it was her intent to make it public and talk about it,

3    correct?

4    A.  It was a part of the book product as best I understood.

5    Q.  So that she could sell more books, correct?

6    A.  Maybe not only because of this part, but she wanted to sell

7    her books.

8    Q.  Thank you.

9         And is it because you believe that publicity -- this

10   publicity has now become part of her lifestyle?

11             MS. CROWLEY:  Objection.

12             THE COURT:  Sustained.

13   Q.  I can rephrase it.

14        Do you believe this publicity has become part of

15   Ms. Carroll's lifestyle?

16   A.  It is an extension of the lifestyle she already knew.

17   Q.  Is that a yes or a no, Ms. Martin?

18   A.  I'm hard-pressed to say yes or no.

19   Q.  At one point, Ms. Carroll hosted a celebration in the City

20   in connection with this case.  Isn't that right?

21   A.  Could you be more -- there was more than one.

22             THE COURT:  I'm sorry, with this case?

23             MS. HABBA:  Yes, this case.

24             THE COURT:  Meaning the one we're on trial in now?

25             MS. HABBA:  Yes, sir.

 1              THE COURT:  Okay.

 2   A.  She hosted -- she didn't host the one I'm thinking of.

 3   Q.  Who did?

 4   A.  It was a couple of journalists who were also celebrating a

 5   related -- there were a lot of ups and downs in the case, and

 6   there would be celebrations.

 7   Q.  Do you know what journalists hosted a party for

 8   Ms. Carroll's lawsuit?

 9   A.  For the lawsuit against Mr. Trump or --

10   Q.  You just testified that there was a party hosted by

11   journalists.  I'm just asking what journalists hosted that

12   party for her?

13   A.  There was more than one, so I don't know which --

14   Q.  Do you know who they write for?

15   A.  Not sure.

16   Q.  Were any from the *New York Times*?

17   A.  Not that I knew personally.

18   Q.  Let me ask a different question.  Were any from *Fox News*?

19   A.  Not that I recall.

20   Q.  How many journalists hosted this party?

21   A.  I wish I knew which party we were referring to because

22   there were some small gatherings that were just lunches from

23   time to time.  We're talking about a four-year period here,

24   I --

25   Q.  Let's break it down then.  How many parties have you been

O1PQcar3                         Martin - Direct

1  to relating to the two lawsuits that Ms. Carroll brought

2  against my client?

3  A.  Maybe six.

4  Q.  Six parties that were hosted by journalists.  Is that

5  right?

6  A.  I'm sorry, I can't tell you for sure they were hosted by

7  journalists.

8  Q.  Were her lawyers present at these parties?

9  A.  No.

10 Q.  So was it just journalists and her friends?

11 A.  I'm sorry, Ms. Habba, I don't know all the people that she

12 knows.  Some were familiar to me.  I haven't worked in the

13 business in 30 years.  It's been awhile.

14 Q.  You mentioned there was one hosted by three journalists,

15 you presumed.  Is that correct?

16 A.  Yes, I think so.

17 Q.  When was that party?

18 A.  I'm not sure.  I'm sorry.

19 Q.  Did those journalists write articles about her case as far

20 as you know?

21       MS. CROWLEY:  Objection.

22       THE COURT:  Sustained.

23 Q.  So you went to six parties with journalists --

24 A.  Approximately.

25 Q.  Approximately, thank you.

1           And at one point you described an over-the-top two-day

2      celebration, didn't you?

3      A.  I think so.

4      Q.  Would you like me to refresh your recollection, Ms. Martin?

5           THE COURT:  She said she thinks so.

6      Q.  Who did you describe that to?

7      A.  I -- I'm not sure.  My sister?  My daughter.

8      Q.  So were you frustrated with Ms. Carroll's celebratory

9      behavior on these lawsuits?

10     A.  On some -- at some points, yes, I was.

11     Q.  And why was that?

12     A.  I -- it's a difference in our personalities, although we

13     seem to work around it, but I have -- I hesitate sometimes to

14     reach farther than we or -- it felt as if maybe things hadn't

15     happened yet, and there was a lot of celebration.  There was a

16     lot of support.

17     Q.  A lot of support for Ms. Carroll, correct?

18     A.  Yes.  Yes.  And for the efforts -- there was also the Adult

19     Survivors law which was also part of these events.

20     Q.  But the parties were for Ms. Carroll, correct?

21     A.  Not specifically.  They were for changes in the system.

22     Q.  Were they after she won her last trial?

23     A.  That would have been last spring.  I can remember one

24     dinner, a small dinner.

25     Q.  Who was at that dinner?

O1PQcar3                    Martin - Direct

1    A.  Jeanne, myself, a couple of writers whose names I'm not

2    sure of.  It was only about six or eight women.

3    Q.  Journalists?

4    A.  Not all.  I think a couple were lawyers.

5    Q.  Her lawyers?

6    A.  No.  I think Robbie was -- I think Robbie -- her lawyer

7    Robbie was there.

8    Q.  Was George Conway there?

9    A.  No.  I know who he is, but he was not.

10   Q.  Have you met him?

11   A.  I've never met him.

12   Q.  At one point you considered downsizing your relationship

13   with Ms. Carroll.  Isn't that true?

14   A.  Yes, that is true.

15   Q.  And that was in the midst of this litigation.  Isn't that

16   right?

17   A.  No, I think that was before the litigation.

18   Q.  Why were you going to consider downsizing your relationship

19   with Ms. Carroll?

20   A.  I know this one because there were a series of

21   conversations with my daughter about her daughter, who's seven,

22   and my daughter was so freaked out about the climate in the

23   country and things were escalating in terms of people -- people

24   feeling fearful about their own safety if they were not

25   involved on the right side.  And so my daughter had to send a

O1PQcar3                          Martin - Direct

1   note to her daughter's head marshal alerting her that these

2   things were starting to happen.  She was just worried.

3   Q.  You stated that she was acting a little scary at one point,

4   didn't you?

5   A.  Who was acting?

6   Q.  Ms. Martin -- Ms. Carroll.

7   A.  Bad choice of words.  I don't know what --

8   Q.  The question was -- sorry, Ms. Martin.  I'm asking you

9   question.

10          Did you state that Ms. Carroll was acting a little

11  scary?

12  A.  If I wrote it, I stated it.

13  Q.  Is that a yes?

14  A.  That would be a yes.

15  Q.  In fact, you described Ms. Carroll as Santa at the

16  Christmas parade, didn't you?

17  A.  I wrote that.

18  Q.  So that's a yes?

19  A.  That's a yes.

20  Q.  In other words, you believe that Ms. Carroll was enjoying

21  the attention she was receiving from this case.  Isn't that

22  right?

23  A.  But I wasn't in her head.  Those were my words.

24  Q.  I asked what you felt.

25  A.  That's what I felt.

O1PQcar3                        Martin - Direct

1   Q.  And in fact you didn't -- didn't you say that Ms. Carroll

2   was loving the adulation?

3   A.  Yes.

4   Q.  Who was she receiving adulation from, Ms. Martin?

5   A.  I don't know specifically.  There was a lot of publicity

6   about these ongoing cases.

7   Q.  Some of the journalists that were giving her publicity,

8   were they at the parties you mentioned?

9          MS. CROWLEY:  Objection.

10          THE COURT:  Asked and answered.

11   Q.  You also stated Ms. Carroll likes the crown.  Isn't that

12   right?

13   A.  I think I know what that refers to, if I could explain.

14   Q.  I'm just asking if you said it, Ms. Martin.  Did you say

15   it?

16   A.  Hard to answer it out of context, but I will say I said it.

17   Q.  Since Ms. Carroll filed lawsuit, have you shared private

18   messages she sent to you with other people?

19   A.  I don't know.

20   Q.  Nate, can you please pull up a document premarked as

21   DX-100.

22          Ms. Martin, without reading the contents, do you

23   recognize the document in front of you?

24   A.  Yes.

25   Q.  Does it appear to be a series of text messages between you

O1PQcar3                        Martin - Direct

1    and an individual named C.B. McGraw on December 1, 2021?

2    A.  It changed right here, but it's DX-100.  Is that the one

3    we're looking at?

4    Q.  That's the one.

5    A.  Yes.

6    Q.  They just zoomed out, Ms. Martin.

7    A.  Excuse me, yes.

8    Q.  Do you recognize that?

9    A.  Yes, I do.

10           MS. HABBA:  Your Honor, I would like to offer DX-100

11   into impeach the witness only, not into evidence.

12           MS. CROWLEY:  To the extent it's offered into

13   evidence, I object.  It's hearsay.

14           MS. HABBA:  I just said, yeah -- no --

15           THE COURT:  I'm sorry?

16           MS. HABBA:  As I just said, I'm not offering it for

17   that purpose.  It's for impeachment purposes.

18           MS. CROWLEY:  Your Honor, I don't believe there is

19   anything to impeach.

20           THE COURT:  Let me please have a legible copy.

21   A.  Can I get it a little larger too?  It's a little hard to

22   read.

23           THE COURT:  Just sit quietly, Ms. Martin.

24           THE WITNESS:  I'm sorry.

25           THE COURT:  Sustained.

O1PQcar3                      Martin - Direct

1    BY MS. HABBA:

2    Q.  Ms. Martin, you have sent private messages to other people

3    from Ms. Carroll, haven't you?

4    A.  Not from her, but about her.  Is that what we're referring

5    to?

6             THE COURT:  The question was whether you've ever sent

7    private messages to other people.

8             THE WITNESS:  Yes, I have.

9    Q.  Have you ever copied and pasted something she wrote you

10   privately to someone else?

11   A.  I really don't remember.

12   Q.  Ms. Martin, we've pulled up DX-100.  Do you recognize that?

13   A.  This came in two weeks ago.

14   Q.  It's dated 12/1/2021, the bottom portion.

15   A.  Yes.  Yes.

16             THE COURT:  Is there a question?

17   Q.  Do you see that you have copied and pasted Ms. Carroll's

18   comments to CB McGraw?

19             THE COURT:  Sustained.  You're reading from a

20   document.

21             MS. HABBA:  I'm not reading from a document.  I asked

22   her a question.

23             THE COURT:  You asked her a question about the

24   substance of a document which is not in evidence.

25             MS. HABBA:  Well, I'm refreshing her recollection,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1PQcar3                              Martin - Cross

1    your Honor.

2              THE COURT:  That's not what you did.

3    Q.  Ms. Martin, why would you send a friend messages from

4    Ms. Carroll?

5              MS. CROWLEY:  Objection.

6              THE COURT:  Sustained.

7    Q.  Ms. Martin, do you believe Ms. Carroll is enjoying this

8    fame to some extent?

9    A.  I think she is adapting to the change in her life.

10   Enjoying is a multifaceted word.

11   Q.  Did you ever say that E. Jean Carroll was turning this

12   never-ending transaction into a lifestyle?

13   A.  Yes.

14             MS. HABBA:  Thank you.  No further questions.

15             THE COURT:  All right.  Thank you.

16             Any redirect -- cross

17             MS. CROWLEY:  Cross.  Yes, your Honor.

18   CROSS-EXAMINATION

19   BY MS. CROWLEY:

20             MS. KAPLAN:  Can I assist.  I believe Ms. Carroll

21   would like some water.  May I approach?

22             MS. HABBA:  Ms. Martin.

23             MS. KAPLAN:  Ms. Martin, I apologize.

24             MS. CROWLEY:  May I proceed, your Honor?

25             THE COURT:  Yes.

1    BY MS. CROWLEY:

2    Q.   Good afternoon, Ms. Martin.

3    A.   Hello.

4    Q.   We've met before, right?

5    A.   Yes, we have.

6    Q.   In fact, Ms. Habba just asked you some questions about

7    meeting with Ms. Carroll's lawyers earlier this month, correct?

8    A.   Correct.

9    Q.   And I believe that you testified that in that meeting you

10   were asked to testify that Ms. Carroll has been damaged by

11   Donald Trump's statements in June 2019.  Do you recall that?

12   A.   I do.

13   Q.   I think you said that you were asked to say that?

14   A.   That I was asked to say ...

15   Q.   That Ms. Carroll has been harmed by Donald Trump's

16   statements.

17   A.   Well, if I believed it, yes, of course.  Yeah.

18   Q.   And, in fact, in the meetings that you had with

19   Ms. Carroll's lawyers, you were just asked to tell the truth,

20   correct?

21   A.   Correct.  Correct.

22   Q.   And you believe, as I think you just said, that Ms. Carroll

23   has been damaged by what Donald Trump said about her back in

24   June 2019, correct?

25        MR. MADAIO:  Objection.  Beyond the scope of direct.

1              THE COURT:  It's Ms. Habba's witness.

2              MS. HABBA:  Objection.  Beyond the scope of direct,

3    your Honor.

4              THE COURT:  Overruled.

5    Q.  And you know that Ms. Carroll has been harmed by Donald

6    Trump's statements because she is one of your closest friends?

7    A.  I do.

8    Q.  Ms. Habba also asked you some questions about your concerns

9    for your safety.  Do you recall those questions?

10   A.  Yes.

11   Q.  And you said that you also have concerns -- or you had

12   concerns about your daughter's safety?

13   A.  I did.

14   Q.  And that was back in 2019?

15   A.  Starting in 2019, yes.

16   Q.  I believe you said that you were concerned because you

17   had -- you were concerned after Ms. Carroll's book was

18   published?

19   A.  And at -- yes.

20   Q.  And the *New York* magazine piece?

21   A.  And *The Daily*, the podcast from the *New York Times*.

22   Q.  Ms. Martin, were you concerned because you had been

23   mentioned in Ms. Carroll's book?

24   A.  I was not mentioned by name in the book.

25   Q.  What do you mean you were not mentioned by name?

O1PQcar3                    Martin - Cross

A.  E. Jean decided to dedicate the book to myself and Lisa
Birnbaum, who is not here I know, but I was not mentioned as --
I was identified as a news reporter.

Q.  And were you discussed not by name, but were you discussed
in the chapter that Ms. Carroll wrote about how Donald Trump
had sexually assaulted her?

            MS. HABBA:  Objection, your Honor.  We discussed all
of this before.  Happy to talk sidebar.

            (Continued on next page)

O1PQcar3                    Martin - Cross

1           (At the sidebar)

2           MS. HABBA:  Your Honor, she made an objection to me

3   going into any of this before we put the witness on the stand.

4   I respected that in your Honor's rulings.  She is now asking

5   her about the anonymity and her name, which is exactly the

6   purpose why I wanted to ask whether she was in *The Cut* or not

7   and her safety.  Mr. Madaio made a record of that.  Now she is

8   discussing the exact thing I could not.

