O1Q5car1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   E. JEAN CARROLL,

4                    Plaintiff,

5            v.                          20 CV 7311 (LAK)

6   DONALD J. TRUMP, in his
    personal capacity,
7
                     Defendant.          TRIAL
8
    ------------------------------x
9                                        New York, N.Y.
                                         January 26, 2024
10                                       9:38 a.m.

11  Before:

12                    HON. LEWIS A. KAPLAN,

13                                       District Judge

14                          APPEARANCES

15  KAPLAN HECKER & FINK LLP
         Attorneys for Plaintiff
16  BY:  ROBERTA ANN KAPLAN
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG

18  HABBA MADAIO & ASSOCIATES LLP
         Attorneys for Defendant
19  BY:  ALINA HABBA
         MICHAEL T. MADAIO
20       PETER SWIFT
         PETER GABRA
21

22

23

24

25
```

O1Q5car1

```
1

2                    (Trial resumed; jury not present)

3             THE COURT:  I notice that the defense is not present.

4    They are coming.

5             THE MARSHAL:  Counsel for Trump is getting screened.

6             THE COURT:  Let the record reflect that Mr. Madaio is

7    in the courtroom.  Ms. Habba has entered.  It is now 20 minutes

8    to 10:00.

9             MS. HABBA:  I'm sorry, your Honor.  I couldn't hear

10   you.

11            THE COURT:  I said you had just entered, it is now 20

12   minutes to 10:00.

13            At the conclusion of the charging conference yesterday

14   afternoon there were a couple of issues that I said I would

15   reflect on and advise counsel of my intentions and that was

16   done by e-mail last night, a copy of which will be marked as

17   Court Exhibit C.

18            Ms. Habba, is your client intending to be here this

19   morning?

20            MS. HABBA:  My client is here, your Honor.

21            THE COURT:  Well, he is not in the courtroom.

22            MS. HABBA:  No.  I can grab him.

23            THE COURT:  Well, I see he is now entering.

24            MS. HABBA:  He is in the courtroom now.

25            THE COURT:  Before we bring the jury in, let me just
```

O1Q5car1

1    be clear, we will have closing arguments.  During closing

2    arguments no one in the courtroom is to say anything except

3    that opposing counsel, if there is an objection, can say

4    objection, and if I think it appropriate, we will have a side

5    bar.  There are to be no interruptions by anybody else, no

6    audible comments by anybody else, and when I charge the jury

7    later, that rule applies to everyone in the courtroom,

8    including counsel.  Counsel will have an opportunity at the

9    conclusion of my instructions to make any objections to the

10   charge, as given, that were not ruled on yesterday, should

11   there be any.

12            Let's get the jury.

13            MS. CROWLEY:  Judge, we just have one issue.  I

14   apologize.

15            We exchanged our slide decks this morning in advance

16   of court.  There are a couple issues with the defendant's

17   presentation that we attempted to work out.  We don't have a

18   resolution.  The first is basically they're showing the jury

19   things that are not in evidence.  There is a slide that

20   contains about a dozen tweets, only three of which were

21   actually received in evidence.  That slide actually appears

22   three times in the presentation.

23            There is also a reference in the presentation to The

24   Cut article appearing at 12:14 p.m.  That's not in evidence.

25   The only reference to 12:14 p.m. came from Ms. Habba, which is

O1Q5car1

1    at 216 of the transcript, where she asked the question:  So, if

2    I represented to you that it was released at 12:14, would that

3    sound right?  And your Honor sustained an objection to that.

4             THE COURT:  First of all, Ms. Habba, are Ms. Crowley's

5    statements correct?

6             MR. MADAIO:  Your Honor, if I may?

7             THE COURT:  Yes.

8             MR. MADAIO:  The full context of the conversation, she

9    was asked when The Cut article was released she said sometime

10   after noon.  Then Ms. Habba asked her about 12:14 and she did

11   say, "yes" so we --

12            THE COURT:  Give me the transcript reference, please.

13            MS. CROWLEY:  It is 214:24 to 218:4.  I believe the

14   question was:  So, if I represented it was released at 12:14,

15   would that sound --

16            THE COURT:  You read it before.  I just want to find

17   it.  What was the date of the transcript?

18            MS. CROWLEY:  Day two.

19            THE COURT:  That would be January 17.  216, line?

20            MS. CROWLEY:  The question is 216, line 2.

21            THE COURT:  Look.  The witness said:  "I'm glad to

22   give the date, it could be," in response to 12:14.  If this

23   becomes an issue, the defense can answer it on defense's

24   argument.  I'm not going to rule that out.

25            Now what about the other one, Mr. Madaio.

O1Q5car1

1            MR. MADAIO:  Your Honor, with regard to the tweets,

2     these were the defense had attempted to enter many of these

3     tweets in the five-hour gap between noon and 5:17 p.m.  Counsel

4     continuously objected to it as cumulative and there is also a

5     stipulation on the record by Ms. Kaplan that there were many

6     tweets during that period.  So we have a slide that contains, I

7     believe, four tweets that were in evidence.  The rest of them

8     are referenced on the slide, they're blacked out, you can't see

9     them, they're blurred out, but it is more to show that there is

10    a stipulation to show there are many tweets in the time period

11    and there were --

12            THE COURT:  The ones that you were trying to enter and

13    did not succeed in entering are not in evidence and they're not

14    going to be in the slide.

15            MR. MADAIO:  Well, your Honor --

16            THE COURT:  You say they're blacked out.  Now show me

17    the slide.

18            MR. MADAIO:  Sure.  Again, your Honor, there was a

19    stipulation by Ms. Kaplan on the record that there were many

20    tweets during that time.

21            THE COURT:  Maybe you should have a slide that said

22    that.

23            MR. MADAIO:  That was part of the resolution of the

24    issue, your Honor, why the tweets were not openly admitted.

25            THE COURT:  Could I have a legible copy of this or

O1Q5car1

1  project it?  This is entirely illegible.

2          MR. MADAIO:  Your Honor, that is the point, is that

3  those tweets are not legible and not intended to be legible.

4          THE COURT:  I want to see what you propose to show to

5  the jury, not a Xerox copy of something that I can't read.

6          MR. MADAIO:  We can pull it up, your Honor.

7          MS. CROWLEY:  Just for the record, on page 290, line 1

8  through 2 of the transcript, Ms. Kaplan said:  We'll stipulate

9  that there were nasty tweets sent to Ms. Carroll before

10 5:17 p.m. on June 21st.

11         THE COURT:  Is that what you are referring to,

12 Mr. Madaio?

13         MR. MADAIO:  I'm sorry.  If Ms. Crowley can repeat?  I

14 was unable to hear.

15         MS. CROWLEY:  We will stipulate there were nasty

16 tweets sent to Ms. Carroll before 5:17 p.m.

17         MR. MADAIO:  Yes, your Honor; that's exactly right.

18         THE COURT:  Now let me see the slide, please.

19         MR. MADAIO:  Your Honor, to be clear, these tweets are

20 included just to show the volume, not the substance, that's why

21 they've been blurred out.

22         THE COURT:  That's the whole point.  They're totally

23 irrelevant.  They're totally irrelevant unless they're in

24 evidence.  You are not using the slide.

25         MR. MADAIO:  Your Honor, that was the point of the

O1Q5car1

```
1   stipulation, is that there was many tweets.

2              THE COURT:  I don't know what was in your head and I

3   don't know what was in their head.  What I know is what

4   Ms. Carroll said, which was taken down.  You are perfectly

5   welcome to say she stipulated there were many whatever it is

6   she said exactly.  You are not going to use a slide that

7   purports to represent how many and what they were about.

8              MR. MADAIO:  We are not trying to enter them for what

9   they were about.

10             THE COURT:  Excuse me.  You are not using that slide.

11  Period.

12             MR. MADAIO:  Thank you, your Honor.

13             MS. HABBA:  No.  No.  Sorry, your Honor.  You can't

14  see the tweets.  Your Honor is --

15             THE COURT:  Ms. Habba.

16             MS. HABBA:  I'm sorry, your Honor.  I have to make a

17  record.

18             THE COURT:  Ms. Habba, you are on the verge of

19  spending some time in the lockup.  Now sit down.

20             MS. HABBA:  Shocking.

21             THE COURT:  OK.  Bring in the jury.

22             (Continued on next page)

