**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

E. JEAN CARROLL,

               *Plaintiff,*

    v.

DONALD J. TRUMP, in his personal capacity,

               *Defendant.*

No. 20 Civ. 7311 (LAK)

**PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION TO STAY EXECUTION OF THE JUDGMENT PENDING DISPOSITION OF THE POST-TRIAL MOTIONS**

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

    I.    TRUMP IS NOT ENTITLED TO AN UNSECURED STAY UNDER RULE 62(B) .... 2

        A.   Rule 62(b) Does Not Authorize an Entirely Unsecured Stay ...................................... 3

        B.   Trump Has Utterly Failed to Meet His Burden in Seeking Relief ............................. 4

        C.   The *Nassau* Factors Favor Carroll ...................................................................... 6

    II.   TRUMP IS NOT ENTITLED TO A STAY UNDER THE FOUR-FACTOR TEST.... 12

        A.   The Test Set Forth in *Nken* Does Not Apply Here .................................................. 12

        B.   Trump Cannot Satisfy the Traditional Four-Factor Test in Any Event ..................... 14

            1.   Likelihood of Success on the Merits .................................................................. 14

            2.   Trump Will Not Be Irreparably Harmed if a Stay is Denied.............................. 26

            3.   By Contrast, a Stay Would Substantially Injure Carroll.................................... 27

            4.   The Public Interest Weighs Against a Stay ........................................................ 27

    III.  TRUMP'S PROPOSAL OF A PARTIAL BOND IS MERITLESS............................. 28

CONCLUSION................................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*American Family Mutual Insurance Co. v. Miell*,
    No. 04 Civ. 0142, 2008 WL 746604 (N.D. Iowa Mar. 19, 2008)........................................ 28

*In re Apollo Grp. Inc. Sec. Litig.*,
    No. 04 Civ. 2147, 2008 WL 410625 (D. Ariz. Feb. 13, 2008)........................................... 14

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559, 116 S. Ct. 1589 (1996).................................................................................. 22

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003).................................................................................................... 15

*Bouveng v. NYG Cap. LLC*,
    175 F. Supp. 3d 338 (S.D.N.Y. 2016)................................................................... 16, 18, 20

*Butler v. Ross*,
    No. 16 Civ. 1282, 2017 WL 6210843 (S.D.N.Y. Dec. 7, 2017)........................................ 13

*Cantu v. Flanigan*,
    705 F. Supp. 2d 220 (E.D.N.Y. 2010) ............................................................................... 21

*Carroll v. Trump*,
    635 F. Supp. 3d 229 (S.D.N.Y. 2022)................................................................................. 14

*Carroll v. Trump*,
    No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ................... 15, 20, 21, 22

*Celle v. Filipino Rep. Enterprises Inc.*,
    209 F.3d 163 (2d Cir. 2000)................................................................................................ 22

*de la Fuente v. DCI Telecommunications, Inc.*,
    269 F. Supp. 2d 237 (S.D.N.Y. 2003)............................................................................... 3, 5

*Dexter 345 Inc. v. Cuomo*,
    663 F.3d 59 (2d Cir. 2011).................................................................................................. 26

*Dillon v. Chicago*,
    866 F.2d 902 (7th Cir. 1988) .............................................................................................. 12

*DiSorbo v. Hoy*,
    343 F.3d 172 (2d Cir. 2003)................................................................................................ 23

*EMA Fin., LLC v. Joey New York Inc.,*
    No. 17 Civ. 9706, 2022 WL 2399754 (S.D.N.Y. July 1, 2022) ........................................... 5

*Ferri v. Berkowitz,*
    561 F. App'x 64 (2d Cir. 2014) ........................................................................................ 16

*Freeman v. Giuliani,*
    No. 21 Civ. 03354 (D.D.C. Dec. 15, 2023) ................................................................ 21, 25

*Frye v. Lagerstrom,*
    No. 15 Civ. 5348, 2018 WL 4935805 (S.D.N.Y. Oct. 10, 2018) ......................................... 3

*Gilead Cmty. Servs., Inc. v. Town of Cromwell,*
    604 F. Supp. 3d 1 (D. Conn. 2022) .................................................................................. 11

*Herbert v. Lando,*
    441 U.S. 153, 99 S. Ct. 1635 (1979) ................................................................................ 22

*Hilton v. Braunskill,*
    481 U.S. 770, 107 S. Ct. 2113 (1987) ......................................................................... 12, 13

*Howell v. Town of Ball,*
    No. 12 Civ. 951, 2017 WL 6210869 (W.D. La. Dec. 7, 2017) ..................................... 14, 27

*Jennings v. Yurkiw,*
    18 F.4th 383 (2d Cir. 2021) ........................................................................................ 22, 24

*John Wiley & Sons, Inc. v. Book Dog Books, LLC,*
    327 F. Supp. 3d 606 (S.D.N.Y. 2018) ................................................................................ 5

*Johnson v. Nextel Commc'ns Inc.,*
    780 F.3d 128 (2d Cir. 2015) ............................................................................................ 23

*Kaneka Corp. v. SKC Kolon PI, Inc.,*
    No. 11 Civ. 3397, 2017 WL 11643347 (C.D. Cal. June 30, 2017) ..................................... 27

*Klingenberg v. Vulcan Ladder USA, LLC,*
    No. 15 Civ. 4012, 2017 WL 4836313 (N.D. Iowa Oct. 25, 2017) ..................................... 28

*Lafferty v. Jones,*
    No. X06-UWY-CV18-6046436-S, 2022 WL 18110184 (Conn. Super. Ct. Nov. 10,
    2022) ............................................................................................................................... 25

*Lee v. Edwards,*
    101 F.3d 805 (2d Cir. 1996) ............................................................................................ 24

*Lynch v. N.Y. Times Co.*,
   171 A.D. 399 (1st Dep't 1916) ........................................................................ 15

*Moore v. Navillus Tile, Inc.*,
   No. 14 Civ. 8326, 2017 WL 4326537 (S.D.N.Y. Sept. 28, 2017) .......................... 4, 13, 13

*In re Nassau Cnty. Strip Search Cases*,
   783 F.3d 414 (2d Cir. 2015) ........................................................................ *passim*

*Nken v. Holder*,
   556 U.S. 418, 129 S. Ct. 1749 (2009) .............................................................. 12, 13, 14

*Olin Corp. v. Lamorak Ins. Co.*,
   No. 84 Civ. 1968, 2021 WL 982426 (S.D.N.Y. Mar. 15, 2021) ................................ 2

*Osorio v. Source Enterprises, Inc.*,
   No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) ................................ 21

*Patrolmen's Benevolent Ass'n. of N.Y.C. v. N.Y.C.*,
   310 F.3d 43 (2d Cir. 2002) ........................................................................ 18

*Payne v. Jones*,
   711 F.3d 85 (2d Cir. 2013) ........................................................................ 24, 25

*Peacock v. Thomas*,
   516 U.S. 349, 116 S. Ct. 862 (1996) .............................................................. 3, 12

*People v. Trump*,
   No. 2024-01134 (1st Dep't Feb. 28, 2024) ...................................................... 9

*People v. Trump*,
   No. 452564/2022 (N.Y. Sup. Ct. Feb. 16, 2024) .............................................. 6, 7

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
   No. 15 Civ. 2739, 2023 WL 8096928 (S.D.N.Y. Nov. 21, 2023) ............................ 4

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   No. 19 Civ. 10023, 2020 WL 7711522 (S.D.N.Y. Dec. 29, 2020) .......................... 14

*Prozeralik v. Capital Cities Commc'ns, Inc.*,
   222 A.D.2d 1020 (4th Dep't 1995) .............................................................. 21

*Restivo v. Hessemann*,
   846 F.3d 547 (2d Cir. 2017) ........................................................................ 20

