# EXHIBIT 1

O1HsCAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

E. JEAN CARROLL,

                Plaintiff,

      v.                          20 CV 7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                Defendant.               TRIAL

------------------------------x

                             New York, N.Y.
                             January 17, 2024
                             10:00 a.m.

Before:

               HON. LEWIS A. KAPLAN,

                           District Judge

                  APPEARANCES

KAPLAN HECKER & FINK LLP
    Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
    SHAWN G. CROWLEY
    MATTHEW J. CRAIG

HABBA MADAIO & ASSOCIATES LLP
    Attorneys for Defendant
BY:  ALINA HABBA
    MICHAEL T. MADAIO
    PETER SWIFT
    PETER GABRA

O1HsCAR1                    Carroll - Direct

1    was your reputation in the world?

2    A.  Well, I'm 80 years old.  So I spent 50 years building a

3    reputation as a magazine journalist both in articles and as an

4    advice columnist.  My column was very popular.  People

5    appreciated my articles because I stuck to the truth and used

6    the facts.

7    Q.  And I think you just testified a minute ago, Ms. Carroll,

8    that as a result of Mr. Trump's defamation, your reputation was

9    shattered.

10            How was it shattered after June 2019?

11   A.  Well, yesterday -- I haven't looked today -- but yesterday,

12   I opened up Twitter and it said, Hey lady, you're a fraud.

13            So, previously, I was known as simply as a journalist

14   and had a column, and now I'm known as the liar, the fraud, and

15   the whack job.

16   Q.  Now, you testified that in addition to being a writer,

17   Ms. Carroll, you're also an advice columnist, is that correct?

18   A.  Yes.

19   Q.  And is reputation important to an advice columnist?

20   A.  Well, yes.  People are not dying to write to an advice

21   columnist who the president says is a disgrace.  People write

22   to advice columnists because they want to get tips and get

23   their problems solved so they can live delightfully and not,

24   like, disgracefully.

25   Q.  Now, Ms. Carroll, is this the first time you have sat in

O1HsCAR1                    Carroll - Direct

1          MS. HABBA:  Objection.

2          THE COURT:  On what ground?

3          MS. HABBA:  Speculation.  It's not the definition.

4    She's assuming.

5          THE COURT:  Overruled.  You can cross-examine.

6    Q.  Now, Ms. Carroll, we've just looked at three statements

7    from Donald Trump, then the president of the United States,

8    over a very brief period in June of 2019?

9    A.  Yes.

10   Q.  Can you tell the jury, what did it feel like to have the

11   president of the United States say those kind of things about

12   you at that time in June?

13   A.  Well, to have the president of the United States, one of

14   the most powerful persons on earth, calling me a liar for

15   three days and saying I'm a liar 26 times -- I counted them --

16   it ended the world that I had been living in, and I -- and a

17   new world.

18   Q.  In terms of that new world, Ms. Carroll, what happened to

19   you after Donald Trump made those statements?

20   A.  I was attacked.

21          (Continued on next page)

22

23

24

25

O1GQcar2                              Carroll - Direct

```
 1   BY MS. KAPLAN:  (Continued)
 2   Q.  How were you attacked?
 3   A.  I was attacked on Twitter.  I was attacked on Facebook I
 4   was attacked in news blogs.  I was brutally attacked in
 5   messages.  As I said, it was a new world.  I had left the world
 6   of facts, a lovely world, and I was living in a new universe.
 7   Q.  How quickly did those attacks happen, Ms. Carroll?
 8   A.  Instantaneously.
 9   Q.  And how did you know that those attacks were the result of
10   what Mr. Trump had said?
11   A.  Because many of the -- much of the wording that people used
12   repeated Donald Trump's words.
13   Q.  I'm going to show you for identification, Ms. Carroll, a
14   document that's been marked as Plaintiff's Exhibit 59.  And,
15   again, without divulging the contents, can you just identify
16   what this document is?
17   A.  Yes, this is a Facebook chat.
18   Q.  To whom was it addressed?
19   A.  To me.
20            MS. KAPLAN:  Plaintiff moves for the admission of 59,
21   your Honor.
22            THE COURT:  Received.
23            (Plaintiff's Exhibit 59 received in evidence)
24   Q.  Do you know the person who sent this to you, Ms. Carroll?
25   A.  No.
```

1           MS. KAPLAN:  Plaintiff moves for the admission of 71,

2     your Honor.

3           THE COURT:  It's received.

4           (Plaintiff's Exhibit 71 received in evidence)

5     Q.  And what is the date this message was sent, Ms. Carroll?

6     A.  This is the Monday, June 24, 2019.

7     Q.  Does the person who sent this message say anything that we

8     haven't seen in the prior messages?

9     A.  Yes.  He talks about how ashamed I should be for making up

10    a fake story because I make it so much harder on the true

11    victims of abuse.

12    Q.  Did Donald Trump say anything like that?

13    A.  Yes.

14    Q.  Before June 2019, Ms. Carroll, on your Ask E. Jean email

15    account that we just looked at, did you receive emails that

16    were critical of your column?

