**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff*, | |
| v. | |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO**
**STAY EXECUTION OF THE JUDGMENT**
**<u>PENDING DISPOSITION OF POST-TRIAL MOTIONS</u>**

HABBA MADAIO & ASSOCIATES LLP
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
      -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
E-mail: ahabba@habbalaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer*
William O. Scharf**
13321 North Outer Forty Road, Suite 300
Chesterfield, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

* *Pro Hac Vice* pending
** *Pro Hac Vice* forthcoming

*Attorneys for President Donald J. Trump*

President Trump requests a brief stay of execution of the judgment until 30 days after the Court decides his post-trial motions, which will be filed in five days and will likely affect the amount of the judgment.  ECF Nos. 286, 287.  Plaintiff E. Jean Carroll ("Plaintiff") opposes this request on various grounds.  ECF No. 303.  None is convincing.  Plaintiff ignores the limited nature of the relief sought, disregards binding case law, and contradicts her own prior positions.

## I.  An Unsecured Stay Is Warranted Under Rule 62(b) and Equitable Principles.

### A.  Rule 62(b) Permits a Stay of Execution Without Bond or Similar Condition.

First, Plaintiff argues that Rule 62(b) "forbid[s]" a stay without posting a bond or similar condition.  ECF No. 303, at 3.  Not so.  In *Nassau County*, the Second Circuit "issued an order granting Nassau County's motion to stay enforcement of the district court's judgment, *without the posting of a bond or other condition*…."  *In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (emphasis added); *see also id.* at 418.  "[A]n inflexible requirement of a bond would be inappropriate ... where the defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money."  *Id.* (quoting *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986)).  The *Nassau County* five-factor test addresses "whether to *waive* the supersedeas bond requirement."  *Id.* (emphasis added); *see, e.g., Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 761 (D.C. Cir. 1980) (affirming the decision to require no bond on appeal); *N. Indiana Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 281 (7th Cir. 1986) ("[I]t is a misreading of Rule 62(d) of the Federal Rules of Civil Procedure to suggest that an appellant who wants to stay execution pending appeal must post a bond.").  Carroll's own cases demonstrate that the defendant's resources alone may provide "other security" under Rule 62(b).  *See, e.g., John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 649 (S.D.N.Y. 2018) (holding that the *Nassau County* factors "contemplate waiving

the requirement of a supersedeas bond because a court is satisfied that the debtor would be able to pay the judgment") (quoting *Butler v. Ross*, 2017 WL 62108432, at *3 (S.D.N.Y. Dec. 7, 2017)); *Rivera v. Home Depot USA Inc*., 2018 WL 3105069, at *3 (S.D.N.Y. June 25, 2018) (waiving bond because Home Depot had "extremely deep pockets" and would be able to pay the judgment).

### B.    Plaintiff's Own Evidence Establishes That She Is Fully Protected.

Next, Plaintiff argues that President Trump has failed to provide evidence of his finances to establish his ability to pay the judgment.  ECF No. 303, at 4-6.  But just over a month ago, *Plaintiff herself* submitted evidence of President Trump's financial resources to this Court during trial.  Pl. Ex. 148.  Trial evidence of the judgment creditor's resources is a proper basis to argue that a debtor is fully secured.  *Am. Fam. Mut. Ins. Co. v. Miell*, No. C04-0142, 2008 WL 746604, at *2 (N.D. Iowa Mar. 19, 2008) (authorizing a bond reduction of two-thirds on the basis that "the parties stipulated at trial that his net worth is in excess of $40 million").  Further, Plaintiff's counsel argued to the jury that President Trump's wealth vastly exceeds the judgment here, Tr. 720:25-721:7—by a factor of *168*.  Tr. 721:12-13 ("That's $14 billion right there, ladies and gentlemen.").

Now, Plaintiff's counsel argues that, in fact, President Trump's financial resources are so precarious that his ability to satisfy a judgment cannot be ensured, even for a few weeks, by any method short of a bond in the full amount of the judgment plus interest.  ECF No. 303, at 4-6.  The doctrine of judicial estoppel does not permit this fast-and-loose approach to the facts.  "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position…."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Judicial estoppel applies where [1] "a party's later position [is] 'clearly inconsistent' with its earlier position," [2] "the party has succeeded in persuading a court to accept that party's earlier position," and [3] "the party seeking to assert an

inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51 (citations omitted).

