### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E. JEAN CARROLL, | Civil Action No.: 1:20-cv-7311-LAK-JLC |
| *Plaintiff*, | |
| v. | |
| DONALD J. TRUMP, in his personal capacity, | |
| *Defendant*. | |

### PRESIDENT TRUMP'S MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL AND/OR TO ALTER OR AMEND THE JUDGMENT <u>UNDER RULE 59 OF THE FEDERAL RULES OF CIVIL PROCEDURE</u>

HABBA MADAIO & ASSOCIATES LLP
Alina Habba, Esq.
Michael T. Madaio, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
　　　　　-and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
E-mail: ahabba@habbalaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer*
William O. Scharf**
13321 North Outer Forty Road, Suite 300
Chesterfield, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

* *Pro Hac Vice* pending
** *Pro Hac Vice* forthcoming

*Attorneys for President Donald J. Trump*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

LEGAL STANDARDS ...................................................................................................1

    I.   The Court Erroneously Excluded Relevant Evidence of Common-Law Malice and Erroneously Instructed the Jury on Common-Law Malice. ..................................................2

        A.  Common-Law Malice Requires Ill Will to Be the Speaker's *Exclusive* Motive. ..........2

        B.  The Exclusion of President Trump's Testimony About His State of Mind ...................5

        C.  The Instruction on Common-Law Malice Was Erroneous and Prejudicial. ...............12

        D.  An Erroneous Instruction on Burden of Proof Compounded the Error. .....................15

    II.  The Awards of Compensatory and Punitive Damages Should Be Remitted. ....................17

        A.  The $7.3 Million Compensatory Award Should Be Remitted. ...................................19

        B.  The $11 Million Award for Reputational Repair Must Be Remitted. .........................26

        C.  The $65 Million Punitive Damages Award Must Be Remitted. ..................................29

CONCLUSION..............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Anderson v. Branen,*
    17 F.3d 552 (2d Cir. 1994) ................................................................................................12

*Anderson Grp., LLC v. City of Saratoga Springs,*
    805 F.3d 34 (2d Cir. 2015) ...............................................................................................2

*Arlio v. Lively,*
    474 F.3d 46 (2d Cir. 2007) ...............................................................................................5

*Banister v. Davis,*
    140 S. Ct. 1698 (2020) ......................................................................................................2

*Bouveng v. NYG Capital LLC,*
    175 F. Supp. 3d 280 (S.D.N.Y. 2016) .............................................................18-19, 22-25, 32

*Calantonio v. Mercy Med. Ctr.,*
    135 A.D.3d 686 (2d Dep't 2016) .....................................................................................4

*Camillo v. Geer,*
    185 A.D.2d 192 (1st Dep't 1992)................................................................................ 16-17

*Carroll v. Trump,*
    No. 20-CV-7311 (LAK), 2023 WL 4393067 (S.D.N.Y. July 5, 2023) ...........................3, 6, 14

*Carroll v. Trump,*
    No. 20-CV-7311-LAK, 2024 WL 97359 (S.D.N.Y. Jan. 9, 2024) ....................................8, 11

*Carroll v. Trump,*
    No. 22-CV-10016 (LAK), 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ..............................32

*Casmento v. Volmar Constr., Inc.,*
    No. 20-CV-00944 (LJL), 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022)..............................18

*Celle v. Filipino Rep. Enterprises Inc.,*
    209 F.3d 163 (2d Cir. 2000) ...................................................................................3, 5, 14

*Chandok v. Klessig,*
    632 F.3d 803 (2d Cir. 2011) ...........................................................................................4, 13

*Costantino v. David M. Herzog, M.D., P.C.,*
    203 F.3d 164 (2d Cir. 2000) ...........................................................................................10

*Cusimano v. United Health Services Hospitals*, Inc.,
  91 A.D.3d 1149 (3d Dep't 2012) ...................................................................4

*Dalbec v. Gentleman's Companion, Inc.*,
  828 F.2d 921 (2d Cir. 1987) ......................................................................29

*Dattner v Pokoik*,
  81 A.D.2d 572 (2d Dep't 1981) .................................................................29

*Dotson v. City of Syracuse*,
  No. 5:04-CV-1388(NAM)(GJD), 2011 WL 817499 (N.D.N.Y. Mar. 2, 2011) .......................18

*Duarte v. St. Barnabas Hosp.*,
  341 F. Supp. 3d 306 (S.D.N.Y. 2018) ................................................... 18-24

*EEOC v. Morgan Stanley & Co., Inc.*,
  2004 WL 1542264 (S.D.N.Y. July 8, 2004) ...............................................10

*Emamian v. Rockefeller Univ.*,
  2018 WL 2849700 (S.D.N.Y. June 8, 2018) .........................................22, 25

*Gasperini v. Ctr. for Humanities, Inc.*,
  518 U.S. 415 (1996) ...........................................................................2, 16

*Gatz v. Otis Ford, Inc.*,
  274 A.D.2d 449 (2d Dep't 2000) ...............................................................10

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .................................................................................26

*Gordon v. New York City Bd. of Educ.*,
  232 F.3d 111 (2d Cir. 2000) .....................................................................12

*Graham v. City of N.Y.*,
  128 F. Supp. 3d 681 (E.D.N.Y. 2015) .......................................................20

*Greenbaum v. Svenska Handelsbanken, N.Y.*,
  979 F. Supp. 973 (S.D.N.Y. 1997) .....................................................14, 17

*Guaranty Trust Co. of N.Y. v. York*,
  326 U.S. 99 (1945) ...................................................................................16

*Hathaway v. Coughlin*,
  99 F.3d 550 (2d Cir. 1996) .......................................................................12

*Hines v. Arkansas Louisiana Gas Co.*,
   613 So.2d 646 (La. App. 1993)............................................................................33

*Hoesten v. Best*,
   34 A.D.3d 143 (1st Dep't 2006).............................................................................4

*Hughes v. Town of Bethlehem*,
   644 F. App'x 49 (2d Cir. 2016) ..............................................................................1

*ING Global v. UPS Oasis Supply Corp.*,
   757 F.3d 92 (2d Cir. 2014) .....................................................................................1

*Kane v. Orange County Publications*,
   232 A.D.2d 526, 649 N.Y.S.2d 23 (2d Dep't 1996)..............................................33

*Khan v. Hip Centralized Lab. Servs., Inc.*,
   CV-03-2411, 2008 WL 4283348 (E.D.N.Y. Sept. 17, 2008) .................................19

*Kirsch v. Fleet St., Ltd.*,
   148 F.3d 149 (2d Cir. 1998) ...................................................................................2

*Koehler v. Metro. Transportation Auth.*,
   No. 16-CV-03 (AYS), 2023 WL 2499117 (E.D.N.Y. Mar. 14, 2023) ....................18

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999)................................................................................................9

*Lewis v. Am. Sugar Ref., Inc.*,
   325 F. Supp. 3d 321 (S.D.N.Y. 2018) .............................................................22, 24

*Liberman v. Gelstein*,
   80 N.Y.2d 429 (N.Y. App. 1992)...................................................................3, 5, 13

*LNC Invest., Inc. v. First Fidelity Bank, N.A. New Jersey*,
   173 F.3d 454 (2d Cir. 1999) ...........................................................................12-15

*Lore v. City of Syracuse*,
   670 F.3d 127 (2d Cir. 2012) ............................................................................5, 22

*MacMillan v. Millennium Broadway Hotel*,
   873 F. Supp. 2d 546 (S.D.N. Y. 2012).................................................................17

*Manley v. AmBase Corp.*,
   337 F.3d 237 (2d Cir. 2003) ...................................................................................1

*Massre v. Bibiyan,*
   No. 1-CV-6615-KPF, 2014 WL 2722849 (S.D.N.Y. June 16, 2014) ....................................28

*McGrory v. City of New York,*
   No. CV 99–4062(FM), 2004 WL 2290898 (S.D.N.Y. Oct. 8, 2004)....................................25

*Memphis Community Sch. Dist. v. Stachura,*
   477 U.S. 299 (1986)................................................................................................................12

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.,*
   746 F. Supp. 2d 575 (S.D.N.Y. 2010) ...................................................................................17

*Michalski v. Home Depot, Inc.,*
   225 F.3d 113 (2d Cir. 2000) ...................................................................................................17

*Montgomery Ward & Co. v. Duncan,*
   311 U.S. 243 (1940).................................................................................................................1

*Morsette v. "The Final Call",*
   309 A.D.2d 249, 764 N.Y.S.2d 416 (1st Dept. 2003) ...................................3, 5-6, 8-9, 13, 17

*Munoz v. Puretz,*
   301 A.D.2d 382 (1st Dep't 2003)............................................................................................16

*Nellis v. Miller,*
   101 A.D.2d 1002 (4th Dep't 1984) ....................................................................................26, 28

*New York Times Co. v. Sullivan,*
   376 U.S. 245 (1976)..................................................................................................................4

*Noonan v. Becker,*
   No. 14-cv-4084 (LTS) (JLC), 2018 WL 1738746 (S.D.N.Y. Apr. 10, 2018)........................32

*O'Neil v. Peekskil Faculty Ass'n Local,*
   156 A.D.2d 514, 549 N.Y.S.2d 41 (2d Dep't 1989) ..............................................................29

*Orange & Rockland Utils., Inc. v. Muggs Pub, Inc.,*
   292 A.D.2d 580 (2d Dep't 2002) ....................................................................................... 16-17

*Osborn v. Haley,*
   549 U.S. 225 (2007)................................................................................................................16

*Palmer v. Hoffman,*
   318 U.S. 109 (1943)................................................................................................................16

*Pappas v. Middle Earth Condo. Ass'n,*
  963 F.2d 534 (2d Cir. 1992) ...................................................................1

