# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

          *Plaintiff,*

   v.

DONALD J. TRUMP, *in his individual capacity*,

          *Defendant*.

No. 20 Civ. 7311 (LAK)

---

## PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S MOTION FOR A NEW TRIAL OR REMITTITUR

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

APPLICABLE STANDARD...................................................................................................... 2

ARGUMENT ............................................................................................................................. 2

I.   A NEW TRIAL IS NOT WARRANTED ............................................................................ 2

    A.  The Court Properly Instructed the Jury on Punitive Damages ............................................ 2

    B.  The Court Did Not Abuse Its Discretion in Limiting Trump's Testimony ....................... 5

        1. Relevant Background ..................................................................................................... 5

        2. To the Extent Reviewable, the Court's Actions Were Sound........................................ 13

    C.  Trump's Substantial Rights Were Not Affected .................................................................. 18

II.  THE JURY'S COMPENSATORY DAMAGES AWARD IS NOT EXCESSIVE ............... 21

    A.  Non-Reputational Repair Campaign Damages ................................................................... 22

    B.  Reputational Repair Campaign Damages ........................................................................... 27

III. THE JURY'S PUNITIVE DAMAGES AWARD IS NOT EXCESSIVE EITHER ............. 32

CONCLUSION.......................................................................................................................... 36

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abascal v. Fleckenstein*,
    820 F.3d 561 (2d Cir. 2016) .................................................................... 18

*Aquavit Pharms., Inc. v. U-Bio Med, Inc.*,
    No. 19 Civ. 3351, 2023 WL 2396511 (S.D.N.Y. Feb. 17, 2023) ........................ 3

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559, 116 S. Ct. 1589 (1996) ................................................... 32

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003) .................................................................... 21

*Bouveng v. NYG Cap. LLC*,
    175 F. Supp. 3d (S.D.N.Y. 2016) ...................................................... 21, 24, 26

*Bouveng v. NYG Cap. LLC*,
    No. 14 Civ. 5474 (S.D.N.Y. June 29, 2015) ........................................... 4

*Calantonio v. Mercy Med. Ctr.*,
    135 A.D.3d 686 (2d Dep't 2016) .......................................................... 3

*Cantu v. Flanigan*,
    705 F. Supp. 2d 220 (E.D.N.Y. 2010) ............................................. 27, 31

*Carroll v. Trump*,
    No. 20 Civ. 7311, 2023  WL 5731152 (S.D.N.Y. Sept. 6, 2023) ............... 1, 5, 17

*Carroll v. Trump*,
    No. 20 Civ. 7311, 2024 WL 97359 (S.D.N.Y. Jan. 9, 2024) ....................... 5, 6

*Carroll v. Trump*,
    No. 22 Civ. 10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ............... *passim*

*Celle v. Filipino Reporter Enterprises Inc.*,
    209 F.3d 163 (2d Cir. 2000) ...................................................... 4, 20, 32

*Chandok v. Klessig*,
    632 F.3d 803 (2d Cir. 2011) ...................................................... 3, 4

*Corrigan v. Bobbs-Merrill Co.*,
    228 N.Y. 58 (1920) ...................................................................... 4

*Cusimano v. United Health Servs. Hosps., Inc.*,
91 A.D.3d 1149 (3d Dep't 2012) ................................................................ 3

*Dalbec v. Gentleman's Companion, Inc.*,
828 F.2d 921 (2d Cir. 1987) ...................................................................... 31

*Daniels v. Kostreva*,
No. 15 Civ. 3141, 2017 WL 823583 (E.D.N.Y. Jan. 12, 2017) ......................... 3

*Dattner v. Pokoik*,
81 A.D.2d 572 (2d Dep't 1981) ................................................................. 31

*DiBella v. Hopkins*,
403 F.3d 102 (2d Cir. 2005) ....................................................................... 3

*DiSorbo v. Hoy*,
343 F.3d 172 (2d Cir. 2003) ..................................................................... 33

*Duverge v. United States*,
No. 3:10 Civ. 1922, 2018 WL 619497 (D. Conn. Jan. 30, 2018) .................... 15

*Ferri v. Berkowitz*,
561 F. App'x 64 (2d Cir. 2014) ................................................................. 21

*Fischer v. OBG Cameron Banfill LLP*,
No. 08 Civ. 7707, 2010 WL 3733882 (S.D.N.Y. Sept. 24, 2010) ..................... 4

*Freeman v. Giuliani*,
No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023) .......................................... 27, 31, 35

*Giuffre v. Dershowitz*,
410 F. Supp. 3d 564 (S.D.N.Y. 2019) ......................................................... 18

*Greenbaum v. Svenska Handelsbanken, N.Y.*,
979 F. Supp. 973 (S.D.N.Y. 1997) ............................................................... 5

*Herbert v. Lando*,
441 U.S. 153, 99 S. Ct. 1635 (1979) .......................................................... 20

*Hoesten v. Best*,
34 A.D.3d 143 (1st Dep't 2006) .................................................................. 3

*Jennings v. Yurkiw*,
18 F.4th 383 (2d Cir. 2021) ................................................................ 32, 34

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015) ............................................................................................ 33

*Katt v. N.Y.C.*,
    151 F. Supp. 2d 313 (S.D.N.Y. 2001) .............................................................................. 30

*Lafferty v. Jones*,
    No. X06-UWY-CV18-6046436-S, 2022 WL 18110184 (Conn. Super. Ct. Nov. 10,
    2022) ................................................................................................................................. 35

*Lee v. Edwards*,
    101 F.3d 805 (2d Cir. 1996) ............................................................................................ 34

*Lewis v. Newsday, Inc.*,
    246 A.D.2d 434 (1st Dep't 1998) ...................................................................................... 3

*Liberman v. Gelstein*,
    80 N.Y.2d 429 (1992) ........................................................................................................ 3

*LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*,
    308 F.3d 169 (2d Cir. 2002) ............................................................................................ 23

*Lynch v. N.Y. Times Co.*,
    171 A.D. 399 (1st Dep't 1916) ........................................................................................ 21

*Marcic v. Reinauer Transp. Cos.*,
    397 F.3d 120 (2d Cir. 2005) ............................................................................................ 18

*Massre v. Bibiyan*,
    No. 12 Civ. 6615, 2014 WL 2722849 (S.D.N.Y. June 16, 2014) ..................................... 30

*Mercado v. One Beacon Ins. Grp.*,
    356 F. App'x 553 (2d Cir. 2009) ..................................................................................... 15

*Morsette v. "The Final Call"*
    309 A.D.2d 249 (1st Dep't 2003) ...................................................................................... 3

*Nellis v. Miller*,
    477 N.Y.S.2d 72 (1984) ................................................................................................... 31

*O'Neil v. Peekskill Fac. Ass'n Loc. No. 2916*,
    156 A.D.2d 514 (2d Dep't 1989) ..................................................................................... 31

*Osorio v. Source Enters., Inc.*,
    No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) ...................................... 27

*Paravas v. Tran*,
    No. 21 Civ. 807, 2022 WL 718842 (S.D.N.Y. Feb. 22, 2022) ............................................ 4

*Patrolmen's Benevolent Ass'n of N.Y.C. v. N.Y.C.*,
    310 F.3d 43 (2d Cir. 2002) ................................................................................................ 24

*Payne v. Jones*,
    711 F.3d 85 (2d Cir. 2013) ......................................................................................... 33, 35

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
    494 F. Supp. 505 (S.D.N.Y. 1980) .................................................................................... 31

*Perry v. N.Y.C.*,
    552 F. Supp. 3d 433 (S.D.N.Y. 2021) ............................................................................... 28

*Present v. Avon Prod., Inc.*,
    253 A.D.2d 183 (1st Dep't 1999) ....................................................................................... 3

*Prozeralik v. Cap. Cities Commc'ns, Inc.*,
    82 N.Y.2d 466 (1993) ........................................................................................... 3, 19, 20

*Prozeralik v. Capital Cities Commc'ns, Inc.*,
    222 A.D.2d 1020 (4th Dep't 1995) .................................................................................... 27

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017) .............................................................................................. 25

*Rogers v. Bradt*,
    No. 10 Civ. 2696, 2013 WL 3990777 (E.D.N.Y. Aug. 5, 2013) ....................................... 15

*Stampf v. Long Island R. Co.*,
    761 F.3d 192 (2d Cir. 2014) ................................................................................................ 2

*State Farm Mutual Automobile Ins. Co. v. Campbell*,
    538 U.S. 408, 123 S. Ct. 1519 (2003) ......................................................................... 33, 34

*Stukuls v. State*,
    42 N.Y.2d 272 (1977) ......................................................................................................... 3

*Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*,
    226 A.D.2d 227 (1st Dep't 1996) ....................................................................................... 3

*Thorsen v. Cnty. of Nassau*,
    722 F. Supp. 2d 277 (E.D.N.Y. 2010) .............................................................................. 24

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014)........................................................................ 32, 34

*United States v. Bell*,
    584 F.3d 478 (2d Cir. 2009).............................................................................. 18

*United States v. Dowdell*,
    737 F. App'x 577 (2d Cir. 2018) ....................................................................... 19

*United States v. Mokol*,
    646 F.3d 479 (7th Cir. 2011) ............................................................................. 15

*United States v. Nouri*,
    711 F.3d 129 (2d Cir. 2013)................................................................................. 2

*United States v. Quinones*,
    511 F.3d 289 (2d Cir. 2007)............................................................................... 15

*United States v. Spoor*,
    904 F.3d 141 (2d Cir. 2018).......................................................................... 17, 18

*United States v. Spruill*,
    808 F.3d 585 (2d Cir. 2015)........................................................................... 14, 15

*Van Buskirk v. The New York Times Co.*,
    325 F.3d 87 (2d Cir. 2003)................................................................................... 5

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)................................................................ 30

*Walia v. Vivek Purmasir & Assocs., Inc.*,
    160 F. Supp. 2d 380 (E.D.N.Y. 2000) ............................................................... 31

