# EXHIBIT A

O1GsCAR1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    E. JEAN CARROLL,

 4                    Plaintiff,

 5              v.                        20 CV 7311 (LAK)
                                          TRIAL
 6    DONALD J. TRUMP, in his personal capacity,

 7                    Defendant.

 8    ------------------------------x
                                          New York, N.Y.
 9                                        January 16, 2024
                                          9:30 a.m.
10
      Before:
11
                          HON. LEWIS A. KAPLAN,
12
                                          District Judge
13                                        -and a Jury-

14                              APPEARANCES

15    KAPLAN HECKER & FINK LLP
           Attorneys for Plaintiff
16    BY:  ROBERTA ANN KAPLAN
           SHAWN G. CROWLEY
17         MATTHEW J. CRAIG

18    HABBA MADAIO & ASSOCIATES LLP
           Attorneys for Defendant
19    BY:  ALINA HABBA
           MICHAEL T. MADAIO
20         PETER SWIFT
           PETER GABRA

21

22

23

24

25
```

O1GsCAR1

1    case, are in a position where they feel they can be fair and

2    impartial to both sides and excusing all those who answer that

3    question yes.

4            Anybody have a problem with that?

5            MS. CROWLEY:  No, your Honor.

6            MS. HABBA:  No, your Honor.

7            THE COURT:  OK.  Secondly, we'll pick a jury of nine.

8    I will pick by the struck-panel method.  That means that the

9    nine jurors occupying seats one through nine when we finish the

10   questioning and the challenges for cause and peremptories will

11   be the jury.  There are no alternates in civil juries in

12   federal court.

13           Next, each party, that is Ms. Carroll and Mr. Trump,

14   is now directed not to say anything within the earshot of any

15   juror or prospective juror and not to communicate or attempt to

16   communicate with any juror or prospective juror by any means,

17   directly or indirectly, unless the party in question has been

18   called as a witness, is on the witness stand, under oath, and

19   responding to a question.

20           If either party thinks it would be appropriate to

21   engage in such communication or attempted communication, he or

22   she shall not do so unless the court and the other side has

23   been advised of the wish to do so and the court has granted

24   permission.

25           Just for sake of clarity, neither individual party is

O1GsCAR1

1    entitled to make any objections to anything that happens in

2    court except through their lawyers.

3          Next, the attorneys in this case on both sides and

4    those assisting them are forbidden to say anything within the

5    earshot of any juror or prospective juror or to communicate or

6    attempt to communicate with any juror or prospective juror,

7    directly or indirectly, except in open court during the regular

8    trial proceedings and in the presence of the court.

9          Next, as both sides are well aware, the court has made

10   a number of rulings precluding evidence and argument on a

11   number of subjects, and in some instances, particular kinds or

12   pieces of evidence or argument.

13         Ms. Kaplan, have you fully and completely advised

14   Ms. Carroll of each of those restrictions?

15         MS. KAPLAN:  We have, your Honor.

16         THE COURT:  Ms. Habba, have you fully and completely

17   advised Mr. Trump of those restrictions?

18         MS. HABBA:  Your Honor, I have and I believe, as we

19   indicated prior to your clerk, we do have issues with them that

20   we would like to address with the court before the jury comes

21   in.

22         THE COURT:  Well, I'll hear you very briefly because

23   that's the way it's going to be.

24         MR. MADAIO:  Your Honor, several issues.

25         THE COURT:  I can't make out what you're saying.

O1GQcarvd2

1          Anyone else in the jury box?

2          Anyone in the back of the room if the answer is yes,

3    please stand.  And the gentleman with the open collar, would

4    you tell me your number, please.

5          JUROR:  57.

6          THE COURT:  Let me find you on my chart.  Yes.  Thank

7    you.  You may now be seated.

8          And the next gentleman.

9          JUROR:  9.

10         THE COURT:  Seat number 40, Juror No. 9.  Thank you.

11   Be seated.

12         The jurors who answered yes, the three individuals,

13   Juror No. 20, Juror No. 40 and Juror No. 41 are excused.  I

14   will ask Juror No. 20 to come and get the juror cards from

15   Andy, and the three of you should go back to room 160 and take

16   the cards, and you will receive further instructions there.

17         The next group of questions I'm going to follow a

18   slightly different procedure.  If the answer is yes, just hold

19   up your hand in the jury box and stand in the back until I call

20   on you.

21         The plaintiff in this case, as I've told you, is

22   E. Jean Carroll.  Do any of you or anyone close to you

23   personally know Ms. Carroll or anyone in her family?  No

24   affirmative response.

25         Have any of you had any dealings, directly or

O1GQcarvd2

1    indirectly, with Ms. Carroll or with any relative, friend or

2    associate of hers?  No affirmative response.

3            Have any of you read, seen or heard anything about

4    Ms. Carroll that would make it hard for you to be entirely fair

5    to both sides in this case?  No affirmative response.

6            Ms. Carroll is represented by Roberta Kaplan of the

7    law firm Kaplan Hecker & Fink.

8            Ms. Kaplan, please stand so they can all see who you

9    are and introduce the other members of the plaintiffs team.

10           MS. KAPLAN:  My partner, Shawn Crowley.  My colleague,

11   Matt Craig.

12           THE COURT:  Thank you.

13           Do any of you know or have you had any dealings,

14   directly or indirectly, with any of those individuals or with

15   the law firm of Kaplan Heck & Fink.

16           The gentleman in the back who is standing, tell us

17   your number, please.

18           JUROR:  30.

19           THE COURT:  Okay, number 30.  What's the connection?

20           JUROR:  We worked together on pro bono cases for

21   marriage equality issues.

22           THE COURT:  You're a lawyer, are you, sir?

23           JUROR:  I am a lawyer, yes.

24           THE COURT:  Would your prior dealings with that firm

25   have any bearing on your ability to be fair and impartial in

O1GsCAR1

AFTERNOON SESSION

3:00 p.m.

1
2
3          (Jury not present)

4          THE DEPUTY CLERK:  Shall I get the jury, Judge?

5          THE COURT:  Yes, please.

6          MR. EPSHTEYN:  Your Honor, Boris Epshteyn, the

7  president's in-house counsel, and a member of the bar in good

8  standing.

9          THE COURT:  Are you a member of this court?

10          MR. EPSHTEYN:  I'm a member of the New York Bar.

11          THE COURT:  Please have a seat.

12          (Jury present)

13          THE DEPUTY CLERK:  Shall I swear the jury?

14          THE COURT:  Please swear the jury.

15          (A jury of nine was impaneled and sworn)

16          All right.  Now that you've been sworn, I'm going to

17  take a few minutes to give you some preliminary instructions

18  about principally the conduct of the trial.

19          It's going to be your duty to find from the evidence

20  what the facts at issue in this case are.  You and you alone

21  will be the judge of those facts, and you will then have to

22  apply to those facts the law as I give it to you.  You must

23  follow that law whether you agree with it or not.

24          Nothing I say or do during the course of the trial is

25  intended to indicate or should be taken by you as indicating

1    she suffered was specifically tied to the publication of two

2    statements -- two.  That's their burden.  To do so, she will

3    allege two specific types of harm in this case.  The first is

4    compensatory damages, and the second is punitive.

5           With respect to compensatory damages, Ms. Carroll will

6    allege that the challenged statements, the two statements

7    harmed her reputation as a journalist and writer, and that the

8    statements caused her some degree of emotional harm.

9           The second on your screen, (B) punitive damages,

10   Ms. Carroll has to prove that those two statements made by the

11   sitting president were made with common law malice, which means

12   that his response was so outrageous that she should get more

13   money that exceeds her claim for her reputation.

14           MS. CROWLEY:  Objection.  I believe that misstates the

15   law.

16           THE COURT:  That does misstate the law, Ms. Habba.

17           And the jury will disregard the assertion of the law.

18   I will give you instructions at the end of the case about what

19   she must prove.

20           MS. HABBA:  The evidence will show that president

21   Trump was merely defending himself.

22           MS. CROWLEY:  Objection.

23           MS. HABBA:  On what basis?

24           THE COURT:  Ms. Crowley?

25           MS. CROWLEY:  Your Honor, I believe that suggests that

O1GQcar2                          Opening – Ms. Habba

1    and still does today.

2             The evidence will show that Ms. Carroll's reputation

3    was not harmed by president Trump's statements.  In fact, it's

4    the exact opposite.  She has gained more fame, more notoriety

5    than she could ever have dreamed of.  Remember, this case does

6    not turn on the truth of plaintiff's original assault

7    allegations.  That was decided.  This is a defamation case.

8    She already had that trial.  She had that day in court.  You

9    are not here to make her whole for that.  That happened.

10            Here she is looking for you to give her a windfall

11   because some people on social media said mean things about her.

12   But in today's day and age, the internet always has something

13   to say, and it's not always going to be nice.  Imagine if every

14   time a public person got a mean tweet, they could get money.

15   They could sue someone and get money for the backlash from that

16   because people didn't agree.

17            Let me be perfectly clear, I am incredibly sympathetic

18   to victims of sexual assault.  But this case is not about that.

19   This case is about a plaintiff who used her story to obtain as

20   much fame and notoriety as possible.  That was the business she

21   was in.  She waited 30 years for the opportune time when she

22   actually was making less to maximize coverage.

23            THE COURT:  What is the objection?

24            MS. CROWLEY:  Waiting 30 years.

25            THE COURT:  Overruled.

O1GQcar2                         Opening – Ms. Habba

1        Let me show you some of those books before:  *Female*

2   *Difficulties:  Sorority Sisters, Rodeo Queens, Frigid Women,*

3   *Smut Stars* --  I had to look up what that means -- *And Other*

4   *Modern Girls*.

5        *A Dog in Heat Is a Hot Dog and Other Rules*.

6        *Men Catching Made Easy*.

7        *Mr. Right, Right Now*.

8        And *What Do We Need Men For?*

9        You will hear further evidence that almost every book

10  featured her face on the cover because that's what she wanted.

11  You will hear her testify that she moved from Montana to New

12  York because the quiet life did not suit her.  In fact, counsel

13  just said in her opening she just wanted to go from Indiana and

14  make it in New York.

15        We will also demonstrate that by 2019, before she came

16  out with her allegation against Donald Trump, her career was

17  dwindling and it needed a spark.  The evidence will show that

18  Ms. Carroll's book shown here, *What Do We Need Men For?* was not

19  met with the critical acclaim that she had hoped for.  We will

20  also show that every interview that she did was centered around

21  Donald Trump, not the book.  We will show through this trial

22  that even Ms. Carroll's own close friends thought that her head

23  was getting too big and that she was loving the adulation after

24  she came out with the allegations.  It is no secret that if you

25  speak about president Trump, you are going to elicit strong

O1HsCAR1                    Carroll - Direct

1   where you live?

2   A.  Yes.  In Upstate New York in the mountains in a small

3   cabin.

4   Q.  And, Ms. Carroll, why are you here today?

5   A.  I'm here because Donald Trump assaulted me.  And when I

6   wrote about it, he said it never happened, he lied, and he

7   shattered my reputation.

8   Q.  Has he continued to lie about you, Ms. Carroll?

9   A.  In this very courtroom in May, a jury found that I had

10  indeed been sexually assaulted by Donald Trump.

11          THE COURT:  Ms. Carroll, please listen to the question

12  and answer the question.

13          MS. KAPLAN:  I'll repeat the question, your Honor.

14  Q.  Ms. Carroll, has he continued to lie about you?

15  A.  Yes, he has continued to lie.  He lied last month.  He lied

16  on Sunday.  He lied yesterday.  And I am here to get my

17  reputation back and to stop him from telling lies about me.

18          MS. HABBA:  Objection, your Honor, nonresponsive.

19  Also, those statements are not at issue here.

20          THE COURT:  Overruled.  Certainly relevant to punitive

21  damages, at least.

22  Q.  Ms. Carroll, when did Donald Trump first start lying about

23  you?

24  A.  June 21, 2019.

25  Q.  And before that time, before June 2019, Ms. Carroll, what

1   was your reputation in the world?

2   A.   Well, I'm 80 years old.  So I spent 50 years building a

3   reputation as a magazine journalist both in articles and as an

4   advice columnist.  My column was very popular.  People

5   appreciated my articles because I stuck to the truth and used

6   the facts.

7   Q.   And I think you just testified a minute ago, Ms. Carroll,

8   that as a result of Mr. Trump's defamation, your reputation was

9   shattered.

10          How was it shattered after June 2019?

11  A.   Well, yesterday -- I haven't looked today -- but yesterday,

12  I opened up Twitter and it said, Hey lady, you're a fraud.

13          So, previously, I was known as simply as a journalist

14  and had a column, and now I'm known as the liar, the fraud, and

15  the whack job.

16  Q.   Now, you testified that in addition to being a writer,

17  Ms. Carroll, you're also an advice columnist, is that correct?

18  A.   Yes.

19  Q.   And is reputation important to an advice columnist?

20  A.   Well, yes.  People are not dying to write to an advice

21  columnist who the president says is a disgrace.  People write

22  to advice columnists because they want to get tips and get

23  their problems solved so they can live delightfully and not,

24  like, disgracefully.

25  Q.   Now, Ms. Carroll, is this the first time you have sat in

1            MS. HABBA:  Objection.

2            THE COURT:  On what ground?

3            MS. HABBA:  Speculation.  It's not the definition.

4    She's assuming.

5            THE COURT:  Overruled.  You can cross-examine.

6    Q.  Now, Ms. Carroll, we've just looked at three statements

7    from Donald Trump, then the president of the United States,

8    over a very brief period in June of 2019?

9    A.  Yes.

10   Q.  Can you tell the jury, what did it feel like to have the

11   president of the United States say those kind of things about

12   you at that time in June?

13   A.  Well, to have the president of the United States, one of

14   the most powerful persons on earth, calling me a liar for

15   three days and saying I'm a liar 26 times -- I counted them --

16   it ended the world that I had been living in, and I -- and a

17   new world.

18   Q.  In terms of that new world, Ms. Carroll, what happened to

19   you after Donald Trump made those statements?

20   A.  I was attacked.

21            (Continued on next page)

22

23

24

25

O1GQcar2                        Carroll - Direct

1    BY MS. KAPLAN:  (Continued)

2    Q.  How were you attacked?

3    A.  I was attacked on Twitter.  I was attacked on Facebook I

4    was attacked in news blogs.  I was brutally attacked in

5    messages.  As I said, it was a new world.  I had left the world

6    of facts, a lovely world, and I was living in a new universe.

7    Q.  How quickly did those attacks happen, Ms. Carroll?

8    A.  Instantaneously.

9    Q.  And how did you know that those attacks were the result of

10   what Mr. Trump had said?

11   A.  Because many of the -- much of the wording that people used

12   repeated Donald Trump's words.

13   Q.  I'm going to show you for identification, Ms. Carroll, a

14   document that's been marked as Plaintiff's Exhibit 59.  And,

15   again, without divulging the contents, can you just identify

16   what this document is?

17   A.  Yes, this is a Facebook chat.

18   Q.  To whom was it addressed?

19   A.  To me.

20        MS. KAPLAN:  Plaintiff moves for the admission of 59,

21   your Honor.

22        THE COURT:  Received.

23        (Plaintiff's Exhibit 59 received in evidence)

24   Q.  Do you know the person who sent this to you, Ms. Carroll?

25   A.  No.

O1GQcar2                          Carroll - Direct

1          MS. KAPLAN:  Plaintiff moves for the admission of 71,

2     your Honor.

3          THE COURT:  It's received.

4          (Plaintiff's Exhibit 71 received in evidence)

5     Q.  And what is the date this message was sent, Ms. Carroll?

6     A.  This is the Monday, June 24, 2019.

7     Q.  Does the person who sent this message say anything that we

8     haven't seen in the prior messages?

9     A.  Yes.  He talks about how ashamed I should be for making up

10    a fake story because I make it so much harder on the true

11    victims of abuse.

12    Q.  Did Donald Trump say anything like that?

13    A.  Yes.

14    Q.  Before June 2019, Ms. Carroll, on your Ask E. Jean email

15    account that we just looked at, did you receive emails that

16    were critical of your column?

17    A.  Oh, yeah.

18    Q.  What kind of criticisms were they?

19    A.  Well, if I advised -- let's say I advised a husband how to

20    fight with his wife, not to let it get out of bounds, maybe the

21    husband's sister wrote in and said, "Listen, I gave him better

22    advice than you did and this is what I said."  So I tended to

23    like those because I became a better advice -- I learned a lot

24    from my correspondence because it kept me in line and would

25    always tell me that they're -- you know, they would give me

O1GQcar2                        Carroll - Direct

1   ideas about how to answer the next question better.

2   Q.  Before June 2019, Ms. Carroll, did you ever receive

3   messages like the three we just looked at on your Ask E. Jean

4   email account or anywhere else?

5   A.  Never.

6   Q.  How did receiving messages like this, Ms. Carroll, make you

7   feel?

8   A.  Well, I thought I -- I thought I had lost something very

9   important.  Here's the thing.  I understand that people have

10  lost a lot more than I have.  I understand that people have

11  been through a lot more than I have ever been through in my

12  life, but this laid me low.  It -- it was so unexpected from a

13  place where I felt that I was doing well in the world and

14  helping people.

15  Q.  Did the messages like this continue, Ms. Carroll?

16  A.  They've never stopped.

17  Q.  How often do you receive them?

18  A.  All the time.

19  Q.  When you say "all the time," every day?

20  A.  Yes.  Scores and scores, sometimes hundreds a day.

21  Q.  Do the messages that you have been receiving since

22  June 2019 share any common themes?

23  A.  Yes.

24  Q.  What are those themes?

25  A.  You're a liar.  You hurt victims.  You are ugly.  Those are

O1GQcar2                          Carroll - Direct

1   A.  It means that she wants me to receive this message and know

2   how ugly I am and what a liar I am.

3   Q.  Did you respond to this message, Ms. Carroll?

4   A.  No.

5   Q.  Now, you'll see, especially on the bottom one from July, it

6   talks about answering to God?

7   A.  Yes.

8   Q.  Did you get messages that talked about you answering to

9   God?

10  A.  Yes.

11  Q.  Can you explain?

12  A.  Well, they want God to punish me.  Not want God.  Know God.

13  They know God will punish me. Other people want the devil to

14  punish me.  It goes both ways.

15  Q.  I'm going to ask Mr. Termonfils to put up another document,

16  Ms. Carroll.  It's Plaintiff's 45 for identification.

17         Again, if you could just tell us what type of document

18  this is?

19  A.  This is an email.

20  Q.  To whom was it addressed?

21  A.  Ask E. Jean.

22         MS. KAPLAN:  Plaintiff moves for the admission of 45,

23  your Honor.

24         THE COURT:  Received.

25         (Plaintiff's Exhibit 45 received in evidence)

O1GQcar2                          Carroll - Direct

1   Q.  This is the same Ask E. Jean column we were talking about

2   before?

3   A.  Yes.

4   Q.  What's the date on here?

5   A.  June 23.

6   Q.  Is this person asking you for advice?

7   A.  No.  Quite the contrary, I remember this email because it

8   hurt my feelings because she said she wasn't going to ask me

9   for any advice.

10  Q.  Why did that hurt your feelings?

11  A.  My whole career, my whole reason for being a happy person

12  is I feel like I'm giving good advice and helping people.

13  Q.  Ms. Carroll, this email asked you how much George Soros

14  paid you to lie about president Trump.  Do you see that?

15  A.  Yes.

16  Q.  Do you know who George Soros is?

17  A.  Yes.

18  Q.  Who is he?

19  A.  He's a very rich old man.

20  Q.  Have you ever met George Soros?

21  A.  No.

22  Q.  Have you ever been to a party where George Soros was there?

23  A.  No.

24  Q.  Did George Soros pay you to lie about Donald Trump?

25  A.  No.

O1GQcar2                          Carroll - Direct

