UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E. JEAN CARROLL,

        *Plaintiff*,

  v.

DONALD J. TRUMP,

        *Defendant*.

No. 20 Civ. 7311 (LAK)

# PLAINTIFF E. JEAN CARROLL'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DONALD J. TRUMP'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
KAPLAN HECKER & FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carrol*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ........................................................................................................................ 1

STANDARD OF REVIEW ........................................................................................................ 6

ARGUMENT .............................................................................................................................. 7

    I.   TRUMP LEGAL ARGUMENT IS MERITLESS............................................................ 8

    II.  TRUMP'S FACT ARGUMENT IS MERITLESS ......................................................... 11

CONCLUSION......................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**                                                                                                          Page(s)

*Brady v. Wal–Mart Stores, Inc.*,
   531 F.3d 127 (2d Cir. 2008) ................................................................................................. 6

*Carroll v. Trump*,
   2023 No. 22 Civ. 10016 (S.D.N.Y. Mar. 30, 2023) ............................................................... 8

*Cash v. Cty. of Erie*,
   654 F.3d 324 (2d Cir. 2011) ....................................................................................... 7, 10, 11

*Celle v. Filipino Rep. Enterprises Inc.*,
   209 F.3d 163 (2d Cir. 2000) ................................................................................................. 9

*Cnty. Vanlines Inc. v. Experian Info. Sols., Inc.*,
   205 F.R.D. 148 (S.D.N.Y. 2002) .......................................................................................... 9

*Dongguk Univ. v. Yale Univ.*,
   734 F.3d 113 (2d Cir. 2013) ............................................................................................... 10

*Goldhirsh Grp., Inc. v. Alpert*,
   107 F.3d 105 (2d Cir. 1997) ................................................................................................. 6

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
   191 F.3d 229, 235-36 (2d Cir. 1999) ................................................................................. 10

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   923 F. Supp. 2d 511 (S.D.N.Y. 2013) .................................................................................. 7

*Mattivi v. S. African Marine Corp.*,
   618 F.2d 163 (2d Cir. 1980) ................................................................................................. 7

*Mehra v. Bentz*,
   529 F.2d 1137 (2d Cir. 1975) ............................................................................................. 10

*Meyers v. Epstein*,
   282 F. Supp. 2d 151 (S.D.N.Y. 2003) ................................................................................ 10

*Miller v. N.Y.C.*,
   No. 17 Civ. 8593, 2023 WL 111783 (S.D.N.Y. Jan. 5, 2023) ............................................ 11

*Potts v. Potts*,
   No. 3:19 Civ. 01403, 2021 WL 4440666 (N.D.N.Y. Sept. 27, 2021) ................................ 11

*Reeves v. Sanderson Plumbing*,
   530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ...................................................... 7

*Ruback v. McCleary, Wallin & Crouse*,
    220 N.Y. 188 (1917) .................................................................................................... 10

*Sorlucco v. New York City Police Dept.*,
    971 F.2d 864 (2d Cir. 1992) ......................................................................................... 6

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555, 566 51 S. Ct. 248, 75 L. Ed. 544 (1931) ............................................. 11

*SUEZ Water New York Inc*,
    2023 WL 2601161 (2023) ............................................................................................ 9

*SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*,
    No. 20 Civ. 10731 ........................................................................................................ 9

*United States v. Spruill*,
    808 F.3d 585 (2d Cir. 2015) ......................................................................................... 8

*Wonzer v. Hernandez*,
    No. 20 Civ. 10836, 2023 WL 4841899 (S.D.N.Y. July 28, 2023) .............................. 9

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ......................................................................................... 7

## RULES & STATUTES

14 N.Y. Prac., New York Law of Torts § 8:6 .................................................................... 8

14 N.Y. Prac., New York Law of Torts § 8:10 .................................................................. 8

44 N.Y. Jur. 2d Defamation and Privacy § 229 ................................................................. 9

Federal Rules of Civil Procedure Rule 50 ........................................................... 1, 7, 10, 11

