# EXHIBIT 1

O1GsCAR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   E. JEAN CARROLL,

 4                  Plaintiff,

 5            v.                         20 CV 7311 (LAK)
                                             TRIAL
 6   DONALD J. TRUMP, in his personal capacity,

 7                  Defendant.

 8   ------------------------------x
                                         New York, N.Y.
 9                                       January 16, 2024
                                         9:30 a.m.
10
     Before:
11
                       HON. LEWIS A. KAPLAN,
12
                                         District Judge
13                                       -and a Jury-

14                        APPEARANCES

15   KAPLAN HECKER & FINK LLP
          Attorneys for Plaintiff
16   BY:  ROBERTA ANN KAPLAN
          SHAWN G. CROWLEY
17        MATTHEW J. CRAIG

18   HABBA MADAIO & ASSOCIATES LLP
          Attorneys for Defendant
19   BY:  ALINA HABBA
          MICHAEL T. MADAIO
20        PETER SWIFT
          PETER GABRA
21

22

23

24

25
```

1  was your reputation in the world?

2  A.  Well, I'm 80 years old.  So I spent 50 years building a

3  reputation as a magazine journalist both in articles and as an

4  advice columnist.  My column was very popular.  People

5  appreciated my articles because I stuck to the truth and used

6  the facts.

7  Q.  And I think you just testified a minute ago, Ms. Carroll,

8  that as a result of Mr. Trump's defamation, your reputation was

9  shattered.

10         How was it shattered after June 2019?

11 A.  Well, yesterday -- I haven't looked today -- but yesterday,

12 I opened up Twitter and it said, Hey lady, you're a fraud.

13         So, previously, I was known as simply as a journalist

14 and had a column, and now I'm known as the liar, the fraud, and

15 the whack job.

16 Q.  Now, you testified that in addition to being a writer,

17 Ms. Carroll, you're also an advice columnist, is that correct?

18 A.  Yes.

19 Q.  And is reputation important to an advice columnist?

20 A.  Well, yes.  People are not dying to write to an advice

21 columnist who the president says is a disgrace.  People write

22 to advice columnists because they want to get tips and get

23 their problems solved so they can live delightfully and not,

24 like, disgracefully.

25 Q.  Now, Ms. Carroll, is this the first time you have sat in

O1HsCAR1                    Carroll - Direct

1   A.  June 21, 2019.

2   Q.  Now, do you remember what time of day it was published?

3   A.  Yes.  Um, the New York Times was going to publish an

4   article about the book that caused New York Magazine to print

5   it on a Friday.  We wanted to go on Monday, but they jumped the

6   gun because of The Times, and it was published in the

7   afternoon, in the afternoon on Friday, June 21st.

8            (Counsel confer)

9   Q.  Did the excerpt of your book that was published in the New

10  York Magazine, did that include portions of your book about the

11  assault by Mr. Trump?

12  A.  Yes.

13  Q.  And did the excerpt -- withdrawn.

14           Do you remember you were in court here yesterday,

15  Ms. Carroll?

16  A.  Yes.

17  Q.  And you heard Ms. Habba's opening argument?

18  A.  Yes.

19  Q.  She talked about a five-hour interval --

20  A.  Yes.

21  Q.  -- between the publication of this excerpt and some

22  statements that she talked about?

23  A.  I remember it well.

24  Q.  Did the excerpt published in New York Magazine contain a

25  denial from Mr. Trump?

O1HsCAR1                      Carroll - Direct

1    Q.  And how did you expect him to respond?

2    A.  Well, I expected him to deny it, but to say it was

3    consensual, which it was not.  But that's what I expected him

4    to say.

5    Q.  Is that what he did?

6    A.  No.

7    Q.  I'm going to show you a document that's been marked as

8    Plaintiff's Exhibit 1.  You have it on the screen in front of

9    you.

10           Do you recognize this document?

11   A.  Yes.

12   Q.  Without going into the contents, can you just say what it

13   is?

14   A.  It's a tweet by Laura Litvan.  She is a journalist for

15   Bloomberg.

16           MS. KAPLAN:  Plaintiff moves for the admission, your

17   Honor, of Plaintiff's Exhibit 1.

18           THE COURT:  Received.

19           (Plaintiff's Exhibit 1 received in evidence)

20   Q.  Ms. Carroll, what is the date that this tweet was posted?

21   A.  June 21, 2019.

22   Q.  And what time of day on June 21, 2019 was it posted?

23   A.  5:17 p.m.

24   Q.  And can you, please, again at a high level, go through this

25   document briefly and identify for the jury where the defamatory

O1HsCAR1                        Carroll - Direct

1    statements about you are in here?

2    A.   Donald Trump says, I've never met this woman in my life.

3    That is a lie.  He said that I was trying to sell --

4              MS. HABBA:  Objection.

5              THE COURT:  Overruled.

6              MS. HABBA:  Can I put my basis, your Honor?

7              THE COURT:  It's not necessary.

8              MS. HABBA:  OK.

9    A.   He said I made up an accusation to sell a book.  That is a

10   lie.  He said I made up an accusation for publicity sake.  That

11   is a lie.  He said that my false accusation damaged the real

12   victims of sexual assault.  That is a lie.

13             MS. HABBA:  Objection, your Honor.

14             THE COURT:  On what ground in a word?

15             MS. HABBA:  She is not a lawyer.

16             THE COURT:  Overruled.

17   A.   But the thing that really got me about this is, from the

18   White House, he asked if anyone had any information about me,

19   and that if they did, to please come forward as soon as

20   possible because he wanted the world to know what's really

21   going on and that people like me should pay dearly.

22   Q.   Have you paid dearly, Ms. Carroll?

23   A.   I've paid just about as dearly as is possible to pay.

24   Q.   I'm going to put another document in front of you,

25   Ms. Carroll.  It's been marked for identification as

O1HsCAR1                          Carroll - Direct

1              MS. HABBA:  Objection.

2              THE COURT:  On what ground?

3              MS. HABBA:  Speculation.  It's not the definition.

4    She's assuming.

5              THE COURT:  Overruled.  You can cross-examine.

6    Q.  Now, Ms. Carroll, we've just looked at three statements

7    from Donald Trump, then the president of the United States,

8    over a very brief period in June of 2019?

9    A.  Yes.

10   Q.  Can you tell the jury, what did it feel like to have the

11   president of the United States say those kind of things about

12   you at that time in June?

13   A.  Well, to have the president of the United States, one of

14   the most powerful persons on earth, calling me a liar for

15   three days and saying I'm a liar 26 times -- I counted them --

16   it ended the world that I had been living in, and I -- and a

17   new world.

18   Q.  In terms of that new world, Ms. Carroll, what happened to

19   you after Donald Trump made those statements?

20   A.  I was attacked.

21              (Continued on next page)

22

23

24

25

O1GQcar2                        Carroll - Direct

1   BY MS. KAPLAN:  (Continued)

2   Q.  How were you attacked?

3   A.  I was attacked on Twitter.  I was attacked on Facebook I

4   was attacked in news blogs.  I was brutally attacked in

5   messages.  As I said, it was a new world.  I had left the world

6   of facts, a lovely world, and I was living in a new universe.

7   Q.  How quickly did those attacks happen, Ms. Carroll?

8   A.  Instantaneously.

9   Q.  And how did you know that those attacks were the result of

10  what Mr. Trump had said?

11  A.  Because many of the -- much of the wording that people used

12  repeated Donald Trump's words.

13  Q.  I'm going to show you for identification, Ms. Carroll, a

14  document that's been marked as Plaintiff's Exhibit 59.  And,

15  again, without divulging the contents, can you just identify

16  what this document is?

17  A.  Yes, this is a Facebook chat.

18  Q.  To whom was it addressed?

19  A.  To me.

20          MS. KAPLAN:  Plaintiff moves for the admission of 59,

21  your Honor.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 59 received in evidence)

24  Q.  Do you know the person who sent this to you, Ms. Carroll?

25  A.  No.

O1GQcar2                      Carroll - Direct

1  Q.  What is the date of this Facebook message?

2  A.  June 21, 2019.

3  Q.  What time was it sent?

4  A.  Six -- nine minutes after 6:00.

5  Q.  It says down there UTC minus four.  Do you know what that

6  means?

7  A.  It's a Universal Time.  This is New York.

8         THE COURT:  I'm sorry.  What is New York?

9         THE WITNESS:  Oh, because they put it at 6:09 p.m. and

10  they said that's using Universal, the Universal Time code or --

11  yeah.

12  Q.  Is it the same as Eastern Standard Time for practical

13  purposes?

14  A.  Yes, it's Eastern Time.

15  Q.  If we could do -- I won't do -- I will do very few of

16  these, but if they could put that, Mr. Termonfils, side by side

17  with Plaintiff's Exhibit 1.

18         So Plaintiff's Exhibit 1, the initial statement, was

19  made at what time on June 21, 2019?

20  A.  5:17.

21  Q.  And Plaintiff's Exhibit 59 that we just looked at is less

22  than an hour later, right?

23  A.  Yes.

24  Q.  And how do you know that Plaintiff's 59 was prompted by

25  Plaintiff's 1?

O1GQcar2                          Carroll - Direct