9           MS. CROWLEY:  Your Honor, I think what I said is if

10  she opened the door to asking about Ms. Martin's concerns for

11  her safety following the release of *The Cut* and the release of

12  the book, then we are entitled to explain why she was

13  concerned, which is that she was one of the people in the

14  article.  It's misleading to suggest that Ms. Martin is just

15  some random friend who is concerned for her safety and texting

16  Ms. Carroll about her concerns for her safety without

17  explaining that she was concerned because she had been brought

18  into the book and had been brought into the lawsuit.  In fact,

19  she was named in the lawsuit.  We need to be able to provide

20  that context.

21          MS. HABBA:  We did not discuss the anonymity per your

22  Honor's --

23          THE COURT:  I'm sorry?

24          MS. HABBA:  We did not discuss the anonymity per your

25  Honor's ruling prior, number one.

1          Number two, I'm only discussing the text messages she

2     sent where Ms. Carroll lied to her, and that was why we brought

3     it up as discussed earlier.  I did not go into the details of

4     the book.

5          THE COURT:  You're the one who elicited the outcry

6     answer.  You did.  That's simply a matter of record.  But now

7     give me the rest of it.  Tell me what your point is.

8          MS. HABBA:  My point is only that we were told we

9     could not bring in the cover of the magazine or how in *The Cut*

10    she was anonymous and now she's not.  Now the questions are

11    going directly to what I had to say, which is Ms. Martin

12    decided to do it.  She lied to -- Ms. Carroll lied to

13    Ms. Martin about the safety issue.  I presented those text

14    messages to her on my direct.

15         THE COURT:  Ms. Martin lied --

16         MS. HABBA:  Excuse me, Ms. Carroll -- Carol Martin,

17    Ms. Carroll.

18         Ms. Carroll lied to Ms. Martin, and she admitted it,

19    when she said that she was not afraid for her safety.

20         MS. CROWLEY:  Your Honor, they elicited the fact that

21    Ms. Martin -- sorry, the names are confusing -- that Ms. Martin

22    had safety concerns, and that her daughter had safety concerns

23    because of her involvement in the book and then the lawsuit.

24         It is misleading to leave the jury with the impression

25    that Ms. Martin just is randomly concerned.  They have opened

O1PQcar3                    Martin - Cross

1    the door to this, and now she is entitled -- as she started to

2    do on her direct, she's entitled to explain why she was

3    concerned.

4              THE COURT:  Is the book in evidence?

5              MS. CROWLEY:  The book is not in evidence.  We

6    attempted to offer *The Cut* article in evidence, and they

7    objected, and your Honor sustained the objection.

8              I'm not going to go into this much, but I think she is

9    entitled to say why she was concerned.

10             MS. HABBA:  I think we've made it clear that she's

11   close friends with her.  She said she was friends with her for

12   33 years.

13             MS. CROWLEY:  She was concerned because she had been

14   brought into this.

15             THE COURT:  She was concerned for herself.

16             MS. HABBA:  Right.  And then I'm going to ask her on

17   redirect with how she was lied to about the safety issues.

18             THE COURT:  You already did that.

19             MS. HABBA:  I thought the book was off limits, your

20   Honor.  I stayed away from it per your ruling.

21             THE COURT:  I will allow it.  You are not to go far

22   into this.  Let's go

23             (Continued on next page)

24

25

O1PQcar3                         Martin - Cross

 1                  (In open court)

 2                  THE COURT:  Let's continue.

 3                  MS. CROWLEY:  Thank you, your Honor.

 4     BY MS. CROWLEY:

 5     Q.  Ms. Martin, before we just broke, we were talking about the

 6     concerns that you expressed about your safety and your

 7     daughter's safety following the release of Ms. Carroll's book.

 8     Do you recall that?

 9     A.  Yes.

10     Q.  Were you concerned because you were mentioned in

11     Ms. Carroll's book, not by name, but you were mentioned in

12     Ms. Carroll's book as one of the people Ms. Carroll told about

13     the fact that Donald Trump had assaulted her back in 1996 --

14                  MS. HABBA:  Your Honor --

15                  THE COURT:  Yes.  I think that goes a bit too far.

16     Rephrase.

17                  MS. HABBA:  Thank you.  I'd like to strike that

18     question please, your Honor.

19                  THE COURT:  The jury has been instructed before and

20     will be instructed again that questions are not evidence.

21     Let's go ahead.

22     BY MS. CROWLEY:

23     Q.  Ms. Martin, were you concerned for your safety because you

24     had been mentioned as an outcry witness, to use your word?

25     A.  Well, my name was not mentioned in the book, but as soon as

O1PQcar3                          Martin - Cross

1   publicity began for the book, of my own volition I joined the

2   group to speak about it.

3   Q.  What did you speak about?

4   A.  Well, that would have been at the -- the first time for me

5   was when we spoke for the podcast that.  The New York Times had

6   Meghan Touhy did an interview with three of us.

7   Q.  Who were the three of you?

8   A.  That would be E. Jean and --

9            MS. HABBA:  Objection.

10            THE COURT:  Sustained.

11  Q.  Ms. Martin, were you concerned because you had been brought

12  into -- strike that.

13            Were you concerned for your safety because you had

14  been involved in Ms. Carroll's lawsuit against Donald Trump?

15            MS. HABBA:  Your Honor, objection.  Asked and

16  answered.

17            THE COURT:  Overruled.

18            Answer please, Ms. Martin.

19  A.  Was I concerned because I had been involved in the -- yes.

20  Yes.

21  Q.  And were you concerned that you had been involved in a

22  lawsuit against Donald Trump?

23  A.  Yes.

24  Q.  Why were you concerned about that?

25  A.  I am a huge consumer of news, and I keep up with everything

O1PQcar3                    Martin - Cross

1    that I can as it happens, and the climate in the country felt

2    dangerous to me.

3    Q.  Now, Ms. Habba asked you about the messages that you sent

4    to your daughter back in 2019 in which you asked Ms. Carroll

5    about whether there were any safety concerns.  Do you recall

6    that?

7    A.  Yes.  Yes.

8    Q.  And Ms. Carroll responded that she at that time -- I

9    apologize, strike that.

10           Ms. Carroll responded that she didn't think that there

11   were safety concerns for your daughter or your granddaughter at

12   that time?

13   A.  Yes.

14   Q.  Ms. Carroll sent these texts to reassure your daughter,

15   correct?

16   A.  Yes, I believe so.

17           MS. HABBA:  Objection.

18           THE COURT:  Sustained.  Answer is stricken.

19   Q.  Are you surprised that Ms. Carroll told that you there were

20   not safety concerns back in 2019?

21           MS. HABBA:  Objection.

22           THE COURT:  Sustained.  Doesn't matter if she was

23   surprised.

24   Q.  Ms. Martin, you were asked about a series of texts that you

25   sent to a friend and to your daughter back in 2019.  Do you

O1PQcar3                       Martin - Cross

1  recall that?

2  A.  Yes.

3  Q.  And those were private texts that you sent, correct?

4  A.  Very much so, yes.

5  Q.  And those texts, again, were from around the time that

6  Ms. Carroll -- her lawsuit was ongoing?

7  A.  Yes.

8  Q.  In those texts, you vented about the fact that you felt

9  that Ms. Carroll's -- her lawsuit had become a lifestyle?

10            MS. HABBA:  Objection.

11            THE COURT:  Overruled.

12  A.  I used the word lifestyle in a way that I regret using it.

13  Q.  By lifestyle, you meant that her lawsuit against Donald

14  Trump had been -- had become an important part of her life?

15  A.  I know E. Jean, if I can just briefly say, for so many

16  years that --

17            MS. HABBA:  Objection, your Honor.

18            THE COURT:  Yes.  Please answer the question directly.

19  A.  If you could ask the question one more time then.

20  Q.  Of course.  By lifestyle, you meant Ms. Carroll's lawsuit

21  had become an important part of her life?

22  A.  Had become a very large part of her life.

23  Q.  And you were concerned that Ms. Carroll's lawsuit might not

24  turn out the way that she hoped?

25            MS. HABBA:  Objection.

1          THE COURT:  Overruled.  Please answer.

2   A.  Yes, I was concerned for that.

3   Q.  And that that would be very hard for her?

4   A.  Oh, I think so, and for all of us who supported her.

5          MS. HABBA:  Objection.

6          THE COURT:  Strike everything after "Oh, I think so."

7          MS. HABBA:  Thank you.

8   Q.  Now, around the time that you sent these texts back in 2019

9   and 2020, Ms. Carroll had sued Donald Trump for defamation,

10  correct?

11  A.  Correct.

12  Q.  But she had not -- wasn't able to sue him for the sexual

13  assault at that time?

14          MS. HABBA:  Your Honor, objection.

15          THE COURT:  Sustained as to form.

16  Q.  Ms. Martin, back in 2019, Ms. Carroll had sued Donald Trump

17  for defamation but not assault, correct?

18  A.  Yes, I believe so.

19  Q.  And I believe you discussed in your testimony with

20  Ms. Habba that she was hoping at that time that New York would

21  pass a law that would allow her to sue Donald Trump --

22          MS. HABBA:  Objection.  I never asked about that.

23          THE COURT:  You elicited it though.  Overruled --

24          MS. HABBA:  It's also improper form.

25          MS. CROWLEY:  I can finish the question before I

O1PQcar3                    Martin - Cross

1   believe I was cut off.

2   Q.  You discussed the fact that Ms. Carroll was hoping back in

3   2019 that New York would pass law that would allow her to sue

4   Donald Trump for sexual assault, correct?

5          MS. HABBA:  Objection form.

6          THE COURT:  Overruled.

7   A.  That's correct.

8   Q.  And doing that would add a second lawsuit against Donald

9   Trump, correct?

10  A.  Yes.

11  Q.  Were you concerned what would happen if Ms. Carroll brought

12  another lawsuit against Donald Trump?

13  A.  I was.

14  Q.  Why?

15  A.  Just ups the ante on the climate, for me anyway.

16  Q.  What do you mean when you say "climate"?

17  A.  Are we talking about 2019 and 2020?

18  Q.  Yes.

19  A.  Yeah.  If I may, I know that at that point the election had

20  just been --

21          MS. HABBA:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.  -- had just been completed, and, again, to me, things were

24  amping up in terms of people being angry.  Mr. Trump I know was

25  certainly saying that he had not lost the election --

1          MS. HABBA:  Objection, your Honor.

2          THE COURT:  Overruled.

3   A.  -- and so I was very concerned that my friend was right in

4   the middle of a lawsuit like this one.

5   Q.  Were you concerned that Donald Trump would do anything to

6   Ms. Carroll if she brought this second lawsuit against him?

7          MS. HABBA:  Objection.

8          THE COURT:  Overruled.

9   A.  I thought in my opinion there were defamations already all

10  over the place, and I figured that would continue and escalate.

11  Q.  By "defamations all over the place," what do you mean?

12  A.  In other words, Mr. Trump, as I understood it, was always

13  saying that this had never happened, and that it was not true

14  what E. Jean Carroll was accusing him of, and so --

15  Q.  I cut you off.

16  A.  That's all I was going to say, so it seemed that that would

17  just escalate.  It would get worse.

18  Q.  You were also asked about a text, a private text, you sent

19  in which I believe you referred to Ms. Carroll as a drug

20  addict.  Do you recall that?

21  A.  Yes.

22  Q.  What did you mean by that?

23  A.  I have no idea.  I'm not trying to be -- I use words too

24  loosely sometimes, and I meant that she is -- she was very --

25  we're alike a lot in that we get very passionate and maybe

O1PQcar3                          Martin – Cross

1    overwrought about certain things.  I used the word drug addict.

2    Bad word to use.

3    Q.  You were also asked about texts in which you talked about

4    various celebrations that were connected to Ms. Carroll's case,

5    correct?

6    A.  Mmm-hmm.  Yes.

7    Q.  Ms. Habba used the word "parties" I believe?

8    A.  Yes.

9    Q.  Did some of those parties include lunches?

10   A.  Yes.  Yes.

11   Q.  And you said that some of the people who attended these

12   celebrations were journalists.  Do you recall that?

13   A.  Yes.

14   Q.  Ms. Carroll has been a journalist her whole life, correct?

15   A.  Yes.  Yes.

16   Q.  So it makes sense that her friends would also be

17   journalists?

18   A.  Can I answer?  Yes.  Yes.

19           In fact, many were but they weren't necessarily people

20   I knew.  They were friends of hers.  Also, just two of those

21   events that I remember happened to have been birthday

22   gatherings, small birthday gatherings.

23   Q.  Now, you were also asked about a text that you wrote back

24   in 2019 in which you referred to Ms. Carroll as a narcissist?

25   A.  Yes.

O1PQcar3                          Martin - Cross

1   Q.  And you said you were suspicious of her motives?

2   A.  Yes.

3   Q.  Do you think Ms. Carroll is a narcissist?

4   A.  I have no idea.

5   Q.  Are you suspicious of her motives?

6   A.  I am not suspicious of her motives, and I am again guilty

7   of misusing words.

8   Q.  Why did you write those things?

9   A.  Passion.

10  Q.  Now, as you testified, you sent those messages after

11  Ms. Carroll told you about a good thing that had happened in

12  her case, correct?

13  A.  I think so, yes.

14  Q.  She would sometimes tell you that she was excited when her

15  case was succeeding?

16  A.  Oh yes.  Yes.

17  Q.  And she wanted to sometimes celebrate those moments with

18  you, correct?

19  A.  Correct.

20  Q.  During this time period back in 2019, did Ms. Carroll tell

21  you about bad things that were happening to her?

22  A.  There were implications.

23  Q.  Implications, but she never told you explicitly?

24  A.  Not as explicit as I later would learn.

25  Q.  In your 30 years of friendship with Ms. Carroll, have you

O1PQcar3                        Martin - Cross

1    known her to be someone who talks about bad things that happens

2    to her?

3    A.  She does not particularly do that.

4    Q.  Have you known her to be someone to talk about when she's

5    feeling sad?

6    A.  She -- sometimes.  She is not the girl you call when you

7    are looking for sad news.  She is someone who generally is an

8    optimist.

9    Q.  Have you known Ms. Carroll in your 30 years of friendship

10   to tell you or talk about when she's feeling scared?

11   A.  Yes.

12   Q.  Let me ask you, when you asked Ms. Carroll how she's doing,

13   what does she usually say?

14            MS. HABBA:  Objection.

15            THE COURT:  Overruled.

16   A.  Answer?

17            THE COURT:  Yes, please.

18   A.  She usually says fabulous.

19   Q.  Do you think she's always doing fabulous?

20   A.  No.

21   Q.  So when you made these comments in the messages that we

22   were talking about, you were commenting on what Ms. Carroll was

23   telling you about how she was doing, correct?