23

24

25
```

1      (Jury present)

2          THE COURT:  Good morning, folks.  I'm sorry we are

3    getting a little bit of a late start but let me tell you how

4    the day is going to go.  We are going to hear closing arguments

5    from both sides.  I don't know exactly how long it is going to

6    go but somewhere between two and three hours in total, is what

7    imagine.

8          Now, depending on exactly what time it is, my

9    inclination here is to -- with a break sometime during the

10   morning, of course, I'm not going to have you sit constantly

11   for three whole hours or more -- but my inclination is at the

12   end of the closing arguments I will give you my instructions,

13   which will probably mean lunch will be later than usual, but it

14   seems to me it makes more sense to get that all done and then

15   you can deliberate while you are having lunch instead of having

16   half an hour or an hour where you are not allowed to talk about

17   the case and then come back and get instructions.  If it gets

18   to be too late and anybody is fainting for want of food, you

19   know, raise your hand, and if it is appropriate we will take a

20   break and you will have a chance to get a quick sandwich.

21         OK.  With that, we will hear closing argument on

22   behalf of the plaintiff.

23         MS. KAPLAN:  Thank you, your Honor.

24         THE COURT:  You may proceed, counsel.

25         MS. KAPLAN:  Thank you, your Honor.

1              Good morning, everyone.  For my closing argument

2        today, I'm going to walk you through the evidence that you

3        heard in this case, highlighting the key points as they relate

4        to the questions you have to decide, all of which have to do

5        with how much to award Ms. Carroll in damages.  That's what

6        lawyers do in closing arguments.  And however unusual this case

7        against a former president may seem, my job and your job -- two

8        at this point -- is straightforward:  Stick to the facts, to

9        the evidence, and to the law.

10             I want to start by mentioning something that Ms. Habba

11       said in her opening argument and I am going to quote her

12       directly.  She said:  "I want the jury to remember one thing.

13       This case is not about assault.  We had that case."  On this

14       point, believe it or not, I agree completely with Ms. Habba.

15             As you know, another jury, in a related case, has

16       already found that Donald Trump sexually assaulted E. Jean

17       Carroll in the spring of 1996.  That same jury also unanimously

18       found that Donald Trump defamed Ms. Carroll in October 2022

19       when he falsely claimed that it never happened, that he never

20       met her, and that she made up her story.

21             In other words, what we know today is that Ms. Carroll

22       did not make it up.  As you have heard, the sexual assault, and

23       as Judge Kaplan will instruct you, the sexual assault happened

24       and Donald Trump's denials and vicious accusations against her

25       were all complete lies.  That has already been proven, right in

O1Q5car1                          Summation - Ms. Kaplan

1    this courtroom by a jury of another nine New Yorkers, sitting

2    in the very seats you are sitting, in last year.  That's why

3    Donald Trump's testimony was so short yesterday.  He doesn't

4    get a do-over.

5                MR. MADAIO:  Objection.

6                THE COURT:  Sustained.  Excuse me.  Overruled.  It is

7    fair argument.

8                MS. KAPLAN:  As a result, we also know that Donald

9    Trump lied when he made his original statements about E. Jean

10   Carroll at issue in this case on June 21 and June 22, 2019.  He

11   lied about never meeting her, he lied about having no idea who

12   she was, he lied about claiming she made up her story because

13   she was getting paid off, or she wanted to sell books, or that

14   she was part of some big political conspiracy.  All of that was

15   totally false.

16               So then, why are we here?  What is this case really

17   about?  This case is about how to compensate Ms. Carroll for

18   the harm that Donald Trump's original statements, going back to

19   June 2019, caused her.  The harm to her reputation as a writer

20   and as an advice columnist, as well as the emotional pain and

21   suffering she has experienced and still experiences today.  But

22   that's not all.  This case is also about punishing Donald Trump

23   for what he has done and for what he continues to do.  It's

24   about punishing him for the malicious nature of his original

25   attacks in 2019 and considering his repeated attacks against

Ms. Carroll, right up to and including during this very trial.
This trial is about getting him to stop once and for all.

If you really think about it, this trial is also about
something much more profound:  Whether the rules that apply to
everyone else, to you and to me, to Ms. Carroll, to our family
and friends, whether they also apply to Donald Trump.  Here is
why that is so important.  Think about Donald Trump's attitude
to these proceedings.  To hear Donald Trump tell it, if
Ms. Carroll suffered harm from his lies and threats back in
June 2019, it is her own fault.  She was asking for it by
revealing that Donald Trump had sexually assaulted her,
according to Donald Trump, she left him no choice but to attack
and defame her.  No choice but to break the law in spreading
lies.

The defense in this case actually has the nerve to
suggest that Ms. Carroll actually should be grateful to Donald
Trump for defaming her because now she is even more famous than
she was before.  But being infamous is different than being
famous.  And being known as a liar and a whack job is different
than being known as a beloved advice columnist.  Using your
common sense and experience, think about that idea for a
minute.

Typically, when a person accuses someone else of
sexual assault, the attacker doesn't have the power or the
influence to destroy their accuser.  But Donald Trump did.

1    Donald Trump responded to E. Jean Carroll's account by trying

2    to ruin her and he did it from the loudest platform on this

3    planet:  the White House.  His lies and threats were heard far

4    and wide and were believed by millions of people.  Not

5    surprisingly, Donald Trump's original statements back in 2019

6    triggered a tsunami of attacks on Ms. Carroll.  A mob on social

7    media repeats and amplifies what he says, often using the very

8    same words.  They made good on his threat that Ms. Carroll

9    should pay dearly for telling the truth and that she was

10    venturing onto dangerous territory by accusing him of sexual

11    assault.

12         Let's pause for a minute and consider those words used

13    by Donald Trump in 2019.  "Pay dearly."  "Dangerous territory."

14    The attacks on E. Jean that followed Donald Trump's statements

15    were no accident, they were the inevitable result of Donald

16    Trump's own lies.  They were absolutely totally foreseeable.

17    They are exactly what he wanted to happen.  As a result, our

18    client, E. Jean Carroll, now has to live her life in a

19    continuous storm of hate and threats and fear and brutality.

20    She is bombarded daily by disgusting, disturbing attacks from

21    people she does not even know, all based on Donald Trump's

22    lies.

23         At various points today I'm going to ask you to try to

24    imagine what it would feel like to walk around every day in

25    Ms. Carroll's high-heeled shoes.  I'm going to ask you to

O1Q5car1                    Summation – Ms. Kaplan

1    consider how difficult, how humiliating, how painful it would

2    be to live each day as the target of Donald Trump and the

3    hateful mob that he inspired.  I am also going to ask you to

4    think about how Donald Trump has tried to normalize conduct

5    that could hardly be more admirable.

6          Typically when someone is held liable in court for

7    spreading false and defamatory lies, they stop.  Think about

8    that.  What would you do if a jury found your statement about

9    someone else was intentionally and damaging to that person and

10   was a lie.  The answer is obvious.  You would stop saying it.

11   In this country in our justice system that is how it is

12   supposed to work.  Even if you don't like a jury's decision,

13   you are supposed to follow it.  Those are the rules.  This

14   doesn't depend on your politics, it doesn't depend on who you

15   vote for or whether you support a particular policy or a

16   particular party.  We all have to follow the law.  Donald

17   Trump, however, acts as if these rules and laws just don't

18   apply to him.

19         After the prior jury found that his attacks on

20   Ms. Carroll were false and defamatory last year did he respect

21   the jury verdict?  No.  Not at all.  Not even for 24 hours.

22   You have seen the evidence we presented, he continued to repeat

23   his defamatory attacks over, and over, and over again.

24         As you know, it didn't stop even once this trial

25   began.  Donald Trump spent his entire trial continuing to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    engage in the very defamation that landed him here in the first

2    place.  He would sit here, right here in this courtroom, and

3    then leave the court house and engage in the exact same conduct

4    that a jury unanimously declared to be unlawful last May.  He

5    continued to defame E. Jean Carroll, proudly and repeatedly

6    during this trial, on an almost daily basis.

7                THE COURT:  Excuse me.

8                The record will reflect that Mr. Trump just rose and

9    walked out of the courtroom.

10               You may continue, Ms. Kaplan.

11               MS. KAPLAN:  Thank you, Judge.

12               Donald Trump, he is the former president of the United

13   States.  He remains very powerful today, obviously.  And, by

14   his own account, he is extremely rich.  He seems to think that

15   his wealth and power entitle him to treat Ms. Carroll however

16   he wants.  And Donald Trump's strategy is to bet that you will

17   agree with him.  He is hoping that you will let him off the

18   hook, that he will suffer no consequences for his unlawful

19   conduct.  He is betting that you will let him continue to

20   defame Ms. Carroll lying about her and destroying her

21   reputation.  But no matter what Donald Trump thinks, and no

22   matter what Donald Trump says, the rules do apply to him.  He

23   is not free to continue to attack and defame Ms. Carroll just

24   because he feels like it.

25               In this country, even the most powerful person can be

held accountable in a court of law.  No one, not even a former

president, is above the law.  In other words, Trump is required

to follow the law whether he likes it or not.  Your job today,

ladies and gentlemen, is to uphold this core principle of our

democracy:  To find the facts and reach a verdict based on the

evidence before you.

Donald Trump has suggested that this case is nothing

more than a money grab.  That is dead wrong.  Ms. Carroll has

never been compensated for the extraordinary harm he caused her

going back to June 2019, and Donald Trump has never been

punished for that harm.

At least one thing we know for sure, the jury verdict

from last year, which involved a different statement from 2022,

did not stop him from continuing to attack and defame

Ms. Carroll.

The law gives Ms. Carroll the right to get her

reputation back.  That is why Ms. Carroll told you she brought

this lawsuit in the first place.  Her old friend Carol Martin

said the same thing yesterday.  She said that E. Jean Carroll

does not want to be known as the woman who lied about being

sexually assaulted by the president.  Her goal, instead, was to

face the person she was accusing.  Carol Martin's words:  *I

know that she always wanted to have her day in court.*  Now she

has her day in court.  It is up to you guys to decide what it

will take to make that happen.

O1Q5car1                    Summation – Ms. Kaplan

1          I am going to now turn back to the evidence, starting

2     with Ms. Carroll's background and her reputation before June

3     2019.

4          THE COURT:  Before we change gears, defense counsel

5     are to remain seated and that includes you Mr. Epshteyn, not

6     that you are among defense counsel at the table.

7          MS. KAPLAN:  As you heard, Ms. Carroll is truly one of

8     a kind.  Growing up in rural Indiana she dreamed of becoming a

9     writer.  She spent years submitting articles to various

10    magazines trying to get published.  She set up her first piece,

11    believe it or not, at the age of 12, but it wasn't until the

12    age of 36 when her first story was finally published.

13         Ms. Carroll told you how she spent decades building

14    her career after moving to New York City.  She told you about

15    the top-tier magazines like *Esquire* and *Rolling Stone* that

16    published her work, and her time as a writer at Saturday Night

17    Live and the Emmy nominations she received about her incredibly

18    poplar advice column "Ask E. Jean" which started running in

19    *Elle* magazine in 1993.

20         As you heard, her column would go on to become the

21    longest running advice column in the world.  It was so

22    successful that in 1994 she got a TV show called "Ask E. Jean"

23    where she gave advice to people, live on the air.  Needless to

24    say, they don't go around handing out TV shows to just anyone.

25         As Ms. Carroll told you, over the course of the time

1  that her advice column ran on *Elle*, she received tens of

2  thousands of letters from men and women, mostly women, seeking

3  her advice.  She built her career and made her name by telling

4  them the truth, by giving them honest advice, and by doing so

5  with her own unique style -- and you saw some of this on the

6  stand -- that blended toughness, humor, and candor.  That's why

7  her former boss, Robbie Myers, who you heard yesterday,

8  testified that so many people wrote to her seeking advice that

9  there would be stacks of letters lying around the office for

10 her to read.

11        As Ms. Myers testified, she thought of E. Jean's

12 column as a sort of a destination, meaning people picked up the

13 magazine and the first thing they would go to would be to read

14 her column.  Robbie Myers noted that as a result, Ms. Carroll

15 was very important to the *Elle* brand.

16        This is a key point.  Much like her success as a

17 writer and journalist, Ms. Carroll's success as an advice

18 columnist obviously depended on the trust of her readers.  In

19 all her work, her journalism, her advice columns, her TV show,

20 and her TV appearances, Ms. Carroll was known as a

21 truth-teller.  This was critically important because it meant

22 that her audience could rely on her.  She built that trust over

23 decades, it was the key to her success.

24        But there was one truth that was too painful, too

25 difficult for Ms. Carroll to share for most of her career.  In

1   the spring of 1996, Donald Trump sexually assaulted her. As we

2   have discussed, this fact has already been proven in this very

3   courtroom. In the aftermath of that assault, and for years

4   afterwards, like many women in her situation, Ms. Carroll tried

5   to suppress what had happened to her, to bury it. She was

6   scared and she was ashamed and she was worried that no one

7   would ever believe her. She just wanted to move on with her

8   life.

9           In 2017, she took a road trip interviewing women

10  around the country for a book she was writing. She talked to

11  women about their lives and about the men in their lives so she

12  could write about their perspectives. However, as she started

13  working on the book, it became more personal. As she

14  explained, it started to change -- and this is her testimony --

15  *It started to change when I started talking to women. If they*

16  *trusted me, why can't I trust myself a little bit and talk*

17  *about some of men in my life?*

18          Initially, Ms. Carroll did not plan to include Donald

19  Trump as part of the men in her life but, as she testified: *I*

20  *was overwhelmed by the honesty of these women* -- the women she

21  was talking to -- *and I thought to myself, my God, I'm such a*

22  *hypocrite. They are telling me their opinions and I am holding*

23  *back. If I don't do it now, I will never do it, so I included*

24  *Donald Trump.*

25          Ultimately, her 274-page book included nine pages

O1Q5car1                    Summation - Ms. Kaplan

1    about Mr. Trump.  Right before the book was released, *New York*

2    magazine published an excerpt on June 21, 2019, and that

3    excerpt included the chapter about Trump's assault.  It is the

4    first time Ms. Carroll spoken publicly about what had happened,

5    the first time she told the world that she had been sexually

6    assaulted by Donald Trump.

7            Donald Trump's response was both brutal and immediate.

8    He started making false and vicious attacks on Ms. Carroll and

9    he did so from the White House, using the world's biggest

10   megaphone to tear her to shreds.  He told lie, after lie, after

11   lie in order to punish E. Jean Carroll for telling the truth

12   about what he had done and in order to destroy her, and

13   probably most importantly, to make sure that nobody would ever

14   believe her.

15           Put up the slide 4?

16           Mr. Trump issued his first defamatory statement about

17   E. Jean Carroll on June 21, 2019, the same day the account of

18   the assault was first published in *New York* magazine.  The

19   statement, itself, was riddled with lies.  He called

20   Ms. Carroll a disgrace for speaking up.  He claimed, *I have*

21   *never met this person in my life.*  A lie.  He accused

22   Ms. Carroll of making up false stories of assault for

23   publicity, or to sell her book, or to carry out a political

24   agenda.  More lies.  He claimed that Ms. Carroll was working

25   for the democratic party.  Another lie.  He claimed that her

O1Q5car1                    Summation - Ms. Kaplan

1    false accusations diminished the severity of sexual assaults

2    experienced by other women.  A lie.  And, as Ms. Carroll told

3    from you that stand, the scariest part was when he concluded by

4    asking for information about her and then made a not so subtle

5    threat.  You see it at the bottom:  People should pay dearly

6    for such false accusations.

7         Remember -- I'm going to say this a couple more times,

8    I can't help myself -- remember, it has already been

9    established that all of these statements that you are looking

10   at were in fact lies.  Donald Trump was lying and he was trying

11   to destroy Ms. Carroll.  And that was just round one.  The next

12   day, on June 22, 2019, Donald Trump doubled down.  Standing on

13   the White House lawn he told reporters that he had no idea who

14   this woman is.  In response, a reporter said to him that there

15   was a photograph of him and Ms. Carroll together with their

16   spouses.  You saw that photo during this trial.  Yet Donald

17   Trump still insisted:  I have no idea who she is.  And he

18   added:  What she did, it is a terrible thing what is going on,

19   so it is a total false accusation and I don't know anything

20   about her.

21        Once again, he accused her of making up her account

22   for the sake of publicity.  Once again, he described it as a

23   false accusation and a disgrace -- more lies -- and once again,

24   he threatened her.  This time even more directly.  Look at this

25   language:  People have to be careful because they're playing

O1Q5car1                        Summation – Ms. Kaplan

1     with very dangerous territory.

2              This one-two punch caused extraordinary harm to

3     Ms. Carroll.  She revealed the truth about Donald Trump and

4     Trump responded with two separate statements within less than

5     24 hours.  These statements trashed her honesty, her integrity,

6     and her credibility.  They accused her of making up a claim for

7     a quick payoff or for politics.  They disparaged her for

8     harming the real victims of sexual assaults.  And, they

9     included threats that she would pay dearly for speaking up.

10    This was all deliberate.  Trump sought to crush Ms. Carroll so

11    quickly and so decisively that nobody would ever believe her.

12             But, his attacks did not stop on June 22nd.  He did it

13    again two days later.  After lying again by claiming that he

14    had never met Ms. Carroll he added, for good measure:  "I will

15    say it with great respect:  She's not my type."

16             Ladies and gentlemen, the implication here could

17    hardly be more obvious.  Ms. Carroll must have been lying

18    because she was too ugly or too unattractive for him to

19    sexually assault.  This statement, in comparison to the other

20    ones we saw, was designed to humiliate Ms. Carroll, to degrade

21    her.  And even this claim, it turns out, was also a lie.

22             Remember that photo I just showed you of Ms. Carroll

23    and Donald Trump and others from the late '80s?  And remember

24    what happened when I showed Donald Trump that photograph during

25    his deposition in this case?  He pointed straight at the photo

1    twice -- we will play it in a second -- mistook Ms. Carroll for

2    his own second wife Marla Maples who, like Ms. Carroll, was a

3    former beauty queen and was definitely his type.

4              Let's watch the video.

5              (Video played)

6              MS. KAPLAN:  Leave it up for a second?

7              Realizing what he had done at the deposition,

8    realizing the mistake he made, Donald Trump then did what he

9    always does.  He made up another lie.  He said that the photo

10   was blurry.  The photo he was looking at is the exact same

11   photo you is see on your screen today.  It is not blurry.  That

12   is classic Donald Trump.

13             In response to Donald Trump's statements back in June

14   2019, Ms. Carroll filed this lawsuit.  As she told you during

15   her testimony when this trial began:  *I am here to get my*

16   *reputation back and to stop him from telling lies about me.*  I

17   am now getting to the heart of the case, the heart of what you

18   guys have to decide:  The damages that you should award

19   Ms. Carroll to compensate her for the harm that Donald Trump

20   caused.  These are called compensatory damages.

21             As Judge Kaplan will instruct you, the first question

22   for you to answer is whether E. Jean Carroll was harmed at all.

23   That should be an easy one.  Obviously, Ms. Carroll suffered

24   harm when then President Trump, speaking from the White House,

25   spread terrible lies about her in order to punish her for

1    speaking up to humiliate and degrade her and to ensure that

2    nobody would ever believe her.

3            So, the real question is how to measure that harm he

4    caused.  In other words how to assign a specific dollar amount

5    to it.  In answering that question there are two categories of

6    harm, each of which supports its own award of what are called

7    compensatory damages.

8            First, there is the reputational harm that Ms. Carroll

9    suffered.  As you have heard, Ms. Carroll has devoted her

10   entire life to succeeding as a writer and as an advice

11   columnist.  The very heart of her success was her reputation

12   for honesty and integrity.  You heard this repeatedly during

13   the trial from Ms. Carroll.  You also heard it from Robbie

14   Myers, her long-time boss.  And because of her excellent

15   reputation, Ms. Carroll did have a lot of success as a writer,

16   her childhood dream.  She wrote articles and books and columns

17   and skits for Saturday Night Live, and appeared frequently on

18   TV.  You heard her describe all of this herself.

19           While Ms. Carroll built that career over five decades,

20   Donald Trump shattered it in less than 24 hours.  As

21   Ms. Carroll described it, people who didn't care about me,

22   really don't care about this person, they now have opinions

23   about me and that is that I am a liar.  You heard extensive

24   evidence on this point from Ms. Carroll.  As she explained to

25   you guys last week: *Previously, I was known simply as a*

*journalist and had a column. Now I'm known as the liar, the fraud, and the whack job.* Again, in her own words. *People are not dying to write to an advice columnist who the president says is a disgrace.*

Can we see the next slide?

Remember this e-mail I showed you, which is one of the many, many, many horrible e-mails E. Jean received after Donald Trump's statement, and remember how she said that despite all the other e-mails calling her ugly, and slutty, and crazy, and everything else, this one hurt her the most. Why did it hurt her so much? Because this person said, "I sure wouldn't ask you for advice." There can hardly be more direct proof -- this is June 23, 2019 -- more direct proof that what Donald Trump said shattered E. Jean Carroll's reputation as an advice columnist.

In a very real way, Donald Trump's lies radically transformed Ms. Carroll's public image. This change had concrete impacts that could be measured. Ms. Carroll, for example, used to receive hundreds of letters per month seeking her advice. Today she only receives eight. She used to write the nation's leading advice column read by millions and millions of people in *Elle* magazine. Today? Her Substack only has 28,000 subscribers with only 1,800 of those being people who pay.

Previously, Ms. Carroll used to make more than $50,000

O1Q5car1                    Summation - Ms. Kaplan

a year doing freelance work for magazines on a wide range of

topics.  Today, or last year, I should say, she only earned

$500 in freelance work, and the only requests she ever gets

anymore are to write about Donald Trump.

To assess the reputational harm that Donald Trump's

statements caused you also heard incredibly detailed testimony

from Ashlee Humphreys, a tenured professor at Northwestern and

expert in calculating the cost of repairing a person's

reputation.

As Professor Humphreys explained, before Ms. Carroll

was defamed by Donald Trump she had a devoted following as an

author, writer, and a columnist.  Using an extremely

conservative method of accounting, Professor Humphreys'

calculated that Donald Trump's false and defamatory statements

in June 2019 about Ms. Carroll, were seen between 85 million

and 104 million times.  Please keep in mind that's only his

statements on June 21 and June 22, 2019, and that's only a

small part of all of the many places where those statements

were spread.

Professor Humphreys explained this in great detail.

For news articles, for example, she only used the 47 articles

we cited in our complaint.  She then considered only the number

of people who visited those corresponding news sites on the

exact same days, June 21 and June 22, that those articles

appeared.  In other words, it is important to think about what

O1Q5car1                    Summation – Ms. Kaplan

1    Professor Humphreys didn't do.  She didn't consider anyone who

2    might have looked up the articles online the next day, June

3    23rd, June 24th, or the next week, or the next month.  She

4    didn't consider any local newspapers that reported Donald