*Silber v. Barbara's Bakery, Inc.*,
950 F. Supp. 2d 432 (E.D.N.Y. 2013) ................................................................. 26

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
538 U.S. 408, 123 S. Ct. 1513 (2003)........................................................... 23, 24

*Tchrs. Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*,
No. 87 Civ. 1259, 1991 WL 254573 (S.D.N.Y. Nov. 21, 1991) ........................... 5

*Thorsen v. Cnty. of Nassau*,
722 F. Supp. 2d 277 (E.D.N.Y. 2010) ............................................................... 18

*Tough Traveler, Ltd. v. Outbound Prods.*,
60 F.3d 964 (2d Cir. 1995)................................................................................. 26

*Turley v. ISG Lackawanna, Inc.*,
774 F.3d 140 (2d Cir. 2014)......................................................................... 22, 24

*United States ex rel. Garibaldi v. Orleans Par. Sch. Bd.*,
No. 96 Civ. 464, 1998 WL 774172 (E.D. La. Oct. 30, 1998)............................. 14

*Yammine v. DeVita*,
43 A.D.3d 520 (3d Dep't 2007)......................................................................... 15

## FEDERAL RULES

Federal Rules of Civil Procedure Rule 62 ............................................................. *passim*

Local Rule 67.1(c) .................................................................................................. 27

## OTHER AUTHORITIES

Ben Protess & Jonah E. Bromwich, *Donald J. Trump Is Racing Against Time to Find a Half-Billion Dollar Bond*, N.Y. Times (Feb. 24, 2024) .................................................. 8

Ben Protess & Kate Christobek, *Trump Rebuffed After Asking a Judge to Delay His $454 Million Penalty*, N.Y. Times (Feb. 28, 2024) ........................................................ 8

Cailey Gleeson, *Trump Lashes Out About Legal Woes In Michigan Speech—Blasts 'Crooked Judge,' Swipes Again At Carroll*, Forbes (Feb. 18, 2024).................................... 25

Christina Jelski, *Trump's Legal Woes Sow Uncertainty for Hotel Brand*, Travel Weekly (Nov. 28, 2023)......................................................................................................... 8

David Enrich, Russ Buettner, Mike McIntire & Susanne Craig, *How Trump Maneuvered His Way Out of Trouble in Chicago*, N.Y. Times (Oct. 8, 2021)............................... 10

Dominic Patten & Ted Johnson, *Donald Trump To Pay $112K Per Day In NY Civil Trial Fraud Interest; Ex-POTUS Has 30 Days To Post $466M Bond For Appeal Or Assets Could Be Seized*, Deadline (Feb. 23, 2024) .......................................................................... 7

George Petras & Javier Zarracina, *A Complete Visual Timeline of the 4-Year Legal Battle over Donald Trump's Tax Returns*, USA Today (Dec. 30, 2022) ............................................... 10

Maggie Haberman & Shane Goldmacher, *Trump's PACs Spent Roughly $50 Million on Legal Expenses in 2023*, N.Y. Times (Jan. 30, 2024) ..................................................................... 9

Michelle Lee, *Has Trump Declared Bankruptcy Four or Six Times?* Wash. Post (Sept. 27, 2016) ......................................................................................................................................... 10

Steve Reilly, *Hundreds Allege Donald Trump Doesn't Pay His Bills*, USA Today (June 9, 2016) ......................................................................................................................................... 11

Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20, 2016) ......................................................................................................................................... 11

## INTRODUCTION

Almost one month after the jury returned its verdict in this case, Defendant Donald J. Trump filed yet another motion for a stay—this time, to stay enforcement of the judgment without a bond or any other security that would ensure that Plaintiff E. Jean Carroll's will be able to collect the $83.3 million that Trump now owes her. The reasoning Trump offers in seeking this extraordinary relief boils down to nothing more than "trust me." He doesn't offer any information about his finances or the nature and location of his assets. He doesn't specify what percentage of his assets are liquid or explain how Carroll might go about collecting. He doesn't even acknowledge the risks that now accompany his financial situation, from a half billion-dollar judgment obtained by the New York Attorney General to the 91 felony charges that might end his career as a businessman permanently. He simply asks the Court to "trust me" and offers, in a case with an $83.3 million judgment against him, the court filing equivalent of a paper napkin; signed by the least trustworthy of borrowers.

There is absolutely no basis in law for Trump's requested relief. In fact, his position fails for four independent reasons. First, Federal Rule of Civil Procedure 62(b) does not authorize unsecured stays. Second, Trump bears the burden of proof under Rule 62(b) and has obviously failed to meet that burden given that he has failed to submit any evidence with his motion. Third, under controlling Second Circuit law, Trump has not made the showings necessary to obtain relief from the presumptive obligation to post a full supersedeas bond. Finally, even if the Court were to apply the traditional four-factor stay framework (which does not apply here), Trump has not shown a likelihood of success in prevailing on his anticipated post-trial motions and every other relevant factor cuts against him. Accordingly, Trump's motion should be denied—including the cursory, unsupported request for a reduction in the bond amount that appears at the end of his brief.

1

**ARGUMENT**

## I.    TRUMP IS NOT ENTITLED TO AN UNSECURED STAY UNDER RULE 62(B)

The general rule in federal court under Rule 62(b) is simple: to secure a stay of judgment enforcement pending appeal, a party must post a supersedeas bond covering the full amount of the judgment plus interest. This requirement may be waived in favor of "other security," but only when the movant provides an acceptable alternative means of securing the judgment. *See In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015). In *Nassau*, the Second Circuit listed five non-exclusive factors to consider in assessing whether to accept such "other security" in lieu of a bond: "(1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position." *Id.* at 417-18 (citation omitted).[1]

Contrary to Trump's view, these factors are "not a device for easing the judgment burden on the losing party." *Olin Corp. v. Lamorak Ins. Co.*, No. 84 Civ. 1968, 2021 WL 982426, at *2 (S.D.N.Y. Mar. 15, 2021). They are, in fact, the opposite—"a tool geared toward ensuring a meaningful outcome for the prevailing party." *Id*. As a result, "the party seeking the stay without a bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the

---

[1] Rule 62 was reorganized in 2018, moving former Rule 62(d) to current Rule 62(b) and adding the words "other security," thereby making "explicit" the "opportunity to post security in a form other than a bond." Fed. R. Civ. P. 62, Advisory Committee Notes to 2018 Amendments.

judgment." *de la Fuente v. DCI Telecommunications, Inc.*, 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2003).

Here, Trump principally requests an "unsecured stay," without offering any security whatsoever to secure the judgment. Mot. 1-14. Under Rule 62(b), there are three independent grounds on which the Court can (and should) deny his request. First, Rule 62(b) does not permit an unsecured stay. Second, Trump has offered no evidence to satisfy his burden in making this request. And third, all the relevant *Nassau* factors cut decisively against granting him an unsecured stay in the circumstances present here.

### A.      Rule 62(b) Does Not Authorize an Entirely Unsecured Stay

The first and most basic reason why Trump's request should be denied is that Rule 62(b) does not authorize fully unsecured stays. The relief that Trump seeks is thus forbidden.

 Rule 62(b) states plainly that "[a]t any time after judgment is entered, a party may obtain a stay *by providing a bond or other security*." Fed. R. Civ. P. 62(b) (emphasis added). As a matter of simple common sense, "other security" here does not mean "no security." Instead, Rule 62(b) requires a party to give something in exchange for a stay—specifically, they must either post a full bond or, but only with permission from the court, "provide[] acceptable alternative means of securing the judgment." *Frye v. Lagerstrom*, No. 15 Civ. 5348, 2018 WL 4935805, at *1 (S.D.N.Y. Oct. 10, 2018); *see also id.* at *3 ("[T]he Rules require the district court to ensure that the judgment creditor's position is secured, ordinarily by a supersedeas bond." (quoting *Peacock v. Thomas*, 516 U.S. 349, 359, 116 S. Ct. 862, 869 (1996))). Put differently, to secure relief from the normal requirement of posting a bond, the requesting party must offer some "alternative means," the whole point of which is to make sure the appellee will be made whole in the event she succeeds on appeal. *Nassau*, 783 F.3d at 417.