17    A.  Oh, yeah.

18    Q.  What kind of criticisms were they?

19    A.  Well, if I advised -- let's say I advised a husband how to

20    fight with his wife, not to let it get out of bounds, maybe the

21    husband's sister wrote in and said, "Listen, I gave him better

22    advice than you did and this is what I said."  So I tended to

23    like those because I became a better advice -- I learned a lot

24    from my correspondence because it kept me in line and would

25    always tell me that they're -- you know, they would give me

O1GQcar2                          Carroll - Direct

1   ideas about how to answer the next question better.

2   Q.  Before June 2019, Ms. Carroll, did you ever receive

3   messages like the three we just looked at on your Ask E. Jean

4   email account or anywhere else?

5   A.  Never.

6   Q.  How did receiving messages like this, Ms. Carroll, make you

7   feel?

8   A.  Well, I thought I -- I thought I had lost something very

9   important.  Here's the thing.  I understand that people have

10  lost a lot more than I have.  I understand that people have

11  been through a lot more than I have ever been through in my

12  life, but this laid me low.  It -- it was so unexpected from a

13  place where I felt that I was doing well in the world and

14  helping people.

15  Q.  Did the messages like this continue, Ms. Carroll?

16  A.  They've never stopped.

17  Q.  How often do you receive them?

18  A.  All the time.

19  Q.  When you say "all the time," every day?

20  A.  Yes.  Scores and scores, sometimes hundreds a day.

21  Q.  Do the messages that you have been receiving since

22  June 2019 share any common themes?

23  A.  Yes.

24  Q.  What are those themes?

25  A.  You're a liar.  You hurt victims.  You are ugly.  Those are

O1GQcar2                           Carroll - Direct

1    A.   It means that she wants me to receive this message and know

2    how ugly I am and what a liar I am.

3    Q.   Did you respond to this message, Ms. Carroll?

4    A.   No.

5    Q.   Now, you'll see, especially on the bottom one from July, it

6    talks about answering to God?

7    A.   Yes.

8    Q.   Did you get messages that talked about you answering to

9    God?

10   A.   Yes.

11   Q.   Can you explain?

12   A.   Well, they want God to punish me.  Not want God.  Know God.

13   They know God will punish me. Other people want the devil to

14   punish me.  It goes both ways.

15   Q.   I'm going to ask Mr. Termonfils to put up another document,

16   Ms. Carroll.  It's Plaintiff's 45 for identification.

17          Again, if you could just tell us what type of document

18   this is?

19   A.   This is an email.

20   Q.   To whom was it addressed?

21   A.   Ask E. Jean.

22          MS. KAPLAN:  Plaintiff moves for the admission of 45,

23   your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 45 received in evidence)

O1GQcar2                        Carroll – Direct

```
1    Q.  This is the same Ask E. Jean column we were talking about
2    before?
3    A.  Yes.
4    Q.  What's the date on here?
5    A.  June 23.
6    Q.  Is this person asking you for advice?
7    A.  No.  Quite the contrary, I remember this email because it
8    hurt my feelings because she said she wasn't going to ask me
9    for any advice.
10   Q.  Why did that hurt your feelings?
11   A.  My whole career, my whole reason for being a happy person
12   is I feel like I'm giving good advice and helping people.
13   Q.  Ms. Carroll, this email asked you how much George Soros
14   paid you to lie about president Trump.  Do you see that?
15   A.  Yes.
16   Q.  Do you know who George Soros is?
17   A.  Yes.
18   Q.  Who is he?
19   A.  He's a very rich old man.
20   Q.  Have you ever met George Soros?
21   A.  No.
22   Q.  Have you ever been to a party where George Soros was there?
23   A.  No.
24   Q.  Did George Soros pay you to lie about Donald Trump?
25   A.  No.
```

1               (Jury present)

2               THE COURT:  A little earlier Plaintiff's Exhibit 6 was

3     received.  There was then an objection.  One page of it may

4     have been exhibited to the jury.  I'm going to strike Exhibit 6

5     now without prejudice to its being offered at a subsequent

6     time, and the jury, unless it is received in evidence, will

7     disregard it.

8               MS. KAPLAN:  Thank you, your Honor.

9               THE COURT:  Let's continue.  You may continue,

10    Ms. Kaplan.

11    BY MS. KAPLAN:

12    Q.  Mr. Termonfils, can you please put up for Ms. Carroll

13    Plaintiff's Exhibit 85.

14              Ms. Carroll, do you recognize the document in front of

15    you?

16    A.  Yes, it's a tweet.

17    Q.  And who posted the original tweet?

18    A.  I did.

19              MS. KAPLAN:  Your Honor, plaintiff moves for the

20    admission of Plaintiff's Exhibit 85.

21              THE COURT:  Received.

22              (Plaintiff's Exhibit 85 received in evidence)

23    Q.  Ms. Carroll, what is the date of the tweet here that you

24    posted?

25    A.  June 20, 2019.

O1GQcar2                          Carroll - Direct

1   Q.  How does that relate in time to Mr. Trump's statements?

2   A.  This is two days beforehand.

3   Q.  Just so the record is clear, let me make sure we have that

4   right.

5   A.  It's one day.  He made the statement June 21.  This is

6   June 20.

7   Q.  What is this tweet, what's it about?

8   A.  I'm offering advice.  That's a picture of Zelda Fitzgerald.

9   I'm saying the best way to deal with heartache is a 6,000-mile

10  road trip.