Judicial estoppel prevents Plaintiff from disputing her own evidence and recent assessment of President Trump's wealth.  First, Plaintiff's current position—that President Trump's ability to satisfy a judgment of $83.3 million is in doubt—is "clearly inconsistent" with her position barely one month ago that President Trump has $14 billion in assets and can thus easily satisfy an enormous punitive award.  *Id.*  Second, Plaintiff "succeeded in persuading," *id.*, the jury to impose a massive $65 million punitive-damages award based on that very argument.  ECF No. 280 at 2. Third, such "self-contradiction" creates "an unfair advantage" and will "impose an unfair detriment on the opposing party."  *New Hampshire*, 532 U.S. at 751.  Indeed, "intentional self-contradiction" itself constitutes a "means of obtaining unfair advantage."  *Id.*; *see also, e.g., Garza v. City of Los Angeles*, 2017 WL 4162203, at *10 (C.D. Cal. Sept. 18, 2017).

Plaintiff attempts to distinguish her own evidence, but to no avail.  First, she argues that her evidence "reflected only how Trump *subjectively* understood the value of his own assets and net worth at two points in 2023."  ECF No. 303, at 6.  But to the jury, she unambiguously described her evidence as describing President Trump's *actual* resources.  Tr. 720:22-721:13.  She argued that President Trump "*is* a very wealthy man," not "*thinks* he is a very wealthy man," *id.* at 720:25-721:1; that his assets "*are* substantial," *id.* at 721:3; and "[t]hat's $14 billion right there, ladies and gentleman," *id.* at 721:12-13 (emphases added).  She also contradicts her own response brief, which argues that "the general evidence of Trump's wealth … justified a higher punitive damages award."  ECF. No. 303, at 24.  Second, Plaintiff argues that her evidence of President Trump's resources was "highly generalized" and "general."  *Id.* at 6, 24.  It is hard to see how this makes any difference.  Plaintiff decided to submit evidence and argue to the jury that President Trump's

resources exceed the judgment in this case by many orders of magnitude. Whether "highly generalized" or specific, *id.*, she is bound by that factual contention now.

Third, Plaintiff argues that there are changed circumstances in President Trump's financial condition, because he has criminal cases pending and faces an adverse judgment in *People v. Trump*, the case brought by the New York Attorney General. ECF No. 303, at 7-9. But all these cases were pending on January 26, 2024, when Plaintiff urged the jury to impose a large punitive award. Tr. 720:22-721:13. Indeed, Plaintiff's assessment of President Trump's resources exceeds the judgment in this case by many factors even if the full amount of the judgment in *People v. New York* – which is unlikely to be upheld on appeal – were to be deducted from them.[1] Tr. 721:12-13.

Likewise, Plaintiff's reliance on President Trump's criminal cases—all of which were pending when Plaintiff made her presentation to the jury—is unconvincing. First, the Court should follow the well-established presumption that President Trump is innocent until proven guilty, which Plaintiff ignores. *Taylor v. Kentucky*, 436 U.S. 478, 485–86 (1978). Second, none of those cases is likely to reach final disposition in the short period before this Court rules on President Trump's post-trial motions, which is the only relief that President Trump seeks now. Third, Plaintiff argues that those cases might affect President Trump's ability to earn money in the future, which has little bearing on the state of his current assets.

Finally, Plaintiff argues that many of President Trump's assets are "illiquid." ECF No. 11. But that argument favors reducing the bond, both because "illiquid" assets provide greater protection to the judgment creditor, and because they impose greater difficulty and expense to the judgment debtor in posting security. *See, e.g., Am. Family*, 2008 WL 746604, at *2-3 (authorizing

---

[1] Having accused President Trump of failing to provide evidence, Plaintiff relies heavily on double-hearsay, speculative news articles alleging facts outside the record to imply that President Trump's financial situation is precarious—contradicting her own trial evidence. ECF No. 303, at 7-10.

a substantial bond reduction where "the bulk of [the defendant's] assets [we]re tied up in real estate, which is not readily movable").  Plaintiff argues that the presence of "illiquid" assets bears on the "complexity of the collection process" and "the amount of time required to obtain a judgment after it is affirmed *on appeal*."  ECF No. 303, at 11 (emphasis added) (quoting *Nassau County*, 783 F.3d at 417).  But those factors have no bearing on President Trump's current motion, which does not seek a stay of execution or reduced bond pending *appeal*, but only pending the limited period until disposition of *post-trial motions*.  ECF No. 287, at 1, 15.