*Park Knoll Associates v. Schmidt,*
  451 N.E.2d 182 (N.Y. App. 1983) .........................................................33

*Patterson v. Balsamico,*
  440 F.3d 104 (2d Cir. 2006) .................................................................18

*Payne v. Jones,*
  711 F.3d 85 (2d Cir. 2013) .............................................................18, 33

*Pelgrift v. 355 W. 41st Tavern, Inc.,*
  14-CV-08934-AJN, 2018 WL 4735705 (S.D.N.Y. Sept. 30, 2018).........................................22

*Perfect Fit Indus. v. Acme Quilting Co., Inc.,*
  494 F. Supp. 505 (S.D.N.Y. 1980) .......................................................28

*Present v. Avon Prod., Inc.,*
  253 A.D.2d 183 (1st Dep't 1999)......................................................3, 13

*Prozeralik v. Capital Cities Commc'ns,*
  82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34 (N.Y. App. 1993).....................4-5, 8-9, 17

*Raedle v. Credit Agricole Indosuez,*
  670 F.3d 411 (2d Cir. 2012) ...................................................................1

*Rainone v. Potter,*
  388 F. Supp. 2d 120 (E.D.N.Y. 2005) ..................................................25

*Ravina v. Columbia University,*
  No. 16-CV-2137 (RA), 2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019) ..................................25

*Restivo v. Hessemann,*
  846 F.3d 547 (2d Cir. 2017) .....................................................................5

*Roginsky v. Richardson-Merrell, Inc.,*
  378 F.2d 832 (2d Cir. 1967) ..................................................................17

*Schwartz v. Liberty Mut. Ins. Co.,*
  539 F.3d 135 (2d Cir. 2008) .....................................................................2

*Sharkey v. Lasmo (Aul Ltd.),*
  55 F. Supp. 2d 279 (S.D.N.Y. 1999) ........................................................5

*Shenkman v. O'Malley*,
    2 A.D.2d 567, 157 N.Y.S.2d 290 (1st Dep't 1956) ................................................................33

*Sladick v. Hudson Gen. Corp.*,
    226 A.D.2d 263 (1st Dep't 1996) ......................................................................................16

*Stampf v. Long Island R.R. Co.*,
    761 F.3d 192 (2d Cir. 2014) ..........................................................................................1, 2

*Starr Indem. & Liab. Co. v. Am. Claims Mgmt.*,
    131 F. Supp. 3d 185 (S.D.N.Y. 2015) ............................................................................1

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ..............................................................................................31, 34

*Stern v. Shammas*,
    No. 12-cv-5210 (NGG) (RER), 2015 WL 6440647 (E.D.N.Y. Oct. 21, 2015) ..................12

*Stukuls v. State*,
    42 N.Y.2d 272 (1977) ....................................................................................................3

*Tesser v. Bd. of Educ. of City Sch. Dist.*,
    370 F.3d 314 (2d Cir. 2004) ....................................................................................10, 12

*Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*,
    226 A.D.2d 227 (1st Dep't 1996) ....................................................................................3

*Toker v. Pollak*,
    376 N.E.2d 163 (N.Y. App. 1978) ..................................................................................33

*Trademark Research Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 (2d Cir. 1993) ..........................................................................................12

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) ................................................................................. 24, 29-34

*United States v. Detrich*,
    865 F.2d 17 (2d Cir. 1988) ............................................................................................10

*United States v. Harris*,
    733 F.2d 994 (2d Cir. 1984) ..........................................................................................10

*United States v. Htut*,
    No. 22-CR-671 (NSR), 2023 WL 4399049 (S.D.N.Y. July 7, 2023)..................................12

*United States v. Kozeny,*
    667 F.3d 122 (2d Cir. 2011) ................................................................1

*United States v. Masotto,*
    73 F.3d 1233 (2d Cir. 1996) .............................................................13

*United States v. McCombs,*
    30 F.3d 310 (2d Cir. 1994) ...............................................................16

*United States v. White,*
    692 F.3d 235 (2d Cir. 2012) ................................................................9

*United States v. Young,*
    No. CR 10-923 (31), 2019 WL 9518255 (C.D. Cal. Apr. 22, 2019) .........................12

*Vera v. Alstom Power, Inc.,*
    189 F. Supp. 3d 360 (D. Conn. 2016) ..................................................20

*Villalta v. JS Barkats, P.L.L.C.,*
    16-CV-02772, 2021 WL 2458699 (S.D.N.Y. Apr. 16, 2021) .............................25

*Walia v. Vivek Purmasir & Assoc's., Inc.,*
    160 F. Supp. 2d 380 (E.D.N.Y. 2000) ...................................................28

*Wray v. Johnson,*
    202 F.3d 515 (2d Cir. 2000) ................................................................9

**Statutes, Rules, and Other Authorities**

Fed. R. Civ. P. 59(a)(1)(A) ................................................................1

N.Y. C.P.L.R. § 5501(c) ...................................................................18

N.Y. Pattern Jury Instr.—Civil §3:30 ..................................................16

Restatement (Second) of Torts § 621 cmt. b (1977) .................................26

Restatement (Second) of Torts § 603 cmt. A ........................................3

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, President Donald J. Trump respectfully requests a new trial, and/or requests that the Court alter or amend the judgment, for the reasons stated herein.

## LEGAL STANDARDS

A district court may grant a new trial "on all or some of the issues … for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). As the Second Circuit has explained, a district court may grant a motion for a new trial "if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). "A verdict was against the weight of the evidence if the jury reached a 'seriously erroneous result' or the verdict constitutes 'a miscarriage of justice.'" *Hughes v. Town of Bethlehem*, 644 F. App'x 49, 50 (2d Cir. 2016) (quotation omitted); *see also Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). Additional grounds for a new trial include substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d Cir. 2014); prejudicial misconduct affecting the fairness of the trial, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992); non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011); and other actions rendering the trial unfair, *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

In adjudicating a motion for a new trial, "the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" *ING Global v. UPS Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (quoting *Raedle*, 670 F.3d at 418). "[I]nstead, the court may weigh the evidence – including the credibility of witnesses – independently." *Starr Indem. & Liab. Co. v. Am. Claims Mgmt.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015), *aff'd*, 665 F. App'x 27 (2d Cir. 2016). A motion for new trial also "gives a

district court the chance to rectify its own mistakes in the period immediately following its decision" based on errors of fact or law or to prevent manifest injustice. *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020); *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 153 (2d Cir. 2008).

A trial judge's discretion to grant a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf*, 761 F.3d at 204 (quotation omitted). "Remittitur is appropriate in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.'" *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Kirsch*, 148 F.3d at 165).

## I.     The Court Erroneously Excluded Relevant Evidence of Common-Law Malice and Erroneously Instructed the Jury on Common-Law Malice.

First, the trial's outcome was infected by two related errors: The exclusion of President Trump's testimony about his own state of mind, which was highly relevant to the issue of common-law malice; and the erroneous jury instruction on the definition of common-law malice. Each of these errors was independently sufficient to taint the jury verdict and warrant a new trial.

### A.     Common-Law Malice Requires Ill Will to Be the Speaker's *Exclusive* Motive.

"Punitive damages may only be assessed under New York law if the plaintiff has established common law malice in addition to the other elements of libel...." *Carroll v. Trump*, No.

2

20-CV-7311 (LAK), 2023 WL 4393067, at *19 (S.D.N.Y. July 5, 2023), *aff'd in part, appeal dismissed in part*, 88 F.4th 418 (2d Cir. 2023).  "To do so, plaintiffs must prove by a preponderance of the evidence that the libelous statements were made out of 'hatred, ill will, [or] spite.' "  *Id.* (quoting *Celle v. Filipino Rep. Enterprises Inc*., 209 F.3d 163, 184 (2d Cir. 2000)).  "The Appellate Division, First Department, one of New York's intermediate appellate courts, has 'held that a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was 'the one and only cause for the publication.'"  *Id.* (quoting *Morsette v. "The Final Call"*, 309 A.D.2d 249, 255, 764 N.Y.S.2d 416 (1st Dept. 2003) (emphasis in original)).

The common-law malice requirement that the allegedly defamatory statement was "*solely* motivated by a desire to injure plaintiff," as "the one and only cause for the publication," *id.*, is well-established in New York law for defamation cases.  New York appellate courts, including the Court of Appeals and the Second Circuit, have repeatedly affirmed that, to establish common law malice, the plaintiff has the "burden of proving that malice was the *one and only cause* for the publication."  *Stukuls v. State*, 42 N.Y.2d 272, 282 (1977) (emphasis added); *id.* at 281 (requiring a showing that the statement was made "*solely* from spite or ill will") (emphasis added) (quoting Restatement (Second) of Torts § 603 cmt. A); *see also, e.g., Present v. Avon Prod., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999) ("A triable issue as to common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure the plaintiff."); *Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*, 226 A.D.2d 227, 229 (1st Dep't 1996) ("[A] triable issue of common-law malice is raised only if a jury could reasonably conclude that "malice was the one and only cause for the publication" of the allegedly defamatory statement"); *Liberman v. Gelstein*, 80 N.Y.2d 429, 439 (N.Y. App. 1992) ("[A] triable issue is raised only if a

jury could reasonably conclude that "malice was the one and only cause for the publication."); *Hoesten v. Best*, 34 A.D.3d 143, 158 (1st Dep't 2006) ("In order to establish a triable issue regarding common-law malice, a defamed plaintiff must show that a jury could reasonably conclude that the speaker spoke out of spite or ill will, and that such malicious motivation 'was the one and only cause for the publication.'") (citation omitted); *Calantonio v. Mercy Med. Ctr.*, 135 A.D.3d 686, 692 (2d Dep't 2016) (no common law malice where plaintiff failed to show that "malice was the one and only cause for the publication.") (citation omitted); *Cusimano v. United Health Services Hospitals*, Inc., 91 A.D.3d 1149, 1151 (3d Dep't 2012) ("[E]ven if [the defendants] disliked plaintiff or possessed some ill will towards her, plaintiff has failed to make an evidentiary showing that they were motivated by malice alone in making the statements.") (citations omitted); *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) ("[A]s to common-law malice, 'only if a jury could reasonably conclude that' spite or ill will 'was the one and only cause for the publication' is 'a triable issue…raised.'") (citations omitted).