*Webber v. Dash*,
    607 F. Supp. 3d 407 (S.D.N.Y. 2022)................................................................... 4

*Wiener v. AXA Equitable Life Ins. Co.*,
    No. 16 Civ. 4019, 2022 WL 950979 (S.D.N.Y. Mar. 29, 2022) ........................ 28

*Yammine v. DeVita*,
    43 A.D.3d 520 (3d Dep't 2007) ......................................................................... 21

**FEDERAL RULES**

Federal Rules of Civil Procedure Rule 59 ................................................................ 28

Federal Rules of Evidence Rule 403................................................................... 6, 17, 18

Federal Rules of Evidence Rule 611................................................................... 15

Federal Rules of Evidence Rule 702................................................................... 28

**OTHER AUTHORITIES**

2 Handbook of Fed. Evid. § 103:7 (9th ed.) ..................................................... 17

Aaron Blake, *Did Trump Just Defame E. Jean Carroll again?*, Wash. Post (Mar. 11, 2024) ..... 35

Aaron Katersky, et al., *Trump Butts Heads with Judge in Heated Courtroom Exchanges During E. Jean Carroll Case*, ABC News (Jan. 17, 2024)................................... 10

Adam Reiss & Dareh Gregorian, *Trump Continues Blasting E. Jean Carroll as Damages Trial Postponed Amid Covid Concerns*, NBC News (Jan. 22, 2024)........................... 10

Cailey Gleeson, *Trump Lashes Out About Legal Woes in Michigan Speech—Blasts 'Crooked Judge,' Swipes Again at Carroll*, Forbes (Feb. 18, 2024) ................................... 35

James Bickerton, *Donald Trump Goes on E. Jean Carroll Posting Binge*, Newsweek (Jan. 19, 2024)................................................................................................. 10

Larry Neumeister, et al., *Trump Scowls as Jury Is Picked to Decide How Much He Owes for Defamation in E. Jean Carroll Case*, Los Angeles Times (Jan. 16, 2024) .......................... 7

Maggie Haberman & Kate Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*, N.Y. Times (Jan. 28, 2024)................................................................. 8, 10

Michael R. Sisak, *Trump Leaves Court Before Attorney Told Jury He Tried to Destroy Columnist's Reputation in Defamation Trial*, PBS Newshour (Jan. 16, 2024)................... 7

Molly Crane-Newman & Kerry Burke, *Donald Trump Attends Jury Selection at NYC Trial Against E. Jean Carroll*, N.Y. Daily News (Jan. 16, 2024)................................... 8

N.Y. Pattern Jury Instr. Civil 3:30................................................................... 3

Sara Dorn, *Trump Posts About E. Jean Carroll More Than 35 Times—Ahead of Today's Potential Testimony*, Forbes (Jan. 25, 2024)..................................................... 10

## PRELIMINARY STATEMENT

In June 2019, when Defendant Donald J. Trump was still president, he released two statements in less than 24 hours in which he denied sexually assaulting Plaintiff E. Jean Carroll, threatened her, and claimed that she had fabricated her accusation to make money, sell books, or as part of a political conspiracy. As the *Carroll II* jury found, those were all lies.

Due to the Court's earlier partial summary judgment ruling, the evidence presented during the *Carroll I* trial concerning the June 2019 statements was designed to answer only two questions: (1) whether the defamatory statements Trump made about Carroll damaged her, and if so, how much Trump should have to pay to compensate her for the harm he caused; and (2) whether Trump made the defamatory statements with common law malice, and if so, how much money he needed to pay to prevent him and others from acting similarly in the future. Carroll presented overwhelming evidence in support of her case. Trump took the stand for less than three minutes. And the jury returned a verdict entirely in favor of Carroll, awarding her $83.3 million in damages.

Here, Trump seeks to set that verdict aside, or, at a minimum, reduce the amount of money he now owes Carroll. His arguments are meritless. The Court's jury instructions were consistent with New York defamation law; the Court acted well within its discretion to limit and strike part of Trump's testimony; the compensatory damages award accurately reflects the evidence presented and does not deviate materially from reasonable compensation; and finally, the punitive damages award is not excessive. Quite the opposite. During the trial itself, the jury heard with their own ears and saw with their own eyes exactly how Trump has continued to defame Carroll since the *Carroll II* verdict and his mid-trial promise to defame her "a thousand times." And the jury watched Trump carry out this promise in real-time, treating the courtroom like a campaign event. For these reasons and others explained below, the Court should deny Trump's motion.

1

## APPLICABLE STANDARD

A court may grant a new trial due to non-harmless errors in "admitting or excluding evidence," *Stampf v. Long Island R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014), or in instructing the jury, *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013). An error is not harmless if it affected the defendant's "substantial rights," which means "that there must be a reasonable probability that the error affected the outcome of the trial." *Id.*

A "trial judge [also] enjoys discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence, and this discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Carroll v. Trump*, No. 22 Civ. 10016, 2023 WL 4612082, at *17 (S.D.N.Y. July 19, 2023) (cleaned up). In considering such a motion, "[t]he role of the [judge] is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.* The judge must "bear in mind, however, that [he] should only grant such a motion when the jury's verdict is egregious" and "should rarely disturb a jury's evaluation of a witness's credibility." *Id.* In analyzing whether an award comes within the confines of state law, "the relevant standard is 'not whether an award deviates *at all* from past awards—it is whether an award deviates *materially* from *reasonable compensation*.'" *Id.* (cleaned up).

## ARGUMENT

## I.    A NEW TRIAL IS NOT WARRANTED

### A.    The Court Properly Instructed the Jury on Punitive Damages

Trump argues that the Court's jury instructions erred in two ways. First, he says the Court downplayed the necessary intent for common law malice. Mot. 2-5, 14. Second, he asserts that the

Court relaxed Carroll's burden to prove that requisite intent. *Id.* at 15-17. Both arguments can be easily discarded—the Court's jury instructions were fully consistent with New York law.

 ***Common law malice***. The Court instructed the jury that it could award punitive damages if it found that Trump had made the defamatory statements with a "deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights." Ex. A ("Tr.") at 792. This language matches the New York Pattern Jury Instructions exactly. *See* N.Y. Pattern Jury Instr. Civil 3:30. Unsurprisingly, it is consistent with New York law. *See Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993); *Lewis v. Newsday, Inc.*, 246 A.D.2d 434, 437 (1st Dep't 1998). And it is also consistent with how courts have instructed juries in this Circuit, *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005), and have otherwise assessed and awarded punitive damages, *Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, No. 19 Civ. 3351, 2023 WL 2396511, at *15 (S.D.N.Y. Feb. 17, 2023), *report and recommendation adopted*, 2023 WL 2584198 (Mar. 21, 2023); *Daniels v. Kostreva*, No. 15 Civ. 3141, 2017 WL 823583, at *13 (E.D.N.Y. Jan. 12, 2017), *report and recommendation adopted*, 2017 WL 519227 (Feb. 8, 2017).

 Against this wall of authority, Trump maintains that the district court should have instructed the jury that it could award punitive damages only if it found that Trump acted "solely" with this intent or motivation. Mot. 2-5. He is mistaken. All but one of the cases Trump relies on arose in the context of using common law malice to overcome a privilege defense, not to award punitive damages. *See id.* at 2-5.[1] Trump's citation to *Chandok v. Klessig* proves the point. There, the Second Circuit identified what it takes to defeat a common law privilege in a claim for

---

[1] *See Stukuls v. State*, 42 N.Y.2d 272, 281-82 (1977); *Present v. Avon Prod., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999); *Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*, 226 A.D.2d 227, 229 (1st Dep't 1996); *Liberman v. Gelstein*, 80 N.Y.2d 429, 439 (1992); *Hoesten v. Best*, 34 A.D.3d 143, 158 (1st Dep't 2006); *Calantonio v. Mercy Med. Ctr.*, 135 A.D.3d 686, 691-922 (2d Dep't 2016); *Cusimano v. United Health Servs. Hosps.*, Inc., 91 A.D.3d 1149, 1150-51 (3d Dep't 2012); *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011). In the one case that did not, *Morsette v. "The Final Call"*, the dissenting opinion identified the majority's "misplaced" reliance on cases from the privilege context. 309 A.D.2d 249, 260-61 (1st Dep't 2003) (Marlow, J., dissenting) (collecting cases).

defamation under New York law. The Second Circuit explained that "while either actual malice or common-law malice will suffice to defeat a conditional privilege, common-law malice will defeat such a privilege … only if a jury could reasonably conclude that spite or ill will was the one and only cause for the publication." 632 F.3d 803, 815 (2d Cir. 2011) (cleaned up) (citation omitted). This presupposes that "spite or ill will" need not be the "one and only cause for the publication" when a privilege is not applicable, or there would be no reason to draw this distinction.

*Burden of proof.* The Court instructed the jury that it could award Carroll punitive damages only if it found "that [she] has proved by a preponderance of the evidence that [] Trump acted maliciously," as defined above. Tr. 792. Trump contends that the proper burden of proof is clear and convincing evidence, rather than preponderance. Mot. 15-17. Once again, he is wrong.