```
 1   Q.  You see here also it says DNC, the three letters.  Do you
 2   see that?
 3   A.  Yes.
 4   Q.  Do you know what that stands for?
 5   A.  Democratic National Committee.
 6   Q.  Do you know anyone who works at the Democratic National
 7   Committee?
 8   A.  No.
 9   Q.  Do you know anyone who used to work at the Democratic
10   National Committee?
11   A.  No.
12   Q.  Did anyone from the DNC pay you to tell lies about Donald
13   Trump?
14   A.  No.
15            MS. KAPLAN:  Is there an objection, Ms. Habba?
16            MS. HABBA:  Yes, your Honor.  I just want to note that
17   now that they have opened the door, and she has denied getting
18   funding, I will be addressing this on cross.
19            THE COURT:  We'll see.
20            The last I heard, Ms. Habba, I do not need
21   announcements from counsel about what they intend to do.
22            MS. HABBA:  Okay.
23            THE COURT:  And I make the rulings here, not the
24   lawyers.  Just get that very clear in your mind, please.
25            MS. HABBA:  Okay, your Honor.  And they just asked her
```

O1GQcar2                        Carroll - Direct

1    a question.  She said she didn't get funding --

2              THE COURT:  Sit down.

3              MS. HABBA:  Okay.

4    BY MS. KAPLAN:

5    Q.  Now, when I first showed you this -- you can put it back

6    up, Mr. Termonfils, if you will, please.

7              When I first showed you this email, Ms. Carroll, you

8    said it particularly hurt your filings because they said they

9    wouldn't be asking you for advice, correct?

10   A.  Right.

11   Q.  Prior to June 2019, how many emails or letters would you

12   get from readers each month asking you for your advice?

13   A.  Around 200 a month.

14   Q.  Today, how many emails or letters do you get from readers

15   asking you for your advice?

16   A.  Around two letters a week.

17   Q.  So that's how many a month?

18   A.  Eight.

19   Q.  We're both very bad at math.

20             MS. KAPLAN:  This might be a good time, your Honor.  I

21   don't know when you wanted to have the morning break.  Is it

22   okay?

23             THE COURT:  Yes, it is.  15 minutes.

24             (Jury not present)

25             THE COURT:  Be seated folks.  Somebody had an

O1GQcar2                        Carroll - Direct

1    application?

2              MS. CROWLEY:  Yes.

3              Judge, Ms. Habba has now twice in front of the jury

4    made comments about things that your Honor has ruled are

5    clearly out of bounds.  The first is Ms. Carroll -- the fact

6    that Ms. Carroll has accused other men of sexual misconduct.

7    Ms. Habba said that twice when we were talking about the *New*

8    *York* magazine excerpt.

9              We sent all of our exhibits to the defense weeks ago.

10   If they had looked at them, they would have seen that that

11   exhibit was redacted.  There was no mention of any of the other

12   men who Ms. Carroll wrote about.

13             The second time was just now when Ms. Habba brought up

14   the fact that Ms. Carroll received funding in connection with

15   this case in front of the jury.  Obviously, that's totally

16   improper as your Honor has ruled.

17             I also just want to put on the record that in light of

18   your Honor's order and instructions to the parties yesterday,

19   Mr. Trump has been sitting at the back table and has been

20   loudly saying things throughout Ms. Carroll's testimony,

21   including things that she is saying are false and noting that

22   she seems to have now gotten her memory back.  It's loud enough

23   for us sitting up here to hear it.  I assume it's loud enough

24   for the jury to hear it.

25             THE COURT:  Ms. Habba?

O1GQcar2                          Carroll - Direct

1          MS. HABBA:  On the first issue, the *New York* magazine

2     excerpt, Ms. Kaplan brought that excerpt in.  It was not

3     redacted in the title which brought up prior men, which brought

4     up the underlying assault, and your ruling was from this

5     weekend which said that we were not -- or perhaps it was

6     Friday; we had several in the last 72 hours.  But that is why,

7     despite us having it, I objected, and you sustained it, your

8     Honor.

9          As to the second issue, they asked her if she had

10    funding.  She said no.  We know that she has funding.  How am I

11    supposed to sit here when they open the door, your Honor?

12    That's the issue.

13          THE COURT:  That wasn't the second issue.

14          MS. HABBA:  No, that was the issue, I believe.

15          THE COURT:  No, it was about Mr. Trump being vocal

16    within the hearing of the jury.  That's what I just heard.

17          MS. CROWLEY:  The second -- I believe, your Honor, the

18    second comment that Ms. Habba improperly made to the jury was

19    about funding.

20          I just want to make clear, we didn't ask Ms. Carroll

21    anything about whether she received funding in connection with

22    this lawsuit.  Ms. Kaplan asked her if when the comment was

23    made back in June of 2019 she had been paid by the DNC or

24    George Soros to tell lies about Mr. Trump.

25          MS. HABBA:  Your Honor, if --

O1GQcar2                          Carroll - Direct

1          THE COURT:  Go ahead.

2          MS. HABBA:  If they are going to ask questions that

3     open the door — this is how the rules work — my understanding

4     is that I can bring it up.  And I'm not going to ask about the

5     underlying men, but when you bring it up and ask her does she

6     have funding from Soros and DNC, but it's Reid Hoffman, how am

7     I supposed to bring that up?  It's their opening of the door,

8     your Honor.  Twice now they've violated your order.  They've

9     gotten into things they're not supposed to do.  I am going to

10    respond if they keep ignoring your order.

11         THE COURT:  When they have gone against my order, I

12    have stopped them, as you know.  I will consider what you've

13    said and we'll see what happens.

14         MS. HABBA:  Thank you, your Honor.

15         DEPUTY CLERK:  All rise.

16         (Recess)

17         THE COURT:  Before we bring in the jury, I'm just

18    going to ask Mr. Trump takes special care to keep his voice

19    down when he's conferring with counsel so that the jury does

20    not overhear it.

21         Let's get the jury.

22         (Continued on next page)

23

24

25

O1GQcar2                         Carroll - Direct

1          (Jury present)

2          THE COURT:  A little earlier Plaintiff's Exhibit 6 was

3    received.  There was then an objection.  One page of it may

4    have been exhibited to the jury.  I'm going to strike Exhibit 6

5    now without prejudice to its being offered at a subsequent

6    time, and the jury, unless it is received in evidence, will

7    disregard it.

8          MS. KAPLAN:  Thank you, your Honor.

9          THE COURT:  Let's continue.  You may continue,

10   Ms. Kaplan.

11   BY MS. KAPLAN:

12   Q.  Mr. Termonfils, can you please put up for Ms. Carroll

13   Plaintiff's Exhibit 85.

14          Ms. Carroll, do you recognize the document in front of

15   you?

16   A.  Yes, it's a tweet.

17   Q.  And who posted the original tweet?

18   A.  I did.

19          MS. KAPLAN:  Your Honor, plaintiff moves for the

20   admission of Plaintiff's Exhibit 85.

21          THE COURT:  Received.

22          (Plaintiff's Exhibit 85 received in evidence)

23   Q.  Ms. Carroll, what is the date of the tweet here that you

24   posted?

25   A.  June 20, 2019.

O1GQcar2                          Carroll - Direct

1   Q.  How does that relate in time to Mr. Trump's statements?

2   A.  This is two days beforehand.

3   Q.  Just so the record is clear, let me make sure we have that

4   right.

5   A.  It's one day.  He made the statement June 21.  This is

6   June 20.

7   Q.  What is this tweet, what's it about?

8   A.  I'm offering advice.  That's a picture of Zelda Fitzgerald.

9   I'm saying the best way to deal with heartache is a 6,000-mile

10  road trip.

11  Q.  Is there a reply to your tweet, Ms. Carroll?

12  A.  Yes.

13  Q.  And when was the reply posted?

14  A.  June 21, 2019.

15  Q.  And is there anything in this reply, Ms. Carroll, in terms

16  of the statements about you that we haven't seen before?

17  A.  Pretty much hit all the high spots.

18  Q.  Does this reply tweet talk about your mental health?

19  A.  Yes.  Psychological messed up to lie about something to

20  draw sales to the book.

21  Q.  Is the theme you were psychologically messed up, is that a

22  theme that you saw in tweets in other messages that you

23  received?

24  A.  Continually.

25  Q.  How, if at all, Ms. Carroll, did the messages you received

O1GQcar2                          Carroll - Direct

1    following June 2019 comment on your appearance?

2    A.  Many.  Many.  Many commented on the way I look.

3    Q.  What kinds of things did they say?

4    A.  Oh, well, just I'm too ugly to go on living.

5    Q.  How did receiving messages like that make you feel?

6    A.  It makes it hard for a girl to get up in the morning,

7    really.  To put on some lipstick, I will avoid a mirror.  You

8    know, it makes me feel bad.  I know I'm old.  I know I'm 80.  I

9    know I'm not a pretty, young woman, but it makes it tough to

10   get on with the day when you open up to see what the breaking

11   news is, and people see you ugly, scrawny, hag, and so that's

12   not a good way to start the day.

13   Q.  Let's take a look -- if you could put up, Mr. Termonfils,

14   Plaintiff's Exhibit 43 for Ms. Carroll.

15            Ms. Carroll, what kind of a document is this?

16   A.  This is an email.

17   Q.  Was it sent to you?

18   A.  It's sent to my personal email.

19            MS. KAPLAN:  Plaintiff moves for the admission of 43,

20   your Honor.

21            THE COURT:  Received.

22            (Plaintiff's Exhibit 43 received in evidence)

23   Q.  Ms. Carroll, do you have any idea -- do you know the person

24   who sent this to you?

25   A.  No.

1   A.  Yes, this is a Facebook message.

2   Q.  To whom was it addressed?

3   A.  This is to me.

4           MS. KAPLAN:  Plaintiff moves for admission of 126.

5           THE COURT:  Received.

6           MS. KAPLAN:  I'm wrong.  128.  I'm wrong.

7           THE COURT:  128 is received, not 126.

8           (Plaintiff's Exhibit 128 received in evidence)

9   Q.  Ms. Carroll, was this message you're looking at now

10  different than some of the messages you received?

11  A.  Yes.

12  Q.  How and why?  Compound.  I object to my own question.

13  How was it different?

14  A.  This person wants me to know it's not himself who is

15  threatening me, but his friend wants to kill me and this man

16  cannot stop him.

17  Q.  If you could put up in front of Ms. Carroll — now I'm on

18  the right number, Mr. Termonfils — plaintiff's 126.

19          Before we get there, in addition to threats of killing

20  you, did you receive any other threats of violence?

21  A.  Yes.

22  Q.  What kind of violence?

23  A.  Raping.  Raping me.

24  Q.  Mr. Termonfils, if you could put up in front of Ms. Carroll

25  Plaintiff's 126, please.

O1GQcar2                          Carroll - Direct

1              Ms. Carroll, do you recognize this document?

2    A.  Yes, I do.

3    Q.  What type of document is it?

4    A.  This is a Facebook message.

5    Q.  To whom was it sent?

6    A.  Me.

7              MS. KAPLAN:  Plaintiff moves for the admission of 126,

8    your Honor.

9              THE COURT:  Received.

10             (Plaintiff's Exhibit 126 received in evidence.

11   Q.  What's the date on this one?

12   A.  This is one day after last year's trial.

13   Q.  What does this person want to have happen to you?

14   A.  Rape and murder.

15   Q.  Now, if you look below the main message, it says something.

16   What does it mean, the second paragraph?

17   A.  It means Jack Daniels Melissa tried to call me.

18   Q.  Did you ever speak to that person?

19   A.  No.

20   Q.  Mr. Termonfils, can you show Ms. Carroll Plaintiff's 114.

21             Ms. Carroll what type of document is this?

22   A.  This is an email to my Ask E. Jean.

23   Q.  What's the date?

24   A.  September 9, 2023.

25             MS. KAPLAN:  Plaintiff moves for the admission of 114,

O1GQcar2                        Carroll - Direct

1    your Honor.

2              THE COURT:  114 received.

3              (Plaintiff's Exhibit 114 received in evidence)

4    Q.  How many months after the trial was over -- we've just been

5    looking at ones for May.  How many months later is this one?

6    A.  Three and a half months -- four months.

7    Q.  I'm going to show you two more, but I'm going to do them at

8    once, Ms. Carroll, if you don't mind.

9              Mr. Termonfils, can you put up in front of

10   Ms. Carroll — they're both short — Plaintiff's 124 and

11   Plaintiff's 130.  And maybe if you could go to the second page.

12             Ms. Carroll, do you recognize what these documents

13   are?

14   A.  Yes.

15   Q.  What are they?

16   A.  They're Facebook messages.

17             MS. KAPLAN:  Plaintiff moves for the admission of 124

18   and 130, your Honor.

19             THE COURT:  They're received.

20             (Plaintiff's Exhibits 124 and 130 received in

21   evidence)

22   A.  I'm sorry that people in the courtroom have to see this

23   picture.

24   Q.  Ma'am, I'm sorry to have to ask you about it, Ms. Carroll,

25   but when you got a message like these, how would you react?

O1GQcar2                       Carroll - Direct

1   A.  I'm -- the image would flash into my mind.  I couldn't help
2   but picture it.  I couldn't help but feel it was imminent.  The
3   heart would, you know, constrict and start to pound, and it's
4   funny, the body believes it's going to happen.  My brain knows
5   it's just a picture, don't worry, but my body thinks something
6   entirely different.  It feels like it's going to happen.
7   Q.  So, Ms. Carroll, when we looked at some of the earlier
8   messages talking about you being ugly or a liar, some of those
9   were posted on public media sites?
10  A.  Yes.
11  Q.  The messages threatening violence are all sent to you
12  privately.  Is that correct?
13  A.  Yes.
14  Q.  Do you understand what the reason for that is?
15  A.  Well, they would be not allowed to put on public social
16  media these kinds of threats.
17  Q.  So we've seen some pretty horrible messages, Ms. Carroll,
18  and the question I have to ask is, why didn't you just delete
19  your social media account?
20  A.  Well, social media is my lifeblood.  It's where I'm
21  connected with my family and friends.  It's where I see -- you
22  know, I could watch my nephew win his swimming race.  I could
23  see my friend's sweater she knit.  And as a journalist, it's
24  where I publish my latest pieces.  It's where I read page.  My
25  favorite journalists are on social media.  It's where I see

O1HsCAR3                          Carroll - Direct

BY MS. KAPLAN:

Q.  Is it remote where you live?

A.  Yes.

Q.  Do you live alone?

A.  Yes.  Well, with my dogs.

Q.  And since you started getting messages like these, what, if

any, steps have you taken to protect yourself?

A.  Well, I have a pit bull, rescue.  He's a great dog, but I

never, never had him off the leash.  When the first threats

came in, I let him off the leash, and he now patrols the place,

I must say, very eagerly and enthusiastically.

Q.  And how do you make sure that he stays on your property?

A.  Put in an electronic fence.

Q.  And what other steps have you taken?

A.  I alerted the neighbors to be on the watch and I bought

bullets for the gun I had inherited from my father.

Q.  Where do you keep that gun?

A.  By my bed.

Q.  Are there any steps you take, Ms. Carroll, when you're

driving?

A.  There is hardly a moment in the day when I don't take steps

to be aware of what is going on.  Driving, I watch before I

pull out of my driveway.  I pay attention to everything going

on around me, who is behind me, who is in front of me.  I am

hyperalert.

O1HsCAR3                        Carroll - Direct

1    Q.  What about when you run errands?

2    A.  Yes.  Choosing a parking place, looking to see who's

3    around, looking to see if I should open the car door, should I

4    drive on, doing the errand.  And then, on the way home, making

5    sure nobody is following me.  If a car turns into my road

6    behind me, I never stop at my house.  I drive to the end of it,

7    to the road.

8    Q.  Have there been any instances where you changed your

9    behavior because of these security concerns you have?

10   A.  I change direction a lot.  There was also a time at the

11   grocery, I had parked in a really safe space.  I had gone to

12   the grocery.  I had done two weeks' worth of shopping.  I had

13   the cart filled to the brim.

14        I'm on the way out to my car with the cart, and I see

15   a man leaning against my car like this, he was wearing a brown

16   shirt and brown pants, waiting for me.  So I backed up with my

17   cart and went back in the grocery and stood behind the wall and

18   watched for him to leave.  And as soon as he walked away and I

19   hadn't seen him anyplace else, then I quickly exited the store,

20   got in my car, and drove home.

21        When I arrived in the driveway and opened my car door,

22   I discovered I had left my entire cart of groceries in the

23   grocery store.  That's how hyperalert I am.  I was way more

24   attentive to my surroundings than I was to the food I had just

25   bought.

O1HsCAR3                         Carroll - Direct

1    Q.  Have the security measures that you have been talking

2    about, Ms. Carroll, have they been effective?

3    A.  Yes.

4    Q.  Do you have personal security with you at this trial?

5    A.  Yes.

6    Q.  Did you have personal security with you at the last trial?

7    A.  Yes.

8    Q.  Have you thought about having personal security with you

9    more often?

10   A.  Many times.

11   Q.  Why don't you?

12   A.  I can't afford it.

13   Q.  Did you report any of the threatening messages you received

14   or others that you may have received, did you report any of

15   them to the police?

16   A.  No.

17   Q.  Why not?

18   A.  I would be reporting stuff to the police -- I wouldn't do

19   it.  It wouldn't do any good.

20   Q.  Why wouldn't it do any good?

21   A.  There is nothing they can do about it.

22   Q.  Ms. Carroll, any of the messages that we looked at today or

23   any other messages like them, threatening you with violence,

24   did you share any of those messages with your friends?

25   A.  No.

O1HsCAR3                        Carroll - Direct

```
 1   Q.  Did you watch the video that's in your hands that I'll

 2   represent is the video in Plaintiff's 146?

 3   A.  Yes.  I watched the video and read along with the

 4   transcript.

 5   Q.  Is that transcript an accurate reflection of what was on

 6   that video?

 7   A.  Yes.

 8           MS. KAPLAN:  Move for the admission of 146, 97, and

 9   97-T, your Honor.

10           MS. HABBA:  Sorry.  It's not necessarily an objection,

11   your Honor, but we will be -- I just want to be clear.

12           THE COURT:  If it's an announcement --

13           MS. HABBA:  No.

14           THE COURT:  Excuse me.  If it's not an objection, it's

15   out of order.

16           MS. HABBA:  Objection.  The entire video should be

17   submitted.

18           MR. TRUMP:  And played.

19           MS. HABBA:  And played.

20           THE COURT:  Nobody has proposed anything else yet, so

21   please sit down and see what happens.

22           Plaintiff's 96 is received, Plaintiff's 97 is

23   received, Plaintiff's 97-T, the transcript, is received.