Restatement (Second) of Torts § 435B (1965) ................................................................ 10

Restatement (Second) of Torts § 622A (1977) .................................................................. 9

## OTHER AUTHORITIES

N.Y. Pattern Jury Instr. Civil ................................................................................... 8, 9, 10

## PRELIMINARY STATEMENT

After Plaintiff E. Jean Carroll rested her case at trial, Defendant Donald J. Trump moved for judgment as a matter of law under Rule 50(a) and argued that Carroll had failed to meet her burden to show that Trump's conduct was the cause of her injuries. Tr. at 534–35. The court heard from both parties and denied Trump's motion from the bench. Tr. at 544. Trump now makes the exact same argument under Rule 50(b), relying on the exact same evidence. But since he first aired this contention, it has grown weaker, not stronger: the jury, which was instructed on causation with Trump's own proposed language, heard extensive argument from Trump on this point in closing, and nevertheless rejected his position in awarding substantial defamation damages to Carroll. For the same reasons that the Court originally rejected Trump's position—and now with the further proviso that Trump's position has been soundly rejected by the jury—Trump's motion should be denied.

## BACKGROUND

Carroll presented overwhelming evidence at trial conclusively proving that Trump's statements caused her injuries. First, the jury heard extensive testimony from Carroll herself. She explained how, on June 21, 2019, she published an excerpt of her book in *New York* magazine recounting how Donald Trump sexually assaulted her. Tr. at 95. She explained that, a few hours later, Trump used the largest microphone in the world to brand her a liar and a fraud: he proclaimed that she made up the assault to sell a book and to garner publicity for herself; he said her allegation diminished the severity of "real" assault; he accused her of being a democratic operative; and he threatened that she should "pay dearly" for speaking out. *Id.* at 97–98 (PX-1); *see id.* at 98 ("But the thing that really got me about this is, from the White House, he asked if anyone had any information about me, and that if they did, to please come forward as soon as possible because he wanted the world to know what's really going on and that people like me should pay dearly.").

1

The next day, June 22, he did it all again: speaking from the White House lawn to a group of reporters, Trump again called Carroll a liar, a fraud, and a political operative; he said that Carroll was paid to come forward and make up a story about him, and he warned that Carroll was "playing with very dangerous territory." *Id.* (PX-2).

Almost immediately after Trump made his first statement on June 21, Carroll's email inbox and social media accounts were bombarded with hateful, insulting, and violent rhetoric parroting the former President's words. *Id.* at 104–05. As she testified: "to have the president of the United States, one of the most powerful persons on earth, calling me a liar . . . it ended the world that I had been living in." *Id.* at 104. "I was attacked on Twitter. I was attacked on Facebook I was attacked in news blogs. I was brutally attacked in messages. As I said, it was a new world." *Id.* at 105.

Carroll's recollection of receiving these messages was specific. She testified that she logged onto Twitter late at night on June 21, 2019—the day that Trump made his first defamatory statement—and saw posts saying, "[y]ou lying whore. You lying scag. You lying slut. You lying psycho. You lying scumbag." *Id.* at 127. Thinking that she would find solace in the email where she received requests for advice from her readers, Carroll opened her inbox, only to find more horribly violent threats and images. *Id.* Her reaction was so physical, so visceral, she told the jury, she deleted the threatening messages immediately: "[w]hen I see messages like that, it's—my brain reacts, and my body reacts. Like it's going to happen right now. And so the heart races. My pulse was up. My senses heighten. And in order to get rid of that horrible feeling of the heart racing and … I became hyperaware. I just delete, delete, delete. It really helped me, you know, get control of the situation." *Id.* at 128–29; *see also id.* at 135 ("I couldn't help but feel it was imminent. The heart would [] constrict and start to pound, and it's funny, the body believes it's going to happen").