```
1    A.  He's repeating that I'm a liar; that it didn't happen; that
2    I'm -- that I only brought this accusation to promote a book.
3              MS. HABBA:  Your Honor, I'm just going to object.  She
4    is speculating.  The question was improper as to the mindset of
5    the person.
6              THE COURT:  It's a little late.  The objection is
7    supposed to come before the answer, counsel.  And besides, it's
8    harmless.  You can cross-examine.  Maybe the person just came
9    up with it spontaneously.  You going to argue that?
10             MS. HABBA:  Thank you.
11             THE COURT:  Maybe it was a bolt of lightning.
12   Q.  Did you receive other messages like Plaintiff's 59 right
13   after Donald Trump started making the statements that we've
14   seen about you?
15   A.  Yes.  Hundreds.
16   Q.  I'm going to show you for identification purposes
17   Plaintiff's 40.  And, again, without divulging the contents,
18   tell me what type of document is this?
19   A.  This is an email.
20   Q.  To whom is it addressed?
21   A.  This is to my Ask E. Jean account.
22             MS. KAPLAN:  Move for admission of Plaintiff's 40,
23   your Honor.
24             THE COURT:  Received.
25             (Plaintiff's Exhibit 40 received in evidence)
```

O1GQcar2                         Carroll - Direct

1          MS. KAPLAN:  Plaintiff moves for the admission of 71,

2    your Honor.

3          THE COURT:  It's received.

4          (Plaintiff's Exhibit 71 received in evidence)

5    Q.  And what is the date this message was sent, Ms. Carroll?

6    A.  This is the Monday, June 24, 2019.

7    Q.  Does the person who sent this message say anything that we

8    haven't seen in the prior messages?

9    A.  Yes.  He talks about how ashamed I should be for making up

10   a fake story because I make it so much harder on the true

11   victims of abuse.

12   Q.  Did Donald Trump say anything like that?

13   A.  Yes.

14   Q.  Before June 2019, Ms. Carroll, on your Ask E. Jean email

15   account that we just looked at, did you receive emails that

16   were critical of your column?

17   A.  Oh, yeah.

18   Q.  What kind of criticisms were they?

19   A.  Well, if I advised -- let's say I advised a husband how to

20   fight with his wife, not to let it get out of bounds, maybe the

21   husband's sister wrote in and said, "Listen, I gave him better

22   advice than you did and this is what I said."  So I tended to

23   like those because I became a better advice -- I learned a lot

24   from my correspondence because it kept me in line and would

25   always tell me that they're -- you know, they would give me

O1GQcar2                          Carroll - Direct

1    ideas about how to answer the next question better.

2    Q.  Before June 2019, Ms. Carroll, did you ever receive

3    messages like the three we just looked at on your Ask E. Jean

4    email account or anywhere else?

5    A.  Never.

6    Q.  How did receiving messages like this, Ms. Carroll, make you

7    feel?

8    A.  Well, I thought I -- I thought I had lost something very

9    important.  Here's the thing.  I understand that people have

10   lost a lot more than I have.  I understand that people have

11   been through a lot more than I have ever been through in my

12   life, but this laid me low.  It -- it was so unexpected from a

13   place where I felt that I was doing well in the world and

14   helping people.

15   Q.  Did the messages like this continue, Ms. Carroll?

16   A.  They've never stopped.

17   Q.  How often do you receive them?

18   A.  All the time.

19   Q.  When you say "all the time," every day?

20   A.  Yes.  Scores and scores, sometimes hundreds a day.

21   Q.  Do the messages that you have been receiving since

22   June 2019 share any common themes?

23   A.  Yes.

24   Q.  What are those themes?

25   A.  You're a liar.  You hurt victims.  You are ugly.  Those are

1           (In open court)

2           THE COURT:  I will strike the witness's partial

3    answer.  The jury will disregard it.

4    BY MS. KAPLAN:

5    Q.  Ms. Carroll, let's start with messages calling you a liar.

6    I am going to show you a document again on the screen that's

7    been marked for identification as Plaintiff's Exhibit 66.

8    Again, if you could just say whether you recognize it?

9    A.  Yes, this is a Facebook chat.

10   Q.  To whom was it addressed?

11   A.  To me.

12           MS. KAPLAN:  Plaintiff moves for the admission of 66,

13   your Honor.

14           THE COURT:  Received.

15           (Plaintiff's Exhibit 66 received in evidence)

16   Q.  Who sent this, Ms. Carroll?

17   A.  A woman named Kathleen Woolard.

18   Q.  Do you know anyone by the name of Kathleen Woolard?

19   A.  No.

20   Q.  What are the dates on this document?

21   A.  June 22, 2019.

22   Q.  Are there any other dates?

23   A.  There's a second one and a third one in July 2019.

24   Q.  What does it mean that there are two or three separate

25   dates on there?

O1GQcar2                        Carroll - Direct

1   A.  It means that she wants me to receive this message and know

2   how ugly I am and what a liar I am.

3   Q.  Did you respond to this message, Ms. Carroll?

4   A.  No.

5   Q.  Now, you'll see, especially on the bottom one from July, it

6   talks about answering to God?

7   A.  Yes.

8   Q.  Did you get messages that talked about you answering to

9   God?

10  A.  Yes.

11  Q.  Can you explain?

12  A.  Well, they want God to punish me.  Not want God.  Know God.

13  They know God will punish me. Other people want the devil to

14  punish me.  It goes both ways.

15  Q.  I'm going to ask Mr. Termonfils to put up another document,

16  Ms. Carroll.  It's Plaintiff's 45 for identification.

17          Again, if you could just tell us what type of document

18  this is?

19  A.  This is an email.

20  Q.  To whom was it addressed?

21  A.  Ask E. Jean.

22          MS. KAPLAN:  Plaintiff moves for the admission of 45,

23  your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 45 received in evidence)

O1GQcar2                          Carroll - Direct

1   Q.  This is the same Ask E. Jean column we were talking about

2   before?

3   A.  Yes.

4   Q.  What's the date on here?

5   A.  June 23.

6   Q.  Is this person asking you for advice?

7   A.  No.  Quite the contrary, I remember this email because it

8   hurt my feelings because she said she wasn't going to ask me

9   for any advice.

10  Q.  Why did that hurt your feelings?

11  A.  My whole career, my whole reason for being a happy person

12  is I feel like I'm giving good advice and helping people.

13  Q.  Ms. Carroll, this email asked you how much George Soros

14  paid you to lie about president Trump.  Do you see that?

15  A.  Yes.

16  Q.  Do you know who George Soros is?

17  A.  Yes.

18  Q.  Who is he?

19  A.  He's a very rich old man.

20  Q.  Have you ever met George Soros?

21  A.  No.

22  Q.  Have you ever been to a party where George Soros was there?

23  A.  No.

24  Q.  Did George Soros pay you to lie about Donald Trump?

25  A.  No.

1              (Jury present)

2              THE COURT:  A little earlier Plaintiff's Exhibit 6 was

3    received.  There was then an objection.  One page of it may

4    have been exhibited to the jury.  I'm going to strike Exhibit 6

5    now without prejudice to its being offered at a subsequent

6    time, and the jury, unless it is received in evidence, will

7    disregard it.

8              MS. KAPLAN:  Thank you, your Honor.

9              THE COURT:  Let's continue.  You may continue,

10   Ms. Kaplan.

11   BY MS. KAPLAN:

12   Q.  Mr. Termonfils, can you please put up for Ms. Carroll

13   Plaintiff's Exhibit 85.

14             Ms. Carroll, do you recognize the document in front of

15   you?

16   A.  Yes, it's a tweet.

17   Q.  And who posted the original tweet?

18   A.  I did.

19             MS. KAPLAN:  Your Honor, plaintiff moves for the

20   admission of Plaintiff's Exhibit 85.

21             THE COURT:  Received.

22             (Plaintiff's Exhibit 85 received in evidence)

23   Q.  Ms. Carroll, what is the date of the tweet here that you

24   posted?

25   A.  June 20, 2019.

O1GQcar2                        Carroll - Direct

1    Q.  Do you have any idea how they got your personal email

2    account?

3    A.  No.

4    Q.  How does this compare to the other messages you receive

5    commenting on your appearance?

6    A.  This is different in that it's written in red in caps, but

7    it's pretty much like most of them.

8    Q.  One more of these, Mr. Termonfils.  If you could put up

9    Plaintiff's 118.

10            Again, Ms. Carroll, what type of document is this?

11   A.  This is a tweet.

12   Q.  Is there an image of you on this posted as part of this

13   tweet?

14   A.  Yes.

15            MS. KAPLAN:  Plaintiff moves for the admission of 118,

16   your Honor.

17   A.  I want to stipulate that I am on the left.

18            THE COURT:  It's received.

19            (Plaintiff's Exhibit 118 received in evidence

20   Q.  Now, did any of the messages you received, Ms. Carroll,

21   accuse you of being promiscuous?

22   A.  Yes.

23   Q.  I'm going to ask Mr. Termonfils to put up Plaintiff's

24   Exhibit 47.

25            What type of document is this, Ms. Carroll?

O1GQcar2                         Carroll - Direct

1    unconnected.  And the room was so small, there was no desk.

2    There was a board that you flapped down from the wall, so I

3    flapped the board down.  I put my computer on the board.  I

4    opened it up.  I immediately went to Twitter where I get

5    breaking news, and I saw:  "You lying whore.  You lying scag.

6    You lying slut.  You lying psycho.  You lying scumbag."

7              My brain just froze.  So to make myself feel good, I

8    went to my Ask E. Jean website thinking that I would feel

9    better if I could read some support.  And I opened it up, and,

10   yes, there was a really lovely email, you know, saying, "You go

11   girl."  And then I opened up the next Ask E. Jean letter, and I

12   looked at it, I read it, and I ducked.  Because the image of

13   what the person said caused me to believe that it was going to

14   happen right now.  I thought I was going to get shot.  And what

15   the hard part was, I couldn't get the curtain across the window

16   closed.  I was sitting in a room with an open window at 11:30

17   at night.  And it's -- when you see the words, the image comes

18   into my mind, and I believed it was happening right now.  So I

19   deleted the message to protect myself.  Then I stood up and

20   tried to get the curtain closed.  Couldn't do it.  I had

21   brought some jumpsuits in my bag.  I tried to hang them up over

22   the window.  And it was -- I had never dealt with anything like

23   that.

24   Q.  And I think as you were telling the story, Ms. Carroll, you

25   said it was June 21.  Is that June 21, 2019?

O1GQcar2                         Carroll - Direct

1     A.  Yes.

2     Q.  Did you get more than one -- was there more than one