24   A.  Yes.

25   Q.  But you had no way, obviously, of knowing what was actually

O1PQcar3                      Martin - Cross

1  happening in her mind?

2  A.  No, I really didn't.  I have no way to know that.

3  Q.  You didn't sit at Ms. Carroll's computer every night and

4  look at the emails she was getting?

5  A.  I have never seen those.

6  Q.  You didn't see the Twitter posts about her?

7  A.  I heard about them.  I have not seen them.  I'm not on

8  Twitter.

9  Q.  Back in 2019, did Ms. Carroll tell you about death threats

10  that she was getting nearly everyday?

11  A.  She told me a bit about that.

12  Q.  She told you later, right?

13  A.  Yes.  Yes.

14  Q.  Now, you testified -- you testified on direct that you also

15  testified in the other trial involving Ms. Carroll and Donald

16  Trump, correct?

17  A.  Yes.

18  Q.  And that was last May?

19  A.  Yes.

20  Q.  Having testified at that trial, are you now aware that

21  Ms. Carroll has received hundreds of death threats since 2019?

22        MS. HABBA:  Objection.

23        THE COURT:  Sustained.

24  Q.  Having testified at that trial, are you aware of the

25  backlash that Ms. Carroll has received since 2019?

O1PQcar3                         Martin - Cross

1                MS. HABBA:  Objection.

2                THE COURT:  Sustained.

3    Q.  Sitting here today, Ms. Martin, do you think that

4    Ms. Carroll loves the adulation that she got after Donald Trump

5    defamed her in June 2019?

6    A.  I do not believe that at all.

7    Q.  You testified on direct, Ms. Martin, that before you

8    retired, you were a journalist and a news anchor, correct?

9    A.  Correct.  Yes.

10   Q.  And that you met Ms. Carroll over 30 years ago?

11   A.  Yes.

12   Q.  What was her job when you met her?

13   A.  I knew her principally as a columnist for the "Ask E. Jean"

14   column in *Elle* magazine.  We did not work together until 1994

15   when we were both doing our own shows for the *America's Talking*

16   cable network.

17   Q.  You're fairly familiar with Ms. Carroll's career as a

18   journalist?

19   A.  Yes.

20   Q.  Would you consider her to be a successful writer?

21   A.  Yes, I would.

22   Q.  Back when she was writing the "Ask E. Jean" column and had

23   a TV show, was she fairly well-known?

24   A.  Yes, she was.

25   Q.  She appeared on TV?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1PQcar3                    Martin - Cross

1    A.   Every day.

2    Q.   She published several books?

3    A.   I think three or four for sure.

4    Q.   Ms. Carroll was a journalist for several decades before she

5    came forward and told people what Donald Trump had done to her,

6    correct?

7    A.   Correct.

8    Q.   What was Ms. Carroll's reputation as a journalist before

9    2019?

10   A.   She was, I'd say, well thought of, respected, pretty well

11   read, I think.  A lot of folks read her column.

12   Q.   Do you think Ms. Carroll wants to be known as the woman who

13   was sexually assaulted by Donald Trump --

14           MS. HABBA:  Objection.

15           MS. CROWLEY:  Your Honor, she was asked questions on

16   direct about her opinion of Ms. Carroll's reputation.

17           THE COURT:  Sustained as to that question.

18   Q.   Ms. Martin, do you think that Ms. Carroll wants to be known

19   as someone who lied about the president sexually assaulting

20   her?

21           MS. HABBA:  Objection.

22           THE COURT:  Overruled.

23           Answer, please.

24   A.   I'm sorry.  Does she want to be --

25   Q.   Do you think that Ms. Carroll wants to be known as the

O1PQcar3                      Martin - Cross

1   woman who lied about the president sexually assaulting her?

2   A.  No, not at all.

3   Q.  Do you think that her goal in coming forward and speaking

4   publicly about -- do you think that that was her goal in coming

5   forward and speaking publicly about what had happened to her?

6   A.  That people would think she lied?  I'm sorry, I don't want

7   to misconstrue.

8               (Continued on next page)

O1P5car4                      Carol – Redirect

1   BY MS. CROWLEY:

2   Q.  Yes, yes.

3   A.  No, her goal was to face her accuser, the person she was

4   accusing.  I know what she always wanted was to have her day in

5   court.  She has said that.

6              [Phone ringing]

7              THE COURT:  Whose telephone is that?  Take this man

8   out of here.

9              MS. CROWLEY:  One moment, your Honor?

10             THE COURT:  Yes.

11             (Counsel conferring)

12             MS. CROWLEY:  We have nothing further.

13             THE COURT:  Thank you.

14             Will there be a redirect?

15             MS. HABBA:  Just briefly, your Honor.

16             THE COURT:  All right.

17  REDIRECT EXAMINATION

18  BY MS. HABBA:

19  Q.  Ms. Martin, you are friends with Ms. Carroll; correct?

20  A.  Yes.

21  Q.  And you only know Ms. Carroll's side of the story; correct?

22  A.  I only know --

23             MS. CROWLEY:  Objection.

24             THE COURT:  Sustained.

25  A.  I don't --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1P5car4

1    Q.  Have you ever spoken to President Trump?

2    A.  No, I have not.

3          MS. HABBA:  No further questions.

4          THE COURT:  OK.  We will take our break for lunch.  We

5    will resume at 10 minutes to 2:00, and I think members of the

6    jury, you will have a little bit more time before we bring you

7    back.  I have some business to do with the lawyers at 10 to

8    2:00.

9          (Luncheon recess; continued next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1P5car4

```
 1                   A F T E R N O O N   S E S S I O N

 2                            1:55 p.m.

 3              THE COURT:  Let's get those doors closed.

 4              Ms. Habba, do you have any more witnesses?

 5              MS. HABBA:  Yes, your Honor.

 6              THE COURT:  Who?

 7              MS. HABBA:  President Trump.

 8              THE COURT:  Anyone else?

 9              MS. HABBA:  That is it, your Honor.  And I will be

10    very brief.

11              THE COURT:  Do you have anything else to offer, apart

12    from Mr. Trump's testimony?

13              MS. HABBA:  No, your Honor.

14              THE COURT:  OK.  Before Mr. Trump takes the stand --

15    and I should indicate that he and Ms. Carroll are both present,

16    with counsel -- I have a few things to say and a few things to

17    obtain some clarification on from the defendant.

18              As everyone in the room knows, there was a trial last

19    year concerning, among other things, the truth or falsity of

20    Ms. Carroll's claim that Mr. Trump sexually assaulted her.

21    Mr. Trump was listed as a witness by the defense in that case

22    but he elected not to testify.  The jury unanimously concluded,

23    among other things, and in brief summary, that Mr. Trump had

24    sexually assaulted Ms. Carroll and that Mr. Trump's claim that

25    she had fabricated her account was false and defamatory.
```

O1P5car4

1          It is a very well-established legal principle in this

2    country that prevents do-overs by disappointed litigants.  It

3    is called issue preclusion or collateral estoppel.  Mr. Trump's

4    counsel are quite familiar with it as they wrote in one of the

5    briefs they filed in this case, quoting a Court of Appeals

6    decision, "The fundamental notion is that an issue of law or

7    fact, actually litigated and decided by a court of competent

8    jurisdiction in a prior action, may not be relitigated in a

9    subsequent suit between the parties."

10          After considering submissions by both sides, this

11    Court ruled that the trial last year conclusively decided,

12    among other things, the following:

13          First, Mr. Trump in fact sexually abused Ms. Carroll

14    by forcibly, and without her consent, inserting his fingers

15    into her vagina.

16          Second, Mr. Trump's June 21st and 22nd statements in

17    2019 were false.  Ms. Carroll did not make up her claim of

18    forcible sexual abuse.

19          Third, Mr. Trump's June 21 and June 22, 2019

20    statements were defamatory.

21          Fourth, Mr. Trump, when he made those statements, knew

22    they were false, had serious doubts as to the truth of what he

23    said, or made those statements with a high degree of awareness

24    that they probably were false.

25          As those issues all were determined previously,

O1P5car4

Mr. Trump cannot offer any evidence or make any argument before
the jury disputing or intending to unwind those determinations.
And it was not just Mr. Trump who was precluded from offering
any evidence as to the occurrence or the details of the sexual
assault.  Ms. Carroll, too, was precluded from doing so.
That's why the jury did not hear her testimony as to those
details.  She adhered to the Court's ruling.

In a January 12 letter, which is on the docket in this
case as item 256, Ms. Kaplan, on behalf of Ms. Carroll,
questioned whether Mr. Trump could offer any testimony at all
that would be admissible in this case in light of the Court's
ruling.  Ms. Habba, in your response, which is on the docket at
265, you asserted that Mr. Trump could offer admissible
testimony on four subjects:

First, you said he should be allowed to testify to the
questions he was asked by reporters which, as you put it, and I
quote, "propagated his response and denial to Ms. Carroll's
story in *New York* magazine, and whether he was acting with
hatred or ill will when he provided his answers."

Second, you said he could testify about his state of
mind and the timing of the statements.

Third, you said he could testify that he had corrected
one statement, and I quote you, "to acknowledge and explain
that he met Ms. Carroll on a receiving line at a charity
event."

O1P5car4

1          Finally, you argued that he should be allowed to

2     testify "about the circumstances of Mr. Trump's comments as

3     they related to what you characterized as comments in

4     Ms. Carroll's continuous parade of interviews and publicity."

5          The Federal Rules of Evidence, specifically Rule

6     103(d), provide that, and I am quoting it, "To the extent

7     practicable, the Court must conduct a jury trial so that

8     inadmissible evidence is not suggested to the jury by any

9     means."

10          In all of the circumstances of this case there is

11     cause for concern as to whether Mr. Trump's examination and

12     testimony will contain or suggest inadmissible evidence to the

13     jury.  Some of those concerns are referred to at pages 2

14     through 4 of Ms. Kaplan's January 12 letter, item 256; and

15     others in her letter of January 20; item no. 274 and its

16     exhibits.

17          In furtherance of the Court's duty to prevent that to

18     the extent practicable, that is, the introduction of

19     inadmissible material before the jury, I want to confirm and

20     obtain clarifications of some of the things that you,

21     Ms. Habba, have stated, and I'm going to begin with

22     clarification.

23          As I mentioned before, you said that Mr. Trump should

24     be allowed to testify to the questions he was asked by

25     reporters which, as you put it, propagated his response and

O1P5car4

1    denial to Ms. Carroll's story in *New York* magazine, and whether

2    he was acting with hatred or ill will when he provided his

3    answers.  What would he testify to, exactly, as to the time

4    period during which he was asked those questions?

5          MS. HABBA:  Well, your Honor, actually, if I may, I

6    have three questions for my client.  It is actually much

7    briefer than going through all of that, number one.

8          THE COURT:  Ms. Habba, we are going to do it my way.

9          MS. HABBA:  Sure.

10         THE COURT:  Answer my question.

11         MS. HABBA:  So you want me to tell you what he is

12   going to testify to, your Honor?

13         THE COURT:  Exactly.  And fully.

14         MS. HABBA:  Sure.  He is going to deny the

15   allegations, if that's what you are asking me.  Would he deny

16   them?

17         THE COURT:  Complete your answer.

18         MS. HABBA:  Please -- I'm sorry.  I'm not

19   understanding your questions.

20         THE COURT:  I want to know everything he is going to

21   say.

22         MS. HABBA:  I do not have an answer to that other than

23   that he stands by his deposition, his testimony that the

24   plaintiff brought in, he is going to say that he stands by his

25   testimony there, he is going to say that he did not make the

O1P5car4

1   statements to hurt Ms. Carroll, and he is going to say that he

2   had to respond to the accusations and deny them.  The

3   statements speak for themselves, they have already been put

4   into evidence.

5           THE COURT:  And that is 100 percent of what he would

6   say on the witness stand?

7           MS. HABBA:  I have three questions, your Honor.  I

8   just ran through it.

9           THE COURT:  Answer my question.

10          MS. HABBA:  I can't tell you.

11          THE COURT:  Answer my question.

12          MS. HABBA:  I am not testifying for my client, your

13  Honor.

14          THE COURT:  You are making an offer of proof and your

15  client is bound by it.

16          MS. HABBA:  That is what my client is going to say, is

17  that he did not do it; at the time he denied it for the reason

18  of having to deny it; that he was addressing them, the

19  questions, because of his accusation; that he never instructed

20  anyone to hurt Ms. Carroll.  That is what he is going to say.

21  And also, that he stands by the depositions that they, frankly,

22  played, which I am happy they did, frankly.

23          THE COURT:  And he will say nothing else?

24          MS. HABBA:  That is my understanding, your Honor.

25          THE COURT:  Let me hear from the other side.

O1P5car4

1          MS. KAPLAN:  So, for one, I'm not sure -- I take it

2     that Ms. Habba is somehow arguing that by putting on the video

3     we opened the door such that he could deny that the sexual

4     assault happened.  I don't see that from what we put on and

5     that has always been -- it is the main part of what the Court's

6     orders are and that he cannot do that and it is the import of

7     what your Honor talked about today.

8          THE COURT:  This is, at this point, on that narrow

9     item, academic.

10          MS. KAPLAN:  Academic in the sense that the jury

11     understands that he still denies it, your Honor?

12          THE COURT:  Pardon me?

13          MS. KAPLAN:  Academic in the sense that the jury

14     obviously understands that that is his position?

15          THE COURT:  Yes.

16          MS. KAPLAN:  So, your Honor, as you were talking and

17     asking the questions of Ms. Habba, we are closer to him than

18     you are, obviously, but Mr. Trump said under his breath that he

19     intended to say that he never met her and had never seen her

20     before.  That's what he was saying under his breath just behind

21     us when Ms. Habba was purporting to say what he is going to

22     say.  So I guess if he just says -- I mean, we have to figure

23     out what is the proper way to say it.

24          THE COURT:  We are going to go back to the way I

25     approached it in the first place.

O1P5car4

1          MS. KAPLAN:  OK.

2          THE COURT:  I infer from what you said, Mr. Habba --

3          MS. HABBA:  Ms.

4          THE COURT:  -- that he will not testify to questions

5     that were asked of him by reporters; is that correct?

6          MS. HABBA:  He is not testifying what questions were

7     asked of him; no, your Honor.

8          If I may, your Honor?

9          THE COURT:  No.

10         MS. HABBA:  OK.

11         THE COURT:  Not right now.

12         So tell me the three questions you propose to ask

13    again.