5    Trump's statements.  And she didn't consider articles that were

6    published later that continued to quote Donald Trump's

7    defamatory claims.

8           For social media, her approach was even more

9    conservative.  First of all, she looked only at Twitter.

10   Second of all, within Twitter, she looked only at tweets that

11   originated from sites like the New York Times or Fox News and

12   quoted or paraphrased Trump's June 21 or June 22 statements.

13   That's obviously only a tiny portion of what happens on

14   Twitter.

15          Professor Humphreys didn't include tweets where

16   someone on their own quoted what Donald Trump said.  And, most

17   importantly, she didn't include any contact from anywhere else

18   on social media.  She didn't look at Facebook.  She didn't look

19   at YouTube.  Didn't look at Instagram or Reddit or Tic Tac --

20   TikTok, excuse me -- Tic Tac is for a sore throat -- or any

21   other social media platform.

22          And with respect to television, she considered only

23   six TV shows, national TV shows, and she didn't consider any

24   local news.  She didn't consider any podcasts.  She didn't

25   consider radio.  She was focused only on the two days that

O1Q5car1                    Summation - Ms. Kaplan

Trump made his statements in 2019 and she didn't even count how
many times Donald Trump's statements continued to be repeated
in the rest of 2019, 2020, 2021, and so on, until today.

      Given the very limited nature of what Professor
Humphreys did, the number of impressions she calculated cannot
even begin to capture just how far Donald Trump's lies spread.
In other words, 85 to 140 million impressions, as large as it
may seem, has to be a dramatic undercount.  We know that far
more people actually heard or read Donald Trump's lies than
that.

      Of the people who saw those statements, Professor
Humphreys found that between 21 and 24 million of them were
likely to believe his lies.  Again, definitely an undercount
for the same reasons I just explained and a very substantial
one.

      Ultimately, Professor Humphreys designed what experts
in the field call a reputational repair campaign, basically a
series of public relations steps necessary to fix the harm that
Donald Trump's defamatory statements caused.  You may not be
familiar with them but, apparently, such programs happen all
the time.  And Professor Humphreys is an expert and teaches her
students how to do that.

      As Professor Humphreys testified, she calculated that
it would cost between $7 million and $12 million to repair the
harm caused by Donald Trump's defamatory statements from

O1Q5car1                    Summation - Ms. Kaplan

1    June 21 and June 22, 2019.  That's obviously a significant

2    number but it is actually a lot smaller than other reputational

3    repair campaigns, as Professor Humphreys explained.

4            MR. MADAIO:  Objection.  That's not in the record your

5    Honor.

6            MS. KAPLAN:  It is.

7            THE COURT:  The jury will remember what is in the

8    record.  In fact, if I recall correctly -- and it is the jury's

9    recollection that controls -- the defense asked Professor

10   Humphreys whether she was familiar with the cost of other

11   campaigns and she referred to one and gave a figure.  I leave

12   it to you.

13           Go ahead.

14           MS. KAPLAN:  In fact -- and I am just going to get

15   there -- she told you about the reputational repair campaign in

16   the case against Rudy Giuliani brought by the election workers

17   he defamed.  She said the amount of that campaign was

18   $48 million.  She also would know because she was the expert --

19           MR. MADAIO:  Objection.  That's not in the record,

20   your Honor.

21           MS. KAPLAN:  It is in the record.

22           THE COURT:  Members of the jury, you are the judges of

23   the facts.  You heard the evidence.  I don't remember, frankly.

24   It is up to you.

25           MS. KAPLAN:  So, it is definitely not a reach to

O1Q5car1                    Summation - Ms. Kaplan

conclude that for Ms. Carroll it would cost at least

$12 million.  This is an exceptional case.  Ms. Carroll has a

national reputation.  Donald Trump has a global audience.  His

June 21 and June 22 statements alone reached at least

100 million and probably many more than 100 million people.

Because he had such a huge microphone, the damage he caused was

significant so the cost of repairing that damage is

significant, too.

            We know from Professor Humphreys' testimony that her

whole model is based on a very conservative undercount of the

actual numbers which we believe justifies an amount by you at

the top of the range, or $12 million.  That's the first

category of compensatory damages, what it would take to fix

Ms. Carroll's reputation.

            The second category of compensatory damages is where

you need to decide how much to award Ms. Carroll for the pain

and suffering that she has been experiencing.  Judge Kaplan is

going to instruct you later that this includes the humiliation

and mental anguish E. Jean Carroll suffers in her public and

private life that was caused by Donald Trump's statements.

Here, the evidence was as shocking as it was unmistakable.  As

Ms. Carroll testified, "Trump's statements ended the world that

I had been living in."

            Imagine for a second what it would feel like to go to

sleep in one world and to wake up in another world where the

O1Q5car1                    Summation - Ms. Kaplan

1    president of the United States, a man who had sexually

2    assaulted you years before he took office, is attacking you as

3    a liar and a fraud for telling the truth.  Imagine Ms. Carroll

4    sitting alone in that hotel room on 10th Avenue, late in the

5    night on June 21, 2019, opening her laptop, only to see

6    horrible things on Twitter; the nasty messages and death

7    threats from strangers flooding her e-mail inbox including

8    graphic images.  Imagine her sitting there struck by fear and

9    sadness and the reality that the man who had attacked her was

10   coming after her again.  E. Jean Carroll testified that she was

11   so terrified that night that she tried to close the hotel room

12   curtain so that no one could see through but she couldn't get

13   it closed.  So, she ultimately hung up a jumpsuit to try to

14   cover up the glass.  She stayed up all night that night of

15   June 21, unable to sleep, heart pounding, as she read the flood

16   of hateful and threatening messages she had received from

17   complete and total strangers.

18          It would have been bad enough had it only been that

19   one night, or one week, or one month.  But, as you heard, those

20   initial attacks, including those initial death threats, were

21   followed by many, many more.  This, again, ladies and

22   gentlemen, was no coincidence.  Remember what he had said?

23   Donald Trump had said that Ms. Carroll should "pay dearly" and

24   that she had entered onto "dangerous territory."  That's

25   exactly what Donald Trump wanted to happen and that's exactly

1    what did happen.  As you heard from Ms. Carroll, this was a

2    pattern.  Every time Donald Trump repeated his lies about her,

3    an online mob attacked her.

4            Ms. Carroll told you how she realized at some point

5    that she was now living in a new universe.  She received

6    horrifying messages on Facebook, on Twitter, and Instagram.

7    And she also -- and also her personal and professional e-mail

8    accounts calling her a liar, a fraud, a hack, a paid operative,

9    ugly, too disgusting to touch or to rape, an enemy of all

10   survivors of sexual assault.

11           These attacks echoed the lies that Donald Trump spread

12   about Ms. Carroll in his June 21 and June 22 statements.  They

13   copied his very words.  They made good on his very threats.

14   For example, one of the things, as everyone knows he said, is

15   that she is a liar.  So, here are e-mails and tweets calling

16   E. Jean Carroll a lying old hag, a lying ass bitch, and a lying

17   fraud.

18           In addition, as you will recall, Donald Trump had said

19   that Ms. Carroll made up these lies in order to sell a book.

20   Here are messages she received:  You're only saying this to

21   promote your book.  You are psychological messed up to lie

22   about something like this to draw sales for your book.  We also

23   need fewer money-grubbing whores who lie.  He also said that

24   she was a political operative and that's why she made up the

25   lie.  You heard this during her testimony, they accused her of

O1Q5car1                          Summation - Ms. Kaplan

being paid off by George Soros of the DNC.  They asked:  How

much did the democrats pay for your lies, bitch?

         And with these attacks, even worse, came terrifying

threats as well -- threats of violence, threats to jail her, to

rape her, to kill her.  Keep in mind that this is just a small

sample of what Ms. Carroll actually received.  She testified

that she receives thousands of attacks and hundreds of threats

of violence.  Imagine what it would be like to live in

Ms. Carroll's new world.  Imagine the toll it would take on you

if day, after day, after day, you had to endure such hate and

threats knowing that there would be more waiting for you every

single time you looked at your phone or opened up your laptop.

Imagine how it would feel if you posted a tweet just last year

on December 25, 2023, simply saying that the Earth needs care

and love, not war and hatred.  And that in response to that

tweet, which had nothing to do with Donald Trump, nothing to do

with politics at all, the responses were -- excuse my

language -- you are a cunt.  Shut the fuck up, lying fraud.  We

also need fewer money grubbing whores who lie.  No way Trump

touched this mess, etc.

         While Ms. Carroll testified that she never received

messages like these before June 2019.  Since then, according to

her, they have never stopped.  All of those attacks have

upended how she thinks of herself, her sense of well being and

self-worth.  As she herself explained it, *To have the president*

1  *of the United States, one of the most powerful persons on Earth*

2  *calling me a liar for three days and saying I'm a liar 26*

3  *times -- I counted them -- it ended the world I had been living*

4  *in and I had a new world.*

5      And then the next slide, she also explained:  *Here is*

6  *the thing.  I understand that people have been through a lot*

7  *more than I have ever been through in my life but this laid me*

8  *low.  It was so unexpected from a place where I felt that I was*

9  *doing well in the world and helping people.*

10     Messages like these understandably made Ms. Carroll

11  worry about her safety.  Imagine knowing that all these people

12  out there hate you, they all want you to be raped or killed,

13  wondering if they live across the street or right down the

14  street, always worried that one day someone would act on these

15  threats, always looking over your shoulder, always looking

16  around the corner in the parking lot wondering if you would

17  ever have peace of mind ever again.

18     Donald Trump's lawyers sat here in this courtroom --

19  or I should say stood here in this courtroom, and dismissed

20  these messages as just a few mean tweets.  Mean tweets?  You

21  have seen them.  And you heard directly from Ms. Carroll about

22  how they made her life so much sadder and darker.  Your verdict

23  should compensate Ms. Carroll for the harm that Donald Trump

24  caused by making these attacks part of her daily existence and

25  causing her to live in fear.

1           How do you assign a dollar number to this?  How do you

2   determine what it would cost to compensate Ms. Carroll for her

3   fear, her terror, her anguish to make her feel safe?  I'm not

4   going to stand here and tell you there is some mathematical

5   formula for this.  There is no model like the one used by

6   Professor Humphreys in connection with the reputational repair

7   campaign but you don't need a model.  We are all human beings

8   and we are all capable of understanding the pain and suffering

9   that Ms. Carroll has experienced.  In our view, the damage to

10  Ms. Carroll's sense of self, to her peace of mind, to the

11  feeling that we all have that we can go about our lives every

12  day and not be suddenly attacked, or raped, or killed, is very

13  significant, so the dollar number to compensate her for that

14  has to be very large.  We, therefore, believe that the number

15  required to compensate Ms. Carroll for her anguish and her

16  suffering is at least as much, and probably much more, than the

17  $12 million it would take for the reputational repair campaign.

18          I have now spoken about what would be required to

19  compensate Ms. Carroll for the damage to her reputation and for

20  the damage to her mental well-being.  Now I want to talk about

21  what it will take to get Donald Trump to stop.  This leads me

22  to the question of punitive damages.

23          The whole point of punitive damages is to punish a

24  defendant who has acted maliciously, to stop him and others

25  like him from act in a similar manner in the future.  I

O1Q5car1                    Summation - Ms. Kaplan

referred to this earlier and Judge Kaplan is going to instruct
you on it.  I suspect that he will tell you that, in
determining the amount of punitive damages to award, you should
consider the reprehensibility of the conduct, the defendant's
awareness of the harm he would cause, the actual or potential
harm that he caused, as well as the defendant's financial
condition and the impact of your award on him or her
financially.

          As you think about all of that, I would like you to
consider what Donald Trump has done here.  Really consider it.
Twenty-five years after Donald Trump sexually assaulted her,
Ms. Carroll came forward to tell her story.  In response,
Donald Trump set out to ruin her life.  Wielding his position
as president, he attacked her integrity and her honesty.  He
not only denied the sexual assault but he said that she made it
up for money or fame or part of a conspiracy.  He said she was
a disgrace who undermined true victims of assault.  He
threatened her twice.  He insulted her claiming she was too
ugly to assault and he unleashed millions of other people to
repeat his lies and flood her with hate.

          Now, you actually got a chance to see some of this for
yourselves yesterday when we played excerpts from Donald
Trump's deposition in this case.  Remember what he said about
E. Jean Carroll during that deposition?  He called her sick.
He called her mentally sick.  He called her a sick person.  He

O1Q5car1                    Summation - Ms. Kaplan

1  also said there is something wrong with her.  And he even

2  threatened to sue her.

3              Let's watch the video.

4              (Video deposition played)

5          MS. KAPLAN:  Ladies and gentlemen, if those excerpts

6  do not show you malice and spite, it is very hard to imagine

7  what possibly could.  And again, Donald Trump's attacks have

8  only continued.

9              In October of 2022, just before the deposition that

10  you just saw, Donald Trump lashed out at Ms. Carroll yet again.

11  Posting on his own social media platform TruthSocial, he

12  repeated his defamatory attack, the same lies and the same

13  insults, but he added some things.  He added the phrase that it

14  was a hoax, a complete con job.  And he couldn't help

15  himself -- he couldn't help himself -- he had to say it again:

16  *She's not my type.*

17              In response to that statement, Ms. Carroll filed her

18  other lawsuit.  As you have heard, that case moved much faster

19  than this case and that's the trial that happened last spring

20  when the jury found unanimously that Donald Trump assaulted

21  Ms. Carroll in 1996 and defamed her with this statement in

22  2022.  But, even after that jury decided that Donald Trump had

23  violated the law and that he was lying about all of this, he

24  kept on doing it.  For most people, losing one trial would be

25  enough to stop you from breaking the law.  But not for Donald

1   Trump.

2          As we have seen, immediately after the jury awarded

3   damages to Ms. Carroll in the first trial, Donald Trump not

4   only defamed her again on national TV, but tried to use his

5   lies about Ms. Carroll to connect people to his presidential

6   campaign.  Think about that.  Think about how disturbing that

7   really is.  Donald Trump is spreading proven lies about his

8   sexual assault victim for his own benefit?  Let me show you.

9          The day after the jury verdict, May 9, the next day,

10  Donald Trump posted this video to his millions of followers on

11  TruthSocial and he repeated the same lies.  Let's watch it.

12          (Video played)

13          MS. KAPLAN:  That wasn't all.  The next day -- I'm

14  sorry.  That video was from the day of the verdict.  I

15  apologize.  That was that evening.  The next day, Donald Trump

16  doubled down again.  He went on television and did a CNN town

17  hall and he again lied about Ms. Carroll.  This is what he

18  said:  *I never met this woman.  I never saw her.  I have no*

19  *idea who the hell she is.*

20          Even though a federal jury had just found

21  Ms. Carroll's account to be true and his statements to be

22  false, Donald Trump called her account fake and made up.

23          Let's watch.

24          (Video played)

25          (Continued on next page)

1          MS. KAPLAN:  (Continued) In addition to the lies and

2     the insults, including the new one there, whack job, what else

3     happens in that video?  The audience laughs.  I'm sure you

4     remember E. Jean on the stand here in this room testifying

5     about how horribly that laughter made her feel.  After she won

6     the last trial, E. Jean told you that at first for a brief

7     period she felt an enormous sense of relief.  She said she

8     thought to herself "Now at least I can start to get my

9     reputation back."  But as she testified, and as you have now

10    seen, that didn't happen.  The initial relief she felt only

11    lasted a few minutes.

12          Imagine that again.  Ms. Carroll had been through a

13    grueling process for four years of a lawsuit to gain her

14    reputation back.

15          She filed a second lawsuit after Donald Trump had

16    defamed her again, and after she was vindicated, after a jury

17    unanimously declared that she was right and he was wrong, Trump

18    went on the attack again, and it hasn't let up since.  If

19    anything, his attacks have only intensified.

20          Donald Trump has continued to post hateful, damaging

21    lies on Ms. Carroll on social media.  He has said that she made

22    up a totally fabricated accusation.  Another lie.  He posted

23    that he has absolutely no idea who she is or even what she

24    looks like.  All lies.

25          Here is the truly shocking part.  The truly shocking

O1QQcar2                          Summation – Ms. Kaplan

1  part is that those false denials and attacks have continued

2  during this trial.  Last week, while Ms. Carroll was still on

3  the stand, Donald Trump walked out of this courtroom and then

4  out of the courthouse to hold a press conference.  During that

5  press conference, while you were sitting in this jury box, he

6  told even more lies about Ms. Carroll.

7                          Go ahead and play it.

8           (Video played)

9           MS. KAPLAN:  He told a similar lie in his *Truth Social*

10  post you have up on the screens in front of you where he said

11  he never heard of her, never touched her and had nothing to do

12  with her.  But he made his most damning statement, his most

13  reprehensible statement of all last Thursday.  You could put

14  that up.  He said, and I quote, "I've said it once and I'll say

15  it again, a thousand times, I never heard of E. Jean Carroll,

16  never touched her or in any way would want to touch her."

17          A thousand times?  Are you kidding me?  Donald Trump

18  has openly made it his mission to destroy Ms. Carroll's

19  reputation and credibility by lying about her, and that he's

20  prepared to keep doing it a thousand times unless you make him

21  stop.

22          And in figuring out what kind of damages would

23  actually cause Donald Trump to stop, to stop attacking

24  Ms. Carroll, there is another very important thing for you to

25  consider.  As you have seen, Donald Trump is a very wealthy

O1QQcar2                       Summation - Ms. Kaplan

1    man.  He has said that his brand alone is worth $10 billion.

2    He said it's the hottest brand in the world.  And that doesn't

3    include his other assets, which are also substantial.  He

4    testified under oath in the case in the other deposition you

5    saw yesterday, that Mar-A-Lago is worth $1.5 billion; that

6    another property in Florida, the Doral, is worth $2 and a half

7    billion --

8              MR. MADAIO:  Objection.  Your Honor, these are not

9    personal assets she's referring to.

10             THE COURT:  Overruled.  The jury will remember the

11   testimony.

12             MS. KAPLAN:  That's $14 billion right there, ladies

13   and gentlemen.  Donald Trump is prepared to use his wealth and

14   power to defame people whenever he wants.  He ignored the last

15   jury verdict as if it had never happened.  In fact, you heard

16   him brag on *CNN* that he thought he was now more popular as a

17   result.  But that's not how this works.  The law protects

18   people from defamatory attacks on their character, and it

19   allows an award of punitive damages to deter them from keeping

20   at it.

21             Indeed, while my cross-examination yesterday went very

22   fast, it did reveal one very important fact.  At the first

23   trial between Ms. Carroll and Mr. Trump, the one where a jury

24   just like you determined that he had sexually assaulted her and

25   had defamed her, Donald Trump didn't even bother to show up.

1              MR. MADAIO:  Objection.

2              THE COURT:  Overruled.

3              MS. KAPLAN:  Yet, at this trial, at this trial where

4    the issue is about how much more money he has to pay, with

5    certain exceptions that you just saw, he has made sure that he

6    has been here for most of the trial.  What does that mean?  It

7    means that the one thing that Donald Trump cares about is

8    money.  While Donald Trump may not care about the law, while he

9    certainly doesn't care about the truth, he does care about

10   money.  As a result, your decision to award a large amount of

11   punitive damages may be the only hope that E. Jean Carroll has

12   to ever be free from Donald Trump's relentless attacks ever

13   again.

14             And so the question for you as a jury is this:  Given

15   Donald Trump's insistence on continuing to defame Ms. Carroll

16   and given his immense wealth, how much will it take to make him

17   stop?  One thing I know for sure, whatever it will take to make

18   Donald Trump stop, simply awarding compensatory damages is not

19   enough.  In fact, it's not even close.  That's why the whole

20   concept of punitive damages exists, and it's your job to decide

21   exactly how much money to give her, to give Ms. Carroll a

22   chance at a normal life again where she is not regularly

23   bullied and humiliated by one of the most powerful men on the

24   planet.

25             I'm getting to the end, I promise.

1          What did Donald Trump's lawyers have to say about all

2    of this?  Mostly, they tried to blame E. Jean Carroll.  Under

3    their theory, any harm that she suffered is somehow her own

4    fault, and Donald Trump's decision to spread lies about her had

5    nothing to do with any harm she experienced.  If anything, they

6    insist - and this is truly incredible - she actually should be

7    grateful to Donald Trump since his lies and attacks got her

8    more Twitter followers.  These arguments are not only wrong,

9    but I hope you see how offensive they really are.  First, Mr.

10   Trump's lawyers accuse Ms. Carroll of bringing all this harm on

11   herself by speaking out in the first place.  Of course, they

12   don't deny that Donald Trump sexually assaulted Ms. Carroll.

13   They can't.  He did it, as Judge Kaplan already told you.

14          MR. MADAIO:  Objection.

15          THE COURT:  Overruled.

16          MS. KAPLAN:  May I go on, Judge?

17          THE COURT:  I overruled it.  Go on.

18          MS. KAPLAN:  But Donald Trump is still asking you to

19   penalize Ms. Carroll for telling her story when she did, with

20   absolutely no evidence to support their position, his attorneys

21   accuse Ms. Carroll of intentionally waiting 23 years to tell

22   the truth, and she did that, according to them, as part of some

23   crazy, undefined scheme hatched long ago to achieve fame and

24   fortune in 2019.  Excuse my language here, but that is nothing

25   less than nutso.

1          You heard Ms. Carroll testify about why she spoke up

2     and when she spoke up.  She was inspired by women across the

3     country whose stories she was learning on a road trip, and she

4     felt she finally owed readers the whole truth in her old age.

5          By the way, Donald Trump had already been famous and

6     rich for decades at this point.  He already had been elected

7     president three years before.  If Ms. Carroll was desperate for

8     money and status and fame, as they claim, then why on earth

9     would she wait until 2019 to first reveal the sexual assault.

10          At bottom Donald, Trump's strategy is to blame the

11     victim, plain and simple.  Rather than accept responsibility

12     for his own behavior, his lawyers attack Ms. Carroll for not

13     keeping quiet, and they suggest that her choice to tell the

14     truth somehow excused Donald Trump's decision to act with

15     vicious lies.

16          You know that's wrong.  Donald Trump isn't the one

17     who's the victim here.  Engaging in illegal defamation is not a

18     legitimate form of self-defense.  The idea that Ms. Carroll was

19     asking for it, that his unlawful behavior is somehow her fault,

20     could hardly be more wrong.  But this isn't just a matter of

21     common sense, which you all know in your guts.  It's also a

22     legal principle.  In contrast to what Mr. Trump's lawyers have

23     previously said, we expect that Judge Kaplan will instruct you

24     later that by coming forward to reveal that she was sexually

25     assaulted, Ms. Carroll did not consent to being defamed by

O1QQcar2                    Summation - Ms. Kaplan

1    Mr. Trump; that she did not authorize him under the law to

2    spread false and defamatory lies about her as some kind of

3    self-defense.  When a woman who has been sexually assaulted

4    comes forward and truthfully reveals what happened to her, her

5    abuser does not get special permission to break the law by

6    engaging in defamation.

7         Trump's next defense is that his statements didn't

8    really matter; that they had no real effect in this world, and

9    that they didn't cause any damage to Ms. Carroll.  As Ms. Habba

10   put it in her opening statements in this case, Trump's

11   statements attacking Ms. Carroll, and I quote, "Did nothing to

12   add to the wave of criticism."