But what Trump proposes here is nothing at all. In support of his position, he fails to cite a single controlling (or even persuasive) case. Instead, he gestures to a handful of scattered out-of-circuit district court cases, most of which were decided, as teenagers say today, in the "last century." Mot. 3-4, 11-12. His reliance on such flimsy authority illustrates the weakness of his position, which has been repeatedly rejected by courts in this District. *E.g.*, *Moore v. Navillus Tile, Inc.*, No. 14 Civ. 8326, 2017 WL 4326537, at *6 (S.D.N.Y. Sept. 28, 2017) (denying request when defendant made "no offer to post a partial bond, or even to accept financial oversight or other conditions that might ameliorate the plaintiffs' legitimate fears," leaving the court with no way "of fashioning an appropriate alternative form of security in this case"); *Petersen Energia Inversora S.A.U. v. Argentine Republic*, No. 15 Civ. 2739, 2023 WL 8096928, at *1 (S.D.N.Y. Nov. 21, 2023) (same and requiring the movant to "pledge alternative assets" even though case presented "extraordinary and unique circumstances").

This is an independently sufficient reason to deny Trump's motion. Under the plain language of Rule 62(b), and persuasive authority interpreting it, an entirely unsecured stay is not permissible.

### B.     Trump Has Utterly Failed to Meet His Burden in Seeking Relief

A second and separate reason to deny Trump's motion is his complete failure to carry his evidentiary burden. Rule 62(b) does not require courts to engage in guesswork or speculation, or to accept a party's assertion that they are good for the money at face value. In fact, the entire premise of Rule 62(b) is that parties with judgments against them must pay those judgments expeditiously, or must instead come forward to affirmatively prove that the money is available and will be readily collectable if they lose their appeal. As Judge Wood has succinctly explained, "[t]he burden is on the moving party to 'objectively demonstrate' the reasons why the court should

'depart from the usual requirement of a full security supersedeas bond to suspend the operation of an unconditional money judgment.'" *Tchrs. Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal*, No. 87 Civ. 1259, 1991 WL 254573, at *3 (S.D.N.Y. Nov. 21, 1991) (citation omitted); *accord de la Fuente*, 269 F. Supp. 2d at 240 (emphasizing that "the party seeking the stay without a bond has the *burden of providing specific reasons*" to depart from the presumptive bond requirement (emphasis added)). In particular, a party seeking to provide "other security" must prove under the *Nassau* standard why they should be entitled not to post a bond. *See John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 649 (S.D.N.Y. 2018).

Here, Trump makes no effort whatsoever to carry this burden. There is not a single exhibit, declaration, or affidavit—literally, no evidence at all—attached to his motion. He offers no proof of what assets he possesses, what they are worth, where they are located, whether they are liquid or illiquid, whether they are unencumbered by debt, or whether they could be used to satisfy the judgment. He offers no evidence of other debts he might currently owe or may come to owe in the months ahead. He provides no demonstration that any of these assets are readily collectible and will remain readily collectible throughout the pendency of an appeal. And he says nothing about how developments in his life, including active criminal proceedings and his election campaign (among others), may affect these matters. As to every single legally relevant consideration under *Nassau*, Trump is either totally silent or offers merely his unsworn say-so. These shortcomings, of course, are reason alone to deny Trump's motion. *See, e.g.*, *EMA Fin., LLC v. Joey New York Inc*., No. 17 Civ. 9706, 2022 WL 2399754, at *3 (S.D.N.Y. July 1, 2022) (denying motion under Rule 62(b) because defendants failed to offer "assurances that they could secure the judgment if Plaintiff prevail[ed] on appeal").

Attempting to side-step his burden, Trump claims that Caroll has "conceded" he is good for the money and is now somehow precluded from suggesting otherwise. Mot. 12. That argument is as baseless as it is misleading. To support it, Trump points to evidence that Carroll introduced at trial concerning his wealth. *Id.* (citing Ex. 1 ("Tr.") at 720-21). But evidence that Carroll offered at trial to support punitive damages is not a proper basis for Trump to seek to carry his own burden in this post-trial setting: it was his duty to offer evidence at this stage—and he offered none. Moreover, even if it were properly considered, the limited evidence that Carroll offered at trial comes nowhere close to carrying Trump's current burden under Rule 62(b). As the Court will recall, that evidence consisted of short excerpts from Trump's testimony in a suit filed by the New York Attorney General accusing him (and others) of financial fraud. It was highly generalized and reflected only how Trump subjectively understood the value of his own assets and net worth at two points in 2023. *See* Ex. 2, Ex. 3. The testimony was unspecific concerning Trump's actual net worth and distribution of assets; it included no testimony about how collectible those assets are; it did not address other debts or obligations that may affect the value or collectability of his assets; and it did not account for significant developments that have occurred since 2023 and that almost certainly had a significant impact on his overall financial position (*see infra* at 7-10). Moreover, Trump's testimony in a case where he was ultimately held liable for financial misconduct is hardly the most reliable evidence of his current financial situation and Carroll's ability to collect in any event. *People v. Trump*, No. 452564/2022 (N.Y. Sup. Ct. Feb. 16, 2024), NYSCEF Doc. No. 1688 ("NYAG Op.").

## C.     The *Nassau* Factors Favor Carroll

Even if the Court were to overlook Trump's request for unavailable relief—and his failure to offer evidence despite his burden—it should deny his motion for yet a third reason: Trump

cannot show that any of the *Nassau* factors (let alone a majority of them) support his position. In fact, Trump does not even address all of these factors, and the arguments that he does make are meritless.

As explained above, *Nassau* listed five relevant factors. *See* 783 F.3d at 417-18. The first two are concerned with the complexity and time involved in collecting on a judgment; the third and fourth address the availability of funds to pay the judgment and whether the defendant's ability to pay is "so plain that the cost of a bond would be a waste of money"; and the fifth factor (which both parties here agree is irrelevant) asks whether the defendant is in such a precarious financial situation that posting a bond would place his other creditors in an insecure position.

With respect to Trump's ability to pay (factors three and four), Trump asks the Court to simply trust that he's very rich—and that posting a bond (or other collateral) would therefore be a waste of money. Mot. 12-14. There are many reasons why this is wrong.

To begin, recent developments give rise to very serious concerns about Trump's cash position and the feasibility (and ease) of collecting on the judgment in this case. Recently, for instance, Justice Engoron found Trump and certain co-defendants liable for financial fraud in a judgment totaling $454 million with interest. NYAG Op. at 91-92. Trump has thirty days to post a bond in that case or the New York Attorney General can initiate enforcement proceedings—and, meanwhile, post-judgment interest will continue to accrue at a rate of $112,000 each day. *Id.*; *see also* Dominic Patten & Ted Johnson, *Donald Trump To Pay $112K Per Day In NY Civil Trial Fraud Interest; Ex-POTUS Has 30 Days To Post $466M Bond For Appeal Or Assets Could Be Seized*, Deadline (Feb. 23, 2024).[2] Just yesterday, a First Department judge denied Trump's request to stay this judgment. *See* Ben Protess & Kate Christobek, *Trump Rebuffed After Asking a Judge*

---

[2] https://deadline.com/2024/02/trump-fraud-trial-1235828148/.