11  Q.  Is there a reply to your tweet, Ms. Carroll?

12  A.  Yes.

13  Q.  And when was the reply posted?

14  A.  June 21, 2019.

15  Q.  And is there anything in this reply, Ms. Carroll, in terms

16  of the statements about you that we haven't seen before?

17  A.  Pretty much hit all the high spots.

18  Q.  Does this reply tweet talk about your mental health?

19  A.  Yes.  Psychological messed up to lie about something to

20  draw sales to the book.

21  Q.  Is the theme you were psychologically messed up, is that a

22  theme that you saw in tweets in other messages that you

23  received?

24  A.  Continually.

25  Q.  How, if at all, Ms. Carroll, did the messages you received

O1GQcar2                          Carroll - Direct

1    following June 2019 comment on your appearance?

2    A.  Many.  Many.  Many commented on the way I look.

3    Q.  What kinds of things did they say?

4    A.  Oh, well, just I'm too ugly to go on living.

5    Q.  How did receiving messages like that make you feel?

6    A.  It makes it hard for a girl to get up in the morning,

7    really.  To put on some lipstick, I will avoid a mirror.  You

8    know, it makes me feel bad.  I know I'm old.  I know I'm 80.  I

9    know I'm not a pretty, young woman, but it makes it tough to

10   get on with the day when you open up to see what the breaking

11   news is, and people see you ugly, scrawny, hag, and so that's

12   not a good way to start the day.

13   Q.  Let's take a look -- if you could put up, Mr. Termonfils,

14   Plaintiff's Exhibit 43 for Ms. Carroll.

15          Ms. Carroll, what kind of a document is this?

16   A.  This is an email.

17   Q.  Was it sent to you?

18   A.  It's sent to my personal email.

19          MS. KAPLAN:  Plaintiff moves for the admission of 43,

20   your Honor.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 43 received in evidence)

23   Q.  Ms. Carroll, do you have any idea -- do you know the person

24   who sent this to you?

25   A.  No.

O1GQcar2                         Carroll - Direct

1   A.  Yes, this is a Facebook message.

2   Q.  To whom was it addressed?

3   A.  This is to me.

4            MS. KAPLAN:  Plaintiff moves for admission of 126.

5            THE COURT:  Received.

6            MS. KAPLAN:  I'm wrong.  128.  I'm wrong.

7            THE COURT:  128 is received, not 126.

8            (Plaintiff's Exhibit 128 received in evidence)

9   Q.  Ms. Carroll, was this message you're looking at now

10  different than some of the messages you received?

11  A.  Yes.

12  Q.  How and why?  Compound.  I object to my own question.

13  How was it different?

14  A.  This person wants me to know it's not himself who is

15  threatening me, but his friend wants to kill me and this man

16  cannot stop him.

17  Q.  If you could put up in front of Ms. Carroll — now I'm on

18  the right number, Mr. Termonfils — plaintiff's 126.

19            Before we get there, in addition to threats of killing

20  you, did you receive any other threats of violence?

21  A.  Yes.

22  Q.  What kind of violence?

23  A.  Raping.  Raping me.

24  Q.  Mr. Termonfils, if you could put up in front of Ms. Carroll

25  Plaintiff's 126, please.

O1GQcar2                              Carroll – Direct

1              Ms. Carroll, do you recognize this document?

2      A.   Yes, I do.

3      Q.   What type of document is it?

4      A.   This is a Facebook message.

5      Q.   To whom was it sent?

6      A.   Me.

7              MS. KAPLAN:  Plaintiff moves for the admission of 126,

8      your Honor.

9              THE COURT:  Received.

10             (Plaintiff's Exhibit 126 received in evidence.

11     Q.   What's the date on this one?

12     A.   This is one day after last year's trial.

13     Q.   What does this person want to have happen to you?

14     A.   Rape and murder.

15     Q.   Now, if you look below the main message, it says something.

16     What does it mean, the second paragraph?

17     A.   It means Jack Daniels Melissa tried to call me.

18     Q.   Did you ever speak to that person?

19     A.   No.

20     Q.   Mr. Termonfils, can you show Ms. Carroll Plaintiff's 114.

21             Ms. Carroll what type of document is this?

22     A.   This is an email to my Ask E. Jean.

23     Q.   What's the date?

24     A.   September 9, 2023.

25             MS. KAPLAN:  Plaintiff moves for the admission of 114,

O1GQcar2                         Carroll – Direct

1    your Honor.

2              THE COURT:  114 received.

3              (Plaintiff's Exhibit 114 received in evidence)

4    Q.  How many months after the trial was over -- we've just been

5    looking at ones for May.  How many months later is this one?

6    A.  Three and a half months -- four months.

7    Q.  I'm going to show you two more, but I'm going to do them at

8    once, Ms. Carroll, if you don't mind.

9              Mr. Termonfils, can you put up in front of

10   Ms. Carroll — they're both short — Plaintiff's 124 and

11   Plaintiff's 130.  And maybe if you could go to the second page.

12             Ms. Carroll, do you recognize what these documents

13   are?

14   A.  Yes.

15   Q.  What are they?

16   A.  They're Facebook messages.

17             MS. KAPLAN:  Plaintiff moves for the admission of 124

18   and 130, your Honor.