### C.   Plaintiff Ignores the Time-Limited Nature of the Relief Sought Here.

This, in fact, is a persistent deficiency in Plaintiff's analysis.  She ignores the time-limited nature of relief sought in this motion.  As many courts have held, staying execution of judgment for the limited time period for the Court to dispose of *post-trial motions* presents only a "minimal" risk to the judgment creditor.  ECF No. 287, at 11-12 (citing *Int'l Wood Processors v. Power Dry, Inc.*, 102 F.R.D. 212, 215 (D.S.C. 1984); *Kaneka Corp. v. SKC Kolon PI, Inc.*, 2017 WL 11643347, at *4 (C.D. Cal. June 30, 2017); *United States v. Salus Rehab., Inc.*, No. 8:11-CV-1303-T-23TBM, 2017 WL 2730229, at *1 (M.D. Fla. Mar. 15, 2017); and *Am. Family*, 2008 WL 746604, at *3).  Plaintiff has no answer to this point; all her cases address stays of execution pending *appeal*, not pending the far more limited period while post-trial motions are pending.

### D.   Rule 62(b) Permits Consideration of Other Equitable Factors.

Plaintiff argues that *Nassau County* forecloses the consideration of the four-factor test of *Nken v. Holder*, 556 U.S. 418, 421 (2009).  ECF No. 303, at 12-14.  *Nassau County* contradicts this argument: "The Seventh Circuit … has enumerated several criteria, which we now adopt as *non-exclusive* factors that a district court *may* consider…."  783 F.3d at 417 (emphases added).  Equity allows for the flexible consideration of all relevant circumstances, and many cases consider

such equitable considerations. *See, e.g., In re Apollo Grp. Inc. Sec. Litig.*, No. 04 Civ. 2147, 2008 WL 410625, at \*2 (D. Ariz. Feb. 13, 2008) (granting a 50 percent bond reduction because of "uncertainty" about the amount of the judgment); *see also Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 CIV. 10023 (KPF), 2020 WL 7711522, at \*2 (S.D.N.Y. Dec. 29, 2020).

### E.      The Punitive Damages Award Is Likely to Be Remitted To a 1:1 Ratio.

Under *Turley*'s "relatively stringent" review, the punitive-damages award is excessive. *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 164 (2d Cir. 2014). Plaintiffs' attempts to distinguish *Turley*, ECF No. 303, at 21-25, are unconvincing. Plaintiff first argues that a 3.6:1 ratio is acceptable here because "the degree of reprehensibility" is supposedly "exceedingly high." *Id.* at 22. Not so. As Plaintiffs' numerous exhibits confirm, all President Trump's statements were *defensive*, as he has clearly and consistently denied any wrongdoing after he was very publicly accused of decades-old alleged misconduct. Denials of public accusations of wrongdoing are not "reprehensib[le]" conduct—in fact, they are privileged from liability in many jurisdictions.[2] *See also Payne v. Jones*, 711 F.3d 85, 101 (2d Cir. 2013) (holding that, where conduct is responsive, "diminishes the degree of reprehensibility" as a "significant mitigating factor[]").

In any event, *Turley* held that the conduct in that case was "egregious in the extreme," 774 F.3d at 165, and yet the Court remitted the 3.8:1-ratio punitive damages award. In so holding, the Second Circuit instructed that "where, as here, [1] the compensatory damages award is imprecise because of the nature of the injury and [2] high when compared with similar cases, 'a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process

---

[2] *See, e.g., Kane v. Orange County Publications*, 649 N.Y.S.2d 23, 26 (N.Y. App. 1996) (noting the allegedly defamatory statement was in "response to unfavorable publicity" and "covered by a qualified privilege") (citing *Hines v. Arkansas Louisiana Gas Co.*, 613 So.2d 646 (La. App. 1993); *Park Knoll Associates v. Schmidt*, 451 N.E.2d 182 (N.Y. App. 1983); *Toker v. Pollak*, 376 N.E.2d 163 (N.Y. App. 1978); and *Shenkman v. O'Malley*, 157 N.Y.S.2d 290 (N.Y. App. 1956)).