New York law distinguishes common-law malice from "constitutional malice," *i.e.*, the First Amendment requirement established in *New York Times Co. v. Sullivan*, 376 U.S. 245 (1976), of recklessness with respect to the truth or falsity of the statement.  Common-law malice is both a different and a more stringent showing.  It focuses on the speaker's intention and requires the intention to be the sole, exclusive desire to harm:

> Actual malice, as defined in *New York Times Co. v. Sullivan*, is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information.  This does not measure up to the level of outrage or malice underlying the public policy which would allow an award of punitive damages….

*Celle*, 209 F.3d at 184 (quoting *Prozeralik v. Capital Cities Commc'ns*, 82 N.Y.2d 466, 605 N.Y.S.2d 218, 626 N.E.2d 34, 41–42 (N.Y. App. 1993)).  "This kind of common-law malice

focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity—the pointed factors that punitive damages are intended to remedy." *Prozeralik*, 82 N.Y.2d at 479–80.  Common law malice requires the *sole and exclusive* motivation for the statement to be "hatred, ill will, spite," akin to a "criminal mental state." *Id.* at 480; *see also Morsette*, 309 A.D.2d at 254.  "If the defendant's statements were made to further" some other motive or purpose, even in part, common-law malice is not proven; the plaintiff must show that "malice was the one and only cause for the publication." *Liberman*, 80 N.Y.2d at 439 (citation omitted).

Here, the trial-court proceedings did not comply with this definition of common-law malice in at least two ways, each of which was independently prejudicial.

### B.       The Exclusion of President Trump's Testimony About His State of Mind.

First, especially when viewed in light of the definition of common-law malice, the Court's restrictions on President Trump's testimony were erroneous and prejudicial.  "[A] court may grant a new trial if substantial errors were made in admitting or excluding evidence, or in charging the jury, or in misconduct, or because a material issue was improperly submitted or withdrawn from a jury." *Sharkey v. Lasmo (Aul Ltd.)*, 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999), *aff'd*, 214 F.3d 371 (2d Cir. 2000).  In general, "an erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'" *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (quoting *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)); *accord Restivo v. Hessemann,* 846 F.3d 547, 573 (2d Cir. 2017).

Prior to trial, Plaintiff sought, among other things, an order restricting the scope of President Trump's testimony, insisting that he not be permitted to testify about his intentions when he made the challenged statements. *See* ECF No. 233, at 5.  President Trump objected to this

request because it would prevent him from offering testimony about his state of mind when he made the statements, which is highly relevant to the issue of common-law malice, and therefore the availability of punitive damages.  ECF No. 235, at 8.  On January 9, 2024, the Court entered an order holding that President Trump was "precluded from arguing that he believed his statements to have been true when uttered," or from "claiming … that he did not make his June 21 and 22, 2019 statements concerning Ms. Carroll with actual malice in the *constitutional sense* of that term."  ECF No. 252, at 17 (emphasis added).  The order repeatedly stated that it was precluding President Trump from testifying inconsistently with the finding of *constitutional* malice—*i.e.*, knowledge of or reckless disregard for the alleged falsity of the statement.  *Id.* ("The Court … has already granted partial summary judgment to Ms. Carroll on the issue of constitutional actual malice…. actual malice in the constitutional sense of that term …. constitutional malice ….").  The order did not, however, address (or place any restrictions on) President Trump's testimony regarding *common-law* malice—*i.e.*, *not* whether "Mr. Trump knew of the falsity of his statements, … or at least [] made them with reckless disregard for their truth or falsity," *id.*, but whether President Trump's statements were "*solely* motivated by a desire to injure plaintiff," as "the one and only cause for the publication," *Carroll*, 2023 WL 4393067, at *19 (quoting *Morsette*, 309 A.D.2d at 255 (emphasis in original)).

Then, just before President Trump took the stand at trial, the Court engaged in a colloquy with defense counsel designed to restrict the scope of President Trump's testimony.  The Court reemphasized its prior ruling on the issue of *constitutional* malice.  Tr. 613:21-24.  But then the Court erroneously precluded President Trump from testifying, or his counsel even asking questions about, the issue of *common-law* malice.  Asked—in the presence of Plaintiff and her counsel—to identify the precise questions she intended to ask President Trump, and to identify "100 percent of

what he would say on the witness stand," Tr. 617:5-6, defense counsel indicated that she intended

to ask about "his state of mind and the timing of the statements." Tr. 614:20-21. The Court

instructed, "I want to know everything he is going to say." Tr. 616:20-21. Defense counsel

answered, "[H]e is going to say that he did not make the statements to hurt Ms. Carroll, and he is

going to say that he had to respond to the accusations and deny them," Tr. 616:25-617:3—

testimony that is of quintessential relevance to the issue of common-law malice. The Court then

directed President Trump's counsel *not* to ask President Trump about his state of mind or allow

him to testify about his state of mind when he made the challenged statements:

> THE COURT: What will he say about his state of mind?
> MS. HABBA: He was defending himself, your Honor.
> THE COURT: And he will say nothing else about his
> state of mind.
> Tr. 619:19-22.
> …
> THE COURT: He will say nothing other than his state
> of mind was that he was responding; is that right?
> Tr. 620:2-3.

The Court then even more narrowly restricted President Trump's testimony: "It seems to me that I

will permit him to get on the stand and you may ask him whether he stands by the testimony that

was played in this court this morning, that he gave previously. End. That's it." Tr. 622:25-623:4.

President Trump's counsel objected that these restrictions would foreclose testimony relevant to

the question of common law malice, but the Court rejected this objection:

> MS. HABBA: So how do they prove common law malice
> when I can't have my client defend himself and say he wasn't
> defaming her, he was defending himself at the time?
> ….
> I have a right to ask about his
> intent, they have an obligation to prove his intent.
> THE COURT: Ms. Habba, I will decide what he has a
> right to do here. That's my job, not yours.

Tr. 624:1-10.

The Court then further clarified that President Trump was not allowed to testify about his state of mind: "Now, question 1. Does he stand by the deposition? Did he deny the allegation because an accusation had been made?  That's it.  *Not what was in your mind*. Why did he do it. And I take it the offer of proof is he did it because someone made an accusation." Tr. 624:11-15 (emphasis added).  The Court indicated that President Trump would be restricted from any other elaboration on his state of mind: "No, it's not an open-ended question.  There will not be an open-ended question." Tr. 624:16-20.  The Court permitted President Trump's counsel to ask only two, extremely limited questions. *Id.*

Then, when President Trump took the stand, the Court struck even the very limited testimony about President Trump's state of mind that the questions allowed:

> Q: Did you ever instruct anyone to hurt Ms. Carroll in your statements?
> A:  No. *I just wanted to defend myself, my family, and*
> *frankly, the presidency.*
> MS. KAPLAN: Objection your Honor.
> THE COURT: *Objection is sustained. Everything after*
> *"no" is stricken.  The jury will disregard.*

Tr. 627:7-13 (emphases added).

This was error, and it was prejudicial.  For common-law malice, the inquiry is focused on "the defendant's mental state in relation to the plaintiff." *Prozeralik,* 82 N.Y.2d at 480; *Morsette*, 309 A.D.2d at 255 (focusing on the defendant's "'mental state in relation to the plaintiff' *i.e.*, that the malice or ill will was directed specifically at plaintiff," as necessary "to support an award of punitive damages") (citing *Prozeralik*, *supra*); *Carroll v. Trump*, 20-CV-7311-LAK, 2024 WL 97359, at *10, n. 75 (S.D.N.Y. Jan. 9, 2024) (acknowledging that "common law malice focuses on the defendant's mental state in relation to the plaintiff") (citing *Prozeralik*, *supra*).  Yet the Court refused to permit President Trump to testify about his own mental state in making the statements

and struck his testimony addressing whether he made the statements with any "malice or ill will directed specifically at plaintiff." *Morsette*, 309 A.D.2d at 255. President Trump's testimony about his own state of mind is the most relevant and probative evidence on the issue of common-law malice, and he was uniquely positioned to address it. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999) ("[T]he terms 'malice' and 'reckless' ultimately focus on the actor's state of mind.").

The error is compounded by the stringent showing required of the plaintiff to show common-law malice—*i.e.*, a very high degree of malice, akin to criminal intent, must be the *exclusive* motivation for the allegedly defamatory statements. *Prozeralik*, 82 N.Y.2d at 480 (describing common-law malice as "hatred, ill will, spite, criminal mental state"). Thus, a defendant's testimony to *any* motivation for the statement, other than a bare desire to harm the plaintiff, fatally undermines a finding of common-law malice and prohibits an award of punitive damages. This is especially true in a case like this, where President Trump's public statements were defensive, made by a high-profile public figure in response to a highly visible, public accusation of uncorroborated, decades-old alleged wrongdoing. Any public figure in such a situation has compelling motivations to deny the allegation for many reasons *other* than the desire to harm the plaintiff. By erroneously foreclosing *any* such testimony—and erroneously striking the one sentence of President Trump's testimony on this point—the Court all but assured that the jury would make a baseless punitive-damages award.