In *Corrigan v. Bobbs-Merrill Co.*, the New York Court of Appeals held that defamation plaintiffs must prove common law malice by a preponderance of the evidence. 228 N.Y. 58, 66 (1920). Consistent with this understanding, in *Celle v. Filipino Reporter Enterprises Inc.*, the Second Circuit explained that "[p]unitive damages may [] be assessed under New York law [only] if the plaintiff has established common law malice … by a preponderance of the evidence." 209 F.3d 163, 184 (2d Cir. 2000) (citation omitted). Trump ignores *Corrigan* and *Celle*, *see* Mot. 15-17, but courts in this Circuit have not: following their direction, these courts have regularly instructed juries and decided cases under a preponderance standard, *see Webber v. Dash*, 607 F. Supp. 3d 407, 412 (S.D.N.Y. 2022); *Bouveng v. NYG Cap. LLC*, No. 14 Civ. 5474 (S.D.N.Y. June 29, 2015), ECF 221 at 3; *Fischer v. OBG Cameron Banfill LLP*, No. 08 Civ. 7707, 2010 WL 3733882, at *3 (S.D.N.Y. Sept. 24, 2010); *see also Paravas v. Tran*, No. 21 Civ. 807, 2022 WL 718842, at *9 (S.D.N.Y. Feb. 22, 2022), *report and recommendation adopted*, 2022 WL 718587 (Mar. 10, 2022). Although state intermediate courts have sometimes applied the wrong standard,

*see* Mot. 16-17; *Greenbaum v. Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 976 (S.D.N.Y. 1997) (collecting examples), those courts are neither binding on this Court nor the ultimate arbiters of New York law, *see Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003).

### B.    The Court Did Not Abuse Its Discretion in Limiting Trump's Testimony

Trump also takes issue with this Court's handling of his testimony. Mot. 5-12. In making this argument, Trump mischaracterizes and excludes key parts of the record; those facts provide critical context, undercut his position, and support the Court's rulings.

#### 1.    Relevant Background

***Pretrial rulings***. After the *Carroll II* verdict and receiving full briefing from the parties, this Court granted partial summary judgment in favor of Carroll. *See Carroll v. Trump*, No. 20 Civ. 7311, 2023 WL 5731152 (S.D.N.Y. Sept. 6, 2023). That order limited the trial in this action to "damages only." *Id.* at *2. As a result, Trump was barred from disputing issues of liability concerning his June 2019 statements because he had already lost those issues in *Carroll II*.

Trump had great difficulty with this directive. The parties met and conferred following the Court's order, and during those discussions, it became clear that Trump intended to introduce evidence at the upcoming trial that would run afoul of the Court's order (and previous evidentiary decisions). So Carroll moved *in limine* to exclude that evidence. *See* ECF 233. And Trump's response demonstrated all the ways in which he intended to circumvent the Court's prior orders at the upcoming trial. *See* ECF 235.

In response, the Court issued an order *in limine*. Here, it granted almost the entirety of Carroll's motion and precluded Trump and his counsel from "offering any evidence, argument, or comments" in the "presence of the jury" concerning certain topics. *Carroll v. Trump*, No. 20 Civ. 7311, 2024 WL 97359, at *11 (S.D.N.Y. Jan. 9, 2024). Most significantly, the Court barred Trump and his counsel from "[s]uggesting or implying that [] Trump did not sexually abuse Carroll; that

he did not make his June 21 and 22, 2019 statements concerning [] Carroll with actual malice in the constitutional sense of that term; that [] Carroll fabricated her account, whether in consequence of a political agenda, financial interests, mental illness, or otherwise; or offering testimony or advancing any argument inconsistent with the Court's collateral estoppel decision determining that [] Trump, with actual malice, lied about sexually assaulting [] Carroll." *Id.*

But Trump did not heed the Court's instruction. After the Court's order, the parties met and conferred over certain exhibits Trump included in the Joint Pretrial Order that were facially no longer permissible in light of the Court's ruling. Trump refused to exclude them. After letter briefing, *see* ECF 254, 261, 264, the Court observed that Trump's "proffer" in support of the relevance of some of those exhibits was "inconsistent with the Court's prior *in limine* ruling," ECF 267. For others, the Court ordered their exclusion under Rule 403, explaining that it "already ha[d] ruled that *Carroll II* collaterally estops [Trump] from contending, among other things, that he did not sexually assault [] Carroll and has precluded evidence on that issue. … The introduction of the [exhibits] needlessly and confusingly would invite the jury to decide this case on the basis of [Trump's] view that those issues are open to discussion or reconsideration. They are not." *Id.* at 3.

Given this pattern of behavior, Carroll understandably had serious concerns that Trump would continue in his attempts to cast into doubt whether he sexually assaulted and defamed Carroll, and would do so in front of the jury. That danger seemed particularly acute if Trump himself elected to testify—since the *Carroll II* verdict, Trump had repeated his defamatory statements about Carroll in multiple forums and included references to topics that this Court had ruled inadmissible in the upcoming trial. *See* Ex. B. And during this intervening period, Trump had also testified in a different lawsuit, where he repeatedly defied the judge's orders in that case. *See* ECF 256 at 2; *see also* ECF 233 at 5-6 (collecting examples). As Trump later explained, he

considered the courtroom as "part of the campaign."[2] Carroll expressed these concerns in a pretrial letter to the Court. *See* ECF 256. Trump disputed that Carroll had any reason to be concerned, *see* ECF 265, and the Court indicated to the parties that it will "take such measures as it finds appropriate to avoid circumvention of its rulings and of the law." ECF 267 at 3.

***Trump's and his counsel's trial conduct***. That brings us to trial itself. Trump did not attend the first trial. Tr. 628. He did attend most of this one. And when Trump did show up, as Carroll had warned, Trump paired his attendance with disruptive conduct.

This behavior began right at the outset. Before calling in the prospective jurors, the Court instructed both parties to not "say anything within the earshot of any juror or prospective juror and not to communicate attempt to communicate with any juror or prospective juror by any means, directly or indirectly." Tr. 3; *see also id.* at 10-11. The Court then reminded the parties that it "ha[d] made a number of rulings precluding evidence and argument on a number of subjects, and in some instances, particular kinds of pieces of evidence or argument," and asked the attorneys to confirm that they and their clients understood each of those restrictions. *Id.* at 4.

Despite Trump's lawyers indicating that Trump understood and would abide by those restrictions, and that they too understood and would abide by them, their trial conduct proved otherwise. During jury selection, the Court instructed the prospective jurors that they must accept that "Trump did sexually assault [] Carroll" and "that he knew when he made the statements about [] Carroll that the statements were false or he made them with reckless disregard as to whether they were true or false." Ex. C at 8. Upon hearing this instruction, Trump "shook his head in disgust."[3] When the Court described the way in which Trump assaulted Carroll, Trump "made a

---

[2] Michael R. Sisak, *Trump Leaves Court Before Attorney Told Jury He Tried to Destroy Columnist's Reputation in Defamation Trial*, PBS Newshour (Jan. 16, 2024).
[3] Larry Neumeister, et al., *Trump Scowls as Jury Is Picked to Decide How Much He Owes for Defamation in E. Jean Carroll Case*, Los Angeles Times (Jan. 16, 2024).

loud 'yech' sound."[4] Then, when the Court asked the prospective jurors to raise their hand if they thought "[] Trump is being treated unfairly by the court system," *id.* at 70, Trump raised his.[5]

Trump left before opening statements. Inside the courtroom, his counsel picked up the baton. During her opening statements, Trump's counsel repeatedly impugned Carroll's motives for revealing that he sexually assaulted her—and then suggested that Trump was "merely defending himself" when he defamed her. Tr. 52; *see also id.* at 56 (arguing that "before she came out with her allegation against Donald Trump," Carroll's "career was dwindling and it needed a spark"); *id.* at 54 (saying Carroll waited "for the opportune time" to expose Trump's misconduct because that "was the business she was in"). included similarly incorrect statements of law on the slide deck presented to the jury. *Id.* at 52. The unmistakable upshot of these arguments was that Carroll's motives for revealing that Trump assaulted her were suspect; that Carroll somehow assumed the risk or consented to Trump's June 2019 defamatory attacks by revealing that he had sexually assaulted her; and that Trump's defamation was somehow justified as a form of public self-defense. *See* ECF 275. These arguments were directly at odds with the Court's prior rulings and resulted in a curative instruction during the final charge. *See* Tr. 798.

The next day, Carroll took the stand. Trump was in attendance. And during her testimony, Trump and his counsel repeatedly defied the Court's orders. As Carroll's counsel noted before the morning recess, "Judge, Ms. Habba has now twice in front of the jury made comments about things that [Y]our Honor has ruled are clearly out of bounds," namely issues related to litigation funding and the fact that Carroll had accused other men of sexual assault. *Id.* at 118. Carroll's counsel also "put on the record that in light of [Y]our Honor's order and instructions to the parties yesterday,

---

[4] Maggie Haberman & Kate Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*, N.Y. Times (Jan. 28, 2024).
[5] Molly Crane-Newman & Kerry Burke, *Donald Trump Attends Jury Selection at NYC Trial Against E. Jean Carroll*, N.Y. Daily News (Jan. 16, 2024).

Mr. Trump has been sitting at the back table and has been loudly saying things throughout Ms. Carroll's testimony, including things that Ms. Carroll is saying are false and noting that she seems to have now gotten her memory back. It's loud enough for us sitting up here to hear it. I assume it's loud enough for the jury to hear it." *Id.* Trump's counsel did not acknowledge her client's behavior. *Id.* at 118-19. After a short recess, the Court asked Trump to take "special care to keep his voice down when he's conferring with counsel so that the jury does not overhear it." *Id.* at 120.

Trump nevertheless refused to comply. Later, before the afternoon recess—and after the jury heard a video Trump posted on Truth Social the day after the *Carroll II* verdict, where he said, "I have absolutely no idea who this woman is. The verdict is a disgrace. A continuation of the greatest witch hunt of all time. Absolutely a shame," Ex. D—the following exchange occurred:

> MS. CROWLEY: Judge, I just want to place on the record, again, that notwithstanding your instruction right before we started, the defendant has been making statements that, again, we can hear at counsel table. Some of the jurors are sitting closer to him than we are. He said, It is a witch hunt. It really is a con job. And when you played the last video, he said, It's true. So we would just ask your Honor to remind the parties that they are not supposed to make statements to or indirectly to the jury.

> THE COURT: Mr. Trump has the right to be present here. That right can be forfeited, and it can be forfeited if he is disruptive, which what has been reported to me consists of, and if he disregards court orders. Mr. Trump, I hope I don't have to consider excluding you from the trial or at least from the presence. I understand you're probably very eager for me to do that.