24           (Plaintiff's Exhibits 96, 97, and 97-T received in

25   evidence)
```

O1HsCAR3                         Carroll - Direct

1              (Jury not present)

2              THE COURT:  I understand there is an application.

3              MS. CROWLEY:  Judge, I just want to place on the

4    record, again, that notwithstanding your instruction right

5    before we started, the defendant has been making statements

6    that, again, we can hear at counsel table.  Some of the jurors

7    are sitting closer to him than we are.

8              He said, It is a witch hunt.  It really is a con job.

9    And when you played the last video, he said, It's true.  So we

10   would just ask your Honor to remind the parties that they are

11   not supposed to make statements to or indirectly to the jury.

12             THE COURT:  Mr. Trump has the right to be present

13   here.  That right can be forfeited, and it can be forfeited if

14   he is disruptive, which what has been reported to me consists

15   of, and if he disregards court orders.

16             Mr. Trump, I hope I don't have to consider excluding

17   you from the trial or at least from the presence.  I understand

18   you're probably very eager for me to do that.

19             MR. TRUMP:  I would love it.

20             THE COURT:  I know you would.  You just can't control

21   yourself in these circumstances, apparently.

22             Thank you.

23             (Recess)

24

25

O1HQcar4                          Carroll - Direct

1   A.  Yes.

2   Q.  Have you gotten used to -- by now, have you gotten used to

3   receiving attacks like that?

4   A.  Never.  I will never -- never get used to attacks like

5   that.

6   Q.  But as we've touched on, you also received positive

7   messages after the verdict?

8   A.  Yes.  Yes.

9   Q.  And from time to time, people would recognize you and

10  congratulate you on the verdict?

11  A.  Yes.

12  Q.  And positive articles were written in the media?

13  A.  Yes.

14  Q.  Didn't that fix your reputation for you, Ms. Carroll?

15  A.  No.

16  Q.  Why not?

17  A.  Because so many more people hated me.

18  Q.  Would you say, Ms. Carroll, that you're more famous since

19  you sued Donald Trump?

20  A.  Yes.  I'm better known.

21  Q.  And are you better known by people who admire you or people

22  feel differently?

23  A.  I'm better known by the people who think I'm a liar --

24  people who didn't know who I was --

25          MS. HABBA:  Objection.  Your Honor, she is speaking to

O1HQcar4                           Carroll - Direct

1   what other people think.

2                THE COURT:  Overruled.

3   Q.  You can finish answering.

4   A.  People who didn't know me from Adam.  People who didn't

5   care about me, really don't care about this person, they now

6   have opinions about me, and that is that I'm a liar.

7   Q.  Now, you testified earlier about your advice column for

8   *Elle* magazine.  For how many years did you write that column?

9   A.  27 years.

10  Q.  How does that compare to the length of other advice

11  columns?

12  A.  It was the longest currently running advice column in

13  American publishing.

14  Q.  When did you stop writing that column?

15  A.  Two thousand -- at the end of 2019.

16  Q.  Do you still write an advice column today?

17  A.  Yes.

18  Q.  How do you do that?

19  A.  I publish it on Substack.

20  Q.  Excuse my ignorance, what is Substack?

21  A.  Substack is a platform where writers can publish directly

22  to their readers.

23  Q.  When did you start publishing your advice column on

24  Substack?

25  A.  2021.

O1HQcar4                          Carroll - Direct

1   Q.  Do you make money from publishing on Substack?

2   A.  Yes.

3   Q.  How does that work?

4   A.  Well, I'm a writer.  I have to feed the dogs and feed

5   myself.  I earn my money by my writing, and so readers pay to

6   read my Substack, and also I have readers who can read it for

7   free.

8   Q.  So how many readers do you have total?  How many

9   subscribers do you have on Substack in total approximately?

10   A.  Subscribers, so 28,000.  I just checked this morning.

11   Q.  About how many of those are paid subscribers?

12   A.  1,800.

13   Q.  Has the number of your Substack -- has the number of your

14   subscribers on Substack increased since you started it?

15   A.  Yes.  Yes, it has.

16   Q.  Have the number of your Twitter followers increased since

17   2019?

18   A.  Yes.

19   Q.  Do you earn any money from your followers on Twitter?

20   A.  No.

21   Q.  What does it mean, Ms. Carroll, to write freelance?

22   A.  Freelance is where you send articles and pitch articles to

23   editors at magazines.  So you're not under contract.

24   Q.  And before June 2019, did you write articles freelance for

25   various magazines?

O1HQcar4                        Carroll - Direct

1   specify which year, please?

2           THE COURT:  That is a proper question for

3   cross-examination unless counsel wants to go into it.

4   Q.  Let me try to ask it this way.  In the years 2017, 2018,

5   how much money, if you can recall, were you making from writing

6   freelance articles?

7   A.  '17 and '18, probably 50,000 a year.

8   Q.  How much did you make from writing freelance articles in

9   2023?

10  A.  So far?  500,000 -- 500,000 -- $500.

11  Q.  Ultimately, Ms. Carroll, how did your book sell?

12  A.  It was a dud.

13  Q.  Now, you testified earlier about being asked to appear on

14  TV shows as an advice columnist.  Do you recall that?

15  A.  Yes.

16  Q.  Do you still get asked to appear on TV shows as an advice

17  columnist?

18  A.  No.

19  Q.  When did that stop?

20  A.  2019.

21  Q.  Last month, Ms. Carroll, did you happen to post any

22  messages on Twitter?

23  A.  Yes.

24  Q.  What kind of a message did you post on Twitter last month?

25  A.  I posted dog videos, and I posted a Christmas message.

O1HsCAR5                        Carroll - Cross

1          (At the sidebar)

2          MS. KAPLAN:  The question was, didn't you say in your

3    book -- wait -- general public would not believe your opinion.

4    That has to go with the truth of what she said.

5          MR. MADAIO:  Your Honor, it goes to --

6          MS. HABBA:  He is going to say --

7          I'm sorry, your Honor.  I didn't want him to

8    interrupt.

9          MR. MADAIO:  Your Honor, it goes to what her

10   expectation was.  She admits it was a difficult-to-believe

11   story.  She put it out there.  She made it public.  It goes

12   towards whatever sort of backlash she was expecting.  It's out

13   in the public, relevant to any emotional harm she suffered,

14   and, again, her reputation.

15         Whether or not the story was believable to begin with

16   relates to whether or not it was president Trump's statement or

17   initial accusation.  She herself put out a statement saying

18   it's a difficult-to-believe story, so it's relevant.

19         MS. KAPLAN:  Your Honor, this is like the huge tail

20   wagging a very small dog.  To introduce evidence that her

21   statement was unbelievable, the overwhelming weight of that is

22   they are trying to suggest that the statement was unbelievable.

23   We have a jury determination that it was true.

24         MR. MADAIO:  Your Honor, one of the main issues in

25   this case is causation.  These statements, these tweets aimed

O1HsCAR5                        Carroll - Cross

1   at Ms. Carroll, were they because of her initial accusation or

2   Mr. Trump, president Trump's response.  The believability of

3   her story goes towards whether or not people would initially

4   think of her as a liar.  It's absolutely relevant.

5            THE COURT:  I understand the relevance argument.  It's

6   not wholly without merit.  The unfair, prejudicial effect of

7   this is impugning the accuracy of the prior determination,

8   which is binding on your client, outweighs whatever probative

9   value this has on the subject of whether or not it was

10  farfetched.

11           MS. HABBA:  While we're on the sidebar, your Honor,

12  just so I want to be clear, so before it goes to emotional

13  damages and her being shocked by the tweets, can I discuss

14  this, so we don't have to stop?

15           THE COURT:  I never know how it is going to come out

16  from you.

17           MS. HABBA:  OK.

18           THE COURT:  Or anybody else for that matter.

19           MS. HABBA:  OK.

20           (Continued on next page)

21

22

23

24

25

O1HsCAR5                          Carroll - Cross

```
 1   A.  Absolutely.
 2             MS. KAPLAN:  Objection, your Honor.
 3   A.  Yes.
 4   Q.  And didn't you say that you suspected that would happen in
 5   your book?
 6   A.  Yes.
 7             THE COURT:  The answer is stricken.  The jury will
 8   disregard it.  I ruled at that at the sidebar, and you just
 9   ignored the ruling.
10   Q.  Now, you said you received threatening messages in your
11   testimony today, correct?
12   A.  Yes.
13   Q.  And you deleted those messages?
14   A.  Yes.
15   Q.  And do you know what happens when you delete a message from
16   your inbox?
17   A.  It goes into the trash in my computer, and then the trash
18   is emptied automatically every 30 days, I think.
19   Q.  Did you ever delete the e-mails from the trash section of
20   your e-mail?
21   A.  I probably did.
22   Q.  So your testimony is that you deleted the messages and then
23   they went to the trash and then you went into the trash and
24   deleted the trash as well, correct?
25   A.  I didn't go into the trash, I just periodically empty my
```

O1HsCAR5                        Carroll - Cross

```
 1   Q.  Ms. Carroll, do you control your e-mail?
 2   A.  Yes.
 3   Q.  Can you provide me those e-mail --
 4           Well, actually, I won't let you do that.
 5           Do you control your e-mail?  Does anybody else control
 6   your e-mail?
 7   A.  Nobody.
 8   Q.  Would anybody else have deleted the messages after we were
 9   in active litigation?
10   A.  I don't think they would.
11   Q.  So only you could have done that, is that correct?
12   A.  Yes.
13   Q.  Ms. Carroll, are you aware that it is illegal to delete
14   evidence after a subpoena has been issued?
15           MS. KAPLAN:  Objection, your Honor.
16           THE COURT:  Sustained.
17           Jury will disregard the question.
18           MS. HABBA:  Your Honor.
19           THE COURT:  You're not instructing the jury, counsel.
20           MS. HABBA:  I was not going to.
21           Your Honor, at this moment, I feel I have to ask for a
22   mistrial.  The witness has just admitted to deleting evidence
23   herself, which are part of her claim of damages, and I haven't
24   seen them.  She has no evidence of them.  She hasn't turned
25   them over.
```

O1HsCAR5                         Carroll - Cross

 1   A.  Yes.

 2   Q.  Anderson Cooper on CNN?

 3   A.  Yes.

 4   Q.  And MSNBC with Chris Matthews?

 5   A.  Yes.

 6   Q.  That's a lot of appearances for somebody who doesn't want

 7   to attract attention, isn't it, Ms. Carroll?

 8          MS. KAPLAN:  Objection.

 9          THE COURT:  Sustained.  That's argumentative and

10   inappropriate.

11   Q.  Who handled your appearances, Ms. Carroll?

12   A.  The publisher.

13   Q.  The publisher of What Do We Need Men For?

14   A.  Yes.

15   Q.  Are they a publicist?

16   A.  No.  They had an entire publicity department, and the vice

17   president of publicity handled my book.

18   Q.  So did they book you?

19   A.  Yes.

20   Q.  Did you have to accept those interviews before they could

21   book you?

22          MS. KAPLAN:  Asked and answered, your Honor.

23          THE COURT:  Sustained.

24          MS. HABBA:  I haven't --

25          THE COURT:  Yes, you have.

O1HsCAR5                          Carroll - Cross

1              (At the sidebar)

2              MS. KAPLAN:  My concern, your Honor --

3              THE COURT:  I can't hear you.

4              MS. KAPLAN:  My concern, your Honor, is the answer to

5    that question is going to be the Anderson Cooper tape that we

6    just dealt with in motion practice.

7              MS. HABBA:  Your Honor, I asked about this.  I'm going

8    to ask about -- I'm not playing the tape.  I'm going to ask

9    about what happened after she made a statement that has nothing

10   to do with the underlying comment and that she actually fought

11   with people on Twitter about it.  She did not shy away from

12   them.

13             MS. KAPLAN:  I don't know what she's talking about.

14   If you ask her that question --

15             MS. HABBA:  If I ask the question --

16             THE COURT:  What is it?

17             MS. HABBA:  I have a series of tweets, your Honor,

18   where Ms. Carroll did not -- she actually got in arguments with

19   people on Twitter about her "rape is sexy" comment.

20             THE COURT:  These are the tweets where she said she

21   never said rape was sexy, right?

22             MS. HABBA:  No.  There is actually articles as well

23   that discuss that she got negative feedback from her cutting to

24   commercial by, Anderson Cooper cutting to commercial break and

25   that whole series.

1          MR. MADAIO:  Your Honor, if I can clarify.  I'm sorry

2     for speaking.

3          But if I can clarify, I know you said in your order

4     that we had only shown her response.  To clarify here, we do

5     have tweets from other people mentioning the statement itself,

6     as well as her response.  So it sort of shows the public's

7     reaction.

8          THE COURT:  We're not going there.

9          MS. HABBA:  Your Honor, I have to make a record.

10         I don't understand how we can't go there when she

11     caused some of the backlash herself and we're in a damages

12     trial.

13         THE COURT:  I understand.

14         We're not going there.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O1HQcar6                        Carroll - Cross

1    days?

2    A.  I haven't seen him, but I wouldn't be surprised.

3    Q.  Was he married to president Trump's campaign person,

4    Ms. Carroll, Ms. Kellyanne Conway?

5            MS. KAPLAN:  Objection.  We're way outside.

6    A.  Yes.

7            MS. HABBA:  It's not outside.

8            THE COURT:  Yes, of course it is.

9            MS. HABBA:  Your Honor, may I put my reasoning --

10           THE COURT:  I don't need to hear your reasoning.

11           MS. HABBA:  Okay.

12           THE COURT:  How much longer do you anticipate?

13           MS. HABBA:  If you would like to break, we can.  I

14   have probably half an hour.

15           THE COURT:  I think we'll break now and resume at 9:30

16   tomorrow morning.

17           (Trial continued January 18, 2024 at 9:30 a.m.)

18

19

20

21

22

23

24

25

O1IQcar1                         Carroll - Cross

1    complaint.

2              And who are you?

3              MR. KATZ:  I'm an attorney working with them.

4              THE COURT:  And does this attorney have a name?

5              MR. KATZ:  Adam Katz.

6              MS. HABBA:  Katz.

7              THE COURT:  Have you appeared in this case?

8              MR. KATZ:  I haven't, your Honor.

9              THE COURT:  Sit behind the bar and stay there.

10             MR. KATZ:  Okay.

11             THE COURT:  Get the complaint.

12             MS. HABBA:  Okay.

13             THE COURT:  Well, paragraph 84 of the complaint said

14   it was posted by Ms. Litvan of *Bloomberg News* at 2:17.

15   Indeed--

16             MS. HABBA:  Is that the time --

17             MR. MADAIO:  But that's a link to the tweet which

18   shows a time of 5:17.  I think that's a typo in there.

19             THE COURT:  So it's a matter for evidence.

20             MS. HABBA:  Okay.

21             THE COURT:  And however it turns out is fine, but

22   we're not just going to keep saying that it was 5:17 before

23   it's established.

24             MR. MADAIO:  Understood, your Honor.  Could we have a

25   clarification to the jury that this was a tweet, not a private

O1IQcar1                          Carroll - Cross

1    A.  Yes.

2    Q.  Thank you.

3            Nate, can you pull up what was marked DX-68 for the

4    witness.

5            Do you recognize this document in front of you?

6    A.  It's a tweet.

7    Q.  Do you recognize that that is also your Twitter handle

8    E. Jean Carroll?

9    A.  Yes.

10   Q.  Does the comment -- excuse me --

11           THE COURT:  What is it, Ms. Kaplan?

12           MS. KAPLAN:  Has it been offered?

13           MS. HABBA:  That's what I was about to do.

14           MS. KAPLAN:  We object to this one.

15   Q.  Does this tweet tag your Twitter account?

16   A.  Yes.

17           MS. HABBA:  Your Honor, I would like to admit DX-68

18   into evidence, please.

19           THE COURT:  Defendant's 68 is received.

20           MS. HABBA:  Thank you.

21           MS. KAPLAN:  We object, your Honor.

22           THE COURT:  You object.  What's the objection?

23           MS. KAPLAN:  The objection is it's inconsistent with

24   your Honor's prior rulings.

25           THE COURT:  Why not -- I'm sorry.  Ms. Habba?

O1IQcar1                    Carroll - Cross

1            MS. HABBA:  Yes.  Your Honor, this goes to show that

2     prior to the president's comments being put on Twitter, people

3     were saying these things to her.  They are not directly related

4     to his statements.  It strictly goes to his statements, and

5     she's testified that it's because of his statements that people

6     were saying things about rape.

7            THE COURT:  It is stricken, and it's inconsistent with

8     the ruling that the Court made before trial.  And, in addition,

9     it's cumulative and, therefore, of no additional value.

10    Q.  Nate, can you please pull up DX-69 for the witness.

11           Ms. Carroll, what is this?

12    A.  This is a tweet.

13    Q.  In that document, do you recognize your Twitter handle

14    @E. Jean Carroll?

15    A.  Yes.

16    Q.  Does that appear to be your actual Twitter handle?

17    A.  Yes.

18    Q.  Does this tweet tag your Twitter account?

19    A.  Yes.

20           MS. HABBA:  Your Honor, I would like to move DX-69

21    into evidence.

22           MS. KAPLAN:  No objection, your Honor.

23           THE COURT:  Received.

24           (Defendant's Exhibit 69 received in evidence)

25    Q.  Ms. Carroll, the tweet states, "Attacked 1990 by the POTUS.

O1IQcar1                           Carroll – Cross

1          THE COURT:  Overruled.

2   A.  Some negative tweets are definitely tied to the president's

3   statement.

4   Q.  Why do you think that?

5   A.  Because they follow Donald Trump.  They want to emulate

6   him.

7   Q.  Ms. Carroll, I just showed you tweets that are responding

8   to things you said in 2016 before the president issued his

9   statement.

10          MS. KAPLAN:  Objection, your Honor.

11          THE COURT:  This is in the nature of a jury summation.

12  Get to a question.

13  Q.  How do you know that, Ms. Carroll?

14          MS. KAPLAN:  Objection, your Honor.

15          THE COURT:  How do you know what?

16  Q.  What she just said --

17          Ms. Carroll --

18  A.  Yes.

19  Q.  -- you believe that they emulated president Trump's

20  statement, correct?

21  A.  Yes.

22  Q.  But these were before president Trump's statement, correct?

23  A.  Yes.

24  Q.  So how can they emulate president Trump's statement?

25  A.  Not that particular statement.  I'm saying they're standing

O1IQcar1                          Carroll – Cross

1              THE COURT:  Sustained.

2    Q.  Do you consider yourself a financially successful person,

3    Ms. Carroll?

4              MS. KAPLAN:  Objection, your Honor.

5              THE COURT:  Sustained.

6    Q.  Have you always paid your mortgage, Ms. Carroll?

7    A.  Yes.

8    Q.  You said you're successful and career is going well.  Isn't

9    that correct?

10   A.  Yes.

11   Q.  And prior to *The Cut*, did you ever publish a tweet asking

12   the public would you have sex with Donald Trump for $17,000,

13   even --

14             MS. KAPLAN:  Objection, your Honor.

15             THE COURT:  Let's hear the rest of the question.

16   Q.  -- even if you could (A) give the money to charity, (B)

17   close your eyes and he's not allowed to speak?

18             MS. KAPLAN:  Objection, your Honor.  Relevance.

19   Inconsistent with your Honor's rulings in 412.

20             THE COURT:  Sustained.

21             MS. HABBA:  Can I be heard on that?

22             THE COURT:  No.

23             MS. HABBA:  Okay.

24   BY MS. HABBA:

25   Q.  During your direct examination, you testified that you were

O1IQcar1                         Carroll - Cross

1    offended that certain tweets were posted concerning your

2    allegations that made you appear to be promiscuous.  Do you

3    recall that?

4           MS. KAPLAN:  Objection, your Honor.

5           THE COURT:  What's the objection?

6           MS. KAPLAN:  It's okay, your Honor.  I'll waive that.

7    I mean, I'll withdraw it.

8    Q.  Do you recall that, Ms. Carroll?

9    A.  Could you repeat the question, please?

10   Q.  Sure.

11          Yesterday you testified that you were upset because

12   certain tweets that you were receiving made you appear

13   promiscuous.  Is that correct?

14   A.  Yes.

15   Q.  And prior to June 21, 2019, did you ever post any tweets

16   that could be considered sexually explicit?

17          MS. KAPLAN:  Same objection, your Honor.

18          THE COURT:  Sustained.

19   Q.  Nate, can you please pull up what has been marked DX-79.

20          Ms. Carroll, do you recognize what this is?

21   A.  Yes.

22   Q.  Please describe for me what this is without reading it.

23   A.  I do recognize it.

24   Q.  Is it a tweet that you posted?

25   A.  Yes.

O1IQcar1                          Carroll - Cross

1    Q.  And in that document, do you recognize that your Twitter

2    handle is tagged @E. Jean Carroll?

3    A.  Yes.

4    Q.  And that's your Twitter handle?

5    A.  Yes.

6              MS. HABBA:  Your Honor, I would like to move into

7    evidence DX-79.

8              MS. KAPLAN:  Objection, your Honor.  Same objections.

9              THE COURT:  Objection sustained.

10   Q.  Nate, can you please pull up DX-80.

11             Ms. Carroll, do you recognize this document?

12   A.  Yes.

13   Q.  What is this document?

14   A.  This is a tweet or a Facebook post, I don't know which.

15   Q.  Let me help.  Is @E. Jean Carroll a Twitter handle?

16   A.  It is.

17   Q.  So is this your Twitter account?

18   A.  Yes.

19   Q.  And that's a statement you made, correct?

20   A.  Yes.

21             MS. HABBA:  Your Honor, I'd like to offer DX-80 into

22   evidence.

23             MS. KAPLAN:  Same objections, your Honor.

24             THE COURT:  Sidebar.

25             (At the sidebar)

O1IQcar1                    Carroll - Cross

1           THE COURT:  Okay.

2           MS. KAPLAN:  This is all irrelevant.  These are

3   statements that were made any before the defamatory statements.

4   The fact that she -- I guess the point that she's trying to

5   make is the fact she talked about sex before 2019 somehow is

6   relevant to the fact that people gave -- said the twit --

7   excuse me -- the tweet that we showed yesterday that was having

8   her sleep with tons of Roman legionnaires -- I can't even

9   remember the thing.  Those posts are things completely

10  irrelevant.  It's 412 and it's 403.

11          MR. MADAIO:  Your Honor, there was testimony --

12          THE COURT:  Not you.  Ms. Habba.

13          MS. HABBA:  Sure.  Your Honor, there was testimony

14  yesterday that it bothered her that people were saying the

15  words and that she associates them with Donald Trump's words,

16  but she --

17          THE COURT:  It bothers her.

18          MS. HABBA:  Your Honor, may I --

19          THE COURT:  Look.

20          MS. HABBA:  I haven't even gotten to say my --

21          THE COURT:  What you've said so far, I don't

22  understand.  Wouldn't you like to know that?

23          MR. MADAIO:  Your Honor, may I please speak?

24          THE COURT:  No.

25          MS. HABBA:  I'm going to just need to make a record of

O1IQcar1                          Carroll - Cross

this.  Ms. Crowley and Ms. Kaplan have both been allowed to

speak sidebar, but for some reason you're not allowing me to

have my partner speak with me.

           THE COURT:  I don't think that is accurate.

           MS. HABBA:  It is absolutely accurate.  Ms. Crowley

spoke --

           THE COURT:  I'm not going to argue with you.

           MS. HABBA:  Okay, but I need to make a record of that.

           Your Honor, this entire case she has been saying that

people are emulating president Trump's statement.  He didn't

say rape.  He didn't say those things.  She has said them.  And

these are responses directly to things prior to him ever saying

anything that she said.  They're responding to her comments.

She has an obligation, and so does Ms. Kaplan, to show that

it's directly related to president Trump's statements.  That's

how defamation works.  It has nothing to do with her sex.  She

in fact testified that she never had sex for last 20 years.  It

has to do with the fact that she has been putting these

statements into the world, and they are there for people to

read.  When she puts out *The Cut* article, it's clear that some

of these Twitter users were responding to things she put into

the world, not president Trump's statement.  You can't equate

everything to president Trump when she herself is using the

word rape, saying would you have sex with Donald Trump.  Things

like that prior to this.  I have to be allowed to show that she

O1IQcar1                    Carroll - Cross

1   can't show causation.

2           MS. KAPLAN:  Your Honor, the tweet that -- it's

3   Plaintiff's Exhibit 47.  "Rapes by Trump?  Present your

4   evidence E. J Carroll, you lying sleep-around known by more

5   penises than Julius Caesar and Pompey had legionnaires."

6           That is directly connected to what Ms. Carroll said in

7   *The Cut* and what Mr. Trump said in response.  The stuff that

8   she is trying to get in right now is totally unrelated, has

9   only to do with 412-type materials and doesn't draw any

10  connection whatsoever between the allegation that Ms. Carroll

11  made of rape and what people said.

12          MS. HABBA:  But yesterday Ms. Kaplan asked her --

13          THE COURT:  What is the date of the exhibit now in

14  question?

15          MS. KAPLAN:  It's 2011, I believe.

16          MS. HABBA:  2011.

17          THE COURT:  So it's eight years earlier?

18          MS. HABBA:  But also, your Honor, she opened the door

19  with promiscuous, and said she was emotionally damaged because

20  people were thinking she was promiscuous.

21          THE COURT:  What page of the transcript?

22          MS. HABBA:  I have it, your Honor.  From yesterday's

23  transcript, page 124, line 20.  Would you like me to read it

24  in?

25          THE COURT:  No.  I have it in front of me.  And the

O1IQcar1                          Carroll - Cross

1   question was:  "Now did any of the messages you received,

2   Ms. Carroll, accuse you of being promiscuous?

3   "A.  Yes.

4           MS. HABBA:  Yes, and then she goes on to say she has

5   emotional harm.

6           THE COURT:  Where does she say that?

7           MS. HABBA:  The question was:  "How did you feel, how

8   did receiving messages like this make you feel?"

9           THE COURT:  What page?

10          MS. HABBA:  125, line 24.

11          THE COURT:  And that refers to Plaintiff's Exhibit 47.

12          MS. HABBA:  Yes, about the promiscuous.

13          THE COURT:  Right.  And Ms. Kaplan just read Exhibit

14  47 into the record.  That's what you're hanging this on?

15          MS. HABBA:  That, and to prove damages, and her entire

16  testimony was trying to show causation from president Trump's

17  statement, I have to be able to prove that this is not the

18  case.  She was putting out statements like -- and your Honor

19  won't allow it in, but "rape is sexy" and she received a

20  backlash from that.

21          THE COURT:  You know, your client says that all the

22  time.

23          MS. HABBA:  "Some people think rape is sexy."

24          THE COURT:  Well, there is rather a material

25  difference even though you can't seem to recognize it.

O1IQcar1                        Carroll - Cross

1              MS. HABBA:  But I do recognize, and there are facts

2       that we will show, that she received more backlash after she

3       said that statement, your Honor.  That was a big part of it.

4       Her own statements.  You can't equate everything to Donald

5       Trump.

6              THE COURT:  That is quite possibly true.  It doesn't

7       get him off the hook.

8              MS. HABBA:  That's extremely prejudicial, your Honor.

9              THE COURT:  Prejudicial.

10             MS. HABBA:  And biased towards my client.

11             THE COURT:  I said it to his lawyer, not to the jury

12      as well you know.

13             MS. HABBA:  I understand, but --

14             THE COURT:  And if he is contributing to it and

15      damaging her in part, I believe the law is that he's liable.

16             MS. HABBA:  Your Honor, this is prior to him saying a

17      statement.

18             THE COURT:  Okay.  We've had enough of this.  I will

19      take one more look at this exhibit.

20             (Continued on next page)

21

22

23

24

25

O1IQcar1                    Carroll - Cross