2

Carroll recounted that, after Trump made his defamatory statements about her, she continued to receive "[s]cores and scores" of messages, "sometimes hundreds a day." *Id.* at 110. And the jury heard that these messages echoed the language that Trump used in his statements, *id.* at 105 ("much of the wording that people used repeated Donald Trump's words." *Id.* at 105, 107) and carried themes that tracked close to Trump himself, such as, "[y]ou're a liar. You hurt victims. You are ugly," *id.* at 110.[1] But the jury did not have to take Carroll's word for it; they saw many of those messages for themselves. Carroll offered and the Court received message after message in which Trump's followers called Carroll a liar, *id.* at 106–07, 113, 121, 124 (PX-40, PX-59, PX-66, PX-85, PX-118), accused her of making up her story to promote a book, *id.* at 106 (PX-59), said she was making it hard on the "real" victims of abuse, *id.* at 109, 121 (PX-71, PX-85), labeled her a political operative, *id.* at 114–15 (PX-45), and threatened that she would "pay dearly," perhaps even with her own life, *id.* at 129, 130, 132, 134 (PX-114, PX-122, PX-124, PX-128, PX-130, PX-132).[2]

This was not the only evidence that Trump's statements caused Carroll's injury. The jury also heard ample testimony about the damage Trump caused her career. Carroll's former boss and Editor in Chief at *Elle*, Robbie Myers, testified at length about Carroll's impressive, hard-won career as a journalist, which had reached new heights by the time Ms. Myers left *Elle* in 2017 and was continuing to rise. *See, e.g.*, *id.* at 71, 180, 517–18. Carroll explained that, after Trump

---

[1] On June 24, 2019, *The Hill* released an interview in which Trump made the following statement in response to Carroll's allegations: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" In other words, and as Carroll's counsel argued to the jury, Trump claimed Carroll was too ugly to sexually assault, a theme that was repeated over and over again by his followers. In order to avoid unnecessary motion practice, Carroll did not pursue defamation liability in connection with Trump's June 24 statement.

[2] The jury also heard that these messages have "never stopped," *id.* at 110, in large part because Donald Trump has never stopped—he continued to call her a liar and an operative, even leading up to and during the trial, ensuring that his followers would continue their attacks. *Id*. at 173–78, 187–88, 347, 525 (PX-3, PX-4, PX-149-T, PX-152, PX-160, PX-164-T, PX-165, PX-166).

defamed her, her career took a serious hit because people no longer sought her advice: "[p]eople are not dying to write to an advice columnist who the president says is a disgrace. People write to advice columnists because they want to get tips and get their problems solved so they can live delightfully and not [] disgracefully." *Id.* at 71. Millions of people used to read Carroll's column. *Id.* at 467. Now, her Substack (where she publishes her column) has only 28,000 subscribers, only 1,800 of whom pay for their subscriptions. *Id.* at 181. But being an advice columnist was not just Carroll's livelihood, it was also her life's purpose. She explained when looking at one hateful message she received: "I remember this email because it hurt my feelings because [the sender] said she wasn't going to ask me for any advice…. My whole career, my whole reason for being a happy person is I feel like I'm giving good advice and helping people." *Id.* at 115.

The jury heard further evidence of causation from Professor Ashlee Humphreys, Carroll's reputational harm expert. Professor Humphreys testified about how far Trump's statements spread, how many people likely believed them, and how much it would cost to repair the damage to Carroll's reputation. Professor Humphreys estimated that Trump's June 2019 statements were seen between 85 and 104 million times, and between 21 and 25 million of the people who saw them likely believed what Trump said. *Id.* at 384–85, 393, 400. She also testified that she did a full "qualitative analysis" to understand "how [] the statements affect[ed] Ms. Carroll's reputation in the public sphere by reading the responses to them and understanding [them] more broadly." *Id.* at 386. She explained what she discovered: "[B]efore June 2019, [Carroll] was known as a journalist, as a women's advice columnist.… After June 2019, the associations with her name were largely about her being a liar, … having a political agenda and working with the Democratic party." *Id.* at 387. She testified as to how "[s]ome of the content in Mr. Trump's statements," including how he "called her a liar, said she wasn't telling the truth, and that she had a particular agenda for

4

not telling the truth" was repeated in the comments and responses that she reviewed. *Id.* at 387–89.