3     message that night --

4     A.  Yes.

5     Q.  -- threatening you with violence?

6     A.  Yes.

7     Q.  And did you -- what did you do with the other messages?

8     A.  Two of them I remember, I immediately deleted because they

9     sent images.  One was a car accident with a very dead woman on

10    the pavement with some of her brains coming out her head.  She

11    had totally died in an accident.  And the other one was a woman

12    who had obviously been murdered, blood on her neck and her

13    chest.

14              MS. HABBA:  Objection, your Honor.  It's inflammatory.

15              THE COURT:  We'll strike the last sentence.

16              The question was:  "What did you do with the other

17    messages?"

18              THE WITNESS:  Yes, I deleted them.

19              MS. HABBA:  Thank you.

20    Q.  Why did you delete them, Ms. Carroll?

21    A.  When I see messages like that, it's -- my brain reacts, and

22    my body reacts.  Like it's going to happen right now.  And so

23    the heart races.  My pulse was up.  My senses heighten.  And in

24    order to get rid of that horrible feeling of the heart racing

25    and, you know, my -- I became hyperaware.  I just delete,

1    delete, delete.  It really helped me, you know, get control of

2    the situation.

3    Q.  What did you do for the rest of that night, Ms. Carroll?

4    A.  Well, probably -- I couldn't help myself, I went back to

5    Twitter.  I wanted to see, you know, if it was as bad as I

6    thought.  I also wanted to find some support.  I found

7    wonderful messages and support, and I spent pretty much the

8    rest of the night looking at the news, reading the horrible

9    things on Twitter, reading some bad messages on Facebook,

10   getting off Facebook.  I was just trying to acclimate to the

11   new world I was in, and I had to do it that night.  In about

12   six, seven hours I got acclimated.

13   Q.  Did you sleep a lot that night?

14   A.  I didn't sleep until the sun came up because of the window,

15   and I probably fell asleep around 6:00 or 7:00 in the morning.

16   Q.  I'm going to ask Mr. Termonfils to put in front of you,

17   Ms. Carroll, a document that's been marked for identification

18   as Plaintiff's 122.  And same thing, Ms. Carroll, can you just

19   say what kind of document this is?

20   A.  This is a Facebook message.

21   Q.  To whom was it addressed?

22   A.  To me.

23        MS. KAPLAN:  Plaintiff moves for the admission of 122,

24   your Honor.

25        THE COURT:  Received.

O1GQcar2                          Carroll - Direct

1              (Plaintiff's Exhibit 122 received in evidence)

2    Q.   Do you know the person who sent you this, Ms. Carroll?

3    A.   No.

4    Q.   And is this message typical of the kind of messages you

5    received threatening you with violence?

6    A.   No.

7    Q.   Why not?

8    A.   This is more, it's longer, more descriptive, in an odd way

9    more eloquent in the way they want me to die.

10   Q.   How do they want you to die?

11   A.   Stretched -- my neck stretched immediately after a quick

12   public trial.

13   Q.   Let me show you another one, Ms. Carroll.

14              Mr. Termonfils, can we put up in front of Ms. Carroll

15   plaintiff's 132.

16   A.   Oh.

17   Q.   Ms. Carroll, what kind of document do you have up in front

18   of you?

19   A.   This is a message.

20   Q.   Social media message?

21   A.   Yes.

22   Q.   To whom was it sent?

23   A.   To me.

24   Q.   Plaintiff moves for the admission of 132, your Honor?

25              THE COURT:   Received.

O1GQcar2                       Carroll - Direct

1    A.  Yes, this is a Facebook message.

2    Q.  To whom was it addressed?

3    A.  This is to me.

4              MS. KAPLAN:  Plaintiff moves for admission of 126.

5              THE COURT:  Received.

6              MS. KAPLAN:  I'm wrong.  128.  I'm wrong.

7              THE COURT:  128 is received, not 126.

8              (Plaintiff's Exhibit 128 received in evidence)

9    Q.  Ms. Carroll, was this message you're looking at now

10   different than some of the messages you received?

11   A.  Yes.

12   Q.  How and why?  Compound.  I object to my own question.

13   How was it different?

14   A.  This person wants me to know it's not himself who is

15   threatening me, but his friend wants to kill me and this man

16   cannot stop him.

17   Q.  If you could put up in front of Ms. Carroll — now I'm on

18   the right number, Mr. Termonfils — plaintiff's 126.

19             Before we get there, in addition to threats of killing

20   you, did you receive any other threats of violence?

21   A.  Yes.

22   Q.  What kind of violence?

23   A.  Raping.  Raping me.

24   Q.  Mr. Termonfils, if you could put up in front of Ms. Carroll

25   Plaintiff's 126, please.

O1GQcar2                              Carroll - Direct

1    your Honor.

2                    THE COURT:  114 received.

3                    (Plaintiff's Exhibit 114 received in evidence)

4    Q.  How many months after the trial was over -- we've just been

5    looking at ones for May.  How many months later is this one?

6    A.  Three and a half months -- four months.

7    Q.  I'm going to show you two more, but I'm going to do them at

8    once, Ms. Carroll, if you don't mind.

9                    Mr. Termonfils, can you put up in front of

10   Ms. Carroll — they're both short — Plaintiff's 124 and

11   Plaintiff's 130.  And maybe if you could go to the second page.

12                   Ms. Carroll, do you recognize what these documents

13   are?

14   A.  Yes.

15   Q.  What are they?

16   A.  They're Facebook messages.

17                   MS. KAPLAN:  Plaintiff moves for the admission of 124

18   and 130, your Honor.

19                   THE COURT:  They're received.

20                   (Plaintiff's Exhibits 124 and 130 received in

21   evidence)

22   A.  I'm sorry that people in the courtroom have to see this

23   picture.

24   Q.  Ma'am, I'm sorry to have to ask you about it, Ms. Carroll,

25   but when you got a message like these, how would you react?

O1GQcar2                         Carroll - Direct

1  A.  I'm -- the image would flash into my mind.  I couldn't help
2  but picture it.  I couldn't help but feel it was imminent.  The
3  heart would, you know, constrict and start to pound, and it's
4  funny, the body believes it's going to happen.  My brain knows
5  it's just a picture, don't worry, but my body thinks something
6  entirely different.  It feels like it's going to happen.
7  Q.  So, Ms. Carroll, when we looked at some of the earlier
8  messages talking about you being ugly or a liar, some of those
9  were posted on public media sites?
10  A.  Yes.
11  Q.  The messages threatening violence are all sent to you
12  privately.  Is that correct?
13  A.  Yes.
14  Q.  Do you understand what the reason for that is?
15  A.  Well, they would be not allowed to put on public social
16  media these kinds of threats.
17  Q.  So we've seen some pretty horrible messages, Ms. Carroll,
18  and the question I have to ask is, why didn't you just delete
19  your social media account?
20  A.  Well, social media is my lifeblood.  It's where I'm
21  connected with my family and friends.  It's where I see -- you
22  know, I could watch my nephew win his swimming race.  I could
23  see my friend's sweater she knit.  And as a journalist, it's
24  where I publish my latest pieces.  It's where I read page.  My
25  favorite journalists are on social media.  It's where I see

O1HQcar4                        Carroll - Direct

1   to make statements about you afterwards?

2   A.  Yes.

3   Q.  And were those statements false?

4   A.  Yes.

5   Q.  Take a look at Plaintiff's 101.  If you could just say what

6   is this, again, the same way we've been doing it.

7   A.  Yes.

8   Q.  What --

9   A.  This is a post by Donald Trump on Truth Social.

10  Q.  Is the post about you?

11  A.  Yes.

12          MS. KAPLAN:  Plaintiff offers 101, your Honor.

13          THE COURT:  Received.

14          (Plaintiff's Exhibit 101 received in evidence)

15  Q.  The *CNN* town hall, Ms. Carroll, when did that take place?

16  A.  One day after the trial, so May 10, 2023.

17  Q.  And what is the date that this is posted?

18  A.  July 12, 2023.

19  Q.  Was that the last statement that Mr. Trump made about you?

20  A.  No.

21  Q.  I'm going to go to the next, which, if I'm counting

22  correctly, is the sixth.  If you could put up on the stand for

23  Ms. Carroll, Mr. Termonfils, Plaintiff's Exhibit 149T.

24          MS. KAPLAN:  And may I approach, your Honor?

25          THE COURT:  You may.

O1HQcar4                        Carroll - Direct

1   Q.  Ms. Carroll, I've shown you a document that's stamped 144T.

2   Do you have that in front of you?

3           THE COURT:  I'm sorry, I thought you said 149T.

4           MS. KAPLAN:  Hold on.  I apologize, your Honor.  It's

5   144 and 144T.  My mistake.

6   Q.  Do you have --

7   A.  Yes.

8   Q.  Do you have a disk in front of you that says 144?

9   A.  Yes.

10  Q.  And do you have a document in front of you that says 144T

11  on the screen?

12  A.  It's not marked.

13  Q.  I'll represent it's 144T.

14          THE COURT:  Let's get it marked.

15          MS. KAPLAN:  Can we mark it?

16  Q.  Ms. Carroll, what is the document that you have in front of

17  you?

18  A.  I have -- this is a transcript of Donald Trump's remarks in

19  a campaign speech.

20  Q.  Did you -- on the disk, is that a video on the disk?

21  A.  Yes.  I watched it.

22  Q.  Did you sign it and date it?

23  A.  Yes, I signed it EJC January 14, 2024.

24  Q.  What does it mean that you signed it?

25  A.  That means I watched the video and followed along with the

O1HQcar4                          Carroll - Direct

1    transcript and they were identical.

2    Q.  Let's watch the video.

3             MS. KAPLAN:  Excuse me.  Your Honor, let me move into

4    evidence 144 and 144T?

5             THE COURT:  Both received.  144T --

6             MR. MADAIO:  Objection, your Honor.

7             THE COURT:  What's the objection?  I'm sorry.  One

8    lawyer per witness.  You're not it.

9             Ms. Habba?

10            MS. HABBA:  Your Honor, I'm sorry, what rule is that?

11            THE COURT:  That is an order I issued this morning

12   when you were present.

13            MS. HABBA:  Can we have a moment to confer with

14   Ms. Kaplan?

15            THE COURT:  Yes.

16            MS. HABBA:  Thank you.

17            (Counsel consult)

18            THE COURT:  You've had the moment and the conference

19   seems to be over.

20   Q.  Let me skip this and put it on hold.  We'll come back to it

21   when we have a chance.  I don't want to waste the time of the

22   jury.

23            Now you testified -- we're okay?  That's good.  Let me

24   go back to where I was before.

25            MS. KAPLAN:  I move for the admission of 149 and 149T?

O1HQcar4                        Carroll - Direct