14         MS. HABBA:  Sure.

15         I would just like him to confirm that he stands by all

16    the testimony at his deposition, also that he made the

17    statements in response to her accusations and what his state of

18    mind was there, and that he --

19         THE COURT:  What will he say about his state of mind?

20         MS. HABBA:  He was defending himself, your Honor.

21         THE COURT:  And he will say nothing else about his

22    state of mind.

23         MS. HABBA:  I think that says it all.

24         THE COURT:  I didn't ask you whether you think it says

25    it all.

O1P5car4

1          MS. HABBA:  Yes.

2          THE COURT:  He will say nothing other than his state

3     of mind was that he was responding; is that right?

4          MS. HABBA:  And that he was defending himself, your

5     Honor, to an accusation that he -- that's it.  And he still

6     does.  And the only other thing was that he never instructed

7     anyone to hurt Ms. Carroll in his statements, and that is a

8     simple yes or no question.  That's it.

9          THE COURT:  Ms. Kaplan?

10          MS. KAPLAN:  The third question, your Honor, which we

11     think is obviously not believable, but the third question seems

12     to me -- seems to us to be OK.  The first two statements I

13     think -- the first two questions and answers, your Honor, bring

14     up the question we were just talking about which is that he may

15     still think that he didn't do it, I understand that, but he had

16     an opportunity to participate in a trial, he didn't participate

17     in the trial.

18          THE COURT:  He lost it and he is bound.  And the jury

19     will be instructed that, regardless of what he says in court

20     here today, he did it, as far as they're concerned.  That is

21     the law.

22          MS. KAPLAN:  And that instruction will be given at the

23     end or after his testimony?  I'm sorry.

24          THE COURT:  It will be given more than once.  Not in

25     those words exactly, but in substance.

O1P5car4

1            MS. KAPLAN:  Look.  We think there is certainly the

2    risk of it being confusing to the jury but your Honor certainly

3    knows how to give an instruction, and if it is limited to those

4    three things, we understand where your Honor is going.

5            THE COURT:  You played the deposition.  They heard it.

6            MS. HABBA:  Your Honor --

7            THE COURT:  Look.  You told me in your letters, I

8    think, that Mr. Trump is well aware of the Court's rulings with

9    respect to issue preclusion and the strict confines placed on

10    his testimony.

11            Do you confirm that?

12            MS. HABBA:  Yes, your Honor.

13            THE COURT:  And you say that because you personally

14    made him aware of those confines?

15            MS. HABBA:  Excuse me, your Honor?

16            (Defendant and counsel conferring)

17            THE DEFENDANT:  I never met the woman.  I don't know

18    who the woman is.  I do not know who the woman is.  I wasn't at

19    the trial.  I don't know who the woman is.  I never met this

20    woman.

21            THE COURT:  Mr. Trump, keep your voice down.

22            MS. HABBA:  Your Honor, I have now answered many times

23    the three questions.  I have literally given a preview into the

24    questions asked --

25            THE COURT:  And I have an outstanding question to you.

O1P5car4

1          MS. HABBA:  OK.  What is it?  I'm sorry.  I'm not

2     understanding what you are asking.

3          THE COURT:  Did you make Mr. Trump personally --

4          MS. HABBA:  Yes.

5          THE COURT:   -- aware of the confines on his

6     testimony?

7          MS. HABBA:  Yes.

8          THE COURT:  And will Mr. Trump comply with those

9     confines?

10          MS. HABBA:  Outside of having a glass ball he will

11     absolutely --

12          THE COURT:  I'm sorry, Mr. Trump.  You are

13     interrupting these proceedings by talking loudly while your

14     counsel is talking and that is not permitted.

15          MS. HABBA:  Your Honor, you have reiterated them just

16     now.  He is aware.  We obviously dispute it.  The case is on

17     appeal with the first case, but as to this case, he is aware.

18     That is why I am asking three questions and sitting down.

19          THE COURT:  So he will comply with the rulings; is

20     that right?

21          MS. HABBA:  That is my understanding and --

22          THE COURT:  Except to the extent of --

23          MS. HABBA:  The deposition that he will agree to,

24     which they put in.

25          THE COURT:  It seems to me that I will permit him to

O1P5car4

```
1   get on the stand and you may ask him whether he stands by the
2   testimony that was played in this court this morning, that he
3   gave previously.  End.  That's it.
4            MS. HABBA:  I can only ask one question?  Is that what
5   your Honor is saying?
6            THE COURT:  Yes.
7            MS. HABBA:  Your Honor, I'm sorry, but I have to prove
8   my -- so I just ask about the deposition.
9            THE COURT:  Oh, and if you want to ask -- the second
10  question you can ask.
11           MS. HABBA:  About his intent.
12           THE COURT:  The question you proposed was did he ever
13  tell anybody to hurt Ms. Carroll.
14           MS. HABBA:  That was the third question.  I can go
15  through them again, your Honor.
16           THE COURT:  Go through them again, Ms. Habba.
17           MS. HABBA:  So, the first is that he will confirm that
18  he stands by everything in the deposition testimony.  My
19  understanding is your Honor has no issue with that.
20           THE COURT:  I have no issue with that.
21           MS. HABBA:  Thank you.
22           The second question is why did you make the statements
23  in response to her accusation.
24           THE COURT:  No.
25           MS. HABBA:  I cannot ask that question.
```

O1P5car4

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | THE COURT:  You can ask him the other question.              |
| 2  | MS. HABBA:  So how do they prove common law malice          |
| 3  | when I can't have my client defend himself and say he wasn't |
| 4  | defaming her, he was defending himself at the time?         |
| 5  | THE COURT:  Those are not mutually exclusive               |
| 6  | propositions.                                                |
| 7  | MS. HABBA:  But I have a right to ask about his             |
| 8  | intent, they have an obligation to prove his intent.         |
| 9  | THE COURT:  Ms. Habba, I will decide what he has a         |
| 10 | right to do here.  That's my job, not yours.                |
| 11 | Now, question 1.  Does he stand by the deposition?          |
| 12 | Did he deny the allegation because an accusation had been made? |
| 13 | That's it.  Not what was in your mind.  Why did he do it.  And |
| 14 | I take it the offer of proof is he did it because someone made |
| 15 | an accusation.  Is that right?  Is that what you propose to do? |
| 16 | MS. HABBA:  I'm happy to ask it that way, why did you      |
| 17 | deny her accusations.  Is that how you would like it, your   |
| 18 | Honor?                                                        |
| 19 | THE COURT:  No, it's not an open-ended question.           |
| 20 | There will not be an open-ended question.                    |
| 21 | Let me put it a different way.  If you were to ask          |
| 22 | that open-ended question, there is likely to be an objection |
| 23 | and it is likely, in significant measure, to be sustained.  |
| 24 | What was your third point?                                   |
| 25 | MS. HABBA:  Did you ever instruct anyone to hurt          |

O1P5car4

1    Ms. Carroll in your statements.

2              THE COURT:  I have no problem with that, if it is

3    asked that way.

4              MS. HABBA:  That's exactly my question.

5              THE COURT:  OK.

6              MS. HABBA:  That's it.

7              MS. KAPLAN:  OK.

8              THE COURT:  Bring in the jury.

9              MS. HABBA:  Sorry, your Honor.  One minute?

10             (Counsel conferring)

11             MS. HABBA:  There is confusion with counsel so I just

12   want to make sure for the record, the second question, which

13   seems to be the only one that I am confused on, did you deny

14   Ms. Carroll's accusation.  That is permitted, correct?

15             THE COURT:  No.  He denied it in the deposition.  He

16   is affirming the deposition.

17             MS. HABBA:  So you had proposed a way for the second

18   question.

19             THE COURT:  I thought you had and it keeps changing.

20   Subtly, but it keeps changing.  You can elicit the fact he made

21   it in response.

22             MS. HABBA:  As long as we have the deposition, your

23   Honor, I think we will be fine.  Thank you.

24             THE COURT:  I hope you will.

25             (Continued on next page)

```
 1                (Jury present)

 2                THE COURT:  Thanks for bearing with us again, ladies

 3     and gentlemen.  I hope lunch was better than the cafeteria

 4     usually turns out.

 5                Ms. Habba, you may call your next witness.

 6                MS. HABBA:  Thank you, your Honor.  The defense calls

 7     President Donald Trump.

 8     DONALD JOHN TRUMP,

 9          called as a witness by the Defendant,

10          having been duly sworn, testified as follows:

11                THE DEPUTY CLERK:  Can please state your name for the

12     record.

13                THE WITNESS:  Donald John Trump.

14                THE COURT:  You may proceed, Ms. Habba.

15                MS. HABBA:  Thank you, your Honor.

16     DIRECT EXAMINATION

17     BY MS. HABBA:

18     Q.  Mr. President, you viewed your deposition which was played

19     by plaintiff's counsel at length during the trial.  Didn't you?

20     A.  Yes, I did.

21     Q.  Do you stand by your testimony at the deposition?

22     A.  100 percent.  Yes.

23     Q.  Did you deny the allegation because Ms. Carroll made an

24     accusation?

25     A.  That's exactly right.  She said something, I consider it a
```

O1P5car4                          Trump – Cross

1    false accusation.  No difference.

2              MS. KAPLAN:  Objection, your Honor.

3              THE COURT:  Everything after "yes, I did," is

4    stricken.  The jury will disregard it.

5              Go ahead.

6    BY MS. HABBA:

7    Q.  Did you ever instruct anyone to hurt Ms. Carroll in your

8    statements?

9    A.  No.  I just wanted to defend myself, my family, and

10   frankly, the presidency.

11             MS. KAPLAN:  Objection your Honor.

12             THE COURT:  Objection is sustained.  Everything after

13   "no" is stricken.  The jury will disregard.

14             MS. HABBA:  I have no further questions.  Thank you.

15             THE COURT:  Thank you.

16             Cross-examination.

17   CROSS-EXAMINATION

18   BY MS. KAPLAN:

19   Q.  Good afternoon, sir.

20             Now, your deposition that we watched earlier today in

21   this trial, took place in October of 2022; correct?

22   A.  I believe so, yes.

23   Q.  And after that, months after that, there was a trial

24   between you and Ms. Carroll that took place actually in this

25   courtroom; correct?

1             MS. HABBA:  Objection.

2             THE COURT:  Overruled.  Excuse me.  Sustained.

3             MS. HABBA:  Thank you.

4    BY MS. KAPLAN:

5    Q.  Sitting here today, Mr. Trump, are you aware that there was

6    another trial between you and Ms. Carroll?

7    A.  Yes.

8             MS. HABBA:  Objection.

9             THE COURT:  Sustained.

10   Q.  Mr. Trump, is this the first trial between you and

11   Ms. Carroll that you have attended?

12            MS. HABBA:  Objection.

13            THE COURT:  I will allow that.

14   A.  Yes.

15            MS. KAPLAN:  No further questions, your Honor.

16            THE COURT:  Any redirect?

17   REDIRECT EXAMINATION

18   BY MS. HABBA:

19   Q.  Mr. President, did you have counsel at the last trial?

20   A.  I had counsel.

21   Q.  Did you listen to the advice of counsel at the last trial?

22            MS. KAPLAN:  Objection, your Honor.

23            THE COURT:  Sustained.

24            MS. HABBA:  No further questions.

25            THE COURT:  Thank you, Mr. Trump.  You are excused.

O1P5car4                          Trump – Redirect

1          (Witness excused)

2          Does the defense have any further evidence?

3          MS. HABBA:  No, your Honor.  The defense rests.

4          THE COURT:  Ms. Kaplan, is there going to be any

5    rebuttal evidence?

6          MS. KAPLAN:  No, there is not, your Honor.

7          THE COURT:  Members of the jury, that concludes the

8    presentation of evidence in this case.  At this point I will

9    need to confer with counsel about the instructions that I am

10   going to give you to decide the case.  We will resume tomorrow

11   morning with you at 9:30 when you will hear closing argument

12   and receive my instructions on the law.  I don't yet know how

13   long counsel anticipates being in closing argument.

14         Are you both in a position to giving me an idea?

15         MS. HABBA:  We spoke, Ms. Kaplan and I and the team,

16   we spoke prior, I think -- correct me if I am not wrong,

17   Robbie -- but I think it is about an hour for each of us.

18         MS. KAPLAN:  We may go a little bit over an hour, your

19   Honor.

20         MS. HABBA:  Same with me.  I mean roughly, your Honor.

21         THE COURT:  You will probably have the case for

22   decision by lunchtime or after lunch tomorrow.

23         OK.  Enjoy the evening and we will see you tomorrow.

24         (Continued on next page)

25

O1P5car4                          Trump - Redirect

 1              (Jury not present)

 2              THE COURT:  Counsel, I will have a couple of paper

 3    copies of the charge from my chambers, I think by 2:30.  We

 4    have to run the copier, approximately 2:30.  Charge conference

 5    at 3:30.

 6              MS. HABBA:  Sure.

 7              THE COURT:  In this room.

 8              MS. KAPLAN:  Thank you, your Honor.

 9              (Recess)

10              (Continued next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1PQcar5

1          (In open court; jury not present)

2          THE COURT:  We will mark as Court Exhibit A the

3     proposed verdict form and as Court Exhibit B the draft jury

4     instructions.

5          We'll start with the verdict form.

6          Any objections from the plaintiff to the verdict form?

7          MR. MATZ:  Yes, your Honor.

8          THE COURT:  Yes?

9          MR. MATZ:  The verdict form separates out with respect

10    to compensatory damages the June 21st and June 22nd statements.

11    Our concern is that that will be extremely confusing to the

12    jury because there was no testimony that was offered that would

13    really allow the jury to intelligently separate either the

14    reputational repair or the pain and suffering compensatory

15    damages attributable to the statements.  The statements

16    occurred less than 24 hours apart.  They were extremely similar

17    in tone and substance --

18         THE COURT:  I understand your point.

19         MR. MATZ:  Thank you, your Honor.

20         Let me hear from the other side on that.

21         MR. MADAIO:  Your Honor, we do have several issues

22    we'd like to address.

23         THE COURT:  How about addressing Mr. --

24         MR. MADAIO:  Yes, your Honor.

25         THE COURT:  -- Matz's point first.

O1PQcar5

1          MR. MADAIO:  On this point we would prefer to keep the

2     charges separated as they are right now.  Again, they are two

3     separate statements.  There's been a lot of discussion about

4     causation and harm caused by each individual statement, so --

5          THE COURT:  What's the legal argument for doing it?

6          MR. MADAIO:  Again, the legal argument is that the

7     jury is required to attribute the harm for each statement.

8     Therefore, they should have to determine --

9          THE COURT:  What case or statute says that?

10         MR. MADAIO:  Again, the harm would have to be

11    attributable to each statement.  I can find a particular case

12    if you would like.