13        In support of this argument Ms. Habba — and you've

14   heard it many times now — points to a handful of statements or

15   a statement that appeared online and what they characterize as

16   the gap between the publication of Ms. Carroll's account in *The

17   Cut* and the publication of Donald Trump's first defamatory

18   statement in that tweet from Laura Litvan.  To hear Ms. Habba

19   tell it, the fact that some people immediately criticize

20   Ms. Carroll online during the so-called gap is somehow proof

21   that Donald Trump's attacks had no impact or that their impact

22   was minimal.  Seriously?  Give me a break.  After all, the

23   White House, which was run by Donald Trump, had already denied

24   Ms. Carroll's claims in *The Cut* article itself.

25        MR. MADAIO:  Objection.

1          THE COURT:  What's the -- overruled.

2          MS. KAPLAN:  So his lies were in circulation from the

3     get-go.

4          And when Donald Trump did speak later in the afternoon

5     on June 21, the attacks on E. Jean Carroll followed almost

6     immediately, which isn't surprising.  His defamatory statements

7     on June 21 and June 22, both issued within 24 hours of each

8     other, included hateful, vicious claims about her.  They also

9     included threats that she should pay dearly.

10          And here you see the statement, the tweet by

11    Ms. Litvan, 5:17 p.m. in one of the many messages Ms. Carroll

12    received not even an hour later.

13          I've talked already about the ways that the mob

14    mimicked the language that Trump used.  Years later, they also

15    made clear they continued to understand what he wanted them to

16    do.  As someone wrote to Ms. Carroll last summer:  "Suing Trump

17    was your first mistake.  Now Trump is going to get back at

18    you."

19          Let me be clear.  Presidents he don't make two public

20    statements within 24 hours because they think that nobody will

21    believe them or act on them.  And Donald Trump didn't make

22    these defamatory statements because he thought they wouldn't

23    have any impact on the world.  He made them because he hoped

24    and he knew that they would.  And he was right.  They caused

25    Ms. Carroll great harm.

1          Donald Trump's third and final argument is that

2     Ms. Carroll brought the harm on herself by speaking publicly,

3     by going on TV and podcasts to tell her side of the story, and

4     to make clear that his statements were lies.  You heard

5     Ms. Habba talk about this during her opening argument.  She

6     talked about a so-called duty to mitigate in her opening

7     statement.  This is one of the slides that she used.  I expect

8     that Judge Kaplan is going to tell you that this statement, her

9     statement in this opening slide, was incorrect; that it was

10    wrong for the defense to try to blame Ms. Carroll in this way.

11    Judge Kaplan will tell you that a person who was defamed has no

12    duty to mitigate or minimize any harm caused to that person by

13    the defamation.  A person who defames a plaintiff is liable to

14    the plaintiff for all damages caused to the plaintiff by the

15    defamation.  Think about that.  Donald Trump's defense counsel

16    at the very beginning of this trial made an argument that has

17    no basis in the law.

18          Yet, Donald Trump's position isn't just wrong as a

19    matter of law; it's also wrong as matter of the facts and as a

20    matter of common sense.  In Donald Trump's view, every time

21    E. Jean Carroll defended herself, she was just baiting him and

22    his supporters to engage in more attacks.  So again, it's her

23    fault.  They simply couldn't control themselves when she

24    defended herself and her reputation.  But ask yourselves what

25    does Donald Trump think Ms. Carroll should have done after he

1    lied about her in June 2019?  Is he really saying that she had

2    a duty to keep her mouth shut and hide in her cabin in the

3    woods?  That's nonsense.  It's just another way of saying that

4    Ms. Carroll should never have come forward in the first place;

5    that she deserves everything that happened to her for daring to

6    tell the truth.

7            Let me be clear, Ms. Carroll had every right to try to

8    establish her reputation in response to Donald Trump's lies.

9    She didn't succeed, but she had every right to try.  Far too

10   many people still view her as a liar and fraud and much worse.

11   In fact, it was courageous, not wrong, of Ms. Carroll to stand

12   up for herself the way she has.

13           That brings me to Donald Trump's most insulting

14   argument; that Ms. Carroll actually benefited from his

15   defamation.  I have to be honest with you, it takes a lot of

16   gall to make an argument like that.  You saw what Donald Trump

17   said about her.  You saw the horrific online attacks that

18   followed.  You saw her testify about how this has impacted her

19   life and how it's harder and sadder and more painful now for

20   her than it used to be.  Could anyone really think that his

21   June 21 and June 22 statements helped her in any way?  Donald

22   Trump's lawyers described Ms. Carroll as a heartless,

23   conniving, controversy-loving, fame-seeking monster --

24           MS. HABBA:  Objection.

25           THE COURT:  The jury will recall the evidence whatever

1    it was.

2            MS. KAPLAN:  -- whose only goal was to make money by

3    getting herself on magazine covers.  By those measures, they

4    insist she's doing better thanks to Donald Trump.  But that's

5    not who E. Jean Carroll is.  You saw her here yourself.  The

6    idea that she should be grateful to him that she's now better

7    off is indefensible.  And once again, like so many of

8    Mr. Trump's other arguments, it's also wrong under the law.  We

9    expect that Judge Kaplan will instruct you on this point, that

10   even if Donald Trump's defamatory statements somehow benefited

11   Ms. Carroll's reputation, even if being called a liar and a

12   fraud and being threatened and insulted somehow improved her

13   standing in some parts of the community, you are not to

14   consider that as any benefit to her in deciding an award of

15   damages.  What matters for your purposes is the harm that

16   Donald Trump caused with his lies, not any claim that he

17   boosted her with his defamation.

18           And what about their argument that Ms. Carroll didn't

19   suffer damages because she's not completely broke?  It's also

20   wrong.  As Ms. Carroll testified, she has definitely found ways

21   to support herself over the past several years, including

22   through her Substack column and from minor book royalties, but

23   she's also faced serious professional and reputational hardship

24   throughout this period.  She's lost many opportunities.  The

25   fact that she has managed to get by and even find some modicum

O1QQcar2                    Summation - Ms. Kaplan

of success is to her credit.  That happened despite Trump's

lies and threats, not because of them, and it does not let

Donald Trump off the hook for the grievous harm he inflicted.

          I'm really going to sit down now in a couple minutes,

I promise.

          Let me say this:  On behalf of E. Jean Carroll, and

our whole team, thank you so much for the time, the patience

and the attention you have given during this trial.  I know

that some of the evidence, particularly some of the threats and

messages, have been ugly, and I appreciate your attention to

all of the evidence.

          As I said earlier, you now have three key questions

you have to answer:  First, what will it take to fix the damage

that Donald Trump caused to Ms. Carroll's reputation?

          Professor Humphreys gave you a range for that number

of between $7 and $12 million.  Since we know that her number

is very conservative and involves a lot of undercounting, we

think that that number should be $12 million.

          Second, what amount is necessary to compensate

Ms. Carroll for the mental anguish that Donald Trump caused her

to suffer to compensate her for the pain and distress, for the

fear, et cetera?

          In our view, given the threats she had and continues

to receive, that number should be at least as much as the

reputational repair campaign, or $12 million, probably much

O1QQcar2                     Summation - Ms. Kaplan

1    more, but at least as much as the $12 million.

2            Finally, we have punitive damages.  I'm not going to

3    stand here and tell you exactly how much you should award in

4    punitive damages, but I will say that punitive damages are

5    effective only if they have a meaningful impact on the

6    defendant, and that the law says that you can consider Donald

7    Trump's wealth, as well as his malicious and spiteful

8    continuing conduct, in making that assessment.  Donald Trump is

9    worth billions of dollars.  He said that under oath.  Billions

10   of dollars to Donald Trump is just a drop in the bucket.  Think

11   about it this way.  A billionaire like Donald Trump could pay a

12   million dollars a day for ten years and still have money left

13   in the bank.  With that sort of extreme wealth, it will take an

14   unusually high punitive damages award to have any hope of

15   stopping Donald Trump, to have any chance of allowing

16   Ms. Carroll's life to return to normal.

17           When you begin your deliberations later today, I also

18   encourage you to step back and think about the bigger picture.

19   At its core, what's really going on here?  We have a former

20   president of the United States, one who sexually assaulted a

21   woman years ago, who brutally defamed and threatened her when

22   she came forward, and who continues to defame her to this day

23   even though one jury has already found him liable and another

24   jury, you, has been hearing evidence in this case.  We have a

25   man who has time and time again shown contempt for the rule of

O1QQcar2                    Summation - Ms. Kaplan

law and our system of justice.  He thinks the rules that govern
everyone else don't apply to him.  He thinks that his fame, his
wealth and his power can buy him the right to do whatever he
wants to whomever he wants whenever he wants.  I know that you
will do the right thing and stand up not only for
E. Jean Carroll but for the principle that the rule of law
applies to all of us, even the rich and powerful, even Donald
Trump.

          Imagine a world where someone who has been found
liable for defamation could avoid responsibility just by
continuing to defame their victim, if continuing to attack
someone with vile, vicious smears could somehow give the
attacker a kind of free pass to keep doing it forever.  In that
world, the law would be meaningless.  In that world, no one,
none of us, would ever be safe from bullies.

          But there is a way to stop someone like Donald Trump,
someone who just last week said he planned to lie about
E. Jean Carroll a thousand times, someone who cares more about
wealth and fame and power than respecting the law.  You
actually have the opportunity, maybe even the responsibility,
to put an end to this right now with your verdict by requiring
Donald Trump to pay an amount of money large enough for him —
and I repeat, large enough for him — that it will finally make
him stop.  What you should do, ladies and gentlemen, is make
him pay for what he has done to E. Jean Carroll.  In fact,

O1QQcar2                        Summation – Ms. Habba

1   borrowing the very same words that Donald Trump used to attack

2   E. Jean Carroll back in June 2019, now is the time to make him

3   pay for it, and now is the time to make him pay for it dearly.

4           Thank you very much.

5           THE COURT:  Thank you, Ms. Kaplan.

6           We'll take a ten minute break.

7           (Recess)

8           THE COURT:  Bring in the jury.

9           The record will reflect Mr. Trump has returned.

10          (Jury present)

11          THE COURT:  Ms. Habba, you may proceed.

12          MS. HABBA:  Thank you, your Honor.

13          Good morning, ladies and gentlemen of the jury.

14          That was some rendition of the facts.  Counsel even

15  went as far as to tell you what my arguments were.  I've never

16  heard that before.  Now I get to actually tell you what the

17  arguments are and also what they have not proven.

18          I want to thank you for spending time away from your

19  families to be here for Ms. Carroll's second civil trial for

20  additional money damages.  We watched six days of a plaintiff

21  trying to pin Twitter trolls' comments on a former president of

22  the United States without accepting any responsibility for the

23  media and the press frenzy and the public profile that she

24  wanted, and she still enjoys.

25          There is no one that can truly express the frustration

1    of the last few years better than my client, the former

2    president of the United States.  This is the president reacting

3    to the trial held last year.

4            (Video played)

5            MS. HABBA:  I want to thank plaintiff's counsel for

6    playing that for me.  They're right, that's how he feels.  Can

7    you imagine a world where someone can accuse you of a terrible

8    accusation and then you defend yourself, respond to reporters

9    on the South Lawn as the sitting president and you can't speak?

10           MS. KAPLAN:  Objection, your Honor.

11           THE COURT:  Overruled.  I said overruled.

12           MS. HABBA:  Thank you, your Honor.

13           In fact, I'm surprised she objected because she just

14   said in her closing that Ms. Carroll defended herself by going

15   on TV, by speaking about my client.  She said that just now;

16   Ms. Carroll had a right to defend herself but what's good for

17   thee is not good for me, I guess.  What's good for me is not

18   good for thee.  They want it both ways.  The president has been

19   consistent.  She's right.  He has said the same thing over and

20   over again, and do you know why he has not wavered?  Because

21   it's the truth.

22           MS. KAPLAN:  Objection, your Honor.

23           THE COURT:  Sustained.  The jury will disregard that

24   assertion.  It has been conclusively determined.  As far as you

25   are concerned, I will instruct you further.

1            MS. HABBA:  He's right, a jury made a decision.  A

2    jury.  But you know who hasn't been inconsistent, who's not

3    consistent at all?  Ms. Carroll.  So her so-called expert whose

4    report has more holes than Swiss cheese, and Ms. Carroll's

5    attorneys whose publicists are peddling her story, we heard

6    that in this court.  It wasn't a pretty fact.  Whose bank

7    rollers are paying my witness's attorneys in a form of

8    desperation that I have never seen.

9            MS. KAPLAN:  Objection.

10            THE COURT:  That's sustained, and the jury will

11    disregard it.  And if you violate by my instructions again,

12    Ms. Habba, you may have consequences.

13            MS. HABBA:  I'm -- I'm --

14            THE COURT:  Don't tell me.  Just continue with your

15    argument.

16            MS. HABBA:  As I predicted -- I'm trying to.

17            THE COURT:  In accordance with the rules.

18            MS. HABBA:  As I predicted on day one, Ms. Carroll has

19    failed to show that she is entitled to any damages at all.  If

20    you will recall, throughout this trial Ms. Carroll and her team

21    kept talking about a White House denial that was contained in

22    *The Cut* article.  A White House denial in an article that

23    Ms. Carroll read, helped write, approved for dissemination and

24    had financial gain and then helped spread all over social media

25    with media appearances.  A statement issued by the White House,

O1QQcar2                     Summation – Ms. Habba

1    not president Trump, which you've never seen and which

2    Ms. Carroll never sued over.  That's why they haven't brought

3    it up.  It's not part of this suit.  This is a distraction.

4    They need to do that because they have a gaping hole in their

5    case.  Ms. Carroll cannot prove causation.  Let's focus on the

6    chain of events.

7          Ms. Carroll decided to give her story to *The Cut*

8    because she thought they — I quote — "knew how to break the

9    news."She was looking to make a splash, and she wanted to

10   spread her story as far and wide as possible.  That is her job,

11   after all.

12         On June 21, 2019 at 12:14, the article that she put

13   out with *The Cut* goes live and ignites a media storm.  They're

14   right about that.  President Trump, however, did not respond or

15   know about it and her allegations for another five hours.  He

16   was busy running the country.  And during that gap, the

17   internet did exactly what Ms. Carroll had expected and hoped:

18   It reacted.  A flood of tweets were directed at Ms. Carroll,

19   and the responses were as polarizing as you would expect,

20   again, before president Trump even made a statement.  There

21   were many messages of love and support.  She testified to that.

22   And there were also a swarm of attacks, but it was before he

23   made his first statement five hours later.  And after his

24   statement, they are nearly identical.  This five-hour gap is

25   critical.  Plaintiff's counsel tried to get ahead of it by

telling you what my argument is, but I'm going to be very

explicit.  President Trump did not respond until 5:17 when he

released a statement to Laura Litvan on Twitter.  These

individuals made up their own minds and came up with their own

conclusions.  In short, they didn't believe her.

Remember, despite what plaintiff's counsel said, you

are not here to pay Ms. Carroll for people who wrote mean

tweets to her.  No.  They have to prove a direct causal

connection between the harm she claims she's suffering and his

two statements, one five hours after the article she put out

and the second the next day on the South Lawn responding to

reporters.  Those are the two statements.  She has to prove

this is because of those two statements.  This is my whole case

right here.  I don't even need to go further, but I can because

there's more.  There is no causation.

In fact, Ms. Carroll under oath acknowledged that

president Trump is not at fault for the wave of negative

messages she received in the wake of the release of *The Cut*

article.  Let's look at her own words from this trial.  When

she said these users were just standing up for the man they

admire.  Ladies and gentlemen, Ms. Carroll is absolutely

correct.  The people who speak negatively about Ms. Carroll are

not doing it because president Trump denied her story.  In

fact, as I just showed you, he hadn't even done it yet.

They're not doing it because president Trump asked them to or

O1QQcar2                         Summation - Ms. Habba

1  wanted them to.  They are doing it because they didn't find her

2  story to be credible, and they independently believed she is a

3  liar.  This is the beauty and dangers of free speech in

4  America.  Everyone is entitled to their opinion.  President

5  Trump has no more control over the thoughts and feelings of

6  social media users than he does the weather.

7        To illustrate this point, let's do a side-by-side

8  comparison of the messages sent to Ms. Carroll before president

9  Trump's response and following president Trump's response.

10        Here, both of these messages on your screen were sent

11 on June 21, and they both responded to the same tweet by

12 Ms. Carroll.  One time stamped at 2:51 p.m., before the

13 president's statement on the left; and one time stamped at

14 9:29 p.m., after the president's statement.  As you can see,

15 these messages share a common theme.  They both call

16 Ms. Carroll a liar.

17        Here is another example.  Simply uncanny.  Again,

18 these messages were both sent on June 21.  The post on the left

19 time stamped 3:22 p.m., before the president's statement; the

20 one on the right 6:09 p.m., after his statement.  Both users

21 claim that they believe that Ms. Carroll came out with her

22 allegations to promote her book.  Frankly, we heard her friend

23 say the same thing.

24        Let's look at the next slide.  The two tweets express

25 the same sentiment, alleging that Ms. Carroll had political

O1QQcar2                    Summation - Ms. Habba

1    motives for coming forward with her allegation.  The first was

2    posted at 2:21 p.m., again prior to president Trump's

3    statement; while the tweet on the right was posted 18 months

4    after president Trump's statement.  In fact, just a month ago.

5            Ladies and gentlemen, this side-by-side comparison not

6    only shows the similar mindset and attitude of these Twitter

7    trolls before and after the president's statement, but that

8    these tweets are sent long after he ever spoke about it.  And

9    here's the point:  It is Ms. Carroll's burden, not president

10   Trump's, to prove that his statements are somehow the cause of

11   any harm.  And clearly she has failed to meet that burden.

12   It's common sense.

13           Now, let's turn to Ms. Carroll's supposed emotional

14   damages that we heard about.  Ms. Carroll would like you to

15   believe that she thought, and perhaps even continues to think,

16   that her life is in danger as a result of president Trump's

17   June 21 and June 22 statements.  But let's unpack this.

18   Ms. Carroll claims she received hundreds of messages

19   threatening violence since president Trump made those

20   statements, yet she showed you six.  Six.  Ladies and

21   gentlemen, I received three this week alone.  That's me on a

22   good day --

23           MS. KAPLAN:  -- objection, your Honor.

24           MS. HABBA:  And president Trump --

25           THE COURT:  Sustained.  Counsel?

O1QQcar2                          Summation - Ms. Habba

1              MS. HABBA:  Yes.

2              THE COURT:  That was inappropriate, and the jury will

3    disregard that.

4              MS. HABBA:  Not only that, but the messages she's

5    shown you all date from 2023.  2023.  Four years later.  She

6    has a whole legal team here, ladies and gentlemen.  2023.  Six

7    threats.  That's what they brought you.  Oh, and let's not

8    forget the reason she can't show you any from 2019, 2020, 2021,

9    or 2022.  The reason she can't show you these messages is

10   because she deleted them, or, alternatively, perhaps they never

11   existed in the first place.

12              (Continued on next page)

1          MS. HABBA:  And wait.  She did that in the middle of a
2     lawsuit.  A lawsuit she brought.
3          So what else isn't true?  Either, one, Ms. Carroll is
4     lying to you and those messages never actually existed in the
5     first place; or two, she deleted the very evidence which she
6     now wants you, as a jury, to rely on in support of her claim
7     for damages.  But guess what?  They're not here.  She has to
8     give them to you and they're not here to support her claim for
9     damages and that is a fact.
10          Remember early in this case Ms. Carroll took the stand
11     and told you that she supposedly received death threats on June
12     21, the day The Cut article was released.  She dramatically sat
13     there and recounted how she opened up her laptop that night,
14     saw the threats and was put in such a state of "trance" that
15     she started hanging up pants on a window because she thought
16     she was about to get shot.  I believe she even ducked on the
17     stand.
18          Ladies and gentlemen, you know what she didn't do?
19     She didn't make her Twitter page private.  She wants us to
20     believe that she hung up a bunch of her pants over a window.
21     Wait.  Ladies and gentlemen.  You know what else she didn't do?
22     She didn't call the police.  But she hung the pants.  She
23     didn't tell anyone, but folks, she hung the pants.
24          Please focus on the details, not the noise.
25          Ms. Carroll told you the time that she viewed the

O1Q5car3                        Summation - Ms. Habba

messages.  That is not something she can prove.  She doesn't

have them.  She hasn't given them to you.  But she admitted

that she did not know when the messages were sent.  So even

assuming the messages existed at all it is impossible to link

them to President Trump's two statements because they could

have been sent before he even issued his statement at 5:17 for

which she conveniently cannot prove because she deleted her own

evidence.  If that's what you believe.  It goes to the larger

question of causation which has been a consistent theme here.

Trial is about proof and hard evidence, not speculation, not

emotion, and not misrepresentation.  Evidence.

When considering Ms. Carroll's claim for emotional

harm you should not give her the benefit of the doubt.  Due to

her own conduct she is unable to demonstrate that she received

any threats within the relevant time frame.  In her own words,

she would just delete, delete, delete.  Never called the cops.

Never filed a report.  Has no evidence.  But what did come out?

She did state that she was freely walking the streets of New

York.  In her own words, she felt that midtown is one of the

safest places on earth.  Her words.  Imagine that.  She felt

afraid in the comfort of her own home but in the heart of the

busiest city in the world she felt completely safe, safe enough

to walk in a fake orange jumpsuit with a fake Donald Trump and

a sign:  "Most Hideous Men in New York City Walking Tour."

She doesn't look afraid there.

1    You don't have to believe me.  Look at the evidence

2    from her nearest and dearest.  Ms. Carroll didn't even tell her

3    closest friends that she was experiencing any fear.  We can't

4    deny the facts.  There are two versions of E. Jean Carroll:

5    The truth, which her friend knew and testified to, and the one

6    that comes to court to get money from my client.  Which do you

7    believe?

8        As you probably learned throughout this trial,

9    Ms. Carroll has never been shy about sharing her feelings.

10    She's a truth-teller.  Yet, when she knew that Carol Martin's

11    daughter had significant concerns for her mother's safety, a

12    close friend for over 30 years to Ms. Carroll, she repeatedly

13    assured her that there were no major security concerns.  In

14    fact, it is the opposite of concern.  Her words.  Dwell on that

15    for a moment.

16        If Ms. Carroll was really, truly experiencing the raw

17    visceral fear that she wants you to believe, wouldn't she have

18    immediately shared those concerns with Carol Martin and her

19    daughter so that they could have protected themselves?  Not lie

20    to her best friend in a group text so that she doesn't upset

21    them.  It just doesn't add up.

22        Even if you believe Ms. Carroll that she really and

23    truly feared for her safety because of the e-mails she

24    received, she still has not shown what she needs to show:  That

25    President Trump is the reason she received them.

1      Ladies and gentlemen, you heard him testify.  You

2  heard him say he did not intend to hurt her.  Pure and simple.

3  We do not know the true identities of the people that sent the

4  messages to Ms. Carroll.  We know nothing of their motivations,

5  their intentions.  All we know is that the people who made

6  these death threats are sick individuals whose messages should