*to Delay His $454 Million Penalty*, N.Y. Times (Feb. 28, 2024).[3] And the *New York Times* has reported that Trump may not have enough cash to cover his post-judgment obligations in the New York state case, let alone in this one. *See* Ben Protess & Jonah E. Bromwich, *Donald J. Trump Is Racing Against Time to Find a Half-Billion Dollar Bond*, N.Y. Times (Feb. 24, 2024)[4] ("As of last year, [Trump] was sitting on more than $350 million in cash — as well as stocks and bonds he can sell in a hurry — but that stockpile is well short of what he needs, according to The Times's review of his financial records. Justice Engoron's $454 million judgment and the $83.3 million judgment Mr. Trump is facing from the defamation trial involving the writer E. Jean Carroll will collectively eclipse the former president's cash reserves, forcing him to seek out a bond in both cases."). Trump does not even mention, much less address, these developments, which are obviously highly relevant to his ability to satisfy the judgment here.

Nor does Trump mention the four criminal cases he is currently facing, including one set to go to trial on March 25, 2024. *See People v. Trump*, 71543/2023 (N.Y. Sup. Ct.); *see also United States v. Trump*, 23 Cr. 257 (D.D.C.); *United States v. Trump*, No. 9:23 Cr. 80101 (S.D. Fl.); *Georgia v. Trump*, No. 23SC188947 (Fulton Cnty.). If Trump is convicted of even a subset of the 91 felony charges lodged against him, the implications for his ability to satisfy the judgment here could be significant. And even prior to a conviction, Trump's "brand"—purportedly his most valuable asset, though not one that can easily be utilized to satisfy a civil judgment—may suffer as a result of the various legal proceedings in which he is enmeshed. *See, e.g.*, Christina Jelski, *Trump's Legal Woes Sow Uncertainty for Hotel Brand*, Travel Weekly (Nov. 28, 2023).[5] That Trump has repeatedly turned to campaign donations to cover his personal legal fees in these actions

---

[3] https://www.nytimes.com/2024/02/28/nyregion/trump-bond-civil-fraud.html.
[4] https://www.nytimes.com/2024/02/24/nyregion/trump-fraud-trial-penalty.html.
[5] https://www.travelweekly.com/Travel-News/Hotel-News/Trump-legal-woes-sow-uncertainty-for-hotel-brand.

raises additional questions about his available liquidity and cashflow. Maggie Haberman & Shane Goldmacher, *Trump's PACs Spent Roughly $50 Million on Legal Expenses in 2023*, N.Y. Times (Jan. 30, 2024).[6] And all those questions only deepened yesterday, when Trump asked the First Department to decrease the bond amount he owes in the New York Attorney General litigation to $100 million, citing the need for him to resort to the unattractive option of selling off his properties in order to raise the necessary cash should his request be denied. *People v. Trump*, No. 2024-01134 (1st Dep't Feb. 28, 2024), NYSCEF Doc. No. 3 at 14, 16. As noted above, the First Department denied his request. *See id.*, NYSCEF Doc. No. 6.

More broadly, Trump is certainly not an example of someone who has fostered transparency or trustworthiness when it comes to his financial situation. Two of the trials discussed above—the Manhattan District Attorney criminal case and the New York Attorney General civil lawsuit—deal with financial impropriety. In the Manhattan District Attorney prosecution, Trump stands accused of criminal falsification of business records. *See People v. Trump*, 71543/2023 (N.Y. Sup. Ct.). In the Attorney General lawsuit, Justice Engoron already found numerous instances of financial fraud committed and aided by Trump himself: Trump "repeatedly falsified business records with the intent to defraud" and knowingly issued false financial statements that misstated his "financial condition or ability to pay" in some material respect. NYAG Op. at 80. As Judge Engoron further observed, such financial impropriety did not stop when the court appointed an Independent Monitor (former Southern District of New York Judge Barbara S. Jones) to oversee the Trump Organization during the pendency of the fraud proceedings. The Independent Monitor reported that Trump and his co-defendants had inappropriately transferred approximately $40 million in assets out of the Donald J. Trump Revocable Trust without notifying her, and "submitted

---

[6] https://www.nytimes.com/2024/01/30/us/politics/trump-legal-fees.html.

disclosures to third parties that fail[ed] to include significant liabilities" as recently as January 2024. NYAG Op. at 86. To add a rotten cherry on top, in seeking to stay the Attorney General's enforcement of the state court judgment, Trump "attempt[ed] to change the business address of six entity Defendants to Florida [even] as the record established those entities are located in Trump Tower at 725 5th Avenue in New York." *People v. Trump*, No. 452564/2022, NYSCEF 1695. These judicial determinations that Trump has lied about his financial situation, violated rules meant to ensure compliance, and attempted to shift the address of his assets all underscore the need for a supersedeas bond to protect Carroll's interest in the judgment here.

Trump's behavior over the past decades further supports that conclusion. After running for office and being elected president, Trump engaged in a four-year battle to keep his tax returns private, bucking the decades-long, standard practice of presidential candidates giving the public accurate information about their financial situation. George Petras & Javier Zarracina, *A Complete Visual Timeline of the 4-Year Legal Battle over Donald Trump's Tax Returns*, USA Today (Dec. 30, 2022).[7] Even before that, Trump maintained a long history of attempting to skirt his debts: between 1990 and 2009, his companies declared bankruptcy six times. *See* Michelle Lee, *Has Trump Declared Bankruptcy Four or Six Times?* Wash. Post (Sept. 27, 2016)[8]; *see also* David Enrich, Russ Buettner, Mike McIntire & Susanne Craig, *How Trump Maneuvered His Way Out of Trouble in Chicago*, N.Y. Times (Oct. 8, 2021).[9] Of course, Trump also has a history of outright refusing to pay people what he owes under the law, as some of his former lawyers have reportedly

---

[7] https://www.usatoday.com/in-depth/graphics/2022/12/30/trump-tax-returns-release/10960010002/.
[8] https://www.washingtonpost.com/politics/2016/live-updates/general-election/real-time-fact-checking-and-analysis-of-the-first-presidential-debate/fact-check-has-trump-declared-bankruptcy-four-or-six-times/.
[9] https://www.nytimes.com/2020/10/27/business/trump-chicago-taxes.html.

experienced. *See* Steve Reilly, *Hundreds Allege Donald Trump Doesn't Pay His Bills*, USA Today (June 9, 2016).[10]

For all these reasons, and considering Trump's failure to offer any evidence or address any of these points, the *Nassau* factors concerning Trump's ability to pay cut decisively against him. There is absolutely no reason to believe that Trump has so much readily collectible cash on hand that requiring him to secure the judgment with a supersedeas bond would be superfluous.

These same facts also favor Carroll in connection with two other *Nassau* factors: the "complexity of the collection process," and the "amount of time required to obtain a judgment after it is affirmed on appeal." 783 F.3d at 417. And even beyond the facts noted above, additional considerations weigh in Carroll's favor concerning the potential challenges of collection. For instance, Trump and the Trump Organization's assets are notoriously complex. Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20, 2016).[11] Many of those assets appear to be illiquid real estate holdings spread around the world—assets with complex legal entanglements and unstable value. *See John Wiley & Sons, Inc.*, 327 F. Supp. at 649 ("[I]t it appears that Defendants' net worth consists largely of illiquid assets, likely complicating any collection effort."); *see also Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 604 F. Supp. 3d 1, 33 (D. Conn. 2022) ("Courts have refused to waive the bond requirement where the payment process was complex and the time for collection of the judgment after appeal would be lengthy."). The presence of the Independent Monitor installed by Justice Engoron would only add further complexity to any collection effort, as would Trump's record of scorched-earth tactics in resisting accountability.

---

[10] https://www.usatoday.com/story/news/politics/elections/2016/06/09/donald-trump-unpaid-bills-republican-president-laswuits/85297274/.
[11] https://www.nytimes.com/2016/08/21/us/politics/donald-trump-debt.html.