19             THE COURT:  They're received.

20             (Plaintiff's Exhibits 124 and 130 received in

21   evidence)

22   A.  I'm sorry that people in the courtroom have to see this

23   picture.

24   Q.  Ma'am, I'm sorry to have to ask you about it, Ms. Carroll,

25   but when you got a message like these, how would you react?

O1GQcar2                          Carroll - Direct

A.  I'm -- the image would flash into my mind.  I couldn't help
but picture it.  I couldn't help but feel it was imminent.  The
heart would, you know, constrict and start to pound, and it's
funny, the body believes it's going to happen.  My brain knows
it's just a picture, don't worry, but my body thinks something
entirely different.  It feels like it's going to happen.

Q.  So, Ms. Carroll, when we looked at some of the earlier
messages talking about you being ugly or a liar, some of those
were posted on public media sites?

A.  Yes.

Q.  The messages threatening violence are all sent to you
privately.  Is that correct?

A.  Yes.

Q.  Do you understand what the reason for that is?

A.  Well, they would be not allowed to put on public social
media these kinds of threats.

Q.  So we've seen some pretty horrible messages, Ms. Carroll,
and the question I have to ask is, why didn't you just delete
your social media account?

A.  Well, social media is my lifeblood.  It's where I'm
connected with my family and friends.  It's where I see -- you
know, I could watch my nephew win his swimming race.  I could
see my friend's sweater she knit.  And as a journalist, it's
where I publish my latest pieces.  It's where I read page.  My
favorite journalists are on social media.  It's where I see

O1HsCAR3                        Carroll - Direct

1  BY MS. KAPLAN:

2  Q.  Is it remote where you live?

3  A.  Yes.

4  Q.  Do you live alone?

5  A.  Yes.  Well, with my dogs.

6  Q.  And since you started getting messages like these, what, if

7  any, steps have you taken to protect yourself?

8  A.  Well, I have a pit bull, rescue.  He's a great dog, but I

9  never, never had him off the leash.  When the first threats

10  came in, I let him off the leash, and he now patrols the place,

11  I must say, very eagerly and enthusiastically.

12  Q.  And how do you make sure that he stays on your property?

13  A.  Put in an electronic fence.

14  Q.  And what other steps have you taken?

15  A.  I alerted the neighbors to be on the watch and I bought

16  bullets for the gun I had inherited from my father.

17  Q.  Where do you keep that gun?

18  A.  By my bed.

19  Q.  Are there any steps you take, Ms. Carroll, when you're

20  driving?

21  A.  There is hardly a moment in the day when I don't take steps

22  to be aware of what is going on.  Driving, I watch before I

23  pull out of my driveway.  I pay attention to everything going

24  on around me, who is behind me, who is in front of me.  I am

25  hyperalert.

O1HsCAR3                          Carroll - Direct

1    Q.   What about when you run errands?

2    A.   Yes.   Choosing a parking place, looking to see who's

3    around, looking to see if I should open the car door, should I

4    drive on, doing the errand.   And then, on the way home, making

5    sure nobody is following me.   If a car turns into my road

6    behind me, I never stop at my house.   I drive to the end of it,

7    to the road.

8    Q.   Have there been any instances where you changed your

9    behavior because of these security concerns you have?

10   A.   I change direction a lot.   There was also a time at the

11   grocery, I had parked in a really safe space.   I had gone to

12   the grocery.   I had done two weeks' worth of shopping.   I had

13   the cart filled to the brim.

14        I'm on the way out to my car with the cart, and I see

15   a man leaning against my car like this, he was wearing a brown

16   shirt and brown pants, waiting for me.   So I backed up with my

17   cart and went back in the grocery and stood behind the wall and

18   watched for him to leave.   And as soon as he walked away and I

19   hadn't seen him anyplace else, then I quickly exited the store,

20   got in my car, and drove home.

21        When I arrived in the driveway and opened my car door,

22   I discovered I had left my entire cart of groceries in the

23   grocery store.   That's how hyperalert I am.   I was way more

24   attentive to my surroundings than I was to the food I had just

25   bought.

O1HsCAR3                          Carroll - Direct

1    Q.  Have the security measures that you have been talking

2    about, Ms. Carroll, have they been effective?

3    A.  Yes.

4    Q.  Do you have personal security with you at this trial?

5    A.  Yes.

6    Q.  Did you have personal security with you at the last trial?

7    A.  Yes.

8    Q.  Have you thought about having personal security with you

9    more often?

10   A.  Many times.

11   Q.  Why don't you?

12   A.  I can't afford it.

13   Q.  Did you report any of the threatening messages you received

14   or others that you may have received, did you report any of

15   them to the police?

16   A.  No.

17   Q.  Why not?

18   A.  I would be reporting stuff to the police -- I wouldn't do

19   it.  It wouldn't do any good.

20   Q.  Why wouldn't it do any good?

21   A.  There is nothing they can do about it.

22   Q.  Ms. Carroll, any of the messages that we looked at today or

23   any other messages like them, threatening you with violence,

24   did you share any of those messages with your friends?

25   A.  No.

1   A.  Yes.

2   Q.  Have you gotten used to -- by now, have you gotten used to

3   receiving attacks like that?