guarantee.'"  *Id.*   Here, both factors are satisfied—the nature of the injury, reputational and emotional damages, is "imprecise," and the award is "high when compared to similar cases."  *Id.* Accordingly, even if the conduct were supposedly reprehensible—which President Trump's is not—a 1:1 ratio presents "the outermost limit of the due process guarantee."  *Id*.

Plaintiff argues that the 3.6:1 ratio "is of no constitutional concern," because *State Farm* supposedly "established 9:1—not 1:1—as the presumptive outer limit."  ECF No. 303, at 23.  Not so.  *Turley* provided 1:1 as the "presumptive outer limit" for awards involving "high" awards of "imprecise damages."  774 F.3d at 165.  In so holding, *Turley* quoted *State Farm*'s statement that, in such cases, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).  Consistent with *State Farm*, *Turley* went on to hold that the 3.8:1 ratio in that case was also invalid as a matter of federal common law: "Where the compensatory award is particularly high, as the one in this case assuredly was, a four-to-one ratio of punishment to compensation, in our view, serves neither predictability nor proportionality."  *Turley*, 774 F.3d at 165.  "[T]his is particularly so where the underlying compensation is, as it is in this case, for intangible—and therefore immeasurable—emotional damages. *Id.* at 165.

Plaintiff points to two cases involving massive punitive awards in defamation cases to argue that cases in other districts have imposed similar awards.  ECF No. 303, at 25.  Neither of these awards would survive scrutiny under *Turley*.  In any event, *Turley* does not require the compensatory award to be "the highest ever awarded."  *Turley* requires only that the $18.3 million award be "high when compared with similar cases," *id.*—which is plainly true here, when compared with *Turley*, *Bouveng*, 175 F. Supp. 3d 280, 348-49 (S.D.N.Y. 2016), and *Carroll II*.

**F.    The Compensatory Damages Award Is Likely to Be Remitted.**

Plaintiff argues that the $7.3 million compensatory award includes compensation for "tangible, continuing economic harm," such as loss of "freelance work for other magazines," loss of paying Substack subscribers, and costs of personal security. ECF No. 303, at 17. This attempt to expand to scope of damages contradicts Plaintiff's representations to both President Trump's counsel and the Court. *See* ECF No. 277, at 6 (joint pre-trial order in which Plaintiff represented that she seeks only "compensatory damages for injury to her reputation, humiliation, and mental anguish," as well as "punitive damages to punish Trump," with no mention of economic damages). This is consistent with the Court's jury instruction, which did not authorize any award of economic damages. Tr. 788:15-19 (instructing the jury that it may award damages "for the injury to her reputation and for any humiliation and mental anguish," not economic damages). Plaintiff's counsel herself argued to the jury that this category of compensatory damages is for "pain and suffering" and "humiliation and mental anguish," not economic injury. Tr.710:15-20.

Plaintiff also suggests that the $7.3 million award may include "testimony about Carroll's public standing, the nature and circulation of Trump's statements, and the backlash provoked by Trump's attacks." ECF No. 303, at 17-18. But she fails to explain how this testimony supports a finding of anything other than (1) emotional damages, or (2) reputational injury to be remediated by the reputation-repair program. Thus, the $7.3 million award includes only compensation for "psychological injury," *i.e.*, emotional harm. *Id.* at 17. Anything else is double-counting.