This error was prejudicial under Second Circuit law. An error is "far from harmless" where, as here, the erroneously "excluded evidence spoke directly to a critical element of [the plaintiff's] case and its exclusion presented [the defendant] from presenting a complete defense." *United States v. White*, 692 F.3d 235, 251-52 (2d Cir. 2012) (citing *Wray v. Johnson*, 202 F.3d 515, 526

(2d Cir. 2000)). "[I]n a classic case of competing stories, the jury was not presented with a comprehensive picture," *id.* at 252—instead, one side's story (President Trump's) was completely muzzled. The Second Circuit "cannot find it harmless to exclude a statement that 'would have supported the main theory of the defense.'" *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (quoting *United States v. Harris*, 733 F.2d 994, 1005 (2d Cir. 1984)); *see also, e.g., EEOC v. Morgan Stanley & Co., Inc.*, 2004 WL 1542264, at *2 (S.D.N.Y. July 8, 2004) ("In sum, the Court should not impede the introduction into evidence of relevant and reliable expert testimony so that the parties can be fully heard and the jury is fully informed.").

This Court's erroneous decision to dramatically limit the scope of President Trump's testimony almost certainly influenced the jury's verdict, and thus a new trial is warranted. *See, e.g., Gatz v. Otis Ford, Inc.*, 274 A.D.2d 449, 450 (2d Dep't 2000) (holding that the "Supreme Court erred in limiting the plaintiff to cross-examination of the witnesses of [the defendant] and precluding him from introducing any evidence in mitigation of the compensatory and punitive damages claimed by [the defendant]," and holding that "a new trial is required to allow the plaintiff to submit any such relevant and appropriate evidence"); *Tesser v. Bd. of Educ. of City Sch. Dist.*, 370 F.3d 314, 319 (2d Cir. 2004) ("[A]n evidentiary error in a civil case is harmless 'unless [the appellant demonstrates that] it is likely that in some material respect the factfinder's judgment was swayed by the error.'") (quoting *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174 (2d Cir. 2000)). As noted above, the prejudice is reinforced by the fact that the plaintiff faces an extremely stringent standard to establish common-law malice—*i.e.*, that ill will or spite toward Plaintiff was the "one and only" motivation for President Trump's statements—and the Court excluded the most relevant, most probative form of evidence on that point, *i.e.*, President Trump's knowledge of his own state of mind. The prejudice is further compounded by the fact that

President Trump's testimony that he had *other* motives to deny the allegations, apart from the bare desire to injure Plaintiff, was eminently credible—indeed, obviously true—and yet the Court struck it. *Any* major public figure faced with lurid allegations of decades-old misconduct that he or she categorically denies has a range of compelling reasons to publicly deny them, especially the sitting President of the United States. Indeed, it is virtually unthinkable that President Trump's "sole" and "one and only" motive for making the challenged statements was that he simply wanted to harm Plaintiff—as opposed to wanting to defend his reputation, protect his family, and defend his Presidency.

The Court justified its *sua sponte* exclusion of President Trump's testimony about his own state of mind by holding that Federal Rule of Evidence 103(d) "provide[s] that … 'To the extent practicable, the Court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.'" Tr. 615:5-9. The Court expressed its belief that President Trump's testimony might "contain or suggest inadmissible evidence," *id.* 615:12—*i.e.*, evidence that the Court ruled excluded based on the collateral estoppel effect of *Carroll II*. *Id.* 615:13-16.

This, too, was error. Regardless of the preclusive effect of the prior jury verdict—an issue that President Trump disputes—Federal Rule of Evidence 103(d) cautions against the jury's exposure to "inadmissible evidence," but it contains no warrant authorizing the Court to suppress admissible, highly probative evidence as a prophylaxis against admitting inadmissible evidence.[1]

---

[1] This reasoning is also at odds with the Court's January 9, 2024 Order, wherein it held that the *Access Hollywood* tape was admissible on the basis that it "could be found to be a unique window into Mr. Trump's mind provided in his own words and in his own voice" and would be "probative of his intent in making the June 21 and June 22 defamatory statements about Ms. Carroll." *Carroll*, 2024 WL 97359, at *10. This ruling turned on the Court's acknowledgment that "the question of whether Mr. Trump defamed Ms. Carroll with common law malice is essential to deciding whether she is entitled to punitive damages and important as well to determining the amount," and, therefore, "[t]here would be nothing inherently 'unfair' in receiving evidence that is uniquely probative on those questions." *Id.* The conclusion that the years-old *Access Hollywood* recording

*See, e.g., United States v. Htut*, No. 22-CR-671 (NSR), 2023 WL 4399049, at *15 (S.D.N.Y. July 7, 2023) (holding that *admissible* evidence could not be excluded under Rule 103(d)); *United States v. Young*, No. CR 10-923 (31), 2019 WL 9518255, at *2 (C.D. Cal. Apr. 22, 2019) (holding that "Rule 103(d) does not warrant the exclusion of" admissible evidence).  President Trump's counsel have found no case holding that Rule 103(d) authorizes a court to suppress *highly probative* evidence on the ground that some inadmissible evidence *might* be included in its submission.  On the contrary, the proper remedy for inadmissible evidence is a curative instruction, which the jury is presumed to follow.  *Tesser*, 370 F.3d at 320 ("It must be assumed that the jury followed instructions.") (alteration omitted) (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 340 (2d Cir. 1993)).

### C.    The Instruction on Common-Law Malice Was Erroneous and Prejudicial.

For similar reasons, the Court's jury instruction regarding common-law malice was erroneous and prejudicial.  "Among the grounds for granting a new trial under Rule 59 is a finding that a jury instruction was erroneous, and that the error was not harmless." *Stern v. Shammas*, No. 12-cv-5210 (NGG) (RER), 2015 WL 6440647, at *2 (E.D.N.Y. Oct. 21, 2015) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)); *see also Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 312 (1986) ("[A]n erroneous instruction, unless harmless, requires a new trial.").  A "jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).  "An error is deemed harmless" only if the court is "convinced that the error did not influence the jury's verdict." *LNC Invest., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d

---

is uniquely probative as to President Trump's motivation for making the June 21 and 22 statements, but his own testimony somehow is not, simply cannot be reconciled.

454, 463 (2d Cir. 1999) (quoting *United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996)).

"[W]here jury instructions create an erroneous impression regarding the standard of liability, it is

not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted."

*Id.* (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 554–55 (2d Cir. 1996)).

Here, the jury instruction on common law malice "create[d] an erroneous impression

regarding the standard of liability."   *Id.*   As discussed above, under New York law, a finding of

common-law malice requires a showing that malice or ill-will was the *sole and exclusive*

motivation for the allegedly defamatory statements.   *Chandok*, 632 F.3d at 815; *Liberman*, 80

N.Y.2d at 439; *Morsette*, 309 A.D.2d at 254; *Present*, 253 A.D.2d at 189.

Here, the Court instructed the jury on common-law malice as follows:

> Punitive damages may be awarded for defamation to punish a defendant who's acted
> maliciously and to deter him and others from doing the same.  A statement is made
> maliciously for purposes of questions 2 and 3 *if it is made with a deliberate intent to injure
> or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's
> rights.*

Tr. 791:23-792:4 (emphasis added).  By its plain terms, this instruction does *not* require a showing

that intent to injury was the sole and motivation for the challenged statements.  *See id.*  In fact—

by allowing the finding of malice to be made based on a showing of "reckless disregard of

another's rights," *id.*, it does not require malice or ill-will to be the motivation for the challenged

statements *at all*.

At the instruction conference, President Trump's counsel objected to this instruction on the

basis that the punitive damages instruction should "state[] that it must be the *sole motivation*," but

the Court overruled this objection.  Tr. 672:12-16 (emphasis added).  President Trump submitted

a proposed instruction specifying that the "sole motive" and the "sole motivation" must be

"hostility and a desire to injure Plaintiff," ECF No. 230, at 18, but the Court declined to adopt it.

Instead, the Court's instruction matched Plaintiff's proposed instruction on this point, which stated: "Punitive damages in relation to a defamation claim may be awarded to punish a defendant who has acted maliciously and to discourage others from doing the same.  A statement is with malice if it is made with deliberate intent to injure or made out of hatred, ill will, or spite or made with willful, wanton, or reckless disregard of another's rights."   ECF No. 228, at 5. Plaintiff cited two cases to support this proposed instruction.  *Id.* at 5-6 (citing *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 174 (2d Cir. 2000), and *Greenbaum v. Svenska Handelsbanken*, N.Y., 979 F. Supp. 973, 976 (S.D.N.Y. 1997), *on reconsideration sub nom. Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649 (S.D.N.Y. 1998)).  Neither case, however, provides a basis to disregard New York's well-established "sole motivation" requirement for common-law malice. *Celle* noted that a similar instruction on punitive damages was given in a libel case, but it also noted that the instruction was given "[w]ithout objection" from either side.  *Celle*, 209 F.3d at 174. Thus, the "sole motivation" issue was never presented to the court, and it was not considered or decided in that case.  *See id.  Greenbaum* provided a long discussion of whether the appropriate burden of proof for punitive damages under New York law is "clear and convincing evidence" or "preponderance of the evidence," and it does not discuss the "sole motivation" standard at all. *Greenbaum*, 979 F. Supp. at 976-983.