> MR. TRUMP: I would love it.

Tr. 167. Despite this warning, Trump and his lawyers persisted in blatantly flouting the Court's orders and rules of decorum throughout the remainder of trial. Trump's lawyers ignored rulings, *id.* at 231, moved for a mistrial in front of the jury, *id.* at 236, included exhibits in their closing slide deck that were not in evidence, *id.* at 684-88, and stated or implied to the jury that Carroll was funded by democrats, *id.* at 553-55, 735, that she accused other men of sexual assault, *id.* at

92-93, and that she lied about when she bought her dress, *id.* at 357.[6] Trump himself even walked out of the courtroom during Carroll's closing argument. *Id.* at 695. And outside of the courtroom, practically every day he attended the trial Trump continued to make statement after statement about Carroll, both on his Truth Social page and in press conferences.[7] In those statements, Trump took special care to emphasize evidence and argument that the Court had explicitly precluded.

  ***Trump's offer of proof***. Unlike in *Carroll II*, Trump elected to testify in this action. The Court addressed the parties outside of the presence of the jury before Trump took the stand. Here, the Court clarified that Trump's testimony could not dispute that he "sexually abused [] Carroll by forcibly, and without her consent, inserting his fingers into her vagina," that his "June 21st and 22nd statements in 2019 were false," that "Carroll did not make up her claim of forcible sexual abuse," that his "statements were defamatory," and that he made those statements with actual malice. *Id.* at 613-14. The Court acknowledged the letters submitted by the parties concerning Trump's testimony. *Id.* at 614-15. It then explained that under Rule 103(d), "[t]o the extent practicable, the Court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means," and that, "[i]n all the circumstances of the case there is cause for concern as to whether [] Trump's examination and testimony will contain or suggest inadmissible evidence to the jury." *Id.* at 615. The Court sought an order of proof from Trump's counsel about the exact nature of the testimony she intended to solicit.

  Trump's counsel began by explaining that she intended to ask only three questions but

---

[6] There are many other examples. *E.g.* Tr. 16, 116-17, 163, 228-29, 247, 252-53, 267, 277, 287-88, 296, 302, 303, 304-10, 311, 321, 323, 480, 490, 590-91, 688, 697, 734, 740, 744, 748, 749, 750, 752, 758, 759, 760; *see also* Haberman & Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*; Aaron Katersky, et al.*, Trump Butts Heads with Judge in Heated Courtroom Exchanges During E. Jean Carroll Case*, ABC News (Jan. 17, 2024).

[7] *See, e.g.*, James Bickerton, *Donald Trump Goes on E. Jean Carroll Posting Binge*, Newsweek (Jan. 19, 2024); Adam Reiss & Dareh Gregorian, *Trump Continues Blasting E. Jean Carroll as Damages Trial Postponed Amid Covid Concerns*, NBC News (Jan. 22, 2024); Sara Dorn, *Trump Posts About E. Jean Carroll More Than 35 Times—Ahead of Today's Potential Testimony*, Forbes (Jan. 25, 2024).

struggled to communicate them. The Court repeatedly asked her to articulate everything that Trump was going to say, considering she was "making an offer of proof and [her] client [was] bound by it." *Id.* at 616-17. Trump's counsel said, "what my client is going to say, is that he did not do it; at the time he denied it for the reason of having to deny it; that he was addressing them, the questions, because of his accusation; that he never instructed anyone to hurt [] Carroll. That is what he is going to say. And also, that he stands by the deposition[]," referring to the portions of Trump's deposition Carroll had played for the jury earlier in the trial. *Id.* at 617. The Court followed up—"And he will say nothing else?" to which Habba responded "That is my understanding, [Y]our Honor." *Id.* While his counsel was speaking, Trump remarked that he also intended to say, "that he never met her and had never seen her before," *id.* at 618, testimony that would clearly conflict with the Court's clear directives.

The Court asked for additional clarity regarding the three questions Habba was proposing to elicit that testimony. Trump's counsel said, "I would just like to confirm that he stands by all the testimony of his deposition, also that he made the statements in response to her accusations and what his state of mind was there, and that he …." *Id.* at 619. Here, recognizing that these questions were inconsistent with the above, the Court interrupted Trump's counsel, asking "[w]hat will he say about his state of mind?", to which Trump's counsel explained that "he was defending himself." *Id.* at 619-20. Finally, Trump's counsel said she would ask Trump to confirm that "he never instructed anyone to hurt [] Carroll in his statements." *Id.* at 620. Carroll's counsel raised concerns that Trump would give testimony that would undermine the Court's collateral estoppel ruling, and said, "[w]e think there is certainly the risk of it being confusing to the jury but [Y]our Honor certainly knows how to give an instruction, and if it is limited to those three things, we understand where [Y]our Honor is going." *Id.* at 621.

11

Here, the Court said, "Look. You told me in your letters, I think, that Mr. Trump is well aware of the Court's rulings with respect to issue preclusion and the strict confines placed on his testimony. Do you confirm that?" *Id.* Trump's counsel responded, "Yes, your Honor." *Id.* At the same time, Trump then yelled out loud while sitting in the courtroom, in direct contrast to his counsel's representation: "I never met the woman. I don't know who the woman is. I do not know who the woman is. I wasn't at the trial. I don't know who the woman is. I never met this woman." *Id.*; *see also id.* at 622 ("Mr. Trump. You are interrupting these proceedings by talking loudly while your counsel is talking and that is not permitted."). The Court asked Trump's counsel whether she personally made him aware of the confines of his testimony and if he would comply with them. *Id.* at 622. She responded that she had, Trump was aware, and he would abide by them.

Trump's counsel then once again went through the three proposed questions. Like before, those three questions changed slightly. *Id.* at 622-23. The first question was "confirm[ing] that he stands by everything in the deposition testimony." *Id.* at 623. The Court authorized that question. *Id.* The second, this time posed as an open-ended question, was "why did you make the statements in response to her accusation." *Id.* The Court denied this question. *Id.* Trump's counsel protested, saying, "So how do they prove common law malice when I can't have my client defend himself and say he wasn't defaming her, he was defending himself at the time?" *Id.* at 624. The Court said, "Did he deny the allegation because an accusation had been made? That's it. … I take it the offer of proof is he did it because someone made an accusation. Is that right? Is that what you propose to do?" *Id.* Trump's counsel said, "I'm happy to ask it that way, why did you deny her accusations[?]" *Id.* But the Court reiterated that there would be no open-ended questions: "Let me put it a different way. If you were to ask that open-ended question, there is likely to be an objection,

and it is likely, in significant measure, to be sustained." *Id.* Last, the Court sanctioned the third question, "did you ever instruct anyone to hurt [] Carroll in your statements." *Id.* at 624-25.

From here, the Court asked to bring in the jury, but Trump's counsel quickly interjected, asking for clarity for the second question. *Id.* at 625. After the Court responded that the second question "keeps changing," it stated that Trump's counsel could "elicit the fact [Trump] made [his statements] in response" to Carroll's accusation. *Id.* Trump's counsel replied, "As long as we have the deposition, [Y]our Honor, I think we will be fine. Thank you." *Id.*

***Trump's testimony***. When Trump took the stand, he provided testimony that went beyond the proffer. His counsel first asked Trump to confirm that he "viewed [his] deposition which was played by plaintiff's counsel at length during the trial. Didn't you?" *Id.* at 626. Trump responded "[y]es, I did." *Id.* She then asked if Trump stood by his testimony at the deposition. *Id.* He answered, "100 percent. Yes." *Id.* She then asked, "Did you deny the allegation because Ms. Carroll made an accusation?" *Id.* Trump responded, "That's exactly right. She said something, I considered it a false accusation. No difference." *Id.* at 626-27. Carroll objected and the Court struck the excess testimony. *Id.* at 627.[8] Finally, she asked, "Did you ever instruct anyone to hurt Ms. Carroll in your statements?" and Trump replied, "No. I just wanted to defend myself, my family, and frankly, the presidency." *Id.* Carroll objected and the Court struck everything after "no." *Id.*

### 2.  To the Extent Reviewable, the Court's Actions Were Sound

Trump argues that the Court abused its discretion during the sequencing outlined above. Trump seemingly focuses on the Court (1) not allowing his counsel to ask an open-ended questions

---

[8] Carroll objected to "that's exactly right. She said something, I considered it a false accusation. No difference." Tr. 627. According to the transcript, the Court said, "[e]verything after 'yes, I did,' is stricken. The jury will disregard it." *Id.* But "yes, I did" was Trump's answer to the first question, whether he had watched his deposition when Carroll played it. *Id.* at 626. A second question was also asked and answered after that response, and Carroll had not objected to either nor had Trump's testimony gone beyond the proffer at that point. *Id.* Giving these circumstances and the timing of the objection, Carroll believes the transcript contains an error and only "She said something, I considered it a false accusation. No difference" was stricken based on her objection.

about Trump's mental state and (2) striking "I just wanted to defend myself, my family, and frankly, the presidency" from Trump's testimony. Mot. 8, 11-12. He is wrong on both counts.

As an initial matter, Trump has waived these arguments. In *United States v. Spruill*, the Second Circuit identified circumstances where a litigant intentionally relinquishes or abandons a known right. 808 F.3d 585, 597 (2d Cir. 2015). As the Second Circuit explained, when a "defendant, through counsel, acted intentionally in pursuing, or not pursuing, a particular course of action," he cannot later secure review of it. *Id.* There are many different circumstances that satisfy this standard, *id.* at 596-97—and multiple are present here, dooming Trump's claim.