```
 1              (In open court)
 2              THE COURT:  The objection to this is sustained.  It's
 3    remote in time, of dubious relevance, and obvious prejudicial
 4    value.
 5    BY MS. HABBA:
 6    Q.  Nate, can you please pull up DX-44.
 7              Ms. Carroll, what is this?
 8    A.  This is a tweet.
 9    Q.  In that document, do you recognize your Twitter handle is
10    tagged -- or is on there, E. Jean Carroll?
11    A.  Yes.
12    Q.  Is this a tweet you put out?
13    A.  Yes.
14    Q.  Does it appear to be your Twitter handle?
15    A.  Yes.
16              MS. HABBA:  Your Honor, I would like to move DX-44
17    into evidence.
18              MS. KAPLAN:  Same objections, your Honor.
19              THE COURT:  Same ruling.  Sustained.
20    Q.  Nate, please pull up DX-82.
21              Ms. Carroll, what is this?
22    A.  This is a tweet.
23    Q.  Is this a tweet you put out?
24    A.  Yes.
25    Q.  And that's your handle, E. Jean Carroll?
```

O1IQcar1                    Carroll – Cross

1   A.  Yes.

2           MS. HABBA:  Your Honor, I would like to admit DX-82

3   into evidence.

4           MS. KAPLAN:  Same objections, your Honor.

5           THE COURT:  Same ruling.  Sustained.

6   Q.  Nate, please pull up DX-83.  Excuse, me let's go to DX-84,

7   actually.

8           Ms. Carroll, do you see this tweet?

9   A.  Yes.

10  Q.  What is it?

11  A.  It's a post by me.

12  Q.  And that's your handle, correct?

13  A.  Yes.

14          MS. HABBA:  Your Honor, I would like to admit DX-84

15  into evidence.

16          MS. KAPLAN:  Same objections, your Honor.

17          THE COURT:  I'm going to allow it.

18          MS. HABBA:  Thank you.

19          (Defendant's Exhibit 84 received in evidence)

20  Q.  Ms. Carroll --

21  A.  Yes.

22  Q.  -- did you tweet, "How do you know your 'unwanted sexual

23  advance' is unwanted until you advance it"?

24  A.  Yes.

25  Q.  And did you put that out at 12:04 p.m. on November 25,

O1IQcar1                              Carroll - Cross

1   appearances, correct?

2   A.  I posted twice on my Substack about it.

3   Q.  Did you post anything on Twitter about it?

4   A.  I think I did make a post on Twitter.

5   Q.  Did you post anything on Instagram?

6   A.  I believe I did post on Instagram.

7   Q.  Did you post anything on Facebook?

8   A.  I believe I -- I'm not sure about Facebook, but I suppose I

9   did.

10  Q.  Have you talked about your victory on any podcasts other

11  than the shows you did on TV?

12  A.  One podcast.

13  Q.  Have you talked to any news reporters since your victory?

14  A.  A group of reporters at my attorney's office.

15  Q.  When was that?

16  A.  The following day.

17  Q.  You had a press conference --

18  A.  No.  No.  No.  It was one newspaper.  They had a group of

19  reporters from one newspaper.

20  Q.  What newspaper was that?

21  A.  The *New York Times*.

22  Q.  Ms. Kaplan arranged for the *New York Times* to be at her

23  office the following day?  Is that your testimony?

24          MS. KAPLAN:  Objection, your Honor.

25          THE COURT:  I'm sorry, what was that?  It's sustained.

O1IQcar1                        Carroll - Cross

1           THE COURT:  Sustained.

2    Q.  Ms. Carroll, has anyone on TV ever questioned your

3    credibility?

4           MS. KAPLAN:  Objection, your Honor.  Inconsistent with

5    your Honor's rulings.

6           THE COURT:  Sustained.

7    Q.  Did you go on TV because you thought it would help your

8    reputation, Ms. Carroll?

9    A.  Yes, I wanted people to know the good news, that we had won

10   this milestone case.

11   Q.  And you went on TV prior to the good news about winning the

12   milestone case, correct?

13   A.  No.  I did for the book four years before that.  I went on

14   four television shows in 2019, yes.

15   Q.  Were you portrayed in a negative light?

16          MS. KAPLAN:  Objection, your Honor.

17          THE COURT:  Sustained.

18   Q.  Would you call yourself a success on social media,

19   Ms. Carroll?

20   A.  No, I'd call myself mediocre on social media.

21   Q.  But you will agree that in the past few years, you have

22   increased your following on social media, correct?

23   A.  Yes, because I started a Substack and because I was more

24   agile at learning how to do Twitter.

25   Q.  How do you know it's not because of this lawsuit,

OiIsCAR2                    Carroll - Recross

1   representing you?

2   A.  No.  No.

3   Q.  George Conway, for instance?

4   A.  No.

5   Q.  Ms. Kaplan just asked you -- this is my last question.

6           Ms. Kaplan just asked you about what your motivations

7   were when you came out with the cover of that magazine on New

8   York; remember that?

9   A.  Yes.

10  Q.  Before you did that and came out with your story, you had a

11  New York Times fact-checkers, didn't you?

12          MS. KAPLAN:  Objection.

13          THE COURT:  Sustained as to form.

14  Q.  Ms. Carroll, you were worried people would question your

15  story, so you had the New York Times fact-check it at one

16  point, didn't you?

17  A.  When The Times was writing the story, yes, they fact-

18  checked it.

19  Q.  And when they fact-checked it, they found errors in your

20  story such as years of the dress, for instance, correct?

21          MS. KAPLAN:  Outside the scope, your Honor.

22          THE COURT:  Sustained.

23          MS. HABBA:  No more questions.

24          THE COURT:  Any redirect?

25          MS. KAPLAN:  Nothing, your Honor.

1   A.  Yes, I am.

2   Q.  How much?

3   A.  For the research and reporting, I'm paid $510 an hour, and

4   for my time for the testimony, I'm paid $850 an hour.

5   Q.  Based on your experience, is that rate or are those rates

6   fairly standard for experts in your field?

7   A.  Yes, those are fairly standard.

8   Q.  Are they toward the higher end or lower end?

9   A.  I would say a little bit more toward the lower end.  Some

10  of my colleagues I know get paid $1,000 an hour.

11  Q.  Were you paid in connection with your work, on the work

12  that you did in Ms. Carroll's other lawsuit?

13  A.  Yes, I was.

14  Q.  And were you paid the same rates?

15  A.  Yes, I believe the rates were the same.

16  Q.  All right.  So, Professor Humphreys, you testified that you

17  were asked to do work in this case.  Can you just describe

18  generally, what was the nature of that work?

19  A.  Yes.  I was asked to calculate the reach for some

20  statements by Mr. Trump about the plaintiff, Ms. Carroll, to

21  assess the reputational harm, if any, of those statements, and

22  then to estimate the cost to repair that reputational damage.

23  Q.  We already talked about this a little bit more later.

24          When you say the reach of those statements by

25  Mr. Trump, what do you mean?

1    A.  I mean how many impressions did they get.  So when a

2    prominent person makes a statement, it's circulated in lots of

3    different types of media, and so I needed to understand first

4    how many people saw this statement.

5    Q.  And what were the dates of the statements that you

6    analyzed?

7    A.  There were three statements initially that I analyzed.  One

8    was on June 21st, 2019, one was on June 22nd, 2019, and there

9    was a third statement in my initial analysis that occurred on

10   June 24th, 2019.

11   Q.  Did there come a time when you removed one of those

12   statements from your analysis?

13   A.  Yes.  I provided a supplemental analysis that removed the

14   June 24th statement.

15   Q.  You're here to testify just about your analysis relating to

16   the June 21 and June 22 statements, correct?

17   A.  That's right.

18   Q.  Did anyone assist you in the work that you did in

19   connection with this case?

20   A.  Yeah.  I was assisted by a team of four research

21   assistants.

22   Q.  Why did you use research assistants?

23   A.  In a case like this, there is quite a bit of data, and they

24   were really helpful in collecting the data, cleaning the data,

25   and then performing calculations at my direction.

OiIsCAR2                          Humphreys – Direct

1    Q.  Did you prepare a report in connection with your work on

2    this case?

3    A.  Yes, I did.

4    Q.  Did you help prepare a slide deck that summarized the

5    methodology that you used and the conclusions that you reached?

6    A.  Yes, I did.

7    Q.  And would that assist the jury in understanding your

8    testimony today?

9    A.  Yes.

10   Q.  If we can just put up on the screen the demonstrative which

11   is marked Plaintiff's Exhibit 14.

12            Is this the slide deck that you helped prepare?

13   A.  Yes, it is.

14            MS. CROWLEY:  May I publish to the jury, your Honor?

15            THE COURT:  Yes.

16   Q.  You testified just a minute ago that your work involved

17   analyzing the reputational harm caused by two statements.

18            If we go to the first slide, this slide shows what's

19   in evidence as Plaintiff's Exhibit 1.

20            Is this one of the statements that you focused on as

21   part of your analysis?

22   A.  Yes, it is.

23   Q.  And on what date was this statement made?

24   A.  June 21st, 2019.

25   Q.  Where was this statement first published?

1    A.  It was first published on to Twitter by a journalist, by a

2    journalist named Laura Litvan.

3    Q.  We can go to the next slide.  You can see what is in

4    evidence on this slide as Plaintiff's Exhibit 2.

5              Is this the other statement that you focused on as

6    part of your analysis?

7    A.  Yes, it is.

8    Q.  What date, what was the date of this statement?

9    A.  This was on June 22, 2019.

10   Q.  And who did Donald Trump make this statement to?

11   A.  This statement was made to some reporters, I believe, on

12   the south lawn of the White House.

13   Q.  In broad strokes, how did you go about analyzing how those

14   two statements affected Ms. Carroll's reputation?

15   A.  The first step was to calculate how many impressions did

16   the statement receive, how many times was it seen or heard on

17   different media channels.  The next step was to understand the

18   impact of those statements, so how did they damage

19   Ms. Carroll's reputation, if they did.

20             And then a second part of that analysis was to

21   understand how many people likely believed the statements when

22   they saw them or were receptive to believing them.  And I call

23   that the impact assessment.

24             And then the third part of my work was to understand

25   or estimate how much would it cost to repair that damage to

OiIsCAR2                              Humphreys - Direct

1   Ms. Carroll's reputation, and I call that the damages model.

2   Q.  In your experience, is this a fairly standard way to

3   measure reputational harm used by experts in your field?

4   A.  Yes, it is.

5   Q.  OK.  Now, you just testified that the final step in your

6   analysis was to determine how much it would cost to repair

7   Ms. Carroll's reputation.

8           Is that another way of saying that you estimated the

9   amount of damages in this case?

10  A.  Yes, that's right.

11  Q.  And are you here to offer an opinion on the amount of

12  reputational damages that Ms. Carroll suffered as a result of

13  Donald Trump's statements?

14  A.  Reputational damages, yes.

15  Q.  Are you offering any opinion on what punitive damages would

16  be in this case?

17  A.  No, I'm not.

18  Q.  Are you offering any opinion as to memory harm or emotional

19  damage that Ms. Carroll may have suffered as a result of

20  Trump's statements?

21  A.  No, I'm not.

22  Q.  At a high level, we're going to go into this, what is your

23  opinion with respect to the reputational damages that Trump's

24  statements caused to Ms. Carroll?

25  A.  I found that Mr. Trump's statement reached a very large

OiIsCAR2                         Humphreys – Direct

1              So this could be certain media channels that the

2   person listens to or watches, it could be something on social

3   media, like hiring influencers.

4   Q.  And we're going to talk about this more in a minute, but

5   can those positive messages be placed anywhere for reputation

6   repair to be effective?

7   A.  No.  For an effective reputational repair campaign, you

8   want to place the message with trusted sources, people that

9   that target audience believes and trusts.

10  Q.  And when you say target audience, what do you mean?

11  A.  The people whose attitudes you're trying to change.

12  Q.  Is it always possible to repair damage to a reputation?

13  A.  No, not for every single person in the audience, no.

14  Q.  What happens if a reputation is not repaired?

15  A.  If a reputation isn't repaired, those associations can

16  linger.  They do linger over time, and anytime that person's

17  name kind of comes up in the public sphere, those same

18  associations emerge.

19  Q.  How, if at all, do social media and the internet affect a

20  reputation that has not been repaired?

21  A.  Um, well, on social media, as we all know, anybody can post

22  anything at any time.  And so if there is a considerable group

23  of people who believe something, they will and can post about

24  it, if they still hold those negative associations.

25  Q.  I would like to talk now about the work that you did on

1   A.   Sure.  So for this, I used a service that -- where you can

2   search newspapers, and I searched for Ms. Carroll's name and

3   the statement.

4   Q.   And how many print articles did you find that shared the

5   June 21st or 22nd statement?

6   A.   That was ten articles, again, in mainstream news like the

7   *Washington Post*, the *Chicago Tribune*, *USA Today*.

8   Q.   How did you determine the total number of times that those

9   statements were read in those newspapers?

10  A.   So, again, I added up the readers from each article to get

11  2.3 million impressions.

12  Q.   Maybe you said this already, but how do you know how many

13  readers each of these newspapers has?

14  A.   So, again, I consulted a third-party source that provides

15  those numbers for advertisers.

16  Q.   And what was the total number of times that the June 21st

17  and 22nd statements were viewed in newspapers?

18  A.   It was 2.3 million times.

19  Q.   We just walked through several different forms of media.

20  Were you able to estimate the total number of times that

21  Trump's June 21st and 22nd statements were viewed in all of

22  those forms of media?

23  A.   Yes.  So here you add up each channel.  For the social

24  media channel, you have an estimate between 25.3 and 7 million.

25  And then you add the others that were from publicly available

1    sources to get a range between 104 million impressions and

2    85.8 million impressions.

3    Q.  Were there any instances in which the statements may have

4    been seen or heard that your analysis didn't take into account?

5    A.  Yes.  So I started with just the articles in the complaint

6    in this case.  I didn't include articles that were not in the

7    complaint that mentioned the statement.  I also didn't include

8    entire platforms, such as Facebook or Reddit.  I didn't include

9    television that wasn't in this database, so that would have

10   been local television.  I also didn't include -- sometimes on

11   television that will be on YouTube, rebroadcast on YouTube, and

12   I didn't include those.  I didn't include the mention of

13   statements on podcast, on radio, or word of mouth.

14   Q.  For television, did you include broadcasts that referenced

15   or paraphrased the statements?

16   A.  No, I included only direct locations.

17   Q.  So in your opinion, was your total impression number likely

18   an undercount.

19   A.  Yes, I considered it an undercount.

20   Q.  Now, after estimating the number of times that Trump's

21   June 21st and 22nd statements were seen or heard, what did you

22   do next?

23   A.  Next I needed to understand what impact, if any, did those

24   statements have on Ms. Carroll's reputation.

25   Q.  I believe you said earlier that's called an impact

1    A.  It can be a channel that someone watches that they trust.

2    It can be something like a podcast where they trust and like

3    the host.  It can also very commonly now be an influencer.

4    Q.  What's an influencer?

5    A.  An influencer is someone, usually on social media, who has

6    a large following and the trust of their audience.  And so

7    typically celebrities and companies will place messages and pay

8    these influencers to share information.

9    Q.  What's a corrective message?

10   A.  A corrective message is something positive that you want to

11   share with the audience and their influencers about almost any

12   topic you can think of.  Influencers also exist in the

13   political space, both on the left and right.

14   Q.  Can you give us examples of corrective messages that you

15   would use in a reputation repair campaign for Ms. Carroll?

16   A.  Sure.  So typically I think it would be someone who has

17   something good to say, who maybe read her book and wants to

18   talk about it.  Or if she has done some recent work to talk

19   about it, share positive things about her.  Again, that would

20   come from a trusted source for this particular audience, so you

21   want to hire influencers who this audience trusts.  I think the

22   most the biggest following would be something somebody like Joe

23   Rogan, or Candace Owens is another one in this space.

24   Q.  How did you determine where -- on what media platforms you

25   would post or send those corrective messages?

O1IQcar3                        Humphreys - Direct

1    think three, five, in some cases even seven times would be

2    appropriate.

3    Q.  So someone from this target audience would likely need to

4    see a corrective message three, five, or seven times to have

5    their minds changed?

6    A.  That's right.

7    Q.  If we could go to the next slide.

8            Can you walk us through how you calculated how much it

9    would cost to place those corrective messages?

10   A.  Sure.  So I created a few tables like this depending on the

11   different elements that I've outlined.  But you start with the

12   total impressions that you want to serve.  So that's

13   123.9 million impressions.  That's showing that target audience

14   a message five times.

15   Q.  I'll just stop you.

16   A.  Sure.

17   Q.  That number, 123 million, that's the number of people who

18   saw Donald Trump's statements and likely believed them?

19   A.  Yeah.  That's basically the 25 million people in the

20   receptive audience showing them a message five times.  So it's

21   five times 25 million.

22   Q.  Okay.  And I'm sorry for interrupting.

23   A.  Sure.  So that's the total number of impressions you need

24   in your campaign, and then you would break it down by channel,

25   where they get their news.  So, for example, on broadcast TV,

1    about a third of your impressions would be on broadcast TV.  So

2    that's 36 million impressions.

3            And then the last step is simply to look up the cost

4    of how much does it cost to buy an impression on that

5    particular source.  So on broadcast television, the industry

6    standard is $16 per thousand impressions.  And so essentially

7    you do math across that row to come up with the cost, which is

8    about half a million dollars.

9    Q.  What does it mean to buy an impression?

10   A.  So it can vary by channel.  To buy an impression on

11   broadcast TV would be a message that looks maybe a little bit

12   more like a traditional advertisement, again, on a trusted

13   source.  *Fox News* might be an example.

14           If it's hiring an influencer, then you would create a

15   brief that tells them what you want them to say.  They

16   sometimes give it their own spin, and then they post it to

17   their followers.

18   Q.  What was the next step in your analysis?

19   A.  The next step was simply to add up the cost for all the

20   channels for each different parameter, so for high and low

21   impressions and for showing a message one, three, or five

22   times.

23   Q.  Why are there -- can you just explain why there are three

24   different ranges here?

25   A.  Yes, of course.  You might remember from the social media

1    calculation, there's a high and a low impression.  I would -- I

2    think the high impressions is more likely in this case.  Then

3    you can choose to show the message either one, three, or five

4    times.  I included one as a baseline here, but I think the more

5    appropriate cost would be either three or five times, so that's

6    between 7.2 and 12.1 million.

7    Q.  I believe you just said this, but just so I'm clear, the

8    first row that says high impressions $2.4 million and low

9    impressions $2.07 million, do you think that that is a

10   reasonable estimate for how much it would cost to run a

11   reputation repair campaign in this case?

12   A.  No, I think given the context, you know, I don't think

13   that's appropriate.

14   Q.  What do you mean by that?

15   A.  I mean that the attitudes at issue here are, from what I

16   saw on my impact analysis, strongly held, and they have been

17   repeated by a trusted source, so I don't think one time is

18   enough to change attitudes.

19   Q.  They need to see a corrective message more than once?

20   A.  I think so.

21   Q.  Professor Humphreys, what was your ultimate conclusion as

22   to how Trump's statements that he made on June 21 and 22, 2019

23   affected Ms. Carroll's reputation?

24   A.  So I first found that Mr. Trump's statements were seen

25   between the 85.8 million and 104 million times across different

1   channels.  I found that they did have an impact on

2   Ms. Carroll's reputation, particularly as a journalist, and

3   that between 21 million and 24.7 million of them were to a

4   receptive audience who likely believed them; that the cost to

5   repair that damage is between $7.2 and $12.1 million.

6   Q.  We could take that slide down.  Thank you.

7           You testified earlier that you have testified in

8   Ms. Carroll's related case against Donald Trump.  When was

9   that?

10  A.  That was last year.

11  Q.  And that case involved a claim for defamation as well?

12  A.  Yeah, it included one claim.

13  Q.  What was the nature of your testimony in that case?

14  A.  The nature of my testimony was similar.  I looked at how

15  many impressions that one statement received.  That was a

16  statement made after the statements I've covered here, and so I

17  calculated how many impressions it had, what reputational

18  damage did that particular statement do, and then I estimated a

19  cost to repair that damage.

20  Q.  When was that statement made?

21  A.  That statement was made in October of 2022.

22  Q.  You can see on your screen Plaintiff's Exhibit 4.  Is that

23  the statement that you're referring to?

24  A.  Yes.

25  Q.  In estimating the damages in that case, did you estimate

O1IsCAR4                        Humphreys - Cross

1   Q.  Did you consider in your analysis whether Trump supporters

2   would have believed Ms. Carroll's initial accusation when

3   drafting your report?

4   A.  No.  My assignment here was to assess whether the readers

5   would have believed Mr. Trump.

6   Q.  Did you think it was relevant whether Trump supporters

7   would have believed Ms. Carroll's accusation as to whether her

8   reputation was actually harmed with those same individuals?

9   A.  Here, I was focused on is the reader likely to believe

10  Mr. Trump.  Those were the statements that I was studying in

11  this case.

12  Q.  But if they already had an opinion formed on the subject

13  and they already didn't believe Ms. Carroll, would president

14  Trump's statement had any effect on their opinion?

15          MS. CROWLEY:  Objection to form.

16          THE COURT:  Sustained as to the form.

17  Q.  Would president Trump's denial of Ms. Carroll's allegation

18  have any effect on these individual's belief if they already

19  did not believe Ms. Carroll?

20          MS. CROWLEY:  Objection to form, and it calls for

21  speculation.

22          THE COURT:  Sustained, form.

23  Q.  So essentially the conclusion in your report is that Trump

24  supporters believed president Trump and that non-Trump

25  supporters believed Ms. Carroll, is that right?

O1IQcar5                        Humphreys - Cross

1          MR. MADAIO:  Your Honor, I asked if she's had any

2     experience other than being a teacher or professor.

3          THE COURT:  No, you said real-world experience quite a

4     few times.

5          MR. MADAIO:  I believe that was the prior question,

6     your Honor.

7          THE COURT:  Ask a new question.

8     BY MR. MADAIO:

9     Q.  Dr. Humphreys, have you ever applied the methodologies

10    utilized in your report in the real world?

11    A.  No.  I teach students how to apply these methodologies.

12    Q.  And you're familiar with a reputational repair firm,

13    correct?

14    A.  With a firm?  Yes, I am.

15    Q.  And did you perform any sort of estimate or obtain any sort

16    of quote from a reputation repair firm to see what sort of cost

17    it would take to repair Ms. Carroll's reputation in this case?

18    A.  No, a campaign had not been initiated yet, so no, I

19    haven't.

20    Q.  And that's what reputation repair firms do, right, they

21    repair reputations for individuals?

22    A.  That's correct.

23    Q.  And in your experience, is $12 million a reasonable amount

24    that you would have to pay a reputation repair firm to repair

25    someone's reputation?

O1IQcar5                         Humphreys - Cross

1   A.  I would say for most -- of many campaigns, that's on the

2   low end.

3   Q.  In your experience, it cost 12 million -- you would have to

4   pay a firm $12 million to perform a campaign such as this?

5   A.  I know of other campaigns that have costed $50 million.

6   I've testified in a previous case about a campaign that would

7   cost $48 million.

8   Q.  Did that campaign involve Joe Rogan and Candace Owens?

9   A.  It might have.

10  Q.  Can you point to any specifics?

11          MS. CROWLEY:  Objection.

12          THE COURT:  I'll allow it.

13  A.  Specifics about what?

14  Q.  Any prior campaigns you're familiar with that cost upwards

15  of more than $10 million?

16  A.  Yes, of course.  There's a hedge fund manager recently who

17  said that he had spent $50 million on a campaign against a

18  company called Nutra-Life, for example.

19  Q.  And what was the issue there?

20  A.  I believe -- I'm only generally familiar with it, but I did

21  read an article that said it cost $50 million.  He, I believe

22  in that case, was trying to send negative messages against

23  Nutra-Life.

24  Q.  This wasn't part of your research; this was an article you

25  read in leisure?

O1IQcar5                          Humphreys - Cross

1    A.  This was an article that came across my newsfeed.

2    Q.  Did you perform any analysis of what Ms. Carroll's

3    reputation was before June 2019?

4    A.  Yes.

5    Q.  And you stated she was a celebrated journalist **at** *Elle*