In response to all this evidence, Trump pointed to a handful of messages that Ms. Carroll received during the brief window of time between when her article came out and when Trump made his first statement. *Id.* at 736–37, 754. This, Trump's counsel told the jury, was their "whole case," *id.* at 737; namely, that because some people sent Carroll messages before Trump made his first defamatory statement about her, Trump's statements had no causal link to any of the injuries Carroll suffered. But as Carroll's counsel argued to the jury in closing, this theory made no sense:

> Trump's next defense is that his statements didn't really matter; that they had no real effect in this world, and that they didn't cause any damage to Ms. Carroll. As Ms. Habba put it in her opening statements in this case, Trump's statements attacking Ms. Carroll, and I quote, "Did nothing to add to the wave of criticism."
>
> In support of this argument Ms. Habba — and you've heard it many times now — points to a handful of statements or a statement that appeared online and what they characterize as the gap between the publication of Ms. Carroll's account in *The Cut* and the publication of Donald Trump's first defamatory statement in that tweet from Laura Litvan. To hear Ms. Habba tell it, the fact that some people immediately criticize Ms. Carroll online during the so-called gap is somehow proof that Donald Trump's attacks had no impact or that their impact was minimal. Seriously? Give me a break. After all, the White House, which was run by Donald Trump, had already denied Ms. Carroll's claims in *The Cut* article itself …
>
> And when Donald Trump did speak later in the afternoon on June 21, the attacks on E. Jean Carroll followed almost immediately, which isn't surprising. His defamatory statements on June 21 and June 22, both issued within 24 hours of each other, included hateful, vicious claims about her. They also included threats that she should pay dearly …
>
> I've talked already about the ways that the mob mimicked the language that Trump used. Years later, they also made clear they continued to understand what he wanted them to do. As someone wrote to Ms. Carroll last summer: "Suing Trump was your first mistake. Now Trump is going to get back at you."

5

> Let me be clear. Presidents don't make two public statements within 24 hours because they think that nobody will believe them or act on them. And Donald Trump didn't make these defamatory statements because he thought they wouldn't have any impact on the world. He made them because he hoped and he knew that they would. And he was right. They caused Ms. Carroll great harm.

*Id.* at 725–26. Later, during rebuttal, Carroll's counsel returned to the point about causation:

> When the president speaks, the world listens. And as we have seen the statements, the hate mail, the threats that she has gotten, they parrot Donald Trump's words. Causation? There couldn't be clearer proof of causation. If Donald Trump hadn't lied, if he hadn't defamed her, Ms. Carroll's life, it would have gone on. Her career would have continued and she wouldn't be flooded with hate and threats and we wouldn't be here today.

Tr. 769–70. Ultimately, after hearing extensive evidence on the issue, as well as detailed arguments from the parties—and after being instructed on causation pursuant to Trump's own proposed language, *id.* at 788–89—the jury weighed the evidence and clearly found that Trump was wrong on the facts.

## STANDARD OF REVIEW

Judgment as a matter of law is reserved for "those rare occasions" where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture or the evidence must be so overwhelming that reasonable and fair minded persons could only have reached the opposite result." *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992) (cleaned up); *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 133 (2d Cir. 2008); *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 110 (2d Cir. 1997) (finding that the jury's verdict could only have been the result of sheer surmise and conjecture because "there was simply no affirmative evidence" to support a party's claim). The movant bears a "particularly heavy" burden where, as here, "the jury has deliberated in the case and actually

returned its verdict in favor of the non-movant." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (citation omitted); *see also Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 515 (S.D.N.Y. 2013) ("A jury verdict should not be set aside lightly.").