```
 1                THE COURT:  149 or 144?

 2                THE WITNESS:  144.

 3                THE COURT:  I was asking Ms. Kaplan.

 4                MS. KAPLAN:  144 and 144T.

 5                THE COURT:  Repeat it, Ms. Kaplan?

 6                MS. KAPLAN:  I apologize, your Honor.  144 and 144T.

 7                THE COURT:  They are received.  The transcript is

 8    received on the same basis as previously.

 9                (Plaintiff's Exhibits 144 and 144T received in

10    evidence)

11                MS. KAPLAN:  Let's play the video.

12                (Video played)

13    Q.  The woman that Mr. Trump was referring to on that video,

14    who was the woman?

15    A.  Me.

16    Q.  Do you know how recently Mr. Trump said that?

17    A.  Within a few days.

18    Q.  Thank you.

19                Let's look at the next time.  Can you put in front of

20    Ms. Carroll plaintiff's 152.  Wait.  Wait.  I want to get it in

21    order.  I'm sorry.  Can you put in front of Ms. Carroll 149T.

22                Ms. Carroll, do you see 149T in front of you?

23    A.  Yes, I do.

24                MS. KAPLAN:  Your Honor, may I approach?

25                THE COURT:  You may.
```

O1HQcar4                     Carroll - Direct

1                MS. KAPLAN:  This is the last one, I promise.

2    Q.  Ms. Carroll, do you have in front of you 149T?

3    A.  Yes.

4    Q.  What is 149T?

5    A.  It is the transcript and a video of Donald Trump giving a

6    press conference.

7    Q.  What is the date of the press conference?

8    A.  January 11.

9    Q.  A few days ago?

10   A.  Yes.

11   Q.  Did you watch the video?

12   A.  Yes.

13   Q.  Did you sign the disk?

14   A.  Yes, I did.

15   Q.  In signing the disk, what were you saying?

16   A.  I'm saying that I watched the video and followed along with

17   the transcript, and they are the same.

18               MS. KAPLAN:  Move for the admission, your Honor, of

19   149 and 149T?

20               THE COURT:  Both received.  Same instruction on the

21   transcript.

22

23               (Plaintiff's Exhibits 149 and 149T received in

24   evidence)

25               (Video played)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  The woman there -- I know it's repetitive, Ms. Carroll.

2   But who is the woman he's referring to?

3   A.  That is me.

4   Q.  Mr. Termonfils, if you could put up in front of the

5   witness, Plaintiff's Exhibit 152.

6          Ms. Carroll, if you could identify what Plaintiff's

7   152 is.

8   A.  It is a post by Donald Trump on Truth Social.

9          MS. KAPLAN:  Move for the admission of Plaintiff's

10  152?

11          THE COURT:  Received.

12          (Plaintiff's Exhibit 152 received in evidence)

13  Q.  Ms. Carroll, what date did Mr. Trump post this on Truth

14  Social?

15  A.  January 14, 2024.

16  Q.  When he says it's a totally fabricated story, what story is

17  he talking about?

18  A.  He's talking about the assault.

19  Q.  We have now looked at, if I counted right, and I think I

20  did because I doublechecked, eight statements that Mr. Trump

21  made after the verdict in your case?

22  A.  Yes.

23  Q.  What happened after he made those statements?

24  A.  There was a flurry of sort of a stream of attacks.

25  Q.  Attacks like the ones we looked at earlier this morning?

O1HQcar4                    Carroll - Direct

1   what other people think.

2           THE COURT:  Overruled.

3   Q.  You can finish answering.

4   A.  People who didn't know me from Adam.  People who didn't

5   care about me, really don't care about this person, they now

6   have opinions about me, and that is that I'm a liar.

7   Q.  Now, you testified earlier about your advice column for

8   *Elle* magazine.  For how many years did you write that column?

9   A.  27 years.

10  Q.  How does that compare to the length of other advice

11  columns?

12  A.  It was the longest currently running advice column in

13  American publishing.

14  Q.  When did you stop writing that column?

15  A.  Two thousand -- at the end of 2019.

16  Q.  Do you still write an advice column today?

17  A.  Yes.

18  Q.  How do you do that?

19  A.  I publish it on Substack.

20  Q.  Excuse my ignorance, what is Substack?

21  A.  Substack is a platform where writers can publish directly

22  to their readers.

23  Q.  When did you start publishing your advice column on

24  Substack?

25  A.  2021.

O1HQcar4                         Carroll - Direct

1    Q.  Do you make money from publishing on Substack?

2    A.  Yes.

3    Q.  How does that work?

4    A.  Well, I'm a writer.  I have to feed the dogs and feed

5    myself.  I earn my money by my writing, and so readers pay to

6    read my Substack, and also I have readers who can read it for

7    free.

8    Q.  So how many readers do you have total?  How many

9    subscribers do you have on Substack in total approximately?

10   A.  Subscribers, so 28,000.  I just checked this morning.

11   Q.  About how many of those are paid subscribers?

12   A.  1,800.

13   Q.  Has the number of your Substack -- has the number of your

14   subscribers on Substack increased since you started it?

15   A.  Yes.  Yes, it has.

16   Q.  Have the number of your Twitter followers increased since

17   2019?

18   A.  Yes.

19   Q.  Do you earn any money from your followers on Twitter?

20   A.  No.

21   Q.  What does it mean, Ms. Carroll, to write freelance?

22   A.  Freelance is where you send articles and pitch articles to

23   editors at magazines.  So you're not under contract.

24   Q.  And before June 2019, did you write articles freelance for

25   various magazines?

O1HQcar4                    Carroll - Direct

1    Q.   What does this person predict is going to happen?

2    A.   This person predicts that suing Trump was a big mistake,

3    and now Trump is going to get back.

4              MS. HABBA:  Objection.  It's mischaracterizing.

5              THE COURT:  In what way is it mischaracterizing?

6              MS. HABBA:  And it's complete -- she's going into the

7    thinking of this person.  I mean, she can read it in.  It can

8    be admitted.

9              THE COURT:  It's offered in evidence.  It was received

10   in evidence.  Now she can read it.

11             MS. HABBA:  Sure.

12             THE COURT:  You didn't object to it.

13   Q.   This person says, Ms. Carroll, that Trump is going to get

14   back at you?

15   A.   Yes, that's what this person says.

16   Q.   Did Mr. Trump get back to you?

17   A.   Yes.  Yes, he did.

18   Q.   Was he tweeting about you as recently as yesterday?

19   A.   That's what I hear.

20   Q.   Excuse me.  Posting about you as recently as yesterday?

21   A.   Yes, I've been told.

22   Q.   Can we take a look at Plaintiff's Exhibit 160.

23             You have a document in front of you that's been marked

24   for identification as Plaintiff's Exhibit 160.  Can you just

25   say what it is, Ms. Carroll?

O1HQcar4                          Carroll - Cross

1    A.  Yes, this is a post by Donald Trump on Truth Social.

2              MS. KAPLAN:  Plaintiff moves for the admission of 160,

3    your Honor.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 160 received in evidence)

6    Q.  Ms. Carroll, what is this?

7    A.  I had heard about these.  This is the first one I've looked

8    at.  And this is -- this was posted as we were in the

9    courtroom.

10   Q.  When?

11   A.  Yesterday.  This is one of many posted during the trial.

12   Q.  Is there anything that he says -- Mr. Trump says about you

13   in this Truth Social post that is true?

14   A.  About me?  No.

15             MS. KAPLAN:  No further questions, your Honor.

16             THE COURT:  Thank you.

17             Cross-examination, Ms. Habba.

18             MS. HABBA:  Can I just have one moment, your Honor?

19             THE COURT:  Sure.

20                            (Counsel consult)

21             THE COURT:  You may proceed.

22             MS. HABBA:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MS. HABBA:

25   Q.  Good afternoon, Ms. Carroll.

O1HsCAR5                           Carroll - Cross

1   A.  Sometime after noon.

2   Q.  So if I represented to you that it was released at 12:14,

3   would that sound about right to you?

4   A.  I'm glad to give the date, yes.  It could be.

5   Q.  And the president's initial response to that article, it

6   wasn't issued until about five hours later at 5:17, correct?

7   A.  No.  The White House ran a denial when the piece was

8   published.  It's right in the piece.  It's in the excerpt.

9   Q.  Right.  So, Ms. Carroll, this lawsuit, that you're saying

10  was prior to the president's statement at 5:17, is that your

11  testimony?

12  A.  I don't understand the question.

13          MS. KAPLAN:  Objection.

14          THE COURT:  Sustained.

15  Q.  Let me walk you through this.  I'll walk through

16  chronologically.

17          You put an article out with The Cut, correct?

18  A.  I put --

19  Q.  In The Cut?

20  A.  Yes, in New York Magazine.  It went online on June 21st,

21  2019.

22  Q.  And did they reach out to the White House for comment?

23  A.  Yes, they reached out.  We had reached -- we had reached

24  the end of fact-checking, that was on a Wednesday or a

25  Thursday.  They said one more thing to do, we have to contact

OiIsCAR2                          Carroll - Redirect