13         THE COURT:  Well, I understood the first time you said

14    the harm has to be attributable to the particular statement.

15    So, needless to say, I got it the second time you said it, and

16    I asked you whether there is any legal authority one way or the

17    other on it.

18         MR. MADAIO:  Your Honor, I'm not aware of any legal

19    authority that stands for the proposition that statements can

20    be grouped together and the harm, you know, considered

21    together.  I mean, generally harm has to be attributable to a

22    particular act.  Here, the act is each statement – the

23    June 21st statement and the June 22nd statement.

24         THE COURT:  Mr. Matz.

25         MR. MATZ:  Your Honor, just as Mr. Madaio is not aware

O1PQcar5

1    of any authority that requires this, I am not aware of any

2    authority that would prohibit grouping the statements together,

3    and particularly in a circumstance like this where the nature

4    of the evidence that has come in would make it very confusing

5    for the jury.  There is also already in the jury instructions a

6    no double recovery instruction, so I think it will be clear to

7    the jury that they are meant to think about the two statements

8    together and award only damages for actual injury with respect

9    to compensatory damages.

10         And we think requiring a presentation in closing and

11   requiring findings by the jury that parse apart the two

12   statements that were so close in time, so close in substance,

13   and produced both emotional and reputational effects that very

14   much ran together and caused harm in tandem would be a sort of

15   confusing and kind of needlessly exercise to ask of the jury.

16         MR. MADAIO:  Your Honor.

17         THE COURT:  Yes, sir.

18         MR. MADAIO:  May I respond to that briefly?

19         THE COURT:  Sure.

20         MR. MADAIO:  Mr. Matz just said that one of the

21   considerations that they are considering is that the

22   reputational effects run together for these statements.  That's

23   exactly why we want these to be dealt with separately because

24   there have been a lot of statements shown to the jury, and I

25   think it's confusing that if you put them together, they may be

O1PQcar5

1    considering the reputational harm of all of the statements as a

2    whole as opposed to looking at each individual statement at

3    issue here, June 21 and June 22.

4               THE COURT:  The problem with that is that they're

5    being told explicitly not to consider as to compensatory

6    damages any harm caused by any statements other than the

7    June 21 and June 22 statements.  So I don't find that

8    persuasive.

9               But I will be frank with you that I have been thinking

10   about this for quite some time, and at this moment my

11   inclination is to combine them, but I will give you till 9:00

12   tonight to submit any additional authority on this point and

13   you will certainly know by first thing tomorrow morning before

14   you sum up which way I'm going go on it.

15              MR. MATZ:  Thank you, your Honor.

16              MR. MADAIO:  Understood, your Honor.

17              THE COURT:  I don't blame you for raising the point.

18   It's a very interesting point, actually.

19              Anything else from the plaintiff on the verdict form?

20              MR. MATZ:  No, your Honor.

21              THE COURT:  Defendant on the verdict form?

22              MR. MADAIO:  Just two points, your Honor.

23              The first is, again, the way the damages are

24   structured here.  We would -- we object to having reputation

25   repair program being separated out as its own damages.  We

O1PQcar5

1  think it would be sufficient to have compensatory damages and

2  that be it.

3          Again, once it comes to reputational repair, you know,

4  the reputational repair program it's our point that it's

5  supposed to make Ms. Carroll whole in terms of her reputation.

6  I think having a compensatory damages line only would be

7  sufficient in terms of allowing her to receive compensatory

8  damages in that regard.

9          THE COURT:  Mr. Matz?

10          MR. MATZ:  Your Honor, in this respect, the jury form

11  that your Honor circulated is the same as at the *Carroll II*

12  trial.  Obviously there was no objection there so far as we

13  could tell --

14          THE COURT:  But they're not bound by that.

15          MR. MATZ:  Of course the Court isn't bound by it.  I'm

16  identifying it as a potentially relevant prior practice that

17  didn't seem to give rise to any particular confusion or

18  difficulty.

19          So far as I'm aware, there is nothing in the law that

20  prohibits the Court from crafting a verdict form from

21  indicating more specific findings, something more in the nature

22  of a special verdict form as to a general verdict form as to a

23  particular bases on which facts are being found.

24          So to the extent the jury is being asked to find two

25  categories of compensatory damages, which they are, which have

O1PQcar5

1    been separated out in the testimony, which will be separated

2    out in the parties' argumentation, it only seems natural to

3    allow them to provide with greater specificity, which will ease

4    the jury's deliberations in the event of an ensuing of an

5    appellate review facilitate better appellate review as well.

6            THE COURT:  The second is the real point.  The

7    objection is overruled.

8            If the jury were to return a single award on a

9    compensatory damage and the case went up on appeal, and there

10   were certainly an instructional error as to one part of the

11   compensatory award but not the other, both awards would be

12   overturned, and you would have a new trial.  Whereas separating

13   them avoids the risk of a new trial in the event of an

14   instructional error as to one form of damages versus the other.

15   And, therefore, it's overruled.

16           MR. MADAIO:  Your Honor, can I propose one

17   alternative, which would be to have it listed as reputational

18   harm and emotional harm.  I think it's a little confusing where

19   it's other compensatory damages.  And, in addition,

20   specifically referring to the reputation repair program, I

21   think gives a lot of credibility to theirs, specifically their

22   expert and the way that she described it as opposed to just

23   saying reputational harm.

24           THE COURT:  Overruled.

25           Anything else on the verdict form?

O1PQcar5

1          MR. MADAIO:  Yes, your Honor.  The other one is that

2     for punitive damages, we would like the standard to be clear

3     and convincing evidence as opposed to preponderance of

4     evidence.

5          THE COURT:  Yes, I've carefully considered what you

6     have said on that.  And with respect, I think you're wrong on

7     the law.

8          Does that take care of the verdict form?  Okay.

9          I wasn't kidding when I commented on the food from the

10    cafeteria.

11         We will go to the charge.  From the beginning to page

12    4, line 14.  Plaintiff, any objection?

13         MR. MATZ:  No objection, your Honor.

14         THE COURT:  Defense?

15         MR. MADAIO:  No objection, your Honor.

16         THE COURT:  Thank you.

17         Page 4, line 15 to page 5, line 15.  Plaintiff?

18         MR. MATZ:  Your Honor, we have several issues to raise

19    with the Court with respect to this set of materials.  Two

20    issues in particular.

21         The first -- and I'm raising it here just because this

22    seems like the most natural point in the instructions -- is

23    that we would respectfully request -- and I am prepared to

24    address this in a bit more than we previously did -- an

25    instruction that any benefit to Ms. Carroll's reputation cannot

O1PQcar5

1     be considered in mitigation of evidence.

2              We previously addressed this point in a letter that we

3     submitted at the Court's direction.  It's Docket No. 275.  What

4     I would highlight is just a couple of key points.

5              The first is that that theme of benefit to her has

6     featured prominently in the case.  It featured as they sought

7     to elicit testimony about it today from Ms. Martin.  Mr. Trump

8     has grumbled about it audibly in the courtroom.  It featured in

9     Ms. Habba's argument today in support of a directed verdict.

10    It came up in her opening argument.

11             It's very clear a major defense theme in this case is

12    that Ms. Carroll's benefit -- reputation benefited in some

13    respect from the June 21 and June 22 statements, and those

14    benefits should be taken as mitigation of damages.

15             It is clear New York law that that is not the case,

16    and rather than having us attempt to argue -- we were prepared

17    to argue that to the jury on the facts because we think they're

18    wrong.  We think that her attempts of defending herself

19    publicly and all of that support damages.  They don't mitigate

20    it.  But it's also wrong legally, and in that respect we think

21    an instruction is really required under these circumstances

22    because --

23             THE COURT:  What is the clear New York law that you're

24    relying on?

25             MR. MATZ:  I refer the Court to the letter we filed on

O1PQcar5

the 21st.  It's docket 275.  What I would highlight there in

particular is that we've gone through a lot of New York cases.

We actually started with the opinion that your Honor issued in

2005 in *Carroll v. LeBoeuf*, a case applying New Jersey law.

THE COURT:  A case involving what will kind of law?

Turkey law?

MR. MATZ:  I'm sorry, New Jersey law.

THE COURT:  I didn't mean that to be humorous.

MR. MATZ:  No.  No.  I completely understand.

Your Honor, we started with that case because that's

where your Honor talks about what was called the benefits rule,

which is the legal principle that's at stake here.  It's a

principle that's articulated in the secondary statement of

torts at Section 920.  And the benefits rule is stated in short

as follows:  When the defendant's tortious conduct has caused

harm to the plaintiff or his property, and in doing so has

conferred a special benefit to the interest of the plaintiff

that was harmed, the value of the benefit conferred is

considered in mitigation of damages to the extent this is

equitable.

That's the benefit rule.  It's the rule that on its

face would presumably support their argument that any benefit

to her reputation is properly considered in mitigation of

damages.

There are two issues.  The first is that New York has

O1PQcar5

1    never accepted it, and indeed appears to have rejected, the

2    application of the benefits rule in the case of intentional

3    torts.  The second problem is that on the face of the benefits

4    rule as articulated in the restatement, and I would refer in

5    particular to comments E in the restatement.

6              THE COURT:  Section 920?

7              MR. MATZ:  Sorry.  Yes.  Restatement (Second) of

8    Torts, Section 920, Comment F.  We quote this.  The comment is

9    actually very clear that where a tortfeasor has forced a

10   benefit on their victim against their will in the context of an

11   intentional tort, it is inequitable under the rule to apply

12   that benefit principle.  And, therefore, given that New York

13   courts have rejected the application of the benefit rule in

14   intentional torts or generally and given that the rule, as

15   articulated in the Restatement of Torts by its terms under

16   Comment F clearly would not apply in these circumstances, we

17   think that the jury should be instructed that any benefit to

18   Ms. Carroll's reputation that may have resulted from Mr. Trump

19   calling her a liar and a fraud and all these other things is

20   simply not relevant.

21             The way the Courts sometimes phrase this is that if

22   the plaintiff experiences what they call a windfall, but any

23   essentially collateral benefit from an intentional tort, the

24   defendant doesn't get the benefit of that in the damages

25   calculation for an intentional tort.  They're on the hook for

O1PQcar5

1    any damage they caused.

2              THE COURT:  Do you have a proposed instruction?

3              MR. MATZ:  Yes, your Honor, I do.  It appears in the

4    final paragraph of that same letter -- sorry, page 3 of that

5    same letter.  It is as follows, and I quote:  "Under the law

6    the injury, if any, that Mr. Trump caused to Ms. Carroll's

7    reputation by his defamatory statements is not mitigated by any

8    benefit to her reputation that Mr. Trump may claim that his

9    defamatory statements caused in some parts of the community.

10   You are not to consider any such reputational benefits, if any,

11   in deciding on a damages award in this case."

12             THE COURT:  I will hear from the other side.

13             MR. MADAIO:  Your Honor, I guess there are two issues

14   here that are sort of running into each other, which is the

15   mitigation of damages issue, as well as the benefit issue.  I

16   don't know if you'd like me to address those separately or

17   together.

18             THE COURT:  Let's stick with the one we're dealing

19   with.

20             MR. MADAIO:  So I will discuss strictly the benefit

21   right now.  I mean, again, the Supreme Court has said that the

22   reputation is the estimation of which one's character is held

23   by his neighbors or associates.  So you have to look at that

24   holistically, and that includes any benefit to her reputation.

25   Again, the New York law, one of the main factors that is needed

O1PQcar5

1    to be considered is the plaintiff's standing in the community.

2            THE COURT:  Let me ask you a question hypothetical.  I

3    don't think it is still the case, although I don't really know,

4    but there was a time where polygamy was legal in one state in

5    the United States.  Yes?

6            MR. MADAIO:  Yes, your Honor.

7            THE COURT:  And in 49 states, or however many, it was

8    not only illegal, it was criminal.  Yes?

9            MR. MADAIO:  Yes.

10            THE COURT:  And I imagine that both in the state where

11    it was legal and in the states where it wasn't, there were

12    communities that believed either that it was the right thing to

13    do or that it was heinous to engage in a polygamist

14    relationship or bigamist relationship.

15            Now, imagine that some widely circulated publication

16    said a hypothetical Mrs. Jones, Mr. Jones, doesn't matter, had

17    eight spouses.  Now, in one state, that would be possibly not

18    defamatory at all.  It, indeed, might be an indication of

19    respect and admiration for the person who had accomplished the

20    wonderful thing of having eight spouses.  And in much of the

21    rest of the country, it would be an imputation of criminal and

22    immoral behavior, right?

23            MR. MADAIO:  Right.

24            THE COURT:  So, depending on just exactly who heard

25    the statement or who read it in the newspaper, the reputation

O1PQcar5

1    could be enhanced for some people and destroyed with others.

2    True?

3              MR. MADAIO:  Your Honor, I think the scenario you're

4    describing goes more towards whether or not the statement is

5    defamatory.

6              THE COURT:  Try answering my question.

7              MR. MADAIO:  I believe -- I mean, I think -- again,

8    looking at -- I think in that scenario and any scenario, you

9    have to look at reputation as a whole.  If it's increased with

10   some and decreased with others, you have to look at the overall

11   effect on the reputation.

12             THE COURT:  How do you measure reputation as a whole?

13             MR. MADAIO:  If you look at the plaintiff's standing

14   in the community, like the law says --

15             THE COURT:  What community?

16             MR. MADAIO:  Again, in this scenario, I believe it

17   would be New York, potentially the -- potentially the nation, I

18   think New York.

19             THE COURT:  You think there are people in New York who

20   believe that the same conduct that some regard as praiseworthy

21   is horrible?

22             MR. MADAIO:  As a general proposition?  Yes.

23             THE COURT:  Sure.  So how do we measure reputation as

24   a whole in New York?

25             MR. MADAIO:  Well, I think that's what plaintiff has

O1PQcar5

1    attempted to do with their expert and their testimony, and it's

2    up to the jury to decide whether and to what extent the

3    plaintiff's reputation was harmed.

4            THE COURT:  Indeed, I didn't understand the expert

5    testimony to be making that argument at all.  I thought what

6    the expert's testimony was, was to look at the harm by virtue

7    of assessing a subgroup of New York as a whole that would have

8    been more disposed to believing Mr. Trump by looking at

9    Republicans, I think is what she did, right?

10           MR. MADAIO:  I believe that's correct, your Honor.

11           THE COURT:  So the plaintiff's expert didn't look at

12   reputation as a whole.  She said the damage was caused, most

13   likely, among Republicans, people predisposed to accept Mr.

14   Trump's statements.

15           MR. MADAIO:  Exactly.  That's why we think she took

16   too narrow of a view and didn't look at the entire reputational

17   effect.