7  be universally condemned.  I agree with that and I think all of

8  us do.  But, President Trump should not have to pay for their

9  threats.  He does not condone them.  He did not direct them.

10  All he did was tell his truth.

11      MS. KAPLAN:  Objection, your Honor.

12      THE COURT:  I will deal with it in my charge.

13      MS. HABBA:  At the end of the day, the evidence shows

14  that Ms. Carroll did not actually suffer any emotional harm.

15  Sure, she tugged on your heartstrings at some points by showing

16  that negative tweets were sent her way.  And, it is awful.  And

17  she told you that her feelings were hurt by some of those

18  people's comments.  I don't blame her for one bit.  My feelings

19  would be hurt, too.  But that's what happens when you are a

20  public figure.

21      Ms. Carroll knew that this backlash would come and she

22  was doing just fine in the days following the president's

23  statements.  In fact, she was happier than ever.  Don't take my

24  word for it, just ask E. Jean.  She said that she was fabulous,

25  buoyant, only a week after President Trump made his statements.

O1Q5car3                    Summation - Ms. Habba

She told *Vanity Fair* that the support she received when walking down the streets was incredibly heartwarming.  She publicly stated that this is probably one of the most carefree and happy times of her life.  She said she was in a cocoon of love.  And when she came on the stand, the courtroom E. Jean testified that she felt warmth and she enjoyed it immensely.  Does this sound like a woman whose world has come crashing down around her?  Does this sound like a person who can't sleep at night?  Whose life was shattered?  No.  This is a woman who was exuberant and enjoying the new-found attention she was receiving and still receives after taking a hit in her professional career before her story ever came out.

She was happy to have the support, the fame, and the praise that she has always craved.  And not only did she express it publicly, she expressed it privately, too.  The very next day, after President Trump's first statement, she reassured Lisa Birnbach, her longtime friend who Ms. Carroll describes as a very good friend of 33 years, that she was fine as wine.  That she slept until noon.  She didn't think you'd see that, ladies and gentlemen.  That's her best friend.  On the stand she recanted her prior testimony, suddenly claiming that it wasn't true.

So, to recap, Ms. Carroll told her personal friend in a private communication that she was feeling great but this week she wants you to believe it is all a lie.

O1Q5car3                    Summation – Ms. Habba

1            Who is E. Jean?  We have now established that
2    Ms. Carroll didn't suffer emotionally from the president's
3    statements and now I will establish that she hasn't suffered
4    professionally.
5            She didn't lose her followers, her advice articles,
6    because of my client.  That's been another misleading
7    representation.  She lost them because she doesn't work for
8    *Elle* anymore.  That happened, conveniently, before she decided
9    to come out with this story.  That's why –– that's why –– she
10   doesn't have *Elle*'s 4.5 million people's views.  She doesn't
11   have that anymore.  That was before all of this.  Right before
12   all of this, actually.
13           MS. KAPLAN:  Objection, your Honor.  That's not the
14   evidence.
15           THE COURT:  Sustained.  The jury will remember the
16   evidence.
17           MS. HABBA:  We have now established that Ms. Carroll
18   didn't suffer emotionally from the president's statements and
19   she certainly hasn't suffered professionally.  When Ms. Carroll
20   came forward, she knew that some people wouldn't believe her
21   account, regardless of what President Trump had to say.  She
22   took that responsibility because she knew that when she came
23   forward, she would receive universal praise from President
24   Trump's critics.
25           Remember, Ms. Carroll told you that status is very

O1Q5car3                     Summation - Ms. Habba

1    important to her.  She testified that improving her status was

2    the reason she brought the suit.  She knew that the media cycle

3    would eat it up and that's exactly what happened.  She

4    capitalized on her newfound fame.  She made rounds on the media

5    after his denial.  Rounds on the media.  Ms. Kaplan says it is

6    in self-defense but I guess it is not OK when my client says

7    what he has to say.

8            She drew more attention to herself.  Remember her book

9    titled: *What Do We Need Men For?*  It contains nine pages about

10   President Trump -- Ms. Kaplan is right -- nine pages.  Do you

11   know how many times she said he was named?  One time.  One

12   time.  One single time.  And yet, those nine pages become the

13   central focus of each of her media appearances ranging from

14   books and articles to podcasts discussing her allegations.

15   But, it is not E. Jean's fault, that's just what they asked her

16   about.  Ms. Carroll is a journalist.  Her friends do TV.  She

17   knew what she was doing.

18           Look at this image here.  She is posing with a Trump

19   impersonator.  She clearly has no problem using President Trump

20   to promote herself, her brand, and sell some books.

21           I asked her on the stand if she planned on doing TV

22   after this.  She didn't say no.

23           MS. KAPLAN:  Objection, your Honor.

24           MS. HABBA:  That's in the record.

25           THE COURT:  The jury will have to remember.  I don't

1    remember.

2            MS. HABBA:  She also, as we showed, never had any

3    problems tweeting away about sex, penises, and a myriad of

4    other topics you wouldn't want to talk about in front of your

5    parents or children.  In fact, topics most persons would find

6    disgusting if spoken about publicly.  But Ms. Carroll would

7    have you believe that her reputation was pure, angelic, and

8    perfect.

9            MS. KAPLAN:  Objection, your Honor.

10            THE COURT:  Overruled.

11            MS. HABBA:  And if there is no reason that anyone

12    would criticize her, no reason at all.  "What Do We Need Men

13    For?" was the title of her book.

14            To highlight a couple of examples, Ms. Carroll tweeted

15    on November 25, 2015, the following:  *How do you know your*

16    *unwanted sexual advance is unwanted, until you advance it?*  Top

17    left, ladies and gentlemen.  Read that.  *How do you know your*

18    *unwanted sexual advance is unwanted, until you advance it?*  The

19    victim, this is her tweet.  November 25, 2015.  By the way, it

20    is still on her Twitter account, I asked her that.

21            MS. KAPLAN:  Objection, your Honor.

22            THE COURT:  What is the objection?

23            MS. KAPLAN:  Use of the word "victim" implying that

24    the underlying assault didn't happen.

25            THE COURT:  Yes; sustained.

1          MS. HABBA:  Another tweet posted on March 6, 2023,

2    bottom right:  *What can be done about the penis?  It gets large*

3    *when you want it small, and it stays small when you want it*

4    *large.*  I am honestly mortified, ladies and gentlemen of the

5    jury, that I have to repeat this in front of you.  I apologize.

6          And:  *Any ideas on how to dominate a man?*

7          Dominate a man.  Advance an unwanted sexual advance.

8    Her tweets, sitting on her Twitter page as we sit here today.

9    She didn't take them down.  These are just four tweets.  *A chap*

10   *is not a mind reader.  Show him what you like or he will soon*

11   *regret he even has a penis.*  Oh my gosh, did she threaten

12   someone?  He will soon regret he even has a penis.  Folks, that

13   was in 2013, that was before she decided to do all this.

14         MS. KAPLAN:  Objection, your Honor.

15         THE COURT:  I'm sorry?

16         MS. KAPLAN:  Same objection, your Honor.

17         THE COURT:  Sustained.

18         MS. HABBA:  These are four tweets.  Ms. Carroll put

19   these into the world years before June of 2019.  She still has

20   them, they're still up.  So the fact that she is now somehow

21   taken aback or offended that tweets from random people made her

22   look scandalous is simply disingenuous.  Ms. Carroll's claim

23   rests on the idea that more people hate her than they love her

24   but has she proven that?

25         MS. KAPLAN:  Objection, your Honor.

O1Q5car3                        Summation - Ms. Habba

1      THE COURT:  I'm going to overrule it but I will
2  instruct the jury on that point.
3      MS. HABBA:  Numbers don't lie.  Take a look at this.
4  These are the tweets and the views all sent to Ms. Carroll just
5  a month ago.  I'm going to start from the top left.  26 views.
6  6 views.  5 views.  15 views.  9 views.  12 views.  Ladies and
7  gentlemen, this is what her legal team picked to show you her
8  damage.  I didn't pick them.
9      As you can see, the total number of views of all these
10  tweets that they feel best represents their case displayed in
11  this slide were sent to Ms. Carroll, is a total of 143 views.
12  They didn't draw your attention to the views.  That is the
13  grand sum of the views they submitted into evidence.  That's
14  not evidence of reputational harm for a woman who has posts
15  with a slide of 3.9 million views when she talked about my
16  client.  "We Won"  3.9 million views.  She's enjoying this.
17      Let's not forget the fact that Ms. Carroll is making
18  more money today than she did in June of 2019 before she
19  brought this up.  In fact, when she decided to go public with
20  her allegations decades after the alleged event, which she has
21  not pinpointed to the year, she hit financial and social rock
22  bottom.  *Elle* magazine chopped her income in half to sixty
23  grand.  There were no more dinners at Elaine's.
24      MS. KAPLAN:  Objection, your Honor.
25      MS. HABBA:  There was no more fancy nights on the town

O1Q5car3                    Summation - Ms. Habba

1    and no more fame; just a cottage in the woods in New York, just

2    like Montana, which she couldn't wait to leave.

3          So, in 2019 she found her way out.  She wrote a book

4    which Ms. Kaplan just reminded me she had been writing for

5    years, and years, and years, but until 2019 decided to put

6    Trump when he was sitting in the Oval Office.

7          MS. KAPLAN:  Objection, your Honor.  I said nothing of

8    the sort.

9          THE COURT:  The jury will remember the evidence.

10         MS. HABBA:  Thank you.

11         So, in 2019 she writes the book.  She decides to add

12   President Trump.  She sat in her cabin, far from the glamour of

13   New York that she was desperate to crawl out and back to so she

14   made her way.  All of a sudden, the release of *The Cut* article,

15   she is making a lot more money now and does not include any

16   income she received from royalties from her books.  You heard

17   her.  She got publicists paid for by lawyers, publishers,

18   parties, dinners, lunches with journalists again, and let's not

19   forget the many primetime shows all discussing my client.  She

20   alleges she doesn't like to mention his name but yet she has

21   been going on TV for years, and years, and years talking about

22   one man, and one man alone, and making money, making money off

23   of him, selling her book off of him, and that is my client.

24         Now, not only is she making more money than she was

25   before these allegations, she is back to the lavish lifestyle,

O1Q5car3                    Summation - Ms. Habba

1    she is living the life of the rich and famous, hanging out with

2    celebrities, Kathy Griffin.  Getting tweets of acclaim from

3    Alyssa Milano, Jamie Lynn [sic] Curtis, Ron [sic] Reiner.  All

4    her circle.  Her new circle like Elaine's all over again.  And

5    why?  Because she made an allegation in the most public forum

6    by design, an allegation that my client has continuously and

7    consistently stated his position.  It is an American right.

8            MS. KAPLAN:  Objection, your Honor.

9            THE COURT:  Sustained.

10           Members of the jury, I instructed you previously and I

11   will instruct you again, it is conclusively determined who is

12   telling the truth about the event, that is to say, whether

13   Mr. Trump sexually attacked or assaulted Ms. Carroll or not.

14   It's established.  You must accept that.

15           MS. HABBA:  It is established by a jury.  You're

16   right, your Honor.

17           THE COURT:  It is established and you will not quarrel

18   with me.

19           MS. HABBA:  I'm not.

20           THE COURT:  You will finish your summing up.

21           MS. HABBA:  I am finishing it, your Honor.

22           Listen to her good friend of 30 years Carol Martin.

23   She came up and told you she believed Ms. Carroll is a

24   narcissist.  She admitted that she had met with Ms. Carroll's

25   legal team and her lawyers, not me.  My witness.  She had met

1    with them.  She gave us some definition of narcissism I have

2    never heard in my life, probably because she was embarrassed.

3    I would be embarrassed if my best friend saw what I really

4    thought of them and I was upset with them and I put that in

5    writing.  That's not all she said.  She also said she was

6    suspicious of her motives, her best friend.  She said she

7    considered downsizing her relationship with E. Jean Carroll,

8    that Ms. Carroll loves the adulation from this lawsuit, that

9    she was acting a little scary, that she believed that she was

10   acting like Santa at the Christmas Parade.  And how can we

11   forget her best friend said that Ms. Carroll is a drug addict

12   and the drug is herself.  Those are not my words, those are her

13   best friend's words in a communication that she never thought

14   you would see.

15         Ms. Carroll testified that the reason she brought this

16   lawsuit is to get her old reputation back.  Do you actually

17   think Ms. Carroll wants her old reputation back, ladies and

18   gentlemen?  Does she want to go back to the cabin with 12,000

19   followers on Twitter?  Does she want to forego the

20   opportunities her new reputation has afforded her?  Does she

21   want to make less money?

22         I asked her:  After this, are you done?  She didn't

23   say no.  She doesn't want her old reputation back, she wants --

24   she was desperately yearning for her old life.  This was a

25   woman with nothing to lose and, as we have seen, everything to

1    gain.

2              I have to admit, this is my favorite part of my

3    closing:  Ms. Humphreys.

4              Ms. Carroll and her legal team had an opportunity to

5    bring an expert.  They picked Ashlee Humphreys.  Throughout her

6    testimony it became so clear that her opinion is neither

7    credible nor reasonable and I'm going to walk you through it.

8              She admitted her report was riddled with mistakes and

9    tried to pawn it off on her poor team that did the research as

10   a labeling error.  Labeling error.  Years and years and years

11   of litigation, tens of thousands of dollars to her benefit, and

12   this so-called expert can't catch 17 numerical errors that we

13   caught?

14             MS. KAPLAN:  Objection, your Honor.

15             THE COURT:  Sustained.

16             MS. HABBA:  I --

17             THE COURT:  Sustained.

18             MS. HABBA:  And that is just what we found.  Just

19   based on that you should ignore her testimony as a whole, but

20   let's continue for fun.

21             The five-hour gap.  Remember the five-hour gap?

22   12:15-5:17, we have a gap.  We already know that Ms. Carroll's

23   story had received widespread attention before President Trump

24   ever spoke about her but did Humphreys account for that?  Of

25   course not.

O1Q5car3                        Summation - Ms. Habba

1           Her entire model relies on a faulty assumption.
2   Remember, her model is based on the fact that she believes
3   E. Jean Carroll's reputation was harmed with republicans after
4   she attacked president Donald Trump.  You will recall her
5   testimony.  She said republicans were more likely not to
6   believe, especially Trump supporters, Ms. Carroll, than
7   non-republicans.  Tens of thousands of dollars to this expert.
8           Ladies and gentlemen of the jury:  Duh.  Duh.  Thank
9   you, Ms. Humphreys.
10          In fact, her own data undermines her position.  She
11  wants you to believe that President Trump's statements branded
12  Ms. Carroll as a liar and ruined her reputation with the
13  public, but when we looked at all of her report it was
14  affiliated with her reputation, all of her report.  I asked
15  her, where is the word "liar"?  Where is the word "liar"?
16          MS. KAPLAN:  Objection, your Honor.
17          THE COURT:  What is the objection?
18          MS. KAPLAN:  A, it is there; and B, this has nothing
19  to do with her opinion on that.
20          THE COURT:  Overruled.
21          MS. HABBA:  Thank you.
22          I will show you where it is.  That was my next point.
23          Thank you, Ms. Kaplan, we have highlighted it for you.
24          Do you see it?  that little word:  "Lying."  I am sure
25  you will recall what she said is this is actually

O1Q5car3                    Summation - Ms. Habba

proportionate, the words in size, to how much they came in and

out when she searched.  That's proportionate.  "Lying."  Do you

know what else guys is that size?  Is "Cohen."  "Money."

"Cohen."  Not Michael Cohen, "Cohen."  That's the same size.

        While she uses some fancy terminology to get there her

conclusion is essentially Trump supporters were more likely to

believe Trump while non-Trump supporters are more likely to

believe Ms. Carroll.  But she didn't look at the ones that

support her.  She said that.  I don't think you need an expert

to make that point, ladies and gentlemen.  But what Professor

Humphreys never explains is how President Trump's denial did

anything to change the equation.  She didn't even look at the

gap.  She didn't even notice that this was happening before he

even said anything.

        People are entitled to their opinions and many did not

believe Ms. Carroll before he even uttered her name.  So how do

they want you to fix it?  You just heard it, it was epic.  Give

her a ton of money to launch some academic philosophy called a

reputational repair campaign.

        OK.  Fair enough.  Let's walk down that for a moment.

        There are PR firms that may be able to do that.  So,

did this so-called expert even reach out to one of them to get

an estimate?  You will recall I asked her, did you actually get

an estimate?  She said none.  She came in to this courtroom,

after being paid a ton of money with all her labeling errors,

O1Q5car3                        Summation - Ms. Habba

1    and she couldn't even make a phone call.  She said her students

2    have gone on to work there, she hasn't.  In fact, we challenged

3    her knowledge on costs and she admitted she had no idea.

4            MS. KAPLAN:  Objection, your Honor.

5            THE COURT:  Sustained.

6            MS. HABBA:  Professor Humphreys admitted she never

7    executed a reputational repair program in her life.  Their

8    expert, the one that came up with the numbers they just put up,

9    she doesn't deny it.  And said it repeatedly throughout her

10   testimony.  In fact, when asked about it, Martha Stewart,

11   Justin Bieber, Taylor Swift; she said I read it in the news.

12           She thinks -- and this was epic, this might have been

13   my favorite moment -- that Joe Rogan and Candace Owens should

14   be paid to help Ms. Carroll fix her reputation.

15           What planet are we living on?

16           One final thing about Professor Humphreys.  We learned

17   something very telling that she didn't think I would notice.

18   She changed her account settings on her social media to private

19   weeks before this trial.  She was worried about the natural

20   backlash that this high-profile trial would cause.  She

21   knowingly changed her settings, something Ms. Carroll could

22   have done, but she chose not to do it.  She actively sought the

23   comments and the attention.

24           Ladies and gentlemen, imagine you are living your

25   life, you have a beautiful family, a wife, kids, and you have a

O1Q5car3                          Summation – Ms. Habba

1   very serious job to do.  You work long days and long nights and

2   all of a sudden you are hit with an allegation.  There are no

3   facts --

4            MS. KAPLAN:  Objection, your Honor.

5            MS. HABBA:  -- that you understand --

6            THE COURT:  Sustained.

7            MS. HABBA:  OK.

8            THE COURT:  Move along.

9            MS. HABBA:  I -- she doesn't even know why I said

10   there are no facts so I would like to finish my thought.

11            There are no facts --

12            MS. KAPLAN:  Objection, your Honor.

13            MS. HABBA:  -- in the record --

14            THE COURT:  Move on to a subject different than you

15   are embarking upon.

16            MS. HABBA:  OK.

17            Ladies and gentlemen, in our country you have the

18   right to speak.  You have a constitutional right to speak.

19            MS. KAPLAN:  Objection, your Honor.

20            THE COURT:  Sustained.

21            You have a constitutional right to some kinds of

22   speech and not others.

23            MS. HABBA:  The facts, ladies and gentlemen, the proof

24   they gave you, despite all of the noise, all of the noise and

25   there has been a lot of noise, facts speak volumes here.

O1Q5car3                    Summation - Ms. Habba

1   Ms. Carroll loves her new reputation and her life.  My client
2   is not enjoying this.  You have heard the objections.  You have
3   heard me be told to sit down --
4         MS. KAPLAN:  Objection, your Honor.
5         MS. HABBA:  -- but I'm here as a lawyer defending my
6   client.  He has a right to defend himself.
7         MS. KAPLAN:  Objection, your Honor.
8         THE COURT:  Move on, counsel.
9         MS. HABBA:  I have got one more sentence, your Honor.
10         Ladies and gentlemen, this isn't about President Trump
11   and E. Jean Carroll.  This is about some people in their
12   mother's basements who will always be mean on social media.  We
13   can't stop that.  And you are not going to stop it by further
14   harming my client.  Ms. Kaplan said she has not been made
15   whole.  That is a complete misrepresentation.  We had a trial,
16   the judge continuously reminds me.  We had a trial --
17         MS. KAPLAN:  Objection, your Honor.
18         MS. HABBA:  -- that trial is done.  She was made
19   whole.
20         MS. KAPLAN:  Objection, your Honor.
21         THE COURT:  Sustained.
22         MS. HABBA:  I want to thank you for your time.  And
23   I'm sorry that you had to spend so much time on this, yet
24   again.
25         MS. KAPLAN:  Objection, your Honor.

1          MS. HABBA:  Thank you.

2          THE COURT:  Thank you, Ms. Habba.

3          Are you ready?

4          MS. CROWLEY:  Yes, your Honor.  Thank you.

5          THE COURT:  We will hear rebuttal argument.

6     Ms. Crowley, you may proceed.

7          MS. CROWLEY:  Thank you.

8          So I have been sitting here listening to Ms. Habba's

9     argument and I think we need to reset a little bit, to rewind

10    this discussion.  I am going to try to get things back on

11    track, and when I do that I'm going to follow the rules of this

12    courtroom, a thing that Mr. Trump and his lawyer doesn't seem

13    to be able to do.

14         MR. MADAIO:  Objection.

15         MS. HABBA:  Objection.

16         THE COURT:  Sustained.

17         MS. CROWLEY:  Ms. Habba just stood up here and

18    repeatedly misstated the evidence and manipulated the facts.  I

19    have just a couple examples of that, I honestly wasn't able to

20    write them all down.

21         First, at some point I think she said that

22    Ms. Carroll -- she put up a slide talking about Ms. Carroll's

23    salary back in 2019 before her book was released.  That slide

24    was totally misleading and wrong.

25         MR. MADAIO:  Objection.

1        THE COURT:  Overruled.

2        MS. CROWLEY:  It left out all of the paid

3   opportunities that Ms. Carroll was getting back in 2019 before

4   the former president defamed her like freelance, like TV spots,

5   like articles in other magazines.  You can find that testimony

6   at page 183 of the transcript.  Ms. Habba conveniently left it

7   out.

8        Another thing that she got wrong, she said that

9   Ms. Carroll left *Elle* magazine before she started writing her

10  book.

11       MR. MADAIO:  Objection.

12       THE COURT:  Sustained.

13       The jury will remember what the evidence is on that

14  point.

15       MS. CROWLEY:  And the jury can look at the transcript,

16  page 180, line 7, to know when Ms. Carroll actually left *Elle*

17  magazine.

18       Ms. Habba said over and over again -- this is another

19  example -- that there was a five-hour gap in time between when

20  the *New York* magazine article was released and Donald Trump

21  made his first defamatory statement.  I am going to talk about

22  this in a second but there is actually no evidence of that

23  five-hour gap of that time period, it is something Ms. Habba

24  said --

25       MR. MADAIO:  Objection.

1          THE COURT:  Overruled.

2          MS. CROWLEY:  -- but again, what Ms. Habba said is not

3    evidence.  She also said that there was a flood of tweets

4    during that five-hour gap.  She showed you five.  She showed

5    you five tweets.

6          MS. HABBA:  Objection.

7          THE COURT:  Now, one lawyer, and one alone.

8          MS. HABBA:  I'm sorry.

9          THE COURT:  Who is it?

10         MS. HABBA:  Michael.

11         MR. MADAIO:  Your Honor, I object.

12         THE COURT:  I didn't hear you or see you stand up.

13   Overruled.

14         MS. CROWLEY:  Just one other example of one of the

15   many things that Ms. Habba just got wrong.  She said this is a

16   small example but I think it matters.  She said that

17   Ms. Carroll was paid for the article in the *New York* magazine.

18   That's not true.

19         MR. MADAIO:  Objection.

20         MS. CROWLEY:  Page 216, line 11.

21         THE COURT:  Overruled.

22         MS. CROWLEY:  She says that the money went to her

23   publisher, she didn't get any money at all.

24         Those are just a couple of examples but they tell you

25   everything that you need to know about Ms. Habba's argument and

O1Q5car3                              Rebuttal - Ms. Crowley

1    their whole defense:  You can't trust it.  So, I would like to

2    just take the next couple minutes -- I'm going to be brief, I

3    promise, but I want to take the next couple minutes just to

4    remind you why we are actually here.

5            Donald Trump sexually assaulted E. Jean Carroll and

6    then he lied about it --

7            THE COURT:  Excuse me, counsel.

8            I have told counsel to remain seated and they

9    continually get up and walk back and forth and are distracting.

10           Proceed.

11           MS. CROWLEY:  Thank you, your Honor.

12           Why we are here, Donald Trump sexually assaulted

13   E. Jean Carroll and then he lied and he defamed her over and

14   over again after she came forward.  That has been proven.

15           MR. MADAIO:  Objection.

16           MS. CROWLEY:  He did those things.