Moreover, by the time the post-trial motions (or the appeal) are fully resolved, Trump may be in a very different position. He could then be President of the United States; he could then be a convicted criminal serving time behind bars; or, given his advanced age, Carroll may be forced to reckon with his estate. Any of these developments could substantially complicate collection efforts here.

## II.     TRUMP IS NOT ENTITLED TO A STAY UNDER THE FOUR-FACTOR TEST

Given that Trump has failed on three separate grounds to support his request for relief, the Court can and should deny his motion under Rule 62(b) alone. But if the Court proceeds to consider any of the other arguments that Trump raises in his brief, it should deem them meritless as well.

### A.     The Test Set Forth in *Nken* Does Not Apply Here

As an alternative to the established Rule 62(b) framework discussed above, Trump argues that he is somehow entitled to a stay under the "traditional four-factor test for equitable relief." Mot. 3. But requests for relief from the bond requirement in Rule 62(b) are governed by *Nassau*, not by the four-factor test recognized in *Nken*. *See also Peacock*, 516 U.S. at 359, 116 S. Ct. at 869 ("[T]he Rules require the district court ensure that the judgment creditor's position is secured, ordinarily by a supersedeas bond.").

In *Nassau*, the Second Circuit considered the test to be applied when assessing whether to waive the supersedeas bond requirement after expiration of Rule 62's automatic stay, and adopted the five-factor test established by the Seventh Circuit in *Dillon v. Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988). The parties in *Nassau* had briefed the motion for a stay under the four-factor framework enumerated in *Hilton v. Braunskill*, 481 U.S. 770, 107 S. Ct. 2113 (1987), and later applied in *Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749 (2009). *See* Pl.-Appellees Decl. for Stay at 2, *In re Nassau Cnty. Strip Search Cases*, No. 14-1388(L), 14-1437 (2d Cir.), ECF No. 100-1; Def.-Appellants Decl. Opp'n to Mot. Stay at 9, *In re Nassau Cnty. Strip Search Cases*, No. 14-

1388(L), 14-1437 (2d Cir.), ECF No. 91-2. But the Second Circuit rejected that approach, holding that, "in contrast to the traditional stay factors," the five-factor *Dillon* test "more directly address the primary purpose of Rule 62(d) [now, Rule 62(b)]: to ensure recovery for a party who ultimately prevails on appeal, and to protect the judgment debtor from the risk of losing the money if the decision is reversed." *Nassau*, 783 F.3d at 418.

District courts have since required parties seeking relief from the bond requirement under Rule 62(b) to satisfy the five *Nassau* factors. *See Moore*, 2017 WL 4326537, at *4 (holding that the traditional four factors "appl[y] only when the judgment sought to be stayed is for injunctive or other equitable relief."); *Butler v. Ross*, No. 16 Civ. 1282, 2017 WL 6210843, at *2 (S.D.N.Y. Dec. 7, 2017) ("[A] motion for a stay of a money judgment is assessed under the announced test for Rule 62[b], which is separate and apart from the test used when assessing a Rule 62(c) motion."). And for good reason. In *Hilton*, where the traditional stay factors were first announced, a state government sought a stay of a successful habeas petitioner's release from custody pending the state's appeal. In that context, "which is akin to obtaining a stay of an injunction rather than a stay of a money judgment," the Supreme Court introduced and applied the traditional stay factors. *Moore*, 2017 WL 4326537 at *4 (citing *Hilton v. Braunskill*, 481 U.S. 770, 107 S. Ct. 2113 (1987)). Similarly, in *Nken*, the Court applied the four stay factors in deciding whether to stay the removal of an alien pending appeal—a scenario analogous to obtaining a stay of an injunction, rather than a stay of a money judgment. 556 U.S. at 433, 129 S. Ct. at 1760. As a result, as Judge McMahon has noted, "nothing in *Nken* suggests" that its four-factor test applies to a case in which "a judgment debtor seeks to stay enforcement of a money judgment against it without complying with Rule 62[b]'s bond requirements." *Moore*, 2017 WL 4326537 at *4.

Trump cites only one post-*Nassau* decision from this District suggesting that a stay of enforcement of a money judgment might be granted by reference to either the *Nassau* or *Nken* factors. Mot. 2. In that case, however, the court's decision to grant the plaintiff's stay request was rooted, almost exclusively, in the fact that the plaintiff had provided adequate security (in the form of a pledge agreement) to satisfy the "other security" requirement of Rule 62(b). *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, 2020 WL 7711522, at *2 (S.D.N.Y. Dec. 29, 2020). Only after concluding that a stay was warranted under *Nassau* did the Court address *Nken*, and its analysis of those factors was limited to a footnote. *Id*. at 2 n.5. Accordingly, there is no reason to interpret *Petroleos* as standing for the mistaken proposition that the *Nken* factors control in this setting. The better view is that the *Nassau* test is the only one that matters in evaluating Trump's motion here.

### B.    Trump Cannot Satisfy the Traditional Four-Factor Test in Any Event

But even if *Nken* did apply, Trump could not satisfy his burden under its four factors.

#### 1.    Likelihood of Success on the Merits

First and most fundamentally, if the *Nken* framework applies, Trump's motion should be denied because he has not established "the requisite strong likelihood of success" in reducing the jury award. *Carroll v. Trump*, 635 F. Supp. 3d 229, 235 (S.D.N.Y. 2022); *see Nken*, 556 U.S. at 434, 129 S. Ct. at 1761 (requiring more than a "mere possibility" of success).[12]

---

[12] The first argument in Trump's brief is that an unsecured stay is appropriate "where the amount of the judgment is uncertain and likely to be affected by the disposition of post-trial motions." Mot. 3. The claim that some vague notion of "uncertainty" is enough for a stay would upend *Nken* test, which requires a "strong likelihood of success." *Carroll*, 635 F. Supp. 3d at 235. Trump identifies no binding precedent for such a proposition, and the three out-of-circuit district court cases he cites (at Mot. 3-4) are easily distinguished. *See Howell v. Town of Ball*, No. 12 Civ. 951, 2017 WL 6210869, at *4 (W.D. La. Dec. 7, 2017) (denying motion to waive or reduce bond requirement for failure to "prove … that the judgment creditor would be able to recover on his judgment if no bond is posted"); *In re Apollo Grp. Inc. Sec. Litig.*, No. 04 Civ. 2147, 2008 WL 410625, at *1 (D. Ariz. Feb. 13, 2008) (granting stay in "unusual circumstances" where "because of the per-share nature of the damages, the total amount of [the] judgment will not be known until the claims process is completed"); *United States ex rel. Garibaldi v. Orleans Par. Sch. Bd.*, No. 96 Civ. 464, 1998 WL 774172, at *1 (E.D. La. Oct. 30, 1998) (granting motion for stay without bond based on state statute making school boards exempt from requirement of a supersedeas bond). But Trump's reliance on, for example, a

A "trial judge enjoys discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence, and this discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 4612082, at *17 (S.D.N.Y. July 19, 2023) (cleaned up). In considering a motion to reduce a damages award, "[t]he role of the [judge] is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.* The judge must "bear in mind, however, that [he] should only grant such a motion when the jury's verdict is egregious" and "should rarely disturb a jury's evaluation of a witness's credibility." *Id.* In considering whether an award comes within the confines of state law, "[t]he relevant standard is not whether an award deviates *at all* from past awards—it is whether an award deviates *materially* from *reasonable compensation*." *Id.* (cleaned up) (emphases in original).

Trump mostly ignores this deferential standard. Mot 7. Applying it here demonstrates that Trump is not likely to succeed in reducing either the compensatory or punitive damages award.