4   A.  Never.  I will never -- never get used to attacks like

5   that.

6   Q.  But as we've touched on, you also received positive

7   messages after the verdict?

8   A.  Yes.  Yes.

9   Q.  And from time to time, people would recognize you and

10  congratulate you on the verdict?

11  A.  Yes.

12  Q.  And positive articles were written in the media?

13  A.  Yes.

14  Q.  Didn't that fix your reputation for you, Ms. Carroll?

15  A.  No.

16  Q.  Why not?

17  A.  Because so many more people hated me.

18  Q.  Would you say, Ms. Carroll, that you're more famous since

19  you sued Donald Trump?

20  A.  Yes.  I'm better known.

21  Q.  And are you better known by people who admire you or people

22  feel differently?

23  A.  I'm better known by the people who think I'm a liar --

24  people who didn't know who I was --

25           MS. HABBA:  Objection.  Your Honor, she is speaking to

O1HQcar4                          Carroll - Direct

1    what other people think.

2                THE COURT:  Overruled.

3    Q.  You can finish answering.

4    A.  People who didn't know me from Adam.  People who didn't

5    care about me, really don't care about this person, they now

6    have opinions about me, and that is that I'm a liar.

7    Q.  Now, you testified earlier about your advice column for

8    *Elle* magazine.  For how many years did you write that column?

9    A.  27 years.

10   Q.  How does that compare to the length of other advice

11   columns?

12   A.  It was the longest currently running advice column in

13   American publishing.

14   Q.  When did you stop writing that column?

15   A.  Two thousand -- at the end of 2019.

16   Q.  Do you still write an advice column today?

17   A.  Yes.

18   Q.  How do you do that?

19   A.  I publish it on Substack.

20   Q.  Excuse my ignorance, what is Substack?

21   A.  Substack is a platform where writers can publish directly

22   to their readers.

23   Q.  When did you start publishing your advice column on

24   Substack?

25   A.  2021.

O1HQcar4                          Carroll - Direct

1   Q.  Do you make money from publishing on Substack?

2   A.  Yes.

3   Q.  How does that work?

4   A.  Well, I'm a writer.  I have to feed the dogs and feed

5   myself.  I earn my money by my writing, and so readers pay to

6   read my Substack, and also I have readers who can read it for

7   free.

8   Q.  So how many readers do you have total?  How many

9   subscribers do you have on Substack in total approximately?

10  A.  Subscribers, so 28,000.  I just checked this morning.

11  Q.  About how many of those are paid subscribers?

12  A.  1,800.

13  Q.  Has the number of your Substack -- has the number of your

14  subscribers on Substack increased since you started it?

15  A.  Yes.  Yes, it has.

16  Q.  Have the number of your Twitter followers increased since

17  2019?

18  A.  Yes.

19  Q.  Do you earn any money from your followers on Twitter?

20  A.  No.

21  Q.  What does it mean, Ms. Carroll, to write freelance?

22  A.  Freelance is where you send articles and pitch articles to

23  editors at magazines.  So you're not under contract.

24  Q.  And before June 2019, did you write articles freelance for

25  various magazines?

O1HQcar4                         Carroll - Direct

1   specify which year, please?

2             THE COURT:  That is a proper question for

3   cross-examination unless counsel wants to go into it.

4   Q.  Let me try to ask it this way.  In the years 2017, 2018,

5   how much money, if you can recall, were you making from writing

6   freelance articles?

7   A.  '17 and '18, probably 50,000 a year.

8   Q.  How much did you make from writing freelance articles in

9   2023?

10  A.  So far?  500,000 -- 500,000 -- $500.

11  Q.  Ultimately, Ms. Carroll, how did your book sell?

12  A.  It was a dud.

13  Q.  Now, you testified earlier about being asked to appear on

14  TV shows as an advice columnist.  Do you recall that?

15  A.  Yes.

16  Q.  Do you still get asked to appear on TV shows as an advice

17  columnist?

18  A.  No.

19  Q.  When did that stop?

20  A.  2019.

21  Q.  Last month, Ms. Carroll, did you happen to post any

22  messages on Twitter?

23  A.  Yes.

24  Q.  What kind of a message did you post on Twitter last month?

25  A.  I posted dog videos, and I posted a Christmas message.

O1IQcar1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

E. JEAN CARROLL,

                    Plaintiff,

             v.                          20 CV 7311 (LAK)
                                              Trial
DONALD J. TRUMP, in his
personal capacity,

                    Defendant.

------------------------------x

                                         New York, N.Y.
                                         January 18, 2024
                                         9:40 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                         District Judge
                                          -and a Jury-

                          APPEARANCES

KAPLAN HECKER & FINK LLP
      Attorneys for Plaintiff
BY:  ROBERTA ANN KAPLAN
      SHAWN G. CROWLEY
      MATTHEW J. CRAIG

HABBA MADAIO & ASSOCIATES LLP
      Attorneys for Defendant
BY:  ALINA HABBA
      MICHAEL T. MADAIO
      PETER SWIFT
      PETER GABRA

O1IQcar3                              Humphreys - Direct

1    A.   Sure.  So for this, I used a service that -- where you can

2    search newspapers, and I searched for Ms. Carroll's name and

3    the statement.