Plaintiff argues that her emotional injury is not "garden-variety," ECF No. 303, at 18-20, but her argument focuses entirely on President Trump's alleged *misconduct*, not on her alleged emotional injury. *See id.* Her entire argument is that President Trump's misconduct was supposedly "malicious[]" and his statements reached a wide audience, *id.*—which magnifies *Turley*'s concern that Plaintiff "stack[s] one attempt to monetize highly offensive behavior, which

effort is necessarily to some extent visceral, upon another." 774 F.3d at 165-66.  Though the nature of the misconduct may sometimes be considered, the predominant consideration in deciding whether emotional distress is "garden-variety" or "significant" is (quite naturally) the evidence of *emotional distress*, not the evidence of allegedly tortious conduct.  *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018); *Bouveng*, 175 F. Supp. 3d at 328-34.  For "'garden variety' emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Id.* (cleaned up). "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." *Id.*

This description precisely fits Plaintiff's evidence.  Instead of citing medical records or diagnoses, Plaintiff emphasizes her own highly metaphorical characterizations of her distress, such as her claim that she "liv[es] in a new universe" and the challenged statements "ended the world [she] had been living in," and that she received hateful communications from third parties that sometimes made her fearful.  ECF No. 303, at 19.  Such testimony matches the evidence in a long list of cases that *Duarte* cites as proving only "garden-variety" emotional distress.  ECF No. 287, at 8 n.4 ("garden-variety" cases involving anxiety, sleeplessness, insomnia, humiliation, fear of going in public, depression, panic attacks, headache, loss of appetite, and fatigue).

Moreover, even if Plaintiff could show that her distress was "significant" rather than "garden-variety," the typical "top of the range for significant emotional distress is $200,000," not $7.3 million, with $500,000 as an outermost bound.  *Duarte*, 341 F. Supp. 3d at 320.

## G.    Denying a Stay Will Inflict Irreparable Harm.

Carroll argues that monetary injuries are not irreparable harm "because money can always be returned."  ECF No. 303, at 26.  But Carroll concedes that President Trump will "incur[] the

fees often associated with obtaining a bond," *id.* at 27, which are considerable for a bond this size. If President Trump prevails on post-trial review, Carroll will likely be liable for many of these costs, but others may be irrecoverable. *Cf. Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2020 WL 3469220, at *2 (E.D. Tex. June 23, 2020) (after the defendant was required to post a large bond pending appeal, holding that the plaintiff, the losing party on appeal, "will be taxed with the $2,248,983.48 in supersedeas bond premiums," but "will not be taxed the $757,473.39 in additional costs consisting of interest and the 'corporate guaranty fee' associated with the supersedeas bond premiums").[3]

## II.   In the Alternative, the Court Should Enter a Partially Secured Stay.

President Trump seeks an unsecured stay of execution for the brief period until 30 days after this Court's disposition of his post-trial motions, which are very likely to affect the amount of the judgment.  But even if the Court does not grant an unsecured stay during this period when the risk to the plaintiff is "minimal," *Kaneka Corp.*, 2017 WL 11643347, at *4, it should, at very least, grant a partially secured stay in an amount substantially reduced from the $91.63 million otherwise required.  *See* ECF No. 287, at 14-15.  Remitting the $7.3 million award and the $65 million punitive award, as discussed above, would reduce the bond amount to $24.475 million, *id.*, which would be more than sufficient to secure any minimal risk to Plaintiff.

## CONCLUSION

President Trump's motion for stay of execution of the judgment pending disposition of post-trial motions, ECF Nos. 286, 287, should be granted.

---

[3] Plaintiff also argues that President Trump can deposit cash in an "interest-bearing account" in lieu of a bond.  *Id.* at 26.  But this proposal would come with its own threat of irreparable injury. A bond of $91.63 million, invested at a return of seven percent per year, would return $6.4 million per year, or $534,508 per month, which may be irrecoverable.

Dated: New York, New York          Respectfully submitted,
      March 2, 2024

*/s/ Alina Habba*                  */s/ D. John Sauer*
Alina Habba, Esq.                D. John Sauer*
Michael T. Madaio, Esq.        William O. Scharf**
HABBA MADAIO & ASSOCIATES LLP  JAMES OTIS LAW GROUP, LLC
1430 U.S. Highway 206, Suite 240    13321 North Outer Forty Road, Suite 300
Bedminster, New Jersey 07921     Chesterfield, Missouri 63017
        -and-                (314) 562-0031
112 West 34th Street, 17th & 18th Floors  John.Sauer@james-otis.com
New York, New York 10120
Telephone: (908) 869-1188       * *Pro Hac Vice* pending
E-mail: ahabba@habbalaw.com     ** *Pro Hac Vice* forthcoming

                          *Attorneys for President Donald J. Trump*

11

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 2, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Michael T. Madaio*