This instruction was erroneous, and the error was prejudicial.  Common law malice is an essential component of "the standard of liability," *LNC Investments*, 173 F.3d at 463, for a punitive-damages award in a New York defamation case.  *Carroll*, 2023 WL 4393067, at *19 ("Punitive damages may only be assessed under New York law if the plaintiff has established common law malice….").  By affirmatively instructing the jury that an intention to harm the plaintiff is not required to support a finding of common-law malice, the instruction plainly "created an erroneous

impression regarding the standard of liability." *LNC Investments*, 173 F.3d at 463, and therefore the error cannot be deemed harmless.  In fact, taken in conjunction with the extreme restrictions on President Trump's testimony discussed above, *see* Tr. 623:11-624:10, 627:7-13, the error was certainly prejudicial.  The jury heard almost no favorable evidence about President Trump's state of mind, and then it was instructed that even a partial motivation of ill will, or even mere recklessness with respect to the plaintiff's well-being, would support a finding of common-law malice.  Tr. 791:21-792:4.  Under these circumstances, at the very least, it is "far from certain that the erroneous instruction was harmless." *LNC Investments*, 173 F.3d at 462.  Instead, "it is certainly possible, if not likely, that the [erroneous] charge played a role in the verdict," especially because the "erroneous … instruction was … integral to the standard of liability." *Id.* at 463.

### D.    An Erroneous Instruction on Burden of Proof Compounded the Error.

The error in this instruction was further aggravated by the fact that the instruction allowed the jury to find malice by a preponderance of the evidence, rather than clear and convincing evidence.  At the instruction conference, President Trump's counsel objected that the verdict form and the jury instructions should advise the jury that the standard for punitive damages is "clear and convincing evidence."  Tr. 637:1-7 (verdict form); Tr. 678:7-13 (jury instructions).  The Court overruled both objections.  *See id.*  Instead, the Court instructed the jury that, "if you find that Ms. Carroll has proved by a preponderance of the evidence that Mr. Trump acted maliciously … in making the June 21 or the June 22 statement about Ms. Carroll – you will write down an amount, if any, that you find Mr. Trump should pay to Ms. Carroll in punitive damages."  Tr. 792:9-14 (emphasis added); see also ECF No. 280, at 1 (verdict form requiring a finding "by a preponderance of the evidence" to authorize punitive damages).

15

Both the instruction and the verdict form misidentified the burden of proof for punitive damages.  The substantive aspects of this case are governed by state law.  *See Osborn v. Haley*, 549 U.S. 225, 245 (2007) (state law claims heard in federal court subsequent to Westfall Act certification are pendent claims arising under the court's federal question subject matter jurisdiction); *see also Gasperini*, 518 U.S. at 427.  The burden of proof is a substantive question requiring the application of state law.  *See*, *e.g.*, *United States v. McCombs*, 30 F.3d 310, 323–24 (2d Cir. 1994) ("Presumptions and other matters related to the burden of proof are considered matters of substantive law, governed by the law of the jurisdiction whose substantive law applies to the merits of the question in issue."); *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945) ("[I]n diversity cases the federal courts must follow the law of the State as to burden of proof"); *Palmer v. Hoffman*, 318 U.S. 109, 117 (1943) ("The question of the burden of establishing contributory negligence is a question of local law which federal courts in diversity of citizenship cases must apply.") (internal citation omitted).  Thus, the question of what burden of proof is proper for punitive damages is governed by New York state law.

Although there is a split amongst New York appellate divisions, "the First and Second Departments have held that the standard is clear and convincing evidence."  N.Y. Pattern Jury Instr.—Civil §3:30 (citing *Orange & Rockland Utils., Inc. v. Muggs Pub, Inc.*, 292 A.D.2d 580 (2d Dep't 2002), and *Camillo v. Geer*, 185 A.D.2d 192, 194 (1st Dep't 1992)); *see also*, *e.g.*, *Munoz v. Puretz*, 301 A.D.2d 382, 384 (1st Dep't 2003) ("In order to recover punitive damages, a plaintiff must show, by 'clear, unequivocal and convincing evidence' … 'egregious and willful conduct' that is 'morally culpable, or is actuated by evil and reprehensible motives.'") (citations omitted); *Sladick v. Hudson Gen. Corp.*, 226 A.D.2d 263, 264 (1st Dep't 1996) ("Plaintiff failed to demonstrate by clear, unequivocal and convincing evidence that defendants' conduct was so

wanton or reckless as to justify an award of punitive damages."). Those divisions are correct. *But see Greenbaum*, 979 F. Supp. at 982 (reviewing the split of authority and concluding that "the preponderance standard is the appropriate standard under New York law"). It is well-established that, under New York law, punitive damages require conduct that "has the character of outrage frequently associated with crime." *Morsette*, 309 A.D.2d at 254 (citing, *inter alia*, *Prozeralik*, 82 N.Y.2d at 479). So, "like criminal conduct, [that conduct] must be clearly established." *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 843 (2d Cir. 1967) (quotations omitted). The First and Second Departments recognized that. *See Camillo*, 185 A.D.2d at 194; *see also Orange & Rockland Utils.*, 292 A.D.2d at 580. The First Department has also recognized that "[i]n defamation cases, the standard for awarding punitive damages is still higher" based on the "constitutionally guaranteed right to free speech." *Morsette*, 309 A.D.2d at 254. That authority is well-grounded, and so forms a persuasive basis for concluding that the "New York Court of Appeals would rule" similarly to the First and Second Departments on the evidentiary standard. *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 117 (2d Cir. 2000). The "clear and convincing evidence" standard should have been applied here.

## II.     The Awards of Compensatory and Punitive Damages Should Be Remitted.

"[W]hen a court is convinced that the jury's award" of non-economic damages "is entirely out of proportion to the plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy." *MacMillan v. Millennium Broadway Hotel,* 873 F. Supp. 2d 546, 560-61 (S.D.N. Y. 2012) (quoting *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.,* 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010)). Whether a jury's award is excessive is a question

of law for the Court to decide. *See, e.g., Koehler v. Metro. Transportation Auth.,* No. 16-CV-03 (AYS), 2023 WL 2499117, at *15 (E.D.N.Y. Mar. 14, 2023).[2]

"A federal court, in reviewing the amount of damages awarded on a state law claim, must apply New York law." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006). Under New York law, the court "reviewing a money judgment ... in which it is contended that the award is excessive or inadequate ... shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." *Id.* (quoting N.Y. C.P.L.R. § 5501(c)); *see also Payne v. Jones*, 711 F.3d 85, 97 n.8 (2d Cir. 2013) (noting that CPLR § 5501 applies for punitive damages; a "federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur."). "This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts." *Id.* The standard is thus "less deferential to [the] jury verdict" than review under federal standards. *Duarte v. St. Barnabas Hosp.,* 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018). Moreover, in "determining whether an award deviates materially from what would be reasonable compensation, district courts compare the jury's award to awards allowed in analogous cases involving similar types of injuries." *Id.* (quoting *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 327 (S.D.N.Y. 2016)).

"While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." *Dotson v. City of Syracuse*, No. 5:04-CV-1388(NAM)(GJD), 2011 WL 817499, at *13 (N.D.N.Y. Mar. 2, 2011) (citations omitted). "'[A] jury has broad discretion in measuring damages, but it may not abandon analysis for sympathy for

---

[2] "Rule 59, not Rule 50, is the proper vehicle for motions to reduce damage awards…" *Casmento v. Volmar Constr., Inc.,* No. 20-CV-00944 (LJL), 2022 WL 15773966, at *9 n. 5 (S.D.N.Y. Oct. 28, 2022) (citing cases).

a suffering plaintiff and treat an injury as though it were a winning lottery ticket.'" *Id.* (quoting *Khan v. Hip Centralized Lab. Servs., Inc.*, CV-03-2411, 2008 WL 4283348, at *6 (E.D.N.Y. Sept. 17, 2008)).

### A.      The $7.3 Million Compensatory Award Should Be Remitted.

First, as discussed in President Trump's motion to stay execution pending resolution of post-trial motions, ECF No. 287, at 7-11, the $7.3 million compensatory award should be remitted. That award of compensatory damages for emotional harm surpasses the permissible bounds for such damages and exceeds comparable awards in this district, warranting a significant reduction.

Under New York law, "a monetary judgment is excessive if it deviates materially from what would be reasonable compensation." *Bouveng*, 175 F. Supp. 3d at 327 (quotation omitted). "In determining whether an award deviates materially from what would be reasonable compensation, district courts compare the jury's award to awards allowed in analogous cases involving similar types of injuries." *Id.* (cleaned up).

Here, the $7.3 million compensatory award is solely for emotional distress. *See* ECF No. 277, at 6 (joint pre-trial order in which Plaintiff represented that she seeks only "compensatory damages for injury to her reputation, humiliation, and mental anguish," as well as "punitive damages to punish Trump," with no mention of economic damages); Tr. 788:15-19 (instructing the jury that it may award damages "for the injury to her reputation and for any humiliation and mental anguish," not economic damages); Tr. 710:15-20 (Plaintiff's counsel arguing to the jury that the first category of damages on the verdict form is for "pain and suffering" and "humiliation and mental anguish").