During the offer of proof, Trump's counsel consented to limiting Trump's testimony to three questions. Tr. 621-22. After a back-and-forth and initial protest over the structure of the second question, the Court stated, "I take the offer of proof is that he did it because someone made an accusation?" *Id.* at 624. Trump's counsel seemingly agreed, but then proposed an open-ended question to get at that answer. *Id.* Here, the Court explained that she could ask it that way, but it would likely lead to a sustained objection. *Id.* After asking for further clarification, Trump's counsel said: "*As long as we have the deposition*, [Y]our Honor, *I think we will be fine*," and subsequently asked the question in yes-or-no form. *Id.* at 625 (emphases added); *see also id.* at 626-27. But now Trump claims that he is not "fine," and the Court erred in not allowing his counsel to ask him an open-ended question about his mental state. Mot. 8-12. Because Trump agreed to this course of action to tactically benefit from asking about the deposition in exchange, he waived review of the arguments he now raises. *See Spruill*, 808 F.3d at 597.

Similarly, during the offer of proof, Trump's counsel described the third question as follows: "And the only other thing was that he never instructed anyone to hurt [] Carroll in his statements [which] is a simple yes or no question." Tr. 620. But Trump now claims that the Court

should have allowed him to go beyond a simple yes or no answer (and therefore erred in striking "I just wanted to defend myself, my family, and frankly, the presidency"). Mot. 8. Because Trump solicited and agreed to this limit on his testimony, he has also waived review of this argument. *Spruill*, 808 F.3d at 597; *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007).

But even if he had not waived them, Trump's arguments are meritless—the Court acted squarely within its discretion by placing limits on Trump's testimony. District courts "enjoy broad latitude in this realm, because '[q]uestions of trial management are quintessentially the[ir] province.'" *Duverge v. United States*, No. 3:10 Civ. 1922, 2018 WL 619497, at *2 (D. Conn. Jan. 30, 2018); *see* Fed. R. Evid. 611; *Mercado v. One Beacon Ins. Grp.*, 356 F. App'x 553, 554 (2d Cir. 2009); *United States v. Mokol*, 646 F.3d 479, 486 (7th Cir. 2011). As part of that discretion, they "may control the scope of examination of witnesses." *Rogers v. Bradt*, No. 10 Civ. 2696, 2013 WL 3990777, at *10 (E.D.N.Y. Aug. 5, 2013). And under Rule 103(d), a court must, "[t]o the extent practicable, … conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Put together, the Court had broad discretion to place limits on the mode of Trump's examination to ensure that he did not mention inadmissible evidence before the jury, and the limits it imposed do not demonstrate that it abused that discretion.

Indeed, the limits the Court imposed were necessary. The Court began the colloquy with counsel explaining that it had concerns that Trump's testimony would introduce inadmissible evidence; those concerns were well-founded. Trump had just testified in the New York Attorney General civil fraud trial, where "he repeatedly offered testimony contradicting the state court's earlier summary judgment ruling." *See* ECF 233 at 5. In addition, Trump had "continually flouted court orders by editorializing and providing non-responsive, repetitive answers, discrediting the court and the legitimacy of the proceeding, accusing the presiding judge of partiality, and attacking

opposing counsel." *See id.* at 5-6. Trump had also given a closing argument in that case where, despite "promis[ing] to just comment on the law and facts, application of one to the other and not go outside of that," Trump "immediately disregarded the court's instructions." ECF 256 at 2-3. Moreover, during this trial, Trump had flouted the Court's rulings and directives from the beginning, repeatedly making inappropriate comments about inadmissible evidence and questioning Carroll's accusation within earshot of the jury. *See supra* at 7-10. So too had his counsel. *See id.* And Trump had posted incessantly about Carroll during the trial outside of the courtroom, invoking topics that were off limits inside. *See supra* at 10. Open-ended questioning was all but assured to lead to Trump testifying to issues and topics that were barred by the Court's prior orders (and in many cases, were highly prejudicial).

The colloquy and his testimony proved the point. When Trump's counsel first disputed the Court's limitation on open-ended questions, the very open-ended question she proposed and the answer she sought to elicit was inadmissible: "So how do they prove common law malice when I can't have my client defend himself and say he wasn't *defaming her*, he was *defending himself* at the time." Tr. 624 (emphasis added). This answer questioned whether Trump defamed Carroll in responding to her accusation and therefore conflicted with the Court's collateral estoppel ruling and instructions to the lawyers, parties, and jury. *See supra* at 5-6, 10-11. And when his counsel assured the Court that Trump understood the strict confines on his testimony, Trump twice on his own interjected to make comments that demonstrated the opposite understanding. *See supra* at 11-12. Then, when Trump did take the stand, he immediately broke the Court's rules. He went beyond a yes-or-no answer to say, "I considered it a false accusation." Tr. 626-27. The truth or falsity of Carroll's accusation was not up for debate, the Court's had instructed Trump that he could not

dispute it, and Trump violated that directive anyway. Then, in response to the third question, Trump again went beyond a yes-or-no answer, again violating the Court's clear instructions.

The Court's solution thus struck a necessary balance: it allowed Trump to testify as to the topics included within his counsel's offer of proof without permitting him to go further and thereby implicate Rule 103(d). Considering these circumstances, the Court did not abuse its discretion.

Finally, the Court did not abuse its discretion in excluding Trump's proposed testimony as to his state of mind and striking Trump's excess answer under Rule 403. When presented with a Rule 403 objection, the Second Circuit will "sustain a district court's decision … so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, and will reverse only if the district court's decision is arbitrary or irrational." *United States v. Spoor*, 904 F.3d 141, 153 (2d Cir. 2018). Trump cannot satisfy this demanding standard.

Regarding Trump's proposed question about his state of mind, which he now insists the Court erred in precluding, his counsel represented that Trump would "say he wasn't *defaming her*, he was *defending himself* at the time." Tr. 624. The Court properly rejected this offer of proof under Rule 403 because the testimony facially conflicted with the Court's collateral estoppel ruling. *Carroll*, 2023 WL 5731152, *2. That Trump now says he would have responded differently to that question is of no consequence, Mot. 8-12—he is bound by his counsel's representations and reasons for admission as specified during the colloquy, *see* 2 Handbook of Fed. Evid. § 103:7 (9th ed.) ("A reviewing court will consider the propriety of an exclusionary ruling only in light of the stated purpose and legal basis for the offer actually made." (collecting cases)).

The Court also properly struck part of the testimony Trump did provide. The payoff of Trump's stricken testimony—"I just wanted to defend myself, my family, and frankly, the presidency"—is that Carroll's assault was dubious and Trump's statements were "somehow

justified as a form of public self-defense." *See* ECF 275 at 4. But this position is "meaningless as a legal matter: when a person commits sexual assault and their victim reveals what they did, the law confers no right of self-defense to make defamatory statements aimed at crushing or humiliating the accuser." *Id.* at 5; *see also Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 576 (S.D.N.Y. 2019) (explaining under New York law that a finding of constitutional actual malice defeats any self-defense privilege in defamation cases). And even if that testimony had some slight probative value, that value was substantially outweighed by the risk of prejudice and confusion concerning the truthfulness of Carroll's revelation that Trump had assaulted her. *See* Fed. R. Evid. 403. The Court's decision to strike this testimony, which went beyond the offer of proof, was not "arbitrary or irrational." *Spoor*, 904 F.3d at 153.

### C.    Trump's Substantial Rights Were Not Affected

Even if the court erred in the ways Trump suggests, Trump fails to demonstrate that any alleged error (or combination of errors) requires a new trial. Mot. 8-12. To make that showing, he would need to establish errors that "affected [his] substantial rights." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005). Only if an error led the jury to "a seriously erroneous result" or a "miscarriage of justice" will the Court vacate the verdict. *United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009); *see also Abascal v. Fleckenstein*, 820 F.3d 561, 567 (2d Cir. 2016) ("A party's substantial rights are affected only where a jury's judgment was likely swayed by the error."). Trump comes nowhere close to making such a showing for at least four reasons.

*First*, testimony of Trump's state of mind ultimately would have been cumulative. Trump's motion insists that the jury heard no evidence from Trump as to his state of mind. Mot. 8-14. But they did, in the designation depositions—there, Trump said that he was "very offended by" Carroll's accusation, that he did not know her, that he "told people there was a false, disgusting lie made about me," that there was "something wrong with [Carroll] … it's a false story," and that he

would "go around saying that to people." Ex. E. These comments, among others, are evidence of Trump's theory of self-defense: that he had to deny her accusation and say these things about Carroll because it was not true. The jury heard Trump reaffirm his deposition testimony at trial. Tr. 626-27. He thus provided evidence as to his mental state in the deposition played before the jury that he now says he was barred from offering evidence to support. Simply put, the jury did not buy it. That outcome does not demonstrate prejudice. *See United States v. Dowdell*, 737 F. App'x 577, 583 (2d Cir. 2018) (harmless error where "excluded evidence was cumulative").

*Second*, even if the precluded testimony was not cumulative, it cannot carry the weight Trump gives it. Trump does not dispute that, during the charge, the Court told the jury that "[y]ou may have heard argument or evidence suggesting that [] Carroll … authorized [] Trump to make [the defamatory statements] as a form of self-defense. I instruct you as a matter of law that [] Carroll did not … grant [Trump] lawful permission to defame her, by publicly stating in June 2019 that he had sexually assaulted her." Tr. 798. Here, the Court instructed the jury to ignore the part of Trump's defense that Trump now says he should have been able to testify to and was prejudiced by the Court's refusal. Trump takes no issue with this instruction.

*Third*, even if the Court was required to instruct the jury that it could only award punitive damages if Trump had acted solely out of common law malice in making his statements (and it was not, *see supra* at 3-4), Trump was not prejudiced by the exclusion of his testimony that he was defending himself (or his family or the presidency). When boiled down, Trump asserts that he published the two defamatory statements because he had concluded that destroying Carroll's reputation with falsehoods was politically desirable. But this "self-defense" claim is evidence of another malicious motive, not an innocent one. Malice captures the "wanton, reckless, or in willful disregard of another's rights," *Prozeralik*, 82 N.Y.2d at 479; here, even on his terms, Trump

willfully disregarded Carroll's rights by publishing lies about her, destroying her reputation, and saying she should "pay dearly" for coming forward—all in an effort to discredit Carroll and blunt any political blowback from the truth being revealed. His "motive in publishing the falsity" was to benefit politically from destroying Carroll—disregarding her rights was how he achieved it. *Id.* In this regard, what Trump represents as an innocent intent itself constitutes malice.