6    magazine, right?

7    A.  Yes.

8    Q.  Among other things?

9    A.  Among other things.

10   Q.  And you represented that Ms. Carroll reached about

11   4.5 million readers during her time at *Elle*, right?

12   A.  Yes, that's the number that *Elle* gives for its circulation.

13   Q.  Okay.  And that number, the 4.5 million, that's from your

14   report, right, or you cite that in your report, correct?

15   A.  I do, yeah.

16   Q.  And in your report, you also state that you weren't able --

17   you were unable to find readership data prior to 2020.  Isn't

18   that correct?  I can refresh your recollection.

19   A.  If you tell me what page.  I don't argue with you.  What

20   page is it?

21   Q.  It's footnote 136.

22          THE COURT:  What document, please?

23          MR. MADAIO:  It's the October 14, 2022 report.

24          THE COURT:  Plaintiff's 202.  What's the footnote?

25          MR. MADAIO:  Footnote 136, which is page 41.

1              THE COURT:  Is there a question?

2              MR. MADAIO:  Yes.

3    BY MR. MADAIO:

4    Q.  Professor Humphreys, you're aware that Ms. Carroll was no

5    longer working for *Elle* as of December or as of 2018, correct?

6    A.  I'm not sure of the exact date, but I am aware that she

7    stopped working for *Elle* at some point.

8    Q.  Okay.  So ultimately you weren't able to find any

9    readership data for the time that she actually worked at *Elle*,

10   right?

11   A.  So I'm a professor in journalism school.  I am aware that

12   readership has declined over time, so I would estimate that in

13   2018, if anything, *Elle* had more readers than 4.5 million.

14   Q.  But you didn't find any data specific to Ms. Carroll in the

15   readership that she had?

16   A.  I pulled the number that I had available to me.  That was

17   the closest to the time period at hand.

18   Q.  I don't think that was responsive to my question.

19   A.  I'm sorry, what was the question?

20   Q.  You never reviewed any data that is specific to Ms. Carroll

21   and her readership, right?

22             MS. CROWLEY:  Objection to form.

23             THE COURT:  Overruled.

24   A.  So given that Ms. Carroll wrote for the magazine *Elle*, the

25   way that you would estimate her readership in my field is to

O1IQcar5                         Humphreys - Cross

1   use the readership of the magazine.

2   Q.  But you have no way of knowing what Ms. Carroll's actual

3   readership was?

4   A.  To my knowledge, there's no finer grain data available to

5   me.

6   Q.  And in your reputation repair program, you talk about

7   social media influencers sending positive messages as a way of

8   repairing Ms. Carroll's reputation.  Do you really think that

9   positive message from social media influencers will have a

10   positive impact on her reputation?

11   A.  As part of a larger reputational repair campaign, I do.

12   Q.  And you stated earlier that you would have influencers say

13   positive things about Ms. Carroll's books and messages like

14   that to help her reputation, right?

15   A.  That's one example.  I'm sure there could be many different

16   messages you could send.

17   Q.  You think that will help repair her reputation to the

18   extent that people believe she's a liar?

19   A.  Yes, I do.

20   Q.  Positive messages about her book?

21   A.  Yes.  These types of positive messages have been shown to

22   affect the attitudes of an audience over time, yes.

23   Q.  So you believe that -- that positive message relating to

24   her book would make them believe she's not a liar -- withdrawn.

25         Do you think Ms. Carroll's numerous media appearances

O1IQcar5                          Humphreys - Cross

1    Q.  And, in fact, you said that you would need to effectively

2    promote her reputation up to -- they would have to relay these

3    messages up to five times, right?

4    A.  Yes, that's one potential campaign.

5    Q.  And your plan is to target Trump supporters to project

6    these messages to, correct?

7    A.  Not exactly.  The plan would be to target these receptive

8    Republicans, people who were receptive to Mr. Trump's claims,

9    so, yes.

10   Q.  Are you suggesting that Ms. Carroll would actually hire or

11   would be able to actually hire Joe Rogan or Candace Owens to

12   perform this reputation repair program?

13   A.  You might have to ask them.  I did not ask them in my work.

14   Q.  Would you consider whether it's a possibility?

15   A.  Yes, I know it's a possibility to hire these two

16   individuals to share messages for payment.

17   Q.  Do you know any other celebrities who would do these type

18   of repair reputation programs that they're paid to do?

19   A.  I'm sorry, could you say it again?

20   Q.  Do you know any other celebrities who are paid to do these

21   type of reputation repair programs?

22   A.  So you mean influencers?  Are there other influencers?

23   Q.  Influencers, celebrities, anybody with a large public

24   profile.

25   A.  Yes.  So influencers exist in many different categories.

O1IQcar5                           Humphreys - Cross

1    impression should be 936,000 right?

2    A.   Correct.

3    Q.   Okay.  Let's pull up the supplemental report, page 29.

4    That's DX-96.  And T3.  Can you tell me what the impressions

5    are for T3?

6    A.   That would be 1.5 million and 241 receptive impressions.

7    Q.   So that 1.5 million is more than the 936,000 in your

8    initial report, correct?

9            MS. CROWLEY:  Your Honor, Professor Humphreys has

10   testified that the actual number --

11           MS. HABBA:  Is that an objection?  Sorry, your Honor.

12   She is just speaking for the witness.

13           THE COURT:  Counsel?

14           MS. CROWLEY:  Your Honor, objection.

15           Professor Humphreys has testified that there was a

16   difference in the labels that were given to each of the sources

17   from the original report to the supplemental report.  However,

18   the numbers, the rating numbers are the same.

19           MS. HABBA:  That's not an objection.  Your Honor that

20   was not an objection.  That was her trying to correct her

21   witness.

22           THE COURT:  Ms. Habba, sit down, please.  Mr. Madaio

23   will defend himself.

24           MR. MADAIO:  Your Honor, she hasn't given a valid

25   objection.  She is trying to testify for her witness.

1         THE COURT:  And far beyond the scope of direct.

2         MR. MADAIO:  That's all I have, your Honor.

3         THE COURT:  Any redirect?

4         MS. CROWLEY:  I'll be brief, your Honor.

5    REDIRECT EXAMINATION

6    BY MS. CROWLEY:

7    Q.  Professor Humphreys, you were just asked for quite some

8    time about two charts:  One from your original report and one

9    from your supplemental report.  Do you recall those questions?

10   A.  Yes.

11   Q.  And you were asked to compare several times TV programs

12   that were listed in your original report and then again listed

13   in your supplemental report, correct?

14   A.  Correct.

15        MS. HABBA:  Objection, your Honor.  Didn't you go

16   through this?

17        THE COURT:  Ms. Habba, it's Mr. Madaio's witness.

18        MS. HABBA:  Okay.  You have the mic, go ahead.

19        MR. MADAIO:  Your Honor, I do think this issue was

20   already discussed at length with the witness.

21        THE COURT:  What makes you think, or do you have any

22   legal authority to suggest, that on redirect the attorney can't

23   go into a subject that was the subject of the

24   cross-examination?  Do you have any authority for that?

25        MR. MADAIO:  The objection is overruled, I'll sit

1    cross about whether you have ever yourself executed a

2    reputation repair campaign.

3              Do you recall that?

4    A.  Yes.

5    Q.  And I believe you said that you haven't yourself, but

6    you've taught some?

7    A.  Correct.

8    Q.  In teaching and studying reputation repair campaigns, are

9    you familiar with campaigns that have actually been run?

10   A.  Yes.

11   Q.  Are those campaigns that you teach your students about?

12   A.  Yes.

13   Q.  And are those students, do those students then go on to

14   actually execute reputation repair campaigns?

15   A.  Yes.  I have quite of a few students that now work in

16   public relations and do these kind of campaigns routinely.

17   Q.  Can you tell us some of the reputation repair campaigns

18   you're familiar with that have actually been executed?

19   A.  Sure.  I mean, there are some well-known ones.  Martha

20   Stewart, for example, hired a firm to repair her reputation

21   after the insider trading scandal, and that is regarded as

22   successful.  There is a number of others.  Hugh Grant, I

23   remember.

24             There are more recent examples of using influencers in

25   these types of strategies.  Justin Beiber, for instance,

1    constructed one of these in 2015.  I believe Taylor Swift has

2    done this as well.

3    Q.  Professor Humphreys, you were asked a number of questions

4    by Mr. Madaio about whether you looked at the harm that may

5    have been caused to Ms. Carroll's reputation by her own

6    allegation.

7           Do you recall that question?

8    A.  Yeah.

9    Q.  In your opinion, did the harm to Ms. Carroll's reputation,

10   was that a result of Ms. Carroll making an allegation against

11   Donald Trump?

12   A.  No.

13   Q.  What do you think caused the harm to Ms. Carroll's

14   reputation?

15   A.  From what I've seen, it was the claim that she was a liar,

16   that she had a political agenda, that she was working with the

17   democratic parties.  These were the associations that harmed

18   her reputation.

19   Q.  And who made that claim?

20   A.  Mr. Trump, the defendant.

21           MS. CROWLEY:  One moment, your Honor.

22           (Counsel confer)

23           Nothing further.

24           THE COURT:  Thank you.

25           Mr. Madaio, anything else?

O1MQcarF

| | |
|---|---|
| 1 | THE COURT:  Please be seated folks.  The other thing I |
| 2 | want to announce is that the defense made a motion for a |
| 3 | mistrial and other relief again late last week.  That motion is |
| 4 | going to be denied.  There will be a written opinion in due |
| 5 | course.  It will be denied in all respects. |
| 6 | MS. HABBA:  Hi, your Honor.  Just on a separate issue? |
| 7 | THE COURT:  Yes, Ms. Habba. |
| 8 | MS. HABBA:  My client reminded me, and I am in trial |
| 9 | mode, I apologize, so tomorrow is the New Hampshire primary, |
| 10 | and he needs to be in New Hampshire.  He was planning to |
| 11 | testify.  Clearly, he flew in last night to be here.  I would |
| 12 | just need his testimony to be Wednesday in light of the news |
| 13 | about the juror today. |
| 14 | THE COURT:  Ms. Kaplan? |
| 15 | MS. KAPLAN:  Your Honor, we would again like to get |
| 16 | this trial over.  There's very short testimony from us left, |
| 17 | and we just think we should finish tomorrow. |
| 18 | THE COURT:  I'm not going to decide right now. |
| 19 | Circumstances may result in your getting what you ask for and |
| 20 | maybe not. |
| 21 | Okay. |
| 22 | MR. MADAIO:  Your Honor, there is one last thing. |
| 23 | We'd like to make a Daubert motion based on Professor |
| 24 | Humphreys' testimony on Thursday if this is the appropriate |
| 25 | time? |

O1MQcarF

1          THE COURT:  The appropriate time would have been

2     before she testified.

3          MR. MADAIO:  Well, your Honor, the Court does have

4     discretion to hear the Daubert motion after the expert's

5     testimony as well.

6          THE COURT:  If you want to file a motion, you can file

7     it.  I'm not telling you I'm going to consider it as timely.

8          MR. MADAIO:  Understood, your Honor.  We'll file it.

9          THE COURT:  Okay.  Thank you folks.

10          (Trial continued to January 23, 2024 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    sued, meaning, you know, she did the work.  But I will say that

2    all of the journalists that worked for us did the work.

3    Q.  Would you have hired an advice columnist or other

4    journalist who was not considered a truth-teller?

5    A.  No.

6    Q.  What role, if any, did you have in determining how much

7    Ms. Carroll was paid for writing her column?

8    A.  All of it.

9    Q.  Did the amount that Ms. Carroll was paid change during the

10   time you were editor-in-chief?

11   A.  It did.

12   Q.  In which direction?

13   A.  I gave her a raise.

14   Q.  Why did you decide to do that?

15   A.  Well, because she was -- well, she was beloved by the

16   readers.  I would say she was probably the most prominent

17   columnist -- she was the most prominent columnist that we had,

18   and I thought of her column as a sort of destination, meaning

19   people picked up the magazine and would often go to her column

20   first.  That's what they told us in, you know, any number of

21   like ways that we would talk to our readers, it was something

22   that we discovered.  But also because she's great.  She's great

23   at her job.

24   Q.  In your 30-plus years in the magazine industry, did you

25   have occasion to read advice columns written by other writers?

O1PQcar1                          Myers - Direct

1    A.  I did.

2    Q.  How would Ms. Carroll's column compare to those?

3    A.  Well, I think that her column was sort of the leader of the

4    pack, and I think it actually inspired a lot of other

5    publications like ours and others not like ours, like, you

6    know, *New York* magazine to bring on, you know, sort of similar

7    talent, and, you know, try to follow E. Jean.  And, look, I'm

8    not saying they weren't good at what they do, but, you know,

9    E. Jean I think probably did it the longest in terms of the

10   modern magazine world.

11   Q.  Did Ms. Carroll's column run the entire 17 years you were

12   editor-in-chief?

13   A.  Yes.

14   Q.  Why did you leave *Elle* at year 17?

15   A.  Because my contract was not renewed.

16   Q.  When you left them, was Ms. Carroll still writing her

17   column?

18   A.  She was.

19   Q.  How would you describe its popularity at that moment in

20   time?

21   A.  High.  I mean, again, you know, she was still as popular as

22   she was, you know, when I started in 2000.  Actually, her

23   popularity grew, so it was high.

24            MR. CRAIG:  No further questions.

25            THE COURT:  All right.  Thank you.  Cross.  Ms. Habba.

O1P5car2

1           What else?

2           MS. CROWLEY:  Just one more issue, your Honor.

3           In our conversation with defense counsel this morning,

4    they suggested that they are also going to ask Ms. Martin about

5    her knowledge of whether Ms. Carroll's lawsuit was funded.

6    That's an issue that's been clearly ruled out of bounds.  I

7    understand that their position is that we somehow opened the

8    door to it by asking Ms. Carroll about an e-mail that she

9    received on June 23rd, 2019, when she was accused of being paid

10   by the DNC and George Soros to tell lies about Donald Trump.

11   That is Plaintiff's Exhibit 45.  That obviously has nothing to

12   do with any funding for this lawsuit.  Your Honor has already

13   ruled on that issue.  Ms. Martin has no personal knowledge of

14   whether Ms. Carroll's lawsuit was funded and we think that it

15   is very prejudicial to even ask the question.

16           MS. HABBA:  Your Honor, if I may, this is what I was

17   trying to get at before.  They have now opened the door not

18   once, but twice, on the Reid Hoffman issue.  The first is when

19   they asked Ms. Carroll to break down that tweet or the e-mail

20   rather, your Honor, and asked her:  Are you funded by anybody

21   related to the DNC?

22           She said:  No.

23           The transcript is 116:1-14.  They also asked her about

24   George Soros if you recall, your Honor.  I'm not asking about

25   George Soros, but when you ask somebody whether they're funded

O1P5car2

1  by the DNC, and they are, and they make a misrepresentation and

2  then Ms. Martin has text messages proving that she knew about

3  it, those are fair game, your Honor.

4        They also played his deposition transcript where they

5  asked about the DNC stuff and president and I will get to that

6  with the president, but the door has been wide open not by me,

7  your Honor, I have respected your rules, but by them, and it is

8  fair game at this point.

9        THE COURT:  The door is closed.

10        MS. CROWLEY:  Thank you, your Honor.

11        THE COURT:  Anything else before we have Ms. Martin?

12  OK.  Let's bring in the jury.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O1P5car2                         Martin - Direct

 1            (Jury present)

 2            THE COURT:  Thanks for bearing with us, folks.  As you

 3   know, especially when you get close to the end of the trial,

 4   all sorts of things have to be resolved.

 5            The plaintiff, as I understand it, rests?

 6            MS. CROWLEY:  That is correct, your Honor.

 7            THE COURT:  That is the conclusion of plaintiff's

 8   evidentiary presentation on her case-in-chief.  The defense now

 9   has an opportunity to put on its case.

10            Ms. Habba?

11            MS. HABBA:  Thanks, your Honor.  The defense calls

12   Ms. Carol Martin to the stand, please.

13   FRANCES CAROL MARTIN,

14        called as a witness by the Defendant,

15        having been duly sworn, testified as follows:

16            THE DEPUTY CLERK:  Please state your name and spell

17   your first and last names for the record.

18            THE WITNESS:  My name is Frances Carol Martin.

19            Did you say spell it as well?

20            THE DEPUTY CLERK:  Yes, ma'am.

21            THE WITNESS:  F-R-A-N-C-E-S, C-A-R-O-L, M-A-R-T-I-N.

22            THE COURT:  You may proceed, Ms. Habba.

23            MS. HABBA:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MS. HABBA:

O1PQcar3                    Martin - Cross

1   BY MS. CROWLEY:

2   Q.  Good afternoon, Ms. Martin.

3   A.  Hello.

4   Q.  We've met before, right?

5   A.  Yes, we have.

6   Q.  In fact, Ms. Habba just asked you some questions about

7   meeting with Ms. Carroll's lawyers earlier this month, correct?

8   A.  Correct.

9   Q.  And I believe that you testified that in that meeting you

10  were asked to testify that Ms. Carroll has been damaged by

11  Donald Trump's statements in June 2019.  Do you recall that?

12  A.  I do.

13  Q.  I think you said that you were asked to say that?

14  A.  That I was asked to say ...

15  Q.  That Ms. Carroll has been harmed by Donald Trump's

16  statements.

17  A.  Well, if I believed it, yes, of course.  Yeah.

18  Q.  And, in fact, in the meetings that you had with

19  Ms. Carroll's lawyers, you were just asked to tell the truth,

20  correct?

21  A.  Correct.  Correct.

22  Q.  And you believe, as I think you just said, that Ms. Carroll

23  has been damaged by what Donald Trump said about her back in

24  June 2019, correct?

25          MR. MADAIO:  Objection.  Beyond the scope of direct.

1           THE COURT:  It's Ms. Habba's witness.

2           MS. HABBA:  Objection.  Beyond the scope of direct,

3   your Honor.

4           THE COURT:  Overruled.

5   Q.  And you know that Ms. Carroll has been harmed by Donald

6   Trump's statements because she is one of your closest friends?

7   A.  I do.

8   Q.  Ms. Habba also asked you some questions about your concerns

9   for your safety.  Do you recall those questions?

10  A.  Yes.

11  Q.  And you said that you also have concerns -- or you had

12  concerns about your daughter's safety?

13  A.  I did.

14  Q.  And that was back in 2019?

15  A.  Starting in 2019, yes.

16  Q.  I believe you said that you were concerned because you

17  had -- you were concerned after Ms. Carroll's book was

18  published?

19  A.  And at -- yes.

20  Q.  And the *New York* magazine piece?

21  A.  And *The Daily*, the podcast from the *New York Times*.

22  Q.  Ms. Martin, were you concerned because you had been

23  mentioned in Ms. Carroll's book?

24  A.  I was not mentioned by name in the book.

25  Q.  What do you mean you were not mentioned by name?

O1PQcar3                    Martin - Cross

1                  (In open court)

2                  THE COURT:  Let's continue.

3                  MS. CROWLEY:  Thank you, your Honor.

4       BY MS. CROWLEY:

5       Q.  Ms. Martin, before we just broke, we were talking about the

6       concerns that you expressed about your safety and your

7       daughter's safety following the release of Ms. Carroll's book.

8       Do you recall that?

9       A.  Yes.

10      Q.  Were you concerned because you were mentioned in

11      Ms. Carroll's book, not by name, but you were mentioned in

12      Ms. Carroll's book as one of the people Ms. Carroll told about

13      the fact that Donald Trump had assaulted her back in 1996 --

14                 MS. HABBA:  Your Honor --

15                 THE COURT:  Yes.  I think that goes a bit too far.

16      Rephrase.

17                 MS. HABBA:  Thank you.  I'd like to strike that

18      question please, your Honor.

19                 THE COURT:  The jury has been instructed before and

20      will be instructed again that questions are not evidence.

21      Let's go ahead.

22      BY MS. CROWLEY:

23      Q.  Ms. Martin, were you concerned for your safety because you

24      had been mentioned as an outcry witness, to use your word?

25      A.  Well, my name was not mentioned in the book, but as soon as

O1PQcar3                          Martin - Cross

1    publicity began for the book, of my own volition I joined the

2    group to speak about it.

3    Q.  What did you speak about?

4    A.  Well, that would have been at the -- the first time for me

5    was when we spoke for the podcast that.  The New York Times had

6    Meghan Touhy did an interview with three of us.

7    Q.  Who were the three of you?

8    A.  That would be E. Jean and --

9                MS. HABBA:  Objection.

10               THE COURT:  Sustained.

11   Q.  Ms. Martin, were you concerned because you had been brought

12   into -- strike that.

13               Were you concerned for your safety because you had

14   been involved in Ms. Carroll's lawsuit against Donald Trump?

15               MS. HABBA:  Your Honor, objection.  Asked and

16   answered.

17               THE COURT:  Overruled.

18               Answer please, Ms. Martin.

19   A.  Was I concerned because I had been involved in the -- yes.

20   Yes.

21   Q.  And were you concerned that you had been involved in a

22   lawsuit against Donald Trump?

23   A.  Yes.

24   Q.  Why were you concerned about that?

25   A.  I am a huge consumer of news, and I keep up with everything

O1P5car4

|   |   |
|---|---|
| 1 | It is a very well-established legal principle in this |
| 2 | country that prevents do-overs by disappointed litigants.  It |
| 3 | is called issue preclusion or collateral estoppel.  Mr. Trump's |
| 4 | counsel are quite familiar with it as they wrote in one of the |
| 5 | briefs they filed in this case, quoting a Court of Appeals |
| 6 | decision, "The fundamental notion is that an issue of law or |
| 7 | fact, actually litigated and decided by a court of competent |
| 8 | jurisdiction in a prior action, may not be relitigated in a |
| 9 | subsequent suit between the parties." |
| 10 | After considering submissions by both sides, this |
| 11 | Court ruled that the trial last year conclusively decided, |
| 12 | among other things, the following: |
| 13 | First, Mr. Trump in fact sexually abused Ms. Carroll |
| 14 | by forcibly, and without her consent, inserting his fingers |
| 15 | into her vagina. |
| 16 | Second, Mr. Trump's June 21st and 22nd statements in |
| 17 | 2019 were false.  Ms. Carroll did not make up her claim of |
| 18 | forcible sexual abuse. |
| 19 | Third, Mr. Trump's June 21 and June 22, 2019 |
| 20 | statements were defamatory. |
| 21 | Fourth, Mr. Trump, when he made those statements, knew |
| 22 | they were false, had serious doubts as to the truth of what he |
| 23 | said, or made those statements with a high degree of awareness |
| 24 | that they probably were false. |
| 25 | As those issues all were determined previously, |

O1P5car4

1    Mr. Trump cannot offer any evidence or make any argument before

2    the jury disputing or intending to unwind those determinations.

3    And it was not just Mr. Trump who was precluded from offering

4    any evidence as to the occurrence or the details of the sexual

5    assault.  Ms. Carroll, too, was precluded from doing so.

6    That's why the jury did not hear her testimony as to those

7    details.  She adhered to the Court's ruling.

8              In a January 12 letter, which is on the docket in this

9    case as item 256, Ms. Kaplan, on behalf of Ms. Carroll,

10   questioned whether Mr. Trump could offer any testimony at all

11   that would be admissible in this case in light of the Court's

12   ruling.  Ms. Habba, in your response, which is on the docket at

13   265, you asserted that Mr. Trump could offer admissible

14   testimony on four subjects:

15             First, you said he should be allowed to testify to the

16   questions he was asked by reporters which, as you put it, and I

17   quote, "propagated his response and denial to Ms. Carroll's

18   story in *New York* magazine, and whether he was acting with

19   hatred or ill will when he provided his answers."

20             Second, you said he could testify about his state of

21   mind and the timing of the statements.

22             Third, you said he could testify that he had corrected

23   one statement, and I quote you, "to acknowledge and explain

24   that he met Ms. Carroll on a receiving line at a charity

25   event."

O1P5car4

1          Finally, you argued that he should be allowed to

2     testify "about the circumstances of Mr. Trump's comments as

3     they related to what you characterized as comments in

4     Ms. Carroll's continuous parade of interviews and publicity."

5          The Federal Rules of Evidence, specifically Rule

6     103(d), provide that, and I am quoting it, "To the extent

7     practicable, the Court must conduct a jury trial so that

8     inadmissible evidence is not suggested to the jury by any

9     means."

10          In all of the circumstances of this case there is

11    cause for concern as to whether Mr. Trump's examination and

12    testimony will contain or suggest inadmissible evidence to the

13    jury.  Some of those concerns are referred to at pages 2

14    through 4 of Ms. Kaplan's January 12 letter, item 256; and

15    others in her letter of January 20; item no. 274 and its

16    exhibits.

17          In furtherance of the Court's duty to prevent that to

18    the extent practicable, that is, the introduction of

19    inadmissible material before the jury, I want to confirm and

20    obtain clarifications of some of the things that you,

21    Ms. Habba, have stated, and I'm going to begin with

22    clarification.

23          As I mentioned before, you said that Mr. Trump should

24    be allowed to testify to the questions he was asked by

25    reporters which, as you put it, propagated his response and

O1P5car4