In the context of Rule 50, "sufficiency" is a question of quantity, not weight. *See Mattivi v. S. African Marine Corp.*, 618 F.2d 163, 167 (2d Cir. 1980) (the guiding principle that trial courts apply when deciding whether to grant a Rule 50 motion is "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached."). The district court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (citing *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) (cleaned up).

## ARGUMENT

Trump offers two arguments in support of his motion. The first misstates the law; the second mischaracterizes the facts. First, his argument that a plaintiff cannot recover where parties present competing theories of causation has no basis in the law; rather, the law is clear that Carroll was required to prove that Trump's statements were a substantial factor in causing her injury, and it was up to the jury to determine whether and to what extent they did. Mot. 3–5. Second, his assertion that the jury's findings on the issue of causation were based not on the evidence presented at trial—and instead rose from confusion, speculation, or prejudice—is belied by the facts. Mot. 7.

## I.   TRUMP LEGAL ARGUMENT IS MERITLESS

Trump argues that Carroll failed to show that "her injuries were not caused by third parties," and asserts (without support) that she "cannot recover if the evidence establishes one or more possible causes of injury for which [Trump] is not responsible." Mot. 3–4. Trump's argument is flawed for three reasons.

*First*, Trump has waived it. He did not propose a jury instruction with this specific theory of causation. *See* ECF 230 at 16–17. He did not ask for it at the charge conference. *See* Tr. 666–69. On the contrary, he asked for specific language "on causation" that went as follows: "It is plaintiff's burden to prove the nature and extent of her damages and to prove that damages were caused by defendant's actions. Your determination of damages must not be based on speculation." *Id.* at 666–68. Carroll did not object, *id.* at 668, and the Court gave this instruction, *id.* at 789. As a result, Trump has waived the argument that Carroll was required to satisfy a standard of causation for which he did not ask (and in fact, asked for a different standard of causation altogether that, as explained below, she easily satisfied, *see infra* at 11–12). *United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015).[3]

*Second*, Trump's newly minted theory is not the law. In New York, the general standard for determining causation for damages resulting from intentional tortious conduct is whether "the defendant's act 'was a substantial cause of the events which produced the injury.'" 14 N.Y. Prac., New York Law of Torts § 8:6; *see also* 14 N.Y. Prac., New York Law of Torts § 8:10 (explaining

---

[3] Trump's proposed instructions in this case match his proposed instructions in *Carroll II*, except he did ask for a proximate cause instruction related to battery. *See Carroll v. Trump*, No. 22 Civ. 10016 (S.D.N.Y. Mar. 30, 2023), ECF 102. That instruction included uncontroversial proposition that "[a]n act or omission is regarded as a cause of an injury, that is if it had such an effect in producing the injury that reasonable people would regard it as a cause of the injury. There may be more than one cause of an injury, but to be substantial, it cannot be slight or trivial." *Id.* at 20 (citing N.Y. Pattern Jury Instr. Civil 2:70, 2:71). This matches the general standard of proximate causation that applies to torts under New York law. *See infra* at 9–11. Even then, Trump did not assert his unsubstantiated and unsupported theory of causation that he presents now.

8

that difference between proving causation for negligent and intentional torts). As the New York Pattern Jury Instructions teach, and recent cases apply, "[t]here may be more than one cause of an injury" but "each of those . . . acts or omissions is regarded as a cause of that injury provided that it was a substantial factor in bringing about that injury." N.Y. Pattern Jury Instr. Civil 2:70; 2:71; *see, e.g.*, *Wonzer v. Hernandez*, No. 20 Civ. 10836, 2023 WL 4841899, at *6 (S.D.N.Y. July 28, 2023); *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, No. 20 Civ. 10731, 2023 WL 2601161, at *5-6 (S.D.N.Y. Mar. 22, 2023). "The act need not be the primary contributing factor to the injury, but it cannot be 'slight or trivial.'" *SUEZ Water New York Inc*, 2023 WL 2601161, at *6.