```
 1    there was a weird purple line going across the screen.
 2              THE COURT:  Thank you.
 3              MS. KAPLAN:  Mr. Termonfilis, can you play for the
 4    jury 164, please.
 5              (Video played)
 6              Ms. Carroll --
 7              MS. HABBA:  I'm sorry, your Honor.  That is not the
 8    full clip.  I was not made aware of this portion only being
 9    shown.
10              OK.  Well, I would like the whole clip played.
11              THE COURT:  Let me have 164-T, Ms. Kaplan.
12              MS. KAPLAN:  Here you go, Mr. Mohan.
13              THE COURT:  Do you have a transcript of the whole
14    thing?
15              MS. KAPLAN:  I do not, your Honor.  I can represent
16    that the things that were cut were either not about
17    Ms. Carroll --
18              THE COURT:  I don't want that either.  You're not a
19    witness.
20              MS. KAPLAN:  OK.  This is what we did with all the
21    other videos, your Honor, that we played.
22              THE COURT:  I don't know that.
23              MS. HABBA:  I have no objection to the video being
24    played, the whole video, your Honor, and it is relevant because
25    they cut what he said about her.
```

O1IQcar3                          Humphreys - Direct

1   A.   Sure.  So for this, I used a service that -- where you can

2   search newspapers, and I searched for Ms. Carroll's name and

3   the statement.

4   Q.   And how many print articles did you find that shared the

5   June 21st or 22nd statement?

6   A.   That was ten articles, again, in mainstream news like the

7   *Washington Post*, the *Chicago Tribune*, *USA Today*.

8   Q.   How did you determine the total number of times that those

9   statements were read in those newspapers?

10  A.   So, again, I added up the readers from each article to get

11  2.3 million impressions.

12  Q.   Maybe you said this already, but how do you know how many

13  readers each of these newspapers has?

14  A.   So, again, I consulted a third-party source that provides

15  those numbers for advertisers.

16  Q.   And what was the total number of times that the June 21st

17  and 22nd statements were viewed in newspapers?

18  A.   It was 2.3 million times.

19  Q.   We just walked through several different forms of media.

20  Were you able to estimate the total number of times that

21  Trump's June 21st and 22nd statements were viewed in all of

22  those forms of media?

23  A.   Yes.  So here you add up each channel.  For the social

24  media channel, you have an estimate between 25.3 and 7 million.

25  And then you add the others that were from publicly available

1    sources to get a range between 104 million impressions and

2    85.8 million impressions.

3    Q.  Were there any instances in which the statements may have

4    been seen or heard that your analysis didn't take into account?

5    A.  Yes.  So I started with just the articles in the complaint

6    in this case.  I didn't include articles that were not in the

7    complaint that mentioned the statement.  I also didn't include

8    entire platforms, such as Facebook or Reddit.  I didn't include

9    television that wasn't in this database, so that would have

10   been local television.  I also didn't include -- sometimes on

11   television that will be on YouTube, rebroadcast on YouTube, and

12   I didn't include those.  I didn't include the mention of

13   statements on podcast, on radio, or word of mouth.

14   Q.  For television, did you include broadcasts that referenced

15   or paraphrased the statements?

16   A.  No, I included only direct locations.

17   Q.  So in your opinion, was your total impression number likely

18   an undercount.

19   A.  Yes, I considered it an undercount.

20   Q.  Now, after estimating the number of times that Trump's

21   June 21st and 22nd statements were seen or heard, what did you

22   do next?

23   A.  Next I needed to understand what impact, if any, did those

24   statements have on Ms. Carroll's reputation.

25   Q.  I believe you said earlier that's called an impact

O1IQcar3                          Humphreys - Direct

1   assessment?

2   A.  That's right.

3   Q.  What's an impact assessment?

4   A.  So it's where I understand both kind of qualitatively how

5   did the statements affect Ms. Carroll's reputation in the

6   public sphere by reading the responses to them and

7   understanding it more broadly.  And then I also conducted a

8   quantitative analysis to figure out, well, what percentage of

9   those impressions that I calculated were receptive to the

10  claims of Mr. Trump.

11  Q.  So let's start with the qualitative analysis.  Can you tell

12  us what you did in that analysis?

13  A.  Sure.  So I started with publicly available data related to

14  Ms. Carroll's name.  I read through book reviews, newspaper

15  articles, any connection to her name in the public sphere.  I

16  also consulted the comments underneath the articles that I

17  counted in that first analysis as well as some social media

18  more generally.

19  Q.  What time period were you focused on in this analysis?

20  A.  I was focused on the time after -- well, both before and

21  after the statements.

22  Q.  In June 2019?

23  A.  That's right.

24  Q.  Could you describe just generally what you observed about

25  Ms. Carroll's reputation prior to June 2019 as compared to her

O1IQcar3                        Humphreys - Direct

reputation after June 2019?

A.   So before June 2019, she was known as a journalist, as a

women's advice columnist to a pretty general audience from

*Elle*.   About 30 percent of *Elle*'s readers are conservative or

Republican.   So she was known as a truth-teller, a sassy advice

columnist.

          After June 2019, the associations with her name were

largely about her being a liar, being -- having a political

agenda and working with the Democratic party.

Q.   When you say associations, what do you mean?

A.   Yeah.   I mean, anytime that her name appeared, those

associations appeared as well.

Q.   And in conducting this analysis, what, if anything, did you

conclude about whether Trump's June 2019 statements affected

Ms. Carroll's reputation?

A.   Yeah.   So I determined that they did affect her reputation,

particularly as a journalist as someone's whose work is based

in the facts.

Q.   Why did you conclude that?

A.   Some of the content in Mr. Trump's statements from the

first and second statement called her a liar, said she wasn't

telling the truth, and that she had a particular agenda for not

telling the truth.

Q.   And you observed those sorts of statements in some of the

comments that you looked at?

O1IQcar3                          Humphreys - Direct

1    A.  That's right.

2    Q.  On what platforms did you or what social media or media

3    platforms did you observe those comments?

4    A.  I looked at both Twitter and Facebook.

5    Q.  If we could go to the next slide.  Are these examples of

6    some of the Twitter commentary that you reviewed?

7    A.  Yes.

8    Q.  Do you see the post that says, "She's only looking for

9    three things:  Publicly for her book, money, and some political

10   agenda"?

11   A.  Yes.

12   Q.  What's the date of that post?

13   A.  This post was made on June 22, 2019.

14   Q.  What's that post replying to?

15   A.  This, as you can see, under it say "replying to" and then

16   it has @dailycaller, which means it was replying to a

17   particular article that was in my first analysis that contained

18   the statements.

19   Q.  So it was replying to an article that published one of

20   Donald Trump's statements?

21   A.  That's right.

22   Q.  And how, if at all, does this post relate to the substance

23   of Trump's statements?

24   A.  So as you can see here, it repeats some of the claims in

25   those statements such as her seeking publicity for her book,

1   having a political agenda.

2   Q.  And do you see the post that says, "Sick, ugly, rejected

3   old hags trying to up their book sales should go to prison

4   themselves"?

5   A.  Yes.

6   Q.  What's the date on that post?

7   A.  That's from September 21, 2022.

8   Q.  Do you see the post that says, "Look, anything you

9   Democratic party touches is corrupt and full of lie"?

10  A.  Yes.

11  Q.  What's the date of that post?

12  A.  That's from September 9, 2020.

13  Q.  How, if at all, do those two posts relate to the substance

14  of Trump's statements?

15  A.  So, again, it uses the content of his statement that she's

16  connected with the Democratic party, and that she's lying in

17  the statement itself.

18  Q.  Were these posts similar to other comments that you

19  reviewed?

20  A.  Yes.  So in my report I provide over a hundred examples

21  that were connected with his particular statement and more than

22  a thousand in the public sphere more generally.

23  Q.  Apart from reviewing commentary on social media, did you

24  look at any other data in connection with the qualitative

25  analysis?

1    Q.   And about 53 percent of people who read *Fox News* believed

2    Trump's statements?

3    A.   Were receptive to them, yes.

4    Q.   What is your next step after determining those percentages?

5    A.   So the next step is essentially to take the impressions

6    from that first analysis, say for the *New York Times*, and only

7    take 12 percent of those impressions to calculate the receptive

8    impressions.  So you do that, and you come up with a number

9    between 24.7 million and 21.2 million receptive impressions.

10   Q.   That's the estimate of how many people who saw Trump's

11   statements and likely believed them?

12   A.   That's right.

13   Q.   Can you remind us what the low estimate is?

14   A.   It's 21.2 million impressions.

15   Q.   Why is there a low estimate?

16   A.   There's a low estimate because of the range provided from

17   social media.

18   Q.   That's the 5 percent and 20 percent of Twitter?

19   A.   That's right.  So this number was important because I based

20   the damages model only on these particular impressions.

21   Q.   Professor Humphreys, to your knowledge, did Ms. Carroll