18           THE COURT:  But that ship has sailed.

19           MR. MADAIO:  Well, that should be a question for the

20   jury.

21           THE COURT:  Of course the jury may not believe her,

22   but that's their right.  I'm having a lot of trouble with your

23   argument on principle.

24           MR. MADAIO:  Your Honor, I mean, I agree that that's

25   what their expert offered and argued, and that's the way that

O1PQcar5

1    she looked at it.  But, again, we believe that that's not what

2    the law allows for.  Again, it's a -- as the Supreme Court and

3    the New York case law establishes, we have to look at the

4    reputation as a whole and the plaintiff's standing in the

5    community as a whole.

6           THE COURT:  What case do you have that supports your

7    argument, if any?

8           MR. MADAIO:  Second Circuit *Ferri v. Berkowitz*, 561

9    F.App'x 64, 65 (2d Cir. 2014).

10          THE COURT:  What does it say?

11          MR. MADAIO:  That's where it lists the factors for

12   looking at how juries are supposed to award fair compensation

13   for the injury to reputation.

14          The factors include:  The plaintiff's standing in the

15   community, the nature of the defendant's statements made about

16   the plaintiff, the extent to which the statement was

17   circulated, and the tendency of the statement to injure a

18   person such as the plaintiff, as well as all the other facts

19   and circumstances in the case.

20          So, again, any positive effect here would be another

21   fact and circumstance of this case.  It also goes towards the

22   tendency of the statements to injure the person because that

23   also implies if it does not injure the person --

24          THE COURT:  So the smaller the population that would

25   be affected adversely vis-a-vis the plaintiff's reputation, the

O1PQcar5

1    lower the damages.  Yes?

2            MR. MADAIO:  Yes, your Honor.

3            THE COURT:  Which is different from saying that you

4    offset the benefit in a different population, isn't it?

5            MR. MADAIO:  Well, your Honor, that's again still one

6    of the factors that should be considered once you're

7    considering -- first of all, standing in the community and

8    then, again, the tendency of the statement to injure a person.

9    If 90 percent of the people don't think that that statement

10   injures them and actually can benefit them, and only ten

11   percent thinks that it injures them, then --

12           THE COURT:  Yes, but why should a person who makes a

13   false statement about another, especially a person who has

14   already been found to have made the false statement knowing it

15   to have been false or in reckless disregard of its

16   truthfulness, benefit from whatever collateral windfall that

17   person may have conferred upon the victim of the knowingly

18   false statement?

19           MR. MADAIO:  I wouldn't say that's a benefit.  I think

20   we're trying to -- again, the job of the jury is to figure out

21   the actual harm.

22           THE COURT:  But it is a benefit.  You want the plus

23   and not the minus, and I'm suggesting to you that the logic of

24   the situation perhaps is that you pay for the minus because you

25   deliberately did the damage, but you don't get the benefit of

O1PQcar5

1    the upside because you don't deserve it.  That's part of the

2    argument, isn't it?

3            MR. MADAIO:  I think the counterargument is that,

4    again, the jury is supposed to determine the actual true harm

5    here that would require looking at both the positive and

6    negative to see what the real harm is.

7            THE COURT:  Well, I hear you.

8            Mr. Matz.

9            MR. MATZ:  Yes, your Honor.

10           If I can, there are just a few things that might be

11   helpful to untangle here.  In deciding whether something is

12   defamatory -- in deciding whether a statement is defamatory,

13   it's true that it needs to be defamatory not universally but

14   only to a substantial part of the community.  Inherent in that

15   rule is the understanding that some defamatory statements may

16   evoke sympathy or support for the person who's been defamed.

17   We, as a result, went through as many cases as we could find,

18   and it was a lot of cases --

19           THE COURT:  Everybody did or at least a lot of people

20   did.

21           MR. MATZ:  We oiled the ocean, as they like to say.

22   We went through a lot of cases, including the recent trials of

23   the Alex Jones case and the Rudy Giuliani case.  The Giuliani

24   case involved New York law, as I recall.  We reviewed the jury

25   instructions there.  There was no suggestion in either of those

O1PQcar5

cases that even though the statements by Mr. Giuliani or

Mr. Jones may have caused abhorrence in some part of the

community and evoked sympathy for the plaintiffs in those

cases, that the ensuing benefit to their reputation would

somehow mitigate damages.

         And what I would highlight again, and I'm sort of

being a little old-fashioned about this, but there is pretty

clearly statement rule that speaks directly to this situation,

it's the controlling law.  It says fairly clearly that where

the defendant in an intentional tort case forces an unwanted

benefit on the plaintiff in the course of committing an

intentional tort, they don't in equity get to sort of recover

the upside or offset as a result of that.  And the New York

cases that have considered the matter have rejected the

application of that benefit principle most emphatically in

cases of intentional torts.  We cite several cases in our

letter, *Bingham v. Zolt* and *Scott v. Brooklyn Hospital.*  And as

your Honor points out, the equitable intuition under these

cases is a reasonable one.  Let's imagine that Mr. Trump made a

statement that absolutely wrecked Ms. Carroll's reputation in

eyes of 49 percent of the audience, but actually let 51 percent

of the audience to think a bit more highly of her.  It would be

rare to think that there are no damages, even though as a

result of that statement 49 percent of the country now thinks

she's terrible.  And that's sort of the instinct that underlies

O1PQcar5

1    their argument; that if more people think highly of her than

2    think less of her, there's actually no harm at all, which is

3    totally at odds with kind of core premises of defamation law.

4           THE COURT:  Well, it depends on much more than

5    numbers.

6           MR. MATZ:  Of course it depends on numbers.  The

7    language I should point out that Mr. Madaio was referring to is

8    not a description of the law by the Second Circuit.  It's just

9    the model instruction for compensatory damages.  It's actually

10   already included elsewhere in your Honor's jury instructions.

11   The reference of the plaintiff's standing in the community, as

12   I understand it, is the plaintiff's standing in the community

13   before the defamation.  Because if you look at what the

14   instruction goes through, it's the plaintiff's standing in the

15   community, then the statement, then the harm caused by the

16   statement.

17          And so the idea that you look at the standing in the

18   community as a whole after the statement has been made and

19   offset any potential benefits is an incorrect characterization

20   of what the instruction says.  It's true the instruction says

21   the jury should consider all of the relevant facts and

22   circumstances, but as a matter of law, any benefit that he

23   forced on her by calling her a liar and fraud is not a benefit

24   that he's entitled to get in mitigation.

25          And there are lots of cases that I would think of.  We

O1PQcar5

1    cite one of these in a footnote in our letter.  It was an

2    opinion by Judge Learned Hand in 1945 applying New York law

3    where a lawyer was accused of acting as an agent of the

4    Communist Party.  Judge Hand says to the extent -- this was

5    1945, so things worked a little bit differently -- he says to

6    the extent the benefit -- the community in whom you would lose

7    your reputation is kind of a despicable community.  The jury

8    can account for that because that was sort of a rule that was

9    in more common circulation back then.  But it doesn't even

10   occur to him in the opinion where these issues are very much at

11   issue to suggest that the fact that Communist sympathizers in

12   America might think more highly of the lawyer for being falsely

13   described as an agent of the Communist Party itself mitigates

14   damages.

15          It is the same principle here.  The fact that somebody

16   who has been defamed could receive some reputational benefit,

17   either from people admiring them for the thing they are accused

18   of having done or being sympathetic to them or abhorrent about

19   the whole situation has never been understood to offset

20   damages.  And given that it is featured so prominently in their

21   argument to the jury, we think that it is important for the

22   jury to understand the correct law which is that as a matter of

23   law, it doesn't apply to the consideration.

24          THE COURT:  All right.  Obviously, you both briefed

25   this.  I have considered it carefully.  I will consider it

O1PQcar5

1     again tonight.  And if there is going to be a change in

2     substance, I will inform you of it before you sum up.

3                MR. MATZ:  Thank you, your Honor.

4                MR. MADAIO:  Thank you, your Honor.

5                MR. MATZ:  At the risk of troubling the Court, I do

6     have a second one.  It appeared actually in the same letter we

7     submitted.  This was also docket 275 at pages 4 and 5 that

8     letter.  It actually again becomes more relevant in light of

9     Mr. Trump's testimony today and the argument advanced by

10    Ms. Habba with respect to seeking a directed verdict.

11               One of Mr. Trump's core arguments in this case has

12    been essentially that he acted in self-defense or that

13    Ms. Carroll in some respect assumed the risk or consented to

14    being defamed by coming forward and speaking up in the first

15    place.  Obviously, the Court has already granted summary

16    judgment with respect to Mr. Trump consent defense, which was

17    essentially in so many words that she was asking for it by

18    coming forward to reveal what he had done.

19               As a matter of the law, the assumption of risk does

20    not apply to intentional torts in New York, and there is no

21    qualified self-defense privilege to a claim of defamation in

22    which the element of actual malice is present.  Because Mr. --

23    we cite all the authorities for this in our letter.

24               Because Mr. Trump has so clearly argued and intends to

25    argue to the jury that he has some kind of legal justification

O1PQcar5

1   for having made the statement on a theory that he was just

2   defending himself, which were his words, and words that we

3   heard from his counsel earlier today, we've included for the

4   Court a proposed curative instruction that we would

5   respectfully request be included in which the Court clarifies

6   to the jury that her having come forward to make that statement

7   did not confer on him either consent or any qualified

8   self-defense privilege as a matter of law.  And I'm prepared to

9   describe that curative instruction so it would be helpful for

10   the Court.

11          THE COURT:  No, I'm generally familiar with it.

12          Mr. Madaio.

13          MR. MADAIO:  Your Honor, the issue of whether

14   president Trump was defending himself is extremely relevant to

15   this case to the extent that punitive damages are at issue.  So

16   his intent and his state of mind, those are all relevant to

17   show the question of whether or not he was acting with common

18   malice.  The fact that he's only defending himself tends to

19   show he was not acting with malice.

20          So I think it would confuse the jury to instruct them

21   on that issue when that's one of the main decisions they're

22   going to be making is whether or not he was acting with malice,

23   and the fact he was defending himself goes to that very

24   question.

25          THE COURT:  Was your point, Mr. Matz, that it's not a

O1PQcar5

1    defense or was your point that they can't consider it at all?

2              MR. MATZ:  Your Honor, I suppose there's two points,

3    but I was making the second, right?  As a matter of law, these

4    are not successful affirmative defenses on the merits to

5    liability, which has already been determined at summary

6    judgment, in any event.

7              The point that I'm making is essentially -- I take

8    Mr. Madaio's point about punitive damages.  At least with

9    respect to compensatory damages, Mr. Trump seems to have

10   clearly advanced the argument that in so many words Ms. Carroll

11   was asking for it by speaking up, and essentially he had no

12   choice but to defame her.  And of course choosing to engage in

13   unlawful speech by defaming somebody is not a lawfully

14   privileged form of self-defense even if you really don't like

15   the fact that someone came forward to reveal that you sexually

16   assaulted them.  And so because he's arguing that, we think the

17   jury should be instructed it doesn't go to compensatory at the

18   very least.

19             THE COURT:  But you're not quarreling with the

20   proposition that if I so instruct, I perhaps also should

21   instruct that they are entitled to consider the fact that he

22   was responding to an accusation on punitive damages.

23             MR. MATZ:  Well, I think that in determining whether

24   he acted -- I think the punitive damages instruction as it

25   stands is clear and sufficient, which is that the question is

O1PQcar5

1   whether he acted with malice, ill will, or spite.  I guess the

2   way I would distinguish the two is this --

3          THE COURT:  So given that that's the instruction as it

4   stands, would there be any objection from the plaintiff if the

5   defendant were to argue that the fact that he was responding,

6   particularly responding at the time, pressure to an accusation

7   was among the things they could consider and whether he was

8   acting with common law malice.

9          MR. MATZ:  Your Honor, I guess the reason we would

10  object to that -- I want to sort of distinguish the two things.

11  We would object to that.  Let me, if I can, explain why.  With

12  respect to compensatory damages, it's simply not relevant as a

13  matter of law that he's trying to re-purpose his losing consent

14  argument into some kind of meritorious mitigation argument.

15  And so as a matter of law, there's a reason why those points

16  aren't properly considered by the jury in mitigation.

17          With respect to punitive damages, it would be

18  confusing to simply instruct the jury that they can consider

19  the fact that he was responding to a statement because the

20  underlying inquiry for punitive damages — the standard there,

21  right, ill will, malice, spite — doesn't depend solely on

22  whether he was responding, which is kind of a circumstantial

23  fact.  It would, at the bare minimum, was it proportionate?

24  Was it continuous?  Was it appropriate over time?  Did the way

25  in which he respond evince malice, evince spite?  so Any

O1PQcar5

1    instruction that would tend to suggest the fact that he was

2    responding to an accusation somehow takes it out of the bucket

3    of punitive damages or is itself indicative that he lacked ill

4    will, malice or spite would seem to me to not go nearly far

5    enough in clarifying the relevance, if at all, of the fact that

6    he was responding to something that she said, right?  You want

7    to frame it more as he was responding, but was the nature of

8    that response and the continuing ongoing character of that

9    response one that reflects the mental attributes and the mental

10   state that we think of as implicating punitive damages.

11           THE COURT:  I will look at this again in light of your

12   arguments.  My inclination at the moment is to give in

13   substance the plaintiff's proposed charge with respect to

14   compensatory damages only and not to address it in the context

15   of punitive damages, and leave you to argue it.  That's my

16   disposition.  And if that changes, I will let you know.

17           MR. MATZ:  Thank you, your Honor.

18           Plaintiff doesn't have any other matters to raise with

19   respect to the page range the Court identified.

20           THE COURT:  Mr. Madaio.

21           MR. MADAIO:  To comment very quickly with respect to

22   the punitive damages, we think it would be prejudicial to

23   include it that statement in the compensatory damages section

24   statement, it's not a valid defense there.  For them to not

25   reference it in the punitive damages section is clearly

O1PQcar5

1    relevant and clearly a valid defense in that area.  So to raise

2    it in one aspect and not the other, we think would be very

3    confusing to the jury.

4            THE COURT:  I just don't see that as a valid

5    objection.  Now --

6            MR. MADAIO:  Your Honor, actually, sorry --

7            THE COURT:  You have something else?

8            MR. MADAIO:  We do.  On this section, it starts on

9    page 1, and actually is the majority of the nature of the case.

10   I don't know if you'd like me to address that all at one, but

11   we're objecting generally to the language in here that is

12   referring to the sexual assault going into much of the detail

13   involving that what was determined at the last case, and it

14   actually was characterized as what the jury actually found.