17           THE COURT:  Overruled, Mr. Madaio.

18           MS. CROWLEY:  And yet, you just heard his lawyer stand

19   up here and say that even though he did those things, even

20   though Donald Trump does whatever he wants, any harm

21   Ms. Carroll suffered is her fault for speaking out and then

22   defending herself when he lied and came after her.

23           Ladies and gentlemen, you know what that sounds like.

24   You have heard it before.  *She asked for it.  She knew what she*

25   *was doing and she asked for it.*  And I have to ask, are we

1   really still doing that?  Are we really not moved past that

2   idea?  I think we have.  I think we can all agree that by

3   coming forward and telling the truth, the proven truth about

4   what Donald Trump had done to her, Ms. Carroll did not ask to

5   be called a liar.  She did not ask to be called ugly.  She

6   didn't ask for death threats.  She didn't ask to be accused of

7   lying, of making up a story for money.

8           Ms. Carroll didn't ask for those things.  She came

9   forward because she thought she decided it was finally time to

10  speak publicly about what he had done to her.

11          She gave interviews on TV because she had to defend

12  herself when he came after her and she brought this lawsuit to

13  try to get him to stop.  The defense seems to be saying, they

14  seem to be arguing that at the end of the day, this case is

15  just about two people disagreeing with each other in a public

16  forum.  I think Ms. Habba just used the phrase:  What is good

17  for thee is not good for me.

18          Nonsense.  You can't equate their conduct.

19  Ms. Carroll and Donald Trump are not doing the same thing here.

20          When Ms. Carroll came forward to reveal that she had

21  been sexually assaulted by Donald Trump, she was telling the

22  truth and the law protects her from being defamed for telling

23  the truth.

24          When Donald Trump told those defamatory lies about

25  Ms. Carroll, he was breaking the law.  And he is still breaking

1    the law, literally, to this day.

2              MR. MADAIO:  Objection.

3              THE COURT:  Overruled.

4              MS. CROWLEY:  The fact that Ms. Carroll truthfully

5    said that Donald Trump sexually assaulted her of course does

6    not give him permission to break the law.  That is not just

7    some innocent version of defending himself that Ms. Habba just

8    tried to sell you on.

9              Ms. Carroll didn't ask for the bad things that

10   happened after Donald Trump went after her and she is not the

11   reason that they happened.  Donald Trump is the reason.  He is

12   responsible for it.

13             Now, the defense also seems to be trying to persuade

14   you that Ms. Carroll is better off now, that she has somehow

15   benefited from Donald Trump defaming her.  First, I expect that

16   Judge Kaplan is going to tell you that is just not the law.

17   Another thing that Ms. Habba just got wrong.  Nonetheless,

18   Ms. Habba said in her opening, and then again today, that

19   Ms. Carroll likes her new brand.

20             I have to ask, what brand is that?  Is it the

21   I-was-paid-to-falsely-accuse-the-president brand?  Or is it the

22   I'm-a-whack-job-who-made-up-a-story-to-sell-books brand?

23   They're saying that's the brand that Ms. Carroll wants and not

24   the brand that she had back in 2019 before he came after her?

25   The brand of being a writer for the world's largest women's

1   fashion magazine?  Or having the longest running advice column

2   in history?  Writing for SNL?  Appearing on primetime TV?

3   Being nominated for an Emmy?  Of course Ms. Carroll prefers the

4   brand she had before Donald Trump defamed her.  Of course she

5   would rather be known as a writer than a liar and a fraud.

6           Now, look.  There is no denying that more people know

7   who Ms. Carroll is now than back in 2019.  She told you that.

8   When you make an allegation against the sitting president and

9   he uses his massive megaphone to go after you, more people are

10  going to know who you are.  And it's also true that there are

11  many people who support Ms. Carroll for coming forward and

12  taking on Donald Trump.  And yeah, that includes some

13  celebrities.  Obviously that support makes her feel good at

14  times, it makes her feel protected, and sometimes it even makes

15  her feel happy.  But, the idea that the positive attention that

16  Ms. Carroll has gotten somehow cancels out the harm that Donald

17  Trump has caused for years, that's nonsense.

18          Ms. Carroll told you that what matters most to her,

19  what she wants her brand to be, is helping people.  She wants

20  to be a trusted advice columnist who helps people solve their

21  problems and that is what she was.  But you can't really be a

22  trusted advice columnist if there are tons of people who think

23  you are a liar because the former president told them that you

24  are.  And that is true whether or not there are other people

25  who may think you're great.  Trustworthy, honest, respected.

1  That is the brand that Ms. Carroll wants and it is the brand

2  she had before Donald Trump came after her.

3         And by the way -- by the way -- while we are talking

4  about brands, let's talk about the brand that actually matters

5  here:  Donald Trump's brand.  This case, one of the questions

6  that you have to decide is whether he acted with malice when he

7  made those statements.  And what could be more on-brand for

8  Donald Trump than malice.  You saw what he has said about her

9  over and over again, dripping with malice, with hate.  Think

10 about that when you go deliberate on how much it will take to

11 get him to stop.

12        Now, I think that we can all agree it has been said by

13 many of the lawyers that this case is not about sexual assault.

14 It's about defamation.  It is not about assault but that does

15 not mean -- that does not mean -- that they get to pretend --

16 that the defense gets to pretend that the assault didn't

17 happen --

18             MR. MADAIO:  Objection.

19             THE COURT:  Overruled.

20             MS. CROWLEY:  -- because that is what Ms. Habba was

21 trying to do.  She is suggesting that Donald Trump had a right

22 to say those things back in 2019 because he had been accused of

23 a sexual assault that didn't happen, that he had a right to lie

24 in order to defend himself.  Or, to use her words:  *To tell his*

25 *truth.*  Ladies and gentlemen, his truth was a lie and he had no

O1Q5car3                          Rebuttal - Ms. Crowley

1   right to say it.  That may be how Donald Trump lives his

2   life --

3            MR. MADAIO:  Objection.

4            THE COURT:  Overruled.

5            MS. CROWLEY:  -- telling a truth that is a lie, but it

6   is not how it works under the law.  The sexual assault happened

7   and Donald Trump had no right to say otherwise, not back in

8   June 2019 --

9            MR. MADAIO:  Objection.

10           THE COURT:  Overruled.

11           MS. CROWLEY:  -- not in October of 2022 when he

12   defamed her again, not last week, not yesterday when he sat

13   here in this courtroom and lied under oath.  He had no right to

14   do that.

15           MR. MADAIO:  Objection.

16           THE COURT:  Overruled.

17           MS. CROWLEY:  Ms. Carroll's accusation against Donald

18   Trump, the account of the assault that was published in her

19   book, that was true.  That has been proven.  And when Donald

20   Trump denied that it happened, when he denied knowing who

21   Ms. Carroll was -- which he still does -- he was lying.  He is

22   lying.

23           MR. MADAIO:  Objection.

24           MS. CROWLEY:  He is breaking the law.

25           MR. MADAIO:  Objection, your Honor.  It is on appeal.

1          THE COURT:  Overruled, as you well know.  Let's go on.

2          MS. CROWLEY:  And yet, Donald Trump seems to be

3     suggesting that he had no choice but to defame Ms. Carroll,

4     that she backed him into a corner by telling the truth so he

5     was forced to destroy her.  Nonsense.  Nonsense.

6          There are ways for people to lawfully respond to an

7     allegation that is true.  You could say nothing.  You could

8     say: *This is a private matter and I'm going to address it*

9     *privately.*  You could say: *This happened a long time ago and*

10    *I'm sorry for it and it is not the man that I am today.*  You

11    have certainly seen those types of statements from public

12    figures before.  By the way, if he had done that, if he had

13    stayed silent or if, God forbid, he told the truth, do you

14    honestly think that any of the terrible things that have

15    happened to Ms. Carroll in the last five years would have come

16    to pass?  If Donald Trump had followed the law and not defamed

17    Ms. Carroll, do you really think that people would have come

18    after her the way they did, calling her a liar?  A paid

19    democratic operative?  A fraud?  Too ugly to sexually assault?

20    Of course not.

21          When the president speaks, the world listens.  And as

22    we have seen the statements, the hate mail, the threats that

23    she has gotten, they parrot Donald Trump's words.  Causation?

24    There couldn't be clearer proof of causation.  If Donald Trump

25    hadn't lied, if he hadn't defamed her, Ms. Carroll's life, it

O1Q5car3                        Rebuttal – Ms. Crowley

1    would have gone on.  Her career would have continued and she

2    wouldn't be flooded with hate and threats and we wouldn't be

3    here today.

4            So, yes, this case it is not about sexual assault, it

5    is about defamation, defamation of a woman who has been

6    sexually assaulted.  Defamation by the man who sexually

7    assaulted her.  And yet, Ms. Habba faults Ms. Carroll for not

8    being miserable all the time.  I guess her argument is that she

9    must not have actually suffered because she's had some happy

10   moments in her life.

11           MR. MADAIO:  Objection.

12           THE COURT:  Overruled.

13           MS. CROWLEY:  And I have to say, this is a bizarre

14   argument.  It is like they're suggesting that Ms. Carroll has

15   to show that she has been a broken wreck of a person every

16   single day for the last five years, that she's had no moments

17   of joy or friendships.  In the defense's view, every time

18   Ms. Carroll went to a party with friends, or celebrated a

19   victory in her lawsuit against him, or presented a brave face

20   to the public, she was somehow showing that his defamatory

21   statements caused her no harm and this case is just some big

22   conspiracy against him.  That makes no sense and I guess it is

23   totally inconsistent with how each of you has experienced life.

24           Two things can be true at the same time.  You can be

25   wrecked inside and also feel moments of triumph.  You can be

O1Q5car3                    Rebuttal - Ms. Crowley

1  sad and also feel proud when people stand by you.  You can feel

2  safe when you are walking around midtown Manhattan and still be

3  terrified when you open your computer and see death threats.

4  You can be hurt, devastated even, and also do your best to find

5  some happiness.

6        Ms. Carroll has friends and admirers who appreciate

7  her bravery in coming forward.  And, at times she has found

8  happiness and comfort, and to use her words, a cocoon of love.

9  But those moments of joy don't mean that her life has been easy

10 since June 2019.  Far from it.  Ms. Carroll may tell people

11 that she is doing fine, even on days when Trump's attacks are

12 bearing down on her, even when she feels scared or sad or laid

13 low by it all.  That defiance is a source of strength.  It's

14 what gets her up every day.  But it also hides an undeniable

15 harm that affects her everyday life and the law entitles her to

16 justice for that harm, even though she is strong.

17       I just have a couple more points.  I want to talk

18 about this supposed five-hour gap for a minute because it was a

19 big theme of Ms. Habba's closing and, as I told you at the

20 beginning, there is actually no evidence of the timing of this

21 so-called gap.

22       MR. MADAIO:  Objection.

23       THE COURT:  I will rely on the jury to look at the

24 evidence carefully.

25       MS. CROWLEY:  But, more than that, I just have two

O1Q5car3                    Rebuttal - Ms. Crowley

1    points about this five-hour gap argument.

2            First of all, it is not disputed that Trump's initial

3    denial of the assault, which was issued by the White House, was

4    published at the same time --

5            MR. MADAIO:  Objection.

6            THE COURT:  Overruled.

7            MS. CROWLEY:  -- was published at the same time as

8    Ms. Carroll's allegation against him.

9            MR. MADAIO:  Objection, your Honor.

10           THE COURT:  Overruled.

11           MS. CROWLEY:  It was in the same exact article.  No

12   gap.  No gap at all.  So, it is no surprise that when people

13   saw that denial --

14           MR. MADAIO:  Objection.

15           MS. CROWLEY:  -- some of them believed it and thought

16   that Ms. Carroll was lying.

17           MR. MADAIO:  Your Honor, this is completely

18   inconsistent with the record.

19           THE COURT:  Overruled.

20           MS. CROWLEY:  And of course Ms. Carroll didn't sue the

21   White House for that denial, because while the statement was a

22   lie, it didn't go on to accuse Ms. Carroll of being a fraud, a

23   paid operative.

24           MR. MADAIO:  Objection, your Honor.  She is speaking

25   of a statement that is not in evidence.  We don't know what was

01Q5car3                              Rebuttal – Ms. Crowley

1    said.

2            THE COURT:  I will see you at side bar.

3            (Continued next page)

1              (At side bar)

2              THE COURT:  What are you relying on it being in the

3       record?

4              MS. CROWLEY:  Your Honor, Ms. Carroll testified that

5       in the same article as -- I'm sorry.  In The Cut article there

6       was a denial of the White House which said her account wasn't

7       true.  That is the evidence in the record on that denial.  What

8       I was saying is just what Trump later said five hours later.

9              MR. MADAIO:  First of all, your Honor, she testified

10      that she didn't know what the denial said, that she couldn't

11      recall what the language was.  And, again, this is a major

12      issue.  They're confusing the jury.  This White House denial is

13      not at issue here, and even if any --

14             THE COURT:  I understand that.

15             MR. MADAIO:  Right, but even if anything is

16      attributable to that White House statement, that is not the

17      same as it being attributable to President Trump.

18             MS. CROWLEY:  I'm making the exact opposite argument.

19             MR. MADAIO:  Your Honor --

20             THE COURT:  The objection is overruled.

21

22

23

24

25

O1Q5car3                          Rebuttal - Ms. Crowley

1              (In open court)

2              THE COURT:  The objection is overruled.  Continue,

3      counsel.

4              MS. CROWLEY:  Thank you, your Honor.

5              It is no surprise that when some people saw that

6      denial in the *New York* magazine article they believed Trump,

7      the president, and thought that Ms. Carroll was lying.  And

8      Ms. Carroll, of course she didn't sue the White House or Donald

9      Trump for that denial.  Because while it wasn't true, it didn't

10     go on to accuse her of being a fraud, a paid operative, someone

11     who made up an assault for money.  It didn't threaten that she

12     would pay dearly for speaking out against Donald Trump.  Donald

13     Trump did those things.  He said those things.  And those are

14     the statements that his followers latched on to.  No causation?

15     You saw the messages.  Those are the things they repeated when

16     they came after her.  Those are the things that they keep

17     saying four years later every time Donald Trump takes to the

18     world stage and repeats his defamatory lies.

19             Ms. Habba just --

20             MR. MADAIO:  Objection.  Your Honor, the --

21             THE COURT:  Overruled.

22             MR. MADAIO:  -- phrase defamatory --

23             THE COURT:  Pardon me?

24             MR. MADAIO:  Defamatory.  Speaking about subsequent

25     statements, there has been no collateral estoppel rulings.

O1Q5car3                    Rebuttal - Ms. Crowley

1          THE COURT:  Overruled.

2          MS. CROWLEY:  Ms. Habba just showed you a very good

3    example of this.  She showed you a message from December 2023,

4    just a couple of weeks ago, where someone yet again parroted

5    Trump's words and came after Ms. Carroll.  I appreciate that

6    because, as we all know, Donald Trump started defaming

7    E. Jean Carroll again after the trial --

8          MR. MADAIO:  Objection.

9          THE COURT:  Grounds.

10          MR. MADAIO:  Again, your Honor, they use the phrase

11   "defaming" and "defamatory."

12          THE COURT:  Overruled.

13          MS. CROWLEY:  The messages you saw from 2023, it makes

14   sense that she was getting those messages, that she was getting

15   that hate mail from 2023.  The trial was in 2023.  You saw what

16   Donald Trump did the day after the jury reached the verdict.

17   Same lies.  Same defamatory statements.  Guess what?  His

18   followers latched on to them and they came after her.  You saw.

19   You heard what he did before and during this trial; same lies,

20   same defamatory statements.  And guess what his followers have

21   done.  They keep coming after her.  No causation?  Give me a

22   break.

23          Now, let me just quickly address what Ms. Habba just

24   said about Professor Humphreys.  Before I do that, I just want

25   to remind you that she is the only expert witness who testified

O1Q5car3                          Rebuttal - Ms. Crowley

1    in this case.

2                MR. MADAIO:  Objection.

3                THE COURT:  Sustained.  Excuse me, I misspoke.

4    Overruled, obviously.

5                MS. CROWLEY:  The defense didn't call an expert so the

6    estimate that Professor Humphreys gave you, that $7 million to

7    $12 million range, that's the only estimate of reputational

8    damages that you heard in this trial.

9                MR. MADAIO:  Objection.

10                THE COURT:  Sustained.  There was other evidence of

11    reputational damage.

12                MS. CROWLEY:  That was the only expert testimony.

13                THE COURT:  It is up to the jury to decide whether you

14    believe it and credit it and to what extent.

15                Go ahead.

16                MS. CROWLEY:  Professor Humphreys was the only expert

17    that you heard testify so you should consider that when you

18    think about the defense's complaints about her.  And what are

19    those complaints?  I am going to tick through them.

20                Ms. Habba mentioned that Professor Humphreys has never

21    run a reputation repair campaign herself.  She's just taught

22    them so she must not actually know how they work.  Seriously?

23    That's like saying a journalism professor, who teaches students

24    how to get their stories published, doesn't know how to write.

25    Professor Humphreys' job is to teach graduate students how to

O1Q5car3                          Rebuttal - Ms. Crowley

1    repair reputations.  Her students go on to repair people's

2    reputations.  Of course she is qualified to testify about that.

3         Another complaint that they had, I am going to refer

4    to it as the labeling defense.  Ms. Habba just mentioned it to

5    you again and you heard her colleague cross-examine

6    Dr. Humphreys about it for like an hour last week.  Really?  We

7    are talking about labels on a chart.  I am sure you remember

8    what actually happened.  The labels of some of the TV programs

9    that Dr. Humphreys analyzed changed from her first report to

10   her second -- the labels -- the labels, not the actual data.

11        MR. MADAIO:  Objection, your Honor.

12        THE COURT:  Overruled.

13        MS. CROWLEY:  Not the numbers that actually mattered

14   to her analysis.  Those stayed exactly the same.

15        Now, either the defense doesn't understand that or

16   they do and they're trying to mislead you into thinking that

17   this is something that it is not.  Either way, you should

18   reject that argument for what it is:  A total distraction.

19        (Continued on next page)

20

21

22

23

24

25

1          MS. CROWLEY:  (Continued) Their last complaint, I

2     guess, is that Professor Humphreys' damages model doesn't count

3     for the positive responses, for the people who believed

4     Ms. Carroll after she came forward in 2019.  And the fact the

5     defendant continues to make this argument makes clear that they

6     don't actually understand what Professor Humphreys did in this

7     case.  She calculated the number of people who saw Trump's

8     defamatory statements and likely believed them.  She then

9     calculated how much it would cost to change those people's

10    minds through a reputation repair program.  Of course,

11    Professor Humphreys didn't include in that calculation people

12    who believed Ms. Carroll and didn't believe Donald Trump.

13    Those people don't need to have their minds changed.  If she

14    had included them in her estimate, you'd better believe that

15    the defense would be up here complaining that she overcounted.

16    But the professor didn't do that because that's not how this

17    works.

18          The law of defamation is about protecting people from

19    the harms that are caused when other people believe lies about

20    them, and a reputation repair program focuses on fixing that

21    person's reputation among those people.  You only have to

22    change the minds of the people who believe the false claims.

23    That's why Professor Humphreys' estimate makes sense.  It's why

24    it's reasonable.  It's why she's the only expert who testified

25    in this case.

1          Now just one more point.  Ms. Habba just went on at

2     some length about the fact that Ms. Carroll deleted some of the

3     death threats that she's gotten, and she's somehow arguing that

4     from that deletion Donald Trump is prejudiced.  Okay.  Let's

5     talk about this because it's one of the many things Ms. Habba

6     got wrong.

7          She cherrypicked some testimony to mislead you into

8     thinking that Ms. Carroll deleted things she was supposed to

9     have kept.  But that is wrong.  That's not what Ms. Carroll

10     said.  You can take a look at that testimony.  Ms. Carroll said

11     that she deleted death threats that she got back in June 2019

12     right after Donald Trump came after her, and that she hasn't

13     deleted anything like that since then.  So that's just wrong.

14     She got that wrong.

15          MR. MADAIO:  Judge, that misstates the testimony.

16          THE COURT:  I'm going to sustain the objection in

17     part.  I'm not going to detail what part right now.  I'm just

18     going to say to the jury, if this matters to you, look at the

19     evidence.  You decide.

20          MS. CROWLEY:  Ms. Carroll did say at page 232 of the

21     transcript that she did delete some of the nasty replies that

22     she'd gotten from some of the tweets that she's posted more

23     recently, but she had no obligation to keep those.  The death

24     threats, the stuff that she got back in June 2019, she had no

25     obligation to keep those either, and I expect Judge Kaplan is

O1QQcar4                        Rebuttal – Ms. Crowley

going to tell you that.  There was no lawsuit back then.  She

wasn't thinking of filing a lawsuit back then.  There was no

requirement that she preserve anything.  She did absolutely

nothing wrong by getting rid of those death threats.  I think

we can all understand why she might not have wanted to keep a

bunch of death threats handy.  It's not exactly the kind of

thing she wants to go back to.  Yes, in a flush of panic back

in June of 2019, she deleted some messages where people told

her that she should be raped or killed.  Who wouldn't do that?

Who among us hasn't deleted a nasty tweet or email?  If

something upsets you, you want to get rid of it.

        But beyond that, what are we actually talking about

here?  What is this evidence that she supposedly got rid of?

It's death threats, death threats from people who believed his

lies and expanded on his threats.  That is not evidence that

Donald Trump would actually want you to see.  It's only more

damning evidence against him.  So, yeah, we agree, Ms. Carroll

deleted death threats from back in 2019, and if she hadn't, you

would have seen even more evidence of the harm that Donald

Trump's caused her.

        But you don't actually need to see more messages to

understand that harm.  You've seen enough.  You've seen and

you've heard how she's gotten messages like this for nearly

five years and how they've changed the way she lives her life

in many ways.  By the way, that's true even when she is having

O1QQcar4                          Rebuttal - Ms. Crowley

1    moments where she — to use her words — feels fine as wine.  She

2    may feel happy.  She may feel great.  And then she turns on her

3    computer and she sees messages like that, and she gets knocked

4    right back down again.  And that happens every time Donald

5    Trump lies about her.  She gets more threats.  You don't need

6    to see every single one of those to know how much she suffered

7    and to know how much she is going to continue to suffer every

8    time Donald Trump comes after her if he's not stopped.

9          Members of the jury, this trial is almost over.

10   You've heard all the arguments from the lawyers, and now you're

11   going to listen to Judge Kaplan's instructions on the law and

12   then go back to the jury room to deliberate to decide how much

13   money Donald Trump should have to pay for what he did to

14   Ms. Carroll and what he keeps doing.

15         And when you do that, I would ask you to think about

16   what Donald Trump wants you to do here; he wants you to hold

17   Ms. Carroll accountable for the harm she suffered as a result

18   of his actions.  Yes, Donald Trump sexually assaulted

19   Ms. Carroll.  Yes, he defamed her over and over again.  Yes,

20   her reputation suffered.  And yes, she gets death threats or,

21   as Ms. Habba called them, mean tweets.  But they want you to

22   decide that that's Ms. Carroll's fault; that somehow Donald

23   Trump is the victim here because she never should have come

24   forward in the first place, because she never should have filed

25   this lawsuit, because she should have shut down her social

O1QQcar4                              Rebuttal - Ms. Crowley

media, stopped doing public appearances, stopped writing her

advice column.  By the way, I want to talk for one second about

these so-called salacious tweets that Ms. Habba showed you.  I

guess her point was to somehow argue that Ms. Carroll deserves

the horrible things that people have said to her because of

these tweets.  Those tweets were questions that readers had

sent to Ms. Carroll's advice column.  She posted them when she