***Compensatory damages.*** "In a libel case, more perhaps than in any other, the jury is generally considered to be the supreme arbiter on the question of damages." *Lynch v. N.Y. Times Co.*, 171 A.D. 399, 401 (1st Dep't 1916). "In actions for other torts there is generally some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." *Yammine v. DeVita*, 43 A.D.3d 520, 521 (3d Dep't 2007) (cleaned up). Indeed, the law presumes damages arising from defamation *per se*, *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir.

---

decades-old Eastern District of Louisiana unpublished decision reveals everything the Court needs to know about the strength of his position.

2003), and juries are instructed that defamation damages cannot be proven with "mathematical accuracy," *Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (quoting N.Y. Pattern Jury Instr., Civil 3:29). Because the assessment of damages is "peculiarly within the jury's province," a court "must use prudence and restraint … in the exercise of its discretion over these awards." *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (omission in original).

Against this backdrop, the jury awarded Carroll $18.3 million in compensatory damages. ECF 280 at 1. Before reaching that number, the jury was instructed that Carroll was entitled "to fair and just compensation for the injury to her reputation and for any humiliation and mental anguish in her public and private lives that was caused by the defamatory statements in question." Tr. 788. The jury was further instructed that fair and just compensation should account for: (1) Carroll's "standing in the community"; (2) the "nature of Mr. Trump's statements made about her"; (3) "the extent to which those statements were circulated"; (4) "the tendency of those statements to injure [her]"; and (5) "all of the other facts and circumstances in the case." *Id.* at 789. While noting that "[f]air compensation" for those harms "may vary," the Court told the jury that it could award a "substantial sum if you decide that the injury was substantial." *Id.*

At that point, the jury was instructed to classify its damages into two separate buckets. The first bucket encapsulated "the amount you award for all defamation compensatory damages attributable to the June 21 and 22 statements, excluding the reputation repair program that was discussed during Professor Humphreys' testimony." *Id.* at 791. The second bucket covered "the amount of damages, if any, that you award for the reputation repair program for" those two statements. *Id.* Ultimately, the jury allocated $7.3 million to the first and $11 million to the second. ECF 280 at 1.

In the instant motion, Trump claims that he is likely to prevail in overturning only the $7.3 million in damages that are unrelated to the reputation repair program. Mot. 7. But his challenge to that portion of the award rests on two erroneous foundations: he incorrectly states that the $7.3 million award was only for "emotional distress," and further errors in claiming that Carroll's "claim of emotional distress" is "garden variety." *Id.* at 7-8. Examination of the actual record and governing caselaw confirms that the verdict here was not a material deviation from reasonable compensation.

*First*, the $7.3 million that the jury awarded went beyond damages solely for emotional distress. Neither the jury instructions nor the verdict form limited the first category of damages to emotional distress damages. Tr. 791; ECF 280 at 1. The only express limitation was "compensatory damages … *other than for the reputation repair program*." ECF 280 at 1. Put simply, costs for the reputation repair program do not cover all the harms that Carroll endured as a result of Trump's defamation spree. The jury heard evidence of Carroll's hard fought and well-respected career as an advice columnist, and how Trump—the man who sexually assaulted her—shattered that career in less than 24 hours, *see, e.g.*, Tr. 71, 179-180, 517-18. This resulted in both psychological injury and tangible, continuing economic harm. Carroll used to write the nation's leading advice column, read by millions and millions of people; now, her Substack column has just 28,000 subscribers, with only 1,800 subscribers who pay. *Id.* at 181, 467. Carroll used to make $50,000 or more per year doing freelance work for other magazines on a wide range of topics; in 2023, she completed only $500 in freelance work. *Id.* at 183. Moreover, Caroll separately testified to the added steps that she should now take to protect her security—and stated that she was unable to take certain additional steps because of the high cost. *Id.* at 137-39. All of this evidence, as well further testimony about Carroll's public standing, the nature and circulation of Trump's statements, and

the backlash provoked by Trump's attacks, went into the damages finding. In that respect, Trump is simply wrong to describe the $7.3 million award as just for emotional harm.

*Second*, this is not a case of "garden variety" emotional harm in any event. Mot. 7-8. In fact, nothing about this case is garden variety. That description of Carroll's emotional injury blinks reality.

As courts have recognized, emotional harm can fall into several categories—and can be elevated into a more substantial bucket based on the nature of the defendant's conduct. "More offensive conduct" will support "significant" emotional distress awards. *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010). And "outrageous or shocking" conduct will allow for even more. *Id.* (noting that "egregious emotional distress claims generally involve *either* outrageous or shocking discriminatory conduct *or* a significant impact on the physical health of the plaintiff" (emphases added)). That principle reflects how the jury was instructed. Tr. 789.

Trump, for his part, ignores the nature of his conduct entirely, and asserts that Carroll's damages must be categorized as "garden variety" because her injuries are supported by her testimony alone. Mot. 8-9. However, "[a] court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." *Bouveng*, 175 F. Supp. 3d at 328; *see also Patrolmen's Benevolent Ass'n of N.Y.C. v. N.Y.C.*, 310 F.3d 43, 55 (2d Cir. 2002) (explaining that more substantial emotional distress damages can be supported by plaintiff's testimony and "the objective circumstances of the violation itself").

Trump's conduct and the objective circumstances of the violation are fatal to his argument regarding garden variety harm. Trump made his two defamatory statements when he was President of the United States Ex. 4, Ex. 5; Tr.104. He maliciously lied and attacked the woman he knew he had sexually assaulted by calling her a liar, a fraud, a political hack, a paid political operative, and

an enemy of all survivors of sexual assault. Ex. 4, Ex. 5. He threatened her twice by warning that she should "pay dearly" and was playing in "dangerous territory." Ex. 4, Ex. 5. On a conservative estimate, his statements generated at least 85 to 104 hundred million impressions within a few days—and surely generated many more over time. Tr. 384-85. Those statements ruined Carroll's reputation and unleashed an onslaught of hateful (and at times terrifying) online attacks that have continued for years. *Id.* at 110, 132-35. Trump made these statements for the apparent purpose of making sure he got away with sexual abuse. Considering all this, it is difficult to imagine a more objectively extreme version of defamation. Labeling the resulting pain and mental anguish that Trump caused by committing this egregious conduct "garden variety" is absurd.

Trump's conduct, coupled with Carroll's testimony of severe emotional distress, more than adequately supports the jury's damages award in this case. As Carroll testified, Trump's statements completely eliminated Carroll's sense of security and self. Carroll testified that because of Trump's statements she now "liv[es] in a new universe": "to have the president of the United States, one of the most powerful persons on earth, calling me a liar for three days and saying I'm a liar 26 times— I counted them—it ended the world I had been living in, and I [had] a new world." *Id.* at 104-05. Carroll further explained the onslaught of hateful and threatening messages that she received in the days following his statements and that she continues to receive today. *See, e.g.*, *id.* at 109-10, 114-15, 121-23. Those messages menace her life and well-being, calling her a liar, a fraud, a political hack, a paid operative, ugly, too disgusting to touch or to rape. *E.g.*, Ex. 6, Ex. 7, Ex. 8, Ex. 9, Ex. 10, Ex. 11, Ex. 12. These attacks echoed the lies that Trump spread about Carroll in his June 21 and 22 statements. *See* Ex. 4, Ex. 5. They copied his words and made good on his threats.