4    Q.   And how many print articles did you find that shared the

5    June 21st or 22nd statement?

6    A.   That was ten articles, again, in mainstream news like the

7    *Washington Post*, the *Chicago Tribune*, *USA Today*.

8    Q.   How did you determine the total number of times that those

9    statements were read in those newspapers?

10   A.   So, again, I added up the readers from each article to get

11   2.3 million impressions.

12   Q.   Maybe you said this already, but how do you know how many

13   readers each of these newspapers has?

14   A.   So, again, I consulted a third-party source that provides

15   those numbers for advertisers.

16   Q.   And what was the total number of times that the June 21st

17   and 22nd statements were viewed in newspapers?

18   A.   It was 2.3 million times.

19   Q.   We just walked through several different forms of media.

20   Were you able to estimate the total number of times that

21   Trump's June 21st and 22nd statements were viewed in all of

22   those forms of media?

23   A.   Yes.  So here you add up each channel.  For the social

24   media channel, you have an estimate between 25.3 and 7 million.

25   And then you add the others that were from publicly available

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1IQcar3                          Humphreys - Direct

1   sources to get a range between 104 million impressions and

2   85.8 million impressions.

3   Q.  Were there any instances in which the statements may have

4   been seen or heard that your analysis didn't take into account?

5   A.  Yes.  So I started with just the articles in the complaint

6   in this case.  I didn't include articles that were not in the

7   complaint that mentioned the statement.  I also didn't include

8   entire platforms, such as Facebook or Reddit.  I didn't include

9   television that wasn't in this database, so that would have

10  been local television.  I also didn't include -- sometimes on

11  television that will be on YouTube, rebroadcast on YouTube, and

12  I didn't include those.  I didn't include the mention of

13  statements on podcast, on radio, or word of mouth.

14  Q.  For television, did you include broadcasts that referenced

15  or paraphrased the statements?

16  A.  No, I included only direct locations.

17  Q.  So in your opinion, was your total impression number likely

18  an undercount.

19  A.  Yes, I considered it an undercount.

20  Q.  Now, after estimating the number of times that Trump's

21  June 21st and 22nd statements were seen or heard, what did you

22  do next?

23  A.  Next I needed to understand what impact, if any, did those

24  statements have on Ms. Carroll's reputation.

25  Q.  I believe you said earlier that's called an impact

O1IQcar5                          Humphreys - Cross

1   A.  This was an article that came across my newsfeed.

2   Q.  Did you perform any analysis of what Ms. Carroll's

3   reputation was before June 2019?

4   A.  Yes.

5   Q.  And you stated she was a celebrated journalist **at** *Elle*

6   magazine, right?

7   A.  Yes.

8   Q.  Among other things?

9   A.  Among other things.

10  Q.  And you represented that Ms. Carroll reached about

11  4.5 million readers during her time at *Elle*, right?

12  A.  Yes, that's the number that *Elle* gives for its circulation.

13  Q.  Okay.  And that number, the 4.5 million, that's from your

14  report, right, or you cite that in your report, correct?

15  A.  I do, yeah.

16  Q.  And in your report, you also state that you weren't able --

17  you were unable to find readership data prior to 2020.  Isn't

18  that correct?  I can refresh your recollection.

19  A.  If you tell me what page.  I don't argue with you.  What

20  page is it?

21  Q.  It's footnote 136.

22          THE COURT:  What document, please?

23          MR. MADAIO:  It's the October 14, 2022 report.

24          THE COURT:  Plaintiff's 202.  What's the footnote?

25          MR. MADAIO:  Footnote 136, which is page 41.

O1PQcar1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   E. JEAN CARROLL,

 4                   Plaintiff,

 5           v.                          20 CV 7311 (LAK)
                                              Trial
 6   DONALD J. TRUMP, in his
     personal capacity,
 7
                     Defendant.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         January 25, 2024
10                                       9:50 a.m.

11   Before:

12                       HON. LEWIS A. KAPLAN,

13                                       District Judge
                                          -and a Jury-
14                           APPEARANCES

15   KAPLAN HECKER & FINK LLP
          Attorneys for Plaintiff
16   BY:  ROBERTA ANN KAPLAN
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG
          JOSHUA MATZ
18
     HABBA MADAIO & ASSOCIATES LLP
19        Attorneys for Defendant
     BY:  ALINA HABBA
20        MICHAEL T. MADAIO
          PETER SWIFT
21        PETER GABRA