"In this Circuit, emotional distress awards ... can generally be grouped into three categories of claims: garden-variety, significant, and egregious." *Duarte*, 341 F. Supp. 3d at 319 (cleaned up)

(quoting *Vera v. Alstom Power, Inc*., 189 F. Supp. 3d 360, 376 (D. Conn. 2016), and *Graham v. City of N.Y.*, 128 F. Supp. 3d 681, 714 (E.D.N.Y. 2015)).   "For 'garden variety' emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury."   *Id.* (cleaned up).   "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration."   *Id.*

> *Duarte* provides a helpful collection of cases illustrating "garden-variety" distress:
>
> *MacCluskey v. Univ. of Connecticut Health Ctr.*, No. 3:13-CV-1408 (MPS), 2017 WL 684440, at *15-16 (D. Conn. Feb. 21, 2017) (plaintiff – who had suffered "multiple incidents of sexual harassment over a sustained period" – had established only "garden variety" emotional distress where she testified that "she felt 'ashamed and embarrassed,' was 'afraid to be home alone,' 'afraid to go out in public,' and 'didn't sleep for weeks,' " and continued to suffer from the past harassment, which caused her to "panic" when she felt "somebody behind [her]"; remitting jury's $200,000 emotional distress award to $125,000); *Manswell v. Heavenly Miracle Acad. Servs., Inc*., No. 14 CV 7114 (MKB) (SMG), 2017 WL 9487194, at *17 (E.D.N.Y. Aug. 23, 2017) (plaintiff had established only "garden variety" emotional distress where she claimed that (1) "she experienced 'extreme anxiety,' 'dreaded going to work,' and 'was fearful at all times' as a result of the harassment she [had] encountered while employed [by defendant]"; and (2) "as a result of the hostility she experienced at work, she felt pains in her chest, fatigue, and sleeplessness," and "would cry at night because she was scared to return to [work] in the morning"), *report and recommendation adopted*, No. 14 CV 7114 (MKB) (SMG), 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017); *Munson v. Diamond*, No. 15 CV 00425 (DAB) (BCM), 2017 WL 4863096, at *8 (S.D.N.Y. June 1, 2017) ("[C]ourts in this District have awarded emotional distress damages in the [garden variety range] based on [ ] general testimony that [a defendant's] discriminatory conduct caused the plaintiff 'continued stress, anger, sadness and frustration,' and that the plaintiff suffered from depression, panic attacks, headaches, nausea, loss of appetite, hives, and severe bouts of insomnia, even after [the plaintiff's] employment was terminated.") (citing *Jowers v. DME Interactive Holdings, Inc*., No. 00 CIV. 4753 (LTS) (KNF), 2006 WL 1408671, at *12 (S.D.N.Y. May 22, 2006)), *report and recommendation adopted*, No. 15 CIV. 425 (DAB), 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017).

*Duarte*, 341 F. Supp. 3d at 321-22.

Plaintiff's claim of emotional distress, which underlies the $7.3 million compensatory damages award for non-reputational injury, ECF No. 280, at 1, constitutes "garden-variety"

emotional injury.  Plaintiff's evidence as to how the June 21 and 22 statements caused her emotional distress consisted solely of her own testimony about her personal feelings.  She did not testify about any physical symptoms of her purported mental distress, much less any long-term physical or emotional effects.  She did not present any testimony from a medical expert, did not offer any medical records into evidence, and did not testify that she sought any medical treatment for any emotional harm she may have suffered as a result of the June 21 and 22 statements.  In short, Plaintiff failed to offer any evidence that her alleged distress was of any significant severity or duration, or that it resulted in any medical, physical, or clinical consequences—or even any extreme emotional effects.[3]

Given the lack of expert testimony, medical diagnosis, medical records, or evidence of any documented physical or psychological effects, Plaintiff's claim for emotional distress is properly classified as "garden variety."  *Duarte*, 341 F. Supp. 3d at 319.  Plaintiff's evidence clearly falls short of establishing the next higher level of emotional injury, *i.e.*, "significant" emotional distress.  "In this Circuit, 'significant' emotional distress is generally found only where a plaintiff has offered medical, psychological, or therapist evidence of substantial, long-term psychological harm," *id.* at 320—all of which are absent here.  In fact, Plaintiff's testimony here falls short of the evidence in *Duarte*, where "Plaintiff's vague and subjective complaints of insomnia, lower self-esteem, depression, anxiety, and stomach aches and headaches—unsupported by medical corroboration—

---

[3] To the contrary, Plaintiff testified that, in the aftermath of the June 21 and 22 statements, she felt embraced by the public, that people were "coming up to [her] in the street to praise [her]," Trial Tr. 237:11-13, and that she had a feeling of "warmth and [she] enjoyed it immensely," *id.* 242:13. She testified that she has experienced "[w]onderful, really wonderful support," *id.* 149:10-11, and that she frequently feels "optimistic and wonderful," *id.* 170:9-10.  When asked whether she has suffered emotional harm from the June 21 and 22 statements, Plaintiff stated: "I experienced both great support, which I found very encouraging, and on the other hand, horrible, menacing, terrible flood of slime.  Both.  Both.  Both things occurred at the same time." *Id.* 238:3-6.

establish[ed] no more than 'garden variety' emotional distress." *Id.* at 321. "Here, … Plaintiff offered no medical evidence whatsoever corroborating her testimony—which itself was quite limited—concerning the emotional distress she suffered…." *Bouveng*, 175 F. Supp. 3d at 332. "Because cases approving multi-hundred-thousand dollar awards for emotional damages all involve post-traumatic stress disorder or medical evidence of some other psychological harm, … the jury's … award cannot stand." *Id.* (cleaned up).

Because Plaintiff's evidence establishes, at most, "garden-variety" emotional distress, the compensatory damages award for non-reputational injury should be reduced to no more than $125,000. "Garden variety emotional distress claims generally merit $30,000.00 to $125,000.00 awards." *Duarte*, 341 F. Supp. 3d at 320 (quoting *Emamian v. Rockefeller Univ.*, 2018 WL 2849700, at *16 (S.D.N.Y. June 8, 2018)); *see also Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has ... affirmed awards of $125,000 each to plaintiffs for emotional distress … where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress.'") (citations omitted). "Awards compensating garden-variety emotional distress or mental anguish in the Second Circuit range from $30,000 to $125,000." *Lewis v. Am. Sugar Ref., Inc.*, 325 F. Supp. 3d 321, 364 (S.D.N.Y. 2018) (collecting cases); *see also Pelgrift v. 355 W. 41st Tavern, Inc.,* 14-CV-08934-AJN, 2018 WL 4735705, at *6 (S.D.N.Y. Sept. 30, 2018) (collecting cases). In the Second Circuit, "'[g]arden variety' emotional distress claims 'generally merit $30,000 to $125,000 awards.'" *Bouveng*, 175 F. Supp. 3d at 330 (citing cases).

In response to President Trump's stay motion, Plaintiff argued that the $7.3 million compensatory award includes compensation for "tangible, continuing economic harm," such as loss of "freelance work for other magazines," loss of paying Substack subscribers, and costs of

personal security.  ECF No. 303, at 17.  This attempt to expand to scope of damages contradicts Plaintiff's representations to both President Trump's counsel and the Court.  *See* ECF No. 277, at 6 (joint pre-trial order in which Plaintiff represented that she seeks only "compensatory damages for injury to her reputation, humiliation, and mental anguish," as well as "punitive damages to punish Trump," with no mention of economic damages).  This is consistent with the Court's jury instruction, which did not authorize any award of economic damages. Tr. 788:15-19 (instructing the jury that it may award damages "for the injury to her reputation and for any humiliation and mental anguish," not economic damages).  Plaintiff's counsel herself argued to the jury that this category of compensatory damages is for "pain and suffering" and "humiliation and mental anguish," not economic injury.  Tr.710:15-20.

Plaintiff also argued that the $7.3 million award may include "testimony about Carroll's public standing, the nature and circulation of Trump's statements, and the backlash provoked by Trump's attacks."  ECF No. 303, at 17-18.  But these are all just other ways to describe reputational injuries to be remediated through the reputation-repair program.  ECF No. 280, at 1.  Plaintiff fails to explain how her testimony supports a finding of anything other than (1) emotional damages, or (2) reputational injury to be remediated by the reputation-repair program.  Thus, the $7.3 million award includes only compensation for "psychological injury," *i.e.*, emotional harm.  *Id.* at 17. Anything else is impermissible double-counting.

Plaintiff also argued that her emotional injury is not "garden-variety," ECF No. 303, at 18-20, but her argument focuses entirely on President Trump's alleged *misconduct*, not on her alleged emotional injury.  *See id.*  Her entire argument is that President Trump's misconduct was supposedly "malicious[]" and his statements reached a wide audience, *id.*  This argument demonstrates the applicability of *Turley*'s concern that Plaintiff "stack[s] one attempt to monetize

highly offensive behavior, which effort is necessarily to some extent visceral, upon another,"
*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165-66 (2d Cir. 2014).  Though the nature of the
misconduct may sometimes be considered, the predominant consideration in deciding whether
emotional distress is "garden-variety" or "significant" is the evidence of the alleged *emotional
distress*, not the evidence of the allegedly tortious conduct.  *Duarte*, 341 F. Supp. 3d at 319;
*Bouveng*, 175 F. Supp. 3d at 328-34.  For "'garden variety' emotional distress claims, the evidence
of mental suffering is generally limited to *the testimony of the plaintiff*, who describes his or her
injury in vague or conclusory terms, without relating either the severity or consequences of the
injury." *Id.* at 328. (cleaned up) (emphasis added).  "Such claims typically lack extraordinary
circumstances and are not supported by any medical corroboration." *Id.*

      Here, instead of citing medical records, diagnoses, or treatment, Plaintiff quotes her own
highly metaphorical characterizations of her alleged distress, such as her claim that she "liv[es] in
a new universe" and the challenged statements "ended the world [she] had been living in," and
that she received hateful communications from third parties that sometimes made her fearful.  ECF
No. 303, at 19.  Such testimony matches the evidence in a long list of cases that *Duarte* cites as
proving only "garden-variety" emotional distress.  *See Duarte*, 341 F. Supp. 3d at 321-22 ("garden-
variety" cases involving anxiety, sleeplessness, insomnia, humiliation, fear of going in public,
depression, panic attacks, headache, loss of appetite, and fatigue).

      For these reasons, the $7.3 million award should be remitted to no more than $125,000.