*Fourth*, the evidence at trial established Trump's common law malice under a clear and convincing evidence standard. That standard is satisfied when an assertion is "highly probable." *See* 4 Modern Federal Jury Instructions-Civil ¶ 73.01 (2022). It is well established that such malice can be demonstrated by "threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights." *Herbert v. Lando*, 441 U.S. 153, 164 n.12, 99 S. Ct. 1635, 1643 n.12 (1979); *accord Celle*, 209 F.3d at 184. Carroll presented overwhelming evidence of malice, including that Trump knew he had assaulted Carroll, threatened her in his statements, repeated the defamatory statements on his Truth Social account just *minutes* after being held liable for sexual battery and defamation in *Carroll II*, *see* ECF 304-14, Ex. D, had posted similar statements attacking Carroll no less than four times *during* the trial, and had publicly promised to never stop, ECF 304-28. All this evidence pointed in one direction— it was "highly probable" that Trump published the statements with a "willful, wanton, or reckless disregard of" Carroll's rights. Indeed, no reasonable jury could have concluded otherwise. Trump's contention that, against all of that evidence, his self-serving statements that he had acted out of a desire to defend himself, his family, and the country (which, although the Court struck them, the jury heard) would have swayed the jury into reaching a different result should be rejected outright.

*       *       *

At bottom, the Court did not abuse its discretion, and even if it did, Trump cannot demonstrate that he was prejudiced. But it is worth emphasizing a theme to Trump's arguments: his regret about the choices he made at the first trial. His repeated suggestion that he was deprived of justice because he was unable to testify about the falsity of Carroll's allegations or the reasons he made his statements ignores reality—there was a two-week trial in which those issues were fully litigated, the Court gave him ample opportunity to speak in his own defense, and Trump elected not to show up, let alone testify. That he chose not to avail himself of that opportunity does not enable him to a do-over here. The Court should reject Trump's attempt to turn his regret about declining to testify at the first trial into prejudice sufficient to overturn this one.

## II.     THE JURY'S COMPENSATORY DAMAGES AWARD IS NOT EXCESSIVE

"In a libel case, more, perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages." *Lynch v. N.Y. Times Co.*, 171 A.D. 399, 401 (1st Dep't 1916). "In actions for other torts there is generally some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." *Yammine v. DeVita*, 43 A.D.3d 520, 521 (3d Dep't 2007) (cleaned up). Indeed, the law presumes damages arising from defamation *per se*, *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003), and juries are instructed that defamation damages cannot be proven with "mathematical accuracy," *Ferri v. Berkowitz*, 561 F. App'x 64, 65 (2d Cir. 2014) (quoting N.Y. Pattern Jury Instr., Civil 3:29). Because the assessment of damages is "peculiarly within the jury's province," a court "must use 'prudence and restraint … in the exercise of its discretion over these awards.'" *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 344 (S.D.N.Y. 2016) (omission in original).

Against this backdrop, the jury awarded Carroll $18.3 million in compensatory damages. ECF 280 at 1. Before reaching that number, the jury was instructed that Carroll was entitled "to

fair and just compensation for the injury to her reputation and for any humiliation and mental anguish in her public and private lives that was caused by the defamatory statement[s] in question." Tr. 788. The jury was further instructed that fair and just compensation should account for: (1) Carroll's "standing in the community"; (2) the "nature of [] Trump's statements made about her"; (3) "the extent to which those statements were circulated"; (4) "the tendency of those statements to injure [her]"; and (5) "all of the other facts and circumstances in the case." *Id.* at 789. While noting that "[f]air compensation" for those harms "may vary," the Court told the jury that it could award a "substantial sum if you decide that the injury was substantial." *Id.*

At that point, the jury was instructed to classify its damages into two separate buckets. The first involved "the amount you award for all defamation compensatory damages attributable to the June 21 and 22 statements, excluding the reputation repair program that was discussed during Professor Humphreys' testimony." *Id.* at 791. The second covered "the amount of damages, if any, that you award for the reputation repair program for" those two statements. *Id.* Ultimately, the jury allocated $7.3 million to the first and $11 million to the second. ECF 280 at 1.

### A.      Non-Reputational Repair Campaign Damages

Trump argues that the Court should remit the $7.3 million in damages that are unrelated to the reputation repair program. Mot. 19-25. But his challenge to that portion of the award continues to rest on two erroneous foundations: he incorrectly states that the $7.3 million award was only for "emotional distress," and further errs in claiming that Carroll's "claim of emotional distress" is "garden variety." *Id.* at 19-20. Examination of the actual record and governing caselaw confirms that the verdict here was not a material deviation from reasonable compensation.

*First*, the $7.3 million that the jury awarded went beyond damages solely for emotional distress. Neither the jury instructions nor the verdict form limited the first category of damages to emotional distress damages. Tr. 791; ECF 280 at 1. The only express limitation was "compensatory

damages … *other than for the reputation repair program*." ECF 280 at 1. Put simply, costs for the reputation repair program do not cover all the harms that Carroll endured as a result of Trump's defamation spree.[9] The jury heard evidence of Carroll's hard fought and well-respected career as an advice columnist, and how Trump—the man who sexually assaulted her—shattered that career in less than 72 hours, *see, e.g.*, Tr. 70-71, 179-80, 517-18. This resulted in both psychological injury and tangible, continuing economic harm, apart from her reputational injury. Carroll used to write the nation's leading advice column, read by millions of people; now, her Substack column has just 28,000 subscribers, only 1,800 of whom pay for their subscription. *Id.* at 181, 467-68. Carroll used to make $50,000 or more per year doing freelance work for other magazines on a wide range of topics; in 2023, she earned only $500 for freelance work. *Id.* at 183. Moreover, Carroll separately testified to the added steps that she now has to take to protect her security—and made clear that she could not afford to take additional steps. *Id.* at 137-39.[10] All this evidence, as well as further testimony about Carroll's public standing, the nature and circulation of Trump's statements, and the backlash provoked by Trump's attacks, went into the damages finding. In that respect, Trump is wrong to describe the $7.3 million award as just for emotional harm.

---

[9] Trump points to Carroll's closing argument for support that the first bucket was only for emotional harm. But it's the Court's instructions and the witness's testimony, not the parties' arguments, that control. *See LNC Invs., Inc. v. Nat'l Westminster Bank, N.J.*, 308 F.3d 169, 177 n.10 (2d Cir. 2002); Tr. 797. In any event, Carroll's counsel discussed these economic injuries in her closing argument. *See* Tr. 704-06. That the jury heard them presented in connection with a discussion of Professor Humphreys's testimony matters little—Professor Humphreys testified as to what it would cost to run a successful reputational repair campaign, not to address these economic harms. By definition, compensatory damages for the reputation repair program must have excluded them. *Cf. id.* at 777. This is not "double counting," as Trump suggests. Mot. 23.

[10] Trump also argues that Carroll could not receive damages for "economic harms" because she did not list those harms in the Joint Pretrial Order. Mot. 19, 23. As Trump sees it, he was allowed to argue that Carroll benefitted economically from being defamed by Trump, *see* Tr. 750-52, but she could not offer evidence demonstrating how Trump's defamation caused her economic harms. His position is baseless. Further, Carroll did not exclude economic harms from her Joint Pretrial Order. There, she stated that she sought "compensatory damages for injury to her reputation" and Trump interpreted that to include economic harm because he replied that, "[c]ontrary to Plaintiff's contention, she did not sustain any … *economic harm* as a result of the Statements." ECF 227 at 6 (emphasis added).

*Second*, this is not a case of "garden variety" emotional harm in any event. Mot. 20-22. Nothing about this case is garden variety, and that description of Carroll's injury blinks reality.

As courts have recognized, emotional harm can fall into several categories—and can be elevated into a more substantial bucket based on the nature of the defendant's conduct. "[M]ore offensive conduct" will support "significant" emotional distress awards. *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010). And "outrageous or shocking" conduct will allow for even more. *Id.* (noting that "egregious emotional distress claims generally involve *either* outrageous or shocking discriminatory conduct *or* a significant impact on the physical health of the plaintiff" (emphases added)). That principle reflects how the jury was instructed. Tr. 789.

Trump, for his part, ignores the nature of his conduct entirely, and asserts that Carroll's damages must be categorized as "garden variety" because her injuries are supported by her testimony alone. Mot. 24. However, "[a] court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." *Bouveng*, 175 F. Supp. 3d at 328; *see also Patrolmen's Benevolent Ass'n. of N.Y.C. v. N.Y.C.*, 310 F.3d 43, 55 (2d Cir. 2002) (explaining that more substantial emotional distress damages can be supported by plaintiff's testimony and "the objective circumstances of the violation itself").

Trump's conduct and the objective circumstances of the violation are fatal to his argument regarding garden variety harm. Trump made his two defamatory statements when he was President of the United States, ECF 304-4, -5; Tr.104. He maliciously lied and attacked the woman he knew he had sexually assaulted by calling her a liar, a fraud, a political hack, a paid political operative, and an enemy of all survivors of sexual assault. ECF 304-4, -5. He threatened her twice by warning that she should "pay dearly" and was playing in "dangerous territory." ECF 304-4, -5. On a conservative estimate, his statements generated at least 85 to 104 hundred million impressions

24

within days—and surely generated many more over time. Tr. 384-85. Those statements ruined Carroll's reputation and unleashed an onslaught of hateful (and at times terrifying) online attacks that have continued. *Id.* at 110, 132-35. Trump made these statements for the apparent purpose of making sure he got away with sexual abuse. Considering all this, it's difficult to imagine a more objectively extreme version of defamation. Labeling the resulting pain and mental anguish that Trump caused by committing this egregious conduct "garden variety" is as offensive as it is absurd.