```
 1   denial to Ms. Carroll's story in New York magazine, and whether

 2   he was acting with hatred or ill will when he provided his

 3   answers.  What would he testify to, exactly, as to the time

 4   period during which he was asked those questions?

 5           MS. HABBA:  Well, your Honor, actually, if I may, I

 6   have three questions for my client.  It is actually much

 7   briefer than going through all of that, number one.

 8           THE COURT:  Ms. Habba, we are going to do it my way.

 9           MS. HABBA:  Sure.

10           THE COURT:  Answer my question.

11           MS. HABBA:  So you want me to tell you what he is

12   going to testify to, your Honor?

13           THE COURT:  Exactly.  And fully.

14           MS. HABBA:  Sure.  He is going to deny the

15   allegations, if that's what you are asking me.  Would he deny

16   them?

17           THE COURT:  Complete your answer.

18           MS. HABBA:  Please -- I'm sorry.  I'm not

19   understanding your questions.

20           THE COURT:  I want to know everything he is going to

21   say.

22           MS. HABBA:  I do not have an answer to that other than

23   that he stands by his deposition, his testimony that the

24   plaintiff brought in, he is going to say that he stands by his

25   testimony there, he is going to say that he did not make the
```

O1P5car4

```
 1   statements to hurt Ms. Carroll, and he is going to say that he

 2   had to respond to the accusations and deny them.  The

 3   statements speak for themselves, they have already been put

 4   into evidence.

 5           THE COURT:  And that is 100 percent of what he would

 6   say on the witness stand?

 7           MS. HABBA:  I have three questions, your Honor.  I

 8   just ran through it.

 9           THE COURT:  Answer my question.

10           MS. HABBA:  I can't tell you.

11           THE COURT:  Answer my question.

12           MS. HABBA:  I am not testifying for my client, your

13   Honor.

14           THE COURT:  You are making an offer of proof and your

15   client is bound by it.

16           MS. HABBA:  That is what my client is going to say, is

17   that he did not do it; at the time he denied it for the reason

18   of having to deny it; that he was addressing them, the

19   questions, because of his accusation; that he never instructed

20   anyone to hurt Ms. Carroll.  That is what he is going to say.

21   And also, that he stands by the depositions that they, frankly,

22   played, which I am happy they did, frankly.

23           THE COURT:  And he will say nothing else?

24           MS. HABBA:  That is my understanding, your Honor.

25           THE COURT:  Let me hear from the other side.
```

O1P5car4

1          MS. KAPLAN:  So, for one, I'm not sure -- I take it

2    that Ms. Habba is somehow arguing that by putting on the video

3    we opened the door such that he could deny that the sexual

4    assault happened.  I don't see that from what we put on and

5    that has always been -- it is the main part of what the Court's

6    orders are and that he cannot do that and it is the import of

7    what your Honor talked about today.

8          THE COURT:  This is, at this point, on that narrow

9    item, academic.

10          MS. KAPLAN:  Academic in the sense that the jury

11    understands that he still denies it, your Honor?

12          THE COURT:  Pardon me?

13          MS. KAPLAN:  Academic in the sense that the jury

14    obviously understands that that is his position?

15          THE COURT:  Yes.

16          MS. KAPLAN:  So, your Honor, as you were talking and

17    asking the questions of Ms. Habba, we are closer to him than

18    you are, obviously, but Mr. Trump said under his breath that he

19    intended to say that he never met her and had never seen her

20    before.  That's what he was saying under his breath just behind

21    us when Ms. Habba was purporting to say what he is going to

22    say.  So I guess if he just says -- I mean, we have to figure

23    out what is the proper way to say it.

24          THE COURT:  We are going to go back to the way I

25    approached it in the first place.

O1P5car4

1           MS. KAPLAN:  OK.

2           THE COURT:  I infer from what you said, Mr. Habba --

3           MS. HABBA:  Ms.

4           THE COURT:  -- that he will not testify to questions

5     that were asked of him by reporters; is that correct?

6           MS. HABBA:  He is not testifying what questions were

7     asked of him; no, your Honor.

8           If I may, your Honor?

9           THE COURT:  No.

10          MS. HABBA:  OK.

11          THE COURT:  Not right now.

12          So tell me the three questions you propose to ask

13    again.

14          MS. HABBA:  Sure.

15          I would just like him to confirm that he stands by all

16    the testimony at his deposition, also that he made the

17    statements in response to her accusations and what his state of

18    mind was there, and that he --

19          THE COURT:  What will he say about his state of mind?

20          MS. HABBA:  He was defending himself, your Honor.

21          THE COURT:  And he will say nothing else about his

22    state of mind.

23          MS. HABBA:  I think that says it all.

24          THE COURT:  I didn't ask you whether you think it says

25    it all.

O1P5car4

1            MS. HABBA:  Yes.

2            THE COURT:  He will say nothing other than his state

3    of mind was that he was responding; is that right?

4            MS. HABBA:  And that he was defending himself, your

5    Honor, to an accusation that he -- that's it.  And he still

6    does.  And the only other thing was that he never instructed

7    anyone to hurt Ms. Carroll in his statements, and that is a

8    simple yes or no question.  That's it.

9            THE COURT:  Ms. Kaplan?

10           MS. KAPLAN:  The third question, your Honor, which we

11   think is obviously not believable, but the third question seems

12   to me -- seems to us to be OK.  The first two statements I

13   think -- the first two questions and answers, your Honor, bring

14   up the question we were just talking about which is that he may

15   still think that he didn't do it, I understand that, but he had

16   an opportunity to participate in a trial, he didn't participate

17   in the trial.

18           THE COURT:  He lost it and he is bound.  And the jury

19   will be instructed that, regardless of what he says in court

20   here today, he did it, as far as they're concerned.  That is

21   the law.

22           MS. KAPLAN:  And that instruction will be given at the

23   end or after his testimony?  I'm sorry.

24           THE COURT:  It will be given more than once.  Not in

25   those words exactly, but in substance.

O1P5car4

1        MS. KAPLAN:  Look.  We think there is certainly the

2   risk of it being confusing to the jury but your Honor certainly

3   knows how to give an instruction, and if it is limited to those

4   three things, we understand where your Honor is going.

5        THE COURT:  You played the deposition.  They heard it.

6        MS. HABBA:  Your Honor --

7        THE COURT:  Look.  You told me in your letters, I

8   think, that Mr. Trump is well aware of the Court's rulings with

9   respect to issue preclusion and the strict confines placed on

10   his testimony.

11        Do you confirm that?

12        MS. HABBA:  Yes, your Honor.

13        THE COURT:  And you say that because you personally

14   made him aware of those confines?

15        MS. HABBA:  Excuse me, your Honor?

16        (Defendant and counsel conferring)

17        THE DEFENDANT:  I never met the woman.  I don't know

18   who the woman is.  I do not know who the woman is.  I wasn't at

19   the trial.  I don't know who the woman is.  I never met this

20   woman.

21        THE COURT:  Mr. Trump, keep your voice down.

22        MS. HABBA:  Your Honor, I have now answered many times

23   the three questions.  I have literally given a preview into the

24   questions asked --

25        THE COURT:  And I have an outstanding question to you.

O1P5car4

1           MS. HABBA:  OK.  What is it?  I'm sorry.  I'm not

2     understanding what you are asking.

3           THE COURT:  Did you make Mr. Trump personally --

4           MS. HABBA:  Yes.

5           THE COURT:   -- aware of the confines on his

6     testimony?

7           MS. HABBA:  Yes.

8           THE COURT:  And will Mr. Trump comply with those

9     confines?

10          MS. HABBA:  Outside of having a glass ball he will

11    absolutely --

12          THE COURT:  I'm sorry, Mr. Trump.  You are

13    interrupting these proceedings by talking loudly while your

14    counsel is talking and that is not permitted.

15          MS. HABBA:  Your Honor, you have reiterated them just

16    now.  He is aware.  We obviously dispute it.  The case is on

17    appeal with the first case, but as to this case, he is aware.

18    That is why I am asking three questions and sitting down.

19          THE COURT:  So he will comply with the rulings; is

20    that right?

21          MS. HABBA:  That is my understanding and --

22          THE COURT:  Except to the extent of --

23          MS. HABBA:  The deposition that he will agree to,

24    which they put in.

25          THE COURT:  It seems to me that I will permit him to

O1P5car4

1    get on the stand and you may ask him whether he stands by the

2    testimony that was played in this court this morning, that he

3    gave previously.  End.  That's it.

4                MS. HABBA:  I can only ask one question?  Is that what

5    your Honor is saying?

6                THE COURT:  Yes.

7                MS. HABBA:  Your Honor, I'm sorry, but I have to prove

8    my -- so I just ask about the deposition.

9                THE COURT:  Oh, and if you want to ask -- the second

10   question you can ask.

11               MS. HABBA:  About his intent.

12               THE COURT:  The question you proposed was did he ever

13   tell anybody to hurt Ms. Carroll.

14               MS. HABBA:  That was the third question.  I can go

15   through them again, your Honor.

16               THE COURT:  Go through them again, Ms. Habba.

17               MS. HABBA:  So, the first is that he will confirm that

18   he stands by everything in the deposition testimony.  My

19   understanding is your Honor has no issue with that.

20               THE COURT:  I have no issue with that.

21               MS. HABBA:  Thank you.

22               The second question is why did you make the statements

23   in response to her accusation.

24               THE COURT:  No.

25               MS. HABBA:  I cannot ask that question.

O1P5car4

```
 1              THE COURT:  You can ask him the other question.