This standard applies to defamation. In the context of defamation *per se*, for instance, damages are "presume[d] to be the natural, proximate and necessary result of publication," 44 N.Y. Jur. 2d Defamation and Privacy § 229. At trial, a plaintiff must prove general damages, *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 179 (2d Cir. 2000), but she need not disprove "one or more possible causes of injury," as Trump suggests, Mot. 4. Indeed, Trump's theory of causation is wrong even in circumstances where a Plaintiff must prove special damages. *See* Restatement (Second) of Torts § 622A (1977) (stating that in the special damages context, "[i]t is not necessary, however, that the defamation be the sole cause of the special harm, so long as it has played a substantial part in bringing it about."); *see also Cnty. Vanlines Inc. v. Experian Info. Sols., Inc.*, 205 F.R.D. 148, 154-55 (S.D.N.Y. 2002) ("[A]though the derogatory statements were originally made by the two third-party sources . . . the courts have said many times that the last utterance may do no less harm than the first, and that the wrong of another cannot serve as an excuse to the defendant."). The burden of proving special damages is heightened as compared to the *per se* context, as illustrated in the differences between the Pattern Jury Instructions. *Compare* N.Y.

9

Pattern Jury Instr. Civil 3:29 (defamation *per se* context; may award damages in which you "decide *was caused* by defendant's statement" (emphasis added)) *with* N.Y. Pattern Jury Instr. Civil 3:29A (requiring a showing of "special harm"; may award damages in which you "find *was directly and actually caused* by defendant's statement" (emphasis added)).

*Third*, none of the cases Trump cites support his untenable argument that a plaintiff cannot recover if the defense presents a competing theory of causation.[4] For starters, only one arises in the context of a Rule 50 motion where the jury has reached a verdict and the challenger faces a "particularly heavy" burden. *Cash*, 654 F.3d at 324. Moreover, three of the cases Trump relies on involve negligence claims—one from more than a century ago. *See Ruback v. McCleary, Wallin & Crouse*, 220 N.Y. 188 (1917); *see also Dongguk Univ. v. Yale Univ.*, 734 F.3d 113 (2d Cir. 2013) (negligence case applying Connecticut law) (emphasis added); *Mehra v. Bentz*, 529 F.2d 1137 (2d Cir. 1975). But it is well-established that "the strictures of proximate cause are applied more loosely in intentional tort cases," and the "responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent." *Meyers v. Epstein*, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003); *see also* Restatement (Second) of Torts § 435B (1965).[5] Finally, all of the cases Trump relies on stand for the obvious proposition that plaintiffs cannot prevail if they've involved situations in which plaintiffs "failed to present *any* support" that their injuries were caused by the defendants. *Dongguk Univ.*, 734 F.3d at 131 (emphasis added); *see also Mehra*, 529 F.2d at 1140 ("no

---

[4] *Mehra v. Bentz*—the sole Rule 50 case that Trump cites—is readily distinguishable from this case on multiple grounds. 529 F.2d 1137, 1139–40 (2d Cir. 1975). There, the Second Circuit affirmed the grant of defendants' Rule 50(b) motion because there was "no testimony whatsoever" suggesting that the defendants were negligent, and "no inference supporting liability could be drawn from the proof." That is plainly not the situation here, where the record contains ample evidence that supports Trump's liability. *See supra* at 1–6.

[5] The remaining case Trump cites, *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235-36 (2d Cir. 1999), involved a RICO claim where the alleged injuries were "derivative of harm to a third party," *not*, as Trump suggests, where harm was attributable to a third party.

10

inference supporting liability could be drawn from the proof"); *Cash*, 654 F.3d at 333 (Rule 50 "imposes a heavy burden" on a movant, who must demonstrate "a complete absence of evidence supporting the verdict" such that the jury's verdict could only have been "the result of sheer surmise and conjecture.").