22   receive any positive messages, positive responses after Donald

23   Trump made his statements in June 2019?

24   A.   Yes, she did.

25   Q.   How, if at all, did you account for positive responses that

O1IQcar3                          Humphreys - Direct

1    calculation, there's a high and a low impression.  I would -- I

2    think the high impressions is more likely in this case.  Then

3    you can choose to show the message either one, three, or five

4    times.  I included one as a baseline here, but I think the more

5    appropriate cost would be either three or five times, so that's

6    between 7.2 and 12.1 million.

7    Q.  I believe you just said this, but just so I'm clear, the

8    first row that says high impressions $2.4 million and low

9    impressions $2.07 million, do you think that that is a

10   reasonable estimate for how much it would cost to run a

11   reputation repair campaign in this case?

12   A.  No, I think given the context, you know, I don't think

13   that's appropriate.

14   Q.  What do you mean by that?

15   A.  I mean that the attitudes at issue here are, from what I

16   saw on my impact analysis, strongly held, and they have been

17   repeated by a trusted source, so I don't think one time is

18   enough to change attitudes.

19   Q.  They need to see a corrective message more than once?

20   A.  I think so.

21   Q.  Professor Humphreys, what was your ultimate conclusion as

22   to how Trump's statements that he made on June 21 and 22, 2019

23   affected Ms. Carroll's reputation?

24   A.  So I first found that Mr. Trump's statements were seen

25   between the 85.8 million and 104 million times across different

 1   A.  This was an article that came across my newsfeed.

 2   Q.  Did you perform any analysis of what Ms. Carroll's

 3   reputation was before June 2019?

 4   A.  Yes.

 5   Q.  And you stated she was a celebrated journalist **at** *Elle*

 6   magazine, right?

 7   A.  Yes.

 8   Q.  Among other things?

 9   A.  Among other things.

10   Q.  And you represented that Ms. Carroll reached about

11   4.5 million readers during her time at *Elle*, right?

12   A.  Yes, that's the number that *Elle* gives for its circulation.

13   Q.  Okay.  And that number, the 4.5 million, that's from your

14   report, right, or you cite that in your report, correct?

15   A.  I do, yeah.

16   Q.  And in your report, you also state that you weren't able --

17   you were unable to find readership data prior to 2020.  Isn't

18   that correct?  I can refresh your recollection.

19   A.  If you tell me what page.  I don't argue with you.  What

20   page is it?

21   Q.  It's footnote 136.

22              THE COURT:  What document, please?

23              MR. MADAIO:  It's the October 14, 2022 report.

24              THE COURT:  Plaintiff's 202.  What's the footnote?

25              MR. MADAIO:  Footnote 136, which is page 41.

O1PQcar1                         Myers - Direct

1   sued, meaning, you know, she did the work.  But I will say that
2   all of the journalists that worked for us did the work.
3   Q.  Would you have hired an advice columnist or other
4   journalist who was not considered a truth-teller?
5   A.  No.
6   Q.  What role, if any, did you have in determining how much
7   Ms. Carroll was paid for writing her column?
8   A.  All of it.
9   Q.  Did the amount that Ms. Carroll was paid change during the
10  time you were editor-in-chief?
11  A.  It did.
12  Q.  In which direction?
13  A.  I gave her a raise.
14  Q.  Why did you decide to do that?
15  A.  Well, because she was -- well, she was beloved by the
16  readers.  I would say she was probably the most prominent
17  columnist -- she was the most prominent columnist that we had,
18  and I thought of her column as a sort of destination, meaning
19  people picked up the magazine and would often go to her column
20  first.  That's what they told us in, you know, any number of
21  like ways that we would talk to our readers, it was something
22  that we discovered.  But also because she's great.  She's great
23  at her job.
24  Q.  In your 30-plus years in the magazine industry, did you
25  have occasion to read advice columns written by other writers?

O1PQcar1                         Myers - Direct

1    A.  I did.

2    Q.  How would Ms. Carroll's column compare to those?

3    A.  Well, I think that her column was sort of the leader of the

4    pack, and I think it actually inspired a lot of other

5    publications like ours and others not like ours, like, you

6    know, *New York* magazine to bring on, you know, sort of similar

7    talent, and, you know, try to follow E. Jean.  And, look, I'm

8    not saying they weren't good at what they do, but, you know,

9    E. Jean I think probably did it the longest in terms of the

10   modern magazine world.

11   Q.  Did Ms. Carroll's column run the entire 17 years you were

12   editor-in-chief?

13   A.  Yes.

14   Q.  Why did you leave *Elle* at year 17?

15   A.  Because my contract was not renewed.

16   Q.  When you left them, was Ms. Carroll still writing her

17   column?

18   A.  She was.

19   Q.  How would you describe its popularity at that moment in

20   time?

21   A.  High.  I mean, again, you know, she was still as popular as

22   she was, you know, when I started in 2000.  Actually, her

23   popularity grew, so it was high.

24              MR. CRAIG:  No further questions.

25              THE COURT:  All right.  Thank you.  Cross.  Ms. Habba.

O1PQcar1                          Myers - Cross

1          THE COURT:  Well, that's fine, but this just came in

2    without objection.

3          MS. HABBA:  Yes, it's no problem.

4          THE COURT:  Okay.  Have a seat.  Thanks.

5          (Plaintiff's Exhibits 164 and 164T received in

6    evidence)

7          MR. CRAIG:  Next we would offer PX-165.

8          Display that for the jury, if it's okay with your

9    Honor.

10          THE COURT:  Hearing no objection, 165 is received.

11          (Plaintiff's Exhibit 165 received in evidence)

12          MR. CRAIG:  Your Honor, if we could return to 165

13    momentarily, we're having a tech issue.

14          We would offer 166.

15          THE COURT:  There being no objection, it's received.

16          (Plaintiff's Exhibit 166 received in evidence)

17          MS. HABBA:  Sorry, can we preview the -- no objection.

18          MR. CRAIG:  And now we can go back to 165.  Thank you,

19    your Honor.

20          MS. HABBA:  No objection.

21          THE COURT:  It was received awhile ago.

22          MR. CRAIG:  Your Honor, next we would offer -- excuse

23    me.  I'll let the jury view this for one moment.

24          Plaintiff next offers PX-147 and 147V.

25          THE COURT:  V as in victor?  V as in video?

O1P5car2

| | |
|---|---|
| 1 | THE COURT:  146 shall be reflected as having been |
| 2 | received. |
| 3 | MR. CRAIG:  Thank you, your Honor. |
| 4 | (Plaintiff's Exhibit 146 received in evidence) |
| 5 | (Recess) |
| 6 | THE COURT:  Now, before we bring the jury in, is the |
| 7 | plaintiff going to rest now?  Or not. |
| 8 | MS. CROWLEY:  We are, your Honor. |
| 9 | THE COURT:  Then I think what we need to do is tell |
| 10 | the jury we will be a little longer and to bear with us, and I |
| 11 | will ask you to rest in the jury's presence when they come |
| 12 | back.  But you are resting now; correct? |
| 13 | MS. CROWLEY:  That's correct, your Honor. |
| 14 | THE COURT:  Is there a motion? |
| 15 | MS. HABBA:  Yes, there is, your Honor. |
| 16 | The defense would like to -- |
| 17 | THE COURT:  Please go to the lectern. |
| 18 | MS. HABBA:  Sure. |
| 19 | Your Honor, at this time, since plaintiff has rested |
| 20 | their case, we would like to move for a motion for judgment as |
| 21 | a matter of law pursuant to Rule 50(a).  President Trump is |
| 22 | entitled to judgment as a matter of law -- |
| 23 | THE COURT:  I'm sorry, Ms. Habba.  Rule 58? |
| 24 | MS. HABBA:  50(a), your Honor. |
| 25 | THE COURT:  50(a). |

O1P5car2

1              MS. HABBA:  Yes.

2              THE COURT:  Sorry.

3              MS. HABBA:  That's OK.

4         President Trump is entitled to judgment as a matter of

5    law because Ms. Carroll has failed to establish any causal link

6    between her claimed damages and President Trump's June 21 and

7    June 22 statements.

8              The record has established that there was a five-hour

9    gap between the release of the article and President Trump's

10   first response to Ms. Carroll's allegation.  Within that time

11   frame, many social media users made posts that echoed the same

12   sentiments that this Court has determined to be defamatory by

13   collateral estoppel.  They said Ms. Carroll is a liar.  They

14   said she made her allegations to sell a book.  And they said

15   she had a nefarious political motivation.  This backlash

16   existed before President Trump even had an opportunity to

17   speak, which proves that he could not be the cause of it.  It

18   is simply impossible for a jury to determine that the

19   president's statements of June 21 and June 22, as opposed to

20   Ms. Carroll's story in The Cut, caused the harm that she claims

21   to have suffered.  Any such finding would be the result of

22   sheer surmise and conjecture.  Therefore, as the Second Circuit

23   recognized in *Samuels v. Air Transport Local 504*, judgment as a

24   matter of law is warranted in this scenario.  I am happy to

25   provide a cite if you would like, your Honor.

1   your Honor, and let me refresh you very quickly.

2              In the first statement he said:  "People should pay

3   dearly."  Repeat:  "People should pay dearly for making

4   statements like that."  That was a call to get people to

5   amplify and repeat what he said and much more which we know the

6   Court and jury has seen.  Then the next day he says:  "She is

7   entering onto dangerous territory."  Dangerous territory, your

8   Honor, again the very same sentiment, his followers knew what

9   he meant, and they followed up on it.

10             Finally, with respect to professional damages, your