15           All the jury did was have a verdict with respect to

16   sexual assault itself, but some of the language in here, I

17   understand that the Court has made certain findings, but this

18   was not found by the jury.  I think it's very inflammatory for

19   the jury to hear some of these instructions.

20           THE COURT:  Look, if there are specific -- let's start

21   with principle.  Principle number one is the jury is going to

22   be instructed as to what has been determined.  Sure, you say

23   it's inflammatory because it's adverse to your client and what

24   was determined in the previous case isn't the prettiest thing

25   in the world.  I got that.  But that's the collateral estoppel

O1PQcar5

 1    ruling.  Now, if there's objection to specific language, I'm
 2    perfectly happy to hear it.  And so the floor is yours.
 3            MR. MADAIO:  Thank you, your Honor.
 4            Well, first, I mean, again, it's our position that
 5    really the only thing -- the jury has already been instructed
 6    on this issue.  Really all they have to be instructed further
 7    is that there was a finding -- you know, again, the defamation
 8    here carries over liability has already been determined; this
 9    is damages only.  There is no need to recount the details of
10    this again.  Particularly on page 2 -- I mean, the language
11    that we certainly object to is where it says:  First, Mr. Trump
12    sexually assaulted Ms. Carroll by forcibly inserting his
13    fingers into her vagina without her consent.
14            Again, that wasn't determined by the jury.  It's
15    extremely inflammatory.
16            THE COURT:  And it also doesn't matter, and here is
17    why it doesn't matter.  The jury was instructed on sexual abuse
18    under New York law and found sexual abuse.  And on a post trial
19    motion, as I remember the sequence of events, you came forward
20    and argued that the verdict was excessive as a matter of law
21    because sexual abuse could have been committed under New York
22    law by just touching her breast, and that was indeed your
23    argument.
24            MR. MADAIO:  I believe it may have been other counsel.
25            THE COURT:  It may have been other counsel, but it was

O1PQcar5

1    Mr. Trump's argument.  There of course was no evidence

2    whatsoever in that trial that he touched her breast.  The only

3    evidence was that he penetrated her with his penis and his

4    fingers.  The verdict as to penal law first degree rape meant

5    that the jury didn't find penile penetration.  Therefore, the

6    only point on which there was any evidence at all after that

7    could sustain the sexual abuse finding was the evidence of

8    digital penetration.  That's all there was.

9        Was there anything else that I overlooked in the

10    evidence?

11        MR. MADAIO:  Well, your Honor, I'm not really

12    particularly addressing the finding --

13        THE COURT:  No.  No.  No.  We're going to address the

14    finding for the moment because that's what you objected to.  So

15    stay with it.

16        MR. MADAIO:  What we're objecting to is explaining

17    that to the jury we believe it's completely unnecessary and

18    inflammatory --

19        THE COURT:  I got that point.  So if I conclude that

20    it's necessary and appropriate, then you don't have a quarrel

21    with the language at line 6 and 7.  Is that correct?

22        MR. MADAIO:  That's precisely the language that we

23    have an issue with.  Again, it's -- there's no need for the --

24        THE COURT:  I know what your argument is; that there

25    is no need for it.  Suppose for the sake of argument I think

O1PQcar5

1    there is a need for it in order for this jury to understand

2    what is not disputed in this case.

3            MR. MADAIO:  Well, your Honor, again, this is a

4    defamation case.

5            THE COURT:  I know what it is.

6            MR. MADAIO:  There's no need to go into this detail.

7            THE COURT:  I know what it is.

8            MR. MADAIO:  Then I don't know why we're explaining

9    the vivid detail of what the Court found -- again, the jury

10   didn't find, but the Court found based on the jury's verdict.

11           THE COURT:  What I just got done explaining to you is

12   why it is that the jury found it.

13           MR. MADAIO:  But there is no need for this jury to

14   hear it.

15           THE COURT:  Separate question.  I am telling you now

16   my ruling is that the jury by necessary implication found

17   precisely this, and if for the sake of argument they hadn't,

18   Rule 49 of the Federal Rules of Civil Procedure says that where

19   an issue that is necessary to support the judgment was not

20   submitted to the jury without -- and it was not submitted

21   without objection, the trial judge makes the finding, and in

22   the alternative I made the finding.  So whether you like it or

23   not, it has been properly found in the prior case that there

24   was digital penetration.

25           Your other point I'm prepared to consider, but we are

O1PQcar5

1    not going to spend all night arguing about --

2           MR. MADAIO:  Your Honor, I understand your ruling in

3    the prior case, and, again, disagree with it, but I understand

4    it, and that's not the point I'm trying to make here.

5           THE COURT:  I know your broad point is that the jury

6    should not be told anything about what the prior case

7    determined.  I understand that.  I got it.  And then I asked

8    you whether assuming I disagree with you on that whether there

9    is any specific language here in describing what the prior case

10   determined that you disagree with, and the first thing you told

11   me was the thing about digital penetration.  Now, we've put

12   that one to bed.

13          Now, is there anything specific in the language on

14   lines 8 and 9, that you think mischaracterizes or is inaccurate

15   with respect to what was found in the earlier case?

16          MR. MADAIO:  Well, again, your Honor, again,

17   there's -- our position is that there is no need for the jury

18   to hear any of this other than the fact that --

19          THE COURT:  Mr. Madaio, I know that.  You're not

20   answering my question.  And if you don't have an answer to the

21   question, that's fine, and we'll go back to figure out the

22   general proposition.  But I am giving you one more chance to

23   tell me if there is any specific language on lines 8 to 16 that

24   you think inaccurately describes facts that were found in the

25   prior case and necessary to support the verdict.

O1PQcar5

1          MR. MADAIO:  Yes, your Honor.  On line 8 the word

2     "forcible" I think is unnecessary.  I think sexual abuse

3     suffices there.

4          THE COURT:  And isn't force an element of sexual

5     abuse?

6          MR. MADAIO:  Right, but there's no need -- exactly, so

7     there is no need to refer to --

8          THE COURT:  So you're back to the no-need, but I'm

9     asking you whether there is any misdescription here.

10          MR. MADAIO:  Again, what the jury found was sexual

11     abuse, so I don't think we need to include forcible.

12          THE COURT:  You're just repeating yourself.  What

13     about the rest of lines 8 through 16.  I'm giving you every

14     opportunity, Mr. Madaio.

15          MR. MADAIO:  Not 10 through 12.

16          And not 13 -- no, so nothing else

17          THE COURT:  So now let's get back to your general

18     proposition.

19          Mr. Matz, what's your answer to Mr. Madaio's general

20     proposition?

21          MR. MATZ:  I guess we have a few thoughts.  The first

22     is that these are all accurate characterizations of the prior

23     jury determination.

24          THE COURT:  We now know that.

25          MR. MATZ:  I know, but it's a good starting point.

O1PQcar5

1    What I would say is that it is well within the discretion of

2    the Court to accurately characterize the prior jury

3    determination, and that it is appropriate for the Court to do

4    so here for several additional reasons.

5        One reason that it's appropriate is that Mr. Trump

6    through his in-court and out-of-court statements and his

7    adoption in his testimony today of his statements in the

8    deposition has continued not only to deny engaging in any of

9    the relevant conduct, but also to make highlight pejorative and

10   inflammatory statements about my client.  And in doing so, I

11   think sort of case for under-describing the nature of the

12   underlying conduct that he has accused her of falsely denying

13   isn't a terribly compelling one.

14       The second reason is that it's relevant because in

15   understanding with respect to compensatory damages the pain and

16   suffering that Ms. Carroll experienced and the reputational

17   harm that she incurred, the fact that what he was denying is

18   conduct that was in fact forcible and was in fact of this

19   nature may illuminate or shed light for the jury on what it

20   would be like to sort of experience a false public denial and

21   associated threats of the kind that he made.

22       And, finally, if your Honor is not persuaded by that,

23   I think it's finally relevant to the question of punitive

24   damages because in assessing whether his conduct here reflected

25   ill will, malice, or spite, the fact that the broader course of

O1PQcar5

1    conduct we're talking about here is forcibly sexually abusing

2    her and engaging in precisely this underlying conduct that's

3    been determined, and then essentially trashing and threatening

4    and insulting her when she came forward to reveal what he had

5    done.  And then continuing to do it not just then but

6    continuously and well over a hundred times during the trial

7    only further illuminates the propriety of providing some

8    specificity in the account of what has in fact already been

9    determined

10          THE COURT:  Mr. Madaio, any final word on this point?

11          MR. MADAIO:  Yes, your Honor.  The fact that Mr. Matz

12   just stated that it's relevant to punitive damages and

13   compensatory damages perfectly illustrates why it's

14   inappropriate here because the underlying incident is not at

15   issue in this case.  It's not something the jury is supposed to

16   consider.  Including language like this will --

17          THE COURT:  You, I think, made an error in that

18   statement in this respect.  They are certainly being instructed

19   that they cannot award damages for the sexual assault itself.

20   That has already been done.  Mr. Matz's argument is a little

21   different, and that is she's entitled to recover here for the

22   emotional and other reputational and psychic, I guess for want

23   of a better term, damages inflicted on her by Mr. Trump's false

24   and defamatory statements of the 21st and the 22nd and

25   Mr. Matz's argument is given how heinous his conduct was in

O1PQcar5

1    fact, that has a bearing on the emotional impact at least of

2    his -- they say outrageous and false denials and trashing her

3    to short circuit what Mr. Matz said.  I understand his point,

4    so if you've got an answer to that, I'm all ears.

5              (Continued on next page)

O1P5car6

1          MR. MADAIO:  I think that that leads to the -- will

2     lead the jury to confuse the issue, leave the jury to consider

3     the emotional harm incurred in connection with the underlying

4     act, as opposed to the statements themselves, which is what is

5     at issue in this case.

6          THE COURT:  Well, let me just look at something else.

7          Maybe, Mr. Matz, you can help me find where I dealt

8     with the point I alluded to before, namely that they could not

9     award damages for the sexual assault itself.

10         MR. MATZ:  We are happy to help.  Here it is.  It is

11    on the bottom of page 2, lines 20 and 21.

12         THE COURT:  Thank you; in front of "damage."

13         MR. MATZ:  Yes.  To be clear, you will not be

14    determining any damages that Ms. Carroll suffered by reason of

15    the forcible sexual assault.

16         That has already been done, and so to the extent the

17    concern is that the jury will be confused as to what they are

18    awarding damages for, the instructions are unequivocal about

19    that and are clear about it within 10 lines of the language

20    about which Mr. Madaio now complains.

21         THE COURT:  Mr. Madaio, in an effort to address your

22    concern, I am perfectly happy, at line 20, after the word

23    "damage" to insert:  ", whether compensatory or punitive," to

24    make clear that the jury can't award any damages at all for the

25    forcible sexual assault itself.

O1P5car6

1             MR. MADAIO:  Again, your Honor, I think it is

2    unnecessary to include the graphic language concerning the

3    underlying act itself.  I think a general description:  Sexual

4    abuse, sexual assault, will suffice.

5             THE COURT:  Overruled.

6             Are we through, I think we are up to -- ah, here it

7    is.  I have now heard all objections up to page 4, line 14;

8    correct?

9             MR. MATZ:  Yes, your Honor.

10            THE COURT:  Mr. Madaio, do you have any disagreement

11   with that?

12            MR. MADAIO:  Your Honor, I am just checking.  Through

13   page 3?

14            THE COURT:  No; page 4, line 14.

15            MR. MADAIO:  Your Honor, we do have objections on

16   page 4.

17            THE COURT:  Yes.

18            MR. MADAIO:  But to the extent we can raise this point

19   I know this was briefed, it was the mitigation issue.

20            THE COURT:  Which starts on line 15.

21            MR. MADAIO:  Line 15.  OK.  Line 15.

22            There is one thing that we would like to add here

23   which is an instruction on causation and I believe we have

24   proposed language.

25            THE COURT:  I think we pretty much adopted your

O1P5car6

1    proposed language.

2            MR. MADAIO:  I may have missed it, your Honor.  I

3    apologize.  I don't believe I saw it in here.

4            THE COURT:  Well --

5            MR. MATZ:  Your Honor, we believe that is on page 4,

6    lines 10 to 14.

7            THE COURT:  That's what I thought.  Thank you.

8            That's a different point.

9            MR. MADAIO:  I did search, your Honor.  I may have

10   missed it.  I don't believe I saw it.

11           THE COURT:  Well, I certainly had intended to and

12   let's find it.  It is probably in the request to charge.  Let's

13   take a look at page 3 -- yes, page 3, lines 17 to 20.  It

14   currently reads:  For each statement you will award an amount,

15   that in the exercise of your good judgment and common sense,

16   you decide is fair and just compensation for the injury to

17   Ms. Carroll's reputation and the humiliation and mental anguish

18   in her public and private lives, which you decide was caused by

19   Mr. Trump's statement.

20           That's what I have and that is precisely taken from

21   your proposed instructions on page 16, word for word.

22           MR. MADAIO:  Your Honor, I believe in our instructions

23   we also had the language:  It is plaintiff's burden to prove

24   the nature and extent of her damages and to prove that damages

25   were caused by defendant's actions.  Your determination of

O1P5car6

1    damages must not be based on speculation or guesswork.

2              That's page 19 of our proposed instructions.

3              MR. MATZ:  Respectfully your Honor, we have no

4    objection to the inclusion of that language.

5              THE COURT:  I actually don't see it on page 19 of your

6    proposed instruction, Mr. Madaio.

7              MR. MATZ:  Your Honor, it is on page 17.  It is page

8    19 of the filing.

9              THE COURT:  I see.  That page 19.

10             MR. MADAIO:  Apologies.

11             THE COURT:  Give me the language again, Mr. Madaio?

12             MR. MADAIO:  It is plaintiff's burden to prove the

13   nature and extent of her damages, and to prove that the damages

14   were caused by defendant's actions.  Your determination of

15   damages must not be based on speculation or guesswork.

16             THE COURT:  Now, didn't the speculation and guesswork

17   line find its way into my charge?

18             MR. MADAIO:  I believe it did, your Honor.  So we may

19   not need to include it here.

20             THE COURT:  On page 4 -- well, the second part of it

21   is.  So you are asking for the two sentences you just read to

22   me, to which Mr. Matz doesn't object.  Where do you ask that

23   go?

24             MR. MADAIO:  I was previously thinking on page 4 but I

25   guess if we are already addressing causation, it may be more

O1P5car6

1  appropriate on page 3 after where it was discussed before line

2  20.

3          MR. MATZ:  Your Honor, on page of 4 of your

4  instructions at lines 5 to 8 is where the language about

5  speculation or sympathy is.  That appears to be the much more

6  natural place to include what would be an additional single

7  sentence from the defendant's proposed instruction, which is

8  the line that it is the plaintiff's burden to prove the nature

9  and extent of her damages.