was answering their questions.  She was doing her job, but they

want her not to do that any more.

         The defense wants you to decide that the only way

Ms. Carroll could have avoided the bad things that have

happened to her is by staying silent.  Meanwhile, the man who

did these things to her, the man who sexually assaulted her, he

gets to do whatever he wants.  According to the defense, he

gets to lie.  He gets to threaten.  He gets to ignore a jury

verdict.

         MR. MADAIO:  Objection.

         THE COURT:  Overruled.

         MS. CROWLEY:  He gets to defy the law and the rules of

this courtroom.  You saw how he has behaved through this trial.

You've heard him.  You saw him stand up and walk out of the

courtroom while Ms. Kaplan was speaking.  Rules don't apply to

Donald Trump.  He gets to do whatever he wants and use his

massive, powerful platform to keep ruining her life.  He even

believes he gets to testify under oath and lie once again.

O1QQcar4                        Rebuttal - Ms. Crowley

1              MR. MADAIO:  Objection.

2              THE COURT:  Overruled.

3              MS. CROWLEY:  Ladies and gentlemen, this isn't a

4    campaign rally.  It's not a press event.  This is a court of

5    law.  And it's Ms. Carroll's life.  Donald Trump sexually

6    assaulted her.  He defamed her.  He keeps defaming her.  He is

7    not the victim.  This is her life.  Help her take it back.

8    Make him stop.  Make him pay enough so that he will stop.

9              Thank you.

10             THE COURT:  Thank you.

11             Members of the jury, what remains in this trial is for

12   me to instruct you on the law.  If any of you need a short

13   break, tell me, and we'll take a short break.  Otherwise, I

14   will go right ahead, and I'm guessing it will take somewhere

15   between 30 and 60 minutes.  Raise your hand if you want a

16   break.

17             Okay.  Andy, do you want to make the usual

18   announcement.

19             DEPUTY CLERK:  To all the spectators in the gallery:

20   The Court is about to charge the jury.  You either must remain

21   seated throughout the duration of this charge or leave at this

22   time.

23             Marshals, please lock the doors.

24             THE COURT:  Members of the jury, we've reached the

25   point in the trial where you are about to perform your function

O1QQcar4                          Rebuttal - Ms. Crowley

as jurors.  My instructions are going to be in four parts.

First, you are going to receive a verdict form that you will use to address the factual questions that you are to decide pursuant to the law as I give it to you.  Second, I will instruct you about the trial process, including the burden of proof.  I will instruct you concerning your evaluation of the evidence.  And, finally, I will talk to you about your deliberations.

Before we do that, let me just say that I sometimes stand up, walk around while I'm instructing a jury, as I'm sure you all appreciate sitting for long periods sometimes is just uncomfortable.  Nothing should be read into that.

Now, your verdict in this case will be in the form of answers to yes-no questions and questions that ask you to provide, if applicable, dollar amounts.  I am going to ask my staff - I don't know who has them; Andy probably has them - to distribute the verdict form to you now because it may help you to follow the instructions I'm about to give you.

You of course know that the plaintiff in this case, Ms. Carroll, is suing Mr. Trump for money damages for injuries she claims to have suffered as a result of the defamatory statements that Mr. Trump made about her in the mid-1990s.  As you know, Ms. Carroll encountered Mr. Trump at the Bergdorf Goodman department store in Manhattan where he sexually assaulted her.  Ms. Carroll's account of being sexually

O1QQcar4                      Rebuttal - Ms. Crowley

assaulted by Mr. Trump first was published on June 21, 2019.
On June 21 and June 22, Mr. Trump made the defamatory
statements at issue in this case where he publicly denied
knowing Ms. Carroll, denied sexually assaulting her, and
accused her of making up the assault for ulterior and improper
purposes.

As I instructed you at the beginning of this trial,
you are not to decide whether Mr. Trump in fact sexually
assaulted Ms. Carroll or whether Mr. Trump's June 21 and
June 22, 2019 statements about her were defamatory.  You
certainly know by now that there have been prior proceedings
relating to those events, including a previous jury trial, and
the jury in that case - as well as other proceedings in this
court - already found that Mr. Trump is liable for sexually
assaulting Ms. Carroll and for defaming her in his June 21 and
22, 2019 statements.  Specifically, the following facts
pertinent to this dispute already have been decided.

First, Mr. Trump sexually abused Ms. Carroll by
forcibly inserting his fingers into her vagina without her
consent.

Second, Ms. Carroll did not make up her claim of
forcible sexual abuse by Mr. Trump.  Mr. Trump's June 21 and
22, 2019 statements were false.

Third, Mr. Trump knew when he made those two
statements that they were false, had serious doubts as to the

O1QQcar4                          Rebuttal - Ms. Crowley

1    truth of those statements, or made those statements with a high

2    degree of awareness that they probably were false.

3            Fourth, those two statements were defamatory.  In

4    other words, his false statements tended to disparage

5    Ms. Carroll in the way of her business, office, profession or

6    trade, or they tended to expose her to hatred, contempt or

7    aversion, or they tended to induce an evil or an unsavory

8    opinion of her in the minds of a substantial number of people

9    in the community.

10           For your purposes, you must accept these points are

11   true no matter what else you heard in this trial.  What remains

12   for you to decide are two very limited issues relating to

13   damages Mr. Trump owes Ms. Carroll for defaming her in the two

14   June 2019 statements I've identified.  To be absolutely clear:

15   You will not be determining any damages that Ms. Carroll

16   suffered by reason of the forcible sexual assault itself.  That

17   has been done already.  Your focus will be entirely on damage

18   issues resulting from Mr. Trump's publication of the June 21

19   and 22, 2019 defamatory statements.

20           First, you must decide whether Ms. Carroll sustained

21   more than nominal damages by reason of those statements, and,

22   if she did, the amount of money damages that Mr. Trump must pay

23   Ms. Carroll to compensate her for the injury she suffered as a

24   result of those statements.  These are called compensatory

25   damages.

O1QQcar4                        Rebuttal - Ms. Crowley

1            And at this moment I'm going to pause a minute.  Andy

2    is going to give counsel a typewritten copy of my instructions.

3    Ladies and gentlemen, I should have said this at the beginning:

4    You will have them in writing in the jury room.  You are

5    welcome to take notes or not to take notes.  Everything I say

6    you will get in writing.

7            The second thing you must decide is whether Mr. Trump

8    should be required to pay Ms. Carroll punitive damages as well

9    as compensatory a damages, and, if so, how much he should be

10   required to pay.  Punitive damages are intended to punish a

11   defendant and to deter future defamatory statements.

12           I'm now going to discuss these remaining damages

13   issues in turn, with reference to the verdict form that you're

14   going to be using to decide the case.

15           A person who has been defamed is entitled to fair and

16   just compensation for the injury to her reputation and for any

17   humiliation and mental anguish in her public and private lives

18   that was caused by the defamatory statement in question.

19   Question 1 on the verdict form deals with such damages for

20   Mr. Trump's June 21 and 22, 2019 statements, which are in

21   evidence as Plaintiff's Exhibit 1 and 2, respectively.

22           For this question, you will award an amount that, in

23   the exercise of your good judgment and common sense, you decide

24   is fair and just compensation for the injury to Ms. Carroll's

25   reputation and the humiliation and mental anguish in her public

O1QQcar4                      Rebuttal - Ms. Crowley

and private lives which you decide was caused by Mr. Trump's

two statements to which I've already referred.  In fixing that

amount, you should consider Ms. Carroll's standing in the

community, the nature of Mr. Trump's statements made about

her — the two statements in question — the extent to which

those statements were circulated, the tendency of those

statements to injure a person such as Ms. Carroll and all of

the other facts and circumstances of the case.  Compensatory

damages can't be proved with mathematical accuracy.  Fair

compensation may vary.  It may range from one dollar, if you

decide that there was no injury at all, to a substantial sum if

you decide that the injury was substantial.

It is Ms. Carroll's burden to prove the nature and

extent of her damages and to prove that the damages were caused

by Mr. Trump's actions.  You may award compensatory damages

only for those injuries that you find that Ms. Carroll has

proven by a preponderance of the evidence.  We'll talk about

what that means later.  Compensatory damages cannot be based on

speculation or sympathy.  They must be based on the evidence

presented at trial and only on that evidence.

Further, you may not award compensatory damages more

than once for the same injury.  For example, where a plaintiff

prevails on two claims and establishes that he or she is

entitled to $100 in compensatory damages for one injury, the

plaintiff is not entitled to $100 in compensatory damages also

1    on the other claim but for the same injury.  Of course, where

2    different injuries are attributed to the separate claims, a

3    person is entitled to be compensated fully for all of the

4    injuries.

5         Now, during her opening statement, Mr. Trump's

6    attorney asserted Ms. Carroll had a duty to mitigate or

7    minimize any damage that she suffered as a consequence of

8    Mr. Trump's statements in this case, the statements we're

9    concerned with.  That statement was not correct.  A person who

10   is defamed has no duty to mitigate or minimize any harm caused

11   to that person by the defamation.  A person who defames a

12   plaintiff is liable to the plaintiff for all damages caused to

13   the plaintiff by the defamation.

14        In addition, the harm, if any, that Mr. Trump caused

15   to Ms. Carroll's reputation by his defamatory statements is not

16   mitigated or reduced or offset by any benefit to her reputation

17   that Mr. Trump may claim that his defamatory statements or

18   Ms. Carroll's allegations against him caused in some parts of

19   the community.  You are not to consider any reputational

20   benefits, if any, in deciding on a damage award in this case.

21        Now, question 1 pertains to compensatory damages for

22   the two statements we're concerned with.  And I've broken it

23   into two parts.  The first part asks you whether Ms. Carroll

24   has proved by a preponderance of the evidence that she suffered

25   more than just nominal damages from Mr. Trump's June 21 and 22,

O1QQcar4                        Rebuttal - Ms. Crowley

1    2019 statements -- meaning that she was injured by those

2    statements in any of the respects that I've just described to

3    an extent warranting damages of more than a dollar.  That is

4    the "yes" or "no" question.  If the answer is "yes," you then

5    will fill in the amount you award for all defamation

6    compensatory damages attributable to the June 21 and 22

7    statements, excluding the reputation repair program that was

8    discussed during Professor Humphreys' testimony.  And then you

9    will fill in the amount of damages, if any, that you award for

10   the reputation repair program for the June 21 and 22, 2019

11   statements in the second part of the first question.

12           On the other hand, if your answer to the first part of

13   question 1 is no; in other words, if you determine that

14   Ms. Carroll has not proved by a preponderance of the evidence

15   that she suffered more than nominal damages as a result of

16   Mr. Trump's June 21 and June 22 statements, then you will write

17   down $1 on the second line of question 1, and you will leave

18   the third line blank.

19           Regardless of your answer to question 1, you will go

20   on to question 2.

21           In addition to seeking compensatory damages, which I

22   just covered in discussing question 1, Ms. Carroll asks also

23   that you award punitive damages.  Punitive damages may be

24   awarded for defamation to punish a defendant who's acted

25   maliciously and to deter him and others from doing the same.

O1QQcar4                          Rebuttal - Ms. Crowley

A statement is made maliciously for purposes of questions 2 and 3 if it is made with a deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights.

Question 2 pertains to Mr. Trump's malice, if any, with respect to the June 21, 2019 statement.  Question 3 pertains to Mr. Trump's malice, if any, with respect to the June 22, 2019 statement.  If you answer "yes" to either question 2 or question 3, or both — that is, if you find that Ms. Carroll has proved by a preponderance of the evidence that Mr. Trump acted maliciously as I have just defined that term for you, in making the June 21 or the June 22? statement about Ms. Carroll — you will write down an amount, if any, that you find Mr. Trump should pay to Ms. Carroll in punitive damages.  If you answer "no" to both question 2 and question 3 — that is, if you find that Ms. Carroll has not proved by a preponderance of the evidence that of Mr. Trump's June 21 or June 22, 2019 statements was made maliciously — you may not award punitive damages.

Let me just pause for a moment.

All right.  I will go on.

In arriving at your decision as to the amount of punitive damages to award, should you decide to award any, you should consider the following factors:

First, your view of the nature and reprehensibility of

1    what Mr. Trump did.  And here we're talking only about the

2    defamatory statements, not the sexual assault.  Bear in mind

3    that would include the character of the wrongdoing and

4    Mr. Trump's awareness of what harm the conduct caused or was

5    likely to cause.  In considering the amount of punitive

6    damages, you should weigh this factor heavily.

7              Second, any actual or potential harm you conclude was

8    caused or threatened by Mr. Trump's conduct.

9              Third, Mr. Trump's financial condition and the impact

10   that any punitive damages you may award will have on him.

11             Fourth, the amount, if any, that you consider

12   necessary to deter Mr. Trump from continuing to defame

13   Ms. Carroll and to punish his misbehavior.  In that regard,

14   punitive damages may be considered expressive of the community

15   attitude towards one who willfully and wantonly causes hurt or

16   injury to another.

17             In arriving at your decision, you may consider

18   additionally the relevant circumstances of the making of the

19   June 21 and 22 statements, provided that they are not too

20   remote.  This includes any subsequent statements that Mr. Trump

21   has made about Ms. Carroll, as well as any other circumstances,

22   that are in evidence and that indicate the existence of any ill

23   will or hostility between the parties.

24             For questions 2 and 3, you may take Mr. Trump's other

25   statements into consideration when determining whether he spoke

O1QQcar4                      Rebuttal - Ms. Crowley

1  maliciously when he made the June 21 and 22, 2019 statements,

2  as well as determining the amount of punitive damages, if any,

3  that you decide to award insofar as any previous or subsequent

4  conduct by Mr. Trump, in your view, bears on the size of an

5  award necessary to deter him from making defamatory statements

6  about Ms. Carroll in the future.

7          The amount of punitive damages that you award, if any,

8  must be both reasonable and proportionate to the actual and

9  potential harm suffered by the plaintiff and to the

10  compensatory damages, if any, that you awarded the plaintiff.

11          Obviously from what I've said already, regardless of

12  how you answer question 2, you will answer question 3 and

13  otherwise follow my instructions.  The instructions I gave you

14  on question 2 apply also to question 3.

15          Now, those are my instructions on the law.  I will now

16  talk to you about the trial process.

17          I'm going to begin with the burden of proof.

18          Ms. Carroll, as I said, has the burden of proving her

19  damages by a preponderance of the evidence.  As I told you at

20  the outset, proof beyond a reasonable doubt, which is the

21  proper standard of proof in a criminal trial, does not apply to

22  a civil case such as this.  You should put it out of your mind.

23  To establish something by a preponderance of the evidence means

24  to prove that the contention of the party with the burden of

25  proof on that question is more likely true than not true.  In

O1QQcar4                    Rebuttal - Ms. Crowley

1    other words, a preponderance of the evidence means that the

2    party who has the burden of proof on a particular question —

3    and in this case, Ms. Carroll has the burden on all of the

4    questions — has demonstrated that the odds of that party being

5    right are more than 50-50, even if only by a tiny amount.  It

6    refers to the quality and the persuasiveness of the evidence,

7    not to the number of witnesses or documents.  In determining

8    whether a claim has been proved by a preponderance of the

9    evidence, you may consider the relevant testimony of all

10    witnesses regardless of which party may have called them, and

11    all the relevant exhibits received in evidence regardless of

12    which party may have produced them.

13        If, after considering all of the evidence, you find

14    that the evidence of both parties is exactly in balance; in

15    other words, that the chances of the plaintiff's contention or

16    the defendant's contention being correct with respect to any

17    question that I've put to you are exactly equal, then

18    Ms. Carroll will have failed to sustain her burden of proof on

19    that question, and you must find for the defendant on that

20    issue.  On the other hand, if Ms. Carroll has persuaded you on

21    a particular question that her contention is more likely

22    correct than the chances that her opponent is right, even if

23    only by a little, then you must find for her on that particular

24    question.

25        Now, folks, you are the sole and the exclusive judges

O1QQcar4                        Rebuttal - Ms. Crowley

1    of the facts.  I certainly do not mean to indicate any opinion

2    as to the facts or as to what your verdict should be.  The

3    rulings I made during the trial are no indication of any views

4    on my part of what you ought to do or who should prevail here.

5    I express no opinion as to how you should decide any of the

6    issues before you.

7            Now, as I've told you, it is my duty to instruct you

8    as to the law, and it is your duty to accept my instructions on

9    the law and apply them to the facts as you determine the facts

10   to be.  You are to draw no inferences from the fact that I may

11   have asked questions of some of the witnesses and made comments

12   to counsel about the manner in which they made their

13   presentations.  I did that to bring out the evidence more

14   quickly, to save time, and to ensure that the trial was

15   conducted properly.  I did not intend to suggest any view

16   concerning the credibility of any witness or as to which side

17   should prevail here, and you must not take my comments or

18   questions as having done so.  Nor should you consider the fact

19   that from time to time I was taking notes and from time to time

20   was using my computer.  Whatever I may have noted, whatever use

21   I was making of the computer here on the bench may have had

22   nothing at all to do with what you are concerned with.  You are

23   to decide the case fairly and impartially based solely on the

24   evidence and my instructions.

25           We now get to the question of your evaluation of the

O1QQcar4                          Rebuttal - Ms. Crowley

1    evidence.  The evidence in this case, of course, is the sworn

2    testimony of the witnesses, the exhibits received in evidence,

3    and any stipulations between counsel.  Stipulations is just a

4    fancy word for agreements as to facts.

5        What is not evidence, however, are questions,

6    arguments, and objections by lawyers.  Nor is any witness

7    testimony that I struck or told you to disregard to be

8    considered in any way.

9        In deciding this case, I remind you that you are

10   obliged to consider only the evidence you have seen and heard

11   in this courtroom.  Anything that you may have learned

12   elsewhere that could conceivably have any bearing on this case

13   must be disregarded.

14       Now, you've heard some evidence and argument during

15   this trial concerning whether Ms. Carroll deleted some emails

16   or tweets containing death threats from her computer, as well

17   as some mention by defense counsel that she was issued a

18   subpoena in this case.  The question of whether Ms. Carroll's

19   conduct implicated any legal duty is entirely for the Court to

20   decide, not for the jury.  I do instruct you, however, that

21   Ms. Carroll had no legal obligation to preserve anything before

22   she reasonably anticipated litigation.  Beyond that, whether

23   her conduct implicated any legal duty is not your concern.  You

24   are entitled to consider exactly what materials, if any,

25   Ms. Carroll disposed of, why and when she did so, and whether

O1QQcar4                              Rebuttal - Ms. Crowley

1   those materials and her testimony affect the question of

2   damages before you.

3           You may have heard argument or evidence suggesting

4   that Ms. Carroll — by revealing in June 2019 that Mr. Trump

5   sexually assaulted her or claiming that he did so — assumed the

6   risk that he would respond with defamatory statements,

7   consented to such statements, or authorized Mr. Trump to make

8   such statements as a form of self-defense.  I instruct you as a

9   matter of law that Ms. Carroll did not consent to Mr. Trump's

10  defamatory statements, or otherwise grant him lawful permission

11  to defame her, by publicly stating in June 2019 that he had

12  sexually assaulted her.

13          As I have instructed you, it already has been

14  established that Mr. Trump's statements were false and

15  defamatory, and the only questions for you concern what harm,

16  if any, Mr. Trump's statements caused Ms. Carroll, and if they

17  did cause her harm, what damages Mr. Trump must pay.

18          Now, I've covered instructions for certain specific

19  evidence, and I'm now going to give you instructions with

20  respect to evidence more generally.  There are two types of

21  evidence that you properly may use in coming to your verdict.

22          One type of evidence is direct evidence.  Direct

23  evidence is when a witness testifies about something that the

24  witness knows by virtue of having perceived it with his or her

25  own senses; in other words, something the witness, saw, felt,

O1QQcar4                              Rebuttal – Ms. Crowley

touched, heard, and in one case I tried last year, tasted,
believe it or not.

Direct evidence can also be in the form of an exhibit.
Imagine we were trying a case and the question at issue in the
case involved an exhibit — this transcript volume I'm holding
up — and the question somehow it mattered was what color it's
bound in.  Well, it's an exhibit.  You can see it.  You can
tell whether it's red or green or chartreuse.  That's direct
evidence, and also an exhibit you can perceive with your own
senses.

The other kind of evidence is called circumstantial
evidence.  That's a term that whatever occurs in movies and on
television is simply evidence that tends to prove some disputed
fact by proving another fact.  The example that is typically
given in this courthouse is that imagine for the sake of
argument this had been a sun shiny morning when you walked in.
Imagine the drapes are all closed.  You can't see the weather
outside.  It suddenly became relevant to determine what the
weather was outside, and if people started walking in through
those doors with wet umbrellas and raincoats, you could look at
the wet umbrellas and raincoats.  That would be circumstantial
evidence that it might be raining outside.  It's the process of
reasoning from one fact to another, and the takeaway here is
that circumstantial evidence is of no less value than direct
evidence.  It's a general rule that the law makes no

O1QQcar4                         Rebuttal - Ms. Crowley

distinction between direct and circumstantial evidence.  It

simply requires that your verdict must be based on a

preponderance of all of the evidence presented.

        Now, some of the testimony before you is in the form

of one or more excerpts from videotaped depositions that were

received in evidence.  A deposition is simply a procedure where

before a trial the parties may question a witness or an

adversary party or a witness before a court stenographer.  You

may consider the testimony of a witness given at a deposition —

which is given under oath — according to the same standards you

would use to evaluate the testimony of a witness if given live

at trial.  It occurs to me also that I believe you either heard

or saw, heard, read or saw, some testimony given in another

court trial.  If that memory is accurate, everything I've said

about your consideration of deposition testimony applies to

that as well.

        There were times during the course of the trial where

counsel on each side had marked for identification and showed

to you visual aids that we lawyers and judges call

demonstratives.  They were shown to you to help you understand

the evidence as it came in.  They are not themselves evidence.

They were used only as a matter of convenience and illustration

so you should consider them accordingly.

        Now, you've had the opportunity to observe the

witnesses, and it is, of course, up to you, and you alone, to

O1QQcar4                         Rebuttal - Ms. Crowley

1   decide how believable each witness was in the witness's

2   testimony in this case subject to the facts that you're

3   required to accept as true the four statements that I read to

4   you earlier, and that you will find also in the typewritten

5   transcript, and that I need not now repeat.

6        You are the sole judges of the credibility of each

7   witness and of the importance of each witness's testimony.  In

8   deciding the weight to give to the testimony of a witness, you

9   should use all of the tests for truthfulness that you would use

10  in determining matters of importance to you in your everyday

11  life.

12       Your decision about whether or not to believe a

13  witness may depend on how that witness impressed you.  You

14  watched them all testify.  Everything a witness did or said on

15  the witness stand or in the deposition or other sworn