None of the comparator cases cited by Trump even remotely approaches this situation. Mot. 8-11. "Although a review of comparable cases is appropriate," the ultimate question is simply

"whether the verdict lies within the reasonable range." *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017). Here, the cases that Trump cites do not establish that the verdict is unreasonable. As this Court recognized in rejecting the comparator cases Trump cited in his motion for a new trial in *Carroll II*, the facts and circumstances of the cases Trump cites were "materially different from the facts and evidence in this case." *Carroll*, 2023 WL 4612082, at *25. Those cases, like these cases, did not "involve[] the scale of attention and influence commanded when the defendant in this case chooses to speak publicly." *Id.* Nor did they compare "in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a 'hoax,' and accused you of making up a horrific accusation to sell a 'really crummy book.'" *Id.*[13]

Nor does Trump's reliance on the verdict in the earlier trial in *Carroll II* help his cause. There, the jury awarded Carroll $1 million in non-reputation campaign damages and $1.7 million for a reputation repair campaign based on a single defamatory statement that generated 13 and 18 million impressions. *Carroll II*, ECF 174; Ex. 13. Here, the jury awarded $7.3 million and $11 million for the same two categories of damages, based on two defamatory statements that were the first ones Trump made about Carroll and that generated at least *85 to 104 hundred million* impressions. Comparing the relevant numbers, it becomes clear that the proportion of reputation repair damages to other compensatory damages was similar across both cases, and the compensatory damages in *Carroll I* increased (in part) in proportion to the greater impressions that Trump's June 2019 statements generated. Thus, even putting aside the many additional factors that would justify a higher award here—including the greater evidence of harm presented at the *Carroll*

---

[13] To demonstrate the differences, in one case Trump cites, *Bouveng v. NYG Cap. LLC*, 500,000 people viewed the defamatory statements over the course of eight months. 175 F. Supp. 3d at 338. Here, Trump's two statements got upwards of 104 million or more views on the days the relevant articles were published alone. Tr. 384-85.

*I* trial and the greater reprehensibility of then-President Trump's 2019 conduct—the verdict in *Carroll II* supports the reasonableness of the verdict here. Notably, Trump has not challenged any aspect of the *Carroll II* damages award on appeal, *see Carroll v. Trump*, No. 23-793 (2d Cir.), ECF 74, rendering laughable his claim that Carroll's other compensatory damages in this case cannot exceed $125,000, Mot. 10.

The soundness of the jury's damages award in this case is further underscored by cases containing comparatively high compensatory damages awards. *See, e.g.*, *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226-31 (E.D.N.Y. 2010) ($150 million in non-economic damages for injury to reputation and humiliation and mental anguish; farce legal complaint in which defendant described plaintiff as an operations manager of a racketeering enterprise who was involved with drug cartels and at one point had conspired with Saddam Hussein); *Osorio v. Source Enterprises, Inc.*, No. 05 Civ. 10029, 2007 WL 683985, at *1, *6 (S.D.N.Y. Mar. 2, 2007) ($4 million in emotional distress damages for "intentional" retaliation; Editor-in-Chief of a prominent publication was "summarily dismissed in retaliation for filing a complaint of gender discrimination"); *Freeman v. Giuliani*, No. 21 Civ. 03354 (D.D.C. Dec. 15, 2023), ECF 135 (two plaintiffs; $20 million each in emotional distress); *see also Prozeralik v. Capital Cities Commc'ns, Inc.*, 222 A.D.2d 1020, 1021 (4th Dep't 1995) (upholding jury's awards of $6,000,000 for injury to reputation and $3,500,000 for noneconomic emotional harm for defamatory comment on a local radio and television station). These cases only support the conclusion that the jury verdict in this case fell within the reasonable range of awards for the kind of conduct Trump engaged in and the kinds of harms Carroll incurred. *Carroll*, 2023 WL 4612082, at *17.

**Punitive damages.** Trump is equally unlikely to succeed in demonstrating that the jury's $65 million punitive damages award should be reduced. Mot. 4. In reviewing the reasonableness

21

of punitive damages awards, courts consider three "guideposts": (1) "'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598-99 (1996)). That analysis fully supports the punitive damages award here.

*First,* the degree of reprehensibility in this case is exceedingly high. This factor is the most important of the three. *Turley*, 774 F.3d at 165. In assessing it, courts have considered "whether a defendant's conduct was marked by violence or presented a threat of violence," or "evinced trickery or deceit as opposed to mere negligence," and whether "the record supports a finding of intentional malice." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021). The evidence at trial here more than fits the bill and firmly established that Trump acted with substantial malice in defaming Carroll: Trump had sexually assaulted Carroll before he defamed her; he knew he had sexually assaulted her when he accused her of fabricating her accusations for a slew of nefarious purposes, ruining her career as a trusted advice columnist in the process; and in each of his defamatory statements, Trump threatened Carroll, warning that she would "pay dearly" and had entered "dangerous territory" by coming forward. Ex. 4, Ex. 5; *Carroll*, 2023 WL 4612082, at *2. The degree of reprehensibility here is only exacerbated by the false and offensive statements that Trump continued to make about Carroll even after losing the *Carroll II* trial—as well as by the statements he made while standing trial in this very proceeding.[14] *See Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643 n.12 (1979); *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 184 (2d Cir. 2000).

---

[14] *See* Ex. 14, Ex. 15, Ex. 16, Ex. 17, Ex. 18, Ex. 19, Ex. 20, Ex. 21, Ex. 22, Ex. 23, Ex. 24, Ex. 25, Ex. 26, Ex. 27, Ex. 28, Ex. 29.

*Second*, the disparity between the harm or potential harm suffered and the size of the punitive damages award is of no constitutional concern. This factor asks "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003). Here, the jury awarded a ratio of 3.6:1 in punitive to compensatory damages. Neither precedent nor logic support Trump's argument that the Court must reduce that ration to 1:1. Mot. 6-7.

In *State Farm Mutual Automobile Insurance Co. v. Campbell, the Supreme Court* explained that "we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. … We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." 538 U.S. 408, 424-25, 123 S. Ct. 1513, 1524 (2003). The Court did, however, identify a few principles to guide lower courts. For example, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* This established 9:1—not 1:1—as the presumptive outer limit for most cases. And while the Court noted that there may be instances involving large compensatory awards where a "lesser ratio, perhaps only equal to compensatory damages" may be the limit, the Court proceeded to emphasize the individualized nature of the inquiry in its very next sentence: "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

The Second Circuit has heeded this guidance. Thus, it has repeatedly reaffirmed that "[t]here is no rigid upper limit on a ratio of punitive damages to compensatory damages," declining repeated invitations to impose such categorical rules. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d

128, 149 (2d Cir. 2015); *see also Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013). That is also true of the Second Circuit's decision in *Turley*, on which Trump principally relies. Mot. 5-6. There, the court invoked a 2:1 ratio based on common law principles, but cautioned that "[w]e are not called upon to, at least at this time, and do not, decide whether a more sizable punitive award would be constitutionally permissible." 774 F.3d at 167. Finally, the Second Circuit has explained that "[e]ven where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages." *Jennings v. Yurkiw*, 18 F.4th 383, 391-92 (2d Cir. 2021); *accord State Farm*, 538 U.S. at 416, 123 S. Ct. 1519.

Those principles support the punitive damages awarded in this case. The ultimate ratio is 3.6:1, well within *State Farm*'s general limits. Nor does the size of the compensatory award require a reduction of the punitive damages: based on the evidence presented to the jury, the principal function of punitive damages in this case was not as a supplement to the compensatory award, but rather as specific deterrence to Trump from continuing to defame Carroll. For instance, the jury heard evidence that Trump had been held liable for sexual battery and defamation in *Carroll II*, and within minutes, had repeated the defamatory statements on his Truth Social account. Ex. 14, Ex. 15. The jury also heard evidence that Trump posted similar statements attacking Carroll four times during this very trial—and in one of those statements he promised to never stop. Ex. 28. This conduct, together with the general evidence of Trump's wealth, Ex. 2, Ex. 3, justified a higher punitive damages award. *See Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) ("Deterrence is directly related to what people can afford to pay"). These circumstances further distinguish this case from *Turley*, which did not refer to deterrence even once as justifying the punitive award there.