22

23

24

25
```

O1PQcar1                         Myers - Direct

1  sued, meaning, you know, she did the work.  But I will say that

2  all of the journalists that worked for us did the work.

3  Q.  Would you have hired an advice columnist or other

4  journalist who was not considered a truth-teller?

5  A.  No.

6  Q.  What role, if any, did you have in determining how much

7  Ms. Carroll was paid for writing her column?

8  A.  All of it.

9  Q.  Did the amount that Ms. Carroll was paid change during the

10  time you were editor-in-chief?

11  A.  It did.

12  Q.  In which direction?

13  A.  I gave her a raise.

14  Q.  Why did you decide to do that?

15  A.  Well, because she was -- well, she was beloved by the

16  readers.  I would say she was probably the most prominent

17  columnist -- she was the most prominent columnist that we had,

18  and I thought of her column as a sort of destination, meaning

19  people picked up the magazine and would often go to her column

20  first.  That's what they told us in, you know, any number of

21  like ways that we would talk to our readers, it was something

22  that we discovered.  But also because she's great.  She's great

23  at her job.

24  Q.  In your 30-plus years in the magazine industry, did you

25  have occasion to read advice columns written by other writers?

O1PQcar1                          Myers – Direct

1   A.  I did.

2   Q.  How would Ms. Carroll's column compare to those?

3   A.  Well, I think that her column was sort of the leader of the

4   pack, and I think it actually inspired a lot of other

5   publications like ours and others not like ours, like, you

6   know, *New York* magazine to bring on, you know, sort of similar

7   talent, and, you know, try to follow E. Jean.  And, look, I'm

8   not saying they weren't good at what they do, but, you know,

9   E. Jean I think probably did it the longest in terms of the

10  modern magazine world.

11  Q.  Did Ms. Carroll's column run the entire 17 years you were

12  editor-in-chief?

13  A.  Yes.

14  Q.  Why did you leave *Elle* at year 17?

15  A.  Because my contract was not renewed.

16  Q.  When you left them, was Ms. Carroll still writing her

17  column?

18  A.  She was.

19  Q.  How would you describe its popularity at that moment in

20  time?

21  A.  High.  I mean, again, you know, she was still as popular as

22  she was, you know, when I started in 2000.  Actually, her

23  popularity grew, so it was high.

24          MR. CRAIG:  No further questions.

25          THE COURT:  All right.  Thank you.  Cross.  Ms. Habba.

O1Q5car1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   E. JEAN CARROLL,
4                 Plaintiff,
5            v.                          20 CV 7311 (LAK)
6   DONALD J. TRUMP, in his
    personal capacity,
7
                  Defendant.             TRIAL
8
    ------------------------------x
9                                        New York, N.Y.
                                         January 26, 2024
10                                       9:38 a.m.
11  Before:
12                      HON. LEWIS A. KAPLAN,
13                                       District Judge
14                          APPEARANCES
15  KAPLAN HECKER & FINK LLP
         Attorneys for Plaintiff
16  BY:  ROBERTA ANN KAPLAN
         SHAWN G. CROWLEY
17       MATTHEW J. CRAIG
18  HABBA MADAIO & ASSOCIATES LLP
         Attorneys for Defendant
19  BY:  ALINA HABBA
         MICHAEL T. MADAIO
20       PETER SWIFT
         PETER GABRA
21
22
23
24
25
```

1  part is that those false denials and attacks have continued

2  during this trial.  Last week, while Ms. Carroll was still on

3  the stand, Donald Trump walked out of this courtroom and then

4  out of the courthouse to hold a press conference.  During that

5  press conference, while you were sitting in this jury box, he

6  told even more lies about Ms. Carroll.

7                    Go ahead and play it.

8           (Video played)

9           MS. KAPLAN:  He told a similar lie in his *Truth Social*

10 post you have up on the screens in front of you where he said

11 he never heard of her, never touched her and had nothing to do

12 with her.  But he made his most damning statement, his most

13 reprehensible statement of all last Thursday.  You could put

14 that up.  He said, and I quote, "I've said it once and I'll say

15 it again, a thousand times, I never heard of E. Jean Carroll,

16 never touched her or in any way would want to touch her."

17          A thousand times?  Are you kidding me?  Donald Trump

18 has openly made it his mission to destroy Ms. Carroll's

19 reputation and credibility by lying about her, and that he's

20 prepared to keep doing it a thousand times unless you make him

21 stop.

22          And in figuring out what kind of damages would

23 actually cause Donald Trump to stop, to stop attacking

24 Ms. Carroll, there is another very important thing for you to

25 consider.  As you have seen, Donald Trump is a very wealthy

1    man.  He has said that his brand alone is worth $10 billion.

2    He said it's the hottest brand in the world.  And that doesn't

3    include his other assets, which are also substantial.  He

4    testified under oath in the case in the other deposition you

5    saw yesterday, that Mar-A-Lago is worth $1.5 billion; that

6    another property in Florida, the Doral, is worth $2 and a half

7    billion --

8            MR. MADAIO:  Objection.  Your Honor, these are not

9    personal assets she's referring to.

10           THE COURT:  Overruled.  The jury will remember the

11   testimony.

12           MS. KAPLAN:  That's $14 billion right there, ladies

13   and gentlemen.  Donald Trump is prepared to use his wealth and

14   power to defame people whenever he wants.  He ignored the last

15   jury verdict as if it had never happened.  In fact, you heard

16   him brag on *CNN* that he thought he was now more popular as a

17   result.  But that's not how this works.  The law protects

18   people from defamatory attacks on their character, and it

19   allows an award of punitive damages to deter them from keeping

20   at it.

21           Indeed, while my cross-examination yesterday went very

22   fast, it did reveal one very important fact.  At the first

23   trial between Ms. Carroll and Mr. Trump, the one where a jury

24   just like you determined that he had sexually assaulted her and

25   had defamed her, Donald Trump didn't even bother to show up.

O1QQcar4                        Rebuttal - Ms. Crowley

1          And at this moment I'm going to pause a minute.  Andy

2     is going to give counsel a typewritten copy of my instructions.