      Moreover, even if Plaintiff could show that her distress was "significant" rather than
"garden-variety"—which she cannot do—the $7.3 million compensatory award would still be
grossly excessive.  The typical "top of the range for significant emotional distress is $200,000,"
not $7.3 million, with $500,000 as an outermost bound.  *Duarte*, 341 F. Supp. 3d at 320.  A

"significant" emotional distress claim "typically support damages awards ranging from $50,000 to $200,000." *Ravina v. Columbia University*, No. 16-CV-2137 (RA), 2019 WL 1450449, at *11 (S.D.N.Y. Mar. 31, 2019).  The uppermost bound for such award is $500,000—far below the $7.3 million awarded here.  *See, e.g., Villalta v. JS Barkats, P.L.L.C.*, 16-CV-02772, 2021 WL 2458699, at *14 (S.D.N.Y. Apr. 16, 2021) (noting that awards "up to $500,000" have been upheld in extreme cases); *Lewis*, 325 F. Supp. 3d at 364 (listing outlier awards exceeding $200,000, none of which exceed $500,000).  Thus, even if Plaintiff's emotional harm claim is viewed as "significant," the award is still excessive by many factors, and remittitur is still appropriate.  *See*, *e.g.*, *Rainone v. Potter*, 388 F. Supp. 2d 120, 126 (E.D.N.Y. 2005) (reducing award for emotional distress claim that was "more than mere garden variety" from $175,000 to $50,000 because there was "no evidence of physical manifestations of emotional distress or debilitating alterations in lifestyle, and no evidence of permanency."); *Emamian*, 2018 WL 2849700, at *17 (reducing "significant" emotional distress award from $2 million to $200,000 where evidence consisted of "[p]laintiff's own testimony regarding her mental state, her trichotillomania and physical manifestations of her emotional suffering," as well as "corroborative medical testimony."); *Bouveng,* 175 F. Supp. 3d at 328-34 (granting a remittitur of a $500,000 compensatory damages award on a sexual harassment claim to $150,000, where there was evidence of significant sexual harassment, but the evidence of emotional distress was limited to plaintiff's testimony); *McGrory v. City of New York*, No. CV 99–4062(FM), 2004 WL 2290898, at *15-16 (S.D.N.Y. Oct. 8, 2004) (granting a remittitur of a $530,000 pain and suffering award to $100,000 where evidence included corroborating testimony, and plaintiff had "established far more than garden variety emotional distress.").

**B.     The $11 Million Award for Reputational Repair Must Be Remitted.**

In addition, the $11 million award for reputational repair must also be remitted.  New York courts only permit the recovery of injury to reputation where record evidence supports a finding of actual injury.  *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974) ("[A]ll awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury."); *Nellis v. Miller*, 101 A.D.2d 1002, 1002–03 (4th Dep't 1984) ("Although injury to reputation is presumed if the defamation is libelous per se, the proof here falls short of establishing that plaintiff was substantially injured by the false statement…."); *see also, e.g.,* Restatement (Second) of Torts § 621 cmt. b (1977) (actual injury "includes 'impairment of reputation and standing in the community,' but this must be supported by competent evidence and cannot be presumed in the absence of proof").

Here, as noted above, Plaintiff did not seek to be compensated for any economic harm flowing from her reputational impairment.  The reputational damages were predicated solely on the "reputational repair program" described by Professor Ashlee Humphreys.  Tr. 818:12-13; *id.* 710:9-20.  Professor Humphrey's testimony was wholly speculative and fails to provide a valid basis for the outsize award.  Professor Humphreys failed to provide any credible testimony explaining why a reputational repair program was necessary, how it would be effective, or otherwise justify its cost.  Further, her testimony was contradictory and based on the false and misguided assumptions about the target audience of the reputational repair campaign.

*First*, Professor Humphreys failed to provide any basis for her estimate that a reputation repair campaign would cost "between $7.2 and $12.1 million." Tr. 401:5.  Professor Humphreys, by her own candid admission, has never performed a reputational repair campaign. Tr. 394:23-25; *id.* 464:11-13.  Despite testifying that she was "familiar with campaigns that have actually been

26

executed," *id.* 494:17-23, she was unable to recall the cost of any of those campaigns, *id.* 496:24-497:8.  When asked to identify "[a]ny prior campaigns [she is] familiar with that cost upwards of … $10 million," she could only point to a $50 million campaign that she "read an article" about because it "came across [her] newsfeed."  *Id.* 466:20-467:1.  That cost, however, was for a hedge fund manager who was "trying to send *negative* messages" about a billion-dollar corporation; it bears no relation to the cost required to *repair* the reputation of a single individual.  *Id.*  Professor Humphreys also acknowledged that she did not consult with any reputational repair firms, or obtain any estimates or quotes, even though those firms customarily carry out reputational repair campaigns. *Id.* 465:12. Therefore, her testimony that Plaintiff's reputational repair campaign would cost between $7.2 to $12.1 million was unfounded and speculative.

*Second*, Professor Humphreys was unable to credibly testify as to how her proposed campaign would be carried out.  On direct, she testified that notable figures, such as Joe Rogan or Candace Owens, could be hired to "talk about" Plaintiff's book or "share positive things about her." Tr. 396:16-23.  However, Professor Humphreys conceded that she never reached out to those individuals, or any conservative influencers, to determine whether they would be willing to participate in a reputational repair campaign on Plaintiff's behalf.  *Id.* 471:1-13.  This deficiency rendered her testimony on this crucial point entirely speculative.

*Third*, Professor Humphreys testified that her campaign would be aimed at people whose "minds [] you need to change," *id.* 391:25, whom she identified as individuals who were part of the "76 percent of Republicans [who] believed [President] Trump on issues of sexual assault" and who saw the June 21 and 22 statements.  *Id.* 392:13-16.  However, Professor Humphreys conceded that she did not take into consideration whether those same individuals "would have believed [Plaintiff's] initial accusation" in the first place; she only "assess[ed] whether [they] would have

27

believed [President] Trump." *Id.* 421:1-11.  Given her testimony that people "more readily believe

information that conforms to their views," *id.* 417:2-6, she effectively conceded that individuals

who already "believed [President] Trump on issues of sexual assault" would be predisposed to

think that Plaintiff's accusation was not credible even without any statement by President Trump.

Therefore, by Professor Humphreys' own logic, President Trump's denial of Plaintiff's accusation

would have no effect on those individuals' opinion of Plaintiff, and there was no harm attributable

to the June 21 and 22 statements.  *See Massre v. Bibiyan,* No. 1-CV-6615-KPF, 2014 WL 2722849,

at \*11 (S.D.N.Y. June 16, 2014) (denying claim for reputational harm where there was no evidence

of "how viewers' opinions of [the defendant] may have been altered.").

Finally, the jury's $11 million award for reputational harm is disproportionately high when

compared to awards in other relevant cases. Most notably, in *Carroll II*, the jury awarded Plaintiff

$1.7 million for reputational harm arising from President Trump's October 12, 2022 statement,

which Plaintiff testified was "equally disparaging and hurtful" to the June 2019 statements at issue

here.[4]  *See* ECF 189 at 328:19–329:7.  The $11 million award is also excessive in comparison to

other awards in this district.  *See Nellis,* 101 A.D.2d at 1002 (on defamation claim where plaintiff

presented evidence of his good reputation, which was refuted by defendant, and there was only

self-serving, uncorroborated testimony as to emotional distress, jury award of $150,000 reduced

to $5,000); *Perfect Fit Indus. v. Acme Quilting Co., Inc.,* 494 F. Supp. 505, 509-10 (S.D.N.Y. 1980)

(Motley, J.) (ordering new trial where $2.5 million award for injury to reputation met the "shocks

the conscience" federal standard; "[a]t no point in the trial did any witness testify that the allegedly

defamatory communications had impaired Acme's reputation."); *Walia v. Vivek Purmasir &*

---

[4] At the time of Plaintiff's testimony in *Carroll II*, the June 24 statement was still part of her claim. So her testimony that the October 12, 2022 statement was "as disparaging" as all three June 2019 statements implies that she views it as *more* disparaging than the June 21 and 22 statements alone.

*Assoc's., Inc.*, 160 F. Supp. 2d 380, 395 (E.D.N.Y. 2000) (award of $20,000 "to compensate [the plaintiff] for the harm done to her reputation and standing in the community" where defendant made numerous defamatory statements that she was a "whore" and a "slut"); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987) ($15,000 award for reputational harm for defaming plaintiff by repeatedly publishing her name in a "swinger's ad" in a magazine); *O'Neil v. Peekskil Faculty Ass'n Local,* 156 A.D.2d 514, 549 N.Y.S.2d 41 (2d Dep't 1989) (reducing jury award of $200,000 to $130,000 for defamation because evidence reflected only that plaintiff lost two contracts totaling $130,000 as a result of the false report constituting the defamation); *Dattner v Pokoik*, 81 A.D.2d 572, 574 (2d Dep't 1981) (reducing $75,000 award for reputation harm to $35,000, where defamatory statement related to plaintiff's profession and plaintiff maintained a good reputation in his industry and steady increase in salary).

**C.    The $65 Million Punitive Damages Award Must Be Remitted.**

The award of $65 million in punitive damages is grossly excessive and must be remitted. As discussed in President Trump's motion to stay execution of the judgment pending disposition of post-trial motions, Second Circuit case law requires this award to be reduced to a 1:1 ratio with compensatory damages.  ECF No. 287, at 3-7.  Further, the reduction in compensatory damages discussed above warrants a corresponding reduction of punitive damages in this one-to-one ratio.

The Second Circuit reviews the excessiveness of punitive awards both "under federal common law, pursuant to the federal appellate courts' supervisory authority over the trial courts." *Turley*, 774 F.3d at 164.  "In such cases, a degree of excessiveness less extreme than 'grossly excessive' will support remanding for a new trial or remittitur of damages." *Id.* (cleaned up).  The Court of Appeals "exercise[s] relatively stringent control over the size of punitive awards in order to ensure that such damages are 'fair, reasonable, predictable, and proportionate,' to avoid

29

extensive and burdensome social costs, and to reflect the fact that punitive awards are imposed without the protections of criminal trials." *Id.* (citation omitted). "[T]he degree of discretion enjoyed by trial courts in these matters is relatively narrow." *Id.* (citation omitted).