Trump's conduct, coupled with Carroll's testimony of severe emotional distress, more than adequately supports the jury's damages award in this case. As Carroll testified, Trump's statements completely eliminated Carroll's sense of security and self. Carroll testified that because of Trump's statements she now "liv[es] in a new universe": "to have the president to have the president of the United States, one of the most powerful persons on earth, calling me a liar for three days and I'm a liar 26 times—I counted them—it ended the world I had been living in, and I [had] a new world." *Id.* at 104-05. Carroll further explained the onslaught of hateful and threatening messages that she received in the days following his statements and that she continues to receive today, many of which the jury saw throughout trial. *See, e.g.*, *id.* at 109-10, 114-15, 121-23. Those messages threated to kill and rape her, in addition to calling her a liar, a fraud, a political hack, a paid operative, ugly, too disgusting to touch or to rape. *E.g.*, ECF 304-6–12. These attacks echoed the lies that Trump spread about Carroll in his June 2019 statements. *See* ECF 304-04, -05. They copied his words and made good on his threats.

None of the comparator cases cited by Trump even remotely approaches this situation. Mot. 22, 24-25. "Although a review of comparable cases is appropriate," the ultimate question is simply "whether the verdict lies within the reasonable range." *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017). As this Court recognized in rejecting the comparator cases Trump cited

in his motion for a new trial in *Carroll II*, the facts and circumstances of the cases were "materially different from the facts and evidence in this case." *Carroll*, 2023 WL 4612082, at *25. Those cases, like these cases, did not "involve[] the scale of attention and influence commanded when the defendant in this case chooses to speak publicly." *Id.* Nor did they compare "in the slightest to being defamed by one of the loudest voices in the world, in a statement read by millions and millions of people, which described you as a liar, labeled your account of a forcible sexual assault a 'hoax,' and accused you of making up a horrific accusation to sell a 'really crummy book.'" *Id.*[11]

Nor does Trump's reliance on the verdict in the earlier trial in *Carroll II* help his cause. There, the jury awarded Carroll $1 million in non-reputation campaign damages and $1.7 million for a reputation repair campaign based on a single defamatory statement that generated 13 and 18 million impressions. *Carroll II*, ECF 174; ECF 304-13. Here, the jury awarded $7.3 million and $11 million for the same two categories of damages, based on two defamatory statements that were the first ones Trump made about Carroll and that generated at least *85 to 104 hundred million* impressions. Tr. 384-85. Comparing the relevant numbers, it becomes clear that the proportion of reputation repair damages to other compensatory damages was similar across both cases, and the compensatory damages in *Carroll I* increased (in part) in proportion to the greater impressions that Trump's June 2019 statements generated. Thus, even putting aside the many additional factors that would justify a higher award here—including the greater evidence of harm presented at the *Carroll I* trial and the greater reprehensibility of then-President Trump's 2019 conduct—the verdict in *Carroll II* supports the reasonableness of the verdict here. Notably, Trump has not challenged any aspect of the *Carroll II* damages award on appeal, *see Carroll v. Trump*, No. 23-

---

[11] To demonstrate the differences, in one case Trump cites, *Bouveng v. NYG Cap. LLC*, 500,000 people viewed the defamatory statements over the course of eight months. 175 F. Supp. 3d at 338. Here, Trump's two statements got upwards of 104 million or more views on the days the relevant articles were published alone. Tr. 384-85.

793 (2d Cir.), ECF 74, rendering laughable his continued assertion that Carroll's other compensatory damages in this case cannot exceed $125,000, Mot. 22.

The soundness of the jury's damages award in this case is further underscored by cases containing comparatively high compensatory damages awards (all of which Trump ignores). *See, e.g.*, *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226-31 (E.D.N.Y. 2010) ($150 million in non-economic damages for injury to reputation and humiliation and mental anguish; defendant described plaintiff as an operations manager of a racketeering enterprise who was involved with drug cartels and at one point had conspired with Saddam Hussein); *Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985, at *1, *5-6 (S.D.N.Y. Mar. 2, 2007) ($4 million in emotional distress damages for "intentional" retaliation; Editor-in-Chief of a prominent publication was "summarily dismissed in retaliation for filing a complaint of gender discrimination"); *Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (two plaintiffs; $20 million each in emotional distress); *see also Prozeralik v. Capital Cities Commc'ns, Inc.*, 222 A.D.2d 1020 (4th Dep't 1995) ($6,000,000 for injury to reputation and $3,500,000 for noneconomic emotional harm for defamatory comment on a local radio and television station). These cases only support the conclusion that the jury verdict in this case fell within the reasonable range of awards for the kind of conduct Trump engaged in and the harms Carroll incurred. *Carroll*, 2023 WL 4612082, at *18.

## B.  Reputational Repair Campaign Damages

The jury's award for defamation damages requires neither remittitur nor a new trial. Trump's challenges to Professor Humphreys's testimony and the jury's award misconstrue the law, evidence, and testimony at trial and fail to show that the award "deviates materially from what would be reasonable compensation." *Id.*

As an initial matter, Professor Humphreys testified extensively about her analysis of defamation damages, which comprised: an "impressions model" determining that between 85 and

104 million people saw Trump's June 2019 statements; an "impact assessment" finding that between 21 and 25 million of those people were likely to believe those statements; and a "damages model" calculating that it would cost between 7 and 12 million dollars to change those people's minds. Tr. 364-68, 400-01. On cross-examination, Trump's counsel questioned her about each of these analyses and drew out detailed testimony about what she did and did not consider, and why. Thus, any "purported weaknesses in Professor Humphreys's testimony" that he invokes were placed before the jury, and the jury surely took them "into account in awarding damages [] below the high end of Professor Humphreys's estimated range." *Carroll*, 2023 WL 4612082, at *23 n.91.

Trump also argues that because Professor Humphreys has not herself executed a reputation repair campaign, her testimony is "unfounded and speculative." Mot. 26-27. But this argument goes to the admissibility of Professor Humphreys's testimony and is therefore untimely. "[I]t is 'well-settled that Rule 59 is not a vehicle for relitigating old issues … or otherwise taking a second bite at the apple.'" *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 4019, 2022 WL 950979, at *4 (S.D.N.Y. Mar. 29, 2022). Trump could have challenged Professor Humphreys's admissibility under Federal Rule of Evidence 702 but failed to do so in a timely fashion.[12] His attempt to exclude Professor Humphreys came "ten months too late," ECF 244 at 4, and a Rule 59 motion does not reset the clock, *see Perry v. N.Y.C.*, 552 F. Supp. 3d 433, 447 (S.D.N.Y. 2021) (denying Rule 59 motion as "untimely" where "Defendants failed to file a pre-trial *Daubert* motion").

Even if Trump's quibbles with Professor Humphreys's experience go to the weight of the evidence, Trump had the opportunity to—and did—explore those arguments on cross-examination. In addition to testifying that she had not executed a repair campaign, Professor Humphreys also confirmed that she "did not … obtain any estimates or quotes" from reputation

---

[12] Trump's counsel also stated at trial that they would like to "make a *Daubert* motion based on Professor Humphreys's testimony on Thursday," Tr. at 505-06, but he never filed one.

repair firms. Mot. 27 (citing Tr. 465-66). But the fact she used one methodology (calculating the cost of a repair campaign using established principles) as opposed to another (asking an outside firm to calculate the cost of a repair campaign using establish principles) does not render her calculations "unfounded and speculative." Nor does the fact that Professor Humphreys teaches instead of executes campaigns impair her opinions. A jury was certainly entitled to find that teaching a subject renders her testimony on that subject credible (no one would argue a constitutional law professor was not an expert in constitutional law merely because she teaches instead of practices). The jury was aware of Humphreys's experience and considered it when determining her credibility. *See Carroll*, 2023 WL 4612082, at *17 ("a court should rarely disturb a jury's evaluation of a witness's credibility").

Trump next argues that Professor Humphreys failed to "credibly testify as to how her proposed campaign would be carried out" because she did not speak with specific conservative influencers "to determine whether they would be willing to participate in a reputational repair campaign on Plaintiff's behalf." Mot. 27. This similarly does not render her testimony "entirely speculative." Professor Humphreys testified that influencers can be hired to spread positive messages, Tr. 396, 469, and she gave two examples of such influencers, *id.* at 471. The fact she did not contact these two influencers directly does not render her testimony about the possibility of hiring influencers speculative.[13] And to the extent a juror may have questioned the possibility of hiring a certain influencer, she could have taken that information into account when assessing the weight and credibility of Humphreys's testimony.

---

[13] Indeed, Professor Humphreys testified that influencers are routinely paid to participate in campaigns like this one, Tr. at 372, 396, 469, that she was familiar with several successful reputation repair campaigns, *id.* at 466, 494-95, and that she estimated the cost of executing a campaign based on the rates influencers charge, *id.* at 398-400.

From here, Trump argues that because some people were likely to believe Trump, they were unlikely to believe Carroll in the first place, and therefore Trump's statements caused no harm. Mot. 27-28. Trump brought this same argument in *Carroll II*, and as the Court held there, it does not provide any "grounds to minimize the weight of [Humphreys's] testimony." *Carroll*, 2023 WL 4612082, at *24. On cross, she clearly delineated what she did and did not consider; namely, the effect Trump's statements had on Carroll's reputation, and not how many people likely believed Carroll prior to his statements. Tr. 421. The jury considered this "purported flaw[] [] Trump's counsel attempted to draw out," and "determined that her testimony still was worthy of sufficient weight" to award $11 million. *Carroll*, 2023 WL 4612082, at *24; *see In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 575 (S.D.N.Y. 2011) ("[I]t is well-established that the computation of damages is a quintessential fact issue for the jury, and that a jury need not accept an expert's damage calculations wholesale."), *aff'd*, 838 F.3d 223 (2d Cir. 2016).[14]

In sum, "the methodology underlying [Professor Humphreys's] conclusions and opinions was clearly laid out for the jury, on both direct and cross-examination, enabling the jurors to decide what weight, if any, they deserved." *Katt v. N.Y.C.*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001). As in *Carroll II*, "[n]one of Mr. Trump's challenges to that testimony, considered separately or collectively, supports a determination that the jury's compensatory damages award was seriously erroneous, egregious, or against the weight of the evidence." *Carroll*, 2023 WL 4612082, at *24.