 2              MS. HABBA:  So how do they prove common law malice

 3    when I can't have my client defend himself and say he wasn't

 4    defaming her, he was defending himself at the time?

 5              THE COURT:  Those are not mutually exclusive

 6    propositions.

 7              MS. HABBA:  But I have a right to ask about his

 8    intent, they have an obligation to prove his intent.

 9              THE COURT:  Ms. Habba, I will decide what he has a

10    right to do here.  That's my job, not yours.

11              Now, question 1.  Does he stand by the deposition?

12    Did he deny the allegation because an accusation had been made?

13    That's it.  Not what was in your mind.  Why did he do it.  And

14    I take it the offer of proof is he did it because someone made

15    an accusation.  Is that right?  Is that what you propose to do?

16              MS. HABBA:  I'm happy to ask it that way, why did you

17    deny her accusations.  Is that how you would like it, your

18    Honor?

19              THE COURT:  No, it's not an open-ended question.

20    There will not be an open-ended question.

21              Let me put it a different way.  If you were to ask

22    that open-ended question, there is likely to be an objection

23    and it is likely, in significant measure, to be sustained.

24              What was your third point?

25              MS. HABBA:  Did you ever instruct anyone to hurt
```

O1P5car4

1    Ms. Carroll in your statements.

2              THE COURT:  I have no problem with that, if it is

3    asked that way.

4              MS. HABBA:  That's exactly my question.

5              THE COURT:  OK.

6              MS. HABBA:  That's it.

7              MS. KAPLAN:  OK.

8              THE COURT:  Bring in the jury.

9              MS. HABBA:  Sorry, your Honor.  One minute?

10             (Counsel conferring)

11             MS. HABBA:  There is confusion with counsel so I just

12   want to make sure for the record, the second question, which

13   seems to be the only one that I am confused on, did you deny

14   Ms. Carroll's accusation.  That is permitted, correct?

15             THE COURT:  No.  He denied it in the deposition.  He

16   is affirming the deposition.

17             MS. HABBA:  So you had proposed a way for the second

18   question.

19             THE COURT:  I thought you had and it keeps changing.

20   Subtly, but it keeps changing.  You can elicit the fact he made

21   it in response.

22             MS. HABBA:  As long as we have the deposition, your

23   Honor, I think we will be fine.  Thank you.

24             THE COURT:  I hope you will.

25             (Continued on next page)

O1P5car4                           Trump - Direct

1            (Jury present)

2            THE COURT:  Thanks for bearing with us again, ladies

3    and gentlemen.  I hope lunch was better than the cafeteria

4    usually turns out.

5            Ms. Habba, you may call your next witness.

6            MS. HABBA:  Thank you, your Honor.  The defense calls

7    President Donald Trump.

8    DONALD JOHN TRUMP,

9         called as a witness by the Defendant,

10        having been duly sworn, testified as follows:

11           THE DEPUTY CLERK:  Can please state your name for the

12   record.

13           THE WITNESS:  Donald John Trump.

14           THE COURT:  You may proceed, Ms. Habba.

15           MS. HABBA:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MS. HABBA:

18   Q.  Mr. President, you viewed your deposition which was played

19   by plaintiff's counsel at length during the trial.  Didn't you?

20   A.  Yes, I did.

21   Q.  Do you stand by your testimony at the deposition?

22   A.  100 percent.  Yes.

23   Q.  Did you deny the allegation because Ms. Carroll made an

24   accusation?

25   A.  That's exactly right.  She said something, I consider it a

O1P5car4                          Trump – Cross

1    false accusation.  No difference.

2              MS. KAPLAN:  Objection, your Honor.

3              THE COURT:  Everything after "yes, I did," is

4    stricken.  The jury will disregard it.

5              Go ahead.

6    BY MS. HABBA:

7    Q.  Did you ever instruct anyone to hurt Ms. Carroll in your

8    statements?

9    A.  No.  I just wanted to defend myself, my family, and

10   frankly, the presidency.

11             MS. KAPLAN:  Objection your Honor.

12             THE COURT:  Objection is sustained.  Everything after

13   "no" is stricken.  The jury will disregard.

14             MS. HABBA:  I have no further questions.  Thank you.

15             THE COURT:  Thank you.

16             Cross-examination.

17   CROSS-EXAMINATION

18   BY MS. KAPLAN:

19   Q.  Good afternoon, sir.

20             Now, your deposition that we watched earlier today in

21   this trial, took place in October of 2022; correct?

22   A.  I believe so, yes.

23   Q.  And after that, months after that, there was a trial

24   between you and Ms. Carroll that took place actually in this

25   courtroom; correct?

O1P5car4                          Trump - Redirect

1              MS. HABBA:  Objection.

2              THE COURT:  Overruled.  Excuse me.  Sustained.

3              MS. HABBA:  Thank you.

4    BY MS. KAPLAN:

5    Q.  Sitting here today, Mr. Trump, are you aware that there was

6    another trial between you and Ms. Carroll?

7    A.  Yes.

8              MS. HABBA:  Objection.

9              THE COURT:  Sustained.

10   Q.  Mr. Trump, is this the first trial between you and

11   Ms. Carroll that you have attended?

12             MS. HABBA:  Objection.

13             THE COURT:  I will allow that.

14   A.  Yes.

15             MS. KAPLAN:  No further questions, your Honor.

16             THE COURT:  Any redirect?

17   REDIRECT EXAMINATION

18   BY MS. HABBA:

19   Q.  Mr. President, did you have counsel at the last trial?

20   A.  I had counsel.

21   Q.  Did you listen to the advice of counsel at the last trial?

22             MS. KAPLAN:  Objection, your Honor.

23             THE COURT:  Sustained.

24             MS. HABBA:  No further questions.

25             THE COURT:  Thank you, Mr. Trump.  You are excused.

O1Q5car1

1    be clear, we will have closing arguments.  During closing

2    arguments no one in the courtroom is to say anything except

3    that opposing counsel, if there is an objection, can say

4    objection, and if I think it appropriate, we will have a side

5    bar.  There are to be no interruptions by anybody else, no

6    audible comments by anybody else, and when I charge the jury

7    later, that rule applies to everyone in the courtroom,

8    including counsel.  Counsel will have an opportunity at the

9    conclusion of my instructions to make any objections to the

10   charge, as given, that were not ruled on yesterday, should

11   there be any.

12           Let's get the jury.

13           MS. CROWLEY:  Judge, we just have one issue.  I

14   apologize.

15           We exchanged our slide decks this morning in advance

16   of court.  There are a couple issues with the defendant's

17   presentation that we attempted to work out.  We don't have a

18   resolution.  The first is basically they're showing the jury

19   things that are not in evidence.  There is a slide that

20   contains about a dozen tweets, only three of which were

21   actually received in evidence.  That slide actually appears

22   three times in the presentation.

23           There is also a reference in the presentation to The

24   Cut article appearing at 12:14 p.m.  That's not in evidence.

25   The only reference to 12:14 p.m. came from Ms. Habba, which is

O1Q5car1

1    at 216 of the transcript, where she asked the question:  So, if

2    I represented to you that it was released at 12:14, would that

3    sound right?  And your Honor sustained an objection to that.

4              THE COURT:  First of all, Ms. Habba, are Ms. Crowley's

5    statements correct?

6              MR. MADAIO:  Your Honor, if I may?

7              THE COURT:  Yes.

8              MR. MADAIO:  The full context of the conversation, she

9    was asked when The Cut article was released she said sometime

10   after noon.  Then Ms. Habba asked her about 12:14 and she did

11   say, "yes" so we --

12             THE COURT:  Give me the transcript reference, please.

13             MS. CROWLEY:  It is 214:24 to 218:4.  I believe the

14   question was:  So, if I represented it was released at 12:14,

15   would that sound --

16             THE COURT:  You read it before.  I just want to find

17   it.  What was the date of the transcript?

18             MS. CROWLEY:  Day two.

19             THE COURT:  That would be January 17.  216, line?

20             MS. CROWLEY:  The question is 216, line 2.

21             THE COURT:  Look.  The witness said:  "I'm glad to

22   give the date, it could be," in response to 12:14.  If this

23   becomes an issue, the defense can answer it on defense's

24   argument.  I'm not going to rule that out.

25             Now what about the other one, Mr. Madaio.

O1Q5car1

1      MR. MADAIO:  Your Honor, with regard to the tweets,

2  these were the defense had attempted to enter many of these

3  tweets in the five-hour gap between noon and 5:17 p.m.  Counsel

4  continuously objected to it as cumulative and there is also a

5  stipulation on the record by Ms. Kaplan that there were many

6  tweets during that period.  So we have a slide that contains, I

7  believe, four tweets that were in evidence.  The rest of them

8  are referenced on the slide, they're blacked out, you can't see

9  them, they're blurred out, but it is more to show that there is

10 a stipulation to show there are many tweets in the time period

11 and there were --

12     THE COURT:  The ones that you were trying to enter and

13 did not succeed in entering are not in evidence and they're not

14 going to be in the slide.

15     MR. MADAIO:  Well, your Honor --

16     THE COURT:  You say they're blacked out.  Now show me

17 the slide.

18     MR. MADAIO:  Sure.  Again, your Honor, there was a

19 stipulation by Ms. Kaplan on the record that there were many

20 tweets during that time.

21     THE COURT:  Maybe you should have a slide that said

22 that.

23     MR. MADAIO:  That was part of the resolution of the

24 issue, your Honor, why the tweets were not openly admitted.

25     THE COURT:  Could I have a legible copy of this or

O1Q5car1

1    project it?  This is entirely illegible.

2                  MR. MADAIO:  Your Honor, that is the point, is that

3    those tweets are not legible and not intended to be legible.

4                  THE COURT:  I want to see what you propose to show to

5    the jury, not a Xerox copy of something that I can't read.

6                  MR. MADAIO:  We can pull it up, your Honor.

7                  MS. CROWLEY:  Just for the record, on page 290, line 1

8    through 2 of the transcript, Ms. Kaplan said:  We'll stipulate

9    that there were nasty tweets sent to Ms. Carroll before

10   5:17 p.m. on June 21st.

11                 THE COURT:  Is that what you are referring to,

12   Mr. Madaio?

13                 MR. MADAIO:  I'm sorry.  If Ms. Crowley can repeat?  I

14   was unable to hear.

15                 MS. CROWLEY:  We will stipulate there were nasty

16   tweets sent to Ms. Carroll before 5:17 p.m.

17                 MR. MADAIO:  Yes, your Honor; that's exactly right.

18                 THE COURT:  Now let me see the slide, please.

19                 MR. MADAIO:  Your Honor, to be clear, these tweets are

20   included just to show the volume, not the substance, that's why

21   they've been blurred out.

22                 THE COURT:  That's the whole point.  They're totally

23   irrelevant.  They're totally irrelevant unless they're in

24   evidence.  You are not using the slide.

25                 MR. MADAIO:  Your Honor, that was the point of the

O1Q5car1

1    stipulation, is that there was many tweets.

2              THE COURT:  I don't know what was in your head and I

3    don't know what was in their head.  What I know is what

4    Ms. Carroll said, which was taken down.  You are perfectly

5    welcome to say she stipulated there were many whatever it is

6    she said exactly.  You are not going to use a slide that

7    purports to represent how many and what they were about.

8              MR. MADAIO:  We are not trying to enter them for what

9    they were about.

10             THE COURT:  Excuse me.  You are not using that slide.

11   Period.

12             MR. MADAIO:  Thank you, your Honor.

13             MS. HABBA:  No.  No.  Sorry, your Honor.  You can't

14   see the tweets.  Your Honor is --

15             THE COURT:  Ms. Habba.

16             MS. HABBA:  I'm sorry, your Honor.  I have to make a

17   record.

18             THE COURT:  Ms. Habba, you are on the verge of

19   spending some time in the lockup.  Now sit down.

20             MS. HABBA:  Shocking.

21             THE COURT:  OK.  Bring in the jury.

22             (Continued on next page)

23

24

25

1    engage in the very defamation that landed him here in the first

2    place.  He would sit here, right here in this courtroom, and

3    then leave the court house and engage in the exact same conduct

4    that a jury unanimously declared to be unlawful last May.  He

5    continued to defame E. Jean Carroll, proudly and repeatedly

6    during this trial, on an almost daily basis.

7                THE COURT:  Excuse me.

8                The record will reflect that Mr. Trump just rose and

9    walked out of the courtroom.

10               You may continue, Ms. Kaplan.

11               MS. KAPLAN:  Thank you, Judge.

12               Donald Trump, he is the former president of the United

13   States.  He remains very powerful today, obviously.  And, by

14   his own account, he is extremely rich.  He seems to think that

15   his wealth and power entitle him to treat Ms. Carroll however

16   he wants.  And Donald Trump's strategy is to bet that you will

17   agree with him.  He is hoping that you will let him off the

18   hook, that he will suffer no consequences for his unlawful

19   conduct.  He is betting that you will let him continue to

20   defame Ms. Carroll lying about her and destroying her

21   reputation.  But no matter what Donald Trump thinks, and no

22   matter what Donald Trump says, the rules do apply to him.  He

23   is not free to continue to attack and defame Ms. Carroll just

24   because he feels like it.

25               In this country, even the most powerful person can be

1          I am going to now turn back to the evidence, starting

2     with Ms. Carroll's background and her reputation before June

3     2019.

4          THE COURT:  Before we change gears, defense counsel

5     are to remain seated and that includes you Mr. Epshteyn, not

6     that you are among defense counsel at the table.

7          MS. KAPLAN:  As you heard, Ms. Carroll is truly one of

8     a kind.  Growing up in rural Indiana she dreamed of becoming a

9     writer.  She spent years submitting articles to various

10    magazines trying to get published.  She set up her first piece,

11    believe it or not, at the age of 12, but it wasn't until the

12    age of 36 when her first story was finally published.

13         Ms. Carroll told you how she spent decades building

14    her career after moving to New York City.  She told you about

15    the top-tier magazines like *Esquire* and *Rolling Stone* that

16    published her work, and her time as a writer at Saturday Night

17    Live and the Emmy nominations she received about her incredibly

18    poplar advice column "Ask E. Jean" which started running in

19    *Elle* magazine in 1993.

20         As you heard, her column would go on to become the

21    longest running advice column in the world.  It was so

22    successful that in 1994 she got a TV show called "Ask E. Jean"

23    where she gave advice to people, live on the air.  Needless to

24    say, they don't go around handing out TV shows to just anyone.

25         As Ms. Carroll told you, over the course of the time

O1Q5car1                    Summation - Ms. Kaplan

1    speaking up to humiliate and degrade her and to ensure that

2    nobody would ever believe her.

3          So, the real question is how to measure that harm he

4    caused.  In other words how to assign a specific dollar amount

5    to it.  In answering that question there are two categories of

6    harm, each of which supports its own award of what are called

7    compensatory damages.

8          First, there is the reputational harm that Ms. Carroll

9    suffered.  As you have heard, Ms. Carroll has devoted her

10   entire life to succeeding as a writer and as an advice

11   columnist.  The very heart of her success was her reputation

12   for honesty and integrity.  You heard this repeatedly during

13   the trial from Ms. Carroll.  You also heard it from Robbie

14   Myers, her long-time boss.  And because of her excellent

15   reputation, Ms. Carroll did have a lot of success as a writer,

16   her childhood dream.  She wrote articles and books and columns

17   and skits for Saturday Night Live, and appeared frequently on

18   TV.  You heard her describe all of this herself.

19         While Ms. Carroll built that career over five decades,

20   Donald Trump shattered it in less than 24 hours.  As

21   Ms. Carroll described it, people who didn't care about me,

22   really don't care about this person, they now have opinions

23   about me and that is that I am a liar.  You heard extensive

24   evidence on this point from Ms. Carroll.  As she explained to

25   you guys last week: *Previously, I was known simply as a*

O1Q5car1                    Summation – Ms. Kaplan

1    *journalist and had a column.*  *Now I'm known as the liar, the*

2    *fraud, and the whack job.*  Again, in her own words.  *People are*

3    *not dying to write to an advice columnist who the president*

4    *says is a disgrace.*

5                    Can we see the next slide?

6                    Remember this e-mail I showed you, which is one of the

7    many, many, many horrible e-mails E. Jean received after Donald

8    Trump's statement, and remember how she said that despite all

9    the other e-mails calling her ugly, and slutty, and crazy, and

10   everything else, this one hurt her the most.  Why did it hurt

11   her so much?  Because this person said, "I sure wouldn't ask

12   you for advice."  There can hardly be more direct proof -- this

13   is June 23, 2019 -- more direct proof that what Donald Trump

14   said shattered E. Jean Carroll's reputation as an advice

15   columnist.

16                    In a very real way, Donald Trump's lies radically

17   transformed Ms. Carroll's public image.  This change had

18   concrete impacts that could be measured.  Ms. Carroll, for

19   example, used to receive hundreds of letters per month seeking

20   her advice.  Today she only receives eight.  She used to write

21   the nation's leading advice column read by millions

22   and millions of people in *Elle* magazine.  Today?  Her Substack

23   only has 28,000 subscribers with only 1,800 of those being

24   people who pay.

25                    Previously, Ms. Carroll used to make more than $50,000

O1Q5car1                    Summation - Ms. Kaplan

a year doing freelance work for magazines on a wide range of

topics.  Today, or last year, I should say, she only earned

$500 in freelance work, and the only requests she ever gets

anymore are to write about Donald Trump.

            To assess the reputational harm that Donald Trump's

statements caused you also heard incredibly detailed testimony

from Ashlee Humphreys, a tenured professor at Northwestern and

expert in calculating the cost of repairing a person's

reputation.

            As Professor Humphreys explained, before Ms. Carroll

was defamed by Donald Trump she had a devoted following as an

author, writer, and a columnist.  Using an extremely

conservative method of accounting, Professor Humphreys'

calculated that Donald Trump's false and defamatory statements

in June 2019 about Ms. Carroll, were seen between 85 million

and 104 million times.  Please keep in mind that's only his

statements on June 21 and June 22, 2019, and that's only a

small part of all of the many places where those statements

were spread.

            Professor Humphreys explained this in great detail.

For news articles, for example, she only used the 47 articles

we cited in our complaint.  She then considered only the number

of people who visited those corresponding news sites on the

exact same days, June 21 and June 22, that those articles

appeared.  In other words, it is important to think about what

O1QQcar2                        Summation - Ms. Habba

1    of the last few years better than my client, the former

2    president of the United States.  This is the president reacting

3    to the trial held last year.

4              (Video played)

5         MS. HABBA:  I want to thank plaintiff's counsel for

6    playing that for me.  They're right, that's how he feels.  Can

7    you imagine a world where someone can accuse you of a terrible

8    accusation and then you defend yourself, respond to reporters

9    on the South Lawn as the sitting president and you can't speak?

10        MS. KAPLAN:  Objection, your Honor.

11        THE COURT:  Overruled.  I said overruled.

12        MS. HABBA:  Thank you, your Honor.

13             In fact, I'm surprised she objected because she just

14   said in her closing that Ms. Carroll defended herself by going

15   on TV, by speaking about my client.  She said that just now;

16   Ms. Carroll had a right to defend herself but what's good for

17   thee is not good for me, I guess.  What's good for me is not

18   good for thee.  They want it both ways.  The president has been

19   consistent.  She's right.  He has said the same thing over and

20   over again, and do you know why he has not wavered?  Because

21   it's the truth.

22        MS. KAPLAN:  Objection, your Honor.

23        THE COURT:  Sustained.  The jury will disregard that

24   assertion.  It has been conclusively determined.  As far as you

25   are concerned, I will instruct you further.

1          MS. HABBA:  He's right, a jury made a decision.  A

2     jury.  But you know who hasn't been inconsistent, who's not

3     consistent at all?  Ms. Carroll.  So her so-called expert whose

4     report has more holes than Swiss cheese, and Ms. Carroll's

5     attorneys whose publicists are peddling her story, we heard

6     that in this court.  It wasn't a pretty fact.  Whose bank

7     rollers are paying my witness's attorneys in a form of

8     desperation that I have never seen.

9          MS. KAPLAN:  Objection.

10          THE COURT:  That's sustained, and the jury will

11     disregard it.  And if you violate by my instructions again,

12     Ms. Habba, you may have consequences.

13          MS. HABBA:  I'm -- I'm --

14          THE COURT:  Don't tell me.  Just continue with your

15     argument.

16          MS. HABBA:  As I predicted -- I'm trying to.

17          THE COURT:  In accordance with the rules.

18          MS. HABBA:  As I predicted on day one, Ms. Carroll has