Here, by contrast, Carroll offered overwhelming evidence that Trump's defamation caused her injuries. *See supra* at 1–6. The fact that Trump presented a competing theory of causation did not, as Trump contends, render her recovery "legally impossible." *Potts v. Potts*, No. 3:19 Civ. 01403, 2021 WL 4440666, at *8 (N.D.N.Y. Sept. 27, 2021) ("not legally impossible for Plaintiff to recover some damages against Defendant for his role in maligning Plaintiff's character and potentially increasing the severity" of third party's actions). To the contrary—as the Supreme Court explained in a case Trump cites, Mot. 4, "[w]hether the unlawful acts of [the defendants] or conditions apart from them constituted the proximate cause of the [harm] was a question, upon the evidence in this record, for the jury.'" *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566, 51 S. Ct. 248, 75 L. Ed. 544 (1931).[6] After hearing all of the arguments Trump now advances and receiving his proposed instruction on causation, the jury determined that Trump's defamatory statements caused Carroll harm, and he has provided no basis for overturning the jury's verdict and has certainly not satisfied Rule 50(b)'s "high bar." *Miller v. N.Y.C.*, No. 17 Civ. 8593, 2023 WL 111783, at *2 (S.D.N.Y. Jan. 5, 2023).

## II.  TRUMP'S FACT ARGUMENT IS MERITLESS

Trump's remaining argument is easily disposed of. The only question here is whether—viewing all the evidence in the light most favorable to Carroll—there was a complete and utter

---

[6] Trump cites *Story Parchment Co.* 282 U.S. 555, 566, 51 S. Ct. 248, 75 L. Ed. 544, for the proposition that "any degree of speculation in computing the amount of damages unless and until causation of damages is first established"—but that quote appears nowhere in the case. Mot. at 4.

11

absence of evidence that Trump's statements caused harm to Carroll. Put differently, the question is whether a jury could rationally surmise that the two defamatory statements—which were issued by the President of the United States at the White House, which conservatively reached at least 85 million people, which falsely accused her of fabricating a sexual assault for despicable reasons, which threatened her and insulted her appearance, which produced a flood of ensuing social media attacks that parroted Trump's words and claims, which had a significant effect on her livelihood and reputation, and which represented a vicious revictimization of a woman who he had previously sexually assaulted—caused harm to Carroll. We need not re-summarize the ample evidence Carroll on each of these points. *See supra* at 1–6. The answer to that question is obviously yes.[7]

---

[7] Trump's focus on the evidence concerning the White House denial published in *The Cut* is a distraction. For starters, Trump's counsel elicited testimony from Carroll about the White House denial on cross examination and questioned Carroll about the alleged "gap" between the publication of *The Cut* article and Trump's first defamatory statement. Tr. 217 (Q. And the president's initial response to that article, it wasn't issued until about five hours later at 5:17 p.m., correct? A. No. The White House ran a denial when the piece was published. It's right in the piece. It's in the excerpt.). More fundamentally, though, Carroll's theory of causation was that Trump's subsequent statements caused her injury; Trump argued that any injury was caused only by Carroll's own revelation of the fact that he had sexually assaulted her; and the jury (after hearing this evidence and argument) rejected Trump's proposed factual inference.

## CONCLUSION

For the foregoing reasons, the Court should deny Trump's renewed motion for judgment as a matter of law.

Dated: New York, New York
March 26, 2023

Respectfully submitted,

/s/ Roberta A. Kaplan
Roberta A. Kaplan
Shawn G. Crowley
Trevor W. Morrison (admitted *pro hac vice*)
Matthew J. Craig
Kaplan Hecker & Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
scrowley@kaplanhecker.com
tmorrison@kaplanhecker.com
mcraig@kaplanhecker.com

Joshua Matz
Kaplan Hecker & Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
jmatz@kaplanhecker.com

*Counsel for Plaintiff E. Jean Carroll*

13