11  Honor, Ms. Carroll testified she gets no freelance work.  The

12  only time she gets writing work now is to write about Donald

13  Trump, which she doesn't want to do.  She is never asked to

14  appear on TV unless it is about Donald Trump.  She used to be

15  on TV all the time, giving advice, it was a portion of her

16  career, none of that is available to her today.

17             There is more than enough here to go to the jury.

18             THE COURT:  The motion is denied.

19             Who will be your first witness, Ms. Habba?

20             MS. HABBA:  Your Honor, I have one additional issue

21  before we bring in the jury.  My first witness will be Carol

22  Martin, to answer your question.

23             THE COURT:  OK.

24             MS. HABBA:  Your Honor, after seeing the testimony

25  that they chose to play from his deposition, the president's

O1P5car6

1        MR. MADAIO:  Again, your Honor, I think it is

2    unnecessary to include the graphic language concerning the

3    underlying act itself.  I think a general description:  Sexual

4    abuse, sexual assault, will suffice.

5        THE COURT:  Overruled.

6        Are we through, I think we are up to -- ah, here it

7    is.  I have now heard all objections up to page 4, line 14;

8    correct?

9        MR. MATZ:  Yes, your Honor.

10        THE COURT:  Mr. Madaio, do you have any disagreement

11    with that?

12        MR. MADAIO:  Your Honor, I am just checking.  Through

13    page 3?

14        THE COURT:  No; page 4, line 14.

15        MR. MADAIO:  Your Honor, we do have objections on

16    page 4.

17        THE COURT:  Yes.

18        MR. MADAIO:  But to the extent we can raise this point

19    I know this was briefed, it was the mitigation issue.

20        THE COURT:  Which starts on line 15.

21        MR. MADAIO:  Line 15.  OK.  Line 15.

22        There is one thing that we would like to add here

23    which is an instruction on causation and I believe we have

24    proposed language.

25        THE COURT:  I think we pretty much adopted your

O1P5car6

1   proposed language.

2          MR. MADAIO:  I may have missed it, your Honor.  I

3   apologize.  I don't believe I saw it in here.

4          THE COURT:  Well --

5          MR. MATZ:  Your Honor, we believe that is on page 4,

6   lines 10 to 14.

7          THE COURT:  That's what I thought.  Thank you.

8          That's a different point.

9          MR. MADAIO:  I did search, your Honor.  I may have

10  missed it.  I don't believe I saw it.

11         THE COURT:  Well, I certainly had intended to and

12  let's find it.  It is probably in the request to charge.  Let's

13  take a look at page 3 -- yes, page 3, lines 17 to 20.  It

14  currently reads:  For each statement you will award an amount,

15  that in the exercise of your good judgment and common sense,

16  you decide is fair and just compensation for the injury to

17  Ms. Carroll's reputation and the humiliation and mental anguish

18  in her public and private lives, which you decide was caused by

19  Mr. Trump's statement.

20         That's what I have and that is precisely taken from

21  your proposed instructions on page 16, word for word.

22         MR. MADAIO:  Your Honor, I believe in our instructions

23  we also had the language:  It is plaintiff's burden to prove

24  the nature and extent of her damages and to prove that damages

25  were caused by defendant's actions.  Your determination of

O1P5car6

1   damages must not be based on speculation or guesswork.

2            That's page 19 of our proposed instructions.

3            MR. MATZ:  Respectfully your Honor, we have no

4   objection to the inclusion of that language.

5            THE COURT:  I actually don't see it on page 19 of your

6   proposed instruction, Mr. Madaio.

7            MR. MATZ:  Your Honor, it is on page 17.  It is page

8   19 of the filing.

9            THE COURT:  I see.  That page 19.

10           MR. MADAIO:  Apologies.

11           THE COURT:  Give me the language again, Mr. Madaio?

12           MR. MADAIO:  It is plaintiff's burden to prove the

13  nature and extent of her damages, and to prove that the damages

14  were caused by defendant's actions.  Your determination of

15  damages must not be based on speculation or guesswork.

16           THE COURT:  Now, didn't the speculation and guesswork

17  line find its way into my charge?

18           MR. MADAIO:  I believe it did, your Honor.  So we may

19  not need to include it here.

20           THE COURT:  On page 4 -- well, the second part of it

21  is.  So you are asking for the two sentences you just read to

22  me, to which Mr. Matz doesn't object.  Where do you ask that

23  go?

24           MR. MADAIO:  I was previously thinking on page 4 but I

25  guess if we are already addressing causation, it may be more

O1P5car6

1      appropriate on page 3 after where it was discussed before line

2      20.

3              MR. MATZ:  Your Honor, on page of 4 of your

4      instructions at lines 5 to 8 is where the language about

5      speculation or sympathy is.  That appears to be the much more

6      natural place to include what would be an additional single

7      sentence from the defendant's proposed instruction, which is

8      the line that it is the plaintiff's burden to prove the nature

9      and extent of her damages.

10             THE COURT:  Yes.

11             MR. MADAIO:  That's fine, your Honor.  We agree with

12     that.

13             THE COURT:  Well, how is that any different from

14     saying they award compensatory damages only for those injuries

15     that you find that Ms. Carroll has proved by a preponderance of

16     the evidence?

17             MR. MADAIO:  I think this language is a little more

18     clear that there has to be a direct causal link and that it is

19     the plaintiff's burden to prove causation.

20             THE COURT:  This is truly a Talmudic distinction.

21     Look.  There being no objection, I will figure out how to get

22     the first sentence that you read me, Mr. Madaio --

23             MR. MADAIO:  Thank you, your Honor.

24             THE COURT:  -- into this at page 4 -- most likely on

25     page 4, but on page 3 or page 4.

O1QQcar2                    Summation - Ms. Kaplan

1  Mr. Trump; that she did not authorize him under the law to

2  spread false and defamatory lies about her as some kind of

3  self-defense.  When a woman who has been sexually assaulted

4  comes forward and truthfully reveals what happened to her, her

5  abuser does not get special permission to break the law by

6  engaging in defamation.

7          Trump's next defense is that his statements didn't

8  really matter; that they had no real effect in this world, and

9  that they didn't cause any damage to Ms. Carroll.  As Ms. Habba

10 put it in her opening statements in this case, Trump's

11 statements attacking Ms. Carroll, and I quote, "Did nothing to

12 add to the wave of criticism."

13          In support of this argument Ms. Habba — and you've

14 heard it many times now — points to a handful of statements or

15 a statement that appeared online and what they characterize as

16 the gap between the publication of Ms. Carroll's account in *The*

17 *Cut* and the publication of Donald Trump's first defamatory

18 statement in that tweet from Laura Litvan.  To hear Ms. Habba

19 tell it, the fact that some people immediately criticize

20 Ms. Carroll online during the so-called gap is somehow proof

21 that Donald Trump's attacks had no impact or that their impact

22 was minimal.  Seriously?  Give me a break.  After all, the

23 White House, which was run by Donald Trump, had already denied

24 Ms. Carroll's claims in *The Cut* article itself.

25          MR. MADAIO:  Objection.

1            THE COURT:  What's the -- overruled.

2            MS. KAPLAN:  So his lies were in circulation from the

3    get-go.

4            And when Donald Trump did speak later in the afternoon

5    on June 21, the attacks on E. Jean Carroll followed almost

6    immediately, which isn't surprising.  His defamatory statements

7    on June 21 and June 22, both issued within 24 hours of each

8    other, included hateful, vicious claims about her.  They also

9    included threats that she should pay dearly.

10           And here you see the statement, the tweet by

11   Ms. Litvan, 5:17 p.m. in one of the many messages Ms. Carroll

12   received not even an hour later.

13           I've talked already about the ways that the mob

14   mimicked the language that Trump used.  Years later, they also

15   made clear they continued to understand what he wanted them to

16   do.  As someone wrote to Ms. Carroll last summer:  "Suing Trump

17   was your first mistake.  Now Trump is going to get back at

18   you."

19           Let me be clear.  Presidents he don't make two public

20   statements within 24 hours because they think that nobody will

21   believe them or act on them.  And Donald Trump didn't make

22   these defamatory statements because he thought they wouldn't

23   have any impact on the world.  He made them because he hoped

24   and he knew that they would.  And he was right.  They caused

25   Ms. Carroll great harm.

O1QQcar2                        Summation - Ms. Habba

1    not president Trump, which you've never seen and which

2    Ms. Carroll never sued over.  That's why they haven't brought

3    it up.  It's not part of this suit.  This is a distraction.

4    They need to do that because they have a gaping hole in their

5    case.  Ms. Carroll cannot prove causation.  Let's focus on the

6    chain of events.

7            Ms. Carroll decided to give her story to *The Cut*

8    because she thought they — I quote — "knew how to break the

9    news."She was looking to make a splash, and she wanted to

10   spread her story as far and wide as possible.  That is her job,

11   after all.

12           On June 21, 2019 at 12:14, the article that she put

13   out with *The Cut* goes live and ignites a media storm.  They're

14   right about that.  President Trump, however, did not respond or