10          THE COURT:  Yes.

11          MR. MADAIO:  That's fine, your Honor.  We agree with

12  that.

13          THE COURT:  Well, how is that any different from

14  saying they award compensatory damages only for those injuries

15  that you find that Ms. Carroll has proved by a preponderance of

16  the evidence?

17          MR. MADAIO:  I think this language is a little more

18  clear that there has to be a direct causal link and that it is

19  the plaintiff's burden to prove causation.

20          THE COURT:  This is truly a Talmudic distinction.

21  Look.  There being no objection, I will figure out how to get

22  the first sentence that you read me, Mr. Madaio --

23          MR. MADAIO:  Thank you, your Honor.

24          THE COURT:  -- into this at page 4 -- most likely on

25  page 4, but on page 3 or page 4.

O1P5car6

1              MR. MADAIO:  Thank you, your Honor.

2              THE COURT:  Anything else through page 4, line 15?

3              MR. MADAIO:  No, your Honor.

4              THE COURT:  OK.  Page 4, lines 15 to 19.

5         Plaintiff?

6              MR. MATZ:  No objection, your Honor.

7              THE COURT:  Mr. Madaio?

8              MR. MADAIO:  Yes, your Honor.

9              We object, obviously, because of the motions that have

10   been filed, so we object to lines 15 through 22, essentially

11   the entire proposition that is in there.  You know what our

12   position is.

13             THE COURT:  I do.  And the objection is overruled.

14             MR. MADAIO:  Understood.

15             THE COURT:  It follows clearly from the two cases

16   cited that the plaintiff is right on this point.

17             Page 4, line 23 through page 5, line 15.

18        Plaintiff?

19             MR. MATZ:  No objection, your Honor.

20             THE COURT:  Defendant?

21             MR. MADAIO:  No.  Although, your Honor, I'm sorry.  I

22   would like to go back to the mitigation point.  I am just

23   reading the language here and it says that there was a

24   misstatement in the opening and that the plaintiff doesn't

25   necessarily have a duty to minimize harm.  That doesn't

O1P5car6

1    actually mean it is not a legitimate defense and I know that

2    that was one of the other issues.

3        THE COURT:  Yes; and it is worse than that for you,

4    I'm afraid.

5        Even if mitigation were a defense, which it is not, it

6    is an affirmative defense that has to be pleaded in the answer,

7    which you didn't plead, and the failure to plead it in the

8    answer -- and I shouldn't blame you because it may have been

9    your predecessor counsel for Mr. Trump, that was a collective

10   "you" for the defense counsel -- but it was never pleaded, it

11   was therefore waived, and even if you were right that otherwise

12   there would have been a duty to mitigate, there isn't.

13       Furthermore, if there were a duty to mitigate it would

14   be your burden to prove failure of mitigation and to prove the

15   amount by which the damages would have been reduced by the

16   proof of failure to mitigate and, therefore, on at least three

17   grounds, you are overruled here.

18       MR. MADAIO:  OK.  Understood, your Honor.

19       THE COURT:  Page 4, line 23 through page 5, line 15.

20       Plaintiff?

21       MR. MATZ:  No objection, your Honor.

22       THE COURT:  Mr. Madaio?

23       MR. MADAIO:  One second, your Honor.  I apologize.

24   Other than to the extent that we have the objection on the

25   verdict form and it references the same language here --

O1P5car6

1           THE COURT:  Of course.  The charge will conform to the

2   verdict form.

3           MR. MADAIO:  Right.  No other objection.

4           THE COURT:  OK.  Page 5, line 17 through page 8, line

5   5.

6           Plaintiff?

7           MR. MATZ:  We have no objection.  I would just note

8   that where this document refers to the verdict form and we

9   previously objected, we assume that carries over.

10          THE COURT:  Yes.  Of course.

11          OK.  Mr. Madaio, up to page 8, line 5.

12          MR. MADAIO:  Your Honor, our objection here is for

13  punitive damages we think that it should be stated that it must

14  be the sole motivation.

15          THE COURT:  I have considered both parties' briefing

16  on that and I don't agree with you.

17          Nothing else through page 8, line 5.  Let's take --

18          MR. MADAIO:  Sorry.  Apologies, your Honor.

19          THE COURT:  That's OK.

20          MR. MADAIO:  There is a couple things here.

21          THE COURT:  All right.

22          MR. MADAIO:  The only other language is on page 7,

23  lines 13 through 15, where it says:  This includes any

24  subsequent statements that Mr. Trump has made about Ms. Carroll

25  that are in evidence, as well as any other circumstances that

O1P5car6

1  indicate the existence of any ill will or hostility between the

2  parties.

3          This language is extremely broad and we would ask that

4  it essentially be limited to the subsequent statements and

5  exclude this language as well as any other circumstances that

6  indicate the existence of any ill will or hostility between the

7  parties.

8          THE COURT:  Well, I think in one respect your point

9  has some merit in that and it is this:  I think that the phrase

10  "as well as any other circumstances" should come after

11  "statements" so that it would read:  This includes any

12  subsequent statements, as well as any other circumstances in

13  evidence, that Mr. Trump has made about Ms. Carroll that

14  indicate...

15          MR. MADAIO:  I think that's fair, your Honor.

16          THE COURT:  OK.

17          MR. MADAIO:  Your Honor, actually there is one

18  additional thing here while talking of punitive damages and

19  subsequent statements.  We had included this language and we

20  think it is important to state that the jury cannot ascribe any

21  amount of damages.  The language that we propose is:  You may

22  not ascribe any amount of damages to a subsequent statement as

23  part of any calculation of punitive damages since those

24  statements are not the subject of this case.

25          So, we are essentially making the point that the jury

O1P5car6

1  cannot be awarding damages specifically for the statements.

2  They can consider it to determine President Trump's intent and

3  whether he was acting with ill will or maliciously but that

4  they can't be awarding damages specifically for those

5  particular statements.

6        THE COURT:  Well, that is true as far as it goes but I

7  wonder if it is entirely appropriate.

8        Mr. Matz?

9        MR. MATZ:  Your Honor, we think that is actually

10  somewhat incorrect.  They can consider the subsequent

11  statements in thinking about general and specific deterrence of

12  Mr. Trump.  The instructions, themselves, are extremely clear,

13  that all damages in this case are damages for the underlying

14  statements and only for the underlying statements, and that the

15  subsequent statements are just considerations that are

16  additionally relevant in the punitive damages context thinking

17  about what is appropriate for purposes that include deterrence.

18  We think that the proposed instruction that Mr. Madaio

19  described would confuse that point and evoke the need for

20  further conditional clarifying instructions and should,

21  therefore, be rejected.

22        THE COURT:  Mr. Madaio, any response to that?

23        MR. MADAIO:  Your Honor, I think this all comes back

24  to the *Celle* case.

25        THE COURT:  I'm sorry?

O1P5car6

1          MR. MADAIO:  This all comes down to the *Celle* case.

2          THE COURT:  *Celle* case?

3          MR. MADAIO:  *Celle*, C-E-L-L-E --

4          THE COURT:  OK.

5          MR. MADAIO:  -- where the proposition in that case is

6     that you can introduce prior subsequent statements to show the

7     defendant's state of mind.  Nowhere in that case and nowhere in

8     any case that I have seen does it state that the jury is

9     allowed to award damages for subsequent prior statements.

10         THE COURT:  Yes, but that the jury is clearly allowed

11    to award punitive damages for the purpose of deterring the

12    defendant and others from continuing to defame the plaintiff.

13    Or, for that matter, anybody else.

14         MR. MADAIO:  I understand that, your Honor, but that's

15    why we would like to make clear that they are not awarding any

16    damages specifically tied to any statement, that is more of a

17    general proposition of deterrence as opposed to saying, you

18    know, you can ascribe any amount of damage for this statement

19    and that statement and that statement.  I think there are two

20    different things and I think that needs to be clear to the

21    jury.

22         THE COURT:  Mr. Matz?

23         MR. MATZ:  Your Honor, I just think that is confusing.

24         THE COURT:  Of course, it is.  Overruled, Mr. Madaio.

25         Page 8, line 7, through page 15, line 3.

O1P5car6

1          MR. MATZ:  Yes, your Honor.

2          We did have a concern, and this is at the bottom of

3   page 10 starting at line 21, continuing through page 11 at line

4   8.  We had a concern about the proposed instruction concerning

5   the evidence of deleted messages.  I have a proposed

6   alternative instruction for that, but before I get to that I am

7   happy to describe the nature of our concern.

8          THE COURT:  Please do.

9          MR. MATZ:  The concern we have is that we worry that

10  the instruction may confuse the jury a little bit but also give

11  rise to implications that the Court, I assume, did not intend.

12  And so, for example, right now it says:  The questions of

13  whether there was any impropriety in Ms. Carroll's actions, and

14  if so, what, if anything could be done about it, are entirely

15  questions for the Court, not the jury.  The idea of what it

16  means for there to be impropriety may be, I think, potentially

17  confusing to them.  Impropriety legally or impropriety in a

18  more equitable sense?  And there may be, frankly, an

19  implication here that there wasn't impropriety and that the

20  Court is in fact doing something about it.  The instruction

21  then goes on to indicate that even though any impropriety is no

22  matter for the jury, the jury may in fact, however, choose to

23  consider relevant --

24          THE COURT:  I have the concern.  What is the proposal?

25          MR. MATZ:  So here is the proposal.  I can just read

O1P5car6

1     the instruction or we can submit it in writing.  It is a little

2     long.

3               THE COURT:  You can do both.

4               MR. MATZ:  We can do both.  OK.  Let's start with

5     reading it.  So here is the proposal, your Honor:  Keep the

6     first sentence about:  You heard some evidence and argument

7     during trial considering whether Ms. Carroll deleted some

8     e-mails or tweets containing death threats, from her computer,

9     as well as some mentioned by the defense counsel that she was

10    issued a subpoena in this case.

11              Here is what we propose:  The question of whether

12    Ms. Carroll's conduct implicated any legal duty is entirely for

13    the Court, not for the jury.  I do instruct you, however, that

14    Ms. Carroll had no legal obligation to preserve anything before

15    she reasonably anticipated litigation.  Beyond that, whether

16    her conduct implicated any legal duty is not your concern.  You

17    are entitled to consider exactly what materials, if any,

18    Ms. Carroll disposed of, and why and when she did so, and

19    whether those materials and her testimony affect the question

20    of damages before you.

21              THE COURT:  Mr. Madaio?

22              MR. MADAIO:  Your Honor, that language is far too

23    one-sided.  We agree with the language as it is stated in the

24    proposed instructions from the Court and we think that this is

25    sufficient and adequately states the relevant questions here.

O1P5car6

```
 1   The way that they're proposing it is much, much too favorable
 2   to the plaintiff and we think that the language here suffices.
 3          THE COURT:  I'm going to give the charge as requested
 4   by the plaintiff, it is much better than what I did myself.
 5   So, would you submit that?
 6          MR. MATZ:  Yes, your Honor.
 7          THE COURT:  Anything else on that section?
 8          MR. MADAIO:  Your Honor, only to preserve for the
 9   record -- you have already ruled on this -- but the burden of
10   proof for punitive damages is set forth on page 8.  I
11   understand you have already ruled on that, but for the purposes
12   of the record.
13          THE COURT:  Correct.
14          Page 15, line 5 to the end.  Plaintiff?
15          MR. MATZ:  No objections, your Honor.
16          THE COURT:  Mr. Madaio?
17          MR. MADAIO:  No objections, your Honor.
18          THE COURT:  OK.  We are done.
19          Now let me, before we disperse, make sure that I have
20   an accurate list of what's now on my to-do list:  Number one, I
21   am going to consider whether, in effect -- shorthand
22   language -- to combine questions 1 and 2; right?
23          MR. MADAIO:  Yes, your Honor.
24          THE COURT:  And I told you -- I think -- that my
25   inclination was to do it; did I not?
```

O1P5car6

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | MR. MATZ:  Yes, your Honor.                                   |
| 2  | MR. MADAIO:  Yes, your Honor.                                 |
| 3  | THE COURT:  I am going to let you know on that.               |
| 4  | Then we had the interesting discussion of what I am           |
| 5  | going to call net versus gross.  Whether, in effect, Mr. Trump |
| 6  | gets the benefit of any enhancement to Ms. Carroll's reputation |
| 7  | by virtue of his defamation.                                  |

Then we had the interesting discussion of what I am going to call net versus gross. Whether, in effect, Mr. Trump gets the benefit of any enhancement to Ms. Carroll's reputation by virtue of his defamation.

Then we have, even though I don't have the exact language in front of me, the language that, in colloquial terms, "she asked for it," is no defense to compensatory damages. Yes? And that goes back to your letter, docket item 274; is that right?

MR. MATZ: I think it was 275. Sorry, I should -- I made the mistake of putting it away. It is 275, your Honor.

LAW CLERK: Yes.

THE COURT: 275. OK.

And then fourth, we are going to get Mr. Madaio's sentence from page 17 of his request to charge into the charge on page 3 or 4.

Is there anything else that I left open?

MR. MATZ: Your Honor, so we will provide to your clerk or if helpful, we can submit the letter --

THE COURT: Letter or e-mail, but copy your adversary on it.

MR. MATZ: Yes, your Honor. I am not handing in

O1P5car6

1    handwritten words.

2            THE COURT:  Well, if your handwriting is twice as good

3    as mine he will be able to read it.

4            I think we are done.  I appreciate the cooperation,

5    counsel, on both sides.

6            (Adjourned to 9:30 a.m., January 26, 2024.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 ROBERTA MYERS

Direct By Mr. Craig  . . . . . .509

Cross By Ms. Habba . . . . . . .519

FRANCES CAROL MARTIN

Direct By Ms. Habba  . . . . . .555

Cross By Ms. Crowley . . . . .589

Redirect By Ms. Habba  . . . .610

DONALD JOHN TRUMP

Direct By Ms. Habba  . . . . .626

Cross By Ms. Kaplan  . . . . .627

Redirect By Ms. Habba  . . . .628

                    PLAINTIFF EXHIBITS

Exhibit No.                                Received

 164 and 164T  . . . . . . . . . . . . . . 525

 165   . . . . . . . . . . . . . . . . . 525

 166   . . . . . . . . . . . . . . . . . 525

 147V and 148  . . . . . . . . . . . . . . 531

 148   . . . . . . . . . . . . . . . . . 532

 PX- 167 and PX- 167-T  . . . . . . . . . . 532

 146   . . . . . . . . . . . . . . . . . 534