16  testimony, the excerpts you saw, counts in your determination.

17  Did the witness appear to be frank, forthright and candid?  Or

18  did the witness answer questions on direct examination in a

19  responsive and forthcoming manner but answer questions on

20  cross-examination evasively or unresponsively?  You should

21  consider the opportunity the witness had to see, to hear, and

22  to know the things about which the witness testified, the

23  accuracy of the witness's memory, the reasonableness and

24  probability of the witness's testimony and its consistency or

25  lack of consistency, and its corroboration or lack of

O1QQcar4                          Rebuttal - Ms. Crowley

corroboration with other credible testimony.

        In evaluating a witness's credibility, you should use
your common sense, your good judgment, and your own life
experience.  Further, you are to perform the duty of evaluating
witnesses without bias or prejudice as to any party, and you
are to perform that duty with an attitude of complete fairness
and impartiality.

        Finally, should you, in the course of your
deliberations, conclude any witness has intentionally testified
falsely as to a material fact during the trial, you are at
liberty to disregard all of that witness's testimony on the
principle that one who testifies falsely as to one material
fact may also testify falsely as to others.  But credibility
isn't necessarily an all-or-nothing proposition.  You may
accept so much of a witness's testimony as you believe is true
and accurate and reject only such parts, if any, that you
conclude are false or inaccurate.

        Now you've also heard during the course of this trial
testimony from an expert witness; namely, Professor Humphreys.
An expert witness is a person who, by education and experience,
has become expert in some art, science, profession or calling.
Under the rules of evidence, expert witnesses are entitled to
state their opinions as to matters in which they profess to be
experts and may also explain the reasons for their opinions.
The purpose of expert testimony is to assist you in

O1QQcar4                    Rebuttal - Ms. Crowley

understanding the evidence and coming to an independent

decision.

          In weighing an expert's testimony, you may consider

the expert's qualifications, her opinions, the bases for the

expert's opinions, and all of the other considerations I've

just described to you in evaluating the witness's credibility.

You may give the expert testimony whatever weight, if any, you

find it deserves in light of all of the evidence in this case.

          You should not accept the expert's testimony just

because she's an expert.  Even with an expert witness, you

should use your common sense, your good judgment, and your own

life experience.

          You may give the expert's testimony as much weight, if

any, as you think it deserves in light of all the evidence.

You also may reject the testimony of an expert witness in whole

or in part if you conclude that the reasons given in support of

the opinion or the testimony are unsound or if you for other

reasons don't believe the expert witness.

          Now, as you know, this case has attracted a great deal

of media attention.  Until a verdict is released and you are

discharged, you must continue to insulate yourself from all

information about this case, except what has come to you in

this courtroom.  That means no reading, watching or listening

to media coverage or commentary about the case or comments from

anyone else, including your friends and loved ones, in the

01QQcar4                    Rebuttal - Ms. Crowley

1    event you see them before this is a result until this case.

2    You are to be sealed off from other information entirely.  And

3    if anything happens that results in some exposure of any juror

4    to some outside source, you're obliged to report it to the

5    Court.

6            This is the point where I am just going to stand up

7    and stretch for a minute.  Andy, do you have the other

8    microphone?

9            DEPUTY CLERK:  Yes, Judge.

10           THE COURT:  As I say, I'm standing up to stretch my

11   back, that's it.

12           You are going to retire in just a few minutes.  I have

13   to just change my glasses to do this.

14           You are going to retire to consider your verdict in

15   just a few minutes.  It's your duty as jurors to consult with

16   each other and deliberate with the goal of coming to an

17   agreement.  Each of you must decide for yourself the answers to

18   the questions that I put to you, but you should do so only

19   after considering the case with your fellow jurors, and you

20   shouldn't hesitate to change your opinion if you are convinced

21   that it is mistaken.  Your answers to every question must be

22   unanimous, but you are not required to give up your honest

23   convictions concerning the effect or weight of the evidence

24   merely for the purpose of returning a verdict or solely because

25   of the opinion of other jurors.  Discuss and weigh your

O1QQcar4                          Rebuttal - Ms. Crowley

1    respective opinions dispassionately, without regard to

2    sympathy, without regard to prejudice or favor for either

3    party, and come to the conclusion that in your good conscience

4    appears to be in accordance with the truth.

5         A word about your notes.  The notes you may have taken

6    during this trial are for your personal use only.  You each may

7    consult your own notes during deliberations, but any notes that

8    you may have taken are not to be relied upon during

9    deliberations as a substitute for the collective memory of all

10   of you.  Your notes should be used as memory aids, but they

11   should not be given precedence over your independent

12   recollection of the evidence.  If you didn't take notes, you

13   should rely on your own recollection, your own independent

14   recollection, of the proceedings, and you shouldn't be

15   influenced by other people's notes.  I emphasize that the notes

16   are entitled to no greater weight than the recollection or

17   impression of each of you as to what the testimony may have

18   been.

19        Again, each of you is to make your own decision about

20   the proper answer to each question based on your consideration

21   of the evidence and your discussions with your fellow jurors.

22   No one should surrender his or her conscientious beliefs solely

23   for the purpose of reaching a unanimous verdict.

24        Now, you are going to have the typewritten

25   instructions that I am now reading to you.  It may take a few

1    moments to get them into the jury room to you.  The printed

2    copy that you will receive contains a variety of legal

3    citations which appear in brackets beneath the various things

4    I've read to you.  I have not read you the legal citations.

5    Those are there for my personal use and for the lawyers' aid.

6    They are essentially my audit trail and the lawyers' audit

7    trail of the legal authority for what I am telling you.

8            I have instructed you on the principles of law that

9    apply to this case, and you must apply them in the manner that

10   I've explained them to you here and now, and you should ignore

11   the citations.  They will probably be seeming to you to be in a

12   foreign language anyway.  And I will describe in a moment what

13   you should do if you need any further instruction on the law.

14           You are not to discuss the case unless all of you are

15   present.  Four or five of you together is only a gathering of

16   individuals; it's not a jury.  The jury is all of you.  When

17   you retire, you will select one member of the jury as a

18   foreperson.  That person will preside over your deliberations

19   and speak for you here in court.

20           The foreperson will send out any notes — and I will

21   get to that in a second — and when the jury has reached a

22   verdict, you'll notify the Officer in whose custody you will be

23   that a verdict has been reached.

24           Now, as you've seen, the verdict form that each of you

25   has consists of questions concerning the issues in this case,

O1QQcar4                          Rebuttal - Ms. Crowley

the important issues in this case.  As I've explained, your

answer to one question will determine whether and how you

answer a subsequent question in certain cases, and the verdict

form indicates how you should proceed through the form.  You

will follow those instructions because you should answer every

question except where the verdict form indicates "don't answer

it."  I think there's one place where it does that, but however

many it is, you have it there.

        Whatever you do, just answer the questions.  I tell

you from experience, you are not to add any commentary

anywhere.  No extraneous remarks or comments.  If that happens,

it will only waste time.

        Once you have reached a unanimous decision, you will

record your answers on one copy of the verdict form.  The

foreperson will fill it out, then each juror will write his or

her juror number — not your seat number, but your juror number;

not the seat you're in, not that number, your juror number — at

the bottom of it, not your name, and advise the Officer that a

verdict has been reached.  Don't give the verdict form to the

Officer.  The foreperson should place it in an envelope and

bring it with him or her to the courtroom when you return.  I

will ask for it.  I stress that each of you should be in

agreement with the verdict that is announced in court.  Once

your verdict is announced by the foreperson in open court and

officially recorded, it ordinarily can't be revoked.

O1QQcar4                         Rebuttal - Ms. Crowley

1           Now, if during your deliberations you want me to

2     discuss further any of the instructions on the law that I've

3     given you, the foreperson should send out a note with the

4     Officer in a sealed envelope explaining your question, and if

5     you want to have testimony read back or submitted to you, tell

6     us what it is you want to hear or have read back.  We can read

7     back testimony to you or sometimes submit it to you in writing.

8     I ask you to ask for a readback or a submission of the

9     testimony only once you've exhausted your recollection and you

10    are convinced that you actually need it.  If you do, by all

11    means, we will get it for you.

12          If you do need it, the procedure is that the

13    foreperson will send in a note telling me exactly what you

14    want, what you need with as much specificity as you can give

15    us:  Who the witness was, whether it was direct, cross, what

16    the subject was and so on.  Because the procedure that we then

17    follow is I share the request with counsel — and this applies

18    also to notes with questions about the instructions — we all

19    have to understand what you mean because they have a right to

20    comment about what the answer ought to be, or what should be

21    read back.  Once it is resolved what you will receive either by

22    way of answer to questions or by readback or testimony going

23    in, we have to pull that together, and that sometimes is almost

24    instantaneous and sometimes it takes time.

25              (Continued on next page)

1          THE COURT:  If you do communicate with the Court

2    before reaching a verdict, you must never indicate to the Court

3    how you are divided, in other words where the vote stands, if

4    it is that kind of a circumstance, unless I specifically ask

5    you to tell me.

6          Now, you are reminded, folks, you took an oath to

7    render judgment impartially and fairly, without prejudice,

8    sympathy or fear, based solely on the evidence in this case and

9    the applicable law.  And I want to elaborate for a minute about

10   your role under that oath.

11         First of all, as I have said more than once, you must

12   accept as true the facts that I explained to you must be

13   accepted as true because they have already been decided.  You

14   may not properly question those facts.

15         In all other respects, you, as jurors, are the judges

16   of the facts.  I just want to remind you again that nothing I

17   have said or done should be taken by you as indicating any view

18   on my part about what your conclusion should be about the facts

19   and about what, if any damages, Ms. Carroll is entitled to.

20   But, in determining those damages, that is, in coming to your

21   decision on the facts, you must follow the rules of law that I

22   have given you.  You may not disregard or question any rule I

23   have stated to you.  You must not substitute or follow your own

24   notion or opinion as to what the law is or ought to be.  It is

25   your job to apply the law as I have explained it to you,

O1Q5car5                    Charge

1    regardless of the consequences and that applies to all of the

2    law I am giving you.

3            Now, folks, jury service is a duty of citizenship.  We

4    all know that.  It is also a privilege.  The jury system is the

5    bedrock of our justice system.  Indeed, the right to trial by

6    jury is enshrined in two separate amendments to the

7    Constitution of the United States.  Everything we have done

8    here these past two weeks has been to enable you to decide this

9    case fairly.

10           The jury embodies what is perhaps the most fundamental

11   idea of our nation that we, the people, created it and we, the

12   people, govern it.  Indeed, the Constitution begins with these

13   words:

14           We the People of the United States, in order to form a

15   more perfect Union, establish justice, insure domestic

16   tranquility, provide for the common defense, promote the

17   general welfare, and secure the blessings of liberty to

18   ourselves and our posterity, do hereby ordain and establish

19   this Constitution for the United States of the America.

20           We the People.  You, ladies and gentlemen, you stand

21   in for all of the people and it is to you that is committed a

22   vital role in our constitutional system and that role dates

23   back to the earliest days of our nation.  The Constitution

24   vests the judicial power of the United States in one Supreme

25   Court and in those other courts that Congress sees fit to

O1Q5car5                    Charge

1    establish.  This is one of those courts.  This court, in fact,

2    has been functioning since 1789.  It was the very first United

3    States Court to hold session under the Constitution.  It did so

4    even before the first session of the United States Supreme

5    Court.  And, as jurors, you are temporarily part of this Court.

6             Since those earliest days in our nation's history --

7    through wars, through economic depressions, through

8    pandemics -- jurors like you have been asked to decide cases

9    and your role is just the same as the role of the countless

10   jurors before you.  You will be entirely fair and impartial to

11   both sides.  You will decide the case only on the evidence

12   before you.  You will decide the case on the basis of my

13   instructions on the law.  This is an important task, folks,

14   doing justice fairly and impartially.  I am confident that you

15   will do that with the utmost care.

16             Now, please remain seated.  If there are any

17   objections to the charge, as delivered, on which I have not

18   previously ruled during the charge conference, counsel should

19   come to the side bar.

20             (Continued next page)

21

22

23

24

25

O1Q5car5                        Charge

1              (At side bar)

2              THE COURT:  OK.  We will start with the plaintiff.

3              MS. CROWLEY:  Judge, page 11.  Starting on page 11,

4     line 22.  It says --

5              THE COURT:  I have to get there.

6              MS. CROWLEY:  I apologize.

7              THE COURT:  OK.  What is the objection?

8              MS. CROWLEY:  I believe there is a "not".

9              MS. HABBA:  No, I thought so and I checked it.  He was

10    right, the Judge was right.  I did the same thing.

11             THE COURT:  I'm sorry.  Somebody should tell me what

12    you are talking about.

13             MS. CROWLEY:  I apologize, Judge.  It starts on

14    page 11, line 22.

15             THE COURT:  All right.

16             MS. CROWLEY:  I instruct you, as a matter of law, that

17    Ms. Carroll did not consent to Mr. Trump's defamatory

18    statements or otherwise.

19             THE COURT:  Slow.  OK.  Did not consent or

20    otherwise -- yes, go ahead.

21             MS. CROWLEY:  -- grant him lawful permission to defame

22    her by publicly stating, in June 2019... I think it should say

23    that he had not sexually assaulted her.

24             THE COURT:  Thank you for that correction.  I will

25    delineate it.

O1Q5car5                     Charge

1          MS. KAPLAN:  One other very little one, your Honor.

2     On page 13 at the top when you made a statement about the NYAG

3     video that was shown.

4          THE COURT:  Just one more second.  When I read from

5     page 11 into page 12, did I include the "not" in what I red or

6     not?

7          MS. HABBA:  No.

8          THE COURT:  I did not.  OK.  So I will.  OK.  Next?

9          MS. KAPLAN:  On page 13 you added detail about the

10    fact that one of the videos they saw was the NYAG case and you

11    said "court trial".  I don't think it is that big a deal, they

12    had seen a deposition.

13         THE COURT:  Anybody care?

14         MS. HABBA:  No.

15         MS. KAPLAN:  I don't care.  I just wanted to raise it.

16         MS. CROWLEY:  That's it for us.

17         THE COURT:  Ms. Habba?

18         MS. HABBA:  I would just renew all of our objections

19    from yesterday, your Honor.

20         THE COURT:  OK.  Fine.

21         So what I propose to do, rather than -- I will reread

22    the sentence at the bottom of 11 and 12, and we will simply

23    make new Xerox copies to go into the jury room and for you, and

24    we will do it with just the handwritten delineation.

25         THE COURT:  OK.

O1Q5car5                          Charge

1               MS. HABBA:  Thank you, your Honor.

2               THE COURT:  Thank you, both.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  I'm human.  I left one word out.  One

3  word.

4          When I was talking about whether Ms. Carroll, by

5  revealing that Mr. Trump had sexually assaulted her, assumed

6  the risk or consented to the defendant's statements, the next

7  sentence should have been read as:  I instruct you, as a matter

8  of law, that Ms. Carroll did not consent to Mr. Trump's

9  defamatory statements or otherwise grant him lawful permission

10  to defame her by publicly stating, in June 2019, that he had

11  not sexually assaulted her.

12          I left the word "not" out the second time and the

13  correct one has the word "not" in it.  So you will find the

14  word "not" written in, by hand, to the copy sent in to the jury

15  room.

16          Now, I did neglect to mention that the exhibits that

17  are in evidence will be sent in to the jury room.  That always

18  takes a little bit of time.

19          A little bit also about schedule.  I normally require

20  counsel to remain in or in the immediate environs of the

21  courtroom so that if there is a note or a verdict, or a

22  read-back request, we can deal with it quickly rather than

23  having to find them.  The exception is going to be that your

24  lunch is waiting for you, their lunch I have no idea.  So, it

25  is now 1:40, and for the first 45 minutes you are back there

1    they're free to go get lunch and during that period we won't

2    take any verdict or answer any notes.

3              OK.  Andy, have I missed anything?

4              THE DEPUTY CLERK:  Just swearing in the marshal.

5              THE COURT:  OK.  Swear in the marshal, the officer.

6              THE DEPUTY CLERK:  Officer, please raise your right

7    hand.

8              (Marshal sworn)

9              THE COURT:  One second.  One other thing, which is how

10   long we are sitting.  This should not be taken as an indication

11   about how quickly or how much time you should take, absolutely

12   not, but we will, if you haven't reached a decision by 4:30, we

13   will break at 4:30.  Or, if you send me a note in advance that

14   you want to stay somewhat later, we will stay somewhat later

15   but we won't stay into the late night, certainly.  And if there

16   is not a verdict today, we will resume Monday.  You should

17   understand that.

18             (Jury retired to deliberate; time noted:  1:43 p.m.)

19             THE COURT:  So far as the exhibits are concerned, the

20   usual practice is that counsel go over the exhibits with Andy

21   and agree on what is to go into the jury room and Andy takes

22   them in.  Is there any objection to proceeding that way?

23             MS. KAPLAN:  No, your Honor.

24             MR. MADAIO:  No, your Honor.

25             THE COURT:  And what about the video evidence?

O1Q5car5                    Verdict

1          MR. CRAIG:  Your Honor, as Andy requested, we have a

2     laptop for the jury, we will show it to opposing counsel, and

3     we have a thumb drive with the exhibits on there that are the

4     exhibits.

5          THE COURT:  Acceptable, Mr. Madaio?

6          MR. MADAIO:  Yes, your Honor.

7          THE COURT:  OK.  Then that will be that.  Anything

8     else we have to do before we go off and have lunch?

9          MS. KAPLAN:  Not for plaintiff, your Honor.

10          THE COURT:  Ms. Habba?

11          MS. HABBA:  No, your Honor.

12          THE COURT:  OK.  Thank you.

13          (Recess pending verdict)

14          THE COURT:  I am advised that the jury has reached a

15     verdict.  We will have no outbursts and will maintain entire

16     decorum during these proceedings.

17          Bring in the jury.

18          (Jury present)

19          THE COURT:  Ladies and gentlemen.  I understand you

20     have reached a verdict.  Who is the foreperson?  Is that

21     correct?

22          THE FOREPERSON:  It is.

23          THE COURT:  Please hand the verdict to Andy.

24          The clerk will read the verdict.

25          (The Court and Deputy confer)

O1Q5car5                    Verdict

1          THE COURT:  Madam foreperson, does the "M" that

2    appears next to various numbers mean -- what does it mean?

3          THE FOREPERSON:  Million.

4          THE COURT:  Thank you.

5          THE DEPUTY CLERK:  Did Ms. Carroll prove, by a

6    preponderance of the evidence, that:

7          1.  Ms. Carroll suffered more than nominal damages as

8    a result of Mr. Trump's publication of the June 21 and June 22,

9    2019 statements?  Answer:  Yes.

10          Compensatory damages:  You award, other than for the

11    reputation repair program, $7.3 million.

12          Compensatory damages:  You award, for the reputational

13    repair program only, $11 million.

14          Question 2.  In making the June 21, 2019 statement,

15    Mr. Trump acted maliciously, out of hatred, ill will or spite,

16    vindictively, or in wanton, reckless, or willful disregard of

17    Ms. Carroll's rights?  Answer:  Yes.

18          3.  In making the June 22, 2019 statement, Mr. Trump

19    acted maliciously, out of hatred, ill will or spite,

20    vindictively, or in wanton, reckless, or willful disregard of

21    Ms. Carroll's rights?  Answer:  Yes.

22          How much, if any, should Mr. Trump pay to Ms. Carroll

23    in punitive damages?  $65 million.

24          THE COURT:  Is there a request for a poll?

25          MS. HABBA:  Yes.

O1Q5car5                         Verdict

1              THE COURT:  Poll the jury, please.

2              THE DEPUTY CLERK:  Juror no. 1, is that your verdict?

3              SEAT NO. 1:  Yes.

4              THE DEPUTY CLERK:  Juror no. 2, is that your verdict?

5              SEAT NO. 2:  Yes.

6              THE DEPUTY CLERK:  I'm sorry?

7              SEAT NO. 2:  Yes.

8              THE COURT:  Thank you.

9              THE DEPUTY CLERK:  We are referring seat numbers?

10             THE COURT:  We are referring to seat numbers, yes.

11             THE DEPUTY CLERK:  Seat no. 3, is that your verdict?

12             SEAT NO. 3:  Yes.

13             THE DEPUTY CLERK:  Seat no. 4, is that your verdict?

14             SEAT NO. 4:  Yes.

15             THE DEPUTY CLERK:  Seat no. 5, is that your verdict?

16             SEAT NO. 5:  Yes.

17             THE DEPUTY CLERK:  Seat no. 6, is that your verdict?

18             SEAT NO. 6:  Yes.

19             THE DEPUTY CLERK:  Seat no. 7, is that your verdict?

20             SEAT NO. 7:  Yes.

21             THE DEPUTY CLERK:  Seat no. 8, is that your verdict?

22             SEAT NO. 8:  Yes.

23             THE DEPUTY CLERK:  Seat no. 9, is that your verdict?

24             SEAT NO 9:  Yes.

25             THE DEPUTY CLERK:  Verdict unanimous, your Honor.

1           THE COURT:  Thank you.

2           Is there any reason why the verdict should not be

3   recorded and the jury discharged?  Ms. Habba?

4           MS. HABBA:  No, your Honor.

5           THE COURT:  The verdict will be recorded, and in due

6   course, judgment will enter.

7           Members of the jury:  There was, years ago, an

8   extraordinarily respected judge of this court who made it a

9   practice never to thank a jury.  And his theory -- Judge

10  Weinfeld's was -- was that it is a duty and a privilege of

11  being a citizen of this great country.  I agree with him about

12  most things but I don't agree with him about that.  I believe

13  juries are entitled to the thanks of all of us every time they

14  do their job.

15          I will not comment on the verdict you have reached, I

16  never do, but it has been clear to me from the beginning that

17  you paid attention, you worked, you decided this case fairly

18  and impartially and on the basis of the record and the law that

19  you were given.  That is all we can ask.

20          In just a few minutes you are going to be discharged.

21  You will be free of my order to keep your identities secret.

22  As individuals, if you want to tell somebody that you served on

23  this jury, you may.  I order you not to disclose the identity

24  of any other juror on this jury.  Those of you who wish it are

25  entitled to maintain your privacy.

O1Q5car5                         Verdict

1          My advice to you is that you never disclose that you

2     were on this jury.  And I won't say anything more about it.

3          In a minute you will be free to go, you will go back

4     into the jury room, you will collect your effects.  The

5     transportation arrangements are in place and you may leave.

6     Whatever notes there may be, leave them in the jury room, they

7     will be dealt with appropriately.

8          Again, thank you, and you may leave.  Enjoy the

9     weekend.

10         (Jury discharged)

11         THE COURT:  Please, be seated.

12         Is there any other business we need to attend to,

13    counsel?  Ms. Kaplan?

14         MS. KAPLAN:  Nothing further, your Honor.

15         THE COURT:  Ms. Habba?

16         MS. HABBA:  No, your Honor.  I would just like to

17    thank the court staff.

18         THE COURT:  You are welcome on every count.

19         OK.  We are adjourned.

20                              o0o

21

22

23

24

25