Of course, courts sometimes remit punitive damages awards because they go well beyond what is necessary for deterrence. *See Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013). But that concern is not present in this case. Here. there was undisputed evidence that Trump's defamation of Carroll actually *increased* after a separate jury found him liable in *Carroll II*, and Trump publicly promised to defame Carroll "a thousand times" more during the trial in *Carroll I* (where liability had already been determined). Ex. 28; ECF 214. On multiple of those occasions, Trump used his lies about Carroll to promote his political campaign. Ex. 15; Ex. 20, Ex. 21. In fact, last week and just days before filing his motion to stay, Trump continued to falsely deny knowing Carroll—illustrating that, if anything, even a $63 million punitive award may have been insufficient to deter Trump from further defamation. *See* Cailey Gleeson, *Trump Lashes Out About Legal Woes In Michigan Speech—Blasts 'Crooked Judge,' Swipes Again At Carroll*, Forbes (Feb. 18, 2024).[15]

*Third*, and finally, the difference between the remedy in this case and the penalties imposed in comparable cases is no basis for remittitur. This brief has articulated the many ways in which the circumstances of this case are unique. In any event, other juries have awarded equal or greater punitive damages in reasonably comparable recent defamation cases. *See, e.g.*, Verdict, *Freeman v. Giuliani*, No. 21 Civ. 03354 (D.D.C. Dec. 15, 2023), ECF 135 (two plaintiffs; $75 million in punitive damages); *Lafferty v. Jones*, No. X06-UWY-CV18-6046436-S, 2022 WL 18110184, at *10 (Conn. Super. Ct. Nov. 10, 2022) (awarding roughly $473 million in punitive damages to family members of victims and a first responder to the December 14, 2012 Sandy Hook shooting resulting from repeated defamation and other torts committed by Alex Jones).

---

[15] https://www.forbes.com/sites/caileygleeson/2024/02/18/trump-lashes-out-about-legal-woes-in-michigan-speech-blasts-crooked-judge-swipes-again-at-carroll/?sh=3929d37e783e.

### 2.    Trump Will Not Be Irreparably Harmed if a Stay is Denied

It is "well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011). Trump insists, without more, that he will incur "substantial, non-recoverable financial costs" if he must post a supersedeas bond under Rule 62(b). Mot. 13. But this vague assertion of harm falls well short of establishing cognizable irreparable injury in this context.

At the outset, there is always a strong presumption that the payment or non-payment of money cannot constitute irreparable injury because money can always be returned. *Dexter 345 Inc.*, 663 F.3d at 63. Trump, moreover, fails to offer any evidence of supposed non-refundable costs at issue. And Trump's insistence on urgency is squarely at odds with his lackadaisical pace: as the Court has already noted, he waited "[t]wenty-five days after the jury verdict in this case, and only shortly before the expiration of Rule 62's automatic stay of enforcement of the judgment" to file this request. ECF 289; *see Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) ("District Courts should generally consider delay in determining whether to grant a preliminary injunction." (collecting cases)); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[F]ailure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.").

In any event, an unsecured stay is not necessary to avoid the harms that Trump describes. In *Carroll II*, Trump posted the full amount of the judgment plus interest in an account with the Court. *See Carroll II*, ECF 209. Rule 62(b) permits money to be maintained in an interest-bearing account as a form of "other security" and as an alternative to posting a supersedeas bond, thus providing Trump with a separate option for satisfying his obligations under the Rules without

incurring the fees often associated with obtaining a bond. *See also* Local Rule 67.1(c). Carroll would have no objection to a similar arrangement in this case. Trump cannot manufacture a claim of irreparable harm by ignoring an option readily available to him that he has already used at least once before.[16]

### 3.     By Contrast, a Stay Would Substantially Injure Carroll

Trump argues that a stay will not injure Carroll because an "unsecured stay while post-trial motions are pending poses minimal risks." Mot. 11. As explained above, however, Trump's premise is factually incorrect. Indeed, it is hard to imagine greater risk and potential harm to Carroll than requiring her to bear the burden of the uncertainty surrounding Trump's finances and assets (not to mention the collectability of a judgment).

### 4.     The Public Interest Weighs Against a Stay

Finally, the public interest cuts against a stay as well. Trump offers only a single sentence on this point, asserting that the "public interest … weighs against imposing additional, needless financial consequences from a manifestly excessive verdict." Mot. 14. But Trump has it exactly backwards. Rule 62(b)'s plain text, which applies to all civil litigants in federal court and has no exception for former presidents or people who claim to be very rich, reflects a public interest against unsecured stays. "The purpose of the rule is to ensure 'that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that

---

[16] Trump once again fails to find support for his position in the authorities he relies on. Trump cites *Nassau* for the uncontroversial point that "where the defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money." Mot. 13 (quoting *Nassau*, 783 F.3d at 417). But *Nassau* made this point in the context of recognizing the district court's authority to allow the "appellant [to] provide[] an acceptable alternative means of securing the judgment," 783 F.3d at 417, which Trump has not, and in any event, does not stand for the position that posting a bond in those circumstances qualifies as irreparable injury under the traditional stay factors. *Kaneka Corp.* says the same in that context, further illustrating Trump's practice of mixing cases across the two distinct standards for points those cases cannot and do not support. No. 11 Civ. 3397, 2017 WL 11643347, at *3 (C.D. Cal. June 30, 2017). The Louisiana district court case Trump relies on pertains to the payment of municipal funds, raising considerations that are not present here. *See Howell*, 2017 WL 6210869, at *2.

payment cannot be recouped if the decision should be reversed.'" *Nassau*, 783 F.3d at 417 (citation omitted).

### III.       TRUMP'S PROPOSAL OF A PARTIAL BOND IS MERITLESS

As an apparent fallback, Trump asks this Court to permit a "substantially reduced bond." Mot. 14. This request should be rejected on its face: he offers virtually no reasoning to support it; he has otherwise failed to satisfy any of the requirements set forth in Rule 62(b); and he has not provided any details about the terms of, or actual availability of, a partial bond for any amount.

In any event, Trump's request fails on its own terms. To the extent that Trump contends that his proposal of a partial bond is sufficient because Carroll at most will recover $22.25 million (as he says above the line) or $36.6 million (as he says in a footnote), Mot. 15, he cannot show any likelihood of success on the merits of his arguments. *See supra* at 14-25. He certainly cannot show a likelihood that this Court (or the Second Circuit) would reduce the award to either of the two specific figures cited in his brief—which is what he would have to show for this Court to conclude that the partial bond fully ensures Carroll's recovery. And there is no sound basis to allow such back-of-the-envelope calculations, sketched roughly in a single paragraph at the end of his brief, to thwart Carroll from the assurance she is entitled to under Rule 62(b) that she will be able to collect the judgment in full when she prevails, as she will.[17]

---

[17] Once again, the out-of-circuit cases that Trump cites do not command a different conclusion. Mot. 14. In *Klingenberg v. Vulcan Ladder USA, LLC*, the court held that that the movant, like Trump here, offered "no evidence or argument" sufficient to demonstrate that "anything less than a supersedeas bond in the full judgment amount should be required." No. 15 Civ. 4012, 2017 WL 4836313, at *3 (N.D. Iowa Oct. 25, 2017). In *American Family Mutual Insurance Co. v. Miell*, the magistrate judge's decision was focused on the court's rejection of the request for an unsecured stay, and it did not provide any reasoning for the amount of the bond it ordered. No. 04 Civ. 0142, 2008 WL 746604, at *1-*3 (N.D. Iowa Mar. 19, 2008). And in *In re Apollo Group*, as already discussed above, the court was faced with a situation where there could not be any certainty regarding total amount of judgment until "the claim process was completed" given the "per-share nature" of the award. 2008 WL 410625 at *1.

## CONCLUSION

For the foregoing reasons, the Court should deny Trump's motion.

Dated: New York, New York
       February 29, 2024

Respectfully submitted,

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Fax: (212) 564-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
Fax: (212) 564-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

29