3     Ladies and gentlemen, I should have said this at the beginning:

4     You will have them in writing in the jury room.  You are

5     welcome to take notes or not to take notes.  Everything I say

6     you will get in writing.

7          The second thing you must decide is whether Mr. Trump

8     should be required to pay Ms. Carroll punitive damages as well

9     as compensatory a damages, and, if so, how much he should be

10    required to pay.  Punitive damages are intended to punish a

11    defendant and to deter future defamatory statements.

12         I'm now going to discuss these remaining damages

13    issues in turn, with reference to the verdict form that you're

14    going to be using to decide the case.

15         A person who has been defamed is entitled to fair and

16    just compensation for the injury to her reputation and for any

17    humiliation and mental anguish in her public and private lives

18    that was caused by the defamatory statement in question.

19    Question 1 on the verdict form deals with such damages for

20    Mr. Trump's June 21 and 22, 2019 statements, which are in

21    evidence as Plaintiff's Exhibit 1 and 2, respectively.

22         For this question, you will award an amount that, in

23    the exercise of your good judgment and common sense, you decide

24    is fair and just compensation for the injury to Ms. Carroll's

25    reputation and the humiliation and mental anguish in her public

O1QQcar4                           Rebuttal - Ms. Crowley

and private lives which you decide was caused by Mr. Trump's

two statements to which I've already referred.  In fixing that

amount, you should consider Ms. Carroll's standing in the

community, the nature of Mr. Trump's statements made about

her — the two statements in question — the extent to which

those statements were circulated, the tendency of those

statements to injure a person such as Ms. Carroll and all of

the other facts and circumstances of the case.  Compensatory

damages can't be proved with mathematical accuracy.  Fair

compensation may vary.  It may range from one dollar, if you

decide that there was no injury at all, to a substantial sum if

you decide that the injury was substantial.

It is Ms. Carroll's burden to prove the nature and

extent of her damages and to prove that the damages were caused

by Mr. Trump's actions.  You may award compensatory damages

only for those injuries that you find that Ms. Carroll has

proven by a preponderance of the evidence.  We'll talk about

what that means later.  Compensatory damages cannot be based on

speculation or sympathy.  They must be based on the evidence

presented at trial and only on that evidence.

Further, you may not award compensatory damages more

than once for the same injury.  For example, where a plaintiff

prevails on two claims and establishes that he or she is

entitled to $100 in compensatory damages for one injury, the

plaintiff is not entitled to $100 in compensatory damages also

O1QQcar4                    Rebuttal - Ms. Crowley

1    on the other claim but for the same injury.  Of course, where

2    different injuries are attributed to the separate claims, a

3    person is entitled to be compensated fully for all of the

4    injuries.

5         Now, during her opening statement, Mr. Trump's

6    attorney asserted Ms. Carroll had a duty to mitigate or

7    minimize any damage that she suffered as a consequence of

8    Mr. Trump's statements in this case, the statements we're

9    concerned with.  That statement was not correct.  A person who

10   is defamed has no duty to mitigate or minimize any harm caused

11   to that person by the defamation.  A person who defames a

12   plaintiff is liable to the plaintiff for all damages caused to

13   the plaintiff by the defamation.

14        In addition, the harm, if any, that Mr. Trump caused

15   to Ms. Carroll's reputation by his defamatory statements is not

16   mitigated or reduced or offset by any benefit to her reputation

17   that Mr. Trump may claim that his defamatory statements or

18   Ms. Carroll's allegations against him caused in some parts of

19   the community.  You are not to consider any reputational

20   benefits, if any, in deciding on a damage award in this case.

21        Now, question 1 pertains to compensatory damages for

22   the two statements we're concerned with.  And I've broken it

23   into two parts.  The first part asks you whether Ms. Carroll

24   has proved by a preponderance of the evidence that she suffered

25   more than just nominal damages from Mr. Trump's June 21 and 22,

O1QQcar4                     Rebuttal - Ms. Crowley

1    2019 statements -- meaning that she was injured by those

2    statements in any of the respects that I've just described to

3    an extent warranting damages of more than a dollar.  That is

4    the "yes" or "no" question.  If the answer is "yes," you then

5    will fill in the amount you award for all defamation

6    compensatory damages attributable to the June 21 and 22

7    statements, excluding the reputation repair program that was

8    discussed during Professor Humphreys' testimony.  And then you

9    will fill in the amount of damages, if any, that you award for

10   the reputation repair program for the June 21 and 22, 2019

11   statements in the second part of the first question.

12          On the other hand, if your answer to the first part of

13   question 1 is no; in other words, if you determine that

14   Ms. Carroll has not proved by a preponderance of the evidence

15   that she suffered more than nominal damages as a result of

16   Mr. Trump's June 21 and June 22 statements, then you will write

17   down $1 on the second line of question 1, and you will leave

18   the third line blank.

19          Regardless of your answer to question 1, you will go

20   on to question 2.

21          In addition to seeking compensatory damages, which I

22   just covered in discussing question 1, Ms. Carroll asks also

23   that you award punitive damages.  Punitive damages may be

24   awarded for defamation to punish a defendant who's acted

25   maliciously and to deter him and others from doing the same.