The Second Circuit also reviews punitive awards under the Constitution, including the Due Process Clause, because "[l]arge punitive damages awards … implicate constitutional due process principles." *Id.* "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* (citation omitted). Here, President Trump "challenges [the] award on both constitutional and non-constitutional grounds," *id.*, both of which lead to the same result—the punitive award must be remitted because it is both excessive under New York and federal common law, and grossly excessive under the Due Process Clause. *See id.* (noting that the Supreme Court's "guideposts" for excessiveness of punitive-damages awards "apply irrespective of whether [the court's] review is constitutional or supervisory in nature").

Under governing precedent, the punitive award violates both the Constitution and New York and federal common law. The jury's verdict, as reflected in the judgment, awards $7.3 million in compensatory damages for emotional injuries, plus $11 million in compensatory damages for the reputation repair program, for a total of $18.3 million in compensatory damages. ECF Nos. 280, 285. The jury then awarded $65 million in punitive damages, creating a punitive-to-compensatory ratio of 3.6:1. *See id.* Second Circuit precedent calls for the reduction of such excessive awards. *See, e.g., Turley*, 774 F.3d at 165-66. *Turley* involved a suit "for violations of state and federal anti-discrimination statutes, and for intentional infliction of emotional distress under New York law," based on "a pattern of extreme racial harassment in the workplace." *Id.* at 146; *see also id.* at 147-48 (describing the pattern of extreme racist behavior lasing over three years). The jury awarded $1.32 million in compensatory damages and $24 million in punitive

damages, which the district court remitted to $5 million—a post-remittitur ratio of 3.8:1, very close to the 3.6:1 ratio here.  *Id.* at 147.  Notwithstanding the egregious nature of the conduct, which left the plaintiff "psychologically scarred and deflated," *id.* at 146, the Second Circuit held that, even after it was remitted to $5 million, "the punitive damages award exceed[ed] the bounds of reasonableness."  *Id.* at 164.  The Second Circuit emphasized that a one-to-one ratio provides the proper guidepost for the "outermost limit" in cases where the compensatory award is both "imprecise" and "high when compared with similar cases":

> As a general matter, the four-to-one ratio of punitive to compensatory damages awarded is 'close to the line of constitutional impropriety.'  And where, as here, the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, 'a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'

*Id.* at 165 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).  So also here.  "[T]he compensatory award is particularly high," and "the underlying compensation is … for intangible—and therefore immeasurable—emotional damages."  *Id.*  "Imposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior … upon another."  *Id.* at 165-66.

Considering the uniquely egregious nature of the conduct in *Turley*—a three-year long pattern of extreme racist harassment and death threats—the Second Circuit concluded that "a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable in these circumstances."  *Id.* at 166.  But the Court also instructed that, in the great majority of cases, a 1-to-1 ratio would likely be the maximum allowable.  *Id.* at 167 ("[T]he Supreme Court has cautioned that, when a compensatory award is particularly high, a 1:1 ratio between compensation and punishment may be the maximum award permitted by the Constitution.").

Under *Turley*, a one-to-one ratio of punitive to compensatory damages, at most, should apply in this case.  Considering other "Second Circuit and New York cases" involving defamation claims, *id.* at 166, demonstrates that the compensatory damages awarded here—$18.3 million— are unquestionably "high."  *See, e.g., Bouveng*, 175 F. Supp. 3d at 348-49 (holding that "the compensatory award on Plaintiff's defamation claim is high" when the jury awarded $1.5 million, less than one-tenth of the amount awarded here); *Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 4612082, at *17 (S.D.N.Y. July 19, 2023) ($2.7 million in compensatory damages for similar conduct, less than 15 percent of the compensatory award here).  Reputational and emotional injuries, moreover, are quintessential forms of "imprecise" injury.  *Turley*, 774 F.3d at 165; *see also Bouveng*, 175 F. Supp. 3d at 348 (noting "the difficulty in determining the monetary value of Plaintiffs' emotional distress and the damage to her reputation").  Thus, as in *Turley*, "the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases." 774 F.3d at 165.  Remitting the punitive damages award would thus be consistent with similar recent decisions of this Court.  *See, e.g., Noonan v. Becker*, No. 14-cv-4084 (LTS) (JLC), 2018 WL 1738746, at *8-9 (S.D.N.Y. Apr. 10, 2018), *report and recommendation adopted by* 2018 WL 2088279 (S.D.N.Y. May 3, 2018) (citing *Turley* and awarding punitive damages at a 1:1 ratio in a case involving far more egregious conduct than alleged here); *Bouveng*, 175 F. Supp. 3d at 350 (holding, in a defamation case involving "conduct … at the extreme end of the spectrum," "that a punitive damage award yielding a ratio of no more than 1:1 as to each defendant is appropriate").

Plaintiffs' attempts to distinguish *Turley* in response to President Trump's stay motion, ECF No. 303, at 21-25, are unconvincing.  Plaintiff first argues that a 3.6:1 ratio is acceptable here because "the degree of reprehensibility" is supposedly "exceedingly high."  *Id.* at 22.  Not so.  As

32

Plaintiffs' numerous exhibits confirm, all President Trump's statements were *defensive*, as he has clearly and consistently denied any wrongdoing after he was very publicly accused of decades-old alleged misconduct.   Denials of public accusations of wrongdoing are not "reprehensib[le]" conduct—in fact, they are privileged from liability in many jurisdictions.[5]  *See also Payne*, 711 F.3d at 101 (holding that, where conduct is responsive, that fact "diminishes the degree of reprehensibility" as a "significant mitigating factor[]").

In any event, *Turley* held that the conduct in that case was "egregious in the extreme," 774 F.3d at 165, and yet the Court remitted the 3.8:1-ratio punitive damages award.   In so holding, the Second Circuit instructed that "where, as here, [1] the compensatory damages award is imprecise because of the nature of the injury and [2] high when compared with similar cases, 'a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'"   *Id.*   Here, both factors are satisfied—the nature of the injury, reputational and emotional damages, is "imprecise," and the award is "high when compared to similar cases."   *Id.* Accordingly, even if the conduct were supposedly reprehensible—which President Trump's is not—a 1:1 ratio presents "the outermost limit of the due process guarantee."   *Id.*

Plaintiff argues that the 3.6:1 ratio "is of no constitutional concern," because *State Farm* supposedly "established 9:1—not 1:1—as the presumptive outer limit."   ECF No. 303, at 23.   Not so.   *Turley* provided 1:1 as the "presumptive outer limit" for awards involving "high" awards of "imprecise damages."   774 F.3d at 165.   In so holding, *Turley* quoted *State Farm*'s statement that,

---

[5] *See, e.g., Kane v. Orange County Publications*, 232 A.D.2d 526, 649 N.Y.S.2d 23, 26 (2d Dep't 1996) (noting the allegedly defamatory statement was in "response to unfavorable publicity" and "covered by a qualified privilege") (citing *Hines v. Arkansas Louisiana Gas Co.*, 613 So.2d 646 (La. App. 1993); *Park Knoll Associates v. Schmidt*, 451 N.E.2d 182 (N.Y. App. 1983); *Toker v. Pollak*, 376 N.E.2d 163 (N.Y. App. 1978); and *Shenkman v. O'Malley*, 2 A.D.2d 567, 157 N.Y.S.2d 290 (1st Dep't 1956)).

in such cases, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* (quoting *State Farm*, 538 U.S. at 425).   Consistent with *State Farm*, *Turley* went on to hold that the 3.8:1 ratio in that case was also invalid as a matter of federal common law: "Where the compensatory award is particularly high, as the one in this case assuredly was, a four-to-one ratio of punishment to compensation, in our view, serves neither predictability nor proportionality."  *Turley*, 774 F.3d at 165.  "[T]his is particularly so where the underlying compensation is, as it is in this case, for intangible—and therefore immeasurable— emotional damages." *Id.* at 165.

Plaintiff points to two cases involving massive punitive awards in defamation cases to argue that cases in other districts have imposed similar awards.   ECF No. 303, at 25.   Neither of these awards would survive scrutiny under *Turley*.   In any event, *Turley* does not require the compensatory award to be "the highest ever awarded."  *Turley* requires only that the $18.3 million award be "high when compared with similar cases," *id.*—which is plainly true here, when compared with *Turley*, *Bouveng*, and *Carroll II*.

For all these reasons, the punitive damages award should be remitted to a one-to-one ratio with compensatory damages.

**CONCLUSION**

For the reasons stated herein, President Trump's motion for new trial or to alter or amend

the judgment under Rule 59 of the Federal Rules of Civil Procedure should be granted.

Dated: New York, New York                      Respectfully submitted,
      March 5, 2024

/s/ Alina Habba                                /s/ D. John Sauer
Alina Habba, Esq.                              D. John Sauer*
Michael T. Madaio, Esq.                        William O. Scharf**
HABBA MADAIO & ASSOCIATES LLP                  JAMES OTIS LAW GROUP, LLC
1430 U.S. Highway 206, Suite 240               13321 North Outer Forty Road, Suite 300
Bedminster, New Jersey 07921                   Chesterfield, Missouri 63017
      -and-                               (314) 562-0031
112 West 34th Street, 17th & 18th Floors       John.Sauer@james-otis.com
New York, New York 10120
Telephone: (908) 869-1188                      * *Pro Hac Vice* pending
E-mail: ahabba@habbalaw.com                    ** *Pro Hac Vice* forthcoming

                                         *Attorneys for President Donald J. Trump*