Finally, Trump's argument that the jury's $11 million award in *Carroll I* was excessive because the jury in *Carroll II* awarded $1.7 million misses the mark. Trump's only support for his argument is the fact that Carroll testified that the backlash from Trump's October 2022 was

---

[14] Trump cites *Massre v. Bibiyan*, Mot. 28, but in that case, there was no expert testimony, "no evidence regarding [plaintiff's] reputation prior to the [statement] or about the current status of his reputation," "no estimate of how many people viewed the [statement], or how viewers' opinions of him may have been altered." No. 12 Civ. 6615, 2014 WL 2722849, at *9, *11 (S.D.N.Y. June 16, 2014).

"equally disparaging and hurtful" as the backlash from the June 2019 statements. Mot. 28. But the fact that the messages she received after each statement qualitatively hurt and disparaged her in the same manner has no bearing on what it would cost to enact a repair campaign for those statements. The estimate, as Professor Humphreys thoroughly testified, is based on an evaluation of how many people likely believed Trump's June 2019 statements, and how much it would cost to change their minds, not on how badly the messages Carroll received after Trump's statements made her feel. Regardless, it makes perfect sense that the *Carroll II* award is smaller than the award in this case, which involved two statements Trump made about Carroll for the first time, when he was still the sitting President, from the White House, that were seen approximately eighty million more times than the statement at issue in *Carroll II. See supra* at 26.

Trump provides a series of inapposite cases in his attempt to show that the jury's award was excessive. And like the ones above, they are easily distinguished—none comes close to "the facts and evidence in this case," *Carroll*, 2023 WL 4612082, at *25; *see supra* at 25-26, or contain defamatory statements made "from the most prominent 'bully pulpit' in the world." ECF 251 at 2.[15] Indeed, there are cases with much higher awards compensating for defamatory statements made by much less prominent figures than the sitting president of the United States. *Cf. Cantu*, 705 F. Supp. 2d at 226-31 ($150 million); *see also Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (between $16-$17 million per plaintiff for defamation by Rudy Giuliani). These cases further demonstrate the reasonableness of the jury's award in this case.

---

[15] *See Nellis v. Miller*, 477 N.Y.S.2d 72 (1984) (statement from a local police station stating plaintiff engaged in "unprofessional conduct" where the "only proof of injury" was the plaintiff's uncorroborated "self-serving testimony"); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 494 F. Supp. 505 (S.D.N.Y. 1980) (statement in letter from one manufacturer to another); *Walia v. Vivek Purmasir & Assocs., Inc.*, 160 F. Supp. 2d 380 (E.D.N.Y. 2000) (defamation claim against a boss for "telling 'other people' that she was a 'whore'"); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921 (2d Cir. 1987) (statement in magazine); *O'Neil v. Peekskill Fac. Ass'n Loc. No. 2916*, 156 A.D.2d 514 (2d Dep't 1989) (actual damages for the amount of fees lost due to defamatory statement); *Dattner v. Pokoik*, 81 A.D.2d 572 (2d Dep't 1981) (statement in local newspaper with a circulation of 7,500 copies).

### III.     THE JURY'S PUNITIVE DAMAGES AWARD IS NOT EXCESSIVE EITHER

The jury's $65 million punitive damages award should not be reduced. In reviewing the reasonableness of punitive damages awards, courts consider three "guideposts": (1) "'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598-99 (1996)). That analysis fully supports the punitive damages award here.

*First,* the degree of reprehensibility in this case is exceedingly high. This factor is the most important of the three. *Turley*, 774 F.3d at 167. In assessing it, courts have considered "whether a defendant's conduct was marked by violence or presented a threat of violence," or "evinced trickery or deceit as opposed to mere negligence," and whether "the record supports a finding of intentional malice." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021). The evidence at trial here more than fits the bill and firmly established that Trump acted with substantial malice in defaming Carroll: Trump had sexually assaulted Carroll before he defamed her; he knew he had sexually assaulted her when he accused her of fabricating her accusations for a slew of nefarious purposes, ruining her career as a trusted advice columnist in the process; and in each of his defamatory statements, Trump threatened Carroll, warning that she would "pay dearly" and had entered "dangerous territory" by coming forward. ECF 304-4, 05; *Carroll*, 2023 WL 4612082, at *2. The degree of reprehensibility here is only exacerbated by the false and offensive statements that Trump continued to make about Carroll even after losing the *Carroll II* trial—as well as by the statements he made outside of the courtroom while standing trial in this very proceeding. *See* ECF 304-14–29; s*ee also Celle*, 209 F.3d at 184. Trump suggestion that his conduct was defensive, and therefore not malicious, is wrong for all the reasons mentioned above. *See supra* at 18-20.

*Second*, the disparity between the harm or potential harm suffered and the size of the punitive damages award is of no constitutional concern. This factor asks, "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *DiSorbo v. Hoy*, 343 F.3d 172, 187 (2d Cir. 2003). Here, the jury awarded a ratio of 3.6:1 in punitive to compensatory damages. Neither precedent nor logic support Trump's argument that the Court must reduce that ratio to 1:1. Mot. 31-32.

In *State Farm Mutual Automobile Insurance Co. v. Campbell*, the Supreme Court explained that "we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. … We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." 538 U.S. 408, 424-25, 123 S. Ct. 1513, 1524 (2003) (citations omitted). But the Court identified a few principles to guide lower courts. For example, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* This established 9:1—not 1:1—as the presumptive outer limit for most cases. And while the Court noted that there may be instances involving large compensatory awards where a "lesser ratio, perhaps only equal to compensatory damages" may be the limit, the Court proceeded to emphasize the individualized nature of the inquiry in the next sentence: "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

The Second Circuit has heeded this guidance. Thus, it has repeatedly reaffirmed that "[t]here is no rigid upper limit on a ratio of punitive damages to compensatory damages," declining repeated invitations to impose such categorical rules. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 149 (2d Cir. 2015); *see also Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013). That is also true

of the Second Circuit's decision in *Turley*, on which Trump principally relies. Mot. 29-33. There, the court invoked a 2:1 ratio based on common law principles, but cautioned that "[w]e are not called upon to, at least at this time, and do not, decide whether a more sizable punitive award would be constitutionally permissible." 774 F.3d at 167. Finally, the Second Circuit has explained that "[e]ven where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages." *Jennings v. Yurkiw*, 18 F.4th 383, 391-92 (2d Cir. 2021); *accord State Farm*, 538 U.S. at 416, 123 S. Ct. 1519. Trump ignores the deterrent function of punitive damages completely. Mot. 29-34.

Those principles support the punitive damages awarded in this case. The ultimate ratio is 3.6:1, well within *State Farm*'s general limits. Moreover, the size of the compensatory award does not require a reduction of the punitive damages: based on the evidence presented to the jury, the principal function of punitive damages in this case was not as a supplement to the compensatory award, but rather as specific deterrence to Trump from continuing to defame Carroll. For instance, the jury heard evidence that Trump had been held liable for sexual battery and defamation in *Carroll II*, and within minutes, he repeated the defamatory statements on his Truth Social account and, the next day, during a CNN town hall event broadcast to the world. ECF 304-14, -15. The jury also heard evidence that Trump posted similar statements attacking Carroll in the weeks leading up to this trial, and four times during the trial itself—once promising that he would "never stop." ECF 304-28. This conduct, together with the general evidence of Trump's wealth, ECF 304-2, -3, justified a higher punitive damages award, *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) ("Deterrence is directly related to what people can afford to pay."). These facts further distinguish this case from *Turley*, which did not refer to deterrence even once as justifying the punitive award.

Of course, courts sometimes remit punitive damages awards because they go well beyond what is necessary for deterrence. *See Payne*, 711 F.3d at 93. But that concern is certainly not present in this case. Here, there was undisputed evidence that Trump's defamation of Carroll actually *increased* after a separate jury found him liable in *Carroll II*, and Trump publicly promised to defame Carroll "a thousand times" more during the trial in *Carroll I* (where liability had already been determined). ECF 304-28; ECF 214. On multiple of those occasions, Trump used his lies about Carroll to promote his political campaign. ECF 304-15, -20, -21. In fact, since the verdict, Trump has continued to falsely deny knowing Carroll and has called her account a "false accusation"—illustrating that, if anything, the $63 million punitive award may have been not high enough to deter Trump from further defamation.[16]

*Third*, and finally, the difference between the remedy in this case and the penalties imposed in comparable cases is no basis for remittitur. This brief has articulated the many ways in which the circumstances of this case are unique, even from the circumstances in *Carroll II*, which lacked similar evidence concerning the need for deterrence. In any event, other juries have awarded equal or greater punitive damages in reasonably comparable recent defamation cases. *See, e.g.*, *Freeman v. Giuliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (two plaintiffs; $75 million total in punitive damages); *Lafferty v. Jones*, No. X06-UWY-CV18-6046436-S, 2022 WL 18110184, at *10 (Conn. Super. Ct. Nov. 10, 2022) (awarding roughly $473 million in punitive damages resulting from repeated defamation and other torts committed by Alex Jones).

---

[16] *See* Aaron Blake, *Did Trump Just Defame E. Jean Carroll again?*, Wash. Post (Mar. 11, 2024); Cailey Gleeson, *Trump Lashes Out About Legal Woes in Michigan Speech—Blasts 'Crooked Judge,' Swipes Again at Carroll*, Forbes (Feb. 18, 2024).

## CONCLUSION

The Court should deny Trump's motion for a new trial or remittitur.

Dated: New York, New York
March 26, 2023

Respectfully submitted,

_____
Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

36