19     failed to show that she is entitled to any damages at all.  If

20     you will recall, throughout this trial Ms. Carroll and her team

21     kept talking about a White House denial that was contained in

22     *The Cut* article.  A White House denial in an article that

23     Ms. Carroll read, helped write, approved for dissemination and

24     had financial gain and then helped spread all over social media

25     with media appearances.  A statement issued by the White House,

O1QQcar2                    Summation - Ms. Habba

1              MS. HABBA:  Yes.

2              THE COURT:  That was inappropriate, and the jury will

3    disregard that.

4              MS. HABBA:  Not only that, but the messages she's

5    shown you all date from 2023.  2023.  Four years later.  She

6    has a whole legal team here, ladies and gentlemen.  2023.  Six

7    threats.  That's what they brought you.  Oh, and let's not

8    forget the reason she can't show you any from 2019, 2020, 2021,

9    or 2022.  The reason she can't show you these messages is

10   because she deleted them, or, alternatively, perhaps they never

11   existed in the first place.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Ladies and gentlemen, you heard him testify.  You

2    heard him say he did not intend to hurt her.  Pure and simple.

3    We do not know the true identities of the people that sent the

4    messages to Ms. Carroll.  We know nothing of their motivations,

5    their intentions.  All we know is that the people who made

6    these death threats are sick individuals whose messages should

7    be universally condemned.  I agree with that and I think all of

8    us do.  But, President Trump should not have to pay for their

9    threats.  He does not condone them.  He did not direct them.

10   All he did was tell his truth.

11          MS. KAPLAN:  Objection, your Honor.

12          THE COURT:  I will deal with it in my charge.

13          MS. HABBA:  At the end of the day, the evidence shows

14   that Ms. Carroll did not actually suffer any emotional harm.

15   Sure, she tugged on your heartstrings at some points by showing

16   that negative tweets were sent her way.  And, it is awful.  And

17   she told you that her feelings were hurt by some of those

18   people's comments.  I don't blame her for one bit.  My feelings

19   would be hurt, too.  But that's what happens when you are a

20   public figure.

21          Ms. Carroll knew that this backlash would come and she

22   was doing just fine in the days following the president's

23   statements.  In fact, she was happier than ever.  Don't take my

24   word for it, just ask E. Jean.  She said that she was fabulous,

25   buoyant, only a week after President Trump made his statements.

1    remember.

2              MS. HABBA:  She also, as we showed, never had any

3    problems tweeting away about sex, penises, and a myriad of

4    other topics you wouldn't want to talk about in front of your

5    parents or children.  In fact, topics most persons would find

6    disgusting if spoken about publicly.  But Ms. Carroll would

7    have you believe that her reputation was pure, angelic, and

8    perfect.

9              MS. KAPLAN:  Objection, your Honor.

10             THE COURT:  Overruled.

11             MS. HABBA:  And if there is no reason that anyone

12   would criticize her, no reason at all.  "What Do We Need Men

13   For?" was the title of her book.

14             To highlight a couple of examples, Ms. Carroll tweeted

15   on November 25, 2015, the following:  *How do you know your*

16   *unwanted sexual advance is unwanted, until you advance it?*  Top

17   left, ladies and gentlemen.  Read that.  *How do you know your*

18   *unwanted sexual advance is unwanted, until you advance it?*  The

19   victim, this is her tweet.  November 25, 2015.  By the way, it

20   is still on her Twitter account, I asked her that.

21             MS. KAPLAN:  Objection, your Honor.

22             THE COURT:  What is the objection?

23             MS. KAPLAN:  Use of the word "victim" implying that

24   the underlying assault didn't happen.

25             THE COURT:  Yes; sustained.

1          MS. HABBA:  Another tweet posted on March 6, 2023,

2     bottom right:  *What can be done about the penis?  It gets large*

3     *when you want it small, and it stays small when you want it*

4     *large.*  I am honestly mortified, ladies and gentlemen of the

5     jury, that I have to repeat this in front of you.  I apologize.

6          And:  *Any ideas on how to dominate a man?*

7          Dominate a man.  Advance an unwanted sexual advance.

8     Her tweets, sitting on her Twitter page as we sit here today.

9     She didn't take them down.  These are just four tweets.  *A chap*

10    *is not a mind reader.  Show him what you like or he will soon*

11    *regret he even has a penis.*  Oh my gosh, did she threaten

12    someone?  He will soon regret he even has a penis.  Folks, that

13    was in 2013, that was before she decided to do all this.

14          MS. KAPLAN:  Objection, your Honor.

15          THE COURT:  I'm sorry?

16          MS. KAPLAN:  Same objection, your Honor.

17          THE COURT:  Sustained.

18          MS. HABBA:  These are four tweets.  Ms. Carroll put

19    these into the world years before June of 2019.  She still has

20    them, they're still up.  So the fact that she is now somehow

21    taken aback or offended that tweets from random people made her

22    look scandalous is simply disingenuous.  Ms. Carroll's claim

23    rests on the idea that more people hate her than they love her

24    but has she proven that?

25          MS. KAPLAN:  Objection, your Honor.

1    THE COURT:  I'm going to overrule it but I will

2    instruct the jury on that point.

3    MS. HABBA:  Numbers don't lie.  Take a look at this.

4    These are the tweets and the views all sent to Ms. Carroll just

5    a month ago.  I'm going to start from the top left.  26 views.

6    6 views.  5 views.  15 views.  9 views.  12 views.  Ladies and

7    gentlemen, this is what her legal team picked to show you her

8    damage.  I didn't pick them.

9    As you can see, the total number of views of all these

10   tweets that they feel best represents their case displayed in

11   this slide were sent to Ms. Carroll, is a total of 143 views.

12   They didn't draw your attention to the views.  That is the

13   grand sum of the views they submitted into evidence.  That's

14   not evidence of reputational harm for a woman who has posts

15   with a slide of 3.9 million views when she talked about my

16   client.  "We Won"  3.9 million views.  She's enjoying this.

17   Let's not forget the fact that Ms. Carroll is making

18   more money today than she did in June of 2019 before she

19   brought this up.  In fact, when she decided to go public with

20   her allegations decades after the alleged event, which she has

21   not pinpointed to the year, she hit financial and social rock

22   bottom.  *Elle* magazine chopped her income in half to sixty

23   grand.  There were no more dinners at Elaine's.

24   MS. KAPLAN:  Objection, your Honor.

25   MS. HABBA:  There was no more fancy nights on the town

O1Q5car3                     Summation - Ms. Habba

1    and no more fame; just a cottage in the woods in New York, just

2    like Montana, which she couldn't wait to leave.

3          So, in 2019 she found her way out.  She wrote a book

4    which Ms. Kaplan just reminded me she had been writing for

5    years, and years, and years, but until 2019 decided to put

6    Trump when he was sitting in the Oval Office.

7          MS. KAPLAN:  Objection, your Honor.  I said nothing of

8    the sort.

9          THE COURT:  The jury will remember the evidence.

10         MS. HABBA:  Thank you.

11         So, in 2019 she writes the book.  She decides to add

12   President Trump.  She sat in her cabin, far from the glamour of

13   New York that she was desperate to crawl out and back to so she

14   made her way.  All of a sudden, the release of *The Cut* article,

15   she is making a lot more money now and does not include any

16   income she received from royalties from her books.  You heard

17   her.  She got publicists paid for by lawyers, publishers,

18   parties, dinners, lunches with journalists again, and let's not

19   forget the many primetime shows all discussing my client.  She

20   alleges she doesn't like to mention his name but yet she has

21   been going on TV for years, and years, and years talking about

22   one man, and one man alone, and making money, making money off

23   of him, selling her book off of him, and that is my client.

24         Now, not only is she making more money than she was

25   before these allegations, she is back to the lavish lifestyle,

1    she is living the life of the rich and famous, hanging out with

2    celebrities, Kathy Griffin.  Getting tweets of acclaim from

3    Alyssa Milano, Jamie Lynn [sic] Curtis, Ron [sic] Reiner.  All

4    her circle.  Her new circle like Elaine's all over again.  And

5    why?  Because she made an allegation in the most public forum

6    by design, an allegation that my client has continuously and

7    consistently stated his position.  It is an American right.

8            MS. KAPLAN:  Objection, your Honor.

9            THE COURT:  Sustained.

10           Members of the jury, I instructed you previously and I

11   will instruct you again, it is conclusively determined who is

12   telling the truth about the event, that is to say, whether

13   Mr. Trump sexually attacked or assaulted Ms. Carroll or not.

14   It's established.  You must accept that.

15           MS. HABBA:  It is established by a jury.  You're

16   right, your Honor.

17           THE COURT:  It is established and you will not quarrel

18   with me.

19           MS. HABBA:  I'm not.

20           THE COURT:  You will finish your summing up.

21           MS. HABBA:  I am finishing it, your Honor.

22           Listen to her good friend of 30 years Carol Martin.

23   She came up and told you she believed Ms. Carroll is a

24   narcissist.  She admitted that she had met with Ms. Carroll's

25   legal team and her lawyers, not me.  My witness.  She had met

O1Q5car3                         Summation – Ms. Habba

1   very serious job to do.  You work long days and long nights and

2   all of a sudden you are hit with an allegation.  There are no

3   facts --

4               MS. KAPLAN:  Objection, your Honor.

5               MS. HABBA:  -- that you understand --

6               THE COURT:  Sustained.

7               MS. HABBA:  OK.

8               THE COURT:  Move along.

9               MS. HABBA:  I -- she doesn't even know why I said

10  there are no facts so I would like to finish my thought.

11              There are no facts --

12              MS. KAPLAN:  Objection, your Honor.

13              MS. HABBA:  -- in the record --

14              THE COURT:  Move on to a subject different than you

15  are embarking upon.

16              MS. HABBA:  OK.

17              Ladies and gentlemen, in our country you have the

18  right to speak.  You have a constitutional right to speak.

19              MS. KAPLAN:  Objection, your Honor.

20              THE COURT:  Sustained.

21              You have a constitutional right to some kinds of

22  speech and not others.

23              MS. HABBA:  The facts, ladies and gentlemen, the proof

24  they gave you, despite all of the noise, all of the noise and

25  there has been a lot of noise, facts speak volumes here.

O1Q5car3                       Summation - Ms. Habba

1   Ms. Carroll loves her new reputation and her life.  My client

2   is not enjoying this.  You have heard the objections.  You have

3   heard me be told to sit down --

4               MS. KAPLAN:  Objection, your Honor.

5               MS. HABBA:  -- but I'm here as a lawyer defending my

6   client.  He has a right to defend himself.

7               MS. KAPLAN:  Objection, your Honor.

8               THE COURT:  Move on, counsel.

9               MS. HABBA:  I have got one more sentence, your Honor.

10              Ladies and gentlemen, this isn't about President Trump

11   and E. Jean Carroll.  This is about some people in their

12   mother's basements who will always be mean on social media.  We

13   can't stop that.  And you are not going to stop it by further

14   harming my client.  Ms. Kaplan said she has not been made

15   whole.  That is a complete misrepresentation.  We had a trial,

16   the judge continuously reminds me.  We had a trial --

17              MS. KAPLAN:  Objection, your Honor.

18              MS. HABBA:  -- that trial is done.  She was made

19   whole.

20              MS. KAPLAN:  Objection, your Honor.

21              THE COURT:  Sustained.

22              MS. HABBA:  I want to thank you for your time.  And

23   I'm sorry that you had to spend so much time on this, yet

24   again.

25              MS. KAPLAN:  Objection, your Honor.

O1Q5car3                      Rebuttal – Ms. Crowley

1          MS. HABBA:  Thank you.

2          THE COURT:  Thank you, Ms. Habba.

3          Are you ready?

4          MS. CROWLEY:  Yes, your Honor.  Thank you.

5          THE COURT:  We will hear rebuttal argument.

6   Ms. Crowley, you may proceed.

7          MS. CROWLEY:  Thank you.

8          So I have been sitting here listening to Ms. Habba's

9   argument and I think we need to reset a little bit, to rewind

10  this discussion.  I am going to try to get things back on

11  track, and when I do that I'm going to follow the rules of this

12  courtroom, a thing that Mr. Trump and his lawyer doesn't seem

13  to be able to do.

14         MR. MADAIO:  Objection.

15         MS. HABBA:  Objection.

16         THE COURT:  Sustained.

17         MS. CROWLEY:  Ms. Habba just stood up here and

18  repeatedly misstated the evidence and manipulated the facts.  I

19  have just a couple examples of that, I honestly wasn't able to

20  write them all down.

21         First, at some point I think she said that

22  Ms. Carroll -- she put up a slide talking about Ms. Carroll's

23  salary back in 2019 before her book was released.  That slide

24  was totally misleading and wrong.

25         MR. MADAIO:  Objection.

O1Q5car3                     Rebuttal – Ms. Crowley

1    in this case.

2              MR. MADAIO:  Objection.

3              THE COURT:  Sustained.  Excuse me, I misspoke.

4    Overruled, obviously.

5              MS. CROWLEY:  The defense didn't call an expert so the

6    estimate that Professor Humphreys gave you, that $7 million to

7    $12 million range, that's the only estimate of reputational

8    damages that you heard in this trial.

9              MR. MADAIO:  Objection.

10             THE COURT:  Sustained.  There was other evidence of

11   reputational damage.

12             MS. CROWLEY:  That was the only expert testimony.

13             THE COURT:  It is up to the jury to decide whether you

14   believe it and credit it and to what extent.

15             Go ahead.

16             MS. CROWLEY:  Professor Humphreys was the only expert

17   that you heard testify so you should consider that when you

18   think about the defense's complaints about her.  And what are

19   those complaints?  I am going to tick through them.

20             Ms. Habba mentioned that Professor Humphreys has never

21   run a reputation repair campaign herself.  She's just taught

22   them so she must not actually know how they work.  Seriously?

23   That's like saying a journalism professor, who teaches students

24   how to get their stories published, doesn't know how to write.

25   Professor Humphreys' job is to teach graduate students how to

1          And at this moment I'm going to pause a minute.  Andy

2     is going to give counsel a typewritten copy of my instructions.

3     Ladies and gentlemen, I should have said this at the beginning:

4     You will have them in writing in the jury room.  You are

5     welcome to take notes or not to take notes.  Everything I say

6     you will get in writing.

7          The second thing you must decide is whether Mr. Trump

8     should be required to pay Ms. Carroll punitive damages as well

9     as compensatory a damages, and, if so, how much he should be

10    required to pay.  Punitive damages are intended to punish a

11    defendant and to deter future defamatory statements.

12         I'm now going to discuss these remaining damages

13    issues in turn, with reference to the verdict form that you're

14    going to be using to decide the case.

15         A person who has been defamed is entitled to fair and

16    just compensation for the injury to her reputation and for any

17    humiliation and mental anguish in her public and private lives

18    that was caused by the defamatory statement in question.

19    Question 1 on the verdict form deals with such damages for

20    Mr. Trump's June 21 and 22, 2019 statements, which are in

21    evidence as Plaintiff's Exhibit 1 and 2, respectively.

22         For this question, you will award an amount that, in

23    the exercise of your good judgment and common sense, you decide

24    is fair and just compensation for the injury to Ms. Carroll's

25    reputation and the humiliation and mental anguish in her public

O1QQcar4                    Rebuttal - Ms. Crowley

and private lives which you decide was caused by Mr. Trump's
two statements to which I've already referred.  In fixing that
amount, you should consider Ms. Carroll's standing in the
community, the nature of Mr. Trump's statements made about
her — the two statements in question — the extent to which
those statements were circulated, the tendency of those
statements to injure a person such as Ms. Carroll and all of
the other facts and circumstances of the case.  Compensatory
damages can't be proved with mathematical accuracy.  Fair
compensation may vary.  It may range from one dollar, if you
decide that there was no injury at all, to a substantial sum if
you decide that the injury was substantial.

It is Ms. Carroll's burden to prove the nature and
extent of her damages and to prove that the damages were caused
by Mr. Trump's actions.  You may award compensatory damages
only for those injuries that you find that Ms. Carroll has
proven by a preponderance of the evidence.  We'll talk about
what that means later.  Compensatory damages cannot be based on
speculation or sympathy.  They must be based on the evidence
presented at trial and only on that evidence.

Further, you may not award compensatory damages more
than once for the same injury.  For example, where a plaintiff
prevails on two claims and establishes that he or she is
entitled to $100 in compensatory damages for one injury, the
plaintiff is not entitled to $100 in compensatory damages also

O1QQcar4                    Rebuttal - Ms. Crowley

2019 statements -- meaning that she was injured by those

statements in any of the respects that I've just described to

an extent warranting damages of more than a dollar.  That is

the "yes" or "no" question.  If the answer is "yes," you then

will fill in the amount you award for all defamation

compensatory damages attributable to the June 21 and 22

statements, excluding the reputation repair program that was

discussed during Professor Humphreys' testimony.  And then you

will fill in the amount of damages, if any, that you award for

the reputation repair program for the June 21 and 22, 2019

statements in the second part of the first question.

          On the other hand, if your answer to the first part of

question 1 is no; in other words, if you determine that

Ms. Carroll has not proved by a preponderance of the evidence

that she suffered more than nominal damages as a result of

Mr. Trump's June 21 and June 22 statements, then you will write

down $1 on the second line of question 1, and you will leave

the third line blank.

          Regardless of your answer to question 1, you will go

on to question 2.

          In addition to seeking compensatory damages, which I

just covered in discussing question 1, Ms. Carroll asks also

that you award punitive damages.  Punitive damages may be

awarded for defamation to punish a defendant who's acted

maliciously and to deter him and others from doing the same.

O1QQcar4                    Rebuttal - Ms. Crowley

A statement is made maliciously for purposes of questions 2 and 3 if it is made with a deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights.

Question 2 pertains to Mr. Trump's malice, if any, with respect to the June 21, 2019 statement.  Question 3 pertains to Mr. Trump's malice, if any, with respect to the June 22, 2019 statement.  If you answer "yes" to either question 2 or question 3, or both — that is, if you find that Ms. Carroll has proved by a preponderance of the evidence that Mr. Trump acted maliciously as I have just defined that term for you, in making the June 21 or the June 227 statement about Ms. Carroll — you will write down an amount, if any, that you find Mr. Trump should pay to Ms. Carroll in punitive damages.  If you answer "no" to both question 2 and question 3 — that is, if you find that Ms. Carroll has not proved by a preponderance of the evidence that of Mr. Trump's June 21 or June 22, 2019 statements was made maliciously — you may not award punitive damages.

Let me just pause for a moment.

All right.  I will go on.

In arriving at your decision as to the amount of punitive damages to award, should you decide to award any, you should consider the following factors:

First, your view of the nature and reprehensibility of

O1QQcar4                    Rebuttal - Ms. Crowley

1    those materials and her testimony affect the question of

2    damages before you.

3           You may have heard argument or evidence suggesting

4    that Ms. Carroll — by revealing in June 2019 that Mr. Trump

5    sexually assaulted her or claiming that he did so — assumed the

6    risk that he would respond with defamatory statements,

7    consented to such statements, or authorized Mr. Trump to make

8    such statements as a form of self-defense.  I instruct you as a

9    matter of law that Ms. Carroll did not consent to Mr. Trump's

10   defamatory statements, or otherwise grant him lawful permission

11   to defame her, by publicly stating in June 2019 that he had

12   sexually assaulted her.

13          As I have instructed you, it already has been

14   established that Mr. Trump's statements were false and

15   defamatory, and the only questions for you concern what harm,

16   if any, Mr. Trump's statements caused Ms. Carroll, and if they

17   did cause her harm, what damages Mr. Trump must pay.

18          Now, I've covered instructions for certain specific

19   evidence, and I'm now going to give you instructions with

20   respect to evidence more generally.  There are two types of

21   evidence that you properly may use in coming to your verdict.

22          One type of evidence is direct evidence.  Direct

23   evidence is when a witness testifies about something that the

24   witness knows by virtue of having perceived it with his or her

25   own senses; in other words, something the witness, saw, felt,