15   know about it and her allegations for another five hours.  He

16   was busy running the country.  And during that gap, the

17   internet did exactly what Ms. Carroll had expected and hoped:

18   It reacted.  A flood of tweets were directed at Ms. Carroll,

19   and the responses were as polarizing as you would expect,

20   again, before president Trump even made a statement.  There

21   were many messages of love and support.  She testified to that.

22   And there were also a swarm of attacks, but it was before he

23   made his first statement five hours later.  And after his

24   statement, they are nearly identical.  This five-hour gap is

25   critical.  Plaintiff's counsel tried to get ahead of it by

O1QQcar2                    Summation - Ms. Habba

1    telling you what my argument is, but I'm going to be very

2    explicit.  President Trump did not respond until 5:17 when he

3    released a statement to Laura Litvan on Twitter.  These

4    individuals made up their own minds and came up with their own

5    conclusions.  In short, they didn't believe her.

6          Remember, despite what plaintiff's counsel said, you

7    are not here to pay Ms. Carroll for people who wrote mean

8    tweets to her.  No.  They have to prove a direct causal

9    connection between the harm she claims she's suffering and his

10   two statements, one five hours after the article she put out

11   and the second the next day on the South Lawn responding to

12   reporters.  Those are the two statements.  She has to prove

13   this is because of those two statements.  This is my whole case

14   right here.  I don't even need to go further, but I can because

15   there's more.  There is no causation.

16         In fact, Ms. Carroll under oath acknowledged that

17   president Trump is not at fault for the wave of negative

18   messages she received in the wake of the release of *The Cut*

19   article.  Let's look at her own words from this trial.  When

20   she said these users were just standing up for the man they

21   admire.  Ladies and gentlemen, Ms. Carroll is absolutely

22   correct.  The people who speak negatively about Ms. Carroll are

23   not doing it because president Trump denied her story.  In

24   fact, as I just showed you, he hadn't even done it yet.

25   They're not doing it because president Trump asked them to or

O1Q5car3                          Summation – Ms. Habba

1  gain.

2          I have to admit, this is my favorite part of my

3  closing:  Ms. Humphreys.

4          Ms. Carroll and her legal team had an opportunity to

5  bring an expert.  They picked Ashlee Humphreys.  Throughout her

6  testimony it became so clear that her opinion is neither

7  credible nor reasonable and I'm going to walk you through it.

8          She admitted her report was riddled with mistakes and

9  tried to pawn it off on her poor team that did the research as

10  a labeling error.  Labeling error.  Years and years and years

11  of litigation, tens of thousands of dollars to her benefit, and

12  this so-called expert can't catch 17 numerical errors that we

13  caught?

14          MS. KAPLAN:  Objection, your Honor.

15          THE COURT:  Sustained.

16          MS. HABBA:  I --

17          THE COURT:  Sustained.

18          MS. HABBA:  And that is just what we found.  Just

19  based on that you should ignore her testimony as a whole, but

20  let's continue for fun.

21          The five-hour gap.  Remember the five-hour gap?

22  12:15-5:17, we have a gap.  We already know that Ms. Carroll's

23  story had received widespread attention before President Trump

24  ever spoke about her but did Humphreys account for that?  Of

25  course not.

1          THE COURT:  Overruled, as you well know.  Let's go on.

2          MS. CROWLEY:  And yet, Donald Trump seems to be

3    suggesting that he had no choice but to defame Ms. Carroll,

4    that she backed him into a corner by telling the truth so he

5    was forced to destroy her.  Nonsense.  Nonsense.

6          There are ways for people to lawfully respond to an

7    allegation that is true.  You could say nothing.  You could

8    say: *This is a private matter and I'm going to address it*

9    *privately.*  You could say: *This happened a long time ago and*

10   *I'm sorry for it and it is not the man that I am today.*  You

11   have certainly seen those types of statements from public

12   figures before.  By the way, if he had done that, if he had

13   stayed silent or if, God forbid, he told the truth, do you

14   honestly think that any of the terrible things that have

15   happened to Ms. Carroll in the last five years would have come

16   to pass?  If Donald Trump had followed the law and not defamed

17   Ms. Carroll, do you really think that people would have come

18   after her the way they did, calling her a liar?  A paid

19   democratic operative?  A fraud?  Too ugly to sexually assault?

20   Of course not.

21         When the president speaks, the world listens.  And as

22   we have seen the statements, the hate mail, the threats that

23   she has gotten, they parrot Donald Trump's words.  Causation?

24   There couldn't be clearer proof of causation.  If Donald Trump

25   hadn't lied, if he hadn't defamed her, Ms. Carroll's life, it

O1Q5car3                          Rebuttal – Ms. Crowley

1      would have gone on.  Her career would have continued and she

2      wouldn't be flooded with hate and threats and we wouldn't be

3      here today.

4              So, yes, this case it is not about sexual assault, it

5      is about defamation, defamation of a woman who has been

6      sexually assaulted.  Defamation by the man who sexually

7      assaulted her.  And yet, Ms. Habba faults Ms. Carroll for not

8      being miserable all the time.  I guess her argument is that she

9      must not have actually suffered because she's had some happy

10     moments in her life.

11             MR. MADAIO:  Objection.

12             THE COURT:  Overruled.

13             MS. CROWLEY:  And I have to say, this is a bizarre

14     argument.  It is like they're suggesting that Ms. Carroll has

15     to show that she has been a broken wreck of a person every

16     single day for the last five years, that she's had no moments

17     of joy or friendships.  In the defense's view, every time

18     Ms. Carroll went to a party with friends, or celebrated a

19     victory in her lawsuit against him, or presented a brave face

20     to the public, she was somehow showing that his defamatory

21     statements caused her no harm and this case is just some big

22     conspiracy against him.  That makes no sense and I guess it is

23     totally inconsistent with how each of you has experienced life.

24             Two things can be true at the same time.  You can be

25     wrecked inside and also feel moments of triumph.  You can be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          And at this moment I'm going to pause a minute.  Andy

2     is going to give counsel a typewritten copy of my instructions.

3     Ladies and gentlemen, I should have said this at the beginning:

4     You will have them in writing in the jury room.  You are

5     welcome to take notes or not to take notes.  Everything I say

6     you will get in writing.

7          The second thing you must decide is whether Mr. Trump

8     should be required to pay Ms. Carroll punitive damages as well

9     as compensatory a damages, and, if so, how much he should be

10    required to pay.  Punitive damages are intended to punish a

11    defendant and to deter future defamatory statements.

12         I'm now going to discuss these remaining damages

13    issues in turn, with reference to the verdict form that you're

14    going to be using to decide the case.

15         A person who has been defamed is entitled to fair and

16    just compensation for the injury to her reputation and for any

17    humiliation and mental anguish in her public and private lives

18    that was caused by the defamatory statement in question.

19    Question 1 on the verdict form deals with such damages for

20    Mr. Trump's June 21 and 22, 2019 statements, which are in

21    evidence as Plaintiff's Exhibit 1 and 2, respectively.

22         For this question, you will award an amount that, in

23    the exercise of your good judgment and common sense, you decide

24    is fair and just compensation for the injury to Ms. Carroll's

25    reputation and the humiliation and mental anguish in her public

O1QQcar4                          Rebuttal - Ms. Crowley

1    and private lives which you decide was caused by Mr. Trump's

2    two statements to which I've already referred.  In fixing that

3    amount, you should consider Ms. Carroll's standing in the

4    community, the nature of Mr. Trump's statements made about

5    her — the two statements in question — the extent to which

6    those statements were circulated, the tendency of those

7    statements to injure a person such as Ms. Carroll and all of

8    the other facts and circumstances of the case.  Compensatory

9    damages can't be proved with mathematical accuracy.  Fair

10   compensation may vary.  It may range from one dollar, if you

11   decide that there was no injury at all, to a substantial sum if

12   you decide that the injury was substantial.

13          It is Ms. Carroll's burden to prove the nature and

14   extent of her damages and to prove that the damages were caused

15   by Mr. Trump's actions.  You may award compensatory damages

16   only for those injuries that you find that Ms. Carroll has

17   proven by a preponderance of the evidence.  We'll talk about

18   what that means later.  Compensatory damages cannot be based on

19   speculation or sympathy.  They must be based on the evidence

20   presented at trial and only on that evidence.

21          Further, you may not award compensatory damages more

22   than once for the same injury.  For example, where a plaintiff

23   prevails on two claims and establishes that he or she is

24   entitled to $100 in compensatory damages for one injury, the

25   plaintiff is not entitled to $100 in compensatory damages also